## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　　　　　vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>　　　　Defendants. | Civil Action No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all others similarly situated, by his attorney, as and for his Class Action Complaint, alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, inter alia, the investigation made by and through his attorney, as detailed in paragraph 180, below.

### INTRODUCTION

1.　　　This is a class action brought by plaintiff in connection with the defendants' breaches of fiduciary duty, issuance of incomplete and materially misleading statements and failure to disclose material facts regarding the merger (the "Merger") of Bank One Corporation ("Bank One") into JPMorgan Chase & Co. ("JPMC" or the "Company").

2.　　　The Class seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breach of fiduciary duty by certain of JPMC's current and former directors.

## OVERVIEW

3.      For years, JPMC's performance, stock price, and reputation have languished under the stewardship of William B. Harrison, Jr., the Company's Chief Executive Officer ("CEO") and Chairman.  As a result, Harrison feared, with good reason, that his lucrative and powerful position was in jeopardy by late 2003.

4.      By contrast, Bank One's CEO and Chairman, the widely-lauded Jamie Dimon was credited with turning around Bank One's profitability and reputation during his four-year tenure.

5.      Motivated at least in part by his desire to remain in charge and shape a graceful conclusion to his career, Harrison pursued a business combination with Bank One.

6.      According to persons close to the secretive negotiations surrounding the Merger, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all*.  Harrison rejected such a merger of equals for no other reason than because Dimon sought to be CEO of the combined entity immediately.

7.      Instead, Harrison and Dimon struck a secret pact.  In exchange for remaining CEO for two more years, Harrison agreed to an exchange ratio in connection with the Merger providing for a significant premium over Bank One's market value.

8.      Thus, for the sole purpose of keeping his CEO title for another two years, Harrison caused JPMC shareholders to pay a significant acquisition premium -- amounting to more than $7 billion in value, a substantial dilution of JPMC shareholders' stake.

9.      The defendants violated federal securities laws by omitting the secret pact, including Harrison's rejection of the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio, from the Joint Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), issued by the defendants to gain shareholder approval of the Merger.

Plaintiff asserts claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)], Rules l0b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §§ 240.l0b-5 and 240.14a-9], Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(a)(2) and 77o], and pendent state law claims.

10.     Unaware of the materially false and misleading statements and failure to disclose material facts in the Proxy/Prospectus, shareholders of JPMC and Bank One overwhelmingly approved the Merger, which was completed on July 1, 2004.

11.     Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to pay a premium for Bank One just so Harrison could stay on as CEO for another two years.

12.     JPMC's directors knew or should have known of this pact and nevertheless they approved and recommended the Merger to JPMC's shareholders.

13.     Neither JPMC nor its directors could have issued the new JPMC shares necessary to effectuate the Merger without amending JPMC's certificate of incorporation, requiring approval by a majority of JPMC's shareholders.

14.     Confirming the critical importance of the secret pact, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger and expressed concerns about Harrison's remaining in that position as well as about the Merger's dilutive impact.  Also, a shareholder proposal to separate the Chairman and CEO posts presented at JPMC's annual meeting received over 500 million votes in its favor.

15.     This omission also violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.  Shareholder approval of a necessary amendment to the

JPMC's charter to expand the corporate authorization to issue shares was also wrongfully obtained by the defendants.

### JURISDICTION AND VENUE

16.     This court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78a-78jj] and supplemental jurisdiction [28 U.S.C. § 1367].

17.     Venue in this case is proper in the District of Delaware pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in the District of Delaware.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

19.     As directors of a Delaware corporation, the Individual Defendants, as defined below, have submitted themselves to the jurisdiction of the state of Delaware pursuant to 10 Del. C. § 3114.

## THE PARTIES

20.      Plaintiff Samuel I. Hyland owned JPMC common stock throughout the Class Period and at all relevant times, as set forth in the accompanying certification, incorporated by reference herein.

21.      Defendant JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices at 270 Park Avenue, New York, NY 10017, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding.  JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

22.      Defendant William B. Harrison, Jr. has served as Chief Executive Officer and Chairman of the Board of Directors of JPMC since 1999.  Defendant Harrison was instrumental in negotiating the Merger and signed the Registration Statement and Proxy/Prospectus issued in connection therewith.

23.      Defendant Hans W. Becherer was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

24.      Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting.

25.      Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the

Merger.  He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004.

26.     Defendant John H. Biggs was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC since March 2003.

27.     Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

28.     Defendant M. Anthony Burns was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.

29.     Defendant Ellen V. Futter was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. She has been a director of JPMC or a predecessor institution since 1997.

30.     Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004.

31.     Defendant Lee R. Raymond was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC or a predecessor institution since 1987.

32.     Defendant William H. Gray, III was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1992.

33.     Defendant John R. Stafford was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC or a predecessor institution since 1982.

34.     Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

35.     Defendant James Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as President and Chief Operating Officer of JPMC.  Dimon was named in the Registration Statement as about to become a director of the combined Company.

36.     The Individual Defendants all signed the Registration Statement dated February 20, 2004 (and Amendments 1 (dated March 29, 2004), 2 (dated April 13, 2004), and 3 (dated April 19, 2004) thereto) and Proxy/Prospectus issued in connection with the Merger.

37.     Defendants Harrison and Dimon are collectively referred to herein as the "Insider Defendants."  The Insider Defendants, because of their positions of control and authority as officers and/or directors of JPMC or Bank One, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to those entities, including, without limitation, the Registration Statement and the Proxy/Prospectus.  Each of the Insider Defendants was provided with copies of management reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  As a result, each of the Insider Defendants is responsible for the accuracy of the

public reports and releases detailed herein as "group published" information, and is therefore responsible and liable for the representations contained therein.

38.    Defendant Dimon and the Individual Defendants are referred to collectively herein as the "Registration Statement Defendants."  As signatories to the Registration Statement (or, in the case of Dimon, as a person who, with his consent, was named in the Registration Statement as about to become a director of the combined Company), the Registration Statement Defendants are strictly liable to any person acquiring the securities registered in the Registration Statement for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

39.    By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to make appropriate disclosure to JPMC shareholders of all material facts concerning the Merger; (d) to disseminate a complete and accurate proxy statement; and (e) to refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action on his own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class consisting of those investors who (1) purchased or otherwise acquired the common stock of JPMC between January 14, 2004 and June 25, 2004 inclusive (the "Class Period"), (2) as shareholders of record of JPMC on April 2, 2004, were entitled to vote on the Merger (and thereby on the proposed amendment to JPMC's certificate of incorporation in connection with

the Merger), as well as (3) those former shareholders of Bank One who surrendered their Bank One shares in connection with the Merger on or about July 1, 2004. Excluded from the Class are Defendants herein; any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

41.     This action is properly maintainable as a class action.

42.     The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all class members is impracticable. There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class. According to the Proxy/Prospectus:

> The board of directors of JPMorgan Chase has fixed the close of business on April 2, 2004 as the record date for determination of stockholders entitled to notice of and to vote at the annual meeting of stockholders. On the record date, there were 2,081,783,154 shares of JPMorgan Chase common stock outstanding, held by approximately 126,350 holders of record.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein. Among other things, members of the Class sustained damages as a result of a Proxy/Prospectus issued in connection with the Merger that omitted and/or misrepresented material facts about the Merger that were required to be disclosed.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and shareholder litigation. Plaintiff has no interests that are in conflict with the interests of the Class.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the defendants' acts as alleged herein;

b.    Whether the Proxy/Prospectus, and other documents and/or statements disseminated to members of the Class in connection with the Merger omitted or misrepresented material facts about the Merger that were required to be disclosed;

c.    Whether defendants acted with the requisite state of mind in omitting to state and/or misrepresenting material facts about the Merger;

d.    Whether defendants breached fiduciary and other common law duties owed by them to plaintiff and other members of the Class; and

e.    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

46.    In addition, the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. The market for JPMC common stock was at all times an efficient market for the following reasons, among others:

a.    JPMC's common stock met the requirements for listing, and were listed on the New York Stock Exchange, a highly efficient securities market;

b.    As a regulated issuer, JPMC filed periodic public reports with the SEC;

c.    JPMC common stock trading volume was substantial during the class period;

d.    JPMC was followed by numerous securities analysts who wrote reports available to investors through various automated data retrieval services;

e.      JPMC disseminated information on a market-wide basis through various electronic media services; and

f.      The market price of JPMC securities reacted efficiently to new information entering the market.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48.     Defendants have acted in a manner which affects plaintiff and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

49.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

**Background: The Besieged Banker**

50.     In June 1999, defendant Harrison became CEO of Chase Manhattan, the predecessor of JPMC, and promptly embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the value-destroying merger with J.P. Morgan in 2000.

51.     An April 7, 2002 article in The New York Times suggested that Harrison's motivation in entering into large transactions was not solely to benefit shareholders:

William B. Harrison was beaming. Mr. Harrison, as chairman of the Chase Manhattan Corporation, had signed a deal to buy J. P. Morgan & Company for $30.9 billion the night before and was already spinning the deal to shareholders. It was mid-September 2000, the economy was in its longest expansion ever, and anything seemed possible. "It's a very fair deal," he said, grinning uncharacteristically. "And most importantly, when we look at the overall transaction two years from now, it should be accretive to the shareholders."

Mr. Harrison had reason to grin — and still does, though not because the bank's shareholders have gained as he predicted. Rather than being "accretive" — that is, increasing earnings per share — the merger has not delivered much for shareholders so far; the stock has lost more than one-third of its value in 18 months. Mr. Harrison might have been glowing because, like many top executives these days, he was about to be paid — a lot — to go shopping.

For overseeing the acquisition of J. P. Morgan, which he nonchalantly said took only three weeks to negotiate, he received a special bonus of $20 million — far more than the total lifetime earnings of the average working stiff. And that bonus, which is spread over 2001 and 2002, came on top of his $1 million salary and $5 million regular bonuses last year and whatever else he receives for this year. Mr. Harrison's three lieutenants, including Geoffrey T. Boisi, a vice chairman who had joined Chase only four months earlier, received special bonuses of $10 million each, on top of their regular salaries and bonuses. All told, Chase directors paid the bank's executives more than $50 million for their outing at the bank mall. (They had done a little window-shopping, chatting up Goldman Sachs and Deutsche Bank, before settling on J. P. Morgan.)

52.    In connection with the merger that created JPMC, the Company's compensation committee, comprised of defendants Gray, Bechtel, Stafford, and Raymond, awarded Harrison $10,000,000 in cash and 237,164 restricted stock units.  According to the March 19, 2002 report of the committee, included in the Company's 2002 proxy statement:

This award will vest and be paid out or distributed as follows, subject to continued employment: 50% of the cash and 50% of the restricted stock units in January 2002; 50% of the cash in January 2003; and 50% of the restricted stock units if the price of JPMorgan Chase common stock achieves the $52 Target Price by January 25, 2007 (but no sooner than January 25, 2003). The cash

awards would be paid out in the event of job elimination, death, or
total disability. The restricted stock unit awards would vest and be
distributed in the event of death or total disability. In the case of
job elimination or retirement, the restricted stock unit awards
related to the Target Price would vest only if the Target Price is
achieved, unless otherwise determined by the committee.

53.    Thus, 118,582 of the restricted stock units, which would vest upon JPMC

achieving a target price by January 25, 2007, were "subject to continued employment."  If vested

at the target price, the units would be worth over $6.1 million.

54.    Harrison was notorious not only for being overpaid but also for overpaying in

deal after deal.  As an interviewer noted in a February 23, 2004 interview with Harrison on

CNBC: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht &

Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset

management bubble."

55.    A February 7, 2002 article in Forbes entitled "Is Harrison Breaking Morgan's

Bank?" reviewed Harrison's tenure, including its many failures, concluding that "Fiscal 2002

will be the make or break."

56.    A June 7, 2002 article in EuroWeek entitled "Time for an outsider to shake up

troubled JP Morgan Chase" strongly criticized Harrison's leadership, pointed out his poor, costly

deals, and suggested that Harrison was due to lose his job:

Look at the evidence. Today no one questions the fact that Chase's
chairman and CEO, Billy Harrison, grossly overpaid for Flemings,
the patrician but still itsy-bitsy UK asset manager with a quirky
securities operation bolted on to the side. It was a brilliant deal for
the Fleming family and blew the myth that Roddy Fleming
couldn't cut a deal without the help of his childhood Scottish
nanny. Billy Harrison would now probably admit that he was sold
a bum steer with Flemings, but he might also blame the purchase
on the recently departed Geoff Boisi, who was, after all, in charge
of investment banking at the time.

However, even if the unassuming Billy Harrison tries to evade the Flemings transaction by pointing an accusing finger at Geoff Boisi, this isn't quite the end of the story.

The harsh fact is that Chase and Billy Harrison had also significantly overpaid to acquire Geoff Boisi's investment banking boutique, Beacon Group, just because they clamoured for the services of its dynamic leader. It is perhaps even more ironic that Chase's attention was so focused on the brilliance of Mr Boisi that they may not have appreciated that David Coulter, who now has Boisi's old job, also came with the Beacon package.

If Chase's Billy Harrison paid over the top for Beacon Group and then Geoff Boisi made the Fleming family rich beyond their wildest dreams, shouldn't Chase shareholders have been wary about the next acquisition? Perhaps there was nothing wrong with putting JP Morgan out of its misery, and the JPM road pointed downhill all the way - but did Chase need to pay $34bn for the privilege? Yes, say the JP Morgan fat-cat top managers who walked away with fortunes which in some individual cases exceeded $100m each. No, say the Chase shareholders who must be asking themselves what they actually bought, other than a large can of worms.

The combined JP Morgan Chase in its present form is nowhere in investment banking, nowhere in equities and its asset management division can be described as fair to middling rather than the crème de la crème. Most of JP Morgan's old guard has left - who said "Thank heavens"? - and for its $34bn, Chase seems to have bought little more than a fizzy derivatives business and an upgrade in debt capital markets.

With such a litany of financial misjudgements, you would have thought that shareholders would be baying for blood. *At the top of the execution list you might have expected to see JPMC's chairman and CEO, Billy Harrison.* However, in the past fortnight it was Boisi who fell rather than Harrison, much to the amazement of most observers and certainly the bookmakers, who will lose a fortune if Harrison is still there by Christmas.

The situation regarding Mr Harrison is especially interesting to ourselves, and please be assured that we are not, and never have been, shareholders in either Chase Manhattan, JP Morgan or JP Morgan Chase.

*In the aftermath of Enron, Billy Harrison's press was so bad that at one time it didn't look as if he would last until April* - remember those bounders and scallywags who said that the best double bet was for Billy Harrison and Credit Suisse's Lukas

Muhlemann to be gone before the first polka dot bikini could be seen on the Côte d'Azure this summer.

But while Harrison has defied the bookmakers' odds so far, he must, unless he requires the services of a guide-dog, be able to see the writing on the wall. Chase Manhattan wasn't exactly the most sparkling bank in the universe. By adding Flemings, Beacon Group and JP Morgan, did Chase then become a world-beater? Not at all. Instead, the combined JP Morgan Chase was described to us by one Scottish fund manager as a dog's dinner - presumably a West Highland White or a Scottie?

That may be slightly unfair, but when you look at the JPMC share price, you have to ask yourself where it's going. Does he realise his own apparent shortcomings or the possible deficiencies of his subordinates, who are considered to be his most likely successors? We don't think so, when you read that *he intends to stay on for another seven years, ie until he is 65.*

We were almost speechless when we saw that comment, and in the world's main financial centres some irreverent bankers rolled around on the floor with laughter. One prominent private banker in Geneva said: "Mr Harrison must be living in cloud cuckoo land" - and in Switzerland they certainly know their cuckoos. In London, one notoriously aggressive proprietary trader commented: *"The odds on Billy Harrison lasting for seven years are longer than those on the United States winning the World Cup."* [Emphasis added.]

57.    An April 22, 2002 BusinessWeek article on Harrison entitled "The Besieged Banker" noted that Harrison was "under siege" due to his poorly timed, badly executed, and expensive deals and numerous disastrous loans.  Despite JPMC's poor performance under his direction, the article observed that "Harrison stands to earn at least $16 million in merger-related bonuses if the stock recovers to $52, its price the day the [Chase-JP Morgan] deal closed.  His top lieutenants will split $25 million more.  And they have given themselves plenty of time to do it—until 2007, to be exact."  Noting that "[t]he execution of the J.P. Morgan merger wasn't much to write home about," the article observed that:

Unlike a steel mill or auto maker, a bank's assets are people, not plants. But after paying top dollar for J.P. Morgan (3.5 times its book value), Harrison let its people walk. Defections started as soon as the deal closed--despite hefty retention bonuses that could

- 15 -

have yielded executives princely sums. Within a year, 25 top
former J.P. Morgan executives had left, and Chairman Douglas A.
"Sandy" Warner III quit at the end of 2001. "We would have liked
some of them to stay," says Harrison. "But I don't think it has cut
into the core of what we're about."

58.     The article also observed internal criticisms of Harrison's poor management:

In interviews about management style, [JPMC] executives
invariably quote [former General Electric Co. CEO Jack] Welch.
They preface answers with "As Jack says..." and few quote
Harrison or even mention him unless they're asked.  As bank
executives tell it, Harrison emphasizes what they call "the soft
stuff"--management coaches, 360-degree reviews, discussing
problems until everyone is singing in harmony. Trouble is,
Harrison has to be more than a choirmaster, he needs his managers
to make their numbers.

59.     A subsequent January 13, 2003 article on Harrison in a <u>BusinessWeek</u> report on

"The Best & Worst Managers" noted that "Some investors speculate that ***Harrison could lose***

***his job by the end of January*** if the bank's fourth-quarter results, due out mid-month, don't

show signs of improvement." (Emphasis added.)

60.     According to analyst Michael Mayo of Prudential Equity: "The biggest problem

of [JPMC's] management, we believe, is lack of capital discipline when it comes to large

strategic acquisitions…"  However, Harrison's lust for corporate conquest remained unfulfilled

and he desperately needed a major event to salvage his career.

61.     The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank,
were so down in the dumps that ***few would have given odds on him even***
***surviving the year***, let alone clawing his way back to pull off one of the biggest
banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty,
and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, ***it seemed to be largely Harrison's fault.*** At the top of the bull
market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP
Morgan. [Emphasis added.]

- 16 -

62.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent.  Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent.  JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

63.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

64.    A July 22, 2004 Wall Street Journal article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

65.    On September 18, 2002, The Wall Street Journal published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

66.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

67.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal, involving allegations that numerous IPOs were manipulated by Wall Street investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

68.    By late 2003, Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582 restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, but which were "subject to continued employment."  If vested at the target price, the units would be worth over $6.1 million.

**Harrison's Secret Deal: The Merger of Jupiter and Apollo**

69.    The fallout from various scandals, as well as his poor business decisions, forced the besieged banker Harrison to conjure yet another massive deal to protect his position.

70.    While JPMC shareholders endured Harrison's reign, James Dimon, Chairman and CEO of Bank One, created substantial value for Bank One shareholders.  From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22.  During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

71.    According to an article posted July 7, 2004 on Slate.com, entitled "The $7 Billion Ego: Did J.P. Morgan Chase waste billions so its CEO could keep his job?":

> ***Harrison's grip at the helm was growing tenuous. But he saw salvation in yet another deal.***  Chicago-based Bank One, run by the charismatic Citigroup exile Jamie Dimon, seemed like a natural acquisition.  Dimon had pulled off an impressive turnaround at

Bank One.  With his operational expertise and cadre of loyal
bankers, Dimon could help improve morale and performance at
Chase and eventually succeed Harrison. [Emphasis added.]

72.    During November 2003, Harrison and Dimon had several discussions concerning

the possibility of a business combination between JPMC and Bank One.  Among other things,

Harrison and Dimon discussed the possible structure of such a transaction.

73.    According to a January 15, 2004 CBS Marketwatch.com article, "By December,

according to a person at the table, Dimon and Harrison and a few other executives huddled in the

conference room of Bank One's M&A law firm, Wachtell Lipton Rosen & Katz."

74.    According to a January 17, 2005 article in Investment Dealers Digest entitled

"Putting JPMorgan On the Map," the negotiations were conducted in the utmost secrecy "at an

apartment in the Waldorf Towers, a sanctuary a few blocks from JPMorgan's midtown

headquarters that the bank keeps as a permanent venue for quiet meetings with clients."  The

article reports that "Sources agree that Harrison and Dimon ironed out a lot of the deal's

particulars together and that Dimon was clearly interested in succeeding Harrison from the get-

go[.]"

75.    As the merger discussion proceeded, financial advisors came up with the

codenames of "Apollo" and "Jupiter" for Bank One and JPMC, respectively, to ensure the

secrecy of the negotiations.

76.    According to the Proxy/Prospectus sent to JPMC and Bank One shareholders in

connection with the Merger, Dimon and Harrison periodically updated members of their

respective Boards of Directors about their negotiations.

77.    At a meeting of the JPMC Board (consisting of the Individual Defendants) on

November 18, 2003, Harrison briefed the full Board on his discussions with Dimon.  The JPMC

Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

78.     In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million. Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

79.     The January 19, 2004 <u>Financial Times</u> described the negotiation process:

> "There was a ***spectrum of outcomes in terms of premium and governance: Jamie laid them out*** and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

> But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

> Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

80.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO. Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger. Little did JPMC shareholders know that buying this extra time for Harrison would cost them ***billions*** of dollars.

81.     Harrison would later claim that he offered a no-premium merger during the negotiations. A January 26, 2004 <u>FORTUNE</u> article entitled "The Dealmaker and the Dynamo" detailed the negotiations and reported Harrison's claims:

> It was early January, and the merger talks between Jamie Dimon, CEO of Bank One, and William Harrison, his counterpart at J.P. Morgan Chase, were deadlocked. In the short time they'd been negotiating, Dimon, a brash boy wonder from Queens, and Harrison, a courtly Southern gentleman, had agreed on a host of issues. Succession was a snap: Dimon would get a virtually ironclad guarantee to replace Harrison as CEO in 2006. The board would be split fifty-fifty between Bank One and J.P. Morgan

directors. Dimon's most trusted lieutenants would be given key roles in the merged company. Most of all, the two men agreed that if they could pull off this deal, combining Bank One's strong consumer businesses and J.P. Morgan's corporate banking franchise, they could create a true banking colossus—the second largest in America and one that could go toe to toe with giant Citigroup.

What was hanging up the deal was the price. ***Harrison was offering what he calls a "market deal," meaning that J.P. Morgan would simply buy Bank One at its current stock price***—around $45 a share. His reasoning was simple. "We'd been criticized for overpaying on past deals, notably Chase's acquisition of J.P. Morgan in 2000," says Harrison. "I thought that if we paid a big premium again, the market would hammer our stock."

Dimon, however, was demanding a markup north of 20%. Pointing to Bank of America's bid to buy FleetBoston for a gigantic 43% premium in late October, Dimon argued that Harrison would be getting a bargain at 20% to 25% over market. In vintage, ultra-enthusiastic Dimon style, the Bank One CEO insisted that the fit was so compelling that even with a big premium, the market wouldn't discount J.P. Morgan's stock. "Jamie was so excited by the combination that he thought he could sell a high premium deal to investors," says Harrison with a grin. "I disagreed." [Emphasis added.]

82.    However, months later, it was revealed that, in fact, Dimon had been willing to agree to a ***no-premium deal*** if he could be CEO of the combined company immediately.  A June 27, 2004 New York Times article entitled "The Yin, the Yang and the Deal" shocked the market with the following stunning revelations:

During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money*** in doing so. Mr. Dimon, always the tough deal maker, ***offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.***

***When Mr. Harrison resisted, Mr. Dimon insisted on a premium***, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

83.    The June 27, 2004 New York Times article was the first opportunity for JPMC stockholders to have discovered that Harrison had turned down a no-premium deal.

84.    Corroborating this account, according to a January 15, 2004 CBS

Marketwatch.com article, "The [merger] talks ran through Christmas week and during that time,

the stickiest issue, succession, was resolved by the two-year compromise."

85.    As one observer related on eFinancialNews.com on February 8, 2004, after

hearing the announcement of the Merger:

> One of the first calls I received was: "That's a hell of a price that Bill Harrison is
> paying to recruit Jamie Dimon."
>
> …
>
> **Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon
> just to save his own skin?** [Emphasis added.]

86.    After the close of trading on January 14, 2004, JPMC and Bank One issued a joint

press release announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co.
> (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that
> they have agreed to merge in a strategic business combination establishing the
> second largest banking franchise in the United States, based on core deposits. The
> combined company will have assets of $1.1 trillion, a strong capital base, 2,300
> branches in seventeen states and top-tier positions in retail banking and lending,
> credit cards, investment banking, asset management, private banking, treasury and
> securities services, middle-market, and private equity. With balanced earnings
> contributions from retail and wholesale banking, the combined company will be
> well-positioned to achieve strong and stable financial performance and increase
> shareholder value through its balanced business mix, greater scale, and enhanced
> efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of directors
> of both companies, provides for a stock-for-stock merger in which 1.32 shares of
> JPMorgan Chase common stock will be exchanged, on a tax-free basis, for each
> share of Bank One common stock. Based on JPMorgan Chase's closing price of
> $39.22 on Wednesday, January 14, 2004, the transaction would have a value of
> approximately $51.77 for each share of Bank One common stock, and would
> create an enterprise with a combined market capitalization of approximately $130
> billion. The premium, based upon the average closing stock prices of JPMorgan
> Chase and Bank One for the previous month, would be approximately 8 percent
> and would be approximately 14 percent based on today's closing prices.
>
> Under the agreement, the combined company will be headed by William B.
> Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47,
> as President and Chief Operating Officer, with Mr. Dimon to succeed Mr.

Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. …

87.    Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22. The drop reflected the unnecessarily dilutive impact of the Merger.  In early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

88.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. *For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.* The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".

…

*Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.* "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

89.    Harrison acknowledged Dimon's considerable experience with mergers in an interview on CNBC: "Well, I would just say again that Jamie and I have been through as many mergers over the last ten years as any two executives out there combined."  Thus, it was not necessary for Harrison to be CEO to ensure a smooth transition in connection with the Merger is mere pretext.

90.    The proposed acquisition of Bank One in a stock-for-stock transaction required approval of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was

necessary for JPMC to have the corporate authority to issue the shares necessary for the exchange.

91.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

92.    Public criticism of the premium was immediate. When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive. They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

93.    James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know. It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

94.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

95.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

96.     The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  ***All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC shareholders to secure that benefit for Harrison.***

97.     In a January 15, 2004 presentation by the Company's management entitled "Creating Scale, Balance and Shareholder Value," it was stated that "Value of cost savings exceeds premium."  This statement has been shown to be false, as the Company's financial performance in the wake of the Merger has disappointed investors.  The presentation also misleadingly claimed that the Merger would produce "Value creation for all shareholders" and represented "A Compelling Value Proposition for Shareholders."

98.     In connection with the Merger, JPMC amended its by-laws to include the following provisions:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which

Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

99.    The Proxy/Prospectus summarized the Merger-related amendments to the

Company's by-laws as follows:

The by-laws of JPMorgan Chase will be amended, effective not later than the completion of the merger, to add a new by-law providing the following:

• that the board of directors has resolved that, effective as of the completion of the merger, Mr. Harrison will continue to serve as Chairman of the Board and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become the President and Chief Operating Officer of JPMorgan Chase; and that Mr. Dimon will be the successor to Mr. Harrison as the Chief Executive Officer of JPMorgan Chase, effective on the second anniversary of the completion of the merger or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of JPMorgan Chase, and that Mr. Harrison will continue to serve as Chairman of the Board following that succession;

• that on the effective date of the merger, the board of directors will be comprised of eight Bank One directors, including Mr. Dimon, and eight JPMorgan Chase directors, including Mr. Harrison;

• that until the date of Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, the number of directors that comprises the full board of directors of JPMorgan Chase will be sixteen; and

• that until Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the governance committee of the board of directors, which will be co-chaired by one former Bank One director and one former JPMorgan Chase director and comprised of an equal number of former Bank One directors and former JPMorgan Chase directors (any deadlocks on the governance committee will be resolved in good faith by the nonmanagement members of the board of directors in a manner intended to preserve the principles of representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

• the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment agreement, prior to Mr. Dimon's succession as Chief

Executive Officer of JPMorgan Chase, or any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of JPMorgan Chase on that date of succession,

•    the removal of Mr. Harrison from, or the failure to appoint or reelect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase,

•    any determination not to nominate Mr. Harrison or Mr. Dimon as a director of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, and

•    any modification, amendment or repeal of, or any adoption of any bylaw provision inconsistent with, the provisions of the by-law amendments described above.

100.    In addition to entrenching himself with the CEO title, Harrison secured for himself an extraordinarily lucrative severance package, as noted in the Proxy/Prospectus:

[I]n connection with the [Merger], the severance policy for Mr. Harrison will be amended, effective upon completion of the merger, so that Mr. Harrison's severance will be the greater of (a) $22.2 million or (b) three times his current base salary and three-year average annual cash performance bonus if he is terminated involuntarily without cause prior to the second anniversary of the completion of the merger.

101.    Harrison also paid himself nearly $3 million within weeks after the Merger was announced. Before his secret deal was revealed, Harrison exercised options on 225,000 shares of JPMC common stock on March 8, 2004, yielding proceeds of $2,920,320.

102.    According to an Institutional Shareholder Services report analyzing the Merger: "The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

103.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

104.    Harrison himself endorsed this view at a January 15, 2004 town hall meeting concerning the Merger, during which he stated: "[T]he way we did it was doing a deal that had merger vehicle characteristics, but we're calling this a merger, we're not calling it a purchase."

105.    The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

106.    **By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other Individual Defendants cost JPMC shareholders over $7 billion of value and substantially diluted their stake in the new, combined company merely so Harrison could remain CEO.**

107.    The Proxy/Prospectus stated that the 1.32 exchange ratio agreed to in connection with the Merger significantly exceeded the "implied exchange ratio from contribution" based on a variety of financial metrics, confirming the unfairness of the exchange ratio.

108.    The valuation analysis by JPMC's banker in the Proxy/Prospectus disclosed the following:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
|---|---|---|---|
| | 57.8% | 42.2% | 1.320 |
| | Contribution by JPMorgan Chase | Contribution by Bank One | Implied Exchange Ratio from Contribution |
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |

| | | | |
|---|---|---|---|
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

109.    The valuation analysis by Bank One's banker in the Proxy/Prospectus disclosed the following:

| | Bank One % | JPMorgan Chase% | Implied | |
|---|---|---|---|---|
| | | | Exchange Ratio | Premium/ (Discount) to Bank One |
| **Income Statement** | | | | |
| GAAP (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |
| Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
| Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk-Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common Stockholders' Equity | 33.3 | 66.7 | 0.918 | (20.0) |
| Tangible Common Stockholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

110.    Revealing that the Merger's exchange ratio offered an extraordinary (and unfair) premium compared to similar transactions (only the premium in the merger between Fleet Financial Group, Inc. and BankBoston Corporation was comparable), the valuation analysis by Bank One's banker in the Proxy/Prospectus also disclosed the following analysis of premiums in comparable transactions:

| | Announcement Date | 1-Day Premium (%) | Ownership (%) |
|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 |

| | | | |
|---|---|---|---|
| Travelers Property Casualty Corp. / The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 |
| First Union Corporation / Wachovia Corporation | 4/15/01 | 7 | 73/27 |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 |
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 |
| Dean Witter, Discover & Co. / Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 |

111.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined.  In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000.  When comparing JPMC's performance under Harrison against the performance of Bank One under Dimon, any suggestion that Harrison's service as CEO for two more years was worth billions of dollars appears absurd.

112.    Despite his poor leadership, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted.  Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

113.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded

changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

114.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

115.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

116.    London's <u>Sunday Telegraph</u> reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

117.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

118.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

119.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

120.    The June 27, 2004 <u>New York Times</u> article observed, "William Harrison may be the acquirer in the [Merger], but it is becoming clear that James Dimon and his posse will call many of the shots."

121.    The <u>Australian</u> reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

122.    <u>Retail Banker International</u> reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint."  <u>Retail Banker International</u> quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively."  The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One."  According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

123.    <u>Retail Banker International</u> further observed:

> Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

124.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community.  One analyst asked Harrison:

> With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

125.    Harrison's answer was evasive:

> It's all part of creating a structure in a negotiation process that works for both firms.  I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance.  And as I said before, I will stay around as Chairman as long as Jamie wants me.

126.    Another analyst also probed the issue:

Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

127.    Dimon delivered a non-answer:

You've got to think a little bit that these are two large organizations coming together.  You want the teams to meld.  I have a lot to learn there.  Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

128.    Despite these clear questions, Harrison concealed that, in fact, he had been presented with that precise alternative -- a merger of equals with no premium at all for Bank One.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and receive a smaller share of the combined company.

129.    Similarly, Dimon concealed the secret pact.

130.    Now that the Merger has been consummated, Harrison appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  Thus, even though Harrison gave away billions of dollars of value from JPMC shareholders to retain his CEO title for another two years, in many respects Dimon already functions as the de facto CEO of the combined entity.

131.    Harrison kept the CEO title to shape a graceful exit for himself.  In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal…."

**The Proxy/Prospectus Violates Federal Securities Laws**

132.    The Proxy/Prospectus sent by Defendants to JPMC shareholders on or about April 21, 2004 in connection with the Merger made no mention at all of the Individual Defendants' rejection of the opportunity to merge Bank One into JMPC without any acquisition premium. JPMC shareholders were repeatedly encouraged to review the Proxy/Prospectus.  For instance,

the press release accompanying the announcement of the Merger stated: "Stockholders are urged to read the joint proxy statement/prospectus regarding the proposed transaction when it becomes available, because it will contain important information."

133.    Although the Proxy/Prospectus represents that the Individual Defendants were regularly kept apprised of the negotiations, not once does the Proxy/Prospectus advise shareholders that a merger of equals was offered but rejected solely because Harrison wanted to keep his CEO title. Defendants knew that the Proxy/Prospectus failed to disclose such critical information and intended to induce JPMC shareholders to approve the Merger. Defendants took pains to describe the negotiation process in great detail but carefully omitted any reference to the crucial facts regarding the acquisition premium:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.

> During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.

> Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms

and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.

The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various

aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

…

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

134.    The Proxy/Prospectus advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

135.    As investors ultimately learned, and as detailed herein, the statements made by Defendants and reproduced in the Proxy/Prospectus issued in connection with the Merger were incomplete and materially misleading and were known by Defendants to be misleading at that time, or were recklessly disregarded thereby as such, for the reasons stated herein.  At no time did Defendants ever disclose the secret pact between Dimon and Harrion or that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

136.    The omissions in the Proxy/Prospectus were designed by Defendants to mislead shareholders of JPMC into approving the Merger (and the amendment to JPMC's certificate of incorporation to expand the corporate authorization to issue shares, without which the Merger could not have been consummated) without knowing that Harrison had passed on nil-premium exchange ratio solely to preserve his CEO title, which he considered to be in danger.  These statements also materially misled investors as to the true rationale for the Merger and, as such, also operated as a fraud and deceit as to investors who purchased shares of the Company at any time during the Class Period.

137.    On May 25, 2004, in justifiable reliance on the materially deceptive Proxy/Prospectus and having been kept in the dark about the full truth concerning the terms of the deal, JPMC shareholders approved the Merger.  According to a Dow Jones Newswire report:

While the merger was approved, *some shareholders did express concern that the $58 billion price tag associated with the deal is hefty.*

One shareholder objected to the merger bid, saying that **Bank One will get the sweeter deal**, even though its earnings power was 6% less than J.P. Morgan's in the last quarter. Bank One will obtain J.P. Morgan's investment-banking expertise, its international capability and half of the company's board of directors, he said. And given the fact that Bank One's Chief Executive James Dimon will take on the role of J.P. Morgan's top officer two years from the conclusion of the merger, the shareholder said, *"It appears as if we're merging into them."*

*The statement was met with loud applause from the shareholders who attended the meeting.* [Emphasis added.]

138.    According to Investor's Business Daily:

The support for an *immediate Dimon regime* became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.

The shareholders remarks were met with a huge ovation, according to reports of the meeting.

"Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off."

139.    On May 25, 2004, JPMC released the results of the shareholder vote at the annual meeting.  The Merger was approved by only 68 percent of the votes outstanding.

140.    Among the shareholder proposals put to a vote at the JPMC annual meeting, the proposal that received by far the most support was one recommending that JPMC's Board adopt a resolution requiring the separation of the Chairman and CEO posts.  There were 562.5 million votes cast in favor of this proposal, confirming the extraordinary desire of JPMC shareholders to separate the Chairman and CEO posts.  The seven other shareholder proposals put to a vote received between 55.1 million votes and 202.6 million votes.  Had Harrison accepted Dimon's nil-premium exchange ratio offer, the Chairman and CEO posts would have been separated, with

Harrison occupying the Chairman post and Dimon serving as CEO.  However, Harrison concealed this opportunity from JPMC shareholders.

141.    With 2,081,783,154 shares entitled to vote at the annual meeting, at least 1,040,891,578 votes had to be cast in favor of the Merger for it to be approved and JPMC's certificate of incorporation amended to reflect the corporate authority necessary to issue enough shares in connection with the Merger.  The threshold was exceeded by 374,785,482 votes, but 562,557,770 votes were cast in favor of the shareholder proposal to separate the Chairman and CEO posts.

142.    On July 1, 2004, JPMC completed the Merger.  All outstanding shares of Bank One were exchanged for newly-issued shares of JPMC, which opened that day at $38.58 per share and closed at $38.17 per share.

143.    At the time the Merger was declared effective, the materially false and misleading statements contained in the Proxy/Prospectus remained unchanged, and these false statements conditioned Bank One's former shareholders to accept JPMC shares as consideration for the tender of their Bank One shares, and to condition other investors to purchase shares of the combined Company, in the open market pursuant and/or traceable to the materially false and misleading Proxy/Prospectus.

144.    In fact, the statements contained in the Proxy/Prospectus (which was also a registration statement for JPMC shares issued in connection with the Merger) were each materially false and misleading when made, as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and/or misleading, including:

    a.    When the Merger was negotiated and recommended, Defendants did not intend for Harrison to be the true CEO of the combined Company, such that it was false and

materially misleading to pretend that this was the intention of Bank One and JPMC prior to the effective time of the Merger, or of JPMC following the effective time of the Merger;

       b.      When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio;

       c.      When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio because Dimon sought to be the CEO of the combined Company;

       d.      As a result of Harrison's secret and undisclosed pact with Dimon, Defendants also materially misled investors as to the true structure and rationale of the Merger; and

       e.      Defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon and made such materially false and misleading statements in the Proxy/Prospectus because this allowed Harrison to preserve his CEO title and allowed Dimon to acquire dominance over the combined Company while securing for himself and other Bank One shareholders a premium to the detriment of JPMC shareholders.

145.     JPMC defrauded JPMC shareholders who would not have voted in favor of the Merger had they known that Dimon was willing to merge Bank One into JPMC for no acquisition premium if Harrison would relinquish his CEO title immediately.  In light of their concerns about the hefty amount being paid to merge with Bank One, that information was plainly critical to JPMC shareholders.  Defendants concealed the information to prevent JPMC shareholders from discovering it and remained silent in the face of a duty to speak.  Defendants intended to induce JPMC shareholders to vote in favor of the Merger.  JPMC shareholders approved the Merger in justifiable reliance on Defendants' representations to them, including the Proxy/Prospectus.

146.    Plaintiff and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction.  As a result of the Merger, pre-Merger JPMC shareholders, including plaintiff and other members of the Class, hold approximately 58 percent of the combined entity.  If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including plaintiff and other members of the Class, would now hold approximately 61 percent of the combined entity.

147.    Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Proxy/Prospectus, to solicit their approval of the Merger.  JPMC paid for the distribution of the Proxy/Prospectus and for all other efforts to solicit proxies in favor of the Merger.

148.    At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board.  JPMC is vicariously liable for Harrison's actions.

149.    Sections 102, 161, and 242 of Delaware's General Corporate Law expressly limit the Company's authority to issue shares to the authorization set forth in JPMC's certificate of incorporation and require a majority of shareholders to vote in favor of any expansion of this authority:

§ 102. Contents of certificate of incorporation.

(a) The certificate of incorporation shall set forth:

(4) If the corporation is to be authorized to issue only 1 class of stock, the *total number of shares of stock which the corporation shall have authority to issue*….

§ 161. Issuance of additional stock; when and by whom. The directors may, at any time and from time to time, if all of the shares of capital stock *which the corporation is authorized by its certificate of incorporation to issue* have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock *up to the amount authorized* in its certificate of incorporation.

§ 242. Amendment of certificate of incorporation after receipt of payment for stock; nonstock corporations.

(a) After a corporation has received payment for any of its capital stock, it may amend its certificate of incorporation,

(3) To increase or decrease its authorized capital stock….

(b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

(1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a *special meeting of the stockholders entitled to vote* in respect thereof for the consideration of such amendment or directing that the amendment proposed be *considered at the next annual meeting of the stockholders*….

(2) The holders of the outstanding shares of a class *shall be entitled to vote* as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, *if the amendment would increase or decrease the aggregate number of authorized shares* of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely….The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the *affirmative vote of the holders of a majority of the stock of the corporation*…. [Emphasis added.]

150.    In connection with the Merger, shareholders approved, based on the defective

Proxy/Prospectus, the following amendment to JPMC's certificate of incorporation:

Article Fourth of the Certificate of Incorporation of the Surviving Corporation shall be amended by: (i) deleting the words "FOUR

BILLION SEVEN HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION TWO HUNDRED MILLION", and (ii) deleting the words "FOUR BILLION FIVE HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION".

151.    The Proxy/Prospectus described the necessity of this amendment as follows:

> Because JPMorgan Chase does not currently have a sufficient number of authorized but unissued and unreserved shares to complete the merger and related transactions, the merger agreement also provides that, as part of the merger, JPMorgan Chase's certificate of incorporation will be amended to increase the authorized shares of its common stock from 4,500,000,000 to 9,000,000,000 and, as amended, will be the certificate of incorporation of the combined company. This amendment will not be effected unless the merger is approved by stockholders and completed.

152.    As a result of the misrepresentations and omissions of material facts set forth herein, including the failure to disclose that Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio, JPMC shareholders voted in favor of amending the Company's certificate of incorporation to allow the Company to issue far more shares than the Company would have needed to issue had Harrison agreed to a nil-premium exchange ratio.

153.    Pre-Merger JPMC shareholders were damaged by the lost opportunity to merge with Bank One without paying any dilutive premium.

154.    The wrongfully-obtained shareholder approval of corporate authority significantly diluted the stake of pre-Merger JPMC shareholders in the combined Company.

### JPMC'S BOARD DID NOT CONTAIN A MAJORITY OF INDEPENDENT DIRECTORS

155.    Each of the Individual Defendants other than Harrison received an annual retainer of $75,000, an annual grant of common stock equivalents valued at $170,000 on the date of grant, and several other valuable benefits.  Further, each chairman of a JPMC Board committee received an additional fee of $15,000 per year.  In addition to the reasons set forth below, the

extraordinary magnitude of the JPMC director compensation package undermined the independence of each of the Individual Defendants other than Harrison.

156.    Defendant Bechtel was beholden to Harrison because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country.  The Trade Bank of Iraq is managed by JPMC.

157.    The staggering size of this financial relationship shows that JPMC and the Bechtel Group, and their respective CEOs, are mutually interested in their ventures in Iraq.  The importance of this relationship to Bechtel Group is clear from its corporate website, which lists the "U.S. Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage.  Further, the website proudly points out that "Iraq Infrastructure II," Bechtel Group's second major Iraq contract, is valued at up to $1.8 billion.  Bechtel Group depends on the Trade Bank of Iraq to execute its lucrative contractual commitments in rebuilding Iraq's infrastructure. JPMC, headed by Harrison, leads the consortium of banks operating the Trade Bank of Iraq.  The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.  Nexant purports to be a "provider of technology solutions and experience-based technical and management consulting services to the global energy industry." On September 27, 2000, Nexant completed its first venture investment round, announcing:

> Nexant, Inc., the energy technology and consulting company
> formed by Bechtel Capital Partners LLC earlier this year,
> announced today that it has successfully completed its first venture
> investment round, securing $15 million in capital from a blue chip
> group of investors, including The Beacon Group, Morgan Stanley
> Dean Witter, the partners of Hellman & Friedman LLC, and Nth

Power Technologies, Inc. Nexant will use the investment proceeds to complete development of new technology solutions for the energy industry.

158.    Defendant Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002.  He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979.  Hearst-Argyle Television, Inc. ("Hearst-Argyle") is related to The Hearst Corporation, which folded its television holdings into Hearst-Argyle.  Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

159.    Hearst-Argyle, which is majority-owned by The Hearst Corporation, was formed in 1997 by the merger of the broadcast group of The Hearst Corporation and Argyle Television, Inc.  According to his executive biography, Bennack was instrumental in creating Hearst-Argyle. Hearst-Argyle's quarterly report discusses its financial relationship with JPMC as follows:

> *J.P. Morgan Chase & Co.* The lead agent bank under the Company's $500 million credit facility entered into in April 1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The outstanding balance on the credit facility was paid off as of September 2003, and the facility matured on April 12, 2004. Frank A. Bennack, Jr., a Director of the Company, served as a Director of J.P. Morgan until July of this year. We expect to enter into a new credit facility for $250 million with J.P. Morgan, and other parties, before the end of the year.

160.    As of September 30, 2004, Hearst-Argyle had approximately $1 billion in long-term debt, amounting to nearly half of its $2.4 billion market capitalization.  Thus, Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its credit facility for its operations and to maximize profits.  As a leading creditor, JPMC possesses substantial leverage over Hearst-Argyle.

161.    In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-Argyle are co-investors in ProAct Technologies, a privately held corporation in which Hearst-Argyle invested $25 million on March 22, 2000.

162.    According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares of Hearst-Argyle, worth approximately $625,000.  Moreover, Bennack's senior position at The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the importance of Hearst-Argyle's success to Bennack.  Accordingly, as Hearst-Argyle is indebted to JPMC, and also co-invests with JPMC, Bennack was unlikely to have challenged Harrison.  Doing so would have risked incurring the wrath of the head of one of Hearst-Argyle's most powerful creditors, potentially resulting in such repercussions as: (1) a less favorable credit facility for Hearst-Argyle when renewed; (2) increased pressure on Hearst-Argyle from a major creditor; or (3) the elimination of further co-investment opportunities with JPMC.  Any of these consequences would have adverse implications for the value of Bennack's investment in Hearst-Argyle, as well as the value of The Hearst Corporation's investment in Hearst-Argyle.  Taken together, Bennack's direct interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

163.    Defendant Bossidy is not an independent director because his son is employed by JPMC as a Vice President who received over $100,000 in compensation from the Company (and, according to salary survey of JPMC Vice Presidents, closer to $200,000).  Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC.  Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement.  Even if Bossidy was otherwise a capable and independent director, for the

purposes of this action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

164.    Defendant Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

165.    According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth approximately $50 million.

166.    As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders.  Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders.  For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time.  In this way, JPMC possesses significant leverage over Ryder.

167.    Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

168.    Defendant Futter is not an independent director because JPMC is a significant benefactor of The American Museum of Natural History (the "Museum"), of which Futter is President and Trustee.  Among other things, the Museum's Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation (the "Foundation").  JPMC makes donations through the Foundation and, according to "The JPMorgan Chase Corporate Responsibility

Annual Report," the Foundation made $312,500 in contributions to the Museum in 2003. This carries on JPMC's long-standing support for the Museum, originating with financier J.P. Morgan's donations of gems and minerals to the Museum's Tiffany-Morgan Collection of Gems, many of which are on display in the J.P. Morgan Hall of Gems.

169.    Due to JPMC's extensive philanthropic involvement with the Museum, Futter could not endanger the Museum's important relationship with JPMC by vigorously opposing an action by Harrison to favor himself over JPMC's shareholders. Futter's career and success depend, in large part, on the nurturing and retention of corporate donors. For Futter to stand in Harrison's way would not only endanger the Museum's relationship with JPMC, but also diminish Futter's ability to solicit other large donations from the corporate community.

170.    An article in the June 20, 2003 edition of The Wall Street Journal specifically profiled Futter and questioned whether she was, in fact, an independent director:

> *Giving at the Office*
>
> On Corporate Boards, Officials From Nonprofits Spark Concern When Directors' Position Helps Raise Funds
>
> When Directors' Positions Help Them Raise Funds, Danger of Conflict Follows
>
> Aiding Ms. Futter's Museum
>
> By David Bank And Joann S. Lublin
>
> When companies look for outsiders to join their boards, they often turn to people such as Ellen Futter, the president of the American Museum of Natural History in New York. As corporations see it, the leaders of big nonprofits can bring independence and a broader view of social issues to a board. Ms. Futter serves on four: insurer American International Group Inc., pharmaceutical maker Bristol-Myers Squibb Co., the energy company Consolidated Edison Inc. and J.P. Morgan Chase & Co., the nation's second-biggest bank.
>
> For museum directors, university presidents and other nonprofit leaders, a corporate directorship offers a big plus too: connections that can lead to major donations. All four of the companies on whose boards Ms. Futter sits have made substantial contributions

to her museum -- both during her nine years as president and before.

But those contributions create a potential conflict of interest: the possibility that money flowing from companies and their executives will make nonprofit officials beholden to the corporate management they are supposed to monitor.

Exhibit A is Enron Corp. The onetime energy-trading giant, its chief executive and affiliated foundations directed millions in donations during the 1990s to a Houston cancer center headed by Enron director John Mendelsohn, who served on Enron's now-famously-inattentive audit committee. (An Enron spokesman declines to comment. Dr. Mendelsohn has said the center doesn't depend heavily on Enron philanthropy.)

The potential problem goes far beyond the well-publicized Enron example. A Delaware Chancery Court judge ruled just last week that a supposedly independent investigative committee created by Oracle Corp.'s board was in fact fraught with "bias-creating relationships." One conflict: The two directors that constituted the panel -- a pair of Stanford University professors -- were asked to investigate controversial stock sales by fellow board members, some of whom had donated heavily to Stanford. The ruling allowed a shareholder lawsuit to go forward against those board members, including Oracle's chairman and chief executive, Larry Ellison, who personally and through the company has given millions to Stanford.

Now, concern about this kind of problem is spurring the Nasdaq Stock Market to propose new rules encouraging companies to limit donations to nonprofits whose executives sit on the companies' boards. The New York Stock Exchange also wants to promote directors' independence, but proposals it has made don't specifically target nonprofit conflicts.

It isn't clear yet how tough the exchanges' new rules will be, but several corporate boards have begun to take action in anticipation of new restrictions. All this comes amid wide-ranging efforts to reform corporate boards after a wave of business scandals that boards did little to curtail.

Acting on her own, Ms. Futter resigned last year from the committee of Bristol-Myers directors that oversees the company's audits. She also stepped down last year from the AIG committee that helps set top executive salaries. Ms. Futter wanted to avoid "even the appearance of conflict" between her duties overseeing the companies and her fund raising, a spokeswoman for the

natural-history museum says. The expectation of the new rules also factored into Ms. Futter's decisions, the spokeswoman says.

Ms. Futter, who declined to be interviewed, remains on the four corporate boards. She continues to serve on committees such as the Bristol-Myers corporate-governance panel, which considers questions of possible conflicts of interest of board members, among other duties. It's far from certain that the proposed rule changes would force any alteration in her relationships with the companies.

The museum chief's fund-raising success illustrates the potential problem created by nonprofit executives serving on corporate boards. In 2001, she received a bonus of more than $150,000 on top of her $450,000 annual salary, in part for opening the museum's $210 million Rose Center for Earth and Space, according to the museum. On a wall honoring major contributors to the multimedia Rose Center, the list of 34 "friends" includes: Bristol-Myers, Con Edison and the Starr Foundation, which was endowed by AIG's founder and is run by current and former AIG executives. Ms. Futter served on the boards of all of the companies when they or their related foundations made these contributions.

Bristol-Myers, through the Bristol-Myers Squibb Foundation, was also the primary sponsor of the museum's 1999 exhibit, "Epidemic!" The foundation contributed $1.2 million over four years for the display on infectious diseases. In addition, Bristol-Myers has given the museum a total of $700,000 for other purposes during Ms. Futter's tenure as president.

Ms. Futter, a lawyer by training and a former president of Barnard College in New York, has also raised large amounts of money from companies and foundations to which she has no direct connection. During her time at the museum, giving by the four companies on whose boards she sits has been "consistent with the philanthropic support these corporations have provided historically to the museum before Ms. Futter became president and/or joined these boards," the museum says in a written statement.

She served on the six-member Bristol-Myers audit committee from 1993 until 2002, chairing the panel in 1998 and 1999. In March, Bristol-Myers restated its financial results from recent years, acknowledging that from 1999 through 2001, it had overstated revenue by a total of nearly $2.5 billion. The restatement raised its revenue by $653 million for the first half of 2002. The company's financial reporting is now under investigation by the Securities and Exchange Commission and the Justice Department. The company has said it is cooperating with the government probes and doing its

own internal investigation. There is no indication the government inquiries are focusing on board members.

Bristol-Myers says that its contributions to the natural-history museum haven't compromised Ms. Futter's role on its board. "Since 1990, she has provided important independent counsel and guidance to the company," Rebecca Taylor, a company spokeswoman, says.

AIG reached a similar conclusion, says company spokesman Joseph Norton. He points out that the Starr Foundation is for legal purposes independent of AIG. But Maurice Greenberg, AIG's chief executive, serves as chairman of the foundation, and other members of AIG's board serve on the foundation's board. Mr. Greenberg serves as a trustee of the natural-history museum, as well.

In 1999, the year Ms. Futter joined AIG's board, the Starr Foundation committed $10 million over two years to build the museum's C.V. Starr Natural Science Building, a $35 million, nine-story research facility in New York, with labs, exhibits and retail space. "We've been funding the museum long before Ellen was there," says Florence Davis, the foundation's president and formerly AIG's top in-house lawyer. "It has nothing to do with her being on AIG's board."

Anne Canty, the museum spokeswoman, says none of the corporate contributions had any effect on Ms. Futter's boardroom decisions. "Ms. Futter's role as a director is independent of her role as president of the museum," Ms. Canty says.

Con Ed and J.P. Morgan Chase say they continue to consider Ms. Futter to be an independent board member.

[…]

171.    Other publications have also criticized Futter for conflicts of interest in

connection with her corporate directorships.  The February 21, 2000 issue of <u>New York</u>

<u>Magazine</u> observed that as "[a] skilled fund-raiser, [Futter] has made the [Museum] corporate-

friendly," and that "Futter -- whose other accomplishments include being the first woman to

chair the board of the New York Federal Reserve Bank as well as memberships on the boards of

Con Edison, Bristol-Myers Squibb, and J.P. Morgan -- tapped her extensive contacts not just for

funding but to boost the museum's visibility."  Futter's willingness to capitalize on her corporate

directorships has on at least one occasion drawn fire for blurring corporate interests with

Museum interests.  According to the <u>New York Magazine</u> article:

> Take the 1999 exhibit "Epidemic! The World of Infectious
> Diseases," sponsored by drug behemoth Bristol-Myers Squibb.
> That Charles A. Heimbold Jr., Bristol-Myers's CEO, sits on the
> museum's board looked like natural fund-raising synergy. That
> Futter sits on Bristol-Myers's board had the appearance of conflict
> of interest. That, as <u>The Nation</u> first reported, Richard Colonno, a
> Bristol-Myers vice-president, served on a special advisory
> committee that helped "shape the content of the exhibition"
> suggested in-house censorship that blunted related issues such as
> pharmaceutical price-gouging.

172.    It is reasonable to expect that Futter, the head of an institution dependent on the

continued financial support of the corporate community, including JPMC, would not endanger

her institution's financial backing, as well as her own career, by standing in the way of

Harrison's self-dealing.  Accordingly, Futter must be considered to be beholden to Harrison for

the purpose of determining whether a majority of JPMC's Board was independent from Harrison

in approving the improper premium.

173.    Defendant Kaplan was not an independent director because she is a Trustee and

Vice-Chair of the Museum, of which, as previously alleged, JPMC is a significant benefactor.

As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it

can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm

financial footing, among other things, by nurturing and pleasing corporate donors like JPMC.

Like Futter, Kaplan's interest in the Company's continued financial support of the Museum

renders her insufficiently independent to assure that she would have vigorously opposed an

action by Harrison to favor himself over JPMC's shareholders.  Kaplan also serves on the Board

of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

174.    Kaplan is also not independent because, as an attorney with Skadden, Arps, Slate,

Meagher & Flom LLP, which receives substantial fees from JPMC, she must be careful not to

cross an important client.  Skadden represented Chase Manhattan and Chemical Bank in their

merger; Chase Manhattan in its merger with J.P. Morgan; and JPMC in the Merger (performing

antitrust and regulatory work).  Skadden also represented JPMC in the Currency Conversion Fee

Antitrust class action litigation and represents JPMC in the WorldCom securities litigation,

among other cases.  Upon information and belief, JPMC pays millions of dollars in legal fees to

Skadden, thereby compromising Kaplan's independence.

       175.    Defendant Gray is not an independent director because JPMC is a National

Sponsor of the United Negro College Fund (UNCF), of which Gray was President and CEO at

all relevant times.  An article in the March 31, 2003 edition of Barron's critiqued the relationship

between Gray and Harrison, as well as UNCF and JPMC:

> Sweet Charity
>
> Should the head of a nonprofit be on the compensation committee
> of one of its corporate donors?
>
> JUST A FEW WEEKS AGO, the annual campaign for the United
> Negro College Fund began at J.P. Morgan Chase, with a high-
> spirited reception at the International Center for Photography in
> New York City. A blizzard of solicitations from bank executives
> ensued, encouraging employees to donate to the "workplace
> campaign" through a secure Website or an interactive telephone
> voice response system.
>
> The longstanding relationship between the two institutions is warm
> and cozy. The Rockefellers, who founded the Chase Manhattan
> Bank, were charter supporters of the United Negro College Fund
> since the UNCF was established in 1944 by Frederick Patterson. A
> third of the money to be raised from J.P. Morgan Chase supports
> the John F. McGillicuddy Scholarship Fund, which has awarded
> $1.4 million in scholarships since 1993. The recipients are students
> going to United Negro College Fund member schools.
>
> In many ways, the relationship between Bill Harrison, chairman of
> the bank that's the nation's second-largest after Citigroup, and Bill
> Gray, is warm and comfortable, too, in the way of men who've
> served on boards with each other for more than a decade.
>
> Gray, 61, is the United Negro College Fund's chairman and chief
> executive. A Baptist minister and Democratic congressman from

Philadelphia from 1979 to 1991, he is today a director of Dell Computer, Electronic Data Systems, MBIA, Pfizer, Prudential Insurance, Rockwell Automation, Viacom and Visteon. Gray is a director of J.P. Morgan, having become a director of Chase Manhattan just after he gave up his congressional seat in '91. Moreover, he also sits on the bank's compensation committee, along with Bechtel Chairman Riley Bechtel, ExxonMobil CEO Lee Raymond and Wyeth Chairman John Stafford, who heads the committee.

In January 2001, that same group approved a $10 million bonus to Harrison for completing the merger between J.P. Morgan and Chase.

It cut Harrison's stock package last year by 50%. But in January of this year, Harrison got the second $5 million installment of the merger-related bonus, even though, like other financial institutions, J.P. Morgan has been hammered by declines in investment banking, increases in bad debt, legal disputes, regulatory investigations and fallout from its relations with Enron and WorldCom. Since Dec. 29, 2000, the day before the merger became effective, J.P. Morgan stock has fallen by 46.9%. In the same period, the S&P 500 index has slid by 34.2%.

Harrison, in turn, serves as treasurer of the United Negro College Fund. And J.P. Morgan and its employees are some of the fund's largest contributors. Last year J.P. Morgan employees raised some $1.28 million, or an average of $179 per gift, which the J.P. Morgan Chase Foundation matched dollar for dollar. Over the past six years, the contribution has totaled approximately $11 million.

Recently, the annual appeal to J.P. Morgan workers kicked off with a target of $1.37 million -- some 7% above the level achieved last year, even though head count has fallen sharply. Midway through last month, the campaign had already raised $414,000 from 1,893 employees, according to a J.P. Morgan Website. The campaign ends on April 4, and payroll deductions start in June. Those giving at the "leadership level" -- or more than $350 -- will be recognized as "UNCF Leaders" and receive a gift.

Arrangements like the one involving Gray, Harrison and JP Morgan draw fire from corporate-governance experts. "This is known as director interlock -- You scratch my back, and I scratch yours," says Charles Elson, head of the Center for Corporate Governance at the University of Delaware. "If I give money to your foundation and you're on my board, and you serve on the compensation committee, in today's environment, that's a conflict of interest. That individual, in my view, would be classified as a

non-independent director and should probably reconsider their service on that board."

Harrison's status as the college fund's treasurer isn't disclosed in J.P. Morgan's proxy statement, including the latest, which was filed Friday. Continues Elson: "From my point of view as a shareholder, I would want that information for voting. I'm surprised it's not disclosed, particularly in today's environment, when discretion is the better part of valor." Elson draws comparison with the case of Charles A. LeMaistre, a former Enron director who was president of the M.D. Anderson Cancer Center at the University of Texas. The cancer center was promised $600,000 in donations from Enron while LeMaistre served on Enron's board.

In a prominent section of J.P. Morgan's Website that addresses corporate governance, Harrison describes his pride in "the 200-year tradition of integrity on which this firm is built." Each of the bank's directors, the Website relates, is independent. Its definition of independence? "The director has no material relationship with the firm, either directly or as a partner, stockholder or officer of an organization that has a relationship with the firm."

J.P. Morgan declined to comment to Barron's. However, a person familiar with the relationship with the fund stressed that "the vast majority" of contributions came from employees, and that a Chase executive has served as the fund's treasurer since inception, "a tradition that's not questioned and nothing untoward and nobody has seen a problem with this for over 60 years." Finally, this person pointed out, J.P. Morgan's own governance guidelines declare that if the bank accounted for 2% of a not-for-profits' budget, and the nonprofit's executive sits on the bank's board, only "then is that director no longer independent." And, this person points out, J.P. Morgan's contribution accounts for less than 2% of the fund's budget.

Gray wasn't available to comment.

J.P. Morgan certainly isn't another Enron. And the fund is indubitably a worthy recipient: 60% of its scholarships go to people who are the first in their families to attend college. Roughly the same percentage goes to people whose families have annual incomes under $25,000. And half its scholars come from single-parent households.

And the J.P. Morgan Chase contribution last year was just a fraction of the $178.8 million in annual support and revenues pledged to the fund. The J.P. Morgan Chase Foundation and J.P. Morgan Chase Bank gave away $73 million in 2002.

Other J.P. Morgan contributions to the fund included sponsoring
its celebrity golf tournament and contributing about $800,000 to
the fund's technology-enhancement capital campaign, the first year
of a two-year commitment. Sure, raising money for charities is
generally a very worthwhile activity. But there are ways to do it
without creating the potential for a conflict of interest.

Happily, conflicts of interest, while rife, are less so than they once
were, observes Elson of the University of Delaware. "They are
certainly on the decline, given what's happened with Enron." But
in relationships like the one between Gray and Harrison, "It's not to
say [the nonprofit executive] wouldn't make a good director. But
should they be on this particular board?"

176.    In 2003, JPMC matched nearly $1.3 million in UNCF donations, making possible

a combined total of $2.6 million raised through employee contributions and matching gifts.

Since 1990, JPMC employees have donated more than $6.6 million to the UNCF, which when

combined with the matching gift and sponsorships, has resulted in a total contribution of nearly

$18.7 million.  The November 3, 2003 issue of Jet, in reporting Gray's intention to retire as

President and CEO of UNCF on March 31, 2004, observed that Gray had raised over $1.5 billion

for the organization.  Thus, the philanthropic relationship between JPMC and UNCF is

significant and long-standing, and Gray's lauded success in fundraising has been due, in large

part, to his ability to nurture and retain corporate donors such as JPMC.

177.    Gray's financial relationship with JPMC and Harrison's service as UNCF's

treasurer (which is disclosed nowhere in the Proxy/Prospectus) raise serious doubts that Gray

would have vigorously opposed an action by Harrison to favor himself over JPMC's

shareholders.  It would not be reasonable to expect the head of an institution interested in the

Company's continued financial support to stand in the way of Harrison's self-dealing.

Moreover, Harrison's undisclosed service as UNCF's treasurer further evidences his close

relationship with Gray.  Accordingly, Gray must be considered beholden to Harrison for the

purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

178.    Defendant Stafford has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003.  Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001.  Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.  According to a November 19, 2004 filing, JPMorgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

179.    According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million.  JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence.  JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth.  For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price.  JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance.  As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders.  Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Wyeth was either undersecured or would be undersecured

within a relatively short time. In all these ways, JPMC possesses substantial leverage over Wyeth. Taken together, Stafford's financial interest in Wyeth and JPMC's relationship with Wyeth raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

## **PLAINTIFF'S INVESTIGATION**

180.    Plaintiff's allegations set forth herein are based on a thorough investigation, conducted by and through his attorney, of all reasonably-available sources of information, in order to obtain information necessary to plead plaintiff's claims, including:

a.     The review and analysis of public filings of JPMC and Bank One with the SEC, as well as documents disseminated to shareholders of JPMC and Bank One;

b.     The review and analysis of securities analysts' reports and investor advisory services concerning JPMC and Bank One;

c.     The review and analysis of JPMC and Bank One press releases and other publicly disseminated statements made by the defendants;

d.     The review and analysis of reports concerning JPMC and Bank One that have appeared in the print and electronic media and computer databases; and

e.     Interviews of relevant witnesses, including Landon Thomas, Jr., the reporter for The New York Times who first broke the story that Harrison had turned down the no-premium deal opportunity.

181.    Except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiff and the public, and lie exclusively within the possession and control of defendants and their agents, thus preventing plaintiff from further detailing defendants' misconduct.

**NO SAFE HARBOR**

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint because the specific statements pleaded herein either were not identified as "forward-looking statements" when made or were unaccompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew or had reason to know that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of JPMC or Bank One who knew or had reason to know that the statement was false or misleading.

**COUNT I**

**AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 THEREUNDER**

183.    Members of the Class who were entitled to vote on the Merger (the "JPMC Holder Class") repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

184.    This Count is brought pursuant to Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 promulgated thereunder by the SEC [17 C.F.R. § 240. 14a-9] on behalf of the members of the JPMC Holder Class, against JPMC and the Registration Statement Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, and does not sound in fraud.

185.    The defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these defendants solicited proxies from the members of the JPMC Holder Class by means of a Proxy/Prospectus that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

186.    As a result, the members of the JPMC Holder Class were denied the opportunity to make an informed decision in voting on the Merger, and received a smaller stake in the combined company than they otherwise would have had the information been disclosed.

187.    The members of the JPMC Holder Class have suffered damages as a result of the Merger which was approved through the use of a proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

188.    The JPMC Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

189.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Holder Class, against the Individual Defendants.

190.    Each of the Individual Defendants was a control person of JPMC by virtue of his/her positions as a director and/or senior officer of JPMC.

191.    Each of the Individual Defendants was a culpable participant in the violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, alleged in Count I, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

192.    The JPMC Holder Class as well as members of the class who purchased or

otherwise acquired the common stock of JPMC during the Class Period (the "JPMC Purchaser

Class"), repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if

fully set forth herein.

193.    This count is brought pursuant to common law, on behalf of the members of the

JPMC Holder Class and JPMC Purchaser Class, against the Individual Defendants for breach of

those defendants' fiduciary duties owed to the members of the JPMC Holder Class and JPMC

Purchaser Class.

194.    Each defendant named herein was a director and/or senior executive officer of

JPMC, and owed to JPMC shareholders the highest obligations of good faith, loyalty, fair

dealing, due care and candor.

195.    By entrenching himself with the CEO title for another two years at a cost to

JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of

loyalty owed to the public shareholders of JPMC.  The other Individual Defendants also

breached their duty of loyalty by approving the Merger with a significant acquisition premium

solely to secure a benefit for Harrison to the detriment of JPMC shareholders.

196.    The Individual Defendants' fiduciary obligations under these circumstances

required them to evaluate the Merger and obtain the best value for JPMC's public shareholders.

Instead, the Individual Defendants agreed to the Merger at a price that gave more than $7 billion

of value belonging to JPMC shareholders to Bank One shareholders just so Harrison could keep

his title and did not disclose to JPMC's shareholders the opportunity to merge with Bank One

without paying any acquisition premium at all.  Acting individually and in concert and aiding

and abetting and conspiring with one another, the Individual Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

197.    Each defendant named herein breached and violated his or her fiduciary duties to the members of the JPMC Holder Class and JPMC Purchaser Class to the detriment of those class members by reason of the wrongful conduct alleged above.

198.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium), as set forth above, because at least nine of JPMC's twelve directors were either interested in the improper premium or not sufficiently independent from Harrison.

199.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium) because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC of his secret pact with Dimon.

200.    The entire fairness standard is the proper standard of review for the Merger because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC that he rejected the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio.

201.    As a result of these defendants' breaches of their fiduciary duties, the members of the JPMC Holder Class and JPMC Purchaser Class have suffered, and will continue to suffer substantial damages.

## COUNT IV

### AGAINST JPMC AND THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER

202.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

203.    This count is brought pursuant to Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.l0b-5], on behalf of the members of the JPMC Purchaser Class, against JPMC and the Insider Defendants.

204.    The defendants named herein knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule l0b-5 thereunder in that they themselves, or a person whom they controlled: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, (iii) engaged in acts, practices and a course of conduct that operated as a fraud or deceit upon the members of the JPMC Purchaser Class in connection with their purchases of JPMC securities.

205.    Each of the defendants named herein participated in and joined the alleged scheme and course of conduct specified above, and each is liable primarily for the aforesaid wrongful acts and statements specified above.

206.    As a result of the foregoing, the market prices of JPMC securities were artificially inflated. In ignorance of the false and misleading nature of the representations described above, the members of the JPMC Purchaser Class relied, to their damage, directly on the misrepresentations or on the integrity of the market both as to price and as to whether to purchase the securities. The members of the JPMC Purchaser Class would not have purchased JPMC securities at the market prices they paid, or at all, if they had been aware that the market

prices had been artificially and falsely inflated by these defendants' false and misleading statements and concealments.

207.    At the time of the purchase of those securities by the members of the JPMC Purchaser Class, the fair market value of JPMC securities was substantially less than the prices paid.

208.    After the truth about Harrison's secret pact was revealed on Sunday, June 27, 2004, months after the Merger announcement, JPMC's stock price fell as low as $37.85 per share the next day, finally closing at $37.95 per share, below its $37.99 per share close the previous Friday.  By contrast, the price of the iShares S&P Global Financials Sector exchange-traded fund rose on June 28, 2004 to $59.35 per unit from its previous closing price of $59.24, and the iShares Dow Jones US Financial Services exchange-traded fund rose that day to $103.04 per unit from its previous closing price of $103.00.

209.    By virtue of the foregoing, the defendants named herein have violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## COUNT V

### AGAINST THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

210.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

211.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Purchaser Class, against the Insider Defendants.

212.    Each of the Insider Defendants was a control person of JPMC by virtue of his positions as a director and senior officer of JPMC or Bank One.

213.    Each of the Insider Defendants was a culpable participant in the violations of Section 10 of the Exchange Act and Rule 10b-5 thereunder, alleged in Count V, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT VI

## AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

214.    Members of the Class who exchanged Bank One shares for shares of JPMC in connection with the Merger (the "Bank One Holder Class") repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

215.    This Count is brought pursuant to Section 11 of the Securities Act [15 U.S.C. § 77k] on behalf of the members of the Bank One Holder Class, against JPMC and the Registration Statement Defendants for Violations of Section 11 of the Securities Act, and does not sound in fraud.  Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

216.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

217.    JPMC is the Registrant for the Registration Statement.

218.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

219.    The defendants named herein are strictly liable to the members of the Bank One Holder Class for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

220.    The defendants named herein issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose *inter alia* the facts set forth above. By reasons of the conduct herein alleged, each of these defendant violated, andlor controlled a person who violated, Section 11 of the Securities Act.

221.    The members of the Bank One Holder Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the Registration Statement.

222.    The members of the Bank One Holder Class have sustained damages.

223.    At the times they acquired JPMC common stock, the members of the Bank One Holder Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year elapsed from the time that plaintiff and members of the Bank One Holder Class discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VII

## AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

224.    The Bank One Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

225.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act [15 U.S.C. § 771(a)(2)] on behalf of the members of the Bank One Holder Class, against JPMC and the Registration Statement Defendants, and does not sound in fraud.  Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

226.    The defendants named herein were sellers, offerors, and/or solicitors of sales of the shares offered pursuant to the Proxy/Prospectus.

227.    The Proxy/Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The solicitation made by the defendants named herein included participating in the preparation of the false and misleading Proxy/Prospectus.

228.    The members of the Bank One Holder Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the defective Proxy/Prospectus.

229.    By reason of the conduct alleged herein, the defendants named herein violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.

230.    Accordingly, the members of the Bank One Holder Class have the right to rescind and recover the consideration exchanged for their JPMC common stock and, hereby reserve the right to rescind and tender their shares to the defendants sued herein.

231.    The members of the Bank One Holder Class who have sold their shares of JPMC common stock are entitled to rescissionary damages.

232.    Less than one year elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VIII

### AGAINST THE INSIDER DEFENDANTS FOR
### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

233.    The Bank One Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

234.     This Count is brought pursuant to Section 15 of the Securities Act [15 U.S.C. § 77o] on behalf of the members of the Bank One Holder Class, against the Insider Defendants, and does not sound in fraud.

235.     Each of the Individual Defendants was a control person of JPMC by virtue of his positions as a director and/or senior officers of JPMC or Old BankAmerica.

236.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts VI and VII, above, based on their having signed the Registration Statement, and having otherwise participated in the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of himself and the Class, plaintiff demands judgment against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying plaintiff as the representative of the Class;

B.     Ordering JPMC to issue additional shares of stock to plaintiff and the other members of the relevant class asserted herein as appropriate to address the misconduct alleged herein;

C.     Declaring and determining that the defendants violated the federal securities laws and common law by reason of their conduct as alleged herein;

D.     Awarding the Class compensatory and punitive damages against defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

E.     Awarding plaintiff his costs and disbursements, including the fees of plaintiff's counsel and experts, and reimbursement of expenses; and

      F.      Granting plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

237.    Plaintiff hereby demands a trial by jury.


DATED:      March 17, 2005      Respectfully submitted,

      /s/ Joseph N. Gielata

      Joseph N. Gielata (#4338)
      Attorney at Law
      501 Silverside Road, Suite 90
      Wilmington, DE 19809
      (302) 798-1096

      ***Attorney for Plaintiff***

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| |
|---|
| SAMUEL I. HYLAND, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　　　　　　　vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>　　　　Defendants. |

**CERTIFICATION OF SAMUEL I. HYLAND
IN SUPPORT OF CLASS ACTION COMPLAINT**

Samuel I. Hyland, for his Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.　　I have reviewed the facts and allegations of the complaint prepared by counsel and have authorized the filing of the complaint.

2.　　I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

3.　　I held 300 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period.  Thus, at the close of the Class Period, I retained 300 shares.  Based on JPMC's stock price on July 1, 2004, when the merger closed, my loss during the Class Period as a result of defendants' fraud was $1,659.25.

4.      I intend to actively monitor the conduct of this action for the benefit of the class. I have retained Joseph N. Gielata, Esq. to prosecute this action.  Mr. Gielata is knowledgeable and experienced in securities law and litigation.

5.      I believe that my claims against the defendants are typical of those of other members of the class.

6.      I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

7.      I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial.  I intend to pursue this litigation for the best interests of all class members.

8.      During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

9.      I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: March  17 , 2005          _____
                                          /s/ Samuel I. Hyland

                                                      Samuel I. Hyland