Exhibit A

EFiled: Sep 2 2004 3:12PM EDT
Filing ID 4148186

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION | CONSOLIDATED C.A. No. 531-N |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, for their Consolidated Complaint against Defendants, allege, upon personal knowledge with respect to themselves, and, as to all other matters, upon the investigation of counsel, which has included, among other things: (i) interviews of persons with knowledge and information concerning the matters alleged herein; (ii) review and analysis of public filings concerning the matters alleged herein; (iii) review and analysis of news articles, press releases, and analysts' reports concerning the matters alleged herein; and (iv) consultations with experts. Plaintiffs believe that further evidentiary support for the allegations set forth below will exist after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of public shareholders of J.P. Morgan Chase & Co. ("JPMC" or the "Company") against JPMC, its Chief Executive Officer and Chairman (William B. Harrison, Jr.), and other persons who were directors of JPMC during the relevant time to seek relief relating to the recent merger (the "Merger") of JPMC and Bank One Corporation ("Bank One"). According to persons close to the deal, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all*, provided only that Bank One's highly successful CEO, James Dimon, immediately become CEO. Instead, for the sole purpose of allowing Harrison to keep the title of CEO for another two years, Defendants caused JPMC shareholders to pay a significant acquisition premium -- amounting to more than $7 billion in

stock, a substantial dilution of JPMC shareholders' stake. ***JPMC shareholders approved the Merger without having been advised of these essential facts by Defendants.*** Confirming the critical importance of the information, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger and expressed concerns about Harrison's remaining in that position as well as about the Merger's dilutive impact. The Defendants violated their duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.

2.      Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to pay a premium for Bank One just so Harrison could stay on as CEO for another two years, even though JPMC's performance, stock price, and reputation have languished under his leadership and certainly JPMC shareholders would have preferred Bank One's successful and respected CEO lead the combined company.

### THE PARTIES

3.      At all relevant times, Plaintiffs Ronda Robins, George Ziegler, and Bruce T. Taylor, as custodian for Julia Ann Taylor, have owned JPMC common stock.

4.      Defendant JPMC is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, NY 10017. JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

5.    Defendant William B. Harrison, Jr. has served as Chief Executive Officer and Chairman of the Board of Directors of JPMC since 1999.

6.    Defendant Hans W. Becherer was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998.

7.    Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting. Defendant Bechtel was not an independent director because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country. The Trade Bank of Iraq is managed by JPMC. The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.

8.    Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC. He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004. He has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

9.    Defendant John H. Biggs was, during the relevant time, a director of JPMC. He has been a director of JPMC since March 2003.

10.    Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998. Bossidy is not an independent director because his son is employed by JPMC as a Vice President.

11.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting. Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

12.    Defendant Ellen V. Futter was, during the relevant time, a director of JPMC. She has been a director of JPMC or a predecessor institution since 1997. Futter is not an independent director because her brother-in-law is employed by JPMC as a managing director. In addition, JPMC is a significant benefactor of The American Museum of Natural History, of which Futter is President and Trustee. Among other things, the Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation.

13.    Defendant William H. Gray, III was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1992. Gray is not an independent director because JPMC is a National Sponsor of The College Fund/UNCF, of which Gray was President and CEO at all relevant times.

14.    Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC. She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004. Kaplan was not an independent director because she is a Trustee and Vice-Chair of The American Museum of Natural History, of which, as previously alleged, JPMC

is a significant benefactor. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

15.    Defendant Lee R. Raymond was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1987.

16.    Defendant John R. Stafford was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1982. He has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003. He was Chairman of the Board from 1986 until 2003. Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001. Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.

17.    Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

18.    By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required: (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to make appropriate disclosure to JPMC shareholders of all material facts concerning the Merger; (d) to disseminate a complete and accurate Proxy Statement; and (e) to refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Court of Chancery, on behalf of the Class consisting of all persons who owned JPMC common stock on the date the Merger was announced (January 14, 2004) and continued to own such stock through the date the Merger closed (July 1, 2004). Excluded from the Class are Defendants herein; any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class.

22.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

23.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and shareholder litigation. Plaintiffs have no interests that are in conflict with the interests of the Class.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:  (a) whether Defendants breached fiduciary and other common law duties owed by them to Plaintiffs and other members of the Class; and (b) whether the Class is entitled to relief as a result of Defendants' wrongful conduct.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.    Defendants have acted in a manner which affects Plaintiffs and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

27.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

**BACKGROUND**

28.    In June 1999, Defendant Harrison became Chief Executive of Chase Manhattan, the predecessor of JPMC, and embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J. P. Morgan in 2000, just before the stock market collapsed. In a February 23, 2004 interview with Harrison on CNBC, the interviewer noted: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

29.    According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large

strategic acquisitions…" However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

30.    The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that *few would have given odds on him even surviving the year*, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, *it seemed to be largely Harrison's fault.* At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

31.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent. Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent. JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

32.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

33.    On September 18, 2002, <u>The Wall Street Journal</u> published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Harrison

concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

34.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

35.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal.

36.    A July 22, 2004 Wall Street Journal article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

37.    Whereas JPMC shareholders have suffered under Harrison's reign, James Dimon, Chairman and Chief Executive Officer of Bank One, has created tremendous value for Bank One shareholders.  From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22.  During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

## DEFENDANTS' WRONGDOING

38.    The fallout from various scandals, as well as his poor business decisions, forced Harrison to conjure yet another massive deal to protect his position.

39.    During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One.  Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

40.     According to the Joint Proxy Statement sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.

41.     At a meeting of the JPMC Board (consisting of the Individual Defendants) on November 18, 2003, Harrison briefed the full Board on his discussions with Dimon.  The JPMC Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

42.     In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million.  Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

43.     The January 19, 2004 <u>Financial Times</u> described the negotiation process:

> "There was a ***spectrum of outcomes in terms of premium and governance: Jamie laid them out*** and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

> But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

> Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

44.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO.  Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger.  Little did JPMC shareholders know that buying this extra time for Harrison would cost them ***billions*** of dollars.

45.     According to a June 27, 2004 <u>New York Times</u> article:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have***

*cost J.P. Morgan shareholders extra money* in doing so. Mr. Dimon, always the tough deal maker, *offered to do the deal for __no premium__ if he could become chief executive immediately, according to two people close to the deal.*

      *When Mr. Harrison resisted, Mr. Dimon insisted on a premium,* which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

46.    As one observer related on eFinancialNews.com on February 8, 2004, after hearing the announcement of the Merger:

> One of the first calls I received was: "That's a hell of a price that Bill Harrison is paying to recruit Jamie Dimon."
>
> …
>
> *Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon just to save his own skin?* [Emphasis added.]

47.    After the close of trading on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that they have agreed to merge in a strategic business combination establishing the second largest banking franchise in the United States, based on core deposits. The combined company will have assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen states and top-tier positions in retail banking and lending, credit cards, investment banking, asset management, private banking, treasury and securities services, middle-market, and private equity. With balanced earnings contributions from retail and wholesale banking, the combined company will be well-positioned to achieve strong and stable financial performance and increase shareholder value through its balanced business mix, greater scale, and enhanced efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of directors of both companies, provides for a stock-for-stock merger in which 1.32 shares of JPMorgan Chase common stock will be exchanged, on a tax-free basis, for each share of Bank One common stock. Based on JPMorgan Chase's closing price of $39.22 on Wednesday, January 14, 2004, the transaction would have a value of approximately $51.77 for each share of Bank One common stock, and would create an enterprise with a combined market capitalization of approximately $130 billion. The premium, based upon the average closing stock prices of JPMorgan Chase and Bank One for the previous month, would be approximately 8 percent and would be approximately 14 percent based on today's closing prices.

Under the agreement, the combined company will be headed by William B. Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. ...

48.    Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22. The drop reflected the unnecessarily dilutive impact of the Merger. In early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

49.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. *For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.* The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".

...

*Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.* "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

50.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

51.     Public criticism of the premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive.  They said JP Morgan is paying too big a premium.  It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

52.     James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know.  It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

53.     Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

54.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

55.     The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  ***All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself***

- 13 -

*CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC*

*shareholders to secure that benefit for Harrison.*

56.      In connection with the Merger, JPMC amended its by-laws to include the

following provisions:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The
> Board of Directors of the Corporation has resolved that, effective as of the
> Effective Time (as defined in the Agreement and Plan of Merger, dated as of
> January 14, 2004, by and between the Corporation and Bank One Corporation
> ("Bank One"), as the same may be amended from time to time (the "Merger
> Agreement")), Mr. William Harrison shall continue to serve as Chairman of the
> Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall
> become the President and Chief Operating Officer of the Corporation. The Board
> of Directors of the Corporation has further resolved that Mr. Dimon shall be the
> successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with
> such succession to become effective on the second anniversary of the Closing
> Date (as defined in the Merger Agreement) or any such earlier date as of which
> Mr. Harrison ceases for any reason to serve in the position of Chief Executive
> Officer of the Corporation (the date of such succession, the "Succession Date"),
> and that Mr. Harrison shall continue to serve as Chairman of the Board following
> the Succession Date.

> (b) Effective as of the Effective Time, the Board of Directors of the
> Corporation shall be comprised of eight Continuing Bank One Directors,
> including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including
> Mr. Harrison. From and after the Effective Time through the Succession Date: (i)
> the number of directors that comprises the full Board of Directors of the
> Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors
> created by the cessation of service of a director shall be filled by a nominee
> proposed by the Governance Committee of the Board of Directors, which shall be
> co-chaired by one Continuing Bank One Director and one Continuing JPMorgan
> Chase Director and comprised of an equal number of Continuing Bank One
> Directors and Continuing JPMorgan Chase Directors (any deadlocks on the
> Governance Committee shall be resolved in good faith by the non-management
> members of the Board of Directors in a manner intended to preserve the principles
> of representation reflected in this By-law.). For purposes of this Section 2.09, the
> terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One
> Directors" shall mean, respectively, the directors of the Corporation and Bank
> One who were selected to be directors of the Corporation by the Corporation or
> Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10
> of the Merger Agreement.

> (c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect
> Mr. Dimon to, any of the positions specifically provided for in this Section 2.09
> and in the employment agreement between the Corporation and Mr. Dimon (the

"Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

57.     According to an Institutional Shareholder Services report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

58.     Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

59.     The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars to Bank One shareholders, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

***60.     By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other Individual Defendants cost JPMC shareholders***

*over $7 billion of value and substantially diluted their stake in the new, combined company merely so Harrison could remain CEO.*

61.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined. In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Thus, the value of Harrison's leadership to JPMC is dubious at best, especially when compared to the performance of Bank One under Dimon. Nevertheless, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted. Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

62.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

63.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

64.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

65.    London's Sunday Telegraph reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: *"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."* [Emphasis added.]

66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

67.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

68.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

69.    The <u>Australian</u> reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[....]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

70.    <u>Retail Banker International</u> reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." <u>Retail Banker International</u> quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

71.    <u>Retail Banker International</u> further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth

transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

72.     The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community.  One analyst asked Harrison:

> With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

73.     Harrison's answer was evasive:

> It's all part of creating a structure in a negotiation process that works for both firms.  I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance.  And as I said before, I will stay around as Chairman as long as Jamie wants me.

74.     Another analyst also probed the issue:

> Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

75.     Dimon delivered a non-answer:

> You've got to think a little bit that these are two large organizations coming together.  You want the teams to meld.  I have a lot to learn there.  Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

76.     Harrison passed on such opportunities to disclose that, in fact, he had been presented with that precise alternative -- a merger of equals with no premium at all for Bank One.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and receive a smaller share of the combined company.

77.     Now that the Merger has been consummated, Harrison appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  Thus, even though Harrison gave away billions of dollars of

- 18 -

value from JPMC shareholders to retain his CEO title for another two years, in many respects Dimon already functions as the de facto CEO of the combined entity.

78.     Harrison kept the CEO title to shape a graceful exit for himself. In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal...."

79.     By entrenching himself with the CEO title for another two years at a cost to JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of loyalty owed to the public shareholders of JPMC. The other Individual Defendants also breached their duty of loyalty by approving the Merger with a significant acquisition premium solely to secure a benefit for Harrison to the detriment of JPMC shareholders.

80.     The Individual Defendants' fiduciary obligations under these circumstances required them to evaluate the Merger and obtain the best value for JPMC's public shareholders. Instead, the Individual Defendants agreed to the Merger at a price that gave more than $7 billion of value belonging to JPMC shareholders to Bank One shareholders just so Harrison could keep his title and did not disclose to JPMC's shareholders the opportunity to merge with Bank One without paying any acquisition premium at all. Acting individually and in concert and aiding and abetting and conspiring with one another, the Individual Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

81.     The Joint Proxy Statement sent by Defendants to JPMC shareholders on or about April 21, 2004 in connection with the Merger made no mention at all of the Individual Defendants' rejection of the opportunity to merge Bank One into JMPC without any acquisition premium. Although Defendants were fully aware of the negotiations, not once does the Proxy Statement advise shareholders that a merger of equals was contemplated but rejected because

Harrison wanted to keep his CEO title. Defendants knew that the Joint Proxy Statement failed to disclose such critical information and clearly intended to induce JPMC shareholders to approve the Merger. Defendants took pains to describe the negotiation process in great detail but carefully omitted any reference to the crucial facts regarding the acquisition premium:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.
>
> During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.
>
> Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.
>
> The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered

into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions

with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

...

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

82.    The Joint Proxy Statement advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

83.    On May 25, 2004, in justifiable reliance on the materially deceptive Joint Proxy

Statement and having been kept in the dark about the full truth concerning the terms of the deal,

JPMC shareholders approved the Merger.  According to a Dow Jones Newswire report:

> While the merger was approved, *some shareholders did express concern that the*
> *$58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that *Bank One will get the*
> *sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in
> the last quarter. Bank One will obtain J.P. Morgan's investment-banking
> expertise, its international capability and half of the company's board of directors,
> he said. And given the fact that Bank One's Chief Executive James Dimon will
> take on the role of J.P. Morgan's top officer two years from the conclusion of the
> merger, the shareholder said, *"It appears as if we're merging into them."*
>
> *The statement was met with loud applause from the shareholders who attended*
> *the meeting.* [Emphasis added.]

84.    According to <u>Investor's Business Daily</u>:

> The support for an *immediate Dimon regime* became palpable when J.P. Morgan
> shareholders met last month to approve the deal. The agreement passed with 99
> percent approval, but one shareholder complained that Bank One was getting the
> better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of
> the meeting.
>
> "Historically, I don't know if the market's been that happy with J.P. Morgan or
> the old Chase's management," said James Mitchell, an analyst with Buckingham
> Research. "Dimon is seen as a savior for the franchise while Harrison has been
> hands off."

85.    On July 1, 2004, after Plaintiffs had commenced this action, JPMC completed its

Merger with Bank One.

86.    JPMC defrauded JPMC shareholders who would not have voted in favor of the

Merger had they known that Dimon was willing to merge Bank One into JPMC for no

acquisition premium if Harrison would relinquish his CEO title immediately.  In light of their

concerns about the hefty amount being paid to merge with Bank One, that information was

plainly critical to JPMC shareholders.  Defendants concealed the information to prevent JPMC

shareholders from discovering it and remained silent in the face of a duty to speak. Defendants intended to induce JPMC shareholders to vote in favor of the Merger. JPMC shareholders approved the Merger in justifiable reliance on Defendants' representations to them, including the Joint Proxy Statement.

87.     Plaintiffs and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction. As a result of the Merger, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, hold approximately 58 percent of the combined entity. If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, would now hold approximately 61 percent of the combined entity.

88.     Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Joint Proxy Statement, to solicit their approval of the Merger. JPMC paid for the distribution of the Joint Proxy Statement and for all other efforts to solicit proxies in favor of the Merger.

89.     At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board. JPMC is vicariously liable for Harrison's actions.

90.     Plaintiffs and all other members of the Class have no adequate remedy at law.

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the representatives of the Class;

B.    Rescinding and setting the Merger aside or awarding rescissory damages to the Class;

C.    Awarding the Class compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

D.    Awarding Plaintiffs their costs and disbursements, including the fees of Plaintiffs' counsel and experts, and reimbursement of expenses; and

E.    Granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

DATED:        September 2, 2004

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By: /s/ Seth D. Rigrodsky
Seth D. Rigrodsky (#3147)
Joseph N. Gielata (#4338)
919 N. Market Street, Suite 411
Wilmington, DE 19801
Tel:  (302) 984-0597
Fax:  (302) 984-0870
- *and* -
Steven G. Schulman
Richard H. Weiss
One Pennsylvania Plaza
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229

**BULL & LIFSHITZ, LLP**
Joshua M. Lifshitz
Peter D. Bull
Christine A. Giovannelli
18 East 41st Street
New York, NY 10017
Tel:  (212) 213-6222
Fax: (212) 213-9405

*Plaintiffs' Co-Lead Counsel*


**LAW OFFICES OF**
  **CHARLES J. PIVEN, PA**
Charles J. Piven
The World Trade Center - Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
(410) 986-0036

**MURRAY FRANK & SAILER LLP**
Eric Belfi
Jacqueline Sailer
275 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

*Plaintiffs' Counsel*