**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
SAMUEL I. HYLAND, individually and on         :
behalf of all others similarly situated,      :
                                              :
                 Plaintiff,                   :
                                              :
            v.                                :    Case No. 1:05-cv-162 (JFF)
                                              :
WILLIAM B. HARRISON, JR., HANS W.             :
BECHERER, RILEY P. BECHTEL,                   :
FRANK A. BENNACK, JR., JOHN H.                :
BIGGS, LAWRENCE A. BOSSIDY,                   :
M. ANTHONY BURNS, ELLEN V.                    :
FUTTER, WILLIAM H. GRAY, III,                 :
HELENE L. KAPLAN, LEE R. RAYMOND,             :
JOHN R. STAFFORD, J.P. MORGAN                 :
CHASE & CO., and JAMES DIMON,                 :
                                              :
                 Defendants.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

## AFFIDAVIT

Michael A. Cooper, being duly sworn, deposes and says:

1. I am Of Counsel to the firm of Sullivan & Cromwell LLP, attorneys for the

individual defendants in the above-captioned action. I have made application, by

certification dated March 29, 2005, to be admitted to the bar of this Court *pro hac vice*

for the purpose of appearing in this action. I submit this affidavit in opposition to

plaintiff's motion for an injunction barring the prosecution of related state court class

actions, including specifically *In re J.P. Morgan Chase Co. Shareholder Litigation,*

No. 531-N (Del. Ch.) (filed June 29, 2004).

2. This action arises out of the merger of J.P. Morgan Chase & Co. ("JPMC"),

incorporated in Delaware, and Bank One (the "Merger"). The Merger was announced on

January 14, 2004. The Joint Proxy Statement for the Merger was filed with the United

States Securities and Exchange Commission on April 19, 2004. On May 25, 2004, the JPMC shareholders held a special meeting at which 99.18% of the votes were cast in favor of the Merger. The Bank One shareholders having also voted in favor, the Merger became effective on July 1, 2004.

3. On Sunday, June 27, 2004, the *New York Times* printed a lengthy feature article on the Merger, in the middle of which the following sentences appeared: "Mr. Dimon [the Bank One CEO], always the tough deal maker, offered to do the deal for no premium if he could become Chief Executive immediately, according to two people close to the deal. When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison pushed down to 14 percent." Landon Thomas, Jr., *The Yin, the Yang and the Deal*, N.Y. TIMES, June 27, 2004, § 3 (Sunday Business), at 1. A copy of the *New York Times* article is appended as Exhibit A.

4. On June 29, two days after the above-described *New York Times* article appeared, a lawyer representing a JPMC shareholder filed a complaint in the Delaware Court of Chancery alleging that the JPMC Board members had breached their fiduciary duties of loyalty and care by failing to accept Dimon's "offer" and that the Joint Proxy Statement was false and misleading for having failed to disclose the "offer," in violation of the Board's duty under Delaware law to make full and fair disclosure to shareholders. *Taylor* v. *Harrison*, No. 531-N (Del. Ch.) (filed June 29, 2004). This was the first action by or on behalf of JPMC shareholders filed after the announcement of the Merger five months previously on January 14. On June 30, two essentially identical complaints were filed in the Delaware Court of Chancery on behalf of two other JPMC shareholders.

*Robins* v. *Harrison,* No. 533-N (Del. Ch.) (filed June 30, 2004); *Ziegler* v. *Harrison*, No. 534-N (Del. Ch.) (filed June 30, 2004).

5. The foregoing three actions were consolidated by order dated July 19, 2004, and on September 2, plaintiffs filed their Consolidated Complaint alleging the same claims that had been pleaded in the original separate actions. A copy of the Consolidated Complaint is appended hereto as Exhibit B. The caption of the consolidated actions was changed to *In re J.P. Morgan Chase & Co. Shareholder Litigation.*

6. On September 22, defendants filed a notice of motion to dismiss the Consolidated Complaint under Court of Chancery Rule 12(b)(6), the Delaware analogue to FED. R. CIV. P. 12(b)(6). The motion was argued in the Chancery Court on January 13, 2005, and remains *sub judice.* Pending decision of the motion to dismiss, discovery was stayed by order filed October 7, 2004.

7. On Thursday, March 17, 2005, the complaint in this action was filed on behalf of three putative partly overlapping and partly conflicted classes alleging violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 and §§ 10(b), 14(a) and 20 of the Securities Exchange Act of 1934 and charging the individual JPMC director defendants with having violated their duty of loyalty and their duty to make fair disclosure to JPMC shareholders. The gravamen of the action is *exactly* the same as that of the Court of Chancery action, namely, that the JPMC Board members (i) breached their fiduciary duty of loyalty in rejecting Bank One CEO Dimon's "offer" to merge with no premium if he could become CEO immediately (instead of two years after the Merger, as the Merger Agreement provided), (ii) wrongfully failed to disclose that offer in the Merger Proxy

Statement, and (iii) caused JPMC to pay an unnecessary premium of approximately $7 billion.

8.    Also on Thursday, March 17, plaintiff's counsel, Joseph N. Gielata, wrote to Vice Chancellor Stephen P. Lamb, who presides over the consolidated JPMC shareholder litigation in the Court of Chancery, requesting that the Vice Chancellor "dismiss the State Action sua sponte for lack of equity jurisdiction, or, in the alternative, stay the State Action in favor of [this] Action." (Citation omitted.) A copy of Mr. Gielata's letter is annexed as Exhibit C.

9.    The following day, plaintiffs' counsel in the Chancery Court proceedings, Seth Rigrodsky of Milberg Weiss Bershad & Schulman LLP, responded to Mr. Gielata's letter, informing Vice Chancellor Lamb that Mr. Gielata had until the previous month been associated with the Milberg Weiss firm and was asking the Court to dismiss an action in which he had himself participated in drafting the complaint and opposing the defendants' motion to dismiss. In his letter, a copy of which is appended as Exhibit D, Mr. Rigrodsky noted the undeniable fact that Mr. Gielata's conduct was "in blatant disregard of his loyalty to his former clients," in violation of Rule 1.9 of the Rules of Professional Conduct. Plaintiffs' counsel opposed Mr. Gielata's request for a dismissal or stay, as did defendants' counsel by separate letter, dated March 21, a copy of which is appended as Exhibit E.

10.    There have been no settlement discussions between the parties to the

Court of Chancery consolidated action, nor are any settlement discussions planned.


Michael A. Cooper
U.S.D.C. S.D.N.Y. MC-5748
Sullivan & Cromwell LLP
125 Broad Street
New York, New York  10004


Sworn to before me this
5th day of April, 2005

RITA I. LYNSKEY
Notary Public, State of New York
No. 4884650
Qualified in Kings County
Certificate Filed in New York County
Commission Expires Jan 26, 2007

# EXHIBIT A

# TO THE

# AFFIDAVIT OF

# MICHAEL A.COOPER

1 of 2 DOCUMENTS

Copyright 2004 The New York Times Company
The New York Times

June 27, 2004 Sunday
Late Edition – Final

**SECTION:** Section 3; Column 5; SundayBusiness; Pg. 1

**LENGTH:** 2453 words

**HEADLINE:** The Yin, the Yang and the Deal

**BYLINE:** By LANDON THOMAS Jr.

**BODY:**

STANDING before his most senior executives in a packed room last week, William B. Harrison Jr., the chief executive of J.P. Morgan Chase, was doing what he loves best: selling a merger. Just eight days remained before the official union of J.P. Morgan and Bank One — a combination that will create the world's second-largest financial institution, after Citigroup, bring James Dimon back to Wall Street and cap a long, sometimes painful journey for Mr. Harrison.

His jacket off, his glasses riding low on his nose, Mr. Harrison ranged back and forth behind the lectern for close to 45 minutes. For inspiration, he cited the teamwork of the Detroit Pistons in upsetting the Los Angeles Lakers this year for the N.B.A. championship; for laughs, he played a 19-year-old video showing David Letterman, then at NBC, breaking into the General Electric building in a vain but hilarious attempt to meet his new boss, John F. Welch Jr., the chief executive of G.E. who had just bought NBC.

"The Pistons didn't have anyone," Mr. Harrison said, his voice rising. "A team beats superstars every time — that's execution. The difference between good and great is going to be execution. Let's be the best. With that, Jamie, I turn it over to you."

Leaping up from his front-row seat, Mr. Dimon reached to shake his boss's proffered hand, then pulled his own hand back sharply with a grin. For a few seconds, Mr. Harrison's hand remained outstretched as Mr. Dimon bounded past him.

The gesture was a joke, a playful take on the video, in which Mr. Letterman's offered hand was also spurned by security guards — "the G.E. corporate handshake," Mr. Letterman called it. But while Mr. Dimon clearly meant no disrespect for Mr. Harrison, a man he often praises as a friend and a business partner, his clumsy prank underscored just how delicate — and unusual — this merger is.

Mr. Harrison may be the acquirer and the chief executive in name, but it is becoming increasingly clear that Mr. Dimon and his posse will call many of the shots. A majority of that group worked with Mr. Dimon at Citigroup during his glory days as Sanford I. Weill's No.2.

Odd as it may seem, J.P. Morgan, the prestigious 200-year-old financial institution that has catered to the Rockefellers and the cream of corporate America, is on the verge of being swallowed by a bank from Chicago with roots in Columbus, Ohio.

The merger, which becomes official on Thursday, comes at a difficult time for Wall Street, amid rising interest rates, shrinking trading profits, increased regulatory scrutiny and a wave of lawsuits related to corporate missteps and scandals.

All of that puts added pressure on the relationship between Mr. Dimon and Mr. Harrison and their ability to oversee a smooth transition while generating the profits and the big deals that investors demand.

Generally, the chief executive doing the buying — in this case Mr. Harrison, who paid $58 billion for Bank One — would be the one burrowing into the nooks and crannies of the acquired business, placing his people in charge and presiding over an exodus of lame-duck executives. That is what happened when Mr. Harrison, then the chief executive of Chase Manhattan, bought J.P. Morgan in 2000 for $35 billion. Within months, Douglas A. Warner III, the chief executive

The New York Times June 27, 2004 Sunday

of J.P. Morgan, and many of his senior bankers departed, leaving Mr. Harrison and his crew in charge.

But this time, it is Mr. Dimon who is doing the heavy lifting. And that is just how Mr. Harrison planned it. Mr. Dimon will plumb the operational depths of the new entity as president and take over as chief executive two years later. That frees Mr. Harrison for other pursuits, like his trip last week to Beijing, where he rubbed shoulders with members of J.P. Morgan's advisory council, including two former secretaries of state, Henry A. Kissinger and George P. Shultz.

THAT is not to say that Mr. Harrison has been detached. He meets with Mr. Dimon daily. He has also led all the bank's in-house leadership training sessions, which he set up in 2002 and modeled after Mr. Welch's highly regarded program at G.E.

So far, the bloody purges that characterize most mergers are lacking. There has been just one significant departure: Donald H. Layton. He was not only a J.P. Morgan man, as vice chairman for risk and finance, but he had also been a member of Mr. Harrison's inner circle since 1991.

Mr. Dimon, who has been in New York since early May, recently moved into Mr. Layton's spacious office on the executive floor of J.P. Morgan's headquarters on Park Avenue in Midtown Manhattan and is working 12-hour days as he explores the complex financial institution that he will inherit in two years.

For two men who are expected to work so closely together until then, Mr. Dimon and Mr. Harrison present a striking contrast in styles, personalities and backgrounds.

Mr. Harrison, 60, whose father and grandfather were bankers in Rocky Mount, N.C., is an amiable but distant man, who with his soft Southern accent and dignified manner might well have stepped out of a Walker Percy novel. His harder-edged peers sometimes refer to him as the last gentleman on Wall Street, representative of a less rapacious era.

He says he was never bent on a Wall Street career. But after he entered the training program at Chemical Bank in 1967, he never returned to North Carolina. Over the next 37 years, his small-town-banker demeanor helped him survive internal battles and a series of mergers to become chief executive of Chase Manhattan in 1999.

Mr. Harrison embarked on his own takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J.P. Morgan in 2000, just before the stock market collapsed.

Then there is Mr. Dimon, who is 48. His grandfather immigrated from Greece to New York City in 1919 and worked his way up from dishwasher to stockbroker. Mr. Dimon's father, also a broker, is approaching his 50th anniversary at Smith Barney.

While Mr. Harrison's Wall Street career may have been accidental, Mr. Dimon's seemed preordained. "I was reading annual reports in high school," he said.

It was through his father that he met Mr. Weill, and he went to work for him during Mr. Weill's last days at American Express. He stayed with him as Mr. Weill built his second financial colossus, starting with a second-tier consumer finance company in Baltimore and ending with today's Citigroup.

Mr. Dimon's ability to deconstruct balance sheets and cut costs endeared him to Mr. Weill during his spree of takeovers, but it was his deal-making acumen and TV anchorman looks that attracted a cultlike following in the later years. Even now, as Mr. Dimon strides about his new home on Park Avenue, popping unannounced into the offices of surprised executives, his aura remains intact.

"The guy is a rock star," said James B. Lee Jr., a vice chairman of J.P. Morgan Chase, as he recounted how Mr. Dimon helped land a big underwriting deal recently, even before the merger becomes official.

But the merger gives Mr. Harrison and Mr. Dimon more than a chance to flex larger muscles in the financial arena. It also offers both the promise of redemption.

After he was fired by Mr. Weill in a power struggle in 1998, Mr. Dimon abandoned Wall Street. He began his comeback by taking over Bank One; now he will be challenging his former mentor's company for supremacy.

Mr. Harrison, for his part, has endured two years of negative publicity as J.P. Morgan's stock plunged to a low of $16, down 70 percent from its high of $52 in early 2001, because of its broad exposure to Enron and imploding telecommunications companies. In Mr. Dimon, he may have found an ideal successor — a Wall Street hero who can recharge J.P. Morgan's flagging reputation among investors.

The New York Times June 27, 2004 Sunday

Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

Mr. Harrison sought counsel from a small group of people, most prominently Mr. Welch, who had been advising him on a range of matters since 2002. Mr. Welch refuses to take any credit for the merger, but he said he spent lots of time on the phone with Mr. Harrison as he contemplated combining with Bank One.

"He is a strong and principled guy," Mr. Welch said of Mr. Harrison, by phone from Beijing. "Bill always does the right thing. He was willing to merge the bank and maybe leave earlier than he had planned."

But not too early.

During the negotiations with Mr. Dimon, he fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.

When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations.

In addition to holding their strategic discussions, Mr. Welch and Mr. Harrison spent significant time together honing the executive training program at J.P. Morgan. Mr. Welch was particularly impressed with Mr. Harrison's use of a group exercise in which senior J.P. Morgan executives, including Mr. Harrison, wrote on a board the personal and professional experiences — the more painful the better — that helped them to evolve as people. "Bill was very good at it," Mr. Welch said. "It makes you become simpatico with the guy."

Mr. Harrison takes his reputation as a merger connoisseur seriously, and he is sensitive to claims by some analysts that his deals, conducted at the market's peak, did not serve shareholders well.

He contends that the merger that created J.P. Morgan Chase was well executed, but that the new entity struggled "because Enron, telecom and private equity blew up."

"So I would say that all of our mergers have been executed well and that needs to be clarified," he said. "This deal will create a higher standard."

Still, J.P. Morgan's stock performance remains lackluster, although it has rallied from its lows of two years ago and is now trading at $38.

Michael L. Mayo, a banking analyst at Prudential Securities, found that since June 1999, when Mr. Harrison became chief executive, J.P. Morgan's stock has fallen a cumulative 6 percent. It ranked last among 17 bank stocks he examined. In third place was Bank One, which has returned 13 percent since Mr. Dimon became chief in March 2000.

For the most part, investors have applauded the deal. The addition of Bank One's retail bank network is expected to smooth out J.P. Morgan's earnings, decreasing its exposure to volatile capital markets and bank lending.

Investors also hope that Mr. Dimon can work his magic again. "The sense on the street is that the day-to-day operations will be run by Jamie," said Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

Indeed, many major units — including retail banking, credit cards, risk and technology — will be run by Mr. Dimon and his team.

The two executives who will be in charge of investment banking are from the J.P. Morgan side, but one of them, Steven D. Black, who already held the job, is a longtime friend of Mr. Dimon's dating back to the days the two worked for Mr. Weill at Smith Barney.

Mr. Dimon is well aware of the pressures that face him. Every Sunday night, he draws up a list of the most unpleasant things he must do the next day; often, they are sensitive personnel matters. "Making this thing hum is job one right now because that creates other opportunities," he said. "I think we have a fabulous opportunity to make this the best financial service company in the world. But expectations are high. I know that."

The New York Times June 27, 2004 Sunday

If he follows through with the $2.2 billion in cost cuts he has promised, the stock will probably move up, giving him the currency to buy what J.P. Morgan now lacks — a brokerage network and a retail banking presence in Europe or in the fast-growing southeastern United States.

While analysts expect cost-cutting to drive the stock price, they also warn that J.P. Morgan may need to reserve as much as $3 billion to cover litigation over its involvement in the Enron and WorldCom bankruptcies.

The stock price is a constant theme in their speeches, but both men say their primary focus now is pulling the two banks together.

One recent evening, 200 senior bankers from both companies gathered for a dinner at J.P. Morgan's headquarters, capping a day of corporate-integration meetings. As Mr. Harrison and Mr. Dimon picked at their filet mignon platters, they again found reassurance in Mr. Welch, who appeared on multiple screens surrounding the diners. "Execute. Get it done," Mr. Welch called out to his rapt audience, with his raspy, Back Bay twang, in a recorded video clip.

Their dinners finished, Mr. Dimon and Mr. Harrison stepped up to the lectern for a closing interview, conducted by Mr. Lee. "Tell us some personal things about yourselves, Jamie and Bill," Mr. Lee said.

AFTER a brief pause, Mr. Harrison talked about growing up in North Carolina, coming to New York, all the blind dates he went on before marrying at the age of 42 and how his daughters, 11 and 13, greet him when he arrives home in Greenwich, Conn: "Hey, Billy boy. How were things at the office?"

As the crowd roared with laughter, Mr. Dimon took his turn. He recalled the reaction of the eldest of his three daughters when he told her that he had been fired from Citigroup. "Can I have your cellphone now? I guess you won't need it," she said.

For all their differences — and despite Mr. Dimon's jocular gesture that same afternoon — the two looked comfortable on stage, a Wall Street version of a two-man vaudeville act. They finished each other's sentences, knew where to go for the laughs and sounded the same themes about the importance of a unified culture to a successful merger.

Then Mr. Lee asked the million-dollar question: What about the stock price?

Mr. Harrison went first, cautiously. "There is huge upside," he said. "If we start performing, our stock is 45."

Without hesitation, Mr. Dimon raised a grander goal. "If we do our jobs and get the $2.2 billion in cost saves, in five years if the stock is not $100, I will eat my hat," he said.


**URL:** http://www.nytimes.com

**GRAPHIC:** Photos: James Dimon, left, incoming president, and William B. Harrison Jr., chief executive of J.P. Morgan Chase. (Photo by Chester Higgins Jr./The New York Times)(pg. 1)
John F. Welch Jr., the former G.E. chief, offered counsel and reassurance about the deal. (Photo by Agence France-Presse) Mr. Harrison and Mr. Dimon, selling the merger to analysts in January. The deal offered both men more than a chance to flex financial muscle. (Photo by Associated Press)(pg. 4)

**LOAD-DATE:** June 27, 2004

# EXHIBIT B

# TO THE

# AFFIDAVIT OF

# MICHAEL A.COOPER

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION | CONSOLIDATED C.A. No. 531-N |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, for their Consolidated Complaint against Defendants, allege, upon personal knowledge with respect to themselves, and, as to all other matters, upon the investigation of counsel, which has included, among other things: (i) interviews of persons with knowledge and information concerning the matters alleged herein; (ii) review and analysis of public filings concerning the matters alleged herein; (iii) review and analysis of news articles, press releases, and analysts' reports concerning the matters alleged herein; and (iv) consultations with experts. Plaintiffs believe that further evidentiary support for the allegations set forth below will exist after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of public shareholders of J.P. Morgan Chase & Co. ("JPMC" or the "Company") against JPMC, its Chief Executive Officer and Chairman (William B. Harrison, Jr.), and other persons who were directors of JPMC during the relevant time to seek relief relating to the recent merger (the "Merger") of JPMC and Bank One Corporation ("Bank One"). According to persons close to the deal, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all,* provided only that Bank One's highly successful CEO, James Dimon, immediately become CEO. Instead, for the sole purpose of allowing Harrison to keep the title of CEO for another two years, Defendants caused JPMC shareholders to pay a significant acquisition premium -- amounting to more than $7 billion in

stock, a substantial dilution of JPMC shareholders' stake. *JPMC shareholders approved the Merger without having been advised of these essential facts by Defendants.* Confirming the critical importance of the information, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger and expressed concerns about Harrison's remaining in that position as well as about the Merger's dilutive impact. The Defendants violated their duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.

2.      Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to pay a premium for Bank One just so Harrison could stay on as CEO for another two years, even though JPMC's performance, stock price, and reputation have languished under his leadership and certainly JPMC shareholders would have preferred Bank One's successful and respected CEO lead the combined company.

## THE PARTIES

3.      At all relevant times, Plaintiffs Ronda Robins, George Ziegler, and Bruce T. Taylor, as custodian for Julia Ann Taylor, have owned JPMC common stock.

4.      Defendant JPMC is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, NY 10017. JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

5.    Defendant William B. Harrison, Jr. has served as Chief Executive Officer and Chairman of the Board of Directors of JPMC since 1999.

6.    Defendant Hans W. Becherer was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998.

7.    Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting. Defendant Bechtel was not an independent director because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country. The Trade Bank of Iraq is managed by JPMC. The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.

8.    Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC. He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004. He has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

9.    Defendant John H. Biggs was, during the relevant time, a director of JPMC. He has been a director of JPMC since March 2003.

10.     Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998. Bossidy is not an independent director because his son is employed by JPMC as a Vice President.

11.     Defendant M. Anthony Burns was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting. Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

12.     Defendant Ellen V. Futter was, during the relevant time, a director of JPMC. She has been a director of JPMC or a predecessor institution since 1997. Futter is not an independent director because her brother-in-law is employed by JPMC as a managing director. In addition, JPMC is a significant benefactor of The American Museum of Natural History, of which Futter is President and Trustee. Among other things, the Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation.

13.     Defendant William H. Gray, III was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1992. Gray is not an independent director because JPMC is a National Sponsor of The College Fund/UNCF, of which Gray was President and CEO at all relevant times.

14.     Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC. She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004. Kaplan was not an independent director because she is a Trustee and Vice-Chair of The American Museum of Natural History, of which, as previously alleged, JPMC

is a significant benefactor. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

15.     Defendant Lee R. Raymond was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1987.

16.     Defendant John R. Stafford was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1982. He has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003. He was Chairman of the Board from 1986 until 2003. Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001. Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.

17.     Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

18.     By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required: (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to make appropriate disclosure to JPMC shareholders of all material facts concerning the Merger; (d) to disseminate a complete and accurate Proxy Statement; and (e) to refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action on their own behalf and as a class action, pursuant to

Rule 23 of the Court of Chancery, on behalf of the Class consisting of all persons who owned

JPMC common stock on the date the Merger was announced (January 14, 2004) and continued to

own such stock through the date the Merger closed (July 1, 2004).  Excluded from the Class are

Defendants herein; any person, firm, trust, corporation, or other entity related to or affiliated with

any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded

person; and any entity controlled by any excluded person.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable.  There

were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held

by thousands of JPMC stockholders who are members of the Class.

22.     Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class were similarly damaged by Defendants' wrongful conduct as complained

of herein.

23.     Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and shareholder litigation.

Plaintiffs have no interests that are in conflict with the interests of the Class.

24.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:  (a) whether Defendants breached fiduciary

and other common law duties owed by them to Plaintiffs and other members of the Class; and (b)

whether the Class is entitled to relief as a result of Defendants' wrongful conduct.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.     Defendants have acted in a manner which affects Plaintiffs and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

27.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## BACKGROUND

28.     In June 1999, Defendant Harrison became Chief Executive of Chase Manhattan, the predecessor of JPMC, and embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J. P. Morgan in 2000, just before the stock market collapsed. In a February 23, 2004 interview with Harrison on CNBC, the interviewer noted: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

29.     According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large

strategic acquisitions…" However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

30.    The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that *few would have given odds on him even surviving the year,* let alone clawing his way back to pull off one of the biggest banking mergers of all time.

> Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

> What's more, *it seemed to be largely Harrison's fault.* At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

31.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent. Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent. JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

32.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

33.    On September 18, 2002, <u>The Wall Street Journal</u> published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Harrison

concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

34.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

35.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal.

36.    A July 22, 2004 <u>Wall Street Journal</u> article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

37.    Whereas JPMC shareholders have suffered under Harrison's reign, James Dimon, Chairman and Chief Executive Officer of Bank One, has created tremendous value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

## DEFENDANTS' WRONGDOING

38.    The fallout from various scandals, as well as his poor business decisions, forced Harrison to conjure yet another massive deal to protect his position.

39.    During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

- 9 -

40.     According to the Joint Proxy Statement sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.

41.     At a meeting of the JPMC Board (consisting of the Individual Defendants) on November 18, 2003, Harrison briefed the full Board on his discussions with Dimon. The JPMC Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

42.     In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million. Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

43.     The January 19, 2004 _Financial Times_ described the negotiation process:

"There was a **_spectrum of outcomes_ in terms of premium and governance:** _Jamie laid them out_ and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the **terms of his succession.** [Emphasis added.]

44.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO. Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger. Little did JPMC shareholders know that buying this extra time for Harrison would cost them **billions** of dollars.

45.     According to a June 27, 2004 _New York Times_ article:

During the negotiations with Mr. Dimon, [Harrison] fought hard to **give himself the two extra years**, to secure a smooth transition, **although he may have**

- 10 -

*cost J.P. Morgan shareholders extra money* in doing so. Mr. Dimon, always the tough deal maker, *offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.*

*When Mr. Harrison resisted, Mr. Dimon insisted on a premium*, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

46.    As one observer related on eFinancialNews.com on February 8, 2004, after hearing the announcement of the Merger:

One of the first calls I received was: "That's a hell of a price that Bill Harrison is paying to recruit Jamie Dimon."

...

*Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon just to save his own skin?* [Emphasis added.]

47.    After the close of trading on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge:

NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that they have agreed to merge in a strategic business combination establishing the second largest banking franchise in the United States, based on core deposits. The combined company will have assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen states and top-tier positions in retail banking and lending, credit cards, investment banking, asset management, private banking, treasury and securities services, middle-market, and private equity. With balanced earnings contributions from retail and wholesale banking, the combined company will be well-positioned to achieve strong and stable financial performance and increase shareholder value through its balanced business mix, greater scale, and enhanced efficiencies and competitiveness.

The agreement, which has been unanimously approved by the boards of directors of both companies, provides for a stock-for-stock merger in which 1.32 shares of JPMorgan Chase common stock will be exchanged, on a tax-free basis, for each share of Bank One common stock. Based on JPMorgan Chase's closing price of $39.22 on Wednesday, January 14, 2004, the transaction would have a value of approximately $51.77 for each share of Bank One common stock, and would create an enterprise with a combined market capitalization of approximately $130 billion. The premium, based upon the average closing stock prices of JPMorgan Chase and Bank One for the previous month, would be approximately 8 percent and would be approximately 14 percent based on today's closing prices.

- 11 -

Under the agreement, the combined company will be headed by William B. Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. ...

48.    Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to

$37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22. The

drop reflected the unnecessarily dilutive impact of the Merger. In early trading the next day,

Bank One shares rose $6.28, or nearly 14 percent.

49.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. *For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.* The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".

...

*Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.* "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

50.    When the Merger was announced, the acquisition premium for Bank One shares

amounted to approximately 14 percent, based on that day's closing prices. In other words, to

merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion

in stock, which substantially diluted their individual holdings. The total value of the deal was

approximately $57 billion.

51.     Public criticism of the premium was immediate. When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive. They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

52.     James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know. It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

53.     Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

54.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

55.     The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor. Many observers considered Dimon to be the de facto CEO. *All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself*

*CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC*

*shareholders to secure that benefit for Harrison.*

56.    In connection with the Merger, JPMC amended its by-laws to include the

following provisions:

Section 2.09. CEO Position and Succession; Board Composition. (a) The
Board of Directors of the Corporation has resolved that, effective as of the
Effective Time (as defined in the Agreement and Plan of Merger, dated as of
January 14, 2004, by and between the Corporation and Bank One Corporation
("Bank One"), as the same may be amended from time to time (the "Merger
Agreement")), Mr. William Harrison shall continue to serve as Chairman of the
Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall
become the President and Chief Operating Officer of the Corporation. The Board
of Directors of the Corporation has further resolved that Mr. Dimon shall be the
successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with
such succession to become effective on the second anniversary of the Closing
Date (as defined in the Merger Agreement) or any such earlier date as of which
Mr. Harrison ceases for any reason to serve in the position of Chief Executive
Officer of the Corporation (the date of such succession, the "Succession Date"),
and that Mr. Harrison shall continue to serve as Chairman of the Board following
the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the
Corporation shall be comprised of eight Continuing Bank One Directors,
including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including
Mr. Harrison. From and after the Effective Time through the Succession Date: (i)
the number of directors that comprises the full Board of Directors of the
Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors
created by the cessation of service of a director shall be filled by a nominee
proposed by the Governance Committee of the Board of Directors, which shall be
co-chaired by one Continuing Bank One Director and one Continuing JPMorgan
Chase Director and comprised of an equal number of Continuing Bank One
Directors and Continuing JPMorgan Chase Directors (any deadlocks on the
Governance Committee shall be resolved in good faith by the non-management
members of the Board of Directors in a manner intended to preserve the principles
of representation reflected in this By-law.). For purposes of this Section 2.09, the
terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One
Directors" shall mean, respectively, the directors of the Corporation and Bank
One who were selected to be directors of the Corporation by the Corporation or
Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10
of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect
Mr. Dimon to, any of the positions specifically provided for in this Section 2.09
and in the employment agreement between the Corporation and Mr. Dimon (the

- 14 -

"Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

57. According to an Institutional Shareholder Services report analyzing the Merger: "The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

58. Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a *merger of equals*, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently *highly beneficial to ONE shareholders* considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

59. The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders. The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars to Bank One shareholders, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

*60. By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other Individual Defendants cost JPMC shareholders*

- 15 -

*over $7 billion of value and substantially diluted their stake in the new, combined company*
*merely so Harrison could remain CEO.*

61.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC

stock had the poorest performance of 17 bank stocks he examined. In third place was Bank One,

which has returned 13 percent since Dimon became CEO in March 2000. Thus, the value of

Harrison's leadership to JPMC is dubious at best, especially when compared to the performance

of Bank One under Dimon. Nevertheless, Harrison has been compensated handsomely -- in

2001, for instance, Harrison was the top paid executive of any public company even though

during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs

mounted. Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of

$1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a

restricted stock award valued at $5 million -- a total of $16 million.

62.    Harrison himself acknowledged the underperformance of JPMC under his

leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero
> who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison
> acknowledged that he had a limited time to turn things around. "If we had gone
> another year without performing, the board probably would have demanded
> changes," he said, leaning back in a plush chair in his office. "There is a point at
> which you can't go on. But in the end, I presume that they liked my leadership."

63.    Numerous comments by analysts and the press confirm that a significant rationale

for the Merger was Dimon's perceived leadership role in the combined entity.

64.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset

Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief

executive. I guess he is going to be running the show from day one."

65.    London's Sunday Telegraph reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

67.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

68.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

69.    The <u>Australian</u> reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[.…]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

70.    <u>Retail Banker International</u> reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." <u>Retail Banker International</u> quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

71.    <u>Retail Banker International</u> further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth

transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

72.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community. One analyst asked Harrison:

> With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

73.    Harrison's answer was evasive:

> It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me.

74.    Another analyst also probed the issue:

> Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

75.    Dimon delivered a non-answer:

> You've got to think a little bit that these are two large organizations coming together. You want the teams to meld. I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

76.    Harrison passed on such opportunities to disclose that, in fact, he had been presented with that precise alternative -- a merger of equals with no premium at all for Bank One. Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and receive a smaller share of the combined company.

77.    Now that the Merger has been consummated, Harrison appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz. Thus, even though Harrison gave away billions of dollars of

value from JPMC shareholders to retain his CEO title for another two years, in many respects
Dimon already functions as the de facto CEO of the combined entity.

78.     Harrison kept the CEO title to shape a graceful exit for himself. In a February 23,
2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal...."

79.     By entrenching himself with the CEO title for another two years at a cost to
JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of
loyalty owed to the public shareholders of JPMC. The other Individual Defendants also
breached their duty of loyalty by approving the Merger with a significant acquisition premium
solely to secure a benefit for Harrison to the detriment of JPMC shareholders.

80.     The Individual Defendants' fiduciary obligations under these circumstances
required them to evaluate the Merger and obtain the best value for JPMC's public shareholders.
Instead, the Individual Defendants agreed to the Merger at a price that gave more than $7 billion
of value belonging to JPMC shareholders to Bank One shareholders just so Harrison could keep
his title and did not disclose to JPMC's shareholders the opportunity to merge with Bank One
without paying any acquisition premium at all. Acting individually and in concert and aiding
and abetting and conspiring with one another, the Individual Defendants breached their fiduciary
duties to the public shareholders of JPMC by proceeding with the Merger without making the
requisite effort to secure the best transaction available or disclosing to shareholders facts highly
material to their decision to vote for or against the Merger.

81.     The Joint Proxy Statement sent by Defendants to JPMC shareholders on or about
April 21, 2004 in connection with the Merger made no mention at all of the Individual
Defendants' rejection of the opportunity to merge Bank One into JMPC without any acquisition
premium. Although Defendants were fully aware of the negotiations, not once does the Proxy
Statement advise shareholders that a merger of equals was contemplated but rejected because

- 19 -

Harrison wanted to keep his CEO title. Defendants knew that the Joint Proxy Statement failed to

disclose such critical information and clearly intended to induce JPMC shareholders to approve

the Merger. Defendants took pains to describe the negotiation process in great detail but

carefully omitted any reference to the crucial facts regarding the acquisition premium:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan
> Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One,
> have known each other for many years. From time to time they have had informal
> discussions about their respective institutions and trends in the financial services
> industry, including the increasing need for scale and diverse revenue bases.
>
> During November 2003, Mr. Harrison and Mr. Dimon had several discussions
> concerning the possibility of more seriously considering the merits of a business
> combination between JPMorgan Chase and Bank One. During these
> conversations, Messrs. Harrison and Dimon preliminarily discussed the possible
> structure of such a transaction. Based on these discussions, Messrs. Harrison and
> Dimon concluded that a transaction between the two companies could offer
> strategic benefits to the companies and their stockholders and that further
> discussions could be productive. Mr. Dimon and Mr. Harrison periodically
> updated members of their respective boards of directors about these contacts. At a
> meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr.
> Harrison briefed the board on his discussions with Mr. Dimon and was authorized
> to continue discussions regarding a possible business combination with Bank
> One. Mr. Dimon, based on his conversations with members of the Bank One
> board of directors, likewise was encouraged to continue discussions regarding a
> possible business combination with JPMorgan Chase. In November 2003, each
> party retained legal and financial advisors in the event that discussions about a
> possible transaction progressed further.
>
> Discussions between Messrs. Harrison and Dimon continued in late
> November and into December. In addition, in December meetings commenced
> between the parties' respective financial advisers. During these discussions, the
> parties began considering in more detail the potential financial and other terms
> and conditions of such a transaction, and concluded that the contemplated merger
> would be for stock consideration based on a fixed exchange ratio. The parties also
> began exchanging information regarding each company's businesses, structure
> and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief
> members of their respective boards of directors in early and mid-December and
> updated their respective boards regarding the status of discussions at board
> meetings in mid-December. At these meetings, the boards endorsed continued
> discussions.
>
> The chief financial officers of each company met in late December 2003 to
> hold additional discussions regarding a possible business combination. In
> connection with the ongoing discussions, Bank One and JPMorgan Chase entered

into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions

- 21 -

with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

. . .

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

82.     The Joint Proxy Statement advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

83.     On May 25, 2004, in justifiable reliance on the materially deceptive Joint Proxy

Statement and having been kept in the dark about the full truth concerning the terms of the deal,

JPMC shareholders approved the Merger. According to a Dow Jones Newswire report:

> While the merger was approved, *some shareholders did express concern that the $58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that *Bank One will get the sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in the last quarter. Bank One will obtain J.P. Morgan's investment-banking expertise, its international capability and half of the company's board of directors, he said. And given the fact that Bank One's Chief Executive James Dimon will take on the role of J.P. Morgan's top officer two years from the conclusion of the merger, the shareholder said, *"It appears as if we're merging into them."*
>
> *The statement was met with loud applause from the shareholders who attended the meeting.* [Emphasis added.]

84.     According to <u>Investor's Business Daily</u>:

> The support for an *immediate Dimon regime* became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of the meeting.
>
> "Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off."

85.     On July 1, 2004, after Plaintiffs had commenced this action, JPMC completed its

Merger with Bank One.

86.     JPMC defrauded JPMC shareholders who would not have voted in favor of the

Merger had they known that Dimon was willing to merge Bank One into JPMC for no

acquisition premium if Harrison would relinquish his CEO title immediately. In light of their

concerns about the hefty amount being paid to merge with Bank One, that information was

plainly critical to JPMC shareholders. Defendants concealed the information to prevent JPMC

shareholders from discovering it and remained silent in the face of a duty to speak. Defendants intended to induce JPMC shareholders to vote in favor of the Merger. JPMC shareholders approved the Merger in justifiable reliance on Defendants' representations to them, including the Joint Proxy Statement.

87.    Plaintiffs and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction. As a result of the Merger, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, hold approximately 58 percent of the combined entity. If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, would now hold approximately 61 percent of the combined entity.

88.    Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Joint Proxy Statement, to solicit their approval of the Merger. JPMC paid for the distribution of the Joint Proxy Statement and for all other efforts to solicit proxies in favor of the Merger.

89.    At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board. JPMC is vicariously liable for Harrison's actions.

90.    Plaintiffs and all other members of the Class have no adequate remedy at law.

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs demand judgment against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the representatives of the Class;

B.     Rescinding and setting the Merger aside or awarding rescissory damages to the Class;

C.     Awarding the Class compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

D.     Awarding Plaintiffs their costs and disbursements, including the fees of Plaintiffs' counsel and experts, and reimbursement of expenses; and

E.     Granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper.


DATED:     September 2, 2004

                    **MILBERG WEISS BERSHAD
                    & SCHULMAN LLP**

                    By: /s/ Seth D. Rigrodsky
                    Seth D. Rigrodsky (#3147)
                    Joseph N. Gielata (#4338)
                    919 N. Market Street, Suite 411
                    Wilmington, DE 19801
                    Tel:  (302) 984-0597
                    Fax: (302) 984-0870
                    - and -
                    Steven G. Schulman
                    Richard H. Weiss
                    One Pennsylvania Plaza
                    New York, NY 10119
                    Tel:   (212) 594-5300
                    Fax:  (212) 868-1229

- 25 -

**BULL & LIFSHITZ, LLP**
Joshua M. Lifshitz
Peter D. Bull
Christine A. Giovannelli
18 East 41st Street
New York, NY 10017
Tel:  (212) 213-6222
Fax:  (212) 213-9405

*Plaintiffs' Co-Lead Counsel*


**LAW OFFICES OF**
  **CHARLES J. PIVEN, PA**
Charles J. Piven
The World Trade Center - Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
(410) 986-0036

**MURRAY FRANK & SAILER LLP**
Eric Belfi
Jacqueline Sailer
275 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

*Plaintiffs' Counsel*

# EXHIBIT C

# TO THE

# AFFIDAVIT OF

# MICHAEL A.COOPER

# JOSEPH N. GIELATA

### ATTORNEY AT LAW
501 SILVERSIDE ROAD, SUITE 90
WILMINGTON, DELAWARE 19809
WWW.GIELATALAW.COM
TEL (302) 798-1096
FAX (302) 792-0777

March 17, 2005

**BY HAND**

The Honorable Stephen P. Lamb
Vice Chancellor
Court of Chancery
New Castle County Courthouse
500 North King Street, Suite 11400
Wilmington, DE  19801

Re:    *In re J.P. Morgan Chase & Co. Shareholder Litigation*

Vice Chancellor Lamb,

I represent a JPMorgan Chase & Co. ("JPMC") investor who has today filed in the District Court of Delaware a class action complaint, attached hereto as exhibit A, seeking damages for violations of federal securities laws and breaches of fiduciary duty (the "Federal Action"). For the reasons set forth below, I urge Your Honor to consider whether the Court of Chancery has any jurisdiction at all over the pending action captioned as *In re J.P. Morgan Chase & Co. Shareholder Litigation*, consolidated civil action number 531-N (the "State Action"). Even if Your Honor ultimately decides that the Court of Chancery has some jurisdiction over the State Action, I respectfully request that any decision on the pending motion to dismiss the State Action be deferred until the District Court of Delaware decides my client's forthcoming request for an injunction restricting proceedings in the State Action.

*The Seventh Amendment Guarantees a Trial by Jury*

The Federal Action demands a trial by jury, as guaranteed by the Seventh Amendment to the United States Constitution, which provides:

> In Suits at common law, where the value in controversy
> shall exceed twenty dollars, the right of trial by jury shall
> be preserved, and no fact tried by a jury, shall be otherwise
> re-examined in any Court of the United States, than
> according to the rules of the common law.

Vice Chancellor Lamb
March 17, 2005, page 2

*See also In re Markel*, 254 A.2d 236, 239 (Del. Supr. 1969) (noting that Article I, § 4 of the Delaware Constitution also guarantees the right to a trial by jury).

The primary purpose of this Amendment is the preservation of "the common law distinction between the province of the court and that of the jury, whereby, in the absence of express or implied consent to the contrary, issues of law are resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court." *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657 (1935). In enforcing a federally created right, such as the rights under federal securities laws, the states may not eliminate trial by jury as to one or more elements. *See Dice v. Akron, C. & Y. R.R.*, 342 U.S. 359 (1952).

In *Ross v. Bernhard*, 396 U.S. 531 (1970), involving a stockholder derivative action, the Court agreed that the action was equitable but asserted that it involved two separable claims. The first, the stockholder's standing to sue for a corporation is an equitable issue; the second, the corporation's claim asserted by the stockholder, may be either equitable or legal. *Id.* at 534-35. Because the 1938 merger of law and equity in the federal courts eliminated any procedural obstacles to transferring jurisdiction to the law side once the equitable issue of standing was decided, the Court continued, if the corporation's claim being asserted by the stockholder was legal in nature, it should be heard on the law side and before a jury. *Id.* at 539.

Although the claims in the Federal Action and State Action are not derivative, *Ross* affirms the importance of presenting claims at law before a jury even if a case contains some equitable feature. In particular, evaluations of materiality, involving as they do "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him ... are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc.*, 426 US 438 (1976); *see also United States v. Gaudin*, 515 U.S. 506 (1995) (holding that failure to present the question of materiality to a jury violates the Fifth and Sixth Amendments). Both the Federal Action and the State Action attack JPMC's materially misleading proxy statement, and it is for a jury to evaluate whether the alleged omissions are material. Thus, the State Action must be dismissed, stayed or enjoined to avoid any violation of the constitutional rights of the thousands of members of not only the Federal Action class, but also unnamed members of the State Action class.

*Federal Law Mandates That The*
*Litigation Belongs In District Court*

Even if the State Action could somehow overcome the constitutional violation described above, several federal statutes make clear that this litigation cannot be maintained in state court.

*PSLRA*

In *In re BankAmerica Corp. Securities Litigation*, 95 F. Supp. 2d 1044 (E.D. Mo. 2000) (attached hereto as exhibit B), *aff'd*, 263 F.3d 795 (8th Cir. 2001) (attached hereto as exhibit C), *cert. denied*, 535 U.S. 970 (2002), District Judge John F. Nangle enjoined the law firm of Milberg Weiss from prosecuting any claims arising out of or relating to

Vice Chancellor Lamb
March 17, 2005, page 3

the merger between BankAmerica Corporation and NationsBank Corporation and related non-disclosures or misrepresentations. Further, the District Court enjoined a California state court from certifying any class(es), or ordering any mediation, arbitration, or other alternative dispute resolution, in a state court action filed by Milberg Weiss.

Judge Nangle granted this sweeping injunction in favor of a federal securities litigation concerning the same merger and misrepresentations after reviewing applicable federal statutes. Noting that the Private Securities Litigation Reform Act of 1995 requires federal courts to appoint a lead plaintiff, Judge Nangle observed that:

> When it became clear that the firm's clients lacked the financial stake to become lead plaintiffs in the federal case, and thereby select Milberg Weiss as lead counsel, Milberg Weiss dismissed the federal case to focus on the California cases where no financial stake rules govern the selection of lead plaintiffs and lead counsel.

95 F. Supp. 2d at 1046.

The PSLRA provides that the most adequate plaintiffs, those with the largest financial interest in the relief sought by the class, shall be appointed lead plaintiffs. 15 U.S.C. §§ 77z-1(a)(3)(B), 78u-4(a)(3)(B). Plaintiffs seeking to be lead plaintiff must certify that they did not purchase the security at the direction of counsel or in order to participate in any private action arising under the securities laws. 15 U.S.C. §§ 77z-1(a)(2)(A)(ii), 78u-4(a)(2)(A)(ii). Further, no person may serve as lead plaintiff in more than five securities class actions in any three-year period unless the court permits otherwise. 15 U.S.C. §§ 77z-1(a)(3)(B)(vi), 78u-4(a)(3)(B)(vi). Finally, the plaintiff selected as most adequate plaintiff has the right to select class counsel subject to the approval of the court. 15 U.S.C. §§ 77z-1(a)(3)(B)(v), 78u-4(a)(3)(B)(v).

### All Writs Act

The All Writs Act provides that "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). *See In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220 (3d Cir. 2002) (affirming the grant of an injunction of a pending state court class action under the All Writs Act).

In *BankAmerica*, Judge Nangle held that:

> Clearly, the PSLRA creates rights in plaintiffs possessing the greatest financial stake in the litigation. They have the right to be appointed lead plaintiffs, to control the course of the class action litigation, and to select class counsel of their choice. This federal right cannot be given its intended scope if competing state court plaintiffs, representing a significantly smaller number of shares, can institute premature settlement negotiations which threaten the orderly conduct of the federal case and which could result in the release of the federal claims.

Vice Chancellor Lamb
March 17, 2005, page 4

95 F. Supp. 2d at 1049. An injunction of the state court action under the All Writs Act
became necessary to protect these rights and because "Milberg Weiss's behavior in these
cases are precisely the sort of lawyer-driven machinations the PSLRA was designed to
prevent." *Id.* at 1050. The appellate court affirmed the injunction, noting that:

> We think it plain that the lead-plaintiff provisions of the
> PSLRA create significant federal rights that previously did
> not exist. It can hardly be gainsaid that the right to steer
> litigation of this magnitude is an important privilege. The
> lead plaintiff's control over aspects of litigation such as
> discovery, choice of counsel, assertion of legal theories,
> retention of consultants and experts, and settlement
> negotiations gives the lead plaintiff decisional muscle that
> other members of the class lack. The very fact of the [state
> court] plaintiffs' flight to state court bespeaks the
> significance of this position.

263 F.3d at 801. Thus, the appellate court "agree[d] with the district court that the rights
created by [the PSLRA's lead plaintiff appointment provision] § 77z-1(a)(3)(B) are
meaningless if a state-court plaintiff who has won the race to the state courthouse may
seize control of the litigation of the federal claims." *Id.* at 803.

My client intends to pursue an injunction consistent with *BankAmerica*'s clear
(and affirmed) holding. Accordingly, on behalf of my client as well as the entire Federal
Action class, I respectfully request that Your Honor briefly defer ruling on the pending
motion to dismiss the State Action until the federal court rules on the injunction.

*SLUSA*

According to Judge Nangle, "Congress noted that after the passage of the PSLRA,
plaintiffs' lawyers sought to circumvent the requirements of the PSLRA by filing
securities suits in state courts in record numbers" and that "[t]his type of attempt to avoid
the requirements of the PSLRA was the impetus behind the Securities Litigation Uniform
Standards Act, 15 U.S.C. §§ 77p(b)-(c), 78bb(f)(1)-(2)." *BankAmerica*, 95 F. Supp. 2d at
1046 n.2. "To stop such practices, the SLUSA bars securities suits filed in state court and
requires that all such suits be removed to federal court." *Id.* (citing 15 U.S.C. §§ 77p(b)-
(c), 78bb(f)(1)-(2)). The appellate court observed that the *BankAmerica* litigation was
initiated prior to the passage of SLUSA, and that "[u]nder SLUSA, [the state court
action] would be preempted altogether, obviating the need for injunctive power of the
sort invoked by the district court under the PSLRA." 263 F.3d at 802.

This Court considered the impact of SLUSA in *Zoren v. Genesis Energy, L.P.*, _ _
n.4 (Del. Ch. 2003) ("It must be noted at the outset that this court has grave reservations
regarding whether it even has jurisdiction to hear the [state action].""). In *Zoren*, Your
Honor noted that the plaintiff had previously filed suit in the Court of Chancery, but
"[b]ecause the [c]omplaint alleged factual matters that could support a claim under the
federal securities laws, the action was removed to the U.S. District Court for the District
of Delaware." *Id.* at _. Following *Zoren*, this Court should consider whether the SLUSA
mandates automatic removal or dismissal of the State Action.

Vice Chancellor Lamb
March 17, 2005, page 5

*The Litigation Cannot Be Maintained in the Court*
*of Chancery Because It Seeks No Equitable Relief*
*And There Is An Adequate Remedy at Law*

The merger between JPMC and Bank One was consummated months ago. No one can seriously contend that rescission of the merger is either feasible or desirable. *See Clark v. Teeven Holding Co.*, 625 A.2d 869, 880 (Del. Ch. 1992) ("This Court will take a practical view of the complaint and will not permit a suit to be brought in the Court where a complete legal remedy otherwise exists but where the claimant has prayed for some traditional equitable relief as an 'open sesame' to the Court."). Once the merger was approved and consummated as a result of the incomplete and materially misleading proxy statement, the fraud was accomplished, the damage to aggrieved stockholders was perfected, and such damage is presently ascertainable. At this point, only monetary damages will redress the losses sustained by the Federal Action class. Thus, equitable relief no longer has any place in this litigation. Lacking any basis in equity to exercise jurisdiction, the Court of Chancery has no authority to adjudicate this controversy.

Although no equitable remedy can make whole defrauded JPMC stockholders, monetary damages can provide an adequate remedy. *See* 10 Del. C. § 342 (the Court of Chancery "shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State."). Damages are completely ascertainable because the following facts are known or knowable: (1) what the exchange ratio should have been, (2) the number of shares outstanding of both companies at all relevant times, and (3) the value per share of JPMC common stock at all relevant times. Accordingly, even if this controversy presently contains some equitable feature (which it does not), this Court should refrain from exercising its discretionary jurisdiction over claims where an adequate remedy at law is available. *Clark*, 625 A.2d at 882 ("This Court should also consider whether the claims are primarily the type that are usually tried before a jury and that depriving the law courts of jurisdiction would also deprive a party of a jury trial.").

*The Rights of State Action Class Members Will*
*Be Adequately Protected In the Federal Action*

The Federal Action includes every class claim asserted in the State Action (and several more), names every defendant named in the State Action (and more), and alleges numerous facts not alleged in the State Action.[1] Whereas the State Action defines the class for whom relief is sought as all persons who owned JPMC common stock when the Merger was announced *and* continued to own when the Merger closed, the Federal Action seeks to recover damages on behalf of a class including, inter alia, every investor who was entitled to vote on the merger. By definition, every member of the State Action class was a shareholder of record of JPMC on the record date set in connection with the

---

[1] For instance, unlike the State Action, the Federal Action alleges that one JPMC director was beholden to JPMC's CEO because of her position with Skadden, Arps, Slate, Meagher & Flom, which earns substantial legal fees from JPMC in connection with the WorldCom securities litigation and several other engagements.

Vice Chancellor Lamb
March 17, 2005, page 6

shareholder vote and, as such, was entitled to vote on the merger. Accordingly, the
Federal Action class is larger than, and completely subsumes, the State Action class.

As a result of the federal court's exclusive jurisdiction over some claims and
ancillary jurisdiction over the rest, only through the Federal Action can the entire
controversy be adjudicated, including every claim asserted in the State Action. On the
other hand, as the State Action alleges at ¶ 27, if the State Action continues in spite of the
Federal Action:

> The prosecution of separate actions by individual members
> of the Class would create a risk of inconsistent or varying
> adjudications with respect to individual members of the
> Class, which would establish incompatible standards of
> conduct for Defendants, or adjudications with respect to
> individual members of the Class which would, as a
> practical matter, be dispositive of the interests of other
> members or substantially impair or impede their ability to
> protect their interests.

In particular, the issue of materiality presents the risk of prejudice to Federal
Action class members. Whereas the question of materiality in the Federal Action will be
decided by a jury evaluating testimony and other evidence, in the State Action the issue
may be decided on the pleadings alone, in the absence of any jury. Thus, as discussed
above, the Seventh Amendment right of every unnamed State Action class member will
be set aside as to the crucial question of materiality. More troubling yet is the possibility
that a bench ruling on materiality in the State Action may prejudice members of the
Federal Action class.

Federal Action class members should not be presumed to have waived their
constitutional rights merely because certain litigants sought to evade applicable federal
statutes requiring that this litigation be maintained in federal court. Refraining from
adjudicating a controversy such as this case is proper to permit a jury to decide questions
of fact, to afford complete relief in one action, to avoid a multiplicity of suits, and,
ultimately, to do full justice. *See Clark,* 625 A.2d at 882. In order to conserve the
resources of the courts, the class and the defendants, and to avoid the risk of inconsistent
verdicts, this Court should dismiss the State Action sua sponte for lack of equity
jurisdiction, *see id* at 883, or, in the alternative, stay the State Action in favor of the
Federal Action. Of course, the plaintiffs in the State Action are free to move to be
appointed lead plaintiff in the Federal Action.

Sincerely,

Joseph N. Gielata

Enclosures
cc:    Jesse A. Finkelstein, Esq. (by hand, w/enc.)
       Seth D. Rigrodsky, Esq. (by hand, w/enc.)

# EXHIBIT D

# TO THE

# AFFIDAVIT OF

# MICHAEL A.COOPER



MILBERG WEISS

Seth D. Rigrodsky
Direct Dial: DE: 302-984-3201
NY: 212-631-8679
srigrodsky@milbergweiss.com

March 18, 2005

**VIA LEXISNEXIS FILE & SERVE**
**AND HAND DELIVERY**

The Honorable Stephen P. Lamb
Vice Chancellor
Court of Chancery
New Castle County Courthouse
500 North King Street, Suite 11400
Wilmington, DE  19801

> **Re:    *In re J.P. Morgan Chase & Co. Shareholder Litigation***
> **Consol. C.A. No. 531-N**

Vice Chancellor Lamb:

We write in response to Joseph N. Gielata's letter to the Court, dated March 17, 2005. For the reasons stated below, the Court should disregard Mr. Gielata's letter in its entirety. We decline to address the substance of Mr. Gielata's arguments, but will do so should the Court deem it appropriate.

Mr. Gielata formerly was associated with Milberg Weiss and worked on this case. He left the firm on February 18, 2005, and no longer represents any party to this action. Mr. Gielata's client in the federal action has not sought to intervene in this case. Accordingly, Mr. Gielata has no standing to ask the Court to dismiss the action, or to seek any other relief. For this reason alone, his letter should be rejected.

More disturbing, however, Mr. Gielata's actions in opposing his own former clients constitute a violation of the Rules of Professional Conduct, in particular Rule 1.9 (Duties to Former Clients). We note the following facts, none of which Mr. Gielata disclosed in his letter:



The Honorable Stephen P. Lamb
March 18, 2005
Page 2

1.    While at Milberg Weiss, Mr. Gielata was actively involved, as one of the attorneys for Plaintiffs, in developing and litigating this action. (A Notice of Attorney Substitution removing Mr. Gielata's name from the list of counsel for Plaintiffs was filed February 17, 2005.)

2.    Among other things, Mr. Gielata helped prepare and appeared on the various pleadings filed by Plaintiffs, including the original Complaint, filed June 30, 2004; the Consolidated Class Action Complaint, filed September 2, 2004; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay Discovery, filed September 27, 2004; and Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss, filed December 10, 2004.

3.    Mr. Gielata also appeared in Court, on behalf of Plaintiffs, at the argument on Defendants' motion to dismiss, on January 13, 2005, and at the argument on Defendants' motion to stay discovery, on October 5, 2004.

4.    Mr. Gielata now argues (at page 5 of his letter) that the consummation of the merger of J.P. Morgan Chase & Co. and Bank One Corp. on July 1, 2004 divested this Court of jurisdiction; yet, months later he appeared on pleadings filed with this Court, under the strictures of Chancery Court Rule 11, and participated at oral argument.

5.    As one of the attorneys at Milberg Weiss actively involved in the development and prosecution of this action, Mr. Gielata was privy to confidential attorney work-product.

6.    In blatant disregard of his duty of loyalty to his former clients, Mr. Gielata is now attacking the very case on which he worked as recently as one month ago. Mr. Gielata has not sought the consent of either my firm or his former client to his representation of a new plaintiff in the federal action.

We leave to the Court to consider what action it might wish to take with respect to Mr. Gielata's serious breaches of his responsibilities as a member of the Delaware Bar and an officer of this Court. We are especially concerned that Mr. Gielata's continued pursuit of his action in the United States District Court, in conflict with the interests of the clients he previously represented, may create confusion in the markets in light of the notice and other procedures mandated by the Private Securities Litigation Reform Act of 1995.

Milberg Weiss Bershad & Schulman LLP

The Honorable Stephen P. Lamb
March 18, 2005
Page 3

      As always, we are available if Your Honor has any questions or concerns.

                  Respectfully,

                  Seth D. Rigrodsky
                  (DSBA #3147)

SDR:srs

cc:   Joseph N. Gielata, Esq. (via fax: (302) 792-0777)
      Jesse A. Finkelstein, Esq. (via LexisNexis File & Serve)
      Joshua M. Lifshitz, Esq. (via LexisNexis File & Serve)
      Andrea L. Rocanelli, Esq. (via hand delivery)
      Richard H. Weiss, Esq. (via e-mail)

# EXHIBIT E

# TO THE

# AFFIDAVIT OF

# MICHAEL A.COOPER

EFiled: Mar 21 2005 3:53PM EST
Filing ID 5404418

# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET

JESSE A FINKELSTEIN
DIRECTOR

WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

DIRECT DIAL NUMBER
302-651-7754
FINKELSTEIN@RLF COM

March 21, 2005

**By LexisNexis File & Serve**

Vice Chancellor Stephen P Lamb
Court of Chancery
New Castle County Courthouse
500 North King Street, Suite 11400
Wilmington, De 19801

Re:    **In re J.P. Morgan Chase & Co. Shareholders Ligitation,
Consol. C.A. No. 531-N**

Dear Vice Chancellor Lamb:

I write on behalf of all defendants in response to Joseph N Gielata's March 17, 2005 letter to the Court  Defendants agree with the points made in the March 18, 2005 letter addressed to Your Honor by Seth Rigrodsky of Milberg Weiss Bershad & Schulman on plaintiffs' behalf and wish to add only that defendants strenuously oppose Mr Gielata's "request that any decision on the pending motion to dismiss the State Action be deferred "

If Your Honor has any questions or requires further elaboration regarding this matter, counsel are available at the Court's convenience

Respectfully,

Jesse A Finkelstein
(DSBA # 1090)

JAF:mrr

cc:    Register in Chancery (By LexisNexis File & Serve)
Joseph N Gielata, Esq (By Email)
Seth D Rigrodsky, Esq (By LexisNexis File & Serve)
Michael A Cooper, Esq (By Email)
Sharon L Nelles, Esq (By Email)
Nancy Schwarzkopf, Esq (By Email)

RLF1-2854620-1