**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>             vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>      Defendants. | Case No. **1:05-cv-162 (JJF)**<br><br>**CLASS ACTION** |

**AFFIDAVIT OF JOSEPH N. GIELATA IN SUPPORT OF
THE MOTION BY PLAINTIFFS SAMUEL HYLAND
AND STEPHANIE SPEAKMAN
FOR APPOINTMENT AS LEAD PLAINTIFFS
AND APPOINTMENT OF LEAD COUNSEL**

      JOSEPH N. GIELATA, a member of the Bar of the Supreme Court of Delaware,

for his affidavit states:

      1.      I represent Plaintiffs Samuel I. Hyland and Stephanie Speakman in the

above-captioned matter.

      2.      I make this affidavit in support of Plaintiffs' Motion For Appointment As

Lead Plaintiffs And Appointment Of Lead Counsel.

      3.      I have been retained by Mr. Hyland and Ms. Speakman and have agreed to

a fee structure which I believe is far more favorable to my clients and the class than the

fee arrangements generally prevailing in the field of securities litigation.  I have prepared a memorandum setting forth the basis for this fee structure, to be submitted ex parte and under seal at the hearing on the lead plaintiff application.[1]  The purpose of this memorandum is to assist the Court in reviewing the reasonableness of the requested fee in the event that a recovery for the class is obtained.  I expect the Court to unseal the memorandum for review in camera only if and when a recovery for the class is obtained.

4.       In accepting this engagement, I have determined that I do not have any conflict of interest.  In particular, I do not own any JPMC common stock and I do not own any mutual fund or similar investment which holds JPMC common stock.  Further, I am not involved in any other litigation in which JPMC is a defendant.  If I am appointed lead counsel in this action, I will, throughout the pendency of the action, (a) refrain from becoming involved in any other litigation in which JPMC is a defendant, and (b) refrain from purchasing JPMC common stock or otherwise owning any interest, direct or indirect, in JPMC common stock.

5.       My law practice is confined to the representation of investors.  I am knowledgeable and experienced in securities law and litigation, and have represented both individual and institutional investors in complex class actions.  I am also knowledgeable and experienced in Delaware corporate law and shareholder litigation involving breach of fiduciary duty.  I previously represented investors with the prominent

---

[1] The inspiration for this memorandum comes from a recent decision by Judge Vaughn Walker.  *See In re HPL Technologies, Inc. Sec. Litig.*, -- F. Supp. 2d --, 2005 WL 941586, at *11 (N.D. Cal. April 22, 2005) ("[C]ounsel's ex ante assessment…that laid out in detail the factors that went into the evaluation [of a potential case] and presented data to back it up would carry a good deal of weight even if the predicted outcome, length of proceedings and costs differed from what actually occurred.").

plaintiffs' firms of Milberg Weiss Bershad & Schulman LLP and Grant & Eisenhofer, P.A., both of which specialize in shareholder litigation, including securities class actions.

      6.    During my tenure with Grant & Eisenhofer, the firm prosecuted the following noteworthy cases:

      A.  *In re DaimlerChrysler AG Securities Litig.*, D. Del., Master File No. 00-0993- (JJF) (co-lead for class, on behalf of Florida State Board of Administration) (achieved $300 million settlement);

      B.  *In re Global Crossing, Ltd. Securities Litig.*, S.D.N.Y., Case No. 02 Civ. 910 (GEL) (sole counsel for class, on behalf of the Public Employees' Retirement System of Ohio and State Teachers' Retirement System of Ohio) (recovered over $300 million so far);

      C.  *In re Oxford Health Plans, Inc., Securities Litig.*, S.D.N.Y., MDL Docket No. 1222 (CLB) (co-lead counsel, on behalf of Public Employees' Retirement Association of Colorado) (recovered $300 million from the company and its auditors);

      D.  *In re Telxon Corp., Securities Litig.*, N.D. Ohio (represented hedge fund in individual lawsuit, obtained substantial recovery);

      E.  *In re Safety-Kleen Corp. Bondholders Litig.*, D.S. Car., Consol. Case No. 3-00-1145 17 (sole lead counsel, on behalf of American High-Income Trust and USAA Research Income Trust) (Grant & Eisenhofer recently took this case through trial and obtained $284 million in judgments and settlements).

7.      I received my law degree from the University of Chicago Law School, where I was a Yee Scholar.  As an undergraduate, I studied economics, politics and philosophy at the University of Pittsburgh, where I was a Chancellor's Scholar, graduated *magna cum laude*, and was named to Phi Beta Kappa.  In addition to my work experience, my undergraduate and graduate coursework substantially enhanced my competence in the fields of corporate finance and accounting, both of which are relevant to my representation of investors.

8.      Attached to this Affidavit are true and correct copies of the following:

A.  The amici curiae memorandum sent by overnight courier to the Honorable William J. Hibbler of the Northern District of Illinois on May 23, 2005 (the supporting affidavit and exhibits, which run to hundreds of pages, are not attached; I will furnish these documents upon the Court's request);

B.  The certification of Samuel I. Hyland, as attached to the amended complaint in this action;

C.  The certification of Stephanie Speakman, as attached to the amended complaint in this action;

D.  The affidavit of Bruce Heller attesting to the publication of the notice of the pendency of this action (attached thereto), as published in the *Investor's Business Daily* on March 23, 2005.

9.      Attached to this Affidavit are true and correct copies of the following unreported decisions:

4

E. *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N, Mem. Op.

(Del. Ch. Apr. 29, 2005);

F. *Janovici v. DVI, Inc.*, Nos. Civ.A.2:03CV04795-LD,

Civ.A.2:03CV04963-LD, Civ.A.2:03CV05000-LD,

Civ.A.2:03CV05111-LD, Civ.A.2:03CV05141-LD,

Civ.A.2:03CV05244-LD, Civ.A.2:03CV05336-LD,

Civ.A.2:03CV05674-LD, 2003 WL 22849604 (E.D. Pa. Nov. 25,

2003);

G. *Marsden v. Select Medical Corp.*, No. 04-4020, slip op. (E.D. Pa. Jan.

18, 2005), also available at 2005 WL 113128.

I declare under penalty of perjury under the laws of the United States that the

foregoing is true and correct.

Executed: May 23, 2005

Joseph N. Gielata (DSB # 4338)

SWORN TO AND SUBSCRIBED BEFORE
ME THIS TWENTY-THIRD DAY OF MAY, 2005.

NOTARY PUBLIC

MY COMMISSION EXPIRES _____

MARY B. DUVALL
NOTARY PUBLIC
STATE OF DELAWARE
My Commission expires Mar. 17, 2008

5

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DR. STEPHEN BLAU, Individually and
On Behalf of All Others Similarly Situated,

    Plaintiff,

          vs.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL,
FRANK A. BENNACK, JR., JOHN H.
BIGGS, LAWRENCE A. BOSSIDY, M.
ANTHONY BURNS, LAURENCE
FULLER, ELLEN V. FUTTER, WILLIAM
H. GRAY, III, HELENE L. KAPLAN, LEE
R. RAYMOND, JOHN R. STAFFORD,
and J.P. MORGAN CHASE & CO.,

    Defendants.

Civil Action No. **04C 6592**

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

## MEMORANDUM OF AMICI CURIAE
## SAMUEL HYLAND AND STEPHANIE SPEAKMAN

DATED:    May 23, 2005

Joseph N. Gielata, of the Delaware Bar
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096
attorney@gielatalaw.com

*Attorney for Amici Curiae*
*Samuel Hyland and*
*Stephanie Speakman*

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Merger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    B.    The Delaware Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Illinois Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Wolf Haldenstein's Other Actions Against JPMC. . . . . . . . . . . . . . . . . .7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES
    NECESSITATE DISQUALIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    A.    The Court Has A Continuing Responsibility to
        Review The Adequacy of the Class Representative. . . . . . . . . . . . . . . . . . .10

    B.    Wolf Haldenstein's Divided Loyalties Amount to a
        Non-Waivable and Disqualifying Conflict of Interest. . . . . . . . . . . . . . . . 12

II.    THIS ACTION SHOULD BE TRANSFERRED TO THE
    DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . .17

III.    WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE
    BECAUSE IT OMITTED CRITICAL INFORMATION. . . . . . . . . . . . . . . . . . .23

IV.    THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED
    UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S
    FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION. . . . . . . . . . . . . 26

V.    WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION
    AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE
    REMOVAL OR SUBSTITUTION OF LEAD COUNSEL. . . . . . . . . . . . . . . . . . 31

    A.    Wolf Haldenstein's Rampant Plagiarism Indicates An
        Insufficient Pre-Filing Investigation Or None At All. . . . . . . . . . . . . . . . .32

    B.    Wolf Haldenstein's Failure to Serve Summons Properly. . . . . . . . . . . . . . .34

    C.    Wolf Haldenstein Names the Wrong Defendants
        And Fails to Name A Crucial Defendant. . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

**TABLE OF AUTHORITIES**

<u>**Cases:**</u>                                                                          <u>**Page**</u>

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Borenstein v. Finova Group, Inc.*,
    C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732
    (D. Ariz. Aug. 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Burke v. Ruttenberg*,
    102 F. Supp. 2d 1280 (N.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*In re Cardinal Health, Inc. ERISA Litig.*,
    225 F.R.D. 552 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*Coats Co., Inc. v. Vulcan Equipment Co., Ltd.*,
    459 F. Supp. 654 (D.C. Ill. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Commonwealth Edison Co. v. Train*,
    71 F.R.D. 391 (N.D. Ill. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n.12

*In re Continental Illinois Sec. Litig.*,
    750 F. Supp. 868 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Courtesy Caribbean v. Aquilar*,
    1995 WL 549127 (N.D. Ill. Aug. 31, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*In re DaimlerChrysler AG Sec. Litig.*,
    269 F. Supp. 2d 508 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*de la Fuente v. DCI Telecommunications, Inc.*,
    259 F. Supp. 2d 250 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 & n.8

*de la Fuente v. DCI Telecommunications, Inc.*,
    269 F. Supp. 2d 229 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Examen, Inc. v. VantagePoint Venture Partners 1996*,
  slip op. (Del. Ch. March 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Ferens v. John Deere Co.*,
  494 U.S. 516 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Park Surgical Center, Inc. v. Inland Steel Co.*,
  1996 WL 204322 (N.D. Ill. Apr. 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Greebel v. FTP Software Inc.*,
  939 F. Supp. 57 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Greenfield v. U.S. Healthcare, Inc.*,
  146 F.R.D. 118 (E.D. Pa. 1993), *aff'd*,
  *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994) . . . . . . . . . . . . .32-34

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Hess v. Gray*,
  85 F.R.D. 15 (N.D. Ill. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill v. Equitable Bank*,
  115 F.R.D. 184 (D. Del. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Hite v. Norwegian Caribbean Lines*,
  551 F. Supp. 390 (E.D. Mich. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Janovici v. DVI, Inc.*,
  2003 WL 22849604 (E.D. Pa. Nov. 25, 2003) . . . . . . . . . . . . . . . . . . . . .23, 25, 26

*Kamilewicz v. Bank of Boston Corp.*,
  100 F.3d 1348 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kayes v. Pacific Lumber Co.*,
  51 F.3d 1449 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Krim v. pcOrder.com, Inc.*,
  210 F.R.D. 581 (W.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kuper v. Quantum Chemical Corp.*,
  145 F.R.D. 80 (S.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Kurczi v. Eli Lilly & Co.*,
  160 F.R.D. 667 (N.D. Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Laborers Local 1298 Pension Fund v. Campbell Soup Co.*,
    2000 WL 486956 (D.N.J. Apr. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Marsden v. Select Medical Corp.*,
    2005 WL 113128 (E.D. Pa. Jan. 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Matter of Excello Press, Inc.*,
    967 F.2d 1109 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Metro Services Inc. v. Wiggins*,
    158 F.3d 162 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nager v. Websecure, Inc.*,
    1997 WL 773717 (D. Mass. Nov. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Oracle Sec. Litig.*,
    131 F.R.D. 688 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Oxford Health Plans, Inc.*,
    182 F.R.D. 42 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*River Road International, L.P. v. Josephthal Lyon & Ross, Inc.*,
    871 F. Supp. 210 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Schwarz v. National Van Lines, Inc.*,
    2004 WL 432483 (N.D. Ill. Feb. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Small v. Lorillard Tobacco Co., Inc.*,
    252 A.D.2d 1 (N.Y.A.D. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36 n.11

*Smith v. Suprema Specialties, Inc.*,
    206 F. Supp. 2d 627 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30 n.6

*So-Comm Inc. v. Reynolds*,
    607 F. Supp. 663 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Solomon v. Continental American Life Insurance Co.*,
    472 F.2d 1043 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sullivan v. Chase Inv. Services of Boston, Inc.*,
    79 F.R.D. 246 (D.C. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Taubenfeld v. Career Education Corp.*,
  2004 WL 554810 (N.D. Ill. March 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*In re Terayon Communications Sys., Inc.*,
  2004 WL 413277 (N.D. Cal. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tracinda Corp. v. DaimlerChrysler AG*,
  -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005) . . . . . . . . . . . . . . . . 21

*Tracinda Corp. v. DaimlerChrysler AG*,
  197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
  197 F. Supp. 2d 86 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
  362 F. Supp. 2d 487 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tranor v. Brown*,
  913 F. Supp. 388 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
  209 F.R.D. 353 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.6

*Van Gelder v. Taylor*,
  621 F. Supp. 613 (D.C. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Van Horn v. Graves*,
  2002 WL 27658 (N.D. Ill. Jan. 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
  231 F.3d 1215 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**Statutes:**

15 U.S.C. § 78u-4(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

15 U.S.C. § 78u-4(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(2)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. § 78u-4(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28 U.S.C. 1404 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

**<u>Treatises:</u>**

Moore's Federal Practice ¶111.13[1][c][iii] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 (1986). . . . . . 19

## INTRODUCTION

Amici Curiae Samuel I. Hyland and Stephanie Speakman (the "Delaware Group"), residents of New Castle County, Delaware and members of the putative class in this action, respectfully submit this brief to protect the class from any further malpractice by the conflicted counsel for plaintiff in this action and to clarify the proper venue and leadership of this litigation.

The purported lead counsel in this action has divided loyalties, failed to publish adequate notice, selected an inappropriate venue, and submitted a false and misleading lead plaintiff application. It has also misrepresented its pre-filing investigation, failed to properly serve crucial defendants, and failed to name and incorrectly named certain defendants. These numerous flagrant blunders not only violate Rule 11 and provisions of the Private Securities Litigation Reform Act ("PSLRA") but also necessitate that, at least, the law firm must be removed as class counsel in this litigation to prevent any further harm to the class and this action should be transferred to an appropriate venue.

## INTEREST OF AMICI CURIAE

As set forth more fully below, the Delaware Group is comprised of two plaintiffs in a separate securities class action, pending in the District of Delaware, which may be affected by rulings in this action. As a result of defendants' misconduct, the Delaware Group sustained an aggregate loss of at least $106,026.08. (Aff. ¶ 4.)[1] On April 2, 2004, the record date for the shareholder vote described herein, the Delaware Group held 19,170 shares of JPMorgan Chase & Co. ("JPMC" or "the Company"). *Id.*

---

[1] All exhibits, statements and unreported decisions referenced herein are attached to the affidavit of Joseph N. Gielata, filed contemporaneously herewith and cited as "Aff. ¶ _" or "Aff. Ex. _."

## BACKGROUND

### A.    The Merger

Defendant JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  (Aff. Ex. B.) Defendant William B. Harrison, Jr. has served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of JPMC since 1999.  However, by late 2003, after years of poor business decisions, costly acquisitions, and financial scandals, numerous public reports denounced Harrison's leadership and predicted that he would soon lose his job.  This situation forced Harrison to conjure yet another massive deal to protect his lucrative and prestigious CEO title.  Accordingly, Harrison commenced negotiations, on JPMC's behalf, with James Dimon, Chairman and CEO of Bank One Corporation ("Bank One"), concerning the possibility of a business combination between JPMC and Bank One.

As a result of these merger negotiations, on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge (the "Merger"). When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings.  The total value of the deal was approximately $57 billion.

The proposed acquisition of Bank One in a stock-for-stock transaction required the approval of a majority of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was necessary for JPMC to have the corporate authority to

issue the shares necessary for the exchange.  Thus, the defendants issued a Joint Proxy

Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), to gain shareholder

approval of the Merger.  Unaware that the Proxy/Prospectus contained materially false

and misleading statements and failed to disclose material facts, shareholders of JPMC

overwhelmingly approved the Merger.

However, months later, it was revealed that, in the course of the secretive

negotiations between Dimon and Harrison, Dimon had been willing to agree to a ***no-

premium deal*** if he could be CEO of the combined company immediately.  Instead,

Harrison and Dimon struck a secret pact allowing Harrison to retain the CEO title for two

more years in exchange for paying a premium.  The Proxy/Prospectus omitted this secret

pact.  However, a June 27, 2004 article in *The New York Times* entitled "The Yin, the

Yang and the Deal" (Aff. Ex. C) shocked the market with the following stunning

revelations:

> During the negotiations with Mr. Dimon, [Harrison] fought
> hard to give himself the two extra years, to secure a smooth
> transition, although he may have cost J.P. Morgan
> shareholders extra money in doing so. ***Mr. Dimon, always
> the tough deal maker, offered to do the deal for no
> premium if he could become chief executive immediately***,
> according to two people close to the deal.
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a
> premium***, which Mr. Harrison was able to push down to 14
> percent. The two men declined to comment on the specifics
> of their negotiations. [Emphasis added.]

This article revealed that the Proxy/Prospectus was incomplete and materially

misleading.  The $7 billion premium paid by JPMC stockholders in the Merger was

completely unnecessary.  Moreover, the enormous acquisition premium paid for Bank

One was a betrayal of the interests of JPMC shareholders, as it served only to entrench

- 3 -

Harrison in the CEO position for two more years, even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered. At no time did any of the defendants ever disclose the secret pact between Dimon and Harrion or that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

**B.    The Delaware Actions**

In June 2004, soon after the secret pact was revealed, three JPMC shareholders commenced actions in the Delaware Court of Chancery in connection with the misconduct described above. The consolidated actions, styled *In re J.P. Morgan Chase & Co. Shareholder Litigation*, Consol. C.A. No. 531-N (the "Chancery Action"), assert common law claims against all defendants in this action. (Aff. Ex. D.) In March 2005, following a diligent investigation, Hyland filed a comprehensive class action complaint in the District of Delaware (the "Delaware Action") asserting claims under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)), Rules l0b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§ 240.l0b-5 and 240.14a-9), Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2) and 77o), and pendent common law claims. (Aff. Ex. A.)

On March 21, 2005, Hyland also moved for an injunction of related state court actions, but the motion was denied without prejudice by the Honorable Joseph J. Farnan, Jr. on April 18, 2005. On April 14, 2005, all defendants in the Delaware Action except for Riley P. Bechtel stipulated to waiver of service of summons. By letter dated April 27, 2005, Bechtel waived service of the summons in the Delaware Action.

On April 29, 2005, Vice Chancellor Stephen P. Lamb issued an opinion granting

defendants' motion to dismiss the Chancery Action. *In re J.P. Morgan Chase & Co.*

*S'holder Litig.*, No. 531-N, Mem. Op. (Del. Ch. Apr. 29, 2005). The opinion specifically

discussed and distinguished the Delaware Action, observing, in relevant part:

> A similar federal class action complaint was filed in the
> District of Delaware on March 17, 2005. The federal
> complaint alleges substantially the same claims that are
> before this court. It does, however, have several important
> differences. First, the federal complaint characterizes the
> deal between Harrison and Dimon as a "secret deal." This
> description implies that the merger negotiations were
> unknown to the board of JPMC, a fact that appears
> inconsistent with the state complaint's primary allegation,
> as well as later allegations in the federal complaint that the
> "[d]efendants were motivated to conceal Harrison's secret
> and undisclosed pact with Dimon."
>
> Second, the federal complaint alleges that JPMC violated
> federal securities laws, specifically Sections 10(b), 11,
> 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange
> Act of 1934. These claims are sufficient to give federal
> courts jurisdiction over the claims, including the related
> breaches of fiduciary duty claims.
>
> Finally, the federal complaint lists important distinguishing
> facts, some of which are inconsistent with facts in this
> action. For instance, the federal complaint states that
> *Harrison* offered the no-premium deal. The complaint
> before this court makes the opposite claim, i.e. that it was
> Dimon who made an offer of that nature. This discrepancy
> is not explained.
>
> The federal complaint alleges additional substantive facts
> concerning certain directors. For example, the federal
> complaint ties Futter's fund-raising activities to her board
> membership, as reported in *New York Magazine* on
> February 21, 2000. Additionally, the federal complaint
> alleges that Kaplan is an attorney whose law firm receives
> substantial fees from JPMC. [Emphasis in original;
> citations omitted.]

*Id.* at 11-12.

On May 3, 2005, Hyland requested leave of Court to serve document preservation subpoenas on the law firm and the investment bank that advised Bank One in connection with the Merger.  Hyland also obtained confirmation that certain document preservation efforts agreed upon by the parties in the Chancery Action remained in force despite the dismissal of the Chancery Action.  On May 23, 3005, Hyland, joined by his mother, Stephanie Speakman, filed an amended complaint.  (Aff. Ex. B.)

### C.      The Illinois Action

On October 13, 2004, Dr. Stephen Blau, a purported JPMC shareholder, *see* Section III *infra*, commenced the action in this Court captioned as *Blau v. Harrison, et al.*, No. 04C 6592 (the "Illinois Action").  (D.E. #1.)

On December 14, 2004, through Wolf Haldenstein, Dr. Blau and another purported JPMC shareholder, the American Growth Fund, Inc. ("AGF"), moved for appointment as lead plaintiffs and appointment of Wolf Haldenstein as lead counsel. Defendants did not oppose this motion and no competing motion was filed.

Publicly-available information indicates that AGF is a mutual fund that, except for two years, trailed 99% of its peers in performance each year between 1990 and 2000. (Aff. Ex. E.)  In August 1997, the Securities and Exchange Commission ("SEC") announced the appointment of "a permanent receiver over American Growth Capital Corp. and American Growth Fund I, LP."  (Aff. Ex. F.)  It is not clear from the announcements whether AGF is the same as or related to the entity referred to in the SEC releases as being managed by persons who "fraudulently managed American Growth Capital and American Growth Fund, including misuse and misappropriation of at least $1,778,000 in investor funds by investing in shell companies, and by paying undisclosed

commissions and other selling expenses, undisclosed compensation to themselves, and undisclosed management fees to American Growth Capital." *Id.*

On January 5, 2005, this Court entered a minute order appointing Dr. Blau and AGF as lead plaintiffs and Wolf Haldenstein as lead counsel (the "Minute Order"). (D.E. #20.) No written opinion followed. Thus, the Court has not yet reviewed in detail the adequacy of any proposed class counsel in the Illinois Action.

On February 18, 2005, Dr. Blau filed an amended complaint. (D.E. #23.) That very same day, AGF, which had previously certified its willingness to represent the class, suddenly withdrew as a lead plaintiff without explanation. (D.E. #24.) On April 22, 2005, the Illinois Action defendants except for Riley P. Bechtel moved to dismiss the amended complaint.[2] (D.E. #32.)

### D.    Wolf Haldenstein's Other Actions Against JPMC

In addition to the Illinois Action, Wolf Haldenstein is currently seeking multi-billion-dollar recoveries from JPMC in several other prominent cases. For instance, Wolf Haldenstein is one of only six firms on the Court-appointed Plaintiffs' Executive Committee in the Initial Public Offering ("IPO") Securities Litigation, in which JPMC is a prominent defendant. (Aff. Ex. G.) The IPO Securities Litigation consists of numerous class actions involving more than 300 IPOs marketed between 1998 and 2000. *Id.* The actions are coordinated in the Southern District of New York. *Id.* The lawsuits generally allege that the IPOs were manipulated by investment banks to artificially inflate the market price of the offered securities and to conceal the amounts of compensation actually received by the underwriters. *Id.* The plaintiff classes consist of investors who purchased securities traceable to the IPOs. The defendants consist of the companies

---

[2] As explained in Section V.B, Bechtel contends that he was never served properly in the Illinois Action.

brought public, certain of their officers and directors and 55 of the investment banks that brought them public and underwrote various follow-on offerings. *Id.*

Wolf Haldenstein partner Adam J. Levitt and Wolf Haldenstein associate Gustavo Bruckner claim on the firm's website to be "actively involved" and to have "worked extensively on drafting and discovery" in the IPO Securities Litigation, respectively. (Aff. Ex. L)  In the Illinois Action, both Levitt and Bruckner appear on the amended complaint as plaintiff's counsel.

Of 307 complaints in the IPO Securities Litigation reviewed by Hyland's counsel, JPMC is a defendant in 128, or 42%, of the actions.  (Aff. ¶ 11 & Ex. H.)  Thus, JPMC is one of the defendants with the highest exposure in the coordinated litigation.  Indeed, the Company has already paid $25 million to settle related charges by the SEC.  *See* Litigation Release No. 18385: "SEC Sues J.P. Morgan Securities Inc. For Unlawful IPO Allocation Practices; J.P. Morgan Agrees To Settlement Calling For Injunction And Payment Of $25 Million Penalty" (Aff. Ex. I).

Damages in the IPO Securities Litigation are reportedly estimated to be **as much as $100 billion**, with a likely recovery of roughly **$25 billion**.  *See* "Banks under legal siege", *The Banker*, March 2, 2003 (Aff. Ex. J).  As a result of a settlement by the issuer defendants, only the investment banks remain defendants in this massive litigation.  *See* Press release: "IPO Securities Litigation Recovery Of At Least $1 Billion Dollars Guaranteed For Plaintiff Classes Upon Approval Of Settlement" (Aff. Ex. G).  In the wake of the preliminary settlement, the Chair of Plaintiffs' Executive Committee asserted in a July 2003 interview with the Associated Press (Aff. Ex. K):

> "The billion dollars is an expression of concern that these
> allegations are real and ***could give rise to staggering***

> *liability.* It simplifies the litigation in that we can focus our
> attention on the conduct of the investment banks. The
> interesting part here is how much broader our inquiries will
> be than the government's has been because we're covering
> 55 banks, not 10. It's going to be far more fascinating to
> demonstrate that the conduct we allege to be serious
> violations of the law was widespread throughout the entire
> industry. ... ***I would be very disappointed if we don't
> achieve multiple billions (in recovery).***" [Emphasis added.]

Thus, JPMC stands to lose billions of dollars in the IPO Securities Litigation, in which case Wolf Haldenstein stands to earn tens of millions in dollars in fees.  Indicating the importance of these cases to Wolf Haldenstein, as well as its leadership role in the litigation, the firm's website has a number of links to press releases describing the litigation.  (Aff. Ex. L.)

In addition to the IPO Securities Litigation, in the wake of Enron's demise, Wolf Haldenstein filed suit on February 22, 2002 in the United States District Court for the Southern District of New York on behalf of purchasers of JPMC between November 28, 2001 and January 28, 2002 against JPMC.  (Aff. Ex. L.)  The class period was subsequently extended to be between November 8, 1999 and December 31, 2000 for purchasers of the securities of The Chase Manhattan Corporation (a predecessor of JPMC) and between January 2, 2001 and July 23, 2002 for purchasers of the securities of JPMC.

According to Wolf Haldenstein's website, the complaint alleges that JPMC misrepresented its risk and loss exposure related to its Enron Corporation dealings as being approximately $900 million.  *Id.*  However, the complaint alleges that JPMC later admitted that, in fact, its total Enron related exposure was actually about $2.6 billion, or almost three times the earlier figure.  *Id.*  Shortly thereafter, JPMC wrote down $1.13 billion in nonperforming assets, specifically losses related to Enron.  *Id.*

As a key financial advisor to Enron, JPMC is one of the primary defendants in the Enron litigation and faces the prospect of having to pay out billions of dollars to resolve that litigation. *See* Timothy L. O'Brien, *The New York Times*, "After Charge for Legal Reserves, J.P. Morgan Takes Big Loss," July 21, 2004 (Aff. Ex. M).

JPMC's recent settlement of WorldCom-related litigation demonstrates the reality of its multi-billion-dollar exposure in the IPO Securities Litigation and Enron-related litigation. On March 16, 2005, JPMC settled with WorldCom investors in a securities class action for $2 billion. (Aff. Ex. N.)

## ARGUMENT

### I.     WOLF HALDENSTEIN'S DIVIDED LOYALTIES NECESSITATE DISQUALIFICATION

Effectively a lead plaintiff appointment by stipulation, the Minute Order, understandably, did not receive strict scrutiny because no adversary was present to call any weaknesses to the Court's attention. Undoubtedly, defendants were content that no adequate representative of the class appeared. They hoped to contain the controversy and were faced with an embarrassingly weak complaint prosecuted by conflicted counsel who have not demonstrated any ability to represent the class adequately.

However, in light of the Court's fiduciary role with respect to the class, the Court has a continuing responsibility to review the adequacy of those purporting to represent the class. Here, the lead plaintiff's "chosen" counsel is incapable of representing the class adequately as a result of its divided loyalties.

### A.     The Court Has A Continuing Responsibility to Review The Adequacy of the Class Representative

With respect to the PSLRA, pertinent case law makes clear the court always retains the authority to re-examine the lead plaintiff appointment. *See Z-Seven Fund, Inc.*

*v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000). Other courts have similarly held that the lead plaintiff designation is an interlocutory order and may be revisited by the district judge under appropriate circumstances. *See Metro Services Inc. v. Wiggins*, 158 F.3d 162, 165 (2d Cir. 1998) (dismissing appeal from lead plaintiff appointment order on the ground that it was not final and could be revisited); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing lead plaintiff and reserving the right to alter the structure if it "proves detrimental, in any way, to the best interests of the class" quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 42, 51 (S.D.N.Y. 1998)); *Borenstein v. Finova Group, Inc.*, C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732, at *30 (D. Ariz. Aug. 28, 2000) (appointing lead plaintiff but reserving the right to "revisit the issues if and when appropriate" and noting that, if another "more adequate member of the class of note purchasers should come forward, the court may also reopen the issue of lead plaintiff").

Indeed, under the provisions of the PSLRA requiring that a lead plaintiff be both typical and adequate in accordance with Rule 23, the Court has a "continuing responsibility" to determine whether lead plaintiffs meet the typicality and adequacy prongs of Rule 23 to ensure that the interests of the class are being protected. *In re Terayon Communications Sys., Inc.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004) (granting defendants' motion to disqualify lead plaintiffs four years after they had been appointed on the grounds that they did not meet the typicality and adequacy requirements of Rule 23 and thus were not appropriate lead plaintiffs). *See also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity,

- 11 -

by approving appropriate representative plaintiffs and class counsel."); *In re Oracle Sec. Litig.*, 131 F.R.D. 688, 691 (N.D. Cal. 1990) (Walker, J.) ("[T]he court bears fiduciary responsibilities to the class.").

      **B.**    **Wolf Haldenstein's Divided Loyalties Amount to a Non-Waivable and Disqualifying Conflict of Interest**

It is a conflict of interest for a law firm to seek recovery from the same defendant on behalf of different classes of plaintiffs. *See In re Cardinal Health, Inc. ERISA Litig.*, 225 F.R.D. 552, 557 (S.D. Ohio 2005) (citing ABA Code of Professional Responsibility, DR 5-105 and EC 5-14 (prohibiting counsel from representing different plaintiffs with conflicting claims against the same defendant because it creates "the appearance of divided loyalties of counsel")). In *Cardinal Health*, a law firm sought to be appointed lead counsel for the plaintiff class, but several plaintiffs objected because the law firm was handling other litigation against the same defendants.  The Court noted that representing multiple classes seeking recovery from the same "common pool" presents a fatal conflict.  225 F.R.D. at 557.  The law firm responded that it would be suing a parent corporation in one case and a subsidiary of that parent in the other, claiming further that any recovery against the subsidiary would not subject the parent to liability in that case. *Id.*  The Court agreed that, if the law firm could prove that recovery against the subsidiary would not subject the parent to liability, there would not be a "common pool" conflict. *Id.*  However, it held that the relationship between the two corporations had not been sufficiently established.  *Id.*  For that reason, and because of the law firm's misconduct in another case, the court rejected the law firm's motion to be appointed lead counsel, instead selecting another candidate with no such conflict*.  Id.* at 558.

As set forth above, in addition to the instant litigation against JPMC, Wolf Haldenstein is currently involved in several other prominent cases seeking substantial recoveries from JPMC, including 128 lawsuits in the IPO Securities Litigation. Thus, Wolf Haldenstein suffers from the same disabling conflict considered in *Cardinal Health*.

In *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002), a law firm attempted to be appointed class counsel. Like Wolf Haldenstein, the law firm was one of the six firms on the Plaintiffs' Executive Committee in the IPO Securities Litigation. Moreover, the corporate defendant, pcOrder.com, was a defendant in the IPO Securities Litigation, albeit in only one action. The court denied the firm's request to be appointed class counsel because, like Wolf Haldenstein: (1) it had not informed the class representatives that it represented other classes in other courts against the same defendants, and (2) because of the possibility that the defendants might not be able to satisfy all the claims. *Id.* at 589. The law firm attempted to counter the latter argument by suggesting that the court could supervise the allocation of any settlement or award. *Id.* at 590. The court rejected this argument, noting that it would not have control over the courts in which the other cases against these defendants are pending. *Id.*

Given the firm's more than 128 other pending suits against JPMC, Wolf Haldenstein is unable to vigorously advance the interests of class members in this litigation while simultaneously prosecuting other cases against JPMC on behalf of different classes in the IPO Securities Litigation and Enron-related securities litigation. As JPMC does not have an unlimited ability to pay, an increased recovery for class members in this litigation would likely come at the expense of class members in the other actions. Thus, this conflict of interest precludes Wolf Haldenstein from seeking to

- 13 -

represent multiple classes pursuing recovery from the same source. *See Sullivan v. Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (D.C. Cal. 1978) (requiring plaintiffs' counsel to certify that they had completely withdrawn from a separate class action against the defendant because the "responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel."); *In re Continental Illinois Sec. Litig.*, 750 F. Supp. 868, 875 (N.D. Ill. 1990) (disallowing attorneys' fees in class action for work on a related derivative action per earlier ruling that such dual representation was impermissible, noting that "[t]he conflict seemed especially likely in the area of settlement negotiations, where the two kinds of plaintiffs might be competing for limited funds"); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) (proposed class representative failed to satisfy adequacy requirement, where its proposed lead counsel had a conflict of interest by virtue of its representation of the plaintiff class in other litigation against the same defendant); *Kuper v. Quantum Chemical Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (declining class certification in securities action because the employee-stockholder class representatives failed to demonstrate that they would vigorously prosecute class interests through qualified counsel in light of the fact that the same counsel represented a class of bondholders in another action against corporation and sought recovery from a common pool of assets that might be insufficient to support the amounts sought by both classes).

In *Sullivan*, the Northern District of California court noted its "major concern about counsel involv[ing] their role in a parallel securities fraud case against [the same corporate defendant] in the District of Maryland" and observed that "[t]he possibility that assets and insurance of the defendants who may have committed fraud against the

plaintiffs will be insufficient to satisfy an alleged liability to the class of over $20 million

is great enough to influence litigation strategy." 79 F.R.D. at 259. Thus, the court held

that "[b]ecause this putative class and the [plaintiffs in the parallel action] have

conflicting interests in the course of each litigation, counsel cannot represent both." *Id.*

Here, Wolf Haldenstein's divided loyalties are even more starkly reflected in the billions

of dollars at stake both in this litigation and in the IPO Securities Litigation. Indeed, the

*very same* Wolf Haldenstein attorneys representing Dr. Blau in this matter have touted

their involvement in the IPO Securities Litigation. (*See* Aff. Ex. L.)

A recent ethics opinion issued by the Illinois State Bar Association confirms not

only that this "common pool" conflict compromises Wolf Haldenstein's ability to

represent the class, but also that the conflict is non-waivable. *See* Opinion No. 04-01

(Nov. 2004) (Aff. Ex. O). The opinion assumes that a lawyer has a collection case for

Client A against Debtor B. Debtor B owns a piece of real estate, which would be

potentially useful in collecting any judgment Client A may obtain against Debtor B.

During the collection proceedings, Client C comes to the lawyer and asks him to

represent Client C in purchasing the aforementioned real estate from Debtor B. The

committee opined that representing Client C in such a matter would be a non-waivable

conflict because, even though "the possibility exists that no judgment will be obtained, it

is also clear that by the time that such question is answered it will be irrelevant, because it

will be too late to negate the damage which may be done…[because the] property

intended to be used to satisfy the judgment will be gone…." *See also Kayes v. Pacific

Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (affirming the necessity of class

counsel's withdrawal to remedy the appearance of divided loyalties, even if "there had as

yet been no reason to believe improper influence had resulted from the representation of two parties with conflicting interests," citing *Sullivan*).

 The form of relief sought in this litigation also may conflict with the other suits maintained by Wolf Haldenstein against JPMC.  In this litigation, it is possible that a recovery in JPMC stock, rather than cash, would make whole aggrieved members of the class.  As the Delaware Action attacks, *inter alia*, the unnecessarily inflated exchange ratio agreed upon in connection with the Merger, one way to correct the inflated exchange ratio is for JPMC to issue JPMC common stock to certain members of the class.  However, this non-cash alternative is in conflict with the cash recovery sought by Wolf Haldenstein in other ongoing litigation against JPMC.  For instance, the continued prosecution by Wolf Haldenstein of other suits against JPMC may harm the value of JPMC common stock, to the detriment of class members who might benefit from a stock settlement or who have retained their stock. *See Kuper*, 145 F.R.D. at 83 ("class members who…continue to [own stock in the corporation] have a vested interest in that corporation's continued existence and viability").  Alternatively, rather than considering solely the best interests of the class in this case, Wolf Haldenstein might seek a stock settlement in this litigation in order to leave JPMC more cash to pay for recoveries in other actions.  Thus, this conflict further impairs Wolf Haldenstein's ability to represent adequately any member of the class in this case.

 The class in this case will not be harmed in any way by the disqualification of Wolf Haldenstein.  First, the Delaware Action, which seeks recovery on behalf of a class including the putative class in the Illinois Action, has been and continues to be vigorously prosecuted.  Second, the Delaware Group has a much larger financial stake in the

litigation than Dr. Blau.  Third, the Illinois Action is at an early stage, as no discovery has

been taken, no motion to dismiss has been ruled upon, and no class has been certified.

Finally, unlike Wolf Haldenstein, counsel for Hyland has no interest in any other lawsuit

against JPMC, and thus has no conflict of interest preventing his effective performance as

class counsel.  (Aff. ¶ 5.)

Disqualifying Wolf Haldenstein will not delay this litigation.  It is apparent that

Wolf Haldenstein has not advanced this litigation to any material degree since its filing.

Although the Illinois Action was commenced on October 15, 2004 (approximately four

months after the Chancery Action was commenced), defendants' motion to dismiss has

not even been fully briefed yet, and the amended complaint in the Illinois Action was

filed barely a month before the Delaware Action was commenced.[3]  Thus, disqualifying

Wolf Haldenstein at this time will not delay this litigation or prejudice any party.  To the

contrary, disqualification will ensure that all parties' interests, including those of absent

class members, will be protected.

Accordingly, this Court should disqualify Wolf Haldenstein from representing

any purported class member in this litigation.

## II.    THIS ACTION SHOULD BE TRANSFERRED TO THE DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district

court may transfer any civil action to any other district or division where it might have

been brought." 28 U.S.C. § 1404 (a).  *See also Ferens v. John Deere Co.*, 494 U.S. 516,

530 (1990) (noting that a court may transfer venue on its own motion); *Hite v. Norwegian*

---

[3] It may be that Wolf Haldenstein attorneys have been preoccupied with the vast amount of work devoted to the IPO Securities Litigation.

*Caribbean Lines*, 551 F. Supp. 390, 392 (E.D. Mich. 1982) (ordering parties "to show cause why the case should not be transferred").

The Delaware Action is properly venued in the District of Delaware because (1) the plaintiffs are Delaware residents, (2) JPMC is a Delaware corporation, (3) Bank One was incorporated in Delaware, (4) the Merger agreement provides that Delaware law governs, (5) the first-filed suits against the defendants were commenced in the Delaware Court of Chancery, (6) Delaware law applies to the breach of fiduciary duty claims in the Delaware Action, (7) JPMC conducts substantial business in the District of Delaware (as did Bank One), and (8) unlike Illinois, Delaware is close enough to New York to compel the trial testimony of several non-party witnesses in New York, where the alleged misconduct took place and where most witnesses reside.

By contrast, the Northern District of Illinois is not an appropriate or convenient forum for this litigation in any respect. Firstly, the plaintiff in the Illinois Action does not even live in Illinois. *See* Moore's Federal Practice ¶111.13[1][c][iii] ("When the chosen forum is neither the plaintiff's residence nor the place where the operative events occurred, the court is likely to override the plaintiff's choice." (citing *Tranor v. Brown*, 913 F. Supp. 388 (E.D. Pa. 1996))); *So-Comm Inc. v. Reynolds*, 607 F. Supp. 663, 666 (N.D. Ill. 1985) ("the plaintiff's choice of forum is entitled to less consideration when he is not a resident of the forum district."). Rather, Dr. Blau apparently resides in New York. Thus, the decision to file suit in the Northern District of Illinois can be explained only by the fact that Wolf Haldenstein has its office in Chicago. Of course, the mere convenience of counsel, without more, cannot justify an otherwise inappropriate choice of venue. *See Solomon v. Continental American Life Insurance Co.*, 472 F.2d 1043, 1047

(3d Cir. 1973) (convenience of counsel not a factor to be considered in determining whether case should be transferred under 28 U.S.C. § 1404(a)).  Thus, there appears to be no justification for maintaining this litigation in the Northern District of Illinois.  *Cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (affirming dismissal of complaint on *forum non conveniens* grounds where neither plaintiff nor witnesses, but only plaintiff's counsel, resided in forum where action was commenced).

Secondly, unlike the Illinois Action, subpoenas issued in the Delaware Action for New York witnesses can be served from the District of Delaware.  Rule 45(b)(2) of the Federal Rules of Civil Procedure provides that "a subpoena may be served…at any place without the district that is within 100 miles of the place of the deposition."  Hyland's counsel has determined that JPMC's headquarters in Manhattan are located 94.4 air miles from the Delaware Federal Courthouse.[4]  (Aff. ¶ 10.A-C.)

The convenience of the witnesses is "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer under 28 U.S.C. § 1404(a)." 15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 at 415 (1986).  *See also Schwarz v. National Van Lines, Inc.*, 2004 WL 432483, at *5 (N.D. Ill. Feb. 24, 2004) ("The convenience of witnesses is often viewed as the most important factor in the transfer balance.").  Crucial non-party witnesses anticipated at trial include the investment bankers and lawyers who advised JPMC and Bank One in connection with the Merger.  The expected testimony from these witnesses, many or all of whom were intimately involved in the negotiations leading to the Merger, will confirm the secret deal

---

[4] Also, the combined Company's credit card operations are based in Wilmington, just blocks from the Delaware Federal Courthouse.  Moreover, one of JPMC's two principal banking subsidiaries, Chase Manhattan Bank USA, National Association, is headquartered in Delaware.

at the heart of this case, as well as related details of the negotiations, such as Harrison's rejection of the nil-premium opportunity.

The investigation of Hyland's counsel indicates that these witnesses include bankers Gary Parr, Tim Dana, and Gary Shedlin of Lazard Frères & Co. LLC for Bank One, lawyers Edward D. Herlihy, Craig M. Wasserman, and Lawrence S. Makow of Wachtell, Lipton, Rosen & Katz for Bank One, lawyers Richard I. Beattie, Lee Meyerson, Maripat Alpuche, Christopher Lee, Kristin H. Johnson and Elsa Fraysse of Simpson Thacher & Bartlett LLP for JPMC, and as-yet-unidentified lawyers with Sullivan & Cromwell LLP for JPMC's board.  (Aff. ¶ 9.)  The offices of these investment banks and law firms are all located in Manhattan, less than 100 air miles from the Delaware Federal Courthouse (less than two hours away by Amtrak).  (Aff. ¶ 10.D-J.)

As each of these anticipated witnesses resides or works within 100 miles of the Delaware Federal Courthouse, their live presence can be compelled judicially to testify at trial in the Delaware Action.  *See Hill v. Equitable Bank*, 115 F.R.D. 184 (D. Del. 1987).  Thus, from the standpoint of the convenience of the most material witnesses, as well as in the interests of justice generally, the District of Delaware is the better forum.  *Coats Co., Inc. v. Vulcan Equipment Co., Ltd.*, 459 F. Supp. 654, 658 (D.C. Ill. 1978).  *See also Courtesy Caribbean v. Aquilar*, 1995 WL 549127, at *4 (N.D. Ill. Aug. 31, 1995) (noting the importance of considering, in comparing venues, the availability of compulsory process for unwilling witnesses); *Hess v. Gray*, 85 F.R.D. 15, 25 (N.D. Ill. 1979) ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury, or most litigants.") (quoting *Gulf Oil*, 330 U.S. at 511).

Thirdly, it is in the interest of justice to have a Delaware judge decide this case because both JPMC and Bank One are Delaware corporations and the Merger agreement provides for Delaware law to govern the contract.[5]  *See Van Gelder v. Taylor*, 621 F. Supp. 613, 620 (D.C. Ill. 1985).  Indeed, "'[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders.'"  *Examen, Inc. v. VantagePoint Venture Partners 1996*, C.A. No. 1142-N, slip op. at 9 (Del. Ch. March 31, 2005) (citing internal affairs doctrine in applying Delaware law to contested stockholder vote concerning a Delaware corporation's merger) (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987)).

Fourthly, the Delaware Action has been assigned to the Honorable Joseph J. Farnan, Jr., who is ideally suited to overseeing this litigation.  Only weeks ago, Judge Farnan issued a final decision in a remarkably similar case.  *See Tracinda Corp. v. DaimlerChrysler AG*, -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005).  In that complex securities litigation concerning a corporate merger, it was alleged that a company's CEO defrauded shareholders into accepting an inadequate merger premium by casting a takeover as a merger of equals.  *See id.* at *36.

Judge Farnan adjudicated numerous complex motions, including multiple motions to dismiss and summary judgment motions, certified a class of investors, oversaw a $300 million settlement for the class, administered a 13-day bench trial on an individual lawsuit and issued a final decision on April 7, 2005.  *See, e.g., Tracinda Corp. v.*

---

[5] The Merger agreement itself provides "8.6. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof)."  *See also* Proxy/Prospectus at 3 ("Subject to the terms and conditions of the merger agreement, and in accordance with Delaware law, at the completion of the merger Bank One will merge with and into JPMorgan Chase.").

*DaimlerChrysler AG*, 197 F. Supp. 2d 86 (D. Del. 2002) (motion to dismiss); *Tracinda*

*Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002) (same); *In re*

*DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) (certifying class); *In re*

*DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508 (D. Del. 2003) (denying

defendants' motions for summary judgment); *Tracinda Corp. v. DaimlerChrysler AG*,

362 F. Supp. 2d 487 (D. Del. 2005) (ruling on post-trial evidentiary objections). Thus,

Judge Farnan's extraordinary experience with a similar securities fraud class action will

ensure the fair and efficient adjudication of this litigation. In *Grand Park Surgical*

*Center, Inc. v. Inland Steel Co.*, 1996 WL 204322, at *1 (N.D. Ill. Apr. 25, 1996), the

Court, on its own motion, ordered transfer to Indiana district court under § 1404(a),

noting that "because Indiana state law applies, a federal district court judge in that state

would be more familiar with the governing law." This rationale is even more compelling

here, given Judge Farnan's recent participation in a case with striking parallels to the

instant litigation.

     The pendency of the Chancery Action (commenced over three months before the

Illinois Action) and the Delaware Action in Delaware constitute significant factors

militating in favor of transfer, since avoiding multiplicity of litigation from a single

transaction is in the interests of justice. *See River Road International, L.P. v. Josephthal*

*Lyon & Ross, Inc.*, 871 F. Supp. 210 (S.D.N.Y. 1995). *See also Van Horn v. Graves*,

2002 WL 27658, at *3 (N.D. Ill. Jan. 10, 2002) ("[T]he desirability of resolving this

controversy where it arose requires transfer.").

     Finally, in addition to the venue considerations set forth above, prosecuting this

litigation in Delaware is preferable because the District of Delaware is a full electronic

filing jurisdiction.  The Northern District of Illinois does not yet mandate electronic

filing.  Electronic filing allows the court and litigants to file and access documents

electronically via the Internet, 24 hours a day, seven days a week.  Court records will also

be available to the public by the same means.  In a case of this magnitude, electronic

filing capability is very important because the potential volume of filings, parties, and

attorneys in this litigation will require streamlined access to the courts.  This litigation

will be under intense media scrutiny.  Without electronic filing, crucial information will

not be readily accessible to nonparties needing it.  For instance, defendants' brief in

support of their motion to dismiss is unavailable electronically, as are exhibits to the lead

plaintiff application.  In such circumstances, the absence of electronic filing puts an

enormous burden on the clerk's office, which has to respond manually to the numerous

requests for information in filings from counsel, the press and other interested parties that

a case of this magnitude engenders.

      Accordingly, the Illinois Action should be transferred to the District of Delaware.

## III.     WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE BECAUSE IT OMITTED CRITICAL INFORMATION

      The PSLRA mandates that after filing a putative class action complaint, a plaintiff

seeking to represent the proposed class must publish a notice that sets forth (i) the

pendency of the action, including a description of the claims asserted and the proposed

class period, and (ii) a statement that any party seeking to serve as lead plaintiff for the

action referenced in the notice must move the applicable court within sixty (60) days of

the date of the notice. 15 U.S.C. § 78u-4(a)(3)(A)(i).  *See Janovici v. DVI, Inc.*, 2003 WL

22849604, at *5 (E.D. Pa. Nov. 25, 2003) (in considering motions for appointment of

lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements).

On October 15, 2004, Wolf Haldenstein published a notice in the *Investor's Business Daily* purportedly advising investors of the pendency of the Illinois Action. (Aff. Ex. P.)  However, two critical pieces of information were missing from the notice. First, the notice discloses the names of only two of the fourteen defendants.  Second, the notice fails to advise class members of their right to retain counsel of their own choice. In addition to these critical omissions, the notice is misleading because it fails to disclose Wolf Haldenstein's divided loyalties, does not reference the newspaper article in which the truth was revealed, and lists the civil action number incorrectly, thereby inhibiting the ability of any reader to locate the Illinois Action on PACER.  (Aff. ¶ 13 & Ex. P.)

In reviewing notices purportedly complying with this requirement, courts have rejected those which fail to include the names of all defendants.  *See, e.g., Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (finding notice inadequate because "[t]here is no explanation of the legal theory underlying plaintiffs' suit; no discussion of ***who*** violated the Securities Exchange Act of 1934; and no description of the alleged wrongdoing that forms the basis of the complaint.") (emphasis added); *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1311 (N.D. Ala. 2000) ("notice must, ***at a minimum***, provide information about…who has filed the suit, ***who is being sued***, the court in which the suit is taking place, and the civil action number of the case") (emphasis added); *id.* at 1316 ("the notice published by [one] plaintiff and his counsel fails to indicate who is seeking relief and ***against whom relief is sought***, facts that would be revealed ***were the entire name of the action included in the notice***") (emphasis added); and *id.* at 1315

- 24 -

("the [competing] notice does not fully inform potential lead plaintiffs…of…the names

of the defendants").  *Cf. Marsden v. Select Medical Corp.*, 2005 WL 113128 (E.D. Pa.

Jan. 18, 2005) (accepting notice which "adequately informs class members of 'the

pendency of the action,' as it identifies the caption of the case, its civil action number, the

Court before which the action was brought, ***and the names of all five Defendants.***")

(emphasis added).

　　　　A notice which omits the right of class members to retain counsel of their choice

is also inadequate.  *See, e.g., Burke*, 102 F. Supp. 2d at 1311 n.39 ("giving only

information directing putative class members to contact counsel would not comport with

the purposes of the subsection"); *id.* at 1314 ("the notice published appears to have been

drafted with the aim of directing clients to the law firms listed in it, thereby permitting

the Burke plaintiffs and counsel associated therewith to avoid any lead plaintiff

challenge.").

　　　　Unlike Wolf Haldenstein's defective notice, counsel for Hyland published a

notice of the pendency of the Delaware Action which included the names of ***all***

defendants in the Delaware Action ***and*** advised class members of their right to retain

counsel of their own choice in considering or seeking the lead plaintiff appointment.

(Aff. Ex. Q.)  *See Janovici*, 2003 WL 22849604, at *8 (finding notice adequate which

"[u]nlike the first three notices, …lists the names of the Defendants…[and] also advises

that potential class members may retain counsel of their choice.").  The Delaware Action

notice also specifically references the newspaper article in which the truth was revealed

and correctly sets forth the civil action number.

Only a legally adequate notice triggers the PSLRA's 60-day period for all lead plaintiff motions. *See Janovici*, 2003 WL 22849604, at *9 ("This [60-day] rule does not apply, however, where the first notice of pendency fails to provide adequate information pursuant to the terms of the PSLRA– the statutory 60 day period begins to run from the date of the first notice that complies with the PSLRA.") Wolf Haldenstein's purported notice plainly failed to inform class members of their critical rights and otherwise failed to notify class members of the pendency of the action. By contrast, the notice in the Delaware Action included every crucial piece of information missing from Wolf Haldenstein's defective notice. Accordingly, only this notice triggered the 60-day period for all lead plaintiff motions.

## IV. THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION

Fed. R. Civ. P. 60(b) provides that a court may vacate an order due to "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party… [or] any other reason justifying relief from the operation of the judgment." Moreover, district courts enjoy wide discretion to sanction misconduct in the management of cases. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). In *Chambers*, the United States Supreme Court advised:

> when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

*Id.* at 50.

One of the more troubling aspects of Wolf Haldenstein's conduct in the Illinois Action is the lead plaintiff application submitted to the Court which led to entry of the Minute Order. Given the inadequate notice published by Wolf Haldenstein, *see* Section III *supra*, it is unsurprising that the application met no competition and, therefore, avoided scrutiny. *See Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (Easterbrook, J., dissenting) ("[T]he court can't vindicate the class's rights because the friendly presentation means that it lacks essential information."). Even a diligent search of dockets nationally would not have revealed the Illinois Action, as Dimon (Harrison's counterparty in the secret deal and a defendant in the Delaware Action) is not named at all, *see* Section V.C *infra*. However, Wolf Haldenstein's lead plaintiff application merits scrutiny because it contains several misrepresentations to this Court.

The lead plaintiff application was premised upon the combined holdings of two purported JPMC shareholders, Dr. Blau and AGF, who together claimed to hold nearly 28,000 shares of JPMC. AGF's holding, prior to its mysterious withdrawal, accounted for 25,000 shares, or 89 percent, of the combined holding. Without AGF, Wolf Haldenstein would have proffered only Dr. Blau, with his "2999.9" shares, as the purported representative of the Illinois Action class. By contrast, the Delaware Group held 19,170 shares at all relevant times, over six times Dr. Blau's claimed holding. This is important because the PSLRA directs the Court to presume that the "most adequate plaintiff" to serve as lead plaintiff "is the person or group of persons" that, inter alia, "has the largest financial interest in the relief sought by the class…" 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb). AGF also certified to the Court its willingness to serve as a representative of the class. However, the veracity of this representation was called into

- 27 -

question when AGF suddenly and without explanation withdrew as a lead plaintiff on February 18, 2005, the date of the filing of the amended complaint, approximately one month after the entry of the Minute Order.  At the very least, Wolf Haldenstein should be ordered to explain to the Court the circumstances of AGF's withdrawal, and whether such withdrawal was anticipated when the lead plaintiff application was filed.  *See Chambers*, 501 U.S. at 44 ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

Indeed, every PSLRA-required certification in the Illinois Action is either defective or absent.  Firstly, AGF's certification is false, as AGF was obviously not willing to serve as a representative of the class.

Secondly, no certification at all accompanies the Illinois Action's amended complaint, in contravention of the PSLRA's requirement that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint...."  15 U.S.C. §78u-4(a)(2)(A).  Thus, Dr. Blau has not certified that, as to the amended complaint, he "has reviewed the complaint and authorized its filing...."  15 U.S.C. §78u-4(a)(2)(A)(i).  Given that AGF withdrew in connection with the filing of the amended complaint, the absence of Dr. Blau's certification is particularly concerning.

Thirdly, Dr. Blau's certification of the original complaint is defective because it represents that Dr. Blau purchased 899.9 shares of JPMC (presumably a JPMC predecessor) on January 21, 1994.  One cannot purchase or sell fractional shares of JPMC common stock.  Thus, this fractional share quantity does not make sense and casts doubt on Dr. Blau's certification.  Further, Dr. Blau claims to have made the following

- 28 -

purchases: 899.9 shares on January 21, 1994 for $11,509, or $12.79 per share (11.2

percent above the $11.50 adjusted close on that date); 600 shares on March 31, 1994 for

$7,458, or $12.43 per share (11.9 percent above the $11.11 adjusted close on that date);

and 1,500 shares on October 6, 1994 for $17,473, or $11.65 per share (11.7 percent above

the $10.43 adjusted close on that date).  (Aff. ¶ 12.)  These price discrepancies are

unexplained.

    In *Nager v. Websecure, Inc.*, 1997 WL 773717, at *1 n.1 (D. Mass. Nov. 26,

1997), the Court rejected a member of a group that was appointed as lead plaintiff for

failure to accurately report one of his transactions in the subject security.  In that case, the

Court stated:

> One of the proposed group, David Renzer, states in his
> affidavit that on "2/7" he purchased 2,500 shares of
> common stock of Websecure, Inc. at a price of $17.50 per
> share. (Waldman Decl. Supp. Websecure Pl. Group's Mot.
> to Consol., Ex. C.)  Information supplied by the plaintiffs
> about the stock's trading indicates, however, that on
> February 7, 1996, the stock closed, as it had the day before,
> at $9.50 per share. (Waldman Aff. Supp. Pls' Mot. for
> Prelim. Inj., Ex. N.)  The statement in the Renzer affidavit
> may thus be suspected of being inaccurate.  The inaccuracy
> may be explainable, but it casts sufficient doubt on Mr.
> Renzer's adequacy as a representative plaintiff that he
> should be excluded from the group appointed to serve as
> lead plaintiffs.

*Id.*

    Dr. Blau's failure to meet the basic requirements of the PSLRA makes it

impossible to determine his financial interest in the litigation.  Moreover, this deficiency

is clear evidence of his inadequacy as a lead plaintiff and, as in *Nager*, constitutes a

sufficient ground to reject him as lead plaintiff.

Lastly, the certifications in the lead plaintiff application are all defective also because they fail to disclose the movants' ownership, if any, of Bank One shares.[6] Defendants will undoubtedly argue that any benefit obtained by Bank One shareholders from the unfair exchange ratio should offset damages flowing from the alleged misconduct. The Delaware Action plaintiffs did not own shares of Bank One. (Aff. ¶ 4.) If Dr. Blau owned Bank One shares, then he may be subject to a unique defense that renders him incapable of adequately representing the class.[7] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). However, Dr. Blau did not disclose his Bank One holdings, if any.

The defects in the certifications identified above provide a basis to revisit the lead plaintiff appointment. *See Greebel v. FTP Software Inc.*, 939 F. Supp. 57, 62 n.4 (D. Mass. 1996) ("Should subsequent discovery reveal that the representations [in plaintiffs' PSLRA certifications] are inaccurate, the court may revisit the lead plaintiff determination.").

Also critically missing from the lead plaintiff application is information necessary for this Court to determine whether the ownership of JPMC common stock by any Wolf Haldenstein attorney constitutes a conflict of interest sufficient to disqualify the firm from representing the plaintiff class. Such a determination is mandated by the PSLRA:

### Attorney conflict of interest

---

[6] AGF's certification is not electronically accessible. However, if AGF's certification fails to evidence the requisite authority to move for appointment as lead plaintiff, that would be further ground for denying the application. *See, e.g., Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 634-35 (D.N.J. 2002) (investment advisor's motion denied because it failed to submit "any evidence that it received permission to move on its clients' behalf."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 357-58 (S.D.N.Y. 2002) (same).

[7] Such an offset argument has been rejected by the United States Supreme Court. *See Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) (noting that "it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them") (internal quotations omitted). However, the test of whether a unique defense impairs the class representative is not the validity of the defense, but whether it threatens to become the focus of the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

> If a plaintiff class is represented by an attorney who
> directly owns or otherwise has a beneficial interest in the
> securities that are the subject of the litigation, the court
> shall make a determination of whether such ownership or
> other interest constitutes a conflict of interest sufficient to
> disqualify the attorney from representing the plaintiff class.

15 U.S.C. §78u-4(a)(9).  The Minute Order reflects no such determination because Wolf

Haldenstein failed to disclose the information necessary for such a determination.  By

contrast, Hyland's counsel freely discloses that he has no beneficial interest, whether

direct or indirect (for instance, through a mutual fund), in JPMC common stock.  (Aff.

¶ 5.)  In addition to the absence of information relating to Wolf Haldenstein's divided

loyalties, *see* Section I *supra*, the absence of information necessary for this Court to make

an appropriate determination under 15 U.S.C. §78u-4(a)(9) also renders Wolf

Haldenstein's lead plaintiff application incomplete and misleading.

Accordingly, the Minute Order should be vacated.

## V.  WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE REMOVAL OR SUBSTITUTION OF LEAD COUNSEL

The plethora of irregularities plaguing Wolf Haldenstein's (mis)management of

the Illinois Action extends well beyond the firm's divided loyalties, failure to publish

adequate notice, inappropriate choice of venue, and false and misleading lead plaintiff

application.  Wolf Haldenstein has also misrepresented its pre-filing investigation, failed

to properly serve crucial defendants, and failed to name and incorrectly named certain

defendants.  Wolf Haldenstein's numerous flagrant blunders not only violate Rule 11 but

also necessitate that the firm must be removed as class counsel in this litigation to prevent

any further harm to the class.

### A.    Wolf Haldenstein's Rampant Plagiarism Indicates An Insufficient Pre-Filing Investigation Or None At All

The Illinois Action amended complaint falsely claims to be based "upon the investigation made by and through plaintiff's counsel," purportedly including a review of JPMC's SEC filings, "as well as press releases, news articles, and other public statements concerning the Company." (D.E. #23 at 1.) Notably absent from this purported investigation is any reference to pleadings in a similar lawsuit. However, a comparison of the Illinois Action amended complaint and the consolidated complaint in the Chancery Action reveals *at least 29 instances* of plagiarism, including several allegations copied verbatim. (Aff. ¶ 8 & Ex. R.) For instance, ¶ 55 of the consolidated complaint in the Chancery Action alleges:

> [A]lthough the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.

Wolf Haldenstein shamelessly lifted this text word for word (but without attribution) at ¶ 55 of the Illinois Action amended complaint, which alleges:

> Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor….

This rampant plagiarism, which permeates the Illinois Action amended complaint, indicates that Wolf Haldenstein either performed no investigation at all or did not investigate or research the allegations and claims in the Illinois Action to the extent required by Rule 11. At best, Wolf Haldenstein blindly and improperly relied upon the investigatory and drafting efforts of plaintiffs' counsel in the Chancery Action.

Wolf Haldenstein has found itself in hot water for such misconduct at least twice in the past. In *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118, 126-28 (E.D. Pa.

1993), *aff'd*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994), plaintiffs'

counsel, including a Wolf Haldenstein partner, were reprimanded because certain

attorneys had failed to personally investigate law and facts underlying a securities fraud

complaint. Although the Wolf Haldenstein attorney was not sanctioned, the Court

sanctioned the attorneys who merely copied their complaint from another complaint for

violating Rule 11's "reasonable inquiry" requirement. *Greenfield*, 146 F.R.D. at 126-28.

*See also Taubenfeld v. Career Education Corp.*, 2004 WL 554810, at \*5 (N.D. Ill. March

19, 2004) ("this issue of copying another's complaint would have persuasive effect if

there was evidence showing that the proposed lead counsel did not, in fact, undertake a

sufficient investigation before filing a complaint."); *Matter of Excello Press, Inc.*, 967

F.2d 1109, 1112 (7th Cir. 1992) ("the right question [is] not whether the claim itself was

frivolous or nonfrivolous, but whether [counsel] conducted an adequate inquiry into the

facts and the law before he filed the claim"); *Garr*, 22 F.3d at 1279 ("[A] signer making

an inadequate inquiry into the sufficiency of the facts and law underlying a document will

not be saved from a Rule 11 sanction by the stroke of luck that the document happened to

be justified.").

Similarly, in *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250,

274 (S.D.N.Y. 2003), the Court granted defendants' request for Rule 11 sanctions against

plaintiffs' counsel including Wolf Haldenstein, this time for improperly asserting clearly

time-barred claims.[8] An adequate inquiry by competent counsel would have prevented

---

[8] In *de la Fuente*, the defendants argued that plaintiffs' counsel violated Rule 11 by simply copying an SEC complaint. 259 F. Supp. 2d at 259. The Court did not find reliance upon the investigatory findings of a regulatory agency to be insufficient and, further, plaintiffs' counsel represented that every allegation in the complaint had been verified through independent investigation. *Id.* at 260. Here, there was no independent investigation by the SEC or other any regulatory agency. Further, any claim that Wolf Haldenstein verified every plagiarized allegation would strain credulity, but, in any case, could be refuted or confirmed by the firm's electronic research records.

this.  Again, Wolf Haldenstein avoided monetary sanctions, *see de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 229, 235 (S.D.N.Y. 2003) (declining to assess Rule 11 sanctions on liaison counsel) but the pattern is clear.  Here, there is abundant evidence of Wolf Haldenstein's inadequate inquiry.  (Aff. Ex. R.)  Indeed, Wolf Haldenstein's misconduct here is all the more inexcusable in that the Illinois Action was commenced several months after the relevant facts first emerged and the Chancery Action was commenced.  *See Garr*, 22 F.3d at 1279 ("[A]n attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints.").  Accordingly, the appropriate sanction is to remove Wolf Haldenstein as class counsel.  At the very least, Wolf Haldenstein should not be permitted to lead this litigation.

### B.    Wolf Haldenstein's Failure to Serve Summons Properly

In the Delaware Action, defendant Riley P. Bechtel waived service of summons upon the formal request of Hyland's counsel.  (Aff. ¶ 6.)  The other defendants have all stipulated to waiver of service of summons in the Delaware Action.  *Id.*  Even if the defendants had not waived service of summons, Hyland could easily have served them all under Delaware's director consent statute.[9]

---

[9] Fed. R. Civ. P. 4(e)(1) provides that service upon an individual from whom a waiver has not been obtained may be effected in any judicial district of the United States pursuant to the law of the state in which the district court is located.  Delaware's "director consent" statute provides, in relevant part: "Every nonresident of this State who…accepts election or appointment as a director…of a corporation organized under the laws of this State or who…serves in such capacity…shall…be deemed thereby to have consented to the appointment of the registered agent of such corporation…as an agent upon whom service of process may be made in all civil actions…brought in this State…against such corporation, in which such director…is a necessary or proper party, or in any action or proceeding against such director…for violation of a duty in such capacity, ***whether or not the person continues to serve as such director***…at the time suit is commenced.  Such acceptance or service as such director…shall be a signification of the consent of such director…that any process when so served shall be of the same legal force and validity as if served upon such director…within this State and such appointment of the registered agent…shall be irrevocable." 10 Del. C. § 3114(a) (emphasis added).

By contrast, according to the Illinois Action docket, Wolf Haldenstein left copies of the summons and complaint with Marjorie G. Joseph, presumably an officer or other agent of JPMC. (*See* D.E. #2-15.) It is unclear why Wolf Haldenstein believed that such service was sufficient or proper, especially given that five of the Illinois Action defendants were no longer directors of JPMC when the Illinois Action was commenced.[10] Fed. R. Civ. P. 4(m) imposes a 120-day time limit to serve a complaint, but more than 120 days have elapsed since the filing of the Illinois Action. Indeed, apparently Bechtel contests the propriety of service in the Illinois Action. (D.E. # 31 at 2 n.2 ("Riley P. Bechtel…was never properly served in this matter.").) Without taking any position on this question, this issue may endanger Dr. Blau's ability to recover against other defendants as well.

The importance of Bechtel's participation in this action is twofold. Firstly, as the billionaire Chairman and CEO of Bechtel Group, Mr. Bechtel appears to be by far the wealthiest individual defendant in this litigation, and thus second only to JPMC in terms of potential sources of recovery. (Aff. Ex. S.) Secondly, Bechtel's background and multiple connections to JPMC, as alleged in the Delaware Action, may give rise to higher liability on his part. (Aff. Ex. B ¶¶ 173-186.) Thus, Wolf Haldenstein's failure to serve summons properly specifically harms the ability of the class to recover damages and further demonstrates the law firm's inability to prosecute this litigation.

---

[10] Laurence Fuller stepped down from the JPMC Board in 2003; Riley P. Bechtel and M. Anthony Burns were JPMC directors until the eve of the JPMC annual meeting on May 25, 2004; Frank A. Bennack, Jr. and Helene L. Kaplan were JPMC directors until the consummation of the Merger on July 1, 2004.

C.    **Wolf Haldenstein Names the Wrong Defendants
       And Fails to Name A Crucial Defendant**

The Illinois Action incorrectly names Laurence Fuller, inexplicably fails to name James Dimon, and names the corporate defendant incorrectly.

Wolf Haldenstein named Fuller as a defendant even though he retired from the JPMC board in 2003 and, thus, could not have approved the Merger agreement, which was reviewed and approved by the board in January 2004.  This mistake is likely due to the fact that Wolf Haldenstein indiscriminately copied documents from the Chancery Action, in which Fuller was listed in the caption in the initial complaints but not in the consolidated complaint.  (Aff. Ex. D.)

Even more troubling than this error is Wolf Haldenstein's failure to name James Dimon, Harrison's counterparty in the secret deal and formerly the Chairman and CEO of Bank One.  By contrast, Dimon is a defendant in the Delaware Action.  Given Dimon's crucial role in the alleged misconduct, and his prominent role in soliciting votes for the Merger, including signing a false and misleading proxy statement, Wolf Haldenstein's failure to name Dimon is inexplicable.[11]

Finally, Wolf Haldenstein did not even get the corporate defendant's name right. The Illinois Action names "J. P. Morgan Chase & Co.," the name of the Company before its charter was amended in connection with the Merger.  (Aff. Ex. T.)  By contrast, JPMorgan Chase & Co. is properly named as the corporate defendant in the Delaware Action.  Although this misnomer may not be a fatal defect in the summons in the Illinois

---

[11] Also inexplicable is Wolf Haldenstein's failure to assert a number of claims asserted in the Delaware Action, including claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-promulgated thereunder, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and pendent common law claims. *See Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 12 (N.Y.A.D. 1998) ("The manner in which the named plaintiffs limited their claims makes them inadequate to represent [the] putative class….").

Action, it further reflects on Wolf Haldenstein's lack of care in prosecuting the Illinois

Action and ought to be corrected through amendment.

## CONCLUSION

For all the foregoing reasons, this Court should disqualify Wolf Haldenstein,

vacate the Minute Order, and transfer the Illinois Action to the District of Delaware.

Counsel welcomes any invitation to participate in oral argument.


DATED:        May 23, 2005                    Respectfully submitted,



                                              Joseph N. Gielata
                                              *of the Delaware Bar*[12]
                                              Attorney at Law
                                              501 Silverside Road, Suite 90
                                              Wilmington, DE 19809
                                              (302) 798-1096
                                              attorney@gielatalaw.com

                                              ***Attorney for Amici Curiae***
                                              ***Samuel Hyland and***
                                              ***Stephanie Speakman***


---

[12] Mr. Gielata's clients proceed as amici curiae but do not wish to intervene or otherwise formally appear in the Illinois Action for fear that doing so might waive their objections to venue. *See Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 394 (N.D. Ill. 1976). Accordingly, no *pro hac vice* application is forthcoming.

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>             vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>        Defendants. | Case No. **1:05-cv-162 (JJF)**<br>**CLASS ACTION** |

**CERTIFICATION OF SAMUEL I. HYLAND**
**IN SUPPORT OF THE AMENDED CLASS ACTION COMPLAINT**

Samuel I. Hyland, for his Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.       I reside in New Castle County, Delaware.

2.       I have reviewed the facts and allegations of the amended complaint prepared by counsel and have authorized the filing of the amended complaint.

3.       I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

4.      I held 300 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period.  Thus, at the close of the Class Period, I retained 300 shares.  Based on JPMC's stock price on July 1, 2004, when the merger closed, my economic loss during the Class Period as a result of the alleged violations was $1,659.25.

5.      I intend to actively monitor the conduct of this action for the benefit of the class.  I have retained Joseph N. Gielata, Esq. to prosecute this action.  Mr. Gielata is knowledgeable and experienced in securities law and litigation.

6.      I believe that my claims against the defendants are typical of those of other members of the class.

7.      I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

8.      I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial.  I intend to pursue this litigation for the best interests of all class members.

9.      I am the founder and manager of a private business, the Brandywine Cider Company, and received a Master's in Business Administration from Columbia University.  I believe that my business experience and investment sophistication will better enable me to represent the class.

10.     During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

11.     I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

/s/ Samuel I. Hyland

Dated: May  23 , 2005     _____

Samuel I. Hyland

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　　　vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>　　　　Defendants. | Case No. **1:05-cv-162 (JJF)**<br>**CLASS ACTION** |

## CERTIFICATION OF STEPHANIE SPEAKMAN
## IN SUPPORT OF THE AMENDED CLASS ACTION COMPLAINT

Stephanie Speakman, for her Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

　　　1.　　　I reside in New Castle County, Delaware.

　　　2.　　　I have reviewed the facts and allegations of the amended complaint prepared by counsel and have authorized the filing of the amended complaint.

　　　3.　　　I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

　　　4.　　　I held 18,870 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period. Thus, at the close of the Class Period, I retained 18,870 shares. Based on JPMC's stock price on July 1, 2004, when the merger

closed, my economic loss during the Class Period as a result of the alleged violations was $104,366.83.

5. Samuel Hyland is my son. I approve his retention of Joseph N. Gielata, Esq. to prosecute this action.

6. I believe that my claims against the defendants are typical of those of other members of the class.

7. I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

8. I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial. I intend to pursue this litigation for the best interests of all class members.

9. During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

10. I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: May 18, 2005

Stephanie Speakman

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit D

## Affidavit of Publication

| | |
|---|---|
| **Name of Publication:** | Investor's Business Daily |
| **Address:** | 12655 Beatrice St |
| **City, State, Zip:** | Los Angeles, CA 90066 |
| **Phone #:** | (310) 448-6700 |
| **State of:** | California |
| **County of:** | Los Angeles |

I, Bruce Heller, for the publisher of *Investor's Business Daily*, published in the State of California, County of Los Angeles, hereby certify that the attached notice was printed in said publication on the following dates:

### Wednesday March 23,2005

Given under my hand, this 24th day of March, 2005.

Signature: _____

Sworn to and subscribed before me this 24th day of March, 2005, at Los Angeles, State of California.

Notary Public: Heather O'Connor

My Commission Expires: 4|28|08

Seal:

HEATHER O'CONNOR
Commission # 1480041
Notary Public - California
Los Angeles County
My Comm. Expires Apr 28, 2008



WEDNESDAY, MARCH 23, 2005    A13

## LEGAL NOTICES

Notice is hereby given that, on March 17, 2005, Joseph N. Gielata, Attorney at Law, filed in the United States District Court for the District of Delaware a class action lawsuit on behalf of purchasers of the common stock of JPMorgan Chase & Co. (the "Company") (NYSE:JPM) between January 14, 2004 and June 25, 2004, holders of the Company's stock who were entitled to vote on the merger between the Company and Bank One Corporation ("One"), and holders of One who exchanged their shares for shares of the Company in connection with the merger. The lawsuit, captioned Hyland v. Harrison et al., No. 1:05cv162, seeks to pursue remedies under the Securities Act of 1933, Securities Exchange Act of 1934, and for breach of fiduciary duty against defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford, James Dimon, and the Company. The complaint alleges that, in his desperation to protect his CEO title, Harrison rejected a valuable opportunity to merge One into the Company without paying any premium solely because One's CEO sought to be CEO of the combined Company immediately. Instead, unbeknownst to investors, Harrison agreed to a multi-billion dollar premium to guarantee his CEO title for two more years. The complaint further alleges that this secret deal was intentionally omitted from the Proxy/Prospectus disseminated to shareholders in connection with the merger. The truth emerged on June 27, 2004, when The New York Times published an article revealing the secret deal. If you are a member of the class described above, and sustained damages, you may, no later than 60 days after the date of this notice, request that the Court appoint you as lead plaintiff. To be lead plaintiff, you must meet certain legal standards. Your ability to share in any recovery is not, however, affected by the decision of whether or not to serve as a lead plaintiff. You may retain Joseph N. Gielata, or other counsel of your choice, to serve as your counsel in this action. If you wish to discuss this action, or have any questions concerning this notice or your rights and interests with regard to the case, please contact Joe Gielata via email at attorney@gielatalaw.com or at (302) 798-1096.

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit E

EFiled:  Apr 29 2005  4:41PM EDT
Filing ID 5722650

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY


IN RE J.P. MORGAN CHASE & CO.          )          Consolidated
SHAREHOLDER LITIGATION                 )          C.A. No. 531-N


## MEMORANDUM OPINION AND ORDER

**Submitted: January 27, 2005**
**Decided: April 29, 2005**


Seth D. Rigrodsky, Esquire, Ralph N. Sianni, Esquire, MILBERG WEISS
BERSHAD & SCHULMAN LLP, Wilmington, Delaware; Steven G.
Schulman, Esquire, Richard Weiss, Esquire, MILBERG WEISS BERSHAD
& SCHULMAN LLP, New York, New York; Peter D. Bull, Esquire, BULL
& LIFSHITZ, LLP, New York, New York, *Attorneys for the Plaintiffs.*

Jesse A. Finkelstein, Esquire, Lisa M. Zwally, Esquire, Michael R.
Robinson, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington,
Delaware; Michael A. Cooper, Esquire, Sharon L. Nelles, Esquire,
SULLIVAN & CROMWELL LLP, New York, New York; Nancy E.
Schwartzkopf, Esquire, JP MORGAN CHASE LEGAL DEPT., New York,
New York, *Attorneys for the Defendants.*


LAMB, Vice Chancellor.

# I.

In 2004, two banks agreed to a business combination that was expected to create the second largest financial institution in the country. One bank paid a premium over the market share price for the other bank, effectively making one bank the acquirer and the other bank the target.

After the merger was completed, the stockholders of the acquirer sued its directors, alleging breaches of fiduciary duty with regard to the acquisition. Their claims stem from the allegation that the directors paid too much for the acquired bank. Specifically, the plaintiffs claim that the CEO of the target proposed a no-premium merger if he were immediately promoted to CEO of the resulting entity. The CEO of the acquirer allegedly refused that offer, choosing instead to pay the premium for the target's stock and retain his title.

The plaintiffs bring this class action in an effort to recover damages for what they contend are direct claims. The defendants move to dismiss the complaint on the basis that the claims are derivative, not direct, and that demand was not excused. For the reasons below, that motion is granted.

# II.[1]

## A.    The Parties

The plaintiffs are Ronda Robins, George Ziegler, and Bruce T. Taylor, who are stockholders of J.P. Morgan Chase & Co. ("JPMC") during the relevant times.[2] The plaintiffs bring this action on their own behalf and as a class action pursuant to Court of Chancery Rule 23.  The class is alleged to consist of all persons who owned JPMC common stock on the date the merger was announced, January 14, 2004, and continued to own such stock through the date the merger closed, July 1, 2004.

The defendants are JPMC and the members of its board of directors who approved the merger with Bank One Corporation ("Bank One").

## B.    Background

On January 14, 2004, JPMC and Bank One published a joint press release announcing their agreed-upon merger, which had been unanimously approved by their respective boards of directors.  Pursuant to the agreement, JPMC would issue shares of its common stock to Bank One stockholders at a premium of 14% over the closing price of Bank One common stock on the date of the announcement of the merger.[3]

---

[1] All facts herein are taken from the well-pleaded allegations of the complaint unless otherwise noted.
[2] Bruce T. Taylor is acting as custodian for Julia Ann Taylor.
[3] Joint Proxy Statement at 36.

The merger agreement also laid out the succession plan for JPMC.  After the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, James Dimon, would succeed. During the interim two years, Dimon would serve as President and COO. Harrison, who was Chairman of JPMC before the merger, would continue in that role indefinitely beyond the two years.

The Joint Proxy Statement filed with the Securities and Exchange Commission on February 20, 2004 listed various reasons for the merger, including "a number of significant strategic opportunities and benefits," "more balanced business mix," "greater geographic diversification," and "expected financial synergies."[4]  The merger, when announced, was expected to create the second largest financial institution in the country, measured by total assets.  On May 25, 2004, the stockholders of JPMC overwhelmingly approved the merger, with 99.18% of the votes cast in its favor.[5]  The merger closed July 1, 2004.

C.     The Dispute

On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon.  According to the article, Dimon offered to sell Bank One to JPMC at no premium if he were appointed CEO of the new entity immediately.  Because much

---

[4] *Id.* at 34-35.
[5] Form 8-K, May 25, 2004.

3

of the complaint hinges on one sentence in the article, the court finds it important
to include it verbatim, as follows: "Mr. Dimon, always the tough deal maker,
offered to do the deal for no premium if he could become the chief executive
immediately, according to two people close to the deal."[6]

The plaintiffs allege that this one sentence proves that JPMC could have
purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO.  The
plaintiffs argue that JPMC instead agreed to pay a premium simply to satisfy
Harrison's desire to retain the CEO title for two more years.  In addition, the
plaintiffs contend that Harrison remains CEO in title only and that Dimon is
effectively exercising the powers of a CEO.  Therefore, they claim, the only
difference between Dimon's preliminary offer and the merger as consummated was
that JPMC agreed to pay the 14% premium.

The defendants respond by pointing out that the plaintiffs' argument
presupposes that the boards of directors of both companies would have approved
Dimon's offer.  The defendants argue that there was no possibility for JPMC
stockholders to approve a merger based on Dimon's alleged offer because neither
board of directors ever agreed to that deal.  The deal that was agreed to by the
boards included a 14% premium for Bank One and a succession plan that had

---

[6] Landon Thomas, Jr., *The Yin, the Yang, and the Deal*, N.Y. TIMES, June 27, 2004, § 3 (Sunday Business) at 1.

Harrison remaining as CEO for two years, followed by Dimon.  They argue that all
other possible transaction formats that may have been proposed to and rejected by
the JPMC board are irrelevant and immaterial, as the JPMC directors'
consideration and rejection of all such proposals are protected by the business
judgment rule.

D.    The Complaint

The plaintiffs pursue all defendants for breaches of fiduciary duties
surrounding the refusal of Dimon's alleged no-premium offer.  They argue that by
allowing Harrison to keep the title of CEO, the board of JPMC overpaid for Bank
One by the 14% premium.  Relying on the proxy materials stating that Harrison
kept the board informed of his negotiations with Dimon, the plaintiffs claim that
the board knew of Dimon's no-premium offer.  Moreover, the plaintiffs claim that
a majority of the board was beholden to Harrison and, thus, not able to act
independently of him.  The plaintiffs allege that the board's lack of independence
caused it to approve the 14% premium in order to let Harrison retain the title of
CEO instead of insisting on the no-premium offer.

Alternatively, the plaintiffs claim that Harrison secretly refused Dimon's no-
premium offer.  Without presenting the offer to the JPMC board, they claim,
Harrison refused to concede the title of CEO, but continued negotiating with

5

Dimon.  Under this set of facts, the plaintiffs contend that Harrison's self-interested refusal caused Dimon to demand a premium over Bank One's share price, which Harrison eventually agreed to and presented to the board.

The plaintiffs seek damages in the amount of the merger exchange ratio premium, approximately $7 billion.  They allege that the JPMC board of directors, by approving the unfavorable merger exchange ratio and the unnecessary premium, harmed them directly by diluting their interests in JPMC.  If the JPMC board had approved a no-premium merger exchange ratio, the argument goes, the plaintiffs would have a greater stake in the resulting company.  Instead, the stockholders of the pre-merger JPMC now have less of a stake in the post-merger JPMC.

The JPMC board consisted of twelve directors—eleven outsiders plus Harrison.  The plaintiffs allege that eight of the eleven outside directors lacked sufficient independence with regard to the merger.[7]  The plaintiffs base their claims on certain relationships between the directors and JPMC and/or Harrison.  The defendants counter that the relationships described by the plaintiffs fall into three categories: normal business relationships, inconsequential charitable relationships, or family relationships that are either disclosed or ended.  The defendants contend

---

[7] The plaintiffs concede that three directors are independent:  Hans W. Becherer, John H. Biggs, and Lee R. Raymond.  The plaintiffs allege that Harrison benefitted from the merger by securing a $3.5 million increase in his severance package to $22.5 million.  They further contend that Harrison knew his job was in jeopardy and he used the Bank One deal to retain the title of CEO for two more years.   Harrison's alleged lack of independence is not disputed by the defendants in this motion to dismiss.

that none of the relationships affect the ability of the directors to act independently. The defendants also point out that a majority of the board of directors was certified as independent pursuant to NYSE Corporate Governance listing standards.

Set forth below are the directors in question and the specific allegations found in the complaint about each.

1.    <u>Riley Bechtel</u>

Bechtel is the Chairman, CEO, and a director of the Bechtel Group, Inc.  The plaintiffs allege that Bechtel is not independent because the Bechtel Group does business with the Trade Bank of Iraq, which is managed by JPMC.  The plaintiffs claim that the Bechtel Group has received $2 billion from the Trade Bank in connection with the reconstruction of Iraq.  The plaintiffs further allege that Bechtel is not independent because JPMC and the Bechtel Group share other financial interests.  As an example, the plaintiffs cite an investment partnership that is jointly owned by partners of the Bechtel Group and a private equity firm affiliated with JPMC.

2.    <u>Lawrence Bossidy</u>

The plaintiffs question the independence of Bossidy because his son is employed as a JPMC Vice President.  The plaintiffs contend that Bossidy would be unable to vote against Harrison because his vote would potentially endanger his son's career.

3.    Ellen Futter

Futter is the President, as well as a trustee, of The American Museum of

Natural History.  The plaintiffs claim that Futter cannot act independently because

JPMC is a significant benefactor to the museum.  The plaintiffs also claim that

Futter cannot act independently because JPMC employed her brother-in-law as a

managing director.[8]

4.    Helene Kaplan

Kaplan is Vice-Chair and a trustee of The American Museum of Natural

History.  Like Futter, Kaplan is a senior fiduciary of the museum and the plaintiffs

challenge her independence on the basis of her charitable ties to JPMC.

5.    William Gray[9]

Gray is the President and CEO of the United Negro College Fund

("UNCF").  In 2003, JPMC matched over $1 million in UNCF donations from its

employees.  Since 1990, JPMC and its employees have contributed over

$18 million to UNCF.  In addition, Harrison has served as treasurer of UNCF.

---

[8] The court takes judicial notice that Futter's brother-in-law was terminated on January 6, 2004
(effective March 8, 2004), one week before the JPMC board approved the merger with Bank
One.  *See Cohan v. J.P. Morgan Chase & Co.*, No. 03-5981 (S.D.N.Y. 2004), Second Amended
Compl.; Joint Proxy Statement at 34.  He has since sued JPMC in connection with his
termination.  *See Cohan*, No. 03-5981, Second Amended Compl.

[9] In their answering brief, the plaintiffs provide more detailed information about Gray than is
contained in the complaint.  For example, they specify the dollar amount of JPMC's
contributions to UNCF instead of simply stating that JPMC is a sponsor.  The court takes these
facts as true since presumably the plaintiffs could amend the complaint to include them.

Based on Gray's charitable ties to JPMC and Harrison's reciprocal involvement with UNCF, the plaintiffs claim that Gray cannot vote independently.

6.    Frank Bennack

Bennack is the Chairman of the Executive Committee and Vice Chairman of the Board of the Hearst Corporation.  He was instrumental in creating Hearst-Argyle Television, Inc., which has a credit facility with a consortium of banks led, in part, by JPMC.  The plaintiffs maintain that the financial relationship between JPMC and Hearst-Argyle, when viewed in the context of the relationship between Bennack and Hearst-Argyle, causes Bennack to be unable to act independently as a director.

7.    John Stafford

Stafford is a consultant to Wyeth and he was Chairman of the Board of Wyeth from 1986 until 2003.  JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  JPMC serves as indenture trustee, paying agent, and conversion agent for $4.5 billion of Wyeth's debt securities.  The plaintiffs maintain that the financial relationship between JPMC and Wyeth precludes Stafford's ability to exercise independence as a director.

8.    M. Anthony Burns

Burns is the Chairman Emeritus and former CEO of Ryder Systems, Inc. JPMC serves as indenture trustee for Ryder, including its recent August 2003 registration of $800 million of securities.  The plaintiffs maintain that the financial

9

relationship between JPMC and Ryder impedes Burns's ability to act as an independent director.

E.     Procedure

The defendants move to dismiss, arguing that the claims asserted are derivative and that demand is not excused.  The defendants further argue that the board of directors has a majority of members who were independent and disinterested, and, therefore, the board's decision to authorize the merger is governed by the business judgment rule.

The plaintiffs oppose the motion, arguing that the claims asserted are direct. Alternatively, they argue that if the claims are found to be derivative, demand is futile and therefore excused because a majority of the board of JPMC was not able to act independently of Harrison in voting to authorize the merger and, therefore, is not capable of acting on a demand.  Even if the claims against the board are dismissed, the plaintiffs assert that they can pursue Harrison individually if he did not relay Dimon's offer to the board for its approval.

The plaintiffs also allege a breach of the directors' disclosure duties in connection with the failure to disclose material information in the proxy statement.[10]

---

[10] In their answering brief, the plaintiffs assert that ¶¶ 81-89 of the complaint state a claim for equitable fraud.  They further assert that the defendants did not address the equitable fraud claim in the defendants' opening brief.  Therefore, the plaintiffs argue, the equitable fraud claim must be permitted to go forward.  The court finds that the complaint does not adequately allege a

F.     Federal Action

A similar federal class action complaint was filed in the District of Delaware on March 17, 2005. The federal complaint alleges substantially the same claims that are before this court. It does, however, have several important differences. First, the federal complaint characterizes the deal between Harrison and Dimon as a "secret deal." This description implies that the merger negotiations were unknown to the board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that the "[d]efendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon."[11]

Second, the federal complaint alleges that JPMC violated federal securities laws, specifically Sections 10(b), 11, 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange Act of 1934. These claims are sufficient to give federal courts jurisdiction over the claims, including the related breaches of fiduciary duty claims.

---

claim for equitable fraud. Under Court of Chancery Rule 8(a), a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Nowhere in ¶¶ 81-89 of the complaint is the term "equitable fraud" to be found. Furthermore, the allegations in those paragraphs do not contain a plain statement that would put the defendants on notice that the plaintiffs were alleging equitable fraud. Moreover, "[a] class action may not be maintained in a purely common law or equitable fraud case." *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992). Even if the allegations in ¶¶ 81-89 of the complaint could be construed as equitable fraud, it is not enough to maintain a class action.

[11] Federal Compl. ¶ 144(e).

Finally, the federal complaint lists important distinguishing facts, some of which are inconsistent with facts in this action. For instance, the federal complaint states that *Harrison* offered the no-premium deal.[12] The complaint before this court makes the opposite claim, i.e. that it was Dimon who made an offer of that nature. This discrepancy is not explained.

The federal complaint alleges additional substantive facts concerning certain directors. For example, the federal complaint ties Futter's fund-raising activities to her board membership, as reported in *New York Magazine* on February 21, 2000.[13] Additionally, the federal complaint alleges that Kaplan is an attorney whose law firm receives substantial fees from JPMC.[14]

On April 18, 2005, the federal district court refused to enjoin this action.[15] In his decision, Judge Farnan stated that any possibility of harm to the federal plaintiff is speculative at this stage of the litigation. This court will therefore proceed to decide the motion to dismiss the state complaint.

## III.

In order to dismiss a complaint under Court of Chancery Rule 12(b)(6), a court "must determine whether it appears with reasonable certainty that, under any

---

[12] *Id.* ¶ 81 (citing *Fortune*, Jan. 26, 2004, which states "Harrison was offering what he calls a 'market deal,' meaning that J.P. Morgan would simply buy Bank One at its current stock price – around $45 a share.").

[13] *Id.* ¶ 171.

[14] *Id.* ¶ 174.

[15] *Hyland v. Harrison*, C.A. No. 05-162, mem. order (D. Del. Apr. 18, 2005).

set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[16]  When making its decision, a court must accept as true all well-pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts.[17]  But a court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[18]

A.    Direct Or Derivative Analysis

The court begins by analyzing whether the stated claims are direct or derivative.  The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative to "turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[19]  "[U]nder *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint."[20]  "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists."[21]

---

[16] *VLIW Tech., L.L.C. v. Hewlett-Packard Co.*, 840 A.2d 606, 610-11 (Del. 2003) (quotations omitted).

[17] *Grobow v. Perot*, 539 A.2d 180, 187 n.6 (Del. 1988).

[18] *Id.* at 187.

[19] *Tooley v. Donaldson, Lulkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

[20] *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004).

[21] *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004).

13

The plaintiffs' main complaint is that the defendant directors breached their fiduciary duty by approving a merger exchange ratio that paid an unnecessary or excessive premium to Bank One stockholders. This premium, the plaintiffs argue, prevented them from receiving their fair share of the resulting business combination, causing them to be harmed directly through dilution of their collective ownership percentage.

1.    <u>Who Suffered The Alleged Harm?</u>

In order to show a direct injury under *Tooley*, a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[22]

By describing the harm as a dilution of their stockholder interests, the plaintiffs attempt to allege a harm to them that does not affect the corporation. But their argument fails to acknowledge the context in which they were allegedly harmed. "[A] complaint that 'directly challenges the fairness of the process and the price' of a merger suggests . . . that the corporation suffered harm . . . and that the harm suffered by stockholders is only a natural and foreseeable consequence of the harm to the corporation."[23] At the heart of their complaint, the plaintiffs claim that JPMC overpaid for Bank One. If JPMC had paid cash for Bank One, the

---

[22] 845 A.2d at 1039.
[23] *Agostino v. Hicks*, 845 A.2d 1110, 1119 (Del. Ch. 2004) (quoting, in part, *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999)).

14

plaintiffs' claim would clearly be derivative.  JPMC would have suffered the alleged harm by paying too much money for Bank One.  Any such cash overpayment would not have harmed the stockholders of JPMC directly.  The only harm to the stockholders would have been the natural and foreseeable consequence of the harm to JPMC.

The fact that this transaction was effectuated by issuing stock and not by paying cash does not change the result.  The harm, if any, was still suffered by JPMC.  Although "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims,"[24] "[they] are individual in nature [only] where a significant stockholder's interest is increased at the sole expense of the minority."[25]  "[T]o the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares . . . results from the issuance of new equity to a third party . . . , plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed."[26]

Here, the plaintiffs rely on the claim of "dilution" in an attempt to frame the harm as direct.  But, they do not allege any stockholder dilution in relation to pre-merger voting rights.  Instead, their claim of dilution is related to the issuance of stock to consummate the merger.  This dilution claim is based on the merger

---

[24] *Gentile v. Singlepoint Fin.*, 2003 WL 1240504, at *5 n.36 (Del. Ch. Mar. 5, 2003).
[25] *In re Paxson Communication Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 10, 2001).
[26] *Id.*

exchange ratio, which was a necessary result of the purchase price for Bank One.
Any alleged dilution was a harm suffered by all pre-merger JPMC stockholders
and, consequently, JPMC itself.  Thus, the harm alleged in the complaint cannot
give rise to a direct claim.

In response to the court's request for support "for the proposition that a
claim which would undoubtedly be a derivative claim is somehow converted into a
direct claim because of the form of consideration,"[27] the plaintiffs were not able to
cite any persuasive authority.  Indeed, in their post-hearing submissions, the
plaintiffs were unable to point to any authority under Delaware law that the
direct/derivative analysis is affected by the form of consideration used in a
transaction.  In fact, Delaware case law states that "if a board of directors
authorizes the issuance of stock for no or grossly inadequate consideration, the
corporation is directly injured and shareholders are injured derivatively."[28]
Furthermore, as Chancellor Chandler has recently noted, "[m]ere claims of
dilution, without more, cannot convert a claim traditionally understood as
derivative, into a direct one."[29]  Thus, the plaintiffs' argument that they were
harmed directly because the merger consideration was stock instead of cash must
fail as a matter of law.

---

[27] Tr. at 44.
[28] *Avacus Partners, L.P. v. Brian*, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990).
[29] *Gatz v. Ponsoldt*, 2004 WL 3029868, at *7 (Del. Ch. Nov. 5, 2004).

16

Putting the 14% premium payment in the proper context, the court finds that any alleged harm was suffered by JPMC, regardless of whether the payment was in cash or in stock. The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC. Therefore, under the first prong of *Tooley*, the court concludes that the plaintiffs' claim is derivative.

2.    <u>Who Would Receive The Benefit Of Any Recovery Or Other Remedy?</u>

Under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will benefit from the remedy.[30] Here, the plaintiffs seek a return of the "proper interest"[31] of JPMC to stockholders who owned pre-merger JPMC stock, but they offer no explanation of what such a proper interest might be. Additionally, the plaintiffs are unable to demonstrate why they, and not JPMC, should receive the benefit of any remedy.

As discussed above, if there was harm suffered by payment of a merger premium, JPMC suffered it. Thus, if the defendants are found liable, the remedy will accrue to JPMC. Although the plaintiffs go to great lengths to define the class in a way that would allow them to argue for a direct class benefit, their effort to make the claim direct fails. The plaintiffs' argument that the previous Bank One stockholders, who ostensibly have already benefitted from any misconduct, should

---

[30] 845 A.2d at 1033.
[31] Pls.' Answering Br. at 43.

17

be excluded from the remedy is not persuasive.  Any remedy from the alleged

harm would necessarily accrue to JPMC and not to a subset of stockholders.

Therefore, the plaintiffs' claims are derivative under the second question of *Tooley*.

B.    Section 220 Demand

Before turning to the issue of whether demand should be excused, the court

notes that the plaintiffs did not make a books and records demand of JPMC before

filing suit.  Section 220 of the Delaware General Corporation Law provides that

stockholders have the right to inspect a corporation's books and records for "any

proper purpose."[32]  Both the Delaware Supreme Court and the Court of Chancery

"have continually advised plaintiffs who seek to plead facts establishing demand

futility that the plaintiffs might successfully have used a Section 220 books and

records inspection to uncover such facts."[33]

In this case, the court is once again confronted with a situation in which the

plaintiffs attempt to plead demand futility, but have not sought access to the books

and records of the corporation under section 220.  Like the plaintiff in *Beam*, the

plaintiffs here did not seek information from the defendant corporation that may

have provided them additional facts, from which they could have fashioned a more

particularized complaint.  For example, if the plaintiffs had successfully sought

information from JPMC, they most likely would have learned whether Harrison

---

[32] 8 *Del. C.* § 220.
[33] *Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004).

18

presented a no-premium offer to the board.  Instead, the plaintiffs rely on general wording from public filings that Harrison kept the board informed.

Furthermore, the plaintiffs could have used section 220 to learn more about the relationships between Harrison and the defendant directors.  As the Delaware Supreme Court noted in *Beam*, plaintiffs who seek information under section 220 may be able to review the minutes of board meetings and determine how the directors handled the CEO's proposals or conduct in various contexts.[34]  Armed with this information, the plaintiffs may have been able to link the alleged relationships to directors' conduct through particularized facts.

Despite the frequent admonitions of the Delaware Supreme Court and the Court of Chancery, the plaintiffs did not pursue this remedy.  Although their failure to use "a books and records inspection does not change the standard to be applied to review of the complaint,"[35] the court notes at the outset that the plaintiffs had the time and opportunity to file such an action.  The plaintiffs did not learn of the alleged no-premium offer from the newspaper article until days before the merger closed.  During the short time available before the merger, they did not seek injunctive relief that may have delayed the closing.  Once the merger closed, however, the plaintiffs had ample time and opportunity to investigate the facts behind the anonymous allegations in the newspaper article through the filing of a

---

[34] *Id.*

[35] *Id.* at 1057 n.52.

19

section 220 action.  The plaintiffs did not file the amended complaint until two

months after the merger closed.

C.    <u>Demand Futility</u>

The plaintiffs argue that if their claims are derivative, demand is excused

because it would be futile.  Under Court of Chancery Rule 23.1, "a plaintiff

shareholder [must] make a demand upon the corporation's current board to pursue

derivative claims owned by the corporation before a shareholder is permitted to

pursue legal action on the corporation's behalf."[36]  If a plaintiff argues demand

futility, the two-prong test under *Aronson* and its progeny must be met.[37]  The first

prong of the *Aronson* test is whether "a shareholder [has pled] *with particularity*

facts that establish that demand would be futile because the directors are not

independent or disinterested."[38]  The second prong of the test is whether "a

reasonable doubt is created that . . . the challenged transaction was otherwise the

product of a valid exercise of business judgment."[39]  The two prongs of the

*Aronson* test are disjunctive, meaning that if either part is satisfied, demand is

excused.[40]

---

[36] *Jacobs v. Yang*, 2004 WL 1728521, at *2 (Del. Ch. Aug. 2, 2004), *aff'd*, 867 A.2d 902 (Del. 2005).
[37] *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000); *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).
[38] *Jacobs*, 2004 WL 1728521, at *2 (emphasis in original).
[39] *Aronson*, 473 A.2d at 814.
[40] *Brehm*, 746 A.2d at 256.

1.    First Prong Of *Aronson*

The plaintiffs argue that demand is excused under the first prong of the *Aronson* test because at least eight of the twelve directors on the board fail the test of being disinterested and independent.[41]  Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[42]  "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[43]

Here, none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial benefit from it other than one that devolved on all JPMC stockholders alike.  Thus, there is no issue regarding these directors' interest in the deal.  Rather, the thrust of the plaintiffs' allegations is that the directors were so positioned, as a result of various business, charitable, or family relationships, that they were disabled from exercising independent judgment.  The complaint alleges that, through these various relationships, the outside directors were beholden to Harrison and unable to act independently of Harrison's influence.

---

[41] The plaintiffs do not challenge the independence of directors Becherer, Biggs, and Raymond. Harrison is the twelfth director and his lack of independence is not disputed in this motion to dismiss.

[42] *Aronson*, 473 A.2d at 812.

[43] *Id.* at 816.

JPMC's board consists of twelve directors. Thus, the plaintiffs need to show that 5 directors, plus Harrison, were not independent.[44] The court's review of the complaint's well-pleaded allegations shows that, in addition to the three concededly independent directors, the plaintiffs fail to meet their burden with respect to any of the other outside directors.

Before analyzing each director individually, the court pauses to note the overall structure of the JPMC board. The board is dominated by outsiders. Eleven of the twelve directors are not employees of JPMC. Harrison cannot fire any of them. Additionally, Harrison is not a controlling stockholder of JPMC and therefore has no power to oust them as directors through a stockholder vote. On the contrary, it is the eleven outside directors who collectively have the power to dismiss Harrison and the rest of his management team. The plaintiffs allege that the defendant directors are beholden to Harrison, but they fail to demonstrate why that is so. Even in cases in which the CEO had a supermajority of voting power, courts have upheld outside directors' independence in the face of additional relationships.[45] Here, Harrison reports to a board of directors that he cannot fire or

---

[44] *See Beam*, 845 A.2d at 1046 ("[D]emand is excused where a board is evenly divided between interested and disinterested directors.").

[45] *Id.* at 1051 ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

remove, a fact that appears lost in the allegations that each director, no matter how indirectly, has some external relationship to JPMC.

The court begins its analysis by looking to defendant directors Bennack, Stafford, and Burns, whose independence is questioned by the plaintiffs due to certain financial ties to JPMC. These three directors are, or were, intimately involved with several of America's largest corporations. All three directors have substantial personal wealth invested in their related companies, each of which conducts business with JPMC.

JPMC is a national commercial and investment bank. That it provided financing to large American companies should come as no shock to anyone. Yet this is all that the plaintiffs allege. What the plaintiffs fail to allege are facts showing a connection between the financing and these three defendant directors. Instead, the plaintiffs attempt to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares[46] and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank. The allegations raised against all three of these directors are simply not enough, without more, to raise a substantial question about their independence.

---

[46] Facts about the stock ownership of Bennack, Stafford, and Burns are contained in the plaintiffs' answering brief. *See supra* note 9.

The plaintiffs also challenge the independence of Bechtel based on his business relationships.  The complaint alleges facts that indicate Bechtel's business ties to JPMC are more direct and more substantial than those of Bennack, Stafford, and Burns, but the complaint again fails to show how such facts impinge on Bechtel's ability to act independently of Harrison.  Although Bechtel's company has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison.  Therefore, the complaint fails to adequately challenge Bechtel's independence.

The court next turns to Futter, whose independence is challenged because she is President and trustee of The American Museum of Natural History.[47]  The plaintiffs make much of the fact that JPMC contributes to the museum.  But the plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter.  Indeed, the plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by JPMC.  The plaintiffs state that JPMC is a significant benefactor, but they never state how

---

[47] Futter is also challenged due her brother-in-law's employment with JPMC.  This employment, however, was terminated before the JPMC board voted on the merger, so the court will not consider this allegation.  *See Grobow*, 539 A.2d at 187 ("A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").

JPMC's contributions could, or did, affect the decision-making process of the

president of one of the largest museums in the nation.  Therefore, as alleged, the

complaint does not demonstrate that Futter is not independent.

The plaintiffs make the same conclusory argument about Kaplan as they do

about Futter.  The only allegation against Kaplan is her relationship to The

American Museum of Natural History.  Again, the plaintiffs fail to connect

JPMC's contributions to the potential lack of independence of a JPMC director.[48]

---

[48] Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence.  *See, e.g., In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003); *In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692 (Del. Ch. Mar. 27, 2002); *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985).  But in those cases, the complaints had many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors.  In *Oracle*, two special litigation committee members, both professors at Stanford, were asked to investigate other Oracle board members who had the following substantial ties to Stanford: (i) one of the other directors was a professor at Stanford who had taught one of the special litigation committee members; (ii) another director was "a Stanford alumnus who [had] directed millions of dollars of contributions to Stanford during recent years;" and (iii) "Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, . . . was considering making donations of his $100 million house and $170 million for a scholarship program." *Oracle*, 824 A.2d at 920-21.  In *The Limited*, the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $25 million donation to the university. *The Limited, Inc. S'holders Litig.*, 2002 WL 537692 at *6-7.  In *Fuqua*, the court found that the sole member of the special litigation committee was not independent because he was President of Duke University, which had recently received a $10 million pledge from the company, and the CEO was a trustee of Duke.  *Fuqua*, 502 A.2d at 966-67.  Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University.  Moreover, *Oracle* and *Fuqua* were cases in which the court made searching inquiries into the nature of a special litigation committee member's independence.  *Beam*, 845 A.2d at 1055 (discussing the special litigation committee's burden of establishing its own independence).  Finally, as noted above, the plaintiffs here did not make a section 220 books and records demand. If they had, they would have been able to investigate the decision-making process behind the qualification of the directors as independent under the NYSE Corporate Governance rules.  Instead, they rely on conclusory allegations that do not create a reasonable doubt about Futter's or Kaplan's independence based on the charitable ties to The American Museum of Natural History.

They simply aver that Kaplan was a trustee of an institution that received contributions from JPMC. Therefore, as pled, the complaint does not raise a substantial question about Kaplan's independence.

Next in the analysis is Bossidy, whose independence is challenged because his son is employed by JPMC. Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management. For example, the NYSE rules governing director independence focus on this subject, holding that employment of a child as an executive officer of the corporation may disqualify an outside director from serving as a disinterested member of the board.[49] Delaware courts also recognize that familial ties to management can disqualify one from functioning disinterestedly.[50] In this case, however, Bossidy's son is not an executive officer of JPMC, and the complaint does not allege that Bossidy and his son live in the same household. Under NYSE Corporate Governance rules, Bossidy was found to meet the criteria for certification as an outside, independent director. Moreover, the fact that Bossidy's son is employed by JPMC is duly disclosed in JPMC's proxy materials. For these reasons, the plaintiffs' attack on Bossidy's independence must fail.

---

[49] NYSE Corporate Governance Rule 303A.02(b)(i) ("In addition, a director is not independent if . . . [t]he director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company.").

[50] *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (finding that familial interest is a basis for demand excusal).

Finally, the court turns to Gray, who is challenged due to his charitable ties with Harrison.  At first glance, the reciprocal relationship between JPMC and UNCF, as evidenced by the positions held by Gray and Harrison, could call into question the independence of Gray.  However, upon closer examination, the court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray.  Nowhere in the complaint do the plaintiffs aver that Harrison was treasurer of UNCF during the merger negotiations or the board vote.  Indeed, this uncertainty about Harrison's involvement with UNCF at the relevant time is noted by the plaintiffs in their answering brief, which states that Harrison's relationship to UNCF is not disclosed in the joint proxy statement.  Furthermore, just as they fail to indicate the importance of JPMC's contributions to The American Museum of Natural History, the plaintiffs fail to indicate how JPMC's contributions would affect UNCF and therefore influence Gray.  The plaintiffs provide only the dollar value, not the representative percentage, of JPMC's contributions to UNCF.  Thus, the plaintiffs' allegations do not successfully challenge Gray's independence.

In addition to the three concededly independent directors, the court finds that the other eight outside directors are also independent.  Therefore, the plaintiffs will be unable to prove that a majority of the board of JPMC was either interested or not independent under the first prong of *Aronson*.

27

2.    <u>Second Prong Of *Aronson*</u>

The plaintiffs argue that demand is also excused under the second prong of

the *Aronson* test.  In order to succeed in their argument, the "plaintiffs must allege

particularized facts that raise doubt about whether the challenged transaction is

entitled to the protection of the business judgment rule."[51]  Specifically, the

"plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt

that the action was taken honestly and in good faith or (2) a reason to doubt that the

board was adequately informed in making the decision."[52]

Nothing in the complaint indicates that the JPMC board was not adequately

informed about the negotiations with Bank One.  Indeed, the plaintiffs note that the

proxy materials stated Harrison kept the board informed of the negotiations.  Yet

this fact presents a paradox for the plaintiffs.  They need to allege that Harrison

informed the board in order to list the other directors as defendants, but they would

rather label those same directors as "uninformed" in order to succeed on the second

prong of *Aronson*.  The complaint fails, however, to allege facts that would

indicate that the board was presented with the decision, but was not provided with

information from which it could make a proper decision.

---

[51] *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003) (citing *Aronson*, 473 A.2d at 814-15).
[52] *Walt Disney*, 825 A.2d at 286.

With regard to the honesty and good faith of the board, the plaintiffs do not allege any facts that directly call into question the acts of the directors. The plaintiffs' allegations concern only the directors' relationships to Harrison. Nowhere in the complaint do the plaintiffs allege that any individual defendant director personally acted without honesty and good faith. The only allegation in the complaint is that somehow, due to their financial, charitable, or personal relationship to Harrison, the individual director defendants were beholden to Harrison, allegations that have already been found to be insufficient.

Due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information, the court finds that the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule.

The plaintiffs are unable to meet either prong of the *Aronson* test. They have failed to show that a majority of the board is either interested or not independent. They have also not shown why the board's decision is not protected by the business judgment rule. Thus, the plaintiffs' derivative claim must be dismissed because demand is not excused.

29

C.     Proxy Disclosure

Finally, the court turns to the plaintiffs' claim that the defendants breached their fiduciary duty by publishing materially inaccurate or incomplete disclosures regarding the proxy statement.  The plaintiffs claim that the purported class was harmed because the proxy did not include information about the alleged offer from Dimon to Harrison.  Notably, however, the complaint does not claim that the merger itself harmed either JPMC or the class.  The harm alleged is the lost opportunity to vote for and approve a better deal, *i.e.* the Dimon offer that was rejected during negotiations and never approved by either board of directors.  For this alleged harm, the complaint seeks money damages.

The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim.  This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.

The disclosure claim alleged by the plaintiffs, like the disclosure claims in *In re Triarc Cos. Class & Derivative Litig.*, if proven, could have supported a claim for equitable relief.[53]  In this case, the plaintiffs did not seek an injunction to stop

---

[53] 791 A.2d 872, 876 (Del. Ch. 2001).  As this court stated in *Triarc*, "*Loudon* recognized a much broader category of cases in which a violation of the duty of disclosure will ordinarily support only a claim for equitable or injunctive relief." *Id.*

the merger before it closed.  The time period between the publication of the article

in *The New York Times* and the consummation of the merger was quite short.

Nevertheless, the plaintiffs had time to seek a temporary restraining order to

preserve the *status quo*, and, had they done so, could have secured the ability to

obtain further equitable remedies, such as an order requiring that JPMC amend its

proxy statement and resolicit the stockholders for another vote.  The plaintiffs also

did not act promptly to preserve any other claimed equitable remedies, such as

rescission.  Now, of course, the "eggs" have been irretrievably "scrambled" and

there is no possibility of effective equitable relief.

Because equitable relief is no longer practicable, the plaintiffs present their

disclosure claim as one seeking money damages.  There are several problems with

this approach.  In order for the plaintiffs' request for compensatory damages

arising from a violation of the duty of disclosure to survive a motion to dismiss, the

court must find that the plaintiffs have set forth in a well-pleaded complaint

allegations to support those damages.[54]  But, for the reasons already discussed, the

court concludes that the injury alleged in the complaint is properly regarded as

injury to the corporation, not to the class, and the damages, if any, flowing from

that alleged breach of fiduciary duty belong to the corporation, not to the class.

How then could the same directors ever be liable to pay actual compensatory

---

[54] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 919 (Del. Ch. 1999).

31

damages to both the corporation and the class for the same injury? The answer, as *Loudon* implicitly recognizes, is that they could not.[55] While the disclosure claim might have given rise to an entitlement to equitable relief that could have been pursued by the stockholders individually or as a class action, the disclosure claim simply does not give rise to a claim for substantial, compensatory damages in this situation. Instead, the claim for actual damages, if there is one, belongs to the corporation and can only be pursued by the corporation, directly or derivatively.

As in *Loudon*, the plaintiffs try to rely on *Tri-Star*[56] for the rule that there is a "per se rule of damages for breach of the fiduciary duty of disclosure."[57] This is no longer an accurate statement of Delaware law. *Loudon* limited *Tri-Star* to its facts, holding that "*Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages."[58] For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or

[55] *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997).
[56] *In re Tri-Star Pictures, Inc., Litig.,* 634 A.2d 319 (Del. 1993).
[57] *Loudon*, 700 A.2d at 141.
[58] *Id.* at 142 (describing *Tri-Star's* per se discussion as dictum). *See also Triarc*, 791 A.2d at 877 ("*Tri-Star* was narrowly limited to its facts in *Loudon v. Archer-Daniels-Midland Co.*"). However, at least one subsequent case states that *Malone* "constitute[s] a retreat to *Tri-Star's* per se rule of damages for all violations of the fiduciary duty of disclosure." *O'Reilly*, 745 A.2d at 918 (discussing *Malone v. Brincat*, 722 A.2d 5 (Del. 1998)). This court does not agree. The *Malone* court was presented with the issue of disclosure in the context of public documents filed as a matter of course with the SEC, not proxy statements soliciting stockholder votes. *Malone*, 722 A.2d at 8. Thus, *Malone's* discussion of the duty of disclosure as it relates to solicitation of stockholder votes is dictum and not controlling.

voting interests of the class of JPMC stockholders. The only economic injury the plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent.[59]

For these reasons, the court concludes that the complaint does not state a cognizable disclosure claim. The issues about the adequacy of the proxy statement disclosure would be of continuing relevance to the underlying derivative claim. For example, the quality of those disclosures is relevant to any potential defense based on a theory of stockholder ratification.[60] Nevertheless, there is no possibility of recovery of either nominal or substantial damages by the class on this complaint.[61]

---

[59] 634 A.2d at 332 ("[T]he power of *Tri-Star*'s minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.").

[60] *See Yiannatsis v. Stephanis,* 653 A.2d 275, 280 (Del. 1995) ("Ratification can occur only if the stockholders are fully informed of the consequences of their vote.").

[61] The court also notes with interest a recent decision of the United States Supreme Court holding that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo,* 125 S.Ct. 1627, 1629 (2005). Thus, the Court affirmed the dismissal, on a Rule 12(b)(6) motion, of a claim that failed to allege facts showing that the misleading disclosures had actually caused loss to the plaintiff beyond the simple assertion that the plaintiff's purchase price was inflated by the defendants' misconduct. In its unanimous opinion, the Court recognized that judicially implied rights of action under the federal securities laws are based on the common law of deceit or misrepresentation, which recognizes that a "plaintiff 'must have suffered substantial damage,' not simply nominal damages, before 'the cause of action can arise.'" *Id.* at 1632 (quoting, in part, W. KEETON ET AL., PROSSER AND KEETON ON LAW OF TORTS § 110, at 765 (5th ed. 1984)).

**IV.**

For the foregoing reasons, the motion to dismiss is GRANTED.  IT IS SO
ORDERED.

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit F



2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

**Motions, Pleadings and Filings**


United States District Court,
E.D. Pennsylvania.
Jeff JANOVICI, Individually and On Behalf of All
Others Similarly Situated
v.
DVI, INC., et al.
Mark B. WILLIAMS, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Allison B. RICE, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Bharat PAREKH, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Stephen BENCE, IV, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Murari OJHA, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Kenneth GROSSMAN, Individually and On Behalf
of All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Shirley H. KAREL, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
**No. Civ.A.2:03CV04795-LD, Civ.A.2:03CV04963-**
**LD, Civ.A.2:03CV05000-LD,**
**Civ.A.2:03CV05111-LD, Civ.A.2:03CV05141-LD,**
**Civ.A.2:03CV05244-LD,**
**Civ.A.2:03CV05336-LD, Civ.A.2:03CV05674-LD.**


Filed Aug. 20, 2003.
Nov. 25, 2003.
represented by Marc A. Topaz, Schiffrin &
Barroway, LLP, Bala Cynwyd, PA, Lead Attorney,
Attorney to be Noticed, for Jeff Janovici, Individually
and on Behalf of all Others Similarly Situated,

Plaintiff.

represented by Gary M. Schildhorn, Adelman Lavine
Gold & Levin, Philadelphia, PA, Lead Attorney,
Attorney to be Noticed, for DVI, Inc., Defendant.

represented by Maura E. Fay, Dilworth Paxson LLP,
Philadelphia, PA, Lead Attorney, Attorney to be
Noticed, for Steven R. Garfinkel, Defendant.

represented by Andrew L. Barroway, Darren J.
Check, Schiffrin & Barroway, LLP, Bala Cynwyd,
PA, Lead Attorney, Attorney to be Noticed, Jeffrey
M. Norton, Wechsler Harwood, LLP, New York,
NY, Lead Attorney, Attorney to be Noticed, for
Stephen Bence, IV, Movant.

represented by Deborah R. Gross, Law Offices
Bernard M. Gross, PC, Philadelphia, PA, Lead
Attorney, Attorney to be Noticed, Susan R. Gross,
Law Offices Bernard Gross, PC, Philadelphia, PA,
Lead Attorney, Attorney to be Noticed, for Milton
Wolson, Movant.

represented by DeBorah R. Gross, Susan R. Gross,
(See above for address), Lead Attorney, Attorney to
be Noticed, for Bharat Parekh, Movant.

represented by Deborah R. Gross, Susan R. Gross,
(See above for address), Lead Attorney, Attorney to
be Noticed, for James Schwartz, Movant.

represented by Robert A. Kauffman, Berger and
Montague, Philadelphia, PA, Lead Attorney,
Attorney to be Noticed, for Gottlieb Family
Foundation Trust, Movant.

represented by Robert A. Kauffman, (See above for
address), Lead Attorney, Attorney to be Noticed, for
Richard Morrell, Movant.

represented by M. Richard Komins, Barrack Rodos
& Bacine, Philadelphia, PA, Lead Attorney, Attorney
to be Noticed, for Thomas Sciba, Movant.

represented by Steven A. Schwartz, Chimicles &
Tikellis LLP, Haverford, PA, Lead Attorney,
Attorney to be Noticed, for Kenneth Grossman,
Movant.

represented by Steven A. Schwartz, (See above for

Not Reported in F.Supp.2d                                                                                      Page 2
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

address), Lead Attorney, Attorney to be Noticed, for
Cedar Street Funds, Movant.

 represented by Steven A. Schwartz, (See above for
address), Lead Attorney, Attorney to be Noticed, for
Cedar Street Offshore Fund, Movant.

 represented by Joanne G. Noble, Trujillo Rodriguez
& Richards LLC,  The Penthouse, Philadelphia, PA,
Lead Attorney, Attorney to be Noticed, R. Bruce
McNew, Taylor & McNew, Greenville, DE, Lead
Attorney, Attorney to be Noticed, for Shirley H.
Karel, Movant.

*MEMORANDUM*

DAVIS, J.

 *1 Presently pending before the Court are eight
securities fraud class action lawsuits against Michael
A. O'Hanlon ("O'Hanlon"), former Chief Executive
Officer and President of DVI and a former member
of its Board of Directors, and Steven R. Garfinkel
[FN1] ("Garfinkel"), Chief Financial Officer and
Executive Vice President of DVI   [FN2] and a
member of its Board of Directors, and the
underwriter of its securities, Merrill Lynch & Co.,
Inc. ("Merrill Lynch"), who was, at all relevant times,
DVI's financial advisor and the lead underwriter in
managing DVI's securitizations. (Garfinkel and
O'Hanlon are collectively identified as the "DVI
Defendants"; O'Hanlon, Garfinkel and Merrill Lynch
are collectively identified as "Defendants".) These
eight actions (the "DVI Actions") allege claims under
Section 21D(a)(3)(B) of the Securities Exchange Act
of 1934 (the "Exchange Act"), as amended by the
Private Securities Litigation Reform Act of 1995 (the
"PSLRA"). Defendants are alleged to have violated
Sections 10(b) and 20(a) of the Exchange Acts, and
Rule 10b-5.

> FN1. On August 13, 2003, DVI placed
> Garfinkel on administrative leave.

> FN2. DVI is not named as a defendant in the
> instant action because it filed for Chapter 11
> Bankruptcy protection on August 25, 2003

 Numerous plaintiffs request consolidation the DVI
Actions pursuant to Rule 42(a) of the Federal Rules
of Civil Procedure. Multiple plaintiffs also petition to
be appointed as Lead Plaintiff as well as for approval
of their selection of Lead Counsel. On November 21,
2003, this Court held oral argument with respect to
these motions. Based on the parties' submissions and

the oral arguments presented to the Court, we grant
the Cedar Street Group's Motion to Consolidate,
appoint the Cedar Street Group as Lead Plaintiff, and
approve Krislov & Associates, Ltd. to serve as Lead
Counsel and Chimicles & Tikellis LLP to serve as
Liaison Counsel.

I. BACKGROUND

 On July 25, 2003, James T. Bennett filed a class
action on behalf of purchasers of DVI stock during
the period of November 7, 2001 through June 27,
2003, against DVI (the "Bennett Complaint"), an
independent specialty finance company for healthcare
providers worldwide with $2.8 billions of managed
assets, and O'Hanlon and Garfinkel. The Bennett
Complaint alleged that DVI and the DVI Defendants
violated Sections 10(b) and 20(a) of the Exchange
Acts, and Rule 10b-5. Specifically, the Bennett
Complaint alleged that DVI and the DVI Defendants
participated in a fraudulent scheme and course of
business that operated as a fraud or deceit on
purchasers of DVI common stock by disseminating
materially false and misleading statements and/or
concealing material adverse facts. The Bennett
Complaint alleged that the scheme did in fact: (i)
deceive the investing public regarding DVI's business
and operations and the intrinsic value of DVI
securities; (ii) enable DVI to sell $25 million of its
subordinated convertible notes during the class
period; (iii) enable DVI to secure credit facilities for
$175 million on favorable terms; and (iv) cause
Bennett and other members of the Class to purchase
DVI securities at artificially inflated prices. (Bennett
Compl. ¶  56). On August 26, 2003, the Bennett
Complaint was voluntarily dismissed.

 *2 On August 20, 2003, Jeff Janovici ("Janovici")
filed a class action against DVI, O'Hanlon and
Garfinkel (DVI, O'Hanlon and Garfinkel collectively
identified as the "Janovici Defendants") on behalf of
purchasers of DVI stock during the period of
November 7, 2001 through June 27, 2003, alleging
violations of Section 10(b) and 20(a) and the
Exchange Action and Rule 10b-5 (the "Janovici
Complaint").   [FN3] Specifically, the Janovici
Complaint alleges that the Janovici Defendants
participated in a fraudulent scheme and course of
business that operated as a fraud or deceit on
purchasers of DVI securities by disseminating
materially false and misleading statements and/or
concealing material adverse facts. The scheme: (i)
deceived the investing public regarding DVI's
business and operations and the intrinsic value of
DVI securities; (ii) enabled DVI to sell $25 million of

Not Reported in F.Supp.2d                                                                                              Page 3
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

its subordinated convertible notes during the class period; (iii) enabled DVI to secure credit facilities for $175 million on favorable terms; and (iv) caused plaintiff and members of the Class to purchase DVI securities at artificially inflated prices. (Janovici Compl. ¶ 14). On September 15, 2003, the Court entered an Order, pursuant to 11 U.S.C. § 362, staying the Janovici action with respect to DVI because the company had filed for bankruptcy protection.

> FN3. The law firm of Schiffrin & Barroway filed the Janovici Complaint on behalf on Mr. Janovici. Schiffrin & Barroway also filed the Bennett Complaint on behalf of Mr. Bennett.

On September 3, 2003, Mark B. Williams ("Williams") filed a class action against on behalf of purchasers of DVI common stock and Senior Notes during the period of November 7, 2001 through August 13, 2003 (the "Class Period"), [FN4] O'Hanlon and Garfinkel alleging violations of Sections 10(b) and 20(a) of the Exchange Acts, and Rule 10b-5 (the "Williams Complaint"). Specifically, the Williams Complaint alleges that the DVI Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DVI's securities. (Williams Compl. ¶ 73).

> FN4. Three of the complaints define the class period as November 7, 2001 through June 27, 2003, and four of the complaints extend the class period through August 13, 2003. Because four of the complaints allege that false and/or materially misleading statements were made through August 13, 2003, we find that Class Period should be extended through that date.
> One complaint, Civil Action No. 03-5674, however, defines the class period as September 1, 2001 through August 13, 2003. Because the complaint filed in this actions fails to allege that any false and/or materially misleading statements were made prior to November 7, 2001, we find that there is no basis for setting the Class Period prior to this date.

In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(I), Williams published a notice of pendency of the action in *Business Wire* on September 3, 2003. Since the filing of the Williams Complaint, six other complaints arising out of similar, if not identical, facts alleging parallel claims have been filed in the Eastern District of Pennsylvania. In addition to these six complaints, six plaintiff and/or plaintiff "groups" filed motions requesting: (i) consolidation of the actions; (ii) appointment as lead plaintiff; and (ii) approval of selection of lead counsel. [FN5]

> FN5. The following plaintiffs filed complaints did not move for appointment as Lead Plaintiff: (I) Mark B. Williams, (ii) Jeff Janovici, (iii) Murari P. Ojha, and (iv) Allison B. Rice.

A. The Movants

1. Thomas Sciba

Mr. Sciba is an individual investor who allegedly suffered losses of approximately $30,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. [FN6]

> FN6. Mr. Sciba did not pursue appoint as Lead Plaintiff beyond the filing of his motion for appointment as lead plaintiff.

2. Stephen Bence, IV

**\*3** Mr. Bence is an individual investor who allegedly suffered losses of approximately $60,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements.

3. The Wolson Group

The Wolson Group is comprised of three individual investors, Milton Wolson, Bharat Parekh, and James Schwartz. The Wolson Group asserts losses of approximately $60,656.30.

4. The Gottlieb/Morrell Group

The Gottlieb/Morrell Group is comprised of the Gottlieb Family Foundation Trust and individual investor Richard W. Morrell. The Gottlieb/Morrell Group claims to have suffered losses of approximately $46,000.

5. The Cedar Street Group

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

The Cedar Street Group is comprised of two institutional investors, the Cedar Street Fund and the Cedar Street Offshore Fund, and an individual investor, Kenneth Grossman. The Cedar Street Group alleges that it suffered losses in excess of $1.6 million as result of purchasing DVI securities at prices inflated by the DVI Defendants' false and misleading statements.

6. The Karel Group

The Karel Group is comprised of seven individual investors who allege a preexisting investment relationship. The Karel Group claims to have suffered losses of approximately $333,000.

II. DISCUSSION

A. Motions to Consolidate

A court has broad discretion to consolidate actions involving common questions of law or fact ... if it will facilitate the administration of justice." *See Smithkline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 2001 WL1249694, at * 5 (E.D.Pa. Sept. 26, 2001) (citing Fed.R.Civ.P. 42(a)). Rule 42(a) provides:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any of all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a). "When considering consolidation the court 'must balance the benefits of judicial economy and expediting the litigation against the possibility of prejudice." ' *Smithkline Beecham,* 2001 WL1249694, at *5 (quoting *Kerley v. Great Lakes Dredge & Dock Co.,* 1996 WL 131136, at *1 (E.D.Pa. March 20, 1996)); *see also Rosario v. SCM Group USA, Inc.,* 2003 WL 21982116, at *1 (E.D.Pa. July 2, 2003) ("Consolidation is at the discretion of the trial court and "should be permitted where the consolidation of separate actions presenting common questions of law or fact will promote convenience and economy in judicial administration.") Moreover, the PSLRA directs that cases should be consolidated where there is "more than one action on behalf of a class asserting substantially the same claim or claims." 15 U.S.C. § 78u-4(a)(3)(B)(ii).

The actions at issue share significant common issues of law and fact. A review of each of the complaints

reveals that each case involves claims against O'Hanlon and Garfinkel for violations of Rule 10b-5 and Sections 10(b) and 20(a) of the Exchange Act. Indeed, the factual basis supporting the claims asserted in the DVI Actions are parallel. The Plaintiffs are all investors who purchased common stock and/or Notes during the Class Period. Additionally, each Plaintiff, in purchasing shares of DVI stock, relied upon statements contained in the same public filings, press releases and other publications. Although the Cedar Group is unique in the claims asserted against Merrill Lynch, this difference is not determinative because the Cedar Group's claims against Merrill Lynch are premised on the same facts and statutory provisions as the claims against O'Hanlon and Garfinkel. *See Skwortz v. Crayfish Co.,* 2001 WL 1160745, at *2 (S.D.N.Y. Sept. 28, 2001) (granting consolidation of eleven complaints where each complaint was based on the same facts and statutory provision, despite the fact that all the complaints did not contain the same claims against the same defendants) (citations omitted). That the actions share common questions of law and fact and should be consolidation is further supported by the fact that each of the movants requested consolidation pursuant to Rule 42(a) and counsel for the moving plaintiffs expressly agreed on consolidation at oral argument. Because consolidation will facilitate the administration of justice and promote judicial economy without any foreseeable prejudice, the Motions to Consolidate filed by the Cedar Street Group in each of the DVI Actions are granted.

B. Appointment of Lead Plaintiff

**\*4** The PSLRA instructs that, "as soon as practicable" after the resolution of the motions to consolidate, the Court shall appoint the most adequate plaintiff to serve as lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(B)(ii).

In 1995, in response to perceived abuses in securities fraud class actions, Congress enacted the PSLRA. *See* S.Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679; H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730. "The purpose behind the PSLRA is to prevent 'lawyer-driven' litigation, and to ensure that 'parties with significant holdings in issues, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel." ' *Crayfish Co.,* 2001 WL 1160745, *2 (citations omitted). "Congress believed that this could best be

Not Reported in F.Supp.2d                                                                          Page 5
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

achieved by encouraging institutional investors to serve as lead plaintiffs. *Id.* (citations omitted). Accordingly, the PSLRA regulates the procedures for bringing class actions under the Securities Act.

The PSLRA requires plaintiffs filing private securities class action complaints to publish a notice of pendency of the suit in a widely circulated business publication or wire service no later than twenty days after the complaint is filed. 15 U.S.C. § 78u-4(a)(3)(A)(I). No later than sixty days after the publication of notice, any member of the purported class may file a motion to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). If a motion for consolidation has been made, the court shall not appoint a lead plaintiff until after it renders a decision on the motion to consolidate. 15 U.S.C. § 78u-4(a)(3)(B)(ii).

The PSLRA instructs the court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B)(I). To this end, the statute creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons that--(aa) has either filed the complaint *or* made a motion in response to a notice ...; (bb) in the determination of the court, has the largest financial interests in the relief sought by the class; (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). This presumption may only be rebutted by a member of the purported plaintiff class upon proof that the presumptively most adequate plaintiff--"(aa) will not fairly and adequately protect the interest of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Cendant Corp. Lit.,* 264 F.3d 201, 266-8 (3d Cir.2001). The process of determining the "most adequate" plaintiff has been summarized by the Third Circuit: "The Reform Act establishes a two-step process for appointing a lead plaintiff: the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class had rebutted the presumption." *In re Cendant Corp. Lit.,* 264 F.3d at 262 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) & (II)).

1. Adequacy of Notice and Filing a Timely Complaint and/or Motion

**\*5** The PSLRA instructs that, within 20 days of filing a complaint under the statute, plaintiff or plaintiffs shall "cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class ... (I) of pendency of the action, the claims asserted therein, and the purported class period; and (II) that not later than 60 days after the date on which the notice was published, any member of the purported plaintiff class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A)(I). If more than one action on behalf of the class asserting substantially the same claims or claims is filed, only the plaintiff or plaintiffs in the "first filed action shall be required to cause notice to be published." 15 U.S.C. § 78u-4(a)(3)(A)(ii).

In deciding a motion for the appointment of lead plaintiff under the PSLRA, the Court has an independent duty to scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA, that is, encouraging the most adequate plaintiff, the plaintiff with the largest financial stake in the outcome of the litigation, to come forward and take control of the litigation. *See Ravens v. Iftikar,* 174 F.R.D. 651, 654-55 (N.D.Cal.1997) (quoting *House Conf. Rep. No. 104-369,* 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 730, 731); *see also Burke v. Ruttenberg,* 102 F.Supp.2d 1280, 1309 (N.D.Ala.2000) ("A district court must exercise exceptional care to insure [sic] that in applying the lead plaintiff provisions of the statute, the concerns that motivated Congress are carefully heeded, as the determination of lead plaintiff by the district court is, with probably little exception, not immediately subject to review."); *In re Oxford Health Plans, Inc. Securities Lit.,* 182 F.R.D. 42, 45 (S.D.N.Y.1998) ("The PSLRA calls for greater supervision by the Court in the selection of which plaintiffs will control the litigation."). This means that in order for a notice of pendency to encourage the most adequate plaintiff to come forward and control the litigation, it must contain accurate information from which an interested class member may contact the Court and readily obtain a copy of the complaint in a *pending* action and/or file a motion to be appointed as lead counsel in that case. *See California Public Employees' Retirement System v. Chubb Corp.,* 127 F.Supp.2d 572, 576 (D.N.J.2001) (finding a notice inadequate where it failed to disclose the caption of the case, the docket number, the judge to whom the case was assigned, the vicinage in which the judge sits, or the address of the Court because "an interested class member would not even know to which courthouse to go to examine a copy of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

complaint" or "would not know before which judge an appropriate motion should be filed."). Requiring the provision of such information comports with the objectives of the PSLRA by ensuring that "institutional plaintiffs with expertise in the securities markets and real financial interests in the integrity of the markets and outcome of the litigation would come forward and control the litigation, rather than the lawyers and their professional plaintiffs." *Id.* at 576. Most significantly, providing information from which a interested class member may contact the Court and readily obtain a copy of the complaint in a *pending* action and/or file a motion to be appointed as lead counsel in that case shields against lawyer - driven litigation because such class members are not forced to contact noticing counsel for additional information to aid in their decision of whether to move for lead plaintiff status.

**\*6** On July 25, 2003, the Bennett action was filed by the law firm of Schriffrin & Barroway. On July 31, 2003, within 20 days of filing his complaint, Mr. Bennett caused a notice to be published noticing the pendency of the Bennett action. On August 20, 2003, Schriffrin & Barroway filed a substantially similar action on behalf of Mr. Janovici. On August 26, 2003, the Bennett action was voluntarily dismissed. On September 3, 2003, three notices of pendency were published in three different business-oriented publications and wire services. Two of the notices, one published by Schiffrin & Barroway in *PrimeZone Media Network,* and the other, published by the law firm of Caully Geller Bowman & Rudman, LLP in *PR Newswire,* noticed the pendency of the Bennett action despite the fact that the Bennett action had not been "pending" for over one week. Both of these notices stated that September 29, 2003 was the moving deadline. The third notice published on September 3, 2003 by the law firm of Milberg Weiss Bershad Hynes & Lerach LLP in *Business Wire,* noticed the pendency of the Williams action, which was filed that very day. The Williams notice stated that November 3, 2003 was the moving deadline.

In the instant action, we find that the Janovici action was the first filed action in the DVI litigation because the Bennett was voluntarily dismissed prior to the consolidation. Consequently, for purposes of the PSLRA notice requirements, we find that the Bennett notice has no effect. More significantly, we find that the Mr. Janovici failed to comply with the notice requirements of the PSLRA because he did not notice the pendency of the Janovici action, which notice is required by the plain language of the PSLRA. Indeed, the September 3, 2003 notices filed by Schiffrin &

Barroway and Caully Geller incorrectly noticed the pendency of the Bennett action, which notice was clearly inaccurate because the Bennett action was, in fact, no longer pending. Purported class members could not have relied on either of these notices for sufficient information from which they could contact the Court and readily obtain a copy of the complaint for an action filed on behalf of DVI securities holders on July 25, 2003 because no such complaint existed. Additionally, purported class members could not have filed a motion for appointment as lead plaintiff in an action that was no longer pending. We find that such misinformation in a notice of pendency does not encourage the most adequate plaintiff to come forward and take control of the litigation; therefore, it contravenes the very purpose of the PSLRA.

If the Janovici action had been properly noticed on September 3, 2003, that is, if it had noticed the pendency of the Janovici action rather than the Bennett action, the PSLRA would have required that such notice inform purported class members that they may move the Court "not later than 60 days after the date on which the notice was published" to be appointed as lead plaintiff. Sixty days from September 3, 2003 was November 3, 2003. Because the plain language of the PSLRA requires that purported class members be given 60 days from the publication date of the notice of pendency in the first filed action, we hold that November 3, 2003 was the moving deadline, as the Williams notice accurately informs the class.

**\*7** After an independent review of the Williams notice, we find that it otherwise complies notice complies with the requirements of the PSLRA. The Williams notice states:

> The law firm of Milberg Weiss Bershad Hynes & Lerach LLP announces that a class action lawsuit was filed on September 3, 2003, on behalf of purchasers of the securities of DVI, Inc ("DVI" or the "Company") (OTC: DVIX. PK) between November 7, 2001 and August 13, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). A copy of the complaint filed in this action in available from the Court, or can be viewed on Milberg Weiss' website at: *http://www.milberg.com/cases/dvi/.*
> The action is pending in the United States District Court for the Eastern District of Pennsylvania, against Defendants Michael A. O'Hanlon, former President and Chief Executive Officer and Director of DVI, and Steven R. Garfinkel, DVI's former Chief Financial Officer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

The Complaint alleges that defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10-b-5 promulgated thereunder, by issuing a series of material misrepresentations to the market between November 7, 2001 and August 12, 2003. According to the complaint, throughout the Class Period, Defendants engaged in a fraudulent scheme to deceive the public as to DVI's true financial condition. Defendants allegedly issued positive statements regarding DVI's business and operations, and overall growth in publicly disseminated press releases and SEC filings and claimed that they were a fair presentation of DVI business. According to the complaint, Defendants failed to disclose material adverse facts, including, but not limited to, the Company's failure to write down the value of certain impaired assets; its failure to properly account for and report non-recurring transactions; its failure to adopt adequate internal control; and its material overstatement of its assets and earnings. As a result of Defendants' fraudulent scheme, DVI stock became artificially inflated during the Class Period, trading as high as $20.99 per share on June 17, 2002, thereby causing damages to Class Period purchasers of DVI securities.

On August 13, 2003, after the market closed, Defendants issued a press release revealing DVI's intention to file for Chapter 11 Bankruptcy protection and that the Company had not yet secured debtor-in-possession financing. The Company blamed its dire situation on the "recent discovery of apparent improprieties in its prior dealings with lenders involving misrepresentations as to the amount and nature of collateral pledged to lenders." In the same release, Defendants announced that DVI's Chief Financial Officer, Defendant Steven Garfinkel, had been placed on administrative leave. This revelation came after Defendants announced that DVI's auditor, Deloitte & Touche LLP, had resigned over a dispute concerning the Company's accounting for certain transactions; that the Company had depleted all availability on its credit facilities; that DVI failed to make interest payments on it 9 7/8 percent Senior Notes due to severe liquidity constraints; and that the SEC had rejected the Company's filing of its quarterly report for the third quarter of 2003. Immediately following the [sic] New York Stock Exchange suspended trading of DVI stock and Senior Notes, pending delisting. On the same day, DVI stock closed at $0.30 per share, representing a one-day decline of 62.50 percent.

**\*8** If you bought the securities of DVI between November 7, 2001 and August 13, 2003 and sustained damages, you may, no later than November 3, 2003, request that the Court appoint you as lead plaintiff. According to the Exchange Act, a notice must be published within 20 days after the date on which the first complaint is filed. A notice was previously published in connection with a related action against the same Defendants. That action was withdrawn and consequently the notice filed in connection with that action has no effect. Rather, the deadline for the filing of a motion for appointment as lead plaintiff is, as stated herein, on November 3, 2003, sixty days from the publication date of this notice. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may together serve as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision whether or not to serve as lead plaintiff. You may retain Milberg Weiss Bershad Hynes & Lerach LLP, or other counsel of your choice, to serve as your counsel in this action.

Milberg Weiss Bershad Hynes & Lerach LLP (*http://www.milberg.com*) is a 190- lawyer firm with offices in New York City, San Diego, San Francisco, Los Angeles, Boca Raton, Philadelphia and Seattle, and is active in major litigations pending in federal and state courts throughout the United States. Milberg Weiss has taken a leading role in many important actions on behalf of defrauded investors, consumers, and others, and has been responsible for more than $20 billion in aggregate recoveries. Please contact Milberg Weiss [sic] website for more information about the firm. If you wish to discuss this action with us, or have any questions concerning this notice or your rights and interests with regard to the case, please contact the following attorneys....

 Unlike the first three notices, the Williams notice lists the names of the defendants, providing purported class members with sufficient information from which they could contact the Court and obtain a copy of the complaint and/or file a motion for appointment as lead plaintiff. Moreover, the Williams notice advises the purported DVI Class of the pendency of the action, the claims asserted, and the purported Class Period. Significantly, the Williams notice advises the purported DVI Class that a member may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

Page 8

move to serve as lead plaintiff, explains the significance of a lead plaintiff, and specifies the date by which such a motion must be filed--November 3, 2003. The Williams notice also advises that potential class members may retain counsel of their choice. For the above-stated reasons, the Williams notice satisfies the notice requirements of the PSLRA.

2. The Most Adequate Plaintiff

**\*9** The PSLRA instructs the Court to appoint the presumptively "most adequate" plaintiff to serve as lead plaintiff. The presumptive "most adequate" plaintiff for the DVI Class is the plaintiff that satisfies the each of following: (1) has either filed a complaint *or* made a motion in response to a notice, (2) in the determination of the court, has the largest financial interests in the relief sought by the class, and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). For the reasons that follow, the Court finds that the Cedar Street Group is the most adequate plaintiff and appoints the Cedar Street Group to serve as lead plaintiff for the Class in the DVI Action.

First, pursuant to the PSLRA statutory framework, the "most adequate" plaintiff must have either filed a complaint in the consolidated actions or timely moved for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa); *see also In re Cephalon Securities Lit., 1998 WL 4700160, at \*5 (E .D. Pa. Aug. 12, 1998)* (appointing as lead plaintiff an individual who, although he did not move for appointment, was a named plaintiff in one of the consolidated class action complaints); *In re Initial Public Offering Securities Lit., 214 F.R.D. 117, 120 n. 4 (S.D.N.Y.2002)* (finding that where numerous complaints have been consolidated, the filing of any of the initially consolidated actions will suffice for purposes of the lead plaintiff selection because the PSLRA specifically instructs courts to rule on consolidation prior to approving lead plaintiff). A motion for appointment of lead plaintiff is timely when filed "not later than 60 days after the date on which the notice is published." 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Generally the 60 day expiration period begins to run from the publication date on which the first notice of pendency was filed. *See* 15 U.S.C. § 78u-4(a)(3)(A)(ii) ("If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiff in the first filed action shall be required to

cause notice to be published ...") This rule does not apply, however, where the first notice of pendency fails to provide adequate information pursuant to the terms of the PSLRA the statutory 60 day period beings to run from the date of the first notice that complies with the PSLRA. *See In re Lucent Technologies, Inc. Securities Lit., 221 F.Supp.2d 463, 466 (D.N.J.2001)* (calculating the 60 day period for filing a motion to be appointed as lead plaintiff pursuant to the PSLRA from the date of publication of the second notice of pendency where the first notice of pendency did not contain adequate information). Additionally, where multiple notices are published informing class members of the pendency of litigation and the notices contain conflicting information regarding the expiration of the 60 day period, it would be inconsistent with basic notions of fairness and the purposes of the notification provisions of the PSLRA to mechanically enforce a strict time limit with respect to the 60 day expiration period. *See Steiner v. Frankino,* 1998 LEXIS 21804, at \*13 (N.D.Ohio July 16, 1998) (recognizing that it would be improper to enforce a strict time limit with respect to the 60 day expiration period where the publication of multiple notices could appear to expand the time period in the eyes of class members); *see also Schulman v. Lumenis, Ltd., 2003 WL 21415287, at \*4 (S.D.N.Y. June 18, 2003)* (noting that courts have taken different approaches with respect to motions filed after the 60 day period has expired and citing to *Steiner v. Frankino* for this proposition).

**\*10** In the instant action, any plaintiff who either (a) filed a complaint in these consolidated actions, or (b) moved to be appointed lead plaintiff not later than November 3, 2003 satisfies the first requirement of the "most adequate" plaintiff test. With respect to motion for appointment as lead plaintiff, we hold that November 3, 2003, not September 29, 2003, was the expiration date for the 60 day period to move for several reasons. First, as previously noted, the first notice of pendency to comply with the requirements of the PSLRA stated that November 3, 2003 was the moving deadline. Additionally, eleven notices were published with three containing the November 3, 2003 deadline and two providing no specific deadline at all. Indeed, counsel for the Gottlieb/Morrell Group published two notices, one stating that September 29, 2003 was the moving deadline, and the other stating that November 3, 2003 was the moving deadline. More significantly, the second of the two Gottlieb/Morrell notices explicitly stated that the September 29, 2003 deadline was no longer effective: "A notice was previously published in connection

Not Reported in F.Supp.2d                                                                    Page 9
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

with a related action against the same Defendants. That action was withdrawn and consequently the notice filed in connection with that action has no effect. Rather, the deadline for the filing of a motion for appointment as lead plaintiff is, as stated herein, on November 3, 2003." Based on a review of the notices in the DVI Action, the Court holds that, indeed, under these particular circumstances, multiple notices with differing deadlines certainly could have created confusion among potential class members with respect to the moving deadline. The potential for such confusion in the case further supports our conclusion that, under these circumstances, setting November 3, 2003 as moving deadline furthers the objectives of the PSLRA.

In the instant action, each of the movants meets the first requirement of the "most adequate" plaintiff test because they either filed an initially-filed complaint in the consolidated action or timely moved for appointment as lead plaintiff.

2. The Plaintiff with the Largest Financial Interest

The PSLRA instructs that the "most adequate," or lead plaintiff have the largest financial interest in the relief sought. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(2).

a. Thomas Sciba

Mr. Sciba is an individual investor who allegedly suffered losses of approximately $30,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. At the time Mr. Sciba moved for appointment as lead plaintiff, he believed he had the largest financial interest in the relief sought by the DVI Class. Contrary to Mr. Sciba's belief, his financial interest is subordinate to the interests of others in the DVI Class. Therefore, Mr. Sciba is not the presumptive "most adequate" plaintiff.

b. Stephen Bence, IV

Mr. Bence is an individual investor who allegedly suffered losses of nearly  $60,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. Mr. Bence asserts that he is the movant with the largest individual financial interest in this litigation and therefore is the presumptive lead plaintiff. Contrary to Mr. Bence's assertion, he does not have the largest individual financial stake in this litigation. Therefore, Mr. Bence is not the presumptive "most adequate" plaintiff.

c. The Wolson Group

**\*11** The Wolson Group is comprised of three individual investors, Milton Wolson, Bharat Parekh, and James Schwartz. The Wolson Group alleges it has the largest financial interest of any movant that timely applied to the Court to be a lead plaintiff in accordance with the provisions of the PSLRA. Specifically, the Wolson Group claims to have suffered losses of approximately $60,656.30. Indeed, the Wolson Group is not the movant with the largest financial interest that timely applied to the Court to be a lead plaintiff in accordance with the provisions of the PSLRA. Therefore, the Wolson Group is not the presumptive "most adequate" plaintiff.

d. The Gottlieb/Morrell Group

The Gottlieb/Morrell Group is comprised of the Gottlieb Family Foundation Trust and individual investor Richard W. Morrell. Upon information and belief, the Gottlieb/Morrell Group alleges that, of all the movants, they have the largest financial interest in this matter, claiming losses of approximately $46,000. Moreover, the Gottlieb/Morrell Group claims to be the only timely movant in compliance with the PSLRA's certification requirements to have sustained losses in both DVI's common stock and notes. Contrarily, the Gottlieb/Morrell Group neither suffered the largest financial losses in this matter nor is the only timely movant in compliance with the PSLRA's certification requirements to have sustained losses in both DVI's common stock and notes. Therefore, the Gottlieb/Morrell Group is not the presumptive "most adequate" plaintiff.

e. The Cedar Street Group

The Cedar Street Group is comprised of two institutional investors, the Cedar Street Fund and the Cedar Street Offshore Fund, and an individual investor, Kenneth Grossman. The Cedar Street Group alleges that it suffered losses in excess of $1.6 million as result of purchasing DVI securities at prices inflated by the DVI Defendants' false and misleading statements. It follows then, that in the instant DVI Action the Cedar Street Group clearly has the largest financial interest in the relief sought. Indeed, none of the other movants dispute this fact and, as discussed below, the Karel Group expressly concedes this point. Accordingly, it is the Cedar Street Group that satisfies the second requirement of the "most adequate" plaintiff test.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 10
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

f. The Karel Group

The Karel Group is comprised of seven individual investors who allege a preexisting investment relationship. The Karel Group acknowledges that the losses of the Cedar Group surpass those of Plaintiff Karel individually and the Karel Group in the aggregate, and that the Cedar Street Group should be named a lead plaintiff. Accordingly, the Karel Group requests that the Court consider appointing the Karel Group as co-lead plaintiff and counsel for the Karel Group as co-lead counsel with counsel for the Cedar Street Group. The Karel Group argues that its appointment as co-lead plaintiff would benefit the class because it would represent the unique perspective of individual investors. Although the Karel Group acknowledges that the Cedar Street Group also includes an individual investor, Kenneth Grossman, the Karel Group suggests that Mr. Grossman's position as a 50% shareholder of the General Partner of the Cedar Street Fund may undermine his capacity to represent the 'unique perspective' of the individual investor. The Karel Group, however, provides no support for this conclusory allegation. As the Karel Group concedes, it is not the presumptive "most adequate" plaintiff.

3. Adequately Represent the Interests of the Class

**\*12** In addition to having the largest financial interest in the relief sought, the presumptive "most adequate" plaintiff must also "otherwise satisf [y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B). Rule 23(a) provides that a party may serve as class representative if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a) is "otherwise" satisfied if the movant "makes a *prima facie* showing that it satisfies the typicality and adequacy requirements." *Smith v. Suprema Specialties, 206 F.Supp.2d 627, 632 (D.N.J.2001)* (citing *Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 924 (3d Cir.1992)*)

The typicality requirement is satisfied if the plaintiff, as a result of the same course of conduct, suffered the same injuries as the absent class members, and their claims are based on the same legal issues. *See Weiss v. York Hosp., 745 F.2d 786, 809 n. 36 (3d Cir.1984).*

That the claims of the class representative be typical of claims of the class does not require that they be identical. *See Gen. Tel. Co. Of the Southwest v. Falcon,* 247 U.S. 147, 155 (1982).

The "fairly and adequately" representing the class requirement is satisfied "when both the class representative and its attorneys are capable of satisfying their obligations, and neither has interests conflicting with those of other class members." *Suprema Specialties, 206 F.Supp.2d at 633* (citations omitted). The Third Circuit explained, that when assessing this requirement, courts should consider whether the proposed lead plaintiff "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." *In re Cendant Corp. Litig ., 264 F.3d at 265* (quoting *Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir.1988)*).

The Cedar Street Group satisfies both the typicality and adequacy requirements of Rule 23(a). The Cedar Street Group represents the interests of the purchasers of both DVI common stock and DVI 9.875% Senior Notes. The Cedar Street Group's interests are typical because they, as a result of the same course of conduct, suffered the same injuries as the absent class members, and their claims are based on the same legal issues. Specifically, the Cedar Street Group: (a) acquired DVI common stock and 9.875% Senior Notes during the Class Period; (b) at market prices allegedly artificially inflated as a result of the Defendants' false and/or misleading statements; (c) which statements were in violation of federal securities laws; and (d) suffered damages thereby. Additionally, the Cedar Street Group adequately represents the interests of the Class because: (a) its interests are clearly aligned with purchasers of both common stock and 9.875% Senior Notes; (b) it is comprised of both individual and institutional investors; and (c) there is no evidence of their interests conflicting with those of the other class members. Moreover, we find that the Cedar Group's selected counsel are capable of satisfying their obligations; evidence of conflict with the interests of other class members is lacking. Thus, the Cedar Street Group satisfies the last requirement of the presumptive "most adequate" plaintiff test.

4. Presumption Not Rebutted

**\*13** The presumption of the "most adequate" plaintiff, however, "may be rebutted only upon proof

Not Reported in F.Supp.2d                                                                      Page 11
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

by a member of the purported plaintiff class that the presumptive most adequate plaintiff--(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Although some of the movants suggest that it is *possible* that the Cedar Street Group *may* not be able to adequately represent the interest of the Class, such speculation is insufficient to overcome the presumption under the PSLRA. No member of the purported plaintiff Class has submitted proof or demonstrated a reasonable basis for finding that the Cedar Street Group will not fairly and adequately protect the interest of the Class, or that it is subject to unique defenses which render it incapable of adequately representing the Class. Therefore, we find that the presumption has not been rebutted and that the Cedar Street Group remains the presumptive "most adequate" plaintiff.

Additionally, the Court finds that the interests of the Class would not be enhanced by appointing the Karel Group as co-lead plaintiff. The Karel Group has not demonstrated the necessity or efficacy to the Class' benefit for such designation as co-lead plaintiff. The Cedar Street Group is comprised of individual and institutional investors and contains holders of both DVI common stock and Senior Notes. Moreover, there is no conflict of interest that prevents the Cedar Street Group from representing the interests of the Karel Group or the rest of the Class. Thus, we conclude that the Cedar Street Group alone will fairly and adequately represent the interests of the Class.

III. Approval of Selection of Lead Counsel

Under the PSLRA, "[t]he most adequate lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Suprema Specialties,* 206 F.Supp.2d at 641 (quoting § 78u-4(a)(3)(B)(v)). The Third Circuit has commented on this issue: "We stress, however, that the question at this stage is not whether the court would 'approve' that movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." *In re Cendant Corp. Lit.,* 264 F.3d at 266. Stated differently, once the presumption is

triggered, the question is "not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair and adequate' job" *Id.* at 268. Indeed, the Conference Committee Report and the Senate Report "indicate that the court should not interfere with lead plaintiff's choice of counsel, unless such intervention is necessary to 'protect the interest of the plaintiff class.' " *Suprema Specialties, Inc.,* 206 F.Supp.2d at 641 (quoting H.R. Conf. Rep. No. 104-369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 734; S.Rep. No. 104-98 at 11-12 (1995) *reprinted in* 1995 U.S.C.C.A.N. 679, 690).

**\*14** The Court does not find such intervention necessary to "protect the plaintiff class." Therefore, Krislov & Associates, Ltd. is approved to serve as Lead Counsel and Chimicles & Tikellis LLP is approved to serve as Liaison Counsel. [FN7]

> FN7. To the extent that the Karel Group submitted a request for the appointment of its counsel as co-lead counsel regardless of the Karel Group being appointed as co-lead plaintiff, such request is also denied.

CONCLUSION

For the foregoing reasons, the Court grants Cedar Street Group's Motion to Consolidate, appoints the Cedar Street Group as Lead Plaintiff, and approves Krislov & Associates, Ltd. to serve as Lead Counsel and Chimicles & Tikellis LLP to serve as Liaison Counsel. An appropriate order follows.

2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636

**Motions, Pleadings and Filings (Back to top)**

• 2:03CV05674                            (Docket) (Oct. 10, 2003)

• 2003 WL 23903662 (Trial Motion, Memorandum and Affidavit) Motion of Thomas Sciba to Consolidate Pending Cases, for Appointment As Lead Plaintiff, and for Approval of Lead Plaintiff's Choice of Counsel (Sep. 29, 2003)

• 2:03CV05244                            (Docket) (Sep. 17, 2003)

• 2:03CV05141                            (Docket) (Sep. 12, 2003)

Not Reported in F.Supp.2d
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

Page 12

- 2:03CV05111 _____ (Docket)
(Sep. 10, 2003)

- 2:03CV05000 _____ (Docket)
(Sep. 04, 2003)

- 2:03CV04963 _____ (Docket)
(Sep. 03, 2003)

- 2:03CV04795 _____ (Docket)
(Aug. 20, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Exhibit in support of*
*Plaintiffs' Motion For Appointment As Lead Plaintiffs*
*And Appointment Of Lead Counsel*

# Exhibit G



Slip Copy                                                                                                          Page 1
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
Clifford C. MARSDEN and Ming XU, Individually
and on Behalf of All Others
Similarly Situated, Plaintiffs,
v.
SELECT MEDICAL CORP., Martin Jackson, Robert
A. Ortenzio, Rocco Ortenzio, and
Patricia Rice, Defendants.
**No. Civ.A.04-4020.**

Jan. 18, 2005.

Eric L. Young, Kenney Lennon & Egan, Plymouth,
PA, Peter E. Seidman, Milberg Weiss Bershad &
Schulman LLP, New York, NY, Stuart T. Steinberg,
Dechert Price and Rhoads, Philadelphia, PA, for
Plaintiffs.

David M. Howard, Dechert LLP, Michael L.
Kichline, Dechert, Price & Rhoads, Philadelphia, PA,
for Defendant.

*MEMORANDUM AND ORDER*

JOYNER, J.

**\*1** Via the motion now pending before this court,
Defendants move to deem inadequate Plaintiffs'
notice of September 10, 2004 pursuant to the Private
Securities Litigation Reform Act of 1995. For the
reasons which follow, this motion shall denied.

*Factual Background*

Plaintiffs Clifford C. Mardsen and Ming Xu filed
this class action complaint on August 24, 2004 on
behalf of all injured investors who purchased Select
Medical stock between July 29, 2003 and May 11,
2004 (the "Class Period"). The Complaint alleges that
Defendants artificially inflated Select Medical stock
prices by means of material misstatements and
omissions. Specifically, Plaintiffs contend that
Defendants misled investors during the Class Period
by emphasizing Select Medical's strong financial
performance while failing to disclose the imminent
possibility of changes to Medicare reimbursement
regulations which would negatively impact the
company's financial success.

In accordance with § 78u-4(a)(3)(A)(i) of the
Private Securities Litigation Reform Act (PSLRA),
Plaintiffs' counsel published the following notice (the
"Milberg Notice") in the September 10, 2004 edition
of Investor's Business Daily:

The law firm of Milberg Weiss Bershad &
Schulman LLP announces that a class action
lawsuit was filed on August 24, 2004 on behalf of
purchasers of the securities of Select Medical Corp.
("Select Medical" or the "Company")
(N.Y.SE:SEM) between July 29, 2003 and May 11,
2004, inclusive, (the "Class Period") seeking to
pursue remedies under the Securities Exchange Act
of 1934 (the "Exchange Act").

The action, captioned Marsden v. Select Medical
Corp., No. 04cv4020, is pending in the United
States District Court for the Eastern District of
Pennsylvania against defendants Select Medical,
Martin Jackson, Robert A. Ortenzio, Rocco
Ortenzio, and Patricia Rice.

The complaint alleges that Select Medical, at all
relevant times, was an operator of specialty
hospitals, including long-term acute care facilities,
whose financial performance was heavily
dependent on Medicare reimbursements. The
complaint further alleges that: (a) throughout the
Class Period Select Medical touted its strong
operations and financial performance, reported
remarkable quarterly increases in revenues, income
and earnings per share, and represented that the
Company was operating pursuant to a business
model that would enable it to grow organically and
through acquisitions; (b) unbeknownst to investors,
Select Medical at all relevant times operated under
the shadow of an imminent regulatory crackdown
that could have a devastating effect on the
Company's operations and financial performance;
(c) defendants knew of or recklessly disregarded
this danger but failed to disclose it to investors; and
(d) defendants engaged in this conduct so that they
and other Select Medical insiders could sell more
than 11 million of their personally-held Select
Medical shares at artificially inflated prices to
unsuspecting shareholders for proceeds in excess
of $270 million.

**\*2** The truth began to emerge on May 11, 2004. On
that date, defendants issued a press release in
which they announced that a proposed Medicare
reimbursement rate rule change, if adopted, would
have a "material adverse effect on Select's results

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 2
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

of operations for the periods after the rule becomes effective." On this news, Select Medical shares, which had opened on May 11, 2004 at $18.55, closed the day at $13.68, their low for the day. On May 12, 2004 the shares opened at $11.80 and fell to a low of $10.25 before rebounding slightly to close the dat at $11.20--for a total two-day decline of 40%. Subsequently, on August 2, 2004, the Centers for Medicare and Medicaid Services announced the phase-in of reduced Medicare reimbursement rates for long-term acute care facilities accepting admissions from host hospitals, such as those operated by Select Medical, and, on August 23, 2004, Select Medical announced that it was scaling back its expansion plans to compensate for the anticipated Medicare cuts.

If you bought the securities of Select Medical between July 29, 2003 and May 11, 2004, and sustained damages, you may, no later than November 9, 2004, request that the Court appoint you as lead plaintiff. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may serve together as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision of whether or not to serve as a lead plaintiff. You may retain Milberg Weiss Bershad & Schulman LLP, or other counsel of your choice, to serve as your counsel in this action.

Milberg Weiss Bershad & Schulman LLP (http://www.milbergweiss.com) is a firm with over 100 lawyers with offices in New York City, Los Angeles, Boca Raton, Delaware, Seattle and Washington, D.C. and is active in major litigations pending in federal and state courts throughout the United States. Milberg Weiss has taken a leading role in many important actions on behalf of defrauded investors, consumers, and others for nearly 40 years. Please contact the Milberg Weiss website for more information about the firm. If you wish to discuss this action with us, or have any questions concerning this notice or your rights and interests with regard to the case, please contact the following attorneys ...

On November 9, 2004, class members Capital Invest, die Kapitalanlagegesellschaft der Bank Austria Creditanstalt Gruppe GmbH (for account of its funds C 43 and GF 5), James Shaver, and Frank C.

Bagatta (the "Capital Group") moved to be appointed lead plaintiff. That motion is currently pending before this Court.

*Discussion*
I. The PSLRA Notice Requirement

The Private Securities Litigation Reform Act (PSLRA) of 1995 was enacted to empower investors so that they, not their lawyers, would retain primary control over private securities class action litigation. S.Rep. No. 104-98 at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683; H.R.Rep. No. 104-369 at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731. To this end, PSLRA imposes procedural protections intended to encourage investors with substantial security holdings, whose interests are likely to be strongly aligned with the interests of the shareholder class, to participate in litigation as lead plaintiffs. S.Rep. No. 104-98 at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685; H.R.Rep. No. 104-369 at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731; *see also* 15 U.S.C. 78u-4(a)(3)(B)(iii) (establishing a rebuttable presumption that the most adequate plaintiff is the party who "has the largest financial interest in the relief sought by the class"). Specifically, the PSLRA instructs that plaintiffs, within 20 days of filing a complaint, "shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class-- (I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. 78u-4(a)(3)(A)(i). The PSLRA notice provisions are not intended, however, to replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure. H.R.Rep. No. 104-369 at 49, FN 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730.

**\*3** In deciding a motion for the appointment of lead plaintiff under PSLRA, courts have an independent duty to "scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA, that is, encouraging the most adequate plaintiff, the plaintiff with the largest financial stake in the outcome of the litigation, to come forward and take control of the litigation." *Janovici*, 2003 U.S. Dist. LEXIS 22315 at 17. In this action, Defendants have petitioned the Court to examine the sufficiency of Plaintiffs' notice in advance of a decision on the outstanding motion for appointment of lead plaintiff.

Slip Copy                                                                                                           Page 3
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

For the most part, courts reviewing the sufficiency of PSLRA notice in the context of motions for lead plaintiff status have taken the minimal requirements of § 78u-4(a)(3)(A)(i) at face value, summarily finding that the notice requirement is satisfied by timely publication setting forth the 60- day period for moving the court. *See, e.g., Bobrow v. Mobilmedia, Inc.,* 1997 U.S. Dist. LEXIS 23806 at 4 (D.N.J.1997); *Greater Pa. Carpenters Pension Fund v. Adolor Corp.,* No. 04-1728, 2004 U.S. Dist. LEXIS 26205 at 6, 2004 WL 3019235 (E.D.Pa.2004); *A.F.I.K. Holding SPRL v. Fass,* 216 F.R.D. 567, 570 (D.N.J.2003). However, the few courts that have addressed this issue in greater detail have typically found that the full extent of a noticing plaintiff's obligations must be informed by the underlying goals of the PSLRA notice provision. *See Burke v. Ruttenberg,* 102 F.Supp.2d 1280, 1311 (N.D.Ala.2000); *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 17-18; *Ravens v. Iftikar,* 174 F.R.D. 651, 658 (N.D.Cal.1997). We agree. Any analysis of the sufficiency of notice under the PSLRA must be guided by the fundamental purpose of the notice requirement, which is to provide class members with sufficient information about the suit and the requirements for lead plaintiff appointment so that they can make an informed judgment about whether they wish to seek lead plaintiff status. *Calif. Pub. Employees' Ret. Sys. v. The Chubb Corp.,* 127 F.Supp.2d 572, 576 (D.N.J.2001); *Burke,* 102 F.Supp.2d at 1312. Furthermore, the notice requirement is intended to give potential plaintiffs an opportunity to make this decision without being forced to contact noticing counsel for additional information, further protecting against "lawyer-driven litigation." *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 19.

In determining the extent to which these general goals should inform our analysis of the sufficiency of the Milberg Notice, we are guided by the United States District Court for the Northern District of Alabama's thoughtful discussion in *Burke v. Ruttenberg,* 102 F.Supp.2d at 1311-12. In that case, the court identified three methods of interpreting the reach of the PSLRA notice requirement. Under the first method, § 78u-4(a)(3)(A)(i) could be construed broadly, requiring "full disclosure of all of the information relevant to the pendency of the action." *Id.* at 1311. While such robust notice certainly satisfies the aims of the PSLRA, it imposes significant costs on the noticing plaintiffs and appears to be "more than is required by the language" of the statute. *Id.* At the other end of the spectrum, notice

under the PSLRA could require only minimal information, namely, that the suit is pending, that it asserts securities claims, and that the class period extends between two dates. This method is inadequate because it does not provide sufficient information from which potential lead plaintiffs could evaluate the action without turning to counsel or "fruitlessly" expending time and money searching out and reviewing the complaint. *Id.* at 1312. The court finally settled on an intermediate method, requiring that notice provide merely enough information to permit reasonable investors to decide whether they wish to perform further investigation and to direct them to further sources of information. *Id.* at 1311. The court held that such an interpretation accords with the purposes of the notice requirement, "in that it gives members of the putative class sufficient information from which to make basic decisions about deciding whether to act as lead plaintiff while not requiring the named plaintiff, who may not be chosen lead plaintiff, to expend too many of his [ ] resources in publishing a notice that is wastefully extensive." *Id.* at 1311-12.

**\*4** We find the reasoning in *Burke* highly persuasive. A class member reading notice published pursuant to the PSLRA should be able to (1) determine whether she is eligible for lead plaintiff status based on the class period; (2) learn enough about the asserted claims to make an initial judgment as to whether to obtain a copy of the full Complaint (which will in turn inform her final judgment about whether to pursue lead plaintiff status); and (3) contact the clerk's office to obtain a copy of the Complaint and discover the procedures for filing a motion. Furthermore, the reader should be able to achieve these three objectives independently, without being forced to contact noticing plaintiff's counsel for additional information or detail.

II. Timeliness of the Instant Motion

Plaintiffs first object to Defendants' November 30, 2004 Motion to Deem Notice Inadequate on the grounds that, while not styled as such, it is essentially an untimely response to the Capital Group's Motion for Appointment as Lead Plaintiff. Pursuant to Local Rule of Civil Procedure 7.1(c), any response to the Capital Group's motion should have been filed with this Court by November 23, 2004.

It is unnecessary for this Court to determine whether the instant motion should be treated as a response to the Capital Group's Motion for Appointment as Lead Plaintiff. Even accepting Plaintiffs' argument to this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

effect, a court may, pursuant to Rule 7.1(c), consider an untimely response where there is sound rationale for doing so, and where so doing does not unfairly prejudice the moving party. *United States v. Eleven Vehicles,* 200 F.3d 203, 215 (3rd Cir.2000). As the instant motion raises significant legal questions regarding the scope of the PSLRA, and as this Court would have an independent duty, upon consideration of the Capital Group's motion, to challenge the sufficiency of the Milberg Notice, there is a sound rationale for addressing the merits of this Motion to Deem Notice Inadequate. *See Avellino v. Herron,* 181 F.R.D. 294, 295 n. 4 (E.D.Pa.1998) (where motion raises important issues of public concern, court may consider merits of a motion despite lack of response); *Janovici v. DVI, Inc.,* 2003 U.S. Dist. LEXIS 22315 at 17, 2003 WL 22849604 (E.D.Pa.2003) (in considering motions for appointment of lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements). Furthermore, Plaintiffs will not be prejudiced by our consideration of the instant motion, as they have had ample opportunity to present their concerns in both a response and surreply.

III. Sufficiency of the Milberg Notice under the PSLRA

Defendants contend that the notice in this action was inadequate because it omitted (i) information about the named plaintiffs and their holdings in Select Medical, (ii) the legal standards governing lead plaintiff motions, (iii) the location of the courthouse and the name of the judge to whom the case is assigned, and (iv) the specific misstatements and omissions underlying Plaintiffs' claims. Defendants further contend that the notice was an "impermissible advertisement" for Milberg Weiss which undermined the objectives of the PSLRA by focusing on self-promotion rather than empowerment of potential lead plaintiffs.

**\*5** In support of their arguments, Defendants rely primarily on two cases from the United States District Court of New Jersey in which District Judges Alfred J. Lechner and Garrett E. Brown rejected PSLRA notices as inadequate for want of information not explicitly required by § 78u-4(a)(3)(A)(i), including the address of the court and name of the presiding judge, the release dates and content of alleged misstatements or omissions, the differing effects of each alleged misstatement or omission, the names of the plaintiffs and a description of their holdings, and an explanation of the possibility of intra-class conflicts. *In re Lucent,* 194 F.R.D. 137 at

147-48; *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 579-80. However, this Court is not bound by those decisions, and, indeed, finds much of their reasoning unpersuasive in light of the intermediate approach to PSLRA notice which this Court has adopted above.

More significantly, one case within the Eastern District of Pennsylvania has addressed the PSLRA notice requirements as applied to a notice also published by Milberg Weis and similar to the instant Milberg motion in language and level of detail, and upheld its sufficiency under the PSLRA. *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 26-27. This Court likewise finds that the extra-statutory requirements relied on by Defendants are not necessary to satisfy the objectives of the PSLRA. The Milberg Notice, while lacking in some of the details considered essential in *In re Lucent,* satisfies both the explicit requirements of § 78u-4(a)(3)(A)(i) and the more general statutory goals. A class member reading the Milberg Notice would learn enough about the nature of the claims to determine his eligibility for lead plaintiff status and make a preliminary decision of whether to seek additional information, and would be able to obtain a copy of the Complaint from the clerk's office if he were so inclined.

A. Timely Publication

The Milberg Notice was published in Investor's Business Daily on September 10, 2004, within 20 days of the date the Complaint in this action was filed. Defendants repeatedly suggest, in their motion and reply, that the notice was of a "stealth character" because it was published "a random 17 days after the case was filed," and was "bur[ied]" in Investor's Business Daily rather than disseminated by a national wire service. Defendants' position on this issue is utterly without merit. Investor's Business Daily is a nationally-circulated business-oriented publication catering to investors, and, as such, satisfies the publication requirement of § 78u-4(a)(3)(A)(i). *Seamans v. Aid Auto Stores, Inc.,* No. 98-7395, 2000 U.S. Dist. LEXIS 1749 at 11-12, 2000 WL 33769023 (E.D.N.Y.2000); *Lax v. First Merchants Acceptance Corp.,* 1997 U.S. Dist. LEXIS 11866 at 15, 1996 WL 461036 (N.D.Ill.1997). [FN1] Furthermore, this Court cannot conceive of any legitimate argument in support of Defendants' suggestion that a notice published "a random 17 days" after the filing of a complaint somehow fails to satisfy the requirements of § 78u-4(a)(3)(A)(i).

FN1. Defendants further suggest that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 5
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
(Cite as: 2005 WL 113128 (E.D.Pa.))

publication of the Milberg Notice in Investor's Business Daily was inadequate because it was a departure from Milberg Weiss' "usual practice" of serving notice by news wire. *See* Defendants' Reply, p. 2. It should be beyond question, however, that the sufficiency of notice under the PSLRA must be judged against the statutory requirements of § 78u-4(a)(3)(A)(i), rather than any particular law firm's typical practice.

B. The "Pendency of the Action" Requirement

 **\*6** The Milberg Notice adequately informs class members of "the pendency of the action," as it identifies the caption of the case, its civil action number, the Court before which the action was brought, and the names of all five Defendants. The purpose of the "pendency of the action" requirement is to provide interested class members with "accurate information from which [they] may contact the Court and readily obtain a copy of the complaint in a pending action and/or file a motion to be appointed as lead counsel in that case." *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 18. In *Janovici,* this Court upheld the sufficiency of a notice, also published by Milberg Weiss, which included only the names of the defendants and the Court, holding that these two identifying facts were sufficient to inform class members of the pendency of the action. *Id.* at 26-27. [FN2] We find that a PSLRA notice which includes the court name, case caption, and docket number provides all the information an interested class member needs to contact the Court and obtain a copy of the complaint. In so holding, we reject the United States District Court of New Jersey's requirement that PSLRA notice include the address of the Court and the name of the judge to whom the case is assigned. *See Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 579; *In re Lucent,* 194 F.R.D. 137 at 147. Surely an investor who reads the Investor's Business Daily on a regular basis and is interested in being lead plaintiff in a class action securities suit is competent enough to consult a telephone directory to find the Court's address and phone number. This Court is not convinced that investors will be discouraged from participating if "force[d] ... to figure it out for themselves." *See* Defendants' Brief, p. 8. And while it might be helpful for a PSLRA notice to include the name of the assigned judge, a class member need not provide that information to get a copy of the complaint, and can readily discover the judge's name by contacting the clerk's office. Because an interested class member reading the Milberg Notice would find

enough information therein to contact the Court and obtain a copy of the Complaint, the notice satisfies the "pendency of the action" requirement of § 78u-4(a)(3)(A)(i).

> FN2. While Defendants make much of the fact that the notice in *Janovici* provided a web link to a copy of the complaint on the Milberg Weiss website, the Court's decision made no mention of that fact, explicitly holding that "list[ing] the names of the defendants ... provid [ed] purported class members with sufficient information from which they could contact the Court and obtain a copy of the complaint and/or file a motion for appointment as lead plaintiff." *Janovici,* 2003 U.S. Dist. LEXIS at 26-27. Furthermore, this Court fails to see how encouraging class members to visit a law firm's website to view the complaint serves the PSLRA's purpose of protecting investors from lawyer-driven lawsuits. *See, e.g., Janovici,* 2003 U.S. Dist. LEXIS 22315 at 19 (providing information from which interested class members may contact the Court shields against lawyer-driven litigation because class members "are not forced to contact noticing counsel for additional information"); *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 580 (where action is not identified by caption or docket number, directing class members to an attorney website to view the complaint does not cure deficiencies of notice and undermines PSLRA goals); *Burke,* 102 F.Supp.2d at 1312 (notice directing class members to contact counsel for a copy of the complaint does not comport with the purposes of the PSLRA).

C. The Claims Asserted and Class Period

 The Milberg Notice satisfies the requirements of § 78u-4(a)(3)(A)(i) relating to information about the claims asserted and the class period. The notice identifies the period between July 29, 2003 and May 11, 2004 as the relevant Class Period. It summarizes the claims asserted in the Complaint, highlighting the allegations that Select Medical, throughout the Class Period, touted its strong financial performance, misrepresented the nature of its business model, and failed to disclose the danger of an imminent regulatory crackdown. The notice further describes the drop in share prices which occurred after Defendants issued a May 11, 2004 press release

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
(Cite as: 2005 WL 113128 (E.D.Pa.))

announcing that the proposed regulatory change would have a material adverse effect on Select Medical's operations.

 **\*7** In support of their contention that the Milberg Notice is deficient because it does not identify the content or dates of the alleged misrepresentations, Defendants cite *In re Lucent,* 194 F.R.D. 137 at 147-48. In that case, the United States District Court for the District of New Jersey relied on *Ravens v. Iftikar,* 174 F.R.D. 651, to hold that a PSLRA notice should describe, in detail, the alleged misstatements or omissions, their release dates, and, if multiple disclosures are at issue, the differing effects of each. *In re Lucent,* 194 F.R.D. 137 at 148. However, it would be a misreading of *Ravens* to impose such strict requirements on all PSLRA notices. *Ravens* addressed a "skeletal" one-paragraph notice which provided no detail about the claims asserted beyond an identification of the statutory grounds (§ 10(b) and 20(a) of the Securities Exchange Act), and no information about the named plaintiffs, who appeared, even on the face of the complaint, "incapable of prosecuting" the action. *Ravens,* 174 F.R.D. at 658. Far from setting forth a firm rule imposing the requirements considered in *In re Lucent,* the United States District Court for the Northern District of California held that "the adequacy of notice published under the Reform Act cannot be evaluated standing alone. The notice must be assessed in light of the pleading to which the notice is designed to alert investors." *Id.* Among the reasons the court gave for finding the notice inadequate were that "the lengthy and detailed allegations of the complaint [were] not summarized," and that "[a]ctual and potential obstacles to plaintiff's representation of the entire class" were not disclosed. *Id.*

 In contrast, the Milberg Notice adequately summarizes the allegations in the Complaint, without overwhelming readers with a flood of detail. The Complaint in this action identifies twelve dates on which Defendants allegedly misrepresented the strength of their operations while failing to disclose the possibility of a financial downturn if proposed Medicare rate changes were to be adopted. We believe that requiring named Plaintiffs, who may not ultimately be chosen as lead plaintiffs, to expend the resources required to publish a "wastefully extensive" notice containing the exact date, content, and individualized impact of each of twelve or more misrepresentations and omissions is beyond the contemplation of the PSLRA. *See Burke,* 102 F.Supp.2d at 1311-12. [FN3] The Milberg Notice

provides a summary of the legal and factual basis of the claims, adequately informing investors of the nature and character of the claims asserted in accordance with the requirements of § 78u-4(a)(3)(A)(i). *See Janovici,* 2003 U.S. Dist. LEXIS 22315 at 27 (finding that a Milberg Weiss notice summarizing misrepresentations generally, but not providing dates or other details, adequately informs investors of the "claims asserted").

> FN3. This is particularly so where, as here, it is clear from both the notice and the Complaint that there were no corrective statements made during the Class Period, and that a single disclosure event occurred at the end of the Class Period. *See Wenderhold v. Cylink Corp.,* 188 F.R.D. 577, 582 (N.D.Ca.1999).

 Furthermore, while Defendants contend that a PSLRA notice must identify the named plaintiffs and describe their holdings, we are not persuaded that the reasoning of the two cases cited in support of that proposition is applicable in this action. In *Calif. Pub. Employees' Ret. Sys.,* the named plaintiff clearly lacked standing to sue because he held no shares during the class period, a fact obvious on the face of the complaint. *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 580-81. Likewise, in *Ravens,* there were numerous obstacles to representation by the named plaintiffs, including unique defenses, concerns regarding their qualifications, and the possibility of intra-class conflicts. *Ravens,* 174 F.R.D. at 657. We note, initially, that this Court is not currently in a position to investigate the sufficiency of the Complaint or the named Plaintiffs' qualifications, and Defendants have identified no conspicuous obstacles to Plaintiffs' representation. Furthermore, where issues of standing or qualification are not obvious on the face of a complaint, we cannot imagine that the drafters of the PSLRA expected named plaintiffs to make inquiries as to these issues and present their findings in notice form. Neither the explicit requirements of § 78u-4(a)(3)(A)(i) nor the general goals of the PSLRA demand the imposition of such an obligation.

 D. Moving for Lead Plaintiff Status

 **\*8** The Milberg Notice advises class members who have sustained damages that they may, within 60 days, move the court to be appointed lead plaintiff. The notice briefly explains the significance of the lead plaintiff, summarizes the typicality and adequacy of representation requirements, specifies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 7
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

that multiple class members may serve together as
lead plaintiffs, and notes that class members who do
not attain lead plaintiff status are nonetheless entitled
to share in any recovery. This information clearly
satisfies the § 78u-4(a)(3)(A)(i)(II) requirement that
notice published pursuant to the PSLRA advise class
members of their right to move for lead plaintiff
status within 60 days.

 Defendant's citation to *In re Lucent* is inapposite. In
that case, the notice in question informed class
members of their right to move the court within 60
days, and indicated only that they "must meet certain
legal requirements" to serve as lead plaintiff. *See In
re Lucent,* 194 F.R.D. 137 at 147. The court found
such notice inadequate because it did not "even
summarily describe the legal requirements" for lead
plaintiff status. *Id.* In contrast, the Milberg Notice in
this action does "summarily describe" the
requirements for lead plaintiff status.

 Nonetheless, Defendants object to the fact that the
Milberg Notice does not mention the PSLRA's
rebuttable presumption that the most adequate
plaintiff is the one with the "largest financial
interest." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). We
note initially that, while the PSLRA was drafted to
encourage plaintiffs with the greatest financial
interest to take control of the litigation, the statute by
no means requires that lead plaintiffs have the largest
financial interest, and explicitly allows for rebuttal of
this presumption. 15 U.S.C. § 78u-4(a)(3)(B)(iii).
Furthermore, this Court has upheld the adequacy of a
similar notice published by Milberg Weiss which
described the requirements for lead plaintiff status in
language identical to the language at issue in this
case. *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 26-
27 (finding that the notice was sufficient because it
advised the class that a member may move to serve
as lead plaintiff, explained the significance of a lead
plaintiff, and specified the date by which such a
motion must be filed). The Milberg Notice is not
rendered inadequate by its failure to include
information concerning the significance of a lead
plaintiff's financial stake in the litigation.

 An appropriate Order follows.

### *ORDER*
 AND NOW, this 18th day of January, 2005, upon
consideration of Defendants' Motion to Deem Notice
Inadequate (Doc. No. 8), and all responses thereto
(Docs. No. 9, 10, 11), it is hereby ORDERED that the
motion is DENIED.

 2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P
93,079

 **Motions, Pleadings and Filings** **(Back to top)**

• 2:04CV04020 (Docket)
(Aug. 24, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.