## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SAMUEL I. HYLAND and STEPHANIE  
SPEAKMAN, individually and on behalf of all  
others similarly situated,

       Plaintiffs,

                v.

WILLIAM B. HARRISON, JR., HANS W.  
BECHERER, RILEY P. BECHTEL, FRANK  
A. BENNACK, JR., JOHN H. BIGGS,  
LAWRENCE A. BOSSIDY, M. ANTHONY  
BURNS, ELLEN V. FUTTER, WILLIAM H.  
GRAY, III, HELENE L. KAPLAN, LEE R.  
RAYMOND, JOHN R. STAFFORD, J.P.  
MORGAN CHASE & CO., and JAMES  
DIMON,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 1:05-cv-162 (JJF)

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**OF COUNSEL:**

Nancy E. Schwarzkopf  
JPMORGAN CHASE LEGAL DEPARTMENT  
1 Chase Manhattan Plaza, 26th Floor  
New York, New York 10081  
(212) 552-3585  
*Counsel for J.P. Morgan Chase & Co.*

Michael A. Cooper  
Sharon L. Nelles  
Keith Levenberg  
SULLIVAN & CROMWELL LLP  
125 Broad Street  
New York, New York 10004  
(212) 558-3712  
*Counsel for the Individual Defendants*

Dated: June 17, 2005

Jesse A. Finkelstein (DSB #1090)  
Michael R. Robinson (DSB #4452)  
RICHARDS, LAYTON & FINGER, P.A.  
One Rodney Square  
920 North King Street  
Wilmington, Delaware 19801  
finkelstein@rlf.com  
robinson@rlf.com  
(302) 651-7700  
*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ............... 1

SUMMARY OF ARGUMENT ....................................................................... 3

STATEMENT OF FACTS ............................................................................. 4

STANDARD OF REVIEW ............................................................................ 9

ARGUMENT ............................................................................................. 10

    I      Plaintiffs Have No Standing to Assert the Vast Majority
          of Their Claims ................................................................... 11

    II     The Joint Proxy Statement Fully and Fairly Disclosed
          All Material Facts ............................................................... 13

          A    The "Omission" Plaintiffs Complain of Is Not Material ... 13

          B    The Joint Statement Did Not Misrepresent the Rationale
                for the Merger .......................................................... 19

          C    The Joint Proxy Statement Did Not Misrepresent the
                Succession Arrangement ............................................ 21

    III    Plaintiffs Fail to Plead the Proxy Claim with Particularity ...... 22

          A    Plaintiffs Do Not Allege with Particularity Why Defendants
                Statements Were Misleading ...................................... 23

          B    The Complaint Improperly Fails To Allege Wrongdoing
                as to Each Director Defendant .................................... 25

    IV    Plaintiffs' Breach of Fiduciary Duty Claim Does Not Merit an
          Exercise of Supplemental Jurisdiction and Already Has Been
          Rejected by the Delaware Court of Chancery ........................ 27

CONCLUSION .......................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adams Golf, Inc. Sec. Litig.*,
 381 F 3d 267 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Allen v. Penn Central Co.*,
 350 F. Supp. 697 (E D. Pa. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ballay v. Legg Mason Wood Walker, Inc.*,
 925 F 2d 682 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Beaumont v. American Can Co.*,
 621 F. Supp. 484 (S D N Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Beaumont v. American Can Co.*,
 797 F 2d 79 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Bond Opportunity Fund v. Unilab Corp.*,
 No. 99-11074, 2003 U S. Dist. LEXIS 7838 (S D.N Y. May 12, 2003)    21, 26

*Brosious v. Children's Place Retail Stores*,
 189 F R D. 138 (D N J 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Brown v. Siegel*,
 No. 94-1829, 1995 U S. Dist. LEXIS 1945 (E D. Pa. Feb 14, 1995) . . . . . . 27

*In re Burlington Coat Factory Sec. Litig.*,
 114 F 3d 1410 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*CalPERS v. Chubb*,
 394 F 3d 126 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 9, 23, 24, 25

*In re Cendant Corp. Sec. Litig.*,
 81 F Supp. 2d 550 (D N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Digital Island Sec. Litig.*,
 223 F. Supp. 2d 546 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*District 65 UAW v. Harper & Row, Publishers, Inc.*,
 576 F. Supp. 1468 (S D N Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dura Pharmaceuticals, Inc. v. Broudo*,
 125 S. Ct. 1627 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Fuqua Industrial Shareholder Litigation,*
    1997 Del. Ch. LEXIS 72 (Del. Ch. May 13, 1997) .......................... 30

*Gustafson v. Alloyd Co.,*
    513 U.S. 561 (1995) ............................................................. 11

*Harris v. Carter,*
    582 A.2d 222 (Del.Ch. 1990) .................................................. 30

*In re J.P. Morgan Chase Sec. Litig.,*
    363 F.Supp.2d 595 (S.D.N.Y. 2005) ......................................... 23

*In re J.P. Morgan Chase & Co. S'holder Litig.,*
    No. 531-N, 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005) ........ *passim*

*Kahn v. Wien,*
    842 F. Supp. 667 (E.D.N.Y. 1994) ........................................... 16

*Lewis v. Oppenheimer & Co.,*
    481 F. Supp. 1199 (S.D.N.Y. 1979) .......................................... 20

*Lieberman v. Cambridge Partners,*
    No. 03-2317, 2003 U.S. Dist. LEXIS 23732 (E.D. Pa. Dec. 17, 2003) ...... 12

*Metz v. United Counties Bancorp,*
    61 F. Supp. 2d 364 (D.N.J. 1999) ............................................ 10

*Minzer v. Keegan,*
    218 F.3d 144 (2d Cir. 2000) .................................................. 14

*In re MobileMedia Sec. Litig.,*
    28 F. Supp. 2d 901 (D.N.J. 1998) ............................................ 11

*Morse v. Lower Merion School Dist.,*
    132 F.3d 902 (3d Cir. 1997) ................................................... 9

*Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of
Land,*
    766 F.2d 685 (2d Cir. 1985) .................................................. 30

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000) .................................................. 10

*Pension Benefits Guaranty Corp. v. White Consolidated Industrial, Inc.,*
    998 F.2d 1192 (3d Cir. 1993) ............................................... 4, 9

*Ravens v. Republic N.Y. Corp.,*
    No. 99-4981, 2002 U.S. Dist. LEXIS 12162 (E.D. Pa. Apr. 24, 2002) ...... 25

*In re Reliance Sec. Litig.*,
　　135 F. Supp. 2d 480 (D. Del. 2001) ..................................................... 20

*Robbins v. Amoco Prod. Co.*,
　　952 F. 2d 901 (5th Cir. 1992) ............................................................. 30

*In re Rockefeller Ctr. Properties Sec. Litig.*,
　　184 F. 3d 280 (3d Cir. 1999) ............................................................. 14

*Santa Fe Indus., Inc. v. Green*,
　　430 U.S. 462 (1977) ......................................................................... 19

*In re Suprema Specialties, Inc. Sec. Litig.*,
　　334 F. Supp. 2d 637 (D.N.J. 2004) ...................................................... 11

*TSC Industrial, Inc. v. Northway, Inc.*,
　　426 U.S. 438 (1976) ......................................................................... 14

*Thomas v. Roblin Industries, Inc.*,
　　520 F. 2d 1393 (3d Cir. 1975) ........................................................... 12

*Tracinda Corp. v. DaimlerChrysler AG*,
　　197 F. Supp. 2d 42 (D. Del. 2002) ...................................................... 26

*Umbriac v. Kaiser*,
　　467 F. Supp. 548 (D. Nev. 1979) ................................................... 17, 18

*Virginia Bankshares, Inc. v. Sandberg*,
　　501 U.S. 1083 (1991) ....................................................................... 27

## STATUTES AND REGULATIONS

15 U.S.C. § 78u-4 ........................................................................... 9, 23, 24

28 U.S.C. § 1367(c)(3) ........................................................................... 26

17 C.F.R. § 240.14a-9 ........................................................................... 12

8 *Del. C.* § 251 ................................................................................... 17

8 *Del. C.* § 252 ................................................................................... 17

## STATEMENT OF THE NATURE AND
## STAGE OF PROCEEDINGS

Plaintiffs Samuel Hyland and Stephanie Speakman, purporting to represent three distinct and conflicting classes, assert a plethora of claims against JPMC, its Board of Directors at the time it agreed to enter into a merger with Bank One Corporation ("Bank One"), and its current President in connection with that merger. Plaintiffs' complaint, at its core, is based solely on a single sentence in a *New York Times* article attributing to two unnamed "sources" the statement that Bank One's Chief Executive Officer ("CEO") "offered to do the deal for *no premium* if he could become Chief Executive [of the combined company] immediately," but the "offer" was turned down. (Am. Compl. ¶ 88 (emphasis added in Am. Compl.).)  Plaintiffs contend that the (i) JPMC Board of Directors wrongfully approved a merger agreement that retained JPMC's CEO and Chairman, William B. Harrison, Jr., as CEO and Chairman of the merged company for two years, "solely" to secure that benefit for Mr. Harrison (Am. Compl. ¶ 239) and (ii) all defendants wrongfully failed to disclose the "offer" in the Joint Proxy Statement for the merger and other public filings.

Plaintiffs conveniently ignore the *Times*'s report that the purpose of the agreed succession arrangement was to "secure a smooth transition" (Am. Compl. ¶ 88) and instead base their complaint on press quotations, pejorative conclusions, and speculation as to why JPMC's CEO and Chairman retained his position post-merger.  The precious few factual allegations contained in the complaint fail to state a claim for relief. Indeed, identical allegations were asserted and rejected in consolidated proceedings in the

-1-

Delaware Court of Chancery. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, No.

531-N, 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005).[1]

   In the instant action, plaintiffs' allegations merely are cut and pasted from

the Delaware Court of Chancery consolidated complaint and underlie, at best, only state

law issues regarding corporate governance decisions. Such claims already have been

disposed of by the Court of Chancery. Plaintiffs' federal securities claims are meritless.

These claims are plainly efforts to invoke this Court's jurisdiction and give the state

claims new life in federal court. The vast majority of those federal claims fail because

plaintiffs, who have certified that they neither purchased nor sold JPMC stock during the

relevant period, undeniably lack standing to assert claims based on statutes granting

rights of action to purchasers or sellers. The only federal claim that plaintiffs have

standing to raise is the federal proxy claim. But an alleged statement by Bank One's

CEO made in the course of a two-month continuing negotiation (assuming *arguendo* it

was made) need not have been disclosed in a proxy statement seeking shareholder

approval of the merger. Corporations are not legally obligated to disclose the details of

every negotiating position taken on the way to agreement on a transaction ultimately

submitted for shareholder vote.

   Defendants submit this opening brief in support of their motion to dismiss

plaintiffs' amended complaint.

---

[1]  A copy of Vice Chancellor Lamb's decision is attached under Tab A. All other
unreported cases cited herein are attached hereto under Tab F.

## SUMMARY OF ARGUMENT

1.    As neither purchasers nor sellers of JPMC's stock during the relevant period, nor acquirers of stock pursuant to an initial offering, plaintiffs lack standing to assert claims under Exchange Act Sections 10(b) and 20(a) and Securities Act Sections 11, 12(a)(2), and 15.

2.    Plaintiffs' Section 14(a) claim fails both because the Joint Proxy Statement accurately disclosed all material facts and because the claim is not pleaded with particularity.

3.    Plaintiffs' state law claims do not merit this Court's exercise of supplemental jurisdiction and already have been rejected by the Delaware Court of Chancery.

## STATEMENT OF FACTS

On January 14, 2004, JPMC and Bank One issued a joint press release announcing that both companies had agreed to a business combination following the unanimous approval of both Boards of Directors. (Am. Compl. ¶ 94.) The release also announced that Mr. Harrison would remain as CEO and Chairman for two years following the merger and that Bank One's CEO, James Dimon, would serve as President and Chief Operating Officer and would succeed Mr. Harrison as CEO in 2006. The *Financial Times* reported on January 19, 2004 that the negotiations between Mr. Harrison and Mr. Dimon covered "a *spectrum of outcomes* in terms of premiums and governance." (Am. Compl. ¶ 84 (emphasis in original).)

The Joint Proxy Statement—filed with the Securities and Exchange Commission on February 20, 2004 and amended April 19, 2004—informed JPMC shareholders that the JPMC Board approved the merger because the Board "believes the merger will provide significant strategic opportunities and benefits," including: (1) "enhanced positions in retail financial services"; (2) a "more balanced business mix and greater geographic diversification"; (3) "enhanced opportunities for wholesale and other financial services businesses"; and (4) significant "expected financial synergies." (Joint Proxy Statement at 34-35.)[2] The Joint Proxy Statement further informed shareholders that the JPMC Board considered corporate governance and succession

---

[2]     The Joint Proxy Statement is incorporated by reference and quoted at length in the complaint (Am. Compl. ¶ 148) and thus may be considered on this motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) The Joint Proxy Statement is attached hereto under Tab B.

issues to be of "significant importance in assuring certainty with respect to CEO succession, continuity of senior management and effective and timely integration of the two companies' operations." (Joint Proxy Statement at 37.)

JPMC and Bank One agreed to an exchange rate of 1.32 JPMC shares for each Bank One share. This exchange rate represented a premium to Bank One shareholders of 8% based on average closing prices of both stocks for the month preceding the merger announcement and a premium of 14% based on stock prices on the day of the announcement. (Proxy Statement at 36.)[3] Although the share price of a company paying a premium to market usually declines following a merger announcement, the JPMC share price rose from $39.22 on the day of the merger announcement to $40.10 one week later. (*See* JPM Historical Prices *at* http://finance.yahoo.com/q/hp?s=JPM.)

The agreement to merge created the second largest financial institution in the country as measured by total assets and was widely reported in the press at the time. The directors of Bank One were sued immediately for having sold Bank One too *cheaply*. *See Shaper v. Bryan*, No. 04-1175 (Cook Cty. Ill.) (filed Jan. 21, 2004).[4] But no JPMC shareholder filed a complaint at that time against the directors of JPMC alleging that they had overpaid for Bank One. On May 25, the JPMC shareholders approved the merger with 99.18% of the votes cast in its favor. (*See* Form 8-K, J.P. Morgan Chase & Co.

---

[3]     In the days immediately preceding the announcement, the price of JPMC stock rose relative to that of Bank One's, thereby nominally increasing this premium figure. (*Id.*)

[4]     It has become increasingly common for both merging parties to be sued—one for paying too much, the other for receiving too little—throwing into doubt the validity of each claim.

(filed May 25, 2004), attached hereto under Tab C.) The merger became effective on July 1, 2004.

On June 27, 2004, a few days before the merger effective date, the *New York Times* printed a feature article on the merger. Included in the article was the following sentence: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal." (Am. Compl. ¶ 88 (*quoting* Landon Thomas Jr., *The Yin, the Yang and the Deal*, N.Y. TIMES, June 27, 2004, § 3 (Sunday Business), at 3-4 (attached hereto under Tab D).) The article also stated that Mr. Harrison "fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so." *Id.*

Within three days of the publication of the *New York Times* article, three lawsuits were brought in the Delaware Court of Chancery on behalf of separate JPMC shareholders alleging that the entire pre-merger JPMC Board (Mr. Harrison and eleven outside directors) had (i) violated their duties of loyalty and due care by turning down the "offer" and (ii) violated their duty of full and fair disclosure to shareholders by not disclosing the "offer" in the Joint Proxy Statement.

After the three actions were consolidated, a consolidated complaint was filed alleging, just as plaintiffs do here, that Mr. Harrison and the outside directors rejected Mr. Dimon's alleged offer to merge JPMC without any acquisition premium solely to allow Mr. Harrison to remain in his position as CEO, and further alleging that the Joint Proxy Statement was defective in failing to disclose that the Board rejected that "offer." The Court of Chancery dismissed the consolidated action on April 29, 2005,

holding that the breach of duty claims were derivative and could not be asserted against the individual defendants directly in a class action. *J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51, at *18. The Court of Chancery further found that plaintiffs had failed to establish that "a majority of the board of JPMC was either interested or not independent" and that, "[d]ue to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information . . . the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule." *Id.* at *39-*41. Finally, in dismissing the proxy disclosure claim, the court held that "JPMC stockholders' voting rights were unaffected by the merger," *id.* at *46, and that plaintiffs failed to seek the appropriate remedy, *i.e.*, "an injunction to stop the merger before it closed." *Id.* at *42.[5] An appeal was filed on May 24, 2005. Plaintiffs in the instant action filed their amended complaint on May 25, 2005.

On March 17, 2005, more than a year after the announcement of the merger, while defendants' motion to dismiss the complaint in the Court of Chancery action was *sub judice*, plaintiffs' counsel in this action, Joseph N. Gielata, filed plaintiffs' complaint. Mr. Gielata was, until mid-February, associated with the law firm Milberg Weiss Bershad & Schulman LLP, the firm representing plaintiffs in the Court of

---

[5] In addition to the Court of Chancery action, on October 13, 2004, a purported class of JPMC shareholders filed suit against JPMC and its pre-merger directors in federal court in the Northern District of Illinois asserting a proxy-disclosure claim under the federal securities laws for failure to disclose the same alleged "offer" based on the same *New York Times* article. *See Blau v. Harrison*, No. 04-6592 (N.D. Ill. filed Oct. 13, 2004). Defendants in that action have moved to dismiss the complaint.

Chancery action. Mr. Gielata actively prosecuted that action until his departure from the firm two months before Vice Chancellor Lamb dismissed the consolidated proceedings.

Plaintiffs here purport to represent several conflicting classes, including a class of JPMC shareholders who purchased or otherwise acquired the common stock of JPMC between January 14, 2004 (the date of the announcement of the merger) and June 25, 2004.[6] Significantly, both plaintiffs have certified that they "did not purchase or sell any [JPMC] shares during the Class Period." (Hyland Certification at ¶ 4; Speakman Certification at ¶ 4.)

Plaintiffs' complaint is a rehash of the allegations set forth in the consolidated complaint filed in the Court of Chancery. There is only one distinction, and it is a distinction without a difference: plaintiffs' re-characterization of the alleged "offer" as a "secret pact." This characterization apparently refers both to Mr. Harrison's purported rejection of the "offer" (e.g., Am. Compl. ¶ 7) and to a conspiracy for Mr. Dimon to serve as the "true CEO" of JPMC. (Am. Compl. ¶ 11.) How "secret" this "pact" was is unclear. Plaintiffs contend both that the Board "knew or should have known" of the offer (Am. Compl. ¶ 239) and that "there will likely be evidence showing that Harrison did not inform the other directors of JPMC of his secret pact with Dimon." (Am. Compl. ¶ 243.) What is the same in both actions is far more important: Both sets of plaintiffs assert violations of fiduciary duties under Delaware law based solely on the

---

[6]     Plaintiffs additionally seek to represent a putative class of JPMC shareholders who were shareholders of record on April 2, 2004 and a putative class of former Bank One shareholders (Am. Compl. ¶ 45). Plaintiffs do not claim to have owned Bank One stock at any time.

same statement in the *New York Times* article, claims rejected by the Delaware Court of

Chancery.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), the Court will "accept as true the well-pleaded allegations in the [] Complaint

and consider the documents incorporated by reference therein." *CalPERS v. Chubb*

*Corp.*, 394 F.3d 126, 134 (3d Cir. 2004). The Court "need not credit a complaint's bald

assertions or legal conclusions," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906

(3d Cir. 1997) (internal quotation marks omitted), and "may consider an undisputedly

authentic document that a defendant attaches as an exhibit to a motion to dismiss if the

plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White*

*Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, because plaintiffs'

claims are grounded in fraud, plaintiffs must satisfy the particularity requirements of Rule

9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform

Act, 15 U.S.C. § 78u-4 (2005). *See Chubb*, 394 F.3d at 144-45. The PSLRA requires

plaintiffs to:

> specify each statement alleged to have been misleading, the reason or
> reasons why the statement is misleading, and, if an allegation regarding
> the statement or omission is made on information and belief, the complaint
> shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

**ARGUMENT**

Plaintiffs' federal securities claims are, in essence, nothing more than a bootstrap for attacking corporate governance decisions that should be evaluated by the Delaware state courts under Delaware law. Those securities claims are, however, an ineffective hook for bringing these state law claims into federal court. Plaintiffs lack standing to raise most of them and fail to allege the substantive elements of the offenses.[7] The only securities claim that plaintiffs have standing to bring, a proxy disclosure claim under Section 14(a), both fails on the merits and is insufficiently pleaded. There is no reason for this Court to exercise supplemental jurisdiction over the state law claim for

---

[7]    For example, despite asserting a Section 10(b) fraud claim, which requires plaintiffs to "establish that defendant[s] acted with scienter," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997), plaintiffs make no effort at "alleging facts to show that defendants had both motive and opportunity to commit fraud" or "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Oran v. Stafford*, 226 F.3d 275, 288-89 (3d Cir. 2000). Scienter is not the only substantive element to which plaintiffs give short shrift. Plaintiffs' loss causation allegations (Am. Compl. §§ 251-52) are indistinguishable from those the Supreme Court specifically held inadequate in *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005). As in *Dura*, plaintiffs' "failure to claim that [the defendant]'s share price fell significantly after the truth became known suggests that the plaintiffs [incorrectly] considered the allegation of purchase price inflation alone sufficient." *Id.* Given that JPMC's stock opened on June 28, 2004 at a *higher* price than before the *Times* article was published and, except for the four-cent drop on Monday, closed each day that week at a price higher than the allegedly "inflated" pre-June 27 price, plaintiffs must offer more than boilerplate to allege loss causation. Plaintiffs similarly ignore the elements of the other securities laws under which they assert claims— for example, asserting a Section 12(a)(2) claim and merely claiming they "are entitled to rescisionary damages" (Am. Compl. ¶ 275) without "mak[ing] an explicit demand for rescission" or "an offer to tender." *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 379 (D.N.J. 1999). A statement in a complaint that plaintiffs "'are entitled . . . to rescind their purchases of [the defendant's] securities' . . . is not an adequate demand for rescission which will satisfy Section 12" because it merely "states the obvious, that the plaintiffs may have options on how to proceed for damages under the statute." *Id.*

-10-

breach of fiduciary duty. It has already been considered and rejected by the Delaware Court of Chancery.

## I.     PLAINTIFFS HAVE NO STANDING TO ASSERT THE VAST MAJORITY OF THEIR CLAIMS.

Plaintiffs are holders of JPMC stock who neither bought nor sold JPMC shares during the purported class period (January 14 to June 25, 2004). (Am. Compl. ¶ 45.) Thus, plaintiffs have no standing to raise virtually any of their federal securities claims:

*Section 11 Claim.*—To state a claim under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (2005), a plaintiff must allege, *inter alia*, that he "purchased securities traceable to an effective registration statement." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 923 (D.N.J. 1998). Plaintiff Hyland certifies that he acquired his 300 shares of JPMC stock no later than January 14, 2004. (Hyland Certification ¶ 4.) Plaintiff Speakman also certifies that she acquired her 18,870 shares no later than January 14, 2004. (Speakman Certification ¶ 4.) The registration statement plaintiffs assert was misleading is dated February 20, 2004. (*See* Am. Compl. ¶ 40.) Thus, the Section 11 claim must be dismissed.

*Section 12(a)(2) Claim.*—"With respect to . . . claims under Section 12(2) [of the Securities Act], the issue is clear-cut: unless a plaintiff has purchased his shares in [an initial offering], he cannot assert a claim." *In re Suprema Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 649 (D.N.J. 2004); *accord Gustafson v. Alloyd Co.*, 513 U.S. 561, 573 (1995) (finding that Congress "intended § 12(2) to govern only initial public offerings"); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 692-94 (3d Cir.

1991) (holding that "section 12(2) claims apply only to initial offerings").[8]  Plaintiffs do

not allege that they purchased shares in an initial offering.  Thus their claim under

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) (2005), must be dismissed.

> **Section 15 Claim.**—Section 15 of the Securities Act, 15 U.S.C. § 77o

(2005), is a "form of derivative liability," which "permits investors to recover, on a joint

and several basis, from 'control persons' who would be otherwise liable under sections

11 and 12(a)(2)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.3 (3d Cir.

2004).  Plaintiffs' lack of standing to assert claims under Sections 11 and 12(a)(2) of the

Securities Act claims forecloses any Section 15 control person claim.  "[S]tanding under

§ 15 is coterminous with the scope of [a plaintiff's] claims under § 12(a)(2)" or

Section 11.  *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 144 (D.N.J.

1999).  Thus, the Section 15 claim also fails.

> **Section 10(b) Claim.**—Plaintiffs' concession that they "did not purchase

or sell any shares during the Class Period" (Hyland Certification ¶ 4; Speakman

Certification ¶ 4), and consequently could not have purchased or sold in reliance on a

misleading statement, is "a critical deficiency, since the United States Supreme Court

has . . . held that only a buyer or seller of securities has standing to assert a claim based

on a 10b-5 violation." *Thomas v. Roblin Indus., Inc.*, 520 F.2d 1393, 1396 (3d Cir. 1975)

(*citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)).  Plaintiffs are

therefore without standing to bring a claim under Section 10(b) of the Exchange Act, 15

---

[8]    Citations to Sections 12(2) and 12(a)(2) refer to the same provision.  "Congress
renumbered Section 12 of the Securities Act in 1995 when it added another
subsection." *Lieberman v. Cambridge Partners, LLC*, No. 03-2317, 2003 U.S.
Dist. LEXIS 23732, at *7 n.4 (E.D. Pa. Dec. 17, 2003).

U.S.C. § 78j(b) (2005), or Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2005).

   ***Section 20(a) Claim.***—Finally, plaintiffs cannot pursue a control person claim under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) (2005), if their Section "10(b) claims, necessary underpinnings of Section 20(a) status, have been dismissed for lack of standing." *In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550, 558 (D.N.J. 2000). Because plaintiffs' Section 10(b) claim cannot stand, the Section 20(a) claim must also be dismissed.

## II. THE JOINT PROXY STATEMENT FULLY AND FAIRLY DISCLOSED ALL MATERIAL FACTS.

   Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) (2005), provides: "No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9 (2005). The "omission" of any reference to Mr. Dimon's alleged "offer" was not a material omission, and none of the factual statements in the Joint Proxy Statement was inaccurate or misleading.

### A. The "Omission" Plaintiffs Complain of Is Not Material.

   The "omission" of Mr. Dimon's alleged "offer" from the Joint Proxy Statement cannot be considered material to shareholder consideration of whether to ratify the merger. The Joint Proxy Statement summarized the history of the negotiations (Joint Proxy Statement at 31-34), set forth all of the material terms of the merger (Joint Proxy

-13-

Statement at 3-10), recited significant "risk factors" (Joint Proxy Statement at 20-21), and described at length the factors considered by the JPMC Board and the Board's reasons for approving the merger as in the best interests of JPMC and its shareholders (Joint Proxy Statement at 34-38). No additional information was required.

A fact is material only if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a *reasonable* investor." *Id.* at 445 (emphasis added). "[A]n omission is immaterial as a matter of law if the facts omitted 'would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings.'" *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 289-90 (3d Cir. 1999) (*quoting In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997)). And even if an omitted or misrepresented fact is material, it does not trigger liability under Rule 14a-9 if "the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transaction," because "such an omission, material or not, could not have caused the injury for which damages are sought." *Minzer v. Keegan*, 218 F.3d 144, 149 (2d Cir. 2000).

Thus, to state a claim under Rule 14a-9, plaintiffs must allege that the inclusion of the purported "offer" would have had a material impact on a reasonable shareholder's prediction of JPMC's future earnings. It could not. That was not the merger transaction on which the shareholders were asked to vote, and there was no obligation to include that "offer"—or any of the myriad other negotiating positions that

-14-

may have been taken before final agreement on the merger terms was reached—in the Joint Proxy Statement. The possibility of having reached a different merger agreement with different terms has no bearing on an analysis of future earnings under the particular agreement submitted for shareholder approval.

The Second Circuit's decision in *Beaumont v. American Can Co.*, 797 F.2d 79 (2d Cir. 1986), is instructive. In *Beaumont*, Associated Madison Companies and the American Can Company "reached an agreement in principle for a proposed merger" under the terms of which Associated shareholders would receive consideration of $15 per share in either cash or American Can stock. *Id.* at 81. However, by early 1982, American Can had acquired 34% of Associated's stock from five institutional investors for $13 per share. *Id.* at 82. The merger was eventually consummated with the overwhelming majority of Associated shareholders receiving $12.61 worth of American Can stock for each Associated share. *Id.*

The plaintiffs commenced a class action "seek[ing] to recover the difference between the value of the American Can stock at the time of the Exchange and the $15 per share figure contemplated in the original merger negotiations." *Id.* The plaintiffs included a claim "argu[ing] that the proxy statement omitted material facts in violation of § 14(a) of the Securities Exchange Act and SEC Rules 14a-9 and 10b-5" on the ground that "they had the right to know, when voting on the merger proposal, that American Can originally sought and obtained the SEC's approval for the merger and pre-merger transactions on the representation that Associated shareholders would receive $15 worth of American Can stock in the merger." *Id.* at 84.

Granting the defendants' motion for summary judgment, the District Court

observed:

> It is readily apparent that the stock (or cash) exchange that occurred after
> the merger was consistent with the proxy statement's description of the
> merger and its consequences in all material respects.  Moreover, although
> information relating to the tentatively agreed upon, but later amended
> terms was not contained in the proxy statement, the omission of that
> information did not make false any of the material contained in the proxy
> statement which accurately described the only proposal then "on the table"
> for shareholder approval or disapproval.  To the contrary, in all likelihood
> the proxy statement could well have been misleading if it had contained
> information concerning the earlier terms.

*Beaumont v. American Can Co.*, 621 F. Supp. 484, 496 (S.D.N.Y. 1985).  The Second

Circuit affirmed, holding that "Plaintiffs have made no showing that Associated

shareholders would have considered information about the originally contemplated $15

per share figure important":

> [W]hat was important for the Associated shareholders to know was the
> actual terms of the proposed merger, not the preliminary terms
> subsequently amended.  Much discussion necessarily takes place in the
> course of any merger negotiation, and some of it may explore the
> possibility of a higher price for the shareholders than that offered in the
> final proposal.  But if companies were forced to disclose all preliminary
> negotiations, proxy statements would become longer and more obtuse than
> they already are.

*Beaumont*, 797 F.2d at 84-85.[9]

Like the proxy statement in *Beaumont*, JPMC's and Bank One's Joint

Proxy Statement "accurately described the only proposal then 'on the table' for

shareholder approval or disapproval." *Beaumont*, 621 F. Supp. at 496; *see also Kahn v.*

*Wien*, 842 F. Supp. 667, 677 (E.D.N.Y. 1994) ("The securities laws do not require that a

---

[9]    It is even easier to reach that result in the instant case, as there is no allegation of
an "agreement in principle" for a no-premium deal, nor was regulatory approval
ever predicated on such terms.  *Id.* at 81-82.

proxy solicitation discuss all of the arguments against, or all of the alternatives to, the proposed course of action."); *District 65 UAW v. Harper & Row, Publishers, Inc.*, 576 F. Supp. 1468, 1486 (S.D.N.Y. 1983) (holding that "plaintiffs have not stated a Proxy Rule violation claim based on [the] assertion that defendants did not adequately consider alternatives" to a transaction, because "Defendants were not required to disclose the 'panoply of possible alternatives' to the action it was proposing to the stockholders"); *Allen v. Penn Central Co.*, 350 F. Supp. 697, 703 (E.D. Pa. 1972) ("Drafters of proxy statements have no obligation to discuss every conceivable alternative to the course of action for which management seeks shareholder approval.").

In *Umbriac v. Kaiser*, 467 F. Supp. 548, 550 (D. Nev. 1979), shareholders brought a Section 14(a) action alleging "that the proxy materials soliciting shareholder approval of [a] plan of liquidation were materially misleading in their failure to discuss either the plaintiffs' proposed alternative plan or, at a minimum, certain facts that allegedly would have alerted shareholders to the possibility that management was blind to its existence." Specifically, in a mirror image of the allegations in this action, the plaintiffs alleged that "the Directors sacrificed a 'control premium'" and that "the proxy materials were materially misleading in that they failed to disclose . . . that a control premium might have been realized." *Id.* at 551. In reasoning that materiality was a "proper subject for summary adjudication," the Court cited two policy considerations based on Supreme Court precedent:

> [(i)] [T]he need to ensure full disclosure must be balanced against the danger that, by setting too low a threshold for civil liability, "management's fear of exposing itself to . . . liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking" . . . [and (ii)] [C]are must be taken to avoid "federaliz[ing] the substantial portion of the law of

corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden.

*Id.* at 553 (*quoting* (i) *TSC*, 426 U.S. at 448-49; (ii) *Santa Fe Indus., Inc. v. Green*, 430

U.S. 462, 479 (1977)). In holding that the failure to disclose the possibility of a control

premium "was immaterial as a matter of law," the Court reasoned:

> While full and fair disclosure is required, complete revelation is not. SEC Rule 14a-9 itself speaks in terms of *Facts*: Management is not required to set before shareholders information only suggestive of mere possibility. . . . Similarly, management is not required to discuss the panoply of possible alternatives to the course of action it is proposing . . . These limitations are born of a recognition that too much information can be as misleading as too little. They also make sense as a matter of state corporation law, which gives shareholders a right of veto or approval over organic corporate changes but entrusts management with the task of devising the means by which the end will be reached. . . . Under Nevada law the shareholders were entitled to decide whether or not [the company] should embark on liquidation, not to pick and choose among the various routes that could be taken to that end.

*Umbriac*, 467 F. Supp. at 553.

Just as the shareholders in *Umbriac* had the right, under Nevada law, to

cast an up-or-down vote on the liquidation but not to "pick and choose" among the

alternatives, Delaware law similarly defines the rights of shareholders of merging

corporations. When the board of directors of a Delaware corporation approves a merger,

Delaware law requires the corporation to provide shareholders with "a copy of the

agreement or a brief summary thereof," following which "the agreement shall be

considered and a vote taken for its *adoption or rejection*." 8 *Del. C.* § 251(c) (2005)

(emphasis added) (made applicable to mergers between Delaware and out-of-state

corporations by 8 *Del. C.* § 252(c) (2005)). Shareholders have two options—for or

against. In the face of this state policy, expanding the materiality standard of

Section 14(a) and Rule 14a-9 would strip directors of their authority to manage the affairs

-18-

of corporations and thwart the Supreme Court's mandate in *Santa Fe* not to override "established state policies of corporate regulation." *Santa Fe*, 430 U.S. at 479. This is particularly the case given the Court of Chancery's dismissal of an identical claim and its holding that the Joint Proxy Statement's non-disclosure of Mr. Dimon's alleged "offer" did not violate state proxy disclosure laws. *J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51, at *41-*45.

**B.     The Joint Proxy Statement Did Not Misrepresent the Rationale for the Merger.**

The rationale for the merger is clear and set forth in the Joint Proxy Statement. The Joint Proxy Statement states that "JPMorgan Chase's board believes that the merger will provide a number of significant strategic opportunities and benefits." (Joint Proxy Statement at 34.) Specifically, the Joint Proxy Statement cites and discusses in detail: (1) "Enhanced Positions in Retail Financial Services"; (2) "More Balanced Business Mix and Greater Geographic Diversification"; (3) "Enhanced Opportunities for Wholesale and Other Financial Services Businesses"; (4) "Expected Financial Synergies"; (5) fourteen "Other Factors," including "management's assessment that the proposed merger was likely to meet each of the criteria they deemed necessary for a successful merger—strategic fit, acceptable execution risk, and financial benefits to JPMorgan Chase and JPMorgan Chase's stockholders." (Joint Proxy Statement at 34-38.) The Joint Proxy Statement proceeds to offer an equally detailed account of Bank One's reasons for favoring the merger. (*See* Joint Proxy Statement at 38-40.) Even the *New York Times* article that spawned this litigation cites securing a "smooth transition" as the rationale for the succession arrangement which JPMC and Bank One ultimately agreed upon. (Am. Compl. ¶ 88.)

Despite this clear rationale for the merger, plaintiffs' complaint relies heavily on speculation about defendants' alleged secret motives. According to plaintiffs, JPMC's directors pursued the merger not for any of the business and financial reasons detailed in the Joint Proxy Statement but "*solely* to secure a benefit for Harrison to the detriment of JPMC shareholders." (Am. Compl. ¶ 239 (emphasis added).) Plaintiffs contend that the statements in the Joint Proxy Statement thus "materially misled investors as to the true rationale for the Merger." (Am. Compl. ¶ 151.) Notably, plaintiffs do not make a single *factual* allegation that supports their conclusion that the Board approved the merger "solely" to benefit Mr. Harrison. (Am. Compl. ¶ 239.)

Even if plaintiffs' unsupported conjecture were true, it would not be actionable. *See In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 514-15 (D. Del. 2001) ("Disbelief or undisclosed motivation standing alone [does not] satisfy the element of fact that must be established under § 14(a)."). "It is well established . . . that for purposes of the federal securities laws, the actual subjective motives behind a controlling shareholder's recommendation of a transaction need not be disclosed, as long as the relevant underlying facts are disclosed." *Lewis v. Oppenheimer & Co.*, 481 F. Supp. 1199, 1204 (S.D.N.Y. 1979).

> Plaintiffs who charge that a statement of opinion . . . is materially misleading, must allege "with particularity" "provable facts" to demonstrate that the statement of opinion is both objectively and subjectively false. Thus, the plaintiff must show both that the directors did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect.

*Bond Opportunity Fund v. Unilab Corp.*, No. 99-11074, 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. May 12, 2003) (*quoting Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-98 (1991)), *aff'd*, 87 Fed. Appx. 772 (2d Cir. 2004) (emphasis in original).

-20-

"[A]bsent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs have not set out sufficient facts to support the conclusion that the proxy and supplemental proxy contained statements that were false and misleading." *Id.* at *16-*17. Because plaintiffs here do nothing more than engage in such "impermissible speculation and extensive extrapolation as to defendants' purposes and motives," their complaint fails to allege that the rationales for the merger represented in the Joint Proxy Statement were either objectively unjustifiable or not genuinely believed by the directors and signatories.

### C.     The Joint Proxy Statement Did Not Misrepresent the Succession Arrangement.

Plaintiffs do not allege merely that Mr. Harrison engineered the merger just to keep his job. (Am. Compl. ¶¶ 3-8.) Plaintiffs also illogically speculate that Mr. Harrison, despite his "desperat[ion]" to cling to the "power of his position" (Am. Compl. ¶¶ 5, 65), actually intended to relinquish that power to Mr. Dimon and allow Mr. Dimon covertly to function as the "true CEO" of JPMC. (Am. Compl. ¶¶ 11, 96, 159(a).) Plaintiffs assert that this was part of a "secret pact" between Mr. Harrison and Mr. Dimon (Am. Compl. ¶ 11), or alternatively between Mr. Harrison, Mr. Dimon, and the Board (*e.g.*, Am. Compl. ¶ 93), that required disclosure, though no factual allegations, not even from the anonymous sources in the *Times*, support the existence of this "secret pact."

Once again, this unsupported speculation is insufficient to sustain a claim under Section 14(a) and Rule 14a-9 because it does not render the succession arrangement described in the Joint Proxy Statement inaccurate. The conceded purpose of the succession arrangement was "to secure a smooth transition." (Am. Compl. ¶ 88.) Thus, it is unsurprising that Mr. Dimon would have a significant and increasing role in

-21-

the leadership of the company while serving as President. Speculation that Mr. Dimon will run "day-to-day operations" (Am. Compl. ¶ 128) and "oversee the operations of the combined entity" (Am. Compl. ¶ 135) is entirely consistent with Mr. Dimon's agreed role of President, Chief Operating Officer, and successor CEO.

Moreover, the nature of the "secret pact" is entirely unclear. Is the "secret pact" between Mr. Dimon and Mr. Harrison, or is the Board also supposed to have known? (*See, e.g.,* Am. Compl. ¶ 93.) Likewise, what is the "secret pact"—the purported rejection of the no-premium "offer" or Mr. Dimon's alleged service as "true CEO"? (*Compare* Am. Compl. ¶¶ 7, 9 *with* Am. Compl. ¶ 11.) Ultimately, it does not matter. No matter how viewed, these allegations do not support a claim and, without any doubt, do not meet requisite pleading standards. (*See* Section III below.)[10]

## III. PLAINTIFFS FAIL TO PLEAD THE PROXY CLAIM WITH PARTICULARITY.

Section 14(a) claims "must meet the PSLRA particularity requirements . . . if a plaintiff elects to ground such claims in fraud," as plaintiffs unequivocally do here. *Chubb Corp.*, 394 F.3d at 144-145 (*citing In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002)).[11] The PSLRA requires plaintiffs to:

---

[10] The Merger Agreement provides that it "constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof" and "is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder." (Joint Proxy Statement at A-49.) If any "secret pact" were made, the ratification of the Merger Agreement would have rendered it ineffective.

[11] Plaintiffs' Section 14(a) claim is grounded in allegations of fraud. The Section 14(a) count incorporates precisely the same paragraphs of the complaint as the Section 10(b) fraud claim. *Compare* Am. Compl. ¶ 227 *with* Am. Compl. ¶ 247; *See In re JPMorgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 636 (S.D.N.Y. 2005) ("There is no requirement . . . that plaintiffs allege fraud in order to state a cause

specify each statement alleged to have been misleading, the reason or
reasons why the statement is misleading, and, if an allegation regarding
the statement or omission is made on information and belief, the complaint
shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

### A.    Plaintiffs Do Not Allege with Particularity Why Defendants' Statements Were Misleading.

In the Third Circuit, a complaint must "state with particularity all facts on

which that belief [that a statement is misleading] is formed" and "provid[e] sufficient

documentary evidence and/or a sufficient description of the personal sources of the

plaintiff's beliefs." *Chubb*, 394 F.3d at 145, 147. Plaintiffs, however, rely exclusively on

a statement in a *New York Times* article attributed to two unidentified "sources."

Reliance on anonymous sources does not satisfy the PSLRA pleading requirements.

In *Chubb*, the Third Circuit rejected a plaintiff's reliance on "confidential

sources" where "they [we]re not 'described . . . with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the

information alleged.'" *Id.* at 148 (*quoting Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d

Cir. 2000)). The plaintiff's nonspecific description of the sources forced the court "to

---

of action pursuant to Section 14(a). Here, however, plaintiffs' Section 14(a)
claim rests on the same charges of fraudulent conduct as their Section 10(b)
claim.") (citation omitted). Among the allegations incorporated in the
Section 14(a) count are claims that "[t]he omissions in the Proxy[ Statement] were
*designed by [Messrs. Harrison and Dimon] to mislead shareholders* of JPMC
into approving the Merger" and that the Proxy Statement "operated as a *fraud and
deceit*." (Am. Compl. ¶ 151 (emphasis added).) Plaintiffs also make allegations
of motive to defraud as to Messrs. Harrison and Dimon (Am. Compl. ¶¶ 56,
159(f)) and claim that all defendants "knew or had reason to know" their
statements were false. (Am. Compl. ¶ 226.) *See* Am. Compl. ¶ 227.

speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." *Id.*

Here, plaintiffs' only source for the existence of the supposed "offer" is the *New York Times*'s reference to "two people close to the deal." (Am. Compl. ¶ 88.) The complaint neither offers a basis upon which to evaluate the reliability of those unnamed sources nor any "allegations regarding how or why such employees would have access to the information they purport to possess." *Chubb*, 394 F.3d at 148. If, as in *Chubb*, a confidential source known to a plaintiff but described too vaguely is insufficient to plead with particularity, plaintiffs' reliance on anonymous sources unknown even to them cannot be taken seriously. Indeed, plaintiffs' allegation that there was some "secret pact" (Am. Compl. ¶¶ 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 143, 150, 171, 243, 253) raises serious questions about how any person "close to the deal" (Am. Compl. ¶ 88) "would have access to the information they purport to possess." *Chubb*, 394 F.3d at 148.

Plaintiffs rely on numerous additional newspaper sources, not to corroborate the *Times* piece, but to support plaintiffs' blind conjecture that Mr. Dimon is the "true CEO" of JPMC. (Am. Compl. ¶¶ 11, 159(a).) The claims in these reports are couched in speculative, noncommittal terms such as "[t]he sense on the street . . . ," "[the] word is . . . ," "[i]t does seem from indications I'm getting . . . ," "JP Morgan's board might have been saying . . . ," and—twice—"I guess. . . ." (Am. Compl. ¶¶ 104, 126, 128, 129, 133, 135.) These are not particularized allegations capable of supporting a securities claim; they merely represent the rumor mill of corporate outsiders. They are precisely the type of allegations which *Chubb* held insufficient to survive the PSLRA. *See Chubb,* 394 F.3d at 155 (rejecting allegations couched in such terms as "[i]t was well

-24-

known" and "[r]umors circulated" and holding: "Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u-4(b)(1)").

### B.     The Complaint Improperly Fails To Allege Wrongdoing as to Each Director Defendant.

The Complaint is also insufficiently particular in consistently failing to distinguish one defendant from another. Plaintiffs allege that the "defendants named herein violated Section 14(a) . . . and Rule 14a-9 . . . in that these defendants solicited proxies . . . by means of a Proxy/Prospectus that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts." (Am. Compl. ¶ 229.) Plaintiffs do not attribute any misstatements to any particular defendant, but instead characterize JPMC's disclosures as "'group published' information." (Am. Compl. ¶ 44.) This pleading tactic proliferated prior to the enactment of PSLRA, under which "the identification of the individual sources of statements [wa]s unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statement, press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation." *Ravens v. Republic N.Y. Corp.*, No. 99-4981, 2002 U.S. Dist. LEXIS 12162, at *36 n.10 (E.D. Pa. Apr. 24, 2002). However, numerous courts within the Third Circuit, including the District of Delaware,

have held that the PSLRA does not allow group pleading. *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002) (collecting cases).[12]

Fatal to plaintiffs' Section 14(a) claim is the lack of a particular allegation that any defendant (other than Messrs. Harrison and Dimon) even knew of the alleged no-premium "offer." There is no explicit allegation that Mr. Harrison ever communicated the "offer" to the Board. Indeed, plaintiffs contend that "Harrison did not inform the other directors of JPMC of his secret pact with Dimon" (Am. Compl. ¶ 243), but rather that Director defendants "knew or *should have known*" of the "offer" and supposed "secret pact." (Am. Compl. ¶¶ 14, 50(d), 93, 239 (emphasis added).) If plaintiffs intended to pursue this theory, they were required to "plead with particularity facts that give rise to a strong inference of negligence on the part of *all* Defendants." *Bond*, 2003 U.S. Dist. LEXIS 7838, at *14 (emphasis added) (holding that plaintiff may not impute knowledge to "individual directors" in stating a Section 14(a) claim). Boilerplate allegations that they should have known of a "secret deal" (whose existence itself is not based on any particularized facts) do not suffice.

---

[12]    In *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 85 (D. Del. 2002), this Court reserved judgment on the question because it had not been briefed or argued by the parties.

IV.    **PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM DOES NOT MERIT AN EXERCISE OF SUPPLEMENTAL JURISDICTION AND ALREADY HAS BEEN REJECTED BY THE DELAWARE COURT OF CHANCERY.**

There is no reason for this Court to exercise supplemental jurisdiction over the state claim if the federal claims do not survive. *See* 28 U.S.C. § 1367(c)(3) (2005) (giving a District Court discretion to decline to exercise supplemental jurisdiction over state claims where it has dismissed all claims over which it has original jurisdiction). "[A] corporate transaction's 'fairness' is not, as such, a federal concern," *Virginia Bankshares, Inc.*, 501 U.S. at 1094 n.6, and when a federal action is "in its infancy," as this one is, and identical claims have been asserted in state court, as here, the considerations against an exercise of supplemental jurisdiction are particularly compelling. *Brown v. Siegel*, No. 94-1829, 1995 U.S. Dist. LEXIS 1945, at *28 (E.D. Pa. Feb. 14, 1995).

Plaintiffs' counsel has already represented to the Court that this action includes "every class claim asserted in the Chancery [a]ction" and that both actions "arise from the same core set of facts." (Pls. Br. in Support of Mot. for Injunction at 5, 7.) This is correct. Plaintiffs' state claim "is brought pursuant to common law . . . against the Individual Defendants for breach of those defendants' fiduciary duties . . . by approving the Merger with a significant acquisition premium." (Am. Compl. ¶¶ 237, 239.) The plaintiffs in the Court of Chancery action are likewise "pursu[ing] all defendants for breach of fiduciary duties" for "overpa[ying] for Bank One by the 14% premium." *J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51, at *7.

The Delaware Court of Chancery already has determined that a breach of fiduciary duty claim in connection with the JPMC/Bank One merger is derivative, not direct. *Id.* at *18-*25. And the Court of Chancery has determined that the JPMC directors (other than Mr. Harrison) were disinterested and independent. *Id.* at *29-*39. Thus, plaintiffs cannot pursue this claim without having made a demand on the Board. *Id.* at *41. They have not.

The Delaware Court of Chancery also determined that, "due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information," the defendants' decision to approve the merger agreement was protected from legal attack by the business-judgment rule. *Id.* at *41. In so holding, the Court noted an interesting tension:

> [T]he plaintiffs note that the proxy materials stated Harrison kept the board informed of the negotiations. Yet this fact presents a paradox for the plaintiffs. They need to allege that Harrison informed the board in order to list the other directors as defendants, but they would rather label those same directors as 'uninformed' in order to succeed on the second prong of *Aronson* [*v. Lewis*, 473 A.2d 805 (Del. 1984), under which plaintiffs can excuse a failure to make demand by establishing that a decision does not merit the protection of the business-judgment rule]. The complaint fails, however, to allege facts that would indicate that the board was presented with the decision, but was not provided with information from which it could make a proper decision.

*Id.* at *40. Plaintiffs' complaint here suffers from the same defect. Plaintiffs avoid taking a position on whether defendants other than Messrs. Harrison and Dimon "knew" or merely "*should* have known" of the alleged "secret pact." (Am. Compl. ¶ 14 (emphasis added).)[13] But, just like the state complaint, plaintiffs do not "allege facts that

---

[13]    Plaintiffs evidently feel this represents a significant distinction from the dismissed state complaint. In fact, the state plaintiffs also tried to have it both ways. The Court of Chancery noted that while "the plaintiffs claim that the board knew of

would indicate that the board . . . was not provided with information from which it could make a proper decision" on whether the merger terms presented to it for approval were fair to the company. 2005 Del. Ch. LEXIS 51, at *40.[14]

Instead, in an effort to distinguish their claim from the state plaintiffs' claims, plaintiffs amended their complaint to assert numerous additional allegations concerning director independence. (Am. Compl. ¶ 175-86, 192, 194-95, 200-01, 206-07, 209-10, 212-215, 219-20, 223.) These new allegations grasp at straws so fine as to be invisible. Among them is the allegation that director "Bossidy is also beholden to Harrison because Bossidy has authored bestselling books on business management and Harrison has assisted Bossidy's efforts to sell the books by lending his name and recommendation to back cover blurbs." (Am. Compl. ¶ 195.) None of the new allegations challenge the Court of Chancery's findings that Mr. Harrison "report[ed] to a board that he cannot fire or remove" and that "none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial

---

Dimon's no-premium offer," "alternatively, the plaintiffs claim that Harrison secretly refused Dimon's no-premium offer . . . [w]ithout presenting the offer to the JPMC board." *J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51, at *7.

[14]     In response to the Delaware Court of Chancery's observation that the instant plaintiffs' invention of a "secret pact" between Messrs. Harrison and Dimon "appears inconsistent with . . . later allegations in the federal complaint that the 'defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon,'" 2005 Del. Ch. LEXIS 51, at *15 (*quoting* Compl. ¶ 144(e)), plaintiffs have amended the offending paragraph to state that only Messrs. Harrison and Dimon were motivated to conceal the alleged "pact." (*See* Am. Compl. ¶ 159(f)). But plaintiffs have not abandoned other allegations that defendants "concealed the secret pact." (Am. Compl. ¶ 9.) Such equivocation about the core alleged misconduct in this case illustrates the instant complaint's fatal similarities to the dismissed state complaint.

benefit other than one that devolved on all JPMC shareholders alike" such that their
independence could be called into question. 2005 Del. Ch. LEXIS 51, at *30-*32.

   In any event, if plaintiffs' new allegations are intended to excuse their
failure to make a demand on the Board, they are directed to the wrong set of directors.
Plaintiffs must justify not having made demand on the Board in office when the action
was commenced, not, as plaintiffs do here, the Board that ratified the transaction. *See In
re Fuqua Indus. S'holder Litig.*, 1997 Del. Ch. LEXIS 72, at *50-*52 (Del. Ch. May 13,
1997); *Harris v. Carter*, 582 A.2d 222, 231-32 (Del. Ch. 1990). On March 17, 2005,
when plaintiff Hyland filed this action, JPMC's seventeen-member Board included nine
who are unquestionably independent: eight who had been directors of Bank One before
the merger and therefore did not ratify the transaction on behalf of JPMC, and one,
William Weldon, who became a director on March 15, 2005. (*See, e.g.*, Schedule 14A,
JPMorgan Chase & Co. (filed Apr. 4, 2005) at 3, pertinent excerpts from which are
attached hereto under Tab E.)

   Even if the Court of Chancery holding does not give rise to formal claim
preclusion, ordinary principles of *stare decisis* counsel against this Court's revisiting the
Court of Chancery's legal disposition of the facts at issue. *Cf. Robbins v. Amoco Prod.
Co.*, 952 F.2d 901, 904 (5th Cir. 1992) (deferring to the court's prior interpretation, in a
case brought by a different plaintiff, of a contract's terms on the grounds that a different
decision would entail overruling the prior case and noting that "this rule applies with
equal force to cases . . . in which state law supplies the substantive rule of decision");
*Nat'l R. R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land*,
766 F.2d 685, 689 (2d Cir. 1985) (deferring to a state court's adjudication, in cases

brought by different plaintiffs, of a property dispute on the grounds that where the state court has already resolved a legal question, "it would be particularly presumptuous of the federal courts to contradict those holdings"). The proper place for any review of the Delaware Court of Chancery's conclusions is the Delaware Supreme Court; an appeal has been noticed and briefing on appeal is underway.

## CONCLUSION

For the reasons stated above, the Court should dismiss this action with

prejudice.

**OF COUNSEL:**

Nancy E. Schwarzkopf
JPMORGAN CHASE LEGAL DEPARTMENT
1 Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-3585
*Counsel for J.P. Morgan Chase & Co.*

Michael A. Cooper
Sharon L. Nelles
Keith Levenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-3712
*Counsel for the Individual Defendants*

Dated: June 17, 2005

Jesse A. Finkelstein (DSB #1090)
Michael R. Robinson (DSB #4452)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
finkelstein@rlf.com
robinson@rlf.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2005, I caused to be electronically filed the foregoing documents with the Clerk of Court using CM/ECF which will send notification of such filings to the following:

> Joseph N  Gielata, Esq.
> 501 Silverside Road
> Suite 90
> Wilmington, DE 19809

_____

Michael R  Robinson (DSBA No  4452)
Richards, Layton & Finger, P A
One Rodney Square
920 N  King Street
Wilmington, DE 19801
(302) 651-7700
robinson@rlf com