# Tab B

# Part 2

## to

# Defendants' Opening Brief
# In Support of Their Motion to
# Dismiss Plaintiffs'
# Amended Complaint

*Comparable Transactions.* Using publicly available information, JPMorgan Securities examined the following transactions involving U.S. banks with transaction values greater than $10 billion since 1997:

| Announcement Date | Acquiror | Target |
|---|---|---|
| October 2003 | Bank of America Corporation | FleetBoston Financial Corporation |
| April 2001 | First Union Corporation | Wachovia Corporation |
| October 2000 | Firstar Corporation | U.S. Bancorp |
| September 2000 | The Chase Manhattan Corporation | J.P. Morgan & Co. Incorporated |
| May 1999 | Firstar Corporation | Mercantile Bancorporation |
| March 1999 | Fleet Financial Group, Inc. | BankBoston Corporation |
| June 1998 | Norwest Corporation | Wells Fargo & Company |
| April 1998 | Bank One Corporation | First Chicago NBD Corporation |
| April 1998 | NationsBank Corporation | BankAmerica Corporation |
| April 1998 | Travelers Group, Inc. | Citicorp |
| November 1997 | First Union Corporation | CoreStates Financial Corp. |
| August 1997 | NationsBank Corporation | Barnett Banks, Inc |

For each of these transactions, JPMorgan Securities analyzed the premium to the market price one day and five days prior to announcement and price as a multiple to the estimated twelve–months forward projected earnings, book value and tangible book value and the premium to core deposits. Set forth below are the results of this analysis for the transactions reviewed, based on information available as of January 12, 2004:

|  | High/Low Range | Median | JPMorgan Chase/ Bank One |
|---|---|---|---|
| 1–day premium to market | 0%–42% | 11% | 15% |
| 5–day premium to market | 0%–44% | 22% | 13% |
| 12–month forward EPS | 12.4x–24.1x | 17.3x | 15.3x |
| Book value | 2.1x–5.3x | 3.3x | 2.6x |
| Tangible book value | 2.6x–9.0x | 4.2x | 2.9x |
| Core deposit premium | 20%–62% | 39% | 28% |

The analysis implied an acquisition value of Bank One common stock ranging from approximately $49 to $63 per share.

*Dividend Discount Analysis.* JPMorgan Securities performed a dividend discount analysis to determine a range of equity values of Bank One common stock, assuming Bank One continued to operate as a stand–alone entity. The range was determined by adding the present value of an estimated future dividend stream for Bank One over a five–year period from 2004 through 2008, and the present value of an estimated terminal value of Bank One common stock at the end of 2008. In performing its analysis, JPMorgan Securities made the following assumptions, among others:

• earnings per share in 2003 and 2004 based on I/B/E/S median estimated earnings per share,

• an earnings per share growth at an annual rate of 10% from 2005 through 2008,

• a targeted tangible common equity/tangible managed assets (TCE/TMA) ratio of 5.75%,

45

- a terminal value of Bank One common stock at the end of 2008 based on price to earnings multiples of 11.0x, 12.0x and 13.0x to year 2009 projected earnings, assuming 10% growth in earnings from 2008 to 2009.

- discount rates from 10.0% to 12.0% to calculate the present value of the dividend stream and terminal values,

- 5% total managed asset growth, and

- a 35% tax rate.

This analysis implied a fully diluted equity value of $43.63 to $53.65 per share of Bank One common stock, on a stand–alone basis. JPMorgan Securities also tested the sensitivity of the values by varying the targeted TCE/TMA ratio from 5.25% to 6.25%, assuming a fixed terminal price to earnings multiple of 12.0x and keeping constant the other assumptions discussed above. This analysis indicated a fully diluted equity value of $45.24 to $51.94 per share of Bank One common stock, on a stand–alone basis.

JPMorgan Securities also performed a dividend discount analysis to determine a range of equity values of JPMorgan Chase common stock, assuming JPMorgan Chase continued to operate as a stand–alone entity. Using a discount rate of 11.0% to 13.0%, a targeted tangible common equity/tangible managed risk–weighted assets (TCE/TMRWA) ratio of 6.50% and otherwise the same assumptions as above, this analysis indicated a fully diluted value of $36.53 to $45.41 per share of JPMorgan Chase common stock, on a stand–alone basis. JPMorgan Securities also tested the sensitivity of the values by varying the targeted TCE/TMRWA ratio from 6.0% to 7.0%, assuming a fixed terminal price to earnings multiple of 11.0x. This analysis implied a fully diluted stand–alone value of JPMorgan Chase common stock ranging from approximately $38.18 to $43.68 per share.

*Dividend Discount Analysis With Cost Savings.* JPMorgan Securities also performed a dividend discount analysis to determine a range of equity values of Bank One common stock that included the expected cost savings from the merger. In performing its analysis, JPMorgan Securities made the following assumptions in addition to the assumptions described under "Dividend Discount Analysis" above, among others:

- cost savings of $2.2 billion, phased in 33% in 2004, 65% in 2005, 85% in 2006, and 100% in 2007,

- 3% annual cost savings growth post 2007, and

- total merger related pre–tax costs of $3 billion.

This analysis indicated a fully diluted equity value of $53.82 to $66.42 per share of Bank One common stock, on a pro forma basis. In addition, JPMorgan Securities tested the sensitivity of the values by varying the amount of cost savings from $2.0 billion to $2.4 billion (representing a range of 20.9% to 25.1% of Bank One's estimated run–rate cash expenses), assuming a terminal multiple of 12.0x and keeping constant the other assumptions discussed above. This analysis indicated an equity value of $56.53 to $63.45 per share of Bank One common stock, on a pro forma basis.

*Historical Exchange Ratio.* JPMorgan Securities calculated the exchange ratio of JPMorgan Chase common stock and Bank One common stock as of January 12, 2004 and the average exchange ratios for a range of periods from a five–day period to a twelve–month period ending on January 12, 2004 and also determined the implied fully diluted ownership of the combined company that Bank One stockholders would have acquired based on those average exchange ratios. JPMorgan Securities also calculated the premiums that the exchange ratio of 1.32 for the merger represents over the

46

average exchange ratios calculated throughout those periods. These results are shown in the following table:

|  | Average Exchange Ratio | Implied Bank One Fully Diluted Ownership | Exchange Ratio Premium |
|---|---|---|---|
| January 12, 2004 | 1.148x | 38.6% | 15% |
| 5–day | 1.167 | 39.0 | 13 |
| 1–month | 1.226 | 40.3 | 8 |
| 3–month | 1.211 | 40.0 | 9 |
| 6–month | 1.174 | 39.2 | 12 |
| 12–month | 1.264 | 41.0 | 4 |

*Contribution Analysis.* JPMorgan Securities compared the 42.2% pro forma equity ownership of the combined company that Bank One's stockholders would hold based on the exchange ratio of 1.32 to the expected relative contributions of JPMorgan Chase and Bank One to the pro forma combined company in terms of estimated GAAP and cash net income for 2004 (based on I/B/E/S median estimated earnings per share), tangible equity as of September 30, 2003 and market value as of January 12, 2004. JPMorgan Securities also calculated the implied exchange ratio implied by these contributions. The results of this analysis are set forth below:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
|---|---|---|---|
| | 57.8% | 42.2% | 1.320 |

| | Contribution by JPMorgan Chase | Contribution by Bank One | &bsp; Implied Exchange Ratio from Contribution |
|---|---|---|---|
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

*Pro Forma Merger Analysis.* JPMorgan Securities analyzed the pro forma impact of the merger on projected earnings per share for JPMorgan Chase for 2005 and 2006, based upon median estimates provided by I/B/E/S, one time pre–tax transaction costs of $3 billion, annual pre–tax cost savings as described below, and assuming, among other factors, JPMorgan Chase repurchases $3.5 billion of common stock per year from 2004 through 2006. The pro forma results were calculated based on publicly available I/B/E/S estimates of GAAP earnings per share and cash earnings per share and information provided by managements of JPMorgan Chase and Bank One regarding expected cost savings and synergies from the merger.

Assuming annual pre–tax cost savings of $2.2 billion are fully realized by 2005, the analysis showed that the merger would be accretive to GAAP earnings per share by 1.0% and cash earnings per share by 5.6%. If 65% of cost savings are realized by 2005, the merger would be dilutive to GAAP earnings per share by 3.2% but accretive to cash earnings per share by 1.5%. The analysis also indicated that the merger would be accretive to GAAP and cash earnings per share in 2006 if 85% or more of cost savings were realized by 2006.

JPMorgan Securities also calculated the potential incremental market value of the combined company from the merger for JPMorgan Chase stockholders by adding the market value of JPMorgan Chase and Bank One common stock as of January 12, 2004 and the potential value of cost savings from the merger. The potential value of cost savings was calculated based on assuming the annual pre–tax cost savings and one time pre–tax transaction costs described

47

above, a 35% tax rate and a 12.0x P/E multiple. Using these assumptions, JPMorgan Securities estimated the potential value of cost savings to be $15 billion. Based on these calculations, JPMorgan Securities estimated the potential market value of the combined company to be $146 billion, or $40.79 per share, after giving effect to an estimated number of shares that JPMorgan Chase would issue to Bank One stockholders in the merger.

The foregoing summary of certain material financial analyses does not purport to be a complete description of the analyses or data presented by JPMorgan Securities. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. JPMorgan Securities believes that the foregoing summary and its analyses must be considered as a whole and that selecting portions of the foregoing summary and these analyses, without considering all of its analyses as a whole, could create an incomplete view of the processes underlying the analyses and its opinion. No single factor or analysis was determinative of JPMorgan Securities' fairness determination. Rather, JPMorgan Securities considered the totality of the factors and analyses performed in determining its opinion. JPMorgan Securities based its analyses on assumptions that it deemed reasonable, including those concerning general business and economic conditions and industry–specific factors. The other principal assumptions upon which JPMorgan Securities based its analysis have been described under the description of each analysis in the foregoing summary. Analyses based upon forecasts of future results are inherently uncertain, as they are subject to numerous factors or events beyond the control of the parties and their advisors. Accordingly, forecasts and analyses used or made by JPMorgan Securities are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by those analyses. Moreover, JPMorgan Securities' analyses are not and do not purport to be appraisals or otherwise reflective of the prices at which businesses actually could be bought or sold. None of the selected companies reviewed as described in the above summary is identical to JPMorgan Chase or Bank One, and none of the selected transactions reviewed was identical to the merger. However, the companies selected were chosen because they are publicly traded companies with operations and businesses that, for purposes of JPMorgan Securities' analysis, may be considered similar to those of JPMorgan Chase and Bank One. The transactions selected were similarly chosen because their participants, size and other factors, for purposes of JPMorgan Securities' analysis, may be considered similar to the merger. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies compared to JPMorgan Chase and Bank One and the transactions compared to the merger.

As a part of its investment banking business, JPMorgan Securities and its affiliates are continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, investments for passive and control purposes, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for estate, corporate and other purposes. JPMorgan Securities is a wholly–owned subsidiary of JPMorgan Chase. JPMorgan Securities and its affiliates have provided, and in the future may continue to provide, for compensation, investment banking and other services to JPMorgan Chase and its affiliates, including serving as underwriter or agent with respect to securities offerings by JPMorgan Chase and acting as financial advisor with respect to acquisitions and divestitures. JPMorgan Securities and its affiliates have provided, and in the future may continue to provide, for compensation, trading, treasury and other services to Bank One and its affiliates, including providing credit, corporate finance and investment management services. In the ordinary course of business, JPMorgan Securities or its affiliates may actively trade in the debt and equity securities of Bank One and, subject to applicable regulatory constraints, JPMorgan Chase for their own accounts and for the accounts of their customers, and accordingly, may at any time hold a long or short position in those securities.

JPMorgan Chase selected JPMorgan Securities to advise it and deliver a fairness opinion with respect to the merger on the basis of its experience and its familiarity with JPMorgan Chase and for the reasons described under "— Decision by JPMorgan Chase Board to Engage Affiliated Financial Advisor" above. JPMorgan Chase has agreed to allocate JPMorgan Securities a fee of $40 million in connection with its engagement upon the completion of the merger. In addition, JPMorgan Chase has agreed to reimburse JPMorgan Securities for its expenses incurred in connection with its services, including the fees and disbursements of counsel, and will indemnify JPMorgan Securities against certain liabilities, including liabilities arising under federal securities laws.

The full text of the written opinion of JPMorgan Securities, dated January 14, 2004, which sets forth, among other things, the assumptions made, procedures followed, matters considered and limitations on the review undertaken by JPMorgan Securities in connection with the opinion, is attached to this document as Annex D and is incorporated in this document by reference. Holders of JPMorgan Chase common stock are urged to, and should, read this opinion carefully and in its entirety. JPMorgan Securities provided its opinion for the information and assistance of the JPMorgan Chase board of directors in connection with its consideration of the transaction contemplated by the merger agreement. The JPMorgan Securities opinion is not a recommendation as to how any holder of JPMorgan Chase common stock should vote with respect to the merger or any other matter. The opinion of JPMorgan Securities will not reflect any developments that may occur or may have occurred after the date of its opinion and prior to the completion of the merger. JPMorgan Securities has no obligation to update, revise or reaffirm its opinion, and JPMorgan Chase does not currently expect that it will request an updated opinion from JPMorgan Securities.

### Opinion of Bank One's Financial Advisor

Lazard acted as Bank One's exclusive investment banker in connection with the merger. Bank One selected Lazard based on Lazard's qualifications, expertise and reputation. In connection with Lazard's engagement, Bank One requested that Lazard evaluate the fairness, from a financial point of view, to the holders of shares of Bank One common stock of the exchange ratio provided for in the merger agreement. On January 14, 2004, at a meeting of the Bank One board of directors held to evaluate the merger, Lazard rendered to Bank One's board an oral opinion, which opinion was confirmed by delivery of a written opinion dated January 14, 2004, the date of the merger agreement, to the effect that, as of that date and based on and subject to the matters described in its opinion, the exchange ratio was fair, from a financial point of view, to the holders of shares of Bank One common stock.

In connection with its opinion, Lazard:

- reviewed the financial terms and conditions of a draft of the merger agreement dated January 13, 2004, which was substantially in the form of the agreement executed by Bank One and JPMorgan Chase on January 14, 2004;

- analyzed certain publicly available financial statements and historical business information relating to Bank One and JPMorgan Chase, respectively;

- reviewed various internal financial forecasts and other data prepared by the managements of Bank One and JPMorgan Chase, respectively, with respect to the businesses and prospects of Bank One and JPMorgan Chase, respectively, the strategic objectives of each, and their estimates of synergies and other anticipated strategic, financial and operational benefits of the merger to the combined company;

- held discussions with members of the senior managements of Bank One and JPMorgan Chase with respect to the businesses and prospects of Bank One and JPMorgan Chase, respectively, the strategic objectives of each, and their estimates of synergies and other

49

anticipated strategic, financial and operational benefits of the merger to the combined company;

• compared the financial performance of Bank One and JPMorgan Chase and the prices and trading activity of Bank One common stock and JPMorgan Chase common stock with that of certain other publicly–traded companies it believed to be generally comparable with Bank One and JPMorgan Chase, respectively, and their securities;

• reviewed the financial terms, to the extent publicly available, of certain business combinations involving companies in lines of businesses it believed to be generally comparable to those of Bank One and JPMorgan Chase, and in other industries generally;

• reviewed the historical stock prices and trading volumes of Bank One common stock and JPMorgan Chase common stock; and

• conducted such other financial studies, analyses and investigations as it deemed appropriate.

In performing its review, Lazard relied upon the accuracy and completeness of the foregoing information, and did not assume any responsibility for and did not conduct any independent verification of such information. In addition, it did not review individual credit files nor did it conduct any independent valuation or appraisal of the assets or liabilities (including any hedge, swaps, foreign exchange, derivative or off–balance–sheet assets and liabilities) of Bank One or JPMorgan Chase or any of their respective subsidiaries, or concerning the solvency or fair value of any of the foregoing entities, and was not furnished with any such valuation or appraisal. With respect to financial forecasts, including projected synergies and other anticipated strategic, financial and operational benefits of the merger, Lazard assumed with Bank One's consent that such forecasts were reasonably prepared on bases reflecting the best currently available estimates and judgments of management of Bank One and JPMorgan Chase as to the future financial performance of Bank One, JPMorgan Chase and the combined company, as the case may be, and it also assumed that such forecasts and projections will be realized in the amounts and at the times contemplated thereby. The financial forecasts provided by each of Bank One and JPMorgan Chase covered only 2004 (and Lazard was informed that no other forecasts were available), and, with Bank One's permission, in analyzing the exchange ratio, Lazard used certain earnings estimates and consensus estimates published by certain financial analysts and databases, respectively. Lazard assumed no responsibility for and expressed no view as to any such forecasts and projections or the assumptions on which they were based. In addition, Lazard is not an expert in the evaluation of loan portfolios or the allowances for losses with respect thereto, and, accordingly, it assumed with Bank One's consent that such allowances for losses for Bank One, JPMorgan Chase or any of their respective subsidiaries were in the aggregate adequate to cover such losses.

Further, Lazard's opinion was necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to it as of, the date of such opinion. Lazard assumed no responsibility for updating or revising its opinion based on circumstances or events occurring after the date thereof.

In rendering its opinion, Lazard assumed that the merger will be consummated on the terms described in the draft merger agreement reviewed by Lazard, including, among other things, that the merger will be treated as a tax–free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and that the merger will be consummated without any waiver of any material terms or conditions. Lazard also assumed that the executed merger agreement would conform in all material respects to the draft merger agreement reviewed by Lazard. In addition, Lazard assumed that obtaining the necessary regulatory and third party approvals for the merger will not have a material adverse effect on the combined company.

Lazard's opinion is directed to the Bank One board of directors and relates only to the fairness to the holders of shares of Bank One common stock of the exchange ratio from a financial point of view, and does not address any other aspect of the merger, the merits of the underlying decision by Bank One or JPMorgan Chase to engage in the merger or the relative merits of the merger as compared to other business strategies that might be available to Bank One or JPMorgan Chase. Lazard was not authorized to, and did not, solicit third party indications of interest in acquiring all or a part of Bank One or engaging in a business combination or any other strategic transaction with Bank One. Lazard did not express any opinion as to the price at which shares of Bank One common stock or shares of JPMorgan Chase common stock may trade subsequent to the announcement of the merger or as to the price at which shares of JPMorgan Chase common stock may trade subsequent to the consummation of the merger.

In its analyses, Lazard considered industry performance, regulatory, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Bank One and JPMorgan Chase. No company, transaction or business used in Lazard's analyses as a comparison is identical to Bank One or JPMorgan Chase or the proposed merger, and an evaluation of the results of those analyses is not entirely mathematical. Rather, the analyses involve complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the merger, public trading or other values of the companies, business segments or transactions being analyzed.

The estimates contained in Lazard's analyses and the ranges of valuations resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than those suggested by the analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, Lazard's analyses and estimates are inherently subject to substantial uncertainty.

Lazard's opinion and financial analyses were only one of many factors considered by Bank One's board of directors in its evaluation of the proposed merger and should not be viewed as determinative of the views of the Bank One board of directors or management with respect to the merger or the exchange ratio.

The following is a summary of the material financial analyses underlying Lazard's opinion dated January 14, 2004 delivered to Bank One's board of directors in connection with the merger. In preparing its opinion to the Bank One board of directors, Lazard performed a variety of financial and comparative analyses, including those described below. The summary of Lazard's analyses described below is not a complete description of the analyses underlying Lazard's opinion. The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances, and, therefore, is not readily susceptible to summary description. In arriving at its opinion, Lazard made qualitative judgments as to the significance and relevance of each analysis and factor that it considered. The financial analyses summarized below include information presented in tabular format. In order to fully understand Lazard's financial analyses, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. Considering the data in the tables below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Lazard's financial analyses.

*Transaction Multiple Analysis.* Lazard calculated an implied transaction value per share of Bank One common stock of $51.35, based on the exchange ratio of 1.320x and the $38.90 closing price per share of JPMorgan Chase common stock on January 13, 2004. The implied value per share represented a premium to the closing price per share of Bank One common stock on January 13, 2004 of 15.1%. The implied value per share also represented a premium to

51

the 52–week high and 52–week low closing price per share of Bank One common stock of 12.4% and 51.3%, respectively.

Lazard also calculated the implied transaction value per share of $51.35 as a multiple of:

• Bank One's last twelve months ("LTM") earnings per share ("EPS") from continuing operations through September 30, 2003;

• median EPS estimates for Bank One for 2003 and 2004 based on I/B/E/S estimates; and

• reported and tangible book value per share as of September 30, 2003.
The results of these calculations are as follows:

| Implied Transaction Value per Share as a Multiple of: | |
|---|---|
| LTM EPS from continuing operations | 17.5x |
| Estimated 2003 EPS–I/B/E/S median | 16.9 |
| Estimated 2004 EPS–I/B/E/S median | 15.3 |
| Reported book value per share | 2.56 |
| Tangible book value per share | 2.93 |

*Exchange Ratio Analysis.* Lazard reviewed the ratio of the closing price of Bank One common stock divided by the closing price of JPMorgan Chase common stock on January 13, 2004, the last day of trading before the date of Lazard's opinion, referred to as the current market, and the ratio of average closing prices of Bank One common stock divided by average closing prices of JPMorgan Chase common stock computed over various periods ended January 13, 2004. Lazard then calculated (i) the fully diluted ownership of Bank One shareholders in the combined company implied by these ratios, and (ii) the premium implied by these ratios over the various periods relative to the 1.147x exchange ratio implied by the current market.

The analysis indicated a range of exchange ratios from 0.947x to 1.292x over the various periods compared to the 1.320x exchange ratio in the merger, and a range of pro forma ownership of Bank One's shareholders in the combined company of 34.0% to 41.4% compared to 42.2% in the merger, as indicated in the following table:

| | Implied Exchange Ratio | Implied Bank One Fully Diluted Ownership | Implied Premium to Bank One |
|---|---|---|---|
| As of January 13, 2004 (current market) | 1.147x | 38.6% | — |
| Exchange Ratio in the merger of 1.320x | 1.320x | 42.2% | 15.1% |
| Period: | | | |
| 5 day average | 1.163x | 38.9% | 1.4% |
| One–month average | 1.221 | 40.1 | 6.5 |
| Three–month average | 1.208 | 39.9 | 5.4 |
| Six–month average | 1.172 | 39.1 | 2.2 |
| One–year average | 1.237 | 40.4 | 7.9 |
| Two–year average | 1.292 | 41.4 | 12.7 |
| Three–year average | 1.108 | 37.7 | (3.4) |
| Five–year average | 0.947 | 34.0 | (17.4) |

Lazard also noted that average exchange ratios for the various periods represented a range of premiums/(discounts) of approximately (17.4)% to 12.7% compared to the 1.147x exchange ratio implied by the current market.

*Contribution Analysis.* Lazard analyzed the relative contributions of Bank One and JPMorgan Chase to the combined company of (i) estimated 2003 and 2004 net income based

52

on generally accepted accounting principles and on a cash earnings basis and (ii) total assets, risk–weighted assets, loans, deposits, common shareholders' equity, tangible common shareholders' equity and Tier 1 capital (which includes common equity, certain qualifying cumulative and noncumulative perpetual preferred stock and related surplus, and minority interests in equity accounts of consolidated subsidiaries) as of September 30, 2003. Estimated GAAP and cash net income for 2003 and 2004 for Bank One and JPMorgan Chase was based on median I/B/E/S estimates as of January 13, 2004. Cash earnings were determined by adding amortization of intangibles to estimated earnings.

Lazard then computed, for each of these items (i) the relative contributions of Bank One and JPMorgan Chase to the combined company, (ii) the resulting implied exchange ratios and (iii) the premium/ (discount) implied by the resulting exchange ratios relative to the 1.147x exchange ratio implied by the current market.

The analysis indicated a range of contribution percentages from 26.8% to 37.5% as compared to the pro forma ownership resulting from the 1.320x exchange ratio of 42.2% in the merger and a range of implied exchange ratios of 0.677x to 1.097x as compared to the 1.320x exchange ratio in the merger, as set forth in the following table:

| | Bank One % | JPMorgan Chase % | Implied | |
| | | | Exchange Ratio | Premium/ (Discount) to Bank One |
| --- | --- | --- | --- | --- |
| **Income Statement** | | | | |
| GAAP (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |
| Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
| Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk–Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common Shareholders' Equity | 33.3 | 66.7 | 0.918 | (20.0) |
| Tangible Common Shareholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

Lazard also noted that the exchange ratios implied by the contribution analysis represented a range of discounts of approximately 4.3% to 41.0% compared to the 1.147x exchange ratio implied by the current market.

53

*Precedent Transaction Analysis.* Lazard reviewed nine stock–for–stock merger transactions since 1995 involving companies in the financial services industry. We refer to those transactions as the "group 1 transactions." Lazard calculated the premium implied by the exchange ratio in each of the group 1 transactions to the closing stock price for the parties in the group 1 transactions on the day prior to the announcement of the transaction and calculated the resulting ownership percentages of the constituent shareholders in the combined company. Lazard then compared the results of this analysis to corresponding data for the merger. This indicated a range of premiums in the group 1 transactions of approximately 0% to 16%, as compared to the implied premium for Bank One's common stock of 15.1% based on the 1.320x exchange ratio in the merger, as indicated in the following table:

| | Announcement Date | 1–Day Premium (%) | Ownership (%) | Board Composition (%) | Chairman Position | CEO Position | Holding Company Name |
|---|---|---|---|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 | 50/50 | JPMorgan Chase | JPMorgan Chase(1) | JPMorgan Chase |
| Travelers Property Casualty Corp. / The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 | 52/48 | Travelers | St. Paul | St. Paul Travelers |
| First Union Corporation / Wachovia Corporation | 4/15/01 | 7 | 73/27 | 50/50 | Wachovia | First Union | Wachovia |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 | 55/45 | Fleet | Fleet(3) | FleetBoston Financial |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 | 50/50 | Wells Fargo | Norwest | Wells Fargo |
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 | 55/45 | NationsBank | NationsBank | Bank of America |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 | 50/50 | First Chicago | Banc One | Bank One |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 | 50/50 | Co–Chairmen | Co–CEOs | Citigroup |
| Dean Witter, Discover & Co. / Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 | 50/50 | Dean Witter | Dean Witter | Morgan Stanley Dean Witter |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 | 57/43 | Chemical | Chemical | Chase Manhattan [Additional columns below] |

[Continued from above table, first column(s) repeated]

| | HQ City |
|---|---|
| JPMorgan Chase/ Bank One | JPMorgan Chase(2) |
| Travelers Property Casualty Corp. / The St. Paul Companies. Inc. | St. Paul |
| First Union Corporation / Wachovia Corporation | First Union |
| Fleet Financial Group, Inc./ BankBoston Corporation | Same |
| Norwest Corporation/ Wells Fargo & Company | Wells Fargo |
| NationsBank Corporation / BankAmerica Corporation | NationsBank |
| Banc One Corporation / First Chicago NBD Corporation | First Chicago |
| Travelers Group Inc. / Citicorp | Same |
| Dean Witter, Discover & Co. / Morgan Stanley Group Inc. | Same |
| Chemical Banking Corporation / The Chase Manhattan Corporation | Same |

1. Chief Executive Officer succession commitment provides for change of Chief Executive Officer in 2006.

2. Retail financial services business, which includes consumer banking. small business. middle market and consumer lending will be headquartered in Chicago.

3  Chief Executive Officer succession commitment for BankBoston executive

As indicated in the table above, Lazard also reviewed the group 1 transactions to determine the composition of the board of directors of the combined company, the affiliation of the chairman and the chief executive officer of the combined company, the name of the combined company and the headquarters of the combined company

54

Lazard also reviewed publicly available financial information for the following fourteen bank merger and acquisition transactions announced since 1995 which had an announced transaction value greater than $10 billion: Bank of America Corporation/ FleetBoston Financial Corporation, First Union Corporation/ Wachovia Corporation, Firstar Corporation/ U.S. Bancorp, The Chase Manhattan Corporation/ J.P. Morgan & Co., Firstar Corporation/ Mercantile Bancorporation Inc., Fleet Financial Group, Inc./ BankBoston Corporation, Norwest Corporation/ Wells Fargo & Company, NationsBank Corporation/ BankAmerica Corporation, Banc One Corporation/ First Chicago NBD Corporation, Travelers Group Inc./ Citicorp, First Union Corporation/ CoreStates Financial Corp, NationsBank Corporation/ Barnett Banks, Inc., Wells Fargo & Company/ First Interstate Bancorp, and Chemical Banking Corporation/ The Chase Manhattan Corporation. Lazard calculated and compared the following multiples and premiums with respect to the fourteen transactions and the Bank One/ JPMorgan Chase merger:

| | Bank One/JPMorgan Chase Merger | Range for Selected Transactions | Median for Selected Transactions |
|---|---|---|---|
| Premium of implied transaction value to closing stock price one day prior to announcement | 15% | 0%–43% | 12% |
| Premium of implied transaction value to closing stock price one month prior to announcement | 16% | 3%–52% | 26% |
| Multiple of implied transaction value to last twelve-months ("LTM") EPS | 17.5x | 11.9x–32.5x | 22.1x |
| Multiple of implied transaction value to reported book value per share | 2.56x | 1.33x–5.39x | 3.13x |
| Multiple of implied transaction value to tangible book value per share | 2.93x | 1.52x–8.22x | 4.14x |

*Comparable Companies Analysis.* Lazard compared trading and operating data of Bank One, JPMorgan Chase and the following publicly traded companies, organized by business focus:

| Retail Focus: | | Wholesale Focus: | Monoline Card: |
|---|---|---|---|
| Bank of America<br>Wells Fargo<br>Wachovia<br>U.S. Bancorp<br>FleetBoston<br>Fifth Third<br>BB&T<br>National City<br>SunTrust<br>PNC Financial<br>KeyCorp | &sp; | Citigroup<br>Bank of America | MBNA<br>Capital One |

55

These companies were selected for comparison purposes through a review of publicly traded financial institutions with similar operating characteristics and size. In general, financial data used was as of September 30, 2003 and market data was as of January 13, 2004. Projected earnings per share and long term growth rates were based on median I/B/E/S estimates as of January 13, 2004.

| | Bank One | JPMorgan Chase | Retail Focus Medians | Wholesale Focus Medians | Monoline Card Medians |
|---|---|---|---|---|---|
| **Multiple of stock price to(1):** | | | | | |
| Estimated 2003 GAAP EPS | 14.7x | 12.5x | 13.7x | 12.8x | 14.0x |
| Estimated 2004 GAAP EPS | 13.3 | 12.4 | 12.7 | 12.0 | 12.4 |
| Reported book value per share | 2.23 | 1.80 | 2.18 | 2.52 | 2.95 |
| Tangible book value per share | 2.54 | 2.30 | 3.17 | 3.72 | 3.75 |
| Current dividend yield | 2.24% | 3.50% | 3.49% | 3.45% | 0.85% |
| Long term growth rate | 10.0 | 10.0 | 10.0 | 11.0 | 14.3 |
| **Last twelve months profitability(2):** | | | | | |
| Return on assets | 1.21% | 0.74% | 1.56% | 1.40% | 3.44% |
| Return on equity | 15.35 | 13.08 | 16.38 | 18.97 | 23.37 |
| Net interest margin | 3.50 | 2.11 | 3.80 | 3.81 | 8.98 |
| Efficiency ratio | 56.8 | 65.5 | 55.6 | 54.1 | 39.2 |
| Ratio of non-interest income to net revenues | 49.4 | 62.2 | 43.6 | 45.7 | 35.5 |
| **Asset quality:** | | | | | |
| Ratio of non-performing assets to loans and real estate owned | 2.2% | 1.7% | 1.2% | 1.9% | — |
| Ratio of reserves to loans | 3.1 | 2.0 | 1.7 | 2.2 | 5.7 |
| Ratio of reserves to non-performing loans | 147.8 | 128.2 | 155.0 | 131.4 | — |
| **Capital Adequacy:** | | | | | |
| Tier 1 ratio | 9.8% | 8.7% | 8.3% | 8.9% | 15.7% |
| Leverage ratio | 8.2 | 5.4 | 7.2 | 5.9 | 16.5 |

(1)   FleetBoston excluded from trading statistics.

(2)   Excludes non-recurring items, including merger and restructuring charges.

    Lazard also reviewed the history of the reported trading prices of Bank One's common stock and JPMorgan Chase's common stock and the relationship between the movements in the prices of Bank One's common stock and JPMorgan Chase's common stock, respectively, to movements in indices composed of each of the three peer group stocks. The results of the one-year and three-year indexed comparisons are as follows.

| | Beginning Index Value January 13, 2003 | Ending Index Value January 13, 2004 |
|---|---|---|
| Bank One | 100 | 119 |
| JPMorgan Chase | 100 | 149 |
| Retail Focus | 100 | 118 |
| Wholesale Focus | 100 | 129 |
| Monoline Card | 100 | 140 |

|  | Beginning Index Value<br>January 13, 2001 | Ending Index Value<br>January 13, 2004 |
|---|---|---|
| Bank One | 100 | 125 |
| JPMorgan Chase | 100 | 83 |
| Retail Focus | 100 | 139 |
| Wholesale Focus | 100 | 121 |
| Monoline Card | 100 | 105 |

Lazard then estimated reference ranges based on the median of certain trading multiples of the companies listed above (other than the monoline card companies) and used such reference ranges to calculate ranges of implied values per share of Bank One common stock. The results of this analysis are set forth below.

|  | Estimated<br>Reference<br>Range | Implied Value per Share<br>of Bank One |
|---|---|---|
| P/E based on estimated 2003 GAAP EPS (I/B/E/S) | 14.0x – 16.0x | $43 – $49 |
| P/E based on estimated 2004 GAAP EPS (I/B/E/S) | 12.5 – 14.0 | 42 – 47 |
| Price per share/reported book value per share | 2.0 – 3.0 | 40 – 60 |

*Dividend Discount Analysis.* Lazard performed a dividend discount analysis to generate reference ranges for the implied present value per share of Bank One and JPMorgan Chase common stock assuming that each continued to operate as a stand–alone company. These ranges were calculated using median I/B/E/S EPS estimates for 2004 and were determined in each case by calculating a "present value" of the estimated future dividends of Bank One and JPMorgan Chase, respectively, through 2009, plus a "present value" of the estimated "terminal value" of the common stock of Bank One and JPMorgan Chase, respectively, as of the end of calendar year 2009. "Terminal value" refers to the value of a particular asset at a specified future time. "Present value" refers to the current value of future cash flows or amounts and is obtained by discounting such future cash flows or amounts by an interest rate that takes into account risk, the opportunity cost of capital, expected returns and other appropriate factors.

Lazard first estimated alternative terminal value ranges for Bank One and JPMorgan Chase common stock at the end of 2009 using (i) a long–term EPS growth rate of 10% for both Bank One and JPMorgan Chase and (ii) a range of terminal value multiples of 11.0x to 13.0x in the case of Bank One, and 10.0x to 12.0x in the case of JPMorgan Chase. Lazard assumed a rate of total asset growth of 5% per year for each of Bank One and JPMorgan Chase and a ratio of tangible common equity to tangible assets of 7.0% and 4.5%, respectively.

The estimated future dividends and terminal values resulting from the calculations described above were discounted to present values using discount rates of 10.0%, 11.0% and 12.0% in the case of Bank One, and 11.0%, 12.0% and 13.0% in the case of JPMorgan Chase. Lazard viewed these ranges as appropriate for companies with Bank One's and JPMorgan Chase's respective risk characteristics.

This analysis resulted in the following reference ranges of implied per share values for Bank One and JPMorgan Chase common stock:

|  | Implied Per Share<br>Equity Value Reference Range |
|---|---|
| Bank One | $44.51 to $54.33 |
| JPMorgan Chase | $37.44 to $46.11 |

Lazard also calculated the following reference ranges assuming (i) a discount rate of 11.0% for Bank One and 12.0% for JPMorgan Chase, (ii) a range of EPS growth rates of 7.0% to

57

10.0% for each of Bank One and JPMorgan Chase, and (iii) a range of terminal value multiples of 11.0x to 13.0x in the case of Bank One, and 10.0x to 12.0x in the case of JPMorgan Chase:

| | Implied Per Share Equity Value Reference Range |
|---|---|
| Bank One | $ 42.31 to $52.24 |
| JPMorgan Chase | $ 35.53 to $44.37 |

*Pro Forma Merger Analysis* Lazard analyzed the potential pro forma effect of the merger on Bank One's and JPMorgan Chase's estimated earnings per share for calendar years 2004 through 2006 and estimated cash earnings per share for calendar years 2004 through 2006, using median I/B/E/S EPS estimates for Bank One and JPMorgan Chase, and applying the following assumptions:

- June 30, 2004 closing of the merger;

- 2005 and 2006 EPS estimates based on median I/B/E/S EPS long–term growth rates of 10% for Bank One and JPMorgan Chase;

- total cost synergies of $2.2 billion (16.5% phased–in in 2004, 65.0% in 2005 and 85.0% in 2006);

- $3.0 billion pre–tax merger–related costs;

- amortization of core deposit and purchased credit card receivables intangible using the usage method over 10 years; and

- common stock repurchases of $3.5 billion per year at a price per share of 12.0x forward earnings per share (2% pre–tax cost of funding).

Based on the 1.320x exchange ratio, this analysis indicated the following accretion/(dilution) to Bank One's and JPMorgan Chase's estimated earnings per share:

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| **Impact to Bank One:** | | | |
| Accretion — GAAP | 16.8% | 20.1% | 25.5% |
| Accretion — Cash | 21.4 | 26.3 | 30.8 |
| **Impact to JPMorgan Chase:** | | | |
| Accretion/(Dilution) — GAAP | (5.8%) | (3.1%) | 1.3% |
| Accretion/(Dilution) — Cash | (2.4) | 1.7 | 5.3 |

Lazard also calculated the accretion in dividends per share to Bank One shareholders based on JPMorgan Chase's current dividend per share of $1.36 and the 1.320x exchange ratio in the merger as follows:

| | Current | Pro Forma | % Change |
|---|---|---|---|
| Bank One | $1.00 | $1.795 | 79.5% |
| JPMorgan Chase | 1.36 | — | — |

*General.* Bank One has agreed to pay Lazard for its investment banking services in connection with the merger a fee of $20 million, a substantial portion of which is contingent, and payable, upon closing of the merger. Bank One also has agreed to reimburse Lazard for its out–of–pocket expenses, including reasonable fees and expenses of legal counsel and any other advisor retained by Lazard, and to indemnify Lazard and its members, employees, agents, affiliates and controlling persons, if any, against liabilities, including liabilities under the federal securities laws, arising out of its engagement. Lazard in the past has provided investment banking and financial advisory services to Bank One and an affiliate of JPMorgan Chase, for which services Lazard has received customary fees.

58

Lazard provides a full range of financial advisory and other services and, in the course of its business, may from time to time effect transactions and hold securities, including derivative securities, of Bank One and JPMorgan Chase for its own account and for the account of clients and customers, and, accordingly, may hold a long or short position in such securities, and may provide advisory and other services in the future.

The full text of the written opinion of Lazard, dated January 14, 2004, which sets forth, among other things, the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Lazard in connection with the opinion, is attached to this document as Annex E and is incorporated in this document by reference. Holders of Bank One common stock are urged to, and should, read this opinion carefully and in its entirety. Lazard provided its opinion for the information and assistance of the Bank One board of directors in connection with its consideration of the transaction contemplated by the merger agreement. The Lazard opinion is not a recommendation as to how any holder of Bank One common stock should vote with respect to the merger or any other matter. The opinion of Lazard will not reflect any developments that may occur or may have occurred after the date of its opinion and prior to the completion of the merger. Lazard has no obligation to update, revise or reaffirm its opinion. Bank One does not currently expect that it will request an updated opinion from Lazard.

## Interests of Directors and Executive Officers in the Merger

*Interests of JPMorgan Chase Directors and Executive Officers.* In considering the recommendation of the board of directors of JPMorgan Chase to vote for the proposal to adopt the merger agreement, stockholders of JPMorgan Chase should be aware that some members of the JPMorgan Chase board of directors and of JPMorgan Chase's executive management have agreements or arrangements that provide them with interests in the merger that may differ from those of JPMorgan Chase's stockholders. The JPMorgan Chase board of directors was aware of these agreements and arrangements during its deliberations on the merits of the merger and in making its decision to recommend to the JPMorgan Chase stockholders that they vote to adopt the merger agreement.

*JPMorgan Chase Management Positions.* The merger agreement provides that Mr. Harrison, JPMorgan Chase's current Chairman and Chief Executive Officer, will remain Chairman and Chief Executive Officer of JPMorgan Chase until the second anniversary of the completion of the merger, at which time (or any earlier time that Mr. Harrison ceases to serve as Chief Executive Officer) Mr. Dimon will succeed him as Chief Executive Officer, and Mr. Harrison will thereafter continue to serve as Chairman. The merger agreement provides for the JPMorgan Chase by–laws to be amended upon consummation of the merger to reflect these arrangements and to provide that a 75% vote of the entire board will be required to alter these arrangements prior to the time that Mr. Dimon succeeds Mr. Harrison. In addition, other members of JPMorgan Chase management will serve in senior management positions at the combined company. For further information, see "— Board of Directors and Management After the Merger" below.

*Harrison Severance Arrangements.* JPMorgan Chase maintains a severance policy that provides for severance in case of involuntary termination, except for cause, under which severance paid to named executive officers would be in an amount equal to two times (three times in the case of Mr. Harrison) current base salary, plus two times (three times in the case of Mr. Harrison) such officer's three–year average annual cash performance bonus. In connection with the merger, the parties have agreed that the policy will be amended, effective upon completion of the merger, so that Mr. Harrison's severance will be the greater of (a) $22.2 million or (b) the amount described in the preceding sentence if he is terminated involuntarily without cause prior to the second anniversary of the completion of the merger. Under the policy as currently in effect, Mr. Harrison could receive severance payments of approximately $18.7 million if his employment were terminated involuntarily at this time. The amendment to the policy is intended to provide consistency with Mr. Dimon's employment agreement described below.

59

*JPMorgan Chase Outside Directors.* Under JPMorgan Chase's deferred compensation and pension liquidation plans for non–employee directors, payments of cash and/or stock compensation that otherwise had been deferred would begin following such time as the director ceases to serve. In accordance with these plans, payments will be made to those directors of JPMorgan Chase who do not become directors of JPMorgan Chase after the merger in accordance with the director's election under the plans, and may be made in a lump sum or in periodic payments over a specified number of years.

*Interests of Bank One Directors and Executive Officers.* In considering the recommendation of the board of directors of Bank One to vote for the proposal to adopt the merger agreement, stockholders of Bank One should be aware that members of the Bank One board of directors and members of Bank One's management team have agreements or arrangements that provide them with interests in the merger that may differ from those of Bank One stockholders. The Bank One board of directors was aware of these agreements and arrangements during its deliberations on the merits of the merger and in making its decision to recommend to the Bank One stockholders that they vote to adopt the merger agreement.

*Bank One Management Positions.* The merger agreement provides that Mr. Dimon, Bank One's current Chairman and Chief Executive Officer, will become President and Chief Operating Officer of JPMorgan Chase upon the completion of the merger, and on its second anniversary (or at any earlier time that Mr. Harrison ceases to serve as Chief Executive Officer), Mr. Dimon will succeed Mr. Harrison as Chief Executive Officer. In addition, other members of Bank One management will serve in senior management positions at the combined company. For further information, see "— Board of Directors and Management After the Merger" below.

*Dimon Employment Agreement.* JPMorgan Chase entered into an employment agreement with Mr. Dimon dated as of January 14, 2004, for a term of employment commencing upon the completion of the merger. If the merger is completed, this employment agreement will supersede the employment agreement Mr. Dimon executed with Bank One in March of 2000 that would have entitled Mr. Dimon to receive, upon a qualifying termination of employment following a change of control, (a) a payment of approximately $20.8 million consisting of (i) a pro–rata bonus (assuming the merger is completed on June 30, 2004) based upon his target bonus for 2004, and (ii) 2.5 times the sum of his base salary and the average annual bonus earned by him in the prior three years; and, in addition, (b) three years of welfare benefits continuation. The merger would constitute a change of control under Mr. Dimon's employment agreement with Bank One. The term of Mr. Dimon's new employment agreement with JPMorgan Chase will end on the first annual meeting of the stockholders of JPMorgan Chase that occurs following the second anniversary of the completion of the merger. Mr. Dimon will serve as JPMorgan Chase's President and Chief Operating Officer from the completion of the merger until the earlier of the second anniversary of the completion of the merger and the date Mr. Harrison ceases to be JPMorgan Chase's Chief Executive Officer. After that date, and for the remainder of the term of employment, Mr. Dimon will serve as JPMorgan Chase's President and Chief Executive Officer.

While serving as President and Chief Operating Officer, Mr. Dimon will receive an annual base salary, annual bonus and equity–based awards no less than ninety percent (90%) of the value of the annual base salary, annual bonus and equity–based awards provided to Mr. Harrison as determined at the discretion of the JPMorgan Chase board (but in no event will Mr. Dimon's annual base salary be less than $1 million). As JPMorgan Chase's President and Chief Executive Officer, Mr. Dimon will be entitled to an annual base salary, annual bonus and equity–based awards as determined by JPMorgan Chase's board of directors, provided that the annual base salary will be no less than his annual base salary as the President and Chief Operating Officer

60

If Mr. Dimon's employment is terminated by JPMorgan Chase without cause (as defined in the agreement) or Mr. Dimon resigns with good reason (as defined below), Mr. Dimon will be entitled, subject to execution of a release in favor of JPMorgan Chase, to receive:

- The greater of (i) $20 million and (ii) three times 90% of the sum of Mr. Harrison's annual base salary and average cash bonus for the three years preceding the date of termination;

- Accelerated vesting of equity–based awards and five years (or full term, if shorter) to exercise vested options; and

- Continued medical and dental benefits for three years and eligibility to participate in JPMorgan Chase's post–termination welfare benefit programs

For purposes of the employment agreement, "good reason" means (i) the failure of JPMorgan Chase to appoint Mr. Dimon to the position of Chief Executive Officer upon the earlier of the second anniversary of the completion of the merger or the date Mr. Harrison ceases to be JPMorgan Chase's Chief Executive Officer, (ii) the assignment to Mr. Dimon of duties inconsistent with, or any diminution of, the position, authority, duties or responsibilities called for by the employment agreement, (iii) the failure to pay Mr. Dimon his compensation under the agreement, (iv) Mr. Dimon's relocation outside of New York, New York, (v) failure of JPMorgan Chase to require the assumption of the employment agreement by a successor or (vi) the failure to elect or reelect Mr. Dimon to JPMorgan Chase's board of directors.

If Mr. Dimon's employment is terminated due to his death or disability, Mr. Dimon (or his estate) will be entitled to receive a pro–rata bonus for the year of termination, accelerated vesting of equity–based awards and five years (or full term, if shorter) to exercise vested options and continued medical and dental benefits (in the case of disability, until age 65 and, upon his death, to his eligible dependents for three years) and eligibility to participate in JPMorgan Chase's post–termination welfare benefit programs.

Under the employment agreement, Mr. Dimon is restricted from revealing confidential information of JPMorgan Chase and, following Mr. Dimon's termination of employment for any reason, neither JPMorgan Chase nor Mr. Dimon may disparage the other party. In addition, for a period of one year following Mr. Dimon's termination of employment for any reason, Mr. Dimon may not solicit for employment any employees of JPMorgan Chase. In the event that any payments to Mr. Dimon are subject to an excise tax under Section 4999 of the Internal Revenue Code, Mr. Dimon will be entitled to an additional payment so that he remains in the same after–tax economic position he would have been in had the excise tax not been imposed.

*Bank One Key Executive Compensation and Severance Arrangements with JPMorgan Chase.* In consideration for waiving change of control protections under Bank One's Key Executive Change of Control Plan (the material terms of which are described below), it is currently contemplated that effective upon completion of the merger certain executive officers of Bank One (other than Mr. Dimon) will be provided a restricted stock unit award, guaranteed levels of compensation through calendar year 2005 (provided the executive officer remains employed) and severance protection for three years following the merger. The restricted stock unit awards will generally have a value equal to 1.5 times the sum of the executive officer's 2003 base salary and 2003 total annual incentive award consisting of cash and restricted stock units. The restricted stock units will vest on the second anniversary of the completion of the merger, but will become immediately vested if the executive officer's employment is terminated without cause or if the executive officer resigns with good reason. If the executive officer is terminated without cause or resigns with good reason prior to the third anniversary of the completion of the merger, the executive officer, subject to executing a release in favor of JPMorgan Chase, will be entitled to:

- Two times the sum of the executive officer's 2005 guaranteed base salary and cash bonus;

61

- Accelerated vesting of all equity incentive awards and at least three years (or full term, if shorter) to exercise vested options granted prior to the merger; and

- All other benefits provided to similarly situated employees under the JPMorgan Chase Executive Severance Policy.

For purposes of these arrangements, "good reason" means (i) the failure of JPMorgan Chase to provide the executive officer the guaranteed compensation described above or (ii) the relocation of the executive officer's principal place of employment following the merger.

If the executive officer's employment is terminated due to death or disability, the executive officer (or his estate) will be entitled to accelerated vesting of all equity incentive awards and at least three years (or full term, if shorter) to exercise vested options granted prior to the merger. If the executive officer resigns without good reason, the outstanding options granted prior to the merger will become fully vested and the executive officer will be provided with at least three years (or full term, if shorter) to exercise such options. In the event that any payments to an executive officer are subject to an excise tax under Section 4999 of the Internal Revenue Code, the executive officer will be entitled to an additional payment so that he or she remains in the same after–tax economic position he or she would have been in had the excise tax not been imposed, if the net after–tax benefit of the additional payment to the executive officer exceeds $100,000.

*Bank One Key Executive Change of Control Plan.* Bank One maintains the Key Executive Change of Control Plan in which each of the Bank One executive officers (other than Mr. Dimon) is eligible to participate. Under the terms of the plan, upon a termination of a participant's employment by the employer other than for cause or by the executive for "good reason" (as defined in the plan) within two years after a change of control of Bank One or by the executive for any reason during the 60–day period after a change of control of Bank One, the participant would be entitled to a pro–rata annual bonus for the year of termination plus a severance payment of 2.5 times the participant's base salary and annual bonus. In addition, the executive would be entitled to continued medical and life insurance coverage for 30 months after the date of termination; the value of 30 months of additional accruals under Bank One's tax–qualified and supplemental defined benefit pension plans; full vesting of all options and restricted stock awards and a minimum of three years to exercise options following termination of employment, subject to the original term of the option; and $50,000 for outplacement. The merger would constitute a change of control under this plan. In the event that any payments to a participant are subject to the excise tax under Section 4999 of the Code, the participant would be entitled to an additional payment such that the participant will be placed in the same after–tax economic position as if no excise tax had been imposed, if the net after–tax benefit of the additional payment to the executive officer exceeds $100,000.

*Bank One Personal Pension Account Plan and Supplemental Plan.* Pursuant to the terms of the Bank One Personal Pension Account Plan and the supplemental plan thereto, the accrued benefits of plan participants will vest upon a change of control of Bank One. The merger would constitute a change of control for purposes of vesting under this plan.

*Bank One Employee Stock Options and Restricted Shares.* Depending on the terms of the award agreements pursuant to which options and other stock–based awards held by Bank One executive officers were granted, each such option or other stock–based award will become vested as of completion of the merger or upon certain terminations of employment or services, as applicable, within a specified period following completion of the merger. Assuming that no restorative options are granted in 2004, the merger is completed on June 30, 2004 and JPMorgan Chase terminates the employment of each executive officer of Bank One immediately following completion of the merger, the number of unvested options and other stock–based awards granted by Bank One that would vest in connection with the merger is approximately 5,789,588 and 869,090, respectively.

62

For additional information about options and other stock–based awards held by certain Bank One directors and executives, see "Other Matters to be Considered at the Bank One Annual Meeting" beginning on page 140 of this document and for additional information on the effect of the merger on stock options and other stock–based awards, see "— Treatment of Stock Options and Other Equity–Based Awards" below.

*Bank One Outside Directors*  Under Bank One's deferred compensation plan for non–employee directors, payments of cash and/or stock compensation that otherwise had been deferred would begin following such time as the director ceases to serve. In accordance with this plan, payments will be made to those directors of Bank One who do not become directors of JPMorgan Chase after the merger in accordance with the director's election under the plan, and may be made in a lump sum or in periodic payments over a specified number of years.

*Indemnification and Insurance.* The merger agreement provides that, upon completion of the merger, JPMorgan Chase will, to the fullest extent permitted by law, indemnify and hold harmless, and provide advancement of expenses to, all past and present officers, directors and employees of Bank One and its subsidiaries to the same extent those persons were entitled to indemnification or advancement of expenses under Bank One's certificate of incorporation, by–laws and indemnification agreements.

The merger agreement also provides that JPMorgan Chase will maintain for a period of six years after completion of the merger the current directors' and officers' liability insurance policies maintained by Bank One, or policies with a substantially comparable insurer of at least the same coverage and amounts containing terms and conditions that are no less advantageous to the insured, with respect to claims arising from facts or events that occurred on or before the completion of the merger, although JPMorgan Chase will not be required to make annual premium payments in excess of 250% of the annual premiums currently paid by Bank One for directors' and officers' liability insurance. After the merger, JPMorgan Chase may satisfy this requirement through self–insurance to the extent JPMorgan Chase does so for its officers and directors.

### Board of Directors and Management After the Merger

*Board of Directors.* The board of directors of JPMorgan Chase after the merger will have sixteen members, consisting of eight directors from JPMorgan Chase, including Mr. Harrison, and eight directors from Bank One, including Mr. Dimon. No directors other than Messrs. Harrison and Dimon will be employees of JPMorgan Chase. Until Mr. Dimon succeeds Mr. Harrison as Chief Executive Officer of JPMorgan Chase, (i) the number of directors that comprises the full board of directors will be sixteen, and (ii) all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the Governance Committee of the board of directors, which will be co–chaired by one Bank One director and one JPMorgan Chase director and will be comprised of an equal number of Bank One directors and JPMorgan Chase directors. The arrangements described above will be included in the amendments to the by–laws of JPMorgan Chase to become effective no later than the completion of the merger that are described under "— Amendments to JPMorgan Chase By–laws" below.

As of the date of this document, neither the board of directors of JPMorgan Chase nor the board of directors of Bank One has made a determination as to which directors (other than Messrs. Harrison and Dimon) will be appointed to the board of directors of JPMorgan Chase after the merger. Biographical information with respect to the nominees for director of Bank One, from whom the designees to the board of directors of JPMorgan Chase after the merger will be selected, is set forth under "Other Matters to be Considered at the Bank One Annual Meeting — Bank One Proposal 2: Election of Directors" beginning on page 140. Biographical information with respect to the current directors of JPMorgan Chase, from whom the JPMorgan Chase

63

designees to the board of directors of JPMorgan Chase after the merger will be selected, is set forth under "Other Matters to be Considered at the JPMorgan Chase Annual Meeting — JPMorgan Chase Proposal 2: Election of Directors" beginning on page 109.

*Other Management.* JPMorgan Chase's senior management team after the merger will include an Office of the Chairman, comprised of Messrs. Harrison and Dimon; Donald H. Layton, Vice Chairman (Finance, Risk & Technology); and David A. Coulter, Vice Chairman (Investment Banking and Investment Management & Private Banking).

Other senior executives who will serve on the combined company's Executive Committee after the merger, and their areas of responsibility, include: Austin Adams, Technology; Linda Bammann, Risk — Deputy; Steven D. Black, Equities; James S. Boshart III, Middle Market; William Campbell, Card Chairman; David E. Donovan, Retail Branches; Dina Dublon, Finance; Ina R. Drew, Treasury; John J. Farrell, Human Resources; Walter A. Gubert, Europe, Middle East and Africa; Joan Guggenheimer, Legal; James B. Lee, Jr., Investment Banking; Jay Mandelbaum, Strategy; William H. McDavid, Legal; Heidi Miller, Treasury and Securities Services; Stephen J. Rotella, Mortgage; John W. Schmidlin, Technology; Charles W. Scharf, Retail Banking and Lending; Richard J. Srednicki, Card CEO; James E. Staley, Investment Management & Private Bank; Jeffrey C. Walker, Private Equity; Don M. Wilson III, Risk; and William T. Winters, Credit & Rates.

## Material United States Federal Income Tax Consequences of the Merger

The following discussion sets forth the material United States federal income tax consequences of the merger to U.S. holders (as defined below) of Bank One common stock. This discussion does not address any tax consequences arising under the laws of any state, local or foreign jurisdiction. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), the regulations of the U.S. Treasury Department and court and administrative rulings and decisions in effect on the date of this document. These laws may change, possibly retroactively, and any change could affect the continuing validity of this discussion.

For purposes of this discussion, we use the term "U.S. holder" to mean:

- a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States or any of its political subdivisions;

- a trust if it (i) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (ii) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person; or

- an estate that is subject to United States federal income tax on its income regardless of its source.

If a partnership holds Bank One common stock, the tax treatment of a partner will generally depend on the status of the partners and the activities of the partnership. If you are a partner of a partnership holding Bank One common stock, you should consult your tax advisors.

This discussion assumes that you hold your shares of Bank One common stock as a capital asset within the meaning of section 1221 of the Code. Further, this discussion does not address all aspects of U.S. federal income taxation that may be relevant to you in light of your particular

64

circumstances or that may be applicable to you if you are subject to special treatment under the United States federal income tax laws, including if you are:

- a financial institution;

- a tax–exempt organization;

- an S corporation or other pass–through entity;

- an insurance company;

- a mutual fund;

- a dealer in securities or foreign currencies;

- a trader in securities who elects the mark–to–market method of accounting for your securities;

- a Bank One stockholder subject to the alternative minimum tax provisions of the Code;

- a Bank One stockholder who received your Bank One common stock through the exercise of employee stock options or through a tax–qualified retirement plan;

- a person that has a functional currency other than the U.S. dollar;

- a holder of options granted under any Bank One benefit plan; or

- a Bank One stockholder who holds Bank One common stock as part of a hedge, straddle or a constructive sale or conversion transaction.

*The Merger.* JPMorgan Chase and Bank One have structured the merger to qualify as a reorganization within the meaning of Section 368(a) of the Code. As described below, it is a condition to each party's respective obligations to complete the merger that JPMorgan Chase and Bank One each receive a legal opinion that the merger will so qualify. In addition, based on representations contained in representation letters provided by JPMorgan Chase and Bank One and on certain customary factual assumptions, all of which must continue to be true and accurate in all material respects as of the effective time of the merger, it is the opinion of Simpson Thacher & Bartlett LLP, counsel to JPMorgan Chase, and Wachtell, Lipton, Rosen & Katz, counsel to Bank One, that the merger will qualify as a reorganization within the meaning of Section 368(a) of the Code. Accordingly, the material United States federal income tax consequences of the merger are as follows:

- you will not recognize gain or loss when you exchange your Bank One common stock solely for JPMorgan Chase common stock, except with respect to any cash received instead of a fractional share of JPMorgan Chase;

- your aggregate tax basis in the JPMorgan Chase common stock that you receive in the merger (including any fractional share interest you are deemed to receive and exchange for cash) will equal your aggregate tax basis in the Bank One common stock you surrender; and

- your holding period for the JPMorgan Chase common stock that you receive in the merger (including any fractional share interest you are deemed to receive and exchange for cash) will include your holding period for the shares of Bank One common stock that you surrender in the exchange.

If you acquired different blocks of Bank One common stock at different times and at different prices, your tax basis and holding period in your JPMorgan Chase common stock may be determined with reference to each block of Bank One common stock.

*Cash Instead of Fractional Shares.* You will generally recognize capital gain or loss on any cash received instead of a fractional share of JPMorgan Chase common stock equal to the

65

difference between the amount of cash received and the tax basis allocated to such fractional share. Any capital gain or loss will constitute long–term capital gain or loss if your holding period in Bank One common stock surrendered in the merger is greater than one year as of the date of the merger.

*Closing Condition Tax Opinions.* It is a condition to the closing of the merger that JPMorgan Chase and Bank One will receive opinions from Simpson Thacher & Bartlett LLP and Wachtell, Lipton, Rosen & Katz, respectively, dated as of the effective date of the merger, to the effect that the merger will qualify as a reorganization within the meaning of section 368(a) of the Code. These opinions will be based on updated representation letters provided by JPMorgan Chase and Bank One to be delivered at the time of closing, and on certain customary factual assumptions. Although the merger agreement allows us to waive this condition to closing, we currently do not anticipate doing so. If either of us does waive this condition and the tax consequences of the merger are materially different from those described in this document, we will inform you of this decision and ask you to vote on the merger taking this into consideration.

Neither of these tax opinions will be binding on the Internal Revenue Service. JPMorgan Chase and Bank One have not and do not intend to seek any ruling from the Internal Revenue Service regarding any matters relating to the merger, and as a result, there can be no assurance that the Internal Revenue Service will not disagree with or challenge any of the conclusions described herein.

*Backup Withholding.* If you are a non–corporate holder of Bank One common stock you may be subject to information reporting and backup withholding on any cash payments received instead of a fractional share interest in JPMorgan Chase common stock. You will not be subject to backup withholding, however, if you:

- furnish a correct taxpayer identification number and certify that you are not subject to backup withholding on the substitute Form W–9 or successor form included in the letter of transmittal to be delivered to you following the completion of the merger; or

- are otherwise exempt from backup withholding.

Any amounts withheld under the backup withholding rules will be allowed as a refund or credit against your United States federal income tax liability, provided you furnish the required information to the Internal Revenue Service.

*Reporting Requirements.* If you receive JPMorgan Chase common stock as a result of the merger, you will be required to retain records pertaining to the merger and you will be required to file with your United States federal income tax return for the year in which the merger takes place a statement setting forth certain facts relating to the merger.

**This discussion does not address tax consequences that may vary with, or are contingent on, individual circumstances. Moreover, it does not address any non–income tax or any foreign, state or local tax consequences of the merger. Tax matters are very complicated, and the tax consequences of the merger to you will depend upon the facts of your particular situation. Accordingly, we strongly urge you to consult with a tax advisor to determine the particular federal, state, local or foreign income or other tax consequences to you of the merger.**

## Accounting Treatment

The merger will be accounted for as a "purchase," as that term is used under generally accepted accounting principles, for accounting and financial reporting purposes. Under purchase accounting, the assets and liabilities of Bank One as of the effective time of the merger will be recorded at their respective fair values and added to those of JPMorgan Chase. Any excess of the purchase price over the net fair value of Bank One's assets and liabilities is recorded as

66

goodwill. Financial statements of JPMorgan Chase issued after the merger will reflect these fair values and will not be restated retroactively to reflect the historical financial position or results of operations of Bank One. See "Unaudited Pro Forma Combined Financial Information" beginning on page 87.

## Regulatory Approvals

To complete the merger, we need to obtain approvals or consents from, or make filings with, a number of U.S. federal and state bank, antitrust, insurance and other regulatory authorities as well as regulatory authorities in various foreign jurisdictions. These approvals and filings are described below.

*Federal Reserve Board Approval.* On February 9, 2004, we filed the required application with the Board of Governors of the Federal Reserve System requesting approval of the merger. Copies of the application were provided to the U.S. Department of Justice and the appropriate state regulatory agencies. The application describes the terms of the merger and the parties involved and provides other financial and managerial information. In evaluating the application, the Federal Reserve Board will consider the financial and managerial resources and prospects of the existing and combined institutions and the convenience and needs of the communities to be served by our insured depository institution subsidiaries, as well as our effectiveness in combatting money–laundering activities. Among other things, the Federal Reserve Board will also evaluate the capital adequacy of JPMorgan Chase after the merger.

The Federal Reserve Board must deny an application if it determines that the transaction would result in a monopoly or be in furtherance of any combination or conspiracy to monopolize or attempt to monopolize a given business activity in any part of the United States. The Federal Reserve Board must also deny an application if it determines that the transaction would substantially lessen competition or would tend to create a monopoly in any section of the country, or would in any other manner result in a restraint of trade, unless the Federal Reserve Board finds that the anti–competitive effects of the transaction are clearly outweighed by the probable effects of the transaction in providing benefits to the public.

Under the Community Reinvestment Act, or CRA, the Federal Reserve Board must take into account the record of performance of each of us in meeting the credit needs of the entire community, including low and moderate income neighborhoods, served by our depository institution subsidiaries. As part of the review process in merger transactions, the Federal Reserve Board frequently receives protests from community groups and others. All of our insured depository institution subsidiaries required to have ratings under the CRA have received either an outstanding or satisfactory CRA rating in their most recent CRA examinations by their respective federal regulators. Applicable federal law provides for the publication of notice and public comment on the application filed by us with the Federal Reserve Board. Under current law, the merger may not be completed until the Federal Reserve Board has approved the merger and a period of 30 days, which may be reduced to 15 days by the Federal Reserve Board with the concurrence of the Attorney General of the United States, following the date of approval by the Federal Reserve Board, has expired.

Our rights to acquire stock under the stock option agreements entered into in connection with the merger agreement are also subject to the prior approval of the Federal Reserve Board to the extent the exercise would result in either of us owning more than 5% of the outstanding shares of common stock of the other. In considering whether to approve the exercise of an option, the Federal Reserve Board will generally apply the same statutory criteria as it would apply to its consideration of approval of the merger.

*U.S. Antitrust Clearance.* JPMorgan Chase's acquisition of Bank One's U.S. nonbanking business will be reviewed by the Antitrust Division of the United States Department of Justice,

67

which we refer to as the Antitrust Division, or the United States Federal Trade Commission, which we refer to as the FTC, to determine whether it complies with applicable antitrust law. Under the provisions of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, and its related rules, the merger cannot be completed until both JPMorgan Chase and Bank One file notification of the proposed transaction with the Antitrust Division and the FTC and the specified waiting periods have expired or been terminated. On February 6, 2004, JPMorgan Chase and Bank One filed their pre–merger notification and report forms pursuant to the Hart–Scott–Rodino Act. Unless otherwise terminated or extended by the Antitrust Division or the FTC, the waiting period will expire on March 8, 2004 at 11:59 p.m. If the Antitrust Division or the FTC issues a Request for Additional Information and Documentary Material, which we refer to as a Second Request, to the parties on or before March 8, 2004, the parties must observe a second 30–day waiting period, which would begin to run only after both parties have substantially complied with the Second Request, unless the waiting period is terminated earlier or extended with the consent of the parties.

At any time before the merger is completed, the Antitrust Division or the FTC could take action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the merger or seeking divestiture of substantial assets of JPMorgan Chase or Bank One or their subsidiaries. Private parties also may seek to take legal action under the antitrust laws under some circumstances. Based upon an examination of information available relating to the businesses in which the companies are engaged, JPMorgan Chase and Bank One believe that the completion of the merger will not violate U.S. antitrust laws. However, we can give no assurance that a challenge to the merger on antitrust grounds will not be made, or, if such a challenge is made, that we will prevail.

In addition, the merger may be reviewed by the state attorneys general in the various states in which JPMorgan Chase and Bank One operate. While we believe there are substantial arguments to the contrary, these authorities may claim that there is authority under the applicable state and federal antitrust laws and regulations, to investigate and/or disapprove the merger under the circumstances and based upon the review set forth in the particular state laws and regulations. There can be no assurance that one or more state attorneys general will not attempt to file an antitrust action to challenge the merger.

*Competition Approvals Abroad.* The merger may require that we comply with notification requirements in a number of countries outside the United States. We are currently in the process of reviewing whether any such notifications will be required or advisable, and intend to make the appropriate regulatory filings if we determine that these filings are required or advisable. Based upon an examination to date of information available relating to the businesses in which the companies are engaged, we believe that the completion of the merger will not violate the laws of any other country. However, we can give no assurance that all required approvals will be obtained.

The local procedural rules in these countries differ from country to country as do the legal tests against which mergers are reviewed to determine if the local competition authority can issue a decision clearing the transaction. Local authorities may have the power to block mergers which breach the substantive test set out in the local jurisdiction, and in some countries, JPMorgan Chase and Bank One may need to obtain approval of the merger prior to closing.

In most cases, the applicable filings generally require the disclosure of financial and transaction information, which is then reviewed by the competition authority. In most reviews, the competition authority will contact other industry participants, such as customers, suppliers and competitors of the merging parties, to confirm that the information provided is correct and to canvass their opinions on the transaction.

In reaching its decision, each competition authority will usually consider if the merger results in a market concentration which is likely to breach the test for acceptable mergers in its

68

jurisdiction. In the majority of countries this test usually relates either to the creation of a dominant position or market power sufficient to operate against the proper functioning of the market

*Other Approvals.* In addition, the merger will require the approval of, or notification to, various state banking and other regulatory authorities, as well as various regulatory authorities in foreign jurisdictions where JPMorgan Chase or Bank One are engaged in business. The change in control of Bank One's subsidiaries that act as insurance underwriters or agencies is subject to the receipt of necessary approvals from, or notice to, various U.S. state insurance regulatory authorities. Ownership changes regarding registered broker–dealers controlled by Bank One are subject to review by the various regulatory and self–regulatory organizations, including the Securities and Exchange Commission and the National Association of Securities Dealers. JPMorgan Chase and Bank One are in the process of filing the required notices and applications in these various jurisdictions or with these various organizations.

The approval of an application means only that the regulatory criteria for approval have been satisfied or waived. It does not mean that the approving authority has determined that the consideration to be received by Bank One stockholders is fair. Regulatory approval does not constitute an endorsement or recommendation of the merger.

While we believe that we will receive the requisite regulatory approvals for the merger, there can be no assurances regarding the timing of the approvals, our ability to obtain the approvals on satisfactory terms or the absence of litigation challenging such approvals. There can likewise be no assurance that U.S. or foreign regulatory authorities will not attempt to challenge the merger on antitrust grounds or for other reasons, or, if such a challenge is made, as to the result thereof. Our obligation to complete the merger is conditioned upon the receipt of all necessary consents, approvals and actions of governmental authorities (without imposition of any condition or restriction that would reasonably be expected to have a material adverse effect on the combined company) and the filing of all other notices with such authorities, which would reasonably be expected to have a material adverse effect on JPMorgan Chase after the merger if they were not received or filed. See "— The Merger Agreement — Conditions to Completion of the Merger" above.

## Exchange of Bank One Stock Certificates

Promptly after the merger is completed, if you are a Bank One stockholder, the combined company's exchange agent will mail to you a letter of transmittal and instructions for use in surrendering your Bank One stock certificates in exchange for stock of JPMorgan Chase (and cash in lieu of any fractional shares of JPMorgan Chase common stock). When you deliver your Bank One stock certificates to the exchange agent along with a properly executed letter of transmittal and any other required documents, your stock certificates will be canceled.

Bank One common stockholders will receive statements indicating book–entry ownership of JPMorgan Chase stock and may request stock certificates representing the number of full shares of JPMorgan Chase stock to which they are entitled under the merger agreement. Bank One common stockholders will receive a cash payment, without interest, instead of any fractional shares of JPMorgan Chase common stock that would have been otherwise issuable to them as a result of the merger. In accordance with the merger agreement, the amount of cash payable to a Bank One stockholder will be determined by multiplying the fractional number of shares that that stockholder would otherwise receive times the closing price per share of JPMorgan Chase common stock as reported by the New York Stock Exchange on the last trading day immediately preceding the completion of the merger.

PLEASE DO NOT SUBMIT YOUR BANK ONE STOCK CERTIFICATES FOR EXCHANGE UNTIL YOU RECEIVE THE TRANSMITTAL INSTRUCTIONS AND LETTER OF TRANSMITTAL FROM THE EXCHANGE AGENT

If you own Bank One common stock in book entry form or through a broker, bank or other holder of record, you will not need to obtain stock certificates to submit for exchange to the exchange agent.

If you hold Bank One stock certificates, you are not entitled to receive any dividends or other distributions on JPMorgan Chase stock until the merger is completed and you have surrendered your Bank One stock certificates in exchange for JPMorgan Chase stock. If there is any dividend or other distribution on JPMorgan Chase stock with a record date after the date on which the merger is completed and a payment date prior to the date you surrender your Bank One stock certificates in exchange for JPMorgan Chase stock, you will receive the dividend or distribution, without interest, with respect to the whole shares of JPMorgan Chase stock issued to you promptly after you surrender your Bank One stock certificates and the JPMorgan Chase shares are issued in exchange. If there is any dividend or other distribution on JPMorgan Chase stock with a record date after the date on which the merger is completed and a payment date after the date you surrender your Bank One stock certificates in exchange for JPMorgan Chase stock, you will receive the dividend or distribution, without interest, with respect to the whole shares of JPMorgan Chase stock issued to you promptly on that payment date.

If your Bank One stock certificate has been lost, stolen or destroyed, you may receive shares of JPMorgan Chase common stock upon the making of an affidavit of that fact. JPMorgan Chase may require you to post a bond in a reasonable amount as an indemnity against any claim that may be made against JPMorgan Chase with respect to the lost, stolen or destroyed Bank One stock certificate.

JPMorgan Chase will only issue stock (or cash instead of a fractional share) in a name other than the name in which a surrendered Bank One stock certificate is registered if you present the exchange agent with all documents required to show and effect the unrecorded transfer of ownership and show that you paid any applicable stock transfer taxes.

There is no need for JPMorgan Chase stockholders to submit their JPMorgan Chase stock certificates to JPMorgan Chase, Bank One, the exchange agent or to any other person in connection with the merger or otherwise take any action as a result of the completion of the merger.

## Treatment of Stock Options and Other Equity–Based Awards

When the merger is completed, JPMorgan Chase will assume each outstanding Bank One employee stock option, and each option will be deemed to constitute an option to acquire the same number of shares of JPMorgan Chase common stock that the holder of the option would have been entitled to receive if the holder had exercised the option in full immediately prior to the effective time of the merger, rounded, if necessary, to the nearest whole share. The exercise price per share for the assumed options will be the exercise price per share under the Bank One stock options divided by the exchange ratio. Holders of outstanding Bank One stock appreciation rights will be entitled to a number of JPMorgan Chase stock appreciation rights determined in the same manner. Holders of outstanding Bank One restricted stock units will be entitled to a number of JPMorgan Chase restricted stock units determined by multiplying the number of Bank One restricted stock units by the exchange ratio. Holders of other outstanding Bank One equity–based awards will be entitled to equivalent JPMorgan Chase equity–based awards determined in the same manner as the restricted stock units. The other terms of all Bank One options, stock appreciation rights, restricted stock or restricted stock units and other equity–based awards referred to above will continue to apply.

JPMorgan Chase will file a registration statement covering the issuance of the shares of JPMorgan Chase common stock subject to each Bank One equity award and will maintain the effectiveness of that registration statement for as long as any of the equity awards remain outstanding.

70

**Restrictions on Sales of Shares by Affiliates of Bank One**

The shares of JPMorgan Chase common stock to be issued in connection with the merger will be registered under the Securities Act of 1933 and will be freely transferable under the Securities Act, except for shares issued to any person who is deemed to be an "affiliate" of Bank One at the time of its annual meeting. Bank One expects that each of those affiliates will agree with JPMorgan Chase that the affiliate will not transfer any shares of stock received in the merger except in compliance with the Securities Act. This document does not cover resales of JPMorgan Chase common stock by affiliates of Bank One or JPMorgan Chase.

**Stock Exchange Listings**

JPMorgan Chase will use all reasonable efforts to cause the following shares of JPMorgan Chase to be approved for listing on the New York Stock Exchange, subject to official notice of issuance, before the completion of the merger:

- JPMorgan Chase common stock to be issued in the merger; and

- JPMorgan Chase common stock reserved for issuance upon exercise of Bank One stock options, restricted stock units or other equity-based awards.

In addition, JPMorgan Chase plans to apply to the London and Tokyo stock exchanges to list the JPMorgan Chase common stock to be issued in the merger and reserved for the Bank One stock options.

**Appraisal Rights**

The following summary of the provisions of Section 262 of the Delaware General Corporation Law is not intended to be a complete statement of the provisions of that section and is qualified in its entirety by reference to the full text of Section 262 of the Delaware General Corporation Law, a copy of which is attached to this document as Annex F and is incorporated into this summary by reference.

Under Delaware law, the common stockholders of JPMorgan Chase and Bank One are not entitled to appraisal rights in connection with the merger. However, holders of JPMorgan Chase's 6.63% Cumulative Preferred Stock, Series H, and Fixed/Adjustable Noncumulative Preferred Stock are entitled to appraisal rights under Delaware law. Those series of preferred stock are referred to below as the "appraisal stock." A holder of depositary receipts evidencing depositary shares representing interests in shares of JPMorgan Chase's 6.63% Cumulative Preferred Stock, Series H held by the depositary must withdraw the shares of JPMorgan Chase's 6.63% Cumulative Preferred Stock, Series H underlying such receipts in order to become a record holder of such shares and comply with the procedures for demanding appraisal described below in order to perfect appraisal rights with respect to the holder's shares of JPMorgan Chase's 6.63% Cumulative Preferred Stock, Series H.

If the merger is completed, each holder of appraisal stock who (1) files written notice with JPMorgan Chase of an intention to exercise rights of appraisal of his, her or its shares prior to the applicable meeting and (2) follows the procedures set forth in Section 262, will be entitled to be paid by JPMorgan Chase after the merger the fair value in cash of the shares of appraisal stock. The fair value of appraisal stock will be determined by the Delaware Court of Chancery, exclusive of any element of value arising from the merger. The shares of appraisal stock with respect to which holders have perfected their appraisal rights in accordance with Section 262 and have not effectively withdrawn or lost their appraisal rights are referred to in this document as the "dissenting shares."

Within ten days after the effective date of the merger, JPMorgan Chase must mail a notice to all stockholders who have complied with clause (1) above notifying those stockholders of the

71

effective date of the merger. Within 120 days after the effective date of the merger, holders of appraisal stock may file a petition in the Delaware Court of Chancery for the appraisal of their shares, although they may, within 60 days of the effective date, withdraw their demand for appraisal. Within 120 days of the effective date of the merger, the holders of dissenting shares may also, upon written request, receive from JPMorgan Chase a statement setting forth the aggregate number of shares with respect to which demands for appraisal have been received.

Appraisal rights are available only to the record holder of shares. If you wish to exercise appraisal rights but have a beneficial interest in shares held by or in the name of another person, such as a broker, bank or nominee, you should act promptly to cause the record holder to follow the procedures set forth in Section 262 to perfect your appraisal rights.

A demand for appraisal should be signed by or on behalf of the stockholder exactly as the stockholder's name appears on the stockholder's stock certificates. If the shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, the demand should be executed in that capacity, and if the shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand should be executed by or on behalf of all joint owners. An authorized agent, including one or more joint owners, may execute a demand for appraisal on behalf of a record holder; however, in the demand the agent must identify the record holder or holders and expressly disclose that the agent is executing the demand as an agent for the record holder or holders. A record holder such as a broker or nominee who holds shares as nominee for several beneficial owners may exercise appraisal rights for the shares held for one or more beneficial owners and not exercise rights for the shares held for other beneficial owners. In this case, the written demand should state the number of shares for which appraisal rights are being demanded. When no number of shares is stated, the demand will be presumed to cover all shares of a particular beneficial owner that are held of record by the broker or nominee.

Dissenting shares lose their status as dissenting shares if:

- the merger is abandoned;

- the dissenting stockholder fails to make a timely written demand for appraisal;

- neither JPMorgan Chase nor the stockholder files a complaint or intervenes in a pending action within 120 days after the effective date of the merger; or

- the stockholder delivers to JPMorgan Chase, within 60 days of the effective date of the merger, or thereafter with JPMorgan Chase's approval, a written withdrawal of the stockholder's demand for appraisal of the dissenting shares, although no appraisal proceeding in the Delaware Court of Chancery may be dismissed as to any stockholder without the approval of the court.

FAILURE TO FOLLOW THE STEPS REQUIRED BY SECTION 262 OF THE DELAWARE GENERAL CORPORATION LAW FOR PERFECTING APPRAISAL RIGHTS MAY RESULT IN THE LOSS OF APPRAISAL RIGHTS, IN WHICH EVENT A STOCKHOLDER WILL BE ENTITLED TO RETAIN THE SHARES FOLLOWING THE EFFECTIVE TIME OF THE MERGER. IN VIEW OF THE COMPLEXITY OF THE PROVISIONS OF SECTION 262 OF THE DELAWARE GENERAL CORPORATION LAW, STOCKHOLDERS WHO ARE CONSIDERING EXERCISING APPRAISAL RIGHTS SHOULD CONSULT THEIR OWN LEGAL ADVISORS.

**Delisting and Deregistration of Bank One Stock After the Merger**

When the merger is completed, the Bank One common stock currently listed on the New York Stock Exchange and the Chicago Stock Exchange will be delisted from those exchanges and deregistered under the Securities Exchange Act of 1934.

72

The Bank One employee stock purchase plan will continue until the earlier of June 30, 2004 (which is the termination of the current offering period) and the completion of the merger. No further offering periods will begin thereafter. The optional cash purchase (but not the dividend reinvestment) feature of the Bank One dividend reinvestment and stock purchase plan will be terminated within 30 days of a written request by JPMorgan Chase unless all such optional cash purchases are satisfied through open market purchases of Bank One common stock and not through new issuances.

## The Merger Agreement

This section of the document describes the material terms of the merger agreement. The following summary is qualified in its entirety by reference to the complete text of the merger agreement, which is incorporated by reference and attached as Annex A to this document. We urge you to read the full text of the merger agreement.

*Completion of the Merger.* The merger will be completed when we file a certificate of merger with the Delaware Secretary of State. However, we may agree to a later time for completion of the merger and specify that time in the certificate of merger. We will file the certificate of merger as soon as practicable after the satisfaction or waiver of the closing conditions in the merger agreement, which are described below.

We expect to complete the merger by mid–2004 if we have received the stockholder and regulatory approvals required to do so.

*Possible Alternative Merger Structure.* The merger agreement provides that we may agree to change the structure of the merger. No such change will alter the kind or amount of consideration to be issued to Bank One's stockholders, or the treatment of Bank One options, units, restricted shares or other equity–based awards; adversely affect the tax consequences to them in the merger; materially delay any required regulatory approval; or otherwise cause any closing condition not to be capable of being fulfilled (unless waived by the party entitled to its benefits).

*Conditions to Completion of the Merger.*

*Conditions to Both Parties' Obligations.* We may not complete the merger unless each of the following conditions is satisfied or waived:

- the merger agreement has been adopted by the affirmative vote of:

  - the holders of a majority of the outstanding shares of Bank One common stock; and

  - the holders of a majority of the outstanding shares of JPMorgan Chase common stock;

- the shares of JPMorgan Chase common stock to be issued in the merger or reserved for issuance upon exercise of Bank One stock options have been authorized for listing on the New York Stock Exchange, subject to official notice of issuance;

- all regulatory approvals necessary for the completion of the merger have been obtained, other than approvals the failure of which to obtain would not reasonably be expected to have a material adverse effect on completion of the merger or on JPMorgan Chase after the merger, and none of those approvals contains a condition or restriction that would reasonably be expected to have a material adverse effect after the merger on the present or prospective financial condition, business or operating results of JPMorgan Chase after the merger;

- the registration statement of which this document is a part has been declared effective by the Securities and Exchange Commission and is not subject to any stop order or proceedings seeking a stop order; and

73

- no restraining order or injunction prohibiting completion of the merger is in effect and completion of the merger is not illegal under any applicable law

*Conditions to Each Party's Obligations.* Each party's obligation to complete the merger is also subject to the satisfaction or waiver of the following additional conditions:

- the representations and warranties of the other party must be true and correct as of the date of the merger agreement and, except for representations and warranties that speak as of an earlier date, must also be true and correct as of the closing date of the merger, subject to any exceptions that do not have, and would not reasonably be expected to have, a material adverse effect on the other party or JPMorgan Chase after the merger;

- the other party must have performed in all material respects all obligations that it is required by the merger agreement to perform on or prior to the closing date; and

- each party has received an opinion from its tax counsel that the merger will be treated as a tax–free reorganization for U.S. federal income tax purposes.

In addition, Bank One is not obligated to consummate the merger if the following condition is not satisfied or waived by it.

- JPMorgan Chase's bylaws must have been amended in the manner described under "— Amendments to JPMorgan Chase By–laws" below to provide for the composition of the board of directors, the succession of Mr. Dimon as Chief Executive Officer of JPMorgan Chase two years after the merger and certain other governance matters.

For purposes of the merger agreement, the term "material adverse effect" means, with respect to either of us, a material adverse effect on the financial condition, properties, assets, liabilities, businesses or results of operations of that company and its subsidiaries taken as a whole or on its ability to perform its obligations under the merger agreement or the stock option agreements on a timely basis. However, any change or event caused by or resulting from the following will not be deemed to have a material adverse effect:

- changes in prevailing interest rates, currency exchange rates or other economic or monetary conditions in the United States or elsewhere;

- changes in United States or foreign securities markets, including changes in price levels or trading volumes;

- changes or events affecting the financial services industry generally and not specifically relating to either of us or our respective subsidiaries, as the case may be;

- changes in generally accepted accounting principles or regulatory accounting requirements applicable to banks or savings associations and their holding companies generally;

- changes in laws, rules or regulations of general applicability or interpretations of those laws, rules or regulations by any governmental entity;

- actions or omissions of either party taken with the prior written consent of the other party or required pursuant to the merger agreement;

- the execution and delivery of the merger agreement or the completion of the transactions contemplated by the merger agreement or the announcement of those transactions; or

- any outbreak of major hostilities in which the United States is involved or any act of terrorism within the United States or directed against its facilities or citizens, wherever located.

In addition, the merger agreement specifically provides that a change in the trading prices of either of our capital stocks, by itself, will not be considered material or constitute a material adverse effect.

74

*Reasonable Best Efforts to Obtain Required Stockholder Vote.* Each party has agreed to take all lawful action to call, give notice of, convene and hold a meeting of its stockholders as promptly as practicable for the purpose of obtaining the required stockholder vote to approve the transactions contemplated by the merger agreement. In addition, each party has agreed that its board of directors will use its reasonable best efforts to obtain from its stockholders the required stockholder vote in favor of adoption of the merger agreement. Nothing in the merger agreement is intended to relieve the parties of their respective obligation to submit the merger agreement to their stockholders for a vote on its adoption.

*No Solicitations of Alternative Transactions.* The merger agreement contains detailed provisions prohibiting each of us from seeking an alternative transaction to the merger. Under these "no solicitation" provisions, we have agreed that neither of us may:

- initiate, solicit, encourage or knowingly facilitate any inquires or the making of an acquisition proposal, as described below;

- have any discussions with, or provide any confidential information or data to, any person relating to an acquisition proposal, or engage in any negotiations concerning an acquisition proposal, or knowingly facilitate any effort or attempt to make or implement an acquisition proposal;

- approve or recommend, or propose publicly to approve or recommend, any acquisition proposal; or

- approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, asset purchase or share exchange agreement, option agreement or other similar agreement related to any acquisition proposal or propose or agree to do any of the foregoing

For purposes of the merger agreement, the term "acquisition proposal" means, with respect to either of us, any proposal or offer with respect to, or a transaction to effect:

- a merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving either of us or any of our respective significant subsidiaries, other than acquisitions permitted by the terms of the merger agreement;

- any purchase or sale of 20% or more of the consolidated assets of either of us and our respective subsidiaries, including stock of our subsidiaries, taken as a whole; or

- any purchase or sale of, or tender or exchange offer for, the voting securities of either of us that, if completed, would result in any person beneficially owning securities representing 20% or more of the total voting power of either of us or of the total voting power of the surviving parent entity in the transaction, or any of our significant subsidiaries.

The merger agreement permits us to comply with Rule 14d–9 and Rule 14e–2 under the Securities Exchange Act with regard to an acquisition proposal that either of us may receive. In addition, if either of us receives an unsolicited bona fide written acquisition proposal, the party receiving that proposal may engage in discussions with or provide nonpublic information to the person making that acquisition proposal only if:

- the board of directors of the party receiving the acquisition proposal receives the acquisition proposal prior to that party's stockholders meeting;

- the board of directors of the party receiving the acquisition proposal concludes in good faith that the acquisition proposal constitutes or would be reasonably likely to result in a superior proposal, as described below;

75

- the board of directors of the party receiving the acquisition proposal, after consultation with outside counsel, determines in good faith that the failure to engage in those discussions or provide that confidential information would likely be inconsistent with the board's fiduciary duties under applicable law;

- the party receiving the acquisition proposal enters into a confidentiality agreement with the person making the inquiry or proposal having terms that are no less favorable to the party providing the information than those in the confidentiality agreement between JPMorgan Chase and Bank One; and

- the party receiving the acquisition proposal notifies the other party to the merger agreement promptly, and in any event within 24 hours of that party's receipt of any acquisition proposal or any request for nonpublic information relating to that party by any third party considering making, or that has made, an acquisition proposal, of the identity of such third party, the material terms and conditions of any inquiries, proposals or offers, and updates on the status of the terms of any such proposals, offers, discussions or negotiations on a current basis.

For purposes of the merger agreement, "superior proposal" means a bona fide written acquisition proposal made to a party to the merger agreement to acquire a majority of the assets or voting power of that party, which the board of directors of that party concludes in good faith, after consultation with its financial and legal advisors, taking into account all legal, financial, regulatory and other aspects of the proposal and the person making the proposal:

- is more favorable to the stockholders of that party from a financial point of view than the merger; and

- is fully financed or reasonably capable of being financed, reasonably likely to receive all required governmental approvals on a timely basis and otherwise reasonably capable of being completed on the terms proposed.

Each of us has agreed in the merger agreement that:

- we will immediately terminate any activities, discussions or negotiations existing as of the date of the merger agreement with any parties conducted before that date with respect to any acquisition proposal;

- we will not release any third party from, or waive any provisions of, any confidentiality or standstill agreement relating to a possible acquisition proposal; and

- we will use reasonable best efforts to inform our respective directors, officers and key employees of the foregoing restrictions in the merger agreement.

Nothing contained in the "no solicitation" provisions of the merger agreement will permit either of us to terminate the merger agreement or affect any of our other obligations under the merger agreement, including our obligations to call and hold meetings of our respective stockholders to vote on the merger agreement.

*Termination.* We may terminate the merger agreement at any time prior to the completion of the merger, whether before or after the stockholder approvals have been obtained, by mutual consent.

In addition, either of us may terminate the merger agreement by written notice to the other party:

- if any governmental entity of competent jurisdiction:

    - that must grant a material regulatory approval has denied approval of the merger and the denial has become final and nonappealable; or

- issues an order, decree or ruling or takes any other action permanently restraining, enjoining or otherwise prohibiting the merger, and the order, decree, ruling or other action has become final and nonappealable;

- except that this right to terminate will not be available to a party whose failure to comply with the merger agreement has been the cause of, or resulted in, that action;

- if the merger is not completed on or before January 14, 2005, except that this right to terminate will not be available to a party whose failure to comply with any provision of the merger agreement has been the cause of, or resulted in, the failure of the merger to be completed by that date;

- the other party's board of directors adversely changes its recommendation that its stockholders vote in favor of the merger, takes any other action inconsistent with that recommendation, or the other party breaches its obligation to hold its stockholders' meeting to vote on adoption of the merger agreement;

- the other party is in material breach of its representations, warranties, covenants or agreements set forth in the merger agreement, the breach would prevent satisfaction by the other party of the relevant closing condition and such breach if curable, is not cured within 60 days; or

- if the stockholders of either party do not approve the merger at their respective stockholders' meeting.

*Termination Fees.* The merger agreement provides that each of us may be required to pay a termination fee to the other of up to $2.30 billion in the following circumstances:

- If a party terminates the merger agreement due to (1) the failure of the other party's board to recommend the merger, the withdrawal or adverse change in the other party's board of director's recommendation of the merger to the other party's stockholders, or the taking of any other action inconsistent with that recommendation, or (2) the material breach by the other party of its obligation under the merger agreement to call a meeting of, and use its reasonable best efforts to obtain the approval of, that other party's stockholders, the other party must pay the full termination fee on the business day following the termination

- If (1) the merger agreement is terminated by either party because the required stockholder vote of a party was not obtained at that party's stockholders' meeting, and (2) a competing acquisition proposal for that party was publicly announced before its stockholders' meeting, then the party whose stockholders failed to approve the merger agreement will owe the other party one–third of the termination fee. If, within 18 months after this termination of the merger agreement, the party whose stockholders failed to approve the merger agreement enters into an agreement for, or completes, an acquisition proposal, the remaining two–thirds of the termination fee will become payable to the other party

- If (1) the merger agreement is terminated by either party because the merger has not been consummated by January 14, 2005 or by one party because of a material breach by the other party that causes a condition to the merger to not be satisfied, (2) a competing acquisition proposal for a party was made before the merger agreement was terminated, and (3) after the announcement of the competing acquisition proposal, the party for which the competing acquisition proposal was made intentionally breached any of its representations, warranties, covenants or agreements and the breach materially contributed to the failure of the merger to become effective, then the party that committed the breach will owe the other party one–third of the termination fee. If within 18 months after this termination of the merger agreement the breaching party enters into an

77

agreement for, or completes, an acquisition proposal, the remaining two–thirds of the termination fee will become payable to the other party.

The termination and termination fee provisions described above, the provisions described under "— No Solicitations of Alternative Transactions" above, and the terms of the stock option agreements described under "— Stock Option Agreements" below, could discourage other companies from seeking to acquire or merge with either JPMorgan Chase or Bank One.

*Conduct of Business Pending the Merger.* Under the merger agreement, each of us has agreed that, during the period before completion of the merger, except as expressly contemplated or permitted by the merger agreement and the stock option agreements described under "— Stock Option Agreements" below, or to the extent that the other party consents in writing, we will carry on our respective businesses in the usual, regular and ordinary course consistent with past practice, and will use all reasonable efforts to preserve intact our present business organizations, maintain our rights and authorizations and preserve our relationships with customers, suppliers and others so that our goodwill and ongoing businesses are not impaired in any material respect. Each of us has agreed not to, and not to permit our subsidiaries to, enter into any new material line of business or to change our or our subsidiaries' lending, investment, underwriting, risk and asset–liability management or other material banking or operating policies in any respect that is material to it, except as required by law or policies of a governmental entity. Each of us has also agreed that we will not, and will not permit any of our subsidiaries to, incur or commit to any capital expenditures or any obligations or liabilities in connection with capital expenditures, other than in the ordinary course of business consistent with past practice. Each of us has further agreed not to, and not to permit our subsidiaries to, enter into, terminate or change any material leases, contracts or agreements except in the ordinary course of business consistent with past practice.

In addition to the above agreements regarding the conduct of business generally, each of us has agreed to various specific restrictions relating to the conduct of our businesses, including the following (in each case subject to exceptions specified in the merger agreement):

- the declaration or payment of dividends and changes in capital stock, other than regular cash dividends, except that Bank One may increase its regular quarterly cash dividend for any quarter prior to the effective date of the merger to an amount not in excess of $0.44875 per share (or to pay the equivalent of the aggregate amount of such incremental increase in any one or more payments);

- the repurchase or redemption of capital stock;

- the issuance or sale of capital stock, voting debt or other equity interests;

- the amendment of our respective certificates of incorporation or by–laws;

- the acquisition of assets or other entities;

- the disposition of assets;

- the incurrence or the guarantee of long–term debt;

- the taking of actions that would result, or might reasonably be expected to result, in a breach of any representations and warranties in the merger agreement or in any conditions to the merger not being satisfied;

- changes in accounting methods;

- the taking of actions that would disqualify the merger as a tax–free reorganization for U.S. federal income tax purposes;

- changes in employee benefit plans and compensation of its directors, executive officers and employees;

78

- material changes in its investment securities portfolio, hedging strategy or gap position or material changes in the credit or risk concentrations associated with its underwriting, market–making and other investment banking businesses; and

- the liquidation or recapitalization of significant subsidiaries.

*Governance.* In the merger agreement, JPMorgan Chase agreed to adopt the amendments to the by–laws of JPMorgan Chase described in the section entitled "— Amendments to JPMorgan Chase By–laws" below, to be effective not later than the completion of the merger.

JPMorgan Chase agreed in the merger agreement to cause its board of directors to be constituted as provided in the section "— Amendments to JPMorgan Chase By–laws" below. In particular, of the sixteen members of the board of directors of JPMorgan Chase following completion of the merger, half will be comprised of seven current independent JPMorgan Chase directors designated by JPMorgan Chase plus Mr. Harrison, and half will be comprised of seven current independent Bank One directors designated by Bank One plus Mr. Dimon. No other directors or employees of JPMorgan Chase or Bank One will be designated to serve on the initial board of directors upon the completion of the merger.

On or prior to the effectiveness of the merger, JPMorgan Chase will cause the persons indicated in the section entitled "— Board of Directors and Management After the Merger" above to be elected or appointed to the offices of JPMorgan Chase specified in that section, effective as of the completion of the merger.

*Operations Following the Merger.* We have agreed in the merger agreement that, following the merger:

- The headquarters of JPMorgan Chase will be located in New York, New York. Chicago will serve has the headquarters for the retail financial services business, which includes consumer banking, small businesses, middle market and consumer lending, and these businesses will maintain a significant presence in the Chicago metropolitan area;

- the retail financial services business will continue to use both the Chase brand and the Bank One brand while research is conducted to determine the best long–term branding strategy;

- the credit card business will be based in Wilmington, Delaware and will continue to use both the JPMorgan Chase brand and the Bank One brand; and

- JPMorgan Chase will maintain its strong commitment to charitable giving in the greater Chicago metropolitan area and to increasing the annual level of charitable giving beyond the current levels of Bank One contributions in that area.

*Additional Agreements.* Each of us has agreed to cooperate with the other and to use our reasonable best efforts to:

- take all actions necessary to comply promptly with all legal requirements which may be imposed on either of us with respect to the merger and to consummate the merger as promptly as practicable; and

- obtain any consent, authorization, order or approval of, or any exemption by, any governmental entity or any other third party which is required to be obtained in connection with the merger or transactions related to the merger

unless in each case it will result in a condition or restriction on JPMorgan Chase or its subsidiaries following the merger that would reasonably be expected to have a material adverse effect after completion of the merger on JPMorgan Chase.

The merger agreement also contains covenants relating to cooperation between us in the preparation of this document and additional agreements between us relating to, among other

79

things, consultation regarding transition matters, access to information, mutual notice of specified matters and public announcements

*Coordination of Dividends.* We have agreed in the merger agreement to coordinate the payment of dividends and the designation of record and payment dates relating to JPMorgan Chase and Bank One common stock so that holders of our common stocks will not receive two dividends, or fail to receive one dividend, for any calendar quarter

*Benefits Matters.* We have agreed that our respective retirement and other employee benefit plans will remain in effect after completion of the merger with respect to employees covered by those plans. We have also agreed to negotiate in good faith to formulate benefit plans for JPMorgan Chase after the effective time of the merger on a basis that does not discriminate between employees who were covered by the benefit plans of JPMorgan Chase and employees who were covered by the benefit plans of Bank One.

In connection with the approval of the merger, the Bank One board of directors approved amendments to the Bank One Corporation Personal Pension Account Plan and the Bank One Corporation Supplemental Personal Pension Account Plan to provide that the "change of control" provisions of the plans will be inapplicable with respect to the merger, other than the provisions of such plans that provide for accelerated vesting of accrued benefits thereunder upon a change of control. JPMorgan Chase will adopt a resolution providing that the receipt by certain Bank One officers and directors of shares of JPMorgan Chase common stock to be issued in connection with the merger and subject to Section 16(b) of the Securities Exchange Act of 1934 are intended to be exempt from liability pursuant to Section 16(b)

*Amendment, Extension and Waiver.* We may amend the merger agreement by action taken or authorized by our respective boards of directors, at any time before or after adoption of the merger agreement by our respective stockholders. After adoption of the merger agreement by either of our respective stockholders, no amendment may be made which by law requires further approval by those stockholders, unless we obtain that further approval. All amendments to the merger agreement must be in writing signed by both of us

At any time before the completion of the merger, we may, by written action taken or authorized by our respective boards of directors, to the extent legally allowed:

• extend the time for the performance of any of the obligations or other acts provided for in the merger agreement;

• waive any inaccuracies in the representations and warranties contained in the merger agreement or in any document delivered pursuant to the merger agreement; and

• waive compliance with any of the agreements or conditions contained in the merger agreement

*Fees and Expenses.* Whether or not the merger is completed, all costs and expenses incurred in connection with the merger agreement, the stock option agreements described under "— Stock Option Agreements" below and the merger will be paid by the party incurring the expense, except as otherwise provided in the merger agreement or stock option agreements and except that:

• if the merger is completed, JPMorgan Chase will pay any property or transfer taxes imposed on either party in connection with the merger; and

• all expenses and fees incurred in connection with the filing, printing and mailing of this document and the registration statement of which it is a part will be shared equally by JPMorgan Chase and Bank One.

80

*Representations and Warranties.* The merger agreement contains customary and substantially reciprocal representations and warranties by each of us relating to, among other things:

- corporate organization and similar corporate matters;

- capital structure;

- authorization of the merger agreement and stock option agreements and absence of conflicts;

- documents filed with the Securities and Exchange Commission, financial statements included in those documents, regulatory reports filed with governmental entities and absence of material undisclosed liabilities;

- information supplied in connection with this document and the registration statement of which it is a part;

- compliance with applicable laws and reporting requirements;

- legal proceedings;

- taxes;

- material agreements;

- employee benefits;

- subsidiaries;

- agreements with regulators;

- absence of specified changes or events;

- board approval and applicable state takeover laws;

- the stockholder vote required to adopt the merger agreement;

- ownership and leasehold interests in properties;

- intellectual property;

- brokers and finders;

- opinion of financial advisor; and

- investment adviser subsidiaries, funds and clients.

**Amendments to JPMorgan Chase By-laws**

This section of the document describes the material terms of the amendments to JPMorgan Chase's by-laws as agreed to in the merger agreement. The following summary is qualified in its entirety by reference to the complete text of the amendments to JPMorgan Chase's by-laws, which are incorporated by reference and attached as Annex G to this document. We urge you to read the full text of these amendments.

The by-laws of JPMorgan Chase will be amended, effective not later than the completion of the merger, to add a new by-law providing the following:

- that the board of directors has resolved that, effective as of the completion of the merger, Mr. Harrison will continue to serve as Chairman of the Board and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become the President and Chief Operating Officer of JPMorgan Chase; and that Mr. Dimon will be the successor to Mr. Harrison as the Chief Executive Officer of JPMorgan Chase, effective on the second anniversary of the

81

completion of the merger or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of JPMorgan Chase, and that Mr. Harrison will continue to serve as Chairman of the Board following that succession;

- that on the effective date of the merger, the board of directors will be comprised of eight Bank One directors, including Mr. Dimon, and eight JPMorgan Chase directors, including Mr. Harrison;

- that until the date of Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, the number of directors that comprises the full board of directors of JPMorgan Chase will be sixteen; and

- that until Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the governance committee of the board of directors, which will be co-chaired by one former Bank One director and one former JPMorgan Chase director and comprised of an equal number of former Bank One directors and former JPMorgan Chase directors (any deadlocks on the governance committee will be resolved in good faith by the nonmanagement members of the board of directors in a manner intended to preserve the principles of representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

- the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment agreement, prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, or any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of JPMorgan Chase on that date of succession,

- the removal of Mr. Harrison from, or the failure to appoint or reelect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase,

- any determination not to nominate Mr. Harrison or Mr. Dimon as a director of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, and

- any modification, amendment or repeal of, or any adoption of any bylaw provision inconsistent with, the provisions of the by-law amendments described above.

**Stock Option Agreements**

This section of the document describes the material terms of the reciprocal stock options that JPMorgan Chase and Bank One granted to each other at the time we entered into the merger agreement.

The following summary is qualified in its entirety by reference to the complete text of the stock option agreements, which are incorporated by reference and attached as Annexes B and C to this document. We urge you to read the full text of the stock option agreements.

In connection with the execution and delivery of the merger agreement, we entered into:

- the JPMorgan Chase stock option agreement, under which JPMorgan Chase granted to Bank One an irrevocable option to purchase, in whole or in part, an aggregate of up to 406,481,383 shares, or up to 19.9% of the then-issued and outstanding shares (other than shares issued pursuant to this option), of JPMorgan Chase common stock at a price of $38.90 per share, exercisable as described below; and

82

- the Bank One stock option agreement, under which Bank One granted to JPMorgan Chase an irrevocable option to purchase, in whole or in part, an aggregate of up to 222,796,825 shares, or up to 19.9% of the then–issued and outstanding shares (other than shares issued pursuant to this option), of Bank One common stock at a price of $44.61 per share, exercisable as described below.

The exercise price for each option was the closing stock price of the option issuer on the New York Stock Exchange on January 13, 2004, the last trading day before we announced the merger.

*When the Options May be Exercised.* The option holder under a stock option agreement may exercise the option to purchase shares of common stock of the option issuer, in whole or in part, at any time following the occurrence of any of the following events:

- if prior to termination of the merger agreement, without the consent of the option holder, the option issuer enters into an agreement to effect, or effects, in a single transaction or series of related transactions, any acquisition proposal;

- if prior to the termination of the merger agreement, any third party or group acquires beneficial ownership of 20% or more of the voting power of the option issuer or any of its significant subsidiaries; or

- if an event occurs the result of which is that the entire termination fee required to be paid by the option issuer under the merger agreement, as described under "— The Merger Agreement — Termination Fees" above is required to be paid.

The right of the option holder to purchase shares of common stock under the applicable stock option agreement will expire on the first to occur of:

- the completion of the merger;

- the termination of the merger agreement, provided that no event has occurred or could occur in the future that would entitle the option holder to purchase common stock under the applicable stock option agreement;

- the date on which the option holder has received $2.87 billion in "total profit," as calculated under the stock option agreement, from, in the aggregate, the exercise or sale of the option or shares issued upon exercise of the option and from the receipt of termination fees under the merger agreement; and

- six months after an event has occurred that would entitle the option holder to purchase common stock under the applicable stock option agreement.

Any purchase of shares of common stock by the option holder may be subject to regulatory approvals, including prior approval of the Federal Reserve Board.

*Adjustments Upon Changes in Capitalization and Substitute Option.* The number and kind of securities subject to each stock option agreement and the exercise price will be adjusted for any change in the number of issued and outstanding shares of common stock of the option issuer in the event of any stock dividend, subdivision, spin–off, stock split, split–up, merger, consolidation, recapitalization, combination, exchange of shares or dividend or distribution, other than regular cash dividends. Accordingly, the option holder will receive, upon exercise of the option, the number and class of shares or other securities or property that the option holder would have received if the option had been exercised immediately before the event or record date for the event, as applicable. In addition, if additional shares of common stock of the option issuer become outstanding after the date of the applicable stock option agreement, the total number of shares of the option issuer's common stock subject to the option will be automatically increased to 19.9% of all the issued and outstanding shares of that option issuer's common stock, excluding any shares previously issued upon exercise of the option.

83

In the event that the option issuer enters into any agreement:

- to consolidate with or merge into any person other than the option holder, and the option issuer will not be the continuing or surviving corporation in the consolidation or merger;

- to permit any person, other than the option holder, to merge into the option issuer and the option issuer will be the continuing or surviving or acquiring corporation but, in connection with the merger;

  - the outstanding shares of common stock of the option issuer will be changed into or exchanged for stock or other securities of any other person or cash or any other property; or

  - the outstanding shares of common stock of the option issuer will, after the merger, represent less than 50% of the outstanding voting securities of the merged company; or

- to sell or otherwise transfer all or substantially all of its assets or all of the assets of its subsidiaries, taken as a whole, to any person, other than the option holder,

then, in each case, the agreement governing the transaction must contain a provision that the option granted under the stock option agreement will upon completion of the transaction be converted into, or exchanged for, a substitute option with substantially identical terms to acquire shares of the surviving corporation or a person that controls the surviving corporation and at a price intended to preserve the economics of the option, except that the substitute option will be immediately exercisable if the original option was at that time exercisable and will be subject to provisions regarding repurchase of the substitute option specified in the stock option agreement.

*Repurchase of the Option.* After an option becomes exercisable, the option holder has the right to require the option issuer to repurchase the option and any shares acquired upon exercise of the option at any time following any of the following events:

- any person other than the option holder acquires or has the right to acquire beneficial ownership of 50% or more of the then outstanding shares of the option issuer's common stock; or

- the option issuer enters into an agreement with a person other than the option holder for a merger, consolidation or sale of all or substantially all of its assets of a type described above in the second paragraph under "— Adjustment Upon Changes in Capitalization and Substitute Option."

The repurchase price for any such repurchase will equal the sum of:

- the aggregate exercise price paid for all shares issued under the option;

- the excess of the market/offer price referred to below over the exercise price times the number of shares with respect to which the option has not been exercised; and

- the excess of the market/offer price over the exercise price paid for each share owned by the option holder with respect to which the option holder had exercised the option.

The term "market/offer price" is defined in the stock option agreements to mean the highest of:

- the highest price per share at which a tender offer or exchange offer for the option issuer's common stock has been made;

- the highest price to be paid for common stock of the option issuer by any third party under an agreement with the option issuer;

- the price per share received by holders of the option issuer's common stock in a business combination transaction;

84

- the highest closing price for shares of the option issuer's common stock within the 12–month period immediately preceding the transaction in question; and

- in the event of a sale of all or substantially all of the option issuer's assets, the sum of the price paid in that sale and the current market value of the remaining assets of the option issuer divided by the number of outstanding shares of the option issuer's common stock.

*Registration Rights.* Each of the stock option agreements provides that the option holder has specified rights to require the option issuer to register, under the Securities Act and any applicable state laws, all shares purchased by the option holder under the stock option agreement. The option issuer may repurchase at a specified average market value any shares requested to be registered instead of registering those shares.

*Profit Limitations.* Each of the stock option agreements provides that in no event will the option holder's "total profit," as defined below, exceed, in the aggregate, $2.87 billion. If the option holder's total profit would otherwise exceed $2.87 billion, the option holder, at its sole discretion, will either (a) reduce the number of shares subject to the option, (b) deliver to the option issuer for cancellation shares of the option issuer's common stock, (c) pay cash to the option issuer, (d) reduce the amount payable by the option issuer upon repurchase of the option and/or the option shares or (e) any combination of the above, so that the option holder's actually realized total profit does not exceed $2.87 billion after taking into account the above actions.

In addition, the option may not be exercised for a number of shares that would result in a "notional total profit," as defined below, of more than $2.87 billion. If exercise of the option would otherwise result in the notional total profit exceeding that amount, the option holder, in its discretion, may take any of the actions specified above so that the notional total profit does not exceed $2.87 billion.

For purposes of the option agreements, "total profit" means the aggregate amount (before taxes) of:

- the excess of (1) the net cash amounts or fair market value of any property received by the option holder in a sale of shares received on exercise of the option, other than to a wholly–owned subsidiary of the option holder, or a repurchase of those shares by the option issuer, over (2) the option holder's aggregate purchase price for those shares, plus

- all equivalent net amounts with respect to any substitute option, plus

- any termination fee paid to the option holder under the merger agreement, minus

- all cash paid and the value of all shares surrendered to the option issuer as described above to reduce the total profit or notional total profit.

For purposes of the stock option agreements, "notional total profit" with respect to any number of shares the option holder proposes to purchase under the option means the total profit on the proposed purchase date assuming that those shares were purchased and, together with all other shares received upon exercise of the option and held by the option holder and its affiliates as of that date, were sold for cash at the closing market price for the option issuer's common stock as of the close of business on the preceding trading day, less customary brokerage commissions.

*Assignability.* Neither of the stock option agreements, nor any of the rights, interests or obligations under them, may be assigned by either of the parties without the prior written consent of the other party.

*Effect of Stock Option Agreements.* The stock option agreements are intended to increase the likelihood that the merger will be completed on the terms set forth in the merger agreement.

85

and to compensate the option holder for the efforts undertaken and the expenses and losses incurred by it if the merger is not completed. The stock option agreements could make any business combination with a third party more expensive than would otherwise be the case. Consequently, the stock option agreements may discourage persons who might be interested in acquiring all or a significant interest in JPMorgan Chase or Bank One before completion of the merger from considering or proposing an acquisition, even if those persons were prepared to offer higher consideration per share of Bank One common stock or JPMorgan Chase common stock than the consideration implicit in the merger.

86

JPMORGAN CHASE/ BANK ONE

## UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

The following unaudited pro forma combined financial information and explanatory notes present how the combined financial statements of JPMorgan Chase and Bank One may have appeared had the businesses actually been combined as of the date indicated. The unaudited pro forma combined balance sheet at December 31, 2003 assumes the merger was completed on that date. The unaudited pro forma combined income statement for the year ended December 31, 2003 gives effect to the merger as if the merger had been completed on January 1, 2003. The unaudited pro forma combined financial information shows the impact of the merger on JPMorgan Chase's and Bank One's combined financial position and results of operations under the purchase method of accounting with JPMorgan Chase treated as the acquiror. Under this method of accounting, JPMorgan Chase will record the assets and liabilities of Bank One at their estimated fair values as of the date the merger is completed.

The unaudited pro forma combined financial information has been derived from and should be read in conjunction with the historical consolidated financial statements and the related notes of both JPMorgan Chase and Bank One which are incorporated into this document by reference. See "Where You Can Find More Information" on page 165.

The unaudited pro forma combined financial information is presented for illustrative purposes only and does not indicate the financial results of the combined company had the companies actually been combined at the beginning of the period presented and had the impact of possible revenue enhancements, expense efficiencies, asset dispositions and share repurchases, among other factors, been considered. In addition, as explained in more detail in the accompanying notes to unaudited pro forma combined financial information, the allocation of the purchase price reflected in the unaudited pro forma combined financial information is subject to adjustment and will vary from the actual purchase price allocation that will be recorded upon completion of the merger based upon changes in the balance sheet including fair value estimates.

87

JPMORGAN CHASE/ BANK ONE

UNAUDITED PRO FORMA COMBINED INCOME STATEMENT

For the Year Ended December 31, 2003
*In millions (except per share data)*

| | JP Morgan Chase | Bank One | Reporting Reclassifications | Pro Forma Adjustments | Pro Forma Combined |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Investment banking fees | $ 2,890 | $ — | $ 371(1) | $ — | $ 3.261 |
| Banking fees and commissions | — | 1.795 | (1,795)(1.2.3) | — | — |
| Trading revenue (losses) | 4.427 | (26) | — | — | 4.401 |
| Fees and commissions | 10.652 | — | 743(2,5.6,7) | 97(O) | 11.492 |
| Private equity gains | 33 | — | 330(4) | — | 363 |
| Securities gains | 1,446 | 122 | (330)(4) | — | 1.238 |
| Mortgage fees and related income | 892 | — | 86(3,8) | — | 978 |
| Credit card revenue | — | 3.764 | 2,971(5) | — | 6,735 |
| Service charges on deposits | — | 1,661 | (1,661)(6) | — | — |
| Fiduciary and investment management fees | — | 656 | (656)(7) | — | — |
| Other revenue | 579 | 91 | 74(8.12.13) | — | 744 |
| **Total noninterest revenue** | 20.919 | 8.063 | 133 | 97 | 29.212 |
| Interest income | 23.444 | 12.661 | — | 41(O) (379)(A) | 35.767 |
| Interest expense | 11.107 | 4.512 | — | (510)(G) (250)(I) 6(O) | 14.865 |
| **Net interest income** | 12.337 | 8.149 | — | 416 | 20,902 |
| Revenue before provision for credit losses | 33.256 | 16.212 | 133 | 513 | 50,114 |
| Provision for credit losses | 1,540 | 2,045 | — | — | 3.585 |
| **Total net revenue** | 31,716 | 14,167 | 133 | 513 | 46.529 |
| **Noninterest Expense** | | | | | |
| Compensation expense | 11.695 | 4.765 | — | 42(O) 188(S) | 16,690 |
| Occupancy expense | 1.912 | 679 | — | 2(O) (10)(R) | 2.583 |
| Technology and communications expense | 2,844 | 213 | 473(9) | 3(O) | 3,533 |
| Surety settlement and litigation reserve | 100 | — | — | — | 100 |
| Equipment | — | 473 | (473)(9) | — | — |
| Outside service fees and processing | — | 1.153 | (1,153)(10) | — | — |
| Marketing and development | — | 957 | (957)(11) | — | — |
| Amortization of intangibles | — | 137 | 294(14) | (137)(K) 1,435(E) | 1.729 |
| Other expense | 5,137 | 1,400 | 1.949(10.11.12,13,14) | 40(O) | 8.526 |
| Total noninterest expense | 21,688 | 9.777 | 133 | 1.563 | 33.161 |
| Income before income tax expense | 10.028 | 4.390 | — | (1,050) | 13.368 |
| Income tax expense | 3,309 | 1,265 | — | (400)(L..O) | 4.174 |
| **Income from continuing operations** | $ 6,719 | $ 3.125 | $ — | p $ (650) | $ 9,194 |
| **Income from continuing operations applicable to common stockholders** | $ 6.668 | $ 3,125 | $ — | $ (650) | $ 9,143 |
| **Per common share information** | | | | | |
| Basic earnings per share from continuing operations | $ 3 32 | $ 2 78 | | | $ 2 62 |
| Diluted earnings per share from continuing operations | $ 3.24 | $ 2.75 | | | $ 2 57 |
| Average common shares outstanding | 2.009 | 1.126 | | 360(M) | 3.495 |
| Average diluted common shares outstanding | 2.055 | 1.135 | | 363(M) | 3,553 |

The notes to unaudited pro forma combined financial information are an integral part of these statements

88

## JPMORGAN CHASE/ BANK ONE

## UNAUDITED PRO FORMA COMBINED BALANCE SHEET

### December 31, 2003
*(in millions)*

| Assets | JP Morgan Chase | Bank One | Reporting Reclassifications | Pro Forma Adjustments | Pro Forma Combined |
|---|---|---|---|---|---|
| Cash and due from banks | $ 20.268 | $ 17.089 | $ — | $ (2.118)(N) | $ 35.239 |
| Deposits with banks | 10,175 | 3.093 | | | 13.268 |
| Federal funds sold and securities purchased under resale agreements | 76,868 | 15,551 | (4,423)(1) | | 87,996 |
| Securities borrowed | 41.834 | — | 4.423 (1) | | 46,257 |
| Trading assets: | | | | | |
| Debt and equity instruments | 169.120 | 11.584 | | | 180,704 |
| Derivative receivables | 83.751 | 5,208 | | | 88.959 |
| Securities | 60.244 | 84.951 | (2,563)(2) | | 142.632 |
| Interests in purchased receivables | — | 32.938 | 4,751 (3) | | 37.689 |
| Loans. net of allowance | 214.995 | 134.675 | (4.751)(3) | 882 (A) | 345,801 |
| Private equity investments | 7,250 | — | 2.563 (2) | | 9,813 |
| Accrued interest and accounts receivable | 12.356 | — | (12,356)(4) | | |
| Premises and equipment | 6.487 | 2,960 | | (200)(R) | 9.247 |
| Goodwill | 8.511 | 2,061 | | 32.779 (C) (2,061)(C) (70)(B) | 41.220 |
| Other intangibles | 6,480 | 758 | | 3,600 (E) 4.900 (E) 1,525 (E) (758)(D) | 16,505 |
| Other assets | 52.573 | 15.695 | 12.356 (4) | 103 (F) (823)(P) | 79.904 |
| Total assets | $770.912 | $326,563 | $ — | $ 37.759 | $1.135.234 |
| **Liabilities** | | | | | |
| Deposits — U S Noninterest–bearing | $ 73.154 | $ — | $ 44.316 (5,6) | $ (2,118)(N) | $ 115.352 |
| Interest–bearing | 125.855 | | 102.286 (6) | 680 (G) | 228,821 |
| Demand | — | 24.485 | (24.485)(5) | | — |
| Savings | — | 99,175 | (99.175)(6) | | — |
| Time | — | 22,942 | (22.942)(6) | | — |
| Foreign offices | 127,483 | 18.019 | | 120 (G) | 145,622 |
| Fed and funds purchased and securities sold under repurchase agreements | 113.466 | 20.573 | | | 134.039 |
| Commercial paper | 14.284 | — | 335 (7) | | 14.619 |
| Other borrowed funds | 8,925 | 47,740 | (335)(7) (36,909)(8) (3,618)(9) | | 15,803 |
| Trading liabilities: | | | | | |
| Debt and equity instruments | 78.222 | — | 3,618 (9) | | 81.840 |
| Derivative payables | 71,226 | 4.050 | | | 75,276 |
| Accounts payable. accrued expenses and other liabilities | 45.066 | 12,683 | | 2,174 (H) 94 (Q) (70)(B) | 59.947 |
| Beneficial interests issued by consolidated variable interest entities | 12.295 | — | 39.574 (8) | | 51.869 |
| Long–term debt | 48.014 | 46.764 | (2.665)(8) | 1,892 (I) (3,315)(F) | 90.690 |
| Junior subordinated deferrable interest debentures held by trusts that issued guaranteed capital debt securities | 6.768 | — | | 3,315 (F) 103 (F) | 10.186 |
| Insurance policy and claims reserves | — | 6.713 | | | 6,713 |
| Total liabilities | 724,758 | 303.144 | — | 2.875 | 1.030,777 |
| **Stockholders' Equity** | | | | | |
| Preferred stock | 1.009 | — | | | 1,009 |
| Common stock | 2,044 | 12 | | 1.465 (J) (12)(J) | 3.509 |
| Capital surplus | 13.512 | 10.290 | | 56.838 (J) (10.290)(J) | 70.350 |
| Retained earnings | 29.681 | 15.514 | | (15.514)(J) | 29,681 |
| Accumulated other comprehensive income (loss) | (30) | 127 | | (127)(J) | (30) |

| | | | | | |
|---|---|---|---|---|---|
| Deferred compensation | — | (189) &bsp; | | 189 (J) | — |
| Treasury stock | (62) | (2.335) | | 2.335 (J) | (62) |
| Total stockholders' equity | 46.154 | 23.419 | — | 34.884 | 104.457 |
| Total liabilities and stockholders' equity | $770.912 | $326.563 | $ — | $ 37.759 | $1,135.234 |

The notes to unaudited pro forma combined financial information are an integral part of these statements.

89