# Tab B

# Part 3

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

## NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

**Note 1 — Basis of Pro Forma Presentation**

The unaudited pro forma combined financial information relating to the merger is presented as of and for the year ended December 31, 2003. The Reporting Reclassifications column represents the change in presentation of certain amounts on the historical consolidated financial statements of Bank One and JPMorgan Chase to conform with the preliminary presentation for the combined entity. For purposes of identifying the reclassification between line items on the financial statements, numerical references are provided to reflect where certain balances have been reclassified. Final determination of financial statement presentation will be completed upon consummation of the merger. During the fourth quarter of 2003, Bank One sold its corporate trust services business to JPMorgan Chase and reported it as discontinued operations. For purposes of the accompanying pro forma financial information, Bank One's income from discontinued operations has been reclassified to income from continuing operations to reflect the retention of this business in the combined entity. In addition, the gain recognized by Bank One on the sale of the corporate trust business has not been included in these pro forma results.

JPMorgan Chase and Bank One are in the process of reviewing their accounting and reporting policies and, as a result of this review, it may be necessary to reclassify either JPMorgan Chase's or Bank One's financial statements to conform to those accounting policies that are determined by the combined company to be most appropriate. While some reclassifications of prior periods have been included in the unaudited pro forma combined financial information included in this document, further reclassifications may be necessary upon the completion of this review.

Material intercompany transactions have been eliminated from the accompanying unaudited pro forma combined financial information. However the information does not reflect the elimination of hedge accounting results and positions for certain intercompany derivatives. Management believes this presentation is more reflective of the pro forma results of the combined entity, as such derivatives qualified for hedge accounting in the periods presented and will continue to qualify as hedges until the date the merger is completed, and it is management's intent to continue hedging with third parties subsequent to closing.

The pro forma adjustments include purchase price adjustments including the conversion of Bank One common stock into JPMorgan Chase common stock using an exchange ratio of 1.32 applied to 1,109,949,000 shares of Bank One common stock outstanding at December 31, 2003 multiplied by the average share price of $39.02 per share of JPMorgan Chase common stock. The share price was computed using the average closing price of JPMorgan Chase common stock for the period commencing two trading days prior to and ending two trading days after the merger was announced on January 14, 2004. Also included in the purchase price is the estimated fair value of $1.134 billion representing 59.9 million vested employee stock options of Bank One that will be converted into options for JPMorgan Chase common stock upon consummation of the merger. The total estimated purchase price for purposes of this pro forma financial information is $58.303 billion.

The merger will be accounted for using the purchase method of accounting requiring the assets and liabilities of Bank One to be fair-valued as of the date of acquisition.

The unaudited pro forma combined financial information includes estimated adjustments to record the assets and liabilities of Bank One at their respective fair values and represents management's best estimates based on information available at this time. The pro forma adjustments may be revised as additional information becomes available and additional analysis is performed. The final allocation of the purchase price will be determined after the merger is completed and after completion of a final analysis to determine the fair values of Bank One's tangible and identifiable intangible assets and liabilities as of the closing date. The final purchase

NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION — (Continued)

accounting adjustments may be materially different from the pro forma adjustments presented in this document. Increases or decreases in the fair value of certain balance sheet amounts including loans, credit card and related intangible assets, securities, deposits and related intangibles and debt will result in adjustments to the balance sheet and/or income statement. Such adjustments compared to the information shown in this document may change the amount of the purchase price allocated to goodwill and other assets and liabilities and may impact the statement of income due to adjustments in yield and/or amortization of the adjusted assets or liabilities

The unaudited pro forma combined financial information presented in this document does not necessarily indicate the combined results of operations or the combined financial position that would have resulted had the merger actually been completed at the beginning of the applicable period presented, nor is it indicative of the results of operations in future periods or the future financial position of the combined company

The merger is expected to result in annual cost savings of approximately $2.2 billion (pre–tax) to be achieved over a three–year period following the consummation of the merger. These expected savings have not been included in the pro forma combined amounts.

It is anticipated that the merger will result in restructuring and merger–related costs of approximately $3.0 billion, pre–tax. Under current accounting rules, a portion of these costs will not be accruable at the closing of the merger. The detailed plans for the restructuring initiatives have not been finalized and, as such, the amount of restructuring costs accruable at the closing of the merger has not been determined. None of the anticipated restructuring costs have been reflected in the unaudited pro forma combined balance sheet or in the unaudited pro forma combined income statement.

## Note 2 — Reporting Reclassifications

*Income Statement*

1 — Adjustment to reclassify Bank One's investment banking fees from Banking fees and commissions into Investment banking fees to conform with JPMorgan Chase's classification.

2 — Adjustment to reclassify Bank One's Banking fees and commissions (other than mortgage fees and related income and investment banking fees) into Fees and commissions to conform with JPMorgan Chase's classification.

3 — Adjustment to reclassify Bank One's mortgage fees and related income from Banking fees and commissions to Mortgage fees and related income to conform with JPMorgan Chase's classification.

4 — Adjustment to reclassify Bank One's Private equity gains from Securities gains into Private equity gains to conform with JPMorgan Chase's classification.

5 — Adjustment to reclassify JPMorgan Chase's credit card revenue from Fees and commissions into Credit card revenue to conform with the combined JPMorgan Chase's classification.

6 — Adjustment to reclassify Bank One's Service charges on deposits into Fees and commissions to conform with JPMorgan Chase's classification.

7 — Adjustment to reclassify Bank One's Fiduciary and investment management fees into Fees and commissions to conform with JPMorgan Chase's classification.

8 — Adjustment to reclassify Bank One's mortgage related income within Other revenue to Mortgage fees and related income to conform with JPMorgan Chase's classification.

91

NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION — (Continued)

9 — Adjustment to reclassify Bank One's Equipment expense to Technology and communications expense to conform with JPMorgan Chase's classification.

10 — Adjustment to reclassify Bank One's Outside service fees and processing into Other expense to conform with JPMorgan Chase's classification.

11 — Adjustment to reclassify Bank One's Marketing and development expense into Other expense to conform with JPMorgan Chase's classification.

12 — Adjustment to reclassify Bank One's minority interest from Other revenue to Other expense to conform with JPMorgan Chase's classification.

13 — Adjustment to reclassify Bank One's gains and losses on sale of OREO to Other expense to conform with JPMorgan Chase's classification.

14 — Adjustment to reclassify JPMorgan Chase's amortization of intangible assets from Other expense to Amortization of intangibles to conform with the combined JPMorgan Chase's classification.

*Balance Sheet*

1 — Adjustment to reclassify Bank One's Securities borrowed from Federal funds sold and securities purchased under resale agreements into Securities borrowed to conform with JPMorgan Chase's classification.

2 — Adjustment to reclassify Bank One's Principal investments from Securities into Private equity investments to conform with JPMorgan Chase's classification.

3 — Adjustment to reclassify JPMorgan Chase's loans of certain consolidated variable interest entities from Loans into Interests in purchased receivables to conform with the combined JPMorgan Chase's classification.

4 — Adjustment to reclassify JPMorgan Chase's Accrued interest and accounts receivable into other assets to conform with the combined JPMorgan Chase's classification.

5 — Adjustment to reclassify Bank One's Demand deposits to Deposits — U.S. noninterest–bearing to conform with JPMorgan Chase's classification.

6 — Adjustment to reclassify Bank One's Savings and Time deposits to Deposits — U.S. interest–bearing and noninterest–bearing to conform with JPMorgan Chase's classification.

7 — Adjustment to reclassify Bank One's Commercial paper from Other borrowed funds to Commercial paper to conform with JPMorgan Chase's classification.

8 — Adjustment to reclassify Bank One's liabilities related to consolidated variable interest entities into Beneficial interests issued by consolidated variable interest entities to conform with JPMorgan Chase's classification.

9 — Adjustment to reclassify Bank One's Trading liabilities — debt and equity instruments to conform with JPMorgan Chase's classification.

**Note 3 — Pro Forma Adjustments**

The unaudited pro forma combined financial information reflects the issuance of 1,465,133,000 shares of JPMorgan Chase common stock with an aggregate value of $57.169 billion and the conversion of approximately 59.9 million Bank One vested employee stock options with a fair value of $1.134 billion at December 31, 2003. The fair value of JPMorgan Chase options that will be issued in exchange for the Bank One options was

92

NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION — (Continued)

estimated using a Black–Scholes option pricing model. Option pricing models require the use of highly subjective assumptions including expected stock price and volatility that, when changed, can materially affect fair value estimates. The more significant assumptions used in estimating the fair value of the JPMorgan Chase stock options to be issued in the exchange for the Bank One stock options include a risk–free interest rate of 2.47%, a dividend yield of 3.49%, a weighted average expected life of 3.0 years and volatility of 41.38%.

|  | December 31, 2003 | |
|---|---|---|
|  | (Dollars in millions except per share amount) | |
| Purchase Price: Bank One common stock outstanding (in thousands) | 1.119.582 | |
| Less: Unvested restricted common stock | 9,633 | |
|  | 1.109.949 | |
| Exchange ratio | 1.32 | |
| Purchase price: JPMorgan Chase common stock to be issued (in thousands) | 1,465,133 | |
| Average purchase price per JPMorgan Chase common share | $    39.02 | |
|  |  | $57.169 |
|  |  | 1.134 |
| Fair value of vested employee stock options |  | $58,303 |
| Total purchase price |  |  |
| Net assets acquired: |  |  |
| Bank One stockholders' equity | 23.419 |  |
| Bank One goodwill and other intangible assets | (2,819) |  |
| Estimated adjustments to reflect assets acquired at fair value: |  |  |
| Loans and leases | 882 |  |
| Identified intangibles | 10,025 |  |
| Pension plan assets | (823) |  |
| Premises and equipment | (200) |  |
| Estimated amounts allocated to liabilities assumed at fair value: |  |  |
| Deposits | (800) |  |
| Deferred income taxes | (2.174) |  |
| Post–retirement plan liabilities | (94) |  |
| Long–term debt | (1,892) |  |
|  |  | 25.524 |
| Goodwill resulting from merger |  | $32.779 |

93

NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION — (Continued)

The pro forma adjustments included in the unaudited pro forma combined financial information are as follows:

(A) Adjustment to fair value the Bank One loan portfolio. The adjustment will be recognized over the estimated remaining life of the loan portfolio of 2.33 years. The impact of this adjustment will reduce pre–tax interest income by $379 million for the year ended December 31, 2003.

(B) Adjustment to eliminate JPMorgan Chase payable for additional purchase price related to the acquisition of Bank One's corporate trust business during the 4th quarter of 2003.

(C) Adjustment to write off historical Bank One goodwill and to record the goodwill resulting from the merger.

(D) Adjustment to write off historical Bank One intangible assets (other than goodwill).

(E) Adjustment to record identifiable intangible assets resulting from the merger based on estimated fair values. The nature, amount and amortization method of various possible identified intangibles are being analyzed by management. The adjustments reflected herein are based on current assumptions and valuations, which are subject to change. For purposes of the pro forma adjustments shown here, management has estimated $10.025 billion of identifiable intangibles that consists of a core deposit intangible of $3.600 billion, credit card related intangibles of $4.900 billion and other customer relationship intangibles of $1.525 billion. Management has estimated the core deposit intangible and credit card related intangibles will be amortized on an accelerated basis not to exceed ten years. Other customer relationship intangibles include a cash management intangible of $375 million to be amortized on an accelerated basis and an asset management intangible of $530 million to be amortized on a straight–line basis, both over periods of up to 20 years. Also included is an indefinite lived asset management intangible of $620 million. Material changes are possible when the analysis is completed. The impact of these adjustments will reduce pro forma pre–tax income from continuing operations by $1.435 billion for the year ended December 31, 2003.

(F) Adjustment to record the deconsolidation of trusts used by Bank One to issue trust preferred securities to conform to JPMorgan Chase. The effect on the pro forma balance sheet of deconsolidating the trusts resulted in recognition of an investment in the trust and an increase to guaranteed preferred beneficial interests in junior subordinated deferrable interest debentures.

(G) Adjustment to fair–value certain Bank One deposit liabilities based on current interest rates for similar instruments. The adjustment will be recognized over the weighted average estimated remaining term of the related deposit liabilities of 1.57 years. This adjustment decreases pro forma pre–tax interest expense by $510 million for the year ended December 31, 2003.

(H) Adjustment to accrued expenses represents additional net deferred tax liability of $2.174 billion resulting from the pro forma adjustments. Deferred taxes were recorded using a combined federal and state rate of 38%.

(I) Adjustment to fair–value Bank One's long–term debt. The adjustment will be recognized over the weighted average remaining life of the long–term debt instruments of 7.58 years. The impact of the adjustment was a decrease in pro forma pre–tax interest expense by approximately $250 million for the year ended December 31, 2003.

94

## NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION — (Continued)

(J) Adjustment to eliminate Bank One's historical stockholders' equity. The adjustment also reflects the issuance of JPMorgan Chase common stock and the exchange of JPMorgan Chase vested stock option and vested restricted stock awards for corresponding Bank One awards.

(K) Adjustment to reverse amortization of intangible assets recorded in Bank One's historical financial statements.

(L) Adjustment to record the tax effect of the pro forma adjustments using a combined federal and state tax rate of 38%.

(M) Weighted average shares were calculated using the historical weighted average shares outstanding of JPMorgan Chase and Bank One for the year ended December 31, 2003, adjusted using the exchange ratio. Earnings per share data have been computed based on the combined historical income of JPMorgan Chase, income from continuing operations for Bank One, and the impact of purchase accounting adjustments.

(N) Adjustment to eliminate intercompany deposits.

(O) Adjustment to reclassify income from discontinued operations to income from continuing operations.

(P) Adjustment to fair value Bank One's net pension plan assets in excess of plan liabilities resulting in write–down of Bank One's prepaid pension costs.

(Q) Adjustment to fair value Bank One's net other post–retirement plan liabilities in excess of plan assets.

(R) Adjustment to fair value Bank One real estate and to decrease pre–tax occupancy expense for the effects of adjusting the fair value of Bank One real estate.

(S) Adjustment to record additional pro forma compensation expense resulting from revaluation of Bank One's unvested stock options and restricted stock awards that are greater than the valuation used in the historical financial statements determined at grant date.

95

## DESCRIPTION OF JPMORGAN CHASE CAPITAL STOCK

The following summary is a description of the material terms of JPMorgan Chase's capital stock and is not complete. You should also refer to JPMorgan Chase's certificate of incorporation, including the certificates of designations pursuant to which the outstanding series of JPMorgan Chase's preferred stock were issued. JPMorgan Chase's certificate of incorporation is filed as Exhibit 3.1 to JPMorgan Chase's Annual Report on Form 10–K for the year ended December 31, 2000 filed with the Securities and Exchange Commission. You should also refer to the applicable provisions of the Delaware General Corporation Law.

THE FOLLOWING DESCRIPTION OF JPMORGAN CHASE'S OUTSTANDING CAPITAL STOCK SHOULD BE READ CAREFULLY BY BANK ONE STOCKHOLDERS SINCE, AT THE EFFECTIVE TIME OF THE MERGER, EACH OUTSTANDING SHARE OF BANK ONE COMMON STOCK WILL BE CONVERTED INTO 1.32 SHARES OF JPMORGAN CHASE COMMON STOCK.

### Common Stock

As of the date of this document, JPMorgan Chase is authorized to issue up to 4,500,000,000 shares of common stock. At the [                ], 2004 record date, JPMorgan Chase had [                ] shares of common stock issued (including [                ] shares held in treasury) and had reserved approximately [                ] shares of common stock for issuance under various employee or director incentive, compensation and option plans. As part of the merger, JPMorgan Chase's authorized common stock will be increased to 9,000,000,000 shares upon completion of the merger. For more information, see "The Merger — Effect of the Merger; What Bank One Stockholders Will Receive in the Merger; Increase in Common Stock" on page 31.

Holders of JPMorgan Chase common stock are entitled to receive dividends when, as and if declared by JPMorgan Chase's board of directors out of funds legally available for payment, subject to the rights of holders of the JPMorgan Chase preferred stock.

Each holder of JPMorgan Chase common stock is entitled to one vote per share. Subject to the rights, if any, of the holders of any series of preferred stock under the applicable certificates of designations and applicable law, all voting rights are vested in the holders of shares of JPMorgan Chase common stock. Holders of shares of JPMorgan Chase common stock have noncumulative voting rights, which means that the holders of more than 50% of the shares voting for the election of directors can elect 100% of the directors and the holders of the remaining shares will not be able to elect any directors.

In the event of a voluntary or involuntary liquidation, dissolution or winding up of JPMorgan Chase, the holders of JPMorgan Chase common stock will be entitled to share equally in any of the assets available for distribution after JPMorgan Chase has paid in full all of its debts and after the holders of all series of JPMorgan Chase's outstanding preferred stock have received their liquidation preferences in full.

The issued and outstanding shares of JPMorgan Chase common stock are fully paid and nonassessable. Holders of shares of JPMorgan Chase common stock are not entitled to preemptive rights. Shares of JPMorgan Chase common stock are not convertible into shares of any other class of capital stock. Mellon Investor Services LLC is the transfer agent, registrar and dividend disbursement agent for the JPMorgan Chase common stock.

### JPMorgan Chase Preferred Stock

Under JPMorgan Chase's certificate of incorporation, JPMorgan Chase's board of directors is authorized, without further stockholder action, to issue up to 200,000,000 shares of preferred stock, in one or more series, and to determine the voting powers and the designations,

96

preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions, of each series.

Under regulations adopted by the Federal Reserve Board, if the holders of any series of JPMorgan Chase preferred stock become entitled to vote for the election of directors because dividends on that series are in arrears, that series may then be deemed a "class of voting securities." In such a case, a holder of 25% or more of the series, or a holder of 5% or more of the series if that holder would also be considered to exercise a "controlling influence" over JPMorgan Chase, may then be subject to regulation as a bank holding company in accordance with the Bank Holding Company Act. In addition, any other bank holding company may be required to obtain the prior approval of the Federal Reserve Board to acquire or retain 5% or more of that series, and any person other than a bank holding company may be required to obtain the approval of the Federal Reserve Board to acquire or retain 10% or more of that series.

As of the date of this document, JPMorgan Chase has five series of preferred stock issued and outstanding, as described in the following table:

| | Stated Value and Redemption Price Per Share(a) | Shares | Amount Outstanding on December 31, 2003 | | Earliest Redemption Date | Rate in Effect at December 31, 2003 |
|---|---|---|---|---|---|---|
| | | (in millions) | (in millions) | | | |
| Adjustable Rate Series A Cumulative | $100.00 | 2.42 | $242 | | See Note(c) | 5.00%(d) |
| 6.63% Series H Cumulative(b) | 500.00 | 0.28 | 139 | | 3/31/06 | 6.63 |
| Adjustable Rate Series L Cumulative | 100.00 | 2.00 | 200 | &sp; | See Note(c) | 4.50(d) |
| Fixed/Adjustable Rate Noncumulative | 50.00 | 4.00 | 200 | | 6/30/03 | 4.96(d) |
| Adjustable Rate Series N Cumulative | 25.00 | 9.10 | 228 | | See Note(c) | 4.50(d) |

(a)   Redemption price is price indicated in table, plus accrued but unpaid dividends, if any.

(b)   The Series H cumulative preferred stock is represented by depositary shares.

(c)   The shares are redeemable at any time with not less than 30 nor more than 60 days' notice.

(d)   Floating rates are based on certain U.S. Treasury rates. The minimum and maximum rates for Series A are 5.00% and 11.50% and for Series L and Series N are 4.50% and 10.50%, respectively. The minimum and maximum rates for the fixed/adjustable rate noncumulative preferred stock are 5.46% and 11.46%, respectively.

*Ranking.* All the outstanding series of JPMorgan Chase preferred stock have the same rank. All the outstanding series of JPMorgan Chase preferred stock have preference over the JPMorgan Chase common stock with respect to the payment of dividends and the distribution of assets in the event of a liquidation or dissolution of JPMorgan Chase.

*Dividends.* Dividends payable on each series of outstanding JPMorgan Chase preferred stock are payable quarterly, when and as declared by the JPMorgan Chase board of directors, on each March 31, June 30, September 30 and December 31. Dividends on all the outstanding series of JPMorgan Chase preferred stock, other than the fixed/adjustable rate noncumulative preferred stock, are cumulative. If JPMorgan Chase fails to declare a dividend on the fixed/adjustable rate noncumulative preferred stock for any dividend period, holders of that series have no right to receive a dividend for that dividend period, whether or not JPMorgan Chase declares dividends on that series for any future dividend periods.

JPMorgan Chase may not declare or pay any dividends on any series of JPMorgan Chase preferred stock unless JPMorgan Chase has previously declared and paid or contemporaneously declares and pays full dividends, and cumulative dividends still owing, if any, on all other series of JPMorgan Chase preferred stock that have the same rank as, or rank senior to, that series of preferred stock. If JPMorgan Chase does not pay in full the dividends on those equally–and senior–ranking series, it may only declare dividends pro rata, so that the amount of dividends declared per share on that series of preferred stock and on each other equally–ranking series of JPMorgan Chase preferred stock will bear to each other the same ratio that accrued dividends per share on that series of preferred stock and those other series bear to each other. In addition, generally, unless JPMorgan Chase has paid full dividends, including cumulative dividends still owing, if any, on all outstanding shares of any series of cumulative preferred stock, JPMorgan Chase may not declare or pay dividends on its common stock and generally may not redeem or purchase any JPMorgan Chase common stock except by payment of shares of common stock or other junior securities. JPMorgan Chase will not pay interest or any sum of money instead of interest on any dividend payment or payments that may be in arrears.

*Rights upon Liquidation; Redemption.* In the event of the liquidation, dissolution or winding–up of JPMorgan Chase, holders of JPMorgan Chase preferred stock are entitled to receive liquidating distributions in the amount set forth opposite the applicable series in the table above, plus accrued and unpaid dividends, if any, before JPMorgan Chase makes any distribution of assets to the holders of JPMorgan Chase common stock. Each of the outstanding series of JPMorgan Chase preferred stock is redeemable at JPMorgan Chase's option at a redemption price per share equal to the redemption price set forth opposite that series in the table above, plus accrued but unpaid dividends, if any.

*Voting Rights.* Holders of shares of JPMorgan Chase outstanding preferred stock have no voting rights, except as described below or as required by the Delaware General Corporation Law. All of the currently outstanding series of JPMorgan Chase preferred stock provide that if, at the time of any annual meeting of JPMorgan Chase stockholders, the equivalent of six quarterly dividends payable on any series of outstanding cumulative preferred stock is in default, the number of directors constituting the JPMorgan Chase board of directors will be increased by two and the holders of all the outstanding preferred stock, voting together as a single class, will be entitled to elect those additional two directors at that annual meeting. In accordance with the requirements of the Series L preferred stock, Series N preferred stock and fixed/ adjustable rate noncumulative preferred stock, each director elected by the holders of shares of the outstanding preferred stock will continue to serve as director for the full term for which he or she was elected, even if prior to the end of that term JPMorgan Chase has paid in full the amount of dividends that had been in arrears. For purposes of this paragraph, "default" means that accrued and unpaid dividends on the applicable series are equal to or greater than the equivalent of six quarterly dividends.

Holders of Series H, Series L and Series N preferred stock and fixed/ adjustable rate noncumulative preferred stock are entitled to one vote per share with respect to matters on which they are entitled to vote. Holders of Series A preferred stock are entitled to one–tenth of one vote per share with respect to matters on which they are entitled to vote.

The JPMorgan Chase Series N preferred stock and fixed/adjustable rate noncumulative preferred stock provide that the affirmative vote of the holders of at least two–thirds of the shares of all outstanding series of preferred stock, voting together as a single class without regard to series, will be required to:

• create any class or series of stock having a preference over any outstanding series of preferred stock; or

98

- change the provisions of the JPMorgan Chase certificate of incorporation in a manner that would adversely affect the voting powers or other rights of the holders of a series of preferred stock.

Those series also state that if the amendment will not adversely affect all series of outstanding preferred stock, then the amendment will only need to be approved by holders of at least two–thirds of the shares of the series of preferred stock adversely affected.

The JPMorgan Chase Series L preferred stock provides as follows:

- the consent of the holders of at least two–thirds of the outstanding shares of the particular series, voting as a separate class, is required for any amendment of the JPMorgan Chase certificate of incorporation that would adversely affect the powers, preferences, privileges or rights of that series; and

- the consent of the holders of at least two–thirds of the voting power of that series and of each series of preferred stock having the same rank, voting together as a single class without regard to series, is required to create, authorize or issue, or reclassify any stock into any additional class or series of, stock ranking prior to that series as to dividends or upon liquidation, or any other security or obligation convertible into or exerciseable for any such prior–ranking stock.

The JPMorgan Chase Series A preferred stock and Series H preferred stock provide that a vote of at least two–thirds of the voting power of all outstanding shares of the applicable series, and all outstanding shares of JPMorgan Chase preferred stock having the same rank as that series, voting together as a single class without regard to series, will be necessary in order to:

- authorize or issue any capital stock that will be senior to that series of preferred stock as to dividends or upon liquidation; or

- amend, alter or repeal any of the provisions of the JPMorgan Chase certificate of incorporation, including the certificate of designations relating to that series, in such a way as to adversely affect (or materially adversely affect, in the case of the JPMorgan Chase Series H preferred stock) the preferences, rights, powers or privileges of the preferred stock of that series.

*Miscellaneous.* No series of outstanding JPMorgan Chase preferred stock is convertible into shares of JPMorgan Chase common stock or other securities of JPMorgan Chase. No series of outstanding JPMorgan Chase preferred stock is subject to preemptive rights.

*Transfer Agent and Registrar.* Mellon Investor Services LLC is the transfer agent, registrar and dividend disbursement agent for the JPMorgan Chase preferred stock. The registrar for the JPMorgan Chase preferred stock will send notices to the holders of the JPMorgan Chase preferred stock of any meetings at which such holders will have the right to elect directors or to vote on any other matter.

### Depositary Shares

*Depositary Shares for Series H Preferred Stock.* The Series H preferred stock is represented by depositary shares, each representing a one–tenth interest in a share of that preferred stock, issued under the deposit agreement between JPMorgan Chase and Morgan Guaranty Trust Company of New York (succeeded through merger by JPMorgan Chase Bank), as depositary. The following is a summary of material provisions of the deposit agreement. This description is qualified by reference to the deposit agreement, which is an exhibit to the registration statement of which this document is a part.

99

*Dividends and Other Distributions.* The depositary will distribute all cash dividends or other cash distributions received on the Series H preferred stock to the record holders of depositary shares in proportion to the number of such depositary shares owned by those holders.

If JPMorgan Chase makes a distribution other than in cash, the depositary will distribute property received by it to the record holders of depositary shares that are entitled to receive the distribution, unless the depositary determines that it is not feasible to make the distribution. If this occurs, the depositary may, with the approval of JPMorgan Chase, sell the property and distribute the net proceeds from that sale to the holders.

*Withdrawal of Stock.* A holder of depositary shares represented by depositary receipts may obtain those shares, or the cash or property represented by those shares, by surrendering his, her or its depositary receipts to the depositary. Holders of depositary shares will be entitled to receive whole shares of the related series of preferred stock, but will not be subsequently entitled to receive depositary shares with respect to those shares of preferred stock. If the depositary receipts surrendered by the holder represent more shares of stock than are being withdrawn by the holder, the depositary will issue a new depositary receipt representing the excess number of shares.

*Redemption of Depositary Shares.* Upon redemption, in whole or in part, of the Series H preferred stock by JPMorgan Chase, the depositary will redeem the depositary shares from the proceeds received by it resulting from the redemption, in whole or in part, of the Series H preferred stock. The redemption price per depositary share will be equal to one–tenth of the redemption price per share of the Series H preferred stock. Whenever JPMorgan Chase redeems shares of Series H preferred stock, the depositary will redeem, as of the same redemption date, the number of depositary shares representing shares of Series H preferred stock redeemed.

*Voting the Series H Preferred Stock.* Upon receipt of notice of any meeting at which the holders of Series H preferred stock are entitled to vote, the depositary will mail the information contained in the notice of meeting to the record holders of the depositary shares. Each record holder of those depositary shares on the record date, which will be the same date as the record date for the Series H preferred stock, will be entitled to instruct the depositary as to the exercise of the voting rights pertaining to the number of shares of Series H preferred stock represented by that holder's depositary shares. The depositary will try, as far as practicable, to vote the number of shares of Series H preferred stock underlying those depositary shares in accordance with those instructions, and JPMorgan Chase will agree to take all action requested by the depositary in order to enable the depositary to do so. The depositary will not vote shares of the Series H preferred stock if it does not receive specific instructions from the holders of depositary shares relating to those shares.

*Amendment and Termination of the Deposit Agreement.* The deposit agreement may be amended at any time by agreement between the depositary and JPMorgan Chase. However, any amendment that materially and adversely alters the rights of the holders of depositary shares will not be effective unless that amendment has been approved by the holders of at least a majority of the depositary shares then outstanding. The deposit agreement may be terminated by JPMorgan Chase or the depositary only if:

- all outstanding depositary shares have been redeemed; or

- there has been a final distribution in respect of the Series H preferred stock in connection with any liquidation, dissolution or winding up of JPMorgan Chase and that distribution has been distributed to the holders of depositary receipts.

*Charges of Depositary.* JPMorgan Chase will pay all transfer and other taxes and governmental charges arising solely from the existence of the depositary arrangements. JPMorgan Chase will also pay charges of the depositary in connection with the initial deposit of the Series H preferred stock and any redemption of the Series H preferred stock. Holders of

100

depositary receipts will pay transfer and other taxes and governmental charges and any other charges as are expressly provided in the deposit agreement to be for their accounts

*Resignation and Removal of Depositary.* The depositary may resign at any time by delivering a notice to JPMorgan Chase of its election to do so. JPMorgan Chase may remove the depositary at any time. Any resignation or removal will take effect upon the appointment of a successor depositary and its acceptance of its appointment. The successor depositary must be appointed within 60 days after delivery of the notice of resignation or removal and must be a bank or trust company having its principal office in the United States and having a combined capital and surplus of at least $50 million.

*Miscellaneous.* The depositary will forward to holders of depositary receipts all reports and communications received from JPMorgan Chase and required to be furnished to the holders of the Series H preferred stock. Neither the depositary nor JPMorgan Chase will be liable if prevented or delayed by law or any circumstance beyond its control in performing its obligations under the deposit agreement. The depositary and JPMorgan Chase disclaim any obligation or liability under the deposit agreement to holders of depositary receipts other than for negligence or willful misconduct. They will not be obligated to prosecute or defend any legal proceeding in respect of any depositary shares or Series H preferred stock unless satisfactory indemnity is furnished. JPMorgan Chase and the depositary may rely upon written advice of counsel or accountants, or upon information provided by persons presenting Series H preferred stock for deposit, by holders of depositary receipts or by other persons believed to be competent, and on documents believed to be genuine. The depositary disclaims responsibility for the failure to carry out any instructions to vote any of the depositary shares or for the manner or effect of any vote made, as long as that action or inaction is in good faith. The depositary will be liable to JPMorgan Chase for any liability arising out of acts performed or omitted by the depositary due to its gross negligence or willful misconduct.

## Anti–Takeover Considerations

Delaware law and JPMorgan Chase's certificate of incorporation and by–laws contain a number of provisions which may have the effect of discouraging transactions that involve an actual or threatened change of control of JPMorgan Chase currently or JPMorgan Chase after the merger. These provisions of JPMorgan Chase's certificate of incorporation and by–laws include the prohibition of stockholder action by written consent, procedures for calling special meetings of stockholders, requirements for advance notice of stockholder–proposed business at annual meetings, the authorization of directors to fill vacancies on the board occurring between annual stockholders meetings and election of directors by a plurality of votes rather than cumulative voting. For a description of these provisions, see "Comparison of Stockholder Rights" beginning on page 102.

## COMPARISON OF STOCKHOLDER RIGHTS

JPMorgan Chase and Bank One are both organized under the laws of the State of Delaware. Any differences, therefore, in the rights of holders of JPMorgan Chase capital stock and Bank One capital stock arise primarily from differences in their respective certificates of incorporation and by–laws. Upon completion of the merger, the certificate of incorporation and by–laws of JPMorgan Chase in effect immediately prior to the effective time of the merger will be the certificate of incorporation and by–laws of the surviving corporation in the merger, except for certain changes required by the merger agreement as discussed below. Consequently, after the effective time of the merger, the rights of the former stockholders of Bank One will be determined by reference to the JPMorgan Chase certificate of incorporation and by–laws.

### Capitalization

*JPMorgan Chase.* The authorized capital stock of JPMorgan Chase consists of:

• 4,500,000,000 shares of JPMorgan Chase common stock, par value $1.00 per share; and

• 200,000,000 shares of JPMorgan Chase preferred stock, par value $1.00 per share.
The JPMorgan Chase certificate of incorporation will be amended, effective upon completion of the merger, to increase its authorized shares of common stock to 9,000,000,000. For more information, see "The Merger — Effect of the Merger; What Bank One Stockholders Will Receive in the Merger; Increase in Common Stock" on page 31.

*Bank One.* The authorized capital stock of Bank One consists of:

• 4,000,000,000 shares of Bank One common stock, par value $0.01 per share; and

• 50,000,000 shares of Bank One preferred stock, par value $0.01 per share.
### Voting Rights

In the case of both JPMorgan Chase and Bank One, each holder of common stock has the right to cast one vote for each share of common stock held of record on all matters submitted to a vote of stockholders, including the election of directors. Holders of common stock do not have cumulative voting rights.

For a description of the voting rights of the JPMorgan Chase preferred stock, see "Description of JPMorgan Chase Capital Stock" beginning on page 96.

### Number and Election of Directors

*JPMorgan Chase.* The board of directors of JPMorgan Chase currently has twelve members. The JPMorgan Chase by–laws provide that the JPMorgan Chase board of directors will consist of a number of directors to be fixed from time to time by the JPMorgan Chase board of directors or the stockholders.

The JPMorgan Chase by–laws will be amended, effective upon completion of the merger, to modify the foregoing provisions as described in "The Merger — Amendments to JPMorgan Chase By–laws" beginning on page 81.

JPMorgan Chase's certificate of incorporation and by–laws do not provide for a staggered board of directors.

*Bank One.* The board of directors of Bank One currently has thirteen members. The Bank One by–laws provide that the Bank One board of directors will consist of a number of directors to be fixed from time to time by the Bank One board of directors. Bank One's certificate of incorporation states that the number of directors will in no case be less than eleven or more than thirty.

Bank One's certificate of incorporation and by-laws do not provide for a staggered board of directors

### Vacancies on the Board of Directors and Removal of Directors

*JPMorgan Chase.* Vacancies on the board of directors of JPMorgan Chase, including vacancies and unfilled newly created directorships resulting from any increase in the authorized number of directors, may be filled by a majority vote of the directors then in office, even if those directors do not constitute a quorum. The directors elected to fill the vacancy will have a term of office expiring at the next annual meeting. On or prior to the effective date of the merger, the JPMorgan Chase by-laws will be amended to modify the foregoing provisions as described in "The Merger — Amendments to JPMorgan Chase By-laws" beginning on page 81.

Delaware law provides that, except in the case of a classified board of directors or where cumulative voting applies, a director, or the entire board of directors, of a corporation may be removed, with or without cause, by the affirmative vote of a majority of the shares of the corporation entitled to vote at an election of directors. These provisions of Delaware law regarding the removal of directors govern the removal of directors from JPMorgan Chase's board of directors.

*Bank One.* Vacancies on the board of directors of Bank One, including vacancies and unfilled newly created directorships resulting from any increase in the authorized number of directors, may be filled by a majority vote of the directors then in office, even if those directors do not constitute a quorum. The directors elected to fill the vacancy will have a term of office expiring at the next annual meeting.

The provisions of Delaware law regarding the removal of directors described above govern the removal of directors from Bank One's board of directors.

### Amendments to the Certificate of Incorporation

The provisions of Delaware law regarding amendments to the certificate of incorporation govern the amendment of the certificates of incorporation of both JPMorgan Chase and Bank One. Under Delaware law, an amendment to the certificate of incorporation of a corporation requires the approval of the corporation's board of directors and the approval of holders of a majority of the outstanding stock entitled to vote upon the proposed amendment.

### Amendments to By-Laws

The certificates of incorporation of each of JPMorgan Chase and Bank One authorize the board of directors to adopt, amend or repeal any provision of the corporation's by-laws. Under Delaware law, stockholders entitled to vote also have the power to adopt, amend or repeal by-laws. Prior to the effective date of the merger, the JPMorgan Chase by-laws will be amended to require a 75% vote of the full board to modify those by-law provisions adopted in connection with the merger as described in "The Merger — Amendments to JPMorgan Chase By-laws" beginning on page 81.

### Action by Written Consent

*JPMorgan Chase.* JPMorgan Chase's certificate of incorporation prohibits action by written consent of holders of common stock. JPMorgan Chase's certificate of incorporation provides that holders of shares of a class or series other than common stock may take action by written consent of holders representing not less than a majority of the voting power of all of the class or series (or such greater minimum percentage as is prescribed by statute), provided notice is given to all holders entitled to vote on the taking of any action without a meeting that is taken by less than unanimous written consent.

103

*Bank One.* Bank One's certificate of incorporation prohibits action by written consent of its stockholders.

## Ability to Call Special Meetings

*JPMorgan Chase.* Special meetings of JPMorgan Chase stockholders may be called at any time by JPMorgan Chase's board of directors, the chairman of the board, a vice chairman of the board, the chief executive officer or the president or as otherwise provided by Delaware law.

*Bank One.* Special meetings of Bank One stockholders may be called at any time by a majority of Bank One's board of directors acting by resolution.

## Notice of Stockholder Action

*JPMorgan Chase.* Under JPMorgan Chase's by-laws, in order for a stockholder to nominate candidates for election to JPMorgan Chase's board of directors at any annual or any special stockholders' meeting at which the board of directors has determined that directors will be elected, timely written notice must be given to the Secretary of JPMorgan Chase before the annual or special meeting. Similarly, in order for a stockholder to propose business to be brought before any annual stockholders' meeting, timely written notice must be given to the Secretary of JPMorgan Chase before the annual meeting.

Under JPMorgan Chase's by-laws, to be timely, notice of stockholder nominations or proposals to be made at an annual stockholders' meeting must be received by the Secretary of JPMorgan Chase no less than 90 days nor more than 120 days before the first anniversary of the preceding year's annual meeting. If the date of the annual meeting is more than 30 days before or more than 60 days after the anniversary of the preceding year's annual meeting, notice will also be timely if delivered within 10 days of the date on which public announcement of the meeting was first made by JPMorgan Chase. In the case of a meeting, notice of a stockholder nomination must be received no less than 60 days nor more than 90 days before a meeting at which directors are to be elected or within 10 days of the date on which public announcement of the meeting was first made by JPMorgan Chase.

In addition, if the number of directors to be elected is increased and no public announcement is made by JPMorgan Chase naming all of the nominees or specifying the size of the increased board of directors at least 90 days before the first anniversary of the preceding year's annual meeting, a stockholder's notice will be considered timely, with respect to the nominees for any new positions created by the increase, if it is delivered to the Secretary of JPMorgan Chase within 10 days of the date on which public announcement of the meeting was first made by JPMorgan Chase.

A stockholder's notice to JPMorgan Chase must set forth all of the following:

- all information required to be disclosed in solicitations of proxies for election of directors, or information otherwise required by applicable law, relating to any person that the stockholder proposes to nominate for election or re-election as a director, including that person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected;

- a brief description of the business the stockholder proposes to bring before the meeting, the reasons for conducting that business at that meeting and any material interest of the stockholder in the business proposed; and

- the stockholder's name and address as they appear on JPMorgan Chase's books, the class and number of shares of JPMorgan Chase that are beneficially owned by the stockholder and whether the stockholder is part of a group that intends to solicit proxies in support of its proposal or nomination.

104

*Bank One.* Under Bank One's certificate of incorporation, in order for a stockholder to nominate candidates for election to Bank One's board of directors at any annual or any special stockholders' meeting at which the board of directors has determined that directors will be elected, timely written notice must be given to the Secretary of Bank One before the annual or special meeting. Under Bank One's certificate of incorporation, to be timely, a stockholder's notice of a director nomination must be delivered to, and received by, the Secretary of Bank One at least 60 days but no more than 90 days prior to the anniversary date of Bank One's immediately preceding annual meeting; provided, however, that in the event the annual meeting is more than 30 days before or 60 days after such anniversary date, notice by the stockholder must be so received not earlier than the close of business on the 90th day prior to the annual meeting and not later than the close of business on the later of the 60th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by Bank One.

The notice shall set forth

- the name and address of the stockholder making the nomination;

- the following relating to any person that the stockholder proposes to nominate for election or re-election as a director: name, age, business address, residence address (if known), principal occupation or employment;

- the number of shares of stock of Bank One that are beneficially owned by each nominee and the nominating stockholder;

- any other information regarding the nominee that may be required by Regulation 14A under the Securities Exchange Act of 1934; and

- the executed written consent of each nominee to being named in the proxy statement as a nominee and to serving as a director if elected.

In the case of a special meeting, under Bank One's by-laws, notice of a stockholder nomination must be received no less than 90 days nor more than 120 days before a special meeting at which directors are to be elected or within 10 days of the date on which public announcement of the special meeting was first made by Bank One.

Similarly, in order for a stockholder to propose business to be brought before any annual stockholders' meeting, timely written notice must be given to the Secretary of Bank One before the annual meeting. Under Bank One's by-laws, to be timely, such notice must be received by the Secretary of Bank One at least 90 days but no more than 120 days prior to the anniversary date of Bank One's immediately preceding annual meeting; provided, however, that in the event the annual meeting is more than 30 days before or 60 days after such anniversary date, notice by the stockholder must be so received not earlier than the close of business on the 120th day prior to the annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by Bank One.

## Limitation of Personal Liability of Directors and Officers

Delaware law provides that a corporation may include in its certificate of incorporation a provision limiting or eliminating the liability of its directors to the corporation and its stockholders for monetary damages arising from a breach of fiduciary duty, except for:

- a breach of the duty of loyalty to the corporation or its stockholders;

- acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;

105

• payment of a dividend or the repurchase or redemption of stock in violation of Delaware law; or

• any transaction from which the director derived an improper personal benefit.

The certificates of incorporation of both JPMorgan Chase and Bank One provide that, to the fullest extent Delaware law permits the limitation or elimination of the liability of directors, no director will be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

## Indemnification of Directors and Officers

*General.* Under Delaware law, a corporation generally may indemnify directors and officers:

• for actions taken in good faith and in a manner they reasonably believed to be in, or not opposed to, the best interests of the corporation; and

• with respect to any criminal proceeding, to the extent they had no reasonable cause to believe that their conduct was unlawful.

In addition, Delaware law provides that a corporation may advance to a director or officer expenses incurred in defending any action upon receipt of an undertaking by the director or officer to repay the amount advanced if it is ultimately determined that he or she is not entitled to indemnification.

*JPMorgan Chase.* JPMorgan Chase's certificate of incorporation permits JPMorgan Chase to indemnify any director, officer, employee, or agent of JPMorgan Chase or any other person serving in that capacity at the request of JPMorgan Chase with another corporation, partnership, joint venture, trust or other enterprise to the fullest extent permitted by Delaware law. JPMorgan Chase's by-laws require JPMorgan Chase to indemnify any of those persons to the fullest extent permitted by applicable law against all expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by those persons in connection with proceedings in which they were, are or have been threatened to be involved by virtue of their positions with JPMorgan Chase. In addition, under JPMorgan Chase's by-laws, JPMorgan Chase will pay in advance of the disposition of any of those proceedings, after receipt of an appropriately documented request, any reasonable expenses incurred by or on behalf of a person who may be entitled to indemnification subject to the person agreeing to repay any amounts advanced if it is determined that JPMorgan Chase cannot indemnify the person against those expenses. The indemnification rights conferred by JPMorgan Chase are not exclusive of any other right to which persons seeking indemnification may be entitled under any statute, JPMorgan Chase's certificate of incorporation or by-laws, any agreement, vote of stockholders or disinterested directors or otherwise.

JPMorgan Chase is authorized to purchase and maintain insurance on behalf of its directors and officers.

*Bank One.* Bank One's certificate of incorporation provides for indemnification, to the fullest extent permitted by Delaware law, of any person who is or was a director, officer or employee of Bank One and who is or was a party, or who is threatened to be made a party, in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she is or was a director, officer or employee of Bank One, or is or was serving at the request of Bank One as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise. This right to indemnification includes the right to be paid expenses incurred in connection with any of those proceedings in advance of its final disposition. The indemnification rights conferred by Bank One are not exclusive of any other right to which persons seeking indemnification may be entitled

106

under any statute, Bank One's certificate of incorporation or by-laws, any agreement, vote of stockholders or disinterested directors or otherwise

Bank One is authorized to purchase and maintain insurance on behalf of its directors, officers, employees and agents

## State Anti-Takeover Statutes; Business Combinations with Interested Stockholders

*Delaware Anti-Takeover Statute.* Under the Delaware business combination statute, a corporation is prohibited from engaging in any business combination with an interested stockholder who, together with its affiliates or associates, owns, or who is an affiliate or associate of the corporation and within a three-year period did own, 15% or more of the corporation's voting stock for a three year period following the time the stockholder became an interested stockholder, unless:

- prior to the time the stockholder became an interested stockholder, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- the interested stockholder owned at least 85% of the voting stock of the corporation, excluding specified shares, upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder; or

- at or subsequent to the time the stockholder became an interested stockholder, the business combination is approved by the board of directors of the corporation and authorized by the affirmative vote, at an annual or special meeting and not by written consent, of at least 66 2/3% of the outstanding voting shares of the corporation, excluding shares held by that interested stockholder.

A business combination generally includes:

- mergers, consolidations and sales or other dispositions of 10% or more of the assets of a corporation to or with an interested stockholder;

- specified transactions resulting in the issuance or transfer to an interested stockholder of any capital stock of the corporation or its subsidiaries; and

- other transactions resulting in a disproportionate financial benefit to an interested stockholder.

The provisions of the Delaware business combination statute do not apply to a corporation if, subject to certain requirements, the certificate of incorporation or by-laws of the corporation contain a provision expressly electing not to be governed by the provisions of the statute or the corporation does not have voting stock listed on a national securities exchange, authorized for quotation on an inter-dealer quotation system of a registered national securities association or held of record by more than 2,000 stockholders.

Neither JPMorgan Chase nor Bank One has adopted any provision in its certificate of incorporation or by-laws to "opt out" of the Delaware business combination statute and the statute is applicable to business combinations involving JPMorgan Chase or Bank One

*Bank One Certificate of Incorporation.* The Bank One certificate of incorporation provides that Bank One may not engage in "business combinations" (as defined below) unless:

- the business combination is approved by the affirmative vote of a majority of the voting power of all the shares of voting stock held by Bank One stockholders other than an "interested stockholder" (as defined below) with which or by or on whose behalf a business combination is proposed, voting together as a single class; or

• the business combination is approved by a majority of the "continuing directors" of Bank One; or

• the business combination complies with certain conditions related to price and procedure

A "business combination" includes:

• any merger or consolidation of Bank One or any of its subsidiaries with an interested stockholder or its affiliates;

• any sale, exchange, lease, transfer or other disposition with or for the benefit of an interested stockholder involving any substantial part (defined as assets having a value of more than 15% of the stockholders' equity of Bank One as reflected on the most recent fiscal year-end balance sheet) of the assets of Bank One or its subsidiaries or any interested stockholder or its affiliates;

• the adoption of any plan or proposal for the liquidation or dissolution of Bank One proposed by an interested stockholder or its affiliates;

• any reclassification of securities, or recapitalization of Bank One or any merger or consolidation of Bank One with any of its subsidiaries or any other transaction that has the effect, directly or indirectly, of increasing the proportionate share of the outstanding shares of any series or class of voting stock (including any securities convertible into voting stock) of Bank One or any subsidiary that is beneficially owned by an interested stockholder or its affiliates; or

• any agreement, contract or other arrangement providing to take any of the actions described above.

An "interested stockholder" includes any person that is the beneficial owner of 10% or more of Bank One voting stock prior to the completion of a business combination, any person that is an affiliate of Bank One and was the beneficial owner of 10% or more of Bank One voting stock at any time within the two year period prior to the business combination, and any assignee of an interested stockholder if the assignment occurred within the two years preceding the business combination and did not involve a public offering.

"Continuing directors" are those members of the Bank One board of directors who are not affiliates of an interested stockholder and who were members of the board prior to the time the interested stockholder became an interested stockholder, or any member of the board who are not affiliates of an interested stockholder and who are recommended to succeed a continuing director by a majority of the then-continuing directors.

Any amendment to these provisions requires the affirmative vote of 80% of the voting power of all the shares of Bank One voting stock, voting together as a single class, provided that if an amendment is proposed on behalf of an interested stockholder, it must also be approved by the affirmative vote of a majority of the voting power of all the shares of voting stock held by stockholders other than the interested stockholder.

There are no comparable provisions in JPMorgan Chase's certificate of incorporation.

108

## OTHER MATTERS TO BE CONSIDERED

## AT THE JPMORGAN CHASE ANNUAL MEETING

The stockholders meeting at which the merger will be considered will also be JPMorgan Chase's annual meeting of stockholders for 2004. Therefore, a number of proposals requiring stockholder action in the ordinary course of JPMorgan Chase's business also are being presented for consideration and voting. This portion of the document discusses these other proposals.

### JPMorgan Chase Proposal 2: Election of Directors

The JPMorgan Chase board of directors has nominated twelve directors for election at its annual meeting to hold office until the next annual meeting and the election of their successors.

### Vote Required

JPMorgan Chase directors must be elected by a plurality of the votes cast at the meeting. This means that the nominees receiving the greatest number of votes will be elected. Votes withheld for any nominee will not be counted.

Although JPMorgan Chase knows of no reason why any of the nominees would not be able to serve, if any nominee is unavailable for election, the proxies would vote your common stock to approve the election of any substitute nominee proposed by the board of directors. JPMorgan Chase's board may also choose to reduce the number of directors to be elected, as permitted by JPMorgan Chase's by-laws.

### General Information about the Nominees

All of the nominees are currently directors. Each has agreed to be named in this document and to serve if elected. All nominees were JPMorgan Chase directors in 2003 and attended at least 75% of the meetings of JPMorgan Chase's board and committees on which they served in that year.

Unless stated otherwise, each nominee has been continuously employed by his or her present employer for more than five years. The age indicated in each nominee's biography is as of February 1, 2004, and all other biographical information is as of the date of this document.

In the following biographies, references to a predecessor institution of JPMorgan Chase are references to The Chase Manhattan Corporation, Chemical Banking Corporation, J.P. Morgan & Co. Incorporated and/or Manufacturers Hanover Corporation.

### Information about the Nominees

*Hans W. Becherer (age 68).* Mr. Becherer has been Retired Chairman and Chief Executive Officer of Deere & Company (equipment manufacturer) since August 2000, having served as Chairman since 1990 and as Chief Executive Officer since 1989. Mr. Becherer is also a director of Honeywell International Inc. and Schering–Plough Corporation. He has been a director of JPMorgan Chase or a predecessor institution since 1998.

*Riley P. Bechtel (age 51).* Mr. Bechtel has been Chairman and Chief Executive Officer of Bechtel Group, Inc. (engineering and construction) since January 1996. Previously he was President and Chief Executive Officer beginning in 1990. Mr. Bechtel is also a director of Fremont Group, L.L.C., Fremont Investors, Inc. and Sequoia Ventures Inc. He has been a director of JPMorgan Chase or a predecessor institution since 1995.

*Frank A. Bennack, Jr. (age 70).* Mr. Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation (publishing, broadcasting,

and media) since June 2002. He is the immediate past President and Chief Executive Officer, positions he held beginning in 1979. Mr. Bennack is a director of Hearst–Argyle Television, Inc., Polo Ralph Lauren Corporation and Wyeth. He has been a director of JPMorgan Chase or a predecessor institution since 1981.

*John H. Biggs (age 67).* Mr. Biggs has been Former Chairman and Chief Executive Officer of Teachers Insurance and Annuity Association — College Retirement Equities Fund (TIAA–CREF) (national teachers' pension fund) since November 2002, having served as Chairman and Chief Executive Officer from 1993 until 2002. Mr. Biggs is also a director of The Boeing Company and a Trustee of the International Accounting Standards Foundation. He has been a director of JPMorgan Chase since March 2003.

*Lawrence A. Bossidy (age 68).* Mr. Bossidy has been Retired Chairman of Honeywell International Inc. (technology and manufacturing) since June 2002, having served as Chairman from July 2001 and from December 1999 to April 2000. He was Chief Executive Officer from July 2001 to February 2002. He was Chairman of AlliedSignal Inc. from 1992 to 1999 and Chief Executive Officer from 1991 to 1999 when he was named Chairman of Honeywell following the merger of the two companies. Mr. Bossidy is also a director of Berkshire Hills Bancorp, Inc. and Merck & Co., Inc. He has been a director of JPMorgan Chase or a predecessor institution since 1998.

*M. Anthony Burns (age 61).* Mr. Burns has been Chairman Emeritus of Ryder System, Inc. (logistics and transportation solutions) since May 2002. He was Chairman from May 1985 through May 2002, Chief Executive Officer from January 1983 through November 2000 and President from December 1979 through June 1999. Mr. Burns is also a director of The Black & Decker Corporation, J.C. Penney Company, Inc. and Pfizer Inc. He has been a director of JPMorgan Chase or a predecessor institution since 1990.

*Ellen V. Futter (age 54).* Ms. Futter has been President and Trustee of the American Museum of Natural History since 1993. She previously served as President of Barnard College beginning in 1980. Ms. Futter is also a director of American International Group, Inc., Bristol–Myers Squibb Company and Consolidated Edison, Inc., and a Trustee of Consolidated Edison Company of New York, Inc. She has been a director of JPMorgan Chase or a predecessor institution since 1997.

*William H. Gray, III (age 62).* Mr. Gray has been President and Chief Executive Officer of The College Fund/UNCF (educational assistance) since 1991 and is scheduled to retire from those positions on March 31, 2004. He was a member of the United States House of Representatives from 1979 to 1991. Mr. Gray is also a director of Dell Computer Corporation, Electronic Data Systems Corporation (from which he is scheduled to retire in May 2004), Pfizer Inc., Prudential Financial, Inc., Rockwell Automation, Inc., Viacom Inc. and Visteon Corporation. He has been a director of JPMorgan Chase or a predecessor institution since 1992.

*William B. Harrison, Jr. (age 60).* Mr. Harrison has been Chairman and Chief Executive Officer of JPMorgan Chase since November 2001, prior to which he was President and Chief Executive Officer from December 2000. He was Chairman and Chief Executive Officer of The Chase Manhattan Corporation from January through its merger with J.P. Morgan & Co. Incorporated in December 2000 and President and Chief Executive Officer from June through December 1999, prior to which he had been Vice Chairman of the Board. He has been a director of JPMorgan Chase or a predecessor institution since 1991. Mr. Harrison is also a director of Merck & Co., Inc.

*Helene L. Kaplan (age 70).* Mrs. Kaplan has been Of Counsel to the firm of Skadden, Arps, Slate, Meagher & Flom LLP (law firm) since 1990. Mrs. Kaplan is also a director of Exxon Mobil Corporation, The May Department Stores Company and MetLife, Inc. She has been a director of JPMorgan Chase or a predecessor institution since 1987.

110

*Lee R. Raymond (age 65).* Mr. Raymond has been Chairman of the Board and Chief Executive Officer of Exxon Mobil Corporation (oil and gas) since December 1999. He was Chairman of the Board and Chief Executive Officer of Exxon Corporation from 1993 until its merger with Mobil Oil Corporation in 1999. He has been a director of JPMorgan Chase or a predecessor institution since 1987.

*John R. Stafford (age 66).* Mr. Stafford has been Retired Chairman of the Board of Wyeth (pharmaceuticals) since January 2003. He was Chairman of the Board from 1986 and Chief Executive Officer from 1986 until May 2001. Mr. Stafford is also a director of Honeywell International Inc. and Verizon Communications Inc. He has been a director of JPMorgan Chase or a predecessor institution since 1982.

## About the JPMorgan Chase Board and its Committees

*The JPMorgan Chase Board.* JPMorgan Chase is governed by its board of directors and various committees of the board that meet throughout the year. Directors discharge their responsibilities throughout the year at board and committee meetings and also through telephone contact and other communications with the Chairman and Chief Executive Officer and others regarding matters of concern and interest to JPMorgan Chase. During 2003, there were 12 meetings of JPMorgan Chase's board.

The JPMorgan Chase board of directors determined that each of the non–management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board. In making its independence determinations, JPMorgan Chase's board noted that Lawrence A. Bossidy's son is employed by JPMorgan Chase as a Vice President and received more than $100,000 in compensation in 2003. JPMorgan Chase's board determined that this relationship was not material. The employment relationship is maintained on an arm's length basis; Mr. Bossidy's son is not an executive officer of JPMorgan Chase or a member of Mr. Bossidy's household; and Mr. Bossidy does not have any material interest in the employment relationship.

The board of directors has regularly scheduled meetings of non–management directors at least twice each year. In accordance with the board's Corporate Governance Practices, one meeting is for review of the Chief Executive Officer, generally in January, and is led by the chairman of the Compensation & Management Development Committee, and one meeting is for a review of the board and its Corporate Governance Practices, generally in July, and is led by the chairman of the Governance Committee. These meetings, or others that may be scheduled, also provide the opportunity for discussion of such other topics as the non–management directors may find appropriate, with discussion to be led by the chairman of the committee most relevant to the topic, including the Audit Committee, the Risk Policy Committee and the Public Policy Committee.

The board's Corporate Governance Practices state that director attendance is expected at annual meetings of stockholders. Each of our directors attended JPMorgan Chase's 2003 annual meeting.

The board's Corporate Governance Practices and charters of the committees described below, which are the board's principal committees, are available on JPMorgan Chase's website at www.jpmorganchase.com. The charter of the Audit Committee is attached as Annex H to this document.

111

*Communications with the Board.* To contact any of the JPMorgan Chase directors or committee chairs or the non–management directors as a group, please mail your correspondence to:

J.P. Morgan Chase & Co.
Attention (director)
Office of the Secretary
270 Park Avenue
New York, New York 10017

*Committees of the Board.* JPMorgan Chase's board has five principal committees. The following describes for each committee its current membership, the number of meetings held during 2003, and its mission. All members of these committees are non–management directors.

*Audit Committee.* The members of JPMorgan Chase's Audit Committee are Hans W. Becherer, Frank A. Bennack, Jr., John H. Biggs (Vice Chairman) and M. Anthony Burns (Chairman). This committee met 13 times in 2003. The Audit Committee is responsible for oversight of:

- the external auditor's qualifications and independence;

- the performance of JPMorgan Chase's internal audit function and external auditor; and

- the Chief Executive Officer's and senior management's responsibilities to assure that there is in place an effective system of controls reasonably designed to safeguard the assets and income of JPMorgan Chase; assure the integrity of JPMorgan Chase's financial statements; and maintain compliance with JPMorgan Chase's ethical standards, policies, plans and procedures, and with laws and regulations.

The Audit Committee is also responsible for preparing the Audit Committee report required by the rules of the Securities and Exchange Commission which is included in this document under "Audit Committee Report" below.

JPMorgan Chase's board of directors has determined that each Audit Committee member is independent in accordance with the listing standards of the New York Stock Exchange and each member is an audit committee financial expert as defined by the Securities and Exchange Commission.

*Compensation & Management Development Committee.* The members of JPMorgan Chase's Compensation & Management Development Committee are Riley P. Bechtel, William H. Gray, III, Lee R. Raymond and John R. Stafford (Chairman). This committee met five times in 2003. The Compensation & Management Development Committee reviews and approves JPMorgan Chase's compensation and benefit programs; ensures the competitiveness of these programs; and advises the board on the development of and succession for key executives.

JPMorgan Chase's board of directors has determined that each Compensation & Management Development Committee member is independent in accordance with the listing standards of the New York Stock Exchange.

*Governance Committee.* The members of JPMorgan Chase's Governance Committee are Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, Ellen V. Futter, Lee R. Raymond (Chairman) and John R. Stafford. This committee met four times in 2003. The Governance Committee of JPMorgan Chase exercises general oversight with respect to the governance of the board of directors.

JPMorgan Chase's board of directors has determined that each Governance Committee member is independent in accordance with the listing standards of the New York Stock Exchange.

112

The charter of the Governance Committee is available on the JPMorgan Chase website at www.jpmorganchase.com.

*Public Policy Committee.* The members of JPMorgan Chase's Public Policy Committee are Hans W. Becherer, Riley P. Bechtel, M. Anthony Burns, William H. Gray, III and Helene L. Kaplan (Chairman). This committee met three times in 2003. The Public Policy Committee reviews the charitable and community oriented activities of JPMorgan Chase and its subsidiaries.

*Risk Policy Committee.* The members of JPMorgan Chase's Risk Policy Committee are Lawrence A. Bossidy (Chairman), Ellen V. Futter and Helene L. Kaplan. This committee met six times in 2003. The Risk Policy Committee is responsible for oversight of the Chief Executive Officer's and senior management's responsibilities to assess and manage JPMorgan Chase's credit risk and market risk and is also responsible for review of JPMorgan Chase's fiduciary and asset management activities.

## Nomination Process

JPMorgan Chase's Governance Committee acts as a nominating committee and is responsible for evaluating and recommending to the board proposed nominees for election to JPMorgan Chase's board of directors. As part of its process, the committee will consider director candidates recommended for consideration by members of the board, by management and by shareholders. Shareholders wishing to recommend to the Governance Committee a candidate for director should write to the Secretary of JPMorgan Chase. Candidates recommended by stockholders will be considered on the same basis as the other candidates. As stated in the board's Corporate Governance Practices, in general, the board wishes to balance the needs for professional knowledge, business expertise, varied industry knowledge, financial expertise, and CEO–level business management experience, while maintaining within these criteria an appropriate gender and minority representation. The Governance Committee also takes into account criteria applicable to board committees.

The board of directors of JPMorgan Chase after the merger will have sixteen members, consisting of eight directors from JPMorgan Chase, including Mr. Harrison, and eight directors from Bank One, including Mr. Dimon. See "The Merger — Board of Directors and Management After the Merger" beginning on page 63. The chair of the Governance Committee of JPMorgan Chase and the chair of the Corporate Governance and Nominating Committee of Bank One will lead efforts within their respective boards to determine the board of the merged company.

## Director Compensation

JPMorgan Chase directors who are officers of JPMorgan Chase do not receive any fees for their services as directors. Each non–management director of JPMorgan Chase receives an annual retainer of $75,000 and an annual grant of common stock equivalents valued at $170,000 on the date of grant. Each chairman of a JPMorgan Chase board committee receives an additional fee of $15,000 per year.

The annual grant of common stock equivalents will earn dividend equivalents and must remain indexed to JPMorgan Chase's common stock until a director's termination of service, at which time it will be paid in cash or may be reallocated in accordance with elections permitted for deferred cash compensation.

JPMorgan Chase's non–management directors may elect to be included in a group term life insurance policy and a business travel accident insurance policy. During 2003, JPMorgan Chase paid average premiums for these coverages of approximately $1,380 per director. A JPMorgan Chase director may elect to participate in JPMorgan Chase's medical insurance coverage, with the cost of the coverage paid by the director at the same rate as would be paid by an employee.

113

*Deferred Compensation Arrangements for Non–Management Directors.* Each year JPMorgan Chase's non–management directors may elect to defer all or part of their cash compensation. A director's right to receive future payments under any deferred compensation arrangement is an unsecured claim against JPMorgan Chase's general assets. Cash amounts may be deferred into various investment equivalents, including a common stock equivalent, and will be paid and distributed in cash after the director retires from JPMorgan Chase's board. Compensation that was paid in common stock in prior years which may have been deferred is distributable only in common stock when the director retires from the board

## Security Ownership of Management

The following table shows the number of shares of JPMorgan Chase common stock and common stock equivalents beneficially owned as of February 11, 2004, by each JPMorgan Chase director who is a nominee, the JPMorgan Chase executive officers named in the summary compensation table, and all JPMorgan Chase directors and executive officers as a group. Unless otherwise indicated, each of the named individuals and each member of the group has sole voting power and sole investment power with respect to the shares shown. The number of shares beneficially owned, as that term is defined by Rule 13d–3 under the Securities Exchange Act of 1934, by all directors and executive officers as a group totals 0.8% of the outstanding JPMorgan Chase common stock as of February 11, 2004. No director or executive officer beneficially owns any JPMorgan Chase preferred stock.

JPMorgan Chase has been notified by the following persons that they are the beneficial owners of more than five percent of JPMorgan Chase common stock as of December 31, 2003. According to a Schedule 13G/A filed with the Securities and Exchange Commission on February 13, 2004, Capital Research and Management Company, 333 South Hope Street, Los Angeles, California 90071, was the beneficial owner of 132,464,130 shares of JPMorgan Chase common stock, representing 6.5% of the JPMorgan Chase outstanding common stock. The shares were acquired in Capital Research's capacity as a registered investment adviser to various investment companies. Capital Research has sole dispositive power over these shares; they disclaim beneficial ownership of the shares. According to a Schedule 13G filed with the Securities and Exchange Commission on February 17, 2004, Barclays Global Investors, NA, 45 Fremont Street, San Francisco, California 94105, together with certain affiliated entities, was the beneficial owner of 109,529,042 shares of JPMorgan Chase common stock, representing 5.36% of the JPMorgan Chase outstanding common stock. The shares reported by Barclays are shares held in trust accounts for the economic benefit of the beneficiaries of those accounts. Barclays has sole dispositive power over 96,024,936 shares and sole voting power over 95,924,698 shares; they disclaim beneficial ownership of the shares.

114

Security Ownership of Directors and Executive Officers

| Name of Individual | Shares of JPMorgan Chase Common Stock |
|---|---|
| Hans W. Becherer | 43,304(1)(2)(3) |
| Riley P. Bechtel | 38,693(1)(2)(3) |
| Frank A. Bennack, Jr. | 54,270(2)(3) |
| John H. Biggs | 9,198(2) |
| Lawrence A. Bossidy | 58,275(1)(2)(3) |
| M. Anthony Burns | 45,566(1)(2)(3) |
| David A. Coulter | 1,388,860(3)(4) |
| Dina Dublon | 962,969(1)(3)(4) |
| Ellen V. Futter | 32,658(1)(2)(3) |
| William H. Gray, III | 45,792(1)(2)(3) |
| William B. Harrison, Jr | 4,723,682(1)(3)(4)(5) |
| Helene L. Kaplan | 61,038(1)(2)(3) |
| Donald H. Layton | 2,369,891(1)(3) |
| Lee R. Raymond | 95,285(1)(2)(3) |
| John R. Stafford | 81,600(1)(2)(3)(5) |
| Don M. Wilson III | 1,290,153(1)(3) |
| All directors and executive officers as a group (21 persons) | 16,433,899 |

(1) The amounts reported include shares of common stock, receipt of which has been deferred under JPMorgan Chase's deferred compensation plan arrangements, as follows: Mr. Becherer: 7,202 shares; Mr. Bechtel: 14,128 shares; Mr. Bossidy: 9,145 shares; Mr. Burns: 7,061 shares; Ms. Dublon: 59,845 shares; Ms. Futter: 10,178 shares; Mr. Gray: 15,337 shares; Mr. Harrison: 112,174 shares; Mrs. Kaplan: 8,808 shares; Mr. Layton: 241,316 shares; Mr. Raymond: 19,328 shares; Mr. Stafford: 13,000 shares; Mr. Wilson: 288,591 shares; and all directors and executive officers as a group: 1,143,303 shares.

(2) The amounts reported include the number of units of common stock equivalents held by directors under JPMorgan Chase's deferred compensation arrangements entitling those directors, upon termination of service, to receive a cash payment for each unit equal to the fair market value at that time of a share of common stock as follows: Mr. Becherer: 23,180 units; Mr. Bechtel: 14,353 units; Mr. Bennack: 28,168 units; Mr. Biggs: 6,148 units; Mr. Bossidy: 12,268 units; Mr. Burns: 20,660 units; Ms. Futter: 12,268 units; Mr. Gray: 22,093 units; Mrs. Kaplan: 28,168 units; Mr. Raymond: 65,745 units; Mr. Stafford: 42,966 units; and all directors as a group: 276,017 units.

(3) The amounts reported include shares of JPMorgan Chase common stock that may be acquired within 60 days of February 11, 2004, through the exercise of stock options as follows: each non– management director: 8,362 shares; Mr. Coulter: 864,401 shares; Ms. Dublon: 595,682 shares; Mr. Harrison: 3,365,344 shares; Mr. Layton: 1,433,560 shares; Mr. Wilson: 662,760 shares; and all directors and executive officers as a group: 10,265,969 shares. The amounts reported also include shares of JPMorgan Chase common stock that may be received at the end of a restricted period and/or when common stock price targets are met pursuant to forfeitable awards of restricted stock and/or restricted stock units as follows: Mr. Coulter: 349,256 shares; Ms. Dublon: 267,879 shares; Mr. Harrison: 698,523 shares; Mr. Layton: 493,962 shares; Mr. Wilson: 232,889 shares; and all executive officers as a group: 3,085,025 shares.

115

(4) The amounts reported include JPMorgan Chase common stock allocated to accounts under a Section 401(k) plan as follows: Mr. Coulter: 109 shares; Ms. Dublon: 2,763 shares; Mr. Harrison: 18,513 shares; and all executive officers as a group: 29,504 shares.

(5) The amounts reported include shares for which beneficial ownership is disclaimed as follows: Mr. Harrison: 30,249 shares; Mr. Stafford: 900 shares; and all directors and executive officers as a group: 31,149 shares.

**Compensation Committee Report on Executive Compensation**

### Compensation Policies

The Compensation & Management Development Committee, which consists solely of non-management directors, administers the compensation and benefit programs of JPMorgan Chase and its subsidiaries and determines the compensation of executive officers. The committee's recommendations regarding officer directors are subject to ratification by JPMorgan Chase's board of directors.

JPMorgan Chase's compensation programs are designed to attract, retain and motivate top quality, effective executives and professionals. The firm's compensation policy for executive officers emphasizes performance-based pay over fixed salary and uses equity-based awards to align the interests of executive officers with JPMorgan Chase's stockholders. JPMorgan Chase seeks to provide compensation levels that are competitive with those provided by the appropriate peer groups of financial institutions in each of the markets and businesses in which it competes. During 2003, the committee received reports from independent consultants to ensure that the program, in the committee's judgment, remains competitive and able to meet its objectives.

In general, each peer group will consist of comparable financial institutions that compete in the same markets and seek to sell similar financial services and products. Appropriate peer groups will change over time. These peer groups do not correspond to the large list of institutions that make up the indices shown on page 121 of this document.

The committee reviewed and approved minor revisions to its charter in January 2004 to ensure that its charter and the committee's practices are fully compliant with the final New York Stock Exchange listing requirements.

### Firm Performance and Compensation

The committee's fundamental principle in determining appropriate compensation levels for individual executive officers and for overall business units is to align compensation award levels with annual performance and progress towards and achievement of long-term strategic and financial goals. Because of JPMorgan Chase's diversified businesses, compensation award amounts vary significantly across businesses in line with the compensation practices in JPMorgan Chase's different competitive markets. The payment of bonuses and the awards of stock options and restricted stock units are directly related to corporate and individual performance and, where relevant, business unit performance.

Quantitative performance goals may vary from year to year and have included such factors as performance against plan, earnings per share growth, stock price performance relative to peers, revenue growth, return on common equity, growth in shareholder value added (SVA), credit quality, and other management indicators. Qualitative measures include the committee's assessment of each executive's success in (1) establishing, refining and executing JPMorgan Chase's long-term strategic plan; (2) improving client satisfaction; (3) achieving market leadership positions in key businesses; (4) improving productivity, including performance against specific six sigma goals; (5) developing leaders who can meet the growing demands of the marketplace; and (6) implementing JPMorgan Chase's diversity efforts at all levels of the organization.

116

In 2003, JPMorgan Chase introduced a Balanced Scorecard for adjusting incentive pools based on firm-wide performance. Financial factors (stock price performance relative to peers; EPS vs. plan; SVA vs. plan; and the firm's credit ratings) had a 70% weighting; nine goals in three more qualitative categories (Partnership, Productivity, and People) were weighted at 30%. For 2003, for most business units, 20% of the business unit's incentive compensation pool at plan was based on JPMorgan Chase's results as determined by the Balanced Scorecard. For corporate functions, the corresponding percentage ranged up to 50% and was 100% for the Executive Committee.

For 2003, the committee approved compensation funding levels for JPMorgan Chase and awards to executive officers based on its assessment of improved financial performance as measured by revenue, earnings and SVA growth in excess of both Plan and prior year. JPMorgan Chase's financial performance reflected record earnings in the Investment Bank, as revenues were strong and commercial credit costs declined dramatically, and in Chase Financial Services, as Chase Home Finance benefited from a strong mortgage market. JPMorgan Chase's private equity business improved significantly versus the prior year. JPMorgan Chase's stock price was up 53% year-over-year and total stock return exceeded its peer group by 22% for the same period. The committee also recognized that JPMorgan Chase maintained its leadership position in key products and markets and continued its expense management discipline with revenue growth exceeding expense growth by 4%. Overall, incentive compensation award pools were up 25% from last year.

### Compensation Program Design

Compensation paid to JPMorgan Chase's executive officers for 2003 consisted primarily of salary, cash bonuses, stock appreciation rights and restricted stock units awarded under JPMorgan Chase's 2000 Key Executive Performance Plan (2000 KEPP) and the 1996 Long-Term Incentive Plan, as amended. Both of these plans were approved by shareholders. In addition, executive officers are eligible to participate in JPMorgan Chase's general benefit plans, including retirement, health and savings plans.

*Salaries* — For each executive, the committee reviews salaries paid to similarly situated executives in the relevant competitor peer group. A particular executive's actual salary will be set based on this competitive review; the executive's performance and potential; and JPMorgan Chase's emphasis on performance-based rather than salary-based compensation.

*Incentives* — Throughout the year, the committee reviews financial and operational results and strategic achievements, both for JPMorgan Chase overall and by line of business, as well as compensation market data and trends for the appropriate peer groups, to determine overall business incentive funding levels and individual awards for executive officers. Individual annual performance incentives are awarded based on the executive's success in achieving corporate, business unit and individual performance goals and the committee's assessment of the individual's current and potential contribution to JPMorgan Chase's success.

*Incentive Mix* — Incentives are awarded in cash and in the form of JPMorgan Chase equity. Because JPMorgan Chase believes that the grant of significant annual equity-based awards further links the interests of senior management and JPMorgan Chase's stockholders, more than 55% of the incentives awarded to executive officers in 2003 were in the form of JPMorgan Chase equity. In January 2004, the committee approved awards of restricted stock units which will vest 50% in January 2006 and 50% in January 2007. The committee also approved stock appreciation rights settled in shares which will become exercisable 50% in January 2006 and 50% in January 2007. These stock appreciation rights will expire on February 11, 2014. All awards vest in case of death, disability or retirement. These terms and conditions applied to awards for all employees across the firm.

117

Executive Committee members own significant amounts of JPMorgan Chase's stock. Effective August 2002, the committee approved stock ownership guidelines for Executive Committee members that require each executive to retain 75% of the net shares of stock received from stock grants and options (after deductions for taxes and option exercise costs).

Final compensation data for JPMorgan Chase's competitive peer groups for calendar year 2003 are not yet available. The committee estimates that total compensation amounts for the firm's executive officers (base salary, annual bonus and equity-based awards) will be approximately in the 75th percentile of compensation levels of applicable peer groups.

### Deductibility of Executive Compensation
In May 1999 JPMorgan Chase's stockholders approved the 2000 KEPP, a plan designed to allow JPMorgan Chase a tax deduction for incentive compensation payments to the Chief Executive Officer and the other four most highly paid executive officers. Absent the 2000 KEPP, such incentive compensation payments would not be deductible to the extent such amounts for any such officer in any year exceeded $1 million. In administering this plan, the committee will promote its policy of maximizing corporate tax deductions, wherever feasible. Under the 2000 KEPP, each participant is allocated a percentage of a bonus pool at the beginning of the performance year (subject to reduction by the committee and a separate individual participant limit).

### Compensation Actions for Mr. Harrison
In January 2004, the committee, as ratified by JPMorgan Chase's board of directors, awarded Mr. Harrison total incentives for 2003 performance of $19 million, an increase of 147% from his 2002 awards, detailed in the table below:

| Year | Cash Bonus | Restricted Stock(1) | Stock Appreciation Rights/Options(2) | Total Annual Incentive Compensation(3) | % Change Versus Prior Year |
|------|-----------|---------------------|--------------------------------------|----------------------------------------|----------------------------|
| 2003 | $7,600,000 | $5,700,000 | $5,700,000 | $19,000,000 | 147% |
| 2002 | $3,080,000 | $2,310,000 | $2,310,000 | $ 7,700,000 | −50% |
| 2001 | $5,000,000 | $5,200,000 | $5,200,000 | $15,400,000 | −13% |

(1)  142,643 restricted stock units granted for 2003. The 2001 restricted stock was reported in Table IV of the 2002 proxy statement and is paid out only if the stock price achieves the $52 target by January 2007.

(2)  427,928 stock appreciation rights settled only in shares granted for 2003 valued at one-third the grant price; stock options granted for 2002 and 2001.

(3)  Does not include merger related payments awarded in July 2001.

The restricted stock units will vest 50% in January 2006 and 50% in January 2007 and the stock appreciation rights become exercisable 50% in January 2006 and 50% in January 2007. These awards reflect JPMorgan Chase's excellent performance in 2003 described above. In addition to Mr. Harrison's overall leadership, the committee noted, among others, Mr. Harrison's contribution to the following significant achievements: (1) continued execution against JPMorgan Chase's strategic goals of earnings diversification, integrated delivery, leadership positions and scale; (2) maintenance and improvement of key market leadership positions across the firm, including equities, syndicated loans, high grade bonds, derivatives, mergers & acquisitions, asset management, private banking, residential mortgages and operating services; (3) disciplined

118

expense management and productivity improvement; and (4) ongoing efforts in leadership development and diversity.

Dated as of February 18, 2004

*Compensation & Management Development Committee*

John R. Stafford (Chairman)
Riley P. Bechtel
William H. Gray, III
Lee R. Raymond

## Executive Compensation Tables

### Summary Compensation Table

| Name and principal position | Year | Annual compensation(1) | | Prior Merger Related(2) | |
|---|---|---|---|---|---|
| | | Salary($) | Bonus($) | Bonus($) | Restricted stock award ($)(4) |
| William B. Harrison. Jr. | 2003 | $1.000.000 | $7.600.000 | $ 0 | $ 0 |
| Chairman and Chief | 2002 | 1.000.000 | 3.080.000 | 5.000.000 | 0 |
| Executive Officer | 2001 | 1.000.000 | 5.000.000 | 5.000.000 | 5.000.000 |
| David A. Coulter | 2003 | 476.667 | 5.800.000 | 0 | 0 |
| Vice Chairman | 2002 | 220.000 | 3.200.000 | 0 | 0 |
| | 2001 | 220.000 | 4.780.000 | 0 | 0 |
| Dina Dublon | 2003 | 500.000 | 4.750.000 | 0 | 0 |
| Chief Financial Officer | 2002 | 500.000 | 2.100.000 | 625.000 | 625,000 |
| | 2001 | 491,667 | 2.500.000 | 625.000 | 625.000 |
| Donald H. Layton | 2003 | 500.000 | 5.800.000 | 0 | 0 |
| Vice Chairman | 2002 | 500.000 | 3.000.000 | 2.500.000 | 0 |
| | 2001 | 500.000 | 8.000.000 | 2.500.000 | 2.500.000 |
| Don M. Wilson III | 2003 | 300.000 | 5.850.000 | 0 | 0 |
| Chief Risk Officer | | | | | |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| Name and principal position | Long–term compensation awards | | | |
|---|---|---|---|---|
| | Awards | | Payouts | |
| | Restricted stock award ($)(3)(4) | Securities underlying options granted (#) | LTIP payouts ($)(6) | All other compensation ($)(7) |
| William B. Harrison. Jr. | $5.700,000 | 427,928 | $ 0 | $74,355 |
| Chairman and Chief | 2,310.000 | 316,873 | 0 | 65,414 |
| Executive Officer | Note (5) | 423,340 | 1.099.013 | 78.477 |
| David A. Coulter | 4.350,000 | 326,577 | 0 | 0 |
| Vice Chairman | 2,290,000 | 314,129 | 0 | 0 |
| | 5.000,000 | 407,057 | 0 | 11.000 |
| Dina Dublon | 2.375,000 | 178,304  P | 0 | 25,000 |
| Chief Financial Officer | 1,575.000 | 216,050 | 0 | 25,000 |
| | 1,875,000 | 152,647 | 396,094 | 24.583 |
| Donald H. Layton | 4.350,000 | 326,577 | 0 | 26.978 |
| Vice Chairman | 2,250.000 | 308,642 | 0 | 10,416 |
| | 3,750.000(5) | 305.293 | 792.188 | 25,000 |
| Don M. Wilson III | 2.925,000 | 219,595 | 0 | 0 |
| Chief Risk Officer | | | | |

(1)  Includes amounts paid or deferred during each year.

(2)  Amounts shown are special JPMorgan–Chase merger related awards granted in 2001 as follows: Mr. Harrison: $10,000,000 and 118,582 restricted stock units; Ms. Dublon: $1,250,000 and 29,646 restricted stock units; and Mr Layton: $5,000,000 and 59,291 restricted stock units. These awards were payable as follows: 50% of the cash portion in January 2002 and 50% in January 2003 (this is reflected in the column "Prior Merger Related — Bonus"). The restricted stock units were distributed in January 2002 for Mr. Harrison and Mr. Layton. Restricted stock units awarded to Ms. Dublon were distributed 50% in

January 2002 and 50% in January 2003.

(3) Market value of the restricted stock units awarded on February 11, 2004, relating to 2003 performance.

(4) All awards of restricted stock units are valued as of the date of grant. Dividend equivalents are payable on all restricted stock units. The number and aggregate market value of all restricted stock units held as of December 31, 2003 were as follows: Mr. Harrison: 777,415 units ($28,554,453); Mr. Coulter: 349,256 units ($12,828,173); Ms. Dublon: 308,885 units ($11,345,346); Mr. Layton: 563,442 units ($20,695,225); and Mr. Wilson: 338,889 units ($12,447,393). The foregoing numbers include awards of restricted stock units made on February 11, 2004, relating to 2003 performance and previous grants of forfeitable awards, other than awards forfeited as discussed in note 6.

(5) Amounts shown in this table for Mr. Harrison for 2001 do not include an award for 2001 performance reported as January 2002 long–term incentive awards in Table IV of JPMorgan Chase's 2002 proxy statement, which the Compensation & Management Development Committee valued at $5,200,000, based upon a grant date stock price of $36.85 per JPMorgan Chase common share. This award will be forfeited if the target price is not met by January 25, 2007. The target price will be achieved when the average of the closing prices of JPMorgan Chase common stock for 10 consecutive trading days equals or exceeds $52. Amounts shown in this table as JPMorgan–Chase merger related awards for Messrs. Harrison and Layton for 2001 also do not include awards reported as July 2001 JPMorgan–Chase merger related awards in Table IV of JPMorgan Chase's 2002 proxy statement. Such JPMorgan–Chase merger related awards were subject to the same target price and forfeiture provisions as JPMorgan Chase's January 2002 long–term incentive awards for 2001 performance for Mr. Harrison.

(6) The 2001 LTIP payout for each of Mr. Harrison, Ms. Dublon and Mr. Layton, represents the aggregate market value of JPMorgan Chase's common stock distributed to them pursuant to the vesting of long–term incentive plan restricted stock units granted on January 20, 1998. Certain of the named executive officers received awards in 1999 of restricted stock units subject to forfeiture if applicable target prices were not met on or before January 25, 2004. Such target prices of $73.33 and $83.33 were not met and the following restricted stock units were forfeited by those named executive officers who were also executive officers in 1999: Mr. Harrison: 32,429 units; Ms. Dublon: 18,366 units; and Mr. Layton: 21,621 units.

(7) Includes employer contributions to 401(k) plans. Mr. Coulter was not eligible to receive the employer contributions to the 401(k) plan in 2002 and 2003; Mr. Layton was not eligible for a portion of 2002; Mr. Wilson was not eligible in 2003. Also includes tax reimbursements in connection with non–business use of corporate aircraft where the imputed value of such use exceeded amounts paid to JPMorgan Chase by an officer, as follows: Mr. Harrison: $24,355 in 2003, $15,414 in 2002 and $28,477 in 2001; and Mr. Layton: $1,978 in 2003.

*Stock Appreciation Rights (SARs) Grant Table*

| Name | SARs granted(1) | Percent of total SARs/options granted to employees | Exercise or base price ($/share) | Expiration date | Grant date present value |
|---|---|---|---|---|---|
| William B. Harrison, Jr. | 427,928 | 1.92% | $39.96 | 2/11/2014 | $5,652.929 |
| David A. Coulter | 326,577 | 1.47% | $39.96 | 2/11/2014 | 4,314.082 |
| Dina Dublon | 178,304 | 0.80% | $39.96 | 2/11/2014 | 2,355.396 |
| Donald H. Layton | 326,577 | 1.47% | $39.96 | 2/11/2014 | 4,314.082 |
| Don M. Wilson III | 219,595 | 0.99% | $39.96 | 2/11/2014 | 2,900,850 |

(1) All grants were stock appreciation rights settled only in shares of JPMorgan Chase common stock, exercisable in two equal annual installments beginning on January 25, 2006.

For the SAR grants disclosed in the above table, present values on the grant date were determined by using the Black–Scholes option pricing model modified to take dividends into account. The values set forth in the table should not be viewed in any way as a forecast of the performance of JPMorgan Chase's common stock, which will be influenced by future events and unknown factors. The model as applied used the applicable grant date and the exercise price shown in the table and the fair market value of JPMorgan Chase's common stock on the grant date, which was the same as the exercise price. The model assumed: (i) a risk–free rate of return of 3.64%, the implied rate on 10–year U.S. Treasury zero coupon bonds on the grant date; (ii) stock price volatility of 41.38%; (iii) a constant dividend yield of 3.347%, based on the historical common stock dividend as of the grant date; and (iv) the exercise of all SARs on the final day of their 10–year terms. No discount from the theoretical value was taken to reflect the waiting period prior to vesting, the limited transferability of the SARs, and the likelihood of the SARs being exercised in advance of the final day of their terms.

120

*Aggregated Option Exercises in 2003 and Year–End Option Values*

| Name | Aggregated option exercises | | Number of securities underlying unexercised options(#) | | Value of unexercised in–the–money options($)(2) | |
|---|---|---|---|---|---|---|
| | Shares acquired on exercise (#) | Value realized ($)(1) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| William B. Harrison. Jr | 225.000 | $2.253.938 | 3,003.862 | 2,572.078 | $15.997.172 | $4.708.733 |
| David A. Coulter | 0 | 0 | 531.038 | 1,566.564 | 0 | 4.667.957 |
| Dina Dublon | 18.000 | 325,364 | 473.320 | 606,008 | 1.065.569 | 3.210.503 |
| Donald H. Layton | 120.000 | 2,511.600 | 1.325.146 | 1,303,744 | 9.690,649 | 4.586.420 |
| Don M. Wilson III | 76.000 | 1.496,489 | 614.951&sp; | 717.160 | 2,366.189 | 5.228.521 |

(1)   Where applicable, amounts indicated include values that would have been realized on exercise but were deferred into JPMorgan Chase common stock units. Option exercises were in connection with 10–year options expiring during 2003 and 2004.

(2)   Value based on $36.73, the closing price per share of JPMorgan Chase common stock on December 31, 2003

*Comparison of Five–Year Cumulative Total Return*

Below is a line graph that compares the yearly percentage change in the cumulative total stockholder return of JPMorgan Chase common stock to the cumulative total return of the S&P Financial Index and the S&P 500 Index for each of the five years in the period commencing December 31, 1998, and ending December 31, 2003. The results are based on an assumed $100 invested on December 31, 1998, and reinvestment of dividends.



| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| JPMorgan Chase | 100 | 111.59 | 100.41 | 82.79 | 57.40 | 87.84 |
| S&P Financial | 100 | 103.97 | 131.08 | 119.36 | 101.89 | 133.51 |
| S&P 500 | 100 | 121.04 | 110.02 | 96.95 | 75.52 | 97.18 |

121

## Retirement Benefits

*Retirement Plan.* Eligible U.S. employees (generally salaried employees) of those JPMorgan Chase subsidiaries that have elected to participate in the JPMorgan Chase Retirement Plan earn benefits under the plan if they have been employed for at least one year. Benefits generally become vested after five years of service. On a monthly basis, a bookkeeping account in a participant's name is credited with an amount equal to a percentage of the participant's base salary ranging from 3% to 10%, depending on years of credited service.

These accounts also receive interest credits based on average 30–year U.S. Treasury rate published for the month of October of the prior year. When a participant terminates employment, the amount credited to the participant's account is converted into an annuity or paid to the participant in a lump sum.

Certain participants who were earning benefits under The Chase Manhattan Bank Retirement Plan as of December 31, 2001, have been grandfathered in the former pay credit schedule of that plan until termination of employment. Other non–grandfathered employees who were covered by that retirement plan remained covered by such former pay credit schedule until December 31, 2003, when the new schedule took effect for them.

In addition, certain participants in the Morgan Guaranty Trust Company of New York Retirement Plan who were earning benefits under the prior formula of that plan as of December 31, 1998, are eligible for a minimum benefit. This minimum benefit is calculated by comparing at the date of distribution a participant's cash balance to the amount accrued under a prior traditional final average pay defined benefit formula using pay and credited service through the earlier of termination of employment or December 31, 2003, when the benefit was frozen.

*Supplemental Retirement Benefits.* Supplemental retirement benefits are provided to certain executive officers and certain other participants under various nonqualified, unfunded programs. Unfunded benefits are provided to certain employees, including each JPMorgan Chase executive officer, whose benefits under the plan are limited by type of compensation or amount under applicable federal tax laws and regulations. Designated JPMorgan Chase employees may also receive an unfunded annual benefit at retirement equal to a percentage of final average base pay compensation multiplied by years of service reduced by the amount of all benefits received under the plan and other nonqualified, unfunded programs. One of these programs provides a fixed retirement benefit per year of service to certain designated persons, including certain executive officers.

*Estimate of Retirement Benefits.* The following table shows the estimated annual retirement benefits, including supplemental retirement benefits under the plans applicable to the named JPMorgan Chase executive officers, that would be payable to the officers listed if they were to retire at age 65 at their 2003 base salary and payments were made in the form of a 50% joint and surviving spouse annuity, which is the normal form of payment for married employees.

### Estimated Age 65 Retirement Benefits(1)

| Name | Estimated annual retirement benefit |
|---|---|
| William B. Harrison, Jr. | $915.346 |
| David A. Coulter | 152.292 |
| Dina Dublon | 455.555 |
| Donald H. Layton | 774.235 |
| Don M. Wilson III | 404.874 |

(1) Amounts include (i) interest credits for cash balances projected to be 5.16% per year on annual salary credits and 6.45% per year on prior service balances, if any, and (ii) accrued benefits as of December 31, 2003, under applicable retirement plans, including nonqualified,

122

unfunded programs, then applicable to the named executive officer. Benefits are not subject to any deduction for social security payments.

*Termination Arrangements.* JPMorgan Chase maintains a severance policy that provides for severance in case of involuntary termination, except for cause, under which severance paid to a named executive officer would be in an amount equal to two times (three times in the case of Mr. Harrison) current base salary, plus two times (three times in the case of Mr. Harrison) such officer's three-year average cash bonus. Under the terms and conditions of restricted stock unit awards and option grants, upon a job elimination officers would be entitled to: (1) full vesting of restricted stock units, except that performance-based restrictions on restricted stock or other stock-based awards would continue; and (2) stock options (other than the Growth Performance Incentive Program stock options) would become exercisable immediately and remain exercisable for their term for persons who are retirement eligible and for up to two years for persons not retirement eligible.

As noted under "The Merger — Interests of Directors and Executive Officers in the Merger" beginning on page 59, in connection with the proposed merger with Bank One, the severance policy for Mr. Harrison will be amended, effective upon completion of the merger, so that Mr. Harrison's severance will be the greater of (a) $22.2 million or (b) three times his current base salary and three-year average annual cash performance bonus if he is terminated involuntarily without cause prior to the second anniversary of the completion of the merger.

## Additional Information about JPMorgan Chase Directors and Executive Officers

*Section 16(a) Beneficial Ownership Reporting Compliance.* JPMorgan Chase's directors and executive officers file reports with the Securities and Exchange Commission and the New York Stock Exchange indicating the number of shares of any class of the JPMorgan Chase equity securities they owned when they became a director or executive officer of JPMorgan Chase and, after that, any changes in their ownership of the JPMorgan Chase equity securities. They must also provide JPMorgan Chase with copies of these reports. These reports are required by Section 16(a) of the Securities Exchange Act of 1934. JPMorgan Chase has reviewed the copies of the reports received and written representations from the individuals required to file the reports. Based on this review, JPMorgan Chase believes that during 2003 each of the JPMorgan Chase directors and executive officers has complied with applicable reporting requirements for transactions in the JPMorgan Chase equity securities.

*Extensions of Credit to Directors and Officers.* In the ordinary course of business, JPMorgan Chase's subsidiaries have made loans and extended credit, and expect in the future to make loans and extend credit, to JPMorgan Chase's directors, officers, and their associates, including corporations of which these individuals may be a director, officer, or both. None of these loans is preferential or nonperforming, and JPMorgan Chase believes that all are in conformity with the Sarbanes-Oxley Act.

*Director and Officer Transactions and Other Business Relationships.* In the ordinary course of business, JPMorgan Chase may use the products or services of organizations of which the JPMorgan Chase directors are officers or directors. Mrs. Kaplan is Of Counsel to a law firm that has provided and is expected during 2004 to provide certain legal services to JPMorgan Chase from time to time.

Approximately 2,600 employees may invest on an after-tax basis in a pool of investments that become available to JPMorgan Chase primarily through the activities of JPMorgan Partners. Participating employees purchase an interest in a limited partnership, the general partner of which is a JPMorgan Chase subsidiary. JPMorgan Chase makes a preferred equity capital contribution to the partnership in an amount equal to three times the amounts invested by the employee participants and is entitled to receive a fixed annual return specified under the terms of the limited partnership agreement.

123

The partnership invests alongside JPMorgan Chase. Upon distribution of partnership assets, JPMorgan Chase is entitled to a priority in the return of its preferred equity contribution, plus the fixed annual return, before distribution of any remaining assets to the employee participants based on their capital contributions. The outstanding balance as of December 31, 2003, of the aggregate preferred equity contributions made by JPMorgan Chase for the named executive officers, from the year that person became an executive officer through 2001, were as follows: Mr. Harrison: $1,972,960; Mr. Coulter: $1,300,238; Ms. Dublon: $708,530; and Mr. Layton: $2,298,508. The named executive officers and the other members of JPMorgan Chase's Executive Committee were not eligible to participate in this program commencing in 2002.

*Compensation Committee Interlocks and Insider Participation.* No member of the Compensation & Management Development Committee is or ever was a JPMorgan Chase officer or employee. No member of the committee is, or was during 2003, an executive officer of another company whose board of directors has a comparable committee on which one of JPMorgan Chase's executive officers serves.

## Audit Committee Report

The Audit Committee of the JPMorgan Chase board of directors is composed of non–management directors and operates under a written charter adopted by the board of directors, a copy of which is attached as Annex H to this document.

JPMorgan Chase management is responsible for JPMorgan Chase's internal controls and the financial reporting process. The external auditor is responsible for performing an independent audit of JPMorgan Chase's consolidated financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In this context, JPMorgan Chase's Audit Committee has met and held discussions with management, the internal auditor and the external auditor. Management represented to the committee that JPMorgan Chase's consolidated financial statements were prepared in accordance with generally accepted accounting principles, and the committee has reviewed and discussed the consolidated financial statements with management and the external auditor. The committee discussed with the external auditor matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees).

JPMorgan Chase's external auditor also provided to the Audit Committee the written disclosures required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), and the committee discussed with the external auditor that firm's independence.

Based on the Audit Committee's discussion with management, the internal auditors, and the external auditor and the committee's review of the representations of management and of the internal auditors, and the report of the external auditor to the committee, the committee recommended to JPMorgan Chase's board of directors, and the board has approved, that the audited consolidated financial statements be included in JPMorgan Chase's Annual Report on Form 10–K for the year ended December 31, 2003, for filing with the Securities and Exchange Commission. The Audit Committee also approved, subject to stockholder ratification, the selection of JPMorgan Chase's external auditor.

The Audit Committee reviewed its charter and practices in 2003 and adopted a revised charter in January 2004. The committee determined that its charter and practices are consistent

with listing standards of the New York Stock Exchange and the provisions of the Sarbanes–Oxley Act of 2002.

Dated as of February 17, 2004

*Audit Committee*
M. Anthony Burns (Chairman)
Hans W. Becherer
Frank A. Bennack, Jr.
John H. Biggs (Vice Chairman)
**JPMorgan Chase Proposal 3: Appointment of External Auditor**

The Audit Committee of JPMorgan Chase's board of directors has appointed PricewaterhouseCoopers LLP, 1177 Avenue of the Americas, New York, NY 10036, as external auditor to audit the financial statements of JPMorgan Chase and its subsidiaries for the year ended December 31, 2004. A resolution will be presented at the meeting to ratify their appointment.

**Fees Paid to PricewaterhouseCoopers LLP**

The fee categories have been classified as Audit, Audit–related, Tax and All other, in line with the Securities and Exchange Commission's new proxy disclosure requirements pursuant to the implementation of the Sarbanes–Oxley Act of 2002.

Aggregate fees for professional services rendered for JPMorgan Chase by PricewaterhouseCoopers LLP for the years ended December 31, 2003 and 2002, were:

|  | 2003 | 2002 |
|---|---|---|
|  | ($ in millions) | |
| Audit | $25.1 | $22.8 |
| Audit–related | 17.3 | 16.8 |
| Tax | 10.3 | 15.1 |
| All other | 0.7 | 14.5 |
| Total | $53.4 | $69.2 |

*Audit fees.* Audit fees for the years ended December 31, 2003 and 2002, were $22.1 million and $19.0 million, respectively, for the annual audit and quarterly reviews of the consolidated financials statements and $3.0 million and $3.8 million, respectively, for services related to statutory/subsidiary audits, attestation reports required by statute or regulation, and comfort letters and Securities and Exchange Commission consents.

*Audit–related fees.* Audit–related fees are comprised of assurance and related services that are traditionally performed by the external auditor. These services include audits of non–consolidated entities, and other attest and agreed–upon procedures not required by statute or regulation, which address accounting, reporting and control matters. These are normally provided by PricewaterhouseCoopers LLP in connection with the recurring audit engagement. Under previous proxy reporting rules, many of these services were required to be included in the All other fees category.

*Tax fees.* Tax fees relate primarily to assistance with tax return compliance.

*All other fees.* As stated in the 2003 proxy statement, JPMorgan Chase's current policy restricts the use of PricewaterhouseCoopers LLP to audit, audit–related and tax services only. For 2003 and 2002, All other fees represent multi–year projects in process of completion prior to adoption of this policy. For 2002 All other fees, the majority of these services were completed by

125

the former consulting arm of PricewaterhouseCoopers LLP and involved implementation of new human resource systems and assistance with JPMorgan Chase merger–related integration.

**Audit Committee Pre–Approval Policies and Procedures**

JPMorgan Chase's policy on the use of PricewaterhouseCoopers LLP services is not to engage its external auditor for services other than Audit, Audit–related, and Tax services.

The Sarbanes–Oxley Act of 2002 required JPMorgan Chase to implement a pre–approval process for all engagements with its external auditor. In response to the Sarbanes–Oxley requirements pertaining to Auditor Independence, JPMorgan Chase's Audit Committee adopted pre–approval procedures for Audit, Audit–related, and Tax services that are reviewed and ratified annually. These procedures require that the annual Audit services engagement terms and fees be pre–approved by JPMorgan Chase's Audit Committee. For Audit–related and Tax services, the Audit Committee has pre–approved a list of these services as documented in the pre–approval policy. All requests or applications for PricewaterhouseCoopers LLP Audit–related and Tax services must be submitted to JPMorgan Chase's Corporate Controller to determine if such services are included within the list of services that have received Audit Committee pre–approval as listed in the pre–approval policy. All requests for Audit–related and Tax services not included in the pre–approval policy must be specifically approved by the Audit Committee. In addition, all fee amounts in excess of pre–approved fee amounts must be specifically approved by the Audit Committee. JPMorgan Chase's pre–approval policy does not provide for a de minimus exception pursuant to which the requirement for pre–approval may be waived.

All internal auditing is performed under the direct control of the General Auditor, who is accountable to JPMorgan Chase's Audit Committee.

A member of PricewaterhouseCoopers LLP will be present at JPMorgan Chase's annual meeting, will have the opportunity to make a statement, and will be available to respond to appropriate questions by stockholders.

**Votes Required**

The affirmative vote of a majority of the total number of shares of common stock represented at the JPMorgan Chase annual meeting and entitled to vote is needed to ratify their appointment. If the stockholders do not ratify the appointment of PricewaterhouseCoopers LLP, the selection of the external auditor will be reconsidered by the Audit Committee of JPMorgan Chase's board of directors.

**JPMorgan Chase's board of directors recommends that stockholders vote FOR ratification of the appointment of PricewaterhouseCoopers LLP.**

### JPMorgan Chase Proposals 4–12: Stockholder Proposals

If a majority of the shares of common stock represented at the JPMorgan Chase annual meeting and entitled to vote are voted in favor of any of the following proposals, then the proposals will be approved.

**JPMorgan Chase Proposal 4**

Mrs. Evelyn Y. Davis, Watergate Office Building, 2600 Virginia Avenue, N.W., Suite 215, Washington, D.C. 20037, the holder of record of 1,044 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that she plans to introduce the following resolution:

"RESOLVED: That the stockholders of J.P. Morgan Chase recommend that the Board take the necessary steps so that future outside directors shall not serve for more than six years.

126

"REASONS: The President of the U S A  has a term limit, so do Governors of many states

"Newer directors may bring in fresh outlooks and different approaches with benefits to all shareholders

"No director should be able to feel that his or her directorship is until retirement.

"If you AGREE, please mark your proxy FOR this resolution."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

The board believes that adoption of an arbitrary limit on a director's term of office would not serve the best interests of JPMorgan Chase's stockholders  As stated in JPMorgan Chase's Corporate Governance Practices, the JPMorgan Chase board "does not believe it appropriate to institute fixed limits on the tenure of directors because the firm and the board would thereby be deprived of experience and knowledge."

JPMorgan Chase is a large and complex financial services company, and to perform their responsibilities effectively, directors must develop familiarity with JPMorgan Chase's management and products, as well as the business and regulatory environment in which JPMorgan Chase operates. A director's years of service enhance his or her experience by adding to the director's knowledge of JPMorgan Chase, its business and management, and its performance in different phases of the economic cycle.

Freshness of outlook and differences in approach are achieved by the board's diversity of background  The current board is the product of a series of mergers, each of which resulted in a board including directors from both constituent corporations. After the proposed merger with Bank One, the board of directors of JPMorgan Chase will have sixteen members, consisting of eight directors from JPMorgan Chase and eight directors from Bank One. See "The Merger — Board of Directors and Management After the Merger" beginning on page 63  The resulting board members will each bring different experience and perspectives to their roles.

As proposed, the six–year limit would apply only to new board members and therefore could be deemed to apply only to former Bank One directors. That result would be contrary to the objectives of the merger and not in the interests of stockholders.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

**JPMorgan Chase Proposal 5**

Mr. Raymond B  Ruddy, 26 Rolling Lane, Dover, MA 02030, the holder of 184 shares of common stock, has advised JPMorgan Chase that he intends to introduce the following resolution:

"Resolved, J.P  Morgan Chase & Co  cease making charitable contributions.

"Supporting Statement: Thomas Jefferson once wrote, "To compel a man to furnish contributions of money for propagation of opinions which he disbelieves is sinful and tyrannical." Choice is a popular word in our culture. Noble prize winning economist and long time critic of corporate charitable contributions, Milton Friedman, writes about the importance of choice in his book, Free to Choose  By making charitable contributions at the corporate level we have usurped the right and duty of individuals to support the charities of their choice  We may also be forcing thousands of people to support causes they may disagree with on a most profound level  For example, abortion rights advocates often use the word choice, without mentioning what the choice is all about, i e , abortion. Today there are a number of prominent charities advocating for abortion and, in at least one case, Planned Parenthood, actually performing abortions. Other charities, often times involved in research for cures of disease, may advocate the destruction of

127

human embryos for research purposes. These may be more controversial examples, but they illustrate the point today, many charities are involved in activities that are divisive and not universally supported. J.P. Morgan Chase & Co. employees and shareholders represent a broad range of interests. It is truly impossible to be sensitive to the moral, religious and cultural sensitivities of so many people. Rather than compel our stakeholders to support potentially controversial charitable groups we should refrain from giving their money away for them. Let each person choose. The importance of individual choice and the importance of each individual cannot be underestimated."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

This proposal is substantially similar to one submitted in 2003. As noted last year, JPMorgan Chase is proud of its long history of charitable giving.

The J.P. Morgan Chase Foundation, which is funded by JPMorgan Chase, concentrates its contributions in three areas — Community Development & Human Services; Pre-collegiate Public Education; and Arts & Culture. This emphasis reflects JPMorgan Chase's conviction that, by enhancing the lives of JPMorgan Chase's customers and employees and improving the communities in which they live, we are strengthening JPMorgan Chase's business franchise and thereby adding stockholder value. JPMorgan Chase has a vital business interest in ensuring and improving the vitality of the markets we serve, because if they thrive, we thrive.

It is also important to note that many regulators, both in the United States and abroad, view strong corporate citizenship as an important part of doing business. In the U.S., financial institutions such as JPMorgan Chase are required to meet certain community development standards, including grants made in low- and moderate-income communities that might be deemed precluded by the proposal. Moreover, in connection with the proposed Bank One merger, JPMorgan Chase has committed to increase the annual level of charitable giving in the Chicago metropolitan area beyond the current level of Bank One's contributions in that area, and that commitment has been communicated to the Federal Reserve as part of the application for merger approval.

JPMorgan Chase's board is confident that, far from damaging JPMorgan Chase's reputation with any of its constituencies, corporate giving strengthens JPMorgan Chase's role as a good citizen and a good neighbor. Additional information on JPMorgan Chase's charitable and other community activities is available in our 2003 Community Partnership Report and our 2003 Corporate Responsibility Report, both available at www.jpmorganchase.com.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

## JPMorgan Chase Proposal 6

SEIU Master Trust, 1313 L Street, N.W., Washington D.C. 20005, the holder of 73,090 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that it intends to introduce the following resolution:

"Resolved, that the shareholders of J.P. Morgan Chase & Co. (the "Company") hereby request that the Company prepare and submit to the shareholders of the Company a separate report, updated annually, containing the following information:

"a. Policies for political contributions made with corporate funds, political action committees sponsored by the Company, and employee political contributions solicited by senior executives of the Company. This shall include, but not be limited to, policies on contributions and donations to federal, state and local political candidates, political parties, political committees and other political entities organized and operating under 26 USC Sec. 527;

128

"b  An accounting of the Company's resources, including property and personnel, contributed or donated to any of the persons and organizations described above;

"c  A business rationale for each of the Company's political contributions or donations; and

"d. Identification of the person or persons in the Company who participated in making the decisions to contribute or donate
"Statement of Support: As shareholders, we support policies that apply transparency and accountability to corporate political giving.

"There is currently no single source of information providing comprehensive disclosure to the Company's shareholders on political contributions made with corporate funds. Without full transparency, we believe Company executives may be able to inappropriately direct corporate resources for political purposes and make decisions unilaterally without a stated business rationale for such donations.

"The result is that shareholders are unaware of how and why the Company chooses to make corporate contributions and the political ends being furthered by the gift of corporate funds. Company officials may, in fact, be funding groups and candidate whose agendas are not in the best interest of the Company and its shareholders.

"According to the Center for Responsive Politics, a leading campaign finance watchdog organization, our Company contributed $196,000 to major party committees and political dinners in the 2002 election cycle. However, shareholders do not know whether that is the full extent of the utilization of our Company's resources for political purposes.

"In our view absent a system of accountability, corporate executives will be free to use the Company's assets in ways that could pose reputational and legal risks for the company.

"For these reasons, we urge a vote FOR this resolution."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

JPMorgan Chase does not (and is not legally permitted to) use corporate funds to make political contributions in connection with federal elections. Contributions made by JPMorgan Chase to state and local candidates and committees, while legally permitted, are very limited, and all such contributions are required to be reported by the recipient and are a matter of public record.

The JPMorgan Chase–sponsored political action committee makes political contributions at the federal, state and local level; however, no corporate funds are used since all political action committee funds come from voluntary contributions made by officers of JPMorgan Chase. Political action committee contributions are generally made to candidates who are involved in banking issues or other legislative matters that directly affect JPMorgan Chase and its business.

As required by law, all political action committee contributions are reported on a periodic basis to the Federal Elections Commission and to relevant state election authorities and, as stated above, are a matter of public record.

JPMorgan Chase's board believes that the disclosure currently being made regarding political contributions is appropriate and that any additional disclosure would entail additional expense to JPMorgan Chase's stockholders with no attendant benefit.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

**JPMorgan Chase Proposal 7**

Mr. Richard A. Dee, 115 East 89th Street, New York NY 10128, the holder of 200 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that he intends to introduce the following resolution:

"Stockholders hereby request that the JPMorgan Chase Board of Directors adopt promptly a resolution requiring that the Chairman of the Board serve in that capacity only, and have no management duties, titles or responsibilities.

"When a person acts, for example, as both a corporation's chairman and its CEO, a vital separation of power and responsibility is eliminated — and the owners of the corporation, its stockholders, are deprived not only of a crucial protection against conflicts of interest, they are deprived of a clear and direct channel of communication with the corporation.

"What stockholder–damaging conflicts of interest can be more serious than those that so often occur when overseers are allowed to oversee and supervise themselves? When a corporation's chairman is also its CEO, such conflicts can and do happen.

"It is well to remember that at Enron, WorldCom, Tyco, and other legends of mismanagement and/or corruption, the chairmen also served CEO's. And their dual roles helped those individuals to achieve virtually total control of the companies.

"Clearly, when a chairman runs a company, the information received by directors and others may or may not be accurate. If a CEO wants to cover up corporate improprieties, how difficult is it to convince subordinates to go along? If they disagree, with whom do they lodge complaints? The chairman?

"As banker, investment banker, and concerned and outspoken stockholder, my experience with corporate chairmen, presidents, CEO's, and directors has been very considerable. And I do not come lately to Corporate Governance. The term was new when, in 1979, I originated and sponsored the first Corporate Governance proposal ever voted upon — at 3M Company, calling upon it to reconstitute its board so that a majority of directors would be non–management Outside Directors.

"Few individual stockholders know enough about companies to questions their activities, and institutional investors, many of whom know just as little, are too busy currying favor with managements to have the guts to questions them — and by doing so risk loss of access to the widely profitable "Inside Information Superhighway". That combination of stockholders has proven a recipe for disaster.

"Stockholders must continue to expect the unexpected unless and until they demand that company boards be composed of substantial majorities of independent and objective outside directors who are particularly well–qualified to serve their interests — and until directors select as chairmen those who are independent of managements.

"While individual stockholders are responsible only to themselves, institutional stockholders are responsible to millions of investors. All too often they have betrayed not only their moral obligations, but their duties as fiduciaries.

"Efforts to improve Corporate Governance have been embodied increasingly in stockholder proposals such as this — which have been opposed almost universally by institutional stockholders. It is time for those whose financial futures are in the hands of money managers to inform those fiduciaries that they expect them to recognize their duties and to fulfill their legal obligations. There is no other priority. Voting in favor of this proposal will help.

"Please vote FOR this proposal."

130