# Tab B

# Part 4

## to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

As stated in JPMorgan Chase's Corporate Governance Practices, the JPMorgan Chase board "currently does not have a non–executive chairman but has no set policy on whether or not to have one." The board believes that the determination of whether to unify or separate the positions of Chairman and Chief Executive officer should be made based on pragmatic considerations, not fixed policy.

Currently, Mr. Harrison serves as JPMorgan Chase's Chairman and Chief Executive Officer. As part of the proposed merger of JPMorgan Chase and Bank One, the boards of the two companies have approved a governance structure under which, following the merger, Mr. Harrison will continue in those positions and Mr. Dimon will become President and Chief Operating Officer of JPMorgan Chase. As of the second anniversary of the merger (or such earlier date as Mr. Harrison ceases to serve as Chief Executive Officer), Mr. Dimon will become Chief Executive Officer and Mr. Harrison will continue to serve as Chairman of JPMorgan Chase. See "The Merger — Board of Directors and Management After the Merger" beginning on page 63.

This proposal would be inconsistent with the above carefully formulated structure and the board of directors believes that the interests of JPMorgan Chase's stockholders are best served by the arrangement contemplated by the merger agreement.

The board notes that JPMorgan Chase has put in place a number of practices designed to preserve the integrity of its board's independent oversight of the firm's business:

- JPMorgan Chase's Corporate Governance Practices include, among other things, a detailed definition of director independence.

- A supermajority of JPMorgan Chase's directors are independent.

- All of JPMorgan Chase's key board committees are composed entirely of independent directors.

- Committees members and chairmen are nominated by JPMorgan Chase's Governance Committee, which is composed entirely of independent directors.

- The performance of JPMorgan Chase's Chief Executive Officer is reviewed annually by the Compensation Committee, which is composed entirely of independent directors.

- Independent members of JPMorgan Chase's board meet in executive session, without management directors, at least twice a year: once in January to review the Chief Executive Officer's performance, and once in July to assess the board's own performance. These meetings are chaired by independent committee chairmen. Additional executive sessions of JPMorgan Chase's board may be convened at any time. All executive sessions are chaired by an independent committee chairman.

- JPMorgan Chase's board and committees are authorized to engage their own professional advisors to assist them in the discharge of their responsibilities, with the costs of such advisors borne by JPMorgan Chase.
  Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

## JPMorgan Chase Proposal 8

Missionary Oblates of Mary Immaculate, 391 Michigan Avenue, NE, Washington DC 20017, the holders of 50,850 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that they intend to introduce the following resolution which is co–sponsored by School Sisters of Notre Dame Cooperative Investment Fund; Maryknoll Sisters of St. Dominic, Inc.; Maryknoll

131

Fathers & Brothers; Community of the Sisters of St. Dominic of Caldwell New Jersey; Sisters of St. Francis of Philadelphia; Sisters of Charity of Saint Elizabeth; General Board of Pension and Health Benefits of The United Methodist Church; Congregation of the Passion; and Grand Rapids Dominicans, each of which is the beneficial owner of at least 100 shares of common stock:

"Whereas: Since the Federal Reserve Chairman Alan Greenspan, Warren Buffet and Robert Rubin have all expressed deep concerns about various aspects of derivatives trading and the extensive use of derivatives throughout the economy, there is a need to improve both the management of credit risk and market transparency in over–the–counter derivatives markets;

"J.P. Morgan Chase is one of the largest, if not the largest, participant in the overall derivatives markets. According to the U.S. Office of the Comptroller of the Currency, J.P. Morgan Chase had $34.7 trillion in derivatives on their books (measured in notional value for the holding company) as of September 30, 2003. The bank acts as a dealer in many derivatives markets and uses 99.5% of its derivatives for trading purpose with only 0.5% used for other purchases such as hedging its banking activity;

"Derivatives transactions, especially in the amount needed to act as a dealer in OTC derivatives markets, can create large amounts of credit risk exposure. As a result of this activity, the Office of the Comptroller of the Currency reported that J.P. Morgan Chase Bank had $354.8 billion in total credit exposure — after bilateral netting — through its derivatives trading alone. This total credit exposure is equal to 783% of capital, and it is more than three times higher than that for other U.S. bank.

"A study of the credit derivatives market conducted by Fitch in 2003 reported several critical concerns about the impact of credit derivatives on financial markets, and stated: 'Without enhanced disclosure it is virtually impossible for the average investor or counterparty to assess the influence of credit derivatives on an institution's risk profile.'

"For shareholders to properly assess the credit risk of the corporation, we believe this disclosure should include the following statements:

- Collateral management policy of the corporation towards its OTC derivatives counterparties. This should include the threshold levels at which collateral is required of the corporation or its counterparties to mitigate its credit exposure, the types of assets that are accepted as collateral (and their haircuts), and the time limits for when required adjustments to collateral must be completed;

- Credit ratings of the corporation's OTC derivatives counter parties broken down according to the credit rating scale used by Standard & Poor's or Moody's, with the figures showing notional value, present value and future potential exposure of outstanding OTC contracts for each grade of credit rating;

- The value at risk from changes in interest rates, exchange rates, equity prices and commodity prices,

- The notional value of all derivatives holdings broken down by exchange traded and OTC, maturity, product and type,

- Credit derivatives exposure that augments current disclosure requirements by breaking down notional and gross fair value figures according to the credit rating scale used by Standard & Poor's or Moody's.

"RESOLVED: That the Board of Directors develop policies to provide shareholders with adequate disclosure of the collateral for over–the–counter derivatives, via the corporate website and a report to shareholders."

JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:

JPMorgan Chase is fully committed to being the market leader in disclosure of credit risk of all forms. In its 2003 Annual Report, JPMorgan Chase has enhanced the disclosure regarding derivatives transactions, in the interest of providing full information on the firm's credit risk management practices. Information on derivatives risk that is relevant to the key risk management practices of the firm goes well beyond the items listed in the resolution and is fully disclosed. To the extent not disclosed, we believe that the information requested by the sponsors of this proposal is not relevant to an assessment of JPMorgan Chase's overall risk profile, is not made by our competitors, and would be detrimental to our competitive position.

Information on JPMorgan Chase's derivatives collateralization is available in JPMorgan Chase's 2003 Annual Report in the Credit Risk Management section, pages 51 through 65, and in Management's Discussion and Analysis on pages 22 through 80. JPMorgan Chase's pre–collateral mark–to–market exposure in derivatives is $84 billion, not $360 billion. As a market leader in derivatives, JPMorgan Chase has long used cash and securities collateral as a primary form of credit risk mitigation. Disciplined application of this practice has resulted in 78% of JPMorgan Chase's derivatives transactions being subject to collateral agreements (an increase from 67% at year–end 2002), as noted on page 60 of the 2003 Annual Report; collateral currently held by JPMorgan Chase covers 43% of the firm's derivatives receivables (an increase from 36% at year–end 2002).

The 2003 Annual Report also addresses the maturity profile of derivative receivables (page 55), and the risk profile from investment–grade to non–investment–grade related to the JPMorgan Chase derivatives transactions and credit derivative hedges (page 55). At the bottom of page 58, the notional amounts, listed by type of derivative, are disclosed. Value at risk information is provided on page 67 of the Market Risk Management section of Management's Discussion and Analysis. Pages 51 through 55 includes information on how JPMorgan Chase has strengthened its credit risk management practices in 2003.

In addition, JPMorgan Chase's Forms 10–Q, filed with the Securities and Exchange Commission on a quarterly basis, contain updated figures on derivatives transactions and related credit risk management.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

## JPMorgan Chase Proposal 9

United Brotherhood of Carpenters Pension Fund, 101 Constitution Avenue, N.W., Washington DC 20001, the holders of 34,200 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that they intend to introduce the following resolution:

"Resolved, that the shareholders of J.P. Morgan Chase & Co. ("Company") request that the Board of Directors and its Audit Committee adopt a policy stating that the public accounting firm retained by our Company to audit the Company's financial statements will perform only "audit" and "audit–related" work for the Company and not perform services generating "tax fees" and "all other fees" as categorized under U.S. Securities and Exchange Commission ("SEC") regulations.

"Supporting Statement: The issue of auditor independence has been a major concern for investors and the markets since the demise of Enron. In response to numerous incidences of accounting fraud that shook the foundations of the corporate financial auditing and reporting system, both Congress and the SEC have responded with important reforms. However, we believe that more needs to be done to limit the potential impairment of auditor independence.

133

"The Sarbanes–Oxley Act ("Sarbanes–Oxley") was a strong effort to deal with various aspects of the auditor independence issue. Sarbanes–Oxley enhanced the role of board audit committees in retaining and monitoring audit firms, while limiting the types of non–audit services that audit firms are permitted to perform for audit clients. The SEC followed–up with enhanced reporting requirements (Release No. 33–8183, May 6, 2003) that provide investors better insight into the range of services beyond audit services for which an audit firm is being utilized. The following categories of service fees must be reported: (1) Audit Fees; (2) Audit–Related Fees; (3) Tax Fees; and (4) All Other Fees.

"We believe important steps have been taken to protect auditor independence but we also believe more needs to be done. The Congress and the SEC have acted. Now we think it is important that shareholders use the enhanced disclosure to protect the integrity of the financial reporting system.

"Fee disclosures indicate that our Company paid the firm retained to audit the Company's financial statements more for non–audit services than for the audit work. Specifically, our Company paid more in combined fees for 7audit–related," "tax" and "all other" work performed by the audit firm than it did for the "audit" work performed by the firm. We believe this imbalance is unhealthy and a potential threat to auditor independence at our Company. Further, when this imbalance occurs we believe it is time for the Board's Audit Committee to adopt a policy that addresses the issue.

"Our resolution presents a straightforward and effective response: The Board and the Audit Committee should adopt a policy that limits the public accounting firm retained to audit the Company's financial statements to performing only "audit" and "audit–related" work. We believe that limiting the audit to providing only audit and audit–related services would be another positive step in protecting auditor independence.

"We urge your support for this reasonable measure to advance auditor independence."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

JPMorgan Chase's board believes in the importance of auditor independence. Current laws and regulations impose restrictions on non–audit services by a company's external auditor, and JPMorgan Chase has implemented policies on this subject as well. In view of the controls already adopted, JPMorgan Chase believes the restrictions proposed in this resolution are unnecessary and would deprive JPMorgan Chase of useful, permitted services by the external auditor, PricewaterhouseCoopers LLP.

The Sarbanes–Oxley Act of 2002 includes limitations on the use of a public company's auditor for services that are not audit–related but permits the engagement of the external auditor for allowed non–audit services with the approval of the public company's Audit Committee.

In 2002, JPMorgan Chase's Audit Committee adopted a policy restricting the use of JPMorgan Chase's external auditor to audit, audit–related, and tax services, and requiring that the Audit Committee review and approve all non–audit engagements. In accordance with that policy, the Audit Committee reviews all non–audit engagements of our external auditor in advance, in order to assure that the provision of such services does not impair the auditor's independence. The Audit Committee report beginning on page 124 of this document describes the pre–approval policies and procedures for such services and reflects the fees paid by JPMorgan Chase to PricewaterhouseCoopers LLP in 2003 in each category.

The adoption of the proposed limitations would put JPMorgan Chase at a competitive disadvantage. Given the limited number of internationally recognized accounting firms, JPMorgan Chase needs to have some flexibility to choose the best qualified to provide advice on complex

issues, within the limits imposed by applicable law and regulations and the Audit Committee's overall responsibility to assure the integrity of the audit process

Accordingly, the JPMorgan Chase board recommends a vote against this proposal

## JPMorgan Chase Proposal 10

Daniel F. Case, 6716 Tildenwood Lane, Rockville, MD 20852, the holder of record of 2,761 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that he intends to introduce the following resolution:

"RESOLVED: That the stockholders recommend that the Board present each year for stockholder approval the Board's proposed plan of compensation of non–employee directors for the upcoming year. Further, that whenever the stockholders do not approve the Board's proposal, such compensation be set at a fallback level approximately equal in value to 95% of the compensation made effective at the preceding annual meeting, such percentage to be adjusted to reflect any change in the consumer price index over the latest 12–month period. Further, that the fallback level for the year 2005–6, if applicable, be based on the 2002–3, rather than the 2004–5, compensation

"REASONS: The Board itself now determines the compensation of non–employee directors. That procedure creates an obvious conflict of interest. To remedy the situation, at least partially, this proposal would give the stockholders the final say.

"Not only the non–employee directors' compensation, but also that of Company executives may be influenced by the present state of affairs. If the stockholders feel no need to exert meaningful control over the directors' compensation, the directors may feel less pressure to exert meaningful control over the executives' compensation than they otherwise would. Although this proposed resolution does not seek to influence executive compensation directly, it does seek to have a moderating effect on executive pay.

"This proposed resolution calls for the compensation to be reduced slightly whenever the stockholders do not approve the Board's proposal. The purpose of this feature is to enhance the possibility that directors' pay will sometimes go down, not up. For the first time when the proposed procedure would be in effect (i.e., for the year 2005–6), the size of the reduction would be based on the level of compensation in effect as of the latest proxy statement before this proposed resolution was submitted. The purpose is to avoid rendering the fallback feature meaningless in the event that the compensation level has been increased, or will be increased, since the appearance of that proxy statement.

"The fallback levels relate to the average across all non–employee directors, whose relative amounts of compensation according to committee assignments, etc. could be made to differ from what they were in the earlier year. In determining the fallback level, the value of the compensation made effective at the earlier date is to be measured as of that date — as for example in the case of restricted stock, whose value changes over time.

"I believe the investing public should make itself felt on the matter of corporate emolument. I urge you to vote FOR this proposal."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

This proposal is substantially similar to a proposal submitted in 2003. As we indicated in 2003, JPMorgan Chase believes that it is essential that JPMorgan Chase be able to attract and retain talented and highly qualified board members to serve as directors. Director compensation is an integral part of JPMorgan Chase's ability to achieve this goal, and the board's current compensation is set forth on page 113.

135

As stated in JPMorgan Chase's Corporate Governance Practices, JPMorgan Chase's Governance Committee makes periodic recommendations to the JPMorgan Chase board regarding executive compensation based on a comparison with relevant peer groups and advice from independent consultants. JPMorgan Chase's board has also recognized that a significant portion of director compensation should be linked to JPMorgan Chase's common stock, so it has formulated its compensation package to consist of approximately one–third cash and two–thirds stock based compensation. The stock–based compensation is in the form of common stock equivalents, which must remain indexed to JP Morgan Chase's common stock until a director's termination of service.

Recent legislative and regulatory initiatives have imposed increased obligations and potential liability on corporate directors. It is today even more important to maintain JPMorgan Chase's competitive position in terms of director compensation in order to attract and retain highly qualified board members to serve JPMorgan Chase. JPMorgan Chase's board believes that, in seeking to establish director compensation levels and types commensurate with those of its peers and competitors, it is acting to protect the interests of its stockholders.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

## JPMorgan Chase Proposal 11

The Catholic Equity Fund, 1100 West Wells Street, Milwaukee, WI 53233, the holder of 5,700 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that they intend to introduce the following resolution, which is co–sponsored by New York Yearly Meeting Religious Society of Friends; Sisters of St. Francis of Dubuque, Iowa; CHRISTUS Health; and The Needmor Fund, each of which is the beneficial owner of at least 100 shares of JPMorgan Chase common stock:

"WHEREAS, in its 2003 survey of pay for U.S. chief executive officers, *Business Week* noted that, "while average exec pay plunged by a third, the median pay for our 365 CEOs actually rose by 5.9%, to $3.7 million." *BW* stated: "With the most gargantuan pay packages scaled back ... that's not to say that pay for performance has been embraced everywhere." (*BW* 04/21/03). Other studies show that CEO pay rose from 100 times the average worker wage in 1980 to more than 1,000 times the average worker wage in 1995 (*FT* 09/19/03).

"Earlier *Business Week* editorialized (04/22/02): "The size of CEO compensation is simply out of hand." For its part The Conference Board issued a report acknowledging that executive compensation has become excessive in many instances and bears no relationship to a company's long–term performance and that changes must be made (09/17/02).

"New York Fed President, William J. McDonough, while acknowledging a market economy requires that some people will be rewarded more than others, has asked: "should there not be both economic and moral limitations on the gap created by the market–driven reward system?" According to *The Wall Street Journal*, McDonough has cited "the biblical admonition to 'love thy neighbor as thyself' as justification for voluntary CEO pay cuts' beginning with the strongest companies. He has said: "CEOs and their boards should simply reach the conclusion that executive pay is excessive and adjust it to more reasonable and justifiable levels" (09/12/02).

"A 2002 Harris Poll found that "87 percent of all adults believe that most top company managers are paid more than they deserve, and that they become rich at the expense of ordinary workers." Two–thirds of respondents believed that rewards in the workplace were distributed less fairly than they had been five years before (Harris Interactive press release, 10/18/02).

"RESOLVED: shareholders request the Board's Compensation Committee to initiate a review of our company's executive compensation policies and to make available, upon request, a report

136

of that review by January 1, 2005 (omitting confidential information and processed at a reasonable cost) We request the report include:

1. A comparison of the total compensation package of top executives and our company's lowest paid workers in the United States in July, 1994 and July, 2004.

2. An analysis of changes in the relative size of the gap between the two groups and the rationale justifying this trend.

3. An evaluation of whether our top executive compensation packages (including, but not limited to, options, benefits, perks, loans and retirement agreements) are "excessive" and should be modified.

4. An explanation of whether the issues of sizable layoffs or the level of pay of our lowest paid workers should result in an adjustment of executive pay to "to more reasonable and justifiable levels" as suggested by William J. McDonough above.
"**Supporting Statement:** When our top officials are given such excessive packages shareholders need to provide checks and balances. Please support this resolution."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

JPMorgan Chase's board believes that the proposed report would not be informative and therefore would not justify the expense of its preparation.

The report of the Compensation & Management Development Committee beginning on page 116 addresses JPMorgan Chase's compensation policy for its executive officers. Compensation at all levels is intended to be competitive with that of other employers in JPMorgan Chase's market so as to attract and retain talented employees.

More broadly, JPMorgan Chase strives to be the employer of choice for its employees. At JPMorgan Chase's various locations, we seek to offer compensation packages that are competitive with those of other top companies in the market because competitive pay is essential to attracting and retaining qualified and enthusiastic personnel at all levels — and they, in turn, are essential to the success of our business endeavors.

JPMorgan Chase is proud of its record of fairness and concern for the welfare of those who work at the firm. In addition to competitive wages, JPMorgan Chase makes a wide array of benefits generally available to employees. These include, for example, for workers in the United States: a choice of affordable health and dental insurance plans, life, accident, disability, long–term care, and other insurance programs, and retirement savings plans, all partially funded by the company; tuition reimbursement and scholarship programs; flexible work arrangements; a free employee assistance program providing counseling services in times of personal crisis; and significant employee discounts on many widely–used commercial products.

JPMorgan Chase does not believe historical comparisons to be relevant to the appropriateness of its present compensation policies. The company that is now JPMorgan Chase did not exist in 1994. JPMorgan Chase's constituent companies varied in size and business emphasis; competed in different markets; were present in different locations; and, for all these reasons, offered different compensation and benefits packages. Whatever the practices of those companies, they are not relevant to an analysis of the practices of the current JPMorgan Chase. We note also that the records necessary to prepare the proposed report are not readily accessible for JPMorgan Chase's constituent companies, and in some cases may no longer exist at all.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

137

JPMorgan Chase Proposal 12

Christian Brothers Investment Services, Inc., 90 Park Avenue, New York, NY 10016, the holder of 210,645 shares of JPMorgan Chase common stock, has advised JPMorgan Chase that they intend to introduce the following resolution, which is co-sponsored by Mr. David Shohl and Domini Social Investments, each of which is the beneficial owner of at least 100 shares of JPMorgan Chase common stock:

"**PROPOSAL: RESOLVED** that the shareholders request the Board to review the role of JPMorgan Chase as an underwriter, lender and financial adviser for transactions in environmentally and/or socially sensitive sectors; consider incorporating criteria related to a transaction's impact on the environment, human rights and the potential to impact the company's reputation into the banks' analyses; and to report its findings to shareholders (at reasonable cost and omitting proprietary information) by October 2004.

"**SUPPORTING STATEMENT:** WHEREAS, JPMorgan Chase (JPMC) has financed controversial companies and projects in environmentally and/or socially sensitive sectors such as dam building, oil drilling, and logging. We believe that, absent a clear understanding of key environmental and human rights issues raised by such projects, our company will expose itself to unnecessary financial impacts and endanger its reputation.

"For example, JPMC was a lead manager for a $400 million loan for Iceland's National Power Company (2003), a project criticized for environmental, geological, economic and legal impacts and risks. ("An Icelandic Battle of Wildlife Versus Voltage," *New York Times*, July 16, 2002) The bank also was the mandated arranger for the refinancing of the Kumtor mine (2002), which has a dangerous environmental and safety record with three toxic spills, including one that spilled two tons of cyanide into local drinking water supplies. In addition, JPMC was the financial advisor to the $900m Oleoducto de Crudos Pesados, a contentious pipeline in Ecuador ("Protests delay completion of Ecuador oil pipeline," *Financial Times*, August 28, 2002), which according to an independent report by the former chief of the World Bank's Environment Department, threatens the Amazon rainforest.

"While many other large banks face similar risks to their reputation and financial position, we believe that JPMorgan Chase's competitors are more effectively managing these risks with existing environmental policies, staff expertise and training programs to effectively identify or evaluate the risks of social and environmental impacts. For example:

- Citigroup has created and implemented environmental polices, procedures and standards as an integral part of investment, credit, and underwriting. Citigroup has also helped establish a coalition of 18 banks that have adopted "The Equator Principles", agreeing to apply World Bank and IFC environmental and social standards to most of their project finance loans.

- Bank of America relies on the 67 sector-specific World Bank Pollution Prevention and Abatement standards.

- Fleet Boston is implementing a formal environmental awareness and business risk training program.

- Merrill Lynch and Morgan Stanley have Environmental Committees that include senior level bankers and policy makers, recognizing the growing relevance of social and environmental risks.
"It is important for a leading bank like JPMorgan Chase to join its peers and competitors in establishing systems to identify, assess and control for social and environmental risks in its financing decisions. We believe that failure to create guidelines and policies and have employees responsible for managing environmental and social risk has the potential to open a company to

138

severe criticism and may damage its reputation and impact the bottom–line and ultimately, shareholder value."

**JPMorgan Chase's board of directors recommends that stockholders vote AGAINST this proposal for the following reasons:**

JPMorgan Chase recognizes the importance of the issues reflected in this proposal. We note the importance of an environmental focus both with respect to our own activities as, for example, a consumer of power and producer of waste, and also in our role in financing and advising on transactions that may be environmentally sensitive or have other social issues to consider. JPMorgan Chase opposes this proposal because we have underway steps to address the issues raised by the proposal and do not believe it would be helpful to adopt an arbitrary deadline for action.

JPMorgan Chase met several times in the last year with the proponent and other interested shareholders. Following those meetings, the JPMorgan Chase Office of the Chairman approved a proposal to establish a new position in JPMorgan Chase, Director of Environmental Affairs, with responsibility for a focus on environmental matters within JPMorgan Chase and to have environmental matters come under the oversight of the board's Public Policy Committee, which agreed to assume such oversight role. JPMorgan Chase is in the process of identifying the appropriate individual to lead JPMorgan Chase's environmental efforts. This person will report to the head of the Community Development office.

In addition, JPMorgan Chase has discussed its environmental activities and plans in JP Morgan Chase's 2003 Community Partnership Report, a copy of which is available on JPMorgan Chase's website, and anticipates further developing such annual reports.

Accordingly, the JPMorgan Chase board recommends a vote against this proposal.

139

OTHER MATTERS TO BE CONSIDERED

AT THE BANK ONE ANNUAL MEETING

The stockholder meeting at which the merger will be considered will also be Bank One's annual meeting of stockholders for 2004. Therefore, a number of proposals requiring stockholder action in the ordinary course of Bank One's business also are being presented for consideration and voting. This portion of the document discusses these other proposals.

### Bank One Proposal 2: Election of Directors

The Bank One board of directors has nominated twelve directors for election at its annual meeting to hold office until the next annual meeting and the election of their successors. However if the merger is completed the nominees for director elected by Bank One stockholders at the annual meeting will only serve as directors of Bank One until the effective time of the merger.

Effective the date of the annual meeting, the size of the Bank One board of directors will be reduced from 13 to 12 members to reflect the retirement of John R. Hall, who has served as a Bank One director since 1987. Management is deeply grateful to John for his dedicated service to Bank One.

### Vote Required

Bank One directors must be elected by a plurality of the votes cast at the meeting. This means that the twelve nominees receiving the greatest number of votes will be elected. Votes withheld for any nominee will not be counted.

Although Bank One knows of no reason why any of the nominees would not be able or would decline to serve, if any nominee is unavailable for election, the proxies would vote your common stock to approve the election of any substitute nominee proposed by the board of directors. Bank One's board may also choose to reduce the number of directors to be elected, as permitted by Bank One's by-laws.

### General Information about the Nominees

The name, principal occupation and certain biographical information of each nominee are provided below. The year in which each became a director of Bank One or its predecessors also is provided. Each nominee currently is serving as a director of Bank One.

*John H. Bryan*

*Director since 1982*

*Age:* 67

*Principal Occupation.* Retired Chairman and Chief Executive Officer of Sara Lee Corporation, a global packaged food and consumer products company (Chairman from 1976–2001; Chief Executive Officer from 1976–2000)

*Other Directorships:* BP p.l.c.; General Motors Corporation; Goldman Sachs & Co.

140

*Stephen B Burke*

*Director since 2003*

*Age: 45*

*Principal Occupation:* President of Comcast Cable Communications, Inc , a cable television operator, June 1998 to present

*Other Directorships:* None

*James S  Crown*

*Director since 1991*

*Age: 50*

*Principal Occupation:* General Partner of Henry Crown and Company (Not Incorporated), a diversified investment company, since 1985

*Other Directorships.* General Dynamics Corporation; Sara Lee Corporation

*James Dimon*

*Director since 2000*

*Age:* 47

*Principal Occupation:* Chairman and Chief Executive Officer of Bank One since March 27, 2000

*Recent Business Experience:* November 1998–March 2000—private investor; October–November 1998—President, Citigroup Inc., and Chairman and Co–Chief Executive Officer of Salomon Smith Barney Holdings, Inc.; November 1993–October 1998—President and Chief Operating Officer, Travelers Group, as well as executive positions with Travelers' subsidiaries Smith Barney, Inc. and Salomon Smith Barney Holdings, Inc  during that period

*Other Directorships:* Yum! Brands, Inc.

*Dr. Maureen A. Fay, O.P.*

*Director since 1985*

*Age.* 69

*Principal Occupation:* President of University of Detroit Mercy since 1990

*Other Directorships.* Kelly Services, Inc.

*Laban P. Jackson, Jr.*

*Director since 1993*

*Age:* 61

*Principal Occupation.* Chairman and Chief Executive Officer of Clear Creek Properties, Inc., a real estate development company, since 1989

*Other Directorships:* Interactive Pictures Corporation

141

*John W Kessler*

*Director since 1995*

*Age: 67*

*Principal Occupation:* Owner of John W. Kessler Company. a real estate development company. since 1972; also Chairman of The New Albany Company, a real estate development firm. since 1988

*Other Directorships:* Abercrombie & Fitch Co

*Robert I Lipp*

*Director since 2003*

*Age: 65*

*Principal Occupation:* Chairman and Chief Executive Officer of Travelers Property Casualty Corp . a property and casualty insurance company. from December 2001 to present

*Recent Business Experience.* Various senior positions with Travelers Group since 1986, including Chairman and Chief Executive Officer from 1993 to 2000; 1991–1993—Chairman and Chief Executive Officer. CitiFinancial Credit Company; and, until December 2000—Vice Chairman and Member of the Office of the Chairman, Citigroup Inc and Chief Executive Officer of Citigroup's Global Consumer Business

*Other Directorships:* Accenture Ltd ; Travelers Property Casualty Corp.

*Richard A Manoogian*

*Director since 1978*

*Age: 67*

*Principal Occupation* Chairman and Chief Executive Officer of Masco Corporation. a diversified manufacturer of home improvement and building products. since 1985

*Other Directorships:* Ford Motor Company; Masco Corporation; Metaldyne Corporation; MSX International, Inc.

*David C Novak*

*Director since 2001*

*Age: 51*

*Principal Occupation:* Chairman (since January 2001) and Chief Executive Officer (since January 2000) of Yum! Brands, Inc . a franchised restaurant operations company

*Recent Business Experience:* June 1997–January 2000—Vice Chairman and President, Tricon Global Restaurants. Inc  (now known as Yum! Brands, Inc ); August 1996–June 1997—Group President and Chief Executive Officer. KFC and Pizza Hut, North America (subsidiaries of PepsiCo); 1994–1996—President. KFC North America (subsidiary of PepsiCo)

*Other Directorships:* Yum! Brands, Inc

142

*John W. Rogers, Jr.*

*Director since 1998*

*Age: 45*

*Principal Occupation:* Chairman and Chief Executive Officer of Ariel Capital Management, LLC, an institutional money management firm founded by Mr. Rogers in 1983; the firm is the investment advisor, administrator and distributor of Ariel Mutual Funds

*Other Directorships:* Aon Corporation; Bally Total Fitness Holding Corporation; GATX Corporation (not standing for re-election; term ends April 22, 2004); Exelon Corporation; McDonald's Corporation; Ariel Mutual Funds

*Frederick P. Stratton, Jr.*

*Director since 1988*

*Age: 64*

*Principal Occupation:* Chairman Emeritus of Briggs & Stratton Corporation, manufacturer of gasoline engines, since January 2003 (Chairman of the Board from December 2001 to January 2003, Chief Executive Officer from 1977 to June 2001 and Chairman from 1986 to December 2001)

*Other Directorships:* Midwest Express Holdings, Inc.; Weyco Group, Inc.; Wisconsin Energy Corporation and its subsidiaries Wisconsin Electric Power Company and Wisconsin Gas Company

## Director Meeting Attendance and Fee Arrangements

The following table summarizes the membership of the board and each of its committees, and the number of times each met during 2003:

| | Board | Audit & Risk Management | Compensation & Organization | Corporate Governance & Nominating | Public Responsibility | Executive |
|---|---|---|---|---|---|---|
| Mr. Bryan | Member | Member | | Member | | |
| Mr. Burke | Member | | Member | | | |
| Mr. Crown | Member | | Member | | Member | |
| Mr. Dimon | Chair | | | | | Chair |
| Dr. Fay | Member | | Member | | Chair | Member |
| Mr. Hall | Member | | Chair | Chair | | Member |
| Mr. Jackson | Member | Chair | Member | | | |
| Mr. Kessler | Member | | | | | |
| Mr. Lipp | Member | | Member | | | |
| Mr. Manoogian | Member | | | | | |
| Mr. Novak | Member | Member | | Member | | |
| Mr. Rogers | Member | Member | | | Member | |
| Mr. Stratton | Member | Member | | | Member | |
| Number of Meetings in 2003 | 6 | 7 | 5 | 4 | 4 | 1 |

During 2003, each director attended 75% or more of the total meetings of the Board and the committees on which he or she served.

Each non-officer director receives annually a cash retainer of $60,000 and a grant of either shares of Bank One common stock or stock units, at the discretion of the director, equal in value to $60,000. The retainers are payable in quarterly installments. The non-officer Chair of each committee receives a chairperson retainer of $6,000. No additional fees are paid to non-officer directors for attending board or committee meetings. Officers of Bank One or its subsidiaries do

143

not receive an annual retainer, meeting fees, stock or other compensation for service as directors or on Board committees.

Non-officer directors may elect each year to have their cash retainer paid in any combination of the following: (i) cash paid on a quarterly basis; (ii) a deferred cash payment pursuant to Bank One's Director Deferred Compensation Plan (the "Director Deferral Plan"); or (iii) shares of Bank One common stock or stock units pursuant to the Director Stock Plan. Amounts deferred into the Director Deferral Plan earn a return equivalent to the rate of return on one or more of the investment funds in Bank One's 401(k) Savings and Investment Plan.

## Corporate Governance

### General

Bank One has taken a number of actions over the last few years in its efforts to adopt and employ best practices with regard to corporate governance. By corporate governance, we mean a system of checks and balances among the board of directors, management and shareholders designed to produce an efficiently functioning corporation, ideally directed to creating long-term stockholder value. At Bank One, this means we are committed to maintaining the highest standards of ethical conduct, reporting financial results with accuracy and transparency, and fully complying with all applicable laws, rules and regulations. Most particularly, corporate governance has come to mean compliance with the Sarbanes-Oxley Act of 2002 and the New York Stock Exchange corporate governance listing standards. In this section of the proxy statement, we have described the steps Bank One has recently taken to ensure independence of directors and committee members from management, to empower the board and board committees to act in the company's best interests, and to encourage greater openness of management practices.

*Corporate Governance Principles.* Bank One first adopted Corporate Governance Principles in September 2000 and the Principles have been revised a number of times since that date to reflect evolving best practices and newly enacted regulatory requirements. The Principles establish a framework for the governance of the company and, by elaborating on the board's and directors' basic duties and responsibilities, the Principles assist both the board of directors and individual directors to understand their obligations and the general boundaries within which they will operate. The Principles delineate responsibilities of the board, management, directors and committees; and address important subjects such as director selection criteria, board size, meeting procedures, board access to senior management, succession planning and board self-assessments and evaluations. The Principles provide for board executive sessions, both with and without the Chief Executive Officer present. The Chair of the Corporate Governance and Nominating Committee presides at executive sessions with outside directors only in attendance. A copy of the Corporate Governance Principles is available on Bank One's website at www.bankone.com (Investor Relations page).

*Code of Ethics.* Bank One has adopted a Code of Ethics which sets forth the guiding principles by which we operate our company and conduct our daily business with our customers, vendors, shareholders and with our fellow employees. These principles apply to all of the directors, officers and employees of Bank One and all of its wholly-owned financial services subsidiaries. To be certain that the principles set forth in the Code of Ethics are clearly understood and consistently applied, officers and employees are subject to rules of behavior contained in a separate Code of Conduct. In addition, Bank One has adopted a Code of Ethics for Senior Financial Officers applicable to the Chief Executive Officer, the Chief Financial Officer and the Controller. Its purpose is to promote honest and ethical conduct and compliance with all applicable laws, rules and regulations, particularly as related to the maintenance of the company's financial records and the preparation of financial statements filed with the Securities and Exchange Commission. Copies of the Code of Ethics and the Code of Ethics for Senior Financial Officers are available on Bank One's website at www.bankone.com (Investor Relations page).

*Policy on Shareholder Communications.* Bank One has adopted a Policy on Shareholder Communications with the board which sets forth the process by which shareholders may send communications to the board of directors or particular directors and how the communications will be relayed to the board or board members. The policy is attached to this document as Annex J.

*Policy on Director Nomination Process.* Bank One has adopted a Policy on Director Nominees which sets forth the process for identifying and evaluating nominees to serve as Bank One directors, the qualifications and skills directors are expected to possess, and the procedures by which shareholders may submit and recommend nominees for consideration. The policy is attached to this document as Annex K.

## Director Independence

Pursuant to the corporate governance listing standards of the New York Stock Exchange, Bank One's board of directors has adopted the standards described below for determining directors' independence under the New York Stock Exchange rules. The board has determined that a director who meets these standards during the completed fiscal year preceding Bank One's annual meeting has no material relationship with Bank One

| Relationship | Standard |
|---|---|
| Loans | All extensions of credit made by Bank One to a director, an immediate family member*, or a director's or immediate family member's principal business affiliations (through ownership or as an executive officer) must be made in the ordinary course of business and on substantially the same terms as those prevailing for comparable transactions with nonaffiliated persons. In addition, all extensions of credit made by Bank One to such persons or entities must comply with applicable law, including Federal Reserve Board Regulation O |
| Financial Services | All financial services provided by Bank One to a director, an immediate family member, or a director's or immediate family member's principal business affiliations must be made in the ordinary course of business on substantially the same terms as those prevailing at the time for comparable transactions with nonaffiliated persons |
| Business Transactions | All transactions between Bank One and a director's or a director's immediate family member's principal business affiliations for property or services, or other contractual arrangements, must be made in the ordinary course of business and on substantially the same terms as those prevailing for comparable transactions with nonaffiliated persons. In addition, the aggregate payments (including interest and fees on loans and financial services) made by the other company to the transaction to Bank One, or received by the other company from Bank One, must not exceed the greater of $1 million, or 2% of consolidated gross annual revenues of the other company |
| Charitable Contributions | All contributions made by Bank One or the Bank One Foundation to any non-profit organization, foundation or university of which a director or immediate family member is employed as an executive officer may not exceed the greater of $1,000,000 or 2% of the consolidated gross annual revenues of the entity |
| Consulting/ Other Compensation | Neither the director nor his immediate family members are permitted to enter into any consulting or personal service contracts with Bank One for which they receive any compensatory fees or personal benefits other than the compensation they receive for service as a director. |

* "Immediate family member" for purposes of these standards includes a director's spouse, minor children and any other relative of the director who shares the director's home or who is financially dependent on the director.

The board has determined that none of the nonemployee directors of Bank One (the "outside directors") has any material relationships with Bank One under the above standards, and therefore, all of the outside directors are independent under these standards. There are additional objective tests for independence in the New York Stock Exchange corporate governance listing standards, and all of the outside directors meet these objective tests for independence. Under both the above standards and the New York Stock Exchange's objective tests, a director employed by Bank One cannot be deemed to be an "independent director", and consequently James Dimon, Chairman and Chief Executive Officer of Bank One, is not an independent director of Bank One.

## Committees of the Board of Directors

In January 2003, the board changed its committee structure to conform more closely to the structure envisioned by the New York Stock Exchange corporate governance listing standards. During 2003, the committees reviewed and revised their charters. The charters of each of the committees described below (except for the Executive Committee, which does not have a charter) are available on Bank One's website at www.bankone.com (Investor Relations page). The Audit and Risk Management Committee's charter is also attached to this document as Annex I.

Each member of the Audit and Risk Management, Compensation and Organization, and Governance and Nominating Committees has been determined by the board of directors to be independent for purposes of the New York Stock Exchange corporate governance listing standards and within the meaning of Securities and Exchange Commission regulations.

*Audit and Risk Management Committee*
The Audit and Risk Management Committee assists the board in its oversight responsibilities with respect to: the integrity of Bank One's financial statements; Bank One's compliance with legal and regulatory requirements; the effectiveness of internal controls and procedures; the independent auditors' qualifications and independence; the performance of Bank One's internal audit function and independent auditors; policy standards and guidelines for risk management; and financial transactions, capital management and financial planning and performance. A detailed list of the committee's functions is included in its charter, which is attached to this document as Annex I and is available on Bank One's website.

*Audit Committee Financial Expert.* The board has determined that each member of the Audit and Risk Management Committee has the requisite financial experience necessary to be a productive and valuable member of the committee and each meets the independence requirements and financial literacy standards of the NYSE corporate governance listing standards. The board has designated Laban P. Jackson, Jr., the chair of the Audit and Risk Management Committee, as an audit committee financial expert as defined by the Sarbanes–Oxley Act of 2002 and rules promulgated thereunder. The board made a qualitative assessment of Mr. Jackson's level of knowledge and experience based on a number of factors, including his experience as owner, chairman and chief executive officer of a number of businesses over many years. In addition to his experience as Chairman and Chief Executive Officer of Clear Creek Properties, Inc. for more than 14 years, Mr. Jackson has served as chairman and/or CEO of several other companies. In that capacity, he has had extensive experience in the analysis and evaluation of financial statements, as well as in the direct supervision of employees responsible for preparation, auditing, analysis and evaluation of financial statements. He has gained similar experience through his service as a director and audit committee member of two companies in addition to Bank One, director of several charitable entities, and a director of the Federal Reserve Bank of Cleveland.

146

*Compensation and Organization Committee*

The Compensation and Organization Committee assists the Bank One board in: discharging the board's responsibilities relating to director and executive compensation; providing oversight with respect to the evaluation of management; and providing oversight with respect to Bank One's human resources strategies and practices

*Corporate Governance and Nominating Committee*

The Corporate Governance and Nominating Committee assists the Bank One board in: monitoring developments concerning corporate governance in order for Bank One to employ best practices in corporate governance and be in compliance with all applicable laws and regulations; developing and recommending to the board a set of corporate governance principles; identifying and proposing to the board qualified candidates to become directors; and providing oversight with respect to the evaluation of the board

*Public Responsibility Committee*

The Public Responsibility Committee: reviews and considers Bank One's position and practices on issues in which the financial services industry interacts with the public; reviews the plans and results of compliance with the Community Reinvestment Act, fair lending laws and related consumer laws; reviews management's plans and actions relating to philanthropic contributions; and reviews management's plans and actions relating to current or emerging public policy issues.

*Executive Committee*

The Executive Committee is composed of the Chairman and Chief Executive Officer of Bank One and the chair of each board committee. The committee is authorized by resolution of the board to exercise all the powers of the board in the management of the business and affairs of Bank One while the board is not in session.

## Beneficial Ownership of Bank One's Common Stock

Generally, under the rules of the Securities and Exchange Commission, a person is deemed to be the beneficial owner of a security with respect to which such person, through any contract, arrangement, understanding, relationship or otherwise, has or shares voting power (which includes power to vote, or direct the voting of, such security) or investment power (which includes power to dispose of, or direct the disposition of, such security). In addition, a person is deemed to be the beneficial owner of a security if he or she has the right to acquire such voting power or investment power over the security within 60 days, such as through the exercise of a stock option.

The following table shows the beneficial ownership of Bank One's common stock as of December 31, 2003 by (i) each person that is the beneficial owner of more than five percent of outstanding Bank One common stock, (ii) each director, (iii) each executive officer named in the Summary Compensation Table on page 154, and (iv) all directors and executive officers as a group

| Name | Amount and Nature of Beneficial Ownership as of December 31, 2003(a) | Percent of Class (if 1% or greater) |
|---|---|---|
| Wellington Management Company, LLP | 55,955,855(b) | 5.005% |
| Linda Bammann | 221,665 | — |
| James S. Boshart III | 771,066 | — |
| John H. Bryan | 24,218 | — |
| Stephen B. Burke | 7,182 | — |
| James S. Crown | 9,260,176(c) | — |
| James Dimon | 4,061,179(d) | — |

| Name | Amount and Nature of Beneficial Ownership as of December 31, 2003(a) | Percent of Class (if 1% or greater) |
|---|---|---|
| Maureen A. Fay | 20,532 | — |
| John R. Hall | 83,299(e) | — |
| Laban P. Jackson, Jr. | 46,138 | — |
| John W. Kessler | 28,042(f) | — |
| Robert I. Lipp | 38,682 | — |
| Richard A. Manoogian | 131,824 | — |
| Heidi Miller | 135,604(g) | — |
| David C. Novak | 28,428 | — |
| John W. Rogers, Jr. | 21,136 | — |
| Charles W. Scharf | 871,079 | — |
| Frederick P. Stratton, Jr. | 53,127(h) | — |
| All Directors and Executive Officers as a Group(i) | 17,331,402 | 1.55% |

(a) As set forth in the following table, the beneficial ownership amounts include shares subject to options held as of December 31, 2003, exercisable within 60 days, and also include any shares held pursuant to Bank One's 401(k) plan as of December 31, 2003:

| Name | Shares | |
|---|---|---|
|  | Subject to options | Subject to 401(k) plan |
| Linda Bammann | 175,000 | 0 |
| James S. Boshart III | 426,686 | 714 |
| John H. Bryan | 9,000 | N/A |
| Stephen B. Burke | 2,000 | N/A |
| James S. Crown | 32,395 | N/A |
| James Dimon | 1,611,490 | 1,368 |
| Maureen A. Fay | 9,000 | N/A |
| John R. Hall | 55,127 | N/A |
| Laban P. Jackson, Jr. | 33,999 | N/A |
| John W. Kessler | 16,711 | N/A |
| Robert I. Lipp | 2,000 | N/A |
| Richard A. Manoogian | 9,000 | N/A |
| Heidi Miller | 75,000 | 627 |
| David C. Novak | 9,000 | N/A |
| John W. Rogers, Jr. | 9,000 | N/A |
| Charles W. Scharf | 610,800 | 942 |
| Frederick P. Stratton, Jr. | 30,127 | N/A |
| All Directors and Executive Officers as a Group | 4,126,534 | 32,269 |

(b) This information is based on Schedule 13G filed on February 12, 2004, with the Securities and Exchange Commission by Wellington Management Company, LLP, a Massachusetts limited liability partnership ("WMC"), on behalf of itself and its wholly-owned subsidiary Wellington Trust Company, NA. WMC, in its capacity as investment adviser, may be deemed to beneficially own 55,955,855 shares, which are held of record by clients of WMC. WMC has shared dispositive power with respect to 55,955,855 shares and shared voting power with respect to 38,935,529 shares. WMC's address is 75 State Street, Boston, Massachusetts 02109.

(c) Includes 74,289 shares Mr. Crown owns individually; 5,477,911 shares owned by partnerships of which Mr. Crown is a partner; 1,172,063 shares owned by a partnership whose partners include a corporation of which Mr. Crown is a director, officer and shareholder, and a trust of which Mr. Crown is a beneficiary; 781,404 shares owned by a not-for-profit corporation of which Mr. Crown is a director; and 1,517,820 shares owned by a partnership whose partners include a corporation of which Mr. Crown is a shareholder, and a partnership of which Mr. Crown is a partner. Also included are 197,909 shares owned by trusts of which Mr. Crown is a co-trustee; and 6,385 shares owned by Mr. Crown's spouse. Mr. Crown disclaims beneficial ownership of the shares held by the various persons and entities described above except for the shares he owns individually and, with respect to shares owned by entities, except to the extent of his interest in such entities.

(d) Includes 1,000,000 shares owned by Mr. Dimon's spouse.

(e) Includes 896 shares, of which Mr. Hall disclaims beneficial ownership, owned by Mr. Hall's spouse.

148

(f) Includes 4,000 shares owned by a trust of which Mr. Kessler is trustee.

(g) Includes 10,000 shares owned by Ms. Miller's spouse; 1,200 shares Ms. Miller holds as custodian for her children; and 4,000 shares held in a grantor retained annuity trust. Ms. Miller disclaims beneficial ownership of these shares.

(h) Includes 5,000 shares held in a retirement plan for Mr. Stratton's benefit.

(i) For purposes of this table, the term "executive officers" includes all persons who were members of the Planning Group on December 31, 2003.

In addition to the shares set forth in the table above, the following directors own Bank One stock units acquired in conjunction with their compensation for service as a director. Each stock unit represents the right to one share of common stock, payable following the director's retirement.

| Name | Number of Stock Units |
|---|---|
| John H. Bryan | 109,811 |
| Stephen B. Burke | 2,125 |
| James S. Crown | 33,223 |
| John R. Hall | 38,142 |
| Laban P. Jackson, Jr. | 16,043 |
| John W. Kessler | 11,866 |
| Robert I. Lipp | 2,125 |
| David C. Novak | 6,089 |
| John W. Rogers, Jr | 6,641 |
| Frederick P. Stratton, Jr | 20,515 |

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires each of Bank One's directors and officers, and each beneficial owner of more than ten percent of a registered class of Bank One's equity securities, to file with the Securities and Exchange Commission an initial report of the person's beneficial ownership of Bank One's equity securities and subsequent reports regarding changes in such ownership. To the best of Bank One's knowledge, each person who was so subject to Section 16(a) with respect to Bank One at any time during 2003 filed on a timely basis all such reports required for the year, except for Maureen A. Fay, a Bank One director who, due to an administrative oversight by Bank One, did not timely file a Form 4 related to a January 2003 stock award. A Form 4 reflecting this transaction was filed in April 2003.

### Compensation and Organization Committee

### Report on Executive Compensation

#### Compensation Philosophy

Bank One's compensation programs for its executive officers are designed to provide competitive overall compensation that is simple and cost-effective with an emphasis on performance-based variable pay which includes both cash and stock-based awards. This approach ensures that executives focus not only on short-term performance but also on long-term sustainable stockholder value creation as a means of increasing their own rewards through stock appreciation.

Underlying this compensation philosophy are the following guiding principles:

- Compensation should be performance-driven, based on individual, business unit and overall corporate results.

- More highly compensated employees should expect a greater proportion of total compensation from long-term, performance-based rewards.

149

- Compensation for more highly compensated executives should have limited or no special entitlements or perquisites and should require greater cost–sharing for basic benefits as evidenced by the following:

  – No supplemental executive retirement plan,

  – No supplemental executive benefits such as split–dollar life insurance policies,

  – Eliminated virtually all executive perquisites,

  – Limited covered earnings and matching contributions under the qualified pension and 401(k) plans, and

  – Higher premium cost–sharing requirements for medical and other welfare benefits

- Long–term, stock–based compensation and stock ownership at all levels, particularly by senior managers, executive officers and directors, is an essential component of overall compensation. At non–executive levels, stock ownership is available through discretionary savings vehicles, which also include a diverse range of investment alternatives.

- Executive officers and directors must be willing to commit to long–term ownership of Bank One stock.

**Compensation Programs and Policies for Executives**

Compensation for an executive generally includes base salary, annual performance–based incentives and long–term stock incentives. The committee uses a peer group of financial institutions in assessing competitive compensation trends and pay levels. The committee then reviews and analyzes Bank One's executive compensation programs with respect to each major component of compensation and aggregate total compensation to ensure competitiveness against the peer group. The committee has defined the peer group as bank holding companies with more than $100 billion in assets and one similar diversified financial services company.

*Base Salaries*

Base salaries for executive officers are reviewed annually and may be adjusted, when appropriate, to reflect competitive practices, changes in roles and responsibilities and individual performance. The committee exercises broad discretion when setting base salary levels.

*Annual Incentive Compensation*

Executives of Bank One are eligible for annual, performance–based incentives in accordance with the stockholder–approved Planning Group Annual Incentive Plan (the "Annual Incentive Plan"). Each year, the committee establishes financial performance expectations as well as minimum or threshold performance goals based upon such financial measures as it may deem appropriate. The committee further establishes a prescribed formula for determining the final incentive "pool" based on actual financial results compared to its pre–determined measures and goals.

For 2003, the committee established an earnings per share ("EPS") goal and a minimum threshold EPS below which no individual awards would be paid under the Annual Incentive Plan. The committee also established a minimum and maximum funding level for awards under the Annual Incentive Plan and approved a formula, based on Return on Equity ("ROE") results, by which final pool funding would be determined.

The committee establishes target annual incentive levels for each executive based on competitive practices of the peer group. The committee also establishes appropriate performance measures to be considered in determining individual awards. These include business unit and overall Bank One financial results as well as subjective factors such as operational efficiency, growth, customer satisfaction, financial and management controls and reporting, and

150

management of employees. For 2003, the committee specified that approximately one-third of the annual incentive award would be paid in the form of restricted stock or restricted stock units.

Based on 2003 financial results, the minimum threshold EPS goal for individual awards was exceeded. In addition, based on 2003 ROE results, a maximum annual incentive pool was determined by applying the approved funding formula. The committee, based on its subjective assessment of Bank One's financial, strategic and operational results for 2003, approved a final award pool that was within the maximum formula-based pool.

Individual awards under the Annual Incentive Plan for Planning Group members are based on the recommendation of the Chief Executive Officer and approved by the committee; and in the case of the Chief Executive Officer, are recommended by the committee and approved by the board. In all cases, individual awards are based on the committee's or board's subjective assessment of the executive's performance relative to his or her specific financial goals and other strategic or non-financial objectives.

*Long Term Stock Incentive Compensation*
Stock incentive awards are made under the stockholder-approved Bank One Stock Performance Plan (the "Stock Plan"). During 2003, stock awards were in the form of non-qualified options and, in accordance with the Annual Incentive Plan, restricted share grants. Non-qualified options awarded under the Stock Plan in 2003 are exercisable in three equal installments on each of the first three anniversaries from the date of grant with a six-year term and with no restorative stock option provision. Stock delivered with respect to an option exercise may not be sold or transferred for two years after the exercise date. Restricted stock units granted in 2004 for 2003 performance will be distributed in shares of Bank One Common Stock three years from the date of grant, subject to continued employment.

*Chief Executive Officer Compensation for 2004*
Upon his hire in March of 2000, Mr. Dimon and Bank One entered into an Employment Agreement covering items such as salary, bonus and stock awards, summarized below under "— Termination of Employment and Change of Control — Agreement with James Dimon" on page 158. In determining Mr. Dimon's compensation for 2003, the committee and board reviewed available competitive compensation data of peer organizations as well as published compensation surveys prepared by several compensation consulting firms. While the committee has the exclusive authority to engage outside experts to advise on compensation matters, no outside consulting assistance was solicited during 2003.

In addition, the committee and the board of directors established various financial and non-financial goals and objectives for Mr. Dimon for 2003. The committee and board of directors considered Mr. Dimon's performance relative to the achievement of these goals as well as his performance with respect to a number of initiatives including improved balance sheet risk management, increased capital, reduced expenses, improved operational efficiencies and expanded and extended product offerings in all businesses and through selective acquisitions.

Based on Mr. Dimon's performance in all these areas, the committee recommended and the board approved the following compensation for Mr. Dimon for 2003:

- An annualized base salary of $1,000,000, which was not increased during 2003;

- For 2003 performance, an award under the Bonus Plan of $7,500,000 of which $5,000,000 was paid in cash and $2,500,000 was awarded in the form of restricted stock units on which restrictions lapse three years from the date of grant; and

151

- In August 2003, a grant of 500,000 non–qualified stock options with a six–year term, exercisable in three equal installments on each of the first three anniversaries from the date of grant with no restorative stock option provision and a requirement that stock delivered with respect to an option exercise may not be sold or transferred for two years after the exercise date.

## Stock Ownership Commitment

Bank One is committed to encouraging stock ownership by its executive officers and establishing a clear link between the financial interests of executives and that of its stockholders. In keeping with this philosophy, the committee has established stock ownership guidelines for members of the Planning Group that require a minimum ownership level as well as a requirement that each executive retain at least 75% of all equity–based awards in excess of the guideline ownership level. In addition, approximately one–third of all awards under the Bonus Plan are delivered in the form of restricted stock or restricted stock units and a substantial component of overall compensation is provided in the form of stock option grants.

Bank One's directors receive half of their annual retainer payments in stock or stock units and may elect to receive the other half in stock units. In addition, Bank One's directors have further demonstrated their commitment toward stock ownership by executing pledge agreements affirming that for as long as they serve as Bank One directors, they would not dispose of any Bank One stock purchased on the open market or obtained pursuant to Bank One's various stock compensation programs.

Bank One also encourages stock ownership by all of its employees through a variety of programs and policies. A significant number of managerial and professional employees also receive annual bonuses partially in the form of restricted stock or restricted stock units and most also are eligible for stock option awards. All employees are encouraged to own stock through pre–tax and after–tax payroll deductions into Bank One's 401(k) plan, which also provides more than fifteen diversified investment alternatives, and the Employee Stock Purchase Plan. For 2003, Bank One contributed $350 to the 401(k) plan accounts of eligible non–exempt employees, which was invested in Bank One stock.

## Covered Compensation and Deductibility

The committee believes that executive compensation should be reasonable and competitive and that a substantial portion of total compensation for executives should be based upon Bank One's performance. The committee desires to optimize both the effectiveness and tax–efficiency of compensation delivered to executive officers. It is Bank One's general policy to obtain the maximum possible corporate tax deduction for all forms of compensation paid to its executive officers by qualifying under Section 162(m) of the Internal Revenue Code. To maximize deductibility of cash compensation under current regulations, cash bonuses for the Chief Executive Officer and other executive officers are awarded under the Annual Incentive Plan. In order to best achieve the goals of Bank One and serve the long–term interests of stockholders,

152

the Committee recognizes that payment of non–deductible compensation may be necessary under certain circumstances

Respectfully submitted,
The Compensation and Organization Committee

John R. Hall, Chair
Stephen B. Burke
James S. Crown
Maureen A. Fay, O P
John W. Kessler
Richard A. Manoogian

### Performance Graph

The following graph compares the cumulative total return on Bank One common stock with:

- the Standard & Poor's 500 Index, and

- the Standard & Poor's 500 Commercial Bank Index.

Each index is market–capitalization–weighted, meaning that companies with a higher market value count more in each index. Each index includes Bank One common stock. The values in the graph show the relative performance of a $100 investment made on December 31, 1998, in Bank One common stock and each index. The comparisons in this table are set forth in response to SEC disclosure requirements and are not intended to forecast or be indicative of the future performance of Bank One common stock.

The S&P 500 Commercial Bank Index is composed of all the companies in the S&P 500 Index that are engaged in the business of banking.



Comparison of Five Year Cumulative Total Return[1]
Among Bank One, S&P 500 Index and S&P 500 Commercial Bank Index[2]

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Bank One | 100 | 65 | 78 | 85 | 81 | 104 |
| S&P 500 | 100 | 121 | 110 | 97 | 76 | 97 |
| S&P 500 Banks | 100 | 86 | 103 | 103 | 102 | 133 |

(1)  Assumes $100 invested at December 31, 1998, with quarterly reinvestment of dividends

(2) At December 31 of each year

153

Compensation of Executive Officers

## Executive Officer Compensation Table

The following table sets forth the compensation paid, earned or awarded for the years indicated, to Bank One's chief executive officer and its other four most highly compensated executive officers.

### Summary Compensation Table

| | | Annual Compensation | | | Long Term Compensation Awards | | |
| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Other Annual Compensation ($)(2) | Restricted Stock Awards ($)(1)(3) | Securities Underlying Options/ SARs (#)(4) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|
| James Dimon Chief Executive Officer | 2003 2002 2001 | $1,000,000 1,000,000 1,000,000 | $5,000,000 3,000,000 3,000,000 | $ 52,029 117,878 286,465 | $2,493,647 1,954,538 2,000,010 | 1,426,766 350,000 700,724 | $ 0 4,089 45,827 |
| Linda Bammann Executive Vice President | 2003 2002 2001 | 475,000 400,000 342,308 | 2,300,000 1,700,000 1,700,000 | 0 10,462 38,432 | 1,196,920 781,815 979,989 | 300,000 100,000 175,000 | 0 1,592 25,320 |
| James S. Boshart III Executive Vice President | 2003 2002 2001 | 500,000 500,000 500,000 | 3,000,000 2,000,000 2,000,000 | 2,939 4,196 44,750 | 1,496,188 977,269 999,986 | 337,087 274,946 130,000 | 0 2,617 38,523 |
| Heidi Miller(a) Executive Vice President | 2003 2002 | 500,000 383,981 | 2,300,000 1,300,000 | 1,129 910 | 1,196,920 513,066 | 300,000 350,000 | 0 1,180 |
| Charles W. Scharf Executive Vice President | 2003 2002 2001 | 500,000 500,000 500,000 | 3,000,000 2,000,000 2,000,000 | 2,135 4,531 10,855 | 1,496,188 977,269 999,986 | 300,000 150,000 130,000 | 0 975 19,499 |

(a)   Ms. Miller commenced employment with Bank One in March 2002.

(1)   For 2003, bonuses awarded to executive officers pursuant to the Planning Group Annual Incentive Plan were paid approximately two–thirds in cash and one–third in restricted stock units. Each restricted stock unit represents the right to receive one share of stock three years from the grant date and quarterly dividend equivalent payments in cash, and has no voting rights.

(2)   This column includes for Mr. Dimon: personal use of corporate aircraft in the amount of $30,889, $45,339 and $32,568 for 2003, 2002 and 2001, respectively; and moving expenses of $19,782 for 2002.

(3)   As of December 31, 2003, the total number of outstanding restricted shares and the value of the shares (based upon the $45.59 per share closing price) were as follows:

| Name | Shares | Value |
|---|---|---|
| James Dimon | 118,885 | $5,419,967 |
| Linda Bammann | 46,665 | 2,127,457 |
| James S. Boshart III | 127,393 | 5,807,847 |
| Heidi Miller | 43,566 | 1,986,174 |
| Charles W. Scharf | 101,143 | 4,611,109 |

Dividends on these shares are payable in cash. The restricted stock units granted for 2003 and the restricted shares granted for 2002 vest 100% three years from the grant date, while

154

restricted shares granted in and for 2001 vest 50% at each of the third and fifth anniversary of the grant date.

(4)   For Messrs. Dimon and Boshart, the number of stock options listed in this column for 2003 represents the sum of new and restorative stock options granted during the year. In 2003, Mr. Dimon was granted 500,000 new stock options and Mr. Boshart 100,000. For a description of restorative stock options, see footnote (2) to the "Options/ SAR Grants in Last Fiscal Year" table.

**Option Grants Table**

The following table provides information on stock options granted in 2003 to the executive officers named in the Summary Compensation Table. In 2003, Bank One granted both new and restorative stock options. All such options were non-qualified stock options, and no stock appreciation rights ("SARs") were granted. The actual value of the options will depend on the market value of Bank One common stock on the dates the options are exercised. No realization of value from the options is possible without an increase in the price of Bank One common stock, which would benefit all Bank One stockholders.

### Option/ SAR Grants in Last Fiscal Year

| Name | Number of Securities Underlying Options/ SARs Granted (#)(1)(2) | Percent of Total Options/SARs Granted to Employees in Fiscal Year(3) | Exercise or Base Price ($/Share) | Expiration Date | Grant Date Present Value ($)(4) |
|---|---|---|---|---|---|
| James Dimon | 500,000 | 2.61% | $39.55 | 8/15/09 | $3,454,500 |
|  | 926,766 | 4.84 | 39.68 | 3/27/10 | 7,309,403 |
| Linda Bammann | 300,000 | 1.57 | 39.55 | 8/15/09 | 2,072,700 |
| James S. Boshart. III | 100,000 | 0.52 | 39.55 | 8/15/09 | 690,900 |
|  | 111,940 | 0.58 | 37.90 | 8/31/10 | 891,602 |
|  | 125,147 | 0.65 | 42.85 | 8/31/10 | 1,034.340 |
| Heidi Miller | 300,000 | 1.57 | 39.55 | 8/15/09 | 2,072,700 |
| Charles W. Scharf | 300,000 | 1.57 | 39.55 | 8/15/09 | 2,072,700 |

(1)   For Mr. Dimon, the first line denotes a new grant made on August 15, 2003 and the second line a restorative grant on July 21, 2003. For Mr. Boshart, the first line denotes a new grant made on August 15, 2003, the second line a restorative grant on May 13, 2003 and the third line a restorative grant on November 13, 2003. The grants listed for all other executive officers were new grants made on August 15, 2003, and none of the other executive officers received a restorative grant in 2003. All new stock options become exercisable in one–third increments on each of the first three anniversaries of the grant date, and stock delivered with respect to an option exercise may not be sold or transferred for two years after the exercise date.

(2)   *Restorative Option Feature.* Stock options granted by Bank One prior to 2003 include a feature which provides for the issuance of restorative options. The restorative feature allows a participant who exercises a stock option during the participant's employment, and who pays all or a part of the exercise price of a stock option with shares of common stock held by the participant for at least six months, to receive a restorative option to purchase the number of shares of common stock equal to the number of whole shares used by the participant to pay the stock option's exercise price and, for new options granted in 2001 and 2002, tax withholding obligations related to the option exercise. Restorative options become exercisable six months after the date of grant. The expiration date of a restorative option is the expiration date of the original stock option to which it relates, and the exercise price is

155

not less than 100% of the closing price of Bank One common stock on the business day preceding the date the restorative option is granted

(3)  The percentages shown are based on total options granted in 2003 (both new and restorative) on 19,160,516 shares of common stock.

(4)  The grant date present values were determined using the Black–Scholes standard option pricing model based on the following assumptions.

| Option Type | Vesting | Duration | Dividend Yield | Volatility | Risk–Free Rate of Return |
|---|---|---|---|---|---|
| New Grants | 1/3 at first 3 anniversaries | 6 years | 2.53% | 33.23% | 2.49% |
| Restoratives: | | | | | |
| 5/13/03 | 6 months | Remainder of original term | 2.41 | 34.34 | 1.89 |
| 7/21/03 | 6 months | Remainder of original term | 2.52 | 32.91 | 1.69 |
| 11/13/03 | 6 months | Remainder of original term | 2.34 | 30.37 | 2.31 |

[Additional columns below]

[Continued from above table, first column(s) repeated]

| Option Type | Expected Life (Years) |
|---|---|
| New Grants | 3.3 |
| Restoratives: | |
| 5/13/03 | 3.0 |
| 7/21/03 | 3.0 |
| 11/13/03 | 3.0 |

For the new grants, the Black–Scholes value includes a 20% discount to adjust for the restriction on selling shares acquired through the exercise of the option. For all grants, no adjustments were made in calculating the grant date present value of an option to account for potential forfeitures or the non–transferable nature of the option.

These assumptions result in Black–Scholes per share values as follows:

| Option Type | Black–Scholes Value (per share) |
|---|---|
| New Grants | $6.91 |
| Restoratives: | |
| 5/13/03 | 7.97 |
| 7/21/03 | 7.89 |
| 11/13/03 | 8.27 |

## 2003 Option Exercises and Year–End Option Value Table

The following table provides information on options exercised in 2003 by the executive officers named in the Summary Compensation Table, the number of unexercised options held at December 31, 2003, and the value of the unexercised in–the–money options held as of that date. No SARs were outstanding at any time during 2003.

### Aggregated Option/ SAR Exercises in Last Fiscal Year

### and FY–End Option/ SAR Values

| Name | Shares Acquired on Exercise(#)(1) | Value Realized ($) | Number of Securities Underlying Unexercised Options/SARs at FY–End(#) | | Value of Unexercised In–the–Money Options/SARs at FY–End($)(2) | |
|---|---|---|---|---|---|---|
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
| James Dimon | 223,570 | $14,651,280 | 641,724 | 3,131,766 | $4,606,873 | $33,027,527 |
| Linda Bammann | 0 | 0 | 165,000 | 535,000 | 1,273,350 | 3,372,900 |
| James S. Boshart III | 32,129 | 1,902,780 | 418,086 | 690,947 | 2,926,183 | 5,399,163 |
| Heidi Miller | 0 | 0 | 75,000 | 580,000 | 316,600 | 2,901,600 |
| Charles W. Scharf | 0 | 0 | 602,200 | 757,800 | 6,853,940 | 6,483,060 |

(1)  This column shows the actual number of shares received from options exercised in 2003 after reduction for the number of shares used to pay the exercise price and applicable tax withholding obligations. The total number of shares underlying the options exercised by Mr. Dimon was 1,296,000 and by Mr. Boshart 283,000.

(2)  The values are based on the $45.59 per share closing price of Bank One's common stock on December 31, 2003, less the exercise price of the options

156

**Pension Plans**

*Personal Pension Account Plan.* In general, salaried employees and regular hourly employees (scheduled to work at least 20 hours per week) of designated subsidiaries are eligible to participate in Bank One's Personal Pension Account Plan ("PPAP") upon completing one year of service. The PPAP provides that a participant is 100% vested after completing five years of vesting service. The PPAP was amended and restated effective as of January 1, 2000, reflecting the merger of predecessor companies' pension plans. Various transition benefits for employees at or nearing retirement age under prior pension plans apply under the PPAP.

After becoming eligible to participate in the PPAP, an employee's PPAP account is credited with a percentage of the employee's covered compensation for each month, as reflected in the following chart. Covered compensation includes base pay, commissions, eligible bonus, overtime, shift differential, and certain amounts deducted on a pre–tax basis up to applicable compensation limits imposed under federal tax laws.

| Completed Anniversary Years of Service For PPAP Contributions | Percent of Eligible Monthly Pay Credited to PPAP Account |
|---|---|
| 1 to 4 | 3.0% |
| 5 to 9 | 4.0 |
| 10 to 14 | 5.0 |
| 15 to 19 | 6.0 |
| 20 to 24 | 7.5 |
| 25+ | 9.0 |

At the end of each month, the participant's beginning account balance also is credited with interest for the month at a rate equal to the one–year U.S. Treasury bill rate plus 1% (subject to a minimum rate of 4.5%). Interest rates are determined on a quarterly basis.

Generally, an employee who has attained age 65 (with a minimum of five years of vesting service) is entitled to receive annual retirement income (in monthly installments) for life equal to the actuarial equivalent of the employee's balance. Participants may commence a reduced annuity benefit at any earlier age after separation from service, and (with spousal consent) may elect a lump sum payment of their PPAP account balance.

*Supplemental Personal Pension Account Plan.* Bank One's Supplemental Personal Pension Account Plan ("Supplemental PPAP") permits the payment of supplemental benefits to employees whose annual benefits upon retirement under the PPAP would exceed those permitted by federal tax laws. There is a $1 million annual ceiling on total covered compensation. The Supplemental PPAP provides that if the amount of the annual retirement benefit that would otherwise be payable under the PPAP to a person who has completed five or more years of vesting service is limited by reason of compliance with federal tax laws, such person shall be entitled to a supplemental benefit equal to the difference between the benefit such person receives under the PPAP and the benefit such person would have received if such limitation had not been in existence. The benefit is payable from the general assets of Bank One.

*Estimated Annual Benefits Payable to Executive Officers.* The following table provides the estimated annual benefits (including Supplemental PPAP benefits) payable for life, beginning at normal retirement age (65), for each of the executive officers named in the Summary Compensation Table based on years of service through December 31, 2003, and with projected

157

interest credits on cash balances estimated at a rate of 4 50% per annum (the applicable rate in December 2003):

| Name | Year of 65th Birthday | Estimated Annual Benefit |
|---|---|---|
| James Dimon | 2021 | $16,334 |
| Linda Bammann | 2021 | 12,242 |
| James S Boshart III | 2010 | 7,875 |
| Heidi Miller | 2018 | 1,869 |
| Charles W Scharf | 2030 | 20,010 |

**Termination of Employment and Change of Control**

*Change of Control Plan.* Effective May 1, 2001, Bank One adopted a Key Executive Change of Control Plan which provides severance and other benefits to members of the Planning Group (including Bammann, Boshart, Miller and Scharf but not Dimon) and other designated key executives in the event their employment terminates for specified reasons within two years following a Change of Control (as defined) of Bank One. This Plan provides generally, that in the event of a covered termination of employment by a participant within two years following a Change of Control, the participant is entitled to receive a severance payment equal to 2.5 times the sum of the participant's base salary and bonus. In addition, the participant would receive certain other payments and benefits, including increased pension benefits, continuation of employee welfare benefits, and accelerated vesting of all outstanding stock option and restricted stock awards. If any amounts payable to a participant under the Plan or otherwise would subject the executive to the excise tax under Internal Revenue Code section 4999, Bank One, subject to a de minimis amount, will make a payment to the participant such that after the payment of all income and excise taxes, the participant will be in the same after–tax position as if no excise tax had been imposed. Mr. Dimon's change of control benefits are governed by his agreement described below. It is currently contemplated that certain Bank One executive officers will waive their rights to receive benefits under this Plan effective upon completion of the merger with JPMorgan Chase in consideration of their acceptance of employment terms with JPMorgan Chase. See "The Merger — Interests of Directors and Executive Officers in the Merger" on page 59.

*Severance/ Pay Continuation Policy.* Each of the executive officers named in the Summary Compensation Table, except Mr. Dimon, is eligible to receive separation benefits in accordance with Bank One's pay continuation policy applicable to all employees. The pay continuation policy provides that if an executive officer is involuntarily terminated, except termination for cause, the officer shall receive his or her base salary for a number of weeks based on years of service, but not less than 16 weeks nor more than 65 weeks of base salary. Mr. Dimon's separation benefits are governed by his agreement described below.

*Agreement with James Dimon.* In connection with the hiring of James Dimon to serve as Bank One's Chairman and Chief Executive Officer, Bank One and Mr. Dimon entered into an Employment Agreement dated as of March 27, 2000 (the "Agreement"). Pursuant to the Agreement, Mr. Dimon received an award, as of March 27, 2000, of 35,242 restricted shares vesting 20% on each of the first five anniversaries of the date of grant and stock options to purchase 3.24 million shares (in tranches of 1.24 million, 1 million and 1 million shares) at $28.375 per share expiring in ten years and exercisable as to each tranche at the rate of 20% per year on each of the first five anniversaries of the date of grant (provided, however, that the options to purchase 1 million shares pursuant to the second and third tranches shall become immediately exercisable on the dates the closing price of the common stock equals or exceeds $50 and $60 respectively). The options to purchase 1 million shares pursuant to the second

158

tranche became immediately exerciseable on January 15, 2004 when the $50 threshold was met. The Agreement provides that Mr. Dimon shall receive a base salary of not less than $1 million, annual equity–based awards (such as stock options and restricted shares) having a grant value of not less than $7 million per year and an annual bonus of up to four times his base salary with a target bonus of 2.5 times base salary. The Agreement also provides that if Mr. Dimon's employment is terminated (other than for cause as defined or due to death or disability) or if Mr. Dimon terminates employment for good reason (as defined), Mr. Dimon will be entitled to receive the following: his base salary through the date of termination, a proportionate bonus based upon his target bonus for that year, and a cash payment equal to 2.5 times the sum of his base salary and the average bonus paid to him for the three prior years; and Bank One will provide Mr. Dimon with continued medical and welfare benefits for 36 months after the date of termination. In the event of a Change of Control (as defined), the restricted shares and stock options granted to Mr. Dimon on March 27, 2000 become vested and immediately exercisable. If any amounts payable to Mr. Dimon under the Agreement would subject him to the excise tax under Internal Revenue Code section 4999, Bank One will make a payment to Mr. Dimon such that after the payment of all income and excise taxes, Mr. Dimon will be in the same after–tax position as if no excise tax had been imposed. In connection with the merger of Bank One with JPMorgan Chase, Mr. Dimon has entered into an employment agreement with JPMorgan Chase subject to and effective upon the completion of the merger, which shall supersede his current employment agreement with Bank One that would have entitled Mr. Dimon to receive, upon a qualifying termination of employment following a change of control, (a) a payment of approximately $20.8 million consisting of (i) a pro–rata bonus (assuming the merger is completed on June 30, 2004) based upon his target bonus for 2004, and (ii) 2.5 times the sum of his base salary and the average annual bonus earned by him in the prior three years; and, in addition, (b) three years of welfare benefits continuation. The merger would constitute a change of control under this agreement. See "The Merger—Interests of Directors and Executive Officers in the Merger" on page 59.

## Transactions with Directors, Executive Officers,

### Stockholders and Associates

Bank One's directors, executive officers and Wellington Management Company, LLP ("WMC") (beneficial owner of more than five percent of the outstanding shares of Bank One common stock), and their respective associates, were customers of, or had transactions with, Bank One or Bank One's banking or other subsidiaries in the ordinary course of business during 2003. Additional transactions may be expected to take place in the future. All outstanding loans to directors, executive officers, WMC and their associates, commitments and sales, purchases and placements of investment securities and other financial instruments included in such transactions, were made in the ordinary course of business, on substantially the same terms, including interest rates and collateral (where applicable), as those prevailing at the time for comparable transactions with other persons, and did not involve more than normal risk of collectibility or present any other unfavorable features.

### Compensation Committee Interlocks and Insider Participation

The members of the Compensation and Organization Committee are James S. Crown, Maureen A. Fay, John R. Hall (Chair), John W. Kessler and Richard A. Manoogian. All of the members of the committee, or their associates, were customers of or had transactions with Bank One or its banking or other subsidiaries in the ordinary course of business during 2003. Additional transactions may be expected to take place in the future. All outstanding loans to the directors and their associates, commitments and sales, purchases and placements of investment securities and other financial instruments included in such transactions, were made in the ordinary course of business, on substantially the same terms, including interest rates and

159

collateral (where applicable), as those prevailing at the time for comparable transactions with other persons, and did not involve more than normal risk of collectibility or present other unfavorable features.

## Report of the Audit and Risk Management Committee

The Audit and Risk Management Committee of the board of directors is composed of five directors and operates under a written charter adopted by the board of directors. Each member of the committee meets the independence requirements of the listing standards of the New York Stock Exchange, on which Bank One's securities are listed, and are independent within the meaning of SEC regulations. The duties of the committee are summarized in this proxy statement under "—Committees of the Board of Directors" above and are more fully described in the charter, which is attached to this document as Annex I.

Management is responsible for Bank One's internal controls and the preparation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America. Bank One's independent auditor is responsible for performing an independent audit of Bank One's consolidated financial statements in accordance with auditing standards generally accepted in the United States of America and issuing a report thereon. The committee's responsibilities include monitoring and overseeing these processes.

In this context, the committee reviewed and discussed Bank One's audited consolidated financial statements for the year ended December 31, 2003 (the "Audited Financial Statements") with management and Bank One's independent auditor for 2003, KPMG LLP. The Committee also discussed with KPMG LLP the matters required to be discussed by Statement on Auditing Standards No. 61, as amended (Communication with Audit Committees), and both KPMG LLP and Bank One's internal auditors directly provide reports on significant matters to the Committee.

The committee has received the written disclosures and the letter from KPMG LLP required by Independence Standards Board Standard No. 1 (Independence Discussion with Audit Committees), and has discussed with KPMG LLP its independence from Bank One. The committee also considered whether the provision of non–audit services by KPMG LLP was compatible with maintaining the independent auditor's independence.

The committee has discussed with management and KPMG LLP such other matters and received such assurances from them as the committee deemed appropriate.

Based on the foregoing review and discussions and relying thereon, the committee recommended that the board of directors include the Audited Financial Statements in Bank One's Annual Report on Form 10–K for the year ended December 31, 2003.

Respectfully Submitted,
The Audit and Risk Management Committee
Laban P. Jackson, Jr., Chair
John H. Bryan
David C. Novak
John W. Rogers, Jr.
Frederick P. Stratton, Jr.
160

Bank One Proposal 3: Ratification of Appointment of

Independent Auditor

A proposal will be presented at the annual meeting to ratify the appointment by the board of directors, on January 20, 2004, of KPMG LLP as Bank One's independent auditor for 2004. KPMG LLP served as Bank One's independent auditor in 2003

The following is a description of the fees billed to Bank One by KPMG LLP in each of the years ended December 31, 2003 and December 31, 2002:

| Type of Service | Year Ended 12/31/03 | Year Ended 12/31/02 |
|---|---|---|
| Audit Fees (for the audit of Bank One's annual financial statements and review of financial statements included in quarterly reports. as well as services normally provided by an independent public accountant in connection with statutory and regulatory filings or engagements) | $4.722.582 | $4.107.320 |
| Audit–Related Fees (for assurance and related services that are reasonably related to the performance of the audit or review of Bank One's financial statements, including private equity due diligence assistance. information technology internal control assessment. SAS 70 reports on effectiveness of internal controls. employee benefit plan audits. various agreed upon procedures engagements and accounting advice) | 2.117.054 | 1.953.194 |
| Tax Fees (for tax compliance and tax advice. including preparation of foreign. state and federal tax returns and assistance with various federal and state tax return amendments and refund claims) | 1.297.981 | 372.500 |
| All Other Fees (for any services not included in the above three categories, including assistance with a disaster recovery project and various regulatory compliance assistance (2002), and internal control preparedness review (2003)) | 20.000 | 665,297 |

The Audit and Risk Management Committee pre–approves all services provided by KPMG LLP, as the independent accounting firm that audits Bank One's financial statements (the "principal accountant") This includes services in connection with Bank One's financial statements, as well as any other services provided to Bank One or any of its subsidiaries. Between meetings, the Chairman pre–approves such services, with ratification at the next committee meeting. In the Chairman's absence, another member of the committee, previously designated by the committee, pre–approves such services.

Management presents all services for pre–approval in sufficient detail to allow the committee to make meaningful judgments as to: (a) the nature and extent of the service; (b) whether the provision of the service may impact the principal accountant's independence; (c) whether the proposed service is not a prohibited service under the Sarbanes–Oxley Act and related rules; and (d) whether the fees (estimated or actual) for such services are reasonable. If at the time of pre–approval the principal accountant or management is unable to determine the final fee to be charged, an estimate will be provided. The principal accountant will provide regular updates to management on fees accrued in the course of the engagement; if such fees are expected to exceed the original estimate, management must present the higher fees to the committee for reapproval. Aggregate fees for the Tax and All Other categories described in the above chart should not exceed the lesser of 25% of aggregate Audit and Audit–Related fees, or $1,500,000

The committee also pre–approves all audit and audit–related services provided by any independent accounting firm (other than the principal accountant) to Bank One or any of its subsidiaries. The procedures used for presentation and approval of these services are identical to those described above with respect to the principal accountant.

Representatives of KPMG LLP will be present at the annual meeting and will have an opportunity to make a statement if they desire to do so. They will also be available to respond to appropriate questions presented at the meeting.

161

The board of directors recommends that the stockholders ratify the appointment of KPMG LLP as Bank One's independent auditor for the year 2004. In the event the selection of KPMG LLP is not ratified by the affirmative vote of a majority of the shares of common stock represented at the annual meeting, the appointment of Bank One's independent auditor will be reconsidered by the Audit and Risk Management Committee and the board.

**The Bank One board of directors recommends a vote FOR ratification of the appointment of KPMG LLP as independent auditor.**

## Other Bank One Matters

As of the date of this document, the Bank One board of directors does not know of any matters to be presented at the Bank One annual meeting other than those specifically set forth above. If other matters should properly come before the Bank One annual meeting or any adjournment thereof, the persons named as proxies in the enclosed proxy card intend to vote the shares represented by them in accordance with their best judgment with respect to any such matters.

162

## LEGAL MATTERS

Simpson Thacher & Bartlett LLP, New York, New York, has provided an opinion for JPMorgan Chase regarding the validity of the shares of JPMorgan Chase offered by this document.

Simpson Thacher & Bartlett LLP and Wachtell, Lipton, Rosen & Katz, New York, New York, counsel for Bank One, have provided and will provide at the closing of the merger opinions regarding certain federal income tax consequences of the merger for JPMorgan Chase and Bank One, respectively.

## EXPERTS

**JPMorgan Chase.** The audited financial statements of JPMorgan Chase incorporated in this document by reference to JPMorgan Chase's Annual Report on Form 10–K for the year ended December 31, 2003 have been incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of that firm as experts in accounting and auditing.

**Bank One.** The audited financial statements of Bank One incorporated in this document by reference to Bank One's Annual Report on Form 10–K for the year ended December 31, 2003 have been incorporated in reliance on the report of KPMG LLP, independent accountants, given on the authority of that firm as experts in accounting and auditing.

## STOCKHOLDER PROPOSALS

### JPMorgan Chase

*Proxy Statement Proposals.* Under the rules of the Securities and Exchange Commission, proposals that stockholders seek to have included in the proxy statement for the next annual meeting of JPMorgan Chase stockholders must be received by the Secretary of JPMorgan Chase not later than [                    ]

*Other Proposals and Nominations.* JPMorgan Chase's by–laws govern the submission of nominations for director or other business proposals that a stockholder wishes to have considered at a meeting of stockholders, but which are not included in JPMorgan Chase's proxy statement for that meeting. Under JPMorgan Chase's by–laws, nominations for director or other business proposals to be addressed at JPMorgan Chase's next annual meeting may be made by a stockholder entitled to vote who has delivered a notice to the Secretary of JPMorgan Chase no later than the close of business on [                    ], and not earlier than [                    ]. The notice must contain the information required by the by–laws.

These advance notice provisions are in addition to, and separate from, the requirements that a stockholder must meet in order to have a proposal included in this document under the rules of the Securities and Exchange Commission.

A proxy granted by a stockholder will give discretionary authority to the proxies to vote on any matters introduced pursuant to the above advance notice by–law provisions, subject to applicable rules of the Securities and Exchange Commission.

Copies of the JPMorgan Chase by–laws are available on the JPMorgan Chase website, www.jpmorganchase.com, or may be obtained from the Secretary of JPMorgan Chase.

### Bank One

If the merger occurs, there will be no Bank One annual meeting of stockholders next year. In that case, stockholder proposals must be submitted to the Secretary of JPMorgan Chase in

163

accordance with the procedures described above. In case the merger is not completed, set forth below is information relevant to a regularly scheduled 2005 Bank One annual meeting of stockholders. Any proposal that a holder of Bank One common Stock intends to present at the Bank One 2005 annual meeting of stockholders, if held, must be received by the Bank One Secretary no later than [                    ], in order to be included in the proxy statement and form of proxy relating to that meeting.

Under Bank One's certificate of incorporation, in order for a stockholder to make nominations for the election of directors before the Bank One annual meeting, a stockholder's notice of a director nomination must be received by the Secretary of Bank One at least 60 days but no more than 90 days prior to the anniversary date of Bank One's immediately preceding annual meeting; provided, however, that in the event the annual meeting is more than 30 days before or 60 days after such anniversary date, notice by the stockholder must be so received not earlier than the close of business on the 90th day prior to the annual meeting and not later than the close of business on the later of the 60th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by Bank One. Further, Bank One's by–laws provide that, in order for a stockholder to propose business to be brought before any annual stockholders' meeting, written notice must be received by the Secretary of Bank One at least 90 days but no more than 120 days prior to the anniversary date of Bank One's immediately preceding annual meeting; provided, however, that in the event the annual meeting is more than 30 days before or 60 days after such anniversary date, notice by the stockholder must be so received not earlier than the close of business on the 120th day prior to the annual meeting and not later than the close of business on the later of the 90th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made by Bank One.

Bank One stockholder notices should be delivered to Bank One Corporation, Attn: Secretary, 1 Bank One Plaza, Mail Code IL1–0276, Chicago, Illinois 60670–0276.

These advance notice provisions are in addition to, and separate from, the requirements that a stockholder must meet in order to have a proposal included in this document under the rules of the Securities and Exchange Commission.

## WHERE YOU CAN FIND MORE INFORMATION

JPMorgan Chase and Bank One file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission. You may read and copy any document we file at the Securities and Exchange Commission's public reference rooms in Washington, D.C. Please call the Securities and Exchange Commission at 1–800–SEC–0330 for further information on the public reference rooms. Our Securities and Exchange Commission filings are also available to the public at the Securities and Exchange Commission's website at http://www.sec.gov. Copies of documents filed by JPMorgan Chase and Bank One with the Securities and Exchange Commission are also available at the offices of The New York Stock Exchange, 20 Broad Street, New York, New York 10005.

JPMorgan Chase has filed a registration statement on Form S–4 under the Securities Act with the Securities and Exchange Commission with respect to JPMorgan Chase's common stock to be issued in the merger. This document constitutes the prospectus of JPMorgan Chase filed as part of the registration statement. This document does not contain all of the information set forth in the registration statement because certain parts of the registration statement are omitted in accordance with the rules and regulations of the Securities and Exchange Commission. The registration statement and its exhibits are available for inspection and copying as set forth above.

The Securities and Exchange Commission allows us to "incorporate by reference" into this document documents filed with the Securities and Exchange Commission by JPMorgan Chase and Bank One. This means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this document, and later information that we file with the Securities and Exchange Commission will update and supersede that information. We incorporate by reference the documents listed below and any documents filed by JPMorgan Chase or Bank One under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act after the date of this document and before the date of our meetings:

| JPMorgan Chase filings (SEC file number 1–5805): | Periods |
|---|---|
| Annual Report on Form 10–K<br>Current Reports on Form 8–K | Year ended December 31, 2003<br>Filed January 21, 2004, January 28, 2004 and February 2, 2004 (other than the portions of those documents not deemed to be filed) |
| The description of JPMorgan Chase's common stock and preferred stock contained in JPMorgan Chase's registration statements filed under Section 12 of the Securities Exchange Act | |

| Bank One filings (SEC file number 1–15323): | Periods |
|---|---|
| Annual Report on Form 10–K<br>Current Reports on Form 8–K | Year ended December 31, 2003<br>Filed January 20, 2004, January 20, 2004, January 28, 2004 and February 3, 2004 (other than the portions of those documents not deemed to be filed) |
| The description of Bank One's common stock and preferred stock contained in Bank One's registration statements filed under Section 12 of the Securities Exchange Act | |

165

You may request a copy of the documents incorporated by reference into this document. Requests for documents should be directed to:

if you are a JPMorgan Chase stockholder:        if you are a Bank One stockholder:
[    ]        [    ]
By Mail: [    ]        By mail:[    ]
[    ]        [    ]
By E–mail: [    ]        By E–mail: [    ]
By Telephone:        By Telephone:
  Within U.S.: [    ]        Within U.S.: [    ]
  Outside U.S.: [    ]        Outside U.S.: [    ]

This document does not constitute an offer to sell, or a solicitation of an offer to purchase, the securities offered by this document, or the solicitation of a proxy, in any jurisdiction to or from any person to whom or from whom it is unlawful to make such offer, solicitation of an offer or proxy solicitation in such jurisdiction. Neither the delivery of this document nor any distribution of securities pursuant to this document shall, under any circumstances, create any implication that there has been no change in the information set forth or incorporated into this document by reference or in our affairs since the date of this document. The information contained in this document with respect to JPMorgan Chase was provided by JPMorgan Chase and the information contained in this document with respect to Bank One was provided by Bank One.

166