# Tab B

# Part 6

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

(b) *Dividends; Changes in Stock.* JPMorgan Chase shall not, nor shall it permit any of its Subsidiaries to, or propose to, (i) declare or pay any dividends on or make other distributions in respect of any of its capital stock, except (A) as provided in Section 5.12, (B) the declaration and payment of regular quarterly cash dividends on the JPMorgan Chase Common Stock at a rate not in excess of the regular quarterly cash dividend most recently declared prior to the date of this Agreement and regular cash dividends on the JPMorgan Chase Preferred Stock in accordance with the terms of such preferred stock as in effect on the date of this Agreement, in each case with usual record and payment dates for such dividends in accordance with JPMorgan Chase's past dividend practice or as required by the terms of such preferred stock, and (C) for dividends by a wholly–owned Subsidiary of JPMorgan Chase, (ii) split, combine or reclassify any of its capital stock or issue or authorize or propose the issuance or authorization of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock, or (iii) repurchase, redeem or otherwise acquire, or permit any Subsidiary to redeem, purchase or otherwise acquire, any shares of its capital stock or any securities convertible into or exercisable for any shares of its capital stock (except for the acquisition of trading account shares, trust account shares and DPC shares in the ordinary course of business consistent with past practice and except pursuant to agreements in effect on the date hereof and disclosed or not required to be disclosed in the JPMorgan Chase Disclosure Schedule).

(c) *Issuance of Securities.* JPMorgan Chase shall not, nor shall it permit any of its Subsidiaries to, issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of its capital stock of any class, any Voting Debt, any stock appreciation rights or any securities convertible into or exercisable or exchangeable for, or any rights, warrants or options to acquire, any such shares or Voting Debt, or enter into any agreement with respect to any of the foregoing, other than (i) the issuance of JPMorgan Chase Common Stock upon the exercise or settlement of stock options, stock appreciation rights, units or other equity rights or obligations under the JPMorgan Chase Stock Plans or JPMorgan Chase Benefit Plans in accordance with the terms of the applicable JPMorgan Chase Stock Plan or JPMorgan Chase Benefit Plan in effect on the date of this Agreement, issuances of stock options and other equity awards in the ordinary course of business or issuances of JPMorgan Chase Common Stock pursuant to the JPMorgan Chase Stock Option Agreement, (ii) issuances by a wholly–owned Subsidiary of its capital stock to its parent or to another wholly–owned Subsidiary of JPMorgan Chase, (iii) issuances in respect of any Acquisitions by JPMorgan Chase or its Subsidiaries permitted by Section 4.2(e), including any financings therefor, and (iv) as disclosed in the JPMorgan Chase Disclosure Schedule.

(d) *Governing Documents.* JPMorgan Chase shall not amend or propose to amend its Certificate of Incorporation or By–laws (except for amendments to its Certificate of Incorporation to eliminate series of JPMorgan Chase Preferred Stock that are no longer outstanding) or, except as permitted pursuant to Section 4.2(e) or 4.2(f), enter into, or permit any Subsidiary to enter into, a plan of consolidation, merger or reorganization with any person other than a wholly–owned Subsidiary of JPMorgan Chase.

(e) *No Acquisitions.* Other than Acquisitions that (A) would not reasonably be expected to materially delay, impede or affect the consummation of the transactions contemplated by this Agreement in the manner contemplated hereby and (B) for which the fair market value of the total consideration paid by JPMorgan Chase and its Subsidiaries in such Acquisitions does not exceed in the aggregate the amount set forth in the JPMorgan Chase Disclosure Schedule, JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, acquire or agree to acquire, by merging or consolidating with, by purchasing a substantial equity interest in or a substantial portion of the assets of, by forming a partnership or joint venture, or by any other manner, any business or any corporation,

A–30

partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets; *provided, however,* that the foregoing shall not prohibit (i) internal reorganizations or consolidations involving existing Subsidiaries that would not present a material risk of any material delay in the receipt of any Requisite Regulatory Approval, (ii) foreclosures and other debt–previously–contracted acquisitions in the ordinary course of business, (iii) acquisitions of control by a banking Subsidiary in its fiduciary capacity, (iv) investments made by small business investment company, venture capital or private equity Subsidiaries, acquisitions of financial assets and merchant banking activities, in each case in the ordinary course of business consistent with past practice, (v) the creation of new Subsidiaries organized to conduct or continue activities otherwise permitted by this Agreement or (vi) acquisitions of securities in the ordinary course of JPMorgan Chase's or its Subsidiaries' underwriting, trading or market–making businesses consistent with past practice.

(f) *No Dispositions*  Other than (i) internal reorganizations or consolidations involving existing Subsidiaries that would not present a material risk of any material delay in the receipt of any Requisite Regulatory Approval, (ii) dispositions referred to in JPMorgan Chase SEC Documents filed prior to the date of this Agreement or as disclosed in the JPMorgan Chase Disclosure Schedule, (iii) securitization activities in the ordinary course of business consistent with past practice, (iv) other activities in the ordinary course of business consistent with past practice, and (v) other dispositions of assets (including Subsidiaries) if the fair market value of the total consideration received therefrom does not exceed in the aggregate the amount set forth in the JPMorgan Chase Disclosure Schedule, JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, sell, lease, assign, encumber or otherwise dispose of, or agree to sell, lease, assign, encumber or otherwise dispose of, any of its assets (including capital stock of its Subsidiaries and indebtedness of others held by JPMorgan Chase and its Subsidiaries) which are material, individually or in the aggregate, to JPMorgan Chase.

(g) *Indebtedness*  JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, incur, create or assume any long–term indebtedness for borrowed money (or modify any of the material terms of any such outstanding long–term indebtedness), guarantee any such long–term indebtedness or issue or sell any long–term debt securities or warrants or rights to acquire any long–term debt securities of JPMorgan Chase or any of its Subsidiaries or guarantee any long–term debt securities of others, other than (i) in replacement of existing or maturing debt, (ii) indebtedness of any Subsidiary of JPMorgan Chase to JPMorgan Chase or to another Subsidiary of JPMorgan Chase, or (iii) in the ordinary course of business consistent with past practice

(h) *Other Actions*  JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, intentionally take any action that would, or reasonably might be expected to, result in any of its representations and warranties set forth in this Agreement being or becoming untrue, subject to such exceptions as do not have, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on JPMorgan Chase or on the Surviving Corporation following the Effective Time, or in any of the conditions to the Merger set forth in Article VI not being satisfied or in a violation of any provision of this Agreement or the Option Agreements, or (unless such action is required by applicable law) which would adversely affect the ability of the parties to obtain any of the Requisite Regulatory Approvals without imposition of a condition or restriction of the type referred to in Section 6 1(f).

(i) *Accounting Methods*  Except as disclosed in any JPMorgan Chase SEC Document filed prior to the date of this Agreement, JPMorgan Chase shall not change its methods of accounting in effect at December 31, 2003, except as required by changes in generally accepted accounting principles as concurred in by JPMorgan Chase's independent auditors.

A–31

(j) *Tax—Free Reorganization Treatment.* JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, intentionally take or cause to be taken any action, whether before or after the Effective Time, which would reasonably be expected to disqualify the Merger as a reorganization within the meaning of Section 368(a) of the Code

(k) *Compensation and Benefit Plans.* During the period from the date of this Agreement and continuing until the Effective Time, JPMorgan Chase agrees as to itself and its Subsidiaries that, except as set forth in the JPMorgan Chase Disclosure Schedule, it will not, without the prior written consent of Bank One, (i) other than in the ordinary course of business, enter into, adopt, amend (except for such amendments as may be required by law) or terminate any JPMorgan Chase Benefit Plan, or any other employee benefit plan or any agreement, arrangement, plan or policy between JPMorgan Chase or a Subsidiary of JPMorgan Chase and one or more of its directors or officers, (ii) except for normal payments, awards and increases in the ordinary course of business or as required by any plan or arrangement as in effect as of the date hereof, increase in any manner the compensation or fringe benefits of any director, officer or employee or pay any benefit not required by any plan or arrangement as in effect as of the date hereof or enter into any contract, agreement, commitment or arrangement to do any of the foregoing, (iii) enter into or renew any contract, agreement, commitment or arrangement (other than a renewal occurring in accordance with the terms thereof) providing for the payment to any director, officer or employee of such party of compensation or benefits contingent, or the terms of which are materially altered, upon the occurrence of any of the transactions contemplated by this Agreement or the Option Agreements or (iv) provide, with respect to the grant of any stock option, restricted stock, restricted stock unit or other equity—related award pursuant to the JPMorgan Chase 2003 bonus program or otherwise granted on or after the date hereof, that the vesting of any such stock option, restricted stock, restricted stock unit or other equity—related award shall accelerate or otherwise be affected by the occurrence of any of the transactions contemplated by this Agreement or the Option Agreements.

(l) *Investment Portfolio.* JPMorgan Chase shall not materially restructure or materially change (on a consolidated basis) its investment securities portfolio, its hedging strategy or its gap position, through purchases, sales or otherwise, or the manner in which the portfolio is classified or reported or materially increase the credit or risk concentrations associated with its underwriting, market—making and other investment banking businesses.

(m) *No Liquidation.* JPMorgan Chase shall not, and shall not permit any of its Significant Subsidiaries to, adopt a plan of complete or partial liquidation or resolutions providing for or authorizing such a liquidation or a dissolution, restructuring, recapitalization or reorganization.

(n) *Other Agreements.* JPMorgan Chase shall not, and shall not permit any of its Subsidiaries to, agree to, or make any commitment to, take, or authorize, any of the actions prohibited by this Section 4.2.

4.3. *Transition.* In order to facilitate the integration of the operations of Bank One and JPMorgan Chase and their Subsidiaries and to permit the coordination of their related operations on a timely basis, and in an effort to accelerate to the earliest time possible following the Effective Time the realization of synergies, operating efficiencies and other benefits expected to be realized by the parties as a result of the Merger, each of Bank One and JPMorgan Chase shall, and shall cause its Subsidiaries to, consult with the other on all strategic and operational matters to the extent such consultation is not in violation of applicable laws, including laws regarding the exchange of information and other laws regarding competition. Each of Bank One and JPMorgan Chase shall, and shall cause its Subsidiaries to, make available to the other at its facilities and those of its Subsidiaries, where determined by JPMorgan Chase or Bank One, as the case may be, to be appropriate and necessary, office space in order to assist it in observing

A—32

all operations and reviewing, to the extent not in violation of applicable laws, all matters concerning the affairs of the other party. Without in any way limiting the provisions of Section 5.2, Bank One and JPMorgan Chase, their respective Subsidiaries and their respective officers, employees, counsel, financial advisors and other representatives shall, upon reasonable notice to the other party, be entitled to review the operations and visit the facilities of the other party and its Subsidiaries at all times as may be deemed reasonably necessary by JPMorgan Chase or Bank One, as the case may be, in order to accomplish the foregoing arrangements.

4.4  *Advice of Changes; Government Filings.* Each party shall confer on a regular and frequent basis with the other, report on operational matters and promptly advise the other orally and in writing of any change or event having, or which would reasonably be expected to have, a material adverse effect on such party or which would cause or constitute a material breach of any of the representations, warranties or covenants of such party contained herein; *provided, however,* that any noncompliance with the foregoing shall not constitute the failure to be satisfied of a condition set forth in Article VI or give rise to any right of termination under Article VII unless the underlying breach shall independently constitute such a failure or give rise to such a right. Bank One and JPMorgan Chase shall file all reports required to be filed by each of them with the SEC between the date of this Agreement and the Effective Time and shall deliver to the other party copies of all such reports promptly after the same are filed. Bank One, JPMorgan Chase and each Subsidiary of JPMorgan Chase or Bank One that is a bank shall file all call reports with the appropriate bank regulators and all other reports, applications and other documents required to be filed with the applicable Governmental Entities between the date hereof and the Effective Time and shall make available to the other party copies of all such reports promptly after the same are filed. Each of Bank One and JPMorgan Chase shall have the right to review in advance, and to the extent practicable each will consult with the other, in each case subject to applicable laws relating to the exchange of information, with respect to all the information relating to the other party, and any of their respective Subsidiaries, which appears in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties hereto agrees to act reasonably and as promptly as practicable. Each party hereto agrees that to the extent practicable it will consult with the other party hereto with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other party apprised of the status of matters relating to completion of the transactions contemplated hereby.

4.5.  *Control of Other Party's Business.* Nothing contained in this Agreement (including, without limitation, Section 4.3) shall give JPMorgan Chase, directly or indirectly, the right to control or direct the operations of Bank One or shall give Bank One, directly or indirectly, the right to control or direct the operations of JPMorgan Chase prior to the Effective Time. Prior to the Effective Time, each of Bank One and JPMorgan Chase shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

## ARTICLE V

## ADDITIONAL AGREEMENTS

5.1.  *Preparation of Proxy Statement; Stockholders Meetings.* (a) As promptly as reasonably practicable following the date hereof, JPMorgan Chase and Bank One shall cooperate in preparing and shall cause to be filed with the SEC mutually acceptable proxy materials which shall constitute the proxy statement/prospectus relating to the matters to be submitted to the Bank One stockholders at the Bank One Stockholders Meeting (as defined in Section 5.1(b)) and to the JPMorgan Chase stockholders at the JPMorgan Chase Stockholders Meeting (as

defined in Section 5.1(c)) (such joint proxy statement/prospectus, and any amendments or supplements thereto, the *"Joint Proxy Statement/ Prospectus"*), and JPMorgan Chase shall prepare and file with the SEC a registration statement on Form S-4 (of which the Joint Proxy Statement/ Prospectus shall be a part) with respect to the issuance of JPMorgan Chase Common Stock in the Merger (such Form S-4, and any amendments or supplements thereto, the *"Form S-4"*). Each of JPMorgan Chase and Bank One shall use reasonable best efforts to have the Joint Proxy Statement/ Prospectus cleared by the SEC and the Form S-4 declared effective by the SEC and to keep the Form S-4 effective as long as is necessary to consummate the Merger and the transactions contemplated thereby. JPMorgan Chase and Bank One shall, as promptly as practicable after receipt thereof, provide the other party with copies of any written comments and advise the other party of any oral comments with respect to the Joint Proxy Statement/ Prospectus or Form S-4 received from the SEC. Each party shall cooperate and provide the other party with a reasonable opportunity to review and comment on any amendment or supplement to the Joint Proxy Statement/ Prospectus and the Form S-4 prior to filing such with the SEC, and each party will provide the other party with a copy of all such filings made with the SEC. JPMorgan Chase shall use its reasonable best efforts to take any action required to be taken under any applicable state securities laws in connection with the Merger and each party shall furnish all information concerning it and the holders of its capital stock as may be reasonably requested in connection with any such action. Each party will advise the other party, promptly after it receives notice thereof, of the time when the Form S-4 has become effective, the issuance of any stop order, the suspension of the qualification of the JPMorgan Chase Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, or any request by the SEC for amendment of the Joint Proxy Statement/ Prospectus or the Form S-4. If at any time prior to the Effective Time any information relating to either of the parties, or their respective affiliates, officers or directors, should be discovered by either party which should be set forth in an amendment or supplement to any of the Form S-4 or the Joint Proxy Statement/ Prospectus so that such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party which discovers such information shall promptly notify the other party hereto and, to the extent required by law, rules or regulations, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the stockholders of Bank One and JPMorgan Chase.

(b) Bank One shall duly take all lawful action to call, give notice of, convene and hold a meeting of its stockholders as promptly as practicable following the date upon which the Form S-4 becomes effective (the *"Bank One Stockholders Meeting"*) for the purpose of obtaining the Required Bank One Vote with respect to the transactions contemplated by this Agreement. The Board of Directors of Bank One shall use its reasonable best efforts to obtain from the Bank One stockholders the Required Bank One Vote in favor of adoption of this Agreement, and nothing contained in this Agreement shall be deemed to relieve Bank One of its obligation to submit this Agreement to its stockholders for a vote on the adoption thereof.

(c) JPMorgan Chase shall duly take all lawful action to call, give notice of, convene and hold a meeting of its stockholders as promptly as practicable following the date upon which the Form S-4 becomes effective (the *"JPMorgan Chase Stockholders Meeting"*) for the purpose of obtaining the Required JPMorgan Chase Vote with respect to the transactions contemplated by this Agreement. The Board of Directors of JPMorgan Chase shall use its reasonable best efforts to obtain from the JPMorgan Chase stockholders the Required JPMorgan Chase Vote in favor of adoption of this Agreement, and nothing contained in this Agreement shall be deemed to relieve JPMorgan Chase of its obligation to submit this Agreement to its stockholders for a vote on the adoption thereof.

(d) Bank One and JPMorgan Chase shall each use their reasonable best efforts to cause the Bank One Stockholders Meeting and the JPMorgan Chase Stockholders Meeting to be held on the same date

5.2. *Access to Information*. (a) Upon reasonable notice, Bank One and JPMorgan Chase shall each (and shall cause each of their respective Subsidiaries to) afford to the representatives of the other, access, during normal business hours during the period prior to the Effective Time, to all its properties, books, contracts and records and, during such period, each of Bank One and JPMorgan Chase shall (and shall cause each of their respective Subsidiaries to) make available to the other (i) a copy of each report, schedule, registration statement and other document filed or received by it during such period pursuant to the requirements of Federal or state securities laws, Federal or state banking laws or the rules and regulations of self regulatory organizations (other than reports or documents which such party is not permitted to disclose under applicable law) and (ii) all other information concerning its business, properties and personnel as such other party may reasonably request. Neither party nor any of its Subsidiaries shall be required to provide access to or to disclose information where such access or disclosure would violate or prejudice the rights of its customers, jeopardize the attorney–client privilege of the institution in possession or control of such information or contravene any law, rule, regulation, order, judgment, decree or binding agreement entered into prior to the date of this Agreement. The parties will make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

(b) The parties will hold any such information which is nonpublic in confidence to the extent required by, and in accordance with, the provisions of the letter dated December 23, 2003, between Bank One and JPMorgan Chase (the *"Confidentiality Agreement"*), which Confidentiality Agreement will remain in full force and effect.

(c) No such investigation by either JPMorgan Chase or Bank One shall affect the representations and warranties of the other.

5.3. *Reasonable Best Efforts*. (a) Each of Bank One and JPMorgan Chase shall, and shall cause its Subsidiaries to, use all reasonable best efforts (i) to take, or cause to be taken, all actions necessary to comply promptly with all legal requirements which may be imposed on such party or its Subsidiaries with respect to the Merger and to consummate the transactions contemplated by this Agreement as promptly as practicable, and (ii) to obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any Governmental Entity and/or any other public or private third party which is required to be obtained or made by such party or any of its Subsidiaries in connection with the Merger and the transactions contemplated by this Agreement; *provided, however*, that a party shall not be obligated to take any action pursuant to the foregoing if the taking of such action or such compliance or the obtaining of such consent, authorization, order, approval or exemption will result in a condition or restriction on such party or on the Surviving Corporation having an effect of the type referred to in Section 6.1(f). Each of Bank One and JPMorgan Chase will promptly cooperate with and furnish information to the other in connection with any such efforts by, or requirement imposed upon, any of them or any of their Subsidiaries in connection with the foregoing.

(b) JPMorgan Chase agrees to execute and deliver, or cause to be executed and delivered by or on behalf of the Surviving Corporation, at or prior to the Effective Time, supplemental indentures and other instruments required for the due assumption of Bank One's outstanding debt, guarantees and other securities to the extent required by the terms of such debt, guarantees and securities and the instruments and agreements relating thereto.

(c) Each of Bank One and JPMorgan Chase and their respective Boards of Directors shall, if any state takeover statute or similar statute becomes applicable to this Agreement, the Merger, the Option Agreements or any other transactions contemplated hereby or thereby, use all

A–35

reasonable best efforts to ensure that the Merger and the other transactions contemplated by this Agreement and the Option Agreements may be consummated as promptly as practicable on the terms contemplated hereby or thereby and otherwise to minimize the effect of such statute or regulation on this Agreement, the Merger, the Option Agreements and the other transactions contemplated hereby or thereby

5 4 *Acquisition Proposals.* (a) Each of JPMorgan Chase and Bank One agrees that neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and that it shall use its reasonable best efforts to cause its and its Subsidiaries' employees, agents and representatives (including any investment banker, attorney or accountant retained by it or any of its Subsidiaries) not to, directly or indirectly, (i) initiate, solicit, encourage or knowingly facilitate any inquiries or the making of any proposal or offer with respect to, or a transaction to effect, a merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving it or any of its Significant Subsidiaries (other than any such transaction permitted by Section 4 1(e) or (f) in the case of Bank One, and Section 4 2(e) or (f) in the case of JPMorgan Chase) or any purchase or sale of 20% or more of the consolidated assets (including, without limitation, stock of its Subsidiaries) of it and its Subsidiaries, taken as a whole, or any purchase or sale of, or tender or exchange offer for, its voting securities that, if consummated, would result in any person (or the stockholders of such person) beneficially owning securities representing 20% or more of its total voting power (or of the surviving parent entity in such transaction) or any of its Significant Subsidiaries (any such proposal, offer or transaction (other than a proposal or offer made by the other party to this Agreement or an affiliate thereof) being hereinafter referred to as an *"Acquisition Proposal"*), (ii) have any discussions with or provide any confidential information or data to any person relating to an Acquisition Proposal, or engage in any negotiations concerning an Acquisition Proposal, or knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal, or (iii) approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, asset purchase or share exchange agreement, option agreement or other similar agreement related to any Acquisition Proposal or propose or agree to do any of the foregoing

(b) (i) Notwithstanding the foregoing, the Board of Directors of each party shall be permitted, prior to its respective meeting of stockholders to be held pursuant to Section 5.1, and subject to compliance with the other terms of this Section 5.4 and to first entering into a confidentiality agreement having provisions that are no less favorable to such party than those contained in the Confidentiality Agreement, to engage in discussions and negotiations with, or provide any nonpublic information or data to, any person in response to an unsolicited bona fide written Acquisition Proposal by such person first made after the date of this Agreement which such party's Board of Directors concludes in good faith constitutes or is reasonably likely to result in a Superior Proposal, if and only to the extent that the Board of Directors of such party reasonably determines in good faith (after consultation with outside legal counsel) that failure to do so would cause it to violate its fiduciary duties under applicable law.

(ii) Each party shall notify the other party promptly (but in no event later than 24 hours) after receipt of any Acquisition Proposal, or any request for nonpublic information relating to such party or any of its Subsidiaries by any person that informs such party or any of its Subsidiaries that it is considering making, or has made, an Acquisition Proposal, or any inquiry from any person seeking to have discussions or negotiations with such party relating to a possible Acquisition Proposal. Such notice shall be made orally and confirmed in writing, and shall indicate the identity of the person making the Acquisition Proposal, the inquiry or request and the material terms and conditions of any inquiries, proposals or offers (including a copy thereof if in writing and any related documentation or correspondence). Each party shall also promptly, and in any event within 24 hours, notify the other party, orally and in writing, if it enters into discussions or negotiations concerning any Acquisition Proposal or

A–36

provides nonpublic information or data to any person in accordance with this Section 5 4(b) and keep the other party informed of the status and terms of any such proposals, offers, discussions or negotiations on a current basis, including by providing a copy of all material documentation or correspondence relating thereto.

(iii) Nothing contained in this Section 5 4 shall prohibit either party or its Subsidiaries from taking and disclosing to its stockholders a position required by Rule 14e–2(a) or Rule 14d–9 promulgated under the Exchange Act; *provided, however,* that compliance with such rules shall not in any way limit or modify the effect that any action taken pursuant to such rules has under any other provision of this Agreement, including Section 7.1(d) or (e), as applicable

(c) Each of JPMorgan Chase and Bank One agrees that (i) it will and will cause its Subsidiaries, and its and their officers, directors, agents, representatives and advisors to, cease immediately and terminate any and all existing activities, discussions or negotiations with any third parties conducted heretofore with respect to any Acquisition Proposal, and (ii) it will not release any third party from, or waive any provisions of, any confidentiality or standstill agreement to which it or any of its Subsidiaries is a party with respect to any Acquisition Proposal. Each of JPMorgan Chase and Bank One agrees that it will use reasonable best efforts to promptly inform its and its Subsidiaries' respective directors, officers, key employees, agents and representatives of the obligations undertaken in this Section 5.4.

(d) Nothing in this Section 5 4 shall (x) permit either party to terminate this Agreement or (y) affect any other obligation of the parties under this Agreement. Neither party shall submit to the vote of its stockholders any Acquisition Proposal other than the Merger

(e) For purposes of this Agreement, *"Superior Proposal"* means a bona fide written Acquisition Proposal which the Board of Directors of JPMorgan Chase or Bank One, as the case may be, concludes in good faith, after consultation with its financial advisors and legal advisors, taking into account all legal, financial, regulatory and other aspects of the proposal and the person making the proposal (including any break–up fees, expense reimbursement provisions and conditions to consummation), (i) is more favorable to the stockholders of JPMorgan Chase or Bank One, as the case may be, from a financial point of view, than the transactions contemplated by this Agreement and (ii) is fully financed or reasonably capable of being fully financed, reasonably likely to receive all required governmental approvals on a timely basis and otherwise reasonably capable of being completed on the terms proposed; *provided* that, for purposes of this definition of "Superior Proposal," the term Acquisition Proposal shall have the meaning assigned to such term in Section 5.4(a), except that the reference to "20% or more" in the definition of "Acquisition Proposal" shall be deemed to be a reference to "a majority" and "Acquisition Proposal" shall only be deemed to refer to a transaction involving JPMorgan Chase or Bank One, as the case may be.

(f) Any disclosure (other than a "stop, look and listen" or similar communication of the type contemplated by Rule 14d–9(f) under the Exchange Act) made pursuant to Section 5 4(b)(iii) shall be deemed to be a Change in Bank One Recommendation (as defined in Section 7.1(d)) or Change in JPMorgan Chase Recommendation (as defined in Section 7.1(e)), as the case may be, unless the Board of Directors of the party making such disclosure expressly reaffirms its recommendation to its stockholders in favor of adoption of this Agreement.

5.5. *Affiliates*. Bank One shall use all reasonable efforts to cause each person who is an "affiliate" (for purposes of Rule 145 under the Securities Act) to deliver to JPMorgan Chase, as soon as reasonably practicable and in any event prior to the Bank One Stockholders Meeting, a written agreement substantially in the form attached as Exhibit 5 5.

5 6 *Stock Exchange Listing*. JPMorgan Chase shall use all reasonable efforts to cause (i) the shares of JPMorgan Chase Common Stock to be issued in the Merger and (ii) the

A–37

shares of JPMorgan Chase Common Stock to be reserved for issuance upon exercise of Bank One Stock Options (as defined below), to be approved for listing on the NYSE, subject to official notice of issuance, prior to the Closing Date.

5 7. *Employee Benefit Plans.* (a) JPMorgan Chase and Bank One agree that, except as otherwise provided herein (including as set forth in Section 5 7(a) of the Bank One Disclosure Schedule or Section 5.7(a) of the JPMorgan Chase Disclosure Schedule, as applicable) and unless otherwise mutually determined, the JPMorgan Chase Benefit Plans and Bank One Benefit Plans in effect at the date of this Agreement shall remain in effect after the Effective Time with respect to employees covered by such plans at the Effective Time, and the parties shall negotiate in good faith to formulate Benefit Plans for the Surviving Corporation and its Subsidiaries, with respect both to employees who were covered by the JPMorgan Chase Benefit Plans and Bank One Benefit Plans at the Effective Time and employees who were not covered by such plans at the Effective Time, that provide benefits for services on a basis that does not discriminate between employees who were covered by the JPMorgan Chase Benefit Plans and employees who were covered by the Bank One Benefit Plans

(b) With respect to Benefit Plans maintained or contributed to outside the United States for the benefit of non–United States citizens or residents, the principles set forth in the preceding paragraph of this Section 5 7 shall apply to the extent the application of such principles does not violate applicable foreign law.

5 8.     *Bank One Equity Awards.* (a) At the Effective Time, each outstanding option to purchase shares of Bank One Common Stock (a *"Bank One Stock Option"*) and each outstanding stock appreciation right (a *"Bank One SAR"*) or restricted stock unit (a *"Bank One Unit"*) or other equity–based award or right in respect of or based on the value of Bank One Common Stock (an *"Other Bank One Equity Right"*) issued pursuant to any Bank One Stock Plan, whether vested or unvested, shall be assumed by JPMorgan Chase, and each share of Bank One Common Stock subject to restrictions that do not lapse upon the Effective Time (a *"Bank One Restricted Share"*) shall be honored by JPMorgan Chase in accordance with their terms following their conversion in the Merger into restricted shares of JPMorgan Chase Common Stock. Each Bank One Stock Option shall be deemed to constitute an option to acquire, on the same terms and conditions as were applicable under such Bank One Stock Option, the same number of shares of JPMorgan Chase Common Stock as the holder of such Bank One Stock Option would have been entitled to receive pursuant to the Merger had such holder exercised such option in full immediately prior to the Effective Time, rounded, if necessary, to the nearest whole share, at a price per share equal to (y) the exercise price per share of the shares of Bank One Common Stock otherwise purchasable pursuant to such Bank One Stock Option divided by (z) the Exchange Ratio, rounded to the nearest cent; *provided, however,* that in the case of any option to which section 421 of the Code applies by reason of its qualification under section 422 of the Code (*"incentive stock options"*), the option price, the number of shares purchasable pursuant to such option and the terms and conditions of exercise of such option shall be determined in accordance with the method set forth above unless use of such method will not preserve the status of such options as incentive stock options, in which case the manner of determination shall be adjusted in a manner that both complies with Section 424(a) of the Code and results in the smallest modification in the economic values that otherwise would be achieved by the holder pursuant to the method set forth above

(b) Each holder of a Bank One SAR shall be entitled to that number of stock appreciation rights of JPMorgan Chase (*"JPMorgan Chase SARs"*), determined in the same manner as set forth above with respect to Bank One Stock Options assumed by JPMorgan Chase. Each holder of a Bank One Unit shall be entitled to that number of restricted stock units of JPMorgan Chase determined by multiplying the number of Bank One Units held by such holder immediately prior to the Effective Time by the Exchange Ratio. Each Other Bank One Equity Right shall cease to represent a right or award with respect to shares of Bank One Common Stock and shall be

A–38

converted into a right or award with respect to shares of JPMorgan Chase Common Stock determined in the same manner as set forth above with respect to Bank One Stock Options.

(c) As soon as practicable after the Effective Time, JPMorgan Chase shall deliver to the holders of Bank One Stock Options, Bank One SARs, Bank One Units, Bank One Restricted Shares and Other Bank One Equity Rights appropriate notices setting forth such holders' rights pursuant to the Bank One Stock Plans and the agreements evidencing the grants of such Bank One Stock Options, Bank One SARs, Bank One Units, Bank One Restricted Shares or Other Bank One Equity Rights, as the case may be, shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 5.8 after giving effect to the Merger and the assumption by JPMorgan Chase as set forth above). If necessary, JPMorgan Chase shall comply with the terms of the applicable Bank One Stock Plan and ensure, to the extent required by, and subject to the provisions of, Section 5.8(a) and such Plan, that Bank One Stock Options which qualified as incentive stock options prior to the Effective Time continue to qualify as incentive stock options of JPMorgan Chase after the Effective Time.

(d) JPMorgan Chase shall take all corporate action necessary to reserve for issuance a sufficient number of shares of JPMorgan Chase Common Stock for delivery upon exercise of Bank One Stock Options, Bank One SARs, Bank One Units, Bank One Restricted Shares and Other Bank One Equity Rights assumed by it in accordance with this Section 5.8. As soon as practicable after the Effective Time, JPMorgan Chase shall file a registration statement on Form S–3 or Form S–8, as the case may be (or any successor or other appropriate forms), with respect to the shares of JPMorgan Chase Common Stock subject to such Bank One equity awards and shall use its best efforts to maintain the effectiveness of such registration statement or registration statements (and maintain the current status of the prospectus or prospectuses contained therein) for so long as such Bank One equity awards remain outstanding. With respect to those individuals who subsequent to the Merger will be subject to the reporting requirements under Section 16(a) of the Exchange Act, where applicable, JPMorgan Chase shall administer the Bank One Stock Plans assumed pursuant to this Section 5.8 in a manner that complies with Rule 16b–3 promulgated under the Exchange Act to the extent the applicable Bank One Stock Plan complied with such rule prior to the Merger.

(e) Assuming that Bank One delivers to JPMorgan Chase the Section 16 Information (as defined below) reasonably in advance of the Effective Time, the Board of Directors of JPMorgan Chase, or a committee of Non–Employee Directors thereof (as such term is defined for purposes of Rule 16b–3(d) under the Exchange Act), shall reasonably promptly thereafter and in any event prior to the Effective Time adopt a resolution providing that the receipt by the Bank One Insiders (as defined below) of JPMorgan Chase Common Stock in exchange for shares of Bank One Common Stock (including Bank One Restricted Shares), and of options or stock appreciation rights to purchase JPMorgan Chase Common Stock upon conversion of Bank One Stock Options and Bank One SARS or to receive shares of JPMorgan Chase Common Stock upon conversion of Bank One Units and Other Bank One Equity Rights, in each case pursuant to the transactions contemplated hereby and to the extent such securities are listed in the Section 16 Information provided by Bank One to JPMorgan Chase prior to the Effective Time, are intended to be exempt from liability pursuant to Section 16(b) under the Exchange Act such that any such receipt shall be so exempt. *"Section 16 Information"* shall mean information accurate in all material respects regarding the Bank One Insiders, the number of shares of Bank One Common Stock held by each such Bank One Insider and the number and description of the Bank One Stock Options, Bank One SARs, Bank One Units, Bank One Restricted Shares and Other Bank One Equity Rights held by each such Bank One Insider. *"Bank One Insiders"* shall mean those officers and directors of Bank One who are subject to the reporting requirements of Section 16(a) of the Exchange Act and who are listed in the Section 16 Information.

5.9.   *Fees and Expenses.* Whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement, the Option Agreements and the

A–39

transactions contemplated hereby and thereby shall be paid by the party incurring such expense, except as otherwise provided in the Option Agreements or in Section 7 2 hereof and except that (a) if the Merger is consummated, the Surviving Corporation shall pay, or cause to be paid, any and all property or transfer taxes imposed on either party in connection with the Merger, and (b) expenses incurred in connection with filing, printing and mailing the Joint Proxy Statement/ Prospectus and the Form S-4 shall be shared equally by JPMorgan Chase and Bank One.

5 10    *Governance.* (a) Prior to the Effective Time, JPMorgan Chase shall take all actions necessary to adopt the amendment to the By-laws of JPMorgan Chase provided for in Exhibit 1 4(b) hereof and to effect the requirements and adopt the resolutions referenced therein On or prior to the Effective Time, JPMorgan Chase's Board of Directors shall cause the number of directors that will comprise the full Board of Directors of the Surviving Corporation at the Effective Time to be 16 Of the members of the initial Board of Directors of the Surviving Corporation at the Effective Time, seven shall be current independent JPMorgan Chase directors designated by JPMorgan Chase plus the current Chief Executive Officer of JPMorgan Chase, and seven shall be current independent Bank One directors designated by Bank One plus the current Chief Executive Officer of Bank One. No other directors or employees of JPMorgan Chase or Bank One shall be designated to serve on the Board of Directors of the Surviving Corporation at the Effective Time.

(b) On or prior to the Effective Time, the JPMorgan Chase Board of Directors shall take such actions as are necessary to cause the persons indicated in Exhibit 5 10(b) to be elected or appointed to the offices of the Surviving Corporation specified in such Exhibit as of the Effective Time.

(c) In accordance with, and to the extent provided in, the By-laws of the Surviving Corporation (as amended as provided in Exhibit 1 4(b)), (i) effective as of the Effective Time, Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Surviving Corporation and Mr James Dimon shall become President and Chief Operating Officer of the Surviving Corporation and (ii) Mr. Dimon shall be the successor to Mr. Harrison as Chief Executive Officer of the Surviving Corporation, with such succession to become effective on the second anniversary of the Closing Date or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Surviving Corporation, and (iii) Mr Harrison shall continue to serve as Chairman of the Board of the Surviving Corporation following the date of such succession.

(d) The headquarters of the Surviving Corporation will be located in New York, New York.

5.11    *Indemnification; Directors' and Officers' Insurance.* (a) From and after the Effective Time, the Surviving Corporation shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless, and provide advancement of expenses to, each person who is now, or has been at any time prior to the date hereof or who becomes prior to the Effective Time, an officer, director or employee of Bank One or any of its Subsidiaries (the *"Indemnified Parties"*) against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any claim, action, suit, proceeding or investigation based in whole or in part on or arising in whole or in part out of the fact that such person is or was a director, officer or employee of Bank One or any Subsidiary of Bank One, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby) (*"Indemnified Liabilities"*) to the same extent such persons are indemnified or have the right to advancement of expenses as of the date of this Agreement by Bank One pursuant to Bank One's Certificate of Incorporation, By-laws and indemnification agreements, if any, in existence on the date hereof with any directors, officers and employees of Bank One and its Subsidiaries

A-40

(b) For a period of six years after the Effective Time, the Surviving Corporation shall cause to be maintained in effect the current policies of directors' and officers' liability insurance maintained by Bank One (*provided* that the Surviving Corporation may substitute therefor policies with a substantially comparable insurer of at least the same coverage and amounts containing terms and conditions which are no less advantageous to the insured) with respect to claims arising from facts or events which occurred at or before the Effective Time; *provided, however,* that the Surviving Corporation shall not be obligated to make annual premium payments for such insurance to the extent such premiums exceed 250% of the premiums paid as of the date hereof by Bank One for such insurance ("*Bank One's Current Premium*"), and if such premiums for such insurance would at any time exceed 250% of Bank One's Current Premium, then the Surviving Corporation shall cause to be maintained policies of insurance which, in the Surviving Corporation's good faith determination, provide the maximum coverage available at an annual premium equal to 250% of Bank One's Current Premium. In the event that JPMorgan Chase acts as its own insurer for its directors and officers generally with respect to matters typically covered by a directors' and officers' liability insurance policy, JPMorgan Chase's obligations under this Section 5 11(b) may be satisfied by such self-insurance, so long as JPMorgan Chase's senior debt ratings by Standard & Poor's Corporation and Moody's Investors Services, Inc are no lower than such ratings as in effect as of the date of this Agreement.

(c) The Surviving Corporation shall pay (as incurred) all expenses, including reasonable fees and expenses of counsel, that an Indemnified Person may incur in enforcing the indemnity and other obligations provided for in this Section 5 11.

(d) If the Surviving Corporation or any of its successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity of such consolidation or merger, or (ii) transfers or conveys all or substantially all of its properties and assets to any person, then, and in each such case, to the extent necessary, proper provision shall be made so that the successors and assigns of the Surviving Corporation, as the case may be, shall assume the obligations set forth in this Section 5 11

(e) The provisions of this Section 5 11 (i) are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party, his or her heirs and representatives and (ii) are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have by contract or otherwise

5.12  *Dividends*. After the date of this Agreement, each of JPMorgan Chase and Bank One shall coordinate with the other the payment of dividends with respect to the JPMorgan Chase Common Stock and Bank One Common Stock and the record dates and payment dates relating thereto, it being the intention of the parties hereto that holders of JPMorgan Chase Common Stock and Bank One Common Stock shall not receive two dividends, or fail to receive one dividend, for any single calendar quarter with respect to their shares of JPMorgan Chase Common Stock and/or Bank One Common Stock or any shares of JPMorgan Chase Common Stock that any such holder receives in exchange for such shares of Bank One Common Stock in the Merger

5.13  *Public Announcements.* JPMorgan Chase and Bank One shall use reasonable best efforts (i) to develop a joint communications plan, (ii) to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan, and (iii) except in respect of any announcement required by applicable law or by obligations pursuant to any listing agreement with or rules of any securities exchange, to consult with each other before issuing any press release or, to the extent practical, otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby In addition to the foregoing, except to the extent disclosed in or consistent with the Joint Proxy Statement/ Prospectus in accordance with the provisions of Section 5.1 or as otherwise permitted under Section 4 4, no party shall issue any press release

A–41

or otherwise make any public statement or disclosure concerning the other party or the other party's business, financial condition or results of operations without the consent of such other party, which consent shall not be unreasonably withheld or delayed. Each party shall provide the other party with its stockholder lists and allow and facilitate the other party's contact with its stockholders and prospective investors and following a Change in Bank One Recommendation or Change in JPMorgan Chase Recommendation, as the case may be, such contacts may be made without regard to the above limitations of this Section 5.13.

5.14. *Commitments to the Community.* (a) Following the Effective Time, the retail financial services business, which includes consumer banking, small businesses, middle market and consumer lending, will maintain a significant presence in the Chicago, Illinois metropolitan area. The combined business will continue to use both the Bank One brand and the JPMorgan Chase brand while research is conducted to determine the best long–term branding strategy. Chicago will serve as the headquarters for the retail financial services business following the Effective Time. Following the Effective Time, the credit card business of the Surviving Corporation will be based in Wilmington, Delaware and will continue to use both the Bank One and JPMorgan Chase brands.

(b) The Surviving Corporation shall maintain its strong commitment to charitable giving in the greater Chicago metropolitan area and to increasing the annual level of charitable giving beyond the current levels of Bank One in that area.

(c) The commitments set forth in this Section 5.14 will be reflected in the minutes of the Surviving Corporation following the Closing Date.

5.15. *Additional Agreements.* In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement or to vest the Surviving Corporation with full title to all properties, assets, rights, approvals, immunities and franchises of either of the Constituent Corporations, the proper officers and directors of each party to this Agreement shall take all such necessary action.

## ARTICLE VI

## CONDITIONS PRECEDENT

6.1. *Conditions to Each Party's Obligation To Effect the Merger.* The respective obligation of each party to effect the Merger shall be subject to the satisfaction prior to the Closing Date of the following conditions:

(a) *Stockholder Approval.* Bank One shall have obtained the Required Bank One Vote in connection with the adoption of the Merger Agreement, and JPMorgan Chase shall have obtained the Required JPMorgan Chase Vote in connection with the adoption of the Merger Agreement.

(b) *NYSE Listing.* The shares of (i) JPMorgan Chase Common Stock to be issued in the Merger and (ii) JPMorgan Chase Common Stock to be reserved for issuance upon exercise of the Bank One Stock Options shall have been authorized for listing on the NYSE upon official notice of issuance.

(c) *Other Approvals.* Other than the filing provided for by Section 1.1, all authorizations, consents, orders or approvals of, or declarations or filings with, and all expirations of waiting periods required from, any Governmental Entity which are necessary for the consummation of the Merger or those the failure of which to be obtained would reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the Surviving Corporation, shall have been filed, have occurred or been obtained (all such permits, approvals, filings and consents and the lapse of all such waiting periods

A–42

being referred to as the *"Requisite Regulatory Approvals"*) and all such Requisite Regulatory Approvals shall be in full force and effect.

(d) *Form S–4.* The Form S–4 shall have become effective under the Securities Act and shall not be the subject of any stop order or proceedings seeking a stop order.

(e) *No Injunctions or Restraints; Illegality.* No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition (an *"Injunction"*) preventing the consummation of the Merger shall be in effect. There shall not be any action taken, or any statute, rule, regulation or order enacted, entered, enforced or deemed applicable to the Merger, by any Governmental Entity of competent jurisdiction which makes the consummation of the Merger illegal.

(f) *Burdensome Condition.* There shall not be any action taken, or any statute, rule, regulation, order or decree enacted, entered, enforced or deemed applicable to the Merger by any Governmental Entity of competent jurisdiction which, in connection with the grant of a Requisite Regulatory Approval or otherwise, imposes any condition or restriction upon the Surviving Corporation or its Subsidiaries which would reasonably be expected to have a material adverse effect after the Effective Time on the present or prospective consolidated financial condition, business or operating results of the Surviving Corporation.

6.2. *Conditions to Obligations of JPMorgan Chase.* The obligation of JPMorgan Chase to effect the Merger is subject to the satisfaction of the following conditions unless waived by JPMorgan Chase:

(a) *Representations and Warranties.* The representations and warranties of Bank One set forth in this Agreement shall be true and correct as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date, subject to such exceptions as do not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Bank One or the Surviving Corporation following the Effective Time, and JPMorgan Chase shall have received a certificate signed on behalf of Bank One by the Chief Executive Officer and Chief Financial Officer of Bank One to such effect.

(b) *Performance of Obligations of Bank One.* Bank One shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and JPMorgan Chase shall have received a certificate signed on behalf of Bank One by the Chief Executive Officer and Chief Financial Officer of Bank One to such effect.

(c) *Tax Opinion.* JPMorgan Chase shall have received the opinion of Simpson Thacher & Bartlett LLP, counsel to JPMorgan Chase, dated the Closing Date, to the effect that the Merger will be treated for Federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code. In rendering such opinion, counsel to JPMorgan Chase shall be entitled to rely upon customary representations and assumptions provided by JPMorgan Chase and Bank One that counsel to JPMorgan Chase reasonably deems relevant.

6.3. *Conditions to Obligations of Bank One.* The obligation of Bank One to effect the Merger is subject to the satisfaction of the following conditions unless waived by Bank One:

(a) *Representations and Warranties.* Each of the representations and warranties of JPMorgan Chase set forth in this Agreement shall be true and correct as of the date of this Agreement and (except to the extent such representations and warranties speak as of an earlier date) as of the Closing Date as though made on and as of the Closing Date, subject to such exceptions as do not have, and would not reasonably be expected to have,

A–43

individually or in the aggregate, a material adverse effect on JPMorgan Chase or the Surviving Corporation following the Closing Date, and Bank One shall have received a certificate signed on behalf of JPMorgan Chase by the Chairman and Chief Executive Officer and by the Chief Financial Officer of JPMorgan Chase to such effect.

(b) *Performance of Obligations of JPMorgan Chase.* JPMorgan Chase shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Bank One shall have received a certificate signed on behalf of JPMorgan Chase by the Chairman and Chief Executive Officer and the Chief Financial Officer of JPMorgan Chase to such effect.

(c) *Tax Opinion.* Bank One shall have received the opinion of Wachtell, Lipton, Rosen & Katz, counsel to Bank One, dated the Closing Date, to the effect that the Merger will be treated for Federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Code. In rendering such opinion, counsel to Bank One shall be entitled to rely upon customary representations and assumptions provided by JPMorgan Chase and Bank One that counsel to Bank One reasonably deems relevant.

(d) *By–Law Amendment.* JPMorgan Chase shall have taken all action necessary so that the amendment to JPMorgan Chase's By-laws set forth in Exhibit 1.4(b), and the resolutions contemplated therein, shall have been duly adopted by the Board of Directors of JPMorgan Chase effective no later than the Effective Time.

ARTICLE VII

TERMINATION AND AMENDMENT

7.1. *Termination.* This Agreement may be terminated at any time prior to the Effective Time, by action taken or authorized by the Board of Directors of the terminating party or parties, whether before or after approval of the Merger by the stockholders of Bank One or JPMorgan Chase:

(a) by mutual consent of JPMorgan Chase and Bank One in a written instrument;

(b) by either JPMorgan Chase or Bank One, upon written notice to the other party, if a Governmental Entity of competent jurisdiction which must grant a Requisite Regulatory Approval has denied approval of the Merger and such denial has become final and non–appealable; or any Governmental Entity of competent jurisdiction shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the Merger, and such order, decree, ruling or other action has become final and nonappealable; *provided, however,* that the right to terminate this Agreement under this Section 7.1(b) shall not be available to any party whose failure to comply with Section 5.3 or any other provision of this Agreement has been the cause of, or resulted in, such action;

(c) by either JPMorgan Chase or Bank One, upon written notice to the other party, if the Merger shall not have been consummated on or before the first anniversary of the date of this Agreement; *provided, however,* that the right to terminate this Agreement under this Section 7.1(c) shall not be available to any party whose failure to comply with any provision of this Agreement has been the cause of, or resulted in, the failure of the Effective Time to occur on or before such date;

(d) by JPMorgan Chase, upon written notice to Bank One, if Bank One shall have (i) failed to recommend adoption of this Agreement at the Bank One Stockholders Meeting; or withdrawn, modified or qualified (or proposed to withdraw, modify or qualify) in any manner adverse to JPMorgan Chase such recommendation; or taken any other action or made any other statement in connection with the Bank One Stockholders Meeting inconsistent with such recommendation (any such action in this clause (i), a *"Change in*

A–44

*Bank One Recommendation*") (or resolved to take any such action), whether or not permitted by the terms hereof, or (ii) materially breached its obligations under this Agreement by reason of a failure to call the Bank One Stockholders Meeting in accordance with Section 5.1(b) or a failure to prepare and mail to its stockholders the Joint Proxy Statement/ Prospectus in accordance with Section 5.1(a);

(e) by Bank One, upon written notice to JPMorgan Chase, if JPMorgan Chase shall have (i) failed to recommend adoption of this Agreement at the JPMorgan Chase Stockholders Meeting; or withdrawn, modified or qualified (or proposed to withdraw, modify or qualify) in any manner adverse to Bank One such recommendation; or taken any other action or made any other statement in connection with the JPMorgan Chase Stockholders Meeting inconsistent with such recommendation (any such action in this clause (i), a *"Change in JPMorgan Chase Recommendation"*) (or resolved to take any such action), whether or not permitted by the terms hereof, or (ii) materially breached its obligations under this Agreement by reason of a failure to call the JPMorgan Chase Stockholders Meeting in accordance with Section 5.1(c) or a failure to prepare and mail to its stockholders the Joint Proxy Statement/ Prospectus in accordance with Section 5.1(a);

(f) by either JPMorgan Chase or Bank One, upon written notice to the other party, if there shall have been a breach by the other party of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of such other party, which breach, either individually or in the aggregate, would result in, if occurring or continuing on the Closing Date, the failure of the condition set forth in Section 6.2(a) or (b) or Section 6.3(a) or (b), as the case may be, and which breach has not been cured within 60 days following written notice thereof to the breaching party or, by its nature, cannot be cured within such time period; or

&sp;   (g) by either JPMorgan Chase or Bank One, if the Required JPMorgan Chase Vote or Required Bank One Vote shall not have been obtained upon a vote taken thereon at the duly convened JPMorgan Chase Stockholders Meeting or Bank One Stockholders Meeting, as the case may be.

7.2 *Effect of Termination.* (a) In the event of termination of this Agreement by either Bank One or JPMorgan Chase as provided in Section 7.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of JPMorgan Chase or Bank One or their respective officers or directors, except with respect to Sections 3.1(r) and 3.2(r), Section 5.2(b), Section 5.9, this Section 7.2 and Article VIII, which shall survive such termination and except that no party shall be relieved or released from any liabilities or damages arising out of its willful and material breach of this Agreement.

(b) JPMorgan Chase shall pay Bank One, by wire transfer of immediately available funds, the sum of $2.30 billion (the *"JPMorgan Chase Termination Fee"*) if this Agreement is terminated as follows:

(i) if Bank One shall terminate this Agreement pursuant to Section 7.1(e), then JPMorgan Chase shall pay the JPMorgan Chase Termination Fee on the business day following such termination;

(ii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(g) because the Required JPMorgan Chase Vote shall not have been received and (B) at any time after the date of this Agreement and at or before the date of the JPMorgan Chase Stockholders Meeting an Acquisition Proposal shall have been publicly announced or otherwise communicated to the senior management or Board of Directors of JPMorgan Chase (a *"Public Proposal"*) with respect to JPMorgan Chase, then JPMorgan Chase shall pay one–third of the JPMorgan Chase Termination Fee on the business day following such termination; and if (C) within eighteen (18) months of the date of such termination of this

A–45

Agreement, JPMorgan Chase or any of its Subsidiaries executes any definitive agreement with respect to, or consummates, any Acquisition Proposal, then JPMorgan Chase shall pay the remaining two–thirds of the JPMorgan Chase Termination Fee upon the date of such execution or consummation; and

(iii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(c) or Bank One shall terminate this Agreement pursuant to Section 7.1(f), (B) at any time after the date of this Agreement and before such termination there shall have been a Public Proposal with respect to JPMorgan Chase, and (C) following the occurrence of such Public Proposal, JPMorgan Chase shall have intentionally breached (and not cured after notice thereof) any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach shall have materially contributed to the failure of the Effective Time to occur prior to the termination of this Agreement, then JPMorgan Chase shall pay one–third of the JPMorgan Chase Termination Fee on the business day following such termination; and if (D) within eighteen (18) months of the date of such termination of this Agreement, JPMorgan Chase or any of its Subsidiaries executes any definitive agreement with respect to, or consummates, any Acquisition Proposal, then JPMorgan Chase shall pay the remaining two–thirds of the JPMorgan Chase Termination Fee upon the date of such execution or consummation.

If JPMorgan Chase fails to pay all amounts due to Bank One on the dates specified, then JPMorgan Chase shall pay all costs and expenses (including legal fees and expenses) incurred by Bank One in connection with any action or proceeding (including the filing of any lawsuit) taken by it to collect such unpaid amounts, together with interest on such unpaid amounts at the prime lending rate prevailing at such time, as published in the *Wall Street Journal*, from the date such amounts were required to be paid until the date actually received by Bank One.

(c) Bank One shall pay JPMorgan Chase, by wire transfer of immediately available funds, the sum of $2.30 billion (the *"Bank One Termination Fee"*) if this Agreement is terminated as follows:

(i) if JPMorgan Chase shall terminate this Agreement pursuant to Section 7.1(d), then Bank One shall pay the Bank One Termination Fee on the business day following such termination;

(ii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(g) because the Required Bank One Vote shall not have been received and (B) at any time after the date of this Agreement and at or before the date of the Bank One Stockholders Meeting there shall have been a Public Proposal with respect to Bank One, then Bank One shall pay one–third of the Bank One Termination Fee on the business day following such termination; and if (C) within eighteen (18) months of the date of such termination of this Agreement, Bank One or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any Acquisition Proposal, then Bank One shall pay the remaining two–thirds of the Bank One Termination Fee on the date of such execution or consummation; and

(iii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(c) or JPMorgan Chase shall terminate this Agreement pursuant to Section 7.1(f), (B) at any time after the date of this Agreement and before such termination there shall have been a Public Proposal with respect to Bank One, (C) following the occurrence of such Public Proposal, Bank One shall have intentionally breached (and not cured after notice thereof) any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach shall have materially contributed to the failure of the Effective Time to occur prior to the termination of this Agreement, then Bank One shall pay one–third of the Bank One Termination Fee on the business day following such termination; and if (D) within eighteen (18) months of the date of such termination of this Agreement, Bank One or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any

A–46

Acquisition Proposal, then Bank One shall pay the remaining two–thirds of the Bank One Termination Fee upon the date of such execution or consummation.

If Bank One fails to pay all amounts due to JPMorgan Chase on the dates specified, then Bank One shall pay all costs and expenses (including legal fees and expenses) incurred by JPMorgan Chase in connection with any action or proceeding (including the filing of any lawsuit) taken by it to collect such unpaid amounts, together with interest on such unpaid amounts at the prime lending rate prevailing at such time, as published in the *Wall Street Journal*, from the date such amounts were required to be paid until the date actually received by JPMorgan Chase.

7.3. *Amendment.* This Agreement may be amended by the parties hereto, by action taken or authorized by their respective Boards of Directors, at any time before or after approval of the matters presented in connection with the Merger by the stockholders of Bank One or of JPMorgan Chase, but, after any such approval, no amendment shall be made which by law requires further approval by such stockholders without such further approval. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

7.4. *Extension; Waiver.* At any time prior to the Effective Time, the parties hereto, by action taken or authorized by their respective Board of Directors, may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or other acts of the other party hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such party. The failure of a party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights. No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. Any waiver shall be effective only in the specific instance and for the specific purpose for which given and shall not constitute a waiver to any subsequent or other exercise of any right, remedy, power or privilege hereunder.

ARTICLE VIII

GENERAL PROVISIONS

8.1. *Non–survival of Representations, Warranties and Agreements.* None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement (other than the Option Agreements, which shall terminate in accordance with their terms), including any rights arising out of any breach of such representations, warranties, covenants, and agreements, shall survive the Effective Time, except for those covenants and agreements contained herein and therein that by their terms apply or are to be performed in whole or in part after the Effective Time.

8.2. *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or by telecopy or telefacsimile, upon confirmation of receipt, (b) on the first business day following the date of dispatch if delivered by a recognized next–day courier service, or (c) on the third business day following the date of mailing if delivered by registered or certified mail, return receipt requested,

A–47

postage prepaid  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

     (a) if to JPMorgan Chase, to

J.P. Morgan Chase & Co.
270 Park Avenue
New York, New York 10017
Attention: William H. McDavid, Esq.
Telecopy No : (212) 270–4288

with a copy to

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention: Richard I. Beattie, Esq.
Lee Meyerson, Esq.
Telecopy No : (212) 455–2502

and

     (b) if to Bank One, to

Bank One Corporation
1 Bank One Plaza
Chicago, Illinois 60670
Attention: Joan Guggenheimer
Telecopy No : (312) 732–8428

with a copy to

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention: Edward D. Herlihy, Esq.
Craig M. Wasserman, Esq.
Lawrence S. Makow, Esq.
Telecopy No : (212) 403–2000

    8 3. *Interpretation.* When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section of or Exhibit or Schedule to this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The phrase "made available" in this Agreement shall mean that the information referred to has been made available if requested by the party to whom such information is to be made available. The phrases "herein," "hereof," "hereunder" and words of similar import shall be deemed to refer to this Agreement as a whole, including the Exhibits and Schedules hereto, and not to any particular provision of this Agreement. Any pronoun shall include the corresponding masculine, feminine and neuter forms. The phrases "known" or "knowledge" mean, with respect to either party to this Agreement, the actual knowledge of such party's executive officers.

    8 4. *Counterparts.* This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed by each of the parties and delivered to the other party, it being understood that both parties need not sign the same counterpart.

8.5. *Entire Agreement; No Third Party Beneficiaries.* This Agreement (including the documents and the instruments referred to herein, including the Option Agreements) (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, other than the Confidentiality Agreement, which shall survive the execution and delivery of this Agreement and (b) except as provided in Section 5.11, is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

8.6. *Governing Law.* This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof).

8.7. *Severability.* Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability and, unless the effect of such invalidity or unenforceability would prevent the parties from realizing the major portion of the economic benefits of the Merger that they currently anticipate obtaining therefrom, shall not render invalid or unenforceable the remaining terms and provisions of this Agreement or affect the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.8. *Assignment.* Neither this Agreement nor any of the rights, interests or obligations of the parties hereunder shall be assigned by either of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party, and any attempt to make any such assignment without such consent shall be null and void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

8.9. *Submission to Jurisdiction.* Each party hereto irrevocably submits to the jurisdiction of (i) the Supreme Court of the State of New York, New York County, and (ii) the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto agrees to commence any action, suit or proceeding relating hereto either in the United States District Court for the Southern District of New York or, if such suit, action or other proceeding may not be brought in such court for reasons of subject matter jurisdiction, in the Supreme Court of the State of New York, New York County. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (A) the Supreme Court of the State of New York, New York County, or (B) the United States District Court for the Southern District of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party hereto further irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or other proceeding by the mailing of copies thereof by mail to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail; *provided* that nothing in this Section shall affect the right of any party to serve legal process in any other manner permitted by law. The consent to jurisdiction set forth in this Section shall not constitute a general consent to service of process in the State of New York and shall have no effect for any purpose except as provided in this Section. The parties hereto agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

8.10. *Enforcement.* The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific

A–49

terms on a timely basis or were otherwise breached  It is accordingly agreed that the parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court identified in the Section above, this being in addition to any other remedy to which they are entitled at law or in equity.

8.11.   *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY, IN ANY MATTERS (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

[Remainder of this page intentionally left blank]

A–50

IN WITNESS WHEREOF, JPMorgan Chase and Bank One have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above

J P MORGAN CHASE & CO

By: /s/ WILLIAM B HARRISON, JR.

Name: William B. Harrison, Jr
Title: Chairman and Chief Executive Officer

BANK ONE CORPORATION

By: /s/ JAMES DIMON

Name: James Dimon
Title: Chairman and Chief Executive Officer

A-51

Annex B

THE TRANSFER OF THIS AGREEMENT IS SUBJECT TO CERTAIN

RESTRICTIONS CONTAINED HEREIN AND TO RESALE RESTRICTIONS UNDER
THE SECURITIES ACT OF 1933, AS AMENDED

STOCK OPTION AGREEMENT

THIS STOCK OPTION AGREEMENT, dated as of January 14, 2004 (this *"Agreement"*), is made by and between BANK ONE CORPORATION, a Delaware corporation (*"Issuer"*), and J.P. MORGAN CHASE & CO., a Delaware corporation (*"Grantee"*).

WHEREAS, Grantee and Issuer are concurrently herewith entering into an Agreement and Plan of Merger, dated as of the date hereof (the *"Merger Agreement"*), pursuant to which Issuer will be merged with and into Grantee, with Grantee being the surviving corporation (the *"Merger"*); and

WHEREAS, as a condition and inducement to Grantee's execution of the Merger Agreement and the JPMorgan Chase Stock Option Agreement (as defined in the Merger Agreement), Grantee has required that Issuer agree, and Issuer has agreed, to grant Grantee the Option (as defined herein).

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein and in the Merger Agreement, and intending to be legally bound hereby, Issuer and Grantee agree as follows:

1. *Defined Terms.*

(a) Capitalized terms which are used but not defined herein shall have the meanings ascribed to such terms in the Merger Agreement.

(b) The term *"person"* shall have the meaning specified in Sections 3(a)(9) and 13(d)(3) of the Exchange Act.

2. *Grant of Option.* Issuer hereby grants to Grantee an irrevocable option (the *"Option"*) to purchase, subject to the terms and conditions set forth herein, up to 222,796,825 shares (as adjusted as set forth herein, the *"Option Shares"*) of common stock, par value $0.01 per share, of Issuer (the *"Issuer Common Stock"*) at a purchase price per Option Share (as adjusted as set forth herein, the *"Purchase Price"*) of $44.61; *provided* that in no event shall the number of Option Shares for which this Option is exercisable exceed 19.9% of the issued and outstanding shares of Issuer Common Stock without giving effect to any shares subject to or issued pursuant to the Option. Issuer shall make proper provision so that each Option Share issued upon exercise of the Option shall be accompanied by the applicable number of rights or other benefits as may be provided in any Issuer rights agreement or similar agreement that may be adopted after the date hereof.

3. *Exercise of Option.*

(a) Grantee may exercise the Option, in whole or in part, at any time and from time to time following the occurrence of a Purchase Event (as defined in Section 3(b)) on or after the date hereof; *provided* that the Option shall terminate and be of no further force or effect upon the earliest to occur of (A) the Effective Time, (B) termination of the Merger Agreement in accordance with the terms thereof so long as, in the case of this clause (B), a Purchase Event has not occurred and could not occur in the future, (C) the date that Grantee's Total Profit equals $2.87 billion (the *"Maximum Profit"*), and (D) the date which is six months after the occurrence of a Purchase Event; and *provided, further*, that any purchase of shares upon exercise of the Option shall be subject to compliance with applicable law; and *provided, further*, that Grantee shall have sent the written notice of such exercise (as provided in Section 3(d)).

within six months following such Purchase Event. Notwithstanding the termination of the Option, Grantee shall be entitled to purchase those Option Shares with respect to which it has exercised the Option in accordance herewith prior to the termination of the Option. The termination of the Option shall not affect any rights hereunder which by their terms extend beyond the date of such termination.

(b) As used herein, a *"Purchase Event"* means any of the following events:

(i) prior to the termination of the Merger Agreement, without Grantee's prior written consent, Issuer or any of its Subsidiaries shall have entered into one or more agreements with any person (other than Grantee or any Subsidiary of Grantee) to effect, or shall have effected, in a single transaction or a series of related transactions, any Acquisition Proposal;

(ii) prior to the termination of the Merger Agreement, any person (other than Grantee or any Subsidiary of Grantee) shall have acquired beneficial ownership (as such term is defined in Rule 13d–3 promulgated under the Exchange Act) of or the right to acquire beneficial ownership of, or any group (as such term is defined in Section 13(d)(3) of the Exchange Act), other than a group of which Grantee or any Subsidiary of Grantee is a member, shall have been formed which beneficially owns or has the right to acquire beneficial ownership of, shares of Issuer Common Stock or other voting securities representing 20% or more of the voting power of Issuer or any of its Significant Subsidiaries (as defined in Rule 1–02 of Regulation S–X of the SEC); or

(iii) the occurrence of an event the result of which is that the fee required to be paid by Issuer pursuant to Section 7.2(c)(i) or 7.2(c)(ii)(C) or 7.2(c)(iii)(D) of the Merger Agreement becomes payable.

(c) Issuer shall notify Grantee promptly in writing of the occurrence of any Purchase Event, it being understood that the giving of such notice by Issuer shall not be a condition to the right of Grantee to exercise the Option.

(d) In the event Grantee wishes to exercise the Option, Grantee shall send to Issuer a written notice (the date of which is herein referred to as the *"Notice Date"*) specifying (i) the total number of Option Shares it intends to purchase pursuant to such exercise and (ii) a place and date not earlier than three business days nor later than 60 business days from the Notice Date for the closing (the *"Closing"*) of such purchase (the date of such Closing, the *"Closing Date"*); *provided* that if the Closing cannot be consummated by reason of any applicable law, rule, regulation or order or the need to obtain any necessary approvals or consents of applicable Governmental Entities, the period of time that otherwise would run pursuant to this sentence shall run instead from the date on which such restriction on consummation has expired or been terminated; and *provided, further*, without limiting the foregoing, that if prior notification to, approval of or authorization by any Governmental Entity is required in connection with such purchase, Issuer shall use its reasonable best efforts to cooperate with Grantee in the prompt filing of the required notice or application for approval or authorization, and the Closing shall occur immediately following the date on which such approvals have been obtained and any required notification or waiting periods have expired.

(e) In the event Grantee receives official notice that an approval or consent of any Governmental Entity required for the purchase of Option Shares will not be issued or granted, Grantee shall be entitled to exercise the Option in connection with the resale of Issuer Common Stock or other securities pursuant to a registration statement as provided in Section 10. The provisions of this Section 3 and Section 4 shall apply with appropriate adjustments to any such exercise.

B–2

4 *Payment and Delivery of Certificates.*

(a) On each Closing Date, Grantee shall (i) pay to Issuer, in immediately available funds by wire transfer to a bank account designated by Issuer (*provided* that the failure or refusal of Issuer to designate a bank account shall not preclude Grantee from exercising the Option), an amount equal to the Purchase Price multiplied by the number of Option Shares to be purchased on such Closing Date, and (ii) present and surrender this Agreement to Issuer at the address of Issuer specified in Section 14(f)

(b) At each Closing, simultaneously with the delivery of immediately available funds and surrender of this Agreement as provided in Section 4(a), (i) Issuer shall deliver to Grantee (A) a certificate or certificates representing the Option Shares to be purchased at such Closing, which Option Shares shall be fully paid, validly issued and non–assessable, free and clear of all liens, claims, charges, security interests or other encumbrances ("*Liens*") other than those created by the express terms of this Agreement, and subject to no preemptive or other similar rights, and (B) if the Option is exercised in part only, an executed new agreement with the same terms as this Agreement evidencing the right to purchase the balance of the shares of Issuer Common Stock purchasable hereunder, and (ii) Grantee shall deliver to Issuer a letter agreeing that Grantee shall not offer to sell or otherwise dispose of such Option Shares in violation of applicable federal and state securities laws or of the provisions of this Agreement

(c) In addition to any other legend that is required by applicable law, certificates for the Option Shares delivered at each Closing shall be endorsed with a restrictive legend which shall read substantially as follows:

**THE TRANSFER OF THE STOCK REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO RESTRICTIONS ARISING UNDER THE SECURITIES ACT OF 1933, AS AMENDED.**

It is understood and agreed that the above legend shall be removed by delivery of substitute certificate(s) without such legend if such Option Shares have been registered pursuant to the Securities Act, such Option Shares have been sold in reliance on and in accordance with Rule 144 under the Securities Act or Grantee shall have delivered to Issuer a copy of a letter from the staff of the SEC, or an opinion of counsel in form and substance reasonably satisfactory to Issuer and its counsel, to the effect that such legend is not required for purposes of the Securities Act.

(d) Upon the giving by Grantee to Issuer of the written notice of exercise of the Option provided for under Section 3(d), the tender of the applicable Purchase Price in immediately available funds and the tender of this Agreement to Issuer, Grantee shall be deemed to be the holder of record of the shares of Issuer Common Stock issuable upon such exercise, regardless of whether the stock transfer books of Issuer are then closed or certificates representing such shares of Issuer Common Stock are then actually delivered to Grantee. Issuer shall pay all expenses, and any and all federal, foreign, state, and local taxes and other charges, that may be payable in connection with the preparation, issuance and delivery of stock certificates under this Section 4(d) in the name of Grantee or its assignee, transferee, or designee.

(e) Issuer agrees (i) that it shall at all times maintain, free from Liens and preemptive or similar rights, sufficient authorized but unissued or treasury shares of Issuer Common Stock so that the Option may be exercised without additional authorization of Issuer Common Stock after giving effect to all other options, warrants, convertible securities and other rights to purchase Issuer Common Stock then outstanding, (ii) that it will not, by charter amendment or through reorganization, recapitalization, consolidation, merger, dissolution, liquidation, spin–off, sale of assets or similar transaction, or by any other voluntary act, avoid or seek to avoid the observance or performance of any of the covenants, agreements, stipulations or conditions to be observed or performed hereunder by Issuer, and (iii) that it will promptly take all action as may from time to time be required (including (A) complying with all premerger notification, reporting

B–3

and waiting period requirements and (B) in the event prior approval or authorization of or notice or application to any Governmental Entity is necessary before the Option may be exercised, cooperating fully with Grantee in preparing such applications or notices and providing such information to such Governmental Entities as may be required) in order to permit Grantee to exercise the Option and Issuer to duly and effectively issue shares of Issuer Common Stock pursuant hereto on a timely basis.

5 *Representations and Warranties of Issuer.* Issuer hereby represents and warrants to Grantee as follows:

(a) *Corporate Authority.* Issuer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; the execution and delivery of this Agreement and, subject to receiving any necessary approvals or consents from Governmental Entities, the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of Issuer, and no other corporate proceedings on the part of Issuer are necessary to authorize this Agreement or to consummate the transactions so contemplated; this Agreement has been duly and validly executed and delivered by Issuer and (assuming due authorization, execution and delivery by Grantee) constitutes a valid and binding obligation of Issuer, enforceable against Issuer in accordance with its terms, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws, now or hereinafter in effect, affecting creditors' rights generally, and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b) *Shares Reserved for Issuance; Capital Stock.* Issuer has taken all necessary corporate action to authorize and reserve and permit it to issue, and at all times from the date hereof through the termination of this Agreement in accordance with its terms, will have reserved for issuance, upon the exercise of the Option, that number of shares of Issuer Common Stock equal to the maximum number of shares of Issuer Common Stock and other shares and securities which are at any time and from time to time purchasable upon exercise of the Option, and all such shares and other securities, upon issuance pursuant to the Option, will be duly authorized, validly issued, fully paid and non–assessable, and will be delivered free and clear of all Liens (other than those created by the express terms of this Agreement) and not subject to any preemptive or other similar rights.

(c) *No Violations.* The execution, delivery and performance of this Agreement does not and will not, and the consummation by Issuer of any of the transactions contemplated hereby will not, constitute or result in (A) a breach or violation of, or a default under, its certificate of incorporation or by–laws, or the comparable governing instruments of any of its Subsidiaries, or (B) a breach or violation of, or a default under, any agreement, lease, contract, note, mortgage, indenture, arrangement or other obligation of it or any of its Subsidiaries (with or without the giving of notice, the lapse of time or both) or under any law, rule, regulation or order or governmental or non–governmental permit or license to which it or any of its Subsidiaries is subject, that would in any case give any other person the ability to prevent or enjoin Issuer's performance under this Agreement in any material respect.

(d) *Board Action.* The Board of Directors of Issuer has approved this Agreement and the consummation of the transactions contemplated hereby as required under Section 203 of the DGCL and, to its knowledge, any other applicable state takeover laws so that any such state takeover laws do not and will not apply to this Agreement or any of the transactions contemplated hereby (including the purchase of shares of Issuer Common Stock pursuant to the Option).

B–4

(e) *No Restrictions* No Delaware law applicable generally to corporations or, to Issuer's knowledge, other takeover statute applicable generally to corporations or similar corporate law and no provision of the certificate of incorporation or by–laws of Issuer or any agreement to which Issuer is a party (i) would or would purport to impose restrictions which might adversely affect or delay the consummation of the transactions contemplated by this Agreement, or (ii) as a result of the consummation of the transactions contemplated by this Agreement, (A) would or would purport to restrict or impair the ability of Grantee to vote or otherwise exercise the rights of a shareholder with respect to securities of Issuer or any of its Subsidiaries that may be acquired or controlled by Grantee or (B) would or would purport to entitle any person to acquire securities of Issuer

6. *Representations and Warranties of Grantee.* Grantee hereby represents and warrants to Issuer as follows:

(a) *Corporate Authority.* Grantee has full corporate power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement; the execution and delivery of this Agreement and, subject to obtaining any necessary approvals or consents from Governmental Entities, the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Grantee; and this Agreement has been duly executed and delivered by Grantee and (assuming due authorization, execution and delivery by Issuer) constitutes a valid and binding obligation of Grantee, enforceable against Grantee in accordance with its terms, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws, now or hereinafter in effect, affecting creditors' rights generally, and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought

(b) *Purchase Not for Distribution.* Any Option Shares or other securities acquired by Grantee upon exercise of the Option will not be acquired with a view to the public distribution thereof in violation of any federal or state securities laws and will not be transferred or otherwise disposed of except in a transaction registered or exempt from registration under the Securities Act and any applicable state securities laws

7. *Adjustment upon Changes in Issuer Capitalization, Etc.*

(a) In the event of any change from time to time in Issuer Common Stock or any other shares or securities subject to the Option by reason of a stock dividend, subdivision, spinoff, stock split, split–up, merger, consolidation, recapitalization, combination, exchange of shares, or dividend or distribution, other than regular cash dividends, on or in respect of the Issuer Common Stock, the type and number of shares or securities subject to the Option, and the Purchase Price therefor, shall be adjusted appropriately, and proper provision shall be made in the agreements governing such transaction, so that Grantee shall receive, upon exercise of the Option, the number and class of shares or other securities or property that Grantee would have received in respect of Issuer Common Stock if the Option had been exercised immediately prior to such event, or the record date therefor, as applicable. If any additional shares of Issuer Common Stock are issued or otherwise become outstanding after the date of this Agreement (other than pursuant to an event described in the first sentence of this Section 7(a) or upon exercise of the Option), the number of shares of Issuer Common Stock subject to the Option shall be increased so that, after such issuance, it, together with any shares of Issuer Common Stock previously issued pursuant hereto, equals 19.9% of the number of shares of Issuer Common Stock then issued and outstanding, without giving effect to any shares subject to or issued pursuant to the Option No provision of this Section 7 shall be deemed to affect or change, or constitute authorization for any violation of, any of the covenants, agreements, representations or warranties in the Merger Agreement.

B–5

(b) Without limiting the parties' relative rights, remedies, liabilities and obligations under the Merger Agreement or this Agreement, in the event that, prior to the termination of the Option, Issuer shall enter into an agreement (other than the Merger Agreement) (i) to consolidate with or merge into any person, other than Grantee or one of its Subsidiaries, and shall not be the continuing or surviving corporation of such consolidation or merger, (ii) to permit any person, other than Grantee or one of its Subsidiaries, to merge into Issuer and Issuer shall be the continuing or surviving corporation, but, in connection with such merger, the then outstanding shares of Issuer Common Stock shall be changed into or exchanged for another class or series of stock or other securities of Issuer or any other person or cash or any other property, or the outstanding shares of Issuer Common Stock immediately prior to such merger shall, after such merger, represent less than 50% of the outstanding shares and share equivalents having general voting power of the merged company, or (iii) to sell or otherwise transfer all or substantially all of its assets (or those of its Subsidiaries taken as a whole) in one transaction or a series of related transactions, to any person, other than Grantee or one of its Subsidiaries, then, and in each such case, the agreement governing such transaction shall make proper provisions so that the Option shall, upon the consummation of any such transaction and upon the terms and conditions set forth herein, be converted into, or exchanged for, an option (the *"Substitute Option"*), at the election of Grantee, of either (x) the Acquiring Corporation (as hereinafter defined), (y) any person that controls the Acquiring Corporation, or (z) in the case of a merger described in clause (ii), Issuer (such person being referred to as the *"Substitute Option Issuer"*).

(c) The Substitute Option shall have the same terms as the Option; *provided* that the exercise price therefor and number of shares subject thereto shall be as set forth in this Section 7 and the repurchase rights relating thereto shall be as set forth in Section 9; *provided, further*, that if a Purchase Event shall have occurred prior to or in connection with the issuance of such Substitute Option, the Substitute Option shall be exercisable immediately upon issuance without the occurrence of a further Purchase Event; and *provided, further*, that if the terms of the Substitute Option cannot, for legal reasons, be the same as the Option, such terms shall be as similar as possible and in no event less advantageous to Grantee. Substitute Option Issuer shall also enter into an agreement with Grantee in substantially the same form as this Agreement, which shall be applicable to the Substitute Option.

(d) The Substitute Option shall be exercisable for such number of shares of Substitute Common Stock (as hereinafter defined) as is equal to the Market/Offer Price (as hereinafter defined) multiplied by the number of shares of Issuer Common Stock for which the Option was theretofore exercisable, divided by the Average Price (as hereinafter defined). The exercise price of the Substitute Option per share of Substitute Common Stock (the *"Substitute Option Price"*) shall then be equal to the Purchase Price multiplied by a fraction in which the numerator is the number of shares of Issuer Common Stock for which the Option was theretofore exercisable and the denominator is the number of shares of Substitute Common Stock for which the Substitute Option is exercisable.

(e) The following terms have the meanings indicated:

(i) *"Acquiring Corporation"* shall mean (x) the continuing or surviving corporation of a consolidation or merger with Issuer (if other than Issuer), or at Grantee's election, any person that controls such surviving corporation, (y) Issuer in a merger in which Issuer is the continuing or surviving person, or (z) the transferee of all or substantially all of Issuer's assets (or of the assets of its Subsidiaries taken as a whole).

(ii) *"Market/Offer Price"* shall mean the highest of (v) the highest price per share of Issuer Common Stock at which a tender offer or an exchange offer therefor has been made, (w) the highest price per share of Issuer Common Stock to be paid by any third party pursuant to an agreement with Issuer, (x) the price per share of Issuer Common Stock received by holders of Issuer Common Stock in connection with any merger or other

B-6

business combination transaction described in Section 7(b)(i), 7(b)(ii) or 7(b)(iii), (y) the highest closing price for shares of Issuer Common Stock within the 12–month period immediately preceding the date on which the merger, consolidation, asset sale or other transaction in question is consummated, and (z) in the event of a sale of all or substantially all of Issuer's assets (or those of its Subsidiaries taken as a whole) an amount equal to (I) the sum of the price paid in such sale for such assets and the current market value of the remaining assets of Issuer, as determined by a nationally–recognized independent investment banking firm selected by Grantee, divided by (II) the number of shares of Issuer Common Stock outstanding at such time. In calculating the Market/ Offer Price, in the event that a tender offer or an exchange offer is made for Issuer Common Stock or an agreement is entered into involving consideration other than cash, the value of the securities or other property issuable or deliverable in exchange for Issuer Common Stock shall be determined by a nationally–recognized independent investment banking firm selected by Grantee.

(iii) *"Average Price"* shall mean the average closing sales price per share of a share of Substitute Common Stock quoted on the NYSE (or if Substitute Common Stock is not quoted on the NYSE, the average closing sales price per share as quoted on the Nasdaq National Market System or, if the shares of Substitute Common Stock are not quoted thereon, the highest bid price per share as quoted on the principal trading market on which such shares are traded as reported by a recognized source) for the 12–month period immediately preceding the date of consummation of the consolidation, merger or sale in question; *provided* that if Issuer is the issuer of the Substitute Option, the Average Price shall be computed with respect to a share of common stock issued by Issuer, by the person merging into Issuer or by any company which controls such person, as Grantee may elect.

(iv) *"Substitute Common Stock"* shall mean the shares of capital stock (or similar equity interest) with the greatest voting power in respect of the election of directors (or persons similarly responsible for the direction of the business and affairs) of the Substitute Option Issuer.

(f) In no event, pursuant to any of the foregoing paragraphs, shall the Substitute Option be exercisable for more than 19 9% of the shares of Substitute Common Stock outstanding prior to exercise of the Substitute Option. In the event that the Substitute Option would be exercisable for more than 19 9% of the shares of Substitute Common Stock but for the limitation in the first sentence of this Section 7(f), Substitute Option Issuer shall make a cash payment to Grantee equal to the excess of (i) the value of the Substitute Option without giving effect to the limitation in the first sentence of this Section 7(f) over (ii) the value of the Substitute Option after giving effect to the limitation in the first sentence of this Section 7(f) This difference in value shall be determined by a nationally–recognized independent investment banking firm selected by Grantee.

(g) Issuer shall not enter into any transaction described in Section 7(b) unless the Acquiring Corporation and any person that controls the Acquiring Corporation assume in writing all the obligations of Issuer hereunder and take all other actions that may be necessary so that the provisions of this Section 7 are given full force and effect (including, without limitation, any action that may be necessary so that the holders of the other shares of common stock issued by Substitute Option Issuer are not entitled to exercise any rights by reason of the issuance or exercise of the Substitute Option and the shares of Substitute Common Stock are otherwise in no way distinguishable from or have lesser economic value (other than any diminution in value resulting from the fact that the shares of Substitute Common Stock are restricted securities, as defined in Rule 144 under the Securities Act or any successor provision) than other shares of common stock issued by Substitute Option Issuer)

8. *Repurchase at the Option of Grantee.*

(a) At the request of Grantee at any time commencing upon the first occurrence of a Repurchase Event (as defined in Section 8(c)) and prior to the termination of the Option

B–7

pursuant to Section 3(a), Issuer (or any successor) shall repurchase from Grantee (x) the Option and (y) all shares of Issuer Common Stock purchased by Grantee pursuant hereto with respect to which Grantee then has beneficial ownership  The date on which Grantee exercises its rights under this Section 8 is referred to as the *"Request Date"*  Such repurchase shall be at an aggregate price (the *"Section 8 Repurchase Consideration"*) equal to the sum of:

     (i) the aggregate Purchase Price paid by Grantee for any shares of Issuer Common Stock acquired pursuant to the Option with respect to which Grantee then has beneficial ownership;

     (ii) the excess, if any, of (x) the Market/ Offer Price for each share of Issuer Common Stock over (y) the Purchase Price (as adjusted pursuant to Section 7), multiplied by the number of shares of Issuer Common Stock with respect to which the Option has not been exercised; and

     (iii) the excess, if any, of the Market/ Offer Price over the Purchase Price paid (or, in the case of Option Shares with respect to which the Option has been exercised but the Closing Date has not occurred, payable, as adjusted pursuant to Section 7) by Grantee for each share of Issuer Common Stock with respect to which the Option has been exercised and with respect to which Grantee then has beneficial ownership, multiplied by the number of such shares

(b) If Grantee exercises its rights under this Section 8, Issuer shall, within 5 business days after the Request Date, pay the Section 8 Repurchase Consideration to Grantee in immediately available funds, and contemporaneously with such payment, Grantee shall surrender to Issuer the Option and the certificates evidencing the shares of Issuer Common Stock purchased thereunder with respect to which Grantee then has beneficial ownership, and Grantee shall warrant that it has sole record and beneficial ownership of such shares and that the same are then free and clear of all Liens  Notwithstanding the foregoing, to the extent that prior notification to or approval of any Governmental Entity is required in connection with the payment of all or any portion of the Section 8 Repurchase Consideration, Grantee shall have the ongoing option to revoke its request for repurchase pursuant to Section 8, in whole or in part, or to require that Issuer deliver from time to time that portion of the Section 8 Repurchase Consideration that it is not then so prohibited from paying and promptly file the required notice or application for approval and expeditiously process the same (and each party shall cooperate with the other in the filing of any such notice or application and the obtaining of any such approval) and the period of time that would otherwise run pursuant to the preceding sentence for the payment of the portion of the Section 8 Repurchase Consideration shall run instead from the date on which, as the case may be, (i) any required notification period has expired or been terminated or (ii) such approval has been obtained and, in either event, any requisite waiting period shall have passed. If any Governmental Entity disapproves of any part of Issuer's proposed repurchase pursuant to this Section 8, Issuer shall promptly give notice of such fact to Grantee  If any Governmental Entity prohibits the repurchase (and Issuer hereby undertakes to use its reasonable best efforts to obtain all required approvals from Governmental Entities to accomplish such repurchase) in part but not in whole, then Grantee shall have the right (i) to revoke the repurchase request or (ii) to the extent permitted by such Governmental Entity, determine whether the repurchase should apply to the Option and/or Option Shares and to what extent to each, and Grantee shall thereupon have the right to exercise the Option as to the number of Option Shares for which the Option was exercisable at the Request Date less the sum of the number of shares covered by the Option in respect of which payment has been made pursuant to Section 8(a)(ii) and the number of shares covered by the portion of the Option (if any) that has been repurchased; whereupon, in the case of clause (ii), Issuer shall promptly (x) deliver to Grantee that portion of the Section 8 Repurchase Consideration that Issuer is not prohibited from delivering and (y) deliver to Grantee, as appropriate, either (A) a new Stock Option Agreement evidencing the right of Grantee to purchase that number of shares of Issuer Common Stock

B–8

obtained by multiplying the number of shares of Issuer Common Stock for which the surrendered Stock Option Agreement was exercisable at the time of delivery of the notice of repurchase by a fraction, the numerator of which is the Section 8 Repurchase Consideration less the portion thereof theretofore delivered to Grantee and the denominator of which is the Section 8 Repurchase Consideration, or (B) a certificate for the Option Shares it is then so prohibited from repurchasing; *provided* that if the Option shall have terminated prior to the date of such notice or shall be scheduled to terminate at any time before the expiration of a period ending on the thirtieth business day after such date, Grantee shall nonetheless have the right so to exercise the Option or exercise its rights under this Section 8 until the expiration of such period of 30 business days. Grantee shall notify Issuer of its determination under the preceding sentence within 10 business days of receipt of notice of disapproval of the repurchase.

(c) As used herein, a *"Repurchase Event"* shall occur if (A) (i) any person (other than Grantee or any Subsidiary of Grantee) shall have acquired beneficial ownership of (as such term is defined in Rule 13d–3 promulgated under the Exchange Act), or the right to acquire beneficial ownership of, or any group shall have been formed which beneficially owns or has the right to acquire beneficial ownership of, 50% or more of the then outstanding shares of Issuer Common Stock or (ii) any of the transactions described in Section 7(b)(i), 7(b)(ii) or 7(b)(iii) has been consummated and (B) a Purchase Event shall have occurred prior to the termination of the Option.

9. *Repurchase of Substitute Option.*

(a) At the request of Grantee at any time prior to the termination of the Substitute Option as set forth in Section 3(a), Substitute Option Issuer (or any successor) shall repurchase from Grantee and (x) the Substitute Option and (y) all shares of Substitute Common Stock purchased by Grantee pursuant hereto with respect to which Grantee then has beneficial ownership. The date on which Grantee exercises its rights under this Section 9 is referred to as the *"Section 9 Request Date"*. Such repurchase shall be at an aggregate price (the *"Section 9 Repurchase Consideration"*) equal to the sum of:

(i) the aggregate purchase price paid by Grantee for any shares of Substitute Common Stock acquired pursuant to the Option or Substitute Option with respect to which Grantee then has beneficial ownership;

(ii) the excess, if any, of (x) the Substitute Applicable Price (as hereinafter defined) for each share of Substitute Common Stock over (y) the Substitute Option Price (as adjusted pursuant to Section 7) multiplied by the number of shares of Substitute Common Stock with respect to which the Substitute Option has not been exercised; and

(iii) the excess, if any, of the Substitute Applicable Price over the purchase price paid (or in the case of shares with respect to which the Option or Substitute Option has been exercised but the Closing Date has not occurred, payable) by Grantee for each share of Substitute Common Stock with respect to which the Option or Substitute Option has been exercised and with respect to which Grantee then has beneficial ownership, multiplied by the number of such shares.

(b) If Grantee exercises its rights under this Section 9, Substitute Option Issuer shall, within 5 business days after the Section 9 Request Date, pay the Section 9 Repurchase Consideration to Grantee in immediately available funds, and contemporaneously with such payment, Grantee shall surrender to Substitute Option Issuer the Substitute Option and the certificates evidencing the shares of Substitute Common Stock purchased thereunder with respect to which Grantee then has beneficial ownership, and Grantee shall warrant that it has sole record and beneficial ownership of such shares and that the same are then free and clear of all Liens. Notwithstanding the foregoing, to the extent that prior notification to or approval of any Governmental Entity is required in connection with the payment of all or any portion of the Section 9 Repurchase

B–9

Consideration, Grantee shall have the ongoing option to revoke its request for repurchase pursuant to Section 9, in whole or in part, or to require that Substitute Option Issuer deliver from time to time that portion of the Section 9 Repurchase Consideration that it is not then so prohibited from paying and promptly file the required notice or application for approval and expeditiously process the same (and each party shall cooperate with the other in the filing of any such notice or application and the obtaining of any such approval) and the period of time that would otherwise run pursuant to the preceding sentence for the payment of the portion of the Section 9 Repurchase Consideration shall run instead from the date on which, as the case may be, (i) any required notification period has expired or been terminated or (ii) such approval has been obtained and, in either event, any requisite waiting period shall have passed. If any Governmental Entity disapproves of any part of Substitute Option Issuer's proposed repurchase pursuant to this Section 9, Substitute Option Issuer shall promptly give notice of such fact to Grantee. If any Governmental Entity prohibits the repurchase (and Substitute Option Issuer hereby undertakes to use its reasonable best efforts to obtain all required approvals from Governmental Entities to accomplish such repurchase) in part but not in whole, then Grantee shall have the right (i) to revoke the repurchase request or (ii) to the extent permitted by such Governmental Entity, determine whether the repurchase should apply to the Substitute Option and/or Option Shares and to what extent to each, and Grantee shall thereupon have the right to exercise the Substitute Option as to the number of Option Shares for which the Substitute Option was exercisable at the Section 9 Request Date less the sum of the number of shares covered by the Substitute Option in respect of which payment has been made pursuant to Section 9(a)(ii) and the number of shares covered by the portion of the Substitute Option (if any) that has been repurchased; whereupon, in the case of clause (ii), Substitute Option Issuer shall promptly (x) deliver to Grantee that portion of the Section 9 Repurchase Consideration that Substitute Option Issuer is not prohibited from delivering and (y) deliver to Grantee, as appropriate, either (A) a new Stock Option Agreement evidencing the right of Grantee to purchase that number of shares of Substitute Common Stock obtained by multiplying the number of shares of Substitute Common Stock for which the surrendered Stock Option Agreement was exercisable at the time of delivery of the notice of repurchase by a fraction, the numerator of which is the Section 9 Repurchase Consideration less the portion thereof theretofore delivered to Grantee and the denominator of which is the Section 9 Repurchase Consideration or (B) a certificate for the Option Shares it is then so prohibited from repurchasing; *provided* that if the Substitute Option shall have terminated prior to the date of such notice or shall be scheduled to terminate at any time before the expiration of a period ending on the 30th business day after such date, Grantee shall nonetheless have the right so to exercise the Substitute Option or exercise its rights under Section 9 until the expiration of such period of 30 business days. Grantee shall notify Substitute Option Issuer of its determination under the preceding sentence within 10 business days of receipt of notice of disapproval of the repurchase.

(c) For purposes of this Agreement, the *"Substitute Applicable Price"* means the highest closing sales price per share of Substitute Common Stock during the six months preceding the Section 9 Request Date.

(d) Following the conversion of the Option into a Substitute Option, all references to *"Issuer"*, *"Issuer Common Stock"* and *"Section 8"* contained herein shall also be deemed to be references to *"Substitute Option Issuer"*, *"Substitute Common Stock"* and *"Section 9"*, respectively.

10 *Registration Rights.*

(a) *Demand Registration Rights.* Issuer shall, subject to the conditions of Section 10(c) below, if requested by any Grantee following a Purchase Event that occurs prior to the termination of the Option, including Grantee and any permitted transferee (*"Selling Stockholder"*), as expeditiously as possible prepare, file and keep current a registration statement under the Securities Act if such registration is necessary in order to permit the sale or

B–10

other disposition of any or all shares of Issuer Common Stock or other securities that have been acquired by or are issuable to the Selling Stockholder upon exercise of the Option in accordance with the intended method of sale or other disposition stated by the Selling Stockholder in such request, including, without limitation, a *"shelf"* registration statement under Rule 415 under the Securities Act or any successor provision, and Issuer shall use its best efforts to qualify such shares or other securities for sale under any applicable state securities laws.

(b) *Additional Registration Rights.* If Issuer at any time after the exercise of the Option proposes to register any shares of Issuer Common Stock under the Securities Act in connection with an underwritten public offering of such Issuer Common Stock, Issuer will promptly give written notice to Grantee of its intention to do so and, upon the written request of any Selling Stockholder given within 30 days after receipt of any such notice (which request shall specify the number of shares of Issuer Common Stock intended to be included in such underwritten public offering by the Selling Stockholder), Issuer will cause all such shares for which a Selling Stockholder requests participation in such registration to be so registered and included in such underwritten public offering; *provided, however,* that Issuer may elect to not cause any such shares to be so registered (i) if in the reasonable good faith opinion of the underwriters for such offering, the inclusion of all such shares by the Selling Stockholder would materially interfere with the marketing of such offering (in which case Issuer shall register as many shares as possible without materially interfering with the marketing of the offering), or (ii) in the case of a registration solely to implement an employee benefit plan or a registration filed on Form S-4 of the Securities Act or any successor Form. If some but not all the shares of Issuer Common Stock with respect to which Issuer shall have received requests for registration pursuant to this Section 10(b) shall be excluded from such registration, Issuer shall make appropriate allocation of shares to be registered among the Selling Stockholders desiring to register their shares pro rata in the proportion that the number of shares requested to be registered by each such Selling Stockholder bears to the total number of shares requested to be registered by all such Selling Stockholders then desiring to have Issuer Common Stock registered for sale.

(c) *Conditions to Required Registration.* Issuer shall use its reasonable best efforts to cause each registration statement referred to in Section 10(a) above to become effective and to obtain all consents or waivers of other parties which are required therefor and to keep such registration statement effective as may be reasonably necessary to effect such sale or other disposition; *provided, however,* that Issuer may delay any registration of Option Shares required pursuant to Section 10(a) above for a period not exceeding 90 days provided Issuer shall in good faith determine that any such registration would adversely affect an offering of other securities by Issuer then in registration, and Issuer shall not be required to register Option Shares under the Securities Act pursuant to Section 10(a) above:

(i) prior to the earlier of (a) termination of the Merger Agreement pursuant to Article VII thereof and (b) a Purchase Event;

(ii) on more than three occasions;

(iii) within 90 days after the effective date of a registration referred to in Section 10(b) above pursuant to which the Selling Stockholder or Selling Stockholders concerned were afforded the opportunity to register all such shares under the Securities Act and shares were registered to the extent requested; and

(iv) unless a request therefor is made to register at least 25% or more of the aggregate number of Option Shares (including shares of Issuer Common Stock and other securities issuable upon exercise of the Option) then outstanding.

In addition to the foregoing, Issuer shall not be required to maintain the effectiveness of any registration statement (other than a shelf registration statement referred to in Section 10(a)) after the expiration of three months from the effective date of such registration statement. Issuer

B-11

shall use its reasonable best efforts to make any filings, and take all steps, under all applicable state securities laws to the extent necessary to permit the sale or other disposition of the Option Shares so registered in accordance with the intended method of distribution for such shares; provided, however, that Issuer shall not be required to consent to general jurisdiction or qualify to do business in any state where it is not otherwise required to so consent to such jurisdiction or to so qualify to do business. If requested by any such Grantee in connection with such registration, Issuer shall become a party to any underwriting agreement relating to the sale of such shares, but only to the extent of obligating itself in respect of representations, warranties, indemnities and other agreements customarily included in secondary offering underwriting agreements. Upon receiving any request under this Section 10 from any Grantee, Issuer agrees to send a copy thereof to any other person known to Issuer to be entitled to registration rights under this Section 10, in each case by promptly mailing the same, postage prepaid, to the address of record of the persons entitled to receive such copies

Notwithstanding anything else in this Section 10, in lieu of complying with its obligations pursuant to a request made by any Grantee under this Section 10, Issuer may, at its election, repurchase the Option Shares requested to be registered by such Grantee at a purchase price per share equal to the average closing price of such Option Shares during the 10 business days preceding the date on which Issuer gives notice to Grantee of its intention to repurchase such Option Shares (which notice shall be given no later than 15 days after Grantee has given notice to Issuer of its election to exercise its registration rights under Section 10(a) or 10(b)).

(d) *Expenses*. Except where applicable state law prohibits such payments and except for underwriting discounts or commissions and brokers' fees, Issuer will pay all expenses (including, without limitation, registration fees, qualification fees, blue sky fees and expenses (including the fees and expenses of counsel), legal fees and expenses, including the reasonable fees and expenses of one counsel to the holders whose Option Shares are being registered, printing expenses and the costs of special audits or *"cold comfort"* letters, expenses of underwriters, excluding discounts and commissions but including liability insurance if Issuer so desires or the underwriters so require, and the reasonable fees and expenses of any necessary special experts) in connection with each registration pursuant to Section 10(a) or 10(b) above (including the related offerings and sales by holders of Option Shares) and all other qualifications, notifications or exemptions pursuant to Section 10(a) or 10(b) above.

(e) *Indemnification*. In connection with any registration under Section 10(a) or 10(b) above, Issuer hereby indemnifies the Selling Stockholders, and each underwriter thereof, including each person, if any, who controls such Selling Stockholders or underwriter within the meaning of Section 15 of the Securities Act, and including each director, officer, stockholder, partner, member, employee, representative and agent of any thereof, against all expenses, losses, claims, damages and liabilities caused by any untrue, or alleged untrue, statement of a material fact contained in any registration statement or prospectus or prospectus or offering circular (including any amendments or supplements thereto) or any preliminary prospectus, or caused by any omission, or alleged omission, to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such expenses, losses, claims, damages or liabilities of such indemnified party are caused by any untrue statement or alleged untrue statement that was included by Issuer in any such registration statement or prospectus or notification or offering circular (including any amendments or supplements thereto) in reliance upon and in conformity with, information furnished in writing to Issuer by such indemnified party expressly for use therein, and Issuer and each person, if any, who controls Issuer within the meaning of Section 15 of the Securities Act, and each director, officer, stockholder, partner, member, employee, representative and agent of Issuer shall be indemnified by such Selling Stockholders, or by such underwriter, as the case may be, for all such expenses, losses, claims, damages and liabilities caused by any untrue, or alleged untrue, statement, that was included by Issuer in any such registration statement or

B–12

prospectus or notification or offering circular (including any amendments or supplements thereto) in reliance upon, and in conformity with, information furnished in writing to Issuer by such Selling Stockholders or such underwriter, as the case may be, expressly for such use

Promptly upon receipt by a party indemnified under this Section 10(e) of notice of the commencement of any action against such indemnified party in respect of which indemnity or reimbursement may be sought against any indemnifying party under this Section 10(e), such indemnified party shall notify the indemnifying party in writing of the commencement of such action, but the failure so to notify the indemnifying party shall not relieve it of any liability which it may otherwise have to any indemnified party under this Section 10(e) unless the failure so to notify the indemnified party results in substantial prejudice thereto. In case notice of commencement of any such action shall be given to the indemnifying party as above provided, the indemnifying party shall be entitled to participate in and, to the extent it may wish, jointly with any other indemnifying party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and satisfactory to such indemnified party. The indemnified party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel (other than reasonable costs of investigation) shall be paid by the indemnified party unless (i) the indemnifying party agrees to pay the same, (ii) the indemnifying party fails to assume the defense of such action with counsel satisfactory to the indemnified party, or (iii) the indemnified party has been advised by counsel that one or more legal defenses may be available to the indemnifying party that may be contrary to the interest of the indemnified party, in which case the indemnifying party shall be entitled to assume the defense of such action notwithstanding its obligation to bear fees and expenses of such counsel. No indemnifying party shall be liable for any settlement entered into without its consent, which consent may not be unreasonably withheld.

If the indemnification provided for in this Section 10(e) is unavailable to a party otherwise entitled to be indemnified in respect of any expenses, losses, claims, damages or liabilities referred to herein, then the indemnifying party, in lieu of indemnifying such party otherwise entitled to be indemnified, shall contribute to the amount paid or payable by such party to be indemnified as a result of such expenses, losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative benefits received by Issuer, the Selling Stockholders and the underwriters from the offering of the securities and also the relative fault of Issuer, the Selling Stockholders and the underwriters in connection with the statements or omissions which resulted in such expenses, losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The amount paid or payable by a party as a result of the expenses, losses, claims, damages and liabilities referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim; provided, however, that in no case shall any Selling Stockholder be responsible, in the aggregate, for any amount in excess of the net offering proceeds attributable to its Option Shares included in the offering. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Any obligation by any Selling Stockholder to indemnify shall be several and not joint with other Selling Stockholders.

In connection with any registration pursuant to Section 10(a) or 10(b) above, Issuer and each Selling Stockholder (other than Grantee) shall enter into an agreement containing the indemnification provisions of this Section 10(e).

(f) *Miscellaneous Reporting.* Issuer shall comply with all reporting requirements and will do all such other things as may be necessary to permit the expeditious sale at any time of any Option Shares by the Selling Stockholders thereof in accordance with and to the extent permitted by any rule or regulation promulgated by the SEC from time to time, including, without limitation, Rule 144. Issuer shall at its expense provide the Selling Stockholders with any information necessary in connection with the completion and filing of any reports or forms required to be

B−13

filed by them under the Securities Act or the Exchange Act, or required pursuant to any state securities laws or the rules of the NASD or any stock exchange

(g) *Issue Taxes.* Issuer will pay all stamp taxes in connection with the issuance and the sale of the Option Shares and in connection with the exercise of the Option, and will save the Selling Stockholders harmless, without limitation as to time, against any and all liabilities with respect to all such taxes

11  *Quotation or Listing.* If Issuer Common Stock or any other securities to be acquired in connection with the exercise of the Option are then authorized for quotation or trading or listing on the NYSE, the Nasdaq National Market System or any other securities exchange or securities quotation system, Issuer, upon the request of Grantee, will promptly file an application, if required, to authorize for quotation or trading or listing the shares of Issuer Common Stock or any other securities to be acquired upon exercise of the Option on such securities exchange or securities quotation system and will use its reasonable best efforts to obtain approval, if required, of such quotation or listing as soon as practicable.

12.  *Division of Option.* This Agreement (and the Option granted hereby) are exchangeable, without expense, at the option of Grantee, upon presentation and surrender of this Agreement at the principal office of Issuer for other Agreements providing for Options of different denominations entitling the holder thereof to purchase in the aggregate the same number of shares of Issuer Common Stock purchasable hereunder, in which event, (i) the "Maximum Profit" in each agreement resulting from such exchange shall be allocated among the several agreements in proportion to the number of Option Shares issuable pursuant thereto so that the sum of the "Maximum Profit" for all such agreements shall total $2.87 billion, (ii) the amount referred to in clause (D) of Section 13(b) of each agreement resulting from such exchange shall be multiplied by a fraction the numerator of which is the number of Option Shares issuable pursuant to each such agreement and the denominator of which is the number of Option Shares issuable pursuant to all such agreements collectively and (iii) such other adjustments, if any, shall be made as are necessary to preserve the overall economic impact and intent of this Agreement (including Section 13 hereof) The terms *"Agreement"* and *"Option"* as used herein include any other Stock Option Agreement and related Options for which this Agreement (and the Option granted hereby) may be exchanged. Upon receipt by Issuer of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Agreement, and (in the case of loss, theft or destruction) of reasonably satisfactory indemnification to protect Issuer from any loss which it may suffer if this Agreement is replaced, and upon surrender and cancellation of this Agreement, if mutilated, Issuer will execute and deliver a new agreement of like tenor and date

13.  *Limitation of Grantee Profit.* (a) Notwithstanding any other provision herein or in the Merger Agreement, in no event shall Grantee's Total Profit (as defined below) exceed the Maximum Profit, and, if it otherwise would exceed such amount, Grantee, at its sole discretion, shall either (i) reduce the number of shares subject to the Option (and any Substitute Option), (ii) deliver to Issuer, or the Substitute Issuer, as the case may be, for cancellation shares of Issuer Common Stock or Substitute Common Stock, as the case may be (or other securities into which such Option Shares are converted or exchanged), (iii) pay cash to Issuer, or the Substitute Issuer, as the case may be, (iv) reduce the amount of the Section 8 Repurchase Consideration or Section 9 Repurchase Consideration or (v) any combination of the foregoing, so that Grantee's actually realized Total Profit shall not exceed the Maximum Profit after taking into account the foregoing actions. Notwithstanding any other provision of this Agreement, the Option may not be exercised for a number of shares as would, as of the date of exercise, result in a Notional Total Profit (as defined below) of more than the Maximum Profit and, if exercise of the Option would otherwise result in the Notional Total Profit exceeding such amount, Grantee, in its discretion, may take any of the actions specified in this Section 13(a) so that the Notional

B–14

Total Profit shall not exceed the Maximum Profit; *provided* that nothing in this sentence shall restrict any subsequent exercise of the Option which at such time complies with this sentence.

(b) For purposes of this Agreement, *"Total Profit"* shall mean: (i) the aggregate amount (before taxes) of (A) the excess of (x) the net cash amounts or fair market value of any property received by Grantee pursuant to a sale of Option Shares (or securities into which such shares are converted or exchanged), other than to a wholly–owned Subsidiary of Grantee, or a repurchase of Option Shares by Issuer pursuant to Section 8 hereof, after payment of applicable brokerage or sales commissions and discounts, over (y) Grantee's aggregate purchase price for such Option Shares (or other securities), plus (B) all amounts received by Grantee upon the repurchase of the Option by Issuer pursuant to Section 8 hereof, plus (C) all equivalent net amounts with respect to the Substitute Option and any amounts paid pursuant to Section 7(f) hereof, plus (D) all amounts received by Grantee pursuant to Section 7.2(c) of the Merger Agreement, minus (ii) all amounts of cash previously paid to Issuer pursuant to Section 13(a) plus the value of the Option Shares (or other securities) previously delivered to Issuer for cancellation pursuant to Section 13(a), which value shall be deemed to be the aggregate Purchase Price paid for such Option Shares (or other securities). For purposes of this Agreement, *"Notional Total Profit"* with respect to any number of shares as to which Grantee may propose to exercise the Option shall be the Total Profit, determined as of the date of such proposed exercise assuming that the Option were exercised on such date for such number of shares, and assuming that such shares, together with all other Option Shares held by Grantee and its affiliates as of such date, were sold for cash at the closing market price for the Issuer Common Stock as of the close of business on the preceding trading day (less customary brokerage commissions). For purposes of this Section 13, transactions by a wholly–owned Subsidiary transferee of Grantee in respect of the Option or Option Shares transferred to it shall be treated as if made by Grantee.

(c) Notwithstanding any other provision of this Agreement, nothing in this Agreement shall affect the ability of Grantee to receive, nor relieve Issuer's obligation to pay, any payment provided for in Section 7.2(c) of the Merger Agreement; *provided* that if and to the extent the Total Profit received by Grantee would exceed the Maximum Profit following receipt of such payment, Grantee shall be obligated to comply with the terms of Section 13(a) within 15 days of the date on which Grantee has realized cash and/or property representing Total Profit in excess of Maximum Profit.

14. *Miscellaneous*.

(a) *Expenses*. Except as otherwise provided herein or in the Merger Agreement, each of the parties hereto shall bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated hereunder, including, without limitation, fees and expenses of its own financial consultants, investment bankers, accountants and counsel.

(b) *Waiver and Amendment*. Any provision of this Agreement may be waived at any time by the party that is entitled to the benefits of such provision. This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights. No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. Any waiver shall be effective only in the specific instance and for the specific purpose for which given and shall not constitute a waiver to any subsequent or other exercise of any right, remedy, power or privilege hereunder.

(c) *Entire Agreement, No Third–Party Beneficiaries, Severability*. This Agreement, together with the Merger Agreement and the other documents and instruments referred to herein and therein, between Grantee and Issuer constitutes the entire agreement and supersedes all prior

B–15

agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement is not intended to confer upon any person other than the parties hereto (or their respective successors and assigns) (other than any transferees of the Option Shares or any permitted transferee of this Agreement pursuant to Section 14(h)) any rights, remedies, obligations or liabilities hereunder. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or Governmental Entity to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected impaired or invalidated. If for any reason such court or Governmental Entity determines that the Option does not permit Grantee to acquire, or does not require Issuer to repurchase, the full number of shares of Issuer Common Stock as provided in Section 2 (as may be adjusted herein), it is the express intention of Issuer to allow Grantee to acquire or to require Issuer to repurchase such lesser number of shares as may be permissible without any amendment or modification hereof.

(d) *Governing Law*. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof).

(e) *Interpretation.* When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated. The descriptive headings contained herein are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "herein," "hereof," "hereunder" and words of similar import shall be deemed to refer to this Agreement as a whole, and not to any particular provision of this Agreement. Any pronoun shall include the corresponding masculine, feminine and neuter forms.

(f) *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, telecopied (with confirmation) or mailed by registered or certified mail (return receipt requested) to the parties at the addresses set forth in the Merger Agreement (or at such other address for a party as shall be specified by like notice).

(g) *Counterparts.* This Agreement and any amendments hereto may be executed in two counterparts, each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed, it being understood that both parties need not sign the same counterpart.

(h) *Assignment.* Neither this Agreement nor any of the rights, interests or obligations hereunder or under the Option shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party, and any attempt to make any such assignment without such consent shall be null and void, except that Grantee may assign this Agreement to a wholly-owned Subsidiary of Grantee (in which event the term "Grantee" as used herein shall be deemed to refer to such Subsidiary). Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns. For the avoidance of doubt, nothing in this paragraph (h) shall prohibit Issuer from engaging in a transaction contemplated by Section 7(b) in accordance with the provisions of Section 7(b), provided that the terms of this Agreement and the Merger Agreement shall remain applicable with respect to any such transaction.

(i) *Further Assurances.* In the event of any exercise of the Option by Grantee, Issuer and Grantee shall execute and deliver all other documents and instruments and take all other action that may be reasonably necessary in order to consummate the transactions provided for by such exercise.

(j) *Submission to Jurisdiction.* Each party hereto irrevocably submits to the jurisdiction of (i) the Supreme Court of the State of New York, New York County, and (ii) the United States

B-16

District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto agrees to commence any action, suit or proceeding relating hereto either in the United States District Court for the Southern District of New York or, if such suit, action or other proceeding may not be brought in such court for reasons of subject matter jurisdiction, in the Supreme Court of the State of New York, New York County. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (A) the Supreme Court of the State of New York, New York County, or (B) the United States District Court for the Southern District of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party hereto further irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or other proceeding by the mailing of copies thereof by mail to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail; *provided* that nothing in this Section shall affect the right of any party to serve legal process in any other manner permitted by law. The consent to jurisdiction set forth in this Section shall not constitute a general consent to service of process in the State of New York and shall have no effect for any purpose except as provided in this Section. Each party hereto agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(k) *Enforcement*. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court as provided in the Section above, this being in addition to any other remedy to which they are entitled at law or in equity.

(l) *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTERS (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

[Remainder of this page intentionally left blank]

B–17

IN WITNESS WHEREOF, Issuer and Grantee have caused this Stock Option Agreement to be signed by their respective officers thereunto duly authorized, all as of the day and year first written above.

BANK ONE CORPORATION

By: /s/ JAMES DIMON

Name: James Dimon
Title: Chairman and Chief Executive Officer

J.P. MORGAN CHASE & CO.

By: /s/ WILLIAM B. HARRISON, JR.

Name: William B. Harrison, Jr.
Title: Chairman and Chief Executive Officer

B-18