# Tab B

# Part 7

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

Annex C

THE TRANSFER OF THIS AGREEMENT IS SUBJECT TO CERTAIN

RESTRICTIONS CONTAINED HEREIN AND TO RESALE RESTRICTIONS UNDER THE SECURITIES ACT OF 1933, AS AMENDED

## STOCK OPTION AGREEMENT

THIS STOCK OPTION AGREEMENT, dated as of January 14, 2004 (this *"Agreement"*), is made by and between J.P. MORGAN CHASE & CO., a Delaware corporation (*"Issuer"*), and BANK ONE CORPORATION, a Delaware corporation (*"Grantee"*).

WHEREAS, Grantee and Issuer are concurrently herewith entering into an Agreement and Plan of Merger, dated as of the date hereof (the *"Merger Agreement"*), pursuant to which Grantee will be merged with and into Issuer, with Issuer being the surviving corporation (the *"Merger"*); and

WHEREAS, as a condition and inducement to Grantee's execution of the Merger Agreement and the Bank One Stock Option Agreement (as defined in the Merger Agreement), Grantee has required that Issuer agree, and Issuer has agreed, to grant Grantee the Option (as defined herein).

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein and in the Merger Agreement, and intending to be legally bound hereby, Issuer and Grantee agree as follows:

1. *Defined Terms.*

(a) Capitalized terms which are used but not defined herein shall have the meanings ascribed to such terms in the Merger Agreement.

(b) The term *"person"* shall have the meaning specified in Sections 3(a)(9) and 13(d)(3) of the Exchange Act.

2. *Grant of Option.* Issuer hereby grants to Grantee an irrevocable option (the *"Option"*) to purchase, subject to the terms and conditions set forth herein, up to 406,481,383 shares (as adjusted as set forth herein, the *"Option Shares"*) of common stock, par value $1.00 per share, of Issuer (the *"Issuer Common Stock"*) at a purchase price per Option Share (as adjusted as set forth herein, the *"Purchase Price"*) of $38.90; *provided* that in no event shall the number of Option Shares for which this Option is exercisable exceed 19.9% of the issued and outstanding shares of Issuer Common Stock without giving effect to any shares subject to or issued pursuant to the Option. Issuer shall make proper provision so that each Option Share issued upon exercise of the Option shall be accompanied by the applicable number of rights or other benefits as may be provided in any Issuer rights agreement or similar agreement that may be adopted after the date hereof.

3. *Exercise of Option.*

(a) Grantee may exercise the Option, in whole or in part, at any time and from time to time following the occurrence of a Purchase Event (as defined in Section 3(b)) on or after the date hereof; *provided* that the Option shall terminate and be of no further force or effect upon the earliest to occur of (A) the Effective Time, (B) termination of the Merger Agreement in accordance with the terms thereof so long as, in the case of this clause (B), a Purchase Event has not occurred and could not occur in the future, (C) the date that Grantee's Total Profit equals $2.87 billion (the *"Maximum Profit"*), and (D) the date which is six months after the occurrence of a Purchase Event; and *provided, further,* that any purchase of shares upon exercise of the Option shall be subject to compliance with applicable law; and *provided, further,* that Grantee shall have sent the written notice of such exercise (as provided in Section 3(d)).

C–1

within six months following such Purchase Event. Notwithstanding the termination of the Option, Grantee shall be entitled to purchase those Option Shares with respect to which it has exercised the Option in accordance herewith prior to the termination of the Option. The termination of the Option shall not affect any rights hereunder which by their terms extend beyond the date of such termination.

(b) As used herein, a *"Purchase Event"* means any of the following events:

(i) prior to the termination of the Merger Agreement, without Grantee's prior written consent, Issuer or any of its Subsidiaries shall have entered into one or more agreements with any person (other than Grantee or any Subsidiary of Grantee) to effect, or shall have effected, in a single transaction or a series of related transactions, any Acquisition Proposal;

(ii) prior to the termination of the Merger Agreement, any person (other than Grantee or any Subsidiary of Grantee) shall have acquired beneficial ownership (as such term is defined in Rule 13d–3 promulgated under the Exchange Act) of or the right to acquire beneficial ownership of, or any group (as such term is defined in Section 13(d)(3) of the Exchange Act), other than a group of which Grantee or any Subsidiary of Grantee is a member, shall have been formed which beneficially owns or has the right to acquire beneficial ownership of, shares of Issuer Common Stock or other voting securities representing 20% or more of the voting power of Issuer or any of its Significant Subsidiaries (as defined in Rule 1–02 of Regulation S–X of the SEC); or

(iii) the occurrence of an event the result of which is that the fee required to be paid by Issuer pursuant to Section 7.2(b)(i) or 7.2(b)(ii)(C) or 7.2(b)(iii)(D) of the Merger Agreement becomes payable.

(c) Issuer shall notify Grantee promptly in writing of the occurrence of any Purchase Event, it being understood that the giving of such notice by Issuer shall not be a condition to the right of Grantee to exercise the Option.

(d) In the event Grantee wishes to exercise the Option, Grantee shall send to Issuer a written notice (the date of which is herein referred to as the *"Notice Date"*) specifying (i) the total number of Option Shares it intends to purchase pursuant to such exercise and (ii) a place and date not earlier than three business days nor later than 60 business days from the Notice Date for the closing (the *"Closing"*) of such purchase (the date of such Closing, the *"Closing Date"*); *provided* that if the Closing cannot be consummated by reason of any applicable law, rule, regulation or order or the need to obtain any necessary approvals or consents of applicable Governmental Entities, the period of time that otherwise would run pursuant to this sentence shall run instead from the date on which such restriction on consummation has expired or been terminated; and *provided, further*, without limiting the foregoing, that if prior notification or application to, approval of or authorization by any Governmental Entity is required in connection with such purchase, Issuer shall use its reasonable best efforts to cooperate with Grantee in the prompt filing of the required notice or application for approval or authorization, and the Closing shall occur immediately following the date on which such approvals have been obtained and any required notification or waiting periods have expired.

(e) In the event Grantee receives official notice that an approval or consent of any Governmental Entity required for the purchase of Option Shares will not be issued or granted, Grantee shall be entitled to exercise the Option in connection with the resale of Issuer Common Stock or other securities pursuant to a registration statement as provided in Section 10. The provisions of this Section 3 and Section 4 shall apply with appropriate adjustments to any such exercise.

C–2

4. *Payment and Delivery of Certificates*

(a) On each Closing Date, Grantee shall (i) pay to Issuer, in immediately available funds by wire transfer to a bank account designated by Issuer (*provided* that the failure or refusal of Issuer to designate a bank account shall not preclude Grantee from exercising the Option), an amount equal to the Purchase Price multiplied by the number of Option Shares to be purchased on such Closing Date, and (ii) present and surrender this Agreement to Issuer at the address of Issuer specified in Section 14(f)

(b) At each Closing, simultaneously with the delivery of immediately available funds and surrender of this Agreement as provided in Section 4(a), (i) Issuer shall deliver to Grantee (A) a certificate or certificates representing the Option Shares to be purchased at such Closing, which Option Shares shall be fully paid, validly issued and non–assessable, free and clear of all liens, claims, charges, security interests or other encumbrances ("*Liens*") other than those created by the express terms of this Agreement, and subject to no preemptive or other similar rights, and (B) if the Option is exercised in part only, an executed new agreement with the same terms as this Agreement evidencing the right to purchase the balance of the shares of Issuer Common Stock purchasable hereunder, and (ii) Grantee shall deliver to Issuer a letter agreeing that Grantee shall not offer to sell or otherwise dispose of such Option Shares in violation of applicable federal and state securities laws or of the provisions of this Agreement.

(c) In addition to any other legend that is required by applicable law, certificates for the Option Shares delivered at each Closing shall be endorsed with a restrictive legend which shall read substantially as follows:

THE TRANSFER OF THE STOCK REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO RESTRICTIONS ARISING UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

It is understood and agreed that the above legend shall be removed by delivery of substitute certificate(s) without such legend if such Option Shares have been registered pursuant to the Securities Act, such Option Shares have been sold in reliance on and in accordance with Rule 144 under the Securities Act or Grantee shall have delivered to Issuer a copy of a letter from the staff of the SEC, or an opinion of counsel in form and substance reasonably satisfactory to Issuer and its counsel, to the effect that such legend is not required for purposes of the Securities Act.

(d) Upon the giving by Grantee to Issuer of the written notice of exercise of the Option provided for under Section 3(d), the tender of the applicable Purchase Price in immediately available funds and the tender of this Agreement to Issuer, Grantee shall be deemed to be the holder of record of the shares of Issuer Common Stock issuable upon such exercise, regardless of whether the stock transfer books of Issuer are then closed or certificates representing such shares of Issuer Common Stock are then actually delivered to Grantee. Issuer shall pay all expenses, and any and all federal, foreign, state, and local taxes and other charges, that may be payable in connection with the preparation, issuance and delivery of stock certificates under this Section 4(d) in the name of Grantee or its assignee, transferee, or designee

(e) Issuer agrees (i) that it shall at all times maintain, free from Liens and preemptive or similar rights, sufficient authorized but unissued or treasury shares of Issuer Common Stock so that the Option may be exercised without additional authorization of Issuer Common Stock after giving effect to all other options, warrants, convertible securities and other rights to purchase Issuer Common Stock then outstanding, (ii) that it will not, by charter amendment or through reorganization, recapitalization, consolidation, merger, dissolution, liquidation, spin–off, sale of assets or similar transaction, or by any other voluntary act, avoid or seek to avoid the observance or performance of any of the covenants, agreements, stipulations or conditions to be observed or performed hereunder by Issuer, and (iii) that it will promptly take all action as may from time to time be required (including (A) complying with all premerger notification, reporting

C–3

and waiting period requirements and (B) in the event prior approval or authorization of or notice or application to any Governmental Entity is necessary before the Option may be exercised, cooperating fully with Grantee in preparing such applications or notices and providing such information to such Governmental Entities as may be required) in order to permit Grantee to exercise the Option and Issuer to duly and effectively issue shares of Issuer Common Stock pursuant hereto on a timely basis.

5  *Representations and Warranties of Issuer.* Issuer hereby represents and warrants to Grantee as follows:

(a) *Corporate Authority.* Issuer has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; the execution and delivery of this Agreement and, subject to receiving any necessary approvals or consents from Governmental Entities, the consummation of the transactions contemplated hereby have been duly and validly authorized by the Board of Directors of Issuer, and no other corporate proceedings on the part of Issuer are necessary to authorize this Agreement or to consummate the transactions so contemplated; this Agreement has been duly and validly executed and delivered by Issuer and (assuming due authorization, execution and delivery by Grantee) constitutes a valid and binding obligation of Issuer, enforceable against Issuer in accordance with its terms, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws, now or hereinafter in effect, affecting creditors' rights generally, and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b) *Shares Reserved for Issuance; Capital Stock.* Issuer has taken all necessary corporate action to authorize and reserve and permit it to issue, and at all times from the date hereof through the termination of this Agreement in accordance with its terms, will have reserved for issuance, upon the exercise of the Option, that number of shares of Issuer Common Stock equal to the maximum number of shares of Issuer Common Stock and other shares and securities which are at any time and from time to time purchasable upon exercise of the Option, and all such shares and other securities, upon issuance pursuant to the Option, will be duly authorized, validly issued, fully paid and non–assessable, and will be delivered free and clear of all Liens (other than those created by the express terms of this Agreement) and not subject to any preemptive or other similar rights.

(c) *No Violations.* The execution, delivery and performance of this Agreement does not and will not, and the consummation by Issuer of any of the transactions contemplated hereby will not, constitute or result in (A) a breach or violation of, or a default under, its certificate of incorporation or by–laws, or the comparable governing instruments of any of its Subsidiaries, or (B) a breach or violation of, or a default under, any agreement, lease, contract, note, mortgage, indenture, arrangement or other obligation of it or any of its Subsidiaries (with or without the giving of notice, the lapse of time or both) or under any law, rule, regulation or order or governmental or non–governmental permit or license to which it or any of its Subsidiaries is subject, that would in any case give any other person the ability to prevent or enjoin Issuer's performance under this Agreement in any material respect.

(d) *Board Action.* The Board of Directors of Issuer has approved this Agreement and the consummation of the transactions contemplated hereby as required under Section 203 of the DGCL and, to its knowledge, any other applicable state takeover laws so that any such state takeover laws do not and will not apply to this Agreement or any of the transactions contemplated hereby (including the purchase of shares of Issuer Common Stock pursuant to the Option)

C–4

(e) *No Restrictions.* No Delaware law applicable generally to corporations or, to Issuer's knowledge, other takeover statute applicable generally to corporations or similar corporate law and no provision of the certificate of incorporation or by−laws of Issuer or any agreement to which Issuer is a party (i) would or would purport to impose restrictions which might adversely affect or delay the consummation of the transactions contemplated by this Agreement, or (ii) as a result of the consummation of the transactions contemplated by this Agreement, (A) would or would purport to restrict or impair the ability of Grantee to vote or otherwise exercise the rights of a shareholder with respect to securities of Issuer or any of its Subsidiaries that may be acquired or controlled by Grantee or (B) would or would purport to entitle any person to acquire securities of Issuer.

6  *Representations and Warranties of Grantee.* Grantee hereby represents and warrants to Issuer as follows:

(a) *Corporate Authority.* Grantee has full corporate power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement; the execution and delivery of this Agreement and, subject to obtaining any necessary approvals or consents from Governmental Entities, the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Grantee; and this Agreement has been duly executed and delivered by Grantee and (assuming due authorization, execution and delivery by Issuer) constitutes a valid and binding obligation of Grantee, enforceable against Grantee in accordance with its terms, except that (i) such enforcement may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, moratorium or other similar laws, now or hereinafter in effect, affecting creditors' rights generally, and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b) *Purchase Not for Distribution.* Any Option Shares or other securities acquired by Grantee upon exercise of the Option will not be acquired with a view to the public distribution thereof in violation of any federal or state securities laws and will not be transferred or otherwise disposed of except in a transaction registered or exempt from registration under the Securities Act and any applicable state securities laws.

7  *Adjustment upon Changes in Issuer Capitalization, Etc.*

(a) In the event of any change from time to time in Issuer Common Stock or any other shares or securities subject to the Option by reason of a stock dividend, subdivision, spinoff, stock split, split−up, merger, consolidation, recapitalization, combination, exchange of shares, or dividend or distribution, other than regular cash dividends, on or in respect of the Issuer Common Stock, the type and number of shares or securities subject to the Option, and the Purchase Price therefor, shall be adjusted appropriately, and proper provision shall be made in the agreements governing such transaction, so that Grantee shall receive, upon exercise of the Option, the number and class of shares or other securities or property that Grantee would have received in respect of Issuer Common Stock if the Option had been exercised immediately prior to such event, or the record date therefor, as applicable. If any additional shares of Issuer Common Stock are issued or otherwise become outstanding after the date of this Agreement (other than pursuant to an event described in the first sentence of this Section 7(a) or upon exercise of the Option), the number of shares of Issuer Common Stock subject to the Option shall be increased so that, after such issuance, it, together with any shares of Issuer Common Stock previously issued pursuant hereto, equals 19.9% of the number of shares of Issuer Common Stock then issued and outstanding, without giving effect to any shares subject to or issued pursuant to the Option. No provision of this Section 7 shall be deemed to affect or change, or constitute authorization for any violation of, any of the covenants, agreements, representations or warranties in the Merger Agreement.

C−5

(b) Without limiting the parties' relative rights, remedies, liabilities and obligations under the Merger Agreement or this Agreement, in the event that, prior to the termination of the Option, Issuer shall enter into an agreement (other than the Merger Agreement) (i) to consolidate with or merge into any person, other than Grantee or one of its Subsidiaries, and shall not be the continuing or surviving corporation of such consolidation or merger, (ii) to permit any person, other than Grantee or one of its Subsidiaries, to merge into Issuer and Issuer shall be the continuing or surviving corporation, but, in connection with such merger, the then outstanding shares of Issuer Common Stock shall be changed into or exchanged for another class or series of stock or other securities of Issuer or any other person or cash or any other property, or the outstanding shares of Issuer Common Stock immediately prior to such merger shall, after such merger, represent less than 50% of the outstanding shares and share equivalents having general voting power of the merged company, or (iii) to sell or otherwise transfer all or substantially all of its assets (or those of its Subsidiaries taken as a whole) in one transaction or a series of related transactions, to any person, other than Grantee or one of its Subsidiaries, then, and in each such case, the agreement governing such transaction shall make proper provisions so that the Option shall, upon the consummation of any such transaction and upon the terms and conditions set forth herein, be converted into, or exchanged for, an option (the *"Substitute Option"*), at the election of Grantee, of either (x) the Acquiring Corporation (as hereinafter defined), (y) any person that controls the Acquiring Corporation, or (z) in the case of a merger described in clause (ii), Issuer (such person being referred to as the *"Substitute Option Issuer"*).

(c) The Substitute Option shall have the same terms as the Option; *provided* that the exercise price therefor and number of shares subject thereto shall be as set forth in this Section 7 and the repurchase rights relating thereto shall be as set forth in Section 9; *provided, further*, that if a Purchase Event shall have occurred prior to or in connection with the issuance of such Substitute Option, the Substitute Option shall be exercisable immediately upon issuance without the occurrence of a further Purchase Event; and *provided, further*, that if the terms of the Substitute Option cannot, for legal reasons, be the same as the Option, such terms shall be as similar as possible and in no event less advantageous to Grantee. Substitute Option Issuer shall also enter into an agreement with Grantee in substantially the same form as this Agreement, which shall be applicable to the Substitute Option.

(d) The Substitute Option shall be exercisable for such number of shares of Substitute Common Stock (as hereinafter defined) as is equal to the Market/ Offer Price (as hereinafter defined) multiplied by the number of shares of Issuer Common Stock for which the Option was theretofore exercisable, divided by the Average Price (as hereinafter defined). The exercise price of the Substitute Option per share of Substitute Common Stock (the *"Substitute Option Price"*) shall then be equal to the Purchase Price multiplied by a fraction in which the numerator is the number of shares of Issuer Common Stock for which the Option was theretofore exercisable and the denominator is the number of shares of Substitute Common Stock for which the Substitute Option is exercisable.

(e) The following terms have the meanings indicated:

(i) *"Acquiring Corporation"* shall mean (x) the continuing or surviving corporation of a consolidation or merger with Issuer (if other than Issuer), or at Grantee's election, any person that controls such surviving corporation, (y) Issuer in a merger in which Issuer is the continuing or surviving person, or (z) the transferee of all or substantially all of Issuer's assets (or of the assets of its Subsidiaries taken as a whole).

(ii) *"Market/ Offer Price"* shall mean the highest of (v) the highest price per share of Issuer Common Stock at which a tender offer or an exchange offer therefor has been made, (w) the highest price per share of Issuer Common Stock to be paid by any third party pursuant to an agreement with Issuer, (x) the price per share of Issuer Common Stock received by holders of Issuer Common Stock in connection with any merger or other

business combination transaction described in Section 7(b)(i), 7(b)(ii) or 7(b)(iii), (y) the highest closing price for shares of Issuer Common Stock within the 12–month period immediately preceding the date on which the merger, consolidation, asset sale or other transaction in question is consummated, and (z) in the event of a sale of all or substantially all of Issuer's assets (or those of its Subsidiaries taken as a whole) an amount equal to (I) the sum of the price paid in such sale for such assets and the current market value of the remaining assets of Issuer, as determined by a nationally–recognized independent investment banking firm selected by Grantee, divided by (II) the number of shares of Issuer Common Stock outstanding at such time. In calculating the Market/ Offer Price, in the event that a tender offer or an exchange offer is made for Issuer Common Stock or an agreement is entered into involving consideration other than cash, the value of the securities or other property issuable or deliverable in exchange for Issuer Common Stock shall be determined by a nationally–recognized independent investment banking firm selected by Grantee.

(iii) *"Average Price"* shall mean the average closing sales price per share of a share of Substitute Common Stock quoted on the NYSE (or if Substitute Common Stock is not quoted on the NYSE, the average closing sales price per share as quoted on the Nasdaq National Market System or, if the shares of Substitute Common Stock are not quoted thereon, the highest bid price per share as quoted on the principal trading market on which such shares are traded as reported by a recognized source) for the 12–month period immediately preceding the date of consummation of the consolidation, merger or sale in question; provided that if Issuer is the issuer of the Substitute Option, the Average Price shall be computed with respect to a share of common stock issued by Issuer, by the person merging into Issuer or by any company which controls such person, as Grantee may elect.

(iv) *"Substitute Common Stock"* shall mean the shares of capital stock (or similar equity interest) with the greatest voting power in respect of the election of directors (or persons similarly responsible for the direction of the business and affairs) of the Substitute Option Issuer.

(f) In no event, pursuant to any of the foregoing paragraphs, shall the Substitute Option be exercisable for more than 19.9% of the shares of Substitute Common Stock outstanding prior to exercise of the Substitute Option. In the event that the Substitute Option would be exercisable for more than 19.9% of the shares of Substitute Common Stock but for the limitation in the first sentence of this Section 7(f), Substitute Option Issuer shall make a cash payment to Grantee equal to the excess of (i) the value of the Substitute Option without giving effect to the limitation in the first sentence of this Section 7(f) over (ii) the value of the Substitute Option after giving effect to the limitation in the first sentence of this Section 7(f). This difference in value shall be determined by a nationally–recognized independent investment banking firm selected by Grantee.

(g) Issuer shall not enter into any transaction described in Section 7(b) unless the Acquiring Corporation and any person that controls the Acquiring Corporation assume in writing all the obligations of Issuer hereunder and take all other actions that may be necessary so that the provisions of this Section 7 are given full force and effect (including, without limitation, any action that may be necessary so that the holders of the other shares of common stock issued by Substitute Option Issuer are not entitled to exercise any rights by reason of the issuance or exercise of the Substitute Option and the shares of Substitute Common Stock are otherwise in no way distinguishable from or have lesser economic value (other than any diminution in value resulting from the fact that the shares of Substitute Common Stock are restricted securities, as defined in Rule 144 under the Securities Act or any successor provision) than other shares of common stock issued by Substitute Option Issuer).

8. *Repurchase at the Option of Grantee.*

(a) At the request of Grantee at any time commencing upon the first occurrence of a Repurchase Event (as defined in Section 8(c)) and prior to the termination of the Option

pursuant to Section 3(a), Issuer (or any successor) shall repurchase from Grantee (x) the Option and (y) all shares of Issuer Common Stock purchased by Grantee pursuant hereto with respect to which Grantee then has beneficial ownership. The date on which Grantee exercises its rights under this Section 8 is referred to as the *"Request Date"*. Such repurchase shall be at an aggregate price (the *"Section 8 Repurchase Consideration"*) equal to the sum of:

(i) the aggregate Purchase Price paid by Grantee for any shares of Issuer Common Stock acquired pursuant to the Option with respect to which Grantee then has beneficial ownership;

(ii) the excess, if any, of (x) the Market/ Offer Price for each share of Issuer Common Stock over (y) the Purchase Price (as adjusted pursuant to Section 7), multiplied by the number of shares of Issuer Common Stock with respect to which the Option has not been exercised; and

(iii) the excess, if any, of the Market/ Offer Price over the Purchase Price paid (or, in the case of Option Shares with respect to which the Option has been exercised but the Closing Date has not occurred, payable, as adjusted pursuant to Section 7) by Grantee for each share of Issuer Common Stock with respect to which the Option has been exercised and with respect to which Grantee then has beneficial ownership, multiplied by the number of such shares

(b) If Grantee exercises its rights under this Section 8, Issuer shall, within 5 business days after the Request Date, pay the Section 8 Repurchase Consideration to Grantee in immediately available funds, and contemporaneously with such payment, Grantee shall surrender to Issuer the Option and the certificates evidencing the shares of Issuer Common Stock purchased thereunder with respect to which Grantee then has beneficial ownership, and Grantee shall warrant that it has sole record and beneficial ownership of such shares and that the same are then free and clear of all Liens. Notwithstanding the foregoing, to the extent that prior notification to or approval of any Governmental Entity is required in connection with the payment of all or any portion of the Section 8 Repurchase Consideration, Grantee shall have the ongoing option to revoke its request for repurchase pursuant to Section 8, in whole or in part, or to require that Issuer deliver from time to time that portion of the Section 8 Repurchase Consideration that it is not then so prohibited from paying and promptly file the required notice or application for approval and expeditiously process the same (and each party shall cooperate with the other in the filing of any such notice or application and the obtaining of any such approval) and the period of time that would otherwise run pursuant to the preceding sentence for the payment of the portion of the Section 8 Repurchase Consideration shall run instead from the date on which, as the case may be, (i) any required notification period has expired or been terminated or (ii) such approval has been obtained and, in either event, any requisite waiting period shall have passed. If any Governmental Entity disapproves of any part of Issuer's proposed repurchase pursuant to this Section 8, Issuer shall promptly give notice of such fact to Grantee. If any Governmental Entity prohibits the repurchase (and Issuer hereby undertakes to use its reasonable best efforts to obtain all required approvals from Governmental Entities to accomplish such repurchase) in part but not in whole, then Grantee shall have the right (i) to revoke the repurchase request or (ii) to the extent permitted by such Governmental Entity, determine whether the repurchase should apply to the Option and/or Option Shares and to what extent to each, and Grantee shall thereupon have the right to exercise the Option as to the number of Option Shares for which the Option was exercisable at the Request Date less the sum of the number of shares covered by the Option in respect of which payment has been made pursuant to Section 8(a)(ii) and the number of shares covered by the portion of the Option (if any) that has been repurchased; whereupon, in the case of clause (ii), Issuer shall promptly (x) deliver to Grantee that portion of the Section 8 Repurchase Consideration that Issuer is not prohibited from delivering and (y) deliver to Grantee, as appropriate, either (A) a new Stock Option Agreement evidencing the right of Grantee to purchase that number of shares of Issuer Common Stock

C–8

obtained by multiplying the number of shares of Issuer Common Stock for which the surrendered Stock Option Agreement was exercisable at the time of delivery of the notice of repurchase by a fraction, the numerator of which is the Section 8 Repurchase Consideration less the portion thereof theretofore delivered to Grantee and the denominator of which is the Section 8 Repurchase Consideration, or (B) a certificate for the Option Shares it is then so prohibited from repurchasing; *provided* that if the Option shall have terminated prior to the date of such notice or shall be scheduled to terminate at any time before the expiration of a period ending on the thirtieth business day after such date, Grantee shall nonetheless have the right so to exercise the Option or exercise its rights under this Section 8 until the expiration of such period of 30 business days. Grantee shall notify Issuer of its determination under the preceding sentence within 10 business days of receipt of notice of disapproval of the repurchase.

(c) As used herein, a *"Repurchase Event"* shall occur if (A) (i) any person (other than Grantee or any Subsidiary of Grantee) shall have acquired beneficial ownership of (as such term is defined in Rule 13d–3 promulgated under the Exchange Act), or the right to acquire beneficial ownership of, or any group shall have been formed which beneficially owns or has the right to acquire beneficial ownership of, 50% or more of the then outstanding shares of Issuer Common Stock or (ii) any of the transactions described in Section 7(b)(i), 7(b)(ii) or 7(b)(iii) has been consummated and (B) a Purchase Event shall have occurred prior to the termination of the Option.

9. *Repurchase of Substitute Option.*

(a) At the request of Grantee at any time prior to the termination of the Substitute Option as set forth in Section 3(a), Substitute Option Issuer (or any successor) shall repurchase from Grantee (x) the Substitute Option and (y) all shares of Substitute Common Stock purchased by Grantee pursuant hereto with respect to which Grantee then has beneficial ownership. The date on which Grantee exercises its rights under this Section 9 is referred to as the *"Section 9 Request Date."* Such repurchase shall be at an aggregate price (the *"Section 9 Repurchase Consideration"*) equal to the sum of:

(i) the aggregate purchase price paid by Grantee for any shares of Substitute Common Stock acquired pursuant to the Option or Substitute Option with respect to which Grantee then has beneficial ownership;

(ii) the excess, if any, of (x) the Substitute Applicable Price (as hereinafter defined) for each share of Substitute Common Stock over (y) the Substitute Option Price (as adjusted pursuant to Section 7) multiplied by the number of shares of Substitute Common Stock with respect to which the Substitute Option has not been exercised; and

(iii) the excess, if any, of the Substitute Applicable Price over the purchase price paid (or in the case of shares with respect to which the Option or Substitute Option has been exercised but the Closing Date has not occurred, payable) by Grantee for each share of Substitute Common Stock with respect to which the Option or Substitute Option has been exercised and with respect to which Grantee then has beneficial ownership, multiplied by the number of such shares.

(b) If Grantee exercises its rights under this Section 9, Substitute Option Issuer shall, within 5 business days after the Section 9 Request Date, pay the Section 9 Repurchase Consideration to Grantee in immediately available funds, and contemporaneously with such payment, Grantee shall surrender to Substitute Option Issuer the Substitute Option and the certificates evidencing the shares of Substitute Common Stock purchased thereunder with respect to which Grantee then has beneficial ownership, and Grantee shall warrant that it has sole record and beneficial ownership of such shares and that the same are then free and clear of all Liens. Notwithstanding the foregoing, to the extent that prior notification to or approval of any Governmental Entity is required in connection with the payment of all or any portion of the Section 9 Repurchase

Consideration, Grantee shall have the ongoing option to revoke its request for repurchase pursuant to Section 9, in whole or in part, or to require that Substitute Option Issuer deliver from time to time that portion of the Section 9 Repurchase Consideration that it is not then so prohibited from paying and promptly file the required notice or application for approval and expeditiously process the same (and each party shall cooperate with the other in the filing of any such notice or application and the obtaining of any such approval) and the period of time that would otherwise run pursuant to the preceding sentence for the payment of any portion of the Section 9 Repurchase Consideration shall run instead from the date on which, as the case may be, (i) any required notification period has expired or been terminated or (ii) such approval has been obtained and, in either event, any requisite waiting period shall have passed. If any Governmental Entity disapproves of any part of Substitute Option Issuer's proposed repurchase pursuant to this Section 9, Substitute Option Issuer shall promptly give notice of such fact to Grantee. If any Governmental Entity prohibits the repurchase (and Substitute Option Issuer hereby undertakes to use its reasonable best efforts to obtain all required approvals from Governmental Entities to accomplish such repurchase) in part but not in whole, then Grantee shall have the right (i) to revoke the repurchase request or (ii) to the extent permitted by such Governmental Entity, determine whether the repurchase should apply to the Substitute Option and/or Option Shares and to what extent to each, and Grantee shall thereupon have the right to exercise the Substitute Option as to the number of Option Shares for which the Substitute Option was exercisable at the Section 9 Request Date less the sum of the number of shares covered by the Substitute Option in respect of which payment has been made pursuant to Section 9(a)(ii) and the number of shares covered by the portion of the Substitute Option (if any) that has been repurchased; whereupon, in the case of clause (ii), Substitute Option Issuer shall promptly (x) deliver to Grantee that portion of the Section 9 Repurchase Consideration that Substitute Option Issuer is not prohibited from delivering and (y) deliver to Grantee, as appropriate, either (A) a new Stock Option Agreement evidencing the right of Grantee to purchase that number of shares of Substitute Common Stock obtained by multiplying the number of shares of Substitute Common Stock for which the surrendered Stock Option Agreement was exercisable at the time of delivery of the notice of repurchase by a fraction, the numerator of which is the Section 9 Repurchase Consideration less the portion thereof theretofore delivered to Grantee and the denominator of which is the Section 9 Repurchase Consideration or (B) a certificate for the Option Shares it is then so prohibited from repurchasing; provided that if the Substitute Option shall have terminated prior to the date of such notice or shall be scheduled to terminate at any time before the expiration of a period ending on the 30th business day after such date, Grantee shall nonetheless have the right so to exercise the Substitute Option or exercise its rights under Section 9 until the expiration of such period of 30 business days. Grantee shall notify Substitute Option Issuer of its determination under the preceding sentence within 10 business days of receipt of notice of disapproval of the repurchase.

(c) For purposes of this Agreement, the "*Substitute Applicable Price*" means the highest closing sales price per share of Substitute Common Stock during the six months preceding the Section 9 Request Date.

(d) Following the conversion of the Option into a Substitute Option, all references to "*Issuer*", "*Issuer Common Stock*" and "*Section 8*" contained herein shall also be deemed to be references to "*Substitute Option Issuer*", "*Substitute Common Stock*" and "*Section 9*", respectively.

10. *Registration Rights.*

(a) *Demand Registration Rights.* Issuer shall, subject to the conditions of Section 10(c) below, if requested by any Grantee following a Purchase Event that occurs prior to the termination of the Option, including Grantee and any permitted transferee ("*Selling Stockholder*"), as expeditiously as possible prepare, file and keep current a registration statement under the Securities Act if such registration is necessary in order to permit the sale or

other disposition of any or all shares of Issuer Common Stock or other securities that have been acquired by or are issuable to the Selling Stockholder upon exercise of the Option in accordance with the intended method of sale or other disposition stated by the Selling Stockholder in such request, including, without limitation, a *"shelf"* registration statement under Rule 415 under the Securities Act or any successor provision, and Issuer shall use its best efforts to qualify such shares or other securities for sale under any applicable state securities laws

(b) *Additional Registration Rights* If Issuer at any time after the exercise of the Option proposes to register any shares of Issuer Common Stock under the Securities Act in connection with an underwritten public offering of such Issuer Common Stock, Issuer will promptly give written notice to Grantee of its intention to do so and, upon the written request of any Selling Stockholder given within 30 days after receipt of any such notice (which request shall specify the number of shares of Issuer Common Stock intended to be included in such underwritten public offering by the Selling Stockholder), Issuer will cause all such shares for which a Selling Stockholder requests participation in such registration to be so registered and included in such underwritten public offering; *provided, however,* that Issuer may elect to not cause any such shares to be so registered (i) if in the reasonable good faith opinion of the underwriters for such offering, the inclusion of all such shares by the Selling Stockholder would materially interfere with the marketing of such offering (in which case Issuer shall register as many shares as possible without materially interfering with the marketing of the offering), or (ii) in the case of a registration solely to implement an employee benefit plan or a registration filed on Form S–4 of the Securities Act or any successor Form. If some but not all the shares of Issuer Common Stock with respect to which Issuer shall have received requests for registration pursuant to this Section 10(b) shall be excluded from such registration, Issuer shall make appropriate allocation of shares to be registered among the Selling Stockholders desiring to register their shares pro rata in the proportion that the number of shares requested to be registered by each such Selling Stockholder bears to the total number of shares requested to be registered by all such Selling Stockholders then desiring to have Issuer Common Stock registered for sale.

(c) *Conditions to Required Registration.* Issuer shall use its reasonable best efforts to cause each registration statement referred to in Section 10(a) above to become effective and to obtain all consents or waivers of other parties which are required therefor and to keep such registration statement effective as may be reasonably necessary to effect such sale or other disposition; *provided, however,* that Issuer may delay any registration of Option Shares required pursuant to Section 10(a) above for a period not exceeding 90 days provided Issuer shall in good faith determine that any such registration would adversely affect an offering of other securities by Issuer then in registration, and Issuer shall not be required to register Option Shares under the Securities Act pursuant to Section 10(a) above:

(i) prior to the earlier of (a) termination of the Merger Agreement pursuant to Article VII thereof and (b) a Purchase Event;

(ii) on more than three occasions;

(iii) within 90 days after the effective date of a registration referred to in Section 10(b) above pursuant to which the Selling Stockholder or Selling Stockholders concerned were afforded the opportunity to register all such shares under the Securities Act and shares were registered to the extent requested; and

(iv) unless a request therefor is made to register at least 25% or more of the aggregate number of Option Shares (including shares of Issuer Common Stock and other securities issuable upon exercise of the Option) then outstanding.

In addition to the foregoing, Issuer shall not be required to maintain the effectiveness of any registration statement (other than a shelf registration statement referred to in Section 10(a)) after the expiration of three months from the effective date of such registration statement. Issuer

C–11

shall use its reasonable best efforts to make any filings, and take all steps, under all applicable state securities laws to the extent necessary to permit the sale or other disposition of the Option Shares so registered in accordance with the intended method of distribution for such shares; provided, however, that Issuer shall not be required to consent to general jurisdiction or qualify to do business in any state where it is not otherwise required to so consent to such jurisdiction or to so qualify to do business. If requested by any such Grantee in connection with such registration, Issuer shall become a party to any underwriting agreement relating to the sale of such shares, but only to the extent of obligating itself in respect of representations, warranties, indemnities and other agreements customarily included in secondary offering underwriting agreements. Upon receiving any request under this Section 10 from any Grantee, Issuer agrees to send a copy thereof to any other person known to Issuer to be entitled to registration rights under this Section 10, in each case by promptly mailing the same, postage prepaid, to the address of record of the persons entitled to receive such copies.

Notwithstanding anything else in this Section 10, in lieu of complying with its obligations pursuant to a request made by any Grantee under this Section 10, Issuer may, at its election, repurchase the Option Shares requested to be registered by such Grantee at a purchase price per share equal to the average closing price of such Option Shares during the 10 business days preceding the date on which Issuer gives notice to Grantee of its intention to repurchase such Option Shares (which notice shall be given no later than 15 days after Grantee has given notice to Issuer of its election to exercise its registration rights under Section 10(a) or 10(b)).

(d) *Expenses*. Except where applicable state law prohibits such payments and except for underwriting discounts or commissions and brokers' fees, Issuer will pay all expenses (including, without limitation, registration fees, qualification fees, blue sky fees and expenses (including the fees and expenses of counsel), legal fees and expenses, including the reasonable fees and expenses of one counsel to the holders whose Option Shares are being registered, printing expenses and the costs of special audits or *"cold comfort"* letters, expenses of underwriters, excluding discounts and commissions but including liability insurance if Issuer so desires or the underwriters so require, and the reasonable fees and expenses of any necessary special experts) in connection with each registration pursuant to Section 10(a) or 10(b) above (including the related offerings and sales by holders of Option Shares) and all other qualifications, notifications or exemptions pursuant to Section 10(a) or 10(b) above.

(e) *Indemnification*. In connection with any registration under Section 10(a) or 10(b) above, Issuer hereby indemnifies the Selling Stockholders, and each underwriter thereof, including each person, if any, who controls such Selling Stockholders or underwriter within the meaning of Section 15 of the Securities Act, and including each director, officer, stockholder, partner, member, employee, representative and agent of any thereof, against all expenses, losses, claims, damages and liabilities caused by any untrue, or alleged untrue, statement of a material fact contained in any registration statement or prospectus or notification or offering circular (including any amendments or supplements thereto) or any preliminary prospectus, or caused by any omission, or alleged omission, to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such expenses, losses, claims, damages or liabilities of such indemnified party are caused by any untrue statement or alleged untrue statement that was included by Issuer in any such registration statement or prospectus or notification or offering circular (including any amendments or supplements thereto) in reliance upon and in conformity with, information furnished in writing to Issuer by such indemnified party expressly for use therein, and Issuer and each person, if any, who controls Issuer within the meaning of Section 15 of the Securities Act, and each director, officer, stockholder, partner, member, employee, representative and agent of Issuer shall be indemnified by such Selling Stockholders, or by such underwriter, as the case may be, for all such expenses, losses, claims, damages and liabilities caused by any untrue, or alleged untrue, statement, that was included by Issuer in any such registration statement or

C–12

prospectus or notification or offering circular (including any amendments or supplements thereto) in reliance upon, and in conformity with, information furnished in writing to Issuer by such Selling Stockholders or such underwriter, as the case may be, expressly for such use

Promptly upon receipt by a party indemnified under this Section 10(e) of notice of the commencement of any action against such indemnified party in respect of which indemnity or reimbursement may be sought against any indemnifying party under this Section 10(e), such indemnified party shall notify the indemnifying party in writing of the commencement of such action, but the failure so to notify the indemnifying party shall not relieve it of any liability which it may otherwise have to any indemnified party under this Section 10(e) unless the failure so to notify the indemnified party results in substantial prejudice thereto. In case notice of commencement of any such action shall be given to the indemnifying party as above provided, the indemnifying party shall be entitled to participate in and, to the extent it may wish, jointly with any other indemnifying party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and satisfactory to such indemnified party. The indemnified party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the fees and expenses of such counsel (other than reasonable costs of investigation) shall be paid by the indemnified party unless (i) the indemnifying party agrees to pay the same, (ii) the indemnifying party fails to assume the defense of such action with counsel satisfactory to the indemnified party, or (iii) the indemnified party has been advised by counsel that one or more legal defenses may be available to the indemnifying party that may be contrary to the interest of the indemnified party, in which case the indemnifying party shall be entitled to assume the defense of such action notwithstanding its obligation to bear fees and expenses of such counsel. No indemnifying party shall be liable for any settlement entered into without its consent, which consent may not be unreasonably withheld

If the indemnification provided for in this Section 10(e) is unavailable to a party otherwise entitled to be indemnified in respect of any expenses, losses, claims, damages or liabilities referred to herein, then the indemnifying party, in lieu of indemnifying such party otherwise entitled to be indemnified, shall contribute to the amount paid or payable by such party to be indemnified as a result of such expenses, losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative benefits received by Issuer, the Selling Stockholders and the underwriters from the offering of such securities and also the relative fault of Issuer, the Selling Stockholders and the underwriters in connection with the statements or omissions which resulted in such expenses, losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The amount paid or payable by a party as a result of the expenses, losses, claims, damages and liabilities referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim; provided, however, that in no case shall any Selling Stockholder be responsible, in the aggregate, for any amount in excess of the net offering proceeds attributable to its Option Shares included in the offering. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. Any obligation by any Selling Stockholder to indemnify shall be several and not joint with other Selling Stockholders

In connection with any registration pursuant to Section 10(a) or 10(b) above, Issuer and each Selling Stockholder (other than Grantee) shall enter into an agreement containing the indemnification provisions of this Section 10(e)

(f) *Miscellaneous Reporting* Issuer shall comply with all reporting requirements and will do all such other things as may be necessary to permit the expeditious sale at any time of any Option Shares by the Selling Stockholders thereof in accordance with and to the extent permitted by any rule or regulation promulgated by the SEC from time to time, including, without limitation, Rule 144 Issuer shall at its expense provide the Selling Stockholders with any information necessary in connection with the completion and filing of any reports or forms required to be

C–13

filed by them under the Securities Act or the Exchange Act, or required pursuant to any state securities laws or the rules of the NASD or any stock exchange

(g) *Issue Taxes.* Issuer will pay all stamp taxes in connection with the issuance and the sale of the Option Shares and in connection with the exercise of the Option, and will save the Selling Stockholders harmless, without limitation as to time, against any and all liabilities with respect to all such taxes.

11. *Quotation or Listing.* If Issuer Common Stock or any other securities to be acquired in connection with the exercise of the Option are then authorized for quotation or trading or listing on the NYSE, the Nasdaq National Market System or any other securities exchange or securities quotation system, Issuer, upon the request of Grantee, will promptly file an application, if required, to authorize for quotation or trading or listing the shares of Issuer Common Stock or any other securities to be acquired upon exercise of the Option on such securities exchange or securities quotation system and will use its reasonable best efforts to obtain approval, if required, of such quotation or listing as soon as practicable.

12. *Division of Option.* This Agreement (and the Option granted hereby) are exchangeable, without expense, at the option of Grantee, upon presentation and surrender of this Agreement at the principal office of Issuer for other Agreements providing for Options of different denominations entitling the holder thereof to purchase in the aggregate the same number of shares of Issuer Common Stock purchasable hereunder, in which event, (i) the "Maximum Profit" in each agreement resulting from such exchange shall be allocated among the several agreements in proportion to the number of Option Shares issuable pursuant thereto so that the sum of the "Maximum Profit" for all such agreements shall total $2.87 billion, (ii) the amount referred to in clause (D) of Section 13(b) of each agreement resulting from such exchange shall be multiplied by a fraction the numerator of which is the number of Option Shares issuable pursuant to each such agreement and the denominator of which is the number of Option Shares issuable pursuant to all such agreements collectively and (iii) such other adjustments, if any, shall be made as are necessary to preserve the overall economic impact and intent of this Agreement (including Section 13 hereof). The terms "*Agreement*" and "*Option*" as used herein include any other Stock Option Agreement and related Options for which this Agreement (and the Option granted hereby) may be exchanged. Upon receipt by Issuer of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Agreement, and (in the case of loss, theft or destruction) of reasonably satisfactory indemnification to protect Issuer from any loss which it may suffer if this Agreement is replaced, and upon surrender and cancellation of this Agreement, if mutilated, Issuer will execute and deliver a new agreement of like tenor and date.

13. *Limitation of Grantee Profit.* (a) Notwithstanding any other provision herein or in the Merger Agreement, in no event shall Grantee's Total Profit (as defined below) exceed the Maximum Profit, and, if it otherwise would exceed such amount, Grantee, at its sole discretion, shall either (i) reduce the number of shares subject to the Option (and any Substitute Option), (ii) deliver to Issuer, or the Substitute Issuer, as the case may be, for cancellation shares of Issuer Common Stock or Substitute Common Stock, as the case may be (or other securities into which such Option Shares are converted or exchanged), (iii) pay cash to Issuer, or the Substitute Issuer, as the case may be, (iv) reduce the amount of the Section 8 Repurchase Consideration or Section 9 Repurchase Consideration or (v) any combination of the foregoing, so that Grantee's actually realized Total Profit shall not exceed the Maximum Profit after taking into account the foregoing actions. Notwithstanding any other provision of this Agreement, the Option may not be exercised for a number of shares as would, as of the date of exercise, result in a Notional Total Profit (as defined below) of more than the Maximum Profit and, if exercise of the Option would otherwise result in the Notional Total Profit exceeding such amount, Grantee, in its discretion, may take any of the actions specified in this Section 13(a) so that the Notional

C–14

Total Profit shall not exceed the Maximum Profit; *provided* that nothing in this sentence shall restrict any subsequent exercise of the Option which at such time complies with this sentence.

(b) For purposes of this Agreement, *"Total Profit"* shall mean: (i) the aggregate amount (before taxes) of (A) the excess of (x) the net cash amounts or fair market value of any property received by Grantee pursuant to a sale of Option Shares (or securities into which such shares are converted or exchanged), other than to a wholly–owned Subsidiary of Grantee, or a repurchase of Option Shares by Issuer pursuant to Section 8 hereof, after payment of applicable brokerage or sales commissions and discounts, over (y) Grantee's aggregate purchase price for such Option Shares (or other securities), plus (B) all amounts received by Grantee upon the repurchase of the Option by Issuer pursuant to Section 8 hereof, plus (C) all equivalent net amounts with respect to the Substitute Option and any amounts paid pursuant to Section 7(f) hereof, plus (D) all amounts received by Grantee pursuant to Section 7.2(b) of the Merger Agreement, minus (ii) all amounts of cash previously paid to Issuer pursuant to Section 13(a) plus the value of the Option Shares (or other securities) previously delivered to Issuer for cancellation pursuant to Section 13(a), which value shall be deemed to be the aggregate Purchase Price paid for such Option Shares (or other securities). For purposes of this Agreement, *"Notional Total Profit"* with respect to any number of shares as to which Grantee may propose to exercise the Option shall be the Total Profit, determined as of the date of such proposed exercise assuming that the Option were exercised on such date for such number of shares, and assuming that such shares, together with all other Option Shares held by Grantee and its affiliates as of such date, were sold for cash at the closing market price for the Issuer Common Stock as of the close of business on the preceding trading day (less customary brokerage commissions). For purposes of this Section 13, transactions by a wholly–owned Subsidiary transferee of Grantee in respect of the Option or Option Shares transferred to it shall be treated as if made by Grantee.

(c) Notwithstanding any other provision of this Agreement, nothing in this Agreement shall affect the ability of Grantee to receive, nor relieve Issuer's obligation to pay, any payment provided for in Section 7.2(b) of the Merger Agreement; *provided* that if and to the extent the Total Profit received by Grantee would exceed the Maximum Profit following receipt of such payment, Grantee shall be obligated to comply with the terms of Section 13(a) within 15 days of the date on which Grantee has realized cash and/or property representing Total Profit in excess of Maximum Profit.

14. *Miscellaneous*.

(a) *Expenses*. Except as otherwise provided herein or in the Merger Agreement, each of the parties hereto shall bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated hereunder, including, without limitation, fees and expenses of its own financial consultants, investment bankers, accountants and counsel.

(b) *Waiver and Amendment*. Any provision of this Agreement may be waived at any time by the party that is entitled to the benefits of such provision. This Agreement may not be modified, amended, altered or supplemented except upon the execution and delivery of a written agreement executed by the parties hereto. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights. No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. Any waiver shall be effective only in the specific instance and for the specific purpose for which given and shall not constitute a waiver to any subsequent or other exercise of any right, remedy, power or privilege hereunder.

(c) *Entire Agreement; No Third–Party Beneficiaries; Severability*. This Agreement, together with the Merger Agreement and the other documents and instruments referred to herein and therein, between Grantee and Issuer constitutes the entire agreement and supersedes all prior

C–15

agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement is not intended to confer upon any person other than the parties hereto (or their respective successors and assigns) (other than any transferees of the Option Shares or any permitted transferee of this Agreement pursuant to Section 14(h)) any rights, remedies, obligations or liabilities hereunder. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or Governmental Entity to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected impaired or invalidated. If for any reason such court or Governmental Entity determines that the Option does not permit Grantee to acquire, or does not require Issuer to repurchase, the full number of shares of Issuer Common Stock as provided in Section 2 (as may be adjusted herein), it is the express intention of Issuer to allow Grantee to acquire or to require Issuer to repurchase such lesser number of shares as may be permissible without any amendment or modification hereof.

(d) *Governing Law*. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof).

(e) *Interpretation*. When a reference is made in this Agreement to Sections, such reference shall be to a Section of this Agreement unless otherwise indicated. The descriptive headings contained herein are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "herein," "hereof," "hereunder" and words of similar import shall be deemed to refer to this Agreement as a whole, and not to any particular provision of this Agreement. Any pronoun shall include the corresponding masculine, feminine and neuter forms.

(f) *Notices*. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, telecopied (with confirmation) or mailed by registered or certified mail (return receipt requested) to the parties at the addresses set forth in the Merger Agreement (or at such other address for a party as shall be specified by like notice).

(g) *Counterparts*. This Agreement and any amendments hereto may be executed in two counterparts, each of which shall be considered one and the same agreement and shall become effective when both counterparts have been signed, it being understood that both parties need not sign the same counterpart.

(h) *Assignment*. Neither this Agreement nor any of the rights, interests or obligations hereunder or under the Option shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other party, and any attempt to make any such assignment without such consent shall be null and void, except that Grantee may assign this Agreement to a wholly-owned Subsidiary of Grantee (in which event the term "Grantee" as used herein shall be deemed to refer to such Subsidiary). Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns. For the avoidance of doubt, nothing in this paragraph (h) shall prohibit Issuer from engaging in a transaction contemplated by Section 7(b) in accordance with the provisions of Section 7(b), provided that the terms of this Agreement and the Merger Agreement shall remain applicable with respect to any such transaction.

(i) *Further Assurances*. In the event of any exercise of the Option by Grantee, Issuer and Grantee shall execute and deliver all other documents and instruments and take all other action that may be reasonably necessary in order to consummate the transactions provided for by such exercise.

(j) *Submission to Jurisdiction*. Each party hereto irrevocably submits to the jurisdiction of (i) the Supreme Court of the State of New York, New York County, and (ii) the United States

C–16

District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party hereto agrees to commence any action, suit or proceeding relating hereto either in the United States District Court for the Southern District of New York or, if such suit, action or other proceeding may not be brought in such court for reasons of subject matter jurisdiction, in the Supreme Court of the State of New York, New York County. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (A) the Supreme Court of the State of New York, New York County, or (B) the United States District Court for the Southern District of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party hereto further irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or other proceeding by the mailing of copies thereof by mail to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail; *provided* that nothing in this Section shall affect the right of any party to serve legal process in any other manner permitted by law. The consent to jurisdiction set forth in this Section shall not constitute a general consent to service of process in the State of New York and shall have no effect for any purpose except as provided in this Section. Each party hereto agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(k) *Enforcement*. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court as provided in the Section above, this being in addition to any other remedy to which they are entitled at law or in equity.

(l) *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTERS (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

[Remainder of this page intentionally left blank]

C-17

IN WITNESS WHEREOF, Issuer and Grantee have caused this Stock Option Agreement to be signed by their respective officers thereunto duly authorized, all as of the day and year first written above.

J.P. MORGAN CHASE & CO.

By: /s/ WILLIAM B. HARRISON, JR.
_____

Name: William B. Harrison, Jr.
Title:    Chairman and Chief Executive Officer

BANK ONE CORPORATION

By: /s/ JAMES DIMON
_____

Name: James Dimon
Title:    Chairman and Chief Executive Officer

C-18

Annex D

January 14, 2004

The Board of Directors

J.P. Morgan Chase & Co
270 Park Avenue
New York, NY 10017

Members of the Board of Directors:

You have requested our opinion as to the fairness, from a financial point of view, to J.P. Morgan Chase & Co. (the "Company") of the Exchange Ratio (as defined below) in the proposed merger (the "Merger") of the Company with Bank One Corporation (the "Merger Partner"). Pursuant to the Agreement and Plan of Merger, dated as of January 14, 2004 (the "Agreement"), between the Company and the Merger Partner, the Merger Partner will merge into the Company, with the Company as the surviving corporation of the Merger, and each outstanding share of common stock, par value $0.01 per share, of the Merger Partner (the "Merger Partner Common Stock"), other than shares of Merger Partner Common Stock held in treasury or owned by the Company, will be converted into 1.32 shares (the "Exchange Ratio") of the Company's common stock, par value $1.00 per share (the "Company Common Stock").

In arriving at our opinion, we have (i) reviewed the Agreement; (ii) reviewed certain publicly available business and financial information concerning the Merger Partner and the Company and the industries in which they operate; (iii) compared the proposed financial terms of the Merger with the publicly available financial terms of certain transactions involving companies we deemed relevant and the consideration paid for such companies; (iv) compared the financial and operating performance of the Merger Partner and the Company with publicly available information concerning certain other companies we deemed relevant and reviewed the current and historical market prices of the Merger Partner Common Stock and the Company Common Stock and certain publicly traded securities of such other companies; (v) reviewed certain internal financial analyses and forecasts prepared by the managements of the Merger Partner and the Company relating to their respective businesses, as well as the estimated amount and timing of the cost savings and related expenses expected to result from the Merger (the "Synergies"); and (vi) performed such other financial studies and analyses and considered such other information as we deemed appropriate for the purposes of this opinion.

In addition, we have held discussions with certain members of the management of the Merger Partner and the Company with respect to certain aspects of the Merger, and the past and current business operations of the Merger Partner and the Company, the historical financial condition and operations and future prospects of the Merger Partner and the Company, the effects of the Merger on the financial condition and future prospects of the Company, and certain other matters we believed necessary or appropriate to our inquiry.

In giving our opinion, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information that was publicly available or was furnished to us by the Company and the Merger Partner or otherwise reviewed by us, and we have not assumed any responsibility or liability therefor. In addition, we are not experts in the evaluation of loan and lease portfolios for purposes of assessing the adequacy of the allowances for losses with respect thereto and, accordingly, we have assumed that such allowances for losses are in the aggregate adequate to cover such losses. We have not reviewed individual credit files nor have we made an independent evaluation or appraisal of the assets and liabilities (including any derivative or off–balance–sheet assets and liabilities) of the Company or the Merger Partner or any of their respective subsidiaries, and we have not been furnished with any such evaluation or appraisal. In relying on financial analyses and forecasts provided to us, including the Synergies,

D–1

J.P. Morgan Chase & Co
January 14, 2004
Page 2

we have assumed that they have been reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by managements of the Merger Partner and the Company as to the expected future results of operations and financial condition of the Merger Partner and the Company to which such analyses or forecasts relate. We have also assumed that the Merger will qualify as a tax–free reorganization for United States federal income tax purposes, and that the other transactions contemplated by the Agreement will be consummated as described in the Agreement. We have relied as to all legal matters relevant to rendering our opinion upon the advice of counsel. We have further assumed that all material governmental, regulatory or other consents and approvals necessary for the consummation of the Merger will be obtained without any adverse effect on the Merger Partner or the Company or on the contemplated benefits of the Merger.

Our opinion is necessarily based on economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. It should be understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise, or reaffirm this opinion. Our opinion is limited to the fairness, from a financial point of view, to the Company of the Exchange Ratio in the proposed Merger and we express no opinion as to the underlying business decision by the Company to engage in the Merger. We are expressing no opinion herein as to the price at which the Merger Partner Common Stock or Company Common Stock will trade at any future time.

We have acted as financial advisor to the Company with respect to the proposed Merger and will receive a fee from the Company for our services. J.P. Morgan Securities Inc. is a wholly–owned subsidiary of the Company. J.P. Morgan Securities Inc. and its affiliates have performed investment banking and other services for the Company in the past and have been compensated for such services. In the ordinary course of our businesses, we and our affiliates may actively trade the debt and equity securities of the Company or the Merger Partner for our own account or for the accounts of customers and, accordingly, we may at any time hold long or short positions in such securities.

On the basis of and subject to the foregoing, it is our opinion as of the date hereof that the Exchange Ratio in the proposed Merger is fair, from a financial point of view, to the Company.

This letter is provided to the Board of Directors of the Company in connection with and for the purposes of its evaluation of the Merger. This opinion does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote with respect to the Merger or any other matter. This opinion may not be disclosed, referred to, or communicated (in whole or in part) to any third party for any purpose whatsoever except with our prior written approval. This opinion may be reproduced in full in any proxy or information statement or proxy statement/prospectus mailed to shareholders of the Company but may not otherwise be disclosed publicly in any manner without our prior written approval.

Very truly yours,

J.P. MORGAN SECURITIES INC.

D–2

**Annex E**

[Letterhead of Lazard Frères & Co. LLC]

January 14, 2004

The Board of Directors

Bank One Corporation
1 Bank One Plaza
Chicago, Illinois 60670

Dear Members of the Board:

We understand that Bank One Corporation, a Delaware corporation ("Bank One"), and J.P. Morgan Chase & Co., a Delaware corporation ("JPMorgan Chase"), propose to enter into an Agreement and Plan of Merger, substantially in the form of the draft dated January 13, 2004 (the "Merger Agreement"), which provides, among other things, for the merger (the "Merger") of Bank One with and into JPMorgan Chase, with JPMorgan Chase as the surviving corporation. Pursuant to the Merger, each outstanding share of common stock, par value $0.01 per share, of Bank One ("Bank One Common Stock"), other than shares held in treasury by Bank One and certain shares held by JPMorgan Chase or Bank One, will be converted into 1.320 shares (the "Exchange Ratio") of common stock, par value $1.00 per share, of JPMorgan Chase ("JPMorgan Chase Common Stock"). The terms and conditions of the Merger are more fully set forth in the draft Merger Agreement.

You have requested our opinion as to the fairness, from a financial point of view, to the holders of shares of Bank One Common Stock of the Exchange Ratio pursuant to the draft Merger Agreement. In connection with this opinion, we have:

(i)   Reviewed the financial terms and conditions of the draft Merger Agreement;

(ii)  Analyzed certain publicly available financial statements and historical business information relating to Bank One and JPMorgan Chase, respectively;

(iii) Reviewed various internal financial forecasts and other data prepared by the managements of Bank One and JPMorgan Chase, respectively, with respect to the businesses and prospects of Bank One and JPMorgan Chase, respectively, the strategic objectives of each, and their estimates of synergies and other anticipated strategic, financial and operational benefits of the Merger to the combined company;

(iv)  Held discussions with members of the senior managements of Bank One and JPMorgan Chase with respect to the businesses and prospects of Bank One and JPMorgan Chase, respectively, the strategic objectives of each, and their estimates of synergies and other anticipated strategic, financial and operational benefits of the Merger to the combined company;

E–1

(v)    Compared the financial performance of Bank One and JPMorgan Chase and the prices and trading activity of Bank One Common Stock and JPMorgan Chase Common Stock with that of certain other publicly-traded companies we believe to be generally comparable with Bank One and JPMorgan Chase, respectively, and their securities;

(vi)   Reviewed the financial terms, to the extent publicly available, of certain business combinations involving companies in lines of businesses we believe to be generally comparable to those of Bank One and JPMorgan Chase, and in other industries generally;

(vii)  Reviewed the historical stock prices and trading volumes of Bank One Common Stock and JPMorgan Chase Common Stock; and

(viii) Conducted such other financial studies, analyses and investigations as we deemed appropriate.

We have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for and have not conducted any independent verification of such information. In addition, we have not reviewed individual credit files nor have we conducted any independent valuation or appraisal of the assets or liabilities (including any hedge, swaps, foreign exchange, derivative or off-balance-sheet assets and liabilities) of Bank One or JPMorgan Chase or any of their respective subsidiaries, or concerning the solvency or fair value of any of the foregoing entities, and we have not been furnished with any such valuation or appraisal. With respect to financial forecasts, including projected synergies and other anticipated strategic, financial and operational benefits of the Merger, we have assumed with your consent that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management of Bank One and JPMorgan Chase as to the future financial performance of Bank One, JPMorgan Chase and the combined company, as the case maybe, and we have assumed that such forecasts and projections will be realized in the amounts and at the times contemplated thereby. As you know, the financial forecasts provided by each of Bank One and JPMorgan Chase covered only 2004 (we were informed that no other forecasts were available), and, with your permission, in analyzing the Exchange Ratio, we have used certain earnings estimates and consensus estimates published by certain financial analysts and databases, respectively. We assume no responsibility for and express no view as to any such forecasts and projections or the assumptions on which they are based. In addition, we are not experts in the evaluation of loan portfolios or the allowances for losses with respect thereto, and, accordingly, we have assumed with your consent that such allowances for losses for Bank One, JPMorgan Chase or any of their respective subsidiaries are in the aggregate adequate to cover such losses.

Further, our opinion is necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof. We assume no responsibility for updating or revising our opinion based on circumstances or events occurring after the date hereof.

In rendering our opinion, we have assumed that the Merger will be consummated on the terms described in the draft Merger Agreement, including, among other things, that the Merger will be treated as a tax-free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended, and that the Merger will be consummated without any waiver of any material terms or conditions. We also have assumed that the executed Merger Agreement will conform in all material respects to the draft Merger Agreement.

E-2

In addition, we have assumed that obtaining the necessary regulatory and third party approvals for the Merger will not have a material adverse effect on the combined company

We do not express any opinion as to the price at which shares of Bank One Common Stock or shares of JPMorgan Chase Common Stock may trade subsequent to the announcement of the Merger or as to the price at which shares of JPMorgan Chase Common Stock may trade subsequent to the consummation of the Merger

Lazard Frères & Co. LLC is acting as investment banker to Bank One in connection with the Merger and will receive a fee for our services, a substantial portion of which is contingent upon the closing of the Merger. Also, as you are aware, we have from time to time in the past provided investment banking and financial advisory services to Bank One and an affiliate of JPMorgan Chase for which we have received fees. Lazard Frères & Co. LLC provides a full range of financial advisory and other services and, in the course of our business, may from time to time effect transactions and hold securities, including derivative securities, of Bank One or JPMorgan Chase for our own account and for the accounts of clients and customers, and, accordingly, may hold a long or short position in such securities and may provide advisory and other services in the future

Our engagement and the opinion expressed herein are for the benefit of the Board of Directors of Bank One, and our opinion is rendered to Bank One's Board of Directors in connection with its consideration of the Merger. Our opinion does not address the merits of the underlying decision by Bank One or JPMorgan Chase to engage in the Merger or the relative merits of the Merger as compared to other business strategies that might be available to Bank One or JPMorgan Chase. In that regard, we were not authorized to, and did not, solicit third party indications of interest in acquiring all or a part of Bank One or engaging in a business combination or any other strategic transaction with Bank One. We express no opinion or recommendation as to how the shareholders of Bank One or JPMorgan Chase should vote at any stockholders' meetings to be held in connection with the Merger. It is understood that this opinion may not be disclosed or otherwise referred to, without our prior written consent, except as may otherwise be required by law or by a court of competent jurisdiction and except that this opinion may be included in its entirety in any filing, if required, made by Bank One in respect of the Merger with the Securities and Exchange Commission.

Based on and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Ratio is fair from a financial point of view to the holders of shares of Bank One Common Stock.

Very truly yours,

LAZARD FRÈRES & CO. LLC

By: /s/ GARY W. PARR

Gary W. Parr
Deputy Chairman
E-3

Annex F

DELAWARE GENERAL CORPORATION LAW

TITLE 8

CORPORATIONS

CHAPTER 1. GENERAL CORPORATION LAW

Subchapter IX. Merger, Consolidation or Conversion

§ 262 APPRAISAL RIGHTS.

(a) Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to §228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a stock corporation and also a member of record of a nonstock corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words and also membership or membership interest of a member of a nonstock corporation; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in one or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository

(b) Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to §251 (other than a merger effected pursuant to §251(g) of this title), §252, §254, §257, §258, §263 or §264 of this title:

(1) Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of and to vote at the meeting of stockholders to act upon the agreement of merger or consolidation, were either (i) listed on a national securities exchange or designated as a national market system security on an interdealer quotation system by the National Association of Securities Dealers, Inc or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in subsection (f) of §251 of this title.

(2) Notwithstanding paragraph (1) of this subsection, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§251, 252, 254, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a. Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b. Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or designated as a national market system security on an

F−1

interdealer quotation system by the National Association of Securities Dealers, Inc. or held of record by more than 2,000 holders;

    c. Cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a. and b. of this paragraph; or

    d. Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing subparagraphs a., b. and c. of this paragraph.

    (3) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under §253 of this title is not owned by the parent corporation immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(c) Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the procedures of this section, including those set forth in subsections (d) and (e) of this section, shall apply as nearly as is practicable.

(d) Appraisal rights shall be perfected as follows:

    (1) If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for such meeting with respect to shares for which appraisal rights are available pursuant to subsections (b) or (c) hereof that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

    *(2) If the merger or consolidation was approved pursuant to §228 or §253 of this title, then either a constituent corporation before the effective date of the merger or consolidation, or the surviving or resulting corporation within 10 days thereafter, shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of mailing of such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such*

F–2

notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e) Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) hereof and who is otherwise entitled to appraisal rights, may file a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) hereof, upon written request, shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such written statement shall be mailed to the stockholder within 10 days after such stockholder's written request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) hereof, whichever is later.

(f) Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g) At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for

F–3

notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder.

(h) After determining the stockholders entitled to an appraisal, the Court shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, permit discovery or other pretrial proceedings and may proceed to trial upon the appraisal prior to the final determination of the stockholder entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i) The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Interest may be simple or compound, as the Court may direct. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j) The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k) From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease.

Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just.

(l) The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

F—4

Annex G

## AMENDMENT TO JPMORGAN CHASE CERTIFICATE OF INCORPORATION

Article Fourth of the Certificate of Incorporation of the Surviving Corporation shall be amended by: (i) deleting the words "FOUR BILLION SEVEN HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION TWO HUNDRED MILLION", and (ii) deleting the words "FOUR BILLION FIVE HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION"

## AMENDMENT TO JPMORGAN CHASE BY–LAWS

The By–laws of JPMorgan Chase shall be amended prior to the Effective Time to include as of the Effective Time the following new Article II, Section 2 09:

Section 2 09. **CEO Position and Succession; Board Composition.** (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr Dimon shall be the successor to Mr Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr Dimon, and eight Continuing JPMorgan Chase Directors, including Mr Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co–chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Board of Directors in a Governance Committee shall be resolved in good faith by the non–management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By–law ) For purposes of this Section 2 09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5 10 of the Merger Agreement.

(c) (i) The removal of Mr Dimon from, or the failure to appoint or re–elect Mr Dimon to, any of the positions specifically provided for in this Section 2 09 and in the employment agreement between the Corporation and Mr Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr Harrison from, or the failure to appoint or re–elect Mr Harrison to, the position of

G–1

Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By–law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By–laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

G–2

Annex H

# CHARTER OF THE JPMORGAN CHASE AUDIT COMMITTEE

## Mission

The Audit Committee is responsible for oversight of:

• the external auditor's qualifications and independence

• the performance of the Corporation's internal audit function and external auditor

• the Chief Executive Officer's and senior management's responsibilities to assure that there is in place an effective system of controls reasonably designed to:

— safeguard the assets and income of the Corporation

— assure the integrity of the Corporation's financial statements

— maintain compliance with the Corporation's ethical standards, policies, plans and procedures, and with laws and regulations

The Audit Committee shall also be responsible for preparing the Audit Committee report required by the rules of the Securities and Exchange Commission to be included in the Corporation's annual proxy statement.

## Membership

1. The Audit Committee shall be composed solely of non–management directors, not fewer than three in number, each of whom shall be independent as defined in the Corporate Governance Practices of the Board.

2. Each member of the Audit Committee shall be financially literate, or become financially literate within a reasonable period of time after appointment to the Audit Committee. At least one member of the Audit Committee shall have accounting or related financial management expertise and at least one member shall have banking or related financial management expertise. The Board of Directors shall determine whether any members of the Audit Committee are audit committee financial experts as defined by the Securities and Exchange Commission.

3. Determinations of independence, audit committee financial expertise, financial literacy and accounting, banking or related financial management expertise shall be made by the Board of Directors as the Board interprets such qualifications in its business judgment and in accordance with applicable law and New York Stock Exchange listing standards.

4. No director may serve as a member of the Audit Committee if such director serves on the audit committees of more than two other public companies, unless the Board of Directors determines that such simultaneous service would not impair the ability of such director to effectively serve on the Audit Committee and discloses such determination in the proxy statement.

5. No member of the Audit Committee may be a large customer of the Corporation, as determined by the Board in accordance with the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and applicable rules and regulations.

## Authorities and responsibilities

1. The Audit Committee shall meet as often as it determines, but not less frequently than quarterly. The Audit Committee shall meet, at least quarterly, with the General Auditor, the external auditor, and management in separate private sessions to discuss any matters that the Audit Committee or these groups believe should be discussed. The Audit Committee may also

meet periodically in separate executive sessions. The Audit Committee may request any officer or employee of the Corporation or the Corporation's outside counsel or external auditor to attend a meeting of the Audit Committee or to meet with any members of, or consultants to, the Audit Committee

2. The Audit Committee has authority to retain outside legal counsel, or accounting or other advisors, when deemed necessary, without the prior permission from the Corporation's Board of Directors or management and shall be provided the necessary resources for such purposes

3. The Audit Committee shall maintain minutes and other relevant documentation of all meetings held.

4. The Audit Committee shall review, at least annually, the committee's charter and recommend any proposed changes to the Board for approval. The Audit Committee shall prepare, and report to the Board the results of, an annual performance evaluation of the Audit Committee, which evaluation shall compare the performance of the Audit Committee with the requirements of this charter.

5. The Audit Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Corporation employees of concerns regarding questionable accounting or auditing matters

In carrying out its responsibilities, the Audit Committee believes its policies and procedures should remain flexible in order to best react to changing circumstances. Subject to this, in carrying out its mission, the Audit Committee shall have the following authorities and responsibilities:

**A. Oversight of the corporation's relationship to internal and external auditors**

1. The external auditor for the Corporation is accountable to the Board of Directors and Audit Committee of the Corporation, as representatives of the stockholders, and shall report directly to the Audit Committee. The Audit Committee shall have the authority and direct responsibility to select, retain, compensate, evaluate and, where appropriate, replace the external auditor, subject to stockholder ratification of the selection if such ratification is required or sought by the Board of Directors.

2. The Audit Committee shall advise the Board of Directors of the engagement of the external auditor, based on review and discussion by the Audit Committee as to the overall plan of audit; adequacy of scope; coordination with the General Auditor; reasonableness of fees; quality of prior performance; composition of the audit team, including a review and evaluation of the external auditor's lead partner and the experience and qualifications of the senior members of the audit team; results of the audit firm's last internal quality–control or peer review; and any other issues raised by the annual auditor's report, status of significant regulatory or litigation problems that may affect the external auditor, and the amount of non–audit services provided by the audit firm. The Audit Committee shall take into account the opinions of management and the Corporation's internal auditors' qualifications, performance and independence. The Audit Committee shall advise the Board of Directors when any change in the audit firm engaged as the principal external auditor, or other action with respect to the external auditor, seems necessary or desirable, provided that the Audit Committee shall be directly responsible for any action to retain or terminate the external auditor.

3. The external auditor shall submit, at least annually, a report to the Audit Committee regarding (a) the auditor's internal quality–control procedures and (b) any material issues raised by the most recent internal quality–control or peer review or by any inquiry or investigations by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the audit firm, and any steps taken to deal with such issues.

H–2

The external auditor shall also submit such a report to the Audit Committee promptly after any review, inquiry or investigation referred to in the preceding sentence. The Audit Committee is responsible for reviewing and discussing with the external auditor whether the auditor's quality controls are adequate.

4. The external auditor shall also submit on a periodic basis, but at least annually, to the Audit Committee a formal written statement delineating all relationships between the audit firm and the Corporation, including each non–audit service provided to the Corporation and at least the matters set forth in Independence Standards Board No. 1. The Audit Committee is responsible for actively engaging in a dialogue with the external auditor as to whether any disclosed relationships or services may impact the objectivity and independence of the external auditor.

5. The Audit Committee shall have authority to approve all fees and terms of engagement of the external auditor and shall pre–approve, or adopt appropriate procedures to pre–approve, all audit and non–audit services to be provided by the external auditor. The Audit Committee shall review and approve management's conclusion that any proposed performance of non–audit services by the principal external auditor would not affect the independence of such auditor in the performance of its audit services.

6. The Audit Committee shall consider whether, in order to assure continuing auditor independence, there should be a regular rotation of the lead audit partner or the audit firm itself, and recommend to the Board policies for the Corporation's hiring of employees or former employees of the audit firm. These policies shall provide that no former employee of the external auditor may become the chief executive officer, controller, chief financial officer or chief accounting officer (or serve in a similar capacity) if such person participated in any capacity in the Corporation's audit within the one–year period preceding the date of initiation of the audit.

7. The Audit Committee shall review and concur in the appointment, replacement, reassignment, or dismissal of the General Auditor. The Audit Committee shall review and approve the General Auditor's proposed annual audit plan and financial budget and staffing. The Audit Committee shall receive periodic communications from the General Auditor on the completion status of the annual audit plan, as well as a summary of significant changes made to such plan.

8. The Audit Committee shall discuss with management and the external auditor, and resolve, any disagreements regarding financial reporting.

**B. Compliance and regulatory oversight responsibilities**

The Audit Committee shall:

1. Receive periodic communications and presentations from the General Auditor on the adequacy of management's systems of control, including computerized information system controls and security, in the Corporation and its subsidiaries; significant audit findings identified and management's responses thereto, including any special audit steps adopted in light of material control deficiencies; and initiation and status of significant special investigations.

2. Receive, when needed, presentations from management and the external auditor on the identification and resolution status of material weaknesses and reportable conditions in the internal control environment, including computerized information system controls and security, if any, and on any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls.

3. Receive periodic presentations from the General Auditor on the review, and related results, of each corporate Executive Committee member's expense account and perquisites, including their use of corporate assets.

H–3

4. Review with management the program established that provides for compliance with laws and regulations and review the record of such compliance; review significant legal cases outstanding against the Corporation or its subsidiaries or other regulatory or legal matters that may have a material impact on the Corporation's financial statements.

5. Review the program established by management that monitors compliance with the Worldwide Rules of Conduct and review the record of such compliance.

6. Review regulatory authorities' significant examination reports pertaining to the Corporation, its subsidiaries and associated companies.

7. Fulfill the requirements of Sections 122 and 123 of the New York State Banking Law with respect to conducting an annual directors' examination. Report thereon to the Board of Directors and the Superintendent of Banks of the State of New York. Utilize assistance, as deemed necessary by the committee, to discharge these statutory duties.

8. Review summaries of significant issues in reports of directors' examinations, or other similar examinations, of the subsidiaries of the Corporation.

9. Receive communications and presentations from management summarizing the suspicious activity reports filed by subsidiaries with the appropriate regulatory and law enforcement agencies.

10. Review management reports issued by the Corporation in accordance with FDICIA and the corresponding external auditor's attestation and agreed–upon procedures reports.

11. Receive from management, periodically, and from the General Auditor, as appropriate, presentations on significant operating and control issues in internal audit reports, management letters, and regulatory authorities' examination reports, and initiate such other inquiries into the affairs of the Corporation as it deems necessary or appropriate.

C. **Financial statement and disclosure matters**

The Audit Committee shall:

1. Review and discuss with management, the external auditor and the General Auditor the scope of the audit, including obtaining assurances from the external auditor that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934.

2. Review and discuss, at least quarterly, with management, the external auditor and, as appropriate, the General Auditor the annual audited financial statements, quarterly financial statements and significant current reports, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operation," and review the process for required quarterly CEO and CFO certifications.

3. Review and discuss with management, the external auditor and, as appropriate, the General Auditor, and receive a timely report from the external auditor with respect to, any significant accounting, income tax, financial, reporting policies, issues or judgments made in connection with the preparation, or audit, of the Corporation's financial statements and other financial or informational reports, including any major issues regarding or significant changes in the Corporation's selection or application of accounting principles, the development, selection and disclosure of critical accounting estimates or judgments (including tax reserves), an analysis of the effect of any alternative assumptions, estimates or GAAP methods on the financial statements, and the effect of regulatory examinations or any regulatory and accounting initiatives, as well as off–balance sheet structures, on the financial statements, and obtain from the external auditors a timely report relating to any material

H–4

communications between the external auditors and management, such as any "management" letter or schedule of unadjusted differences

4  Review internal accounting control reports (management letters) submitted by the external auditor which related to the Corporation  Review summaries of significant issues in management letters addressed to subsidiaries of the Corporation

5  Discuss with management the Corporation's earnings press releases, including the use of "pro-forma" financial information, as well as financial information and earnings guidance provided to analysts and rating agencies

6  Taking into consideration the Board's allocation of responsibility for review of credit risk, market risk and fiduciary risk to the Board's Risk Policy Committee, review with management guidelines and policies for assessing and managing the Corporation's exposure to risks, the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures

7  Discuss with the external auditor the matters required to be described by SAS 61, including without limitation, any difficulties encountered in the course of the work, any restriction on the scope of the external auditor's activities or on access to requested information and any significant disagreements with management

8  Inquire of the Corporation's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of internal controls that could adversely affect the Corporation's ability to record, process, summarize and report financial data any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporations' internal controls

9  Require that the external auditors submit to the Audit Committee annually a formal written statement of the fees billed in each of the last two fiscal years for each of the following categories of services rendered by the external auditors: (i) the audit of the Corporation's annual financial statements and the reviews of the financial statements included in the Corporation's Quarterly Reports on Form 10-Q or services that are normally provided by the external auditors in connection with statutory and regulatory filings or engagements; (ii) assurance and related services not included in clause (i) that are reasonably related to the performance of the audit or review of the Corporation's financial statements, in the aggregate and by each service; (iii) tax compliance, tax advice and tax planning services, in the aggregate and by each service; and (iv) all other products and services rendered by the external auditors, in the aggregate and by each service

Annex I

# CHARTER

## THE AUDIT AND RISK MANAGEMENT COMMITTEE

### OF THE BOARD OF DIRECTORS
### BANK ONE CORPORATION

The Audit and Risk Management Committee is a standing committee of the Board of Directors (the "Board") of Bank One Corporation ("Bank One").

## Purpose

The purpose of the Audit and Risk Management Committee is to assist the Board in its oversight responsibilities with respect to (1) the integrity of Bank One's financial statements, (2) Bank One's compliance with legal and regulatory requirements, (3) the effectiveness of internal controls and procedures, (4) the independent auditors' qualifications and independence, (5) the performance of Bank One's internal audit function and independent auditors, (6) policy standards and guidelines for risk management and (7) financial transactions, capital management and financial planning and performance.

The Committee shall have responsibility and authority with respect to the matters stated in this charter for Bank One and its subsidiaries. It is not the duty of the Committee to plan or conduct audits or to determine that Bank One's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles and applicable rules and regulations. These are the responsibilities of management and the independent auditor.

The Committee will review and reassess the adequacy of this charter at least annually.

## Membership

The members of the Committee shall be appointed by the Board on the recommendation of the Corporate Governance and Nominating Committee. Committee members shall serve at the pleasure of the Board for such term or terms as the Board may determine, and shall meet the independence and experience requirements of the New York Stock Exchange corporate governance listing standards, the Sarbanes–Oxley Act of 2003 and rules promulgated thereunder, and other applicable laws and regulations. The Committee shall consist of not less than three directors, including a Chairman.

## Meetings, Access and Accountability

The Committee shall meet as often as it determines, but at least four times annually. The presence of fifty percent of the members of the Committee shall constitute a quorum of the Committee, and the act of the majority of the members present at any meeting at which a quorum is present shall be the act of the Committee.

The Committee shall have the authority to retain special legal, accounting or other advisors to advise and assist the Committee and Bank One shall provide appropriate funding, as determined by the Committee, for payment of compensation to such advisors. The Committee may request any officer or employee of Bank One or Bank One's outside counsel or independent auditor to attend a meeting of the Committee or to meet with any members of, or advisors to, the Committee.

The Committee may delegate its duties and responsibilities to subcommittees composed of one or more members of the Committee or to the Chairman as the Committee deems necessary or appropriate.

I–1

The Committee shall meet periodically with the Chief Auditor and the independent auditors, and any other persons whom the Committee deems appropriate, in separate executive sessions

The Committee shall make regular reports to the Board.

The Committee shall annually evaluate its own performance

The Committee shall prepare the report required by the Securities and Exchange Commission's proxy rules to be included in Bank One's annual proxy statement.

**Duties and Responsibilities**

The Committee shall have the following duties and responsibilities:

**A.    Oversight of Independent Auditors**

1.    Be directly responsible for the appointment (subject, if determined by management, to ratification by the Corporation's stockholders), compensation, retention, oversight of the work and termination of the independent auditor (including resolution of disagreements between management and the auditor regarding financial reporting) engaged for the purpose of preparing or issuing audit reports or performing other audit, review or attest services for Bank One. The independent auditor shall report directly to the Committee.

2.    Establish policies and procedures for the pre–approval of all audit and permissible non–audit services and fees of the independent auditor.

3.    Meet with the independent auditor to review the planning of its audit of Bank One's financial statements

4.    Discuss with the independent auditor matters relating to the conduct of the audit as required by professional auditing standards.

5.    Review with the independent auditor any audit problems or difficulties the auditor may have encountered in its work and management's response.

6.    At least annually, obtain and review a report by the independent auditor describing: the firm's internal quality control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm; any steps taken to deal with any such issues; and, in order to assess the auditor's independence, all relationships between the independent auditor and Bank One.

7.    Discuss with the independent auditor any disclosed relationships or services that may impact the firm's objectivity and independence. Evaluate the qualifications, performance and independence of the independent auditor, including whether the provision of non–audit services is compatible with maintaining the auditor's independence. If so determined by the Committee, recommend that the Board take appropriate action in response to the auditor's report to satisfy itself of the independence of the firm

8.    Set clear hiring policies for employees or former employees of the independent auditors in compliance with applicable laws and regulations.

**B.    Oversight of Internal Audit Function**

1.    Review appointment and replacement of the Chief Auditor and review annually the responsibilities, budget and staffing of the internal audit function.

2.    Review the implementation of the annual internal audit plan.

**C.    Financial Statements, Internal Controls and Disclosure**

1.    Discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the disclosures under

I–2

"Management's Discussion and Analysis of Financial Condition and Results of Operations "

2. Discuss and recommend to the Board whether Bank One's audited financial statements should be included in Bank One's annual report on Form 10–K.

3. Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

4. Review with management and the independent auditor significant accounting principles and practices applied by Bank One in preparing its financial statements, including a discussion with the independent auditor regarding its judgments about the quality of accounting principles used in Bank One's financial reporting.

5. Review and discuss reports from the independent auditor on, among other things: critical accounting policies and practices to be used; alternative treatments of financial information within generally accepted accounting principles; and other material written communications between the independent auditor and management, such as any management letter and Bank One's response to such letter or schedule of unadjusted differences.

6. Review changes to Bank One's accounting principles and practices that materially impact Bank One's consolidated financial statements.

7. Review with management its evaluation of Bank One's internal control over financial reporting and review management's conclusions as to the effectiveness of Bank One's internal control over financial reporting.

8. Review any significant reported violations of Bank One's Code of Ethics and Code of Conduct.

9. Establish procedures for the receipt, retention and treatment of complaints received by Bank One regarding accounting, internal accounting controls or auditing matters, including confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters.

D. **Risk Management**

1. Discuss policies with respect to risk assessment and risk management, including, as appropriate, limits and limit allocations for credit risk, market risk, investment risk, liquidity risk, interest rate risk and operating risk.

2. Receive periodic reports regarding Bank One's contingent liabilities, and, as appropriate, review guidelines and procedures for assuming significant contingent liabilities.

3. Review significant operational and customer service issues and monitor remediation of such issues as appropriate.

4. Review, as appropriate, guidelines relating to the issuance of securities and capital actions.

5. Review, as appropriate, acquisitions, joint ventures and strategic arrangements from the perspective of assessing the risks assumed by such actions and the controls, if applicable, implemented to limit such risks.

6. Review reports of significant issues prepared by internal audit and other risk oversight functions.

E. **Legal and Regulatory Compliance**

1. Review with the Chief Legal Officer material litigation, significant correspondence with or actions by regulators or government agencies, and compliance with applicable laws and regulations, or any other matters that may have a material impact on Bank One's consolidated financial statements.

I–3

2.  Review the significant results of regulatory examinations of Bank One and its subsidiaries

3.  Review the assessment of management regarding compliance by subsidiary banks with laws and regulations designated by the FDIC as being essential for safety and soundness, and compliance by subsidiary banks with regulations of the OCC relating to fiduciary activities

I–4

Annex J

## BANK ONE CORPORATION

### Policy on Shareholder Communications with the Board

1.  Shareholders who wish to send communications to Bank One Corporation's Board of Directors or any member of the Board may do so in writing addressed as follows:

    Bank One Corporation
    Board of Directors (or name of Director)
    1 Bank One Plaza
    Chicago, IL 60670
    Attn: Secretary
    Mail Code IL1-0276

2.  All shareholder communications so addressed will be relayed to Board members except those that (i) relate to the redress of a personal grievance or claim against the company or any other person, or further a personal interest, which is not shared by other shareholders generally, (ii) deal with a matter related to the company's ordinary business operations, or (iii) are frivolous or scurrilous in nature.

3.  All shareholder communications not relayed to Board members will be forwarded to the relevant areas within the company for review and follow-up and, where appropriate, a response will be communicated to the shareholder.

J-1

Annex K

### BANK ONE CORPORATION

#### Policy on Director Nominees

The responsibilities of the Corporate Governance and Nominating Committee include (i) considering and establishing criteria for identifying and selecting individuals who may be nominated for election to the Board of Directors, (ii) proposing to the Board candidates for election as directors by the shareholders, and (iii) developing policies and procedures to carry out the director nomination and election process. In furtherance of the Committee's responsibilities, the following shall constitute Bank One Corporation's policy concerning nominees for election to the Board of Directors.

1. The Board of Directors should be composed of individuals from diverse professional backgrounds who combine a broad spectrum of experience and expertise with a reputation for integrity. Directors should have experience in positions with a high degree of responsibility, be leaders in the companies or institutions with which they are affiliated and be selected for nomination to serve based upon contributions they can make to the Board, management and the company.

2. It shall be preferred that each nominee, other than persons who serve as officers of the company, meet the criteria for director independence in accordance with the applicable rules of the New York Stock Exchange.

3. The Governance Committee will consider all director candidates proposed by any currently serving director, the Chief Executive Officer or a shareholder of the company. The process for evaluating candidates and the manner of evaluation conducted by the Committee shall be the same regardless of the category of person recommending the proposed nominees.

4. Materials submitted in connection with any proposed director candidate should include the name of the candidate, the candidate's biography, and other relevant information the Committee should consider, such as experience, areas of expertise and qualifications to serve as a director. The materials should be delivered to the Secretary of Bank One Corporation, who shall then forward them to the Chair of the Committee.

5. The Committee shall use such resources and information, as it deems appropriate, to evaluate each of the individuals it is considering to recommend that the Board nominate to serve as a director of the company, including all submitted materials, third party references, interviews, publicly available reference items, and professional advice concerning applicable laws, rules, regulations and listing standards as well as taking into account factors relative to the size and overall composition of the Board such as the mix of expertise and capabilities of existing Board members, desirable skills and competencies that would enhance Board performance, and the ability of the Board as a whole to work together effectively in the best interests of the company.

6. All persons nominated to serve as directors of the company are expected to attend the company's Annual Meeting of Stockholders.

K–1