# Tab B

# Part 8

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 20.    Indemnification of Directors and Officers.**
Pursuant to the Delaware General Corporation Law (the "DGCL"), a corporation may indemnify any person in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than a derivative action by or in the right of such corporation) who is or was a director, officer, employee or agent of such corporation, or serving at the request of such corporation in such capacity for another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding, if such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of such corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.

The DGCL also permits indemnification by a corporation under similar circumstances for expenses (including attorneys' fees) actually and reasonably incurred by such persons in connection with the defense or settlement of a derivative action, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to such corporation unless the Delaware Court of Chancery or the court in which such action or suit was brought shall determine upon application that such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

The DGCL provides that the indemnification described above shall not be deemed exclusive of other indemnification that may be granted by a corporation pursuant to its by-laws, disinterested directors' vote, stockholders' vote, agreement or otherwise.

The DGCL also provides corporations with the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation in a similar capacity for another corporation, partnership, joint venture, trust or other enterprise, against any liability asserted against him or her in any such capacity, or arising out of his or her status as such, whether or not the corporation would have the power to indemnify him or her against such liability as described above.

The certificate of incorporation of J.P. Morgan Chase & Co. (the "Registrant") provides that, to the fullest extent that the DGCL as from time to time in effect permits the limitation or elimination of the liability of directors, no director of the Registrant shall be personally liable to the Registrant or its stockholders for monetary damages for breach of fiduciary duty as a director.

The Registrant's certificate of incorporation empowers the Registrant to indemnify any director, officer, employee or agent of the Registrant or any other person who is serving at the Registrant's request in any such capacity with another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, an employee benefit plan) to the fullest extent permitted under the DGCL as from time to time in effect, and any such indemnification may continue as to any person who has ceased to be a director, officer, employee or agent and may inure to the benefit of the heirs, executors and administrators of such a person.

The Registrant's certificate of incorporation also empowers the Registrant by action of its board of directors, notwithstanding any interest of the directors in the action, to purchase and maintain insurance in such amounts as the board of directors deems appropriate to protect any director, officer, employee or agent of the Registrant or any other person who is serving at the Registrant's request in any such capacity with another corporation, partnership, joint venture,

II–1

trust or other enterprise (including, without limitation, an employee benefit plan) against any liability asserted against him or her or incurred by him or her in any such capacity arising out of his or her status as such (including, without limitation, expenses, judgments, fines (including any excise taxes assessed on a person with respect to any employee benefit plan) and amounts paid in settlement) to the fullest extent permitted under the DGCL as from time to time in effect, whether or not the Registrant would have the power or be required to indemnify any such individual under the terms of any agreement or by-law or the DGCL.

In addition, the Registrant's by-laws require indemnification to the fullest extent permitted under applicable law, as from time to time in effect. The by-laws provide a clear and unconditional right to indemnification for expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by any person in connection with any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, administrative or investigative (including, to the extent permitted by law, any derivative action) by reason of the fact that such person is or was serving as a director, officer, employee or agent of the Registrant or, at the request of the Registrant, of another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, an employee benefit plan). The by-laws specify that the right to indemnification so provided is a contract right, set forth certain procedural and evidentiary standards applicable to the enforcement of a claim under the by-laws and entitle the persons to be indemnified to have all expenses incurred in advance of the final disposition of a proceeding paid by the Registrant. Such provisions, however, are intended to be in furtherance and not in limitation of the general right to indemnification provided in the by-laws, which right of indemnification and of advancement of expenses is not exclusive.

The Registrant's by-laws also provide that the Registrant may enter into contracts with any director, officer, employee or agent of the Registrant in furtherance of the indemnification provisions in the by-laws, as well as create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure payment of amounts indemnified.

The foregoing statements are subject to the detailed provisions of Section 145 of the DGCL and the by-laws of the Registrant.

**Item 21.    Exhibits and Financial Statement Schedules.**

(a) The following exhibits are filed herewith or incorporated herein by reference:

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of January 14, 2004, between J.P. Morgan Chase & Co. and Bank One Corporation, including the Stock Option Agreements (included as Annexes A, B and C, respectively, to the joint proxy statement-prospectus forming a part of this Registration Statement and incorporated herein by reference) |
| 3.1 | Restated Certificate of Incorporation of J.P. Morgan Chase & Co. (incorporated by reference to Exhibit 3.1 to the Annual Report on Form 10-K of J.P. Morgan Chase & Co. (File No. 1-5805) for the year ended December 31, 2000) |
| 4.1 | Deposit Agreement between J.P. Morgan Chase & Co. Incorporated (succeeded through merger by J.P. Morgan Chase & Co.) and Morgan Guaranty Trust Company of New York (succeeded through merger by JPMorgan Chase Bank), as depositary (incorporated by reference to Exhibit 4.7 to the Registration Statement on Form 8-A of The Chase Manhattan Corporation (now known as J.P. Morgan Chase & Co.) File No. 1-5805, filed December 20, 2000) |

| Exhibit No. | Description |
|---|---|
| 4.2 | Form of Amendments to Restated Certificate of Incorporation and By–laws of J.P. Morgan Chase & Co. (included as Annex G to the joint proxy statement–prospectus forming a part of this Registration Statement and incorporated herein by reference) |
| 5.1 | Opinion of Simpson Thacher & Bartlett LLP regarding legality of securities being registered* |
| 8.1 | Opinion of Simpson Thacher & Bartlett LLP regarding certain U.S. income tax aspects of the merger* |
| 8.2 | Opinion of Wachtell, Lipton, Rosen & Katz regarding certain U.S. income tax aspects of the merger* |
| 10.1 | Employment Agreement, dated as of January 14, 2004, by and between J.P. Morgan Chase & Co. and James Dimon |
| 23.1 | Consent of PricewaterhouseCoopers LLP, independent accountants for J.P. Morgan Chase & Co. |
| 23.2 | Consent of KPMG LLP, independent accountants for Bank One Corporation |
| 23.3 | Consent of Simpson Thacher & Bartlett LLP (included as part of its opinion filed as Exhibit 5.1 and incorporated herein by reference)* |
| 23.4 | Consent of Simpson Thacher & Bartlett LLP (included as part of its opinion filed as Exhibit 8.1)* |
| 23.5 | Consent of Wachtell, Lipton, Rosen & Katz (included as part of its opinion filed as Exhibit 8.2)* |
| 24.1 | Powers of Attorney |
| 99.1 | Opinion of J.P. Morgan Securities Inc. (included as Annex D to the joint proxy statement–prospectus forming a part of this Registration Statement) |
| 99.2 | Opinion of Lazard Frères & Co. LLC (included as Annex E to the joint proxy statement–prospectus forming a part of this Registration Statement) |
| 99.3 | Form of Proxy of J.P. Morgan Chase & Co.* |
| 99.4 | Form of Proxy of Bank One Corporation* |
| 99.5 | Consent of J.P. Morgan Securities Inc. |
| 99.6 | Consent of Lazard Frères & Co. LLC (included as part of its opinion filed as Exhibit 99.2) |

* To be filed by amendment.

Item 22.    Undertakings
    The undersigned Registrant hereby undertakes:

    (1) To file, during any period in which offers or sales are being made, a post–effective amendment to this registration statement:

        (i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

        (ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post–effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement; notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in

II–3

volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

    (iii) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement

    (2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof

    (3) To remove from registration by means of a post–effective amendment any of the securities being registered which remain unsold at the termination of the offering.

    (4) That, for purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in this registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof

    (5) That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form

    (6) That every prospectus (i) that is filed pursuant to paragraph (5) immediately preceding, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Securities Act of 1933 and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post–effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

    (7) To respond to requests for information that is incorporated by reference into this prospectus pursuant to Items 4, 10(b), 11, or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means; this includes information contained in documents filed subsequent to the effective date of this registration statement through the date of responding to the request.

    (8) To supply by means of a post–effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in this registration statement when it became effective.

Insofar as indemnification for liabilities under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is therefore unenforceable. In the event a claim of indemnification against such

II–4

liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in a successful defense of any action, suit or proceeding) is asserted by such director, officer, or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

II–5

SIGNATURES

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on February 20, 2004.

J.P. MORGAN CHASE & CO.

By: _____  *  _____

Name: William B. Harrison, Jr
Title: Chairman and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| *<br>(William B Harrison, Jr) | Director, Chairman and Chief Executive Officer (Principal Executive Officer) | February 20, 2004 |
| *<br>(Hans W Becherer) | Director | February 20, 2004 |
| *<br>(Riley P Bechtel) | Director | February 20, 2004 |
| *<br>(Frank A Bennack. Jr) | Director | February 20, 2004 |
| *<br>(John H Biggs) | Director | February 20, 2004 |
| *<br>(Lawrence A. Bossidy) | Director | February 20, 2004 |
| *<br>(M. Anthony Burns) | Director | February 20, 2004 |
| *<br>(Ellen V Futter) | Director | February 20, 2004 |
| *<br>(William H Gray, III) | Director | February 20, 2004 |
| *<br>(Helene L Kaplan) | Director | February 20, 2004 |
| *<br>(Lee R Raymond) | Director | February 20, 2004 |

II–6

| Signature | Title | Date |
|---|---|---|
| * | Director | February 20, 2004 |
| (John R. Stafford) | | |
| * | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | February 20, 2004 |
| (Dina Dublon) | | |
| * | Executive Vice President and Controller (Principal Accounting Officer) | February 20, 2004 |
| (Joseph L. Sclafani) | | |

* Anthony J. Horan hereby signs this registration statement on behalf of each of the indicated persons for whom he is attorney-in-fact on February 20, 2004 pursuant to a power of attorney filed herewith.

By: /s/ ANTHONY J. HORAN

Anthony J. Horan
Attorney-in-fact

Dated: February 20, 2004

II-7

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 2.1 p | Agreement and Plan of Merger, dated as of January 14, 2004, between J P Morgan Chase & Co and Bank One Corporation, including the Stock Option Agreements (included as Annexes A, B and C, respectively, to the joint proxy statement–prospectus forming a part of this Registration Statement and incorporated herein by reference) |
| 3.1 | Restated Certificate of Incorporation of J P Morgan Chase & Co. (incorporated by reference to Exhibit 3 1 to the Annual Report on Form 10–K of J P Morgan Chase & Co (File No. 1–5805) for the year ended December 31, 2000) |
| 4.1 | Deposit Agreement between J P Morgan & Co. Incorporated (succeeded through merger by J.P. Morgan Chase & Co ) and Morgan Guaranty Trust Company of New York (succeeded through merger by JPMorgan Chase Bank), as depositary (incorporated by reference to Exhibit 4 7 to the Registration Statement on Form 8–A of The Chase Manhattan Corporation (now known as J.P. Morgan Chase & Co.) File No. 1–5805, filed December 20, 2000) |
| 4.2 | Form of Amendments to Restated Certificate of Incorporation and By–laws of J P Morgan Chase & Co. (included as Annex G to the joint proxy statement–prospectus forming a part of this Registration Statement and incorporated herein by reference) |
| 5.1 | Opinion of Simpson Thacher & Bartlett LLP regarding legality of securities being registered* |
| 8.1 | Opinion of Simpson Thacher & Bartlett LLP regarding certain U.S. income tax aspects of the merger* |
| 8.2 | Opinion of Wachtell, Lipton, Rosen & Katz regarding certain U.S income tax aspects of the merger* |
| 10.1 | Employment Agreement. dated as of January 14, 2004, by and between J.P. Morgan Chase & Co and James Dimon |
| 23.1 | Consent of PricewaterhouseCoopers LLP, independent accountants for J P Morgan Chase & Co |
| 23.2 | Consent of KPMG LLP, independent accountants for Bank One Corporation |
| 23.3 | Consent of Simpson Thacher & Bartlett LLP (included as part of its opinion filed as Exhibit 5.1 and incorporated herein by reference)* |
| 23.4 | Consent of Simpson Thacher & Bartlett LLP (included as part of its opinion filed as Exhibit 8 1)* |
| 23.5 | Consent of Wachtell. Lipton. Rosen & Katz (included as part of its opinion filed as Exhibit 8 2)* |
| 24.1 | Powers of Attorney |
| 99.1 | Opinion of J P Morgan Securities Inc (included as Annex D to the joint proxy statement–prospectus forming a part of this Registration Statement) |
| 99.2 | Opinion of Lazard Frères & Co LLC (included as Annex E to the joint proxy statement–prospectus forming a part of this Registration Statement) |
| 99.3 | Form of Proxy of J.P Morgan Chase & Co * |
| 99.4 | Form of Proxy of Bank One Corporation* |
| 99.5 | Consent of J P Morgan Securities Inc. |
| 99.6 | Consent of Lazard Frères & Co LLC (included as part of its opinion filed as Exhibit 99 2) |

* To be filed by amendment.

**JPMorgan**  # J P MORGAN CHASE & CO (JPM)

270 PARK AVE
39TH FL
NEW YORK, NY 10017
212 270 6000
http://www.jpmorganchase.com

# EX–10.1

EMPLOYMENT AGREEMENT
S–4 Filed on 02/20/2004
File Number 333–112967

GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800 669.1154&nbsp
www.gsionline.com

Exhibit 10 1

EXECUTION COPY

# EMPLOYMENT AGREEMENT

AGREEMENT by and between J P Morgan Chase & Co a Delaware corporation (the "Company"). and James Dimon (the "Executive"). dated as of the 14th day of January, 2004

The Company has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of the Executive pending and following the merger (the "Merger") of the Company and Bank One Corporation ("Bank One") pursuant to the Agreement and Plan of Merger. dated as of January 14th. 2004, between the Company and Bank One (the "Merger Agreement") Therefore, in order to accomplish these objectives, the Executive and the Company desire to enter into this Agreement.

NOW, THEREFORE, IT IS HEREBY AGREED AS FOLLOWS:

1. Effective Date. The "Effective Date" shall mean the date on which the "Effective Time" (as defined in the Merger Agreement) of the Merger occurs In the event that the Effective Time shall not occur this Agreement shall be null and void ab initio and of no further force and effect

2 Employment Period. The Company hereby agrees to employ the Executive, and the Executive hereby agrees to serve the Company, subject to the terms and conditions of this Agreement, for the period commencing on the Effective Date and ending on the day after the first annual meeting of the stockholders of the Company following the second anniversary of the Effective Date (the "Employment Period") The Employment Period shall be divided into two periods. the "Initial Period" and the "Second Period " The Initial Period shall commence on the Effective Date and end on the date on which the Chief Executive Officer of the Company as of the date hereof (the "Initial CEO") ceases for any reason to serve as Chief Executive Officer of the Company. but in no event later than the second anniversary of the Effective Date The Second Period shall begin at the end of the Initial Period and end on the day after the first annual meeting of the stockholders of the Company following the second anniversary of the Effective Date

3. Terms of Employment. (a) Position and Duties. (i) During the Initial Period, the Executive shall serve as the President and Chief Operating Officer of the Company, and, during the Second Period, the Executive shall serve as the President and Chief Executive Officer of the Company, in each case, with such duties and responsibilities as are customarily assigned to such positions During the Initial Period. the Executive shall report directly to the Initial CEO The Board of Directors of the Company (the "Board") shall appoint the Executive to the positions specified above at the times specified above throughout the Employment Period. The Executive shall be appointed to the Board and shall serve on the Board during the Employment Period, subject to election by the shareholders of the Company, without additional consideration

(ii) During the Employment Period. and excluding any periods of vacation and sick leave to which the Executive is entitled. the Executive agrees to devote substantially all of his business attention and time to the business and affairs of the Company

and, to the extent necessary to discharge the responsibilities assigned to the Executive hereunder, to use the Executive's reasonable best efforts to perform faithfully and efficiently such responsibilities. During the Employment Period, it shall not be a violation of this Agreement for the Executive to (A) subject to the approval of the Board, serve on corporate, civic or charitable boards or committees, (B) deliver lectures, fulfill speaking engagements or teach at educational institutions and (C) manage personal investments, so long as such activities do not significantly interfere with the performance of the Executive's responsibilities as an employee of the Company in accordance with this Agreement. It is expressly understood and agreed that to the extent that any such activities have been conducted by the Executive prior to the Effective Date and set forth on Schedule A hereto, the continued conduct of such activities (or the conduct of activities similar in nature and scope thereto) subsequent to the Effective Date shall not thereafter be deemed to interfere with the performance of the Executive's responsibilities to the Company.

(b) Compensation. (i) Base Salary. During the Initial Period, the Executive shall receive an annual base salary ("Annual Base Salary") at a rate of not less than 90% of the annual base salary paid to the Initial CEO (but in no event less than $1 million) payable in accordance with the Company's normal payroll policies. During the Second Period, the Executive's Annual Base Salary shall be determined by the Compensation & Management Development Committee of the Board (the "Committee"), but shall in no event be less than the Annual Base Salary payable during the Initial Period. The Executive's Annual Base Salary shall be reviewed for increase at least annually by the Board pursuant to its normal performance review policies for senior executives. Annual Base Salary shall not be reduced after any increase and the term Annual Base Salary as utilized in this Agreement shall refer to Annual Base Salary as so increased.

(ii) Annual Bonus. With respect to each fiscal year ending during the Initial Period, the Executive shall receive an annual bonus ("Annual Bonus") of not less than 90% of the annual bonus earned by the Initial CEO with respect the applicable fiscal year. With respect to each fiscal year ending during the Second Period, the Executive's Annual Bonus shall be determined by the Committee.

(iii) Equity–Based Grants. With respect to each fiscal year during the Initial Period, the Executive's equity–based awards shall be no less than 90% of the value of those awarded to the Initial CEO and have terms and conditions no less favorable than those applicable to the awards granted to the Initial CEO.

(iv) Retirement Benefits. During the Employment Period, the Executive shall be entitled to participate in all savings and retirement plans that are tax–qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and in all plans that are supplemental to any such tax–qualified plans, in each case, as are applicable to senior executives of the Company generally.

(v) Other Employee Benefit Plans. During the Employment Period, the Executive and/or the Executive's family, as the case may be, shall be eligible for participation in and shall receive all benefits under all welfare benefit plans, practices, policies and programs provided by the Company (including, without limitation, medical, prescription, dental, vision, disability, salary continuance, group life and supplemental group life, accidental

2

death, travel accident insurance, sick leave and vacation plans, practices, policies and programs), on the same basis as such plans, practices, policies and programs are applicable or made available to the senior executives of the Company. Executive shall be eligible for participation in fringe benefits and perquisite plans, practices, policies and programs (including, without limitation, expense reimbursement plans, practices, policies and programs) no less favorable than those provided to the Initial CEO. For purposes of all compensation and benefit plans, programs and policies of the Company, all service credited to the Executive by Bank One up to the Effective Date shall be credited by the Company for purposes of each such corresponding plan, program and policy, provided, however, that in no event shall the Executive be entitled to any credit to the extent that it would result in a duplication of benefits with respect to the same period of service.

4. Termination of Employment. (a) Death or Disability. The Executive's employment shall terminate automatically upon the Executive's death during the Employment Period. If the Company determines in good faith that the Disability of the Executive has occurred during the Employment Period (pursuant to the definition of Disability set forth below), it may provide the Executive with written notice in accordance with Section 10(b) of this Agreement of its intention to terminate the Executive's employment. In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"), provided that, within the 30 days after such receipt, the Executive shall not have returned to full-time performance of the Executive's duties. For purposes of this Agreement, "Disability" shall mean the absence of the Executive from the Executive's duties with the Company on a full-time basis for 180 consecutive business days as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to the Executive or the Executive's legal representative.

(b) Cause. The Company may terminate the Executive's employment during the Employment Period either with or without Cause. For purposes of this Agreement, "Cause" shall mean:

(i) the Executive is convicted of, or pleads guilty or nolo contendere to a charge of commission of, a felony; or

(ii) the Executive has engaged in willful gross neglect or willful gross misconduct in carrying out his duties, which results in material economic harm to the Company or in reputational harm causing quantifiable material injury to the Company.

For purposes of this provision, no act or failure to act, on the part of the Executive, shall be considered "willful" unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that the Executive's action or omission was in the best interests of the Company. Any act, or failure to act, based upon authority given pursuant to a resolution duly adopted by the Board or upon the instructions of the Initial CEO during the Initial Period or based upon the advice of counsel for the Company shall be conclusively presumed to be done, or omitted to be done, by the Executive in good faith and in the best interests of the Company. The cessation of employment of the Executive shall not be deemed to be for Cause unless and until there shall have been delivered to the Executive a copy of a resolution duly adopted by the

3

affirmative vote of not less than two–thirds of the entire membership of the Board at a meeting of the Board called and held for such purpose (after reasonable notice is provided to the Executive and the Executive is given an opportunity, together with counsel, to be heard before the Board), finding that, in the good faith opinion of the Board, the Executive is guilty of the conduct described in clause (ii) above, and specifying the particulars thereof in detail

(c) Good Reason. The Executive's employment may be terminated by the Executive with Good Reason. For purposes of this Agreement, "Good Reason" shall mean in the absence of a written consent of the Executive:

(i) the failure of the Company to appoint the Executive to the position of Chief Executive Officer of the Company upon the expiration of the Initial Period;

(ii) the assignment to the Executive of any duties inconsistent with the Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a) of this Agreement, or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated, insubstantial or inadvertent action not taken in bad faith and which is remedied by the Company within 30 days after receipt of notice thereof given by the Executive;

(iii) any failure by the Company to comply with any of the provisions of Section 3(b) of this Agreement, other than an isolated, insubstantial or inadvertent failure not occurring in bad faith and which is remedied by the Company within 30 days after receipt of notice thereof given by the Executive;

(iv) any requirement by the Company that the Executive's services be rendered primarily at a location or locations other than New York, New York;

(v) any failure by the Company to comply with Section 9(c) of this Agreement; or

(vi) any failure to elect or reelect the Executive to the Board.

For purposes of this provision, "Good Reason" shall cease to exist for an event on the ninetieth day after the Executive first has knowledge of such event, unless the Executive has given the Company written notice thereof prior to such date.

(d) Notice of Termination. Any termination by the Company for Cause, or by the Executive for Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 10(b) of this Agreement. For purposes of this Agreement, a "Notice of Termination" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated and (iii) if the Date of Termination (as defined below) is other than the date of receipt of such notice, specifies the termination date (which date shall be not more than 30 days after the giving of such notice) The failure by the Executive or the Company to set forth in the Notice of Termination any fact or circumstance

4

which contributes to a showing of Good Reason or Cause shall not waive any right of the Executive or the Company, respectively, hereunder or preclude the Executive or the Company, respectively, from asserting such fact or circumstance in enforcing the Executive's or the Company's rights hereunder

(e) Date of Termination. "Date of Termination" means (i) if the Executive's employment is terminated by the Company for Cause, or by the Executive with or without Good Reason, the date of receipt of the Notice of Termination or any later date specified therein within 30 days of such notice, as the case may be, (ii) if the Executive's employment is terminated by the Company other than for Cause or Disability, the Date of Termination shall be the date on which the Company notifies the Executive of such termination and (iii) if the Executive's employment is terminated by reason of death or Disability, the Date of Termination shall be the date of death of the Executive or the Disability Effective Date, as the case may be

(f) Resignation. Upon termination of the Executive's employment for any reason, the Executive agrees to resign, as of the Date of Termination, to the extent applicable, from any positions that the Executive holds with the Company and its affiliated companies, the Board (and any committees thereof) and the Board of Directors (and any committees thereof) of any of the affiliated companies

5 Obligations of the Company upon Termination. (a) Good Reason; Other Than for Cause, Death or Disability. If, during the Employment Period, the Company shall terminate the Executive's employment other than for Cause, death or Disability or the Executive shall terminate employment for Good Reason:

(i) the Company shall pay to the Executive in a lump sum in cash within 30 days after the Date of Termination (but in no event prior to the expiration of the revocation period contained in the release described in this Section 5(a)) the aggregate of the following amounts:

A  the sum of (1) the Executive's accrued Annual Base Salary and any accrued vacation pay through the Date of Termination, (2) the Executive's business expenses that have not been reimbursed by the Company as of the Date of Termination that were incurred by the Executive prior to the Date of Termination in accordance with the applicable Company policy, and (3) the Executive's Annual Bonus earned for the fiscal year immediately preceding the fiscal year in which the Date of Termination occurs if such bonus has been determined but not paid as of the Date of Termination (the sum of the amounts described in clauses (1) through (3), shall be hereinafter referred to as the "Accrued Obligations"); and

B  the greater of (1) $20 million, and (2) the amount equal to the product of (A) three times (B) 90% of the sum of the Initial CEO's (x) base salary and (y) average cash bonus paid or payable (including any cash bonus amounts deferred at the election of the Initial CEO) in respect of the three fiscal years prior to the Date of Termination; and

5

(ii) any equity–based awards granted to the Executive shall vest and become free of restrictions immediately. any stock options granted to the Executive shall be exercisable for the longer of (1) any period specified in any award agreement or plan governing such stock option or (2) the shorter of (x) five years after the Date of Termination or (y) the remainder of their original full term. and all restrictive covenants in any plans or agreements governing such equity–based compensation awards shall be of no further force and effect; and

(iii) for the three–year period following the Date of Termination, the Company shall continue to provide medical and dental benefits to the Executive and his eligible dependents as if the Executive remained an active employee of the Company. and the Executive and his eligible dependents shall be eligible to participate in the Company's post–retirement welfare benefit programs in effect for senior executives of the Company (collectively "Medical Benefits") The applicable period of health benefit continuation under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") shall begin on the Date of Termination; and

(iv) to the extent not theretofore paid or provided. the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided or which the Executive is eligible to receive under any plan. program, policy or practice or contract or agreement of the Company and its affiliated companies through the Date of Termination (such other amounts and benefits shall be hereinafter referred to as the "Other Benefits") As used in this Agreement. the term "affiliated companies" shall include any company controlled by, controlling or under common control with the Company

In the event of the Executive's termination during the Employment Period by the Company other than for Cause or Disability or by the Executive for Good Reason. each of the Executive and the Company agree to execute a mutual general release in favor of the other party, substantially in the form attached hereto as Schedule B The payments and provision of benefits to the Executive required by Section 5(a) (other than the Accrued Obligations and Other Benefits) shall be conditioned upon the Executive's delivery (and non–revocation prior to the expiration of the revocation period contained in the release) of such release in favor of the Company, subject to the Company's delivery to the Executive of such release in favor of the Executive

(b) Death If the Executive's employment is terminated by reason of the Executive's death during the Employment Period. this Agreement shall terminate without further obligations to the Executive's legal representatives under this Agreement, other than for (1) payment of Accrued Obligations, (2) the timely payment or provision of Other Benefits and (3) payment of the product of (x) the highest annual bonus paid or payable to the Executive for any of the three fiscal years prior to such termination and (y) a fraction, the numerator of which is the number of days elapsed in the fiscal year in which such termination occurs through the Date of Termination. and the denominator of which is 365 (the "Prorata Bonus") In addition. any equity–based awards granted to the Executive shall vest and become free of restrictions immediately. any stock options granted to the Executive shall be exercisable for the longer of (i) any period specified in any award agreement or plan governing such stock option or (ii) the shorter of (A) five years after the Date of Termination or (B) the remainder of their original full term, and all restrictive covenants in any plans or agreements governing such equity–based compensation awards shall be of no further force and effect. Accrued Obligations and the

6

Prorata Bonus shall be paid to the Executive's estate or beneficiary, as applicable, in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 5(b) shall include death benefits for which the Company pays as in effect on the date of the Executive's death (which shall be no less favorable than those applicable to the Initial CEO, other than insurance funded death benefits as of the Effective Date provided to the Initial CEO) and the continued provision of the Medical Benefits. The applicable period of health benefit continuation under COBRA shall begin on the Date of Termination.

(c) Disability. If the Executive's employment is terminated by the Company by reason of the Executive's Disability during the Employment Period, this Agreement shall terminate without further obligations to the Executive, other than for (1) payment of Accrued Obligations, (2) the timely payment or provision of Other Benefits and (3) payment of the Prorata Bonus. In addition, any equity-based awards granted to the Executive shall vest and become free of restrictions immediately, any stock options granted to the Executive shall be exercisable for the longer of (i) any period specified in any award agreement or plan governing such stock option or (ii) the shorter of (A) five years after the Date of Termination or (B) the remainder of their original full term, and all restrictive covenants in any plans or agreements governing such equity-based compensation awards shall be of no further force and effect. Accrued Obligations and the Prorata Bonus shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination. With respect to the provision of Other Benefits, the term Other Benefits as utilized in this Section 5(c) shall include, and the Executive shall be entitled after the Disability Effective Date to receive, disability and other benefits as in effect at any time thereafter generally with respect to the Initial CEO and the continued provision of Medical Benefits. Notwithstanding the foregoing, if the Executive's employment is terminated by the Company by reason of the Executive's Disability during the Employment Period, the Company shall continue to provide medical and dental benefits to the Executive and his eligible dependents until the Executive attains age sixty-five as if the Executive remained an active employee of the Company. The applicable period of health benefit continuation under COBRA shall begin on the Date of Termination.

(d) Cause; Other than for Good Reason. If the Executive's employment shall be terminated by the Company for Cause or the Executive terminates his employment without Good Reason during the Employment Period, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay to the Executive (i) the Accrued Obligations through the Date of Termination and (ii) Other Benefits, in each case to the extent theretofore unpaid. Accrued Obligations shall be paid to the Executive in a lump sum in cash within 30 days of the Date of Termination. In addition, in the event the Executive terminates his employment without Good Reason, any stock options granted to the Executive prior to the Effective Date shall fully vest and be exercisable for the longer of (i) any period specified in any award agreement or plan governing such stock option or (ii) the shorter of (A) five years after the Date of Termination or (B) the remainder of their original full term, and all restrictive covenants in any plans or agreements governing such equity-based compensation awards shall be of no further force and effect. The preceding sentence of this Section 5(d) shall survive the expiration of the Employment Period.

7

6. Full Settlement. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against the Executive or others. In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement and, such amounts shall not be reduced whether or not the Executive obtains other employment. The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, the Executive or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee of performance thereof (including as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement)

7. Certain Additional Payments by the Company. (a) Anything in this Agreement to the contrary notwithstanding, in the event it shall be determined that any payment or distribution by the Company to or for the benefit of the Executive (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, but determined without regard to any additional payments required under this Section 7) (a "Payment") would be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code") or any interest or penalties are incurred by the Executive with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then the Executive shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by the Executive of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, the Executive retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the Payments

(b) Subject to the provisions of Section 7(c), all determinations required to be made under this Section 7, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by KPMG LLP or such other nationally recognized certified public accounting firm reasonably acceptable to the Executive as may be designated by the Company (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Executive within 15 business days of the receipt of notice from the Executive that there has been a Payment, or such earlier time as is requested by the Company. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Section 7, shall be paid by the Company to the Executive or directly to the Internal Revenue Service, in the sole discretion of the Company, within five days of the later of (i) the due date for the payment of any Excise Tax, and (ii) the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Executive. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to Section 7(c) and the Executive thereafter is required to make a payment of any Excise Tax, the

8

Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Executive

(c) The Executive shall notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross–Up Payment  Such notification shall be given as soon as practicable but no later than ten business days after the Executive is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which it gives such notice to the Company (or such Executive shall not pay such claim prior to the expiration of the 30–day period following the date on which it gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due)  If the Company notifies the Executive in writing prior to the expiration of such period that it desires to contest such claim, the Executive shall:

(i) give the Company any information reasonably requested by the Company relating to such claim,

(ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting legal representation with respect to such claim by an attorney reasonably selected by the Company,

(iii) cooperate with the Company in good faith in order effectively to contest such claim, and

(iv) permit the Company to participate in any proceedings relating to such claim;

"*provided, however*, that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Executive harmless, on an after–tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 7(c), the Company shall control all proceedings taken in connection with such contest, and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either pay the tax claimed to the appropriate taxing authority on behalf of the Executive and direct the Executive to sue for a refund or contest the claim in any permissible manner, and the Executive agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; *provided, however*, that, if the Company pays such claim and directs the Executive to sue for a refund, the Company shall indemnify and hold the Executive harmless, on an after–tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such payment or with respect to any imputed income in connection with such payment; and *provided, further*, that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Executive with respect to

9

which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which the Gross-Up Payment would be payable hereunder, and the Executive shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d) If, after the receipt by the Executive of a payment by the Company of an amount on the Executive's behalf pursuant to Section 7(c), the Executive becomes entitled to receive any refund with respect to such claim, the Executive shall (subject to the Company's complying with the requirements of Section 7(c)) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after payment by the Company of an amount on the Executive's behalf pursuant to Section 7(c), a determination is made that the Executive shall not be entitled to any refund with respect to such claim and the Company does not notify the Executive in writing of its intent to contest such denial of refund prior to the expiration of 30 days after such determination, then the amount of such payment shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

8. Confidential Information; Non-Solicitation; Non-Disparagement. (a) The Executive shall hold in a fiduciary capacity for the benefit of the Company all secret or confidential information, knowledge or data relating to the Company or any of its affiliated companies, and their respective businesses, which shall have been obtained by the Executive during the Executive's employment by the Company or any of its affiliated companies and which shall not be or become public knowledge (other than by acts by the Executive or representatives of the Executive in violation of this Agreement). After termination of the Executive's employment with the Company, the Executive shall not, without the prior written consent of the Company or as may otherwise be required by law or legal process, communicate or divulge any such information, knowledge or data to anyone other than the Company and those designated by it.

(b) During the one year period following the Date of Termination for any reason, the Executive will not, directly or indirectly, on behalf of the Executive or any other person, solicit for employment with any entity other than the Company and its affiliated companies any person who is employed by the Company or its affiliated companies as of the date of such solicitation or was employed by the Company or its affiliated companies during the one year period prior to such Date of Termination. For purposes hereof, general solicitations not directed at a particular person or advertising in media directed at the general public shall not provide a basis for a claim by the Company that the Executive violated this Section 8(b).

(c) Following the Date of Termination for any reason, the Executive and the Company (including its executive officers and directors) shall not (except as required by law) directly or indirectly make any statement or release any information, or encourage others to make any statement or release any information that is designed to embarrass or criticize the other (or their respective employees, directors or shareholders).

10

(d) The Executive acknowledges (and with respect to Section 8(c) the Company acknowledges) that the Company (and with respect to Section 8(c) the Executive) would be irreparably injured by a violation of this Section 8 and the Executive or the Company, as applicable, agrees that the Company or the Executive. as applicable, in addition to any other remedies available to it for such breach or threatened breach. shall be entitled. without posting a bond. to a preliminary injunction. temporary restraining order, or other equivalent relief. restraining the Executive or the Company (including its executive officers and directors). as applicable. from any actual or threatened breach of this Section 8

9. Successors (a) This Agreement is personal to the Executive and without the prior written consent of the Company shall not be assignable by the Executive. This Agreement shall inure to the benefit of and be enforceable by the Executive's legal representatives, heirs or legatees

(b) This Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns

(c) The Company will require any successor (whether direct or indirect. by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law. or otherwise

10. Miscellaneous. (a) This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

(b) All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail. return receipt requested. postage prepaid. addressed as follows:

If to the Executive:          At the most recent address
                              on file at the Company

If to the Company:
                              Attention:

11

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

(b) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(c) The Company may withhold from any amounts payable under this Agreement such Federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable law or regulation.

(d) The Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Executive or the Company may have hereunder, including, without limitation, the right of the Executive to terminate employment for Good Reason pursuant to Section 4(c)(i)–(vi) of this Agreement, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement, except as set forth in Section 4(c).

&bsp;      (e) Except as otherwise expressly provided herein, from and after the Effective Date, this Agreement shall supersede any other employment, severance or change of control agreement between the parties and between the Executive and Bank One, with respect to the subject matter hereof (including without limitation, the employment agreement between the Executive and Bank One dated as of March 27, 2000). Any provision of this Agreement that by its terms continues after the expiration of the Employment Period or the termination of the Executive's employment shall survive in accordance with its terms.

12

IN WITNESS WHEREOF, the Executive has hereunto set the Executive's hand and, pursuant to the authorization from its Board of Directors, the Company has caused these presents to be executed in its name on its behalf, all as of the day and year first above written.

JAMES DIMON

/s/ James Dimon
_____

J.P. MORGAN CHASE & CO

By     /s/ John J Farrell
_____

Name: John J. Farrell
Title: Director Human Resources

p

13

Schedule A

Federal Reserve System's Federal Advisory Council

Board of Directors of The National Center on Addiction and Substance Abuse (CASA)

Board of Directors of Yum! Brands. Inc.

Board of Directors of University of Chicago, Harvard Business School. the United Negro College Fund, the Clearing House. the Economic Club of Chicago and the Civic Committee of the Commercial Club of Chicago

Member of the World Economic Forum. the Financial Services Forum and the Council on Foreign Relations

Board of Directors of the Mount Sinai–NYU Medical Center and Health Systems

Schedule B

Release

For and in consideration of the payments and other benefits described in the employment agreement dated as of January 14, 2004 (the "Agreement") between J.P. Morgan Chase & Co. (the "Company") and James Dimon (the "Executive") and for other good and valuable consideration, Executive hereby releases the Company, its divisions, affiliates, subsidiaries, parents, branches, predecessors, successors, assigns, officers, directors, trustees, employees, agents, shareholders, administrators, representatives, attorneys, insurers and fiduciaries, past, present and future (the "Released Parties") from any and all claims of any kind arising out of, or related to, his employment with the Company, its affiliates and subsidiaries (collectively, with the Company, the "Affiliated Entities"), his separation from employment with the Affiliated Entities or derivative of Executive's employment, which Executive now has or may have against the Released Parties, whether known or unknown to Executive, by reason of facts which have occurred on or prior to the date that Executive has signed this Release. Such released claims include, without limitation, any and all claims under federal, state or local laws pertaining to employment, including, without limitation, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et. seq., the Fair Labor Standards Act, as amended, 29 U.S.C. Section 201 et. seq., the Americans with Disabilities Act, as amended, 42 U.S.C. Section 12101 et. seq., the Reconstruction Era Civil Rights Act, as amended, 42 U.S.C. Section 1981 et. seq., the Rehabilitation Act of 1973, as amended, 29 U.S.C. Section 701 et. seq., the Family and Medical Leave Act of 1992, 29 U.S.C. Section 2601 et. seq., the New York State Human Rights Law, N.Y. Exec. Law, Section 296 et. seq., the New York City Administrative Code, the New Jersey State Law Against Discrimination, N.J. Stat., Section 10:5–1, et. seq., and Connecticut General Statutes, Section 46a–60 et. seq., and any and all state or local laws regarding employment discrimination and/or federal, state or local laws of any type or description regarding employment, including but not limited to any claims arising from or derivative of Executive's employment with the Affiliated Entities, as well as any and all claims under state contract or tort law.

Executive has read this Release carefully, acknowledges that Executive has been given at least 21 days to consider all of its terms and has been advised to consult with any attorney and any other advisors of Executive's choice prior to executing this Release, and Executive fully understands that by signing below Executive is voluntarily giving up any right which Executive may have to sue or bring any other claims against the Released Parties, including any rights and claims under the Age Discrimination in Employment Act. Executive also understands that Executive has a period of seven days after signing this Release within which to revoke his agreement, and that neither the Company nor any other person is obligated to make any payments or provide any other benefits to Executive pursuant to the Agreement until eight days have passed since Executive's signing of this Release without Executive's signature having been revoked, other than the Accrued Obligations and the Other Benefits (in each case, as defined in the Agreement). Finally, Executive has not been forced or pressured in any manner whatsoever to sign this Release, and Executive agrees to all of its terms voluntarily.

For and in consideration of the obligations upon Executive as set forth in the Agreement, and for other good and valuable consideration, the Company hereby (on its own behalf and that of the other Affiliated Entities. the divisions and predecessors and successors of the Affiliated Entities and the directors and officers of the Company in their capacity as such (collectively, the "Releasing Entities")) releases Executive and his heirs. executors, successors and assigns (the "Executive Released Parties") of and from all debts. obligations, promises, covenants, collective bargaining obligations. agreements, contracts. endorsements, bonds. controversies, suits. claims or causes of every kind and nature whatsoever, arising out of, or related to, his employment with the Affiliated Entities, his separation from employment with the Affiliated Entities or derivative of Executive's employment, which the Releasing Entities now have or may have against the Executive Released Parties, whether known or unknown, by reason of facts which have occurred on or prior to the date that the Company has signed this Release; provided, however, that nothing contained in this Release shall release the Executive Released Parties from any claim or form of liability arising out of acts or omissions by Executive which constitute a violation of the criminal or securities laws of any applicable jurisdiction.

Notwithstanding anything else herein to the contrary, this Release shall not affect: the obligations of the Company or Executive set forth in the Agreement or other obligations that. in each case, by their terms, are to be performed after the date hereof by the Company or Executive (including, without limitation. obligations to Executive under any stock option. stock award or agreements or obligations under any pension plan or other benefit or deferred compensation plan, all of which shall remain in effect in accordance with their terms); obligations to indemnify Executive respecting acts or omissions in connection with Executive's service as a director, officer or employee of the Affiliated Entities; or any right Executive may have to obtain contribution in the event of the entry of judgment against Executive as a result of any act or failure to act for which both Executive and any of the Affiliated Entities are jointly responsible.

This Release, and the attached covenants. are final and binding and may not be changed or modified except in a writing signed by both parties.

| | |
|---|---|
| _____ | _____ |
| Date | JAMES DIMON |
| _____ | _____ |
| Date | J.P. MORGAN CHASE & CO |

2

**JPMorgan** **J P MORGAN CHASE & CO** (JPM)

270 PARK AVE
39TH FL
NEW YORK, NY 10017
212. 270 6000
http://www.jpmorganchase.com

# EX–23.1

CONSENT OF PRICEWATERHOUSECOOPERS LLP
S–4 Filed on 02/20/2004
File Number 333–112967



Exhibit 23.1

CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in this Registration
Statement on Form S-4 of our report dated January 20, 2004 relating to the
financial statements, which appears in JPMorgan Chase's Annual Report on Form
10-K for the year ended December 31, 2003. We also consent to the reference to
us under the heading "Experts" in such Registration Statement.

----------------------------

PricewaterhouseCoopers LLP

New York, New York

February 19, 2004

**JPMorgan**  **J P MORGAN CHASE & CO** (JPM)

270 PARK AVE
39TH FL
NEW YORK, NY 10017
212. 270 6000
http://www.jpmorganchase.com

# EX–23.2

**CONSENT OF KPMG LLP**
**S–4 Filed on 02/20/2004**
File Number 333–112967



GSI

LIVEDGAR® Information Provided by Global Securities Information. Inc
800 669.1154&nbsp
www.gsionline.com

Exhibit 23.2

Consent of Independent Public Accountants

The Board of Directors
Bank One Corporation:

We consent to the incorporation by reference in this Registration Statement on
Form S-4 ("Registration Statement") of J.P. Morgan Chase & Co. of our report
dated January 20, 2004, relating to the consolidated balance sheets of Bank One
Corporation and subsidiaries ("Bank One") as of December 31, 2003 and 2002, and
the related consolidated statements of income, stockholders' equity and cash
flows for each of the years in the three-year period ended December 31, 2003,
which report appears in the 2003 Annual Report to Stockholders which is included
in Bank One's 2003 Form 10-K, incorporated by reference in the Registration
Statement. Our report dated January 20, 2004 refers to Bank One's adoption of
FASB Interpretation No. 46, Consolidation of Variable Interest Entities,
effective December 31, 2003, and the discontinuance and sale of Bank One's
corporate trust services business in 2003. We also consent to the reference to
our firm under the heading "Experts" in the Registration Statement.

KPMG LLP

Chicago, Illinois
February 18, 2004

**JPMorgan**   **J P MORGAN CHASE & CO** (JPM)

270 PARK AVE
39TH FL
NEW YORK, NY 10017
212 270.6000
http://www.jpmorganchase.com

# EX–24.1

**POWERS OF ATTORNEY**
**S–4 Filed on 02/20/2004**
File Number 333–112967

**GSI** 

LIVEDGAR® Information Provided by Global Securities Information, Inc.
800 669.1154&nbsp
www.gsionline.com

Exhibit 24.1

POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS that the undersigned in his or her capacity as an officer or director of J.P. Morgan Chase & Co., a Delaware corporation (the "Corporation"), hereby constitutes and appoints WILLIAM B. HARRISON, JR., DINA DUBLON, WILLIAM H. MCDAVID and ANTHONY J. HORAN, and each of them severally, his or her true and lawful attorneys-in-fact and agents, with the power to act with or without the others and with full power of substitution and resubstitution, for and on behalf of him or her and in his or her name, place and stead, in any and all capacities, to perform any and all acts and do all things and to execute any and all instruments which said attorneys-in-fact and agents and each of them may deem necessary or desirable to enable the Corporation to comply with the Securities Act of 1933, as amended (the "Act"), and any rules, regulations and requirements of the Securities and Exchange Commission (the "Commission") thereunder in connection with the registration under the Act of equity securities of the Corporation pursuant to resolutions adopted by the Board of Directors of the Corporation on January 14, 2004, authorizing the preparation and filing of Registration Statements, on Form S-4 and/or such other Form or Forms as shall be appropriate, for the registration under the Act of equity securities of the Corporation issuable pursuant to the Agreement and Plan of Merger, dated as of January 14, 2004, between the Corporation and Bank One Corporation, a Delaware corporation, as the same may be amended, including without limiting the generality of the foregoing, power and authority to sign each or any such registration statement, including without limitation, the prospectuses and prospectus supplements contained therein, and any and all amendments, including post-effective amendments, and exhibits thereto (collectively, the "Registration Statement") to be filed with the Commission, and to sign any and all instruments or documents to be filed as a part of or in connection with said Registration Statement, whether such instruments or documents are filed before or after the effective date of such Registration Statement, to file such Registration Statement as so signed, together with any and all instruments or documents to be filed as a part of or in connection with such Registration Statement, with the Commission, to appear before the Commission in connection with any matter relating to such Registration Statement; and to do any and all acts and all things and to execute any and all instruments which said attorneys-in-fact and agents and each of them may deem necessary or desirable to enable the Corporation to comply with the Act and the Securities Exchange Act of 1934, as amended, and any rules, regulations and requirements of the Commission thereunder, including specifically, but without limiting the generality of the foregoing, power and authority to sign the name of each undersigned director or officer in such capacity, to any application, report, instrument, certificate, form or other documents, and any and all supplements and amendments thereto, to be filed on behalf of said Corporation with the Commission, hereby granting to such attorneys-in-fact and agents, and each of them, full power to do and perform any and all acts and things requisite and necessary to be done as he or she might or could do in person, and hereby ratifying and confirming all that said attorneys-in-fact and agents and each of them may lawfully do or cause to be done by virtue hereof.

IN WITNESS WHEREOF, the undersigned has executed this Power of Attorney as of the 19th day of February, 2004.

[Signature pages follow]

Exhibit 24.1

```
/s/ William B. Harrison, Jr.
-------------------------------------
William B. Harrison, Jr
Director, Chairman and Chief
Executive Officer


/s/ Hans W. Becherer
-------------------------------------
Hans W. Becherer
Director

/s/ Riley B. Bechtel
-------------------------------------
Riley B. Bechtel
Director

/s/ Frank A. Bennack, Jr.
---------------------------
Frank A. Bennack, Jr.
Director


/s/ John H. Biggs
-------------------------------------
John H. Biggs
Director

/s/ Lawrence A. Bossidy
-------------------------------------
Lawrence A. Bossidy
Director

/s/ M. Anthony Burns
-------------------------------------
M. Anthony Burns
Director

/s/ Ellen V. Futter
-------------------------------------
Ellen V. Futter
Director

/s/ William H. Gray, III
-------------------------------------
William H. Gray, III
Director

/s/ Helene L. Kaplan
-------------------------------------
Helene L. Kaplan
Director

/s/ Lee R. Raymond
-------------------------------------
Lee R. Raymond
Director
```

Exhibit 24.1

/s/ John R. Stafford
-------------------------------------
John R. Stafford
Director

/s/ Dina Dublon
-------------------------------------
Dina Dublon
Executive Vice President and
Chief Financial Officer

/s/ Joseph L. Sclafani
-------------------------------------
Joseph L. Sclafani
Executive Vice President and
Controller

**JPMorgan** J P MORGAN CHASE & CO (JPM)

270 PARK AVE
39TH FL
NEW YORK, NY 10017
212  270 6000
http://www.jpmorganchase.com

# EX–99.5

**CONSENT OF J.P. MORGAN SECURITIES INC.**
**S–4 Filed on 02/20/2004**
File Number 333–112967



GSI

LIVEDGAR® Information Provided by Global Securities Information, Inc
800 669.1154&nbsp
www.gsionline.com

EXHIBIT 99.5

CONSENT OF J.P. MORGAN SECURITIES INC.

We hereby consent to (i) the use of our opinion letter dated January 14, 2004 to the Board of Directors of J.P. Morgan Chase & Co. (the "Company") included in Annex D to the Joint Proxy Statement/Prospectus which forms part of the Registration Statement on Form S-4 relating to the proposed merger of the Company and Bank One Corporation, and (ii) the references to such opinion in such Joint Proxy Statement/Prospectus and Registration Statement. In giving such consent, we do not admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder, nor do we hereby admit that we are experts with respect to any part of such Registration Statement within the meaning of the term "experts" as used in the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder.

J.P. MORGAN SECURITIES INC.

By: /s/ Douglas Braunstein
    _____

    Name:  Douglas Braunstein
    Title: Managing Director

February 19, 2004