# Tab F

# Part 1

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

LEXSEE 2003 US DIST LEXIS 7838

BOND OPPORTUNITY FUND and STEVEN GIDUMAL, suing on their own behalf individually, and on behalf of shareholders of UNILAB CORPORATION, Plaintiffs, - v.- UNILAB CORPORATION, DAVID C. WEAVIL, HAYWOOD COCHRANE, Jr., KIRBY L. CRAMER, WILLIAM J. GEDALE, RICHARD A. MICHAELSON, GABRIEL B. THOMAS, and BT ALEX.BROWN, Defendants.

99 Civ. 11074 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 7838; Fed. Sec. L. Rep. (CCH) P92,418*

May 9, 2003, Decided
May 12, 2003, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Bond Opportunity Fund v Unilab Corp, 2004 US App LEXIS 2217 (2d Cir N Y, Feb 10, 2004)*

**DISPOSITION:** Defendants' motion to dismiss complaint granted.

LexisNexis(R) Headnotes

**COUNSEL:** [*1] For Bond Opportunity Fund, PLAINTIFF: Joel P Laitman, Samuel P Sporn, Schoengold & Sporn, PC, New York, NY USA. Howard I Rhine, Coleman, Rhine & Goodwin LLP, New York, NY USA. Howard I Rhine, Bruce S Coleman, Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, New York, NY USA

For Steven Gidumal, PLAINTIFF: Joel P Laitman, Samuel P Sporn, Schoengold & Sporn, PC, New York, NY USA Howard I Rhine, Bruce S Coleman, Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, New York, NY USA

For Unilab Corporation, DEFENDANT: Jay B Kasner, Skadden, Arps, Slate, Meagher & Flom, New York, NY USA

For David C Weavil, Haywood Cochrane, Kirby L Cramer, William J Gedale, Richard A Michaelson, Gabriel B Thomas, DEFENDANTS: John R Oller,

Willkie, Farr & Gallagher, New York, NY USA

**JUDGES:** JOHN S MARTIN, Jr, United States District Judge

**OPINIONBY:** JOHN S. MARTIN, Jr.

**OPINION: OPINION AND ORDER**

JOHN S MARTIN, Jr, United States District Judge:

This purported class action, filed by former shareholders of Unilab Corporation, arises out of a buyout of virtually all of the public shareholders of Unilab in a merger of Unilab into UC Acquisition Sub, Inc, a subsidiary of Kelso [*2] & Co, which was created for that purpose Plaintiffs allege that the proxy statement dated October 26, 1999, and a supplemental proxy statement dated November 15, 1999, n1 contained false and misleading statements in violation of § § 14(a) and 20(a) of the Securities Exchange Act, *15 U.S.C § § 78n(a), 78t(a)* In addition, Plaintiffs assert state law claims of breach of fiduciary duty, common law fraud and deceit, and negligent misrepresentation.

n1 The Plaintiffs filed their original Complaint in this action, seeking to enjoin the merger, on November 4, 1999 The supplemental proxy was prepared with the participation of Plaintiffs' counsel, and published pursuant to a preliminary settlement, subject to confirmatory

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

discovery The shareholder vote, in which the merger was approved, took place on November 23, 1999

Plaintiffs claim that the allegedly misleading proxy materials were issued in furtherance of a scheme to induce shareholders to sell their Unilab shares at an unfairly low price [*3] They contend that this scheme was intended to benefit the director defendants, BT Alex Brown (the investment banker), Kelso, and three institutional shareholders, two of which remained shareholders after the merger. Plaintiffs claim that the extent to which Unilab stock was undervalued in the merger is demonstrated by the fact that 18 months after the buyout at $ 5 85 per share, Kelso took the successor company public at $ 16 per share, and it closed its first day of trading at $ 23 per share This increase took place despite the fact that Unilab's results over that period of time were not as good as had been expected, and the stock market declined generally

All Defendants have moved to dismiss the Third Amended Complaint pursuant to Fed R Civ P Rules 12(b)(6) and 9(b), and § 21D(b) of the Securities Exchange Act, 15 U S C § 78u, 4 (b), for failure to state a cause of action. In addition, BT Alex Brown has moved to dismiss the securities law claims asserted against it as barred by the statute of limitations

The Proxy Materials

Plaintiffs charge that the original proxy statement contained a number of misstatements and omissions, and that the supplemental [*4] proxy that was sent to shareholders after the Plaintiffs filed the original Complaint in this action, and before the vote approving the merger, did not remedy a number of deficiencies in the disclosure with respect to the merger Plaintiffs allege that the following statements constituted material misstatements and omissions

1 The statement in both the proxy and the supplemental proxy that two institutional investors, Pequot Scott Fund, LP and EOS Partners, LP, were retaining a portion of their shares in the merger and that this was a benefit to other shareholders, who would be able to receive cash for all of their shares, and would allow their merger to be accounted for as a recapitalization, was untrue because Pequot and EOS Partners actually were permitted to retain their shares primarily because they had expressed disappointment in the proposed $ 5 85 buy out price

2 The proxy and supplemental proxy did not disclose that prior to the announcement of the merger, the Unilab Board had elected not to exercise a prepayment option on

a $ 14 million note held by Oaktree, which was convertible into Unilab stock, allegedly giving Oaktree a windfall and gaining Oaktree's support [*5] for the buyout as a result.

3 The proxy stated that the $ 5 85 buy out price was supported by earnings estimates of research analysts, when, in fact, there was only one research analyst who covered Unilab, and it was not disclosed that Unilab had urged that analyst to reduce her earnings estimates

4 The proxy did not disclose that the financial projections that were included in the proxy were not the ones used by BT Alex Brown in rendering its fairness opinion to the Board, and that using the same projections would have yielded an implied range of values that were $ 1 95 higher than the range of values presented to the Board

5 The proxy stated that the company had engaged in an extensive auction process, which ensured that the buyout price was fair Plaintiffs allege that this statement was false and misleading because it failed to state that in addition to its role as financial advisor to Unilab, BT Alex Brown had agreed to provide financing to six of the nine parties that initially indicated interest in purchasing Unilab, to two of the final three bidders, and to Kelso, with whom Unilab negotiated exclusively in May 1999 Kelso, the ultimate purchaser, also agreed [*6] to permit BT Alex Brown to purchase a 1% interest in the new company Consequently, according to Plaintiffs, BT Alex Brown was on both sides of the negotiations In addition, while the proxy stated that the Board had created a special committee to oversee the negotiations, the negotiations were actually left to BT Alex Brown, which allegedly had motivation to keep the price as low as possible and to ensure that Kelso was the winning bidder

6 The proxy statement included a fairness opinion prepared by BT Alex Brown, and stated that in reaching its opinion, BT Alex Brown relied upon data prepared by management and publicly available research analysts' estimates, when the estimated financial data upon which BT Alex Brown relied actually was prepared by Unilab alone and did not include projections of benefits from Unilab's recent Meris and Bio-Cypher acquisitions

7 The Unilab net income figure for the last twelve months that was included in the proxy allegedly was understated because it did not include the benefit of Unilab's net operating loss carry forwards

8 BT Alex Brown allegedly did not use appropriate

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

discount rates in the proxy, making the "discounted [*7] cash flow analysis" materially false and misleading Moreover, the inclusion of "Projections" and the description of a discounted cash flow analysis made it appear that BT Alex Brown had discounted the projections in arriving at its range of fairness, when, it is alleged, it had not

The supplemental proxy disclosed BT Alex Brown's compensation from Unilab and Kelso, BT Alex Brown's intent to make an equity investment in UC Acquisition Sub, and the failure to include net operating loss carryforwards in BT Alex Brown's discounted cash flow analysis, but it did not correct the alleged misrepresentations and omissions regarding the auction process, the fairness opinion, the failure to use appropriate discount rates, the failure to include the benefits of the Meris and BioCypher acquisitions in the cash flow figures, the true reason why EOS and Pequot would retain their shares after the merger, the fact that only one analyst followed Unilab and that Unilab employees had urged her to reduce her price projections for the company, and the benefit realized by Oakland due to Unilab's failure to prepay its note

*Section 14(a)* Claims

A motion to dismiss is directed to the sufficiency [*8] of the Complaint, and, for purposes of the motion, all of the material allegations of the Complaint are assumed to be true, and are viewed in the light most favorable to the plaintiff *Jenkins v McKeithen* 395 U S 411, 423. 89 S Ct 1843. 1849. 23 L Ed 2d 404 (1969); *Harris v City of New York* 186 F 3d 243, 247 (2d Cir 1999). The motion may be granted only if it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief *Minzer v Keegan* 218 F 3d 144, 148 (2d Cir 2000), cert denied, 531 U S 1192, 149 L Ed 2d 106, 121 S Ct 1190 (2001)

The *Private Securities Litigation Reform Act of 1995* ("PSLRA") dictates the pleading standards for Plaintiffs' claim under § 14(a) of the *Securities Exchange Act and Rule 14a-9* The PSLRA requires that the complaint specify each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity upon which that belief is formed *15 U S C § 78u-4* [*9] *(b)(1)*. In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U S C § 78u-4(b)(2)* The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." *In re Champion. 145 F Supp 2d*

*871, 877 (E D Mich 2001)*(citing *Helwig v Vencor, 251 F 3d 540, 553 (6th Cir 2001)*, cert denied, *536 U S 935, 153 L Ed 2d 800, 122 S Ct 2616 (2002)*) However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. *Novak v Kasaks, 216 F 3d 300. 313-14 (2d Cir)*, cert denied, *531 U S 1012, 148 L Ed 2d 486. 121 S Ct 567 (2000)*

*Rule 14a-9* provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits [*10] to state any material fact necessary in order to make the statements therein not false or misleading

*17 C F R § 240 14a-9(a)*.

Thus, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction *Mills v Elec Auto-Lite Co . 396 U S 375. 384-85. 90 S Ct 616. 621-22, 24 L Ed 2d 593 (1970)*

Materiality

A plaintiff who charges that a statement or omission is materially false must show:

> a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

*TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)* [*11]

In the context of a merger, an omitted or misstated fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

On a motion to dismiss pursuant to *Rule 12(b)*, the Court may dismiss for lack of materiality only if the facts that are alleged to have been omitted or misleading are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re MCI World Com, Inc. Securities Litigation, 93 F. Supp. 2d 276, 282 (E.D.N.Y. 2000).* On the other hand, proxy materials need not be perfect. They need only convey a sufficiently accurate picture so as not to mislead. *Id.; Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 (2d Cir. 1978)*("Nit-picking should not become the name of the game.")

State of Mind

Although the Supreme Court has reserved decision on whether *scienter* is necessary for liability under *§ 14(a)*, *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1091 n.5, 111 S. Ct. 2749, 2757 n.5, 115 L. Ed. 2d 929,* the lower courts generally [*12] have held that the plaintiffs need prove only negligence when seeking to impose liability under that section and *Rule 14a-9.* In *Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298-1301 (2d Cir. 1973)*, the Second Circuit held that with respect to a corporate defendant, plaintiffs who "represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement . . . are not required to establish any evil motive or even reckless disregard of the facts." *Id., 478 F.2d at 1300.* n2 Numerous other courts have held that the negligence standard also applies to *§ 14(a)* claims against individual defendants. See, e.g., *Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 778 (3rd Cir. 1976); In re Trump Hotels Shareholder Derivative Litigation, 2000 U.S. Dist. LEXIS 13550, Nos. 96 Civ. 7820, 96 Civ. 8527, 2000 WL 1371317, *12 (S.D.N.Y. Sept. 21, 2000); In re Reliance Securities Litigation, 135 F. Supp. 2d 480, 511 (D. Del. 2001)*("In enforcing that standard, courts should apply the standard of due [*13] diligence rather than the standard of actual knowledge or gross negligence."); *In re McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000); Lichtenberg v. Besicorp Group, Inc., 43 F. Supp. 2d 376, 384-85 (S.D.N.Y. 1999)*, app. dism., *204 F.3d 397 (2d Cir. 2000); Katz v. Pels, 774 F. Supp. 121, 126 (S.D.N.Y.*

*1991)*("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure.").

> n2 In that case, the Second Circuit did "not pass on the principles that govern liability of directors and other individuals having some responsibility for the statement, as distinguished from a controlling corporation which has been the beneficiary of the action that was induced." *Gerstle v. GambleSkogmo, 478 F.2d at 1298.*

Therefore, under the standards imposed [*14] by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants. For this purpose, the corporation is assumed to know all that any of its agents know. *Gerstle v. Gamble-Skogmo, 478 F.2d at 1299.* However, with respect to the individual directors, the PSLRA has eliminated the "group pleading" doctrine. Therefore, Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held. *In re Reliance, 135 F. Supp. 2d at 507; In re Digital Island Securities Litigation, 223 F. Supp. 2d 546, 555 (D. Del. 2002)* (That insiders "must have known" true facts does not satisfy the relevant pleading requirements.); *In re NAHC, Inc. Securities Litigation, No. 004020, 2001 U.S. Dist. LEXIS 16754, *64 (E.D. Pa. Oct. 17, 2001)*(Under the PSLRA pleading requirements, general statements that a defendant must have been aware that statements were false by virtue of his position within the company are inadequate.). Moreover, where plaintiffs contend that the defendants had access to facts contrary to those stated in the [*15] proxy materials, they must specifically identify the reports or statements containing this information. *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)*, cert. denied, *531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000).*

Statements of Opinion

Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege "with particularity" "provable facts" to demonstrate that the statement of opinion is both objectively and subjectively false. *Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1093-98, 111 S. Ct. 2749, 2758-60, 115 L. Ed. 2d 929 (1991).* Thus, the plaintiff must show both that the directors did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect. *Id. at 2760* ("To recognize liability

Case 1:05-cv-00162-JJF    Document 33-12    Filed 06/17/2005    Page 6 of 22

Page 6

2003 U S. Dist. LEXIS 7838, *; Fed Sec. L. Rep. (CCH) P92,418

on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize *§ 14(a)* litigation confined solely to what one skeptical court spoke of as the 'impurities' of a director's 'unclean heart.'"); *In re Reliance Securities Litigation. 135 F Supp 2d 480. 514-15 (D Del 2001)* [*16] ("Disbelief or undisclosed motivation alone does not satisfy the element of fact that must be established under *§ 14(a)*")(quoting *Freedman v Value Health. Inc , 958 F Supp 745. 752 (D Conn 1997)*); *In re McKesson HBOC, Inc. Securities Litigation, 126 F Supp 2d 1248. 1260. 1265 (N D Cal 2000)*("While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held."; "Plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false ")

The Motions to Dismiss

Plaintiffs' claims fail to meet the demanding pleading standards set out by the PSLRA and in the cases An examination of the proxy and supplemental proxy reveals that although the disclosure with respect to the merger may not have been perfect, the "total mix" of information provided was complete and accurate enough to allow a shareholder to make an informed decision. Moreover, absent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs have not set out sufficient facts to support the conclusion [*17] that the proxy and supplemental proxy contained statements that were false and misleading

For example, Plaintiffs allege that it was not disclosed that the real reason why the Pequot Scott Fund and EOS Partners were allowed to retain 25% and 43% of their shares, respectively, in the merger, was to buy their votes in favor of the merger after they expressed dissatisfaction with the price However, in the proxy statement, it is stated that:

> although they would continue to have the opportunity to participate in any potential improvements of Unilab's business following the merger, the institutional stockholders of Unilab and members of Unilab's management in either case designated by UC Acquisition Sub and who agree to retain shares in the merger would, by that agreement, enable all other common stockholders to receive cash for all of their shares and ensure that the merger be accounted for as a recapitalization

The supplemental proxy elaborated further, identifying EOS Partners and Pequot Scott as the two institutional investors that would retain shares after the merger, stated the number of shares that each would retain, and stated that Mr Weavil would retain a small [*18] percentage of his shares Thus, the proxy does acknowledge that retaining Unilab shares would allow the institutional investors to participate in future improvements in the business In fact, the proxy makes no other statement regarding the funds' reasons or motivation for retaining a portion of their shares It simply does not say, or imply, that the funds agreed to retain shares in the company *in order to* benefit the other shareholders. Furthermore, Plaintiffs have done no more than speculate as to the "real motive" that they allege, and they do not explain why the Funds would agree to sell the majority of their shares at an inadequate price in return for the "opportunity" to keep fewer than half of their shares as compensation, given that the significant number of shares that they owned would have given them a fair chance of defeating the merger, had they sought to oppose it n3 Nor have Plaintiffs shown that the statement that the institutional shareholders' willingness to retain some of their shares would allow the company to purchase all of the public shareholders' tendered shares and account for the transaction as a recapitalization was, in fact, false

> n3 There was testimony during discovery that Pequot was "disappointed" by the merger price, but no evidence has been cited to support the claim that EOS Partners held the same view

[*19]

Plaintiffs also allege that the statement that the $5 85 buyout price was supported by the earnings estimates of independent research analysts (plural) was false and misleading because there was, in fact, only one analyst who covered Unilab stock, and Unilab employees had urged that analyst to reduce her estimates Assuming it is true that there was only one analyst, n4 this distinction is *de minimus* - and not a fact that would so alter the total mix of available information that it might change the vote of a reasonable shareholder Plaintiffs also have not pled facts to support the conclusion that simply because Unilab employees suggested to the analyst that she reduce her earnings estimates, either that her original estimates were not overly optimistic or that her judgment was so overborne that her estimates could no longer be considered independent.

> n4 Defendants argue that it was true that

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

there were at least two analysts covering Unilab because the Stephens report on Unilab was signed by two individuals

[*20]

Plaintiffs allege that the net income figures for the last twelve months that were included in the proxy statement were understated because they did not include Unilab's net operating loss carry forwards However, the supplemental proxy did state that net operating loss carry forwards were not factored into the discounted cash flow analysis performed by BT Alex Brown in connection with its fairness opinion. Even if this statement addresses a slightly different issue, it would put a reasonable investor at least on inquiry notice as to the inclusion of such figures in Unilab's cash flow analyses and income figures

Plaintiffs assert that the directors' recommendation that the shareholders vote to approve the merger was misleading because the financial projections that were included in the proxy were not the same as those used by BT Alex Brown in rendering its fairness opinion to the Board, and using the same projections would have yielded an implied range of values $ 1 95 higher than the range of values presented to the Board However, the fairness opinion does not set out or otherwise state what financial projections BT Alex Brown relied on in preparing its opinion n5 In addition, [*21] the proxy contained a "Cautionary Statement Regarding Forward-Looking Statements" that was more than a full page long As the Court stated in *Rodman v Grant Foundation, 608 F 2d 64, 72 (2d Cir 1979)*, a company has no duty to include "speculative financial predictions" in a proxy

n5 The Fairness Opinion stated that BT Alex Brown had "(i) reviewed the reported prices and trading activity for Unilab Common Stock, (ii) compared certain financial and stock market information for Unilab with similar information for certain other companies whose securities are publicly traded, (iii) reviewed the financial terms of certain recent business combinations which it deemed comparable in whole or in part, (iv) reviewed the terms of a draft of the Merger Agreement dated May 24, 1999, and (v) performed such other studies and analyses and considered such other factors as it deemed appropriate "

Therefore, if anything, Plaintiffs' allegations regarding BT Alex Brown's financial analyses would tend to support [*22] a claim that the Board was misled by BT Alex Brown, not that the Board misled the public shareholders Furthermore, if it is true that the proxy statement contained projections that yielded a higher range of values than those presented to the Board, the shareholders were, in fact, given the information from which they could have concluded for themselves that the merger price was not adequate That is all that § 14(a) requires

The plaintiffs allege that BT Alex Brown did not use appropriate discount rates, making the discounted cash flow analysis contained in the "Projections" section of the proxy materially false and misleading It is clearly stated, however, in that section, that the projections were prepared for the company's internal purposes, and are included in the proxy only because they were furnished to UC Acquisition Sub and Kelso in connection with the negotiation of the Merger Agreement n6 It stated further that

It is not possible to predict whether the assumptions made in preparing the projected financial information will be valid, and actual results may prove to be materially higher or lower than those contained in the projections The inclusion of this information [*23] should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events, and this information should not be relied on as such None of the Company, UC Acquisition Sub or any of their respective representatives assumes any responsibility for the validity, reasonableness, or completeness of the projected financial information, and the Company has made no representation to UC Acquisition Sub regarding such information

Thus, absent a showing that BT Alex Brown knowingly used inappropriate rates in order to mislead the shareholders, or incompetently did so, and that the Board was negligent in its failure to discover this lack of care, this allegation cannot support a claim under § 14(a)

N6 There is no allegation that this statement is untrue

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

Plaintiffs allege that the fairness opinion prepared by BT Alex Brown and attached to the proxy statement falsely stated that BT Alex Brown had relied on estimated [*24] financial data from management and publicly available research analysts' estimates, when, in fact, the data was prepared by Unilab alone, and did not include benefits from the recent acquisitions of Meris and Bio-Cypher However, the fairness opinion states that:

> in arriving at its opinion, BT Alex Brown has reviewed certain publicly available financial and other information concerning Unilab and certain internal analyses and other information furnished to or discussed with it by Unilab and its advisors. BT Alex Brown has also held discussions with members of the senior management of Unilab and Kelso regarding the business and prospects of Unilab

Proxy at B-1

Nowhere in this statement, nor in the rest of the paragraph detailing analyses and reviews conducted by BT Alex Brown, is there mention of research analysts' estimates The statements to which Plaintiffs object are located on page 22 of the proxy in the sections titled, "Analysis of Selected Public Companies" and "Analysis of Selected Precedent Transactions " Plaintiffs do not state on what information they base the allegation that BT Alex Brown did not look at analysts' reports, but assuming that to be [*25] true, it is a *de minimus* misstatement, which would not have affected a reasonable shareholder's vote with respect to the merger, especially in light of the statement that

> The above summary is not a complete description of the opinion of BT Alex Brown to the Board of Directors or the financial analyses performed and factors considered by BT Alex Brown in connection with its opinion. The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, a fairness opinion is not readily susceptible to summary description BT Alex Brown did not form a conclusion as to whether any

single factor or analysis, considered in isolation, supported or did not support an opinion as to fairness from a financial point of view Rather, BT Alex Brown believed that the totality of the factors considered and analyses performed by it in connection with its opinion operated collectively to support its determination as to the fairness of the Common Stock Merger Consideration from a financial point of view [*26] Accordingly, BT Alex Brown believes that its analyses and the summary above must be considered as a whole and that selecting portions of its analyses and factors or focusing on information presented in tabular format, without considering its analyses and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying BT Alex Brown's analyses and opinion.

Proxy at 24 n7

> n7 If Plaintiffs' complaint is that there was only one analyst who covered Unilab, that misstatement (if it actually is a misstatement, given that the Stephens report is signed by two analysts), it cannot be found, as stated previously, that such a discrepancy would affect the vote of a reasonable shareholder with respect to the merger To allow this action to continue on the basis of discrepancies of this type would violate the direction that "nitpicking should not become the name of the game " *Kennecott Copper Corp v Curtiss Wright Corp , 584 F 2d 1195. 1200 (2d Cir 1978)*

[*27]

Furthermore, Plaintiffs present no reason to doubt that BT Alex Brown "reviewed certain publicly available financial and other information concerning Unilab," including Unilab's public SEC filings, which are themselves incorporated by reference into the proxy statement. In addition, the proxy stated that the "Company's management believed that the Meris acquisition offered a strong opportunity for the Company " (Proxy at 15) The proxy also referenced both the Meris and the Bio-Cypher transactions in the Note on page 11, which stated that the variation in year-to-year financial results were primarily due to the acquisition of

2003 U S Dist LEXIS 7838, *; Fed Sec L Rep (CCH) P92,418

Bio-Cypher Laboratories on May 6, 1999, and of Meris on November 5, 1998

Some of Plaintiffs' other claims of failure to disclose cannot support a cause of action pursuant to § 14(a) because they are actually claims of breach of fiduciary duty or corporate waste. n8 For example, Plaintiffs claim that the Board failed to disclose that it had declined to exercise a prepayment option on a $ 14 million note held by Oaktree, which was convertible into Unilab stock, in order to give Oaktree additional consideration for its shares and gain Oaktree's support for the [*28] buyout While apparently pled in order to demonstrate that Oaktree realized that the merger price was unsatisfactory and that the Defendants had to use such a device to secure Oaktree's vote in favor of the merger, there is nothing in the Complaint to support Plaintiffs' conclusion that the failure to prepay the note was a way of giving Oaktree additional consideration for its shares and thereby buying Oaktree's vote Absent that speculative and conclusory extrapolation, all that is alleged is that the Unilab Board's treatment of the Oaktree note violated the duty to protect corporate assets for the benefit of all of the shareholders

n8 Since the waste of corporate assets affects all shareholders equally, it is a derivative claim, which is extinguished upon completion of a merger Behrens v Aerial Communications, Inc , Civil Action No 17436, 2001 Del Ch LEXIS 80. *19 (Del Ch May 18. 2001), revised, 2001 Del Ch LEXIS 80 (Del Ch May 22, 2001)

The breach of such a fiduciary [*29] duty does not give rise to a securities law claim, however Section 14(a) and Rule 14a-9 relate only to disclosure obligations They do not give rise to a cause of action for breach of fiduciary duty, or even for Plaintiffs a right to an advantageous price, or even a fair price for their shares Minzer v Keegan, 218 F 3d 144, 151 (2d Cir 2000), cert. denied, 531 U S 1192. 149 L Ed 2d 106, 121 S Ct 1190 (2001)(There is no § 14(a) violation for merely failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders ); Mendell v Greenberg, 938 F 2d 1528, 1529 (2d Cir 1991)("Securities laws do not guarantee sound business practices and do not protect investors against reverses "); see In re PHLCORP Securities Tender Offer Litigation. 700 F Supp 1265, 1269 (S D N Y 1988)(stating, in the context of a § 14(e) case, that as long as the relevant underlying facts are disclosed, the securities laws do not require insiders to characterize conflict of interest transactions with pejorative nouns or adjectives)(citing Goldberg v Meridor. 567 F 2d 209. 218 n 8 (2d Cir 1977), [*30] cert denied, 434 U S 1069. 55 L Ed 2d 771, 98 S Ct 1249 (1978))

Furthermore, claims based on Defendants' failure to disclose past acts that may have negatively impacted the value of Plaintiffs' shares do not state a cause of action pursuant to § 14(a) because knowledge of those facts, which would tend to support a conclusion that the corporation was worth less than the value attributed to it by the market, would not have influenced a reasonable shareholder to decline to sell his or her shares and reject the merger Minzer v Keegan, 218 F 3d at 149; In re McKesson HBOC. Inc Securities Litigation, 126 F Supp 2d 1248. 1260 (N D Cal 2000)

Plaintiffs' claims relating to the statements regarding the auction process through which Unilab found a buyer for the company are somewhat similar in that they have more weight as complaints about the way the Board conducted the process, than about the disclosure related to that process Plaintiffs allege that the statement that the auction process ensured that the buyout price was fair was false and misleading because it did not reveal either the full extent of BT Alex Brown's [*31] role throughout that process or BT Alex Brown's alleged motivation to keep the price low and to ensure that Kelso was the ultimate purchaser, and did not reveal that the special committee appointed to supervise the final negotiations with Kelso allegedly abdicated its responsibilities and left those negotiations entirely in BT Alex Brown's hands

However, an examination of the proxy statement and supplemental proxy reveals that the disclosure on these subjects was at least adequate to place a reasonable shareholder on inquiry notice as to the relevant facts. The original proxy stated that BT Alex Brown had acted as a financial advisor to Unilab in connection with the merger and would receive a fee for its services, "a significant portion of which is contingent upon the consummation of the merger," that BT Alex Brown would be participating in the financing of the merger, and that it had provided financial services to both Unilab and Kelso in the past The supplemental proxy added more specific information about BT Alex Brown's role in the financing of the merger, and stated that an affiliate of BT Alex Brown would act as "lead arranger, book manager, administrative agent and a lender [*32] under Unilab's new credit facility," and as a deal manager for Unilab's repurchase of its outstanding notes, and it set forth the fees that BT Alex Brown would receive for those services It also stated that BT Alex Brown and Kelso anticipated that an affiliate of BT Alex Brown would make an approximately $ 2 to $ 3 million investment in UC Acquisition Sub Plaintiffs have presented no facts

beyond those set forth in the proxy and supplemental proxy with respect to BT Alex.Brown's role to support their contention that BT Alex.Brown was motivated to keep the price to be paid for the shares as low as possible, n9 and to ensure that Kelso was the ultimate purchaser.

> n9 The proxy states that upon completion of the merger, BT Alex.Brown would receive an aggregate financial advisory fee equal to 1% of the aggregate consideration paid, a fact that would make it in BT Alex.Brown's interest to negotiate a higher share price. On the other hand, BT Alex.Brown's role as an equity investor in the new company, which is disclosed in the supplemental proxy, creates an interest in a lower price. Regardless of what BT Alex.Brown's motivations may have been in this regard, its multiple roles were disclosed to the Unilab shareholders.

[*33]

According to Plaintiffs, the strongest evidence that the disclosure in the proxy materials was misleading is the fact that eighteen months later, UC Acquisition Sub shares sold for as much as $ 17.15 (or 300%) more than the price paid in the merger, even though the stock market fell generally over that period of time. Defendants respond that this argument constitutes an impermissible attempt to plead fraud by hindsight. "Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.), cert. denied, 531 U.S. 1012. 148 L. Ed. 2d 486. 121 S. Ct. 567 (2000). See also *In re NAHC, Inc Securities Litigation*, No. 00-4020, 2001 U.S. Dist. LEXIS 16754. *34 (E.D. Pa. Oct. 17, 2001), aff'd, 306 F.3d 1314 (3rd Cir. 2002)("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.") The mere fact that the shares increased in value over the eighteen months subsequent [*34] to the merger does not, in itself, constitute any evidence of a securities law violation.

Furthermore, Defendants indicated in the proxy statement that they believed that Unilab stock was worth more than its current market price. The proxy stated, "Notwithstanding the significantly improved financial performance, the Company's stock price was essentially flat. As a result, the Company believes its historical stock market price has not fully reflected the Company's true

value." (Proxy at 15). In fact, it is stated that this was a major reason for seeking a purchaser for the company. In addition, the section titled "Historical and Recent Market Prices Compared to Consideration to be Received by Holders of Common Stock" showed that over the 2-1/2 to 3 months prior to the issuance of the proxy statement, the price of Unilab shares had risen markedly (Proxy at 18), and the "Premiums Analysis" in the proxy showed that the premium implied in the merger had decreased from 122.9% in March 1999, to 53.4% in April, to 18.5% on the day prior to the public announcement of the merger. (Proxy at 23). For the reasons stated, none of the misstatements or omissions alleged by Plaintiffs can pass the [*35] materiality test of § 14(a). Moreover, even if one or more of the alleged misstatements or omissions were actually false and misleading, and could, in fact, have altered the "total mix" of available information in a way that might have caused a reasonable shareholder to withhold his or her vote for the merger, Plaintiffs have not shown that the directors were negligent in their failure to disclose that information in the proxy materials. Given that knowledge cannot be attributed to directors simply by virtue of their positions, it is difficult to imagine that the directors knew or should have known of the alleged flaws in the financial analyses, which allegedly were so hidden that Plaintiffs' counsel, who engaged in exacting scrutiny and began confirmatory discovery prior to the approval of the merger, and who are experts in this field, were satisfied with the supplemental proxy. In fact, Plaintiffs allege that due to BT Alex.Brown's overreaching, the directors were affirmatively misled by BT Alex.Brown. In addition, they claim that despite diligent inquiry, they themselves were not able to discover the true facts until November 1, 2000. Thus, Plaintiffs present no support either [*36] for the proposition that the directors did not believe that the price paid for the shares in the merger was fair from a financial point of view, and that it was in the best interests of the shareholders generally, or that they were negligent in not discovering that their belief was incorrect.

In this regard, it is extremely significant that all of the defendant directors sold all or most of their Unilab shares for the same $ 5.85 buyout price that was paid to the public shareholders. The one exception was defendant Weavil, who retained less than 6% of his shares (85,000 out of total holdings of 1,487,428 shares). As the Second Circuit stated in *Shields v. Citytrust Bancorp, Inc*. 25 F.3d 1124, 1130 (2d Cir. 1994), we must "assume the [director] defendant[s are] acting in [their] informed economic self-interest." See also *Kalnit v. Eichler*, 264 F.3d 131. 141 (2d Cir. 2001)("Where plaintiff's view of the facts defies economic reason, . . . it

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

does not yield a reasonable inference of fraudulent intent "; achieving a superior merger would have benefitted all shareholders, including defendants) Thus, achieving a higher price for the shares would [*37] have benefitted the directors, and particularly defendant Weavil, whose holdings were substantial.

Plaintiffs attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price, and therefore they had no motivation to ensure that the shareholders receive the highest price possible. This, however, does not negate these directors' self-interest in achieving a higher price for their shares. Since it is very common for directors and officers of a company to be given the opportunity to purchase shares at below market prices, acceptance of Plaintiffs' theory in this regard, without a further factual showing, would raise suspicion about directors' and officers' "conflicts" in any case where directors and officers have been given such opportunities. Furthermore, the proxy contains full disclosure as to the exercise prices of the directors' options (Proxy at 47) *Section 20(a) Control Person Liability*

In order to maintain a cause of action for control person liability under § 20(a), *15 U.S.C. § 78t(a)*, plaintiffs must establish: (1) an underlying violation [*38] by a control person or entity; (2) that the defendants are controlling persons; and (3) that the defendants were in some meaningful sense culpable participants in the fraud. *In re Digital Island Secs. Litigation. 223 F. Supp. 2d 546, 560 (D. Del 2002)*. Since the Complaint fails to state an underlying violation of § 14(a), plaintiffs' claims pursuant to § 20(a) must be dismissed as well. *Feasby v Industri-Matematik Int'l Corp., 2000 U.S. Dist. LEXIS 9792. No. 99 Civ. 8761. 2000 WL 977673, *7 (S.D.N.Y. July 17, 2000); Ellison v American Image Motor Co., 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999)* This being the case, there is no need to determine whether the defendant directors were controlling persons within the meaning of the securities laws and whether they were culpable participants in an underlying securities violation.

State law claims

Plaintiffs have alleged state law claims of breach of fiduciary duty against the directors, and of fraud and deceit against the directors and Unilab. Since jurisdiction over these claims is asserted solely on the basis of the Court's supplemental jurisdiction pursuant to *28 U.S.C § 1367*, [*39] and the court has found that the securities law claims over which it has original jurisdiction should be dismissed, there is no reason or basis upon which to

retain supplemental jurisdiction over the state law claims. *United Mine Workers v Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130. 1139, 16 L. Ed. 2d 218 (1966); Leyh v Property Clerk of City of New York Police Dep't. 774 F. Supp. 742. 747 (E.D.N.Y. 1991)* Therefore, Plaintiffs' state law claims shall be dismissed as well.

Claims Against BT Alex.Brown

Plaintiffs added BT Alex.Brown as a defendant in this action in an Amended Complaint filed in September 2001 They asserted claims against BT Alex.Brown under § 14(a), for aiding and abetting the directors' breach of their fiduciary duties, fraud and deceit, and negligent misrepresentation. BT Alex.Brown contends that the § 14(a) claim should be dismissed because it did not participate in the solicitation of proxies and there was no substantial connection between the use of BT Alex.Brown's name and the solicitation effort, see *Lazzaro v Manber, 701 F. Supp. 353, 367 (E.D.N.Y 1988)*, and because the claims are time-barred. [*40] The statute of limitations applicable to the § 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less. *Ceres Partners v GEL Associates, 918 F.2d 349, 362-63 (2d Cir. 1990)* Although the original Complaint was filed in this action in November 1999, Plaintiffs did not name BT Alex Brown as a defendant until nearly two years later. BT Alex Brown contends that Plaintiffs were on inquiry notice as to its role in the merger as of November 1999, causing the one year limitations period to begin to run. Plaintiffs argue that they did not learn the true facts of BT Alex.Brown's involvement until they took BT Alex Brown's deposition in November 2000, and that therefore the limitations period should not expire until November 2001

In *LC Capital Partners v. Frontier Ins. Group, 318 F.3d 148 (2d Cir. 2003)*, the Second Circuit stated:

> The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action *or notice of the facts, which in the exercise of reasonable diligence, would* [*41] *have led to actual knowledge* "

*318 F.3d at 154* (citing *Kahn v Kohlberg, Kravis, Roberts & Co. 970 F.2d 1030, 1042 (2d Cir.)*, cert. denied, *506 U.S. 986, 121 L. Ed. 2d 432, 113 S. Ct. 494 (1992)*)(emphasis in original)

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

In LC Capital Partners, the Court elaborated:

> As we have explained, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." "Such circumstances are often analogized to 'storm warnings'"
>
> The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor "in the exercise of reasonable diligence, should have discovered" concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud

*Id.* (citations omitted)

In [*42] this case, Plaintiffs claim that because they began to make inquiry immediately upon issuance of the proxy, in late October/early November 1999, knowledge of BT Alex.Brown's role should not be imputed until they actually learned all the facts in November 2000. This argument is unconvincing, however. *LC Capital Partners* holds that the running of the statute of limitations against a plaintiff who has attempted to make an inquiry and learn the facts will be delayed as compared to the application of the statute in a situation to a plaintiff who simply sat back and made no such attempt. However, this does not mean that a plaintiff can move that inquiry along slowly, limited only by the otherwise applicable three year maximum limitations period. Thus, the Second Circuit clearly referred to the point at which, "in the exercise of reasonable diligence, [the plaintiff] should have discovered" the facts of the alleged fraud as the point at which the statute of limitations begins to run

against a plaintiff who makes an inquiry. A minimal or lackadaisical investigation will not serve to extend the statute of limitations until the plaintiff actually learns facts that could have been discovered [*43] much earlier had a diligent investigation taken place

In this case, given that at least the basics of BT Alex.Brown's role as a key player on both sides of the merger was disclosed in the October 26, 1999 proxy statement, and elaborated in the supplemental proxy dated November 15, 1999, it is incomprehensible how Plaintiffs can claim that they were not sufficiently aware of BT Alex.Brown's involvement in this transaction to name it as a defendant in this action prior to its deposition in November 2000. Nor is it understandable how Plaintiffs can claim that they engaged in a diligent inquiry yet did not obtain the testimony of a BT Alex.Brown representative until a full year after the merger took place. Accordingly, the statute of limitations has run on Plaintiffs' § 14(a) claims against BT Alex.Brown, and those claims will be dismissed.

State Law Claims Against BT Alex.Brown

Since jurisdiction over the state law claims against BT Alex.Brown is founded on the Court's supplemental jurisdiction pursuant to *28 U.S.C. § 1367*, and the securities law claims against BT Alex.Brown are being dismissed, the state law claims against BT Alex.Brown shall be [*44] dismissed as well. See *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)*.

Conclusion

For the foregoing reasons, the securities claims asserted against Unilab and the director defendants in the Third Amended Complaint are dismissed pursuant to *Fed. R. Civ. P. Rules 12(b)(6) and 9(b)*, and *§ 21D(b) of the Securities Exchange Act for* failure to state a cause of action. The securities claims against BT Alex.Brown are dismissed as time-barred. Upon dismissal of all of the federal claims asserted in the Third Amended Complaint, the state law claims are dismissed as well.

**SO ORDERED.**

Dated: New York, New York

May 9, 2003

JOHN S. MARTIN, JR.

U.S.D.J.

1995 U.S. Dist. LEXIS 1945, *

LEXSEE 1995 US DIST LEXIS 1945

SHELLEY BROWN, Plaintiff vs. SHELDON SIEGEL, Individually and as President and Chief Executive Officer of WLVT-TV-39 Public Television, and WLVT-TV-39 PUBLIC TELEVISION, Defendants

CIVIL ACTION NO. 94-1829

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1995 U.S. Dist. LEXIS 1945*

February 10, 1995, Decided
February 13, 1995, FILED; February 14, 1995, ENTERED

LexisNexis(R) Headnotes

COUNSEL:    [*1]    For SHELLEY BROWN, PLAINTIFF: RICHARD F. STEVENS, ALLENTOWN, PA.

For SHELDON SIEGEL, Individually and as President and Chief Executive Officer and WLVT-TV-39 PUBLIC TELEVISION, WLVT-TV-39 PUBLIC TELEVISION, DEFENDANTS: JOHN J. SOROKO, DUANE, MORRIS & HECKSCHER, PHILA, PA. MAXWELL E. DAVISON, DUANE, MORRIS & HECKSCHER, ALLENTOWN, PA.

JUDGES: E. Mac Troutman, S.J.

OPINIONBY: E. Mac Troutman

OPINION:

### MEMORANDUM

This is an action pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") chapter of the Organized Crime Control Act of 1970, Pub. L. 91-452, Title IX, 84 Stat. 941, as amended, *18 U.S.C.A. § § 1961-1968* (West 1984 & Supp.), Subchapter 1 of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, Title I, 88 Stat. 832, as amended, *29 U.S.C.A. § § 1001-§ 1145* (West 1985 & Supp.), and various pendent state claims. Jurisdiction is based on federal question, *28 U.S.C.A. § 1331* (West 1994), and supplemental jurisdiction, *28 U.S.C.A. §*

*1367* (West 1994). Defendants have filed a motion to dismiss pursuant to *Fed. R. Civ. P.* [*2] *12(b)(6)* and *Fed. R. Civ. P. 12(b)(1)* and, for the reasons that follow, the motion will be granted.

### I. BACKGROUND.

Shelley Brown, the former Vice President for Development and Community Relations, as well as Executive Producer for Local Programming, at the defendant television station, WLVT, (Complaint P6), alleges that defendant Sheldon Siegel, President and CEO of WLVT, as part of a cover-up of his illegal activities, successfully waged a campaign to ruin her in retaliation for her disclosure of his illegal activities.

The illegal activities disclosed by plaintiff to William Greenawald, Vice Chairman of the Board of Directors of WLVT and a member of the executive committee, (Complaint P11), involved fraud and deception during the station's annual On Air Auction. In essence, Siegel, with the cooperation of volunteers, caused artificially inflated bid prices to be posted, thus causing viewer-bidders to pay more for auctioned items (the -- "auction scheme" or "auction fraud"). Plaintiff also reported that Siegel's management of the station was not in the best interest of the station, that is, he caused morale problems, used employees for personal gain, and spent money improperly   [*3]   (See generally Complaint P12.)

After plaintiff reported the situation to Greenawald, Siegel began to yell at plaintiff and lied about her to Board members, ordered her to move from her regular office into a smaller one, demoted plaintiff by changing

her title then later returning the title but no authority, and changed his belief that plaintiff should succeed him. (Complaint PP19-20.) Ultimately, Siegel's campaign resulted in plaintiff's "forced" resignation. (Complaint P31.)

## II. STANDARD OF REVIEW.

On motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the Court must accept as true all the well pleaded factual allegations, and all the reasonable inferences therefrom, in plaintiff's complaint; the Court must construe the complaint in a light most favorable to plaintiff; and the Court must determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Bensalem Township v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303.* reh'g en banc denied, *1994 U.S. App. Lexis 30669 (3d Cir. 1994)* "Dismissal is appropriate only if no relief could be granted under any set of facts [*4] which could be proved." *Gasoline Sales, Inc. v. Aero Oil Co., 39 F.3d 70, 71 (3d Cir. 1994)*, *Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1255 (3d Cir. 1994).* Bensalem Township, See also Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. ___, 114 S. Ct. 798, ___, 127 L. Ed. 2d 99, 107, reh'g denied, ___ U.S. ___ 114 S. Ct. 1340, 127 L. Ed. 2d 688 (1994). Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). Although the complaint need not state each element with precision, *Rose v. Bartle, 871 F.2d 331, 356 (3d Cir. 1989)*, it must, nonetheless, allege each element.

## III. DISCUSSION.

Under Count I against Siegel, and under Count II against WLVT, plaintiff's complaint asserts claims pursuant to RICO § 1964(c) for violations of *18 U.S.C.A. § 1962*(a)-(d). Similarly, plaintiff makes claims for violations of *29 U.S.C.A. § 1104* [*5] ERISA fiduciary duties against Siegel (Count III) and WLVT (Count IV).

### A. Civil RICO

In order to state a civil RICO claim pursuant to *18 U.S.C.A. § 1964*(c) (West 1984), plaintiff must allege (1) an injury to plaintiff's business or property as a result of (2) defendants' violation of one or more of the four substantive provisions of *18 U.S.C.A. § 1962.* See *Sedima. S.P.R.L. v. Imrex Co., 473 U.S. 479, 495, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).*

Generally, the four substantive provisions of RICO make it unlawful for: (a) any person to use or invest income obtained from a pattern of racketeering activity in an enterprise engaged in interstate commerce, *18 U.S.C.A. § 1962*(a) (West 1984); (b) any person to

control any enterprise engaged in interstate commerce through a pattern of racketeering, *18 U.S.C.A. § 1962*(b) (West 1984); (c) any person associated with any enterprise engaged in interstate commerce to conduct the affairs of the enterprise through a pattern of racketeering [*6] activity, *18 U.S.C.A. § 1962*(c) (West 1984); and (d) any person to conspire to violate § 1962(a), (b), or (c). *18 U.S.C.A. § 1962*(d) (West Supp. 1994).

Plaintiff has alleged that defendants violated each of the substantive provisions of § 1962. The court first will review civil RICO "standing" under § 1964(c) and, thereafter, each of the four substantive provisions of § 1962.

### 1. RICO Standing: § 1964(c)

Section 1964(c) of RICO provides a private civil remedy to "any person injured in his business or property by reason of a violation of section 1962 of this chapter...." To plead properly a civil RICO § 1964(c) claim, therefore, the complaint must allege, inter alia, "an injury to business or property by reason of [a violation of § 1962]." *Shearin v. E.F. Hutton Group. Inc., 885 F.2d 1162. 1164 (3d Cir. 1989)* This is commonly referred to as RICO standing. Id.

The Supreme Court, however, has rejected "but for" causation for civil RICO claims. *Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992)* [*7] Rather, a plaintiff must show, not only "but for" causation, but proximate causation as well. Id. at ___, 112 S. Ct. at ___, 117 L. Ed. 2d at 544. Civil RICO proximate causation is used "to label generically the judicial tools used to limit a person's responsibility for the consequences of the person's own acts." Id. At common law, this concept induced a "demand for some direct relation between the injury asserted and the injurious conduct alleged." Id. This "directness," although not the sole requirement, is one of the central elements of causation which "apply with equal force to suits under § 1964(c)." Id. at ___, 112 S. Ct. at ___, 117 L. Ed. 2d at 545.

The elements for each of the four substantive RICO provisions differ somewhat; thus, each will be reviewed separately. n1 Analysis of each substantive provision also will include a review of whether plaintiff's complaint can reasonably be read to allege RICO standing for each substantive provision, that is, whether the proper causal nexus between defendants' racketeering activities and her injury is alleged.

n1 Unfortunately, plaintiff's complaint does not plead separately the alleged violation of each

1995 U S Dist LEXIS 1945, *

subsection, leaving to the court the task of parsing out her complaint to be sure that each element of each subsection can be found somewhere within the complaint

[*8]

2. *18 U S C A § 1962*(a) n2

n2  *18 U S C A §  1962*(a) (West 1984) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce

To state properly a §  1964(c) civil RICO claim arising from a violation of §  1962(a), a plaintiff must allege: (1) defendant obtained income from a pattern of racketeering activity; (2) defendant invested such income in an enterprise engaged in interstate commerce; and (3) an injury resulting [*9]  from the investment of such racketeering income distinct from an injury suffered from the predicate acts themselves  See *Lightning Lube, Inc  v Witco Corp ,  4  F 3d  1153,  1188  (3d Cir  1993), Brittingham v Mobil Corp ,  943 F 2d 297, 303 (3d Cir 1991)* (citing *Rose, 871 F 2d at 358), Shearin, 885 F 2d at 1165, Rose, 871 F 2d at 357,*

Under subsection (a), the enterprise and the defendant need not be distinct, separate entities  *Shearin, 885 F 2d at 1165*

Assuming, arguendo, that plaintiff  properly has pleaded all the requirements of the first two aspects of her claim, the court concludes that her complaint fails on the third aspect  The United States Court of Appeals for the  Third  Circuit has held, "repeatedly,"  that  an

allegation "that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff -- is insufficient to meet the injury requirement of section 1962(a) "  *Shearin, 885 F 2d at 1165* (discussing Brittingham [*10]   and *Glessner v Kenny, 952 F 2d 702 (3d Cir  1991) )*

Plaintiff's complaint states just such an injury, e g , Siegel invested the monies "in the operation of [the] corporation to further its affairs; to ensure Defendant Siegel's power and control of the corporation; to obtain further  funding  from  the  Corporation  for  Public Broadcasting;  to  bolster  Defendant  Siegel's  own reputation  and  to  cover-up  the  illicit  scheme " (Complaint P35); the scheme enabled Siegel "to maintain power  and  control  at  [WLVT]"  and  to  obtain  even greater  funds  from  the  Corporation  for  Public Broadcasting, (Complaint P42); the scheme permitted Siegel to "maintain control of [WLVT] by ensuring the continued financial success of [WLVT] as well as by making himself appear successful," (Complaint P46); Siegel used the auction scheme income "to invest in the future operation of the corporate enterprise of [WLVT] as well as to ensure the maintenance of his own position at [WLVT] and his control of the station " (Complaint P48)  It was, according to the plaintiff's complaint, generally, Siegel's power and control, maintained by the auction fraud, which led to plaintiff's injury  (Complaint [*11]  PP5, 58-62 )  In other words, but for  the auction fraud, Siegel would not have maintained his power and control and would not have injured plaintiff  See also, e g , *Brittingham, 943 F 2d at 304-05* ("plaintiffs allege injury from the use or investment of racketeering income only to the extent that reinvestment of the proceeds of prior  frauds  permitted  defendants  to  continue  their fraudulent scheme " Such a causal connection is "tenuous at best  Plaintiffs have neither alleged nor demonstrated a connection with the use or investment of racketeering income other than the normal reinvestment of corporate profits ")

In the current matter, the causal connection between the  claimed  injury,  forced  resignation,  and  the reinvestment of racketeering money, is tenuous  The alleged injury could be said to have come about because of Siegel's campaign against plaintiff, but not because of any investment of racketeering monies

With regard to WLVT, the complaint is simply void of any sustainable allegation sufficient to state a claim under subsection (a)

Plaintiff's complaint fails to state a §  1964(c) civil RICO claim for acts allegedly arising from defendants' [*12]  violation of §  1962(a)

1995 U.S. Dist. LEXIS 1945, *

3  *18 U.S.C.A. § 1962*(b). n3

n3  *18 U.S.C.A. § 1962*(b) (West 1984)
provides:

It shall be unlawful for any person
through a pattern of racketeering
activity or through collection of an
unlawful debt to acquire or
maintain, directly or indirectly,
any interest in or control of any
enterprise which is engaged in, or
the activities of which affect,
interstate or foreign commerce.

To state a § 1964 civil RICO claim arising from a
violation of § 1962(b), plaintiff must allege (1) a specific
nexus between defendants' acquisition or control of the
enterprise and the alleged racketeering activity, *Lightning
Lube, 4 F.3d at 1190, Kehr Packages, Inc. v. Fidelcor,
Inc., 926 F.2d 1406, 1411 (3d Cir.), cert. denied, 501
U.S. 1222, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991).*
and (2) an injury by defendants' [*13] acquisition or
maintenance of control over the enterprise. *Gasoline
Sales, 39 F.3d at 72.* "It is not enough for a plaintiff
merely to show that a person engaged in racketeering has
an otherwise legitimate interest in an enterprise." 
*Lightning Lube, 4 F.3d at 1190, Kehr Packages, 926
F.2d at 1411.*

There is no allegation that Siegel obtained his
position through illegitimate means; plaintiff alleges,
however, that Siegel maintained his position through a
pattern of racketeering activity. As in *Lightning Lube, 4
F.3d at 1191,* however, the court concludes that
plaintiff's allegation "merely parrots the same injury that
section 1962(c) is meant to remedy . . ." By alleging that
Siegel, the President and CEO of WLVT, who "at all
times material hereto, . . . was acting within the course and
scope of his employment . . . and in furtherance of the
business interests of [WLVT]," (Complaint P9), engaged
in a pattern of racketeering to maintain control over
WLVT, plaintiff's complaint does no more than allege
that Siegel conducted the affairs of WLVT through a
pattern of racketeering [*14] activity, that is, in violation
of § 1962(c).

Moreover, it is also counter intuitive to assert that an
enterprise, i.e., WLVT, could gain or maintain control of
itself through a pattern of racketeering activity. The
complaint is simply void of any sustainable allegation
sufficient to state a claim against WLVT under

subsection (b).

Plaintiff's complaint fails to state a § 1964(c) civil
RICO claim for acts allegedly arising from defendants'
violation of § 1962(a).

4  *18 U.S.C.A. § 1962*(c). n4

n4  *18 U.S.C.A. § 1962*(c) (West 1984)
provides:

It shall be unlawful for any person
employed by or associated with
any enterprise engaged in, or the
activities of which affect, interstate
or foreign commerce, to conduct
or participate, directly or
indirectly, in the conduct of such
enterprise's affairs through a
pattern of racketeering activity or
collection of unlawful debt.

To state a § 1964(c) civil RICO claim arising from a
violation of [*15] § 1962(c), the plaintiff must allege
(1) an enterprise, (i) separate and distinct from the
defendants, (ii) affecting interstate commerce; (2)
defendant was associated with the enterprise; (3)
defendant participated in the conduct or affairs of the
enterprise; (4) defendant so participated through a pattern
of racketeering activity, *Sedima, 473 U.S. at 496;
Gasoline Sales, 39 F.3d at 72-73, Shearin, 885 F.2d at
1165,* and (5) "[plaintiff] has been injured in his business
or property by the conduct constituting the violation."
*Sedima, 473 U.S. at 496.*

Unlike subsection (a), which requires that plaintiff
be injured by way of the use or investment of
racketeering income, under subsection (c), a plaintiff may
recover for injuries caused by the predicate act
themselves as subsection (c) requires only that the
defendant's racketeering activity be the proximate cause
of plaintiff's injuries. *Brittingham, 943 F.2d at 303-04.*

An Enterprise n5

n5  Enterprise is defined to include
individuals, legal entities, and any "group of
individuals associated in fact although not a legal
entity." *18 U.S.C.A. § 1961*(4) (West 1984) An
enterprise under subsections (a) and (b) is
"something acquired through the use of illegal
activities or by money obtained from illegal

activities; it is the victim of unlawful activity." Scheidler, 510 U.S. at , 114 S. Ct. at , 127 L. Ed. 2d at 109. The enterprise in subsection (c) "connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity... Since the enterprise in subsection (c) is not being acquired, it need not have a property interest than can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity." Scheidler, 510 U.S. at , 114 S. Ct. at , 127 L. Ed. 2d at 109 (footnote omitted). Under any subsection, however, the enterprise need not be legitimate nor possess any economic motivation. Id.

[*16]

Although the definitions of person and enterprise are broad, the defendants must be sufficiently distinct from the enterprise, however, to have conducted the enterprise within the meaning of § 1962(c). *Gasoline Sales, 39 F.3d at 72-73*

Plaintiff has not clearly pleaded the enterprise element of her subsection (c) claim. The complaint states: "Defendant Sheldon Siegel also participated in the conduct of the affairs of Channel 39 through a pattern of racketeering activity...", (Complaint P51), thus intending WLVT as the subsection (c) enterprise. The complaint also states the subsection (c) enterprise to be the association in fact between Siegel and the auction volunteers: "employed by or associated with any enterprise (this use of enterprise refers to the association in fact of Siegel and the volunteers)..." (Complaint P51)

An enterprise under subsection (c) is "the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., CA Nos. 93-5783, 93-5784 slip op. at 15, *1995 U.S. App. Lexis 852, 1995 WL 15932* [*17] (3d Cir. Jan. 18, 1995) (quoting Scheidler, 510 U.S. at , 114 S. Ct. at 804, 127 L. Ed. 2d at 109; Reves v. Ernst & Young, U.S.  , , 113 S. Ct. 1163, 1171, 122 L. Ed. 2d 469, (1993)). Therefore, "a claim against one corporation as both 'person' and 'enterprise' is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant 'persons' acting through a distinct 'enterprise'" Jaguar Cars, CA No. 93-5783, slip op at 17-18. "[A] corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise'..." Jaguar Cars, CA No. 93-5783, slip op. at 18

Only persons can be sued under § 1962(c). Id.; *Gasoline Sales, 39 F.3d at 73* (citing *Petro-Tech, Inc. v. Western Co of N. Am., 824 F.2d 1349, 1358 n.* (3d Cir. 1987). An enterprise, such as WLVT, cannot conduct itself within the meaning of § 1962(c) and, thus, plaintiff cannot sue WLVT under subsection (c) as a person if it is also the enterprise. *Gasoline Sales, 39 F.3d at 73* [*18] (citing *Kehr Packages, 926 F.2d at 1411, Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990), B.F. Hirsch v. Enright, 751 F.2d 628, 633-34 (3d Cir. 1984)*). As an enterprise cannot conduct itself in violation of § 1962(c), it likewise cannot be vicariously or directly liable for violations of § 1962(c) committed by its employees. *Gasoline Sales, 39 F.3d at 73* (citing *Kehr Packages, 926 F.2d at 1411, Petro-Tech, 824 F.2d at 1351, 1358-60*)

Because the subsection (c) enterprise cannot also be a subsection (c) defendant, the court will presume that plaintiff intended to plead the association in fact of Siegel and the auction volunteers as the subsection (c) enterprise. Such an enterprise is separate and distinct from the defendants, thus permitting WLVT to be included among the defendants as plaintiff intended. (See Complaint PP65-71.)

Plaintiff has alleged that the enterprise affected viewer/bidders from New Jersey, and thus, satisfies the interstate commerce aspect n6

n6 The nexus with interstate commerce required for a RICO claim is minimal. *Rose, 871 F.2d at 357*

[*19]

Even thusly construed in a manner more favorable to plaintiff, however, the court nonetheless concludes that the complaint fails to state a claim as to WLVT. First, WLVT is not pleaded as a person within the association in fact. However, because of the way the court has construed the complaint, and again giving plaintiff a favorable construction, even if so pleaded, as a general matter a corporate enterprise cannot directly or vicariously be liable under § 1962(c) for conducting an enterprise with itself and its own employees, including volunteers acting for the benefit of the corporation, as the employees' actions are constructively the enterprise's own actions. *Gasoline Sales, 39 F.3d at 73* (citing *Lorenz v. CSX Corp., 1 F.3d 1406, 1411-13 (3d Cir. 1993); Glessner, 952 F.2d at 710-13. Brittingham, 943 F.2d at 302-03*) n7

1995 U.S. Dist. LEXIS 1945, *

n7 Plaintiff argues that an exception applies in her case. In Gasoline Sales, the court discussed such a hypothetical, narrow, and rare exception where the allegations are that the corporation "had a role in the racketeering activity that was distinct from the undertakings of those acting on its behalf." Gasoline Sales, 93-7555, slip op. at 6 (quoting *Brittingham, 943 F.2d at 302*). As in Gasoline Sales, the exception does not apply to plaintiff as she has not alleged WLVT to have acted in such a manner. Rather, the complaint clearly alleges that WLVT simply let its CEO run its affairs; she makes no allegation that WLVT ever was engaged in the racketeering activity in any distinct manner.

[*20]

Construing the subsection (c) enterprise as the association in fact between Siegel and the auction volunteers and the subsection (c) persons as Siegel and the auction volunteers, however, satisfies the enterprise element.

(b) Associated With.

The complaint properly alleges that Siegel was associated with the enterprise.

(c) Defendant Participated in the Conduct of the Enterprise.

Plaintiff's complaint properly pleads that Siegel participated in the conduct of, or conducted, the affairs of, the association in fact enterprise. Siegel invented the auction fraud scheme, (Complaint PP35, 36); participated in the auction fraud, (Complaint P46); and Siegel would determine which bids should be inflated. (Complaint P55.)

(d) Pattern of Racketeering Activity n8

n8 Racketeering activity is defined as any of a number of predicate offenses including, as alleged in this matter, mail and wire fraud. *18 U.S.C.A. § 1961*(1) (West Supp. 1994).

Pattern of racketeering activity is defined to be the commission of at least two acts of racketeering activity within a ten year period. *18 U.S.C.A. § 1961*(5) (West 1984). Proof of more than simply two predicate acts, however, is necessary. Plaintiff must show that the predicate acts are related and that they pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239,*

*109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*

[*21]

The complaint alleges that Siegel participated in the affairs of the enterprise through a pattern of racketeering activity. The claimed acts of wire fraud occurred, most recently on May 7, 1992, but have been "continuous and regular" for sixteen years. (See, e.g., Complaint P43.) The court concludes that plaintiff has properly pleaded a "pattern of racketeering activity".

(e) Injured by the Conduct Constituting the Violation.

Plaintiff's complaint fails to allege that defendants' "conduct constituting the violation" of § 1962(c), that is, a pattern of racketeering activity or the predicate acts, were the proximate cause of her injury, i.e., her forced resignation. To be sure, the complaint is detailed about Siegel's alleged scheme to ruin plaintiff as retaliation for her act of speaking out against Siegel's conduct of the affairs of WLVT; the complaint is also detailed about the racketeering activities and the auction fraud scheme; and plaintiff alleges: "Defendant[s'] participation in the overall scheme of the commission of the predicate acts and the coverup of those racketeering activities, ... which furthered the conspiracy, caused Plaintiff to suffer damage to her business [*22] and property -- i.e., it caused Plaintiff to lose her job," (Complaint P62), n9 but her resignation cannot reasonably be read to have occurred as the result of Siegel's acts of fraud nor does her complaint allege that the plan to ruin her amounted to a pattern of racketeering activity. Her pleading, missing the critical nexus between Siegel's scheme to ruin her and the claimed racketeering activities, alleges no more than the sort of "but for" causation rejected by the Supreme Court in Holmes.

n9 Despite the placement of this allegation with the conspiracy claim, and the explicit mention of the conspiracy, the court reads the complaint liberally to construe this, the most clear allegation of a link between the two schemes, that is, the auction fraud and the plan to ruin plaintiff, and plaintiff's injury, as an attempt to plead the necessary causal link. Although the court so reads her complaint, it cannot read this, or any other "constructive" allegation, as being sufficient in itself; otherwise, the need to plead properly would be ineffectual.

[*23]

Plaintiff's complaint fails to state a § 1964(c) civil

1995 U.S. Dist. LEXIS 1945, *

RICO claim for a violation of § 1962(c) against defendants

6 18 U.S.C.A. § 1962(d). n10

> n10 18 U.S.C.A. § 1962(d) (West Supp. 1994), the RICO conspiracy provision, provides:
>
>> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

To state a § 1964(c) civil RICO claim arising from a violation of § 1962(d), the plaintiff must allege (1) an agreement to commit the predicate acts; (2) knowledge of those acts as part of a pattern of racketeering in violation of (a), (b), or (c), Rose, 871 F.2d at 366; and (3) an injury proximately caused by the conspiracy. The complaint must describe, in at least a general way, the composition of the conspiracy, its objectives, and the defendant's role in the conspiracy. Shearin, 885 F.2d at 1166, Rose, 871 F.2d at 366 [*24] However, "any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." Lightning Lube, 4 F.3d at 1191, Jaguar Cars, CA No 93-5783, slip op. at 5

Because her claims under subsections (a), (b), and (c) fail, so must plaintiff's claim under subsection (d). n11

> n11 The court also concludes that plaintiff's complaint does not allege properly an exception under Shearin. First, the association in fact, as alleged in the complaint, was engaged only in the auction fraud and not in the retaliation campaign; thus, there was no alleged agreement or ratification by the association in fact of Siegel's vendetta against plaintiff Second, a fair reading of the complaint reveals that the vendetta was a pattern of retaliation and/or discrimination committed by Siegel. Third, it was not until after plaintiff disclosed the auction scheme that Siegel began his pattern of retaliation. His acts, thus, could not have been committed as part of a cover-up in furtherance of the conspiracy or prevent her from making further disclosures In this matter, the injury suffered, forced resignation, is temporally too remote from the alleged

conspiracy to commit acts of racketeering to fit within the Shear in exception.

Finally, the complaint alleges an intra-corporate conspiracy. Such an allegation is insufficient under § 1962(d). As noted earlier, the complaint alleges that at all times Siegel acted within the course and scope of his employment. The complaint also makes no allegation that the auction volunteers were not acting on behalf of WLVT or were acting for their own gain. The alleged conspiracy, therefore, was no more than a conspiracy "between an entity and itself, which is no conspiracy at all." Plemmons v. Pennsylvania Manu. Assoc. Ins. Co., CA No. 90-2495, 1991 US Dist. Lexis 9253, *17, 1991 WL 125982 (E.D. Pa. July 3, 1991).

[*25]

Plaintiff's complaint fails to state a § 1964(c) civil RICO claim against the defendants for a violation of § 1962(d).

B. ERISA.

Plaintiff brings this claim pursuant to 29 U.S.C.A. § 1132(a)(2) (West 1985) to seek relief for the defendants' breach of the fiduciary duties outlined under 29 U.S.C.A. § 1104 (West 1985 & Supp.). The relief permitted for such an action is listed at 29 U.S.C.A. § 1109 (West 1985) and is limited to, in essence, restitution to the plans for any loss incurred as a result of a breach, restoration to the plans of profits made from use of plan assets, and such other equitable relief deemed appropriate. n12

> n12 29 U.S.C.A. § 1109 (a) (West 1985) provides, in full:
>
>> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including

1995 U.S. Dist. LEXIS 1945, *

removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

[*26]

The relief allowed under § 1109 is for the benefit of the plan, not participants. In *Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985),* the Supreme Court addressed whether an ERISA fiduciary "may be held personally liable to a plan participant or beneficiary for extra-contractual compensatory or punitive damages caused by improper or untimely processing of benefit claims," that is, for a breach of fiduciary duty. *Id. at 136.* The Supreme Court held that "we do not find in [§ 1109] express authority for an award of extra-contractual damages to a beneficiary." *Id. at 144.* The textual context makes abundantly clear that recovery under § 1109 is for the benefit of the plan as a whole. *Id. at 140.* The "catch all" language, "such other equitable or remedial relief as the court may deem appropriate," does not change the analysis. *Id. at 141-42.* [*27] The United States Court of Appeals for the Third Circuit subsequently noted, in dicta, that § 1109 does not provide a recovery directly to participants: "[§ 1109] liability accrues only to the plan itself, not to participants suing in their individual capacities." *Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1162 n.7 (3d Cir. 1990)* (citing *Massachusetts Mut. Life Ins. Co., 473 U.S. at 140).* "Because plaintiffs here seek to recover benefits allegedly owed to them in their individual capacities, their action is plainly not authorized by ... [§ 1109] ...." *Id.*

In her complaint, plaintiff seeks relief, not for the benefit of the plan, but for herself. (See, e.g., Complaint P86 ("wherefore clause") ("benefits to which Plaintiff would have been entitled had Defendant[s] ... not breached [their] fiduciary obligations ...").) The court concludes that plaintiff fails to state a claim for relief allowed under § 1109 and enforceable via § 1132(a)(2). n13

n13 Neither party in this matter raised the issue of the propriety of the relief plaintiff seeks under § 1109. Nonetheless, and although it need not reach the matter, the court finds merit in defendants' argument that plaintiff is not a "participant" with proper standing to bring this claim. ERISA defines a participant as "any employee or former employee of an employer ...,

who is or may become eligible to receive a benefit or any type from an employee benefit plan which covers employees of such employer ...." *29 U.S.C.A. § 1002(6)* (West Supp. 1994). Assuming all else fits plaintiff's situation, e.g., there exists a plan, etc., in order for plaintiff to be able to press her ERISA claim, she must be considered one who may become eligible for a benefit.

In *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989),* the Supreme Court considered the issue of ERISA standing, that is, "which persons are 'participants' entitled to obtain information about benefit plans covered by ERISA." *Id. at 105.* The Supreme Court concluded that a former employee must have "a colorable claim that (1) she will prevail in a suit for benefits, ...," *id. at 117,* to be considered a participant under § 1132(a)(1). A former employee "who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.'" *Id. at 118.*

In the current matter, plaintiff claims to be a § 1132(a)(2) participant rather than the § 1132(a)(1) participant discussed in Firestone. The court concludes, however, that the analysis would be, at least, the same. Arguably, the participant analysis would be stricter under § 1132(a)(2) than it is under § 1132(a)(1). Under § 1132(a)(1) a plaintiff is seeking information regarding rights to benefits under a plan. The purpose of the "disclosure provisions" is to ensure that participants know precisely where they stand with respect to the plan. *Firestone, 489 U.S. at 118.* Thus, a construction offering greater latitude to claimants might be in order, particularly if the information sought would clarify the class of participants. No such consideration should figure in a § 1132(a)(2) claim which seeks to hold a plan fiduciary liable to the plan for an alleged breach of fiduciary duty.

Thus, the court concludes that, on this complaint, plaintiff is not a person with a colorable claim to vested benefits and, therefore, does not have standing to maintain her ERISA claim.

[*28]

C. State Claims.

1995 U S Dist LEXIS 1945, *

*28 U S C A § 1367* gives that court discretion whether to consider plaintiff's remaining state law claims when original jurisdiction can no longer be had. *Henglein v Informal Plan for Plant Shutdown Benefits, 974 F 2d 391 (3d Cir 1992)* This action is in its infancy and the court notes that plaintiff has filed an action in the state court. The court will, therefore, decline to exercise jurisdiction over the state claims and will dismiss those claims without prejudice

## IV. CONCLUSION.

The court concludes that plaintiff's complaint fails to state claims for RICO violations and for a breach of ERISA fiduciary duty. Counts I, II, III, and IV of her complaint will, therefore, be dismissed Having dismissed the claims giving this court original jurisdiction over this action, the court will decline to exercise supplemental jurisdiction over plaintiff's remaining state claims and will dismiss the same without prejudice. Defendants' motion to dismiss pursuant to *Fed R Civ P 12(b)(6)* will be granted Accordingly, an appropriate order follows.

## ORDER

AND NOW, this 10th day of February, [*29] 1995, upon consideration of Motion Of Defendants To Dismiss Pursuant to *Fed R Civ P 12(b)(6)* and *Fed R Civ P 12(b)(1)* (Doc. #3), and the response thereto, IT IS **ORDERED** that the motion is **GRANTED**. Counts I, II, III, and IV of plaintiff's complaint are dismissed with prejudice, Counts V, VI, VII, VIII, IX, and X are dismissed without prejudice, and the Clerk shall mark this action **"closed"** for statistical purposes.

E MAC TROUTMAN, S J.