# Tab F

# Part 2

# to

# Defendants' Opening Brief In Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

LEXSEE 1997 DEL. CH. LEXIS 72

IN RE FUQUA INDUSTRIES, INC. SHAREHOLDER LITIGATION

CONSOLIDATED Civil Action No. 11974

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1997 Del. Ch. LEXIS 72*

November 6, 1996, Date Submitted
May 13, 1997, Date Decided

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court May 20, 1997. Motion denied by, Motion granted by *In re Fuqua Indus., 1999 Del. Ch. LEXIS 190* (Del. Ch., Sept. 17, 1999)

**PRIOR HISTORY:** *In re Fuqua Indus., 1992 Del. Ch. LEXIS 204* (Del. Ch., Oct. 8, 1992)

**DISPOSITION:**

All but one of plaintiffs' claims dismissed.

LexisNexis(R) Headnotes

**COUNSEL:**

Pamela S. Tikellis, Esquire, and James C. Strum, Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Wilmington, Delaware and Joseph A. Rosenthal, Esquire, of ROSENTHAL, MONHAIT, GROSS & GODDESS, Wilmington, Delaware; OF COUNSEL: Lowell E. Sachnoff, Esquire, Duane F. Sigelko, Esquire, and Christine M. Bodewes, Esquire, of SACHNOFF & WEAVER, LTD., Chicago, Illinois; David Schachman, Esquire, and Gregory W. Knapp, Esquire, of DAVID SCHACHMAN AND ASSOCIATES, P.C., Chicago, Illinois; Mark C. Gardy, Esquire, and Judith Spanier, Esquire, of ABBEY & ELLIS, New York, New York; Scott Fisher, Esquire, of GARWIN, BRONZAFT, GERSTEIN & FISHER, New York, New York; Curtis V. Trinko, Esquire, of LAW OFFICE OF CURTIS V. TRINKO, New York, New York; Robert I. Harwood, Esquire, of WECHSLER HARWOOD HALEBIAN & FEFFER, LLP, New York, New York, Attorneys for Plaintiffs and Executive Committee Members.

Donald J. Wolfe, Jr., Esquire, and Kevin R. Shannon, Esquire, of POTTER ANDERSON & CORROON, Wilmington, Delaware, Attorneys for Defendants J. Rex Fuqua, D. Carl Hamill, Lawrence P. Klamon, Anthony A. Malizia, [*2] Carl E. Sanders and John B. Zellars.

R. Franklin Balotti, Esquire, and Anne C. Foster, Esquire, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware, Attorneys for Defendant Metromedia International Group, Inc.

Thomas Reed Hunt, Jr., Esquire, and David J. Teklits, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, Attorneys for Defendant J.B. Fuqua.

Edward P. Welch, Esquire, Randolph K. Herndon, Esquire, and Cheryl Siskin, Esquire, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Wilmington, Delaware, Attorneys for Clark A. Johnson, Charles R. Scott and Thomas N. Warner.

**JUDGES:** CHANDLER, Vice Chancellor

**OPINIONBY:** CHANDLER

**OPINION:**

MEMORANDUM OPINION

CHANDLER, Vice Chancellor

Plaintiffs allege that corporate directors, over a period of ten years, engaged in numerous violations of

1997 Del Ch LEXIS 72, *

fiduciary duties and other wrongdoing including fraud, usurpation of corporate opportunity, waste of corporate assets, entrenchment, gross mismanagement, disclosure of false and misleading information, self-dealing, formation of an unlawful business combination, denial of a class right to lawful and informed elections, and failure to maximize shareholder value Finding a few of plaintiffs' [*3] claims barred by a previous release and the majority of plaintiffs' allegations insufficient to withstand defendants' motion to dismiss for failure to state a claim, I dismiss all but one of plaintiffs' claims

Because the defendant directors' decisions to exempt a corporate shareholder from *8 Del C § 203* and to repurchase stock resulted in the creation of shares restricted in their ability to be voted against the Board's nominees for directors, and raises a reasonable doubt that the directors' actions will be protected by the presumption of the business judgment rule, I find that plaintiffs have alleged and supported facts sufficient to withstand defendants' motion to dismiss for failure to state a claim and for failure to show why demand should be excused

## I BACKGROUND

Fuqua Industries, Inc ("FII") was a Delaware corporation with principal lines of business in sporting goods, lawn and garden equipment, and photofinishing In 1993, FII changed its name to The Actava Group, Inc ("Actava") and, in November 1995, merged with three other companies Its name is now Metromedia International Group, Inc ("Metromedia")

The Consolidated Second Amended Derivative and Class Action [*4]    Complaint ("Second Amended Complaint") identifies plaintiffs as current or former shareholders of FII and Actava n1 Defendants are Triton Group, Inc ("Triton") n2 and former members of FII's Board of Directors n3 Defendants J B Fuqua, Clark A Johnson ("Johnson"), Lawrence P Klamon ("Klamon"), Carl E Sanders ("Sanders"), Charles R Scott ("Scott"), and Thomas N Warner ("Warner") were FII's directors when the initial complaint ("First Complaint") was filed in February 1991 Defendants J Rex Fuqua, D Carl Hamill ("Hamill"), Anthony A Malizia ("Malizia") and John B Zellers ("Zellers") were directors of FII at various times between 1984 and 1991

n1 Second Am Compl PP 7, 8

n2 Triton, an affiliate of Intermark, Inc , merged with Intermark, Inc in 1990 For consistency, Triton before and after the merger will be referred to as "Triton "

n3 FII is named as a nominal defendant

### A Contentions of the Parties

Plaintiff Virginia E Abrams filed the First Complaint on February 22, 1991 After [*5] consolidation with two other complaints, n4 plaintiffs filed a Consolidated Amended Derivative and Class Action Complaint ("First Amended Complaint") on August 30, 1991 Just over four years later, plaintiffs filed the Second Amended Complaint on December 28, 1995

n4 The First Complaint was consolidated with *Behrens v Fuqua Indus* , C A No 11988 (filed Mar 1, 1991) and Freberg v Fuqua Indus , C A No 11989 (filed Mar 1, 1991)

At the core of the Second Amended Complaint lies the allegation that the defendants planned and carried out a scheme to entrench themselves in office until J B Fuqua's planned retirement in 1989, at which time, management would purchase FII in a leveraged buyout Plaintiffs further contend that upon the realization that a buyout would be prohibitively expensive, defendants modified the plan to instead transfer control of FII to Triton, a "friendly" stockholder who would allow the defendants to retain their positions Finally, plaintiffs claim that as part of this plan, defendants [*6] wasted corporate assets by entering into a series of transactions intended to prevent the acquisition of FII by other parties These transactions included the acquisition, retention and sale of Georgia Federal Bank, FSB ("Georgia Federal"), the 1987 Qualex joint venture with Eastman Kodak Company ("Kodak"), J B Fuqua's 1989 sale of his six percent of FII stock to Triton, the 1989 agreement ("Section 203 Agreement") between FII and Triton, which exempted the latter from *8 Del C § 203* (Delaware's business combination statute) and FII's 1989-1990 stock repurchase program. Plaintiffs also contend that, as a result of the entrenchment plan, defendants released false and misleading disclosures in FII's public filings including FII's 1990 and 1991 shareholder proxies for the election of FII's Board

The Second Amended Complaint states four causes of action First, plaintiffs allege that J B Fuqua's sale of stock to Triton was a corporate opportunity which defendants usurped for their own benefit In addition, they claim that the premium received by J B Fuqua was improper--representing a "pay off" in exchange for actions by J B Fuqua and defendants in support of the

1997 Del. Ch. LEXIS 72, *

entrenchment [*7] plan. Count I thus seeks disgorgement of a $ 15.7 million "premium" obtained by J.B. Fuqua for the sale of his stock.

Second, plaintiffs allege that J.B. Fuqua, Klamon, Malizia, and Sanders again usurped a corporate opportunity and breached their fiduciary duties in connection with the sale of their individual shares of Georgia Federal in 1986. Accordingly, Count II seeks disgorgement of the $ 15 million profits earned by these defendants.

Third, plaintiffs allege that defendants, by breaching their fiduciary duties, wasting corporate assets and engaging in gross mismanagement and self-dealing, damaged FII and captured personal benefits from the purchase, retention and sale of Georgia Federal, the formation and sale of FII's interest in Qualex, the formation of the Section 203 Agreement, the repurchase of FII's stock, and the disclosure of false and misleading information in public filings. n5

    n5 Count III does not include a specific request for relief.

Finally, plaintiffs assert a class action claim that [*8] seeks damages for breach of fiduciary duties. Specifically, plaintiffs claim that defendants deprived the class of information pertaining to 1990 and 1991 Board elections and of the right to vote on a business combination with Triton.

Defendants seek to dismiss plaintiffs' derivative claims for failure to comply with Chancery Court Rules 12(b)(6) and 23.1. In addition, they argue that claims relating to the purchase of Georgia Federal are barred by a settlement, release and final judgment of class action claims filed and approved by this Court prior to FII's acquisition of Georgia Federal in 1986. n6 Finally, they seek to dismiss the class action claim for failure to state a class claim.

    n6 *Wechsler v. Fuqua Indus.*, Del. Ch., C.A. No. 8117, Berger, V.C. (May 16, 1986)

B. Legal Standards for a Motion to Dismiss for Failure to Comply with Chancery Court Rules 12(b)(6) and 23.1

Defendants' motion to dismiss for failure to comply with Chancery Court Rule 12(b)(6), which directs plaintiffs to [*9] state a claim upon which relief can be granted, requires me to accept all well-pled allegations as true and to construe all inferences in favor of plaintiffs. n7 Defendants' 12(b)(6) motion to dismiss, therefore, will not be granted unless I am reasonably certain that plaintiff is not entitled to relief under any set of facts which could be inferred. n8 Conclusory allegations unsupported by specific factual references, however, will not be accepted as true. n9

    n7 *In re Tri-Star Pictures, Inc. Litig.*, Del. Supr., 634 A.2d 319, 326 (1993).

    n8 *In re USA Cafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991).

    n9 *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d at 326.

Chancery Court Rule 23.1 requires plaintiffs asserting a derivative claim on behalf of a corporation to either make demand upon the corporations' board of directors or state "with particularity" their reasons for failing to make such demand. Defendants do not directly attack the plaintiffs' allegations of demand futility; they instead [*10] assert that plaintiffs have targeted the wrong Board. Rather than focus on the Board existing when the First Complaint was filed, defendants argue that plaintiffs should be required to make demand upon the current Board of Directors.

C. The Challenged Transactions

Plaintiffs attack five separate transactions occurring between 1986 and 1994. These transactions include the acquisition, retention and sale of Georgia Federal, the 1987 Qualex joint venture, J.B. Fuqua's 1989 sale of his six percent of FII stock to Triton, the Section 203 Agreement, and FII's 1989-1990 stock repurchase program. Related to these transactions are allegations that defendants released misleading or fraudulent public disclosures, that defendants usurped corporate opportunities, wasted corporate assets, engaged in gross mismanagement and self-dealing and formed an unlawful business combination. Plaintiffs also allege that the overall effect of these acts was the denial of the class's right to lawful and informed elections and the failure to maximize shareholders value. Finally, plaintiffs string these myriad allegations together with the contention that, when viewed as whole, they reveal the existence of [*11] a scheme designed to entrench the defendants in office until FII could be sold to management or control of FII could be transferred to Triton. n10 For the purposes of the motion to dismiss, I accept the following

1997 Del Ch LEXIS 72, *

nonconclusory factual allegations as true.

n10 At oral argument, counsel for some of the individual defendants characterized these myriad allegations (fifty pages and 127 paragraphs in the Second Amended Complaint) as a "dog's breakfast," an effort by plaintiffs to "offer up a bowl of mixed leftovers to a mutt" as an appetizing meal. A colorful metaphor, with perhaps an apt reference to my role in this matter.

1. The Acquisition, Retention and Sale of Georgia Federal

In February 1986, FII acquired Georgia Federal as a wholly-owned subsidiary for $ 225 million n11 During the sixteen months immediately preceding the acquisition, six of FII's nine directors purchased approximately ten percent of Georgia Federal's outstanding shares at prices ranging from $ 8.00 to $ 10.00 per share. n12 When FII purchased [*12] all of Georgia Federal's outstanding shares at $ 27.75 per share, some of the defendants reaped personal profits ranging from $ 34,300 to just over $ 14 million. n13

n11 Second Am. Compl. P 17

n12 Id. P 23

n13 Id.

As a result of the acquisition, FII became subject to Federal Savings and Loan Insurance Corporation ("FSLIC") and Federal Home Loan Bank Board ("FHLBB") regulations which prevented anyone from acquiring more than ten percent of FII's stock without obtaining prior FHLBB approval. In 1987, FII's Board announced it was seeking to sell Georgia Federal. n14 Press releases stated an asking price of $ 350 million. n15 FII discussed the possible sale with several potential buyers between 1987 and February 1989, none of whom were willing to pay more than $ 250 million. n16 Finally, on February 1, 1989, FII entered an agreement to sell Georgia Federal for $ 234,500,000. n17

n14 Id. P 92

n15 Id. P 94 [*13]

n16 Id. P 93.

n17 Id. P 41.

2. The Kodak - FII Joint Venture

On December 7, 1987, FII and Kodak entered into a joint venture to combine their photofinishing operations into one organization: Qualex, Inc. ("Qualex"). In 1994, FII (then renamed Actava) sold its fifty-percent interest in Qualex to Kodak and reported a loss of $ 37.9 million on the sale. n18

n18 Id. P 27.

3. J.B. Fuqua's Sale of FII Stock

In August and October, 1988, Triton purchased almost three percent of FII's shares in the market at prices ranging from $ 27.00 to $ 29.00 per share. n19 In response to FII's October 7 press release, which revealed Triton's purchase and stated that Triton, intending further purchases, had had preliminary discussions with J.B. Fuqua about the possible purchase of his shares, FII's stock price rose to $ 32 per share. n20 On October 27, Triton revealed that the day before, J.B. Fuqua had granted to Triton [*14] an option to purchase J.B. Fuqua's six percent of FII's shares for $ 38 per share. n21 with $ 2 per share of this price representing the cost of the option itself. n22 Triton exercised this option on January 11, 1989, purchasing J.B. Fuqua's entire six percent. n23 Combined with the three percent Triton previously purchased, Triton's ownership of FII at this time amounted to just under ten percent, the maximum allowed without FHLBB approval.

n19 Id. P 31.

n20 Id. P 32.

n21 Id. P 35.

n22 Id. P 34.

n23 Id. P 39.

4. The Section 203 Agreement

Section 203 of Delaware's General Corporation Law is commonly referred to as our business combination statute. It provides that a corporation shall not engage in a business combination with an interested shareholder n24 within three years of the date on which that shareholder became an interested shareholder unless 1) prior to that date the corporation's board of directors had

approved the business combination or had approved the shareholder [*15] becoming an interested shareholder, 2) at the time the shareholder became an interested shareholder it obtained at least eighty-five percent of the voting stock of the corporation, or 3) the business combination is approved by the board of directors and two-thirds of the disinterested shareholders. At FII's May 17, 1989, Board meeting, J.B. Fuqua, Klamon and Sanders approved a resolution (the "Board Resolution"), pursuant to section 203(a)(1), to allow Triton or its affiliates to purchase over fifteen percent of FII's stock and thereby become an interested shareholder. n25 The Board Resolution conditioned the final agreement with Triton (the "Section 203 Agreement") on three terms. First, Triton and its affiliates n26 would be prevented from entering into a business combination with FII for a period of three years from the date on which Triton became an interested shareholder unless it first obtained the approval of a majority of FII's disinterested directors. The Board Resolution defined "disinterested director" as "one who was not an officer, director or control person of Triton or any 'affiliate' of Triton." n27 Second, during this three-year period, FII's Board would consist of [*16] a minimum of seven directors, three of whom would be disinterested. Third, Triton and its affiliates would vote their FII shares in favor of the Board's nominees for FII's directors. On May 22, 1989, Triton and FII entered into the Section 203 Agreement which also provided that FII would not be considered an affiliate of Triton. This provision ensured that FII's officers and directors would be classified as "disinterested directors" as long as they were not officers or directors of Triton or any of its affiliates other than FII. By July 1989, Triton owned fifteen percent of FII's stock. By September, it had acquired just over twenty percent. n28

n24 In general terms, an "interested shareholder" is one who owns 15% or more of the corporation's outstanding stock. See 8 Del. C. § 203(c)(5)

n25 Defendant Scott also attended the meeting but is not alleged to have voted in favor of the resolution. Second Am. Compl. P 45.

n26 "Affiliate" was defined by reference to section 203 which describes an affiliate as "a person that directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, another person." "Control," in turn, is defined as ownership "of 20% or more of a corporation's outstanding stock." Control upon such ownership will be presumed "in the absence of proof by a

preponderance of the evidence to the contrary." [*17]

n27 Second Am. Compl. P 51.

n28 Id. P 60.

5. The Stock Repurchase Program

Between November 1989 and October 1990, FII's Board authorized the repurchase of six million shares in three two-million share increments. n29 FII stopped repurchases in late 1990 when it had acquired 4.9 million shares at a total cost of approximately $110 million. n30 As a result of the repurchases, Triton's ownership of FII increased from just over twenty percent to just over twenty-five percent, the minimum amount necessary for Triton to avoid classification as a passive investor and to avoid the need to comply with the associated reporting requirements of the Investment Company Act of 1940. n31

n29 Id. P 62.

n30 Id. P 63.

n31 Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 30 [hereinafter Pls.' Memo.]

II. GEORGIA FEDERAL RELEASE n32

n32 Defendants also argue that plaintiffs' Georgia Federal claims are barred by res judicata and, alternatively, fail to state a claim for fraud. It is not necessary to address the merits of these claims as the discussion below is dispositive of plaintiffs' claims addressed by these arguments.

[*18]

Plaintiffs allege that Georgia Federal was acquired for "entrenchment and anti-takeover purposes." n33 Furthermore, they claim that the proxy solicitation through which the Board obtained the consent of FII's shareholders to purchase Georgia Federal contained false and misleading statements. Specifically, plaintiffs refer to the following sentence:

The Board of Directors is not proposing the merger because of its anti-takeover

1997 Del. Ch. LEXIS 72, *

effect and the proposed merger is not part of a plan by the Board of Directors to take a series of anti-takeover actions. The Board of Directors is proposing the Merger because it believes the acquisition of Georgia Federal will be beneficial to Fuqua and its stockholders. n34

Arguing that FII "had an official corporate policy against adopting mechanisms or taking actions for the purpose of preventing a takeover of FII," n35 plaintiffs assert that the proxy, in order to not be misleading, had to reveal 1) that Georgia Federal was purchased for its anti-takeover effects, 2) that the purchase of Georgia Federal was part of a planned series of anti-takeover actions, and 3) the nature and existence of the entrenchment plan and the way in which the [*19] purchase of Georgia Federal would further that plan. Finally, plaintiffs allege that defendants J.B. Fuqua, Klamon, Malizia and Sanders usurped a corporate opportunity of FII and reaped personal profits by purchasing shares of Georgia Federal during the sixteen months prior to its acquisition by FII.

n33 Second Am. Compl. P 16.

n34 Id. P 20.

n35 Id. P 15.

Defendants argue that plaintiffs' claims relating to the purchase of Georgia Federal are barred by a settlement, release and final judgment of a previous class action approved by this Court in 1986. n36 Plaintiffs contend that the release is unenforceable, having been obtained through solicitation based on the fraudulent proxy statement.

n36 Wechsler, C.A. No. 8117.

I do not find that the proxy statement was fraudulent. Contrary to plaintiffs' assertions, defendants [*20] were not required to reveal their allegedly improper motives. n37 Moreover, plaintiffs' counsel reviewed and commented upon the proxy statement which sought shareholder approval of the Georgia Federal acquisition "to assure that the pertinent facts relating to the proposed transaction and all of the personal interests of the Individual Defendants in the transaction were fully disclosed to stockholders." n38 Counsel concluded "that the Proxy Statement insured full and complete disclosure of all material facts." n39 Finding that the release is valid, I must determine whether its scope bars plaintiffs'

claims of usurpation of corporate opportunity and entrenchment. Defendants, relying on *Nottingham Partners v. Dana* n40 and *In re Union Square Assocs Sec. Litig.*, n41 argue that the release bars all claims arising from the same set of operative facts or the same factual predicate. The release discharges the *Wechsler* defendants, including Fuqua, Klamon, Malizia and Sanders from

> any and all liability under or based upon each and every claim, cause, matter and issue which is fairly embraced within the scope of the pleadings or which is, or could have been, set forth therein [*21] or which may arise out of, under, or in connection with the acquisition of Georgia Federal by [FII] or any matter or transaction referred to in the pleadings n42

n37 *Stroud v. Grace, Del. Supr., 606 A.2d 75, 84 (1992).*

n38 Appendix to Opening Brief in Support of the Defendants' Motion to Dismiss EX. H at 9 [hereinafter Defs.' Open. Br. App.] (Plaintiffs' Memorandum in Support of Approval of Settlement and Application for Attorneys Fees and Expenses)

n39 *Id.*

n40 *Del. Supr., 564 A.2d 1089, 1105-07 (1989)*

n41 Del. Ch., C.A. No. 11028, at 15-16, Chandler, V.C. (Nov. 29, 1993)

n42 Defs.' Open. Br. App. Ex. F. P 5 (Order and Final Judgment)

Defendants argue that because the complaint in *Weschler* alleged that J.B. Fuqua "unfairly profited" as a result of his purchase of Georgia Federal stock, n43 plaintiffs' corporate opportunity claims, based on allegedly wrongful purchases of Georgia Federal stock, arose out of or in connection with the acquisition of Georgia Federal [*22] and "could have been asserted" at the time of the Weschler settlement. Defendants contend that plaintiffs' entrenchment and anti-takeover claims, which are based on FHLBB regulations in existence at the time FII acquired Georgia Federal, are likewise barred. Finally, defendants argue that plaintiffs' claims based on the retention of Georgia Federal are barred

because "retention of an asset surely is an issue which 'hereafter arise[s] out of the acquisition' of that asset." n44

> n43 Reply Brief of Certain Defendants in Support of Defendants' Motion to Dismiss Ex. K P 14 [hereinafter Certain Defs.' Reply Br.] (Am. Compl.)
>
> n44 Opening Brief in Support of the Defendants' Motion to Dismiss at 19 [hereinafter Defs.' Open. Br.] (citing Defs.' Open. Br. App. Ex. G at 6 (Stipulation of Compromise and Settlement))

Also relying on *Nottingham Partners,* n45 plaintiffs argue that their claims are not barred by the *Wechsler* claims because the two claims do not share a common gravamen. They explain that [*23] the *Wechsler* action asserted a claim of waste based on FII's overpayment for Georgia Federal while the current action asserts that defendants usurped a corporate opportunity by purchasing Georgia Federal shares in advance of FII's purchase of Georgia Federal. Furthermore, plaintiffs contend that even if the release were found to cover claims of corporate opportunity, the release cannot cover claims occurring after the settlement date. Accordingly, they assert that the defendants' refusal to sell Georgia Federal, despite recognizing that its continued ownership was depressing FII's stock price, was wrongfully motivated by the defendants' desire to reduce the cost of transferring control of FII to either management or Triton and, thus, not covered by the terms of the release.

> n45 *See 564 A.2d at 1106*

Plaintiffs' present corporate opportunity claims are based upon the defendants' receipt of individual profits resulting from the sale of their personal stock. Thus, the basis of the complaint is that [*24] the defendants unfairly profited at the expense of FII. Messrs. Klamon, Sanders and Malizia were defendants in the *Wechsler* action and the events which formed the basis of the unfair profit allegation against J. B. Fuqua in that action are the same events on which plaintiffs now attempt to construct claims of usurpation of corporate opportunity against the other defendants. n46 Accordingly, I find that the terms of the *Wechsler* release bar plaintiffs' claims of usurpation of corporate opportunity against defendants J. B. Fuqua; Klamon, Malizia and Sanders. Plaintiffs' claim that the acquisition of Georgia Federal was

motivated by the defendants' desire to entrench themselves in office and to acquire the anti-takeover effects of the FHLBB regulations is also barred by the *Weschler* release because the FHLBB regulations were in existence when Georgia Federal was acquired and the effects of those existing regulations arose out of or in connection with the acquisition.

> n46 The *Weschler* complaint charged that defendants were "liable to [FII] for all loss and damage that it has suffered or will suffer from the wrongs alleged herein." Certain Defs.' Reply Br. Ex. K P 14 (Am. Compl.)

[*25]

Plaintiffs' remaining Georgia Federal claim asserts that defendants wrongfully refused to sell Georgia Federal, despite awareness that continued retention was depressing FII's stock price and harming FII's shareholders. This wrongful refusal to sell, according to plaintiffs, constituted a waste of FII's assets and resulted from defendants' desire to transfer control of FII (at the lowest possible price) to management or Triton, and to provide J.B. Fuqua with an inflated premium for the sale of his stock. n47 While this is also partly an entrenchment and anti-takeover claim, it is not based on the effects of the FHLBB regulations. As the alternate bases (allegations of waste and/or entrenchment) for this claim of wrongful refusal to sell are unrelated to the acquisition of Georgia Federal or the existence of the FHLBB regulations, it is not barred by the release. n48

> n47 Second Am. Compl. P 98.
>
> n48 This finding does not preclude dismissal on other grounds.

### III. MOTION TO DISMISS

#### A. Standard of Review [*26]

Relying on *Unocal Corp. v. Mesa Petroleum Co.,* n49 plaintiffs assert that the defendants' acts, which had the effect of "insuring effective control in the hands of Triton and, thereby, foreclosing any real opportunity for the FII shareholders to receive an acquisition proposal" n50 must be examined with enhanced scrutiny which requires defendants to demonstrate that they had reasonable grounds for believing in the existence of a threat to corporate policy and effectiveness and that their actions in response were reasonable in relation to the degree of the threat. n51 Plaintiffs also assert that,

1997 Del Ch LEXIS 72, *

according to *Weinberger v UOP, Inc*, n52 the existence of the defendant directors' financial interests in Triton requires these defendants to demonstrate that these self-dealing transactions were entirely fair to FII and its shareholders

n49 *Del Supr*, 493 A 2d 946 (1985)

n50 Pls' Memo at 18

n51 *See Unitrin, Inc v American Gen Corp*, *Del Supr*, 651 A 2d 1361, 1373 (1995)

n52 *Del Ch*, 409 A 2d 1262 (1979)

[*27]

Defendants argue that enhanced scrutiny is not required because plaintiffs have failed to allege that defendants acted in response to a "perceived threat to corporate policy and effectiveness which touches upon issues of control" n53 Defendants interpret the allegations of the complaint as suggesting that they facilitated, rather than defended against, a change of control. Furthermore, defendants assert that plaintiffs' "conclusory allegation" of self-dealing fails to identify specific transactions and, therefore, does not require the defendants to demonstrate entire fairness

n53 Certain Defs' Reply Br. at 14 (quoting *Unitrin*, 651 A 2d at 1372 n 9)

Plaintiffs make no allegations that the Board was faced with a threat to corporate control. Plaintiffs' allegations are not presented as preemptive acts designed to defend against a threat to control but as deliberate acts designed to entrench the directors and assist them in pursuit of either a management buyout or transfer of control to Triton. As such, [*28] the allegations do not trigger enhanced scrutiny and the burden of rebutting the presumption of the business judgment rule remains on the plaintiffs

B The Georgia Federal Claim of Waste

Plaintiffs claim that FII's Board deliberately waited to sell Georgia Federal until Triton purchased J.B. Fuqua's stock and that the Board's refusal to sell Georgia Federal before that time, despite the Board's awareness that continued ownership of Georgia Federal was depressing FII's stock price, constituted a waste of FII's assets n54 A claim of waste is typically founded upon a board's decision to acquire, rather than dispose of, a corporate asset. Thus, the determination of whether a board has engaged in acts of corporate waste is frequently expressed as based upon "whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid. If it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction." n55 In this case it may be said that plaintiffs attempt to allege two separate claims of waste: one based on the harm that [*29] FII suffered as a result of the Board's decision to sell Georgia Federal for $ 235 million, and one based on the Board's delay in selling Georgia Federal. Neither attempt is successful

n54 Second Am Compl. P 91.

n55 *Saxe v Brady*, *Del Ch*, 40 Del Ch 474, 184 A 2d 602, 610 (1962) *See also Grobow v Perot*, *Del Supr*, 539 A 2d 180, 189 (1988), *Chrysogelos v London*, Del. Ch., C.A. No. 11910, at 10, Jacobs, V.C. (March 25, 1992).

Plaintiffs' allegations reveal that FII announced its intentions to sell Georgia Federal at an asking price of $ 350 million. According to the complaint, the price was based upon a multiple of book value and the addition of $ 110 million in good will. n56 The complaint also states that "FII was approached by a number of qualified purchasers, who were willing to purchase Georgia Federal for its fair market value," that the fair market value was "approximately $ 230,000,000 to $ 250,000,000," and that FII ultimately agreed to sell Georgia Federal for just under [*30] $ 235 million. n57 Absent facts which would support a finding that the decision to include $ 110 million in good will in the initial asking price or the decision to agree to sell Georgia Federal for $ 235 million, a price which plaintiffs concede is within the fair market value, could not have been the result of sound business judgment, plaintiffs' allegations fail to establish a claim of waste. I dismiss all of plaintiffs' claims of waste based on the sale or the timing of the sale of Georgia Federal

n56 Second Am. Compl. P 94

n57 *Id* P 41.

C The Validity of the Section 203 Agreement

Plaintiffs allege that FII entered into the Section 203 Agreement with Triton in violation of the Board Resolution approved on May 17, 1989, by defendants

J.B. Fuqua, Klamon and Sanders. Specifically, plaintiffs allege that the Board Resolution, but not the Agreement, required FII's Board to consist of at least three disinterested directors and required approval of the majority of disinterested directors before [*31] Triton could enter into a business combination with FII. Furthermore, the Agreement, unlike the Board Resolution, exempts FII from the definition of disinterested director.

Plaintiffs contend that the Agreement is null and void because defendants failed to either amend the Section 203 Agreement to conform to the Board Resolution or to ratify the Section 203 Agreement, even though it did not conform to the Board Resolution. n58 The Agreement is also null and void, according to plaintiffs, because each of the three directors approving the Board Resolution owned stock of Triton or its affiliated companies ranging in amounts from approximately $ 65,000 to over $ 3.6 million, Klamon was a director of Pier 1, an affiliate of Triton, and none of these financial interests were "discussed or properly addressed in connection with the approval of the" Board Resolution. n59 Thus, plaintiffs conclude that the directors are not entitled to the protections of *8 Del. C. § 144* and that the directors must demonstrate that the transaction was entirely fair.

n58 *Id.* P 57.

n59 *Id.* P 48.

[*32]

The business judgment rule protects the Board's decision not to amend or formally ratify the Section 203 Agreement. The Board Resolution authorized the officers of FII to enter into an agreement that would exempt Triton from *8 Del. C. § 203*. The terms of the Agreement were subject to certain conditions. Whether the Section 203 Agreement complied with the Board's authorization and whether the Section 203 Agreement was in the best interests of FII was a decision for the Board. Under the terms of the Agreement, any business combination between Triton and FII would require the approval of the majority of FII's disinterested directors. Plaintiffs' allegations that the directors approving the Board Resolution were stockholders or directors of Triton and its affiliates fails to rebut the presumptions of the business judgment rule in connection with the Section 203 Agreement. Finding no reason to presume that the Section 203 Agreement was not the result of a valid exercise of business judgment, I dismiss plaintiffs' claim that the Agreement is null and void.

D. The J.B. Fuqua Stock Sale

Relying on *Frantz Mfg. Co. v. EAC Industries* n60 and *Citron v. Steego Corp.,* n61 [*33] plaintiffs assert that directors may sell their shares in a corporation if they act in good faith and do not "dominate, interfere with, or mislead" other shareholders in the exercise of their rights n62 Plaintiffs allege that J.B. Fuqua obtained an inflated premium on the sale of his six percent of FII's stock to Triton by agreeing to promote Triton's interest within the corporation. Such an allegation, if true, would be a breach of fiduciary duty. n63 Plaintiffs, however, fail to support this allegation with sufficient facts to withstand defendants' motion to dismiss for failure to state a claim.

n60 *Del. Supr., 501 A.2d 401, 408 (1985)*

n61 Del. Ch., C.A. No. 10171, at 18, Allen, C. (Sept. 9, 1988).

n62 Pls.' Memo. at 19.

n63 *Endervelt v. Nostalgia Network, Inc.,* Del. Ch., C.A. No. 11415, at 7-8, Chandler, V.C. (July 23, 1991).

According to plaintiffs, Triton's agreement with J.B. Fuqua was not an option agreement but a firm agreement to purchase J.B. Fuqua's shares in January at a fixed [*34] price of $ 38 per share. The complaint alleges that news of the agreement was deliberately withheld from the public until after FII's October 7 press release which caused FII's stock price to jump from $ 28 to $ 32 per share in response to news that Triton and J.B. Fuqua had discussed purchase of his shares. Starting with the $ 28 per share price of FII's stock prior to October 7 and ignoring the $ 2 per share "purported option price," plaintiffs allege that J.B. Fuqua received an improper thirty-six percent premium n64 over market price for his shares n65--a premium which represented payment for an agreement by J.B. Fuqua and other Board members to "use and abuse their power and control over FII in their official capacity to manipulate FII for their own personal benefit, contrary to the interest of FII's other stockholders." n66 The acts that J.B. Fuqua and other defendants are alleged to have agreed to undertake in exchange for the inflated premium include:

. a series of entrenchment and anti-takeover devices designed to ensure that Triton could purchase control of FII without paying a control premium to FII's shareholders

1997 Del Ch LEXIS 72, *

. actions to depress FII's stock [*35] price to ensure that the defendants and Triton could gain control of FII at the lowest possible price

. fraudulent public disclosures which concealed the entrenchment plan and prevented election of disinterested directors

. an agreement to sell Georgia Federal only after J.B. Fuqua sold his stock

. J.B. Fuqua's agreement to delay execution and announcement of the option agreement until after Triton had purchased three percent of FII's shares

. an agreement to place Triton's nominees on FII's Board of Directors and elect Scott as Chairman of the Board

. an agreement to enter into, but delay the announcement of, the Section 203 Agreement, and

. FII's stock repurchase program

n64 The record does not reveal FII's stock price on the date the option agreement was announced. Using the stated October 7 price of $ 32 per share, the premium, including the $ 2 per share option price, was 19%. Examined as an option agreement, with $ 2 allocated to the price of the option, the agreement provided the option to purchase 6% of FII, in the future, at a premium of 13% over the current share price. [*36]

n65 Second Am. Compl. P 35.

n66 Id. P 36.

The impact of these actions, allegedly performed in exchange for the premium received by J.B. Fuqua, was to enrich Triton and its shareholders including J.B. Fuqua, Johnson, Klamon, Sanders, Scott, and Warner n67 Thus, according to plaintiffs, "[J.B.] Fuqua sold his 6% shares [sic] of FII to Triton not in a personal and private capacity but in his official capacity as the Chairman of the Board of FII, the Chief Executive Officer of FII, and

the dominating and controlling director of FII." n68 Plaintiffs fail to allege facts supporting the alleged connection between the sale of J.B. Fuqua's stock and later actions taken by FII's directors. There are no facts indicating that the premium was shared with the other directors or that J.B. Fuqua was in a position to dominate or control the other directors. In sum, plaintiffs fail to explain why the other defendants would be willing to breach their fiduciary duties and engage in allegedly improper acts in order for J.B. Fuqua to obtain a premium on the sale of his shares. n69 Accordingly, I dismiss [*37] Count I which seeks disgorgement of the "premium" obtained by J.B. Fuqua in connection with the sale of his stock

n67 Id. P 103.

n68 Id. P 102.

n69 Plaintiffs' separate claim that the directors' financial interests in Triton or its affiliates motivated the performance of the acts listed above is addressed separately throughout this opinion. See, e.g., text of this Opinion at 23-24.

E. The Stock Repurchase Program

Plaintiffs allege that the defendants breached their fiduciary duties by approving the repurchase program "to further their self-interests and the interests of [Triton]" n70 Plaintiffs, however, do not identify which, if any, directors had financial interests in Triton or its affiliates at the time of approval. Thus, the claim of self-interest must be based upon plaintiffs' assertion that "once [Triton] acquired 20% or more of FII's stock, by definition, no member of FII's Board of Directors would be a Disinterested Director because FII itself would be an affiliate [*38] of [Triton] and the requirements of the Board Authorization for an agreement with [Triton] could no longer be satisfied." n71 This allegation is internally inconsistent. On one hand, plaintiffs rely on the existence of the Section 203 Agreement, which contains the definition of "disinterested director" and yet, on the other hand, plaintiffs assume that the additional provision of the Section 203 Agreement, which exempts FII from the definition of disinterested director, does not exist. Thus, even if the failure of FII's directors to be "disinterested directors" under the terms of the Section 203 Agreement were relevant for the purpose of determining whether they were interested in approval of the repurchase program, a question which I do not need to resolve, the allegations of plaintiffs' complaint cannot be read to assert a claim of self-interest. n72

n70 Pls' Memo. at 30.

n71 Second Am. Compl. P 54. The reasoning is apparently based on the following. Once Triton acquired over 20% of FII, it was presumed to "control" FII. *8 Del. C. § 203(c)(4)* FII, under the "control" of Triton, was considered to be an affiliate of Triton. *Id.* Under the Section 203 Agreement, FII's directors could not be "disinterested directors" with respect to their ability to approve a business combination with Triton, if they were also a director of Triton or any of its affiliates. The Section 203 Agreement also provided, however, that FII would not be considered an affiliate of Triton. [*39]

n72 Plaintiffs also contend that the repurchase program resulted in an unlawful business combination under *8 Del. C. § 203(c)(3)(iv)* Second Am. Compl. P 61. However, the Section 203 Agreement, the validity of which plaintiffs have failed to successfully challenge, allowed Triton to become an "interested shareholder." The repurchase program is, therefore, not an unlawful business combination.

## F. The Disclosure Claims

Plaintiffs allege that FII's Board caused the release of numerous false and misleading disclosures in the 1990 and 1991 election proxies and various public filings including FII's 8K filed on February 16, 1991 and FII's 10K filed on April 1, 1991. n73 None of plaintiffs' allegations are sufficient to support a finding that the defendants breached their duty of disclosure. I dismiss plaintiffs' allegations, such as those found in paragraphs 68, 75, and 79 of the Second Amended Complaint, which are dependent upon the invalidity of the Section 203 Agreement or the failure of the Agreement to mirror the terms of the Board Resolution because, as discussed above, I find no indication [*40] that the Section 203 Agreement was not the result of a valid exercise of business judgment. I also dismiss plaintiffs' contention, found throughout the Second Amended Complaint, that defendants breached their fiduciary duty by failing to disclose the existence of the entrenchment plan and the ways in which the various acts of the defendants supported that plan. Delaware law does not require directors to reveal their allegedly improper schemes and plans. n74

n73 Second Am. Compl. PP 68, 75, 79, 84, 86-87.

n74 *Stroud,* 606 A.2d at 84.

## IV. ENTRENCHMENT CLAIMS

A successful claim of entrenchment requires plaintiffs to prove that the defendant directors engaged in action which had the effect of protecting their tenure and that the "action was motivated primarily or solely for the purpose of achieving that effect." n75

n75 *Heineman v. Datapoint,* Del. Ch., C.A. No. 7956, at 4, Allen, C. (Oct. 9, 1990)

[*41]

## A. The Remaining Georgia Federal Claim

In addition to the entrenchment claim based upon the effects of the FHLBB regulations, plaintiffs assert that the defendants' wrongful refusal to sell Georgia Federal was motivated by defendants' desire to transfer control of FII (at the lowest possible price) to FII's management or to Triton. n76 As discussed, the former claim is barred by the *Weschler* release. n77 The latter fails to allege how, aside from the effects of the FHLBB regulations, the retention of Georgia Federal served to protect the tenure of the defendant directors. Accordingly, it fails to allege a claim of entrenchment and must be dismissed.

n76 Second Am. Compl. P 98.

n77 *See* text of this Opinion at 12-18.

## B. Qualex Joint Venture

Plaintiffs allege that the formation of the Qualex joint venture was part of an entrenchment plan and was designed to "lock up the assets, cash flow and control of FII's Colorcraft subsidiary, one of the most valuable and profitable of FII's business [*42] segments" n78 until the planned retirement of J.B. Fuqua. According to plaintiffs, the terms of the joint venture provided that "after the Entrenchment Plan was implemented, the cash flow generated by the Colorcraft assets would be reinstated by FII." n79 Furthermore, the joint venture allegedly allowed "an onerous change of control of Colorcraft in favor of Kodak if a change of control of FII occurred during the first two years of the joint venture agreement" and "explicitly exempted the defendants' contemplated

management buy out." n80 Entirely lacking from plaintiffs' complaint are any facts to support these conclusory allegations of "onerous" terms and entrenchment effects. Conclusory allegations unsupported by specific factual references may not be accepted as true even under the lenient pleading standards of Rule 12(b)(6). n81 I dismiss plaintiffs' claims of entrenchment based on the Qualex joint venture.

n78 Second Am. Compl. P 24.

n79 *Id.* P 25.

n80 *Id.* PP 26, 27.

n81 *In re Tri-Star Pictures Inc. Litig.* 634 A.2d at 326.

[*43]

C. The Section 203 Agreement

Plaintiffs' allegations with respect to the Section 203 Agreement are sufficient to state a claim. Under either the Board Resolution or the Section 203 Agreement, Triton and its affiliates were required to vote their shares in favor of the FII board's nominees for directors. Properly supported allegations that a board's acts have resulted in the creation of shares that may not be used to vote against the board's nominees raise a reasonable doubt that the actions were not taken solely or primarily to protect the board's tenure. n82 Thus, a reasonable doubt exists that the board's decision to exempt Triton from *8 Del. C § 203* will be protected by the business judgment rule and I deny defendants' motion to dismiss this claim.

n82 *See Abajian v. Kennedy,* Del. Ch., C.A. No. 11425, at 14, Allen, C. (Jan. 17, 1992) ("Even if one assumes that there could be valid corporate purposes served by consensually restricting the ability of a substantial shareholder to oppose management or communicate with other shareholders, it seems nevertheless to be the case that such restrictions do raise the prospect of impermissible motivation as one plain possibility.").

[*44]

D. The Repurchase Program

Plaintiffs allege that FII repurchased only 4.9 million shares, as opposed to the authorized six million shares,

because the repurchase of 4.9 million shares was all that was needed to increase Triton's ownership of FII, which by this time had already increased to approximately twenty percent, to just over twenty-five percent--the minimum amount necessary for Triton to avoid the need to comply with the reporting requirements of the Investment Company Act of 1940. The reason why FII sought to assist Triton, according to plaintiffs, was to further the entrenchment plan, hinder the ability of third parties to acquire a "cash-rich" FII, and transfer control of FII to Triton. Because the terms of the Section 203 Agreement provide that all of Triton's shares of FII shall be voted in favor of the FII Board's nominees for directors, the repurchase program had the effect of further increasing the number of shares that were limited in their ability to remove the current directors. Thus, the effect of the repurchase program, like the effect of the Section 203 Agreement, raises a reasonable doubt that the Board's actions were not motivated by defendants' desire [*45] to entrench themselves in office. Accordingly, I deny defendants' motion to dismiss this claim.

V. DEMAND

Only one of plaintiffs' claims survives defendants' Chancery Court Rule 12(b)(6) motion to dismiss--the claim of entrenchment based on the Board's decisions to enter into the Section 203 Agreement and to repurchase stock. Defendants argue that this claim still must be dismissed because plaintiffs failed to comply with Chancery Court Rule 23.1.

Plaintiffs did not make demand on FII's Board. Defendants seek to dismiss plaintiffs' derivative claims because the allegations fail to establish that demand on the current board is futile and, thus, should be excused. Citing to *Rales v. Blasband,* they assert that when the majority of directors approving the challenged transactions have been replaced, the focus of the court should be on "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations." n83 Furthermore, relying on this Court's holding in *Harris v. Carter,* they argue that in a case such as this, where an amended complaint raises claims that are not already "validly in litigation," n84 [*46] the board that should address demand is the board in existence at the time of filing of the amended complaint. In sum, defendants argue that because 1) nine of the Board's ten current directors were not on the Board when the First Complaint was filed, 2) over four years elapsed between the filing of the First Complaint and the Second Amended Complaint, and 3) the Second Amended Complaint raises allegations not contained in the First

1997 Del. Ch. LEXIS 72, *

Complaint, the Court must require plaintiffs to make demand upon the current disinterested Board in order to allow it "the opportunity to exercise its judgment and manage the corporation's affairs." n85

> n83 *Del. Supr., 634 A.2d 927, 934 (1993)*
>
> n84 *Del. Ch., 582 A.2d 222, 230 (1990)*
>
> n85 Defs.' Open. Br. at 28

Plaintiffs assert that under well-established Delaware law, n86 a court must consider whether the board in existence at the time the first complaint was filed could have impartially considered demand. Furthermore, relying on *Rales,* n87 they argue that this rule [*47] applies even when the board that would be addressing demand is not the board that approved the challenged transactions. Thus, plaintiffs' Second Amended Complaint does not allege that demand upon the current Board would be futile. Instead, it repeats the allegations, stated initially in the First Complaint, that demand upon the Board existing in February 1991 would have been futile because a majority of the directors at that time were not disinterested and independent. n88

> n86 *Pogostin v. Rice, Del. Supr., 480 A.2d 619 (1984), Katz v. Halperin,* Del. Ch., C.A. No. 13811, Steele, V.C. (Feb. 5, 1996); *Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, Allen, C. (July 19, 1995).
>
> n87 *See 634 A.2d at 933-34*
>
> n88 Second Am. Compl. P 107

## A. Chancery Court Rule 23.1

Derivative suits allege injury to the corporation. Because the injury is to the corporation and not directly to the plaintiff (either individually or as a member of a class), and because the responsibility for management of [*48] the corporation's business and affairs is vested with the board of directors, n89 it is the right of the board, at least initially, to seek redress for injuries to the corporation. Thus, before filing a derivative suit on behalf of a corporation, plaintiffs must generally first give the board notice of the alleged wrong and offer to it the opportunity to assess the merits of the allegations and to determine the appropriate response. The board's response, like other decisions affecting the management and affairs of the corporation, is protected by the business judgment rule, a rule which recognizes that the

board, not the Court, is in the best position to manage the corporation's affairs. Business decisions by an informed, disinterested, independent board will be respected by this Court.

> n89 *8 Del. C § 141(a)*

Allegations that the board is unable to act in an informed, disinterested and independent fashion challenge the assumption that the board is in the best position to craft a response reflective of [*49] the best interests of the corporation. Accordingly, a showing that the transaction which caused the alleged injury was not the product of valid business judgment, or a showing that a majority of the board is not able to disinterestedly and independently consider the demand, will excuse the plaintiff from making demand.

This requirement that plaintiffs either make demand or show that demand should be excused is codified in Chancery Court Rule 23.1 which, unlike its federal counterpart, is not merely a procedural requirement. The corresponding substantive test which this Court must apply to the question of demand excusal is "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." n90 Because this test requires an application of the business judgment rule to the conduct of the board, the test should not be applied when the transaction at issue was not the result of a conscious business decision made by the board that would be considering demand (e.g., the board in existence when the complaint is filed). [*50] Such a situation arises when the challenged transaction is either 1) not the result of a business decision (e.g., where the board did not act) or 2) the result of a business decision but a majority of those making the decision have since been replaced or the decision was made by the board of a different corporation. n91

> n90 *Aronson v. Lewis, Del. Supr., 473 A.2d 805, 814 (1984). See also Grobow, 539 A.2d at 183, 186, Pogostin, 480 A.2d at 624-25*
>
> n91 *Rales, 634 A.2d at 934*

The appropriate test in any of these cases, therefore, is not an examination of whether the board has already demonstrated an inability to exercise business judgment with respect to the challenged transaction or an

1997 Del. Ch. LEXIS 72, *

examination of whether the board approving the transaction is unable to exercise disinterested and independent judgment with respect to demand because, in any of these cases, there will have been no exercise of business judgment with respect to the transaction or the majority of the board approving the transaction [*51] will not be represented on the current board that would be considering demand. The appropriate test, therefore, is whether the board in existence at the time the complaint is filed is able to properly carry out its fiduciary duty to evaluate demand in a disinterested and independent fashion. In such unique circumstance, only this test recognizes that it is the fundamental right of the board to manage the corporation's affairs and that this right should not be trampled unless plaintiffs are able to show that the board has already failed in this regard or is otherwise so tainted as to lead to the conclusion that it is unable to act in the best interests of the corporation.

When, as here, the majority of the board is replaced between the filing of a first complaint and the filing of an amended complaint, it is necessary to determine upon which board the plaintiff should make demand or with respect to which board the plaintiff should be required to show that demand is futile and, thus, should be excused. As when the majority of the board is replaced between the challenged transaction and the filings of the first complaint, the appropriate demand board when the majority of the board has [*52] been replaced between the filings of the first and amended complaints is the board in existence when the first complaint is filed. n92 The filing of an amended complaint only affects this initial finding to the extent that the amended complaint raises claims not already "validly in litigation." n93 For only with respect to those claims will adherence to the policy of making demand upon the first board deprive a board of its right to control the business and affairs of the corporation. Thus, claims alleged in an amended complaint, which were not already validly in litigation, should be presented to the board in existence at the time of filing of the amended complaint or the plaintiff should state with particularity why demand upon that board would be futile and, thus, should be excused.

n92 Id. at 935; Harris, 582 A.2d at 231.

n93 Harris, 582 A.2d at 230.

Defendants contend that because the current board has never had the opportunity to assess demand for any of the claims asserted in the [*53] Second Amended Complaint, they have been denied the right to control the affairs of the corporation. Thus, they argue that this Court

should follow the reasoning of Brody v. Chemical Bank, n94 which held that a court should assess whether demand is excused by reference to the board in existence at the date of filing of the amended complaint. Defendants, however, fail to raise any arguments that this Court has not already considered and rejected. In Harris, Chancellor Allen considered the reasoning in Brody and acknowledged the importance of allowing a corporation "the opportunity to take over a suit which was brought on its behalf." n95 He determined, however, that "What important interest may be otherwise served." n96

n94 517 F.2d 932 (2d Cir. 1975).

n95 Harris, 582 A.2d at 230 (citing Brody, 517 F.2d at 934).

n96 Id. at 230.

When a board is comprised of new directors who are under no personal conflict with respect to prosecution of a pending derivative claim, the board [*54] may cause the corporation to act in a number of ways with respect to that litigation. It may move the court to take control of the litigation by being re-aligned as a party plaintiff . . ., move to dismiss the case as not, in the board's business judgment, in the corporation's best interest . . . [or] allow the representative plaintiff and his counsel to carry the litigation forward. These options fully protect the legitimate right of the board under Section 141(a) to manage the corporation's business and affairs.

Thus, when during the pendency of a derivative litigation there occurs a change in the composition of a board that had been disabled by conflict, and the board as newly constituted is capable of validly exercising judgment concerning that corporate claim, it has sufficient avenues open to it to meet its Section 141(a) responsibilities. There are good reasons not to go further and require that a derivative plaintiff interrupt litigation, when amending his pleading or otherwise, to make a demand upon such a newly constituted board.

When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires [*55] that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one. In that circumstance a new board should be required to take one of the steps outlined above, should it decide to act at all with respect to the matter. n97

Thus, here, as in *Harris,* if demand is excused with respect to the Board in existence at the time of the filing of the First Complaint, the existence of a disinterested Board at the time of filing of the Second Amended Complaint affects only those claims not already validly in litigation. The first question I must answer is, therefore, whether plaintiffs have complied with Rule 23.1 with respect to the Board in existence in February, 1991.

> n97 *Harris, 582 A.2d at 230-31* (citations omitted).

B. Have Plaintiffs Complied with Rule 23.1 with Respect to the February 1991 Board for Those Actions Occurring Before that Date?

J.B. Fuqua, Johnson, Klamon, Sanders, Scott and Warner were the six members [*56] of FII's Board at the time the First Complaint was filed on February 22, 1991. n98 In order for this Court to excuse demand on the grounds of demand futility, a plaintiff must show that the Board on which demand would have been made did not consist of at least a majority of disinterested directors. Plaintiffs' only surviving derivative claim alleges that the Board's decisions to exempt Triton from section 203 and to repurchase FII's stock were motivated solely by the defendants' desire to secure their positions in office. Five members of the demand Board, J.B. Fuqua, Klamon, Sanders, Scott and Warner were on the Board that made the decision to enter into the Section 203 Agreement and the Board that made the decision to repurchase FII's stock. Accordingly, with only one apparently disinterested member, demand upon the February 1991 Board to address the merits of plaintiffs' claim would have been futile and I deny defendants' motion to dismiss plaintiffs' derivative claims for failure to comply with Chancery Court Rule 23.1.

n98 The First Complaint alleges that there were seven, not six members of FII's Board on this date. *See* First Complaint at 9. However, the First Consolidated Complaint makes it clear that Holder resigned in December, 1990. *See* First Consolidated Complaint at 8. Thus, there were only six members of the FII Board in February 1991.

[*57]

VI. THE CLASS CLAIM

Plaintiffs' class claim may be read to allege three separate claims. The first, based on the defendants' breach of the fiduciary duty of disclosure, even if properly asserted as a class claim, fails to state a claim for which relief may be granted. n99 The second, that the class was deprived of its right to lawful and informed elections, is based upon plaintiffs' contention that the members of the Board committee charged with nominating candidates for directors must be "disinterested." Plaintiffs state that "the requirement of an independent nominating committee arises from the 203 Agreement, not Delaware law." n100 According to the complaint, the Section 203 Agreement requires only that FII's Board consist of a minimum of seven directors, of which three shall be disinterested, and that any business combination with Triton receive the approval of the majority of the disinterested directors. n101 Finding no support for plaintiffs' allegation that the nominating committee must be "disinterested," I dismiss their claim that the class was deprived of its right to lawful and informed elections. Finally, plaintiffs make allegations that the defendants transferred control [*58] of FII to Triton and failed to take steps to ensure that the class was able to maximize the value of their stock. n102 These vague claims, found only in the complaint and not addressed in plaintiffs' reply, fail to explain how Triton's open market purchases of FII stock, or FII's repurchase program, constituted an impermissible attempt to transfer control or how Triton's ownership of FII stock resulted in an ability to control FII. Consequently, I must dismiss this claim as well. Each of plaintiffs' class allegations fails to state a claim for which relief may be granted.

> n99 *See* text of this Opinion at 29-30.
>
> n100 Pls.' Memo. at 34.
>
> n101 Second Am. Compl. P 50.
>
> n102 *Id.*

1997 Del Ch LEXIS 72, *

form of Order that implements this decision

Counsel should confer and attempt to agree upon a

2003 U.S. Dist. LEXIS 23732, *; Fed. Sec. L. Rep. (CCH) P92,650

LEXSEE 2003 US DIST LEXIS 23732

IRVIN S. LIEBERMAN, and all others similarly situated, Plaintiffs v.
CAMBRIDGE PARTNERS, LLC and J.B. HANAUER & COMPANY, Defendants

CIVIL ACTION NO. 03-2317

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

2003 U.S. Dist. LEXIS 23732; Fed. Sec. L. Rep. (CCH) P92,650

December 16, 2003, Decided
December 17, 2003, Entered

**SUBSEQUENT HISTORY:** Claim dismissed by *Lieberman v. Cambridge Partners, L.L.C., 2004 U.S. Dist. LEXIS 11553 (E.D. Pa., June 21, 2004)*

**DISPOSITION:** [*1] Defendant's Motion to Dismiss Complaint was granted. All claims against Defendant J.B. Hanauer & Company were dismissed with prejudice. All claims against Defendant Cambridge Partners, LLC were dismissed without prejudice for failure to serve Complaint within the time permitted under *Federal Rule of Civil Procedure 4(m)*.

LexisNexis(R) Headnotes

**COUNSEL:** For Irvin S. Lieberman, PLAINTIFF: Michael J Molder, Innelli and Molder, John F Innelli, Philadelphia, PA USA.

For JB Hanauer & Co, DEFENDANT: Jacquelyn J Ager, Robert N Feltoon, Conrad O'Brien Gellman & Rohn PC, Philadelphia, PA USA.

For JB Hanauer & Co, DEFENDANT: Lawrence M Rolnick, Thomas E Redburn, Jr, Lowenstein Sandler PC, Roseland, NJ USA.

**JUDGES:** CYNTHIA M. RUFE, J.

**OPINIONBY:** CYNTHIA M. RUFE

**OPINION:**

MEMORANDUM OPINION

RUFE, J.

This federal securities litigation comes before the Court on Defendant J.B. Hanauer & Company's Motion to Dismiss. For the reasons below, the Motion is granted. In addition, the Court dismisses all claims against Defendant [*2] Cambridge Partners, LLC because Plaintiff failed to serve that Defendant in a timely manner.

I. BACKGROUND

Plaintiff Irvin S. Lieberman, a Pennsylvania resident, brings this putative class action pursuant to *Sections 12(a)* and 15 of the Securities Act of 1933 (the "Securities Act"), *15 U.S.C. §§ 77l(a)* and *77o*. Plaintiff claims he purchased debt securities issued by the Allegheny County Industrial Development Authority ("ACIDA") pursuant to a prospectus allegedly containing false and misleading statements. Complaint PP 1, 15, 22-32. Defendants are two underwriters associated with ACIDA's bond offering: Cambridge Partners, LLC ("Cambridge Partners"), a New York corporation, and J.B. Hanauer & Company ("Hanauer"), a New Jersey corporation. Id. PP 5-6. Only Defendant Hanauer has appeared in this case. Jurisdiction is premised on diversity of citizenship and the Securities Act. See *15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332(a)*.

ACIDA issued bonds in April 1998 in order to fund a loan to Lanchester Energy Partners, L.P. ("LEP"). LEP used the loan proceeds to finance landfill gas recycling projects [*3] at three sanitary landfills. Complaint PP 16-17. Each project involved the purchase and installation of equipment for recycling and processing naturally-generated landfill gas into commercially valuable

2003 U S Dist LEXIS 23732, *; Fed Sec L Rep (CCH) P92,650

methane gas Id. P 18 According to the prospectus attached to Defendant's Motion at Exhibit C (the "Official Statement"), the bonds were to be serviced and repaid from the revenues generated by the sale of methane gas and from tax credits for alternative fuels available under *Section 29 of the Internal Revenue Code, 26 U S C § 29* Official Statement at 20-25, 30-31 n1

> n1 When ruling on a motion to dismiss for failure to state a claim, in addition to the complaint, the Court may consider a document that is integral to or relied upon in the complaint *In re Rockefeller Ctr Props Sec Litig . 184 F 3d 280. 287 (3d Cir 1999)* Here, the Court may consider the Official Statement because alleged misrepresentations and omissions therein serve as the basis for Plaintiff's Complaint

[*4]

Plaintiff purchased $ 25,000 in ACIDA bonds on April 21, 1998 and alleges that he has sustained "substantial damages " Complaint P 4. He claims that the Official Statement contains several material misrepresentations and omissions and seeks relief under *Sections 12(a)(2) and 15* of the Securities Act Complaint PP 7, 34-37, 40

Defendant Hanauer moves to dismiss the Complaint on three grounds First, it moves to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(5)* for failure to serve the Complaint in compliance with either the Federal or Pennsylvania Rules of Civil Procedure. Second, it moves to dismiss for failure to state a claim under *Section 12(a)(2) of the Securities Act* Finally, it moves to dismiss for failure to state a claim under *Section 15 of the Securities Act* because *Section 15* liability is derivative of Plaintiff's deficient underlying *Section 12(a)(2)* claim

## II. DISCUSSION

For purposes of today's decision, and in the interests of judicial economy, the Court will assume that Plaintiff properly served Hanauer The Court will focus its analysis on whether the Complaint fails to state a claim under *Sections 12(a)(2)* [*5] *and 15 of the Securities Act* n2

> n2 The familiar standard governing *12(b)(6)* motions applies here The Court must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. *Colburn v Upper Darby Township. 838 F 2d 663, 665-66 (3d Cir 1988)* A *Rule 12(b)(6)* motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff *Ransom v Marrazzo, 848 F 2d 398, 401 (3d Cir 1988)*

### A. *Section 12(a)(2) of the Securities Act*

Hanauer contends that it cannot be held liable under *Section 12(a)(2) of the Securities Act* because the debt securities Plaintiff claims to have purchased were issued by a public instrumentality of the Commonwealth of Pennsylvania, and that such securities are expressly exempt from *Section 12(a)(2)*'s liability provisions [*6] n3 Hanauer bears the burden of showing that the bonds are exempt from the *Securities Act.* See *SEC v Ralston Purina Co . 346 U S 119. 126. 97 L Ed 1494, 73 S Ct 981 (1953)* *Section 12(a)(2)* imposes liability on

> Any person who … offers or sells a security (whether or not exempted by the provisions of section 77c of this title, *other than paragraphs (2)* and (14) *of subsection (a) of said section*), … by means of a prospectus … which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements … not misleading …

*15 U S C § 77l(a)(2)* (emphasis added) Accordingly, securities described at *15 U S C § 77c(a)(2)* are exempt from liability under *Section 12(a)(2)* According to § *77c(a)(2)*, also known as Section 3(a)(2) of the Securities Act, "any security issued or guaranteed by … any State of the United States, or by any political subdivision of a State … or by any *public instrumentality* of one or more States … " is exempt from the Securities Act *§ 77c(a)(2)* (emphasis added); see [*7] also *Gustafson v Alloyd Co . Inc . 513 U S 561. 571, 131 L Ed 2d 1. 115 S Ct 1061 (1995)* ("By its terms, § 12(2) [now *Section 12(a)(2)* n4 ] exempts from its coverage prospectuses relating to the sales of government-issued securities ")

> n3 Defendant advances two alternative arguments for dismissal: (1) that Plaintiff's claims are time-barred under Section 13 of the Securities

2003 U.S. Dist. LEXIS 23732, *; Fed. Sec. L. Rep. (CCH) P92,650

Act, *15 U.S.C. § 77m*, and the Sarbanes-Oxley Act of 2002, *28 U.S.C. § 1658*; and (2) that the Official Statement disclosed all of the material risk factors that Plaintiff claims were concealed. Because the Court concludes that the bonds at issue are exempt from liability under *Section 12 of the Securities Act*, the Court does not reach these arguments.

n4 Congress renumbered Section 12 of the Securities Act in 1995 when it added another subsection. See Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, § 105, 109 Stat. 737, 757 (codified at *15 U.S.C. § 77l*)

[*8]

Plaintiff does not dispute that ACIDA is a "public instrumentality," nor could he. See *73 P.S. § 376(a)* (West 2003) ("Every industrial and commercial development authority incorporated under this act shall be a public instrumentality of the Commonwealth and a public body corporate and politic..."); *Basehore v. Hampden Indus. Dev. Auth., 433 Pa. 40, 248 A.2d 212, 216 (Pa. 1968)* ("There is no question that the [Industrial Development] Authorities are instrumentalities of the Commonwealth."). Plaintiff argues instead that the bonds at issue are subject to Securities and Exchange Commission ("SEC") *Rule 131(a)* and therefore are excluded from *Section 3(a)(2)'s* exemption.

SEC Rule 131(a) provides:

> Any part of an obligation evidenced by any bond, note, debenture, or other evidence of indebtedness issued by any governmental unit specified in section 3(a)(2) of the Act which is payable from payments to be made in respect of property or money which is or will be used, under a lease, sale, or loan arrangement, by or for industrial or commercial enterprise, shall be deemed to be a separate security within the meaning of section 2(l) of the Act, issued by the [*9] lessee or obligor under the lease, sale or loan arrangement.

*17 C.F.R. § 230.131(a)*. Distilled to its essence, SEC *Rule 131(a)* provides that any security issued by a government entity involving a lease agreement between it and a private entity is deemed to be two separate securities, with both entities considered to be separate issuers of securities. n5 The agreement between the government entity and the private entity is a separate

security subject to the coverage of the *Securities Act*, including the liability provisions in *Section 12(a)(2)*. Plaintiff argues that the bonds were issued to make a loan to LEP for a wholly private venture. He further argues that because LEP's agreement with ACIDA requires that revenues from methane gas sales be used to service and repay the bonds, the agreement is a "separate security," and therefore *Rule 131(a)* brings ACIDA's bond issue back within *Section 12(a)(2)'s* liability provisions.

n5 One court has explained the rationale for SEC *Rule 131* accordingly:

> *Rule 131* was promulgated to deal with problems created by certain revenue bonds, in particular industrial development bonds, which generally involve a government entity issuing bonds to finance the construction of a facility that is then leased to a private entity, with the lease payments providing the sole revenue source to pay off the bondholders. Prior to *Rule 131*, revenue bonds were exempt from registration under federal securities law because they are technically issued by a government entity. However, revenue bonds are not backed in any way by the taxing authority of the particular government entity like general obligation bonds are. Thus, revenue bonds were exempt from registration, but did not have the commitment of repayment that general obligation bonds have. Since this obligation or guarantee of repayment provided by a government's taxing authority is the primary reason government bonds were allowed to be exempt from registration, *Rule 131* was enacted to exclude revenue bonds from the exemption provisions since they did not have the same public commitment as general obligation bonds.

*McKay v. Juran & Moody, Inc., No. Civ. A 3-97-86, 1998 WL 1780694, at *5 (D.N.D. Sept. 1,*

2003 U.S. Dist. LEXIS 23732, *; Fed. Sec. L. Rep. (CCH) P92,650

1998) (citing Thomas Lee Hazen, 1 The Law of Securities Regulation § 4.3 (3d ed. 1995); Louis Loss and Joel Seligman, Fundamentals of Securities Regulation, pp. 268-72 (3d ed. 1995)); see also Notice of Proposed Rule 131 Under the Securities Act of 1933 and Proposed Rule 3b-5 Under the *Securities Exchange Act of 1934, 1968 WL 87384.* at *1, SEC Release No. 33-4896 (Feb. 1, 1968) ("Since the purchaser of an industrial revenue bond looks principally, if not entirely, to the lease payments for the payment of principal and interest on the bond, he is really purchasing an interest in the lease obligation of the private company. The new rules are proposed for the purpose of identifying the interest in the obligation of the private company as a separate 'security' issued by the private company.").

[*10]

Plaintiff's argument misses one key component of the ACIDA bonds at issue here: they are tax-exempt, and thus are still excluded from *Section 12(a)(2)*'s liability provisions. Section 3(a)(2) of the Securities Act exempts "any security which is an industrial development bond . . . the interest on which is excludable from gross income under section 103(a)(1) of Title 26 if, by reason of the application of paragraph (4) or (6) of section 103(c) of Title 26 n6 . . . paragraph (1) of such section 103(c) does not apply to such security." *15 U.S.C. § 77c(a)(2).* Congress added this provision of *Section 3(a)(2)* in 1970 in response to SEC *Rule 131. See Industrial Revenue Bonds. SEC Release No. 33-5103, 1970 WL 5620,* at *1 (Nov. 23, 1970). As the SEC explained, the effect of the amendment was to "exempt from the registration requirements of the [*Securities Act*], any issue of industrial revenue bonds issued for certain specified purposes . . . [including those relating to] solid waste disposal facilities." *Id.* at *1-2.

N6 These references to Title 26 are to the Internal Revenue Code of 1954, which have been recodified at *26 U.S.C. §§ 103. 141-151.* See discussion infra.

[*11]

Hanauer contends that the ACIDA bonds fit within *Section 3(a)(2)*'s exemption because they are tax-exempt industrial development bonds issued to construct and operate a gas recycling project that qualifies as a solid waste disposal facility. The Official Statement clearly states that the interest on the ACIDA bonds "is excludable from gross income for federal tax purposes," and reference to the Internal Revenue Code supports this conclusion. Official Statement at 38. Under *Internal Revenue Code §§ 103(a) & (c)(1),* the interest payable under the ACIDA bonds is excluded from gross income because it is an obligation of a political subdivision of Pennsylvania. See *26 U.S.C §§ 103(a), (c)(1).* There are some limited exceptions, but none applies here. *Section 103(b)(1)* makes taxable "any private activity bond," which Hanauer apparently concedes includes the ACIDA bonds, but it also excludes "qualified bond[s]" as defined in *Internal Revenue Code § 141.* A "qualified bond" includes any private activity bond that is "an exempt facility bond." *26 U.S.C. § 141(e)(1)(A).* The term "exempt facility [*12] bond" is defined as "any bond issued as part of an issue 95 percent or more of the net proceeds of which are to be used to provide . . . (6) solid waste disposal facilities . . . ." *26 U.S.C. § 142(a)(6)*

Hanauer contends that the ACIDA bonds fit squarely within this definition, and the Court agrees. Proceeds from sale of the ACIDA bonds were loaned to LEP to finance "the purchase and installation of plant and equipment necessary to recycle and process landfill gas produced at three landfills into pipeline quality gas." Official Statement at 5. Internal Revenue Service regulations explain that *§ 142(a)(6)*'s reference to "solid waste disposal facility" embraces this kind of project:

> In the case of property which has both a solid waste disposal function and a function other than the disposal of solid waste, only the portion of the cost of the property allocable to the function of solid waste disposal . . . is taken into account as an expenditure to provide solid waste disposal facilities. *A facility which otherwise qualifies as a solid waste disposal facility will not be treated as having a function other than solid waste disposal merely because material* [*13] *or heat which has utility or value is recovered or results from the disposal process. Where materials or heat are recovered, the waste disposal function includes the processing of such materials or heat which occurs in order to put them into the form in which the materials or heat are in fact sold or used,* but does not include further processing which converts the materials or heat into other products.

*26 C.F.R. § 171(a) (2003).* (emphasis added). The facilities funded by the ACIDA bond issue were expected to capture and process naturally generated landfill gas

2003 U.S. Dist. LEXIS 23732, *; Fed. Sec. L. Rep. (CCH) P92,650

into commercially valuable methane gas. In light of the above-quoted regulation, undoubtedly such a project conforms to the IRS's interpretation of "solid waste disposal facility." See also *SEC Release No. 33-5103, 1970 WL 5620,* at *2 (*Section 3(a)(2)* "removes from the registration requirements of the Acts, industrial development bonds, substantially all of the proceeds of which are to be used to provide . . . sewage or solid waste disposal facilities").

Although not cited by the parties, the Court's own research has revealed that other courts, when presented with similar arguments, [*14] have reached the same conclusion. See *In re Bexar County Health Facility Dev Corp Sec. Litig., 125 F.R.D. 625, 633-35 (E.D. Pa 1989)* (denying class certification, determining that *Section 3(a)(2)* exempts the securities at issue from *Section 12(2)* liability, and concluding that SEC *Rule 131* does not apply where proceeds of bond sale were for a loan to a tax-exempt non-profit); *Gorsey v. I.M. Simon & Co., Inc., Civ. A. No. 86-1875-Z, 1987 U.S. Dist. LEXIS 1940,* at *7-11 (D. Mass. Feb. 23, 1987)* (dismissing plaintiffs' *Section 12(2)* claims, agreeing with defendants that the notes at issue were exempt from *Section 12(2)* because of the exceptions in *Section 3(a)(2)* for bonds issued by a political subdivision of a state and/or tax-exempt industrial development bonds, and concluding that SEC *Rule 131* does not apply).

For the foregoing reasons, the Court agrees with Hanauer that the ACIDA bonds are tax-exempt "industrial development bond[s]" within the meaning of *Section 3(a)(2) of the Securities Act,* that SEC *Rule 131* does not apply, and that the ACIDA bonds are exempt from the liability provisions of *Section 12(a)(2) of the Securities Act.* Accordingly, [*15] the Court must dismiss Plaintiff's claims premised on *Section 12(a)(2).* Because amendment of the Complaint would be futile, the dismissal is with prejudice. Having concluded that Plaintiff's *Section 12(a)(2)* claims fail because the ACIDA bonds are exempt, the Court need not reach Plaintiff's alternative arguments as to the statute of limitations or the sufficiency of the Official Statement's disclosures.

### B. *Section 15 of the Securities Act*

Section 15 of the Securities Act imposes liability on any person who "controls any person liable under sections 77k [§ 11] or 77l [§ 12]." *15 U.S.C. § 77o.* Liability under *Section 15,* therefore, is predicated on the presence of liability of a controlled person under *Sections 11 or 12. In re US Interactive, Inc. Class Action Sec*

*Litig., 2002 U.S. Dist. LEXIS 16009, No. 01-CV-522, 2002 WL 1971252,* at *5 n.7 (E.D. Pa. Aug. 23, 2002); Gannon v. Continental Ins. Co., 920 F. Supp. 566, 575-76 (D.N.J. 1996); Jenkins v. Fidelity Bank, 365 F. Supp 1391, 1402 (E.D. Pa. 1973).* Plaintiff does not allege any violation of *Section 11* in his Complaint. Having concluded above that Plaintiff cannot [*16] make out liability under *Section 12,* his claims arising under *Section 15* must also be dismissed.

### C. Claims Against Defendant Cambridge Partners

Plaintiff named Cambridge Partners as a defendant to this action, but failed to serve it within the time period provided in *Federal Rule of Civil Procedure 4(m).* On August 25, 2003, the Court issued an Order to Show Cause why this action should not be dismissed for failure to effect service in a timely fashion. Plaintiff responded by filing an executed summons as to Defendant Hanauer but explained that his efforts to locate Cambridge Partners were unsuccessful. Plaintiff stated that he would file an appropriate motion, presumably asking for more time to serve Cambridge Partners, but no such motion ever appeared on the case docket. Accordingly, the Court dismisses the claims against Cambridge Partners.

An appropriate Order follows.

### ORDER

AND NOW, this 16th day of December, 2003, upon consideration of Defendant J.B. Hanauer & Company's Motion to Dismiss the Complaint [Doc. # 6], Plaintiff's Opposition thereto [Doc. # 11], Defendant's Reply [Doc. # 12], and for the reasons set forth [*17] in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED.** All claims against Defendant J.B. Hanauer & Company are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that all claims against Defendant Cambridge Partners, LLC are **DISMISSED WITHOUT PREJUDICE** for failure to serve the Complaint within the time permitted under *Federal Rule of Civil Procedure 4(m).*

The Clerk of Court shall mark this case closed for statistical purposes.

It is so **ORDERED.**

**BY THE COURT:**

**CYNTHIA M. RUFE, J.**

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

LEXSEE 2002 US DIST LEXIS 12162

GEETA RAVENS, individually and on behalf of all others similarly situated, v. REPUBLIC NEW YORK CORPORATION, REPUBLIC NEW YORK SECURITIES CORPORATION, HSBC USA, INC. and WILLIAM H. ROGERS

Civil Action No. 99-4981

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2002 U.S. Dist. LEXIS 12162; Fed. Sec. L. Rep. (CCH) P91,947*

**April 24, 2002, Decided**

**DISPOSITION:** [*1] All claims against Defendant Rogers DISMISSED. All claims against Defendant Republic New York Securities Corp. DISMISSED. Count II of Amended Complaint DISMISSED as against Defendants Republic New York Corp. and HSBC USA, Inc.

LexisNexis(R) Headnotes

**COUNSEL:** For GEETA RAVENS, PLAINTIFF: MARC TOPAZ, SCHIFFRIN AND CRAIG, BALA CYNWYD, PA USA.

For GEETA RAVENS, PLAINTIFF: STUART L. BERMAN, SCHIFFRIN & BARROWAY, LLC , BALA CYNWYD, PA USA.

For GEETA RAVENS, PLAINTIFF: MARC WILLNER, SCHIFFRIN & BARROWAY, LLP, BALA CYNWYD, PA USA.

For REPUBLIC NEW YORK CORPORATION, REPUBLIC NEW YORK SECURITIES CORPORATION, DEFENDANTS: MAITE AQUINO, SULLIVAN & CROMWELL, NEW YORK, NY USA.

For REPUBLIC NEW YORK CORPORATION, REPUBLIC NEW YORK SECURITIES CORPORATION, HSBC USA, INC., DEFENDANTS: ABBE F. FLETMAN, WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP, PHILADELPHIA, PA USA.

For REPUBLIC NEW YORK CORPORATION,

REPUBLIC NEW YORK SECURITIES CORPORATION, HSBC USA, INC., DEFENDANTS: RICHARD F. ZIEGLER, JENNIFER L. KROMAN, CHRISTOPHER H. LUNDING, DAVID E. BRODSKY, CLEARY, GOTTLIEB, STEEN & HAMILTON, NEW YORK, NY USA.

For WILLIAM H. ROGERS, DEFENDANT: LOUIS CHARLES SHAPIRO, BLANK ROME COMISKY & MC CAULEY, PHILA, PA USA.

For WILLIAM H. ROGERS, DEFENDANT: JAMES G. WILES, YARDLEY, PA USA. [*2]

**JUDGES:** R. Barclay Surrick, Judge.

**OPINIONBY:** R. Barclay Surrick

**OPINION:**

MEMORANDUM & ORDER

**SURRICK, J.**

APRIL 24, 2002

This action arises from a merger between HSBC Holdings plc ("HSBC Holdings") and Republic New York Corporation ("Republic Corp."). Plaintiff, Geeta Ravens, represents a putative class of investors (the "Class") who were allegedly damaged as a result of their acquisition of the common stock of Republic Corp. between May 10, 1999 and September 15, 1999 (the "Class Period"). Plaintiff seeks remedies under Sections 10(b) and 20(a) of the Exchange Act of 1934, *15 U.S.C. 78j*(b) and 78t(a), and Rule 10b-5 of the Securities and

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

Exchange Commission, *17 C.F.R. § 240.10b-5*. Defendants are Republic Corp., a full-service banking institution during the Class Period; Republic New York Securities Corp. ("Republic Securities"), a full-service brokerage firm that was a wholly-owned subsidiary of Republic Corp. during the Class Period; HSBC USA Inc. ("HSBC USA"), the successor corporation to Republic Corp.; and William H. Rogers, an officer of Republic Securities and President of Republic Securities' futures trading division [*3] (the "Futures Division") until being fired during the Class Period.

Currently before the Court are the Motion of Republic New York Corporation, Republic New York Securities Corporation, and HSBC USA, Inc. to Dismiss the Amended Complaint (the "Republic Motion," Docket No. 16), and the Motion to Dismiss of William H. Rogers (the "Rogers Motion," Docket No. 17). For the following reasons, the Republic Motion will be granted in part and denied in part, and the Rogers Motion will be granted.

## I. FACTS

On May 10, 1999, HSBC Holdings and Republic Corp. jointly announced that Republic Corp. had entered into a merger agreement with HSBC Holdings and Safra Holdings (the "Merger Agreement") whereby HSBC Holdings would acquire all of Republic Corp.'s outstanding common stock for $ 72 per share in cash. Am. Cmpl. P 129. The $ 72 per share was said to represent a "substantial premium" over the market price of Republic Corp. stock prior to the news of the Merger. *Id.* P 130. The stock closed at $ 60.25 per share one week before the initial public announcement of the Merger, and the average trading price for the stock for the 60-day and 30-day periods ending on May 7, 1999 was [*4] $ 48.06 and $ 52.24 respectively. *Id.* Republic Corp. filed a Form 8-K periodic report with the SEC on May 10, 1999, that announced the terms of the Merger. *Id.* P 131. On May 14, 1999, Republic Corp. filed an Amended Form 8-K with the SEC with the Merger Agreement as an Exhibit (the "May 1999 8-K/A") *Id.* P 132.

The Merger Agreement stated that neither Republic Corp., Republic Securities, nor the executives of Republic Securities were aware of any facts or circumstances that occurred or became known since December 31, 1998 that could have a material adverse impact upon Republic Corp. or its ability to consummate the then-pending merger with HSBC Holdings. *Id.* PP 4, 137. n1

n1 The Merger Agreement specifically

stated:

> ABSENCE OF CERTAIN CHANGES OR EVENTS (a) Except as publicly disclosed in the Company Reports [defined as reports filed with the SEC] filed prior to the date of this Agreement, since December 31, 1998, no event has occurred and no fact or circumstance shall have come to exist or come to be known which, directly or indirectly, individually or taken together with all other facts, circumstances and events (described in any paragraph of this Article III or otherwise), has had, or is reasonably likely to have, a Material Adverse Effect with respect to [Republic Corp. or Safra Holdings].

Am. Compl. P 134. A "Material Adverse Effect" is defined in the Merger Agreement as any effect that "is or is reasonably likely to be material and adverse to the condition (financial or otherwise), business, liabilities, properties, assets, prospects or results of operations of [Republic Corp., Safra Holdings] and their Subsidiaries taken as a whole other than any change, effect, event or occurrence arising out of the performance by the parties of their obligations under this Agreement." *Id.* P 135. In addition, the Merger Agreement provided that "[a] fact, event, circumstance or occurrence shall be within a Person's 'Knowledge' if, with respect to the Company or any of its Subsidiaries, such fact, event, circumstance or occurrence is or was actually known by any of the Company's or the relevant Subsidiary's executive officers or directors." *Id.* P 136.

[*5]

Republic Corp. also warranted in the Merger Agreement that it would "promptly advise" HSBC Holdings of any event that could have a material adverse effect upon the company. *Id.* P 142 n2. On August 9, 1999, Republic Corp. mailed an SEC Schedule 14(a) Proxy Statement concerning the Merger (the "Proxy") to all Republic Corp. shareholders. *Id.* PP 145-47. The Proxy, by the attached Merger Agreement, warranted that the parties to the Merger would promptly correct the Proxy if they became aware that any of its contents or omissions were materially false or misleading, and

2002 U S Dist LEXIS 12162, *; Fed Sec L Rep (CCH) P91,947

promptly inform the other party of the relevant information. Id P 147. n3

n2 The Merger Agreement provided:

7.9 ADVICE OF CHANGES [HSBC Holdings] and [Republic Corp and Safra Holdings] shall promptly advise the other parties of any change or event having, or which *could have*, a Material Adverse Effect on it or them, as applicable, or which would be reasonably likely to cause or constitute a material breach of any of its representations, warranties or covenants contained herein or would reasonably likely to cause any of the conditions in Article VIII [related to the conditions to closing the Merger] not to be satisfied or to cause the satisfaction thereof to be materially delayed.

Am Cmpl P 142 (emphasis added) [*6]

n3 The Merger Agreement attached to the Proxy stated:

Each of [Republic Corp, Safra Holdings and HSBC Holdings] further agrees that if it shall become aware prior to the Effective Time . . . of any information furnished by it that would cause any of the statements in the Proxy Statement . . . to be false or misleading with respect to any material fact, or to omit to state any material fact necessary to make the statements therein not false or misleading, to promptly inform the other party thereof and to take the necessary steps to correct the Proxy Statement . . . .

Am Cmpl P 147

Plaintiff alleges that these representations and warranties were misleading because, prior to that time, Defendants were active participants in a fraudulent

scheme which involved the sale of billions of dollars of notes (the "Princeton Notes," and the "Noteholder Fraud") to Japanese investors (the "Noteholders") by companies affiliated with indicted financier Martin Armstrong, a client of Republic Securities (the "Armstrong Companies"). Id PP 3-17. Republic Corp. later finalized the Merger Agreement [*7] without disclosing the Noteholder Fraud, which Plaintiff alleges exposed Defendants to hundreds of millions of dollars in liability. Id PP 4, 121-49

Martin Armstrong was by far the largest client of Republic Securities' Futures Division. Id P 8. Originally, from around 1991 until approximately February 1995, Prudential Securities, Inc. ("Prudential") served as the fiduciary for the funds created by the sale of the Princeton Notes. Id P 52. Rogers was Armstrong's broker at Prudential. Id In or about February 1995, Prudential terminated its relationship with Armstrong, and Rogers left Prudential. Id P 53. Rogers was then hired as the President of Republic Securities' Futures Division. Notwithstanding Prudential's alleged refusal to handle Armstrong's business, Republic Securities accepted Armstrong as a client. Id PP 54-55. At that time, Republic Securities agreed to replace Prudential as the fiduciary and custodian of the segregated accounts maintained on behalf of the Noteholders (the "Noteholder Accounts"). Id P 57. In doing so, Republic Securities undertook a contractual obligation to maintain the assets of the Noteholders in segregated accounts. [*8] Id PP 12, 58

Plaintiff alleges that Defendants permitted Armstrong to continue his speculative trading by allowing the Armstrong Companies to use a master account (the "Master Account") enabling the Armstrong Companies to take on margin loans secured by the segregated Noteholder Accounts. Id PP 12, 67, 74-78. Plaintiff alleges that Defendants utilized the Noteholders' assets to pay down deficits accrued by the Armstrong Companies in the Master Account. Id n4

n4 The Amended Complaint states that pooling of Noteholders' funds into the Master Account was directed by Republic Corp. Id P 67. However, in its detailed description of the creation of the Master Account, the Amend Complaint fails to implicate Republic Corp., but instead states that Republic Securities directed the creation of the Master Account and the commingling of the Noteholders' funds. Id PP 74-80. Plaintiff's allegation that Republic Corp directed the pooling of Noteholders' funds appears to be further contradicted by the

2002 U S Dist LEXIS 12162, *; Fed Sec L Rep (CCH) P91,947

Amended Complaint, which alleges that the Master Account was created in approximately November 1997, id PP 75, 79, whereas Plaintiff alleges that Republic Corp was an "active participant in the Noteholder Fraud from at least April 1998 forward " Id P 107.

[*9]

Plaintiff alleges that in order to conceal the unlawful treatment of the Noteholder Accounts, Defendants permitted the Armstrong Companies to transfer assets among the Noteholder Accounts at Armstrong's complete discretion Id PP 11, 13, 81-97 This practice enabled the Armstrong Companies to issue fraudulent "net asset value" letters to the Noteholders ("NAV Letters") setting forth false account balances for the Noteholder Accounts. Id PP 11, 13. Plaintiff alleges that the NAV Letters were used by Armstrong to falsely demonstrate stellar returns on the Princeton Notes and to assure the Noteholders that their assets were being maintained in separate accounts and were appreciating in value Id P 11.

In approximately July 1998, the Credit Review Department of Republic National Bank ("RNB"), a wholly-owned subsidiary of Republic Corp , conducted an examination and wrote a report for Republic Corp concerning Republic Securities' Futures Division (the "Credit Report") Id P 98. The Credit Report assigned a rating of "UNSATISFACTORY" to the Futures Division, primarily due to Republic Securities' relationship with Armstrong and the Armstrong Companies. Id P 100 [*10] The Credit Report identified the credit risk to Republic Securities resulting from the Futures Division practice of improperly cross-margining the Noteholder Accounts Id PP 102-03

It is alleged that Republic Corp., on the advice of RNB's Credit Review Department, instructed Republic Securities to obtain "cross-margining" agreements from Armstrong on behalf of the issuers of the Notes; and to restructure the various accounts in a manner designed to insulate Republic Corp and Republic Securities against the credit risk presented by the deficits in the Master Account Id P 104. The findings of the Credit Report were communicated to Defendants Id P 105 Plaintiff alleges that, as demonstrated by the Credit Report, Republic Corp was an active participant in the Noteholder fraud from at least April 1998, because the report was prepared for Republic Corp and was reviewed and endorsed by high-ranking Republic Corp officials, including those with supervisory responsibility over Republic Securities Id P 107

In or about May 1998, the New York Mercantile Exchange ("NYMEX") conducted an audit of Republic

Securities, including a review of the Noteholder Accounts [*11] Id P 109 Plaintiff alleges that, notwithstanding misrepresentations made by Republic Securities in connection with the audit, NYMEX concluded that Republic Securities was inappropriately cross-margining the Noteholder Accounts Id PP 110, 111 NYMEX took the position that a guarantee agreement for cross-margining would be insufficient and warned Republic Securities that a shut down might be required. Id PP 110-112, 115 Plaintiff alleges that in or about July 1998, Armstrong and Republic Securities began to close the Noteholder Accounts and convert them into sub-accounts in the Master Account (the "Noteholder Sub-Accounts") Id P 114 On or about September 23, 1998, Armstrong, without the knowledge or consent of the Noteholders, signed a guarantee agreement on behalf of the issuers of the Notes Id P 116 Plaintiff alleges that like the Noteholder Accounts they replaced, the Noteholder Sub-Accounts were used by Defendants as collateral to support the trading sub-accounts (the "Trading Sub-Accounts") in the Master Account Id P 120.

In February 1999, Rogers sent Armstrong a NAV Letter that was to be provided to Amanda Co , Ltd. ("Amanda") Id P 92 [*12] Rogers knew the letter falsely represented the balance of Amanda's Noteholder Account and the nature of the assets contained therein. Id In addition, in a March 17, 1999 letter from Rogers that was again intended for Amanda's Noteholders, Republic Securities confirmed for the Noteholders that their accounts were segregated Id P 62

Plaintiff contends that Defendants misrepresented themselves in the Merger Agreement by not disclosing their prior involvement in the Noteholder Fraud which, Plaintiff alleges, Defendants knew subjected them to potential liability Plaintiff alleges that, because of the (No Material Adverse Effect ("No MAE") statement in the Merger Agreement, investors were induced to purchase Republic Corp 's common stock at inflated prices Id PP 3, 210-14

In May 1999, Japan's securities regulating agency, the Financial Supervisory Agency of Japan (the "FSA"), raided the offices of Cresvale-Tokyo, the company that marketed the Princeton Notes in Japan. Id P 150 Plaintiff alleges that, through their communications with Armstrong and the Armstrong Companies, Defendants were aware of the raid and their potential liability Id P 151 Following [*13] the announcement of the Merger and the FSA's raid on Cresvale-Tokyo's office, Plaintiff alleges that Republic Corp demanded that the accumulated deficits in the Noteholder Sub-Accounts be reduced or eliminated in anticipation of the Merger and

2002 U S Dist LEXIS 12162, *; Fed Sec L Rep (CCH) P91,947

the due diligence that HSBC Holdings would conduct prior to the consummation of the Merger *Id* PP 152-53 From July 1, 1999 until about August 27, 1999, Republic Securities transferred more than $ 500 million from the Noteholder Sub-Accounts to cover the deficit balances in the Trading Sub-Accounts. *Id* PP 155, 158. While the transfers were taking place, on or about August 18, 1999, the FSA forwarded a request for information to the Federal Reserve Bank and RNB seeking information regarding the Noteholder Accounts *Id* PP 157

Plaintiff contends that by attaching the Merger Agreement to the Proxy, Republic Corp, repeated the misrepresentations in the Merger Agreement *Id* P 146 According to Plaintiff, the Merger Agreement and Proxy were materially misleading because of the No MAE statement and because Republic Corp. had warranted, on behalf of itself and its subsidiaries, that any material misrepresentation or omission would [*14] be corrected. *Id* P 147 Republic Corp. did not make any disclosure regarding the Noteholder Fraud until after the Proxy was filed

On September 1, 1999, Republic Corp. publicly announced in a press release that it had received a letter from the FSA regarding its investigation of a client of the Futures Division of its subsidiary Republic Securities, that it had commenced its own investigation, and that it had "replaced the management of the Futures Division of [Republic Securities] and [had] suspended the chief executive officer of [Republic Securities]." *Id* P 163. Republic Corp also announced that "it had advised HSBC of these developments and [would] resolved to work towards a closing" of the Merger. *Id* On September 15, 1999, Republic Corp. publicly acknowledged its connection with the Noteholder Fraud *Id* P 165. In a press release, Republic Corp. disclosed that the client involved in the FSA's investigation was Princeton Global Management ("PGM"), and that the United States Attorney's Office had announced the filing of a criminal indictment against Martin A. Armstrong, charging him with securities fraud *Id*

Plaintiff alleges that Defendants [*15] failed to correct the No MAE representation from May 14, 1999, when they filed the May 1999 8-K/A, until at least September 1, 1999, and that they concealed their participation in the Noteholder Fraud. *Id* PP 139-44 Plaintiff contends that only after Republic Corp and Republic Securities had protected their financial interests to the extent possible by converting the money held in the Noteholder Accounts to pay for the deficits incurred by Armstrong in the PGM Master Account, did Republic Corp reveal that the Noteholder Fraud was under investigation by Republic Corp., HSBC Holdings and

government authorities *Id* PP 17, 158-59

Plaintiff purchased 300 shares of Republic Corp. common stock during the Class Period at $ 63 1/4 per share *Id* P 27 Plaintiff sold 25 shares on October 7, 1999 at $ 62 5/8 and sold the remaining 275 shares at a price of $ 61 3/16 per share *Id* P 28. Thus, Plaintiff incurred a loss in connection with her Class Period investment in Republic Corp. common stock

On November 8, 1999, Republic Corp. announced that the Merger would close at the originally agreed upon $ 72 per share in cash for each publicly held Republic Corp share The Merger [*16] did occur as represented on December 31, 1999 *Id* PP 171, 179 Plaintiff alleges the Merger was consummated only because the Merger Agreement was amended, forcing Republic Corp.'s largest shareholder, Edmond Safra, to agree: (a) to reduce the consideration he received in connection with the Merger by $ 450 million; and (b) to pay up to an additional $ 180 million to HSBC Holdings, under certain circumstances, to indemnify it for liability incurred as a result of the numerous lawsuit arising from the Noteholder Fraud. *Id* PP 171-77. However, Plaintiff alleges that prior to the announcement of Safra's concessions, Defendants' participation in the Noteholder Fraud created substantial doubt as to whether the Merger would be consummated. *Id* PP 7, 210-14. As a result, the market price of Republic Corp. common stock fell sharply *Id* PP 7, 143, 164. Plaintiff and other shareholders who purchased the Company's shares during the Class Period, but who sold their shares prior to the announcement of Safra's concession, suffered significant losses as a direct result of the alleged false representations and material omissions *Id* P 28

## II. NATURE AND STAGE OF PROCEEDING [*17]

Plaintiff filed her complaint on October 7, 1999. On September 1, 2000, this Court entered an order granting Plaintiff's motion for appointment as lead plaintiff in this action. (Docket No. 12). An amended complaint was filed on October 19, 2000. (Docket No. 13). Defendants, Republic Corp., Republic Securities and HSBC USA have filed a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* (Docket No. 16). Rogers has also filed a separate motion to dismiss. (Docket No. 17). The **Republic Motion and the Rogers Motion are the subject of this Memorandum & Order.**

## III. STANDARD

When considering a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), n5 this Court must "accept as true the facts alleged in the

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)* (citing *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988))*, see *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*, [*18] see also *Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. A court will only dismiss a complaint if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" *H.J. Inc., 492 U.S. at 249-50* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)), Nietzke v. Williams, 490 U.S. 319, 326-327, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1984)*. Nevertheless, a court need not credit a plaintiffs "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)*.

n5 Rule 12(b)(6) provides that:

> Every defense, in law or fact, to a claim for relief in any pleading shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . (6) failure to state a claim upon which relief can be granted . . .

*Fed. R. Civ. P. 12(b)(6)*.

[*19]

## IV. DISCUSSION

### A. Claims Under Section 10(b) and Rule 10b-5 (Count I)

#### 1. Elements

To state a valid claim under Section 10(b) n6 and Rule 10b-5, n7 a plaintiff must show that the defendants (1) made a misrepresentation or omission of a material fact, (2) with scienter, (3) in connection with the purchase or the sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that the plaintiff's reliance was the proximate cause of his or her injury. *Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir. 2000)*.

n6 Section 10(b) makes it unlawful for any person, directly or indirectly . . to use or employ, in connection with the purchase or sale of any security . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . . 15 U.S.C. § 78j(b).

n7 Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

[*20]

While notice pleading is sufficient in most cases, a plaintiff alleging fraud must also satisfy *Fed. R. Civ. P. 9(b)* n8 by stating the circumstances constituting fraud with particularity "in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Serville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211, 105 S. Ct. 1179, 84 L. Ed. 2d 327 (1985)*.

n8 *Fed. R. Civ. P. 9(b)* provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

In securities fraud actions, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a heightened pleading standard. It requires a specification of each misleading statement, the reasons [*21] why the statement is misleading, and the facts on which the belief is formed if the allegation is made on information or belief. 15 U.S.C.A. § 78u-4(b)(1). It also requires the

plaintiff, for each alleged act or omission, to allege "with particularity" facts that give rise to a strong inference that the defendant acted with the required state of mind  *15 U S C A § 78u-4*(b)(2)  n9 In any private action arising under the Exchange Act, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of subsection (1) and (2) are not met  *15 U S C A § 78u-4*(b)(3)(A)  Since the requirement under  *Fed R Civ P 9(b)* is no more strict than that established by the PSLRA, those allegations of fraud that comply with the PSLRA pleading standard also satisfy Rule 9(b)  *In re Equimed, Inc .  2000 U S  Dist  LEXIS 6209, 2000 WL 562909*, at *6 (Shapiro, J ) (E D  Pa  May 9, 2000)

n9 The PSLRA states:

(1)  Misleading  statements  and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant -
(A) made an untrue statement of material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed
(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind

*15 U S C A § 78u-4*(b)

[*22]

Courts in this District have cautioned that the PSLRA "was not intended to create an insurmountable pleading hurdle for plaintiffs in such cases "  *In re Unisys Corp  Sec  Litig , 2000 U S  Dist  LEXIS 13500, 2000 WL 1367951*, at *4 (Newcomer, J ) (E D  Pa  Sep  21, 2000) (quoting *In re Resources America Sec  Litig , 2000 U S  Dist  LEXIS 10640, 2000 WL 1053861*, at *7 (DuBois, J ) (E D  Pa  July 26, 2000))  The plaintiffs in securities fraud cases are not required to plead all of the evidence and proof thereunder supporting their claims  *Id*

The Amended Complaint states that the allegations are made upon information and belief, except those allegations specifically pertaining to Plaintiff or her counsel, which are based on Plaintiff's personal knowledge  (Am  Compl , pg  1)  Under the PSLRA, Plaintiff must not only specify each misleading statement or omission, and the reasons why each is misleading, but also state with particularity all facts on which her belief is formed  *15 U S C § 78u-4*(b)(1)  Plaintiff may satisfy this requirement by stating with particularity the sources of the facts alleged on information and belief  *See  In re Aetna Inc  Sec  Litig , 34 F  Supp  2d 935, 942-43 (E D  Pa  1999)* [*23] (dismissing the Amended Complaint for failure to identify what SEC filings and analysts' reports the plaintiffs relied on, and what "other publications disseminated by defendants" and "other sources of information" were reviewed, and instructing the plaintiffs to state with particularity the sources of the facts that they alleged on information and belief in amending their Amended Complaint); *In re Silicon Graphics, Inc  Sec  Litig , 970 F  Supp  746, 763-66 (N D  Cal  1997)*  Plaintiff has met this burden by identifying in Paragraph 215 of the Amended Complaint the sources that form the basis of her allegations, based on information and belief

2  Misrepresentation and Omission

(a) Republic Corp

Plaintiff contends that the representations and warranties in the Merger Agreement were misleading because, prior to the Merger announcement, Defendants were active participants in the Noteholder Fraud  Plaintiff alleges that the No MAE statement in Republic Corp 's Merger Agreement was false when made and Republic Corp  made the misrepresentation by attaching the Merger Agreement to its Form 8-K/A filed with the SEC on May 14, 1999  Am  Cmpl  P 4  Plaintiff contends [*24] that the Proxy, by the attached Merger Agreement, repeated the alleged misrepresentations in the Merger Agreement  *Id* P 146  According to Plaintiff, the Merger Agreement and Proxy were materially misleading

because of the No MAE statement and because Republic Corp. had warranted, on behalf of itself and its subsidiaries, that any material misrepresentation or omission would be corrected *Id.* P 147.

To satisfy the pleading requirement with respect to Republic Corp.'s misrepresentations, Plaintiff must identify what the false statement is; by whom, when, and where it was made; and why it was misleading. *In re Unysis Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 13500, 2000 WL 1367951.* at *4; *Vogel v. Sands Bros. & Co. Ltd., 126 F. Supp. 2d 730, 738 (S.D.N.Y. 2001). In re Milestone Scientific Sec. Litig., 103 F. Supp. 2d 425, 462 (D.N.J. 2000). see also Cell Pathways, 2000 U.S. Dist. LEXIS 8584, 2000 WL 805221,* at *9 (addressing the Exchange Act and Rule 9(b)); *In re Walnut Leasing Co., Inc., 1999 U.S. Dist. LEXIS 14517, 1999 WL 729267,* at *5 (E.D. Pa. Sep. 8, 1999). Plaintiff has clearly identified the allegedly false statements in the Merger Agreement that were disseminated by Republic [*25] Corp. with the distribution of the 1999 8-K/A and Proxy. Defendant contends, however, that Plaintiff has not sufficiently identified why the statements were false or misleading.

In the Merger Agreement, Republic Corp. represented that, from December 31, 1998 to May 10, 1999, the date of the Merger Agreement, no event or fact had occurred or had come to be known to Republic Corp., Republic Securities, or their officers, that had or would reasonably have a Material Adverse Effect with respect Republic Corp. Am. Cmpl. PP 134-136. The Merger Agreement also obligated Republic Corp. to correct and update their disclosures with respect to any change or event occurring after the date of the Merger Agreement that *could* have a Material Adverse Effect on Republic Corp., or that *could* materially delay the Merger *Id.* P 142. Republic Corp. repeated its No MAE statement and assurances regarding changes or events in the Proxy. Plaintiff does not argue that the Proxy contains representations or warranties that are broader than those in the Merger Agreement. Accordingly, Republic Corp.'s representations and warranties were limited to events occurring or becoming known after the December 31, 1998. In [*26] order to properly allege that Republic Corp. made misrepresentations, Plaintiff must alleged facts of events occurring or becoming known to Republic Corp., Republic Securities, or their officers, after December 31, 1998 that could have had a Material Adverse Effect on Republic Corp. or that could have caused a material delay to the Merger.

Plaintiff has alleged several events occurring after December 31, 1998. Plaintiff alleges that in February 1999, Rogers sent Armstrong a false NAV Letter that was intended for Amanda. *Id.* P 92. Rogers knew the letter falsely represented the balance of Amanda's Noteholder Account and the nature of the assets contained therein. *Id.* Moreover, in a March 17, 1999 letter from Rogers that was again intended for Amanda's Noteholders, Republic Securities confirmed for the Noteholders that their accounts were segregated. *Id.* P 62. In addition, Plaintiff alleges that, in or around May 1999, Republic Corp. and Republic Securities were aware of the FSA's raid on the Cresvale-Tokyo office and that both were aware of the potential liability. *Id.* P 151. Finally, from July 1, 1999 through August 27, 1999, Republic Securities transferred over $ 500 [*27] million from the Noteholder Sub-Accounts to cover deficit balances in the Trading Sub-Accounts. *Id.* P 155. The issue to be determined is whether these events could have had a material and adverse effect on Republic Corp. or caused a material delay to the Merger.

It has been well established that a statement or omission is material if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Ep MedSystems, Inc. v. Echocath, Inc., 235 F.3d 865, 872 (3d Cir. 2000)* (quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).* The issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor. *Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992).* "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *TSC Indus., Inc., 426 U.S. at 450* [*28] The district court, however, can rule that the allegations are inactionable as a matter of law "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Id.*

Here, Plaintiff alleges that Defendant's misrepresentations and omissions created an unrealistically positive assessment of Republic Corp. among investors and caused its common stock to be overvalued and artificially inflated. Am. Cmpl. P 210. Plaintiff alleges that she and other members of the Class would not have purchased Republic Corp. common stock at the market prices that prevailed during the Class Period, if at all, had they been aware of the true facts concerning the Company's business operations and prospects. *Id.* P 212. If we take the well-pleaded allegations of the misrepresentations and omissions as true, certainly these misrepresentations and omissions could have affected a reasonable shareholder's assessment of the probability that the Merger would be

Case 1:05-cv-00162-JJF    Document 33-13    Filed 06/17/2005    Page 31 of 38

Page 10

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

consummated and the shareholder's decision to purchase or sell Republic Corp.'s stock. The allegations concerning facts or events that became known after December 31, 1998 satisfy [*29] Plaintiff's burden of alleging a misrepresentation of a material fact.

We disagree with Defendants' contention that the alleged omissions are merely non-actionable corporate mismanagement. While recognizing that the federal securities laws do not regulate internal corporate mismanagement, we are satisfied that a claim that Defendants failed to disclose material facts is actionable. *Marra v. Tel-Save Holdings, Inc.*, 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103, at *7 (Buckwalter, J.) (E.D. Pa. May 18, 1999) (holding that having stated claims that the defendants misrepresented or omitted information pertaining to existing material events, the plaintiffs have alleged more than mere corporate mismanagement). A complaint is not subject to dismissal if the plaintiff pleads "specific facts permitting the inference that defendants were intentionally concealing [mismanagement]." *Aetna*, 34 F. Supp. 2d at 950 (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 711 (3d Cir. 1996)). Moreover, a complaint states an actionable misrepresentation if it alleges "a defendant was aware that mismanagement had occurred and made a material public statement of corporate affairs inconsistent [*30] with the existence of the mismanagement." *Id.* (quoting *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992))

Republic Corp. argues that, because of the speculative nature of the impact of these events, it had no duty to disclose the events prior to the time it received the FSA letter in August 1999. Republic Corp. contends it had no duty to disclose the possibility of litigation against it or Republic Securities. *See In re Nat'l Media Sec. Litig.*, 1994 U.S. Dist. LEXIS 10385, Civ. A. No. 93-2977, 1994 WL 397398, *3 (Padova, J.) (E.D. Pa. July 27, 1994) (citing *General Elec. Co. v. Cathcart*, 980 F.2d 927, 935 (3d Cir. 1992) ("mere possibility of litigation is not [material]")). This argument misses the point. Although Republic Corp. had no duty to predict and disclose the threat of possible litigation against it or its subsidiaries, Plaintiff's claims concern existing facts known to Republic Securities that could have materially and adversely affected Republic Corp. and delayed the Merger. We cannot conclude that the post December 31, 1998 activities related to Republic Securities would not have had a Material Adverse Effect, and, to the extent that they were [*31] "substantially likely to be significant to a reasonable investor, [they] must be disclosed, even though the legal consequence of the violation may be a contingency." *In re Craftmatic Sec. Litig. v. Kraftsow (In re Craftmatic Sec. Litig.)* 890 F.2d 628, 640 (3d Cir. 1989)

Republic Corp. also argues that it had no duty to predict the possibility of future liability. *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000), *In re Craftmatic Sec. Litig.*, 890 F.2d at 644, *Ash v. LFE Corp.*, 525 F.2d 215, 219-20 (3d Cir. 1975) (no duty of self-flagellation) Defendants overlook the fact that once it made its representations and warranties in the Merger Agreement and Proxy, it was under an obligation to disclose all facts necessary to make its statements nonmisleading. *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 948 (E.D. Pa. 1999); *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 368-69 (E.D. Pa. 1997) Clearly, Republic Corp. had an obligation to disclose any facts or events that occurred or became known to it or its subsidiaries after December 31, 1998 that *could have* had a material and adverse [*32] effect on Republic Corp. or *could have* materially delayed the Merger. Am. Cmpl. P 142

Several cases involving representations in merger agreements that are similar to the No MAE statement in this action demonstrate Republic Corp.'s disclosure obligation under the Merger Agreement and Proxy. *Voit v. Wonderware Corp.*, *supra*, is an example. In *Voit*, the acquiring company in a merger transaction represented that it would inform the acquired company of "any change that has or had a material adverse effect" upon the acquiring company. 977 F. Supp. at 365-66 The *Voit* court concluded that the acquiring company's representations obligated it to disclose "information regarding changes in operations which would result in lower income as percent of revenue and regarding significant changes in key personnel." *Id.* at 369 In the instant action, Republic Corp.'s obligation is arguably broader, as the Merger Agreement assures disclosure of facts or events that "could have" a Material Adverse Effect. Am. Cmpl. P 142

At this stage in the proceeding, where we must construe all facts and reasonable inferences in favor of the Plaintiff, we [*33] conclude that the omitted facts and events which allegedly occurred after December 31, 1998, could have had a Material Adverse Effect or caused a material delay to the Merger. The amendments to the Merger Agreement and the alleged restructuring of the consideration conferred in connection with the Merger once the FSA's investigation was fully disclosed permits a reasonable inference that these facts not only could have had a material adverse effect on the Merger, they in fact did have such an effect. Having made affirmative representations in the Merger Agreement and Proxy that were misleading, Republic Corp. was under a duty to disclose information necessary to make its statements not misleading. *Aetna*, 34 F. Supp. 2d at 948, *Voit*, 977 F. Supp. at 369 Plaintiff here has adequately

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

alleged that Republic Corp. made misrepresentations and omissions of material facts that threatened the consummation of the Merger. Therefore, Plaintiff has stated actionable misrepresentations and omissions against Republic Corp.

(b) Rogers and Republic Securities

The Amended Complaint exhaustively details the Noteholder Fraud in an attempt to posit a misrepresentation [*34] by Rogers and Republic Securities. Plaintiff has pointed to concrete sources and documents to support allegations *a, b, c, d, e* and *f* of Paragraph 149 of the Amended Complaint with respect to her belief that Rogers and Republic Securities were involved in the Noteholder Fraud. *Id.* P 149; *see also id.* PP 58-59, 62, 85, 86, 91, 92, 98-108, 109-112, 200-203, 208-209. These details have been sufficiently pled to support Plaintiff's belief that Republic Securities was obligated but failed to maintain segregated accounts; that Republic Securities authorized the cross-margining of the accounts, the creation of the Master Account, and the transfer of funds among the Noteholder Accounts and the Master Account; that Rogers on behalf of Republic Securities issued NAV letters to the Noteholders with false accounts balances; and that Rogers and Republic Securities, by supplying these letters to Armstrong Companies, knowingly permitted these letters to be utilized by Armstrong Companies to give false assurance to the Noteholders of segregated accounts. *Id.* PP 58-59, 62, 85, 86, 91, 92, 98-108, 109-112, 200-203, 208-209).

We are satisfied that these allegations cannot form the [*35] basis of Plaintiff's Section 10(b) and Rule 10b-5 claims because the only misrepresentations which Plaintiff alleges were relied upon by the purported shareholder Class were the No MAE statement and Republic Corp.'s assurance that any material misrepresentation or omission would be corrected and updated. *Id.* PP 131-47. These statements were made in the Merger Agreement and Proxy by Republic Corp., not by Republic Securities or Rogers.

Plaintiff argues that the alleged misrepresentations made in connection with the Merger can be attributed to Rogers and Republic Securities based on their assumed indirect involvement in the making of the statements. In particular, Plaintiff contends that Republic Securities and Rogers participated in the alleged misrepresentations because the No MAE Statement in the May 1999 8-K was attributed to all of Republic Corp.'s subsidiaries, in addition to itself, by a provision in the Merger Agreement defining "Knowledge." *Id.* PP 134-38. In particular, the Merger Agreement stated, "[a] fact, event, circumstance or occurrence shall be within a Person's 'Knowledge' if, with respect to the Company or any of its

Subsidiaries, such fact, event, circumstance [*36] or occurrence is or was actually known by any of the Company's or the relevant Subsidiary's executive officers or directors." *Id.* P 136. Therefore, Plaintiff contends that the Merger Agreement's No MAE representation amounted to an assurance made by Republic Corp. that Republic Corp., its subsidiaries (including Republic Securities), and their officers and directors, including Rogers, were not aware of any facts or circumstances that were reasonably likely to have a material adverse impact upon Republic Corp. *Id.* P 137.

Although the representations and assurances encompass the knowledge of Republic Corp. and all its subsidiaries and officers, they were made by only Republic Corp., not Republic Securities or Rogers. Without alleging specific facts that Republic Securities or Rogers participated in the formation of the Merger Agreement, the Amended Complaint fails to allege any misrepresentation by Republic Securities or Rogers. n10 The general assertion that Republic Securities and Rogers "caused" Republic Corp. to issue the No MAE Representation fails the particularity test as well. *Id.* P 4.

n10 Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statement, press releases, or other "group published information" that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation. *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999). It is unclear, however, whether the PSLRA effectively overruled the group pleading doctrine. *Id.* n 7. Absent a decision from our Court of Appeals on this issue, at least two courts of this District have expressed disfavor of the group pleading doctrine. *Marra v. Tel-Save Holdings, Inc.*, 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103, at *5 (Buckwalter, J.) (E.D. Pa. May 18, 1999); *In re Home Health Corp. of Am., Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 1230, 1999 WL 79057, at *21 (Yohn, J.) (E.D. Pa. Jan. 29, 1999) (holding that the group published information doctrine is inconsistent with the PSLRA's pleading requirements, and specific allegations as to the actions and scienter of each defendant are necessary). In *Marra*, the court noted that the continued vitality of the judicially created group pleading doctrine is suspect since the PSLRA

Case 1:05-cv-00162-JJF    Document 33-13    Filed 06/17/2005    Page 33 of 38

Page 12

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

specifically requires that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pled with regard to "each act or omission" sufficient to give "rise to a strong inference the defendant acted with the required state of mind. *Marra, 1999 WL 317103*, at *5 The court then held that plaintiffs must properly plead wrongdoing as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within the corporate organization and concluded that conclusory allegations of "access to the adverse undisclosed information . from internal corporate documents," "involvement in the drafting, producing reviewing, and /or disseminating" the false and misleading statements, and the averments that the individual defendants signed various annual reports will not prevent dismissal. *Id.* at *6 Without disputing the conclusion of these cases that the group pleading doctrine failed to survive the enactment of the PSLRA, we note that Plaintiff has not alleged facts that would enable this Court to apply the group pleading doctrine. *See Aetna, 34 F. Supp. 2d at 949* (stating that doctrine required allegations of parties' participation in corporation's day-to-day activities or had a special relationship with the corporation, such as participating in or preparing group information at particular times)

[*37]

In addition, Plaintiff's Section 10(b) and Rule 10b-5 claims against Rogers and Republic Securities fail to meet the standard established by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 128 L. Ed. 2d 119. 114 S. Ct. 1439 (1994)* In *Central Bank*, the Court held that liability under Section 10(b) "does not itself reach those who aid and abet .. [but] prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *511 U.S. at 177*

After *Central Bank*, federal courts have differed over the degree of involvement necessary to result in liability. Although the Court of Appeals for the Third Circuit has not addressed this issue, n11 recent case law from other Circuits reveals that a defendant may not be held liable under Section 10(b) and Rule 10b-5 for making a material misstatement (or omission) unless there are allegations which demonstrate that the particular defendant named in the complaint in fact made a misstatement or omission. *See Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1996)* ("A claim under § 10(b)

must allege [*38] a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of a security."); *Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226-27 (10th Cir. 1996)* n12 As stated in *Shapiro, 123 F.3d at 720*, "Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms used throughout the complaint all fall within the prohibitive bar of *Central Bank*."

n11 We note that in a recent case, *In re IKON Office Solutions. Inc., 277 F.3d 658, 667 n 8 (3d Cir. 2002)*, the Third Circuit chose not to address the "substantial participation" theory with respect to primary liability for secondary actors. The investors in that case brought a securities fraud action under Section 10(b) against a corporation, its individual officers and an auditing company, Ernst & Young LLP. The district court granted summary judgment in favor of the auditing company because it neither drafted nor directed any meaningful aspect of the press releases bearing the alleged misrepresentations. *130 F. Supp. 2d 680, 685 n 5 (E.D. Pa. 2001)* Presented with an opportunity to address the "substantial participation" theory with respect to primary liability against the auditing company as secondary actors, the Third Circuit affirmed the lower courts decision on scienter grounds only *277 F.3d at 667 n 8* [*39]

n12 Plaintiff cites the Second Circuit decision in *SEC v. First Jersey Securities, 101 F.3d 1450, 1471 (2d Cir. 1996)* for the proposition that "liability may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." That holding, however, has been effectively overruled by the Second Circuit's decisions in *Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1996)* and *Wright v. Ernst & Young LLP, 152 F.2d 169, 175 (2d Cir. 1998)* ("Secondary actors who may no longer be held primarily liable under § 10(b) for mere knowledge and assistance in the fraud."). Although no case from our Court of Appeals has addressed this issue, *Shapiro* and *Wright* have been cited approvingly by district courts in the Third Circuit. *See In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 685 (E.D.

Pa 2001), Copland v. Grumet, 88 F. Supp. 2d 326, 332 (D N J 1999) (defendants' participation in preparing false financial information that was incorporated in company's publicly disseminated documents could not be considered the equivalent of making false statements). Moreover, the Amended Complaint fails to plead with particularity that Republic Securities or Rogers assisted or participated in the formulation of the Merger Agreement and Proxy, and thus the dissemination of the No MAE statement.

[*40]

In Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998), the Second Circuit reaffirmed the holding in Shapiro and held further that to impose primary liability on a secondary actor under the Exchange Act for alleged misrepresentations, the misrepresentations must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision; holding otherwise would circumvent the reliance requirements of the Act. 152 F.3d at 175.

Plaintiff contends that the alleged role of Republic Securities in the publication of the No MAE statement is sufficient to support primary liability under Section 10(b) and Rule 10b-5. Citing Anixter v. Home-Stake Prod Co., 77 F.3d 1215, 1226- 27 (10th Cir. 1996) and Wright, supra, Plaintiff argues that "there is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach." Wright, 152 F.2d at 175 (quoting Anixter, 77 F.3d at 1226), see also In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S D N Y 1998) ("Where the defendant [*41] has made a misstatement but used another actor to deliver the message, the defendant still may be liable as a primary violator."). We do not disagree with this principle, however, in order to be held liable under Section 10(b) and Rule 10b-5, "a defendant must know or should know that his representation would be communicated to investors." Id (quoting Shapiro, 123 F.3d at 720), Anixter, 77 F.3d at 1226 Here, the Amended Complaint fails to plead with particularity that Republic Securities or Rogers made any representations, let alone misrepresentations, in connection with the Merger Agreement and Proxy. Plaintiff has not alleged that Republic Securities or Rogers were involved in any way other than that Republic Corp. made certain representations concerning Republic Securities. n13

n13  In support of its argument against Republic Securities and Rogers, Plaintiff cites Carley Capital Group v. Deloitte & Touche, 27

F. Supp. 2d 1324 (N D Ga 1998) Carley Capital discussed the Second Circuit's holdings in Shapiro and Wright, but rejected them in favor of the SEC's position, and concluded "a secondary actor can be primarily liable when it, acting alone or with others, creates a misrepresentation even if the misrepresentation is not publicly attributed to it." Carley Capital, 27 F. Supp. 2d at 1334 As stated, however, Plaintiff has not alleged with particularity how Republic Securities or Rogers was involved in the making of the alleged misrepresentation.

[*42]

The Amended Complaint does not allege that Republic Securities or Rogers in fact made the No MAE statement, nor does it even allege that they participated in the formation of the Merger Agreement. Rather, it attributes the statement to Republic Securities and Rogers by cross-reference of two provisions in the Merger Agreement between Republic Corp. and HSBC Holdings. Without alleging their actual knowledge of these provisions, the Amended Complaint fails to attribute the alleged misrepresentation to Republic Securities or Rogers at the time of public dissemination. We find the Amended Complaint fails to allege that Republic Securities or Rogers made any misrepresentation.

The two Ninth Circuit cases relied upon by Plaintiff are easily distinguished from the present action. These cases held that corporate defendants may be directly liable under 10b-5 for providing false or misleading information to third-party securities analysts where the Complaint asserts that the corporate defendant intentionally used these third parties to disseminate false information to the investing public. In such a case, the defendants are not charged with aiding and abetting or secondary liability, but rather [*43] with primary liability. Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997), Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996) Here, the Amended Complaint fails to allege any facts that demonstrate Republic Securities intended to use Republic Corp. to disseminate the No MAE statement to HSBC Holdings and hence to the investing public. In fact, the Amended Complaint alleges no facts to identify that Republic Securities had any role in the Merger between Republic Corp. and HSBC Holdings.

Plaintiff also contends that the alleged misrepresentations may be linked to Rogers and Republic Securities because the Amended Complaint alleges that the No MAE statement was made based upon information provided by Republic Securities (Am. Compl. PP 4, 134-36). In advancing this argument,

Case 1:05-cv-00162-JJF    Document 33-13    Filed 06/17/2005    Page 35 of 38

Page 14

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

Plaintiff relies on *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998). Plaintiff's reliance is misplaced. In *Kidder Peabody*, a subsidiary was held primarily liable for the false financial data provided by the subsidiary and incorporated in the SEC filings of its parent company. *Kidder Peabody*, 10 F. Supp. 2d at 407 [*44]. The district court found that the subsidiary made a misrepresentation by providing false financial information to the parent and, therefore, the subsidiary could be liable because it controlled the content of the information and its parent company, which communicated the statement to investors, served as a mere conduit for the defendant's statement. *Id.* The court held that where the subsidiary was an original and knowing source of a misrepresentation and knew or should have known that the misrepresentation would be communicated to investors, primary liability should attach. *Id.*

*Kidder Peabody* is easily distinguished from the instant action. First, it is not alleged that Republic Securities or Rogers was the original and knowing source of the No MAE statement. Plaintiff argues that because Rogers was knowingly and inextricably involved in the Noteholder Fraud, he was the source of the No MAE statement. His involvement in the fraud against the Noteholders, however, does not lead to an inference of an involvement in making the No MAE statement, which was made by Republic Corp., the parent company, in the Merger. Without pleading particular facts showing Rogers had a role [*45] in preparing or providing information for the preparation of the No MAE statement, Plaintiff's assertion is without merit. Second, the allegations do not lead to the conclusion that Republic Corp. was a "mere conduit" for Republic Securities when making the No MAE statement, rather, Republic Corp. was making an assurance on its own behalf to HSBC Holdings regarding the Merger between Republic Corp. and HSBC Holdings. The Amended Complaint therefore fails the test under *Kidder Peabody*. *See Gabriel Capital*, 94 F. Supp. 2d 491, 509-510 (S.D.N.Y. 2000).

Plaintiff contends that a plaintiff need not allege that a defendant played any role in making any representation at all to state a cause of action because Section 10(b) and Rule 10b-5 proscribe a wide range of fraudulent conduct. Plaintiff argues that the Amended Complaint sufficiently alleges that Republic Securities violated Rule 10b-5 by employing a "device, scheme, or artifice to defraud or deceive" Plaintiff and members of the Class. However, except for the allegations that Republic Securities and Rogers participated in a massive fraud perpetrated against the Noteholders, Plaintiff has alleged no particular facts [*46] to show that Republic Securities or

Rogers significantly participated in a manipulative or deceptive scheme against Republic Corp. investors. *Cf. Levine v. Metal Recovery Technologies, Inc.*, 182 F.R.D. 102 (D. Del. 1998) (holding the Amended Complaint sufficiently alleges that defendant broker directly engaged in a scheme to defraud defendant corporation's investors by accepting bribes to inflate the corporation's stock, and broker personally profited by the scheme).

Plaintiff's failure to plead a connection between Republic Securities or Rogers and the making of the misrepresentations in the Merger Agreement and Proxy prevents Republic Securities or Rogers from being held liable for any alleged material omission. It is well established that "silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988). *see also Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) ("Even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."); [*47] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("Except for specific periodic reporting requirements ... there is no general duty on the part of a company to provide the public with all material information."). Plaintiff does not allege that Republic Securities or Rogers owed any fiduciary duty to the Company's investors so that they were obligated to disclose the allegedly omitted facts. *See Voit*, 977 F. Supp. at 368 (citing *Chiarella v. United States*, 445 U.S. 222, 230, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980)).

A duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure. *Oran*, 226 F.3d 275, 285-86. Here, there are no insider trading allegations, nor does Plaintiff point to any statute requiring the disclosure by Republic Securities or Rogers. Rather, Plaintiff argues that Republic Securities and Rogers are liable for the alleged omissions based on their duty to correct misleading statements. *See, Aetna*, 34 F. Supp. 2d 935, 948 (citing *Kline v. First Western Gov't Securities*, 24 F.3d 480, 491 (3d Cir. 1994) [*48] ("There is a duty to disclose information when disclosure is necessary to make Defendants' other statements, whether mandatory or volunteered, not misleading."); *Voit*, 977 F. Supp. at 368-69. Since the Amended Complaint fails to allege that Republic Securities or Rogers made any misleading statement, the omission allegations against them shall be dismissed as well.

Consequently, Plaintiff has failed to satisfy the first element of a Section 10(b) and Rule 10b-5 claim. Count I will therefore be dismissed as to Republic Securities and

Case 1:05-cv-00162-JJF    Document 33-13    Filed 06/17/2005    Page 36 of 38

Page 15

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

Rogers

### 3 Scienter

Having determined that Plaintiff's Section 10(b) and Rule 10b-5 claims against Rogers and Republic Securities must be dismissed, we will address the element of scienter only with respect to Republic Corp. To comply with the requirements of the PSLRA, a "complaint shall, with respect to each act or omission alleged to violate [the Securities Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C.A. § 78u-4*(b)(2). In securities actions, the requisite state of mind, scienter, is defined as "a mental [*49] state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976), In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989)* (quoting *Dirks v. SEC, 463 U.S. 646, 663 n.23, 77 L. Ed. 2d 911, 103 S. Ct. 3255 (1983)).* To plead scienter, a plaintiff must allege facts "establishing a motive and an opportunity to commit fraud, or set forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Sec. Litig., 180 F.3d 525, 534-35, see also EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 880 (3d Cir. 2000)* Recklessness, in turn, is defined as an extreme departure from the standards of ordinary care, which presents a danger of being misleading that is either known to the defendant or is so obvious that the actor must be aware of it. *Id.* at 535. Moreover, in accordance with heightened pleading requirements, motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must be supported by facts stated "with [*50] particularity" and must give rise to a "strong inference" of scienter. *Id.* (quoting *15 U.S.C.A. § 78u-4*(b)(2)). "After the [PSLRA], catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *Id.*

#### (a) Conscious behavior or recklessness

Plaintiff contends that Republic Corp. made the No MAE statement in the Merger Agreement and Proxy knowing or recklessly disregarding the fact that the representations were false and misleading. Plaintiff therefore must plead facts demonstrating that, by the start of the Class Period, Republic Corp. either knew or recklessly disregarded the fact that material adverse events had occurred. *In re Advanta, 180 F.3d at 539* ("[A] pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of

the facts."). The argument that Republic Corp. "should have known" is insufficient. *Id.* Plaintiff may not rely on the alleged scienter of Republic Securities or Rogers because their [*51] state of mind cannot be imputed to Republic Corp. *Chill v. Gen. Elec. Corp., 101 F.3d 263, 268-71 (2d Cir. 1996), In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 554 (6th Cir. 1999), see also In re Advanta, 180 F.3d at 539* ("Generalized imputations of knowledge do not suffice."). n14

> n14 We note that Plaintiff argues that scienter may be established under Maryland's corporate veil piercing case law. Without deciding whether this doctrine can be applied to our analysis of scienter in a federal securities claim, we find that Plaintiff has not pled facts that would enable this Court to pierce the corporate veil. *Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 61 (4th Cir. 1993)* (holding that veil piercing requires parent's control over subsidiary and showing of factors including a disregard for corporate formalities, fraudulent formation of subsidiary, and undercapitalization); *Newman v. Motorola, Inc., 125 F. Supp. 2d 717, 722 (D. Md. 2000)* (same). Thus, only if Republic Corp. expressly authorized and directed its subsidiary's wrongful acts with the requisite state of mind can Republic Corp. be held liable. *Cf. In re American Honda Motor Co., Inc. Dealership Litig., 958 F. Supp. 1045, 1051 (D. Md. 1997)*

[*52]

The Amended Complaint alleges that, as early as August 11, 1998, Republic Corp. received the Credit Report and therefore knew: 1) Republic Securities breached its obligation to keep the Noteholders' funds in separate accounts by cross-margining the Noteholder Accounts; 2) this practice presented a significant credit risk to Republic Securities, with a credit exposure of $329 million as of April 30, 1998; and 3) the cross-margining practices violated federal commodities laws and that the margin for the Noteholder Accounts could no longer be aggregated. Am. Cmpl. PP 101-105. The Amended Complaint further alleges that in response to the Credit Report, Republic Corp. on the advice of RNB's Credit Review Department, instructed Republic Securities: (a) to obtain "cross-margining" agreements from Armstrong on behalf of the Issuers; and (b) to restructure the various accounts in a manner designed to insulate Republic Corp. and Republic Securities against the credit risk presented by the deficits in the PGM Master Account. *Id.* P 104.

2002 U.S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

We agree that the Credit Report gave Republic Corp. sufficient notice of Republic Securities' obligation to keep separate accounts for Noteholders, and [*53] Republic Securities' failure to do so. Plaintiff alleges that Republic Corp. was aware of the FSA raid upon the Cresvale-Tokyo offices in May 1999, and that Defendants knew of their potential liability. Id. P 151. Plaintiff also alleges that, after learning of the Cresvale-Tokyo raid, Republic Corp. demanded that the deficits in the Noteholder Sub-Accounts be reduced or eliminated in anticipation of the Merger and the due diligence that HSBC Holdings would be conducting. Id. P 153. This allegation, if proven, would demonstrate that the funds in the Noteholder Accounts and Sub-Accounts were not maintained separately and that Republic Securities had continued its cross-margining practices after December 31, 1998. See id. PP 154-55.

Republic Corp. contends that, even if it ordered that the deficits be reduced, this simply demonstrates that Republic Corp. followed the advice of the Credit Report by directing Republic Securities to obtain cross-margining agreements from Armstrong on behalf of the issuers of the Notes. Republic Corp. therefore argues that it believed it had eliminated Republic Securities' risk of liability and that Plaintiff does not allege any subsequent facts [*54] creating a strong inference that Republic Corp. knew Republic Securities remained at risk.

At this stage in the proceedings, it would be inappropriate for this Court to dismiss the Amended Complaint based on Republic Corp.'s explanation of these facts. In our view, a strong inference can be drawn from Plaintiff's allegations that Republic Corp., in directing that the deficits be reduced or eliminated, knew that the deficits and the practices which caused them could materially affect the Merger. An inference can also be drawn that Republic Corp. knew that the deficits and cross-margining practices exposed Republic Securities to potential liability to the Noteholders. Because Plaintiff contends that Republic Corp. made the No MAE statement and related assurances in the Merger and Proxy with knowledge of these alleged facts, Plaintiff has adequately pled scienter.

(b) Motive and Opportunity

Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. In re Advanta, 180 F.3d at 535. Therefore, blanket assertions [*55] of motive and opportunity cannot be an independent basis for pleading scienter. There is no doubt that Republic Corp. had an opportunity to make

misleading statements because it controlled the content of its SEC filings, including the Proxy and other public representations concerning the Merger. See In re Unisys Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 13500, 2000 WL 1367951, at *6 (Newcomer, J.) (E.D. Pa. Sep. 21, 2000). Plaintiff alleges that Defendants had substantial motives to commit the fraudulent acts. Having decided that Plaintiff has sufficiently pled that Republic Corp. made a material misrepresentation either knowing or recklessly disregarding the misleading nature of the statements, we need not decide whether Republic Corp.'s goal of consummating the Merger is probative of its alleged motivation to commit fraud. n15

n15. Plaintiff argues that disclosure of the Noteholder Fraud by Republic Corp. would have had a material and adverse effect on the Merger by, at the very least, dramatically reducing the consideration Republic Corp.'s shareholders received from the deal. Republic Corp. cites cases that stand for the proposition that the desire to consummate a merger is too generalized a motive to support a strong inference of scienter. Calliot v. HFS, Inc., 2000 U.S. Dist. LEXIS 4368, 2000 WL 351753, at *8 (N.D. Tex. Mar. 3, 2000); Freedman v. Value Health, Inc., 2000 WL 630916, at *4 (D. Conn. Mar. 24, 2000). Courts of this District, however, have found that such a desire can establish a strong inference of scienter. Marra v. Tel-Save Holding, Inc., 1999 U.S. Dist. LEXIS 7303, 1999 WL 317103 (Buckwalter, J.) (E.D. Pa. May 18, 1999); see also In re Unisys Corp. Sec. Litig., 2000 U.S. Dist. LEXIS 13500, 2000 WL 1367951, at *6 (E.D. Pa. Sep. 21, 2000) (stating that the artificial inflation of stock price in acquisition context is, at the very least, suspicious and that, in some circumstances, such inflation may be sufficient to establish scienter); In re Resources America Sec. Litig., 2000 U.S. Dist. LEXIS 10640, 2000 WL 1053861, at *6 (DuBois, J.) (E.D. Pa. July 26, 2000) (holding that artificially inflating stock price of a company to complete public offering on desired terms is sufficient to plead scienter)

[*56]

4. Remaining Elements

Assuming all alleged facts to be true and construing all reasonable inferences in favor of Plaintiff, we are unpersuaded by Republic Corp.'s arguments that the alleged misrepresentations were not made "in connection with the purchase or the sale of a security," that Plaintiff

Case 1:05-cv-00162-JJF    Document 33-13    Filed 06/17/2005    Page 38 of 38

Page 17

2002 U S. Dist. LEXIS 12162, *; Fed. Sec. L. Rep. (CCH) P91,947

has not adequately alleged "reasonable reliance" on the alleged misrepresentations, or that the alleged misrepresentations did not "proximately cause" Plaintiff's injury

**B.** Claims Under Section 20(a)

Plaintiff brings claims under Section 20(a) of the Exchange Act against Republic Corp., HSBC USA (as successor to Republic Corp.), and Rogers. Section 20(a) imposes joint and several liability on any person who "directly or indirectly, controls a person liable under any provision of" the Act "to the same extent as such controlled person to any person to whom such controlled person is liable." *15 U S.C.A. § 78t*(a). To maintain a claim under Section 20(a), the plaintiff must establish (1) an underlying violation by a controlled person or entity; (2) that the defendants are controlling persons; and (3) that they were "in some meaningful sense culpable [*57] participants in the fraud." *In re Equimed, Inc Sec Litig., 2000 U S. Dist LEXIS 6209, 2000 WL 562909, *10* (Shapiro, J.) (E.D. Pa. May 9, 2000). In addition, the heightened pleading standards of the PSLRA apply to Section 20(a) claims and a plaintiff must plead particularized facts alleging the controlling person's conscious misbehavior as a culpable participant in the fraud. *Id*.

Claims under Section 20(a) are derivative, and a plaintiff must first plead a predicate violation of the Act or its rules and regulations. *In re Advanta, 180 F 3d at 541.* "Once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based." *In re CDNOW, Inc. Sec. Litig., 138 F. Supp 2d 624, 644 (E D. Pa. 2001)* (quoting *Shapiro, 964 F.2d at 279*). Here, the Amended Complaint has failed to plead a predicate violation of Section 10(b) or Rule 10b-5 against Rogers or Republic Securities. Rogers cannot be liable as a controlling person where the Amended Complaint has failed to plead a predicate violation of Section 10(b) or Rule 10b-5 against Republic Securities. Similarly, Republic Corp. cannot be liable as a controlling [*58] person when neither Rogers nor Republic Securities can be liable for the alleged underlying violation. The same holds true for HSBC

USA as Republic Corp.'s successor. Plaintiff's Section 20(a) claims are therefore dismissed.

## V. CONCLUSION

Plaintiff has failed to allege a misrepresentation by either Republic Securities or Rogers upon which Plaintiff relied. Neither Republic Securities nor Rogers had an obligation of disclosure to Plaintiff. Plaintiff's Section 10(b) and Rule 10b-5 claims against Republic Securities and Rogers are dismissed. Furthermore, because Plaintiff has not plead a primary violation against Republic Securities, the Section 20(a) claim against Rogers as an alleged controlling person is dismissed. With respect to Plaintiff's Section 10(b) and Rule 10b-5 claims against Republic Corp., Plaintiff has pled facts that are sufficient to withstand a motion to dismiss. Finally, because Plaintiff has not plead a primary violation against Republic Securities or Rogers, the Section 20(a) claim against Republic Corp. and thus against HSBC USA as an alleged controlling person is dismissed.

An appropriate Order follows.

## ORDER

AND NOW, this 24th day [*59] of April, 2002, upon consideration of the Republic motion to dismiss (Doc. No. 16), and the Rogers motion to dismiss (Doc. No. 17) and all papers filed in support thereof or in opposition thereto, it is ORDERED as follows:

1. The Rogers Motion is **GRANTED**, and all claims against Defendant William H. Rogers in the Amended Complaint are **DISMISSED**

2. The Republic Motion is **GRANTED in PART** and **DENIED in PART**. All claims in the Amended Complaint against Defendant Republic New York Securities Corp. are **DISMISSED**. With respect to Defendant Republic New York Corp. and HSBC USA, Inc., Count II of the Amended Complaint is **DISMISSED**. The Republic Motion is **DENIED** in all other respects.

AND IT IS SO ORDERED.

R. Barclay Surrick, Judge