# EXHIBIT B

**Comparison of Independence-Related Allegations in
The Chancery Action Consolidated Complaint
Against the Operative Complaint in This Action**

| Defendant | Page |
|---|---|
| Riley P. Bechtel | 2 |
| Frank A. Bennack, Jr. | 6 |
| Lawrence A. Bossidy | 9 |
| M. Anthony Burns | 10 |
| Ellen V. Futter | 12 |
| Helene L. Kaplan | 20 |
| William H. Gray, III | 22 |
| John R. Stafford | 28 |

## Defendant Riley P. Bechtel

***Allegations from Chancery Action consolidated complaint:***

7.    Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting. Defendant Bechtel was not an independent director because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country. The Trade Bank of Iraq is managed by JPMC. The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.

***Allegations from ¶¶ 173-184 of the operative complaint in this action:***[1]

Defendant Bechtel was beholden to Harrison because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country. The Trade Bank of Iraq is managed by JPMC.

The staggering size of this financial relationship shows that JPMC and the Bechtel Group, and their respective CEOs, are mutually interested in their ventures in Iraq. The importance of this relationship to Bechtel Group is clear from its corporate website, which lists the "U.S. Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage. Further, the website proudly points out that "Iraq Infrastructure II," Bechtel Group's second major Iraq contract, is valued at up to $1.8

---

[1] The sections in **bold** indicate information never raised in the Chancery Action record.

billion.  Bechtel Group depends on the Trade Bank of Iraq to execute its lucrative

contractual commitments in rebuilding Iraq's infrastructure.  JPMC, headed by Harrison,

leads the consortium of banks operating the Trade Bank of Iraq.

   **Given JPMC's control over the Trade Bank of Iraq, and Bechtel Group's**

**dependence on the Trade Bank of Iraq to execute its projects abroad, future**

**reconstruction work for Bechtel Group would be jeopardized if defendant Bechtel**

**voted against Harrison or otherwise vigorously opposed an action by Harrison to**

**favor himself over JPMC's shareholders.  Of course, such friction between Harrison**

**and Bechtel was avoided entirely by Bechtel because it could have harmed any**

**future Bechtel Group projects in which JPMC was in any way involved.**

   The Bechtel Group and JPMC share other considerable financial interests, such as

their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners,

LLC, an investment partnership owned by certain partners of the Bechtel Group and The

Beacon Group, a private equity investment firm affiliated with JPMC, which manages

approximately $1.6 billion in assets in the energy industry.  Nexant purports to be a

"provider of technology solutions and experience-based technical and management

consulting services to the global energy industry."  On September 27, 2000, Nexant

completed its first venture investment round, announcing:

> Nexant, Inc., the energy technology and consulting
> company formed by Bechtel Capital Partners LLC earlier
> this year, announced today that it has successfully
> completed its first venture investment round, securing $15
> million in capital from a blue chip group of investors,
> including The Beacon Group, Morgan Stanley Dean Witter,
> the partners of Hellman & Friedman LLC, and Nth Power
> Technologies, Inc. Nexant will use the investment proceeds
> to complete development of new technology solutions for
> the energy industry.

In 1986, Bechtel Group spun off its Bechtel Investments subsidiary into a separate corporation called the Fremont Group, headed by Alan Dachs, Riley Bechtel's brother-in-law. In addition to their shared interest in Nexant, JPMC (through its J.P. Morgan Fleming Asset Management subsidiary) and Bechtel Group (through the Fremont Group) are co-investors in LightSand Communications, Inc., which manufactures equipment used to transport data in storage area networks.

Defendant Bechtel was also beholden to Harrison because Bechtel Group's financial interests (and thus Bechtel's financial interests) depend on the Export-Import Bank, the official export credit agency of the United States, which has financed or guaranteed numerous loans for Bechtel Group projects abroad.

According to the Export-Import Bank December 2003 annual report, JPMC Senior Vice President Jacqueline A. Kaiko was a member of the Export-Import Bank's advisory committee. Thus, Ms. Kaiko served in this capacity while the Merger was negotiated.

According to the list of attendees for the Export-Import Bank 2003 Annual Conference, Ms. Kaiko attended on behalf of JPMC, as did the following other JPMC personnel: Maria Adamczyk (Assistant Vice President), Robert Blades (Senior Vice President), Gamal Boulos (Assistant Treasurer), Sergio Chua (Vice President), Charles Dugan (Vice President), Marguerite Gill (Vice President), Joseph Longo (Vice President), Olivera Mladenovic (Vice President), Jo Morrison (Vice President) and M.G. Shetty (Vice President).

Also in attendance at the Export-Import Bank 2003 Annual Conference were three Bechtel Group personnel: Ed Crooks (Business Development Manager, Bechtel Infrastructure), Robert Draggon (Associate Managing Director, Bechtel Enterprises, Inc.), and Arthur Pilzer (Vice President, Bechtel Enterprises, Inc.).

Moreover, (1) according to the Export-Import Bank's list of Delegated Authority Lenders dated November 30, 2004, JPMC was one of the Export-Import Bank's Delegated Authority Lenders, with Ms. Kaiko designated the contact person for JPMC; and (2) Chase Manhattan Bank NA, a JPMC subsidiary, was listed on the Export-Import Bank's Lender Referral List as of June 30, 2004, with Ms. Kaiko designated the contact person.

Thus, as the Merger was being negotiated, future projects abroad for Bechtel Group would be jeopardized if defendant Bechtel voted against Harrison or otherwise vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

The depth of the relationship between the Bechtel Group and JPMC is further corroborated by the fact that former secretary of state George P. Shultz serves on the Bechtel Group board of directors and served as chairman of the International Council of JPMC.  Shultz is also a member of the Augusta National Golf Club, as are defendants Bechtel, Harrison, and Bossidy.

As a trained corporate lawyer, Bechtel possessed legal expertise which enhanced his understanding of fiduciary obligations and disclosure obligations under federal securities laws.

## Defendant Frank A. Bennack, Jr.

**_Allegations from Chancery Action consolidated complaint:_**

8.    Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC. He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004. He has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

**_Allegations from ¶¶ 187-191 of the operative complaint in this action:_**

Defendant Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Hearst-Argyle Television, Inc. ("Hearst-Argyle") is related to The Hearst Corporation, which folded its television holdings into Hearst-Argyle. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

Hearst-Argyle, which is majority-owned by The Hearst Corporation, was formed in 1997 by the merger of the broadcast group of The Hearst Corporation and Argyle Television, Inc. According to his executive biography, Bennack was instrumental in creating Hearst-Argyle. A Hearst-Argyle quarterly report discusses its financial relationship with JPMC as follows:

> _J.P. Morgan Chase & Co._ The lead agent bank under the Company's $500 million credit facility entered into in April 1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The outstanding balance on the credit facility was paid off as of

> September 2003, and the facility matured on April 12,
> 2004. Frank A. Bennack, Jr., a Director of the Company,
> served as a Director of J.P. Morgan until July of this year.
> We expect to enter into a new credit facility for $250
> million with J.P. Morgan, and other parties, before the end
> of the year.

As of September 30, 2004, Hearst-Argyle had approximately $1 billion in long-term debt, amounting to nearly half of its $2.4 billion market capitalization. Thus, Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its credit facility for its operations and to maximize profits. As a leading creditor, JPMC possesses substantial leverage over Hearst-Argyle.

In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-Argyle are co-investors in ProAct Technologies, a privately held corporation in which Hearst-Argyle invested $25 million on March 22, 2000.

According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares of Hearst-Argyle, worth approximately $625,000. Moreover, Bennack's senior position at The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the importance of Hearst-Argyle's success to Bennack. Accordingly, as Hearst-Argyle is indebted to JPMC, and also co-invests with JPMC, Bennack was unlikely to have challenged Harrison. Doing so would have risked incurring the wrath of the head of one of Hearst-Argyle's most powerful creditors, potentially resulting in such repercussions as: (1) a less favorable credit facility for Hearst-Argyle when renewed; (2) increased pressure on Hearst-Argyle from a major creditor; or (3) the elimination of further co-investment opportunities with JPMC. Any of these consequences would have adverse implications for the value of Bennack's investment in Hearst-Argyle, as well as the value of The Hearst Corporation's investment in Hearst-Argyle. Taken together, Bennack's direct

interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

## Defendant Lawrence A. Bossidy

***Allegations from Chancery Action consolidated complaint:***

> 10.     Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998. Bossidy is not an independent director because his son is employed by JPMC as a Vice President.

***Allegations from ¶¶ 193-95 of the operative complaint in this action:***

Defendant Bossidy is not an independent director because his son is employed by JPMC as a Vice President **who received over $100,000 in compensation from the Company in 2003 (and, according to a publicly-available salary survey of JPMC Vice Presidents, closer to $200,000).** Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC. Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement. Even if Bossidy was otherwise a capable and independent director, for the purposes of this action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

**Bossidy's close relationship to Harrison is also demonstrated by the fact that both men serve as directors of Merck & Co., Inc. and are members of the Augusta National Golf Club.**

**Bossidy is also beholden to Harrison because Bossidy has authored best-selling books on business management and Harrison has assisted Bossidy's efforts to sell the books by lending his name and recommendation to back cover blurbs.**

## Defendant M. Anthony Burns

**_Allegations from Chancery Action consolidated complaint:_**

11.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.  Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

**_Allegations from ¶¶ 196-99 of the operative complaint in this action:_**

Defendant Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth approximately $50 million.

As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders.  Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders.  For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time.  In this way, JPMC possesses significant leverage over Ryder.

Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

## Defendant Ellen V. Futter

**_Allegations from Chancery Action consolidated complaint:_**

12.    Defendant Ellen V. Futter was, during the relevant time, a director of JPMC.  She has been a director of JPMC or a predecessor institution since 1997.  Futter is not an independent director because her brother-in-law is employed by JPMC as a managing director.  In addition, JPMC is a significant benefactor of The American Museum of Natural History, of which Futter is President and Trustee.  Among other things, the Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation.

**_Allegations from ¶¶ 201-09 of the operative complaint in this action:_**

Defendant Futter is not an independent director because JPMC is a significant benefactor of The American Museum of Natural History (the "Museum"), of which Futter is President and Trustee.  **A former corporate lawyer, Futter earned $470,362 annually from the Museum, according to a May 10, 2003 article in the <u>New York Daily News</u> entitled "Nonprofit execs still sit pretty."  However, according to the same article, Futter was paid $440,000 in connection with her service as a paid director of JPMC, Con Edison, Bristol-Myers Squibb, and American International Group, not including stock or option awards.  Thus, Futter's compensation for her directorships represent a substantial and material portion of her total income.**

Due to JPMC's extensive philanthropic involvement with the Museum, Futter could not endanger the Museum's important relationship with JPMC by vigorously opposing an action by Harrison to favor himself over JPMC's shareholders.  Among other things, the Museum's Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation (the "Foundation").  JPMC makes donations through the Foundation and, according to "The JPMorgan Chase Corporate Responsibility Annual

Report," the Foundation made $312,500 in contributions to the Museum in 2003. This carries on JPMC's long-standing support for the Museum, originating with financier J.P. Morgan's donations of gems and minerals to the Museum's Tiffany-Morgan Collection of Gems, many of which are on display in the J.P. Morgan Hall of Gems.

In addition to her corporate directorship fees, Futter's career and success depend on the nurturing and retention of corporate donors such as JPMC. For Futter to stand in Harrison's way would not only endanger the Museum's relationship with JPMC, but also diminish Futter's ability to solicit other large donations from the corporate community and her desirability as a compliant director.

**An article in the June 20, 2003 edition of** The Wall Street Journal **specifically profiled Futter and questioned whether she was, in fact, an independent director:**

> *Giving at the Office*
>
> **On Corporate Boards, Officials From Nonprofits Spark Concern When Directors' Position Helps Raise Funds**
>
> **When Directors' Positions Help Them Raise Funds, Danger of Conflict Follows**
>
> **Aiding Ms. Futter's Museum**
>
> **By David Bank And Joann S. Lublin**
>
> **When companies look for outsiders to join their boards, they often turn to people such as Ellen Futter, the president of the American Museum of Natural History in New York. As corporations see it, the leaders of big nonprofits can bring independence and a broader view of social issues to a board. Ms. Futter serves on four: insurer American International Group Inc., pharmaceutical maker Bristol-Myers Squibb Co., the energy company Consolidated Edison Inc. and J.P. Morgan Chase & Co., the nation's second-biggest bank.**
>
> **For museum directors, university presidents and other nonprofit leaders, a corporate directorship offers a big**

plus too: connections that can lead to major donations. All four of the companies on whose boards Ms. Futter sits have made substantial contributions to her museum -- both during her nine years as president and before.

But those contributions create a potential conflict of interest: the possibility that money flowing from companies and their executives will make nonprofit officials beholden to the corporate management they are supposed to monitor.

Exhibit A is Enron Corp. The onetime energy-trading giant, its chief executive and affiliated foundations directed millions in donations during the 1990s to a Houston cancer center headed by Enron director John Mendelsohn, who served on Enron's now-famously-inattentive audit committee. (An Enron spokesman declines to comment. Dr. Mendelsohn has said the center doesn't depend heavily on Enron philanthropy.)

The potential problem goes far beyond the well-publicized Enron example. A Delaware Chancery Court judge ruled just last week that a supposedly independent investigative committee created by Oracle Corp.'s board was in fact fraught with "bias-creating relationships." One conflict: The two directors that constituted the panel -- a pair of Stanford University professors -- were asked to investigate controversial stock sales by fellow board members, some of whom had donated heavily to Stanford. The ruling allowed a shareholder lawsuit to go forward against those board members, including Oracle's chairman and chief executive, Larry Ellison, who personally and through the company has given millions to Stanford.

Now, concern about this kind of problem is spurring the Nasdaq Stock Market to propose new rules encouraging companies to limit donations to nonprofits whose executives sit on the companies' boards. The New York Stock Exchange also wants to promote directors' independence, but proposals it has made don't specifically target nonprofit conflicts.

It isn't clear yet how tough the exchanges' new rules will be, but several corporate boards have begun to take action in anticipation of new restrictions. All this comes amid wide-ranging efforts to reform corporate boards

after a wave of business scandals that boards did little to curtail.

Acting on her own, Ms. Futter resigned last year from the committee of Bristol-Myers directors that oversees the company's audits. She also stepped down last year from the AIG committee that helps set top executive salaries. Ms. Futter wanted to avoid "even the appearance of conflict" between her duties overseeing the companies and her fund raising, a spokeswoman for the natural-history museum says. The expectation of the new rules also factored into Ms. Futter's decisions, the spokeswoman says.

Ms. Futter, who declined to be interviewed, remains on the four corporate boards. She continues to serve on committees such as the Bristol-Myers corporate-governance panel, which considers questions of possible conflicts of interest of board members, among other duties. It's far from certain that the proposed rule changes would force any alteration in her relationships with the companies.

The museum chief's fund-raising success illustrates the potential problem created by nonprofit executives serving on corporate boards. In 2001, she received a bonus of more than $150,000 on top of her $450,000 annual salary, in part for opening the museum's $210 million Rose Center for Earth and Space, according to the museum. On a wall honoring major contributors to the multimedia Rose Center, the list of 34 "friends" includes: Bristol-Myers, Con Edison and the Starr Foundation, which was endowed by AIG's founder and is run by current and former AIG executives. Ms. Futter served on the boards of all of the companies when they or their related foundations made these contributions.

Bristol-Myers, through the Bristol-Myers Squibb Foundation, was also the primary sponsor of the museum's 1999 exhibit, "Epidemic!" The foundation contributed $1.2 million over four years for the display on infectious diseases. In addition, Bristol-Myers has given the museum a total of $700,000 for other purposes during Ms. Futter's tenure as president.

Ms. Futter, a lawyer by training and a former president of Barnard College in New York, has also raised large amounts of money from companies and foundations to which she has no direct connection. During her time at the museum, giving by the four companies on whose boards she sits has been "consistent with the philanthropic support these corporations have provided historically to the museum before Ms. Futter became president and/or joined these boards," the museum says in a written statement.

She served on the six-member Bristol-Myers audit committee from 1993 until 2002, chairing the panel in 1998 and 1999. In March, Bristol-Myers restated its financial results from recent years, acknowledging that from 1999 through 2001, it had overstated revenue by a total of nearly $2.5 billion. The restatement raised its revenue by $653 million for the first half of 2002. The company's financial reporting is now under investigation by the Securities and Exchange Commission and the Justice Department. The company has said it is cooperating with the government probes and doing its own internal investigation. There is no indication the government inquiries are focusing on board members.

Bristol-Myers says that its contributions to the natural-history museum haven't compromised Ms. Futter's role on its board. "Since 1990, she has provided important independent counsel and guidance to the company," Rebecca Taylor, a company spokeswoman, says.

AIG reached a similar conclusion, says company spokesman Joseph Norton. He points out that the Starr Foundation is for legal purposes independent of AIG. But Maurice Greenberg, AIG's chief executive, serves as chairman of the foundation, and other members of AIG's board serve on the foundation's board. Mr. Greenberg serves as a trustee of the natural-history museum, as well.

In 1999, the year Ms. Futter joined AIG's board, the Starr Foundation committed $10 million over two years to build the museum's C.V. Starr Natural Science Building, a $35 million, nine-story research facility in New York, with labs, exhibits and retail space. "We've been funding the museum long before Ellen was there,"

says Florence Davis, the foundation's president and formerly AIG's top in-house lawyer. "It has nothing to do with her being on AIG's board."

Anne Canty, the museum spokeswoman, says none of the corporate contributions had any effect on Ms. Futter's boardroom decisions. "Ms. Futter's role as a director is independent of her role as president of the museum," Ms. Canty says.

Con Ed and J.P. Morgan Chase say they continue to consider Ms. Futter to be an independent board member.

[…]

Other publications have also criticized Futter for conflicts of interest in connection with her corporate directorships. The February 21, 2000 issue of New York Magazine observed that as "[a] skilled fund-raiser, [Futter] has made the [Museum] corporate-friendly," and that "Futter -- whose other accomplishments include being the first woman to chair the board of the New York Federal Reserve Bank as well as memberships on the boards of Con Edison, Bristol-Myers Squibb, and J.P. Morgan -- tapped her extensive contacts not just for funding but to boost the museum's visibility." Futter's willingness to capitalize on her corporate directorships has on at least one occasion drawn fire for blurring corporate interests with Museum interests. According to the New York Magazine article:

Take the 1999 exhibit "Epidemic! The World of Infectious Diseases," sponsored by drug behemoth Bristol-Myers Squibb. That Charles A. Heimbold Jr., Bristol-Myers's CEO, sits on the museum's board looked like natural fund-raising synergy. That Futter sits on Bristol-Myers's board had the appearance of conflict of interest. That, as The Nation first reported, Richard Colonno, a Bristol-Myers vice-president, served on a special advisory committee that helped "shape the content of the exhibition" suggested in-house

censorship that blunted related issues such as pharmaceutical price-gouging.

Futter's accommodation of corporate interests (especially those of corporations on which she is a director) to bolster the Museum's fund raising efforts and improve her own career was also exposed in connection with her service as a director of AIG, a company which has been recently plagued by scandal.  An article entitled "AIG's Secret Connection with Director" in the June 23, 2003 issue of <u>Schiff's Insurance Observer</u> revealed that AIG's proxy statements did not disclose that (a) The Starr Foundation, a charitable foundation affiliated with AIG and controlled by AIG executives, gave $36.5 million to the Museum; or that (b) Hank Greenberg, the recently-deposed CEO of AIG, is a trustee of the Museum.  The <u>Schiff's</u> article presented the following question: "Might the fact that The Starr Foundation gave $36.5 million to Futter's museum make her, as an AIG director, disinclined to differ with Hank Greenberg?"

In addition to JPMC's direct philanthropic contributions to the Museum, JPMC also makes payments and channels contributions to the Museum in other ways.  For instance, according to the March 28, 2005 <u>BusinessWeek</u> article entitled "Dimon's Grand Design," JPMC sponsors events at the Museum: "One recent winter night, [JPMC] pulled out the stops for a lavish bash at New York's American Museum of Natural History.  Among the 200 or so guests were such luminaries as Senator Hillary Rodham Clinton (D-N.Y.) and Apple Computer Inc. (AAPL) CEO Steven P. Jobs.  It was as much a celebration of the bank as it was a fund-raiser for the Global Fund for Women."

It is reasonable to expect that Futter, the head of an institution dependent on the continued financial support of the corporate community, including JPMC, would not endanger her institution's financial backing, as well as her own career, by standing in the way of Harrison's self-dealing. Accordingly, Futter must be considered to be beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

As a trained corporate lawyer who spent over five years with the New York corporate law firm of Milbank, Tweed, Hadley & McCloy, Futter possessed legal expertise which enhanced her understanding of fiduciary obligations and disclosure obligations under federal securities laws.

# Defendant Helene L. Kaplan

***Allegations from Chancery Action consolidated complaint:***

14.    Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC. She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004. Kaplan was not an independent director because she is a Trustee and Vice-Chair of The American Museum of Natural History, of which, as previously alleged, JPMC is a significant benefactor. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

***Allegations from ¶¶ 211-14 of the operative complaint in this action:***

Defendant Kaplan was not an independent director because she is a Trustee and Vice-Chair of the Museum, of which, as previously alleged, JPMC is a significant benefactor. As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm financial footing, among other things, by nurturing and pleasing corporate donors like JPMC. Like Futter, Kaplan's interest in the Company's continued financial support of the Museum renders her insufficiently independent to assure that she would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

**Kaplan is also not independent because, as an attorney with Skadden, Arps, Slate, Meagher & Flom LLP, which receives substantial fees from JPMC, she must be careful not to cross an important client. Skadden represented Chase Manhattan and Chemical Bank in their merger; Chase Manhattan in its merger with J.P. Morgan; and JPMC in the Merger (performing antitrust and regulatory work).**

Skadden also represented JPMC in the Currency Conversion Fee Antitrust class action litigation and, as the Merger was negotiated, was representing JPMC in the WorldCom securities litigation, among other cases.  According to a March 24, 2005 article by Laurie P. Cohen and Robin Sidel in The Wall Street Journal with the headline, "J.P. Morgan's $630 Million Error," subtitled "The Role of a Skadden Arps Lawyer":

> [The primary Skadden partner] had dozens of Skadden lawyers on his team, and J.P. Morgan's co-general counsel, William McDavid, was heavily involved in guiding strategy, say lawyers for other syndicate members. These lawyers say the syndicate was paying Skadden some $13 million in monthly legal fees, a figure that Mr. Kasner declined to comment upon.

Upon information and belief, JPMC pays tens of millions of dollars in legal fees to Skadden, thereby compromising Kaplan's independence.

As a trained and highly experienced corporate lawyer, Kaplan possessed legal expertise which enhanced her understanding of fiduciary obligations and disclosure obligations under federal securities laws.

# Defendant William H. Gray, III

***Allegations from Chancery Action consolidated complaint:***

13.     Defendant William H. Gray, III was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1992. Gray is not an independent director because JPMC is a National Sponsor of The College Fund/UNCF, of which Gray was President and CEO at all relevant times.

***Allegations from ¶¶ 216-19 of the operative complaint in this action:***

Defendant Gray is not an independent director because JPMC is a National Sponsor of the United Negro College Fund (UNCF), of which Gray was President and CEO at all relevant times. **An article in the March 31, 2003 edition of <u>Barron's</u> critiqued the relationship between Gray and Harrison, as well as UNCF and JPMC:**

> **Sweet Charity**
>
> **Should the head of a nonprofit be on the compensation committee of one of its corporate donors?**
>
> **JUST A FEW WEEKS AGO, the annual campaign for the United Negro College Fund began at J.P. Morgan Chase, with a high-spirited reception at the International Center for Photography in New York City. A blizzard of solicitations from bank executives ensued, encouraging employees to donate to the "workplace campaign" through a secure Website or an interactive telephone voice response system.**
>
> **The longstanding relationship between the two institutions is warm and cozy. The Rockefellers, who founded the Chase Manhattan Bank, were charter supporters of the United Negro College Fund since the UNCF was established in 1944 by Frederick Patterson. A third of the money to be raised from J.P. Morgan Chase supports the John F. McGillicuddy Scholarship Fund, which has awarded $1.4 million in scholarships since 1993. The recipients are students going to United Negro College Fund member schools.**

In many ways, the relationship between Bill Harrison, chairman of the bank that's the nation's second-largest after Citigroup, and Bill Gray, is warm and comfortable, too, in the way of men who've served on boards with each other for more than a decade.

Gray, 61, is the United Negro College Fund's chairman and chief executive. A Baptist minister and Democratic congressman from Philadelphia from 1979 to 1991, he is today a director of Dell Computer, Electronic Data Systems, MBIA, Pfizer, Prudential Insurance, Rockwell Automation, Viacom and Visteon. Gray is a director of J.P. Morgan, having become a director of Chase Manhattan just after he gave up his congressional seat in '91. Moreover, he also sits on the bank's compensation committee, along with Bechtel Chairman Riley Bechtel, ExxonMobil CEO Lee Raymond and Wyeth Chairman John Stafford, who heads the committee.

In January 2001, that same group approved a $10 million bonus to Harrison for completing the merger between J.P. Morgan and Chase.

It cut Harrison's stock package last year by 50%. But in January of this year, Harrison got the second $5 million installment of the merger-related bonus, even though, like other financial institutions, J.P. Morgan has been hammered by declines in investment banking, increases in bad debt, legal disputes, regulatory investigations and fallout from its relations with Enron and WorldCom. Since Dec. 29, 2000, the day before the merger became effective, J.P. Morgan stock has fallen by 46.9%. In the same period, the S&P 500 index has slid by 34.2%.

Harrison, in turn, serves as treasurer of the United Negro College Fund. And J.P. Morgan and its employees are some of the fund's largest contributors. Last year J.P. Morgan employees raised some $1.28 million, or an average of $179 per gift, which the J.P. Morgan Chase Foundation matched dollar for dollar. Over the past six years, the contribution has totaled approximately $11 million.

Recently, the annual appeal to J.P. Morgan workers kicked off with a target of $1.37 million -- some 7%

above the level achieved last year, even though head count has fallen sharply. Midway through last month, the campaign had already raised $414,000 from 1,893 employees, according to a J.P. Morgan Website. The campaign ends on April 4, and payroll deductions start in June. Those giving at the "leadership level" -- or more than $350 -- will be recognized as "UNCF Leaders" and receive a gift.

Arrangements like the one involving Gray, Harrison and JP Morgan draw fire from corporate-governance experts. "This is known as director interlock -- You scratch my back, and I scratch yours," says Charles Elson, head of the Center for Corporate Governance at the University of Delaware. "If I give money to your foundation and you're on my board, and you serve on the compensation committee, in today's environment, that's a conflict of interest. That individual, in my view, would be classified as a non-independent director and should probably reconsider their service on that board."

Harrison's status as the college fund's treasurer isn't disclosed in J.P. Morgan's proxy statement, including the latest, which was filed Friday. Continues Elson: "From my point of view as a shareholder, I would want that information for voting. I'm surprised it's not disclosed, particularly in today's environment, when discretion is the better part of valor." Elson draws comparison with the case of Charles A. LeMaistre, a former Enron director who was president of the M.D. Anderson Cancer Center at the University of Texas. The cancer center was promised $600,000 in donations from Enron while LeMaistre served on Enron's board.

In a prominent section of J.P. Morgan's Website that addresses corporate governance, Harrison describes his pride in "the 200-year tradition of integrity on which this firm is built." Each of the bank's directors, the Website relates, is independent. Its definition of independence? "The director has no material relationship with the firm, either directly or as a partner, stockholder or officer of an organization that has a relationship with the firm."

J.P. Morgan declined to comment to Barron's. However, a person familiar with the relationship with

the fund stressed that "the vast majority" of contributions came from employees, and that a Chase executive has served as the fund's treasurer since inception, "a tradition that's not questioned and nothing untoward and nobody has seen a problem with this for over 60 years." Finally, this person pointed out, J.P. Morgan's own governance guidelines declare that if the bank accounted for 2% of a not-for-profits' budget, and the nonprofit's executive sits on the bank's board, only "then is that director no longer independent." And, this person points out, J.P. Morgan's contribution accounts for less than 2% of the fund's budget.

Gray wasn't available to comment.

J.P. Morgan certainly isn't another Enron. And the fund is indubitably a worthy recipient: 60% of its scholarships go to people who are the first in their families to attend college. Roughly the same percentage goes to people whose families have annual incomes under $25,000. And half its scholars come from single-parent households.

And the J.P. Morgan Chase contribution last year was just a fraction of the $178.8 million in annual support and revenues pledged to the fund. The J.P. Morgan Chase Foundation and J.P. Morgan Chase Bank gave away $73 million in 2002.

Other J.P. Morgan contributions to the fund included sponsoring its celebrity golf tournament and contributing about $800,000 to the fund's technology-enhancement capital campaign, the first year of a two-year commitment. Sure, raising money for charities is generally a very worthwhile activity. But there are ways to do it without creating the potential for a conflict of interest.

Happily, conflicts of interest, while rife, are less so than they once were, observes Elson of the University of Delaware. "They are certainly on the decline, given what's happened with Enron." But in relationships like the one between Gray and Harrison, "It's not to say [the nonprofit executive] wouldn't make a good director. But should they be on this particular board?"

In 2003, JPMC matched nearly $1.3 million in UNCF donations, making possible a combined total of $2.6 million raised through employee contributions and matching gifts. Since 1990, JPMC employees have donated more than $6.6 million to the UNCF, which when combined with the matching gift and sponsorships, has resulted in a total contribution of nearly $18.7 million. The November 3, 2003 issue of Jet, in reporting Gray's intention to retire as President and CEO of UNCF on March 31, 2004, observed that Gray had raised over $1.5 billion for the organization. Thus, the philanthropic relationship between JPMC and UNCF is significant and long-standing, and Gray's lauded success in fundraising has been due, in large part, to his ability to nurture and retain corporate donors such as JPMC.

Gray's financial relationship with JPMC and Harrison's service as UNCF's treasurer (which is disclosed nowhere in the Proxy/Prospectus) raise serious doubts that Gray would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. It would not be reasonable to expect the head of an institution interested in the Company's continued financial support to stand in the way of Harrison's self-dealing. Moreover, Harrison's undisclosed service as UNCF's treasurer further evidences his close relationship with Gray. Accordingly, Gray must be considered beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

**According to an article entitled "Fat cats feeding" in the October 9, 2003 edition of The Economist, Gray serves on the boards of eight S&P 500 companies, more than any other director of an S&P 500 company. According to a July 11, 2003 article by Virginia Citrano in Forbes entitled "Overworked Directors Still**

Overworked, But Not As Much," Gray is a director of Dell Computer, Electronic Data Systems, JPMC, Pfizer, Prudential Financial, Rockwell Automation, Viacom, and Visteon.  As Gray is not likely to have become wealthy heading a non-profit institution (or serving as a legislator prior to his work heading UNCF), upon information and belief, the substantial directorship fees he receives constitute a material percentage of his income.  Accordingly, Gray is not independent because he depends on directorship fees, including the extraordinary fees he receives as a JPMC director.

# Defendant John R. Stafford

### *Allegations from Chancery Action consolidated complaint:*

16.    Defendant John R. Stafford was, during the relevant time, a director of JPMC.  He has been a director of JPMC or a predecessor institution since 1982.  He has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003.  Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001.  Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.

### *Allegations from ¶¶ 221-22 of the operative complaint in this action:*

Defendant Stafford has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003. Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001.  Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.  According to a November 19, 2004 filing, JPMorgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million.  JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence.  JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth.  For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price.  JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance.  As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders.  Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Wyeth was either undersecured or would be undersecured within a relatively short time.  In all these ways, JPMC possesses substantial leverage over Wyeth.  Taken together, Stafford's financial interest in Wyeth and JPMC's relationship with Wyeth raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

# EXHIBIT C



87 Fed.Appx. 772                                                                                       Page 1
87 Fed.Appx. 772, Fed. Sec. L. Rep. P 92,683
**(Cite as: 87 Fed.Appx. 772)**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Second Circuit Rules § 0.23. (FIND CTA2 s 0.23.)

United States Court of Appeals,
Second Circuit.
BOND OPPORTUNITY FUND, Steven Gidumal, suing on his own behalf
individually, and on behalf of all shareholders of Unilab Corporation,
Plaintiffs-Appellants,
v.
UNILAB CORPORATION, David C. Weavil, Haywood Cochrane, Kirby L. Cramer, William J. Gedale, Richard A. Michaelson, Gabriel B. Thomas, B.T. Alex Brown,
Defendants-Appellees.
**No. 03-7592.**

Feb. 10, 2004.

**Background:** Former shareholders brought action against former directors, investment banker, and others, alleging that proxy materials containing false and misleading statements were issued in furtherance of scheme to induce them to sell their shares at unfairly low price pursuant to buyout arising from merger. The United States District Court for the Southern District of New York, Martin, J., J., 2003 WL 21058251, dismissed complaint, and shareholders appealed.

**Holdings:** The Court of Appeals held that:

(1) proxy's suggestion that two institutional shareholders retained their stock in order to benefit other shareholders was not misleading, and

(2) proxy's misstatement that outside auditor's fairness opinion was supported by "publicly available research analysts' estimates," when there was only one analyst covering company, was obviously unimportant.
Affirmed.

West Headnotes

**[1] Securities Regulation** ☞49.21
349Bk49.21 Most Cited Cases
Proxy's suggestion that two institutional shareholders retained their stock in order to benefit other shareholders was not misleading, and thus did not support claim under § 14(a) and Rule 14a-9, despite contention that they actually did so to earn additional profit, absent explanation as to why institutional investors would have cashed out majority of their shares at unacceptable price in order to retain rest of their shares, when they carried enough voting power to have chance of defeating merger. Securities Exchange
Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

**[2] Securities Regulation** ☞49.26(3)
349Bk49.26(3) Most Cited Cases
Proxy's misstatement that outside auditor's fairness opinion was supported by "publicly available research analysts' estimates," when there was only one analyst covering company, was obviously unimportant, and thus failed to meet standard for materiality necessary to support claim under § 14(a) and Rule 14a-9. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).
*772 Appeal from the United States District Court for the Southern District of New York (Martin, J.).

Thomas S. McNamara, Indik & McNamara, Philadelphia, PA, for Appellants.

Steven J. Kolleeny, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Appellee Unilab.

*773 Stephen W. Greiner, Wilkie Farr & Gallagher, New York, NY, for Appellees Weavil, et al.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 Fed.Appx. 772, Fed. Sec. L. Rep. P 92,683
**(Cite as: 87 Fed.Appx. 772)**

James D. Mathias, Piper Rudnick, Baltimore, MD, for Appellee B.T. Alex Brown.

Present:    POOLER,   Circuit   Judge,   [FN*] UNDERHILL, District Judge.  [FN**]

> FN* The Honorable Amalya L. Kearse of the United States Court of Appeals for the Second Circuit was originally assigned as a member of the panel, but recused herself prior to oral argument and did not participate in the appeal. The appeal is being determined by the remaining members of the panel, who are in agreement. *See* 2d Cir. R. § 0.14(b); *Murray v. National Broad. Co., 35 F.3d 45, 46 (2d Cir.1994).*

> FN** The Honorable Stefan R. Underhill, District Judge of the United States District Court for the District of Connecticut, sitting by designation.

### SUMMARY ORDER
**ON   CONSIDERATION   WHEREOF,   IT   IS HEREBY   ORDERED,   ADJUDGED,   AND DECREED** that the judgment of said District Court be and it hereby is **AFFIRMED.**

Plaintiffs, Bond Opportunity Fund and Steven Gidumal, appeal from a judgment granting Defendants' 12(b)(6) motion and dismissing their complaint in its entirety. We assume the reader's familiarity with the underlying facts, procedural history, and specification of appellate issues and hold as follows.

Plaintiffs' Corrected Complaint, filed on November 5, 1999, shows that on that date they at least had notice of the facts giving rise to an action against B.T. Alex Brown and thus failed to meet the one year statute of limitations that applies in Section 14(a) actions when they first named B.T. Alex Brown as a defendant on September 26, 2001, in their Second Amended Complaint.  *See Ceres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d Cir.1990).* Thus, we affirm the district court's decision to dismiss the claims against B.T. Alex Brown on timeliness grounds.

In order to recover under Section 14(a) and Rule 14a-9, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the

accomplishment of the transaction. Furthermore, the PSLRA requires the complaint to specify each allegedly misleading statement, explain the reason (or reasons) that the statement is misleading, and, if an allegation is made upon information and belief, all facts with particularity upon which that belief is formed. 15 U.S.C. § 78u-4(b)(1). None of the misstatements identified by Plaintiffs in the Unilab proxy statement (the "Proxy") is pleaded in such a way as to meet these standards.

[1] Plaintiffs first claim that the Proxy was misleading because it suggested that two institutional shareholders retained their stock in order to benefit the other shareholders, when they actually did so to earn an additional profit. However, Plaintiffs do not provide any support for their vote-buying theory, and mere speculation is insufficient to satisfy the PSLRA pleading standard. Furthermore, Plaintiffs fail to adequately explain why the institutional investors would cash out the majority of their shares at an unacceptable price in order to retain the rest of their shares, when they carried enough voting power to have a chance of defeating the merger.

Plaintiffs next allege that the Proxy was misleading because it failed to disclose that Unilab's board of directors had provided a financial windfall to another institutional investor in order to buy its vote. However, Plaintiffs rely on nothing more than **\*774** pure speculation to connect the windfall to the merger, and thus fail to meet the PSLRA pleading standard.

Third, Plaintiffs take issue with the Proxy's explanation of how B.T. Alex Brown reached its fairness opinion, suggesting that the Proxy misleads the reader into thinking that B.T. Alex Brown used the Projections that are included in the Proxy in doing so. However, this is not a misstatement, as the Projections clearly state that "they were prepared solely for the Company's internal purposes ... and such information is being included in this proxy statement *solely* because it was furnished to UC Acquisition Sub and Kelso" and that "[t]he inclusion of this information should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events...."

[2] Fourth, Plaintiffs claim that the Proxy was misleading because it stated that B.T. Alex Brown's fairness opinion was supported by "publicly available research analysts' estimates" when there was only one analyst   covering   the   company.     This   alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 Fed.Appx. 772                                                                                                    Page 3
87 Fed.Appx. 772, Fed. Sec. L. Rep. P 92,683
**(Cite as: 87 Fed.Appx. 772)**

misstatement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Thus, it fails to meet the standard for materiality. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Plaintiffs also argue that the Proxy was made misleading by the failure to disclose that this research analyst was urged by the company to reduce her projections. This claim fails to meet the PSLRA pleading standard because there is no suggestion that the analyst's independence was compromised.

Fifth, Plaintiffs argue that the Proxy's claim that the extensive auction process supported the fairness of the merger price was misleading because B.T. Alex Brown's involvement on both sides prevented the bidding process from being fair. However, Unilab's proxy supplement adequately disclosed the multiple roles played by B.T. Alex Brown, precluding this claim from being brought under Section 14(a).

Finally, we do not reach the state of mind issue because Plaintiffs have failed to adequately plead that a material misrepresentation was made.

Thus, we affirm the district court's dismissal of the Section 14(a) claims and the dismissal of the entirety of the complaint with prejudice.

87 Fed.Appx. 772, Fed. Sec. L. Rep. P 92,683

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 24057950 (Appellate Brief) Reply Brief for Plaintiffs-Appellees Bond Opportunity Fund and Steven Gidumal (Dec. 02, 2003)Original Image of this Document (PDF)

• 2003 WL 24057949 (Appellate Brief) Brief for Defendant-Appellee B.T. Alex Brown (Nov. 14, 2003)Original Image of this Document (PDF)

• 03-7592 (Docket) (Jun. 10, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**U.S. Securities and Exchange Commission**

## UNITED STATES OF AMERICA
## before the
## SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 43862 / January 19, 2001

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1360 / January 19, 2001

Admin. Proc. File No. 3-9500

---

In the Matter of

KPMG PEAT MARWICK LLP

c/o Michael Carroll, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

---

OPINION OF THE COMMISSION

CEASE-AND-DESIST PROCEEDING

Ground for Remedial Action

Violation of Rules Governing Financial
Statements
Causing Violations of Reporting
Provisions

RULE 102(e) PROCEEDING

Ground for Remedial Action

Improper Professional Conduct

Accounting firm cannot be considered
independent when it conducted audit of
registrant's financial statements and issued
audit report while loan from accounting firm to
registrant's officer was outstanding and when

accounting firm had the right to receivea fee contingent on the registrant's financial success. Accounting firm violated requirement that audit report accurately state that audit was made in accordance with Generally Accepted Auditing Standards. Accounting firm also caused registrant to violate reporting provisions, because the financial statements included as part of registrant's annual report, were not, as represented, audited by independent accountants. <u>Held</u>, it is in the public interest to order that accounting firm cease and desist from causing violations of Section 13(a) of the Securities Exchange Act of 1934 and Rule 13a-1 thereunder, or from committing violations of Rule 2-02(b) of Regulation S-X, by having any transactions, interests, or relationships that would impair its independence under Rule 2-01 of Regulation S-X or under Generally Accepted Auditing Standards. Because of the unique procedural posture of the proceeding, however, it cannot be concluded that accounting firm engaged in improper professional conduct within the meaning of Rule 102(e).

APPEARANCES:

<u>Stephen J. Crimmins</u> and <u>Richard C. Sauer</u>, for the Division of Enforcement and the Office of the Chief Accountant.

<u>Michael P. Carroll</u> and <u>Joseph Warganz</u>, of Davis Polk & Wardwell, <u>Donald W. Rose</u>, of KPMG LLP (of counsel), and <u>Ronald S. Flagg</u>, of Sidley & Austin (of counsel), for KPMG Peat Marwick LLP.

Appeal filed: February 11, 2000
Last brief filed: July 19, 2000
Oral argument held: September 28, 2000

I.

The Division of Enforcement and the Office of the Chief Accountant (together the "Division") appeal from the decision of an administrative law judge finding that KPMG Peat Marwick LLP ("Peat

Marwick"), a Delaware limited liability partnership,[1] failed to adhere to standards of auditor independence in connection with its audit of Porta Systems Corp.'s ("PORTA") financial statements. The law judge concluded that Peat Marwick violated Rule 2-02 of Regulation S-X[2] and caused violations of Section 13(a) of the Securities Exchange Act of 1934 and Rule 13a-1 thereunder.[3] The law judge also concluded, however, that Peat Marwick did not engage in improper professional conduct within the meaning of Commission Rule of Practice 102(e).[4] The law judge dismissed the proceeding insofar as it alleged that Peat Marwick engaged in improper professional conduct and denied the Division's request for entry of a cease-and-desist order against Peat Marwick pursuant to Section 21C of the Exchange Act.[5] We base our findings on an independent review of the record.

II.

On September 29, 1994, L. Glenn Perry, a senior partner in Peat Marwick's Department of Professional Practice ("DPP"),[6] met with staff members of the Commission's Office of the Chief Accountant ("OCA") for just over thirty minutes to discuss the contents of a "draft on an independence matter" he had sent to OCA via facsimile the previous afternoon.[7] The draft described the creation of an entity -- KPMG Corporate Finance ("KPMGCF") - that would be involved in a "business relationship" with Peat Marwick and that would provide clients with financial advice and related services.[8] The draft set forth, in very general terms, KPMGCF's proposed operations and briefly outlined the contours of the proposed relationship between Peat Marwick and KPMGCF. According to the draft, Peat Marwick had concluded that it and KPMGCF would be "separate" entities and that the independence rules applicable to Peat Marwick would not constrain KPMGCF's activities. The draft solicited the staff's views on the matter.

During the meeting, Perry mentioned certain information addressed in the draft: 1) Peat Marwick

would extend to KPMGCF a $5 million working capital loan; 2) Peat Marwick would license to KPMGCF the use of the "KPMG" initials; and 3) in return for the license Peat Marwick would receive a royalty from KPMGCF. Perry also responded to certain questions posed by OCA staff regarding the use of Peat Marwick's staff in KPMGCF engagements, another aspect of the proposed relationship mentioned in the draft. One of the items in the draft -- not discussed during the meeting --indicated that KPMGCF proposed to provide "services to troubled companies in the context of turnaround or bankruptcy."[9] Perry was not prepared to discuss that point; he had "no specific understanding" as to its meaning, beyond what was said in the draft.

At the end of the meeting, the Deputy Chief Accountant, John Riley, advised Perry that he had not heard anything during the meeting that would cause the staff to raise questions about Peat Marwick's independence. Because the alliance was in the planning stages and details remained to be worked out, however, Riley anticipated that Peat Marwick would consult with OCA again as decisions about the contours of the alliance were refined and finalized. The staff also advised Perry that the activities of KPMGCF and its relationship with Peat Marwick raised a number of issues that Perry should discuss with staff of the Commission's Division of Market Regulation. The OCA staff advised Perry that another national accounting firm had previously abandoned a similar proposal when it became apparent that the Division of Market Regulation would view the accounting firm as acting in the capacity of a broker-dealer by virtue of the proposed affiliation.

Although Peat Marwick did not follow up with either OCA or the Division of Market Regulation, it nevertheless determined to proceed with the alliance. In January 1995, it entered into a license agreement with KPMG BayMark, LLC ("BayMark"), a Delaware limited liability company, and BayMark's two subsidiaries - KPMG BayMark Strategies, LLC ("Strategies"), a Delaware limited liability company,

and KPMG BayMark Capital, LLC ("Capital"), a Delaware limited liability company (collectively the "BayMark parties"). The agreement described BayMark as "a newly formed limited liability company which [would] provide financial services" including "investment banking, corporate recovery, crisis management and other services under the direction of David Maughan, Mark Taffet, Edward Olson, and Dan Armel." Each of these persons were "Principals" of BayMark andeach held a 25% ownership interest in BayMark.[10] BayMark was to conduct business through its subsidiaries. Strategies planned to engage in a corporate recovery, crisis management, and restructuring advisory business based in California and Virginia. Olson would serve as its Executive Managing Director.[11] BayMark owned 51% of the interests in the Strategies limited liability company, and Olson and Armel each owned 24.5%. Capital, based in New York, New York, was to engage in investment banking and other brokerage activities. BayMark owned 51% of the Capital limited liability company interests, and Maughan and Taffet each owned 24.5%.

Under its license agreement with the BayMark parties, Peat Marwick agreed to lend $100,000 to each of the four Principals on a non-recourse basis, to be used by the Principals as equity contributions to BayMark and its subsidiaries. Those equity interests in turn were pledged by the Principals to Peat Marwick as security for the loans. Thus, for example, Olson executed a promissory note and entered into a pledge agreement with Peat Marwick. Olson promised, among other things, to make a $99,000 capital contribution to Strategies and a $1,000 capital contribution to BayMark on receipt of the loan from Peat Marwick. He also pledged to Peat Marwick his equity interests in Strategies and BayMark as security for payment on the note.

Under the license agreement, Peat Marwick granted the BayMark parties rights to use "KPMG" as part of their names, provided, among other things, that the BayMark parties: (a) sought and received approval

from Peat Marwick to use any advertising bearing the initials; (b) complied withcertain "professional and ethical policies and standards of practice" to which Peat Marwick adhered; and (c) used the phrase "A Strategic Alliance of KPMG Peat Marwick" in connection with the use of the "KPMG" initials.[12] In return for the license, each BayMark party agreed to pay Peat Marwick a license fee ("royalty fee") of five percent of its quarterly consolidated fee income, excluding certain revenues received from another BayMark party less certain fees. The royalty fees were to be paid to Peat Marwick quarterly, within thirty days after the close of each quarter.

In addition, Peat Marwick agreed to enter into revolving credit agreements with the BayMark subsidiaries under which Peat Marwick would lend the subsidiaries up to $2.3 million each.[13] In return, Peat Marwick took a security interest in Strategies' and Capital's accounts receivable, contracts, licenses, intangibles, proceeds, and other properties. Peat Marwick also agreed to provide, for an hourly fee, financial analysis and other services to the BayMark parties in support of their engagements. The BayMark parties in turn agreed to assist in developing Peat Marwick's financial analysis and support services business through their "sources."[14]

The financial and trade press published news of the Peat Marwick/BayMark alliance in late August or early September 1995. When Michael Sutton, then the Commission's Chief Accountant, became aware of these articles, he directed his staff to gather more information. On September 29, 1995, Perry responded to staff inquiries by sending a letter reiterating, almost verbatim, the information set forth in his 1994 draft memorandum, together with a brief description of the ownership of BayMark and the background of its owners. Thus, for example, the letter described Olson's background as follows: "Thirty years of operational expertise, including 15 years of corporate turnaround consulting. Most recently, Ed was president of his own consulting

company."

On October 19, 1995, Perry and Chris Trattou, a senior manager in Peat Marwick's DPP, met with OCA staff, including Sutton.[15] Jerry Sullivan, Executive Director of the Public Oversight Board ("POB"), also attended the meeting.[16] The purpose of the meeting was to address the staff's concerns and questions about Peat Marwick's relationship with BayMark. Among other things, OCA expressed concern that Peat Marwick could be found to be lacking in independence if Peat Marwick controlled BayMark and BayMark provided services to registrants audited by Peat Marwick. Specifically, the staff expressed concern about BayMark's use of the "KPMG" initials, the royalty fee arrangement, and BayMark's financing.[17] The staff also indicated that Peat Marwick's independence might be adversely affected by the services it would provide BayMark's clients as a subcontractor. Accordingly, the staff informed Perry and Trattou that OCA would "not say `at this . . . time' that . . . [it did] not object to the strategic alliance." According to Perry's notes, Sutton ended the meeting by cautioning Perry: "If you have a significant SEC client, we suggest you consult with us before you use BayMark." Perry asked Sutton what he meant by "significant" SEC client, and Sutton responded, "A client you do not want to embarrass."[18] As Van Brunt put it:

[T]he meeting more or less ended with Mr. Sutton indicating that whatever BayMark was providing, it ought not to be provided to any of the audit clients of . . . [Peat Marwick] if they considered the client to be a client they wanted to retain. I don't remember the exact phraseology, but there was some indication that the auditing of a BayMark client by Peat Marwick would be a problem and that Mike would be particularly interested in that matter with respect to independence of the firm.

Despite this interchange, Perry and Trattou failed to indicate to OCA that just such a situation was about to occur. Between two and three weeks earlier,

Case 1:05-cv-00621-JE    Document 52-3    Filed 07/11/2005    Page 42 of 206

Strategies had submitted a letter agreement to PORTA under which Strategies would provide PORTA (a Syosset, New York telecommunications company that was experiencing losses from operations) with turnaround management services for fifteen months.[19] PORTA had been Peat Marwick's audit client for a few years. Leonard Sturm, a partner in Peat Marwick's Long Island, New York office, was the engagement partner for PORTA's 1994 audit. Sometime in the early summer of 1995, in the course of a partners' meeting, Sturm learned that Peat Marwick had a strategic alliance with an entity called BayMark and that BayMark "provided turn-around services . . . and helped secure financing for companies." Later, when Sturm learned that PORTA's management was seeking assistance to turn the company around, Sturm contacted a colleague at Peat Marwick and, ultimately, Strategies was "introduced" to PORTA.[20]

Under the agreement between PORTA and Strategies, which was executed on November 3, 1995, Olson was to assume the title of Chief Operating Officer ("COO") of the company and direct itsturnaround effort in exchange for a management fee of $250,000 and certain percentages of PORTA's earnings, disposed inventory, and restructured debt ("success fee").[21] Strategies, through Olson, was given authority to put in place a management team that would lead the turnaround effort, establish control of the company's cash flow, "take whatever actions are necessary to enable [PORTA] to survive," restructure the company's business, develop reward and compensation systems, and seek out opportunities for "profitable growth." The work was to be performed "with a view toward the development of specific short term and long term business strategies" for PORTA. On November 9, 1995, PORTA's Board of Directors elected Olson president and COO of the company.[22]

In October 1995, Sturm became aware that PORTA was going to engage BayMark (Strategies). Although he thought BayMark would provide only

Case 1:05-cv-00621-JEF   Document 52-3   Filed 07/11/2005   Page 43 of 206
http://www.sec.gov/litigation/opinions/34-43862.htm

consulting services to PORTA, because he knew little about the alliance or BayMark, Sturm contacted the DPP to determine whether it was "okay for [BayMark] to provide services, consulting services, to an audit client." He was referred to Trattou, whom he understood to be "fielding questions on anything related to BayMark." Trattou let Sturm know that the situation was "okay" -- that "the way the alliance was set up . . . [BayMark] could provide services to an audit client." Trattou further stated that the alliance had been discussed with the "SEC" and it had no objection.

Sometime during the first few days of December, after Sturm became aware that Olson had assumed the positions of president and COO of PORTA and in anticipation of beginning an audit "down the road," Sturm again called Trattou to inquire about "a second potential independence question" - "[w]hether it was okay for Ed Olson to not only be performing consulting services . . . [but also to be] performing . . . COO-type functions at the company . . . [and to] ha[ve] the title[s] of COO and President."[23] Trattou "indicated that he needed to take a look at [the situation] and get back" to Sturm.

On December 5, 1995, Trattou forwarded to Thomas Vasquez[24] an e-mail Trattou had written concerning Sturm's inquiry. The forwarding header told Vasquez that Trattou would "try and work this out" with the partner in charge of the DPP, Michael Conway, and others "before [Vasquez] ha[d] to get involved." The forwarded message read:

We have been asked by a [Peat Marwick] office whether BayMark Strategies (Ed Olsen [sic]) may act as interim president, for 15 months ($10,000 a month), for a public audit client. The purpose is to turn around the companies [sic] financial condition and develop a new strategy. [Peat Marwick] will continue to be the auditors during the turn around period and the original Chairman/CEO and a new CFO from industry will continue their roles.

Case 1:05-cv-00621-JJF    Document 52-3    Filed 07/11/2005    Page 44 of 206

The e-mail continued:

Glenn [Perry] and Mike [Conway] believe this situation is not appropriate. They believe if there is ever an audit failure in this type of situation, where we are indirectly getting `representations' from KPMG BayMark, we will be extremely embarrassed as a firm. In THEORY, they believe the situation should be able to work if Strategies is truly independent and not controlled by [Peat Marwick], but the form is such that it does not work.

Trattou went on to state that he disagreed with Conway and Perry and believed that "this situation can work." He further opined that "[t]here must be a way to structure such engagements to make them work by using walls, proper representations and full disclosure concepts." He concluded:

If BayMark is `independent' then they must `always' be deemed independent from [Peat Marwick] in substance and form for all transactions. If we start identifying transactions that `look' like problems then we weaken our position that BayMark is truly an independent company, not controlled by [Peat Marwick]. A no answer has obvious impacts to the financial success of the strategic alliance with BayMark Strategies and spill over effects to BayMark Capital transactions with public audit clients.

Perry and Conway met with OCA staff and representatives of the POB on December 6, 1995, the day after this e-mail.[25] They did not, however, mention anything about Strategies' PORTA engagement. Instead, the discussion focused on the same concerns raised in the October 19 meeting. Thus, Sutton reiterated OCA's concern that the relationship between BayMark and Peat Marwick (including Peat Marwick's loans to BayMark's subsidiaries and its Principals, Peat Marwick's contractual right to a royalty, and BayMark's use of the "KPMG" initials) might compromise Peat Marwick's independence from audit clients that would engage BayMark. The staff also expressed reservations about whether Peat Marwick could

provide services to audit clients as a BayMark subcontractor and maintain its independence. Focusing again on Capital's business, the staff warned that broker-dealer activities were not compatible with audit functions and that those activities raised separate issues for the Division of Market Regulation. As Conway's notes reflect, the POB representatives "basically side[d]" with OCA with respect to these issues. The meeting ended without any resolution of OCA's concerns but with an understanding that dialogue would continue.

Before the meeting drew to a close, Sutton again warned Perry and Conway that, if BayMark and Peat Marwick were viewed as one entity, "any services provided to an audit client by BayMark would have to be viewed as services provided by the combined entity." Based on his "working assumption" that Peat Marwick controlled BayMark, Sutton indicated, in substance, that Peat Marwick "can't audit SEC registrants who use BayMark if BayMark's services . . . are precluded for auditor."[26] As Burns' notes of the meeting state: "Problem if BM [BayMark] doing anything PM [Peat Marwick] can't do."

On December 8, 1995, Trattou called Sturm seeking information, to use in an upcoming meeting with OCA staff, about the services Sturm proposed to provide to PORTA.[27] He did not answer Sturm's earlier independence questions. He asked about the amount of the fee Sturm proposed to charge for conducting the audit of PORTA's financial statements. Sturm replied that he proposed to charge $150,000. Trattou inquired whether Sturm had yet commenced any audit procedures. Sturm replied that he had not. Trattou also asked whether Peat Marwick had providedany services to PORTA as a BayMark subcontractor and whether it intended to do so in the future. Sturm told him "no, we had not, and we did not intend to." After Sturm answered the questions, Trattou told Sturm, in essence, "not to worry . . . unless [Sturm] heard back" from Trattou and that, "if [Sturm] didn't hear anything prospectively, then assume that things are okay;

Case 1:05-cv-00621-JEF   Document 52-3   Filed 07/11/2005   Page 46 of 206

otherwise [Trattou] . . . would call [Sturm] back."
During the hearing, Sturm recalled that he and
Trattou had a number of follow-up conversations
that Sturm did not consider to have further
resolved the independence question.

On December 18, 1995, Conway met again with
OCA staff and other Commission employees.[28] The
purpose of the meeting was to give Conway and
Peat Marwick's attorneys the opportunity to
demonstrate why the relationship between Peat
Marwick and BayMark was not "a potentially
independence impairing relationship." Although
Conway and Harvey Pitt, an attorney representing
Peat Marwick, argued at some length that the
alliance did not raise independence concerns, those
attending the meeting discussed no new issues.[29]
There were no discussions of particular BayMark
engagements with Peat Marwick audit clients, such
as PORTA, although there was some "generic"
discussion that BayMark had some ongoing
relationships with audit clients and "generically"
what they involved.[30] The focus was on Capital's
business and Sutton's concern that certain aspects
of the alliance would lead a "reasonably informed
person . . . [to] consider [Peat Marwick to be] in
[the] invest[ment] banking bus[iness] as well as
auditing."

Sutton recalled that at this meeting he "definitely
said" that, if BayMark was performing services that
Peat Marwick could not itself perform, Peat
Marwick's independence would be impaired.
According to Burns' detailed notes, as the meeting
drew to a close, Conway stated that, if OCA would
"undertake to consider the[] issues" raised by
suggestions as to ways in which the structure of the
alliance might be modified, Conway would
"undertake to place a moratorium" on BayMark
performing services for Peat Marwick's public audit
clients. Sutton responded by noting that the only
alternative would be to consider the services
provided to each client and to make a case-by-case
assessment as to whether or not those services
would impair Peat Marwick's independence from

that client.

On December 26, 1995, Sutton and Conway met again. Sutton indicated that "in order to avoid staff objections to the structure" of the alliance, Peat Marwick needed to drop the "KPMG" initials from the BayMark parties' names, eliminate the royalty fee arrangement, and bring about the repayment of the $400,000 in loans made to the BayMark Principals.[31] Sutton and Conway agreed to follow up this meeting with a telephone call to talk about "whatever was still pending." Accordingly, in a December 28, 1995 telephone call, Conway answered certain questions Sutton had posed on December 26 concerning Peat Marwick's revolving credit arrangements with BayMark's subsidiaries.[32] In addition, the two men again discussed the ways in which Peat Marwick and BayMark's relationship needed to change. As a result of these conversations, Conway and Sutton came to an agreement that Peat Marwick would undertake negotiations with BayMark to end the BayMark parties' use of the "KPMG" initials, terminate the royalty fee arrangement, and have the BayMark Principals repay their loans.

During the course of these conversations, Sutton and Conway also discussed pending BayMark engagements.[33] Conway let Sutton know that eighteen engagements were "on hold" since the October 19 meeting and would stay on hold until OCA's concerns were resolved.[34] Conway then turned to other engagements that, as Sutton acknowledged he understood, were not on hold but rather "in progress." These engagements were dual engagements "contracted for [by] both BayMark and Peat Marwick" and had been identified because Conway had asked for such information and "someone" at Peat Marwick had gotten it for him. That person prepared a chart "identif[ying] six engagements where [Peat Marwick] w[as] auditor of record [and] . . . BayMark had contracts with . . . [and was] doing work for those particular clients."[35] Conway "needed to know one way or the other fairly soon whether we had to stop those

engagements or if they could proceed."[36] He wanted, and we find that he sought, Sutton's "yea or nay as to whether or not [the six dual engagements] could go forward." [37]

One of the six dual engagements involved Strategies' provision of turnaround management to PORTA.[38] Conway knew that "someone" from Strategies was acting as president of PORTA and that the "someone" was "running" PORTA. But Conway testified that he may not have known that the person was a BayMark Principal or a person to whom Peat Marwick had lent $100,000.[39] AsConway recognized, however, Peat Marwick "clearly" could not itself have provided the services he understood Strategies to be providing to PORTA because an audit firm cannot "have an audit client where [it] had someone in running the company."

According to Sutton's notes, Conway described the PORTA situation to Sutton as follows: "[S]trategies - assistance to troubled companies; work-out; top level management [KPMG could not do]" (second brackets in original).[40] Conway did not identify PORTA by name, did not indicate that Olson was the person who would provide the top level management, and did not mention that the person who would manage PORTA (Olson) was a BayMark Principal or a person to whom Peat Marwick had loaned $100,000. Nor did Conway mention that Strategies would earn a success fee[41] or discuss precisely when Peat Marwick would be performing audit work for PORTA.[42] According to Conway, Sutton expressed some "concern" about the PORTA situation. Conway recalled that Sutton "must've said . . . is this something that [Peat Marwick] could . . . do, and I said to him that Peat Marwick could not do what BayMark Strategies is doing."

The Division and Peat Marwick generally agree that there was consensus during these conversations that Peat Marwick would resolve OCA's independence concerns if it proceeded to modify the alliance in the three respects specified by OCA. They disagree sharply, however, as to whether the

six dual engagements could proceed to completion before the changes to the alliance were implemented. We find that Sutton neither told Conway that he approved or disapproved of the six dual engagements nor asked that Peat Marwick take steps to discontinue any of them. On the other hand, Conway testified that he believed that there was agreement with OCA that the six engagements could go ahead while the resolution of the issues posed by the alliance went forward. The law judge, who observed the demeanor of all the witnesses, found credible Conway's testimony as to his belief, and we find no basis to overturn that determination.

Sometime before December 27, 1995, Trattou called Sturm with an answer to Sturm's earlier independence inquiries. Trattou's answer professed to reflect accurately the content of Conway's dialogue with Sutton. According to Sturm, Trattou told him that the "SEC" was "aware of the PORTA situation," that PORTA had been mentioned to the "SEC" by name, and that Sturm "should proceed with the audit unless [he] heard otherwise and that even if there was an issue . . . because everybody knew about [the PORTA situation], it would be grandfathered." Indeed, Trattou implied that the situation had been described as he and Sturm had discussed -- that "Ed Olson had [been] hired, had those titles, and BayMark was performing some services there." Trattou also indicated that there would be some changes to the strategic alliance, but he mentioned only that the "KPMG" initials would be dropped from BayMark's name. Trattou did not, in the course of this conversation (or during those that took place earlier), inform Sturm about the concerns voiced by Commission staff about the structure of the alliance. Nor did Trattou or anyone else in the DPP tell Sturm that Peat Marwick hadloaned money to Olson or that the BayMark subsidiaries were obligated to pay a five percent royalty to Peat Marwick for use of the "KPMG" initials.

On December 29, 1995, Conway directed an e-mail to Vasquez and copied it to Perry, among others.

The message -- which updated Vasquez on "where we stand with our latest discussions with Mike Sutton" -- summarized the structural changes to the strategic alliance that Conway had agreed to discuss with BayMark and noted that Sutton "again indicated that it was important that we resolve any problems" that the Division of Market Regulation might have with the alliance because certain of their determinations might affect OCA's conclusions about independence. The e-mail continued:

Mr. Sutton said that he was going to try to get the matter resolved on the basis that we discussed and that, if resolved quickly, he thought that Baymark would be able to complete the engagements in process without jeopardizing our independence with respect to our SEC audit clients. Mr. Sutton needed to discuss the matter with others before he came to a final conclusion . . . .[43]

On January 3, 1996, Conway contacted Sutton to inform him that Peat Marwick was ready to begin negotiating the changes to the alliance but that Conway wanted to be sure that OCA was "satisfied before putting the lawyers to work." Sutton told Conway that OCA would get back to him. On January 5, Burns called Conway to say that "OCA was comfortable with the proposals he had made but . . . could not give him any approval or clearance until the Market Regulation issues were resolved." Conway understood this to mean that Peat Marwick's counsel was to begin discussions with the Division of Market Regulation and that the changes to the alliance could not be made until Market Regulation resolved its concerns about the alliance.

Sutton and Conway then exchanged letters purporting to reflect the outcome of their discussions. In a letter dated January 29, 1996, Conway summarized the proposed modifications to the structure of the strategic alliance and then stated that OCA had informed Peat Marwick "that the implementation of the foregoing revisions (which . . . remain subject to negotiation with BayMark) would resolve all issues that might be

said to arise as a result of the strategic alliance under applicable independence rules." Two days later, Sutton replied in a letter correcting Conway's statement about the resolution of independence issues: Sutton's letter stated that all "independence issues raised by the OCA are, and will remain, open until all issues raised by the Division of Market Regulation have been resolved." On February 14, 1996, Conway replied to Sutton's letter and acknowledged that "[o]urrespective recollections [as to the discussions] are generally consistent." Nowhere in these letters is there a reference to the six ongoing dual engagements.

Again, the parties agree that "independence issues" remained open pending further action by the Division of Market Regulation. But the Division contends, in essence, that the "independence issues" included whether the six engagements could proceed, while Peat Marwick argues, in essence, that it was understood that the six engagements could proceed while the "independence issues" as to the overall structure of the alliance were being resolved. We believe that the December 29 e-mail and the subsequent correspondence can fairly be read as being consistent with either view. Accordingly, they do not lead us to overturn the law judge's determination to credit Conway's testimony concerning his belief that Peat Marwick and the BayMark subsidiaries were free to go forward with the pending engagements.

In the meantime, however, on December 27, 1995, PORTA signed Peat Marwick's engagement letter. Field work began sometime in January 1996. The audit team did not interact with Olson. Indeed, Olson deliberately stayed clear of the auditors. He was mindful that, at the outset of his dealings with Peat Marwick, Vasquez had told him that Peat Marwick wanted to maintain its independence from BayMark.[44]

On the other hand, as PORTA's president, Olson signed the management representation letter on which the audit team relied in conducting the audit. As a consequence, Olson, along with the other

officers and the director who signed the letter, took responsibility for "the fair presentation" in consolidated financial statements of PORTA's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles ("GAAP"). Moreover, the fact that Olson, a person associated with Strategies, was managing PORTA was certainly not lost on the audit team. As Peat Marwick's workpapers reflect, the audit engagement team considered whether it "needed to reevaluate" its relationship with PORTA "due to man[agement] turnover." In determining not to do so, the team considered, among other things, that the "new COO, Ed Olson, is with BayMark Strategies [and] came highly recommended by [Peat Marwick's] corporate finance personnel."

On January 5, 1996, Catherine McGuire, Chief Counsel of the Division of Market Regulation, met with Burns of OCA to discuss the Peat Marwick/BayMark alliance. She had become concerned that the resolution of the auditor independence issues raised by the BayMark venture ought to be better coordinated with the resolution of the broker-dealer registration issues. She was optimistic, however, that the broker-dealer issues might be resolved quickly given Conway's demonstrated willingness toundertake structural modifications to the alliance. Accordingly, on January 17, 1996, counsel for Peat Marwick and BayMark met with staff of the Division of Market Regulation, including McGuire. McGuire expressed concern, in light of Peat Marwick's failure to initiate dialogue with Market Regulation, that Peat Marwick seemed to be ignoring the broker-dealer issues arising from its relationship with BayMark and Capital. McGuire wanted Peat Marwick to understand that those issues were "extremely difficult and . . . important" and had been "the show stopper" with respect to another accounting firm's attempt to establish an affiliation similar to that of Peat Marwick and the BayMark parties. Accordingly, while McGuire invited Peat Marwick to submit a formal no-action request with respect to whether

Peat Marwick could provide certain services to Capital's clients without broker or dealer registration, she stated that the staff had "said no . . . [to] the last account[ing] firm that wanted to do this."

On February 12, 1996, McGuire again conferred with attorneys representing Peat Marwick and provided detailed guidance on how the firm might seek no-action relief. First, McGuire identified those aspects of the license agreement that raised concerns about whether Peat Marwick controlled BayMark. Next, McGuire specified the sorts of representations Peat Marwick should make concerning the services it intended to supply to Capital's customers. Two months later, on April 12, 1996, Peat Marwick submitted a discussion draft of a no-action request. In McGuire's view, the draft failed to make the "simple representations" that might warrant no-action relief. McGuire explained that, instead of addressing relevant issues, the letter argued that the services that Peat Marwick would provide BayMark (Capital) were proper accounting functions and therefore were not broker-dealer functions. After it submitted a revised June 13 draft, Peat Marwick did not proceed further with the request.

Before Peat Marwick submitted the first draft no-action request -- and before it had effected any structural changes to the alliance - Sturm and the rest of the audit team concluded the audit of PORTA's 1995 year-end financial statements and Peat Marwick issued its "Independent Auditors' Report." PORTA's consolidated statements of operations reported a net loss of over $31 million for 1995 and the audit report, dated March 22, 1996, expressed substantial doubt about PORTA's ability to continue as a going concern. PORTA included the report as part of its 1995 annual report on Form 10-K, filed with the Commission on April 1, 1996. The annual report listed Olson as the company's president and COO and noted that Olson "is also one of the principals of KPMG BayMark Strategies LLC." The report also stated that "Mr. Olson continues in this position while serving as

Case 1:05-cv-00162-JJF    Document 52-3    Filed 07/11/2005    Page 54 of 206

President and Chief Operating Officer of the Company."[45] Olson signed the annual report as "President" of PORTA.

As Sturm was reviewing the draft Form 10-K, he noticed that it described BayMark (Strategies) as "KPMG BayMark." Because he had been told that the "KPMG" initials would be dropped from BayMark's name pursuant to Peat Marwick's agreement with OCA, he called Conway to inquire specifically about whether the name BayMark Strategies, LLC should appear in the Form 10-K with the "KPMG" initials and generally to "reconfirm that there were no independence issues." He (or another member of the audit team) also discussed the matter with Vasquez. Ultimately, Conway and Vasquez "reconfirmed that the SEC was aware that BayMark was performing the work at PORTA, our independence has not been impaired, and that, due to the SEC review, we should not accept any subcontracted work from BayMark . . .".[46]

On May 6, 1996, OCA learned of the PORTA audit after Van Brunt and others in OCA ran a search on the Commission's Electronic Data Gathering and Retrieval System ("EDGAR") for filings in which the initials "KPMG" and the name "BayMark" appeared. The search disclosed that Peat Marwick had performed an audit of the financial statements of a public audit client, PORTA, while BayMark was providing, through its subsidiary, Strategies, and a BayMark Principal, Olson, management services to that client. Van Brunt and others told Sutton about the situation. Sutton directed them to talk with Peat Marwick and get the facts about the PORTA audit.

Approximately one week later, Burns mentioned to Conway that the staff was "looking at PORTA" and on May 20, 1996, Burns[47] informed Conway that, in the staff's view, Peat Marwick was not independent from PORTA for "at least two reasons." First, because the structural changes to the strategic alliance had not been implemented, the staff considered Peat Marwick and BayMark to have been one entity for independence purposes and

"[o]ne entity cannot be both management and auditor of a registrant's financial statements." Second, loans to a company (BayMark) owned by Olson "would constitute a loan from the auditor to a member of management and violate the fact and appearance of Peat's audit independence." Burns also told Conway that OCA would not "take action" on this determination until Sutton returned to the office.

At Conway's request, Conway met with Sutton and other members of the OCA staff on June 20, 1996.[48] Counsel for Peat Marwick also attended the meeting. During the meeting, Sutton advised Conway that OCA did not consider Peat Marwick to have been independent from PORTA. Sutton further advised Conway that he had "difficulty" understanding how Peat Marwick "could come to [the] conclusion" that it was "indep[endent] of [a] co[mpany] BM [BayMark] was managing . . . in view of our [1995] discussions." Although Conway insisted that he had "mentioned P/S [PORTA] as [a] man[agement] relationship," Sutton indicated that he had no recollection of that discussion.

By letter dated June 21, 1996, Sutton advised the Chairman of PORTA's Board of Directors, Warren Esanu, that "the existence of financial, operating, and other relationships among Mr. Olson, KPMG BayMark and KPMG Peat Marwick, adversely impacts KPMG Peat Marwick's independence with respect to Porta Systems." For that reason, the letter advised Esanu, the financial statements PORTA had included in its 1995 annual report would be considered unaudited and not in compliance with the federal securities laws. The letter also advised Esanu that PORTA should arrange for the immediate audit of its financial statements by an independent certified public accountant and should consider whether and how to notify public investors and others who might be relying on the then-current financial statements.[49]

III.

The capital formation process depends, in large

part, on the availability of accurate and reliable financial information. As we have stated, "[a]n investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest."[50]

The investing public must be able to rely on reports by "independent" public accountants concerning the financial statements included in filings with the Commission. These reports provide the assurance that outside experts have examined a filer's financial statements and have arrived at objective opinions about whether the filer's financial position, results of operations, and cash flows are presented fairly in conformity with GAAP. Independent audits thus improve the reliability of financial statements and enhance their credibility.

Although the independence of auditors does not alone assure reliable and credible financial reporting, its absence would certainly undermine public confidence in that reporting, and thereby harm the securities markets.[51] Accountants and their firms must be -- and must reasonably be perceived to be -- free from influences that would impair objective, unbiased examinations, even when the results are contrary to management's interests. As we have consistently recognized, if an auditor "is predisposed, or even appears predisposed, to blindly validate management's work rather than subjecting it to careful scrutiny, the ultimate result will be a diminution of public confidence in the profession and the integrity of the securities markets."[52]

In enacting the federal securities laws, Congress underscored the crucial function of independent auditors by requiring, or permitting the Commission to require, that "independent" public accountants certify financial statements filed with the Commission by public companies and others.[53] As the United States Supreme Court recognized in United States v. Arthur Young & Co., 465 U.S. 805,

817-818 (1984), these requirements place a special responsibility on accountants who audit the financial statements of public companies:

By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.[54]

Congress did not define "independent;" instead it authorized the Commission to define "accounting, technical and trade" terms used in the federal securities laws.[55] We have adopted Rule 2-01 of Regulation S-X,[56] which provided, at all relevant times, in subsection (b) that the Commission "will not recognize any certified public accountant or public accountant as independentwho is not in fact independent." Based on the recognition that certain relationships between an auditor and a client are so likely to compromise an auditor's objectivity as to preclude a finding that an auditor is independent,[57] the rule gave examples of situations that gave rise to an accountant being "considered not independent."[58] The rule also stressed that, in determining whether an accountant is independent with respect to a particular person, the Commission would "give appropriate consideration to all relevant circumstances, including evidence bearing on all relationships between the accountant and that person or any affiliate thereof."[59]

In our adjudicatory capacity, we have issued decisions over the last six decades finding impaired independence in a variety of factual situations.[60] Various releases in which we have proposed and adopted amendments to disclosure items and to Rule 2-01 itself also contain in-depthdiscussions of

auditor independence issues.[61] We also have issued extensive interpretations specifically designed to assist registrants and auditors in recognizing and evaluating independence questions.[62]

In addition, Rule 2-02(b)(1) of Regulation S-X requires an auditor's report to state "whether the audit was made in accordance with generally accepted auditing standards [GAAS]." GAAS, in turn, requires that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors."[63] In keeping with this standard, the senior technical body of the American Institute of Certified Public Accountants ("AICPA")[64] issued Statement on Auditing Standards ("SAS") No.1, Section 220, providing that: "[i]t is of utmost importance to the profession that the general public maintain confidence in the independence of independent auditors."[65]

The AICPA has developed a body of independence standards, set out in its Code of Professional Conduct, that applies to audits performed by its members.[66] Auditors look to thesestandards (and to the interpretations and ethics rulings concerning these standards) to determine whether they are independent for purposes of GAAS.[67] Ultimately, at least insofar as audits of financial statements of Commission registrants are concerned, however, the Commission retains the responsibility to ensure the development of an independence framework that serves the public interest and protects investors.

Independence traditionally has been understood by the profession to be a state of mind and a matter of character - subjective attributes of integrity, honesty, and objectivity.[68] Thus, an individual auditor is said to be "independent in fact" when he or she possesses a mental attitude giving rise to an ability to act with objectivity and integrity.[69] As we have recognized, however, "[s]ince objectivity exists only as a state of mind, [and] independence

Case 1:05-cv-00161-JJF    Document 52-3    Filed 07/11/2005    Page 59 of 206

in fact, or the absence of it, is rarely susceptible to demonstrable proof . . . both the appearance and the fact of independence are equally important" under the securities laws.[70] In addition, because it is vital that audits not only produce more reliablefinancial information but also that investors believe that they do, it is critical that auditors appear free of biases and prejudices that may impair their objectivity.[71] Indeed, as SAS No.1, Section 220,[72]states:

Public confidence would be impaired by evidence that independence was actually lacking, and it might also be impaired by the existence of circumstances which reasonable people might believe likely to influence independence. To be independent, the auditor must be intellectually honest; to be recognized as independent, [the auditor] must be free from any obligation to or interest in the client, its management, or its owners.

As a consequence, both we and the AICPA have identified relationships and other circumstances so inherently compromising that they are judged necessarily to impugn independence. When, as a factual matter, such relationships are present, independence "shall be considered to be impaired" under GAAS,[73] and an accountant would "be considered not independent" under ourformer Rule 2-01.[74] Such relationships must be scrupulously avoided in order to preserve the credibility of audits.[75]

The questions we address today turn on whether, on the basis of the record before us, there were any such relationships among Peat Marwick, Strategies, Strategies' owner, Olson, and Peat Marwick's audit client, PORTA. As discussed below, we conclude that there were at least two relationships that compromised Peat Marwick's independence. We discuss only relationships that were not the subject of discussion between Peat Marwick and OCA. We need not reach other relationships that are asserted to give rise to independence impairments, because

even without reaching them, we conclude that Peat Marwick should be ordered to cease and desist from violating the securities laws.[76]

IV.

A.

The first relationship we consider is Peat Marwick's debtor/creditor relationship with Olson. Peat Marwick's loan to Olson remained outstanding while Olson was PORTA's president and COO and Peat Marwick was auditing PORTA's financial statements and when Peat Marwick issued its audit report. Peat Marwick concedes that, as a result of this relationship, it was not independent from PORTA.

Former rule 2-01 required auditors and their firms to avoid direct and material indirect business relationships with officers of clients, including borrowing or lending.[77] We have stated that these relationships engender a "mutuality or identity of interests with the client [that] would cause the accountant to lose the appearance of objectivity and impartiality . . . ".[78] This is so because a reasonable person, knowing that an auditor or his or her firm has a financial stake in the repayment of the loan and knowing that the repayment might be dependent, at least to some extent, on the audit client's continued operation and solvency, would harbor serious doubt about whether the auditor will objectively assess the client's financial condition.[79]

GAAS is to the same effect. The AICPA Code of Professional Conduct, Interpretation 101-1, states that "[i]ndependence shall be considered to be impaired if, . . . [d]uring the period of a professional engagement or at the time of expressing an opinion," an auditor or his firm "[h]ad any loan to or from" an audit client, or any of its officers, directors or principal shareholders.[80] Thisinterpretation establishes what we have called an "absolute prohibition of loans."[81] Peat Marwick's loan to Olson violated that prohibition.

Peat Marwick's witnesses admitted -- and on review

Peat Marwick admits -- that the loan to Olson impaired Peat Marwick's independence under GAAS. Indeed, one of Peat Marwick's expert witnesses testified that in 25 years of auditing he had "not seen an audit up until this one where the audit firm had a loan to the client."[82] Peat Marwick nevertheless attempts to minimize what one witness correctly characterized as "an absolute blatant out-and-out violation of the AICPA Code of Professional Conduct" by characterizing it as a "mistake."[83] We agree, but we stress that the "mistake" was serious and arose from Peat Marwick's failure to exercise ordinary care to maintain its independence.

B.

Another set of relationships between and among Peat Marwick, Strategies, and PORTA gave Peat Marwick the right to a fee attributable, in part, to PORTA's financial success. We also conclude that these relationships prevented Peat Marwick from being recognized as independent. As set out above, PORTA's turnaround agreement with Strategies required PORTA to pay Strategies a "success fee" of specified percentages of PORTA's quarterly earnings, disposed inventory, and restructured debt. The portion of the success fee attributable to earnings (five percent of the company's quarterly "earnings before interest taxes") was to be paid "at the end of each quarter during [the] engagement" and for three years thereafter. Strategies, in turn, was obligated to pay to Peat Marwick, on a fiscal quarterly basis in arrears, a royalty fee of five percent of its quarterly consolidated fee income.

Rule 302 of the AICPA's Code of Professional Conduct[84] prohibits arrangements under which an auditor has the right to receive a fee that is contingent on the financial success of an audit client. The rule flatly prohibits an auditor from "perfor[ming] for a contingent fee any professional services for, or receiv[ing] such a fee" from a client for whom the auditor performs an audit or review of a financial statement. Peat Marwick ran afoul of that prohibition by "receiving" such a fee within the

meaning of the Rule.[85]

Peat Marwick insists that it did not accept any royalties "once OCA raised a question" about the royalty fee arrangement, and that the success fee/royalty fee arrangements therefore do not support a finding of lack of independence. But, as Peat Marwick's own evidence shows, royalty fees due Peat Marwick for quarters ending after September 30, 1995, were deposited by BayMark in a "separate segregated account" established by BayMark, and the BayMark parties stood ready to make all required payments due under the terms of the license agreement once independence issues were resolved. In any event, whether Peat Marwick chose to avail itself of its right to share in the success fee is beside the point. Under AICPA Rule 302, as interpreted by ethics ruling 17, a contingent fee is deemed received when "the performance of the related services is complete and the fee . . . is determined."[86] Thus, it was the relationships between and among Peat Marwick, Strategies, andPORTA permitting Peat Marwick to receive a determinable fee, not the actual receipt of funds, that created the danger of clouding objectivity and impartiality in the audit.

C.

In the respects described above, Peat Marwick established and maintained relationships that impaired independence from its audit client, PORTA. By virtue of its debtor/creditor relationship with Olson, Peat Marwick cannot be recognized as independent from PORTA under former Rule 2-01. We also conclude that the loan to Olson and Peat Marwick's right to share in Strategies' success fee ran afoul of AICPA Code rules aimed at safeguarding independence. Accordingly, these relationships, whether considered individually or collectively, impaired Peat Marwick's independence under GAAS.

Concerning our findings under former Rule 2-01, Peat Marwick argues that the record shows that the audit team was independent "in fact" as evinced by,

among other things, the quality of the audit report, the issuance of the going concern qualification, and the fact that the audit team itself had no knowledge of the loan to Olson or of the other features of the alliance structure.[87] Peat Marwick's argument misreads former Rule 2-01. Its argument essentially is that independence "in fact" -- the auditor's state of mind -- is to be determined by the outcome of the audit, and not by reference to those circumstances that have been designated by the Commission as inconsistent with independence. If the audit was properly performed, the argument goes, it must follow that the persons who performed it were independent.

This argument, in effect, calls upon us to replace the independence requirement with a "good audit" requirement. The argument assumes that, if the outcome of an audit was acceptable, it followsthat the auditors were objective. Of course, the absence of bias is not demonstrated by an adequate audit, just as an inadequate audit does not demonstrate that the auditor was biased. Rather, the independence requirement is designed to give investors the assurance that the persons examining a registrant's financial statements are capable of exercising objective and unbiased judgment. This assurance is at the core of the independence requirement, since investors are rarely in a position to judge whether, when financial statements are filed with the Commission, they have been subject to rigorous review and are accurate.[88]

Peat Marwick's argument fails for an additional reason. The circumstances identified in former Rule 2-01(b) as impairing independence were those involving the accountant, "his firm, or a member of his firm." This phrase appeared in subsections (b)(1) and (2), which gave examples of situations in which an accountant would be "considered not independent." Indeed, the situation described in subsection (b)(1) was one in which the accountant's "firm had . . . any direct financial interest or any material indirect financial interest" in an audit client or its affiliates. The rule plainly did not make

Case 1:05-cv-00162-JJF (Document 52-3    Filed 07/11/2005    Page 64 of 206

the question of whether an auditor's independence is impaired because of a relationship between the firm and the audit client depend on an inquiry into what each auditor in the firm knew.[89]

Finally, it is apparent that some of the circumstances of the alliance did, in fact, have a significant effect on the audit at issue. As we have noted, the fact that Olson and Strategies would provide management services to PORTA was not lost on the audit team: in spite of significant management turnover, they decided not to reevaluate the audit relationship with PORTA, in part because Olson, the new COO, was "with BayMark Strategies" and "came highly recommended" by Peat Marwick's corporate finance personnel.

In another argument pertaining to former Rule 2-01, Peat Marwick contends that findings that its relationships adversely affected its independence would impose on it, without notice, new rules of conduct.[90] We disagree. Due process requires only that laws give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited."[91] The degree of required noticevaries according to the circumstances.[92] In cases such as this one, regulations satisfy due process so long as they are sufficiently specific that a regulated entity "acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects" it to conform "by reviewing the regulations and other public statements issued by the agency."[93]

We conclude that a reasonably prudent accounting firm would have had fair warning from the face of former Rule 2-01 that we would deem independence impaired when, during the period of an audit engagement, the firm maintained a debtor/creditor relationship with an officer of an audit client. Any doubt could have been resolved by recourse to, among other sources, our published decisions and our codification of financial reporting policies. In sum, our finding that Peat Marwick's

relationship with Olson impaired its independence imposes no new rules of conduct.[94]

We therefore conclude that, by virtue of its lack of independence from PORTA, Peat Marwick violated our Rule 2-02(b)(1)[95] by issuing an audit report stating that the audit was conducted in accordance with GAAS, when it was not.[96] We also conclude that, because Peat Marwick lacked independence (gauged both by GAAS and former Rule 2-01), PORTA violated Section 13(a) of the Exchange Act and Rule 13a-1, since the financial statements included as part of PORTA's 1995 annual report, were not, as represented, audited by independent accountants.[97] We note that each impairment we have found, considered on its own, compromised Peat Marwick's independence and each is sufficient, on its own, to support our finding of violations of Section 13(a) and Rule 13a-1. Similarly, each impairment is sufficient, standing alone, to compromise independence under GAAS and to support our finding of violation of Rule 2-02(b)(1).

## V.

We now address whether Peat Marwick should be sanctioned for the conduct we have found. Under Exchange Act Section 21C(a), we may order a person to cease and desist from certain conduct if the person "is violating, has violated, or is about to violate" any provision of the Exchange Act, or anyrule or regulation thereunder.[98] The section also authorizes us to order a person to cease and desist from certain conduct if the person "is, was or would be a cause of [a] violation [of the Exchange Act or the rules and regulations thereunder], due to an act or omission the person knew or should have known would contribute to such violation." As we conclude below, Peat Marwick acted negligently, and its conduct resulted both in its primary violation of Rule 2-02 and in its being the "cause" of PORTA's violations of Section 13(a) of the Exchange Act and Rule 13a-1. Because of the unique procedural posture of this case, however, negligence is not sufficient to warrant a conclusion

that Peat Marwick engaged in "improper professional conduct" within the meaning of our Rule 102(e). Instead, Peat Marwick engaged in improper professional conduct only if it acted intentionally, knowingly, or recklessly.[99]

### A.

We hold today that negligence is sufficient to establish "causing" liability under Exchange Act Section 21C(a), at least in cases in which a person is alleged to "cause" a primary violation that does not require scienter.[100] Therefore, if Peat Marwick acted at least negligently with respect to whether its conduct would contribute to PORTA's violations, Peat Marwick is liable under Section 21C(a) as a cause of those violations.

Ordinarily, the phrase "should have known" used in Section 21C(a) is classic negligence language.[101] On the other hand, the meaning of the phrase is flexible and can vary depending on the context.[102] Where, as here, the primary violations do not require culpability beyond negligence, we see no reason not to give the phrase its ordinary meaning[103] and much that compels us to adhere to that meaning. As we discuss infra pp. 47-49, the legislative history of Section 21C and its parallel provisions shows that it was designed to provide a flexible remedy against persons who commit isolated infractions and present less threat to investors than do persons against whom injunctive relief is sought.[104]

We also find support for our holding in the construction of an analogous provision of the Exchange Act, Section 15(c)(4).[105] Section 15(c)(4) permits us to proceed administratively against a person who is "a cause of [another person's] failure to comply [with certain provisions of the Exchange Act or rules and regulations thereunder] due to an act or omission the person knew or should have known would contribute to the failure." In George C. Kern, Jr., [1988-1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶84,342,

at 89,591-92 (Nov. 14, 1988), <u>aff'd in part and vacated in part on other grounds</u>, 50 S.E.C. 596 (1991), then-Chief Administrative Law Judge Warren Blair, taking into consideration the language of the section, its legislative history, and its "disclosure philosophy," among other things, held that a negligence standard governs "causing" liability under Section 15(c)(4). A number of commentators suggest that Section 21C's formulation for "causing" liability appears to be derived from Section 15(c)(4).[106]

B.

Based on our review of the record, we conclude that Peat Marwick acted negligently, but not recklessly, in concluding that it was independent from PORTA. It was unreasonable for Peat Marwick, in the person of Conway, to overlook how the terms of the Strategies engagement with PORTA compromised Peat Marwick's independence. As the head of Peat Marwick's DPP, Conway was in charge of a "group of experts" to whom Peat Marwick professionals were directed to turn for guidance on questions about independence. Specifically, the DPP was charged with dealing with, among otherthings, independence questions that might arise "in the field."[107] As Sturm explained, when he had questions of this sort, he would turn first to "the professional literature" and, if he could not ascertain the answer on his own, he would contact the DPP. It was because he could not, on his own, ascertain the answers to his concerns about Olson's relationship with Peat Marwick and PORTA that Sturm repeatedly contacted the DPP. In early December, for example, Sturm asked Trattou whether Peat Marwick's independence would be impaired if, in addition to performing consulting services for PORTA, Olson functioned as its COO and bore the titles of president and COO of the company. As a result of this inquiry, Conway had reasons to be - and initially was - concerned about Peat Marwick's independence from PORTA. As a consequence, he should have taken the steps necessary to resolve Sturm's inquiry appropriately.

He did not do so.

As Trattou's December 5 e-mail indicates, Conway was informed about Sturm's December inquiry shortly after Sturm called Trattou. Although it is not clear from the e-mail what Conway was told about the inquiry in particular, or the PORTA situation in general, it is clear that, based on what he did know, Conway "believed" that the "situation [was] not appropriate." On its face, this e-mail demonstrates that Conway was aware that the PORTA situation raised concerns about independence. Indeed, Peat Marwick's close identification with BayMark and its subsidiaries, the subject of ongoing discussion with OCA, rendered the PORTA situation particularly problematic from an independence standpoint, because Strategies would actively manage PORTA and therefore "indirectly [provide] `representations'" to the audit team.[108]

Because he had these concerns, and because he was the head of Peat Marwick's DPP, Conway had a duty to inquire carefully about the specifics of Strategies' PORTA engagement and to assess diligently whether the audit could proceed. But he did not do so. Instead, Conway simply asked someone at Peat Marwick to gather information[109] about dual engagements and proceeded with his independence assessment on the basis of a skeletal description of the PORTA situation set forth in a brief chart. That chart included only information on the client's name, year-end date, and assets; a summary description of the services Strategies would provide; and an incomplete description of the fees Strategies would earn. The chart was lacking in basic information -- such as the identity of the Strategies employee who would provide the management services.[110]

Thus, as Conway himself has admitted, he may well not have known many of the critical specifics of the PORTA situation. He should have. Had he known these facts, along with other facts he did know, he would have known that Peat Marwick's independence was impaired. For example, Conway

knew that Peat Marwick had loaned money to the BayMark Principals. That fact, with the fact that a BayMark Principal would serve as PORTA's president (a fact Conway should, but may not, have known), would have given rise to immediate and obvious independence concerns.[111] Conway did not know these specifics because he was satisfied with an incomplete account of the PORTA situation.

Conway had ready access to multiple sources of information about the PORTA situation - e.g., Vasquez,[112] Trattou, and Sturm. Conway failed, however, to elicit material facts from his colleagues,even though he knew that they possessed information pertinent to the independence inquiries he was obligated to resolve. Despite his responsibility to make independence determinations for Peat Marwick, and despite his concerns, Conway simply never thought through the issues in meaningful detail. Conway's conduct, of course, is attributed to Peat Marwick for purposes of this proceeding.

Conway was not the only Peat Marwick employee whose conduct was negligent. For example, although Sturm was responsible for compliance with GAAS in the conduct of the PORTA engagement,[113] Sturm failed to take reasonable steps to assure himself that Peat Marwick was independent from PORTA. Although he knew that he did not know enough about Peat Marwick's relationship with BayMark to assess whether it was "okay" for Olson to perform "COO-type" functions for a Peat Marwick audit client, he attempted to discharge his responsibilities under GAAS by relying without question on DPP's and Vasquez' conclusory assurances that independence had not been impaired. From all that appears in the record, Sturm made no inquiry into the specifics of the Peat Marwick/BayMark alliance, even though he had reason to know that Trattou and Vasquez had access to those facts. Had he made any specific inquiry, he would have learned, for example, that Olson, the person performing the "COO-type" functions for PORTA, had a loan outstanding from

Peat Marwick. Instead, he simply relied on the blanket assurances of others that the structure of the alliance was such that it obviated independence issues and that the matter had been discussed with the Commission.

Peat Marwick attempts to minimize the seriousness of its employees' negligence by relying on Conway's discourse with Sutton. In our view, Conway's interactions with Sutton support, rather than undermine, our conclusion that Conway (and hence Peat Marwick) acted unreasonably. Although we have accepted the law judge's finding that Conway concluded his conversations with Suttonbelieving that OCA would not assert that Peat Marwick's independence was impaired with respect to the six overlapping engagements, OCA's position was plainly based on the facts as Conway presented them. But Conway did not tell OCA that Olson would be acting as PORTA's president and COO, nor did he tell OCA that PORTA had promised to pay Strategies a success fee under certain contingencies. Conway could not reasonably have believed that OCA was giving Peat Marwick a "free pass" on any and all independence issues that might arise in the course of the six engagements including issues arising from matters that were never discussed with OCA.

Even when Conway and Sturm had the opportunity to reconsider the PORTA situation, in the context of Sturm's call to Conway as the PORTA audit was nearing completion, neither man asked the other enough to elicit the facts each man claims he did not know, even though Sturm knew, for example, that Olson was providing COO services to PORTA, and Conway knew or was on notice that Olson was a Principal of BayMark. Instead, both men simply fell back on Conway's conversation with Sutton and "reconfirmed that the SEC was aware that BayMark was performing the work at PORTA" and hence that Peat Marwick's independence had not been impaired.

In an attempt to explain why he did not "put the pieces together," Conway observed that "all of my

Case 1:05-cv-00621-JEL   Document 52-3   Filed 07/11/2005   Page 71 of 206

focus was on the relationship with BayMark. I mean, I spent all of my time, virtually all of [it] certainly, talking to [Sutton] about the basic relationship with BayMark. I just never focused on the loan." Although this is certainly an accurate description of Conway's interactions with OCA, it hardly excuses his failure to gather, assess, and impart facts about the specific engagement. Conway was concerned enough about the PORTA situation to seek OCA's guidance; he had the obligation to learn and disclose the salient facts about that situation. His failure to do so cannot be justified by his focus on structural issues or on his perception of views expressed by OCA. Without focusing on all the salient engagement-specific facts, Conway was negligent in concluding that Peat Marwick was independent from PORTA.

At the same time, although it is a close question, we are unable to conclude that Conway or Sturm acted recklessly. Conway talked repeatedly with OCA about independence issues raised by the BayMark alliance. Indeed, he put eighteen engagements on hold while he discussed those issues with OCA. There is no direct evidence that Conway was aware of the material facts that he did not raise with OCA, nor is there evidence that he sought to avoid learning them. When he did consider all the facts, Conway "used a four letter word to [himself] saying that [he] was disappointed in [himself] that [he] didn't realize this before." Conway was alarmingly careless in not learning what he needed to know and in not appreciating the significance of what he knew. But his misconduct, we conclude, fell short of recklessness. Similarly, we do not conclude that Sturm was reckless in relying on DPP's assurances. We particularly note that Sturm may have been misled by Trattou into believing that the PORTA situation had been discussed with OCA as Trattou and Sturm had discussed it, e.g., including information that Olson was performing the management functions at PORTA.

We find that Conway and Sturm negligently failed to inform themselves about facts material to

Case 1:05-cv-00621-JEI   Document 52-3   Filed 07/11/2005   Page 72 of 206

specific issues about independence attending the PORTA situation - when both had questions or concerns about the propriety of the audit and had ready access to relevant information. We therefore conclude that Peat Marwick, through Conway and Sturm, necessarily should have known that its conduct would render false its representation that its audit was in accordance with GAAS, thereby violating Rule 2-02(b)(1). We further conclude that Peat Marwick, through Conway and Sturm, also should have known that its conduct would contribute to PORTA's violations of the securities laws within the meaning of Exchange Act Section 21C(a). Because of the unique posture of this proceeding (see supra note 99), however, we are constrained to conclude that Peat Marwick did not engage in improper professional conduct within the meaning of Rule 102(e).

VI.

In determining whether to issue a cease-and-desist order against Peat Marwick, the law judge considered: the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that his occupation will present opportunities for future violations.[114]

These factors are used by courts in determining whether the Commission has shown a reasonable likelihood of future violation warranting injunctive relief.[115] Since we were given cease-and-desist authority in the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("RemediesAct"),[116] we have not determined whether the Division must show a likelihood of future violations to warrant cease-and-desist relief.[117]

Our decision to impose any remedial sanction is governed by certain general principles. Within the context of our statutory authority, we have broad

discretion in choosing a sanction.[118] All that is required is that the remedy we select have a "reasonable relation" to the record before us and to the violations we have found.[119] In imposing sanctions, we traditionally have balanced a variety of mitigating and aggravating circumstances, such as the harm caused by the violations, the seriousness of the violations, the extent of the wrongdoer's unjust enrichment, and the wrongdoer's disciplinary record. The questions this case poses are whether, as a matter either of statutory command or in the exercise of our broad discretion, we will require some showing of likelihood of future violations before issuing a cease-and-desist order, and how that showing may be made.

We believe that there must be some likelihood of future violations whenever we issue a cease-and-desist order. The nature of the cease-and-desist remedy almost by definition looks in part to the future. The remedy requires that a wrongdoer "cease" his unlawful conduct and "desist" from such conduct in the future. The forward-looking aspect of the remedy is further evidenced by the authority the statute gives us to impose conditions in cease-and-desist orders to assure future compliance.[120] If there is no possible risk of future violation, it is difficult to see the remedial purpose of a cease-and-desist order.[121]

Though "some" risk is necessary, it need not be very great to warrant issuing a cease-and-desist order. Absent evidence to the contrary, a finding of violation raises a sufficient risk of future violation. To put it another way, evidence showing that a respondent violated the law once probably also shows a risk of repetition that merits our ordering him to cease and desist. Our conclusion is suggested, though not compelled, by the statutory language. The statute specifies that we may impose a cease-and-desist order on a person who "has violated" the securities laws. This contrasts with our authority to seek injunctive relief in those instances when a person "is engaged or about to engage" in

violative conduct.[122]

The public discussion that ultimately resulted in the enactment of our cease-and-desist authority, as well as the legislative history of the Remedies Act, shows that this authority was designed to provide the Commission with a remedy that could be based on a finding of past violation. As far as we are aware, cease-and-desist authority for the Commission was first suggested in 1972 by the late Arthur F. Mathews in a letter to the Commission's Advisory Committee on Enforcement Policies and Practices ("Wells Committee").[123] Mathews suggested that a cease-and-desist order remedy similar to that employed by state securities regulators would be a useful remedy "where there does not exist any reasonable likelihood that the person will commit statutory violations in the future."[124] The Wells Committee did not adopt Mathews' suggestion.[125]

A decade later, then-Commissioner Bevis Longstreth, suggested asking Congress for cease-and-desist authority in insider trading cases[126] and in 1983, the Commission launched a formal review to study whether it should seek authority to impose administratively a greater range of remedies, including cease-and-desist orders.[127] The issue of cease-and-desist authority was again raised in October 1987 by the National Commission on Fraudulent Financial Reporting ("Treadway Commission").[128] The Treadway Commission recommended, among other things, that the Commission be authorized "to issue cease-and-desist orders when it finds a securities law violation."[129] The Treadway Commission found that cease-and-desist power "would provide increaseddeterrence in . . . financial reporting cases . . . in which the SEC lacks sufficient evidence to demonstrate a reasonable likelihood of future violations."[130]

On February 1, 1990, then-Chairman Richard Breeden appeared before a Senate committee

considering enforcement remedies and requested legislation that would give the Commission authority to issue temporary and permanent cease-and-desist orders. In support of this cease-and-desist power, Chairman Breeden stated that,

The proposed cease-and-desist authority would . . . benefit the Commission by providing it with a flexible administrative remedy that is comparable to an injunction. This would enable the Commission to address violations in a manner that recognizes different degrees of securities violations. Where the consequences collateral to an injunction are not necessary or appropriate, the availability of a cease-and-desist order would permit the Commission to resolve cases without protracted negotiation or litigation. Such authority also would provide the Commission with an alternative remedy against persons who commit isolated infractions and present a lesser threat to investors.[131]

On February 9, the Commission submitted to Congress a revised draft of the remedies legislation, which included the new cease-and-desist authority.[132]

Without further hearings, the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Energy and Commerce favorably reported the bill to their respective bodies. Both the House and Senate committee reports on the Remedies Act acknowledged the usefulness of cease-and-desist authority as an "alternative remedy" to an injunction against persons who commit isolated infractions and present a lesser threat to investors.[133] Both reports also noted that other agencies have authority to issue cease-and-desist orders, mentioning specifically the CommodityFutures Trading Commission, Federal Trade Commission, National Labor Relations Board, and bank regulatory agencies.[134]

We have examined the use of cease-and-desist authority by these agencies; their practices do not provide clear guidance. In the case of the National

Labor Relations Board, some courts have said that the NLRB <u>must</u> impose at least a cease-and-desist order upon finding that a person has engaged in an unfair labor practice, without regard to any other considerations,[135] while other courts have held cease-and-desist orders to be tantamount to an injunction, thus suggesting that the scope of cease-and-desist relief can depend on a finding of likelihood of future violations.[136]

The Federal Trade Commission's standard for imposing a cease-and-desist order is also unclear. Although <u>Borg-Warner Corp. v. FTC</u>,[137] held that the FTC was required to show a "cognizable danger of recurrent violation" in order to impose a cease-and-desist order, the case concerned the unlawfulness of interlocking directorates, and accordingly the court followed the holding in <u>United States v. W.T. Grant Co.</u>,[138] the leading case on the subject of interlocking directorates and an injunctive action in federal court.[139] Other FTC cases, however, hold that the agency "hasbroad discretion to determine whether . . . [a cease-and-desist] order is needed to prevent resumption of the [violative] practice."[140]

Federal bank regulatory agencies do not seem to require a finding of a likelihood of future violation before imposing a cease-and-desist order.[141] The banking agencies' cease-and-desist authority, however, is somewhat different from ours. It is intended to reverse business practices that may endanger a bank's soundness, whereas ours is intended to prevent resumption of unlawful actions.[142]

The Commodity Futures Trading Commission, an agency with a mission analogous to that of this Commission, appears to require that its cease-and-desist orders be supported by a reasonable likelihood that misconduct will be repeated.[143] This approach appears to have been taken, at leastinitially, in reliance on case law concerning injunctive actions, however.[144]

Nevertheless, at least one circuit court has held, relying on agency precedent, that, in deciding whether to impose a cease-and-desist order, the CFTC "must determine whether there is a reasonable likelihood that the misconduct will be repeated."[145] Another court has required a showing that a violator has a "proclivity" to commit future violations.[146]

With the experience of other regulatory agencies as an uncertain guide, we rely principally on the language of the Remedies Act and its history. We conclude that, while Congress intended that cease-and-desist orders be forward-looking, like injunctions, it intended that the showing of risk of future violations be significantly less than that required for an injunction. This is a persistent theme of all the discussion leading up to the enactment of the Remedies Act, starting with Arthur Mathews' suggestion in 1972. These comments indicate that, in the ordinary case, a finding of a past violation is sufficient to demonstrate a risk of future ones. Had Congress intended to require more, it would have said as much. And were we to require more, we would frustrate the Congressional purpose of providing us with an administrative remedy to use instead of an injunction against persons who pose a lesser threat to investors.[147]

Along with the risk of future violations, we will continue to consider our traditional factors in determining whether a cease-and-desist order is an appropriate sanction based on the entire record. Many of these factors are akin to those used by courts in determining whether injunctions are appropriate, including the seriousness of the violation, the isolated or recurrent nature of the violation, the respondent's state of mind, the sincerity of the respondent's assurances against future violations, the respondent's recognition of the wrongful nature of his or her conduct, and the respondent's opportunity to commit future violations. In addition, we consider whether the violation is recent, the degree of harm to investors

Case 1:05-cv-00621-UE Document 52-3    Filed 07/11/2005    Page 78 of 206

or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings.[148] This inquiry is a flexible one and no one factor is dispositive. This inquiry is undertaken not to determine whether there is a "reasonable likelihood" of future violations but to guide our discretion.

Applying these factors to the present case, we believe that each of the violations[149] we have found today independently calls for cease-and-desist relief.[150] Although certain factors, such as the isolated nature of the violations and the lack of demonstrated harm to investors and the marketplace resulting from the violations, tend to counsel against relief, other factors, such as the seriousness of these violations, the wrongdoer's failure to appreciate that seriousness, and, particularly, the forward-looking effect to be served by the cease-and-desist order, all counsel that we grant the requested relief.

Indeed, contrary to the law judge, we consider there to be a serious risk of future violation. Peat Marwick is a Big Five accounting firm whose practice requires it to make independence determinations constantly. Modern multi-disciplinary accounting firms have a wide variety of relationships with third parties. When, as here, a firm enters into complex relationships with other entities that in turn have relationships with audit clients, persons in charge of making independence determinations must exercise particular vigilance. While it is of course appropriate to focus on structural concerns that could impair independence in any and all engagements, such a focus does not excuse a failure to gather, analyze, and assess sufficiently the facts peculiar to each and every engagement.[151] Given the lack of care, at senior levels, that attended the determinations at issue here, there is a sufficiently high level of risk of future violations to warrant a cease-and-desist

order.

As we have made clear, we consider independence to be a keystone of our disclosure system. In this case, both the engagement partner and the head of Peat Marwick's DPP failed to undertake any reasonable inquiry that necessarily would have led them to discover clear impairments of independence.[152] Under these circumstances, we believe that cease-and-desist relief is fully warranted.[153]

An appropriate order will issue.[154]

By the Commission (Chairman LEVITT and Commissioners HUNT and UNGER);

Commissioner CAREY not participating.[155]

Jonathan G. Katz
Secretary

---

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 43862 / January 19, 2001

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1360 / January 19, 2001

Admin. Proc. File No. 3-9500

In the Matter of

KPMG PEAT MARWICK LLP

c/o Michael Carroll, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued

this day, it is

ORDERED that KPMG LLP (formerly known as KPMG Peat Marwick LLP) cease and desist from committing any violation or future violation of Rule 2-02(b) of Regulation S-X, or from being a cause of any violation or future violation of Section 13(a) of the Securities Exchange Act of 1934 or Rule 13a-1 thereunder due to an act or omission KPMG LLP knows or should know will contribute to such violation, by having any transactions, interests, or relationships that would impair its independence under Rule 2-01 of Regulation S-X or under Generally Accepted Auditing Standards (GAAS).

By the Commission.

Jonathan G. Katz
Secretary

---

**Footnotes**

[1] Peat Marwick has changed its name to KPMG LLP. For purposes of this decision, however, the firm will be referred to as Peat Marwick.

[2] 17 C.F.R. § 210.2-02.

[3] 15 U.S.C. § 78m(a) and 17 C.F.R. § 240.13a-1.

[4] 17 C.F.R. § 201.102(e).

[5] 15 U.S.C. § 78u-3.

[6] The DPP was responsible for resolving certain accounting and auditing issues, including auditor independence issues, for Peat Marwick partners and staff.

[7] Perry met with John Riley, then Deputy Chief Accountant, Robert Burns, Chief Counsel, and Roy Van Brunt, then Assistant Chief Accountant.

[8] This business alliance was conceived by Thomas E. Vasquez, the partner in charge of Peat Marwick's Corporate Transaction Services Group. Vasquez and others determined that Peat Marwick could expand

its business by providing investment banking and financial advisory services to small- and medium-sized businesses. As Vasquez recognized, however, Peat Marwick "fac[ed] tremendous independence issues" in developing such an alliance. For example, Peat Marwick could not "be a broker dealer and be an accounting firm, and [it could not] be an investment banker without being a broker dealer." According to Vasquez and others, the "solution" was to form a "strategic alliance" with another firm that would be newly formed, would have only a "very limited" number of employees, would use the "KPMG" initials, and would employ Peat Marwick's staff and other resources to deliver products and services to clients referred by Peat Marwick.

[9] Perry testified that this item was not discussed at the meeting. On the other hand, Riley recalled that Perry said that KPMGCF "may provide certain services to troubled companies" but Riley did not remember discussing the nature of those services and was not certain what they would encompass.

[10] According to Vasquez and others familiar with the alliance, Peat Marwick "select[ed] people and form[ed] a group" to run BayMark "that was very consistent with the way that [Peat Marwick] thought about the marketplace and [its] culture." Thus, in 1994, Olson, who was running his own crisis management firm, Ed Olson Consulting Group Ltd., was approached by Vasquez and his (Olson's) attorney, Jim D'Agostino, who "mentioned that they would like to start on a national basis, a crisis management type situation." Vasquez told Olson that he would like Olson to "team up with a partner," Dan Armel, a former partner at Coopers & Lybrand who had done "crisis or consulting work in the past." Vasquez then introduced Olson to Armel and to the persons who would run Capital - Taffet and Maughan. (Before this meeting, Olson did not know and had not even heard of Armel, Taffet, or Maughan. Subsequently, Olson had little interaction with the other three Principals). At the introductory meeting, "it was mentioned that there would be a .

. . revolving credit agreement" and that "there would have to be money put into the company." Olson stated that he didn't have money to invest in the company and was told that "there would be a non-recourse personal loan." Following this meeting, Vasquez introduced the BayMark Principals, including Olson, to Merlin Dewing, a recently retired Peat Marwick partner. The Principals decided that Dewing would serve as the chairman of BayMark because he had knowledge of Peat Marwick and its functions.

[11] According to a brochure describing the alliance between Peat Marwick and Strategies, Strategies employed eight professionals, including Olson and Armel.

[12] The agreement also gave Peat Marwick the right (a) to approve or reject policy and procedures manuals governing such items as the BayMark parties' engagement and client acceptance procedures; (b) to inspect the books and records, properties, and assets of the BayMark parties and to conduct audits of relevant books and records to determine that royalty fees had been accurately determined and paid; (c) to assist the BayMark parties in establishing a marketing and communications program reasonably acceptable to Peat Marwick; and (d) to receive and review annual financial statements audited by an independent accounting firm reasonably acceptable to Peat Marwick. In addition, the agreement prevented the BayMark parties from entering into any joint venture, partnership, or similar arrangement without the express written consent of Peat Marwick. It also provided that, should the control of the BayMark parties' equity interests change without the express prior written consent of Peat Marwick, Peat Marwick could terminate the agreement.

[13] During the relevant period, the credit lines were increased and Strategies, for example, ultimately borrowed an amount exceeding $3 million.

[14] Although, as we describe below, Peat Marwick

subsequently had a series of meetings with OCA about the strategic alliance, it did not supply a copy of the license agreement to OCA. A copy of the agreement was included with Capital's application for registration as a broker-dealer filed with the National Association of Securities Dealers, Inc. ("NASD"). Market Regulation staff obtained a copy from the NASD in mid-November 1995 and forwarded it to OCA. At this point, OCA learned that the $5 million loan mentioned in the September 1994 meeting was actually a loan of $100,000 to each of the four Principals and two revolving credit agreements totaling $4.6 million.

[15] The other members of the OCA staff in attendance were Burns, Van Brunt, and Scott Bayless, then Assistant Chief Accountant. A staff member in the Division of Market Regulation also attended the meeting.

[16] The POB is an oversight board established by the SEC Practice Section of the American Institute of Certified Public Accountants ("AICPA") to monitor and evaluate, among other things, the activities of the Section's peer review and executive committees. The AICPA is the national membership association for certified public accountants in the United States.

[17] In this meeting, as in the preceding meeting and those that would follow, the participants focused primarily on these aspects of the structure of the alliance. To the extent that they discussed specific services, the participants focused not on the entire range of services that BayMark's subsidiaries would provide to clients, but instead on those services that would be provided by Capital (i.e., investment banking and brokerage services).

[18] During the meeting, Sutton and others asked questions about the strategic alliance. Thosequestions -- about the nature of the royalty fee arrangement, the terms of the license and loan agreements, and the nature of the services Peat Marwick expected to provide to BayMark clients as a subcontractor -- were addressed (again in a

summary fashion) by Perry in a November 6, 1995 letter to Sutton. Illustrative of the summary nature of that letter is its treatment of Peat Marwick's loans to the BayMark Principals: "KPMG has extended a total of $5 million in loans to BayMark and its owners with a scheduled maturity of five years." Before the law judge, Perry explained that he "had no details" about the loans.

[19] At all relevant times, PORTA's stock was registered with the Commission under Section 12(b) of the Exchange Act, 15 U.S.C. § 78l(b), and was traded on the American Stock Exchange, Inc.

[20] According to an audit completion memorandum signed by Sturm, among others, Olson was hired by PORTA "[t]hrough an introduction made by Len Sturm." Thus, while Olson testified that he acquired PORTA as a client by virtue of his own research, the record discloses that Peat Marwick played a significant role in securing the PORTA engagement for Strategies.

[21] PORTA agreed to pay to Strategies: five percent of its quarterly "earnings before interest taxes" at the end of each quarter during the engagement and for three years immediately following the end of the engagement; one percent of the face amount of disposed inventory; and one-half percent of the face amount of total debt restructured or modified, excluding debentures. At the outset of the engagement, Strategies anticipated that the success fee would total $1.5 million. Ultimately, after Strategies was restructured into two new firms, one of the new firms, Dominion Management, LLC, another entity in a strategic alliance with Peat Marwick, received between $400,000 and $500,000 as a success fee.

[22] Olson resigned as PORTA's president and COO twelve months after the engagement began.

[23] At this point, Sturm was not aware that Olson had an ownership interest in BayMark and Strategies. As far as Sturm understood, Olson was merely an employee of BayMark.

[24] See supra notes 8 and 10.

[25] Sutton and Burns attended the meeting, as did A.A. Sommer, Jerry Sullivan, and Donald Kirk of the POB.

[26] Conway's notes state: "SEC [therefore] says: can't audit SEC registrants who use BayMark if BayMark's services (or arrangements, equity ownership, contingent fees, etc.) are precluded for auditor." Conway testified that these notes reflected not what was actually said at the meeting but rather what he deduced, based on what was said, about the conclusions OCA might reach if "we couldn't get our issues resolved." Even if this were so, Conway's notes demonstrate that he was aware that Peat Marwick's independence from those audit clients that had or would engage BayMark's subsidiaries was subject to substantial doubt.

[27] There is no evidence that Peat Marwick imparted to OCA the information provided by Sturm.

[28] Sutton and Burns attended the meeting, as did a number of other Commission staff members. Perry was absent.

[29] Pitt argued, on behalf of Peat Marwick, that Peat Marwick was independent "in fact" from audit clients that engaged Strategies and Capital and that the Commission's independence standards did not cover "appearance" of independence. Even if they did, Pitt argued, a person informed about the facts would conclude that Peat Marwick's independence was not impaired.

[30] It also appears that, at this meeting, there was some general discussion of loans to BayMark Principals.

[31] OCA also considered requiring that the revolving lines of credit be canceled and that all outstanding obligations be refinanced through another lender. Ultimately, Sutton chose not to insist on this condition.

32 According to Conway, Vasquez was in Conway's office during the telephone conversation and an e-mail that Conway wrote reflects that Vasquez supplied at least some of the information concerning the revolving credit arrangements discussed in that conversation.

33 It is not clear whether these dual engagements were discussed on December 26, 28, or on both dates. After careful scrutiny of Sutton's, Conway's, and Burns' notes and the participants' testimony about these meetings, we conclude that these engagements were discussed on December 26 and, possibly, on December 28 as well.

34 Conway testified that, at this point, Peat Marwick was "not referring any other work to BayMark. That as I had indicated to Mike Sutton, other than those six engagements that were in process, there were eighteen on hold. So, for all practical purposes, we had shut down operations with BayMark."

35 During the hearing, Conway could not recall whether the chart was prepared by "somebody" in the DPP; he remembered only that it was prepared by "somebody" at Peat Marwick. Conway used the chart, dated December 20, 1995, in preparing for the December 26 meeting with Sutton.

36 In the notes he prepared in anticipation of his meeting with Sutton, Conway put it this way: "[n]eed to finish engagements contracted for - both BayMark and Peat Marwick . . . [n]eed to resolve ASAP -- This week."

37 We do not find, as Sutton recalled, that Conway simply reported the existence of ongoing BayMark engagements. And, although Sutton testified that he did not remember Conway describing any audits as ongoing, we further find, primarily on the basis of Conway's notes, that Conway described the situations as dual engagements - i.e. that the BayMark subsidiaries were providing services to clients Peat Marwick was or would soon be auditing.

**38** The chart described the PORTA situation as follows: PORTA was identified as the "Active SEC Attestation Client"; its year-end date was identified as 12/31; its total assets were said to amount to $85 million; the type of BayMark engagement was described as "Strategies/Acting as President"; and the transaction value of the BayMark engagement was estimated to be $12,000/month for 15 months. The other five dual engagements involved Capital and its provision of investment banking and brokerage services to audit clients.

**39** Conway testified that he was "not even sure" that he knew these facts when he talked with Sutton in late December, although "perhaps" he knew that a BayMark Principal was the person providing the management services. Of course, as the content of Conway's conversations with Sutton shows, Conway knew that Peat Marwick had loaned $400,000 to the BayMark Principals. Indeed, he received and, in anticipation of his first meeting with Sutton, reviewed a copy of the November 6 correspondence from Perry to Sutton stating that Peat Marwick had loaned money to the four Principals of BayMark, that two of those Principals had over 45 years of management/bankruptcy experience, that Strategies provided corporate managementturnaround and bankruptcy services, and that Strategies employed only seven professionals. He also reviewed a copy of the September 29 correspondence from Perry to OCA stating that Olson (who was described as having "operational expertise" and being experienced in the area of corporate turnaround consulting) was an owner of BayMark. Conway testified that not until May 1996 (when a lawyer for Peat Marwick informed him of the loan) did he put the "pieces" of information together that would have led him to understand that the firm had a loan to an officer of an audit client.

**40** On the basis of Sutton's, Conway's, and Burns' notes and relevant testimony, we find that Sutton's notes accurately reflected the substance of Conway's description of the PORTA situation as the

Case 1:05-cv-00621-JJF  Document 52-3    Filed 07/11/2005    Page 88 of 206

provision of top level management, not as
management consulting as Sutton recalled, or
merely "involvement" in operations as the Division
contends.

[41] Although there had been some indication in
earlier meetings that BayMark might earn
contingent fees in connection with engagements,
nothing in the record suggests that Conway
disclosed to Sutton that Strategies would be
earning a "success fee" in connection with its
PORTA engagement. At oral argument, we
repeatedly asked counsel for Peat Marwick whether
Conway informed Sutton about the success fee
PORTA would pay to Strategies. Counsel repeatedly
answered "yes" and in one instance explained that
OCA had been provided with the license agreement
and, indeed, "all the documentation" in 1995. This
answer is not accurate. It confuses the question
whether OCA knew about the success fee PORTA
agreed to pay Strategies (under their turnaround
agreement) with the question whether OCA knew
about the royalty fee Strategies agreed to pay Peat
Marwick (under their license agreement). In
addition, it confuses the question of whether one or
both of these arrangements was structured as a
contingent fee with the question whether, when
both arrangements are considered together, they
resulted in Peat Marwick's receipt of a contingent
fee. While OCA did obtain a copy of the
BayMark/Peat Marwick license agreement from the
Division of Market Regulation (not from Peat
Marwick) (see supra note 14), it was Strategies'
turnaroundagreement with PORTA that contained
the provision for a "success fee." Neither Peat
Marwick nor anyone else provided OCA with a copy
of that turnaround agreement until PORTA's 10-K
was filed with the Commission in 1996. Nor did Peat
Marwick (or anyone else) disclose to OCA the bulk
of that agreement's contents (including the success
fee provision) before the filing of the Form 10-K.
Both royalty fee and success fee arrangements
existed in this case and, as we discuss below, the
question is whether, when both arrangements are
considered together, they resulted in Peat

Marwick's receipt of a contingent fee.

[42] Sutton stated that he would not have been surprised, however, to learn that the audit was being conducted at that time, because he was aware that many audits of public companies are calendar year-end engagements.

[43] Conway testified that this portion of his e-mail reflected his belief that, when Sutton received approval for the agreement Conway and Sutton had worked out, Peat Marwick should begin its discussions with staff in the Division of Market Regulation.

[44] At around the time the audit began, no one from Peat Marwick informed Olson that the Commission had voiced concerns about the BayMark/Peat Marwick alliance nor that any agreement had been reached to modify the alliance. Indeed, it was not until July 1996 that Olson was made aware that he should repay the $100,000 loan from Peat Marwick.

[45] The Form 10-K did not disclose that Peat Marwick had loaned money to Olson. Moreover, although the turnaround agreement was attached to the Form 10-K and, therefore, the success fee to be paid to Strategies was disclosed, the fact that Strategies was obligated to a pay a percentage of its fee income to Peat Marwick was not.

[46] Conway also told Sturm that the "KPMG" initials were in the process of being removed from BayMark's name, but the change would not be effective until BayMark had its annual meeting.

[47] Van Brunt and Bayless, as well as staff members from the Division of Market Regulation, participated in the call.

[48] Sutton, Burns, Van Brunt, Bayless, and Michael Kigin of OCA attended the meeting, as did George Diacont of the Division of Enforcement.

[49] A second audit, paid for by Peat Marwick and conducted by another auditing firm, reached the

same results as did Peat Marwick in its audit.

50 Accounting Series Release ("ASR") 296 (Aug. 20, 1981), published in Codification of Financial Reporting Policies ("FRC"), § 601.01, 7 Fed. Sec. L. Rep. (CCH) ¶73,251, at 62,882; see General Accounting Office, The Accounting Profession, Major Issues: Progress and Concerns 26 (Sept. 1996) ("GAO Report").

51 From its inception, the Commission consistently has emphasized that auditor independence is critically important to the efficient functioning of the nation's securities markets, which depend on a continuous flow of reliable financial information. E.g., Cornucopia Gold Mines, 1 S.E.C. 364, 367 (1936) (insistence on certification by independent public accountant "signifies the real function which certification should perform . . . [:] the submission to an independent and impartial mind of the accounting practices and policies of registrants . . . to the end that . . . security holders will be protected against unsound accounting practices and procedure and will be afforded . . . the truth about the financial condition" of the issuer); Revision of the Commission's Auditor Independence Requirements, Exchange Act Rel. No. 43602 (Nov. 21, 2000), ___ SEC Docket ___, ___ (stating that independent auditors have "an important public trust . . . . [T]he auditor's opinion . . . furnishes investors with critical assurance that . . . financial statements have been subjected to a rigorous examination by an objective, impartial, and skilled professional, and that investors, therefore, can rely on them").

52 ASR 296, FRC § 601.01, 7 Fed. Sec. L. Rep. (CCH) ¶73,251, at 62,882.

53 For example, registration statements filed under the Securities Act of 1933 must be accompanied by financial statements certified by an independent public or certified accountant. See ¶¶25 and 26 of Schedule A, 15 U.S.C. § 77aa(25) and (26). In addition, Sections 12(b) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78l(b) and

78m(a), provide that the Commission may require registrants by rule or regulation to file financial statements certified by independent public accountants as part of, among other things, periodic reports. Other provisions of the federal securities laws also recognize the importance of independent audits. See, e.g., Section 17(e) of the Exchange Act, 15 U.S.C. § 78q(e) (requiring registered brokers and dealers to file annually with the Commission financial statements certified by independent public accountants); Section 17(f) of the Investment Company Act of 1940, 15 U.S.C. § 80a-17(f) (authorizing the Commission to require periodic inspections by independent public accountants of registered management companies); Section 30(g) of the Investment Company Act, 15 U.S.C. § 80a-29(g) (authorizing the Commission to require investmentcompanies to file annual reports accompanied by financial statements certified by independent public accountants); and Section 203(c) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3(c) (authorizing the Commission to require applications for investment adviser registration to include financial statements certified by independent public accountants).

54 As we have stated, the federal securities laws make "independent auditors the `gatekeepers' to the public securities markets. This statutory framework gives auditors both a valuable economic franchise and an important public trust. Within this statutory framework, the independence requirement is vital to our securities markets." Revision of the Commission's Auditor Independence Requirements, Exchange Act Rel. No. 43602 (Nov. 21, 2000), __ SEC Docket __, __ (citation omitted).

55 See, e.g., Securities Act § 19(a), 15 U.S.C. § 77s(a), and Exchange Act § 3(b), 15 U.S.C. § 78c(b).

56 17 C.F.R. § 210.2-01. On June 30, 2000, we published a proposal to amend this rule (Proposed Revision of the Commission's Auditor Independence Requirements, Exchange Act Rel. No. 42994 (June 30, 2000), 72 SEC Docket 2384) and on November

21, 2000, we adopted amendments. <u>See</u> Revision of the Commission's Auditor Independence Requirements, Exchange Act Rel. No. 43602 (Nov. 21, 2000), __ SEC Docket __. Of course, the rule as it existed and was interpreted before this amendment governs our decision in this proceeding.

[57] As a practical matter, an auditor's independence may be assessed only by evaluating relevant relationships with the audit client. It would be a rare situation in which direct information concerning an auditor's mindset was available.

[58] 17 C.F.R. § 210.2-01(b). The rule also set out other examples of situations in which "independence will not be deemed to be affected adversely." <u>Id</u>. Thus, as commentators have recognized, the concept of "appearance of independence" can be traced to the very first enactment of the rule. By using the word "considered," for example, the rule from its outset "officially introduced into the concept of independence as it applied to the accounting profession . . . the element of appearance, in addition to the element of actuality." 2 John L. Carey, <u>The Rise of the Accounting Profession to Responsibility and Authority: 1937-1969</u>, 176-177 (American Inst. of Certified Pub. Accountants 1970). Thus, as commentators have recognized, this Commission has, from its beginning, refused to accept "`certificates' from auditors whose relations with clients would appear to the public to create conflicts of interest." <u>Id</u>. at 180.

[59] 17 C.F.R. § 210.2-01(c).

[60] <u>E.g.</u>, <u>Cornucopia Gold Mines</u>, 1 S.E.C. at 364 (determination that auditor was not independent because, among other things: (a) person in charge of audit simultaneously was made comptroller of registrant and (b) firm received set fee plus one percent of registrant's sales of certain products for one year); <u>A. Hollander & Son, Inc.</u>, 8 S.E.C. 586 (1941) (among other things, stockholdings in registrant and loans to and from registrant's officers

and directors precluded auditor from being regarded as independent); South Bay Indus., Inc., 42 S.E.C. 83 (1964) (accountant's equity interest and positions as promoter, vice president, and director of a company co-owned by officer of audit client compromised independence); Russell Ponce, Exchange Act Rel. No. 43245 (Aug. 31, 2000), 73 SEC Docket 442 (unpaid fees for prior services rendered auditor lacking in independence), appeal docketed, No. 00-71398 (9th Cir. Nov. 1, 2000).

[61] See Office of the Chief Accountant, Securities and Exchange Commission, Staff Report on Auditor Independence, 20-34, 36-37 (1994) (discussing releases) ("Staff Report").

[62] These interpretations (including illustrations of situations that have involved questions of independence) are collected in Section 600 of the FRC under the heading entitled "Matters Relating to Independent Accountants" and are published in 7 Fed. Sec. L. Rep. (CCH) ¶73,251, et seq. The codification is meant to provide guidance to registrants, independent public accountants, and others in complying with the Commission's requirements relating to financial reporting. See Financial Reporting Release ("FRR") 1 (Apr. 15, 1982), 7 Fed. Sec. L. Rep. (CCH) ¶72,401, at 62,021. Our amendment to Rule 2-01 brings together much of the Commission's precedent, including much of Section 600 of the FRC, into the text of the rule.

[63] AICPA Professional Standards, Vol. 1, AU § 150.02 (June 1, 1996). Citations to GAAS, Statements on Auditing Standards, the AICPA Code of Professional Conduct, and the interpretations and ethics rulings regarding Code rules, are to text current as of June 1, 1996.

[64] See supra note 16.

[65] AICPA Professional Standards, Vol. 1, AU § 220.03. Interpretations of GAAS are issued as Statements on Auditing Standards by the Auditing Standards Board - the entity designated by the

AICPA to issue pronouncements on auditing matters.

[66] The Commission has referred registrants and their auditors to AICPA standards to the extent that they do not conflict with those of the Commission. FRR 50 (Feb. 18, 1998), 7 Fed. Sec. L. Rep. (CCH) ¶72,450, at 62,308. In some instances, the Commission's interpretiveguidance has been more expansive or more explicit than the AICPA's. See Staff Report, supra, at Appendix II (discussing the then-current differences between AICPA and Commission auditor independence standards). Thus, conduct that does not run afoul of GAAS may nevertheless be inconsistent with Rule 2-01(b).

[67] SAS No. 1 provides that "[i]nsofar as . . . precepts [to guard against the presumption of loss of independence] have been incorporated in the [AICPA Code of Professional Conduct], they have the force of professional law for the independent auditor." AICPA Professional Standards, Vol. 1, AU § 220.04. According to expert testimony in this proceeding, this means that "the way you determine whether you are independent or not [for purposes of GAAS] is by [consulting] the rules in the Code of Professional Conduct."

[68] Carey, supra at 175.

[69] See, e.g., id. at 179.

[70] Qualifications and Reports of Accountants; Proposed Amendment of Rules Regarding Independence of Accountants, Exchange Act Rel. No. 19137 (Oct. 14, 1982), 26 SEC Docket 559, 560; see, e.g., A. Hollander & Son, Inc., 8 S.E.C. at 613 (stating that "one of the purposes of requiring a certificate by an independent public accountant is to remove the possibility of impalpable and unprovable biases which an accountant may unconsciously acquire" because of certain relationships with clients); SEC, Tenth Annual Report of the Securities and Exchange Commission 205 (1944) (stating that the Commission "has viewed the requirement of independence not only

as a safeguard against conscious falsification but also as a preventive of impalpable and improvable biases . . . which may arise as a result of incompatibleinterests or relationships"); ASR 165 (Dec. 20, 1974), FRC § 601.02, 7 Fed. Sec. L. Rep. (CCH) ¶73,252, at 62,882 (stating that independence "in fact and appearance is an essential ingredient" of the disclosure system); ASR 296, FRC § 601.01, 7 Fed. Sec. L. Rep. (CCH) ¶73,251, at 62,881 (stating that an auditor "is deemed to be independent if he is independent in fact and if he appears to be independent. He must act in an unbiased and objective manner and he must be free of any . . . interest which would create the perception that he may not be independent").

[71] See United States v. Arthur Young & Co., 465 U.S. 805, 819 n.15 (1984) ("If investors were to view the auditor as an advocate for the corporate client, the value of the audit function itself might well be lost"). See also GAO Report, supra, at 37 ("The auditor must be independent in both fact and appearance so that the results of the auditor's examination are perceived to be fair and impartial").

[72] AICPA Professional Standards, Vol. 1, AU § 220.03 (emphasis omitted).

[73] AICPA Professional Standards, Vol. 2, ET §101.02.

[74] See, e.g., 17 C.F.R. § 210.2-01(b) and supra note 58. By the use of the introductory words "for example" our rule made it clear that "relationships which would prevent an accountant from being independent in fact" include, but are not limited to, the relationships set forth in the rule. ASR 44 (May 24, 1943), [1937-1982 Accounting Series Releases Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶72,062, at 62,134 (amending the rule to insert the words "for example" at the beginning of the second sentence of paragraph (b)). In circumstances where the relationship at issue is not otherwise delineated, the basic test that has emerged from our pronouncements is: whether a reasonable

Case 1:05-cv-00621-JJF   Document 52-3   Filed 07/11/2005   Page 96 of 206

investor, knowing all relevant facts and circumstances, would perceive an auditor as having neither mutual nor conflicting interests with its audit client and as exercising objective and impartial judgment on all issues brought to the auditor's attention.

FRR 50, 7 Fed. Sec. L. Rep. (CCH) ¶72,450, at 62,307-08; see Staff Report, supra, at 2.

[75] See, e.g., AICPA Professional Standards, Vol. 2, ET § 55.01 ("Independence precludes relationships that may appear to impair a member's objectivity in rendering attestation services").

[76] We wish to make clear, however, that, depending on how they are structured and their practical consequences, so-called "strategic alliances" can raise serious independence issues. In not reaching the independence issues raised by the BayMark alliance, we state no view whether the alliance passed muster under Rule 2-01(b) as then in effect, much less under our recently amended rule. We further remind accountants that they have a non-delegable responsibility to assess their independence.

[77] See, e.g., FRC § 602.02.g, 7 Fed. Sec. L. Rep. (CCH) ¶73,272, at 62,905 (stating that direct and material indirect business relationships -- such as those between a creditor and debtor (see example 2, FRC § 602.02.g) - with a client or with persons associated with the client in a decision-making capacity, such as officers, "will" adversely affect the accountant's independence with respect to that client); see also Harmon R. Stone, 41 S.E.C. 532, 536 (1963).

[78] FRC § 602.02.g, 7 Fed. Sec. L. Rep. (CCH) ¶73,272, at 62,905; cf. A. Hollander & Son, Inc., 8 S.E.C. at 615-616 (viewing loans that accountant extended to, and made from, officers of audit client to "constitute additional evidence of the accountant's lack of independence" and stating that an "accountant's interest as a lender in seeing to it that the borrower is able to repay the loan may be

a potent factor in depriving the accountant of this independence").

[79] See FRC § 602.02.g, 7 Fed. Sec. L. Rep. (CCH) ¶73,272, at 62,905; cf. Harmon R. Stone, 41 S.E.C. at 536.

[80] Rule 101 of the AICPA Code of Professional Conduct provides that a "member in public practice shall be independent in the performance of professional services . . .". AICPA Professional Standards, Vol. 2, ET § 101.01. Interpretation 101-1 lists certain transactions, interests, or relationships that give rise to an accountant's independence being "considered to be impaired." Loans to or from an audit client and persons closely associated with the client (officers, directors, and principal shareholders) are included in this list. AICPA Professional Standards, Vol. 2, ET § 101.02.

[81] Moore Stephens, P.C., Exchange Act Rel. No. 41425 (May 19, 1999), 69 SEC Docket 2469, 2482 (settled case).

[82] Other testimony was consistent. Another expert retained by Peat Marwick to testify in this case, who had been an auditor for over 30 years and who had participated in approximately 100 audits, acknowledged, for example, that he had never participated in an audit in which he or his firm had a loan outstanding to an audit client or an officer of an audit client.

[83] Peat Marwick elicited testimony below that this impairment was merely "technical" in the sense that it was trivial. We could not disagree more strongly. As noted above, independence requirements serve a vital public interest, and we regard a blatant violation of an unambiguous prohibition as anything but trivial.

[84] AICPA Professional Standards, Vol. 2, ET § 302.01. Peat Marwick contends that this rule is not an independence rule and therefore a violation of the rule does not constitute an appropriate basis for finding a lack of independence. We disagree. The

Case 1:05-cv-00621-JJF    Document 52-3    Filed 07/11/2005    Page 98 of 206

examples of independence impairing relationships in Interpretation 101-1 are expressly "not intended to be all-inclusive" and as the Division's expert opined, "[t]his rule has generally been understood by professional accountants to be related to maintaining audit independence." This makes sense: the receipt of contingent fees raises obvious concerns about whether an auditor has a mutuality of interest with its client incompatible with the maintenance of objectivity and integrity in an audit. Peat Marwick also argues, and its expert opined, that the royalty was not a fee paid for services and therefore cannot be considered a contingent fee. But this ignores the fact that the amount of the royalty that Peat Marwick received would have depended on the results of Strategies' management of PORTA's operations.

[85] The Division also asserts, without any analysis, that these arrangements impaired Peat Marwick's independence under former Rule 2-01. We reject this assertion.

[86] AICPA Professional Standards, Vol. 2, ET § 391.033-034. The receipt of certain commissions is similarly prohibited by Rule 503 (AICPA Professional Standards, Vol. 2, ET § 503.01) and the same test governs when commissions are deemed received as governs contingent fees. Thus, ethics ruling 17 goes on to give an example involving commissions: "if in one year a member sells a life insurance policy to a client and the member's commissionpayments are determined to be a fixed percentage of future years' renewal premiums, the commission is deemed to be received in the year the policy is sold."

[87] Peat Marwick asserts that we lack the authority under former Rule 2-01 to sanction for the appearance of lack of independence because the rule used the phrase "in fact independent" and stated that we would give "appropriate consideration to all relevant circumstances" in determining whether a person may in fact be not independent. As explained supra pp. 21-28, however, the rule by its terms embraced the

element of appearance, and for many decades we have interpreted the rule (in our adjudicatory decisions, in our codification of financial reporting policies, and in various other formal and informal contexts), to encompass myriad relationships that would cause the reasonable investor to conclude that the auditor is not independent. To interpret the rule otherwise would run contrary to its purpose. Only if investors perceive auditors to be independent will audits perform the critical function of enhancing financial statement credibility.

[88] See Bollt & Shapiro, 38 S.E.C. 815, 820 (1959) (that the accuracy and completeness of the registrant's balance sheets was not questioned in the proceedings did not either cure or reduce the importance of the lack of independence by the certifying accountant).

[89] In any event, the firm is the "accountant" under these circumstances, since the audit opinion was issued in the firm's name, and it is the firm's independence that is in question.

[90] In addition, Peat Marwick claims that it was denied due process when it was "denied access" to "potentially exculpatory documents" it had a right to receive under Brady v. Maryland, 373 U.S. 83 (1963). The apparent basis for this claim is the law judge's refusal to order the Division to search in Commissioners' offices for documents relating to communications between OCA and Peat Marwick. The law judge made this ruling after directing the Division, both orally and in writing, to make available to Peat Marwick all Brady material in the possession, custody, or control of divisions located in the Commission's headquarters. The law judge also relied on the Division's repeated representations (a) that it was aware of the appropriate standards for Brady disclosure (and that it had in fact employed a standard more liberal than required and had turned over favorable documents without regard to their materiality); (b) that it had undertaken a search of headquarters divisions and OCA to identify all disclosable material and had turned over all such material; and (c) that

it had reviewed relevant action memoranda from staff to the Commission and was satisfied that there was not <u>Brady</u> material in those memoranda. The law judge was entitled to rely on these representations (<u>see</u> <u>Landry v. FDIC</u>, 204 F.3d 1125, 1137 (D.C. Cir. 2000)), to conclude that the scope of the search was reasonably designed to identify all disclosable material, and therefore to deny Peat Marwick the right to launch a search of the offices of individual Commissioners. <u>Cf</u>. <u>Orlando Joseph Jett</u>, 52 S.E.C. 830, 830-831 (1996) (<u>Brady</u> does not authorize a respondent to engage in fishing expeditions through confidential government material) (citations omitted).

Although, before us, Peat Marwick specifically identifies two such "potentially exculpatory" items, it failed to bring them to the law judge's attention. It failed to do so, even though it had been provided with documents referring to them at least by the time of the hearing on this matter and even though the law judge, after he made his ruling, emphasized that "[s]omething could come up, in which case, things could change." Indeed, he expressly invited Peat Marwick to make a showing that there was information "out there that [the Division] [(]A[)] doesn't know about and maybe with some looking around could find, or [(B)] does know about and is withholding." Since the items were within the scope of the Division's search and since Peat Marwick does not even attempt a plausible showing that they contain favorable and material information, we reject this due process challenge. <u>Cf</u>. <u>Orlando Joseph Jett</u>, 52 S.E.C. at 831 (to obtain in camera review, plausible showing must be made that document in question contains information that is both favorable and material to respondent's defense); <u>Landry v. FDIC</u>, 204 F.3d at 1137 (party's conclusory suspicions are insufficient to impel adjudicator to delve behind government's representation that it has conducted <u>Brady</u> review and found nothing).

[91] <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).

[92] Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498 (1982).

[93] Trinity Broadcasting v. FCC, 211 F.3d 618, 628 (D.C. Cir. 2000) (quoting General Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995); see Freeman United Coal Mining Co. v. FMSHRC, 108 F.3d 358, 362 (D.C. Cir. 1997) (regulations will be found to satisfy due process "so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require").

[94] Thus, while Peat Marwick appears to argue that our findings would involve us in "retroactive rulemaking," we conclude that Peat Marwick had adequate notice of the grounds of impairment we find in this opinion. Moreover, it is well established that, because we cannot foresee every possible application of rules, we may determine specific applications on a case-by-case basis in adjudication. See Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 96-97 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication"); SEC v. Chenery Corp., 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency"); see also NRDC, Inc. v. SEC, 606 F.2d 1031, 1055 (D.C. Cir. 1979) ("Traditionally, it is the agency, not the court, which determines whether to proceed by rulemaking, by individual adjudication, or by a combination of the two").

[95] The Division asserts, without contest, that a showing of negligence or other mental state is not required to prove a violation of Regulation S-X.

[96] When an auditor is not independent, "any procedures he might perform would not be in accordance with generally accepted auditing

Case 1:05-cv-00162-JJF    Document 52-3    Filed 07/11/2005    Page 102 of 206

standards, and he would be precluded from expressing an opinion on [financial] statements." AICPA Professional Standards, Vol. 1, AU § 504.09. Accordingly, under those circumstances, GAAS requires an accountant to "disclaim an opinion with respect to the financial statements" and to "state specifically that he is not independent." Id.

[97] Section13(a)(2) of the Exchange Act, 15 U.S.C. § 78m(a)(2), permits the Commission to require that certain issuers file annual reports certified by independent public accountants. Rule 13a-1, 17 C.F.R. § 240.13a-1, requires issuers to file annual reports and 17 C.F.R. § 249.310 requires that a Form 10-K be used. Form 10-K (Item 8) in turn requires issuers to furnish financial statements meeting the requirements of Regulation S-X, including the requirement in Rule 2-02 that an accountant's report (defined in 17 C.F.R. § 210.1-02(a) as a document in which an "independent" public or certified accountant sets forth certain information) state whether the audit was made in accordance with GAAS. See also Rule 1-01(a)(2) of Regulation S-X, 17 C.F.R. 210.1-01(a)(2) (directing that Regulation S-X govern "the form and content of and requirements for financial statements required to be filed as part of" annual reports, among other filings).

[98] 15 U.S.C. § 78u-3(a).

[99] When we recently amended Rule 102(e), we stated that, regardless of when the violation at issue occurred, the amended rule would automatically apply in all cases considered after the amendment's effective date, except for trials already underway. Securities Act Rel. No. 7593 (Oct. 19, 1998), 68 SEC Docket 707, 708. In this case, the hearing commenced before Rule 102(e) was amended and, on Peat Marwick's motion, the law judge determined to apply a scienter standard, including recklessness. In giving content to that standard in his opinion (rendered after the rule was amended), the law judge applied the definition of recklessness set forth in the adopting release. Id. at 710 & nn. 36-37. That standard is derived from

Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977) and defines recklessness to mean an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the [actor] or is so obvious that the actor must have been aware of it" (internal quotation omitted). Neither party asked to reopen the record or suggested that it would suffer unfair prejudice from the application of this standard. Accordingly, we do not consider whether Peat Marwick engaged in "highly unreasonable" conduct in circumstances in which it knew, or should have known, that heightened scrutiny was warranted as specified in amended Rule 102(e).

Before us, Peat Marwick argues that application of Rule 102(e) would violate due process. Citing Checkosky v. SEC, 139 F.3d 221, 225 (D.C. Cir. 1998), Peat Marwick asserts that "at the time the conduct that was the subject of this proceeding took place, the term `improper professional conduct' as used in the rule simply, as the D.C. Circuit has held, `yields no clear and coherent standard' that would have put Peat Marwick on notice that its conduct was prohibited . . .". Peat Marwick mischaracterizes the Checkosky decision. The court in Checkosky vacated the Commission's decision because the Commission failed in that case to articulate clearly the mental state required to find improper professional conduct. The court did not, however, disavow earlier decisions that the Commission had the power to discipline accountants for intentional or reckless misconduct. The high culpability standard applied by the law judge and that we apply today is not novel and had been used in proceedings that predated both Checkosky and Peat Marwick's conduct here. See Albert Glenn Yesner, Exchange Act Rel. No. 42030 (Oct. 19,1999), 70 SEC Docket 2743, 2747 (citing Potts v. SEC, 151 F.3d 810, 812 (8th Cir. 1998), cert. denied, 119 S. Ct. 1574 (1999)).

100 Our holding applies to Exchange Act Section 21C(a) and parallel provisions in the Securities Act of 1933, Section 8A(a), 15 U.S.C. § 77h-1(a), the

Commissoin Opinion: re KPMG Peat Marwick LLP (34-43862)                http://www.sec.gov/litigation/opinions/34-43862.htm

Investment Company Act, Section 9(f), 15 U.S.C. § 80a-9(f), and the Investment Advisers Act, Section 203(k), 15 U.S.C. § 80b-3(k).

101 See, e.g., Davis v. Monroe County Board of Education, 526 U.S. 629, 642 (1999) (noting that the Court had previously declined to hold a school district liable under Title IX of the Education Amendments of 1972 for failure to react to teacher-student harassment of which it knew or should have known; to do so would have "impose[d] liability under what amounted to a negligence standard"); United States v. Finkelstein, 229 F.3d 90, 95 (2d Cir. 2000) ("should have known" connotes a concept "more akin to negligence than to knowledge"); United States v. Ladish Malting Co., 135 F.3d 484, 488 (7th Cir. 1998) (unelaborated "should have known" jury instruction is the usual formulation in civil negligence cases); Dickey v. Royal Banks of Missouri, 111 F.3d 580, 584 (8th Cir. 1997) ("knew or should known" language is "at home in negligence cases"); Knippen v. Ford Motor Co., 546 F.2d 993, 1003 (D.C. Cir. 1976) ("knew or should have known" is "the language of negligence").

102 See, e.g., Bilden v. United Equitable Ins. Co., 921 F.2d 822, 828 n.7 (8th Cir. 1990) (elaborated "knew or should have known" language in jury instruction correctly imposed recklessness standard); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 n.16 (2d Cir.1978) (suggesting that "knew or should have known" can constitute a "less strict test" of recklessness).

103 It can be argued that a standard higher than negligence should be applied to limit the reach of the statute and so avoid the spectre of cease-and-desist orders against persons who have little contact with the primary actor. At least in cases such as this one involving non-scienter-based primary violations, however, this concern does not warrant our imposing a standard higher than negligence. If Congress wanted to apply such a culpability standard, it could easily have used different language, for example, language such as

that employed in Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e) (deeming persons who "knowingly provide[] substantial assistance to another person" in violation of Exchange Act provisions to be in violation of such provisions "to the same extent as the person to whom such assistance is provided").

104 Our holding today is consistent with our prior pronouncements (see, e.g., Securities Act Rel. No. 7593 (Oct. 19, 1998), 68 SEC Docket 707, 710 & n.38 (stating that, in certain instances, the federal securities laws subject persons to liability without requiring intentional conduct, giving as an example Section 11 of the Securities Act, 15 U.S.C. § 77k, which allows recovery for negligent conduct, and noting Section 21C and its "knew or should have known" language)), congressional testimony (see Staff Report on Private Securities Litigation: Hearing Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs, 103rd Cong. 49 & n.27 (1994) (written statement of Chairman Levitt that the scope of liability as a "cause" of a violation under Section 21C "would appear to be as broad, if not broader, than aiding and abetting liability" and noting that "knew or should have known" equates with negligence in other contexts)), statements in a number of consent orders, (e.g., Rita L. Schwartz, Exchange Act Rel. No. 42684 (Apr. 13, 2000), 72 SEC Docket 514, 518 (citing Carole L. Haynes, Init. Dec. No. 78 (Nov. 24, 1995), 60 SEC Docket 2294, 2341, for the proposition that the "should have known" language in Section 21C "sets forth [a] negligence standard"); Incomnet, Inc., Exchange Act Rel. No. 40281 (July 30, 1998), 67 SEC Docket 2062, 2070 (same)), commentary (see, e.g., 5D Arnold S. Jacobs, Litigation and Practice Under Rule 10b-5, § 261.05[e][vii] at 11-391(2000) (identifying "should have known" language in cease-and-desist provisions as "a negligence standard" but opining that, in the context of a primary violation of the antifraud provisions of Rule 10b-5, 17 C.F.R. § 240.10b-5, "contribute" ought to be equated to traditional 10b-5 secondary liability

theories); William R.McLucas, Stephen M. DeTore & Arian Colachis, <u>SEC Enforcement: A Look at the Current Program and Thoughts About the 1990s</u>, 755 PLI/Corp 283, 323 (1991) ("cause" standard makes relief applicable against "a broader class of persons than the primary violators and aiders and abettors that can be sued in judicial proceedings"); S. Scott Luton, <u>The Ebb and Flow of Section 10(b) Jurisprudence: An Analysis of Central Bank</u>, 17 U. Ark. Little Rock L.J. 45, 67 (1994) ("By employing this `negligence-sounding standard,' the SEC can reach a person who causes securities law violations as long as he `should have known' that an act or omission would contribute to a violation, even if [the] person is neither a primary violator nor an aider and abettor")) and numerous decisions by law judges (<u>e.g.</u>, <u>Edward D. Jones & Co.</u>, Init. Dec. No. 125 (Apr. 15, 1998), 66 SEC Docket 3086; <u>Carole L. Haynes</u>, <u>supra</u>).

<u>105</u> 15 U.S.C. § 78o(c)(4).

<u>106</u> <u>See</u>, <u>e.g.</u>, Ann Maxey, <u>SEC Enforcement Actions Against Securities Lawyers: New Remedies vs. Old Policies</u>, 22 Del. J. Corp. L. 537, 571 (1997); Ralph C. Ferrara, Thomas A. Ferrigno & David S. Darland, <u>Hardball! The SEC's New Arsenal of Enforcement Weapons</u>, 47 Bus. Law. 33, 59-60 (Nov. 1991).

<u>107</u> By virtue of his position at Peat Marwick, and as a member of the AICPA's Independence and Behavioral Standards Subcommittee and various other professional groups, Conway was very experienced in identifying and resolving independence questions.

<u>108</u> Before the law judge, Conway testified that his belief about the propriety of the situation was grounded on two concerns. First, "that was at the time that the staff was raising issues about our relationship with BayMark, and I didn't understand where those issues were going to go." Second, because PORTA was a "troubled company" and Strategies, an entity using the "KPMG" initials, was "going to have someone in there in a key management position, . . . there was some risk to

Case 1:05-cv-00162-JJF Document 52-3    Filed 07/11/2005    Page 107 of 206    http://www.sec.gov/litigation/opinions/34-43862.htm

reputation in the event something went wrong." In our view, under the circumstances of this case, Conway's concern that, in the event of audit failure, Peat Marwick would risk its reputation when it got "representations" from a party with whom it had financial ties was equivalent to being concerned that a reasonable person would perceive Peat Marwick to have impaired its independence.

109 Although the record is silent as to the identity of that person, it does disclose that Trattou asked Sturm various questions about the audit Sturm planned to conduct (see infra p.12) and that Sturm was aware that Trattou was "conferring" with Conway about the PORTA situation.

110 As noted above, Strategies employed only seven or eight professionals. Under these circumstances, the identity of the Strategies' employee who was providing the management services to PORTA was highly relevant.

111 Conway also knew that Strategies was obligated to pay five percent of its fee income to Peat Marwick. Inasmuch as Strategies would receive a success fee from PORTA (a fact Conway may not, but should, have known), the royalty fee arrangement gave rise to significant independence concerns.

112 As set out above, Vasquez conceived of the strategic alliance and selected and formed the group that would run the alliance partner. Thereafter, he was kept apprised of the alliance's operations. Thus, for example, Strategies sent him status reports providing the following information about its engagements: client name, status of engagement, category of service provided, amount of fees (and calculation of success fees, if any), BayMark contact, and Peat Marwick contact. Indeed, he was informed about the very engagement at issue in this case. A memorandum addressed to him and dated October 31, 1995, advised that Olson and Van Lanier, another Strategies employee, were directing three "crisis management" engagements,including one that Olson was directing

Case 1:05-cv-00162-JJF  Document 52-3    Filed 07/11/2005    Page 108 of 206

for PORTA. The PORTA engagement was described as beginning on October 31, Strategies functioning as "Interim COO," and yielding fees of "$240,000+" and success fees of "$1.5 mm." The Strategies contact was identified as Ed Olson and a senior manager in Peat Marwick's Corporate Transaction Services Group was identified as the Peat Marwick contact. Vasquez also received copies of significant correspondence and memoranda concerning the alliance. Thus, for example, he was informed about the independence issues arising from the structure of the alliance (and the progress of discussions between OCA and Peat Marwick about those issues) and even was informed (by the December 5 e-mail) about certain independence concerns attending the PORTA engagement. Indeed, Vasquez was physically present in Conway's office during one of the conversations between Sutton and Conway in which independence issues were discussed and he provided information, in response to Sutton's questions, about the loans to the BayMark subsidiaries. It would have been an exceedingly simple matter for Conway to learn the specifics of the Strategies' PORTA engagement from Vasquez.

[113] See, e.g., AICPA Professional Standards, Vol. 1, AU § 161.01-.03.

[114] 71 SEC Docket at 1508 (citing Joseph J. Barbato, 69 SEC Docket 178, 200 n.31 (Feb.10, 1999) (quoting Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981))).

[115] See, e.g., SEC v. Steadman, 967 F.2d 636, 647-648 (D.C. Cir. 1992) ("[t]he ultimate test of whether an injunction should issue is whether the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation[s] in the future . . . . The relevant factors we consider . . . include whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future" (internal quotations omitted)).

116 Pub. L. No. 101-429, 104 Stat. 931 (1990).

117 Our analysis in this opinion concerning the legislative history of our cease-and-desist authority and the standards governing the issuance of cease-and-desist orders by other agencies is largely similar to that appearing in a law review article entitled "SEC Cease-And-Desist Orders" 51 Admin. L. Rev. 1197 (Fall 1999). At the time that article was published, its author was a member of the Commission staff, and the article grew out of his work as a Commission employee.

118 See Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185 (1973) (holding that an agency's choice of sanction is "peculiarly a matter for administrative competence") (internal quotations omitted). See also id. at 187 (holding that a court of appeals erred when it held that an agency could impose a sanction only for intentional and flagrant misconduct when the statute granting sanctioning authority made no reference to intentional misconduct).

119 FTC v. National Lead Co., 352 U.S. 419, 429 (1957).

120 Securities Act Section 8A(a), 15 U.S.C. § 77h-1(a); Exchange Act Section 21C(a), 15 U.S.C. § 78u-3(a), Investment Company Act Section 9(f), 15 U.S.C. § 80a-9(f), and Investment Advisers Act Section 203(k), 15 U.S.C. § 80b-3(k). (providing that a cease-and-desist order may "require [a violator] to comply, or to take steps to effect compliance, with [the securitieslaws], upon such terms and conditions and within such time as the Commission may specify in such order").

121 We also are guided by the general "reasonable relation" requirement. See supra note 119; see also FTC v. Colgate-Palmolive Co., 380 U.S. 374, 394-395 (1965). Thus, for example, when, as we have determined to do in this case (see infra p. 53) we exercise our authority (e.g., Exchange Act 21C(a), 15 U.S.C. § 78u-3(a)) to order a person to

cease and desist from "future violations of the same provision, rule or regulation" we have found that person to have violated in the past, our order will extend only to violative acts "the threat of which in the future is indicated because of their similarity or relation to those [past] unlawful acts." NLRB v. Express Pub. Co., 312 U.S. 426, 436 (1941).

122 Compare Securities Act Section 8A(a), 15 U.S.C. § 77h-1(a), and Exchange Act Section 21C(a), 15 U.S.C. § 78u-3(a), with Securities Act Section 20(b), 15 U.S.C. § 77t(b), and Exchange Act Section 21(d), 15 U.S.C. § 78u(d).

But see Section 209(d) of the Investment Advisers Act, 15 U.S.C. § 80b-9(d), and Section 42(d) of the Investment Company Act, 15 U.S.C. § 80a-41(d), which both authorize the Commission to seek an injunction against any person who "has engaged" in violations of the respective statutes. Several cases applying these provisions have required the Commission to demonstrate a "reasonable likelihood of future violations," relying on cases applying the somewhat different language of the injunctive provisions of the Securities Act and Exchange Act. See, e.g., SEC v. Suter, 732 F.2d 1294, 1301 (7th Cir. 1984); SEC v. Keller Corp., 323 F.2d 397, 402 (7th Cir. 1963); SEC v. S&P Nat'l Corp., 360 F.2d 741, 747 (2d Cir. 1966). One court, however, granted an injunction to the Commission relying solely upon the "has engaged" language of Investment Advisers Act Section 209(d). SEC v. Olsen, 243 F. Supp. 338, 339-340 (S.D.N.Y. 1965).

123 Arthur F. Mathews, The SEC and Civil Injunctions: It's Time to Give the Commission an Administrative Cease and Desist Remedy, 6 Sec. Reg. L. J. 345, 345 (1979).

124 Id. at 346.

125 Id.

126 Bevis Longstreth, SEC Battle Against Insider Trading is Worth the Effort, Legal Times, May 10,

1982, at 16 (stating that cease-and-desist remedy would "provide relief from the . . . traditional equitable requirements for obtaining an injunction -- most notably the need to prove the defendant is likely to violate the law again in the future").

[127] See Letter from John S.R. Shad to the Hon. Timothy E. Wirth, Chairman, Subcomm. on Telecommunications and Finance of the House Comm. on Energy and Commerce, dated Feb. 22, 1984. See also Irwin B. Arieff, SEC Studying Trio of New Enforcement Tools, Legal Times, Mar. 14, 1983, at 4.

[128] Report of the National Commission on Fraudulent Financial Reporting, 63-64 (Oct. 1987). A former Commissioner of this agency, James Treadway, was the Chairman of the Treadway Commission.

[129] Id. at 65.

[130] Id. at 66.

[131] The Securities Law Enforcement Remedies Act of 1989: Hearings Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs on S.647 to Amend the Federal Securities Laws to Revise Enforcement Remedies for Civil Violations of Those Laws, 101st Cong. 56-57 (1990) (footnote omitted) (written statement of Richard Breeden).

[132] S. Rep. No. 101-337, at 5 (1990); H.R. Rep. No. 101-616, at 39 (1990).

[133] S. Rep. No. 101-337, at 18; H.R. Rep. No. 101-616, at 24.

[134] S. Rep. No. 101-337, at 19; H.R. Rep. No. 101-616, at 23.

[135] See, e.g., IUUAAAIW v. NLRB, 427 F.2d 1330, 1332-1333 (6th Cir. 1970) (holding that the law "commands that when the [NLRB] finds that an unfair labor practice has occurred, `. . . [it] shall

issue [a cease-and-desist order]'") (emphasis in original) (citing <u>IWA, AFL-CIO v. NLRB</u>, 380 F.2d 628, 630-631 (D.C. Cir. 1967)).

<u>136</u> See <u>NLRB v. Ochoa Fertilizer</u>, 283 F.2d 26, 29 (1st Cir. 1960) ("An order, when implemented by us, becomes an injunction"), <u>rev'd on other grounds</u>, 368 U.S. 318 (1961); <u>NLRB v. Lipshutz</u>, 149 F.2d 141, 142 (5th Cir. 1945) ("When sustained by the court, the order is in effect an injunction, hence it must be exact and specific in what it requires or forbids"); <u>cf.</u> <u>Local 1814, ILA, AFL-CIO v. NLRB</u>, 735 F.2d 1384, 1400 (D.C. Cir. 1984) ("The proper scope of a cease-and-desist order is determined only by inquiry into whether the Board could reasonably conclude from the evidence that the order was necessary to prevent further violations").

<u>137</u> 746 F.2d 108, 110-111 (2d Cir. 1984).

<u>138</u> 345 U.S. 629 (1953).

<u>139</u> See, <u>e.g.</u>, <u>SCM Corp. v. FTC</u>, 565 F.2d 807, 812 (2d Cir. 1977) (applying <u>W.T. Grant</u> standard).

<u>140</u> <u>Deer v. FTC</u>, 152 F.2d 65, 66 (2d Cir. 1945). <u>See</u> <u>Grand Union Co. v. FTC</u>, 300 F.2d 92, 100 (2d Cir. 1962) ("Administrative agencies have a wide discretion to frame orders enjoining continuation of past practices found unlawful"); <u>Zale Corp. v. FTC</u>, 473 F.2d 1317, 1320 (5th Cir. 1973) (stating that courts leave to the FTC's discretion "the question whether the public interest requires the protection of an order in cases where the unlawful practices have been discontinued") (quotation omitted).

<u>141</u> See, <u>e.g.</u>, <u>Interamericas Investments Ltd. v. Federal Reserve Board</u>, 111 F.3d 376, 385-386 (5th Cir. 1997); <u>Saratoga S&L v. Federal Home Loan Bank Board</u>, 879 F.2d 689, 693 (9th Cir. 1989). <u>See</u> <u>also</u> <u>Lindquist & Vennum v. FDIC</u>, 103 F.3d 1409, 1418 (8th Cir. 1997) (holding that "the FDIC need only show proof of misconduct to exercise its power to order a party to cease and desist from that misconduct"); <u>Greene County Bank</u>

v. FDIC, 92 F.3d 633, 636 (8th Cir. 1996) ("Proof of misconduct alone entitles the FDIC to invoke its broad cease and desist enforcement powers").

142 The cease-and-desist orders of the banking agencies usually contain detailed plans for avoiding future problems. See First Nat'l Bank of Bellaire v. Comptroller of the Currency, 697 F.2d 674, 681 (5th Cir. 1983) (OCC may only impose a cease-and-desist order where a bank's violative practices have a "reasonably direct effect on a bank's financial stability").

143 See, e.g., In re Mayer, 1998 WL 80513 at *29 (Feb. 25, 1998), aff'd sub nom. Reddy v. CFTC, 191 F.3d 109 (2d Cir. 1999) ("Cease and desist orders are appropriate where there is a reasonable likelihood the conduct will be repeated") (citing In re GNP Commodities, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶25,360, at 39,223 (Aug.11, 1992), rev'd on other grounds, sub nom. Monieson v. CFTC, 996 F.2d 852 (7th Cir. 1993)); In re Brody, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶23,081, at 32,181 (May 20, 1986) (cease-and-desist order "`is appropriate enforcement tool if there is a reasonablelikelihood that earlier violations will be repeated'") (quoting In re Dillon-Gage, Inc., [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶22,574, at 30,482-83 (June 20, 1984)).

144 Thus, the first significant CFTC decision on the subject of which we are aware, relying on a decision in an injunctive action, held that, in order to impose a cease-and-desist order, the agency would "look to whether `there is a reasonable likelihood that the wrong will be repeated.'" In re Richardson Securities, Inc., [1980-82 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,145, at 24,647 (Jan. 27, 1981) (quoting CFTC v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir. 1977) (citations omitted)). British Am. Commodity Options Corp. was an injunctive action.

145 Reddy v. CFTC, 191 F.3d 109, 125 (2d Cir. 1999) (citing In re Fetchenhier, published as

Case 1:05-cv-00162-JJF   Document 52-3   Filed 07/11/2005   Page 114 of 206

amended in [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶27,055, at 45,016 (May 13, 1997)). It appears that when <u>Fetchenhier</u> addressed "likelihood" of future wrongdoing, however, it did so not in connection with determining whether to issue a cease-and-desist order but in connection with determining whether to deny Fetchenhier's application for registration as a floor trader.

[146] <u>Precious Metals Assocs., Inc. v. CFTC</u>, 620 F.2d 900, 912 (1st Cir. 1980) (holding that the CFTC may issue a cease-and-desist order "when the party who commits statutory transgressions is likely to persist in the contumacy in the future, unless restrained" and citing <u>NLRB v. Union Nacional de Trabajadores</u>, 540 F.2d 1, 11 (1st Cir. 1976) for how "proclivity" is shown).

[147] Commentators have concluded that the Remedies Act does not require a finding beyond a past violation for us to order cease-and-desist relief. 10 Louis Loss & Joel Seligman, <u>Securities Regulation</u> 4989 (3d ed. rev. 1996) ("An obvious advantage of the administrative cease and desist route in contrast to an injunction is that it does not require the Commission to show a likelihood of future violation"); Gary G. Lynch & James D. Liss, <u>The Securities Enforcement Remedies and Penny Stock Reform Act of 1990</u>, in Securities Enforcement and Penny Stock Reform Act of 1990, at 65, 75, PLI Corp. Law and Practice Course Handbook Series No. 718 (1990) (noting that the Remedies Act "does not require the Commission to find that a violator is likely to violate the law again before issuing a cease and desist order"); <u>Cease-and-Desist Authority May Have Limited Use, SEC Staff Officials Say</u>, 23 Sec. Reg. & L. Rep. (BNA) 369, 370 (1991) (comments of the Division's then Associate Director, to the effect that "the [C]ommission does not have to show the likelihood of future violations with a cease-and-desist order").

[148] In some instances, we also may consider the function that a cease-and-desist order serves in alerting the public that a respondent has violated the securities laws.

Case 1:05-cv-00162-JJF  Document 52-3  Filed 07/11/2005  Page 115 of 206

149 As explained above (supra pp. 36, 44-45), Peat Marwick was not independent as a result of two relationships, each of which, standing alone, compromised Peat Marwick's independence and thereby led to Peat Marwick's primary violation of Rule 2-02 and to its causing violations of Section 13(a) and Rule 13a-1. Either the "causing" violations or the primary violation are sufficient, standing alone, to support cease-and-desist relief.

150 Peat Marwick contends that the order proposed by the Division would be overbroad. The order we will issue encompasses conduct reasonably related to the violations we have found.

151 Peat Marwick argues that it is not considering pursuing an alliance structure similar to that of its BayMark alliance. The risk of future violations, however, arises not so much from the likelihood that Peat Marwick will again rely on the same structure, but that it will again provide the same inadequate level of scrutiny to independence issues.

152 It is apparent that their ignorance may have resulted, at least in part, from a failure among their colleagues, particularly Trattou and Vasquez, to adhere to systems designed to provide assurance that the firm maintained its independence. We expect each firm practicing before usto adopt, implement and maintain a thorough system of quality control policies and procedures to provide it with reasonable assurance that it is conforming with GAAS, including its independence standards, in its audit engagements. GAAS certainly requires as much. See, e.g., AICPA Professional Standards, Vol. 1, AU § 161.02-.03; AICPA Professional Standards, Vol. 2, QC § 10. In this case, it is beyond doubt that Peat Marwick's system failed.

153 In the exercise of our discretion, however, we decline to impose the reporting requirements sought by the Division. In appropriate circumstances a detailed order may be necessary to make a cease-and-desist order effective. In light of the circumstances here, however, we believe that a

Case 1:05-cv-00162-JJF Document 52-3    Filed 07/11/2005    Page 116 of 206

more limited directive will be sufficient.

<u>154</u> We have considered all of the contentions advanced by the parties. We reject or sustain them to the extent that they are inconsistent or in accord with the views expressed herein. On July 19, 2000, Peat Marwick sought leave to file a surreply. We hereby grant that request. We deny the Division's request to file a "rejoinder" to the surreply.

<u>155</u> As reflected in the record, the Secretary's office received notification on September 6, 2000, that Commissioner Carey had determined to recuse himself from participation in any matters concerning this proceeding.

*http://www.sec.gov/enforce/opinions/34-42144.htm*

Westlaw.

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re THE LOEWEN GROUP INC. Securities
Litigation
**No. Civ.A. 98-6740.**

Aug. 18, 2004.

Chet B. Waldman, Wolf Popper, LLP, Lester Levy,
Wolf, Popper, Ross, Wolf & Jones, Mark C. Gardy,
Abbey Gardy, LLP, Stephen J. Fearon, Jr., Squitieri
& Fearon, LLP, New York, NY, Daniel E. Bacine,
Jeffrey W. Golan, Barrack Rodos & Bacine, Deborah
R. Gross, Robert P. Frutkina, Law Offices of Bernard
M. Gross PC, Jacob A. Goldberg, Sherrie R. Savett,
Berger & Montague, PC, Philadelphia, PA, Steven J.
Toll, Cohen Milstein Hausfeld & Toll, Seattle, WA,
for Plaintiff.

Brian Troyer, Jones Day Reavis & Pogue, Jason
Nicoles Mather, Jones Day, John W. Edwards, II,
Cleveland, OH, Craig E. Ziegler, David H. Marion,
Michael K. Twersky, Richard G. Placey,
Montgomery, McCracken, Walker & Rhoads, LLP,
Steven E. Bizar, Buchanan Ingersoll, P.C.,
Philadelphia, PA, for Defendants.

*MEMORANDUM*

ONEILL, J.

**\*1** In this class action plaintiffs allege that
defendants committed securities fraud in violation of
§ § 10(b) and 20(a) of the Securities Exchange Act
of 1934, 15 U.S.C. § § 78(b) and 78(t), and
Securities and Exchange Commission Rule 10b-5, 17
C.F.R. § 240.10b-5.

I have before me two motions to dismiss the corrected
consolidated amended class action complaint, which I
will refer to as the new complaint, under Federal
Rules of Civil Procedure 12(b)(6) and 9(b) and the
Private Securities Litigation Reform Act of 1995, 15
U.S.C. § 78u-4(b)(1) and (2) (2002). The individual
defendants, Raymond Loewen and Paul Wagler, filed

a joint motion to dismiss, the corporate defendant
filed its own motion to dismiss and plaintiffs filed a
memorandum in opposition to the motions. I have
heard oral argument.

BACKGROUND [FN1]

FN1. Because this is a motion to dismiss, I
take all facts from the new complaint and
consider them in the light most favorable to
plaintiffs.

I. Facts

The factual background of this case can be found in
my decision of July 16, 2003. *In re The Loewen
Group, Inc. Sec. Litig.* 2003 U.S. Dist. LEXIS 15680
(E. D.Pa. July 16, 2003). Therefore, I will give only a
brief recitation of the important facts.

Loewen Group, Inc. was a publicly held company
specializing in the operation of funeral homes and
cemeteries in Canada and the United States. The
company's principal executive office was in Canada,
but Loewen Group also maintained corporate offices
in Covington, Kentucky and Trevose, Pennsylvania.
At all times during the class period Loewen Group
stock was traded on the New York Stock Exchange
("NYSE"). The company filed periodic reports with
the NYSE and the United States Securities and
Exchange Commission and was followed by analysts
from a number of major brokerage firms.

Defendant Raymond Loewen was chairman of the
board and CEO of Loewen Group at the beginning of
the class period, which ran from March 5, 1997
through January 14, 1999. He resigned from these
positions on October 9, 1998, after which he
remained with the company as non-executive co-
chairman of the board until January 1999. Defendant
Paul Wagler was the Chief Financial Officer, a
member of the company's executive committee and a
director of the company when the class period began
and held those positions until December 17, 1998.
Twice during 1998 he assumed new positions, first as
Executive Vice President, Finance and then as
Executive Vice President, Operations and Chief
Operating Officer. Although Mr. Wagler retired from
the board in December 1998, he now serves as Chief
Operating Officer of Alderwoods Group, Inc., the
successor to Loewen Group.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
2004 WL 1853137 (E.D.Pa.)
**(Cite as: 2004 WL 1853137 (E.D.Pa.))**

Lead plaintiffs are the City of Philadelphia, through its Board of Pensions and Retirement, Phil Schwartz, James McGlathery, Terry Roberts, Kurt Mueller, Jr., Harley Puff and Morton Silas. Lead plaintiffs bring this action on behalf of themselves and all other persons who purchased or otherwise acquired Loewen Group common stock, preferred stock or call options during the class period.

In the two years leading up to the class period Loewen Group expanded its focus from funeral homes to include cemetery businesses. It acquired a large number of cemetery-related businesses. The new complaint focuses on three transactions in particular. In 1995 Loewen Group acquired Osiris, a company that held a large number of cemeteries and funeral homes. As a result of the transaction two of Osiris' principals, Lawrence Miller and William R. Shane, became senior executives in Loewen Group. The two other transactions occurred in 1996 and brought under Loewen Group control Prime Succession, Inc., a large funeral services company, and Rose Hills Memorial Park, a large cemetery and mortuary. The acquisitions of Prime Succession and Rose Hills were complex transactions that involved Blackstone Group, two newly-created holding companies and put/call option agreements.

*2 In September 1996, six months before the beginning of the class period, Service Corporation International ("SCI"), the world's largest chain of funeral homes, made an unsolicited bid to buy all of Loewen Group's common stock for a higher price than the stock was currently trading for on the NYSE. Loewen Group's Board of Directors unanimously rejected the bid.

After rejecting SCI's bid, Loewen Group continued its well-publicized acquisition program. The new complaint alleges that at least some of the acquisitions were "poison acquisitions" designed to prevent a takeover by SCI. According to the new complaint SCI's efforts to takeover Loewen Group continued even after SCI announced that it was no longer interested in Loewen Group. During the class period Loewen Group accumulated a large debt load as a result of high prices paid for acquisitions and high operating costs. When the company began selling its assets and deferring the payment of dividends early in 1999 its stock quickly lost value.

Loewen Group's stock traded at a high of $35.50 per share on July 18, 1997. On January 14, 1999, the last day of the class period, the stock closed at $5.12 per share. By the end of May, 1999, the price was down to $0.56 per share. On June 1, 1999 the company filed to reorganize under Chapter 11 of the Bankruptcy Code.

II. Allegations

A. Alleged materially false and misleading statements and omissions made by defendants during the class period

There were numerous publications during the class period that reported or reflected Loewen Group's revenue, income and the value of its assets. It is not disputed that defendants disclosed the company's financial figures to the Securities and Exchange Commission, to various securities analysts and to the public directly. The disclosures include the following filings with the Securities and Exchange Commission: Forms 10-K and 10-Q and the company's Registration Statements and Prospectus. New compl. ¶ ¶ 84, 85, 89, 92-93, 95-96, 106-07, 113-14, 120-21, 134, 142-44. The new complaint also relies on press releases and interviews in which defendants reported the revenue, income and assets of Loewen Group. New compl. ¶ ¶ 81, 83, 90-91, 94, 99-101, 103-04, 111- 12, 116-18, 122, 124, 129.

Plaintiffs claim that defendants' representations of Loewen Group's financial status were materially false and misleading. The alleged falsity is said to be a result of the following actions by defendants: (1) recording inflated values of properties and businesses held; (2) failing to deduct imputed interest created by its zero interest payment plans; (3) failing to adjust the value of accounts receivable for loss in value; (4) recording as assets covenants not to compete that were valueless; (5) recording as revenue dividends paid in preferred stock of two holding companies; and (6) not accounting for probable losses on put/call agreements related to the holding companies. These actions allegedly violated Canadian Generally Accepted Accounting Practices, which are set forth in the *Canadian Institute of Chartered Accountants Handbook ("CICA Handbook"* ). Plaintiffs assert that the complained-of accounting practices resulted in artificially high valuation of Loewen Group's assets, revenue and income, which in turn resulted in artificially inflated stock prices.

*3 In addition to the effect of the accounting treatment of the Prime Succession and Rose Hills transactions on Loewen Group's financial statements, plaintiffs make a claim that defendants' statements regarding the put/call options violated securities laws.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
2004 WL 1853137 (E.D.Pa.)
**(Cite as: 2004 WL 1853137 (E.D.Pa.))**

New compl. ¶¶ 69-70. Plaintiffs challenge the validity of defendants 1996 and 1997 statement that "Any payment to Blackstone is subject to Blackstone or the Company exercising their respective rights under the Put or Call. It is not currently possible to determine whether Blackstone or the Company will exercise such rights." New compl. ¶ 69. According to plaintiffs defendants knew that Blackstone would exercise its put rights and should have recorded a contingent loss.

Plaintiffs also challenge the validity of statements made by defendants regarding the liquidity of the corporation, a plan to securitize receivables and a plan to repurchase 5% of the company's outstanding common and preferred stock. New compl. ¶ 42. Plaintiffs allege that the statements were fraudulent because the company's liquidity was so poor that it would have been impossible for Loewen Group to securitize any of its receivable or repurchase 5% of the outstanding shares. New compl. ¶¶ 143, 149.

### B. Scienter Allegations

#### 1. Motive and Opportunity

Plaintiffs point out several facts that set the background for the alleged motive to inflate artificially the price of Loewen Group common stock. First, in September 1996 Loewen Group's board rejected the bid by SCI to buy all Loewen Group common stock at a price significantly over market value. New compl. ¶ 35. Plaintiffs allege that the takeover threat continued through the class period, even though SCI announced before the class period began that it would not continue its takeover attempts. New compl. ¶¶ 34-44. A statement made by Mr. Loewen that was quoted in the *Death Care Business Advisor* indicates that he considered the takeover threat to be "intense" in October 1997 even though it had become "unofficial" the month before. New compl. ¶ 38.

Second, Loewen Group carried a large debt load. Certain debt covenants that bound Loewen Group during the class period required that the company maintain specific financial ratios. New compl. ¶ 143. Furthermore, the company required new sources of credit to continue its acquisitions and maintain operations. *Id.*

Plaintiffs argue that the individual defendants had the opportunity to commit the alleged fraudulent acts because they were part of the senior management of Loewen Group for most or all of the class period.

#### 2. Circumstances Indicting Conscious Misbehavior or Recklessness

Plaintiffs plead facts that they argue support their claim that defendants acted with recklessness or conscious misbehavior. Because the individual defendants were top executive officers with Loewen Group during the class period plaintiffs argue that they should have known that the company's financial statements and statements about the liquidity of the corporation, the securitization of receivables and the plan to buyback shares were false and misleading. New compl. ¶¶ 173, 174.

**\*4** The new complaint alleges that Loewen Group paid more than twice the EBITDA (earnings before interest, taxes, depreciation and amortization) factor for acquisitions that its competitors were willing to pay. New compl. ¶ 171. It also relies upon charges and losses taken on assets during and after the class period. New compl. ¶ 172. Plaintiffs point out that Loewen Group admitted in March 2001 that many of its properties had been overvalued on its books. *Id.* They also rely upon the fact that Loewen Group sought approval from the bankruptcy court to void or cancel existing contracts and covenants not to compete. *Id.*

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiffs' complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citations omitted). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendant on notice of the essential elements of the plaintiff's cause of action." *Id.* Claims should be dismissed under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

Nevertheless, in evaluating plaintiffs' pleadings I will not credit any "bald assertions." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997). Nor will I accept as true legal conclusions or unwarranted factual inferences. *Conley v.. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Not Reported in F.Supp.2d                                                                                                     Page 4
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

Because plaintiffs make claims of securities fraud, Federal Rule of Civil Procedure 9(b) and the Reform Act impose a higher level of scrutiny than that used for most Rule 12(b)(6) motions. The Court of Appeals has said that "Rule 9(b) and the Reform Act impose independent, threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6)." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,* 311 F.3d 198, 224 (3d Cir.2002). A securities fraud complaint may be dismissed under Rule 9(b) and the Reform Act even if it would survive traditional Rule 12(b)(6) scrutiny. *Id.* The requirements of Rule 9(b) and the Reform Act will be discussed in detail hereafter.

On a motion to dismiss filed pursuant to Rule 12(b)(6) the materials at which I may look are limited. *Burlington Coat Factory,* 114 F.3d at 1424-25. To determine whether plaintiffs have met their burdens I may consider only the facts alleged in the complaint and the documents upon which the complaint relies. *Id.* I may consider a document not cited in or attached to the complaint only if it is "integral to or explicitly relied upon in the complaint." *Id.* at 1426, quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996).

## DISCUSSION

I. Applicable Law

**\*5** Plaintiffs bring their claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. 15 U.S.C. § § 78j(b) (2004) [FN2] and 78t(a) (2004); [FN3] 17 C.F.R. § 240.10b-5 (2004). [FN4]

FN2. 15 U.S.C. § 78(j), entitled "Manipulative and deceptive devices" declares:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
(a) [omitted]
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

FN3. 15 U.S.C. § 78t(a) provides for joint and several liability for a supervisor who controls a subordinate who violates the Exchange Act.

FN4. 17 C.F.R. § 240.10b-5, entitled "Employment of manipulative and deceptive devices" reads as follows:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

A. Sections 10(b) and 20(a)

To state a valid securities fraud claim under Section 10(b), plaintiffs must first establish that defendants, in connection with the purchase or sale of a security, "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *Burlington Coat Factory,* 114 F.3d at 1417. Additionally, plaintiffs must establish that defendants acted with scienter, as defined in the Reform Act, and that plaintiffs' reasonable reliance on defendants' misstatement proximately caused them injury. *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989). Finally, plaintiffs must ensure that the complaint complies with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

Plaintiffs concede that they may not collect on any judgment obtained against the corporate defendant because it is protected by its bankruptcy Order and Section 524(a)(1) of the Bankruptcy Code. Plaintiffs want to collect any judgment entered against Loewen Group from the individual defendants under the Reform Act's uncollectible share provision, 15 U.S.C. § 78u-4(f)(4). Loewen Group bases its motion to

Not Reported in F.Supp.2d                                                                    Page 5
2004 WL 1853137 (E.D.Pa.)
**(Cite as: 2004 WL 1853137 (E.D.Pa.))**

dismiss in part on the Bankruptcy Code.

 Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the Exchange Act. 15 U.S.C. § 78t. Claims under Section 20(a) are derivative, therefore, and must be dismissed if the underlying Section 10(b) claim is dismissed. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999).

 B. Federal Rule of Civil Procedure 9(b)

 Section 10(b) claims and their derivative Section 20(a) claims sound in fraud and therefore must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." The Court of Appeals has made clear that Rule 9(b) is to be "vigorously applied in securities fraud cases," although courts must be sensitive to a situation in which the factual information is in the defendant's control. *Burlington Coat Factory,* 114 F.3d at 1417-18.

 Rule 9(b) does not require that the plaintiffs "plead the 'date, place or time' of the fraud, but they must use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud." ' *In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 577 (D.N.J.2001) (citations omitted). For a claim made under Section 10(b), plaintiffs can satisfy the specificity requirement of Rule 9(b) by pleading:
  (1) defendants made a misrepresentation or omission;
  **\*6** (2) the misrepresentation or omission was material;
  (3) the misrepresentation or omission was of a fact;
  (4) defendants acted with scienter;
  (5) plaintiffs reasonably relied on the misrepresentation or omission; and
  (6) plaintiffs consequently suffered damage.

 *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996).

 C. The Requirements of the Private Securities Litigation Reform Act of 1995

 There is yet another source of pleading requirements for federal securities fraud claims the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1) and (2) (2004). The Reform Act heightens the pleading standards regarding the misrepresentations or omissions themselves and the

state of mind of the defendants.

 With respect to pleading a statement or omission, the Reform Act requires that a plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In other words, a plaintiff must plead "the who, what, when, where and how: the first paragraph of any newspaper story." *Advanta Corp.,* 180 F.3d at 534, quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990).

 With respect to pleading state of mind or scienter of the defendant, the Reform Act requires that "with respect to each act or omission ... [plaintiffs] state with particularity facts giving rise to a strong inference that the defendant acted" with knowledge or recklessness. 15 U.S.C. § 78u-4(b)(2). Plaintiffs must plead facts supporting a "strong inference" of scienter by alleging either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior." *Advanta Corp.,* 180 F.3d at 530, 534.

 Plaintiffs cite articles published in several trade journals and newspapers as evidence that defendants violated securities fraud laws. Media sources can satisfy the heightened pleading requirements of the Reform Act. *In re Daimlerchrysler AG Sec. Litig.,* 197 F.Supp.2d 42, 98-103 (D.Del.2002). To meet the pleading requirements media sources must be "sufficiently detailed to indicate that their reliability" and be "based on an independent investigative effort." *Id.* at 101-02. The articles plaintiffs rely upon were published in industry journals (e.g. *The Death Care Business Advisor* ) and reputable newspapers (e.g. *The Wall Street Journal* ) and meet the requirements of being independent and reliable. Therefore, I will consider them in determining whether plaintiffs have met their pleading burden.

 II. Law Applied to Allegations Pleaded

 A. Alleged materially false and misleading statements and omissions made by defendants during the class period

 **\*7** I will now address each allegedly false and misleading statement to determine if it states a claim under Section 10(b) and meets the pleading requirements of Federal Rule of Civil Procedure 9(b)

Not Reported in F.Supp.2d
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

and the Reform Act.

1. Financial statements

Plaintiffs allege that every financial statement Loewen Group published during the class period was materially false and misleading in violation of Section 10(b). The alleged violations are said to be the result of the use of fraudulent accounting for businesses and properties, an interest free or low-interest payment program, accounts receivable, certain covenants not to compete, certain in-kind dividends and two particular put/call agreements. I will examine each of these allegations in turn.

a. Businesses and Properties

During the class period Loewen Group acquired many cemetery properties and funeral home businesses. The parties dispute whether Loewen Group carried the acquired businesses on its books at the proper values. Plaintiffs claim that Loewen Group substantially overpaid for the acquired properties and kept them at inflated values in their books. The published asset valuations, plaintiffs argue, were consequently materially false and misleading.

In my 2003 decision I held that plaintiffs had not pleaded this claim with sufficient specificity to satisfy Rule 9(b) and the Reform Act because the claim was not supported by specific facts. *Loewen Group,* 2003 U.S. Dist. LEXIS 15680, at * 34-35. Plaintiffs did not plead the amount by which any acquisition was overvalued, the time at which and amount by which any asset should have been written down, who knew the assets were overvalued or what information was available to defendants that should have alerted them to the need for a write-down. Plaintiffs attempt to rectify those problems in the new complaint.

Plaintiffs allege that "[a] person who is actively engaged in purchases and sales of cemetery and funeral home properties at all relevant times, who had personal knowledge of the facts as a result of that participation, has advised plaintiffs that Loewen regularly paid 15% more than other acquirers of cemetery properties were willing to pay and a somewhat lesser premium for funeral homes." New compl. ¶ 62. Furthermore, plaintiffs state that Loewen Group was paying more than two times the factor of EBITDA for businesses that its competitors were. New compl. ¶¶ 89, 172. In addition to the allegations of overpayment for every acquisition plaintiffs have a specific claim regarding one

acquisition, the 1995 purchase of Osiris, a company that held a number of cemeteries and funeral homes. New compl. ¶ 89. Two of Osiris' principals, Lawrence Miller and William R. Shane, became senior executives in Loewen Group as a result of the transaction and plaintiffs allege that $25 million of the book value assigned to the Osiris acquisition by Loewen Group was really paid to Miller and Shane as a signing bonus. *Id.*

*8 The new complaint relies upon prices for which the properties sold during and after the end of the class period as support for its claims that defendants overpaid for the acquisitions and failed to write down their book value. New compl. ¶¶ 63, 73, 164. Plaintiffs allege that the book values of Loewen Group's cemeteries and funeral homes were materially overstated by the fourth quarter of 1997, at which time the cemeteries and funeral homes acquired by the end of 1996 had lost at least 15% of their book value or $260 million. New compl. ¶ 108-09. Loewen Group's 1998 Form 10-K reported that it sold a group of 124 cemeteries for $193,000,000 and had to record a $333,900,000 loss on those properties. New compl. ¶ 165. Plaintiffs argue that if the properties sold at a "fair value," which defendants stated they did, the fact that the fair value was only 39% of the book value shows that the assets had been carried at inflated values on Loewen Group's books.

There are several additional facts that plaintiffs argue support their contention that Loewen Group carried their properties at inflated book values. Loewen Group's 1997 Form 10-K stated that the number of funeral services performed at locations owned for a year or more declined by 3.2% from 1996. *Id.,* n. 7. Additionally, in 1998 Loewen Group took a $315.2 million charge to the Prime Succession and Rose Hills holdings, a charge that plaintiffs claim should have been made in 1996. New compl. ¶ 167.

Plaintiffs have compiled a number of statements by analysts and Loewen Group's post-class period Chairman that all support plaintiffs' claim that Loewen Group's assets were overvalued. A report in the March 23, 1998 *Death Care Business Advisor* stated "the company overpaid for properties in bidding wards with other consolidators." New compl. ¶ 166. In June 1999 the current Chairman of the Board of Loewen Group "faulted company founder Mr. Loewen for driving the Company into ever more acquisitions, despite rising purchase prices...." New compl. ¶ 169 (quoting article from June 2, 1999 *Wall Street Journal* ). Analysts appear to have agreed that Loewen Group overpaid for its acquisitions made

Not Reported in F.Supp.2d                                                                    Page 7
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

during the class period. New compl. ¶ 170 ("[t]hey paid too much for acquisitions," Merrill Lynch Global Securities; "Ray Loewen bought up ever cemetery, funeral home and crematory he could.... All too often, they paid more than they were worth," Raymond James & Assoc.).

Defendants first assert that the allegation regarding the purchase price for Osiris is time-barred. Plaintiffs filed the first complaint on December 29, 1998. The amended consolidated class action complaint, which I am considering now, was filed in August 2003.

Allegations under § 10(b) of the Exchange Act are governed by the one year limitations rule set forth in § 9(e) of the Act. *Lampf v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The limitations period begins to run when plaintiffs "discovered or in the exercise of reasonable diligence should have discovered the basis for their action." *In re NAHC Sec. Litig.,* 306 F.3d 1314, 1325 (3d Cir.2002). An investor should have known the basis for a claim of securities fraud when a "reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning" "of culpable activity." *Id.*

**\*9** Plaintiffs claim that any new material in the new complaint relates back to the 1998 complaint so that none of their claims are time-barred. Under Rule 15(c)(2) of the Federal Rules of Civil Procedure "an Amendment of a pleading relates back to the date of the original pleading when the claim ... asserted in the amended pleading arose out of the conduct transaction, or occurrence set forth or attempted to be set forth in the original pleading." Rule 15(c) is to be applied liberally in favor of allowing amendment if defendants had notice of the claim and would not be prejudiced by the amendment. *In re Campbell Soup Co. Sec. Litig.,* 145 F.Supp.2d 574, 602 (D.N.J.2001). Other courts in this Circuit have held that amendments relate back if the amendments to the pleadings are based on the same fraudulent statements alleged in the first complaint. *In re Nat'l Media Sec. Litig.,* 1994 U.S. Dist. LEXIS 16396, at \* 7-8 (E.D.Pa.1994); *Hill v. Equitable Bank,* 599 F.Supp. 1062, 1071-72 (D.Del.1984). I agree and hold that when the first complaint was filed defendants became aware that the statements at issue were being challenged as fraudulent.

The complaint that plaintiffs filed in 1998 challenged the asset valuations reported by Loewen Group during the class period. Defendants have been on notice of claims regarding those valuations since

that time. None of plaintiffs' claims relating to the alleged falsity of asset valuations, including the claim regarding and alleged signing bonus for Osiris principal, are time-barred. [FN5]

> FN5. Plaintiffs' claims relate only to the financial statements reported during the class period and, therefore, do not relate to the purchase price paid for the Osiris properties in 1995, but only to the book values at which the properties were held during the class period.

Defendants next ask me to dismiss this claim because it does not meet the pleading requirements of 9(b) or the Reform Act. They challenge plaintiffs' use of an unnamed source. Furthermore, defendants allege that the claim of overvalued assets is premised on no more than "fraud by hindsight," which is not a sufficient basis for a securities fraud claim. *See Rockefeller Ctr. Properties, Inc.,* 311 F.3d at 225.

The source on whom plaintiffs rely for the statement that Loewen Group paid more than 15% more than its competitors would for cemetery properties and funeral homes is described as "[a] person who is actively engaged in purchases and sales of cemetery and funeral home properties at all relevant times, who had personal knowledge of the facts as a result of that participation...." New compl. ¶ 62. Regarding whether a Section 10(b) claim can use an unnamed source, I agree with and adopt the reasoning of my colleague, Judge Dalzell:

> We will ... not necessarily disregard averments of fact based on anonymous sources. If the averments are particularized, if they provide circumstantial assurance that "a person in the position occupied by the source would possess the information alleged," we will consider them as part of the constellation of facts alleged for why the defendants' statement is false or misleading.

*In re ATI Technologies, Inc., Sec. Litig.,* 216 F.Supp.2d 418, 432-33 (E.D.Pa.2002), following *Novak v. Kasaks,* 216 F.3d 300, 312-14 (2d Cir.2000). In this instance plaintiffs have not provided sufficient information about the source to comply with the standard set forth in *ATI Technologies.* Plaintiffs do not say for whom the source worked or in what capacity. They have not specified how the source knew about the market for cemetery properties and funeral homes in general or in specific relation to the acquisitions made by Loewen Group. Because the identification of the source is insufficient under the pleading requirements of the Reform Act, I will not consider the source's

Not Reported in F.Supp.2d
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

assertions in determining whether the allegation of fraudulently inflated asset valuations survives the motion to dismiss.

**\*10** Defendants argue that without the anonymous source plaintiffs are relying solely on the theory of "fraud by hindsight." Plaintiffs do point to the difference between the value at which certain properties were carried on Loewen Group's books during the class period and the price to which they were ultimately written down or for which they eventually sold.

The price for which properties sold is only relevant for one of the properties. Loewen Group sold the Osiris properties during the class period for what the company said was "their fair value." That value was only 39% of the value at which the company had been carrying the Osiris properties on its books. New compl. ¶ 165, 166. That sale took place before Loewen Group filed for bankruptcy. Because plaintiffs have evidence of what defendants believed was the fair value of the properties and they sold for far less than that before Loewen Group had declared bankruptcy plaintiffs have pleaded sufficient facts supporting the claim regarding Osiris.

Plaintiffs have also satisfied the pleading burden for their claim that defendants fraudulently overvalued other cemetery properties and funeral homes. Plaintiffs have provided me with information on which properties were overvalued and by how much. Plaintiffs indicate what reasonable purchase prices would have been, based on EBITDA, and when the properties should have been written down.

With respect to this allegation, defendants also assert that plaintiffs have not properly pleaded scienter. I will address scienter later in this decision.

b. Imputed Interest

Plaintiffs allege that Loewen Group's revenue and income reports were inflated because the company did not account properly for its zero percent financing incentive program. New compl. ¶ 90. The new complaint states that Loewen Group's revenue and income were overstated by $6.5 million in imputed interest in the first quarter of 1997. *Id.* Furthermore, the reported income for the first quarter of 1998 was allegedly overstated by approximately $3.5 million because of Loewen Group's failure to deduct imputed interest. New compl. ¶ 117.

While Loewen Group reported an increase of 2.4%

in cemetery cross margins from the second quarter of 1996 to the second quarter of 1997, plaintiffs allege that if Loewen Group had deducted the imputed interest and provided an adequate reserve for accounts receivable the cemetery gross margin actually declined 7.7% during that period. New compl. ¶ 96. The new complaint states that the first quarter 1997 Form 10-Q overstated Loewen Group's cemetery gross margin by approximately 6% as a result of its failure to deduct the imputed interest on no or low interest payment plans. New compl. ¶ 92. It also alleges that the cemetery gross margins for the first quarter of 1998 were inflated by 22% because of Loewen Group's failure to record the $3.5 million in imputed interest and failure to create adequate reserves for uncollectible accounts receivable. New compl. ¶ 118.

**\*11** Plaintiffs cite a March 15, 1998 report by Griffith McBurney Partners that states: "the company implemented a zero interest incentive program on its pre-need cemetery sales in 1997. Like any other financing incentive there is an imputed cost to the company providing this financing." *Id.* The Griffith report pointed out that Loewen Group did not reduce its income and revenue for the imputed interest in the first half of 1997 "and had to take a $10 million charge in Q4/97 (in addition to the $3 million taken in Q3/97) to account for the short fall." *Id.* The new complaint also alleges that Loewen Group "assured Griffiths McBurney Partners ... that the Company would not" fail to record imputed interest in 1998. New compl. ¶ 115.

Defendants assert that the allegations of failure to account for imputed interest are time-barred. Loewen Group's failure to account for imputed interest is alleged to have resulted in materially false statements of income and revenue. Defendants knew from the first complaint filed this case that plaintiffs challenged all statements regarding Loewen Group's income and revenue during the class period. Therefore, plaintiffs' claims about failure to recognize imputed income are not time-barred.

The analyst report relied upon by plaintiffs indicates that Loewen Group instituted the no interest payment plan in 1997 and took a related $3 million charge in the third quarter of 1997 and a related $10 million charge in the fourth quarter of 1997. Defendants have not denied that they were using a no-interest payment plan in the first two quarters of 1997. If they were and did not take a related charge in those quarters the income reported for those quarters would have been materially false. Plaintiffs have adequately pleaded

Not Reported in F.Supp.2d                                                                                            Page 9
2004 WL 1853137 (E.D.Pa.)
**(Cite as: 2004 WL 1853137 (E.D.Pa.))**

this claim and if plaintiffs have pleaded scienter properly this claim will survive the motion to dismiss.

c. Accounts Receivable

Regarding the accounts receivable, plaintiffs allege that Loewen Group's financial statements materially overstated the company's accounts receivable and materially understated the reserve for accounts receivable. New compl ¶ ¶ 64, 71, 73, 75-76, 91. In my 2003 decision I held that plaintiffs had not met the pleading requirement for this claim because the complaint did not include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the cancellations experienced, and how many accounts ultimately were uncollectible. *Loewen Group,* 2003 U.S. Dist. LEXIS 15680, at * 30-31. Plaintiffs attempt to rectify these problems in the new complaint.

Plaintiffs now assert that in 1998 Loewen Group officials had a meeting with people from a company called Duff & Phelps wherein it was discussed that 40% of the company's cemetery receivables were delinquent. New compl. ¶ 64 and n. 3. The source for this fact is "a source who was personally present at Duff & Phelps and received that information from them." *Id.* Defendants again question whether plaintiffs' use of an unnamed source satisfies the Reform Act's pleading requirements as explained in *ATI Technologies, Inc.,* 216 F. Supp 2d at 432-33. Plaintiffs do not include any details that would "provide circumstantial assurance that 'a person in the position occupied by the source would possess the information alleged." ' Plaintiffs do not say in what capacity the source attended the meeting. Simply stating that the source was present at the meeting does not satisfy the Reform Act's pleading requirements. Accordingly, I will not give any weight to the reported statement.

**\*12** The new complaint alleges that Loewen Group knew it was required to increase its reserve for cemetery accounts receivable "by the first quarter of 1998" and that the fact that Loewen Group increased its reserve for accounts receivable from $57.9 million at the end of 1997 to $124 million at the end of 1998 "[d]emonstrat[es] the fact that more than 40% of the Company's receivables were uncollectible." New compl. ¶ 117, 131. Each time Loewen Group announced earnings below forecast because of

charges taken to provide an increase in the allowance for cemetery receivables the company's stock dropped in value. New compl. ¶ ¶ 127, 128, 136, 140. Plaintiffs quote Mr. Wagler's statement on January 18, 1999 that Loewen Group's cemetery accounting was "not up to speed." New compl. ¶ 159.

Canadian GAAP provides that "[a]n account or note receivable should be written off as soon as it is known to be uncollectible or should be written down to its estimated realizable value as soon as it is known that it is not collectible in full." New compl. ¶ 76, *CICA Handbook* ¶ 3020.10. Plaintiffs argue that they cannot provide any information about which accounts were uncollectible because a company with a large number of small accounts receivable, like Loewen Group, bases its reserve on its portfolio for receivables as a whole. New Compl. ¶ 71. Plaintiffs are able to estimate that Loewen Group's reserve for the first quarter of 1997 was $3.9 million less than it should have been. New compl. ¶ 92 They arrived at that number by taking the difference between the 13% loss Loewen Group took on the sale of the cemetery receivable to an affiliate and the 8% reserve that Loewen Group maintained in the first quarter of 1997. *Id.* The new complaint also states that the income reported for the third quarter of 1997 was inflated by $3 .6 million, and the annual income for 1997 inflated by $15 million, due to Loewen Group's understating its reserve for accounts receivable. New compl. ¶ ¶ 104, 106, 111. The new complaint does not state the source for the third quarter or annual 1997 figures.

Plaintiffs have not pleaded sufficient facts indicating that Loewen Group overvalued its accounts receivable and kept too small a reserve for uncollectible receivables. [FN6] As I stated in my 2003 decision, "[n]either the increase in allowance toward the end of the class period nor the eventual financial ruin of Loewen Group are proof that defendants committed any acts worse than mismanagement." *Loewen Group,* 2003 U.S. Dist. LEXIS 15680, at *30- 31, citing *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 465- 66 (D.N.J.2000). I will dismiss this claim.

> FN6. In their opposition to the motions to dismiss, but not in the new complaint, plaintiffs cite to statements by industry analysts in 1998 to support their claim that Loewen Group overvalued its accounts receivable and undervalued the reserve for its accounts receivable. I will not consider

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

Page 10

these statements, however, because a plaintiff may not rely on new facts submitted in response to a motion to dismiss. *Hammond v. City of Philadelphia,* 2001 U.S. Dist. LEXIS 10182, at *8 (E.D. Pa. June 29, 2001).

d. Covenants Not to Compete

Regarding the covenants not to compete, plaintiffs allege that Loewen Group entered into covenants not to compete with funeral directors whose companies Loewen Group acquired and that those covenants were at all times worthless. New compl. ¶ 74. The new complaint alleges that the assets listed in Loewen Group's 1997 financial statements included approximately $70 million in covenants not to compete that were in fact valueless and should have been written off. New compl. ¶ 110. Plaintiffs base this assertion on the fact that Loewen Group sought to be relieved from 208 covenants not to compete after it filed for bankruptcy in 1999. New compl. ¶ 110.

**\*13** In my view, this claim is based solely on a fraud by hindsight argument. The only fact pleaded in the new complaint is that Loewen Group asked the bankruptcy court to release it from the covenants not to compete, "which no longer had any value to the Company." New compl. ¶ 110

Plaintiffs have not pleaded in the new complaint facts showing the covenants not to compete had no value at the time the parties entered into them. [FN7] Therefore, this claim will be dismissed.

> FN7. Plaintiffs do not bring up statements made by funeral home owners who sold their businesses to Loewen Group until their brief in opposition to defendants' motions to dismiss. As I stated earlier, plaintiffs may not rely on new facts in response to a motion to dismiss. *Hammond v. City of Philadelphia,* 2001 U.S. Dist. LEXIS 10182, at * 8.

e. Dividends

Defendants recorded as revenue preferred stock received as dividends on Loewen Group's preferred stock holdings in Prime Succession and Rose Hills. New compl. ¶ 90. Plaintiffs allege that the treatment of payment in kind dividends as revenue violated Canadian GAAP because its value was not "measurable" and "ultimate collection" was not

"reasonably assured." New compl. ¶ 66. The new complaint states that income reported for the third quarter of 1997 included "$3.6 million in dividends that should not have been included and that Loewen Group's income for the year 1997 wrongly included $15.25 million in dividends. New compl. ¶ ¶ 104, 106, 111. The company's income reported for the first quarter of 1998 was allegedly inflated by $4.1 million in Prime Succession and Rose Hills dividends. New compl. ¶ 130.

Defendants challenge the claim regarding treatment of dividends as time-barred. As I held earlier, amendments found in the new complaint relate back to the original complaint and are not time-barred if they are additional reasons why the statements cited in the original complaint are false. Plaintiffs use the allegedly wrongful accounting treatment of dividends as another reason why defendants' publications of Loewen Group's income and revenue were false. Defendants have been on notice that plaintiffs were challenging their statements of revenue and income during the class period since the original complaint was filed. Therefore, plaintiffs' allegations regarding Loewen Group's accounting treatment of dividends are not time-barred.

Defendants next argue that the accounting treatment of the dividends was proper as evidenced by the audit and certification by KPMG's certified Canadian accountants. The proper treatment under Canadian GAAP is a question of fact that I cannot decide at this stage of the litigation.

I will consider defendants' argument that even if the treatment of the dividends were in error it did not amount to securities fraud because the method of accounting and amount of revenue recorded each quarter was disclosed in documents submitted to the SEC. This is a question of materiality. The issue of materiality is generally left to the jury; however, complaints may contain "claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." *Burlington Coat Factory,* 114 F.3d at 1426. The materiality question asks of each statement: is the allegedly false statement, in the context in which it was publicized, "information that would be important to a reasonable investor in making his or her investment decision." *Id. at 1425.* Even if the accounting treatment of a particular item violates GAAP the error is not material if the method of accounting is disclosed. *See Vosgerichian v. Commodore Int'l,* 862 F.Supp. 1371, 1376-77 (E.D.Pa.1994) (holding that even if accounting

Not Reported in F.Supp.2d                                                          Page 11
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

treatment violated GAAP that mistreatment as immaterial because all relevant information about the transaction was disclosed); *Bay v. Palmisan,* 2002 U.S. Dist. LEXIS 20848, at *27 (E.D.La. Oct. 25, 2002) (same).

**\*14** Defendants quote statements made in Loewen Group's 1996 10-K that report the income recognized for the payment-in-kind dividends. Corrected Memo. in Support of Loewen Group's Mot. to Dismiss at p. 31. Loewen Group's forms 10-K disclosed that the dividends were paid in the form of shares of Prime and Rose Hills and that the dividends were recorded as income. *Id.,* quoting 1996 10-K at p. 44. Because all relevant information was disclosed to investors in the form 10-K, the accounting treatment of the payment-in-kind dividends as income is not material, even if it violated GAAP.

Plaintiffs also challenge the veracity of a statement in Loewen Group's 1996 and 1997 forms 10-K that said "[t]he investments for which it is not practicable to estimate fair value comprise primarily the preferred share investments in Prime and RH Holdings." New compl. ¶ 67. Because plaintiffs did not provide me with a page number for that quote I have been unable to verify its accuracy. However, even assuming the quote is accurate it does not render the forms 10-K materially false and misleading. No reasonable investor would read the 10-K and not see the income attributed to the dividends. Therefore, all claims regarding the payment-in-kind dividends will be dismissed.

f. The Put/Call Agreements

Plaintiffs allege that Loewen Group's statements regarding and accounting treatment of the put/call agreements with Blackstone regarding Prime Succession and Rose Hills are instances of securities fraud. The statements challenged are found in Loewen Group's 1996 and 1997 Form 10-K where the company stated that "it is not currently possible to determine whether Blackstone or the Company will exercise [the Put or Call] rights" and that "it is not possible at this date to estimate the future amount that may be payable to Blackstone on the exercise of the Put or the Call." New compl. ¶¶ 85, 114.

In contrast to those statements, Prime Succession and Rose Hill as early as October 1996 and February 1997, respectively, each published that "By virtue of the Put/Call Agreement, it is likely that the Company will become a wholly owned subsidiary of Loewen Group." New Compl. ¶ 70. Plaintiffs also claim that

Loewen Group's description of the Prime Succession and Rose Hills transactions as "joint ventures" was misleading. New compl. ¶ 83. Plaintiffs assert that the Prime Succession and Rose Hills transactions with Blackstone were not instances of unusually structured legal financing, but rather "designed to keep the debt associated with acquiring the properties off its balance sheet and to allow [Loewen Group] to improperly record dividend revenue." New compl. ¶ 53.

The accounting treatment being challenged is Loewen Group's failure to record contingent losses for the put/call agreements. Plaintiffs claim that failure violated the Section 3290.12-13 of Canadian GAAP, which states:

The amount of a contingent loss should be accrued in the financial statements by a charge to income when both of the following conditions are met:

**\*15** a. it is likely that a future event will confirm that an asset had been impaired or a liability incurred at the date of the financial statements; and
b. the amount of the loss can be reasonably estimated.

New compl. ¶ 77. Plaintiffs claim that Loewen Group knew from the time of the original transactions that if Loewen Group exercised the call it would cost Loewen Group approximately $200 million and even more if Blackstone exercised the put. New compl. ¶ 86. Loewen Group recorded a contingent liability to Blackstone of $128 million in the fourth quarter of 1998. New compl. ¶¶ 70, 87. Plaintiffs allege that the liability should have been recorded in Loewen Group's 1996 financial reports. New compl. ¶ 87.

Defendants argue that the allegation of fraudulent statements regarding Prime Succession and Rose Hills is time-barred. This situation requires a different analysis than the allegations already discussed because the statements themselves were not included in the original complaint. Plaintiffs argue that even though the statements themselves did not appear in the original complaint the allegations based on them are not time-barred because they are a part of the scheme to defraud investors that was originally plead.

It is common for securities fraud plaintiffs to clarify and recast some of their claims in amended pleadings. *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp 2d at 602. The new claims need not be exactly the same as those originally plead, but under Federal Rule of Civil Procedure 15(c) they do have to arise out of the same conduct, transaction or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

occurrence set forth in the original complaint.

Plaintiffs rely on a Southern District of New York case that held that new allegations relate back under Rule 15(c) if they are "natural offshoot[s]" of the "basic scheme" to defraud investors that was pleaded in the original complaint. *In re Chaus Sec. Litig. ., 801 F.Supp. 1257, 1264 (S.D.N.Y.1992).* The *Chaus* plaintiffs' first complaint alleged that the defendants used various accounting manipulations to falsely inflate income and asset values. Later they sought to amend their complaint to add a claim that the defendants failed to account properly for uncollectible receivables. The court found that the new allegations related back to the original complaint under Rule 15(c) because the original complaint gave the defendants notice that they were being sued for false financial statements during the class period and that the allegations regarding the accounts receivable were part of the same " 'basic scheme' to defraud investors by misrepresenting the company's earnings and profitability." *Id.*

Like the amended claims in *Chaus* the new claims regarding defendants' statements about Prime Succession and Rose Hills are part of the same basic scheme described in the original complaint. The alleged falsity of the statements is material because it affected the financial statements published by Loewen Group. The 1998 complaint put defendants on notice that all statements made during the class period regarding the financial condition of the company were being challenged. Plaintiffs' claims regarding the specific statements about the nature of financial effect of the Prime Succession and Rose Hills transactions are not time barred.

**\*16** Although the claims are not time-barred, plaintiffs have failed to plead facts showing that the statements "it is not currently possible to determine whether Blackstone or the Company will exercise [the Put or Call] rights" and that "it is not possible at this date to estimate the future amount that may be payable to Blackstone on the exercise of the Put or the Call" were false. Prime Succession and Rose Hills did say that "[b]y virtue of the Put/Call Agreement, it is likely that the Company will become a wholly owned subsidiary of Loewen Group," but that statement does not conflict with those by defendants. Whether the puts or the calls were exercised, Prime Succession and Rose Hills would become subsidiaries of Loewen Group. Prime Succession and Rose Hills did not specify whether it would be the puts or the calls that would be exercised. Nor do plaintiffs claim that the companies estimated a

payment that would be made to them upon the execution of the puts or calls. Therefore, the claim regarding those two statements will be dismissed.

Nor will the claim regarding Loewen Group's statement that its transactions with Blackstone were a "joint venture" survive the motion to dismiss. The label used to describe the transactions is immaterial in light of the disclosures regarding the transactions made by Loewen Group in its filings with te SEC. The 1996 10-K revealed that "[u]pon a Call, Blackstone will receive, at a minium, its original investment plus a 24.1% compound return per annum thereon regardless of the calculated equity value." Memo. in Support of Loewen Group's Mot. to Dismiss at p. 33. Because Loewen Group disclosed the potential nature of the relationship wherein Blackstone would receive 24.1% interest on its investment the description of the relationship as a "joint venture" would not mislead a reasonable investor. It is immaterial and plaintiffs' claim based on that statement will be dismissed.

In contrast to the claims based on the statements, the claims based on the accounting treatment of the Prime Succession and Rose Hills put/call agreements are pleaded sufficiently and will survive the motion to dismiss. When it became likely that Prime Succession and Rose Hills would become part of Loewen Group and the amount of the loss to Loewen Group could have been estimated reasonably, the company should have recorded a contingent loss. Whether that occurred prior to the loss recorded in 1998 is a question of fact that cannot be decided on a motion to dismiss.

2. Statements Regarding Liquidity

Plaintiffs allege that the following statement, made in Loewen Group's 1997 Form 10-K and Forms 10-Q for the first and second quarters of 1998, was materially false and misleading:

The Company intends to fund its on-going expansion programs through a combination fo debt equity offerings and borrowing under its credit facilities.... The Company plans to finance principal repayments on debt primarily by the issuance of additional debt or equity or borrowings under revolving credit facilities and plans to ensure financing is available well in advance of scheduled repayment dates, thereby protecting the Company's liquidity and maintaining it[s] financial flexibility.

**\*17** New compl. ¶ ¶ 142, 144. The reasons for the alleged falsity are: (1) Loewen Group announced that it planned to spend $500 million in acquisitions in

1998; (2) Loewen Group had been in default on debt covenants and forced to seek waivers from those lenders; (3) it had a negative operating cash flow of $173 million in 1997; and (4) its long-term debt had increased from less than $1.5 billion at the beginning of 1997 to almost $2 billion at the time the 1997 Form 10-K was issued. New compl. ¶ 143. For those reasons, plaintiffs argue, "unless the Company's income improved materially it would again be in violation of its debt covenants, its debt ratings would decline and it would find itself unable to borrow the vast sums necessary to even fund its huge negative cash flows...." *Id.*

Plaintiffs have not pleaded facts that support their theory that Loewen Group's statements about liquidity were false or misleading at the time they were made. By plaintiffs' own admission the steps that Loewen Group "intended" and "planned" to take could have been accomplished if "the Company's income improved materially." New compl. ¶ 143. This claim will be dismissed.

3. Statements Regarding Securitization of Cemetery Receivables

Plaintiffs point to several statements that defendants made regarding a plan to securitize cemetery receivables. Mr. Wagler reportedly told a group of institutional investors in January 1998 that Loewen Group was "exploring the possibility of securitizing its receivables." New compl. ¶ 145. In July 1998 Duff and Phelps reported that Loewen Group had an "intention to securitize at least a portion of its cemetery installment contracts." New compl. ¶ 146. The *Financial Post* of Canada reported in August 1998 that Loewen Group "may securitize installment payments on cemetery plots in a move to put some life into the ailing company's finances." New compl. ¶ 147. That same month Standard & Poor's reported that Loewen Group's "immediate liquidity remains adequate, reflecting availability under its U.S. $600 million bank facility and the opportunity to securitize cemetery installment contracts." New compl. 148.

Plaintiffs allege that the statements made by defendants to investors and analysts were false and misleading because 40% of Loewen Group's receivables were uncollectible, a situation that meant there was "no realistic prospect that the Company could securitize those receivables." New compl. ¶ 149. Plaintiffs attempt to show that the statements were material by pointing out that they led analysts to report to investors that the securitization plan would help Loewen Group's "immediate liquidity" needs.

*Id.*

Defendants argue that the allegation of fraudulent statements regarding securitization of receivables is time-barred. I do not reach that question because the statements are immaterial.

The Reform Act specifically provides protection for forward looking statements, which include "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(A) and (B) (2004). The "safe harbor" provision protects forward looking statements from securities fraud liability if plaintiffs fail to prove that the person making the statement had actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c). Therefore, to survive a motion to dismiss plaintiffs must plead facts that support the inference that the person making the statement had actual knowledge that the statement was false or misleading.

**18** The Court of Appeals considered forward looking statements in *In re Advanta Securities Litigation*, 180 F.3d 525 (3d Cir.1999). The pertinent alleged misstatement in *Advanta* was "as [Advanta] converts more than $5 billion in accounts that are now at teaser rates of about 7% to its normal interest rate of about 17%...." *Id.* at 536. The Court considered Advanta's statement a "plan to reprice its teaser-rate accounts to a rate of about 17%." *Id.* If Advanta's more definite-sounding statement was a forward looking statement, Mr. Loewen's statement that Loewen Group was "exploring the possibility of securitizing its receivables" qualifies as a forward looking statement. So do the reports made by Duff & Phelps and *The Financial Post* that Loewen Group had an "intention to securitize at least a portion of its cemetery installment contracts" and that Loewen Group "may securitize installment payments on cemetery plots."

To survive the motion to dismiss on this claim plaintiffs must plead specific facts that would support an inference that Mr. Loewen or another executive officer had actual knowledge that Loewen Group had no intention of exploring the possibility of securitizing receivables. Plaintiffs have not pleaded such facts. Even if, as plaintiffs claim, it would have been nearly impossible to succeed in securitizing the

Not Reported in F.Supp.2d                                                                 Page 14
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

receivable, plaintiffs have not pleaded any facts showing that defendants had no intention of exploring the possibility. This claim will be dismissed.

4. Statements Regarding the Stock Repurchase Plan

In a September 15, 1997 press release Loewen Group announced that it had authorized a plan to repurchase 5% of Loewen Group's outstanding common and preferred stock. New compl. ¶ 100. Plaintiffs allege that this statement was materially misleading because "in light of the Company's announced intent to spend many hundreds of millions of dollars on acquisitions and its ever increasing negative cash flows ... it would make it highly improbable, if not impossible, that the Company could obtain the necessary financing to both pursue its ambitions acquisition program and spend more than $100 million repurchasing its stock." *Id.*

Defendants argue that the allegation of fraudulent statements regarding the stock repurchase plan is time-barred. I do not reach that question because the statements are immaterial.

This claim will be dismissed because plaintiffs have failed to show that the statements were material, even if they were false. Material information is "information that would be important to a reasonable investor in making his or her investment decision. *Burlington Coat Factory,* 114 F.3d at 1425. The materiality question is an objective one that asks of each statement: is the allegedly false statement, in the context in which it was publicized, "information that would be important to a reasonable investor in making his or her investment decision." *Id.* It is a mixed question of law and fact. *Ieradi v. Mylan Labs. Inc.,* 230 F.3d 594, 599 (3d Cir.2000). At this stage of the litigation I will make a legal analysis regarding materiality while accepting as true all well pleaded allegations in the new complaint. If "alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," dismissal is proper. *Shapiro v. UJV Fin. Corp.,* 964 F.2ds 272, 281 n. 11 (3d Cir.1992). If the question is not so clear it must be left to the jury. *Ieradi,* 230 F.3d at 599.

**\*19** As reported in the September 15, 1997 Form 8-K, the entire statement reads "the company said that its board of directors has authorized a plan to purchase 3.6 million Common shares (approximately 5% of the outstanding common shares) and up to 440,000 Series C Preferred Shares (approximately 5% of the outstanding Series C Preferred Shares) from time to time and as market and business conditions warrant, on the open market." Appendix to Loewen Group's Mot. to Dismiss, F1. The plan was not implemented, simply "authorized." It was clearly not to be implemented unless market and business conditions warranted. The plan told investors no more than that the corporation could buy back shares if and when it saw fit. The statement is immaterial as a matter of law.

B. Pleading Scienter

Not only must plaintiffs making Section 10(b) claims meet factual pleading requirements as to the details of the alleged fraudulent acts, they also must plead facts that support that each defendant acted with the required state of mind.

The Reform Act requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u4(b)(2). In this Circuit a plaintiff may establish this strong inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat Factory,* 114 F.3d at 1418. Furthermore, "while under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable.... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 150 (3d Cir.2004), quoting *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 741 (8th Cir.2002).

1. Plaintiffs' pleading of motive and opportunity

The District Court for the Southern District of New York has succinctly described the analysis of motive pleading: "The question turns, then, on the concreteness of the allegations; a generalized desire to maintain a higher stock price will not rise to the level of motive for [Section 10(b) ] purposes. However, the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." *In re Complete Mgmt., Inc. Sec. Litig.,* 153 F.Supp.2d 314, 328 (S.D.N.Y.2001).

a. Mr. Loewen's Alleged Motives

Not Reported in F.Supp.2d                                                                 Page 15
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

Plaintiffs cite two motives specific to Mr. Loewen. First is his sale of Loewen Group stock to Canadian Imperial Bank of Commerce. According to plaintiffs, Loewen pledged his Loewen Group stock to obtain a multi-million dollar loan and in November 1998 sold all of the pledged shares to the bank to reduce his outstanding debt by $91 million. New compl. ¶ ¶ 175-77. Mr. Loewen characterizes the transfer of shares as a repossession. This is a factual issue that I cannot decide on a motion to dismiss. Therefore, I will consider the claim as part of plaintiffs' pleading of Mr. Loewen's motive to commit securities fraud.

**\*20** The second motive plaintiffs allege specifically regarding Mr. Loewen is his desire to thwart the takeover bid by SCI. New compl. ¶ 178-84. The *Burlington Coat Factory* Court stated that a specific takeover bid could motivate corporate officers to create fraudulently a temporary raise in stock price. *Id.; see also Weiner v. The Quaker Oats Company, 129 F.3d 310, 318 n. 8 (3d Cir.1997)*. Although SCI withdrew its official takeover bid in January 1997, plaintiffs have provided evidence that Mr. Loewen considered the threat to be ongoing in October of that year. New compl. ¶ 179, quoting an article in the October 23, 1997 *Death Care Business Advisor*. Mr. Loewen purchased a large amount of Loewen Group stock from June 1997 through January 1998, using his own money and borrowed money. By September 1998 it was reported that Mr. Loewen had "pledged more than 85% of his stake [in Loewen Group], valued at $151 million, as collateral" for loans he used to purchase more Loewen Group stock. New compl. ¶ 182, quoting an article in the September 15, 1998 edition of *The Financial Post*. Another article reported that "[m]any industry analysts believe [d] that Ray Loewen [was] merely positioning himself to fend off another takeover attempt by increasing his family's purchase of ownership in the company, which [then stood] about between 16 and 18 percent." New compl. ¶ 181, quoting an article in the November 20, 1997 *Death Care Business Advisor*. On October 24, 1999 *The Los Angeles Times* reported: "In 1996, Service Corps attempted a hostile takeover of Loewen Group. In response, Loewen Group's founder went on a buying spree partly intended to run up enough debt to make his company less appetizing. He succeeded a bit too well." New compl. ¶ 170. Loewen's purchase of more than 3,000,000 shares of Loewen Group stock during the class period cannot negate the showing of motive. Viewing all properly pleaded facts in the light most favorable to plaintiffs, it is possible that Loewen bought the shares as part of an attempt to thwart

SCI's takeover bid.

Plaintiffs have also pleaded facts showing that Mr. Loewen had the opportunity to commit the alleged fraud. In addition to being one of the founders of Loewen Group, he described himself as a hands-on chairman of the board and CEO. He told analysts in 1998 that he was involved in the day-to-day operations of Loewen Group "[f]rom about seven in the morning until about 12 at night." New compl. ¶ 173.

b. All Defendants' Motives

Plaintiffs claim that all defendants shared a motive to commit fraud in Loewen Group's need to obtain financing and comply with existing debt covenants. New compl. ¶ 185. A company's ability to borrow money depends on its debt/equity ratio and the ratio of its earnings to interest charges. The new complaint states that by early 1998 Loewen Group's bank credit had been reduced from $1 billion to $600 million. New compl. ¶ 115. It also claims that the company's negative cash flow increased from negative $173 million in 1997 to $376 million in 1998. *Id.* Furthermore, some of the company's debt covenants required the company to maintain a certain interest coverage ratio. The new complaint alleges that these financial requirements motivated defendants to inflate Loewen Group's equity and earnings and under report its debt and interest charges.

**\*21** The need to comply with debt covenants may be considered as contributing motive to commit securities fraud. *P.R. Diamonds, Inc. v. Chandler, 91 Fed. Appx. 418 (6th Cir.2004); Howard v. Everex Sys., Inc., 228 F.3d 1057 (9th Cir.2000); Wilson v. Bernstock, 195 F.Supp.2d 619 (D.N.J.2002)*. The desire to maintain a high credit rating is not sufficient, however, to satisfy the requirement for pleading motive. In *In re E.Spire Communications, Inc. Sec. Litig., 127 F.Supp.2d 734 (D.Md.2001)*, the District Court in Maryland considered a motive pleading very similar to that made by plaintiffs. The *E.Spire* plaintiffs alleged that "e.spire had severe cash flow problems and that if it could not satisfy certain debt covenants ... it would be unable to continue to borrow much needed funds to maintain its operations." *Id.* at 744. The District Court stated that even severe cash flow problems cannot by themselves satisfy the pleading requirement for motive because otherwise every corporation that experienced a decline in the price of its stock would face a securities fraud action. *Id.* The District Court of New Jersey agreed. *Wilson, 195 F.Supp.2d at 636-*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

37.

Plaintiffs' only allegation of motivation regarding Mr. Wagler is based on the need for financing and to comply with debt covenants. Because that is not a sufficient allegation of motive, plaintiffs have failed to plead motive for Mr. Wagler by showing motive and opportunity.

2. Plaintiffs' pleading of circumstantial evidence of conscious misbehavior or recklessness by defendants

Another way to satisfy the Reform Act's pleading requirement regarding scienter is to plead strong circumstantial evidence of conscious misbehavior or recklessness by defendants. *Advanta Corp., 180 F.3d at 530, 534.* "A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta, 180 F.3d at 535.* Because plaintiffs have shown motive and opportunity for Mr. Loewen, I will now consider the pleading of reckless or conscious misbehavior on the part of Mr. Wagler. I also need only consider plaintiffs' pleading of reckless or conscious misbehavior regarding the three claims for which the new complaint meets the other pleading requirements: (1) the claim of fraudulent reports of the value of Loewen Group's businesses and properties; (2) the claim of failure to deduct imputed interest on low- or no-interest financing; and (3) the claim of failure to record contingent liabilities for the put/call agreements.

Plaintiffs allege that Wagler knew that the cemetery properties Loewen Group acquired could not make enough income to justify the purchase prices Loewen Group paid for them. New compl. ¶ 171.

The facts that plaintiffs claim demonstrate Mr. Wagler's knowing misrepresentations of the cemetery assets can be grouped into three categories. First, plaintiffs point out actions taken after the end of the class period. New compl. ¶ 172. Loewen Group took charges adding up to hundreds of millions of dollars on sales of its assets beginning in 1999. During the bankruptcy Loewen Group asked the court to void existing purchase agreements for cemetery properties. Second, plaintiffs rely on several statements made after the end of the class period. *Id.* In March 2001 Loewen Group admitted "that the prices obtained in its asset disposition program and

the write downs to fair value show that ... many of its properties were overvalued in the Company's annual earnings reports." *Id.* A March 1999 edition of the *Canadian National Post* stated regarding Loewen Group's 1995 purchase of Osiris: "At the time, Loewen Group was buying Osiris more to acquire experiences cemetery management than for its assets." *Id.* Third, plaintiffs states that Loewen Group paid 24- times EBITDA for the Rose Hills and Prime Succession businesses. *Id.*

**\*22** In some instances plaintiffs admit facts that contradict their assertion that defendants engaged in conscious misbehavior. In regards to their allegation that defendants overstated the value of the businesses Loewen Group acquired, plaintiffs say that Loewen Group "based its willingness to pay more than other acquirers would on assumptions that the profitability of the acquired properties would increase dramatically after acquisition." New compl. ¶ 62. If Mr. Wagler believed that Loewen Group could dramatically increase the profitability of the businesses the bought there was no fraud involved.

Statements made, charges taken and low sales prices received after the end of the class period cannot be used as evidence that defendants knew they were overstating the value of their assets during the class period. It is improper to plead fraud by hindsight. *In re Tseng Labs., Inc., 954 F.Supp. 1024, 1030 (E.D.Pa.1996).* Furthermore, the size of a financial adjustment or loss does not by itself evidence fraud. *DiLeo, 901 F.2d at 627* ("even a large column of big numbers need not add up to fraud); *Kennilworth Partners L.P. v. Cendant Corp., 59 F.Supp.2d 417, 429-30 (D.N.J.1999)* ("sheer magnitude" of restatement does not lead to inference of scienter).

Plaintiffs' only pleading that supports a theory that Mr. Wagler knew or was reckless in not knowing during the class period that Loewen Group's assets were overvalued is their claim that Loewen Group was paying more than two times the factor of EBITDA for businesses that its competitors were. New compl. ¶ 172. Mr. Wagler held the positions of Chief Financial Officer and non-executive co-chairman of the board during the class period. If Loewen Group was paying more then twice the EBITDA factor its competitors were for funeral homes and cemetery properties, as I must assume on this motion to dismiss, it is strong circumstantial evidence of conscious misbehavior or recklessness by Mr. Wagler. Therefore, plaintiffs have met the scienter pleading burden for Mr. Wagler for this claim.

Not Reported in F.Supp.2d
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

Page 17

Factual pleading regarding the accounting treatment of imputed interest and the put/call agreements together with pleading regarding Wagler's role in the corporation constitute sufficient pleading of scienter for Mr. Wagler for those claims.

Stating that a defendant held an executive position in a corporation is not sufficient as a pleading of scienter. *Advanta,* 1998 U.S. Dist. LEXIS 10189, at *24 (E.D.Pa. July 9, 1998) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions...."). However, if a plaintiff pleads alleged fraud concerning the corporation's core business and the defendant held a position from which he would have been aware of the true facts and misleading disclosures, scienter is pleaded sufficiently. *See Campbell Soup Co.,* 145 F.Supp.2d at 599; *In re Tel-Save Sec. Litig.,* 1999 U.S. Dist. LEXIS 16800, at *14 (E.D.Pa. Oct. 19, 1999); *In re Aetna Inc. Sec. Litig.,* 34 F.Supp.2d 935, 953 (E.D.Pa.1999) The claims regarding the accounting treatment of the imputed interest and the put/call agreements concern allegedly fraudulent financial statements. The positions that Mr. Wagler held at Loewen Group put him in a particular position to monitor the company's accounting methods and financial statements. Therefore, I find that plaintiffs have pleaded scienter for Mr. Wagler for all remaining claims.

D. Leave to Amend

**\*23** Although leave to amend is to be granted liberally, there are several reasons for which leave to amend a dismissed claim may be denied. Fed. R. Civ. Pro. 15(a); *Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000). One reason that justifies denying leave to amend is undue delay. *Oran,* 226 F.3d at 291. The *Oran* Court affirmed the district court's denial of leave to amend a dismissed complaint. The plaintiffs in *Oran* had already amended their complaint once. Their case was a year and a half old. Plaintiffs in this case have filed three complaints: the first complaint in 1998, the consolidated class action complaint in 2002 and the pending complaint. This case is has been active for three years. [FN8] In light of these facts, I find that plaintiffs have been given sufficient opportunities to include all factual allegations in their complaint and to allow another amendment would create undue delay. Therefore, plaintiffs are not granted leave to amend the claims that I will dismiss.

FN8. The first complaint was filed on December 29, 1998, but the case was in suspense from June 9, 1999 until December 21, 2001.

E. Loewen Group's Bankruptcy Claims

Loewen Group raises two additional points. First, it argues that the November 30, 2001 and December 5, 2001 orders of the United States Bankruptcy Court for the District of Delaware, which discharged its debts under 11 U.S.C. § 524(a), make it impossible for plaintiffs to retain Loewen Group as a defendant (1) because the § 524(a) discharge alone voids any suit against Loewen Group or, alternatively, (2) because the discharge renders moot any suit against Loewen Group. Second, in the event plaintiffs are allowed to sue to establish its nominal liability so as to trigger the "uncollectible share" provision of the Reform Act, 15 U.S.C. § 78u-4(f)(4), Loewen Group asserts that plaintiffs should be required to pay its reasonable legal fees. I disagree with Loewen Group on both points. I hold that plaintiffs may sue Loewen Group solely to establish its nominal liability under the Reform Act, and that plaintiffs need not pay Loewen Group's legal fees.

I have not found any case that considers whether a plaintiff may sue a bankrupt debtor whose debts have been discharged under 11 U.S.C. § 524(a) solely to establish the debtor's liability and collect from co-defendants under the "uncollectible share" provision of the Reform Act. Analogous cases, however, suggest that such a suit is permissible, and that I need not modify debtor defendant's § 524(a) injunction for the suit to proceed. *In re Munoz,* 287 B.R. 546, 555 (B.A.P. 9th Cir.2002); *In re Edgeworth,* 993 F.2d 51, 53 (5th Cir.1993); *Green v. Welsh,* 956 F.2d 30, 33 (2d Cir.1992); *In re Jet Florida Sys., Inc.,* 883 F.2d 970, 976 (11th Cir.1989). These decisions rely primarily on 11 U.S.C. § § 524(a) and 524(e). Section 524(a)(2) says that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect, recover, or offset any such debt as a personal liability of the debtor."

**\*24** Courts that have allowed suits to proceed against bankrupt defendants have reasoned that § 524(e) trumps § 524(a); § 524(e) states that "discharge of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." In other words, these courts have refused to permit bankruptcies to relieve third parties, typically insurers, from their obligations. In this case, the

individual defendants could be obliged by 15 U.S.C. § 78u-4(f)(4) to pay a portion of any judgment against Loewen Group (since that judgment will uncollectible against Loewen Group), and Loewen Group's § 524(a) discharge will not excuse them from their statutory obligation.

Loewen Group mistakenly relies on *In re Columbia Gas Transmission Corp.,* 219 B.R. 716 (S.D.W.Va.1998). In that case, the obligation of debtor defendant's insurance could be activated only by a judgment requiring defendant to pay $200,000 out of its own pocket. Because the § 524(a) injunction prevented plaintiff from collecting anything from debtor defendant, the insurer's obligation was never activated. *Munoz, Edgeworth, Green,* and *Jet Florida Systems* are distinguishable from *Columbia Gas,* because the insurance policies in those cases required no activation payment from the insured bankrupt defendant. In this case, individual defendants' statutory obligation requires no activation payment by Loewen Group, so Loewen Group's § 524(a) bankruptcy discharge presents no obstacle to plaintiffs' suit to establish Loewen Group's nominal liability solely for the purpose of collecting from the individual defendants under the uncollectible share provision of the Reform Act.

Loewen Group next argues that plaintiffs' claim is moot, because "it will never be possible for defendant to provide any relief." *Bryan v. All Out Die Cutting, Inc.,* 32 Fed. Appx. 651, 651-52 (3d Cir.2002). As a technical matter, this is true; shielded by its § 524(a) bankruptcy discharge, Loewen Group will never have to pay anything to plaintiffs. Loewen Group, however, ignores the cases that allowed plaintiffs to sue debtor defendants despite not being able to collect from them directly. *Munoz,* 287 B.R. at 555; *Edgeworth,* 993 F.2d at 53; *Green,* 956 F.2d at 33; *Jet Florida Sys.,* 883 F.2d at 976.

I agree with plaintiffs that *Nat'l Iranian Oil Co. v. Mapco Int'l, Inc.,* 983 F.2d 485 (3d Cir.1992) refutes Loewen Group's argument. There, the Court declared that a case is "moot if there will never be any possibility of satisfying a favorable judgment, thus permanently precluding all forms of relief." *Mapco,* 983 F.2d at 489, citing *Triland Holdings & Co. v. Sunbelt Service Corp.,* 884 F.2d 205, 208 (5th Cir.1989). The Court also stated that "if a trial court's order will have possible collateral legal consequences, a case is not moot." *Mapco,* 983 F.2d at 490; *see also In re Establish Inspection of Metal Bank of Am., Inc.,* 700 F.2d 910, 913-14 (3d Cir.1983). The Reform Act's uncollectible share

provision, which makes the individual defendants partially liable for any judgment against Loewen Group, is a collateral legal consequence that rescues this case from mootness.

**\*25** A debtor defendant shielded by a § 524(a) bankruptcy discharge may be sued to establish the liability of a third party only if the debtor is a necessary party--"a party in whose absence the suit against the third party would be dismissed under applicable tort and procedural laws." *In re Catania,* 94 B.R. 250, 253 (Bankr.D.Mass.1989). The only case I have found that sets forth a formal test for the "necessary party" requirement is *In re Czuba,* 146 B.R. 225 (Bankr.D.Minn.1992). [FN9] The *Czuba* court defined the term "necessary party" by quoting Federal Rule of Civil Procedure 19(a). Thus, a party is "necessary" under *Czuba* if:

> FN9. Few cases question whether debtor defendant is a "necessary party," because the typical case involves a plaintiff suing a debtor solely as a prerequisite to recovery against the debtor's insurer. In those cases, the debtor's presence as a party is necessary, either because the insurance policy itself requires a judgment against the debtor, or because state law forbids direct suits against insurers.

(1) in the [party's] absence complete relief cannot be accorded among those already parties; and
(2) the [party] claims an interest relating to the subject of the action and is so situated that the disposition of the action in the [party's] absence may -
(a) as a practical matter impair or impede the [party's] ability to protect that interest, or
(b) leave anyone already a party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the [party's] claimed interest.
*Czuba,* 146 B.R. at 229.

The first prong of the *Czuba* "necessary party" test justifies retaining Loewen Group as a defendant. The text of 15 U.S.C. § 78u-4(f)(4)--the uncollectible share provision--shows that Loewen Group must be a party in order for the provision to operate:
(A) In general. Notwithstanding paragraph (2)(B), [if] upon motion made not later than 6 months after a final judgment is entered in any private action, the court determines that all or part of the share of the judgment of the *covered person* is not collectible against that *covered person,* and is also

Not Reported in F.Supp.2d                                                                 Page 19
2004 WL 1853137 (E.D.Pa.)
(Cite as: 2004 WL 1853137 (E.D.Pa.))

not collectible against a *covered person* described in paragraph (2)(A), each *covered person* described in paragraph (2)(B) shall be liable for the uncollectible share as follows...."

15 U.S.C.S. § 78u-4(f)(4)(A) (2004) (emphasis added). It is clear that the uncollectible share provision does not operate unless the party in question qualifies as a "covered person" under the statute. The Reform Act defines a "covered person" as "(i) a defendant in any private action arising under this title; or (ii) a defendant ... who is an outside director of the issuer of the securities that are the subject of the action." 15 U.S.C.S. § 78u-4(f)(10)(C) (2004). Loewen Group must be a party for the plaintiffs to recover under the Reform Act's uncollectible share provision. Without Loewen Group as a defendant, I would be unable to accord the complete relief required by the first prong of the *Czuba* "necessary party" test.

The second prong of the *Czuba* "necessary party" test is inapplicable because Loewen Group does not claim an interest relating to the subject of this action; it has nothing to lose or gain from this litigation. Nor would its dismissal subject the individual defendants to a substantial risk of multiple liability.

**\*26** The two prongs of the *Czuba* "necessary party" test make it clear that plaintiffs will be harmed if Loewen Group is dismissed and that Loewen Group and the individual defendants will lose nothing if it is retained.   [FN10] Other courts have held that potential harm to plaintiffs' interests suffices to make a debtor a necessary party. *In re Stanton,* 121 B.R. 438, 440-41 (Bankr.S.D.N.Y.1990) ("[D]ebtor ... is a necessary party in [the] action in order for the state court to determine the entire controversy with respect to the rights of all the parties in the case"); *In re McGraw,* 18 B.R. 140, 141 (Bankr.W.D.Wis.1982) ("Without [debtor], the plaintiffs cannot establish the requisites of the respondeat superior doctrine, nor can negligence be apportioned among the parties as required per Wis. Stats. § 895.045"). I agree and hold that Loewen Group is a necessary party and should not be dismissed. [FN11]

FN10. In fact, the individual defendants would benefit if Loewen Group were dismissed. Under 15 U.S.C. § 78u-4(f)(3)(A), the jury would be required to apportion some fault to Loewen Group (if the evidence warranted such a conclusion), yet plaintiffs would be unable to collect any of Loewen Group's liability from the individual defendants under the uncollectible share provision.

FN11. It should be noted that two events would call for the dismissal of Loewen Group. First, if plaintiffs were to obtain summary judgment on either of the individual defendants' liability for a knowing violation of the securities laws, then that individual defendant would become jointly and severally liable to the plaintiffs. 15 U.S.C.S. § 78u-4(f)(2)(A) (2004). If that should happen, Loewen Group would be dismissed, because plaintiffs would be guaranteed recovery from the jointly and severally liable individual defendant. *Czuba,* 146 B.R. at 229-30 (holding that defendant employer's joint and several liability for its bankrupt employee's sexual harassment rendered the bankrupt employee an unnecessary party). Second, if this Court were to grant plaintiffs summary judgment, concluding that the individual defendants were 100% or 0% at fault, Loewen Group would have to be dismissed. In the former case, Loewen Group would not be liable for anything at all, and the uncollectible share provision could not operate. In the latter case, Loewen Group would be solely liable, and the § 524(a) injunction would prevent plaintiffs from recovering on their judgment.

The *Czuba* and *Catania* courts--both district courts--required plaintiff to pay debtor defendant's "reasonable costs of defense" if no third party would agree to bear those costs. *Catania,* 94 B.R. at 253; *Czuba,* 146 B.R. at 229. However, all the Courts of Appeals that have addressed the issue squarely have rejected this requirement. *Green,* 956 F.2d at 34; *In re Walker,* 927 F.2d 1138, 1142 (10th Cir.1991); *Jet Florida Sys.,* 883 F.2d at 976.

I adopt the reasoning of the *Green, Walker* and *Jet Florida Systems* courts and hold that plaintiffs in this case are not required to pay Loewen Group's legal expenses. [FN12] By virtue of the § 524(a) discharge injunction, plaintiffs cannot collect on any judgment against Loewen Group. Therefore, there is no reason for Loewen Group to defend itself in court; plaintiffs can do nothing to threaten Loewen Group's fresh start. If Loewen Group wishes to defend its reputation, it must do so at its own expense. Nor may Loewen Group seek compensation for the time and effort it expends complying with plaintiffs' discovery requests. *See In re Pappas,* 106 B.R. 268, 271

Not Reported in F.Supp.2d                                                                    Page 20
2004 WL 1853137 (E.D.Pa.)
**(Cite as: 2004 WL 1853137 (E.D.Pa.))**

(Bankr.D.Wyo.1989) (holding that time debtor defendant loses because of litigation is not compensable).

> FN12. *Edgeworth* is unpersuasive on this issue. The *Edgeworth* defendant's insurance company bore the cost of the defense so the statement that plaintiff would have to cover the costs of defense if no third party did is dicta. *Edgeworth,* 993 F.2d at 54.

F. Section 20(a) Claims

The individual defendants moved to dismiss the entire complaint but did not make any arguments specific to the Section 20(a) claims. A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud. *In re MobileMedia Secs. Litig.,* 28 F.Supp.2d 901, 940 (D.N.J.1998). Plaintiffs alleging a Section 20(a) violation must plead facts showing a primary violation of the securities fraud laws by the company and circumstances establishing the individual defendants' control over the company. *Id.*

I have already held that plaintiffs have pleaded several Section 10(b) violations by Loewen Group. I need only consider whether plaintiffs have pleaded control by Loewen and Wagler. Claims under Section 20(a) are not subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) or the Reform Act. *Tel-Save,* 1999 U.S. Dist. LEXIS 16800, at * 18-19. The pleading of facts that "support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator" will survive a motion to dismiss. *Id.,* quoting *In re Health Mgmt. Inc. Sec. Lit.,* 970 F.Supp. 192, 205 (E.D.N.Y.1997). The new complaint alleges that Loewen and Wagler possessed control over the company due to their executive, managerial and/or directorial positions and their shareholdings in the company. New compl. ¶ 197. It also alleges that Loewen and Wagler exercised the control to cause the company to commit securities fraud. *Id.*

**\*27** For each of the sufficiently pleaded Section 10(b) violations plaintiffs have pleaded Section 20(a) violations by Loewen and Wagler. For those Section 10(b) claims that will be dismissed the corresponding Section 20(a) claims will also be dismissed.

An appropriate Order follows.

*ORDER*

AND NOW, this day of August, 2004, in consideration of defendants' motions to dismiss, plaintiffs' opposition thereto, oral argument by the parties and the various supplemental memoranda and briefs that have been filed, and for the reasons set forth in the accompanying memorandum, defendants' motions to dismiss are DENIED as to the following claims:

(1) the § 10(b) claim of materially misleading reporting of the value of Loewen Group's businesses and properties

(2) the § 10(b) claim of failure to account properly for imputed interest on zero interest finance plans;

(3) the § 10(b) claim of failure to record contingent losses on the put/call agreements with Blackstone regarding the Prime Succession and Rose Hill investments; and

(4) the § 20(a) claims related to those three § 10(b) claims.

The remainder of defendants' motions to dismiss are GRANTED. All claims for which the motions were not specifically denied are DISMISSED WITH PREJUDICE.

2004 WL 1853137 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:98CV06740 (Docket) (Dec. 29, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
John S. PEREIRA, As Trustee of Trace International
Holdings, Inc., & Trace Foam
Sub, Inc., Plaintiff-Appellee,
v.
Andrea FARACE, Frederick Marcus, Philip Smith, &
Karl Winters, Defendants-
Appellants,
Marshall S. COGAN, Robert Nelson, Saul S.
Sherman, & Tambra King, Defendants.
**No. 03-5035(L), 03-5055(CON).**

Argued: Nov. 12, 2004.
Decided: June 30, 2005.

**Background:** Chapter 7 trustee brought adversary
proceeding against corporate debtor's former chief
executive officer (CEO), its officers and directors for
their alleged self-dealing or breach of fiduciary duty.
The United States District Court for the Southern
District of New York, Sweet, J., denied defendants'
request for jury trial and ruled that they had breached
their fiduciary duties. Appeal was taken.

 **Holdings:** The Court of Appeals, McLaughlin,
Circuit Judge, held that:
 (1) relief sought by Chapter 7 trustee on his breach
of fiduciary duty claims against former officers and
directors of debtor-corporation for allegedly allowing
debtor's chief executive officer (CEO) to engage in
certain purportedly improper transactions unchecked,
consisting of money judgment against officers and
directors based upon CEO's unauthorized borrowing,
excessive compensation and the like, had to be
regarded as legal remedy in nature of "compensatory
damages," rather than as "restitution," for Sixth
Amendment jury trial purposes;
 (2) trustee did not waive claim for money damages;
and
 (3) trustee could not bring duty of care claims.
Vacated and remanded.

Newman, Circuit Judge, concurred and filed opinion.

Defendants, corporate officers and directors, appeal
from a judgment awarding damages to plaintiff,
trustee of the corporation, following a bench trial in

the United States District Court for the Southern
District of New York (Sweet, J.). Defendants
challenge the district court's denial of their request
for a jury trial and its holding that they breached their
fiduciary duties.

Judgment Vacated and Remanded.

 Theodore J. Fischkin, LeBoeuf, Lamb, Greene &
MacRae, L.L.P., New York, N.Y. (John P. Campo &
John S. Kinzey, on the brief), for Plaintiff-Appellee.

 Guy Petrillo, Dechert, LLP, New York, N.Y., for
Defendant-Appellant Andrew Farace.

 Brian E. Mass, Frankfurt Kurnit Klein & Selz, PC,
New York, N.Y.  (Wendy Stryker, on the brief), for
Defendant-Appellant Frederick Marcus.

 Robert A. Meister, Piper Rudnick Gray Cary LLP,
New York, N.Y. (John J. Clarke, Jr. & Joshua S.
Sohn, on the brief), for Defendants-Appellants Philip
Smith and Karl Winters.

 Martin S. Kaufman & Briscoe R. Smith, Atlantic
Legal Foundation, New York, N.Y., for Amicus
Curiae Corporate Law Department's Section of the
L.A. County Bar Association, in support of
Defendant-Appellant Philip Smith.

 Before: NEWMAN, McLAUGHLIN, and POOLER,
Circuit Judges.

 Judge NEWMAN concurs in the majority opinion
and in a separate opinion.

 MCLAUGHLIN, Circuit J.

 **\*1** Defendants Andrea Farace, Frederick Marcus,
and Philip Smith  (collectively, "defendants") are
former officers and directors of Trace International
Holdings, Inc. ("Trace"), which is now in bankruptcy.
Plaintiff John Pereira is the trustee ("Trustee" or
"plaintiff") acting on behalf of Trace; he was
appointed by the bankruptcy court. Defendants now
appeal from a judgment entered against them by
Judge Robert Sweet in the United States District
Court for the Southern District of New York.

 In July 2000, the Trustee filed an amended
complaint suing defendants and other Trace officers

2005 WL 1532318                                                                   Page 2
--- F.3d ---
(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))

and directors for, *inter alia,* breach of fiduciary duty arising from their roles in Trace's financial demise. In November 2002, having denied defendants' request for a jury trial, the district court conducted a twelve-day bench trial. In an opinion dated May 8, 2003, the court held that defendants breached their fiduciary duties by allowing a number of improper transactions to take place that exhausted Trace funds. Judgment was granted to the Trustee against all defendants, who were found jointly and severally liable.

On appeal, defendants challenge the denial of their request for a jury trial, as well as the finding that they breached their fiduciary duties.

Because we agree that the district court erred in denying defendants a jury trial, we vacate the judgment below and remand for a jury trial. We also find that: (1) the Trustee did not waive his right to seek compensatory damages on remand; (2) the Trustee does not have standing to bring due care claims; and (3) the district court erred in applying the Cash Flow and Capital Adequacy test to determine insolvency.

BACKGROUND

I. *The Facts*

The facts are set forth exhaustively by the district court. *See Pereira v. Cogan,* No. 00 Civ. 619, 294 B.R. 449 (S.D.N.Y. May 8, 2003) (Sweet, *J.*) ("*Pereira III* "). We therefore summarize the background only to the extent relevant to this appeal.

Until 2000, Trace was a privately-held Delaware corporation headquartered in Manhattan. Trace served as a holding company, the primary assets of which were stock in Foamex International, Inc. ("Foamex"), United Auto Group, Inc., and CHF Industries. [SPA 51]

Marshall Cogan helped to form Trace in 1974. Since that time, he has been Trace's majority shareholder, chairman of the board of directors ("Board"), and the company's chief executive officer ("CEO"). Although Cogan's conduct lies at the heart of this case, he is not a party to this appeal. [FN1] [SPA 51-52]

Defendant Andrea Farace was a member of the Trace Board from December 1993 until December 1997. During that period, Farace also served as Trace's executive vice-president. Farace became Trace's President in December 1994, a position he held until December 1997. Although Farace was named CEO of Foamex in April 1997, his employment at Trace did not end until two months later when he assumed the Foamex position. Farace left Foamex in 1999. [SPA 51-52]

**\*2** Defendant Frederick Marcus served on Trace's Board from 1975 until 1999, and on the Trace Compensation Committee in 1997 and 1998. Between 1984 and 1997, Marcus was vice-chairman of the Board and Trace's senior managing director. [SPA 51-52]

Defendant Philip Smith, a lawyer, held numerous positions as an officer at Trace. He served as General Counsel from January 1988 until December 1999. He also served as corporate secretary and as one of Trace's vice-presidents. [SPA 54, JA 1234]

Defendant Karl Winters, a certified public accountant, was also a Trace officer. Winters worked at Trace from September 1993 to December 1999. He became a vice-president in June 1994. As such, he reported to the chief financial officer ("CFO"). [SPA 54, JA 1234]

At the core of this appeal are several transactions which effectively exhausted Trace's capital, driving Trace into bankruptcy.

Cogan's original employment agreement ("Employment Agreement") with Trace, entered into in 1987, called for Cogan to serve as chairman and CEO for a ten-year "initial term." The Employment Agreement set Cogan's compensation at $2.4 million per year, which could be increased only with Board authorization. The Employment Agreement was approved by the Board. [SPA 52-53, 55]

In 1991, Cogan unilaterally increased his annual salary to $3.6 million without Board approval. Five years later, however, upon the recommendation of the Compensation Committee and outside counsel, the Board retroactively ratified Cogan's compensation for the period between 1988 and 1994. [SPA 60-62]

In August 1997, when the ten-year Employment Agreement was about to expire, Cogan unilaterally renewed it for a second ten-year term. Despite having the right to reject the renewal, the Board was not even involved. [SPA 63-63]

From 1995 through 1998, Cogan unilaterally borrowed over $13 million from Trace. Without any input from Trace's other officers or directors, Cogan's personal lawyer drafted notes evidencing the loans. Cogan also caused Trace Inc. to make $1.7 million in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1532318                                                                                    Page 3
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

loans and gifts to his wife and other employees-- all without Board approval. [SPA 79-82]

Between 1995 and 1998, in spite of its precarious financial condition, Trace paid $5.1 million in dividends to its shareholders. Nearly $2 million of the dividend payments were made without Board approval. [SPA 73-75]

Dow Chemical Company ("Dow") owned $10 million of Trace Series A Preferred Stock. In 1997, Dow asked Trace to buy back the stock. Complying with Dow's request, Smith drafted, and Cogan signed, an agreement whereby Trace would buy back Dow's stock or cause it to be purchased by May 1998. [SPA 71-73]

By May 1998, Trace was almost $2 million in arrears on cumulative dividends due to a convertible preferred stock that ranked *pari passu* with Dow's Series A Stock. Smith was advised by a Delaware law firm that Trace could not buy back Dow's stock without first paying all the dividend arrearages. To save Trace $2 million, Smith had Cogan purchase Dow's stock with a $3 million secured loan from Trace. The preferred stock in question served as the collateral. [SPA 71- 73]

**\*3** In June 1997, Cogan spent $1 million of Trace's funds to throw himself a 60th birthday party at the Museum of Modern Art in New York. The funds were used without Board approval. The party included the screening of a film entitled "The Life of Marshall Cogan," which cost $108,000 to produce. [SPA 81- 82]

II. *Procedural History*

In July 1999, Trace filed for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. At the time, Trace's liabilities exceeded its assets by $121 million. [SPA 51]

In August 1999, the Office of the United States Trustee appointed an official unsecured Creditors' Committee on behalf of Trace. With the permission of the Bankruptcy Court, the Creditors' Committee filed a complaint in the Southern District of New York (Sweet, *J.*), against, *inter alios*, Cogan and the defendants named herein. [SPA 49-51]

On January 24, 2000, the Bankruptcy Court converted Trace's Chapter 11 reorganization into a Chapter 7 liquidation. John Pereira was appointed as

trustee. As such, Pereira replaced the creditors as plaintiff in the Southern District action. [SPA 49-50]

Pereira's complaint alleged that: (1) all Trace's officers and directors had breached their fiduciary duties to Trace under Delaware common law (Count IV); and (2) all the directors had violated Delaware General Corporation Law §§ 160 and 174(a), which prohibit the payment of dividends while the corporation is insolvent or which will render it insolvent, *see EBS Litig. v. Barclay's Global Investors, N.A.,* 304 F.3d 302, 305 (3d Cir.2002), or the redemption of stock when a corporation's capital is impaired or which will impair the corporate capital (Count V). *See* Del.Code. Ann. tit. 8, §§ 160, 174(a) (2005). [JA 96-104]

According to the complaint, Trace had been insolvent since 1995; therefore the directors and officers owed fiduciary duties to Trace's creditors as well as to its stockholders. The Trustee sought damages for: (1) Cogan's unauthorized borrowing of over $13 million from Trace; (2) Cogan's unauthorized loans and gifts to other insiders; (3) Cogan's excessive compensation; (4) Cogan's unilateral renewal of his employment agreement; (5) payment of dividends without Board approval and at a time when Trace's capital was impaired; (6) a $3 million redemption of Trace preferred stock when capital was impaired; *and* (7) use of over $1 million in corporate funds for Cogan's birthday party. [JA 96-104]

Prior to trial, defendants demanded a jury trial on Counts IV and V. The Trustee responded that he was seeking the equitable remedy of restitution on Counts IV and V (despite his request for compensatory damages in the complaint). In *Pereira v. Cogan,* No. 00 Civ. 619, 2002 WL 989460 (S.D.N.Y. May 10, 2002) ("*Pereira II* "), Judge Sweet found that Counts IV and V did not constitute a suit "at law," within the meaning of the Seventh Amendment of the United States Constitution. He reasoned that: (1) actions for breach of fiduciary duty were historically equitable; and (2) the Trustee was in fact seeking restitution. *Id.* at \*2-4. Based on these findings, the court denied defendants' request for a jury trial. *Id.*

**\*4** After a twelve-day bench trial, Judge Sweet found defendants liable for mismanaging Trace. *Pereira III,* 294 B.R. at 449. Specifically, the court found that defendants had: (1) disregarded corporate governance procedures, *id.* at 500, 532; (2) turned a "blind eye" to Cogan's actions, *id.* at 463; and, therefore (3) breached the fiduciary duties owed to

2005 WL 1532318                                                                                      Page 4
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

both Trace's shareholders and its creditors, *id.* at 539.

In holding that defendants had breached their fiduciary duties to the creditors, the district court found that Trace was insolvent or, at least, in the vicinity of insolvency at the time of defendants' improper acts. The district court applied two insolvency formulas: (1) a balance sheet test, which was agreed upon by both the Trustee's and defendants' experts; and (2) a Cash Flow and Capital Adequacy test ("Cash Flow test"), which was advocated only by the Trustee's expert. [SA 105-07]

Additionally, the court held the director-defendants liable for their issuance of improper dividends and for allowing the Dow redemption to occur. Specifically, the court found that the director-defendants violated: (1) Delaware General Corporation Law § 174, which prohibits the payment of a stock dividend while a corporation is insolvent, or one that renders a company insolvent; and (2) Delaware General Corporation Law § 160, which prohibits the redemption of stock "when the capital of [a] corporation is impaired or when such ... redemption would cause any impairment of the capital of the corporation." *See Id.* at 541.

The court also held that the exculpatory clause in Trace's Articles of Incorporation, which shields directors from liability to Trace for the breach of the duty of care, was inapplicable because the Trustee had brought the action for the benefit of the creditors, not Trace. *Id.* at 533-34; *Pereira v. Cogan,* No. 00 Civ. 619, 2001 WL 243537, at *9-10 (S.D.N.Y. Mar. 8, 2001) ("*Pereira I* "). In so holding, the district court rejected the director-defendants' argument that the "[e]xculpatory [c]lause is inapplicable only to claims by individual creditors, which the Trustee lacks standing to assert." *Pereira III,* 294 B.R. at 534.

Finally, observing that the majority of the challenged transactions were not the subject of board action the district court declined to apply the "business judgment rule" to protect the director-defendants. *Id.* at 530-31. The court thus required defendants to show that each transaction was "entirely fair" to Trace, which they failed to do. *Id.* at 529.

The court entered judgment against defendants as follows: (a) Marcus was liable for $37.4 million; (b) Farace for $27.3 million; (c) Smith for $21.4 million; and (d) Winters for $21.4 million.

Defendants Marcus, Farace, and Smith appeal this judgment. [FN2]

DISCUSSION

Defendants raise a sandstorm of claims on appeal. However, our focus on this appeal is their principal argument: whether the district court erred in denying them a jury trial on Counts IV and V. On the merits, defendants argue that the court made numerous errors in finding them liable for breach of their fiduciary duty under Delaware common law (Count IV) and Delaware statutory law (Count V).

**\*5** We address each argument in turn to the extent necessary in light of our decision to reverse the denial of a jury trial.

I. *Jury Trial*

Defendants argue that they were entitled to a jury trial on the Trustee's breach of fiduciary duty claim because the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution. For the reasons stated below, we agree.

[1] We review *de novo* a district court's decision to deny a jury trial. *See Brown v. Sandimo Materials,* 250 F.3d 120, 125 (2d Cir.2001).

Although Rule 2 of the Federal Rules of Civil Procedure grandly proclaims that "[t]here shall be one form of action to be known as 'civil action' ' thereby causing the merger of law and equity, the distinction "retains its viability" today. *New York v. White,* 528 F.2d 336, 338 (2d Cir.1975). By preserving the right to a jury trial only in "suits at common law," the Seventh Amendment of the United States Constitution perpetuates the law/equity dichotomy. U.S. Const. amend. VII. Indeed, the phrase "suits at common law" refers to "suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized and equitable remedies [are] administered." *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (quoting *Parsons v. Bedford,* 28 U.S. (3.Pet.) 433, 447 (1830)). Therefore, despite the near universal merger of law and equity effectuated by Federal Rule of Civil Procedure 2, trial by jury remains today "the sword in the bed that prevents the complete union of law and equity." *Fredal v. Forster,* 9 Mich.App. 215, 156 N.W.2d 606, 612 (Mich.1967) (quoting an unpublished lecture by the redoubtable Professor Zechariah Chafee, Jr., late of Harvard University Law School).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1532318                                                                                      Page 5
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

The right to trial by jury has long been an important protection in the civil law of this country. According to the Founding Fathers, the right served as "an important bulwark against tyranny and corruption." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 343, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehquist, *J.,* dissenting). As then-Justice Rehnquist reminded us: "Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense, the 'passional elements in our nature,' and thus keep the administration of law in accord with the wishes and feelings of the community." *Id.* at 343-44 (Rehquist, *J.,* dissenting) (quoting O. Holmes, *Collected Legal Papers* 237 (1920)).

[2][3] In deciding whether a particular action is a suit at law that triggers this important protection, we are instructed to apply the two-step test set forth in *Granfinanciera,* 492 U.S. at 42. *First,* we ask "whether the action would have been deemed legal or equitable in 18th century England." *Germain v. Connecticut Nat'l Bank,* 988 F.2d 1323, 1328 (2d Cir.1993) (citing *Granfinanciera,* 492 U.S. at 42). *Second,* " 'we examine the remedy sought and determine whether it is legal or equitable in nature.' " *Granfinanciera,* 492 U.S. at 42 (quoting *Tull v. United States,* 481 U.S. 412, 417-18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)). We then "balance the two, giving greater weight to the latter." *Germain,* 988 F.2d at 1328 (citing *Granfinanciera,* 492 U.S. at 42).

A. *Step 1: Legal or Equitable Action in 18th Century England?*

**\*6** [4] After three decades of grappling with the law versus equity analysis, the late Justice William Brennan threw up his hands. He had wearied of "rattling through dusty attics of ancient writs" and suggested that Seventh Amendment jurisprudence should sever its dependence on historical analogies to English common law as it existed in 1791. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 574-75, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (Brennan, *J.,* concurring). However much we may sympathize with his position, Justice Brennan's suggestion has gone unheeded, and thus, we are left to scour through the "dusty attics" ourselves.

Count IV, brought pursuant to Delaware common law, alleges a claim for breach of fiduciary duty. Count V, which seeks damages against Farace and Marcus for allowing payment of dividends while Trace's capital was impaired, is a claim for breach of

Delaware General Corporation Law § 174(a). Nevertheless, Count V is analogous to a breach of fiduciary duty claim, and was properly treated as such by the district court.

In analyzing Counts IV and V, the district court concluded that "[t]he general rule is that 'actions for breach of fiduciary duty, historically speaking, are almost uniformly actions "in equity"--carrying with them no right to trial by jury." ' *Pereira II,* 2002 WL 989460, at \*3. (quoting *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,* 2001 WL 863552, at \*4 (S.D.N.Y. July 30, 2001)). The court thus believed that the first step of the *Granficiera* test tilted in favor of denying defendants a jury trial.

We accept the district court's statement that as a "general rule" breach of fiduciary duty claims were historically within the jurisdiction of the equity courts. *See Terry,* 494 U.S. at 567 (citing 2 J. Story, *Commentaries on Equity Jurisprudence* § 960, at 266 (13th ed. 1886) and *Restatement (Second) of Trusts* § 199(c) (1959)). Defendants emphasize, however, that this was and is only a general rule. They contend that under *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), "[t]he Seventh Amendment question depends on *the nature of the issue* to be tried rather than the character of the overall action." *Id.* at 538 (emphasis added); *see also Halladay v. Verschoor,* 381 F.2d 100, 109 (8th Cir.1967) ("Ordinarily, enforcement of administration of trusts and proceedings involving trusts are subjects for equity jurisdiction, but where the basic nature of the claims present only legal issues, it is entirely proper ... to treat the case as one belonging on the law docket."); *DePinto v. Provident Sec. Life Ins. Co.,* 323 F.2d 826, 837 (9th Cir.1963) ( "[W]e hold that where a claim of breach of fiduciary duty is predicated upon underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is ... a jury question.").

Applying the "nature of the issues" test, defendants maintain that the issues in Counts IV and V are negligence-based because Delaware applies a "gross negligence" standard to breach of fiduciary duty claims. Because negligence is historically a legal claim, *see Ross,* 396 U.S. at 542, defendants assert they are entitled to a jury trial under the Seventh Amendment.

**\*7** Judge Sweet rejected this argument. He cautioned that defendants' interpretation of *Ross* would effectively permit every breach of fiduciary duty

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1532318                                                                 Page 6
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

claim to be recast as an action at law such that "parties seemingly would be entitled to a jury trial on any and all breach of fiduciary duty claims." *Pereira II,* 2002 WL, at *3.

We agree with Judge Sweet that defendants mischaracterize the holding of *Ross.* In *Ross,* shareholders brought a derivative suit against corporate directors, alleging breach of fiduciary duty, breach of contract, and gross negligence. *Ross,* 396 U.S. at 531. Although shareholder derivative claims had been traditionally heard in equity, the Supreme Court found a right to a jury trial because plaintiff's claims presented legal issues--breach of contract and negligence. *Id.* at 542. Despite defendants' claim that *Ross* requires us to break the Trustee's breach of fiduciary duty claim into its most elemental parts, *Ross* merely requires courts to look beyond the procedural vehicle of a shareholders derivative suit to the possible legal nature of the corporation's underlying claims. *Id.* at 540 (noting that "nothing turns upon the form of the action or the procedural device by which the parties happened to come before the court").

We decline, therefore, to adopt defendants' expansive interpretation of *Ross.* Accordingly, we hold that Counts IV and V would have been equitable in 18th century England and thus that step one of *Granfinanciera* weighs against a jury trial.

B. *Step 2: Nature of Relief Sought*

[5] The second step of the *Granfinanciera* test focuses on the nature of the relief sought. *Granfinanciera,* 492 U.S. at 42. It calls upon us to decide whether the "type of relief [sought] was available in equity courts as a general rule." *Rego v. Westvaco Corp.,* 319 F.3d 140, 145 (4th Cir.2003). This step is accorded "greater weight" than the first, *Germain,* 988 F.2d at 1328, and, as such, is the "more important" step. *Granfinanciera,* 492 U.S. at 42.

In his prayer for relief, the Trustee sought "compensatory damages," which is, of course, the classic form of *legal* relief. The district court, however, "looked beyond [the Trustee's] characterization[ ] to what the claim for relief actually [was]." *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477-78, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."). The district court then went on to determine that the Trustee had, in fact, *actually* "limited his relief to restitution," which is equitable in

nature. *Pereira III,* 294 B.R. at 544. In so doing the district court concluded that "the fact that the officers and directors never personally possessed any of the disputed funds [does] not militate that the relief [is] not equitable." *Id.* at 544-45 (internal footnote and citation omitted).

On appeal, defendants challenge the court's characterization of the relief as equitable. They emphasize that, because they never possessed the funds in question and thus were not unjustly enriched, the remedy sought against them cannot be considered equitable. Rather, according to defendants, the remedy sought was legal and thus they were entitled to a jury trial. We agree.

**\*8** We have to concede that our decision in *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138 (2d Cir.1999), points to a contrary result. In *Strom,* we characterized as equitable the monetary relief sought by plaintiff for defendant's alleged breach of fiduciary duty even though the defendant did not actually *possess* the funds in question. *Id.* at 144. We wrote that "plaintiff's claim is based on the alleged breach of a fiduciary duty, a claim that always has been within the exclusive jurisdiction of equity and that never has required a showing of unjust enrichment because the theory of the action is entirely different." *Id.* at 145 (footnote omitted). We also found that "[t]he absence of unjust enrichment here therefore is not inconsistent with accurate characterization of the relief plaintiff seeks as 'equitable.' " *Id.*

Two years later, however, the Supreme Court's decision in *Great-West Life & Annuity Insurance Company v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), reconfigured the legal landscape of restitution. In *Great-West,* the Supreme Court stated that, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property *in the defendant's possession.*" *Id.* at 214 (footnote omitted) (emphasis added). This reasoning cuts across the grain of *Strom.* Indeed, several courts have already agreed that *Great-West* has overruled our decision in *Strom. See, e.g., Callery v. United States Life Ins. Co.,* 392 F.3d 401, 408 (10th Cir.2004) (stating that "the Supreme Court has rejected [*Strom* 's] broad definition of 'equitable remedy' "); *Bona v. Barasch,* No. 01 Civ. 2289, 2003 WL 1395932, at *11 (S.D.N.Y. Mar. 20, 2003); *De Pace v. Matsushita Elec. Corp. of Am.,* 257 F.Supp.2d 543, 563 (E.D.N.Y.2003); *Kishter v. Principal Life Ins. Co.,* 186 F.Supp.2d 438, 443 (S.D.N.Y.2002) (stating that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---
(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))

"the Second Circuit's reasoning in *Strom* has been superseded by *Great-West* "); *Augienello v. Coast-to-Coast Fin. Corp.,* No. 01 Civ. 11608, 2002 WL 1822926, at *6 (S.D.N.Y. Aug.7, 2002),* aff'd,* 64 Fed. Appx. 820 (2d Cir.2003) (unpublished summary order); *see also Rego v. Westvaco Corp.,* 319 F.3d 140, 145 (4th Cir.2003) (noting that the "[t]he Supreme Court has squarely rejected" the argument that "actions for breach of fiduciary duty by a trustee could only be brought in equity").

The Trustee contends that the holding of *Great-West* is inapplicable here because *Great-West* involved only non-fiduciary defendants. In *Callery,* the Tenth Circuit rejected this same argument. 392 F.3d at 409. That court found that, while the "distinction made in *Strom* ... based on the status of the defendant as a fiduciary ... may have been compelling before *Great-West,* [it is] not so now." *Id.* (positing that "we must adhere to the Supreme Court's rather emphatic guidance [in *Great-West* ]"); *see also McLeod v. Oregon Lithoprint Inc.,* 102 F.3d 376, 378 (9th Cir.1996) ("[T]he status of the defendant, whether fiduciary or nonfiduciary, does not affect the question of whether damages constitute 'appropriate equitable relief.' ").

**9** Like our sister circuits, we are compelled to read *Great-West* as broadly as it is written. Nor can we ignore the Supreme Court's inclusion of footnote 2, highlighting a single exception to its rule that a defendant must possess the funds at issue for the remedy of equitable restitution to lie against him. *Great-West,* 534 U.S. at 214 n. 2. (That "limited exception" is for "an accounting of profits," which, of course, is not relevant to this case. *Id.*)

Finally, Justice Ginsburg's dissent in *Great-West* offers further guidance by pointing out that restitution is measured by a defendant's "unjust gain, rather than [by a plaintiff's] loss." *Id.* at 229 (Ginsburg, *J.,* dissenting) (citing 1 D. Dobbs, *Law of Remedies* § 12.1(1), at 9). It is undeniable here that the Trustee seeks only to recover funds attributable to Trace's loss, not the director's unjust gain.

We thus hold that the district court improperly characterized the Trustee's damages as restitution. Plaintiff's claim is for compensatory damages--a legal claim. *See Terry,* 494 U.S. at 570. Because we afford "greater weight" to *Granfinanciera* 's second step than to its first, we conclude that defendants were entitled to a jury trial on the Trustee's breach of fiduciary duty claims and we remand for that purpose.

II. *Additional Issues*

Defendants raise a plethora of other issues on appeal. Because we are remanding for a jury trial we see no need to resolve all of these issues. However, these issues were fully briefed and may recur, so we briefly address three of them: (1) whether the Trustee has waived his right to non-equitable damages; (2) the Trustee's standing to assert the rights of the creditors; *and* (3) the correct insolvency standard.

[6] We review *de novo* a district court's legal conclusions. *See Travelers Int'l A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1574 (2d Cir.1994).

[7] Because Trace is incorporated in Delaware we apply Delaware law to the questions presented to us. *See generally EBS Litig. v. Barclay's Global Investors, N.A.,* 304 F.3d at 305 (applying Delaware law under similar circumstances); *McCall v. Scott,* 250 F.3d 997, 999 (6th Cir.2001) (same).

A. *Waiver*

[8] Defendants maintain that the Trustee has waived any claim for money damages. They base this argument on the Trustee's abandonment of his request for "compensatory damages" in favor of equitable restitution, which the defendants allege the Trustee did in order to defeat defendants' jury trial request. We reject defendants' argument.

Given our holding that the Trustee sought (and, indeed, properly alleged in his complaint) compensatory damages, it would be wholly inequitable-- particularly in this era of relaxed pleading rules--to preclude him from seeking such damages on remand merely because he advocated for restitution on the jury trial issue.

Accordingly, we hold that the Trustee did not waive his right to seek compensatory damages on remand.

B. *Trustee Standing*

**10** [9] The director-defendants argue that both Trace's Certificate of Incorporation and Delaware law shield them from any money damages rooted in a violation of the director's duty of care. More particularly, they contend that the Trustee, as legal successor to Trace, lacks standing to bring due care claims as he too is bound by the Certificate. We agree.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1532318                                                                          Page 8
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

Delaware General Corporation Law § 102(b)(7) authorizes corporations to adopt a charter provision shielding directors from the payment of monetary awards based on *breaches of the duty of care. See* Del.Code Ann. tit. 8, § 102(b)(7) (2005). Trace adopted just such an "exculpatory" clause. It states:

> To the fullest extent permitted by the General Corporation Law, as the same presently exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the *director's duty of loyalty* to the Corporation or its stockholders, (ii) for acts or omissions not in *good faith* or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

(emphasis added). This clause makes it abundantly clear that directors are shielded from liability for breaches of the duty of care, but not for (1) improper dividends or redemptions, *see id.* § 174, or (2) breaches of the duties of good faith or loyalty.

The Trustee argues, and the district court agreed, that despite the existence of the exculpatory clause, the Trustee could bring a claim for breach of the duty of care *on behalf of the creditors,* rather than the corporation. The court reasoned that "where the injury is to all creditors as a class, it is the creditors who lack standing and the Trustee who may bring a claim based on that generalized injury." *Pereira I,* 2001 WL 243537, at *11 (citing *Kalb Vorhis & Co. v. Am. Fin. Co.,* 8 F.3d 130, 132-33 (2d Cir.1993), and *St. Paul Fire & Marine Ins. Co. v. Pepsico. Inc.,* 884 F.2d 688, 696-99 (2d Cir.1989)). While this proposition may be true--because claims that injure all creditors as a class normally belong to the corporation, *see Production Resources Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 792-93 (Del.Ch.2004)--it does not imply that the Trustee's rights are greater than the rights the corporation would have against malfeasant directors.

[10][11][12] "Under the Bankruptcy Code [a] trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991). Thus, "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt

corporation itself." *Id.* at 118 (citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)). Although corporate officers and directors owe fiduciary duties to creditors when a corporation is insolvent in fact, *see Geyer v. Ingersoll Pubs. Co.,* 621 A.2d 784, 787-88 (Del.Ch.1992), these duties do not expand the circumscribed rights of the *trustee,* who may only assert claims of the bankrupt corporation, not its creditors, *see Production Resources,* 863 A.2d at 795.

 **\*11** In *Production Resources,* the Delaware Chancery court considered a similar issue. The court held that an exculpatory charter provision precluded creditor claims predicated on mismanagement--*i.e.,* duty of care violations--but did not preclude claims based on deliberate wrongdoing--*i.e.,* duty of loyalty violations. *Id.* at 793-95. In so holding, the court found that the breach of fiduciary duty claim belonged to the corporation and not the individual creditors. *Id.* at 776, 792-93. Thus the creditors could raise these claims only derivatively. *Id* . And "[a]lthough § 102(b)(7) itself does not mention creditors specifically, its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors." *Id.* at 793 (footnote omitted). Therefore, the exculpatory clause applied to defeat the creditors' due care claim. *Id.* at 793-95; *see also Continuing Creditors Comm. of Star Telecomm., Inc. v. Edgecomb,* No. Civ. A. 03-278-KAJ, 2004 WL 2980736, at * 11-13 (D.Del. Dec.21, 2004) (applying *Production Resources* to bar claims in bankruptcy premised on breach of the duty of due care).

 In this case, because breach of fiduciary duty claims belong to the corporation, they are subject to the exculpatory clause defense even when pressed by a trustee. We hold, therefore, that the exculpatory clause in Trace's Certificate of Incorporation precludes the Trustee from bringing any due care claims seeking monetary awards against the directors, whether brought on behalf of the creditors or Trace itself.

C. *Insolvency Standard*

[13] Defendants suggest that the district court applied an incorrect standard to determine "cash" insolvency. Specifically, they allege that the court erred by adopting the Trustee's expert's testimony concerning Delaware law on insolvency and consequently erred in determining the extent of Trace's financial distress during the period at issue.

2005 WL 1532318                                                                                                 Page 9
--- F.3d ---
(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))

With respect to the district court's use of the Trustee's expert's Cash Flow test in determining insolvency, we agree with defendants. However, the Cash Flow test may prove useful in addressing those claims not dependent on a finding of insolvency.

Under Delaware Law, the financial status of a corporation serves as the benchmark in deciding when certain duties arise and whether questioned transactions, such as the issuance of dividends and stock redemptions, are improper. *See generally* Del.Code Ann. tit. 8, § § 160, 174(a) (2005).

[14] Delaware courts define insolvency in two ways. *See* *United States Bank Nat'l Ass'n v. United States Timberlands Klamath Falls, LLC,* 864 A.2d 930, 947-48 (Del.Ch.2004), *vacated on other grounds,* No. 36, 2005, 2005 WL 1353766 (Del. June 6, 2005). "First, a company is insolvent if it is unable to pay its debts as they fall due in the usual course of business. Second, a company may be insolvent if it has liabilities in excess of a reasonable market value of assets held." *Id.*

*12 In evaluating Trace's financial status, the district court applied the Cash Flow test that "look[ed] not only at Trace's ability to pay its current maturing obligations as they came due, but also the ability to meet cash and capital requirements in the future, including those required to repay the additional borrowings that were being incurred to fund Trace's cash flow deficits." *Pereira III,* 294 B.R. at 501. Based on this test, the court found that Trace was insolvent.

The Cash Flow test does not accord exactly with either Delaware definition. The Cash Flow test projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at whether the corporation has been paying bills on a timely basis and/or whether its liabilities exceed its assets. Therefore, the Cash Flow test cannot assist a trier of fact in determining whether a corporation is insolvent under the applicable Delaware law. However, because a showing of insolvency is not required for a finding of liability on two of the Trustee's remaining claims-- *i.e.,* the improper redemption and dividends claims--it is likely that portions of the Trustee's expert's Cash Flow test testimony will be useful to the jury when it considers these claims. The district court should determine this issue in the first instance.

Additionally, Trace's financial status will be an issue in determining whether the officers and directors violated Delaware General Corporation Law § § 160 and 174(a). The financial standards necessary to make a finding of liability under these two sections differ greatly. However, upon review of the record, the district court set forth the appropriate standards, *i.e.,* that directors may not authorize dividends while a corporation is insolvent or that would render the corporation insolvent and that a corporation may not redeem its own stock if its capital is impaired or would be impaired by the redemption--and we have no reason to believe that the court will not do the same when instructing the jury on remand.

CONCLUSION

For the reasons stated above, we VACATE the judgment of the district court and REMAND the case for a jury trial consistent with this opinion.

JON O. NEWMAN, Circuit Judge, concurring.

Whether a jury is available for a claim against a fiduciary for money damages for breach of fiduciary duties is, for me, a close question. The Court is confident that a jury trial is available. I find that proposition at odds with centuries of equitable proceedings involving claims against trustees, estate executors, and other fiduciaries, although I acknowledge that the proposition finds some support in the two cases from the 1960s cited by the Court and, more significantly, in the dictum recently stated by the Supreme Court in *Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). Although that statement is dictum, I reluctantly agree that we should follow it, and therefore concur. I think it useful, however, to indicate that the issue is far closer

*13 It is literally black letter law, as set forth in the Restatement (Second) of Trusts, that remedies against a fiduciary, such as a trustee, are exclusively equitable, with an exception, inapplicable in the pending case, for recovery of (1) a fixed sum of money that the fiduciary is under a duty to pay immediately and unconditionally or (2) a chattel that the fiduciary is under a duty to transfer immediately and unconditionally:

§ 197 Nature of Remedies of Beneficiary
Except as stated in § 198, the remedies of the beneficiary against the trustee are *exclusively equitable.*

§ 198 Legal Remedies of Beneficiary
(1) If the trustee is under a duty to pay money

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

immediately and unconditionally to the beneficiary, the beneficiary can maintain an action at law against the trustee to enforce payment.
(2) If the trustee of a chattel is under a duty to transfer it immediately and unconditionally to the beneficiary and in breach of trust fails to transfer it, the beneficiary can maintain an action at law against him.

Restatement (Second) of Trusts § § 197, 198 (1959) (emphasis added).

As the Restatement makes clear, the remedy at law for payment of a sum of money immediately and unconditionally due the beneficiary applies to money in the hands of the trustee that is being wrongfully withheld. An example is money to be paid to a trust beneficiary upon reaching a specified age. *See* Restatement (Second) Trusts, § 198, illustration 1. Apart from this exception, it is black letter law that the beneficiary has an equitable remedy to compel the trustee to redress a breach of trust:

§ 199 Equitable Remedies of Beneficiary
The beneficiary of a trust can maintain a suit
...
(c) to compel the trustee to redress a breach of trust[.]

§ 205 Liability in Case of Breach of Trust
If the trustee commits a breach of trust, he is chargeable with
(a) any loss ... in the value of the trust estate resulting from the breach of trust[.]
Restatement (Second) Trusts § § 199, 205.

A leading encyclopedia states the matter in similar language:
A trustee may be sued in equity, upon misapplication of trust funds, for a breach of trust, and, indeed, the remedies available to the beneficiaries of a testamentary trust against the trustee for a breach of trust are *exclusively equitable.* An action by beneficiaries for a breach of trust is an equitable proceeding, *even if money damages are the only remedy sought.*
76 Am.Jur.2d § 598, at 627-28 (footnotes omitted) (emphases added).

A leading treatise echoes the point:

§ 199. Equitable Remedies of Beneficiary
A court of equity, having jurisdiction over the administration of trusts, will give the beneficiaries of a trust such remedies as are necessary for the protection of their interests.... These remedies

include ... redress for breach of trust.
III William F. Fratcher, *Scott on Trusts* § 199, at 203-04 (4th ed.1988).

Abundant case law supports the ability of the victims of a breach of fiduciary duties to obtain money damages in equity from a defendant in breach of fiduciary duties. *See, e.g., In re Interborough Consolidated Corp.,* 288 F. 334 (2d Cir.1923); *Masters v. Bissett,* 101 Or.App. 163, 790 P.2d 16, *modified on other grounds,* 102 Or.App. 289, 794 P.2d 445 (1990) *Magill v. Dutchess Bank and Trust Co.,* 150 A.D.2d 531, 541 N.Y.S.2d 437 (2d Dep't 1989); *Estate of Rothko,* 84 Misc.2d 830, 887, 379 N.Y.S.2d 923, 978 (N.Y.Sur.1975) (surrogate required trustee to pay $6,464,880 in damages to trust beneficiaries), *mod. on other grounds,* 56 A.D.2d 499, 392 N.Y.S.2d 870 (1st Dep't), *aff'd,* 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291 (1977).

**\*14** Despite the sweep of the pronouncements in the Restatement, the American Jurisprudence encyclopedia, and the Scott treatise, and the decisions that have awarded money damages in equity against fiduciaries in breach of their fiduciary duties, some decisions have made a distinction between claims against a fiduciary in equity and claims against a fiduciary at law. "Where ... the beneficiaries of a trust sue the trustee in order to restore funds to the trust, the action is considered equitable in nature." *Allard v. Pacific National Bank,* 99 Wash.2d 394, 400-401, 663 P.2d 104, 108 (1983) (citing *Baldus v. Bank of California,* 12 Wash.App. 621, 530 P.2d 1350 (1975); *Spitznass v. First National Bank,* 269 Or. 676, 525 P.2d 1318 (1974)). The restoration of funds to the trust is often referred to as a "surcharge." *Allard,* 99 Wash. at 401, 169 P. 828 (citing *Lockwood v. OFB Corp.,* 305 A.2d 636, 638 (Del.Ch.1973)). On the other hand, "[w]here the beneficiaries seek recovery for themselves personally, the action is considered legal in nature." *Id. at 400,* 169 P. 828 (citing *Brys v. Pratt,* 55 Wash.2d 122, 104 P. 169 (1909)).

In the pending case, the Court cites two court of appeals decisions from the 1960s in support of the proposition that a jury is required in a suit involving a trust or a fiduciary where only "legal issues," *Halladay v. Verschoor,* 381 F.2d 100, 109 (8th Cir.1967), or a claim "actionable in a direct suit at common law," *DePinto v. Provident Security Life Insurance Co.,* 323 F.2d 826, 837 (9th Cir.1963), are involved. *Halladay* strikes me as rather weak authority for a jury right in claims against a fiduciary because the Court noted that the complaint against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1532318                                                                      Page 11
--- F.3d ---
**(Cite as: 2005 WL 1532318 (2nd Cir.(N.Y.)))**

the defendant "failed to allege any specific averments of fiduciary relationship between the parties." *Halladay,* 381 F.3d at 109. *DePinto* broadly states that "where a claim of breach of fiduciary duty is predicated on underlying conduct, such as negligence, which is actionable in a direct suit at common law, the issue of whether there has been such a breach is ... a jury question." 323 F.2d at 837. That statement, if followed literally, would authorize jury trials for countless surcharge actions against trustees and executors, normally litigated on the equity side, because it is not uncommon for a claim of breach of fiduciary duties to include an allegation that the breaching fiduciary was negligent.

 More relevant, it seems to me, is the discussion in Ross v. Barnhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), which upheld a right to jury trial for a shareholder's derivative suit. In ruling for a jury trial, the Court said:
   [T]he corporations claim is, at least in part, a legal one. The relief sought is money damages. There are allegations in the complaint of breach of fiduciary duty, but there are also allegations of ordinary breach of contract and gross negligence. The corporation, had it sued on its own behalf, would have been entitled to a jury's determination, at a minimum, of its damages against its broker under the brokerage contract and of its rights against its own directors because of their negligence. Under these circumstances it is unnecessary to decide whether the corporations' other claims are also properly triable to a jury.
 **\*15** *Id.* at 542-43. Although the Court does not decide whether the other claims, *i.e.,* the breach of fiduciary duty claims, are triable to a jury, a reasonable inference from the introduction of the law claims with the word "but," in distinction to the breach of fiduciary claims is that the latter, standing alone, would not require a jury.

 Even if the isolated state court cases such as *Spitznass* and *Brys,* cited above, are correct in requiring a jury for a claim against a trustee for damages for the personal benefit of a plaintiff, as distinguished from a claim to replenish a trust, I have difficulty understanding why the issue of whether a fiduciary has breached his duties requires a jury when the defaulting trustee must pay money to a claimant but does not require a jury in a typical surcharge action when the trustee must pay the same amount of money to the trust for the same breach of duty.

 Despite the sweep of the language from the Restatement supporting actions in equity against

fiduciaries for breach of their duties and the rarity of decisions requiring a jury for such claims, I am persuaded that the Supreme Court's dictum in *Great-West,* sends a signal that should not be ignored. The Court there stated: "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds in the defendant's possession." *Great-West,* 534 U.S. at 214 (footnote omitted). The statement is dictum with respect to an action against a fiduciary because the defendant in *Great-West* was not a fiduciary. But the Court appears to be little concerned with the nature of the defendant and critically concerned with whether the defendant is being compelled to disgorge specific, traceable funds in his possession, in which case the action is in equity, or to pay money out of his pocket, *i.e.,* damages, to a claimant. Restitution of the latter type, the Court states, requires a jury. In my view, this broad assertion of a jury right is at odds with numerous traditional equity actions that have historically been brought and currently are being brought in probate courts throughout the country without juries. Nevertheless, the Supreme Court has asserted that the availability of the jury turns on whether the funds being sought are in the defendant's possession, and I am obliged to follow that guidance.

 Since the funds being sought in the pending case are not in the defendant's possession, the claim appears to require a jury under *Great-West,* notwithstanding that the basis of the claim is breach of fiduciary duties. For these reasons, I concur in the Court's opinion.

> FN1. Cogan was found liable by the district court for $44.4 million. He then settled with the Trustee.

> FN2. Winters entered into a settlement with the Trustee prior to the issuance of this Opinion.

 2005 WL 1532318 (2nd Cir.(N.Y.))

 END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274
**(Cite as: 1996 WL 411654 (E.D.Pa.))**

H

United States District Court, E.D. Pennsylvania.
In re REGAL COMMUNICATIONS
CORPORATION SECURITIES LITIGATION.
This Document Relates to all Actions.
**Master File No. 94-179.**

July 17, 1996.

 Barry E. Ungar, Mann, Ungar, Spector, Labovitz,
P.C., Sherrie R. Savett, Philadelphia, PA, Richard
Schiffrin, Schiffrin & Craig, Ltd., Bala Cynwyd, PA,
Susan R. Gross, Law Offices of Bernard M. Gross,
P.C., Philadelphia, PA, Donald B. Lewis, Law
Offices of Donald B. Lewis, Bala Cynwyd, PA, M.
Richard Komins, Gerald J. Rodos, Barrack, Rodos &
Bacine, Philadelphia, PA, Nancy Kaboolian, Abbey
and Ellis, New York City, for Brad Richman and
Jacob Bailis.

 Howard J. Kaufman, Edmund B. Luce, Kaufman,
Coren & Ress, Philadelphia, PA, for Arthur L. Toll.

 Joseph M. Donley, Kittredge, Donley, Elson, Fullem
& Embick, Richard J. Sestak, Kittredge, Donley,
Elson, Fullem & Embick, Philadelphia, PA, for Bruce
B. Edmondson.

 Bruce B. Edmondson, Brandon, FL, pro se.

 Laurence Z. Shiekman, Paul R. Rosen, Spector,
Gadon & Rosen, P.C.,     Sherrie R. Savett,
Philadelphia, PA, Mark Gardy, Abbey & Ellis, New
York City, Gerald J. Rodos, Barrack, Rodos &
Bacine, Philadelphia, PA, for Regal Communications
Corp.

 Henry H. Janssen, Rapp, White, Janssen & German,
Ltd., Philadelphia, PA, for Coopers & Lybrand.

 Jeffrey G. Weil, Jan P. Levine, Dechert, Price &
Rhoads, Philadelphia, PA, Judah I. Labovitz,
Philadelphia, PA, Marguerette N. Hosbach, Ernst and
Young LLP, New York City, John W. Frazier, IV,
Montgomery, McCracken, Walker & Rhoads,
Philadelphia, PA, Kathryn A. Oberly, Ernst and
Young, New York City, Michael L. Rugen, Heller,
Ehrman, White and McAuliffe, San Francisco, CA,
for Ernst & Young LLP.

*MEMORANDUM*

GILES, District Judge.

 **\*1** Plaintiffs allege violations by the defendants
[FN1] of Sections 10(b) and 20 of the Securities
Exchange Act of 1934, as amended 15 U.S.C. §
78j(b) and 78t(a), and Rule 10b-5 promulgated
thereunder by the Securities Exchange Commission
("SEC"), 17 C.F.R. 240.10b-5 (Count I); violations of
Sections 11 and 15 of the Securities Act of 1933, as
amended 15 U.S.C. § §  77k and 77o (Count II); and
common law negligent misrepresentation under
Pennsylvania common law (Count IV).

> FN1. The defendants are Arthur L. Toll
> ("Toll") and Bruce B. Edmondson
> ("Edmondson"), and Ernst & Young, LLP
> ("E & Y").     During the relevant time
> periods, Arthur Toll was Chairman of the
> Board of Directors and Chief Executive
> Officer of Regal Communications ("Regal"),
> and Bruce Edmondson was Regal's
> Executive Vice President, Chief Financial
> Officer, and a director of Regal.

 Much of the facts of this case are documented in this
court's memorandum and order certifying the class.
*See In Re Regal Communications,* No. 94-179, 1995
WL 550454 (E.D.Pa. September 12, 1995).  For the
purposes of deciding this motion, it will suffice to say
that plaintiffs contend that defendants issued a series
of materially false and misleading public statements
about Regal's operations, prospects and financial
standing, thereby creating a misleadingly optimistic
picture and resulting in an artificially inflated price of
Regal securities during the Class Period.     The
allegations of misconduct against Toll and
Edmondson are numerous and include counterfeited
documents,   forged   signatures   and   phantom
transactions.

 Plaintiffs' claims against E & Y stem from its audit
and opinion of Regal's 1992 financial statements (the
"1992 financials") which were included in Regal's
registration statement Form 10-K filed with the SEC
and prospectus for Regal's June 1993 debenture
offering.     The 1992 financials reported accounts
receivable of approximately $12.3 million.  Three of
these  receivables,  totaling  approximately  $7.5
million, were non-existent.  As a result, Regal was
able to report a profit in 1992 instead of a large loss.
E & Y concedes that it is almost certain that plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274
**(Cite as: 1996 WL 411654 (E.D.Pa.))**

will show that these receivables were fraudulent. However, E & Y takes issue with plaintiffs' allegations that E & Y issued an unqualified opinion on the 1992 financials without properly confirming that these receivables did, in fact, exist. Plaintiffs essentially argue that E & Y's audit was such a deviation from generally accepted accounting standards ("GAAS") that it amounted to a sham audit and therefore, E & Y is jointly liable for the misrepresentations.

Before the court is E & Y's motion for partial summary judgment. For the reasons which follow, the motion is granted in part and denied in part.

*STANDARD FOR SUMMARY JUDGMENT*

Summary judgment under *Fed.R.Civ.P. 56(c)* is appropriate when there remains no material issue of fact upon which a reasonable jury could find in favor of the non-moving party or the moving party is entitled to judgment as a matter of law. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-27 (1986).

The inquiry on summary judgment is whether the evidence presents a sufficient factual disagreement to require submission to a jury, or whether the evidence is so one-sided that the moving party deserves judgment in its favor as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). Disputed facts are material if they might affect the outcome of the suit. *Id. at 249.* The court must view all inferences to be drawn from the facts in the light most favorable to the non-moving party, *id. at 247-48,* but inferences based on mere speculation or conjecture cannot create a fact dispute sufficient to defeat summary judgment. *Robertson B. Allied Signal, Inc.,* 914 F.2d 360, 383 n. 12 (3d Cir.1990). The non-moving party must demonstrate through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict for the non-moving party. *Celotex,* 477 U.S. at 322-27.

*DISCUSSION*

**\*2** E & Y asserts that summary judgment should be granted in its favor on all the claims except for the Section 11 claims by class members who purchased Regal debentures prior to January 14, 1994 and held to that date or later. We now address each of the bases offered by E & Y.

A. The Existence of Scienter

E & Y first moves for summary judgment against plaintiffs' 10(b) claims. One of the requisite elements of a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 is proof that the defendant acted with scienter, namely the intent to deceive, manipulate, or defraud. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983). E & Y contends that plaintiffs can offer no evidence from which a jury could reasonably conclude that E & Y acted with scienter. We disagree.

Proof of reckless conduct will satisfy the scienter requirement. *McLean v. Alexander,* 599 F.2d 1190, 1197-98 (3d Cir.1979). Reckless conduct is "highly unreasonable [conduct], involving not merely inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *McLean,* 599 F.2d at 1197 (alteration in original) (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)). "A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief of it have traditionally supported a finding of liability." *Id. at 1198.*

Where an auditor virtually hands over the confirmation process to the corporation being audited, a reasonable jury could find that the auditor had no genuine belief in the accuracy of those receivables. [FN2] Plaintiffs have shown a genuine issue of fact as to whether E & Y gave Regal control over the confirmation letters. There is evidence which infers that the Uprise confirmation was never sent by E & Y. [FN3] Similarly, E & Y claims to have received a confirmation on the Inphomation receivable, but that document has been purportedly lost. Moreover, there are E & Y work papers which imply that the Inphomation confirmation was not received. (Confirmation Control Log, Pls.' Ex. 29). Finally, it is conceded that the third confirmation--the INFO receivable--was not received. [FN4] Although E & Y counters this evidence with numerous explanations, it is precisely the job of a jury to weigh the credibility of those explanations.

FN2. This is particularly true where, as here, plaintiffs intend to present evidence showing that the auditor knew the corporate officers had been associated with prior instances of

Not Reported in F.Supp.                                                                                          Page 3
1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274
**(Cite as: 1996 WL 411654 (E.D.Pa.))**

securities fraud. (Pls.' Mem. at 62-63; Supp.Mem. at 2).

FN3. For example, it is virtually certain that plaintiffs will show that the signature of Thomas Pileggi on the Uprise receivable was a forgery. At the very least this raises an inference that E & Y did not actually send the confirmation to Uprise, but rather allowed someone at Regal to handle the confirmation process. Further, the confirmation is dated three days before E & Y purportedly sent it. (Pl.'s Mem. at 51-54).

FN4. Moreover, plaintiffs have also shown a factual issue as to whether Craig Cohen, the auditor handling the INFO receivable, actually sent out a confirmation letter. Cohen's work papers contain the notation that this receivable needed confirmation. (Pls.' Mem. at 38-39).

E & Y claims to have performed numerous additional procedures to confirm the receivables which negate any finding of recklessness as a matter of law. These allegations, in some cases relying on documents no longer in existence or that are arguably suspect, [FN5] could raise more issues of fact. Whether E & Y's audit was reckless is clearly a question of fact to be determined by a jury.

FN5. For example, E & Y purports that the INFO receivable was supported by vendor statements, but those statements cannot be found in the work papers. (Pls' Mem. at 43 n. 13). Similarly, the Uprise receivable was purportedly supported by invoices and shipping documents which no longer exist. (Def.'s Mem. at 13-14). Finally, the purported payment checks from Uprise are simply treasurers checks with the name "Uprise Sales" typed in. (Pls.' Ex. 34).

B. The Proposed January 14, 1994 Cut-Off Date.

**\*3** E & Y moves for summary judgment against all class members who purchased securities *after* January 14, 1994 (the date this lawsuit was announced to the public), arguing that by this date, the investing community had knowledge of fraud at Regal. Thus, E & Y argues that (1) it has rebutted the presumption of reasonable reliance on E & Y's opinion, and (2) that its opinion was no longer material after January 14, 1994.

Under the fraud-on-the-market theory, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) ... will be sufficient to rebut the presumption." *Basic Inc. v. Levinson,* 485 U.S. 224, 248 (1988). If truth of the misstatements entered the market *and dissipated the effects of those misstatements,* plaintiffs cannot be said to have relied on the market price. *Id.* at 248-49 (emphasis added). The presumption of reliance, however, is not rebutted as soon as *any* public statement is made. *Id.* at n. 28 ("We do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price"). The fraud-on-the-market presumption deals with the market's reflection of the value through the *price* of the stock. *Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989). Thus, summary judgment is inappropriate so long as a reasonable jury could find that the market price of Regal stock was still artificially inflated after January 14, 1996.

Here it cannot be said that the disclosures made by January 14, 1994, as a matter of law, dissipated the effects of the alleged misrepresentations. The fact that the price of Regal stock fell 28 per cent after the April 14, 1994 disclosure [FN6] at least raises a factual issue of whether the market was fully apprised of the fraud any earlier. (Affid. of J. Torkelsen, Pls.' Ex. 35). *Sherin v. Gould,* 115 F.R.D. 171, 175 (E.D.Pa.1987) (holding that a drop in market price following a second public announcement precluded a finding, as a matter of law, that the first announcement fully cured the misrepresentation). Moreover, as a matter of policy, it is unreasonable to charge prospective stock purchasers with access to every bit of information that may impact their decision. *See In re Western Union Securities Litigation,* 120 F.R.D. 629, 638 (D.N.J.1988).

FN6. It is conceded that it was not until April 14, 1994, that the public announcement was made that the 1992 financials and E & Y's certification could not be relied on.

As to the materiality of the alleged misstatements, while E & Y argues that the financials were over fifteen months old by January 14, 1996, it provides no authority to support the proposition that an auditor's opinion becomes "stale" as a matter of law within a certain time frame. It is true that Regal had issued subsequent quarterly financial statements, but those statements refer back to the information in the

Not Reported in F.Supp.                                                                 Page 4
1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274
**(Cite as: 1996 WL 411654 (E.D.Pa.))**

Form 10-K incorporating E & Y's opinion. (Pls.' Mem. at 90). Plaintiffs' expert states that investors typically rely on a company's most recent Form 10-K. (Pls.' Ex. 35). Finally, where the market price of Regal stock fell 28 per cent after disclosure that E & Y's opinion was no longer reliable, a jury could reasonably find that E & Y's opinion was still material.

**\*4** For these reasons, we are also unpersuaded by E & Y's argument that class members who retained their stock *after* January 14, 1996, cannot prove causation as a matter of law. Assuming that the decision to retain stock after knowledge of an alleged fraud constitutes a second investment decision which breaks the causal chain, there still remains a factual question as to *when* the market reflected knowledge of the alleged fraud. It may well be the case that some of the more knowledgeable or vigilant class members suspected fraud prior to April 14, 1996. (Def.'s Mem. at 57-59). However, it is for a jury to decide whether there was sufficient information in the market so as to impute knowledge to the entire class.

C. E & Y's Negative Causation Defense

E & Y moves for partial summary judgment on the claims under Section 11 of the Securities Act of 1933, as amended 15 U.S.C. § § 77k, against all plaintiffs who sold their debentures *prior* to January 13, 1994. Section 11(e) provides an affirmative defense, known as the defense of negative causation, for defendants who can prove that the decline in the value of the security in question was not caused by the alleged misrepresentations. 15 U.S.C. § 77k(e). *See also McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir.1995).* E & Y argues that the first disclosure of potential problems with the 1992 financials occurred when Regal filed its Form 8-K with the SEC on January 13, 1994. Thus, any decline in the price of the debentures prior to this date cannot be attributed to the alleged misrepresentations.

As a general rule, any decline in price before disclosure may not be charged to the defendants. *See Akerman v. Oryx Communications, Inc., 810 F.2d 336, 342 (2d Cir.1987).* However, because of the alleged fraud, price may not accurately reflect the value of the securities. *McMahan, 65 F.3d at 1048.* Plaintiffs' expert will testify that the value of the Debentures at the time of issuance was $200 and remained constant throughout the Debenture period. (Pls.' Mem. at 99). Therefore, when and how much

the value of the Debentures declined is a factual issue for the jury.

D. The "Controlling Persons" Claim

E & Y moves for summary judgment on the claims arising under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o. The purpose of these "controlling persons" provisions is to impose secondary liability on one who controls a violator of the securities laws and fails to show he acted in good faith. *Rochez Brothers, Inc. v. Rhoades, 527 F.2d 880, 889 (3d Cir.1975).* [FN7] Plaintiff's concede that E & Y did not control anyone other than its own audit team. However, no individual auditors are named defendants in this action. Where, as here, the defendant is alleged to be primarily liable for violations of the securities laws, it makes no sense to assert secondary liability under Sections 15 and 20(a). A person cannot be both the controller and the controlled. Summary judgment is granted as to the portions of Count I and Count II alleging liability pursuant to 15 U.S.C. § § 77o, 78t(a).

> FN7. Although *Rochez* only addresses Section 20(a), it's definition of "control" is equally applicable to Section 15. *See In re Chambers Development Securities Litigation, 848 F.Supp. 602, 618 (W.D.Pa.1994).*

E. The Common Law Claims

**\*5** Finally, E & Y moves for summary judgment on plaintiffs' common law claims of negligent misrepresentation (Count IV), arguing that plaintiffs cannot show the necessary elements of reliance and privity. Although plaintiffs present no argument to defend this largely duplicitous claim, we nevertheless find persuasive authority exists to deny summary judgment.

Pennsylvania recognizes the claim of negligent misrepresentation as stated in Section 552 of the Restatement (Second) of Torts. [FN8] Reliance is a necessary element of this tort. Plaintiffs concede that they do not intend to prove actual reliance, but shall rely upon the fraud-on-the-market theory. (Pls.' Mem. at 100).

> FN8. The relevant provisions provide:
> (1) One who, in the course of his business, profession or employment, or in any other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00162-JJF    Document 52-3    Filed 07/11/2005    Page 152 of 206

Not Reported in F.Supp.                                                         Page 5
1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274
**(Cite as: 1996 WL 411654 (E.D.Pa.))**

transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts, § 552 (1977).

In certifying the class, this court noted that the fraud-on-the-market theory has not been adopted by the Pennsylvania courts for claims of negligent misrepresentation. *See Peil v. Speiser*, 806 F.2d 1154, 1163 n. 17 (3d Cir.1986). However, the continuing validity of the *Peil* footnote is questionable in light of the Supreme Court's adoption of the theory in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). *See, e.g., Healthcare Services Group, Inc. Sec. Litigation*, No. 91-6097, 1993 WL 54437, at *6 (E.D.Pa. Mar. 1, 1993); *In re Atlantic Financial Fed. Sec. Litig.*, No. 89- 0645, 1990 WL 171191, at *2-3 (E.D.Pa. Oct. 31, 1990). We find the reasoning of these cases persuasive. *Peil* was predicting Pennsylvania law in absence of any case law on the subject. If the Third Circuit were confronted with this issue today, we think that it would find that the "reasoning [of *Basic* ] is no less persuasive in a negligent misrepresentation case concerning a securities market." *Atlantic*, 1990 WL 171191, at *2.

E & Y also argues that plaintiffs must show that they were in privity with E & Y in order to pursue a claim for negligent misrepresentation. In *Eisenberg v. Gagnon*, 766 F.2d 770, 779 (3d Cir.1985), *cert. denied*, 474 U.S. 946 (1985), the Third Circuit rejected this argument. We recognize that district courts in this circuit have been divided as to whether *Eisenberg* is limited to its facts. *See In re Phar-Mor, Inc. Sec. Litig.*, 892 F.Supp. 676, 690– 93 (W.D.Pa.1995) (collecting cases). Nevertheless, the plain language of Section 552 allows a claim to be

brought against one acting in the course of his business to be brought by members of a class intended to be benefitted the information disclosed. The limitations are clearly enunciated and we are loathe to infer another absent guidance from the Third Circuit. *See, e.g., In re Intelligent Electronics, Inc. Sec. Litig.*, Nos. 95-7663, 95-7712, 1996 WL 304852, at *4 (holding that both the plain language of Section 552 and policy considerations make a privity requirement inappropriate).

### CONCLUSION

Although E & Y assert numerous arguments against holding them liable under the securities laws, they are more properly presented to a jury. There are material issues of fact precluding summary judgment at this time. Under the plaintiffs' theory, however, E & Y cannot be a controlling person within the meaning of 15 U.S.C. § § 77o, 78t. Summary judgment shall be granted in their favor on this limited issue.

**\*6** An appropriate order follows.

### ORDER

AND NOW, this 15th day of July, 1996, upon consideration of the motion of defendant Ernst & Young ("E & Y") for partial summary judgment and for the reasons which follow, it is hereby ORDERED that:

1. The motion is GRANTED in part. Ernst & Young are not "controlling persons" within the meaning of Section 15 of the Securities Act of 1933, 15 U.S.C. § 78t(a) or Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 77o.

2. In all other respects, the motion is DENIED.

1996 WL 411654 (E.D.Pa.), Fed. Sec. L. Rep. P 99,274

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Alex TSE, et al., Plaintiffs,
v.
VENTANA MEDICAL SYSTEMS, INC.; Jack W.
Schuler; John Patience; and Marquette
Venture Partners, Defendants.
No. C.A. 97-37-SLR.

Sept. 23, 1998.

Stephen P. Lamb, and Joel E. Friedlander, of Lamb
& Bouchard, Wilmington, Delaware, Emil Hirsch, of
Freedman, Levy, Kroll & Simonds, Washington,
D.C., for plaintiffs, of counsel.

Jesse A. Finkelstein, and Raymond J. DiCamillo, of
Richards, Layton & Finger, Wilmington, Delaware,
Steven M. Katz, Elizabeth M. Saunders, and Michele
E. Rose, of Wilson, Sonsini, Goodrich & Rosati, Palo
Alto, California, for defendants, of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

**\*1** Plaintiffs Alex Tse, Margaret Wai Lam Leung,
Michelle Leung, and Ching-Shuang Shih filed this
action against defendants Ventana Medical Systems,
Inc. ("Ventana"), Jack W. Schuler, John Patience, and
Marquette Venture Partners ("Marquette"), alleging
violations of § 10(b) of the Securities Exchange Act
of 1934, 15 U.S.C. § § 78a *et seq.* ("the 1934 Act")
and Rule 10b-5 promulgated by the Securities and
Exchange Commission, in connection with a merger
between Biotek Solutions, Inc. [FN1] ("Biotek") and
Ventana. (D.I.27, ¶ ¶ 53-77) Plaintiffs allege
numerous related state and common law violations.
(D.I.27, ¶ ¶ 78-100) Specifically, it is alleged that an
insider transaction of Ventana stock between
defendants was not disclosed when plaintiffs were
asked to approve the merger. (D.I.27) Plaintiffs also
allege that the terms of the insider transaction were
far more favorable than the terms offered to the
shareholders of Biotek for Ventana stock. (D.I.27)

FN1. Biotek is "in the business of

developing, manufacturing, and marketing
instruments/reagent systems that automate
immunohistochemistry and [*in situ* ]
hybridization tests for the analysis of cells
and tissues on microscope slides." (D.I.27, ¶
13)

Jurisdiction over the federal securities law claim is
authorized under 28 U.S.C. § 1331 and 15 U.S.C. §
78aa. The court has supplemental jurisdiction over
the state and common law claims since they are
related to plaintiffs' federal claim. 28 U.S.C. §
1367(a).

Presently before the court is defendants' motion to
dismiss the complaint pursuant to Fed.R.Civ.P.
12(b)(6) for failure to state a cognizable claim.
(D.I.48)

II. BACKGROUND

Defendant Ventana is a Delaware corporation with
its principal offices in Tucson, Arizona. (D.I.27, ¶ 4)
Ventana is in the business of developing,
manufacturing, and marketing medical instruments
that are used in the analysis of cells and tissues in
connection with the diagnosis and treatment of
cancer. Until February 1996, Ventana was Biotek's
principal competitor. (D.I.27, ¶ 23) Defendants
Schuler and Patient reside in Illinois and are directors
of Ventana. (D.I.27, ¶ ¶ 5-6) Defendant Marquette is
a venture capital investment firm. [FN2] (D.I.27, ¶ 7)
Marquette is an Illinois partnership in which
defendant Patience was a general partner until March
1995. (D.I.27, ¶ 7)

FN2. Marquette, through an initial capital
investment, began its financial relationship
with Ventana in 1989. (D.I. 41, Ex. A at 28-
31) Since Marquette's investment in Ventana
was substantial, a Marquette representative
(Patience) was elected to sit on Ventana's
board of directors in a non-voting capacity
beginning in July 1989. (D.I. 41, Ex. A at 7-
8, 34-35; D.I. 43, Ex. 7 at V000051)
Marquette was also given visitation rights to
attend Ventana's board meetings and
examine board meeting minutes, financial
materials, and other information provided to
Ventana's board. (D.I. 43, Ex. 7 at V000051)
In addition to serving as a director of

Not Reported in F.Supp.2d
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

Page 2

Ventana in his own right, Patience continued to serve as Marquette's representative even after his separation from Marquette in March 1995. (D.I. 41, Ex. A at 34, 44-45) After March 1995, Marquette also designated Keith Kerman as its representative on Ventana's board of directors. (D.I. 41, Ex. A at 44) Accordingly, Kerman, on behalf of Marquette, also attended Ventana's board meetings. (D.I. 41, Ex. A at 44-45; D.I. 43, Ex. 41, 44, 48-49, 51, 55-56) At some time after 1992, Ventana, at the request of Marquette, changed its state of incorporation from California to Delaware. (D.I. 41, Ex. A at 35-36)

Between 1992 and 1995, plaintiffs made several cash investments in Biotek. (D.I.27, ¶ 12) In return for these investments, plaintiffs received Biotek common stock ("Biotek Stock") and Biotek promissory notes ("Biotek Notes"). (D.I.27, ¶ ¶ 12-15) The following are the total shares of Biotek Stock and dollar amounts of Biotek Notes that each plaintiff received:

| Plaintiff | Shares of Biotek Stock | Biotek Notes |
| --- | --- | --- |
| Tse | 18,904 | $34,035.00 |
| Margaret Leung | 547,835 | $1,060,054.64 |
| Michelle Leung | 35,252 | $70,450.76 |
| Shih | 19,935 | $38,038.14 |

(D.I. 27, ¶ ¶ 16-22

On December 12, 1995, Biotek and Ventana entered into a letter of intent setting forth the proposed terms of a merger plan. (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Under the terms of the merger plan, Ventana Acquisition Corporation, a wholly-owned subsidiary of Ventana, was to "merge[ ] with and into Biotek, leaving Biotek as the successor corporation and a wholly-owned subsidiary of Ventana." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) The plan also provided that after Biotek satisfied certain liabilities, Biotek Stock would be converted into the right to receive cash and promissory notes of Ventana, called "Ventana Payment Notes." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Biotek Notes would be converted into subordinated convertible promissory notes of Ventana, called "Ventana Exchange Notes." (D.I. 27, ¶ 26; D.I. 49, Ex. 1) Under the terms of the merger, Ventana Exchange Notes were convertible into Ventana common stock at a rate of $5.00 per share. (D.I. 27, ¶ 42; D.I. 49, Ex. 1) The letter of intent concluded by stating that "[t]he parties shall diligently and in good faith use their best efforts to negotiate and execute a definitive acquisition agreement and attendant documents and to consummate the Acquisition." (D.I. 49, Ex. 1 at A5)

**\*2** Plaintiffs allege that on or about January 10, 1996, the board of directors for Biotek approved a proposed merger with Ventana. (D.I.27, ¶ 25)

Plaintiffs allege that on January 16, 1996, Ventana's board of directors approved in principle the sale of 646,664 shares of Ventana common stock to defendants Schuler, Patience, and Marquette. (D.I.27, ¶ 48(a)) Ostensibly, the sale was compensation for Schuler's and Patience's time spent working on Ventana's business. [FN3] (D.I. 29 at 2) Plaintiffs allege that the adjusted (post Reverse-Split) purchase price of $1.62 per share was determined by Ventana's board of directors "to equal the fair market value of Ventana's Common Stock as of January 1996." (D.I.27, ¶ 48(b)) Final approval of the compensation package occurred at Ventana's February 23, 1996 board meeting.

> FN3. According to Patience, his resignation from Marquette involved a "Separation Agreement [ ] which, *inter alia,* outlined the disposition of compensation [he] received from certain Marquette portfolio companies during a defined period of time." (D.I. 29 at 1) Patience claims that when Ventana's board of directors authorized his right to purchase Ventana stock at a specified price, a "question arose between [him] and Marquette as to whether" this right was subject to the Separation Agreement. According to Patience, this question was resolved by assigning to Marquette Patience's right to purchase a certain portion of Ventana stock at the designated price. (D.I. 29 at 2)

On January 19, 1996, a definitive letter of intent to merge, which incorporated the terms set forth in the letter of intent, was executed. (D.I. 27, ¶ 27; D.I. 49, Ex. 2) On or about February 8, 1996, Biotek's board of directors sent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

a letter to all holders of Biotek securities, soliciting their approval of the planned merger. (D.I.27, ¶ 28) The letter explained the terms of the merger and the proposed conversion of Biotek Stock and Notes into Ventana Payment Notes and Exchange Notes. (D.I.27, ¶ ¶ 28-29) Enclosed with the letter was an Information Sheet (D.I.49, Ex. 3), jointly issued by Biotek and Ventana, which disclosed that "due to the size of Biotek's outstanding liabilities, there would be no cash proceeds or Ventana Payment Notes available for disbursement to the holders of Biotek Stock." (D.I.27, ¶ 31)

Included as an exhibit to the Information Sheet was the Agreement and Plan of Reorganization ("the Agreement"). (D.I. 27, ¶ 32; D.I. 49, Ex. 2) Section 4.5 of the Agreement set forth the "authorized capital stock of Ventana as of the date hereof" and identified that Ventana had 2, 110, 789 shares of common stock and 70, 089 shares of preferred stock "reserved for issuance ... under its stock option and stock purchase plans." (D.I. 49, Ex. 2 at A30-31) Section 4.7 of the Agreement provided:

No representation or warranty made by Ventana in this Article IV or in any other Article or Section of this Agreement, or in any certificate, schedule or other document furnished or required to be furnished by Ventana pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they are made.

(D.I. 49, Ex. 2 at A31) Similarly, § 6.3(a) provided that [t]he representations and warranties of Ventana and Sub set forth in Article IV of this Agreement shall be true and correct in all material respects on and as of the date of this Agreement and as of the Effective Time as though made on and as of the Effective Time (except to the extent such represenations and warranties speak only as of an earlier date, including, without limitation, Ventana's representations as to outstanding capitalization), and the covenants and agreements of Ventana and Sub set forth herein shall have been complied with in all material respects and Bio[t]ek shall have received a certificate signed by an authorized officer of Ventana and Sub dated the Effective Time to such effect.

*3 (D.I. 49, Ex. 2 at A39)

Based on the terms of the merger agreement, 90% of the outstanding Biotek Stock had to vote in favor of the planned merger. (D.I.27, ¶ 35) Plaintiffs Tse and Margaret Leung, who owned 9.12% of the outstanding Biotek Stock, were dissatisfied with the planned merger because they would receive no payment for their Biotek Stock. (D.I.27, ¶ ¶ 33, 35) After expressing their

dissatisfaction to Biotek director Johnson Lee ("Lee"), plaintiffs allege that Lee and Michael R. Danzi ("Danzi"), Biotek's president, sought to persuade them to change their position. (D.I.27, ¶ 36) According to plaintiffs, Danzi represented that Biotek was experiencing a serious shortage of capital and had to accept the planned merger or file for bankruptcy. (D.I.27, ¶ 37(a)) Danzi also allegedly stated that Ventana was planning to make an initial public offering soon after the proposed merger and that the expected initial public offering price was estimated to be between $4.00 and $5.00 per share without the Biotek merger, and $8.00 per share after the merger. (D.I.27, ¶ 37(b)) Plaintiffs also aver that they were informed by Danzi that he "and all Ventana insiders did not receive and were not about to receive any commission or other compensation in connection with their efforts in facilitating" the planned merger. (D.I.27, ¶ 37(d))

On February 19, 1996, plaintiffs Tse and Margaret Leung sent Biotek a letter, indicating that they would vote to approve the merger plan. (D.I.27, ¶ 39) Plaintiffs Shih and Michelle Leung also approved the merger plan and agreed to the conversion of their Biotek Stock and Notes. (D.I.27, ¶ 40)

On February 23, 1996, the merger plan was formerly approved and became effective on February 26, 1996. (D.I.27, ¶ 41) Under the terms of the merger agreement, the Ventana Exchange Notes that were to be issued to holders of Biotek securities were convertible into Ventana common stock at a conversion price of $13.53 per share. [FN4] (D.I.27, ¶ 42) Biotek Noteholders had 30 days beginning on February 26, 1996, to convert all or part of their holdings into Ventana common stock. (D.I.27, ¶ 42)

FN4. The conversion price of $13.53 per share is based on an adjustment from the original conversion price of $5.00 per share because of a 2.7 to 1 reverse stock split of Ventana Common Stock. (D.I. 27, ¶ 42 n. 1)

On March 20, 1996, a public meeting was held in Newport Beach, California by Ventana to, *inter alia,* inform and educate holders of Biotek securities about the advantages and disadvantages of exercising the right to convert the Ventana Exchange Notes. (D.I.27, ¶ 50) A private meeting was held immediately preceding the public meeting in which Schuler, Patience, Danzi, Lee, and Michelle Leung were present. (D.I.27, ¶ 50) Ventana's president and chief executive officer, R. James Danehy, was also present at the private meeting. (D.I.27, ¶ 50) According to plaintiffs, the defendants made no mention of any compensation plan for Ventana insiders in either the private or the public meeting.

Not Reported in F.Supp.2d                                                              Page 4
1998 WL 743668 (D.Del.)
**(Cite as: 1998 WL 743668 (D.Del.))**

On March 24, 1996, Tse, Margaret Leung, and Michelle Leung elected not to convert any of their Ventana Exchange Notes into Ventana common stock. (D.I.27, ¶ 43) Plaintiff Shih converted half of her Ventana Exchange Notes and received 1,434 [FN5] shares of Ventana Common Stock and an unsecured promissory note in the amount of $19,389.77. (D.I.27, ¶ 44)

> FN5. Prior to the Reverse-Split, Shih had received 3,879 shares of Ventana common stock. (D.I.27, ¶ 44)

**\*4** In April and May 1996, Patience, Schuler, and Marquette completed the purchase of the stocks they were offered as part of a purported compensation package. Patience and Schuler purchased a total of 616,481 shares, while Marquette purchased 30,183 shares. (D.I.27, ¶ 48) According to plaintiffs, this "insider transaction" was not disclosed to the plaintiffs or the public until it was made public in a July 3, 1996 preliminary prospectus issued in connection with Ventana's initial public offering. (D.I.27, ¶ 51)

On or about March 1, 1997, the Ventana Exchange Notes were paid in full. (D.I.27, ¶ 33)

Plaintiffs allege that the approval of the merger was tainted by the following representations and omissions:
a. As early as January 16, 1996, Ventana's [b]oard of [d]irectors approved in principle the sale of a total of 646,664 shares of Ventana [c]ommon [s]tock to insiders[ ] Jack W. Schuler and John Patience[ ] and Defendant[ ] Marquette Venture Partners[ ], a venture capital fund, with whom Patience had an affiliation [ ].
b. The purchase price under the [i]nsider [t]ransaction was fixed by the [b]oard of [d]irectors at $1.62 per share ( [p]ost Reverse [-] Split) which was determined by the [b]oard to equal the fair market value of the Ventana [c]ommon [s]tock as of January 1996. This determination of value at $1.62 was contemporaneous with Ventana's offer to convert the Ventana Exchange Notes into Ventana [c]ommon [s]tock at a price of $13.53 ( [p]ost Reverse[-]Split) within thirty days after February 26, 1996.
c. The specific terms of the [i]nsider [t]ransaction and its final approval were given by the [b]oard of [d]irectors of Ventana on February 23, 1996, which had also been set to be the date on which the [s]pecial [m]eeting of [s]hareholders of Biotek was held in order to approve the [m]erger.
d. The proxy materials and, specifically, the Information Statement, disclosed all common stock equivalents as of December 31, 1995. Similarly, ¶ 4.5 of the [ ] Agreement discussed Ventana's outstanding

options, warrants and other common stock equivalents as of January 19, 1996 but did not disclose the [i]nsider [t]ransaction under which a significant block of dilutive Ventana [c]ommon [s]tock was to be issued, thus rendering the discussion of options, warrants and other stock equivalents misleading. In addition, by holding the $13.53 per share price ( [p]ost Reverse[-]Split) out to Plaintiffs as a conversion price, Ventana impliedly represented that such a number bore a reasonable realitionship to the per share fair market value of that stock.
(D.I. 51 at 7) (citations omitted).

## III. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court primarily must consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case as well as exhibits attached to the complaint may also be taken into account. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993).* The court also may "consider a concededly authentic document upon which the complaint is based when the defendant attaches such a document to its motion to dismiss." *Id. at 1196.* In ruling on a 12(b)(6) motion, the factual allegations of the complaint must be accepted as true. *See Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)* (*per curiam*). Moreover, the court must accept as true all allegations contained in the complaint and is bound to give the plaintiff the benefit of every reasonable inference to be drawn from those allegations. *See Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir.1991).* Accordingly, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *See Hughes v. Rowe, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)* (*per curiam* ). Thus, the "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Ransom v. Mazzaro, 848 F.2d 398, 401 (3d Cir.1988).*

## IV. DISCUSSION

### A. Plaintiffs' Section 10(b) and Rule 10b-5 Claim

**\*5** The relevant statutes for purposes of evaluating defendants' motion are § 10(b) of the 1934 Act and Rule 10b-5. Section 10(b) prohibits any person
[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities

Not Reported in F.Supp.2d
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

Page 5

exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1997). Rule 10b-5, enacted pursuant to § 10, makes it unlawful in connection with the purchase or sale of any security

[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b-5(b) (1998). [FN6]

FN6. The Supreme Court, in *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), held that a merger constitutes a "sale" under Rule 10b-5 because securities of the acquired corporation are "purchased" in exchange for an acquiring corporation's securities. *See id.* at 468. Therefore, defendants' exchange of Ventana securities for Biotek securities is a "sale" within the meaning of Section 10(b).

In addition, compliance with § 14 of the Securities Exchange Act is required whenever a corporation solicits a proxy. Rule 14a-9, promulgated under § 14 of the 1934 Act, provides that

[n]o solicitation subject to this regulation shall be made by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a) (1996). The Third Circuit recognizes that Rule 14a-9 and Rule 10b-5, both of the 1934 Act, apply equally to false or misleading statements used to solicit a proxy. *See Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir.1991).

To establish a claim for securities fraud under Rule 10b-5 or Rule 14a-9, plaintiffs must prove that (1) a recognized duty existed with the defendants; (2) the defendants made misstatements or omissions of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which plaintiffs relied; and (6) that plaintiffs' reliance was the proximate cause of their injury.

*See id.; In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989); *D & N Financial Corp. v. RCM Partners Ltd. Partnership*, 735 F.Supp. 1247 (D.Del.1990). Furthermore, since the claim being asserted is a fraud claim, plaintiffs must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A fraud complaint must state "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Rule 9(b)'s heightened pleading standard provides defendants with notice of the claims against them while reducing the number of frivolous suits brought solely to extract settlements. *See In re Burlington*, 114 F.3d at 1418 (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994)). However, when the factual information is within defendants' control, as it is here, the standard is "relaxed". *See id.* To meet this "relaxed" standard, plaintiffs must accompany their legal theory with factual allegations that make their theory seem plausible. *See id.; Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.1992).

1. Loss Causation

*6 Initially, defendants argue that plaintiffs have failed to state a § 10(b) claim because they have not adequately pled loss causation. Under Rule 10b-5, plaintiffs have "the burden of proving that the act or omission of the defendant caused the losses for which [they] seek[ ] to recover damages". 15 U.S.C. § 78u-4(b)(4). To prove the causation element, plaintiffs must establish both transaction and loss causation. [FN7] *See Scattergood*, 945 F.2d at 622; *see also Litton Indus., Inc., v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir.1992). Transaction causation focuses on whether the misrepresentation induced the plaintiff to enter the transaction. *See Edward J. DeBartolo Corp. v. Coopers & Lybrand*, 928 F.Supp. 557, 562 (W.D.Pa.1996). Loss causation, on the other hand, looks to whether the misrepresentation caused plaintiff's pecuniary loss. *See id.* Thus, transaction causation is akin to but-for causation while loss causation corresponds to proximate causation. *See id.* Transaction causation is presumed in securities cases when the claim is based on a failure to disclose and the information withheld is material. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Litton*, 967 F.2d at 748. In contrast, to establish loss causation, plaintiffs must allege that the misrepresentation was the direct or proximate cause of the economic loss. *See Edward J.*

Not Reported in F.Supp.2d                                                                                                                    Page 6
1998 WL 743668 (D.Del.)
**(Cite as: 1998 WL 743668 (D.Del.))**

*DeBartolo Corp.,* 928 F.Supp. at 562; *Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 209 (S.D.N.Y.1997). Only loss causation is at issue on this motion.

> FN7. Although the Third Circuit has not directly addressed the issue of loss causation, it has noted that proximate cause is an element of a Rule 10b-5 claim and that a plaintiff must show that the misrepresentations "touch upon the reasons for the investment's decline in value." *In re Phillips Petroleum,* 881 F.2d at 1244 (citing *Huddleston v. Herman & MacLean,* 640 U.S. 534, 549 (5th Cir.1981), *aff'd in part reversed in part,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

Plaintiffs claim that they have suffered damages as a result of defendants' omission and misrepresentation of material facts, avering that they would have held out for more favorable conversion terms. (D.I.27, ¶¶ 72, 77). Specifically, plaintiffs allege

> that the nondisclosure and concealment of Ventana's true fair market value of $1.62[ ] per share, as determined by its [b]oard of [d]irectors[,] allowed Ventana's pre-merger shareholders to retain approximately eighty-three percent (83%) of the combined equity after the [m]erger, whereas a full disclosure of the true fair market value of Ventana would have necessitated a material decrease in the Five Dollar ($5.00) conversion price which would have allowed the holders of Biotek [s]ecurities to receive upon conversion forty percent (40%) of the combined equity after the [m]erger.

(D.I. 27, ¶ 72; *see also* D.I. 27, ¶ 77) The primary loss alleged by plaintiffs is the opportunity to convert their Ventana Exchange Notes into Ventana common stock at the lower rate offered to the directors ($1.62), not the $5.00 rate which the Agreement allegedly implied was the fair market value, and thereby realize " 'a greater piece of the Ventana Pie.' " [FN8] (D.I. 51 at 12)

> FN8. As noted above, plaintiff Shih did elect to convert one-half of her notes into 3,879 shares of Ventana stock.

The Third Circuit recognizes standing to bring suit based upon claims of lost opportunity. *See Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761 (3d Cir.1976). In *Gould,* plaintiffs filed suit claiming inadequate disclosure in a proxy statement. Plaintiffs claimed that selected shareholders were offered more favorable conversion terms for their holdings under the terms in a merger than were other shareholders and that this arrangement was not disclosed in the proxy statement. *See Gould,* 535 F.2d at 765-69. In finding for the plaintiffs, the Third Circuit,

agreeing with the reasoning of the trial court, found that by the circulation of defective proxy materials "plaintiffs were lulled to inaction and thereby suffered the loss of an opportunity to secure a merger agreement which would be more favorable to them." *Id.* at 782 ("[W]hile it was possible that full disclosure and correction of the defective proxy materials would not have affected the terms of the merger it was equally possible that such disclosure might have resulted in the favored defendants sharing with plaintiffs the premium of $8.25 per share which the former received.").

**\*7** Defendants rely on the holding in *Norwood,* 959 F.Supp. at 209-10, in which the court dismissed plaintiff's § 10b claim for failure to adequately plead loss causation. In *Norwood,* plaintiff, a non-convertible note holder, sued the acquiring company for, *inter alia,* violations of Rule 10b-5 arising out of alleged misrepresentations made during the course of merger negotiations. *See id.* at 207. Plaintiff alleged that "it was damaged because, had it known about defendants' fraud, it would have pursued other options, such as selling [the target company] to another interested company or putting [the target] into bankruptcy sooner." *Id.* at 209. The *Norwood* court found that plaintiff, as a debt holder, had failed to allege actual loss due to a decline in the acquiring corporation's stock price. *See id.* at 209-10. Although sufficient allegations of misrepresentation were found, the court found no causal link between the drop in stock price following the merger and plaintiff's notes. *See id.* at 209-10. The court reasoned that "absent a [the acquiring corporation's] solvency (which was not alleged), a decrease in [the acquirer's] stock price cannot render [plaintiff's] debt less likely to be paid." *Id.* at 209-10.

In the instant case, however, plaintiffs' complaint alleges that their loss resulted from the opportunity to convert at a better rate, not merely from their status as Ventana security holders. In *Kusner v. First Pennsylvania Corp.,* 531 F.2d 1234 (3d Cir.1976), the Third Circuit held that a convertible bond purchaser who alleged purchase of securities in reliance on misleading statements and omissions in a prospectus had standing to bring a suit for damages under Rule 10b-5. *See id.* at 1238-39. The Third Circuit reasoned that because of the convertible feature of a bond, which is directly related to stock price, "a misrepresentation in the prospectus that would be material to a stock purchaser would be material to a convertible bond purchaser. The convertible bond purchaser may well have been defrauded of the interest differential." *Id.* at 1238. Even absent actual conversion or default of the debentures, the court concluded that a convertible bondholder may have experienced the same fraud as a stock purchaser because of misrepresentation in a prospectus. *See id.* at 1238-39. This convertible feature,

Not Reported in F.Supp.2d                                    Page 7
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

which the plaintiffs in the instant action possessed, differentiates the instant case from the holding in *Norwood.*

In the case at bar, the Agreement required a 90% affirmative vote of the outstanding Biotek Notes in order to consummate the merger. (D.I.27, ¶ 35) Plaintiffs owned approximately 9.12% of all the outstanding Biotek Notes. (D.I.27, ¶ 35) Consequently, although their consent was not necessarily required to effectuate the merger, plaintiffs were in a relatively strong bargaining position. Thus, the court cannot conclude, based upon the pleadings, that had plaintiffs not been "lulled to inaction" by defendants' alleged omissions/misrepresentations, they would not have successfully prevailed upon Ventana to pay a higher price for Biotek. [FN9] *Cf. Fought v. Hayes Wheels Int'l, Inc.,* 101 F.3d 1275, 1277 (8th Cir.1996) (stating that a court cannot afford a non-moving party " 'the benefit of unreasonable inferences' " (citation omitted)); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1318 (2d Cir.1990) (same). Therefore, accepting plaintiffs' allegations as true, the court finds that plaintiffs have adequately pled facts establishing loss causation.

> FN9. The court notes defendants' argument that "by the spring of 1995, Biotek was experiencing considerable financial difficulties and by that fall it was on the verge of bankruptcy." (D.I. 48 at 5) However, support for this statement is drawn from Ventana's Initial Public Offering Prospectus, dated July 26, 1996, a document that was neither attached to nor the basis of plaintiffs' complaint; thus, the court cannot consider this document in considering defendants' motion to dismiss.

2. Duty to Disclose Omitted Facts

**\*8** Plaintiff makes four arguments in support of defendants' duty to disclose: (1) defendants' duty to prospective purchasers; (2) defendants' duty to correct and update prior statements; (3) defendants' duty arising from the good faith obligation expressed in the letter of intent; and (4) defendants' duty to disclose as a function of California law.

Duty to prospective purchasers. Absent a specific statutory or regulatory duty, insider trading, or a fiduciary duty, a corporation and its officers have no affirmative duty of disclosure. *See In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1129 (D.Del.1988). Thus, a duty to disclose under § 10(b) does not arise merely from the possession of non-market information. *See Chiarella v. United States,* 445 U.S. 222,

235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Rather, liability for securities nondisclosure "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Id.* at 230; *accord Dirks v. SEC,* 463 U.S. 646, 657-658, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *see also Berkowitz v. Conrail,* No. Civ. A. 97-1214, 1997 WL 611606, at \*7 (E.D.Pa. Sept. 25, 1997) (stating that when a fraud claim is based on nondisclosure of information, "there can be no finding of fraud if the corporation was under no duty to disclose the information"). As the Supreme Court acknowledged in *Chiarella,* corporate insiders, particularly officers, directors, or controlling stockholders, assume an affirmative duty of disclosure when trading in shares of their own corporation. *See Chiarella* 445 U.S. at 226-27 (citing *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 1961 WL 3743 (1961)). "[I]nsiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *Cady, Roberts,* 1961 WL at \*3. This duty extends not only to existing shareholders but also to nonshareholders when sales of securities are made to them. *See id.* at \*5; *see also Gratz v. Claughton,* 187 F.2d 46, 49 (2d Cir.1951). Such a duty ensures that corporate insiders "will not benefit personally through fraudulent use of material, nonpublic information." *Chiarella,* 445 U.S. at 230.

Defendants argue that where the acquirer was neither an insider nor a fiduciary of the target, the acquirer owes no duty to disclose to the shareholders of the target. Although such a assertion may be true, it is not relevant under the circumstances of the case at bar. [FN10] In the instant action, the acquiring corporation traded in its own securities. By the terms of the Agreement, defendants were asking plaintiffs to become equity shareholders in the acquiring corporation, Ventana. Accordingly, as "insiders," defendants assumed an affirmative duty to disclose material information. [FN11] Given the fact that plaintiffs allege that approval in principle of the Schuler/Patience compensation package (i.e., the "insider transaction") occurred virtually simultaneously with the issuance of the proxy materials, plaintiffs' complaint adequately states a claim based on defendants' duty to disclose material information. [FN12] *See Voit v. Wonderware Corp.,* 977 F.Supp. 363, 369 (E.D.Pa.1997) (finding that plaintiffs established a duty to disclose where they alleged that the acquiring corporation traded on its overvalued shares by using to them to purchase the target). [FN13]

> FN10. Defendants rely on two cases in support of their position, neither of which is applicable to the case at bar. In *Staffin v. Greenberg,* 672 F.2d

Not Reported in F.Supp.2d                                                                                    Page 8
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

1196 (3d Cir.1982), *rev'd on other grounds,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Third Circuit held that an acquiring corporation which was neither an insider nor a fiduciary was not under a duty to disclose its plans to acquire the target company even if the purchase was based on knowledge of nonpublic material facts. *See id.* at 1202. In *Gordon v. Diagnostek,* 812 F.Supp. 57 (E.D.Pa.1993), plaintiffs filed suit against both companies involved in a merger negotiation, alleging a failure to disclose financial data. *See id.* at 59. Citing to the Third Circuit's decision in *Staffin,* the district court held that an acquiring corporation in a failed arms-length acquisition owed no duty to disclose to the shareholders of the target corporation. *See id.* at 60. There was no duty, the court reasoned, because the acquiring corporation had no relationship with the target: absent "a fiduciary or other relationship of trust stemming from prior dealings between the parties" no duty to disclose nonpublic market information arises. *Id.* Neither of these cases involved an acquiring corporation trading in its own securities; thus, they are inapplicable to the case at bar.

FN11. Defendants argue that the complaint fails to allege that (1) Marquette made any material misstatement or omission or (2) any facts which would give rise to any duty between Marquette and plaintiffs. (D.I. 48 at 32) Plaintiffs do not contest defendants' assertions. However, after review of the complaint and items appearing in the record of the case, the court finds that Marquette is an "insider" within the meaning of Rule 10b-5.

Although "insiders" are traditionally defined as directors, officers, and controlling shareholders of the corporation, these three groups do not define the classes of persons who have an obligation to refrain from trading on nonpublic information. Rather, the prohibition extends to those individuals who are in a special relationship with the corporation and are thereby privy to confidential information. *See Cady, Roberts,* 1961 Wl 3743. Thus, under certain circumstances, even outsiders can be subject to the same restraints as are insiders. *See Dirks,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911. Moreover, where an individual is "deputized" to serve as a director of another company, for the benefit of that third party, then the third party also incurs liability. *See Blau v. Lehman,* 368 U.S. 403, 409, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

In the case at bar, in 1989, Marquette acquired a substantial interest in Ventana. (D.I. 41, Ex. A at 28) Since that time, a representative from Marquette has served on Ventana's board of directors, albeit in a non-voting capacity. (D.I. 41, Ex. A at 34-35) As a capital investment firm, Marquette has a substantial interest in monitoring Ventana's financial welfare. With a member on the board of directors, even though non-voting, Marquette could influence and direct certain financial decisions. (D.I. 41 at 58) In fact, Marquette insisted that Ventana change its state of incorporation to Delaware. (D.I. 41 at 36) Thus, given Marquette's close relationship with Ventana, the court finds that Marquette is also an "insider" within the meaning of Rule 10b-5.

FN12. For purposes of securities fraud litigation, for a fact to be material " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ' *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc. .,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Materiality is a mixed question of law and fact, and the assessment of the inferences a reasonable shareholder would draw from a particular set of facts is "peculiarly for the trier of fact." *Shapiro,* 964 F.2d at 281 n .11. Only if the alleged omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to resolve the issue as a matter of law through dismissal. *See id.; TSC Indus.,* 426 U.S. at 449. Applying this standard to the case at bar, the court finds defendants' alleged omission of the Schuler/Patience compensation package to be material.

FN13. The court declines to address plaintiffs' alternative theories as to defendants' duty to disclose.

3. Scienter

*9 Defendants argue that plaintiffs have failed to plead scienter with the required particularity. In response to the debate over frivolous litigation, Congress enacted the Private Securities Reform Litigation Act ("PSRLA"), Pub.L. No. 104-67, 109 Stat. 737, 15 U.S.C. § 78u-4

Not Reported in F.Supp.2d
1998 WL 743668 (D.Del.)
(Cite as: 1998 WL 743668 (D.Del.))

Page 9

(1995). Applicable to actions filed after December 22, 1995, the PSRLA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint which fails to meet this standard must be dismissed upon motion by the defendant(s). *See id.* § 78u-4(b)(3)(A). However, in drafting the PSRLA, Congress failed to include what allegation of facts are sufficient to establish a "strong inference that the defendant acted with the required state of mind." As a result, courts are split as to the pleading burden the PSRLA places on plaintiffs.

Prior to enactment of the PSRLA, a majority of circuit courts, including the Third Circuit, uniformly held that recklessness constituted scienter under Rule 10b-5. *See In re Phillips Petroleum,* 881 F.2d at 1244; *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989); *Hackbart v. Holmes,* 675 F.2d 1114, 1117 (10th Cir.1982); *Broad v. Rockwell Int'l. Corp.,* 642 F.2d 929, 961-62 (5th Cir.1981); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044 (7th Cir.1977). However, the courts were split as to what facts alleging scienter a plaintiff was required to plead. The Second Circuit, among others, required that plaintiffs plead a "strong inference of scienter" by alleging facts that (1) established a motive and opportunity to commit fraud on the part of defendants; or (2) facts constituting circumstantial evidence of reckless or conscious behavior. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995); *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir.1993). In contrast, the Ninth Circuit rejected a requirement that plaintiff allege facts from which intent to commit fraud could be inferred, finding that scienter could be averred generally without requiring plaintiffs to satisfy the "strong inference" test of the Second Circuit. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1546-47 (9th Cir.1994). The Third Circuit adopted the approach taken by the Second Circuit, recognizing that "[w]hile state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " *In Re Burlington Coat,* 114 F.3d at 1418.

While the language of the PSRLA suggests that Congress codified the Second Circuit's scienter requirement, district courts are split as to whether or not this is the case. Several courts have adopted the Second Circuit's more rigid "conscious behavior" standard, requiring plaintiffs to allege specific facts that constitute circumstantial evidence of conscious behavior by the defendants. *See Voit,* 977 F.Supp. at 373 (rejecting "motive and opportunity" test and recklessness liability); *Norwood,* 959 F.Supp. at 208-09 ("A plaintiff cannot simply couple a factual statement with a conclusory allegation of

fraudulent intent to adequately plead scienter. Nor is it sufficient to simply allege statements of a prosperous future compared to a bleaker reality" (citation omitted)); *Friedberg v. Discreet Logic, Inc.,* 959 F.Supp. 42, 47- 50 (D.Mass.1997) (holding that a plaintiff "must set forth specific facts that constitute strong circumstantial evidence of conscious behavior by defendants"); *In re Silicon Graphics, Inc. Sec. Litig.,* No. C 96-0393, 1996 WL 664639,*5-6 (N.D.Cal. September 25, 1996), *aff'd on rehearing,* 970 F.Supp. 746 (N.D.Cal.) (same). Other courts, while interpreting the PSLRA as codifying the Second Circuit case law, have retained both recklessness liability and the "motive and opportunity" test. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1308-11 (C.D.Cal.1996) (holding that "Second Circuit jurisprudence in the area of securities fraud claims is wholly consistent with both the language and purpose of the PSRLA"); *Rehm v. Eagle Fin., Corp.,* 954 F.Supp. 1246, 1250-53 (N.D.Ill.1997) (same); *In re Health Management, Inc., Sec. Litig.,* 970 F.Supp. 192, 199-202 (E.D.N.Y.1997) (finding that "pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the court a novel legal theory" fulfills the "strong inference" requirement). Consistent with this approach, a plaintiff may plead either circumstantial evidence of recklessness or, in the alternative, motive and opportunity. Finally, other courts have adopted an approach that incorporates features of both of the other approaches. These courts have rejected the "motive and opportunity" test while retaining the "conscious recklessness test" as well as liability for recklessness. *See In re Baesa Sec. Litig.,* 969 F.Supp. 238, 240-42 (S.D.N.Y.1997) (reasoning that § 21D(b)(2) addresses only pleadings, codifying the "strong inference" standard while failing to mention any specific test); *Queen Uno Ltd. Partnership v. Coeur D'Alene Mines Corp.,* 2 F.Supp.2d 1345, 1355-59 (D.Colo.1998) (agreeing that recklessness still suffices as scienter under the PSRLA); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1106-07 (D.Nev.1998) (same).

**\*10** Regardless of which approach the Third Circuit may choose to employ, the court finds that plaintiffs' allegations are sufficient, even under the strictest "conscious behavior" standard, to withstand a motion to dismiss. Plaintiffs do not rely strictly on the assertion of insider trading to fulfill the PSRLA's strong inference requirement for scienter. [FN14] Instead, plaintiffs' complaint alleges strong circumstantial evidence indicating that defendants knowingly attempted to conceal material facts surrounding the merger. [FN15] Thus, the court finds that plaintiffs' complaint sufficiently alleges "conscious behavior," meeting the standard for pleading scienter under the PSRLA. *See Voit,* 977 F.Supp. at 374.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 10
1998 WL 743668 (D.Del.)
**(Cite as: 1998 WL 743668 (D.Del.))**

FN14. Specifically, plaintiffs allege that Patience and Schuler knowingly availed themselves of an opportunity unavailable to other Ventana security holders by purchasing a substantial block of Ventana common stock at a preferential price ($1.62), thereby realizing an aggregate windfall profit. (D.I.27, ¶¶ 67, 69-70)

FN15. Besides alleging generally that the nondisclosure of the "insider transaction" was done with the intent to deceive them, plaintiffs allege that the following circumstances are indicative of "conscious behavior" of an intent to deceive:
i) Schuler and Patience ... controlled and were in a position to approve the issuance of disclosures to be made to the Biotek Shareholders and Noteholders and the public and were the direct and immediate beneficiaries of the highly profitable Insider Transaction;
ii) As of the July 1996 IPO, Defendants Schuler and Patience owned a total of 1,258,752 shares of Ventana Common Stock, of which 616,481 shares, or 49% thereof, were acquired as a result of the undisclosed Insider Transaction;
iii) The number of shares issued was unusually high and not made as part of a larger offering;
iv) The non-disclosure of the Insider Transaction enabled the Ventana Insiders to retain numerical voting control over Ventana both before and after the IPO;
v) Two insiders, Schuler and Patience, have reaped windfall profits of at least $5,166,111.78 to date as a result of the Insider Transaction;
vi) Schuler and Patience actually reaped the windfall profits derived from the Insider Transaction;
vii) The Defendants seek to justify their fraudulent conduct on the basis that the shares issued under the Insider Transaction were part of a compensation package. This assertion is pretextual and deceptive ...;
viii) The February 23, 1996 final approval of the Insider Transaction was timed so as to avoid disclosure of the Insider Transaction in the proxy solicitation for the Merger notwithstanding the fact that the approval thereof in principle was fixed as of late January 1996 and the date of the operative fair market value determination made by the Ventana Board of Directors was January 1996;
ix) The price at which Ventana acquired Biotek was at least 70.16% less than Biotek's true market value. But for the nondisclosure of the Insider Transaction, Ventana would not have

been able to obtain such windfall to the detriment of the holders of Biotek Securities who received no cash whatsoever on account of their Biotek shares; and
x) Schuler and Patience concealed the existence of the Insider Transaction and its pricing component at the Private Meeting. During the Private Meeting Johnson Lee specifically asked Patience and Schuler whether Ventana could set a floor of Five Dollars ($5.00) on any future issuance of Ventana Common Stock. Patience and Schuler provided such assurance by representing to the participants at the Private Meeting that no stock would be issued at less than Five Dollars ($5.00) per share because their 'incentive' in any effort to raise capital began at Four Dollars ($4.00) per share....
(D.I.27, ¶ 77(i)-(x))

**4. Circumstances of Fraud**

Under the PSRLA, plaintiffs are required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If the plaintiffs' complaint fails to meet this requirement, it must be dismissed upon motion of the defendant(s). *See id.* § 78u-4(b)(3)(A).

In the case at bar, plaintiffs allege two false or misleading statements on the part of defendants. First, that the affirmative representation made in § 4.7 of the Information Statement was false. (D.I.27, ¶ 58(a)) Second, that the Information Statement's representations regarding Ventana's capitalization were misleading. (D.I.27, ¶ 58(b)) With respect to the first statement, plaintiffs contend that it was false because (1) the Agreement and Information Statement failed to disclose the existence, terms, and conditions of the alleged "insider transaction" which were known to defendants and (2) the capitalization of Ventana as set forth in § 4.5 of the Agreement failed to disclose that as of January 16, 1996 Ventana had granted Schuler and Patience the right to purchase a dilutive block of Ventana Common Stock at $1.62 per share. (D.I.27, ¶ 58(a)) Plaintiffs aver that the second statement was misleading because Ventana knew at the time it sent the Information Statement to Biotek security holders that a dilutive block of 646,664 shares of Ventana common stock had been approved for issuance and future grant to Schuler and Patience at a price per share significantly lower than the warrant exercise price. (D.I.27, ¶ 58(b)) As a result of the false and misleading statements, plaintiffs argue they were left with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"mistaken and indeed false impression" that the $5.00 per share conversion price constituted an implied representation that $5 .00 per share was a reasonable determination of the fair market value (pre Reverse-Split) of Ventana's common stock. (D.I.27, ¶ 60)

  The court finds that plaintiffs' complaint meets the requirements of Rule 9(b) and the PSRLA. Plaintiffs have identified those statements which they allege to have been false or misleading and have sufficiently identified contemporaneous facts indicating that the statements were false or misleading when made by defendants. Even assuming arguendo that these facts were not literally false as of February 8, 1996, the court has already determined that defendants as "insiders" assumed an affirmative duty to disclose material facts. Plaintiffs' complaint sufficiently alleges what facts defendants were required to disclose and why such disclosure was mandated. (D.I.27, ¶¶ 56, 58) Accordingly, the court finds that plaintiffs have stated a cause of action for securities fraud under § 10(b) and Rule 10b-5.

B. Plaintiffs' State Law Claims

  *11 Besides their federal claims, plaintiffs allege numerous state law claims. First, plaintiff Michelle Leung alleges violations of § 25401 of California's Blue Sky Law, Cal. Corp.Code § 25401 (count I). (D.I.27, ¶¶ 78-83) Second, plaintiffs collectively allege violations of § 25402 of California's Blue Sky Law, Cal. Corp.Code § 25402 (count III). (D.I.27, ¶¶ 84-86) Third, plaintiffs allege that defendants committed fraud under the common law of California (count IV). (D.I.27, ¶¶ 87-92) Fourth, plaintiff Shih alleges that defendants Schuler and Patience, as directors of Ventana, breached their fiduciary duty and committed constructive fraud (count V). (D.I.27, ¶¶ 93-96) Finally, plaintiffs Tse and Margaret Leung allege that defendant Ventana violated § 78A-56 of North Carolina's Blue Sky Law, N.C. Gen.Stat. § 78A-56 (count VI). (D.I.27, ¶¶ 97-100)

1. Plaintiffs' California State Law Claims

  Plaintiff Leung, as a resident of California, filed a state law claim under § 25401 of California's Corporate Code. (D.I.27, ¶¶ 78-86). Section 25401, modeled after clause (b) of Rule 10b-5, provides that

    [i]t is unlawful for any person to offer or to sell or to buy or offer to buy a security in this state by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statement not misleading.

  Cal. Corp.Code § 25401 (1997). Unlike Rule 10b-5, however, reliance on any alleged misrepresentation or

omission is not required under § 25402. See Lynch v. Cook, 148 Cal.App.3d 1072, 196 Cal.Rptr. 544, 553-54 (Cal.Ct.App.1983). Since California's statute is virtually identical to the federal securities statute, the court finds, given earlier discussion of the federal claims, that plaintiff Leung has alleged sufficient facts with respect to count II to withstand a motion to dismiss.

  Collectively, plaintiffs filed an additional claim under § 25402 of the California Corporate Code, alleging insider trading against defendants Patience, Schuler, and Ventana. Section 25402 provides in relevant part that it is unlawful for an insider

    to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of that information.

  Cal. Corp.Code § 25402 (emphasis added). Defendants contend that plaintiffs have failed to allege, inter alia, how the alleged omission could have "significantly affect[ed] the market price" of Ventana common stock since Ventana was a private company and the offer to plaintiffs to convert their Biotek Notes was at a negotiated price. (D.I. 48 at 31 n. 19) Plaintiffs do not address defendants' assertion.

  *12 According to the treatise cited by defendants, Harold Marsh, Jr. & Robert H. Volk, 1 Practice Under California Securities Laws (4th ed.1996), [FN16] the statutory requirement that the material information "significantly affect the market price" in order for the insider to incur liability was, inter alia, "to indicate that these sections were intended to be applicable only to situations where purchases or sales were made in the market." (D.I. 48, Ex. 11 at 14-31)

      FN16. Marsh and Volk were the principal drafters of the California Corporate Securities Law of 1968. See Mirkin v. Wasserman, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, 580 (Cal.1993). Marsh was the reporter for the drafting committee and Volk was Commissioner of Corporations at that time. See id. at 580 n. 10.

  The court is unaware of, and the parties have not provided, any California case law interpreting this requirement generally, much less in a context similar to that at bar. In the absence of any guidance from the California courts, the court interprets the plain language of the statute to preclude defendants' liability under the

Not Reported in F.Supp.2d                                                                                      Page 12
1998 WL 743668 (D.Del.)
**(Cite as: 1998 WL 743668 (D.Del.))**

circumstances. The instant action involves a negotiated sale of stock, not a market transaction. Moreover, prior to the merger, Ventana was a private company. Thus, there is no indication, nor have plaintiffs alleged, that the material information at issue would have "significantly affect[ed] the market price" of the stock as required by the statute. Accordingly, plaintiffs' complaint is insufficient to withstand defendants' motion to dismiss with respect to count III.

2. Plaintiffs' Common Law Fraud Claim

 Plaintiffs allege that "[t]he omissions to disclose material facts and misrepresentations contained in the Agreement constitute fraud under the common law of California." (D.I.27, ¶ 90) Under California law, a claim for common law fraud requires the plaintiff to demonstrate that defendants (1) made a false representation; (2) with knowledge of the statement's falsity; (3) intending to induce reliance thereon; and (4) that plaintiffs actually and reasonably relied on the representation, thereby suffering injury. *See Gray v. First Winthrop Corp.,* 776 F.Supp. 504, 512 (N.D.Cal.1991).

 Based on its previous discussions regarding the federal claims, the court finds that plaintiffs have sufficiently alleged a claim for fraud under California common law. Despite defendants' arguments to the contrary, plaintiffs have pled fraud with the particularity mandated by Fed.R.Civ.P. 9(b); defendants had a duty to disclose the allegedly omitted information; and plaintiffs have adequately pled a causal nexus between the alleged omission and the claimed damages. Consequently, the court finds that plaintiffs' claim for fraud is sufficient to withstand defendants' motion to dismiss.

3. Plaintiffs' Claim for Breach of Fiduciary Duty [FN17]

   FN17. In their complaint, plaintiffs did not specify the state law under which they were bringing their breach of fiduciary duty/dilution claim. However, since in their answering brief opposing defendants' motion to dismiss, plaintiffs solely cited Delaware case law, the court will look to Delaware law in evaluating plaintiffs' claim.

 In their complaint, plaintiffs allege that upon conversion of plaintiff Shih's Ventana Exchange into Ventana common stock, Schuler and Patience, as directors of Ventana, owed a fiduciary duty of loyalty to plaintiff Shih as well as other holders of Ventana Exchange Notes who had elected to convert all or a portion of their notes into Ventana common stock ("the Converting Shareholders"). (D.I.27, ¶ 94) Under Delaware law, directors of

corporations owe a fiduciary duty to the corporations upon whose board they serve as well as to the shareholders of those corporations. *See Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989). This duty does not extend, however, to holders of a corporation's convertible debentures (until conversion occurs), *see Simons v. Cogan,* 549 A.2d 300, 303-04 (Del.1988), or to prospective stockholders, *see Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171 (Del.1988). Hence defendants are correct in their assertion that they did not owe a fiduciary obligation to the Converting Shareholders with respect to preconversion disclosure of the compensation package. However, the question posed by plaintiffs' complaint is whether after conversion, consummation of the compensation package violated defendants' duty of loyalty to the Converting Shareholders.

 **\*13** The duty of loyalty mandates against self-dealing resulting in the personal financial gain of one or more directors who participate in the board approval. Plaintiffs contend that, pursuant to their fiduciary obligation, Schuler and Patience were required after the conversion not only to disclose to the Converting Shareholders the existence and terms of the compensation package but to not continue the effectuation of the compensation package, which was still executory at the time of plaintiff Shih's conversion. (D.I.27, ¶¶ 95-96) Plaintiffs contend that defendants' breach of their duty of loyalty resulted in stock dilution and a corresponding decrease in stockholder voting power. (D.I.27, ¶ 96(b)-(c)) Such allegations, if true, constitute an actionable individual claim under Delaware corporate law. *See In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 330 (Del.1993) ("It is well settled that the test used to distinguish between derivative and individual harm is whether the plaintiff suffered 'special injury.' A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." (citations omitted)).

4. Plaintiffs' North Carolina State Law Claim

 With respect to count VI, plaintiffs Tse and Margaret Leung ("the Tse plaintiffs") allege the following:
98. The Tse Plaintiffs are residents of the State of North Carolina and are entitled to the protection of the North Carolina securities laws. Danzi and/or Lee telephoned the Plaintiff Alex Tse in North Carolina in order to solicit the Tse Plaintiffs' approval of the Merger.
99. Therefore, Ventana's offer to sell Ventana Exchange Notes or, alternatively, its offer to buy the Biotek Notes and the Biotek Shares was made in the State of North Carolina within the meaning of N.C. Gen.Stat. § 78A-

Not Reported in F.Supp.2d
1998 WL 743668 (D.Del.)
**(Cite as: 1998 WL 743668 (D.Del.))**

Page 13

63.

100. Ventana's omissions to disclose material facts and the misrepresentation of material facts ... constitute a violation of § 78A-56 of North Carolina's Blue Sky Law, N.C. Gen.Stat. § 78A-56.

(D.I.27, ¶¶ 98-100) Defendants contend that plaintiffs' claim fails to state a cause of action because (1) it is pleaded inadequately; (2) the North Carolina law cited by plaintiffs does not apply to merger transactions; and (3) plaintiffs fail to allege that any defendant directed conduct towards the Tse plaintiffs in North Carolina. Plaintiffs do not contest defendants' assertions regarding the insufficiency of count VI.

Section 78A-56 provides in pertinent part that:

(a) Any person who: ...

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission) ... is liable to the person purchasing the security from him....

**\*14** N.C. Gen.Stat. § 78A-56(a)(2). However, expressly excluded from the term "purchase" within the purview of this statute is

[a]ny transaction incident to a class vote by security holders, pursuant to the certificate of incorporation or the applicable corporation statute, on a merger, consolidation, reclassification of securities, or sale of corporate assets in consideration of the issuance of securities of another corporation.

*Id.* § 78A-2(8)(f)(3) (emphasis added). The court interprets the plain language of this statute to preclude defendants' liability under the circumstances at bar. [FN18] Further, plaintiffs have not alleged that any defendant directed conduct regarding the merger at issue towards the Tse plaintiffs in North Carolina; rather plaintiffs allege only that individuals associated with Biotek, not Ventana, contacted them in North Carolina. Thus, the court concludes that plaintiffs Tse and Margaret Leung have failed to state a claim for violation of the North Carolina General Statute § 78A-56. Accordingly, count VI shall be dismissed.

> FN18. The court is unaware of and the parties have not provided any North Carolina case law directly on point.

## V. CONCLUSION

For the reasons stated above, the court finds that plaintiffs have adequately pled facts sufficient to withstand defendants' motion to dismiss with respect to counts I, II, IV, and V of plaintiffs' amended complaint

(D.I.27). The court further finds that plaintiffs have failed to state a claim with respect to count III of the complaint. Similarly, the court finds that plaintiffs Tse and Margaret Leung have failed to state a claim with respect to count VI of the complaint. Accordingly, counts III and VI are dismissed without prejudice. An appropriate order shall issue.

1998 WL 743668 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
In Re: U.S. INTERACTIVE, INC. CLASS ACTION
SECURITIES LITIGATION.
**No. 01-CV-522.**

Aug. 23, 2002.

MEMORANDUM

GILES.

I. Introduction

**\*1** This securities class action is brought on behalf of
all persons, except for defendants, who purchased
U.S. Interactive, Inc. ("USIT") common stock
between February 10, 2000 and November 8, 2000
("Class Period"). The action is also brought on behalf
of a sub-class of investors who purchased in an April
12, 2000 secondary offering of USIT common stock
("Secondary Offering"). An amended complaint
alleges claims against the individual officers of USIT
during the Class Period ("Individual Defendants") for
violations of Section 10(b), Rule 10b-5 (Count I), and
Section 20(A) (Counts II) of the Securities Exchange
Act of 1934 ("Exchange Act"). It also charges the
Individual Defendants, directors of USIT at the time
of the Secondary Offering ("Director Defendants"),
and the underwriters of the Secondary Offering
("Underwriters") with violations of Sections 11
(Count III) and 12(a)(2) (Counts IV) of the Securities
Act of 1933 ("Securities Act"). Count V is a claim
against the Individual Defendants for violation of
Section 15 of the Securities Act against the
Individual Defendants.

Now before the court is a motion to dismiss Counts
I-II by the Individual Defendants, a motion to dismiss
Counts III-V by the Individual Defendants and
Director Defendants, and a motion by the
Underwriter Defendants to dismiss Counts III-IV.

For the reasons that follow, the motion by the
Individual Defendants to dismiss Counts I-II is
granted in part and denied in part, the motion by the
Individual Defendants and Director Defendants to
dismiss Counts III-V is granted, and the motion by
the Underwriters to dismiss Counts III-V is granted.

I. Facts
*A. Parties*

Plaintiffs, a class of former shareholders of USIT
who purchased stock during the Class Period and a
sub-class of shareholders who purchased stock
pursuant to the Secondary Offering, allege that the
Individual Defendants undertook a scheme to inflate
artificially the price of USIT stock by making highly
positive statements about the Company when they
knew they were false and misleading. The Director
Defendants and the Underwriter Defendants allegedly
participated in the issuance of the Registration
Statement and Prospectus ("Prospectus") for the
Secondary Offering which contained material
representations and omissions known by them to be
false.

Defendants are the former directors of USIT at the
time of the Secondary Offering, [FN1] the
underwriters for the secondary offering, [FN2] and
the following four individual defendants: (1) Stephen
Zarrilli ("Mr.Zarilli") was President and Chief
Executive Officer of the Company for much of the
Class Period until his resignation on September 8,
2000. It is alleged that during the Class Period, while
in possession of confidential USIT information, he
sold 60,000 shares of USIT stock at artificially
inflated prices for proceeds of more than $1 million.
Specifically, on the days immediately following his
positive remarks in an April 25, 2000
RadioWallstreet.com interview, (April 26, 27, and
28), he sold 51,500 shares of his USIT stock for
proceeds of $858,419 and on May 1, 2000 he sold 8,
500 shares for $144,942. [FN3] (Id.¶ ¶ 55- 58.); (2)
Eric Pulier ("Mr.Pulier") was the Chairman of the
Board of USIT. It is alleged that while in possession
of confidential USIT information, he sold 242,500
shares of USIT stock at artificially inflated prices for
proceeds of more than $3.59 million. Specifically, on
the days immediately following Mr. Pulier's remarks
in an April 25, 2000 RadioWallstreet.com interview,
(April 26, 27, and 28), Mr. Pulier sold 128, 000
shares for proceeds of $2.14 million and on May 1,
2000, sold an additional 21, 500 shares for proceeds
of $366,618. (Am.Compl.¶ ¶ 55-58.) Mr. Pulier sold
another 92,500 shares for $1.09 million on August 3,
2000. (Am.Compl.¶   74.); (3) John Shulman
("Mr.Shulman") was a director of the Company and a
member of its audit committee. It is alleged that he

Not Reported in F.Supp.2d                                                                                          Page 2
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

was privy to non-public information about the Company, and had the power to influence and control the decision-making of the Company, including the content and dissemination of the false and misleading statements in the public statements. During the class period, while in possession of confidential USIT information, he sold 37,500 shares of USIT stock at artificially inflated prices for proceeds of more than $484,625. Specifically, within days of Mr. Zarrilli's positive remarks in a May 2, 2000 RadioWallstreet.com interview about USIT, it is alleged that on May 17, 2000, Mr. Shulman sold 25,000 shares for proceeds of $352,000 and on May 24, 2000, sold an additional 10, 000 shares for proceeds of $100,300. (Id.¶ 63.); and (4) Philip Calamia ("Mr.Calamia") was the Senior Vice President and Chief Financial Officer during the Class Period. Mr. Calamia signed the Company's 10-Q and 10-K filings with the SEC. All Individual Defendants signed the Company's Prospectus in connection with its Secondary Offering, effective April 12, 2000. (Id.¶ 19.)

> FN1. The six directors who signed the Prospectus are Mohan Uttarwar, Robert E. Keith, Jr., Michael Foraghsh, John H. Klein, William C. Jennings, and Robert V. Napier.

> FN2. The underwriters are Lehman Brothers Inc., Chase H & Q Securities Inc., Deutsche Banc Alex. Brown, First Union Securities Inc., Adams, Harkness & Hill, Inc., and Fidelity Capital Markets.

> FN3. Only stock sales relevant to the allegations of scienter are discussed.

*B. USIT*

**\*2** USIT was an Internet professional services firm which provided integrated Internet strategy consulting, marketing, and technology services to enable clients to utilize Internet-based technologies to transact business, communicate information, and share knowledge across employees, customers, and suppliers. (Id.¶ 33.) The Company was formed in 1991, commenced business in 1994, and took its present name in 1995. (Id.¶ 34.) USIT went public in an initial Public Offering ("IPO") in August 1999 and raised about $38.2 million, after deducting costs and expenses. (Id.¶ 35.) In August 1999, the officers entered into a lock-up agreement which prevented them from selling their shares for a period of 180 days from the date of the IPO. (Id.¶ 36.)

On February 1, 2000, USIT announced that it had entered into a definitive merger agreement to acquire Soft Plus, Inc. The consideration for the transaction was 4.8 million shares of USIT common stock, $20 million in cash, and a one-year $80 million note due to the selling Soft Plus shareholders. (Id.¶ 37.) On March 8, 2000, USIT completed its acquisition of Soft Plus.

On March 10, 2000, USIT filed the initial registration statement for its Secondary Offering and USIT's Registration Statement and Prospectus became effective on April 12, 2000. (Id.¶ 44.) The Company received approximately $41.7 million after deducting costs and expenses for its Secondary Offering. (Id.)

Plaintiffs allege that during the Class Period, the Individual Defendants repeatedly represented that the USIT was achieving explosive growth and would achieve profitability by year end. At the time that they were making these statements. It is alleged that they were aware of underlying conditions which were adversely affecting the company which made their statements false and misleading. Specifically, plaintiffs allege that the Individual Defendants knew that USIT's acquisition of Soft Plus would cause a debt burden to USIT and prevent the company from achieving profitability. (Id.¶ 3.) Plaintiffs contend that the Individual Defendants knew, but did not disclose, that the $80 million Soft Plus debt would not be paid off with the proceeds of USIT's Secondary Offering even though allegedly the company stated in public interviews, in its 10-K, and in its Prospectus that it anticipated repaying the $80 million note with these proceeds. (Id.¶ ¶ 39, 42-43, 45.) By the end of the Class Period, no part of the $80 million debt had been paid off.

Plaintiffs further allege that by late April 2000, the Individual Defendants were aware that at least two of the dot-com companies, NetSmart and Exist Corporation, owned in part by several of them, had financial difficulties and would not be paying USIT for services it provided. Mr. Pulier owned equity in, and was a director of, NetSmart. Mssrs. Pulier and Shulman owned stakes in, and were directors of, Exist Corporation. (Id.¶ 67.) However, during the Class Period, the Individual Defendants reassured the public that its dot-com risk was minimal because the Company carefully evaluated all dot-com organizations that it provided services to and made sure that USIT only did business with dot-com organizations with proper levels of funding. (Id.¶ 4.)

Not Reported in F.Supp.2d                                                                                                      Page 3
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
(Cite as: 2002 WL 1971252 (E.D.Pa.))

Plaintiffs further allege that in late April 2000, the Individual Defendants knew that USIT was being negatively affected by a lengthening of its sales cycle; nevertheless, the Individual Defendants represented that any effects from the lengthening of the sales cycle were being counterbalanced by larger sales. (Id.¶ 5.)

**\*3** Plaintiffs allege that in July 2000, USIT sent Dieter Schoenegger, Chief Technology Officer of the company adidas America, a letter informing him that USIT was going out of business. (Id.¶ 71.)

On September 20, 2000, USIT pre-announced that its third quarter performance would be worse than expected due to rapid changes in the Internet professional services market. (Id.¶ 6.) On November 8, 2000, when USIT announced its actual third quarter performance, its third quarter financial results were worse than pre-announced, and the Company wrote-off $8.8 million of uncollectible accounts receivable during the third quarter, which amounts were primarily related to services performed for dot-com organizations. (Id.¶ 8.)

During the class period USIT stock traded as high as $50.00 and, by the end of the Class period, USIT stock dropped to $0.81 per share. (Id.¶ 9.)

### III. Procedural History

Plaintiffs argue that, although not named as a defendant because it filed for bankruptcy protection in January 2001, USIT is a primary violator of Section 10(b) of the Exchange Act and Rule 10b-5, as well as Sections 11 and 12(a)(2) of the Securities Act, through the conduct of the named defendants who were controlling persons of USIT. (Am.Compl.¶ 16.)

Counts I-II allege that 23 different statements made in press releases, Internet-based interviews on the website RadioWallstreet.com, public filings, and through analysts' statements violate Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 because they were false and misleading. (Am.Compl.¶ 10.) Plaintiffs allege that the Individual Defendants artificially inflated USIT's stock in order to sell over $5 million worth of their USIT stock at prices significantly higher than the price to which USIT shares dropped at the end of the Class Period. (Am.Compl.¶ 11.)

Counts III-IV are against the Director Defendants, Underwriter Defendants, as well as the Individual Defendants. Plaintiffs allege that the six Director

Defendants are liable for false statements contained in USIT's Prospectus as directors of the Company at the time of USIT's Secondary Offering and as signatories of the Prospectus. (Am.Compl.¶ 21.) Plaintiffs allege that the six Underwriter Defendants are liable for the misrepresentations and omissions made in the Company's Prospectus as sellors, offerors, and/or solicitors of sales of the shares offered in connection with USIT's Secondary Offering. (Am.Compl.¶ 23.)

The defendants moved in three different motions to dismiss the respective claims against them on the basis that plaintiff's allegations failed to meet the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"). Argument was heard on all motions on July 30, 2002. Counts I-II are dismissed in part. Counts III-V are dismissed in their entirety. The Director Defendants and Underwriter Defendants are dismissed from this case.

### IV. Discussion
A. Legal Standards

#### 1. 12(b)(6) Motion to Dismiss

**\*4** While plaintiffs must plead fraud with specificity under Rule 9(b) [FN4] and meet the standards of the PSLRA, Rule 12(b)(6) standards still apply to securities fraud litigation. On a motion to dismiss, the court must accept as true all well-pled allegations of fact in the plaintiff's complaint, construe the complaint in the light most favorable to the plaintiffs, and determine whether, "under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief." *Colby v. Upper Darby Twnshp,* 838 F.2d 663, 665-66 (3d Cir.1988).

> FN4. Rule 9(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. FED. R. CIV. P. 9(b).

Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997).

#### 2. *Pleading Standards Under the PSLRA*

##### a. Relationship to *Rule 9(b)*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The PSLRA made two changes to the Securities Act and Exchange Act that are relevant here. First, it established a pleading standard requiring particularized allegations even beyond Rule 9(b) of the Federal Rules of Civil Procedure. Under this standard a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The third circuit has noted that the particularity language of § 78u-4(b), like Rule 9(b) of the Federal Rules of Civil Procedure, requires plaintiff to plead "the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999).

The PSLRA also requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This is in contrast to Rule 9(b) which allows state of mind to be averred generally. Therefore, on the issue of state of mind, the third circuit has found that the PSLRA supersedes Rule 9(b) for securities fraud litigation. *Advanta,* 180 F.3d at 531 n. 5.

Second, the PSLRA provides a safe-harbor for certain forward-looking statements that prove to be false. *See,* discussion *infra.*

A complaint that fails to comply with any of these requirements must be dismissed. *See* 15 U.S.C. § 78u-4(b)(3)(A).

### *b. Group Pleading Under the PSLRA*
Defendants argue that the "group pleading rule," a doctrine which allows allegations that misstatements contained in company documents such as press releases and SEC filings to be presumed to be the collective work of that company's directors and officers, did not survive the passage of the PSLRA. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Counts I and II of the Am. Compl. at 9 n.7.) Thus, each individual defendant would only be liable for a statement made by him.

There is no third circuit precedent on this issue and district courts in this circuit are divided. *See Marra v. Tel-Save Holdings, Inc.,* 1999 WL 317103, at *5 (E.D.Pa. May 18, 1999)* (holding that the continued vitality of the group pleading doctrine is suspect); *In re Home Health Corp. of Am.,* 1999 WL 79057, at

*21 (E.D.Pa. Jan.29, 1997)* (same). *But see In re Aetna, Inc. Sec. Litig.,* 34 F.Supp.2d 935, 949 (E.D.Pa.1999)* (analyzing the liability of an outside director using the group pleading doctrine). This court follows a narrowly construed group pleading doctrine and finds that it is valid when applied to officers where it is almost certain that given the high-level position of the officer within the company and the nature of the published writing that he or she would have been involved directly with writing the document or approving its content and that the officer was privy to information concerning the accuracy of the statements within the document. All of the individual officers in this case are such high-ranking officers and the SEC filings and press releases are such collectively published documents. Thus, the Individual Defendants are presumptively responsible for the statements in the SEC filings and press releases. [FN5]

> FN5. The Individual Defendants cannot be held liable for the September 20, 2000 press release which is attributed to a new CEO. "The Company expects its revenues for the third quarter ending September 30, 2000 will be in the range of $21 million to $23 million, more than double third quarter 1999 revenues of $9.9 million but below the $29.5 million reported for second quarter 2000. William C. Jennings, recently appointed CEO, U.S. Interactive, said, " 'After a track record of double-digit sequential growth each quarter, this quarter's performance is principally due to the rapid changes in the Internet professional services market, including lengthening sales cycles, re-evaluation of e-business initiated by our clients and prospects, and reduced funding available to dot-com clients.' " September 20, 2000 Press Release (Am.Compl.¶ 78.) (Statement D)

### *B. Section 11 and 12 Claims Under the Securities Act (Counts III-IV)* [FN6]

> FN6. The Securities Act claims are discussed first because resolution of the claims based on the statements in the Prospectus results in the dismissal of the Director Defendants and the Underwriter Defendants and is relevant for the claims against the Individual Defendants.

**\*5** Counts III-IV of the Amended Complaint allege as to the Individual Defendants, Director Defendants,

Not Reported in F.Supp.2d                                                                    Page 5
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

and Underwriter Defendants violations of Sections 11 and 12(a)(2) of the Securities Act because they issued, caused to be issued, or participated in the issuance of the Prospectus in connection with USIT's Secondary Offering, which misrepresented or failed to disclose material facts. (Am.Compl.¶ 113.) Allegedly, the Prospectus contained material misstatements concerning (1) use of proceeds from the Secondary Offering, (2) USIT's ability to remain solvent, and (3) the its competitive position. Plaintiffs argue that the cautionary statements in the Prospectus were insufficient because the Prospectus did not contain two additional warnings: (1) that two of USIT's largest customers were likely to withhold payments on substantial debts owed USIT and (2) that USIT's expenses were increasing dramatically while its revenues were not keeping pace. (Pls.' Mem. of Law in Opp. to Mots. to Dismiss by Underwriters, Directors, and Individual Defs. at 15.)

 Under Section 11 of the Securities Act, purchasers of registered securities may sue, among others, an issuer, its directors, any person who signs the corresponding registration statement, and every underwriter, if the registration statement (which includes the prospectus) contains an untrue statement of a material fact or an omission of a material fact required to be stated or necessary to make the statements in the registration statement not misleading. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability upon any person or officer who offers or sells a security by means of a prospectus which contains a material misstatement or omission. 15 U.S.C. § 77l. Therefore, to state a claim under Sections 11 or 12(a)(2) of the Securities Act, plaintiffs must demonstrate that the Prospectus contained misleading statements of material fact or omissions of material fact necessary to make the statements not misleading. 15 U.S.C. § § 77k(a) & 78j(b). [FN7]

      FN7. The liability of the Individual Defendants under Section 15 of the Securities Act (Count V) is not discussed separately because resolution of the Section 11 and 12 claims in favor of all of the defendants necessarily decides whether the Individual Defendants were controlling persons within the definition of Section 15 of the Securities Act. Controlling person liability is derivative of whatever underlying liability may exist. Dismissal of Counts III and IV requires dismissal of Count V.

The challenged statements in the Prospectus are as

follows:

      **\*6** (A) The amount of principal which we must pay under the $80 million note will be reduced under certain circumstances relating to: (i) our rights to be indemnified by the principal shareholders of Soft Plus under the Merger agreement, (ii) the results of certain audits being performed after the closing of the Merger, and (iii) costs incurred by Soft Plus in the Merger above agreed levels. The $80 million note is due and payable on the earlier of March 8, 2001 or the receipt by us of not less than $80 million from the net proceeds of a public offering of our capital stock. However, we may pay a portion of the $80 million note with some of the proceeds from this offering. We intend to use the net proceeds from this offering to repay any outstanding balance under our revolving credit agreement with a commercial bank, open new offices and for other general Corporate purposes. In addition, we may use a portion of the net proceeds from this offering for acquisitions or to repay a portion of the $80 million dollar note issued in the Merger. ("Statement A.") (Am. Compl. ¶ 45; Prospectus at pp. 14-15)
      (B) The Company believes that the net proceeds from this offering, current cash balances, and borrowings available under the credit facilities will be sufficient to fund requirements for working capital and capital expenditure for at least the next 18 months. ("Statement B.") (Am. Compl. ¶ 47; Prospectus at p. 26.)
      (C) We believe that in order to be successful in this market, professional services firms must possess an integrated model of Internet strategy, marketing skills, expertise in wireless and broadband technologies, technology integration skills, and clients and project management capabilities. We believe we are the only Internet professional services firm that integrates all of these skills, with a dedicated focus on e2e solutions. ("Statement C.") (Am. Compl. ¶ 49; Prospectus at p. 29.)

 For all practical purposes, the court considers the two motions to dismiss Counts III-V together and then discusses any relevant differences in the bases for dismissal.

 The Individual Defendants and Director Defendants argue that all three statements are protected under Prong 1 of the PSLRA safe-harbor and that Statement 3 is immaterial since it is mere puffing. (Mem. of Director Defs. and Individual Defs. in Supp. of Their Mot. to Dismiss Counts III, IV, and V at 2.) The Underwriter Defendants argue that Statements 1-3 are not misleading when read in the context of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

Prospectus as a whole because these statements are not false on their face, or are accompanied by cautionary text that precludes risk of misleading as a matter of law. (Mem. of Underwriter Defs. in Supp. of Their Mot. to Dismiss at 2-4.) The Underwriter Defendants also argue that the claims against them are time-barred. (Id. at 31.)

As a threshold matter, the court finds that plaintiffs' claims against the Underwriter Defendants are not time-barred. The Underwriter Defendants argue that plaintiffs' claims against them are time-barred because all the facts forming the basis for the claims were revealed in the Prospectus for the Secondary Offering on April 12, 2000. According to the Underwriter Defendants, plaintiffs were under inquiry notice on April 12, 2000, more than one-year before they filed their Amended Complaint on June 18, 2001, which first included the Underwriter Defendants. Plaintiffs argue that the "dire financial problems of the Company," its lack of a niche in its industry, and its inability to pay off any of the $80 million note, was not known until the first week of November 2000. (Pls.' Mem. of Law in Opp. to Mots. to Dismiss Counts III-V at 21-22.)

**\*7** Claims for relief pursuant to Sections 11 and Section 12(a)(2) of the Securities Act must be brought within one-year from the time the plaintiff discovered or, after the exercise of reasonable diligence, should have discovered, the untrue statements or omissions. 15 U.S.C. § 77m. A court need only consider at what point in time investors were on notice of the facts which rendered the alleged misstatements false or misleading. _McKowan Lowe & Co. v. Jasmien Ltd.,_ 127 F.Supp.2d 516, 526 (D.N.J.2000), _rev'd on other grounds._ The court agrees with the plaintiffs that they were not on inquiry notice about the securities fraud claims until the stock price dropped and that the June 18, 2001 amended complaint is well within the one-year statute of limitations.

Four principles are relevant to the court's analysis of whether the Prospectus contained an actionable misstatement or omission of material fact.

_First._ In order to be actionable under securities fraud, a statement must be a fact and not an opinion. Vague expressions of hope by corporate managers are not actionable. _See EP Medsystems Inc. v. EchoCath,_ 235 F.3d 865, 872 (3d Cir.2000).

_Second._ Even a false statement is not actionable if it is "immaterial." _Id._ In order for a misrepresentation

or omitted fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." _Id._ at 872 (quoting _TSC Indus. V. Northway, Inc.,_ 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "Vague and general statements of optimism that constitute no more than 'puffery' and are understood by reasonable investors as such," will not support a claim. _Advanta,_ 180 F.3d at 538. In other words, only statements that would be important to a reasonable investor in making his or her investment decision are material. _Burlington,_ 114 F.3d at 1425-26. Because questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, in order for a court to determine that a statement is immaterial, the omission or misstatement must be so obviously unimportant that courts can rule them immaterial as a matter of law at the pleading stage. _See id. at 1426._

_Third._ The third circuit has held that in determining whether statements contained in a prospectus are materially misleading, the prospectus must be read as a whole. Courts must avoid examining the alleged misstatements in isolation "because accompanying statements may render [them] immaterial as a matter of law." _EP Med Systems,_ 235 F.3d at 873.

**\*8** _Fourth._ Congress passed the PSLRA in 1995 which added to the Securities Act a "safe harbor" provision that applies to certain forward-looking statements.

The PSLRA states in relevant part:

A person shall not be liable with respect to any forward-looking statement if and to the extent that-
(A) the forward-looking statement is-
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) is immaterial ("Prong 1"); or
(B) the plaintiff fails to prove that the forward-looking statement-
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
(ii) if made by a business entity; was-
(I) made by or with the approval of an executive officer of that entity; and
(II) made or approved by such officer with actual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

knowledge by that officer that the statement was false or misleading. ("Prong 2")."
15 U.S.C. § 78u-5(c)(1)(A)-(B).

 The PSLRA establishes a two-pronged analysis for determining when persons will be insulated from liability for forward-looking statements that prove to be incorrect. The PSLRA first looks to the statement itself and grants protection to the forward-looking statement if it is accompanied by sufficient cautionary statements or if it is otherwise immaterial. In a second and alternative prong, the PSLRA looks to the state of mind of the person making the disclosure and grants protection if the plaintiff cannot prove that the forward-looking statement, even if unaccompanied by cautionary language, was made "with actual knowledge ... that the statement was false or misleading." Greebel v. FTP Software, Inc., 194 F.3d 185, 201 (1st Cir.1999).

 *1. Statement (A) Concerning Use of Proceeds from Secondary Offering*

 Statement (A) is not actionable because, on its face, it is not misleading. Plaintiffs allege that Statement (A) is materially misleading because defendants knew that "such funds were required to pay off other debts and for working capital" and would not be used to repay the $80 million note. (Am.Compl.¶ 46.) However, Statement (A) disclosed that USIT intends to use the net proceeds from the Secondary Offering to repay a commercial loan, open new offices, and for other general corporate purposes. (Id.¶ 45.) The Prospectus stated that USIT might use some of the proceeds from the Secondary Offering to repay a portion of the $80 million note. (Id.) To find this statement actionable, the court would have to find that it was materially misleading in that it promised that proceeds of the Secondary Offering would definitely be used to repay all or a substantial portion of the $80 million note, even though USIT stated that it would use the proceeds to pay a different loan and for capital expenditures. It is not possible for a reasonable investor to read Statement (A) except as an expression of a hope that some portion of the $80 million note might be reduced by such proceeds.

 Further, other statements within the Prospectus stated the means, other than the Secondary Offering, by which USIT intended to repay the $80 million note. The Prospectus expressly stated that USIT expected to pay down the $80 million note with funds raised through "proceeds to be obtained from one or more of the following: borrowings under our credit facilities, a refinancing, and a sale of capital stock or

debt securities in the public or private markets, together with revenues generated from operations." (Prospectus at p. 9.) Reading the Prospectus as a whole shows unequivocally that it was the intent of USIT, as a last resort, to repay the $80 million note with proceeds from the Secondary Offering and that the Company preferred to repay the note through alternate sources. The Prospectus even warned that the note might not be paid off at all. It stated, "there can be no assurances that we will be able to obtain funds sufficient to repay the [note] on terms satisfactory to us, in which event our ability to achieve profitability may be materially adversely affected. (Id.) Thus, as to Statement (A), the court finds that plaintiffs have failed to plead a misleading fact.

 *2. Statement (B) Concerning USITS Ability to Remain Solvent*

 **\*9** This statement is not actionable because it is protected under the PSLRA safe-harbor provision. [FN8] The statement about USIT"s ability to remain solvent is a financial projection that falls squarely within the statutory definition of a forward-looking statement. [FN9] 15 U.S.C. § 78u-5(i)(1)(A). Within the Prospectus, it is explicitly identified as forward-looking as it is qualified by the term "belief." The Prospectus explained under the heading "Forward Looking Statements," "that [w]hen used in this prospectus, the words 'anticipate,' 'believe,' 'estimate,' 'expect,' 'seek,' 'intend,' 'may,' and similar expressions are generally intended to identify forward-looking statements. (Prospectus at p. 13.)

> FN8. Because the court finds that the statements in the Prospectus are protected by the PSLRA safe-harbor, *see* discussion *infra* concerning Section 10(b) liability as well, the court dispenses with a discussion of the bespeaks caution doctrine, a common-law doctrine which provides that affirmative forward-looking statements are not actionable where the company has previously or contemporaneously warned investors of risks that could cause a projection not to come to pass. *See EP Medsystems*, 235 F.3d at 873-75; *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 871 (3d Cir.1993).

> FN9. The PSLRA defines "forward-looking" statements to include:
> (A) A statement containing a projection of revenues, income (including income loss),

Not Reported in F.Supp.2d                                                    Page 8
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) A statement of plans and objectives of management for future operations ...;
(C) A statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC].
15 U.S.C. § 78u-5(i)(1)(A)-(C).

Further, this statement was accompanied by sufficient cautionary language of risk factors that might cause USIT to exhaust available funds within 18 months. As required under applicable SEC regulations, the Prospectus made extensive disclosures about USIT's "Liquidity and Capital Resources," which included the Company's current and historical cash positions, past borrowing and available credit, and working capital requirements. (Id. at 24-27.) The Prospectus detailed that the Company had not achieved profitability, that it may never achieve profitability, and that it may continue to incur substantial losses even if revenues increase. (Id. at p. 6.) The Prospectus disclosed that the Company's expenses were dramatically increasing and that losses had increased recently. (Id. at pp. 5, 6, 19.) The Prospectus included a seven-page discussion of risk factors that could cause investors to "lose all or part of their investment." (Id. at 6.)

As discussed *supra,* plaintiffs argue that defendants failed to disclose two material omissions about forgiving certain customers' debts and about increasing expenses and thus, the cautionary statements in the Prospectus were made inadequate. Defendants respond that under the First Prong of the safe harbor, a person is not required to caution against every material risk and need not even warn against the specific risks that ultimately caused actual results to differ from predicted results. *Harris v. Ivax,* 182 F.3d 799, 807 (11th Cir.1999) (citing H.R. Conf. Rep. 104-369, at 44 (1995) *reprinted at* 1995 U.S.C.C.A.N. 730, 743. The issue is whether the cautionary language is sufficient to convey to an investor that the prediction in question is not a guarantee. Cautionary language is sufficient when an investor has been warned of risks similar to that actually realized so that the investor is on notice of the danger of the investment. *Harris,* 182 F.3d at 807. The court finds that a host of factors was disclosed and that the accompanying cautionary language was sufficient to warn investors that it was not guaranteed that USIT would be solvent for a period of 18 months.

**\*10** Plaintiffs argue that the safe-harbor provision is defeated by their demonstrating that the challenged statements were made with actual knowledge that the statements were false or misleading. 15 U.S.C. § 78u5(c)(1)(B). However, once a court determines that a statement in a Prospectus is forward-looking and is accompanied by meaningful cautionary language, the state of mind of the person making the statement is irrelevant. *Harris,* 182 F.3d at 803. The legislative history of the PSLRA shows that use of the words "meaningful" and "important factors" are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss without examining the state of mind of the defendant. *Id.* (citing H.R. Conf. Rep. 104-369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 743). The first prong of the safe harbor requires courts to examine only the forward-looking statement and the cautionary statements accompanying it.

Moreover, the third circuit has found a virtually identical statement not to be actionable. In *EP Medsystems,* defendants' representatives stated that the proceeds of the plaintiffs' investment, when coupled with the funds of other investors, would provide sufficient operating funs for "at least 18 to 24 months." *Id.* at 879-80. Since the representation was about "anticipated" funds, "not guaranteed," the third circuit held that the statement was immaterial and protected under the PSLRA safe-harbor since it was a mere expression of belief. *Id.* Similarly, Statement (B) conveys a hope by corporate managers based on the amount of money that USIT might obtain through the Secondary Offering. It is necessarily a contingent statement and is not a misstatement of fact. [FN10]

> FN10. The Individual Defendants and Defendant Directors also argue that the plaintiffs lack standing to assert claims under Sections 11 and 12 of the Securities Act because all plaintiffs have not alleged that they purchased stock in the Secondary Offering itself.
> Plaintiffs counter that they have standing under Sections 11 and 12 because at least one plaintiff bought USIT shares in the Secondary Offering. Plaintiffs submitted an affidavit that plaintiff Contino purchased USIT common stock in the Secondary Offering on the date of the Second Offering and at the price of the Secondary Offering

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

through her broker, Deutsche Banc Alex. Brown, which served as a managing underwriter for the Secondary Offering. (Dec. of Douglas Risen.) Defendants counter that the affidavit and documents do not state whether the shares were acquired through the open market or were part of Alex. Brown's initial distribution of its allotment of shares. Defendants argue that regardless of how plaintiff Contino obtained her shares, the claims of alleged class members who did not purchase their USIT shares directly from the underwriters in the initial distribution of shares do not have standing. Third circuit precedent shows that plaintiffs are entitled through discovery to try to establish that they purchased their stock directly in the Secondary Offering itself. *Shapiro,* 964 F.3d at 286. However, because the court dismisses all the claims based on the statements in the Prospectus on other grounds, discovery on this issue is moot.

### 3. Statement (C) Concerning USIT's Competitive Position

**\*11** This statement is not actionable because it is nothing more than a general statement of optimism about USIT and is mere puffery. It would be understood by a reasonable investor as such and is immaterial. *Advanta,* 180 F.3d at 538 (finding that "vague and general statements of optimism constitute no more than mere puffery and are understood by reasonable investors as such"). Statement (C) is not claiming that USIT possessed any skills that a professional services firm would not be expected to have. Further, a reasonable investor would expect a professional services firm to say that it was the best at integrating these skills. Such "puffing" would not significantly alter the "total mix" of information available to a reasonable investor or be important to a reasonable investor in making an investment risk decision, especially as to a company that it knew had never made a profit. *Burlington,* 114 F.3d at 1426. As such, Statement (C) is immaterial.

### C. Claims under Section 10(b) of the Exchange Act and Rule 10b-5 (Count I)

The Amended Complaint alleges that a series of statements by the Individual Defendants, including those in the Prospectus, constitute violations of Sections 10(b) and 20(A) of the Exchange Act and Rule 10b-5. The court has resolved the claims based

on the statements in the Prospectus and the same discussion and analysis is dispositive of the Exchange Act claims based on those statements. The principles, discussed *supra,* of whether the Prospectus contained an actionable misstatement or omission of material fact are equally relevant in analyzing the remaining challenged statements. In addition, the court must consider whether plaintiffs' allegations support a strong inference of scienter.

To state a cause of action under Section 10(b) of the Exchange Act and Rule 10b-5, a complaint must allege (1) that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that the defendant acted with scienter; (3) that the defendant's misstatement caused injury; and (4) those facts sufficient to meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. *Burlington Coat Factory,* 114 F.3d at 1417. Because Section 10(b) and Rule 10b-5 are anti-fraud provisions, plaintiffs must plead with the particularity required by Rule 9(b). *Id.*

Section 10(b) makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78(j)(b). Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). These provisions create a private right of action for plaintiffs to recover damages for "false or misleading statements or omissions of material fact that affect trading on the secondary market." *Advanta,* 18 F.3d at 535.

The Individual Defendants argue that plaintiffs' complaint fails to meet the heightened pleading standard required by the PSLRA which establishes a safe harbor for statements from securities fraud liability. Specifically, defendants argue that plaintiffs' Section 10(b) and Rule 10b-5 claims suffer from the three following deficiencies: (1) the challenged statements, when read in full context, are not misstatements or omissions of material facts; (2) the challenged statements fall within the PSLRA safe harbor and the bespeaks caution doctrine because they were accompanied by meaningful cautionary statements, and in any case, were not made with actual knowledge; and (3) plaintiffs' conclusory

Not Reported in F.Supp.2d                                                                              Page 10
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

allegations are devoid of facts necessary to support a strong inference of scienter. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Count I-II at 1.)

*1. Allegations of a Strong Inference of Scienter Under the PSLRA*

**\*12** In *Advanta,* the third circuit found that the PSLRA was intended to modify procedural requirements while leaving substantive law undisturbed. 180 F.3d at 534. Thus, even after the PSLRA, the third circuit has maintained the substantive second circuit standard for pleading scienter when it is required in securities fraud cases: "[I]t remains sufficient for plaintiffs to plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute evidence of either conscious or reckless behavior.' " Id. at 534-35. However, motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated "with particularity" and must give rise to a "strong inference of scienter." Id. at 535.

In attempting to meet the scienter requirement, plaintiffs maintain that knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers, and directors. In re Tel-Save Sec. Litig., No. C.I.V.A.98-3145, 1999 WL 999427, at \*5 (E.D.Pa. Oct.19, 1999).

*a. Motive and Opportunity*

Plaintiffs pled that the Individual Defendants had the motive and opportunity to artificially inflate USIT's stock price. Motive would entail concrete benefits that could be realized by one or more of the statements and wrongful disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." Aetna, 34 F.Supp.2d at 955.

Plaintiffs attempt to rely on the Individual Defendants' stock sales during the class period as evidence of a motive and opportunity giving rise to an inference of scienter. The third circuit has stated that it will not infer fraudulent intent from the mere fact that some officers sold stock; instead, in order for such an inference to be drawn, plaintiffs must plead facts that show that the stock sales were unusual in scope or timing. See Advanta, 180 F.3d at 540. To support an inference that sales are made at suspicious times or in suspicious amounts, the third circuit requires that plaintiffs plead the percentage of

the insider's stock holdings sold, the trading practices of the insider prior to the class period, whether the profit made by the insider from the sales during the class period was substantial in relation to his or her compensation, and the holdings and trading activity of other parties. See Aetna, 34 F.Supp.2d at 955.

*b. Circumstantial Evidence of Conscious Misbehavior or Recklessness*

**\*13** A plaintiff may also establish a strong inference of scienter by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. A reckless statement is one " 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Advanta, 180 F.3d at 535.

*c. Novak Factors*

In a more recent decision, the second circuit elaborated on the scienter requirement. The court stated that courts should not be wedded to the words "motive and opportunity" and found that an inference of scienter may arise when the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir.2000).

This court must decide whether any of the nineteen remaining challenged statements could be a basis for liability against the Individual Defendants under the Exchange Act. The court discusses by category which statements are not actionable. The court also discusses which statements meet the PSLRA pleading requirements and on which the plaintiffs are entitled to discovery.

*2. Challenged Statements Which Are Not Misleading Statements of Fact*

(E) "God knows, we feel exceptionally devalued [in terms of stock price.]" Pulier's remarks in September 12, 2000 RadioWallstreet.com interview (Am.Compl.¶ 76.)

(F) "The Company believes that the net proceeds from the recently completed public offering, combined with current cash balances and borrowings available under the credit facilities will be sufficient to fund requirements for working

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 11
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

capital and capital expenditures for at least the next eighteen months provided, however that the Company is able to obtain funds sufficient to repay the $80 million note on terms satisfactory to the Company as described above." First Quarter 10-Q dated May 15, 2000 (Am.Compl.¶ 61.)

(G) "Knowing that we're at a cash flow of break even or soon to be, it's obviously not there to supplement working capital for general operating purposes.... We do have a $80 million note due to the sellers of Soft Plus that's due in March of 2001. I would expect a fair amount of the proceeds associated with the secondary offering that we just completed will be applied to the note." Zarrilli's remarks in April 25, 2000 RadioWallstreet.com interview (Am.Compl.¶ 53.)

(H) "It is anticipated that the filing will occur in the first quarter of 2000.... It is anticipated that part of the proceeds to the Company will be used to satisfy the $80 million one-year note to be issued to shareholders of Soft Plus, Inc. in connection with its pending merger of Soft Plus announced last week by the Company." February 10, 2000 Press Release (Am.Compl.¶ 38.)

(I) "[W]e anticipate that we will repay the $80 million note, which we issued in the [Soft Plus] Merger, with proceeds of an underwritten public offering of our common stock. On March 10, 2000, we filed a registration statement on Form S-1 ... relating to the offering...." 1999 10-K filed on March 29, 2000 (Am.Compl.¶ 42.)

**\*14** Statement (E) is not actionable because it is not a statement of fact but rather an opinion. In order to be actionable, the challenged statement must be one of fact and not of opinion or subjective evaluation. *See EP Medsystems, 235 F.3d at 872.*

Statement (F) is not actionable because it is not misleading on its face. The statement about the sufficiency of the funding is qualified by the phrase "provided, however that the Company is able to obtain funds sufficient to repay the $80 million note on terms satisfactory to the Company as described above." The statement makes clear that the belief about sufficiency of cash and capital is contingent on the Company securing funds to repay the note.

When read in context, as it must be, Statement (G) is not materially misleading.

The entire statement is as follows:
Interviewer: One final question for you, and that's the company recently completed a secondary offering raising approximately 45 million dollars in

proceeds. How does the company plan to put that to work over the next several months.
Mr. Zarilli: Well, knowing that we're at a cash flow of _____soon to be it's obviously there to supplement working capital for general operating purposes. A little bit of it will be used to the continuous built out of offices or our business across the world actually, but we expect to sit quietly with this cash and we don't have any specific plans other than to manage our business in the way that we have in the past. We do have a $80 million note due to the sellers of Soft Plus that's due in March of 2001. I would expect that a fair amount of the proceeds associated with the secondary offering that we've just completed will be applied to that note. But also we we'll be looking for other ways in which to continue to enhance out financial position in the marketplace. (Exs. to Defs.' Mem. of Law in Supp. of Mot. to Dismiss Counts I & II, Ex. 15 Radiowallstreet.com interview dated April 25, 200 with Steven Zarilli at 6-7.)

In this statement, Mr. Zarilli speaks of the intended multiple uses for the proceeds of the Secondary Offering. Read in context, it cannot be read as an intention to use the proceeds to pay down the note, but rather a "wait and see" approach to the management of the business, as a whole, subject to possible changes in financial conditions.

Statements (H) and (I) are neither misleading on their face nor material. The statements indicates that USIT hopes that proceeds from the Secondary Offering will be used to satisfy the $80 million note. It does not say that USIT will pay off the note with the proceeds but only that it anticipates that it would do so. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Counts I & II at 8.) Further, the statements are immaterial as a reasonable investor would read these representation only as an anticipated use and not a firm guarantee of how the money would be used. *See EP Medsystems, 235 F.3d at 880.*

### 3. Challenged Statements Which are Immaterial
**\*15** (J) "The strong second quarter operating results reflect our ability to remain nimble, anticipate the changing needs of our clients, and pave the way to the next generation of e-business using leading edge technologies ... U.S. Interactive strives to create and deliver innovative solutions...." Remarks attributed to Zarrilli in July 27, 2000 Press Release (Am.Compl.¶ 69.)

(K) "[O]pportunities [are] really bright right now when we look at some of the expansion opportunities in Europe and Asia and the Fortune

Not Reported in F.Supp.2d                                                                                    Page 12
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

500 companies that are going to finance around our customer value contribution message.... [The Internet] is deepening the relationship with their customers and it's mandating a completely new type of organization.... And to bring together all the different silos of an organization in order to become competitive in this arena, is really a different type of expertise. I think you're seeing softness in the industry because not a lot of companies can nail this expertise. As we evaluate ourselves and prepare ourselves for this next phase, we realize and celebrate that we are the leader *right now* in the telecom industry in enabling the customer value chain. We've got a prefabricated, preintegrated hub that has the [incomprehensible] to market advantage that is in use in tens of thousands of users right now around the world.... We think that right now our ability to leverage that with a change in the market place gives us an edge, and that's what we want." Pulier's remarks in September 12, 2000 RadioWallstreet.com interview (Am.Compl.¶ 76.)

 These statements are typical of "[v]ague and general statements of optimism that constitute no more than 'puffery' and are understood by reasonable investors as such." *Advanta*, 180 F.3d at 538. This type of optimistic statement would not alter the "total mix" of information available to an investor to make a decision. *Burlington*, 114 F.3d at 1426.

 *4. Challenged Statements Which are Analyst Statements*

(L) "We spoke with management and 2Q00 appears to be on track with estimates of $28.0 mm in revenue and ($0.07) 'cash' EPS. Tone of business remains solid across all verticals and virtually all products in queue now benefitting from 4Q99 rate increase.... We are fine-tuning our 2000 estimates to $119.9 mm in revenue from $106.5 mm and to ($0.19) 'cash' EPS from ($0.25) to better reflect momentum from 1Q00 results and current tone of business. Also adjusting 2001 estimates to $192.0 mm in revenue from $180.0 mm and to $0.26 'cash' EPS from $0.17.... Retain our Strong Buy rating. Reiterate greater comfort with combined company's ability to scale, generate stronger momentum, and become more visible leader in the sector." June 1, 2000 Deutsche Banc Alex. Brown analyst report. (Am.Compl.¶ 64.)
(M) "On the profitability side, management expects to approach break even EBITA, notably ahead of our estimate of a loss of $443,000 .... With most of its (10-15% of revenue) dot-com business coming from related venture capitalists (Safeguard and TL

Ventures) management sees no concern with its exposure in this area." June 6, 2000 First Union analyst report**.** (Am.Compl.¶ 66.)
(N) "I'm actually excited ... about the prospects for U.S. Interactive. The company is signing on some very high-profile clients overseas, the integration of Soft Plus is running smoothly, and we could see the company reach a break-even a little ahead of schedule. August 3, 2000 Adams, Harkness & Hill analyst report. (Am.Compl.¶ 73.)

 **\*16** These statements issued by analysts are not actionable against the Individual Defendants. Such statements would be actionable only if plaintiffs pled facts showing that a particular defendant both made the statement to the analyst and controlled the content of the report. *See Klein v. General Nutrition Cos., 186 F.3d 338, 345 (3d Cir.1999).* Plaintiffs have not pled who made the statements to the analysts, much less that a particular Individual Defendant controlled the content of the report. Plaintiffs only plead that Deutsche Banc Alex. Brown based its report on conversations with "USIT management Pulier and/or Zarrilli." (Am.Compl.¶ 64.)

 *5. Plaintiffs Have Alleged Misstatements Made with Sufficient Scienter to Defeat a 12(b)(6) Motion for the Following Statements:*
(O) "[A]s the announcement has indicated, we're looking to offer approximately 5 million shares, 50% of which will be offered by the company and the balance by selling shareholders ..., and outside of that, one of the uses of the proceeds, if you will, will be the satisfaction of the debt that is part of the Soft Plus merger...." Calamia's remarks in February 10, 2000 RadioWallstreet.com interview (Am.Compl.¶ 39.)
(P) "Pulier stated that there was 'incredible demand for [USIT's] services'; that 'we really have no price demand, we charge our full rates'; that 'this sector is known widely for explosive growth and I don't think you're going to see a manifestation of that anywhere more fully than in U.S. Interactive's numbers moving forward'; and that 'we believe that we will be the number one player in this space.' " Pulier's remarks in a February 10, 2000 RadioWallstreet.com interview (Am.Compl.¶ 39.)
(Q) "Calamia stated that 'demand ... is certainly very, very robust' and that 'we can see [margins] accrete upward toward 50% in the latter part of the year.' " Calamia's remarks in February 10, 2000 RadioWallstreet.com interview (Am.Compl.¶ 39.)
(R) "US Interactive has changed the e-business services landscape through the Soft Plus acquisition on March 8, 2000, with a vertical

Not Reported in F.Supp.2d
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
(Cite as: 2002 WL 1971252 (E.D.Pa.))

penetration model to exploit the opportunities of B2B and wireless ... The record revenue and strong first quarter operating results are indicative of our ability to remain ahead of market demands." Remarks attributed to Zarrilli in April 24, 2000 press release (Am.Compl.¶ 51.)

(S) "Third quarter break even along the line that analysts had projected for the Company is reasonable. We don't expect to have any difficulty meeting that goal.... The sales cycles are beginning to get a little bit longer, but interestingly enough, the sales themselves are beginning to be a lot larger than they were in the past. So they tend to counterbalance themselves. What we're seeing is a lot of strength in the demand tunnel for the services we're providing in the marketplace. Relationships with our partners were driving a fair number of leads and opportunities. We are working on a number of different joint opportunities.... We are seeing that a significant amount of expansion and activity around our European operations.... So when you look at all of the various points of the marketplace that we're touching upon, we're seeing a significant amount of demand for our services, so it's not surprising that we're able to go into a quarter with such a strong level of confidence with a solid book of business. And we continue to see that even growing as we move towards the third quarter...." Zarrilli's remarks in April 25, 2000 RadioWallstreet.com interview (Am.Compl.¶ 53.)

(T) "Well, we're hitting our stride.... [T]he company's really maturing into something that's really going to be significant in the marketplace. We're hitting our stride, we're growing our business quickly, we're seeing that the demand flow on the revenue side being very strong, but we're also starting to see the leverage of the infrastructure assets that we've put into place. That spending, if you will, that we've gone through over the last two or three years as we've put the foundation there for the business to grow upon, that's all taking form now. It is like a bud on a tree that's starting to bloom. The other thing that we're finding is that we're [sic] actually there's a lot of noise in the marketplace. When you look at the sector that U.S. Interactive is focused upon, the e-business services sectors, there is now 22 companies that are public. But what people have to remember is U.S. Interactive went public when there were only about 3 or 4 others out there. So we've been around this block for a longer period of time and we're one of the more mature players out there in the marketplace. We're a quarter away from profitability, based upon where the financial analyst [sic] have their models...." Zarrilli's

remarks in May 2, 2000 RadioWallstreet.com interview. (Am Compl. ¶ 59.)

**\*17** (U) "[D]emand is still strong ... Well, let's talk about gross margins. 52% is the financial model that we currently have and that we operate under for the balance of the year, running into the first part of the year, but I actually think there is some upside there.... From a dot com perspective. Let's keep in mind a couple of things. The company's always had a target of keeping our dot com exposure to no more than 20% of our revenue. In Q2 it was 13%, in Q1 it was 11%. We like the dot com work on one level because it provides some unique challenge to our staff and our staff like to work on those types of projects. But we do have to manage the financial risk. One way to do that is making sure what types of dot coms we're working with. And a lot of the flow of our dot coms come from parties we have relationships with, be it SafeGuard Scientific, be it Internet Capital Group, or TL Ventures, or Trident Capital, you know, original investors in the Company. If it's not coming through that fashion, which the majority are going through that funnel, if you will, then the other ones are dealt with companies we feel have proper levels of funding. We make sure we've got real solid contracts in place. We do as much as we can to evaluate their levels of funding as it relates to their ability to meet their obligations to U.S. Interactive. We have proactively created ways in which to make sure that we bill timely and collect timely on those amounts so that we're not at risk. But the overall emphasis is not to let it get to be too much of our overall business. We've only had one significant situation with a dot com that was properly reserved for in connection with the closing of Q2.... I think you'll start seeing some of our metrics start reflect the accelerated integration of SoftPlus. You'll see it in our billing rates, you'll see it in our utilization rates, you'll see it in our ability to generate levels of profitability that the company has obviously focused on. That is our primary goal today.... " Zarrilli's remarks in a July 27, 2000 RadioWallstreet.com interview (Am.Compl.¶ 70.)

(V) "I actually think that our sector has taken an unduly amount of punishment with regard to valuation over this period of time. A sector that, if you will ... for the most part is at profitability or moving toward profitability with regard to each of the individual companies that comprise the sector.... I look at the group and I tend to view us as being probably at a valuation of half of where we should be in a legitimate market environment. But we know that we can recapture that value...."

Not Reported in F.Supp.2d
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
(Cite as: 2002 WL 1971252 (E.D.Pa.))

Zarrilli's remarks in April 25, 2000 RadioWallstreet.com interview (Am.Compl.¶ 53.) **18** (W) "We're not getting the recognition, I don't think, with regard to our stock price, quite honestly in the marketplace. And I think we're oversold, we're being undervalued, the discount is just way too large in relationship to some of our peers. Not that I necessarily need to trade at 12 or 15 times revenue multiples any longer--I know that there's been a reevaluation in the marketplace--when you're trading at 3 or 4 times knowing you've got a lot of value and you're building your business at greater than 100% a year, a quarter away from being profitable, meeting or beating the street expectations ... Joe, I don't know what else I can do to kind of get this thing moving in the right direction for the company." Zarrilli's remarks in May 2, 2000 RadioWallstreet.com interview (Am.Compl.¶ 59.)

 The above statements purport to be representations of the current situation of USIT at the time the respective statements were made. [FN11] To the degree that the statements contain forward-looking statements, the court specifies which components of the larger statement are not actionable. [FN12] As stated above, because questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, in order for a court to determine that a statement is immaterial, the omission or misstatement must be so obviously unimportant to an investor that reasonable minds cannot differ and courts can rule them immaterial as a matter of law at the pleading stage. *Burlington,* 114 F.3d at 1426. The court finds that the above statements are not so obviously unimportant that a trier of fact does not have to determine their materiality.

  FN11. Individual defendants argue that *Harris* holds that "mixed statements" containing both forward-looking statements and statements of present facts should be treated as forward-looking statements for purposes of analyzing whether a statement falls under the PSLRA. 182 F.3d at 806- 7. First, this is eleventh circuit precedent, not third circuit, and therefore is not binding on this court. Second, the court reads *Harris* as having a much more narrow holding than defendants assert.
 *Harris* distinguishes between observed facts and assumptions. *Id.* at 806. The statutory definition of a forward-looking statement includes any statement of the *assumption* underlying or relating to any statement described in subparagraph (A), (B), or (C). 15 U.S.C. § 78u-5(i)(1)(D) [emphasis added]. The opinion quotes Webster's for the definition that an "assumption" is "the act of taking for granted or supposing that a thing is true." Webster's Third New International Dictionary (1981). *Id.* n. 9. *Harris* states that if any of the individual sentences within the larger statement describe known facts which were allegedly false, "we could easily conclude that that smaller non-forward-looking statement falls outside the safe-harbor. But the allegation here is that the list *as a whole* misleads anyone reading it for an explanation of the [Company's] projections." *Id.* at 806. Conversely, in this case plaintiffs address components of the various larger statement and analyze why a component is allegedly false. Further, *Harris* specifies that a list or explanation will only qualify for this treatment [treating mixed lists as forward-looking] if it contains assumptions underlying a forward-looking statement. *Id.* at 807.
 Defendants cannot convert a larger statement containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking. A larger statement can be divided into component parts and analyzed. In this case since most of the components of the above statements are statements of current facts, this court details which specific components of the larger statements are forward-looking and clearly non-actionable. See *In re Lason Sec. Litig.,* 143 F.Supp.2d 855, 860 (E.D.Mi.2001) (finding that false statements were mixed with forward-looking statements, yet "the actionable statements were based on fraudulent historical and current facts.")

  FN12. This following specific component of a larger statement is not actionable:
 Statement A-"We believe that we will be the number one player in this space."

 As to these statements, plaintiffs have pled sufficient allegations of scienter to meet the stringent PSLRA requirements. Plaintiffs allege that the Individual Defendants knew that various public statements were false when made. (Am.Compl.¶ ¶ 86-90). Plaintiff may establish a strong inference of scienter by

Not Reported in F.Supp.2d                                                                            Page 15
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**

alleging that defendants knew or had access to information suggesting that their public statements were not accurate. *Novak,* 216 F.3d at 311. Given the positions of the Individual Defendants in USIT, plaintiffs have alleged that they knew specific facts and had access to particular information which suggested that their public statements were inaccurate. *Tel-Save Sec. Litig.,* 1999 WL 999427, at *5.

As to Statements (P), (Q), (S), and (U), which concern demand for USIT's services, plaintiffs allege that at the very time defendants made statements concerning "the healthy demand" for USIT's services and its "strong business condition," defendants were well aware that sales to large, established traditional companies were being negatively impacted by longer sales cycles, of the reduced demand by these companies for USIT's services due to USIT's weakness in back-end integration, and of existing and prospective clients' decisions to use more established companies or "Big 5" consulting companies rather than USIT, for example, USIT was aware that large clients such as AIG and Citigroup were dissatisfied with the work performed by USIT. (Am.Compl.¶ 90.) Similarly, as to Statement (O) pertaining to the satisfaction of the $80 million Soft Plus note, plaintiffs allege that contrary to defendants' representation that "one of the uses of the proceeds, if you will, *will* be the satisfaction of the debt that is part of the Soft Plus merger," the Company was aware, at the time this statement was made, that no funds raised in the Secondary Offering would be used to satisfy the note. (emphasis added) (Id.¶ 43.)

**\*19** Plaintiffs also allege that the scope and timing of the stock sales by the Individual Defendants supports an inference that the defendants schemed to artificially inflate USIT's stock price to sell their own shares. (Am.Compl.¶ 91.) Consistent with third circuit precedent and *Novak,* plaintiffs pled the substantial proceeds the Individual Defendants received from the sale of USIT stock in order to show that the Individual Defendants benefitted in a concrete and personal way from the fraud. *Novak,* 216 F.3d at 311. On the days immediately following Mr. Zarrilli's remarks in an April 25, 2000 RadioWallstreet.com interview, (April 26, 27, and 28), Statements (R), (S), and (V), Mr. Zarilli sold 51, 500 shares of his USIT stock for proceeds of $858, 419 and on May 1, 2000 sold 8, 500 shares for $144, 942; Mr. Pulier sold 128, 000 shares for proceeds of $2.14 million and on May 1, 2000, sold an additional 21, 500 shares for proceeds of $366, 618. (Am.Compl.¶¶ 55-58.)

Similarly within days of Mr. Zarrilli's remarks in a May 2, 2000 RadioWallstreet.com interview, Statements (T) and (W), on May 17, 2000 Mr. Shulman sold 25, 000 shares for proceeds of $352, 000 and on May 24, 2000, he sold an additional 10, 000 shares for proceeds of $100, 300. (Am.Compl.¶ 63.) These were the first times any of the Individual Defendants sold USIT stock.

The court finds that for each challenged statement, plaintiffs have alleged a strong inference of scienter with particularity to survive a motion to dismiss.

*D. Control Person Liability Under § 20(a)(Count II)*

Plaintiffs allege that the Individual Defendants acted as controlling persons of USIT for purposes of Section 20(a) liability. Section 20(a) of the Exchange Act imposes joint and several liability on any persons who controls a "person" liable under any provision of the Exchange Act. 15 U.S.C. § 78t(a). Section 20(a) requires proof that "one person controlled another person, but also that the 'controlled person' is liable under the Act." *Tel-Save,* 1999 WL 999427, at *6 (quoting *Aetna,* 34 F.Supp.2d at 956.)

Having decided that plaintiffs have sufficiently alleged a primary violation by USIT of Section 10(b) of the Exchange Act, the court now has to decide whether plaintiffs have alleged sufficient control for the Individual Defendants for Section 20(a) purposes. *Tel-Save,* 1999 WL 999427, at *6.

**\*20** The heightened pleading requirements of Rule 9(b) do not apply to claims under Section 20(a). *Id.* Allegations that "support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator" suffice to plead control person liability. *Id.* (quoting *In re Health Management, Inc., Sec. Litig.,* 970 F.Supp. 192, 205 (E.D.N.Y.1997).)

Plaintiffs have met this less-stringent pleading requirement. They have alleged that by virtue of these defendants' "high-level positions, substantial stock holdings, participation in and/or awareness of USIT's operations ... the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of USIT, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. Each of the [Individual Defendants] was provided with or had unlimited access to copies of USIT's internal reports,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P 92,015
**(Cite as: 2002 WL 1971252 (E.D.Pa.))**
Page 16

press releases, public filings and other statements
alleged by plaintiffs to be misleading prior to and /or
shortly after these statements were issued and had the
ability to prevent the issuance of the statements or
cause the statements to be corrected." (Am.Compl.¶
106.) Through these contentions, plaintiffs have
alleged sufficient control by the Individual
Defendants over USIT to state a claim under Section
20(a).

V. Conclusion

For the reasons discussed above, defendants' motions
to dismiss Counts III-V against all defendants are
granted. These counts are dismissed with prejudice.
The Individual Defendants' motion to dismiss Counts
I-II is granted in part and denied in part.

An appropriate order follows.

**ORDER**

AND NOW, this ___ day of August, 2002, upon
consideration of the Motion by the Individual
Defendants to Dismiss Counts I-II, the Motion by the
Individual Defendants and Director Defendants to
Dismiss Counts III-V, and the Motion by the
Underwriter Defendants to Dismiss Counts III-IV,
and the respective responses thereto, as well as oral
argument on the motions, it is hereby ORDERED as
follows:

(1) The Motion by the Individual Defendants to
Dismiss Counts I-II, Docket # 39, is GRANTED
IN PART and DENIED IN PART;

(2) The Motion by the Individual Defendants and
Director Defendants to Dismiss Counts III-V,
Docket # 40, is GRANTED;

(3) The Motion by the Underwriter Defendants to
Dismiss Counts III-IV, Docket # 41, is
GRANTED;

(4) All claims against the Director Defendants and
Underwriter Defendants are DISMISSED WITH
PREJUDICE. These Defendants are DISMISSED
from this matter; and

(5) A scheduling conference shall take place on
*September 9, 2002* at *4:00 p.m.* in Chambers,
Room 17614, United States Courthouse.

2002 WL 1971252 (E.D.Pa.), Fed. Sec. L. Rep. P
92,015

**Motions, Pleadings and Filings  (Back to top)**

•            2:01CV00522            (Docket)
(Feb. 01, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Not Reported in F.Supp.                                                    Page 1
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

United States District Court; N.D. Ohio.
U.S. Smelting, Refining and Mining Co.
v.
Clevite Corp.
**Civil Action Nos. C68-210
C68-345**

June 17, 1968

BATTISTI, District Judge

*1 In these consolidated actions both United States Smelting, Refining, and Mining Company (Smelting) and Clevite Corporation (Clevite) seek relief by way of a preliminary injunction. The numerous issues raised by these motions may best be defined and discussed after a thorough chronological review of the factual background out of which these actions arise.

Clevite, an Ohio corporation with its principal place of business in Cleveland, Ohio, is a publicly held corporation whose common and preferred shares are listed on the New York Stock Exchange. Presently, Clevite has outstanding 1,908,829 shares of common stock and 273,571 shares of cumulative convertible preferred stock. The common stock is held by more than 11,000 shareholders and the preferred by approximately 4,000 shareholders. (Laffer affidavit filed May 9, 1968).

Clevite, with 19 plants in the United States, conducts manufacturing operations in three basic product categories: sleeve bearings and related products, batteries and related products, and electronic and related products. These products, which are sold by eight operating divisions, accounted for sales of $166,579,442 and a net income of $8,290,144 for the year ended December 31, 1967. (Laffer affidavit filed May 9, 1968.) It would appear that in recent years the operations of Clevite have expanded significantly by way of the acquisition of companies such as Servel and Sonotone.

Smelting, a Maine corporation with its principal offices in New York City, is a publicly held corporation whose common and preferred shares are listed on the New York Stock Exchange. Smelting's common stock is held by approximately 4,600 shareholders.

Smelting is engaged in the businesses of mining (principally copper), smelting, refining and fabricating metal products. It also engages in certain oil and gas operations. (Laffer affidavit filed May 9, 1968; Horwitz affidavit filed May 16, 1968; and transcript of March proceedings pp. 6, 7). Smelting has investments in various subsidiary and associated corporations, including 18% of the outstanding common stock of Cudahy Company (a meat packing company) and 100% of the outstanding common stock of Mueller Brass Company (a manufacturer of copper, brass and aluminum products). Last year Smelting had sales of approximately $145,000,000 and a net income of approximately $12,000,000.

[*Control*]
Mr. Martin Horwitz, Chairman of the Board of Smelting, and Mr. Jack Wilder, President of Smelting, obtained control of Smelting through proxy contests which occurred in 1962 and 1963. Subsequently, Smelting acquired the Mueller Brass Company by way of a tender offer. In 1966 Smelting purchased 18% of the Cudahy Company's outstanding common stock, and, presently, has 5 representatives on its 9 member Board. (Horwitz affidavit filed May 16, 1968; (Laffer affidavit filed May 9).

The changes in control alluded to in the preceding paragraph resulted in some changes in top management. The extent of these changes in management is not entirely clear. It would appear however that after the changes in control each of the companies involved achieved significantly higher earnings. Adjusting, for a stock split and stock dividends, the market price of Smelting common stock has increased from a high of $11.75 per share in 1963 to $68.37 per share as of May 6, 1968 (Horwitz affidavit filed May 16).

*2 On or about December 14, 1967, Smelting began purchasing large blocks of Clevite's common and preferred shares. Because these shares were held in a street name, Smelting's identity as the purchaser of the same did not become apparent for some time.

Late in February 1968, Mr. William Laffer, President and chief executive officer of Clevite, noticed a sharp increase in the volume of trading of Clevite shares (Laffer affidavit filed March 25, 1968) and soon heard rumors to the effect that Smelting had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

acquired a position in Clevite.    (Tr. 16-unless otherwise indicated, Tr. refers to transcript of proceedings of May 20-21). However, Mr. Laffer took no steps to contact representatives of Smelting. (Tr. 16).

While Mr. Laffer did not contact Smelting representatives upon hearing the rumors that it was acquiring Clevite's shares, it is clear that he immediately undertook to investigate the background of Smelting and its officers.    (Tr. 21- 32).  It also seems clear that from almost the beginning of his investigation Mr. Laffer was of the view that Smelting was a "raider," and, as such, was in his view undesirable.  (Tr. 31-34).

In his initial investigation into Smelting's background, it would appear that Mr. Laffer looked into matters such as the changes in personnel which occurred as a result of changes in the control of Smelting and its affiliates, and the earnings records of those companies subsequent to the changes in control.  As previously noted, while there were some changes in top management subsequent to those changes in control, the extent of and the circumstances behind them are not entirely clear. Mr. Laffer's investigation revealed significant increases in the earnings of Smelting, but, in rather nebulous terms he indicates some doubt as to whether Smelting's financial statements accurately reflect the earnings trend of that company.  (Tr. 25-26).  In this regard it is notable that Smelting's books are audited by the same firm that audits Clevite's books. (Tr. 23-24).

[*Special Directors' Meeting*]

On Sunday, March 3, 1968 there was a special meeting of the Clevite Board of Directors, and the minutes of this meeting (which was held before there had been any contacts between Clevite and Smelting representatives) are, in pertinent part, as follows:

"Mr. Laffer stated that the meeting had been called because we had received reports that there had been unusual activity in the trading of the Corporation's Common Stock, and that there were rumors, which we believe to be authentic, that United States Smelting Refining and Mining Company had taken a position in the Corporation's Common Stock and was about to make an effort to take over the management of the Corporation.

"The Chairman (Laffer) made a full report of the information received to date and discussed various courses of action that might be taken if the stories proved to be correct.  A full discussion followed."

The "courses of action" discussed were to decrease

the number of directors and "to investigate merger and acquisition opportunities, to speed up those discussions that we perhaps had had up to that time." (Tr. 19, 20).

*3 It should be mentioned at this point that prior to Smelting's entrance upon the scene, Clevite, according to Mr. Laffer, "preferred to go it alone," to make its own acquisitions or grow internally and to retain the Clevite identity (Tr. 75-77). But, as will be discussed later in more detail, Clevite had been exploring certain merger possibilities prior to March 3, 1968.

[*Proxy Mailed*]

On March 4, 1968 Clevite mailed its shareholders a Notice of Annual Meeting and Proxy Statement.  The Notice indicated that the Clevite Annual Meeting was to be held on April 1, 1968 and that one of the matters tot be considered and acted upon at the meeting was:

"Fixing the number of and electing directors for the ensuing year."

The Proxy Statement related that it was management's "present" intention to vote the proxies it received in favor of fixing the number of directors at fifteen (the same number that had been on the Board during the preceding year), and listed the names of the fifteen persons for whom the votes would be cast.

On March 4, 1968-the same day Clevite's Notice of Annual Meeting was mailed-Mr. Horwitz called Mr. Laffer.  In this first contact between Clevite and Smelting, Mr. Horwitz said that Smelting had taken a position in Clevite and that it was his desire to travel to Cleveland and get acquainted with the Clevite management.  (Tr. 16).  At that time a meeting was arranged for March 6 at the Clevite offices in Cleveland.    As of March 4, Smelting owned approximately 9% of Clevite's outstanding common shares and 2% of the Clevite's preferred.

On March 5, 1968 there was another special meeting of the Clevite Board of Directors. The minutes of this meeting are, in pertinent part, as follows:

"The Chairman stated that since the meeting held on Sunday, March 3, 1968, he had been contacted by officials of United States Smelting Refining and Mining Company and that he had agreed to meet with them here tomorrow morning. Developments to date were reported and a full discussion followed.  The Chairman also stated that over a period of years there had been discussions with representatives of the Weatherhead Company about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 3
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

the possibilities of merger with Clevite and that he had revived these discussions with a view to negotiations."

In connection with the reference in the March 5 minutes to discussions with Weatherhead, it should be noted that according to Mr. Laffer Clevite had carried on general discussions with Weatherhead for approximately a year prior to March of 1968, but they had not been disclosed to the public, and, evidently, no terms had been agreed upon prior to March 5, 1968. (Tr. 40).

Mr. Laffer has testified that at the March 5 directors meeting the directors indicated that they "didn't want to have anything to do with raiders, any raiders." (Tr. 21). An objective analysis of Mr. Laffer's testimony indicates that he believed by March 5 that Smelting should be so characterized. (See Mr. Laffer's definition of "raider." (Tr. 21,22)).

[*Rumor Published*]

**\*4** On March 5 the Cleveland newspapers reported a "rumor" to the effect that Smelting would seek control of Clevite. According to Mr. Laffer, as soon as word was out that Smelting was buying into Clevite he was deluged with inquiries from firms interested in discussing a merger with Clevite. These inquiries, and the actions which Mr. Laffer took in connection with the same, will be discussed later in detail. It might here be noted, however, that since Mr. Laffer was of the view that Clevite had one of the best earnings records in the country, he certainly was not suprised that a large number of companies would be interested in merging with his company. (Tr. 102-103).

At approximately 9:00 A.M. on March 6, 1968 Mr. Horwitz and Mr. Wilder arrived at the offices of Clevite. There they met with Mr. Laffer, Mr. Colborn, of Jones, Day, Cockley and Reavis (Clevite's Counsel) and one Mr. Shay (Vice-President and Treasurer of Laffer's. It also appears that Mr. Grabner, President of Weatherhead, was present at some portion of the meeting. (Tr. 41). According to Mr. Laffer, Mr. Horwitz revealed that:

"\*\*\* Smelting now owned more shares than the Clevite Board of Directors reported in their proxy statement as owning, and they would like to have two places on the Board of Directors;

"He (Horwitz) also gave us a letter asking for, or demanding a stockholders list-which we could disregard until we had given them the answer on the membership on the board." (Tr. 17).

It was agreed that Clevite would respond to Smelting's request by March 8. Presumably, such

amount of time was needed in order to obtain the views of the Clevite directors. There may well have been a substantial question on March 6, whether as a tactical matter, Smelting should be given representation on the Clevite board. But it is quite clear, from the evidence, that the Clevite directors were unalterably opposed to Smelting's request (see for example; Tr. 21,34).

At the April 6 meeting Mr. Laffer told Mr. Horwitz that, in his opinion, Clevite "was worth at least $100 a share," but that he was probably prejudiced in that regard. (Tr. 80). Mr. Laffer also suggested, at the April 6 meeting, that Smelting sell Mueller Brass to Clevite. (Tr. 167).

After the April 6 meeting between the Smelting and Clevite representatives, Mr. Laffer went to lunch with Mr. Grabner of Weatherhead. Thereafter, Mr. Laffer and Mr. Grabner proceeded to the office of Mr. John Reavis, managing partner of Jones, Day, Cockley and Reavis. (Mr. Reavis is a Trustee of the Weatherhead estate and his law firm is counsel for both Clevite and the Weatherhead company). While Mr. Laffer's recollection is rather hazy, it is clear that a decision was reached at this meeting to issue a news release (dated March 6) indicating "that for some time discussions have been held looking to a possible merger of the two companies (Clevite and Weatherhead), and these are continuing." Mr. Laffer testified that as of March 6 no agreement had been reached between Weatherhead and Clevite as to "financial terms" or ""ratio of exchange" (Tr. 42); but that Clevite and Weatherhead had "*some* management terms" (emphasis supplied, Tr. 42), and had "signed a management agreement." (Tr. 43). The signed "agreement" has not been presented to the Court.

**\*5** Mr. Grabner's recollection of the March 6 meeting with Mr. Reavis is much clearer than Mr. Laffer's. According to the Weinberg affidavit filed on April 17, 1968, Mr. Grabner has testified on deposition as follows:

"Q. Then it was decided on the 6th between you and Mr. Laffer to issue a press release concerning your discussion?

"A. Yes. As a matter of fact, we went from-we had lunch with Bill and went downtown to sit down with our counsel and get out a press release.

"Q. You went to Jones, Day, Cockley & Reavis's office?

"A. Right.

"Q. Who did you see?

"A. Mr. Reavis."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

Page 25:
"Q. Whose suggestion was it to go down to counsel to prepare-
"A. Mine.
"Q. What was the purpose of that?
"A. Well, Jack is acting as counsel and also as Trust Adviser and just to let him know that-to get his affirmation of going ahead.  Now, we had a meeting Tuesday afternoon.  I think maybe I mentioned this a minute ago.  That was with Fangboner and Reavis, in which we had made the decision to go ahead.
"Q. Had it been your practice to issue press releases in connection with merger discussion?
"A. No, no, because we have never had anything this serious, Ken.
"Q. Well, then, who actually prepared the press release?
"A. It was prepared by Clevite's public relations people with our people going over it so that they were in on it.
"Q. Why was it that you wanted a press release issued?
"A. Well, I think first of all we wanted to get Clevite very badly because this would give us the things we wanted to do.  And we felt that maybe by putting out a press release we could show our intent and possibly then U. S. Smelting wouldn't be as interested in going a situation in which we had a very big block of stock."
Page 27:
"Q. Did Mr. Laffer raise any objections to issuing a press release?
"A. No, no.  I don't think there is any question, Ken, that both of us felt that this would be a good opportunity for both companies because we had a young management group and Bill wanted some young people.
"Q. Had the Board of Directors approved the press release?
"A. They were aware of it, yes.  We didn't have a formal board meeting.

* * *

"Q. Wasn't the issuance of a press release a little bit inconsistent with your desire to keep the price down?
"A. Yes, but more important was the fact that we wanted to get in there and get the company before U. S. Smelting did.
"Q. Of course, U. S. Smelting knew you were interested?
"A. Right.
"Q. Prior to the press release?
"A. Right."

[*Fear Intended*]
It is apparent from Mr. Grabner's testimony that as of March 6 Mr. Laffer was most anxious to frighten Smelting and to drive it from the scene.

On the morning of March 8 Mr. Laffer met with the executors of the Weatherhead estate (one of these being Mr. John Reavis, managing partner of the law firm of Jones, Day, Cockley & Reavis).  According to Mr. Laffer (Tr.45), the executors of the Weatherhead estate indicated at this meeting that they wished to withdraw from merger negotiations with Clevite because of the large holdings of Smelting in Clevite.  Notwithstanding the fact that there had been a press release on March 6 with regard to the continuance of negotiations between Clevite and Weatherhead, there was no press release issued with regard to the termination of such talks.  (Tr. 48) Mr. Laffer's justification in this regard is that he and Mr. Grabner still had "hopes" that Weatherhead and Clevite might get together in the future.  (Tr. 49).

 *6 While Mr. Laffer had agreed to give Mr. Horwitz an answer to his request for representation on the Clevite Board by March 8, 1968, he (Mr. Laffer) called Mr. Horwitz on March 8 and told him that he had not yet been able to reach two of the directors in order to obtain their views (Tr.38). On the basis of that representation, Mr. Laffer delayed a response to the Smelting request until March 13, 1968.

On March 10 the Board of Directors of Clevite met once again.  The minutes of this meeting are, in pertinent part, as follows:
"The Chairman reported on his meeting on March 6, 1968, with Messrs. Horwitz and Wilder and on his telephone conversation with them on March 8, 1968, and on other developments to date.  During the course of the discussion, Messrs. Colborn, Holmes, and Rose expanded on various phases of the report.  A full discussion followed.  The Chairman also reported that the Weatherhead Company had suspended discussions looking toward a merger with Clevite because of the presence in the Clevite situation of a block of stock such as that held by United States Smelting Refining and Mining Company."
At this meeting the Directors of Clevite authorized Director Rose (a partner of Jones, Day, Cockley & Reavis) to make a trip to Washington to gather information with regard to Smelting's request to obtain representation on the Clevite Board of Directors.

Not Reported in F.Supp.                                                                Page 5
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

On March 11, 1968, Mr. Laffer either received or solicited a call from Mr. Shepard, President of Thompson, Ramo & Wooldridge (TRW) with regard to the possibility of a merger of Clevite into T. R. W. (Tr. 60). (The evidence reflects that T. R. W. also has been represented by the law firm of Jones, Day, Cockley & Reavis in numerous matters other than the merger talks with Clevite.) During this conversation on March 11, Mr. Laffer and Mr. Shepard agreed to meet on the following day.

*[First Meeting]*

On March 12, Mr. Laffer and Mr. Shepard met for the first time to discuss the possibility of a merger of Clevite into T. R. W. (Tr. 60-61). At this meeting they engaged in a rather general discussion relating to the desirability of such a merger. There was no discussion of price or rates of exchange. (Tr. 82). They agreed to postpone the discussions "until certain legal matters were checked out." (Tr. 61).

During the afternoon of March 12 there was another Clevite Board of Directors meeting. The minutes of that meeting indicate in part as follows:

"The Chairman stated that he expected to meet with Messrs. Horwitz and Wilder of United States Smelting Refining and Mining Company the morning of March 13, 1968, and had agreed to tell them at that time whether we would agree to give them representation on the Board of Directors of Clevite Corporation. Messrs. Laffer, Colborn, Rose, and Schey reported on all phases of the problem, including (1) the difficulties in negotiating a merger with The Weatherhead Company in the circumstances created by a block of stock such as that held by United States Smelting Refining and Mining Company group in the picture; (2) the possible effect on the Corporation's position as a Contractor for the U. S. Government Department of Defense if it became concerned about the stability and continuity of management of the Corporation; and (3) various alternative courses of action which might or might not be desirable. The Chairman reported discussions with representatives of TRW Inc., looking toward a merger of TRW Inc. and Clevite.

**\*7** "Mr. Rose referred to interviews in Washington the previous day with representatives of the Department of Defense and of the Navy and gave his opinion that the contract position of the Corporation with the Navy, particularly on the Mark 48 torpedo program, would be materially and adversely affected if there were a prospect that the continuity and stability of control of Clevite and its management were to be jeopardized in this way.

Mr. Morse, concurring, said that, in the light of his Navy Department experience, he was convinced that the continuity, stability and attitude of management were factors of major importance, particularly in a large-scale development program to be contracted for in segments as it progressed, and that from his awareness of the magnitude of the program, he felt that the support of an organization like TRW Inc. would be of affirmative assistance.

"Mr. Colborn recounted in some detail the discussions that he and Mr. Schey had had on the previous day with representatives of the Securities and Exchange Commission regarding the exemption that would be necessary if the Corporation were to buy its own stock, and gave it as his opinion that it would be very difficult, even for a purchase off the market of the shares now held by United States Smelting Refining and Mining Company, to secure an exemption at a price above the market (then about 63) or at most a point or two in excess of that price. After full discussion, upon motions duly made and seconded, the following resolutions were adopted by the affirmative vote of all Directors present:

"RESOLVED, that it is the opinion of the Directors present that it would not be to the best interests of the Corporation for the management of United States Smelting Refining and Mining Company to be represented on the Board of Directors of Clevite Corporation, and that Mr. Laffer be and hereby is authorized to tell them that this Board will not assist them in getting this representation.

"RESOLVED, that the appropriate officer or officers of the Corporation be and hereby are authorized, subject to (1) the securing of the necessary exemption or other clearance from the Securities and Exchange Commission satisfactory to counsel, and (2) United States Smelting Refining and Mining Company providing satisfactory documentary proof of ownership, to purchase up to 200,000 shares of Clevite Corporation $1 par value Common Stock at a price not in excess of $70 per share from the United States Smelting Refining and Mining Company upon such terms and conditions as the negotiating officer or officers, with the approval of counsel, may deem necessary or desirable and in the best interests of the Corporation.

"RESOLVED, that the appropriate officer or officers of the Corporation be and hereby are authorized to discuss and negotiate terms of a merger of the Corporation with TRW Inc., subject to the approval of this Board of Directors and the shareholders of the Corporation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 6
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

**\*8** "There was discussion of the possible advisability of amending the notice of annual meeting and the proxy soliciting material to provide for changing the Corporation's Regulations to clasify its Board of Directors into three classes and to fix the number of each class at three directors. Decision on the advisability of this program was postponed."

On March 13, Mr. Laffer met with Mr. Horwitz in New York City. At this meeting, Mr. Laffer first asked whether Smelting would be willing to sell its Clevite stock at cost (Tr. 50). After determining that Smelting was not willing to sell its Clevite shares, Mr. Laffer indicated that Clevite would not grant Smelting any positions on the Clevite Board.

At the March 13 meeting, Smelting suggested a merger of Mueller Brass Co. and Clevite. Mr. Laffer has testified as follows with respect to that suggestion:

"A Smelting gentleman-I believe Mr. Horwitz-suggested that Mueller be merged into Clevite, or, in other words, that Clevite acquire Mueller Brass for sufficient shares plus cash to give Smelting control of Clevite; and it was suggested that I was to run the combined deal and I could write my own ticket." (Tr. 153, 154).

Mr. Laffer immediately rejected the suggestion (Tr. 154).

[*Proxy Solicitation Intended*]

After learning that their request for representation on the Clevite Board would not be granted, the Smelting representatives told Mr. Laffer at the March 13 meeting that Smelting was going to solicit shareholder's votes for election of four directors. While Smelting readily volunteered its plans, Mr. Laffer gave no indication that serious consideration was then being given to a proposal which would drastically change the Clevite Board. Moreover, he absolutely refused to grant Smelting's request for a copy of Clevite's shareholder's list.

After its request for a copy of the shareholder's list had been denied, Smelting filed an action in the New York Supreme Court seeking a copy of said list. It may be needless to add that Mr. Laffer and his counsel obviously recognized that by denying the Smelting request for a shareholder's list they would be able to delay and, therefore, impede Smelting's efforts to solicit proxies for the April 1 meeting.

On March 14 the Clevite Board of Directors met once again. The minutes of this meeting are, in

pertinent part, as follows:

"Messrs. Laffer and Colborn reported on their meeting on March 13, 1968, with Messrs. Horwitz, Wilder, and Turpin, officials of the United States Smelting Refining and Mining Company, and discussed developments to date. After full discussion, upon motion duly made and seconded, the following resolutions were adopted by the affirmative vote of all Directors present:

"RESOLVED, that the Board of Directors of Clevite Corporation hereby approves the proposed amendment to Article II, Section 1 of the Regulations of the Corporation, in the form presented to this meeting, to clasify the Directors of the Corporation into three classes of not less than three each, and recommends its adoption by the shareholders at the next annual meeting of shareholders.

**\*9** "RESOLVED, that the President, any Vice President, and the Secretary of the Corporation, and each of them, acting upon the advice of counsel, hereby are authorized (1) to approve the President's letter to shareholders, the revised notice of annual meeting of shareholders, a supplement to the proxy statement, and revised proxy card for use in connection with the annual meeting of shareholders of the Corporation to be held on April 1, 1968, in the preliminary forms presented to this meeting; (2) to approve changes in said proxy material in response to any comments thereon of the Securities and Exchange Commission or as they otherwise deem necessary or advisable: and (3) to authorize the distribution of said proxy material in final form to shareholders and the filing thereof with the Securities and Exchange Commission and the New York Stock Exchange."

The supplemental proxy material referred to in the above-quoted minutes had evidently been prepared during the preceding couple of days (Tr. 52). According to Mr. Laffer, the supplemental proxy material ultimately sent to shareholders is substantially the same that was before the Clevite Board at its March 14 meeting (Tr. 52).

On March 19 Clevite appeared for a hearing in the New York Supreme Court case and voluntarily furnished Smelting a copy of its shareholder list.

[*Proxy Supplement*]

On March 19 Clevite mailed its shareholders an "Amended Notice of Annual Meeting" and "Supplement to Proxy Statement" dated March 18. In this March 18 proxy material it was indicated that a proposal to amend Article II, Section 1 of the Regulations of the Corporation would be considered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 7
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

and acted upon at the April 1 meeting. This proposed amendment of the Clevite Regulations provided in part as follows:

"The Directors shall be divided into three classes, each class to consist of such number of Directors, not less than three, as the shareholders may determine. A separate election shall be held for each class of Directors as hereinafter in this paragraph provided. Directors elected at the first election for the first class shall hold office for the term of one year from the date of their election and until the election of their successors, Directors elected at the first election for the second class shall hold office for the term of two years from the date of their election and until the election of their successors, and Directors elected at the first election for the third class shall hold office for the term of three years from the date of their election and until the election of their successors ..."

The operation of the proposed amendment was clearly described at page 2 of the March 18 proxy material. There, it was stated:

"The Board *** recommends that action be taken at the annual meeting to amend the Regulations to provide for the division of Directors into three classes of not less than three members each whose respective terms would expire in different years. It also recommends that the Board be reduced from fifteen members to nine members, three of whom would be elected for a term expiring in 1969, three for a term expiring in 1970 and three for a term expiring in 1971. A separate vote would be taken for the election of each class. A minority group currently can elect a Director with approximately 6% of the voting power represented at a meeting. The proposed amendment would require 25% of the vote to affect the composition of the Board-but this 25% would elect three Directors the first year-one in each class. This action would facilitate the continuance of the present management and make it more difficult for Smelting or any other group to obtain representation on or majority control of the Board of Directors."

*10 As is readily apparent, and as Clevite readily concedes, the purpose behind the proposal to amend the Regulations was to make it more difficult for U. S. Smelting to obtain representation on or majority control of the Clevite Board of Directors.

Clevite's March 18 proxy material stated as follows with regard to the method of voting on the proposal to amend the Regulations:

"The adoption of the proposed amendment will require the affirmative vote of the holders of a majority of the $2.50 Cumulative Convertible Preference Stock, Series A, and Common Stock voting together as a single class."

It further stated that:

"Clevite has recently been engaged in discussions with several other companies relating to merger and acquisition possibilities and at the present time active negotiations are continuing with a major Cleveland-based company. There is no assurance at the present time that any agreement will be reached or any merger or acquisition will be consummated as a result of any of these discussions or negotiations. Announcement was previously made that your management and the management of The Weatherhead Company had been continuing discussions initiated many months ago looking toward the merger of Clevite Corporation with that company, a large, privately-owned, Cleveland manufacturer of fluid controls and parts. On March 8, 1968, such discussions were suspended by The Weatherhead Company."

On March 19, Mr. Laffer and Mr. Shepard met for a second time to discuss a possible merger of Clevite into T. R. W. This meeting took place at Mr. Shepard's home at approximately 5:15 p. m. Mr. Laffer has testified as follows with regard to that meeting:

"Q. What was discussed in the meeting?

"A. The actual negotiations and the merger.

"Q. Meaning the terms?

"A. We discussed terms that night, a little bit. We talked evaluations, earnings, and Mr. Shepard said he would like to see-

* * *

"A. He said he wanted to know about the pitfalls in our earnings projection for the year '68, and I said I would be glad to do that, and if he would care to we would meet the next morning with this information, which we did; and we talked management philosophy, such as centralization vs. decentralization, and things of this kind, and we agreed to meet the next morning at 9:00 o'clock in his office, which we did." (Tr. 84, 85).

Mr. Laffer has also stated that he may have told Mr. Shepard on March 19 that he "had to receive over $70.00" for the Clevite common (Tr. 86) and that the preferred shareholders would have to be given special consideration (Tr. 87). Mr. Laffer explains this need for giving special consideration to the preferred as follows:

"Well, the preferred, as a class, to approve a merger has to have over fifty per cent voting in favor of the merger, and because there is such a

Not Reported in F.Supp.                                                                                              Page 8
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

small quantity of Clevite preferred out, anybody wanting to block a merger could take that area for less money than taking the common area." (Tr. 87, 88).

**\*11** At approximately noon on March 20, Mr. Laffer received a telephone call from a Mr. Riley of T. R. W. Mr. Laffer has testified that the first mention of price occurred during that telephone conversation. (Tr. 85) According to Mr. Laffer, Mr. Riley indicated that T. R. W. offered to give T. R. W. preferred and common shares then having a value of approximately $70.00 in exchange for each share of Clevite common, and T. R. W. preferred shares then having a value of $73.00 in exchange for each share of Clevite preferred. (Tr. 86, 87) Approximately 4 1/2 hours after he received this initial offer, Mr. Laffer accepted the same with but one slight modification and entered into a preliminary agreement to merge. (Tr. 98).

*[Agreed Price]*

On the date the preliminary merger agreement was reached with T. R. W., Clevite common was selling on the market at approximately $61.00 per share. Thus, the value on that date of the package offered by T. R. W. ($70.00) was approximately fifteen per cent greater than market. Mr. Laffer has testified that as a general rule:

"Basically on a take-over in the merger acquisition area you have to offer approximately fifteen per cent or slightly more than that of the market; and on this basis the shareholder thinks that is all right, particularly if it is a tax-free deal with a reliable company." (Tr. 69).

While Mr. Laffer indicates that he did not agree to the $70.00 figure solely on the basis of the fifteen per cent rule, it is far from clear what matters he actually did take into consideration in determining what Clevite's common shareholders should receive for their shares. (See, for example, Tr. 95, 96.)

On March 22, 1968, Smelting filed Civil Action No. C 68-210 (one of the two consolidated actions here under consideration). In its original complaint, Smelting alleged that the actions taken by Clevite management in connection with the scheduled April 1, 1968, shareholders' meeting had, in a great many respects, been contrary to law. In conjunction with the filing of its complaint, Smelting also moved for an order temporarily enjoining Clevite from holding the shareholders' meeting scheduled for April 1 (hereafter referred to as "first" motion for a temporary injunction). In urging that it was entitled to a temporary injunction, Smelting placed almost exclusive emphasis on its claim that the March 18

proxy material was false, misleading, and omitted material facts in the following three respects:
(1) It stated that the proposed amendment establishing a classified Board of Directors required the affirmative vote of the holders of a majority of the preferred and common shares voting together as a single class, whereas the Articles of Incorporation required that the preferred shareholders vote separately and approve such an amendment by a two-thirds majority.
(2) It failed to state that the proposed method for electing members of the classified Board of Directors violated Ohio Revised Code, § 1701.55.
**\*12** (3) It failed to state that a preliminary merger agreement had been entered into between T. R. W. and Clevite.

Smelting further urged that the timing of the issuance of the March 18 proxy material in effect precluded Smelting from soliciting proxies.

On March 25 this Court heard oral arguments on Smelting's first motion for a temporary injunction.

At a meeting held on the morning of March 29, the Clevite Board of Directors approve the merger agreement with T. R. W. The Directors also passed a resolution calling for a special meeting of shareholders on May 24 for the purpose of acting upon the merger agreement. The resolution provided that only shareholders of record at the close of business on April 11, 1968, would be entitled to vote at the special meeting.

On the afternoon of March 29 this Court filed an opinion and order denying Smelting's first motion for a temporary injunction.

On March 30, the Clevite Board of Directors met and passed a number of resolutions relating to the April 1 annual meeting and the proposed merger. One of these resolutions changed the date of the special meeting of shareholders from May 24 to June 4.

At the April 1 annual meeting, the Clevite shareholders approved the amendment establishing a classified Board and, thereafter, voted separately for each of the three classes of Directors. It would appear that Smelting abstained from voting at the April 1 meeting.

*[Awareness of Clevite]*

It seems clear that as of April 1 Clevite's management and Directors were well aware that there was a definite possibility that Smelting might make a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 9
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

tender offer for some or all of Clevite's shares. In fact, in the proxy materials ultimately issued by Clevite Management for the June 4 meeting, reference is made to the fact that the possibility of such a tender offer was taken into consideration in negotiating the exchange rate provided in the merger agreement with T. R. W. Further, the fact that an early record date had been set for the June 4 meeting certainly made it more likely that Smelting would ultimately make some type of tender offer.

It seems clear that T. R. W. was obviously concerned with the opposition which the proposed merger might face in the event Smelting solicited proxies and/or made a tender offer. The minutes of a Clevite Board meeting of April 4 certainly seem to reflect such concern on the part of T. R. W. These minutes, which are attached to the Weinberg affidavit filed May 17, indicate in part as follows:

"Messrs. Laffer, Colborn, Rose, and Tracy reported that at their meeting with officials of TRW Inc. on April 3, 1968, *the TRW Inc. officials had indicated that they felt that it would be desirable if a proper settlement could be worked out with United States Smelting Refining and Mining Company*. The legal restrictions on management, the Securities and Exchange Commission's requirements and the reason why such a settlement would be in the best interests of Clevite Corporation stockholders were discussed at length. After a lengthy discussion of all phases of the problems, on motion duly made and seconded, the following resolution was adopted by the affirmative vote of all Directors present:

**\*13** "RESOLVED, that this Corporation purchase, or agree to purchase, from United States Smelting Refining and Mining Company shares of this Corporation's Common Stock in such number less than 10% of the outstanding stock at a price of not more than $80 per share and on such other terms and conditions as the President with the advice of counsel shall approve, subject to (a) securing from the Securities and Exchange Commission an appropriate exemption order and (b) the consent of TRW Inc. as required by the Agreement of Merger dated March 30, 1968." (Emphasis added.)

It should be noted that under the proposal quoted above, Smelting would have received an amount *substantially* in excess of the then (April 4) market value of any shares which it sold. Moreover, it would appear that Smelting also would have received an amount in excess of the then market value of the T. R. W. package. Further, from pretrial discussions had in these actions, it seems clear to the Court that the ten per cent limitation in

the proposal was inserted to minimize the risk to Smelting that it might, under Section 16(b) of the Securities and Exchange Act, be required to disgorge the several million dollars profit it would make in connection with the sale of its Clevite shares.

The minutes of a Clevite Board meeting held on April 11 are, in pertinent part, as follows:

"Messrs. Colborn and Rose reported in detail on the negotiations which had been held between Smith Barney, United States Smelting Refining and Mining Company, TRW Inc., and Clevite Corporation since the April 4, 1968 meeting of the Board of Directors. All phases of the negotiations were discussed. After full discussion, upon motion duly made and seconded, the following resolution was adopted by the affirmative vote of all Directors present:

"RESOLVED, that the appropriate officer or officers of the Corporation be and hereby are authorized to enter into an option agreement with United States Smelting Refining and Mining Company at a cost not in excess of $12.00 per share providing the option to purchase after six months such number of shares less than 10% of the outstanding stock of the Corporation at a price of not more than $71.50 per share for Common Stock and not more than $74.00 per share for $2.50 Series A Preference Stock, and on such other terms and conditions as the President with the advice of counsel shall approve subject to securing the consent of TRW Inc. as required by the Agreement of Merger dated March 30, 1968.

"FURTHER RESOLVED, that the appropriate officers of the Corporation be and hereby are authorized to do any and all things which they may deem necessary or advisable to carry out the intent and purpose of the foregoing resolution."

The comments made in connection with the content of the minutes of the April 4 Board meeting seem applicable to what is reflected in the minutes of the April 12 meeting.

For the purposes of the motions presently before the Court, the information reflected in the minutes of Clevite Board meetings of April 4 and April 12 appears to be pertinent only to the extent that it indicates one of the many avenues which have been pursued in an effort to stop Smelting from gaining any significant influence in the affairs of Clevite.

**\*14** In the preceding chronological summary of the events which transpired between late February and early April, the Court has incorporated some observations with regard to the significance of certain

Not Reported in F.Supp.                                                                     Page 10
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

of the facts reflected therein. It seems appropriate at this point to make some further observations in that regard.

[*Intentions Honorable*]

Since the time it first became known that Smelting had taken a position in Clevite stock, there have been comments made and charges leveled to the effect that Smelting is a "raider." It seems clear that at least in the eyes of the general public charges to that effect often carry with them implications of a most derogatory nature. It would be unfortunate indeed if such implications have been drawn in the instant case, because Clevite has made absolutely no claim, and there is not one scintilla of evidence, that the motivations behind any of the actions taken by Smelting's officers and directors have been anything other than the most honorable. Moreover, Clevite has made absolutely no claim, and there is not one scintilla of evidence, that Smelting has acted in a manner other than that which it considered to be in the best interests of all the Clevite shareholders.

According to Mr. Laffer's definition, the term "raider" refers to a company which seeks influence in the affairs of another "when it is not wanted." (Tr. 21). Giving full credence to Mr. Laffer's testimony, it would appear that his and the other Clevite directors determination that Smelting was not "wanted" was based primarily upon their view that the existing Clevite management was performing satisfactorily and the Smelting management did not have experience in the technical fields in which Clevite is engaged. In this regard it should be noted however that Clevite's directors obviously recognized that the management of Smelting had very successfully managed a rather diverse range of operations.

As previously noted, the evidence thus far indicates that it was quite early in March when the Clevite directors concluded that they were opposed to any attempt on the representation on the Clevite Board. Moreover, it seems clear that at the same time the Clevite directors decided that swift and rather drastic steps would have to be taken in order to defeat whatever efforts Smelting might make in that regard. The decision to act quickly was evidently predicated upon a view that Smelting might soon purchase enough Clevite shares to either gain control or place it in a position to block any "defensive" merger proposal which the directors might submit to shareholders. Further, it was clear that without a substantial reduction in the Clevite Board or a classification of the same Smelting would readily be able to elect at least one director at the April 1 annual

meeting.

It would appear that as early as March 3 Clevite management had concluded that the merger route was probably the best way to stop Smelting from gaining any influence in the affairs of Clevite. When it subsequently became known to the general public that Smelting had acquired a substantial interest in Clevite, other companies no doubt realized that Clevite management might be receptive to merger "feelers." Thus, as previously noted, Mr. Laffer was contacted during the month of March by approximately 20 companies interested in discussing mergers with Clevite. (Tr. 70). Included among these were Republic Steel, Youngstown Sheet and Tube, Thiokal Chemical, Eaton, Yale & Towne, Midland Ross, Gould-National Batteries, Inc. (Tr. 70-79, 112). Other than Eaton, Yale & Towne, Mr. Laffer apparently did not actively explore or follow up the 20 or so inquiries he received. (Tr. 156). In the case of Eaton, Yale the parties were unable to agree upon a satisfactory exchange rate.

**\*15** Mr. Laffer's recollection as to when he received the 20 inquiries is rather vague. (Tr. 156, 157). It seems clear, however, that all of these inquiries were received prior to the time the Clevite Board approved the T. R. W. merger. (Tr. 157). Mr. Laffer has indicated that the inquiries were not followed up partially because of the pending discussions with Weatherhead and T. R. W. On the evidence to date, however, it seems that in all likelihood these inquiries were not fully investigated primarily because Mr. Laffer believed the circumstances to require that affirmative action be taken immediately. An investigation of a large number of the inquiries probably would have resulted in a considerable delay in the consummation of a merger agreement.

[*Discovery*]

Shortly after April 1 Smelting undertook a substantial discovery program in connection with the issues raised in Civil Action No. C 68-210. This program included requests for the production of documents and depositions of Mr. Shepard, Mr. Grabner, and most of the principal officers and directors of Clevite. Many of the facts previously noted first came to Smelting's attention by way of such discovery procedures.

On or about May 2, 1968 Mr. Laffer received a letter from William T. Ylvisaker, Chairman of the Board of Gould-National Batteries, Inc. (Gould), containing a proposal for the merger of Gould and Clevite. (See Plaintiff's Exhibit 9-9E). According to Mr.

Not Reported in F.Supp.                                                  Page 11
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

Ylvisaker's letter, the common shareholders of Clevite would receive under the proposal stock having a value of $86.65 for each share of their Clevite common stock. Mr. Ylvisaker also pointed out that while he recognized there were antitrust problems in connection with a merger of Gould and Clevite he was nonetheless of the view that these problems could be resolved by the divestiture of a small portion of Gould's operations. By a letter dated May 2 Mr. Laffer responded to Mr. Ylvisaker's proposal as follows:

"I have your letter of May 1 and the supporting documents in which you have made a proposal that you requested me to discuss with the Board of Directors of Clevite Corporation, which I did today.

"Of course you are aware that, by the authority of the Board of Directors, Clevite on March 30 entered into a definitive contract with TRW, Inc., subject to approval of our shareholders at a meeting to be held on June 4, 1968, to merge into TRW on terms with which you are familiar.

"Under these circumstances, and also because of the serious problems which your proposal frankly sets forth, my Board has concluded that we are not at present in a position to give favorable consideration to your letter."

*[Tender Offer Published]*

On May 6 Smelting published in various newspapers, including *The Plain Dealer,* a newspaper of general circulation in the Northern District of Ohio, an offer to purchase 300,000 shares of Clevite common stock at a price of $80.00 per share net (hereinafter referred to as "Tender Offer"). The Tender Offer was to expire on May 24 unless extended to not later than May 31. The Tender Offer provided that Smelting would purchase only those shares which were eligible to vote at the June 4 meeting, and, further, required that the person tendering shares execute an irrevocable proxy for all shares purchased by Smelting pursuant to the Tender Offer.

**\*16** On the same day the Tender Offer was published Naoma L. Stewart, an attorney with Jones, Day, Cockley & Reavis, went to the offices of the Ohio Division of Securities in Columbus, Ohio and filed a complaint in connection with the Smelting Tender Offer. Upon this *ex parte* application a "Cease and Desist Order" was issued ordering Smelting not to engage in the business of buying common stock of the Clevite Corporation in the State of Ohio without first complying with Section 1707.14(B) of the Ohio Revised Code. (Udinsky affidavit, Plaintiff's Exhibit

5). Smelting's counsel was notified of the ""Order" on the afternoon of May 6, and shortly thereafter went to Columbus, Ohio to confer with the personnel of the Ohio Division of Securities who were evidently responsible for the so-called "Order." According to an affidavit of Smelting's counsel, the Division's attorneys conceded that there was no statutory provision or regulation authorizing the issuance of an "Order" such as had been entered on May 6. (Cohen affidavit filed May 10). In appearing before the Division Smelting's counsel "took the position that the law of Ohio did not require such offer (Tender Offer) to be made through a licensed dealer broker, but the procedure suggested by the Commission was so easily complied with and time was of such essence that U. S. Smelting, while not conceding the Commission's authority or jurisdiction, immediately agreed to appoint a dealer broker and U. S. Smelting was immediately advised that it was therefore in compliance with the law of Ohio." (Cohen affidavit filed May 10, pp 4, 5).

On May 9 Clevite, George Enos (a Clevite Director), John Sherwin (a Clevite Director), and Ben Bailey (assistant to Mr. Laffer) filed an action challenging a number of aspects of the Smelting Tender Offer. (Civil Action No. C 68-345). In conjunction with the filing of their complaint, the plaintiffs also moved for a preliminary injunction requiring Smelting (1) to offer shareholders who have tendered prior to issuance of the order the right to rescind their tenders, (2) with respect to other shareholders, to take no action pursuant to the Tender Offer after issuance of the order, and (3) not to renew the Tender Offer or make any other offer to purchase shares of stock of Clevite without an order of the Court. This motion for a preliminary injunction is one of the matters which is presently before the Court for decision. The arguments on this motion were heard on May 17. At this hearing Civil Actions Nos. C 68-210 and C 68-345 were consolidated.

The complaint in Civil Action No. C 68-345 alleges that the action is brought under the Securities Exchange Act of 1934 (15 USCA Sections 78a-78jj) for violations of Sections 10(b) and 14 of the Act (15 USCA Sections 78j, 78n) and the rules and regulations issued thereunder. The complaint further alleges that the action is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure.

*[Claims]*

**\*17** In moving for a preliminary injunction in C 68-345, the plaintiffs make essentially two claims: They are:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 12
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

(1) That the tender offer constitutes a solicitation of proxies in violation of Sec. 14(a) of the Securities and Exchange Act of 1934 and the rules and regulations issued thereunder, and,

(2) that the Tender Offer violates Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 in that it contains false statements and material omissions.

*[Offeror's Defenses]*

In opposing the plaintiff's motion for a preliminary injunction, Smelting urges:

(1) That the solicitation of proxies in conjunction with the Tender Offer falls within the exemption provided by Rule 14a-2(c) for "solicitation by a person in respect of securities of which he is the beneficial owner,"

(2) that the Tender Offer contains no false statements or material omissions, and, that the plaintiffs lack standing to maintain an action under Section 10(b) or Rule 10b-5.

The foregoing claims will be discussed later in greater detail.

On May 6 Clevite management mailed proxy materials for the June 4 special meeting of shareholders. Further, on May 6 Mr. Laffer sent shareholders a letter titled "*Important*-Message About Tender Offer." On May 8 Smelting mailed its proxy materials for the June 4 special meeting.

On May 15 Smelting filed its second motion for a preliminary injunction in Civil Action No. C 68-210. In the brief which was attached to this motion Smelting indicated that it would subsequently file an amended complaint incorporating matters which had come to its attention since the filing of the original complaint. In support of its second motion for a preliminary injunction Smelting urges essentially the following points:

(1) That in negotiating and approving the T. R. W. merger the officers and directors of Clevite violated their fiduciary duty to Smelting and the other Clevite shareholders.

(2) That the Clevite management's proxy materials dated May 6 and Mr. Laffer's letter of May 10 contain false and misleading statements and material omissions.

(3) That Ohio law requires that the T. R. W. merger be approved by the holders of 2/3 of Clevite's preferred shares voting as a class, whereas management has represented that it requires a majority, and, further, that Ohio law requires the T. R. W. shareholders to approve the merger whereas

the agreement provides otherwise.

As indicated in the brief in support of its second motion for a preliminary injunction, on May 16. Smelting moved for leave to file an amended complaint and to add parties defendant. On May 20, before the Court had ruled on Smelting's motion for leave to file an amended complaint, Clevite and the new defendants filed an answer and counterclaim to said amended complaint. On May 20 Clevite also filed (in Civil Action No. C 68-210) a motion for a preliminary injunction directed towards Smelting's proxy materials.

On May 20, 21 and 27 the Court heard evidence and arguments with regard to the issues raised by the requests for preliminary relief in Civil Action No. C 68- 210. At the May 27 hearing Clevite withdrew the motion for a preliminary injunction which it had filed on May 20.

**\*18** On May 24 the Smelting Tender Offer was extended until May 31.

On May 27 Mr. William Ylvisaker, Chairman of Gould-National, sent another offer of merger to Clevite. The letter conveying their offer stated:
"This is to advise you that I am authorized by the Board of Directors of Gould-National Batteries, Inc., to make an offer to combine Clevite and Gould-National on the following basis:
"1) For the Clevite common stock either "(a) 1.9 shares of Gould-National common stock for each share of Clevite common stock, or
"(b) Each presently outstanding Clevite common share would be exchanged for for one share of Gould-National common stock plus 0.7 share of a new Gould-National $2.00 Convertible Preferred stock, each share of which is convertible into 1.1 shares of Gould-National common stock. In addition, each share of Clevite common would receive one-half (0.5) of a Gould-National detachable common stock warrant, each full warrant to permit the holder to purchase one share of Gould-National common stock at $55.00 per share, exercisable at any time within four (4) years.
"2) For the Clevite $2.50 Preference Stock either
"(a) 1.7 shares of Gould-National $2.00 Convertible preferred stock for each share of $2.50 Clevite Preference Stock, or
"(b) Each presently outstanding share of Clevite Preference Stock would be exchanged for 1.6 shares of a new Gould $2.00 Convertible Preferred Stock, each share of which is convertible into 1.1 shares of Gould-National common stock. In

Not Reported in F.Supp.                                                                                                Page 13
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

addition, each presently outstanding share of Clevite Preference Stock would receive one-half (0.5) of a Gould-National detachable common stock warrant, each full warrant to permit the holder to purchase one share of Gould-National common stock at $55.00 per share, exercisable at any time within four (4) years.

"3. Based on the closing market price of Gould common stock as of May 24, 1968, the offer under 1(a) above has an indicated value of more than $94.00 per share of common stock of Clevite.

"4. We will undertake to take all necessary action reasonably required of us to eliminate any anti-trust problem which might arise from the proposed combination of our two companies. As we have previously informed you, we see no meaningful anti-trust problem except for the possible requirement that we dispose of a relatively small amount of our assets, for which there is a ready market.

"5. This offer would be implemented with the execution of a definitive merger agreement as is normal in such circumstances and would, of course, require the approval of the shareholders of Clevite and Gould-National.

"6. We have been in touch with United States Smelting Refining and Mining Company, your largest stockholder and have secured its agreement in support of a merger of our two companies on the basis indicated. A copy of our agreement with United States Smelting Refining and Mining Company is enclosed.

"7. This offer will terminate unless management of Clevite agrees on or before July 3, 1968 to a merger and to submit a merger agreement based upon such offer to its shareholders within two months thereafter.

**\*19** "8. Any reasonable right to terminate the transaction by Clevite would be agreeable to us provided that a similar basis of termination is provided for us. In all other respects the merger agreement would be substantially in the form of the present agreement between TRW Inc. and Clevite."

The agreement between Gould-National and Smelting which is referred to in Mr. Ylvisaker's letter to Clevite dated May 27 is attached to the Cohen affidavit filed on June 3, 1968. Under this agreement Smelting obligated itself (1) to support the Gould offer if Clevite management agrees on or before July 3 to submit the same to Clevite shareholders (2) to dispose of any Gould-National stock it receives pursuant to a Clevite-Gould National merger within 6 months after the completion of the transaction. The agreement further noted that Smelting had indicated

that it would advise all Clevite shareholders who had tendered shares that they would have the right to rescind their tenders.

[*Rescission Offered*]

On May 28 Smelting notified those who had tendered shares pursuant to its tender offer that they would be given an opportunity to rescind their tenders.

On May 28 Clevite management sent shareholders a letter, which reads in part as follows:

"On May 1, 1968, more than a month after Clevite's Board of Directors had approved the merger agreement with TRW, we were sent a merger proposal from Gould National Batteries, Inc. Our directors and management felt its offer was subject to such uncertainties that they didn't think it worthy of reporting.

"Yesterday, we received a new proposal from Gould National Batteries, Inc. Gould's proposal is for a merger of Gould and Clevite on one or the other of two alternative bases. On the first alternative, present shareholders of Gould would retain their approximately 1,740,000 common shares and Clevite common shareholders would receive 1.9 Gould common shares for each Clevite common share. There would thus be a total of approximately 5,400,000 Gould common shares outstanding. Gould proposes that Clevite preferred shareholders receive 1.7 shares of a new $2 Gould preferred stock, each share convertible into 1.1 shares of Gould common stock.

"Under the second alternative proposed by Gould, Clevite common shareholders would receive one share of Gould common stock and .7 of a share of the new $2 Gould convertible preferred stock, plus .5 of a warrant, each full warrant to permit the purchase of one share of Gould common stock at $55 at any time within four years. Clevite preferred shareholders would receive 1.6 shares of the new $2 Gould convertible preferred stock, plus .5 of a Gould common stock warrant with the terms described above.

"Based upon the substantial but incomplete information presently available, our management and directors continue to feel strongly that the TRW merger is in the interest of Clevite shareholders. However, we are proceeding to complete our information in this respect and will give further consideration to the several proposals. As soon as possible we will send you a detailed statement of our views after such consideration.

**\*20** "To permit time to send you further information, we propose at the Clevite shareholders

Not Reported in F.Supp.
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

Page 14

meeting on June 4, 1968 to recess the meeting until June 18, 1968."

 As stated in the letter to shareholders dated May 28, the special meeting of Clevite shareholders was convened on June 4 and immediately adjourned until June 18.  At this meeting it was discovered that the certified list of shareholders (as of the record date of April 11) which had been supplied to Smelting by Clevite's counsel was incorrect. According to affidavits which were filed on June 5 the errors in this list are attributable to the personnel of the data processing department of Clevite's transfer agent, Central National Bank of Cleveland. The affidavit of J. T. Lieser indicates that the shareholder list supplied to Smelting included the names of shareholders of record as of April 30 rather than those of record as of April 11.  In his affidavit Mr. Lieser states:
 "On the basis of our review of a correct list of Clevite shareholders of record as of April 11 and transfer sheets since that date through April 20, there are *approximately* 185 Common Stock shareholder accounts which were "closed out,' that is, accounts which were of record as of April 11 but do not appear on the list prepared on May 14. These accounts represented an aggregate of *approximately* 20,613 shares of Common Stock." (Emphasis supplied).
 No explanation is given as to why the Court has been supplied with only approximations.

 Turning, now, to a discussion of the various issues which have been raised by the motions for a preliminary injunction, consideration will be given first to those raised by Smelting in C 68-210.

 SMELTING'S CLAIM THAT THE DIRECTORS AND OFFICERS OF CLEVITE HAVE VIOLATED THEIR FIDUCIARY DUTY TO SMELTING AND OTHER CLEVITE SHAREHOLDERS IN CONNECTION WITH THE PROPOSED TRW MERGER.

 In support of its claim that the directors and officers of Clevite have violated their fiduciary duty to the Clevite shareholders, Smelting relies substantially upon the following circumstances reflected in the evidence presently before the Court:
 1. The effort on the part of Clevite directors and officers to deny Smelting representation on the Clevite Board in the manner previously described.
 2. The rapid decision to deviate from an established policy (of "going it alone") in order to prevent Smelting from gaining any influence in the affairs of the corporation.

 3. The great speed with which Clevite directors and officers proceeded in an effort to find a merger arrangement which would prevent Smelting from gaining influence in the affairs of the corporation.
 4. The failure on the part of Clevite directors and officers to explore inquiries from the large number of substantial firms which had expressed interest in merging with Clevite.
 5. The creation of what Smelting claims to have been a "smoke screen" in connection with the Weatherhead discussions previously described.
 **\*21** 6. The manner in which the TRW agreement was reached, including:
 a. The great speed with which the agreement was formulated.
 b. The lack of analysis and bargaining in connection with the matter of an appropriate rate of exchange.
 c. The requesting of *special* treatment for the holders of preferred shares in order to assure their support of the merger.
 7. Indications and statements made at various times by Mr. Laffer that he was of the view that Clevite shares had a value in excess of the value of the package provided under the TRW agreement.
 8. The out-of-hand rejection of the May 1 Gould National proposal and the failure to inform shareholders of the same in the May 6 proxy materials.

 [*Bad Faith Alleged*]
 Smelting urges that the circumstances above mentioned clearly demonstrate that the Clevite directors and officers have acted in bad faith and in disregard of the best interests of the Clevite shareholders.   Smelting further urges that the evidence clearly demonstrates that such conduct has been motivated by a selfish desire on the part of the Clevite management to maintain itself in power.

 There need be no citation of authority for the fundamental principle that corporate management and directors have a duty to act reasonably and in good faith to serve the interests of all of their shareholders.  While the principle may be stated in simple terms, its application to particular fact situations is often most difficult.

 Here, it seems clear that early in March the officers and directors of Clevite concluded that Smelting might in the near future attempt to gain control or substantial influence in the affairs of the Corporation. The evidence presently before the Court does not clearly establish that such conclusion was necessarily correct, nor does it clearly establish that Clevite acted

unreasonably or in bad faith in coming to such a view.

Having concluded that Smelting might in the near future attempt to gain either control or substantial influence in the affairs of Clevite, it did not follow, and Smelting does not urge, that the Clevite management and directors were thereafter necessarily obligated to take no action in connection with such a possibility. *Selama-Dindings Plantations, Ltd. v. Durham,* 216 F. Supp. 104 (S. D. Ohio 1963), *aff'd per curiam,* 337 F. 2d 949 (6th Cir. 1964); *Cohen v. Standard Products Co.* (unreported) (N. D. Ohio 1965). What Smelting does urge, however, is that under the circumstances of this case the specific actions taken by the Clevite officers and directors were in bad faith and contrary to the interests of the shareholders.

There seems to be absolutely no dispute but that the Clevite management and directors acted swiftly and decisively once they realized that Smelting was rapidly purchasing substantial blocks of Clevite stock. It might here be noted that during February and early March, Smelting's purchases of Clevite common were as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

Evidently, the Clevite officers and directors believed that if they did not take immediate action Smelting would in the meantime have purchased a sufficient number of shares to block any action which they might ultimately propose. (Transcript of proceedings of May 27, p. 1965.)

**\*22** Certainly, numerous situations may arise where corporate officers or directors may reasonably and in good faith conclude that quick action is necessary in order to serve the best interests of all their shareholders. Under such circumstances, the mere fact that such action has been taken does not require a conclusion that the officers and directors have acted improperly. Moreover, under such circumstances it would seem that the exigencies of the situation must be thoroughly considered in determining the reasonableness of the particular actions taken by the officers and directors. What might be reasonable under one set of circumstances may be totally unreasonable under another.

Situations such as that which faced the Clevite officers and directors at the beginning of March surely require sophisticated business judgments. The circumstances reflected in the evidence presently before the Court may well cast shadows of doubt upon the propriety of the judgments made and actions taken by the Clevite directors and officers, nonetheless it must be recognized that the realm within which such judgments and actions fall is one in which such shadows of doubt may well be dispelled when all of the evidence is presented. Taking this reality into consideration, together with the fact that a finding of bad faith may cause serious and irreparable harm to the individuals and corporation involved, it would seem that the reasonable exercise of judicial discretion at this juncture militates in favor of considerable restraint.

*[No Irreparable Injury]*

As Clevite itself has both noted and proposed, in the event that the Clevite shareholders ultimately approve the TRW merger the questions of bad faith raised in C 68-210 may be fully heard and decided prior to the consummation of the merger. This being so, it does not appear that substantial or irreparable injury will result if Smelting is denied the preliminary relief it seeks in connection with its claim that the Clevite officers and directors have acted in bad faith and have breached their fiduciary duty to shareholders. Moreover, there is certainly present the possibility that the Clevite shareholders will reject the TRW merger. In that event, many of the issues raised by Smelting would be rendered moot.

Under the circumstances set forth above, Smelting's request for preliminary relief based upon its claim of bad faith and breach of fiduciary duty is denied.

SMELTING CLAIM WITH REGARD TO THE VOTING RIGHTS OF THE HOLDERS OF CLEVITE PREFERRED

The original proxy materials distributed by both Clevite management and Smelting indicated that the adoption of the TRW merger proposal would require the affirmative vote of the holders of a majority of the Clevite preferred shares voting as a class. Smelting now urges (and has indicated to Clevite shareholders) that under Ohio Revised Code Section 1701.79) (B) and Clevite Articles the adoption of the TRW merger proposal requires the approval of the holders of 2/3 of the preferred shares voting as a class. Section 1701.79 (B), which relates to the adoption of merger agreements provides in part:

**\*23** "In addition, whenever the agreement, if adopted would have an effect which, if accomplished through an amendment to the articles, would entitle the holders of shares of any

Not Reported in F.Supp.                                                                                    Page 16
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

particular class to vote as a class or the adoption of such amendment, such agreement (including any amendments or additions thereto proposed at each such meeting) in order to be adopted must receive the affirmative vote of the holders of at least two-thirds or, if the articles provide or permit, a greater or lesser proportion, but not less than a majority of the shares of such class."

Division A, Section 6 (b) (i) (i) of the Clevite's Article of Incorporation provides that the vote or consent of the holders of at least two-thirds of the preferred shares shall be necessary to effect the "authorization or creation of, or the increase in the authorized amount of, any shares of any class, or any security convertible into shares of any class, or any security convertible into shares of any class, ranking prior to the Serial Preference Stock," Smelting, after pointing out that under the TRW proposal the Clevite preferred shareholders would receive a TRW preferred stock which is junior to certain other TRW preferred, urges that both Ohio Revised Code § 1701.79 (B) and Section 6 (b) (i) (i) of the Clevite Articles require a 2/3 vote of the preferred for approval of the merger.

In the Court's view, Smelting's argument seems to ignore the plain language and intent of Section 6 (e) of the Clevite Articles. That section provides:

"(c) The vote or consent of the holders of at least a majority of the shares of Serial Preference Stock at the time outstanding, given in person or by proxy either in writing or at a meeting called for the purpose at which the holders of Serial Preference Stock shall vote separately as a class, shall be necessary to effect any one or more of the following but so far as the holders of Serial Preference Stock are concerned, such action may be effected with such vote or consent):

"(i) The sale, lease or conveyance by the Corporation of all or substantially all of its property or business; or

"(ii) The consolidation of the Corporation with or its merger into any other corporation unless the corporation resulting from such consolidation or merger will have after such consolidation or merger no class of shares either authorized or outstanding ranking prior to or on a parity with the Serial Preference Stock except the same number of shares ranking prior to or on a parity with the Serial Preference Stock and having the same rights and preferences as the shares of the Corporation authorized and outstanding immediately preceding such consolidation or merger, and each holder of Serial Preference Stock immediately preceding such consolidation or merger shall receive the same

number of shares, with the same rights and preferences, of the resulting corporation; or

"(iii) The authorization of any shares ranking on a parity with the Serial Preference Stock or an increase in the authorized number of shares of Serial Preference Stock."

**\*24** It seems clear that paragraph 6 (c) (ii) is directed specifically towards a situation such as that which is presented by the TRW merger proposal. It likewise seems clear that intent behind Section 6 (c) (ii) was to override the general two-thirds vote provision contained in 6(b)(i)(i) and to provide for a majority vote where the situation contemplated by that section 6(b)(i)(i) arises in connection with a merger such as that here under consideration.

Section 6(c)(ii), which provides for a majority vote, is in no manner inconsistent with Ohio Revised Code § 1701.79 (B). Since the court is of the view that section 6(c)(ii) controls in connection with the TRW merger proposal, it follows that preliminary relief must be denied in connection with Smelting's claim that a 2/3 vote is required.

SMELTING'S CLAIM THAT THE CLEVITE MERGER SHOULD BE ENJOINED UNLESS IT IS SUBMITTED TO A VOTE OF THE TRW SHAREHOLDERS.

Smelting urges that because of proposed amendments to the T. R. W. Articles of Incorporation (see exhibits A and B of the Proxy Statement) to be effected between the date of the agreement to merge and the date of the merger, together with certain amendments made to its regulations at the annual meeting of T. R. W. on April 30, 1968, the proposed merger is required to be approved by the shareholders of T. R. W. pursuant to Ohio Revised Code, Section 1701.79 (A) (3) (4) and (5), which provides, in pertinent part, as follows:

(A) The directors of each constituent corporation, upon approving the agreement of merger or consolidation, shall direct that the agreement be submitted to the shareholders entitled to vote on it at a meeting of shareholders of such corporation held for such purpose, and notice of such meeting shall be given to all shareholders of such corporation whether or not entitled to vote thereat, which notice shall be accompanied by a copy or summary of the agreement; provided, that an agreement of merger need not be submitted to or adopted by the shareholders of the constituent corporation which is designated in the agreement of merger as the surviving corporation if all of the following conditions exist:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 17
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

* * *

"(3) The agreement of merger sets forth without change all of the provisions contained in the articles of the corporation which is to survive (other than the statement with respect to initial stated capital);

"(4) The agreement of merger adopts without change the regulations of the corporation which is to survive;

"(5) The agreement of merger does not contain any provision conflicting with or effecting a change in any provision of the articles or the regulations of the corporation which is to survive ...."

The agreement of merger, pursuant to O. R. C. Sec. 1701. 79 (A) (3) and  (4), does in fact, set forth the articles and adopts the regulations of the surviving corporation (T. R. W.), and, further, does not conflict with or effect any change in the articles of the surviving corporation under subsection (5).

**\*25** While there have been two changes, as noted above, in the T. R. W. regulations between the date of the merger agreement and the effective date of the merger, they were made pursuant to action taken by the T. R. W. shareholders at the April 30, 1968 annual shareholders meeting.   A reasonable construction to be applied to the provisions of O. R. C. Sec. 1701.79 (A) (3) (4) and (5) is that they are intended to pro-habit changes in the articles and regulations of the surviving corporation by way of the merger agreement itself, without submission to the shareholders.   It would seem anomalous to construe O. R. C. Sec. 1701.79 (A) (3) (4) and (5) as a restriction on the fundamental right of the shareholders of the surviving corporation to make appropriate changes in their corporate articles and regulations.   Otherwise, they might not be able to properly conduct the affairs of the corporation.

Therefore, Smelting's request for a preliminary injunction on the ground that the merger must be submitted to the T. R. W. shareholders is denied.

SMELTING'S CLAIM THAT PROXIES HAVE
BEEN SOLICITED BY CLEVITE MANAGEMENT
ON THE
BASIS OF PROXY MATERIALS WHICH
CONTAIN FALSE AND MISLEADING
STATEMENTS AND
MATERIAL OMISS

Smelting urges that the proxies solicited and received thus far by Clevite management have been solicited on the basis of materials which contain numerous false and misleading statements and also

material omissions. Smelting urges therefore that all proxies solicited pursuant to such materials must be voided.

For the purposes of discussion, Smelting's claims may be grouped within the following categories:
(1) Misleading and inadequate financial data in the May 6 proxy statement.
(2) Failure to disclose the rights of T. R. W. under the merger agreement.
(3) Failure to disclose that the market value of T. R. W. package offered to Clevite shareholders is subject to fluctuations in the market value of T. R. W. shares.
(4) Failure to fully disclose the factual background and circumstances leading up to the execution of the T. R. W. merger agreement.
(5) Failure to disclose the May 1 Gould-National offer in the May 6 proxy statement and, the validity of proxies solicited and received on the basis of proxy materials which did not afford the Clevite shareholders an opportunity to evaluate the May 1 and/or the May 27 Gould-National offers.

Each of these categories will be discussed separately.

(1).  *Misleading and inadequate financial data in the May 6 proxy statement.*

Smelting urges that the proxy statement does not fairly indicate to shareholders the fact that the net income per share of the shares they now own will be diluted by reason of the TRW merger.  In the Court's view, however, this fact is adequately reflected at page 10 of the proxy statement.

Smelting further urges that "the preferred shareholders of Clevite are not informed that the dividends they would receive if they convert preferred shares which they now hold to common shares will result in 40 percent *less* dividends, at the current rate, than they would upon conversion of preferred shares to common if Clevite were to remain as an independent entity."  (brief filed May 15, pp. 12, 13).   In the Court's view, however, this information is adequately reflected at pages 3 and 11 of the proxy statement.

**\*26** During the course of the oral arguments held on May 27, counsel for Smelting called the Court's attention to certain financial data on pages 10 and 11 of Clevite's Proxy Statement and urged that the same was confusing.   While it seems clear that an interpretation of the figures in question requires *substantial* sophistication in the fields of accounting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 18
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

and corporate finance, it does not appear that the figures are either false or stated in terms not in accordance with sound and generally accepted accounting procedures. (See Tracy affidavit filed May 28). Therefore, the Court can find no impropriety in connection with the inclusion of the same within the proxy statement.

A claim is also made that the shareholders have not been clearly informed that the TRW preferred they would receive under the merger would not automatically be listed on a stock exchange. It seems however that this fact is adequately represented to the shareholders on page 2 of the proxy statement. Moreover, it seems almost inconceivable that the shares in question would not be accepted for listing.

(2) *Failure to disclose the rights of TRW under the merger agreement.*

Smelting has urged that Clevite management's proxy materials do not adequately indicate that TRW has an absolute right of termination at any time prior to the actual consummation of the merger. In the Court's view, however, this right on the part of TRW is clearly spelled out at page 5 of the proxy statement.

(3) *Failure to disclose that the market value of the TRW package offered to Clevite shareholders is subject to fluctuations in the market value of TRW shares.*

While this point is not *specifically* called to the shareholder's attention in the Clevite management's proxy materials, it nonetheless seems clear that the point would be readily apparent to anyone reading these materials. Therefore, the Court considers Smelting's claim to be without merit.

(4) *Failure to fully disclose the factual background and circumstances leading up to the execution to TRW merger agreement.*

In a brief filed on June 4, Smelting has listed thirteen items which it claims to be material omissions from the Clevite proxy materials. They are:
"1. The failure to advise shareholders that the TRW price was pegged to a figure which management thought would be acceptable to shareholders rather than one which management thought represented a good value for shareholders.
"2. The failure to inform the shareholders that inquiries from twenty other companies had been received in connection with merger possibilities.
"3. The failure to disclose that the TRW

negotiations were only a result of U. S. Smelting's ownership of Clevite's stock.
"4. The failure to disclose that the TRW merger represented a reversal of company policy.
"5. The failure to disclose that the President of Clevite had valued Clevite common stock at $100.00 per share shortly before he had entered into a preliminary agreement with TRW for an exchange ratio which at that time had a value of only $70.00 per share.
**\*27** "6. The failure to disclose that Clevite preferred stock was given special treatment in determining a ratio of exchange.
"7. The failure to disclose that the so-called 'negotiations' on the TRW merger occupied a period of only four hours.
"8. The proxy statement was false and misleading in failing to disclose that no other ratios of exchange were discussed with any other company to serve as a basis for comparison in evaluating the TRW merger.
"9. In failing to disclose that there was no protection in the TRW merger agreement for fall in the price of TRW stock.
"10. In failing to advise the shareholders that the exchange value would decrease in the event of a fall in the market price of TRW stock.
"11. In failing to advise the shareholders that independent investment advice was not sought in connection with the TRW merger.
"12. In failing to advise the shareholders that no consideration was given to waiting until the first quarter earnings were announced so that a higher price could be obtained from TRW.
"13. In failing to advise the shareholders that no real estate appraisal had been obtained for Clevite real estate." (pp. 2-7 Smelting's brief filed June 4).
It is apparent that a number of these thirteen items have been framed in a most argumentative manner. It is also apparent that these items constitute, in essence, the alleged circumstances upon which Smelting relies in urging that the Court should find that Clevite's officers and directors have acted in bad faith and in violation of their fiduciary duty to shareholders.

Were it to be concluded that the Clevite officers have acted in bad faith and in violation of their fiduciary duty to shareholders, it seems clear that the thirteen alleged "circumstances" would take on considerable significance. On the other hand, if it were to be concluded that the Clevite officers and directors had acted in good faith, and consistent with their fiduciary duties to shareholders, it would seem to follow that these alleged circumstances would be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 19
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

rendered immaterial and insignificant. It would appear, therefore, that the question of the materiality of the thirteen alleged "circumstances" is almost inexorably tied to the issue of whether the officers and directors of Clevite have acted in good faith and consistent with their fiduciary duties to shareholders. Since, as previously discussed, the Court is unwilling at this point to conclude that the officers and directors of Clevite have acted in bad faith and in violation of their fiduciary duties to shareholders, consistency requires a similar unwillingness to presently conclude that the thirteen alleged "circumstances" constitute material omissions from Clevite's proxy materials.

> Failure to Disclose the May 1 Gould-National Proposal in the May 6 Proxy Statement and the Validity of Proxies Solicited and Received on the Basis of Proxy Material Which Did Not Afford Clevite Shareholders an Opportunity to Evaluate the May 1 and/or the May 27 Gould-National Proposal.

**\*28** As previously noted, it would appear that sometime during March Mr. Ylvisaker of Gould-National contacted Mr. Laffer and expressed interest in merger discussions with Clevite. As in the case of similar contacts from numerous other companies, Mr. Laffer refused to actively pursue such discussions with Gould-National. The May 1 and May 27 Gould-National offers bear witness, however, to the fact that Mr. Ylvisaker was far more persevering than the numerous other rejected suitors.

Clevite management's May 6 proxy materials did not inform shareholders of the May 1 Gould-National offer. Smelting urges that this failure to inform shareholders of the May 1 offer constituted a material omission from the May 6 proxy materials, and, therefore, that proxies solicited by way of those materials have been solicited in violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9.

Rule 14a-9 provides:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

In *J. I. Case Company v. Borak,* 377 US 426 (1964) the Court stated that the purpose behind Section 14(a) and the rules promulgated thereunder is:

"\*\*\* to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13. It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders.' Id., at 14. 'Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.' S. Rep. No. 792, 73d Cong., 2d Sess., 12. These broad remedial purposes are evidenced in the language of the section which makes it 'unlawful for any person ... to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security ... registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'DDDDDDD'

**\*29** While Clevite management did not inform Clevite shareholders of the May 1 Gould-National offer in its May 6 materials, it has very recently sent to the shareholder a rather lengthy discussion of the May 27 Gould-National offer. In a brief filed on June 5, Clevite has offered the following explanation of its conduct in connection with the Gould-National offers:

"In any event, Smelting relies primarily upon an allegation that Clevite did not describe to shareholders other 'offers', particularly the Gould-National offer, of which Smelting makes so much. But, as plaintiff's exhibits make clear, the Gould offer of May 1, 1968 carried with it major antitrust problems. Gould's proposed 'solution' of these antitrust difficulties would have required Clevite to dispose of a substantial portion of its assets-action which would have been in direct violation of its existing contractual commitment to TRW. On such facts, Clevite management was fully justified in not considering the Gould 'offer' of May 1 appropriate for shareholder consideration. Moreover, subsequent events have served to eliminate any substance that this complaint ever had. Almost on the eve of the Clevite shareholders' meeting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 20
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

scheduled to consider the TRW merger agreement, Gould-National, as the result of an agreement with Smelting, made a new offer. In contract to the offer of May 1, the new Gould offer contemplates that Gould will dispose of whatever business it must to resolve antitrust difficulties; thus this offer does not presuppose Clevite's disposition of part of its business and thus does not require that Clevite violate its contractual obligations to TRW. Under these substantially different circumstances, Clevite management has concluded that shareholders should know the facts regarding it before voting on the TRW merger. By reason of the lateness of this offer and the lack of time to analyze it prior to the Clevite meeting, that meeting was recessed to permit analysis and dissemination of information concerning the offer to Clevite shareholders. In the meantime, Smelting, by communications addressed to Clevite shareholders, has made much of the new Gould offer. As stated, the new offer obviously has antitrust problems. That offer also proposes that a larger corporation (Clevite) with a good earnings record be merged into a smaller corporation (Gould-National) with an unimpressive earnings record and with the elimination of the entire Clevite slate of officers and the entire Clevite Board of Directors and with the removal of the offices of the corporation from Cleveland to Minnesota. This is the offer described by Smelting as being superior to the negotiated merger of Clevite into TRW. Irrespective of the obvious weaknesses of the new Gould offer, any alleged failure to disseminate information concerning its earlier proposal has been and will be cured by the full publicity resulting from Clevite's and Smelting's proxy material concerning that offer."

[*Materiality*]

**\*30** As witnessed by the proxy materials dated June 11, it seems clear that Clevite management has itself recognized that the May 27 Gould-National offer is a matter of material significance to shareholders in connection with the decision they are being asked to make at the special meeting now set for June 21. In this regard it should be noted that the Clevite shareholders are being asked by management to approve a merger agreement with TRW which *may* be less favorable to them than the outstanding Gould-National proposal. (See pp. 2 & 4 of June 11 proxy materials.)

While Clevite management has recognized an obligation to inform its shareholders of the May 27 Gould-National offer, it apparently did not recognize a similar obligation in connection with the May 1

Gould-National offer. As indicated in the brief filed on June 5, Clevite urges that the different attitude taken with regard to the later offer is attributable to the fact that the May 27 offer presented "substantially different circumstances."

Except for providing an additional basis of exchange, the financial terms of the May 27 offer are essentially the same as those contained in the May 1 offer. According to Clevite the "substantial difference" between these two offers relates to the antitrust problem. Thus, Clevite urges that the May 27 offer, unlike the May 1 offer, does not presuppose that Clevite will have to dispose of a "substantial" part of its assets in order to meet potential antitrust problems, and, therefore, does not require Clevite to breach its agreement with TRW. This claim clearly deserves closer analysis, for it should be obvious that the underlying antitrust problem is the same in the case of both offers.

In his letter conveying the May 1 Gould-National offer, Mr. Ylvisaker noted the following with regard to potential antitrust problems:
'There are obvious but not insurmountable Justice Department problems, but these are probably no greater than exist in your present situation. As indicated in the enclosed opinion we might have to divest Marathon and *one or the other of our nickel-cadmium operations*. In total these divestitures would amount to only about 5% or $15,000,000 in sales and a proportionately lesser amount in profits (Emphasis supplied.) Ex. 9 B.

The "opinion" referred to in Mr. Ylvisaker's letter was an opinion letter from the law firm of Doherty, Rumble & Butler of St. Paul, Minnesota, discussing the antitrust implications of a Clevite Gould National merger (Exhibit 9 F). In this opinion letter, the view was expressed that such a merger might be challenged because of two areas of product line overlap, that is, in nickel cadmium batteries and dry cells. The opinion letter indicates that both companies have operations in these two areas. To meet these two potential problem areas, counsel suggested that Gould be prepared to dispose of its Marathon subsidiary and the sealed cell portion of Sonotone's (a Clevite subsidiary) business.

**\*31** While it is clear that the opinion letter did suggest the disposition of a portion of Sonotone's assets, it is equally clear that Mr. Ylvisaker's letter of May 1 indicated great flexibility in this regard. Thus, while Mr. Ylvisaker did refer to the opinion letter, he did not "require" divestiture of a portion of

Not Reported in F.Supp.                                                                                                Page 21
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

Sonotone's assets. Rather, he merely indicated that "we might have to divest *** *one or the other* of our nickel-cadmium operations. It seems entirely unreasonable to urge that Clevite could have reasonably concluded on the basis of Mr. Ylvisaker's letter that the Gould-National proposal of May 1 required divestiture of a portion of Sonotone's assets. While the language of Mr. Ylvisaker's letter in connection with this matter might have called for a request for clarification, it clearly did not call for a summary rejection of the offer on the ground that it "required" the divestiture of a substantial portion of Sonotone's assets.

 As noted above, Clevite also urges that the alleged divestiture "requirement" of the May 1 offer would have required Clevite to violate its agreement with T. R. W. Even assuming such a "requirement" in the May 1 offer, it is entirely untenable to urge that by *informing* shareholders of such an offer Clevite management would thereby be violating its agreement with TRW. Moreover, the existence of the TRW agreement certainly did not extinguish management's obligation to supply material information to the shareholders. As witnessed by their disclosure with regard to the May 27 offer, Clevite management itself evidently does not urge to the contrary.

 Accordingly to Clevite, the substantial difference between the May 1 and May 27 offers is contained in Paragraph 4 of the May 27 offer. There, as previously noted, it is stated by Gould-National:
  "4. We will undertake to take all necessary action reasonably required of us to eliminate any anti-trust problem which might arise from the proposed combination of our two companies. As we have previously informed you, we see no meaningful anti-trust problem except for the possible requirement that we dispose of a relatively small amount of our assets, for which there is a ready market.

 In the Court's view, this proposed "solution" to the antitrust problem is entirely consistent with that stated in the May 1 proposal. A fair and reasonable reading of Mr. Ylvisaker's letter of May 1 indicates a willingness on his part to consider disposal of either a portion of Sonotone's assets or the corresponding assets of Gould-National. It is, therefore, entirely unreasonable for Clevite to urge that the May 27 offer is substantially different than the May 1 offer in that the former does not require Clevite to divest itself of a substantial portion of its assets whereas the latter does so "require."

 Rule 14a-9 does not require that the "proponents of a particular plan to present or discuss every other possible plan or alternative." *Doyle v. Milton,* 73 F. Supp. 281, 285 (1947). Certainly, however, when shareholders are being called upon by management to approve a particular merger proposal there would appear to be no information of greater materiality to him than that relating to other definitive merger proposals available to the corporation. This would appear to be particularly true where, as in the instant case, the other definitive proposal or proposals *may* be of greater advantage to the shareholders than the one being submitted by management. In submitting extensive materials to shareholders in connection with the May 27 Gould-National offer, Clevite management has surely given recognition to fact that its shareholders are vitally interested in being informed with regard to proposals such as that made by Gould-National. Only by way of such disclosure may it be assured that the shareholders will be afforded an opportunity to make an "informed" judgment.

[*Failure Was Material*]

 **\*32** After thoroughly considering all of the evidence, this Court is convinced that under the circumstances Clevite management's failure to inform shareholders of the May 1 Gould-National offer in its May 6 proxy materials constituted a failure to disclose information of a most material nature, and, further, that the failure to disclose this information constituted a violation of Rule 14a-9. Clevite's argument that "substantial" differences between the May 1 and May 27 offers justified non-disclosure of the former is, in the Court's view, entirely without merit.

 Clevite urges that even if it was required to disclose the May 1 Gould-National offer in its May 6 proxy materials, its failure to do so has been cured by the June 11 proxy materials which discuss the May 27 offer. This argument, however, ignores many of the realities of the situation. Some of these realities are:
  (1) That for over one month the Clevite management has been actively soliciting proxies pursuant to the defective May 6 materials.
  (2) That in all likelihood a great many of the shareholders have disposed of the May 6 proxy materials discussing the T. R. W. proposal, and, therefore, would not presently have available the information necessary to evaluate and compare the two offers.
  (3) That shareholders are being called upon to decide how they will vote in an atmosphere of great confusion; that is, after numerous mailings,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 22
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

telephone calls, adjournments of meetings, and
wide newspaper reporting of the charges and
countercharges which have been made in this
action.

(4) That, with the meeting set for June 21, the
shareholders will have *at most* nine days within
which to evaluate the June 11 materials, and, in the
case of large numbers of shareholders holding
shares in a street name, far less or no opportunity to
evaluate such materials.

(5) That Smelting, in soliciting proxies in
opposition to the T. R. W. merger, has obviously
been placed at a serious disadvantage by the late
disclosure of the Gould-National offer.

(6) That, while Clevite urges that its shareholders
have the opportunity and right in the next few days
to revoke the proxies which have been executed
over a period of the last month, the portion of the
June 11 proxy materials which purports to explain
this right is at best rather vague, to wit:

"If you have previously sent us your proxy voting
in favor of the TRW merger and do not care to
change your vote, you need not return the enclosed
proxy.

"If you have not previously sent us a proxy, use the
enclosed proxy to vote FOR the TRW merger and
thus support us in our considered judgment that
prompt completion of the TRW merger is in the
best interests of Clevite shareholders as a whole."

Even if the right to revoke was clearly stated and
explained, it seems entirely inappropriate for a Court
to allow the voting of proxies received from a
defective solicitation.

Under the circumstances discussed above, "fair
corporate suffrage" cannot and will not be served if
those proxies solicited thus far by Clevite
management are found to be valid. Therefore, an
order will be entered voiding all proxies received by
way of solicitation thus far undertaken by Clevite
management, and, further, requiring that the
shareholders' meeting set for June 21 be postponed
until such time as a new solicitation of proxies has
been undertaken.

**\*33** In ordering a resolicitation of proxies, and
postponing the meeting set for June 21, this Court
is in no manner indicating what course the shareholders
of Clevite should follow:

The Court will now consider the issues raised by
Clevite in its motion for a preliminary injunction (C
68-345).

As previously mentioned, Smelting, pursuant to its
agreement with Gould-National, gave all persons
who tendered shares pursuant to its Tender Offer an
opportunity to rescind their tenders. Smelting then
exercised its right of purchase with regard to those
tenders not rescinded. The Court has been given no
indication as to the number of shares so purchased. It
might be noted, however, that since Clevite shares
were selling at a price in excess of $30.00 at the time
the right of rescission was given, it would seem most
unlikely that a significant number of shares have
been purchased pursuant to the tender offer. Thus, it
appears that for all practical purposes the issues
raised in connection with the tender offer may now
be moot.

Clevite and the other plaintiffs in C 68-345 make
essentially two claims in connection with the tender
offer. They are:

(1) That the tender offer constitutes a solicitation of
proxies in violation of Section 14(a) of the
Securities and Exchange Act of 1934 and the rules
and regulations issued thereunder, and,

(2) That the Tender Offer violates Section 10(b) of
the Securities and Exchange Act of 1934 and Rule
10b-5 in that it contains false statements and
material omissions.

### [*Exemption*]

Smelting urges that the solicitation of proxies in
conjunction with the tender offer fails within the
exemption provided by Rule 14a-2(c) for "solicitation
by a person in respect of securities of which he is the
beneficial owner," and, therefore, that it may not be
found to have violated Section 14(a) of the Act. As
may readily be observed, Rule 14a-2(c) speaks in
terms of solicitation by a person who *"is"* the
beneficial owner of shares. At the time the tender
offer was made, Smelting obviously was not the
beneficial owner of the shares it was seeking to
purchase. Therefore, under very literal construction
of Rule 14a-2(c), Smelting's solicitation of proxies in
conjunction with its tender offer would not be exempt
from proxy solicitation rules. Such a literal
construction of Rule 14a-2(c) does not appear,
however, to be appropriate. *Mills v. Sarjem Corp*.,
113 F. Supp. 753 (1955); Fleischer & Mundheim,
*Acquisition By Tender Offer*, 115 U. Pa. L. Review,
317, 370 (1967).

It seems clear that the "irrevocable" proxies which
Smelting solicited in conjunction with its tender offer
were to be made available for Smelting's use only in
the event that Smelting purchased the shares covered
by the proxies. In *Mills v. Sarjem, supra*, the Court

Not Reported in F.Supp.                                                                                         Page 23
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
(Cite as: 1968 WL 2140 (N.D.Ohio))

had before it a quite similar solicitation of proxies in conjunction with a tender offer.

There, as in the instant case, a claim was made that the solicitation did not fall within the exemption provided by Rule 14a-2(c). In rejection of that claim the Court stated:

**\*34** "Sarjem, it is contended, in failing to send proxy statements to the stockholders solicited by it, and failing to file a statement with the Securities and Exchange Commission, violated the foregoing provision of the Act and the above and other rules applicable to solicitation of proxies. .... Emphasis is laid by the plaintiffs on the fact that at the time the proxies were solicited Sarjem was not a beneficial owner, exempt from the requirements to furnish proxy statements under Rule 14a-2(c), 17 F. C. R. 227, and that since the proxies were irrevocable from the time signed and the purchase of the securities by Sarjem was optional and conditional, the requirement for such filing of statements was particularly Sarjem's burden.

"While it is true that the signer of the form (Annex 2) agreed irrevocably to give the option and proxy from the time he signed until November 1, 1948, there was no right in Sarjem to make use of the proxy until the escrow moneys had been deposited. On October 22, 1948, when this occurred, the signer of the form was no longer interested in the stock. His interest was the promised purchase price thereof which was secured to him by the deposit in escrow. Sarjem, on the other hand, was vested with the beneficial interest in the stock itself from that time. The plaintiffs called the escrow deposit a sham, but the fact is that the plaintiffs and the other stockholders, in due course, in accordance with the option commitments, received payment for their stock. It seems plain, then, that Sarjem acquired nothing but the agreement that it would have the right to acquire the proxy up to November 1, 1948, providing it fulfilled the conditions of the escrow. *Sarjem did not acquire an irrevocable proxy upon the delivery of the offer, Annex 2, and cannot be said to have solicited proxies as contemplated by the Rule*, since the letter, Annex 1, and the offer, Annex 2, did not seek to place Sarjem in position to vote the stockholder's shares in the normal sense of the delivery of a proxy so to do." *Id*. at 768. (Emphasis added).

The view expressed in *Mills v. Sarjem* appears to be consistent with the Securities and Exchange Commission's interpretation of Rule 14a-2(c). See 115 U. Pa. L. Review 317, 370 (1967). While Clevite had attempted to draw distinction between

*Mills v. Sarjem* and the instant case, no material distinctions are present.

Since it appears that Smelting's solicitation of proxies in conjunction with its tender offer falls within the exemption provided by Rule 14a-2(c), Clevite's claim that Smelting has violated the proxy solicitation rules appears to be of most doubtful merit. Under this circumstances, Clevite's request for preliminary relief on that basis must be denied.

CLAIM THAT THE TENDER OFFER VIOLATES SECTION 10(B) OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND RULE 10B-5 IN THAT IT CONTAINS FALSE STATEMENTS AND MATERIAL OMISSIONS

Rule 10b-5 provides that:

**\*35** "It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, \*\*\*

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, \*\*\* in connection with the purchase of sale of any security."

A substantial question is raised as to whether the plaintiffs in C 60-345 have standing to secure relief under Section 10(b) and Rule 10b-5. See, for example, *Mutual Shares Corp. v. Genesco, Inc., 384 F. 2d 540 (C. A. 2 1967)*; *Birnbaum v. Newport Steel Corp., 193 F. 2d 461 (C. A. 2)*; *Moore v. Greatamerica Corp., 274 F. Supp. 490 (1967)*; *Studebaker Corp. v. Allied Prods. Corp., 256 F. Supp. 173 (1966)*. It is unnecessary, however, to here meet that question for even it be assumed that the plaintiffs have standing, it does not appear that the Smelting tender offer contained material misstatements or omissions within the meaning of Rule 10b-5.

As Clevite has itself noted, the duty of disclosure imposed by Rule 10b-5 is confined to persons having information which has come to them because of their relationship to the corporation in other words, "insiders." *SEC v. Texas Gulf Sulphur Co., 258 F. Supp. 262 (1966)*; *Mutual Shares Corp. v. Genesco, supra*. Under the facts of this case, it would be entirely inappropriate to classify Smelting as an "insider" at the time it made its tender offer. Clevite's claim that Smelting became an "insider" by reason of discovery procedures undertaken in this action appears to be unsupported by the evidence.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 24
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

Other than indicating recent prices of Clevite common shares, the Smelting Tender Offer included no information except that relating to the terms of the offer. Clevite urges, however, that pursuant to Rule 10b-5 Smelting had a duty to disclose within the tender offer financial information concerning Clevite, Smelting's plans in the event it purchased shares, and the tax consequences to shareholders if they sold their shares pursuant to the tender offer. Under the circumstances reflected in the evidence, it would appear, however, that Smelting had no such duty.

The Court is also of the view that Smelting had no duty to disclose in its tender offer what appears to be a remote possibility that it might be required in the event the T. R. W. merger is approved, to disgorge Section 16(b) profits.

[*False Statements*]
Finally, Clevite urges that the tender offer violated Rule 10b-5 in that it falsely stated that the tenders and proxies being solicited were irrevocable. Since the tender offer adequately indicated that the proxies solicited were to be irrevocable only as to the shares actually purchased, the claim which Clevite makes with regard to the "irrevocability" of proxies is without merit.

**\*36** The claim which Clevite makes with regard to the "irrevocability" of tenders is predicated upon the previously mentioned "Order" of the Ohio Division of Securities. According to Clevite, since the tender offer as originally structured allegedly violated Ohio Securities Law, Ohio residents who tendered shares prior to "compliance" were entitled to rescind. It is, however, not clear to the Court (1) that the tender offer actually violated Ohio Securities Law, (2) that the "order" issued by the Ohio Division of Securities was valid, or (3) that the essence of the alleged violation was in any manner material to the shareholders in question. Moreover, as previously noted, all shareholders have been given a right to rescind subsequent to ""compliance." Under these circumstances, preliminary relief is not justified on Clevite's claim with regard to the "irrevocability" of tenders.

The plaintiffs' request for a preliminary injunction in C 68-345 is denied.

SUMMARY OF CONCLUSIONS
The plaintiffs' motion for a preliminary injunction in C 68-345 is denied.

The plaintiff's motion for a preliminary injunction in C 68-210 is, to extent previously noted, granted.

A number of questions remain unresolved with regard to the form and substance of the order called for by the findings made in connection with Smelting's motion for a preliminary injunction. Included among these are the precise language to be incorporated in the order, and whether, under the circumstances, a new record date must or should be set. While the matter of a new record date has been argued in briefs recently filed, the Court believes both parties should be given a further opportunity to argue this question in light of the findings herein made.

Realizing that there will probably be an immediate appeal from the Court's findings, and, further, realizing that the time for taking such an appeal is brief, the Court is willing, should either party desire, to defer further arguments on the unresolved matters, and thereby expedite whatever appeals might be taken. Therefore, in the event either party should so request, an order will be entered immediately denying Clevite's motion for a preliminary injunction in C 68-345 and granting Smelting's motion for a preliminary injunction in C 68-210. Such an order will provide in part:

(1) That the Clevite special meeting set for June 21 is postponed until further order of this Court.
(2) That all proxies received by Clevite management on the basis of solicitation thus far undertaken are voided.
(3) That a decision on unresolved matters relating to a resolicitation of proxies is deferred pending appeal.

In the event that neither party requests that an immediate order be entered, the Court will hear arguments on the unresolved questions at 10:00 a.m., on June 19, 1968. On that date, both parties should present proposed orders and should be prepared to fully argue all unresolved matters.

THE AMOUNT OF THE BOND
**\*37** Rule 65(c) of the Federal Rules of Civil Procedure provides in pertinent part as follows:
"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, *in such sum as the Court deems proper,* for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." (Emphasis supplied.)

The only costs which *might* be attributed to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 25
1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P 92,691
**(Cite as: 1968 WL 2140 (N.D.Ohio))**

restraining order in this case are those involved in the
resolicitation of proxies by Clevite management, but,
on the circumstances developed thus far, this rather
tenuous liability is suggested only out of an
abundance of caution.

 Clevite, however, urges that a fifty million dollar
($50,000,000.00) bond is required on the speculation
that a restraining order may lead T. R. W. to exercise
its option not to consumate the proposed merger, and
as a consequence the market price of Clevite shares
might go downward.  This argument seems untenable
on its face.   However, a brief comment may be
appropriate.

 A mere perusal of the material before the Court will
demonstrate that Clevite is a most substantial and
desirable company.   To speculate that its worth or
value will somehow be decreased or deflated by the
failure of the proposed merger with T. R. W.,
particularly in view of the Gould offer, is to grapple
with remoteness; and to so exercise judicial
discretion would amount to abuse.

 Bond is set in the amount of $25,000.00.

 This opinion shall constitute the Court's findings of
fact and conclusions of law.

 1968 WL 2140 (N.D.Ohio), Fed. Sec. L. Rep. P
92,691

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.