## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SAMUEL I. HYLAND and STEPHANIE   :
SPEAKMAN, individually and on behalf of all   :
others similarly situated,   :

      Plaintiff,     :

               :   Case No. 1:05-cv-162 (JJF)

         v.       :

               :

WILLIAM B. HARRISON, JR., HANS W.   :
BECHERER, RILEY P. BECHTEL, FRANK   :
A. BENNACK, JR., JOHN H. BIGGS,   :
LAWRENCE A. BOSSIDY, M. ANTHONY   :
BURNS, ELLEN V. FUTTER, WILLIAM H.   :
GRAY, III, HELENE L. KAPLAN, LEE R.   :
RAYMOND, JOHN R. STAFFORD, J.P.   :
MORGAN CHASE & CO., and JAMES   :
DIMON,   :

               :

      Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION
## TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**OF COUNSEL:**

Nancy E. Schwarzkopf
JPMORGAN CHASE LEGAL DEPARTMENT
1 Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-3585
*Counsel for JPMorgan Chase & Co.*

Michael A. Cooper
Sharon L. Nelles
Keith Levenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-3712
*Counsel for the Individual Defendants*

Jesse A. Finkelstein (#1090)
(finkelstein@rlf.com)
Michael R. Robinson (#4452)
(robinson@rlf.com)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
finkelstein@rlf.com
robinson@rlf.com
(302) 651-7700
*Counsel for Defendants*

Dated: <u>August 1, 2005</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ..................................................................................................... 3

I.     The Allegations Crucial to Plaintiffs' Claims Are Not Sufficiently Pleaded .......... 5

     A.    None of Plaintiffs' Allegations Supports the Existence of a "Secret Pact." ............................................................................... 5

     B.    Plaintiffs Cannot Evade the Applicability of Heightened Pleading Standards ........................................................................ 8

II.    The Alleged Omissions Are Not Material ............................................ 11

     A.    *Basic*'s Materiality Analysis Is Inapposite to Plaintiffs' Section 14(a) Claim ............................................................... 12

     B.    *Tracinda* Illustrates the Complaint's Fatal Flaws ..................... 15

III.    Plaintiffs Are Not Entitled to Proceed on Claims They Have No Standing to Raise ......................................................................................... 16

IV.    Superficial Distinctions Between Plaintiffs' Complaint and the Dismissed State Complaint Do Not Warrant This Court's Re-Adjudicating Meritless State Claims ................................................................................... 18

CONCLUSION .............................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acito v. IMCERA Group,*
    47 F.3d 47 (2d Cir. 1995)...............................................................................11

*Alameda Oil Co. v. Ideal Basic Indus., Inc.,*
    337 F. Supp. 194 (D. Colo. 1972)...............................................................14

*In re Advanta Corp. Sec. Litig.,*
    180 F.3d 525 (3d Cir. 1999)............................................................................8

*In re Bank of Boston Corp. Sec. Litig.,*
    762 F. Supp. 1525 (D. Mass. 1991) .............................................................17

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)...........................................................................5, 12-14

*Beaumont v. American Can Co.,*
    797 F.2d 79 (2d Cir. 1986).............................................................................14

*Brown v. Sibley,*
    650 F.2d 760 (5th Cir. 1981) .........................................................................17

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997).........................................................................17

*CalPERS v. Chubb,*
    394 F.3d 126 (3d Cir. 2004)........................................................................8, 9

*Ferber v. Travelers Corp.,*
    785 F. Supp. 1101 (D. Conn. 1991)................................................................9

*Halpert Enterprises, Inc. v. Harrison,*
    No. 02-9501, 2005 U.S. Dist. LEXIS 15022
    (S.D.N.Y. July 26, 2005) ...............................................................................19

*Hershfang v. Citicorp,*
    767 F. Supp. 1251 (S.D.N.Y. 1991)................................................................9

*Hoxworth v. Blinder, Robinson & Co.,*
    980 F.2d 912 (3d Cir. 1992)...........................................................................17

*In re J. P. Morgan Chase & Co. S'holder Litig.*,
    No. 531-N, 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005) ................... *passim*

*Lewis v. Chrysler Corp.*,
    949 F.2d 644 (3d Cir. 1991) ........................................................................7

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ................................................................................14

*In re NAHC Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ....................................................................8

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) ..........................................................10

*PIRG of NJ, Inc. v. Magnesium Elektron, Inc.*,
    124 F.3d 111 (3d Cir. 1997) ....................................................................16

*Podany v. Robertson Stephens, Inc.*,
    350 F. Supp. 2d 375 (S.D.N.Y. 2004) ......................................................10

*Port Authority v. Arcadian Corp.*,
    189 F.3d 305 (3d Cir. 1999) ....................................................................16

*In re Reliance Sec. Litig.*,
    91 F. Supp. 2d 706 (D. Del. 2000) .............................................................8

*Scott v. Multi-Amp Corp.*,
    386 F. Supp. 44 (D.N.J. 1974) ................................................................14

*SEC v. Texas Gulf Sulfur Co.*,
    401 F.2d 833 (2d Cir. 1968) ....................................................................13

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ....................................................................10

*Sosna v. Iowa*,
    419 U.S. 393 (1975) ................................................................................16

*South Coast Services Corp. v. Santa Ana Valley Irrigation Co.*,
    669 F.2d 1265 (9th Cir. 1982) ................................................................14

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002) ...................................................... *passim*

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................................................12

iii

*Weiner v. Quaker Oats Co.*,
  129 F.3d 310 (3d Cir. 1997)...............................................................................10

*Winer Family Trust v. Queen*,
  No. 03-4318, 2004 U.S. Dist. LEXIS 1825 (E.D. Pa. Feb. 6, 2004) ......................10

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)...............................................................17

## STATUTES, RULES, AND LEGISLATIVE HISTORY

15 U.S.C. § 78u-4 ...............................................................................................5

15 U.S.C. § 78n(a) .......................................................................................*passim*

FED. R. CIV. P. 9(b) .........................................................................................8, 9

8 Del. C. § 102(b)(7)...........................................................................................19

S. Rep. No. 104-98 (1995) ...............................................................................10

## PRELIMINARY STATEMENT

Plaintiffs are not the first to fail at concocting claims based on a single sentence in a newspaper report about the merger of JPMC and Bank One. That sentence attributed to "two [unnamed] people close to the deal" a statement that the Chairman of Bank One offered to sell his institution to JPMC for no premium if he could become CEO upon consummation of the merger and that JPMC's Chairman had rejected the offer. The same attempt was made in the Delaware Court of Chancery, which dismissed the claims. *In re J. P. Morgan Chase & Co. S'holder Litig.*, No. 531-N, 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005) (appeal pending) (Defs. Opening Br. (D.I. 33), Exh. A).[1]

Striving to avoid a similar fate before this Court, plaintiffs attempt to transform this single sentence and unsubstantiated allegation into a mysterious "secret deal." Indeed, they repudiate the very sentence on which they rely by a sleight-of-hand change of rejection into agreement. In an attempt to obscure the baseless nature of their central "secret pact" claim, plaintiffs (i) rely on press reports as a basis for alleging "facts" never reported; (ii) attribute to defendants arguments never made; (iii) rely on decisions (including one by this Court) that are patently distinguishable and utterly ignore others that are controlling and dispositive of plaintiffs' claims; and (iv) profess to assert claims they admittedly have no standing to raise by mischaracterizing the issue as one of "typicality" to be resolved on a motion for class certification.

In the imaginative hands of plaintiffs' counsel, the offer and rejection of a "no premium" deal, which at least appears in one citable press report (Am. Compl. (D.I. 51) ¶ 88), magically becomes a "secret deal" to "conceal" the offer and rejection (Pls. Br.

---

[1]    Unreported decisions are attached hereto under Tab A in alphabetical order.

(D.I. 52) at 2), for which there is no factual support at all. And, again without support, this "secret deal" is expanded into another "secret deal" that JPMC's Chairman would be the CEO in name only and Bank One's Chairman the *de facto* CEO. This Court can scrutinize the single news article cited as support without finding any reference to this "deal." (*See* Pls. Br. at 18 (*citing* Am. Compl. ¶ 98).)

Plaintiffs do not—and cannot—cite any factual basis for alleging that the actual agreed price and succession arrangement in the Agreement and Plan of Merger were not accurately described in the Joint Proxy Statement. They were, and with precision. (*See* Defs. Opening Br., Exh. B at 31-87.) So plaintiffs attempt to go behind the agreed merger terms to contend that the discussions preceding, and superseded by, the merger agreement should have been disclosed. They set up a straw man by attributing to defendants the "tortured, technical" argument that "merger discussions are always immaterial as a matter of law." (Pls. Br. at 3.) Defendants made no such argument. Defendants do argue that *negotiating* positions taken in discussions culminating in a definitive merger agreement need not be disclosed in a merger proxy statement, and for *that* proposition there is ample authority and none to the contrary cited by plaintiffs. (*See* Defs. Opening Br. at 13-18.)

To support their novel position, plaintiffs repeatedly rely on wholly inapposite cases, none more so than this Court's decision in *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002). The alleged misrepresentation in *Tracinda* as to the very nature of the agreed transaction as a merger of equals—where the Daimler-Benz CEO was quoted as admitting that it was in fact a takeover and that, if

so characterized in the proxy statement, it would have been rejected by Chrysler's shareholders—finds *no* parallel in this case.

Plaintiffs embrace entire classes of security holders—buyers (who they were not) and sellers (again who they were not)—to bolster their status. But plaintiffs, as continuing shareholders of JPMC throughout the merger negotiation, approval, and consummation period, are very differently situated than purchasers or sellers of shares during that period and have no standing to assert the claims of purchasers or sellers (who in any event suffered no identifiable injury). Plaintiffs' lack of standing is not an issue for class certification; it is a threshold Article III question to be resolved at the outset.

No amount of misdirection can cloak the emptiness of plaintiffs' federal or common law claims, all of which should be dismissed with prejudice.

## ARGUMENT

Simply calling something a "secret deal" does not make it so. Indeed, the *New York Times* article that is the linchpin for plaintiffs' claims does not suggest a deal (secret or not) at all, but the very opposite—an offer and a rejection. That article states, in reliance on two unidentified sources:

> During the negotiations with Mr. Dimon, [Mr. Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.

> When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations.

(Am. Compl. ¶ 88.) Assuming *arguendo* the accuracy of the third-hand report, the article describes nothing more than the back and forth of merger negotiations, which always range over a spectrum of outcomes regarding price, governance, and other terms.

Nonetheless, seeking to cast those merger negotiations as nefarious, plaintiffs characterize the rejection of the purported offer as a "secret deal" or a "secret pact." Plaintiffs do not define the terms of this alleged pact clearly or consistently anywhere in their amended complaint. As described in their opposition brief, the "secret pact" consists of three elements: (i) Mr. Harrison would remain CEO of the combined business in exchange for Bank One receiving a premium (Pls. Br. at 7); (ii) Mr. Dimon would be the "true" CEO of the combined business (Pls. Br. at 18); and (iii) Messrs. Harrison and Dimon would conceal these "facts." (Pls. Br. at 1.) Nowhere, however, does the *New York Times* article state or even imply that Messrs. Harrison and Dimon secretly agreed to link premium and succession, nowhere does it state or even imply that Mr. Dimon would be the "true" CEO, and nowhere does it state or even imply that there was some agreement to conceal those "facts." Rather, the article states that Mr. Dimon made the "offer" as a "tough deal maker" and Mr. Harrison resisted "to secure a smooth transition." (Am. Compl. ¶ 88.)

Indeed, the first element of the purported "secret pact" is no secret at all. The proxy statement clearly discloses that Mr. Harrison would remain the CEO of the combined business for two years. (Joint Proxy Statement at 81.) It also clearly discloses that a premium would be paid to Bank One. (Joint Proxy Statement at 3, 36.) The second and third elements are completely without support anywhere in the complaint. Media gossip that Mr. Dimon—who is, after all, the company President and Chief

Operating Officer—will assert increasing executive authority (*e.g.*, Am. Compl. ¶ 98), even if entitled to consideration, cannot be transmogrified into a well-pleaded allegation that there was some secret pre-merger agreement he would be the "true" CEO. And there is not a shred of support anywhere in the complaint for plaintiffs' allegation that Messrs. Harrison and Dimon had an agreement to conceal any "facts."

Plaintiffs raise three primary arguments in opposition to the motion to dismiss. *First*, plaintiffs contend that their allegations of a "secret pact" satisfy pleading requirements generally as well as the PSLRA's particularity standards. *See* 15 U.S.C. § 78u-4 (2005). They do not. Plaintiffs offer nothing but unsupported speculation regarding the purported "secret pact." *Second*, plaintiffs argue in reliance on *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002), that the materiality of the alleged "secret pact" is a question of fact that cannot be resolved on this motion. *Tracinda* is clearly distinguishable and *Basic* wholly inapposite; the alleged omission is immaterial as a matter of law. Moreover, plaintiffs are not entitled even to argue materiality because they have failed to plead with sufficient particularity the facts they claim to exist. *Third*, plaintiffs argue that their common law claims are different from those dismissed by the Court of Chancery. But the distinctions they point to are distinctions without a difference.

## I.     The Allegations Crucial to Plaintiffs' Claims Are Not Sufficiently Pleaded.

### A.     None of Plaintiffs' Allegations Supports the Existence of a "Secret Pact."

Plaintiffs seek to avoid a crucial deficiency in their pleadings by asserting that defendants do not "actually argue that the secret deal is not presented with sufficient particularity in the Complaint." (Pls. Br. at 20.) Not so. Defendants argue that

plaintiffs' "secret pact" theory is not well-pleaded, should not be credited, and even if

credited does not state a claim. (Defs. Br. at 21-22.) Plaintiffs' entire complaint rests on

their "secret pact" theory. (*See* Am. Compl. ¶¶ 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 143,

150, 171, 243, 253 ("secret pact"); ¶¶ 50, 89, 90, 91, 92, 93, 112, 138, 147, 148, 239, 240

("secret deal").) It informs all their federal and state claims, and plaintiffs cite it proudly

as the primary factor distinguishing their complaint from the dismissed state complaint.

(*See* Pls. Br. at 9 ("First, the federal complaint characterizes the deal between Harrison

and Dimon as a 'secret deal.'") (*quoting J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51, at

*15).) The complaint cannot survive if the supposed "secret pact" is not well pleaded. It

is not.

Plaintiffs' only support for their speculation that there was a "secret pact"

is the *New York Times* article. Plaintiffs characterize the article's author as "the journalist

with *The New York Times* who exposed the secret deal." (Pls. Br. at 2.) Plaintiffs

similarly allege in their complaint that it was the *Times* that revealed Mr. Harrison "had

cut a secret deal." (Am. Compl. ¶ 91.) And plaintiffs' counsel contended during oral

argument on their motion for an injunction that "three days before the merger closed, the

secret[] pac[]t was exposed in an article in the *New York Times*." (Apr. 18, 2005 Tr. at 4

(attached under Tab B).) But nothing in the *Times* piece suggests any secret agreement.[2]

---

[2]    The word "deal" is not used; the word "pact" is not used; the word "secret" is not
used. And plaintiffs' claim that their lawyer met with the *New York Times*
reporter "face-to-face" (Pls. Br. at 21) makes no suggestion that the reporter used
those terms outside his published work, either. Plaintiffs do not attribute any
allegations in their complaint to this "face-to-face" meeting. In fact, plaintiffs
carefully avoid any suggestion that the reporter provided their counsel any
information at all. *See Tracinda*, 197 F. Supp. 2d at 78-79 (finding allegations
"not adequately supported" when plaintiffs did not "link[] their sources of

There is an obvious difference between secrecy during negotiations, which is the approach in most mergers, and a "secret deal."

Plaintiffs also stretch the English language to make something out of the answers by Messrs. Harrison and Dimon to questions about the succession arrangement at a post-announcement press conference. An analyst queried Mr. Harrison, "[W]hy are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away?" (Am. Compl. ¶ 136.) He responded, "I have at least a couple of years left to produce value and we think this is a good balance." (Am. Compl. ¶ 137.) Another analyst asked Mr. Dimon the same question. (Am. Compl. ¶ 139.) Mr. Dimon responded, "[T]hese are two large organizations coming together. You want the teams to meld. I have a lot to learn there." (Am. Compl. ¶ 140.) Each answer, far from evidencing a "secret pact," *supports* the *Times*' report that Mr. Harrison wished to delay succession "to secure a smooth transition." (Am. Compl. ¶ 88.)[3]

Even if the claim that Mr. Dimon "offered to do the deal for no premium if he could become chief executive immediately" (Am. Compl. ¶ 88) were a well-pleaded allegation, the notion that Mr. Dimon made a secret pact with Mr. Harrison is not a "reasonable inference[] that can be drawn therefrom." *Lewis v. Chrysler Corp.*, 949 F.2d 644, 646 n.1 (3d Cir. 1991). And the idea that there was a "secret deal" that Mr. Dimon would be the "true CEO" is even more tenuous, based on nothing but press reports of

---

information to their allegations or identif[y] the information from their sources that supports their allegations").

[3]    Suppose Mr. Dimon had supplemented his answer verbatim with what plaintiffs wanted him to say—that he "*had* moved to become CEO immediately." (Pls. Br. at 8.) That would not contradict either man's statement that they ultimately agreed to the succession arrangement in order to enable Mr. Harrison to continue

market expectations as to Mr. Dimon's responsibilities. (Am. Compl. ¶¶ 125-35.) There

is not a whit of support for a "secret pact" in any cited source.[4]

**B.     Plaintiffs Cannot Evade the Applicability of Heightened Pleading**
**Standards.**

The "secret pact" is not well pleaded under any standard, and certainly not

the PSLRA or Rule 9(b). Plaintiffs argue that the heightened standards do not apply to

their Section 14(a) claim, relying on a five-year-old statement of this Court that it "will

await direction from the Third Circuit" before applying the PSLRA to Section 14(a)

claims. (Pls. Br. at 23 (*citing In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del.

2000)).) Plaintiffs ignore that the Third Circuit has explicitly provided that direction in

*In re NAHC Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002), and *CalPERS v. Chubb*, 394

F.3d 126, 144-45 (3d Cir. 2004), holding that Section 14(a) claims "must meet the

PSLRA particularity requirements . . . if a plaintiff elects to ground such claims in fraud."

(*See* Defs. Br. at 22 (*citing Chubb*).)[5]

Plaintiffs also ignore that their primary authority, *Tracinda*, applied the

heightened pleading standards of FED. R. CIV. P. 9(b) and the PSLRA to Section 14(a)

claims. *See* 197 F. Supp. 2d at 70. In *Tracinda*, this Court found that the plaintiffs'

---

"to produce value," help "two large organizations com[e] together," and allow
"the teams to meld." (Am. Compl. ¶¶ 137, 140.)

[4]     Desperate for even the feeblest corroboration, plaintiffs claim that a report "that
Dimon had 'laid out' a 'spectrum of outcomes in terms of premium and
governance'" supports the existence of a "secret deal," explaining that this
straightforward language was "corporate Newspeak," evidently understood only
by them. (Pls. Br. at 7 (*quoting* Am. Compl. ¶ 84).)

[5]     Plaintiffs' frivolous challenge to the PSLRA's constitutionality, even if indulged,
would not disturb Rule 9(b)'s requirement that plaintiffs state "the circumstances
constituting fraud . . . with particularity" and plead "the 'who, what, when, where,
and how'" of the fraudulent conduct alleged. *In re Advanta Corp. Sec. Litig.*, 180
F.3d 525, 531, 534 (3d Cir. 1999).

allegations survived the PSLRA and FED. R. CIV. P. 9(b) because they "asserted facts

describing the 'who, what, where and when' related to the[] alleged misrepresentations"

by "describing in detail the meetings . . . in which these alleged misrepresentations were

made." *Id.* at 70. Plaintiffs here provide no such detail.

By plaintiffs' own account, their pre-suit investigation was limited to

consulting media sources and public filings. (*See* Am. Compl. ¶ 224.) Although news

articles "can form the basis for adequate pleading under the PSLRA if they are

sufficiently detailed to indicate their reliability," *Tracinda*, 197 F. Supp. 2d at 80, reliance

on unnamed sources with no indication "how or why such [sources] would have access to

the information they purport to possess" lacks the statutorily requisite detail. *Chubb*, 394

F.3d at 148; *see also Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255-58 (S.D.N.Y. 1991)

(a claim that does not otherwise satisfy Rule 9(b) is not transformed into a sufficiently

particular claim just because it is made in a newspaper article); *Ferber v. Travelers

Corp.*, 785 F. Supp. 1101, 1108 (D. Conn. 1991) ("[T]he court is reluctant to hold that the

plaintiffs have met their burden under Rule 9(b) when the fact upon which the allegations

of fraud are predicated is a statement that appeared in an article in the Sunday *New York

Times Magazine*. . . . The strictures of Rule 9(b) are not satisfied by indirect quotes taken

from a newspaper reporter's notebook.").

Plaintiffs' use of these news articles exceeds the permissible use of media

reports to support factual allegations. In *Tracinda*, the CEO of DaimlerChrysler admitted

on the record the allegations made in the complaint. Here, quite differently, plaintiffs

imaginatively extrapolate from vague analyst remarks. Comments that Mr. Dimon will

be "running the show" (Am. Compl. ¶ 126) or "calling the shots" (Am. Compl. ¶ 129) are

too vague to support plaintiffs' inferences that he functions as the "de facto CEO" of JPMC (Am. Compl. ¶ 144), much less that defendants intended him to be the "true CEO" (Am. Compl. ¶ 159(a)) or that he made a "secret pact" to function as such (Am. Compl. ¶ 11). *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 308 (D.N.J. 2001) (analyst criticism that company was "outta control" too vague to support allegations of what, precisely, was out of control, and no basis from which to "draw[] inferences").

        Plaintiffs speculate that "the one and only real reason behind the premium" was Mr. Harrison's desire to "keep his CEO title." (Pls. Br. at 19; Am. Compl. ¶ 8.) Plaintiffs do not support this *ipse dixit* with any statements made by Messrs. Harrison or Dimon or any revelations about their confidential negotiations.[6] Nor do plaintiffs resolve the tension between this speculation and the report that Mr. Harrison's motivation in remaining CEO for two years was "to secure a smooth transition." (Am. Compl. ¶ 88.)[7] Plaintiffs also assert that the acquisition premium "was completely

---

[6]    In an effort to evade the PSLRA, plaintiffs state that "the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiff and the public, and lie exclusively within the possession and control of defendants and their agents." (Am. Compl. ¶ 225.) In this Circuit, "a boilerplate allegation that plaintiffs believe the necessary information lies in defendants' exclusive control, if made, must be accompanied by a statement of facts upon which their allegation is based." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992). Plaintiffs allege no such "facts." With the PSLRA, Congress intended to end "fishing expeditions" and permit discovery "only after the court has sustained the legal sufficiency of the complaint." S. Rep. No. 104-98, at 14 (1995); *accord Winer Family Trust v. Queen*, No. 03-4318, 2004 U.S. Dist. LEXIS 1825 at *4-*5 (E.D. Pa. Feb. 6, 2004). Thus, "discovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim." *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004).

[7]    Plaintiffs characterize transition concerns as a "pretext," referring, without examples, to Mr. Dimon's "considerable experience with mergers." (Am. Compl. ¶ 99.) This does not change the fact that the proxy statement clearly explained

unnecessary." (Pls. Br. at 8.) But plaintiffs make no allegation that *Bank One* directors and shareholders would have approved a no-premium deal, which is the bare minimum of particular support needed for the speculation that the premium was unnecessary. Absent this, plaintiffs' allegations about the reason for the premium can be safely disregarded.[8]

## II.    The Alleged Omissions Are Not Material.

The proxy statement describes the terms of the merger and its business rationale at length, and plaintiffs do not dispute the accuracy of that description. Plaintiffs' only objection is that the proxy statement "omitted any reference to the secret deal [and] the rejected opportunity" to merge at no premium. (Am. Compl. ¶ 148.) The short answer is that the proxy statement does not purport to describe every thrust and parry during the months'-long negotiations. To the contrary, the proxy statement specifically noted that Messrs. Harrison and Dimon "continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management." (Am. Compl. ¶ 148.) No shareholder could have expected to be told all "possible financial terms" and all configurations of "senior management" that had been considered, proposed, or rejected

---

JPMC's reliance on its own "management's experience in implementing previous strategic merger transactions," experience necessarily specific to JPMC's operations. (Joint Proxy Statement at 37.)

[8]    Plaintiffs' speculation about the reasons for the premium rests on equally inadequate allegations of motive. For example, plaintiffs insinuate that if Mr. Harrison had been replaced as CEO, he would have lost restricted stock awards worth $6.1 million that were "subject to continued employment." (See Am. Compl. ¶¶ 57-58.) In nurturing the fantasy that JPMC would have fired Mr. Harrison unceremoniously, plaintiffs offer no explanation why $6.1 million in restricted stock outweighs the $18.7 million in cash he would have received in his severance package. (Joint Proxy Statement at 59.) In any event, courts routinely reject motive allegations premised solely on defendants' desiring more compensation. *E.g., Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995).

during the negotiations. What they expected and were entitled to be told was the terms of the proposed merger and the business rationale for combining the two institutions, which the proxy statement sets out in fine detail.

The myriad positions taken during merger negotiation regarding the innumerable points on which agreement must be reached is simply not material to the shareholder vote on the merger agreement eventually reached, and if the information is not material, there is no need to disclose it and good reason not to. The law does not require proxy statements "to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976).

Plaintiffs rely on *Basic* and *Tracinda* to support their proposition that a rejected negotiating position is somehow material, or at least a creates a material question of fact, and must be disclosed. Plaintiffs' reliance on these cases is misplaced.

A.    ***Basic*'s Materiality Analysis Is Inapposite to Plaintiffs' Section 14(a) Claim.**

*Basic* was a Section 10(b) case addressing when merger negotiations must be publicized at all, not what should be disclosed about them once disclosure is warranted. In *Basic*, the Supreme Court "appl[ied] the materiality requirement of § 10(b) of the Securities Exchange Act . . . in the context of preliminary corporate merger discussions." 485 U.S. at 226. The "narrow question" before the Court in *Basic* was "whether information concerning the *existence* and *status* of preliminary merger discussions is significant to the reasonable investor's *trading decision*." *Id.* at 235 (emphasis added).

- 12 -

The Court's very statement of the question makes plain *Basic*'s inapplicability here. *Basic* acknowledged that the *existence* of ongoing merger negotiations is sometimes material to investors' trading decisions. But plaintiffs here do not claim that the *existence* of the JPMC/Bank One negotiations should have been disclosed sooner, nor did they allegedly base a trading decision on a denial that merger negotiations were taking place. (In fact, plaintiffs clearly allege that they held their JPMC shares throughout the relevant period.) In this case, there is no question regarding the "existence" and "status" of merger discussions. They transpired, they were completed, and a definitive merger agreement was executed and disclosed. The question is whether the *content* of negotiations occurring on the way to an executed merger agreement must be included in the disclosure, and there *Basic* is silent. *Basic* imposes no duty on a corporation, once it has disclosed the existence of merger discussions, to disclose information about particular negotiating positions taken. Nor does it impose a duty, once the corporation has already disclosed the terms of an agreement, to disclose the details of earlier negotiating positions that were taken and *rejected.*

Under *Basic*, the materiality of preliminary merger discussions "'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" 485 U.S. at 238 (*quoting SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).[9] Assuming that standard pertinent here, at the time of the

---

[9]    The Court cautioned that "the application of [the Section 14(a)] materiality standard to preliminary merger discussions is not self-evident" because preliminary discussions, if disclosed, necessarily entail "contingent or speculative" statements whose significance in the perception of a reasonable

- 13 -

shareholder vote on the JPMC/Bank One merger, "the indicated probability that the [no-premium deal] will occur" was zero. *Id.* By February 20, 2004, when the proxy statement which plaintiffs allege was misleading was published, JPMC's and Bank One's Boards had already approved a transaction with an acquisition premium and a two-year CEO-succession transition period. Thus, whatever possibility may once have existed of entering a different transaction with no premium and no transition period was not even "contingent or speculative"; it was non-existent. *Id.* at 232. Whether it once had been discussed could not influence the vote of any reasonable shareholder evaluating the actual and only transaction on the table. (*See* Defs. Opening Br. at 15-18.)[10]

Plaintiffs all but concede that the Section 14(a) precedents defendants cited, such as *Beaumont v. American Can Co.*, 797 F.2d 79 (2d Cir. 1986), would foreclose their claims unless *Basic* can be read to overrule them. (*See* Pls. Br. at 16.) If *Basic* is inapposite, plaintiffs have no other leg to stand on.[11]

---

investor is difficult to gauge given "the ever-present possibility that the contemplated transaction will not be effectuated." *Id.* at 232.

[10]   *See also South Coast Services Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265, 1273 (9th Cir. 1982) (holding that a proxy only needed to disclose "firm or definite offers," not a proposal that "could have [been] withdrawn or changed" and which "at best . . . was but a step in negotiating a purchase, with no assurance whatsoever that such negotiations would bear fruit or, if they did, whether the final terms would have been better than" the deal eventually accepted); *Scott v. Multi-Amp Corp.*, 386 F. Supp. 44, 65 (D.N.J. 1974) (holding that "[t]here was no necessity to disclose in the Proxy Statement the 'overture'" from a potential acquirer because "[i]t was but a casual inquiry, and not in the 'firm offer' category"); *Alameda Oil Co. v. Ideal Basic Indus., Inc.*, 337 F. Supp. 194, 195 (D. Colo. 1972) (holding there was no obligation to disclose an alternative merger offer because it "had been withdrawn and was not outstanding").

[11]   Plaintiffs also argue that factors regarding board independence were omitted from the proxy statement, claiming they thus "were prevented from assessing for themselves the purported independence of [JPMC's] directors." (Pls. Br. at 11.) Plaintiffs' only authority in support of this argument holds that "a serious conflict of interest" among directors is material to a proxy statement. *Mills v. Electric*

**B.**    *Tracinda* **Illustrates the Complaint's Fatal Flaws.**

The only similarity between *Tracinda* and this case is that both happen to involve corporate governance issues in connection with a merger. The *Tracinda* plaintiffs alleged that the CEO of Daimler-Benz admitted to misrepresenting the key terms of a merger in order to obtain shareholder approval. 197 F. Supp. 2d at 51. There is no comparable allegation here.

In *Tracinda*, the CEOs of Daimler-Benz and Chrysler, Jurgen Schrempp and Robert Eaton, respectively, had announced to Chrysler's shareholders "that the proposed business combination was not a take-over, but a 'merger of equals,' and that the post-merger management structure would be consistent with a 'merger of equals.'" *Id.* at 50. The proxy statement soliciting shareholder votes for the transaction likewise "repeatedly referred to the merger as a 'merger of equals.'" *Id.* at 51.

Shortly after Chrysler stockholders approved the transaction, the new DaimlerChrysler leadership "fir[ed] . . . several key Chrysler executives" and "subsequent[ly] replace[d] . . . these individuals by longstanding Daimler-Benz executives." *Id.* at 51-52. Commenting on these developments, Schrempp conceded in a news article that he now saw "no reason to maintain the fiction" that the deal was a "merger of equals." *Id.* at 52. He "admitted that Chrysler had been relegated to a standalone division" and explained:

> Me being a chess player, I don't normally talk about the second or third move. The structure we have now with Chrysler (as a standalone division)

_____

*Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970). The Delaware Court of Chancery has already determined, after a lengthy analysis, that no conflict of interest impairs any of the eleven outside directors' independence. *In re J.P. Morgan Chase & Co.*, 2005 Del. Ch. LEXIS 51 at *9-*14, *29-*38; *see also* Defs. Opening Br. at 29-30.

- 15 -

> was always the structure I wanted. . . . We had to go a roundabout way
> but it had to be done for psychological reasons. If I had gone and said
> Chrysler would be a division, everybody on their side would have said:
> "There is no way we'll do a deal." But it's precisely what I wanted to do.
> From the start structure, we have moved to what we have today.

*Id.* Plaintiffs here offer nothing analogous to this damning admission. The most

plaintiffs can muster is their unsupported speculation that "Harrison and Dimon knew

that JPMC's shareholders would not have approved the Merger had they known of the

secret deal." (*See* Pls. Br. at 19 (*quoting* Am. Compl. ¶ 90).) In other words, plaintiffs in

*Tracinda* alleged a *fact*, citing statements by Daimler's CEO, but plaintiffs here offer

only imaginative speculation and legal boilerplate.[12]

## III.    Plaintiffs Are Not Entitled to Proceed on Claims They Have No Standing to Raise.

Plaintiffs' lack of standing has nothing to do with "an attack on the

typicality of Plaintiffs as class representatives which should be reserved for the

determination of class certification." (Pls. Br. at 28.) Standing is not an issue of

typicality; it is a "threshold jurisdictional requirement, derived from the 'case or

controversy' language of Article III of the constitution." *PIRG of NJ, Inc. v. Magnesium*

*Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997).

"There must . . . be a *named plaintiff* who has such a case or controversy

*at the time the complaint is filed.*" *Sosna v. Iowa*, 419 U.S. 393, 402 (1975) (emphasis

added). "A federal district court may not permit a plaintiff to circumvent the standing

---

[12]    Plaintiffs argue that such boilerplate is enough, contending that because the
complaint alleges the legal conclusion that shareholders would have voted against
the merger if they knew of the so-called "rejected opportunity" (Am. Compl. ¶
148), the complaint suffices to state a claim. (*See* Pls. Br. at 19.) The Third
Circuit has rejected this tactic: Plaintiffs cannot survive a Rule 12(b)(6) motion
"merely [by] go[ing] through a check list for the elements of a . . . claim" in a
complaint. *Port Authority v. Arcadian Corp.*, 189 F.3d 305, 312 (3d Cir. 1999).

requirement simply because the plaintiff files his suit as a class action. . . . Thus, when

the issue of standing is raised by a party, the Court must resolve that issue *before*

considering the class certification requirements." *In re Bank of Boston Corp. Sec. Litig.*,

762 F. Supp. 1525, 1531 (D. Mass. 1991) (*citing Brown v. Sibley*, 650 F.2d 760, 771 (5th

Cir. 1981) ("Standing cannot be acquired through the back door of a class action.")).

  The cases cited in support of plaintiffs' request to proceed with claims for

which they have no standing are of no avail. For example, *Hoxworth v. Blinder,*

*Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992), was a post-judgment challenge to class

certification that never questioned the plaintiffs' standing. And in *In re WorldCom, Inc.*

*Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003), the lead plaintiff "fulfilled its

obligation to assess the causes of action available to the class . . . and to identify as

named plaintiffs any additional class representatives that were necessary to assert the

claims." Plaintiffs here did not.[13]

  Plaintiffs ask the Court to grant them leave to amend their complaint to

add new plaintiffs necessary to assert any claims for which they lack standing. (Pls. Br.

at 28.) This is nothing more than a request for a fishing license. Plaintiffs' counsel is in

effect arguing: *My clients do not have standing because they were not purchasers or*

*sellers (see* Pls. Br. at 27-28), *but if you dismiss, I will forage for some purchasers or*

---

[13]  Moreover, the course of conduct alleged in *WorldCom* to have been wrongful
affected purchasers in successive offerings similarly so that in proving its own
claim, the plaintiff might well be proving the claims of purchasers in other
offerings. In this case, the continuing owners of JPMC securities may
theoretically have a claim to have been induced to vote for a merger that they
would otherwise have opposed, but that alleged nondisclosure did not injure
purchasers or sellers of JPMC shares in any manner plaintiffs have even
attempted to articulate.

*sellers, even though we have alleged no injury to purchasers or sellers.*[14]  The Court

should not indulge this fishing expedition.  Moreover, in the absence of any explanation

satisfying the element of loss causation as to how nondisclosure of the offer and rejection

of a no-premium deal (or even the supposed "secret pact") could have damaged

purchasers or sellers of JPMC shares, amending the complaint to add purchasers or

sellers would be an act of futility.

## IV.   Superficial Distinctions Between Plaintiffs' Complaint and the Dismissed State Complaint Do Not Warrant This Court's Re-Adjudicating Meritless State Claims.

Plaintiffs' efforts to distinguish this case from the action dismissed by the

Delaware Court of Chancery are unconvincing.  Plaintiffs cite various minor distinctions

between their complaint and the dismissed state complaint (*see* Pls. Br. at 9-10, 33-34,

36-37), as though the same class could take infinite bites of the apple merely by tweaking

complaints based on the same conduct.  Plaintiffs rely primarily on four distinctions

noted by the Delaware Court of Chancery.[15]  First,

---

[14]  Leave to amend is not warranted in cases of "undue delay" or "futility," both of which apply here.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).  There is no reason counsel could not have located appropriate plaintiffs when he first investigated causes of action.  Further, any amendment would be futile.  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted" evaluated under "the same standard of legal sufficiency as applies under Rule 12(b)(6)."  *Id.*  If the alleged omission is not material to a Section 14(a) claim, its materiality to plaintiffs' other securities claims is even less apparent.  These claims also lack merit for the reasons described in defendants' opening brief (at 10 n.7) and because they suffer from the same non-particular pleading as the Section 14(a) claim.

[15]  Other asserted "distinctions" are nonsense.  For example, plaintiffs note that "Dimon is not even a defendant in the [Court of] Chancery [a]ction" (Pls. Br. at 33), but plaintiffs do not name Mr. Dimon as a defendant on their state-law claims, either (*see* Am. Compl. ¶¶ 39, 237), nor could they—the CEO who negotiated the transaction on Bank One's behalf could not possibly have owed a fiduciary duty to *JPMC*'s shareholders.

the federal complaint characterizes the deal between Harrison and Dimon as a secret deal. This description implies that merger negotiations were unknown to the Board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that the [director] "defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon."

*In re J.P. Morgan Chase & Co.*, 2005 Del. Ch. LEXIS 51 at *15 (*quoted in* Pls. Br. at 9).

Plaintiffs attempted to remedy this latter inconsistency (*compare* Compl. (D.I. 1) ¶ 144(e) *with* Am. Compl. ¶ 159(f)), but plaintiffs still attempt to carry water on both shoulders by contending that the independent directors "knew or should have known" of a secret deal. (Pls. Br. at 22-23.) The state plaintiffs also tried to have it both ways (*see* Defs. Opening Br. at 28-29 n.13),[16] but even if this were a salient distinction, it would be immaterial. If the directors "knew," there is no difference between this case and the state case. If they "should have known," the complaint pleads only a due-care violation for which JPMC's directors are not liable. *See* 8 *Del. C.* § 102(b)(7) (2005).[17] Moreover, if Harrison and Dimon conspired to conceal their "secret pact," how "should" the other directors have learned of it?

The Court of Chancery's second distinction is that plaintiffs' complaint purports to bring federal claims. (*See* Pls. Br. at 9.) Indeed it does, but those claims are without merit. Third, the Court of Chancery noted that the "federal complaint states that *Harrison* offered the no-premium deal." (Pls. Br. at 9.) This is no distinction but merely

---

[16]    In fact, the state plaintiffs also characterized the offer and rejection as a "secret deal." (Pls. Answering Br., *J.P. Morgan Chase* (Del. Ch. File & Serve #4766524, Dec. 10, 2004) at 5-6 (attached under Tab C).)

[17]    As this makes plain, plaintiffs' Section 14(a) claim against the independent directors "amounts to nothing more than an attempt to dress up an ordinary state breach of fiduciary duty claim in federal securities law clothing, a maneuver that the caselaw plainly prohibits." *Halpert Enterprises, Inc. v. Harrison*, No. 02-9501, 2005 U.S. Dist. LEXIS 15022 at *9 (S.D.N.Y. July 26, 2005).

underscores the incoherence and inconsistencies rampant in the complaint. Finally, the Court of Chancery noted that the "federal complaint alleges additional substantive facts concerning certain directors." (Pls. Br. at 10.) But that does not change the fact that the allegations are made as to the *wrong* directors. (*See* Defs. Opening Br. at 29-30.)

The distinctions raised by plaintiffs are not meaningful. The commonalities are fatal. Plaintiffs' Delaware law claims have been heard and dismissed by a Delaware court. There is no cause for this Court to revisit them.

## CONCLUSION

For the reasons stated above and in defendants' opening brief, the Court should dismiss the action with prejudice.

Respectfully submitted,

Jesse A. Finkelstein (#1090)
(finkelstein@rlf.com)
Michael R. Robinson (#4452)
(robinson@rlf.com)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
*Counsel for Defendants*

**OF COUNSEL:**

Michael A. Cooper
Sharon L. Nelles
Keith Levenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-3712
*Counsel for the Individual Defendants*

Nancy E. Schwarzkopf
JPMORGAN CHASE LEGAL DEPARTMENT
1 Chase Manhattan Plaza, 26th Floor
New York, New York 10081
(212) 552-3585
*Counsel for JPMorgan Chase & Co.*

Dated: August 1, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2005, I caused to be electronically filed the foregoing documents with the Clerk of Court using CM/ECF which will send notification of such filings to the following:

Joseph N. Gielata, Esq.
501 Silverside Road
Suite 90
Wilmington, DE 19809

Michael R. Robinson (DSBA No. 4452)
robinson@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700