# Tabs A and B

## to

## Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

# Tab A

## to

# Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

Case 1:05-cv-00162-JJF    Document 54-2    Filed 08/01/2005    Page 3 of 57

Page 2
2005 U.S. Dist. LEXIS 15022, *

LEXSEE 2005 US DIST LEXIS 15022

**HALPERT ENTERPRISES, INC., derivatively on behalf of nominal defendant J.P. Morgan Chase & Co., Plaintiff, -against- WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, H. LAURANCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, LLOYD D. WARD and MARINA v. N. WHITMAN, Defendants, and J.P. MORGAN CHASE & Co., a Delaware Corporation, Nominal Defendant.**

02 Civ. 9501 (SHS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 15022*

**July 26, 2005, Decided**
**July 26, 2005, Filed**

**DISPOSITION:** [*1] Halpert's request for leave to submit yet another amended complaint in event of dismissal denied.

**COUNSEL:** For Halpert Enterprises, Inc., derivatively on behalf of nominal defendant J.P. Morgan Chase & Co., Plaintiff: Jeffrey Paul Fink, Robbins Umeda & Fink, LLP, San Diego, CA; Leigh Laskey, Lasky, Rifkind, LTD, New York, NY.

For William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., Lawrence A. Bossidy, M. Anthony Burns, H. Laurance Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford, Lloyd D. Ward, Marina N. Whitman, J.P. Morgan Chase & Co., Defendants: Ahuva Genack, Mark E. Segall, J.P. Morgan Chase Legal Department, New York, NY.

For JP Morgan Chase and Co., a Delaware Corporation, Nominal Defendant: Ahuva Genack, Mark E. Segall, J.P. Morgan Chase Legal Department, New York, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J.

**OPINIONBY:** Sidney H. Stein

**OPINION:**

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

On March 28, 2005, this Court issued an Opinion and Order dismissing the amended complaint in this action for failure to plead the futility of making a demand upon the Board of Directors of J.P. Morgan Chase & Co. in conformity [*2] with the requirements of *Fed. R. Civ. P. 23.1.* See *Halpert Enters., Inc. v. Harrison, 362 F. Supp. 2d 426 (S.D.N.Y. 2005).* The Court granted plaintiff Halpert Enterprises, Inc. leave to file a second amended complaint, which it has done. Defendants have now moved to dismiss that Verified Second Amended Shareholder Derivative Complaint ("Second Amended Complaint") That motion is granted because Halpert has failed to remedy the deficiencies set forth in this Court's March 28, 2005 Opinion.

The Second Amended Complaint contains, as did its predecessor, claims against members of the Board of Directors of J.P. Morgan Chase & Co. (the "Directors," the "Board" or "defendants") for: 1) violating Section 14(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78n(a)*, in failing to disclose material liabilities in filings submitted to the Securities and Exchange

Commission; 2) breaching fiduciary duties in failing to supervise and monitor J.P. Morgan Chase's operations and in failing to seek legal redress for harm to the company; 3) grossly mismanaging the bank; and 4) wasting the bank's assets. Halpert purports to bring all of its claims derivatively [*3] on behalf of the corporation, thereby triggering an obligation to adhere to the requirements of *Fed. R. Civ. P. 23.1*.

The Directors now move to dismiss the Second Amended Complaint -- which is 147 pages long -- on the ground that Halpert has not pled with requisite particularity that it would have been futile for Halpert to have made a demand on the Directors that J.P. Morgan Chase itself bring this action. In addition, the Directors urge that Halpert's *Section 14(a)* claim is merely a garden-variety breach of fiduciary duty claim and is, in part, moot. Defendants' motion to dismiss the Second Amended Complaint is granted, because Halpert has failed to allege with the necessary particularity that it would have been futile to have made a demand on the Board. n1

> n1 The parties dispute whether Halpert must plead futility of demand with respect to the Board as it existed as of the date of the filing of the original complaint in this action or with respect to the Board as it existed as of the filing of the Second Amended Complaint. The Court need not reach that issue, however, because regardless of what date is operative for futility pleading purposes, Halpert has failed to satisfy the requirements of *Fed. R. Civ. P. 23.1*.

[*4]

The previously dismissed complaint contained allegations relating to J.P. Morgan Chase's transactions with the Enron Corporation. The Second Amended Complaint includes supplemented allegations relating to Enron, as well as a laundry list of newly alleged instances of purported breaches of fiduciary duties. As Halpert has characterized it, the Second Amended Complaint asserts allegations concerning:

> (a) a myriad of unlawful financial arrangements with Enron to ensure the Company's lucrative relationship with Enron[;]
> (b) failing to conduct due diligence that would have uncovered the extensive fraud at WorldCom in conjunction with underwriting the issuance of $ 18 billion

in WorldCom bonds[;]
(c) funding and thereby profiting from the illegal practice of market timing in connection with the trading of mutual funds[;]
(d) violating National Association of Securities Dealers ("NASD") rules by making recommendations and sales of mutual funds to their customers without considering or adequately disclosing, on a consistent basis, that an equal investment in Class A shares would generally have been more economically advantageous for their customers by providing [*5] a higher overall rate of return[;]
(e) violating Securities and Exchange Commission ("SEC"), NASD and New York Stock Exchange ("NYSE") rules by failing to adequately separate the Analyst functions of the Company from the Investment Banking business of the Company that resulted in improper influence of the Investment Banking business over analyst functions[;]
(f) violating SEC and NASD rules in connection with the underwriting of IPOs[;] and
(g) failing to preserve documents requested by the SEC in relation to an investigation into J.P. Morgan.

(Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss the Second Amended Complaint at 3-4); see also Second Amended Complaint. Halpert maintains that making a demand on the Board would have been futile, but the Second Amended Complaint contains allegations relating to the putative futility of demand that are substantially identical to those that the Court previously held insufficient to satisfy the particularity requirement of *Fed. R. Civ. P. 23.1*. See *Halpert, 362 F. Supp. 2d 426*.

Halpert contends that even though it has not meaningfully augmented its demand futility allegations, it has alleged a gallimaufry [*6] of new misdeeds on the part of J.P. Morgan Chase that relate not only to the Enron debacle, but also to several other corporate scandals. According to Halpert, those alleged misdeeds constitute "red flags," of which the Directors should have been aware. Halpert maintains that those "red flags" evince the futility of demand. Halpert's litany of new substantive allegations fails to demonstrate that "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested

and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984)*, overruled on other grounds by *Brehm v. Eisner, 746 A.2d 244, 253-54 (Del. 2000)*.

Halpert's allegations do not overcome the presumption of the business judgment rule. See *Aronson, 473 A.2d at 812*. Halpert has failed to "plead with particularity what obvious danger signs were ignored or what additional measures the directors should have taken." *In re Baxter Int'l, Inc. Sec. Litig., 654 A.2d 1268, 1271 (Del. 1995)*; see also *Simon v. Becherer, 7 A.D.3d 66, 72-73, 775 N.Y.S. 2d 313 [*7] (1st Dep't 2004)*; *In re Citigroup, Inc. S'holders Litig., 2003 Del. Ch. LEXIS 61, No. 19827, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003)*; see also *Rattner v. Bidzos, 2003 Del. Ch. LEXIS 103, No. Civ.A. 19700, 2003 WL 22284323, at *12-13 (Del. Ch. Oct. 7, 2003)*; *Guttman v. Huang, 823 A.2d 492, 506-07 & n.36 (Del. Ch. 2003)*. Indeed, Halpert never proffers more than conclusory allegations that the directors should have known about alleged wrongdoing. See *In re Citigroup, 2003 Del. Ch. LEXIS 61, 2003 WL 21384599, at *2*; *Fink v. Komansky, 2004 U.S. Dist. LEXIS 24660, No. 03CV0388, 2004 WL 2813166, at *4-5 (S.D.N.Y. Dec. 8, 2004)*. In other words, the Second Amended Complaint lacks particularized allegations suggesting that any red flags were hoisted within the Board's field of vision. See *In re Citigroup, 2003 Del. Ch. LEXIS 61, 2003 WL 21384599, at *2* ("Red flags 'are only useful when they are either [waved] in one's face or displayed so that they are visible to the careful observer.'").

It is beyond cavil that J.P. Morgan Chase suffered losses as a result of scandals reflected in the Second Amended Complaint. "The fact of those losses, however, is not alone enough for a court to conclude that a majority [*8] the corporation's board of directors is disqualified from considering a demand that [J.P. Morgan Chase] bring suit against those responsible." *In re Citigroup, 2003 Del. Ch. LEXIS 61, 2003 WL 21384599, at *3*. The Second Amended Complaint must be dismissed because it fails to allege with particularity the futility of making a demand on the Board.

Halpert denominated its complaint a "Shareholder Derivative Complaint" and specifically set forth that each claim is a "derivative claim." (See Second Amended Complaint PP355-374). Accordingly, Halpert's claim pursuant to Section 14(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78n(a)*, is dismissed -- as are Halpert's other claims -- for failure to plead demand futility with adequate particularity. See *Fed. R. Civ. P. 23.1*. Nevertheless, even were Halpert's claim pursuant to *Section 14(a)* to be construed as one brought directly rather than derivatively on behalf of J.P. Morgan Chase, it would still merit dismissal, because it merely alleges that members of the Board failed to accuse themselves of wrongdoing for allegedly being oblivious to improprieties perpetuated by others. See *Koppel v. 4987 Corp., [*9] 167 F.3d 125, 133-34 (2d Cir. 1999)*; *Field v. Trump, 850 F.2d 938, 947 (2d Cir. 1988)*. Given the absence of any specific allegations against any individual defendant for actively engaging in any wrongdoing, Halpert's *Section 14(a)* claim amounts to nothing more than an attempt to dress up an ordinary state breach of fiduciary duty claim in federal securities law clothing, a maneuver that the caselaw plainly prohibits. See *Field, 850 F.2d at 947*.

Defendants' motion to dismiss the Second Amended Complaint is granted in light of Halpert's failure to comply with the particularity requirement of *Fed. R. Civ. P. 23.1*. After several years and three complaints, Halpert has demonstrated an inability to proffer allegations substantiating demand futility. Thus, Halpert's request for leave to submit yet another amended complaint in the event of dismissal is denied, as re-pleading would be futile. See *Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001)* (citing *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*).

Dated: New York, New York

July 26, 2005

SO ORDERED

Sidney H. Stein, U.S.D.J.   [*10]

2005 Del. Ch. LEXIS 51, *

LEXSEE 2005 DEL CH LEXIS 51

IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION

Consolidated C.A. No. 531-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 51*

**January 27, 2005, Submitted
April 29, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motion to dismiss granted

**LexisNexis(R) Headnotes**

**COUNSEL:**

Seth D. Rigrodsky, Esquire, Ralph N. Sianni, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, Wilmington, Delaware; Steven G. Schulman, Esquire, Richard Weiss, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, New York; Peter D. Bull, Esquire, BULL & LIFSHITZ, LLP, New York, New York, Attorneys for the Plaintiffs.

Jesse A. Finkelstein, Esquire, Lisa M. Zwally, Esquire, Michael R. Robinson, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael A. Cooper, Esquire, Sharon L. Nelles, Esquire, SULLIVAN & CROMWELL LLP, New York, New York; Nancy E. Schwartzkopf, Esquire, JP MORGAN CHASE LEGAL DEPT., New York, New York, Attorneys for the Defendants.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

LAMB, Vice Chancellor

**I.**

In 2004, two banks agreed to a business combination that was expected to create the second largest financial institution in the country. One bank paid a premium over the market share price for the other bank, effectively making one bank the acquirer and the [*2] other bank the target.

After the merger was completed, the stockholders of the acquirer sued its directors, alleging breaches of fiduciary duty with regard to the acquisition. Their claims stem from the allegation that the directors paid too much for the acquired bank. Specifically, the plaintiffs claim that the CEO of the target proposed a no-premium merger if he were immediately promoted to CEO of the resulting entity. The CEO of the acquirer allegedly refused that offer, choosing instead to pay the premium for the target's stock and retain his title.

The plaintiffs bring this class action in an effort to recover damages for what they contend are direct claims. The defendants move to dismiss the complaint on the basis that the claims are derivative, not direct, and that demand was not excused. For the reasons below, that motion is granted.

**II.** n1

n1 All facts herein are taken from the well-pleaded allegations of the complaint unless otherwise noted.

2005 Del. Ch. LEXIS 51, *

### A. The Parties

The plaintiffs are Ronda Robins, [*3] George Ziegler, and Bruce T. Taylor, who are stockholders of J.P. Morgan Chase & Co. ("JPMC") during the relevant times. n2 The plaintiffs bring this action on their own behalf and as a class action pursuant to Court of Chancery Rule 23. The class is alleged to consist of all persons who owned JPMC common stock on the date the merger was announced, January 14, 2004, and continued to own such stock through the date the merger closed, July 1, 2004.

n2 Bruce T. Taylor is acting as custodian for Julia Ann Taylor.

The defendants are JPMC and the members of its board of directors who approved the merger with Bank One Corporation ("Bank One").

### B. Background

On January 14, 2004, JPMC and Bank One published a joint press release announcing their agreed-upon merger, which had been unanimously approved by their respective boards of directors. Pursuant to the agreement, JPMC would issue shares of its common stock to Bank One stockholders at a premium of 14% over the closing price of Bank One common stock on the date [*4] of the announcement of the merger. n3

n3 Joint Proxy Statement at 36.

The merger agreement also laid out the succession plan for JPMC. After the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, James Dimon, would succeed. During the interim two years, Dimon would serve as President and COO. Harrison, who was Chairman of JPMC before the merger, would continue in that role indefinitely beyond the two years.

The Joint Proxy Statement filed with the Securities and Exchange Commission on February 20, 2004 listed various reasons for the merger, including "a number of significant strategic opportunities and benefits," "more balanced business mix," "greater geographic diversification," and "expected financial synergies." n4 The merger, when announced, was expected to create the second largest financial institution in the country,

measured by total assets. On May 25, 2004, the stockholders of JPMC overwhelmingly approved the merger, with 99.18% [*5] of the votes cast in its favor. n5 The merger closed July 1, 2004.

n4 Id. at 34-35.

n5 Form 8-K, May 25, 2004.

### C. The Dispute

On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon. According to the article, Dimon offered to sell Bank One to JPMC at no premium if he were appointed CEO of the new entity immediately. Because much of the complaint hinges on one sentence in the article, the court finds it important to include it verbatim, as follows: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become the chief executive immediately, according to two people close to the deal." n6

n6 Landon Thomas, Jr., *The Yin, the Yang, and the Deal,* N.Y. TIMES, June 27, 2004, § 3 (Sunday Business) at 1.

[*6]

The plaintiffs allege that this one sentence proves that JPMC could have purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO. The plaintiffs argue that JPMC instead agreed to pay a premium simply to satisfy Harrison's desire to retain the CEO title for two more years. In addition, the plaintiffs contend that Harrison remains CEO in title only and that Dimon is effectively exercising the powers of a CEO. Therefore, they claim, the only difference between Dimon's preliminary offer and the merger as consummated was that JPMC agreed to pay the 14% premium.

The defendants respond by pointing out that the plaintiffs' argument presupposes that the boards of directors of both companies would have approved Dimon's offer. The defendants argue that there was no possibility for JPMC stockholders to approve a merger based on Dimon's alleged offer because neither board of directors ever agreed to that deal. The deal that was agreed to by the boards included a 14% premium for Bank One and a succession plan that had Harrison

2005 Del. Ch. LEXIS 51, *

remaining as CEO for two years, followed by Dimon. They argue that all other possible transaction formats that may have been proposed to and rejected by the [*7] JPMC board are irrelevant and immaterial, as the JPMC directors' consideration and rejection of all such proposals are protected by the business judgment rule.

### D. The Complaint

The plaintiffs pursue all defendants for breaches of fiduciary duties surrounding the refusal of Dimon's alleged no-premium offer. They argue that by allowing Harrison to keep the title of CEO, the board of JPMC overpaid for Bank One by the 14% premium. Relying on the proxy materials stating that Harrison kept the board informed of his negotiations with Dimon, the plaintiffs claim that the board knew of Dimon's no-premium offer. Moreover, the plaintiffs claim that a majority of the board was beholden to Harrison and, thus, not able to act independently of him. The plaintiffs allege that the board's lack of independence caused it to approve the 14% premium in order to let Harrison retain the title of CEO instead of insisting on the no-premium offer.

Alternatively, the plaintiffs claim that Harrison secretly refused Dimon's no-premium offer. Without presenting the offer to the JPMC board, they claim, Harrison refused to concede the title of CEO, but continued negotiating with Dimon. Under this set of facts, [*8] the plaintiffs contend that Harrison's self-interested refusal caused Dimon to demand a premium over Bank One's share price, which Harrison eventually agreed to and presented to the board.

The plaintiffs seek damages in the amount of the merger exchange ratio premium, approximately $ 7 billion. They allege that the JPMC board of directors, by approving the unfavorable merger exchange ratio and the unnecessary premium, harmed them directly by diluting their interests in JPMC. If the JPMC board had approved a no-premium merger exchange ratio, the argument goes, the plaintiffs would have a greater stake in the resulting company. Instead, the stockholders of the pre-merger JPMC now have less of a stake in the post-merger JPMC.

The JPMC board consisted of twelve directors-- eleven, outsiders plus Harrison. The plaintiffs allege that eight of the eleven outside directors lacked sufficient independence with regard to the merger. n7 The plaintiffs base their claims on certain relationships between the directors and JPMC and/or Harrison. The defendants counter that the relationships described by the plaintiffs fall into three categories: normal business relationships, inconsequential charitable [*9]

relationships, or family relationships that are either disclosed or ended. The defendants contend that none of the relationships affect the ability of the directors to act independently. The defendants also point out that a majority of the board of directors was certified as independent pursuant to NYSE Corporate Governance listing standards.

> n7 The plaintiffs concede that three directors are independent: Hans W. Becherer, John H. Biggs, and Lee R. Raymond. The plaintiffs allege that Harrison benefitted from the merger by securing a $ 3.5 million increase in his severance package to $ 22.5 million. They further contend that Harrison knew his job was in jeopardy and he used the Bank One deal to retain the title of CEO for two more years. Harrison's alleged lack of independence is not disputed by the defendants in this motion to dismiss

Set forth below are the directors in question and the specific allegations found in the complaint about each.

### 1. Riley Bechtel

Bechtel is the Chairman, CEO, and a director [*10] of the Bechtel Group, Inc. The plaintiffs allege that Bechtel is not independent because the Bechtel Group does business with the Trade Bank of Iraq, which is managed by JPMC. The plaintiffs claim that the Bechtel Group has received $ 2 billion from the Trade Bank in connection with the reconstruction of Iraq. The plaintiffs further allege that Bechtel is not independent because JPMC and the Bechtel Group share other financial interests. As an example, the plaintiffs cite an investment partnership that is jointly owned by partners of the Bechtel Group and a private equity firm affiliated with JPMC.

### 2. Lawrence Bossidy

The plaintiffs question the independence of Bossidy because his son is employed as a JPMC Vice President. The plaintiffs contend that Bossidy would be unable to vote against Harrison because his vote would potentially endanger his son's career.

### 3. Ellen Futter

Futter is the President, as well as a trustee, of The American Museum of Natural History. The plaintiffs claim that Futter cannot act independently because JPMC is a significant benefactor to the museum. The

plaintiffs also claim that Futter cannot act independently because JPMC employed her brother-in-law [*11] as a managing director. n8

> n8. The court takes judicial notice that Futter's brother-in-law was terminated on January 6, 2004 (effective March 8, 2004), one week before the JPMC board approved the merger with Bank One. *See Cohan v. J P Morgan Chase & Co.*, No. 03-5981 (S.D.N.Y. 2004), Second Amended Compl.; Joint Proxy Statement at 34. He has since sued JPMC in connection with his termination. *See Cohan*, No 03-5981, Second Amended Compl.

### 4. Helene Kaplan

Kaplan is Vice-Chair and a trustee of The American Museum of Natural History. Like Futter, Kaplan is a senior fiduciary of the museum and the plaintiffs challenge her independence on the basis of her charitable ties to JPMC.

### 5. William Gray n9

> n9. In their answering brief, the plaintiffs provide more detailed information about Gray than is contained in the complaint. For example, they specify the dollar amount of JPMC's contributions to UNCF instead of simply stating that JPMC is a sponsor. The court takes these facts as true since presumably the plaintiffs could amend the complaint to include them.

[*12]

Gray is the President and CEO of the United Negro College Fund ("UNCF"). In 2003, JPMC matched over $ 1 million in UNCF donations from its employees. Since 1990, JPMC and its employees have contributed over $ 18 million to UNCF. In addition, Harrison has served as treasurer of UNCF. Based on Gray's charitable ties to JPMC and Harrison's reciprocal involvement with UNCF, the plaintiffs claim that Gray cannot vote independently.

### 6. Frank Bennack

Bennack is the Chairman of the Executive Committee and Vice Chairman of the Board of the Hearst Corporation. He was instrumental in creating Hearst-Argyle Television, Inc., which has a credit facility with a consortium of banks led, in part, by JPMC. The plaintiffs maintain that the financial relationship between JPMC and Hearst-Argyle, when viewed in the context of the relationship between Bennack and Hearst-Argyle, causes Bennack to be unable to act independently as a director.

### 7. John Stafford

Stafford is a consultant to Wyeth and he was Chairman of the Board of Wyeth from 1986 until 2003. JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. JPMC serves as indenture trustee, paying agent, and conversion [*13] agent for $ 4.5 billion of Wyeth's debt securities. The plaintiffs maintain that the financial relationship between JPMC and Wyeth precludes Stafford's ability to exercise independence as a director.

### 8. M. Anthony Burns

Burns is the Chairman Emeritus and former CEO of Ryder Systems, Inc. JPMC serves as indenture trustee for Ryder, including its recent August 2003 registration of $ 800 million of securities. The plaintiffs maintain that the financial relationship between JPMC and Ryder impedes Burns's ability to act as an independent director.

### E. Procedure

The defendants move to dismiss, arguing that the claims asserted are derivative and that demand is not excused. The defendants further argue that the board of directors has a majority of members who were independent and disinterested, and, therefore, the board's decision to authorize the merger is governed by the business judgment rule.

The plaintiffs oppose the motion, arguing that the claims asserted are direct. Alternatively, they argue that if the claims are found to be derivative, demand is futile and therefore excused because a majority of the board of JPMC was not able to act independently of Harrison in voting [*14] to authorize the merger and, therefore, is not capable of acting on a demand. Even if the claims against the board are dismissed, the plaintiffs assert that they can pursue Harrison individually if he did not relay Dimon's offer to the board for its approval.

The plaintiffs also allege a breach of the directors' disclosure duties in connection with the failure to disclose material information in the proxy statement n10

> n10. In their answering brief, the plaintiffs assert that PP 81-89 of the complaint state a claim for equitable fraud. They further assert that

the defendants did not address the equitable fraud claim in the defendants' opening brief. Therefore, the plaintiffs argue, the equitable fraud claim must be permitted to go forward. The court finds that the complaint does not adequately allege a claim for equitable fraud. Under Court of Chancery Rule 8(a), a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Nowhere in PP 81-89 of the complaint is the term "equitable fraud" to be found. Furthermore, the allegations in those paragraphs do not contain a plain statement that would put the defendants on notice that the plaintiffs were alleging equitable fraud. Moreover, "[a] class action may not be maintained in a purely common law or equitable fraud case." *Gaffin v. Teledyne, Inc., 611 A.2d 467, 474 (Del. 1992)*. Even if the allegations in PP 81-89 of the complaint could be construed as equitable fraud, it is not enough to maintain a class action.

[*15]

F. Federal Action

A similar federal class action complaint was filed in the District of Delaware on March 17, 2005. The federal complaint alleges substantially the same claims that are before this court. It does, however, have several important differences. First, the federal complaint characterizes the deal between Harrison and Dimon as a "secret deal." This description implies that the merger negotiations were unknown to the board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that the "defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon." n11

n11 Federal Compl. P 144(e)

Second, the federal complaint alleges that JPMC violated federal securities laws, specifically *Sections 10(b), 11, 12(a)(2), 14(a), 15*, and *20(a) of the Securities Exchange Act of 1934*. These claims are sufficient to give federal courts jurisdiction over the claims, including the related breaches of fiduciary [*16] duty claims.

Finally, the federal complaint lists important distinguishing facts, some of which are inconsistent with facts in this action. For instance, the federal complaint

states that *Harrison* offered the no-premium deal. n12 The complaint before this court makes the opposite claim, i.e. that it was Dimon who made an offer of that nature. This discrepancy is not explained.

n12 *Id.* P 81 (citing *Fortune*, Jan. 26, 2004, which states "Harrison was offering what he calls a market deal,' meaning that J.P. Morgan would simply buy Bank One at its current stock price - around $ 45 a share.")

The federal complaint alleges additional substantive facts concerning certain directors. For example, the federal complaint ties Futter's fund-raising activities to her board membership, as reported in *New York Magazine* on February 21, 2000. n13 Additionally, the federal complaint alleges that Kaplan is an attorney whose law firm receives substantial fees from JPMC. n14

n13 *Id.* P 171 [*17]

n14 *Id.* P 174

On April 18, 2005, the federal district court refused to enjoin this action. n15 In his decision, Judge Farnan stated that any possibility of harm to the federal plaintiff is speculative at this stage of the litigation. This court will therefore proceed to decide the motion to dismiss the state complaint.

n15 *Hyland v. Harrison*, C.A. No. 05-162, mem. order (D. Del. Apr. 18, 2005).

III.

In order to dismiss a complaint under Court of Chancery Rule 12(b)(6), a court "must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." n16 When making its decision, a court must accept as true all well-pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts. n17 But a court need not "blindly accept as true all allegations, nor must [*18] it draw all inferences from them in plaintiffs' favor unless they are

reasonable inferences." n18

n16 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del. 2003)* (quotations omitted).

n17 *Grobow v. Perot, 539 A.2d 180, 187 n.6 (Del. 1988).*

n18 *Id. at 187.*

A. Direct Or Derivative Analysis

The court begins by analyzing whether the stated claims are direct or derivative. The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative to "turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n19 "Under *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n20 "Instead the court must look to all the facts [*19] of the complaint and determine for itself whether a direct claim exists." n21

n19 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).*

n20 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*

n21 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

The plaintiffs' main complaint is that the defendant directors breached their fiduciary duty by approving a merger exchange ratio that paid an unnecessary or excessive premium to Bank One stockholders. This premium, the plaintiffs argue, prevented them from receiving their fair share of the resulting business combination, causing them to be harmed directly through dilution of their collective ownership percentage.

1. Who Suffered The Alleged Harm?

In order to show a direct injury under *Tooley*, a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

[*20] " n22

n22 *845 A.2d at 1039.*

By describing the harm as a dilution of their stockholder interests, the plaintiffs attempt to allege a harm to them that does not affect the corporation. But their argument fails to acknowledge the context in which they were allegedly harmed. "[A] complaint that directly challenges the fairness of the process and the price' of a merger suggests ... that the corporation suffered harm ... and that the harm suffered by stockholders is only a natural and foreseeable consequence of the harm to the corporation." n23 At the heart of their complaint, the plaintiffs claim that JPMC overpaid for Bank One. If JPMC had paid cash for Bank One, the plaintiffs' claim would clearly be derivative. JPMC would have suffered the alleged harm by paying too much money for Bank One. Any such cash overpayment would not have harmed the stockholders of JPMC directly. The only harm to the stockholders would have been the natural and foreseeable consequence of the harm to JPMC.

n23 *Agostino v. Hicks, 845 A.2d 1110, 1119 (Del. Ch. 2004)* (quoting, in part, *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1245 (Del. 1999)).*

[*21]

The fact that this transaction was effectuated by issuing stock and not by paying cash does not change the result. The harm, if any, was still suffered by JPMC. Although "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims," n24 "[they] are individual in nature [only] where a significant stockholder's interest is increased at the sole expense of the minority." n25 "To the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." n26

n24 *Gentile v. Singlepoint Fin., 2003 Del. Ch. LEXIS 21, 2003 WL 1240504, at *5 n.36 (Del. Ch. Mar. 5, 2003).*

n25 *In re Paxson Communication Corp. S'holders Litig., 2001 Del. Ch. LEXIS 95, 2001*

*WL. 812028, at *5 (Del. Ch. July 10, 2001)*

n26 *Id.*

Here, the plaintiffs rely on the claim of "dilution" in an attempt [*22] to frame the harm as direct. But, they do not allege any stockholder dilution in relation to pre-merger voting rights. Instead, their claim of dilution is related to the issuance of stock to consummate the merger. This dilution claim is based on the merger exchange ratio, which was a necessary result of the purchase price for Bank One. Any alleged dilution was a harm suffered by all pre-merger JPMC stockholders and, consequently, JPMC itself. Thus, the harm alleged in the complaint cannot give rise to a direct claim.

In response to the court's request for support "for the proposition that a claim which would undoubtedly be a derivative claim is somehow converted into a direct claim because of the form of consideration," n27 the plaintiffs were not able to cite any persuasive authority. Indeed, in their post-hearing submissions, the plaintiffs were unable to point to any authority under Delaware law that the direct/derivative analysis is affected by the form of consideration used in a transaction. In fact, Delaware case law states that "if a board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders [*23] are injured derivatively." n28 Furthermore, as Chancellor Chandler has recently noted, "mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one." n29 Thus, the plaintiffs' argument that they were harmed directly because the merger consideration was stock instead of cash must fail as a matter of law.

n27 Tr. at 44.

n28 *Avacus Partners, L.P. v. Brian,* 1990 Del. Ch. LEXIS 178, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990).

n29 *Gatz v. Ponsoldt,* 2004 WL. 3029868, at *7 (Del. Ch. Nov. 5, 2004).

Putting the 14% premium payment in the proper context, the court finds that any alleged harm was suffered by JPMC, regardless of whether the payment was in cash or in stock. The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC. Therefore, under the first prong of *Tooley,* the court concludes that the plaintiffs'

claim is derivative.

2. Who Would Receive The Benefit Of Any Recovery [*24] Or Other Remedy?

Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n30 Here, the plaintiffs seek a return of the "proper interest" n31 of JPMC to stockholders who owned pre-merger JPMC stock, but they offer no explanation of what such a proper interest might be. Additionally, the plaintiffs are unable to demonstrate why they, and not JPMC, should receive the benefit of any remedy.

n30 *845 A.2d at 1033.*

n31 Pls.' Answering Br. at 43.

As discussed above, if there was harm suffered by payment of a merger premium, JPMC suffered it. Thus, if the defendants are found liable, the remedy will accrue to JPMC. Although the plaintiffs go to great lengths to define the class in a way that would allow them to argue for a direct class benefit, their effort to make the claim direct fails. The plaintiffs' argument that the previous Bank One stockholders, who ostensibly have already benefitted from any misconduct, should [*25] be excluded from the remedy is not persuasive. Any remedy from the alleged harm would necessarily accrue to JPMC and not to a subset of stockholders. Therefore, the plaintiffs' claims are derivative under the second question of *Tooley.*

B. Section 220 Demand

Before turning to the issue of whether demand should be excused, the court notes that the plaintiffs did not make a books and records demand of JPMC before filing suit. *Section 220 of the Delaware General Corporation Law* provides that stockholders have the right to inspect a corporation's books and records for "any proper purpose." n32 Both the Delaware Supreme Court and the Court of Chancery "have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a *Section 220* books and records inspection to uncover such facts." n33

n32 *8 Del. C. § 220.*

n33 *Beam v. Stewart,* 845 A.2d 1040, 1056 (Del. 2004).

In this case, the court is once again confronted [*26] with a situation in which the plaintiffs attempt to plead demand futility, but have not sought access to the books and records of the corporation under *section 220.* Like the plaintiff in *Beam,* the plaintiffs here did not seek information from the defendant corporation that may have provided them additional facts, from which they could have fashioned a more particularized complaint. For example, if the plaintiffs had successfully sought information from JPMC, they most likely would have learned whether Harrison presented a no-premium offer to the board. Instead, the plaintiffs rely on general wording from public filings that Harrison kept the board informed.

Furthermore, the plaintiffs could have used *section 220* to learn more about the relationships between Harrison and the defendant directors. As the Delaware Supreme Court noted in *Beam,* plaintiffs who seek information under *section 220* may be able to review the minutes of board meetings and determine how the directors handled the CEO's proposals or conduct in various contexts. n34 Armed with this information, the plaintiffs may have been able to link the alleged relationships to directors' conduct through particularized [*27] facts.

n34 *Id.*

Despite the frequent admonitions of the Delaware Supreme Court and the Court of Chancery, the plaintiffs did not pursue this remedy. Although their failure to use "a books and records inspection does not change the standard to be applied to review of the complaint," n35 the court notes at the outset that the plaintiffs had the time and opportunity to file such an action. The plaintiffs did not learn of the alleged no-premium offer from the newspaper article until days before the merger closed. During the short time available before the merger, they did not seek injunctive relief that may have delayed the closing. Once the merger closed, however, the plaintiffs had ample time and opportunity to investigate the facts behind the anonymous allegations in the newspaper article through the filing of a *section 220* action. The plaintiffs did not file the amended complaint until two months after the merger closed.

n35 *Id. at 1057 n. 52.*

[*28]

C. Demand Futility

The plaintiffs argue that if their claims are derivative, demand is excused because it would be futile. Under Court of Chancery Rule 23.1, "a plaintiff shareholder [must] make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf." n36 If a plaintiff argues demand futility, the two-prong test under *Aronson* and its progeny must be met. n37 The first prong of the *Aronson* test is whether "a shareholder [has pled] *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested." n38 The second prong of the test is whether "a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment." n39 The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused." n40

n36 *Jacobs v. Yang, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at *2 (Del. Ch. Aug. 2, 2004), aff'd, 867 A.2d 902 (Del. 2005) 2005 Del. LEXIS 38.* [*29]

n37 *Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000); Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).*

n38 *Jacobs, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at *2* (emphasis in original).

n39 *Aronson, 473 A.2d at 814.*

n40 *Brehm, 746 A.2d at 256.*

1. First Prong Of *Aronson*

The plaintiffs argue that demand is excused under the first prong of the *Aronson* test because at least eight of the twelve directors on the board fail the test of being disinterested and independent. n41 Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." n42 "Independence means that a director's decision is based on the corporate merits of

the subject before the board rather than extraneous considerations or influences." n43

> n41 The plaintiffs do not challenge the independence of directors Becherer, Biggs, and Raymond. Harrison is the twelfth director and his lack of independence is not disputed in this motion to dismiss. [*30]

> n42 *Aronson, 473 A.2d at 812.*
>
> n43 *Id. at 816.*

Here, none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial benefit from it other than one that devolved on all JPMC stockholders alike. Thus, there is no issue regarding these directors' interest in the deal. Rather, the thrust of the plaintiffs' allegations is that the directors were so positioned, as a result of various business, charitable, or family relationships, that they were disabled from exercising independent judgment. The complaint alleges that, through these various relationships, the outside directors were beholden to Harrison and unable to act independently of Harrison's influence.

JPMC's board consists of twelve directors. Thus, the plaintiffs need to show that 5 directors, plus Harrison, were not independent. n44 The court's review of the complaint's well-pleaded allegations shows that, in addition to the three concededly independent directors, the plaintiffs fail to meet their burden with respect to any of the other [*31] outside directors.

> n44 *See Beam, 845 A.2d at 1046* ("Demand is excused where a board is evenly divided between interested and disinterested directors.").

Before analyzing each director individually, the court pauses to note the overall structure of the JPMC board. The board is dominated by outsiders. Eleven of the twelve directors are not employees of JPMC. Harrison cannot fire any of them. Additionally, Harrison is not a controlling stockholder of JPMC and therefore has no power to oust them as directors through a stockholder vote. On the contrary, it is the eleven outside directors who collectively have the power to dismiss Harrison and the rest of his management team.

The plaintiffs allege that the defendant directors are beholden to Harrison, but they fail to demonstrate why that is so. Even in cases in which the CEO had a supermajority of voting power, courts have upheld outside directors' independence in the face of additional relationships. n45 Here, Harrison reports to a board of directors [*32] that he cannot fire or remove, a fact that appears lost in the allegations that each director, no matter how indirectly, has some external relationship to JPMC.

> n45 *Id. at 1051* ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

The court begins its analysis by looking to defendant directors Bennack, Stafford, and Burns, whose independence is questioned by the plaintiffs due to certain financial ties to JPMC. These three directors are, or were, intimately involved with several of America's largest corporations. All three directors have substantial personal wealth invested in their related companies, each of which conducts business with JPMC.

JPMC is a national commercial and investment bank. That it provided financing [*33] to large American companies should come as no shock to anyone. Yet this is all that the plaintiffs allege. What the plaintiffs fail to allege are facts showing a connection between the financing and these three defendant directors. Instead, the plaintiffs attempt to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares n46 and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank. The allegations raised against all three of these directors are simply not enough, without more, to raise a substantial question about their independence.

> n46 Facts about the stock ownership of Bennack, Stafford, and Burns are contained in the plaintiffs' answering brief. *See supra* note 9.

The plaintiffs also challenge the independence of Bechtel based on his business relationships. The complaint alleges facts that indicate Bechtel's business [*34] ties to JPMC are more direct and more substantial than those of Bennack, Stafford, and Burns, but the complaint again fails to show how such facts impinge on Bechtel's ability to act independently of Harrison. Although Bechtel's company has received over $ 2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison. Therefore, the complaint fails to adequately challenge Bechtel's independence.

The court next turns to Futter, whose independence is challenged because she is President and trustee of The American Museum of Natural History. n47 The plaintiffs make much of the fact that JPMC contributes to the museum. But the plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter. Indeed, the plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by JPMC. The plaintiffs state that JPMC is a significant benefactor, but they never state how JPMC's contributions could, or [*35] did, affect the decision-making process of the president of one of the largest museums in the nation. Therefore, as alleged, the complaint does not demonstrate that Futter is not independent.

n47 Futter is also challenged due her brother-in-law's employment with JPMC. This employment, however, was terminated before the JPMC board voted on the merger, so the court will not consider this allegation. See Grobow, 539 A.2d at 187 ("A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").

The plaintiffs make the same conclusory argument about Kaplan as they do about Futter. The only allegation against Kaplan is her relationship to The American Museum of Natural History. Again, the plaintiffs fail to connect JPMC's contributions to the potential lack of independence of a JPMC director. n48 They simply aver that Kaplan was a trustee of an institution that received contributions from JPMC. Therefore, [*36] as pled, the complaint does not raise a substantial question about Kaplan's independence.

n48 Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence. See, e.g., In re Oracle Corp. Derivative Litig., 824 A.2d 917 (Del. Ch. 2003); In re The Limited, Inc. S'holders Litig., 2002 Del. Ch. LEXIS 28, 2002 WL 537692 (Del. Ch. Mar. 27, 2002); Lewis v. Fuqua, 502 A.2d 962 (Del. Ch. 1985). But in those cases, the complaints had many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors. In Oracle, two special litigation committee members, both professors at Stanford, were asked to investigate other Oracle board members who had the following substantial ties to Stanford: (i) one of the other directors was a professor at Stanford who had taught one of the special litigation committee members; (ii) another director was "a Stanford alumnus who [had] directed millions of dollars of contributions to Stanford during recent years;" and (iii) "Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle,      was considering making donations of his $ 100 million house and $ 170 million for a scholarship program." Oracle, 824 A.2d at 920-21. In The Limited, the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $ 25 million donation to the university. The Limited, Inc. S'holders Litig., 2002 Del. Ch. LEXIS 28, 2002 WL 537692 at *6-7. In Fuqua, the court found that the sole member of the special litigation committee was not independent because he was President of Duke University, which had recently received a $ 10 million pledge from the company, and the CEO was a trustee of Duke. Fuqua, 502 A.2d at 966-67. Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University. Moreover, Oracle and Fuqua were cases in which the court made searching inquiries into the nature of a special litigation committee member's independence. Beam, 845

2005 Del. Ch. LEXIS 51, *

*A 2d at 1055* (discussing the special litigation committee's burden of establishing its own independence). Finally, as noted above, the plaintiffs here did not make a *section 220* books and records demand. If they had, they would have been able to investigate the decision-making process behind the qualification of the directors as independent under the NYSE Corporate Governance rules. Instead, they rely on conclusory allegations that do not create a reasonable doubt about Futter's or Kaplan's independence based on the charitable ties to The American Museum of Natural History.

[*37]

Next in the analysis is Bossidy, whose independence is challenged because his son is employed by JPMC. Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management. For example, the NYSE rules governing director independence focus on this subject, holding that employment of a child as an executive officer of the corporation may disqualify an outside director from serving as a disinterested member of the board. n49 Delaware courts also recognize that familial ties to management can disqualify one from functioning disinterestedly. n50 In this case, however, Bossidy's son is not an executive officer of JPMC, and the complaint does not allege that Bossidy and his son live in the same household. Under NYSE Corporate Governance rules, Bossidy was found to meet the criteria for certification as an outside, independent director. Moreover, the fact that Bossidy's son is employed by JPMC is duly disclosed in JPMC's proxy materials. For these reasons, the plaintiffs' attack on Bossidy's independence must fail.

        n49 NYSE Corporate Governance Rule 303A.02(b)(i) ("In addition, a director is not independent if ... the director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company."). [*38]

        n50 *Grimes v. Donald, 673 A.2d 1207, 1216 (Del. 1996)* (finding that familial interest is a basis for demand excusal).

Finally, the court turns to Gray, who is challenged due to his charitable ties with Harrison. At first glance, the reciprocal relationship between JPMC and UNCF, as evidenced by the positions held by Gray and Harrison, could call into question the independence of Gray. However, upon closer examination, the court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray. Nowhere in the complaint do the plaintiffs aver that Harrison was treasurer of UNCF during the merger negotiations or the board vote. Indeed, this uncertainty about Harrison's involvement with UNCF at the relevant time is noted by the plaintiffs in their answering brief, which states that Harrison's relationship to UNCF is not disclosed in the joint proxy statement. Furthermore, just as they fail to indicate the importance of JPMC's contributions to The American Museum of Natural History, the plaintiffs fail to indicate [*39] how JPMC's contributions would affect UNCF and therefore influence Gray. The plaintiffs provide only the dollar value, not the representative percentage, of JPMC's contributions to UNCF. Thus, the plaintiffs' allegations do not successfully challenge Gray's independence.

In addition to the three concededly independent directors, the court finds that the other eight outside directors are also independent. Therefore, the plaintiffs will be unable to prove that a majority of the board of JPMC was either interested or not independent under the first prong of *Aronson*.

2. Second Prong Of Aronson

The plaintiffs argue that demand is also excused under the second prong of the *Aronson* test. In order to succeed in their argument, the "plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule." n51 Specifically, the "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." n52

        n51 *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)* (citing *Aronson, 473 A.2d at 814-15).* [*40]

        n52 *Walt Disney, 825 A.2d at 286.*

Nothing in the complaint indicates that the JPMC board was not adequately informed about the negotiations with Bank One. Indeed, the plaintiffs note that the proxy materials stated Harrison kept the board informed of the negotiations. Yet this fact presents a paradox for the plaintiffs. They need to allege that Harrison informed the board in order to list the other directors as defendants, but they would rather label those same directors as "uninformed" in order to succeed on the second prong of *Aronson*. The complaint fails, however, to allege facts that would indicate that the board was presented with the decision, but was not provided with information from which it could make a proper decision.

With regard to the honesty and good faith of the board, the plaintiffs do not allege any facts that directly call into question the acts of the directors. The plaintiffs' allegations concern only the directors' relationships to Harrison. Nowhere in the complaint do the plaintiffs allege that any individual defendant director personally acted without [*41] honesty and good faith. The only allegation in the complaint is that somehow, due to their financial, charitable, or personal relationship to Harrison, the individual director defendants were beholden to Harrison, allegations that have already been found to be insufficient.

Due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information, the court finds that the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule.

The plaintiffs are unable to meet either prong of the *Aronson* test. They have failed to show that a majority of the board is either interested or not independent. They have also not shown why the board's decision is not protected by the business judgment rule. Thus, the plaintiffs' derivative claim must be dismissed because demand is not excused.

C. Proxy Disclosure

Finally, the court turns to the plaintiffs' claim that the defendants breached their fiduciary duty by publishing materially inaccurate or incomplete disclosures regarding [*42] the proxy statement. The plaintiffs claim that the purported class was harmed because the proxy did not include information about the alleged offer from Dimon to Harrison. Notably, however, the complaint does not claim that the merger

itself harmed either JPMC or the class. The harm alleged is the lost opportunity to vote for and approve a better deal, *i.e.* the Dimon offer that was rejected during negotiations and never approved by either board of directors. For this alleged harm, the complaint seeks money damages.

The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim. This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.

The disclosure claim alleged by the plaintiffs, like the disclosure claims in *In re Triarc Cos. Class & Derivative Litig.*, if proven, could have supported a claim for equitable relief. n53 In this case, the plaintiffs did not seek an injunction to stop the merger before it closed. The time period between the publication [*43] of the article in *The New York Times* and the consummation of the merger was quite short. Nevertheless, the plaintiffs had time to seek a temporary restraining order to preserve the *status quo*, and, had they done so, could have secured the ability to obtain further equitable remedies, such as an order requiring that JPMC amend its proxy statement and resolicit the stockholders for another vote. The plaintiffs also did not act promptly to preserve any other claimed equitable remedies, such as rescission. Now, of course, the "eggs" have been irretrievably "scrambled" and there is no possibility of effective equitable relief.

> n53 *791 A.2d 872, 876 (Del. Ch. 2001)*. As this court stated in *Triarc*, "*Loudon* recognized a much broader category of cases in which a violation of the duty of disclosure will ordinarily support only a claim for equitable or injunctive relief." *Id.*

Because equitable relief is no longer practicable, the plaintiffs present their disclosure claim as one seeking money [*44] damages. There are several problems with this approach. In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages. n54 But, for the reasons already discussed, the court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the

class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same directors ever be liable to pay actual compensatory damages to both the corporation and the class for the same injury? The answer, as *Loudon* implicitly recognizes, is that they could not. n55 While the disclosure claim might have given rise to an entitlement to equitable relief that could have been pursued by the stockholders individually or as a class action, the disclosure claim simply does not give rise to a claim for substantial, compensatory damages in this situation. Instead, the claim for actual damages, if there is one, belongs to the corporation [*45] and can only be pursued by the corporation, directly or derivatively.

n54 *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 919 (Del. Ch. 1999)

n55 *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997).

As in *Loudon*, the plaintiffs try to rely on *Tri-Star* n56 for the rule that there is a "per se rule of damages for breach of the fiduciary duty of disclosure." n57 This is no longer an accurate statement of Delaware law. *Loudon* limited *Tri-Star* to its facts, holding that *"Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." n58 For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the [*46] plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent. n59

n56 *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319 (Del. 1993)

n57 *Loudon*, 700 A.2d at 141.

n58 *Id.* at 142 (describing *Tri-Star's* per se

discussion as dictum). *See also Triarc*, 791 A.2d at 877 (*"Tri-Star* was narrowly limited to its facts in *Loudon v. Archer-Daniels-Midland Co.*") However, at least one subsequent case states that *Malone* "constitute[s] a retreat to *Tri-Star's* per se rule of damages for all violations of the fiduciary duty of disclosure." *O'Reilly*, 745 A.2d at 918 (discussing *Malone v. Brincat*, 722 A.2d 5 (Del. 1998)). This court does not agree. The *Malone* court was presented with the issue of disclosure in the context of public documents filed as a matter of course with the SEC, not proxy statements soliciting stockholder votes. *Malone*, 722 A.2d at 8. Thus, *Malone's* discussion of the duty of disclosure as it relates to solicitation of stockholder votes is dictum and not controlling. [*47]

n59 *634 A.2d at 332* ("The power of *Tri-Star's* minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.").

For these reasons, the court concludes that the complaint does not state a cognizable disclosure claim. The issues about the adequacy of the proxy statement disclosure would be of continuing relevance to the underlying derivative claim. For example, the quality of those disclosures is relevant to any potential defense based on a theory of stockholder ratification. n60 Nevertheless, there is no possibility of recovery of either nominal or substantial damages by the class on this complaint. n61

n60 *See Yiannatsis v. Stephanis*, 653 A.2d 275, 280 (Del. 1995) ("Ratification can occur only if the stockholders are fully informed of the consequences of their vote.").

n61 The court also notes with interest a recent decision of the United States Supreme Court holding that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo*, 161 L.Ed.2d 577, 125 S.Ct. 1627, 1629 (2005). Thus, the Court affirmed the dismissal, on a Rule 12(b)(6) motion, of a claim that failed to allege facts showing that the misleading disclosures had actually caused loss to the plaintiff beyond the

2005 Del. Ch. LEXIS 51, *

simple assertion that the plaintiff's purchase price was inflated by the defendants' misconduct. In its unanimous opinion, the Court recognized that judicially implied rights of action under the federal securities laws are based on the common law of deceit or misrepresentation, which recognizes that a "plaintiff must have suffered substantial damage,' not simply nominal damages, before the cause of action can arise.'"

*Id.* at 1632 (quoting, in part, W. KEETON ET AL., PROSSER AND KEETON ON LAW OF TORTS § 110, at 765 (5th ed. 1984))

[*48]

**IV.**

For the foregoing reasons, the motion to dismiss is GRANTED. IT IS SO ORDERED.

2004 U.S. Dist. LEXIS 1825, *

LEXSEE 2004 US DIST LEXIS 1825

**THE WINER FAMILY TRUST v. MICHAEL QUEEN, et al.**

**CIVIL ACTION NO. 03-4318**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 1825*

**February 6, 2004, Filed**

**SUBSEQUENT HISTORY:** Dismissed by, in part *Winer Family Trust v. Queen, 2004 U.S. Dist. LEXIS 19244 (E.D. Pa., Sept. 27, 2004)*

**DISPOSITION:** Plaintiff's motion to confirm right to proceed with discovery related to breach of fiduciary duty claim and for relief from stay of discovery related to federal securities claims granted in part and denied in part. Plaintiff's request for relief from stay of discovery to pursue discovery from Robert McClain granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For SMITHFIELD FOODS, INC., Defendant: ALAN K. COTLER, ROBERT A. NICHOLAS, MILIND M. SHAH, REED SMITH LLP, PHILADELPHIA, PA. EDWARD J. FUHR, TERENCE J. RASMUSSEN, HUNTON & WILLIAMS, LLP, RICHMOND, VA. For DENNIS BLAND, Defendant: ERIC F. SPADE, FREY PETRAKIS DEEB BLUM BRIGGS & MITTS, P.C., PHILADELPHIA, PA

For THE WINER FAMILY TRUST, Plaintiff: STEVEN A. SCHWARTZ, CHIMICLES & TIKELLIS LLP, HAVERFORD, PA

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

**MEMORANDUM**

Padova, J.

Presently before the Court in this securities fraud class action is The Winer Family Trust's "Motion to Confirm Right to Proceed with Discovery Related to Breach of Fiduciary Duty Claim and for Relief from Stay of Discovery Related to Federal Securities Claims." For the reasons that follow, the Court grants the Motion in part and denies the Motion in part.

**I. BACKGROUND**

On July 24, 2003, The Winer Family Trust (hereinafter "Lead Plaintiff") filed a putative Class Action Complaint on behalf of public investors who purchased the securities of Pennexx Foods, Inc. ("Pennexx") during the period from February 8, 2002 until June 12, 2003. The Class Action Complaint alleged violations [*2] of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and Rule 10b-5 promulgated thereunder, see *17 C.F.R. § 240.10b-5*, as well as a breach of fiduciary duty claim, against Pennexx, Smithfield Foods, Inc. ("Smithfield"), and various officers and directors of those corporations. n1 On December 5, 2003, Pennexx filed a Cross-Claim against Defendants Smithfield, Joseph W. Luter IV, and Michael H. Cole, alleging a number of state law claims. On December 22, 2003, Lead Plaintiff filed an Amended Class Action Complaint that reiterated the federal securities claims, and also asserted, on behalf of public investors who currently own Pennexx securities, state law claims for breach of fiduciary duty against Defendant Michael Queen, breach of fiduciary duty against Smithfield, aiding and abetting the breach of

2004 U.S. Dist. LEXIS 1825, *

fiduciary duty against Defendants Joseph W. Luter IV and Michael H. Cole, and successor liability against Smithfield and Showcase Foods, Inc ("Showcase") On December 30, 2003, Lead Plaintiff filed the instant Motion, [*3] to which Smithfield, Showcase, Joseph W. Luter IV, and Michael H Cole (collectively "the Smithfield Defendants") filed a timely response Pennexx, Michael Queen, Dennis Bland, and Thomas McGreal (collectively "the Pennexx Defendants") have not timely responded to the instant Motion n2 Subsequent to the filing of the instant Motion, the Pennexx Defendants and the Smithfield Defendants each filed Motions to Dismiss the Amended Complaint, the response to which is due by February 20, 2004

> n1 The individual Defendants include Joseph W. Luter IV, executive Vice President of Smithfield and Pennexx director; Michael H. Cole, associate general counsel of Smithfield and Pennexx director; Michael Queen, Chief Executive Officer of Pennexx; Dennis Bland, Chief Operating Officer of Pennexx; and Thomas McGreal, Vice President of Sales for Pennexx

> n2 With respect to the Pennexx Defendants, the Court declines to grant the instant Motion as uncontested pursuant to Local Rule of Civil Procedure 7 1(c).

## II. LEGAL STANDARD [*4]

The PSLRA provides that "in any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." *15 U.S.C. § 78u-4(b)(3)(B).* The automatic stay of discovery proceedings reflects the PSLRA's general purpose of restricting abuses in securities class action litigation, including the abuse of the discovery process to coerce settlement. *In re Advanta Corp. Securities Litigation, 180 F.3d 525, 531 (3d Cir. 1999)*(citing H.R. Conf. Rep. No. 104-369, at 28 (1995)); see also *Novak v. Kasaks, 216 F.3d 300, 304 (2d Cir. 2000)*(observing that PSLRA is intended "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries") Because the PSLRA's automatic stay of discovery provision contemplates that "discovery should be permitted in

securities class actions only after the court has sustained the legal sufficiency [*5] of the complaint," only "exceptional circumstances" will justify relief from the stay prior to a ruling on the motion to dismiss *SG Cowen Sec. Corp. v. U.S. 4 Dist. Ct. for N. Dist. of Cal., 189 F.3d 909, 912-13 (9th Cir. 1999)*(quoting S. Rep No. 104-98, at 14 (1995))

Such extraordinary circumstances are established only where discovery is necessary either "to preserve evidence or to prevent undue prejudice to [the moving] party." *15 U.S.C. § 78u-4(b)(3) (B).* A party alleging that discovery is necessary to preserve evidence is required to make a specific showing that "the loss of evidence is imminent as opposed to merely speculative." *In re CFS-Related Secs. Fraud Litig. (AUSA, 179 F. Supp. 2d 1260, 1265 (N.D. Okla. 2001).* A party alleging that discovery is necessary to prevent undue prejudice must specifically identify "improper or unfair treatment amounting to something less than irreparable harm." *Sarantakis v. Gruttadauria, 2002 U.S. Dist. LEXIS 14349, Civ. A. No. 02-1609, 2002 WL 1803750, at *2 (N.D. Ill. Aug. 5, 2002)*(citations omitted); see also *In re CFS-Related Secs. Fraud Litig., 179 F. Supp. 2d at 1265* ("Undue [*6] prejudice is prejudice that is improper or unfair under the circumstances.")

Even where a movant demonstrates that discovery is necessary to either preserve evidence or prevent undue prejudice, the court should refrain from lifting the PSLRA stay unless the movant has made "particularized" requests for discovery *15 U.S.C. § 78u-4(b)(3)(B).* Thus, the movant must "adequately specify the target of the requested discovery and the types of information needed" to relieve the extraordinary circumstances. *In re Lernout & Hauspie Sec. Litig., 214 F. Supp. 2d 100, 108 (D. Mass. 2002).*

## III. DISCUSSION

A. Discovery for Breach of Fiduciary Duty Claims

Despite the express applicability of the PSLRA's automatic stay provision to "all discovery," Lead Plaintiff argues that this Court should allow discovery to proceed on the state common law breach of fiduciary duty claims, which are set forth in counts III-V of the Amended Complaint. In support of this argument, Lead Plaintiff cites *Tobias Holdings, Inc. v. Bank United Corp., 177 F. Supp. 2d 162 (S.D.N.Y. 2001)*, wherein the court held that the PSLRA does not stay discovery [*7] with respect to a plaintiff's non-fraud state law claims where such claims are separate and distinct from the federal securities claims alleged in the complaint and where the court has an independent basis for

jurisdiction over the non-fraud state law claims. *Id. at 168-69*.

In contrast to the scenario presented in *Tobias Holdings*, this Court does not have an independent basis for jurisdiction over Lead Plaintiff's breach of fiduciary duty claims. Indeed, the lone basis for jurisdiction identified in Plaintiff's Amended Complaint is supplemental jurisdiction. (See Am. Compl. P 11.) As the United States Court of Appeals for the Ninth Circuit has recognized, "Congress' attempt to address [concerns of discovery abuse] would be rendered meaningless if securities plaintiffs could circumvent the stay simply by asserting pendent state law claims in federal court in conjunction with their federal law claims." *SG Cowen Sec. Corp., 189 F.3d at 913 n.1 (9th Cir. 1999)*(emphasis added). For this reason, numerous courts have held that the PSLRA stay on discovery is applicable to pendent state law claims. See, e.g., *Sarantakis, 2002 U.S. Dist. LEXIS 14349, 2002 WL 1803750, at *4 [*8]* (holding that Tobias Holdings was inapposite because plaintiff did not plead diversity jurisdiction); *In re CFS-Related Secs. Fraud Litig., 179 F. Supp. 2d at 1267* (holding that PSLRA stay provision applied to plaintiffs' state law claims in part because plaintiffs have "not demonstrated that they have an independent jurisdictional basis for their state law claims").

Lead Plaintiff attempts to distinguish these cases by asserting that supplemental jurisdiction over its breach of fiduciary duty claims is predicated on Pennexx's Cross-Claim, rather than on the federal securities claims alleged in the Amended Complaint. See (Pl. Reply Mem. at 2-3.) Lead Plaintiff maintains that since Pennexx has an independent basis of jurisdiction with respect to its Cross-Claim, i.e., diversity jurisdiction, this Court may properly exercise jurisdiction over the breach of fiduciary duty claims, which are related to the same set of facts as Pennexx's claims. In essence, Lead Plaintiff appears to argue that allowing discovery on state law claims where supplemental jurisdiction is predicated on a defendant's cross-claim is less offensive to the PSLRA's general purpose of [*9] restricting abuses in securities class action litigation, as the defendant has "opened the door" for such discovery by filing the cross-claim.

This Court concludes, however, that Congress's attempt to address concerns of discovery abuse would also be rendered meaningless if securities plaintiffs could circumvent the PSLRA stay (and relevant case law) simply by asserting pendent state law claims in conjunction with a defendant's cross-claim. Indeed,

regardless of whether supplemental jurisdiction is based on Lead Plaintiff's federal securities claims or Pennexx's Cross-Claim, any discovery sought on the breach of fiduciary duty claims will very likely be relevant to the federal securities claims, as each set of claims is necessarily based on a "common nucleus of operative fact." See *De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 308 (3d Cir. 2003)*(noting that federal courts may exercise supplemental jurisdiction where state law claims share a "common nucleus of operative fact" with claims that support the court's original jurisdiction)(quoting *United Mine Workers v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)); Ambromovage v. United Mine Workers of America, 726 F.2d 972, 990 (3d Cir. 1984)* [*10] (holding that any claim satisfying *Federal Rule of Civil Procedure 13*'s "transaction or occurrence" test necessarily satisfies the supplemental jurisdiction requirements of *28 U.S.C. § 1367(a)*) n3 Accordingly, the Court declines to allow discovery to proceed on this ground.

> n3 Notably, while Lead Plaintiff stresses that its breach of fiduciary duty claims are separate and distinct from its federal securities claims, it has made no showing that the discovery it seeks on each set of claims would be separate and distinct. See *Benbow v. Aspen Tech., Inc., 2003 U.S. Dist. LEXIS 6568, Civ. A. No. 02-2881, 2003 WL 1873910, at *4 (E.D. La. Apr. 11, 2003)*(staying discovery on state law claims in part because plaintiff's discovery requests "constitute[] general discovery addressing all of the plaintiffs' claims against [Defendant] (i.e., state and federal claims)"); *Angell Investments, LLC v. Purizer Corp., 2001 U.S. Dist. LEXIS 17782, Civ. A. No. 01-6359, 2001 WL 1345996, at *1 (N.D. Ill. Oct. 31, 2001)*(staying discovery on state law claim where the discovery sought on state claim "would be precisely the same as what plaintiffs would seek on the securities violation claims absent the discovery stay").

[*11]

Lead Plaintiff also contends that the PSLRA stay of discovery is inapplicable to its breach of fiduciary duty claims because it would otherwise be penalized for asserting these claims in federal court. Lead Plaintiff's contentions are misplaced, however, as the PSLRA expressly authorizes federal courts to stay discovery proceedings in a state court action. See *15 U.S.C. § 78u-*

*4(b)(2)(D)*("Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph"); see also *Benbow, 2003 U.S. Dist. LEXIS 6568, 2003 WL 1873910, at *3* (noting that "Congress enacted [the PSLRA stay of state court discovery provision] as a tool to be used as necessary to stay proceedings/discovery in state court used to circumvent the automatic stay provisions of the PSLRA")(emphasis in original); *In re Trump Hotel Shareholder Derivative Litig., 1997 U.S. Dist. LEXIS 11353, Civ. A. No. 96-7820, 1997 WL 442135 (S.D.N.Y. Aug. 5, 1997)*(rejecting argument that application of PLSRA stay would penalize plaintiffs for alleging [*12] a federal securities claim in conjunction with their state law claims as "having chosen to invoke *Section 14 of the Exchange Act*, plaintiffs are necessarily subject to the PSLRA"). Accordingly, the Court declines to allow discovery to proceed on this ground.

The Court concludes, therefore, that the PSLRA stay of "all discovery" encompasses the breach of fiduciary duty claims set forth in the Amended Complaint. See *Fazio v. Lehman Brothers, Inc., 2002 U.S. Dist. LEXIS 15157, Civ. A. Nos. 02-157, 02-370, 02-382, 2002 WL 32121836, at *2 (N.D. Ohio May 16, 2002)*(observing that "the reference in the [PSLRA] statute to a stay of 'all discovery' is to be interpreted broadly.") Accordingly, whether Lead Plaintiff can obtain particularized discovery on its breach of fiduciary duty claims, as well as its federal securities claims, will depend on whether a showing of sufficiently extraordinary circumstances has been made under the PSLRA.

B. Relief from PSLRA Stay of Discovery

1. Preservation of evidence

Lead Plaintiff asserts that discovery is necessary to preserve evidence because there exists a significant risk of spoliation of relevant documents and materials. Specifically, Lead Plaintiff [*13] contends that Pennexx's business records could potentially be lost or destroyed because Pennexx, which has ceased to function as an operational entity, no longer has possession of its own documents. Lead Plaintiff's spoliation concerns are also founded on allegations in Pennexx's Cross-Claim that Defendants Luter IV and Cole ordered Smithfield lawyers to conceal statements that they had made during the September 2002 Pennexx Board of Directors meeting which revealed their potentially conflicting loyalties between Smithfield and

Pennexx. (Pennexx Cross-Claim P 204-208, 216, 219.) Lead Plaintiff also notes that, in a separate action involving Smithfield and Pennexx, Smithfield's counsel wrote a letter to the court advising that a Pennexx employee had warned Smithfield, against the instructions of his superiors, that Smithfield should send its auditors to Pennexx's plant "because of what was happening there." (Am. Comp. P 141; Pl. Mem. Ex. D P 15.)

In response, the Smithfield Defendants argue that the letter referenced by Lead Plaintiff provides no clear indication that Pennexx was destroying or altering documents. Even if Pennexx was previously destroying or altering documents, the [*14] Smithfield Defendants note that Pennexx is no longer in control of its documents, as Smithfield took over Pennexx's operations several months ago. Furthermore, the Smithfield Defendants deny the allegations in the Cross-Claim that the minutes from the September 2002 Pennexx Board of Directors meeting was fraudulently edited.

The Court concludes that the incidents cited by Lead Plaintiff fail to specifically show that "the loss of evidence is imminent as opposed to merely speculative." *In re CFS-Related Secs. Fraud Litig., 179 F. Supp. 2d at 1265*; see also *In re Fluor Corp. Secs. Litig., 1999 U.S. Dist. LEXIS 22128, Civ. A. No. 97-734, 2001 WL 817206, at *3 (C.D. Cal. Jan. 15, 1999)*(holding that generalized "allegations of possible loss or destruction" are insufficient)(emphasis added). In any event, Lead Plaintiff's concerns about the potential spoliation of relevant evidence are adequately addressed by the Stipulated Order that the Court has entered in this case, which expressly provides that all parties shall "take reasonable steps, during the pendency of this litigation, or until the further order of this Court, to preserve all documents, data compilations (including electronically [*15] recorded or stored data) and tangible objects within their possession, custody, or control, containing information that is relevant to the allegations and defenses in this litigation or may lead to the discovery of admissible evidence." (11/17/03 Order); see also *In re CFS-Related Secs. Fraud Litig., 179 F. Supp. 2d at 1264* (denying plaintiff's request for immediate discovery in part because the court had already entered two document preservation orders in the case). In addition, the PSLRA itself mandates the preservation of evidence during the pendency of a stay of discovery and permits courts to impose sanctions on willful violators. See *15 U.S.C. § 78u-4(b)(3)(C)*. Finally, the Court notes that the Smithfield Defendants have specifically represented that they will preserve all relevant

documents and materials in their possession. See (Smithfield Brf at 10); see also *In re AOL Time Warner, Inc. Sec & "ERISA" Litig., 2003 U S Dist LEXIS 12846, Civ. A. No. 02-5575, 2003 WL 21729842, at *2 (S D N Y July 25, 2003)*(denying discovery request where Defendants "assured the Court that they will uphold their obligation under the PSLRA to preserve evidence"); [*16] *Sarantakis, 2002 U S Dist LEXIS 14349, 2002 WL 1803750, at *3* (holding that "lifting the stay is not necessary to preserve evidence when, as in this case, the party from whom discovery has sought has represented to the court that it will maintain the evidence at issue"); *In re Carnegie Intl Corp Secs Litig., 107 F Supp 2d 676, 684 (D Md 2000)*(same). Accordingly, the Court declines to grant Lead Plaintiff relief from the PSLRA stay of discovery on this ground.

Lead Plaintiff next asserts that discovery is necessary to preserve evidence from two critical witnesses. Specifically, Lead Plaintiff maintains that Joseph W Luter III, who serves as Chairman and Chief Executive Officer of Smithfield, and Robert McClain, who was employed by Smithfield as an engineer during the time period relevant to the allegations in the Amended Complaint, are experiencing serious health problems.

In response, the Smithfield Defendants insist that Mr Luter III does not have any significant health problems that would necessitate the preservation of his testimony. The Court accepts this representation by the Smithfield Defendants, as Lead Plaintiff has offered no evidence to the contrary. Indeed, [*17] the Lead Plaintiff merely cites a letter sent by its counsel to the Smithfield Defendants' counsel inquiring "about whether expedited discovery is necessary because of health concerns regarding Joseph W Luter III." (Pl Mem Ex A.) Notably, counsel for the Smithfield Defendants' responded in kind to this inquiry by advising that "we know of no reason for expedited discovery because of health concerns regarding Joseph W Luter III." (Pl Mem Ex B.) Accordingly, the Court declines to grant Lead Plaintiff relief from the PSLRA stay of discovery on this ground.

The Smithfield Defendants do admit, however, that Mr McClain has been diagnosed with Stage IV brain cancer, for which he has recently undergone chemotherapy, radiation, and intensive speech and physical therapy. The Smithfield Defendants further allege that Mr McClain cannot be deposed in the foreseeable future because of his diminished physical and mental capacities. Nevertheless, the fact remains that Lead Plaintiff has a right to preserve evidence and may well be unduly prejudiced should Mr McClain pass away during the pendency of the stay of discovery. Significantly, "the sole example proffered by Congress as to what [*18] justifies lifting the stay is 'the terminal illness of an important witness,' which might 'necessitate the deposition of the witness prior to ruling on the motion to dismiss.'" *Faulkner v Verizon Communications, Inc., 156 F Supp 2d 384, 402 (S D N Y 2001)*(citation to Senate Report omitted). As the Smithfield Defendants do not dispute the seriousness of Mr McClain's illness nor his importance to Lead Plaintiff's case, the Court concludes that Lead Plaintiff is entitled to relief from the PSLRA stay for the narrow purpose of pursuing discovery from Mr McClain. Given Mr McClain's alleged incapacity, however, the Court will require the parties to file motions or other appropriate submissions concerning the scope, terms, and conditions of any such discovery.

2. Undue prejudice

Lead Plaintiff argues that it will suffer undue prejudice if Defendants are permitted to seek discovery from each other in connection with Pennexx's Cross-Claim, especially should Defendants attempt to reach a settlement that would inure to their benefit and to the detriment of either of the two proposed plaintiff classes. Lead Plaintiff notes that Pennexx recently filed a "Motion for [*19] Discovery and Evidentiary Hearing" in a separate action in this District involving Pennexx and Smithfield (civil action number 03-3155), and served a broad set of interrogatories and document requests on Smithfield. See (Pl. Reply Mem. Ex. 1). Lead Plaintiff maintains that these broad requests cover most of the issues relevant to its claims. Moreover, Lead Plaintiff notes that Pennexx's motion makes clear Pennexx's intent to pursue such discovery in the instant case if discovery does not proceed in the civil action number 03-3155.

The Court notes that no discovery has yet taken place between Pennexx and Smithfield in civil action number 03-3155, as Pennexx's discovery motion is still pending. Furthermore, the Smithfield Defendants have refused to consent to a request by Pennexx for discovery relating to the Cross-Claim in the instant action, see Pl. Mem. Ex. B, and Pennexx has not yet filed any discovery motions with this Court. Thus, Lead Plaintiff's concerns about Defendants obtaining discovery from each other on the Cross-Claim in the instant action, or in civil action number 03-3155, are merely speculative and do not demonstrate undue prejudice. Moreover, even if Lead [*20] Plaintiff could make a sufficient

2004 U.S. Dist. LEXIS 1825, *

showing of undue prejudice, it has failed to satisfy the "particularized discovery" requirement of the PSLRA. Lead Plaintiff maintains that this Court should permit discovery to proceed "without limitation." (Pl. Reply Mem. at 3.) Although the PSLRA's requirement of particularized discovery is "a nebulous one," *Mishkin v. Ageloff, 220 B.R. 784, 793 (S.D.N.Y. 1998)*, courts have made clear that "general requests to open all discovery do not satisfy this burden." *Sarantakis, 2002 U.S. Dist. LEXIS 14349, 2002 WL 1803750, at \*2*; see also *Faulkner, 156 F. Supp. 2d at 404* (finding that plaintiffs request of "all documents, testimony and transcripts that have been previously been produced or will be produced in the future" not sufficiently particularized); *In re Carnegie Intern. Corp. Secs. Litig., 107 F. Supp. 2d at 684* (declining to grant relief from stay where discovery requests covered "virtually every piece of paper and every piece of information" in opposing party's possession); *Mishkin, 220 B.R. at 793* (denying request to lift stay where "the items of discovery sought by the [plaintiff] encompass [\*21] an open-ended boundless universe of discovery" and "is basically a request to continue any and all discovery that may arise") Accordingly, the Court declines to grant Lead Plaintiff relief from the stay of discovery on this ground.

## IV. CONCLUSION

For the foregoing reasons, Lead Plaintiff's Motion to Confirm Right to Proceed with Discovery Related to Breach of Fiduciary Duty Claim and for Relief from Stay of Discovery Related to Federal Securities Claims is granted in part and denied in part. An appropriate Order follows.

## ORDER

**AND NOW,** this day of February, 2004, upon consideration of Lead Plaintiff Winer Family Trust's Motion to Confirm Right to Proceed with Discovery Related to Breach of Fiduciary Duty Claim and for Relief from Stay of Discovery Related to Federal Securities Claims (Doc. No. 30), the Smithfield Defendants' Response thereto (Doc. No. 31), and all attendant and responsive briefing, **IT IS HEREBY ORDERED** that said Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Lead Plaintiff's request for relief from the stay of discovery to pursue discovery from Robert McClain is hereby **GRANTED.** The parties [\*22] shall file motions or other appropriate submissions as to the scope, terms, and conditions of any such discovery within seven (7) days of the date of this Order.

2. Lead Plaintiff's Motion is hereby **DENIED** in all other respects.

BY THE COURT:

John R. Padova, J.

# Tab B

## to

# Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    SAMUEL I. HYLAND,                  :        CIVIL ACTION
      Individually and On Behalf         :
 5    Of Others Similarly Situated,      :
                                         :
 6                  Plaintiff            :
                                         :
 7              vs.                      :
                                         :
 8    WILLIAM B. HARRISON, JR., HANS     :
      W. BECHERER, RILEY P. BECHTEL,     :
 9    FRANK A. BENNACK, JR., JOHN H.     :
      BIGGS, LAWRENCE A. BOSSIDY,        :
10    M. ANTHONY BURNS, ELLEN V.         :
      FUTTER, WILLIAM H. GRAY, III,      :
11    HELENE L. KAPLAN, LEE R.           :
      RAYMOND, JOHN R. STAFFORD,         :
12    J. P. MORGAN CHASE & CO. and       :
      JAMES DIMON,                       :
13                                       :
                  Defendants            :        NO. 05-162 (JJF)
14
                              -  -  -
15
                                   Wilmington, Delaware
16                                 Monday, April 18, 2005
                                   12:05 o'clock, p.m.
17
                              -  -  -
18
      BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.
19
                              -  -  -
20
      APPEARANCES:
21
                  JOSEPH N. GIELATA, ESQ.
22
                        Counsel for Plaintiff
23

24                                 Valerie J. Gunning
                                   Official Court Reporter
25
```

```
 1   APPEARANCES (Continued):

 2
               RICHARDS, LAYTON & FINGER
 3             BY:  MICHAEL R. ROBINSON, ESQ.

 4
                         -and-
 5

 6             SULLIVAN & CROMWELL LLP
               BY:  MICHAEL A. COOPER, ESQ.
 7                (New York, New York)

 8                     Counsel for Individual Defendants,
                      Other Than Riley Bechtel
 9

10                       -and-

11
               J. P. MORGAN CHASE
12             BY:  NANCY E. SCHWARZKOPF, ESQ.
                  (New York, New York)
13
                      Counsel for Defendant J. P. Morgan
14                    Chase & Co.

15                       - - -

16

17

18

19

20

21

22

23

24

25
```

1

2                        P R O C E E D I N G S

3

4              (Proceedings commenced in the courtroom,

5       beginning at 12:05 p.m.)

6

7              THE COURT:  Be seated, please.  And good

8       afternoon.

9              Okay.  We're here on the plaintiffs' motion

10      to enjoin the Chancery Court.

11             MR. GIELATA:  Your Honor, thank you for

12      granting a hearing on such short notice.  My client wished

13      to attend but, unfortunately, wasn't able to make it after

14      the rescheduling.

15             May it please the Court, on my client's motion,

16      this Court is confronted with two competing class actions

17      involving securities.  My client's complaint basically

18      alleges that J. P. Morgan's CEO sold his shareholders down

19      the river in order to save his own skin.  Now, the facts

20      of the Complaint are relatively simple.  While negotiating

21      the terms of a merger with Bank One, J. P. Morgan's CEO,

22      Harrison, rejected the opportunity to merge with Bank One

23      without paying any premium.

24             He did so because Bank One's CEO sought to be

25      the CEO of the combined company immediately.  Instead,

4

1    Mr. Harrison cut himself a secret back-room deal.  This

2    secret packet gave him the CEO title for two more years

3    in exchange for paying a premium amounting to billions

4    of dollars.

5            While the defendants solicited votes in favor

6    of the merger, they carefully concealed the secret packet.

7    Now, the defendants got the votes that they wanted and

8    the merger was approved.  But, three days before the

9    merger closed, the secrets packet was exposed in an

10   article in the New York Times.

11           Now, the misconduct that I just described

12   violated a number of federal securities laws and damaged

13   the class, and that's what our Complaint seeks to recover.

14           Just down the street from us, there's another

15   Complaint pending in the Chancery Court concerning the

16   very same facts that I've just described to you.  However,

17   that Complaint doesn't include any of the federal

18   securities counts in our Complaint.  But every class

19   claim asserted in that Complaint is asserted in our

20   Complaint.  Every defendant named in that action is named

21   in our Complaint and every class, every class member in

22   that action is covered by the class asserted in our

23   Complaint.

24           Now, your Honor let the record reflect that

25   the plaintiff's lawyers in the State Court action aren't

1   here today.  They have not opposed this motion in any
2   way.  However, in a bizarre twist, the defendants are
3   here to defend the State Court action.  I think it's easy
4   to see what they want.

5           With competing class actions, defendants can
6   get a settlement from the lowest bidder.  Now, typically,
7   the lowest bidder is going to be the party with the
8   weakest claims.

9           Well, if we look at who has the weakest
10  claims here, there's no jury in Chancery Court, there
11  are no punitive damages available in Chancery Court and
12  you cannot assert any federal securities law claims in
13  Chancery Court.

14          However, in the Matsushita case, the Supreme
15  Court said that litigants in Chancery Court can release
16  claims that can't even be asserted there.  So let's
17  think about that for a second.  Since plaintiffs can
18  release but not litigate claims, federal claims in the
19  Court of Chancery, those claims can only have value
20  through a settlement, however pitiful.

21          The defendants obviously hope to take
22  advantage of this paradox.

23          THE COURT:  When you were with Milberg and
24  they were making a decision with the plaintiffs of where
25  to bring the action, was there any consideration given

1   to being in Federal Court?  Because it seems that, from

2   what I could read in the papers, that there was no

3   consideration to a federal action, that at that time

4   Milberg -- and I understand from the papers you were on

5   the team handling that case for plaintiffs -- made a

6   decision to be in the State Chancery Court.

7               MR. GIELATA:  Well, your Honor, I was an

8   associate with Milberg for less than a year.

9               THE COURT:  Right.

10              MR. GIELATA:  And Milberg was one of the four

11  law firms listed on the Complaint and --

12              THE COURT:  I'm wondering what the thinking

13  was, why the federal action only comes over, you know,

14  after Chancellor -- I guess it's Vice Chancellor Lamb has

15  under consideration a motion to dismiss and he has already

16  stayed discovery, which is really what normally the

17  Missouri case and the Eighth Circuit case says might give

18  rise to a Federal Judge enjoining a parallel state action.

19              So I am trying to understand, what was the

20  initial thoughts, about not picking the federal forum in

21  any regard?

22              MR. GIELATA:  Well, your Honor, without

23  compromising, you know, the decision-making process that

24  happened among the plaintiffs, I will say that, you know,

25  of the four lawyers listed among the Milberg lawyers on

1    the Complaint, I was the only associate, and had I been

2    a partner at Milberg Weiss and, if I had had my way, this

3    action would have been commenced in the Federal Court.

4            THE COURT:  Okay.  And is it because of the

5    kinds of reasons you told me in the papers then that you

6    are telling me now?  You believe there will be some

7    disenfranchisement of rights by parallel actions?

8            MR. GIELATA:  That's correct.  When you have

9    competing class actions, defendants can, as I just said --

10           THE COURT:  Right.  Well, tell me specifically

11   in the context of this case what rights would be

12   disenfranchised by the parallel actions?

13           MR. GIELATA:  Well, there wouldn't be any

14   federal securities claims asserted in the parallel action.

15   And there's a possibility --

16           THE COURT:  But they would be here?

17           MR. GIELATA:  Yes.  There are here.

18           On the other hand, all the common law causes

19   of action asserted in the Chancery Court are within the

20   jurisdiction of this Court in this Complaint.  And they're

21   asserted in this Complaint.

22           So you have a situation where in one court,

23   only a few claims can be asserted, and in another -- in

24   another court, all of the claims can be asserted.

25           So the question is why are certain claims

8

1   being left on the table?

2              THE COURT:  But that's not the grounds for

3   your request to me to enjoin the Chancery action, just the

4   fact that there's parallel -- in other words, the bare

5   fact that there are parallel actions with different causes

6   of action available and different remedies available, isn't

7   the criterion --

8              MR. GIELATA:  No.  I agree with that.

9              THE COURT:  -- for my enjoining Vice Chancellor

10  Lamb --

11             MR. GIELATA:  I agree with that.

12             THE COURT:  All right.  So that's something

13  that could happen in any securities case?

14             MR. GIELATA:  Absolutely.

15             THE COURT:  So what is it, I'm still trying

16  to understand, what is it -- am I right that Vice

17  Chancellor Lamb has stayed discovery in his action?

18             MR. GIELATA:  That's correct.

19             THE COURT:  And he's considering a motion to

20  dismiss?

21             MR. GIELATA:  That's correct.

22             THE COURT:  Now, the big thing about federal

23  actions, we stay discovery, and we consider a motion to

24  dismiss so we're both going to be doing, it would sound

25  like -- some of the cases -- the case you cite, they

 1  didn't do that.  There was this race to the courthouse
 2  kind of decision-making going on.
 3            Is that the case here?
 4            MR. GIELATA:  I think it is.
 5            THE COURT:  Okay.  Tell me why.
 6            MR. GIELATA:  In Bank America, the issue of
 7  the automatic stay of discovery was not really before the
 8  Court.  What the Court considered in Bank America wasn't
 9  the stay of discovery, but the fact that Congress has
10  passed not one, but two major pieces of legislation
11  regulating securities class actions.  In particular,
12  the -- both the lower Missouri court and the Eighth
13  Circuit look to the fact that the PSLRA created a lead
14  plaintiff procedure to appoint a lead plaintiff, and
15  that takes a while.
16            And the -- and both courts agreed that that
17  procedure and the rights of that lead plaintiff, whoever
18  it is, would be frustrated by parallel state class
19  actions involving securities.
20            THE COURT:  That might be someone in Missouri.
21  I don't know a whole lot about what -- how their
22  litigation is conducted.  But you are not suggesting that
23  the Delaware Chancery Court doesn't know how to properly
24  appoint a lead plaintiff and lead counsel?
25            MR. GIELATA:  Well, there's no Delaware statute

1  regarding --

2          THE COURT:  I understand that.  But the case

3  law, pretty much from the day Judge Seitz set out how that

4  occurs.  Are you challenging appointment?  I'm really

5  trying to understand, are you challenging that procedure

6  that they have by the body of the case law?

7          MR. GIELATA:  I think there's no dispute that

8  the lead plaintiff procedure, to the extent that there's

9  any procedure in the Delaware court, doesn't match or

10  mirror the specific lead plaintiff provisions of the

11  PSLRA.  There's no --

12          THE COURT:  Well, what's deficient there

13  that would cause me to enjoin that in deference to this

14  action?

15          MR. GIELATA:  Well, aside from the fact that

16  the Complaint needs to be structured differently and

17  certain claims need to be left on the table to file in

18  the Court of Chancery, there's no notice requirement in

19  filing a case in the Court of Chancery.  On the other

20  hand, in a federal complaint, a plaintiff has to publish

21  national notice and let all potential class members know

22  that they're entitled to move for the lead plaintiff

23  appointment win a certain amount of time.

24          THE COURT:  Okay.

25          MR. GIELATA:  That kind of competition for who

1    gets to be lead plaintiff certainly isn't required in the

2    Court of Chancery and, in my experience, the lead plaintiff

3    appointments are generally, with few exceptions, agreed

4    upon by plaintiff's counsel.

5             THE COURT:  But is it your -- and I don't

6    know the answer to this and I will take your advice.  I

7    will ask defendants.  In the Chancery Court, do they

8    consider financial stake?

9             MR. GIELATA:  There are -- in the few cases

10   where there are conflicts between people seeking a lead

11   plaintiff position, leadership over a case --

12             THE COURT:  Right.

13             MR. GIELATA:  -- I can recall at least one case

14   in particular, the Digex shareholder litigation, in which

15   the Court said that the size of the financial stake was

16   one factor it would consider.  It didn't say it was the

17   determining factor.  Certainly not in the way that the

18   PSLRA mandates that the most adequate plaintiff is

19   presumed to be the person with the largest financial

20   stake.

21             THE COURT:  Okay.  And that's essentially

22   considered on the federal side, too?

23             MR. GIELATA:  In the federal side, under the

24   PSLRA, there's a presumption, a statutory presumption --

25             THE COURT:  Right.

1    MR. GIELATA:  -- that the movant, the lead

2    plaintiff movant with the largest financial stake is the

3    presumptive lead plaintiff.

4         THE COURT:  Right.

5         MR. GIELATA:  There's no such -- there's just

6    no statute governing that in the Court of Chancery and it

7    is just one factor of many that is considered.  And only

8    in cases where there's a disagreement among plaintiffs'

9    lawyers as to who -- as to who's going to lead the case.

10        Here, the job of picking or approving the

11   lead plaintiff is up to the Court.

12        THE COURT:  Right.

13        MR. GIELATA:  As I mentioned in the last

14   decade, Congress has passed two statutes regulating class

15   actions involving securities.  I submit that, unless the

16   injunction is entered in this case, those two statutes

17   might as well not exist.

18        The Bank America case holds that an injunction

19   here is expressly authorized by an act of Congress and

20   the -- I don't believe that the defendants have urged

21   that Bank America be overruled.  And they have not cited

22   a single case involving two competing class actions

23   involving securities.  So I think that Bank America's

24   analysis and holding dictates that an injunction should

25   be entered.

1    I'd like to wrap up by saying that there's a
2  lot of potential for shenanigans in competing class
3  actions and I think that the Matsushita case proves that
4  all too well.  But an injunction in this case can prevent
5  such problems from ever happening.

6    And the defendants will have a complete
7  opportunity to defend themselves against all the federal
8  claims as well as all the common law claims all in a
9  single forum.  And the plaintiffs in the State action
10 are, of course, free to move for appointment as lead --
11 as lead plaintiff in this action as are any other class
12 members in the action who wish to do so.  Therefore, I
13 can't think of any down side if the injunction here is
14 entered.

15    THE COURT:  All right.  Just let me review
16 this with you for a moment so I have plaintiff's argument.

17    So we have a plaintiff here, Hyland --

18    MR. GIELATA:  Yes.

19    THE COURT:  -- and plaintiff agrees that
20 there's no per se prohibition from parallel actions in
21 securities cases such as here in a State Court and a
22 Federal Court?  There's no pre-emption by the federal --

23    MR. GIELATA:  If the Court of Chancery cases
24 were individual actions, I would have no -- I would have
25 no problem with that, but when you have overlapping class

1  actions, I think that's when the problem arises.

2           THE COURT:  I understand, but you're not --

3  the plaintiff is not saying here that every time there's

4  a class action in State Court and Federal Court, that the

5  Federal Court, by virtue of the private Securities Act,

6  is to enjoin the State Court parallel action?  It's not a

7  pro se -- I mean, it's not a per se test?

8           MR. GIELATA:  No.  It's to the extent that the

9  parallel State class action would frustrate the PSLRA.

10          THE COURT:  All right.  So now we're into that

11 area.  Now there's some analysis that has to be undertaken.

12          And the cases that you cite, the Missouri

13 District Court case and the Eighth Circuit case say, in

14 those cases, there were some facts, five actions going on

15 in California.  But basically, what you are saying here

16 is, that the act is frustrated by the Chancery Court's

17 lack of a statute in the appointment of a lead plaintiff?

18          MR. GIELATA:  I think that's part of what I'm

19 saying.

20          THE COURT:  Okay.

21          MR. GIELATA:  But --

22          THE COURT:  Would that be one thing -- I'm

23 trying to figure out what the harms are that undermine

24 the federal statute.  Is that one of them?

25          MR. GIELATA:  The harm is this:  Congress has

1   twice said if you are going to bring a securities class

2   action, please do it in Federal Court, and here's how you

3   do it.   And if you try to evade these and we're passing

4   statutes to prevent lawyers from trying to evade these

5   statutes.

6               And when a lawyer tries to evade the statutes,

7   there are oftentimes harmful repercussions for the class.

8   In Matsushita, for instance, there was a Court of Chancery

9   action brought by Milberg Weiss.   There was -- against a

10  tender offer.   There was also an action brought in

11  District Court in California.

12              The District Court case was dismissed and,

13  while it was on appeal, the action was settled in the

14  Court of Chancery.   The first settlement attempt by the

15  defendants and the plaintiff's counsel was for $1 million

16  in attorneys' fees, nothing else.

17              THE COURT:   See, I understand that argument,

18  but one of the things the District Judge said in the

19  Missouri case, which I'm trying to understand if it's

20  here, he wouldn't have entered the injunction in the

21  first instance, but he found something to the extent that

22  his confidence or whatever in plaintiff's counsel was

23  misplaced because of what occurred with the shenanigans

24  that I'm trying to ask you if they're going on here.

25              And after he found out that his confidence was

1    misplaced, he decided to then make the decision that those

2    state actions had to be enjoined in deference to the

3    federal statute, because all the harms for which the

4    federal statute was passed were occurring.  Not all of

5    them I guess, but some.

6              Is that your understanding of what the Judge

7    said there in the District Court?

8              MR. GIELATA:  I understand that he observed

9    and noted certain shenanigans and those might have

10   animated his decision, but they aren't -- they aren't part

11   of his holding and his statutory analysis in the case.  I

12   would say that those observations were dicta.

13             THE COURT:  Well, his statutory analysis was

14   simply that the Anti-Injunction Act doesn't bar because

15   basically, the Private Securities Act comes in.  When it

16   weighs in, it overcomes that and provides an exception.

17             MR. GIELATA:  Correct.

18             THE COURT:  But, for instance, in this case,

19   Vice Chancellor Lamb has done what we would do in the

20   Federal Court.  He has granted a stay of discovery.

21             So all that's going on, unless I'm wrong from

22   what I've read, is that the motion to dismiss was briefed,

23   completed sometime in January of this year, and is awaiting

24   his decision.

25             MR. GIELATA:  I think --

1           THE COURT: Shouldn't I at least wait for his

2   decision on that motion? For instance, deny your

3   application today, without prejudice to bring it back

4   after I see his decision on the motion to dismiss if

5   there's maybe something going on in the State Court that

6   undermines a parallel federal action?

7           MR. GIELATA: Well, I actually think that the

8   fact that Vice Chancellor Lamb has not ruled on that

9   motion to dismiss yet weighs in favor of an injunction.

10   What it says here, what I'm suggesting here is that --

11           THE COURT: Gosh, I took a longer time than

12   January. I've had those motions. They're pretty hard.

13   But go ahead. You are not just saying because of time,

14   because I will be embarrassed here.

15           MR. GIELATA: No. What I'm suggesting is

16   that I see down the road a train wreck about to happen.

17   There will be a conflict between two cases and at some

18   point, we're going to see a reoccurrence of Matsushita,

19   where the class gets ripped off and a lot of federal

20   claims eliminated.

21           THE COURT: But can't I step in, when those

22   kind of facts mature or ripen, rather than kind of like,

23   Oh, there's a state action, Judge, you've got to step

24   right in because we know what's going to happen? But we

25   don't know. I mean, we really don't have anything in

1    this case.  In fact, it all seems to be what's going on

2    in the Chancery Court not undermining the -- except for

3    the difference in the claims, not undermining anything

4    that would go on here.

5              MR. GIELATA:  I think the defendants suggested

6    or noted in their brief that there have been no settlement

7    discussions, and --

8              THE COURT:  Right.

9              MR. GIELATA:  -- at the very least --

10             THE COURT:  That weighs against the injunction.

11             MR. GIELATA:  I should hope that at the very

12   least, if the injunction is not granted, that they --

13   that they be ordered to notify me or whoever the lead

14   plaintiff turns out to be in the federal action of any

15   settlement discussions in the -- in the Chancery action.

16             But if we're faced with a dangerous

17   intersection, and I don't think that we need to wait for

18   somebody to die at the intersection to put up a traffic

19   light.  I think that a conflict here is inevitable down

20   the road.  I'm not sure whether it's going to happen.

21   And I just think that it's -- it would be sound to enter

22   the injunction today, before we get into discussions

23   about collateral estoppel, res judicata, whether or not

24   the adequacy of a settlement in a related case.

25             THE COURT:  Let me just ask you this one last

1   question.  Just for the record, what standard for the

2   injunction do I apply?  What factors do I consider, in

3   your view?

4            MR. GIELATA:  I think that the injunction

5   here turns on whether or not the intended scope of the

6   PSLRA can only be fulfilled if the State Court action is

7   enjoined.

8            THE COURT:  All right.  Thanks for your help.

9            MR. COOPER:  Good afternoon, your Honor.

10           THE COURT:  Good afternoon.

11           MR. COOPER:  My name is Michael Cooper, your

12  Honor.  I'm a partner of the law firm in New York named

13  Sullivan & Cromwell.  I've made application to appear pro

14  hac vice in this matter and paid the fee and I don't know

15  whether the application has been granted or not.

16           THE COURT:  I hope we didn't break you with

17  that fee.

18           MR. COOPER:  No.

19           THE COURT:  That's a new thing we have going

20  on here.  But your application is granted and welcome to

21  the District Court.

22           MR. COOPER:  Thank you very much.  And I

23  appreciate the privilege of appearing here.

24           I represent the individual defendants, with

25  the exception of one, a man named Riley Bechtel.  Nancy

1   Schwarzkopf, who is seated next to me at counsel table

2   is counsel for J. P. Morgan Chase, the bank, of which

3   the individuals are present or former directors.

4          Let me -- I have some points I had planned to

5   make and hope I can make, but I really want to get --

6   clear some of the underbrush away here and some

7   misconceptions that might have -- well, might come into

8   your Honor's mind as a result of plaintiffs' argument.

9          He says there's a race to the courthouse here.

10  Well, it's a heck of a race, your Honor, in which three

11  Chancery Court actions, not one, but three, were brought

12  within two days, three days of the operative events,

13  which was a newspaper article reporting certain

14  conversations that allegedly took place during the merger

15  negotiations.  And this action, which is brought nine

16  months after those events, that doesn't strike me as a

17  race to the courthouse.

18         Furthermore, as to whether there is a lead

19  plaintiff in the Chancery Court proceedings, after those

20  three actions were brought, but what normally happens

21  happened.  The actions were consolidated.  The plaintiffs

22  agreed to file a Consolidated Amended Complaint.  They

23  did so.  There are three named plaintiffs, but they're

24  being represented by the battery of lawyers who is

25  representing them separately.  They file the Consolidated

1    Amended Complaint and we move to dismiss it.  And that

2    motion was argued on January 13, with Mr. Gielata sitting

3    in the courtroom, representing the plaintiffs opposing

4    that motion.

5              And he is now asking to have that proceeding

6    enjoined.

7              I also want to dispel this notion that what

8    is involved here, what the defendants are really hoping

9    to set up is a situation in which they can settle with

10   the lowest bidder.  I can tell you, as I said under oath,

11   there have been no settlement discussions.  I can tell

12   you that there are none planned.  And I can represent to

13   you that, unless I am directed to the contrary by my

14   client, and I do not anticipate being so directed, there

15   will be none until after the Vice Chancellor has ruled on

16   that motion.

17             What's really at issue here is speculation on

18   the part of the plaintiff as to how the Vice Chancellor

19   may rule, what he may say in support of that ruling, and

20   what effect, whether it be estoppel or res judicata or

21   just persuasiveness, that ruling may have upon your Honor.

22   But that speculation as to how he may rule and what he

23   may say in the ruling is not a basis for enjoining him

24   from ruling at all.

25             Since 1793, four years after the federal

1   judiciary was created, there has been a federal statute

2   that prohibits federal courts from enjoining State Court

3   proceedings except in narrowly-defined circumstances.  And

4   when I use the word narrowly, that is not argument on my

5   part, your Honor.  That is the language of the Supreme

6   Court in one of the cases we've cited in our brief.  It's

7   called Kokimchu (phonetic) versus Exxon.

8           There's an absolute ban in that statute as

9   against an injunction, not as a matter of prudence, not

10  as a matter of comity, but as a matter of statutory

11  prohibition, unless the application falls within one of

12  three specifically defined circumstances.

13          Now, the plaintiff says, Well, I've met that

14  test because an injunction here is expressly authorized.

15  That's the word.  Expressly authorized by an act of

16  Congress.  And the act here -- well, there are two of

17  them.  One is the Private Securities Litigation Reform

18  Act.  And he cites a decision of the Eighth Circuit, a

19  split decision of the Eighth Circuit, with a short and

20  very forceful dissent that I would invite your Honor to

21  read.  It's very short, which he says we are trying to

22  overrule.

23          Well, I'm not asking your Honor to overrule

24  the Court of Appeals for the Eighth Circuit.  We are saying

25  and have said that that case just simply couldn't be more

1    different than this one.  There, the plaintiff in the
2    State Court actions in California had an investment that
3    was 1/26th the amount of the investment of the plaintiffs
4    in the Federal Court action.

5              Here, the plaintiff in the Federal Court
6    action owns 300 shares, is alleging a loss of $1,000.

7              The three plaintiffs in the Chancery Court
8    proceeding have not alleged their share ownership and
9    because we've moved to dismiss, we have not had an
10   opportunity to explore that.  But I think your Honor can
11   assume that, among the three, there is a fair chance that
12   they own 300 shares.  Certainly, they don't own a
13   minuscule fraction of 300 shares.

14             In that case, when the Milberg Weiss firm
15   found out that it was not going to be lead counsel, they
16   attempted to withdraw from the federal action and they
17   were permitted to withdraw.  And they went to California
18   and they tried to get a class certified that would not
19   be removable under the PSLRA and they actually were
20   removed and then it was remanded and they got the State
21   Court to direct mediation.

22             So there was a case where the law firm that
23   had been in the Federal Court took its marbles elsewhere
24   when it wasn't in the controlling position and they tried
25   to settle the State Court action and they get the benefit

1    of a bar of the federal claims to which Mr. Gielata has

2    referred.   It's just simply not this case.   It doesn't

3    remotely resemble this case.

4              Plaintiff, in his reply brief, says, well,

5    there's another part of PSLRA.   Didn't mention this in

6    his initial brief.   There's a provision in there for a

7    stay of discovery or other proceedings in the State Court.

8    Excuse me.   Other proceedings.   It's actually in this

9    action.   That's the section that he quoted.

10             Well, there's no discovery going on here, no

11   other proceedings going on here.   There's no discovery

12   going on in the State Court.

13             So he can't find authority for an injunction

14   there.

15             He then turns to this Securities Uniform --

16   Securities Litigation Uniform Standards Act, I believe it

17   is, SLUSA, and he says, Well, there's some authority

18   there because there's nothing in there that says anything

19   about an injunction.   It does say that certain actions as

20   described shall be maintained in the federal courts.   But

21   it carves out expressly, we've quoted the language in our

22   brief, and any action arising under state law in the

23   State Court involving an entity that is organized under

24   the jurisdiction of that law, it's called the Delaware

25   exception.   That's how it's referred to in the cases.

1        So that is why he can't invoke that statute.
2   And, as a matter of fact, it also exempts specifically
3   actions that involve claims based on attempts to affect
4   the decision by owners of shares as to how to vote those
5   shares.  And in the State Court, there is a claim that
6   the defendants, by not disclosing this supposed secret
7   deal in the proxy statement, violated the common law duty
8   of fair disclosure that's owed by a board to the
9   shareholders.

10       And I might say that in explicating those
11  cases, we've -- we have briefed them to the Chancery
12  Court, the Chancery Court applies the same rules, the
13  same principles that the Federal Court does under Section
14  14(a).

15       Now, he says that, well, courts should --
16  invokes the All Writs Act, that the Court shall grant an
17  injunction in aid of this jurisdiction.  Well, the
18  Supreme Court has said that you have to read the All Writs
19  Act and the Anti-Injunction Act together.  And they fit
20  together very well because the Anti-Injunction Act says
21  when you may not enjoin a State Court, and then -- that's
22  all it says, and there are exceptions, but it has no
23  affirmative grant of authority to issue an injunction.

24       If you fall under the exception for instances
25  where an injunction is necessary in aid of the jurisdiction

1   of the Federal Court, then the All Writs Act gives you the

2   affirmative authority to issue that injunction.  But the

3   two have to be read together.  And you've got to satisfy,

4   the plaintiff has to satisfy one of those exceptions

5   first.  And he can't do so.

6           He then comes up with an argument, which I

7   think has the virtue of novelty, but I respectfully submit

8   no other version, and that is that there's an implied

9   exception to the anti-injunction statute if there is a

10  threatened deprivation of the right to trial by jury,

11  the Seventh Amendment.

12          Well, if he means by that that there are

13  proceedings, when there are parallel proceedings in the

14  State court, where there is no right to juries, in the

15  Chancery Court you have to enjoin them because they might

16  have some impact on the Federal Court proceeding, that

17  would have a rather significant influence on the ability

18  of the Delaware -- the Court of chancery of Delaware to

19  develop the law of directors' duties.

20          He says, Well, we've got to protect the

21  classes against the threat that the Vice Chancellor may

22  say something that will affect their class rights.

23          Well, if he's talking about the class in the

24  Chancery Court, he's got no standing to speak for them.

25  They have their own counsel.  They're in another

1    proceeding.

2            If he's talking about the class in the action

3    before your Honor, then what he's really saying -- and

4    this is what he's saying, he made it clear in his reply

5    brief.  I won't quote the language to you.  But he says

6    the Vice Chancellor may issue some ruling on materiality

7    that will adversely affect my client.

8            And, as I said to you earlier, your Honor,

9    that can be for one of two reasons:  Either it has some

10   estoppel effect as a matter of law or, if not, then

11   because it's persuasive to your Honor.

12           And that simply isn't the basis for granting an

13   injunction.

14           Now, your Honor asked early on, and I will --

15   I guess I will end with this and just one more point, if

16   you will indulge me, why or whether consideration was

17   given to bringing the action in the Federal Court in the

18   first instance rather than in the Chancery Court.  Of

19   course, I wasn't privy to those discussions, but I think

20   I know the answer.

21           The answer is that the real core of the claim

22   there is that by rejecting the supposed offer, they cause

23   the corporation, J. P. Morgan Chase, to pay $7 million

24   in premium to the shareholders of the company with which

25   it was merging that it wouldn't otherwise have to pay.

1    And that was a breach of the duty that the directors

2    owed to their corporation, the duty of loyalty to their

3    corporation, which they sacrificed because they wanted

4    to confer some benefit upon their Chief Executive

5    Officer.

6            So I submit, it really is a common law claim,

7    and the Section 14(a) claim is simply, well, you didn't

8    disclose the it, you breached a common law duty.

9            The final point I'd make to your Honor is that

10   there is another proceeding.  I didn't -- I will mention

11   it, just so that you have the complete picture, but I

12   don't think it is necessary to point it out in the briefs

13   because it's not necessary to defeat this motion.

14           There's an action pending in the Northern

15   District of Illinois that was brought in October, three

16   months after the merger, in the Federal Court, alleging

17   the same violation of Section 14(a), as has been alleged

18   in the action before your Honor.

19           The lead plaintiff has been appointed there.

20   An Amended Complaint has been served.  A motion to

21   dismiss will be filed this Friday.  That's its due date.

22           So the -- I mean, that failure to disclose

23   your own doing is a violation of Section 14(a).  That's --

24   that's before another Federal Judge.

25           The claim that they were violations of the

1   Section 11 and 12(2), the Securities Act, and 10(b)(5) of
2   the Exchange Act are claims that this plaintiff is in
3   absolutely no position to assert because he has certified
4   to the Court that he owned his shares throughout, from
5   the announcement of the merger through the effective date
6   of the merger. He neither purchased nor sold. Those
7   statutes create rights in favor of purchases or sellers.
8           So we need not really be concerned with those
9   claims.
10          If your Honor has no other questions --
11          THE COURT:  No.  Thank you.
12          MR. COOPER:  Thank you.
13          THE COURT:  Ms. Schwarzkopf, do you have
14   anything to add?
15          MS. SCHWARZKOPF:  No.  Mr. Cooper was
16   authorized to speak on behalf of the corporation as well.
17          THE COURT:  Okay.  Thank you.
18          MS. SCHWARZKOPF:  Thank you.
19          MR. GIELATA:  Just a few points, your Honor.
20          Firstly, I don't think it matters to the
21   analysis here whether my client owns one share or a
22   billion shares.  What matters is that the PSLRA has set
23   forth a procedure, specific procedure and, through that
24   procedure, a lead plaintiff will be appointed in the
25   near future, in the next few weeks, and it doesn't matter

1  who that person is or how many shares that person has.

2            As to the question of standing, I think it's

3  premature, and in any case there are several decisions

4  appointing lead plaintiffs who don't have the standing

5  to assert certain claims, but are, nevertheless, given

6  the authority to assert all claims on behalf of all class

7  members.

8            Lastly, the -- the Anti-Injunction Act does

9  have three exceptions.  One of the exceptions is for

10 injunctions necessary in aid of a Court's jurisdiction.

11 However, the injunction requested here doesn't fit within

12 that exception.  It instead fits in as Bank America held,

13 in the expressly authorized exception.

14            Now, the phrase, necessary in aid of its

15 jurisdiction does not appear exactly in the All Writs Act.

16 Instead, there, the phrase is, all writs necessary or

17 appropriate in aid of the Court's jurisdiction.  Thus,

18 this Court need not find that an injunction is necessary.

19 The Court need only determine that the injunction is

20 appropriate in this situation.

21            That's all I have.

22            THE COURT:  All right.  Thank you.

23            I will, in short order, get a decision to you.

24 I am going to tell you that I'm going to deny the motion

25 to strike defendants' brief that was filed, so that we

31

1    have all the papers in place.

2                    And I have a question.  Have all defendants

3    been served now?

4                    MR. GIELATA:  13 of the 14 defendants, those

5    represented here, have waived judicial process, and I

6    expect that Riley Bechtel will be served in the next week

7    or two.

8                    THE COURT:  And that will be resolved, then?

9                    MR. GIELATA:  Yes.

10                    THE COURT:  Okay.  Thank you all very much.

11                    (Hearing concluded at 12:50 p.m.)

12                           -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25