# Tab C

## to

## Defendants' Reply Brief in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint

EFiled: Dec 10 2004 8:49PM EST
Filing ID 4766524

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION | CONSOLIDATED C.A. No. 531-N |

## PLAINTIFFS' ANSWERING BRIEF IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# PART 1 of 2

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
919 N. Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)
        -- and --
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

**BULL & LIFSHITZ, LLP**
18 East 41st Street
New York, NY 10017
(212) 213-6222
(212) 213-9405 (fax)

*Co-Lead Counsel for Plaintiffs*

Dated: December 10, 2004

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| IN RE J.P. MORGAN CHASE & CO.<br>SHAREHOLDER LITIGATION | CONSOLIDATED<br>C.A. No. 531-N |

## PLAINTIFFS' ANSWERING BRIEF IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
919 N. Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)
        -- and --
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

**BULL & LIFSHITZ, LLP**
18 East 41st Street
New York, NY 10017
(212) 213-6222
(212) 213-9405 (fax)

*Co-Lead Counsel for Plaintiffs*

Dated:  December 10, 2004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ...................................................................................................................1

COUNTER-STATEMENT OF FACTS ..................................................................................5

    I.       THE SECRET DEAL AND THE IMPROPER PREMIUM ......................................5

    II.     THE TRUTH IS REVEALED, BUT THE MERGER IS
             CONSUMMATED ANYWAY .....................................................................................6

    III.    EVEN THOUGH HARRISON STILL HAS THE CEO TITLE,
             DIMON IS THE TRUE CEO .......................................................................................9

STANDARD OF REVIEW ...................................................................................................11

ARGUMENT ..........................................................................................................................11

    I.       THE IMPROPER PREMIUM FAILS THE ENTIRE
             FAIRNESS STANDARD AND IS NOT SHELTERED
             BY THE BUSINESS JUDGMENT RULE ..............................................................11

          A.     The Entire Fairness Standard Governs the Challenged
                   Transaction .....................................................................................................12

                 1.     Harrison...........................................................................................13

                 2.     Riley Bechtel....................................................................................15

                  3.     Lawrence Bossidy ...........................................................................17

                  4.     Ellen Futter......................................................................................18

                  5.     William Gray ...................................................................................21

                  6.     Helene Kaplan..................................................................................22

                  7.     Frank Bennack .................................................................................22

                  8.     John Stafford....................................................................................24

                  9.     M. Anthony Burns ...........................................................................25

B.  The Business Judgment Rule Cannot Shelter the Alleged
Misconduct................................................................................................27

II.  THE COMPLAINT STATES A VALID CLASS CLAIM FOR
BREACH OF THE DUTY OF DISCLOSURE.................................................30

III.  PLAINTIFFS' CLAIMS ARE DIRECT, NOT DERIVATIVE............................35

IV.  EVEN IF PLAINTIFFS' CLAIMS ARE FOUND TO BE
DERIVATIVE IN NATURE, PLAINTIFFS HAVE
DEMONSTRATED THAT DEMAND IS EXCUSED.......................................43

A.  The Standard For Establishing Demand Futility ..........................43

B.  The Board Cannot Impartially Consider Demand ........................43

C.  Demand Is Also Excused Because Plaintiffs Allege
Particularized Facts Far Exceeding Those Sufficient To
Raise A Reasonable Doubt that Defendants' Conduct Was
Outside the Protection Of The Business Judgment Rule..............45

V.  PLAINTIFFS' CLAIMS, EVEN IF DERIVATIVE, SHOULD
NOT BE DISMISSED UNDER RULE 12(B)(6)...........................................45

VI.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY SECTION
102(B)(7) OF THE DGCL.......................................................................46

A.  Consideration Of The Section 102(b)(7) Issue Is Premature.......46

B.  Section 102(b)(7) Does Not Bar Plaintiffs' Claims ....................47

VII.  DEFENDANTS BLOCKED INJUNCTIVE RELIEF BY
CLOSING THE MERGER AS SOON AS THE TRUTH WAS
REVEALED ..........................................................................................49

VIII.  DEFENDANTS HAVE NOT MOVED TO DISMISS
PLAINTIFFS' CLAIM FOR EQUITABLE FRAUD ......................................49

CONCLUSION................................................................................................52

# TABLE OF AUTHORITIES

## CASES

*Page*

*Agostino v. Hicks,*
    845 A.2d 1110 (Del. Ch. 2004) .................................................................................36

*Alessi v. Beracha,*
    849 A.2d 939 (2004) .................................................................................31, 32

*Arnold v. Society for Sav. Bancorp., Inc.,*
    650 A.2d 1270 (Del. 1994) .................................................................................30, 48

*Arnold v. Society for Sav. Bancorp, Inc.,*
    678 A.2d 533 (Del. 1996) .................................................................................51

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) .................................................................................14, 43, 45

*Ash v. McCall,*
    2000 Del. Ch. LEXIS 144 (September 15, 2000) .................................................................................52

*Barkan v. Amsted Indus., Inc.,*
    567 A.2d 1279 (Del. 1989) .................................................................................31

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988) .................................................................................32

*Beam v. Stewart,*
    845 A.2d 1040 (Del. 2004) .................................................................................20

*Behrens v. Aerial Communications, Inc.,*
    2001 Del. Ch. LEXIS 80 (Del. Ch. May 22, 2001) .................................................................................39

*In re Berkshire Realty Company Shareholder Litigation,*
    2002 Del. Ch. LEXIS 146 (Del. Ch. Dec. 18, 2002) .................................................................................40

*Blackmore Partners, L.P. v. Link Energy LLC,*
    2004 Del. Ch. LEXIS 164 (Nov. 10, 2004) .................................................................................11

*Branson v. Exide Elecs. Corp.,*
    1994 Del. LEXIS 129 (1994) .................................................................................32

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000)................................................................................43

*Butler v. Butler,*
  222 A.2d 269, 272 (Del. 1966) ......................................................................50

*Cede & Co. v. Technicolor, Inc.,*
  634 A.2d 345 (Del. 1993),
    *modified on reargument in part,* 636 A.2d 956 (Del. 1994) ........................28

*Chaffin v. GNI Group, Inc.,*
  1999 Del. Ch. LEXIS 182 .............................................................................18

*In re Chrysler Corp. S'holders Litig.,*
  No. 11873, 1992 WL 181024 (Del. Ch. July 27, 1992).................................45

*Chrysogelos v. London,*
  No. 11910, 1992 WL 58516 (Del. Ch. Mar. 25, 1992) ..................................45

*Cinerama, Inc. v. Technicolor, Inc.,*
  663 A.2d 1156 (Del. 1995).............................................................................14

*Clements v. Rogers,*
  790 A.2d 1222,(Del. Ch. 2001) .....................................................................33

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund,*
  624 A.2d 1199, 1206 (Del. 1993) ..................................................................27

*Dieterich v. Harper,*
  857 A.2d 1017 (Del. Ch. 2004) ................................................................41, 42

*Eisenberg v. Chicago Milwaukee Corp.,*
  537 A.2d 1051 (Del. Ch. 1987).......................................................................51

*Emerald Partners v. Berlin,*
  787 A.2d 85 (Del. 1999).......................................................................12, 46, 47

*In re Emerging Communications, Inc. Shareholders Litig.,*
  No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004)..................16, 18

*Erickson v. Centennial Beauregard Cellular LLC,*
  2003 Del. Ch. LEXIS 38 .................................................................................50

*In re Fuqua Indus., Inc. S'holder Litig.,*
    No. 11974, 1997 WL 257460 (Del. Ch. May 13, 1997) ............ ..................................11

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996)..................................................................................18

*Harbor Fin. Partners v. Huizenga,*
    751 A.2d 879 (Del. Ch. 1999)..........................................................................17

*Harris v. Carter,*
    582 A.2d 222 (Del. Ch. 1990) .........................................................................44

*In re J.P. Stevens & Co., Inc.,*
    542 A.2d 770 (Del. Ch. 1988)...........................................................................28

*Kramer v. Western Pacific Indus., Inc.,*
    546 A.2d 348 (Del. 1988)................................................................................39

*Krasner v. Moffett, 826 A.2d 277,*
    287 (Del. 2003) ................................................................................................30

*Lewis v. Fuqua,*
    502 A.2d 962, 970 (Del. Ch. 1985) ................................................................26

*In re Lukens Inc. Shareholders Litig.,*
    757 A.2d 720 (Del. Ch. 1999).........................................................................51

*Harman v. Masoneilan International, Inc.,*
    442 A.2d 487 (Del. 1982)..............................................................................49

*Malone v. Brincat,*
    722 A.2d 5 (Del. 1998).....................................................................................34

*Mizel v. Connelly,*
    C.A. No. 16638, 1999 Del. Ch. LEXIS 157....................................................18

*Moran v. Household Int'l. Inc.,*
    490 A.2d 1059 (Del. Ch. 1985) 86)..........................................................40, 41

*In re New Valley Corp. Deriv. Litig.,*
    No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ....................................44

*ODS Technologies v. Marshall,*
    832 A.2d 1254 (Del. Ch. 2003)......................................................................51

*In re Oracle Derivative Litigation,*
824 A.2d 917 (Del. Ch. 2003) ...................................................................19, 20

*Orman v. Cullman,*
794 A.2d 5 (Del. Ch. 2002) ...............................................................12, 15, 19
47

*Parnes v. Bally Entertainment Corp.,*
722 A.2d 1243 (Del. 1999) .................................................28, 37, 38, 39, 42

*Parnes v. Bally Entertainment Corp.,*
1997 Del. Ch. Lexis 70 (May 12, 1997) ...............................................................38

*In re Ply Gem Indus.,*
2001 WL 755133 (Del. Ch. June 26, 2001) ...............................................................47

*Rosenblatt v. Getty Oil Co.,*
493 A.2d 929 (Del. 1985) ...............................................................30

*Shell Petroleum, Inc. v. Smith,*
606 A.2d 112 (Del. 1992) ...............................................................31

*Smith v. Van Gorkom,*
488 A.2d 858 (Del. 1985) ...............................................................45

*Solomon v. Pathe Commun. Corp.,*
672 A.2d 35 (Del. 1996) ...............................................................11

*In re Staples, Inc. Shareholders. Litig.,*
792 A.2d 934 (Del. Ch. 2001) ...............................................................33

*State of Wisconsin Inv. Bd. v. Bartlett,*
C.A. No. 17727, 2000 Del. Ch. LEXIS 42 (Feb. 24, 2000) ...............................................................14

*Stroud v. Grace,*
606 A.2d 75 (Del. 1992) ...............................................................30

*In re The Limited, Inc. S'holders Litig.,*
2002 Del. Ch. LEXIS 28 (March 27, 2002) ...............................................................13

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004)................................................................36, 37, 40, 41

*In re Tri-Star Pictures, Inc. Litig.*,
    634 A.2d 319 (Del. 1993)................................................................................34

*Triarc Companies Class & Derivative Litigation*,
    791 A.2d 872 (Del. Ch. 2001)........................................................................40

*Turner v. Bernstein*,
    776 A.2d 530 (Del. Ch. 2000).........................................................................48

*Wells Fargo & Co. v. First Interstate Bancorp*,
    1996 Del. Ch. LEXIS 3 (1996) ......................................................................32

*Zirn v. VLI Corp.*,
    621 A.2d 773 (Del. 1993).........................................................................33, 35

*Zirn v. VLI Corp.*,
    681 A.2d 1050, 1062 (Del. 1996) ..................................................................51

## STATUTES

11 U.S.C. § 362......................................................................................................25, 26

Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq ........................................25, 26

8 Del. C. § 102(b)(7) ...............................................................................................*passim*

Plaintiffs respectfully submit this Answering Brief in Opposition to the Motion to Dismiss filed by Defendants J.P. Morgan Chase & Co. ("JPMC" or the "Company"), William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, and John R. Stafford[1] (the "Motion").

## INTRODUCTION

In an act that betrayed the interests of the shareholders to whom he owed a duty of loyalty, Defendant Harrison, the Chairman and CEO of JPMC, agreed to the payment of a multi-billion dollar premium to merge with Bank One Corporation ("Bank One"), and forwent the opportunity to merge without paying any acquisition premium at all, merely so he could retain his title as CEO for two more years. Defendant Harrison rejected -- and concealed from shareholders -- an offer by Bank One to merge. In a blatant act of disloyalty, Harrison rejected this offer only because he would have had to give up his CEO title.

However, everyone sees that the emperor has no clothes. Despite the ill-gotten title, investors, employees, analysts, and other observers understand that James Dimon, Bank One's CEO, not Harrison, already serves as the true CEO of the new combined Company.

---

[1]    Harrison, Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, and John R. Stafford served on JPMC's Board at all relevant times and are referred to herein as the "Individual Defendants."

Plaintiffs bring this class action, on behalf of shareholders[2] of pre-merger JPMC, to challenge the premium paid by them to merge with Bank One, which was paid solely for the benefit of Harrison and for no legitimate business purpose. Directly contrary to their fiduciary duties to act in the best interests of the Company's shareholders, Harrison and the other Individual Defendants who comprised the Board of JPMC, agreed to a stock exchange ratio favoring Bank One shareholders at the expense of Class members for no reason other than to allow Harrison to retain his CEO title. Defendants also failed in the proxy materials disseminated to shareholders to solicit their support for the proposed merger, to make any disclosure whatever of the foregone opportunity to merge without paying any acquisition premium. As a direct result of Defendants' wrongdoing, pre-merger JPMC shareholders were left owning a smaller percentage of the new, combined Company than if the deal had not included the multi-billion dollar acquisition premium. The business judgment rule cannot protect the Individual Defendants because this outrageous decision far exceeds the bounds of reasonable judgment and, moreover, a majority of the JPMC Board was interested in the challenged transaction or lacked sufficient independence from Harrison. It is inexplicable that supposedly independent directors, acting in good faith, could choose a deal requiring the payment of a multi-billion dollar premium solely so that the CEO could keep his title, *in name only*, when a proposal to merge without any premium was on the table.

---

[2]    The Class consists of all persons who owned JPMC common stock on the date the Merger was announced (January 14, 2004) and continued to own such stock through the date the Merger closed (July 1, 2004). Excluded from the Class are Defendants; any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

Defendants' Motion both misapprehends and misapplies Delaware law and demonstrates a fundamental misunderstanding of the nature of Plaintiffs' claims. Defendants' considerable reliance on the business judgment rule is unfounded, as the improper premium[3] must be evaluated against, and fails, the entire fairness standard.

In addition, Plaintiffs' disclosure claim should not be dismissed because Defendants have not demonstrated that the challenged omission was immaterial as a matter of law. Materiality is clearly present here but, in any case, is a question of fact inappropriate for resolution at the pleadings stage. Further, an exculpatory provision in JPMC's charter does not bar Plaintiffs' claims, because the claims arise from a breach of the Individual Defendants' duties of loyalty.

Defendants also argue that certain of Plaintiffs' claims actually are derivative in nature and should be dismissed because Plaintiffs did not make any demand on the Board before commencing this lawsuit. As discussed herein, all of Plaintiffs' claims are clearly direct, not derivative. Class members, not JPMC, suffered damage as a result of having been forced to vote on the proposed merger without full information and having their ownership interest in the Company diluted unnecessarily by the improper premium. Defendants' misconduct resulted in Class members owning a smaller share of the new, post-merger Company. Clearly, this is not an injury to the Company. Any financial recovery or remedy will go to Class members, not to JPMC.

---

[3]    Shares of JPMC and Bank One closed at $39.22 and $45.22, respectively, just before the Merger was announced. Plaintiffs challenge the decision to merge with Bank One using an exchange ratio of 1.32 JPMC shares for each share of Bank One rather than a ratio of 1.153 (implying an equal exchange of value, as $1.153 * 39.22 = 45.22$).

Even if some of Plaintiffs' claims are held to be derivative in nature, a shareholder demand that the Company bring the claims would have been futile by virtue of the interest and lack of independence of JPMC's Board members at the time this lawsuit was commenced. Demand is excused for Plaintiffs' claims relating to the improper premium because a majority of the Board was beholden to Harrison. Also, Plaintiffs have pled sufficient facts to show far more than a "reasonable doubt" that the business judgment rule will protect the Individual Defendants. Their failure to exercise any business judgment precludes application of the rule's presumptive protections and their self-dealing in favoring Harrison's interests to protect their personal interests is compelling evidence that far exceeds the reasonable doubt standard. As a result, even if some of Plaintiffs' claims are held to be derivative in nature, they should be allowed to go forward because demand is excused.

Defendants' argument that Plaintiffs have waived their right to relief by not moving for a temporary restraining order cannot be taken seriously. No jurisprudence supports this contention, and the facts bear out, or will bear out at trial, that Plaintiffs did all they reasonably could have done in the few days between the public revelation of misconduct and the closing of the merger. On the other hand, Defendants decided against taking any actions to correct their misconduct.[4]

---

[4]    Harrison and the Individual Defendants should have seized the opportunity to merge with Bank One with a 1.153 exchange ratio. Barring that, they should have (1) disclosed that Harrison had turned down the 1.153 exchange ratio so that he could continue to serve as CEO for two more years, and (2) formed a special committee of disinterested and independent directors to consider the terms of the proposed merger. Barring even that, upon the revelation of Harrison's secret deal, Defendants should have (1) delayed the closing of the Merger, (2) scheduled a second vote by shareholders, and (3) distributed a complete and accurate proxy statement prior to the second vote.

- 4 -

## COUNTER-STATEMENT OF FACTS

On January 14, 2004, JPMC issued a press release announcing it had entered into a merger agreement with Bank One (the "Merger"). (¶ 47.)[5] Bank One shareholders would receive 1.32 shares of JPMC common stock for each share of Bank One they owned, amounting to an aggregate $7 billion premium over Bank One's pre-announcement market capitalization. (¶¶ 1, 47, 50.) Upon completion of the Merger, Bank One would be merged with and into JPMC. (¶ 85.) Defendant Harrison would keep his CEO and Chairman titles for two more years and James Dimon (Bank One's Chairman and CEO) would become the President and Chief Operating Officer of the combined entity. (¶¶ 1, 47, 56.)

## I.    THE SECRET DEAL AND THE IMPROPER PREMIUM

Under Harrison, JPMC has not fared well. (¶¶ 28-37.) Indeed, Harrison was desperate for a major event to salvage his lucrative position. (¶¶ 29-30.) The Merger fit the bill perfectly, as it assured Harrison's tenure as CEO for another two years. (¶ 56.) However, on June 27, 2004, just days before the Merger was due to close, an article in *The New York Times* revealed:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to *give himself the two extra years*, to secure a smooth transition, *although he may have cost J.P. Morgan shareholders extra money in doing so.* Mr. Dimon, always the tough deal maker, *offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.*

---

[5]     References to "¶ _" are to paragraphs in the Consolidated Class Action Complaint.

> ***When Mr. Harrison resisted, Mr. Dimon insisted on a premium,*** which
> Mr. Harrison was able to push down to 14 percent. The two men declined
> to comment on the specifics of their negotiations.

(¶ 45 (emphasis added).)

Thus, Harrison entered into a secret deal, exchanging a massive premium for two
more years as CEO. (¶¶ 38, 44, 45.) In addition to entrenching himself with the CEO
title, Harrison secured for himself an extraordinarily lucrative severance package, as
noted in the joint proxy statement mailed to shareholders (the "Proxy Statement"):

> [I]n connection with the [Merger], the severance policy for
> Mr. Harrison will be amended, effective upon completion
> of the merger, so that Mr. Harrison's severance will be the
> greater of (a) $22.2 million or (b) three times his current
> base salary and three-year average annual cash
> performance bonus if he is terminated involuntarily without
> cause prior to the second anniversary of the completion of
> the merger.

When the Merger was announced, the acquisition premium for Bank One shares
amounted to approximately 14 percent, based on that day's closing prices. (¶¶ 45, 47, 48,
50.) In other words, to merge with Bank One and accommodate Harrison's secret deal,
JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which
substantially diluted their individual holdings and left them owning less of the new,
combined entity. (¶¶ 1, 50, 60, 87.) The total value of the deal was approximately $57
billion. (¶ 50.)

## II.    THE TRUTH IS REVEALED, BUT THE
MERGER IS CONSUMMATED ANYWAY

On the last two days of June, 2004, three JPMC shareholders filed complaints.
On July 1, 2004, just after Plaintiffs had filed their complaints and notwithstanding the
allegations that Defendants had failed to make full and proper disclosure in the Proxy

- 6 -

Statement, Defendants closed the Merger. (¶¶ 83, 85.) The cases were consolidated by

stipulation, upon Order granted by this Court on July 19, 2004. On September 2, 2004,

Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint").

     The claims asserted in the Complaint arise out of a reported offer made by Bank

One's CEO, Dimon, to merge without a market premium if JPMC's CEO, Harrison,

would agree to cede his CEO position to Dimon immediately after the Merger. (¶¶ 1, 45.)

Harrison refused and, as a result, pre-Merger JPMC shareholders paid a substantial

premium to merge with Bank One, amounting to more than $7 billion in stock. (¶¶ 1, 50,

60, 80.) Defendants' failure to disclose this critical information rendered the Proxy

Statement sent to JPMC shareholders to solicit their support of the proposed Merger

materially false and misleading. (¶¶ 81-87.)

     As alleged in the Complaint, numerous sources confirm the materiality of the

undisclosed deal between Harrison and Dimon and the unfair premium. For instance, on

the Kudlow & Cramer show on CNBC, Lawrence Kudlow observed: "[S]ome people I

spoke to today said this is too dilutive. They said JP Morgan is paying too big a

premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase,

[JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc." (¶

51.) Shareholders and the analyst community also expressed concern about the size of

the premium. (¶¶ 48, 51, 53.)

     Capturing precisely the general sentiment, London's *Sunday Telegraph* reported

on January 18, 2004:

> JP Morgan's shares gained 30 cents on news of the deal,
> but as one arb put it to me: ***"If JP Morgan announced that***
> ***Harrison was resigning and they had hired Jamie Dimon***

> *as the new CEO, the stock would have been up a few*
> *bucks."*

(¶ 65 (emphasis added).)

Confirming investors' interest in the reasons behind Harrison's retention of the

CEO title, the issue arose several times during at the conference call held by Harrison and

Dimon on January 15, 2004 to explain the Merger to the investment community.  One

analyst directly asked Harrison:

> With regard to separating the Chairman and CEO positions,
> I think that is best practices from a corporate governing
> standpoint, but why are you CEO for two years and doing
> this tag team thing? Why not just go directly to Chairman
> and have Jamie be CEO right away? What was your
> thought process there?

(¶ 72.) Harrison's answer was evasive:

> It's all part of creating a structure in a negotiation process
> that works for both firms.  I am 60 years old. I have at least
> a couple of years left to produce value and we think this is
> a good balance.  And as I said before, I will stay around as
> Chairman as long as Jamie wants me.

(¶ 73.) Another analyst also probed this issue:

> Mr. Dimon, you talked about the fact that you are going to
> become CEO in two years. The question is obviously, why
> you didn't decide to move for that now, as you know,
> things can change a lot in two years based on your
> experience?

(¶ 74.) Dimon delivered a non-answer:

> You've got to think a little bit that these are two large
> organizations coming together.  You want the teams to
> meld.  I have a lot to learn there.  Bill and I have known
> each other a long time so we feel pretty comfortable about
> this and I'm convinced this will work.

(¶ 75.)

Harrison passed on such opportunities to disclose that, in fact, he had been presented with the alternative of Dimon immediately serving as CEO in a merger of equals with no premium at all for Bank One. (¶ 76.) Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and end up with a smaller share of the combined Company. (*Id.*)

## III.    EVEN THOUGH HARRISON STILL HAS THE CEO TITLE, DIMON IS THE TRUE CEO

Exacerbating the outrageousness of the unnecessary premium, it turns out that Dimon is the true CEO of JPMC, even though his official title is President and Chief Operating Officer. (¶¶ 49, 52, 55, 63-71.) Although Harrison formally retains the title of CEO, numerous sources, including several cited in the Complaint, confirm that investors, analysts, and other observers widely recognize Dimon as the true CEO of JPMC. (*Id.*) One money manager observed: "This deal's all about Jamie Dimon...That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one." (¶ 64.)

Thus, aside from ensuring that Harrison will retain the title of CEO for another two years, the billions of dollars of shareholder value that were diverted from members of the Class to Bank One shareholders have accomplished nothing at all. (¶ 55.) If the Merger had gone forward with a no-premium exchange ratio (as in a true merger of equals[6]), instead of the unfair ratio approved by the Individual Defendants, every aspect

---

[6]    Several analysts observed that the Merger was, in substance, a merger of equals. (*See, e.g.,* ¶¶ 43, 44.)

of JPMC would be precisely the same today. The Company's business and operations would be been no different – for instance, the Company's bank branches and ATMs were not affected in any way by the exchange ratio. The Company's capital structure would be no different – neither JPMC's balance sheet nor its income statement was affected by the exchange ratio. The Company expended no cash as a result of the acquisition premium, which ensured Harrison's continued tenure. As the Complaint emphasizes, *all that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly paid by the Company's pre-Merger shareholders to secure that benefit for Harrison.* (*Id.*)

Clearly, the alleged misconduct has inflicted no harm on the Company itself. Members of the Class, on the other hand, saw their individual holdings diluted greatly, to the chagrin of many pre-Merger JPMC shareholders. (¶¶ 60, 76, 79, 80, 83, 84.) As a result of the Merger, Plaintiffs and other pre-Merger JPMC shareholders hold approximately 58% of the combined entity, but if JPMC had merged with Bank One without paying any acquisition premium, these shareholders would now hold approximately 61% of the combined entity. (¶ 87.) As of December 9, 2004, JPMC had a market capitalization of over $130 billion. Thus, the value improperly diverted to secure a benefit for Defendant Harrison comes to billions of dollars.

On September 22, 2004, Defendants moved to dismiss the Complaint, and they filed their opening brief in support of the Motion on October 26, 2004.

## STANDARD OF REVIEW

In the context of a motion to dismiss, "the truthfulness of all well-pleaded allegations in the complaint is to be assumed." *Solomon v. Pathe Commun. Corp.*, 672 A.2d 35, 38 (Del. 1996). In addition, the Court must give the Plaintiff "the benefit of all reasonable inferences that can be drawn from its pleading." *Id.* (quoting *In re USACafes, L.P. Litig.*, 600 A.2d 43, 47 (Del. Ch. 1991)). The Court should not dismiss a complaint "unless [it is] reasonably certain that Plaintiff is not entitled to relief under any set of facts which could be inferred." *In re Fuqua Indus., Inc. S'holder Litig.*, No. 11974, 1997 WL 257460, at *2 (Del. Ch. May 13, 1997).

In *Blackmore Partners, L.P. v. Link Energy LLC*, 2004 Del. Ch. LEXIS 164, at *2 (Nov. 10, 2004), this Court considered a motion to dismiss a complaint that, like the instant Complaint, alleged disloyal conduct by directors. However, unlike the instant Complaint, the plaintiff in *Blackmore* did not specifically allege that a majority of the directors were either interested in the transaction or lacked independence. Nevertheless, this Court denied the motion to dismiss:

> [T]he well-pleaded allegations of fact found in the complaint, if true, could support a reasonable inference of disloyal conduct. This is all that is required to survive a motion to dismiss.

*Id.*

## ARGUMENT

### I.  THE IMPROPER PREMIUM FAILS THE ENTIRE FAIRNESS STANDARD AND IS NOT SHELTERED BY THE BUSINESS JUDGMENT RULE

Defendants presume that the misconduct alleged in the Complaint is not actionable due to the business judgment rule. However, for the business judgment rule to

protect directors' decisions in the first place, a disinterested and independent board of

directors must approve the transaction, especially one involving self-dealing, as here.

### A.    The Entire Fairness Standard Governs the Challenged Transaction

In *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002), Chancellor Chandler provided

an excellent analytical roadmap that, if followed, confirms the complete viability of the

instant Complaint. There, the Court denied the defendants' motion to dismiss fiduciary

duty claims asserted in connection with a merger after extensively discussing the

applicability of the entire fairness standard to duty of loyalty claims and reviewing the

allegations of the complaint. Chancellor Chandler explained the applicable standards as

follows:

> As a general matter, the business judgment rule
> presumption that a board acted loyally can be rebutted by
> alleging facts which, if accepted as true, establish that the
> *board* was either interested in the outcome of the
> transaction or lacked the independence to consider
> objectively whether the transaction was in the best interest
> of its company and all of its shareholders. To establish that
> a *board* was interested or lacked independence, a plaintiff
> must allege facts as to the interest and lack of independence
> of the *individual members* of that board. To rebut
> successfully business judgment presumptions in this
> manner, thereby leading to the application of the entire
> fairness standard, a plaintiff must normally plead facts
> demonstrating that a *majority* of the director defendants
> have a financial interest in the transaction or were
> dominated or controlled by a materially interested director.

794 A.2d at 22-23 (emphasis in original, citations and quotes omitted); *see also Emerald*

*Partners v Berlin*, 787 A.2d 85, 95 (Del. 2001) (noting that entire fairness standard shifts

to director defendants burden of establishing that challenged transaction was entirely

fair).

As twelve directors sat on JPMC's Board when the Merger was negotiated, voted upon, approved, and recommended to shareholders, Plaintiffs need only show that six or more[7] of those directors were either interested in the Merger (or, more precisely, the improper premium) or not independent from a materially interested director in order for the entire fairness standard of review to apply to the Individual Defendants' approval of the Merger. The Complaint alleges that, of JPMC's twelve directors, Harrison was interested in the Merger and at least eight others – a clear majority – lacked sufficient independence from Harrison.

### 1.    Harrison

Harrison's direct personal interest in the improper premium is beyond dispute. The Complaint alleges that Harrison agreed to the payment of a multi-billion dollar acquisition premium, and forwent the opportunity to merge without paying any premium, to retain his CEO title. (¶¶ 38, 44, 45.) Thus, the Complaint alleges that Harrison benefited directly and personally from the improper premium to the detriment of JPMC shareholders whose interests he was obligated to protect.

---

[7]    The business judgment rule only protects corporate decisions approved by a majority of disinterested and independent directors. Absent a special committee of disinterested and independent directors, if fifty percent or more of a board of directors is either interested or not independent, then approval by a majority (i.e., greater than fifty percent) of disinterested and independent directors is mathematically impossible. Thus, for a board made up of an even number of directors, as here, Plaintiffs need only show that *half or more* (as opposed to more than half) were either interested in the challenged decision or not independent from a materially interested director in order for the entire fairness standard of review to apply. *See In re The Limited, Inc. S'holders Litig.*, 2002 Del. Ch. LEXIS 28, at \*28 (March 27, 2002) ("Where the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

- 13 -

In *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), the Supreme Court defined interest as meaning that a director cannot "expect to derive any personal financial benefit from [a transaction] in the sense of self-dealing[.]" *See also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995) (affirming that entire fairness standard applies "if actual self-interest is present"); *State of Wisconsin Inv. Bd. v. Bartlett*, C.A. No. 17727, 2000 Del. Ch. LEXIS 42, at *12 (Feb. 24, 2000) (observing that entire fairness standard applies if "a majority of directors have a financial interest in the transaction or a motive to entrench themselves in office through the merger").

Harrison entrenched himself with the CEO title through the Merger and his self-dealing thus disqualifies his approval of the Merger for the purpose of determining whether the Court should apply the business judgment rule.

Defendants contend that Plaintiffs' allegations are "nonsensical" because Harrison could simply have walked away with $18.7 million in severance compensation had he voluntarily given up his CEO title. (Defs' Br. at 12.) This is not true. Harrison would have been entitled to $18.7 million in severance only "if his employment were terminated *involuntarily*[.]" (Proxy Statement at 59 (emphasis added).) Defendants fail to point out that, in connection with the Merger, Harrison secured for himself a $3.5 million increase in his severance package, to $22.2 million. (*Id.*) Ignoring this self-dealing, they nevertheless maintain that Harrison could have declined to pursue the Merger if all he sought was to preserve his CEO title. Without speculating as to whether such disloyal conduct in bad faith would have been actionable, this claim contradicts the Complaint's allegations that Harrison knew that his job was in danger. (¶¶ 28-30.) Accordingly, Defendants' arguments miss their mark.

If Harrison concealed his negotiations with Dimon from the other JPMC directors, this Court need not examine the independence or disinterest of the remaining directors. When an interested director *fails to disclose his interest in a transaction* to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction, the entire fairness standard is the proper standard of review. *Orman*, 794 A.2d at 23 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995)). The Complaint alleges that the Individual Defendants were aware of the opportunity to merge without paying any premium, based, among other things, upon the Proxy Statement's representations that Harrison kept the other Individual Defendants apprised of the negotiations leading to the Merger. (¶¶ 40, 41, 81.) If discovery reveals that those representations were inaccurate, and that Harrison hid Dimon's proposal from his fellow directors, then the entire fairness standard must apply regardless of their independence. After all, independent or not, directors cannot make an informed decision if material facts have been concealed to avoid their consideration.

### 2.    Riley Bechtel

Riley Bechtel is Chairman, CEO, and a director of Bechtel Group, Inc.[8] (¶ 7.) Forbes magazine estimates his wealth at $3.2 billion, due to his inherited interest in Bechtel Group. The Complaint alleges that Bechtel Group has received over $2 billion from the Trade Bank of Iraq, which is managed by JPMC. (*Id.*) The staggering size of

---

[8]    The Complaint alleges the lack of independence of certain directors based on publicly-available filings, reports, and articles, any or all of which Plaintiffs can provide upon the Court's request.

this financial relationship shows that JPMC and the Bechtel Group, and their respective

CEOs, are mutually interested in their ventures in Iraq. The importance of this

relationship to Bechtel Group is clear from its corporate website, which lists the "U.S.

Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage.

Further, the website proudly points out that "Iraq Infrastructure II," Bechtel Group's

second major Iraq contract, is valued at up to $1.8 billion. Bechtel Group depends on the

Trade Bank of Iraq to execute its lucrative contractual commitments in rebuilding Iraq's

infrastructure  JPMC, headed by Harrison, leads the consortium of banks operating the

Trade Bank of Iraq. (*Id.*) Accordingly, Riley Bechtel cannot be considered independent

from Harrison.

That Bechtel was beholden to Harrison is apparent enough from the Bechtel

Group's dependence on the Trade Bank of Iraq. However, the Bechtel Group and JPMC

share other considerable financial interests, such as their holdings in Nexant Corporation,

which is partly owned by Bechtel Capital Partners, LLC, an investment partnership

owned by certain partners of Bechtel Group, and The Beacon Group, a private equity

investment firm affiliated with JPMC,[9] which manages approximately $1.6 billion in

assets in the energy industry. (*Id.*)

Nexant purports to be a "provider of technology solutions and experience-based

technical and management consulting services to the global energy industry." On

September 27, 2000, Nexant completed its first venture investment round, announcing:

---

[9]    JPMC's predecessor Chase Manhattan paid $500 million for The Beacon Group in 2000,
just months before it merged with JPMorgan.

> Nexant, Inc., the energy technology and consulting
> company formed by Bechtel Capital Partners LLC earlier
> this year, announced today that it has successfully
> completed its first venture investment round, securing $15
> million in capital from a blue chip group of investors,
> including The Beacon Group, Morgan Stanley Dean Witter,
> the partners of Hellman & Friedman LLC, and Nth Power
> Technologies, Inc. Nexant will use the investment proceeds
> to complete development of new technology solutions for
> the energy industry.

Riley Bechtel's interests are deeply intertwined with JPMC's. (*Id.*) As head of

JPMC, Harrison had the power to discontinue or limit these financial relationships.

Through the Iraq commitments and mutual investments, Harrison and Riley Bechtel have

effectively become business partners. *See Harbor Fin. Partners v. Huizenga*, 751 A.2d

879, 889 (Del. Ch. 1999) ("This long-standing pattern of mutually advantageous business

relations makes me doubtful that Hudson could impartially consider a demand that

Republic file a lawsuit adverse to Huizenga's interests."). Thus, Riley Bechtel lacked the

requisite independence to assure this Court that he would have vigorously opposed an

action by Harrison to favor himself over JPMC's shareholders.

### 3.    Lawrence Bossidy

The Complaint alleges that Bossidy was not an independent director because his

son is employed by JPMC as a Vice President. (¶ 10.)  In *In re Emerging*

*Communications, Inc. Shareholders Litigation*, 2004 Del. Ch. LEXIS 70, at *124 (May 3,

2004), a member of a special committee, established to consider a going-private offer by

the company's own Chairman and CEO, was found to be beholden to the Chairman and

CEO in part because his son-in-law was employed by the Chairman and CEO. *See also*

*Huizenga*, 751 A.2d at 889 (director has disabling conflict where director's decision

- 17 -

could advance economic or career opportunities of family member); *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) ("material financial or familial interest" can undermine independence and thereby justify demand excusal); *Mizel v. Connelly*, C.A. No. 16638, 1999 Del. Ch. LEXIS 157, at *11-12, mem. op. at 9-11 (July 22, 1999) (grandson could not objectively consider demand adverse to interests of his grandfather); *Chaffin v. GNI Group, Inc.*, 1999 Del. Ch. LEXIS 182, at *17-18, mem. op. at 14 (September 3, 1999) (where approval of transaction benefited son of director, the father-director was interested for purposes of business judgment rule analysis).

Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC. Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement. Even if Bossidy was otherwise a capable and independent director, for the purposes of this action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

### 4.    Ellen Futter

The Complaint alleges that Futter was not an independent director because her brother-in-law is employed by JPMC as a managing director. (¶ 12.) As with Bossidy, Futter's familial interest raises serious doubts that she would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

In addition, JPMC is a significant benefactor of The American Museum of Natural History, of which Futter is President and Trustee. (*Id.*) Among other things, the

Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation, the corporate philanthropy arm of JPMC. (*Id.*)

In *In re Oracle Derivative Litigation*, 824 A.2d 917 (Del. Ch. 2003), Vice Chancellor Strine held that philanthropic ties can result in loss of director independence. In *Oracle*, the board had formed a special litigation committee of two directors to investigate allegations of insider trading and determine whether the claims should be pursued. Vice Chancellor Strine found that the two committee members lacked sufficient independence from the directors under investigation because of a variety of relationships the directors had with Stanford University. Both members of the committee were tenured professors at Stanford. The directors under investigation included a Stanford alumnus, who was a major contributor to Stanford and Stanford Law School. The head of the company was a large donor to Stanford and was considering a multi-million-dollar gift to Stanford at roughly the time the committee members joined the company's board. Vice Chancellor Strine broadly inquired into the potential motivations of the committee members based on the Stanford connections of the directors they were investigating. The Court concluded it could not dismiss the shareholder claims because the Stanford affiliations raised a substantial doubt as to the ability of the committee members to exercise impartial judgment. Vice Chancellor Strine observed:

> As noted by Chancellor Chandler recently [in *Orman v. Cullman*], a director may be compromised if he is beholden to an interested person. Beholden in this sense does not mean just owing in the financial sense, it can also flow out of personal or other relationships to the interested party.

*Oracle*, 824 A.2d at 938-39 (citations and quotes omitted). Further, the Vice Chancellor recognized "the importance (i.e., the materiality) of other bias-creating factors other than

fear that acting a certain way will invite economic retribution by the interested directors."
*Id.* at 939, n.55.

As in *Oracle*, JPMC's extensive philanthropic involvement with The American
Museum of Natural History warrants concern that Futter would not endanger the
Museum's important relationship with JPMC by vigorously opposing an action by
Harrison to favor himself over JPMC's shareholders. Futter's career and success depend,
in large part, on the nurturing and retention of corporate donors. For Futter to stand in
Harrison's way would not only endanger the Museum's relationship with JPMC, but also
diminish Futter's ability to solicit other large donations from the corporate community.

The Museum's direct financial dependence on JPMC is far from the vague
"structural bias" allegations rejected in *Beam v. Stewart*, 845 A.2d 1040 (Del. 2004). (*See*
Defs' Br. at 16.) For instance, the Complaint alleges that the Young Naturalist awards
are funded by a grant from the J.P. Morgan Chase Foundation. (¶ 12.) JPMC makes
donations through the Foundation and, according to "The JPMorgan Chase Corporate
Responsibility Annual Report," the Foundation made $312,500 in contributions to the
Museum in 2003.[10] This carries on JPMC's long-standing support for the Museum,
originating with financier J.P. Morgan's donations of gems and minerals to the Museum's
Tiffany-Morgan Collection of Gems, many of which are on display in the J.P. Morgan
Hall of Gems. Such corporate philanthropy is certainly commendable, but it also serves
as reason to infer that Futter is not sufficiently independent from Harrison. It certainly is

---

[10]     It is not clear whether these monetary contributions are separate from and in addition to
JPMC's funding of the Young Naturalist awards.

reasonable to expect that the head of an institution dependent on the Company's continued financial support would not endanger her institution's financial backing, as well as her own career, by standing in the way of Harrison's self-dealing. Accordingly, Futter must be considered to be beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

### 5.    William Gray

The Complaint alleges that Gray was not an independent director because JPMC is a National Sponsor of the United Negro College Fund (UNCF), of which Gray was President and CEO at all relevant times. (¶ 13.) In 2003, JPMC matched nearly $1.3 million in UNCF donations, making possible a combined total of $2.6 million raised through employee contributions and matching gifts. Since 1990, JPMC employees have donated more than $6.6 million to the UNCF, which when combined with the matching gift and sponsorships, has resulted in a total contribution of nearly $18.7 million. The November 3, 2003 issue of *Jet*, in reporting Gray's intention to retire as President and CEO of UNCF on March 31, 2004, observed that Gray had raised over $1.5 billion for the organization. Thus, the philanthropic relationship between JPMC and UNCF is significant and long-standing, and Gray's lauded success in fundraising has been due, in large part, to his ability to nurture and retain corporate donors such as JPMC.

Gray's connections to Harrison extend beyond the financial relationship between JPMC and UNCF. According to Prudential Securities senior analyst Mike Mayo's report "Corporate Governance at Banks," Harrison has served as treasurer of the UNCF (even though this fact is disclosed nowhere in the Proxy Statement).

- 21 -

Like Futter, Gray's financial relationship with JPMC and Harrison's service as UNCF's treasurer raise serious doubts that Gray would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. As with Futter, it would not be reasonable to expect the head of an institution interested in the Company's continued financial support to stand in the way of Harrison's self-dealing. Moreover, Harrison's undisclosed service as UNCF's treasurer further evidences his close relationship with Gray. Accordingly, Gray must be considered beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

### 6.    Helene Kaplan

The Complaint alleges Kaplan was not an independent director because she is Vice-Chair and a Trustee of The American Museum of Natural History, of which JPMC is a significant benefactor, as described above. (¶ 14.) As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm financial footing, among other things, by nurturing and pleasing corporate donors like JPMC. Like Futter, Kaplan's interest in the Company's continued financial support of the Museum renders her insufficiently independent to assure this Court that she would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

### 7.    Frank Bennack

Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. (¶ 8.) He also is the immediate past President and CEO of The Hearst Corporation, positions he held beginning in 1979.

- 22 -

EFiled: Dec 10 2004 8:49PM EST
Filing ID 4766524

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

|                                          |                          |
| ---------------------------------------- | ------------------------ |
| IN RE J.P. MORGAN CHASE & CO.            | CONSOLIDATED             |
| SHAREHOLDER LITIGATION                   | C.A. No. 531-N           |

PLAINTIFFS' ANSWERING BRIEF IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# PART 2 of 2

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
919 N. Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)
    -- and --
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

**BULL & LIFSHITZ, LLP**
18 East 41st Street
New York, NY 10017
(212) 213-6222
(212) 213-9405 (fax)

*Co-Lead Counsel for Plaintiffs*

Dated: December 10, 2004

(*Id.*) The Complaint alleges that Bennack was not an independent JPMC director because

Hearst-Argyle Television, Inc. has a credit facility with a consortium of banks led, in

part, by JPMC. (*Id.*)

Hearst-Argyle, which is majority-owned by The Hearst Corporation, was formed

in 1997 by the merger of the broadcast group of The Hearst Corporation and Argyle

Television, Inc. Bennack was instrumental in creating Hearst-Argyle. Hearst-Argyle's

most recent quarterly report discusses its financial relationship with JPMC as follows:

> *J.P. Morgan Chase & Co.* The lead agent bank under the
> Company's $500 million credit facility entered into in April
> 1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The
> outstanding balance on the credit facility was paid off as of
> September 2003, and the facility matured on April 12,
> 2004. Frank A. Bennack, Jr., a Director of the Company,
> served as a Director of J.P. Morgan until July of this year.
> We expect to enter into a new credit facility for $250
> million with J.P. Morgan, and other parties, before the end
> of the year.

As of September 30, 2004, Hearst-Argyle had approximately $1 billion in long-

term debt, amounting to nearly half of its $2.4 billion market capitalization. Thus,

Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its

credit facility for its operations and to maximize profits. As a leading creditor, JPMC

possesses substantial leverage over Hearst-Argyle.

In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-Argyle

are co-investors in ProAct Technologies, a privately held corporation in which Hearst-

Argyle invested $25 million on March 22, 2000.

According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares of

Hearst-Argyle, worth approximately $625,000. Moreover, Bennack's senior position at

- 23 -

The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the importance

of Hearst-Argyle's success to Bennack. Accordingly, as Hearst-Argyle is indebted to

JPMC, and also co-invests with JPMC, Bennack was unlikely to have challenged

Harrison. Doing so would have risked incurring the wrath of the head of one of Hearst-

Argyle's most powerful creditors, potentially resulting in such repercussions as: (1) a less

favorable credit facility for Hearst-Argyle when renewed; (2) increased pressure on

Hearst-Argyle from a major creditor; or (3) the elimination of further co-investment

opportunities with JPMC. Any of these consequences would have adverse implications

for the value of Bennack's investment in Hearst-Argyle, as well as the value of The

Hearst Corporation's investment in Hearst-Argyle. Taken together, Bennack's direct

interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and

Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he

would have vigorously opposed an action by Harrison to favor himself over JPMC's

shareholders.

### 8.    John Stafford

Stafford has been retired Chairman of the Board of, and consultant to, Wyeth

since January 2003. (¶ 16.) He was Chairman of the Board from 1986 until 2003. (*Id.*)

Stafford also was CEO of Wyeth from 1986 until May 2001. (*Id.*) Stafford was not an

independent director because JPMC is the administrative agent and a lending bank under

Wyeth's credit facilities. (*Id.*) Also, JPMC serves as indenture trustee, paying agent, and

conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate

Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August

2003 registration of debt securities. (*Id.*) According to a November 19, 2004 filing,

JPMorgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million. JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence. JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth. For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price. JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance. As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders. Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Wyeth was either undersecured or would be undersecured within a relatively short time. In all these ways, JPMC possesses substantial leverage over Wyeth. Taken together, Stafford's financial interest in Wyeth and JPMC's relationship with Wyeth raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

### 9.    M. Anthony Burns

As the Chairman Emeritus and former CEO of Ryder System, Inc., Burns was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves

as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities. (¶ 11.) According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth over $60 million.

As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders. Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders. For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time. In this way, JPMC possesses significant leverage over Ryder.

Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

*       *       *

Accordingly, the entire fairness standard is the proper standard of review because at least nine of JPMC's twelve directors were either interested in the improper premium or not sufficiently independent from Harrison. The business judgment rule applies only when corporate action has been approved by a majority of disinterested and independent directors. *See Lewis v. Fuqua*, 502 A.2d 962, 970 (Del. Ch. 1985) ("The *business*

- 26 -

*judgment* rule would *only* be applicable, however, if there was a *majority* of disinterested

directors and there had been no domination of the Board by one or more directors.")

(emphasis in original). Given the myriad of financial and familial relationships and other

ties detailed above, this is not the case here. Thus, the Merger was not approved by a

Board consisting of a majority of disinterested, independent directors.

     Alternatively, if discovery reveals that Harrison concealed Dimon's proposal to

merge without any premium from the other JPMC directors, the entire fairness standard is

the proper standard of review without regard to the independence of JPMC's other

directors. This issue of fact alone necessitates denial of the Motion. *See Solomon*, 672

A.2d at 38 (holding that, in context of motion to dismiss, the Court must give the plaintiff

"the benefit of all reasonable inferences that can be drawn from its pleading"); *Desert*

*Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1206 (Del.

1993) (holding that "motion for judgment on the pleadings cannot be granted when a

material question of fact exists").

     **B.**    **The Business Judgment Rule Cannot Shelter the Alleged Misconduct**

     Even though many JPMC shareholders and observers have questioned his

leadership, the Complaint does not seek relief for Harrison's failed stewardship. Rather,

the Complaint narrowly challenges an arrangement that sacrificed the interests of pre-

Merger JPMC's shareholders and aims to remedy the disastrous consequences for

JPMC's unwitting shareholders. As explained above, Harrison's pact with Dimon cost

JPMC shareholders billions of dollars in value, in exchange for which Harrison retained

his title as CEO for another two years. Harrison sold out JPMC's shareholders because

he knew his job was in danger. Adding insult to injury, Harrison is not even the

Company's true CEO. His breach of his duty of loyalty to JPMC's shareholders cost

them dearly, but, ultimately, Dimon was and is seen as the Company's true CEO,

regardless of Harrison's corrupt bargain.

The circumstances here recall *Parnes v. Bally Entertainment Corp.*, 722 A.2d

1243, 1246 (Del. 1999), in which Bally's CEO allegedly demanded bribes from

prospective takeover bidders and allegedly received such a bribe from the successful

bidder. In holding that the Plaintiff shareholder had stated a cause of action, the Court

observed that "it is inexplicable that independent directors, acting in good faith, could

approve the deal" when it was so tainted. 722 A.2d at 1246 ("The presumptive validity of

a business judgment is rebutted in those rare cases where the decision under attack is 'so

far beyond the bounds of reasonable judgment that it seems essentially inexplicable on

any ground other than bad faith.'" (quoting *In re J.P. Stevens & Co., Inc.*, 542 A.2d 770,

780-81 (Del. Ch. 1988))); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361

(Del. 1993), *modified on reargument in part*, 636 A.2d 956 (Del. 1994) ("The rule posits

a powerful presumption in favor of actions taken by the directors in that a decision made

by a loyal and informed board will not be overturned by the courts unless it cannot be

'attributed to any rational business purpose.'" (quoting *Sinclair Oil Corp. v. Levien*, 280

A.2d 717, 720 (Del. 1971))).

As in *Parnes*, here, Harrison sought for himself an extraordinary benefit, at

enormous cost to JPMC's shareholders, as a condition for the merger. In *Parnes*, the

company's head allegedly sought monetary bribes; here, Harrison sought another two

years as CEO, fearing that his title was in danger due to widespread criticism of his poor

record. Because the opportunity to merge with Bank One without paying any premium

was on the table, Harrison's agreement to an enormous premium so he could remain CEO cannot be attributed to any rational business purpose. As the recent spate of corporate scandals has shown, the egotism of many corporate chieftains should not be underestimated. If discovery confirms that Harrison passed on a zero-premium exchange for no other reason than to continue calling himself CEO for two more years, then neither law nor equity compels this Court to apply the business judgment rule.

Defendants suggest that the two extra years for Harrison were worth the billions of dollars in value diverted from JPMC's pre-Merger shareholders because this arrangement was necessary to ensure a "smooth transition." (Defs' Br. at 16.) The transparency of this pretext is clear from the allegations of the Complaint concerning the wide recognition, both inside and outside the Company, that Harrison's leadership has been disastrous and that Dimon is now JPMC's true CEO. The handing off of the reins *did* take place as soon as Dimon took charge at JPMC. (*Cf. id.* ("Any reasonable director would have serious reservations about immediately handing over the reins....").) The transition *was* immediate. Harrison's CEO title is hollow, mere words. He behaves as a Chairman no longer managing the Company, and is seen as such, although he is still paid like a CEO. Accordingly, Plaintiffs are entitled to prove at trial the Complaint's allegations that, because the "smooth transition" rationale, the only rationale offered by Defendants, is false, the Individual Defendants simply had no business purpose at all in rejecting a no-premium merger of equals and instead causing shareholders to pay a huge

- 29 -

premium.[11] Once Plaintiffs rebut the presumption of the business judgment rule,

Defendants bear the burden of proving that their decision was entirely fair to the

Company's pre-Merger shareholders. *Krasner v. Moffett*, 826 A.2d 277, 287 (Del. 2003)

(citing *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 n.9 (Del.

1993) (noting that "where actual self-interest is present and affects a majority of the

directors approving a transaction, a court will apply ...exacting scrutiny to determine

whether the transaction is entirely fair to the stockholders").

## II.  THE COMPLAINT STATES A VALID CLASS CLAIM FOR BREACH OF THE DUTY OF DISCLOSURE

The Delaware Supreme Court has repeatedly articulated the strict standard

applicable to a director's fiduciary duty of disclosure. *See, e.g., Shell Petroleum, Inc. v.*

*Smith*, 606 A.2d 112, 114 (Del. 1992); *Stroud v. Grace*, 606 A.2d 75, 84-5 (Del. 1992);

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985). That is, "directors of

Delaware corporations are under a fiduciary duty to disclose fully and fairly all material

information within the board's control when it seeks shareholder action." *Arnold v.*

*Society for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (citations omitted).

The test for whether a fact is material is as follows:

> An omitted fact is material if there is a substantial
> likelihood that a reasonable shareholder would consider it
> important in deciding how to vote.... It does not require
> proof of a substantial likelihood that disclosure of the
> omitted fact would have caused a reasonable investor to

---

[11]     The Individual Defendants' reliance upon a conflicted financial advisor in approving the premium offers no reassurance that the premium was fair to pre-Merger shareholders of JPMC. The Proxy Statement prominently and repeatedly advises: "As a result of its affiliation with JPMorgan Chase, JPMorgan Securities may be deemed to have had potential conflicts of interest in performing its duties as financial advisor." (Proxy Statement at 6-7, 41.)

> change his vote. What the standard does contemplate is a
> showing of a substantial likelihood that, under all the
> circumstances, the omitted fact would have assumed actual
> significance in the deliberations of the reasonable
> shareholder. Put another way, there must be a substantial
> likelihood that the disclosure of the omitted fact would
> have been viewed by the reasonable investor as having
> significantly altered the "total mix" of information made
> available.

*Zirn v. VLI Corp.*, 621 A.2d 773, 779 (Del. 1993).

This test for materiality represents an objective standard measured from the

viewpoint of a reasonable investor, and does not require that the information be of such

importance that its revelation would have caused an investor to change his vote. *Id.*

Thus, directors are not to be guided by their own subjective views to the exclusion of an

objective analysis of what an investor might consider relevant. *Id.*; *see Shell Petroleum*,

606 A.2d at 114; *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1289 (Del. 1989).

Contrary to Defendants' contention, negotiations preceding the setting of final

price and structure terms can constitute material information. (*See* Defs' Br. at 25-27

(citing *Bershad v. Curtiss Wright Corp.*, 535 A.2d 840 (Del. 1987)).) Chancellor

Chandler made this clear in *Alessi v. Beracha*, 849 A.2d 939 (2004), where, following

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), he distinguished *Bershad* and held:

> The United States Supreme Court provided meaningful
> standards to assess whether merger discussions should be
> disclosed. The Court noted that whether a contingent
> event, such as a merger, is material will depend at any
> given time upon a balancing of both the indicated
> probability that the event will occur and the anticipated
> magnitude of the event in light of the totality of the
> company activity. The probability/magnitude approach is a
> familiar one. In the context of merger discussions,...in
> order to assess the probability that the event will occur, a
> fact finder will need to look to indicia of interest in the

> transaction at the highest levels. And to assess the
> magnitude of the transaction, a fact finder will need to
> consider such facts as the size of the two corporate entities
> and the potential premiums over market value. Lastly, the
> materiality standard is applied with respect to the
> shareholder action being sought.

849 A.2d at 949 (citations and quotes omitted). The many factual questions raised here

preclude dismissal before any discovery has taken place. *See id.* at 950 n.68 ("In such a

fact-sensitive inquiry as materiality, dismissing a complaint outright before any discovery

is uncommon."). Moreover, the allegations of the Complaint all weigh in favor of the

*Basic* factual factors approved in *Alessi*: (1) the Merger was likely to occur, and did

occur, among other reasons, because Harrison needed it to save his job, (2) the magnitude

of the transaction, both on an absolute and relative basis, is unquestionable, as the Merger

represented the largest transaction of 2004 and left pre-Merger JPMC shareholders

holding only 58 percent of the combined entity, (3) the premium paid in connection with

the Merger is *the* central issue underlying Plaintiffs' claims, and (4) the shareholder

action being sought was shareholder approval of the Merger, without which the Merger

could not have taken place.

    Importantly, because the question of materiality is a highly factual one, duty of

disclosure claims ordinarily are not amenable to disposition at the pleadings stage. *See*

*Wells Fargo & Co. v. First Interstate Bancorp*, 1996 Del. Ch. LEXIS 3, at *29 (1996)

("question of materiality is difficult to treat as a question of law on a motion to dismiss");

*Branson v. Exide Elecs. Corp.*, 1994 Del. LEXIS 129, at *8 (1994) ("Whether or not a

statement or omission in an offering prospectus was material is a question of fact that

generally cannot be resolved on a motion to dismiss, but rather it must be determined

after the development of an evidentiary record."). Thus, "if a complaint states a claim upon which the pleader might recover, the complaint should not be dismissed until the plaintiff has had an opportunity to develop a factual record, i.e., by motion for summary judgment, or a trial." *Id.* at *8-9.

With respect to the Complaint's allegations concerning the succession arrangement between Dimon and Defendant Harrison, Defendants assert that, because the no-premium merger offer was rejected, it was no longer on the table and was thereby rendered immaterial as a matter of law. (Defs' Br. at 24, 28.) Regardless of whether the Individual Defendants were compelled to accept the alleged offer, under Delaware law, the succession arrangement's relation to the premium should have been disclosed because there is at the very least a substantial likelihood that reasonable investors would have viewed the omitted information as significantly altering the "total mix" of information made available. *Zirn*, 621 A.2d at 779.

Given the billions of dollars of value diverted from JPMC's shareholders through the Merger's improper premium, there can be no dispute that the reasons for the improper premium and the possibility of not paying it at all was highly material information. *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 Del. Ch. LEXIS 3, at *29-30 (Del. Ch. 1996) (court could not hold that failure to disclose circumstances surrounding Board's decision concerning merger was immaterial as matter of law); *In re Staples, Inc. Shareholders. Litig.*, 792 A.2d 934, 954 (Del. Ch. 2001) ("The directors must also avoid partial disclosures that create a materially misleading impression."). The Proxy Statement covers the negotiations leading to the Merger in great detail, but specifically left out Harrison's secret deal. *See Clements v. Rogers*, 790 A.2d 1222, 1242 (Del. Ch.

- 33 -

2001) ("When a Proxy Statement details the functioning of [the negotiating] process, it must do so in a fair and balanced manner that does not create a materially misleading impression of how the [the negotiating person(s)] actually operated in fact."). Eliminating any doubt that the omitted facts were material, the succession arrangement was specifically scrutinized at the press conference announcing the Merger and likely represented *the* most-discussed and important aspect of the Merger.

Defendants' assertion that Plaintiffs cannot articulate how the Company's shareholders were damaged as a result of the Merger is baseless. (Defs' Br. at 28.) Under Delaware law, a Plaintiff is not required to allege damages at the pleading stage as an element of the *prima facie* case for breach of the fiduciary duty of disclosure. *See In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 333 (Del. 1993). The Delaware Supreme Court has held:

> An action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action *does not include the elements of reliance, causation and actual quantifiable monetary damages*. Instead, such actions require the challenged disclosure to have a connection to the request for shareholder action. The essential inquiry in such an action is whether the alleged omission or misrepresentation is material.

*Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998) (emphasis added). In any event, the Complaint *does* articulate precisely how the Class suffered injury. At a minimum the shareholders were injured in that they were forced to vote on the Merger without full and fair disclosure of the material facts concerning the deal between Dimon and Harrison. Additionally, there can be no question that the pre-Merger shareholders were financially

damaged by the enormous premium which diluted their ownership interest in the combined Company.

The Individual Defendants' argument that they are immune from monetary liability because of the Section 102(b)(7) provision of JPMC's Certificate of Incorporation (the "Section 102(b)(7) Provision") fails for several reasons. First, by failing to disclose all material information in the Proxy Statement concerning the Merger's costly benefit for Harrison, the Individual Defendants breached their duty of loyalty to the Company's shareholders. Stemming as it does from the duty of loyalty owed by the Individual Defendants, the particular breach of the duty of disclosure claim alleged here is not subject to the Section 102(b)(7) Provision. *See Zirn v. VLI Corp.*, 621 A.2d 773, 774-77 (Del. Supr. 1993) ("the legislative history of the statute authorizing this provision, 8 Del. C. § 102(b)(7), indicates that corporations are empowered to shield directors from breaches of the duty of care, not the duty of loyalty, which also embraces the duty of disclosure that is at issue here"). The allegations of the Complaint also make clear that the Individual Defendants' acts were committed in bad faith, and involved actions from which Harrison derived an improper personal benefit, *see, e.g.*, (¶¶ 1, 2, 29, 44-46, 55, 80) — allegations which exclude Plaintiffs' breach of the duty of disclosure claim from the reach of the Section 102(b)(7) Provision.

## III.    PLAINTIFFS' CLAIMS ARE DIRECT, NOT DERIVATIVE

What distinguishes this action is that the alleged misconduct did not adversely impact the Company in any way. Rather, only the constitution of JPMC's ownership was altered, to the detriment of Plaintiffs and the Class. Accordingly, this action seeks no relief that would go to the Company.

Plaintiffs claim, among other things, that Defendants breached their fiduciary obligations by (i) failing to disclose all material facts about the Merger to allow for an informed shareholder vote and (ii) agreeing to pay a huge premium to Bank One shareholders in order for Harrison to stay on as CEO of the combined Company for an additional two years. Defendants do not even attempt to argue that Plaintiffs' disclosure claims are derivative in nature. The remaining claims are all direct as well because Plaintiffs' individual interests were diluted by the improper premium.

In determining whether a shareholder's claim is direct or derivative, the Court must examine: "(1) who suffered the alleged harm, (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004). Under *Tooley*, Plaintiffs' claims are clearly direct, and not derivative, because there are no claims asserting injury to JPMC itself, and none of the relief sought would go to the Company. *See id.* at 1039; *see also Agostino v. Hicks*, 845 A.2d 1110, 1121 (Del. Ch. 2004) (asking whether plaintiff has suffered any injury "independent" of any injury to corporation). This is particularly true where, as here, the Merger was effected through issuance of a Proxy Statement that urged JPMC shareholders to vote for the Merger but failed to disclose that the Merger could have been completed without a $7 billion premium. The material omission at issue here only injured JPMC shareholders who were deprived of their right to vote on an informed basis, to their economic detriment. Moreover, Shareholders of the pre-Merger Company (including Plaintiffs and the Class) suffered a dilution of their proportionate interest in the post-Merger Company. The Company itself is unaffected by

- 36 -

whether 40 percent is owned by one constituency and 60 percent by another, or vice

versa. Thus, the Merger did not injure the Company, as no corporate assets were harmed.

In *Tooley*, the Delaware Supreme Court expressly rejected prior precedent that

claims are derivative when "special injury" is lacking, that is, the injury falls equally

upon all stockholders. 845 A.2d at 1037. The Court explained:

> Experience has shown this concept to be confusing and
> inaccurate. It is confusing because it appears to have been
> intended to address the fact that an injury to the corporation
> tends to diminish each share of stock equally because
> corporate assets or their value are diminished. In that
> sense, the indirect injury to the stockholders arising out of
> the harm to the corporation comes about solely by virtue of
> their stockholdings. It does not arise out of any
> independent or direct harm to the stockholders,
> individually. *That concept is also inaccurate because a
> direct, individual claim of stockholders that does not
> depend on harm to the corporation can also fall on all
> stockholders equally, without the claim thereby becoming
> a derivative claim.*

*Id.* (emphasis added).

*Parnes*, acknowledged by the Supreme Court in *Tooley* to have applied the

"proper analysis," also illustrates that this action is properly framed as a direct class

action.

In *Parnes*, the shareholder plaintiff alleged that the board "improperly delegated

merger negotiations" to Goldberg, Bally's Chairman and CEO, who demanded illegal

personal payments as a condition to any transaction, and that as a result, the board failed

to maximize shareholder value. On defendants' motion to dismiss, the Court of Chancery

characterized the claim as one for "waste" and held that "[o]n the record.., [it] could not

tell whether the payments and fees made to Goldberg, all of which appear to be

conditioned on the effectiveness of the merger, are so egregious that Board approval

cannot meet the test of business judgment." *Parnes v. Bally Entertainment Corp.*, C.A.

No. 15192, 1997 Del. Ch. LEXIS 70, at *11 (May 12, 1997). However, the Court

granted defendants' motion for judgment on the pleadings on the ground that plaintiffs'

claims were derivative and that the shareholders had lost standing to pursue it as a result

of the merger.

On appeal, the Supreme Court reversed, holding that the claim was not derivative

because it directly attacked the fairness of the merger:

> Although the Court of Chancery made that finding in the
> context of what it viewed as a waste claim, it is equally
> appropriate in the merger claim. If, as Parnes claims,
> Goldberg tainted the entire process of finding an interested
> merger partner and negotiating the transaction by
> demanding a bribe, then it is inexplicable that independent
> directors, acting in good faith, could approve the deal.

*Parnes*, 722 A.2d at 1246-47.

Here, the JPMC Board breached its fiduciary duties to pre-merger JPMC's

shareholders because, like the Board in *Parnes*, it approved a merger that patently

conferred substantial benefits on Harrison as well as Bank One shareholders to the

detriment of JPMC shareholders. Plaintiffs' allegations with respect to Harrison's role in

the Merger are similar in many respects to the allegations made by Parnes with respect to

Goldberg's role in the Bally/Hilton merger. Like Goldberg, Harrison was the Chairman

of the Board and CEO. Like Goldberg, Harrison controlled the Merger negotiations.

Like Goldberg, Harrison demanded an extraordinary benefit for himself. Like Goldberg,

Harrison preferred himself over his shareholders. Moreover, as in *Parnes*, Plaintiffs

allege that the other JPMC directors breached their fiduciary duties of loyalty by

- 38 -

acquiescing in Harrison's self-interested negotiations and approving the Merger with an improper, excessive, and unnecessary premium. Whereas Goldberg's misconduct diverted cash to himself, Harrison's misconduct diverted stock to Bank One shareholders, with no fiscal repercussions to the Company. The *Parnes* Court found that plaintiff's complaint constituted a direct action because it directly challenged the fairness of the process and the price of the merger. Here, Plaintiffs' allegations challenge the fairness of the Merger, specifically with respect to the failure to provide full and fair disclosure regarding the circumstances behind the improper premium and by diluting the value of their shareholdings.

The cases Defendants cite are inapposite. For example, in *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348 (Del. 1988), plaintiffs alleged that the payment of golden parachutes and other allegedly unnecessary fees in the period prior to a merger constituted a waste of corporate assets. The Court held that the gravamen of those claims was corporate mismanagement, resulting in an injury to the corporation which only a derivative action could remedy. *Id.* at 352-53. In *Kramer*, not only were *corporate assets* wasted but successful prosecution of the case would result in a recovery for the corporate entity. Here, however, Plaintiffs claim that, as a result of Defendants' breaches of their fiduciary obligation of loyalty, only JPMC shareholders suffered an actual injury, since neither the Company nor Bank One stockholders were harmed.

Defendants' reliance on *Behrens v. Aerial Communications, Inc.*, 2001 Del. Ch. LEXIS 80 (Del. Ch. May 22, 2001), *In re Berkshire Realty Company Shareholder Litigation*, 2002 Del. Ch. LEXIS 146 (Del. Ch. Dec. 18, 2002), and *In re Triarc Companies Class & Derivative Litigation*, 791 A.2d 872 (Del. Ch. 2001), is also

- 39 -

misplaced. Each of those cases relied on the "special injury test" which the Delaware Supreme Court squarely rejected in *Tooley*. *See Behrens* at *18-19 ("In short, the Aerial minority shareholders did not suffer, as a result of the debt replacement transaction, the unique dilution that was inflicted on the minority in Tri-Star, nor did the Aerial minority suffer any 'special injury' distinct from that inflicted upon all of Aerial's shareholders collectively."); *In re Berkshire Realty* at* 9 ("An action seeking compensation for a special injury that is different from an injury to the corporation or other shareholders is a direct action; whereas an action seeking compensation for injury to the corporation is a derivative action."); *Triarc* ("'To set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." (citing *Moran v. Household Int'l Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985), aff'd 500 A.2d 1346 (Del. 1986)).[12]

---

[12]    *See also Tooley* at 1035, commenting on the analysis performed by the lower court:

> The trial court's analysis was hindered, however, because it focused on the confusing concept of "special injury" as the test for determining whether a claim is derivative or direct. The trial court's premise was as follows:

> > In order to bring a direct claim, a plaintiff must have experienced some "special injury." [citing *Lipton v. News Int'l*, 514 A.2d 1075, 1079 (Del. 1986)]. A special injury is a wrong that "is separate and distinct from that suffered by other shareholders, ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." [citing

In *Dieterich v. Harper*, 857 A.2d 1017 (Del. Ch. 2004), this Court explored the direct/derivative distinction in its examination of five counts in the shareholder plaintiff's complaint. In sum, this Court held that the three disclosure claims and the claim challenging a consummated merger were all direct, whereas the claim concerning a transaction that never materialized was derivative. *See* 857 A.2d at 1026 n.7 ("The remaining counts of the complaint allege violation of the duty of disclosure and, if they state claims for relief, those claims can be pursued directly[.]").

Following *Tooley*'s guidance, this Court characterized as derivative the claim concerning the transaction that never materialized because the alleged misconduct "simply never resulted in an event or transaction that could have injured the stockholders directly, rather than indirectly as a result of their ownership of...shares." *Id.* at 1028. The alleged misconduct actually led to *nothing in particular*, which, even if wrongful or harmful, damaged the company in question through mismanagement only. *Id.* at 1027. The shareholder plaintiff continued to own the same percentage interest in the company as before, regardless of whether the alleged misconduct harmed or wronged the company.

By contrast, this Court characterized as direct the latter count, which challenged the entire fairness of a merger that *was* consummated. The theory behind this count was that the alleged misconduct "was an integral part of and unfairly infected the final merger negotiations" leading to the consummated transaction. *Id.* at 1028. In light of *Tooley* and

---

*Moran v. Household Int'l. Inc.*, 490 A.2d 1059, 1070
(Del. Ch. 1985), *aff'd* 500 A.2d 1346 (Del. 1986)].

following *Parnes*, this Court agreed with plaintiff that the entire fairness claim directly

attacked the fairness or validity of the merger. *Id.*

As in *Parnes* and *Dieterich*, Plaintiffs here have attacked the fairness and validity

of the Merger. The Complaint alleges that the Merger was unfair because the exchange

ratio should have been lower (specifically, 1.153 instead of 1.32), which would have

resulted in Plaintiffs and the Class individually owning a higher percentage of the

combined entity. The Complaint also alleges that that Merger should be invalidated

because Defendants concealed Harrison's secret deal in soliciting votes from

shareholders. Thus, *Parnes* and *Dieterich* confirm that Plaintiffs' claims are all direct.

As the Complaint attacks the fairness and validity of the Merger, it is clear that

Plaintiffs have asserted a direct cause of action. Plaintiffs and the Class would have

owned a greater proportionate interest in post-Merger JPMC had Harrison and other

Individual Defendants acted loyally. Pre-Merger JPMC shareholders suffered this injury,

not the Company. In fact, recharacterizing Plaintiffs' claim, and the resultant relief, as

belonging to the Company would have the perverse consequence of benefiting many

parties, such as former Bank One shareholders, who already have benefited from the

misconduct. Only a subset of JPMC's *current* shareholders, as well as certain pre-

Merger JPMC shareholders who no longer own shares of the Company, ought to receive

any recovery from this action.[13]

_____

[13]    Thus, even under the abandoned concept of "special injury", i.e., injury which is separate
and distinct from that suffered by other shareholders, Plaintiffs' claim is direct, as the injury
suffered by Plaintiffs and the Class was not suffered by all current shareholders of JPMC, many
of whom formerly owned shares of Bank One.

The remedy for this misconduct is to restore the proper interest of Plaintiffs and the Class in the Company, or equivalent monetary damages. Plaintiffs and the Class suffered the injury, and the relief must go to them.

## IV. EVEN IF PLAINTIFFS' CLAIMS ARE FOUND TO BE DERIVATIVE IN NATURE, PLAINTIFFS HAVE DEMONSTRATED THAT DEMAND IS EXCUSED

### A. The Standard For Establishing Demand Futility

Under the demand futility standard enunciated in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), demand is excused if: (1) there is a reasonable doubt that the directors are "disinterested and independent;" or (2) the allegations create a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000) (internal quotations omitted). The test is in the disjunctive, meaning that if either part is satisfied, demand is excused. *Id.* Here, both prongs of the test are satisfied and demand is excused under either one for any of Plaintiffs' claims held to be derivative, although as shown above, under controlling authority, all of Plaintiffs' are direct. Plaintiffs have alleged particularized facts demonstrating far more than a reasonable doubt that the business judgment rule properly applies to each transaction challenged in the Complaint.

### B. The Board Cannot Impartially Consider Demand

For derivative claims, Plaintiffs must show that a majority of the Board could not impartially consider a shareholder demand. (Defs' Br. at 21-22.) The relevant Defendants for purposes of the demand analysis are those who were directors at the time of the filing of the original complaints on the last two days of June 2004, not the post-

- 43 -

Merger directors.[14]  In Delaware, the original filing date of the complaint is the appropriate benchmark for determining as to which Board demand futility must be assessed.  *Harris v. Carter*, 582 A.2d 222, 228 (Del. Ch. 1990).  Moreover, under Chancery Court Rule 15(c)(2), the Complaint relates back to the initial complaints.  Defendants themselves concede that the Complaint "asserts the same claims…[as] the original complaints…." (Defs' Br. at 5.)

Demand is excused because at least nine of the Company's twelve directors at the time of the filing of the original complaints could not impartially consider a shareholder demand to bring the instant litigation on behalf of the Company and, therefore, it would have been futile to bring such a demand. *(See* Section I.A.)  As detailed above, the Complaint alleges direct financial relationships between certain JPMC directors and JPMC that rendered them beholden to Harrison.  Evaluating the materiality of those relationships is premature at this stage of the litigation because it is a factual issue. *See In re New Valley Corp. Deriv. Litig.*, No. 17649, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001) ("[a]lthough the actual extent of [the directors'] relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss").

---

[14]      Defendants assert that demand futility must be assessed against the post-Merger Board, but cite no authority for this proposition.  Of course, the post-Merger directors, half of whom were with Bank One, would not have brought this suit, as such action would diminish the enormous windfall Bank One shareholders received as a result of the deal between Harrison and Dimon.

C.     **Demand Is Also Excused Because Plaintiffs Allege Particularized Facts Far Exceeding Those Sufficient To Raise A Reasonable Doubt that Defendants' Conduct Was Outside the Protection Of The Business Judgment Rule**

In *Aronson*, the Delaware Supreme Court held that "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." 473 A.2d at 812. "Certainly, if this is an 'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases. In that event futility of demand has been established by any objective or subjective standard." *Id.* at 815. In fact, a Plaintiff need only raise a reasonable doubt that the transaction is not entitled to business judgment protection. *Id.* Furthermore, the business judgment rule does not apply where directors have failed to exercise any business judgment. *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985) (failure to exercise informed judgment deprives the board of the protection of the business judgment rule). Here, Plaintiffs have shown through particularized facts, raising far more than a reasonable doubt, that the Individual Defendants are not entitled to the protection of the business judgment rule. (*See* Section I.B.)

V.     **PLAINTIFFS' CLAIMS, EVEN IF DERIVATIVE, SHOULD NOT BE DISMISSED UNDER RULE 12(b)(6)**

The standard for pleading under Rule 23.1 is significantly more rigorous than the pleading requirements under Rule 12(b)(6). This Court has held on numerous occasions that that a complaint that satisfies the requirements of pleading why demand is excused *a fortiori* satisfies the requirements of stating a claim under Rule 23.1. *Chrysogelos v. London*, No. 11910, 1992 WL 58516, at *7 (Del. Ch. Mar. 25, 1992); *In re Chrysler*

- 45 -

*Corp. S'holders Litig.*, No. 11873, 1992 WL 181024, at *5 (Del. Ch. July 27, 1992). For the reasons discussed above, even if Plaintiffs' claims were found to be derivative, and they are not, the Complaint details facts that excuse demand. Thus, the pleading requirements of Rule 12(b)(6) are satisfied as well.

## VI.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY SECTION 102(B)(7) OF THE DGCL

Defendants' argument that Plaintiffs' claims must be dismissed under Section 102(b)(7) of the DGCL is fundamentally flawed. First, as shown above, Plaintiffs' claims must be evaluated under the entire fairness standard. (*See* Section I.A.) Thus, consideration of the Section 102(b)(7) issue is barred as a matter of law. *Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 1999). Second, even if the Court properly may consider Defendants' claim of immunity from damages under Section 102(b)(7), that provision does not bar any of the claims alleged in this case.

### A.    Consideration Of The Section 102(b)(7) Issue Is Premature

As demonstrated above, Plaintiffs' claims relating to the improper premium require Defendants to prove the entire fairness of the Merger. (*See* Section I.A.) Precisely because the *Defendants* bear the burden of proving that the Merger and its improper premium were entirely fair to the Company's shareholders, Defendants' argument that Section 102(b)(7) bars Plaintiffs' claims is without merit.

In *Emerald*, the Supreme Court of Delaware held that where the circumstances require a Court to evaluate a transaction for its entire fairness, the Court must engage in that analysis *before* even considering a defendant's claim of immunity from monetary damages under Section 102(b)(7):

- 46 -

> If the Court of Chancery determines that the transaction was entirely fair, the director defendants have no liability for monetary damages. The Court of Chancery should address the Section 102(b)(7) charter provision only if it makes a determination that the challenged transaction was not entirely fair. The director defendants' Section 102(b)(7) request for exculpation must then be examined in the context of the completed judicial analysis that resulted in a finding of unfairness. ***The director defendants can avoid personal liability for paying monetary damages <u>only</u> if they have established that their failure to withstand an entire fairness analysis is <u>exclusively attributable to a violation of the duty of care.</u>***

*Emerald*, 787 A.2d at 98 (emphasis added). *See also Orman*, 794 A.2d at 41 (disclosure claim that implicated interest and lack of independence of directors could not be dismissed by application of §102(b)(7)); *In re Ply Gem Indus.*, 2001 WL 755133, at *10 (Del. Ch. June 26, 2001) (allegations of disloyalty preclude dismissal pursuant to § 102(b)(7)).

In the present case, Defendants bear the burden of establishing the entire fairness of the Merger and the improper premium. (*See* Section I.A.) As a result, this Court may not consider Defendants' claims of immunity from monetary damages under Section 102(b)(7) until they have satisfied their burden in this case.

### B. Section 102(b)(7) Does Not Bar Plaintiffs' Claims.

Even if this Court could properly consider the Section 102(b)(7) issue, and it cannot, Defendants' argument that Plaintiffs' claims must be dismissed based on the exculpatory provision in the Company's Certificate of Incorporation is without merit. As Defendants themselves acknowledge, Section 102(b)(7) of the DGCL only insulates the *director* Defendants from liability for damages arising from a violation of the duty of care. It does not bar claims for damages arising from a breach of the duty of loyalty or

- 47 -

the duty of good faith. *See Emerald*, 787 A.2d at 90 ("The purpose of Section 102(b)(7) was to permit shareholders . . . to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, *but not for duty of loyalty violations, good faith violations and certain other conduct.*" (emphasis added)).

 Nor does Section 102(b)(7) bar claims against officers. 8 Del. C. § 102(b)(7) (providing that Certificate of Incorporation may contain "a provision eliminating or limiting the personal liability *of a director* to the corporation or its stockholders for monetary damages for breach of fiduciary duty *as a director* . . ." (emphasis added)). Plaintiffs have sued Harrison in his capacity as an officer of the Company. (¶¶ 1, 2, 5, 18, 89.) As a matter of law, those claims are not barred by Section 102(b)(7). *See Arnold v. Society for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1288 (Del. 1994) (actions taken in capacity as officer not protected by Section 102(b)(7)).

 Further, in addition to compensatory and rescissory damages, Plaintiffs seek equitable relief. (Complaint at page 25) (demanding rescission of the Merger). *See* 8 Del. C. § 102(b)(7) (Certificate of Incorporation may eliminate or limit liability of director "for monetary damages"); *Arnold v. Society for Sav. Bancorp, Inc.,* 678 A.2d 533, 542 (Del. 1996) ("While section 102(b)(7) and charter provisions adopted thereunder will leave stockholders without a monetary remedy in some instances, *they remain protected by the availability of injunctive relief.*"); *Turner v. Bernstein*, 776 A.2d 530, 549 (Del. Ch. 2000) (even plaintiff seeking injunctive relief solely on purely duty of care claims can escape application of Section 102(b)(7)).

## VII.    DEFENDANTS BLOCKED INJUNCTIVE RELIEF BY CLOSING THE MERGER AS SOON AS THE TRUTH WAS REVEALED

Defendants cannot seriously claim that in the three days between the revelation of misconduct and the closing of the Merger, Plaintiffs should have (1) retained counsel, (2) researched, drafted, filed, and served their complaints, *and* (3) moved for a temporary restraining order, including submission of briefs, exhibits, and affidavits as well as scheduling, preparing, and holding oral argument. Although Plaintiffs accomplished steps (1) and (2) in the extremely limited time available, Defendants claim that there was "certainly sufficient time to seek injunctive relief" in the remaining hours before the Merger closed. (Defs' Br. at 29.) Importantly, the revelation of misconduct came *after* the shareholder vote had already taken place. Thus, the remedy suggested by Defendants, supplemental disclosures alone, would not have been meaningful without a second shareholder vote.

Defendants are essentially offering a laches defense by pointing to the fact that Plaintiffs did not seek injunctive relief within the three days between the revelation of misconduct and closing of the Merger. However, the issue of laches is prematurely raised on Defendants' motion to dismiss. *See Harman v. Masoneilan International, Inc.*, 442 A.2d 487, 502-503 (Del. 1982). To establish a defense of laches, Defendants must establish, among other things, unreasonable delay. *Id.* at 503. Whether there has been unreasonable delay is properly addressed after discovery on a motion for summary judgment or at trial. *Id.* In *Harman*, the Supreme Court stated:

> For the Court to rule on the remedies ultimately available to plaintiff before the rights and liabilities of the parties have been tried and determined . . . is to put the cart before the horse. That is particularly true here where rescissional

- 49 -

> relief, if found to be appropriate, may take various forms,
> including rescissional damages in lieu of actual rescission,
> if impractical.

*Id.* Citing *Brown v. Dolese*, 154 A.2d 233 (Del. Ch. 1959), *aff'd Dolese Bros. Co. v.*

*Brown*, 157 A.2d 784 (Del. 1960), the Court held:

> The Chancellor's holding in *Dolese* is precisely in point.
> There, in a strikingly similar case, the Chancellor declined
> to rule on a laches contention raised by the defense, before
> answer, as a basis for dismissal of an action for alleged
> breach of fiduciary duty of a controlling shareholder to
> minority shareholders. The Chancellor stated:

>> "Defendants having been charged with fraudulent
>> concealment of the essential facts upon which
>> plaintiffs propose to rely in order to establish their
>> cause of action in a situation in which the principal
>> actor, Roger, owed a heavy fiduciary duty to both of
>> his sisters, statute of limitations or laches should not
>> at this juncture be applied to bar recovery as Roger
>> may in fact have been guilty of fraudulent breaches
>> of trust resulting in his self-enrichment at the
>> expense of the corporation, (citations omitted) in the
>> light of the allegations of the complaint, statute of
>> limitations . . . as well as *laches should be*
>> *affirmatively pleaded, Rule 8(c), and established at*
>> *trial.*" 154 A.2d at 240.

*Id.* at 502 (emphasis added). Thus, it is clearly inappropriate to determine now whether

Defendants have met their burden of showing that three days constitutes unreasonable

delay. *See Butler v. Butler*, 222 A.2d 269, 272 (Del. 1966) (referring to "the factual

defense of laches"); *Erickson v. Centennial Beauregard Cellular LLC*, 2003 Del. Ch.

LEXIS 38, at *19 (April 11, 2003) (holding that "defenses based on laches or

acquiescence require a more fully developed factual record").

Further, although Defendants had at least 6 months to disclose to JPMC

shareholders that Harrison had rejected the opportunity to merge with Bank One without

- 50 -

paying any acquisition premium (which he should accepted in the first place), Defendants paradoxically argue that Plaintiffs should be penalized for not seeking a temporary restraining order because there were 3 or 4 days between the release of the June 27, 2004 *New York Times* article and the July 1, 2004 completion of the Merger. Defendants even accuse Plaintiffs of "gamesmanship." (Defs' Br. at 30.) It would be more accurate to accuse Defendants of this, as they chose to close the Merger as soon as Harrison's secret deal was revealed to the public, and thereby block injunctive relief.[15]

But for the fortuitous event of *The New York Times* revealing Harrison's secret deal, perhaps "no one would have been the wiser." But to bootstrap that into an affirmative defense that Plaintiffs are barred by laches from obtaining any remedy at all is truly remarkable. Put simply, Defendants are hiding behind their own failure to disclose and using that to concoct a laches defense. They may include such a defense in their Answer and attempt to prove it at trial, but the Motion must be denied to the extent that it seeks to dismiss the Complaint, or limit any relief sought therein, on the basis of unreasonable delay.

---

[15] The cases cited by Defendants are inapposite. In *In re Lukens, Inc. Shareholders Litigation*, 757 A.2d 720, 728 (Del. Ch. 1999), the plaintiffs' claims included only a violation of duty of care, and were therefore precluded under a Section 102(b)(7) provision in the company's charter. Here, Plaintiffs allege specific violations, such as bad faith and breach of duty of loyalty, which are specific statutory exceptions to Section 102(b)(7). Furthermore, *Arnold v. Society for Savings Bancorp, Inc.*, 678 A.2d 533, 542 (Del. 1996), concerned a decision on summary judgment, and *Zirn v. VLI Corp.*, 681 A.2d 1050, 1062 (Del. 1996), concerned a post-trial judgment; these cases have no import on a motion to dismiss. Similarly, both *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262-63 (Del. Ch. 2003), and *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987), are inapposite because they addressed whether the plaintiffs had met the "irreparable harm" threshold for obtaining injunctive relief. Because both found that an injunction was indeed warranted, there was no further definitive discussion of what would have happened had the plaintiffs not moved for the preliminary injunction.

## VIII.   DEFENDANTS HAVE NOT MOVED TO DISMISS PLAINTIFFS' CLAIM FOR EQUITABLE FRAUD

The Complaint includes a claim for equitable fraud. (¶¶ 81-89.) Defendants did not move to dismiss this claim. The claim is not addressed anywhere in their opening brief. Therefore, the Complaint must be permitted to go forward as to the claim of equitable fraud even if Defendants' motion is granted in its entirety. If Defendants attempt to address this issue in their reply, then the Court should either ignore their new arguments as outside the scope of a reply brief, or permit Plaintiffs to file a sur-reply.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.

As set forth herein, Plaintiffs have more than adequately pleaded their claims. However, if the Court grants Defendants' motion, in the whole or in part, Plaintiffs respectfully request leave to replead. *See Ash v. McCall*, 2000 Del. Ch. LEXIS 144, at *59 (Sept. 15, 2000).

Even if the Court grants Defendants' motion to dismiss in its entirety, Plaintiffs' claim of equitable fraud against all Defendants must be allowed to proceed.

Date:  December 10, 2004

MILBERG WEISS BERSHAD
& SCHULMAN LLP

By:   /s/ Seth D. Rigrodsky
Seth D. Rigrodsky (# 3147)
Ralph N. Sianni (# 4151)
Joseph N. Gielata (# 4338)
919 N. Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)
   -- *and* --

- 52 -

Steven G. Schulman
Richard Weiss (admitted *pro hac vice*)
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

**BULL & LIFSHITZ, LLP**
Peter D. Bull
18 East 41st Street
New York, NY 10017
(212) 213-6222
(212) 213-9405 (fax)

*Co-Lead Counsel for Plaintiffs*

EFiled: Dec 10 2004  8:49PM EST
Filing ID 4766524

## CERTIFICATE OF SERVICE

I, Joseph N. Gielata, do hereby certify that, on this 10th day of December 2004, I caused

the foregoing Plaintiffs' Answering Brief In Opposition To Defendants' Motion To Dismiss to

be served electronically upon the following counsel of record:

> Jesse A. Finkelstein, Esq.
> **RICHARDS LAYTON & FINGER, P.A.**
> One Rodney Square
> Wilmington, DE  19801
> email: finkelstein@rlf.com
>
> Sharon L. Nelles, Esq.
> **SULLIVAN & CROMWELL LLP**
> 125 Broad Street
> New York, NY 10004-2498
> email: Nelless@sullcrom.com

> <u>  /s/  Joseph N. Gielata  </u>
> Joseph N. Gielata (DSBA No. 4338)