**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. HYLAND, et al., <br>         Plaintiffs, <br>   v. <br> WILLIAM B. HARRISON, JR., et al., <br>         Defendants. | Case No. **1:05-cv-162 (JJF)** <br><br> **CLASS ACTION** |

**PLAINTIFFS' SUBMISSION OF SUBSEQUENT AUTHORITY**

# Exhibit B

Westlaw.

2005 WL 1620323                                                                                                                Page 1
--- F.3d ----
**(Publication page references are not available for this document.)**

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
Ronald CANTOR; Ivan Snyder; James A. Scarpone, as Trustees of the Mafco Litigation Trust, Appellants
v.
Ronald O. PERELMAN; MAFCO Holdings, Inc.; MacAndrews & Forbes Holdings, Inc.; Andrews Group Incorporated; William C. Bevins; Donald G. Drapkin.
**Nos. 04-1790, 04-2896.**

Argued Feb. 14, 2005.
Opinion Filed July 12, 2005.

**Background:** Trustees of bankrupt corporation sued controlling shareholders and holding companies that actually owned corporation's shares, alleging breach of fiduciary duty in violation of Delaware law. The United States District Court for the District of Delaware, Kent A. Jordan, J., 235 F.Supp.2d 377, adopting report and recommendation of Thynge, United States Magistrate Judge, entered partial summary judgment in favor of defendants, and trustees appealed.

**Holdings:** The Court of Appeals, Stapleton, Circuit Judge, held that:
(1) genuine issues of material fact precluded summary judgment on breach of fiduciary duty claims;
(2) doctrine of laches did not bar unjust enrichment claim;
(3) statute of limitations for damages claim was not equitably tolled.

Affirmed in part, reversed in part, and remanded.

Edward A. Friedman (Argued), Andrew W. Goldwater, Robert D. Kaplan, Daniel B. Rapport, Friedman, Kaplan, Seiler & Adelman, New York, N.Y. and Emily A. Stubbs, Friedman, Kaplan, Seiler & Adelman, Newark, NJ and Lawrence C. Ashby, Philip Trainer, Jr., Ashby & Geddes, Wilmington, DE, for Appellants.

Robert E. Zimet (Argued), Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Appellees.

Before SLOVITER, ALDISERT and STAPLETON, Circuit Judges.

*OPINION OF THE COURT*

STAPLETON, Circuit Judge.

The trustees of the MAFCO Litigation Trust ("plaintiffs") [FN1] appeal an order denying their motion for partial summary judgment against defendant Ronald O. Perelman and granting cross-motions for summary judgment in favor of defendants Perelman, MAFCO Holdings, Inc., MacAndrews & Forbes Holdings, Inc., Andrews Group, Incorporated, William C. Bevins, and Donald G. Drapkin. The District Court held that plaintiffs had failed to tender sufficient evidence to support a finding of a breach of fiduciary duty on the part of defendants. We will reverse in part, affirm in part, and remand for further proceedings.

**I. BACKGROUND**
A. *The Players*
Financier Ronald O. Perelman ("Perelman")

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was at all relevant times a director of Marvel Entertainment Co., Inc. ("Marvel"), and Chairman of Marvel's board. Through a chain of wholly-owned corporations (the "Marvel Holding Companies"), Perelman also owned a controlling interest in Marvel. The Marvel Holding Companies consisted of Mafco Holdings Inc. ("Mafco"), which owned 100% of MacAndrews & Forbes Holdings Inc. ("MacAndrews & Forbes"), which in turn owned 100% of Marvel III Holdings Inc. ("Marvel III"), which owned 100% of Marvel (Parent) Holdings Inc. ("Marvel Parent"), which owned 100% of Marvel Holdings Inc. ("Marvel Holdings"). Marvel Parent and Marvel Holdings together held 60% to 80% of Marvel's publicly traded, outstanding shares during the relevant period.

Bevins was a director and CEO of Marvel, a director of each of the Marvel Holding Companies, and Vice-Chairman of MacAndrews & Forbes. Drapkin was a director of Marvel, a director of each of the Marvel Holding Companies, and Vice-Chairman of MacAndrews & Forbes. Perelman, Bevins and Drapkin were three of the four members of the Executive Committee of the Marvel board. Perelman, Bevins and Drapkin also together comprised the entire board of each of the Marvel Holding Companies. Because the individual defendants hold these positions and Perelman's control of the Marvel Holding Companies is acknowledged, Perelman, Bevins, Drapkin and the Marvel Holding Companies in most instances are referred to collectively as "the defendants" in the following discussion.

### B. *The Notes*

During 1993 and 1994, the defendants caused the Marvel Holding Companies to issue three tranches of notes. The first tranche was issued by Marvel Holdings in April 1993 (the "Marvel Holdings Notes"). The second tranche was issued by Marvel Parent in October 1993 ("Marvel Parent Notes"). The third tranche was issued by Marvel III in February 1994 ("the Marvel III Notes", and collectively with the Marvel Holdings Notes and the Marvel Parent Notes, the "Notes"). All of the defendants' stock in Marvel was pledged as collateral for the Notes. The Notes were non-recourse debt.

The defendants received $553.5 million from the three issuances. None of the proceeds went to Marvel or were used for Marvel's benefit. The defendants used Marvel resources to market and sell the Notes. They caused Marvel's senior management, for example, to participate in "road shows" to market the Notes to potential investors. App. at 1593, 1603, 1840-65.

### C. *The Restrictions in the Note Indentures*

In each of the Note Indentures, the issuing company commits itself to prevent Marvel from taking certain actions ("the restrictions"):

1. Restriction on issuing debt: Section 4.04 of each Indenture provides that, with the exception of seven categories of debt listed in the section, the issuing company "shall not permit Marvel or any Subsidiary of Marvel to issue, directly or indirectly, any debt, unless" a certain financial ratio is met.

2. Restriction on issuing equity: Section 4.04(c) of each Indenture provides that the issuing company "shall not permit Marvel to issue any preferred stock," except under specified circumstances;

3. Restriction on share ownership: Section

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4.09(a) of each Indenture provides that the Marvel Holding Companies shall continue to hold a majority of Marvel's voting shares (*i.e.,* restricting Marvel's ability to issue stock that might dilute Perelman's stake); and

4. Restriction on making "Restricted Payments": Section 4.05 of each Indenture provides that the issuing company "shall not permit" any of its subsidiaries (including, *e.g.,* Marvel) to make Restricted Payments as defined by the Indenture (including dividends and stock buybacks).

The defendants' underwriter advised that these restrictions were "necessary to market the" Notes. App. at 1628.

### D. *Marvel's Bankruptcy*

Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 27, 1996. The Note holders have not been repaid.

### E. *The District Court Proceedings*

Plaintiffs brought this action, claiming that the defendants breached their fiduciary duty to Marvel by agreeing to impose the restrictions of the Notes on Marvel. They sought "disgorgement" of the $558 million obtained by the defendants in the Notes transactions as well as damages.

The District Court referred this action to a Magistrate Judge under 28 U.S.C. § 636(b). The plaintiffs moved for partial summary judgment against defendant Perelman, and the defendants moved for summary judgment on all claims against them. The Magistrate Judge issued a Memorandum and Order (the "Report") recommending that the District Court deny plaintiffs' motion and grant summary judgment to the defendants on all of plaintiffs' claims.

In her Report, the Magistrate Judge found that:
 (a) the Marvel Holding Companies were acting at the direction of Perelman when they issued the Notes;
 (b) in the Indentures, the Marvel Holding Companies agreed to impose restrictions on certain corporate actions of Marvel, including limitations on Marvel's ability to engage in debt and equity financing;
 (c) Marvel did not receive any of the proceeds of the Note transactions; and
 (d) Perelman at all relevant times owed a fiduciary duty to Marvel and its minority stockholders.

The Magistrate Judge nevertheless concluded that the defendants did not breach their duty of loyalty. Relying on *Bragger v. Budacz,* 1994 WL 698609 (Del.Ch. Dec.7, 1994), the Magistrate Judge accepted the defendants' contention that the Note transactions merely amounted to "potential conflicting loyalties" and that an actual conflict "never materialized" because Marvel "did not attempt to perform or refrain from one of the prohibited acts." App. at 19.

The District Court adopted the Magistrate Judge's Report "in all respects." App. at 6-9. Relying upon *Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del.1971), the District Court agreed with the Magistrate Judge that under Delaware law it was the Plaintiff's burden to show that "Perelman had caused Marvel 'to act in such a way' that he benefitted at Marvel's expense," App. at 8, and that "Perelman's potential conflicting loyalties between Marvel and the holding companies 'never materialized and cannot form the basis for a breach of fiduciary duty.' " App. at 9. [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. THE DISTRICT COURT'S SUMMARY JUDGMENTS IN FAVOR OF DEFENDANTS

A. *The Unjust Enrichment Claim*

[1][2] Applying Delaware law, the District Court held that to succeed plaintiffs "must show that Perelman caused Marvel to act in such a way that he benefitted at Marvel's expense." App. at 8, citing *Sinclair Oil Corp.,* 280 A.2d at 717. We agree that such a showing would justify an award for breach of fiduciary duty, but this is an unduly restrictive view of the duty of loyalty imposed by the Delaware corporation law. [FN3] Where, as here, the record will support a finding that the defendants exploited their fiduciary position for personal gain, summary judgment is inappropriate. Such exploitation would constitute a breach of fiduciary duty and that breach would justify an unjust enrichment award without regard to whether the fiduciary caused the beneficiary to act to its detriment.

The record before us would support a finding that Perelman's companies received $553.5 million in financing they would not otherwise have been able to secure by committing to prevent Marvel from taking certain actions and by utilizing Marvel's corporate resources to market that financing. And, given the nature of the restrictions imposed, the commitment was one that could be effectuated only by exercising the defendants' control of Marvel's board of directors. This is thus not a case in which a fiduciary allegedly sold stockholder votes that it was entitled to cast in its own interest. This is a case involving an alleged sale of director votes.

[3][4] A corporate fiduciary receiving a "personal benefit not received by the shareholders generally" is a "classic" example of a breach of the duty of loyalty. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 362 (Del.1993). As the Supreme Court of Delaware explained in a similar situation in *Thorpe By Castleman v. CERBCO, Inc.,* 676 A.2d 436 (Del.1996):

Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. Although this Court in *In re Tri-Star Pictures, Inc., Litig.,* Del.Supr., 634 A.2d 319 (1993). was addressing disclosure violations, we reasoned from a more general standard concerning the duty of loyalty:

"[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity." *Oberly v. Kirby,* Del.Supr. 592 A.2d 445, 463 (1991).

* * *

The strict imposition of penalties under Delaware law are designed to discourage disloyalty.

The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Id. at 445. [FN4]

Defendants' insistence that Marvel was not a party to the Indentures and, accordingly, was not bound by their terms, is not a full answer to plaintiffs' claims. In the prospectuses necessary to market the Notes, the defendants not only described the restrictions, which are said to "limit ... Marvel," but also stressed that Perelman was "able to direct and control the policies of" Marvel. *See, e.g.,* App. at 1037, 1137, 1166. A trier of fact could well view this as a recognition by the defendants that their promises to prevent Marvel from taking the actions in the restrictive covenants were credible and would be relied upon by Note purchasers only because Perleman had the power to carry out those promises and had committed himself to do so. Based on the fact that defendants were advised by their underwriters that the restrictions were necessary to the success of the issuances and the fact that the Notes were successfully marketed, a trier of fact could further conclude that the defendants were successful in convincing the marketplace that they would in fact "prevent" Marvel from taking the forbidden actions. The success of these offerings tends to show that it was not necessary to the financing for Marvel to be a party to the Indentures or for Note holders to be able to sue Marvel for specific performance of the restrictions.

For much the same reason, it is also no answer for the defendants to say that there was never a proposal before the board to take action contrary to the restrictions and that they would have taken measures to deal with the conflict of interest problem had such an occasion arisen. A trier of fact could well conclude on this record that the restrictions began to affect Marvel when the Notes were issued, that measures to deal with the conflict of interest should have been taken before the restrictions were proposed, and that the restrictions were responsible for the fact that no proposal for their violation ever came before the Marvel board.

Having concluded that plaintiffs may be able to require the defendants to account for their unjust enrichment at the time of the issuance of the respective Notes, we do not suggest, as plaintiffs contend, that defendants should necessarily be required to pay $553 million. They received their financing in return for a commitment to repay in the future and pledges of stock which they themselves owned. As a result, an unjust enrichment award of $553 million could result in a windfall. The defendants did not contend in support of their motions for summary judgment that the plaintiffs were not able to submit evidence of unjust enrichment and the issue of the extent of any unjust enrichment is, accordingly, not before us. For that reason, it would not be appropriate for us to restrict plaintiffs' proof on remand. We note only that plaintiffs should at least have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation. *See* Boyer v. Wilmington Materials, Inc., 754 A.2d 881 (Del.Ch.1999). [FN5]

B. *The Damage Claims*
[5] In addition, the District Court erred in concluding that there is no material dispute of fact as to whether the Note restrictions caused Marvel injury.

The defendants insist that the restriction in Marvel's own credit agreements during the period from 1992 through to the fall of 1996

were more constraining than those found in the Note Indentures. Their expert, Professor Holthausen, so opined. There is also evidence that Marvel was able to raise $600 million during this period to finance an aggressive acquisition campaign.

On the other hand, there is evidence in the record from which a trier of fact could conclude that, but for the Indenture restrictions, a Marvel management acting in its best interest would have had a different and more favorable capital structure. As plaintiffs' expert investment banker, William Purcell, points out, Prof. Holthausen reached his conclusion that Marvel was not injured by the Indentures restrictions by comparing the coverage ratios there set forth to those in Marvel's bank credit agreements. This analysis assumes that Marvel's capital structure would have remained the same in the absence of the Indenture restrictions. Dr. Purcell provided an alternative analysis, however, which would provide a basis for concluding that Marvel did suffer injury from those restrictions. He expressed the following opinions, for example:

> [I]t is my opinion that the economic harm to Marvel caused by the restrictions in the Indentures cannot be assessed without considering the effect of those restrictive covenants on Marvel's capital structure, and Marvel's likely capital structure in the absence of those restrictions.
>
> Based upon my experience as an investment banker, in the absence of the Holding Company debt made possible by Section 4.04 and other restrictions relating to Marvel, it would have been extremely unlikely that Marvel would have financed its aggressive acquisition program almost entirely with commercial bank debt. Rather, Marvel probably would have financed its acquisition program with a combination of long-term debt and equity, which would have afforded significant advantages over bank debt.

* * *

> It is my opinion that Marvel could have received an investment-grade (i.e., BBB or Baa) rating for a long-term debt financing in 1993 and the first half of 1994, and that such a financing would have been well received in the market.... Moreover, the terms available in the public market for investment-grade debt during 1993 and 1994 were very favorable, and such an issue would have benefited Marvel greatly from both a liquidity and a restrictive covenant point of view.

* * *

> It is my opinion that, in the absence of the restrictive covenants and the Holding Company debt made possible thereby, the issuance of common stock would have been another attractive financing alternative for Marvel during the 1993-- 1994 period that would have been well-received by the markets. The cost of money to Marvel would have been very low, there would have been little or no dilution in reported earnings per share, Marvel could have retired bank debt which would thus be available for future acquisitions and contingencies, and its stated stockholders' equity per share could have increased.

App. at 2396, 2399-2401 (footnotes omitted).

We do not suggest that these portions of the record reflect the only material disputes of fact regarding the issue of whether Marvel was injured by the restrictions. We hold, however, that they are sufficient to preclude summary judgment for the defendants on their damage claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### C. *Timeliness of Suit*

The defendants insist that all of plaintiffs' claims are barred by 10 Del.Code Ann. § 8106, [FN6] a three-year statute of limitations, and urge us, if necessary, to affirm their summary judgments on this alternative basis. Plaintiffs' response is two-fold: laches, rather than limitations, should govern the timeliness of their unjust enrichment claim and, in any event, the statute of limitations was tolled until they knew or should have known of the defendants' breaches of fiduciary duty.

### 1. *The Unjust Enrichment Claims*

[6] The Supreme Court of Delaware explained the relationship of laches and limitations as follows in *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 169-70 (Del.1976):

> Generally speaking, an action in the Court of Chancery for damages or other relief which is legal in nature is subject to the statute of limitations rather than the equitable doctrine of laches. *Bokat v. Getty Oil Company* [Del.Supr., 262 A.2d 246 (1970)] *supra.* There is, however, an established exception to this principle which denies its protection to those who owe a fiduciary duty to a corporation. In brief, the benefit of the statute of limitations will be denied to a corporate fiduciary who has engaged in fraudulent self-dealing. *Bovay v. H.M. Byllesby & Co.,* [Del.Supr., 27 Del.Ch. 381, 38 A.2d 808 (1944)] *supra; Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973). In *Bovay*, Chief Justice Layton said this:
> Sound public policy requires the acts of corporate officers and directors in dealing with the corporation to be viewed with a reasonable strictness. Where suit is brought in equity to compel them to account for loss or damage resulting to the corporation through passive neglect of duty, without more, the argument that they ought not to be deprived of the benefit of the statute of limitations is not without weight; but where they are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but as serious breaches of trust, and will point the moral and make clear the principle that corporate officers and directors, while not in strictness trustees, will, in such case, be treated as though they were in fact trustees of an express and subsisting trust, and without the protection of the statute of limitations....

The issue in *Laventhol* was whether the "*Bovay* exception" to the general rule should be applied in a situation where the defendants were accountants who were "not alleged to have wrongfully diverted corporate assets for their own benefit" but who "knowingly join[ed] a fiduciary in an enterprise" that enriched the fiduciary. The Court held that the "enlargement of the *Bovay* exception [to cover the accountants] was both logical and proper." *Laventhol,* 372 A.2d at 171.

[7][8] Our survey of the Delaware cases decided since *Laventhol* provides no persuasive basis for believing that the *Bovay* exception to the general rule is no longer viable, at least as applied to situations in which a fiduciary has enriched himself by breaching his fiduciary duty. Accordingly, we hold that the timeliness of plaintiffs' unjust enrichment claims are to be determined by the doctrine of laches. "The essential elements of laches are: (i) plaintiff must have knowledge of the claim, and (ii) there must be prejudice to the defendant arising from an unreasonable delay by plaintiff in bringing the claim." *Fike v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Ruger, 752 A.2d 112, 113 (Del.2000). We find no evidence in this record that would support a finding that the defendants were prejudiced by the failure of the plaintiffs to earlier file suit. The prejudice they assert is that "[d]ue to the silence of plaintiffs' predecessors-in-interest, defendants lost the opportunity to adjust the note offerings in response to the arguments plaintiffs now belatedly raise." Appellees' Br. at 76. [FN7] We have found no Delaware case suggesting that this is the kind of prejudice that will support a laches defense. The suggestion, as we understand it, is that if the plaintiffs had warned the defendants that by burdening Marvel they were deriving an improper benefit, the defendants would not have pursued that course of action in the same way. But, if plaintiffs prove the case, the defendants surely were aware that they were deriving a benefit by burdening Marvel, and their failure to avoid a breach of fiduciary duty cannot be attributed to the failure of plaintiffs to bring suit earlier.

2. *The Damage Claims*

[9] Plaintiffs acknowledge that, to the extent they seek damages for the defendants' alleged breach of fiduciary duty, § 8106 determines the timeliness of their claims. They correctly assert, however, that a Delaware court of equity will toll the statute until such time as a reasonably diligent and attentive stockholder knew or had reason to know the facts alleged to constitute the breach of fiduciary duty. *See, e.g.,* Tobacco and Allied Stocks, Inc. v. Transamerica Corp., 143 F.Supp. 323, 328-29 (D.Del.1956). With respect to the third issuance of Notes, plaintiffs insist that the three-year statute has not run even without the benefit of tolling.

(a). *The Marvel III Issuance*
The Marvel III issuance occurred on February 15, 1994, and plaintiffs' breach of fiduciary duty damage claim with respect to those Notes occurred no earlier than that date. Accordingly, the three-year limitations period prescribed by § 8106 had not expired when Marvel's bankruptcy was filed on December 27, 1996. Under 11 U.S.C. § 108(a), when a debtor files a bankruptcy petition, the statute of limitations for all claims not then barred is extended for two years. For this reason, the damage claim with respect to the Marvel III issuance was timely filed by the plaintiffs on October 30, 1997.

(b). *The Marvel Holding Notes*
[10] Plaintiffs contend that the limitations period for their damage claims with respect to the issuance of the Marvel Holding Notes on April 22, 1993, was tolled until the terms of those Notes were disclosed in a Marvel SEC filing on March 30, 1994. The record indicates, however, that all Marvel shareholders were notified of the terms of these Notes--including the restrictive covenants--on April 16, 1993, when a tender offer statement was mailed to each of them and filed with Marvel's required filings at the SEC. Attached to the SEC filing was a copy of the Indenture. This put Marvel and its stockholders at least on inquiry notice and forecloses equitable tolling beyond that date as a matter of law.

(c). *The Parent Notes*
[11] The Parent Notes were issued on October 20, 1993. Here also the plaintiffs insist that the limitations period for their damage claim was equitably tolled until the terms of these Notes were disclosed in a Marvel SEC filing on March 30, 1994. The defendants respond that plaintiffs were put on inquiry notice by the Parent July 2, 1993, filing with the SEC in connection with the issuance of the Parent Notes and by media

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

coverage of that issuance which should have led any interested person to that filing.

We have found no case law suggesting to us that the Delaware courts would regard a non-Marvel SEC filing as putting plaintiffs on notice as a matter of law even when combined with media coverage commenting on the event giving rise to the filing (albeit without reference to the restrictive covenants). Moreover, we reject defendants' suggestion that Marvel and its stockholders, being on notice of the issuance of the Marvel Holding Notes, should have expected that other Perelman companies would do the same thing again.

The Delaware courts have recognized that equitable tolling may involve a fact intensive inquiry to determine when a reasonable person in plaintiffs' position knew or should have known of the claim. *See, e.g.,* [Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 860 A.2d 312 (Del.2004)](). We conclude that such an inquiry is appropriate here and that material disputes of fact preclude summary judgment for either side.

### III. THE DISTRICT COURT'S DENIAL OF PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS

[12] Plaintiffs moved for partial summary judgment against defendant Perelman on their unjust enrichment claim. As we have explained, the basis of this claim is that he secured $553.5 million in financing for himself and his companies by committing to prevent Marvel from taking any of the actions set forth in the restrictive covenants. As we have also explained, there is substantial evidence tending to support this claim. The covenants themselves contain express commitments to do just that, the prospectuses stress that Perelman is in a position to control what Marvel does, and there is evidence that the defendants' underwriter regarded the covenants as essential to the success of the issuances.

Perelman has an alternative explanation, however, regarding the effect of the covenants and the testimony that they were essential to the success of the Note issuances. The only significance of the covenants, Perelman insists, is that any violation constituted an event of default which, if left uncured, would entitle the Notes holders to take control of Marvel. The reality of the matter, Perelman contends, is that potential Note purchasers would insist upon having the covenants not because the covenants provided assurance that Marvel would refrain from taking the stipulated actions, but rather because they provided assurance that the Note holders could seize control if Marvel did. Under this view, there was no expectation that the Marvel board would do anything other than function as an independent body, and the sole potential effect of the covenants on Marvel was the possibility that they might occasion a change in its stockholders.

The current record contains some support for Perelman's view. In their depositions, for example, Perelman, Drapkin and Bevins each testified that Marvel's board was expected to act independently and that the covenants were expected to have no effect whatever on Marvel. There is also evidence tending to show that Marvel's board did in fact act independently when financial misfortune struck in 1996.

We conclude that there is a material dispute of fact as to whether Perelman exploited his fiduciary position for personal gain when he caused the Notes to be issued. Accordingly, summary judgment for plaintiffs would have been inappropriate on this record. We note

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as well that plaintiffs have not provided a record that would support an unjust enrichment award in the face amount of the Notes.

## IV. CONCLUSION

The summary judgments entered by the District Court in favor of the defendants on plaintiffs' unjust enrichment claims will be reversed. We will also reverse those summary judgments in favor of defendants on plaintiffs' damage claims with respect to the issuance of the Parent Notes and the Marvel III Notes. We will affirm the summary judgments in favor of the defendants on plaintiffs' damage claim arising from the Marvel Holdings Note issuance. Finally, we will affirm the District Court's refusal to enter summary judgment in plaintiffs' favor. This matter will be remanded for further proceedings consistent with this opinion.

> FN1. The MAFCO Litigation Trust was established pursuant to the plan of reorganization in the Marvel bankruptcy cases to pursue Marvel's claims against the defendants.
>
> FN2. The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), because this action was related to the Marvel bankruptcy. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because it is an appeal from a final judgment.
> The standard of review in an appeal from an order resolving cross-motions for summary judgment is plenary. *Int'l Union, United Mine Workers of Am. v. Racho Trucking Co.,* 897 F.2d 1248, 1252 (3d Cir.1990). This Court applies the test provided in Federal Rule of Civil Procedure 56(c): (a) is there no genuine issue of material fact, and (b) is one party entitled to judgment as a matter of law? *Id.*
>
> FN3. The District Court relied upon *Sinclair Oil Corp.* for the proposition that "self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary." However, we do not read *Sinclair Oil Corp.* to hold that a breach of fiduciary duty can never occur under Delaware corporate law without a detriment to the beneficiary. Nor do we read *Bragger,* the only case relied upon by the Magistrate Judge, to so hold. In *Bragger,* the defendant director also sat as a director of another corporation that could have competing interests. The Court of Chancery held that being subject to these potentially conflicting fiduciary duties was not actionable in the absence of a situation in which there was an actual conflict and the defendant served the interest of one to the detriment of the other. The plaintiffs in this case do not fault the individual defendants for sitting simultaneously on the boards of Marvel and the Marvel holding companies. Rather, they charge that those defendants imposed restrictions on Marvel in order to benefit themselves.
> Neither the Magistrate's report nor the District Court's opinion makes reference to a usurpation of corporate opportunity claim. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appears to have been occasioned by the plaintiffs' failure to advance such a theory before them. We do not regard that theory as being appropriately before us.

FN4. As the Court of Chancery has cogently put it, if a director "secure[s] more advantageous treatment by a promise, express or implied, that he will promote [a prospective] buyer's interest in the corporation, it is obviously the case that the premium is the fruit of a breach of fiduciary duty and may be impressed with a constructive trust." *Citron v. Steego Corp.,* 1988 WL 94738 (Del. Ch.1988). This result thus does not turn on whether the corporation took action to its detriment.

FN5. We reject plaintiffs' argument that the amount of unjust enrichment defendants received should take into account the fact that the subsequent bankruptcies of defendants resulted in their not having to repay the loans evidenced by the Notes. Any unjust enrichment occurred at the time of the issuance of the Notes and must be evaluated as of that point in time.

FN6. 10 Del.Code Ann. § 8106 provides:
No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action....

FN7. They suggest:
For example:
Before the notes were issued, defendants could have amended or altered the terms of the indenture in response to any stockholder complaint.
Defendants could have negotiated with an independent committee of directors for Marvel to be bound by the terms of the indentures in exchange for a fee.
Defendants could have left the terms of the indentures alone and set up in advance a special committee to consider any transaction that implicated the terms of the indenture.
Defendants could have petitioned for a declaratory judgment, which would have resolved this dispute before the pledged shares were irretrievably committed.
Appellees' Br. at 76-77.

--- F.3d ----

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.