# Exhibit A

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 6592 | **DATE** | 1/5/2005 |
| **CASE TITLE** | BLAU, et al. vs. HARRISON, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motion of Dr. Stephen Blau and American Growth Fund, Inc. for reassignment based on relatedness, to consolidate all actions is denied as moot. The motion to appoint lead plaintiffs Dr. Stephen Blau and American Growth Fund, Inc. and lead counsel Wolf Haldenstein is granted. Plaintiffs to file an amended complaint by 2/18/05. Defendants to respond by 3/18/05. Status hearing reset to 3/23/05 at 9:30 a.m.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JAN 06 2005 | |
| | Notified counsel by telephone. | | date docketed | 20 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| JHC | courtroom deputy's initials | | date/time received in central Clerk's Office | mailing deputy initials |

# Exhibit B

# JOSEPH N. GIELATA

### ATTORNEY AT LAW
501 SILVERSIDE ROAD, SUITE 90
WILMINGTON, DELAWARE 19809
WWW.GIELATALAW.COM
TEL (302) 798-1096
FAX (302) 792-0777

May 23, 2005

**BY OVERNIGHT COURIER**

The Honorable William J. Hibbler
United State District Court
Northern District of Illinois
Eastern Division
Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois 60604

Re:    ***Blau v. Harrison, et al.***, No. 1:04-cv-06592

Judge Hibbler,

I am writing on behalf of class members Samuel I. Hyland and Stephanie Speakman to submit the enclosed amici curiae memorandum to inform this Court of numerous outrageous irregularities in the prosecution of the above-captioned action. These irregularities include the blatant conflict of interest disabling Dr. Blau's counsel, the inexplicable and inappropriate choice of this venue, the inadequate notice of the pendency of this class action, the defective (if not fraudulent) lead plaintiff application, and several other inexcusable acts by Dr. Blau's counsel. My clients have commenced a class action in the District of Delaware and fear that these irregularities may harm the class by undermining the prosecution of not only this action but also adversely affecting the prosecution of the District of Delaware action through stare decisis or otherwise.

Submission of this amici curiae memorandum is consistent with Judge Posner's holding in *National Organization for Women v. Scheidler*, 223 F.3d 615, 617 (7th Cir. 2000), under which permission to submit an amicus brief should be granted:
(1) when the amicus has a unique perspective, or information, that can assist the court beyond what the parties are able to do;
(2) when a party is not adequately represented; or
(3) when the would-be amicus has a direct interest in another case, and the case in which he seeks permission to file an amicus curiae brief may, by operation of stare decisis or res judicata, materially affect that interest.

My clients qualify under each of the three alternatives. Firstly, the enclosed memorandum presents highly relevant information, including the misconduct of Dr.

The Honorable William J. Hibbler
May 23, 2005, page 2

Blau's counsel, which the parties in this action have no incentive to bring to light. Secondly, the memorandum explains that the class is not adequately represented in this action because Dr. Blau's counsel must be disqualified due to, inter alia, a non-waivable conflict of interest. Finally, my clients are the plaintiffs in a separate case which could be adversely affected by rulings in this action.

Given the plethora of irregularities plaguing class counsel's (mis)management of this action, the enclosed memorandum unfortunately but necessarily exceeds the Local Rule 7.1 page limit. Granting leave to exceed the page limit is particularly appropriate under these unique circumstances, in light of the many meritorious issues to be raised and with so much at stake – the Delaware lawsuit seeks over $10 billion in damages on behalf of hundreds of thousands of investors. Also, at least three of the substantive issues (whether to transfer venue, whether to disqualify counsel, and whether to vacate the lead plaintiff appointment) could have been the subject of independent briefs each satisfying the applicable page limit.[1]

For the reasons set forth in the enclosed memorandum, the Court should vacate the January 5, 2005 minute order, disqualify Dr. Blau's counsel, and transfer this litigation to the District of Delaware.

Respectfully,

Joseph N. Gielata
*of the Delaware Bar*

cc:    (by overnight courier)
       Michael Dobbins, Clerk of Court
       Adam Levitt, Esq.
       Kathleen L. Roach, Esq.

       (by email)
       Michael Cooper, Esq.          Adam Levitt, Esq.
       Sharon Nelles, Esq.           Mary Jane Fait, Esq.
       Jesse A. Finkelstein, Esq.    Kathleen L. Roach, Esq.
       Michael Robinson, Esq.        Julie A. Lepri, Esq.
       Gustavo Bruckner, Esq.        Keith Levenberg, Esq.
       Gregory Nespole, Esq.         Kate McGuire, Esq.
       Jeffrey G. Smith, Esq.        Chante D. Spann, Esq.
       Courtney A. Rosen, Esq.

---

[1] At the Court's request, my clients would be willing to submit three separate briefs, each satisfying the applicable page limit, instead of the enclosed omnibus memorandum.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DR. STEPHEN BLAU, Individually and
On Behalf of All Others Similarly Situated,

      Plaintiff,

           vs.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL,
FRANK A. BENNACK, JR., JOHN H.
BIGGS, LAWRENCE A. BOSSIDY, M.
ANTHONY BURNS, LAURENCE
FULLER, ELLEN V. FUTTER, WILLIAM
H. GRAY, III, HELENE L. KAPLAN, LEE
R. RAYMOND, JOHN R. STAFFORD,
and J.P. MORGAN CHASE & CO.,

      Defendants.

Civil Action No.  **04C 6592**

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

**MEMORANDUM OF AMICI CURIAE**
**SAMUEL HYLAND AND STEPHANIE SPEAKMAN**

DATED:      May 23, 2005

Joseph N. Gielata, of the Delaware Bar
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096
attorney@gielatalaw.com

*Attorney for Amici Curiae*
*Samuel Hyland and*
*Stephanie Speakman*

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.    The Merger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    B.    The Delaware Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Illinois Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Wolf Haldenstein's Other Actions Against JPMC. . . . . . . . . . . . . . . . . . . . .7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES
    NECESSITATE DISQUALIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    A.    The Court Has A Continuing Responsibility to
         Review The Adequacy of the Class Representative. . . . . . . . . . . . . . . . . . . . . .10

    B.    Wolf Haldenstein's Divided Loyalties Amount to a
         Non-Waivable and Disqualifying Conflict of Interest. . . . . . . . . . . . . . . . . . . 12

II.    THIS ACTION SHOULD BE TRANSFERRED TO THE
    DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . .17

III.    WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE
    BECAUSE IT OMITTED CRITICAL INFORMATION. . . . . . . . . . . . . . . . . . . . . .23

IV.    THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED
    UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S
    FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION. . . . . . . . . . . . . . 26

V.    WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION
    AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE
    REMOVAL OR SUBSTITUTION OF LEAD COUNSEL. . . . . . . . . . . . . . . . . . . . 31

    A.    Wolf Haldenstein's Rampant Plagiarism Indicates An
         Insufficient Pre-Filing Investigation Or None At All. . . . . . . . . . . . . . . . . . . .32

    B.    Wolf Haldenstein's Failure to Serve Summons Properly. . . . . . . . . . . . . . . . .34

    C.    Wolf Haldenstein Names the Wrong Defendants
         And Fails to Name A Crucial Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

## TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page**

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Borenstein v. Finova Group, Inc.*,
    C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732
    (D. Ariz. Aug. 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Burke v. Ruttenberg*,
    102 F. Supp. 2d 1280 (N.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*In re Cardinal Health, Inc. ERISA Litig.*,
    225 F.R.D. 552 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*Coats Co., Inc. v. Vulcan Equipment Co., Ltd.*,
    459 F. Supp. 654 (D.C. Ill. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Commonwealth Edison Co. v. Train*,
    71 F.R.D. 391 (N.D. Ill. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n.12

*In re Continental Illinois Sec. Litig.*,
    750 F. Supp. 868 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Courtesy Caribbean v. Aquilar*,
    1995 WL 549127 (N.D. Ill. Aug. 31, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*In re DaimlerChrysler AG Sec. Litig.*,
    269 F. Supp. 2d 508 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*de la Fuente v. DCI Telecommunications, Inc.*,
    259 F. Supp. 2d 250 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 & n.8

*de la Fuente v. DCI Telecommunications, Inc.*,
    269 F. Supp. 2d 229 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Examen, Inc. v. VantagePoint Venture Partners 1996,*
  slip op. (Del. Ch. March 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Ferens v. John Deere Co.,*
  494 U.S. 516 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Park Surgical Center, Inc. v. Inland Steel Co.,*
  1996 WL 204322 (N.D. Ill. Apr. 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Greebel v. FTP Software Inc.,*
  939 F. Supp. 57 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Greenfield v. U.S. Healthcare, Inc.,*
  146 F.R.D. 118 (E.D. Pa. 1993), *aff'd,*
  *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994) . . . . . . . . . . . . .32-34

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Hess v. Gray,*
  85 F.R.D. 15 (N.D. Ill. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill v. Equitable Bank,*
  115 F.R.D. 184 (D. Del. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Hite v. Norwegian Caribbean Lines,*
  551 F. Supp. 390 (E.D. Mich. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Janovici v. DVI, Inc.,*
  2003 WL 22849604 (E.D. Pa. Nov. 25, 2003) . . . . . . . . . . . . . . . . . . . . .23, 25, 26

*Kamilewicz v. Bank of Boston Corp.,*
  100 F.3d 1348 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kayes v. Pacific Lumber Co.,*
  51 F.3d 1449 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Krim v. pcOrder.com, Inc.,*
  210 F.R.D. 581 (W.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kuper v. Quantum Chemical Corp.,*
  145 F.R.D. 80 (S.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Kurczi v. Eli Lilly & Co.,*
  160 F.R.D. 667 (N.D. Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Laborers Local 1298 Pension Fund v. Campbell Soup Co.*,
    2000 WL 486956 (D.N.J. Apr. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Marsden v. Select Medical Corp.*,
    2005 WL 113128 (E.D. Pa. Jan. 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Matter of Excello Press, Inc.*,
    967 F.2d 1109 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Metro Services Inc. v. Wiggins*,
    158 F.3d 162 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nager v. Websecure, Inc.*,
    1997 WL 773717 (D. Mass. Nov. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Oracle Sec. Litig.*,
    131 F.R.D. 688 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Oxford Health Plans, Inc.*,
    182 F.R.D. 42 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*River Road International, L.P. v. Josephthal Lyon & Ross, Inc.*,
    871 F. Supp. 210 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Schwarz v. National Van Lines, Inc.*,
    2004 WL 432483 (N.D. Ill. Feb. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Small v. Lorillard Tobacco Co., Inc.*,
    252 A.D.2d 1 (N.Y.A.D. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36 n.11

*Smith v. Suprema Specialties, Inc.*,
    206 F. Supp. 2d 627 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30 n.6

*So-Comm Inc. v. Reynolds*,
    607 F. Supp. 663 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Solomon v. Continental American Life Insurance Co.*,
    472 F.2d 1043 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sullivan v. Chase Inv. Services of Boston, Inc.*,
    79 F.R.D. 246 (D.C. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Taubenfeld v. Career Education Corp.*,
    2004 WL 554810 (N.D. Ill. March 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*In re Terayon Communications Sys., Inc.*,
    2004 WL 413277 (N.D. Cal. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tracinda Corp. v. DaimlerChrysler AG*,
    -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005) . . . . . . . . . . . . . . . . 21

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 86 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tranor v. Brown*,
    913 F. Supp. 388 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    209 F.R.D. 353 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.6

*Van Gelder v. Taylor*,
    621 F. Supp. 613 (D.C. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Van Horn v. Graves*,
    2002 WL 27658 (N.D. Ill. Jan. 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
    231 F.3d 1215 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

## <u>Statutes:</u>

15 U.S.C. § 78u-4(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

15 U.S.C. § 78u-4(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(2)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. § 78u-4(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28 U.S.C. 1404 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

**<u>Treatises:</u>**

Moore's Federal Practice ¶111.13[1][c][iii] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 (1986). . . . . . 19

## INTRODUCTION

Amici Curiae Samuel I. Hyland and Stephanie Speakman (the "Delaware Group"), residents of New Castle County, Delaware and members of the putative class in this action, respectfully submit this brief to protect the class from any further malpractice by the conflicted counsel for plaintiff in this action and to clarify the proper venue and leadership of this litigation.

The purported lead counsel in this action has divided loyalties, failed to publish adequate notice, selected an inappropriate venue, and submitted a false and misleading lead plaintiff application. It has also misrepresented its pre-filing investigation, failed to properly serve crucial defendants, and failed to name and incorrectly named certain defendants. These numerous flagrant blunders not only violate Rule 11 and provisions of the Private Securities Litigation Reform Act ("PSLRA") but also necessitate that, at least, the law firm must be removed as class counsel in this litigation to prevent any further harm to the class and this action should be transferred to an appropriate venue.

## INTEREST OF AMICI CURIAE

As set forth more fully below, the Delaware Group is comprised of two plaintiffs in a separate securities class action, pending in the District of Delaware, which may be affected by rulings in this action. As a result of defendants' misconduct, the Delaware Group sustained an aggregate loss of at least $106,026.08. (Aff. ¶ 4.)[1] On April 2, 2004, the record date for the shareholder vote described herein, the Delaware Group held 19,170 shares of JPMorgan Chase & Co. ("JPMC" or "the Company"). *Id.*

---

[1] All exhibits, statements and unreported decisions referenced herein are attached to the affidavit of Joseph N. Gielata, filed contemporaneously herewith and cited as "Aff. ¶ _" or "Aff. Ex. _."

# BACKGROUND

## A.    The Merger

Defendant JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  (Aff. Ex. B.) Defendant William B. Harrison, Jr. has served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of JPMC since 1999.  However, by late 2003, after years of poor business decisions, costly acquisitions, and financial scandals, numerous public reports denounced Harrison's leadership and predicted that he would soon lose his job.  This situation forced Harrison to conjure yet another massive deal to protect his lucrative and prestigious CEO title.  Accordingly, Harrison commenced negotiations, on JPMC's behalf, with James Dimon, Chairman and CEO of Bank One Corporation ("Bank One"), concerning the possibility of a business combination between JPMC and Bank One.

As a result of these merger negotiations, on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge (the "Merger").  When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings.  The total value of the deal was approximately $57 billion.

The proposed acquisition of Bank One in a stock-for-stock transaction required the approval of a majority of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was necessary for JPMC to have the corporate authority to

issue the shares necessary for the exchange.  Thus, the defendants issued a Joint Proxy

Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), to gain shareholder

approval of the Merger.  Unaware that the Proxy/Prospectus contained materially false

and misleading statements and failed to disclose material facts, shareholders of JPMC

overwhelmingly approved the Merger.

However, months later, it was revealed that, in the course of the secretive

negotiations between Dimon and Harrison, Dimon had been willing to agree to a ***no-
premium deal*** if he could be CEO of the combined company immediately.  Instead,

Harrison and Dimon struck a secret pact allowing Harrison to retain the CEO title for two

more years in exchange for paying a premium.  The Proxy/Prospectus omitted this secret

pact.  However, a June 27, 2004 article in *The New York Times* entitled "The Yin, the

Yang and the Deal" (Aff. Ex. C) shocked the market with the following stunning

revelations:

> During the negotiations with Mr. Dimon, [Harrison] fought
> hard to give himself the two extra years, to secure a smooth
> transition, although he may have cost J.P. Morgan
> shareholders extra money in doing so. ***Mr. Dimon, always
> the tough deal maker, offered to do the deal for no
> premium if he could become chief executive immediately***,
> according to two people close to the deal.
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a
> premium***, which Mr. Harrison was able to push down to 14
> percent. The two men declined to comment on the specifics
> of their negotiations. [Emphasis added.]

This article revealed that the Proxy/Prospectus was incomplete and materially

misleading.  The $7 billion premium paid by JPMC stockholders in the Merger was

completely unnecessary.  Moreover, the enormous acquisition premium paid for Bank

One was a betrayal of the interests of JPMC shareholders, as it served only to entrench

Harrison in the CEO position for two more years, even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered. At no time did any of the defendants ever disclose the secret pact between Dimon and Harrion or that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

### B.    The Delaware Actions

In June 2004, soon after the secret pact was revealed, three JPMC shareholders commenced actions in the Delaware Court of Chancery in connection with the misconduct described above. The consolidated actions, styled *In re J.P. Morgan Chase & Co. Shareholder Litigation*, Consol. C.A. No. 531-N (the "Chancery Action"), assert common law claims against all defendants in this action. (Aff. Ex. D.) In March 2005, following a diligent investigation, Hyland filed a comprehensive class action complaint in the District of Delaware (the "Delaware Action") asserting claims under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)), Rules l0b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§ 240.l0b-5 and 240.14a-9), Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2) and 77o), and pendent common law claims. (Aff. Ex. A.)

On March 21, 2005, Hyland also moved for an injunction of related state court actions, but the motion was denied without prejudice by the Honorable Joseph J. Farnan, Jr. on April 18, 2005. On April 14, 2005, all defendants in the Delaware Action except for Riley P. Bechtel stipulated to waiver of service of summons. By letter dated April 27, 2005, Bechtel waived service of the summons in the Delaware Action.

On April 29, 2005, Vice Chancellor Stephen P. Lamb issued an opinion granting

defendants' motion to dismiss the Chancery Action.  *In re J.P. Morgan Chase & Co.*

*S'holder Litig.*, No. 531-N, Mem. Op. (Del. Ch. Apr. 29, 2005).  The opinion specifically

discussed and distinguished the Delaware Action, observing, in relevant part:

> A similar federal class action complaint was filed in the
> District of Delaware on March 17, 2005.  The federal
> complaint alleges substantially the same claims that are
> before this court.  It does, however, have several important
> differences.  First, the federal complaint characterizes the
> deal between Harrison and Dimon as a "secret deal."  This
> description implies that the merger negotiations were
> unknown to the board of JPMC, a fact that appears
> inconsistent with the state complaint's primary allegation,
> as well as later allegations in the federal complaint that the
> "[d]efendants were motivated to conceal Harrison's secret
> and undisclosed pact with Dimon."
>
> Second, the federal complaint alleges that JPMC violated
> federal securities laws, specifically Sections 10(b), 11,
> 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange
> Act of 1934.  These claims are sufficient to give federal
> courts jurisdiction over the claims, including the related
> breaches of fiduciary duty claims.
>
> Finally, the federal complaint lists important distinguishing
> facts, some of which are inconsistent with facts in this
> action.  For instance, the federal complaint states that
> *Harrison* offered the no-premium deal.  The complaint
> before this court makes the opposite claim, i.e. that it was
> Dimon who made an offer of that nature.  This discrepancy
> is not explained.
>
> The federal complaint alleges additional substantive facts
> concerning certain directors.  For example, the federal
> complaint ties Futter's fund-raising activities to her board
> membership, as reported in *New York Magazine* on
> February 21, 2000.  Additionally, the federal complaint
> alleges that Kaplan is an attorney whose law firm receives
> substantial fees from JPMC. [Emphasis in original;
> citations omitted.]

*Id.* at 11-12.

On May 3, 2005, Hyland requested leave of Court to serve document preservation subpoenas on the law firm and the investment bank that advised Bank One in connection with the Merger. Hyland also obtained confirmation that certain document preservation efforts agreed upon by the parties in the Chancery Action remained in force despite the dismissal of the Chancery Action. On May 23, 3005, Hyland, joined by his mother, Stephanie Speakman, filed an amended complaint. (Aff. Ex. B.)

### C. The Illinois Action

On October 13, 2004, Dr. Stephen Blau, a purported JPMC shareholder, *see* Section III *infra*, commenced the action in this Court captioned as *Blau v. Harrison, et al.*, No. 04C 6592 (the "Illinois Action"). (D.E. #1.)

On December 14, 2004, through Wolf Haldenstein, Dr. Blau and another purported JPMC shareholder, the American Growth Fund, Inc. ("AGF"), moved for appointment as lead plaintiffs and appointment of Wolf Haldenstein as lead counsel. Defendants did not oppose this motion and no competing motion was filed.

Publicly-available information indicates that AGF is a mutual fund that, except for two years, trailed 99% of its peers in performance each year between 1990 and 2000. (Aff. Ex. E.) In August 1997, the Securities and Exchange Commission ("SEC") announced the appointment of "a permanent receiver over American Growth Capital Corp. and American Growth Fund I, LP." (Aff. Ex. F.) It is not clear from the announcements whether AGF is the same as or related to the entity referred to in the SEC releases as being managed by persons who "fraudulently managed American Growth Capital and American Growth Fund, including misuse and misappropriation of at least $1,778,000 in investor funds by investing in shell companies, and by paying undisclosed

commissions and other selling expenses, undisclosed compensation to themselves, and undisclosed management fees to American Growth Capital." *Id.*

On January 5, 2005, this Court entered a minute order appointing Dr. Blau and AGF as lead plaintiffs and Wolf Haldenstein as lead counsel (the "Minute Order"). (D.E. #20.) No written opinion followed. Thus, the Court has not yet reviewed in detail the adequacy of any proposed class counsel in the Illinois Action.

On February 18, 2005, Dr. Blau filed an amended complaint. (D.E. #23.) That very same day, AGF, which had previously certified its willingness to represent the class, suddenly withdrew as a lead plaintiff without explanation. (D.E. #24.) On April 22, 2005, the Illinois Action defendants except for Riley P. Bechtel moved to dismiss the amended complaint.[2] (D.E. #32.)

**D.    Wolf Haldenstein's Other Actions Against JPMC**

In addition to the Illinois Action, Wolf Haldenstein is currently seeking multi-billion-dollar recoveries from JPMC in several other prominent cases. For instance, Wolf Haldenstein is one of only six firms on the Court-appointed Plaintiffs' Executive Committee in the Initial Public Offering ("IPO") Securities Litigation, in which JPMC is a prominent defendant. (Aff. Ex. G.) The IPO Securities Litigation consists of numerous class actions involving more than 300 IPOs marketed between 1998 and 2000. *Id.* The actions are coordinated in the Southern District of New York. *Id.* The lawsuits generally allege that the IPOs were manipulated by investment banks to artificially inflate the market price of the offered securities and to conceal the amounts of compensation actually received by the underwriters. *Id.* The plaintiff classes consist of investors who purchased securities traceable to the IPOs. The defendants consist of the companies

---

[2] As explained in Section V.B, Bechtel contends that he was never served properly in the Illinois Action.

brought public, certain of their officers and directors and 55 of the investment banks that brought them public and underwrote various follow-on offerings. *Id.*

Wolf Haldenstein partner Adam J. Levitt and Wolf Haldenstein associate Gustavo Bruckner claim on the firm's website to be "actively involved" and to have "worked extensively on drafting and discovery" in the IPO Securities Litigation, respectively. (Aff. Ex. L)  In the Illinois Action, both Levitt and Bruckner appear on the amended complaint as plaintiff's counsel.

Of 307 complaints in the IPO Securities Litigation reviewed by Hyland's counsel, JPMC is a defendant in 128, or 42%, of the actions.  (Aff. ¶ 11 & Ex. H.)  Thus, JPMC is one of the defendants with the highest exposure in the coordinated litigation.  Indeed, the Company has already paid $25 million to settle related charges by the SEC.  *See* Litigation Release No. 18385: "SEC Sues J.P. Morgan Securities Inc. For Unlawful IPO Allocation Practices; J.P. Morgan Agrees To Settlement Calling For Injunction And Payment Of $25 Million Penalty" (Aff. Ex. I).

Damages in the IPO Securities Litigation are reportedly estimated to be **as much as $100 billion**, with a likely recovery of roughly **$25 billion**.  *See* "Banks under legal siege", *The Banker*, March 2, 2003 (Aff. Ex. J).  As a result of a settlement by the issuer defendants, only the investment banks remain defendants in this massive litigation.  *See* Press release: "IPO Securities Litigation Recovery Of At Least $1 Billion Dollars Guaranteed For Plaintiff Classes Upon Approval Of Settlement" (Aff. Ex. G).  In the wake of the preliminary settlement, the Chair of Plaintiffs' Executive Committee asserted in a July 2003 interview with the Associated Press (Aff. Ex. K):

> "The billion dollars is an expression of concern that these
> allegations are real and ***could give rise to staggering***

> *liability.* It simplifies the litigation in that we can focus our
> attention on the conduct of the investment banks. The
> interesting part here is how much broader our inquiries will
> be than the government's has been because we're covering
> 55 banks, not 10. It's going to be far more fascinating to
> demonstrate that the conduct we allege to be serious
> violations of the law was widespread throughout the entire
> industry. ... *I would be very disappointed if we don't
> achieve multiple billions (in recovery).*" [Emphasis added.]

Thus, JPMC stands to lose billions of dollars in the IPO Securities Litigation, in which case Wolf Haldenstein stands to earn tens of millions in dollars in fees. Indicating the importance of these cases to Wolf Haldenstein, as well as its leadership role in the litigation, the firm's website has a number of links to press releases describing the litigation. (Aff. Ex. L.)

In addition to the IPO Securities Litigation, in the wake of Enron's demise, Wolf Haldenstein filed suit on February 22, 2002 in the United States District Court for the Southern District of New York on behalf of purchasers of JPMC between November 28, 2001 and January 28, 2002 against JPMC. (Aff. Ex. L.) The class period was subsequently extended to be between November 8, 1999 and December 31, 2000 for purchasers of the securities of The Chase Manhattan Corporation (a predecessor of JPMC) and between January 2, 2001 and July 23, 2002 for purchasers of the securities of JPMC.

According to Wolf Haldenstein's website, the complaint alleges that JPMC misrepresented its risk and loss exposure related to its Enron Corporation dealings as being approximately $900 million. *Id.* However, the complaint alleges that JPMC later admitted that, in fact, its total Enron related exposure was actually about $2.6 billion, or almost three times the earlier figure. *Id.* Shortly thereafter, JPMC wrote down $1.13 billion in nonperforming assets, specifically losses related to Enron. *Id.*

As a key financial advisor to Enron, JPMC is one of the primary defendants in the Enron litigation and faces the prospect of having to pay out billions of dollars to resolve that litigation. *See* Timothy L. O'Brien, *The New York Times*, "After Charge for Legal Reserves, J.P. Morgan Takes Big Loss," July 21, 2004 (Aff. Ex. M).

JPMC's recent settlement of WorldCom-related litigation demonstrates the reality of its multi-billion-dollar exposure in the IPO Securities Litigation and Enron-related litigation. On March 16, 2005, JPMC settled with WorldCom investors in a securities class action for $2 billion. (Aff. Ex. N.)

## ARGUMENT

### I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES NECESSITATE DISQUALIFICATION

Effectively a lead plaintiff appointment by stipulation, the Minute Order, understandably, did not receive strict scrutiny because no adversary was present to call any weaknesses to the Court's attention. Undoubtedly, defendants were content that no adequate representative of the class appeared. They hoped to contain the controversy and were faced with an embarrassingly weak complaint prosecuted by conflicted counsel who have not demonstrated any ability to represent the class adequately.

However, in light of the Court's fiduciary role with respect to the class, the Court has a continuing responsibility to review the adequacy of those purporting to represent the class. Here, the lead plaintiff's "chosen" counsel is incapable of representing the class adequately as a result of its divided loyalties.

### A.    The Court Has A Continuing Responsibility to Review The Adequacy of the Class Representative

With respect to the PSLRA, pertinent case law makes clear the court always retains the authority to re-examine the lead plaintiff appointment. *See Z-Seven Fund, Inc.*

*v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000). Other courts have similarly held that the lead plaintiff designation is an interlocutory order and may be revisited by the district judge under appropriate circumstances. *See Metro Services Inc. v. Wiggins*, 158 F.3d 162, 165 (2d Cir. 1998) (dismissing appeal from lead plaintiff appointment order on the ground that it was not final and could be revisited); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing lead plaintiff and reserving the right to alter the structure if it "proves detrimental, in any way, to the best interests of the class" quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 42, 51 (S.D.N.Y. 1998)); *Borenstein v. Finova Group, Inc.*, C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732, at *30 (D. Ariz. Aug. 28, 2000) (appointing lead plaintiff but reserving the right to "revisit the issues if and when appropriate" and noting that, if another "more adequate member of the class of note purchasers should come forward, the court may also reopen the issue of lead plaintiff").

Indeed, under the provisions of the PSLRA requiring that a lead plaintiff be both typical and adequate in accordance with Rule 23, the Court has a "continuing responsibility" to determine whether lead plaintiffs meet the typicality and adequacy prongs of Rule 23 to ensure that the interests of the class are being protected. *In re Terayon Communications Sys., Inc.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004) (granting defendants' motion to disqualify lead plaintiffs four years after they had been appointed on the grounds that they did not meet the typicality and adequacy requirements of Rule 23 and thus were not appropriate lead plaintiffs). *See also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity,

- 11 -

by approving appropriate representative plaintiffs and class counsel."); *In re Oracle Sec. Litig.*, 131 F.R.D. 688, 691 (N.D. Cal. 1990) (Walker, J.) ("[T]he court bears fiduciary responsibilities to the class.").

**B.    Wolf Haldenstein's Divided Loyalties Amount to a Non-Waivable and Disqualifying Conflict of Interest**

It is a conflict of interest for a law firm to seek recovery from the same defendant on behalf of different classes of plaintiffs. *See In re Cardinal Health, Inc. ERISA Litig.*, 225 F.R.D. 552, 557 (S.D. Ohio 2005) (citing ABA Code of Professional Responsibility, DR 5-105 and EC 5-14 (prohibiting counsel from representing different plaintiffs with conflicting claims against the same defendant because it creates "the appearance of divided loyalties of counsel")).  In *Cardinal Health*, a law firm sought to be appointed lead counsel for the plaintiff class, but several plaintiffs objected because the law firm was handling other litigation against the same defendants.  The Court noted that representing multiple classes seeking recovery from the same "common pool" presents a fatal conflict.  225 F.R.D. at 557.  The law firm responded that it would be suing a parent corporation in one case and a subsidiary of that parent in the other, claiming further that any recovery against the subsidiary would not subject the parent to liability in that case.  *Id.*  The Court agreed that, if the law firm could prove that recovery against the subsidiary would not subject the parent to liability, there would not be a "common pool" conflict.  *Id.*  However, it held that the relationship between the two corporations had not been sufficiently established.  *Id.*  For that reason, and because of the law firm's misconduct in another case, the court rejected the law firm's motion to be appointed lead counsel, instead selecting another candidate with no such conflict.  *Id.* at 558.

As set forth above, in addition to the instant litigation against JPMC, Wolf Haldenstein is currently involved in several other prominent cases seeking substantial recoveries from JPMC, including 128 lawsuits in the IPO Securities Litigation. Thus, Wolf Haldenstein suffers from the same disabling conflict considered in *Cardinal Health*.

In *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002), a law firm attempted to be appointed class counsel. Like Wolf Haldenstein, the law firm was one of the six firms on the Plaintiffs' Executive Committee in the IPO Securities Litigation. Moreover, the corporate defendant, pcOrder.com, was a defendant in the IPO Securities Litigation, albeit in only one action. The court denied the firm's request to be appointed class counsel because, like Wolf Haldenstein: (1) it had not informed the class representatives that it represented other classes in other courts against the same defendants, and (2) because of the possibility that the defendants might not be able to satisfy all the claims. *Id.* at 589. The law firm attempted to counter the latter argument by suggesting that the court could supervise the allocation of any settlement or award. *Id.* at 590. The court rejected this argument, noting that it would not have control over the courts in which the other cases against these defendants are pending. *Id.*

Given the firm's more than 128 other pending suits against JPMC, Wolf Haldenstein is unable to vigorously advance the interests of class members in this litigation while simultaneously prosecuting other cases against JPMC on behalf of different classes in the IPO Securities Litigation and Enron-related securities litigation. As JPMC does not have an unlimited ability to pay, an increased recovery for class members in this litigation would likely come at the expense of class members in the other actions. Thus, this conflict of interest precludes Wolf Haldenstein from seeking to

represent multiple classes pursuing recovery from the same source. *See Sullivan v. Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (D.C. Cal. 1978) (requiring plaintiffs' counsel to certify that they had completely withdrawn from a separate class action against the defendant because the "responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel."); *In re Continental Illinois Sec. Litig.*, 750 F. Supp. 868, 875 (N.D. Ill. 1990) (disallowing attorneys' fees in class action for work on a related derivative action per earlier ruling that such dual representation was impermissible, noting that "[t]he conflict seemed especially likely in the area of settlement negotiations, where the two kinds of plaintiffs might be competing for limited funds"); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) (proposed class representative failed to satisfy adequacy requirement, where its proposed lead counsel had a conflict of interest by virtue of its representation of the plaintiff class in other litigation against the same defendant); *Kuper v. Quantum Chemical Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (declining class certification in securities action because the employee-stockholder class representatives failed to demonstrate that they would vigorously prosecute class interests through qualified counsel in light of the fact that the same counsel represented a class of bondholders in another action against corporation and sought recovery from a common pool of assets that might be insufficient to support the amounts sought by both classes).

In *Sullivan*, the Northern District of California court noted its "major concern about counsel involv[ing] their role in a parallel securities fraud case against [the same corporate defendant] in the District of Maryland" and observed that "[t]he possibility that assets and insurance of the defendants who may have committed fraud against the

plaintiffs will be insufficient to satisfy an alleged liability to the class of over $20 million is great enough to influence litigation strategy." 79 F.R.D. at 259.  Thus, the court held that "[b]ecause this putative class and the [plaintiffs in the parallel action] have conflicting interests in the course of each litigation, counsel cannot represent both."  *Id.*  Here, Wolf Haldenstein's divided loyalties are even more starkly reflected in the billions of dollars at stake both in this litigation and in the IPO Securities Litigation.  Indeed, the *very same* Wolf Haldenstein attorneys representing Dr. Blau in this matter have touted their involvement in the IPO Securities Litigation.  (*See* Aff. Ex. L.)

A recent ethics opinion issued by the Illinois State Bar Association confirms not only that this "common pool" conflict compromises Wolf Haldenstein's ability to represent the class, but also that the conflict is non-waivable.  *See* Opinion No. 04-01 (Nov. 2004) (Aff. Ex. O).  The opinion assumes that a lawyer has a collection case for Client A against Debtor B.  Debtor B owns a piece of real estate, which would be potentially useful in collecting any judgment Client A may obtain against Debtor B.  During the collection proceedings, Client C comes to the lawyer and asks him to represent Client C in purchasing the aforementioned real estate from Debtor B.  The committee opined that representing Client C in such a matter would be a non-waivable conflict because, even though "the possibility exists that no judgment will be obtained, it is also clear that by the time that such question is answered it will be irrelevant, because it will be too late to negate the damage which may be done…[because the] property intended to be used to satisfy the judgment will be gone…."  *See also Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (affirming the necessity of class counsel's withdrawal to remedy the appearance of divided loyalties, even if "there had as

yet been no reason to believe improper influence had resulted from the representation of two parties with conflicting interests," citing *Sullivan*).

The form of relief sought in this litigation also may conflict with the other suits maintained by Wolf Haldenstein against JPMC. In this litigation, it is possible that a recovery in JPMC stock, rather than cash, would make whole aggrieved members of the class. As the Delaware Action attacks, *inter alia*, the unnecessarily inflated exchange ratio agreed upon in connection with the Merger, one way to correct the inflated exchange ratio is for JPMC to issue JPMC common stock to certain members of the class. However, this non-cash alternative is in conflict with the cash recovery sought by Wolf Haldenstein in other ongoing litigation against JPMC. For instance, the continued prosecution by Wolf Haldenstein of other suits against JPMC may harm the value of JPMC common stock, to the detriment of class members who might benefit from a stock settlement or who have retained their stock. *See Kuper*, 145 F.R.D. at 83 ("class members who…continue to [own stock in the corporation] have a vested interest in that corporation's continued existence and viability"). Alternatively, rather than considering solely the best interests of the class in this case, Wolf Haldenstein might seek a stock settlement in this litigation in order to leave JPMC more cash to pay for recoveries in other actions. Thus, this conflict further impairs Wolf Haldenstein's ability to represent adequately any member of the class in this case.

The class in this case will not be harmed in any way by the disqualification of Wolf Haldenstein. First, the Delaware Action, which seeks recovery on behalf of a class including the putative class in the Illinois Action, has been and continues to be vigorously prosecuted. Second, the Delaware Group has a much larger financial stake in the

litigation than Dr. Blau.  Third, the Illinois Action is at an early stage, as no discovery has been taken, no motion to dismiss has been ruled upon, and no class has been certified. Finally, unlike Wolf Haldenstein, counsel for Hyland has no interest in any other lawsuit against JPMC, and thus has no conflict of interest preventing his effective performance as class counsel.  (Aff. ¶ 5.)

Disqualifying Wolf Haldenstein will not delay this litigation.  It is apparent that Wolf Haldenstein has not advanced this litigation to any material degree since its filing. Although the Illinois Action was commenced on October 15, 2004 (approximately four months after the Chancery Action was commenced), defendants' motion to dismiss has not even been fully briefed yet, and the amended complaint in the Illinois Action was filed barely a month before the Delaware Action was commenced.[3]  Thus, disqualifying Wolf Haldenstein at this time will not delay this litigation or prejudice any party.  To the contrary, disqualification will ensure that all parties' interests, including those of absent class members, will be protected.

Accordingly, this Court should disqualify Wolf Haldenstein from representing any purported class member in this litigation.

## II.    THIS ACTION SHOULD BE TRANSFERRED TO THE DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404 (a).  *See also Ferens v. John Deere Co.*, 494 U.S. 516, 530 (1990) (noting that a court may transfer venue on its own motion); *Hite v. Norwegian*

---

[3] It may be that Wolf Haldenstein attorneys have been preoccupied with the vast amount of work devoted to the IPO Securities Litigation.

*Caribbean Lines*, 551 F. Supp. 390, 392 (E.D. Mich. 1982) (ordering parties "to show cause why the case should not be transferred").

The Delaware Action is properly venued in the District of Delaware because (1) the plaintiffs are Delaware residents, (2) JPMC is a Delaware corporation, (3) Bank One was incorporated in Delaware, (4) the Merger agreement provides that Delaware law governs, (5) the first-filed suits against the defendants were commenced in the Delaware Court of Chancery, (6) Delaware law applies to the breach of fiduciary duty claims in the Delaware Action, (7) JPMC conducts substantial business in the District of Delaware (as did Bank One), and (8) unlike Illinois, Delaware is close enough to New York to compel the trial testimony of several non-party witnesses in New York, where the alleged misconduct took place and where most witnesses reside.

By contrast, the Northern District of Illinois is not an appropriate or convenient forum for this litigation in any respect. Firstly, the plaintiff in the Illinois Action does not even live in Illinois. *See* Moore's Federal Practice ¶111.13[1][c][iii] ("When the chosen forum is neither the plaintiff's residence nor the place where the operative events occurred, the court is likely to override the plaintiff's choice." (citing *Tranor v. Brown*, 913 F. Supp. 388 (E.D. Pa. 1996))); *So-Comm Inc. v. Reynolds*, 607 F. Supp. 663, 666 (N.D. Ill. 1985) ("the plaintiff's choice of forum is entitled to less consideration when he is not a resident of the forum district."). Rather, Dr. Blau apparently resides in New York. Thus, the decision to file suit in the Northern District of Illinois can be explained only by the fact that Wolf Haldenstein has its office in Chicago. Of course, the mere convenience of counsel, without more, cannot justify an otherwise inappropriate choice of venue. *See Solomon v. Continental American Life Insurance Co.*, 472 F.2d 1043, 1047

(3d Cir. 1973) (convenience of counsel not a factor to be considered in determining whether case should be transferred under 28 U.S.C. § 1404(a)). Thus, there appears to be no justification for maintaining this litigation in the Northern District of Illinois. *Cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (affirming dismissal of complaint on *forum non conveniens* grounds where neither plaintiff nor witnesses, but only plaintiff's counsel, resided in forum where action was commenced).

Secondly, unlike the Illinois Action, subpoenas issued in the Delaware Action for New York witnesses can be served from the District of Delaware. Rule 45(b)(2) of the Federal Rules of Civil Procedure provides that "a subpoena may be served…at any place without the district that is within 100 miles of the place of the deposition." Hyland's counsel has determined that JPMC's headquarters in Manhattan are located 94.4 air miles from the Delaware Federal Courthouse.[4] (Aff. ¶ 10.A-C.)

The convenience of the witnesses is "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer under 28 U.S.C. § 1404(a)." 15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 at 415 (1986). *See also Schwarz v. National Van Lines, Inc.*, 2004 WL 432483, at *5 (N.D. Ill. Feb. 24, 2004) ("The convenience of witnesses is often viewed as the most important factor in the transfer balance."). Crucial non-party witnesses anticipated at trial include the investment bankers and lawyers who advised JPMC and Bank One in connection with the Merger. The expected testimony from these witnesses, many or all of whom were intimately involved in the negotiations leading to the Merger, will confirm the secret deal

---

[4] Also, the combined Company's credit card operations are based in Wilmington, just blocks from the Delaware Federal Courthouse. Moreover, one of JPMC's two principal banking subsidiaries, Chase Manhattan Bank USA, National Association, is headquartered in Delaware.

at the heart of this case, as well as related details of the negotiations, such as Harrison's rejection of the nil-premium opportunity.

The investigation of Hyland's counsel indicates that these witnesses include bankers Gary Parr, Tim Dana, and Gary Shedlin of Lazard Frères & Co. LLC for Bank One, lawyers Edward D. Herlihy, Craig M. Wasserman, and Lawrence S. Makow of Wachtell, Lipton, Rosen & Katz for Bank One, lawyers Richard I. Beattie, Lee Meyerson, Maripat Alpuche, Christopher Lee, Kristin H. Johnson and Elsa Fraysse of Simpson Thacher & Bartlett LLP for JPMC, and as-yet-unidentified lawyers with Sullivan & Cromwell LLP for JPMC's board.  (Aff. ¶ 9.)  The offices of these investment banks and law firms are all located in Manhattan, less than 100 air miles from the Delaware Federal Courthouse (less than two hours away by Amtrak).  (Aff. ¶ 10.D-J.)

As each of these anticipated witnesses resides or works within 100 miles of the Delaware Federal Courthouse, their live presence can be compelled judicially to testify at trial in the Delaware Action.  *See Hill v. Equitable Bank*, 115 F.R.D. 184 (D. Del. 1987).  Thus, from the standpoint of the convenience of the most material witnesses, as well as in the interests of justice generally, the District of Delaware is the better forum.  *Coats Co., Inc. v. Vulcan Equipment Co., Ltd.*, 459 F. Supp. 654, 658 (D.C. Ill. 1978).  *See also Courtesy Caribbean v. Aquilar*, 1995 WL 549127, at *4 (N.D. Ill. Aug. 31, 1995) (noting the importance of considering, in comparing venues, the availability of compulsory process for unwilling witnesses); *Hess v. Gray*, 85 F.R.D. 15, 25 (N.D. Ill. 1979) ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury, or most litigants.") (quoting *Gulf Oil*, 330 U.S. at 511).

Thirdly, it is in the interest of justice to have a Delaware judge decide this case

because both JPMC and Bank One are Delaware corporations and the Merger agreement

provides for Delaware law to govern the contract.[5]  *See Van Gelder v. Taylor*, 621 F.

Supp. 613, 620 (D.C. Ill. 1985).  Indeed, "'[n]o principle of corporation law and practice

is more firmly established than a State's authority to regulate domestic corporations,

including the authority to define the voting rights of shareholders.'"  *Examen, Inc. v.

VantagePoint Venture Partners 1996*, C.A. No. 1142-N, slip op. at 9 (Del. Ch. March 31,

2005) (citing internal affairs doctrine in applying Delaware law to contested stockholder

vote concerning a Delaware corporation's merger) (quoting *CTS Corp. v. Dynamics

Corp. of Am.*, 481 U.S. 69, 89 (1987)).

Fourthly, the Delaware Action has been assigned to the Honorable Joseph J.

Farnan, Jr., who is ideally suited to overseeing this litigation.  Only weeks ago, Judge

Farnan issued a final decision in a remarkably similar case.  *See Tracinda Corp. v.

DaimlerChrysler AG*, -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005).  In that

complex securities litigation concerning a corporate merger, it was alleged that a

company's CEO defrauded shareholders into accepting an inadequate merger premium

by casting a takeover as a merger of equals.  *See id.* at *36.

Judge Farnan adjudicated numerous complex motions, including multiple motions

to dismiss and summary judgment motions, certified a class of investors, oversaw a $300

million settlement for the class, administered a 13-day bench trial on an individual

lawsuit and issued a final decision on April 7, 2005.  *See, e.g., Tracinda Corp. v.*

---

[5] The Merger agreement itself provides "8.6. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof)."  *See also* Proxy/Prospectus at 3 ("Subject to the terms and conditions of the merger agreement, and in accordance with Delaware law, at the completion of the merger Bank One will merge with and into JPMorgan Chase.").

*DaimlerChrysler AG*, 197 F. Supp. 2d 86 (D. Del. 2002) (motion to dismiss); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002) (same); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) (certifying class); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508 (D. Del. 2003) (denying defendants' motions for summary judgment); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005) (ruling on post-trial evidentiary objections). Thus, Judge Farnan's extraordinary experience with a similar securities fraud class action will ensure the fair and efficient adjudication of this litigation. In *Grand Park Surgical Center, Inc. v. Inland Steel Co.*, 1996 WL 204322, at *1 (N.D. Ill. Apr. 25, 1996), the Court, on its own motion, ordered transfer to Indiana district court under § 1404(a), noting that "because Indiana state law applies, a federal district court judge in that state would be more familiar with the governing law." This rationale is even more compelling here, given Judge Farnan's recent participation in a case with striking parallels to the instant litigation.

The pendency of the Chancery Action (commenced over three months before the Illinois Action) and the Delaware Action in Delaware constitute significant factors militating in favor of transfer, since avoiding multiplicity of litigation from a single transaction is in the interests of justice. *See River Road International, L.P. v. Josephthal Lyon & Ross, Inc.*, 871 F. Supp. 210 (S.D.N.Y. 1995). *See also Van Horn v. Graves*, 2002 WL 27658, at *3 (N.D. Ill. Jan. 10, 2002) ("[T]he desirability of resolving this controversy where it arose requires transfer.").

Finally, in addition to the venue considerations set forth above, prosecuting this litigation in Delaware is preferable because the District of Delaware is a full electronic

filing jurisdiction.  The Northern District of Illinois does not yet mandate electronic

filing.  Electronic filing allows the court and litigants to file and access documents

electronically via the Internet, 24 hours a day, seven days a week.  Court records will also

be available to the public by the same means.  In a case of this magnitude, electronic

filing capability is very important because the potential volume of filings, parties, and

attorneys in this litigation will require streamlined access to the courts.  This litigation

will be under intense media scrutiny.  Without electronic filing, crucial information will

not be readily accessible to nonparties needing it.  For instance, defendants' brief in

support of their motion to dismiss is unavailable electronically, as are exhibits to the lead

plaintiff application.  In such circumstances, the absence of electronic filing puts an

enormous burden on the clerk's office, which has to respond manually to the numerous

requests for information in filings from counsel, the press and other interested parties that

a case of this magnitude engenders.

Accordingly, the Illinois Action should be transferred to the District of Delaware.

## III.    WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE BECAUSE IT OMITTED CRITICAL INFORMATION

The PSLRA mandates that after filing a putative class action complaint, a plaintiff

seeking to represent the proposed class must publish a notice that sets forth (i) the

pendency of the action, including a description of the claims asserted and the proposed

class period, and (ii) a statement that any party seeking to serve as lead plaintiff for the

action referenced in the notice must move the applicable court within sixty (60) days of

the date of the notice. 15 U.S.C. § 78u-4(a)(3)(A)(i).  *See Janovici v. DVI, Inc.*, 2003 WL

22849604, at *5 (E.D. Pa. Nov. 25, 2003) (in considering motions for appointment of

lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements).

On October 15, 2004, Wolf Haldenstein published a notice in the *Investor's Business Daily* purportedly advising investors of the pendency of the Illinois Action. (Aff. Ex. P.)  However, two critical pieces of information were missing from the notice. First, the notice discloses the names of only two of the fourteen defendants.  Second, the notice fails to advise class members of their right to retain counsel of their own choice. In addition to these critical omissions, the notice is misleading because it fails to disclose Wolf Haldenstein's divided loyalties, does not reference the newspaper article in which the truth was revealed, and lists the civil action number incorrectly, thereby inhibiting the ability of any reader to locate the Illinois Action on PACER.  (Aff. ¶ 13 & Ex. P.)

In reviewing notices purportedly complying with this requirement, courts have rejected those which fail to include the names of all defendants.  *See, e.g., Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (finding notice inadequate because "[t]here is no explanation of the legal theory underlying plaintiffs' suit; no discussion of *who* violated the Securities Exchange Act of 1934; and no description of the alleged wrongdoing that forms the basis of the complaint.") (emphasis added); *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1311 (N.D. Ala. 2000) ("notice must, *at a minimum*, provide information about…who has filed the suit, *who is being sued*, the court in which the suit is taking place, and the civil action number of the case") (emphasis added); *id.* at 1316 ("the notice published by [one] plaintiff and his counsel fails to indicate who is seeking relief and *against whom relief is sought*, facts that would be revealed *were the entire name of the action included in the notice*") (emphasis added); and *id.* at 1315

("the [competing] notice does not fully inform potential lead plaintiffs…of…the names of the defendants"). *Cf. Marsden v. Select Medical Corp.*, 2005 WL 113128 (E.D. Pa. Jan. 18, 2005) (accepting notice which "adequately informs class members of 'the pendency of the action,' as it identifies the caption of the case, its civil action number, the Court before which the action was brought, ***and the names of all five Defendants.***") (emphasis added).

A notice which omits the right of class members to retain counsel of their choice is also inadequate. *See, e.g., Burke*, 102 F. Supp. 2d at 1311 n.39 ("giving only information directing putative class members to contact counsel would not comport with the purposes of the subsection"); *id.* at 1314 ("the notice published appears to have been drafted with the aim of directing clients to the law firms listed in it, thereby permitting the Burke plaintiffs and counsel associated therewith to avoid any lead plaintiff challenge.").

Unlike Wolf Haldenstein's defective notice, counsel for Hyland published a notice of the pendency of the Delaware Action which included the names of ***all*** defendants in the Delaware Action ***and*** advised class members of their right to retain counsel of their own choice in considering or seeking the lead plaintiff appointment. (Aff. Ex. Q.) *See Janovici*, 2003 WL 22849604, at *8 (finding notice adequate which "[u]nlike the first three notices, …lists the names of the Defendants…[and] also advises that potential class members may retain counsel of their choice."). The Delaware Action notice also specifically references the newspaper article in which the truth was revealed and correctly sets forth the civil action number.

Only a legally adequate notice triggers the PSLRA's 60-day period for all lead plaintiff motions. *See Janovici*, 2003 WL 22849604, at *9 ("This [60-day] rule does not apply, however, where the first notice of pendency fails to provide adequate information pursuant to the terms of the PSLRA– the statutory 60 day period begins to run from the date of the first notice that complies with the PSLRA.") Wolf Haldenstein's purported notice plainly failed to inform class members of their critical rights and otherwise failed to notify class members of the pendency of the action. By contrast, the notice in the Delaware Action included every crucial piece of information missing from Wolf Haldenstein's defective notice. Accordingly, only this notice triggered the 60-day period for all lead plaintiff motions.

## IV.    THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION

Fed. R. Civ. P. 60(b) provides that a court may vacate an order due to "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party… [or] any other reason justifying relief from the operation of the judgment." Moreover, district courts enjoy wide discretion to sanction misconduct in the management of cases. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). In *Chambers*, the United States Supreme Court advised:

> when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

*Id.* at 50.

One of the more troubling aspects of Wolf Haldenstein's conduct in the Illinois Action is the lead plaintiff application submitted to the Court which led to entry of the Minute Order. Given the inadequate notice published by Wolf Haldenstein, *see* Section III *supra*, it is unsurprising that the application met no competition and, therefore, avoided scrutiny. *See Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (Easterbrook, J., dissenting) ("[T]he court can't vindicate the class's rights because the friendly presentation means that it lacks essential information."). Even a diligent search of dockets nationally would not have revealed the Illinois Action, as Dimon (Harrison's counterparty in the secret deal and a defendant in the Delaware Action) is not named at all, *see* Section V.C *infra*. However, Wolf Haldenstein's lead plaintiff application merits scrutiny because it contains several misrepresentations to this Court.

The lead plaintiff application was premised upon the combined holdings of two purported JPMC shareholders, Dr. Blau and AGF, who together claimed to hold nearly 28,000 shares of JPMC. AGF's holding, prior to its mysterious withdrawal, accounted for 25,000 shares, or 89 percent, of the combined holding. Without AGF, Wolf Haldenstein would have proffered only Dr. Blau, with his "2999.9" shares, as the purported representative of the Illinois Action class. By contrast, the Delaware Group held 19,170 shares at all relevant times, over six times Dr. Blau's claimed holding. This is important because the PSLRA directs the Court to presume that the "most adequate plaintiff" to serve as lead plaintiff "is the person or group of persons" that, inter alia, "has the largest financial interest in the relief sought by the class…" 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb). AGF also certified to the Court its willingness to serve as a representative of the class. However, the veracity of this representation was called into

question when AGF suddenly and without explanation withdrew as a lead plaintiff on February 18, 2005, the date of the filing of the amended complaint, approximately one month after the entry of the Minute Order. At the very least, Wolf Haldenstein should be ordered to explain to the Court the circumstances of AGF's withdrawal, and whether such withdrawal was anticipated when the lead plaintiff application was filed. *See Chambers*, 501 U.S. at 44 ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

Indeed, every PSLRA-required certification in the Illinois Action is either defective or absent. Firstly, AGF's certification is false, as AGF was obviously not willing to serve as a representative of the class.

Secondly, no certification at all accompanies the Illinois Action's amended complaint, in contravention of the PSLRA's requirement that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint…." 15 U.S.C. §78u-4(a)(2)(A). Thus, Dr. Blau has not certified that, as to the amended complaint, he "has reviewed the complaint and authorized its filing…." 15 U.S.C. §78u-4(a)(2)(A)(i). Given that AGF withdrew in connection with the filing of the amended complaint, the absence of Dr. Blau's certification is particularly concerning.

Thirdly, Dr. Blau's certification of the original complaint is defective because it represents that Dr. Blau purchased 899.9 shares of JPMC (presumably a JPMC predecessor) on January 21, 1994. One cannot purchase or sell fractional shares of JPMC common stock. Thus, this fractional share quantity does not make sense and casts doubt on Dr. Blau's certification. Further, Dr. Blau claims to have made the following

purchases: 899.9 shares on January 21, 1994 for $11,509, or $12.79 per share (11.2 percent above the $11.50 adjusted close on that date); 600 shares on March 31, 1994 for $7,458, or $12.43 per share (11.9 percent above the $11.11 adjusted close on that date); and 1,500 shares on October 6, 1994 for $17,473, or $11.65 per share (11.7 percent above the $10.43 adjusted close on that date).  (Aff. ¶ 12.)  These price discrepancies are unexplained.

In *Nager v. Websecure, Inc.*, 1997 WL 773717, at *1 n.1 (D. Mass. Nov. 26, 1997), the Court rejected a member of a group that was appointed as lead plaintiff for failure to accurately report one of his transactions in the subject security.  In that case, the Court stated:

> One of the proposed group, David Renzer, states in his affidavit that on "2/7" he purchased 2,500 shares of common stock of Websecure, Inc. at a price of $17.50 per share. (Waldman Decl. Supp. Websecure Pl. Group's Mot. to Consol., Ex. C.)  Information supplied by the plaintiffs about the stock's trading indicates, however, that on February 7, 1996, the stock closed, as it had the day before, at $9.50 per share. (Waldman Aff. Supp. Pls' Mot. for Prelim. Inj., Ex. N.)  The statement in the Renzer affidavit may thus be suspected of being inaccurate.  The inaccuracy may be explainable, but it casts sufficient doubt on Mr. Renzer's adequacy as a representative plaintiff that he should be excluded from the group appointed to serve as lead plaintiffs.

*Id.*

Dr. Blau's failure to meet the basic requirements of the PSLRA makes it impossible to determine his financial interest in the litigation.  Moreover, this deficiency is clear evidence of his inadequacy as a lead plaintiff and, as in *Nager*, constitutes a sufficient ground to reject him as lead plaintiff.

Lastly, the certifications in the lead plaintiff application are all defective also because they fail to disclose the movants' ownership, if any, of Bank One shares.[6] Defendants will undoubtedly argue that any benefit obtained by Bank One shareholders from the unfair exchange ratio should offset damages flowing from the alleged misconduct. The Delaware Action plaintiffs did not own shares of Bank One. (Aff. ¶ 4.) If Dr. Blau owned Bank One shares, then he may be subject to a unique defense that renders him incapable of adequately representing the class.[7] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). However, Dr. Blau did not disclose his Bank One holdings, if any.

The defects in the certifications identified above provide a basis to revisit the lead plaintiff appointment. *See Greebel v. FTP Software Inc.*, 939 F. Supp. 57, 62 n.4 (D. Mass. 1996) ("Should subsequent discovery reveal that the representations [in plaintiffs' PSLRA certifications] are inaccurate, the court may revisit the lead plaintiff determination.").

Also critically missing from the lead plaintiff application is information necessary for this Court to determine whether the ownership of JPMC common stock by any Wolf Haldenstein attorney constitutes a conflict of interest sufficient to disqualify the firm from representing the plaintiff class. Such a determination is mandated by the PSLRA:

### Attorney conflict of interest

---

[6] AGF's certification is not electronically accessible. However, if AGF's certification fails to evidence the requisite authority to move for appointment as lead plaintiff, that would be further ground for denying the application. *See, e.g., Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 634-35 (D.N.J. 2002) (investment advisor's motion denied because it failed to submit "any evidence that it received permission to move on its clients' behalf."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 357-58 (S.D.N.Y. 2002) (same).

[7] Such an offset argument has been rejected by the United States Supreme Court. *See Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) (noting that "it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them") (internal quotations omitted). However, the test of whether a unique defense impairs the class representative is not the validity of the defense, but whether it threatens to become the focus of the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

> If a plaintiff class is represented by an attorney who
> directly owns or otherwise has a beneficial interest in the
> securities that are the subject of the litigation, the court
> shall make a determination of whether such ownership or
> other interest constitutes a conflict of interest sufficient to
> disqualify the attorney from representing the plaintiff class.

15 U.S.C. §78u-4(a)(9).  The Minute Order reflects no such determination because Wolf

Haldenstein failed to disclose the information necessary for such a determination.  By

contrast, Hyland's counsel freely discloses that he has no beneficial interest, whether

direct or indirect (for instance, through a mutual fund), in JPMC common stock.  (Aff.

¶ 5.)  In addition to the absence of information relating to Wolf Haldenstein's divided

loyalties, *see* Section I *supra*, the absence of information necessary for this Court to make

an appropriate determination under 15 U.S.C. §78u-4(a)(9) also renders Wolf

Haldenstein's lead plaintiff application incomplete and misleading.

Accordingly, the Minute Order should be vacated.

## V.    WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE REMOVAL OR SUBSTITUTION OF LEAD COUNSEL

The plethora of irregularities plaguing Wolf Haldenstein's (mis)management of

the Illinois Action extends well beyond the firm's divided loyalties, failure to publish

adequate notice, inappropriate choice of venue, and false and misleading lead plaintiff

application.  Wolf Haldenstein has also misrepresented its pre-filing investigation, failed

to properly serve crucial defendants, and failed to name and incorrectly named certain

defendants.  Wolf Haldenstein's numerous flagrant blunders not only violate Rule 11 but

also necessitate that the firm must be removed as class counsel in this litigation to prevent

any further harm to the class.

### A.    Wolf Haldenstein's Rampant Plagiarism Indicates An Insufficient Pre-Filing Investigation Or None At All

The Illinois Action amended complaint falsely claims to be based "upon the investigation made by and through plaintiff's counsel," purportedly including a review of JPMC's SEC filings, "as well as press releases, news articles, and other public statements concerning the Company."  (D.E. #23 at 1.)  Notably absent from this purported investigation is any reference to pleadings in a similar lawsuit.  However, a comparison of the Illinois Action amended complaint and the consolidated complaint in the Chancery Action reveals *at least 29 instances* of plagiarism, including several allegations copied verbatim.  (Aff. ¶ 8 & Ex. R.)  For instance, ¶ 55 of the consolidated complaint in the Chancery Action alleges:

> [A]lthough the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.

Wolf Haldenstein shamelessly lifted this text word for word (but without attribution) at ¶ 55 of the Illinois Action amended complaint, which alleges:

> Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor….

This rampant plagiarism, which permeates the Illinois Action amended complaint, indicates that Wolf Haldenstein either performed no investigation at all or did not investigate or research the allegations and claims in the Illinois Action to the extent required by Rule 11.  At best, Wolf Haldenstein blindly and improperly relied upon the investigatory and drafting efforts of plaintiffs' counsel in the Chancery Action.

Wolf Haldenstein has found itself in hot water for such misconduct at least twice in the past.  In *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118, 126-28 (E.D. Pa.

1993), *aff'd*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994), plaintiffs'

counsel, including a Wolf Haldenstein partner, were reprimanded because certain

attorneys had failed to personally investigate law and facts underlying a securities fraud

complaint. Although the Wolf Haldenstein attorney was not sanctioned, the Court

sanctioned the attorneys who merely copied their complaint from another complaint for

violating Rule 11's "reasonable inquiry" requirement. *Greenfield*, 146 F.R.D. at 126-28.

*See also Taubenfeld v. Career Education Corp.*, 2004 WL 554810, at *5 (N.D. Ill. March

19, 2004) ("this issue of copying another's complaint would have persuasive effect if

there was evidence showing that the proposed lead counsel did not, in fact, undertake a

sufficient investigation before filing a complaint."); *Matter of Excello Press, Inc.*, 967

F.2d 1109, 1112 (7th Cir. 1992) ("the right question [is] not whether the claim itself was

frivolous or nonfrivolous, but whether [counsel] conducted an adequate inquiry into the

facts and the law before he filed the claim"); *Garr*, 22 F.3d at 1279 ("[A] signer making

an inadequate inquiry into the sufficiency of the facts and law underlying a document will

not be saved from a Rule 11 sanction by the stroke of luck that the document happened to

be justified.").

Similarly, in *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250,

274 (S.D.N.Y. 2003), the Court granted defendants' request for Rule 11 sanctions against

plaintiffs' counsel including Wolf Haldenstein, this time for improperly asserting clearly

time-barred claims.[8] An adequate inquiry by competent counsel would have prevented

---

[8] In *de la Fuente*, the defendants argued that plaintiffs' counsel violated Rule 11 by simply copying an SEC
complaint. 259 F. Supp. 2d at 259. The Court did not find reliance upon the investigatory findings of a
regulatory agency to be insufficient and, further, plaintiffs' counsel represented that every allegation in the
complaint had been verified through independent investigation. *Id.* at 260. Here, there was no independent
investigation by the SEC or other any regulatory agency. Further, any claim that Wolf Haldenstein verified
every plagiarized allegation would strain credulity, but, in any case, could be refuted or confirmed by the
firm's electronic research records.

this.  Again, Wolf Haldenstein avoided monetary sanctions, *see de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 229, 235 (S.D.N.Y. 2003) (declining to assess Rule 11 sanctions on liaison counsel) but the pattern is clear.  Here, there is abundant evidence of Wolf Haldenstein's inadequate inquiry.  (Aff. Ex. R.)  Indeed, Wolf Haldenstein's misconduct here is all the more inexcusable in that the Illinois Action was commenced several months after the relevant facts first emerged and the Chancery Action was commenced.  *See Garr*, 22 F.3d at 1279 ("[A]n attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints.").  Accordingly, the appropriate sanction is to remove Wolf Haldenstein as class counsel.  At the very least, Wolf Haldenstein should not be permitted to lead this litigation.

## B.    Wolf Haldenstein's Failure to Serve Summons Properly

In the Delaware Action, defendant Riley P. Bechtel waived service of summons upon the formal request of Hyland's counsel.  (Aff. ¶ 6.)  The other defendants have all stipulated to waiver of service of summons in the Delaware Action.  *Id.*  Even if the defendants had not waived service of summons, Hyland could easily have served them all under Delaware's director consent statute.[9]

---

[9] Fed. R. Civ. P. 4(e)(1) provides that service upon an individual from whom a waiver has not been obtained may be effected in any judicial district of the United States pursuant to the law of the state in which the district court is located.  Delaware's "director consent" statute provides, in relevant part: "Every nonresident of this State who…accepts election or appointment as a director…of a corporation organized under the laws of this State or who…serves in such capacity…shall…be deemed thereby to have consented to the appointment of the registered agent of such corporation…as an agent upon whom service of process may be made in all civil actions…brought in this State…against such corporation, in which such director…is a necessary or proper party, or in any action or proceeding against such director…for violation of a duty in such capacity, ***whether or not the person continues to serve as such director***…at the time suit is commenced.  Such acceptance or service as such director…shall be a signification of the consent of such director…that any process when so served shall be of the same legal force and validity as if served upon such director…within this State and such appointment of the registered agent…shall be irrevocable." 10 Del. C. § 3114(a) (emphasis added).

By contrast, according to the Illinois Action docket, Wolf Haldenstein left copies of the summons and complaint with Marjorie G. Joseph, presumably an officer or other agent of JPMC.  (*See* D.E. #2-15.)  It is unclear why Wolf Haldenstein believed that such service was sufficient or proper, especially given that five of the Illinois Action defendants were no longer directors of JPMC when the Illinois Action was commenced.[10] Fed. R. Civ. P. 4(m) imposes a 120-day time limit to serve a complaint, but more than 120 days have elapsed since the filing of the Illinois Action.  Indeed, apparently Bechtel contests the propriety of service in the Illinois Action.  (D.E. # 31 at 2 n.2 ("Riley P. Bechtel…was never properly served in this matter.").)  Without taking any position on this question, this issue may endanger Dr. Blau's ability to recover against other defendants as well.

The importance of Bechtel's participation in this action is twofold.  Firstly, as the billionaire Chairman and CEO of Bechtel Group, Mr. Bechtel appears to be by far the wealthiest individual defendant in this litigation, and thus second only to JPMC in terms of potential sources of recovery.  (Aff. Ex. S.)  Secondly, Bechtel's background and multiple connections to JPMC, as alleged in the Delaware Action, may give rise to higher liability on his part.  (Aff. Ex. B ¶¶ 173-186.)  Thus, Wolf Haldenstein's failure to serve summons properly specifically harms the ability of the class to recover damages and further demonstrates the law firm's inability to prosecute this litigation.

---

[10] Laurence Fuller stepped down from the JPMC Board in 2003; Riley P. Bechtel and M. Anthony Burns were JPMC directors until the eve of the JPMC annual meeting on May 25, 2004; Frank A. Bennack, Jr. and Helene L. Kaplan were JPMC directors until the consummation of the Merger on July 1, 2004.

### C.     Wolf Haldenstein Names the Wrong Defendants
And Fails to Name A Crucial Defendant

The Illinois Action incorrectly names Laurence Fuller, inexplicably fails to name James Dimon, and names the corporate defendant incorrectly.

Wolf Haldenstein named Fuller as a defendant even though he retired from the JPMC board in 2003 and, thus, could not have approved the Merger agreement, which was reviewed and approved by the board in January 2004. This mistake is likely due to the fact that Wolf Haldenstein indiscriminately copied documents from the Chancery Action, in which Fuller was listed in the caption in the initial complaints but not in the consolidated complaint. (Aff. Ex. D.)

Even more troubling than this error is Wolf Haldenstein's failure to name James Dimon, Harrison's counterparty in the secret deal and formerly the Chairman and CEO of Bank One. By contrast, Dimon is a defendant in the Delaware Action. Given Dimon's crucial role in the alleged misconduct, and his prominent role in soliciting votes for the Merger, including signing a false and misleading proxy statement, Wolf Haldenstein's failure to name Dimon is inexplicable.[11]

Finally, Wolf Haldenstein did not even get the corporate defendant's name right. The Illinois Action names "J. P. Morgan Chase & Co.," the name of the Company before its charter was amended in connection with the Merger. (Aff. Ex. T.) By contrast, JPMorgan Chase & Co. is properly named as the corporate defendant in the Delaware Action. Although this misnomer may not be a fatal defect in the summons in the Illinois

---

[11] Also inexplicable is Wolf Haldenstein's failure to assert a number of claims asserted in the Delaware Action, including claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-promulgated thereunder, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and pendent common law claims. *See Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 12 (N.Y.A.D. 1998) ("The manner in which the named plaintiffs limited their claims makes them inadequate to represent [the] putative class….").

Action, it further reflects on Wolf Haldenstein's lack of care in prosecuting the Illinois

Action and ought to be corrected through amendment.

## **CONCLUSION**

For all the foregoing reasons, this Court should disqualify Wolf Haldenstein,

vacate the Minute Order, and transfer the Illinois Action to the District of Delaware.

Counsel welcomes any invitation to participate in oral argument.


DATED:        May 23, 2005                Respectfully submitted,



                                          Joseph N. Gielata
                                          *of the Delaware Bar*[12]
                                          Attorney at Law
                                          501 Silverside Road, Suite 90
                                          Wilmington, DE 19809
                                          (302) 798-1096
                                          attorney@gielatalaw.com

                                          ***Attorney for Amici Curiae***
                                          ***Samuel Hyland and***
                                          ***Stephanie Speakman***

---

[12] Mr. Gielata's clients proceed as amici curiae but do not wish to intervene or otherwise formally appear in the Illinois Action for fear that doing so might waive their objections to venue. *See Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 394 (N.D. Ill. 1976). Accordingly, no *pro hac vice* application is forthcoming.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated, <br><br>     Plaintiff, <br><br>           vs. <br><br> WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO., <br><br>     Defendants. | Civil Action No. **04C 6592** <br><br> Judge William J. Hibbler <br><br> Magistrate Judge Martin C. Ashman |

**AFFIDAVIT OF JOSEPH N. GIELATA IN SUPPORT OF**
**THE MEMORANDUM OF AMICI CURIAE**
**SAMUEL HYLAND AND STEPHANIE SPEAKMAN**

      JOSEPH N. GIELATA, a member of the Bar of the Supreme Court of Delaware, for his affidavit states:

      1.      I represent Samuel I. Hyland and Stephanie Speakman, both of whom are members of the putative class in the above-captioned matter.

      2.      I make this affidavit in support of the Memorandum Of Amici Curiae Samuel Hyland and Stephanie Speakman.

      3.      I have been retained by Mr. Hyland and Ms. Speakman to prosecute the securities class action against JPMorgan Chase & Co. ("JPMC") and other defendants,

captioned *Hyland v. Harrison, et al.*, No. 05-162, pending in the District of Delaware

before the Honorable Joseph J. Farnan, Jr. (the "Delaware Action").

4.     As their certifications (attached to the amended complaint) attest, Mr.

Hyland and Ms. Speakman owned 300 and 18,870 shares of JPMC during the relevant

period, respectively, including on April 2, 2004.  I understand that neither Mr. Hyland

nor Ms. Speakman owned any Bank One shares in 2004.  Given my clients' aggregate

holding of 19,170 shares, I have calculated that their economic loss (*i.e.* what it would

take to restore their interest as though Harrison had accepted the 1.153 exchange ratio)

was at least $106,026.08, based on JPMC's stock price on July 1, 2004, when the Merger

closed.

5.     In accepting the Delaware Action engagement, I have determined that I do

not have any conflict of interest.  In particular, I am not involved in any other litigation in

which JPMC is a defendant.  Further, I do not own any common stock of JPMC and I do

not own any mutual fund or similar investment which holds JPMC common stock.  If I

am appointed lead counsel in the Delaware Action, I will, throughout the pendency of the

action, (a) refrain from becoming involved in any other litigation in which JPMC is a

defendant, and (b) refrain from purchasing JPMC common stock or otherwise owning

any interest, direct or indirect, in JPMC common stock.

6.     On March 21, 2005, on Mr. Hyland's behalf, I moved for an injunction of

related state court class actions, but the motion was denied without prejudice by the

Honorable Joseph J. Farnan, Jr. on April 18, 2005.  On April 14, 2005, all defendants in

the Delaware Action except for Riley P. Bechtel stipulated to waiver of service of

2

summons.  By letter dated April 27, 2005, in response to my formal request for waiver of service of the summons and complaint, Bechtel waived service of the summons in the Delaware Action.

7.     On May 3, 2005, in the wake of the dismissal of *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N (Del. Ch.), a related action in Delaware's Court of Chancery (the "Chancery Action"), I requested leave of Court in the Delaware Action to serve document preservation subpoenas on the law firm and the investment bank which advised Bank One in connection with the Merger.  I also obtained confirmation that certain document preservation efforts agreed upon by the parties in *In re J.P. Morgan Chase & Co. Shareholder Litigation* remained in force despite the dismissal of that action.

8.     I have compared the amended complaint in *Blau v. Harrison* against the consolidated complaint in the Chancery Action, which was filed over a month before the initial complaint in *Blau* was filed and over four months before the amended complaint in *Blau* was filed.  I have compiled, in the chart attached hereto as Exhibit R, several discrete selections which appear to have been plagiarized directly from the consolidated complaint in the Chancery Action.  I have also, where applicable, suggested explanations for discrepancies in the plagiarized sections.  I participated in the drafting of the consolidated complaint in the Chancery Action and was responsible for all electronic research underlying the allegations therein.  Accordingly, I am familiar with the investigatory efforts forming the basis for the consolidated complaint in the Chancery Action.  Based on my review of the complaints, I doubt that any Wolf Haldenstein

3

attorney personally reviewed or confirmed the plagiarized allegations. Wolf Haldenstein's electronic research records can confirm this well-grounded suspicion.

9.    Based on their roles as the investment bankers and M&A lawyers advising parties to the Merger, I believe that the following persons were close to the negotiations leading to the Merger and may be able to confirm the allegations in the operative complaint in the Delaware Action: (A) Gary Parr, Tim Dana, and Gary Shedlin of Lazard Frères & Co. LLC for Bank One, (B) lawyers Edward D. Herlihy, Craig M. Wasserman, and Lawrence S. Makow of Wachtell, Lipton, Rosen & Katz for Bank One, (C) lawyers Richard I. Beattie, Lee Meyerson, Maripat Alpuche, Christopher Lee, Kristin H. Johnson and Elsa Fraysse of Simpson Thacher & Bartlett LLP for JPMC, and (D) as-yet-unidentified lawyers with Sullivan & Cromwell LLP for JPMC's board.

10.    In order to determine the distance between the Delaware Federal Courthouse and certain addresses in Manhattan, I employed commonly available Global Positioning System calculators, yielding the following conclusions:

A.    I have determined that the Delaware Federal Courthouse ("DFC"), with its address at 844 North King Street, Wilmington, DE 19801, is located at Latitude 39.743607 (39:44:36.985N) and Longitude -075.547921 (75:32:52.516W).

B.    JPMC's headquarters ("HQ"), with its address at 270 Park Avenue, New York, NY 10017, are located at Latitude 40.755844 (40:45:21.038N) and Longitude -073.975374 (73:58:31.346W).

C.   The distance between HQ [40 45'21"N, 73 58'31"W] and DFC [39 44'36"N, 75 32'52"W] is 94.3793 air miles.

D.   The New York office of Sullivan & Cromwell LLP ("SC"), with its address at 125 Broad Street, New York, NY 10004, is located at Latitude 40.701888 (40:42:6.797N) and Longitude -074.011054 (74:00:39.794W).

E.   The distance between SC [40 42'6"N, 74 0'39"W] and DFC [39 44'36"N, 75 32'52"W] is 91.0666 air miles.

F.   The office of Wachtell, Lipton, Rosen & Katz ("WLRK"), with its address at 51 West 52nd Street, New York, NY 10019 is located at Latitude 40.760577 (40:45:38.077N) and Longitude -073.977893 (73:58:40.415W).

G.   The distance between WLRK [40 45'38"N, 73 58'40"W] and DFC [39 44'36"N, 75 32'52"W] is 94.4732 air miles.

H.   Lazard Frères & Co. LLC maintains offices in New York with addresses at 435 East 79th Street, New York, NY 10021 ("LF1") and 30 Rockefeller Plaza, New York, NY 10112 ("LF2"), located at Latitude 40.772048 (40:46:19.373N) and Longitude -073.951904 (73:57:6.854W), and Latitude 40.758816 (40:45:31.738N) and Longitude -073.978848 (73:58:43.853W), respectively.

I.   The distance between LF1 [40 46'19"N, 73 57' 6"W] and DFC [39 44'36"N, 75 32'52"W] is 95.8248 air miles.

5

J.    The distance between LF2 [40 45'31"N, 73 58'43"W] and DFC [39 44'36"N, 75 32'52"W] is 94.3692 air miles.

11.    I have reviewed 307 complaints in the IPO Securities Litigation (available at http://www.iposecuritieslitigation.com/amended.php3 ) and determined that JPMC is a defendant in 128, or 41.7%, of the actions.  The results of my review are attached hereto as Exhibit H.  In particular, I reviewed the 307 consolidated and/or amended and/or corrected complaints filed in connection with the IPOs of the issuers listed in Exhibit H, Table A (with their respective docket numbers), all of which are related to *In re Initial Public Offering Securities Litigation*.  Of the 307 complaints I reviewed, JPMorgan Chase & Co. (and/or one of its wholly-owned subsidiaries) is named as a defendant in 128 of the complaints.  These are listed in Exhibit H, Table B.  Of the 128 complaints listed by issuer-defendant and docket number in Exhibit H, Table B, the law firm of Wolf Haldenstein Adler Freeman & Herz LLP is listed as one of six firms representing plaintiffs in each and every matter except for the complaint in which Critical Path, Inc. was the issuer, for which I was unable to obtain the signature page.  However, I have no reason to believe that the signature page in this complaint differed from the signature pages in the other 127 complaints.

12.    According to Commodity Systems, Inc.'s database of historical stock prices (available on Yahoo! Finance), the prices for common stock of JPMC's predecessor were as follows on the dates below:

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|-----------|
| 6-Oct-94 | 34.13 | 34.38 | 33.88 | 34.13 | 775,800 | 10.43 |

* Close price adjusted for dividends and splits.

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|------------|
| 31-Mar-94 | 35.50 | 36.88 | 34.50 | 36.38 | 1,677,700 | 11.11 |

*Close price adjusted for dividends and splits.*

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|------------|
| 21-Jan-94 | 38.00 | 38.13 | 37.38 | 37.63 | 2,702,800 | 11.50 |

*Close price adjusted for dividends and splits.*

13.    On May 22, 2005, I visited the CM/ECF website for the Northern District of Illinois and logged in using my PACER login and password.  I initiated a query by searching for "04 C 6592," the civil action number of the action described in Wolf Haldenstein's "Legal Notice," attached hereto as Exhibit P.  However, "04 C 6592" yielded no results, as the website explained it was not in an acceptable format.

**SUPPORTING EXHIBITS:**

14.    Attached to this Affidavit are true and correct copies of the following:

A.    The initial complaint in *Hyland v. Harrison, et al.*, No. 05-162, pending in the District of Delaware, filed on March 17, 2005;

B.    The amended complaint in *Hyland v. Harrison, et al.*, No. 05-162, pending in the District of Delaware, filed on March 23, 2005;

C.    Landon Thomas, Jr., "The Yin, the Yang and the Deal," *The New York Times*, June 27, 2004.

D.    The consolidated complaint in *In re J.P. Morgan Chase & Co. Shareholder Litigation*, Consol. C.A. No. 531-N, filed in the Delaware Court of Chancery on September 2, 2004.

7

E.  Laura Saunders Egodigwe, "Fund Manager Abandons Ship? Don't Run for the Lifeboat," *The Wall Street Journal Interactive Edition*, August 4, 2000.

F.  Litigation Release Nos. 15457 (August 21, 1997), 15445 (August 18, 1997), and 15440 (August 12, 1997) issued by the Securities and Exchange Commission.

G.  The press release dated June 26, 2003 entitled "IPO SECURITIES LITIGATION RECOVERY OF AT LEAST $1 BILLION DOLLARS GUARANTEED FOR PLAINTIFF CLASSES UPON APPROVAL OF SETTLEMENT," available at http://www.ipofraud.com/press-releases/06-26-2003.html ;

H.  The results of a review by the undersigned counsel of 307 complaints in the IPO Securities Litigation concluding that JPMC is a defendant in 128, or 41.7%, of the actions.

I.  The press release entitled "SEC Sues J.P. Morgan Securities Inc. For Unlawful IPO Allocation Practices; J.P. Morgan Agrees To Settlement Calling For Injunction And Payment Of $25 Million Penalty," Litigation Release No. 18385, dated October 1, 2003, concerning the matter of *Securities and Exchange Commission v. J.P. Morgan Securities Inc.*, Civil Action No. 1:03 CV 02028 (ESH) (D.D.C.);

J.  "Banks under legal siege", published in the March 2, 2003 of *The Banker*, available at

http://www.thebanker.com/news/fullstory.php/aid/250/Banks_under_l
egal_siege.html .

K.  The Associated Press interview of Melvyn Weiss, entitled "Securities
lawyer says investors still open to abuse," dated July 25, 2003 and
available at

http://www.kansascity.com/mld/kansascity/business/6367301.htm?tem
plate=contentModules/printstory.jsp ;

L.  Selected web pages available at the website for Wolf Haldenstein
Adler Freeman & Herz LLP ( http://www.whafh.com/ ), including the
firm's primary page for the IPO Securities Litigation,

http://www.whafh.com/modules/case/index.php?action=view&id=330,

the attorney bio pages for Adam J. Levitt,

http://www.whafh.com/modules/attorney/index.php?action=view&id=
39 , and Gustavo Bruckner,

http://www.whafh.com/modules/attorney/index.php?action=view&id=
57 , and the website for at least one of their JPMC actions,

http://www.whafh.com/modules/case/index.php?action=view&id=291

(visited on May 19, 2005; note that clicking on "Initial Complaint"
links to the *Blau v. Harrison* complaint, ***not*** to any complaint
involving Enron).

M.  An article dated July 21, 2004 in *The New York Times* entitled "After
Charge for Legal Reserves, J.P. Morgan Takes Big Loss.";

9

N.   The March 16, 2005 press release issued by the Office of the New York State Comptroller entitled "Hevesi Announces Settlement with J.P. Morgan Chase in WorldCom Securities Litigation; Total Recovery for WorldCom Class Now More Than $6 Billion; Trial Remains Set to Commence on March 17, 2005," available at http://www.osc.state.ny.us/press/releases/mar05/031605b.htm ;

O.   Illinois State Bar Association Advisory Opinion on Professional Conduct No. 04-01 (Nov. 2004), available at http://www.isba.org/ethicsopinions/04%2D01.asp ;

P.   The legal notice published by Wolf Haldenstein in the *Investor's Business Daily* on October 15, 2004;

Q.   The affidavit of Bruce Heller attesting to the publication of the notice of the pendency of *Hyland v. Harrison* (attached thereto, as published in the *Investor's Business Daily* on March 23, 2005);

R.   A chart, compiled by the undersigned counsel, of passages in the amended complaint in *Blau v. Harrison* apparently copied from the consolidated complaint in *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N (Del. Ch.);

S.   Forbes 400 (2004) entry #87, Riley P. Bechtel, available at http://www.forbes.com/finance/lists/54/2004/LIR.jhtml?passListId=54&passYear=2004&passListType=Person&uniqueId=QGCP&datatype=Person ;

T.  The Restated Certificate Of Incorporation of JPMorgan Chase & Co.,

dated January 18, 2005, available on SEC's EDGAR database at

http://www.sec.gov/Archives/edgar/data/19617/000095012305002539/
y05475exv3w1.htm ; and cover page of By-Laws of JPMorgan Chase

& Co., as amended by the Board of Directors on March 16, 2004,

effective July 1, 2004 (noting that "Effective July 20, 2004, name

changed to JPMorgan Chase & Co."), available at

http://www.sec.gov/Archives/edgar/data/19617/000095012305002539/
y05475exv3w2.htm .

## UNREPORTED DECISIONS:

15.  Attached to this Affidavit are true and correct copies of the following

unreported decisions:

U.  *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N, Mem. Op. (Del. Ch. Apr. 29, 2005);

V.  *Borenstein v. Finova Group, Inc.*, C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732 (D. Ariz. Aug. 28, 2000);

W.  *Courtesy Caribbean v. Aquilar*, 1995 WL 549127 (N.D. Ill. Aug. 31, 1995);

X.  *Examen, Inc. v. VantagePoint Venture Partners 1996*, C.A. No. 1142-N, slip op. (Del. Ch. March 31, 2005);

Y.  *Grand Park Surgical Center, Inc. v. Inland Steel Co.*, 1996 WL 204322 (N.D. Ill. Apr. 25, 1996);

Z.  *Janovici v. DVI, Inc.*, 2003 WL 22849604 (E.D. Pa. Nov. 25, 2003);

AA.  *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, 2000 WL 486956 (D.N.J. Apr. 24, 2000);

BB.  *Marsden v. Select Medical Corp.*, 2005 WL 113128 (E.D. Pa. Jan. 18, 2005);

11

CC.    *Nager v. Websecure, Inc.*, 1997 WL 773717 (D. Mass. Nov. 26, 1997);

DD.    *Schwarz v. National Van Lines, Inc.*, 2004 WL 432483 (N.D. Ill. Feb. 24, 2004);

EE.    *Taubenfeld v. Career Education Corp.*, 2004 WL 554810 (N.D. Ill. March 19, 2004);

FF.    *In re Terayon Communications Sys., Inc.*, 2004 WL 413277 (N.D. Cal. Feb. 23, 2004);

GG.    *Tracinda Corp. v. DaimlerChrysler AG*, -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005);

HH.    *Van Horn v. Graves*, 2002 WL 27658 (N.D. Ill. Jan. 10, 2002).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed: May 23, 2005

_____
Joseph N. Gielata

SWORN TO AND SUBSCRIBED BEFORE
ME THIS TWENTY-THIRD DAY OF MAY, 2005.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES _____

MARY B. DUVALL
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Mar. 17, 2008

12

*Exhibit in Support of the Memorandum Of*
*Amici Curiae Samuel Hyland and Stephanie Speakman*

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>          vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>      Defendants. | Civil Action No.  <u>1:05-cv-162</u><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, individually and on behalf of all others similarly situated, by his attorney, as and for his Class Action Complaint, alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, inter alia, the investigation made by and through his attorney, as detailed in paragraph 180, below.

## <u>INTRODUCTION</u>

1.      This is a class action brought by plaintiff in connection with the defendants' breaches of fiduciary duty, issuance of incomplete and materially misleading statements and failure to disclose material facts regarding the merger (the "Merger") of Bank One Corporation ("Bank One") into JPMorgan Chase & Co. ("JPMC" or the "Company").

2.      The Class seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breach of fiduciary duty by certain of JPMC's current and former directors.

## OVERVIEW

3.    For years, JPMC's performance, stock price, and reputation have languished under the stewardship of William B. Harrison, Jr., the Company's Chief Executive Officer ("CEO") and Chairman.  As a result, Harrison feared, with good reason, that his lucrative and powerful position was in jeopardy by late 2003.

4.    By contrast, Bank One's CEO and Chairman, the widely-lauded Jamie Dimon was credited with turning around Bank One's profitability and reputation during his four-year tenure.

5.    Motivated at least in part by his desire to remain in charge and shape a graceful conclusion to his career, Harrison pursued a business combination with Bank One.

6.    According to persons close to the secretive negotiations surrounding the Merger, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all*.  Harrison rejected such a merger of equals for no other reason than because Dimon sought to be CEO of the combined entity immediately.

7.    Instead, Harrison and Dimon struck a secret pact.  In exchange for remaining CEO for two more years, Harrison agreed to an exchange ratio in connection with the Merger providing for a significant premium over Bank One's market value.

8.    Thus, for the sole purpose of keeping his CEO title for another two years, Harrison caused JPMC shareholders to pay a significant acquisition premium -- amounting to more than $7 billion in value, a substantial dilution of JPMC shareholders' stake.

9.    The defendants violated federal securities laws by omitting the secret pact, including Harrison's rejection of the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio, from the Joint Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), issued by the defendants to gain shareholder approval of the Merger.

- 2 -

Plaintiff asserts claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)], Rules l0b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §§ 240.l0b-5 and 240.14a-9], Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(a)(2) and 77o], and pendent state law claims.

10.     Unaware of the materially false and misleading statements and failure to disclose material facts in the Proxy/Prospectus, shareholders of JPMC and Bank One overwhelmingly approved the Merger, which was completed on July 1, 2004.

11.     Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to pay a premium for Bank One just so Harrison could stay on as CEO for another two years.

12.     JPMC's directors knew or should have known of this pact and nevertheless they approved and recommended the Merger to JPMC's shareholders.

13.     Neither JPMC nor its directors could have issued the new JPMC shares necessary to effectuate the Merger without amending JPMC's certificate of incorporation, requiring approval by a majority of JPMC's shareholders.

14.     Confirming the critical importance of the secret pact, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger and expressed concerns about Harrison's remaining in that position as well as about the Merger's dilutive impact.  Also, a shareholder proposal to separate the Chairman and CEO posts presented at JPMC's annual meeting received over 500 million votes in its favor.

15.     This omission also violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.  Shareholder approval of a necessary amendment to the

JPMC's charter to expand the corporate authorization to issue shares was also wrongfully obtained by the defendants.

**JURISDICTION AND VENUE**

16.     This court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78a-78jj] and supplemental jurisdiction [28 U.S.C. § 1367].

17.     Venue in this case is proper in the District of Delaware pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b) and (c). Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in the District of Delaware.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

19.     As directors of a Delaware corporation, the Individual Defendants, as defined below, have submitted themselves to the jurisdiction of the state of Delaware pursuant to 10 Del. C. § 3114.

## THE PARTIES

20.     Plaintiff Samuel I. Hyland owned JPMC common stock throughout the Class Period and at all relevant times, as set forth in the accompanying certification, incorporated by reference herein.

21.     Defendant JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices at 270 Park Avenue, New York, NY 10017, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding.  JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

22.     Defendant William B. Harrison, Jr. has served as Chief Executive Officer and Chairman of the Board of Directors of JPMC since 1999.  Defendant Harrison was instrumental in negotiating the Merger and signed the Registration Statement and Proxy/Prospectus issued in connection therewith.

23.     Defendant Hans W. Becherer was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

24.     Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting.

25.     Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the

Merger.  He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004.

26.    Defendant John H. Biggs was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC since March 2003.

27.    Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

28.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.

29.    Defendant Ellen V. Futter was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. She has been a director of JPMC or a predecessor institution since 1997.

30.    Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004.

31.    Defendant Lee R. Raymond was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC or a predecessor institution since 1987.

32.    Defendant William H. Gray, III was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1992.

33.    Defendant John R. Stafford was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger. He has been a director of JPMC or a predecessor institution since 1982.

34.    Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

35.    Defendant James Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as President and Chief Operating Officer of JPMC.  Dimon was named in the Registration Statement as about to become a director of the combined Company.

36.    The Individual Defendants all signed the Registration Statement dated February 20, 2004 (and Amendments 1 (dated March 29, 2004), 2 (dated April 13, 2004), and 3 (dated April 19, 2004) thereto) and Proxy/Prospectus issued in connection with the Merger.

37.    Defendants Harrison and Dimon are collectively referred to herein as the "Insider Defendants."  The Insider Defendants, because of their positions of control and authority as officers and/or directors of JPMC or Bank One, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to securities analysts pertaining to those entities, including, without limitation, the Registration Statement and the Proxy/Prospectus.  Each of the Insider Defendants was provided with copies of management reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  As a result, each of the Insider Defendants is responsible for the accuracy of the

public reports and releases detailed herein as "group published" information, and is therefore responsible and liable for the representations contained therein.

38.    Defendant Dimon and the Individual Defendants are referred to collectively herein as the "Registration Statement Defendants."  As signatories to the Registration Statement (or, in the case of Dimon, as a person who, with his consent, was named in the Registration Statement as about to become a director of the combined Company), the Registration Statement Defendants are strictly liable to any person acquiring the securities registered in the Registration Statement for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

39.    By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to make appropriate disclosure to JPMC shareholders of all material facts concerning the Merger; (d) to disseminate a complete and accurate proxy statement; and (e) to refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

40.    Plaintiff brings this action on his own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class consisting of those investors who (1) purchased or otherwise acquired the common stock of JPMC between January 14, 2004 and June 25, 2004 inclusive (the "Class Period"), (2) as shareholders of record of JPMC on April 2, 2004, were entitled to vote on the Merger (and thereby on the proposed amendment to JPMC's certificate of incorporation in connection with

the Merger), as well as (3) those former shareholders of Bank One who surrendered their Bank One shares in connection with the Merger on or about July 1, 2004. Excluded from the Class are Defendants herein; any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

41.     This action is properly maintainable as a class action.

42.     The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all class members is impracticable. There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class. According to the Proxy/Prospectus:

> The board of directors of JPMorgan Chase has fixed the close of business on April 2, 2004 as the record date for determination of stockholders entitled to notice of and to vote at the annual meeting of stockholders. On the record date, there were 2,081,783,154 shares of JPMorgan Chase common stock outstanding, held by approximately 126,350 holders of record.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein. Among other things, members of the Class sustained damages as a result of a Proxy/Prospectus issued in connection with the Merger that omitted and/or misrepresented material facts about the Merger that were required to be disclosed.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and shareholder litigation. Plaintiff has no interests that are in conflict with the interests of the Class.

- 9 -

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the defendants' acts as alleged herein;

b.    Whether the Proxy/Prospectus, and other documents and/or statements disseminated to members of the Class in connection with the Merger omitted or misrepresented material facts about the Merger that were required to be disclosed;

c.    Whether defendants acted with the requisite state of mind in omitting to state and/or misrepresenting material facts about the Merger;

d.    Whether defendants breached fiduciary and other common law duties owed by them to plaintiff and other members of the Class; and

e.    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

46.    In addition, the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. The market for JPMC common stock was at all times an efficient market for the following reasons, among others:

a.    JPMC's common stock met the requirements for listing, and were listed on the New York Stock Exchange, a highly efficient securities market;

b.    As a regulated issuer, JPMC filed periodic public reports with the SEC;

c.    JPMC common stock trading volume was substantial during the class period;

d.    JPMC was followed by numerous securities analysts who wrote reports available to investors through various automated data retrieval services;

e.    JPMC disseminated information on a market-wide basis through various electronic media services; and

f.    The market price of JPMC securities reacted efficiently to new information entering the market.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

48.    Defendants have acted in a manner which affects plaintiff and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

49.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

**Background: The Besieged Banker**

50.    In June 1999, defendant Harrison became CEO of Chase Manhattan, the predecessor of JPMC, and promptly embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the value-destroying merger with J.P. Morgan in 2000.

51.    An April 7, 2002 article in The New York Times suggested that Harrison's motivation in entering into large transactions was not solely to benefit shareholders:

William B. Harrison was beaming. Mr. Harrison, as chairman of the Chase Manhattan Corporation, had signed a deal to buy J. P. Morgan & Company for $30.9 billion the night before and was already spinning the deal to shareholders. It was mid-September 2000, the economy was in its longest expansion ever, and anything seemed possible. "It's a very fair deal," he said, grinning uncharacteristically. "And most importantly, when we look at the overall transaction two years from now, it should be accretive to the shareholders."

Mr. Harrison had reason to grin — and still does, though not because the bank's shareholders have gained as he predicted. Rather than being "accretive" — that is, increasing earnings per share — the merger has not delivered much for shareholders so far; the stock has lost more than one-third of its value in 18 months. Mr. Harrison might have been glowing because, like many top executives these days, he was about to be paid — a lot — to go shopping.

For overseeing the acquisition of J. P. Morgan, which he nonchalantly said took only three weeks to negotiate, he received a special bonus of $20 million — far more than the total lifetime earnings of the average working stiff. And that bonus, which is spread over 2001 and 2002, came on top of his $1 million salary and $5 million regular bonuses last year and whatever else he receives for this year. Mr. Harrison's three lieutenants, including Geoffrey T. Boisi, a vice chairman who had joined Chase only four months earlier, received special bonuses of $10 million each, on top of their regular salaries and bonuses. All told, Chase directors paid the bank's executives more than $50 million for their outing at the bank mall. (They had done a little window-shopping, chatting up Goldman Sachs and Deutsche Bank, before settling on J. P. Morgan.)

52.     In connection with the merger that created JPMC, the Company's compensation committee, comprised of defendants Gray, Bechtel, Stafford, and Raymond, awarded Harrison $10,000,000 in cash and 237,164 restricted stock units. According to the March 19, 2002 report of the committee, included in the Company's 2002 proxy statement:

This award will vest and be paid out or distributed as follows, subject to continued employment: 50% of the cash and 50% of the restricted stock units in January 2002; 50% of the cash in January 2003; and 50% of the restricted stock units if the price of JPMorgan Chase common stock achieves the $52 Target Price by January 25, 2007 (but no sooner than January 25, 2003). The cash

- 12 -

awards would be paid out in the event of job elimination, death, or total disability. The restricted stock unit awards would vest and be distributed in the event of death or total disability. In the case of job elimination or retirement, the restricted stock unit awards related to the Target Price would vest only if the Target Price is achieved, unless otherwise determined by the committee.

53.     Thus, 118,582 of the restricted stock units, which would vest upon JPMC achieving a target price by January 25, 2007, were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.

54.     Harrison was notorious not only for being overpaid but also for overpaying in deal after deal. As an interviewer noted in a February 23, 2004 interview with Harrison on CNBC: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

55.     A February 7, 2002 article in <u>Forbes</u> entitled "Is Harrison Breaking Morgan's Bank?" reviewed Harrison's tenure, including its many failures, concluding that "Fiscal 2002 will be the make or break."

56.     A June 7, 2002 article in <u>EuroWeek</u> entitled "Time for an outsider to shake up troubled JP Morgan Chase" strongly criticized Harrison's leadership, pointed out his poor, costly deals, and suggested that Harrison was due to lose his job:

> Look at the evidence. Today no one questions the fact that Chase's chairman and CEO, Billy Harrison, grossly overpaid for Flemings, the patrician but still itsy-bitsy UK asset manager with a quirky securities operation bolted on to the side. It was a brilliant deal for the Fleming family and blew the myth that Roddy Fleming couldn't cut a deal without the help of his childhood Scottish nanny. Billy Harrison would now probably admit that he was sold a bum steer with Flemings, but he might also blame the purchase on the recently departed Geoff Boisi, who was, after all, in charge of investment banking at the time.

- 13 -

However, even if the unassuming Billy Harrison tries to evade the Flemings transaction by pointing an accusing finger at Geoff Boisi, this isn't quite the end of the story.

The harsh fact is that Chase and Billy Harrison had also significantly overpaid to acquire Geoff Boisi's investment banking boutique, Beacon Group, just because they clamoured for the services of its dynamic leader. It is perhaps even more ironic that Chase's attention was so focused on the brilliance of Mr Boisi that they may not have appreciated that David Coulter, who now has Boisi's old job, also came with the Beacon package.

If Chase's Billy Harrison paid over the top for Beacon Group and then Geoff Boisi made the Fleming family rich beyond their wildest dreams, shouldn't Chase shareholders have been wary about the next acquisition? Perhaps there was nothing wrong with putting JP Morgan out of its misery, and the JPM road pointed downhill all the way - but did Chase need to pay $34bn for the privilege? Yes, say the JP Morgan fat-cat top managers who walked away with fortunes which in some individual cases exceeded $100m each. No, say the Chase shareholders who must be asking themselves what they actually bought, other than a large can of worms.

The combined JP Morgan Chase in its present form is nowhere in investment banking, nowhere in equities and its asset management division can be described as fair to middling rather than the crème de la crème. Most of JP Morgan's old guard has left - who said "Thank heavens"? - and for its $34bn, Chase seems to have bought little more than a fizzy derivatives business and an upgrade in debt capital markets.

With such a litany of financial misjudgements, you would have thought that shareholders would be baying for blood. *At the top of the execution list you might have expected to see JPMC's chairman and CEO, Billy Harrison.* However, in the past fortnight it was Boisi who fell rather than Harrison, much to the amazement of most observers and certainly the bookmakers, who will lose a fortune if Harrison is still there by Christmas.

The situation regarding Mr Harrison is especially interesting to ourselves, and please be assured that we are not, and never have been, shareholders in either Chase Manhattan, JP Morgan or JP Morgan Chase.

*In the aftermath of Enron, Billy Harrison's press was so bad that at one time it didn't look as if he would last until April* - remember those bounders and scallywags who said that the best double bet was for Billy Harrison and Credit Suisse's Lukas

Muhlemann to be gone before the first polka dot bikini could be seen on the Côte d'Azure this summer.

But while Harrison has defied the bookmakers' odds so far, he must, unless he requires the services of a guide-dog, be able to see the writing on the wall. Chase Manhattan wasn't exactly the most sparkling bank in the universe. By adding Flemings, Beacon Group and JP Morgan, did Chase then become a world-beater? Not at all. Instead, the combined JP Morgan Chase was described to us by one Scottish fund manager as a dog's dinner - presumably a West Highland White or a Scottie?

That may be slightly unfair, but when you look at the JPMC share price, you have to ask yourself where it's going. Does he realise his own apparent shortcomings or the possible deficiencies of his subordinates, who are considered to be his most likely successors? We don't think so, when you read that *he intends to stay on for another seven years, ie until he is 65.*

We were almost speechless when we saw that comment, and in the world's main financial centres some irreverent bankers rolled around on the floor with laughter. One prominent private banker in Geneva said: "Mr Harrison must be living in cloud cuckoo land" - and in Switzerland they certainly know their cuckoos. In London, one notoriously aggressive proprietary trader commented: *"The odds on Billy Harrison lasting for seven years are longer than those on the United States winning the World Cup."* [Emphasis added.]

57.    An April 22, 2002 BusinessWeek article on Harrison entitled "The Besieged Banker" noted that Harrison was "under siege" due to his poorly timed, badly executed, and expensive deals and numerous disastrous loans.  Despite JPMC's poor performance under his direction, the article observed that "Harrison stands to earn at least $16 million in merger-related bonuses if the stock recovers to $52, its price the day the [Chase-JP Morgan] deal closed.  His top lieutenants will split $25 million more.  And they have given themselves plenty of time to do it—until 2007, to be exact."  Noting that "[t]he execution of the J.P. Morgan merger wasn't much to write home about," the article observed that:

Unlike a steel mill or auto maker, a bank's assets are people, not plants. But after paying top dollar for J.P. Morgan (3.5 times its book value), Harrison let its people walk. Defections started as soon as the deal closed--despite hefty retention bonuses that could

- 15 -

have yielded executives princely sums. Within a year, 25 top
former J.P. Morgan executives had left, and Chairman Douglas A.
"Sandy" Warner III quit at the end of 2001. "We would have liked
some of them to stay," says Harrison. "But I don't think it has cut
into the core of what we're about."

58.     The article also observed internal criticisms of Harrison's poor management:

In interviews about management style, [JPMC] executives
invariably quote [former General Electric Co. CEO Jack] Welch.
They preface answers with "As Jack says..." and few quote
Harrison or even mention him unless they're asked.  As bank
executives tell it, Harrison emphasizes what they call "the soft
stuff"--management coaches, 360-degree reviews, discussing
problems until everyone is singing in harmony. Trouble is,
Harrison has to be more than a choirmaster, he needs his managers
to make their numbers.

59.     A subsequent January 13, 2003 article on Harrison in a BusinessWeek report on

"The Best & Worst Managers" noted that "Some investors speculate that **Harrison could lose**

**his job by the end of January** if the bank's fourth-quarter results, due out mid-month, don't

show signs of improvement." (Emphasis added.)

60.     According to analyst Michael Mayo of Prudential Equity: "The biggest problem

of [JPMC's] management, we believe, is lack of capital discipline when it comes to large

strategic acquisitions…"  However, Harrison's lust for corporate conquest remained unfulfilled

and he desperately needed a major event to salvage his career.

61.     The January 18, 2004 Sunday Tribune described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank,
were so down in the dumps that **few would have given odds on him even
surviving the year**, let alone clawing his way back to pull off one of the biggest
banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty,
and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, **it seemed to be largely Harrison's fault.** At the top of the bull
market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP
Morgan. [Emphasis added.]

- 16 -

62.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent.  Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent.  JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

63.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

64.    A July 22, 2004 Wall Street Journal article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

65.    On September 18, 2002, The Wall Street Journal published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

66.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

67.     On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal, involving allegations that numerous IPOs were manipulated by Wall Street investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

68.     By late 2003, Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582 restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, but which were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.

**Harrison's Secret Deal: The Merger of Jupiter and Apollo**

69.     The fallout from various scandals, as well as his poor business decisions, forced the besieged banker Harrison to conjure yet another massive deal to protect his position.

70.     While JPMC shareholders endured Harrison's reign, James Dimon, Chairman and CEO of Bank One, created substantial value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

71.     According to an article posted July 7, 2004 on Slate.com, entitled "The $7 Billion Ego: Did J.P. Morgan Chase waste billions so its CEO could keep his job?":

> ***Harrison's grip at the helm was growing tenuous. But he saw
> salvation in yet another deal.*** Chicago-based Bank One, run by
> the charismatic Citigroup exile Jamie Dimon, seemed like a natural
> acquisition. Dimon had pulled off an impressive turnaround at

Bank One. With his operational expertise and cadre of loyal bankers, Dimon could help improve morale and performance at Chase and eventually succeed Harrison. [Emphasis added.]

72.     During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

73.     According to a January 15, 2004 CBS Marketwatch.com article, "By December, according to a person at the table, Dimon and Harrison and a few other executives huddled in the conference room of Bank One's M&A law firm, Wachtell Lipton Rosen & Katz."

74.     According to a January 17, 2005 article in Investment Dealers Digest entitled "Putting JPMorgan On the Map," the negotiations were conducted in the utmost secrecy "at an apartment in the Waldorf Towers, a sanctuary a few blocks from JPMorgan's midtown headquarters that the bank keeps as a permanent venue for quiet meetings with clients." The article reports that "Sources agree that Harrison and Dimon ironed out a lot of the deal's particulars together and that Dimon was clearly interested in succeeding Harrison from the get-go[.]"

75.     As the merger discussion proceeded, financial advisors came up with the codenames of "Apollo" and "Jupiter" for Bank One and JPMC, respectively, to ensure the secrecy of the negotiations.

76.     According to the Proxy/Prospectus sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.

77.     At a meeting of the JPMC Board (consisting of the Individual Defendants) on November 18, 2003, Harrison briefed the full Board on his discussions with Dimon. The JPMC

- 19 -

Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

78.     In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million.  Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

79.     The January 19, 2004 Financial Times described the negotiation process:

"There was a ***spectrum of outcomes*** *in terms of premium and governance: Jamie laid them out* and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

80.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO.  Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger.  Little did JPMC shareholders know that buying this extra time for Harrison would cost them ***billions*** of dollars.

81.     Harrison would later claim that he offered a no-premium merger during the negotiations.  A January 26, 2004 FORTUNE article entitled "The Dealmaker and the Dynamo" detailed the negotiations and reported Harrison's claims:

It was early January, and the merger talks between Jamie Dimon, CEO of Bank One, and William Harrison, his counterpart at J.P. Morgan Chase, were deadlocked. In the short time they'd been negotiating, Dimon, a brash boy wonder from Queens, and Harrison, a courtly Southern gentleman, had agreed on a host of issues. Succession was a snap: Dimon would get a virtually ironclad guarantee to replace Harrison as CEO in 2006. The board would be split fifty-fifty between Bank One and J.P. Morgan

- 20 -

directors. Dimon's most trusted lieutenants would be given key roles in the merged company. Most of all, the two men agreed that if they could pull off this deal, combining Bank One's strong consumer businesses and J.P. Morgan's corporate banking franchise, they could create a true banking colossus—the second largest in America and one that could go toe to toe with giant Citigroup.

What was hanging up the deal was the price. ***Harrison was offering what he calls a "market deal," meaning that J.P. Morgan would simply buy Bank One at its current stock price***—around $45 a share. His reasoning was simple. "We'd been criticized for overpaying on past deals, notably Chase's acquisition of J.P. Morgan in 2000," says Harrison. "I thought that if we paid a big premium again, the market would hammer our stock."

Dimon, however, was demanding a markup north of 20%. Pointing to Bank of America's bid to buy FleetBoston for a gigantic 43% premium in late October, Dimon argued that Harrison would be getting a bargain at 20% to 25% over market. In vintage, ultra-enthusiastic Dimon style, the Bank One CEO insisted that the fit was so compelling that even with a big premium, the market wouldn't discount J.P. Morgan's stock. "Jamie was so excited by the combination that he thought he could sell a high premium deal to investors," says Harrison with a grin. "I disagreed." [Emphasis added.]

82.    However, months later, it was revealed that, in fact, Dimon had been willing to agree to a ***no-premium deal*** if he could be CEO of the combined company immediately.  A June 27, 2004 New York Times article entitled "The Yin, the Yang and the Deal" shocked the market with the following stunning revelations:

During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money*** in doing so. Mr. Dimon, always the tough deal maker, ***offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.***

***When Mr. Harrison resisted, Mr. Dimon insisted on a premium***, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

83.    The June 27, 2004 New York Times article was the first opportunity for JPMC stockholders to have discovered that Harrison had turned down a no-premium deal.

- 21 -

84.    Corroborating this account, according to a January 15, 2004 CBS

Marketwatch.com article, "The [merger] talks ran through Christmas week and during that time,

the stickiest issue, succession, was resolved by the two-year compromise."

85.    As one observer related on eFinancialNews.com on February 8, 2004, after

hearing the announcement of the Merger:

> One of the first calls I received was: "That's a hell of a price that Bill Harrison is
> paying to recruit Jamie Dimon."
>
> …
>
> **Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon
> just to save his own skin?** [Emphasis added.]

86.    After the close of trading on January 14, 2004, JPMC and Bank One issued a joint

press release announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co.
> (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that
> they have agreed to merge in a strategic business combination establishing the
> second largest banking franchise in the United States, based on core deposits. The
> combined company will have assets of $1.1 trillion, a strong capital base, 2,300
> branches in seventeen states and top-tier positions in retail banking and lending,
> credit cards, investment banking, asset management, private banking, treasury and
> securities services, middle-market, and private equity. With balanced earnings
> contributions from retail and wholesale banking, the combined company will be
> well-positioned to achieve strong and stable financial performance and increase
> shareholder value through its balanced business mix, greater scale, and enhanced
> efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of directors
> of both companies, provides for a stock-for-stock merger in which 1.32 shares of
> JPMorgan Chase common stock will be exchanged, on a tax-free basis, for each
> share of Bank One common stock. Based on JPMorgan Chase's closing price of
> $39.22 on Wednesday, January 14, 2004, the transaction would have a value of
> approximately $51.77 for each share of Bank One common stock, and would
> create an enterprise with a combined market capitalization of approximately $130
> billion. The premium, based upon the average closing stock prices of JPMorgan
> Chase and Bank One for the previous month, would be approximately 8 percent
> and would be approximately 14 percent based on today's closing prices.
>
> Under the agreement, the combined company will be headed by William B.
> Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47,
> as President and Chief Operating Officer, with Mr. Dimon to succeed Mr.

- 22 -

Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. …

87.    Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22. The drop reflected the unnecessarily dilutive impact of the Merger. In early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

88.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. **For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.** The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".

…

**Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.** "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

89.    Harrison acknowledged Dimon's considerable experience with mergers in an interview on CNBC: "Well, I would just say again that Jamie and I have been through as many mergers over the last ten years as any two executives out there combined." Thus, it was not necessary for Harrison to be CEO to ensure a smooth transition in connection with the Merger is mere pretext.

90.    The proposed acquisition of Bank One in a stock-for-stock transaction required approval of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was

- 23 -

necessary for JPMC to have the corporate authority to issue the shares necessary for the exchange.

91.     When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings.  The total value of the deal was approximately $57 billion.

92.     Public criticism of the premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive.  They said JP Morgan is paying too big a premium.  It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

93.     James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?

> Mr. VANDERVLIET: I would favor Bank One and Bank One management.

> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?

> KUDLOW: Well, I know.  It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

94.     Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

- 24 -

95.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

96.     The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  *All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC shareholders to secure that benefit for Harrison.*

97.     In a January 15, 2004 presentation by the Company's management entitled "Creating Scale, Balance and Shareholder Value," it was stated that "Value of cost savings exceeds premium."  This statement has been shown to be false, as the Company's financial performance in the wake of the Merger has disappointed investors.  The presentation also misleadingly claimed that the Merger would produce "Value creation for all shareholders" and represented "A Compelling Value Proposition for Shareholders."

98.     In connection with the Merger, JPMC amended its by-laws to include the following provisions:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which

Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

99.     The Proxy/Prospectus summarized the Merger-related amendments to the

Company's by-laws as follows:

The by-laws of JPMorgan Chase will be amended, effective not later than the completion of the merger, to add a new by-law providing the following:

- that the board of directors has resolved that, effective as of the completion of the merger, Mr. Harrison will continue to serve as Chairman of the Board and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become the President and Chief Operating Officer of JPMorgan Chase; and that Mr. Dimon will be the successor to Mr. Harrison as the Chief Executive Officer of JPMorgan Chase, effective on the second anniversary of the completion of the merger or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of JPMorgan Chase, and that Mr. Harrison will continue to serve as Chairman of the Board following that succession;

- that on the effective date of the merger, the board of directors will be comprised of eight Bank One directors, including Mr. Dimon, and eight JPMorgan Chase directors, including Mr. Harrison;

- that until the date of Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, the number of directors that comprises the full board of directors of JPMorgan Chase will be sixteen; and

- that until Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the governance committee of the board of directors, which will be co-chaired by one former Bank One director and one former JPMorgan Chase director and comprised of an equal number of former Bank One directors and former JPMorgan Chase directors (any deadlocks on the governance committee will be resolved in good faith by the nonmanagement members of the board of directors in a manner intended to preserve the principles of representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

- the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment agreement, prior to Mr. Dimon's succession as Chief

Executive Officer of JPMorgan Chase, or any determination not to
appoint, or any failure to appoint, Mr. Dimon as Chief Executive
Officer of JPMorgan Chase on that date of succession,

• the removal of Mr. Harrison from, or the failure to
appoint or reelect Mr. Harrison to, the position of Chairman of the
Board and Chief Executive Officer of JPMorgan Chase prior to
Mr. Dimon's succession as Chief Executive Officer of JPMorgan
Chase,

• any determination not to nominate Mr. Harrison or
Mr. Dimon as a director of JPMorgan Chase prior to Mr. Dimon's
succession as Chief Executive Officer of JPMorgan Chase, and

• any modification, amendment or repeal of, or any
adoption of any bylaw provision inconsistent with, the provisions
of the by-law amendments described above.

100.    In addition to entrenching himself with the CEO title, Harrison secured for

himself an extraordinarily lucrative severance package, as noted in the Proxy/Prospectus:

[I]n connection with the [Merger], the severance policy for Mr. Harrison will be
amended, effective upon completion of the merger, so that Mr. Harrison's
severance will be the greater of (a) $22.2 million or (b) three times his current
base salary and three-year average annual cash performance bonus if he is
terminated involuntarily without cause prior to the second anniversary of the
completion of the merger.

101.    Harrison also paid himself nearly $3 million within weeks after the Merger was

announced.  Before his secret deal was revealed, Harrison exercised options on 225,000 shares of

JPMC common stock on March 8, 2004, yielding proceeds of $2,920,320.

102.    According to an Institutional Shareholder Services report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

103.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal
split in outside board of directors and the near even split among targeted members
of the new executive committee. This is interesting and apparently ***highly
beneficial to ONE shareholders*** considering it appears that ONE will represent
only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans,
34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

- 28 -

104.     Harrison himself endorsed this view at a January 15, 2004 town hall meeting concerning the Merger, during which he stated: "[T]he way we did it was doing a deal that had merger vehicle characteristics, but we're calling this a merger, we're not calling it a purchase."

105.     The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

106.     ***By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other Individual Defendants cost JPMC shareholders over $7 billion of value and substantially diluted their stake in the new, combined company merely so Harrison could remain CEO.***

107.     The Proxy/Prospectus stated that the 1.32 exchange ratio agreed to in connection with the Merger significantly exceeded the "implied exchange ratio from contribution" based on a variety of financial metrics, confirming the unfairness of the exchange ratio.

108.     The valuation analysis by JPMC's banker in the Proxy/Prospectus disclosed the following:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
| --- | --- | --- | --- |
| | 57.8% | 42.2% | 1.320 |
| | Contribution by JPMorgan Chase | Contribution by Bank One | Implied Exchange Ratio from Contribution |
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |

| | | | |
|---|---|---|---|
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

109. The valuation analysis by Bank One's banker in the Proxy/Prospectus disclosed the following:

| | Bank One % | JPMorgan Chase % | Implied Exchange Ratio | Implied Premium/ (Discount) to Bank One |
|---|---|---|---|---|
| **Income Statement** | | | | |
| GAAP (I/ B/ E/ S) | | | | |
|   Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |
|   Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
|   Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
|   Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk-Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common Stockholders' Equity | 33.3 | 66.7 | 0.918 | (20.0) |
| Tangible Common Stockholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

110. Revealing that the Merger's exchange ratio offered an extraordinary (and unfair) premium compared to similar transactions (only the premium in the merger between Fleet Financial Group, Inc. and BankBoston Corporation was comparable), the valuation analysis by Bank One's banker in the Proxy/Prospectus also disclosed the following analysis of premiums in comparable transactions:

| | Announcement Date | 1-Day Premium (%) | Ownership (%) |
|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 |

| | | | |
|---|---|---|---|
| Travelers Property Casualty Corp./ The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 |
| First Union Corporation / Wachovia Corporation | 4/15/01 | 7 | 73/27 |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 |
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 |
| Dean Witter, Discover & Co. / Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 |

111.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined.  In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000.  When comparing JPMC's performance under Harrison against the performance of Bank One under Dimon, any suggestion that Harrison's service as CEO for two more years was worth billions of dollars appears absurd.

112.    Despite his poor leadership, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted.  Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

113.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded

changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

114.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

115.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

116.    London's <u>Sunday Telegraph</u> reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

117.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

118.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

119.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

120.    The June 27, 2004 <u>New York Times</u> article observed, "William Harrison may be the acquirer in the [Merger], but it is becoming clear that James Dimon and his posse will call many of the shots."

121.    The <u>Australian</u> reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

122.    Retail Banker International reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint."  Retail Banker International quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively."  The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One."  According to Retail Banker International: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

123.    Retail Banker International further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

124.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community.  One analyst asked Harrison:

With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

125.    Harrison's answer was evasive:

It's all part of creating a structure in a negotiation process that works for both firms.  I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance.  And as I said before, I will stay around as Chairman as long as Jamie wants me.

126.    Another analyst also probed the issue:

- 33 -

Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

127.    Dimon delivered a non-answer:

You've got to think a little bit that these are two large organizations coming together.  You want the teams to meld.  I have a lot to learn there.  Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

128.    Despite these clear questions, Harrison concealed that, in fact, he had been presented with that precise alternative -- a merger of equals with no premium at all for Bank One.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and receive a smaller share of the combined company.

129.    Similarly, Dimon concealed the secret pact.

130.    Now that the Merger has been consummated, Harrison appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  Thus, even though Harrison gave away billions of dollars of value from JPMC shareholders to retain his CEO title for another two years, in many respects Dimon already functions as the de facto CEO of the combined entity.

131.    Harrison kept the CEO title to shape a graceful exit for himself.  In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal…."

**The Proxy/Prospectus Violates Federal Securities Laws**

132.    The Proxy/Prospectus sent by Defendants to JPMC shareholders on or about April 21, 2004 in connection with the Merger made no mention at all of the Individual Defendants' rejection of the opportunity to merge Bank One into JMPC without any acquisition premium. JPMC shareholders were repeatedly encouraged to review the Proxy/Prospectus.  For instance,

the press release accompanying the announcement of the Merger stated: "Stockholders are urged to read the joint proxy statement/prospectus regarding the proposed transaction when it becomes available, because it will contain important information."

133.    Although the Proxy/Prospectus represents that the Individual Defendants were regularly kept apprised of the negotiations, not once does the Proxy/Prospectus advise shareholders that a merger of equals was offered but rejected solely because Harrison wanted to keep his CEO title.  Defendants knew that the Proxy/Prospectus failed to disclose such critical information and intended to induce JPMC shareholders to approve the Merger.  Defendants took pains to describe the negotiation process in great detail but carefully omitted any reference to the crucial facts regarding the acquisition premium:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.
>
> During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.
>
> Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms

and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.

The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various

- 36 -

aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

…

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

134.    The Proxy/Prospectus advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

135.    As investors ultimately learned, and as detailed herein, the statements made by Defendants and reproduced in the Proxy/Prospectus issued in connection with the Merger were incomplete and materially misleading and were known by Defendants to be misleading at that time, or were recklessly disregarded thereby as such, for the reasons stated herein. At no time did Defendants ever disclose the secret pact between Dimon and Harrion or that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

136.    The omissions in the Proxy/Prospectus were designed by Defendants to mislead shareholders of JPMC into approving the Merger (and the amendment to JPMC's certificate of incorporation to expand the corporate authorization to issue shares, without which the Merger could not have been consummated) without knowing that Harrison had passed on nil-premium exchange ratio solely to preserve his CEO title, which he considered to be in danger. These statements also materially misled investors as to the true rationale for the Merger and, as such, also operated as a fraud and deceit as to investors who purchased shares of the Company at any time during the Class Period.

137.    On May 25, 2004, in justifiable reliance on the materially deceptive Proxy/Prospectus and having been kept in the dark about the full truth concerning the terms of the deal, JPMC shareholders approved the Merger. According to a Dow Jones Newswire report:

While the merger was approved, *some shareholders did express concern that the $58 billion price tag associated with the deal is hefty.*

One shareholder objected to the merger bid, saying that *Bank One will get the sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in the last quarter. Bank One will obtain J.P. Morgan's investment-banking expertise, its international capability and half of the company's board of directors, he said. And given the fact that Bank One's Chief Executive James Dimon will take on the role of J.P. Morgan's top officer two years from the conclusion of the merger, the shareholder said, *"It appears as if we're merging into them."*

*The statement was met with loud applause from the shareholders who attended the meeting.* [Emphasis added.]

138.    According to <u>Investor's Business Daily</u>:

The support for an *immediate Dimon regime* became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.

The shareholders remarks were met with a huge ovation, according to reports of the meeting.

"Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off."

139.    On May 25, 2004, JPMC released the results of the shareholder vote at the annual meeting.  The Merger was approved by only 68 percent of the votes outstanding.

140.    Among the shareholder proposals put to a vote at the JPMC annual meeting, the proposal that received by far the most support was one recommending that JPMC's Board adopt a resolution requiring the separation of the Chairman and CEO posts.  There were 562.5 million votes cast in favor of this proposal, confirming the extraordinary desire of JPMC shareholders to separate the Chairman and CEO posts.  The seven other shareholder proposals put to a vote received between 55.1 million votes and 202.6 million votes.  Had Harrison accepted Dimon's nil-premium exchange ratio offer, the Chairman and CEO posts would have been separated, with

Harrison occupying the Chairman post and Dimon serving as CEO. However, Harrison concealed this opportunity from JPMC shareholders.

141. With 2,081,783,154 shares entitled to vote at the annual meeting, at least 1,040,891,578 votes had to be cast in favor of the Merger for it to be approved and JPMC's certificate of incorporation amended to reflect the corporate authority necessary to issue enough shares in connection with the Merger. The threshold was exceeded by 374,785,482 votes, but 562,557,770 votes were cast in favor of the shareholder proposal to separate the Chairman and CEO posts.

142. On July 1, 2004, JPMC completed the Merger. All outstanding shares of Bank One were exchanged for newly-issued shares of JPMC, which opened that day at $38.58 per share and closed at $38.17 per share.

143. At the time the Merger was declared effective, the materially false and misleading statements contained in the Proxy/Prospectus remained unchanged, and these false statements conditioned Bank One's former shareholders to accept JPMC shares as consideration for the tender of their Bank One shares, and to condition other investors to purchase shares of the combined Company, in the open market pursuant and/or traceable to the materially false and misleading Proxy/Prospectus.

144. In fact, the statements contained in the Proxy/Prospectus (which was also a registration statement for JPMC shares issued in connection with the Merger) were each materially false and misleading when made, as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and/or misleading, including:

    a.    When the Merger was negotiated and recommended, Defendants did not intend for Harrison to be the true CEO of the combined Company, such that it was false and

materially misleading to pretend that this was the intention of Bank One and JPMC prior to the effective time of the Merger, or of JPMC following the effective time of the Merger;

b.      When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio;

c.      When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio because Dimon sought to be the CEO of the combined Company;

d.      As a result of Harrison's secret and undisclosed pact with Dimon, Defendants also materially misled investors as to the true structure and rationale of the Merger; and

e.      Defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon and made such materially false and misleading statements in the Proxy/Prospectus because this allowed Harrison to preserve his CEO title and allowed Dimon to acquire dominance over the combined Company while securing for himself and other Bank One shareholders a premium to the detriment of JPMC shareholders.

145.    JPMC defrauded JPMC shareholders who would not have voted in favor of the Merger had they known that Dimon was willing to merge Bank One into JPMC for no acquisition premium if Harrison would relinquish his CEO title immediately.  In light of their concerns about the hefty amount being paid to merge with Bank One, that information was plainly critical to JPMC shareholders.  Defendants concealed the information to prevent JPMC shareholders from discovering it and remained silent in the face of a duty to speak.  Defendants intended to induce JPMC shareholders to vote in favor of the Merger.  JPMC shareholders approved the Merger in justifiable reliance on Defendants' representations to them, including the Proxy/Prospectus.

146.    Plaintiff and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction.  As a result of the Merger, pre-Merger JPMC shareholders, including plaintiff and other members of the Class, hold approximately 58 percent of the combined entity.  If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including plaintiff and other members of the Class, would now hold approximately 61 percent of the combined entity.

147.    Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Proxy/Prospectus, to solicit their approval of the Merger.  JPMC paid for the distribution of the Proxy/Prospectus and for all other efforts to solicit proxies in favor of the Merger.

148.    At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board.  JPMC is vicariously liable for Harrison's actions.

149.    Sections 102, 161, and 242 of Delaware's General Corporate Law expressly limit the Company's authority to issue shares to the authorization set forth in JPMC's certificate of incorporation and require a majority of shareholders to vote in favor of any expansion of this authority:

§ 102. Contents of certificate of incorporation.

(a) The certificate of incorporation shall set forth:

(4) If the corporation is to be authorized to issue only 1 class of stock, the *total number of shares of stock which the corporation shall have authority to issue*….

§ 161. Issuance of additional stock; when and by whom. The directors may, at any time and from time to time, if all of the shares of capital stock *which the corporation is authorized by its certificate of incorporation to issue* have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock *up to the amount authorized* in its certificate of incorporation.

§ 242. Amendment of certificate of incorporation after receipt of payment for stock; nonstock corporations.

(a) After a corporation has received payment for any of its capital stock, it may amend its certificate of incorporation,

(3) To increase or decrease its authorized capital stock….

(b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

(1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a *special meeting of the stockholders entitled to vote* in respect thereof for the consideration of such amendment or directing that the amendment proposed be *considered at the next annual meeting of the stockholders*….

(2) The holders of the outstanding shares of a class *shall be entitled to vote* as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, *if the amendment would increase or decrease the aggregate number of authorized shares* of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely….The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the *affirmative vote of the holders of a majority of the stock of the corporation*…. [Emphasis added.]

150.    In connection with the Merger, shareholders approved, based on the defective Proxy/Prospectus, the following amendment to JPMC's certificate of incorporation:

Article Fourth of the Certificate of Incorporation of the Surviving Corporation shall be amended by: (i) deleting the words "FOUR

- 43 -

BILLION SEVEN HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION TWO HUNDRED MILLION", and (ii) deleting the words "FOUR BILLION FIVE HUNDRED MILLION" in the first sentence thereof and inserting in its place the words "NINE BILLION".

151.    The Proxy/Prospectus described the necessity of this amendment as follows:

> Because JPMorgan Chase does not currently have a sufficient number of authorized but unissued and unreserved shares to complete the merger and related transactions, the merger agreement also provides that, as part of the merger, JPMorgan Chase's certificate of incorporation will be amended to increase the authorized shares of its common stock from 4,500,000,000 to 9,000,000,000 and, as amended, will be the certificate of incorporation of the combined company. This amendment will not be effected unless the merger is approved by stockholders and completed.

152.    As a result of the misrepresentations and omissions of material facts set forth herein, including the failure to disclose that Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio, JPMC shareholders voted in favor of amending the Company's certificate of incorporation to allow the Company to issue far more shares than the Company would have needed to issue had Harrison agreed to a nil-premium exchange ratio.

153.    Pre-Merger JPMC shareholders were damaged by the lost opportunity to merge with Bank One without paying any dilutive premium.

154.    The wrongfully-obtained shareholder approval of corporate authority significantly diluted the stake of pre-Merger JPMC shareholders in the combined Company.

## JPMC'S BOARD DID NOT CONTAIN A MAJORITY OF INDEPENDENT DIRECTORS

155.    Each of the Individual Defendants other than Harrison received an annual retainer of $75,000, an annual grant of common stock equivalents valued at $170,000 on the date of grant, and several other valuable benefits.  Further, each chairman of a JPMC Board committee received an additional fee of $15,000 per year.  In addition to the reasons set forth below, the

extraordinary magnitude of the JPMC director compensation package undermined the independence of each of the Individual Defendants other than Harrison.

156.    Defendant Bechtel was beholden to Harrison because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country.  The Trade Bank of Iraq is managed by JPMC.

157.    The staggering size of this financial relationship shows that JPMC and the Bechtel Group, and their respective CEOs, are mutually interested in their ventures in Iraq.  The importance of this relationship to Bechtel Group is clear from its corporate website, which lists the "U.S. Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage.  Further, the website proudly points out that "Iraq Infrastructure II," Bechtel Group's second major Iraq contract, is valued at up to $1.8 billion.  Bechtel Group depends on the Trade Bank of Iraq to execute its lucrative contractual commitments in rebuilding Iraq's infrastructure. JPMC, headed by Harrison, leads the consortium of banks operating the Trade Bank of Iraq.  The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.  Nexant purports to be a "provider of technology solutions and experience-based technical and management consulting services to the global energy industry." On September 27, 2000, Nexant completed its first venture investment round, announcing:

> Nexant, Inc., the energy technology and consulting company
> formed by Bechtel Capital Partners LLC earlier this year,
> announced today that it has successfully completed its first venture
> investment round, securing $15 million in capital from a blue chip
> group of investors, including The Beacon Group, Morgan Stanley
> Dean Witter, the partners of Hellman & Friedman LLC, and Nth

Power Technologies, Inc. Nexant will use the investment proceeds to complete development of new technology solutions for the energy industry.

158.    Defendant Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002.  He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979.  Hearst-Argyle Television, Inc. ("Hearst-Argyle") is related to The Hearst Corporation, which folded its television holdings into Hearst-Argyle.  Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

159.    Hearst-Argyle, which is majority-owned by The Hearst Corporation, was formed in 1997 by the merger of the broadcast group of The Hearst Corporation and Argyle Television, Inc.  According to his executive biography, Bennack was instrumental in creating Hearst-Argyle. Hearst-Argyle's quarterly report discusses its financial relationship with JPMC as follows:

> *J.P. Morgan Chase & Co.* The lead agent bank under the Company's $500 million credit facility entered into in April 1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The outstanding balance on the credit facility was paid off as of September 2003, and the facility matured on April 12, 2004. Frank A. Bennack, Jr., a Director of the Company, served as a Director of J.P. Morgan until July of this year. We expect to enter into a new credit facility for $250 million with J.P. Morgan, and other parties, before the end of the year.

160.    As of September 30, 2004, Hearst-Argyle had approximately $1 billion in long-term debt, amounting to nearly half of its $2.4 billion market capitalization.  Thus, Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its credit facility for its operations and to maximize profits.  As a leading creditor, JPMC possesses substantial leverage over Hearst-Argyle.

161.    In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-Argyle are co-investors in ProAct Technologies, a privately held corporation in which Hearst-Argyle invested $25 million on March 22, 2000.

162.    According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares of Hearst-Argyle, worth approximately $625,000.  Moreover, Bennack's senior position at The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the importance of Hearst-Argyle's success to Bennack.  Accordingly, as Hearst-Argyle is indebted to JPMC, and also co-invests with JPMC, Bennack was unlikely to have challenged Harrison.  Doing so would have risked incurring the wrath of the head of one of Hearst-Argyle's most powerful creditors, potentially resulting in such repercussions as: (1) a less favorable credit facility for Hearst-Argyle when renewed; (2) increased pressure on Hearst-Argyle from a major creditor; or (3) the elimination of further co-investment opportunities with JPMC.  Any of these consequences would have adverse implications for the value of Bennack's investment in Hearst-Argyle, as well as the value of The Hearst Corporation's investment in Hearst-Argyle.  Taken together, Bennack's direct interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

163.    Defendant Bossidy is not an independent director because his son is employed by JPMC as a Vice President who received over $100,000 in compensation from the Company (and, according to salary survey of JPMC Vice Presidents, closer to $200,000).  Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC.  Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement.  Even if Bossidy was otherwise a capable and independent director, for the

purposes of this action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

164.    Defendant Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

165.    According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth approximately $50 million.

166.    As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders.  Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders.  For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time.  In this way, JPMC possesses significant leverage over Ryder.

167.    Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

168.    Defendant Futter is not an independent director because JPMC is a significant benefactor of The American Museum of Natural History (the "Museum"), of which Futter is President and Trustee.  Among other things, the Museum's Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation (the "Foundation").  JPMC makes donations through the Foundation and, according to "The JPMorgan Chase Corporate Responsibility

Annual Report," the Foundation made $312,500 in contributions to the Museum in 2003. This carries on JPMC's long-standing support for the Museum, originating with financier J.P. Morgan's donations of gems and minerals to the Museum's Tiffany-Morgan Collection of Gems, many of which are on display in the J.P. Morgan Hall of Gems.

169.    Due to JPMC's extensive philanthropic involvement with the Museum, Futter could not endanger the Museum's important relationship with JPMC by vigorously opposing an action by Harrison to favor himself over JPMC's shareholders. Futter's career and success depend, in large part, on the nurturing and retention of corporate donors. For Futter to stand in Harrison's way would not only endanger the Museum's relationship with JPMC, but also diminish Futter's ability to solicit other large donations from the corporate community.

170.    An article in the June 20, 2003 edition of <u>The Wall Street Journal</u> specifically profiled Futter and questioned whether she was, in fact, an independent director:

> *Giving at the Office*
>
> On Corporate Boards, Officials From Nonprofits Spark Concern When Directors' Position Helps Raise Funds
>
> When Directors' Positions Help Them Raise Funds, Danger of Conflict Follows
>
> Aiding Ms. Futter's Museum
>
> By David Bank And Joann S. Lublin
>
> When companies look for outsiders to join their boards, they often turn to people such as Ellen Futter, the president of the American Museum of Natural History in New York. As corporations see it, the leaders of big nonprofits can bring independence and a broader view of social issues to a board. Ms. Futter serves on four: insurer American International Group Inc., pharmaceutical maker Bristol-Myers Squibb Co., the energy company Consolidated Edison Inc. and J.P. Morgan Chase & Co., the nation's second-biggest bank.
>
> For museum directors, university presidents and other nonprofit leaders, a corporate directorship offers a big plus too: connections that can lead to major donations. All four of the companies on whose boards Ms. Futter sits have made substantial contributions

- 49 -

to her museum -- both during her nine years as president and before.

But those contributions create a potential conflict of interest: the possibility that money flowing from companies and their executives will make nonprofit officials beholden to the corporate management they are supposed to monitor.

Exhibit A is Enron Corp. The onetime energy-trading giant, its chief executive and affiliated foundations directed millions in donations during the 1990s to a Houston cancer center headed by Enron director John Mendelsohn, who served on Enron's now-famously-inattentive audit committee. (An Enron spokesman declines to comment. Dr. Mendelsohn has said the center doesn't depend heavily on Enron philanthropy.)

The potential problem goes far beyond the well-publicized Enron example. A Delaware Chancery Court judge ruled just last week that a supposedly independent investigative committee created by Oracle Corp.'s board was in fact fraught with "bias-creating relationships." One conflict: The two directors that constituted the panel -- a pair of Stanford University professors -- were asked to investigate controversial stock sales by fellow board members, some of whom had donated heavily to Stanford. The ruling allowed a shareholder lawsuit to go forward against those board members, including Oracle's chairman and chief executive, Larry Ellison, who personally and through the company has given millions to Stanford.

Now, concern about this kind of problem is spurring the Nasdaq Stock Market to propose new rules encouraging companies to limit donations to nonprofits whose executives sit on the companies' boards. The New York Stock Exchange also wants to promote directors' independence, but proposals it has made don't specifically target nonprofit conflicts.

It isn't clear yet how tough the exchanges' new rules will be, but several corporate boards have begun to take action in anticipation of new restrictions. All this comes amid wide-ranging efforts to reform corporate boards after a wave of business scandals that boards did little to curtail.

Acting on her own, Ms. Futter resigned last year from the committee of Bristol-Myers directors that oversees the company's audits. She also stepped down last year from the AIG committee that helps set top executive salaries. Ms. Futter wanted to avoid "even the appearance of conflict" between her duties overseeing the companies and her fund raising, a spokeswoman for the

natural-history museum says. The expectation of the new rules also factored into Ms. Futter's decisions, the spokeswoman says.

Ms. Futter, who declined to be interviewed, remains on the four corporate boards. She continues to serve on committees such as the Bristol-Myers corporate-governance panel, which considers questions of possible conflicts of interest of board members, among other duties. It's far from certain that the proposed rule changes would force any alteration in her relationships with the companies.

The museum chief's fund-raising success illustrates the potential problem created by nonprofit executives serving on corporate boards. In 2001, she received a bonus of more than $150,000 on top of her $450,000 annual salary, in part for opening the museum's $210 million Rose Center for Earth and Space, according to the museum. On a wall honoring major contributors to the multimedia Rose Center, the list of 34 "friends" includes: Bristol-Myers, Con Edison and the Starr Foundation, which was endowed by AIG's founder and is run by current and former AIG executives. Ms. Futter served on the boards of all of the companies when they or their related foundations made these contributions.

Bristol-Myers, through the Bristol-Myers Squibb Foundation, was also the primary sponsor of the museum's 1999 exhibit, "Epidemic!" The foundation contributed $1.2 million over four years for the display on infectious diseases. In addition, Bristol-Myers has given the museum a total of $700,000 for other purposes during Ms. Futter's tenure as president.

Ms. Futter, a lawyer by training and a former president of Barnard College in New York, has also raised large amounts of money from companies and foundations to which she has no direct connection. During her time at the museum, giving by the four companies on whose boards she sits has been "consistent with the philanthropic support these corporations have provided historically to the museum before Ms. Futter became president and/or joined these boards," the museum says in a written statement.

She served on the six-member Bristol-Myers audit committee from 1993 until 2002, chairing the panel in 1998 and 1999. In March, Bristol-Myers restated its financial results from recent years, acknowledging that from 1999 through 2001, it had overstated revenue by a total of nearly $2.5 billion. The restatement raised its revenue by $653 million for the first half of 2002. The company's financial reporting is now under investigation by the Securities and Exchange Commission and the Justice Department. The company has said it is cooperating with the government probes and doing its

own internal investigation. There is no indication the government inquiries are focusing on board members.

Bristol-Myers says that its contributions to the natural-history museum haven't compromised Ms. Futter's role on its board. "Since 1990, she has provided important independent counsel and guidance to the company," Rebecca Taylor, a company spokeswoman, says.

AIG reached a similar conclusion, says company spokesman Joseph Norton. He points out that the Starr Foundation is for legal purposes independent of AIG. But Maurice Greenberg, AIG's chief executive, serves as chairman of the foundation, and other members of AIG's board serve on the foundation's board. Mr. Greenberg serves as a trustee of the natural-history museum, as well.

In 1999, the year Ms. Futter joined AIG's board, the Starr Foundation committed $10 million over two years to build the museum's C.V. Starr Natural Science Building, a $35 million, nine-story research facility in New York, with labs, exhibits and retail space. "We've been funding the museum long before Ellen was there," says Florence Davis, the foundation's president and formerly AIG's top in-house lawyer. "It has nothing to do with her being on AIG's board."

Anne Canty, the museum spokeswoman, says none of the corporate contributions had any effect on Ms. Futter's boardroom decisions. "Ms. Futter's role as a director is independent of her role as president of the museum," Ms. Canty says.

Con Ed and J.P. Morgan Chase say they continue to consider Ms. Futter to be an independent board member.

[…]

171.    Other publications have also criticized Futter for conflicts of interest in connection with her corporate directorships.  The February 21, 2000 issue of <u>New York Magazine</u> observed that as "[a] skilled fund-raiser, [Futter] has made the [Museum] corporate-friendly," and that "Futter -- whose other accomplishments include being the first woman to chair the board of the New York Federal Reserve Bank as well as memberships on the boards of Con Edison, Bristol-Myers Squibb, and J.P. Morgan -- tapped her extensive contacts not just for funding but to boost the museum's visibility."  Futter's willingness to capitalize on her corporate

- 52 -

directorships has on at least one occasion drawn fire for blurring corporate interests with

Museum interests.  According to the <u>New York Magazine</u> article:

> Take the 1999 exhibit "Epidemic! The World of Infectious
> Diseases," sponsored by drug behemoth Bristol-Myers Squibb.
> That Charles A. Heimbold Jr., Bristol-Myers's CEO, sits on the
> museum's board looked like natural fund-raising synergy. That
> Futter sits on Bristol-Myers's board had the appearance of conflict
> of interest. That, as <u>The Nation</u> first reported, Richard Colonno, a
> Bristol-Myers vice-president, served on a special advisory
> committee that helped "shape the content of the exhibition"
> suggested in-house censorship that blunted related issues such as
> pharmaceutical price-gouging.

172.    It is reasonable to expect that Futter, the head of an institution dependent on the

continued financial support of the corporate community, including JPMC, would not endanger

her institution's financial backing, as well as her own career, by standing in the way of

Harrison's self-dealing.  Accordingly, Futter must be considered to be beholden to Harrison for

the purpose of determining whether a majority of JPMC's Board was independent from Harrison

in approving the improper premium.

173.    Defendant Kaplan was not an independent director because she is a Trustee and

Vice-Chair of the Museum, of which, as previously alleged, JPMC is a significant benefactor.

As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it

can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm

financial footing, among other things, by nurturing and pleasing corporate donors like JPMC.

Like Futter, Kaplan's interest in the Company's continued financial support of the Museum

renders her insufficiently independent to assure that she would have vigorously opposed an

action by Harrison to favor himself over JPMC's shareholders.  Kaplan also serves on the Board

of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

174.    Kaplan is also not independent because, as an attorney with Skadden, Arps, Slate,

Meagher & Flom LLP, which receives substantial fees from JPMC, she must be careful not to

cross an important client.  Skadden represented Chase Manhattan and Chemical Bank in their merger; Chase Manhattan in its merger with J.P. Morgan; and JPMC in the Merger (performing antitrust and regulatory work).  Skadden also represented JPMC in the Currency Conversion Fee Antitrust class action litigation and represents JPMC in the WorldCom securities litigation, among other cases.  Upon information and belief, JPMC pays millions of dollars in legal fees to Skadden, thereby compromising Kaplan's independence.

175.    Defendant Gray is not an independent director because JPMC is a National Sponsor of the United Negro College Fund (UNCF), of which Gray was President and CEO at all relevant times.  An article in the March 31, 2003 edition of <u>Barron's</u> critiqued the relationship between Gray and Harrison, as well as UNCF and JPMC:

> Sweet Charity
>
> Should the head of a nonprofit be on the compensation committee of one of its corporate donors?
>
> JUST A FEW WEEKS AGO, the annual campaign for the United Negro College Fund began at J.P. Morgan Chase, with a high-spirited reception at the International Center for Photography in New York City. A blizzard of solicitations from bank executives ensued, encouraging employees to donate to the "workplace campaign" through a secure Website or an interactive telephone voice response system.
>
> The longstanding relationship between the two institutions is warm and cozy. The Rockefellers, who founded the Chase Manhattan Bank, were charter supporters of the United Negro College Fund since the UNCF was established in 1944 by Frederick Patterson. A third of the money to be raised from J.P. Morgan Chase supports the John F. McGillicuddy Scholarship Fund, which has awarded $1.4 million in scholarships since 1993. The recipients are students going to United Negro College Fund member schools.
>
> In many ways, the relationship between Bill Harrison, chairman of the bank that's the nation's second-largest after Citigroup, and Bill Gray, is warm and comfortable, too, in the way of men who've served on boards with each other for more than a decade.
>
> Gray, 61, is the United Negro College Fund's chairman and chief executive. A Baptist minister and Democratic congressman from

Philadelphia from 1979 to 1991, he is today a director of Dell Computer, Electronic Data Systems, MBIA, Pfizer, Prudential Insurance, Rockwell Automation, Viacom and Visteon. Gray is a director of J.P. Morgan, having become a director of Chase Manhattan just after he gave up his congressional seat in '91. Moreover, he also sits on the bank's compensation committee, along with Bechtel Chairman Riley Bechtel, ExxonMobil CEO Lee Raymond and Wyeth Chairman John Stafford, who heads the committee.

In January 2001, that same group approved a $10 million bonus to Harrison for completing the merger between J.P. Morgan and Chase.

It cut Harrison's stock package last year by 50%. But in January of this year, Harrison got the second $5 million installment of the merger-related bonus, even though, like other financial institutions, J.P. Morgan has been hammered by declines in investment banking, increases in bad debt, legal disputes, regulatory investigations and fallout from its relations with Enron and WorldCom. Since Dec. 29, 2000, the day before the merger became effective, J.P. Morgan stock has fallen by 46.9%. In the same period, the S&P 500 index has slid by 34.2%.

Harrison, in turn, serves as treasurer of the United Negro College Fund. And J.P. Morgan and its employees are some of the fund's largest contributors. Last year J.P. Morgan employees raised some $1.28 million, or an average of $179 per gift, which the J.P. Morgan Chase Foundation matched dollar for dollar. Over the past six years, the contribution has totaled approximately $11 million.

Recently, the annual appeal to J.P. Morgan workers kicked off with a target of $1.37 million -- some 7% above the level achieved last year, even though head count has fallen sharply. Midway through last month, the campaign had already raised $414,000 from 1,893 employees, according to a J.P. Morgan Website. The campaign ends on April 4, and payroll deductions start in June. Those giving at the "leadership level" -- or more than $350 -- will be recognized as "UNCF Leaders" and receive a gift.

Arrangements like the one involving Gray, Harrison and JP Morgan draw fire from corporate-governance experts. "This is known as director interlock -- You scratch my back, and I scratch yours," says Charles Elson, head of the Center for Corporate Governance at the University of Delaware. "If I give money to your foundation and you're on my board, and you serve on the compensation committee, in today's environment, that's a conflict of interest. That individual, in my view, would be classified as a

- 55 -

non-independent director and should probably reconsider their service on that board."

Harrison's status as the college fund's treasurer isn't disclosed in J.P. Morgan's proxy statement, including the latest, which was filed Friday. Continues Elson: "From my point of view as a shareholder, I would want that information for voting. I'm surprised it's not disclosed, particularly in today's environment, when discretion is the better part of valor." Elson draws comparison with the case of Charles A. LeMaistre, a former Enron director who was president of the M.D. Anderson Cancer Center at the University of Texas. The cancer center was promised $600,000 in donations from Enron while LeMaistre served on Enron's board.

In a prominent section of J.P. Morgan's Website that addresses corporate governance, Harrison describes his pride in "the 200-year tradition of integrity on which this firm is built." Each of the bank's directors, the Website relates, is independent. Its definition of independence? "The director has no material relationship with the firm, either directly or as a partner, stockholder or officer of an organization that has a relationship with the firm."

J.P. Morgan declined to comment to Barron's. However, a person familiar with the relationship with the fund stressed that "the vast majority" of contributions came from employees, and that a Chase executive has served as the fund's treasurer since inception, "a tradition that's not questioned and nothing untoward and nobody has seen a problem with this for over 60 years." Finally, this person pointed out, J.P. Morgan's own governance guidelines declare that if the bank accounted for 2% of a not-for-profit's budget, and the nonprofit's executive sits on the bank's board, only "then is that director no longer independent." And, this person points out, J.P. Morgan's contribution accounts for less than 2% of the fund's budget.

Gray wasn't available to comment.

J.P. Morgan certainly isn't another Enron. And the fund is indubitably a worthy recipient: 60% of its scholarships go to people who are the first in their families to attend college. Roughly the same percentage goes to people whose families have annual incomes under $25,000. And half its scholars come from single-parent households.

And the J.P. Morgan Chase contribution last year was just a fraction of the $178.8 million in annual support and revenues pledged to the fund. The J.P. Morgan Chase Foundation and J.P. Morgan Chase Bank gave away $73 million in 2002.

- 56 -

> Other J.P. Morgan contributions to the fund included sponsoring its celebrity golf tournament and contributing about $800,000 to the fund's technology-enhancement capital campaign, the first year of a two-year commitment. Sure, raising money for charities is generally a very worthwhile activity. But there are ways to do it without creating the potential for a conflict of interest.
>
> Happily, conflicts of interest, while rife, are less so than they once were, observes Elson of the University of Delaware. "They are certainly on the decline, given what's happened with Enron." But in relationships like the one between Gray and Harrison, "It's not to say [the nonprofit executive] wouldn't make a good director. But should they be on this particular board?"

176.    In 2003, JPMC matched nearly $1.3 million in UNCF donations, making possible a combined total of $2.6 million raised through employee contributions and matching gifts. Since 1990, JPMC employees have donated more than $6.6 million to the UNCF, which when combined with the matching gift and sponsorships, has resulted in a total contribution of nearly $18.7 million.  The November 3, 2003 issue of Jet, in reporting Gray's intention to retire as President and CEO of UNCF on March 31, 2004, observed that Gray had raised over $1.5 billion for the organization.  Thus, the philanthropic relationship between JPMC and UNCF is significant and long-standing, and Gray's lauded success in fundraising has been due, in large part, to his ability to nurture and retain corporate donors such as JPMC.

177.    Gray's financial relationship with JPMC and Harrison's service as UNCF's treasurer (which is disclosed nowhere in the Proxy/Prospectus) raise serious doubts that Gray would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  It would not be reasonable to expect the head of an institution interested in the Company's continued financial support to stand in the way of Harrison's self-dealing. Moreover, Harrison's undisclosed service as UNCF's treasurer further evidences his close relationship with Gray.  Accordingly, Gray must be considered beholden to Harrison for the

purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

178.    Defendant Stafford has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003.  Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001.  Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.  According to a November 19, 2004 filing, JPMorgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

179.    According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million.  JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence.  JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth.  For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price.  JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance.  As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders.  Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Wyeth was either undersecured or would be undersecured

within a relatively short time.  In all these ways, JPMC possesses substantial leverage over

Wyeth.  Taken together, Stafford's financial interest in Wyeth and JPMC's relationship with

Wyeth raise serious doubts that he would have vigorously opposed an action by Harrison to

favor himself over JPMC's shareholders.

### PLAINTIFF'S INVESTIGATION

180.    Plaintiff's allegations set forth herein are based on a thorough investigation,

conducted by and through his attorney, of all reasonably-available sources of information, in

order to obtain information necessary to plead plaintiff's claims, including:

       a.    The review and analysis of public filings of JPMC and Bank One with the

SEC, as well as documents disseminated to shareholders of JPMC and Bank One;

       b.    The review and analysis of securities analysts' reports and investor

advisory services concerning JPMC and Bank One;

       c.    The review and analysis of JPMC and Bank One press releases and other

publicly disseminated statements made by the defendants;

       d.    The review and analysis of reports concerning JPMC and Bank One that

have appeared in the print and electronic media and computer databases; and

       e.    Interviews of relevant witnesses, including Landon Thomas, Jr., the

reporter for The New York Times who first broke the story that Harrison had turned down the

no-premium deal opportunity.

181.    Except as alleged herein, the underlying information relating to defendants'

misconduct and the particulars thereof are not available to plaintiff and the public, and lie

exclusively within the possession and control of defendants and their agents, thus preventing

plaintiff from further detailing defendants' misconduct.

**NO SAFE HARBOR**

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint because the specific statements pleaded herein either were not identified as "forward-looking statements" when made or were unaccompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew or had reason to know that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of JPMC or Bank One who knew or had reason to know that the statement was false or misleading.

**COUNT I**

**AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR
VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
AND RULE 14A-9 THEREUNDER**

183.    Members of the Class who were entitled to vote on the Merger (the "JPMC Holder Class") repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

184.    This Count is brought pursuant to Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 promulgated thereunder by the SEC [17 C.F.R. § 240. 14a-9] on behalf of the members of the JPMC Holder Class, against JPMC and the Registration Statement Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, and does not sound in fraud.

185.    The defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these defendants solicited proxies from the members of the JPMC Holder Class by means of a Proxy/Prospectus that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

186.    As a result, the members of the JPMC Holder Class were denied the opportunity to make an informed decision in voting on the Merger, and received a smaller stake in the combined company than they otherwise would have had the information been disclosed.

187.    The members of the JPMC Holder Class have suffered damages as a result of the Merger which was approved through the use of a proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

188.    The JPMC Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

189.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Holder Class, against the Individual Defendants.

190.    Each of the Individual Defendants was a control person of JPMC by virtue of his/her positions as a director and/or senior officer of JPMC.

191.    Each of the Individual Defendants was a culpable participant in the violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, alleged in Count I, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT III

## AGAINST THE INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

192.    The JPMC Holder Class as well as members of the class who purchased or

otherwise acquired the common stock of JPMC during the Class Period (the "JPMC Purchaser

Class"), repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if

fully set forth herein.

193.    This count is brought pursuant to common law, on behalf of the members of the

JPMC Holder Class and JPMC Purchaser Class, against the Individual Defendants for breach of

those defendants' fiduciary duties owed to the members of the JPMC Holder Class and JPMC

Purchaser Class.

194.    Each defendant named herein was a director and/or senior executive officer of

JPMC, and owed to JPMC shareholders the highest obligations of good faith, loyalty, fair

dealing, due care and candor.

195.    By entrenching himself with the CEO title for another two years at a cost to

JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of

loyalty owed to the public shareholders of JPMC.  The other Individual Defendants also

breached their duty of loyalty by approving the Merger with a significant acquisition premium

solely to secure a benefit for Harrison to the detriment of JPMC shareholders.

196.    The Individual Defendants' fiduciary obligations under these circumstances

required them to evaluate the Merger and obtain the best value for JPMC's public shareholders.

Instead, the Individual Defendants agreed to the Merger at a price that gave more than $7 billion

of value belonging to JPMC shareholders to Bank One shareholders just so Harrison could keep

his title and did not disclose to JPMC's shareholders the opportunity to merge with Bank One

without paying any acquisition premium at all.  Acting individually and in concert and aiding

and abetting and conspiring with one another, the Individual Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

197.    Each defendant named herein breached and violated his or her fiduciary duties to the members of the JPMC Holder Class and JPMC Purchaser Class to the detriment of those class members by reason of the wrongful conduct alleged above.

198.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium), as set forth above, because at least nine of JPMC's twelve directors were either interested in the improper premium or not sufficiently independent from Harrison.

199.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium) because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC of his secret pact with Dimon.

200.    The entire fairness standard is the proper standard of review for the Merger because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC that he rejected the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio.

201.    As a result of these defendants' breaches of their fiduciary duties, the members of the JPMC Holder Class and JPMC Purchaser Class have suffered, and will continue to suffer substantial damages.

## COUNT IV

## AGAINST JPMC AND THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER

202.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

203.    This count is brought pursuant to Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.l0b-5], on behalf of the members of the JPMC Purchaser Class, against JPMC and the Insider Defendants.

204.    The defendants named herein knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule l0b-5 thereunder in that they themselves, or a person whom they controlled: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, (iii) engaged in acts, practices and a course of conduct that operated as a fraud or deceit upon the members of the JPMC Purchaser Class in connection with their purchases of JPMC securities.

205.    Each of the defendants named herein participated in and joined the alleged scheme and course of conduct specified above, and each is liable primarily for the aforesaid wrongful acts and statements specified above.

206.    As a result of the foregoing, the market prices of JPMC securities were artificially inflated. In ignorance of the false and misleading nature of the representations described above, the members of the JPMC Purchaser Class relied, to their damage, directly on the misrepresentations or on the integrity of the market both as to price and as to whether to purchase the securities. The members of the JPMC Purchaser Class would not have purchased JPMC securities at the market prices they paid, or at all, if they had been aware that the market

- 64 -

prices had been artificially and falsely inflated by these defendants' false and misleading statements and concealments.

207.    At the time of the purchase of those securities by the members of the JPMC Purchaser Class, the fair market value of JPMC securities was substantially less than the prices paid.

208.    After the truth about Harrison's secret pact was revealed on Sunday, June 27, 2004, months after the Merger announcement, JPMC's stock price fell as low as $37.85 per share the next day, finally closing at $37.95 per share, below its $37.99 per share close the previous Friday.  By contrast, the price of the iShares S&P Global Financials Sector exchange-traded fund rose on June 28, 2004 to $59.35 per unit from its previous closing price of $59.24, and the iShares Dow Jones US Financial Services exchange-traded fund rose that day to $103.04 per unit from its previous closing price of $103.00.

209.    By virtue of the foregoing, the defendants named herein have violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## COUNT V

## AGAINST THE INSIDER DEFENDANTS FOR
## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

210.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

211.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Purchaser Class, against the Insider Defendants.

212.    Each of the Insider Defendants was a control person of JPMC by virtue of his positions as a director and senior officer of JPMC or Bank One.

213.    Each of the Insider Defendants was a culpable participant in the violations of Section 10 of the Exchange Act and Rule 10b-5 thereunder, alleged in Count V, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT VI

### AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

214.    Members of the Class who exchanged Bank One shares for shares of JPMC in connection with the Merger (the "Bank One Holder Class") repeat and reallege each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

215.    This Count is brought pursuant to Section 11 of the Securities Act [15 U.S.C. § 77k] on behalf of the members of the Bank One Holder Class, against JPMC and the Registration Statement Defendants for Violations of Section 11 of the Securities Act, and does not sound in fraud.  Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

216.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

217.    JPMC is the Registrant for the Registration Statement.

218.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

219.    The defendants named herein are strictly liable to the members of the Bank One Holder Class for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

220.    The defendants named herein issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose *inter alia* the facts set forth above. By reasons of the conduct herein alleged, each of these defendant violated, andlor controlled a person who violated, Section 11 of the Securities Act.

221.    The members of the Bank One Holder Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the Registration Statement.

222.    The members of the Bank One Holder Class have sustained damages.

223.    At the times they acquired JPMC common stock, the members of the Bank One Holder Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year elapsed from the time that plaintiff and members of the Bank One Holder Class discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VII

## AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

224.    The Bank One Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

225.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act [15 U.S.C. § 771(a)(2)] on behalf of the members of the Bank One Holder Class, against JPMC and the Registration Statement Defendants, and does not sound in fraud.  Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

226.    The defendants named herein were sellers, offerors, and/or solicitors of sales of the shares offered pursuant to the Proxy/Prospectus.

227.    The Proxy/Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The solicitation made by the defendants named herein included participating in the preparation of the false and misleading Proxy/Prospectus.

228.    The members of the Bank One Holder Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the defective Proxy/Prospectus.

229.    By reason of the conduct alleged herein, the defendants named herein violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.

230.    Accordingly, the members of the Bank One Holder Class have the right to rescind and recover the consideration exchanged for their JPMC common stock and, hereby reserve the right to rescind and tender their shares to the defendants sued herein.

231.    The members of the Bank One Holder Class who have sold their shares of JPMC common stock are entitled to rescissionary damages.

232.    Less than one year elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VIII

### AGAINST THE INSIDER DEFENDANTS FOR
### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

233.    The Bank One Holder Class repeats and realleges each and every allegation in paragraphs 1 through 182, above, as if fully set forth herein.

234.    This Count is brought pursuant to Section 15 of the Securities Act [15 U.S.C. § 77o] on behalf of the members of the Bank One Holder Class, against the Insider Defendants, and does not sound in fraud.

235.    Each of the Individual Defendants was a control person of JPMC by virtue of his positions as a director and/or senior officers of JPMC or Old BankAmerica.

236.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts VI and VII, above, based on their having signed the Registration Statement, and having otherwise participated in the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of himself and the Class, plaintiff demands judgment against defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying plaintiff as the representative of the Class;

B.    Ordering JPMC to issue additional shares of stock to plaintiff and the other members of the relevant class asserted herein as appropriate to address the misconduct alleged herein;

C.    Declaring and determining that the defendants violated the federal securities laws and common law by reason of their conduct as alleged herein;

D.    Awarding the Class compensatory and punitive damages against defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

E.    Awarding plaintiff his costs and disbursements, including the fees of plaintiff's counsel and experts, and reimbursement of expenses; and

F.      Granting plaintiff and the Class such other and further relief as the Court

may deem just and proper.

## JURY TRIAL DEMAND

237.    Plaintiff hereby demands a trial by jury.


DATED:        March 17, 2005              Respectfully submitted,

                                          /s/ Joseph N. Gielata
                                          _____
                                          Joseph N. Gielata (#4338)
                                          Attorney at Law
                                          501 Silverside Road, Suite 90
                                          Wilmington, DE 19809
                                          (302) 798-1096

                                          **_Attorney for Plaintiff_**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| |
|---|
| SAMUEL I. HYLAND, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>          vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>     Defendants. |

**CERTIFICATION OF SAMUEL I. HYLAND**
**IN SUPPORT OF CLASS ACTION COMPLAINT**

Samuel I. Hyland, for his Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.     I have reviewed the facts and allegations of the complaint prepared by counsel and have authorized the filing of the complaint.

2.     I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

3.     I held 300 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period.  Thus, at the close of the Class Period, I retained 300 shares.  Based on JPMC's stock price on July 1, 2004, when the merger closed, my loss during the Class Period as a result of defendants' fraud was $1,659.25.

4.      I intend to actively monitor the conduct of this action for the benefit of the class. I have retained Joseph N. Gielata, Esq. to prosecute this action.  Mr. Gielata is knowledgeable and experienced in securities law and litigation.

5.      I believe that my claims against the defendants are typical of those of other members of the class.

6.      I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

7.      I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial.  I intend to pursue this litigation for the best interests of all class members.

8.      During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

9.      I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: March  17 , 2005          _____/s/ Samuel I. Hyland_____

                                                              Samuel I. Hyland

*Exhibit in Support of the Memorandum Of*
*Amici Curiae Samuel Hyland and Stephanie Speakman*

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>        vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>    Defendants. | Case No. **1:05-cv-162 (JJF)**<br><br><br>**CLASS ACTION COMPLAINT FOR BREACHES OF FIDUCIARY DUTY AND VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Samuel I. Hyland and Stephanie Speakman, individually and on behalf of all others similarly situated, through counsel, as and for this Amended Class Action Complaint, allege the following upon personal knowledge as to themselves and as to all other matters upon information and belief based upon, inter alia, the investigation made by counsel, as detailed in paragraph 225, below.

## INTRODUCTION

1.      This is a class action brought by plaintiffs in connection with the defendants' issuance of incomplete and materially misleading statements, breaches of fiduciary duty, and failure to disclose material facts regarding the merger (the "Merger")

of Bank One Corporation ("Bank One") into JPMorgan Chase & Co. ("JPMC" or the "Company").

2.    The Class seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breach of fiduciary duty by certain of JPMC's current and former directors.

## OVERVIEW

3.    For years, JPMC's performance, stock price, and reputation have deteriorated under the stewardship of William B. Harrison, Jr., the Company's Chief Executive Officer ("CEO") and Chairman.  Facing the wrath of shareholders who clamored for his ouster, Harrison feared that his lucrative and powerful position was in jeopardy by late 2003.

4.    By contrast, Bank One's CEO and Chairman, the widely-lauded Jamie Dimon, was credited with turning around Bank One's profitability and reputation during his four-year tenure.

5.    Unwilling to yield the riches and power of his position, and seeking to shape a graceful conclusion to his career, Harrison pursued a business combination with Bank One.

6.    According to persons close to the secretive negotiations surrounding the Merger, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all*.  Harrison rejected such a merger of equals for no other reason than because Dimon sought to be CEO of the combined entity immediately.

7.    Instead, Harrison and Dimon struck a secret pact.  In exchange for remaining CEO for two more years, Harrison agreed to an exchange ratio in connection with the Merger providing for a massive premium over Bank One's market value.

- 2 -

8.     Thus, for the sole purpose of keeping his CEO title for another two years, Harrison caused JPMC shareholders to lose a multi-billion-dollar opportunity to combine with Bank One without unfairly diluting JPMC shareholders' stake.

9.     The defendants violated federal securities laws by omitting the secret pact, including Harrison's rejection of the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio, from the Joint Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), issued by the defendants to gain shareholder approval of the Merger.  Defendants falsely described the Merger and concealed the secret pact in numerous written and oral statements to shareholders.  Plaintiffs assert claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)], Rules l0b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §§ 240.l0b-5 and 240.14a-9], Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§ 77k, 77l(a)(2) and 77o], and pendent common law claims.

10.     JPMC investors were left with the mistaken impression that Harrison had bargained on their behalf to maximize their interest in the combined Company.  In fact, through the secret pact, Harrison had sold JPMC investors "down the river…just to save his own skin," as one observer put it.

11.     JPMC investors were also left with the mistaken impression that, in light of the acquisition premium, Harrison would run the combined Company, when in fact, part of the secret pact was that Dimon would serve as the true CEO of the combined Company.

12.     Unaware of the secret pact, and due to materially false and misleading statements and the failure to disclose material facts in the Proxy/Prospectus, shareholders of JPMC and Bank One approved the Merger, which was completed on July 1, 2004.

13.     Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to an unfairly dilutive exchange ratio in the Merger merely to entrench Harrison in the CEO office.

14.     JPMC's directors knew or should have known of the secret pact and nevertheless they approved and recommended the Merger to JPMC's shareholders.

15.     Neither JPMC nor its directors had the authority to issue the new JPMC shares necessary to effectuate the Merger without amending JPMC's certificate of incorporation, which required approval by a majority vote of JPMC's shareholders.  Such approval was solicited and wrongfully obtained without disclosing, as the defendants should have, the secret pact and the rejected nil-premium opportunity.

16.     The omission of the secret pact and the rejected nil-premium opportunity throughout the solicitation of votes thus violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.  Accordingly, the shareholder approval of the necessary amendment to JPMC's charter to expand the corporate authorization to issue shares was wrongfully obtained by the defendants and is null and void.

17.     Confirming the critical importance of the secret pact, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger, expressed

concerns about Harrison's remaining in that position, and denounced the Merger's dilutive impact.

18.      Also, a shareholder proposal to separate the Chairman and CEO posts presented at JPMC's annual meeting received over 500 million votes in its favor.  This resounding and extraordinary outcome left no doubt as to the will of JPMC's pre-Merger shareholders, which was stealthily thwarted by the secret pact.

## JURISDICTION AND VENUE

19.      This court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78a-78jj] and supplemental jurisdiction [28 U.S.C. § 1367].

20.      Venue in this case is proper in the District of Delaware pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in the District of Delaware.  In addition, JPMC is incorporated in Delaware and conducts substantial business in the District of Delaware. Bank One was also incorporated in Delaware.

21.      In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

22.      Venue is also proper in the District of Delaware because JPMC and Bank One conducted substantial business in Delaware and JPMC continues to conduct substantial business in Delaware in the wake of the Merger.

23.    Venue is also proper in the District of Delaware because Plaintiffs reside in Delaware.

24.    As directors of a Delaware corporation, the Registration Statement Defendants, as defined below, submitted themselves to the jurisdiction of the state of Delaware.

## THE PARTIES

25.    Plaintiffs Samuel I. Hyland and Stephanie Speakman reside in New Castle County, Delaware and owned JPMC common stock at all relevant times, including on April 2, 2004, as set forth in the accompanying certifications, incorporated by reference herein.

26.    Defendant JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices at 270 Park Avenue, New York, NY 10017, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding.  JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

27.    Defendant William B. Harrison, Jr. has served as CEO and Chairman of the Board of Directors of JPMC since 1999.  Defendant Harrison was instrumental in negotiating the Merger and signed the Registration Statement and Proxy/Prospectus issued in connection therewith.

28.    Defendant Hans W. Becherer was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

29.    Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting.

30.    Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004.

31.    Defendant John H. Biggs was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC since March 2003.

32.    Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998.

33.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.

34.     Defendant Ellen V. Futter was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  She has been a director of JPMC or a predecessor institution since 1997.

35.     Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004.

36.     Defendant Lee R. Raymond was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1987.

37.     Defendant William H. Gray, III was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1992.

38.     Defendant John R. Stafford was, during the relevant time, a director of JPMC and signed the Registration Statement and Proxy/Prospectus issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1982.

39.     Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

40.     The Individual Defendants all signed the Registration Statement dated February 20, 2004 (and Amendments 1 (dated March 29, 2004), 2 (dated April 13, 2004),

and 3 (dated April 19, 2004) thereto) and Proxy/Prospectus issued in connection with the Merger.

41.    By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to disclose to JPMC shareholders all material facts concerning the Merger; (d) to disseminate a complete and accurate proxy statement; and (e) to refrain from abusing their positions of control.

42.    Defendant James Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as President and Chief Operating Officer of JPMC.  Dimon was named in the Registration Statement as about to become a director of the combined Company.

43.    Defendant Dimon and the Individual Defendants are referred to collectively herein as the "Registration Statement Defendants."  As signatories to the Registration Statement (or, in the case of Dimon, as a person who, with his consent, was named in the Registration Statement as about to become a director of the combined Company), the Registration Statement Defendants are strictly liable to any person acquiring the securities registered in the Registration Statement for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

44.    Defendants Harrison and Dimon are collectively referred to herein as the "Insider Defendants." The Insider Defendants, because of their positions of control and authority as chief officers and directors of JPMC or Bank One, were able to and did control the contents of the various quarterly reports, SEC filings, press releases and presentations to investors and securities analysts pertaining to those entities, including, without limitation, the Registration Statement and the Proxy/Prospectus. Each of the Insider Defendants was provided with copies of press releases and SEC filings alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the Insider Defendants is responsible for the accuracy of the public reports and releases detailed herein as "group published" information, and is therefore responsible and liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

45.    Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class consisting of those present and former JPMC shareholders who (1) purchased or otherwise acquired the common stock of JPMC between January 14, 2004 and June 25, 2004 inclusive (the "Class Period"), (2) as shareholders of record of JPMC on April 2, 2004, were entitled to vote on the Merger (and thereby on the proposed amendment to JPMC's certificate of incorporation in connection with the Merger), and/or (3) acquired their JPMC shares by surrendering Bank One shares in connection with the Merger on or about July 1, 2004. Excluded from the Class are Defendants herein; any person related to any of the Individual Defendants; any firm, trust, corporation, or other entity affiliated with any of the Defendants (except for those holding JPMC common stock in solely a

fiduciary capacity); the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

46.    This action is properly maintainable as a class action.

47.    The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all class members is impracticable.  There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class.  According to the Proxy/Prospectus:

> The board of directors of JPMorgan Chase has fixed the close of business on April 2, 2004 as the record date for determination of stockholders entitled to notice of and to vote at the annual meeting of stockholders. On the record date, there were 2,081,783,154 shares of JPMorgan Chase common stock outstanding, held by approximately 126,350 holders of record.

48.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.  Among other things, members of the Class sustained damages as a result of a Proxy/Prospectus issued in connection with the Merger that omitted and/or misrepresented material facts about the Merger that were required to be disclosed.

49.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and shareholder litigation.  Plaintiffs have no interests that are in conflict with the interests of the Class.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by the defendants' acts as alleged herein;

b.      Whether the Proxy/Prospectus, and other documents and/or statements disseminated to members of the Class in connection with the Merger omitted or misrepresented material facts about the Merger that were required to be disclosed;

c.      Whether the Insider Defendants acted with the requisite state of mind in omitting to state and/or misrepresenting material facts about the Merger;

d.      Whether the Individual Defendants other than Harrison knew or should have known about the secret deal and/or the rejected nil-premium opportunity;

e.      Whether defendants breached fiduciary and other common law duties owed by them to plaintiffs and other members of the Class; and

f.      Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

51.     In addition, the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. The market for JPMC common stock was at all times an efficient market for the following reasons, among others:

a.      JPMC's common stock met the requirements for listing, and were listed on the New York Stock Exchange, a highly efficient securities market;

b.      As a regulated issuer, JPMC filed periodic public reports with the SEC;

c.      JPMC common stock trading volume was substantial during the class period;

d.     JPMC was followed by numerous securities analysts who wrote reports available to investors through various automated data retrieval services;

e.     JPMC disseminated information on a market-wide basis through various electronic media services; and

f.     The market price of JPMC securities reacted efficiently to new information entering the market.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

53.     Defendants have acted in a manner which affects plaintiffs and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

54.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### Background: The Besieged Banker

55.     In June 1999, defendant Harrison became CEO of Chase Manhattan, the

predecessor of JPMC, and promptly embarked on a takeover spree, spending more than

$41 billion on acquisitions, culminating in the value-destroying merger with J.P. Morgan

in 2000.

56.     An April 7, 2002 article in The New York Times suggested that

Harrison's motivation in entering into large transactions was not necessarily to benefit

shareholders:

> William B. Harrison was beaming. Mr. Harrison, as
> chairman of the Chase Manhattan Corporation, had signed
> a deal to buy J. P. Morgan & Company for $30.9 billion the
> night before and was already spinning the deal to
> shareholders. It was mid-September 2000, the economy
> was in its longest expansion ever, and anything seemed
> possible. "It's a very fair deal," he said, grinning
> uncharacteristically. "And most importantly, when we look
> at the overall transaction two years from now, it should be
> accretive to the shareholders."
>
> Mr. Harrison had reason to grin — and still does, though
> not because the bank's shareholders have gained as he
> predicted. Rather than being "accretive" — that is,
> increasing earnings per share — the merger has not
> delivered much for shareholders so far; the stock has lost
> more than one-third of its value in 18 months. Mr. Harrison
> might have been glowing because, like many top
> executives these days, he was about to be paid — a lot —
> to go shopping.
>
> For overseeing the acquisition of J. P. Morgan, which he
> nonchalantly said took only three weeks to negotiate, he
> received a special bonus of $20 million — far more than
> the total lifetime earnings of the average working stiff. And
> that bonus, which is spread over 2001 and 2002, came on
> top of his $1 million salary and $5 million regular bonuses
> last year and whatever else he receives for this year. Mr.
> Harrison's three lieutenants, including Geoffrey T. Boisi, a

> vice chairman who had joined Chase only four months
> earlier, received special bonuses of $10 million each, on
> top of their regular salaries and bonuses. All told, Chase
> directors paid the bank's executives more than $50 million
> for their outing at the bank mall. (They had done a little
> window-shopping, chatting up Goldman Sachs and
> Deutsche Bank, before settling on J. P. Morgan.)

57.    In connection with the merger that created JPMC, the Company's

compensation committee, comprised of defendants Gray, Bechtel, Stafford, and

Raymond, awarded Harrison $10,000,000 in cash and 237,164 restricted stock units.

According to the March 19, 2002 report of the committee, included in the Company's

2002 proxy statement:

> This award will vest and be paid out or distributed as
> follows, subject to continued employment: 50% of the cash
> and 50% of the restricted stock units in January 2002; 50%
> of the cash in January 2003; and 50% of the restricted stock
> units if the price of JPMorgan Chase common stock
> achieves the $52 Target Price by January 25, 2007 (but no
> sooner than January 25, 2003). The cash awards would be
> paid out in the event of job elimination, death, or total
> disability. The restricted stock unit awards would vest and
> be distributed in the event of death or total disability. In the
> case of job elimination or retirement, the restricted stock
> unit awards related to the Target Price would vest only if
> the Target Price is achieved, unless otherwise determined
> by the committee.

58.    Thus, 118,582 of the restricted stock units, which would vest upon JPMC

achieving a target price by January 25, 2007, were "subject to continued employment."

If vested at the target price, the units would be worth over $6.1 million.

59.    Harrison was notorious not only for being overpaid but also for

overpaying in deal after deal.  As an interviewer noted in a February 23, 2004 interview

with Harrison on CNBC: "You acquired JP Morgan at the top of the equity bubble, you

acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

60.    A February 7, 2002 article in <u>Forbes</u> entitled "Is Harrison Breaking Morgan's Bank?" reviewed Harrison's tenure, including its many failures, concluding that "Fiscal 2002 will be the make or break."

61.    A June 7, 2002 article in <u>EuroWeek</u> entitled "Time for an outsider to shake up troubled JP Morgan Chase" strongly criticized Harrison's leadership, pointed out his poor, costly deals, and suggested that Harrison was due to lose his job:

> Look at the evidence. Today no one questions the fact that Chase's chairman and CEO, Billy Harrison, grossly overpaid for Flemings, the patrician but still itsy-bitsy UK asset manager with a quirky securities operation bolted on to the side. It was a brilliant deal for the Fleming family and blew the myth that Roddy Fleming couldn't cut a deal without the help of his childhood Scottish nanny. Billy Harrison would now probably admit that he was sold a bum steer with Flemings, but he might also blame the purchase on the recently departed Geoff Boisi, who was, after all, in charge of investment banking at the time.
>
> However, even if the unassuming Billy Harrison tries to evade the Flemings transaction by pointing an accusing finger at Geoff Boisi, this isn't quite the end of the story.
>
> The harsh fact is that Chase and Billy Harrison had also significantly overpaid to acquire Geoff Boisi's investment banking boutique, Beacon Group, just because they clamoured for the services of its dynamic leader. It is perhaps even more ironic that Chase's attention was so focused on the brilliance of Mr Boisi that they may not have appreciated that David Coulter, who now has Boisi's old job, also came with the Beacon package.
>
> If Chase's Billy Harrison paid over the top for Beacon Group and then Geoff Boisi made the Fleming family rich beyond their wildest dreams, shouldn't Chase shareholders have been wary about the next acquisition? Perhaps there was nothing wrong with putting JP Morgan out of its misery, and the JPM road pointed downhill all the way -

- 16 -

but did Chase need to pay $34bn for the privilege? Yes, say the JP Morgan fat-cat top managers who walked away with fortunes which in some individual cases exceeded $100m each. No, say the Chase shareholders who must be asking themselves what they actually bought, other than a large can of worms.

The combined JP Morgan Chase in its present form is nowhere in investment banking, nowhere in equities and its asset management division can be described as fair to middling rather than the crème de la crème. Most of JP Morgan's old guard has left - who said "Thank heavens"? - and for its $34bn, Chase seems to have bought little more than a fizzy derivatives business and an upgrade in debt capital markets.

With such a litany of financial misjudgements, you would have thought that shareholders would be baying for blood. ***At the top of the execution list you might have expected to see JPMC's chairman and CEO, Billy Harrison.*** However, in the past fortnight it was Boisi who fell rather than Harrison, much to the amazement of most observers and certainly the bookmakers, who will lose a fortune if Harrison is still there by Christmas.

The situation regarding Mr Harrison is especially interesting to ourselves, and please be assured that we are not, and never have been, shareholders in either Chase Manhattan, JP Morgan or JP Morgan Chase.

***In the aftermath of Enron, Billy Harrison's press was so bad that at one time it didn't look as if he would last until April*** - remember those bounders and scallywags who said that the best double bet was for Billy Harrison and Credit Suisse's Lukas Muhlemann to be gone before the first polka dot bikini could be seen on the Côte d'Azure this summer.

But while Harrison has defied the bookmakers' odds so far, he must, unless he requires the services of a guide-dog, be able to see the writing on the wall. Chase Manhattan wasn't exactly the most sparkling bank in the universe. By adding Flemings, Beacon Group and JP Morgan, did Chase then become a world-beater? Not at all. Instead, the combined JP Morgan Chase was described to us by one Scottish fund manager as a dog's dinner - presumably a West Highland White or a Scottie?

- 17 -

That may be slightly unfair, but when you look at the JPMC share price, you have to ask yourself where it's going. Does he realise his own apparent shortcomings or the possible deficiencies of his subordinates, who are considered to be his most likely successors? We don't think so, when you read that *he intends to stay on for another seven years, ie until he is 65.*

We were almost speechless when we saw that comment, and in the world's main financial centres some irreverent bankers rolled around on the floor with laughter. One prominent private banker in Geneva said: "Mr Harrison must be living in cloud cuckoo land" - and in Switzerland they certainly know their cuckoos. In London, one notoriously aggressive proprietary trader commented: *"The odds on Billy Harrison lasting for seven years are longer than those on the United States winning the World Cup."* [Emphasis added.]

62.    An April 22, 2002 <u>BusinessWeek</u> article on Harrison entitled "The Besieged Banker" noted that Harrison was "under siege" due to his poorly timed, badly executed, and expensive deals and numerous disastrous loans.  Despite JPMC's poor performance under his direction, the article observed that "Harrison stands to earn at least $16 million in merger-related bonuses if the stock recovers to $52, its price the day the [Chase-JP Morgan] deal closed.  His top lieutenants will split $25 million more.  And they have given themselves plenty of time to do it—until 2007, to be exact."  Noting that "[t]he execution of the J.P. Morgan merger wasn't much to write home about," the article observed that:

Unlike a steel mill or auto maker, a bank's assets are people, not plants. But after paying top dollar for J.P. Morgan (3.5 times its book value), Harrison let its people walk. Defections started as soon as the deal closed--despite hefty retention bonuses that could have yielded executives princely sums. Within a year, 25 top former J.P. Morgan executives had left, and Chairman Douglas A. "Sandy" Warner III quit at the end of 2001. "We would have liked some of them to stay," says Harrison. "But I don't think it has cut into the core of what we're about."

- 18 -

63.    The article also observed internal criticisms of Harrison's poor

management:

> In interviews about management style, [JPMC] executives
> invariably quote [former General Electric Co. CEO Jack]
> Welch.  They preface answers with "As Jack says..." and
> few quote Harrison or even mention him unless they're
> asked.  As bank executives tell it, Harrison emphasizes
> what they call "the soft stuff"--management coaches, 360-
> degree reviews, discussing problems until everyone is
> singing in harmony. Trouble is, Harrison has to be more
> than a choirmaster, he needs his managers to make their
> numbers.

64.    A subsequent January 13, 2003 article on Harrison in a <u>BusinessWeek</u>

report on "The Best & Worst Managers" noted that "Some investors speculate that

***Harrison could lose his job by the end of January*** if the bank's fourth-quarter results,

due out mid-month, don't show signs of improvement." (Emphasis added.)

65.    According to analyst Michael Mayo of Prudential Equity: "The biggest

problem of [JPMC's] management, we believe, is lack of capital discipline when it comes

to large strategic acquisitions…"  However, Harrison's lust for corporate conquest

remained unfulfilled and he desperately needed a major event to salvage his career.

66.    The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his
> bank, were so down in the dumps that ***few would have given odds on him
> even surviving the year***, let alone clawing his way back to pull off one of
> the biggest banking mergers of all time.

> Serious business downturns nearly always claim at least one banking
> casualty, and of the American banks, JP Morgan Chase looked easily the
> most vulnerable.

> What's more, ***it seemed to be largely Harrison's fault.*** At the top of the
> bull market, he had forked out $ 32bn in Chase Manhattan equity to
> acquire JP Morgan. [Emphasis added.]

67.     From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22.  By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent.  Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent.  JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

68.     JPMC's involvement in financial scandal also has marked Harrison's tenure.  In particular, JPMC found itself targeted in securities litigation involving Enron, WorldCom, and IPO allocation.

69.     A July 22, 2004 Wall Street Journal article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

70.     On September 18, 2002, The Wall Street Journal published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even

condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

71.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

72.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal, involving allegations that numerous IPOs were manipulated by Wall Street investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

73.    By late 2003, Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582 restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, but which were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.


**Harrison's Secret Deal: The Merger of Jupiter and Apollo**

74.    The fallout from various scandals, as well as his poor business decisions, forced the besieged banker Harrison to conjure yet another massive deal to protect his position.

75.     While JPMC shareholders endured Harrison's reign, James Dimon, Chairman and CEO of Bank One, created substantial value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

76.     According to an article posted July 7, 2004 on Slate.com, entitled "The $7 Billion Ego: Did J.P. Morgan Chase waste billions so its CEO could keep his job?":

> ***Harrison's grip at the helm was growing tenuous. But he saw salvation in yet another deal.*** Chicago-based Bank One, run by the charismatic Citigroup exile Jamie Dimon, seemed like a natural acquisition. Dimon had pulled off an impressive turnaround at Bank One. With his operational expertise and cadre of loyal bankers, Dimon could help improve morale and performance at Chase and eventually succeed Harrison. [Emphasis added.]

77.     During November 2003, Harrison and Dimon commenced negotiations concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

78.     According to a January 15, 2004 CBS Marketwatch.com article, "By December, according to a person at the table, Dimon and Harrison and a few other executives huddled in the conference room of Bank One's M&A law firm, Wachtell Lipton Rosen & Katz."

79.     According to a January 17, 2005 article in Investment Dealers Digest entitled "Putting JPMorgan On the Map," the negotiations were conducted in the utmost secrecy "at an apartment in the Waldorf Towers, a sanctuary a few blocks from

JPMorgan's midtown headquarters that the bank keeps as a permanent venue for quiet meetings with clients." As the merger discussion proceeded, financial advisors came up with the codenames of "Apollo" and "Jupiter" for Bank One and JPMC, respectively, to ensure the secrecy of the negotiations.

80.    The <u>Investment Dealers Digest</u> article reports that "Sources agree that Harrison and Dimon ironed out a lot of the deal's particulars together and that Dimon was clearly interested in succeeding Harrison from the get-go[.]"

81.    According to the Proxy/Prospectus sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations. Thus, the Individual Defendants other than Harrison either were fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to inquire into the details of such negotiations.

82.    According to the Proxy/Prospectus, Harrison briefed the full Board on his discussions with Dimon at a meeting of the JPMC Board (consisting of the Individual Defendants) on November 18, 2003 and the JPMC Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

83.    In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a wholly-owned JPMC subsidiary, as its financial advisor for a fee of $40 million. As the Proxy/Prospectus itself admitted, "[JPMC's] Financial Advisor is an Affiliate of [JPMC] and May be ***Deemed to Have Conflicts of Interest***." (Emphasis added.) This statement was false and misleading because JPMC's financial advisor was not simply a JPMC

- 23 -

affiliate; rather, it was a wholly-owned and controlled subsidiary.  Only by retaining a

conflicted financial advisor could Harrison control the process and justify paying more

than was necessary for Bank One.

84.    The January 19, 2004 <u>Financial Times</u> described the negotiation process:

"There was a ***spectrum of outcomes* in terms of premium and
governance: *Jamie laid them out*** and Bill was very responsive in
December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just
before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance
between two key issues: the price Mr. Dimon would extract for Bank
One's shareholders - later fixed at a 14 per cent premium -- and the ***terms
of his succession***. [Emphasis added.]

85.    Although Harrison wanted to merge JPMC with Bank One, he refused to

relinquish his position as CEO.  Dimon, on the other hand, sought to be CEO

immediately.  Ultimately, Harrison compromised and settled for continuing as CEO of

the combined entity for two years after the Merger, with the expectation of remaining the

Company's Chairman thereafter.  Little did JPMC shareholders know that buying this

extra time for Harrison would cost them ***billions*** of dollars.

86.    Harrison would later claim that he offered a no-premium merger during

the negotiations.  However, Harrison's claims omitted to state material facts necessary in

order to make the statements made, in the light of the circumstances under which they

were made, not misleading.  A January 26, 2004 <u>FORTUNE</u> article entitled "The

Dealmaker and the Dynamo" detailed the negotiations and reported Harrison's claims:

It was early January, and the merger talks between Jamie
Dimon, CEO of Bank One, and William Harrison, his
counterpart at J.P. Morgan Chase, were deadlocked. In the
short time they'd been negotiating, Dimon, a brash boy
wonder from Queens, and Harrison, a courtly Southern

gentleman, had agreed on a host of issues. Succession was a snap: Dimon would get a virtually ironclad guarantee to replace Harrison as CEO in 2006. The board would be split fifty-fifty between Bank One and J.P. Morgan directors. Dimon's most trusted lieutenants would be given key roles in the merged company. Most of all, the two men agreed that if they could pull off this deal, combining Bank One's strong consumer businesses and J.P. Morgan's corporate banking franchise, they could create a true banking colossus—the second largest in America and one that could go toe to toe with giant Citigroup.

What was hanging up the deal was the price. ***Harrison was offering what he calls a "market deal," meaning that J.P. Morgan would simply buy Bank One at its current stock price***—around $45 a share. His reasoning was simple. "We'd been criticized for overpaying on past deals, notably Chase's acquisition of J.P. Morgan in 2000," says Harrison. "I thought that if we paid a big premium again, the market would hammer our stock."

Dimon, however, was demanding a markup north of 20%. Pointing to Bank of America's bid to buy FleetBoston for a gigantic 43% premium in late October, Dimon argued that Harrison would be getting a bargain at 20% to 25% over market. In vintage, ultra-enthusiastic Dimon style, the Bank One CEO insisted that the fit was so compelling that even with a big premium, the market wouldn't discount J.P. Morgan's stock. "Jamie was so excited by the combination that he thought he could sell a high premium deal to investors," says Harrison with a grin. "I disagreed." [Emphasis added.]

87.    However, months later, it was revealed that, in fact, Dimon had been willing to agree to a ***no-premium deal*** if he could be CEO of the combined company immediately.  Thus, Harrison's claim to have offered a "market deal" without disclosing that Dimon was willing to accept such a deal, albeit with one condition, omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

88.     On June 27, 2004, <u>The New York Times</u> published an article by Landon Thomas, Jr., entitled "The Yin, the Yang and the Deal," which shocked the market with the following stunning revelations:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money*** in doing so. Mr. Dimon, always the tough deal maker, ***offered to do the deal for <u>no premium</u>*** *if he could become chief executive immediately, according to two people close to the deal.*
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a premium***, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

89.     The essence of the secret deal, as revealed in "The Yin, the Yang and the Deal," was that Harrison had been presented with an option: (a) merge Bank One into JPMC using an exchange ratio of 1.153,[1] and serve as Chairman but not CEO of the combined Company; or (b) merge Bank One into JPMC using an exchange ratio of 1.32, and serve as both Chairman and CEO of the combined Company.  Harrison chose (a). This secret deal, in effect an option which was exercised, was the most critical term of the Merger.

90.     For Harrison and Dimon this undisclosed provision was plainly the sine qua non of the Merger.  However, Harrison and Dimon knew that JPMC's shareholders would not have approved the Merger had they known of the secret deal.  After all, as set forth below, a substantial number of JPMC shareholders specifically did not want the same person to hold both the Chairman and CEO positions.

---

[1] This exchange ratio would not have represented any premium over the market value of Bank One shares, based on the closing stock prices of JPMC and Bank One on January 14, 2004.  However, given the market's possible anticipation of merger synergies, this lower exchange ratio does not mean that Bank One's price per share would not have surged had the Merger been announced with a 1.153 exchange ratio.

91.     The June 27, 2004 New York Times article was the first opportunity for JPMC stockholders to have discovered that Harrison had turned down a no-premium opportunity and had cut a secret deal.

92.     A January 15, 2004 CBS Marketwatch.com article supports this account: "The [merger] talks ran through Christmas week and during that time, the stickiest issue, succession, was resolved by the two-year compromise."  However, while this account, the January 19, 2004 Financial Times article, and the January 26, 2004 FORTUNE article entitled "The Dealmaker and the Dynamo" all corroborate the portrait of the negotiations in the June 27, 2004 New York Times article, none of the previous articles revealed or even suggested the secret deal.

93.     With the secret deal agreed upon, Harrison presented the proposed Merger to the other Individual Defendants, who knew or should have known about the secret deal.  The Individual Defendants approved the Merger.

94.     After the close of trading on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that they have agreed to merge in a strategic business combination establishing the second largest banking franchise in the United States, based on core deposits. The combined company will have assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen states and top-tier positions in retail banking and lending, credit cards, investment banking, asset management, private banking, treasury and securities services, middle-market, and private equity. With balanced earnings contributions from retail and wholesale banking, the combined company will be well-positioned to achieve strong and stable financial performance and increase shareholder value through its balanced business mix, greater scale, and enhanced efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of directors of both companies, provides for a stock-for-stock merger in which 1.32 shares of JPMorgan Chase common stock will be exchanged,

- 27 -

on a tax-free basis, for each share of Bank One common stock. Based on JPMorgan Chase's closing price of $39.22 on Wednesday, January 14, 2004, the transaction would have a value of approximately $51.77 for each share of Bank One common stock, and would create an enterprise with a combined market capitalization of approximately $130 billion. The premium, based upon the average closing stock prices of JPMorgan Chase and Bank One for the previous month, would be approximately 8 percent and would be approximately 14 percent based on today's closing prices.

Under the agreement, the combined company will be headed by William B. Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. …

95.    As one observer related on eFinancialNews.com on February 8, 2004,

after hearing the announcement of the Merger:

One of the first calls I received was: "That's a hell of a price that Bill Harrison is paying to recruit Jamie Dimon."

…

**Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon just to save his own skin?** [Emphasis added.]

96.    The joint press release made no mention at all of Harrison's rejection of

the opportunity to merge Bank One into JMPC without any acquisition premium.  Nor

did it disclose that Harrison agreed to the premium solely to give himself two more years

as CEO of JPMC.  Accordingly, the joint press release omitted to state material facts

necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading.  Also, the joint press release falsely represented

that Harrison would head the combined Company, when, despite his titles, Dimon would

be the true CEO of JPMC.

97.     Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22.  The drop reflected the unnecessarily dilutive impact of the Merger.  In early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

98.     On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

> Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. ***For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.*** The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".
>
> …
>
> ***Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.*** "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

99.     Harrison acknowledged Dimon's considerable experience with mergers in an interview on CNBC: "Well, I would just say again that Jamie and I have been through as many mergers over the last ten years as any two executives out there combined." Thus, any claim that it was necessary for Harrison to be CEO to secure a smooth transition in connection with the Merger is mere pretext.

100.     The proposed acquisition of Bank One in a stock-for-stock transaction required the approval of JPMC's shareholders, as an amendment to JPMC's certificate of

incorporation was necessary for JPMC to have the corporate authority to issue the shares necessary for the exchange.

101.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

102.    None of the Merger "consideration" came from the Company itself; rather, the stock issued in connection with the Merger, including the stock issued to cover the unnecessary premium, directly lessened the stake of JPMC's pre-Merger shareholders in the resultant entity.  Thus, while the stake of JPMC's pre-Merger shareholders in the resultant entity was diluted by the premium, the Company itself was not affected in any way.  Indeed, neither the Company's assets nor its liabilities nor its income nor its cash flow (nor any other quality in which a corporation can be said to exist) could have been affected in any way by the premium, no matter how large or how small.  By contrast, the size of the premium directly impacted the percentage of the combined Company held by JPMC's pre-Merger shareholders.

103.    Public criticism of the Merger's premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive.  They said JP Morgan is paying too big a premium.  It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

104.    James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know.  It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

105.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

106.    Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

107.    The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  ***All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly funded by JPMC shareholders to secure that benefit for Harrison.***

108. In a January 15, 2004 presentation by the Company's management entitled "Creating Scale, Balance and Shareholder Value," it was stated that "Value of cost savings exceeds premium." This statement has been shown to be false, as the Company's financial performance in the wake of the Merger has disappointed investors; thus far the Merger's cost savings have not exceed the multi-billion-dollar premium. The presentation also misleadingly claimed that the Merger would produce "Value creation for all shareholders" and represented "A Compelling Value Proposition for Shareholders." These statements omitted to state material facts (such as that Harrison rejected the opportunity to merge Bank One into JPMC without paying any premium) necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

109. In connection with the Merger, JPMC amended its by-laws to include the following provisions:

Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase

Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

110.    The Proxy/Prospectus summarized the Merger-related amendments to the

Company's by-laws as follows:

The by-laws of JPMorgan Chase will be amended, effective not later than the completion of the merger, to add a new by-law providing the following:

- that the board of directors has resolved that, effective as of the completion of the merger, Mr. Harrison will continue to serve as Chairman of the Board and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become the President and Chief Operating Officer of JPMorgan Chase; and that Mr. Dimon will be the successor to Mr. Harrison as the Chief Executive Officer of JPMorgan Chase, effective on the second anniversary of the completion of the merger or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of JPMorgan Chase, and that Mr. Harrison will continue to serve as Chairman of the Board following that succession;

- that on the effective date of the merger, the board of directors will be comprised of eight Bank One directors, including Mr. Dimon, and eight JPMorgan Chase directors, including Mr. Harrison;

- that until the date of Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, the number of directors that comprises the full board of directors of JPMorgan Chase will be sixteen; and

- that until Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the governance committee of the board of directors, which will be co-chaired by one former Bank One director and one former JPMorgan Chase director and comprised of an equal number of former Bank One directors and former JPMorgan Chase directors (any deadlocks on the governance committee will be resolved in good faith by the nonmanagement members of the board of directors in a manner intended to preserve the principles of representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

• the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment agreement, prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, or any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of JPMorgan Chase on that date of succession,

• the removal of Mr. Harrison from, or the failure to appoint or reelect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase,

• any determination not to nominate Mr. Harrison or Mr. Dimon as a director of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, and

• any modification, amendment or repeal of, or any adoption of any bylaw provision inconsistent with, the provisions of the by-law amendments described above.

111.    In addition to entrenching himself with the CEO title, Harrison secured for

himself an extraordinarily lucrative severance package, as noted in the Proxy/Prospectus:

> [I]n connection with the [Merger], the severance policy for Mr. Harrison will be amended, effective upon completion of the merger, so that Mr. Harrison's severance will be the greater of (a) $22.2 million or (b) three times his current base salary and three-year average annual cash performance bonus if he is terminated involuntarily without cause prior to the second anniversary of the completion of the merger.

112.    Harrison also obtained nearly $3 million within weeks after the Merger

was announced.  Before his secret deal was revealed, Harrison exercised options on

225,000 shares of JPMC common stock on March 8, 2004, yielding proceeds of

$2,920,320.  At the time of exercise, JPMC's stock price was artificially influenced by

Harrison's incomplete and materially misleading statements about the Merger.

- 35 -

113.    According to an Institutional Shareholder Services report analyzing the Merger: "The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

114.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

115.    Harrison himself endorsed this view at a January 15, 2004 town hall meeting concerning the Merger, during which he stated: "[T]he way we did it was doing a deal that had merger vehicle characteristics, but we're calling this a merger, we're not calling it a purchase."

116.    The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

117.    ***By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other Defendants cost JPMC shareholders over $7 billion of value and substantially diluted their stake in the new, combined company merely so Harrison could remain CEO.***

118.    The Proxy/Prospectus stated that the 1.32 exchange ratio agreed to in connection with the Merger significantly exceeded the "implied exchange ratio from

contribution" based on a variety of financial metrics, confirming the unfairness of the exchange ratio.

119.    The valuation analysis by JPMC's conflicted banker in the Proxy/Prospectus disclosed the following:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
|---|---|---|---|
| | 57.8% | 42.2% | 1.320 |

| | Contribution by JPMorgan Chase | Contribution by Bank One | Implied Exchange Ratio from Contribution |
|---|---|---|---|
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

120.    The valuation analysis by Bank One's banker in the Proxy/Prospectus disclosed the following:

| | Bank One % | JPMorgan Chase% | Implied Exchange Ratio | Premium/ (Discount) to Bank One |
|---|---|---|---|---|
| **Income Statement** | | | | |
| GAAP (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |
| Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
| Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk-Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common | 33.3 | 66.7 | 0.918 | (20.0) |

| | | | | |
|---|---|---|---|---|
| Stockholders' Equity | | | | |
| Tangible Common Stockholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

121.    Revealing that the Merger's exchange ratio offered an extraordinary (and unfair) premium compared to similar transactions (only the premium in the merger between Fleet Financial Group, Inc. and BankBoston Corporation was comparable), the valuation analysis by Bank One's banker in the Proxy/Prospectus also disclosed the following analysis of premiums in comparable transactions:

| | Announcement Date | 1-Day Premium (%) | Ownership (%) |
|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 |
| Travelers Property Casualty Corp. / The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 |
| First Union Corporation / Wachovia Corporation | 4/15/01 | 7 | 73/27 |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 |
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 |
| Dean Witter, Discover & Co./ Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 |

122.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined.  In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Comparing JPMC's performance under Harrison against the performance of Bank One

under Dimon reveals the absurdity of even suggesting that Harrison's service as CEO for two more years was worth billions of dollars.

123.    Despite his poor leadership, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted. Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

124.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

125.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

126.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

127.    London's Sunday Telegraph reported on January 18, 2004:

> JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and***

***they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

128.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

129.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

130.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

131.    An April 19, 2005 article in Bloomberg reported the following comment: "'He is their future,' said Jack Welch, the former CEO of General Electric Co., who has worked as a consultant to JPMorgan, in an interview. 'He's the new guy. It's his company."

132.    The June 27, 2004 New York Times article observed, "William Harrison may be the acquirer in the [Merger], but it is becoming clear that James Dimon and his posse will call many of the shots."

133.    The Australian reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

134.    Retail Banker International reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint."  Retail Banker International quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be

viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

135.    <u>Retail Banker International</u> further observed:

> Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

136.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community. One analyst specifically asked Harrison:

> With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

137.    Harrison's evasive answer omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

> It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me.

138.    Harrison's answer specifically concealed that he had preserved his CEO title only by agreeing to a massive premium in connection with the Merger, at the

expense of pre-Merger JPMC shareholders.  Despite Harrison's assertion that the two-year arrangement represented "a good balance," he specifically concealed the secret deal.

139.    Another analyst on the January 15, 2004 conference call also probed the specific issues of succession and titles:

> Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

140.    Dimon's response to this question omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

> You've got to think a little bit that these are two large organizations coming together.  You want the teams to meld.  I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

141.    Harrison's failure to respond to this clear question, which demonstrated shareholder interest in the two-year arrangement, also represented a failure to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  In fact, Harrison knew that Dimon *had* sought the CEO position immediately.

142.    Despite these clear questions, Harrison concealed that, in fact, he had contemplated a merger of equals with no premium at all for Bank One, and Dimon assuming the CEO position.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to fund a multi-billion-dollar premium for Bank One and receive a smaller share of the combined Company.

143.    Similarly, Dimon also concealed the secret pact at the conference call.

144.    Now that the Merger has been consummated, Harrison has retreated and appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  By contrast, Dimon has managed the operations of the combined Company.  Thus, even though Harrison gave away billions of dollars of value belonging to JPMC shareholders to retain his CEO title for another two years, in many respects Dimon already functions as the de facto CEO of the combined entity.

145.    In addition to his financial reasons, Harrison kept the CEO title to shape a graceful exit for himself.  In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal…."

**The False and Misleading Proxy/Prospectus Violates Federal Securities Laws**

146.    JPMC shareholders were repeatedly encouraged to review the Proxy/Prospectus sent by Defendants to JPMC shareholders on or about April 21, 2004 in connection with the Merger.  For instance, the press release accompanying the announcement of the Merger stated: "Stockholders are urged to read the joint proxy statement/prospectus regarding the proposed transaction when it becomes available, because it will contain important information."

147.    However, the Proxy/Prospectus made no mention at all of the secret deal or the rejection of the opportunity to merge Bank One into JMPC without any acquisition premium.

148.    Although the Proxy/Prospectus represents that the Individual Defendants were regularly kept apprised of the negotiations, not once does the Proxy/Prospectus

- 43 -

advise shareholders that a merger of equals was offered but rejected solely because

Harrison wanted to keep his CEO title.  The Proxy/Prospectus described the negotiation

process in great detail but carefully omitted any reference to the secret deal or the

rejected opportunity:

William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.

During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.

Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of

discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.

The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and

members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

…

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote

of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

149.    The Proxy/Prospectus advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

150.    As investors ultimately learned, and as detailed herein, the statements made in the Proxy/Prospectus issued in connection with the Merger were incomplete and materially misleading (and were known by the Insider Defendants to be misleading at that time, or were recklessly disregarded thereby as such, for the reasons stated herein). At no time during the solicitation of votes from JPMC shareholders was the secret pact between Dimon and Harrion ever disclosed.  Also not disclosed was that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

151.    The omissions in the Proxy/Prospectus were designed by the Insider Defendants to mislead shareholders of JPMC into approving the Merger (and the amendment to JPMC's certificate of incorporation to expand the corporate authorization to issue shares, without which the Merger could not have been consummated) without knowing that Harrison had passed on a nil-premium exchange ratio solely to preserve his

CEO title, which he considered to be in danger.  These statements also materially misled investors as to the true rationale for the Merger and, as such, also operated as a fraud and deceit as to investors who purchased shares of the Company at any time during the Class Period.

152.    On May 25, 2004, in justifiable reliance on the materially deceptive Proxy/Prospectus and having been kept in the dark about the full truth concerning the terms of the deal, JPMC shareholders approved the Merger.  According to a Dow Jones Newswire report on the shareholder meeting:

> While the merger was approved, *some shareholders did express concern that the $58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that *Bank One will get the sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in the last quarter. Bank One will obtain J.P. Morgan's investment-banking expertise, its international capability and half of the company's board of directors, he said. And given the fact that Bank One's Chief Executive James Dimon will take on the role of J.P. Morgan's top officer two years from the conclusion of the merger, the shareholder said, *"It appears as if we're merging into them."*
>
> *The statement was met with loud applause from the shareholders who attended the meeting.* [Emphasis added.]

153.    According to a June 3, 2004 article by David Weidner of <u>CBS MarketWatch</u> entitled "Bank One's Dimon may get early start atop J.P. Morgan":

> The support for an *immediate Dimon regime* became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of the meeting.
>
> "Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst

with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off."

154.    On May 25, 2004, JPMC released the results of the shareholder vote at the annual meeting. The Merger was approved by 68 percent of the votes outstanding.

155.    Among the shareholder proposals put to a vote at the JPMC annual meeting, the proposal that received by far the most support was one recommending that JPMC's Board adopt a resolution requiring the separation of the Chairman and CEO posts. There were 562.5 million votes cast in favor of this proposal, confirming the extraordinary desire of JPMC shareholders to separate the Chairman and CEO posts. The seven other shareholder proposals put to a vote received between 55.1 million votes and 202.6 million votes. Had Harrison accepted Dimon's nil-premium exchange ratio offer, the Chairman and CEO posts would have been separated, with Harrison occupying the Chairman post and Dimon serving as CEO. However, Harrison concealed this opportunity from JPMC shareholders.

156.    With 2,081,783,154 shares entitled to vote at the annual meeting, at least 1,040,891,578 votes had to be cast in favor of the Merger for it to be approved and JPMC's certificate of incorporation amended to reflect the corporate authority necessary to issue enough shares in connection with the Merger. The threshold was exceeded by 374,785,482 votes, but 562,557,770 votes were cast in favor of the shareholder proposal to separate the Chairman and CEO posts.

157.    On July 1, 2004, JPMC completed the Merger. All outstanding shares of Bank One were exchanged for newly-issued shares of JPMC, which opened that day at $38.58 per share and closed at $38.17 per share.

158.    At the time the Merger was declared effective, the materially false and misleading statements contained in the Proxy/Prospectus remained unchanged, and these false statements conditioned Bank One's former shareholders to accept JPMC shares as consideration for the tender of their Bank One shares, and to condition other investors to purchase shares of the combined Company, in the open market pursuant and/or traceable to the materially false and misleading Proxy/Prospectus.

159.    In fact, the statements contained in the Proxy/Prospectus (which was also part of the Registration Statement for JPMC shares issued in connection with the Merger) were each materially false and misleading when made, as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and/or misleading, including:

a.    When the Merger was negotiated and recommended, Defendants did not intend for Harrison to be the true CEO of the combined Company, such that it was false and materially misleading to pretend that this was the intention of Bank One and JPMC prior to the effective time of the Merger, or of JPMC following the effective time of the Merger;

b.    When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio;

c.    When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio because Dimon sought to be the CEO of the combined Company;

d.      A majority of JPMC's Board was not independent as a result of numerous undisclosed financial relationships between certain of the Individual Defendants and JPMC and personal relationships between certain of the Individual Defendants and Harrison, as set forth more fully below;

e.      As a result of Harrison's secret and undisclosed pact with Dimon, Defendants also materially misled investors as to the true structure and rationale of the Merger; and

f.      The Insider Defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon and made such materially false and misleading statements in the Proxy/Prospectus because this allowed Harrison to preserve his CEO title and allowed Dimon to acquire dominance over the combined Company while securing for himself and other Bank One shareholders a premium to the detriment of JPMC shareholders.

160.    Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Proxy/Prospectus, to solicit their approval of the Merger.  JPMC paid for the distribution of the Proxy/Prospectus and for all other efforts to solicit proxies in favor of the Merger.

161.    At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board.  JPMC is vicariously liable for Harrison's actions.

**Damages Sustained by Pre-Merger JPMC Shareholders**

162.    Many shareholders would not have voted in favor of the Merger had they known that Dimon was willing to merge Bank One into JPMC for no acquisition

- 51 -

premium if Harrison would relinquish his CEO title immediately.  In light of their concerns about the hefty amount being paid to merge with Bank One, that information was plainly critical to JPMC shareholders.  The Insider Defendants concealed the information to prevent JPMC shareholders from discovering it and remained silent in the face of a duty to speak.

163.    Plaintiffs and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction.

164.    As a result of the Merger, pre-Merger JPMC shareholders, including plaintiffs and other members of the Class, hold approximately 58 percent of the combined entity.  If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including plaintiffs and other members of the Class, would have held approximately 61 percent of the combined entity.

165.    Sections 102, 161, and 242 of Delaware's General Corporate Law expressly limit the Company's authority to issue shares to the authorization set forth in JPMC's certificate of incorporation and require the direct approval of a majority of shareholders in favor of any expansion of this authority:

§ 102. Contents of certificate of incorporation.

(a) The certificate of incorporation shall set forth:

(4) If the corporation is to be authorized to issue only 1 class of stock, the *total number of shares of stock which the corporation shall have authority to issue....*

§ 161. Issuance of additional stock; when and by whom. The directors may, at any time and from time to time, if all of the shares of capital stock *which the corporation is authorized by its certificate of incorporation to issue* have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock *up to the amount authorized* in its certificate of incorporation.

§ 242. Amendment of certificate of incorporation after receipt of payment for stock; nonstock corporations.

(a) After a corporation has received payment for any of its capital stock, it may amend its certificate of incorporation,

(3) To increase or decrease its authorized capital stock….

(b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

(1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a *special meeting of the stockholders entitled to vote* in respect thereof for the consideration of such amendment or directing that the amendment proposed be *considered at the next annual meeting of the stockholders*….

(2) The holders of the outstanding shares of a class *shall be entitled to vote* as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, *if the amendment would increase or decrease the aggregate number of authorized shares* of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely….The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the *affirmative vote of the holders of a majority of the stock of the corporation*…. [Emphasis added.]

166.    In connection with the Merger, shareholders approved, based on the

defective Proxy/Prospectus, the following amendment to JPMC's certificate of

incorporation:

Article Fourth of the Certificate of Incorporation of the
Surviving Corporation shall be amended by: (i) deleting the
words "FOUR BILLION SEVEN HUNDRED MILLION"
in the first sentence thereof and inserting in its place the
words "NINE BILLION TWO HUNDRED MILLION",
and (ii) deleting the words "FOUR BILLION FIVE
HUNDRED MILLION" in the first sentence thereof and
inserting in its place the words "NINE BILLION".

167.    The Proxy/Prospectus described the necessity of this amendment as

follows:

Because JPMorgan Chase does not currently have a
sufficient number of authorized but unissued and
unreserved shares to complete the merger and related
transactions, the merger agreement also provides that, as
part of the merger, JPMorgan Chase's certificate of
incorporation will be amended to increase the authorized
shares of its common stock from 4,500,000,000 to
9,000,000,000 and, as amended, will be the certificate of
incorporation of the combined company. This amendment
will not be effected unless the merger is approved by
stockholders and completed.

168.    As a result of the misrepresentations and omissions of material facts set

forth herein, including the failure to disclose that Harrison rejected the opportunity to

merge Bank One into JPMC with a nil-premium exchange ratio, JPMC shareholders

voted in favor of amending the Company's certificate of incorporation to allow the

Company to issue far more shares than the Company would have needed to issue had

Harrison agreed to a nil-premium exchange ratio.

169.    Pre-Merger JPMC shareholders were damaged by the lost opportunity to

merge with Bank One without paying any dilutive premium.

170.    The wrongfully-obtained shareholder approval of corporate authority

significantly diluted the stake of pre-Merger JPMC shareholders in the combined

Company.

171.    Given that over 500 million votes were cast in favor of separating the CEO and Chairman titles, Harrison would have been pressured to accept Dimon's no-premium offer (which would have had the effect of separating the CEO and Chairman titles) but for the omission of the secret pact from the Proxy/Prospectus and other statements soliciting votes in favor of the Merger.

## JPMC'S BOARD DID NOT CONTAIN
## A MAJORITY OF INDEPENDENT DIRECTORS

172.    Each of the Individual Defendants other than Harrison received an annual retainer of $75,000, an annual grant of common stock equivalents valued at $170,000 on the date of grant, and several other valuable benefits.  Further, each chairman of a JPMC Board committee received an additional fee of $15,000 per year.  In addition to the reasons set forth below, the extraordinary magnitude of the JPMC director compensation package undermined the independence of each of the Individual Defendants other than Harrison.

### 1. Riley P. Bechtel

173.    Defendant Bechtel was beholden to Harrison because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country.  The Trade Bank of Iraq is managed by JPMC.

174.    The staggering size of this financial relationship shows that JPMC and the Bechtel Group, and their respective CEOs, are mutually interested in their ventures in Iraq.  The importance of this relationship to Bechtel Group is clear from its corporate website, which lists the "U.S. Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage.  Further, the website proudly points out that "Iraq

Infrastructure II," Bechtel Group's second major Iraq contract, is valued at up to $1.8 billion. Bechtel Group depends on the Trade Bank of Iraq to execute its lucrative contractual commitments in rebuilding Iraq's infrastructure. JPMC, headed by Harrison, leads the consortium of banks operating the Trade Bank of Iraq.

175.     Given JPMC's control over the Trade Bank of Iraq, and Bechtel Group's dependence on the Trade Bank of Iraq to execute its projects abroad, future reconstruction work for Bechtel Group would be jeopardized if defendant Bechtel voted against Harrison or otherwise vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. Of course, such friction between Harrison and Bechtel was avoided entirely by Bechtel because it could have harmed any future Bechtel Group projects in which JPMC was in any way involved.

176.     The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry. Nexant purports to be a "provider of technology solutions and experience-based technical and management consulting services to the global energy industry." On September 27, 2000, Nexant completed its first venture investment round, announcing:

> Nexant, Inc., the energy technology and consulting
> company formed by Bechtel Capital Partners LLC earlier
> this year, announced today that it has successfully
> completed its first venture investment round, securing $15
> million in capital from a blue chip group of investors,
> including The Beacon Group, Morgan Stanley Dean Witter,
> the partners of Hellman & Friedman LLC, and Nth Power
> Technologies, Inc. Nexant will use the investment proceeds

to complete development of new technology solutions for the energy industry.

177.    In 1986, Bechtel Group spun off its Bechtel Investments subsidiary into a separate corporation called the Fremont Group, headed by Alan Dachs, Riley Bechtel's brother-in-law.  In addition to their shared interest in Nexant, JPMC (through its J.P. Morgan Fleming Asset Management subsidiary) and Bechtel Group (through the Fremont Group) are co-investors in LightSand Communications, Inc., which manufactures equipment used to transport data in storage area networks.

178.    Defendant Bechtel was also beholden to Harrison because Bechtel Group's financial interests (and thus Bechtel's financial interests) depend on the Export-Import Bank, the official export credit agency of the United States, which has financed or guaranteed numerous loans for Bechtel Group projects abroad.

179.    According to the Export-Import Bank December 2003 annual report, JPMC Senior Vice President Jacqueline A. Kaiko was a member of the Export-Import Bank's advisory committee.  Thus, Ms. Kaiko served in this capacity while the Merger was negotiated.

180.    According to the list of attendees for the Export-Import Bank 2003 Annual Conference, Ms. Kaiko attended on behalf of JPMC, as did the following other JPMC personnel: Maria Adamczyk (Assistant Vice President), Robert Blades (Senior Vice President), Gamal Boulos (Assistant Treasurer), Sergio Chua (Vice President), Charles Dugan (Vice President), Marguerite Gill (Vice President), Joseph Longo (Vice President), Olivera Mladenovic (Vice President), Jo Morrison (Vice President) and M.G. Shetty (Vice President).

181.    Also in attendance at the Export-Import Bank 2003 Annual Conference were three Bechtel Group personnel: Ed Crooks (Business Development Manager, Bechtel Infrastructure), Robert Draggon (Associate Managing Director, Bechtel Enterprises, Inc.), and Arthur Pilzer (Vice President, Bechtel Enterprises, Inc.).

182.    Moreover, (1) according to the Export-Import Bank's list of Delegated Authority Lenders dated November 30, 2004, JPMC was one of the Export-Import Bank's Delegated Authority Lenders, with Ms. Kaiko designated the contact person for JPMC; and (2) Chase Manhattan Bank NA, a JPMC subsidiary, was listed on the Export-Import Bank's Lender Referral List as of June 30, 2004, with Ms. Kaiko designated the contact person.

183.    Thus, as the Merger was being negotiated, future projects abroad for Bechtel Group would be jeopardized if defendant Bechtel voted against Harrison or otherwise vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

184.    The depth of the relationship between the Bechtel Group and JPMC is further corroborated by the fact that former secretary of state George P. Shultz serves on the Bechtel Group board of directors and served as chairman of the International Council of JPMC. Shultz is also a member of the Augusta National Golf Club, as are defendants Bechtel, Harrison, and Bossidy.

185.    As a trained corporate lawyer, Bechtel possessed legal expertise which enhanced his understanding of fiduciary obligations and disclosure obligations under federal securities laws.

186.    Although the Proxy/Prospectus represented that the Individual Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy/Prospectus omitted the full extent of defendant Bechtel's relationship with JPMC, as set forth above. Accordingly, JPMC shareholders were prevented from assessing for themselves Bechtel's purported independence.

**2. Frank A. Bennack, Jr.**

187.    Defendant Bennack has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Hearst-Argyle Television, Inc. ("Hearst-Argyle") is related to The Hearst Corporation, which folded its television holdings into Hearst-Argyle. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

188.    Hearst-Argyle, which is majority-owned by The Hearst Corporation, was formed in 1997 by the merger of the broadcast group of The Hearst Corporation and Argyle Television, Inc. According to his executive biography, Bennack was instrumental in creating Hearst-Argyle. A Hearst-Argyle quarterly report discusses its financial relationship with JPMC as follows:

> *J.P. Morgan Chase & Co.* The lead agent bank under the
> Company's $500 million credit facility entered into in April

1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The outstanding balance on the credit facility was paid off as of September 2003, and the facility matured on April 12, 2004. Frank A. Bennack, Jr., a Director of the Company, served as a Director of J.P. Morgan until July of this year. We expect to enter into a new credit facility for $250 million with J.P. Morgan, and other parties, before the end of the year.

189.    As of September 30, 2004, Hearst-Argyle had approximately $1 billion in long-term debt, amounting to nearly half of its $2.4 billion market capitalization. Thus, Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its credit facility for its operations and to maximize profits. As a leading creditor, JPMC possesses substantial leverage over Hearst-Argyle.

190.    In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-Argyle are co-investors in ProAct Technologies, a privately held corporation in which Hearst-Argyle invested $25 million on March 22, 2000.

191.    According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares of Hearst-Argyle, worth approximately $625,000. Moreover, Bennack's senior position at The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the importance of Hearst-Argyle's success to Bennack. Accordingly, as Hearst-Argyle is indebted to JPMC, and also co-invests with JPMC, Bennack was unlikely to have challenged Harrison. Doing so would have risked incurring the wrath of the head of one of Hearst-Argyle's most powerful creditors, potentially resulting in such repercussions as: (1) a less favorable credit facility for Hearst-Argyle when renewed; (2) increased pressure on Hearst-Argyle from a major creditor; or (3) the elimination of further co-investment opportunities with JPMC. Any of these consequences would have adverse implications for the value of Bennack's investment in Hearst-Argyle, as well as the value

of The Hearst Corporation's investment in Hearst-Argyle. Taken together, Bennack's direct interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

192.   Although the Proxy/Prospectus represented that the Individual Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy/Prospectus omitted the full extent of defendant Bennack's relationship with JPMC, as set forth above. Accordingly, JPMC shareholders were prevented from assessing for themselves Bennack's purported independence.

**3. Lawrence A. Bossidy**

193.   Defendant Bossidy is not an independent director because his son is employed by JPMC as a Vice President who received over $100,000 in compensation from the Company in 2003 (and, according to a publicly-available salary survey of JPMC Vice Presidents, closer to $200,000). Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC. Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement. Even if Bossidy was otherwise a capable and independent director, for the purposes of this

action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

194.    Bossidy's close relationship to Harrison is also demonstrated by the fact that both men serve as directors of Merck & Co., Inc. and are members of the Augusta National Golf Club.

195.    Bossidy is also beholden to Harrison because Bossidy has authored best-selling books on business management and Harrison has assisted Bossidy's efforts to sell the books by lending his name and recommendation to back cover blurbs.

## 4. M. Anthony Burns

196.    Defendant Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

197.    According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth approximately $50 million.

198.    As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders. Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders.  For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time.  In this way, JPMC possesses significant leverage over Ryder.

199.    Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

200.    Although the Proxy/Prospectus represented that the Individual Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy/Prospectus omitted the full extent of defendant Burns' relationship with JPMC, as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Burns' purported independence.

**5. Ellen V. Futter**

201.    Defendant Futter is not an independent director because JPMC is a significant benefactor of The American Museum of Natural History (the "Museum"), of which Futter is President and Trustee.  A former corporate lawyer, Futter earned $470,362 annually from the Museum, according to a May 10, 2003 article in the New York Daily News entitled "Nonprofit execs still sit pretty."  However, according to the same article, Futter was paid $440,000 in connection with her service as a paid director of JPMC, Con Edison, Bristol-Myers Squibb, and American International Group, not

including stock or option awards.  Thus, Futter's compensation for her directorships

represent a substantial and material portion of her total income.

202.    Due to JPMC's extensive philanthropic involvement with the Museum,

Futter could not endanger the Museum's important relationship with JPMC by vigorously

opposing an action by Harrison to favor himself over JPMC's shareholders.  Among

other things, the Museum's Young Naturalist awards are funded by a grant from the J.P.

Morgan Chase Foundation (the "Foundation").  JPMC makes donations through the

Foundation and, according to "The JPMorgan Chase Corporate Responsibility Annual

Report," the Foundation made $312,500 in contributions to the Museum in 2003.  This

carries on JPMC's long-standing support for the Museum, originating with financier J.P.

Morgan's donations of gems and minerals to the Museum's Tiffany-Morgan Collection

of Gems, many of which are on display in the J.P. Morgan Hall of Gems.

203.    In addition to her corporate directorship fees, Futter's career and success

depend on the nurturing and retention of corporate donors such as JPMC.  For Futter to

stand in Harrison's way would not only endanger the Museum's relationship with JPMC,

but also diminish Futter's ability to solicit other large donations from the corporate

community and her desirability as a compliant director.

204.    An article in the June 20, 2003 edition of <u>The Wall Street Journal</u>

specifically profiled Futter and questioned whether she was, in fact, an independent

director:

> *Giving at the Office*
>
> On Corporate Boards, Officials From Nonprofits Spark
> Concern When Directors' Position Helps Raise Funds
>
> When Directors' Positions Help Them Raise Funds, Danger
> of Conflict Follows

Aiding Ms. Futter's Museum

By David Bank And Joann S. Lublin

When companies look for outsiders to join their boards, they often turn to people such as Ellen Futter, the president of the American Museum of Natural History in New York. As corporations see it, the leaders of big nonprofits can bring independence and a broader view of social issues to a board. Ms. Futter serves on four: insurer American International Group Inc., pharmaceutical maker Bristol-Myers Squibb Co., the energy company Consolidated Edison Inc. and J.P. Morgan Chase & Co., the nation's second-biggest bank.

For museum directors, university presidents and other nonprofit leaders, a corporate directorship offers a big plus too: connections that can lead to major donations. All four of the companies on whose boards Ms. Futter sits have made substantial contributions to her museum -- both during her nine years as president and before.

But those contributions create a potential conflict of interest: the possibility that money flowing from companies and their executives will make nonprofit officials beholden to the corporate management they are supposed to monitor.

Exhibit A is Enron Corp. The onetime energy-trading giant, its chief executive and affiliated foundations directed millions in donations during the 1990s to a Houston cancer center headed by Enron director John Mendelsohn, who served on Enron's now-famously-inattentive audit committee. (An Enron spokesman declines to comment. Dr. Mendelsohn has said the center doesn't depend heavily on Enron philanthropy.)

The potential problem goes far beyond the well-publicized Enron example. A Delaware Chancery Court judge ruled just last week that a supposedly independent investigative committee created by Oracle Corp.'s board was in fact fraught with "bias-creating relationships." One conflict: The two directors that constituted the panel -- a pair of Stanford University professors -- were asked to investigate controversial stock sales by fellow board members, some of whom had donated heavily to Stanford. The ruling allowed a shareholder lawsuit to go forward against those board members, including Oracle's chairman and chief executive,

Larry Ellison, who personally and through the company has given millions to Stanford.

Now, concern about this kind of problem is spurring the Nasdaq Stock Market to propose new rules encouraging companies to limit donations to nonprofits whose executives sit on the companies' boards. The New York Stock Exchange also wants to promote directors' independence, but proposals it has made don't specifically target nonprofit conflicts.

It isn't clear yet how tough the exchanges' new rules will be, but several corporate boards have begun to take action in anticipation of new restrictions. All this comes amid wide-ranging efforts to reform corporate boards after a wave of business scandals that boards did little to curtail.

Acting on her own, Ms. Futter resigned last year from the committee of Bristol-Myers directors that oversees the company's audits. She also stepped down last year from the AIG committee that helps set top executive salaries. Ms. Futter wanted to avoid "even the appearance of conflict" between her duties overseeing the companies and her fund raising, a spokeswoman for the natural-history museum says. The expectation of the new rules also factored into Ms. Futter's decisions, the spokeswoman says.

Ms. Futter, who declined to be interviewed, remains on the four corporate boards. She continues to serve on committees such as the Bristol-Myers corporate-governance panel, which considers questions of possible conflicts of interest of board members, among other duties. It's far from certain that the proposed rule changes would force any alteration in her relationships with the companies.

The museum chief's fund-raising success illustrates the potential problem created by nonprofit executives serving on corporate boards. In 2001, she received a bonus of more than $150,000 on top of her $450,000 annual salary, in part for opening the museum's $210 million Rose Center for Earth and Space, according to the museum. On a wall honoring major contributors to the multimedia Rose Center, the list of 34 "friends" includes: Bristol-Myers, Con Edison and the Starr Foundation, which was endowed by AIG's founder and is run by current and former AIG executives. Ms. Futter served on the boards of all of the companies

when they or their related foundations made these contributions.

Bristol-Myers, through the Bristol-Myers Squibb Foundation, was also the primary sponsor of the museum's 1999 exhibit, "Epidemic!" The foundation contributed $1.2 million over four years for the display on infectious diseases. In addition, Bristol-Myers has given the museum a total of $700,000 for other purposes during Ms. Futter's tenure as president.

Ms. Futter, a lawyer by training and a former president of Barnard College in New York, has also raised large amounts of money from companies and foundations to which she has no direct connection. During her time at the museum, giving by the four companies on whose boards she sits has been "consistent with the philanthropic support these corporations have provided historically to the museum before Ms. Futter became president and/or joined these boards," the museum says in a written statement.

She served on the six-member Bristol-Myers audit committee from 1993 until 2002, chairing the panel in 1998 and 1999. In March, Bristol-Myers restated its financial results from recent years, acknowledging that from 1999 through 2001, it had overstated revenue by a total of nearly $2.5 billion. The restatement raised its revenue by $653 million for the first half of 2002. The company's financial reporting is now under investigation by the Securities and Exchange Commission and the Justice Department. The company has said it is cooperating with the government probes and doing its own internal investigation. There is no indication the government inquiries are focusing on board members.

Bristol-Myers says that its contributions to the natural-history museum haven't compromised Ms. Futter's role on its board. "Since 1990, she has provided important independent counsel and guidance to the company," Rebecca Taylor, a company spokeswoman, says.

AIG reached a similar conclusion, says company spokesman Joseph Norton. He points out that the Starr Foundation is for legal purposes independent of AIG. But Maurice Greenberg, AIG's chief executive, serves as chairman of the foundation, and other members of AIG's

board serve on the foundation's board. Mr. Greenberg
serves as a trustee of the natural-history museum, as well.

In 1999, the year Ms. Futter joined AIG's board, the Starr
Foundation committed $10 million over two years to build
the museum's C.V. Starr Natural Science Building, a $35
million, nine-story research facility in New York, with labs,
exhibits and retail space. "We've been funding the museum
long before Ellen was there," says Florence Davis, the
foundation's president and formerly AIG's top in-house
lawyer. "It has nothing to do with her being on AIG's
board."

Anne Canty, the museum spokeswoman, says none of the
corporate contributions had any effect on Ms. Futter's
boardroom decisions. "Ms. Futter's role as a director is
independent of her role as president of the museum," Ms.
Canty says.

Con Ed and J.P. Morgan Chase say they continue to
consider Ms. Futter to be an independent board member.

[…]

205.    Other publications have also criticized Futter for conflicts of interest in

connection with her corporate directorships.  The February 21, 2000 issue of <u>New York</u>

<u>Magazine</u> observed that as "[a] skilled fund-raiser, [Futter] has made the [Museum]

corporate-friendly," and that "Futter -- whose other accomplishments include being the

first woman to chair the board of the New York Federal Reserve Bank as well as

memberships on the boards of Con Edison, Bristol-Myers Squibb, and J.P. Morgan --

tapped her extensive contacts not just for funding but to boost the museum's visibility."

Futter's willingness to capitalize on her corporate directorships has on at least one

occasion drawn fire for blurring corporate interests with Museum interests.  According to

the <u>New York Magazine</u> article:

Take the 1999 exhibit "Epidemic! The World of Infectious
Diseases," sponsored by drug behemoth Bristol-Myers
Squibb. That Charles A. Heimbold Jr., Bristol-Myers's

CEO, sits on the museum's board looked like natural fund-raising synergy. That Futter sits on Bristol-Myers's board had the appearance of conflict of interest. That, as The Nation first reported, Richard Colonno, a Bristol-Myers vice-president, served on a special advisory committee that helped "shape the content of the exhibition" suggested in-house censorship that blunted related issues such as pharmaceutical price-gouging.

206.    Futter's accommodation of corporate interests (especially those of corporations on which she is a director) to bolster the Museum's fund raising efforts and improve her own career was also exposed in connection with her service as a director of AIG, a company which has been recently plagued by scandal. An article entitled "AIG's Secret Connection with Director" in the June 23, 2003 issue of Schiff's Insurance Observer revealed that AIG's proxy statements did not disclose that (a) The Starr Foundation, a charitable foundation affiliated with AIG and controlled by AIG executives, gave $36.5 million to the Museum; or that (b) Hank Greenberg, the recently-deposed CEO of AIG, is a trustee of the Museum. The Schiff's article presented the following question: "Might the fact that The Starr Foundation gave $36.5 million to Futter's museum make her, as an AIG director, disinclined to differ with Hank Greenberg?"

207.    In addition to JPMC's direct philanthropic contributions to the Museum, JPMC also makes payments and channels contributions to the Museum in other ways. For instance, according to the March 28, 2005 BusinessWeek article entitled "Dimon's Grand Design," JPMC sponsors events at the Museum: "One recent winter night, [JPMC] pulled out the stops for a lavish bash at New York's American Museum of Natural History. Among the 200 or so guests were such luminaries as Senator Hillary Rodham

Clinton (D-N.Y.) and Apple Computer Inc. (AAPL) CEO Steven P. Jobs.  It was as much a celebration of the bank as it was a fund-raiser for the Global Fund for Women."

208.    It is reasonable to expect that Futter, the head of an institution dependent on the continued financial support of the corporate community, including JPMC, would not endanger her institution's financial backing, as well as her own career, by standing in the way of Harrison's self-dealing.  Accordingly, Futter must be considered to be beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

209.    As a trained corporate lawyer who spent over five years with the New York corporate law firm of Milbank, Tweed, Hadley & McCloy, Futter possessed legal expertise which enhanced her understanding of fiduciary obligations and disclosure obligations under federal securities laws.

210.    Although the Proxy/Prospectus represented that the Individual Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy/Prospectus omitted the full extent of defendant Futter's relationship with JPMC (and the Museum's relationship with JPMC), as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Futter's purported independence.

**6. Helene L. Kaplan**

211.    Defendant Kaplan was not an independent director because she is a Trustee and Vice-Chair of the Museum, of which, as previously alleged, JPMC is a significant benefactor.  As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm financial footing, among other things, by nurturing and pleasing corporate donors like JPMC.  Like Futter, Kaplan's interest in the Company's continued financial support of the Museum renders her insufficiently independent to assure that she would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

212.    Kaplan is also not independent because, as an attorney with Skadden, Arps, Slate, Meagher & Flom LLP, which receives substantial fees from JPMC, she must be careful not to cross an important client.  Skadden represented Chase Manhattan and Chemical Bank in their merger; Chase Manhattan in its merger with J.P. Morgan; and JPMC in the Merger (performing antitrust and regulatory work).  Skadden also represented JPMC in the Currency Conversion Fee Antitrust class action litigation and, as the Merger was negotiated, was representing JPMC in the WorldCom securities litigation, among other cases.  According to a March 24, 2005 article by Laurie P. Cohen and Robin Sidel in The Wall Street Journal with the headline, "J.P. Morgan's $630 Million Error," subtitled "The Role of a Skadden Arps Lawyer":

> [The primary Skadden partner] had dozens of Skadden
> lawyers on his team, and J.P. Morgan's co-general counsel,
> William McDavid, was heavily involved in guiding
> strategy, say lawyers for other syndicate members. These

> lawyers say the syndicate was paying Skadden some $13
> million in monthly legal fees, a figure that Mr. Kasner
> declined to comment upon.

213.    Upon information and belief, JPMC pays tens of millions of dollars in

legal fees to Skadden, thereby compromising Kaplan's independence.

214.    As a trained and highly experienced corporate lawyer, Kaplan possessed

legal expertise which enhanced her understanding of fiduciary obligations and disclosure

obligations under federal securities laws.

215.    Although the Proxy/Prospectus represented that the Individual Defendants

"determined that each of the non-management directors is independent in accordance

with the director independence definition specified in the Corporate Governance

Practices of JPMorgan Chase's board, which definition includes the independence

standards applicable under the listing standards of the New York Stock Exchange for

independence of board members," the Proxy/Prospectus omitted the full extent of

defendant Kaplan's relationship with JPMC, as set forth above, including without

limitation the substantial legal fees paid by JPMC to Kaplan's law firm and the

Museum's relationship with JPMC.  Accordingly, JPMC shareholders were prevented

from assessing for themselves Kaplan's purported independence.

**7. William H. Gray, III**

216.    Defendant Gray is not an independent director because JPMC is a

National Sponsor of the United Negro College Fund (UNCF), of which Gray was

President and CEO at all relevant times.  An article in the March 31, 2003 edition of

Barron's critiqued the relationship between Gray and Harrison, as well as UNCF and

JPMC:

Sweet Charity

Should the head of a nonprofit be on the compensation committee of one of its corporate donors?

JUST A FEW WEEKS AGO, the annual campaign for the United Negro College Fund began at J.P. Morgan Chase, with a high-spirited reception at the International Center for Photography in New York City. A blizzard of solicitations from bank executives ensued, encouraging employees to donate to the "workplace campaign" through a secure Website or an interactive telephone voice response system.

The longstanding relationship between the two institutions is warm and cozy. The Rockefellers, who founded the Chase Manhattan Bank, were charter supporters of the United Negro College Fund since the UNCF was established in 1944 by Frederick Patterson. A third of the money to be raised from J.P. Morgan Chase supports the John F. McGillicuddy Scholarship Fund, which has awarded $1.4 million in scholarships since 1993. The recipients are students going to United Negro College Fund member schools.

In many ways, the relationship between Bill Harrison, chairman of the bank that's the nation's second-largest after Citigroup, and Bill Gray, is warm and comfortable, too, in the way of men who've served on boards with each other for more than a decade.

Gray, 61, is the United Negro College Fund's chairman and chief executive. A Baptist minister and Democratic congressman from Philadelphia from 1979 to 1991, he is today a director of Dell Computer, Electronic Data Systems, MBIA, Pfizer, Prudential Insurance, Rockwell Automation, Viacom and Visteon. Gray is a director of J.P. Morgan, having become a director of Chase Manhattan just after he gave up his congressional seat in '91. Moreover, he also sits on the bank's compensation committee, along with Bechtel Chairman Riley Bechtel, ExxonMobil CEO Lee Raymond and Wyeth Chairman John Stafford, who heads the committee.

In January 2001, that same group approved a $10 million bonus to Harrison for completing the merger between J.P. Morgan and Chase.

It cut Harrison's stock package last year by 50%. But in January of this year, Harrison got the second $5 million installment of the merger-related bonus, even though, like other financial institutions, J.P. Morgan has been hammered by declines in investment banking, increases in bad debt, legal disputes, regulatory investigations and fallout from its relations with Enron and WorldCom. Since Dec. 29, 2000, the day before the merger became effective, J.P. Morgan stock has fallen by 46.9%. In the same period, the S&P 500 index has slid by 34.2%.

Harrison, in turn, serves as treasurer of the United Negro College Fund. And J.P. Morgan and its employees are some of the fund's largest contributors. Last year J.P. Morgan employees raised some $1.28 million, or an average of $179 per gift, which the J.P. Morgan Chase Foundation matched dollar for dollar. Over the past six years, the contribution has totaled approximately $11 million.

Recently, the annual appeal to J.P. Morgan workers kicked off with a target of $1.37 million -- some 7% above the level achieved last year, even though head count has fallen sharply. Midway through last month, the campaign had already raised $414,000 from 1,893 employees, according to a J.P. Morgan Website. The campaign ends on April 4, and payroll deductions start in June. Those giving at the "leadership level" -- or more than $350 -- will be recognized as "UNCF Leaders" and receive a gift.

Arrangements like the one involving Gray, Harrison and JP Morgan draw fire from corporate-governance experts. "This is known as director interlock -- You scratch my back, and I scratch yours," says Charles Elson, head of the Center for Corporate Governance at the University of Delaware. "If I give money to your foundation and you're on my board, and you serve on the compensation committee, in today's environment, that's a conflict of interest. That individual, in my view, would be classified as a non-independent director and should probably reconsider their service on that board."

Harrison's status as the college fund's treasurer isn't disclosed in J.P. Morgan's proxy statement, including the latest, which was filed Friday. Continues Elson: "From my point of view as a shareholder, I would want that information for voting. I'm surprised it's not disclosed, particularly in today's environment, when discretion is the

better part of valor." Elson draws comparison with the case of Charles A. LeMaistre, a former Enron director who was president of the M.D. Anderson Cancer Center at the University of Texas. The cancer center was promised $600,000 in donations from Enron while LeMaistre served on Enron's board.

In a prominent section of J.P. Morgan's Website that addresses corporate governance, Harrison describes his pride in "the 200-year tradition of integrity on which this firm is built." Each of the bank's directors, the Website relates, is independent. Its definition of independence? "The director has no material relationship with the firm, either directly or as a partner, stockholder or officer of an organization that has a relationship with the firm."

J.P. Morgan declined to comment to Barron's. However, a person familiar with the relationship with the fund stressed that "the vast majority" of contributions came from employees, and that a Chase executive has served as the fund's treasurer since inception, "a tradition that's not questioned and nothing untoward and nobody has seen a problem with this for over 60 years." Finally, this person pointed out, J.P. Morgan's own governance guidelines declare that if the bank accounted for 2% of a not-for-profits' budget, and the nonprofit's executive sits on the bank's board, only "then is that director no longer independent." And, this person points out, J.P. Morgan's contribution accounts for less than 2% of the fund's budget.

Gray wasn't available to comment.

J.P. Morgan certainly isn't another Enron. And the fund is indubitably a worthy recipient: 60% of its scholarships go to people who are the first in their families to attend college. Roughly the same percentage goes to people whose families have annual incomes under $25,000. And half its scholars come from single-parent households.

And the J.P. Morgan Chase contribution last year was just a fraction of the $178.8 million in annual support and revenues pledged to the fund. The J.P. Morgan Chase Foundation and J.P. Morgan Chase Bank gave away $73 million in 2002.

Other J.P. Morgan contributions to the fund included sponsoring its celebrity golf tournament and contributing

about $800,000 to the fund's technology-enhancement
capital campaign, the first year of a two-year commitment.
Sure, raising money for charities is generally a very
worthwhile activity. But there are ways to do it without
creating the potential for a conflict of interest.

Happily, conflicts of interest, while rife, are less so than
they once were, observes Elson of the University of
Delaware. "They are certainly on the decline, given what's
happened with Enron." But in relationships like the one
between Gray and Harrison, "It's not to say [the nonprofit
executive] wouldn't make a good director. But should they
be on this particular board?"

217.    In 2003, JPMC matched nearly $1.3 million in UNCF donations, making

possible a combined total of $2.6 million raised through employee contributions and

matching gifts.  Since 1990, JPMC employees have donated more than $6.6 million to the

UNCF, which when combined with the matching gift and sponsorships, has resulted in a

total contribution of nearly $18.7 million.  The November 3, 2003 issue of Jet, in

reporting Gray's intention to retire as President and CEO of UNCF on March 31, 2004,

observed that Gray had raised over $1.5 billion for the organization.  Thus, the

philanthropic relationship between JPMC and UNCF is significant and long-standing,

and Gray's lauded success in fundraising has been due, in large part, to his ability to

nurture and retain corporate donors such as JPMC.

218.    Gray's financial relationship with JPMC and Harrison's service as

UNCF's treasurer (which is disclosed nowhere in the Proxy/Prospectus) raise serious

doubts that Gray would have vigorously opposed an action by Harrison to favor himself

over JPMC's shareholders.  It would not be reasonable to expect the head of an institution

interested in the Company's continued financial support to stand in the way of Harrison's

self-dealing.  Moreover, Harrison's undisclosed service as UNCF's treasurer further

evidences his close relationship with Gray.  Accordingly, Gray must be considered

beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

219.    According to an article entitled "Fat cats feeding" in the October 9, 2003 edition of The Economist, Gray serves on the boards of eight S&P 500 companies, more than any other director of an S&P 500 company.  According to a July 11, 2003 article by Virginia Citrano in Forbes entitled "Overworked Directors Still Overworked, But Not As Much," Gray is a director of Dell Computer, Electronic Data Systems, JPMC, Pfizer, Prudential Financial, Rockwell Automation, Viacom, and Visteon.  As Gray is not likely to have become wealthy heading a non-profit institution (or serving as a legislator prior to his work heading UNCF), upon information and belief, the substantial directorship fees he receives constitute a material percentage of his income.  Accordingly, Gray is not independent because he depends on directorship fees, including the extraordinary fees he receives as a JPMC director.

220.    Although the Proxy/Prospectus represented that the Individual Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy/Prospectus omitted the full extent of defendant Gray's relationship with Harrison and JPMC, as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Gray's purported independence.

**8. John R. Stafford**

221.    Defendant Stafford has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003.  Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001. Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.  According to a November 19, 2004 filing, JPMorgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

222.    According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million.  JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence.  JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth.  For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price.  JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance.  As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders.  Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to

the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using

its discretion to determine that Wyeth was either undersecured or would be undersecured

within a relatively short time.  In all these ways, JPMC possesses substantial leverage

over Wyeth.  Taken together, Stafford's financial interest in Wyeth and JPMC's

relationship with Wyeth raise serious doubts that he would have vigorously opposed an

action by Harrison to favor himself over JPMC's shareholders.

223.    Although the Proxy/Prospectus represented that the Individual Defendants

"determined that each of the non-management directors is independent in accordance

with the director independence definition specified in the Corporate Governance

Practices of JPMorgan Chase's board, which definition includes the independence

standards applicable under the listing standards of the New York Stock Exchange for

independence of board members," the Proxy/Prospectus omitted the full extent of

defendant Stafford's relationship with JPMC, as set forth above.  Accordingly, JPMC

shareholders were prevented from assessing for themselves Stafford's purported

independence.

## PLAINTIFFS' INVESTIGATION

224.    Plaintiffs' allegations set forth herein are based on a thorough

investigation, conducted by and through counsel, of all reasonably-available sources of

information, in order to obtain information necessary to plead plaintiffs' claims,

including:

a.    The review and analysis of public filings of JPMC and Bank One

with the SEC, as well as documents disseminated to shareholders of JPMC and Bank

One;

b.    The review and analysis of securities analysts' reports and investor advisory services concerning JPMC and Bank One, including without limitation the analyst and advisory reports cited herein;

c.    The review and analysis of JPMC and Bank One press releases and other publicly disseminated statements made by the defendants, including but not limited to documents filed with and available at the SEC's EDGAR database system;

d.    The review and analysis of reports concerning JPMC and Bank One that have appeared in the print and electronic media and computer databases, including without limitation the articles cited herein; and

e.    Interviews of relevant witnesses, including Landon Thomas, Jr., the reporter for The New York Times who first broke the story that Harrison had turned down the no-premium deal opportunity.  Mr. Thomas has extensively followed JPMC for years.  For instance, he previously authored a comprehensive article on JPMC and Harrison entitled "The Two J.P. Morgans" in the October 7, 2002 issue of New York Magazine as well as an article in January 18, 2004 edition of The New York Times on Dimon and the Merger entitled "Dimon's Bank Deal: Big, but Maybe Not His Last."

225.    Except as alleged herein, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plaintiffs and the public, and lie exclusively within the possession and control of defendants and their agents, thus preventing plaintiffs from further detailing defendants' misconduct.

## NO SAFE HARBOR

226.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint because the specific statements pleaded herein either were not identified

as "forward-looking statements" when made or were unaccompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements. To the extent that the statutory safe harbor applies to any of the statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew or had reason to know that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of JPMC or Bank One who knew or had reason to know that the statement was false or misleading.

## COUNT I

## AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 THEREUNDER

227.    Members of the Class who were entitled to vote on the Merger (the "JPMC Holder Class") repeat and reallege each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

228.    This Count is brought pursuant to Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 promulgated thereunder by the SEC [17 C.F.R. § 240. 14a-9] on behalf of the members of the JPMC Holder Class, against JPMC and the Registration Statement Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, and does not sound in fraud.

229.    The defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these defendants solicited proxies from the members of the JPMC Holder Class by means of a Proxy/Prospectus that contained statements which, at the time and in the light of the circumstances under which they were made, were false

and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

230.    As a result, the members of the JPMC Holder Class were denied the opportunity to make an informed decision in voting on the Merger, and received a smaller stake in the combined company than they otherwise would have had the information been disclosed.

231.    The members of the JPMC Holder Class have suffered damages as a result of the Merger which was approved through the use of a proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

232.    The JPMC Holder Class repeats and realleges each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

233.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Holder Class, against the Individual Defendants.

234.    Each of the Individual Defendants was a control person of JPMC by virtue of his/her positions as a director and/or senior officer of JPMC.

235.    Each of the Individual Defendants was a culpable participant in the violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, alleged in Count I, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT III

## AGAINST THE INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

236.    The JPMC Holder Class as well as members of the class who purchased or

otherwise acquired the common stock of JPMC during the Class Period (the "JPMC

Purchaser Class"), repeat and reallege each and every allegation in paragraphs 1 through

227, above, as if fully set forth herein.

237.    This count is brought pursuant to common law, on behalf of the members

of the JPMC Holder Class and JPMC Purchaser Class, against the Individual Defendants

for breach of those defendants' fiduciary duties owed to the members of the JPMC

Holder Class and JPMC Purchaser Class.

238.    Each defendant named herein was a director and/or chief executive officer

of JPMC, and owed to JPMC shareholders the highest obligations of good faith, loyalty,

fair dealing, due care and candor.

239.    By entrenching himself with the CEO title for another two years at a cost

to JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary

duty of loyalty owed to the public shareholders of JPMC.  The other Individual

Defendants also breached their duty of loyalty by approving the Merger with a significant

acquisition premium solely to secure a benefit for Harrison to the detriment of JPMC

shareholders.  The Individual Defendants other than Harrison knew or should have

known of Harrison's secret deal with Dimon and nevertheless they approved and

recommended the Merger to JPMC's shareholders.

240.    The Individual Defendants' fiduciary obligations under these

circumstances required them to evaluate the Merger and obtain the best value for JPMC's

public shareholders.  Instead, the Individual Defendants (1) agreed to the Merger with an exchange ratio presenting a $7 billion premium, funded by JPMC shareholders, to Bank One shareholders just so Harrison could keep his CEO title and (2) failed to disclose to JPMC's shareholders the secret deal, including the opportunity to merge with Bank One without paying any acquisition premium at all.  Acting individually and in concert and aiding and abetting and conspiring with one another, the Individual Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

241.    Each defendant named herein breached and violated his or her fiduciary duties to the members of the JPMC Holder Class and JPMC Purchaser Class to the detriment of those class members by reason of the wrongful conduct alleged above.

242.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium), as set forth above, because at least nine of JPMC's twelve directors were either interested in the improper premium or not sufficiently independent from Harrison.

243.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium) because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC of his secret pact with Dimon.

244.    The entire fairness standard is the proper standard of review for the Merger because, after a reasonable opportunity for further investigation or discovery,

there will likely be evidence showing that Harrison did not inform the other directors of JPMC that he rejected the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio.

245.    The Merger was not entirely fair to JPMC shareholders because, as a result of the rejection of the no-premium merger opportunity, they were deprived of the opportunity to own a larger portion of the combined Company.

246.    As a result of these defendants' breaches of their fiduciary duties, the members of the JPMC Holder Class and JPMC Purchaser Class have suffered, and continue to suffer substantial damages.

## COUNT IV

### AGAINST JPMC AND THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER

247.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

248.    This count is brought pursuant to Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.l0b-5], on behalf of the members of the JPMC Purchaser Class, against JPMC and the Insider Defendants.

249.    The defendants named herein knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they themselves, or a person whom they controlled: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and a course of conduct that operated as

a fraud or deceit upon the members of the JPMC Purchaser Class in connection with their purchases of JPMC securities.

250.     Each of the defendants named herein participated in and joined the alleged scheme and course of conduct specified above, and each is liable primarily for the aforesaid wrongful acts and statements specified above.

251.     As a result of the foregoing, the market prices of JPMC securities were artificially inflated.  In ignorance of the false and misleading nature of the representations described above, the members of the JPMC Purchaser Class relied, to their detriment, directly on the misrepresentations or on the integrity of the market both as to price and as to whether to purchase the securities.  The members of the JPMC Purchaser Class would not have purchased JPMC securities at the market prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' false and misleading statements and concealments.

252.     At the time of the purchase of those securities by the members of the JPMC Purchaser Class, the fair market value of JPMC securities was substantially less than the prices paid.

253.     During the Class Period, shares of JPMC traded as high as $43.84 per share (on March 5, 2004).  However, after the truth about Harrison's secret pact was revealed on Sunday, June 27, 2004, months after the Merger announcement and dissemination of the Proxy/Prospectus, JPMC's stock price fell as low as $37.85 per share the next day, finally closing at $37.95 per share, below its $37.99 per share closing price the previous Friday.  By contrast, the price of the iShares S&P Global Financials Sector exchange-traded fund rose on June 28, 2004 to $59.35 per unit from its previous

closing price of $59.24, and the iShares Dow Jones US Financial Services exchange-traded fund rose that day to $103.04 per unit from its previous closing price of $103.00.

254.    By virtue of the foregoing, the defendants named herein have violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## COUNT V

### AGAINST THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

255.    The JPMC Purchaser Class repeats and realleges each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

256.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Purchaser Class, against the Insider Defendants.

257.    Each of the Insider Defendants was a control person of JPMC by virtue of his positions as a director and senior officer of JPMC or Bank One.

258.    Each of the Insider Defendants was a culpable participant in the violations of Section 10 of the Exchange Act and Rule 10b-5 thereunder, alleged in Count IV, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT VI

### AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

259.    Members of the Class who received JPMC by exchanging Bank One shares for shares of JPMC in connection with the Merger (the "JPMC Exchange Class") repeat and reallege each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

260.    This Count is brought pursuant to Section 11 of the Securities Act [15 U.S.C. § 77k] on behalf of the members of the JPMC Exchange Class, against JPMC and the Registration Statement Defendants for Violations of Section 11 of the Securities Act, and does not sound in fraud.  Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

261.    The Registration Statement (which included the Proxy/Prospectus) was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

262.    JPMC is the Registrant for the Registration Statement.

263.    The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

264.    The defendants named herein are strictly liable to the members of the JPMC Exchange Class for any untrue statement of material fact contained in the Registration Statement, and any omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

265.    The defendants named herein issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose *inter alia* the facts set forth above. By reasons of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, Section 11 of the Securities Act.

266.    The members of the JPMC Exchange Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the Registration Statement.

267.    The members of the JPMC Exchange Class have sustained damages.

268.    At the times they acquired JPMC common stock, the members of the JPMC Exchange Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year elapsed from the time that plaintiffs and members of the JPMC Exchange Class discovered or reasonably could have discovered the facts upon which this complaint is based to the time that this action was commenced. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VII

### AGAINST JPMC AND THE REGISTRATION STATEMENT DEFENDANTS FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT

269.    The JPMC Exchange Class repeats and realleges each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

270.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act [15 U.S.C. § 77l(a)(2)] on behalf of the members of the JPMC Exchange Class, against JPMC and the Registration Statement Defendants, and does not sound in fraud. Allegations of the defendants' knowing or reckless misconduct are not incorporated herein.

271.    The defendants named herein were sellers, offerors, and/or solicitors of sales of the shares offered pursuant to the Proxy/Prospectus.

272.    The Proxy/Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and

concealed and failed to disclose material facts. The solicitation made by the defendants named herein included participating in the preparation of the false and misleading Proxy/Prospectus.

273.    The members of the JPMC Exchange Class acquired JPMC common stock issued pursuant to, or traceable to, and in reliance on, the defective Proxy/Prospectus.

274.    By reason of the conduct alleged herein, the defendants named herein violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.

275.    Accordingly, the members of the JPMC Exchange Class who have sold their shares of JPMC common stock are entitled to rescissionary damages.

276.    Less than one year elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that this action was commenced.  Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public.

## COUNT VIII

### AGAINST THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

277.    The JPMC Exchange Class repeats and realleges each and every allegation in paragraphs 1 through 227, above, as if fully set forth herein.

278.    This Count is brought pursuant to Section 15 of the Securities Act [15 U.S.C. § 77o] on behalf of the members of the JPMC Exchange Class, against the Insider Defendants, and does not sound in fraud.

279.    Each of the Insider Defendants was a control person of JPMC or Bank One by virtue of his positions as a director and chief officer of JPMC or Bank One.

280.    Each of the Insider Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts VI and VII, above, based on their having signed the Registration Statement, and having otherwise participated in the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, plaintiffs demand judgment against defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying plaintiffs as representatives of the Class;

B.    Ordering JPMC to issue 299,269,107 shares[2] of stock to plaintiffs and the other members of the JPMC Holder Class as appropriate to address the misconduct alleged herein;

C.    Declaring and determining that the defendants violated the federal securities laws and common law by reason of their conduct as alleged herein;

D.    Awarding the Class compensatory and punitive damages against defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

E.    Awarding plaintiffs their costs and disbursements, including the fees of plaintiffs' counsel and experts, and reimbursement of expenses; and

---

[2] Where (a) JPMC had 2,081,783,154 shares outstanding on the record date, (b) according to the Proxy/Prospectus, 21 JPMC directors and executive officers (excluded from the Class) owned 16,433,899 shares as a group, and (c) JPMC must issue shares equaling 14.49% of the JPMC Holder Class's holding to restore its interest to 60.75% of the combined Company (which they would have owned had the Merger been consummated using a 1.153 exchange ratio providing no premium for Bank One), then (2,081,783,154 shares - 16,433,899 shares) * 14.49% = 299,269,107 shares.  This quantity is subject to revision upon discovery of, inter alia, the JPMC holdings of other persons excluded from the Class.

   F.  Granting plaintiffs and the Class such other and further relief as the

Court may deem just and proper.

## JURY TRIAL DEMAND

  281.  Plaintiffs hereby demand a trial by jury for all issues so triable.


DATED:  May 23, 2005    Respectfully submitted,

              Joseph N. Gielata (#4338)
              Attorney at Law
              501 Silverside Road, Suite 90
              Wilmington, DE 19809
              (302) 798-1096

              ***Attorney for Plaintiffs***
                ***Samuel I. Hyland and***
                  ***Stephanie Speakman***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>Defendants. | Case No. **1:05-cv-162 (JJF)**<br>**CLASS ACTION** |

## CERTIFICATION OF STEPHANIE SPEAKMAN
## IN SUPPORT OF THE AMENDED CLASS ACTION COMPLAINT

Stephanie Speakman, for her Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.      I reside in New Castle County, Delaware.

2.      I have reviewed the facts and allegations of the amended complaint prepared by counsel and have authorized the filing of the amended complaint.

3.      I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

4.      I held 18,870 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period. Thus, at the close of the Class Period, I retained 18,870 shares. Based on JPMC's stock price on July 1, 2004, when the merger

closed, my economic loss during the Class Period as a result of the alleged violations was $104,366.83.

5.    Samuel Hyland is my son. I approve his retention of Joseph N. Gielata, Esq. to prosecute this action.

6.    I believe that my claims against the defendants are typical of those of other members of the class.

7.    I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

8.    I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial. I intend to pursue this litigation for the best interests of all class members.

9.    During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

10.   I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: May 18, 2005

_____
Stephanie Speakman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>              vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>    Defendants. | Case No. **1:05-cv-162 (JJF)**<br>**CLASS ACTION** |

**CERTIFICATION OF SAMUEL I. HYLAND**
**IN SUPPORT OF THE AMENDED CLASS ACTION COMPLAINT**

Samuel I. Hyland, for his Certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.       I reside in New Castle County, Delaware.

2.       I have reviewed the facts and allegations of the amended complaint prepared by counsel and have authorized the filing of the amended complaint.

3.       I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 14, 2004 through July 1, 2004 (the "Class Period").

4.      I held 300 shares of JPMC common stock at the opening of the Class Period. I did not purchase or sell any shares during the Class Period.  Thus, at the close of the Class Period, I retained 300 shares.  Based on JPMC's stock price on July 1, 2004, when the merger closed, my economic loss during the Class Period as a result of the alleged violations was $1,659.25.

5.      I intend to actively monitor the conduct of this action for the benefit of the class.  I have retained Joseph N. Gielata, Esq. to prosecute this action.  Mr. Gielata is knowledgeable and experienced in securities law and litigation.

6.      I believe that my claims against the defendants are typical of those of other members of the class.

7.      I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

8.      I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial.  I intend to pursue this litigation for the best interests of all class members.

9.      I am the founder and manager of a private business, the Brandywine Cider Company, and received a Master's in Business Administration from Columbia University.  I believe that my business experience and investment sophistication will better enable me to represent the class.

10.      During the three-year period preceding the date of this Certification, I have not served or sought to serve as lead plaintiff in any securities fraud class actions.

11.     I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: May  23 , 2005

/s/ Samuel I. Hyland
_____

Samuel I. Hyland

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DR. STEPHEN BLAU, Individually and
On Behalf of All Others Similarly Situated,

      Plaintiff,

      v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL,
FRANK A. BENNACK, JR., JOHN H.
BIGGS, LAWRENCE A. BOSSIDY, M.
ANTHONY BURNS, LAURENCE
FULLER, ELLEN V. FUTTER, WILLIAM
H. GRAY, III, HELENE L. KAPLAN, LEE
R. RAYMOND, JOHN R. STAFFORD,
and J.P. MORGAN CHASE & CO.,

      Defendants.

Civil Action No. **04C 6592**

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

## SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE* SAMUEL HYLAND AND STEPHANIE SPEAKMAN

*Amici curiae* Samuel Hyland and Stephanie Speakman (together, the "Delaware Plaintiffs"), residents of New Castle County, Delaware and members of the putative class in this action, respectfully submit this supplemental brief to protect the class from any further mismanagement by the conflicted counsel for plaintiff in this action and to clarify the proper venue and leadership of this litigation. On June 21, 2005, the Delaware Plaintiffs were appointed lead plaintiffs in an overlapping class action commenced in the District of Delaware. *See Hyland v. Harrison*, No. 05-162, Order (D. Del. Jun. 21, 2005) (attached hereto as Exhibit A).

By *amici curiae* brief dated May 23, 2005 (the "Amici Brief") (D.E. # 40), the Delaware Plaintiffs previously informed this Court of numerous irregularities attributable

to the putative class counsel in the above-captioned case. Even more troubling facts surfaced subsequently, validating concerns raised in the Amici Brief. (D.E. # 50.)

By minute Order entered June 1, 2005, this Court permitted the parties in this action to file a statement addressing the Amici Brief before July 25, 2005 (D.E. # 46). That deadline passed without any response by the putative class counsel. Indeed, the putative class counsel has repeatedly stalled in responding to defendants' motion to dismiss, such that briefing in Illinois is presently not due to be completed until September 23, 2005. (D.E. # 28, 46, 47, 49, 51, 53.)

Meanwhile, the Delaware Plaintiffs' zealous prosecution of valuable class claims in the District of Delaware proceeds apace. Briefing on the motion to dismiss in that action will be completed by August 1, 2005.[1] If experience is any guide, the answering brief by putative class counsel in this action will largely mirror, if not plagiarize verbatim, the answering brief already filed by the Delaware Plaintiffs on July 11, 2005 (attached hereto as Exhibit B). Given the overlapping class actions present here, this Court may be confronted with the awkward and unnecessary task of adjudicating a controversy already being handled capably in a more appropriate venue. The Amici Brief offers several compelling reasons and options to avert an otherwise inevitable clash of rulings.

An additional reason to refrain from letting this action continue in Illinois is to prevent a "reverse auction" from taking place.[2] Already, evidence of possible collusion

---

[1] Briefing in the appeal of a related action dismissed by Delaware's Court of Chancery is also underway.
[2] Judge Posner has described a "reverse auction" as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (citations omitted). "The ineffectual lawyers are happy to sell out a class they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom line--the sum

has appeared. For instance, although the putative class counsel does not appear to have served the complaint properly on several of the defendants, the latter have refrained from raising such a defense. Indeed, one defendant signaled such a defense in defendants' motion to dismiss (*see* D.E. # 31 at 2 n.2 ("Riley P. Bechtel...was never properly served in this matter.")), but subsequently abandoned it. The timing of this change of heart is plainly suspicious: Bechtel joined in the other defendants' motion to dismiss *just three days* after the date of the Amici Brief. (*See* D.E. # 40 (dated May 23, 2005), 45 (dated May 26, 2005).)[3] The objective of such a gambit is clear: by electing to fight weaker claims, defendants hope to build precedent against the far stronger claims asserted by the Delaware Plaintiffs. No other reason adequately explains the enthusiastic willingness of several of the defendants to defend against claims without proper service of process.

This troubling pattern of accommodation also appears in the voluntary dismissal of defendant Laurence Fuller, as well as the failure to name JPMC President James Dimon, a defendant named by the Delaware Plaintiffs. As to the former, again the timing is telling: the parties jointly requested the dismissal of Fuller *just three days* after the date of the Amici Brief. (*See* D.E. # 40 (dated May 23, 2005), 41 (dated May 26, 2005).) Although Fuller should never have been named in the first place, the unusually-accommodating relationship between the putative class counsel and defendants is out of place in multi-billion-dollar class action litigation.

By contrast, the Delaware Plaintiffs have pressed their claims with maximum vigor, leaving no doubt as to their commitment to the interests of other class members. In addition to asserting several more claims backed by stronger allegations, the Delaware

---

of the settlement and the attorneys' fees--and not the allocation of money between the two categories of expense." *Id.*

[3] Indicating their haste to file, the Notice of Filing still denotes counsel as ***not*** representing Bechtel.

Plaintiffs have also served document-preservation subpoenas on investment bankers and merger lawyers who likely possess relevant evidence. *See Hyland v. Harrison*, No. 05-162, Order (D. Del. May 31, 2005), and underlying filings (attached hereto as Exhibit C). Further, the Delaware Plaintiffs have prosecuted their action without undue delay in an unrelenting quest for a jury trial.

For all the foregoing reasons, including the reasons set forth extensively in the Amici Brief, this Court should disqualify the putative class counsel in this action, vacate the minute Order appointing lead plaintiffs and lead counsel (D.E. # 20), and transfer the above-captioned action to the District of Delaware.

Alternatively, this Court should stay the above-captioned action in favor of the action being prosecuted ably by the Delaware Plaintiffs on a faster schedule.[4]

DATED:       July 27, 2005                    Respectfully submitted,

Joseph N. Gielata
*of the Delaware Bar*
501 Silverside Road, Suite 90
Wilmington, DE 19809
attorney@gielatalaw.com
(302) 798-1096

***Attorney for Amici Curiae***

---

[4] *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.") (citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1975) ("As between federal district courts, …though no precise rule has evolved, the general principle is to avoid duplicative litigation.") (affirming dismissal of concurrent federal proceeding due to, *inter alia*, "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss").

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2005, copies of the foregoing **Supplemental Memorandum of *Amici Curiae* Samuel Hyland and Stephanie Speakman** have been mailed, by U.S. mail, postage prepaid, to the persons listed below:

The Honorable William J. Hibbler
United States District Court
Northern District of Illinois, Eastern Division
Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois 60604

Michael Dobbins, Clerk of Court
United States District Court
Northern District of Illinois, Eastern Division
Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois 60604

Adam Levitt
Wolf Haldenstein Adler Freeman & Herz LLP
55 West Monroe St., Suite 1111
Chicago, Illinois 60603
*Counsel for Plaintiff*

Kathleen L. Roach
Sidley Austin Brown & Wood LLP
10 South Dearborn
Chicago, Illinois 60603
*Counsel for Defendants*

Joseph N. Gielata
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, Delaware 19809
(302) 798-1096
attorney@gielatalaw.com

# Exhibit C

## PLAINTIFF'S CERTIFICATION

Dr. Stephen Blau ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in J.P. Morgan Chase & Co. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|-----------------|-------|
| 1/21/94 | 899.9 | | 11,509 |
| 3/31/94 | 600 | | 7,458 |
| 10/6/94 | 1500 | | 17,473 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __12__ day of __Oct__, 2004.

_SN Blau MD_
Dr. Stephen Blau