# EXHIBIT



## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

The chart below compares certain selections from the amended complaint in *Blau v. Harrison* (and the initial complaint, where applicable) against the consolidated complaint in *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N (Del. Ch.), which was filed over a month before the initial complaint in *Blau* was filed and over four months before the amended complaint in *Blau* was filed.

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

28.    In June 1999, Defendant Harrison became Chief Executive of Chase Manhattan, the predecessor of JPMC, and embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J. P. Morgan in 2000, just before the stock market collapsed.  In a February 23, 2004 interview with Harrison on CNBC, the interviewer noted: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

29.    According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large strategic acquisitions..."  However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

19.    In 1999, Mr. Harrison became Chief Executive of Chase Manhattan, predecessor of J.P. Morgan Chase.  Soon thereafter, he spent more than $40 billion on acquisitions. One such acquisition was the 2000 merger with J.P. Morgan, just prior to the stock market "bubble" popped and the market entered into a prolonged corrective cycle.  Mr. Harrison's propensity for doing "big deals" that simply did not perform well going-forward, was characterized by Prudential Equity analyst Michael Mayo as a function of a "lack of capital discipline when it comes to large strategic acquisitions."  *Interview with CNBC on February 23, 2004.*

NOTE:  The Wolf Haldenstein complaint erroneously attributes Michael Mayo's comment to a CNBC interview.  In fact, Harrison's CNBC interview was with Maria Bartiromo; Michael Mayo's analysis comes from a written report.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

31.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent. Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent. JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

24.    In the face of these scandals and poor strategic decisions, J.P. Morgan Chase shareholders have weathered tough times. From June 1999 to January 14, 2004, J.P. Morgan Chase common stock declined 18 percent, from $48.08 to $39.22 per share. On the other hand, Citigroup stock (a major competitor) climbed 66 percent, and the S&P Financial Index (an index of 81 large banks) increased 16 percent.

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

 32. JPMC's involvement in financial scandal also has marked Harrison's tenure.

 33. On September 18, 2002, The Wall Street Journal published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

 20. Mr. Harrison's tenure has been dogged by controversy, poor performance and scandal as J.P. Morgan Chase has been implicated in some of the largest cases of financial malfeasance with Mr. Harrison providing poor stewardship in the face of these problems.

 21. On September 18, 2002, *The Wall Street Journal* published an op-ed submission by Mr. Harrison in which he strongly rejected any charges of misconduct by J.P. Morgan Chase under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Mr. Harrison concluded: "To say that they [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

<u>EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN</u>

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

34.     Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

35.     On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal.


PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

22.     Despite Mr. Harrison's public protestation of complete innocence, on July 28, 2003, J.P. Morgan Chase paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that J.P. Morgan Chase aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

23.     On October 1, 2003, J.P. Morgan Chase paid an additional $25 million to settle an action brought by the SEC in connection with its role in the IPO allocation scandal.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      37.    Whereas JPMC shareholders have suffered under Harrison's reign, James Dimon, Chairman and Chief Executive Officer of Bank One, has created tremendous value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      26.    Bank One shareholders experienced a remarkably dissimilar fate during a similar period of time. Under Mr. Dimon's leadership, beginning in March 2000 until the Merger in January 2004, Bank One's common stock rose 41 percent while during the same period J.P. Morgan Chase stock fell 38 percent.

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

38.    The fallout from various scandals, as well as his poor business decisions, forced

Harrison to conjure yet another massive deal to protect his position.

30.    The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that *few would have given odds on him even surviving the year*, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, *it seemed to be largely Harrison's fault.* At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

27.    In the face of serious scandals, a declining stock price, and growing

dissatisfaction with his leadership, Mr. Harrison sought out a transaction that would both protect

his position at J.P. Morgan Chase and deflect some of the pointed criticisms directed at him. The

January 18, 2004 *Sunday Tribune* described Mr. Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that few would have given odds on him even surviving the year, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable. What's more, it seemed to be largely Harrison's fault. At the top of the bull market, he had forked out $32bn in Chase Manhattan equity to acquire J.P. Morgan.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

39.    During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

40.    According to the Joint Proxy Statement sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

28.    In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies. They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions. This they did.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN INITIAL COMPLAINT:

28.    In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies. They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions. This they did.

<u>EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN</u>

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      44.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO. Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger. Little did JPMC shareholders know that buying this extra time for Harrison would cost them **billions** of dollars.

      45.     According to a June 27, 2004 <u>New York Times</u> article:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to *give himself the two extra years*, to secure a smooth transition, *although he may have cost J.P. Morgan shareholders extra money* in doing so. Mr. Dimon, always the tough deal maker, *offered to do the deal for <u>no premium</u> if he could become chief executive immediately, according to two people close to the deal.*
>
>     *When Mr. Harrison resisted, Mr. Dimon insisted on a premium*, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

[see next page for plagiarized allegation]

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     30.    Specifically, several news sources have subsequently reported that Mr. Dimon initially offered to merge Bank One with J.P. Morgan Chase in a transaction <u>that would not have required J.P. Morgan Chase stockholders to pay a premium for Bank One's shares</u>. In this way, Mr. Dimon initially proposed a true "merger of equals." Mr. Harrison, however, insisted that he be the surviving entity's CEO for at least two years. This condition was more important to him than whether J.P. Morgan Chase's stockholders ultimately had to pay a higher price than necessary for Bank One in order to consummate the transaction. Reputable newspapers cite several sources corroborating these events.

     31.    For example, as reported in the June 27, 2004 edition of *The New York Times*:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the two extra years, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money in doing so***. Mr. Dimon, always the tough deal maker, ***offered to do the deal for no premium*** if he could become chief executive immediately, ***according to two people close to the deal.***
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent.*** The two men declined to comment on the specifics of their negotiations.

Landon Thomas, Jr., *The Yin, the Yang and the Deal,* N.Y. Times, June 27, 2004, at C1. (Emphasis supplied.)

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

43.    The January 19, 2004 <u>Financial Times</u> described the negotiation process:

"There was a ***spectrum of outcomes*** *in terms of premium and governance:* ***Jamie laid them out*** and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession.*** [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

32.    On July 3, 2004, *The Financial Times* (London) reported on the above-referenced *N.Y. Times* article and <u>quoted an additional</u> source that corroborated Mr. Harrison's insistence that he remain in control, regardless of the cost to J.P. Morgan Chase shareholders, and that it would result in the payment of a premium to Bank One shareholders. According to the article, authored by David Wighton, "'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time." Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay."

NOTE: In fact, the phrase quoted by Wolf Haldenstein comes originally from the July 19, 2004 *Financial Times*, not the July 3, 2004 edition.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      42.    In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million. Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      34.    During November 2003, J.P. Morgan Chase and Bank One each retained financial advisors with respect to the proposed Merger. J.P. Morgan Chase retained one of its own subsidiaries, J.P. Morgan Securities, Inc. to have as its financial advisor, and agreed to pay it $40 million to perform services. This retention of a conflicted financial advisor (indeed, a subsidiary) aided and abetted Mr. Harrison's improper insistence that he retain his position even though it forced J.P. Morgan Chase shareholders to pay an unnecessary premium for Bank One's shares.

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

     50.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     33.    Indeed, the Merger, as it was consummated on July 1, 2004, included a premium of approximately 14% for the Bank One shares (based on the closing price the trading day before the Merger was agreed to and announced), with a provision that Mr. Harrison would remain CEO of J.P. Morgan Chase for two years after completion of the Merger. The agreement also provides that for those two years, Mr. Dimon will serve as President and Chief Operating Officer of J.P. Morgan Chase, after which he will take over as sole CEO. In short, J.P. Morgan Chase shareholders unnecessarily paid greater than a more than $7 billion premium for Bank One, so that Mr. Harrison could remain CEO for two additional years, even though Mr. Dimon was prepared to structure the deal as a "merger of equals" from the outset, assuming he could run the combined entities – which he would anyway eventually run.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

     61.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined. In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Thus, the value of Harrison's leadership to JPMC is dubious at best, especially when compared to the performance of Bank One under Dimon. Nevertheless, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted. Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     41.    That the exchange ratio was unfair to the interests of J.P. Morgan Chase shareholders is evidenced, in part, by the weakness of Mr. Harrison's performance as a CEO when compared to Mr. Dimon's performance while at Bank One's helm. Between the time that Mr. Harrison became CEO in June 1999, and the consummation of the Merger, J.P. Morgan Chase's stock price declined approximately 6%. Notably, according to Michael L. Mayo, a banking analyst at Prudential Securities, J.P. Morgan Chase's stock price performance ranked at the very bottom of the 17 bank stocks he covered, Bank One, on the other hand, which according to Mr. Mayo provided 13% in returns under Mr. Dimon's leadership, sat near the top of his list, ranking at third place. *N.Y. Times*, June 27, 2004.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

42.    In actuality, one of the factors supporting the Merger was the perceived value of Mr. Dimon's leadership.  A fund manager at Victory Capital stated: "[T]he sense on the street is that the day-to-day operations will be run by Jamie ... We have a lot of faith in him." (Quoted in *N.Y. Times*, June 27, 2004.)    One vice president of J.P. Morgan Chase said publicly of Mr. Dimon, "[t]he guy is a rock star." *Id.*

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    62.    Harrison himself acknowledged the underperformance of JPMC under his

leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero
> who can recharge J. P. Morgan's flagging reputation among investors.

> Although his board stood by him through the brutal times, Mr. Harrison
> acknowledged that he had a limited time to turn things around. "If we had gone
> another year without performing, the board probably would have demanded
> changes," he said, leaning back in a plush chair in his office. "There is a point at
> which you can't go on. But in the end, I presume that they liked my leadership."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    43.    In contrast, Mr. Harrison, as noted in *The New York Times*, "has endured two

years of negative publicity as J.P. Morgan's stock plunged to a low of $16, down 70 percent from

its high of $52 in early 2001." *Id.* Even Mr. Harrison conceded the problems under his tenure,

stating, "If we had gone another year without performing, the board probably would have

demanded changes ... [t]here is a point at which you can't go on." *Id.*

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    51.    Public criticism of the premium was immediate. When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive. They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    44.    In addition, once the Merger was announced public criticism of the premium paid to Bank One shareholders was immediate: Lawrence Kudlow observed on CNBC's Kudlow & Cramer program: "[S]ome people I spoke to today said this is too dilutive. They said J.P. Morgan Chase is paying too big a premium. It's great for Bank One shareholders but it's not great for J.P. Morgan Chase, [former] Manny Hanny, [former] Chemical shareholders, etc."

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

52.    James Cramer of Kudlow & Cramer discussed the Merger announcement with

Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?

Mr. VANDERVLIET: I would favor Bank One and Bank One management.

CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?

KUDLOW: Well, I know. It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

45.    James Cramer, also of Kudlow & Cramer, discussed the Merger with Lehman

Brothers Bank Analyst Brock Vandervliet:

CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?

Mr. VANDERVLIET: I would favor Bank One and Bank One management.

CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips—that it's the Bank One upstarts that take it over?

KUDLOW: Well, I know. It's an odd – a lot of people – I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

53.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

54.    Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

46.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

47.    Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", an analyst with Natexis Bleichroeder commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      64.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      48.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of J.P. Morgan getting Jamie Dimon to **[word missing?]** the next chief executive. I guess he is going to be running the show from day one."

NOTE: The "[word missing?]" edit appears to be a typo by a Wolf Haldenstein attorney who noticed that the typist failed to copy the Delaware Complaint's allegation exactly.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

65.    London's <u>Sunday Telegraph</u> reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: *"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."* [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

49.    London's Sunday *Telegraph* reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: *"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."* [Emphasis added.]

NOTE:  The publication cited in these allegations is, indeed, *The Sunday Telegraph*, not the Sunday edition of the Telegraph, as the Wolf Haldenstein attorney presumed.  Had the Wolf Haldenstein attorney performed any investigation at all, he or she would have realized that this is the companion publication of *The Daily Telegraph*.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      50.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital management in Cleveland, specializing in bank stocks. "We have a lot of faith in him." *New York Times, June 27, 2004.*

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    67.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

    68.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    51.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns J.P.MC stock and owned Bank One: "Jamie will run the show."

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    69.    The <u>Australian</u> reported on January 16, 2004:

> "JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[....]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    52.    *The Australian* reported in January 16, 2004:

> "J.P. Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[....] "Dimon brings a new broom to J.P. Morgan, which has a lot of management issues."

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

70.    <u>Retail Banker International</u> reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." <u>Retail Banker International</u> quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

53.    *Retail Banker International* reported on February 11, 2004, that, despite Mr. Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

71.     <u>Retail Banker International</u> further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth

transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

54.     *Retail Banker International* further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking.  Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process.  It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

## EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      55.    The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor. Many observers considered Dimon to be the de facto CEO. *All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC shareholders to secure that benefit for Harrison.*

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      55.    Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor, thereby negating the need to pay Bank One shareholders a premium other than for reasons that served Mr. Harrison's interests.

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    56.    In connection with the Merger, JPMC amended its by-laws to include the

following provisions:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The
> Board of Directors of the Corporation has resolved that, effective as of the
> Effective Time (as defined in the Agreement and Plan of Merger, dated as of

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    56.    Specifically, when the Merger was announced, it was billed as J.P. Morgan

Chase's acquisition of Bank One, thereby justifying a 14% premium or $7 billion in additional

merger compensation. The transaction, however, was, in fact, a "merger of equals." For

example, in connection with the Merger, J.P. Morgan Chase amended it's By-Laws to include

the following:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The
> Board of Directors of the Corporation has resolved that, effective as of the
> Effective Time (as defined in the Agreement and Plan of Merger, dated as of

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:
     57.    According to an Institutional Shareholder Services report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:
     57.    According to an *Institutional Shareholder Services* report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

EXHIBIT A – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

58.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

58.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

# EXHIBIT

# B

**Legal Notice**

Dated: October 15, 2004

Notice: On October 13, 2004, a class action was filed in United States District Court for the Northern District of Illinois - Eastern Division by Wolf Haldenstein Adler Freeman & Herz LLP against J.P. Morgan Chase & Co., along with William B. Harrison Jr., (J.P. Morgan Chase's Chief Executive Officer and Chairman of the Board, and additional officers and directors of J.P. Morgan Chase) on behalf of all those who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy that was issued in connection with such meeting) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation, which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement). The complaint alleges violations of sections 14(a) and rule 14a - 9, and section 20(a) of the Securities Exchange Act of 1934. The action is pending before the Honorable William J. Hibbler and is styled Blau v. Harrison, et al., 04 C 6592.

Specifically, the complaint alleges, among other things, that the merger was consummated following shareholder approval of a 15% premium in favor of Bank One, but defendants never disclosed that Bank One offered to consummate the merger without demanding a premium for its shares and that Defendant Harrison rejected that offer so that he could prolong his executive tenure. This conduct (the facts of which are omitted from the proxy statement's discussions of related issues - namely, the merger negotiation and approval process, the exchange ratio, and Mr. Harrison's continued employment) ultimately cost J.P. Morgan Chase shareholders over $7 billion in merger compensation.

If you are a member of the Class, you may, no later than December 14, 2004, move the Court to serve as lead plaintiff of the Class. Your ability to share in a recovery is not, however, affected by the decision whether or not to serve as the lead plaintiff. If you have any questions concerning this notice or rights with regard to this case, please contact Gregory Mark Nespole, Esq., at Wolf Haldenstein Adler Freeman & Herz LLP, at 270 Madison Avenue, New York New York 10016, 212-545-4600.

# EXHIBIT

# C

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DR. STEPHEN BLAU, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiff,

  v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK A.
BENNACK, JR., JOHN H. BIGGS, LAWRENCE
A. BOSSIDY, M. ANTHONY BURNS,
LAURENCE FULLER, ELLEN V. FUTTER,
WILLIAM H. GRAY, III, HELENE L. KAPLAN,
LEE R. RAYMOND, JOHN R. STAFFORD,
and J.P. MORGAN CHASE & CO.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 04C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

Months after J.P. Morgan Chase & Co. ("JPMC") and Bank One Corporation

("Bank One") merged (the "Merger"), plaintiff sued JPMC and all its then directors[1] based solely

on a single sentence in a *New York Times* article – published before the Merger – attributing to

unnamed sources the statement that during the negotiations leading up to the Merger agreement

Bank One's CEO *"offered to do the deal for no premium* if he could become chief executive

immediately." (Compl. ¶ 31 (emphasis in Complaint, but not in article)).  Plaintiff contends that

defendants are liable under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and

Rule 14a-9(a) of the Securities and Exchange Commission for failing to disclose that alleged

"offer" in the Proxy Statement that sought stockholder approval of the Merger.  For all of the

---

[1] Plaintiff also named Laurence Fuller, who retired from the JPMC board of directors well before the
Merger.  Counsel for the parties have conferred, and plaintiff's counsel has agreed to voluntarily dismiss
Mr. Fuller from the action.

reasons discussed below, the Amended Class Action Complaint ("Complaint") should be dismissed.[2]

First, the putative class lacks standing to bring a private action under Section 14(a). Only those persons who owned JPMC stock as of April 2, 2004—the Proxy record date for voting on the Merger—have the right to bring such an action. The putative class is improperly defined to include persons who did not hold stock at that time, which requires that the Complaint be dismissed.

Second, the Complaint fails to state a Section 14(a) claim, both because it does not satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. Rule 9(b), and because the alleged omission was immaterial as a matter of law. The Complaint does not allege that the actual terms of the Merger (which was approved by the Board of Directors of both banks and by 99.18% of JPMC shareholders) were not adequately described in the Proxy Statement. Rather, the Complaint is based squarely and solely on an "offer" alleged to have been made and rejected during the months of negotiations which preceded the Merger's approval by both Boards of Directors, and bases its allegations as to that purported offer only on one newspaper article that relied entirely upon anonymous sources reportedly "close to the deal." The Complaint fails to allege facts that would establish that these sources were present when the "offer" was made or whether, instead, they heard about it second-, third-, or fourth-hand. For all these reasons, the Complaint fails to allege a legally sufficient basis for plaintiff's Section 14(a) claim.

---

[2] This motion to dismiss is filed on behalf of all defendants except Riley P. Bechtel, who was never properly served in this matter. However, the arguments contained herein are equally applicable to Mr. Bechtel.

Even if plaintiff had alleged with due particularity the making of this supposed "offer," moreover, its omission from the Proxy Statement was immaterial as a matter of law to shareholders who were being called upon not to supervise the negotiations, but rather to approve or reject the Merger terms ultimately agreed upon and approved by both Banks' Boards of Directors. In the absence of any *material* omission from the Proxy Statement, plaintiff's Section 14(a) claim must be dismissed.

Third, because plaintiff fails to allege adequately a predicate underlying violation of Section 14(a), plaintiff's Section 20(a) claim cannot stand.

**BACKGROUND**

JPMC is a global provider of financial services relating to investment banking, treasury and securities matters, investment management, private banking, and other financial and banking functions. (Compl. ¶ 18). In November 2003, JPMC CEO and Chairman William Harrison began discussing the possibility of a merger with James Dimon, then the CEO and Chairman of Bank One, a financial and multi-bank holding company. (Id. ¶¶ 25, 28). On January 14, 2004, the Boards of Directors of both JPMC and Bank One each unanimously approved a stock-for-stock merger in which 1.32 shares of JPMC common stock would be issued to Bank One shareholders for each share of Bank One common stock. (Id. ¶¶ 39, 40).

On April 19, 2004, JPMC and Bank One issued their Proxy Statement (attached as Exhibit A hereto).[3] The Proxy Statement contains a notice of the annual stockholders

---

[3] The Court can consider the Proxy Statement without converting the instant motion to a motion for summary judgment because documents referred to in the Complaint are deemed incorporated into the Complaint. See Pokuta v. Trans World Airlines, Inc., 191 F.3d 834, 835 (7th Cir. 1999) (proper to consider documents referred to or incorporated by reference into plaintiff's complaint). Moreover, in considering defendants' motion to dismiss, the Court should consider the plain language of the Proxy Statement rather than plaintiff's mischaracterization thereof. See, e.g., Sedighim v. Donaldson, Lufkin & Jenrette, Inc., 167 F. Supp. 2d 639 (S.D.N.Y. 2001) ("If . . . allegations of securities fraud conflict with

meeting, which entitled JPMC "[c]ommon stockholders of record at the close of business on

April 2, 2004" to vote. (Ex. A). The Proxy Statement described the specific terms of the Merger

in considerable detail and informed JPMC stockholders that its Board had approved the Merger

on such terms because it "believe[d] that the merger will provide a number of significant

strategic opportunities and benefits," including "enhanced positions in retail financial services,"

a "more balanced business mix and greater geographic diversification," "enhanced opportunities

for wholesale and other financial services businesses," and significant "expected financial

synergies." (Id. at 34–35). The Proxy Statement further informed JPMC shareholders that the

Board considered corporate governance and succession issues, "which the JPMC Board

considered to be of significant importance with respect to CEO succession, continuity of senior

management and effective and timely integration of the two companies' operations." (Id. at 41).

The JPMC Board agreed to an exchange rate that represented a premium to Bank

One shareholders of 8% based on average closing prices of the two stocks for the month

preceding announcement of the Merger, and of 14% based on the stock prices on the day of

announcement. (Id. at 36; see also Compl. ¶ 33). (In the days immediately preceding the

announcement, the price of JPMC stock rose relative to that of Bank One stock, thereby

nominally increasing the premium). (See Ex. A at 36).

The agreement to merge was widely reported in the press when it was announced

on January 14, 2004. (See, e.g., Compl. ¶¶ 27, 37, 49, 52, 53, 54). Suit was immediately filed

against the Bank One Directors charging them with having sold Bank One too cheaply. See

Shaper, et. al. v. Bryan, et. al., No. 04-1175 (Cook Cty. Ill. Ch.) (filed Jan. 21, 2004). The Proxy

---

the plain language of the publicly filed disclosure documents, the disclosure documents control, and the
court need not accept the allegations as true.").