# EXHIBIT

# I

*F I L E D*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUL - 6 2005

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

DR. STEPHEN BLAU, Individually and On )
Behalf of All Others Similarly Situated, )
                                     )      Civil Action No. 04C 6592
        Plaintiff,         )
                                       )      Judge William J. Hibbler
   v.                             )
                                       )      Magistrate Judge Martin C. Ashman
WILLIAM B. HARRISON, JR., HANS W. )
BECHERER, RILEY P. BECHTEL, FRANK A. )
BENNACK, JR., JOHN H. BIGGS, )
LAWRENCE A. BOSSIDY, M. ANTHONY )
BURNS, LAURENCE FULLER, ELLEN V. )
FUTTER, WILLIAM H. GRAY, III, HELENE )
L. KAPLAN, LEE R. RAYMOND, JOHN R. )
STAFFORD, and J.P. MORGAN CHASE & CO., )
                                       )
        Defendants.       )

## AGREED MOTION TO REVISE BRIEFING
## SCHEDULE ON DEFENDANTS' MOTION TO DISMISS

      Plaintiff Dr. Stephen Blau and Defendants William B. Harrison, Jr., Hans W. Becherer,

Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony

Burns, Laurence Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R.

Raymond, John R. Stafford, and J.P. Morgan Chase & Co., respectfully move the Court, by

agreement, to enter an Order revising the current briefing schedule with respect to Defendants'

pending Motion to Dismiss. In support of their Agreed Motion, the parties state as follows:

      1.     Pursuant to the current, Court-ordered, briefing schedule relating to Defendants'

Motion to Dismiss,[1] Plaintiff's opposition to Defendants' Motion to Dismiss is due on July 7,

2005, and Defendants' reply in support of their motion is due on August 4, 2005.

---

[1] On or about June 1, 2005, Defendant Riley Bechtel filed his motion to dismiss. Mr. Bechtel's
motion merely incorporates by reference the other Defendants' dismissal papers in their entirety.
As such, throughout this motion, Plaintiff will refer to the motions to dismiss in the singular,
rather than the plural.

2. Due to a family emergency, Plaintiff's lead attorney in this litigation approached Defendants' counsel and requested a three week extension of the current briefing schedule in order to facilitate the filing of his opposition to Defendants' dismissal motion.

3. Defendants graciously acceded to Plaintiff's request, but, as a result of previously-scheduled and long-planned vacations and other time commitments, Defendants requested a slight further extension of the proposed schedule in order to accommodate their schedules – to which Plaintiff agreed.

4. Should the Court enter an Order adopting the parties proposed modification of the briefing schedule, Plaintiff's opposition memorandum would be due on or before August 15, 2005, and Defendants' reply memorandum would be due on or before September 23, 2005.

**WHEREFORE**, the parties respectfully request that the Court enter an Order extending Plaintiff's deadline to file his response in opposition to Defendants' motion to dismiss through August 15, 2005, and extending Defendants' deadline to reply in support of their motion through September 23, 2005.

**Dated:** July 6, 2005

Respectfully submitted,

Adam J. Levitt
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
(312) 984-0000 (t)
(312) 984-0001 (f)

*Lead Counsel for Plaintiff and the
Proposed Class*

8147

# EXHIBIT

# J

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



**F I L E D**

FEB 1 8 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,

Defendants.

CIVIL ACTION NO. 04C 6592

JUDGE WILLIAM T. HIBBLER

MAGISTRATE JUDGE MARTIN C. ASHMAN

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff, Dr. Stephen Blau, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges (upon the investigation made by and through plaintiff's counsel) which included, *inter alia*, a review of relevant public filings made by J.P. Morgan Chase & Co. ("J.P. Morgan Chase" or the "Company") with the Securities and Exchange Commission ("SEC"), as well as press releases, news articles, and other public statements concerning the Company. Furthermore, this Complaint is based upon plaintiff's personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief, based upon the aforementioned investigation, as to all other matters.

## SUMMARY OF ACTION

1.  This is a class action on behalf of all persons, other than defendants, who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for

voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting (the "Proxy Statement")) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation ("Bank One")), which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement (the "Merger").

2.      The Merger was consummated following J.P. Morgan Chase shareholder approval of a 14 percent premium in favor of Bank One; defendants, however, failed to disclose that Bank One offered to consummate the Merger without receiving a premium for its shares and that J.P. Morgan Chase's Chairman and Chief Executive Officer, Defendant William B. Harrison, rejected that offer so he could prolong his executive tenure. Bank One's Chief Executive Officer James Dimon, only then, following Mr. Harrison's refusal to step-down, demanded that Bank One shareholders receive the 14 percent premium. Mr. Harrison's selfish action (the facts of which are omitted from the Proxy Statement's discussions of related issues – namely, the Merger negotiation and approval process, the exchange ratio, and Mr. Harrison's continued employment) ultimately cost J.P. Morgan Chase shareholders over $7 billion in unnecessary Merger compensation. Plaintiff brings this action to recover damages caused by defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to sections 14(a) and 20(a) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. §§ 78n(a) and 78t(a)] and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.14a-9].

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and section 27 of the Exchange Act [15 U.S.C. § 78aa].

5.     Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Bank One, the entity with which Defendant J.P. Morgan Chase joined in the Merger at issue, is headquartered in Chicago, and many of the material acts alleged herein occurred within this District.

6.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

7.     Plaintiff was a holder of J.P. Morgan Chase common stock at the time the Merger was consummated, and was damaged by defendants' actions, described herein.

8.     Defendant J.P. Morgan Chase is incorporated under the laws of Delaware; it maintains its principal place of business at 270 Park Avenue, New York, NY, 10017.  J.P. Morgan Chase is a financial holding company and global financial services firm; it is engaged in the provision of investment banking, securities, investment management, and other financial and banking services.  J.P. Morgan Chase is traded on the New York Stock Exchange under the symbol "JPM".

9.     Defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H.  Biggs, Lawrence A. Bossidy, M. Anthony Burns, Laurence Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford were, at relevant times, directors of J.P. Morgan Chase.  In addition, William B. Harrison was J.P. Morgan Chase's Chief Executive Officer and Chairman of the Board.

10.     Due to their positions as officers and/or directors, the individual defendants are responsible for the statements in the joint proxy statement (which also served as a prospectus for

J.P. Morgan Chase), dated April 19, 2004 (collectively, with the documents it annexes, the "Proxy Statement"). This is particularly clear given that the individual defendants were all directors of J.P. Morgan Chase, and the proxy statement contained the unanimous recommendation of the Board that the shareholders approve the merger.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who held common stock of J.P. Morgan Chase, on either April 2, 2004 (the record date), or at any time from April 19, 2004 (the proxy date) through July 1, 2004 (the Merger date). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous that joinder of all members is impracticable. According to J.P. Morgan Chase's quarterly report filed on Form 10-Q with the SEC on May 10, 2004, there were 2,082,430,974 shares of the Company's common stock outstanding as of April 30, 2004. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent; they will be notified of the pendency of this action by mail, using a form of notice customarily used in securities class action at the appropriate time.

4

13. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14. Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

15. Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    (a) whether the federal securities laws were violated by defendants' acts as alleged herein;

    (b) whether the Proxy Statement disseminated by defendants to the investing public in connection with the Merger misrepresented and/or omitted material facts concerning the Merger negotiations;

    (c) whether defendants participated in and pursued the improper course of conduct complained of herein; and

    (d) to what extent the members of the Class sustained damages, and the proper measure of damages.

16. A class action is superior to all other available methods of litigation for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

17. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not sufficiently identified as "forward-looking statements" when made, and there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results could differ materially from those in the purportedly forward-looking statements. Moreover, the statements alleged to be false were not accompanied by meaningful cautionary language.

## SUBSTANTIVE ALLEGATIONS

### J.P. Morgan Chase

18. Defendant J.P. Morgan Chase is a global provider of financial services relating to investment banking, treasury and securities matters, investment management, private banking, and other financial and banking functions. As of the end of 2003, it possessed approximately $771 billion in assets, and $46 billion in stockholders' equity.

19. In 1999, Mr. Harrison became Chief Executive of Chase Manhattan, predecessor of J.P. Morgan Chase. Soon thereafter, he spent more than $40 billion on acquisitions. One such acquisition was the 2000 merger with J.P. Morgan, just prior to the stock market "bubble" popped and the market entered into a prolonged corrective cycle. Mr. Harrison's propensity for doing "big deals" that simply did not perform well going-forward, was characterized by Prudential Equity analyst Michael Mayo as a function of a "lack of capital discipline when it comes to large strategic acquisitions." *Interview with CNBC on February 23, 2004.*

6

20.    Mr. Harrison's tenure has been dogged by controversy, poor performance and scandal as J.P. Morgan Chase has been implicated in some of the largest cases of financial malfeasance with Mr. Harrison providing poor stewardship in the face of these problems.

21.    On September 18, 2002, *The Wall Street Journal* published an op-ed submission by Mr. Harrison in which he strongly rejected any charges of misconduct by J.P. Morgan Chase under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Mr. Harrison concluded: "To say that they [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

22.    Despite Mr. Harrison's public protestation of complete innocence, on July 28, 2003, J.P. Morgan Chase paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that J.P. Morgan Chase aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

23.    On October 1, 2003, J.P. Morgan Chase paid an additional $25 million to settle an action brought by the SEC in connection with its role in the IPO allocation scandal.

24.    In the face of these scandals and poor strategic decisions, J.P. Morgan Chase shareholders have weathered tough times.  From June 1999 to January 14, 2004, J.P. Morgan Chase common stock declined 18 percent, from $48.08 to $39.22 per share.  On the other hand, Citigroup stock (a major competitor) climbed 66 percent, and the S&P Financial Index (an index of 81 large banks) increased 16 percent.

**Bank One**

25.    Bank One (prior to its merger with J.P. Morgan Chase) was a financial holding and multi-bank holding company, incorporated in Delaware and headquartered in Chicago.  It

7

was engaged in the provision of various services relating to domestic retail banking, international commercial banking, finance, and credit cards, and the management of trusts and investments, as well as other business and finance related services.

26.     Bank One shareholders experienced a remarkably dissimilar fate during a similar period of time.  Under Mr. Dimon's leadership, beginning in March 2000 until the Merger in January 2004, Bank One's common stock rose 41 percent while during the same period J.P. Morgan Chase stock fell 38 percent.

**The Merger Negotiations**

27.     In the face of serious scandals, a declining stock price, and growing dissatisfaction with his leadership, Mr. Harrison sought out a transaction that would both protect his position at J.P. Morgan Chase and deflect some of the pointed criticisms directed at him.  The January 18, 2004 *Sunday Tribune* described Mr. Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that few would have given odds on him even surviving the year, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

> Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable. What's more, it seemed to be largely Harrison's fault.  At the top of the bull market, he had forked out $32bn in Chase Manhattan equity to acquire J.P. Morgan.

28.     In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies.  They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions.  This they did.

8

29.     These negotiations, however, were not conducted by Mr. Harrison with the best interests of J.P. Morgan Chase shareholders in mind. Mr. Harrison, instead, had an eye toward protecting his own position at J.P. Morgan Chase; he also desired to retain the coveted title of CEO of the combined entity.

30.     Specifically, several news sources have subsequently reported that Mr. Dimon initially offered to merge Bank One with J.P. Morgan Chase in a transaction that would not have required J.P. Morgan Chase stockholders to pay a premium for Bank One's shares. In this way, Mr. Dimon initially proposed a true "merger of equals." Mr. Harrison, however, insisted that he be the surviving entity's CEO for at least two years. This condition was more important to him than whether J.P. Morgan Chase's stockholders ultimately had to pay a higher price than necessary for Bank One in order to consummate the transaction. Reputable newspapers cite several sources corroborating these events.

31.     For example, as reported in the June 27, 2004 edition of *The New York Times*:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the two extra years, to secure a smooth transition, **although he may have cost J.P. Morgan shareholders extra money in doing so**. Mr. Dimon, always the tough deal maker, **offered to do the deal for no premium** if he could become chief executive immediately, **according to two people close to the deal.**
>
> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent.** The two men declined to comment on the specifics of their negotiations.

Landon Thomas, Jr., *The Yin, the Yang and the Deal*, N.Y. Times, June 27, 2004, at C1. (Emphasis supplied.)

32.     On July 3, 2004, *The Financial Times* (London) reported on the above-referenced *N.Y. Times* article and quoted an additional source that corroborated Mr. Harrison's insistence

9

that he remain in control, regardless of the cost to J.P. Morgan Chase shareholders, and that it would result in the payment of a premium to Bank One shareholders. According to the article, authored by David Wighton, "'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time." Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay."

33.     Indeed, the Merger, as it was consummated on July 1, 2004, included a premium of approximately 14% for the Bank One shares (based on the closing price the trading day before the Merger was agreed to and announced), with a provision that Mr. Harrison would remain CEO of J.P. Morgan Chase for two years after completion of the Merger. The agreement also provides that for those two years, Mr. Dimon will serve as President and Chief Operating Officer of J.P. Morgan Chase, after which he will take over as sole CEO. In short, J.P. Morgan Chase shareholders unnecessarily paid greater than a more than $7 billion premium for Bank One, so that Mr. Harrison could remain CEO for two additional years, even though Mr. Dimon was prepared to structure the deal as a "merger of equals" from the outset, assuming he could run the combined entities – which he would anyway eventually run.

34.     During November 2003, J.P. Morgan Chase and Bank One each retained financial advisors with respect to the proposed Merger. J.P. Morgan Chase retained one of its own subsidiaries, J.P. Morgan Securities, Inc. to have as its financial advisor, and agreed to pay it $40 million to perform services. This retention of a conflicted financial advisor (indeed, a subsidiary) aided and abetted Mr. Harrison's improper insistence that he retain his position even though it forced J.P. Morgan Chase shareholders to pay an unnecessary premium for Bank One's shares.

35.     *The Wall Street Journal* also has reported on Mr. Harrison's conduct, citing an additional source familiar with the negotiations.  Specifically, on December 29, 2004, *The Wall Street Journal* reported that "in-house bankers at J.P. Morgan endorsed the $56.9 billion price [Merger] – negotiated by their boss [Harrison] - as "fair"," even though "during the negotiations [Dimon] … suggested selling his bank [Bank One] for billions of dollars less if, among other conditions, he immediately became chief of the merged firm, according to a person familiar with the talks.  The suggestion wasn't accepted by J.P. Morgan."

36.     The discussions concerning the Merger's terms continued during December 2003, when the chief financial officers of the companies met, as did financial advisors for each bank. Messrs. Dimon and Harrison further discussed the key terms of a possible business transaction, including the deal's pricing and executive retention components.  They periodically updated their respective boards on these communications.

37.     Despite Messrs. Dimon's and Harrison's reported meetings to brief their respective Boards, Mr. Harrison, on a February 23, 2004, CNBC interview with Maria Bartiromo, stated that he and Mr. Dimon had "secret meetings" once they "got serious" about doing the deal.  The meetings took place at J.P. Morgan Chase's "suite at the Waldorf" and Mr. Dimon "came out to my [Mr. Harrison's] . . . home in Greenwich one time".   Mr. Harrison additionally stated that only he and Mr. Dimon knew about the details: "Nobody knew any difference between whether we were serious or not except us, so we were just very careful about it."

38.     In early to mid-January 2004, each company's respective boards of directors convened special meetings to consider the Merger's terms.  At these meetings board members reviewed the terms of Mr. Dimon's employment agreement; proposed arrangements for other

11

senior management were also reviewed, along with the exchange ratio and related valuation information as it pertained to each company.

39.     On January 14, 2004, each company's board of directors approved the Merger. After the exchange, former J.P. Morgan Chase shareholders would own approximately 58% and former Bank One shareholders approximately 42% of the combined entity.

40.     Later that day, J.P. Morgan Chase and Bank One announced that they had reached an agreement to merge, subject to regulatory and shareholder approval, in a stock-for-stock transaction. Under the terms of the deal, each Bank One shareholder would receive 1.32 shares of J.P. Morgan Chase for each share of Bank One that they held. No mention was made that Mr. Dimon proposed to structure the transaction absent J.P. Morgan Chase shareholders paying a premium for Bank One, and that the premium was attached subsequently because Mr. Harrison refused to relinquish his position.

41.     That the exchange ratio was unfair to the interests of J.P. Morgan Chase shareholders is evidenced, in part, by the weakness of Mr. Harrison's performance as a CEO when compared to Mr. Dimon's performance while at Bank One's helm. Between the time that Mr. Harrison became CEO in June 1999, and the consummation of the Merger, J.P. Morgan Chase's stock price declined approximately 6%. Notably, according to Michael L. Mayo, a banking analyst at Prudential Securities, J.P. Morgan Chase's stock price performance ranked at the very bottom of the 17 bank stocks he covered, Bank One, on the other hand, which according to Mr. Mayo provided 13% in returns under Mr. Dimon's leadership, sat near the top of his list, ranking at third place. *N.Y. Times*, June 27, 2004.

42.     In actuality, one of the factors supporting the Merger was the perceived value of Mr. Dimon's leadership. A fund manager at Victory Capital stated: "[T]he sense on the street is

that the day-to-day operations will be run by Jamie ... We have a lot of faith in him." (Quoted in *N.Y. Times*, June 27, 2004.) One vice president of J.P. Morgan Chase said publicly of Mr. Dimon, "[t]he guy is a rock star." *Id.*

43. In contrast, Mr. Harrison, as noted in *The New York Times*, "has endured two years of negative publicity as J.P. Morgan's stock plunged to a low of $16, down 70 percent from its high of $52 in early 2001." *Id.* Even Mr. Harrison conceded the problems under his tenure, stating, "If we had gone another year without performing, the board probably would have demanded changes ... [t]here is a point at which you can't go on." *Id.*

44. In addition, once the Merger was announced public criticism of the premium paid to Bank One shareholders was immediate: Lawrence Kudlow observed on CNBC's Kudlow & Cramer program: "[S]ome people I spoke to today said this is too dilutive. They said J.P. Morgan Chase is paying too big a premium. It's great for Bank One shareholders but it's not great for J.P. Morgan Chase, [former] Manny Hanny, [former] Chemical shareholders, etc."

45. James Cramer, also of Kudlow & Cramer, discussed the Merger with Lehman Brothers Bank Analyst Brock Vandervliet:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips—that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know. It's an odd – a lot of people – I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

46.     Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

47.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", an analyst with Natexis Bleichroeder commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

48.     "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of J.P. Morgan getting Jamie Dimon to **[word missing?]** the next chief executive. I guess he is going to be running the show from day one."

49.     London's Sunday *Telegraph* reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

50.     "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital management in Cleveland, specializing in bank stocks. "We have a lot of faith in him." *New York Times, June 27, 2004.*

51.     "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns J.P.MC stock and owned Bank One: "Jamie will run the show."

52.     *The Australian* reported in January 16, 2004:

"J.P. Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….] "Dimon brings a new broom to J.P. Morgan, which has a lot of management issues."

14

53.     *Retail Banker International* reported on February 11, 2004, that, despite Mr. Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

54.     *Retail Banker International* further observed:

> Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

55.     Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor, thereby negating the need to pay Bank One shareholders a premium other than for reasons that served Mr. Harrison's interests.

56.     Specifically, when the Merger was announced, it was billed as J.P. Morgan Chase's acquisition of Bank One, thereby justifying a 14% premium or $7 billion in additional merger compensation. The transaction, however, was, in fact, a "merger of equals." For example, in connection with the Merger, J.P. Morgan Chase amended it's By-Laws to include the following:

Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time tot time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the board and Chief Executive officer of the Corporation and Mr. James Dimon shall become the president and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing J.P. Morgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (I) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing J.P. Morgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing J.P. Morgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing J.P. Morgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c)(i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a

16

Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

57.     According to an *Institutional Shareholder Services* report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

58.     Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

59.     Thus, given the fact the deal was ostensibly the coming together of equal partners, there was no reason for J.P. Morgan Chase shareholders to have paid a 14% premium for Bank One stock (except to satisfy Mr. Harrison's desire to remain in control), especially where it is apparent that both investors and industry analysts recognized Mr. Dimon was to be the leader of the combined entity from the outset and Mr. Harrison's role would be ceremonial going forward.

60.     Further revelations well into late 2004, and early 2005, demonstrate that Bank One shareholders received the better end of the bargain and that the 14 percent premium was unwarranted from the outset. On January 19, 2005, J.P. Morgan Chase (the "combined entity") released fourth-quarter 2004 earnings that reflected an 11% percent decline in quarterly profits because of, in part, higher-than-expected costs stemming from the Merger. J.P. Morgan Chase reportedly expects to spend $4.5 billion because of the deal, up from an earlier forecast of $4

billion. In October 2004, J.P. Morgan Chase previously stated that Merger-related spending would cut fourth-quarter earnings by $300 million, bringing the year's total to $1.1 billion. Based on the quarter's actual results, Merger-related expenses had increased to $324 million.

61.     As detailed above, Mr. Harrison's insistence on retaining his job resulted in J.P. Morgan Chase paying a 14 percent premium for Bank One stock. Since the deal was a stock for stock transaction, it resulted in Bank One shareholders receiving excess J.P. Morgan Chase stock in an amount equal to approximately $7 billion – an amount that Mr. Dimon was initially willing to forego. As a further result, [legacy] J.P. Morgan Chase shareholders suffered unnecessary dilution in their holdings. As became apparent, again, with the release of fourth quarter results for the combined entity, the new company earned $1.67 billion, or 46 cents per share, compared with the $1.86 billion or 89 cents a share, in the prior year's period earned by [legacy] J.P. Morgan Chase. Thus, [legacy] J.P. Morgan Chase shareholders have seen the dilution of their stockholdings, caused by the payment of an unnecessary premium translate into a decline in earnings per share of 43 cents over the prior period.

### FALSE AND MISLEADING STATEMENTS
### IN THE PROXY STATEMENT

62.     The Proxy Statement describing, *inter alia*, the negotiation of the Merger and its final terms (which also served as a prospectus for J.P. Morgan Chase) is dated April 19, 2004, was filed with the SEC in J.P. Morgan's Form S-4/A on April 19, 2004, and, according to J.P. Morgan's website, became effective with the SEC on that date. On April 21, 2004, the Board of Directors of J.P. Morgan Chase again filed the Proxy Statement with the SEC (it had been filed by Bank One on April 20, 2004), and also disseminated it to shareholders. The companies urged their respective shareholders to approve of the agreement.

18

63.     The Proxy Statement was materially false and misleading because it failed to disclose Mr. Dimon's offer to consummate the Merger with no premium in favor of Bank One. This omission forced J.P. Morgan Chase shareholders to make their determinations concerning the Merger in the absence of that material information.  This omission, and the statements rendered misleading thereby, as described below, also artificially depressed the price of J.P. Morgan Chase stock.

64.     The omission of information concerning the better offer, in light of the statements that the Proxy Statement did contain, rendered the document misleading in several material respects.

65.     The Proxy Statement is misleading as to the factors considered by the J.P. Morgan Chase Board in approving the Merger.  These factors (listed in the Proxy Statement at 37-42) are divided into "Strategic Considerations" (relating to business mix, financial synergies, and similar issues), and a list of "Other Factors Considered by the J.P. Morgan Chase Board",  such as (in relevant part):

- the financial analyses and presentations of JPMorgan Chase's financial advisor and its opinion that the exchange ratio was fair, from a financial point of view, to JPMorgan Chase...;

* * *

- the fact that the exchange ratio represented a premium of 8% based on the average closing prices of JPMorgan Chase and Bank One common stock during the one month prior to announcement of the merger and a premium of 14% over the closing price of Bank One common stock on the date of announcement of the merger;

- the determination that an exchange ratio that is fixed and not subject to adjustment is appropriate to reflect the strategic purpose of the merger and consistent with market practice for mergers of this type and that a fixed exchange ratio fairly captures the respective ownership interests of

19

the JPMorgan Chase and Bank One stockholders based on fundamental valuation assessments and avoids fluctuations caused by near-term market volatility; [and]

- the corporate governance provisions established for the transaction, including the post-merger board composition, the Chief Executive Officer succession arrangements, the employment agreement with Mr. Dimon and the designation of key senior management of the combined company, which the JPMorgan Chase board considered to be of significant importance in assuring certainty with respect to Chief Executive Officer succession, continuity of senior management and an effective and timely integration of the two companies' operations.

66.     Notably missing from this list was any mention of Mr. Dimon's offer to enter into the Merger with no premium for Bank One's shares.

67.     Similarly misleading is the list of risk factors that the Proxy Statement indicates that the J.P. Morgan Chase board considered with respect to the Merger. This includes a number of issues, including "Potential conflicts of interest of J.P. Morgan Chase officers and directors in connection with the merger" (Proxy Statement at 42), and references a later section, which identifies among such conflicts (in most relevant part):

*JPMorgan Chase Management Positions*. The merger agreement provides that Mr. Harrison, JPMorgan Chase's current Chairman and Chief Executive Officer, will remain Chairman and Chief Executive Officer of JPMorgan Chase until the second anniversary of the completion of the merger, at which time (or any earlier time that Mr. Harrison ceases to serve as Chief Executive Officer) Mr. Dimon will succeed him as Chief Executive Officer, and Mr. Harrison will thereafter continue to serve as Chairman. In addition, other members of JPMorgan Chase management will serve in senior management positions at the combined company. (Proxy Statement at 66).

These warnings about risks and conflicts of interest are misleading in the absence of a mention that Mr. Harrison rejected an offer of exchange with no premium to protect his own position.

20

68.     In fact, the Proxy Statement is misleading each time it discusses the retention agreements for Harrison and Dimon.  For example, in addition to the statements identified elsewhere herein, it states:

> Some of the directors and executive officers of JPMorgan Chase and Bank One have interests in the merger that are different from, or are in addition to, the interests of stockholders of JPMorgan Chase and Bank One. These interests include:
>
> • the agreed-upon appointment of various members of senior management of JPMorgan Chase and Bank One to senior management positions at JPMorgan Chase after the merger [of which the Proxy Statement indicates that the board was aware when deciding to approve the merger]. (Proxy Statement at 8-9)

69.     Similarly, the Proxy Statement also says:

> • Following the merger, Mr. Harrison will continue to serve as Chairman and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become President and Chief Operating Officer of JPMorgan Chase. As part of the merger, the parties have agreed that as of the second anniversary of the completion of the merger (or, if earlier, when Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer), Mr. Dimon will become Chief Executive Officer of JPMorgan Chase. Mr. Harrison will continue to serve as Chairman of JPMorgan Chase following the date of Mr. Dimon's succession as Chief Executive Officer. (Proxy Statement at 9.)

and:

> ...Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.
>
> * * *
>
> JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements ..." (Proxy Statement at 36.)

21

70.    All discussions concerning Mr. Harrison's and Mr. Dimon's employment arrangements post Merger were misleading because they failed to mention that the arrangements were executed at the cost of over $7 billion to J.P. Morgan Chase shareholders.

71.    The Proxy Statement's discussion of the exchange ratio, as well as the negotiation and fairness thereof, is also misleading, because it fails to mention that the premium included in such exchange ratio could have been avoided.  In addition to the statements identified above in connection with the Board's discussion of "Other Factors Considered by the JPMorgan Chase Board", the Proxy Statement states, for example, that:

> During these discussions [in late November and into December], the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, ***and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio***.  (Proxy Statement at 35.) (Emphasis supplied.)

72.    The Proxy Statement further states:

> [On January 14, at a special meeting of the JPMorgan Chase board to consider the deal] JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the Merger was fair, from a financial point of view, to JPMorgan Chase.  (Proxy Statement at 37.)

73.    The Proxy Statement is further misleading when it states, generally, that the board of directors reviewed the Merger and approves of it.  Statements such as "The JPMorgan Chase board of directors has determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement," (Proxy Statement at 7) are misleading, because in making such them, defendants are silent as to whether they considered Mr. Dimon's superior offer.

74.     Other misleading statements of this type in the Proxy Statement are:

(a)     Each of our boards of directors unanimously recommends that stockholders vote FOR the merger. We strongly support this combination of our companies and join our boards in their recommendations. (Letter from Harrison.)

(b)     The JPMorgan Chase board of directors unanimously determined that the merger, the merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously approved the merger agreement.   The JPMorgan Chase board unanimously recommends that JPMorgan Chase stockholders vote "FOR" adoption of the merger agreement.   (Proxy Statement at 42.)

(c)     "WHEREAS, the Boards of Directors of JPMorgan Chase and Bank One have approved, and deem it advisable and in the best interests of their respective stockholders to consummate, the business combination transaction provided for herein in which Bank One would merge with and into JPMorgan Chase (Merger Agreement annexed to the Proxy Statement at A-1.)

(d)     "A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence.

* * *

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also

23

attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements … JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors…. [And]…discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors."

\* \* \*

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. …*Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by*

24

> *those agreements, and resolved to recommend that its*
> *stockholders vote to adopt the merger agreement.* (Proxy
> Statement at 36-37.) (Emphasis supplied.)

75.     The Proxy Statement is also misleading in its description of J.P. Morgan

Chase/J.P. Morgan Securities's analysis of comparable transactions. It states that:

> JPMorgan Chase believes that an assessment of the pro forma
> impact of the proposed merger on a cash basis as well as a GAAP
> basis facilitates consistent and meaningful comparisons between
> the effects of the proposed merger and the effects of *other*
> *comparable financial services mergers* on a basis unaffected by
> those company-specific variations and facilitates trend analysis
> between reporting periods on a basis unaffected by variations in
> amortization levels. (Proxy Statement at 39.) (Emphasis supplied.)

76.     This is followed several pages later by a statement that JP Morgan Securities (J.P.

Morgan Chase's financial advisor) that it was setting forth a chart of comparable transactions. It

described such chart in the following manner:

> Comparable Transactions. Using publicly available information,
> JPMorgan Securities examined the following transactions
> involving U.S. banks with transaction values greater than $10
> billion since 1997. (Proxy Statement at 50.)

77.     Obviously, any discussion of comparable transactions is misleading without

mention of the most comparable transaction of all, a merger of the same two companies, absent

the share premium for the Bank One shares.

78.     On May 25, 2004, shareholders of J.P. Morgan Chase and Bank One voted during

their respective annual meetings to approve the Merger. The Proxy Statement provided in

connection with that merger contained statements that were, as described above, materially false

and misleading when made, as they misrepresented and/or omitted then existing facts which the

Company was required to disclose in order to make the statements not false and/or misleading,

including, but not limited to: (a) an offer was made to complete the Merger with no premium for

the Bank One shares; and (b) Mr. Harrison rejected this offer to protect his executive position at J.P. Morgan Chase.

79.     Had the negotiation process been characterized appropriately, the Company would have had to report this offer, and shareholders would have had the opportunity to vote their proxies with the full information in hand. This information was material. Accordingly, the Proxy Statement was materially misleading at all relevant times.

80.     All of the defendants are liable for the statements in this Proxy Statement. It is the filing of defendant J.P. Morgan Chase, and it reflects the deliberations and unanimous recommendation of the Board of Directors, on which each of the individual defendants sat.

## FIRST CLAIM

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 of the SEC
### (Against All Defendants)

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Count is asserted against all defendants.

82.     This cause of action is brought by plaintiff pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78(n)(e) and Rule 14a-9(a) promulgated thereunder on behalf of all persons, other than defendants who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation), which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement. This claim is brought against all defendants and does not sound in fraud.

83.     Section 14(a) of the Exchange Act provides that "it shall be unlawful for any person ... in contravention of such rules and regulations as the Commission [SEC] may prescribe ... to solicit ... any proxy or consent or authorization in respect of any security ... registered pursuant to ... this title." Exchange Act § 14(a), 15 U.S.C. § 78n(a).

84.     Rule 14a-9(a) promulgated thereunder provides that "no solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...." 17 C.F.R. § 240.14a-9(a).

85.     J.P. Morgan Chase and Bank One filed and disseminated the Proxy Statement seeking shareholder votes in support of J.P. Morgan Chase's planned merger with Bank One and outlined the factors giving rise to the Merger and the conditions of the agreement.

86.     This Proxy Statement was false and misleading in that it failed to disclose material facts about Mr. Dimon's offer on behalf of Bank One to engage in a transaction with no premium for the Bank One shareholders. This disclosure was necessary to make the disclosures that were made not misleading.

87.     The Defendants were negligent in disseminating the Proxy Statement with these materially false and misleading statements.

88.     The omissions and false and misleading statements in the Proxy Statement were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would have viewed a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

89.     The omissions and false and inaccurate statements made in the Proxy Statement concerning the negotiation of the Merger, with its exchange ratio of 1.32 shares of J.P. Morgan Chase common stock for each of the common stock of Bank One, were material.

90.     By reason of the foregoing, defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) of the SEC and are liable to plaintiff and all other members of the Class who held stock in J.P. Morgan Chase that were exchanged for Bank One shares pursuant to the J.P. Morgan Chase/Bank One Merger.

91.     Each shareholder has been damaged, in a total amount to be determined at trial, as a direct and proximate result of such violations, because they were denied the opportunity to make an informed decision in response to the proposed transaction with respect to the Merger premium, which resulted in the Merger being consummated with an unnecessary premium that would otherwise have not been approved.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     The individual defendants acted as controlling persons of J.P. Morgan Chase within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors (and in the case of Mr. Harrison, Chief Executive Officer), and, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, they had the power to influence and control and did influence and control, directly or indirectly,

the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

94.     Individual defendants Bennack, Biggs, and Burns also were members of J.P. Morgan Chase's audit committee and thus were responsible for oversight of the CEO's and senior management's "responsibilities to maintain compliance with JPMorgan Chase's ethical standards, policies, plans and procedures, and with laws and regulations," (Proxy Statement at 119), Defendants Bechtel, Gray, Raymond, and Stafford were also members of the Compensation & Management Development Committee, and thus would reasonably have been expected to be involved in the decisions about Mr. Harrison's retention after the Merger.

95.     Each of the individual defendants was provided with or had unlimited access to copies of the Company's proxy statements and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In particular, each of the individual defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In addition, as the Proxy Statement sets forth at length, and as described herein, the individual defendants were all involved in negotiating, reviewing and approving the Merger.  The Proxy Statement describes the various issues and information that they reviewed and considered, descriptions which must have had input from the directors themselves.  The Proxy Statement at issue contained the unanimous recommendation of each of the individual defendants to approve the Merger.  They were thus directly involved in the making of this document.

29

97.     Individual Defendant Harrison was the recipient of Mr. Dimon's offer to join the two companies with no premium for the Bank One shares.

98.     By virtue of the foregoing, the individual defendants have violated Section 20(a) of the Exchange Act.

99.     As set forth above, J.P. Morgan Chase and the individual defendants each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with the exchange of J.P. Morgan Chase shares for Bank One shares at the time the Merger was completed.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

100.    Determining that this action is a proper class action, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

101.    Awarding compensatory damages (including but not limited to recisionary damages) in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

102.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

103.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**Dated:** February 18, 2005

Respectfully submitted,

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLC**

By:

Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois. 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email: levitt@whafh.com

**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
Gregory M. Nespole
Gustavo Bruckner
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: nespole@whafh.com

*Lead Counsel for
Plaintiff and the Proposed Class*

**LAW OFFICE OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

*Additional Counsel for
Plaintifs and the Proposed Class*

7333

31

# EXHIBIT

# K

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re J.P. MORGAN CHASE & CO. Shareholder
Litigation
**No. Civ.A. 531-N.**

Submitted Jan. 27, 2005.
Decided April 29, 2005.

Seth D. Rigrodsky , Ralph N. Sianni , Milberg Weiss
Bershad & Schulman LLP , Wilmington, Delaware;
Steven G. Schulman , Richard Weiss , Milberg Weiss
Bershad & Schulman LLP , New York, New York;
Peter D. Bull , Bull & Lifshitz, LLP, New York, New
York, for the Plaintiffs.
Jesse A. Finkelstein , Lisa M. Zwally , Michael R.
Robinson , Richards, Layton & Finger, P.A. ,
Wilmington, Delaware; Michael A. Cooper , Sharon
L. Nelles , Sullivan & Cromwell LLP , New York,
New York; Nancy E. Schwartzkopf , JP Morgan
Chase Legal Dept., New York, New York, for the
Defendants.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

**\*1** In 2004, two banks agreed to a business
combination that was expected to create the second
largest financial institution in the country. One bank
paid a premium over the market share price for the
other bank, effectively making one bank the acquirer
and the other bank the target.

After the merger was completed, the stockholders of
the acquirer sued its directors, alleging breaches of
fiduciary duty with regard to the acquisition. Their
claims stem from the allegation that the directors paid
too much for the acquired bank. Specifically, the
plaintiffs claim that the CEO of the target proposed a
no-premium merger if he were immediately
promoted to CEO of the resulting entity. The CEO of
the acquirer allegedly refused that offer, choosing
instead to pay the premium for the target's stock and

retain his title.

The plaintiffs bring this class action in an effort to
recover damages for what they contend are direct
claims. The defendants move to dismiss the
complaint on the basis that the claims are derivative,
not direct, and that demand was not excused. For the
reasons below, that motion is granted.

II. FN1

FN1. All facts herein are taken from the
well-pleaded allegations of the complaint
unless otherwise noted.

A. *The Parties*

The plaintiffs are Ronda Robins, George Ziegler, and
Bruce T. Taylor, who are stockholders of J.P.
Morgan Chase & Co. ("JPMC") during the relevant
times. FN2 The plaintiffs bring this action on their
own behalf and as a class action pursuant to Court
Chancery Rule 23. The class is alleged to consist of
all persons who owned JPMC common stock on the
date the merger was announced, January 14, 2004,
and continued to own such stock through the date the
merger closed, July 1, 2004.

FN2. Bruce T. Taylor is acting as custodian
for Julia Ann Taylor.

The defendants are JPMC and the members of its
board of directors who approved the merger with
Bank One Corporation ("Bank One").

B. *Background*

On January 14, 2004, JPMC and Bank One published
a joint press release announcing their agreed-upon
merger, which had been unanimously approved by
their respective boards of directors. Pursuant to the
agreement, JPMC would issue shares of its common
stock to Bank One stockholders at a premium of 14%
over the closing price of Bank One common stock on
the date of the announcement of the merger. FN3

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN3. Joint Proxy Statement at 36.

The merger agreement also laid out the succession plan for JPMC. After the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, James Dimon, would succeed. During the interim two years, Dimon would serve as President and COO. Harrison, who was Chairman of JPMC before the merger, would continue in that role indefinitely beyond the two years.

The Joint Proxy Statement filed with the Securities and Exchange Commission on February 20, 2004 listed various reasons for the merger, including "a number of significant strategic opportunities and benefits," "more balanced business mix," "greater geographic diversification," and "expected financial synergies." FN4 The merger, when announced, was expected to create the second largest financial institution in the country, measured by total assets. On May 25, 2004, the stockholders of JPMC overwhelmingly approved the merger, with 99.18% of the votes cast in its favor. FN5 The merger closed July 1, 2004.

FN4. *Id.* at 34-35.

FN5. Form 8-K, May 25, 2004.

C. *The Dispute*

**\*2** On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon. According to the article, Dimon offered to sell Bank One to JPMC at no premium if he were appointed CEO of the new entity immediately. Because much of the complaint hinges on one sentence in the article, the court finds it important to include it verbatim, as follows: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become the chief executive immediately, according to two people close to the deal." FN6

FN6. Landon Thomas, Jr., *The Yin, the Yang, and the Deal,* N.Y. Times, June 27, 2004, § 3 (Sunday Business) at 1.

The plaintiffs allege that this one sentence proves that JPMC could have purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO.

The plaintiffs argue that JPMC instead agreed to pay a premium simply to satisfy Harrison's desire to retain the CEO title for two more years. In addition, the plaintiffs contend that Harrison remains CEO in title only and that Dimon is effectively exercising the powers of a CEO. Therefore, they claim, the only difference between Dimon's preliminary offer and the merger as consummated was that JPMC agreed to pay the 14% premium.

The defendants respond by pointing out that the plaintiffs' argument presupposes that the boards of directors of both companies would have approved Dimon's offer. The defendants argue that there was no possibility for JPMC stockholders to approve a merger based on Dimon's alleged offer because neither board of directors ever agreed to that deal. The deal that was agreed to by the boards included a 14% premium for Bank One and a succession plan that had Harrison remaining as CEO for two years, followed by Dimon. They argue that all other possible transaction formats that may have been proposed to and rejected by the JPMC board are irrelevant and immaterial, as the JPMC directors' consideration and rejection of all such proposals are protected by the business judgment rule.

D. *The Complaint*

The plaintiffs pursue all defendants for breaches of fiduciary duties surrounding the refusal of Dimon's alleged no-premium offer. They argue that by allowing Harrison to keep the title of CEO, the board of JPMC overpaid for Bank One by the 14% premium. Relying on the proxy materials stating that Harrison kept the board informed of his negotiations with Dimon, the plaintiffs claim that the board knew of Dimon's no-premium offer. Moreover, the plaintiffs claim that a majority of the board was beholden to Harrison and, thus, not able to act independently of him. The plaintiffs allege that the board's lack of independence caused it to approve the 14% premium in order to let Harrison retain the title of CEO instead of insisting on the no-premium offer.

Alternatively, the plaintiffs claim that Harrison secretly refused Dimon's no-premium offer. Without presenting the offer to the JPMC board, they claim, Harrison refused to concede the title of CEO, but continued negotiating with Dimon. Under this set of facts, the plaintiffs contend that Harrison's self-interested refusal caused Dimon to demand a premium over Bank One's share price, which Harrison eventually agreed to and presented to the

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

board.

**\*3** The plaintiffs seek damages in the amount of the merger exchange ratio premium, approximately $7 billion. They allege that the JPMC board of directors, by approving the unfavorable merger exchange ratio and the unnecessary premium, harmed them directly by diluting their interests in JPMC. If the JPMC board had approved a no-premium merger exchange ratio, the argument goes, the plaintiffs would have a greater stake in the resulting company. Instead, the stockholders of the pre-merger JPMC now have less of a stake in the post-merger JPMC.

The JPMC board consisted of twelve directors-eleven outsiders plus Harrison. The plaintiffs allege that eight of the eleven outside directors lacked sufficient independence with regard to the merger. FN7 The plaintiffs base their claims on certain relationships between the directors and JPMC or Harrison. The defendants counter that the relationships described by the plaintiffs fall into three categories: normal business relationships, inconsequential charitable relationships, or family relationships that are either disclosed or ended. The defendants contend that none of the relationships affect the ability of the directors to act independently. The defendants also point out that a majority of the board of directors was certified as independent pursuant to NYSE Corporate Governance listing standards.

> FN7. The plaintiffs concede that three directors are independent: Hans W. Becherer, John H. Biggs, and Lee R. Raymond. The plaintiffs allege that Harrison benefitted from the merger by securing a $3.5 million increase in his severance package to $22.5 million. They further contend that Harrison knew his job was in jeopardy and he used the Bank One deal to retain the title of CEO for two more years. Harrison's alleged lack of independence is not disputed by the defendants in this motion to dismiss.

Set forth below are the directors in question and the specific allegations found in the complaint about each.

### 1. *Riley Bechtel*

Bechtel is the Chairman, CEO, and a director of the Bechtel Group, Inc. The plaintiffs allege that Bechtel is not independent because the Bechtel Group does business with the Trade Bank of Iraq, which is managed by JPMC. The plaintiffs claim that the Bechtel Group has received $2 billion from the Trade Bank in connection with the reconstruction of Iraq. The plaintiffs further allege that Bechtel is not independent because JPMC and the Bechtel Group share other financial interests. As an example, the plaintiffs cite an investment partnership that is jointly owned by partners of the Bechtel Group and a private equity firm affiliated with JPMC.

### 2. *Lawrence Bossidy*

The plaintiffs question the independence of Bossidy because his son is employed as a JPMC Vice President. The plaintiffs contend that Bossidy would be unable to vote against Harrison because his vote would potentially endanger his son's career.

### 3. *Ellen Futter*

Futter is the President, as well as a trustee, of The American Museum of Natural History. The plaintiffs claim that Futter cannot act independently because JPMC is a significant benefactor to the museum. The plaintiffs also claim that Futter cannot act independently because JPMC employed her brother-in-law as a managing director. FN8

> FN8. The court takes judicial notice that Futter's brother-in-law was terminated on January 6, 2004 (effective March 8, 2004), one week before the JPMC board approved the merger with Bank One. *See Cohan v. J.P. Morgan Chase & Co.,* No. 03-5981 (S.D.N.Y.2004), Second Amended Compl.; Joint Proxy Statement at 34. He has since sued JPMC in connection with his termination. *See Cohan,* No. 03-5981, Second Amended Compl.

### 4. *Helene Kaplan*

Kaplan is Vice-Chair and a trustee of The American Museum of Natural History. Like Futter, Kaplan is a senior fiduciary of the museum and the plaintiffs challenge her independence on the basis of her charitable ties to JPMC.

### 5. *William Gray* FN9

Not Reported in A.2d                                                                 Page 4
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN9. In their answering brief, the plaintiffs provide more detailed information about Gray than is contained in the complaint. For example, they specify the dollar amount of JPMC's contributions to UNCF instead of simply stating that JPMC is a sponsor. The court takes these facts as true since presumably the plaintiffs could amend the complaint to include them.

**\*4** Gray is the President and CEO of the United Negro College Fund ("UNCF"). In 2003, JPMC matched over $1 million in UNCF donations from its employees. Since 1990, JPMC and its employees have contributed over $18 million to UNCF. In addition, Harrison has served as treasurer of UNCF. Based on Gray's charitable ties to JPMC and Harrison's reciprocal involvement with UNCF, the plaintiffs claim that Gray cannot vote independently.

### 6. *Frank Bennack*

Bennack is the Chairman of the Executive Committee and Vice Chairman of the Board of the Hearst Corporation. He was instrumental in creating Hearst-Argyle Television, Inc., which has a credit facility with a consortium of banks led, in part, by JPMC. The plaintiffs maintain that the financial relationship between JPMC and Hearst-Argyle, when viewed in the context of the relationship between Bennack and Hearst-Argyle, causes Bennack to be unable to act independently as a director.

### 7. *John Stafford*

Stafford is a consultant to Wyeth and he was Chairman of the Board of Wyeth from 1986 until 2003. JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. JPMC serves as indenture trustee, paying agent, and conversion agent for $4.5 billion of Wyeth's debt securities. The plaintiffs maintain that the financial relationship between JPMC and Wyeth precludes Stafford's ability to exercise independence as a director.

### 8. *M. Anthony Burns*

Burns is the Chairman Emeritus and former CEO of Ryder Systems, Inc. JPMC serves as indenture trustee for Ryder, including its recent August 2003

registration of $800 million of securities. The plaintiffs maintain that the financial relationship between JPMC and Ryder impedes Burns's ability to act as an independent director.

### E. *Procedure*

The defendants move to dismiss, arguing that the claims asserted are derivative and that demand is not excused. The defendants further argue that the board of directors has a majority of members who were independent and disinterested, and, therefore, the board's decision to authorize the merger is governed by the business judgment rule.

The plaintiffs oppose the motion, arguing that the claims asserted are direct. Alternatively, they argue that if the claims are found to be derivative, demand is futile and therefore excused because a majority of the board of JPMC was not able to act independently of Harrison in voting to authorize the merger and, therefore, is not capable of acting on a demand. Even if the claims against the board are dismissed, the plaintiffs assert that they can pursue Harrison individually if he did not relay Dimon's offer to the board for its approval.

The plaintiffs also allege a breach of the directors' disclosure duties in connection with the failure to disclose material information in the proxy statement. FN10

FN10. In their answering brief, the plaintiffs assert that ¶¶ 81-89 of the complaint state a claim for equitable fraud. They further assert that the defendants did not address the equitable fraud claim in the defendants' opening brief. Therefore, the plaintiffs argue, the equitable fraud claim must be permitted to go forward. The court finds that the complaint does not adequately allege a claim for equitable fraud. Under Court of Chancery Rule 8(a), a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Nowhere in ¶¶ 81-89 of the complaint is the term "equitable fraud" to be found. Furthermore, the allegations in those paragraphs do not contain a plain statement that would put the defendants on notice that the plaintiffs were alleging equitable fraud. Moreover, "[a] class action may not be maintained in a purely common law or

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

equitable fraud case." *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 474 (Del.1992). Even if the allegations in ¶¶ 81-89 of the complaint could be construed as equitable fraud, it is not enough to maintain a class action.

## F. *Federal Action*

A similar federal class action complaint was filed in the District of Delaware on March 17, 2005. The federal complaint alleges substantially the same claims that are before this court. It does, however, have several important differences. First, the federal complaint characterizes the deal between Harrison and Dimon as a "secret deal." This description implies that the merger negotiations were unknown to the board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that the "[d]efendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon." FN11

FN11. Federal Compl. ¶ 144(e).

**\*5** Second, the federal complaint alleges that JPMC violated federal securities laws, specifically Sections 10(b), 11, 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange Act of 1934. These claims are sufficient to give federal courts jurisdiction over the claims, including the related breaches of fiduciary duty claims.

Finally, the federal complaint lists important distinguishing facts, some of which are inconsistent with facts in this action. For instance, the federal complaint states that *Harrison* offered the no-premium deal. FN12 The complaint before this court makes the opposite claim, i.e. that it was Dimon who made an offer of that nature. This discrepancy is not explained.

FN12. *Id.* ¶ 81 (citing *Fortune,* Jan. 26, 2004, which states "Harrison was offering what he calls a 'market deal,' meaning that J.P. Morgan would simply buy Bank One at its current stock price-around $45 a share.").

The federal complaint alleges additional substantive facts concerning certain directors. For example, the federal complaint ties Futter's fund-raising activities to her board membership, as reported in *New York Magazine* on February 21, 2000. FN13 Additionally, the federal complaint alleges that Kaplan is an

attorney whose law firm receives substantial fees from JPMC. FN14

FN13. *Id.* ¶ 171.

FN14. *Id.* ¶ 174.

On April 18, 2005, the federal district court refused to enjoin this action. FN15 In his decision, Judge Farnan stated that any possibility of harm to the federal plaintiff is speculative at this stage of the litigation. This court will therefore proceed to decide the motion to dismiss the state complaint.

FN15. *Hyland v. Harrison,* C.A. No. 05-162, mem. order (D.Del. Apr. 18, 2005).

### III.

In order to dismiss a complaint under Court of Chancery Rule 12(b)(6), a court "must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." FN16 When making its decision, a court must accept as true all well-pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts. FN17 But a court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." FN18

FN16. *VLIW Tech., L.L.C. v. Hewlett-Packard Co.,* 840 A.2d 606, 610-11 (Del.2003) (quotations omitted).

FN17. *Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

FN18. *Id.* at 187.

### A. *Direct Or Derivative Analysis*

The court begins by analyzing whether the stated claims are direct or derivative. The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative to "turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy

Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(the corporation or the stockholders, individually)?" FN19 "[U]nder *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." FN20 "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." FN21

FN19. *Tooley v. Donaldson, Lulkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del.2004).

FN20. *In re Syncor Int'l Corp. S'holders Litig.,* 857 A.2d 994, 997 (Del.Ch.2004).

FN21. *Dieterich v. Harrer,* 857 A.2d 1017, 1027 (Del.Ch.2004).

The plaintiffs' main complaint is that the defendant directors breached their fiduciary duty by approving a merger exchange ratio that paid an unnecessary or excessive premium to Bank One stockholders. This premium, the plaintiffs argue, prevented them from receiving their fair share of the resulting business combination, causing them to be harmed directly through dilution of their collective ownership percentage.

1. *Who Suffered The Alleged Harm?*

**\*6** In order to show a direct injury under *Tooley,* a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." FN22

FN22. 845 A.2d at 1039.

By describing the harm as a dilution of their stockholder interests, the plaintiffs attempt to allege a harm to them that does not affect the corporation. But their argument fails to acknowledge the context in which they were allegedly harmed. "[A] complaint that 'directly challenges the fairness of the process and the price' of a merger suggests ... that the corporation suffered harm ... and that the harm suffered by that JPMC overpaid for Bank One. If JPMC had paid cash for Bank One, the plaintiffs' claim would clearly be derivative. JPMC

would have suffered the alleged harm by paying too much money for Bank One. Any such cash overpayment would not have harmed the stockholders of JPMC directly. The only harm to the stockholders would have been the natural and foreseeable consequence of the harm to JPMC.

FN23. *Agostino v. Hicks,* 845 A.2d 1110, 1119 (Del.Ch.2004) (quoting, in part, *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1245 (Del.1999)).

The fact that this transaction was effectuated by issuing stock and not by paying cash does not change the result. The harm, if any, was still suffered by JPMC. Although "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims," FN24 "[they] are individual in nature [only] where a significant stockholder's interest is increased at the sole expense of the minority." FN25 "[T]o the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." FN26

FN24. *Gentile v. Singlepoint Fin.,* 2003 WL 1240504, at \*5 n. 36 (Del.Ch. Mar.5, 2003).

FN25. *In re Paxson Communication Corp. S'holders Litig.,* 2001 WL 812028, at \*5 (Del.Ch. July 10, 2001).

FN26. *Id.*

Here, the plaintiffs rely on the claim of "dilution" in an attempt to frame the harm as direct. But, they do not allege any stockholder dilution in relation to pre-merger voting rights. Instead, their claim of dilution is related to the issuance of stock to consummate the merger. This dilution claim is based on the merger exchange ratio, which was a necessary result of the purchase price for Bank One. Any alleged dilution was a harm suffered by all pre-merger JPMC stockholders and, consequently, JPMC itself. Thus, the harm alleged in the complaint cannot give rise to a direct claim.

In response to the court's request for support "for the proposition that a claim which would undoubtedly be a derivative claim is somehow converted into a direct claim because of the form of consideration," FN27

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the plaintiffs were not able to cite any persuasive authority. Indeed, in their post-hearing submissions, the plaintiffs were unable to point to any authority under Delaware law that the direct/derivative analysis is affected by the form of consideration used in a transaction. In fact, Delaware case law states that "if a board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders are injured derivatively." FN28 Furthermore, as Chancellor Chandler has recently noted, "[m]ere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one." FN29 Thus, the plaintiffs' argument that they were harmed directly because the merger consideration was stock instead of cash must fail as a matter of law.

FN27. Tr. at 44.

FN28. *Avacus Partners, L.P. v. Brian,* 1990 WL 161909, at *6 (Del.Ch. Oct.24, 1990).

FN29. *Gatz v. Ponsoldt,* 2004 WL 3029868, at *7 (Del.Ch. Nov.5, 2004).

**\*7** Putting the 14% premium payment in the proper context, the court finds that any alleged harm was suffered by JPMC, regardless of whether the payment was in cash or in stock. The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC. Therefore, under the first prong of *Tooley,* the court concludes that the plaintiffs' claim is derivative.

2. *Who Would Receive The Benefit Of Any Recovery Or Other Remedy?*

Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. FN30 Here, the plaintiffs seek a return of the "proper interest" FN31 of JPMC to stockholders who owned pre-merger JPMC stock, but they offer no explanation of what such a proper interest might be. Additionally, the plaintiffs are unable to demonstrate why they, and not JPMC, should receive the benefit of any remedy.

FN30. 845 A.2d at 1033.

FN31. Pls.' Answering Br. at 43.

As discussed above, if there was harm suffered by payment of a merger premium, JPMC suffered it. Thus, if the defendants are found liable, the remedy will accrue to JPMC. Although the plaintiffs go to great lengths to define the class in a way that would allow them to argue for a direct class benefit, their effort to make the claim direct fails. The plaintiffs' argument that the previous Bank One stockholders, who ostensibly have already benefitted from any misconduct, should be excluded from the remedy is not persuasive. Any remedy from the alleged harm would necessarily accrue to JPMC and not to a subset of stockholders. Therefore, the plaintiffs' claims are derivative under the second question of *Tooley.*

B. *Section 220 Demand*

Before turning to the issue of whether demand should be excused, the court notes that the plaintiffs did not make a books and records demand of JPMC before filing suit. Section 220 of the Delaware General Corporation Law provides that stockholders have the right to inspect a corporation's books and records for "any proper purpose." FN32 Both the Delaware Supreme Court and the Court of Chancery "have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts." FN33

FN32. 8 *Del. C.* § 220.

FN33. *Beam v. Stewart,* 845 A.2d 1040, 1056 (Del.2004).

In this case, the court is once again confronted with a situation in which the plaintiffs attempt to plead demand futility, but have not sought access to the books and records of the corporation under section 220. Like the plaintiff in *Beam,* the plaintiffs here did not seek information from the defendant corporation that may have provided them additional facts, from which they could have fashioned a more particularized complaint. For example, if the plaintiffs had successfully sought information from JPMC, they most likely would have learned whether Harrison presented a no-premium offer to the board. Instead, the plaintiffs rely on general wording from public filings that Harrison kept the board informed.

**\*8** Furthermore, the plaintiffs could have used section 220 to learn more about the relationships between Harrison and the defendant directors. As the

Not Reported in A.2d                                                                                    Page 8
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Delaware Supreme Court noted in *Beam,* plaintiffs who seek information under section 220 may be able to review the minutes of board meetings and determine how the directors handled the CEO's proposals or conduct in various contexts. FN34 Armed with this information, the plaintiffs may have been able to link the alleged relationships to directors' conduct through particularized facts.

      FN34. *Id.*

Despite the frequent admonitions of the Delaware Supreme Court and the Court of Chancery, the plaintiffs did not pursue this remedy. Although their failure to use "a books and records inspection does not change the standard to be applied to review of the complaint," FN35 the court notes at the outset that the plaintiffs had the time and opportunity to file such an action. The plaintiffs did not learn of the alleged no-premium offer from the newspaper article until days before the merger closed. During the short time available before the merger, they did not seek injunctive relief that may have delayed the closing. Once the merger closed, however, the plaintiffs had ample time and opportunity to investigate the facts behind the anonymous allegations in the newspaper article through the filing of a section 220 action. The plaintiffs did not file the amended complaint until two months after the merger closed.

      FN35. *Id.* at 1057 n. 52.

### C. *Demand Futility*

The plaintiffs argue that if their claims are derivative, demand is excused because it would be futile. Under Court of Chancery Rule 23.1, "a plaintiff shareholder [must] make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf." FN36 If a plaintiff argues demand futility, the two-prong test under *Aronson* and its progeny must be met. FN37 The first prong of the *Aronson* test is whether "a shareholder [has pled] *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested." FN38 The second prong of the test is whether "a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment." FN39 The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused.

FN40

      FN36. *Jacobs v. Yang,* 2004 WL 1728521, at *2 (Del.Ch. Aug.2, 2004), *aff'd,* 867 A.2d 902 (Del.2005).

      FN37. *Brehm v. Eisner,* 746 A.2d 244, 256 (Del.2000) ; *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

      FN38. *Jacobs,* 2004 WL 1728521, at *2 (emphasis in original).

      FN39. *Aronson,* 473 A.2d at 814.

      FN40. *Brehm,* 746 A.2d at 256.

### 1. *First Prong Of* Aronson

The plaintiffs argue that demand is excused under the first prong of the *Aronson* test because at least eight of the twelve directors on the board fail the test of being disinterested and independent. FN41 Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." FN42 "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences ." FN43

      FN41. The plaintiffs do not challenge the independence of directors Becherer, Biggs, and Raymond. Harrison is the twelfth director and his lack of independence is not disputed in this motion to dismiss.

      FN42. *Aronson,* 473 A.2d at 812.

      FN43. *Id.* at 816.

*9 Here, none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial benefit from it other than one that devolved on all JPMC stockholders alike. Thus, there is no issue regarding these directors' interest in the deal. Rather, the thrust of the plaintiffs' allegations is that the directors were so positioned, as a result of various business, charitable, or family relationships, that they were disabled from exercising independent judgment. The complaint

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

alleges that, through these various relationships, the outside directors were beholden to Harrison and unable to act independently of Harrison's influence.

JPMC's board consists of twelve directors. Thus, the plaintiffs need to show that 5 directors, plus Harrison, were not independent. FN44 The court's review of the complaint's well-pleaded allegations shows that, in addition to the three concededly independent directors, the plaintiffs fail to meet their burden with respect to any of the other outside directors.

> FN44. *See Beam*, 845 A.2d at 1046 ("[D]emand is excused where a board is evenly divided between interested and disinterested directors.").

Before analyzing each director individually, the court pauses to note the overall structure of the JPMC board. The board is dominated by outsiders. Eleven of the twelve directors are not employees of JPMC. Harrison cannot fire any of them. Additionally, Harrison is not a controlling stockholder of JPMC and therefore has no power to oust them as directors through a stockholder vote. On the contrary, it is the eleven outside directors who collectively have the power to dismiss Harrison and the rest of his management team. The plaintiffs allege that the defendant directors are beholden to Harrison, but they fail to demonstrate why that is so. Even in cases in which the CEO had a supermajority of voting power, courts have upheld outside directors' independence in the face of additional relationships. FN45 Here, Harrison reports to a board of directors that he cannot fire or remove, a fact that appears lost in the allegations that each director, no matter how indirectly, has some external relationship to JPMC.

> FN45. *Id.* at 1051 ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

The court begins its analysis by looking to defendant directors Bennack, Stafford, and Burns, whose independence is questioned by the plaintiffs due to certain financial ties to JPMC. These three directors are, or were, intimately involved with several of America's largest corporations. All three directors have substantial personal wealth invested in their related companies, each of which conducts business with JPMC.

JPMC is a national commercial and investment bank. That it provided financing to large American companies should come as no shock to anyone. Yet this is all that the plaintiffs allege. What the plaintiffs fail to allege are facts showing a connection between the financing and these three defendant directors. Instead, the plaintiffs attempt to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares FN46 and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank. The allegations raised against all three of these directors are simply not enough, without more, to raise a substantial question about their independence.

> FN46. Facts about the stock ownership of Bennack, Stafford, and Burns are contained in the plaintiffs' answering brief. *See supra* note 9.

**\*10** The plaintiffs also challenge the independence of Bechtel based on his business relationships. The complaint alleges facts that indicate Bechtel's business ties to JPMC are more direct and more substantial than those of Bennack, Stafford, and Burns, but the complaint again fails to show how such facts impinge on Bechtel's ability to act independently of Harrison. Although Bechtel's company has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison. Therefore, the complaint fails to adequately challenge Bechtel's independence.

The court next turns to Futter, whose independence is challenged because she is President and trustee of The American Museum of Natural History. FN47 The plaintiffs make much of the fact that JPMC contributes to the museum. But the plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter. Indeed, the plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by JPMC. The plaintiffs state that JPMC is a

significant benefactor, but they never state how JPMC's contributions could, or did, affect the decision-making process of the president of one of the largest museums in the nation. Therefore, as alleged, the complaint does not demonstrate that Futter is not independent.

FN47. Futter is also challenged due her brother-in-law's employment with JPMC. This employment, however, was terminated before the JPMC board voted on the merger, so the court will not consider this allegation. *See Grobow,* 539 A.2d at 187 ("A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.").

The plaintiffs make the same conclusory argument about Kaplan as they do about Futter. The only allegation against Kaplan is her relationship to The American Museum of Natural History. Again, the plaintiffs fail to connect JPMC's contributions to the potential lack of independence of a JPMC director. FN48 They simply aver that Kaplan was a trustee of an institution that received contributions from JPMC. Therefore, as pled, the complaint does not raise a substantial question about Kaplan's independence.

FN48. Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence. *See, e.g., In re Oracle Corp. Derivative Litig.,* 824 A.2d 917 (Del.Ch.2003); *In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692 (Del.Ch. Mar.27, 2002); *Lewis v. Fuqua,* 502 A.2d 962 (Del.Ch.1985). But in those cases, the complaints had many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors. In *Oracle,* two special litigation committee members, both professors at Stanford, were asked to investigate other Oracle board members who had the following substantial ties to Stanford: (i) one of the other directors was a professor at Stanford who had taught one of the special litigation committee members; (ii) another director was "a Stanford alumnus who [had] directed millions of dollars of contributions to Stanford during recent years;" and (iii)

"Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, ... was considering making donations of his $100 million house and $170 million for a scholarship program." *Oracle,* 824 A.2d at 920-21. In *The Limited,* the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $25 million donation to the university. *The Limited, Inc. S'holders Litig.,* 2002 WL 537692 at *6-7. In *Fuqua,* the court found that the sole member of the special litigation committee was not independent because he was President of Duke University, which had recently received a $10 million pledge from the company, and the CEO was a trustee of Duke. *Fuqua,* 502 A.2d at 966-67. Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University. Moreover, *Oracle* and *Fuqua* were cases in which the court made searching inquiries into the nature of a special litigation committee member's independence. *Beam,* 845 A.2d at 1055 (discussing the special litigation committee's burden of establishing its own independence). Finally, as noted above, the plaintiffs here did not make a section 220 books and records demand. If they had, they would have been able to investigate the decision-making process behind the qualification of the directors as independent under the NYSE Corporate Governance rules. Instead, they rely on conclusory allegations that do not create a reasonable doubt about Futter's or Kaplan's independence based on the charitable ties to The American Museum of Natural History.

Next in the analysis is Bossidy, whose independence is challenged because his son is employed by JPMC. Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management. For example, the NYSE rules governing director independence focus on this subject, holding that employment of a child as an executive officer of the corporation may disqualify an outside director from serving as a disinterested member of the board. FN49 Delaware courts also

recognize that familial ties to management can disqualify one from functioning disinterestedly. FN50 In this case, however, Bossidy's son is not an executive officer of JPMC, and the complaint does not allege that Bossidy and his son live in the same household. Under NYSE Corporate Governance rules, Bossidy was found to meet the criteria for certification as an outside, independent director. Moreover, the fact that Bossidy's son is employed by JPMC is duly disclosed in JPMC's proxy materials. For these reasons, the plaintiffs' attack on Bossidy's independence must fail.

> FN49. NYSE Corporate Governance Rule 303A.02(b)(i) ("In addition, a director is not independent if ... [t]he director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company.").

> FN50. *Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996) (finding that familial interest is a basis for demand excusal).

**\*11** Finally, the court turns to Gray, who is challenged due to his charitable ties with Harrison. At first glance, the reciprocal relationship between JPMC and UNCF, as evidenced by the positions held by Gray and Harrison, could call into question the independence of Gray. However, upon closer examination, the court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray. Nowhere in the complaint do the plaintiffs aver that Harrison was treasurer of UNCF during the merger negotiations or the board vote. Indeed, this uncertainty about Harrison's involvement with UNCF at the relevant time is noted by the plaintiffs in their answering brief, which states that Harrison's relationship to UNCF is not disclosed in the joint proxy statement. Furthermore, just as they fail to indicate the importance of JPMC's contributions to The American Museum of Natural History, the plaintiffs fail to indicate how JPMC's contributions would affect UNCF and therefore influence Gray. The plaintiffs provide only the dollar value, not the representative amount, of JPMC's contributions to UNCF. Thus, the plaintiffs' allegations do not successfully challenge Gray's independence.

In addition to the three concededly independent directors, the court finds that the other eight outside

directors are also independent. Therefore, the plaintiffs will be unable to prove that a majority of the board of JPMC was either interested or not independent under the first prong of *Aronson.*

## 2. *Second Prong Of* Aronson

The plaintiffs argue that demand is also excused under the second prong of the *Aronson* test. In order to succeed in their argument, the "plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule." FN51 Specifically, the "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." FN52

> FN51. *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 286 (Del.Ch.2003) (citing *Aronson,* 473 A.2d at 814-15).

> FN52. *Walt Disney,* 825 A.2d at 286.

Nothing in the complaint indicates that the JPMC board was not adequately informed about the negotiations with Bank One. Indeed, the plaintiffs note that the proxy materials stated Harrison kept the board informed of the negotiations. Yet this fact presents a paradox for the plaintiffs. They need to allege that Harrison informed the board in order to list the other directors as defendants, but they would rather label those same directors as "uninformed" in order to succeed on the second prong of *Aronson.* The complaint fails, however, to allege facts that would indicate that the board was presented with the decision, but was not provided with information from which it could make a proper decision.

With regard to the honesty and good faith of the board, the plaintiffs do not allege any facts that directly call into question the acts of the directors. The plaintiffs' allegations concern only the directors' relationships to Harrison. Nowhere in the complaint do the plaintiffs allege that any individual defendant director personally acted without honesty and good faith. The only allegation in the complaint is that somehow, due to their financial, charitable, or personal relationship to Harrison, the individual director defendants were beholden to Harrison, allegations that have already been found to be insufficient.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*12** Due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information, the court finds that the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule.

The plaintiffs are unable to meet either prong of the *Aronson* test. They have failed to show that a majority of the board is either interested or not independent. They have also not shown why the board's decision is not protected by the business judgment rule. Thus, the plaintiffs' derivative claim must be dismissed because demand is not excused.

### C. *Proxy Disclosure*

Finally, the court turns to the plaintiffs' claim that the defendants breached their fiduciary duty by publishing materially inaccurate or incomplete disclosures regarding the proxy statement. The plaintiffs claim that the purported class was harmed because the proxy did not include information about the alleged offer from Dimon to Harrison. Notably, however, the complaint does not claim that the merger itself harmed either JPMC or the class. The harm alleged is the lost opportunity to vote for and approve a better deal, *i.e.* the Dimon offer that was rejected during negotiations and never approved by either board of directors. For this alleged harm, the complaint seeks money damages.

The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim. This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.

The disclosure claim alleged by the plaintiffs, like the disclosure claims in *In re Triarc Cos. Class & Derivative Litig.,* if proven, could have supported a claim for equitable relief. FN53 In this case, the plaintiffs did not seek an injunction to stop the merger before it closed. The time period between the publication of the article in *The New York Times* and the consummation of the merger was quite short. Nevertheless, the plaintiffs had time to seek a temporary restraining order to preserve the *status quo,* and, had they done so, could have secured the

ability to obtain further equitable remedies, such as an order requiring that JPMC amend its proxy statement and resolicit the stockholders for another vote. The plaintiffs also did not act promptly to preserve any other claimed equitable remedies, such as rescission. Now, of course, the "eggs" have been irretrievably "scrambled" and there is no possibility of effective equitable relief.

> FN53. 791 A.2d 872, 876 (Del.Ch.2001). As this court stated in *Triarc,* "*Loudon* recognized a much broader category of cases in which a violation of the duty of disclosure will ordinarily support only a claim for equitable or injunctive relief." *Id.*

Because equitable relief is no longer practicable, the plaintiffs present their disclosure claim as one seeking money damages. There are several problems with this approach. In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages. FN54 But, for the reasons already discussed, the court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same directors ever be liable to pay actual compensatory damages to both the corporation and the class for the same injury? The answer, as *Loudon* implicitly recognizes, is that they could not. FN55 While the disclosure might have given rise to an entitlement to equitable relief that could have been pursued by the stockholders individually or as a class action, the disclosure claim simply does not give rise to a claim for substantial, compensatory damages in this situation. Instead, the claim for actual damages, if there is one, belongs to the corporation and can only be pursued by the corporation, directly or derivatively.

> FN54. *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 919 (Del.Ch.1999).

> FN55. *See Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997).

**\*13** As in *Loudon,* the plaintiffs try to rely on *Tri-Star* FN56 for the rule that there is a "per se rule of damages for breach of the fiduciary duty of

Not Reported in A.2d                                                                                      Page 13
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

disclosure." FN57 This is no longer an accurate statement of Delaware law. *Loudon* limited *Tri-Star* to its facts, holding that "*Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." FN58 For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent. FN59

FN56. *In re Tri-Star Pictures, Inc., Litig.,* 634 A.2d 319 (Del.1993).

FN57. *Loudon,* 700 A.2d at 141.

FN58. *Id.* at 142 (describing *Tri-Star's* per se discussion as dictum). *See also Triarc,* 791 A.2d at 877 ("*Tri-Star* was narrowly limited to its facts in *Loudon v. Archer-Daniels-Midland Co."* ). However, at least one subsequent case states that *Malone* "constitute[s] a retreat to *Tri-Star's* per se rule of damages for all violations of the fiduciary duty of disclosure." *O'Reilly,* 745 A.2d at 918 (discussing *Malone v. Brincat,* 722 A.2d 5 (Del.1998)). This court does not agree. The *Malone* court was presented with the issue of disclosure in the context of public documents filed as a matter of course with the SEC, not proxy statements soliciting stockholder votes. *Malone,* 722 A.2d at 8. Thus, *Malone's* discussion of the duty of disclosure as it relates to solicitation of stockholder votes is dictum and not controlling.

FN59. 634 A.2d at 332 ("[T]he power of *Tri-Star's* minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.").

For these reasons, the court concludes that the complaint does not state a cognizable disclosure claim. The issues about the adequacy of the proxy statement disclosure would be of continuing relevance to the underlying derivative claim. For example, the quality of those disclosures is relevant to any potential defense based on a theory of stockholder ratification. FN60 Nevertheless, there is no possibility of recovery of either nominal or substantial damages by the class on this complaint. FN61

FN60. *See Yiannatsis v. Stephanis,* 653 A.2d 275, 280 (Del.1995) ( "Ratification can occur only if the stockholders are fully informed of the consequences of their vote.").

FN61. The court also notes with interest a recent decision of the United States Supreme Court holding that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo,* --- U.S. ----, ----, 125 S.Ct. 1627, 1629, --- L.Ed.2d ----, ---- (2005). Thus, the Court affirmed the dismissal, on a Rule 12(b)(6) motion, of a claim that failed to allege facts showing that the misleading disclosures had actually caused loss to the plaintiff beyond the simple assertion that the plaintiff's purchase price was inflated by the defendants' misconduct. In its unanimous opinion, the Court recognized that judicially implied rights of action under the federal securities laws are based on the common law of deceit or misrepresentation, which recognizes that a "plaintiff 'must have suffered substantial damage,' not simply nominal damages, before 'the cause of action can arise." ' *Id.* at 1632 (quoting, in part, W. Keeton et al., Prosser and Keeton on Law of Torts § 110, at 765 (5th ed.1984)).

IV.

For the foregoing reasons, the motion to dismiss is GRANTED. IT IS SO ORDERED.

Del.Ch.,2005.
In re J.P. Morgan Chase & Co.
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 14
Not Reported in A.2d, 2005 WL 1076069 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

# L

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2003 WL 21652163
(E.D.Pa.)
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
LEXINGTON INSURANCE COMPANY, Plaintiff,
v.
CALECO, INC., and Peco, Inc., Defendants.
**No. CIV.A. 01-5196.**

Jan. 25, 2003.

*MEMORANDUM AND ORDER*

DAVIS.

I. Background and Procedural History

**\*1** On June 16, 2001, severe storms and flooding
caused water to enter into and gather in the basement
laundry room area of Building A of the Village Green
Apartments, a residential apartment complex in
Hatboro, Pennsylvania. The water caused a clothes
dryer in the laundry room area to become dislodged.
According to the allegations in the Complaint filed in
this matter, this resulted in a break in the steel gas
line connected to the dryer, which, in turn, caused gas
to accumulate within Building A, ultimately resulting
in an explosion and a fire which destroyed Building
A and killed six individuals.

The Scully Company ("Scully") is the property
management company that managed the Village
Green Apartments. Scully was insured by Plaintiff
Lexington Insurance Company ("Plaintiff"), an
insurance company based in Massachusetts and
licensed to do business in Pennsylvania. Following
the explosion and fire, Scully filed a claim with
Plaintiff seeking to recover the costs of the resulting
damages. Plaintiff paid approximately four million
dollars to Scully pursuant to Scully's insurance claim.
Plaintiff then filed the instant subrogation suit on
October 12, 2001, against Defendants Caleco, Inc.
("Caleco") and PECO, Inc. ('PECO"). Caleco, a
Pennsylvania corporation, owned, installed, operated,
and maintained the dryers in the Village Green
Apartment laundry room. PECO, also a Pennsylvania
corporation, supplied gas to the Village Green
Apartments. In this suit, Plaintiff states claims for

negligence and breach of implied warranties against
both Defendants. Plaintiff also states a strict liability
claim against PECO, and a breach of contract claim
against Caleco.

In addition to this federal action, there are apparently
three actions related to this incident currently pending
in state court. One lawsuit, *Manlove v. Philadelphia
Electric Co. et al.,* Phila. C.C.P., Sept. Term 2001,
No. 3022, was instituted by the executors of the
Estate of John N. Manlove (the "Manlove Action").
A second suit, *Williams et al. v. Scully Company et
al.,* Phila. C.C.P., March Term 2002, No. 547, was
instituted by the fiduciaries of the estates of Louisa
Mae Williams, Roger Allen Williams, Rudolph J.
Malizia, and Angelina Malizia, and by Nicholas
Baldini, Michelle Seeger, Thomas Mulvihill, John
Denny, Godron Weir, and Anne Weir (the "Williams
Action"). A third action, *Whitaker v. Scully Company
et al.,* Phila. C.C.P., April Term 2002, No. 2239, was
instituted by the executor of the Estate of Ruth Ann
Widmer (the "Whitaker Action"). *See* Motion to
Intervene and for a Stay of All Proceedings, at 2 & n.
1; Reply Memorandum in Support of Motion to
Intervene and for a Stay of All Proceedings, at 1 n. 1.

Presently before the Court are the following motions:
(1) a Motion to Dismiss Counts V and VI of
Plaintiff's Amended Complaint for Failure to State a
Claim for Either Strict Liability or Breach of
Warranty, filed by PECO on December 21, 2001; (2)
a Motion to Dismiss, or in the Alternative, to Stay
this Action Pending Resolution of State Court
Action, filed by PECO on January 7, 2002; (3) a
Motion for Stay filed by Caleco on January 15, 2002;
(4) a Motion to Intervene and for a Stay of All
Proceedings filed on March 27, 2002 by the
fiduciaries of the estates of Louisa Mae Williams,
Roger Allen Williams, Rudolph J. Malizia, and
Angelina Malizia, and by Nicholas Baldini, Michelle
Seeger, Thomas Mulvihill, John Denny, Godron
Weir, and Anne Weir; and (5) a Motion to Intervene
and for a Stay of All Proceedings filed by Donald N.
Manlove and Diane Simmons on April 3, 2002. For
the reasons set forth below, this Court will: (1) deny
PECO's Motion to Dismiss Counts V and VI of
Plaintiff's Amended Complaint; (2) deny PECO's
Motion to Dismiss, or, in the Alternative, to Stay this
Action Pending Resolution of State Court Action; (3)
deny Caleco's Motion for Stay; and (4) deny the two
Motions to Intervene and for a Stay of All

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Proceedings.

## II. PECO's Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint

*2 PECO has filed a motion to dismiss Count V (a strict liability claim against PECO) and Count VI (a breach of implied warranties claim against PECO) of Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[w]e must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them," Doe v. Delie, 257 F.3d 309, 313 (3d Cir.2001), and we must view the allegations "in the light most favorable to plaintiff," In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997). "We may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Doe, 257 F.3d at 313. "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." In re Burlington Coat Factory, 114 F.3d at 1420. " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In its 12(b)(6) Motion to Dismiss, PECO argues that Plaintiff's strict liability and breach of implied warranties claims are both subject to dismissal because, even taking the allegations in Plaintiff's Amended Complaint as true, Plaintiff has not alleged the elements required to impose strict liability or to find a breach of an implied warranty in this context. The Court concludes that the strict liability and breach of implied warranties claims in Plaintiff's Amended Complaint are sufficient to withstand the Motion to Dismiss.

Under Pennsylvania law, in order to prevail on either a strict liability claim, or a claim for breach of an implied warranty, FN1 a plaintiff must show, in addition to various other elements, that there was a sale of a product or good, and that such product or good was defective. See Dougherty v. Hooker Chemical Corp., 540 F.2d 174, 177 (3d Cir.1976) (pursuant to § 402A of the Restatement (Second) of

Torts, which has been adopted by Pennsylvania courts, "strict liability arises from the sale of any product in a defective condition unreasonably dangerous to the user or consumer"); Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir.1992) ("Both the implied warranty of merchantability and the warranty of fitness for a particular purpose arise by operation of law and serve to protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose."). PECO argues that Plaintiff's strict liability and breach of warranties claims are premised upon the contention that PECO supplied allegedly defective regulating equipment, and that both claims must fail because the allegedly defective regulating equipment was never sold by PECO.

> FN1. A breach of implied warranty claim may involve a claim for breach of the implied warranty of fitness for a particular purpose, see 13 Pa. Cons.Stat. Ann. § 2315 (2003), or the implied warranty of merchantability, see 13 Pa. Cons.Stat. Ann. § 2314 (2003).

Initially, Plaintiff's Amended Complaint does not clearly identify whether the particular defective product or good in question is alleged to be the gas supplied by PECO, or the regulating equipment supplied by PECO, or both. The strict liability claim against PECO in the Amended Complaint expressly provides that "the natural gas" supplied by PECO "was defective and unreasonably dangerous," as well as "unregulated and unsafe for its intended use." See Plaintiff's Amended Complaint ("Pl.'s Amended Complaint") at 9, ¶ 37, 38. Similarly, the breach of implied warranties claim expressly provides that the gas supplied by PECO was not merchantable or suitable for its intended use because it was "unregulated, unsafe for use and not in conformity with the gas supply plaintiff's insured bargained for with PECO." See Pl.'s Amended Complaint at 9, ¶ 41, 42. However, Plaintiff contends elsewhere in the Amended Complaint that it was "the gas distribution, metering and regulating equipment," supplied by PECO and located in the basement of Building C of the Village Green Apartments, which was defective, rather than the gas. See Pl.'s Amended Complaint at 3, ¶ 11, 12, 14, 16 (alleging that the distribution, metering and regulating equipment was submerged in, and infiltrated by, water as a result of the severe storms, which caused an increase in the rate at which the gas flowed into the laundry area in Building A,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which in turn contributed to the cause of the explosion).

**\*3** To the extent that the strict liability and breach of warranties claims are premised upon the allegation that the *regulating equipment* in the basement of Building C constitutes the defective good or product in question, PECO is correct that these claims are deficient as a matter of law. This is because the Amended Complaint expressly acknowledges that the regulating equipment was owned by PECO, FN2 and was never sold by PECO, as is required for strict liability and breach of implied warranty claims. *See, e.g., Rush v. UGI Corp.,* 12 Pa. D. & C.3d 302 (1979) (holding that the defendant's allegedly defective gas main could not trigger strict liability under § 402A because it was not sold or delivered to gas customers).

> FN2. "The gas distribution equipment within Building C and the related piping and devices, were owned, maintained, installed, fabricated and designed by defendant PECO." Pl.'s Amended Complaint at 3, ¶ 12.

However, to the extent that the strict liability and breach of implied warranties claims are premised upon the allegation that the *gas* supplied by PECO constitutes the defective product or good in question, the allegations in Plaintiff's Amended Complaint are sufficient to withstand the Motion to Dismiss. Consumable goods, such as gas and electricity, may be considered distinct, tangible, movable products once they pass through the customer's meter. *See Schriner v. Pennsylvania Power & Light Co.,* 348 Pa.Super. 177, 501 A.2d 1128, 1133 (Pa.Super.1985). Moreover, although Plaintiff has not specified in the Amended Complaint how the gas was allegedly defective, Plaintiff's allegation that the gas was defective is sufficient to withstand the Motion to Dismiss, and Plaintiff should be permitted an opportunity to discover and offer evidence to support this allegation. *See Maio,* 221 F.3d at 482. For these reasons, PECO's Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint must be denied.

### III. PECO's Motion to Dismiss or Stay and Caleco's Motion for Stay

**\*4** PECO filed a motion on January 7, 2002 (referred to herein as PECO's Motion to Dismiss or Stay) requesting that this action be dismissed without

prejudice, or, in the alternative, that this action be stayed. Caleco filed a motion on January 15, 2002 (referred to herein as Caleco's Motion for Stay), similarly requesting that this action be stayed. PECO's and Caleco's arguments are based upon the abstention doctrine set forth in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). We therefore begin with a brief review of the *Colorado River* doctrine, which sets forth a narrow exception to federal jurisdiction.

Generally, " 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.' " *Colorado River,* 424 U.S. at 817 (citation omitted). "The general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action." *University of Maryland v. Peat Marwick Main & Co.,* 923 F.2d 265, 275-76 (3d Cir.1991). "Nevertheless, in *Colorado River,* the Supreme Court recognized that there are certain extremely limited circumstances in which a federal court may defer to pending state court proceedings based on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.' " *Ryan v. Johnson,* 115 F.3d 193, 195-96 (3d Cir.1997) (quoting *Colorado River,* 424 U.S. at 817).

"A threshold issue that must be decided in any *Colorado River* abstention case is whether the two actions are 'parallel.' If they are not, then the district court lacks the power to abstain.... Generally, cases are parallel when they involve the same parties and claims." *Ryan,* 115 F.3d at 196. "[W]hen a federal court case involves claims that are distinct from those at issue in a state court case, the cases are not parallel and do not justify *Colorado River* abstention." *Trent v. Dial Medical of Florida, Inc.,* 33 F.3d 217, 224 (3d Cir.1994). "It is important ... that only truly duplicative proceedings be avoided. When the claims, parties, or requested relief differ, deference may not be appropriate." *Complaint of Bankers Trust Co. v. Chatterjee,* 636 F.2d 37, 40 (3d Cir.1980).

Only if the two actions are found to be parallel, the court must then consider a number of factors to determine whether it should abstain: (1) whether the state court assumed in rem jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

order in which jurisdiction was obtained by the concurrent forums; (5) whether state or federal law provides the rule of decision; and (6) whether the state court would adequately protect the rights at issue. *Id.* at 196, 197 & n. 3 (citing *Colorado River,* 424 U.S. at 818,* and *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25-27, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Furthermore, "*Colorado River* abstention applies only in clear and exceptional cases, 'with the balance heavily weighted in favor of the exercise of jurisdiction.' " *University of Maryland,* 923 F.2d at 276 (quoting *Colorado River,* 460 U.S. at 16).

The sole pending state court action at the time of the filing of PECO's Motion to Dismiss or Stay and Caleco's Motion for Stay was the Manlove Action. It is patently clear that the Manlove Action and the present federal court action are not "parallel." FN3 While the facts giving rise to the present action and the Manlove Action may well be the same, and although some of the issues may overlap, neither the parties nor the issues in the two actions are substantially identical.

> FN3. In their briefs, PECO and Caleco also argue that the present federal court action should be dismissed or stayed based upon the other state court suits which, at the time of PECO's and Caleco's Motions, had not yet been filed, but which, PECO and Caleco argue, would likely be filed in the future by the estates of the other five decedents. PECO and Caleco have not cited any authority for the proposition that a federal court should consider abstaining based upon speculative future state court actions. Nor have PECO or Caleco filed additional documents requesting the Court to consider the two state court actions that have, in fact, been filed since the filing of PECO's and Caleco's Motions (the Williams Action and the Whitaker Action). Even assuming *arguendo* that the Court, under these circumstances, should consider these two additional state court actions, it appears that each of the two additional state court actions essentially mirror the Manlove Action, and therefore an analysis of why the present federal action and the Manlove Action are not parallel applies equally to the additional state court actions brought by the estates of the other decedents.

**\*5** The defendants in the Manlove Action include PECO, Caleco, Scully (the property management company for the Village Green Apartments), Village Green Apartments, Inc., and Village Green Associates, L.L.P. Thus, four of the parties in the Manlove Action are not parties in the present action (the estate of John N. Manlove, Scully, Village Green Apartments, Inc., and Village Green Associates, L.L.P.). Furthermore, Plaintiff in the present action, Lexington Insurance Company, is not a party in the Manlove Action. Therefore, the parties in the Manlove Action and the present federal action are not the same. FN4

> FN4. PECO and Caleco argue that Plaintiff Lexington and Scully are essentially the same party, since the present action is a subrogation suit in which Plaintiff seeks to assert its right to "stand in the shoes" of its insured, Scully. *See, e.g., Brennan v. Independence Blue Cross,* 949 F.Supp. 305, 306 (E.D.Pa.1996). Even assuming *arguendo* the validity of PECO's argument, there would still be three parties in the Manlove Action who are not parties in the present action (the estate of John N. Manlove, Village Green Apartments, Inc., and Village Green Associates, L.L.P.).

More importantly, neither the issues nor the claims in the state and federal actions are the same. The present subrogation suit brought by Lexington against PECO and Caleco involves (1) negligence claims against both PECO and Caleco, (2) a breach of contract claim against Caleco, and (3) a breach of implied warranty claim against Caleco, (4) a strict liability claim against PECO, and (5) a breach of implied warranty claim against PECO. The Manlove Action, on the other hand, states claims for negligence, seeks to recover damages pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. Cons.Stat. Ann. § 8301 (2003) , and the Pennsylvania Survival Act, 42 Pa. Cons.Stat. Ann. § 8302 (2003), and states a claim for punitive damages. Therefore, while certain issues in the federal action may overlap with issues in the Manlove Action, "the lack of identity of all issues necessarily precludes *Colorado River* abstention." *University of Maryland at Baltimore v. Peat Marwick Main & Co.,* 923 F.2d 265, 276 (3d Cir.1991); *see also Complaint of Bankers Trust Co.,* 636 F.2d at 37 (holding that abstention under *Colorado River* is inappropriate where the two proceedings are not "truly duplicative "). Because the actions are not parallel, abstention pursuant to the *Colorado River*

doctrine is not appropriate here. For this reason PECO's Motion to Dismiss or Stay, and Caleco's Motion For Stay, will be denied.

### IV. Motions to Intervene and for a Stay

On March 27, 2002, a "Motion to Intervene and for a Stay of All Proceedings" was filed by the fiduciaries of the estates of four individuals (Louisa Williams, Roger Williams, Rudolph Malizia, and Angelina Malizia) who died in the fire on June 16, 2001, and by six additional individuals (Nicholas Baldini, Michelle Seeger, Thomas Mulvihill, John Denny, Godron Weir, and Anne Weir) who were injured in the fire. An identical motion was filed on April 3, 2002 by the fiduciaries of the estate of John N. Manlove, who also died in the fire. FN5 According to the Motions to Intervene and for a Stay, Proposed Intervenors seek to intervene for the limited purpose of moving to stay all proceedings. Proposed Intervenors seek a stay of all proceedings on the grounds that they have filed actions in state court (the Manlove Action and the Williams Action) against various parties, including PECO and Caleco, and that they wish to protect their interest in having funds available to satisfy potential judgments against PECO and Caleco in the state court actions. In other words, Proposed Intervenors are concerned that if this action proceeds to judgment and Plaintiff collects significant damages from PECO and Caleco, Proposed Intervenors' ability to collect upon possible future judgments against PECO and Caleco in the state court actions will be impeded. Thus, Proposed Intervenors seek a stay of this action until their claims against PECO and Caleco have been resolved in the state court actions.

> FN5. These two motions shall be referred to herein as the Motions to Intervene and for a Stay, and the parties filing the Motions to Intervene and for a Stay shall be referred to as Proposed Intervenors.

The Motions to Intervene and for a Stay must be denied for a number of reasons. To begin with, intervention generally contemplates that the proposed intervenor will align itself either as a plaintiff or as a defendant. *See, e.g., Hubner v. Schoonmaker,* 1990 WL 149207, at 7 (E.D.Pa.) ; *Kamerman v. Steinberg,* 681 F.Supp. 206, 211 (S.D.N.Y.1988). Accordingly, intervention requires that the intervenor present a "claim or defense," *see* Fed.R.Civ.P. 24(c), related to the existing litigation, which the intervenor wishes to

assert as part of the existing litigation rather than in a separate action, *see Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir.1990) ("The purpose of the rule allowing intervention is to prevent a multiplicity of suits where common questions of law or fact are involved.") (citing *Reich v. Webb,* 336 F.2d 153, 160 (9th Cir.1964), *cert. denied,* 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 801 (1965)). Specifically, Rule 24(c) requires that all motions to intervene "shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c). Here, Proposed Intervenors have not attached a "pleading setting forth the claim or defense for which intervention is sought" as required by Rule 24(c). This technical failing alone would warrant denial of the motion. *See, e.g., School Dist. of Philadelphia v. Pennsylvania Milk Mktg. Bd.,* 160 F.R.D. 66, 67 (E.D.Pa.1995) ; *Creative Dimensions in Management, Inc. v. Thomas Group, Inc.,* 1999 WL 163621, at 2 n. 4 (E.D.Pa.1999); *see also Securities and Exchange Commission v. Investors Sec. Leasing Corp.,* 610 F.2d 175, 178 (3d Cir.1979) (holding that parties must comply with requirements of Rule 24(c)).

**\*6** Furthermore, Proposed Intervenors' failure to comply with the requirement that they file "a pleading setting forth the claim or defense for which intervention is sought" represents more than merely a technical violation of Rule 24(c). In fact, it does not appear that Proposed Intervenors have any claim or defense for which intervention is sought-at least, none has been asserted. Proposed Intervenors seek to intervene not to assert a claim or defense, but rather to delay this action until the related state court actions are resolved. *See* Motion to Intervene and for a Stay of All Proceedings, filed March 27, 2002 ("Motion to Intervene"), at 1-2. This is not an appropriate basis for a motion to intervene.

In *Kamerman v. Steinberg,* 681 F.Supp. 206, the District Court for the Southern District of New York addressed a similar situation and reached the same conclusion. In that case, the movants sought to intervene pursuant to Rule 24 "for the limited purpose of pressing the motion to stay." *Id.* at 210. The movants argued that the federal action should be stayed until final disposition of a related state court action because, according to the movants, a judgment in the federal action could prejudice the claims in the state court action. *Id.* The Court determined that this was not an appropriate basis for a motion to intervene:

> The court notes at the outset the peculiar character

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

of movants' application to intervene. Ordinarily, a person desiring to intervene seeks to join a pending action either as a plaintiff or as defendant. The federal rules therefore require that the applicant "set forth the claim or defense for which intervention is sought." If the application is granted, the intervenor is "treated as if he [or she] were an original party...." The movants here, on the other hand, do not seek to join this action as either plaintiffs or as defendants. They have no claim to press against defendants; nor have they any defense to assert against plaintiffs. In fact, they have no intention whatsoever of litigating the causes of action asserted in the federal complaint. Their sole purpose in submitting their motion is to delay the prosecution of the federal action. With this goal in mind, they dress in the language of Rule 24 what is in reality an application for some special status permitting them to press their motion for a stay. For this reason alone, the court believes that the application to intervene should be denied.

**\*7** *Id.* at 211 (citations omitted). For similar reasons, this Court concludes that Proposed Intervenors here have "dress[ed] in the language of Rule 24 what is in reality an application for some special status permitting them to press their motion for a stay." *Id.* Because Proposed Intervenors have failed to file a pleading as required by Rule 24(c), and because they, in fact, do not seek to join this action as either plaintiffs or as defendants, and have no "claim or defense for which intervention is sought," the Motions to Intervene and for a Stay must be denied. FN6

> FN6. Proposed Intervenors cite two cases in support of the proposition that "it is a well-established procedure in this Circuit for a non-party to move to intervene in an action for the purpose of moving for a stay." Reply Memorandum in Support of Motion to Intervene and for a Stay of All Proceedings, at 2. However, these two cases are distinguishable from the instant case. The first case, *Securities and Exchange Commission v. Mersky,* 1994 WL 22305 (E.D.Pa.1994) (allowing United States Attorney to intervene in pending civil action in federal court), supports only the narrow proposition that "a state is permitted to intervene in a federal civil action when there is a pending state criminal action involving common questions of law or fact." *Anthony v. City of Philadelphia,* 2001 WL 118964, at 1 (E.D.Pa.2001). In the second case, *Riley v.*

*Simmons,* 839 F.Supp. 1113 (D.N.J.1993), the Court permitted the New Jersey Commissioner of Insurance, who had been appointed as the Rehabilitator of an insolvent life insurance company, to intervene in a federal action filed by 200,000 annuitants of the life insurance company against the former directors of the life insurance company. The Rehabilitator was permitted to intervene for the purpose of moving to dismiss or stay the federal action primarily because a particular New Jersey statute granted the Rehabilitator the power to " 'prosecute any action which may exist on behalf of creditors, members, policyholders or shareholders of the insurer against any director or officer of the insurer,' " *id.* at 1118 (citing N.J.S.A. 17B:32-50(a)(15)), and because the Rehabilitator was therefore found to have "a cognizable duty which would be compromised if the Rehabilitator were not allowed to intervene," *id.* at 1118.

Even if this Court were to consider the substantive merits of the Motions to Intervene and for a Stay, the Court would nonetheless deny the Motions because Proposed Intervenors' arguments are flawed on numerous levels. Proposed Intervenors argue that they should be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(a) ("Intervention of Right") FN7 or, in the alternative, pursuant to Rule 24(b) ("Permissive Intervention"). "Under Rule 24(a)(2), a person is entitled to intervene if (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *Harris v. Pernsley,* 820 F.2d 592, 596 (3d Cir.1987).

> FN7. Rule 24(a) provides: "Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

by existing parties."

As to the requirement that an intervenor demonstrate "an interest relating to the property or transaction which is the subject of the action," Fed.R.Civ.P. 24(a)(2), "the applicant must demonstrate that there is a tangible threat to a legally cognizable interest," *Harris,* 820 F.2d at 601. Proposed Intervenors allege that their interest here is in ensuring that there are sufficient funds available to satisfy *potential* judgments against PECO and Caleco in the related state court actions. Although the Third Circuit Court of Appeals has not directly addressed the issue, District Courts in Pennsylvania have consistently held that intervention pursuant to Rule 24(a)(2) is inappropriate where the proposed intervenor's interest is contingent upon prevailing on a separate action. *See Continental Casualty Co. v. SSM Group, Inc.,* 1995 WL 422780, at 3 (E.D.Pa.1995) ("The court finds that this contingency weighs heavily against the granting of intervention as of right."); *Liberty Mut. Ins. Co. v. Pacific Indemnity Co.,* 76 F.R.D. 656 (W.D.Pa.1977) ("Analysis of cases involving interests factually similar to [proposed intervenor's] reveals that an interest contingent upon a favorable result in an associated lawsuit is not an interest sufficient to require intervention under Rule 24(a)."); *see also Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361, 368 n. 11 (3d Cir.1995) (recognizing the existence of "decisions denying a third party's motion to intervene when the party's interest depended upon prevailing on a tort claim in a separate action," but not expressly addressing the issue because the facts in the case before the Court did not present such an issue). Here, any interest Proposed Intervenors might have in the present action is clearly contingent upon obtaining judgments against PECO and Caleco in the related state court actions, and therefore intervention is inappropriate pursuant to Rule 24(a)(2).

Under Rule 24(a)(2), Proposed Intervenors must also demonstrate that "the interest may be affected or impaired, as a practical matter by the disposition of the action." *Harris,* 820 F.2d at 596. Here, even assuming *arguendo* that the interest articulated by Proposed Intervenors is sufficient for purposes of 24(a)(2), the Court is unable to perceive any legitimate threat to that interest. In the present action, Plaintiff seeks to recover approximately four million dollars from Defendants PECO and Caleco. Plaintiff contends, and Proposed Intervenors do not dispute, that as of September 30, 2001, PECO had total assets of $10.791 billion, and that Caleco has a two million

dollar primary insurance policy as well as a nine million dollar excess insurance policy, in addition to its corporate assets. *See* Plaintiff's Memorandum of Law in Opposition to Motion to Intervene and for a Stay of All Proceedings, at 10-11. Thus, even were Plaintiff to successfully recover 4 million dollars from PECO and Caleco, there is no indication that the assets of either PECO or Caleco would be depleted, and, therefore, no reason to conclude that Proposed Intervenors' interest may be impaired by the disposition of this action. For these reasons, the requirements for Intervention of Right are not satisfied here.

**\*8** As to Proposed Intervenors' alternative argument in support of intervention, Rule 24(b)(2) provides for Permissive Intervention "[u]pon timely application" where "an applicant's claim or defense and the main action have a question of law or fact in common," and further provides that "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). As noted above, Proposed Intervenors do not appear to have any claim or defense for which intervention is sought, making it impossible to analyze whether Permissive Intervention is appropriate under the express language of Rule 24(b)(2). Moreover, it is clear that permitting Proposed Intervenors to intervene here would "unduly delay or prejudice the adjudication of the rights of the original parties," as Proposed Intervenors' express objective is to stay the present action until the related state court actions are resolved. For these reasons, Permissive Intervention is not appropriate.

Finally, Proposed Intervenors also argue that if they are allowed to intervene, the Court should then consider and grant their motion to stay the present action because, pursuant to the "superior equities doctrine," the interests of Proposed Intervenors in the assets of PECO and Caleco are "superior" to those of Plaintiff. *See* Motion to Intervene at 8-11. In fact, the superior equities doctrine, which has only been cited in a single Pennsylvania case, *Mellon Bank, N.A. v. National Union Ins. Co. of Pittsburgh, PA,* 768 A.2d 865, 872 (Pa.Super.2001), has absolutely no application to the instant circumstances. The doctrine addresses the situation where an insurer-subrogee seeks to recover from a third party whose conduct allegedly contributed to or permitted the loss. *See id.* (citing Gregory R. Veal, *Subrogation: The Duties and Obligations of the Insured and Rights of the Insurer Revisited,* 28 Tort and Insurance Law Journal

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

69, 70-71 (1992) [hereinafter *Veal* ] ). FN8 The doctrine has no relevance to the present question of whether injured parties suing an alleged tortfeasor with limited funds for injuries arising out of a particular incident have some sort of "superior" claim over an insurer-subrogee who, in a parallel action, has sued the same alleged tortfeasor for property damage suffered by its insured arising out of the same incident. Thus, even if Proposed Intervenors were permitted to intervene, it does not appear that they would be entitled to stay the present proceedings.

> FN8. For example, where a bank is insured by an insurer, and the bank suffers a loss as a result of an outsider who cashes forged checks with the bank, the insurer, after compensating the insured for the loss, may seek to recover from a director or officer of the bank who, the insurer alleges, bears some degree of responsibility for the circumstances surrounding the loss. *See Veal* at 78-79. According to the superior equities doctrine, a court in such circumstances should compare the relative positions of the insurer-subrogee and the subrogation defendant, and decide who ultimately should bear the loss. *See id.* at 70-71.

For the above-stated reasons, the Motions to Intervene and for a Stay will be denied.

### V. Conclusion

**\*9** In summary, PECO's Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint will be denied; PECO's Motion to Dismiss, or in the Alternative, to Stay this Action Pending Resolution of State Court Action will be denied; Caleco's Motion for Stay will be denied; and Proposed Intervenors' Motions to Intervene and for a Stay will be denied. An order follows.

### *AMENDED ORDER*

AND NOW, this day of January, 2003, it is hereby ORDERED as follows:

1. The Court's previous Order in this matter, dated and filed on January 27, 2003, is hereby RESCINDED and is superceded in full by this Order. The Memorandum previously filed accompanying the rescinded Order remains in effect.

2. The "Motion to Dismiss Counts V and VI of Plaintiff's Amended Complaint for Failure to State a Claim for Either Strict Liability or Breach of Warranty," filed by Defendant PECO, Inc. ("PECO") on December 21, 2001 (Docket No. 8), is DENIED.

3. The "Motion to Dismiss, or in the Alternative, to Stay this Action Pending Resolution of State Court Action," filed by PECO on January 7, 2002 (Docket No. 11), is DENIED.

4. The "Motion for Stay" filed by Defendant Caleco, Inc. on January 15, 2002 (Docket No. 13) is DENIED.

5. The "Motion to Intervene and for a Stay of All Proceedings" filed by the fiduciaries of the estates of Louisa Mae Williams, Roger Allen Williams, Rudolph J. Malizia, and Angelina Malizia, and by Nicholas Baldini, Michelle Seeger, Thomas Mulvihill, John Denny, Godron Weir, and Anne Weir on March 27, 2002 (Docket No. 22), and the "Motion to Intervene and for a Stay of All Proceedings" filed by Donald N. Manlove and Diane Simmons on April 3, 2002 (Docket No. 23), are DENIED.

E.D.Pa.,2003.
Lexington Ins. Co. v. Caleco, Inc.
Not Reported in F.Supp.2d, 2003 WL 21652163 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01cv05196 (Docket) (Oct. 12, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

# M

Westlaw.

Slip Copy
Slip Copy, 2005 WL 681308 (D.Del.)
**(Cite as: Slip Copy)**

Page 1

Slip Copy, 2005 WL 681308 (D.Del.)
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
STRATOS LIGHTWAVE, INC., Plaintiff,
v.
PICOLIGHT, INC., Defendant.
**No. Civ.A.03-917 JJF.**

March 23, 2005.

Melanie K. Sharp , of Young Conaway Stargatt & Taylor, LLP , Wilmington, Delaware, Alan L. Barry , Patricial Kane Schmidt , and Jason A. Engel, of Bell. Boyd & Lloyd LLC, Chicago, Illinois, for Plaintiff, of counsel.
Lawrence C. Ashby , Steven J. Balick , and John G. Day , of Ashby & Geddes , Wilmington, Delaware, James P. Brogan , and Craig A. Neugeboren , of Cooley Godward LLP, Broomfield, Colorado, for Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
**\*1** Presently before the Court is the Motion To Dismiss Due To Prior Pending Action, Or, In The Alternative, For Stay Pending Resolution Of Prior Action (D.I.35) filed by Defendant Picolight, Inc. ("Picolight"). For the reasons discussed, the Court will deny the Motion.

BACKGROUND

Plaintiff Statos Lightwave, Inc. ("Stratos") filed a lawsuit ("Stratos I") against Picolight in this Court on June 4, 2002, alleging that Picolight's optoelectronic products infringe eight of Stratos's patents: U.S. Patent No. 36,820 ; 5,717,533 ; 5,734,558 ; 5,864,468 ; 5,879,173 ; 6,201,704 ; 6,220,878 ; and 6,267,606. The Court's case number is 02-cv-478-JJF.

On March 20, 2003, Stratos filed a second lawsuit ("Stratos II") in the U.S. District Court for the Northern District of Illinois, alleging that Picolight's optoelectronic products infringe four other patents: 6,430,053; 36,491; 5,812,582; and 6,108,114.

The Northern District of Illinois transferred the second case to this District by Order dated September 12, 2003. The case was assigned case number 03-cv-917-JJF and is the instant case.

PARTIES' CONTENTIONS

By its Motion, Picolight contends that Stratos II is barred by the doctrine of "claim splitting," due to the pendency of a prior action involving the same parties, accused products, legal theories, and possible relief, and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Picolight further contends that that the patents asserted in Stratos II could have been asserted in Stratos I. In the alternative, Picolight moves to stay Stratos II until the Court resolves Stratos I because Picolight contends that a final judgment in Stratos I will bar Stratos II pursuant to the doctrine of *res judicata.*

In response, Stratos contends that it need not have sued Picolight on all its patents in Stratos I because each patent asserted raises an independent and distinct cause of action. Stratos further contends that the doctrine of *res judicata* will not apply to Stratos's claims in Stratos II, and that Stratos II should not be stayed because there is no identity of issues between the two cases.

LEGAL STANDARD

A motion to dismiss tests the legal sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45-56 (1957). In reviewing a motion to dismiss pursuant to Rule 12(b)(6), courts "must accept as true the factual allegations in the [c]omplaint and all reasonable inferences that can be drawn therefrom." *Langford v. Atlantic City,* 235 F.3d 845, 847 (3d Cir.2000). A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief. *Id.*

A court has the inherent power to stay an action in the interests of efficient and fair resolution of the disputed issues. *See Texaco, Inc. v. Borda,* 383 F.2d 607, 608 (3d Cir.1967).

DISCUSSION

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court concludes that Stratos II should not be dismissed or stayed.

**\*2** In support of its Motion To Dismiss, Picolight relies first on the doctrine of "claim splitting," which "prohibits a party from seeking to avoid the effects of *res judicata* by splitting a cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits." *American Stock Exchange, LLC v. Mopex, Inc.,* 215 F.R.D. 87, 91 (S.D.N.Y.2002).

The Court finds that the doctrine of "claim splitting" does not apply to the circumstances of this case. Stratos is asserting different patents in Stratos II than in Stratos I, not different claims of the same patents. "Each patent asserted raises an independent and distinct cause of action." *Kearns v. General Motors Corp.,* 94 F.3d 1553, 1555 (Fed.Cir.1996).

Further, the Court is not persuaded that the two causes of action should have been litigated together. *Res judicata* does not automatically apply to claims that might have been included in the prior complaint; it must be shown that they necessarily were included in the judgment, and that the interests of justice are not disserved by applying the doctrine of *res judicata* to claims that were never presented for adjudication. *See Brown v. Felsen,* 442 U.S. 127, 132 (1979). The Court finds that Picolight has not made such a showing.

With regard to staying Stratos II, because infringement must be separately proved as to each patent, Picolight cannot show that identical issues are presented by the eight patents litigated in Stratos I and the four patents asserted in Stratos II.

### CONCLUSION

For these reasons, the Court concludes that it must not dismiss or stay Stratos II. Accordingly, the Motion To Dismiss Due To Prior Pending Action, Or, In The Alternative, For Stay Pending Resolution Of Prior Action (D.I.35) filed by Defendant Picolight will be denied.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this *23* day of March 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the Motion To Dismiss Due To Prior Pending Action, Or, In The Alternative, For Stay Pending Resolution Of Prior Action (D.I.35) filed by Defendant Picolight, Inc. ("Picolight") is *DENIED.*

D.Del.,2005.
Stratos Lightwave, Inc. v. Picolight, Inc.
Slip Copy, 2005 WL 681308 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00917 (Docket) (Sep. 29, 2003)

END OF DOCUMENT