## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated, | Case No. **1:05-cv-162 (JJF)** |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON, | |
| Defendants. | |

## OPENING BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION TO DISQUALIFY
## <u>WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP</u>

Dated: September 15, 2005

Joseph N. Gielata (DSB # 4338)
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096

*Lead Counsel for Plaintiffs*
*and the Putative Class*

## **TABLE OF CONTENTS**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      The Instant Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

      Wolf Haldenstein's Conflict Of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES
     NECESSITATE DISQUALIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

     A.    The Court Should Review The
          Adequacy of Wolf Haldenstein. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.    Wolf Haldenstein's Divided Loyalties Amount To A
          Non-Waivable And Disqualifying Conflict Of Interest. . . . . . . . . . . . . .8

     C.    The PSLRA Mandates An Additional Conflict Analysis. . . . . . . . . . . . 13

II.   WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION
     AND MULTIPLE POTENTIAL RULE 11 VIOLATIONS
     MERIT DISQUALIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

     A.    Wolf Haldenstein's Plagiarism Indicates an
          Insufficient Pre-Filing Investigation or None at All. . . . . . . . . . . . . . . . 15

     B.    Wolf Haldenstein's Failure To Serve Summons Properly. . . . . . . . . . . .18

     C.    Wolf Haldenstein Filed Suit In An Inappropriate Venue. . . . . . . . . . . . 19

     D.    Wolf Haldenstein Names The Wrong Defendants
          And Fails To Name A Crucial Defendant. . . . . . . . . . . . . . . . . . . . . . . . 24

     E.    Wolf Haldenstein's Abusive "Certification" Scheme. . . . . . . . . . . . . . . 25

     F.    Wolf Haldenstein's Misleading Notice. . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## <u>TABLE OF AUTHORITIES</u>

<u>Cases:</u>                                                                                    <u>Page</u>

*Bradgate Associates, Inc. v. Fellows, Read & Associates, Inc.*,
    999 F.2d 745 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Burke v. Ruttenberg*,
    102 F. Supp. 2d 1280 (N.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Cardinal Health, Inc. ERISA Litig.*,
    225 F.R.D. 552 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

*In re Continental Illinois Sec. Litig.*,
    750 F. Supp. 868 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*In re Corn Derivatives Antitrust Litig.*,
    748 F.2d 157 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re DaimlerChrysler AG Sec. Litig.*,
    216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*In re DaimlerChrysler AG Sec. Litig.*,
    269 F. Supp. 2d 508 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*de la Fuente v. DCI Telecommunications, Inc.*,
    259 F. Supp. 2d 250 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*de la Fuente v. DCI Telecommunications, Inc.*,
    269 F. Supp. 2d 229 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Examen, Inc. v. VantagePoint Venture Partners 1996*,
    873 A.2d 318 (Del. Ch. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Garr v. U.S. Healthcare, Inc.*,
    22 F.3d 1274 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Grand Park Surgical Center, Inc. v. Inland Steel Co.*,
    1996 WL 204322 (N.D. Ill. Apr. 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Greenfield v. U.S. Healthcare, Inc.*,
    146 F.R.D. 118 (E.D. Pa. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Hill v. Equitable Bank*,
    115 F.R.D. 184 (D. Del. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*International Business Mach. Corp. v. Levin*,
    579 F.2d 271 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Jack Eckerd Corp. v. Dart Group Corp.*,
    621 F. Supp. 725 (D. Del. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Janovici v. DVI, Inc.*,
    2003 WL 22849604 (E.D. Pa. Nov. 25, 2003) . . . . . . . . . . . . . . . . . . . . . . .31, 33

*Kamilewicz v. Bank of Boston Corp.*,
    100 F.3d 1348 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Kayes v. Pacific Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Krim v. pcOrder.com, Inc.*,
    210 F.R.D. 581 (W.D. Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

*Kuper v. Quantum Chemical Corp.*,
    145 F.R.D. 80 (S.D. Ohio 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kurczi v. Eli Lilly & Co.*,
    160 F.R.D. 667 (N.D. Ohio 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

*Marsden v. Select Medical Corp.*,
    2005 WL 113128 (E.D. Pa. Jan. 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*Matter of Excello Press, Inc.*,
    967 F.2d 1109 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.*,
    632 F. Supp. 418 (D. Del. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*In re Network Associates, Inc., Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*In re Oracle Sec. Litig.*,
    131 F.R.D. 688 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Solomon v. Continental American Life Insurance Co.*,
    472 F.2d 1043 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Stauffer Chemical Co. v. FMC Corp.*,
    218 F. Supp. 568 (D. Del. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Sullivan v. Chase Inv. Services of Boston, Inc.*,
    79 F.R.D. 246 (D.C. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Taubenfeld v. Career Education Corp.*,
    2004 WL 554810 (N.D. Ill. Mar. 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Terayon Communications Sys., Inc.*,
    2004 WL 413277 (N.D. Cal. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .7-8

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 86 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tracinda Corp. v. DaimlerChrysler AG*,
    364 F. Supp. 2d 362 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Tranor v. Brown*,
    913 F. Supp. 388 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Tuff Torq Corp. v. Hydro-Gear Ltd. Partnership*,
    882 F. Supp. 359 (D. Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*U.S. v. Gordon*,
    334 F. Supp. 2d 581 (D. Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Miller*,
    624 F.2d 1198 (3d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Van Gelder v. Taylor*,
    621 F. Supp. 613 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Waltz v. County of Lycoming*,
    974 F.2d 387 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Rules:**

15 U.S.C. §78u-4(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

15 U.S.C. § 78u-4(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

ABA CODE OF PROFESSIONAL RESPONSIBILITY, DR 5-105 AND EC 5-14. . . . 8

Fed. R. Civ. P. 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 4(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18 n.6

Fed. R. Civ. P. 4(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 45(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

Model Rules of Professional Conduct 1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Model Rules of Professional Conduct 1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Model Rules of Professional Conduct 1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Model Rules of Professional Conduct 3.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Model Rules of Professional Conduct 3.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

**Other Authorities:**

Moore's Federal Practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

Wright, Miller & Cooper, *Federal Practice and Procedure 2d.* . . . . . . . . . . . . . . . . . . 21

This brief is respectfully submitted by lead plaintiffs Samuel I. Hyland and Stephanie Speakman (collectively, the "Delaware Plaintiffs") in support of their motion to disqualify Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein").[1]

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The Delaware Plaintiffs have commenced and vigorously prosecuted the instant securities class action in this Court (the "Delaware Action"). Pending in the Northern District of Illinois is an action captioned *Blau v. Harrison, et al.*, No. 04C 6592 (the "Illinois Action"), in which Wolf Haldenstein purports to be lead counsel. While both actions arise from the same core set of facts, there are critical differences in the respective actions, which are discussed below. In both actions, a class has yet to be certified, no discovery has been taken, and motions to dismiss remain pending.

On August 24, 2005, more than five months after the filing of the Delaware Action and three months after counsel in the Delaware Action notified Wolf Haldenstein in writing of: (i) the existence of the Delaware Action; (ii) a series of disturbing errors committed by Wolf Haldenstein in the Illinois Action; and (iii) disabling conflicts of interest which preclude Wolf Haldenstein from involvement in the Illinois Action, Wolf Haldenstein appeared in this Court to request intervention and a stay of the Delaware Action. To date, no Wolf Haldenstein attorney has moved for admission *pro hac vice*.

## SUMMARY OF THE ARGUMENT

1.    Wolf Haldenstein's representation of class members in this litigation is fatally impaired because it is seeking recovery on behalf of different classes of plaintiffs (with opposing interests) from the same "common pool." As the motion to dismiss in this action has already been fully briefed, and the putative class in this litigation is adequately

---

[1] A brief filed by Wolf Haldenstein in this action lists the firm as both an LLP and an LLC. (D.I. 59 at 9.) The motion to disqualify presumes that the firm is an LLP, but it is respectfully requested that disqualification of Wolf Haldenstein, if ordered, extend to its related and/or controlled entities, if any.

represented by present counsel, to prevent a disabling conflict of interest and the appearance of impropriety, Wolf Haldenstein should be disqualified.

2.      Wolf Haldenstein's incompetence, lack of diligence and potential Rule 11 violations merit disqualification.

## STATEMENT OF FACTS

### THE INSTANT LITIGATION

The Delaware Action concerns materially false and misleading statements and omissions by defendant JPMorgan Chase & Co. (together with its subsidiaries, "JPMC" or "the Company") and named individual defendants in connection with the merger (the "Merger") between JPMC and Bank One Corporation ("Bank One"), which was consummated on July 1, 2004.  The Delaware Plaintiffs allege that shareholder approval of the Merger was illegally obtained by means of *inter alia* a false and misleading Joint Proxy Statement-Prospectus dated April 19, 2004 (the "Proxy/Prospectus").  The claims on behalf of shareholders of the Company include violations of federal securities laws and breach of fiduciary duty.

While the Illinois Action arises from the same core set of facts, it asserts far fewer claims and allegations on behalf of a smaller putative class.[2]  On December 14, 2004, the law firm of Wolf Haldenstein moved for an order appointing it as lead counsel and its purported clients Dr. Stephen Blau ("Blau"), an individual, and the American Growth Fund, Inc. ("AGF"), a registered open-ended investment company, as lead plaintiffs in the Illinois Action.  (A copy of the motion is attached as Exhibit 1 to the Declaration of Joseph N. Gielata ("Decl.") submitted herewith.)  AGF's financial stake of 25,000 shares of JPMC is more than eight times that of Blau, who inexplicably claims to own "2999.9"

---

[2] An informative table pointing out many of these differences is included in the Delaware Plaintiffs' opposition to the recent motion to intervene.  (D.I. 62 at 20-22.)

shares of JPMC.[3]  As Wolf Haldenstein claimed to represent clients with a financial stake

of 28,000 shares, no challenger with a larger claimed financial stake emerged and the

proposed order (the "Minute Order") was entered without opposition or further briefing

on January 5, 2005.  The Northern District of Illinois has yet to review the adequacy of

any proposed class counsel in the Illinois Action, as Wolf Haldenstein has not moved for

class certification.

On February 18, 2005, Blau filed an amended complaint.  (Decl. Ex. 2.)  That

very same day, AGF (which had unwittingly and mistakenly signed a "plaintiff's

certification" form), withdrew from the Illinois Action without explanation.  (Decl. Ex.

3.)  On April 22, 2005, the Illinois Action defendants except for Riley P. Bechtel moved

to dismiss the amended complaint.[4]  (Decl. Ex. 4.)

### WOLF HALDENSTEIN'S CONFLICT OF INTEREST

In addition to the Illinois Action, Wolf Haldenstein is currently seeking multi-

billion-dollar recoveries from JPMC in several other high-profile cases.  In particular,

Wolf Haldenstein is one of only six firms on the Court-appointed Plaintiffs' Executive

Committee in the Initial Public Offering ("IPO") Securities Litigation, in which JPMC is

a prominent defendant.  (Decl. Ex. 5.)  The IPO Securities Litigation consists of

numerous class actions involving more than 300 IPOs marketed between 1998 and 2000.

*Id.*  The actions are coordinated in the Southern District of New York.  *Id.*  The lawsuits

generally allege that the IPOs were manipulated by investment banks, including JPMC, to

artificially inflate the market price of the offered securities and to conceal the amounts of

compensation actually received by the underwriters.  *Id.*  The plaintiff classes consist of

investors who purchased securities traceable to the IPOs.  The defendants consist of the

---

[3] It is impossible to buy or sell fractional shares on the New York Stock Exchange, raising a reasonable doubt as to the accuracy of Blau's purported holding.
[4] As discussed below, Mr. Bechtel contends that Wolf Haldenstein failed to serve him with the complaint.

companies brought public, certain of their officers and directors and 55 of the investment banks that brought them public and underwrote various follow-on offerings. *Id.*

Wolf Haldenstein partner Adam J. Levitt and Wolf Haldenstein associate Gustavo Bruckner claim on the firm's website to be "actively involved" in the IPO Securities Litigation and to have "worked extensively on drafting and discovery" therein. (Decl. Ex. 6.) Messrs. Levitt and Bruckner appear on the amended complaint as plaintiff's counsel in the Illinois Action.

Of the 307 complaints in the IPO Securities Litigation, each of which was reviewed by the Delaware Plaintiffs' counsel, JPMC is a defendant in 128, or 42%, of the actions. (Decl. ¶ 7 & Ex. 7.) Thus, JPMC is one of the defendants with the highest exposure in the coordinated litigation. Indeed, the Company has already paid a $25 million penalty to settle related charges by the Securities and Exchange Commission (the "SEC"). *See* Litigation Release No. 18385: "SEC Sues J.P. Morgan Securities Inc. For Unlawful IPO Allocation Practices; J.P. Morgan Agrees To Settlement Calling For Injunction And Payment Of $25 Million Penalty" (Decl. Ex. 8).

Damages in the IPO Securities Litigation are reportedly estimated to be **as much as $100 billion**, with a recovery predicted to be roughly **$25 billion**. *See* "Banks under legal siege", *The Banker* (Mar. 2, 2003) (Decl. Ex. 9). As a result of a settlement by the issuer defendants, only the investment banks remain defendants in this massive litigation. *See IPO Securities Litigation Recovery of at Least $1 Billion Dollars Guaranteed For Plaintiff Classes Upon Approval Of Settlement* (Jun. 26, 2003) (Decl. Ex. 5). In addition, the settling issuers have assigned to class members certain claims they may have against the investment banks, including JPMC. *Id.* In a July 2003 interview with the Associated

Press (Decl. Ex. 10), the Chair of Plaintiffs' Executive Committee asserted in the wake of the preliminary settlement:

> "The billion dollars is an expression of concern that these allegations are real and ***could give rise to staggering liability.*** It simplifies the litigation in that we can focus our attention on the conduct of the investment banks. The interesting part here is how much broader our inquiries will be than the government's has been because we're covering 55 banks, not 10. It's going to be far more fascinating to demonstrate that the conduct we allege to be serious violations of the law was widespread throughout the entire industry. ... ***I would be very disappointed if we don't achieve multiple billions (in recovery).***" [Emphasis added.]

Thus, JPMC stands to lose billions of dollars in the IPO Securities Litigation, in which case Wolf Haldenstein could potentially earn tens of millions in dollars in fees. The firm's website, with several prominent links concerning the IPO Securities Litigation, indicates the importance of these cases to Wolf Haldenstein, as well as its leadership role in the litigation. (Decl. Ex. 6.)

Recent developments demonstrate the reality of JPMC's multi-billion-dollar exposure in the IPO Securities Litigation. On March 16, 2005, JPMC settled a class action brought by WorldCom investors for $2 billion. (Decl. Ex. 11.) On June 14, 2005, JPMC settled a class action brought by Enron investors for $2.2 billion. (Decl. Ex. 12.)

## ARGUMENT

Wolf Haldenstein's loyalties are incurably divided due to its involvement in conflicting multi-billion dollar class actions against JPMC, including one action purportedly on behalf of JPMC's owners concurrent with other actions against JPMC on behalf of issuers and their owners. Wearing multiple hats—attacking JPMC on one hand, representing its owners on the other—will impair the recovery for at least one class

represented by Wolf Haldenstein and, at a minimum, creates the appearance of impropriety.

In addition to having divided loyalties, Wolf Haldenstein selected an inappropriate venue with no relevance to the litigation, submitted a misleading lead plaintiff application, misrepresented its pre-filing investigation, failed to properly serve crucial defendants, and both failed to name and incorrectly named certain defendants. These various flagrant blunders not only potentially violate Rule 11 and provisions of the Private Securities Litigation Reform Act ("PSLRA") but also necessitate that Wolf Haldenstein be disqualified from acting as counsel in this litigation to prevent potential harm to the interests of the putative class.

The court has the power to supervise the professional conduct of attorneys appearing before it. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). This includes the power to disqualify an attorney. *Id.* In a class action, an "attorney's duty to the class requires him or her to make known to the court any conflicts in order that the court may take appropriate steps to protect the interests of all class members." *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 165 (3d Cir. 1984) (citation omitted).

Pursuant to Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct ("MRPC"). *U.S. v. Gordon*, 334 F. Supp. 2d 581, 587 (D. Del. 2004). As to conflicts of interest, this Court has observed:

> As Judge Seitz noted in *In Re Corn Products Derivatives Antitrust Litigation*, 748 F.2d at 162, an important consideration is the maintenance of public confidence in the integrity of the Bar. In order to maintain this confidence, lawyers are held to higher standards of loyalty and integrity than other fiduciaries…. In order to maintain the public confidence in the Bar, it is essential for attorneys to avoid situations that pose these apparent conflicts.

*Jack Eckerd Corp. v. Dart Group Corp.*, 621 F. Supp. 725, 733 (D. Del. 1985) (granting motion to disqualify law firm); *see also International Business Mach. Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978) ("An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public…. The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." (citations omitted)).

I.    **WOLF HALDENSTEIN'S DIVIDED LOYALTIES
NECESSITATE DISQUALIFICATION**

Wolf Haldenstein's appointment as lead counsel in the Illinois Action, understandably, did not receive strict scrutiny because no adversary was present to call any problems to the Court's attention.  Undoubtedly, defendants were content with the lack of an adequate representative of the class.  They wanted to contain the controversy and were presented with a weak complaint prosecuted by conflicted counsel who have not demonstrated any ability to represent the class adequately.

However, in light of the Court's fiduciary role in the class action context, the Court should review the adequacy of those purporting to represent the class.  Here, Wolf Haldenstein's divided loyalties render it incapable of representing the class adequately.

A.    **The Court Should Review The
Adequacy of Wolf Haldenstein**

Under the provisions of the PSLRA requiring that a lead plaintiff be both typical and adequate in accordance with Rule 23, the Court has a "continuing responsibility" to determine whether lead plaintiffs meet the typicality and adequacy prongs of Rule 23 to ensure that the interests of the class are being protected.  *In re Terayon Communications*

*Sys., Inc.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004) (granting defendants'

motion to disqualify lead plaintiffs four years after they had been appointed on the

grounds that they did not meet the typicality and adequacy requirements of Rule 23 and

thus were not appropriate lead plaintiffs). *See also In re GMC Pick-Up Truck Fuel Tank*

*Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he court plays the important role

of protector of the absentees' interests, in a sort of fiduciary capacity, by approving

appropriate representative plaintiffs and class counsel."); *In re Oracle Sec. Litig.*, 131

F.R.D. 688, 691 (N.D. Cal. 1990) (Walker, J.) ("[T]he court bears fiduciary

responsibilities to the class."). To the extent that Wolf Haldenstein purports to represent

a class, its adequacy as counsel should be considered by the Court.

### B.    Wolf Haldenstein's Divided Loyalties Amount To A Non-Waivable And Disqualifying Conflict Of Interest

It is a conflict of interest for a law firm to seek recovery from the same defendant

on behalf of different classes of plaintiffs. *See In re Cardinal Health, Inc. ERISA Litig.*,

225 F.R.D. 552, 557 (S.D. Ohio 2005) (citing ABA Code of Professional Responsibility,

DR 5-105 and EC 5-14 (prohibiting counsel from representing different plaintiffs with

conflicting claims against the same defendant because it creates "the appearance of

divided loyalties of counsel")). *See also* MRPC Rule 1.7(a)(2) ("a lawyer shall not

represent a client if… there is a significant risk that the representation of one or more

clients will be materially limited by the lawyer's responsibilities to another client… or by

a personal interest of the lawyer").

In *Cardinal Health*, a law firm sought to be appointed lead counsel for the

plaintiff class, but several plaintiffs objected because the law firm was handling other

litigation against the same defendants. The Court noted that representing multiple classes

seeking recovery from the same "common pool" presents a fatal conflict. 225 F.R.D. at

557.  The court rejected the law firm's motion to be appointed lead counsel, instead

selecting another candidate with no such conflict.  *Id.* at 558.

 As set forth above, in addition to the instant litigation against JPMC, Wolf

Haldenstein is currently involved in several other high-profile cases seeking substantial

recoveries from JPMC, including 128 lawsuits in the IPO Securities Litigation.  Thus,

Wolf Haldenstein suffers from a disabling conflict similar to that considered in *Cardinal

Health*.

 In *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002), the court denied

a law firm's attempt to be appointed class counsel.  Like Wolf Haldenstein, the law firm

was one of the six firms on the Plaintiffs' Executive Committee in the IPO Securities

Litigation.  Moreover, the corporate defendant, pcOrder.com, was a defendant in the IPO

Securities Litigation, albeit in only one action.  The court denied the firm's request to be

appointed class counsel because: (1) of the possibility that the defendants might not be

able to satisfy all the claims, and (2) like Wolf Haldenstein, it had not informed the class

representatives that it represented other classes in other courts against the same

defendants.  *Id.* at 589.  The law firm attempted to counter the latter argument by

suggesting that the court could supervise the allocation of any settlement or award.  *Id.* at

590.  The court rejected this argument, noting that it would not have control over the

courts in which the other cases against these defendants are pending.  *Id.*

 Given the firm's at least 128 other pending suits against JPMC, Wolf Haldenstein

is unable to vigorously advance the interests of class members in this litigation while

simultaneously prosecuting other cases against JPMC on behalf of different classes in the

IPO Securities Litigation.  As JPMC does not have an unlimited ability to pay, an

increased recovery for class members in the IPO Securities Litigation would likely come

at the expense of class members in this litigation. It is widely settled that this conflict of interest precludes Wolf Haldenstein from seeking to represent multiple classes pursuing recovery from the same source. *See Sullivan v. Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (D.C. Cal. 1978) (requiring plaintiffs' counsel to certify that they had completely withdrawn from a separate class action against the defendant because the "responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel."); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) (proposed class representative failed to satisfy adequacy requirement, where its proposed lead counsel had a conflict of interest by virtue of its representation of the plaintiff class in other litigation against the same defendant); *Kuper v. Quantum Chemical Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (declining class certification in securities action because the employee-stockholder class representatives failed to demonstrate that they would vigorously prosecute class interests through qualified counsel in light of the fact that the same counsel represented a class of bondholders in another action against corporation and sought recovery from a common pool of assets that might be insufficient to support the amounts sought by both classes); *In re Continental Illinois Sec. Litig.*, 750 F. Supp. 868, 875 (N.D. Ill. 1990) (disallowing attorneys' fees in class action for work on a related derivative action per earlier ruling that such dual representation was impermissible, noting that "[t]he conflict seemed especially likely in the area of settlement negotiations, where the two kinds of plaintiffs might be competing for limited funds").

In *Sullivan*, the Northern District of California court noted its "major concern about counsel involv[ing] their role in a parallel securities fraud case against [the same corporate defendant] in the District of Maryland" and observed that "[t]he possibility that

- 10 -

assets and insurance of the defendants who may have committed fraud against the plaintiffs will be insufficient to satisfy an alleged liability to the class of over $20 million is great enough to influence litigation strategy." 79 F.R.D. at 259. Thus, the court held that "[b]ecause this putative class and the [plaintiffs in the parallel action] have conflicting interests in the course of each litigation, counsel cannot represent both." *Id.* Here, Wolf Haldenstein's divided loyalties are more clearly reflected in the billions of dollars at stake both in this litigation and in the IPO Securities Litigation. Indeed, not just the same firm, but the very same Wolf Haldenstein attorneys representing Blau in this matter have touted their involvement in the IPO Securities Litigation. (*See* Decl. Ex. 6.)

At a minimum, the appearance of a conflict is undeniable. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (affirming the necessity of class counsel's withdrawal to remedy the appearance of divided loyalties, even if "there had as yet been no reason to believe improper influence had resulted from the representation of two parties with conflicting interests," citing *Sullivan*). Wolf Haldenstein has not even attempted to mitigate the conflict. Since some of the same Wolf Haldenstein attorneys represent plaintiffs in both the Illinois Action and the IPO Securities Litigation, it is clear that the firm has not instituted any "Chinese Wall" between the cases. *See Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.*, 632 F. Supp. 418 (D. Del. 1986) (Farnan, J.) (granting motion to disqualify attorney, but declining to disqualify attorney's law firm in light of "Chinese Wall").

The form of relief sought in this litigation poses a substantial risk of conflict with the other suits maintained by Wolf Haldenstein against JPMC. In this litigation, a recovery in JPMC stock, rather than cash, would make whole aggrieved members of the class. As the Delaware Action attacks, *inter alia*, the unnecessarily inflated exchange

ratio agreed upon in connection with the Merger, one way to correct the inflated exchange ratio is for JPMC to issue JPMC common stock to certain members of the class. However, this non-cash alternative is in conflict with the cash recovery sought by Wolf Haldenstein in other ongoing litigation against JPMC. For instance, the continued prosecution by Wolf Haldenstein of other suits against JPMC may harm its balance sheet and/or the value of its common stock, to the detriment of class members who might benefit from a stock settlement or who have retained their stock. *See Kuper*, 145 F.R.D. at 83 ("class members who…continue to [own stock in the corporation] have a vested interest in that corporation's continued existence and viability"). Alternatively, rather than considering solely the best interests of the class in this case, Wolf Haldenstein might seek a stock settlement in this litigation in order to leave JPMC more cash to pay for recoveries in the IPO Securities Litigation. Thus, this conflict further impairs Wolf Haldenstein's ability to represent the putative class in this case.

The putative classes in this litigation and in the IPO Securities Litigation are in direct opposition. In this case, the class covers certain JPMC shareholders, *i.e.*, the Company's owners. In the IPO Securities Litigation, the claims are on behalf of issuers and their owners. The recovery sought by the latter comes at the expense of the interests of JPMC shareholders. Wolf Haldenstein cannot refuse to choose a side.

The class in this case will not be harmed by the disqualification of Wolf Haldenstein. First, the Delaware Action, which seeks recovery on behalf of a class including the putative class in the Illinois Action, has been and continues to be vigorously prosecuted by the Delaware Plaintiffs. Second, the Delaware Plaintiffs have a much larger financial stake in the litigation than Blau, ensuring that their interests are aligned with those of the class. Third, the Illinois Action is at an early stage, as no discovery has

been sought, no motion to dismiss has been ruled upon (or even fully briefed), and no class has been certified.  Fourth, if Wolf Haldenstein is disqualified, Blau will still be represented by other counsel (the Law Office of Marc S. Henzel in the Illinois Action and Chimicles & Tikellis LLP in the Delaware Action).  Finally, unlike Wolf Haldenstein, the Delaware Plaintiffs' counsel is not counsel in any other lawsuit against JPMC, and thus has no conflict of interest preventing his effective performance as class counsel.  (Decl. ¶ 3.)

Disqualifying Wolf Haldenstein will not delay this litigation.  It is apparent that Wolf Haldenstein has not advanced this litigation to any material degree since its filing. Although the Illinois Action was commenced on October 15, 2004 (almost four months after a related action in the Court of Chancery (the "Chancery Action") was commenced), defendants' motion to dismiss has not even been fully briefed yet, and the amended complaint in the Illinois Action was filed barely a month before the Delaware Action was commenced.  Thus, disqualifying Wolf Haldenstein will not delay this litigation or prejudice any party.  To the contrary, disqualification will ensure that all parties' interests, including those of absent class members, will be protected.  Accordingly, this Court should disqualify Wolf Haldenstein from representing any purported class member in this litigation.

### C.        The PSLRA Mandates An Additional Conflict Analysis

Wolf Haldenstein has not yet disclosed information necessary to determine whether the ownership of JPMC common stock by any Wolf Haldenstein attorney constitutes a conflict of interest sufficient to disqualify the firm from representing the plaintiff class.  Such a determination is mandated by the PSLRA:

**Attorney conflict of interest**

> If a plaintiff class is represented by an attorney who
> directly owns or otherwise has a beneficial interest in the
> securities that are the subject of the litigation, the court
> shall make a determination of whether such ownership or
> other interest constitutes a conflict of interest sufficient to
> disqualify the attorney from representing the plaintiff class.

15 U.S.C. §78u-4(a)(9). Wolf Haldenstein has yet to disclose which, if any, of its

attorneys directly own or otherwise have a beneficial interest in JPMC common stock.

By contrast, the Delaware Plaintiffs' counsel freely disclosed that counsel has no

beneficial interest, whether direct or indirect (for instance, through a mutual fund), in

JPMC common stock. (D.I. 28 at 14.) Accordingly, this Court should require Wolf

Haldenstein to make the necessary disclosure under the PSLRA to determine whether its

loyalties are even more divided than already shown.

**II.    WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION
        AND MULTIPLE POTENTIAL RULE 11 VIOLATIONS
        <u>MERIT DISQUALIFICATION</u>**

In addition to (and perhaps resulting from) the firm's divided loyalties, a plethora

of irregularities has plagued Wolf Haldenstein's (mis)management of the Illinois Action.

These irregularities include an inappropriate choice of venue, the failure to publish

adequate notice, and a false and misleading lead plaintiff application. Wolf Haldenstein

has also misrepresented its pre-filing investigation, failed to properly serve crucial

defendants, and both failed to name and incorrectly named certain defendants. Wolf

Haldenstein's various flagrant blunders not only potentially violate Rule 11 but also

necessitate that the firm be disqualified as counsel in this litigation to prevent potential

harm to the class.

A.    **Wolf Haldenstein's Plagiarism Indicates an**
      <u>**Insufficient Pre-Filing Investigation or None at All**</u>

The Illinois Action amended complaint falsely claims to be based "upon the investigation made by and through plaintiff's counsel," purportedly including a review of JPMC's SEC filings, "as well as press releases, news articles, and other public statements concerning the Company."  (Decl. Ex. 2 at 1.)  Notably absent from this purported investigation is any reference to pleadings in a similar lawsuit.  However, a comparison of the Illinois Action amended complaint and the consolidated complaint in the Chancery Action reveals at least ***29 instances of plagiarism***, including several allegations copied verbatim.  (Decl. ¶ 4 & Ex. 13.)  For instance, ¶ 55 of the consolidated complaint in the Chancery Action alleges:

> [A]lthough the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.

Wolf Haldenstein shamelessly lifted this text word for word (but without attribution) at ¶ 55 of the Illinois Action amended complaint, which alleges:

> Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor….

The sloppiness of Wolf Haldenstein's apish drafting is shown by an edit mistakenly left in (Decl. Ex. 13 at 19), and when the complaint erroneously cites an analyst (*id.* at 1), and a foreign publication (*id.* at 20).

This flagrant plagiarism, which permeates the Illinois Action amended complaint, indicates that Wolf Haldenstein either performed no investigation at all or did not investigate or research the allegations and claims in the Illinois Action to the extent required by Rule 11.  The extent of the plagiarism strongly suggests that Wolf

Haldenstein attorneys did not, in fact, review for themselves the articles, reports, and transcripts cited in the complaint. Rather, Wolf Haldenstein blindly and improperly relied upon the investigatory and drafting efforts of plaintiffs' counsel in the Chancery Action.

Wolf Haldenstein has found itself in hot water for such misconduct at least twice in the past. In *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118, 126-28 (E.D. Pa. 1993), *aff'd*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994), plaintiffs' counsel, including a Wolf Haldenstein partner, were reprimanded because certain attorneys had failed to personally investigate law and facts underlying a securities fraud complaint. Although the Wolf Haldenstein attorney was not sanctioned, the Court sanctioned the attorneys who merely copied their complaint from another complaint for violating Rule 11's "reasonable inquiry" requirement. *Greenfield*, 146 F.R.D. at 126-28. *See also Garr*, 22 F.3d at 1279 ("[A] signer making an inadequate inquiry into the sufficiency of the facts and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified."); *Bradgate Associates, Inc. v. Fellows, Read & Associates, Inc.*, 999 F.2d 745, 752 (3d Cir. 1993) ("The focus of a district court's Rule 11 inquiry is the reasonableness of the investigation…."); *Taubenfeld v. Career Education Corp.*, 2004 WL 554810, at *5 (N.D. Ill. Mar. 19, 2004) (noting that "this issue of copying another's complaint would have persuasive effect if there was evidence showing that the proposed lead counsel did not, in fact, undertake a sufficient investigation before filing a complaint."); *Matter of Excello Press, Inc.*, 967 F.2d 1109, 1112 (7th Cir. 1992) ("the right question [is] not whether the claim itself was frivolous or nonfrivolous, but whether [counsel] conducted an adequate inquiry into the facts and the law before he filed the claim").

Similarly, in *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250, 274 (S.D.N.Y. 2003), the Court granted defendants' request for Rule 11 sanctions against plaintiffs' counsel including Wolf Haldenstein, this time for improperly asserting clearly time-barred claims.[5] An adequate inquiry by competent counsel would have prevented this. Again, Wolf Haldenstein avoided monetary sanctions, *see de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 229, 235 (S.D.N.Y. 2003) (declining to assess Rule 11 sanctions on liaison counsel) but the pattern is clear. Here, there is abundant evidence of Wolf Haldenstein's inadequate inquiry. (Decl. Ex. 13.) Indeed, Wolf Haldenstein's misconduct here is all the more inexcusable in that the Illinois Action was commenced several months after the relevant facts first emerged and the Chancery Action was commenced. *See Garr*, 22 F.3d at 1279 ("[A]n attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints.").

"[T]he use of the auxiliary verb 'shall' in Rule 11 was intended to surmount any hesitancy to issue sanctions against attorneys and parties who run afoul of the duty to conduct a reasonable investigation." *Bradgate*, *supra*, 999 F.2d at 753. "Although sanctions may properly include an award of counsel fees and expenses to the adversary, the prime goal should be deterrence of repetition of improper conduct, and an award of counsel fees or other monetary sanction should not automatically be the sanction of choice." *Waltz v. County of Lycoming*, 974 F.2d 387, 390 (3d Cir. 1993). Wolf Haldenstein has, despite repeated previous warnings, violated its responsibility to conduct

---

[5] In *de la Fuente*, the defendants argued that plaintiffs' counsel violated Rule 11 by simply copying an SEC complaint. 259 F. Supp. 2d at 259. The Court found reliance upon the investigatory findings of a regulatory agency to be sufficient and, importantly, plaintiffs' counsel represented that every allegation in the complaint had been verified through independent investigation. *Id.* at 260. Here, there was no independent investigation by the SEC or other any regulatory agency. Further, any claim that Wolf Haldenstein verified every plagiarized allegation would strain credulity, but, in any case, could be refuted or confirmed by the firm's electronic research records.

a reasonable investigation.  In a case of this magnitude, Wolf Haldenstein may view monetary sanctions merely as a "cost of doing business."  Accordingly, the appropriate sanction is to disqualify Wolf Haldenstein as counsel.

### B.    Wolf Haldenstein's Failure To Serve Summons Properly

In keeping with Wolf Haldenstein's pattern of carelessness in the Illinois Action, the firm failed to serve its complaint on several of the defendants.  Now that the statutory time period for service of process has run (as well as possibly the statute of limitations on certain claims), it is unclear whether Wolf Haldenstein's inexcusable failure is curable.

In the Delaware Action, defendant Riley P. Bechtel waived service of summons upon the formal request of the Delaware Plaintiffs' counsel.  (D.I. 21.)  The other defendants have all expressly stipulated to waiver of service of summons in the Delaware Action.  *Id.*  Even if the defendants had not waived service of summons, the Delaware Plaintiffs could easily have served them all under Delaware's director consent statute.[6]

By contrast, according to the Illinois Action docket, Wolf Haldenstein left copies of the summons and complaint with Marjorie G. Joseph, presumably an officer or other agent of JPMC.  (Decl. ¶ 9.)  It is unclear why Wolf Haldenstein believed that such service was sufficient or proper, especially given the fact that five of the Illinois Action

---

[6] Fed. R. Civ. P. 4(e)(1) provides that service upon an individual from whom a waiver has not been obtained may be effected in any judicial district of the United States pursuant to the law of the state in which the district court is located.  Delaware's "director consent" statute provides, in relevant part: "Every nonresident of this State who…accepts election or appointment as a director…of a corporation organized under the laws of this State or who…serves in such capacity…shall…be deemed thereby to have consented to the appointment of the registered agent of such corporation…as an agent upon whom service of process may be made in all civil actions…brought in this State…against such corporation, in which such director…is a necessary or proper party, or in any action or proceeding against such director…for violation of a duty in such capacity, ***whether or not the person continues to serve as such director***…at the time suit is commenced.  Such acceptance or service as such director…shall be a signification of the consent of such director…that any process when so served shall be of the same legal force and validity as if served upon such director…within this State and such appointment of the registered agent…shall be irrevocable."  10 Del. C. § 3114(a) (emphasis added).

defendants were no longer directors of JPMC when the Illinois Action was commenced.[7]

Fed. R. Civ. P. 4(m) imposes a 120-day time limit to serve a complaint, but that period

elapsed long ago.  In fact, defendant Bechtel expressly contests the propriety of service in

the Illinois Action.  (Decl. Ex. 4 at 2 n.2 ("Riley P. Bechtel…was never properly served

in this matter.").)  Without taking any position on the issue of Wolf Haldenstein's attempt

to serve the complaint, it is important to note that this issue may endanger Blau's ability

to recover against other defendants as well.

The importance of Mr. Bechtel's participation in this action is twofold.  First, Mr.

Bechtel's background and multiple connections to JPMC, as alleged in the Delaware

Action, may give rise to higher liability on his part.  (D.I. 51 ¶¶ 173-186.)  Second, as the

billionaire Chairman and CEO of Bechtel Group, Mr. Bechtel is second only to JPMC in

terms of potential sources of recovery.  (Decl. Ex. 14.)  Thus, Wolf Haldenstein's failure

to serve summons properly specifically impairs the ability of the class to recover

damages and further demonstrates the law firm's inability to adequately prosecute this

litigation.

## C.    Wolf Haldenstein Filed Suit In An Inappropriate Venue

The Delaware Action is properly venued in this district because (1) the plaintiffs

are Delaware residents, *see Tuff Torq Corp. v. Hydro-Gear Ltd. Partnership*, 882 F.

Supp. 359, 362 (D. Del. 1994) ("deference to plaintiff's choice of forum applies when

plaintiff has chosen its 'home turf' as the forum for the lawsuit"), (2) JPMC is a

Delaware corporation, (3) Bank One was incorporated in Delaware, (4) the Merger

agreement provides that Delaware law governs, (5) the first-filed suits against the

defendants were commenced in the Delaware Court of Chancery, (6) Delaware law

---

[7] Laurence Fuller stepped down from the JPMC Board in 2003; Riley P. Bechtel and M. Anthony Burns were JPMC directors until the eve of the JPMC annual meeting on May 25, 2004; Frank A. Bennack, Jr. and Helene L. Kaplan were JPMC directors until the consummation of the Merger on July 1, 2004.

applies to the breach of fiduciary duty claims in the Delaware Action, (7) JPMC conducts

substantial business in the District of Delaware (as did Bank One), and (8) unlike Illinois,

Delaware is close enough to New York to compel the trial testimony of several non-party

witnesses in New York, where the alleged misconduct took place and where most

witnesses reside.

By contrast, the Northern District of Illinois is not an appropriate or convenient

forum for this litigation in any respect.  First, the plaintiff in the Illinois Action does not

reside in Illinois.  *See* Moore's Federal Practice ¶111.13[1][c][iii] ("When the chosen

forum is neither the plaintiff's residence nor the place where the operative events

occurred, the court is likely to override the plaintiff's choice." (citing *Tranor v. Brown*,

913 F. Supp. 388 (E.D. Pa. 1996))).  Rather, Blau apparently resides in New York.[8]

Thus, the decision to file suit in the Northern District of Illinois can be explained only by

the fact that Wolf Haldenstein has its office in Chicago.  Of course, the mere convenience

of counsel, without more, cannot justify an otherwise inappropriate choice of venue.  *See*

*Solomon v. Continental American Life Insurance Co.*, 472 F.2d 1043, 1047 (3d Cir.

1973) (convenience of counsel not a factor to be considered in determining whether case

should be transferred under 28 U.S.C. § 1404(a)).  Thus, there appears to be no

justification for maintaining this litigation in the Northern District of Illinois.  *See Gulf*

*Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (affirming dismissal of complaint on

*forum non conveniens* grounds where neither plaintiff nor witnesses, but only plaintiff's

counsel, resided in forum where action was commenced).

Second, unlike the Illinois Action, subpoenas issued in the Delaware Action for

New York witnesses can be served from the District of Delaware.  *See* Fed. R. Civ. P.

---

[8] The civil cover sheet in the Illinois Action lists Blau as residing in Westchester, New York.

- 20 -

45(b)(2) ("a subpoena may be served…at any place without the district that is within 100 miles of the place of the deposition."). The Delaware Plaintiffs' counsel has determined that JPMC's headquarters in Manhattan are located 94.4 air miles from the Delaware Federal Courthouse.[9] (Decl. ¶ 6.A-C.)

The convenience of the witnesses is "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer under 28 U.S.C. § 1404(a)." 15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 at 415 (1986). Crucial non-party witnesses anticipated at trial include the investment bankers and lawyers who advised JPMC and Bank One in connection with the Merger. The expected testimony from these witnesses, many or all of whom were intimately involved in the negotiations leading to the Merger, will confirm the secret deal at the heart of this case, as well as related details of the negotiations, such as Harrison's rejection of the zero-premium merger offer.

The investigation of the Delaware Plaintiffs' counsel indicates that these witnesses may include, among others, bankers Gary Parr, Tim Dana, and Gary Shedlin of Lazard Frères & Co. LLC for Bank One, lawyers Edward D. Herlihy, Craig M. Wasserman, and Lawrence S. Makow of Wachtell, Lipton, Rosen & Katz for Bank One, lawyers Richard I. Beattie, Lee Meyerson, Maripat Alpuche, Christopher Lee, Kristin H. Johnson and Elsa Fraysse of Simpson Thacher & Bartlett LLP for JPMC, and as-yet-unidentified lawyers with Sullivan & Cromwell LLP for JPMC's board. (Decl. ¶ 5.) The offices of these investment banks and law firms are all located in Manhattan, less than 100 air miles from the Delaware Federal Courthouse (and less than two hours away by Amtrak). (Decl. ¶ 6.D-J.)

---

[9] Also, the combined Company's credit card operations are based in Wilmington, just blocks from the Delaware Federal Courthouse. Moreover, one of JPMC's two principal banking subsidiaries, Chase Manhattan Bank USA, National Association, is headquartered in Delaware.

As each of these anticipated witnesses resides or works within 100 miles of the Delaware Federal Courthouse, their live presence can be compelled judicially to testify at trial in the Delaware Action. *See Hill v. Equitable Bank*, 115 F.R.D. 184 (D. Del. 1987). Thus, from the standpoint of the convenience of the most material witnesses, as well as in the interests of justice generally, the District of Delaware is clearly the better forum. *See Stauffer Chemical Co. v. FMC Corp.*, 218 F. Supp. 568 (Del. 1963) (holding Delaware to be a superior forum to Wyoming where litigation grew out of negotiations held in New York City which was place of the home offices of parties and a considerable number of witnesses were in New York area); *Gulf Oil*, *supra*, 330 U.S. at 511 ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury, or most litigants.").

Third, it is in the interest of justice to have a Delaware court decide this case because both JPMC and Bank One are Delaware corporations and the Merger agreement provides for Delaware law to govern the contract.[10] *See Van Gelder v. Taylor*, 621 F. Supp. 613, 620 (N.D. Ill. 1985). Indeed, "'[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders.'" *Examen, Inc. v. VantagePoint Venture Partners 1996*, 873 A.2d 318, 323 (Del. Ch. 2005) (citing internal affairs doctrine in applying Delaware law to contested stockholder vote concerning a Delaware corporation's merger) (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987)).

---

[10] The Merger agreement itself provides "8.6. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof)." *See also* Proxy/Prospectus at 3 ("Subject to the terms and conditions of the merger agreement, and in accordance with Delaware law, at the completion of the merger Bank One will merge with and into JPMorgan Chase.").

Fourth, this Court is ideally suited to overseeing this litigation. Earlier this year, this Court issued a final decision in a remarkably similar case. *See Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362 (D. Del. 2005). In that complex securities litigation concerning a corporate merger, it was alleged that a company's CEO defrauded shareholders into accepting an inadequate merger premium by casting a takeover as a merger of equals. *See id.* at 406.

This Court adjudicated numerous complex motions, including multiple motions to dismiss and summary judgment motions, certified a class of investors, oversaw a $300 million settlement for the class, administered a 13-day bench trial on an individual lawsuit and issued a final decision on April 7, 2005. *See, e.g., Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 86 (D. Del. 2002) (motion to dismiss); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002) (same); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) (certifying class); *In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508 (D. Del. 2003) (denying defendants' motions for summary judgment); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005) (ruling on post-trial evidentiary objections). Thus, this Court's unique experience with a similar securities fraud class action will ensure the fair and efficient adjudication of this litigation, to the benefit of all parties. In *Grand Park Surgical Center, Inc. v. Inland Steel Co.*, 1996 WL 204322, at *1 (N.D. Ill. Apr. 25, 1996), the Court, on its own motion, ordered transfer to Indiana district court under § 1404(a), noting that "because Indiana state law applies, a federal district court judge in that state would be more familiar with the governing law." This rationale is even more compelling here, given this Court's recent participation in a case with striking parallels to the instant litigation.

Whether Wolf Haldenstein filed suit in Illinois to avoid attention and competition, or for its own convenience, there is simply no reason for its choice of forum. Thus, its choice of forum potentially violated Fed. R. Civ. P. 11(b)(1)'s prohibition of pleadings presented "for any improper purpose…." Accordingly, pursuant to Fed. R. Civ. P. 11(c)(2), Wolf Haldenstein should be disqualified.

### D. Wolf Haldenstein Names The Wrong Defendants And Fails To Name A Crucial Defendant

The Illinois Action incorrectly named Laurence Fuller, inexplicably fails to name James Dimon, and names the corporate defendant incorrectly. First, Wolf Haldenstein named Fuller as a defendant even though he retired from the JPMC board in 2003 and, thus, could not have approved the Merger agreement, which was reviewed and approved by the board in January 2004. This mistake is likely due to the fact that Wolf Haldenstein indiscriminately copied documents from the Chancery Action, in which Fuller was listed in the caption in the initial complaints but not in the consolidated complaint.

Second, even more troubling than this error is Wolf Haldenstein's failure to name James Dimon, the former Chairman and CEO of Bank One and Harrison's counterparty in the secret deal. By contrast, Dimon is a defendant in the Delaware Action. Given Dimon's crucial role in the alleged misconduct, and his prominent role in soliciting votes for the Merger, including signing a false and misleading proxy statement, Wolf Haldenstein's failure to name Dimon is inexplicable.[11]

Finally, Wolf Haldenstein misstated the corporate defendant's name. The Illinois Action names "J. P. Morgan Chase & Co.," the name of the Company before its charter

---

[11] Also inexplicable is Wolf Haldenstein's failure to assert a number of claims asserted in the Delaware Action, including claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-promulgated thereunder, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and pendent common law claims. *See Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 12 (N.Y.A.D. 1998) ("The manner in which the named plaintiffs limited their claims makes them inadequate to represent [the] putative class….").

was amended in connection with the Merger.  (Decl. Ex. 15.)  Again, this is likely due to

the fact that Wolf Haldenstein plagiarized pleadings from the Chancery Action, which

was commenced before JPMC's name was changed.  By contrast, "JPMorgan Chase &

Co." is properly named as the corporate defendant in the Delaware Action.  Although this

misnomer may not be a fatal defect in the summons in the Illinois Action, it further

reflects Wolf Haldenstein's lack of care in prosecuting the Illinois Action.

### E.    Wolf Haldenstein's Abusive "Certification" Scheme

District courts enjoy wide discretion to sanction misconduct in the management of

cases.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  In *Chambers*, the United

States Supreme Court advised:

> when there is bad-faith conduct in the course of litigation
> that could be adequately sanctioned under the Rules, the
> court ordinarily should rely on the Rules rather than the
> inherent power.  But if in the informed discretion of the
> court, neither the statute nor the Rules are up to the task,
> the court may safely rely on its inherent power.

*Id.* at 50.

One of the more troubling aspects of Wolf Haldenstein's conduct in the Illinois

Action is the lead plaintiff application submitted in the Illinois Action which led to entry

of the Minute Order.  Given the inadequate notice published by Wolf Haldenstein, as

discussed below, it is unsurprising that the application met no competition and, therefore,

avoided scrutiny.  *See Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir.

1996) (Easterbrook, J., dissenting) ("[T]he court can't vindicate the class's rights because

the friendly presentation means that it lacks essential information.").  Even a diligent

search of dockets nationally may not have revealed the Illinois Action, as Dimon

(Harrison's counterparty in the secret deal and a defendant in the Delaware Action) is not

named at all, *see* Section II.D *supra*. However, Wolf Haldenstein's lead plaintiff application merits scrutiny because it was based on a sham.

The lead plaintiff application was premised upon the combined holdings of two purported JPMC shareholders, Blau and AGF, who together claimed to hold nearly 28,000 shares of JPMC. AGF's holding, prior to its mysterious withdrawal, accounted for 25,000 shares, or 89 percent, of the combined holding. Without AGF, Wolf Haldenstein would have proffered only Dr. Blau, with his "2999.9" shares, as the purported representative of the Illinois Action class. By contrast, the Delaware Plaintiffs held 19,170 shares at all relevant times, over six times Dr. Blau's claimed holding. This is important because the PSLRA directs the Court to presume that the "most adequate plaintiff" to serve as lead plaintiff "is the person or group of persons" that, *inter alia*, "has the largest financial interest in the relief sought by the class…" 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb).

AGF also certified to the Court its willingness to serve as a representative of the class. However, this certification was called into question when AGF suddenly and without explanation withdrew as a lead plaintiff on February 18, 2005, the date of the filing of the amended complaint, approximately one month after the entry of the Minute Order. The circumstances behind this withdrawal have now become clear—AGF was misled by Wolf Haldenstein.

In the wake of the PSLRA's passage, some unscrupulous class action law firms invented a scheme to take control of securities class actions by soliciting unwitting institutional investors to sign lead plaintiff certification forms closely resembling proof of claim forms. In *Mass Solicitations Dupe Institutional Investors* (Decl. Ex. 16), shareholder lawyers Max Berger and Robert Gans warned of this abusive scheme:

[M]any traditional class action attorneys who have been unable to attract institutional clients have been creative in their attempts to subvert the Congressional intent and perpetuate the regime of class action litigation dominated by attorneys whose clients only have a nominal interest in the litigation.

For example, certain law firms have taken advantage of a provision of the PSLRA that requires the plaintiff in the first-filed case to publish a notice in a national business publication or wire service informing class members of the pendency of the action, and of their right to apply to the Court to be appointed lead plaintiff. Although Congress contemplated that only one notice would be published, attorneys have used this provision to publish dozens of notices, most of which more closely resemble advertisements for particular law firms than anything else. *The goal of these advertisements is to attract…a large investor that is unfamiliar with its rights and responsibilities under the PSLRA….*

More recently, many law firms have adopted a variation of this model, investing tens of thousands dollars in direct mailings to all institutional investors, their money managers, and their brokerage firms. Typically, these mailings are not directed to any individual with significant decision-making authority for the investment entity; instead, they are *designed to look like proof of claim forms* that would be provided to class members later in a case to secure a portion of any recovery obtained, and *provide relatively little information* regarding the facts of the case. *The mailings, also, often misleadingly imply that it is necessary to complete and return an enclosed "certification" form to participate in the action.* Neither the certification form itself, nor the materials accompanying the form, specify the obligations that a lead plaintiff is expected to perform. *The form merely contains boilerplate language* stating the willingness of the recipient to serve as a "named plaintiff" or "class representative" - terms that are used interchangeably, and without any explanation of the added duties and responsibilities assumed by a lead plaintiff in the litigation. *In most instances, the recipient need only fill in his stock purchase information, sign the form, and return it to the law firm* in a postage paid, pre-addressed envelope. Finally, most of the mass solicitations sent by law firms never inform the recipient that he can participate in the Action without assuming any of these duties or obligations,

and will be notified of any recovery during the course of the litigation. [Emphasis added.]

The very scheme described and denounced above is precisely what took place in the Illinois Action. All evidence indicates that AGF believed it was submitting nothing more than a proof of claim form. Indeed, Delaware Plaintiffs' counsel twice spoke with an AGF executive who specifically stated that AGF's involvement in the Illinois Action was the result of a "clerical error." (Decl. ¶ 10.) In fact, AGF never wanted to be a named plaintiff in the Illinois Action, let alone a lead plaintiff. Immediately after AGF discovered how it was being used in the Illinois Action, it ordered its withdrawal.

The SEC has specifically denounced this manipulative and abusive scheme under similar circumstances:

> In its *Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995* (Apr. 1997), the [SEC's] Office of General Counsel noted (at 65-66) that some lawyers, "[t]aking advantage of [the Act's] provision" allowing appointment of a "group of persons" as lead plaintiff, have attempted "to recruit investors as additional clients." They have done so, the Report explained, by phrasing Reform Act notices "in a way more likely to attract clients, rather than competition from investors (and other law firms) independently vying to be named lead plaintiff."

> A striking example of abuse is provided by *Parnes v. Digital Lightwave, Inc.*, No. 98-152-CIV-T-24(C) (M.D. Fla.), *appeal pending*, 99-11293-FF (11th Cir.), a case in which at least one member of a ten-person lead plaintiff group (and likely others as well) did not know he was appointed lead plaintiff until after lead counsel had submitted a proposed settlement for court approval. After responding to a law firm's internet notice about the class action, the investor received a series of cryptic mailings from the law firm's non-attorney Shareholder Relations Manager. They did not inform the investor, who signed a certification stating that he was "willing to serve as a representative party," that he had in fact been put forward as a member of a lead plaintiff group, who "our group of plaintiffs" was, what the "lead plaintiff" was, or that

> multiple lead law firms had been proposed. Although a
> later mailing said that "the Court appointed a group of
> plaintiffs represented by this firm and two other firms as
> lead plaintiffs and appointed this firm and the other two
> firms as lead counsel," it did not identify the "group of
> plaintiffs," its function, or the "other firms."
>
> No attorney at the law firm spoke or wrote to the investor
> until almost six months after he had responded to the law
> firm's internet notice and a month after a settlement had
> been reached in the case. Despite the investor's repeated
> requests over a six-week period, lead counsel did not
> provide him with the information for which he asked about
> the action, including a copy of the stipulation of settlement
> filed with the district court. Only after the court had
> preliminarily approved the settlement and asked at that
> hearing if the lead plaintiff group had seen it, did lead
> counsel send the stipulation to the investor.

*Memorandum of the SEC as Amicus Curiae* appended to *In re Network Associates, Inc.,*

*Sec. Litig.*, 76 F. Supp. 2d 1017, 1052 (N.D. Cal. 1999) (rejecting one proffered lead

plaintiff candidate who "selected" a law firm "merely because he received its mass-

mailed form. He sent it in erroneously thinking it was necessary to do so to participate in

any recovery").

Demonstrating yet another "striking example of abuse," *see Network Associates*,

76 F. Supp. 2d at 1052, below are essentially-undisputed facts from the Illinois Action:[12]

(1) On or about November 19, 2004, AGF sent to Wolf Haldenstein a fill-in-the-

blank "plaintiff's certification" form, unsigned, listing AGF's relevant stock transactions.

How AGF received the vague form (which not once uses the phrase "lead plaintiff")

remains shrouded in mystery.  Importantly, there is no evidence that AGF in fact received

or reviewed a copy of the complaint and authorized its filing.

---

[12] The facts are taken from the affidavit of Wolf Haldenstein partner Gregory Mark Nespole and exhibits
attached thereto, filed in the Illinois Action.  (Decl. Ex. 17.)  Since no waiver of attorney-client privilege is
disclosed or referenced, apparently Wolf Haldenstein believes that the privilege does not extend to an
illusory client such as AGF.

(2) On or about November 23, 2004, Wolf Haldenstein wrote back to AGF, requesting a signature—however, no explanation of the lead plaintiff process was offered, nor were the responsibilities of a lead plaintiff discussed.

(3) AGF returned the form, this time with a signature.[13]

(4) Nearly four months later, and well after AGF had been appointed a lead plaintiff, Wolf Haldenstein sent to AGF a draft of the amended complaint in the Illinois Action on or about February 14, 2005.

(5) At this time, AGF appeared to realize the unintended consequences of its clerical error and immediately called Wolf Haldenstein to sever its involvement.

(6) On February 16, confronted with the exposure of its gambit, Wolf Haldenstein sent a letter to AGF to shield itself from future scrutiny.

(7) That same day, an AGF executive sent a letter to Wolf Haldenstein stating its position in no uncertain terms: "This is to confirm my earlier message. [AGF] does not wish to participate in a class action lawsuit against Chase Morgan." The letter does not suggest that AGF had misgivings, or that AGF *no longer* wished to be a lead plaintiff—rather, it confirms that AGF never intended to be a lead plaintiff. The Delaware Plaintiffs' counsel has confirmed this fact in two conversations with the AGF executive.

Wolf Haldenstein has sought to minimize its role in the scheme, to offer "plausible deniability" as to its involvement – but its spin on the story, even if believed, does not cure the fact that it exploited an unwitting investor, an unwilling plaintiff, an illusory client. In any case, the documents themselves suggest that Wolf Haldenstein's dummy defense is simply not credible. Wolf Haldenstein cannot plead ignorance as to AGF's unwillingness to participate in the Illinois Action.

---

[13] Since the form was apparently signed after November 23, 2004 (when Wolf Haldenstein returned the unsigned form), the certification's claims to have been executed on November 19 is necessarily inaccurate.

At the very least, Wolf Haldenstein should be required to explain to this Court the complete circumstances of AGF's withdrawal. *See Chambers*, 501 U.S. at 44 ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

### F.    Wolf Haldenstein's Misleading Notice

The PSLRA mandates that after filing a putative class action complaint, a plaintiff seeking to represent the proposed class must publish a notice that sets forth (i) the pendency of the action, including a description of the claims asserted and the proposed class period, and (ii) a statement that any party seeking to serve as lead plaintiff for the action referenced in the notice must move the applicable court within sixty (60) days of the date of the notice. 15 U.S.C. § 78u-4(a)(3)(A)(i).  *See Janovici v. DVI, Inc.*, 2003 WL 22849604, at *5 (E.D. Pa. Nov. 25, 2003) (in considering motions for appointment of lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements).

On October 15, 2004, Wolf Haldenstein published a notice in the *Investor's Business Daily* purportedly advising investors of the pendency of the Illinois Action. (Decl. Ex. 18.)  However, two critical pieces of information were missing from the misleading notice.  First, the notice discloses the names of only two of the fourteen defendants.  Second, the notice fails to advise class members of their right to retain counsel of their own choice.  In addition to these critical omissions, the notice is misleading because it fails to disclose Wolf Haldenstein's divided loyalties, does not reference the newspaper article in which the truth was revealed, and lists the civil action number incorrectly, thereby inhibiting the ability of any reader to locate the Illinois Action on PACER.  (Decl. ¶ 8 & Ex. 18.)

In reviewing notices purportedly complying with this requirement, courts have rejected those which fail to include the names of all defendants. *See, e.g., Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (finding notice inadequate because "[t]here is no explanation of the legal theory underlying plaintiffs' suit; no discussion of ***who*** violated the Securities Exchange Act of 1934; and no description of the alleged wrongdoing that forms the basis of the complaint.") (emphasis added); *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1311 (N.D. Ala. 2000) ("notice must, ***at a minimum***, provide information about…who has filed the suit, ***who is being sued***, the court in which the suit is taking place, and the civil action number of the case") (emphasis added); *id.* at 1316 ("the notice published by [one] plaintiff and his counsel fails to indicate who is seeking relief and ***against whom relief is sought***, facts that would be revealed ***were the entire name of the action included in the notice***") (emphasis added); and *id.* at 1315 ("the [competing] notice does not fully inform potential lead plaintiffs…of…the names of the defendants"). *Cf. Marsden v. Select Medical Corp.*, 2005 WL 113128 (E.D. Pa. Jan. 18, 2005) (accepting notice which "adequately informs class members of 'the pendency of the action,' as it identifies the caption of the case, its civil action number, the Court before which the action was brought, ***and the names of all five Defendants.***") (emphasis added).

A notice which omits the right of class members to retain counsel of their choice is also inadequate. *See, e.g., Burke*, 102 F. Supp. 2d at 1311 n.39 ("giving only information directing putative class members to contact counsel would not comport with the purposes of the subsection"); *id.* at 1314 ("the notice published appears to have been drafted with the aim of directing clients to the law firms listed in it, thereby permitting the Burke plaintiffs and counsel associated therewith to avoid any lead plaintiff

challenge."); *Network Associates, Inc.*, *supra*, 76 F. Supp. 2d at 1032 (criticizing the published PSLRA notices at issue and directing that "[i]n the future, all such notices should (i) make clear that investors may apply for the role of lead plaintiff through their own counsel and need not necessarily apply through counsel publishing the notice and (ii) make clear that filling out a form or contacting counsel at the initial stage is not a prerequisite to participation in any class recovery").

Unlike Wolf Haldenstein's defective notice, the Delaware Plaintiffs' counsel published an adequate notice of the pendency of the Delaware Action which included the names of **all** defendants in the Delaware Action **and** advised class members of their right to retain counsel of their own choice in considering or seeking the lead plaintiff appointment. (D.I. 28 Ex. D.)  *See Janovici*, 2003 WL 22849604, at *8 (finding notice adequate which "[u]nlike the first three notices, …lists the names of the Defendants…[and] also advises that potential class members may retain counsel of their choice.").  The Delaware Action notice also specifically references the newspaper article in which the truth was revealed and correctly sets forth the civil action number.

Only a legally adequate notice triggers the PSLRA's 60-day period for all lead plaintiff motions.  *See Janovici*, 2003 WL 22849604, at *9 ("This [60-day] rule does not apply, however, where the first notice of pendency fails to provide adequate information pursuant to the terms of the PSLRA– the statutory 60 day period begins to run from the date of the first notice that complies with the PSLRA.").  Wolf Haldenstein's purported notice plainly failed to inform class members of their critical rights and otherwise failed to notify class members of the pendency of the action.  By contrast, the notice in the Delaware Action included every crucial piece of information missing from Wolf

Haldenstein's defective notice.  Accordingly, only this notice triggered the 60-day period for all lead plaintiff motions.

At best, Wolf Haldenstein's notice was critically defective.  At worst, it was designed to mislead putative class members.  Either way, Wolf Haldenstein failed its responsibilities to class members under the PSLRA.

*      *      *

The litany of blunders, misconduct and potential Rule 11 violations detailed above demonstrate that Wolf Haldenstein is unfit to represent any purported class member (let alone the class) in this litigation.  The various irregularities also violate MRPC 1.1 (competence), 1.3 (diligence), 1.4 (communications with clients), 3.2 (expediting litigation), and 3.3 (candor toward the tribunal).  The appropriate remedy is disqualification.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, the Delaware Plaintiffs respectfully request that the Motion be granted and that the proposed order disqualifying Wolf Haldenstein be entered.

DATED:        September 15, 2005                Respectfully submitted,

                                                /s/ Joseph N. Gielata
                                                Joseph N. Gielata (DSB # 4338)
                                                Attorney at Law
                                                501 Silverside Road, Suite 90
                                                Wilmington, DE 19809
                                                (302) 798-1096

                                                *Lead Counsel for Plaintiffs
                                                    and the Putative Class*

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 15, 2005, I electronically filed the foregoing

*OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY WOLF*

*HALDENSTEIN ADLER FREEMAN & HERZ LLP* with the Clerk of Court using CM/ECF

which will send notification of such filing to:

> Michael R. Robinson, Esq.
> **RICHARDS LAYTON & FINGER, P.A.**
> One Rodney Square
> Wilmington, DE  19801
> *Counsel for Defendants*

> Robert R. Davis, Esq.
> **CHIMICLES & TIKELLIS LLP**
> P.O. Box 1035
> One Rodney Square
> Wilmington, DE  19899
> *Counsel for Proposed Intervenor*

>  /s/ Joseph N. Gielata
> Joseph N. Gielata (DSB # 4338)
> Attorney at Law
> 501 Silverside Road, Suite 90
> Wilmington, Delaware 19809
> (302) 798-1096
> attorney@gielatalaw.com