# EXHIBIT

# 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ORIGINAL

DOCKETED

JAN 0 6 2005

---

DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,

Defendants.

Civil Action No. 04 C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

FILED

DEC 1 4 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

GLENN ARNER, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and JPMORGAN CHASE & CO. (f/k/a ,J.P. Morgan Chase & Co.)

Defendants.

Civil Action No. 04 C 7477

Judge Amy J. St. Eve

Magistrate Judge Nan R. Nolan



## MOTION OF DR. STEPHEN BLAU AND AMERICAN GROWTH FUND, INC. FOR REASSIGNMENT BASED ON RELATEDNESS, TO CONSOLIDATE ALL ACTIONS AND TO APPOINT LEAD PLAINTIFFS AND LEAD COUNSEL

Proposed lead plaintiffs Dr. Stephen Blau and American Growth Fund, Inc. ("Movants"), by their undersigned counsel, respectfully move this Court for an Order: **(i)** finding *Arner v. Harrison, et al.*, Civil Action No. 04C 7477 (the "Arner Action") related to the earlier-filed *Blau v. Harrison, et al.*, Civil Action No. 04C 6592 (the "Blau Action"), and reassigning the Arner Action to the Honorable Judge William J. Hibbler, in the United States District Court for the Northern District of Illinois, Eastern Division; **(ii)** consolidating the Arner Action, as well as any subsequently filed related actions, with the Blau Action (hereinafter collectively referred to as the "Actions"), for all purposes, pursuant to Rule 42 of the Federal Rule of Civil Procedure ("Fed. R. Civ. P."); **(iii)** appointing Movants as Lead Plaintiffs in the above-captioned Actions and in any subsequently filed, related class action; and **(iv)** approving Movants' selection of Wolf Haldenstein as Lead Counsel. In support of their motion, Dr. Blau and American Growth Fund, Inc. submit herewith their Memorandum of Law in support thereof, the Declaration of Adam J. Levitt and a Proposed Order.

**WHEREFORE**, Movants respectfully request that this Court grant their motion and: **(a)** find that *Arner v. Harrison, et al.*, Civil Action No. 04 C 7477 is related to the earlier-filed *Blau v. Harrison, et al.* Civil Action 04 C 6592, and reassign the Arner Action to this Court **(b)** consolidate all related securities claims presently pending in, filed in the future in, or transferred to this judicial

district; **(c)** appoint Movants as Lead Plaintiffs of this Action and any action subsequently consolidated herewith; **(d)** approve Movants' selection of Wolf Haldenstein as Lead Counsel; and **(e)** grant such other and further relief as this Court may deem just and proper.

**Dated:**  December 14, 2004                    Respectfully submitted,

Mary Jane Edelstein Fait
Adam J. Levitt
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLC**
656 West Randolph Street
Suite 500W
Chicago, Illinois 60661
Telephone: (312) 466-9200
Facsimile:  (312) 466-9292

Jeffrey G. Smith
Gregory M. Nespole
Kate McGuire
**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4563

*Counsel for Plaintiffs*
*and Proposed Lead Counsel*

386402

–3–

**ORIGINAL**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

JAN 0 6 2005

DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

    v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,

      Defendants.

Civil Action No. 04C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman



**FILED**

DEC 1 4 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

GLENN ARNER, Individually and On Behalf of All Others Similarly Situated,

      Plaintiff,

    v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and JPMORGAN CHASE & CO. (f/k/a ,J.P. Morgan Chase & Co.)

      Defendants.

Civil Action No. 04C 7477

Judge Amy J. St. Eve

Magistrate Judge Nan R. Nolan

## NOTICE OF MOTION

**TO:**   All Counsel on Attached Service List



**PLEASE TAKE NOTICE** that that at 10:00 [~~9:30~~] a.m. on Mon., Jan. 3 [~~Tuesday, December 21,~~] 2005 [~~2004~~]

plaintiffs Dr. Stephen Blau and American Growth Fund, Inc., by their undersigned counsel, shall

appear before the Honorable William J. Hibbler, Room 1225, 219 South Dearborn Street,

Chicago, Illinois 60604, and then and there present the ***Motion of Dr. Stephen Blau and***

***American Growth Fund, Inc. for Reassignment Based on Relatedness, to Consolidate all***

***Actions and to Appoint Lead Plaintiffs and Lead Counsel***, a copy of which is attached hereto

and is hereby served upon you.

**DATED:**  December 14, 2004

By: _____

Adam J. Levitt
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
656 West Randolph Street, Suite 500W
Chicago, Illinois 60661
(312) 466-9200 (t)
(312) 466-9292 (f)

***Counsel for Plaintiffs***

6824

ORIGINAL

## CERTIFICATE OF SERVICE

I, Kate McGuire, one of plaintiff's attorneys, hereby certify that on December 14,

2004, I caused copies of the foregoing:

- *Motion of Dr. Stephen Blau and American Growth Fund, Inc. for Reassignment Based on Relatedness, to Consolidate All Actions and Appoint Lead Plaintiffs and Lead Counsel;*

- *Memorandum of Law in Support of Motion of Dr. Stephen Blau and American Growth Fund, Inc. for Reassignment Based on Relatedness, to Consolidate All Actions and to Appoint Lead Plaintiffs and Lead Counsel;*

- *Declaration of Adam J. Levitt In Support of Motion of Dr. Stephen Blau and American Growth Fund, Inc. for Reassignment Based on Relatedness, to Consolidate All Actions and to Appoint Lead Plaintiffs and Lead Counsel; and*

- *Proposed Order Reassigning Based On Relatedness, Consolidating All Actions and Appointing Lead Plaintiffs and Lead Counsel*

to be served upon the following counsel, by Federal Express:

> Kathleen L. Roach
> SIDLEY AUSTIN BROWN & WOOD LLP
> Bank One Plaza
> 10 South Dearborn Street
> Chicago, Illinois 60603
>
> *Attorneys for Defendants*
>
>
> Marc A. Topaz
> Richard A. Maniskas
> SCHIFFRIN & BARROWAY, LLP
> Three Bala Plaza East
> Suite 400
> Bala Cynwyd, Pennsylvania 19004
>
> *Attorneys for Plaintiff Glenn Arner*

Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
MILLER FAUCHER and CAFFERTY LLP
30 North LaSalle Street
Suite 3200
Chicago, Illinois  60602

***Local Counsel for Plaintiff Glenn Arner***

_____
Kate M. McGuire

\349982

ORIGINAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
JAN 0 6 2005

---

DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,

     Plaintiff,

    v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,

     Defendants.

Civil Action No. 04C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

FILED

DEC 1 4 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

GLENN ARNER, Individually and On Behalf of All Others Similarly Situated,

     Plaintiff,

    v.

WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and JPMORGAN CHASE & CO. (f/k/a ,J.P. Morgan Chase & Co.)

     Defendants.

Civil Action No. 04C 7477

Judge Amy J. St. Eve

Magistrate Judge Nan R. Nolan



**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
DR. STEPHEN BLAU AND AMERICAN GROWTH FUND, INC. FOR
REASSIGNMENT BASED ON RELATEDNESS, TO CONSOLIDATE ALL ACTIONS
AND TO APPOINT LEAD PLAINTIFFS AND LEAD COUNSEL**

## I.   RELIMINARY STATEMENT

Pursuant to Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, and for the reasons set forth below, Dr. Stephen Blau and American Growth Fund, Inc. ("American Growth Fund"), collectively, the "Proposed Lead Plaintiffs" or "Movants", by their undersigned counsel, respectfully submit this memorandum of law in support of their motion: **(i)** to find *Arner v. Harrison, et al.*, Civil Action No. 04 C 7477 (the "Arner Action") as related to the earlier-filed *Blau v. Harrison, et al.*, Civil Action No. 04 C 6592 (the "Blau Action"), and reassign the Arner Action to the Honorable Judge William J. Hibbler, in the United States District Court for the Northern District of Illinois, Eastern Division; **(ii)** to consolidate the Arner Action,[1] as well as any subsequently-filed related actions, with the Blau Action (hereinafter collectively referred to as the "Actions"), for all purposes, pursuant to Rule 42 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.); **(iii)** to appoint Movants as Lead Plaintiffs in the above-captioned Actions and in any subsequently-filed, related class action; and **(iv)** to approve Movants' selection of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as Lead Counsel on behalf of all persons and entities who held J.P. Morgan Chase & Co. ("J.P. Morgan Chase" or the "Company") securities, as set forth below.

This action is based upon misleading statements and omissions in the proxy statement ("Proxy Statement") issued by J.P. Morgan Chase in connection with the Company's Merger with

---

[1] *Arner v. Harrison*, which was filed on November 18, 2004, is presently pending before Judge Amy St. Eve and Magistrate Judge Nolan. Movants have provided Judge St. Eve with a courtesy copy of this motion.

Bank One Corporation ("Bank One"). The action has been brought on behalf of all persons who held shares of J.P. Morgan Chase common stock, either on April 2, 2004 (the record date for voting at J.P. Morgan Chase's May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting) through July 1, 2004 (the date on which the merger was consummated after being approved by shareholders pursuant to the above-dated materially false and misleading proxy statement) (the "Class").[2]

With respect to reassignment and consolidation, as set forth herein, due to the similarities and the confluence of interests and issues between the later-filed action and this case and the efficiencies to be realized through this requested reassignment and consolidation, this Court should reassign the later-filed case to this Court on the grounds that it is related to the Blau Action, and consolidate it herewith because it involves common questions of law and fact.

With respect to appointment of lead plaintiff and lead counsel, this motion is premised on the grounds that Dr. Blau and American Growth Fund[3] are the most adequate plaintiffs, as defined by the PSLRA, because they suffered substantial losses in connection with their ownership of J.P. Morgan Chase securities at the above-identified relevant times, and because, to their knowledge, they are the only plaintiffs to move for appointment as Lead Plaintiffs[4] and thus have clearly suffered the greatest

---

[2] Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

[3] The PSLRA specifically authorizes class members, regardless of whether they have filed a complaint, to move for appointment as lead plaintiff. *See* 15 U.S.C. §78u-4(a)(3)(B).

[4] Should either Dr. Blau or American Growth Fund later be deemed to be an unsuitable class representative, plaintiffs reserve the right to offer alternative representatives from among any additional class members who has executed or shall execute a certificate pursuant to the PSLRA evidencing their willingness and requisite standing to participate in the prosecution of the action.

financial loss sustained by any moving class member.[5]  As a result of their losses, they are

sufficiently interested in this litigation to ensure that it will be zealously prosecuted by their chosen

counsel.  They have, moreover, further demonstrated their commitment to vigorously litigating this

action by seeking to be appointed lead plaintiffs, and by retaining competent counsel.  In addition,

for the purposes of this motion, Movants amply satisfy the requirements of Fed. R. Civ. P. 23, in that

their claims are typical of the claims of the Class and that they will fairly and adequately represent

the Class's interests.

## II.  **STATEMENT OF FACTS**[6]

J.P. Morgan Chase, a Delaware corporation presently headquartered in New York, New

York, is a financial holding company and financial services firm that provides investment banking,

securities, investment management and other financial and banking services around the world.  *Cplt*.

at ¶ 7.

In November 2003, William B. Harrison, the chief executive officer and chairman of the

board of J.P. Morgan Chase, and James Dimon, the chief executive officer and chairman of Bank

One, began to seriously discuss the possibility of combining their companies.  *Cplt*. at ¶19.   Over

the course of the next few months, Messrs. Harrison and Dimon, and their respective boards of

directors, negotiated an agreement whereby the two companies would merge.

---

[5]  The losses suffered by Plaintiffs, as detailed herein, are not the same as their legally compensable damages, the measurement of which is often a complex legal question that cannot be determined at this stage of the litigation.  Plaintiffs' approximate losses, however, can be determined from their executed Certification forms.

[6]  The factual allegations are drawn from the allegations contained in the action filed on October 13, 2004, styled *Blau v. Harrison, et al.,* Civil Action No. 04C 6592 (the "Blau Action" or "Action"), and references to "*Cplt*. at ¶ __," refer to the averments contained in that Complaint (the "Complaint").  A copy of the Complaint filed in the Blau Action is annexed as Exhibit A to the *Declaration of Adam J. Levitt* ("Levitt Decl."), dated December 14, 2004, submitted in support of the *Motion of Dr. Stephen Blau and American Growth Fund, Inc. to Consolidate All Actions and to*

During these discussions, Mr. Dimon offered to enter into the merger with no premium for Bank One's shares, if Mr. Harrison would step down as CEO immediately and allow Mr. Dimon to take his place. *Cplt.* at ¶¶ 21-22. Mr. Harrison refused to relinquish his position, however, to Mr. Dimon. Thus, Mr. Dimon insisted that Bank One's shareholders receive a premium in exchange for Mr. Harrison's remaining CEO of the surviving entity.

On January 14, 2004, the deal (including the premium) was announced. *Cplt.* at ¶ 28. No mention of Mr. Dimon's better offer was made to the public; nor were shareholders informed that Mr. Harrison had insisted on retaining his position to their detriment. *Id.*

On or about April 21, 2004, a proxy statement dated April 19, 2004 was issued to shareholders, soliciting their votes on the merger. *Cplt.* at ¶ 32. This proxy statement detailed the negotiation and approval process but, again, failed to mention Mr. Dimon's offer to consummate the deal absent a premium. *Cplt.* at ¶¶ 33, 35-47.

Specifically, as detailed in the Complaint at ¶¶ 35-47, the proxy statement included statements concerning:

    (a)    the factors (including risk factors) considered by the Board in approving the merger;

    (b)    the retention agreements for Messrs. Harrison and Dimon;

    (c)    the exchange ratio;

    (d)    the negotiation process;

    (e)    the Board's approval of the merger; and

    (f)    the analysis of comparable transactions.

---

*Appoint Lead Plaintiffs and Lead Counsel.* For a complete recitation of the facts, Plaintiffs respectfully refer the Court to the Complaint.

Such statements were each materially false and misleading when made, because, *inter alia*, they failed to disclose:

(a) that Mr. Dimon offered to enter into the merger absent demanding a premium for Bank One's shareholders;

(b) that Mr. Harrison rejected this offer in a selfish move to retain his executive position for two years; and

(c) that Mr. Harrison's refusal to step down and the concomitant payment of a premium to the Bank One shareholders necessitated that the Company spend approximately an additional $7 billion in unnecessary merger compensation.

Because of the individual defendants' positions with J.P. Morgan Chase, they had access to the adverse undisclosed information about its merger negotiations with Bank One and the drafting process for the Proxy Statement. *Cplt.* at ¶¶ 9, 63-67. This is especially clear in light of the fact that virtually all of the individual defendants were J.P. Morgan directors at the time the Proxy Statement was approved, and that the Proxy Statement received the unanimous approval of all directors on the Board. *Cplt.* at ¶¶ 8-9, 66. However, none of them disclosed to the public the better offer.

On May 25, 2004, shareholders voted to approve the merger, without the benefit of this highly relevant information. *Cplt.* at ¶ 48. On June 1, 2004, the merger was consummated, with a premium that could easily have been avoided of approximately $7 billion. *Cplt.* at ¶ 23.

On June 27, 2004, nearly a month after the merger was consummated, *The New York Times* published an article citing two people close to the merger as stating that "Mr. Dimon ... offered to do the deal for no premium if he could become chief executive immediately...[but] [w]hen Mr. Harrison resisted, Mr. Dimon insisted on a premium." *Cplt.* at ¶22. Mr. Harrison and Mr. Dimon declined to comment to the *Times* concerning this assertion.

On October 13, 2004, Plaintiff Blau filed the instant class action lawsuit in the United States District Court for the Northern District of Illinois on behalf of the Class seeking to recover damages caused by defendants' violations of sections 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§

5

78n(a) and 78t(a)] and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.14a-9]. *Cplt.* ¶¶ 1-2.

On November 18, 2004, a class action lawsuit, *Arner v. Harrison, et al.*, Civil Action No. 04C 7477[7], was filed in the United States District Court for the Northern District of Illinois, on behalf of an identical class, against the same defendants, for violations of the same federal securities provisions.

### III. ARGUMENT

### A. THE ARNER ACTION SHOULD BE REASSIGNED TO THIS COURT BASED ON RELATEDNESS

Whether to reassign a case under Local Rule 40.4 lies within the sound discretion of this Court. *Clark v. Ins. Car Rentals, Inc.*, 42 F. Supp. 2d 846, 847 (N.D. Ill. 1999). To have a case reassigned based on relatedness, the moving parties must demonstrate that the cases are related under Local Rule 40.4(a) and that reassignment is appropriate pursuant to Local Rule 40.4(b).

Under Local Rule 40.4(a), two or more civil cases may be found to be related if one or more of the following conditions are met: (i) the cases involve the same property; (ii) the cases involve some of the same issues of fact or law; (iii) the cases grow out of the same transaction or occurrence; or (iv) in class action suits, one or more of the classes involved in the cases is or are the same. These cases meet the second, third, and fourth requirements for a finding of relatedness. *See Teacher's Ret. Sys. of La. v. Black*, Case No. 04 C 834, 2004 U.S. Dist. LEXIS 10259, *6-7 (N.D. Ill. June 3, 2004) (finding relatedness in similar cirucmstances). Each case originates from the allegedly wrongful conduct of J.P. Morgan

---

[7] A copy of the Complaint in the Arner Action is filed herewith as Exhibit B to the Levitt Declaration.

Chase and its Board of Directors with respect to their proxy statement issued in connection with a proposed merger. Each lawsuit names a virtually identical set of defendants. Each complaint asserts that the Defendants violated sections Exchange Act Sections 14(a) and 20(a), and Rule 14a-9 promulgated thereunder, based on the same set of facts and circumstances. Each complaint asserts claims on behalf of an identical class of shareholders. This Court should thus conclude that these two cases are related under Local Rule 40.4(a).

Under Local Rule 40.4(b), cases may be reassigned only if each of the following criteria are met: (1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding.

Both of these cases are pending in the Northern District of Illinois, so the first requirement is readily met. Moreover, adjudicating the legal and factual issues in this case will require significant judicial resources. Where the cases are as closely related as these two, it conserves resources to have them all determined by a single judge. As for the third requirement, each of these cases is in its early stages. Thus, no substantial delays would result from the reassignment. As these two cases originate from the same core of facts, it is clear that they are susceptible of disposition in a single proceeding. Indeed, Rule 42 of the Federal Rules of Civil Procedure encourages consolidation of cases like this into a single proceeding. The requirements for reassignment under Local Rule 40.4(b) have been satisfied.

## B.   THE ACTIONS SHOULD BE CONSOLIDATED PURSUANT TO RULE 42(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE

The consolidation of actions filed in federal court is governed by Fed. R. Civ. P. 42(a), which provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Consolidation is appropriate when actions involve common questions of law and fact. Moore, *Manual for Complex Litigation* § 20.123 at 13-14 (3d ed. 1995); *Mayo v. Apropos Tech., Inc.*, No. 01 C 8406, 2002 U.S. Dist. LEXIS 1924 (N.D. Ill. Feb. 6, 2002). As long as the "common questions of law or fact" requirement of Fed. R. Civ. P. 42(a) is met, the district courts possess broad discretion in determining the proper scope of a consolidation order. See, e.g., *Dollens v. Zionts*, Case Nos. 01 C 5931, 01 C 2826, 2001 U.S. Dist. LEXIS 19966, *6 (N.D. Ill. Dec. 4, 2001) (citing *Ikerd v. Lapworth*, 435 F.2d 197, 204 (7th Cir. 1970) ("A court has discretion to consolidate related cases, which involve common questions of fact and law under Fed. R. Civ. P. 42(a), 'under the policy that considerations of judicial economy strongly favor simultaneous resolution of all claims growing out of one event'."). Similarly, Section 21D(a)(3)(A)(ii) of the Securities Act contemplates the consolidation of multiple actions "asserting substantially the same claim or claims."

Consolidation is particularly appropriate here. Each of the Actions is based on substantially similar factual allegations and makes substantially similar legal claims under the federal securities laws. As a result, consolidation will serve to avoid duplicative discovery, motion practice, and other proceedings that will result if the actions are not consolidated. The interests of economy and justice therefore militate strongly in favor of consolidation of the actions.

Consolidation of future filed cases is permissible.  *Dollens v. Zionts*, Case Nos. 01 C 5931, 01 C 2826, 01 C 2826, 2001 U.S. Dist. LEXIS 19966, at *7 (N.D. Ill. Dec. 4, 2001) ("consolidation of [the instant cases] and any future shareholder derivative actions based on the same or similar set of facts and law into one action is appropriate").  *See also In re Nuveen Fund Litig.*, Cons. No. 94 C 360, 1994 U.S. Dist. LEXIS 13098, at *2 (N.D. Ill. Sept. 9, 1994) (referencing consolidation order that provided that "any other actions pending at the present *or any future time* in this district which arise out of the alleged action [there at issue] will be consolidated if and when they are drawn to the Court's attention") (emphasis supplied).  As with consolidation of present actions, consolidation of this and future federal securities actions related to or arising from the same facts and circumstances as this Action will serve the interests of justice and judicial economy.

## C.  DR. BLAU AND AMERICAN GROWTH FUND SHOULD BE APPOINTED LEAD PLAINTIFFS

### 1.  The Procedure Required By The PSLRA

The PSLRA establishes a procedure governing the appointment of lead plaintiffs in "each action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1), (a)(3).

First, the plaintiff who files the initial action must publish a notice to the Class, within twenty (20) days of filing the action, informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i).  Following commencement of the Blau Action, Dr. Blau's counsel caused notice to be published in *Investor's Business Daily* on October 15, 2004.[8]  *See*

---

[8] *Investor's Business Daily* and other national news services, are consistently recognized as suitable vehicles for meeting the statutory requirement that notice be published "in a widely circulated national business-oriented publication or wire service." *See, e.g., Lax v. First Merchs. Acceptance Corp.*, Case No. 97 C 2715, *et seq.*, 1997 U.S. Dist. LEXIS 11866, at *2 (N.D. Ill. Aug. 6, 1997); *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 62-64 (D. Mass. 1996).

*Levitt Decl.* at Ex. C. The PSLRA further instructs that within 60 days after publication of the first notice, any person or group of persons who are members of the proposed class may apply to the Court to be appointed lead plaintiff, whether or not they have previously filed a complaint in the action. 15 U.S.C. § 78u-4(a)(3)(A) and (B).

Second, the PSLRA provides that within 90 days after publication of the notice, the Court shall consider any motion made by a class member and shall appoint as lead plaintiff the member or members of the class that the Court determines to be most capable of adequately representing the interests of class members. 15 U.S.C. § 78u-4 (a)(3)(B). In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that - -
>
> (aa)    has either filed the complaint or made a motion in response to a notice. . . .
>
> (bb)    in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii). *See generally Charles Dechter Family Trust v. Anicom, Inc.,* No. 00 CV 4391, 2000 U.S. Dist. LEXIS 14949, at *3 (N.D. Ill. Oct 3, 2000).

**2.    Dr. Blau and American Growth Fund Satisfy The "Lead Plaintiff" Provisions of the PSLRA and Should Thus Be Appointed Lead Plaintiffs**

**(A)    Dr. Blau and American Growth Fund Satisfy the PSLRA's Lead Plaintiff Requirements**

The time period in which class members may move to be appointed lead plaintiff under 15 U.S.C. § 78u-4(a)(3)(A), (B) expires on December 14, 2004. Pursuant to the PSLRA, and within the requisite time frame after publication of the required notice, Dr. Blau and American Growth Fund timely move this Court to be appointed Lead Plaintiffs on behalf of all members of the Class.

Movants signed certifications attesting to the fact that each has reviewed the Complaint filed in the one of the Actions and each is willing to serve as a representative party on behalf of the Class. *See Levitt Decl.*, Ex. D. As explained below, Movants' certifications also, by showing their stock ownership, demonstrate that they have suffered substantial losses in connection with their purchases of J.P. Morgan Chase securities. In addition, Movants have selected and retained experienced and competent counsel to represent them and the Class. *See Levitt Decl.* at Ex. E.

Accordingly, Movants have satisfied the requirements of 15 U.S.C. § 78u-4(a)(3)(B) and are entitled to have their application for appointment as Lead Plaintiffs and their concomitant selection of Wolf Haldenstein to serve as Lead Counsel approved by this Court.

**(B)    Dr. Blau And American Growth Fund Are The Movants With The Largest Financial Interest In The Litigation**

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(iii), the Court shall appoint as lead plaintiff the class member or members who represent the largest financial interest in the relief sought by the action.

Dr. Blau bought 2,999.9 shares of J.P. Morgan Chase common stock well in advance of the events at issue in this litigation, and held all such shares on the record date for voting on the merger, on the date of the proxy statement, and at the time the merger was consummated. American Growth Fund also bought 25,000 shares of J.P. Morgan Chase common stock well in advance of the events at issue in this litigation, and held all such shares on all relevant dates.[9]

### (C)    Dr. Blau and American Growth Fund Also Satisfy the Requirements of Fed. R. Civ. P. 23

According to 15 U.S.C. § 78u-4(a)(3)(B), in addition to possessing the largest financial interest in the litigation and meeting the individual lead plaintiff prerequisites, the proposed lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." Fed. R. Civ. P. 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[9] Here, two proposed lead plaintiffs constitute a small, cohesive group that have communicated with their chosen counsel concerning this litigation and are representative of the class. They have come together to jointly prosecute this action, as is appropriate under the PSLRA. 15 U.S.C. 78u-4(a)(3)(B)(iii) (rebuttable presumption that most adequate plaintiff is "person or *group of persons*..." (emphasis supplied). *See also Lax,* 1997 U.S. Dist. LEXIS 11866, at *27 (appointing group of numerous lead plaintiffs). Moreover, the structure of this plaintiff group, which includes both an individual investor and an institutional investor, will be particularly beneficial, in that it will "ensure[] that the interests of all class members will be adequately represented in the prosecution of the action and in the negotiation and approval of a fair settlement." *In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y. 1998).

Of the four prerequisites to class certification, only two – typicality and adequacy – directly address the personal characteristics and/or qualifications of the class representatives. Accordingly, in adjudicating a lead plaintiff motion, the Court must limit its inquiry to the typicality and adequacy prongs of Fed. R. Civ. P. 23(a) and defer examination of the remaining requirements until the lead plaintiffs move for class certification. *See, e.g., Dechter Family Trust,* 2000 U.S. Dist. LEXIS 14949, *4; *Lax,* 1997 U.S. Dist. LEXIS 11866, at *20. As detailed below, Dr. Blau and American Growth Fund satisfy both the typicality and adequacy requirements of Fed. R. Civ. P. 23(a), thereby justifying their appointment as Lead Plaintiffs in the Actions.

Fed. R. Civ. P. 23(a)(3) mandates that the claims or defenses of the representative parties must be typical of those of the Class. Typicality exists if claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992) (*quoting De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983)). *See also Weltz v. Lee,* 199 F.R.D. 129 (S.D.N.Y. 2001) (finding typicality where claims were based on statements in an allegedly false proxy statement). Furthermore, factual variations among the claims of the class representatives and class members will not defeat typicality:

> The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact.

*De La Fuente,* 713 F.2d at 232 (citations omitted). *See also In re NeoPharm, Inc. Sec. Litig.,* No. 02 C 2976, 2004 U.S. Dist. LEXIS 16287, at *8 (N.D. Ill. August 17, 2004).

Dr. Blau and American Growth Fund satisfy the Fed. R. Civ. P. 23(a)(3) typicality requirement because, like all other class members, they held J.P. Morgan Chase securities at the relevant times and suffered damages as a result thereof. Their claims are thus typical of those of the

other Class members, since all of these claims arose out of the same course of events and are premised on the same legal theories.

Under Fed. R. Civ. P. 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class." In assessing adequacy, the court looks to see that the representative "(1) [does] not have claims that are antagonistic to or that conflict with those of other class members; (2) ha[s] sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) [is] represented by attorneys who are competent, experienced, qualified, and generally able to conduct the litigation vigorously." *Lax*, 1997 U.S. Dist. LEXIS 11866, at **21-22 (internal citations omitted).

Dr. Blau and American Growth Fund satisfy the Fed. R. Civ. P. 23(a)(4) adequacy requirement and will be adequate Class representatives because there is no indication or evidence of antagonism or conflict between their interests and those of the other members of the Class. Moreover, they have taken significant steps demonstrating their commitment to the interests of the Class by seeking to become Lead Plaintiffs in prosecuting this action and in retaining counsel possessing the experience, dedication, and professionalism that prosecuting this complex litigation demands.

Movants' above-described satisfaction of the applicable Fed. R. Civ. P. 23(a) requirements further militates in favor of this Court appointing them as Lead Plaintiffs in these Actions.

### D. THE COURT SHOULD APPROVE DR. BLAU AND AMERICAN GROWTH FUND'S CHOICE OF WOLF HALDENSTEIN AS LEAD COUNSEL

The PSLRA vests authority in the lead plaintiffs, subject to court approval, to select and retain counsel to represent the Class. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). Assuming, therefore, that this Court appoints Dr. Blau and American Growth Fund to be Lead Plaintiffs in the consolidated

action, this Court should approve, and not disturb, their choice of counsel unless necessary to "protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). Movants have retained Wolf Haldenstein to serve as Lead Counsel for the Class. Wolf Haldenstein has extensive experience in securities class action litigation and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors, as demonstrated in its firm resume. *See Levitt Decl.*, at Ex. E.

## IV.   CONCLUSION

For all of the foregoing reasons, Movants Dr. Stephen Blau and American Growth Fund respectfully request that this Court: **(a)** find that *Arner v. Harrison, et al.*, Civil Action No. 04C 7477 is related to the earlier-filed *Blau v. Harrison, et al.*, Civil Action No. 04C 6592, and reassign the Arner Action to this Court **(b)** consolidate all related securities claims presently pending in, filed in the future in, or transferred to this judicial district; **(c)** appoint Movants as Lead Plaintiffs of this Action and any action subsequently consolidated herewith; **(d)** approve Movants' selection of Wolf Haldenstein as Lead Counsel; and **(e)** grant such other and further relief as this Court may deem just and proper.

**Dated:**   December 14, 2004

Respectfully submitted,

Mary Jane Edelstein Fait
Adam J. Levitt
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
656 West Randolph Street
Suite 500W
Chicago, Illinois 60661
Telephone: (312) 466-9200
Facsimile: (312) 466-9292

Jeffrey G. Smith

Gregory M. Nespole
Kate McGuire
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4563

*Counsel for Plaintiffs
and Proposed Lead Counsel*

383177

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 04 C 6592 |
| Plaintiff, | Judge William J. Hibbler |
| v. | Magistrate Judge Martin C. Ashman |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO., |  |
| Defendants. |  |

|  |  |
|---|---|
| GLENN ARNER, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 04 C 7477 |
| Plaintiff, | Judge Amy J. St. Eve |
| v. | Magistrate Judge Nan R. Nolan |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and JPMORGAN CHASE & CO. (f/k/a ,J.P. Morgan Chase & Co.) |  |
| Defendants. |  |

**[PROPOSED] ORDER
REASSIGNING BASED ON RELATEDNESS, CONSOLIDATING
ALL ACTIONS AND APPOINTING LEAD PLAINTIFFS AND LEAD COUNSEL**

Having considered the papers filed in support of the *Motion of Dr. Stephen Blau and American Growth Fund, Inc. for Reassignment Based on Relatedness, to Consolidate All Actions and to Appoint Lead Plaintiffs and Lead Counsel*, pursuant to § 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 42 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and Local Rule 40.4, and for good cause as shown, the Court hereby enters the following Order:

**I.   REASSIGMENT BASED ON RELATEDNESS**

1.   *Arner v. Harrison, et al.*, Civil Action No. 04 C 7477, is hereby found to be related to the earlier-filed *Blau v. Harrison, et al.*, Civil Action No. 04 C 6592.

2.   *Arner v. Harrison, et al.*, Civil Action No. 04 C 7477, is hereby reassigned to the Honorable Judge William J. Hibbler, in the United States District Court for the Northern District of Illinois, Eastern Division.

**II.   CONSOLIDATION OF THIS AND FUTURE ACTIONS:**

3.   *Blau v. Harrison, et al.*, Civil Action No. 04C 6592 and *Arner v. Harrison, et al.*, Civil Action No. 04C 7477 are hereby consolidated for all purposes into one action pursuant to Fed. R. Civ. P. 42(a) and § 21D(a)(3)(B)(ii) of the Exchange Act .

4.   These actions shall be referred to as the "Consolidated Action." This Order shall apply to the Consolidated Action and to any and all cases that are subsequently filed in this Court or transferred to this Court that relate to or arise out of the same subject matter as the Consolidated Action.

5.   The short caption for the Consolidated Action shall be "*Blau v. Harrison, et al.*, Civil Action No. 04 C 6592." Every pleading in the Consolidated Action shall bear the following caption:

DR. STEPHEN BLAU, Individually and On
Behalf of All Others Similarly Situated,

           Plaintiff,

    v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK A.
BENNACK, JR., JOHN H. BIGGS,
LAWRENCE A. BOSSIDY, M. ANTHONY
BURNS, LAURENCE FULLER, ELLEN V.
FUTTER, WILLIAM H. GRAY, III, HELENE
L. KAPLAN, LEE R. RAYMOND, JOHN R.
STAFFORD, and J.P. MORGAN CHASE &
CO.,

           Defendants.

Civil Action No. 04C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

      6.     This Court requests the assistance of counsel in calling to the attention of the Clerk of this Court the filing or transfer of any case which might properly be consolidated as part of the Consolidated Action.

## III.    CREATION OF A MASTER DOCKET AND MASTER FILE

      7.     A Master Docket and Master File shall be established for the Consolidated Action. The Master File number shall be Civil Action No. 04 C 6592. Entries in the Master Docket shall be applicable to this Consolidated Action. Separate dockets shall also be maintained for each consolidated Action, and entries shall be made in accordance with the regular procedures of the Clerk of the Court, except as modified by this Order.

3

## IV.   NEWLY FILED OR TRANSFERRED ACTIONS

8.      If a case that arises out of the subject matter of this action is hereinafter filed in this Court or transferred from another Court, the Clerk of this Court shall:

    a.   file a copy of this Order in the separate file for such action;

    b.   mail a copy of this Order to the attorneys for the plaintiff(s) in the newly filed or transferred case and to any new defendant(s) in the newly filed or transferred case; and

    c.   make the appropriate entry in the docket for this action.

9.      Each new case which arises out of the subject matter of this Action that is filed in this Court or transferred to this Court shall be consolidated with this action and this Order shall apply thereto, unless a party objecting to this Order or any provision of this Order shall, within ten (10) days after the date upon which a copy of this Order is served on counsel for such party, file an application for relief from this Order or any provisions herein and this Court deems it appropriate to grant such application.

## V.   APPOINTMENT OF LEAD PLAINTIFFS AND LEAD COUNSEL

10.      Dr. Stephen Blau and American Growth Fund, Inc. ("American Growth Fund") have moved this Court to be appointed as Lead Plaintiffs in this class action (the "Action") and to approve the counsel they have retained as Lead Counsel.

11.      Having considered the provisions of § 21D (a)(3)(B) of the Exchange Act, the Court hereby determines that Dr. Blau and American Growth Fund are the "most adequate plaintiffs" and that they satisfy the requirements of § 21D.   The Court hereby appoints Dr. Stephen Blau and American Growth Fund to be Lead Plaintiffs and to represent the interests of the Class (as defined in the Memorandum of Law filed herewith) in the Consolidated Action.

12.     Pursuant to § 21D(a)(3)(B)(v) of the Exchange Act, Dr. Stephen Blau and American Growth Fund have selected and retained the firm of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as Lead Counsel.  This Court approves Dr. Stephen Blau and American Growth Fund's selection of Wolf Haldenstein as Lead Counsel for the Consolidated Action.

13.     Lead Counsel shall have the following responsibilities and duties, to be carried out either personally or through counsel whom Lead Counsel shall designate:

     a.  to coordinate the briefing and argument of any and all motions;

     b.  to coordinate the conduct of any and all discovery proceedings;

     c.  to coordinate the examination of any and all witnesses in depositions;

     d.  to coordinate the selection of counsel to act as spokesperson at all pretrial conferences;

     e.  to call meetings of plaintiffs' counsel as they deem necessary an appropriate from time to time;

     f.  to coordinate all settlement negotiations with counsel for defendants;

     g.  to coordinate and direct the pretrial discovery proceedings and the preparation for trial and the trial of this matter and to delegate work responsibilities to selected counsel as may be required;

     h.  to coordinate the preparation and filings of all pleadings; and

     i.  to supervise all other matters concerning the prosecution or resolution of the Action.

14.     No motion, discovery request, or other pretrial proceedings shall be initiated or filed by any plaintiffs without the approval of Lead Counsel, so as to prevent duplicative pleadings or discovery by plaintiffs.  No settlement negotiations shall be conducted without the approval of Lead Counsel.

15.     Lead Counsel shall have the responsibility of receiving and disseminating Court orders and notices.

16.     Lead Counsel shall be the contact between plaintiffs' counsel and defendants' counsel, as well as the spokesperson for all plaintiffs' counsel, and shall direct and coordinate the activities of plaintiffs' counsel. Lead Counsel shall also be the contact between the Court and plaintiffs and their counsel.

17.     All counsel for plaintiffs in the Consolidated Action shall submit to Lead Counsel detailed time reports reflecting the hours of work expended by each attorney, their billing rate, and the subject matter of the work performed. Time reports shall be submitted on a quarterly basis with the first report due no later than one month following entry of this Order, and shall continue for each subsequent quarter thereafter or on such schedule as Lead Counsel shall determine. Any failure to timely submit such reports to Lead Counsel may result in the disqualification of such unreported time from being reimbursed from any common fund which may be created in the Consolidated Action.

18.     Defendants shall effect service of papers on plaintiffs by serving copies on Lead Counsel by overnight delivery service, telecopy, or hand delivery. Plaintiffs shall effect service of papers on defendants by serving copies on each of their counsel by overnight delivery service, telecopy, or hand delivery.

19.     During the pendency of this litigation, or until further Order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody, or control, including computer-generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or which may lead to the discovery of information relevant to the subject matter of the pending litigation.


**IT IS SO ORDERED.**


DATED:


WILLIAM J. HIBBLER
UNITED STATES DISTRICT JUDGE

\386403

6

# EXHIBIT

# 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



**FILED**

FEB 1 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DR. STEPHEN BLAU, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK A.
BENNACK, JR., JOHN H. BIGGS,
LAWRENCE A. BOSSIDY, M. ANTHONY
BURNS, LAURENCE FULLER, ELLEN V.
FUTTER, WILLIAM H. GRAY, III, HELENE
L. KAPLAN, LEE R. RAYMOND, JOHN R.
STAFFORD, and J.P. MORGAN CHASE &
CO.,

Defendants.

CIVIL ACTION NO. 04C 6592

JUDGE WILLIAM T. HIBBLER

MAGISTRATE JUDGE MARTIN C.
ASHMAN

AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff, Dr. Stephen Blau, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges (upon the investigation made by and through plaintiff's counsel) which included, *inter alia*, a review of relevant public filings made by J.P. Morgan Chase & Co. ("J.P. Morgan Chase" or the "Company") with the Securities and Exchange Commission ("SEC"), as well as press releases, news articles, and other public statements concerning the Company. Furthermore, this Complaint is based upon plaintiff's personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief, based upon the aforementioned investigation, as to all other matters.

## SUMMARY OF ACTION

1. This is a class action on behalf of all persons, other than defendants, who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for

voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting (the "Proxy Statement")) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation ("Bank One")), which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement (the "Merger").

2.      The Merger was consummated following J.P. Morgan Chase shareholder approval of a 14 percent premium in favor of Bank One; defendants, however, failed to disclose that Bank One offered to consummate the Merger without receiving a premium for its shares and that J.P. Morgan Chase's Chairman and Chief Executive Officer, Defendant William B. Harrison, rejected that offer so he could prolong his executive tenure. Bank One's Chief Executive Officer James Dimon, only then, following Mr. Harrison's refusal to step-down, demanded that Bank One shareholders receive the 14 percent premium. Mr. Harrison's selfish action (the facts of which are omitted from the Proxy Statement's discussions of related issues – namely, the Merger negotiation and approval process, the exchange ratio, and Mr. Harrison's continued employment) ultimately cost J.P. Morgan Chase shareholders over $7 billion in unnecessary Merger compensation. Plaintiff brings this action to recover damages caused by defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to sections 14(a) and 20(a) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. §§ 78n(a) and 78t(a)] and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.14a-9].

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and section 27 of the Exchange Act [15 U.S.C. § 78aa].

2

5. Venue is proper in this District pursuant to section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Bank One, the entity with which Defendant J.P. Morgan Chase joined in the Merger at issue, is headquartered in Chicago, and many of the material acts alleged herein occurred within this District.

6. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

7. Plaintiff was a holder of J.P. Morgan Chase common stock at the time the Merger was consummated, and was damaged by defendants' actions, described herein.

8. Defendant J.P. Morgan Chase is incorporated under the laws of Delaware; it maintains its principal place of business at 270 Park Avenue, New York, NY, 10017. J.P. Morgan Chase is a financial holding company and global financial services firm; it is engaged in the provision of investment banking, securities, investment management, and other financial and banking services. J.P. Morgan Chase is traded on the New York Stock Exchange under the symbol "JPM".

9. Defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Laurence Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford were, at relevant times, directors of J.P. Morgan Chase. In addition, William B. Harrison was J.P. Morgan Chase's Chief Executive Officer and Chairman of the Board.

10. Due to their positions as officers and/or directors, the individual defendants are responsible for the statements in the joint proxy statement (which also served as a prospectus for

3

J.P. Morgan Chase), dated April 19, 2004 (collectively, with the documents it annexes, the "Proxy Statement"). This is particularly clear given that the individual defendants were all directors of J.P. Morgan Chase, and the proxy statement contained the unanimous recommendation of the Board that the shareholders approve the merger.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who held common stock of J.P. Morgan Chase, on either April 2, 2004 (the record date), or at any time from April 19, 2004 (the proxy date) through July 1, 2004 (the Merger date). Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

12.    The members of the Class are so numerous that joinder of all members is impracticable. According to J.P. Morgan Chase's quarterly report filed on Form 10-Q with the SEC on May 10, 2004, there were 2,082,430,974 shares of the Company's common stock outstanding as of April 30, 2004. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent; they will be notified of the pendency of this action by mail, using a form of notice customarily used in securities class action at the appropriate time.

13. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14. Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

15. Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

    (b)    whether the Proxy Statement disseminated by defendants to the investing public in connection with the Merger misrepresented and/or omitted material facts concerning the Merger negotiations;

    (c)    whether defendants participated in and pursued the improper course of conduct complained of herein; and

    (d)    to what extent the members of the Class sustained damages, and the proper measure of damages.

16. A class action is superior to all other available methods of litigation for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

17.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to existing facts and conditions.  In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not sufficiently identified as "forward-looking statements" when made, and there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results could differ materially from those in the purportedly forward-looking statements.  Moreover, the statements alleged to be false were not accompanied by meaningful cautionary language.

## SUBSTANTIVE ALLEGATIONS

### J.P. Morgan Chase

18.     Defendant J.P. Morgan Chase is a global provider of financial services relating to investment banking, treasury and securities matters, investment management, private banking, and other financial and banking functions.  As of the end of 2003, it possessed approximately $771 billion in assets, and $46 billion in stockholders' equity.

19.     In 1999, Mr. Harrison became Chief Executive of Chase Manhattan, predecessor of J.P. Morgan Chase.  Soon thereafter, he spent more than $40 billion on acquisitions. One such acquisition was the 2000 merger with J.P. Morgan, just prior to the stock market "bubble" popped and the market entered into a prolonged corrective cycle.  Mr. Harrison's propensity for doing "big deals" that simply did not perform well going-forward, was characterized by Prudential Equity analyst Michael Mayo as a function of a "lack of capital discipline when it comes to large strategic acquisitions." *Interview with CNBC on February 23, 2004.*

6

20.     Mr. Harrison's tenure has been dogged by controversy, poor performance and scandal as J.P. Morgan Chase has been implicated in some of the largest cases of financial malfeasance with Mr. Harrison providing poor stewardship in the face of these problems.

21.     On September 18, 2002, *The Wall Street Journal* published an op-ed submission by Mr. Harrison in which he strongly rejected any charges of misconduct by J.P. Morgan Chase under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Mr. Harrison concluded: "To say that they [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

22.     Despite Mr. Harrison's public protestation of complete innocence, on July 28, 2003, J.P. Morgan Chase paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that J.P. Morgan Chase aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

23.     On October 1, 2003, J.P. Morgan Chase paid an additional $25 million to settle an action brought by the SEC in connection with its role in the IPO allocation scandal.

24.     In the face of these scandals and poor strategic decisions, J.P. Morgan Chase shareholders have weathered tough times. From June 1999 to January 14, 2004, J.P. Morgan Chase common stock declined 18 percent, from $48.08 to $39.22 per share. On the other hand, Citigroup stock (a major competitor) climbed 66 percent, and the S&P Financial Index (an index of 81 large banks) increased 16 percent.

**Bank One**

25.     Bank One (prior to its merger with J.P. Morgan Chase) was a financial holding and multi-bank holding company, incorporated in Delaware and headquartered in Chicago. It

7

was engaged in the provision of various services relating to domestic retail banking, international commercial banking, finance, and credit cards, and the management of trusts and investments, as well as other business and finance related services.

26.     Bank One shareholders experienced a remarkably dissimilar fate during a similar period of time. Under Mr. Dimon's leadership, beginning in March 2000 until the Merger in January 2004, Bank One's common stock rose 41 percent while during the same period J.P. Morgan Chase stock fell 38 percent.

**The Merger Negotiations**

27.     In the face of serious scandals, a declining stock price, and growing dissatisfaction with his leadership, Mr. Harrison sought out a transaction that would both protect his position at J.P. Morgan Chase and deflect some of the pointed criticisms directed at him. The January 18, 2004 *Sunday Tribune* described Mr. Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that few would have given odds on him even surviving the year, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

> Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable. What's more, it seemed to be largely Harrison's fault. At the top of the bull market, he had forked out $32bn in Chase Manhattan equity to acquire J.P. Morgan.

28.     In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies. They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions. This they did.

8

29. These negotiations, however, were not conducted by Mr. Harrison with the best interests of J.P. Morgan Chase shareholders in mind. Mr. Harrison, instead, had an eye toward protecting his own position at J.P. Morgan Chase; he also desired to retain the coveted title of CEO of the combined entity.

30. Specifically, several news sources have subsequently reported that Mr. Dimon initially offered to merge Bank One with J.P. Morgan Chase in a transaction that would not have required J.P. Morgan Chase stockholders to pay a premium for Bank One's shares. In this way, Mr. Dimon initially proposed a true "merger of equals." Mr. Harrison, however, insisted that he be the surviving entity's CEO for at least two years. This condition was more important to him than whether J.P. Morgan Chase's stockholders ultimately had to pay a higher price than necessary for Bank One in order to consummate the transaction. Reputable newspapers cite several sources corroborating these events.

31. For example, as reported in the June 27, 2004 edition of *The New York Times*:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the two extra years, to secure a smooth transition, **although he may have cost J.P. Morgan shareholders extra money in doing so**. Mr. Dimon, always the tough deal maker, **offered to do the deal for no premium** if he could become chief executive immediately, **according to two people close to the deal.**
>
> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent**. The two men declined to comment on the specifics of their negotiations.

Landon Thomas, Jr., *The Yin, the Yang and the Deal*, N.Y. Times, June 27, 2004, at C1. (Emphasis supplied.)

32. On July 3, 2004, *The Financial Times* (London) reported on the above-referenced *N.Y. Times* article and quoted an additional source that corroborated Mr. Harrison's insistence

that he remain in control, regardless of the cost to J.P. Morgan Chase shareholders, and that it would result in the payment of a premium to Bank One shareholders. According to the article, authored by David Wighton, "'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time." Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay."

33. Indeed, the Merger, as it was consummated on July 1, 2004, included a premium of approximately 14% for the Bank One shares (based on the closing price the trading day before the Merger was agreed to and announced), with a provision that Mr. Harrison would remain CEO of J.P. Morgan Chase for two years after completion of the Merger. The agreement also provides that for those two years, Mr. Dimon will serve as President and Chief Operating Officer of J.P. Morgan Chase, after which he will take over as sole CEO. In short, J.P. Morgan Chase shareholders unnecessarily paid greater than a more than $7 billion premium for Bank One, so that Mr. Harrison could remain CEO for two additional years, even though Mr. Dimon was prepared to structure the deal as a "merger of equals" from the outset, assuming he could run the combined entities – which he would anyway eventually run.

34. During November 2003, J.P. Morgan Chase and Bank One each retained financial advisors with respect to the proposed Merger. J.P. Morgan Chase retained one of its own subsidiaries, J.P. Morgan Securities, Inc. to have as its financial advisor, and agreed to pay it $40 million to perform services. This retention of a conflicted financial advisor (indeed, a subsidiary) aided and abetted Mr. Harrison's improper insistence that he retain his position even though it forced J.P. Morgan Chase shareholders to pay an unnecessary premium for Bank One's shares.

35.     *The Wall Street Journal* also has reported on Mr. Harrison's conduct, citing an additional source familiar with the negotiations. Specifically, on December 29, 2004, *The Wall Street Journal* reported that "in-house bankers at J.P. Morgan endorsed the $56.9 billion price [Merger] – negotiated by their boss [Harrison] - as "fair"," even though "during the negotiations [Dimon] … suggested selling his bank [Bank One] for billions of dollars less if, among other conditions, he immediately became chief of the merged firm, according to a person familiar with the talks. The suggestion wasn't accepted by J.P. Morgan."

36.     The discussions concerning the Merger's terms continued during December 2003, when the chief financial officers of the companies met, as did financial advisors for each bank. Messrs. Dimon and Harrison further discussed the key terms of a possible business transaction, including the deal's pricing and executive retention components. They periodically updated their respective boards on these communications.

37.     Despite Messrs. Dimon's and Harrison's reported meetings to brief their respective Boards, Mr. Harrison, on a February 23, 2004, CNBC interview with Maria Bartiromo, stated that he and Mr. Dimon had "secret meetings" once they "got serious" about doing the deal. The meetings took place at J.P. Morgan Chase's "suite at the Waldorf" and Mr. Dimon "came out to my [Mr. Harrison's] . . . home in Greenwich one time". Mr. Harrison additionally stated that only he and Mr. Dimon knew about the details: "Nobody knew any difference between whether we were serious or not except us, so we were just very careful about it."

38.     In early to mid-January 2004, each company's respective boards of directors convened special meetings to consider the Merger's terms. At these meetings board members reviewed the terms of Mr. Dimon's employment agreement; proposed arrangements for other

11

senior management were also reviewed, along with the exchange ratio and related valuation information as it pertained to each company.

39.     On January 14, 2004, each company's board of directors approved the Merger. After the exchange, former J.P. Morgan Chase shareholders would own approximately 58% and former Bank One shareholders approximately 42% of the combined entity.

40.     Later that day, J.P. Morgan Chase and Bank One announced that they had reached an agreement to merge, subject to regulatory and shareholder approval, in a stock-for-stock transaction. Under the terms of the deal, each Bank One shareholder would receive 1.32 shares of J.P. Morgan Chase for each share of Bank One that they held. No mention was made that Mr. Dimon proposed to structure the transaction absent J.P. Morgan Chase shareholders paying a premium for Bank One, and that the premium was attached subsequently because Mr. Harrison refused to relinquish his position.

41.     That the exchange ratio was unfair to the interests of J.P. Morgan Chase shareholders is evidenced, in part, by the weakness of Mr. Harrison's performance as a CEO when compared to Mr. Dimon's performance while at Bank One's helm. Between the time that Mr. Harrison became CEO in June 1999, and the consummation of the Merger, J.P. Morgan Chase's stock price declined approximately 6%. Notably, according to Michael L. Mayo, a banking analyst at Prudential Securities, J.P. Morgan Chase's stock price performance ranked at the very bottom of the 17 bank stocks he covered, Bank One, on the other hand, which according to Mr. Mayo provided 13% in returns under Mr. Dimon's leadership, sat near the top of his list, ranking at third place. *N.Y. Times*, June 27, 2004.

42.     In actuality, one of the factors supporting the Merger was the perceived value of Mr. Dimon's leadership. A fund manager at Victory Capital stated: "[T]he sense on the street is

that the day-to-day operations will be run by Jamie ... We have a lot of faith in him." (Quoted in *N.Y. Times*, June 27, 2004.)   One vice president of J.P. Morgan Chase said publicly of Mr. Dimon, "[t]he guy is a rock star." *Id.*

43.     In contrast, Mr. Harrison, as noted in *The New York Times*, "has endured two years of negative publicity as J.P. Morgan's stock plunged to a low of $16, down 70 percent from its high of $52 in early 2001." *Id.* Even Mr. Harrison conceded the problems under his tenure, stating, "If we had gone another year without performing, the board probably would have demanded changes ... [t]here is a point at which you can't go on." *Id.*

44.     In addition, once the Merger was announced public criticism of the premium paid to Bank One shareholders was immediate: Lawrence Kudlow observed on CNBC's Kudlow & Cramer program: "[S]ome people I spoke to today said this is too dilutive.  They said J.P. Morgan Chase is paying too big a premium.  It's great for Bank One shareholders but it's not great for J.P. Morgan Chase, [former] Manny Hanny, [former] Chemical shareholders, etc."

45.     James Cramer, also of Kudlow & Cramer, discussed the Merger with Lehman Brothers Bank Analyst Brock Vandervliet:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips—that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know.  It's an odd – a lot of people – I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

46. Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

47. Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", an analyst with Natexis Bleichroeder commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

48. "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of J.P. Morgan getting Jamie Dimon to **[word missing?]** the next chief executive. I guess he is going to be running the show from day one."

49. London's Sunday *Telegraph* reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

50. "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital management in Cleveland, specializing in bank stocks. "We have a lot of faith in him." *New York Times, June 27, 2004.*

51. "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns J.P.MC stock and owned Bank One: "Jamie will run the show."

52. *The Australian* reported in January 16, 2004:

"J.P. Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….] "Dimon brings a new broom to J.P. Morgan, which has a lot of management issues."

53.     *Retail Banker International* reported on February 11, 2004, that, despite Mr. Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

54.     *Retail Banker International* further observed:

> Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

55.     Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor, thereby negating the need to pay Bank One shareholders a premium other than for reasons that served Mr. Harrison's interests.

56.     Specifically, when the Merger was announced, it was billed as J.P. Morgan Chase's acquisition of Bank One, thereby justifying a 14% premium or $7 billion in additional merger compensation. The transaction, however, was, in fact, a "merger of equals." For example, in connection with the Merger, J.P. Morgan Chase amended it's By-Laws to include the following:

15

Section 2.09.  CEO Position and Succession; Board Composition.  (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time tot time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the board and Chief Executive officer of the Corporation and Mr. James Dimon shall become the president and Chief Operating Officer of the Corporation.  The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing J.P. Morgan Chase Directors, including Mr. Harrison.  From and after the Effective Time through the Succession Date: (I) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing J.P. Morgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing J.P. Morgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.).  For purposes of this Section 2.09, the terms "Continuing J.P. Morgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c)(i)  The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a

16

Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

57.     According to an *Institutional Shareholder Services* report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

58.     Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

59.     Thus, given the fact the deal was ostensibly the coming together of equal partners, there was no reason for J.P. Morgan Chase shareholders to have paid a 14% premium for Bank One stock (except to satisfy Mr. Harrison's desire to remain in control), especially where it is apparent that both investors and industry analysts recognized Mr. Dimon was to be the leader of the combined entity from the outset and Mr. Harrison's role would be ceremonial going forward.

60.     Further revelations well into late 2004, and early 2005, demonstrate that Bank One shareholders received the better end of the bargain and that the 14 percent premium was unwarranted from the outset. On January 19, 2005, J.P. Morgan Chase (the "combined entity") released fourth-quarter 2004 earnings that reflected an 11% percent decline in quarterly profits because of, in part, higher-than-expected costs stemming from the Merger. J.P. Morgan Chase reportedly expects to spend $4.5 billion because of the deal, up from an earlier forecast of $4

17

billion. In October 2004, J.P. Morgan Chase previously stated that Merger-related spending would cut fourth-quarter earnings by $300 million, bringing the year's total to $1.1 billion. Based on the quarter's actual results, Merger-related expenses had increased to $324 million.

61.     As detailed above, Mr. Harrison's insistence on retaining his job resulted in J.P. Morgan Chase paying a 14 percent premium for Bank One stock. Since the deal was a stock for stock transaction, it resulted in Bank One shareholders receiving excess J.P. Morgan Chase stock in an amount equal to approximately $7 billion – an amount that Mr. Dimon was initially willing to forego. As a further result, [legacy] J.P. Morgan Chase shareholders suffered unnecessary dilution in their holdings. As became apparent, again, with the release of fourth quarter results for the combined entity, the new company earned $1.67 billion, or 46 cents per share, compared with the $1.86 billion or 89 cents a share, in the prior year's period earned by [legacy] J.P. Morgan Chase. Thus, [legacy] J.P. Morgan Chase shareholders have seen the dilution of their stockholdings, caused by the payment of an unnecessary premium translate into a decline in earnings per share of 43 cents over the prior period.

## FALSE AND MISLEADING STATEMENTS
## IN THE PROXY STATEMENT

62.     The Proxy Statement describing, *inter alia*, the negotiation of the Merger and its final terms (which also served as a prospectus for J.P. Morgan Chase) is dated April 19, 2004, was filed with the SEC in J.P. Morgan's Form S-4/A on April 19, 2004, and, according to J.P. Morgan's website, became effective with the SEC on that date. On April 21, 2004, the Board of Directors of J.P. Morgan Chase again filed the Proxy Statement with the SEC (it had been filed by Bank One on April 20, 2004), and also disseminated it to shareholders. The companies urged their respective shareholders to approve of the agreement.

18

63.    The Proxy Statement was materially false and misleading because it failed to disclose Mr. Dimon's offer to consummate the Merger with no premium in favor of Bank One. This omission forced J.P. Morgan Chase shareholders to make their determinations concerning the Merger in the absence of that material information.   This omission, and the statements rendered misleading thereby, as described below, also artificially depressed the price of J.P. Morgan Chase stock.

64.    The omission of information concerning the better offer, in light of the statements that the Proxy Statement did contain, rendered the document misleading in several material respects.

65.    The Proxy Statement is misleading as to the factors considered by the J.P. Morgan Chase Board in approving the Merger.  These factors (listed in the Proxy Statement at 37-42) are divided into "Strategic Considerations" (relating to business mix, financial synergies, and similar issues), and a list of "Other Factors Considered by the J.P. Morgan Chase Board",  such as (in relevant part):

- the financial analyses and presentations of JPMorgan Chase's financial advisor and its opinion that the exchange ratio was fair, from a financial point of view, to JPMorgan Chase…;

* * *

- the fact that the exchange ratio represented a premium of 8% based on the average closing prices of JPMorgan Chase and Bank One common stock during the one month prior to announcement of the merger and a premium of 14% over the closing price of Bank One common stock on the date of announcement of the merger;

- the determination that an exchange ratio that is fixed and not subject to adjustment is appropriate to reflect the strategic purpose of the merger and consistent with market practice for mergers of this type and that a fixed exchange ratio fairly captures the respective ownership interests of

19

the JPMorgan Chase and Bank One stockholders based on fundamental valuation assessments and avoids fluctuations caused by near-term market volatility; [and]

- the corporate governance provisions established for the transaction, including the post-merger board composition, the Chief Executive Officer succession arrangements, the employment agreement with Mr. Dimon and the designation of key senior management of the combined company, which the JPMorgan Chase board considered to be of significant importance in assuring certainty with respect to Chief Executive Officer succession, continuity of senior management and an effective and timely integration of the two companies' operations.

66.    Notably missing from this list was any mention of Mr. Dimon's offer to enter into the Merger with no premium for Bank One's shares.

67.    Similarly misleading is the list of risk factors that the Proxy Statement indicates that the J.P. Morgan Chase board considered with respect to the Merger. This includes a number of issues, including "Potential conflicts of interest of J.P. Morgan Chase officers and directors in connection with the merger" (Proxy Statement at 42), and references a later section, which identifies among such conflicts (in most relevant part):

> ***JPMorgan Chase Management Positions***. The merger agreement provides that Mr. Harrison, JPMorgan Chase's current Chairman and Chief Executive Officer, will remain Chairman and Chief Executive Officer of JPMorgan Chase until the second anniversary of the completion of the merger, at which time (or any earlier time that Mr. Harrison ceases to serve as Chief Executive Officer) Mr. Dimon will succeed him as Chief Executive Officer, and Mr. Harrison will thereafter continue to serve as Chairman. In addition, other members of JPMorgan Chase management will serve in senior management positions at the combined company. (Proxy Statement at 66).

These warnings about risks and conflicts of interest are misleading in the absence of a mention that Mr. Harrison rejected an offer of exchange with no premium to protect his own position.

68.     In fact, the Proxy Statement is misleading each time it discusses the retention agreements for Harrison and Dimon. For example, in addition to the statements identified elsewhere herein, it states:

> Some of the directors and executive officers of JPMorgan Chase and Bank One have interests in the merger that are different from, or are in addition to, the interests of stockholders of JPMorgan Chase and Bank One. These interests include:
>
> - the agreed-upon appointment of various members of senior management of JPMorgan Chase and Bank One to senior management positions at JPMorgan Chase after the merger [of which the Proxy Statement indicates that the board was aware when deciding to approve the merger]. (Proxy Statement at 8-9)

69.     Similarly, the Proxy Statement also says:

> - Following the merger, Mr. Harrison will continue to serve as Chairman and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become President and Chief Operating Officer of JPMorgan Chase. As part of the merger, the parties have agreed that as of the second anniversary of the completion of the merger (or, if earlier, when Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer), Mr. Dimon will become Chief Executive Officer of JPMorgan Chase. Mr. Harrison will continue to serve as Chairman of JPMorgan Chase following the date of Mr. Dimon's succession as Chief Executive Officer. (Proxy Statement at 9.)

and:

> ...Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.
>
>                                   * * *
>
> JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements ..." (Proxy Statement at 36.)

21

70.     All discussions concerning Mr. Harrison's and Mr. Dimon's employment arrangements post Merger were misleading because they failed to mention that the arrangements were executed at the cost of over $7 billion to J.P. Morgan Chase shareholders.

71.     The Proxy Statement's discussion of the exchange ratio, as well as the negotiation and fairness thereof, is also misleading, because it fails to mention that the premium included in such exchange ratio could have been avoided. In addition to the statements identified above in connection with the Board's discussion of "Other Factors Considered by the JPMorgan Chase Board", the Proxy Statement states, for example, that:

> During these discussions [in late November and into December], the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, **and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio**. (Proxy Statement at 35.) (Emphasis supplied.)

72.     The Proxy Statement further states:

> [On January 14, at a special meeting of the JPMorgan Chase board to consider the deal] JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the Merger was fair, from a financial point of view, to JPMorgan Chase. (Proxy Statement at 37.)

73.     The Proxy Statement is further misleading when it states, generally, that the board of directors reviewed the Merger and approves of it. Statements such as "The JPMorgan Chase board of directors has determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement," (Proxy Statement at 7) are misleading, because in making such them, defendants are silent as to whether they considered Mr. Dimon's superior offer.

22

74.     Other misleading statements of this type in the Proxy Statement are:

(a)     Each of our boards of directors unanimously recommends that stockholders vote FOR the merger. We strongly support this combination of our companies and join our boards in their recommendations. (Letter from Harrison.)

(b)     The JPMorgan Chase board of directors unanimously determined that the merger, the merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously approved the merger agreement.   The JPMorgan Chase board unanimously recommends that JPMorgan Chase stockholders vote "FOR" adoption of the merger agreement.    (Proxy Statement at 42.)

(c)     "WHEREAS, the Boards of Directors of JPMorgan Chase and Bank One have approved, and deem it advisable and in the best interests of their respective stockholders to consummate, the business combination transaction provided for herein in which Bank One would merge with and into JPMorgan Chase (Merger Agreement annexed to the Proxy Statement at A-1.)

(d)     "A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence.

* * *

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also

23

attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements ... JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors.... [And]...discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors."

\* \* \*

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. ...*Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by*

24

> *those agreements, and resolved to recommend that its*
> *stockholders vote to adopt the merger agreement.* (Proxy
> Statement at 36-37.) (Emphasis supplied.)

75.     The Proxy Statement is also misleading in its description of J.P. Morgan

Chase/J.P. Morgan Securities's analysis of comparable transactions.  It states that:

> JPMorgan Chase believes that an assessment of the pro forma
> impact of the proposed merger on a cash basis as well as a GAAP
> basis facilitates consistent and meaningful comparisons between
> the effects of the proposed merger and the effects of *other*
> *comparable financial services mergers* on a basis unaffected by
> those company-specific variations and facilitates trend analysis
> between reporting periods on a basis unaffected by variations in
> amortization levels.  (Proxy Statement at 39.) (Emphasis supplied.)

76.     This is followed several pages later by a statement that JP Morgan Securities (J.P.

Morgan Chase's financial advisor) that it was setting forth a chart of comparable transactions.  It

described such chart in the following manner:

> Comparable Transactions. Using publicly available information,
> JPMorgan Securities examined the following transactions
> involving U.S. banks with transaction values greater than $10
> billion since 1997.  (Proxy Statement at 50.)

77.     Obviously, any discussion of comparable transactions is misleading without

mention of the most comparable transaction of all, a merger of the same two companies, absent

the share premium for the Bank One shares.

78.     On May 25, 2004, shareholders of J.P. Morgan Chase and Bank One voted during

their respective annual meetings to approve the Merger.  The Proxy Statement provided in

connection with that merger contained statements that were, as described above, materially false

and misleading when made, as they misrepresented and/or omitted then existing facts which the

Company was required to disclose in order to make the statements not false and/or misleading,

including, but not limited to: (a) an offer was made to complete the Merger with no premium for

25

the Bank One shares; and (b) Mr. Harrison rejected this offer to protect his executive position at J.P. Morgan Chase.

79.    Had the negotiation process been characterized appropriately, the Company would have had to report this offer, and shareholders would have had the opportunity to vote their proxies with the full information in hand. This information was material. Accordingly, the Proxy Statement was materially misleading at all relevant times.

80.    All of the defendants are liable for the statements in this Proxy Statement. It is the filing of defendant J.P. Morgan Chase, and it reflects the deliberations and unanimous recommendation of the Board of Directors, on which each of the individual defendants sat.

## FIRST CLAIM

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 of the SEC
### (Against All Defendants)

81.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Count is asserted against all defendants.

82.    This cause of action is brought by plaintiff pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78(n)(e) and Rule 14a-9(a) promulgated thereunder on behalf of all persons, other than defendants who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation), which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement. This claim is brought against all defendants and does not sound in fraud.

83.     Section 14(a) of the Exchange Act provides that "it shall be unlawful for any person ... in contravention of such rules and regulations as the Commission [SEC] may prescribe ... to solicit ... any proxy or consent or authorization in respect of any security ... registered pursuant to ... this title." Exchange Act § 14(a), 15 U.S.C. § 78n(a).

84.     Rule 14a-9(a) promulgated thereunder provides that "no solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...." 17 C.F.R. § 240.14a-9(a).

85.     J.P. Morgan Chase and Bank One filed and disseminated the Proxy Statement seeking shareholder votes in support of J.P. Morgan Chase's planned merger with Bank One and outlined the factors giving rise to the Merger and the conditions of the agreement.

86.     This Proxy Statement was false and misleading in that it failed to disclose material facts about Mr. Dimon's offer on behalf of Bank One to engage in a transaction with no premium for the Bank One shareholders. This disclosure was necessary to make the disclosures that were made not misleading.

87.     The Defendants were negligent in disseminating the Proxy Statement with these materially false and misleading statements.

88.     The omissions and false and misleading statements in the Proxy Statement were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would have viewed a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

89.     The omissions and false and inaccurate statements made in the Proxy Statement concerning the negotiation of the Merger, with its exchange ratio of 1.32 shares of J.P. Morgan Chase common stock for each share of the common stock of Bank One, were material.

90.     By reason of the foregoing, defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) of the SEC and are liable to plaintiff and all other members of the Class who held stock in J.P. Morgan Chase that were exchanged for Bank One shares pursuant to the J.P. Morgan Chase/Bank One Merger.

91.     Each shareholder has been damaged, in a total amount to be determined at trial, as a direct and proximate result of such violations, because they were denied the opportunity to make an informed decision in response to the proposed transaction with respect to the Merger premium, which resulted in the Merger being consummated with an unnecessary premium that would otherwise have not been approved.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     The individual defendants acted as controlling persons of J.P. Morgan Chase within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors (and in the case of Mr. Harrison, Chief Executive Officer), and, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, they had the power to influence and control and did influence and control, directly or indirectly,

the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

94.    Individual defendants Bennack, Biggs, and Burns also were members of J.P. Morgan Chase's audit committee and thus were responsible for oversight of the CEO's and senior management's "responsibilities to maintain compliance with JPMorgan Chase's ethical standards, policies, plans and procedures, and with laws and regulations," (Proxy Statement at 119), Defendants Bechtel, Gray, Raymond, and Stafford were also members of the Compensation & Management Development Committee, and thus would reasonably have been expected to be involved in the decisions about Mr. Harrison's retention after the Merger.

95.    Each of the individual defendants was provided with or had unlimited access to copies of the Company's proxy statements and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.    In particular, each of the individual defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. In addition, as the Proxy Statement sets forth at length, and as described herein, the individual defendants were all involved in negotiating, reviewing and approving the Merger. The Proxy Statement describes the various issues and information that they reviewed and considered, descriptions which must have had input from the directors themselves. The Proxy Statement at issue contained the unanimous recommendation of each of the individual defendants to approve the Merger. They were thus directly involved in the making of this document.

29

97. Individual Defendant Harrison was the recipient of Mr. Dimon's offer to join the two companies with no premium for the Bank One shares.

98. By virtue of the foregoing, the individual defendants have violated Section 20(a) of the Exchange Act.

99. As set forth above, J.P. Morgan Chase and the individual defendants each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the individual defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with the exchange of J.P. Morgan Chase shares for Bank One shares at the time the Merger was completed.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

100. Determining that this action is a proper class action, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

101. Awarding compensatory damages (including but not limited to recisionary damages) in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

102. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

103. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**Dated:** February 18, 2005

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

By: _____
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois. 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email: levitt@whafh.com


**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole
Gustavo Bruckner
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: nespole@whafh.com

*Lead Counsel for*
*Plaintiff and the Proposed Class*

**LAW OFFICE OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

*Additional Counsel for*
*Plaintifs and the Proposed Class*

7333

# EXHIBIT

# 3



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,<br><br>Defendants. | CIVIL ACTION NO. 04C 6592<br><br>JUDGE WILLIAM T. HIBBLER<br><br>MAGISTRATE JUDGE MARTIN C. ASHMAN<br><br>NOTICE OF WITHDRAWAL OF AMERICAN GROWTH FUND, INC., AS LEAD PLAINTIFF<br><br>**FILED**<br><br>FEB 1 8 2005<br><br>MICHAEL W DOBBINS<br>CLERK, U S DISTRICT COURT |

**PLEASE TAKE NOTICE** that Lead Plaintiff American Growth Fund, Inc., one of the

Court-appointed Lead Plaintiffs in the above-captioned action, hereby voluntarily withdraws as

Lead Plaintiff from this case.

**Dated:** February 18, 2005

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

By: _____
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois. 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email: levitt@whafh.com

1

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole
Gustavo Bruckner
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: nespole@whafh.com

*Lead Counsel for*
*Plaintiff and the Proposed Class*

**LAW OFFICE OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

*Additional Counsel for*
*Plaintiff and the Proposed Class*

7320

2