# EXHIBIT

# 5



Milberg Weiss Bershad & Schulman LLP



THE **IPO** FRAUD

< Return to Home

**Press Release**

FOR IMMEDIATE RELEASE

IPO SECURITIES LITIGATION RECOVERY OF AT LEAST $1 BILLION DOLLARS GUARANTEED FOR PLAINTIFF CLASSES UPON APPROVAL OF SETTLEMENT

(New York, NY June 26, 2003) The Plaintiffs' Executive Committee announced that a proposed settlement between the issuer defendants and their directors and officers and the plaintiffs has been structured in the Initial Public Offering Securities Litigation which would guarantee at least (or the first) $1 billion dollars to investors who are class members from the insurers of the issuers. (This is separate from any recoveries to be received by investors as a result of any government or regulatory action). The cases will continue against the 55 investment bank underwriter defendants.

The Initial Public Offering Securities Litigation consists of 309 class actions involving more than 300 IPOs marketed between 1998 and 2000. The actions are coordinated before U.S. District Court Judge Shira A. Scheindlin in the Southern District of New York.

The defendants consist of the companies brought public, certain of their officers and directors and 55 of the investment banks that brought them public and underwrote various follow-on offerings.

The lawsuits allege that the IPOs were manipulated by the investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

**Melvyn I. Weiss**
Chair of the Executive Committee for the IPO Securities Litigation

The plaintiffs' attorneys are led by a Court-appointed Executive Committee which has been in a year-long mediation with the non-investment bank defendants to arrive at a settlement of all claims against them.

A Memorandum of Understanding ("MOU") to settle plaintiffs' claims against the issuers and their directors and officers has now been approved as to form by counsel, and the process of obtaining approval by all parties to the MOU is now underway. The parties will be required to prepare many complex documents necessary to consummate the settlement, which will be submitted to the Court for preliminary approval. Final approval will be required by the Court following notice to class members and a fairness hearing.

The settlement provides that the class members will be guaranteed $1 billion dollars in recoveries by the insurers of the issuers. In addition, the settling issuer defendants will assign to the class members certain claims that they may have against the underwriters. If recoveries in excess of $1 billion dollars are obtained by the classes from the underwriters, the settling defendants' monetary obligations to the class plaintiffs will be satisfied.

If more than $5 billion dollars are recovered from the underwriter defendants, the settling defendants and their insurers will be able to recover various expenses incurred in connection with the litigation

The proposed settlement does not resolve the claims against the underwriter defendants. Plaintiffs will continue to prosecute those claims.


**The Plaintiffs' Executive Committee consists of the following:**

| | |
|---|---|
| Melvyn I. Weiss | Milberg Weiss Bershad & Schulman LLP - *Chair* |
| Stanley Bernstein | Bernstein Liebhard & Lifshitz, LLP - *Vice Chair* |
| Richard Schiffrin | Schiffrin & Barroway, LLP |
| Howard Sirota | Sirota & Sirota LLP |
| Jules Brody | Stull, Stull & Brody |
| Fred T. Isquith | Wolf Haldenstein Adler Freeman & Herz LLP |

**For More Information:**
Brigitte S. Rudman
Director of Communications
Milberg Weiss Bershad & Schulman LLP

Phone: 212-631-8680
Email: brudman@milbergweiss.com

# EXHIBIT
# 6

Attorneys | Adam Levitt | Wolf Haldenstein Adler Freeman & Herz LLP    http://www.whafh.com/modules/attorney/index.php?action=view&...

## WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

MAILING LIST    CONTACT US

ABOUT THE FIRM    PRACTICE AREAS    ATTORNEYS    CASES    WHAFH IN THE NEWS    PUBLICATIONS    RESOURCES

Home | Attorneys | Adam Levitt

# ATTORNEYS

SEARCH

Entire Site

GO

JOIN THE
MAILING LIST
>> GO

A TRADITION
SINCE 1888
>> OUR HISTORY

## Adam J. Levitt
**Partner**

PRINT PAGE    EMAIL PAGE

**Chicago**
656 West Randolph St.
Chicago, Illinois 60661

p. 312-984-0000
f. 312-984-0001
**Email Adam**

PRACTICE AREAS

Class Action Consumer

Class Action Litigation

General Litigation

Institutional Investor
Svcs

Securities Litigation

**Adam J. Levitt** is a partner in the firm's Chicago office. Mr. Levitt graduated from Columbia College, Columbia University in 1990 (A.B. *magna cum laude*) and the Northwestern University School of Law in 1993. Mr. Levitt was admitted to the Illinois Bar in 1993 and is also admitted to practice before the United States District Courts for the Northern and Southern Districts of Illinois, the Northern and Eastern Districts of Texas, the District of Nebraska, and the Northern District of Indiana; as well as the United States Court of Appeals for the First and Seventh Circuits, and the Supreme Court of the United States. He is rated "AV" by Martindale-Hubbell[sm].

Substantially all of Mr. Levitt's practice is focused on complex commercial litigation and class action practice on both the trial and appellate court levels, in federal and state courts nationwide, in the areas of securities, consumer protection, technology, and agricultural law. Since 1993, Mr. Levitt has served as lead counsel, co-lead counsel, or in other leadership positions in numerous class and other complex litigations throughout the United States, including *In re StarLink Corn Products Liability Litigation*, MDL No.1403 (N.D. Illinois) (recovered $110 million for U.S. corn farmers who sustained market losses arising from defendants' contamination of the U.S. food corn supply with an improperly bioengineered corn seed product); *Court Reporting Services v. Compaq Computer Corporation*, C.A. No. 02 CV 044 (E.D. Texas) (obtained full recovery, valued at not less than $35 million, on behalf of Compaq Presario purchasers with improperly partitioned hard disk drives); and various Internet privacy cases, including *Supnick v. Amazon.com*, Inc. (W.D. Wash.) and *In re DoubleClick, Inc. Privacy Litigation* (S.D.N.Y.). Mr. Levitt is currently serving as co-lead counsel in thirteen class action lawsuits against the Monsanto Company, Pioneer Hi-Bred International, and E.I. DuPont de Nemours and Company, predicated upon those companies' alleged improper conduct arising from their sale of genetically-engineered soybean and corn seeds, and as lead counsel in *In re Comdisco Securities Litigation;* and is actively involved in the *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC 92 (SAS) (S.D.N.Y.) (consolidated action against 309 issuers and 55 underwriters alleging manipulation, misrepresentations, and omissions relating to the market for various high-tech initial public offerings). Mr. Levitt also provides, legal services to various private companies involving complex litigation and general corporate matters.

Mr. Levitt is a member of the American Law Institute ("ALI") and is part of the ALI's Members Consultative Group on the Principles of the Law of Aggregate Litigation. Mr. Levitt is also the Seventh Circuit Contributing Editor to the American Bar Association's *Class Action & Derivative Suits* newsletter, and regularly serves as a moot court judge in the Julius H. Miner Moot Court Competition at the Northwestern University School of Law. He is the author of *Foreign Investors Serving as Lead Plaintiffs in U.S.-Based*

RELATED NEWS

05/10/05
WOLF HALDENSTEIN
APPOINTED LEAD
COUNSEL – AON ERISA
LITIGATION

>> VIEW ALL

PUBLICATIONS

Foreign Investors Serving
as Lead Plaintiffs in
U.S.-Based Securities
Cases (Part I of II)

WHAFH Leads Opposition
to Proposed Illinois Rule
Limiting Class Actions

>> VIEW ALL

Case 1:05-cv-00162-JJF    Document 65-7    Filed 09/15/2005    Page 7 of 126

*Securities Cases*, International Practice Section Newsletter (Association of Trial Lawyers of America, Washington, D.C.), Winter 2004 and Spring 2005.; *Proposed Rule 225: A Death Warrant for Class Actions in Illinois*, 93 Illinois Bar Journal 202 (2005); *The Big Business Wish List: Proposed Illinois Supreme Court Rule 225 and the Demolition of Consumer Rights*, The Class Act (The Newsletter of the National Association of Securities and Consumer Law Attorneys), February 25, 2005; and *An Illinois Lawyer's Guide to Service of Process in Mexico*, 82 Illinois Bar Journal 434 (1994). Mr. Levitt has also testified before the Illinois Supreme Court Rules Committee on class action practice and related issues. In recognition of his achievements to date, Mr. Levitt was named one of the "40 Illinois Attorneys Under 40 Years Old to Watch" by the *Chicago Daily Law Bulletin* and the *Chicago Lawyer*.



About the Firm  |  Practice Areas  |  Attorneys  |  Cases  |  WHAFH In the News  |  Publications  |  Resources  |  Contact Us

Copyright © 2004 Wolf Haldenstein Adler Freeman & Herz   Disclaimer  |  Site Map

Case 1:05-cv-00162-JJF   Document 65-7   Filed 09/15/2005   Page 8 of 126

## WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

MAILING LIST   CONTACT US

ABOUT THE FIRM    PRACTICE AREAS    ATTORNEYS    CASES    WHAFH IN THE NEWS    PUBLICATIONS    RESOURCES

Home | Attorneys | Gustavo Bruckner

# ATTORNEYS

SEARCH

Entire Site

[ ] GO

JOIN THE
MAILING LIST
>> GO

A TRADITION
SINCE 1888
>> OUR HISTORY

## Gustavo Bruckner
### Associate

PRINT PAGE   EMAIL PAGE



**New York**
270 Madison Avenue
New York, New York 10016

p. 212-545-4600
f. 212-545-4653
**Email Gustavo**

PRACTICE AREAS

Class Action Litigation

Securities Litigation

**Gustavo Bruckner** is an associate of the firm. He received his law degree from Yeshiva University's Benjamin N. Cardozo School of Law in 1992, where he served as an Editor of the Moot Court Board. He received his undergraduate degree in Marketing and International Business with honors from New York University in 1988 and his MBA in Finance and International Business from New York University's Stern School of Business in 1989. He is licensed to practice in New York and New Jersey and has been admitted to practice before the United States District Courts for the Eastern and Southern Districts of New York, the United States District Court for the District of New Jersey, and the United States Supreme Court. Prior to joining the firm, Mr. Bruckner served as chief-of-staff to a New York City legislator. Mr. Bruckner concentrates his practice in the areas of securities litigation and general and corporate business litigation. He has worked extensively on drafting and discovery in *In re Initial Public Offering Securities Litigation*, Master File No. 21 MC 92 (S.D.N.Y.)(SAS), currently pending in the Southern District of New York and involving more than 300 class actions alleging manipulation of the market for IPO stock. Mr. Bruckner sits on the firm's technology committee and is part of the case development department, which involves working with clients, litigation strategy and lead plaintiff issues.



RELATED NEWS

05/10/05
WOLF HALDENSTEIN
APPOINTED LEAD
COUNSEL – AON ERISA
LITIGATION

12/08/04
EMPLOYEE
ERISA
LITIGATION

11/04/04
Class action lawsuit
accuses St. Paul
Travelers of deceit

11/03/04
INSURANCE SCANDAL

06/26/03
IPO Securities Litigation
Recovery Of At Least $1
Billion Guaranteed For
Plaintiff Classes

02/20/03
WHAFH Announces Court
Opinion Denying Motion
to Dismiss in IPO
Manipulation Class
Action Suit

>> VIEW ALL



About the Firm | Practice Areas | Attorneys | Cases | WHAFH In the News | Publications | Resources | Contact Us

Copyright © 2004 Wolf Haldenstein Adler Freeman & Herz    Disclaimer | Site Map

Cases | IPO Securities Litigation | Wolf Haldenstein Adler Freeman... http://www.whafh.com/modules/cases/index.php?action=view&id=330



# CASES

Home | Cases | IPO Securities Litigation

**SEARCH**

Entire Site

GO

## Case List
## New Cases
## Settlements
## Case Studies

JOIN THE
MAILING LIST
>> GO

A TRADITION
SINCE 1888
>> OUR HISTORY

## IPO Securities Litigation

PRINT PAGE   EMAIL PAGE

### PARTICIPATE IN THIS CLASS ACTION

The Initial Public Offering ("IPO") Securities Litigation consists of 309 class actions involving more than 300 IPOs marketed between 1998 and 2000. The actions are coordinated before U. District Court Judge Shira A. Scheindlin in the Southern District of New York. Wolf Haldenstein Adler Freeman & Herz LLP announced that the motion to dismiss in IN RE: IPO SECURITIES LITIGATION 21 MC 92 (SAS) was denied on February 20, 2003, by Judge Shira A. Scheindlin in the Southern District of New York. The Underwriter Defendants include, among others, Credit Suisse First Boston Corp., [NYSE:CSR]: The Goldman Sachs Group, Inc., [NYSE:GS]: Morgan Stanley Dean Witter & Co., [NYSE:MWD]: and Salomon Smith Barney, Inc., [NYSE:C].

A copy of the Opinion denying the motion to dismiss can viewed by clicking the link to the right.

The cases were consolidated and Wolf Haldenstein was appointed one of the Co-lead Counsel and member of the Executive Committee. Amended complaints were filed and defendants moved to dismiss. On February 19, 2003, the Court, in part, denied defendants' Motion to Dismiss. The case will now proceed to the discovery investigatory phase in preparation for trial.

On October 13, 2004, the Court granted class certification in six focus cases. The Court's Opinion and Order can be accessed here.

On February 15, 2005, the Court issued an order preliminarily approving a partial settlement of $1 billion with the issuer defendants. Please click the link to the right to view and print the preliminary approval order.

Wolf Haldenstein has extensive experience in the prosecution of securities class actions and derivative litigation in state and federal trial and appellate courts across the country. The firm has approximately 60 attorneys in various practice areas and offices in Chicago, New York City and San Diego. The reputation and expertise of this firm in shareholder and other class litigation have been repeatedly recognized by the courts, which have appointed it to major positions in complex securities multi-district and consolidated litigation.

Wolf Haldenstein Adler Freeman & Herz LLP at 270 Madison Avenue, New York , New York 10016. Telephone: (800) 575-0735 (Fred Taylor Isquith, Esq., Thomas Burt, Esq., or Gustavo Bruckner, Esq.).

**RELATED NEWS**

02/20/03
WHAFH Announces Court Opinion Denying Motion to Dismiss in IPO Manipulation Class Action Suit

**CASE DOCUMENTS**

Master Allegations Part 1

Master Allegations Part 2

Master Allegations Appendices A & B

Opinion Denying Defendants' Motion to Dismiss

Opinion and Order Preliminarily Approving $1 Billion Partial Settlement

>> PARTICIPATE IN THIS CLASS ACTION



About the Firm | Practice Areas | Attorneys | Cases | WHAFH In the News | Publications | Resources | Contact Us

5/19/2005 11:36 AM

# EXHIBIT
# 7

# Involvement of Wolf Haldenstein Adler Freeman & Herz LLP
## in
## *In re Initial Public Offering Securities Litigation*

**TABLE A**
**(complaints reviewed)**

| Issuer | Docket Number |
|---|---|
| Agency.com Ltd. | 01 Civ. 5902 |
| Agile Software Corp. | 01 Civ. 9413 |
| Agilent Technologies, Inc. | 01 Civ. 10639 |
| AirNet Communications Corp. | 01 Civ. 10161 |
| Akamai Technologies, Inc. | 01 Civ. 6000 |
| Apropos Technology, Inc. | 01 Civ. 9982 |
| Audible, Inc. | 01 Civ. 5258 |
| Be Free, Inc. | 01 Civ. 10827 |
| Bottomline Technologies, Inc. | 01 Civ. 6824 |
| Braun Consulting, Inc. | 01 Civ. 10629 |
| BSquare Corp. | 01 Civ. 6216 |
| Buy.com, Inc. | 01 Civ. 6323 |
| Cacheflow, Inc. | 01 Civ. 5143 |
| Calico Commerce, Inc. | 01 Civ. 2601 |
| Caliper Technologies Corp. | 01 Civ. 5072 |
| Capstone Turbine Corp. | 01 Civ. 11220 |
| Carrier1 International, | 01 Civ. 10940 |
| Centra Software, Inc. | 01 Civ. 10988 |
| Chartered Semiconductor Manufacturing, Ltd | 01 Civ. 10839 |
| Chinadotcom Corp. | 01 Civ. 5937 |
| Choice One Communications, Inc. | 01 Civ. 10576 |
| Chordiant Software, Inc. | 01 Civ. 6222 |
| Clarent Corp. | 01 Civ. 6322 |
| Click Commerce, Inc. | 01 Civ. 11234 |
| CNET Networks, Inc. | 01 Civ. 7669 |
| Cobalt Networks, Inc. | 01 Civ. 10971 |
| Commerce One, Inc. | 01 Civ. 5575 |
| CommTouch Software, Inc. | 01 Civ. 7044 |
| Concur Technologies, Inc. | 01 Civ. 6828 |
| Copper Mountain Networks, Inc. | 01 Civ. 10943 |
| Corio, Inc. | 01 Civ. 10686 |
| Corvis Corporation | 01 Civ. 3857 |
| CoSine Communications, Inc. | 01 Civ. 10105 |
| Covad Communications Group, Inc. | 01 Civ. 5834 |
| Critical Path, Inc. | 01 Civ. 6542 |
| Cybersource Corporation | 01 Civ. 7000 |
| Daleen Technologies, Inc. | 01 Civ. 10944 |

| | |
|---|---|
| Data Return Corporation | 01 Civ. 10107 |
| deCode Genetics, Inc. | 01 Civ. 11219 |
| Delano Technology Corporation | 01 Civ. 7180 |
| DeltaThree.com | 01 Civ. 5425 |
| Dice, Inc. | 01 Civ. 9747 |
| Digimarc Corp. | 01 Civ. 3792 |
| Digital Impact, Inc. | 01 Civ. 4942 |
| Digital Insight Corporation | 01 Civ. 11231 |
| Digital Island, Inc. | 01 Civ. 6887 |
| Digital River, Inc. | 01 Civ. 7355 |
| Digital Think, Inc. | 01 Civ. 9619 |
| Digitas, Inc. | 01 Civ. 5948 |
| DoubleClick, Inc. | 01 Civ. 3980 |
| drkoop.com, Inc. | 01 Civ. 6242 |
| Drugstore.com, Inc. | 01 Civ. 5838 |
| eBenX Inc. | 01 Civ. 9411 |
| eGain Communications Corp. | 01 Civ. 9414 |
| E-LOAN, Inc. | 01 Civ. 7467 |
| Eloquent, Inc. | 01 Civ. 6775 |
| El Sitio, Inc. | 01 Civ. 5089 |
| Engage Technologies, Inc. | 01 Civ. 8404 |
| E.piphany, Inc. | 01 Civ. 6158 |
| Equinix, Inc. | 01 Civ. 7002 |
| EToys, Inc. | 01 Civ. 5911 |
| Evolve Software, Inc. | 01 Civ. 9800 |
| Exchange Applications, Inc. | 01 Civ. 9516 |
| Exfo Electro Optical Engineering, Inc. | 01 Civ. 10684 |
| Expedia, Inc. | 01 Civ. 4973 |
| Extensity, Inc | 01 Civ. 11246 |
| Extreme Networks, Inc. | 01 Civ. 6143 |
| F5 Networks, Inc. | 01 Civ. 7055 |
| FairMarket, Inc. | 01 Civ. 6948 |
| Fatbrain.com, Inc. | 01 Civ. 10164 |
| Finisar Corporation | 01 Civ. 10813 |
| FirePond, Inc. | 01 Civ. 7048 |
| Flashnet Communications, Inc. | 01 Civ. 10738 |
| Focal Communications Corp. | 01 Civ. 10111 |
| Foundry Networks, Inc. | 01 Civ. 10640 |
| FreeMarkets, Inc. | 01 Civ. 7039 |
| Gadzoox Networks, Inc. | 01 Civ. 5039 |
| Gigamedia Ltd. | 01 Civ. 10884 |
| Global Crossing Ltd. | 01 Civ. 7023 |
| Globespan, Inc. | 01 Civ. 10741 |
| GOTO, Inc. | 01 Civ. 6339 |
| GRIC Communications, Inc. | 01 Civ. 6771 |
| GT Group Networks, Inc. | 01 Civ. 9748 |

| | |
|---|---|
| Handspring, Inc. | 01 Civ. 7033 |
| High Speed | 01 Civ. 9743 |
| Hoover's, Inc. | 01 Civ. 10122 |
| iBasis, Inc. | 01 Civ. 6272 |
| Ibeam Broadcasting Corp. | 01 Civ. 6842 |
| Imanage, Inc. | 01 Civ. 6277 |
| Immersion Corp. | 01 Civ. 9975 |
| IMPSAT Fiber Networks, Inc. | 01 Civ. 9710 |
| Informatica Corp. | 01 Civ. 9922 |
| InforMax, Inc. | 01 Civ. 10834 |
| Inforte Corp. | 01 Civ. 10836 |
| Inrange Technologies Corp. | 01 Civ. 10800 |
| InsWeb Corporation | 01 Civ. 10969 |
| Integrated Information Systems, Inc. | 01 Civ. 6120 |
| Integrated Telecom Express, Inc. | 01 Civ. 10108 |
| InterNAP Network Services Corp. | 01 Civ. 6084 |
| Internet Capital Group, Inc. | 01 Civ. 3975 |
| Merrill Lynch Internet Infrastructure HOLDRS | 01 Civ. 7654 |
| Internet Initiative Japan | 01 Civ. 10974 |
| Intersil Holding Corp. | 01 Civ. 5144 |
| InterTrust Technologies Corp. | 01 Civ. 4187 |
| Interwave Communications International, Ltd | 01 Civ. 10598 |
| Interwoven, Inc. | 01 Civ. 9917 |
| Intraware, Inc. | 01 Civ. 9349 |
| iPrint.com, Inc. | 01 Civ. 5365 |
| ITXC Corp. | 01 Civ. 6892 |
| iVillage, Inc. | 01 Civ. 4974 |
| iXL Enterprises | 01 Civ. 9417 |
| Jazztel P.L.C. | 01 Civ. 10983 |
| JNI Corporation | 01 Civ. 10740 |
| Juniper Networks Inc. | 01 Civ. 10899 |
| Kana Software, Inc. | 01 Civ. 6822 |
| Keynote Systems, Inc. | 01 Civ. 7666 |
| Korea Thrunet Co., Ltd. | 01 Civ. 9442 |
| Lante Corporation | 01 Civ. 7046 |
| Latitude Communications, Inc. | 01 Civ. 10121 |
| Lexent, Inc. | 01 Civ. 9440 |
| Liberate Technologies, | 01 Civ. 4147 |
| Lionbridge Technologies, Inc. | 01 Civ. 6770 |
| Liquid Audio, Inc. | 01 Civ. 6661 |
| LookSmart, Ltd. | 01 Civ. 7030 |
| Loudeye Technologies, Inc. | 01 Civ. 6872 |
| Manufacturers Services, Ltd. | 01 Civ. 11000 |
| Marimba, Inc. | 01 Civ. 3483 |
| Marketwatch.com, Inc. | 01 Civ. 3225 |
| Martha Stewart Living Omnimedia, Inc. | 01 Civ. 10900 |

Marvell Technology Group Ltd.     01 Civ. 7053
MatrixOne, Inc.     01 Civ. 6757
Maxygen, Inc.     01 Civ. 10990
McAfee.com Corp.     01 Civ. 7034
McData, Corp.     01 Civ. 6627
MCK Communications, Inc.     01 Civ. 9799
Mediaplex, Inc.     01 Civ. 6301
MedicaLogic, Inc.     01 Civ. 7726
Meta Solv Software, Inc.     01 Civ. 9651
Metawave Communications Corporation     01 Civ. 9799
Microtune, Inc.     01 Civ. 6823
Modem Media, Inc.     01 Civ. 7201
MP3.Com, Inc.     01 Civ. 4183
Multex.Com, Inc.     01 Civ. 3910
NaviSite, Inc.     01 Civ. 5374
Neoforma, Inc.     01 Civ. 6689
Net Perceptions, Inc.     01 Civ. 9675
Net2000 Communications, Inc.     01 Civ. 5227
Net2Phone, Inc.     01 Civ. 7028
Netcentives, Inc.     01 Civ. 5332
NetRatings, Inc.     01 Civ. 9798
Netro Corp.     01 Civ. 7035
NETsilicon, Inc.     01 Civ. 7281
NetSolve, Inc.     01 Civ. 11239
Network Engines, Inc.     01 Civ. 10894
Network Plus Corp.     01 Civ. 6089
Netzero, Inc.     01 Civ. 3358
New Focus, Inc.     01 Civ. 5822
Next Level Communications, Inc.     01 Civ. 6004
Next Card, Inc.     01 Civ. 10823
Nextel Partners, Inc.     01 Civ. 10945
Niku Corporation     01 Civ. 7280
NorthPoint Communications Group, Inc.     01 Civ. 9561
Nuance Communications, Inc.     01 Civ. 7344
Numerical Technologies     01 Civ. 9513
OmniSky Corporation     01 Civ. 6660
OmniVision Technologies, Inc.     01 Civ. 10775
On Semiconductor Corporation     01 Civ. 6114
ONI Systems Corp.     01 Civ. 7842
Onvia.com, Inc.     01 Civ. 5354
Onyx Software Corporation     01 Civ. 9560
OpenTV Corp.     01 Civ. 7032
Openwave Systems, Inc.     01 Civ. 9744
Oplink Communications, Inc.     01 Civ. 9904
Optio Software, Inc.     01 Civ. 10051
OraPharma, Inc.     01 Civ. 9918

| | |
|---|---|
| Oratec Interventions, Inc. | 01 Civ. 10799 |
| ORCHID BIOSCIENCES.PDF | 01 Civ. 10575 |
| Organic, Inc. | 01 Civ. 4778 |
| OTG Software, Inc. | 01 Civ. 6873 |
| Pacific Internet Ltd. | 01 Civ. 11202 |
| Packeteer, Inc. | 01 Civ. 10185 |
| Pac-West Telecomm, Inc. | 01 Civ. 11217 |
| Palm, Inc. | 01 Civ. 5613 |
| Paradyne Networks, Inc. | 01 Civ. 10797 |
| PCOrder.com, Inc. | 01 Civ. 10828 |
| Perot Systems Corp. | 01 Civ. 6820 |
| PlanetRX.com, Inc. | 01 Civ. 2621 |
| Portal Software, Inc. | 01 Civ. 6160 |
| Predictive Systems, Inc. | 01 Civ. 10059 |
| Preview Systems, Inc. | 01 Civ. 7279 |
| Priceline.com, Inc. | 01 Civ. 2261 |
| Primus Knowledge Solutions, Inc. | 01 Civ. 11201 |
| Prodigy Communications, Inc. | 01 Civ. 9504 |
| Proton Energy Systems, Inc. | 01 Civ. 6082 |
| PSI Technologies Holdings, Inc. | 01 Civ. 8401 |
| PurchasePro.com, Inc. | 01 Civ. 10867 |
| Quest Software, Inc. | 01 Civ. 10745 |
| QuickLogic Corp. | 01 Civ. 9503 |
| Radio One, Inc. | 01 Civ. 10160 |
| Radware | 01 Civ. 9978 |
| Ravisent Technologies, Inc. | 01 Civ. 10683 |
| Razorfish, Inc. | 01 Civ. 5427 |
| Red Hat, Inc. | 01 Civ. 2712 |
| Redbank Networks, Inc. | 01 Civ. 6090 |
| Regent Communications, Inc. | 01 Civ. 10942 |
| REGISTER.PDF | 01 Civ. 10120 |
| Repeater Technologies, Inc. | 01 Civ. 10140 |
| Resonate, Inc. | 01 Civ. 11245 |
| Retek, Inc. | 01 Civ. 5225 |
| Rhythms NetConnections, Inc. | 01 Civ. 6128 |
| RoweCom, Inc. | 01 Civ. 6950 |
| SABA SOFTWARE, INC. | 01 Civ. 10754 |
| Satyam Infoway Ltd. | 01 Civ. 9746 |
| SciQuest.com, Inc. | 01 Civ. 7415 |
| Selectica, Inc. | 01 Civ. 4941 |
| Sequenom, Inc. | 01 Civ. 10831 |
| Silicon Image, Inc. | 01 Civ. 10903 |
| Silicon Laboratories | 01 Civ. 11218 |
| Silverstream Software, Inc. | 01 Civ. 5600 |
| Sirenza Microdevices, Inc. | 01 Civ. 10596 |
| SmartDisk Corporation | 01 Civ. 6870 |

| | |
|---|---|
| SMTC Corporation | 01 Civ. 10838 |
| SonicWall, Inc. | 01 Civ. 10941 |
| Sonus Networks, Inc. | 01 Civ. 9921 |
| Spanish Broadcasting System, Inc. | 01 Civ. 10753 |
| Stamps.com, Inc. | 01 Civ. 4186 |
| StarMedia Network, Inc. | 01 Civ. 6846 |
| StorageNetworks, Inc. | 01 Civ. 7181 |
| Stratos Lightwave, Inc. | 01 Civ. 6821 |
| Support.com, Inc. | 01 Civ. 10756 |
| Switchboard Inc. | 01 Civ. 10595 |
| Sycamore Networks, Inc. | 01 Civ. 6001 |
| Talarian Corp. | 01 Civ. 7474 |
| Telaxis Communications Corp. | 01 Civ. 5267 |
| TeleCommunication Systems, Inc. | 01 Civ. 9500 |
| TeleCorp PCS, Inc. | 01 Civ. 11249 |
| TenFold Corporation | 01 Civ. 9797 |
| Terra Networks, S.A. | 01 Civ. 6288 |
| TheGlobe.com, Inc. | 01 Civ. 7247 |
| TheStreet.com, Inc. | 01 Civ. 10970 |
| Tibco Software, Inc. | 01 Civ. 6110 |
| Ticketmaster Online Inc. | 01 Civ. 10822 |
| Tickets.com, Inc. | 01 Civ. 6008 |
| TippingPoint Technologies, Inc | 01 Civ. 10976 |
| Tivo, Inc. | 01 Civ. 5269 |
| Transmeta Corp. | 01 Civ. 6492 |
| Triton Network Systems, Inc. | 01 Civ. 10115 |
| Turnstone Systems, Inc. | 01 Civ. 9981 |
| Tut Systems, Inc. | 01 Civ. 9563 |
| UAXS Global Holdings | 01 Civ. 9719 |
| United Pan-Europe Communications N.V. | 01 Civ. 10744 |
| US Internetworking, Inc. | 01 Civ. 9348 |
| UTStarcom, Inc. | 01 Civ. 9604 |
| VA Linux Systems, Inc. | 01 Civ. 0242 |
| ValiCert, Inc. | 01 Civ. 10889 |
| Valley Media, Inc. | 01 Civ. 9745 |
| Value America, Inc. | 01 Civ. 5739 |
| Variagenics, Inc. | 01 Civ. 10999 |
| Ventro Corporation | 01 Civ. 3450 |
| Verado Holdings, Inc. | 01 Civ. 9558 |
| VerticalNet, Inc. | 01 Civ. 5241 |
| Via Net.Works, Inc. | 01 Civ. 9720 |
| Viador, Inc. | 01 Civ. 10040 |
| Viant Corp. | 01 Civ. 6403 |
| Vicinity Corp. | 01 Civ. 6906 |
| Vignette Corporation | 01 Civ. 9514 |
| Virage, Inc. | 01 Civ. 7866 |

Virata Corp.                              01 Civ. 10833
Vitria Technology, Inc.                   01 Civ. 10092
Vixel Corporation                         01 Civ. 10053
WebMD Corporation                         01 Civ. 6768
WebMethods, Inc.                          01 Civ. 10830
Webvan Group, Inc.                        01 Civ. 6365
Wink Networks, Inc.                       01 Civ. 10638
Wireless Facilities, Inc.                 01 Civ. 4779
Women.com Networks, Inc.                  01 Civ. 10866
World Wrestling Federation Entertainment, Inc.     01 Civ. 10972
XCARE.NET, INC.                           01 Civ. 10075
XPEDIOR, INC.                             01 Civ. 10984
Z-Tel Technologies, Inc                   01 Civ. 5074

**TABLE B**
**(complaints in which**
**JPMC is a defendant)**

| Issuer | Docket Number |
|---|---|
| Agency.com Ltd. | 01 Civ. 5902 |
| Agile Software Corp. | 01 Civ. 9413 |
| Agilent Technologies, Inc. | 01 Civ. 10639 |
| AirNet Communications Corp. | 01 Civ. 10161 |
| Akamai Technologies, Inc. | 01 Civ. 6000 |
| Apropos Technology, Inc. | 01 Civ. 9982 |
| Audible, Inc. | 01 Civ. 5258 |
| Be Free, Inc. | 01 Civ. 10827 |
| Bottomline Technologies, Inc. | 01 Civ. 6824 |
| Braun Consulting, Inc. | 01 Civ. 10629 |
| BSquare Corp. | 01 Civ. 6216 |
| Buy.com, Inc. | 01 Civ. 6323 |
| Cacheflow, Inc. | 01 Civ. 5143 |
| Calico Commerce, Inc. | 01 Civ. 2601 |
| Caliper Technologies Corp. | 01 Civ. 5072 |
| Clarent Corp. | 01 Civ. 6322 |
| CNET Networks, Inc. | 01 Civ. 7669 |
| Cobalt Networks, Inc. | 01 Civ. 10971 |
| Concur Technologies, Inc. | 01 Civ. 6828 |
| Copper Mountain Networks, Inc. | 01 Civ. 10943 |
| CoSine Communications, Inc. | 01 Civ. 10105 |
| Covad Communications Group, Inc. | 01 Civ. 5834 |
| Critical Path, Inc. | 01 Civ. 6542 |
| Cybersource Corporation | 01 Civ. 7000 |
| Daleen Technologies, Inc. | 01 Civ. 10944 |
| Dice, Inc. | 01 Civ. 9747 |
| Digital Impact, Inc. | 01 Civ. 4942 |
| Digital Island, Inc. | 01 Civ. 6887 |
| drkoop.com, Inc. | 01 Civ. 6242 |
| E-LOAN, Inc. | 01 Civ. 7467 |
| El Sitio, Inc. | 01 Civ. 5089 |
| Engage Technologies, Inc. | 01 Civ. 8404 |
| Equinix, Inc. | 01 Civ. 7002 |
| EToys, Inc. | 01 Civ. 5911 |
| Exchange Applications, Inc. | 01 Civ. 9516 |
| F5 Networks, Inc. | 01 Civ. 7055 |
| FairMarket, Inc. | 01 Civ. 6948 |
| Fatbrain.com, Inc. | 01 Civ. 10164 |
| Foundry Networks, Inc. | 01 Civ. 10640 |
| Gadzoox Networks, Inc. | 01 Civ. 5039 |
| Global Crossing Ltd. | 01 Civ. 7023 |

| | |
|---|---|
| GOTO, Inc. | 01 Civ. 6339 |
| Handspring, Inc. | 01 Civ. 7033 |
| High Speed | 01 Civ. 9743 |
| iBasis, Inc. | 01 Civ. 6272 |
| Ibeam Broadcasting Corp. | 01 Civ. 6842 |
| Inrange Technologies Corp. | 01 Civ. 10800 |
| Integrated Information Systems, Inc. | 01 Civ. 6120 |
| InterNAP Network Services Corp. | 01 Civ. 6084 |
| Intersil Holding Corp. | 01 Civ. 5144 |
| Intraware, Inc. | 01 Civ. 9349 |
| ITXC Corp. | 01 Civ. 6892 |
| iVillage, Inc. | 01 Civ. 4974 |
| JNI Corporation | 01 Civ. 10740 |
| Juniper Networks Inc. | 01 Civ. 10899 |
| Kana Software, Inc. | 01 Civ. 6822 |
| Korea Thrunet Co., Ltd. | 01 Civ. 9442 |
| Lexent, Inc. | 01 Civ. 9440 |
| Liberate Technologies, | 01 Civ. 4147 |
| Loudeye Technologies, Inc. | 01 Civ. 6872 |
| Manufacturers Services, Ltd. | 01 Civ. 11000 |
| Marvell Technology Group Ltd. | 01 Civ. 7053 |
| McAfee.com Corp. | 01 Civ. 7034 |
| MCK Communications, Inc. | 01 Civ. 9799 |
| Mediaplex, Inc. | 01 Civ. 6301 |
| Microtune, Inc. | 01 Civ. 6823 |
| NaviSite, Inc. | 01 Civ. 5374 |
| Net Perceptions, Inc. | 01 Civ. 9675 |
| Net2000 Communications, Inc. | 01 Civ. 5227 |
| Net2Phone, Inc. | 01 Civ. 7028 |
| Netcentives, Inc. | 01 Civ. 5332 |
| NETsilicon, Inc. | 01 Civ. 7281 |
| New Focus, Inc. | 01 Civ. 5822 |
| Next Card, Inc. | 01 Civ. 10823 |
| Numerical Technologies | 01 Civ. 9513 |
| OmniSky Corporation | 01 Civ. 6660 |
| On Semiconductor Corporation | 01 Civ. 6114 |
| ONI Systems Corp. | 01 Civ. 7842 |
| Onvia.com, Inc. | 01 Civ. 5354 |
| Openwave Systems, Inc. | 01 Civ. 9744 |
| Oratec Interventions, Inc. | 01 Civ. 10799 |
| Pacific Internet Ltd. | 01 Civ. 11202 |
| Paradyne Networks, Inc. | 01 Civ. 10797 |
| Perot Systems Corp. | 01 Civ. 6820 |
| PlanetRX.com, Inc. | 01 Civ. 2621 |
| Portal Software, Inc. | 01 Civ. 6160 |
| Primus Knowledge Solutions, Inc. | 01 Civ. 11201 |

| | |
|---|---|
| PSI Technologies Holdings, Inc. | 01 Civ. 8401 |
| PurchasePro.com, Inc. | 01 Civ. 10867 |
| Red Hat, Inc. | 01 Civ. 2712 |
| Repeater Technologies, Inc. | 01 Civ. 10140 |
| Rhythms NetConnections, Inc. | 01 Civ. 6128 |
| RoweCom, Inc. | 01 Civ. 6950 |
| SciQuest.com, Inc. | 01 Civ. 7415 |
| Sequenom, Inc. | 01 Civ. 10831 |
| Sirenza Microdevices, Inc. | 01 Civ. 10596 |
| SmartDisk Corporation | 01 Civ. 6870 |
| Sonus Networks, Inc. | 01 Civ. 9921 |
| StarMedia Network, Inc. | 01 Civ. 6846 |
| StorageNetworks, Inc. | 01 Civ. 7181 |
| Stratos Lightwave, Inc. | 01 Civ. 6821 |
| Switchboard Inc. | 01 Civ. 10595 |
| Sycamore Networks, Inc. | 01 Civ. 6001 |
| Telaxis Communications Corp. | 01 Civ. 5267 |
| TeleCommunication Systems, Inc. | 01 Civ. 9500 |
| Terra Networks, S.A. | 01 Civ. 6288 |
| TheGlobe.com, Inc. | 01 Civ. 7247 |
| TheStreet.com, Inc. | 01 Civ. 10970 |
| Ticketmaster Online Inc. | 01 Civ. 10822 |
| TippingPoint Technologies, Inc | 01 Civ. 10976 |
| Tivo, Inc. | 01 Civ. 5269 |
| Transmeta Corp. | 01 Civ. 6492 |
| UAXS Global Holdings | 01 Civ. 9719 |
| US Internetworking, Inc. | 01 Civ. 9348 |
| UTStarcom, Inc. | 01 Civ. 9604 |
| Valley Media, Inc. | 01 Civ. 9745 |
| Variagenics, Inc. | 01 Civ. 10999 |
| VerticalNet, Inc. | 01 Civ. 5241 |
| Via Net.Works, Inc. | 01 Civ. 9720 |
| Viant Corp. | 01 Civ. 6403 |
| Vicinity Corp. | 01 Civ. 6906 |
| Vignette Corporation | 01 Civ. 9514 |
| WebMD Corporation | 01 Civ. 6768 |
| Webvan Group, Inc. | 01 Civ. 6365 |
| Wink Networks, Inc. | 01 Civ. 10638 |
| Wireless Facilities, Inc. | 01 Civ. 4779 |
| World Wrestling Federation Entertainment, Inc. | 01 Civ. 10972 |
| Z-Tel Technologies, Inc | 01 Civ. 5074 |

# EXHIBIT
# 8

J.P. Morgan Securities Inc.: Lit. Rel. No. 18385 / October 1, 2003          file:///C|/Documents%20and%20Settings/user/My%20Documents...

Case 1:05-cv-00162-JJF          Document 65-7          Filed 09/15/2005          Page 22 of 126



U.S. Securities and Exchange Commission

## U.S. SECURITIES AND EXCHANGE COMMISSION

### Litigation Release No. 18385 / October 1, 2003

***SECURITIES AND EXCHANGE COMMISSION v. J.P. MORGAN SECURITIES INC.* Civil Action No. 1:03 CV 02028 (ESH) (D.D.C.)**

### SEC SUES J.P. MORGAN SECURITIES INC. FOR UNLAWFUL IPO ALLOCATION PRACTICES; J.P. MORGAN AGREES TO SETTLEMENT CALLING FOR INJUNCTION AND PAYMENT OF $25 MILLION PENALTY

The Securities and Exchange Commission ("Commission") announced the filing of a settled civil injunctive action in federal court against J.P. Morgan Securities Inc. ("J.P. Morgan"), a subsidiary of J.P. Morgan Chase & Co., relating to the firm's allocation of stock to institutional customers in initial public offerings ("IPOs") it underwrote during 1999 and 2000. In settlement of this matter, J.P. Morgan has consented, without admitting or denying the allegations of the complaint, to a final judgment that would permanently enjoin J.P. Morgan from violating Rule 101 of the Commission's Regulation M and NASD Conduct Rule 2110, and order it to pay a $25 million civil penalty. The settlement terms are subject to approval by the court.

In its complaint, the Commission alleges that J.P. Morgan violated Rule 101 of Regulation M under the Securities Exchange Act of 1934 by attempting to induce certain customers who received allocations of IPOs to place purchase orders for additional shares in the aftermarket. The complaint further alleges that J.P. Morgan did in fact induce certain customers to place such orders and such customers often purchased stock during the new issues' first few trading days.

The Commission's complaint also alleges that, in

another instance, J.P. Morgan violated NASD Conduct Rule 2110, which requires member firms to observe just and equitable principles of trade, by persuading one or more customers in July 1999, to accept an allocation of a "cold" IPO (*i.e.*, one where there is little interest in IPO shares) by promising the reward of an allocation of an upcoming oversubscribed IPO.

The Commission's complaint, filed in the United States District Court for the District of Columbia, includes the following allegations:

Rule 101 of Regulation M, among other things, prohibits underwriters, during a restricted period prior to the completion of their participation in the distribution of IPO shares, from directly or indirectly bidding for, purchasing, or attempting to induce any person to bid for or purchase any offered security in the aftermarket. As a prophylactic rule, Regulation M is designed to prohibit activities that could artificially influence the market for the offered security, including for example, supporting the IPO price by creating the perception of scarcity of IPO stock or creating the perception of aftermarket demand.

During the restricted period, *i.e.*, prior to J.P. Morgan's completion of participation in the distribution of IPO shares, J.P. Morgan attempted to induce certain customers to make aftermarket purchases in violation of Rule 101 of Regulation M by engaging in the following activities:

- J.P. Morgan solicited customers to provide information about whether and at what price and in what quantity they intended to place aftermarket orders for IPO stock.

- J.P. Morgan communicated to certain customers that expressing an interest in buying shares in the aftermarket and/or aftermarket buying (providing "aftermarket interest") would help them obtain allocations of hot and oversubscribed IPOs. For example, in the Large Scale Biology IPO, a sales representative

reported in an e-mail that she "was very aggressive in pushing [the customer] for aftermarket action - stressing how important it was going to be for the process."

- J.P. Morgan encouraged certain customers that had provided aftermarket interest to increase the prices they had told J.P. Morgan they were willing to pay in the aftermarket typically because other customers seeking allocations had provided aftermarket interest at higher price limits. For example, a sales representative told a customer that its aftermarket price limit was "sort of out of the game" and there was "interest at much higher levels." In the Dyax IPO, a sales representative told the syndicate desk in an e-mail, "If [the customer] gets 50,000 [IPO shares], he will buy 50,000 more (up to $16). If need be, I will tell him to increase his aftermarket price sensitivity to a higher number."

- J.P. Morgan solicited aftermarket interest from certain customers who J.P. Morgan knew had no interest in owning stock of the IPO companies long term. J.P. Morgan knew that some of these customers usually or always flipped (immediately sold) their IPO allocations. Nevertheless, J.P. Morgan expected these customers to follow through and buy in the aftermarket when they provided aftermarket interest. A number of these customers bought in the aftermarket and then sold their allocation or closed out their entire position within days of the IPOs.

- J.P. Morgan accepted, and in at least one instance sought, aftermarket interest from certain customers who said they intended to purchase an amount of shares in the aftermarket equal to the size of their IPO allocation ("1 for 1") or intended to purchase specific amounts of shares in the aftermarket that were pegged to different allocation amounts without any reference to a fixed total position

J.P. Morgan Securities Inc. / Exch. Act. No. 48385 / October 1, 2003    file:///C|/Documents%20and%20Settings/user/My%20Documents...

Case 1:05-cv-00162-JJF    Document 65-7    Filed 09/15/2005    Page 25 of 126

size. Some customers who gave this type of aftermarket interest received large allocations even though this aftermarket interest did not provide information as to a customer's desired position size or whether a customer intended to be a long-term holder.

- After the restricted period, J.P. Morgan solicited aftermarket orders by making follow-up calls to customers who had previously indicated aftermarket interest. Further, J.P. Morgan often tracked whether customers followed through on their aftermarket interest and actually purchased in the aftermarket.

- When customers did not follow through, J.P. Morgan encouraged its sales force to place follow-up calls to these customers to solicit orders to purchase stock. For instance, on Aug. 6, 1999, the day after the Interactive Pictures Corp. ("IPIX") IPO started trading, the head of Global Equity Capital Markets sent an e-mail to regional sales managers and the head of syndicate, which included the following comments: (1) one customer "owe[s] it to us to be in buying the stock today"; (2) "we should push [another customer] today and if they don't show up, keep them out of these tiers going forward"; and (3) "let's make [another customer] show up today."

- In addition, in a number of instances, J.P. Morgan described certain customers' aftermarket interest as promises, obligations and commitments. For example, in an e-mail about the Genentech IPO, a sales representative said that an institutional customer "followed up in the aftermarket exactly as promised (every share through us)."

In addition to its violations of Rule 101 of Regulation M, J.P. Morgan violated NASD Conduct Rule 2110 by persuading one or more customers in July 1999, to accept an allocation of Biopure, a "cold" IPO, by promising the reward of an allocation of IPIX, an

upcoming oversubscribed IPO. J.P. Morgan had difficulties in generating sufficient interest for the Biopure IPO and therefore reduced the number of shares being offered, reduced the proposed price range and delayed the final pricing of the IPO. On the evening of July 29, 1999, when the Biopure IPO was ultimately priced, but before J.P. Morgan told customers what their Biopure allocations would be, the head of syndicate noted in an e-mail: "IPIX allocations (very strong deal) will be heavily weighted toward those investors that participated in the Biopure offering . . . Given that we have fully allocated all accounts in the Biopure deal . . . it is extremely important that your investors take these allocations. I want to reiterate that we will provide you with the means to reward these clients."

➤ SEC Complaint in this matter

*http://www.sec.gov/litigation/litreleases/lr18385.htm*

# EXHIBIT

# 9



## Banks under legal siege

Published: 02 March, 2003

Wall Street banks are facing damages to the tune of $25bn but are reluctant to set aside reserves as they fear it may encourage new claims. *Suzanne Miller* reports on the legal battle that threatens to spread overseas.

If Wall Street banks thought they had put the worst behind them when they shut the door on 2002, think again. Yes, many were vilified and bled of earnings because of their role in some of history's worst corporate failures. But 2003 could be a year of legal reckoning - the lawyers' ballroom dance on the corporate carnage still strewn across the marketplace.

An army of lawyers representing scores of banks and thousands of plaintiffs are squaring off for a battle where tens of billions of dollars in claims are at stake. Banks are already reforming research practices thanks to regulators, but the next big challenge is surviving a five-front legal war that could leave Wall Street short of billions of dollars. At the very least, many will stagger away from the boxing ring with torn pinstripe lapels, bruised knuckles and hefty legal bills.

Banks are facing down an unprecedented conurbation of legal ills. Analysts stand accused of tailoring research to help their investment bank cohorts clinch business while bankers stand accused of failing to perform their due diligence duties when underwriting tens of billions of dollars in securities for companies whose accounts were later found to be wanting.

Although New York Attorney General Eliot Spitzer clinched a $1.4bn global settlement with 12 investment banks in December, there are hundreds if not thousands of private arbitration claims still pending. Bankers are also fending off allegations that they committed fraud by artificially inflating stock prices to make a killing on "hot" initial public offerings (IPOs). Moreover, they must worry that the Supreme Court, the Securities and Exchange Commission (SEC) and an army of state attorney generals may exact hefty fines for alleged misdeeds. They have also been targeted by The National Securities Dealers Association.

On January 9, the NASD censored Robertson Stephens, and ordered the investment banking firm to pay $28m for receiving inflated commissions from more than 100 client accounts in exchange for the allocation of "hot" IPOs in 1999 and 2000 at the height of the IPO boom. More such fines and censures are expected to follow.

Finally, there is bankruptcy court, where creditors of fallen titans will go for the jugular of any involved parties still able to write a decent cheque. Banks have become the favourite quarry of just about everyone – institutional investors, retail investors, politicians and regulators.

In Europe, things are hardly better with the mania for suing banks spreading across the Atlantic. The chairman of Deustche Bank's supervisory board, Rolf Breuer, is the subject of a court ruling that he breached confidentiality by commenting publicly on the health of the Kirch media group. Meanwhile the bank's management board head Josef Ackermann has been charged with awarding payments to Mannesmann executives (he was on the company's supervisory board at the time) during the takeover by Vodafone.

**Running for the hills**

"This is the largest groundswell of investor complaints on different fronts that Wall Street has ever faced," says Charles Geisst, a market historian and professor of finance at Manhattan College. On this point, at least, most concur. "You're talking about systemic issues concerning banking practices and I don't think history is a great guide in terms of what must be done here," says Dennis Orr, a partner at law firm Mayer, Brown, Rowe & Maw, which represents issuing companies that have been named in lawsuits.

Melvyn Weiss, co-founder of Milberg Weiss Bershad Hynes & Lerach, the country's leading law firm on class action suits, has a simple solution: sue the pants off Wall Street. His firm is working on a toxic mix of class action suits against scores of companies and investment banks.

In April last year, the firm filed a consolidated class action suit against Enron and a coterie of banks that was whittled from nine to six defendants after a December 20 ruling by Judge Melinda Harmon, who is presiding in the Houston court where the Enron case is unfolding. Those six are Citigroup's Salomon Smith Barney, JP Morgan Chase, Credit Suisse First Boston, CIBC, Barclays Bank and Merrill Lynch. The Enron suit is being spearheaded by partner William S. Lerach, while Mr Weiss is chairman and co-chairman on two different class action committees involving securities and IPO abuses that target a total of 58 investment banks and 303 IPOs.

"We haven't had discovery yet, but once we do defendants are going to run for the hills because they can't afford to have us get in their records. It's going to be a disaster for them," Mr Weiss says of some cases his firm is working on. Mr Weiss is convinced banks will want to settle rather than open their books or face a messy courtroom battle. But that does not mean he expects swift progress. "One thing I've learned, even though corporate executives know they have a very bad case against them, they don't want the money to be spent on their watch so they stall and stall to put off the judgment date. But sooner or later the companies are going to have to pay," Mr Weiss says.

**Counting the cost**

Most agree banks and their corporate clients will end up paying something, but there is no consensus on how much and for what offences. Initially, private investors and their lawyers thought they would take the banks to court for abuse of research after Merrill Lynch was forced to pay $400m in settlement for a suit filed against the firm and its former internet star, Henry Blodget. At the end of last year, though, another private suit against Mr Blodget was dismissed out of hand. Some of these suits will succeed, but most probably will not because it is extremely hard to prove analysts intentionally lied about their views on shares to snare business and commissions. It is even more difficult to prove that investors relied on these reports to make investment decisions that led to losses. Banks, moreover, did not admit or deny wrongdoing when they settled with Mr Spitzer.

Gerard Cassidy, managing director and bank analyst at RBC Capital Markets, suggests tort (breach of duty) lawyers will have a tough time proving cases against banks because the legal hurdles are high. "Class action lawyers have to prove fraud. They're going to get some, but for the majority of people they're going to have to wake up and admit it takes two to tango. People wanted to get wealthy and didn't recognise the risks."

That may be true, but try explaining the technicalities of the tango dance to a courtroom packed with surly jurors. Lawyers are banking big on public sympathies while finance executives are praying that judges reviewing the merits of these cases will dismiss them based on legal flaws. One of the more significant rulings – the legal merit of the IPO class actions – is currently hanging in the balance as the judge presiding in that case determines if banks

can be prosecuted on anti-trust grounds.

All of these unknowns make it tough to count ultimate costs. On January 7, Michael Mayo, a senior banking analyst at Prudential Financial, hosted a conference call with investors and guest speaker Donald Langevoort, a lawyer from the Georgetown Law Center, and an expert on securities law, to talk about litigation risks. Mr Langevoort said he had revised his initial damage estimates, excluding possible regulatory and federal fines, from $100bn to $20-25bn – an all-in estimate of damages he expects Wall Street banks to ultimately pay. That is a huge come-down, but it is also still a huge potential payout.

The real danger lies in underwriting abuses, where US securities laws are the toughest and clearest. "The liability that an investment bank faces for underwriting securities is the most powerful, the strongest of anything we see in the securities laws," Mr Langevoort told investors in the conference call. "If the bank was negligent, had reason to suspect that there might be problems, but looked the other way and ignored red flags, the bank is liable." Most agree Enron was loaded with red flags and it will not help that Capitol Hill has been suggesting bankers may have had a hand in styling some of the financial structures of Enron, he said.

The other big hurdle is fending off accusations that they facilitated fraud under the SEC Act of 1934 by artificially inflating stock prices on numerous companies. Plaintiffs have claimed roughly $30bn in damages from the Enron case alone, though a settlement would be far less as payments tend to be 10% to 20% of claims.

"You're talking about a $3bn case that plaintiffs expect to recover just on Enron," says Roy Smith, finance professor at New York University's Stern School of Business and a former partner of Goldman Sachs. "They may get half to three-quarters of a billion from the directors and money set aside from insurance. If they're going to succeed they're going to get it from the banks." He sees the tally climbing.

"Let's say plaintiffs get a couple billion dollars from the Enron banks and then move over to WorldCom and Global Crossing," Mr Smith says. For these deals alone, a small group of four to five banks might be forced to cough up $4bn or $5bn, he says, adding: "The question is if they've set aside sufficient reserves." That's a particularly relevant question for Citigroup and JP Morgan, which Prudential estimates underwrote $5bn to $6bn in securities for Enron and WorldCom alone.

**The provisions problem**

Piers Brown, analyst at Commerzbank Securities, said in January he initially expected banks most affected by legal claims to set aside a total of $3bn in litigation reserves. That estimate was driven, he says, by provisions that Citigroup and Credit Suisse First Boston took in the fourth quarter – $1.3bn and $450m respectively – for anticipated litigation costs. Both banks said those provisions could increase depending on developments. JP Morgan also said it set aside part of a $1.3bn charge in the fourth quarter to cover future litigation related to Enron and other legal problems. Otherwise, few others have made similar provisions.

"The danger of making a provision is that you're effectively telling people 'Hey, we've put away this pot of money – come and get it," Mr Brown says. He also says there is a feeling among some banks that they did not do anything wrong. Reserving money might send the wrong message. "Deutsche Bank made a point of saying it didn't allocate [the Spitzer fine] to investment banking but took it as a corporate cost. It doesn't feel guilt and said this is the cost of being in the business," Mr Brown says.

Robert Swanton, head of banking practice at Standard & Poor's, says banks want a better handle on legal risks before they commit reserves. "It's not clear cut that one wants to build reserves early," he says. "One can say it's conservative from a credit perspective but from an accounting perspective it may be considered rather aggressive."

Tom Foley, S&P brokerage analyst, believes banks are squirreling away legal reserves as a precaution – reserves that do not have to be disclosed unless they are material. As a general rule of thumb, analysts say, the bigger banks can sock away up to $100m in legal reserves before they have to disclose. In the long run, Mr Foley believes banks will weather financial damages.

Banks will use everything in their arsenal to avoid forfeiting any portion of their earnings. For that, many will pay hefty legal expenses. The estimated tab for lawyer bills has been another moving target – one that keeps climbing. A year ago lawyers and analysts were estimating a worse-case scenario of $100m. Now lawyers are saying banks may have to fork out at least $200m. One lawyer said some of the banks could be faced with individual legal bills averaging $30m to $40m a year. Unless everyone rushes to settlement, the litigation quagmire could easily take two or more years to resolve, experts say. Mr Weiss warns: "Banks are going to have to spend a lot more than $200m. There are a lot of lawyers out there – and that doesn't include the in-house cost of time spent by executives and support people."

**Tort attack**

It is hard to predict how many banks will wind up in court or settlement, although the majority of securities lawsuits tend to get settled if the judge permits the case to go ahead. Still, some banks may be tempted to fight some of the cases against them, especially those that have already tasted courtroom victory. Morgan Stanley, for instance, was emboldened when a lawsuit filed against its star internet analyst Mary Meeker was dismissed out of hand in August 2001 by US District Judge of New York Milton Pollack. The judge, esteemed in legal circles, denounced the claim filed by law firm Wolf, Haldenstein, Adler, Freeman & Herz as "an abuse of the tenets of federal pleading and to say the least is in grossly bad taste". The lawyers representing that case have said they will not re-file for "strategic" reasons, though they are still pursuing other Wall Street quarry.

Milberg Weiss and its team of 220 litigation lawyers are leading this hungry pack of class action lawyers who have become the scourge of corporate and finance executives for their propensity of extracting enormous settlements from their foes: think Big Tobacco and breast implants. Sometimes, their zeal to sue can backfire. Like the time one disgusted judge likened lawyers from Milberg Weiss to "squeegee boys" – itinerants who flock with dripping rags around the windshields of unsuspecting drivers at New York City traffic intersections.

Wall Street and its own flock of ivy-league lawyers would like nothing more than to flick these tort lawyers off like wanton fleas. "You ask most of corporate America would they rather have an elimination of the tax on dividends or tort reform and they'd go for tort reform without breathing," says Rodgin Cohen, chairman of the Wall Street law firm Sullivan & Cromwell.

In fact, reform was instituted in 1995 - the Private Securities Litigation Reform Act, designed to discourage group lawsuits. Many believe the Act has slowed the onslaught of lawsuits and increased the number of dismissals. "Since the reform act of 1995 the percentage of cases that are dismissed has increased. Very roughly, some 20% to 30% of cases brought are now dismissed out of the box, and that is the key statistic," says Robert Wise, a partner at Davis, Polk & Wardwell, a law firm that is representing Wall Street banks in some of the current lawsuits.

The 1995 legislation may have slowed the onslaught of cases filed, but the numbers have nonetheless steadily risen since the institution of the Act, with

the exception of 1996 when the number of class actions fell to 108 from 1995's 188, according to Stanford Securities Class Action Clearinghouse. In 2001, though, investors were fuming after the internet bubble burst. That is when 488 class actions were filed, with 312 being IPO allocation allegations. Many of these cases are outstanding.

Banks may bluster that they will not be cowed by legal threats, but in truth their tribulations look like the equivalent of Hercules' travails – which is why many will want to stall settlements as long as they can, hoping tempers will eventually cool. That may well be worth the cost of outlandish legal bills.

"Right now quite candidly the atmosphere in this country makes it hard to go to trial," one Wall Street lawyer says. "As a defendant you don't want to be picking a jury now because it's guilt by association. It seems there's no end in sight."

Mailing address: Financial Times Business Ltd, Tabernacle Court, 16-28 Tabernacle Street, London EC2A 4DD, UK

Phone number: +44 (0)20 7382 8000

© The Banker - 2005

# EXHIBIT

# 10

**KansasCity●com**

Posted on Fri, Jul. 25, 2003

## Securities lawyer says investors still open to abuse

**By HOPE YEN**
**AP Business Writer**

**NEW YORK -** As Wall Street contends with lawsuits brought by investors who suffered massive stock market losses in recent years, perhaps no name is more prominent than the law firm Milberg Weiss Bershad Hynes & Lerach LLP.

Since opening in 1965, the firm has come to dominate the civil class-action field alleging securities fraud, including a $1.3 billion settlement with junk bond king Michael Milken in 1992 and recent accounting fraud cases against companies such as Enron, Tyco and ImClone.

Major corporations have bitterly complained about the law firm's litigation, which they say amounts to "legalized blackmail" since it often costs less to settle a lawsuit than engage in a costly defense to prove their innocence.

Milberg Weiss' influence hasn't escaped the notice of lawmakers. In 1995, Congress passed legislation making it tougher to file securities lawsuits, a move many say was directly aimed at hobbling the law firm.

Milberg Weiss also has grappled with internal partner disputes over legal tactics and compensation as it grew in size. Last month, the 200-lawyer firm said it will split off its West Coast offices, which represent half of its practice and are handling high-profile suits against Enron and AOL Time Warner. The breakup is pending.

Yet the firm continues to push forward. A recent study by Stanford Law School's Securities Class Action Clearinghouse and Cornerstone Research found Milberg Weiss was a lead counsel in more than 50 percent of class-action securities lawsuits settled since 1995.

And the East Coast practice, led by co-founding partner Melvyn Weiss, recently announced a settlement of $1 billion with insurers for 300 companies that staged hot initial public offerings including Global Crossing, Ask Jeeves and Red Hat. The case alleged that the firms conspired with 55 brokerage firms to illegally rig stock sales. The case against the brokerages is continuing.

The class-action suit charges that Wall Street firms unjustly profited by inflating the prices paid by individual investors for stocks after the IPOs launched, leading to bigger losses after the IPO bubble burst. Some analysts have said the lawsuit could result in a total recovery of between $1 billion to $3 billion.

In an interview with The Associated Press, Melvyn Weiss chatted about his legal crusade against Wall Street and why investors shouldn't feel safe even as the stock market starts to recover.

AP: How big was the $1 billion settlement for ordinary investors in the IPO fraud case in your view? How much do you hope to get from the brokerages?

Weiss: The billion dollars is an expression of concern that these allegations are real and could give rise to staggering liability.

It simplifies the litigation in that we can focus our attention on the conduct of the investment banks. The interesting part here is how much broader our inquiries will be than the government's has been because we're covering 55 banks, not 10. It's going to be far more fascinating to demonstrate that the conduct we allege to be serious violations of the law was widespread throughout the entire industry. …

I would be very disappointed if we don't achieve multiple billions (in recovery).

AP: Do you expect to uncover the level of apparent fraud and analysts' conflicts of interest as seen in documents exposed in the government investigation led by New York Attorney General Elliot Spitzer?

Weiss: We have that and more already.

AP: Can you give examples or characterize the nature of the documents you've uncovered?

Weiss: At this point, everything is produced pursuant to a confidential order or stipulation with the understanding we will have (sessions) ... to isolate the ones that really are entitled to confidentiality.

I don't know everything that General Spitzer got -- his investigation was predominantly focused on the analyst conduct. That's only a small portion of what we're doing.

AP: New York federal judge Milton Pollack recently threw out an investor lawsuit against Merrill Lynch, saying he believed a natural bursting of the tech bubble, and not broker fraud, was to blame for investment losses. He also called the plaintiffs "high-risk speculators" who shouldn't "twist the federal securities laws into a scheme of cost-free speculators' insurance." Your firm wasn't involved in that lawsuit, but at what point should investors take responsibility for losses?

Weiss: There's no question about it -- bubbles are created in many different ways. Sometimes it's just hot air, and sometimes it's a manufactured, synthetic bubble. Sometimes the bubble is based on solid reasons. This bubble was the product of massive wrongdoing. ... It's one thing to take a risk in an honest market. It's another thing to take a risk in a fixed market.

Like somebody said in the past, "Nobody wants to shoot craps with crooked dice." Now I am a great admirer of Judge Pollack ... but I have to respectfully to disagree with some of his characterizations in that decision as to what happened or who's at fault.

AP: One criticism of the government's $1.4 billion Wall Street settlement is that none of the $387.5 million set aside for compensating victims will likely go to mutual fund investors, in part because of procedural difficulties. Does the settlement go far enough?

Weiss: The $400 million ... is not nearly enough to compensate victims. But (regulators) knew we were there all along with the civil litigation to do that, and also a lot of individual claims are being asserted through the arbitration process. So I don't think the measure of the $400 million is inadequate, because it wasn't intended to be a final solution.

(As to everyday investors,) mutual funds are members of our (class-action lawsuits). If they bought during a class period, and there's no evidence they engaged in wrongful practices, the funds themselves will be able to make claims in any recovery that we accomplish.

Any stockholder actions, whether Tyco, Martha Stewart or Enron or whatever, the biggest checks we make out to, are institutional investors -- mutual funds -- because they're the biggest investors. The problem is, if I own the mutual fund at the time the wrong took place, and I no longer have my position in the mutual fund, I can't share in that redress, because only the present fund holders would have that advantage. But if I am a long-term fund holder, I will get the advantage of all those recoveries.

AP: The stock market is now showing signs of a recovery. In light of reforms such as Sarbanes-Oxley, can investors jump back into the market with greater faith in its integrity?

Weiss: No. ... There was an epidemic of bad ethics and bad moral conduct and people got used to making huge amounts of money from working in that industry. ... A lot of them are very young people who are used to walking into restaurants and buying $500,000 bottles of wine and taking expensive places out in the Hamptons and taking trips to the south of France, buying Maseratis.

A lot of these people were never really mentored in any proper way to be ethical and upstanding in the way they conducted themselves. I don't know what's going to happen to those people. I don't know if they will go through a lifetime of questioning, or the same kind of lifestyle and not caring about how they go about getting it. I think we have to be very careful. There are a lot of bright people out there whose minds have been tortured in their moral compasses.

AP: You seem to be characterizing Wall Street as a decadent, corrupt institution.

Weiss: There's no doubt about it. I think they infected accounting firms and corporate management. …You had the M&A business -- Wall Street taught them how to get mega-rich fast by mergers and acquisitions, with golden this and golden that. When that blew up, they found stock options as a way to create that sudden wealth, and stock options can only create sudden wealth when stocks go up. You have to create ways to make them go up. It's a self-fulfilling prophecy.

AP: So what can investors do to protect themselves?

Weiss: I think that it would be wise for investors to try and document in a better way how they get into these investments -- who gives them the advice. So they don't have to be challenged later on, "Why did you buy this stock?" Speak to your broker, get him to send you some reports that he's relying on and put it into your file and keep it there. So that if something goes wrong in that situation, they can't just say you didn't protect yourself. And the more information you ask for, the more burden you're putting on the other side to do due diligence.

The other thing I would do is be very careful about overconcentration -- excessive concentration in any particular industry or any particular stock. … You have to be diversified. You never know whether a particular company is going to be a subject of fraud or a whole industry for that matter.

---

© 2003 Kansas City Star and wire service sources. All Rights Reserved.
Http://www.kansascity.com

# EXHIBIT
# 11



# NEWS
## From the Office of the New York State Comptroller
# Alan G. Hevesi

**CONTACT:**     Press Office                    **FOR RELEASE:** Immediately
                 (518) 474-4015                                   March 16, 2005

### Hevesi Announces Settlement with J. P. Morgan Chase
### in WorldCom Securities Litigation
### Total Recovery for WorldCom Class Now More Than $6 Billion
### Trial Remains Set to Commence on March 17, 2005

Alan G. Hevesi, New York State Comptroller and sole Trustee of the New York State
Common Retirement Fund and Court-appointed Lead Plaintiff in the WorldCom
Securities Litigation, announced today that J.P. Morgan Securities and certain of its
affiliates, which underwrote 37.5 percent of the May 2000 offering and 32.11 percent of
the May 2001 offering, and served as a Co-Lead Underwriter for the May 2001 offering,
have agreed to pay $2 billion in settlement of the claims asserted against them.

If this settlement and the settlements achieved earlier in the case are approved by the
Court, this will bring the total amount recovered for the WorldCom investor class to
$6,001,500,000.

"J.P. Morgan Chase is one of the most important financial institutions in the U.S. and in
New York. I am particularly pleased that the management of the bank has decided to put
this issue from the past behind it so it can focus on growing and creating jobs. We remain
willing to talk with other defendants about potential settlements, but we remain focused
on the start of the trial against any remaining defendants next week," Hevesi said.

This settlement follows the $460.5 million settlement with Bank of America announced
on March 3, the $100.3 million settlement with Lehman Brothers, Goldman Sachs, Credit
Suisse First Boston, and UBS Warburg announced on March 4, the $428.4 million in
settlements with ABN AMRO, Mitsubishi Securities International, BNP Paribas
Securities Corp. and Mizuho International announced on March 9, 2005, the $325 million
settlement with Deutsche Bank Securities Inc. and the $112.5 million in settlements with
WestLB and Cabato Holding announced on March 10, as well as the $2.575 billion
settlement with the Citigroup Defendants, which was approved by United States District
Court Judge Denise Cote on November 12, 2004.

The amount being paid by J.P. Morgan is higher, on a percentage basis, than the rate
established by the amount the Citigroup Defendants agreed in May 2004 to pay to settle
the bond portions of the claims against them.

Hevesi is the Court-appointed Lead Plaintiff in the consolidated securities class action, In

re WorldCom, Inc. Securities Litigation, which is pending before Judge Cote.

The NYSCRF and investor class are represented by the law firms of Barrack, Rodos & Bacine and Bernstein Litowitz Berger & Grossmann LLP, who were appointed as Lead Counsel by Judge Cote in August 2002. The two firms also served as Lead Counsel in the Cendant class action, which was previously the highest recovery ever achieved in a securities law class case.

To obtain further information concerning that Settlement and the submission of proof of claim forms, investors may access the website maintained by Lead Counsel, at www.worldcomlitigation.com.

                                ###

Albany Phone: (518) 474-4015  Fax:(518) 473-8940
NYC Phone: (212) 681-4825  Fax:(212) 681-4468
Internet: http://www.osc.state.ny.us
E-Mail:press@osc.state.ny.us

# EXHIBIT

# 12

Case 1:05-cv-00162-JJF        Document 65-7        Filed 09/15/2005        Page 39 of 126

**University of California** Office of the President

A-Z Index | Find People | Search

The President | The Regents | Academic Senate | OP Divisions | UC Locations | About UC | News | OP Home

Back

FOR IMMEDIATE RELEASE
Tuesday, June 14, 2005
Contact: Trey Davis, (510) 987-0056
trey.davis@ucop.edu
For investor questions: 800-449-4900 or www.enronfraud.com/contact.html

**UC secures $2.2 billion settlement with JPMorgan Chase in Enron fraud case**

The University of California has reached a second large settlement in less than a week in the Enron Corp. securities fraud class action, with the announcement today (Jun. 14) of a $2.2 billion agreement with JPMorgan Chase. The university is lead plaintiff representing a class of Enron investors who lost tens of billions of dollars.

"This agreement represents an extremely important and very substantial recovery for Enron investors and sustains the course of highly favorable settlements," said James E. Holst, the university's general counsel. "JPMorgan Chase and its advisors have acted very responsibly in reaching this settlement. We will now move ahead with our objective of additional large recoveries from the remaining defendants, either through settlement or at trial."

UC alleged that JPMorgan Chase participated in an elaborate scheme to defraud investors and thereby violated Section 10(b) of the Securities Exchange Act of 1934 and other securities laws.

"We are very proud of the University of California's achievement," said William S. Lerach, of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, lead counsel for the university in the litigation. "We continue to pursue other defendants, including other banks that have been charged with knowingly participating in the scheme to defraud Enron investors. Beyond today's agreement, the lawsuit continues to proceed very satisfactorily and further large recoveries are anticipated."

With this $2.2 billion latest settlement, UC has now obtained more than $4.7 billion for Enron investors, including $2 billion from Citigroup, $222.5 million from Lehman Brothers, $69 million from Bank of America, $168 million from Enron's outside directors, and $32 million from Andersen Worldwide. Through the bankruptcy proceeding for the LJM2 partnership involved in the Enron scheme, UC will secure a distribution of approximately $32 million for investors.

Retired federal judge Hon. J. Lawrence Irving, who is acting as an advisor to the UC Regents in the Enron litigation, said, "I unqualifiedly endorse this additional settlement and hope it helps lead to further substantial recoveries for Enron investors."

This settlement is subject to approval by the UC Regents, the JPMorgan Chase board of directors and the court.

Remaining defendants in the investors' lawsuit include the financial institutions of Merrill Lynch, Credit Suisse First Boston, Canadian Imperial Bank of Commerce, Barclays Bank, Deutsche Bank, Toronto-Dominion Bank, Royal Bank of Canada and the Royal Bank of Scotland, all alleged to be key players in a series of fraudulent transactions that ultimately cost Enron investors an estimated $40-45 billion in market losses.

These banks allegedly set up false investments in clandestinely controlled Enron partnerships, used offshore companies to disguise loans and facilitated phony sales of phantom Enron assets. As a result, Enron executives were able to deceive investors by reporting increased cash flow from operations and by moving billions of dollars of debt off Enron's balance sheet, thereby artificially inflating securities prices.

Additional remaining defendants include Goldman Sachs, because of its role as an underwriter of Enron securities, as well as former officers of Enron, its accountants, Arthur Andersen, and certain law firms.

In February 2002, UC was named lead plaintiff in the Enron shareholders' class action suit previously filed against 29 top executives of Enron Corp. and its accounting firm, Arthur Andersen LLP. The university filed a consolidated complaint on April 8, 2002, adding nine banks and two law firms as defendants in the case. In April 2003, U.S. District Court Judge Melinda Harmon completed her rulings on the various defendants' motions to dismiss and lifted the stay on discovery. Following those rulings, UC filed an amended complaint on May 14, 2003.

Other institutional investors acting as representative plaintiffs on behalf of Enron investors include Washington State Investment Board, the Amalgamated Bank and its Long View Funds, Illinois State Board of Investment, San Francisco City and County Employees' Retirement System, Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund, Hawaii Laborers Pension Plan, Greenville Plumbers Pension Plan,

Archdiocese of Milwaukee and Staro Asset Management.

Depositions in the case began in June 2004, with the trial slated to begin in Houston on Oct. 16, 2006.

Recovered f unds, to be split among investors who bought Enron shares or publicly traded debt securities issued by Enron and Enron-related entities between Sept. 9, 1997, and its Dec. 2001 bankruptcy filing, are earning interest. The court must approve an allocation plan for the distribution . At this point, the total amount of money that will be recovered and the total pool of investor shares to receive it are unknown.

For more background on the Enron lawsuit: www.universityofcalifornia.edu/news/enron

A copy of Judge Irving's letter to the UC regents is available at

www.universityofcalifornia.edu/news/enron/irvingmorgan.pdf

# # #

# EXHIBIT

# 13

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

The chart below compares certain selections from the amended complaint in *Blau v. Harrison* (and the initial complaint, where applicable) against the consolidated complaint in *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N (Del. Ch.), which was filed over a month before the initial complaint in *Blau* was filed and over four months before the amended complaint in *Blau* was filed.

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

28.    In June 1999, Defendant Harrison became Chief Executive of Chase Manhattan, the predecessor of JPMC, and embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J. P. Morgan in 2000, just before the stock market collapsed. In a February 23, 2004 interview with Harrison on CNBC, the interviewer noted: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

29.    According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large strategic acquisitions…" However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

19.    In 1999, Mr. Harrison became Chief Executive of Chase Manhattan, predecessor of J.P. Morgan Chase. Soon thereafter, he spent more than $40 billion on acquisitions. One such acquisition was the 2000 merger with J.P. Morgan, just prior to the stock market "bubble" popped and the market entered into a prolonged corrective cycle. Mr. Harrison's propensity for doing "big deals" that simply did not perform well going-forward, was characterized by Prudential Equity analyst Michael Mayo as a function of a "lack of capital discipline when it comes to large strategic acquisitions." *Interview with CNBC on February 23, 2004.*

NOTE: The Wolf Haldenstein complaint erroneously attributes Michael Mayo's comment to a CNBC interview. In fact, Harrison's CNBC interview was with Maria Bartiromo; Michael Mayo's analysis comes from a written report.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      31.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent. Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent. JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      24.    In the face of these scandals and poor strategic decisions, J.P. Morgan Chase shareholders have weathered tough times. From June 1999 to January 14, 2004, J.P. Morgan Chase common stock declined 18 percent, from $48.08 to $39.22 per share. On the other hand, Citigroup stock (a major competitor) climbed 66 percent, and the S&P Financial Index (an index of 81 large banks) increased 16 percent.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      32.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

      33.    On September 18, 2002, The Wall Street Journal published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      20.    Mr. Harrison's tenure has been dogged by controversy, poor performance and scandal as J.P. Morgan Chase has been implicated in some of the largest cases of financial malfeasance with Mr. Harrison providing poor stewardship in the face of these problems.

      21.    On September 18, 2002, *The Wall Street Journal* published an op-ed submission by Mr. Harrison in which he strongly rejected any charges of misconduct by J.P. Morgan Chase under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Mr. Harrison concluded: "To say that they [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

     34.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

     35.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     22.    Despite Mr. Harrison's public protestation of complete innocence, on July 28, 2003, J.P. Morgan Chase paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that J.P. Morgan Chase aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

     23.    On October 1, 2003, J.P. Morgan Chase paid an additional $25 million to settle an action brought by the SEC in connection with its role in the IPO allocation scandal.

<u>EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN</u>

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      37.    Whereas JPMC shareholders have suffered under Harrison's reign, James Dimon, Chairman and Chief Executive Officer of Bank One, has created tremendous value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      26.    Bank One shareholders experienced a remarkably dissimilar fate during a similar period of time. Under Mr. Dimon's leadership, beginning in March 2000 until the Merger in January 2004, Bank One's common stock rose 41 percent while during the same period J.P. Morgan Chase stock fell 38 percent.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

 38. The fallout from various scandals, as well as his poor business decisions, forced

Harrison to conjure yet another massive deal to protect his position.

 30. The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his bank,
> were so down in the dumps that *few would have given odds on him even
> surviving the year*, let alone clawing his way back to pull off one of the biggest
> banking mergers of all time.

> Serious business downturns nearly always claim at least one banking casualty,
> and of the American banks, JP Morgan Chase looked easily the most vulnerable.

> What's more, *it seemed to be largely Harrison's fault.* At the top of the bull
> market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP
> Morgan. [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

 27. In the face of serious scandals, a declining stock price, and growing

dissatisfaction with his leadership, Mr. Harrison sought out a transaction that would both protect

his position at J.P. Morgan Chase and deflect some of the pointed criticisms directed at him. The

January 18, 2004 *Sunday Tribune* described Mr. Harrison's predicament:

> [A] little more than 18 months ago Harrison's fortunes, and those of his bank,
> were so down in the dumps that few would have given odds on him even
> surviving the year, let alone clawing his way back to pull off one of the biggest
> banking mergers of all time.

> Serious business downturns nearly always claim at least one banking casualty,
> and of the American banks, JP Morgan Chase looked easily the most vulnerable.
> What's more, it seemed to be largely Harrison's fault. At the top of the bull
> market, he had forked out $32bn in Chase Manhattan equity to acquire J.P.
> Morgan.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      39.    During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

      40.    According to the Joint Proxy Statement sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.


PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      28.    In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies. They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions. This they did.


PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN INITIAL COMPLAINT:

      28.    In November 2003, it was reported that Mr. Harrison, J.P. Morgan Chase's CEO, and James Dimon, Bank One's CEO and Chairman of its Board, began discussing the possibility of a business combination between the two companies. They periodically briefed their respective boards about these conversations; on November 18, 2003, each was encouraged by his respective board to engage in further discussions. This they did.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      44.    Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO.  Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger.  Little did JPMC shareholders know that buying this extra time for Harrison would cost them *billions* of dollars.

      45.    According to a June 27, 2004 <u>New York Times</u> article:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to *give himself the two extra years*, to secure a smooth transition, *although he may have cost J.P. Morgan shareholders extra money* in doing so. Mr. Dimon, always the tough deal maker, *offered to do the deal for <u>no premium</u> if he could become chief executive immediately, according to two people close to the deal.*
>
> *When Mr. Harrison resisted, Mr. Dimon insisted on a premium*, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

[see next page for plagiarized allegation]

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    30.    Specifically, several news sources have subsequently reported that Mr. Dimon initially offered to merge Bank One with J.P. Morgan Chase in a transaction <u>that would not have required J.P. Morgan Chase stockholders to pay a premium for Bank One's shares</u>. In this way, Mr. Dimon initially proposed a true "merger of equals." Mr. Harrison, however, insisted that he be the surviving entity's CEO for at least two years. This condition was more important to him than whether J.P. Morgan Chase's stockholders ultimately had to pay a higher price than necessary for Bank One in order to consummate the transaction. Reputable newspapers cite several sources corroborating these events.

    31.    For example, as reported in the June 27, 2004 edition of *The New York Times*:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the two extra years, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money in doing so***. Mr. Dimon, always the tough deal maker, ***offered to do the deal for no premium*** if he could become chief executive immediately, ***according to two people close to the deal.***
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent.*** The two men declined to comment on the specifics of their negotiations.

Landon Thomas, Jr., *The Yin, the Yang and the Deal,* N.Y. Times, June 27, 2004, at C1. (Emphasis supplied.)

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

     43.     The January 19, 2004 <u>Financial Times</u> described the negotiation process:

"There was a ***spectrum of outcomes in terms of premium and governance:*** ***Jamie laid them out*** and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession.*** [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     32.     On July 3, 2004, *The Financial Times* (London) reported on the above-referenced *N.Y. Times* article and <u>quoted an additional</u> source that corroborated Mr. Harrison's insistence that he remain in control, regardless of the cost to J.P. Morgan Chase shareholders, and that it would result in the payment of a premium to Bank One shareholders. According to the article, authored by David Wighton, "'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time." Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay."

NOTE: In fact, the phrase quoted by Wolf Haldenstein comes originally from the July 19, 2004 *Financial Times*, not the July 3, 2004 edition.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      42.    In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million. Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      34.    During November 2003, J.P. Morgan Chase and Bank One each retained financial advisors with respect to the proposed Merger. J.P. Morgan Chase retained one of its own subsidiaries, J.P. Morgan Securities, Inc. to have as its financial advisor, and agreed to pay it $40 million to perform services. This retention of a conflicted financial advisor (indeed, a subsidiary) aided and abetted Mr. Harrison's improper insistence that he retain his position even though it forced J.P. Morgan Chase shareholders to pay an unnecessary premium for Bank One's shares.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

50.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings.  The total value of the deal was approximately $57 billion.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

33.    Indeed, the Merger, as it was consummated on July 1, 2004, included a premium of approximately 14% for the Bank One shares (based on the closing price the trading day before the Merger was agreed to and announced), with a provision that Mr. Harrison would remain CEO of J.P. Morgan Chase for two years after completion of the Merger.  The agreement also provides that for those two years, Mr. Dimon will serve as President and Chief Operating Officer of J.P. Morgan Chase, after which he will take over as sole CEO.  In short, J.P. Morgan Chase shareholders unnecessarily paid greater than a more than $7 billion premium for Bank One, so that Mr. Harrison could remain CEO for two additional years, even though Mr. Dimon was prepared to structure the deal as a "merger of equals" from the outset, assuming he could run the combined entities – which he would anyway eventually run.

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

61.     According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined. In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Thus, the value of Harrison's leadership to JPMC is dubious at best, especially when compared to the performance of Bank One under Dimon. Nevertheless, Harrison has been compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted. Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

41.     That the exchange ratio was unfair to the interests of J.P. Morgan Chase shareholders is evidenced, in part, by the weakness of Mr. Harrison's performance as a CEO when compared to Mr. Dimon's performance while at Bank One's helm. Between the time that Mr. Harrison became CEO in June 1999, and the consummation of the Merger, J.P. Morgan Chase's stock price declined approximately 6%. Notably, according to Michael L. Mayo, a banking analyst at Prudential Securities, J.P. Morgan Chase's stock price performance ranked at the very bottom of the 17 bank stocks he covered, Bank One, on the other hand, which according to Mr. Mayo provided 13% in returns under Mr. Dimon's leadership, sat near the top of his list, ranking at third place. *N.Y. Times*, June 27, 2004.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

66.     "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

42.     In actuality, one of the factors supporting the Merger was the perceived value of Mr. Dimon's leadership. A fund manager at Victory Capital stated: "[T]he sense on the street is that the day-to-day operations will be run by Jamie … We have a lot of faith in him." (Quoted in *N.Y. Times*, June 27, 2004.)   One vice president of J.P. Morgan Chase said publicly of Mr. Dimon, "[t]he guy is a rock star." *Id.*

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

     62.    Harrison himself acknowledged the underperformance of JPMC under his

leadership in the June 27, 2004 <u>New York Times</u> article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.

> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around. "If we had gone another year without performing, the board probably would have demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

     43.    In contrast, Mr. Harrison, as noted in *The New York Times*, "has endured two years of negative publicity as J.P. Morgan's stock plunged to a low of $16, down 70 percent from its high of $52 in early 2001." *Id.* Even Mr. Harrison conceded the problems under his tenure, stating, "If we had gone another year without performing, the board probably would have demanded changes ... [t]here is a point at which you can't go on." *Id.*

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    51.    Public criticism of the premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive.  They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    44.    In addition, once the Merger was announced public criticism of the premium paid to Bank One shareholders was immediate: Lawrence Kudlow observed on CNBC's Kudlow & Cramer program: "[S]ome people I spoke to today said this is too dilutive.  They said J.P. Morgan Chase is paying too big a premium.  It's great for Bank One shareholders but it's not great for J.P. Morgan Chase, [former] Manny Hanny, [former] Chemical shareholders, etc."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

52.    James Cramer of Kudlow & Cramer discussed the Merger announcement with

Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?

> Mr. VANDERVLIET: I would favor Bank One and Bank One management.

> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?

> KUDLOW: Well, I know. It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

45.    James Cramer, also of Kudlow & Cramer, discussed the Merger with Lehman

Brothers Bank Analyst Brock Vandervliet:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view. When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title. Who wins in this culture clash?

> Mr. VANDERVLIET: I would favor Bank One and Bank One management.

> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips—that it's the Bank One upstarts that take it over?

> KUDLOW: Well, I know. It's an odd – a lot of people – I mean, this is kind of an interesting thing because of what it says about both sides. I mean, Dimon, I guess, is the powerhouse manager here.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

  53. Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

  54. Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

  46. Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

  47. Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", an analyst with Natexis Bleichroeder commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

64.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

48.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management.  "That was the price of J.P. Morgan getting Jamie Dimon to **[word missing?]** the next chief executive.  I guess he is going to be running the show from day one."

NOTE:  The "[word missing?]" edit appears to be a typo by a Wolf Haldenstein attorney who noticed that the typist failed to copy the Delaware Complaint's allegation exactly, mistakenly leaving out the word "be."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    65.   London's <u>Sunday Telegraph</u> reported on January 18, 2004:

> JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    49.   London's Sunday *Telegraph* reported on January 18, 2004:

> JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

NOTE:  The publication cited in these allegations is, indeed, *The Sunday Telegraph*, not the Sunday edition of the Telegraph, as the Wolf Haldenstein attorney presumed.  Had the Wolf Haldenstein attorney performed any investigation at all, he or she would have realized that this is the companion publication of *The Daily Telegraph.*

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    50.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital management in Cleveland, specializing in bank stocks. "We have a lot of faith in him." *New York Times, June 27, 2004.*

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

      67.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots,"

related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

      68.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which

owns JPMC stock and owned Bank One: "Jamie will run the show."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

      51.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots,"

related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

      According to James McGlynn, a manager at Summit Fund in Cincinnati, which
owns J.P.MC stock and owned Bank One: "Jamie will run the show."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    69.    The <u>Australian</u> reported on January 16, 2004:

> "JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    52.    *The Australian* reported in January 16, 2004:

> "J.P. Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….] "Dimon brings a new broom to J.P. Morgan, which has a lot of management issues."

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

70.    Retail Banker International reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." Retail Banker International quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to Retail Banker International: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

53.    *Retail Banker International* reported on February 11, 2004, that, despite Mr. Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

71.    Retail Banker International further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth

transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

54.    Retail Banker International further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking.  Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process.  It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

55.    The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  *All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC shareholders to secure that benefit for Harrison.*

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

55.    Although the Merger was structured as an acquisition with an acquisition premium, it was, in reality, a "merger of equals" at best, with the balance tipping in Mr. Dimon's favor, thereby negating the need to pay Bank One shareholders a premium other than for reasons that served Mr. Harrison's interests.

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

    56.    In connection with the Merger, JPMC amended its by-laws to include the following provisions:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

    56.    Specifically, when the Merger was announced, it was billed as J.P. Morgan Chase's acquisition of Bank One, thereby justifying a 14% premium or $7 billion in additional merger compensation. The transaction, however, was, in fact, a "merger of equals." For example, in connection with the Merger, J.P. Morgan Chase amended it's By-Laws to include the following:

> Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of

## EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:
     57.    According to an Institutional Shareholder Services report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."


PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:
     57.    According to an *Institutional Shareholder Services* report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

EXHIBIT 13 – PLAGIARISM BY WOLF HALDENSTEIN

ORIGINAL ALLEGATION FROM CONSOLIDATED COMPLAINT IN DELAWARE:

58.     Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

PLAGIARIZED ALLEGATION IN WOLF HALDENSTEIN AMENDED COMPLAINT:

58.     Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

# EXHIBIT
# 14



arca|ex

469,891,

NUMBERS LIKE THIS
ARE HARD TO IGNORE

**Forbes**

Jump | Free Trial Issue

Search    Quote

**Forbes**

SAVE $64

Select Section    Go

U.S. | EUROPE | ASIA    HOME PAGE FOR THE WORLD'S BUSINESS LEADERS

HOME    BUSINESS    TECHNOLOGY    MARKETS    WORK    **LISTS**    PERSONAL FINANCE    LIFESTYLE    MEMBERS

Home > Lists > Forbes 400 > Bechtel, Riley P

1996    1997    1998    1999    2000    2001    2002    2003    **2004**    sponsored by [hp]

< Previous    Next >

## #87, Bechtel, Riley P
▶ ▶ ▶ ▶ Track This Person  | Functionaries

**Net Worth: $2.4 billion** ▼
**Source:** Service, engineering, construction
Inherited

**Age:** 52
**Marital Status:** married , 3 children
**Hometown:** San Francisco , CA
**Undergraduate:** University of Calif Davis, Bachelor of Arts / Science
**Graduate:** Stanford University, Master of Business Administration

With father Stephen, co-owners of engineering giant Bechtel. Rebuilding Iraq helped boost engineering
giant's revenues 40% over last year, but bigger business came from $5 billion waste treatment plant in
Washington State, $4.5 billion petrochemical complex in southern China. Third-generation family business
built Hoover Dam, Hong Kong airport, Channel Tunnel, managed Boston's Big Dig. Family also major
stakeholder in private equity investor Fremont Group.

### Distribution of the Forbes 400 by U.S. State
Diameter of disc reflects size of fortune. The red disc indicates Bechtel, Riley P

🌐 - Rich List Members Living Abroad

See distribution of Forbes 400 since 1996

▲ Net worth up from 2003    ▼ Net worth down    ⟷ Net worth unchanged    ☆ Returns to list    ★ New to list

< Previous    Next >

**Associated Companies:**
Bechtel Group    # 7 on Largest Private Cos. 2003 , # 6 on Largest Private Cos. 2002
, # 6 on Largest Private Cos. 2001 , # 5 on Largest Private Cos.
2000 , # 6 on Largest Private Cos. 1999

**Other Lists:**
Bechtel, Riley P.    # 147 on World's Richest People 2004 , # 104 on World's Richest
People 2003 , # 127 on World's Richest People 2002 , # 151 on
World's Richest People 2001 , # 55 on Forbes 400 2003 , # 50 on
Forbes 400 2002 , # 52 on Forbes 400 2001 , # 79 on Forbes 400
2000 , # 68 on Forbes 400 1999

### Search Forbes 400
.

Enter person's last name to search this list

[        ]    >    [go]

— or —

Find people on this list for whom

the [category ▾]

is [selection ▾]

and

the [category ▾]

is [selection ▾]    >    [go]

.

The **Forbes 400**
Full Coverage >

Complete List By Net
Worth

**In Pictures:**

• The Top Ten
• Notable Newbies
• Dropoffs

**Index:**

Cost Of Living Extremely
Well

**Video:**

Working Women

# EXHIBIT

# 15

EX-3.1 2 y05475exv3w1.htm EX-3.1: RESTATED CERTIFICATE OF INCORPORATION

<div align="right"><b>Exhibit 3.1</b></div>

<div align="center">

**RESTATED CERTIFICATE OF INCORPORATION**
of
**JPMORGAN CHASE & CO.**

Under Section 245
of the
General Corporation Law of the State of Delaware

</div>

JPMorgan Chase & Co. (the "Corporation"), does hereby certify under the seal of the Corporation as follows:

First: The name of the Corporation is JPMorgan Chase & Co.; the Corporation was originally incorporated as Chemical New York Corporation.

Second: The Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware in Dover, Delaware, on the 28th day of October, 1968.

Third: This Restated Certificate of Incorporation was duly adopted in accordance with Section 245 of the General Corporation Law of Delaware and only restates and integrates and does not further amend the provisions of the Corporation's Restated Certificate of Incorporation as heretofore restated, amended and supplemented. There is no discrepancy between those provisions and the provisions of this Restated Certificate of Incorporation.

Fourth: The text of the Restated Certificate of Incorporation of the Corporation, as amended, is hereby restated to read in full, as follows:

FIRST. The name of the Corporation is JPMorgan Chase & Co.

SECOND. The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

THIRD. The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware. Without limiting in any manner the scope and generality of the foregoing, the Corporation shall have the following purposes and powers:

(1) To acquire by purchase, subscription, or otherwise, and to receive, hold, own, guarantee, sell, assign, exchange, transfer, mortgage, pledge, or otherwise dispose of or deal in and with any and all securities, as such term is hereinafter defined, issued or created by any corporation, firm, organization, association or other entity, public or private, whether formed under the laws of the United States of America or of any state, commonwealth, territory, dependency or possession thereof, or of any foreign country or of any political subdivision, territory, dependency, possession or municipality thereof, or issued or created by the United States of America or any state or commonwealth thereof or any foreign country, or by any agency, subdivision, territory, dependency, possession or municipality of any of the foregoing, and as owner thereof to possess and exercise all

http://www.sec.gov/Archives/edgar/data/19617/0009501230500...

the rights, powers and privileges of ownership, including the right to execute consents and vote thereon;

(2) to make, establish and maintain investments in securities, and to supervise and manage such investments;

(3) to cause to be organized under the laws of the United States of America or of any state, commonwealth, territory, dependency or possession thereof, or of any foreign country or of any political subdivision, territory, dependency, possession or municipality thereof, one or more corporations, firms, organizations, associations or other entities and to cause the same to be dissolved, wound up, liquidated, merged or consolidated;

(4) to acquire by purchase or exchange, or by transfer to or by merger or consolidation with the Corporation or any corporation, firm, organization, association or other entity owned or controlled, directly or indirectly, by the Corporation, or to otherwise acquire, the whole or any part of the business, good will, rights or other assets of any corporation, firm, organization, association or other entity, and to undertake or assume in connection therewith the whole or any part of the liabilities and obligations thereof, to effect any such acquisition in whole or in part by delivery of cash or other property, including securities issued by the Corporation, or by any other lawful means;

(5) to make loans and give other forms of credit, with or without security, and to negotiate and make contracts and agreements in connection therewith;

(6) to aid by loan, subsidy, guaranty or in any other lawful manner any corporation, firm, organization, association or other entity of which any securities are in any manner directly or indirectly held by the Corporation or in which the Corporation or any such corporation, firm, organization, association or entity may be or become otherwise interested; to guarantee the payment of dividends on any stock issued by any such corporation, firm, organization, association or entity; to guarantee or, with or without recourse against any such corporation, firm, organization, association or entity, to assume the payment of the principal of, or the interest on, any obligations issued or incurred by such corporation, firm, organization, association or entity; to do any and all other acts and things for the enhancement, protection or preservation of any securities which are in any manner, directly or indirectly, held, guaranteed or assumed by the Corporation, and to do any and all acts and things designed to accomplish any such purpose;

(7) to borrow money for any business, object or purpose of the Corporation from time to time, without limit as to amount; to issue any kind of evidence of indebtedness, whether or not in connection with borrowing money, including evidences of indebtedness convertible into stock of the Corporation, to secure the payment of any evidence of indebtedness by the creation of any interest in any of the property or rights of the Corporation, whether at that time owned or thereafter acquired;

2

http://www.sec.gov/Archives/edgar/data/19617/0009501230500...

(8) to render service, assistance, counsel and advice to, and to act as representative or agent in any capacity (whether managing, operating, financial, purchasing, selling, advertising or otherwise) of, any corporation, firm, organization, association or other entity; and

(9) to engage in any commercial, financial, mercantile, industrial, manufacturing, marine, exploration, mining, agricultural, research, licensing, servicing, or agency business not prohibited by law, and any, some or all of the foregoing.

The term "securities" as used in this Certificate of Incorporation shall mean any and all notes, stocks, treasury stocks, bonds, debentures, evidences of indebtedness, certificates of interest or participation in any profit-sharing agreement, collateral-trust certificates, preorganization certificates or subscriptions, transferable shares, investment contracts, voting trust certificates, certificates of deposit for a security, fractional undivided interests in oil, gas, or other mineral rights, or, in general, any interests or instruments commonly known as "securities", or any and all certificates of interest or participation in, temporary or interim certificates for, receipts for, guaranties of, or warrants or rights to subscribe to or purchase, any of the foregoing.

The purposes and powers specified in the foregoing paragraphs shall, except where otherwise expressed, be in nowise limited or restricted by reference to, or inference from, the terms of any other paragraph in this Certificate of Incorporation, but the purposes and powers specified in each of the foregoing paragraphs of this Article THIRD shall be regarded as independent purposes and powers.

The Corporation shall possess and may exercise all powers and privileges necessary or convenient to effect any or all of the foregoing purposes, or to further any or all of the foregoing powers, and the enumeration herein of any specific purposes or powers shall not be held to limit or restrict in any manner the exercise by the Corporation of the general powers and privileges now or hereafter conferred by the laws of the State of Delaware upon corporations formed under the General Corporation Law of Delaware.

FOURTH. The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is NINE BILLION TWO HUNDRED MILLION, of which TWO HUNDRED MILLION shares shall be shares of preferred stock of the par value of $1 per share (hereinafter called "Preferred Stock") and NINE BILLION shares shall be shares of common stock of the par value of $1 per share (hereinafter called "Common Stock").

Any amendment to this Certificate of Incorporation which shall increase or decrease the authorized capital stock of the Corporation may be adopted by the affirmative vote of the holders of capital stock representing not less than a majority of the voting power represented by the outstanding shares of capital stock of the Corporation entitled to vote.

The designations and the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, of the Preferred Stock shall be as follows:

(1) The Board of Directors is expressly authorized at any time, and from time to time, to provide for the issuance of shares of Preferred Stock in one or more series, with such voting powers, full or limited but not to exceed one vote per share, or without

3

voting powers and with such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions providing for the issue thereof adopted by the Board of Directors, and as are not stated and expressed in this Certificate of Incorporation, or any amendment thereto, including (but without limiting the generality of the foregoing) the following:

(a) the designation of such series;

(b) the dividend rate of such series, the conditions and dates upon which such dividends shall be payable, the preference or relation which such dividends shall bear to the dividends payable on any other class or classes or on any other series of any class or classes of capital stock, and whether such dividends shall be cumulative or non-cumulative;

(c) whether the shares of such series shall be subject to redemption by the Corporation, and, if made subject to such redemption, the times, prices and other terms and conditions of such redemption;

(d) the terms and amount of any sinking fund provided for the purchase or redemption of the shares of such series;

(e) whether or not the shares of such series shall be convertible into or exchangeable for shares of any other class or classes or of any other series of any class or classes of capital stock of the Corporation, and, if provision be made for conversion or exchange, the times, prices, rates, adjustments and other terms and conditions of such conversion or exchange;

(f) the extent, if any, to which the holders of the shares of such series shall be entitled to vote as a class or otherwise with respect to the election of the directors or otherwise; provided, however, that in no event shall any holder of any series of Preferred Stock be entitled to more than one vote for each share of such Preferred Stock held by him;

(g) the restrictions, if any, on the issue or reissue of any additional Preferred Stock;

(h) the rights of the holders of the shares of such series upon the dissolution of, or upon the distribution of assets of, the Corporation.

(2) Except as otherwise required by law and except for such voting powers with respect to the election of directors or other matters as may be stated in the resolutions of the Board of Directors creating any series of Preferred Stock, the holders of any such series shall have no voting power whatsoever.

(3) The voting powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof,

4

of the Corporation's 6 $^5/_8$% Cumulative Preferred Stock, are set forth in Appendix A hereto and are incorporated by reference.

(4) The voting powers, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof, of the Corporation's Fixed/Adjustable Rate Noncumulative Preferred Stock, are set forth in Appendix B hereto and are incorporated by reference.

FIFTH. The by-laws may be made, altered, amended or repealed by the Board of Directors. The books of the Corporation (subject to the provisions of the laws of the State of Delaware) may be kept outside of the State of Delaware at such places as from time to time may be designated by the Board of Directors.

SIXTH. (1) To the fullest extent that the General Corporation Law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended permits the limitation or elimination of the liability of directors, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

(2) The Corporation shall have the power to indemnify any director, officer, employee or agent of the Corporation or any other person who is serving at the request of the Corporation in any such capacity with another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, any employee benefit plan) to the fullest extent permitted by the General Corporation Law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended, and any such indemnification may continue as to any person who has ceased to be a director, officer, employee or agent and may inure to the benefit of the heirs, executors and administrators of such a person.

(3) By action of its Board of Directors, notwithstanding any interest of the directors in the action, the Corporation may purchase and maintain insurance, in such amounts as the Board of Directors deems appropriate, to protect any director, officer, employee or agent of the Corporation or any other person who is serving at the request of the Corporation in any such capacity with another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, any employee benefit plan) against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such (including, without limitation, expenses, judgments, fines and amounts paid in settlement) to the fullest extent permitted by the General Corporation Law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended, and whether or not the Corporation would have the power or would be required to indemnify any such person under the terms of any agreement or by-law or the General Corporation Law of the State of Delaware. For purposes of this paragraph (3), "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan.

SEVENTH. (1) Any action required or permitted to be taken by the holders of Common Stock of the Corporation must be effected at a duly called annual or special meeting of the stockholders of the Corporation and may not be effected by any consent in writing.

5

(2) Whenever the vote of holders of shares of any class or series other than Common Stock at a meeting thereof is required or permitted to be taken for or in connection with any corporate action by any provision of the General Corporation Law of the State of Delaware, the meeting and vote of such stockholders may be dispensed with if such action is taken with the written consent of such holders representing not less than a majority of the voting power of all the capital stock of such class or series entitled to be voted upon such action if a meeting were held; provided that in no case shall the written consent be by such holders having less than the minimum percentage of the vote required by statute for such action, and provided that prompt notice is given in writing to all such stockholders entitled to vote thereon of the taking of corporate action without a meeting and by less than unanimous written consent.

(3) Election of directors need not be by ballot unless the by-laws so provide.

EIGHTH. The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

6

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed by its authorized officer and caused the corporate seal of the Corporation to be hereunto affixed this 18th day of January, 2005.

By /s/ Anthony J. Horan
_____

Anthony J. Horan
Corporate Secretary

[Corporate Seal]

EX-3.2 3 y05475exv3w2.htm EX-3.2: BY-LAWS

**Exhibit 3.2**



# BY-LAWS

# OF

# JPMORGAN CHASE & CO.

As amended by the Board of Directors on March 16, 2004
Effective July 1, 2004

Effective July 20, 2004, name changed to JPMorgan Chase & Co.

# EXHIBIT

# 16

**BLB&G**

Bernstein
Litowitz
Berger &
Grossmann
LLP

*January, 2000*

# INSTITUTIONAL INVESTOR

# *Advocate*

## A SECURITIES FRAUD AND CORPORATE GOVERNANCE QUARTERLY

From time to time, issues emerge regarding securities class actions that have the potential to affect institutional investors in a very significant way. Where we, at Bernstein Litowitz Berger & Grossmann LLP, believe that it is important to bring these issues to your attention before the publication of our regular quarterly newsletter, we will issue a special informtion *BULLETIN*, such as this one. Our next regular issue of the *Advocate* should reach you during the first week of March, 2000.

## MASS SOLICITATIONS DUPE INSTITUTIONAL INVESTORS

*By Max W. Berger and Robert S. Gans*

The purpose of this bulletin is to alert you to an alarming trend among certain class action attorneys to solicit institutional investors to participate in securities litigation as lead plaintiffs through deceptive means. As detailed in a recent important decision emanating from the United States District Court for the Northern District of California, many institutional investors have fallen prey to these techniques, which include advising investors that it is necessary to register with a particular law firm at the outset of litigation to participate in any recovery, when no such requirement exists. We believe that this matter requires your immediate attention, since many institutions already have been victimized by these deceptive solicitation efforts.

As detailed in prior issues of the *Advocate*, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires courts to appoint as lead plaintiff in any class action alleging federal securities law violations "the person or group of persons that . . . has the largest financial interest in the relief sought by the Class." Congress enacted this provision to encourage large institutional shareholders to assume control over securities class action litigation. Nevertheless, many traditional class action attorneys who have been unable to attract institutional clients have been creative in their attempts to subvert the Congressional intent and perpetuate the regime of class action litigation dominated by attorneys whose clients only have a nominal interest in the litigation.

For example, certain law firms have taken advantage of a provision of the PSLRA that requires the plaintiff in the first-filed case to publish a notice in a national business publi-

*Although Congress contemplated that only one notice would be published, attorneys have used this provision to publish dozens of notices, most of which more closely resemble advertisements for particular law firms than anything else.*

cation or wire service informing class members of the pendency of the action, and of their right to apply to the Court to be appointed lead plaintiff. Although Congress contemplated that only one notice would be published, attorneys have used this provision to publish dozens of notices, most of which more closely resemble advertisements for particular law firms than anything else. The goal of these advertisements is to attract either a large investor that is unfamiliar with its rights and responsibilities under the PSLRA, or a large group of small, unsophisticated investors that

*Continued on next page.*

# *Advocate*

the soliciting attorney will seek to have appointed as the "lead plaintiff group" in the litigation, and which invariably selects the soliciting law firm to serve as lead counsel. This strategy, when successfully employed, allows the attorney to perpetuate the pre-PSLRA problem of lawyer-controlled litigation, without regard to the interests of the class.

More recently, many law firms have adopted a variation of this model, investing tens of thousands dollars in direct mailings to all institutional investors, their money managers, and their brokerage firms. Typically, these mailings are not directed to any individual with significant decision-making authority for the investment entity; instead, they are designed to look like proof of claim forms that would be provided to class members later in a case to secure a portion of any recovery obtained, and provide relatively little information regarding the facts of the case. The mailings, also, often misleadingly imply that it is necessary to complete and return an enclosed "certification" form to participate in the action. Neither the certification form itself, nor the materials accompanying the form, specify the obligations that a lead plaintiff is expected to perform. The form merely contains boilerplate language stating the willingness of the recipient to serve as a "named plaintiff" or "class representative"—terms that are used interchangeably, and without any explanation of the added duties and responsibilities assumed by a lead plaintiff in the litigation. In most instances, the recipient need only fill in his stock purchase information, sign the form, and return it to the law firm in a postage paid, pre-addressed envelope. Finally, most of the mass solicitations sent by law firms never inform the recipient that he can participate in the Action without assuming any of these duties or obligations, and will be notified of any recovery during the course of the litigation.

*Institutions should not be fooled by these mass solicitations.* You do not need to take any kind of affirmative action to participate as a class member in securities class actions. By returning a certification form, you are agreeing to be a named party to the action, and are assuming substantial obligations in connection with the litigation — obligations

> *You do not need to take any kind of affirmative action to participate as a class member in securities class actions.*

that you may not want to assume in some circumstances, and that you need not assume to participate in any recovery obtained on behalf of the Class. These obligations, as recognized by the SEC and various courts addressing the issue, include the following:

- Maintaining authority and responsibility to consult with and direct counsel with respect to major litigation events, including important motions, trial and settlement;

- Consulting with counsel in advance to determine whether major litigation tasks are necessary and appropriate;

- Meeting with counsel regularly to review the progress and status of the case; and

- Attending major hearings and trial of the Action.

Recently, Judge William Alsup of the United States District Court for the Northern District of California addressed the propriety of mass solicitations and lead plaintiff group formation in a decision that is likely to be followed throughout the nation. Judge Alsup's opinion arose from a bitter dispute between competing

law firms for appointment as lead counsel in the case *In re Network Associates, Inc., Securities Litigation,* which was filed on behalf of purchasers of Network Associates common stock between January 20, 1998 and April 19, 1999. On one side of the battle was the law firm Milberg Weiss Bershad Hynes & Lerach LLP, which purported to represent over 1700 individuals seeking to be appointed lead plaintiffs who responded to numerous notices published by the law firm over wire services. Opposing their motion was a group led by the law firm Weiss & Yourman, which claimed to represent more than one hundred institutions and thousands of individuals who responded to a direct mail solicitation campaign orchestrated by the firm.

Over a period of seven months, the two law firms engaged in a paper war, which centered upon Milberg's allegation that Weiss & Yourman's direct mail campaign violated ethical rules and criminal statutes. In his thoroughly researched and detailed opinion, Judge Alsup criticized the mass solicitation tactics engaged in by both law firms. The Court bemoans the fact that the "race to the courthouse," which the PSLRA was designed to eradicate, has been replaced by "a race to both the courthouse and thence to the publisher", in an effort to accumulate as many large investors to support an application for appointment as lead plaintiff as possible. In this regard, Judge Alsup recognizes that the notices do not serve the purpose of attracting institutional investors to assert control over this litigation, as intended by Congress, but instead are designed "to steer investors away from seeking the lead role on their own and to steer them toward registering with a lawyer who already has a lead plaintiff candidate." The result is the formation of mass plaintiff groups incapable of asserting any real control over the litigation. Indeed, the Court noted that the group name used in a lead plaintiff motion is

# *Advocate*

not stated in the published notice or the certification form signed by the members of the group, nor are the names of the proposed lead counsel indicated on most certification forms. As a result, the members of the group "do not, in all probability, even know they belong to a group or know its name or know how their form is being used." Therefore, the Court disqualified both groups from serving as lead plaintiffs.

Significantly for institutional investors, the same concerns that precluded the Court from appointing a lead plaintiff group also prevented a large investment fund with millions of dollars in losses from serving as the sole lead plaintiff in the Action. Judge Alsup found that the fund, which was represented by the Weiss law firm, was confused by the mass solicitation issued by the firm, and had submitted a signed certification form based only on its mistaken belief that "it was necessary to do so to participate in any recovery." The Court found

that the proposed lead plaintiff had very little understanding of the case or the nature of the lead plaintiff motion, and was not even aware that its selected counsel was already suing an affiliated entity for securities fraud in a separate case.

Nevertheless, even though the Court criticized the substance of the published notices and mass mailings used to attract lead plaintiffs, it refused to prohibit the practice of mass solicitations altogether. In finding that such mailings are not contrary to the PSLRA, Judge Alsup was swayed by the views of the SEC, which opined in a brief filed with the Court that "[t]he effect of mailings could be to encourage additional investors to come forward, negotiate with and retain counsel, and move to be lead plaintiff, thereby enhancing competition for lead plaintiff and lead counsel." The SEC warned, however, that such mailings and published notice campaigns are not only potentially deceptive, but also can undermine the goal of the PSLRA.

*The Court bemoans the fact that the "race to the courthouse," which the PSLRA was designed to eradicate, has been replaced by "a race to both the courthouse and thence to the publisher."*

Indeed, the SEC noted that in a securities fraud case involving Digital Lightwave, Inc. pending in Florida, at least one member of the ten-person lead plaintiff group appointed in the action did not even know that he was a lead plaintiff until after lead counsel submitted a

*Continued on back page.*

---

## DON'T BE DUPED — STEPS TO FOLLOW

*Institutional investors can avoid being duped only if they act wisely and cautiously, which should include taking the following steps:*

✔ *Read unsolicited mailings carefully, and tell your money managers to do the same.* There is no requirement to submit a form to anyone at the outset of a securities class action to participate in any recovery. Any mailing that states or implies that it is necessary to register with a particular law firm should be discussed with a known and trusted attorney. Any mailing or notice that states or implies that you will get a higher percentage of any recovery obtained for the Class simply by virtue of serving as a lead plaintiff is false.

✔ *Do not sign anything unless you want to be a lead plaintiff.* Many of the certification forms used in connection with mass solicitation campaigns do not clearly state that, by submitting the form, you are agreeing to be a lead plaintiff in the litigation. The forms often interpose the term "class representative" for "lead plaintiff", and generally do not

detail the duties and responsibilities of a lead plaintiff in overseeing litigation. The best course is to consult with an attorney you know and trust before responding to these solicitations.

✔ *Choose an attorney carefully.* You are not limited to using an attorney who publishes a notice, directs a mailing to you, or files a complaint to represent you in connection with securities litigation. You are free to select any attorney of your choice to file a lead plaintiff motion on your behalf, to apply to serve as lead counsel for the Class, or even to simply monitor the litigation for you.

✔ *Act quickly.* The PSLRA provides sixty days from the time notice of the filing of a securities class action is published for lead plaintiff motions to be filed. It is important that you use that time, in consultation with an attorney of your choice, to investigate the claim, evaluate your losses, and determine whether it is in your best interest to file a lead plaintiff motion. Delay could result in your making a rushed and uninformed judgment that you could later regret.

---

BLB&G
**INSTITUTIONAL INVESTOR**

*Advocate*

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

BULLETIN

Continued from page 3.

settlement of the case to the Court for approval. In this instance, lead counsel failed to respond to this "lead plaintiff's" repeated requests for information regarding the status of the action for over six months, and never even informed him that he had been appointed a lead plaintiff by the Court. Thus, while the SEC concluded that the practice of mass solicitation itself should not be banned, it stressed to Judge Alsup that it was not "sanctioning the methods utilized by Weiss & Yourman in forming a proposed lead plaintiff group." The Court concurred in the SEC's judgment, however, that abuses in the practice should be dealt with through regulatory or other means short of a blanket prohibition.

Despite the abuses recognized by Judge Alsup, and echoed by the SEC, the prac-

tice of soliciting institutional investors through mass mailings is likely to continue, and probably will accelerate. Further, the prospects for implementing a regulatory framework to cure the abuses inherent in this process are questionable at best, and even under the most ambitious schedule would likely take years to complete.

The lead plaintiff provisions of the PSLRA were passed to protect the rights of institutional investors. By monitoring securities fraud filings carefully and scrutinizing unsolicited mailings from law firms (read checklist on page 3), you can help end abuse, and ensure that these goals are achieved.

*Max W. Berger can be reached at mwb@blbglaw.com. Robert S. Gans can be reached at robert@blbg.law.com*

BLB&G
**INSTITUTIONAL INVESTOR**

*Advocate*

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
Phone: 212-554-1400
E-mail: blbg@blbglaw.com
**www.blbglaw.com**

BLB&G: INSTITUTIONAL INVESTOR ADVOCATE is published by Bernstein Litowitz Berger & Grossmann LLP, which prosecutes class and private actions, nationwide, on behalf of institutional and individual investors. The materials in this newsletter have been prepared for information purposes only and are not intended to be, and should not be taken as, legal advice.

*Editor:* Gerald H. Silk
*Editorial Director:* Ava C. Thorin
*Contributing Attorneys:* Max W. Berger, Robert S. Gans

© 2000. ALL RIGHTS RESERVED. Quotation with attribution permitted.

# EXHIBIT
# 17

U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

DR. STEPHEN BLAU, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK
A. BENNACK, JR., JOHN H. BIGGS,
LAWRENCE A. BOSSIDY, M. ANTHONY
BURNS, ELLEN V. FUTTER, WILLIAM H.
GRAY, III, HELENE L. KAPLAN, LEE R.
RAYMOND, JOHN R. STAFFORD, and J.P.
MORGAN CHASE & CO.,

Defendants.

CIVIL ACTION NO. 04C 6592

JUDGE WILLIAM T. HIBBLER

MAGISTRATE JUDGE MARTIN C.
ASHMAN

JURY TRIAL DEMANDED

**FILED**

J.N

AUG 2 4 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## AFFIDAVIT OF GREGORY MARK NESPOLE, ESQ. IN SUPPORT OF LEAD PLAINTIFF'S RESPONSE TO THE MEMORANDUM AND SUPPLEMENTAL MEMORANDUM OF AMICI CURIAE MAILED TO THIS COURT BY SAMUEL HYLAND AND STEPHANIE SPEAKMAN

STATE OF NEW YORK      )
                                         ) ss.:
COUNTY OF NEW YORK  )

I, Gregory Mark Nespole, Esq., being duly sworn, deposes and says;

1.      I am an attorney at law of the State of New York. I am a partner at the law firm

of Wolf Haldenstein Adler Freeman & Herz LLP, located at 270 Madison Avenue, New York,

10016. I offer this affidavit in support of Lead Plaintiff's Response To The Memorandum And

Supplemental Memorandum of Amici Curiae Mailed To This Court By Samuel Hyland and

Stephanie Speakman I also offer this affidavit in support of the introduction of true and correct copies of the following document listed below:

        a.    The Delaware Attorney General's Indictment of Mr. Gielata, attached as Exhibit A;

        b.    The Delaware Court's Order appointing Mr. Hyland and Mrs. Speakman LP, attached as Exhibit B; and

        c.    The Bloomberg Run reporting the adjusted close price of J.P. Morgan shares on the dates Dr. Blau purchased his shares, attached as Exhibit C.

2.    As a threshold matter, Counsel for the Hyland Plaintiffs[1] insinuates that my firm may be inadequate to serve as lead counsel in the Blau Action because, in part, former Lead Plaintiff American Growth Fund, Inc. elected to withdraw as a court appointed Lead Plaintiff prior to the filing of the amended complaint in the Blau Action. This contention is meritless.

3.    Following the filing of the Blau Action in October 2004, I directed that notice of pendency be published in the *Investors Business Daily*. See Exhibit D.

4.    On or about November 23, 2004, I received in the mail an unsigned plaintiff's certificate from the American Growth Fund, Inc. concerning its shares of J.P. Morgan common stock. See Exhibit E.

5.    Given that the certificate was unsigned, I called Timothy E. Taggart of AGF and left him a voicemail stating that I had received the certificate, but it was defective because it was unsigned by a person with authority to approve AGF's involvement in the litigation. Mr. Taggart's name was listed on the certificate as AGF's contact person.

---

[1] Defined terms in this affidavit shall have the same meaning as they were assigned in the accompanying memorandum.

6. That same day, I wrote Mr. Taggart requesting that he resubmit a signed certificate. A copy of that letter is annexed hereto as Exhibit F.

7. Within days, I received a duly executed certificate, signed by Mr. Taggart. See Exhibit G.

8. Again, I called Mr. Taggart and left him a detailed message explaining the process, and that we were planning to proffer as Lead Plaintiffs AGF and Dr. Blau, and that we were working on an amended complaint that I would send to him in draft form once it was fairly advanced.

9. On February 14, 2005, I sent Mr. Taggart a draft of the amended complaint. See Exhibit H.

10. Sometime on February 16, 2005, Mr. Taggart called me and said he had some misgivings about continuing as a Lead Plaintiff in a class action against J. P. Morgan. At no time did he state that he mistakenly executed a certificate or that AGF had not intended to serve as a lead plaintiff.

11. We spoke additional times on February 16, 2005. Mr. Taggart stated that he was mindful and concerned that as a fiduciary, he might have an obligation to pursue the case on behalf of investors in AGF. I explained to him that he had no obligation to participate and regardless of whether he proffered AGF as a lead plaintiff, AGF was a member of the class and that I would, assuming the case was successful, make sure he received a claim form and would assist him in submitting it. During our last conversation on that day, Mr. Taggart requested that I send him a copy of the certificate he executed on behalf of AGF and that he would bring up the matter with others at AGF.

3

12.     Pursuant to his request, at the end of business on February 16, I sent Mr. Taggart, via e-mail/PDF, fax, and Federal Express, the information he requested along with a cover letter. See Exhibit I.

13.     On February 17, 2005, Mr. Taggart called me and asked that I withdraw AGF as a Lead Plaintiff in the Blau Action. During our February 17, 2005 telephone call, Mr. Taggart said that he would remain open to the possibility that AGF might be willing to serve as a proposed class representative should defendants' motion to dismiss be denied. Later in the week, I received, via express mail, a letter dated February 16, 2005, confirming that AGF wished to withdraw as Lead Plaintiff. See Exhibit J.

14.     We submitted AGF's withdrawal to the Court on February 18, 2005, the same date upon which we filed the Amended Complaint in the *Blau* Action. Accordingly, with respect to my dealings with AGF, I complied with the PSLRA and all other applicable ethical obligations. For Mr. Gielata to state otherwise is simply not supported by the record.

15.     In addition to casting aspersions on my firm, Mr. Gielata baselessly attacks AGF, though he purports to have spoken to it. *See* Hyland Memorandum at 6. Specifically, his allegations border on libel when he states that AGF may be the same or related entity to American Growth Capital Corp. and American Growth Fund, I, LP – two entities forced into receivership by the SEC in 1997. Upon reading Mr. Gielata's allegations with respect to AGF, I personally conducted an investigation to determine their validity, or lack thereof.

16.     I initially conducted a LEXIS search and found a *Wall Street Journal* article dated August 13, 1997, that identified the entities as being based in Las Vegas and were "funds [that] aren't related to other mutual funds or similar names," according to an SEC staff attorney referred to in the article. See Exhibit K.

17.     The article stated that attorney Laurie T. Butler in California represented the two funds in receivership. I obtained Ms. Butler's telephone number and called her. We spoke at length, and she told me that AGF was not one of the funds she represented in the receivership matter and that Mr. Gielata was apparently mistaken. Accordingly, Mr. Gielata's attack on AGF was unfounded and careless.

18.     Mr. Gielata's failure to do his homework is further evidenced by his contention that my firm was sanctioned in the two actions he cites. Curiously, however, he also concluded that my firm was not sanctioned in those actions. Putting aside Mr. Gielata's confusion, as a member of Wolf Haldenstein, I can represent that neither I nor my firm were sanctioned in the *De la Fuentes v. DCI Telecommunications, Inc.* matter. Indeed, Mr. Gielata fails to cite the subsequent opinion that explicitly holds that my firm was not sanctioned. *See De la Fuente v DCI Telecommunications*, 269 F. Supp. 2d. 229 (S.D.N.Y. 2003). Had Mr. Gielata simply Shepardized the case he cited, he might have been more cautious prior to accusing me or my firm of misconduct. Similarly, with respect to *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118 (E.D. Pa. 1993), no member of my firm was sanctioned in connection with the case either.

19.     Mr. Gielata's litany of feckless allegations continues when he accuses my firm of colluding with Defendants and their counsel here. This allegation strains credulity to the breaking point. This is a contentious litigation. Indeed, Defendant Bechtel endeavored to evade service for months. Only after threatening to obtain an order permitting alternative service given that Mr. Bechtel is reportedly accompanied by a security detail and service was both impossible and dangerous, did he ultimately agree to accept service and join in Defendants' motion to dismiss  Further, the decision to dismiss claims against Laurence Fuller followed discussion among the parties' counsel concerning whether Mr. Fuller was on the board of J.P. Morgan at the

5

time of the merger. Accordingly, I thought it a prudent course to agree to dismiss that defendant instead of engaging in a time-consuming, collateral battle over one outside director.

20.     Further, that Mr. Blau has elected not to name Mr. Dimon as a defendant was a conscious litigation strategy, as was the decision to limit the Blau Action to claims under Section 14 of the Exchange Act. Indeed, Mr. Gielata's complaint alleges at Count I the same proxy allegations as the Blau Action, and at Count II the same control person allegations. Mr. Gielata's Count III, however, alleges claims that were dismissed by Vice Chancellor Lamb in *In re J.P. Morgan Chase & Co. Shareholder Litigation*, C.A. No. 531-N, on the grounds they were derivative, not direct claims, and plaintiffs in that action were unable to allege demand futility.

21.     With respect to Mr. Gielata's fraud-based claim under Section 10(b), the Blau Action purposefully elected to pursue claims only under Section 14 because I believed that defendants conduct clearly constituted negligent conduct, while it was a much closer call as to whether the Blau Action could allege the requisite scienter required by Section 10(b). In short, counsel in the Blau Action elected to plead and prove claims that required a showing of negligence, not scienter, as a strategic course, and not because we simply forgot to do it, as Mr. Gielata implies.

22.     Finally, counsel in the Blau Action elected to forego the Securities Act claims alleged by Mr. Gielata because I conclude the only way to plead them properly would require plaintiffs to plead that they sounded in fraud. Again, I elected to pursue claims that sounded in negligence, given the circumstances and facts presented at least while the PSLRA's discovery stay was in effect. This is not to say that I might not amend in the future should discovery reveal

that defendants' conduct was fraudulent. Accordingly, Dr. Blau's action, from its inception, has

pursued Section 14 claims that require a showing of negligence, not fraud-based claims that

require pleading scienter.

FURTHER AFFIANT SAYETH NOT.

GREGORY MARK NESPOLE

Sworn to before me this
24th day of August, 2005

JAMES A. CIRIGLIANO
Notary Public, State of New York
No. 01CI6106186
Qualified in Queens County
Commission Expires March 1, 2008

412608

7

# EXHIBIT A

/35

## RULE 9 WARRANT/BOTH

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | I.D.#0506021946 |
| JOSEPH N. GIELATA | ) | #0507018523 |
| WAYNE CHEN | ) | |

The Grand Jury of New Castle County charges JOSEPH N. GIELATA AND WAYNE

CHEN with the following offenses;

### COUNT I. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

JOSEPH N. GIELATA AND WAYNE CHEN, on or between November 25, 2003 and

December 24, 2003, in the County of New Castle, State of Delaware, did take, exercise control

over, or obtain, pursuant to a common scheme, United States Currency or other miscellaneous

property valued in excess of $1,000.00, belonging to Pay Pal, Inc., or another business or person,

intending to deprive that business or person and/or the owner of the property, or to appropriate it.

### COUNT II. A FELONY

#N_____

#N_____

CONSPIRACY SECOND DEGREE in violation of Title 11, Section 512 of the Delaware

Code of 1974, as amended.

JOSEPH N. GIELATA AND WAYNE CHEN, on or between November 25, 2003 and December 24, 2003, in the County of New Castle, State of Delaware, when intending to promote or facilitate the commission of the felony of Theft, did agree with each other and/or Geoffrey Keston, to aid each other or another person or persons in the planning or commission of the felony or an attempt or solicitation to commit the felony, and one of them or another person, with whom they conspired, did commit an overt act in pursuance of the conspiracy.

A TRUE BILL

FOREPERSON

ATTORNEY GENERAL

DEPUTY ATTORNEY GENERAL

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated, | Case No. **1:05-cv-162 (JJF)** |
| Plaintiffs, | **CLASS ACTION** |
| vs. | |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON, | |
| Defendants. | |

## [PROPOSED] ORDER APPOINTING LEAD PLAINTIFFS AND LEAD COUNSEL

IT IS HEREBY ORDERED AND DECREED, this ___21___ day of ___June___, 2005,

that Samuel I. Hyland and Stephanie Speakman are hereby appointed lead plaintiffs in the above-

captioned litigation.

IT IS FURTHER ORDERED AND DECREED that Joseph N. Gielata, Esq. is hereby

appointed lead counsel in the above-captioned litigation. subject to defendants reservations (D.I. 31)

_____

The Honorable Joseph J. Farnan, Jr.
United States District Judge

**EXHIBIT C**

<HELP> for explanation.                                          N161 **Equity HP**

## Comp/CLOSE/PRICE

JPMORGAN CHASE & CO        (JPM    US)       PRICE 34.35        B    $    DELAYED

Page  1 / 6

HI 13.8333   ON  1/17/94

Range 12/3/94 to 12/30/94      Period D Daily      AVE 12.493   VL  1608408

USD       Market T Trade      LOW 11.375   ON 10/ 6/94

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 12/30 | 11.958 | 1458900 | F | 12/ 9 | 12.333 | 1507200 | F | 11/18 | 11.792 | 4029300 |
| T | 12/29 | 12.167 | 1469100 | T | 12/ 8 | 12.333 | 851100 | T | 11/17 | 11.917 | 2577300 |
| W | 12/28 | 12.208 | 1039200 | W | 12/ 7 | 12.583 | 1116000 | W | 11/16 | 12.125 | 1812900 |
| T | 12/27 | 12.125 | 1559100 | T | 12/ 6 | 12.833 | 1006800 | T | 11/15 | 12.167 | 2579700 |
| M | 12/26 | | | M | 12/ 5 | 12.667 | 1057800 | M | 11/14 | 12.125 | 1570500 |
| F | 12/23 | 12.208 | 1062600 | F | 12/ 2 | 12.458 | 981300 | F | 11/11 | 11.958 | 1024200 |
| T | 12/22 | 12.208 | 1882500 | T | 12/ 1 | 12.208 | 1255200 | T | 11/10 | 12.00 | 1260900 |
| W | 12/21 | 12.25 | 2344800 | W | 11/30 | 12.125 | 2495700 | W | 11/ 9 | 11.958 | 1815300 |
| T | 12/20 | 12.375 | 1778100 | T | 11/29 | 12.25 | 1628100 | T | 11/ 8 | 12.042 | 1229700 |
| M | 12/19 | 12.417 | 1724100 | M | 11/28 | 11.875 | 2343600 | M | 11/ 7 | 12.00 | 1239900 |
| F | 12/16 | 12.375 | 2956500 | F | 11/25 | 12.00 | 1142100 | F | 11/ 4 | 12.125 | 951300 |
| T | 12/15 | 12.458 | 4200600 | T | 11/24 | | | T | 11/ 3 | 12.375 | 710400 |
| W | 12/14 | 12.667 | 3634800 | W | 11/23 | 12.083 | 2557800 | W | 11/ 2 | 12.167 | 1107300 |
| T | 12/13 | 12.625 | 3074700 | T | 11/22 | 11.417 | 4359300 | T | 11/ 1 | 12.333 | 1219800 |
| M | 12/12 | 12.458 | 629400 | M | 11/21 | 11.75 | 2289900 | M | 10/31 | 12.667 | 1239000 |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G447-654-0 24-Aug-05  9:51:39

Bloomberg

<HELP> for explanation.                                    N161 **Equity** **HP**

# Comp/CLOSE/PRICE
                                                                         Page  2 / 6
JPMORGAN CHASE & CO        (JPM      US)       PRICE 34.35        B      %    DELAYED
                                                                   HI 13.8333   ON  1/17/94
    Range 1/ 3/94  to 12/30/94    Period D Daily            AVE 12.493   VL  1608408
                              USD        Market T Trade      LOW 11.375   ON 10/ 6/94

|   | DATE | PRICE | VOLUME |   | DATE | PRICE | VOLUME |   | DATE | PRICE | VOLUME |
|---|------|-------|--------|---|------|-------|--------|---|------|-------|--------|
| F | 10/28 | 12.458 | 2253000 | F | 10/ 7 | 11.708 | 984900 | F | 9/16 | 12.333 | 2338200 |
| T | 10/27 | 12.333 | 658200 | T | 10/ 6 | 11.375 | 966600 | T | 9/15 | 12.333 | 1275300 |
| W | 10/26 | 12.083 | 1427700 | W | 10/ 5 | 11.375 | 2044800 | W | 9/14 | 12.292 | 642900 |
| T | 10/25 | 11.958 | 1169100 | T | 10/ 4 | 11.417 | 1784100 | T | 9/13 | 12.25 | 1089900 |
| M | 10/24 | 11.792 | 1725300 | M | 10/ 3 | 11.542 | 1044000 | M | 9/12 | 12.208 | 933300 |
|   |  |  |  |  |  |  |  |  |  |  |  |
| F | 10/21 | 12.125 | 1223100 | F | 9/30 | 11.667 | 980700 | F | 9/ 9 | 12.417 | 2040300 |
| T | 10/20 | 12.25 | 1206300 | T | 9/29 | 11.833 | 917400 | T | 9/ 8 | 12.708 | 1203600 |
| W | 10/19 | 12.458 | 1128000 | W | 9/28 | 11.875 | 915000 | W | 9/ 7 | 12.667 | 735900 |
| T | 10/18 | 12.542 | 794400 | T | 9/27 | 11.833 | 1280400 | T | 9/ 6 | 12.75 | 812400 |
| M | 10/17 | 12.542 | 1132200 | M | 9/26 | 11.833 | 1764600 | M | 9/ 5 |  |  |
|   |  |  |  |  |  |  |  |  |  |  |  |
| F | 10/14 | 12.458 | 776700 | F | 9/23 | 12.042 | 2526300 | F | 9/ 2 | 12.792 | 942300 |
| T | 10/13 | 12.292 | 1418700 | T | 9/22 | 12.125 | 2453100 | T | 9/ 1 | 12.792 | 848400 |
| W | 10/12 | 12.292 | 748800 | W | 9/21 | 12.167 | 2955300 | W | 8/31 | 12.917 | 1389600 |
| T | 10/11 | 11.958 | 912600 | T | 9/20 | 12.083 | 2011200 | T | 8/30 | 13.083 | 1431300 |
| M | 10/10 | 11.958 | 660300 | M | 9/19 | 12.083 | 1620000 | M | 8/29 | 13.167 | 1840800 |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G447-654-0 24-Aug-05  9:51:42

Bloomberg

<HELP> for explanation.

## Comp/CLOSE/PRICE

JPMORGAN CHASE & CO        (JPM    US)        PRICE 34.35        B    $    DELAYED

Page 3 / 6

Range 1/ 3/94 to 12/30/94    Period D Daily    Market T Trade

HI 13.8333    ON  1/17/94
AVE 12.493    VL  1608408
LOW 11.375    ON 10/ 6/94
USD

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|------|-------|--------|---|------|-------|--------|---|------|-------|--------|
| F | 8/26 | 13.208 | 1161900 | F | 8/ 5 | 12.625 | 912900 | F | 7/15 | 12.875 | 2190300 |
| T | 8/25 | 13.125 | 841200 | T | 8/ 4 | 12.667 | 1338300 | T | 7/14 | 13.042 | 2322900 |
| W | 8/24 | 13.208 | 830700 | W | 8/ 3 | 12.958 | 825900 | W | 7/13 | 12.75 | 982500 |
| T | 8/23 | 13.125 | 1534500 | T | 8/ 2 | 12.958 | 1047900 | T | 7/12 | 12.75 | 789600 |
| M | 8/22 | 13.00 | 1268400 | M | 8/ 1 | 12.917 | 780000 | M | 7/11 | 12.792 | 543300 |
| | | | | | | | | | | | |
| F | 8/19 | 12.917 | 4692300 | F | 7/29 | 12.792 | 1546200 | F | 7/ 8 | 12.75 | 531300 |
| T | 8/18 | 12.875 | 1665600 | T | 7/28 | 12.542 | 1208700 | T | 7/ 7 | 12.833 | 684600 |
| W | 8/17 | 12.958 | 1477500 | W | 7/27 | 12.50 | 1383000 | W | 7/ 6 | 12.708 | 983400 |
| T | 8/16 | 13.042 | 1209300 | T | 7/26 | 12.75 | 3420600 | T | 7/ 5 | 12.792 | 930300 |
| M | 8/15 | 12.792 | 1464600 | M | 7/25 | 12.75 | 1765200 | M | 7/ 4 | | |
| | | | | | | | | | | | |
| F | 8/12 | 12.792 | 1089600 | F | 7/22 | 12.625 | 1034100 | F | 7/ 1 | 12.958 | 706500 |
| T | 8/11 | 12.667 | 1290300 | T | 7/21 | 12.625 | 932700 | T | 6/30 | 12.833 | 938400 |
| W | 8/10 | 12.625 | 986100 | W | 7/20 | 12.542 | 2060700 | W | 6/29 | 12.792 | 1111500 |
| T | 8/ 9 | 12.625 | 928200 | T | 7/19 | 12.792 | 2146500 | T | 6/28 | 13.00 | 1187700 |
| M | 8/ 8 | 12.667 | 923700 | M | 7/18 | 12.917 | 1591800 | M | 6/27 | 13.042 | 1076400 |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G447-654-0 24-Aug-05  9:51:52

Bloomberg

&lt;HELP&gt; for explanation.                                    N161 **Equity** HP

# Comp/CLOSE/PRICE
                                                              Page  4 / 6
JPMORGAN CHASE & CO        (JPM     US)      PRICE 34.35         B      $    DELAYED
                                                        HI 13.8333   ON  1/17/94
Range 1/ 3/94 to 12/30/94     Period D Daily            AVE 12.493   VL  1608408
                        USD   Market T Trade            LOW 11.375   ON 10/ 6/94

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 6/24 | 12.792 | 1105500 | F | 6/ 3 | 13.292 | 1103100 | F | 5/13 | 11.50 | 2060700 |
| T | 6/23 | 12.958 | 811500 | T | 6/ 2 | 13.125 | 682200 | T | 5/12 | 11.458 | 1229700 |
| W | 6/22 | 13.042 | 1177500 | W | 6/ 1 | 13.25 | 1407900 | W | 5/11 | 11.458 | 1104600 |
| T | 6/21 | 12.917 | 1403400 | T | 5/31 | 12.792 | 1151700 | T | 5/10 | 11.708 | 1328400 |
| M | 6/20 | 13.125 | 1233000 | M | 5/30 | | | M | 5/ 9 | 11.417 | 1562100 |
| | | | | | | | | | | | |
| F | 6/17 | 13.292 | 2146800 | F | 5/27 | 12.667 | 425400 | F | 5/ 6 | 11.542 | 1743000 |
| T | 6/16 | 13.417 | 1117200 | T | 5/26 | 12.333 | 716400 | T | 5/ 5 | 11.75 | 1647900 |
| W | 6/15 | 13.458 | 1654500 | W | 5/25 | 12.375 | 1013700 | W | 5/ 4 | 11.875 | 1713300 |
| T | 6/14 | 13.458 | 1184400 | T | 5/24 | 12.292 | 1215000 | T | 5/ 3 | 11.875 | 1760100 |
| M | 6/13 | 13.625 | 1559100 | M | 5/23 | 12.00 | 766800 | M | 5/ 2 | 11.833 | 1609800 |
| | | | | | | | | | | | |
| F | 6/10 | 13.333 | 814500 | F | 5/20 | 12.042 | 922800 | F | 4/29 | 11.583 | 1336500 |
| T | 6/ 9 | 13.167 | 929400 | T | 5/19 | 12.333 | 1260000 | T | 4/28 | 11.667 | 1559100 |
| W | 6/ 8 | 13.208 | 1011000 | W | 5/18 | 12.458 | 2129700 | W | 4/27 | | |
| T | 6/ 7 | 13.208 | 1524300 | T | 5/17 | 11.917 | 1365300 | T | 4/26 | 11.833 | 1199400 |
| M | 6/ 6 | 13.458 | 1587600 | M | 5/16 | 11.583 | 1553400 | M | 4/25 | 11.75 | 1675200 |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
                                                              G447-654-0 24-Aug-05  9:52:02

Bloomberg

<HELP> for explanation.                                        N151 **Equity HP**

# Comp/CLOSE/PRICE
                                                                   Page  5 / 6
JPMORGAN CHASE & CO        (JPM    US)       PRICE 34.35      B    S    DELAYED
                                                            HI 13.8333   ON  1/17/94
Range **1/ 3/94** to **12/30/94**    Period **D** Daily     AVE 12.493   VL  1608408
                            **USD**        Market **T** Trade  LOW 11.375   ON 10/ 6/94

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 4/22 | 12.00 | 1485600 | F | 4/ 1 | | | F | 3/11 | 12.125 | 2567100 |
| T | 4/21 | 12.25 | 1745700 | T | 3/31 | 12.125 | 2722500 | T | 3/10 | 11.958 | 2444100 |
| W | 4/20 | 12.125 | 977700 | W | 3/30 | 11.833 | 3234000 | W | 3/ 9 | 11.958 | 2845800 |
| T | 4/19 | 12.333 | 1444200 | T | 3/29 | 12.208 | 2229900 | T | 3/ 8 | 12.125 | 2825100 |
| M | 4/18 | 12.50 | 1159800 | M | 3/28 | 12.375 | 990900 | M | 3/ 7 | 12.125 | 2059800 |
| | | | | | | | | | | | |
| F | 4/15 | 12.708 | 2790900 | F | 3/25 | 12.417 | 1806600 | F | 3/ 4 | 12.125 | 2517900 |
| T | 4/14 | 12.667 | 1631100 | T | 3/24 | 12.667 | 2148300 | T | 3/ 3 | 12.00 | 2345100 |
| W | 4/13 | 12.583 | 1623300 | W | 3/23 | 12.75 | 1086000 | W | 3/ 2 | 12.333 | 3251400 |
| T | 4/12 | 12.833 | 1125300 | T | 3/22 | 12.792 | 1573200 | T | 3/ 1 | 12.417 | 1791000 |
| M | 4/11 | 12.917 | 2398200 | M | 3/21 | 12.708 | 1087200 | M | 2/28 | 12.417 | 1005000 |
| | | | | | | | | | | | |
| F | 4/ 8 | 12.542 | 2184600 | F | 3/18 | 12.792 | 4375800 | F | 2/25 | 12.625 | 1084200 |
| T | 4/ 7 | 12.667 | 1995000 | T | 3/17 | 12.917 | 2329800 | T | 2/24 | 12.458 | 1966200 |
| W | 4/ 6 | 12.125 | 2928600 | W | 3/16 | 13.00 | 1883400 | W | 2/23 | 12.50 | 1282800 |
| T | 4/ 5 | 12.125 | 2471700 | T | 3/15 | 12.708 | 3094200 | T | 2/22 | 12.375 | 890700 |
| M | 4/ 4 | 11.958 | 6395100 | M | 3/14 | 12.542 | 1522800 | M | 2/21 | | |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G447-654-0 24-Aug-05  9:52:14

Bloomberg

<HELP> for explanation.                                    N161 **Equity** **HP**

# Comp/CLOSE/PRICE

JPMORGAN CHASE & CO        (JPM    US)        PRICE 34.35

Page 6 / 6
B    $    DELAYED
HI 13.8333   ON  1/17/94
AVE 12.493   VL  1608408
LOW 11.375   ON 10/ 6/94

Range 1/ 3/94 to 12/30/94    Period D Daily
USD                          Market T Trade

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 2/18 | 12.167 | 1662900 | F | 1/28 | 13.042 | 1851000 | F | 1/ 7 | 13.542 | 3363000 |
| T | 2/17 | 12.208 | 1725900 | T | 1/27 | 12.833 | 1274100 | T | 1/ 6 | 13.167 | 2865600 |
| W | 2/16 | 12.25 | 1031100 | W | 1/26 | 12.625 | 1593600 | W | 1/ 5 | 13.375 | 3010500 |
| T | 2/15 | 12.208 | 907500 | T | 1/25 | 12.417 | 1833600 | T | 1/ 4 | 13.50 | 1971300 |
| M | 2/14 | 12.167 | 843900 | M | 1/24 | 12.583 | 977100 | M | 1/ 3 | 13.458 | 2140200 |
| F | 2/11 | 12.208 | 826200 | F | 1/21 | 12.542 | 2264700 | | | | |
| T | 2/10 | 12.333 | 1018500 | T | 1/20 | 12.667 | 914400 | | | | |
| W | 2/ 9 | 12.458 | 1659900 | W | 1/19 | 12.875 | 2179200 | | | | |
| T | 2/ 8 | 12.292 | 2142900 | T | 1/18 | 13.50 | 2042400 | | | | |
| M | 2/ 7 | 12.417 | 1992000 | M | 1/17 | H13.833 | 1405200 | | | | |
| F | 2/ 4 | 12.333 | 1668900 | F | 1/14 | 13.833 | 3084600 | | | | |
| T | 2/ 3 | 12.625 | 1450500 | T | 1/13 | 13.833 | 3350400 | | | | |
| W | 2/ 2 | 13.042 | 1016700 | W | 1/12 | 13.708 | 2177400 | | | | |
| T | 2/ 1 | 12.875 | 1131600 | T | 1/11 | 13.667 | 1845000 | | | | |
| M | 1/31 | 13.167 | 1383300 | M | 1/10 | 13.75 | 1775400 | | | | |

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2005 Bloomberg L.P.
G447-654-0 24-Aug-05  9:52:21

Bloomberg

# EXHIBIT D

**Legal Notice**

Dated: October 15, 2004

Notice: On October 13, 2004, a class action was filed in United States District Court for the Northern District of Illinois - Eastern Division by Wolf Haldenstein Adler Freeman & Herz LLP against J.P. Morgan Chase & Co., along with William B. Harrison Jr., J.P. Morgan Chase's Chief Executive Officer and Chairman of the Board, and additional officers and directors of J.P. Morgan Chase) on behalf of all those who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy that was issued in connection with such meeting) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation, which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement). The complaint alleges violations of sections 14(a) and rule 14a - 9, and section 20(a) of the Securities Exchange Act of 1934. The action is pending before the Honorable William J. Hibbler and is styled Blau v. Harrison, et al., 04 C 6592.

Specifically, the complaint alleges, among other things, that the merger was consummated following shareholder approval of a 15% premium in favor of Bank One, but defendants never disclosed that Bank One offered to consummate the merger without demanding a premium for its shares and that Defendant Harrison rejected that offer so that he could prolong his executive tenure. This conduct (the facts of which are omitted from the proxy statement's discussions of related issues - namely, the merger negotiation and approval process, the exchange ratio, and Mr. Harrison's continued employment) ultimately cost J.P. Morgan Chase shareholders over $7 billion in merger compensation.

If you are a member of the Class, you may, no later than December 14, 2004, move the Court to serve as lead plaintiff of the Class. Your ability to share in a recovery is not, however, affected by the decision whether or not to serve as the lead plaintiff. If you have any questions concerning this notice or rights with regard to this case, please contact Gregory Mark Nespole, Esq., at Wolf Haldenstein Adler Freeman & Herz LLP at 270 Madison Avenue, New York New York 10016, 212-545-4600.

# EXHIBIT E

# PLAINTIFF'S CERTIFICATION

American Growth Fund, Inc ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in J.P. Morgan Chase & Co. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 11/14/01 | 25,000 | N/A | 37.99 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of November, 2004.

# EXHIBIT F

# WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE

NEW YORK, NY 10016

212-545-4600

WWW.WHAFH.COM

JOHN L. FREEMAN
EDGAR J. NATHAN, 3RD
CHARLES H. BALLER
DAVID A. RUTTENBERG
PETER L. KLAUSNER*
DANIEL W. KRASNER
FRED T. ISQUITH
STUART M. SAFTY
ERIC B. LEVINE
JEFFREY G. SMITH†
FRANCIS M. GREGOREK†
MARY JANE FAIT*
ROBERT D. STEELE
MARK C. SILVERSTEIN
ELI D. GREENBERG
PETER C. HARRAR
LAWRENCE P. KOLKER
MARK C. RIFKIN◊
JEFFREY H. SCHWARTZ
MICHAEL JAFFE†
MARIA I. BELTRANI*
MICHAEL E. FLEISS
BETSY C. MANIFOLD†
ALEXANDER H. SCHMIDT*
JEFFREY B. REICH*
GREGORY M. NESPOLE
DAVID L. WALES
FRANCIS A. BOTTINI, JR.†
DEMET BASAR*
ADAM J. LEVITT‡
LISA A. LOWENTHAL

N. JOSHUA ABER
CARL R. SLOAN
ROBERT D. WEINTRAUB
ROBERT ABRAMS

OF COUNSEL

ALAN McDOWELL◊
JULIE M. SULLIVAN
LINDA A. REDLISKY
NANCY S. FITKOFSKY*
STEVEN D. BLACKUS*
MICHAEL C. HULE*
RACHELE R. RICKERT*
BRIAN S. COHEN
THOMAS H. BURT
JILL H. BLUMBERG*
MARK A. HAKIM*
SCOTT J. FARRELL*
KATHERINE B. DUBOSE
KATE M. McGUIRE
GUSTAVO BRUCKNER*
STACEY T. KELLY
STEFANIE A. LINDEMAN
RONNIE BRONSTEIN
MICHAEL J. MISEK
TAMARA E. GROSS
CHRISTOPHER S. HINTON
JOSHUA BERENGARTEN
INGRID C. NANEVITZ

ALSO ADMITTED
*FLA., †CAL., ◊N.J., ‡IL.
ONLY ADMITTED
▽CA,‡IL, ◊VA, ♦NJ & PA

SYMPHONY TOWERS
750 B STREET - SUITE 2770
SAN DIEGO, CA 92101
619-239-4599

625 NORTH FLAGLER DRIVE
9th FLOOR
WEST PALM BEACH, FL 33401
561-833-1778

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
656 WEST RANDOLPH STREET, SUITE 500W
CHICAGO, IL 60661
312-456-6200
DIRECT DIAL (212) 545-4657
FACSIMILE (212) 545-4758
NESPOLE@WHAFH.COM

November 23, 2004

## Via Federal Express

Mr. Timothy Taggart
c/o American Growth Fund, Inc.
110 16th Street, Suite 1400
Denver, Colorado 80202

Re:   **J.P. Morgan Chase & Company Securities Litigation**

Dear Mr. Taggart:

Thank you for submitting to us American Growth fund's filled-out plaintiff's certification. However, the certificate does need a signature. Please arrange for signing of the certificate on behalf of the Fund, and return it my attention in the Federal Express envelope that we have provided for you.

Should you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Gregory Mark Nespole

GMN:mns/384190

# EXHIBIT G

# PLAINTIFF'S CERTIFICATION

American Growth Fund, Inc ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transactions in J.P. Morgan Chase & Co. securities during the Class Period specified in the Complaint are as follows:

| Date | # of Shares Purchased | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 11/14/01 | 25,000 | N/A | 37.99 |

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __17__ day of __November__, 2004.

Please complete the following information so that we may include your contact information with your Plaintiff's Certification upon being returned to us. By filling out this form, it will facilitate the process of providing you with updates on the status of the case.

**NAME:** Timothy E Taggart

**ADDRESS:** 110 16th St. Suite 1400
Denver, CO 80202

**HOME PHONE:**

**WORK PHONE:** (303) 626-0600

**E-MAIL ADDRESS:** Tim.Taggart@AmericanGrowthFund.com

**CASE NAME:** J.P. Morgan Chase & Company

**EXHIBIT H**




## WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

JOHN L. FREEMAN
EDGAR J. NATHAN, 3RD
CHARLES H. BALLER
DAVID A. RUTTENBERG
DANIEL W. KRASNER
FRED T. ISQUITH
STUART M. SAFT*
ERIC B. LEVINE
JEFFREY G. SMITH†
FRANCIS M. GREGOREK†
MARY JANE FAIT*
ROBERT D. STEELE
MARK C. SILVERSTEIN
ELI D. GREENBERG
PETER C. HARRAR
LAWRENCE P. KOLKER
MARK C. RIFKIN°
JEFFREY M. SCHWARTZ
MICHAEL JAFFE†
MARIA I. BELTRANI*
MICHAEL E. FLEISS
BETSY C. MANIFOLD†
ALEXANDER H. SCHMIDT°
JEFFREY S. REICH*
GREGORY M. NESPOLE
DAVID L. WALES
FRANCIS A. BOTTINI, JR.°
DEMET BASAR*
ADAM J. LEVITT‡
LISA A. LOWENTHAL

FOUNDED 1888

270 MADISON AVENUE

NEW YORK, NY 10016

212-545-4600

www.whafh.com

SYMPHONY TOWERS
750 B STREET - SUITE 2770
SAN DIEGO, CA 92101
619-239-4599

625 NORTH FLAGLER DRIVE
9TH FLOOR
WEST PALM BEACH, FL 33401
561-833-1776

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
656 WEST RANDOLPH STREET, SUITE 500W
CHICAGO, IL 60661
312-466-9200

DIRECT DIAL (212) 545-4657
FACSIMILE (212) 545-4758
NESPOLE@WHAFH.COM

February 14, 2005

M. JOSHUA ABER
CARL R. SLOAN
ROBERT B. WEINTRAUB
ROBERT ABRAMS
OF COUNSEL

ALAN McDOWELL°
LINDA A. REDLISKY
NANCY S. PITKOFSKY°
STEVEN D. SLADKUS°
JULIE A. FOX‡
MICHAEL C. MULÉ°
RACHELE R. RICKERT°
THOMAS H. BURT
JILL H. BLUMBERG°
SCOTT J. FARRELL°
KATE M. McGUIRE
LAUREN P. KRAUS°
GUSTAVO BRUCKNER°
STACEY T. KELLY°
RONNIE BRONSTEIN
PAULETTE S. FOX°
MICHAEL J. MISKE
TAMARA E. GROSS
CHRISTOPHER S. HINTON
JOSHUA BERENGARTEN
INGRID C. MANEVITZ°
MATTHEW M. GUINEY
MARTHA J. BROSIUS
AYA BOUCHEDID
JESSICA HOFF*

ALSO ADMITTED
*FLA., †CAL., °N.J., ♦IL.
ONLY ADMITTED
▽CA,‡IL,□VA,◊NJ & PA. ●CT

### VIA FEDERAL EXPRESS

Mr. Timothy Taggart
c/o American Growth Fund, Inc.
110 16th Street, Suite 1400
Denver, Colorado 80202

**Re:    J.P. Morgan Chase & Company Securities Litigation**

Dear Mr. Taggart:

Enclosed, please find a draft complaint we intend to file on Friday, February 18, 2005, alleging claims against J.P. Morgan Chase and certain former officers and directors. We believe the claim is very strong. Please review the draft complaint and call me if you have any questions.

Very truly yours,

Gregory Mark Nespole

GMN:dm/392790
Encl.

271
300

**FedEx** US Airbill
Express

Sender's Copy

FedEx
Track. No.
Number  **8499 2174 1976**

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PACKAGE.

**1 From** Please print and press hard.
Date  2/14/05    Sender's FedEx Account Number  0100-2513-3

Sender's Name  Gregory M. Nepole    Phone ( 212 ) 545-4600

Company  WOLF HALDENSTEIN ADLER FREEMAN

Address  270 MADISON AVE

City  NEW YORK    State  NY    ZIP  10016-0601

**2 Your Internal Billing Reference**  3282.001

**3 To**
Recipient's Name  Mr. Timothy Taggart    Phone (    )

Company  c/o American Growth Fund, Inc.

Recipient's Address  110 16th Street,

Address  Suite 1400

City  Denver    State  CO    ZIP  80202

**Try online shipping at**

Questions? Visit our Web site at fedex.com
or call 1.800.Go.FedEx 1.800.463.3339

**NO POUCH NEEDED.**
See back for peel and stick application instructions.

**4a Express Package Service**   *Packages up to 150 lbs.*
☒ FedEx Priority Overnight    ☐ FedEx Standard Overnight    ☐ FedEx First Overnight
☐ FedEx 2Day    ☐ FedEx Express Saver

**4b Express Freight Service**    *Packages over 150 lbs.*
☐ FedEx 1Day Freight    ☐ FedEx 2Day Freight    ☐ FedEx 3Day Freight

**5 Packaging**
☒ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling**
☐ SATURDAY Delivery
☐ HOLD Weekday    ☐ HOLD Saturday

Does this shipment contain dangerous goods?
☒ No    ☐ Yes    ☐ Yes    ☐ Dry Ice    ☐ Cargo Aircraft Only

**7 Payment**  Bill to:
☒ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Total Packages    Total Weight    Total Declared Value
$                                    .00

**8 Sign to Authorize Delivery Without a Signature**

0294B09105

466

FedEx Use Only

**EXHIBIT I**

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE

NEW YORK, NY 10016

212-545-4600

WWW.WHAFH.COM

JOHN L. FREEMAN
EDGAR J. NATHAN, 3RD
CHARLES H. BALLER
DAVID A. RUTTENBERG
DANIEL W. KRASNER
FRED T. ISQUITH
STUART M. SAFT*
ERIC B. LEVINE
JEFFREY G. SMITH*
FRANCIS M. GREGOREK†
MARY JANE FAIT*
ROBERT D. STEELE
MARK C. SILVERSTEIN
ELI D. GREENBERG
PETER C. HARRAR
LAWRENCE P. KOLKER
MARK C. RIFKIN°
JEFFREY M. SCHWARTZ
MICHAEL JAFFE†
MARIA I. BELTRANI*
MICHAEL E. FLEISS
BETSY C. MANIFOLD†
ALEXANDER H. SCHMIDT*
JEFFREY S. REICH*
GREGORY M. NESPOLE
DAVID L. WALES†
FRANCIS A. BOTTINI, JR.*
DENET BASAR*
ADAM J. LEVITT‡
LISA A. LOWENTHAL

SYMPHONY TOWERS
750 B STREET - SUITE 2770
SAN DIEGO, CA 92101
619-239-4599

825 NORTH FLAGLER DRIVE
9TH FLOOR
WEST PALM BEACH, FL 33401
561-833-1776

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
656 WEST RANDOLPH STREET, SUITE 500W
CHICAGO, IL 60661
312-466-9200

DIRECT DIAL (212) 545-4657
FACSIMILE (212) 545-4758
NESPOLE@WHAFH.COM

M. JOSHUA ABER
CARL R. SLOAN
ROBERT B. WEINTRAUB
ROBERT ABRAMS
OF COUNSEL

ALAN McDOWELL°
LINDA A. REDLISKY
NANCY S. PITKOFSKY*
STEVEN D. SLADKUS*
JULIE A. FOX‡
MICHAEL C. MULÉ°
RACHELE R. RICKERT*
THOMAS H. BURT
JILL H. BLUMBERG*
SCOTT J. FARRELL°
KATE M. McGUIRE
LAUREN P. KRAUS*
GUSTAVO BRUCKNER*
STACEY T. KELLY*
RONNIE BRONSTEIN
PAULETTE S. FOX*
MICHAEL J. MISKE
TAMARA E. GROSS
CHRISTOPHER S. HINTON
JOSHUA BERENGARTEN
INGRID C. MANEVITZ*
MATTHEW M. GUINEY
MARTHA J. BROSIUS
AYA BOUCHEDID
JESSICA HOFF*

ALSO ADMITTED
*FLA., †CAL., °N.J., ◆IL.
ONLY ADMITTED
°CA, ‡IL, □VA, ◇NJ & PA, °CT

February 16, 2005

## VIA TELECOPIER (303) 626-0614
## and FEDERAL EXPRESS

Mr. Timothy Taggart
c/o American Growth Fund, Inc.
110 16th Street, Suite 1400
Denver, Colorado 80202

**Re:   J.P. Morgan Chase & Company Securities Litigation**

Dear Mr. Taggart:

It was a pleasure speaking to you this afternoon concerning the case. So that your records are complete, I have enclosed copies of the pertinent correspondence, including the certificate signed by American Growth Fund, Inc., by you on or about November 19, 2004. I have also enclosed a copy of the letter I sent to you asking that you re-submit the form to me; as we discussed, the version that you originally sent to me was not signed and I wrote to you requesting that you in fact sign it so that we could proceed.

I believe this is a very strong case, that defendants' malfeasance is substantial, and members of the proposed class may indeed have suffered damages in excess of $7 billion dollars in the form of the payment of unnecessary, excess merger compensation to Bank One's shareholders.

Also, as we discussed, the amended complaint is due to be filed on Friday, February 18, 2005 in Chicago; if you wish to remain a lead plaintiff, please let me know by the end of tomorrow, February 17 so that we may include you. I sincerely hope you elect to stay on-board.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

February 16, 2005
Page 2

    · If you wish to be withdrawn as a lead plaintiff we will, of course, accommodate you and you will not be listed on the amended complaint. I will file the necessary papers withdrawing the Fund by the end of this week as well.

    Regardless of the choice you make concerning whether to proceed as a lead plaintiff, I am mindful that your fund may at some point in time be entitled to a substantial recovery. Thus, should we be successful in this litigation, I will make certain that you receive a claim form and I will help you complete and file it with the claims administrator.

    I look forward to speaking to you sometime tomorrow.

Very truly yours,

Gregory Mark Nespole

GMN:dm/393216
Encl.

EXHIBIT J



American Growth Fund, Inc.
110 Sixteenth Street, Suite 1400
Denver, CO 80202
(800) 525-2406
(303) 626-0600
(303) 626-0614 Fax

February 16th, 2005

Gregory Nespole
Wolf Handenstein Adler freeman & Herz LLP
270 Madison Ave
New York, NY 10016

Dear Mr. Nespole,

This is to confirm my earlier message. American Growth Fund, Inc. does not wish to participate in a class action lawsuit against Chase Morgan.

If you have any questions please feel free to call me.

Timothy E. Taggart

**EXHIBIT K**

Source: News & Business > News > By Individual Publication > W > Wall Street Journal
Terms: "american growth capital corp" and date(geq (08/10/1997) and leq (08/31/1997)) (Edit Search)

*The Wall Street Journal August 13, 1997 Wednesday*

Copyright 1997 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



factiva.

(Copyright (c) 1997, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL

The Wall Street Journal

**August** 13, 1997 Wednesday

**SECTION:** Pg. C22

**LENGTH:** 304 words

**HEADLINE:** Two Mutual Funds Named in SEC Suit That Alleges Fraud

**BODY:**

LOS ANGELES -- The Securities and Exchange Commission sued several individuals and two small mutual funds alleging fraud and other misdeeds in connection with about $7.9 million they raised from over 300 investors around the country.

Named as defendants in the action, filed in Los Angeles federal district court, were American Growth Fund I LP and Capital Growth Fund I LP, both managed by investment advisers in Las Vegas.

The funds aren't related to other mutual funds of similar names, said Kelly Bowers, an SEC attorney on the case. Among several individual defendants was Charles E. Duquette, also of Las Vegas, whom the SEC complaint called the "undisclosed control person" behind the two funds.

In its complaint, the SEC claimed that American Growth Fund and its investment adviser, **American Growth Capital Corp.**, raised about $7.4 million on the promise that the money would be invested in "emerging growth companies" that hadn't yet gone public. The SEC claimed that, among other things, some of the defendants were involved in the "misappropriation of at least $1.6 million" of those funds. In the case of Capital Growth Fund and its investment adviser, Growth Capital Resources Corp., the SEC complaint alleged that the misdeeds included undisclosed payments and expenses and a "kickback" that the investment adviser received in connection with one of the fund's investments.

Calls to American Growth Capital's office weren't returned. Mr. Duquette couldn't be located for comment. His attorney didn't return phone calls.

Laurie J. Butler, an attorney for Capital Growth Fund and Growth Capital Resources, said her clients "vigorously dispute" the SEC's contentions. But they agreed to settle the case with the SEC and agree to an injunction and appointment of a receiver in order to avoid the expense of litigation.

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 6, 2004

Source: News & Business > News > By Individual Publication > W > **Wall Street Journal** 
Terms: **"american growth capital corp" and date{geq (08/10/1997) and leq (08/31/1997))** (Edit Search)
View: Full
Date/Time: Thursday, May 26, 2005 - 4:47 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.