# EXHIBIT
# 18

**Legal Notice**

Dated: October 15, 2004

Notice: On October 13, 2004, a class action was filed in United States District Court for the Northern District of Illinois - Eastern Division by Wolf Haldenstein Adler Freeman & Herz LLP against J.P. Morgan Chase & Co., along with William B. Harrison Jr., (J.P. Morgan Chase's Chief Executive Officer and Chairman of the Board, and additional officers and directors of J.P. Morgan Chase) on behalf of all those who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy that was issued in connection with such meeting) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation, which was approved by shareholders pursuant to the above-dated materially false and misleading proxy statement. The complaint alleges violations of sections 14(a) and rule 14a - 9, and section 20(a) of the Securities Exchange Act of 1934. The action is pending before the Honorable William J. Hibbler and is styled Blau v. Harrison, et al., 04 C 6592.

Specifically, the complaint alleges, among other things, that the merger was consummated following shareholder approval of a 15% premium in favor of Bank One, but defendants never disclosed that Bank One offered to consummate the merger without demanding a premium for its shares and that Defendant Harrison rejected that offer so that he could prolong his executive tenure. This conduct (the facts of which are omitted from the proxy statement's discussions of related issues - namely, the merger negotiation and approval process, the exchange ratio, and Mr. Harrison's continued employment) ultimately cost J.P. Morgan Chase shareholders over $7 billion in merger compensation.

If you are a member of the Class, you may, no later than December 14, 2004, move the Court to serve as lead plaintiff of the Class. Your ability to share in a recovery is not, however, affected by the decision whether or not to serve as the lead plaintiff. If you have any questions concerning this notice or rights with regard to this case, please contact Gregory Mark Nespole, Esq., at Wolf Haldenstein Adler Freeman & Herz LLP, at 270 Madison Avenue, New York New York 10016, 212-545-4600.

# EXHIBIT
# 19

EFiled: Sep 2 2004 3:12PM EDT
Filing ID 4148186

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

---

IN RE J.P. MORGAN CHASE & CO.
SHAREHOLDER LITIGATION

CONSOLIDATED
C.A. No. 531-N

---

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, for their Consolidated Complaint against Defendants, allege, upon personal knowledge with respect to themselves, and, as to all other matters, upon the investigation of counsel, which has included, among other things: (i) interviews of persons with knowledge and information concerning the matters alleged herein; (ii) review and analysis of public filings concerning the matters alleged herein; (iii) review and analysis of news articles, press releases, and analysts' reports concerning the matters alleged herein; and (iv) consultations with experts. Plaintiffs believe that further evidentiary support for the allegations set forth below will exist after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of public shareholders of J.P. Morgan Chase & Co. ("JPMC" or the "Company") against JPMC, its Chief Executive Officer and Chairman (William B. Harrison, Jr.), and other persons who were directors of JPMC during the relevant time to seek relief relating to the recent merger (the "Merger") of JPMC and Bank One Corporation ("Bank One"). According to persons close to the deal, Harrison rejected the opportunity to merge with Bank One *without paying any acquisition premium at all*, provided only that Bank One's highly successful CEO, James Dimon, immediately become CEO. Instead, for the sole purpose of allowing Harrison to keep the title of CEO for another two years, Defendants caused JPMC shareholders to pay a significant acquisition premium -- amounting to more than $7 billion in

stock, a substantial dilution of JPMC shareholders' stake. ***JPMC shareholders approved the Merger without having been advised of these essential facts by Defendants.*** Confirming the critical importance of the information, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger and expressed concerns about Harrison's remaining in that position as well as about the Merger's dilutive impact. The Defendants violated their duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.

2.     Harrison and the other JPMC directors breached the fiduciary duties of loyalty and care they owed to JPMC's shareholders by agreeing to pay a premium for Bank One just so Harrison could stay on as CEO for another two years, even though JPMC's performance, stock price, and reputation have languished under his leadership and certainly JPMC shareholders would have preferred Bank One's successful and respected CEO lead the combined company.

## THE PARTIES

3.     At all relevant times, Plaintiffs Ronda Robins, George Ziegler, and Bruce T. Taylor, as custodian for Julia Ann Taylor, have owned JPMC common stock.

4.     Defendant JPMC is a Delaware corporation with its principal executive offices at 270 Park Avenue, New York, NY 10017. JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

5.     Defendant William B. Harrison, Jr. has served as Chief Executive Officer and Chairman of the Board of Directors of JPMC since 1999.

6.     Defendant Hans W. Becherer was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998.

7.     Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting. Defendant Bechtel was not an independent director because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country. The Trade Bank of Iraq is managed by JPMC. The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group, Inc., and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.

8.     Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC. He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004. He has been Chairman of the Executive Committee and Vice Chairman of the Board of The Hearst Corporation since June 2002. He also is the immediate past President and Chief Executive Officer of The Hearst Corporation, positions he held beginning in 1979. Bennack was not an independent director because Hearst-Argyle has a credit facility with a consortium of banks led, in part, by JPMC.

9.     Defendant John H. Biggs was, during the relevant time, a director of JPMC. He has been a director of JPMC since March 2003.

10.    Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998. Bossidy is not an independent director because his son is employed by JPMC as a Vice President.

11.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting. Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

12.    Defendant Ellen V. Futter was, during the relevant time, a director of JPMC. She has been a director of JPMC or a predecessor institution since 1997. Futter is not an independent director because her brother-in-law is employed by JPMC as a managing director. In addition, JPMC is a significant benefactor of The American Museum of Natural History, of which Futter is President and Trustee. Among other things, the Young Naturalist awards are funded by a grant from the J.P. Morgan Chase Foundation.

13.    Defendant William H. Gray, III was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1992. Gray is not an independent director because JPMC is a National Sponsor of The College Fund/UNCF, of which Gray was President and CEO at all relevant times.

14.    Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC. She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004. Kaplan was not an independent director because she is a Trustee and Vice-Chair of The American Museum of Natural History, of which, as previously alleged, JPMC

is a significant benefactor. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

15.     Defendant Lee R. Raymond was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1987.

16.     Defendant John R. Stafford was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1982. He has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003. He was Chairman of the Board from 1986 until 2003. Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001. Stafford is not an independent director because JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.

17.     Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Individual Defendants."

18.     By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Individual Defendants owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to make appropriate disclosure to JPMC shareholders of all material facts concerning the Merger; (d) to disseminate a complete and accurate Proxy Statement; and (e) to refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

19.    Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Court of Chancery, on behalf of the Class consisting of all persons who owned JPMC common stock on the date the Merger was announced (January 14, 2004) and continued to own such stock through the date the Merger closed (July 1, 2004). Excluded from the Class are Defendants herein; any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

20.    This action is properly maintainable as a class action.

21.    The Class is so numerous that joinder of all members is impracticable. There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class.

22.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

23.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and shareholder litigation. Plaintiffs have no interests that are in conflict with the interests of the Class.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants breached fiduciary and other common law duties owed by them to Plaintiffs and other members of the Class; and (b) whether the Class is entitled to relief as a result of Defendants' wrongful conduct.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.    Defendants have acted in a manner which affects Plaintiffs and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

27.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## BACKGROUND

28.    In June 1999, Defendant Harrison became Chief Executive of Chase Manhattan, the predecessor of JPMC, and embarked on a takeover spree, spending more than $41 billion on acquisitions, culminating in the ill-timed merger with J. P. Morgan in 2000, just before the stock market collapsed.  In a February 23, 2004 interview with Harrison on CNBC, the interviewer noted: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

29.    According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large

strategic acquisitions…" However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

30.    The January 18, 2004 <u>Sunday Tribune</u> described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that *few would have given odds on him even surviving the year,* let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, *it seemed to be largely Harrison's fault.* At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

31.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22. By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent. Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent. JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

32.    JPMC's involvement in financial scandal also has marked Harrison's tenure.

33.    On September 18, 2002, <u>The Wall Street Journal</u> published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal. Harrison

- 8 -

concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

34.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the Securities and Exchange Commission (the "SEC"), which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

35.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal.

36.    A July 22, 2004 Wall Street Journal article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the merger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

37.    Whereas JPMC shareholders have suffered under Harrison's reign, James Dimon, Chairman and Chief Executive Officer of Bank One, has created tremendous value for Bank One shareholders. From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22. During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

## DEFENDANTS' WRONGDOING

38.    The fallout from various scandals, as well as his poor business decisions, forced Harrison to conjure yet another massive deal to protect his position.

39.    During November 2003, Harrison and Dimon had several discussions concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.

40.     According to the Joint Proxy Statement sent to JPMC and Bank One shareholders in connection with the Merger, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations.

41.     At a meeting of the JPMC Board (consisting of the Individual Defendants) on November 18, 2003, Harrison briefed the full Board on his discussions with Dimon. The JPMC Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

42.     In November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained J.P. Morgan Securities Inc., a JPMC subsidiary, as its financial advisor for a fee of $40 million. Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

43.     The January 19, 2004 <u>Financial Times</u> described the negotiation process:

"There was a ***spectrum of outcomes*** *in terms of premium and governance: Jamie laid them out* and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

44.     Although Harrison wanted to merge JPMC with Bank One, he did not want to relinquish his position as CEO. Ultimately, he compromised and settled for continuing as CEO of the combined entity for two years after the Merger. Little did JPMC shareholders know that buying this extra time for Harrison would cost them ***billions*** of dollars.

45.     According to a June 27, 2004 <u>New York Times</u> article:

During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have***

*cost J.P. Morgan shareholders extra money* in doing so. Mr. Dimon, always the tough deal maker, *offered to do the deal for <u>no premium</u> if he could become chief executive immediately, according to two people close to the deal.*

   *When Mr. Harrison resisted, Mr. Dimon insisted on a premium,* which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

46.    As one observer related on eFinancialNews.com on February 8, 2004, after

hearing the announcement of the Merger:

   One of the first calls I received was: "That's a hell of a price that Bill Harrison is paying to recruit Jamie Dimon."

   ...

   *Has Harrison sold JP Morgan Chase down the river to Bank One and Dimon just to save his own skin?* [Emphasis added.]

47.    After the close of trading on January 14, 2004, JPMC and Bank One issued a joint

press release announcing their agreement to merge:

   NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase & Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today announced that they have agreed to merge in a strategic business combination establishing the second largest banking franchise in the United States, based on core deposits. The combined company will have assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen states and top-tier positions in retail banking and lending, credit cards, investment banking, asset management, private banking, treasury and securities services, middle-market, and private equity. With balanced earnings contributions from retail and wholesale banking, the combined company will be well-positioned to achieve strong and stable financial performance and increase shareholder value through its balanced business mix, greater scale, and enhanced efficiencies and competitiveness.

   The agreement, which has been unanimously approved by the boards of directors of both companies, provides for a stock-for-stock merger in which 1.32 shares of JPMorgan Chase common stock will be exchanged, on a tax-free basis, for each share of Bank One common stock. Based on JPMorgan Chase's closing price of $39.22 on Wednesday, January 14, 2004, the transaction would have a value of approximately $51.77 for each share of Bank One common stock, and would create an enterprise with a combined market capitalization of approximately $130 billion. The premium, based upon the average closing stock prices of JPMorgan Chase and Bank One for the previous month, would be approximately 8 percent and would be approximately 14 percent based on today's closing prices.

- 11 -

Under the agreement, the combined company will be headed by William B. Harrison, 60, as Chairman and Chief Executive Officer, and by James Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to serve as Chairman. The company's sixteen-member Board of Directors will have fourteen outside directors, seven each from JPMorgan Chase and Bank One, plus Messrs. Harrison and Dimon. ...

48.    Within minutes of the announcement of the Merger, JPMC shares fell 4 percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that day of $39.22. The drop reflected the unnecessarily dilutive impact of the Merger. In early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

49.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the deal:

Do not doubt for a minute that the real winner in the proposed merger between JP Morgan Chase and Bank One is Jamie Dimon. Without his presence there would have been no deal. Dimon returns to New York in triumph after being dumped by Sandy Weill, his former boss at Citigroup. *For JP Morgan, Dimon's arrival is a blessing because William Harrison, chairman and chief executive, has never looked to be more than a part-time caretaker.* The line managers below him were described to me by a former Morgan banker as "a rum bunch who spend too much time squabbling with each other".

...

*Harrison, who is not due to retire for two years, will be the nominal leader and, on paper at least, Dimon's boss. However, senior sources within JP Morgan Chase and Bank One confirm that Dimon will be calling most of the shots.* "It is now the Dimon show and he knows that he has the full support of Harrison and the JP Morgan Chase board. You won't even have to wait until the summer to see some big personnel changes, which will all have Dimon's stamp on them," said a partner in one of Wall Street's most prestigious law firms, who has been a friend of Dimon since his early days as a protege of Weill. [Emphasis added.]

50.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

51.     Public criticism of the premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive.  They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

52.     James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know.  It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

53.     Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

54.     Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

55.     The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  ***All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself***

*CEO for another two years and the multi-billion-dollar premium unknowingly paid by JPMC*

*shareholders to secure that benefit for Harrison.*

56.    In connection with the Merger, JPMC amended its by-laws to include the

following provisions:

Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the

"Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

57.    According to an Institutional Shareholder Services report analyzing the Merger:

"The board and management considerations detailed…under the bylaw amendments indicate a

merger of equals deal."

58.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a *merger of equals*, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently *highly beneficial to ONE shareholders* considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

59.    The enormous acquisition premium paid for Bank One was a betrayal of the

interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share

of Bank One) represented an acquisition premium of billions of dollars to Bank One

shareholders, at the expense of JPMC's shareholders, based only on Harrison's desire to retain

his CEO title for another two years even though under his leadership JPMC's stock price has

fallen significantly and JPMC's reputation has suffered.

*60.    By rejecting Dimon's offer to merge JPMC and Bank One without any*

*acquisition premium, Harrison and the other Individual Defendants cost JPMC shareholders*

*over $7 billion of value and substantially diluted their stake in the new, combined company*

*merely so Harrison could remain CEO.*

61.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC

stock had the poorest performance of 17 bank stocks he examined. In third place was Bank One,

which has returned 13 percent since Dimon became CEO in March 2000. Thus, the value of

Harrison's leadership to JPMC is dubious at best, especially when compared to the performance

of Bank One under Dimon.  Nevertheless, Harrison has been compensated handsomely -- in

2001, for instance, Harrison was the top paid executive of any public company even though

during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs

mounted.  Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of

$1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a

restricted stock award valued at $5 million -- a total of $16 million.

62.    Harrison himself acknowledged the underperformance of JPMC under his

leadership in the June 27, 2004 New York Times article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero
> who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison
> acknowledged that he had a limited time to turn things around. "If we had gone
> another year without performing, the board probably would have demanded
> changes," he said, leaning back in a plush chair in his office. "There is a point at
> which you can't go on. But in the end, I presume that they liked my leadership."

63.    Numerous comments by analysts and the press confirm that a significant rationale

for the Merger was Dimon's perceived leadership role in the combined entity.

64.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset

Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief

executive. I guess he is going to be running the show from day one."

65.    London's Sunday Telegraph reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: *"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."* [Emphasis added.]

66.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

67.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

68.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

69.    The <u>Australian</u> reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[....]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

70.    <u>Retail Banker International</u> reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." <u>Retail Banker International</u> quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to <u>Retail Banker International</u>: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

71.    <u>Retail Banker International</u> further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth

transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

72.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community. One analyst asked Harrison:

> With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

73.    Harrison's answer was evasive:

> It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me.

74.    Another analyst also probed the issue:

> Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

75.    Dimon delivered a non-answer:

> You've got to think a little bit that these are two large organizations coming together. You want the teams to meld. I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

76.    Harrison passed on such opportunities to disclose that, in fact, he had been presented with that precise alternative -- a merger of equals with no premium at all for Bank One. Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to pay a multi-billion-dollar premium for Bank One and receive a smaller share of the combined company.

77.    Now that the Merger has been consummated, Harrison appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz. Thus, even though Harrison gave away billions of dollars of

value from JPMC shareholders to retain his CEO title for another two years, in many respects Dimon already functions as the de facto CEO of the combined entity.

78.    Harrison kept the CEO title to shape a graceful exit for himself. In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal...."

79.    By entrenching himself with the CEO title for another two years at a cost to JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of loyalty owed to the public shareholders of JPMC. The other Individual Defendants also breached their duty of loyalty by approving the Merger with a significant acquisition premium solely to secure a benefit for Harrison to the detriment of JPMC shareholders.

80.    The Individual Defendants' fiduciary obligations under these circumstances required them to evaluate the Merger and obtain the best value for JPMC's public shareholders. Instead, the Individual Defendants agreed to the Merger at a price that gave more than $7 billion of value belonging to JPMC shareholders to Bank One shareholders just so Harrison could keep his title and did not disclose to JPMC's shareholders the opportunity to merge with Bank One without paying any acquisition premium at all. Acting individually and in concert and aiding and abetting and conspiring with one another, the Individual Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

81.    The Joint Proxy Statement sent by Defendants to JPMC shareholders on or about April 21, 2004 in connection with the Merger made no mention at all of the Individual Defendants' rejection of the opportunity to merge Bank One into JMPC without any acquisition premium. Although Defendants were fully aware of the negotiations, not once does the Proxy Statement advise shareholders that a merger of equals was contemplated but rejected because

Harrison wanted to keep his CEO title. Defendants knew that the Joint Proxy Statement failed to disclose such critical information and clearly intended to induce JPMC shareholders to approve the Merger. Defendants took pains to describe the negotiation process in great detail but carefully omitted any reference to the crucial facts regarding the acquisition premium:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.
>
> During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.
>
> Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.
>
> The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered

into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions

with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

...

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

82.    The Joint Proxy Statement advised shareholders that the JPMC Board (i.e., the Individual Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

83.    On May 25, 2004, in justifiable reliance on the materially deceptive Joint Proxy

Statement and having been kept in the dark about the full truth concerning the terms of the deal,

JPMC shareholders approved the Merger.  According to a Dow Jones Newswire report:

> While the merger was approved, *some shareholders did express concern that the*
> *$58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that *Bank One will get the*
> *sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in
> the last quarter. Bank One will obtain J.P. Morgan's investment-banking
> expertise, its international capability and half of the company's board of directors,
> he said. And given the fact that Bank One's Chief Executive James Dimon will
> take on the role of J.P. Morgan's top officer two years from the conclusion of the
> merger, the shareholder said, *"It appears as if we're merging into them."*
>
> *The statement was met with loud applause from the shareholders who attended*
> *the meeting.* [Emphasis added.]

84.    According to Investor's Business Daily:

> The support for an *immediate Dimon regime* became palpable when J.P. Morgan
> shareholders met last month to approve the deal. The agreement passed with 99
> percent approval, but one shareholder complained that Bank One was getting the
> better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of
> the meeting.
>
> "Historically, I don't know if the market's been that happy with J.P. Morgan or
> the old Chase's management," said James Mitchell, an analyst with Buckingham
> Research. "Dimon is seen as a savior for the franchise while Harrison has been
> hands off."

85.    On July 1, 2004, after Plaintiffs had commenced this action, JPMC completed its

Merger with Bank One.

86.    JPMC defrauded JPMC shareholders who would not have voted in favor of the

Merger had they known that Dimon was willing to merge Bank One into JPMC for no

acquisition premium if Harrison would relinquish his CEO title immediately.  In light of their

concerns about the hefty amount being paid to merge with Bank One, that information was

plainly critical to JPMC shareholders.  Defendants concealed the information to prevent JPMC

shareholders from discovering it and remained silent in the face of a duty to speak. Defendants intended to induce JPMC shareholders to vote in favor of the Merger. JPMC shareholders approved the Merger in justifiable reliance on Defendants' representations to them, including the Joint Proxy Statement.

87.    Plaintiffs and other members of the Class have been damaged in that, because of Defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction. As a result of the Merger, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, hold approximately 58 percent of the combined entity. If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, would now hold approximately 61 percent of the combined entity.

88.    Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Joint Proxy Statement, to solicit their approval of the Merger. JPMC paid for the distribution of the Joint Proxy Statement and for all other efforts to solicit proxies in favor of the Merger.

89.    At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board. JPMC is vicariously liable for Harrison's actions.

90.    Plaintiffs and all other members of the Class have no adequate remedy at law.

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs demand judgment against Defendants as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the representatives of the Class;

B.      Rescinding and setting the Merger aside or awarding rescissory damages to the Class;

C.      Awarding the Class compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

D.      Awarding Plaintiffs their costs and disbursements, including the fees of Plaintiffs' counsel and experts, and reimbursement of expenses; and

E.      Granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper.


DATED:      September 2, 2004

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By: /s/ Seth D. Rigrodsky
Seth D. Rigrodsky (#3147)
Joseph N. Gielata (#4338)
919 N. Market Street, Suite 411
Wilmington, DE 19801
Tel:   (302) 984-0597
Fax:   (302) 984-0870
- and -
Steven G. Schulman
Richard H. Weiss
One Pennsylvania Plaza
New York, NY 10119
Tel:   (212) 594-5300
Fax:   (212) 868-1229

- 25 -

**BULL & LIFSHITZ, LLP**
Joshua M. Lifshitz
Peter D. Bull
Christine A. Giovannelli
18 East 41st Street
New York, NY 10017
Tel:  (212) 213-6222
Fax: (212) 213-9405

*Plaintiffs' Co-Lead Counsel*


**LAW OFFICES OF**
  **CHARLES J. PIVEN, PA**
Charles J. Piven
The World Trade Center - Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
(410) 986-0036

**MURRAY FRANK & SAILER LLP**
Eric Belfi
Jacqueline Sailer
275 Madison Avenue, 8th Floor
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

*Plaintiffs' Counsel*

# EXHIBIT

# 20



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
GRAND PARK SURGICAL CENTER, INC.,
Plaintiff,
v.
INLAND STEEL COMPANY, Defendant.
**No. 95 C 5979.**

April 25, 1996.

*MEMORANDUM OPINION AND ORDER*

ASPEN, Chief Judge:

**\*1** Plaintiff Grand Park Surgical Center brings this action, premised on diversity jurisdiction, against Inland Steel Company. According to the complaint, Grand Park provided medical services to patients covered by Inland's health care plans, but many patients have failed to pay outstanding bills for the services. The plaintiff alleges that Inland, by accusing Grand Park of overcharging for the services and by urging the patients to refrain from paying the bills, has intentionally interfered with contractual relationships and defamed Grand Park. Previously, we granted in part and denied in part the defendant's motion to dismiss, and then ordered the parties to brief whether this case should be transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1404(a). As we explain below, transfer is appropriate in the instant action.

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Although a plaintiff's choice in selecting a forum is generally entitled to substantial weight, "'the plaintiff's preference has minimal value" when "the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum." *Dunn v. Soo Line R.R.,* 864 F. Supp. 64, 65 (N.D. Ill. 1994) (quoting *Robinson v. Town of Madison,* 752 F. Supp. 842, 847 (N.D. Ill. 1990)). In addition, while

"the convenience of witnesses is one of the most important factors to be considered," *id.,* the convenience of counsel is accorded little if any weight, *see Genden v. Merrill, Lynch, Pierce, Fenner & Smith,* 621 F. Supp. 780, 782 (N.D. Ill. 1985); *Commonwealth Edison Co. v. Train,* 71 F.R.D. 391, 394 (N.D. Ill. 1976). Finally, the "interest of justice" factor "relate[s] to the efficient administration of the court system." *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 221 (7th Cir. 1986). For example, "[i]n a diversity action it is also considered advantageous to have federal judges try a case who are familiar with the applicable law." *Id.*

In this case, we have already determined that Indiana law applies, *see* Memorandum Op. at 3 n.2, based on several factors also relevant to our § 1404(a) decision. The events giving rise to this action occurred in Indiana, and thus we need not accord much weight to the plaintiff's choice of forum. Grand Park is located and incorporated in Indiana, and the Inland facility associated with the patients at issue is located in northwest Indiana. Most of the patients work and live in Indiana. And most, although not all, of the witnesses in this action reside in Indiana. *See* Pl.'s Br. at 4-6. Convenience favors that the Northern District of Indiana hear this case. Moreover, because Indiana state law applies, a federal district court judge in that state would be more familiar with the governing law. In light of these factors, the case is transferred to the Northern District of Indiana. It is so ordered.

1996 WL 204322 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

•        1:95CV05979        (Docket)
(Oct. 18, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# 21



**H**

**Motions, Pleadings and Filings**

United States District Court,
N.D. Illinois, Eastern Division.
Daniel TAUBENFELD, individually and on behalf of
all others similarly situated,
Plaintiff,
v.
CAREER EDUCATION CORPORATION, John M.
Larson and Patrick K. Pesch, Defendants.
**No. 03 C 8884.**

March 19, 2004.

Marvin Alan Miller, Anthony F. Fata, Miller Faucher and Cafferty, LLP, Chicago, IL, Steven G. Schulman, Andrei V. Rado, Peter Seidman, Milberg, Weiss, Bershad, Hynes & Lerach LLP, Joshua Lifshitz, Bull & Lifshitz, LLP, New York, NY, for Plaintiff.

Mary Ellen Hennessy, David H. Kistenbroker, Joni S. Jacobsen, Karl Richard Barnickol, Katten Muchin Zavis Rosenman, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.

**\*1** Currently pending in this district are six related securities fraud putative class actions (the "related cases") brought against Career Education Corporation ("CEC"), John M. Larson ("Larson") and Patrick K. Pesch ("Pesch"). [FN1] Each action alleges that the defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated under § 78j(b), and § 20(a) of the Act, 15 U.S.C. § 78t(a). The court has been presented with three competing motions for appointment of lead plaintiff in these cases, brought by, respectively, (1) Thomas Schroder; (2) Phil M. Campbell and Laurence Ratnofsky; and (3) Jeffrey Koontz and Nicholas Margaritis. Each potential lead plaintiff seeks an order granting similar relief, including (a) consolidation of the related cases; (b) appointment as lead plaintiff; and (3) approval of lead counsel for the class. For the reasons stated below, Schroder's motion is granted in part and ruling is reserved in part while the other potential lead

plaintiffs' motions are denied.

FN1. The related cases are *Taubenfeld v. Career Ed. Corp., et al.,* 03 C 8884; *Stellato v. Career Ed. Corp., et al.,* 03 C 8939; *Katz v. Career Ed. Corp., et al.,* 03 C 9157; *Morris, et al. v. Career Ed. Corp., et al.,* 04 C 305; *Woo v. Career Ed. Corp., et al.,* 04 C 0339; and *Schild v. Career Ed. Corp., et al.,* 04 C 0906.

BACKGROUND

CEC is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois. During the time period relevant to this action, Larson served as CEC's Chief Executive Officer, President and Chairman, and Pesch as its Chief Financial Officer, Treasurer and Secretary. CEC is a provider of private, for-profit postsecondary education with 51 campuses in countries including the United States, Canada, France, the United Kingdom and the United Arab Emirates. In each of the six cases before this court, CEC, Larson and Pesch are alleged to have made materially false and misleading statements during the proposed class period. The defendants are alleged to have falsified student records in order to increase graduation rates and enrollment, concealed problems that could have threatened the accreditation of many of its schools, graduated students who had not completed required courses and billed students for taking courses they never attended.

DISCUSSION
A. Consolidation

All of the potential lead plaintiffs argue that the six related cases should be consolidated because there are similar issues of fact and law involved in each case. Consolidation is appropriate "[w]hen actions involving a common question of law or fact are pending before the court...." Fed.R.Civ.P. 42(a). The court agrees that consolidation is appropriate for the six related cases insofar as each involves class action claims on behalf of purchasers of CEC stock and each asserts similar if not overlapping claims for relief. Moreover, given the similarity of the claims, the court believes that consolidation of these cases will result in substantial savings of judicial time and effort. Accordingly, the related cases are hereby consolidated for all purposes pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

Not Reported in F.Supp.2d                                                      Page 2
2004 WL 554810 (N.D.Ill.), Fed. Sec. L. Rep. P 92,715
**(Cite as: 2004 WL 554810 (N.D.Ill.))**

B. Appointment of Lead Plaintiff

The Private Securities Litigation Reform Act
("PSLRA"), 15 U.S.C. § § 78u-4 *et seq.,* establishes
the procedure for appointment of a lead plaintiff in
"each private action arising under [the Act] that is
brought as a plaintiff class action pursuant to the
Federal Rules of Civil Procedure." 15 U.S.C. § 78u-
4(a)(1). The PSLRA presents a rebuttable
presumption that

    **\*2** the most adequate plaintiff in any private action
    arising under this chapter is the person or group of
    persons that-
    (aa) has either filed the complaint or made a
    motion in response to a notice [published to
    potential class members] ...;
    (bb) in the determination of the court, has the
    largest financial interest in the relief sought by the
    class; and
    (cc) otherwise satisfies the requirements of Rule 23
    of the Federal Rules of Civil Procedure.
    15 U.S.C. § 78u-4(a)(3)(B)(iii).

Each of the potential lead plaintiffs abided by
requirement (aa) set out above. Under the PSLRA,
after notice of the law suit is provided to the potential
class members (which occurred in this case on
December 10, 2003), within 60 days of this notice
any person or group of persons who wishes to
proceed as lead plaintiff must present their motion to
the court. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). That 60
day period expired on February 9, 2004. The motions
currently pending before the court were all made by
this February 9 date.

As for the potential lead plaintiff with the largest
financial interest, the parties focus on who had the
most net losses during the proposed class period.
Under that benchmark, there is no dispute that
Schroder had the most losses, measured at $96,512.
This is significantly larger than the $10,344.93
Campbell and Ratnofsky claimed to have lost and the
$52,300 claimed to have been lost by Koontz and
Margaritis. Thus, so long as Schroder otherwise
satisfies the requirements of Rule 23 of the Federal
Rules of Civil Procedure, he would be the most
adequate plaintiff envisioned under the PSLRA.

Rule 23(a) states that
    One or more members of a class may sue or be
    sued as representative parties on behalf of all only
    if (1) the class is so numerous that joinder of all
    members is impracticable, (2) there are questions
    of law or fact common to the class, (3) the claims

or defenses of the representative parties are typical
of the claims or defenses of the class, and (4) the
representative parties will fairly and adequately
protect the interests of the class.

In selecting the lead plaintiff under the PSLRA, the
court focuses on the typicality and adequacy
requirements as the only relevant considerations. *See,
e.g., Johnson v. Tellabs, Inc.,* 214 F.R.D. 225, 228
(N.D.Ill.2002); *Lax v. First Merchants Acceptance
Corp.,* 1997 WL 461036, at \*6 (N.D.Ill. Aug.11,
1997) (" '[a] wide-ranging analysis under Rule 23 is
not appropriate and should be left for consideration
of a motion for class certification. This inquiry,
therefore, focuses on ... typicality and adequacy." ')
(brackets in original, citation omitted). The typicality
requirement is met so long as "plaintiff's claim ...
arises from the same event or practice or course of
conduct that gives rise to the claims of other class
members and his or her claims are based on the same
legal theory." *Rosario v. Livaditis,* 963 F.2d 1013,
1018 (7th Cir.1992) (quoting *Fuente v.. Stokley-Van
Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)). Under
the adequacy requirement the plaintiff must
demonstrate that "(1) his claims are not antagonistic
or in conflict with those of the class; (2) he has
sufficient interest in the outcome of the case to ensure
vigorous advocacy; and (3) he is represented by
competent, experienced counsel who [is] able to
prosecute the litigation vigorously." *Johnson,* 214
F.R.D. at 228-29.

**\*3** Koontz and Margaritis attack Schroder's ability to
serve as lead counsel on both typicality and adequacy
grounds. Concerning typicality, Koontz and
Margaritis claim that Schroder was a day trader,
thereby making him atypical from the remaining
members of the class and subject to certain unique
defenses. As for adequacy of representation, Koontz
and Margaritis argue that Schroder's choice of
counsel (the law firm of Goodkind Labaton Rudoff &
Sucharow LLP ("Goodkind Labaton")) is inadequate
because rather than conducting an independent
investigation prior to filing its complaint, Goodkind
Labaton copied the complaint prepared by counsel
for Koontz and Margaritis (the law firm of Milberg
Weiss Bershad Hynes & Lerach LLP ("Milberg
Weiss")). As provided for in the PSLRA, in
challenging the presumptive lead plaintiff's typicality
and adequacy, Koontz and Margaritis must come
forward with proof that Schroder will not adequately
protect the interests of the class or that he is subject
to unique defenses making him incapable of
adequately representing the class. 15 U.S.C. § 78u-
4(a)(3)(B)(iii)(II).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
2004 WL 554810 (N.D.Ill.), Fed. Sec. L. Rep. P 92,715
**(Cite as: 2004 WL 554810 (N.D.Ill.))**

Starting with the challenge to Schroder's typicality, at first glance it would certainly appear that Schroder meets all of the typicality requirements. He purchased shares of CEC stock during the proposed class period at prices alleged to have been inflated by false and misleading statements, which thereby caused him damage. Koontz and Margaritis nevertheless suggest that Schroder's status as an alleged "day trader" makes him atypical and subject to unique defenses. According to Koontz and Margaritis, Schroder "sold CEC common stock in the same day or, in one instance, sold it the day after purchasing it" and that he "clearly is not an investor in any true sense of the word, rather he is a trader looking to capitalize on small price fluctuations in CEC common stock that arguably have little to do with integrity of the Company's Class Period representations." Because of his pattern of trading, Koontz and Margaritis contend that Schroder is subject to unique defenses and cannot avail himself of the "fraud on the market" theory to prove reliance on CEC's false and misleading statements.

As Schroder points out, Koontz and Margaritis do not elaborate on what, in their view, makes someone a "day trader."  [FN2] In any event, that description does not appear apt for Schroder. Schroder attaches to his certification his trading record in CEC's stock within the class period, which includes a purchase and sale of 5,000 shares on November 17, 2003 (resulting in a net loss of $20,000), a purchase and sale of 4,600 shares on December 1, 2003 (resulting in a net loss of $10,212), a purchase of 5,000 shares on December 2, 2003 for $273,750 and a sale of those 5,000 shares on December 3, 2003 for $207,450. Schroder's record certainly does not appear to be one of an individual who makes frequent trades each day or one that is attempting to make a career out of buying and selling stocks very quickly. Indeed, evidence in the record shows that Schroder serves as a manager for an environmental engineering construction company. [FN3]

> FN2. The web site *www.investorwords.com.* brought to the court's attention by Schroder, defines a "day trader" as a
> Very active stock trader who holds positions for a very short time and makes several trades each day. Day traders are individuals who are trying to make a career out of buying and selling stocks very quickly, often making dozens of trades in a single day and generally closing all positions at the end of each day. Day trading can be costly, since

the commissions and the bid/ask spread add up when there are so many transactions.

> FN3. Koontz and Margaritis would apparently like to portray themselves as long term investors in CEC stock. The record, however, discloses that Koontz bought shares of CEC stock on November 18, 2003, which he then sold on December 4, 2003. He purchased more shares on December 8, 2003, which he sold on December 15, 2003. As for Margaritis, he purchased shares on November 26, 2003, most of which were then sold on November 28 and December 3, 2003.

**\*4** The case Koontz and Margaritis cite in support of their belief that status as a day trader makes Schroder atypical is *Bank One Shareholders Class Actions,* 96 F.Supp.2d 780 (N.D.Ill.2000). In that case the court noted that Thales Fund Management L.L.C. (referred to in the opinion as "Thales") was

> an institutional investment manager (a hedge fund) that engaged in extensive daytrading, first shorting Bank One stock (presumably because it was regarded as overvalued at market price) and then buying to cover the short position. In addition to that trading pattern, of course Thales is not simply a buyer for its own account, standing instead in the place of whatever number of investors are participants in its managed fund. Taken all in all, this Court does not view that posture as qualifying Thales for the "most adequate plaintiffs" designation in preference to the handful of institutional investors who ... [have] greater aggregate claimed losses.

*Id.* at 784.

As Schroder points out, there are numerous portions of the *Bank One* case that are distinguishable, including that Thales had engaged in "extensive daytrading" and that its losses actually represented those of "an unknown number of investors." Moreover, Thales' status as the largest investor was certainly questionable given that the court made clear that Thales did not have a larger loss than the "handful of institutional investors who make up the Pension Group." The facts here are not similar enough to those in *Bank One* to warrant that case's application.

Koontz and Margaritis also theorize that day traders may not be able to rely on the "fraud on the market" theory of reliance. They cite no case for this proposition and, in any event, many courts have

Not Reported in F.Supp.2d                                                    Page 4
2004 WL 554810 (N.D.Ill.), Fed. Sec. L. Rep. P 92,715
**(Cite as: 2004 WL 554810 (N.D.Ill.))**

rejected this theory. *See, e.g., In re Royal Ahold N.V. Sec. and ERISA Litig., 219 F.R.D. 343, 354 (D.Md.2003)* ("It has been suggested that Generic is atypical because it is a day-trader, and day-traders allegedly do not rely on the financial statements or the fundamental value of a company as the rest of the market does. But where false information and misleading omissions pollute the market, all types of investors are injured."); *In re Sunbeam Sec. Litig.,* No. 98-8258-Civ, *2001 WL 899658, at \*1-2 (S.D.Fla. July 3, 2001)* ("I have not found, nor have defendants presented, persuasive precedent or case law establishing that day traders ... absent specific refutation of the rebuttable presumption of reliance, are not entitled to the presumption of reliance where they bought in an efficient secondary market like the NYSE."). Accordingly, seeing no proof that Schroder is subject to unique defenses making him incapable of adequately representing the class, the challenge to his typicality is rejected.

As for adequacy of representation, Koontz and Margaritis argue that Schroder has selected counsel that has not independently investigated this case but instead simply copied the work product of counsel for Koontz and Margaritis. On the court's own review of the two complaints at issue, they are, in fact, identical. One was filed by Milberg Weiss on behalf of Daniel Taubenfeld. Thereafter, Goodkind Labaton filed the identical complaint on behalf of Stuart Katz. [FN4] Some courts have taken issue with such behavior and questioned whether it is indicative of counsel taking part in the necessary investigation required by Federal Rule of Civil Procedure 11. *See, e.g., Mayo v. Apropros Tech., Inc.,* No. 01 C 8406, 2002 WL 193393, at \*5 (N.D.Ill. Feb.7, 2002); *In re Razorfish, Inc. Sec. Litig.,* 143 F.Supp.2d 304, 311 (S.D.N.Y.2001). Nevertheless, without commenting on the appropriateness of copying another plaintiff's complaint verbatim, for two reasons the court does not believe this reflects on Schroder's adequacy to serve as lead plaintiff.

> FN4. Neither Taubenfeld nor Katz has moved for appointment to serve as lead plaintiff.

**\*5** Initially, this issue seems more a reflection on Schroder's choice of counsel rather than his adequacy to serve as lead plaintiff. Indeed, the court in *Mayo* addressed this issue in relation to the lead plaintiff's selection of lead counsel. Under the PSLRA the most adequate plaintiff may select and retain counsel subject, of course, to the court's approval. 15 U.S.C. 78u-4(a)(3)(B)(v); *see also, In re Party City Sec.*

*Litig.,* 189 F.R.D. 91, 114 (D.N.J.1999) ("The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court."). More fundamentally, however, this issue of copying another's complaint would have persuasive effect if there was evidence showing that the proposed lead counsel did not, in fact, undertake a sufficient investigation before filing a complaint. That is not the case here. In an affidavit filed in further support of Schroder's motion, an attorney at Goodkind Labaton swore that the firm conducted an internal investigation into the alleged wrongdoing at CEC six days before the initial Taubenfeld complaint was filed and that this examination included review of analyst reports and various public records such as newspaper articles and Securities and Exchange Commission filings. (Keller Aff. in further support at ¶ ¶ 3-4.) On December 4, 2003, Goodkind Labaton prepared an internal report examining a variety of public sources which contained many of the basic factual and legal allegations now found in the Taubenfeld and Katz complaints. (*Id.* at ¶ 6.) Moreover, Goodkind Labaton claims that many of its additional allegations, which were derived based on confidential sources, were not provided in the complaint it filed because it would have given the defendants more time to prepare defenses to such information. [FN5] (*Id.* at ¶ 11.) Accordingly, the court sees no merit to the suggestion that Goodkind Labaton conducted no pre-complaint investigation and otherwise rejects the suggestion that Schroder should not serve as lead plaintiff because his adequacy of representation can be questioned. [FN6]

> FN5. In response to the suggestion of copying, Goodkind Labaton states that it is "common practice" in class action securities fraud cases for plaintiffs to copy, in whole or in substantial part, earlier filed complaints, particularly where, as here, those complaints are based predominantly on publicly available information. Once again, the court need not and does not comment on such practices.

> FN6. Koontz and Margaritis also argue that there is evidence of some sort of "eleventh-hour agreement between lawyers," specifically between Goodkind Labaton and counsel for Campbell and Ratnofsky, the law firm of Cauley Geller. Koontz and Margaritis suggest that Cauley Geller ceded to Goodkind Labaton in this case in exchange for Goodkind Labaton ceding to Cauley Geller in a class action filed in

Massachusetts. Insofar as Schroder has the largest financial interest in this case and otherwise meets the requirements of Rule 23(a), which this alleged "agreement" does not change, the court sees no merit to this argument.

Based on the above, because Schroder has the largest financial interest in the relief sought by the class and because he satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the court appoints him as lead plaintiff in this action.

C. Appointment of Lead Counsel

The PSLRA provides that the "most adequate plaintiff shall, subject to approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Nevertheless, "[t]he decision to approve counsel selected by the lead plaintiff is a matter with[in] the discretion of the district court." *Mayo,* 2002 WL 193393, at *5 (first bracket in original) (quoting *In re Party City Sec. Litig.,* 189 F.R.D. at 114). Schroder has chosen Goodkind Labaton to serve as lead counsel. Goodkind Labaton lists a number of securities fraud class actions in which it has participated as lead counsel. However, the firm's biography, which is claimed to be attached as exhibit 3, is not included. Moreover, Schroder's motion contains no information about important matters such as the anticipated staffing of this case and the proposed fee structure. This is significant information the court would like to review prior to making a determination on lead counsel. *See, e.g., In re Motorola Sec. Litig.,* No. 03 C 0287, 2003 WL 21673928, at *7 (N.D.Ill. July 16, 2003) (approving lead counsel with evidence of proposed fees that "do not appear unreasonable"); *Johnson,* 214 F.R.D. at 229 (approving lead counsel "[b]ecause the anticipated staffing and proposed fees ... do not appear unreasonable ...,"); *Mayo,* 2002 WL 193393, at *5-6 (requesting potential lead plaintiffs to "submit information as to the agreed fees, how each firm anticipates staffing this matter, and the hourly rates for attorneys and staff."). Accordingly, Goodkind Labaton is instructed to submit to the court information concerning its proposed fee structure and its anticipated staffing of this action, in addition to its firm biography. It is also instructed to bring forth its suggestion for liaison counsel, which was not contained in its motion. The court will reserve ruling on the issue of lead counsel until it has received and reviewed such information.

CONCLUSION

**\*6** For the reasons stated above, Schroder's motion for appointment of lead plaintiff and approval of proposed lead plaintiff's selection of lead counsel is granted in part and ruling reserved in part [# 10]. The motions of Koontz and Margaritis [# 12] and Campbell and Ratnofsky [# 15] are denied. The court orders the following cases consolidated for all purposes: *Taubenfeld v. Career Ed. Corp., et al.,* 03 C 8884; *Stellato v. Career Ed. Corp., et al.,* 03 C 8939; *Katz v. Career Ed. Corp., et al.,* 03 C 9157; *Morris, et al. v. Career Ed. Corp., et al.,* 04 C 305; *Woo v. Career Ed. Corp., et al.,* 04 C 0339; and *Schild v. Career Ed. Corp., et al.,* 04 C 0906. The court further appoints Thomas Schroder as lead plaintiff in this consolidated action. Schroder shall have until April 7, 2004 to file the supplemental information discussed above. Ruling is reserved on the motion for approval of Schroder's selection of lead counsel until that information has been received and reviewed.

2004 WL 554810 (N.D.Ill.), Fed. Sec. L. Rep. P 92,715

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 1073668 (Trial Pleading) Second Amended Consolidated Complaint for Violation of the Federal Securities Laws (Apr. 01, 2005)

• 2004 WL 2175237 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Dismiss (Jul. 30, 2004)

• 2004 WL 2175236 (Trial Pleading) Amended Consolidated Complaint for Violation of the Federal Securities Laws (Jun. 17, 2004)

• 2004 WL 2175234 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law of Thomas Schroder in Further Support of His Motion for Lead Plaintiff and in Opposition to the Two Competing Motions for Appointment as Lead Plaintiff by Nicholas Margaritis, Jr. and Jeffrey Koontz, and by Phil M. Campbell an d Laurence Ratnofsky (Mar. 09, 2004)

• 2004 WL 2175235 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Jeffrey Koontz and Nicholas Margaritis, Jr. in Further Support of Their Motion for Consolidation and Appointment of Lead Plaintiff and Lead and Liaison Counsel (Mar. 09, 2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 554810 (N.D.Ill.), Fed. Sec. L. Rep. P 92,715
**(Cite as: 2004 WL 554810 (N.D.Ill.))**

Page 6

• 2004 WL 2175226 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Thomas Schroder in Opposition to Competing Motions for Appointment as Lead Plaintiff (Feb. 24, 2004)

• 2004 WL 2175229 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions and in Further Support of the Motion of Phil M. Campbell and Laurence Ratnofsky for Appointment as Lead Plaintiff and for Approval of Selection of Lead and Liaison Counsel (Feb. 24, 2004)

• 2004 WL 2175232 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of the Motion of Jeffrey Koontz and Nicholas Margaritis, Jr. for Consolidation and Appointment of Lead Plaintiff and Lead and Liaison Counsel and in Opposition to the Other Motions (Feb. 24, 2004)

• 2004 WL 2175222 (Trial Motion, Memorandum and Affidavit) Motion of Thomas Schroder for Appointment as Lead Plaintiff and Approval of Proposed Lead Plaintiff's Selection of Lead Counsel (Feb. 09, 2004)

• 2004 WL 2175223 (Trial Motion, Memorandum and Affidavit) The Motion of Jeffrey Koontz and Nicholas Margaritis, Jr. for Consolidation and Appointment of Lead Plaintiff and Lead and Liaison Counsel (Feb. 09, 2004)

• 2004 WL 2175224 (Trial Motion, Memorandum and Affidavit) Motion for Consolidation, Appointment as Lead Plaintiffs and for Approval of Selection of Lead and Liaison Counsel (Feb. 09, 2004)

• 2003 WL 23800572 (Trial Pleading) Class Action Complaint for Violations of Federal Securities Laws (Dec. 09, 2003)

• 1:03CV08884 (Docket) (Dec. 09, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# 22



Not Reported in F.Supp.2d
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

Page 1



**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
In re TERAYON COMMUNICATIONS SYSTEMS,
INC. Securities Litigation
**No. C 00-01967 MHP.**

Feb. 23, 2004.

**Background:** Consolidated securities class actions were brought on behalf of individuals who purchased publicly traded common stock of a communications corporation.

 **Holdings:** On a defense motion to disqualify lead plaintiffs, the District Court, Patel, Chief District Judge, held that:
 (1) court had an obligation to consider the material presented by the defense as to the fitness of lead plaintiffs to continue as leads, and
 (2) lead plaintiffs would be disqualified as leads.
 Ordered accordingly.

West Headnotes

**[1] Federal Civil Procedure** 🔑 187
170Ak187 Most Cited Cases
Court had an obligation to consider the material presented by the defense as to the fitness of lead plaintiffs to continue as leads in consolidated securities class actions; but for the machinations of plaintiffs' counsel, the defense likely would have been able to present evidence regarding their fitness as leads at an earlier stage in the litigation, and the court had a duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members.

**[2] Federal Civil Procedure** 🔑 187
170Ak187 Most Cited Cases
Investors' short sale purchases of stock disqualified them as lead plaintiffs in consolidated securities class actions; a pattern of affirmatively engaging in campaigns devised to lower the price of the stock in

question contained within it the seeds of discord between those investors and the remaining plaintiffs. 15 U.S.C.A. § 78u-4(a)(3)(B)(iii); Fed.R.Civ.P. 23(a)(4).
 Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA, Martin D. Chitwood, Chitwood & Harley, Atlanta, GA, Sandy A. Liebhard, Bernstein, Liebhard & Lifshitz, New York, NY, Jeffrey W. Lawrence, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Francisco, CA, Brian A. Eddington, Law Offices of Brian A. Eddington, Baton Rouge, LA, William S. Lerach, Amber L. Eck, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego, CA, for Plaintiffs.

 Paul H. Goldstein, Morrison & Foerster, Palo Alto, CA, Jordan Eth,  Christopher A. Patz, Morrison & Foerster LLP, San Francisco, CA, for Defendants.

*MEMORANDUM AND ORDER*

PATEL, Chief J.

 **\*1** This Document Relates To: ALL ACTIONS

 These consolidated securities class actions were brought on behalf of individuals who purchased the publicly traded common stock of Terayon Communications Systems, Inc. between November 15, 1999 and April 11, 2000. The parties came before the court on Defendants' Motion to disqualify Lead Plaintiffs Cardinal Partners and Marshall Payne. Having reviewed the motion and after hearing on the matter, the court has concerns not only about the appropriateness of Cardinal Partners and Marshall Payne as lead plaintiffs but also about the role of lead counsel. For the reasons set forth below, the court issues the following memorandum and order.

*BACKGROUND* [FN1]

> FN1. The court assumes familiarity with background facts of the case as set out in detail in the court's prior orders.

I. *Cardinal's Investment in Terayon*

 Cardinal Investment Company ("Cardinal") is an investment company located in Dallas Texas. Cardinal was founded and is operated by Edward ("Rusty") Rose, III. Marshall Payne is an employee

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

of Cardinal, as are James Traweek, Jr. and Kent McGaughy. Declaration of Christopher A. Patz ("Patz Decl.") Ex. 11.

 In August of 1999 a publication called "Short Alert" identified Terayon as a good candidate for short selling. *Id.,* Ex. 1 (Alpert Dep. At 20:14-21:9). A "short sale" is a security trading practice "in which a party speculates that a particular stock will go down in price and seeks to profit from that drop." *Lapidus v. Hecht,* 232 F.3d 679, 680 (9th Cir.2000)(quotations and citations omitted). The party places an order to sell a security it does not own. The party borrows the security from a broker and covers the short by subsequently purchasing the security and returning the recently purchased security to the broker. If in the interim period the security's price declined, the purchaser makes a profit. If the price of the security increased in the interim, the purchaser takes a loss.

 After becoming aware of Terayon stock through the "Short Alert," Cardinal began shorting Terayon's stock in its clients' accounts. Patz Decl. Ex. 3 (Cardinal Dep. At 108:13-110:8). The parties on whose behalf Cardinal shorted the stock were: Cardinal Partners, Marshall Payne and at least five other individuals and entities. During the third quarter of 1999, Rusty Rose also personally accumulated a large short position in Terayon. By March 2000, Rose had a short position in approximately 125,000 shares of Terayon and Cardinal had another 400,000 shares on behalf of its clients. *Id.* Exs. 11 & 12 (Rose Dep. at 121:3-8)(Cardinal Dep. at 108:22-109:2). Marshall Payne's largest short position was roughly 14,000 shares.

 In the Spring of 2000 Cardinal also bet that the price of Terayon stock would fall by buying "put options." "A put option is the right to sell a security at a specified price; thus, the value of a put option increases as the price of the underlying security falls." *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 321 n. 2 (2d Cir.1998).

 Instead of declining as Cardinal had bet, Terayon's stock price rose dramatically. When Cardinal first purchased Terayon stock in August 1999 its highest price had been $41 5/8. In March 2000 Terayon's stock hit an all time high price of $277 5/8. By March 2000, Cardinal and Rose were short more than 500,000 shares--equivalent to an $80 million loss for Cardinal and a loss of $25 million for Rose personally.

 *2 Defendants assert that to counteract its losses Cardinal devised a "game plan" to drive down the price of Terayon stock and that this "game plan" was implemented during the class period. Cardinal had a thesis that CableLabs would not accept Terayon's S-CDMA technology as a standard in the industry. *See e.g.* Patz Dec. Ex. 1. (Alpert Dep. at 120:12-21). Based on this thesis Cardinal claimed that statements Terayon made to the contrary were fraudulent. Cardinal undertook a campaign to inform the market and regulatory agencies about this alleged fraud and about perceived weaknesses in Terayon's business strategy. Cardinal's goal was to have the market lower the value of Terayon stock which would "help [Cardinal's] investment pay off." Patz Dec. Ex. 1 (Alpert Dep. at 125:7-24).

 On October 19, 1999, Cardinal sent a copy of its thesis to reporter Brenda Moore at *The Wall Street Journal. Id.* Ex. 1 (Alpert Dep. at 127:1-8); Ex. 3 (Cardinal Dep. at 135:18-136:10; Ex. 15. Moore did write an article about Terayon which appeared in *The Wall Street Journal* on December 29, 1999, however the price of Terayon stock remained stable in the two week period after the article appeared. In October 1999 Cardinal also began communicating about Terayon to the Milberg Weiss firm, now designated as lead counsel for plaintiffs in this case. Patz Dec. Ex. 12 (Traweek Dep. at 201:1-202:14). Traweek testified that from 1999 to April 2000 he personally contacted the Milberg Weiss firm "on the order of ten times." *Id.*

 During January and February of 2000, Rose and his staff considered "ways in which Cardinal Investment Company could communicate its views about Terayon to the public." *Id.* Ex. 11 (Rose Dep. at 58:6-25). In this time period, Cardinal employee Kent McGaughy created a document entitled "Game Plan" which document begins by posing the question "What are the key levers we can pull?" *Id.* Ex. 20. Whether McGaughy created this document of his own accord or at Rose's suggestion is in dispute. *Id.* Ex. 11 (Rose Dep. at 58:6-25); McGaughy Supp. RT at 31:5-11. Plaintiffs insinuate that McGaughy then did nothing about the "Game Plan," but this assertion is belied by the deposition testimony where it is clear that the substance of the "Game Plan" was discussed with other Cardinal employees. *Compare* Plaintiffs' Response to Motion at 8:14-17 ("three pages of hand written notes ... which were not even shown to anyone else hardly qualifies as an elaborate game plan") with Patz Dec. Ex. 1 (Alpert Dep. at 117:6-118:16.)(discussions were had among Cardinal employees about the "Game Plan"). Moreover,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 413277 (N.D.Cal.)
(Cite as: 2004 WL 413277 (N.D.Cal.))

Cardinal employees in fact pursued the agenda items listed on the plan.

One of the items on McGaughy's "Game Plan" called for Cardinal to encourage CableLabs to make a statement about Terayon. Cardinal hoped CableLabs would state unequivocally that Terayon's technology would not be part of a DOCSIS standard, thus lowering Terayon's market value. *Id.* Ex. 8 (McGaughy Dep. at 44:18-45:6). *See also Id.* Ex. 11 (Rose Dep. 104:14-23)(Rose communicated Cardinal's thesis with the wish that "everyone would divest their holdings in Terayon" and the wish that the "stock price of Terayon would go down.")

*3 It is undisputed that Cardinal employees bombarded CableLabs with calls. *See e.g. Id.* Ex. 5 (Fellows Dep. 181:20-182:10)(Alpert alone made 50 phone calls to Fellows). It is also undisputed that starting in February 2000, Cardinal began a letter writing campaign regarding Terayon to the Securities and Exchange Commission ("SEC"), [FN2] the National Association of Securities Dealers ("NASD") and the Assistant United States Attorney for the Southern District of New York. Cardinal's opening letter to the SEC was 12 pages long with 56 footnotes and claimed that "TERAYON HAS BLATANTLY LIED ABOUT ITS INDUSTRY IN EVERY SEC DOCUMENT IT HAS FILED SINCE IT WENT PUBLIC IN ORDER TO FALSELY INFLATE MARKET PERCEPTION ABOUT ITS TECHNOLOGY." Patz. Dec. Ex. 36 at 2 (emphasis in the original). Cardinal wrote letters in a similar vein to the SEC on February 23, March 8, March 15, March 20, April 12 and April 25, 2000.

>    FN2. Cardinal sent letters to several individuals at the SEC including Brian J. Lane, Director of Corporate Finance, Bud Ross at the Office of Internet Enforcement and Barry Summers, Associate Director of the Financial Services Division of Corporate Finance.

Starting in February 2000 Internet web site postings encouraged parties to contact the Milberg Weiss firm about a proposed lawsuit against Terayon. Despite the fact that these web postings in February 2000 claimed a lawsuit against Terayon was imminent, the stock drop which is the issue of the current lawsuit did not occur until April 12, 2000. *See* Patz Dec. Ex. 19 (postings of a_r_san of 2/09/00, 3:12 p.m.("Will there be a class action suit? Messrs Lerach, Weiss will be looking into it.") and 2/09/00, 5:42 p.m. ("I am in the process of faxing my TERN stock

transactions to [Milberg Weiss] to initiate the class action lawsuit."). The court notes that the class period in the original complaint, i.e. the first day on which plaintiffs claim they were damaged, was February 9, 2000 the same day these Internet postings appeared. Defendants assert that these web postings were part of plaintiffs' alleged scheme to drive the price of the stock down.

In early April 2000 Cardinal Partners purchased April "puts" on Terayon stock. *Id.* Ex. 3 (Cardinal Dep. At 13:2-22), Ex. 23, Ex. 60. The "puts" expired on April 15, 2000. Thus Cardinal was betting that something would cause a decline in Terayon stock between April 7 and April 15. On April 11, 2000 Cardinal employee Kent McGaughy called into Terayon's quarterly earnings conference call. McGaughy used a false name, and posing as a *bona fide* securities analyst, accused Terayon of fraud. Defendants assert that two other people participated in the conference call at Cardinal's behest. These two, Jonathan Daws and Amir Elgindy also used false names and raised issues of alleged fraud by Terayon.

On April 12, 2000, Terayon's stock price fell. April 12, 2000 also constituted one of the ten worst declines in NASDAQ history. Plaintiffs filed their complaint in the Central District of California on April 13, 2000--clearly indicating that plaintiffs had been in contact with counsel for some time prior to the April 12, 2000 stock decline. While the complaint purports to have been signed on April 12, 2000, the attached "Certification of Named Plaintiff" signed by named plaintiff in that case, Shlomo Birnbaum, was dated April 11, 2000--one day prior to Terayon's stock plunge. While neither Cardinal Partners or Payne were named as plaintiffs in the Birnbaum complaint, much of the language of the complaint very closely tracks the language of Cardinal's letters to the SEC. Cardinal Partners and Payne signed their Certification of Named Plaintiffs on April 14, 2000.

*4 Milberg Weiss's relationship with Rose was not limited to the Terayon case. As set out in the *Fields v. Biomatrix* case, 198 F.R.D. 451, 454 (D.N.J.2000) the Milberg Weiss firm also represented Rose in an almost identical short sale case. As in the case at bar, defendants in *Fields* also asserted that Rose and his associates had "systematically [made] false and misleading allegations against Biomatrix on Internet message boards" and again as here, the messages advised investors that the writer was planning a securities fraud action and that interested parties should contact the Milberg Weiss firm.

Not Reported in F.Supp.2d                                                                                    Page 4
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

The complaint in the Fields case also was "almost entirely copied from letters written to members of Genzyme's board of directors and to the SEC by short seller, Edward W. "Rusty" Rose, III, and his associates" who had been trying unsuccessfully for months to get Genzyme's board to cancel the merger in order to cause a decline in Biomatrix stock prices. *Fields*, 198 F.R.D. at 455.

### II. *Prior Class Certification Procedures*

The original action filed in the Central District of California (*Birnbaum* ) and those filed here in the Northern District (*Henry* and *Pludo* ) listed the class period as February 2, 2000 to April 11, 2000 inclusive. *See* Patz Dec., Exs 24, 47. On April 14, 2000, Cardinal Partners and Payne each prepared a "Certification of Named Plaintiff Pursuant to Federal Securities Laws." Patz. Dec., Exs. 24, 27. Pursuant to 15 U.S.C. 78u-4(a)(2)(A)(iv), the proposed named plaintiffs are to state on the certification "all of the transactions of the plaintiff in the security that is the subject of the complaint *during the class period specified by the complaint." Id.* (emphasis added). The Certifications filed by Cardinal Partners and Payne were deficient on their face as they did not reveal Cardinal Partners "put" transactions made in early April. Because Cardinal and Payne's numerous short sales all occurred outside this February-April window, counsel and plaintiffs were not at that time required by the statute to list the short sales on the certification. Nonetheless, given the magnitude of the short sales, and that the losses incurred during the class period were as a result of the short sales prior to the class period, these transactions were highly relevant to the case. The court assumes that plaintiffs' counsel was aware of these short sales when it drafted the original complaint with the February to April class period.

On June 12, 2000 plaintiffs filed a motion in the *Pludo* action to appoint Cardinal Partners, Marshall Payne and three other individuals as lead plaintiffs. This motion states that Marshall and Payne had suffered losses of almost $2.5 million during the February to April class period, but omitted the fact that these losses resulted from Cardinal Partners and Payne's significant short position in Terayon. Counsel for Cardinal and Payne also indicated that "there is no evidence of any antagonism between interests of these individuals and the proposed class members." Terayon Lead Plaintiffs' Group Motion at 13:4- 5. Counsel made no mention to the court either in papers or at the hearing that lead plaintiffs had significant short sales in Terayon stock. *See* Motion

Transcript of 8/7/00 in *Henry v. Terayon.* On September 19, 2000 this court appointed Cardinal Partners, Payne and the three other individuals as lead plaintiffs and approved the plaintiffs' selection of counsel Milberg Weiss as lead counsel.

**\*5** Two days after the court ruled on the lead plaintiff issue, the Milberg Weiss firm filed the consolidated class complaint. The consolidated complaint changed the class period to November 15, 1999 to April 11, 2000. While the new class period clearly encompassed lead plaintiffs' vast short sales, plaintiffs' counsel did not provide the court with updated Certifications of Named Plaintiffs which corresponded to the new class period, nor did counsel apprise the court of the short sales which now clearly came within the class period. The court is left to wonder whether once the court's scrutiny of lead plaintiffs had concluded, counsel felt free to manipulate the class period.

On July 25, 2002 plaintiffs filed their motion for class certification. Plaintiffs' counsel did not propose that lead plaintiffs Cardinal Partners or Marshall Payne be certified as class representatives. It is clear from the deposition testimony that counsel for plaintiffs made the determination not to request class representative status for either Cardinal Partners or Marshall Payne. At the hearing on the present motion, counsel for plaintiffs explained this choice in the following way: "It's unfair to have the class--not saddled with--but be responsible for what Cardinal Partners did or didn't do since they--there's no question--they did a lot of due diligence in investigating this company." September 8, 2003 Hearing Transcript at 18:15-19.

### *LEGAL STANDARD*

#### A. *Appointment as a Lead Plaintiff*

The Private Securities Litigation Reform Act ("PSLRA") sets forth a rebuttable presumption that the "most adequate plaintiff," i.e., the one who is to be selected as lead plaintiff, is the one who:

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

This presumption may be rebutted only upon proof *by a member of the purported plaintiff class* that the presumptively most adequate plaintiff (a) will not fairly and adequately protect the interests of the class; or (b) is subject to unique defenses that render such plaintiff incapable of inadequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added).

In order to be appointed a lead plaintiff the prospective lead plaintiff must satisfy the requirements of typicality and adequacy set forth in Rule 23 of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 23(a)(4) provides that the representative parties must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Generally, plaintiffs bear the burden of showing that their claims are typical, as well as the burden of demonstrating that other prerequisites to class action are satisfied. Fed.R.Civ.P. Rule 23(a); *see Staton v. Boeing* 313 F.3d 447, 2002 WL 31656586 (9th Cir.2002); *see also In re Dalkon Shield IUD Products Liability Litigation,* 693 F.2d 847 (9th Cir.1982).

*DISCUSSION*

**\*6** Defendants present several arguments as to why plaintiffs Cardinal Partners and Marshall Payne should no longer be designated as lead plaintiffs. Defendants assert that Cardinal and Payne should not be lead plaintiffs as they were short-sellers. Defendants contend that neither Cardinal Partners nor Marshall Payne relied on Terayon's representations and thus cannot represent other plaintiffs in a fraud on the market case. Finally defendants assert that these two plaintiffs have a conflict of interest with the plaintiffs' class and cannot act as fiduciaries as required by Federal Rule of Civil Procedure 23.

Plaintiffs argue that defendants have no standing to challenge the appointment of lead plaintiffs and that even if they did, there is no reason that short sellers cannot be lead plaintiffs.

A. *Standing to Challenge the Appointment of Lead Plaintiffs*

[1] Lead plaintiffs have a fiduciary duty to "monitor, manage and control the litigation, making, as is the case in ordinary cases, litigation decisions on resource allocation and settlement with, of course, the advice of, but not the prerogative of class counsel." *In re Network Assocs., Inc. Sec. Litig.,* 76 F.Supp.2d 1017, 1020 (N.D.Cal.1999). As noted above, the

PSLRA provides that the presumption of adequacy of a lead plaintiff "may be rebutted only upon proof by a member of the purported plaintiff class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Plaintiffs read this section to act as an absolute bar to a motion brought by the defendants or for that matter presumably to the court acting *sua sponte* based on information made available to it. In support of their proposition, plaintiffs cite to *Wenderhold v. Cylink Corp.,* 188 F.R.D. 577 (N.D.Cal.1999). The *Wenderhold* case is inapposite as the court specifically did not reach the issue of defendants' standing. The Wenderhold court did, however, reiterate a court's ongoing obligation to determine the appropriateness of the lead plaintiffs. *Wenderhold,* 188 F.R.D. at 584. (regardless of whether defendants have standing to object, the court is required to determine whether the proposed lead plaintiffs are capable of adequately protecting the interests of the class members).

Nor does *Takeda v. Turbodyne,* 67 F.Supp.2d 1129 (C.D.Cal.1999) aid plaintiffs' argument. Although the court in *Takeda* found that defendants lacked standing at the early stages of the proceeding it did not rule out the possibility that defendants would later have standing to make such a challenge. More importantly, *Takeda* held that the court could "raise and address certain of the concerns addressed in defendants' statement" *sua sponte. Takeda,* 67 F.Supp.2d 1138. *See also Fields v. Biomatrix,* 198 F.R.D. 451, 454 (D.N.J.2000).

*In re Cavanaugh,* the only Ninth Circuit law plaintiffs cite, is inapposite due to the procedural posture of the case at bar. *In re Cavanaugh,* 306 F.3d 726 (9th Cir.2002). In *Cavanaugh,* the Ninth Circuit reviewed on a writ the district court's use of an interview process to select the lead plaintiff. The Ninth Circuit rejected this process, referring the court back to the lead plaintiff selection scheme elaborated under the PSLRA. No defendant in *Cavanaugh* sought to have input into the lead plaintiff decision, so the case is not dispositive. Nor had discovery already been taken. In the case at bar, extensive discovery has been taken and the case is on the brink of trial. Therefore, the court does not find *Cavanaugh* persuasive.

**\*7** What is clear under the reasoning of *Wenderhold* and *Takeda,* is that the court has a duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members. As the court held in *In re Critical Path,* "the fact that a searching inquiry under Rule 23 is not required at this stage of the litigation does not mean that the Court

Not Reported in F.Supp.2d                                                                                   Page 6
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

must pay mere lip service to the requirement of the statute that a prospective lead plaintiff 'satisf[y] the requirements of *Rule 23*." ' *In re Critical Path, Inc. Sec. Litig.,* 156 F.Supp.2d 1102 (N.D.Cal.2001). *See* 15 U.S.C. § 78u-4(a)(3)(b)(iii)(I)(cc). The doctrine against conducting a searching inquiry under *Rule 23* at the earliest stage of the lawsuit encourages efficiency. However, the court has a continuing responsibility to determine whether lead plaintiffs meet the typicality and adequacy prongs of *Rule 23* such that the interests of the class are protected. *See.e.g. Z-Seven Fund, Inc. v. Motorcar Parts & Accessories,* 231 F.3d 1215, 1218-19 (9th Cir.2000)(district court may make changes to lead plaintiff status consistent with court's continuing duty to ensure adequate representation of class.).

 Normally, these issues would have been raised at the time the lead plaintiffs moved to be appointed as class representatives. Plaintiffs' counsel circumvented this inquiry by determining to only seek class representative status for the three individual defendants and not for Cardinal Partners and Payne. But for the machinations of plaintiffs' counsel, the defendants likely would have been able to present evidence regarding the fitness of Cardinal and Payne as lead plaintiffs at an earlier stage in the litigation. Based on the above, the court finds that it has an obligation to consider the material presented by defendant as to Cardinal and Payne's fitness to continue as lead

B. *Lead Plaintiff as Short Sellers*

 [2] Defendants advance several arguments as to why plaintiffs should be disqualified as lead plaintiffs due to their short sale purchases of Terayon stock. Defendants first assert that being a short sale purchaser is *per se* disqualifying for a lead plaintiff. Defendants further argue that Cardinal and Payne cannot be adequate lead plaintiffs in this case since the case is premised on a fraud on the market theory and those two plaintiffs cannot demonstrate reliance on the alleged misrepresentations made by Terayon. In a similar vein, defendants argue that Cardinal and Payne have a fatal conflict of interest with the rest of the plaintiff class. Plaintiffs generally allege damages based on the devaluation of Terayon stock, whereas Cardinal and Payne actively sought to drive down the price of Terayon stock.

 Citing *In re Critical Path,* defendants assert that short sellers cannot be named as lead plaintiffs. [FN3] In *Critical Path,* Columbus Capital, one of the proposed lead plaintiffs, had purchased 410,000

shares and sold 20,000 shares short. Based on these short sales, the court found Columbus Capital not a suitable lead plaintiff. The court held that it would be "a poor choice to appoint a class representative who engaged in a trading practice premised on the belief the stock would fall." *Critical Path,* 156 F.Supp.2d at 1110. The court analyzed that an issue arises with short sellers as to whether the seller was actually relying on the market price, and that "the court is not served by its representative coming under such scrutiny." *Id. See also Weisz v. Calpine Corp.,* No. C 02-1200 SBA, slip op. at 12 (N.D.Cal. Aug. 19, 2002). Apparently, the desire to avoid such scrutiny was also the motivating factor in plaintiffs' decision not to seek class representative status for Cardinal and Payne. Moreover, unlike in *Critical Path,* where the lead plaintiff had both short and long purchases, according to deposition testimony, Cardinal Partners never intended at any point to take a long position in Terayon. Patz Dec. Ex. 1 (Alpert Depo. 22:4-10).

> FN3. Further, if plaintiffs had disclosed to the court that they were short sellers at the time they filled out the request for appointment, defendants believe that this court never would have named them as lead plaintiffs in the first place.

 *8 Plaintiffs cite no controlling precedent on this issue. Moreover, the court finds the cases plaintiffs rely on to be either inapposite or unpersuasive. The holding of *Danis v. USN Communications,* 189 F.R.D. 391 (N.D.Ill.1999) was rejected by the Northern District Court in *Critical Path* and is distinguishable on the facts as well. In *Danis,* the court recognized the inherent potential for conflict in a fraud on the market case between lead plaintiff Thomas Karr, who had engaged in short sales, and other plaintiffs who had not: "**[t]he motivations behind short selling may indeed be inconsistent with the assumptions underlying the fraud on the market theory**." *Danis,* 189 F.R.D. at 396. Although the court ultimately approved Karr, it did so because Karr had made both short sales and ordinary stock purchases during the class period. The *Danis* court found that Karr could use "**these [ordinary] purchases to invoke the fraud on the market presumption of reliance**." *Id*. Unlike Karr, neither Cardinal nor Payne made ordinary purchases other than those needed to cover their short sales.

 The court finds plaintiffs' citation to *Fields v. Biomatrix,* 198 F.R.D. 451, 454 (D.N.J.2000) illuminating not for its reasoning or holding but for the facts of the case which tend to support defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claims about Cardinal and Payne. If the court had reservations about the "typicality" of short sellers Cardinal and Payne before, the *Fields* case provides the response. While some short sales may not, in and of themselves render a lead plaintiff's claims atypical, a pattern of affirmatively engaging in campaigns devised to lower the price of the stock in question certainly contains within it the seeds of discord between lead plaintiffs and the remaining plaintiffs. [FN4] Based upon the exposition herein, to the extent that Cardinal and Payne appear as lead plaintiffs or class representatives, the court removes them from those respective positions.

> FN4. Indeed, Cardinal and Payne appear to have participated, if not perpetrated, a fraud of their own on the market. Other class members who were not parties to or aware of their scheme may find they have a claim against their purported class representatives.

### C. *Concerns about Lead Counsel*

The court is extremely concerned by the lack of candor to the court by plaintiffs and by lead counsel. As in the *Fields* case, evidence in the record indicates that counsel had been working with plaintiffs Cardinal and Payne significantly in advance of the filing of the complaint. In October 1999 Cardinal began passing information about Terayon to the Milberg Weiss firm. Patz Dec. Ex. 12 (Traweek Dep. at 201:1-202:9).

In both the *Fields* case and the case at bar, posting on Internet web sites encouraged parties to contact the Milberg Weiss firm not only before the complaint was filed, but at least in the Terayon case at least two months before there was even a drop in the stock price. Despite the fact that these web postings in February 2000 claimed a lawsuit against Terayon was imminent, the stock drop which is the issue of the current lawsuit did not occur until April 12, 2000. Questions arise as to what knowledge of, or participation in, this plan the Milberg Weiss firm may have had.

**\*9** Plaintiffs filed their complaint on April 13, 2000. While the *Birnbaum* complaint purports to have been signed on April 12, 2000, the attached "Certification of Named Plaintiff" was dated April 11, 2000--one day prior to Terayon's stock plunge. This fact again raises issues about knowledge by counsel of plaintiffs' actions during the Terayon conference call, which actions were allegedly intended to devalue Terayon stock.

The court is of the impression that the Milberg Weiss firm was in close contact with plaintiff Cardinal significantly in advance of the time the suit was filed as much of the language of the complaint tracks the language of Cardinal's letters to the SEC. The court is also greatly troubled by an apparent attempt to mislead the court as to the scope and nature of lead plaintiffs' holdings in Terayon stock. As noted above, the Certifications filed by Cardinal Partners and Payne did not reveal Cardinal Partners "put" transactions, nor did they reveal Cardinal Partners and Payne's short sales in Terayon stock. That counsel made a change to the class period only two days after this court approved lead plaintiffs, coupled with the fact that counsel made no effort to update the certifications so that they would accord to the requirements of 15 U.S.C. 78u-4(a)(2)(A)(iv), gives rise to the presumption that these actions were taken intentionally to avoid closer court scrutiny of plaintiffs Cardinal Partners and Payne. Counsel's later decision not to request class representative status for either Cardinal Partners or Marshall Payne is similarly suspect. All of these issues leave the court to speculate whether counsel for plaintiffs actively participated in or provided advice to plaintiffs regarding their scheme to cause a fall in Terayon's stock price. [FN5] In either case, the court finds that it is probable that there is a conflict not only between lead plaintiffs and the class but also between lead counsel and the remainder of the class.

> FN5. Milberg Weiss bills itself as "the recognized leader in the fight against securities fraud ....known for its fierce representation of aggrieved shareholders." *www.milberg.com.* It may be that the ferocity has crossed the line, for certainly looking at the actions of their clients Cardinal and Payne the court wonders which of them was the aggrieved shareholder.

### *CONCLUSION*

As detailed above, the court finds that according to information currently available to it, lead plaintiffs do not meet the typicality and adequacy of representation requirements of Rule 23 and this are not appropriate lead plaintiffs.

As it relates to class counsel, the court has serious concerns about potential conflicts of interest and also counsel's candor to the court. As the court indicated at the hearing, the court wishes further discovery into at a minimum, the following issues:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                               Page 8
2004 WL 413277 (N.D.Cal.)
**(Cite as: 2004 WL 413277 (N.D.Cal.))**

 (1) The number of cases or actions in which Milberg Weiss represents Rose, Payne, Cardinal Partners any other Cardinal entity or affiliate;

 (2) The dates that Milberg Weiss was first contacted by each of those parties and the date Milberg Weiss was retained as counsel by each of those parties;

 (3) The amount of fees billed to those entities and paid by them and the dates of such billings and payments;

 (4) The fee arrangements that existed between those parties and the Milberg Weiss firm since the beginning of any representation by Milberg Weiss of any of these parties through and including the present.

 **\*10** (5) The names of all attorneys at the Milberg Weiss firm who have worked for any of these clients, the dates they provided such services, and if the work was related to a filed action, to which action was it related.

 Counsel for defendants may also propound any relevant discovery seeking non-privileged information by _____. [FN6]

> FN6. The court is willing to entertain a motion addressing whether the privilege has been waived to any extent, and, if so, to what extent.

 The Milberg Weiss firm shall have thirty (30) days from service this order to file the information ordered by this court.

 The Milberg Weiss firm shall have thirty (30) days from the service of the discovery requests to respond to the discovery propounded by defendants on these issues, with copies to defense counsel and the court.

 IT IS SO ORDERED.

 2004 WL 413277 (N.D.Cal.)

 **Motions, Pleadings and Filings (Back to top)**

• 3:00CV01967_____ (Docket) (Jun. 01, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

# 23

Westlaw.

Not Reported in F.Supp.2d
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

**Motions, Pleadings and Filings**


United States District Court,
E.D. Pennsylvania.
Jeff JANOVICI, Individually and On Behalf of All
Others Similarly Situated
v.
DVI, INC., et al.
Mark B. WILLIAMS, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Allison B. RICE, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Bharat PAREKH, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Stephen BENCE, IV, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Murari OJHA, Individually and On Behalf of All
Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Kenneth GROSSMAN, Individually and On Behalf
of All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
Shirley H. KAREL, Individually and On Behalf of
All Others Similarly Situated
v.
Michael A. O'HANLON, et al.
**No. Civ.A.2:03CV04795-LD, Civ.A.2:03CV04963-
LD, Civ.A.2:03CV05000-LD,
Civ.A.2:03CV05111-LD, Civ.A.2:03CV05141-LD,
Civ.A.2:03CV05244-LD,
Civ.A.2:03CV05336-LD, Civ.A.2:03CV05674-LD.**


Filed Aug. 20, 2003.
Nov. 25, 2003.
 represented by Marc A. Topaz, Schiffrin &
Barroway, LLP, Bala Cynwyd, PA, Lead Attorney,
Attorney to be Noticed, for Jeff Janovici, Individually
and on Behalf of all Others Similarly Situated,

Plaintiff.

 represented by Gary M. Schildhorn, Adelman Lavine
Gold & Levin, Philadelphia, PA, Lead Attorney,
Attorney to be Noticed, for DVI, Inc., Defendant.

 represented by Maura E. Fay, Dilworth Paxson LLP,
Philadelphia, PA, Lead Attorney, Attorney to be
Noticed, for Steven R. Garfinkel, Defendant.

 represented by Andrew L. Barroway, Darren J.
Check, Schiffrin & Barroway, LLP, Bala Cynwyd,
PA, Lead Attorney, Attorney to be Noticed, Jeffrey
M. Norton, Wechsler Harwood, LLP, New York,
NY, Lead Attorney, Attorney to be Noticed, for
Stephen Bence, IV, Movant.

 represented by Deborah R. Gross, Law Offices
Bernard M. Gross, PC, Philadelphia, PA, Lead
Attorney, Attorney to be Noticed, Susan R. Gross,
Law Offices Bernard Gross, PC, Philadelphia, PA,
Lead Attorney, Attorney to be Noticed, for Milton
Wolson, Movant.

 represented by DeBorah R. Gross, Susan R. Gross,
(See above for address), Lead Attorney, Attorney to
be Noticed, for Bharat Parekh, Movant.

 represented by Deborah R. Gross, Susan R. Gross,
(See above for address), Lead Attorney, Attorney to
be Noticed, for James Schwartz, Movant.

 represented by Robert A. Kauffman, Berger and
Montague, Philadelphia, PA, Lead Attorney,
Attorney to be Noticed, for Gottlieb Family
Foundation Trust, Movant.

 represented by Robert A. Kauffman, (See above for
address), Lead Attorney, Attorney to be Noticed, for
Richard Morrell, Movant.

 represented by M. Richard Komins, Barrack Rodos
& Bacine, Philadelphia, PA, Lead Attorney, Attorney
to be Noticed, for Thomas Sciba, Movant.

 represented by Steven A. Schwartz, Chimicles &
Tikellis LLP, Haverford, PA, Lead Attorney,
Attorney to be Noticed, for Kenneth Grossman,
Movant.

 represented by Steven A. Schwartz, (See above for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

address), Lead Attorney, Attorney to be Noticed, for
Cedar Street Funds, Movant.

 represented by Steven A. Schwartz, (See above for
address), Lead Attorney, Attorney to be Noticed, for
Cedar Street Offshore Fund, Movant.

 represented by Joanne G. Noble, Trujillo Rodriguez
& Richards LLC,  The Penthouse, Philadelphia, PA,
Lead Attorney, Attorney to be Noticed, R. Bruce
McNew, Taylor & McNew, Greenville, DE, Lead
Attorney, Attorney to be Noticed, for Shirley H.
Karel, Movant.

*MEMORANDUM*

DAVIS, J.

 **\*1** Presently pending before the Court are eight
securities fraud class action lawsuits against Michael
A. O'Hanlon ("O'Hanlon"), former Chief Executive
Officer and President of DVI and a former member
of its Board of Directors, and Steven R. Garfinkel
[FN1] ("Garfinkel"), Chief Financial Officer and
Executive Vice President of DVI   [FN2] and a
member of its Board of Directors, and the
underwriter of its securities, Merrill Lynch & Co.,
Inc. ("Merrill Lynch"), who was, at all relevant times,
DVI's financial advisor and the lead underwriter in
managing DVI's securitizations. (Garfinkel and
O'Hanlon are collectively identified as the "DVI
Defendants"; O'Hanlon, Garfinkel and Merrill Lynch
are collectively identified as "Defendants".) These
eight actions (the "DVI Actions") allege claims under
Section 21D(a)(3)(B) of the Securities Exchange Act
of 1934 (the "Exchange Act"), as amended by the
Private Securities Litigation Reform Act of 1995 (the
"PSLRA"). Defendants are alleged to have violated
Sections 10(b) and 20(a) of the Exchange Acts, and
Rule 10b-5.

> FN1. On August 13, 2003, DVI placed
> Garfinkel on administrative leave.

> FN2. DVI is not named as a defendant in the
> instant action because it filed for Chapter 11
> Bankruptcy protection on August 25, 2003

 Numerous plaintiffs request consolidation the DVI
Actions pursuant to Rule 42(a) of the Federal Rules
of Civil Procedure. Multiple plaintiffs also petition
to be appointed as Lead Plaintiff as well as for approval
of their selection of Lead Counsel. On November 21,
2003, this Court held oral argument with respect to
these motions. Based on the parties' submissions and

the oral arguments presented to the Court, we grant
the Cedar Street Group's Motion to Consolidate,
appoint the Cedar Street Group as Lead Plaintiff, and
approve Krislov & Associates, Ltd. to serve as Lead
Counsel and Chimicles & Tikellis LLP to serve as
Liaison Counsel.

I. BACKGROUND

 On July 25, 2003, James T. Bennett filed a class
action on behalf of purchasers of DVI stock during
the period of November 7, 2001 through June 27,
2003, against DVI (the "Bennett Complaint"), an
independent specialty finance company for healthcare
providers worldwide with $2.8 billions of managed
assets, and O'Hanlon and Garfinkel. The Bennett
Complaint alleged that DVI and the DVI Defendants
violated Sections 10(b) and 20(a) of the Exchange
Acts, and Rule 10b-5. Specifically, the Bennett
Complaint alleged that DVI and the DVI Defendants
participated in a fraudulent scheme and course of
business that operated as a fraud or deceit on
purchasers of DVI common stock by disseminating
materially false and misleading statements and/or
concealing material adverse facts. The Bennett
Complaint alleged that the scheme did in fact: (i)
deceive the investing public regarding DVI's business
and operations and the intrinsic value of DVI
securities; (ii) enable DVI to sell $25 million of its
subordinated convertible notes during the class
period; (iii) enable DVI to secure credit facilities for
$175 million on favorable terms; and (iv) cause
Bennett and other members of the Class to purchase
DVI securities at artificially inflated prices. (Bennett
Compl. ¶  56). On August 26, 2003, the Bennett
Complaint was voluntarily dismissed.

 **\*2** On August 20, 2003, Jeff Janovici ("Janovici")
filed a class action against DVI, O'Hanlon and
Garfinkel (DVI, O'Hanlon and Garfinkel collectively
identified as the "Janovici Defendants") on behalf of
purchasers of DVI stock during the period of
November 7, 2001 through June 27, 2003, alleging
violations of Section 10(b) and 20(a) and the
Exchange Action and Rule 10b-5 (the "Janovici
Complaint").   [FN3] Specifically, the Janovici
Complaint alleges that the Janovici Defendants
participated in a fraudulent scheme and course of
business that operated as a fraud or deceit on
purchasers of DVI securities by disseminating
materially false and misleading statements and/or
concealing material adverse facts. The scheme: (i)
deceived the investing public regarding DVI's
business and operations and the intrinsic value of
DVI securities; (ii) enabled DVI to sell $25 million of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 3
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

its subordinated convertible notes during the class period; (iii) enabled DVI to secure credit facilities for $175 million on favorable terms; and (iv) caused plaintiff and members of the Class to purchase DVI securities at artificially inflated prices. (Janovici Compl. ¶ 14). On September 15, 2003, the Court entered an Order, pursuant to 11 U.S.C. § 362, staying the Janovici action with respect to DVI because the company had filed for bankruptcy protection.

> FN3. The law firm of Schiffrin & Barroway filed the Janovici Complaint on behalf on Mr. Janovici. Schiffrin & Barroway also filed the Bennett Complaint on behalf of Mr. Bennett.

On September 3, 2003, Mark B. Williams ("Williams") filed a class action against on behalf of purchasers of DVI common stock and Senior Notes during the period of November 7, 2001 through August 13, 2003 (the "Class Period"), [FN4] O'Hanlon and Garfinkel alleging violations of Sections 10(b) and 20(a) of the Exchange Acts, and Rule 10b-5 (the "Williams Complaint"). Specifically, the Williams Complaint alleges that the DVI Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DVI's securities. (Williams Compl. ¶ 73).

> FN4. Three of the complaints define the class period as November 7, 2001 through June 27, 2003, and four of the complaints extend the class period through August 13, 2003. Because four of the complaints allege that false and/or materially misleading statements were made through August 13, 2003, we find that Class Period should be extended through that date.
> One complaint, Civil Action No. 03-5674, however, defines the class period as September 1, 2001 through August 13, 2003. Because the complaint filed in this actions fails to allege that any false and/or materially misleading statements were made prior to November 7, 2001, we find that there is no basis for setting the Class Period prior to this date.

In accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A)(I), Williams published a notice of pendency of the action in *Business Wire* on September 3, 2003. Since the filing of the Williams Complaint, six other complaints arising out of similar, if not identical, facts alleging parallel claims have been filed in the Eastern District of Pennsylvania. In addition to these six complaints, six plaintiff and/or plaintiff "groups" filed motions requesting: (i) consolidation of the actions; (ii) appointment as lead plaintiff; and (ii) approval of selection of lead counsel. [FN5]

> FN5. The following plaintiffs filed complaints did not move for appointment as Lead Plaintiff: (I) Mark B. Williams, (ii) Jeff Janovici, (iii) Murari P. Ojha, and (iv) Allison B. Rice.

A. The Movants

1. Thomas Sciba

Mr. Sciba is an individual investor who allegedly suffered losses of approximately $30,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. [FN6]

> FN6. Mr. Sciba did not pursue appoint as Lead Plaintiff beyond the filing of his motion for appointment as lead plaintiff.

2. Stephen Bence, IV

**\*3** Mr. Bence is an individual investor who allegedly suffered losses of $60,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements.

3. The Wolson Group

The Wolson Group is comprised of three individual investors, Milton Wolson, Bharat Parekh, and James Schwartz. The Wolson Group asserts losses of approximately $60,656.30.

4. The Gottlieb/Morrell Group

The Gottlieb/Morrell Group is comprised of the Gottlieb Family Foundation Trust and individual investor Richard W. Morrell. The Gottlieb/Morrell Group claims to have suffered losses of approximately $46,000.

5. The Cedar Street Group

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 4
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

The Cedar Street Group is comprised of two institutional investors, the Cedar Street Fund and the Cedar Street Offshore Fund, and an individual investor, Kenneth Grossman. The Cedar Street Group alleges that it suffered losses in excess of $1.6 million as result of purchasing DVI securities at prices inflated by the DVI Defendants' false and misleading statements.

6. The Karel Group

The Karel Group is comprised of seven individual investors who allege a preexisting investment relationship. The Karel Group claims to have suffered losses of approximately $333,000.

II. DISCUSSION

A. Motions to Consolidate

A court has broad discretion to consolidate actions involving common questions of law or fact ... if it will facilitate the administration of justice." *See Smithkline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 2001 WL1249694, at * 5 (E.D.Pa. Sept. 26, 2001) (citing Fed.R.Civ.P. 42(a)). Rule 42(a) provides:

> When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any of all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a). "When considering consolidation the court 'must balance the benefits of judicial economy and expediting the litigation against the possibility of prejudice." ' *Smithkline Beecham,* 2001 WL1249694, at *5 (quoting *Kerley v. Great Lakes Dredge & Dock Co.,* 1996 WL 131136, at *1 (E.D.Pa. March 20, 1996)); *see also Rosario v. SCM Group USA, Inc.,* 2003 WL 21982116, at *1 (E.D.Pa. July 2, 2003) ("Consolidation is at the discretion of the trial court and "should be permitted where the consolidation of separate actions presenting common questions of law or fact will promote convenience and economy in judicial administration.") Moreover, the PSLRA directs that cases should be consolidated where there is "more than one action on behalf of a class asserting substantially the same claim or claims." 15 U.S.C. § 78u-4(a)(3)(B)(ii).

The actions at issue share significant common issues of law and fact. A review of each of the complaints

reveals that each case involves claims against O'Hanlon and Garfinkel for violations of Rule 10b-5 and Sections 10(b) and 20(a) of the Exchange Act. Indeed, the factual basis supporting the claims asserted in the DVI Actions are parallel. The Plaintiffs are all investors who purchased common stock and/or Notes during the Class Period. Additionally, each Plaintiff, in purchasing shares of DVI stock, relied upon statements contained in the same public filings, press releases and other publications. Although the Cedar Group is unique in the claims asserted against Merrill Lynch, this difference is not determinative because the Cedar Group's claims against Merrill Lynch are premised on the same facts and statutory provisions as the claims against O'Hanlon and Garfinkel. *See Skwortz v. Crayfish Co.,* 2001 WL 1160745, at *2 (S.D.N.Y. Sept. 28, 2001) (granting consolidation of eleven complaints where each complaint was based on the same facts and statutory provision, despite the fact that all the complaints did not contain the same claims against the same defendants) (citations omitted). That the actions share common questions of law and fact and should be consolidation is further supported by the fact that each of the movants requested consolidation pursuant to Rule 42(a) and counsel for the moving plaintiffs expressly agreed on consolidation at oral argument. Because consolidation will facilitate the administration of justice and promote judicial economy without any foreseeable prejudice, the Motions to Consolidate filed by the Cedar Street Group in each of the DVI Actions are granted.

B. Appointment of Lead Plaintiff

**\*4** The PSLRA instructs that, "as soon as practicable" after the resolution of the motions to consolidate, the Court shall appoint the most adequate plaintiff to serve as lead plaintiff of the class. 15 U.S.C. § 78u-4(a)(3)(B)(ii).

In 1995, in response to perceived abuses in securities fraud class actions, Congress enacted the PSLRA. *See* S.Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679; H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730. "The purpose behind the PSLRA is to prevent 'lawyer-driven' litigation, and to ensure that 'parties with significant holdings in issues, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel." ' *Crayfish Co.,* 2001 WL 1160745, *2 (citations omitted). "Congress believed that this could best be

Case 1:05-cv-00162-JJF    Document 65-8    Filed 09/15/2005    Page 53 of 68

Not Reported in F.Supp.2d                                                                    Page 5
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

achieved by encouraging institutional investors to serve as lead plaintiffs. *Id.* (citations omitted). Accordingly, the PSLRA regulates the procedures for bringing class actions under the Securities Act.

The PSLRA requires plaintiffs filing private securities class action complaints to publish a notice of pendency of the suit in a widely circulated business publication or wire service no later than twenty days after the complaint is filed. 15 U.S.C. § 78u-4(a)(3)(A)(I). No later than sixty days after the publication of notice, any member of the purported class may file a motion to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). If a motion for consolidation has been made, the court shall not appoint a lead plaintiff until after it renders a decision on the motion to consolidate. 15 U.S.C. § 78u-4(a)(3)(B)(ii).

The PSLRA instructs the court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B)(I). To this end, the statute creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons that--(aa) has either filed the complaint *or* made a motion in response to a notice ...; (bb) in the determination of the court, has the largest financial interests in the relief sought by the class; (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). This presumption may only be rebutted by a member of the purported plaintiff class upon proof that the presumptively most adequate plaintiff--"(aa) will not fairly and adequately protect the interest of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Cendant Corp. Lit., 264 F.3d 201, 266-8 (3d Cir.2001).* The process of determining the "most adequate" plaintiff has been summarized by the Third Circuit: "The Reform Act establishes a two-step process for appointing a lead plaintiff: the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class had rebutted the presumption." *In re Cendant Corp. Lit., 264 F.3d at 262* (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) & (II)).

1. Adequacy of Notice and Filing a Timely Complaint and/or Motion

**\*5** The PSLRA instructs that, within 20 days of filing a complaint under the statute, plaintiff or plaintiffs shall "cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class ... (I) of pendency of the action, the claims asserted therein, and the purported class period; and (II) that not later than 60 days after the date on which the notice was published, any member of the purported plaintiff class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A)(I). If more than one action on behalf of the class asserting substantially the same claims or claims is filed, only the plaintiff or plaintiffs in the "first filed action shall be required to cause notice to be published." 15 U.S.C. § 78u-4(a)(3)(A)(ii).

In deciding a motion for the appointment of lead plaintiff under the PSLRA, the Court has an independent duty to scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA, that is, encouraging the most adequate plaintiff, the plaintiff with the largest financial stake in the outcome of the litigation, to come forward and take control of the litigation. *See Ravens v. Iftikar, 174 F.R.D. 651, 654-55 (N.D.Cal.1997)* (quoting *House Conf. Rep. No. 104-369,* 104th Cong., 1st Sess., 1996 U.S.C.C.A.N. 730, 731); *see also Burke v. Ruttenberg, 102 F.Supp.2d 1280, 1309 (N.D.Ala.2000)* ("A district court must exercise exceptional care to insure [sic] that in applying the lead plaintiff provisions of the statute, the concerns that motivated Congress are carefully heeded, as the determination of lead plaintiff by the district court is, with probably little exception, not immediately subject to review."); *In re Oxford Health Plans, Inc. Securities Lit., 182 F.R.D. 42, 45 (S.D.N.Y.1998)* ("The PSLRA calls for greater supervision by the Court in the selection of which plaintiffs will control the litigation."). This means that in order for a notice of pendency to encourage the most adequate plaintiff to come forward and control the litigation, it must contain accurate information from which an interested class member may contact the Court and readily obtain a copy of the complaint in a *pending* action and/or file a motion to be appointed as lead counsel in that case. *See California Public Employees' Retirement System v. Chubb Corp., 127 F.Supp.2d 572, 576 (D.N.J.2001)* (finding a notice inadequate where it failed to disclose the caption of the case, the docket number, the judge to whom the case was assigned, the vicinage in which the judge sits, or the address of the Court because "an interested class member would not even know to which courthouse to go to examine a copy of the

2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

complaint" or "would not know before which judge an appropriate motion should be filed."). Requiring the provision of such information comports with the objectives of the PSLRA by ensuring that "institutional plaintiffs with expertise in the securities markets and real financial interests in the integrity of the markets and outcome of the litigation would come forward and control the litigation, rather than the lawyers and their professional plaintiffs." *Id.* at 576. Most significantly, providing information from which a interested class member may contact the Court and readily obtain a copy of the complaint in a *pending* action and/or file a motion to be appointed as lead counsel in that case shields against lawyer - driven litigation because such class members are not forced to contact noticing counsel for additional information to aid in their decision of whether to move for lead plaintiff status.

 **\*6** On July 25, 2003, the Bennett action was filed by the law firm of Schriffrin & Barroway. On July 31, 2003, within 20 days of filing his complaint, Mr. Bennett caused a notice to be published noticing the pendency of the Bennett action. On August 20, 2003, Schriffrin & Barroway filed a substantially similar action on behalf of Mr. Janovici. On August 26, 2003, the Bennett action was voluntarily dismissed. On September 3, 2003, three notices of pendency were published in three different business-oriented publications and wire services. Two of the notices, one published by Schiffrin & Barroway in *PrimeZone Media Network,* and the other, published by the law firm of Caully Geller Bowman & Rudman, LLP in *PR Newswire,* noticed the pendency of the Bennett action despite the fact that the Bennett action had not been "pending" for over one week. Both of these notices stated that September 29, 2003 was the moving deadline. The third notice published on September 3, 2003 by the law firm of Milberg Weiss Bershad Hynes & Lerach LLP in *Business Wire,* noticed the pendency of the Williams action, which was filed that very day. The Williams notice stated that November 3, 2003 was the moving deadline.

 In the instant action, we find that the Janovici action was the first filed action in the DVI litigation because the Bennett was voluntarily dismissed prior to the consolidation. Consequently, for purposes of the PSLRA notice requirements, we find that the Bennett notice has no effect. More significantly, we find that the Mr. Janovici failed to comply with the notice requirements of the PSLRA because he did not notice the pendency of the Janovici action, which notice is required by the plain language of the PSLRA. Indeed, the September 3, 2003 notices filed by Schiffrin &

Barroway and Caully Geller incorrectly noticed the pendency of the Bennett action, which notice was clearly inaccurate because the Bennett action was, in fact, no longer pending. Purported class members could not have relied on either of these notices for sufficient information from which they could contact the Court and readily obtain a copy of the complaint for an action filed on behalf of DVI securities holders on July 25, 2003 because no such complaint existed. Additionally, purported class members could not have filed a motion for appointment as lead plaintiff in an action that was no longer pending. We find that such misinformation in a notice of pendency does not encourage the most adequate plaintiff to come forward and take control of the litigation; therefore, it contravenes the very purpose of the PSLRA.

 If the Janovici action had been properly noticed on September 3, 2003, that is, if it had noticed the pendency of the Janovici action rather than the Bennett action, the PSLRA would have required that such notice inform purported class members that they may move the Court "not later than 60 days after the date on which the notice was published" to be appointed as lead plaintiff. Sixty days from September 3, 2003 was November 3, 2003. Because the plain language of the PSLRA requires that purported class members be given 60 days from the publication date of the notice of pendency in the first filed action, we hold that November 3, 2003 was the moving deadline, as the Williams notice accurately informs the class.

 **\*7** After an independent review of the Williams notice, we find that it otherwise complies notice complies with the requirements of the PSLRA. The Williams notice states:

> The law firm of Milberg Weiss Bershad Hynes & Lerach LLP announces that a class action lawsuit was filed on September 3, 2003, on behalf of purchasers of the securities of DVI, Inc ("DVI" or the "Company") (OTC: DVIX. PK) between November 7, 2001 and August 13, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). A copy of the complaint filed in this action in available from the Court, or can be viewed on Milberg Weiss' website at: *http:// www.milberg.com/cases/dvi/.*

> The action is pending in the United States District Court for the Eastern District of Pennsylvania, against Defendants Michael A. O'Hanlon, former President and Chief Executive Officer and Director of DVI, and Steven R. Garfinkel, DVI's former Chief Financial Officer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 7
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

The Complaint alleges that defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10-b-5 promulgated thereunder, by issuing a series of material misrepresentations to the market between November 7, 2001 and August 12, 2003. According to the complaint, throughout the Class Period, Defendants engaged in a fraudulent scheme to deceive the public as to DVI's true financial condition. Defendants allegedly issued positive statements regarding DVI's business and operations, and overall growth in publicly disseminated press releases and SEC filings and claimed that they were a fair presentation of DVI business. According to the complaint, Defendants failed to disclose material adverse facts, including, but not limited to, the Company's failure to write down the value of certain impaired assets; its failure to properly account for and report non-recurring transactions; its failure to adopt adequate internal control; and its material overstatement of its assets and earnings. As a result of Defendants' fraudulent scheme, DVI stock became artificially inflated during the Class Period, trading as high as $20.99 per share on June 17, 2002, thereby causing damages to Class Period purchasers of DVI securities.

On August 13, 2003, after the market closed, Defendants issued a press release revealing DVI's intention to file for Chapter 11 Bankruptcy protection and that the Company had not yet secured debtor-in-possession financing. The Company blamed its dire situation on the "recent discovery of apparent improprieties in its prior dealings with lenders involving misrepresentations as to the amount and nature of collateral pledged to lenders." In the same release, Defendants announced that DVI's Chief Financial Officer, Defendant Steven Garfinkel, had been placed on administrative leave. This revelation came after Defendants announced that DVI's auditor, Deloitte & Touche LLP, had resigned over a dispute concerning the Company's accounting for certain transactions; that the Company had depleted all availability on its credit facilities; that DVI failed to make interest payments on it 9 7/8 percent Senior Notes due to severe liquidity constraints; and that the SEC had rejected the Company's filing of its quarterly report for the third quarter of 2003. Immediately following the [sic] the New York Stock Exchange suspended trading of DVI stock and Senior Notes, pending delisting. On the same day, DVI stock closed at $0.30 per share, representing a one-day decline of 62.50 percent.

**\*8** If you bought the securities of DVI between November 7, 2001 and August 13, 2003 and sustained damages, you may, no later than November 3, 2003, request that the Court appoint you as lead plaintiff. According to the Exchange Act, a notice must be published within 20 days after the date on which the first complaint is filed. A notice was previously published in connection with a related action against the same Defendants. That action was withdrawn and consequently the notice filed in connection with that action has no effect. Rather, the deadline for the filing of a motion for appointment as lead plaintiff is, as stated herein, on November 3, 2003, sixty days from the publication date of this notice. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may together serve as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision whether or not to serve as lead plaintiff. You may retain Milberg Weiss Bershad Hynes & Lerach LLP, or other counsel of your choice, to serve as your counsel in this action.

Milberg Weiss Bershad Hynes & Lerach LLP (*http://www.milberg.com*) is a 190- lawyer firm with offices in New York City, San Diego, San Francisco, Los Angeles, Boca Raton, Philadelphia and Seattle, and is active in major litigations pending in federal and state courts throughout the United States. Milberg Weiss has taken a leading role in many important actions on behalf of defrauded investors, consumers, and others, and has been responsible for more than $20 billion in aggregate recoveries. Please contact Milberg Weiss [sic] website for more information about the firm. If you wish to discuss this action with us, or have any questions concerning this notice or your rights and interests with regard to the case, please contact the following attorneys....

Unlike the first three notices, the Williams notice lists the names of the defendants, providing purported class members with sufficient information from which they could contact the Court and obtain a copy of the complaint and/or file a motion for appointment as lead plaintiff. Moreover, the Williams notice advises the purported DVI Class of the pendency of the action, the claims asserted, and the purported Class Period. Significantly, the Williams notice advises the purported DVI Class that a member may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

move to serve as lead plaintiff, explains the significance of a lead plaintiff, and specifies the date by which such a motion must be filed--November 3, 2003. The Williams notice also advises that potential class members may retain counsel of their choice. For the above-stated reasons, the Williams notice satisfies the notice requirements of the PSLRA.

2. The Most Adequate Plaintiff

**\*9** The PSLRA instructs the Court to appoint the presumptively "most adequate" plaintiff to serve as lead plaintiff. The presumptive "most adequate" plaintiff for the DVI Class is the plaintiff that satisfies the each of following: (1) has either filed a complaint *or* made a motion in response to a notice, (2) in the determination of the court, has the largest financial interests in the relief sought by the class, and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). For the reasons that follow, the Court finds that the Cedar Street Group is the most adequate plaintiff and appoints the Cedar Street Group to serve as lead plaintiff for the Class in the DVI Action.

First, pursuant to the PSLRA statutory framework, the "most adequate" plaintiff must have either filed a complaint in the consolidated actions or timely moved for appointment as lead plaintiff. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa); *see also In re Cephalon Securities Lit.,* 1998 WL 4700160, at \*5 (E.D. Pa. Aug. 12, 1998) (appointing as lead plaintiff an individual who, although he did not move for appointment, was a named plaintiff in one of the consolidated class action complaints); *In re Initial Public Offering Securities Lit.,* 214 F.R.D. 117, 120 n. 4 (S.D.N.Y.2002) (finding that where numerous complaints have been consolidated, the filing of any of the initially consolidated actions will suffice for purposes of the lead plaintiff selection because the PSLRA specifically instructs courts to rule on consolidation prior to approving lead plaintiff). A motion for appointment of lead plaintiff is timely when filed "not later than 60 days after the date on which the notice is published." 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Generally the 60 day expiration period begins to run from the publication date on which the first notice of pendency was filed. *See* 15 U.S.C. § 78u-4(a)(3)(A)(ii) ("If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiff in the first filed action shall be required to

cause notice to be published ...") This rule does not apply, however, where the first notice of pendency fails to provide adequate information pursuant to the terms of the PSLRAthe statutory 60 day period beings to run from the date of the first notice that complies with the PSLRA. *See In re Lucent Technologies, Inc. Securities Lit.,* 221 F.Supp.2d 463, 466 (D.N.J.2001) (calculating the 60 day period for filing a motion to be appointed as lead plaintiff pursuant to the PSLRA from the date of publication of the second notice of pendency where the first notice of pendency did not contain adequate information). Additionally, where multiple notices are published informing class members of the pendency of litigation and the notices contain conflicting information regarding the expiration of the 60 day period, it would be inconsistent with basic notions of fairness and the purposes of the notification provisions of the PSLRA to mechanically enforce a strict time limit with respect to the 60 day expiration period. *See Steiner v. Frankino,* 1998 LEXIS 21804, at \*13 (N.D.Ohio July 16, 1998) (recognizing that it would be improper to enforce a strict time limit with respect to the 60 day expiration period where the publication of multiple notices could appear to expand the time period in the eyes of class members); *see also Schulman v. Lumenis, Ltd.,* 2003 WL 21415287, at \*4 (S.D.N.Y. June 18, 2003) (noting that courts have taken different approaches with respect to motions filed after the 60 day period has expired and citing to *Steiner v. Frankino* for this proposition).

**\*10** In the instant action, any plaintiff who either (a) filed a complaint in these consolidated actions, or (b) moved to be appointed lead plaintiff not later than November 3, 2003 satisfies the first requirement of the "most adequate" plaintiff test. With respect to motion for appointment as lead plaintiff, we hold that November 3, 2003, not September 29, 2003, was the expiration date for the 60 day period to move for several reasons. First, as previously noted, the first notice of pendency to comply with the requirements of the PSLRA stated that November 3, 2003 was the moving deadline. Additionally, eleven notices were published with three containing the November 3, 2003 deadline and two providing no specific deadline at all. Indeed, counsel for the Gottlieb/Morrell Group published two notices, one stating that September 29, 2003 was the moving deadline, and the other stating that November 3, 2003 was the moving deadline. More significantly, the second of the two Gottlieb/Morrell notices explicitly stated that the September 29, 2003 deadline was no longer effective: "A notice was previously published in connection

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

with a related action against the same Defendants. That action was withdrawn and consequently the notice filed in connection with that action has no effect. Rather, the deadline for the filing of a motion for appointment as lead plaintiff is, as stated herein, on November 3, 2003." Based on a review of the notices in the DVI Action, the Court holds that, indeed, under these particular circumstances, multiple notices with differing deadlines certainly could have created confusion among potential class members with respect to the moving deadline. The potential for such confusion in the case further supports our conclusion that, under these circumstances, setting November 3, 2003 as moving deadline furthers the objectives of the PSLRA.

In the instant action, each of the movants meets the first requirement of the "most adequate" plaintiff test because they either filed an initially-filed complaint in the consolidated action or timely moved for appointment as lead plaintiff.

2. The Plaintiff with the Largest Financial Interest

The PSLRA instructs that the "most adequate," or lead plaintiff have the largest financial interest in the relief sought. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(2).

a. Thomas Sciba

Mr. Sciba is an individual investor who allegedly suffered losses of approximately $30,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. At the time Mr. Sciba moved for appointment as lead plaintiff, he believed he had the largest financial interest in the relief sought by the DVI Class. Contrary to Mr. Sciba's belief, his financial interest is subordinate to the interests of others in the DVI Class. Therefore, Mr. Sciba is not the presumptive "most adequate" plaintiff.

b. Stephen Bence, IV

Mr. Bence is an individual investor who allegedly suffered losses of nearly $60,000 as a result of purchasing DVI stock at prices inflated by the DVI Defendants' false and misleading statements. Mr. Bence asserts that he is the movant with the largest individual financial stake in this litigation and therefore is the presumptive lead plaintiff. Contrary to Mr. Bence's assertion, he does not have the largest individual financial stake in this litigation. Therefore, Mr. Bence is not the presumptive "most adequate" plaintiff.

c. The Wolson Group

**\*11** The Wolson Group is comprised of three individual investors, Milton Wolson, Bharat Parekh, and James Schwartz. The Wolson Group alleges it has the largest financial interest of any movant that timely applied to the Court to be a lead plaintiff in accordance with the provisions of the PSLRA. Specifically, the Wolson Group claims to have suffered losses of approximately $60,656.30. Indeed, the Wolson Group is not the movant with the largest financial interest that timely applied to the Court to be a lead plaintiff in accordance with the provisions of the PSLRA. Therefore, the Wolson Group is not the presumptive "most adequate" plaintiff.

d. The Gottlieb/Morrell Group

The Gottlieb/Morrell Group is comprised of the Gottlieb Family Foundation Trust and individual investor Richard W. Morrell. Upon information and belief, the Gottlieb/Morrell Group alleges that, of all the movants, they have the largest financial interest in this matter, claiming losses of approximately $46,000. Moreover, the Gottlieb/Morrell Group claims to be the only timely movant in compliance with the PSLRA's certification requirements to have sustained losses in both DVI's common stock and notes. Contrarily, the Gottlieb/Morrell Group neither suffered the largest financial losses in this matter nor is the only timely movant in compliance with the PSLRA's certification requirements to have sustained losses in both DVI's common stock and notes. Therefore, the Gottlieb/Morrell Group is not the presumptive "most adequate" plaintiff.

e. The Cedar Street Group

The Cedar Street Group is comprised of two institutional investors, the Cedar Street Fund and the Cedar Street Offshore Fund, and an individual investor, Kenneth Grossman. The Cedar Street Group alleges that it suffered losses in excess of $1.6 million as result of purchasing DVI securities at prices inflated by the DVI Defendants' false and misleading statements. It follows then, that in the instant DVI Action the Cedar Street Group clearly has the largest financial interest in the relief sought. Indeed, none of the other movants dispute this fact and, as discussed below, the Karel Group expressly concedes this point. Accordingly, it is the Cedar Street Group that satisfies the second requirement of the "most adequate" plaintiff test.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**

f. The Karel Group

The Karel Group is comprised of seven individual investors who allege a preexisting investment relationship. The Karel Group acknowledges that the losses of the Cedar Group surpass those of Plaintiff Karel individually and the Karel Group in the aggregate, and that the Cedar Street Group should be named a lead plaintiff. Accordingly, the Karel Group requests that the Court consider appointing the Karel Group as co-lead plaintiff and counsel for the Karel Group as co-lead counsel with counsel for the Cedar Street Group. The Karel Group argues that its appointment as co-lead plaintiff would benefit the class because it would represent the unique perspective of individual investors. Although the Karel Group acknowledges that the Cedar Street Group also includes an individual investor, Kenneth Grossman, the Karel Group suggests that Mr. Grossman's position as a 50% shareholder of the General Partner of the Cedar Street Fund may undermine his capacity to represent the 'unique perspective' of the individual investor. The Karel Group, however, provides no support for this conclusory allegation. As the Karel Group concedes, it is not the presumptive "most adequate" plaintiff.

3. Adequately Represent the Interests of the Class

**\*12** In addition to having the largest financial interest in the relief sought, the presumptive "most adequate" plaintiff must also "otherwise satisf [y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B). Rule 23(a) provides that a party may serve as class representative if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a) is "otherwise" satisfied if the movant "makes a *prima facie* showing that it satisfies the typicality and adequacy requirements." *Smith v. Suprema Specialties, 206 F.Supp.2d 627, 632 (D.N.J.2001)* (citing *Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 924 (3d Cir.1992)*)

The typicality requirement is satisfied if the plaintiff, as a result of the same course of conduct, suffered the same injuries as the absent class members, and their claims are based on the same legal issues. *See Weiss v. York Hosp., 745 F.2d 786, 809 n. 36 (3d Cir.1984).*

That the claims of the class representative be typical of claims of the class does not require that they be identical. *See Gen. Tel. Co. Of the Southwest v. Falcon,* 247 U.S. 147, 155 (1982).

The "fairly and adequately" representing the class requirement is satisfied "when both the class representative and its attorneys are capable of satisfying their obligations, and neither has interests conflicting with those of other class members." *Suprema Specialties, 206 F.Supp.2d at 633* (citations omitted). The Third Circuit explained, that when assessing this requirement, courts should consider whether the proposed lead plaintiff "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." *In re Cendant Corp. Litig ., 264 F.3d at 265* (quoting *Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir.1988)*).

The Cedar Street Group satisfies both the typicality and adequacy requirements of Rule 23(a). The Cedar Street Group represents the interests of the purchasers of both DVI common stock and DVI 9.875% Senior Notes. The Cedar Street Group's interests are typical because they, as a result of the same course of conduct, suffered the same injuries as the absent class members, and their claims are based on the same legal issues. Specifically, the Cedar Street Group: (a) acquired DVI common stock and 9.875% Senior Notes during the Class Period; (b) at market prices allegedly artificially inflated as a result of the Defendants' false and/or misleading statements; (c) which statements were in violation of federal securities laws; and (d) suffered damages thereby. Additionally, the Cedar Street Group adequately represents the interests of the Class because: (a) its interests are clearly aligned with purchasers of both common stock and 9.875% Senior Notes; (b) it is comprised of both individual and institutional investors; and (c) there is no evidence of their interests conflicting with those of the other class members. Moreover, we find that the Cedar Group's selected counsel are capable of satisfying their obligations; evidence of conflict with the interests of other class members is lacking. Thus, the Cedar Street Group satisfies the last requirement of the presumptive "most adequate" plaintiff test.

4. Presumption Not Rebutted

**\*13** The presumption of the "most adequate" plaintiff, however, "may be rebutted only upon proof

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
(Cite as: 2003 WL 22849604 (E.D.Pa.))

by a member of the purported plaintiff class that the presumptive most adequate plaintiff--(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Although some of the movants suggest that it is *possible* that the Cedar Street Group *may* not be able to adequately represent the interest of the Class, such speculation is insufficient to overcome the presumption under the PSLRA. No member of the purported plaintiff Class has submitted proof or demonstrated a reasonable basis for finding that the Cedar Street Group will not fairly and adequately protect the interest of the Class, or that it is subject to unique defenses which render it incapable of adequately representing the Class. Therefore, we find that the presumption has not been rebutted and that the Cedar Street Group remains the presumptive "most adequate" plaintiff.

Additionally, the Court finds that the interests of the Class would not be enhanced by appointing the Karel Group as co-lead plaintiff. The Karel Group has not demonstrated the necessity or efficacy to the Class' benefit for such designation as co-lead plaintiff. The Cedar Street Group is comprised of individual and institutional investors and contains holders of both DVI common stock and Senior Notes. Moreover, there is no conflict of interest that prevents the Cedar Street Group from representing the interests of the Karel Group or the rest of the Class. Thus, we conclude that the Cedar Street Group alone will fairly and adequately represent the interests of the Class.

III. Approval of Selection of Lead Counsel

Under the PSLRA, "[t]he most adequate lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Suprema Specialties,* 206 F.Supp.2d at 641 (quoting § 78u-4(a)(3)(B)(v)). The Third Circuit has commented on this issue: "We stress, however, that the question at this stage is not whether the court would 'approve' that movant's choice of counsel or the terms of its retainer agreement or whether another movant may have chosen better lawyers or negotiated a better fee agreement; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all." *In re Cendant Corp. Lit.,* 264 F.3d at 266. Stated differently, once the presumption is

triggered, the question is "not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair and adequate' job" *Id.* at 268. Indeed, the Conference Committee Report and the Senate Report "indicate that the court should not interfere with lead plaintiff's choice of counsel, unless such intervention is necessary to 'protect the interest of the plaintiff class." ' *Suprema Specialties, Inc.,* 206 F.Supp.2d at 641 (quoting H.R. Conf. Rep. No. 104-369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 734; S.Rep. No. 104-98 at 11-12 (1995) *reprinted in* 1995 U.S.C.C.A.N. 679, 690).

**\*14** The Court does not find such intervention necessary to "protect the plaintiff class." Therefore, Krislov & Associates, Ltd. is approved to serve as Lead Counsel and Chimicles & Tikellis LLP is approved to serve as Liaison Counsel. [FN7]

> FN7. To the extent that the Karel Group submitted a request for the appointment of its counsel as co-lead counsel regardless of the Karel Group being appointed as co-lead plaintiff, such request is also denied.

CONCLUSION

For the foregoing reasons, the Court grants Cedar Street Group's Motion to Consolidate, appoints the Cedar Street Group as Lead Plaintiff, and approves Krislov & Associates, Ltd. to serve as Lead Counsel and Chimicles & Tikellis LLP to serve as Liaison Counsel. An appropriate order follows.

2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636

**Motions, Pleadings and Filings** (Back to top)

• 2:03CV05674                     (Docket) (Oct. 10, 2003)

• 2003 WL 23903662 (Trial Motion, Memorandum and Affidavit) Motion of Thomas Sciba to Consolidate Pending Cases, for Appointment As Lead Plaintiff, and for Approval of Lead Plaintiff's Choice of Counsel (Sep. 29, 2003)

• 2:03CV05244                     (Docket) (Sep. 17, 2003)

• 2:03CV05141                     (Docket) (Sep. 12, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                      Page 12
2003 WL 22849604 (E.D.Pa.), Fed. Sec. L. Rep. P 92,636
**(Cite as: 2003 WL 22849604 (E.D.Pa.))**


•       <u>2:03CV05111</u>(Docket)
(Sep. 10, 2003)

•       <u>2:03CV05000</u>(Docket)
(Sep. 04, 2003)

•       <u>2:03CV04963</u>(Docket)
(Sep. 03, 2003)

•       <u>2:03CV04795</u>(Docket)
(Aug. 20, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT

# 24



Slip Copy                                                                                          Page 1
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
Clifford C. MARSDEN and Ming XU, Individually
and on Behalf of All Others
Similarly Situated, Plaintiffs,
v.
SELECT MEDICAL CORP., Martin Jackson, Robert
A. Ortenzio, Rocco Ortenzio, and
Patricia Rice, Defendants.
**No. Civ.A.04-4020.**

Jan. 18, 2005.
Eric L. Young, Kenney Lennon & Egan, Plymouth,
PA, Peter E. Seidman, Milberg Weiss Bershad &
Schulman LLP, New York, NY, Stuart T. Steinberg,
Dechert Price and Rhoads, Philadelphia, PA, for
Plaintiffs.

David M. Howard, Dechert LLP, Michael L.
Kichline, Dechert, Price & Rhoads, Philadelphia, PA,
for Defendant.

*MEMORANDUM AND ORDER*

JOYNER, J.

**\*1** Via the motion now pending before this court,
Defendants move to deem inadequate Plaintiffs'
notice of September 10, 2004 pursuant to the Private
Securities Litigation Reform Act of 1995. For the
reasons which follow, this motion shall denied.

*Factual Background*
Plaintiffs Clifford C. Mardsen and Ming Xu filed
this class action complaint on August 24, 2004 on
behalf of all injured investors who purchased Select
Medical stock between July 29, 2003 and May 11,
2004 (the "Class Period"). The Complaint alleges that
Defendants artificially inflated Select Medical stock
prices by means of material misstatements and
omissions. Specifically, Plaintiffs contend that
Defendants misled investors during the Class Period
by emphasizing Select Medical's strong financial
performance while failing to disclose the imminent
possibility of changes to Medicare reimbursement
regulations which would negatively impact the
company's financial success.

In accordance with § 78u-4(a)(3)(A)(i) of the
Private Securities Litigation Reform Act (PSLRA),
Plaintiffs' counsel published the following notice (the
"Milberg Notice") in the September 10, 2004 edition
of Investor's Business Daily:

The law firm of Milberg Weiss Bershad &
Schulman LLP announces that a class action
lawsuit was filed on August 24, 2004 on behalf of
purchasers of the securities of Select Medical Corp.
("Select Medical" or the "Company")
(N.Y.SE:SEM) between July 29, 2003 and May 11,
2004, inclusive, (the "Class Period") seeking to
pursue remedies under the Securities Exchange Act
of 1934 (the "Exchange Act").

The action, captioned Marsden v. Select Medical
Corp., No. 04cv4020, is pending in the United
States District Court for the Eastern District of
Pennsylvania against defendants Select Medical,
Martin Jackson, Robert A. Ortenzio, Rocco
Ortenzio, and Patricia Rice.

The complaint alleges that Select Medical, at all
relevant times, was an operator of specialty
hospitals, including long-term acute care facilities,
whose financial performance was heavily
dependent on Medicare reimbursements. The
complaint further alleges that: (a) throughout the
Class Period Select Medical touted its strong
operations and financial performance, reported
remarkable quarterly increases in revenues, income
and earnings per share, and represented that the
Company was operating pursuant to a business
model that would enable it to grow organically and
through acquisitions; (b) unbeknownst to investors,
Select Medical at all relevant times operated under
the shadow of an imminent regulatory crackdown
that could have a devastating effect on the
Company's operations and financial performance;
(c) defendants knew of or recklessly disregarded
this danger but failed to disclose it to investors; and
(d) defendants engaged in this conduct so that they
and other Select Medical insiders could sell more
than 11 million of their personally-held Select
Medical shares at artificially inflated prices to
unsuspecting shareholders for proceeds in excess
of $270 million.

**\*2** The truth began to emerge on May 11, 2004. On
that date, defendants issued a press release in
which they announced that a proposed Medicare
reimbursement rate rule change, if adopted, would
have a "material adverse effect on Select's results

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of operations for the periods after the rule becomes effective." On this news, Select Medical shares, which had opened on May 11, 2004 at $18.55, closed the day at $13.68, their low for the day. On May 12, 2004 the shares opened at $11.80 and fell to a low of $10.25 before rebounding slightly to close the dat at $11.20--for a total two-day decline of 40%. Subsequently, on August 2, 2004, the Centers for Medicare and Medicaid Services announced the phase-in of reduced Medicare reimbursement rates for long-term acute care facilities accepting admissions from host hospitals, such as those operated by Select Medical, and, on August 23, 2004, Select Medical announced that it was scaling back its expansion plans to compensate for the anticipated Medicare cuts.

If you bought the securities of Select Medical between July 29, 2003 and May 11, 2004, and sustained damages, you may, no later than November 9, 2004, request that the Court appoint you as lead plaintiff. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may serve together as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision of whether or not to serve as a lead plaintiff. You may retain Milberg Weiss Bershad & Schulman LLP, or other counsel of your choice, to serve as your counsel in this action.

Milberg Weiss Bershad & Schulman LLP (http://www.milbergweiss.com) is a firm with over 100 lawyers with offices in New York City, Los Angeles, Boca Raton, Delaware, Seattle and Washington, D.C. and is active in major litigations pending in federal and state courts throughout the United States. Milberg Weiss has taken a leading role in many important actions on behalf of defrauded investors, consumers, and others for nearly 40 years. Please contact the Milberg Weiss website for more information about the firm. If you wish to discuss this action with us, or have any questions concerning this notice or your rights and interests with regard to the case, please contact the following attorneys ...

On November 9, 2004, class members Capital Invest, die Kapitalanlagegegesellschaft der Bank Austria Creditanstalt Gruppe GmbH (for account of its funds C 43 and GF 5), James Shaver, and Frank C.

Bagatta (the "Capital Group") moved to be appointed lead plaintiff. That motion is currently pending before this Court.

*Discussion*
I. The PSLRA Notice Requirement

The Private Securities Litigation Reform Act (PSLRA) of 1995 was enacted to empower investors so that they, not their lawyers, would retain primary control over private securities class action litigation. S.Rep. No. 104-98 at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683; H.R.Rep. No. 104-369 at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731. To this end, PSLRA imposes procedural protections intended to encourage investors with substantial security holdings, whose interests are likely to be strongly aligned with the interests of the shareholder class, to participate in litigation as lead plaintiffs. S.Rep. No. 104-98 at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 685; H.R.Rep. No. 104-369 at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731; *see also* 15 U.S.C. 78u-4(a)(3)(B)(iii) (establishing a rebuttable presumption that the most adequate plaintiff is the party who "has the largest financial interest in the relief sought by the class"). Specifically, the PSLRA instructs that plaintiffs, within 20 days of filing a complaint, "shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class-- (I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. 78u-4(a)(3)(A)(i). The PSLRA notice provisions are not intended, however, to replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure. H.R.Rep. No. 104-369 at 49, FN 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730.

**\*3** In deciding a motion for the appointment of lead plaintiff under PSLRA, courts have an independent duty to "scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA, that is, encouraging the most adequate plaintiff, the plaintiff with the largest financial stake in the outcome of the litigation, to come forward and take control of the litigation." *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 17. In this action, Defendants have petitioned the Court to examine the sufficiency of Plaintiffs' notice in advance of a decision on the outstanding motion for appointment of lead plaintiff.

For the most part, courts reviewing the sufficiency of PSLRA notice in the context of motions for lead plaintiff status have taken the minimal requirements of § 78u-4(a)(3)(A)(i) at face value, summarily finding that the notice requirement is satisfied by timely publication setting forth the 60- day period for moving the court. *See, e.g., Bobrow v. Mobilmedia, Inc.,* 1997 U.S. Dist. LEXIS 23806 at 4 (D.N.J.1997); *Greater Pa. Carpenters Pension Fund v. Adolor Corp.,* No. 04-1728, 2004 U.S. Dist. LEXIS 26205 at 6, 2004 WL 3019235 (E.D.Pa.2004); *A.F.I.K. Holding SPRL v. Fass,* 216 F.R.D. 567, 570 (D.N.J.2003). However, the few courts that have addressed this issue in greater detail have typically found that the full extent of a noticing plaintiff's obligations must be informed by the underlying goals of the PSLRA notice provision. *See Burke v. Ruttenberg,* 102 F.Supp.2d 1280, 1311 (N.D.Ala.2000); *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 17-18; *Ravens v. Iftikar,* 174 F.R.D. 651, 658 (N.D.Cal.1997). We agree. Any analysis of the sufficiency of notice under the PSLRA must be guided by the fundamental purpose of the notice requirement, which is to provide class members with sufficient information about the suit and the requirements for lead plaintiff appointment so that they can make an informed judgment about whether they wish to seek lead plaintiff status. *Calif. Pub. Employees' Ret. Sys. v. The Chubb Corp.,* 127 F.Supp.2d 572, 576 (D.N.J.2001); *Burke,* 102 F.Supp.2d at 1312. Furthermore, the notice requirement is intended to give potential plaintiffs an opportunity to make this decision without being forced to contact noticing counsel for additional information, further protecting against "lawyer-driven litigation." *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 19.

In determining the extent to which these general goals should inform our analysis of the sufficiency of the Milberg Notice, we are guided by the United States District Court for the Northern District of Alabama's thoughtful discussion in *Burke v. Ruttenberg,* 102 F.Supp.2d at 1311-12. In that case, the court identified three methods of interpreting the reach of the PSLRA notice requirement. Under the first method, § 78u-4(a)(3)(A)(i) could be construed broadly, requiring "full disclosure of all of the information relevant to the pendency of the action." *Id.* at 1311. While such robust notice certainly satisfies the aims of the PSLRA, it imposes significant costs on the noticing plaintiffs and appears to be "more than is required by the language" of the statute. *Id.* At the other end of the spectrum, notice

under the PSLRA could require only minimal information, namely, that the suit is pending, that it asserts securities claims, and that the class period extends between two dates. This method is inadequate because it does not provide sufficient information from which potential lead plaintiffs could evaluate the action without turning to counsel or "fruitlessly" expending time and money searching out and reviewing the complaint. *Id.* at 1312. The court finally settled on an intermediate method, requiring that notice provide merely enough information to permit reasonable investors to decide whether they wish to perform further investigation and to direct them to further sources of information. *Id.* at 1311. The court held that such an interpretation accords with the purposes of the notice requirement, "in that it gives members of the putative class sufficient information from which to make basic decisions about deciding whether to act as lead plaintiff while not requiring the named plaintiff, who may not be chosen lead plaintiff, to expend too many of his [ ] resources in publishing a notice that is wastefully extensive." *Id.* at 1311-12.

**\*4** We find the reasoning in *Burke* highly persuasive. A class member reading notice published pursuant to the PSLRA should be able to (1) determine whether she is eligible for lead plaintiff status based on the class period; (2) learn enough about the asserted claims to make an initial judgment as to whether to obtain a copy of the full Complaint (which will in turn inform her final judgment about whether to pursue lead plaintiff status); and (3) contact the clerk's office to obtain a copy of the Complaint and discover the procedures for filing a motion. Furthermore, the reader should be able to achieve these three objectives independently, without being forced to contact noticing plaintiff's counsel for additional information or detail.

II. Timeliness of the Instant Motion

Plaintiffs first object to Defendants' November 30, 2004 Motion to Deem Notice Inadequate on the grounds that, while not styled as such, it is essentially an untimely response to the Capital Group's Motion for Appointment as Lead Plaintiff. Pursuant to Local Rule of Civil Procedure 7.1(c), any response to the Capital Group's motion should have been filed with this Court by November 23, 2004.

It is unnecessary for this Court to determine whether the instant motion should be treated as a response to the Capital Group's Motion for Appointment as Lead Plaintiff. Even accepting Plaintiffs' argument to this

Slip Copy                                                                                            Page 4
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

effect, a court may, pursuant to Rule 7.1(c), consider an untimely response where there is sound rationale for doing so, and where so doing does not unfairly prejudice the moving party. *United States v. Eleven Vehicles,* 200 F.3d 203, 215 (3rd Cir.2000). As the instant motion raises significant legal questions regarding the scope of the PSLRA, and as this Court would have an independent duty, upon consideration of the Capital Group's motion, to challenge the sufficiency of the Milberg Notice, there is a sound rationale for addressing the merits of this Motion to Deem Notice Inadequate. *See Avellino v. Herron,* 181 F.R.D. 294, 295 n. 4 (E.D.Pa.1998) (where motion raises important issues of public concern, court may consider merits of a motion despite lack of response); *Janovici v. DVI, Inc.,* 2003 U.S. Dist. LEXIS 22315 at 17, 2003 WL 22849604 (E.D.Pa.2003) (in considering motions for appointment of lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements). Furthermore, Plaintiffs will not be prejudiced by our consideration of the instant motion, as they have had ample opportunity to present their concerns in both a response and surreply.

### III. Sufficiency of the Milberg Notice under the PSLRA

Defendants contend that the notice in this action was inadequate because it omitted (i) information about the named plaintiffs and their holdings in Select Medical, (ii) the legal standards governing lead plaintiff motions, (iii) the location of the courthouse and the name of the judge to whom the case is assigned, and (iv) the specific misstatements and omissions underlying Plaintiffs' claims. Defendants further contend that the notice was an "impermissible advertisement" for Milberg Weiss which undermined the objectives of the PSLRA by focusing on self-promotion rather than empowerment of potential lead plaintiffs.

**\*5** In support of their arguments, Defendants rely primarily on two cases from the United States District Court of New Jersey in which District Judges Alfred J. Lechner and Garrett E. Brown rejected PSLRA notices as inadequate for want of information not explicitly required by § 78u-4(a)(3)(A)(i), including the address of the court and name of the presiding judge, the release dates and content of alleged misstatements or omissions, the differing effects of each alleged misstatement or omission, the names of the plaintiffs and a description of their holdings, and an explanation of the possibility of intra-class conflicts. *In re Lucent,* 194 F.R.D. 137 at

147-48; *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 579-80. However, this Court is not bound by those decisions, and, indeed, finds much of their reasoning unpersuasive in light of the intermediate approach to PSLRA notice which this Court has adopted above.

More significantly, one case within the Eastern District of Pennsylvania has addressed the PSLRA notice requirements as applied to a notice also published by Milberg Weis and similar to the instant Milberg motion in language and level of detail, and upheld its sufficiency under the PSLRA. *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 26-27. This Court likewise finds that the extra-statutory requirements relied on by Defendants are not necessary to satisfy the objectives of the PSLRA. The Milberg Notice, while lacking in some of the details considered essential in *In re Lucent,* satisfies both the explicit requirements of § 78u-4(a)(3)(A)(i) and the more general statutory goals. A class member reading the Milberg Notice would learn enough about the nature of the claims to determine his eligibility for lead plaintiff status and make a preliminary decision of whether to seek additional information, and would be able to obtain a copy of the Complaint from the clerk's office if he were so inclined.

### A. Timely Publication

The Milberg Notice was published in Investor's Business Daily on September 10, 2004, within 20 days of the date the Complaint in this action was filed. Defendants repeatedly suggest, in their motion and reply, that the notice was of a "stealth character" because it was published "a random 17 days after the case was filed," and was "bur[ied]" in Investor's Business Daily rather than disseminated by a national wire service. Defendants' position on this issue is utterly without merit. Investor's Business Daily is a nationally-circulated business-oriented publication catering to investors, and, as such, satisfies the publication requirement of § 78u-4(a)(3)(A)(i). *Seamans v. Aid Auto Stores, Inc.,* No. 98-7395, 2000 U.S. Dist. LEXIS 1749 at 11-12, 2000 WL 33769023 (E.D.N.Y.2000); *Lax v. First Merchants Acceptance Corp.,* 1997 U.S. Dist. LEXIS 11866 at 15, 1996 WL 461036 (N.D.Ill.1997). [FN1] Furthermore, this Court cannot conceive of any legitimate argument in support of Defendants' suggestion that a notice published "a random 17 days" after the filing of a complaint somehow fails to satisfy the requirements of § 78u-4(a)(3)(A)(i).

FN1. Defendants further suggest that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

publication of the Milberg Notice in Investor's Business Daily was inadequate because it was a departure from Milberg Weiss' "usual practice" of serving notice by news wire. *See* Defendants' Reply, p. 2. It should be beyond question, however, that the sufficiency of notice under the PSLRA must be judged against the statutory requirements of § 78u-4(a)(3)(A)(i), rather than any particular law firm's typical practice.

B. The "Pendency of the Action" Requirement

**\*6** The Milberg Notice adequately informs class members of "the pendency of the action," as it identifies the caption of the case, its civil action number, the Court before which the action was brought, and the names of all five Defendants. The purpose of the "pendency of the action" requirement is to provide interested class members with "accurate information from which [they] may contact the Court and readily obtain a copy of the complaint in a pending action and/or file a motion to be appointed as lead counsel in that case." *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 18. In *Janovici,* this Court upheld the sufficiency of a notice, also published by Milberg Weiss, which included only the names of the defendants and the Court, holding that these two identifying facts were sufficient to inform class members of the pendency of the action. *Id.* at 26-27. [FN2] We find that a PSLRA notice which includes the court name, case caption, and docket number provides all the information an interested class member needs to contact the Court and obtain a copy of the complaint. In so holding, we reject the United States District Court of New Jersey's requirement that PSLRA notice include the address of the Court and the name of the judge to whom the case is assigned. *See Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 579; *In re Lucent,* 194 F.R.D. 137 at 147. Surely an investor who reads the Investor's Business Daily on a regular basis and is interested in being lead plaintiff in a class action securities suit is competent enough to consult a telephone directory to find the Court's address and phone number. This Court is not convinced that investors will be discouraged from participating if "force[d] ... to figure it out for themselves." *See* Defendants' Brief, p. 8. And while it might be helpful for a PSLRA notice to include the name of the assigned judge, a class member need not provide that information to get a copy of the complaint, and can readily discover the judge's name by contacting the clerk's office. Because an interested class member reading the Milberg Notice would find

enough information therein to contact the Court and obtain a copy of the Complaint, the notice satisfies the "pendency of the action" requirement of § 78u-4(a)(3)(A)(i).

> FN2. While Defendants make much of the fact that the notice in *Janovici* provided a web link to a copy of the complaint on the Milberg Weiss website, the Court's decision made no mention of that fact, explicitly holding that "list[ing] the names of the defendants ... provid [ed] purported class members with sufficient information from which they could contact the Court and obtain a copy of the complaint and/or file a motion for appointment as lead plaintiff." *Janovici,* 2003 U.S. Dist. LEXIS at 26-27. Furthermore, this Court fails to see how encouraging class members to visit a law firm's website to view the complaint serves the PSLRA's purpose of protecting investors from lawyer-driven lawsuits. *See, e.g., Janovici,* 2003 U.S. Dist. LEXIS 22315 at 19 (providing information from which interested class members may contact the Court shields against lawyer-driven litigation because class members "are not forced to contact noticing counsel for additional information"); *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 580 (where action is not identified by caption or docket number, directing class members to an attorney website to view the complaint does not cure deficiencies of notice and undermines PSLRA goals); *Burke,* 102 F.Supp.2d at 1312 (notice directing class members to contact counsel for a copy of the complaint does not comport with the purposes of the PSLRA).

C. The Claims Asserted and Class Period

The Milberg Notice satisfies the requirements of § 78u-4(a)(3)(A)(i) relating to information about the claims asserted and the class period. The notice identifies the period between July 29, 2003 and May 11, 2004 as the relevant Class Period. It summarizes the claims asserted in the Complaint, highlighting the allegations that Select Medical, throughout the Class Period, touted its strong financial performance, misrepresented the nature of its business model, and failed to disclose the danger of an imminent regulatory crackdown. The notice further describes the drop in share prices which occurred after Defendants issued a May 11, 2004 press release

announcing that the proposed regulatory change would have a material adverse effect on Select Medical's operations.

*7 In support of their contention that the Milberg Notice is deficient because it does not identify the content or dates of the alleged misrepresentations, Defendants cite *In re Lucent,* 194 F.R.D. 137 at 147-48. In that case, the United States District Court for the District of New Jersey relied on *Ravens v. Iftikar,* 174 F.R.D. 651, to hold that a PSLRA notice should describe, in detail, the alleged misstatements or omissions, their release dates, and, if multiple disclosures are at issue, the differing effects of each. *In re Lucent,* 194 F.R.D. 137 at 148. However, it would be a misreading of *Ravens* to impose such strict requirements on all PSLRA notices. *Ravens* addressed a "skeletal" one-paragraph notice which provided no detail about the claims asserted beyond an identification of the statutory grounds (§ 10(b) and 20(a) of the Securities Exchange Act), and no information about the named plaintiffs, who appeared, even on the face of the complaint, "incapable of prosecuting" the action. *Ravens,* 174 F.R.D. at 658. Far from setting forth a firm rule imposing the requirements considered in *In re Lucent,* the United States District Court for the Northern District of California held that "the adequacy of notice published under the Reform Act cannot be evaluated standing alone. The notice must be assessed in light of the pleading to which the notice is designed to alert investors." *Id.* Among the reasons the court gave for finding the notice inadequate were that "the lengthy and detailed allegations of the complaint [were] not summarized," and that "[a]ctual and potential obstacles to plaintiff's representation of the entire class" were not disclosed. *Id.*

In contrast, the Milberg Notice adequately summarizes the allegations in the Complaint, without overwhelming readers with a flood of detail. The Complaint in this action identifies twelve dates on which Defendants allegedly misrepresented the strength of their operations while failing to disclose the possibility of a financial downturn if proposed Medicare rate changes were to be adopted. We believe that requiring named Plaintiffs, who may not ultimately be chosen as lead plaintiffs, to expend the resources required to publish a "wastefully extensive" notice containing the exact date, content, and individualized impact of each of twelve or more misrepresentations and omissions is beyond the contemplation of the PSLRA. *See Burke,* 102 F.Supp.2d at 1311-12. [FN3] The Milberg Notice

provides a summary of the legal and factual basis of the claims, adequately informing investors of the nature and character of the claims asserted in accordance with the requirements of § 78u-4(a)(3)(A)(i). *See Janovici,* 2003 U.S. Dist. LEXIS 22315 at 27 (finding that a Milberg Weiss notice summarizing misrepresentations generally, but not providing dates or other details, adequately informs investors of the "claims asserted").

> FN3. This is particularly so where, as here, it is clear from both the notice and the Complaint that there were no corrective statements made during the Class Period, and that a single disclosure event occurred at the end of the Class Period. *See Wenderhold v. Cylink Corp.,* 188 F.R.D. 577, 582 (N.D.Ca.1999).

Furthermore, while Defendants contend that a PSLRA notice must identify the named plaintiffs and describe their holdings, we are not persuaded that the reasoning of the two cases cited in support of that proposition is applicable in this action. In *Calif. Pub. Employees' Ret. Sys.,* the named plaintiff clearly lacked standing to sue because he held no shares during the class period, a fact obvious on the face of the complaint. *Calif. Pub. Employees' Ret. Sys.,* 127 F.Supp.2d at 580-81. Likewise, in *Ravens,* there were numerous obstacles to representation by the named plaintiffs, including unique defenses, concerns regarding their qualifications, and the possibility of intra-class conflicts. *Ravens,* 174 F.R.D. at 657. We note, initially, that this Court is not currently in a position to investigate the sufficiency of the Complaint or the named Plaintiffs' qualifications, and Defendants have identified no conspicuous obstacles to Plaintiffs' representation. Furthermore, where issues of standing or qualification are not obvious on the face of a complaint, we cannot imagine that the drafters of the PSLRA expected named plaintiffs to make inquiries as to these issues and present their findings in notice form. Neither the explicit requirements of § 78u-4(a)(3)(A)(i) nor the general goals of the PSLRA demand the imposition of such an obligation.

D. Moving for Lead Plaintiff Status

*8 The Milberg Notice advises class members who have sustained damages that they may, within 60 days, move the court to be appointed lead plaintiff. The notice briefly explains the significance of the lead plaintiff, summarizes the typicality and adequacy of representation requirements, specifies

Slip Copy                                                                                          Page 7
2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P 93,079
**(Cite as: 2005 WL 113128 (E.D.Pa.))**

that multiple class members may serve together as
lead plaintiffs, and notes that class members who do
not attain lead plaintiff status are nonetheless entitled
to share in any recovery. This information clearly
satisfies the § 78u-4(a)(3)(A)(i)(II) requirement that
notice published pursuant to the PSLRA advise class
members of their right to move for lead plaintiff
status within 60 days.

Defendant's citation to *In re Lucent* is inapposite. In
that case, the notice in question informed class
members of their right to move the court within 60
days, and indicated only that they "must meet certain
legal requirements" to serve as lead plaintiff. *See In
re Lucent,* 194 F.R.D. 137 at 147. The court found
such notice inadequate because it did not "even
summarily describe the legal requirements" for lead
plaintiff status. *Id.* In contrast, the Milberg Notice in
this action does "summarily describe" the
requirements for lead plaintiff status.

Nonetheless, Defendants object to the fact that the
Milberg Notice does not mention the PSLRA's
rebuttable presumption that the most adequate
plaintiff is the one with the "largest financial
interest." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii). We
note initially that, while the PSLRA was drafted to
encourage plaintiffs with the greatest financial
interest to take control of the litigation, the statute by
no means requires that lead plaintiffs have the largest
financial interest, and explicitly allows for rebuttal of
this presumption. 15 U.S.C. § 78u-4(a)(3)(B)(iii).
Furthermore, this Court has upheld the adequacy of a
similar notice published by Milberg Weiss which
described the requirements for lead plaintiff status in
language identical to the language at issue in this
case. *Janovici,* 2003 U.S. Dist. LEXIS 22315 at 26-
27 (finding that the notice was sufficient because it
advised the class that a member may move to serve
as lead plaintiff, explained the significance of a lead
plaintiff, and specified the date by which such a
motion must be filed). The Milberg Notice is not
rendered inadequate by its failure to include
information concerning the significance of a lead
plaintiff's financial stake in the litigation.

An appropriate Order follows.

### *ORDER*

AND NOW, this 18th day of January, 2005, upon
consideration of Defendants' Motion to Deem Notice
Inadequate (Doc. No. 8), and all responses thereto
(Docs. No. 9, 10, 11), it is hereby ORDERED that the
motion is DENIED.

2005 WL 113128 (E.D.Pa.), Fed. Sec. L. Rep. P
93,079

**Motions, Pleadings and Filings** (Back to top)

• 2:04CV04020 (Docket)
(Aug. 24, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.