# Exhibit 1

**FILED**

MAY 24 2005 *ra*

MICHAEL W. DOBBINS
CLERK. U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DR. STEPHEN BLAU, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, LAURENCE FULLER, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, and J.P. MORGAN CHASE & CO.,<br><br>Defendants. | Civil Action No. **04C 6592**<br><br>Judge William J. Hibbler<br><br>Magistrate Judge Martin C. Ashman |

**FILED**

MAY 2 4 2005 *ra*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## MEMORANDUM OF AMICI CURIAE
## SAMUEL HYLAND AND STEPHANIE SPEAKMAN

DATED:     May 23, 2005

Joseph N. Gielata, of the Delaware Bar
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096
attorney@gielatalaw.com

*Attorney for Amici Curiae*
*Samuel Hyland and*
*Stephanie Speakman*

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.    The Merger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

    B.    The Delaware Actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Illinois Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    Wolf Haldenstein's Other Actions Against JPMC. . . . . . . . . . . . . . . . . . . . .7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES
    NECESSITATE DISQUALIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    A.    The Court Has A Continuing Responsibility to
        Review The Adequacy of the Class Representative. . . . . . . . . . . . . . . . . . . . . . .10

    B.    Wolf Haldenstein's Divided Loyalties Amount to a
        Non-Waivable and Disqualifying Conflict of Interest. . . . . . . . . . . . . . . . . . . 12

II.    THIS ACTION SHOULD BE TRANSFERRED TO THE
    DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a) . . . . . . . . . . . . . . . . . . . . .17

III.    WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE
    BECAUSE IT OMITTED CRITICAL INFORMATION. . . . . . . . . . . . . . . . . . . . . . .23

IV.    THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED
    UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S
    FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION. . . . . . . . . . . . . . . 26

V.    WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION
    AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE
    REMOVAL OR SUBSTITUTION OF LEAD COUNSEL. . . . . . . . . . . . . . . . . . . . . .31

    A.    Wolf Haldenstein's Rampant Plagiarism Indicates An
        Insufficient Pre-Filing Investigation Or None At All. . . . . . . . . . . . . . . . . . . .32

    B.    Wolf Haldenstein's Failure to Serve Summons Properly. . . . . . . . . . . . . . . . .34

    C.    Wolf Haldenstein Names the Wrong Defendants
        And Fails to Name A Crucial Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page**

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Borenstein v. Finova Group, Inc.,*
    C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732
    (D. Ariz. Aug. 28, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Burke v. Ruttenberg,*
    102 F. Supp. 2d 1280 (N.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*In re Cardinal Health, Inc. ERISA Litig.,*
    225 F.R.D. 552 (S.D. Ohio 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*Coats Co., Inc. v. Vulcan Equipment Co., Ltd.,*
    459 F. Supp. 654 (D.C. Ill. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Commonwealth Edison Co. v. Train,*
    71 F.R.D. 391 (N.D. Ill. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n.12

*In re Continental Illinois Sec. Litig.,*
    750 F. Supp. 868 (N.D. Ill. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Courtesy Caribbean v. Aquilar,*
    1995 WL 549127 (N.D. Ill. Aug. 31, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*CTS Corp. v. Dynamics Corp. of Am.,*
    481 U.S. 69 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re DaimlerChrysler AG Sec. Litig.,*
    216 F.R.D. 291 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*In re DaimlerChrysler AG Sec. Litig.,*
    269 F. Supp. 2d 508 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*de la Fuente v. DCI Telecommunications, Inc.,*
    259 F. Supp. 2d 250 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 & n.8

*de la Fuente v. DCI Telecommunications, Inc.,*
    269 F. Supp. 2d 229 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Examen, Inc. v. VantagePoint Venture Partners 1996,*
  slip op. (Del. Ch. March 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Ferens v. John Deere Co.,*
  494 U.S. 516 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Park Surgical Center, Inc. v. Inland Steel Co.,*
  1996 WL 204322 (N.D. Ill. Apr. 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Greebel v. FTP Software Inc.,*
  939 F. Supp. 57 (D. Mass. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Greenfield v. U.S. Healthcare, Inc.,*
  146 F.R.D. 118 (E.D. Pa. 1993), *aff'd,*
  *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274 (3d Cir. 1994) . . . . . . . . . . . . .32-34

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Hess v. Gray,*
  85 F.R.D. 15 (N.D. Ill. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill v. Equitable Bank,*
  115 F.R.D. 184 (D. Del. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Hite v. Norwegian Caribbean Lines,*
  551 F. Supp. 390 (E.D. Mich. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17, 18

*Janovici v. DVI, Inc.,*
  2003 WL 22849604 (E.D. Pa. Nov. 25, 2003) . . . . . . . . . . . . . . . . . . . . .23, 25, 26

*Kamilewicz v. Bank of Boston Corp.,*
  100 F.3d 1348 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kayes v. Pacific Lumber Co.,*
  51 F.3d 1449 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Krim v. pcOrder.com, Inc.,*
  210 F.R.D. 581 (W.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kuper v. Quantum Chemical Corp.,*
  145 F.R.D. 80 (S.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Kurczi v. Eli Lilly & Co.,*
  160 F.R.D. 667 (N.D. Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Laborers Local 1298 Pension Fund v. Campbell Soup Co.*,
  2000 WL 486956 (D.N.J. Apr. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Marsden v. Select Medical Corp.*,
  2005 WL 113128 (E.D. Pa. Jan. 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Matter of Excello Press, Inc.*,
  967 F.2d 1109 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Metro Services Inc. v. Wiggins*,
  158 F.3d 162 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nager v. Websecure, Inc.*,
  1997 WL 773717 (D. Mass. Nov. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Oracle Sec. Litig.*,
  131 F.R.D. 688 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Oxford Health Plans, Inc.*,
  182 F.R.D. 42 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.7

*Ravens v. Iftikar*,
  174 F.R.D. 651 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*River Road International, L.P. v. Josephthal Lyon & Ross, Inc.*,
  871 F. Supp. 210 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Schwarz v. National Van Lines, Inc.*,
  2004 WL 432483 (N.D. Ill. Feb. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Small v. Lorillard Tobacco Co., Inc.*,
  252 A.D.2d 1 (N.Y.A.D. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36 n.11

*Smith v. Suprema Specialties, Inc.*,
  206 F. Supp. 2d 627 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30 n.6

*So-Comm Inc. v. Reynolds*,
  607 F. Supp. 663 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Solomon v. Continental American Life Insurance Co.*,
  472 F.2d 1043 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sullivan v. Chase Inv. Services of Boston, Inc.*,
  79 F.R.D. 246 (D.C. Cal. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Taubenfeld v. Career Education Corp.*,
    2004 WL 554810 (N.D. Ill. March 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*In re Terayon Communications Sys., Inc.*,
    2004 WL 413277 (N.D. Cal. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tracinda Corp. v. DaimlerChrysler AG*,
    -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005) . . . . . . . . . . . . . . . . 21

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 86 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tracinda Corp. v. DaimlerChrysler AG*,
    362 F. Supp. 2d 487 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tranor v. Brown*,
    913 F. Supp. 388 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    209 F.R.D. 353 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30 n.6

*Van Gelder v. Taylor*,
    621 F. Supp. 613 (D.C. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Van Horn v. Graves*,
    2002 WL 27658 (N.D. Ill. Jan. 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*,
    231 F.3d 1215 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**Statutes:**

15 U.S.C. § 78u-4(a)(3)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

15 U.S.C. § 78u-4(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(2)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15 U.S.C. § 78u-4(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28 U.S.C. § 1404 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

**<u>Treatises:</u>**

Moore's Federal Practice ¶111.13[1][c][iii] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 (1986). . . . . . 19

## INTRODUCTION

Amici Curiae Samuel I. Hyland and Stephanie Speakman (the "Delaware Group"), residents of New Castle County, Delaware and members of the putative class in this action, respectfully submit this brief to protect the class from any further malpractice by the conflicted counsel for plaintiff in this action and to clarify the proper venue and leadership of this litigation.

The purported lead counsel in this action has divided loyalties, failed to publish adequate notice, selected an inappropriate venue, and submitted a false and misleading lead plaintiff application. It has also misrepresented its pre-filing investigation, failed to properly serve crucial defendants, and failed to name and incorrectly named certain defendants. These numerous flagrant blunders not only violate Rule 11 and provisions of the Private Securities Litigation Reform Act ("PSLRA") but also necessitate that, at least, the law firm must be removed as class counsel in this litigation to prevent any further harm to the class and this action should be transferred to an appropriate venue.

## INTEREST OF AMICI CURIAE

As set forth more fully below, the Delaware Group is comprised of two plaintiffs in a separate securities class action, pending in the District of Delaware, which may be affected by rulings in this action. As a result of defendants' misconduct, the Delaware Group sustained an aggregate loss of at least $106,026.08. (Aff. ¶ 4.)[1] On April 2, 2004, the record date for the shareholder vote described herein, the Delaware Group held 19,170 shares of JPMorgan Chase & Co. ("JPMC" or "the Company"). *Id.*

---

[1] All exhibits, statements and unreported decisions referenced herein are attached to the affidavit of Joseph N. Gielata, filed contemporaneously herewith and cited as "Aff. ¶ _" or "Aff. Ex. _."

## BACKGROUND

### A.    The Merger

Defendant JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. (Aff. Ex. B.) Defendant William B. Harrison, Jr. has served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of JPMC since 1999. However, by late 2003, after years of poor business decisions, costly acquisitions, and financial scandals, numerous public reports denounced Harrison's leadership and predicted that he would soon lose his job. This situation forced Harrison to conjure yet another massive deal to protect his lucrative and prestigious CEO title. Accordingly, Harrison commenced negotiations, on JPMC's behalf, with James Dimon, Chairman and CEO of Bank One Corporation ("Bank One"), concerning the possibility of a business combination between JPMC and Bank One.

As a result of these merger negotiations, on January 14, 2004, JPMC and Bank One issued a joint press release announcing their agreement to merge (the "Merger"). When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in stock, which substantially diluted their individual holdings. The total value of the deal was approximately $57 billion.

The proposed acquisition of Bank One in a stock-for-stock transaction required the approval of a majority of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was necessary for JPMC to have the corporate authority to

- 2 -

issue the shares necessary for the exchange. Thus, the defendants issued a Joint Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), to gain shareholder approval of the Merger. Unaware that the Proxy/Prospectus contained materially false and misleading statements and failed to disclose material facts, shareholders of JPMC overwhelmingly approved the Merger.

However, months later, it was revealed that, in the course of the secretive negotiations between Dimon and Harrison, Dimon had been willing to agree to a *no-premium deal* if he could be CEO of the combined company immediately. Instead, Harrison and Dimon struck a secret pact allowing Harrison to retain the CEO title for two more years in exchange for paying a premium. The Proxy/Prospectus omitted this secret pact. However, a June 27, 2004 article in *The New York Times* entitled "The Yin, the Yang and the Deal" (Aff. Ex. C) shocked the market with the following stunning revelations:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. *Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately,* according to two people close to the deal.
>
> *When Mr. Harrison resisted, Mr. Dimon insisted on a premium*, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

This article revealed that the Proxy/Prospectus was incomplete and materially misleading. The $7 billion premium paid by JPMC stockholders in the Merger was completely unnecessary. Moreover, the enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders, as it served only to entrench

- 3 -

Harrison in the CEO position for two more years, even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered. At no time did any of the defendants ever disclose the secret pact between Dimon and Harrion or that Dimon had offered to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

### B.   The Delaware Actions

In June 2004, soon after the secret pact was revealed, three JPMC shareholders commenced actions in the Delaware Court of Chancery in connection with the misconduct described above. The consolidated actions, styled *In re J.P. Morgan Chase & Co. Shareholder Litigation*, Consol. C.A. No. 531-N (the "Chancery Action"), assert common law claims against all defendants in this action. (Aff. Ex. D.) In March 2005, following a diligent investigation, Hyland filed a comprehensive class action complaint in the District of Delaware (the "Delaware Action") asserting claims under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)), Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5 and 240.14a-9), Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(a)(2) and 77o), and pendent common law claims. (Aff. Ex. A.)

On March 21, 2005, Hyland also moved for an injunction of related state court actions, but the motion was denied without prejudice by the Honorable Joseph J. Farnan, Jr. on April 18, 2005. On April 14, 2005, all defendants in the Delaware Action except for Riley P. Bechtel stipulated to waiver of service of summons. By letter dated April 27, 2005, Bechtel waived service of the summons in the Delaware Action.

On April 29, 2005, Vice Chancellor Stephen P. Lamb issued an opinion granting

defendants' motion to dismiss the Chancery Action. *In re J.P. Morgan Chase & Co.*

*S'holder Litig.*, No. 531-N, Mem. Op. (Del. Ch. Apr. 29, 2005). The opinion specifically

discussed and distinguished the Delaware Action, observing, in relevant part:

> A similar federal class action complaint was filed in the
> District of Delaware on March 17, 2005. The federal
> complaint alleges substantially the same claims that are
> before this court. It does, however, have several important
> differences. First, the federal complaint characterizes the
> deal between Harrison and Dimon as a "secret deal." This
> description implies that the merger negotiations were
> unknown to the board of JPMC, a fact that appears
> inconsistent with the state complaint's primary allegation,
> as well as later allegations in the federal complaint that the
> "[d]efendants were motivated to conceal Harrison's secret
> and undisclosed pact with Dimon."
>
> Second, the federal complaint alleges that JPMC violated
> federal securities laws, specifically Sections 10(b), 11,
> 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange
> Act of 1934. These claims are sufficient to give federal
> courts jurisdiction over the claims, including the related
> breaches of fiduciary duty claims.
>
> Finally, the federal complaint lists important distinguishing
> facts, some of which are inconsistent with facts in this
> action. For instance, the federal complaint states that
> *Harrison* offered the no-premium deal. The complaint
> before this court makes the opposite claim, i.e. that it was
> Dimon who made an offer of that nature. This discrepancy
> is not explained.
>
> The federal complaint alleges additional substantive facts
> concerning certain directors. For example, the federal
> complaint ties Futter's fund-raising activities to her board
> membership, as reported in *New York Magazine* on
> February 21, 2000. Additionally, the federal complaint
> alleges that Kaplan is an attorney whose law firm receives
> substantial fees from JPMC. [Emphasis in original;
> citations omitted.]

*Id.* at 11-12.

On May 3, 2005, Hyland requested leave of Court to serve document preservation subpoenas on the law firm and the investment bank that advised Bank One in connection with the Merger. Hyland also obtained confirmation that certain document preservation efforts agreed upon by the parties in the Chancery Action remained in force despite the dismissal of the Chancery Action. On May 23, 3005, Hyland, joined by his mother, Stephanie Speakman, filed an amended complaint. (Aff. Ex. B.)

### C.    The Illinois Action

On October 13, 2004, Dr. Stephen Blau, a purported JPMC shareholder, *see* Section III *infra*, commenced the action in this Court captioned as *Blau v. Harrison, et al.*, No. 04C 6592 (the "Illinois Action"). (D.E. #1.)

On December 14, 2004, through Wolf Haldenstein, Dr. Blau and another purported JPMC shareholder, the American Growth Fund, Inc. ("AGF"), moved for appointment as lead plaintiffs and appointment of Wolf Haldenstein as lead counsel. Defendants did not oppose this motion and no competing motion was filed.

Publicly-available information indicates that AGF is a mutual fund that, except for two years, trailed 99% of its peers in performance each year between 1990 and 2000. (Aff. Ex. E.) In August 1997, the Securities and Exchange Commission ("SEC") announced the appointment of "a permanent receiver over American Growth Capital Corp. and American Growth Fund I, LP." (Aff. Ex. F.) It is not clear from the announcements whether AGF is the same as or related to the entity referred to in the SEC releases as being managed by persons who "fraudulently managed American Growth Capital and American Growth Fund, including misuse and misappropriation of at least $1,778,000 in investor funds by investing in shell companies, and by paying undisclosed

- 6 -

commissions and other selling expenses, undisclosed compensation to themselves, and undisclosed management fees to American Growth Capital." *Id.*

On January 5, 2005, this Court entered a minute order appointing Dr. Blau and AGF as lead plaintiffs and Wolf Haldenstein as lead counsel (the "Minute Order"). (D.E. #20.) No written opinion followed. Thus, the Court has not yet reviewed in detail the adequacy of any proposed class counsel in the Illinois Action.

On February 18, 2005, Dr. Blau filed an amended complaint. (D.E. #23.) That very same day, AGF, which had previously certified its willingness to represent the class, suddenly withdrew as a lead plaintiff without explanation. (D.E. #24.) On April 22, 2005, the Illinois Action defendants except for Riley P. Bechtel moved to dismiss the amended complaint.[2] (D.E. #32.)

## D.    Wolf Haldenstein's Other Actions Against JPMC

In addition to the Illinois Action, Wolf Haldenstein is currently seeking multi-billion-dollar recoveries from JPMC in several other prominent cases. For instance, Wolf Haldenstein is one of only six firms on the Court-appointed Plaintiffs' Executive Committee in the Initial Public Offering ("IPO") Securities Litigation, in which JPMC is a prominent defendant. (Aff. Ex. G.) The IPO Securities Litigation consists of numerous class actions involving more than 300 IPOs marketed between 1998 and 2000. *Id.* The actions are coordinated in the Southern District of New York. *Id.* The lawsuits generally allege that the IPOs were manipulated by investment banks to artificially inflate the market price of the offered securities and to conceal the amounts of compensation actually received by the underwriters. *Id.* The plaintiff classes consist of investors who purchased securities traceable to the IPOs. The defendants consist of the companies

---

[2] As explained in Section V.B, Bechtel contends that he was never served properly in the Illinois Action.

brought public, certain of their officers and directors and 55 of the investment banks that

brought them public and underwrote various follow-on offerings. *Id.*

Wolf Haldenstein partner Adam J. Levitt and Wolf Haldenstein associate Gustavo

Bruckner claim on the firm's website to be "actively involved" and to have "worked

extensively on drafting and discovery" in the IPO Securities Litigation, respectively.

(Aff. Ex. L.) In the Illinois Action, both Levitt and Bruckner appear on the amended

complaint as plaintiff's counsel.

Of 307 complaints in the IPO Securities Litigation reviewed by Hyland's counsel,

JPMC is a defendant in 128, or 42%, of the actions. (Aff. ¶ 11 & Ex. H.) Thus, JPMC is

one of the defendants with the highest exposure in the coordinated litigation. Indeed, the

Company has already paid $25 million to settle related charges by the SEC. *See*

Litigation Release No. 18385: "SEC Sues J.P. Morgan Securities Inc. For Unlawful IPO

Allocation Practices; J.P. Morgan Agrees To Settlement Calling For Injunction And

Payment Of $25 Million Penalty" (Aff. Ex. I).

Damages in the IPO Securities Litigation are reportedly estimated to be **as much
as $100 billion**, with a likely recovery of roughly **$25 billion**. *See* "Banks under legal

siege", *The Banker*, March 2, 2003 (Aff. Ex. J). As a result of a settlement by the issuer

defendants, only the investment banks remain defendants in this massive litigation. *See*

Press release: "IPO Securities Litigation Recovery Of At Least $1 Billion Dollars

Guaranteed For Plaintiff Classes Upon Approval Of Settlement" (Aff. Ex. G). In the

wake of the preliminary settlement, the Chair of Plaintiffs' Executive Committee asserted

in a July 2003 interview with the Associated Press (Aff. Ex. K):

> "The billion dollars is an expression of concern that these
> allegations are real and *could give rise to staggering*

-8-

> *liability.* It simplifies the litigation in that we can focus our
> attention on the conduct of the investment banks. The
> interesting part here is how much broader our inquiries will
> be than the government's has been because we're covering
> 55 banks, not 10. It's going to be far more fascinating to
> demonstrate that the conduct we allege to be serious
> violations of the law was widespread throughout the entire
> industry. ... *I would be very disappointed if we don't
> achieve multiple billions (in recovery)."* [Emphasis added.]

Thus, JPMC stands to lose billions of dollars in the IPO Securities Litigation, in
which case Wolf Haldenstein stands to earn tens of millions in dollars in fees. Indicating
the importance of these cases to Wolf Haldenstein, as well as its leadership role in the
litigation, the firm's website has a number of links to press releases describing the
litigation. (Aff. Ex. L)

In addition to the IPO Securities Litigation, in the wake of Enron's demise, Wolf
Haldenstein filed suit on February 22, 2002 in the United States District Court for the
Southern District of New York on behalf of purchasers of JPMC between November 28,
2001 and January 28, 2002 against JPMC. (Aff. Ex. L) The class period was
subsequently extended to be between November 8, 1999 and December 31, 2000 for
purchasers of the securities of The Chase Manhattan Corporation (a predecessor of
JPMC) and between January 2, 2001 and July 23, 2002 for purchasers of the securities of
JPMC.

According to Wolf Haldenstein's website, the complaint alleges that JPMC
misrepresented its risk and loss exposure related to its Enron Corporation dealings as
being approximately $900 million. *Id.* However, the complaint alleges that JPMC later
admitted that, in fact, its total Enron related exposure was actually about $2.6 billion, or
almost three times the earlier figure. *Id.* Shortly thereafter, JPMC wrote down $1.13
billion in nonperforming assets, specifically losses related to Enron. *Id.*

- 9 -

As a key financial advisor to Enron, JPMC is one of the primary defendants in the Enron litigation and faces the prospect of having to pay out billions of dollars to resolve that litigation. *See* Timothy L. O'Brien, *The New York Times*, "After Charge for Legal Reserves, J.P. Morgan Takes Big Loss," July 21, 2004 (Aff. Ex. M).

JPMC's recent settlement of WorldCom-related litigation demonstrates the reality of its multi-billion-dollar exposure in the IPO Securities Litigation and Enron-related litigation. On March 16, 2005, JPMC settled with WorldCom investors in a securities class action for $2 billion. (Aff. Ex. N.)

## ARGUMENT

### I.    WOLF HALDENSTEIN'S DIVIDED LOYALTIES NECESSITATE DISQUALIFICATION

Effectively a lead plaintiff appointment by stipulation, the Minute Order, understandably, did not receive strict scrutiny because no adversary was present to call any weaknesses to the Court's attention. Undoubtedly, defendants were content that no adequate representative of the class appeared. They hoped to contain the controversy and were faced with an embarrassingly weak complaint prosecuted by conflicted counsel who have not demonstrated any ability to represent the class adequately.

However, in light of the Court's fiduciary role with respect to the class, the Court has a continuing responsibility to review the adequacy of those purporting to represent the class. Here, the lead plaintiff's "chosen" counsel is incapable of representing the class adequately as a result of its divided loyalties.

#### A.    The Court Has A Continuing Responsibility to Review The Adequacy of the Class Representative

With respect to the PSLRA, pertinent case law makes clear the court always retains the authority to re-examine the lead plaintiff appointment. *See Z-Seven Fund, Inc.*

- 10 -

*v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000). Other courts have similarly held that the lead plaintiff designation is an interlocutory order and may be revisited by the district judge under appropriate circumstances. *See Metro Services Inc. v. Wiggins*, 158 F.3d 162, 165 (2d Cir. 1998) (dismissing appeal from lead plaintiff appointment order on the ground that it was not final and could be revisited); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing lead plaintiff and reserving the right to alter the structure if it "proves detrimental, in any way, to the best interests of the class" quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 42, 51 (S.D.N.Y. 1998)); *Borenstein v. Finova Group, Inc.*, C.A. No. 00-619-PHX-SMM, 2000 U.S. Dist. LEXIS 14732, at *30 (D. Ariz. Aug. 28, 2000) (appointing lead plaintiff but reserving the right to "revisit the issues if and when appropriate" and noting that, if another "more adequate member of the class of note purchasers should come forward, the court may also reopen the issue of lead plaintiff").

Indeed, under the provisions of the PSLRA requiring that a lead plaintiff be both typical and adequate in accordance with Rule 23, the Court has a "continuing responsibility" to determine whether lead plaintiffs meet the typicality and adequacy prongs of Rule 23 to ensure that the interests of the class are being protected. *In re Terayon Communications Sys., Inc.*, 2004 WL 413277, at *7 (N.D. Cal. Feb. 23, 2004) (granting defendants' motion to disqualify lead plaintiffs four years after they had been appointed on the grounds that they did not meet the typicality and adequacy requirements of Rule 23 and thus were not appropriate lead plaintiffs). *See also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("[T]he court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity,

- 11 -

by approving appropriate representative plaintiffs and class counsel."); *In re Oracle Sec.*
*Litig.*, 131 F.R.D. 688, 691 (N.D. Cal. 1990) (Walker, J.) ("[T]he court bears fiduciary
responsibilities to the class.").

## B. Wolf Haldenstein's Divided Loyalties Amount to a Non-Waivable and Disqualifying Conflict of Interest

It is a conflict of interest for a law firm to seek recovery from the same defendant
on behalf of different classes of plaintiffs. *See In re Cardinal Health, Inc. ERISA Litig.*,
225 F.R.D. 552, 557 (S.D. Ohio 2005) (citing ABA Code of Professional Responsibility,
DR 5-105 and EC 5-14 (prohibiting counsel from representing different plaintiffs with
conflicting claims against the same defendant because it creates "the appearance of
divided loyalties of counsel")). In *Cardinal Health*, a law firm sought to be appointed
lead counsel for the plaintiff class, but several plaintiffs objected because the law firm
was handling other litigation against the same defendants. The Court noted that
representing multiple classes seeking recovery from the same "common pool" presents a
fatal conflict. 225 F.R.D. at 557. The law firm responded that it would be suing a parent
corporation in one case and a subsidiary of that parent in the other, claiming further that
any recovery against the subsidiary would not subject the parent to liability in that case.
*Id.* The Court agreed that, if the law firm could prove that recovery against the subsidiary
would not subject the parent to liability, there would not be a "common pool" conflict.
*Id.* However, it held that the relationship between the two corporations had not been
sufficiently established. *Id.* For that reason, and because of the law firm's misconduct in
another case, the court rejected the law firm's motion to be appointed lead counsel,
instead selecting another candidate with no such conflict. *Id.* at 558.

As set forth above, in addition to the instant litigation against JPMC, Wolf Haldenstein is currently involved in several other prominent cases seeking substantial recoveries from JPMC, including 128 lawsuits in the IPO Securities Litigation. Thus, Wolf Haldenstein suffers from the same disabling conflict considered in *Cardinal Health*.

In *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581 (W.D. Tex. 2002), a law firm attempted to be appointed class counsel. Like Wolf Haldenstein, the law firm was one of the six firms on the Plaintiffs' Executive Committee in the IPO Securities Litigation. Moreover, the corporate defendant, pcOrder.com, was a defendant in the IPO Securities Litigation, albeit in only one action. The court denied the firm's request to be appointed class counsel because, like Wolf Haldenstein: (1) it had not informed the class representatives that it represented other classes in other courts against the same defendants, and (2) because of the possibility that the defendants might not be able to satisfy all the claims. *Id.* at 589. The law firm attempted to counter the latter argument by suggesting that the court could supervise the allocation of any settlement or award. *Id.* at 590. The court rejected this argument, noting that it would not have control over the courts in which the other cases against these defendants are pending. *Id.*

Given the firm's more than 128 other pending suits against JPMC, Wolf Haldenstein is unable to vigorously advance the interests of class members in this litigation while simultaneously prosecuting other cases against JPMC on behalf of different classes in the IPO Securities Litigation and Enron-related securities litigation. As JPMC does not have an unlimited ability to pay, an increased recovery for class members in this litigation would likely come at the expense of class members in the other actions. Thus, this conflict of interest precludes Wolf Haldenstein from seeking to

- 13 -

represent multiple classes pursuing recovery from the same source. *See Sullivan v. Chase*
*Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (D.C. Cal. 1978) (requiring plaintiffs'
counsel to certify that they had completely withdrawn from a separate class action against
the defendant because the "responsibility of class counsel to absent class members whose
control over their attorneys is limited does not permit even the appearance of divided
loyalties of counsel."); *In re Continental Illinois Sec. Litig.*, 750 F. Supp. 868, 875 (N.D.
Ill. 1990) (disallowing attorneys' fees in class action for work on a related derivative
action per earlier ruling that such dual representation was impermissible, noting that
"[t]he conflict seemed especially likely in the area of settlement negotiations, where the
two kinds of plaintiffs might be competing for limited funds"); *Kurczi v. Eli Lilly & Co.*,
160 F.R.D. 667, 679 (N.D. Ohio 1995) (proposed class representative failed to satisfy
adequacy requirement, where its proposed lead counsel had a conflict of interest by virtue
of its representation of the plaintiff class in other litigation against the same defendant);
*Kuper v. Quantum Chemical Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992) (declining class
certification in securities action because the employee-stockholder class representatives
failed to demonstrate that they would vigorously prosecute class interests through
qualified counsel in light of the fact that the same counsel represented a class of
bondholders in another action against corporation and sought recovery from a common
pool of assets that might be insufficient to support the amounts sought by both classes).

In *Sullivan*, the Northern District of California court noted its "major concern
about counsel involv[ing] their role in a parallel securities fraud case against [the same
corporate defendant] in the District of Maryland" and observed that "[t]he possibility that
assets and insurance of the defendants who may have committed fraud against the

- 14 -

plaintiffs will be insufficient to satisfy an alleged liability to the class of over $20 million

is great enough to influence litigation strategy." 79 F.R.D. at 259. Thus, the court held

that "[b]ecause this putative class and the [plaintiffs in the parallel action] have

conflicting interests in the course of each litigation, counsel cannot represent both." *Id.*

Here, Wolf Haldenstein's divided loyalties are even more starkly reflected in the billions

of dollars at stake both in this litigation and in the IPO Securities Litigation. Indeed, the

*very same* Wolf Haldenstein attorneys representing Dr. Blau in this matter have touted

their involvement in the IPO Securities Litigation. (*See* Aff. Ex. L.)

A recent ethics opinion issued by the Illinois State Bar Association confirms not

only that this "common pool" conflict compromises Wolf Haldenstein's ability to

represent the class, but also that the conflict is non-waivable. *See* Opinion No. 04-01

(Nov. 2004) (Aff. Ex. O). The opinion assumes that a lawyer has a collection case for

Client A against Debtor B. Debtor B owns a piece of real estate, which would be

potentially useful in collecting any judgment Client A may obtain against Debtor B.

During the collection proceedings, Client C comes to the lawyer and asks him to

represent Client C in purchasing the aforementioned real estate from Debtor B. The

committee opined that representing Client C in such a matter would be a non-waivable

conflict because, even though "the possibility exists that no judgment will be obtained, it

is also clear that by the time that such question is answered it will be irrelevant, because it

will be too late to negate the damage which may be done...[because the] property

intended to be used to satisfy the judgment will be gone...." *See also Kayes v. Pacific

Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (affirming the necessity of class

counsel's withdrawal to remedy the appearance of divided loyalties, even if "there had as

- 15 -

yet been no reason to believe improper influence had resulted from the representation of two parties with conflicting interests," citing *Sullivan*).

The form of relief sought in this litigation also may conflict with the other suits maintained by Wolf Haldenstein against JPMC. In this litigation, it is possible that a recovery in JPMC stock, rather than cash, would make whole aggrieved members of the class. As the Delaware Action attacks, *inter alia*, the unnecessarily inflated exchange ratio agreed upon in connection with the Merger, one way to correct the inflated exchange ratio is for JPMC to issue JPMC common stock to certain members of the class. However, this non-cash alternative is in conflict with the cash recovery sought by Wolf Haldenstein in other ongoing litigation against JPMC. For instance, the continued prosecution by Wolf Haldenstein of other suits against JPMC may harm the value of JPMC common stock, to the detriment of class members who might benefit from a stock settlement or who have retained their stock. *See Kuper*, 145 F.R.D. at 83 ("class members who...continue to [own stock in the corporation] have a vested interest in that corporation's continued existence and viability"). Alternatively, rather than considering solely the best interests of the class in this case, Wolf Haldenstein might seek a stock settlement in this litigation in order to leave JPMC more cash to pay for recoveries in other actions. Thus, this conflict further impairs Wolf Haldenstein's ability to represent adequately any member of the class in this case.

The class in this case will not be harmed in any way by the disqualification of Wolf Haldenstein. First, the Delaware Action, which seeks recovery on behalf of a class including the putative class in the Illinois Action, has been and continues to be vigorously prosecuted. Second, the Delaware Group has a much larger financial stake in the

- 16 -

litigation than Dr. Blau. Third, the Illinois Action is at an early stage, as no discovery has

been taken, no motion to dismiss has been ruled upon, and no class has been certified.

Finally, unlike Wolf Haldenstein, counsel for Hyland has no interest in any other lawsuit

against JPMC, and thus has no conflict of interest preventing his effective performance as

class counsel. (Aff. ¶ 5.)

Disqualifying Wolf Haldenstein will not delay this litigation. It is apparent that

Wolf Haldenstein has not advanced this litigation to any material degree since its filing.

Although the Illinois Action was commenced on October 15, 2004 (approximately four

months after the Chancery Action was commenced), defendants' motion to dismiss has

not even been fully briefed yet, and the amended complaint in the Illinois Action was

filed barely a month before the Delaware Action was commenced.[3] Thus, disqualifying

Wolf Haldenstein at this time will not delay this litigation or prejudice any party. To the

contrary, disqualification will ensure that all parties' interests, including those of absent

class members, will be protected.

Accordingly, this Court should disqualify Wolf Haldenstein from representing

any purported class member in this litigation.

## II.     THIS ACTION SHOULD BE TRANSFERRED TO THE DISTRICT OF DELAWARE UNDER 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district

court may transfer any civil action to any other district or division where it might have

been brought." 28 U.S.C. § 1404 (a). *See also Ferens v. John Deere Co.*, 494 U.S. 516,

530 (1990) (noting that a court may transfer venue on its own motion); *Hite v. Norwegian*

---

[3] It may be that Wolf Haldenstein attorneys have been preoccupied with the vast amount of work devoted to the IPO Securities Litigation.

- 17 -

*Caribbean Lines*, 551 F. Supp. 390, 392 (E.D. Mich. 1982) (ordering parties "to show cause why the case should not be transferred").

The Delaware Action is properly venued in the District of Delaware because (1) the plaintiffs are Delaware residents, (2) JPMC is a Delaware corporation, (3) Bank One was incorporated in Delaware, (4) the Merger agreement provides that Delaware law governs, (5) the first-filed suits against the defendants were commenced in the Delaware Court of Chancery, (6) Delaware law applies to the breach of fiduciary duty claims in the Delaware Action, (7) JPMC conducts substantial business in the District of Delaware (as did Bank One), and (8) unlike Illinois, Delaware is close enough to New York to compel the trial testimony of several non-party witnesses in New York, where the alleged misconduct took place and where most witnesses reside.

By contrast, the Northern District of Illinois is not an appropriate or convenient forum for this litigation in any respect. Firstly, the plaintiff in the Illinois Action does not even live in Illinois. *See* Moore's Federal Practice ¶111.13[1][c][iii] ("When the chosen forum is neither the plaintiff's residence nor the place where the operative events occurred, the court is likely to override the plaintiff's choice." (citing *Tranor v. Brown*, 913 F. Supp. 388 (E.D. Pa. 1996))); *So-Comm Inc. v. Reynolds*, 607 F. Supp. 663, 666 (N.D. Ill. 1985) ("the plaintiff's choice of forum is entitled to less consideration when he is not a resident of the forum district."). Rather, Dr. Blau apparently resides in New York. Thus, the decision to file suit in the Northern District of Illinois can be explained only by the fact that Wolf Haldenstein has its office in Chicago. Of course, the mere convenience of counsel, without more, cannot justify an otherwise inappropriate choice of venue. *See Solomon v. Continental American Life Insurance Co.*, 472 F.2d 1043, 1047

(3d Cir. 1973) (convenience of counsel not a factor to be considered in determining whether case should be transferred under 28 U.S.C. § 1404(a)). Thus, there appears to be no justification for maintaining this litigation in the Northern District of Illinois. *Cf. Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) (affirming dismissal of complaint on *forum non conveniens* grounds where neither plaintiff nor witnesses, but only plaintiff's counsel, resided in forum where action was commenced).

Secondly, unlike the Illinois Action, subpoenas issued in the Delaware Action for New York witnesses can be served from the District of Delaware. Rule 45(b)(2) of the Federal Rules of Civil Procedure provides that "a subpoena may be served...at any place without the district that is within 100 miles of the place of the deposition." Hyland's counsel has determined that JPMC's headquarters in Manhattan are located 94.4 air miles from the Delaware Federal Courthouse.[4] (Aff. ¶ 10.A-C.)

The convenience of the witnesses is "[p]robably the most important factor, and the factor most frequently mentioned, in passing on a motion to transfer under 28 U.S.C. § 1404(a)." 15 Wright, Miller & Cooper, *Federal Practice and Procedure 2d* § 3851 at 415 (1986). *See also Schwarz v. National Van Lines, Inc.*, 2004 WL 432483, at *5 (N.D. Ill. Feb. 24, 2004) ("The convenience of witnesses is often viewed as the most important factor in the transfer balance."). Crucial non-party witnesses anticipated at trial include the investment bankers and lawyers who advised JPMC and Bank One in connection with the Merger. The expected testimony from these witnesses, many or all of whom were intimately involved in the negotiations leading to the Merger, will confirm the secret deal

---

[4] Also, the combined Company's credit card operations are based in Wilmington, just blocks from the Delaware Federal Courthouse. Moreover, one of JPMC's two principal banking subsidiaries, Chase Manhattan Bank USA, National Association, is headquartered in Delaware.

at the heart of this case, as well as related details of the negotiations, such as Harrison's
rejection of the nil-premium opportunity.

The investigation of Hyland's counsel indicates that these witnesses include
bankers Gary Parr, Tim Dana, and Gary Shedlin of Lazard Frères & Co. LLC for Bank
One, lawyers Edward D. Herlihy, Craig M. Wasserman, and Lawrence S. Makow of
Wachtell, Lipton, Rosen & Katz for Bank One, lawyers Richard I. Beattie, Lee
Meyerson, Maripat Alpuche, Christopher Lee, Kristin H. Johnson and Elsa Fraysse of
Simpson Thacher & Bartlett LLP for JPMC, and as-yet-unidentified lawyers with
Sullivan & Cromwell LLP for JPMC's board. (Aff. ¶ 9.) The offices of these investment
banks and law firms are all located in Manhattan, less than 100 air miles from the
Delaware Federal Courthouse (less than two hours away by Amtrak). (Aff. ¶ 10.D-J.)

As each of these anticipated witnesses resides or works within 100 miles of the
Delaware Federal Courthouse, their live presence can be compelled judicially to testify at
trial in the Delaware Action. *See Hill v. Equitable Bank*, 115 F.R.D. 184 (D. Del. 1987).
Thus, from the standpoint of the convenience of the most material witnesses, as well as in
the interests of justice generally, the District of Delaware is the better forum. *Coats Co.,
Inc. v. Vulcan Equipment Co., Ltd.*, 459 F. Supp. 654, 658 (D.C. Ill. 1978). *See also
Courtesy Caribbean v. Aquilar*, 1995 WL 549127, at *4 (N.D. Ill. Aug. 31, 1995) (noting
the importance of considering, in comparing venues, the availability of compulsory
process for unwilling witnesses); *Hess v. Gray*, 85 F.R.D. 15, 25 (N.D. Ill. 1979)
("Certainly to fix the place of trial at a point where litigants cannot compel personal
attendance and may be forced to try their cases on deposition, is to create a condition not
satisfactory to court, jury, or most litigants.") (quoting *Gulf Oil*, 330 U.S. at 511).

Thirdly, it is in the interest of justice to have a Delaware judge decide this case because both JPMC and Bank One are Delaware corporations and the Merger agreement provides for Delaware law to govern the contract.[5] *See Van Gelder v. Taylor*, 621 F. Supp. 613, 620 (D.C. Ill. 1985). Indeed, "'[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders.'" *Examen, Inc. v. VantagePoint Venture Partners 1996*, C.A. No. 1142-N, slip op. at 9 (Del. Ch. March 31, 2005) (citing internal affairs doctrine in applying Delaware law to contested stockholder vote concerning a Delaware corporation's merger) (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987)).

Fourthly, the Delaware Action has been assigned to the Honorable Joseph J. Farnan, Jr., who is ideally suited to overseeing this litigation. Only weeks ago, Judge Farnan issued a final decision in a remarkably similar case. *See Tracinda Corp. v. DaimlerChrysler AG*, -- F. Supp. 2d --, 2005 WL 782888 (D. Del. Apr. 7, 2005). In that complex securities litigation concerning a corporate merger, it was alleged that a company's CEO defrauded shareholders into accepting an inadequate merger premium by casting a takeover as a merger of equals. *See id.* at *36.

Judge Farnan adjudicated numerous complex motions, including multiple motions to dismiss and summary judgment motions, certified a class of investors, oversaw a $300 million settlement for the class, administered a 13-day bench trial on an individual lawsuit and issued a final decision on April 7, 2005. *See, e.g., Tracinda Corp. v.*

---

[5] The Merger agreement itself provides "8.6. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware (without giving effect to choice of law principles thereof)." *See also* Proxy/Prospectus at 3 ("Subject to the terms and conditions of the merger agreement, and in accordance with Delaware law, at the completion of the merger Bank One will merge with and into JPMorgan Chase.").

*DaimlerChrysler AG*, 197 F. Supp. 2d 86 (D. Del. 2002) (motion to dismiss); *Tracinda*

*Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002) (same); *In re*

*DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291 (D. Del. 2003) (certifying class); *In re*

*DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508 (D. Del. 2003) (denying

defendants' motions for summary judgment); *Tracinda Corp. v. DaimlerChrysler AG*,

362 F. Supp. 2d 487 (D. Del. 2005) (ruling on post-trial evidentiary objections). Thus,

Judge Farnan's extraordinary experience with a similar securities fraud class action will

ensure the fair and efficient adjudication of this litigation. In *Grand Park Surgical*

*Center, Inc. v. Inland Steel Co.*, 1996 WL 204322, at *1 (N.D. Ill. Apr. 25, 1996), the

Court, on its own motion, ordered transfer to Indiana district court under § 1404(a),

noting that "because Indiana state law applies, a federal district court judge in that state

would be more familiar with the governing law." This rationale is even more compelling

here, given Judge Farnan's recent participation in a case with striking parallels to the

instant litigation.

    The pendency of the Chancery Action (commenced over three months before the

Illinois Action) and the Delaware Action in Delaware constitute significant factors

militating in favor of transfer, since avoiding multiplicity of litigation from a single

transaction is in the interests of justice. *See River Road International, L.P. v. Josephthal*

*Lyon & Ross, Inc.*, 871 F. Supp. 210 (S.D.N.Y. 1995). *See also Van Horn v. Graves*,

2002 WL 27658, at *3 (N.D. Ill. Jan. 10, 2002) ("[T]he desirability of resolving this

controversy where it arose requires transfer.").

    Finally, in addition to the venue considerations set forth above, prosecuting this

litigation in Delaware is preferable because the District of Delaware is a full electronic

- 22 -

filing jurisdiction. The Northern District of Illinois does not yet mandate electronic

filing. Electronic filing allows the court and litigants to file and access documents

electronically via the Internet, 24 hours a day, seven days a week. Court records will also

be available to the public by the same means. In a case of this magnitude, electronic

filing capability is very important because the potential volume of filings, parties, and

attorneys in this litigation will require streamlined access to the courts. This litigation

will be under intense media scrutiny. Without electronic filing, crucial information will

not be readily accessible to nonparties needing it. For instance, defendants' brief in

support of their motion to dismiss is unavailable electronically, as are exhibits to the lead

plaintiff application. In such circumstances, the absence of electronic filing puts an

enormous burden on the clerk's office, which has to respond manually to the numerous

requests for information in filings from counsel, the press and other interested parties that

a case of this magnitude engenders.

    Accordingly, the Illinois Action should be transferred to the District of Delaware.

## III.   WOLF HALDENSTEIN'S PSLRA NOTICE WAS INADEQUATE BECAUSE IT OMITTED CRITICAL INFORMATION

    The PSLRA mandates that after filing a putative class action complaint, a plaintiff

seeking to represent the proposed class must publish a notice that sets forth (i) the

pendency of the action, including a description of the claims asserted and the proposed

class period, and (ii) a statement that any party seeking to serve as lead plaintiff for the

action referenced in the notice must move the applicable court within sixty (60) days of

the date of the notice. 15 U.S.C. § 78u-4(a)(3)(A)(i). *See Janovici v. DVI, Inc.*, 2003 WL

22849604, at *5 (E.D. Pa. Nov. 25, 2003) (in considering motions for appointment of

lead plaintiff, court has an independent duty to scrutinize the published notice for compliance with PSLRA requirements).

On October 15, 2004, Wolf Haldenstein published a notice in the *Investor's Business Daily* purportedly advising investors of the pendency of the Illinois Action. (Aff. Ex. P.) However, two critical pieces of information were missing from the notice. First, the notice discloses the names of only two of the fourteen defendants. Second, the notice fails to advise class members of their right to retain counsel of their own choice. In addition to these critical omissions, the notice is misleading because it fails to disclose Wolf Haldenstein's divided loyalties, does not reference the newspaper article in which the truth was revealed, and lists the civil action number incorrectly, thereby inhibiting the ability of any reader to locate the Illinois Action on PACER. (Aff. ¶ 13 & Ex. P.)

In reviewing notices purportedly complying with this requirement, courts have rejected those which fail to include the names of all defendants. *See, e.g., Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (finding notice inadequate because "[t]here is no explanation of the legal theory underlying plaintiffs' suit; no discussion of *who* violated the Securities Exchange Act of 1934; and no description of the alleged wrongdoing that forms the basis of the complaint.") (emphasis added); *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1311 (N.D. Ala. 2000) ("notice must, *at a minimum*, provide information about...who has filed the suit, *who is being sued*, the court in which the suit is taking place, and the civil action number of the case") (emphasis added); *id.* at 1316 ("the notice published by [one] plaintiff and his counsel fails to indicate who is seeking relief and *against whom relief is sought*, facts that would be revealed *were the entire name of the action included in the notice*") (emphasis added); and *id.* at 1315

- 24 -

("the [competing] notice does not fully inform potential lead plaintiffs...of...the names
of the defendants"). *Cf. Marsden v. Select Medical Corp.*, 2005 WL 113128 (E.D. Pa.
Jan. 18, 2005) (accepting notice which "adequately informs class members of 'the
pendency of the action,' as it identifies the caption of the case, its civil action number, the
Court before which the action was brought, *and the names of all five Defendants*.")
(emphasis added).

A notice which omits the right of class members to retain counsel of their choice
is also inadequate. *See, e.g., Burke*, 102 F. Supp. 2d at 1311 n.39 ("giving only
information directing putative class members to contact counsel would not comport with
the purposes of the subsection"); *id.* at 1314 ("the notice published appears to have been
drafted with the aim of directing clients to the law firms listed in it, thereby permitting
the Burke plaintiffs and counsel associated therewith to avoid any lead plaintiff
challenge.").

Unlike Wolf Haldenstein's defective notice, counsel for Hyland published a
notice of the pendency of the Delaware Action which included the names of *all*
defendants in the Delaware Action *and* advised class members of their right to retain
counsel of their own choice in considering or seeking the lead plaintiff appointment.
(Aff. Ex. Q.) *See Janovici*, 2003 WL 22849604, at *8 (finding notice adequate which
"[u]nlike the first three notices, ...lists the names of the Defendants...[and] also advises
that potential class members may retain counsel of their choice."). The Delaware Action
notice also specifically references the newspaper article in which the truth was revealed
and correctly sets forth the civil action number.

Only a legally adequate notice triggers the PSLRA's 60-day period for all lead

plaintiff motions. *See Janovici*, 2003 WL 22849604, at *9 ("This [60-day] rule does not

apply, however, where the first notice of pendency fails to provide adequate information

pursuant to the terms of the PSLRA– the statutory 60 day period begins to run from the

date of the first notice that complies with the PSLRA.") Wolf Haldenstein's purported

notice plainly failed to inform class members of their critical rights and otherwise failed

to notify class members of the pendency of the action. By contrast, the notice in the

Delaware Action included every crucial piece of information missing from Wolf

Haldenstein's defective notice. Accordingly, only this notice triggered the 60-day period

for all lead plaintiff motions.

## IV. THE JANUARY 5, 2005 MINUTE ORDER SHOULD BE VACATED UNDER FED. R. CIV. P. 60(b) DUE TO WOLF HALDENSTEIN'S FALSE AND MISLEADING LEAD PLAINTIFF APPLICATION

Fed. R. Civ. P. 60(b) provides that a court may vacate an order due to "fraud

(whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other

misconduct of an adverse party... [or] any other reason justifying relief from the

operation of the judgment." Moreover, district courts enjoy wide discretion to sanction

misconduct in the management of cases. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43

(1991). In *Chambers*, the United States Supreme Court advised:

> when there is bad-faith conduct in the course of litigation
> that could be adequately sanctioned under the Rules, the
> court ordinarily should rely on the Rules rather than the
> inherent power. But if in the informed discretion of the
> court, neither the statute nor the Rules are up to the task,
> the court may safely rely on its inherent power.

*Id.* at 50.

- 26 -

One of the more troubling aspects of Wolf Haldenstein's conduct in the Illinois Action is the lead plaintiff application submitted to the Court which led to entry of the Minute Order. Given the inadequate notice published by Wolf Haldenstein, *see* Section III *supra*, it is unsurprising that the application met no competition and, therefore, avoided scrutiny. *See Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (Easterbrook, J., dissenting) ("[T]he court can't vindicate the class's rights because the friendly presentation means that it lacks essential information."). Even a diligent search of dockets nationally would not have revealed the Illinois Action, as Dimon (Harrison's counterparty in the secret deal and a defendant in the Delaware Action) is not named at all, *see* Section V.C *infra*. However, Wolf Haldenstein's lead plaintiff application merits scrutiny because it contains several misrepresentations to this Court.

The lead plaintiff application was premised upon the combined holdings of two purported JPMC shareholders, Dr. Blau and AGF, who together claimed to hold nearly 28,000 shares of JPMC. AGF's holding, prior to its mysterious withdrawal, accounted for 25,000 shares, or 89 percent, of the combined holding. Without AGF, Wolf Haldenstein would have proffered only Dr. Blau, with his "2999.9" shares, as the purported representative of the Illinois Action class. By contrast, the Delaware Group held 19,170 shares at all relevant times, over six times Dr. Blau's claimed holding. This is important because the PSLRA directs the Court to presume that the "most adequate plaintiff" to serve as lead plaintiff "is the person or group of persons" that, inter alia, "has the largest financial interest in the relief sought by the class…" 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(bb). AGF also certified to the Court its willingness to serve as a representative of the class. However, the veracity of this representation was called into

- 27 -

question when AGF suddenly and without explanation withdrew as a lead plaintiff on February 18, 2005, the date of the filing of the amended complaint, approximately one month after the entry of the Minute Order. At the very least, Wolf Haldenstein should be ordered to explain to the Court the circumstances of AGF's withdrawal, and whether such withdrawal was anticipated when the lead plaintiff application was filed. *See Chambers*, 501 U.S. at 44 ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

Indeed, every PSLRA-required certification in the Illinois Action is either defective or absent. Firstly, AGF's certification is false, as AGF was obviously not willing to serve as a representative of the class.

Secondly, no certification at all accompanies the Illinois Action's amended complaint, in contravention of the PSLRA's requirement that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint...." 15 U.S.C. §78u-4(a)(2)(A). Thus, Dr. Blau has not certified that, as to the amended complaint, he "has reviewed the complaint and authorized its filing...." 15 U.S.C. §78u-4(a)(2)(A)(i). Given that AGF withdrew in connection with the filing of the amended complaint, the absence of Dr. Blau's certification is particularly concerning.

Thirdly, Dr. Blau's certification of the original complaint is defective because it represents that Dr. Blau purchased 899.9 shares of JPMC (presumably a JPMC predecessor) on January 21, 1994. One cannot purchase or sell fractional shares of JPMC common stock. Thus, this fractional share quantity does not make sense and casts doubt on Dr. Blau's certification. Further, Dr. Blau claims to have made the following

- 28 -

purchases: 899.9 shares on January 21, 1994 for $11,509, or $12.79 per share (11.2

percent above the $11.50 adjusted close on that date); 600 shares on March 31, 1994 for

$7,458, or $12.43 per share (11.9 percent above the $11.11 adjusted close on that date);

and 1,500 shares on October 6, 1994 for $17,473, or $11.65 per share (11.7 percent above

the $10.43 adjusted close on that date).  (Aff. ¶ 12.)  These price discrepancies are

unexplained.

    In *Nager v. Websecure, Inc.*, 1997 WL 773717, at *1 n.1 (D. Mass. Nov. 26,

1997), the Court rejected a member of a group that was appointed as lead plaintiff for

failure to accurately report one of his transactions in the subject security.  In that case, the

Court stated:

> One of the proposed group, David Renzer, states in his
> affidavit that on "2/7" he purchased 2,500 shares of
> common stock of Websecure, Inc. at a price of $17.50 per
> share. (Waldman Decl. Supp. Websecure Pl. Group's Mot.
> to Consol., Ex. C.) Information supplied by the plaintiffs
> about the stock's trading indicates, however, that on
> February 7, 1996, the stock closed, as it had the day before,
> at $9.50 per share. (Waldman Aff. Supp. Pls' Mot. for
> Prelim. Inj., Ex. N.) The statement in the Renzer affidavit
> may thus be suspected of being inaccurate. The inaccuracy
> may be explainable, but it casts sufficient doubt on Mr.
> Renzer's adequacy as a representative plaintiff that he
> should be excluded from the group appointed to serve as
> lead plaintiffs.

*Id.*

    Dr. Blau's failure to meet the basic requirements of the PSLRA makes it

impossible to determine his financial interest in the litigation.  Moreover, this deficiency

is clear evidence of his inadequacy as a lead plaintiff and, as in *Nager*, constitutes a

sufficient ground to reject him as lead plaintiff.

Lastly, the certifications in the lead plaintiff application are all defective also because they fail to disclose the movants' ownership, if any, of Bank One shares.[6] Defendants will undoubtedly argue that any benefit obtained by Bank One shareholders from the unfair exchange ratio should offset damages flowing from the alleged misconduct. The Delaware Action plaintiffs did not own shares of Bank One. (Aff. ¶ 4.) If Dr. Blau owned Bank One shares, then he may be subject to a unique defense that renders him incapable of adequately representing the class.[7] 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). However, Dr. Blau did not disclose his Bank One holdings, if any.

The defects in the certifications identified above provide a basis to revisit the lead plaintiff appointment. *See Greebel v. FTP Software Inc.*, 939 F. Supp. 57, 62 n.4 (D. Mass. 1996) ("Should subsequent discovery reveal that the representations [in plaintiffs' PSLRA certifications] are inaccurate, the court may revisit the lead plaintiff determination.").

Also critically missing from the lead plaintiff application is information necessary for this Court to determine whether the ownership of JPMC common stock by any Wolf Haldenstein attorney constitutes a conflict of interest sufficient to disqualify the firm from representing the plaintiff class. Such a determination is mandated by the PSLRA:

### Attorney conflict of interest

---

[6] AGF's certification is not electronically accessible. However, if AGF's certification fails to evidence the requisite authority to move for appointment as lead plaintiff, that would be further ground for denying the application. *See, e.g., Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 634-35 (D.N.J. 2002) (investment advisor's motion denied because it failed to submit "any evidence that it received permission to move on its clients' behalf."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 357-58 (S.D.N.Y. 2002) (same).

[7] Such an offset argument has been rejected by the United States Supreme Court. *See Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) (noting that "it is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them") (internal quotations omitted). However, the test of whether a unique defense impairs the class representative is not the validity of the defense, but whether it threatens to become the focus of the litigation. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

> If a plaintiff class is represented by an attorney who
> directly owns or otherwise has a beneficial interest in the
> securities that are the subject of the litigation, the court
> shall make a determination of whether such ownership or
> other interest constitutes a conflict of interest sufficient to
> disqualify the attorney from representing the plaintiff class.

15 U.S.C. §78u-4(a)(9). The Minute Order reflects no such determination because Wolf

Haldenstein failed to disclose the information necessary for such a determination. By

contrast, Hyland's counsel freely discloses that he has no beneficial interest, whether

direct or indirect (for instance, through a mutual fund), in JPMC common stock. (Aff.

¶ 5.) In addition to the absence of information relating to Wolf Haldenstein's divided

loyalties, *see* Section I *supra*, the absence of information necessary for this Court to make

an appropriate determination under 15 U.S.C. §78u-4(a)(9) also renders Wolf

Haldenstein's lead plaintiff application incomplete and misleading.

Accordingly, the Minute Order should be vacated.

## V.   WOLF HALDENSTEIN'S INADEQUATE REPRESENTATION AND MULTIPLE RULE 11 VIOLATIONS NECESSITATE REMOVAL OR SUBSTITUTION OF LEAD COUNSEL

The plethora of irregularities plaguing Wolf Haldenstein's (mis)management of

the Illinois Action extends well beyond the firm's divided loyalties, failure to publish

adequate notice, inappropriate choice of venue, and false and misleading lead plaintiff

application. Wolf Haldenstein has also misrepresented its pre-filing investigation, failed

to properly serve crucial defendants, and failed to name and incorrectly named certain

defendants. Wolf Haldenstein's numerous flagrant blunders not only violate Rule 11 but

also necessitate that the firm must be removed as class counsel in this litigation to prevent

any further harm to the class.

**A.    Wolf Haldenstein's Rampant Plagiarism Indicates An
Insufficient Pre-Filing Investigation Or None At All**

The Illinois Action amended complaint falsely claims to be based "upon the

investigation made by and through plaintiff's counsel," purportedly including a review of

JPMC's SEC filings, "as well as press releases, news articles, and other public statements

concerning the Company." (D.E. #23 at 1.) Notably absent from this purported

investigation is any reference to pleadings in a similar lawsuit. However, a comparison

of the Illinois Action amended complaint and the consolidated complaint in the Chancery

Action reveals *at least 29 instances* of plagiarism, including several allegations copied

verbatim. (Aff. ¶ 8 & Ex. R.) For instance, ¶ 55 of the consolidated complaint in the

Chancery Action alleges:

> [A]lthough the Merger was structured as an acquisition,
> with an acquisition premium, it was, in reality, a merger of
> equals at best, with the balance tipping in Dimon's favor.

Wolf Haldenstein shamelessly lifted this text word for word (but without

attribution) at ¶ 55 of the Illinois Action amended complaint, which alleges:

> Although the Merger was structured as an acquisition
> with an acquisition premium, it was, in reality, a "merger of
> equals" at best, with the balance tipping in Mr. Dimon's
> favor....

This rampant plagiarism, which permeates the Illinois Action amended

complaint, indicates that Wolf Haldenstein either performed no investigation at all or did

not investigate or research the allegations and claims in the Illinois Action to the extent

required by Rule 11. At best, Wolf Haldenstein blindly and improperly relied upon the

investigatory and drafting efforts of plaintiffs' counsel in the Chancery Action.

Wolf Haldenstein has found itself in hot water for such misconduct at least twice

in the past. In *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118, 126-28 (E.D. Pa.

- 32 -

1993), *aff'd*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994), plaintiffs' counsel, including a Wolf Haldenstein partner, were reprimanded because certain attorneys had failed to personally investigate law and facts underlying a securities fraud complaint. Although the Wolf Haldenstein attorney was not sanctioned, the Court sanctioned the attorneys who merely copied their complaint from another complaint for violating Rule 11's "reasonable inquiry" requirement. *Greenfield*, 146 F.R.D. at 126-28. *See also Taubenfeld v. Career Education Corp.*, 2004 WL 554810, at *5 (N.D. Ill. March 19, 2004) ("this issue of copying another's complaint would have persuasive effect if there was evidence showing that the proposed lead counsel did not, in fact, undertake a sufficient investigation before filing a complaint."); *Matter of Excello Press, Inc.*, 967 F.2d 1109, 1112 (7th Cir. 1992) ("the right question [is] not whether the claim itself was frivolous or nonfrivolous, but whether [counsel] conducted an adequate inquiry into the facts and the law before he filed the claim"); *Garr*, 22 F.3d at 1279 ("[A] signer making an inadequate inquiry into the sufficiency of the facts and law underlying a document will not be saved from a Rule 11 sanction by the stroke of luck that the document happened to be justified.").

Similarly, in *de la Fuente v. DCI Telecommunications, Inc.*, 259 F. Supp. 2d 250, 274 (S.D.N.Y. 2003), the Court granted defendants' request for Rule 11 sanctions against plaintiffs' counsel including Wolf Haldenstein, this time for improperly asserting clearly time-barred claims.[8] An adequate inquiry by competent counsel would have prevented

---

[8] In *de la Fuente*, the defendants argued that plaintiffs' counsel violated Rule 11 by simply copying an SEC complaint. 259 F. Supp. 2d at 259. The Court did not find reliance upon the investigatory findings of a regulatory agency to be insufficient and, further, plaintiffs' counsel represented that every allegation in the complaint had been verified through independent investigation. *Id.* at 260. Here, there was no independent investigation by the SEC or other any regulatory agency. Further, any claim that Wolf Haldenstein verified every plagiarized allegation would strain credulity, but, in any case, could be refuted or confirmed by the firm's electronic research records.

this. Again, Wolf Haldenstein avoided monetary sanctions, *see de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 229, 235 (S.D.N.Y. 2003) (declining to assess Rule 11 sanctions on liaison counsel) but the pattern is clear. Here, there is abundant evidence of Wolf Haldenstein's inadequate inquiry. (Aff. Ex. R.) Indeed, Wolf Haldenstein's misconduct here is all the more inexcusable in that the Illinois Action was commenced several months after the relevant facts first emerged and the Chancery Action was commenced. *See Garr*, 22 F.3d at 1279 ("[A]n attorney with a great deal of time to file a document might be expected to make a more comprehensive inquiry than an attorney working under severe time constraints."). Accordingly, the appropriate sanction is to remove Wolf Haldenstein as class counsel. At the very least, Wolf Haldenstein should not be permitted to lead this litigation.

**B.    Wolf Haldenstein's Failure to Serve Summons Properly**

In the Delaware Action, defendant Riley P. Bechtel waived service of summons upon the formal request of Hyland's counsel. (Aff. ¶ 6.) The other defendants have all stipulated to waiver of service of summons in the Delaware Action. *Id.* Even if the defendants had not waived service of summons, Hyland could easily have served them all under Delaware's director consent statute.[9]

---

[9] Fed. R. Civ. P. 4(e)(1) provides that service upon an individual from whom a waiver has not been obtained may be effected in any judicial district of the United States pursuant to the law of the state in which the district court is located. Delaware's "director consent" statute provides, in relevant part: "Every nonresident of this State who...accepts election or appointment as a director...of a corporation organized under the laws of this State or who...serves in such capacity...shall...be deemed thereby to have consented to the appointment of the registered agent of such corporation...as an agent upon whom service of process may be made in all civil actions...brought in this State...against such corporation, in which such director...is a necessary or proper party, or in any action or proceeding against such director...for violation of a duty in such capacity, *whether or not the person continues to serve as such director*...at the time suit is commenced. Such acceptance or service as such director...shall be a signification of the consent of such director...that any process when so served shall be of the same legal force and validity as if served upon such director...within this State and such appointment of the registered agent...shall be irrevocable." 10 Del. C. § 3114(a) (emphasis added).

By contrast, according to the Illinois Action docket, Wolf Haldenstein left copies

of the summons and complaint with Marjorie G. Joseph, presumably an officer or other

agent of JPMC. (*See* D.E. #2-15.) It is unclear why Wolf Haldenstein believed that such

service was sufficient or proper, especially given that five of the Illinois Action

defendants were no longer directors of JPMC when the Illinois Action was commenced.[10]

Fed. R. Civ. P. 4(m) imposes a 120-day time limit to serve a complaint, but more than

120 days have elapsed since the filing of the Illinois Action. Indeed, apparently Bechtel

contests the propriety of service in the Illinois Action. (D.E. # 31 at 2 n.2 ("Riley P.

Bechtel...was never properly served in this matter.").) Without taking any position on

this question, this issue may endanger Dr. Blau's ability to recover against other

defendants as well.

The importance of Bechtel's participation in this action is twofold. Firstly, as the

billionaire Chairman and CEO of Bechtel Group, Mr. Bechtel appears to be by far the

wealthiest individual defendant in this litigation, and thus second only to JPMC in terms

of potential sources of recovery. (Aff. Ex. S.) Secondly, Bechtel's background and

multiple connections to JPMC, as alleged in the Delaware Action, may give rise to higher

liability on his part. (Aff. Ex. B ¶¶ 173-186.) Thus, Wolf Haldenstein's failure to serve

summons properly specifically harms the ability of the class to recover damages and

further demonstrates the law firm's inability to prosecute this litigation.

---

[10] Laurence Fuller stepped down from the JPMC Board in 2003; Riley P. Bechtel and M. Anthony Burns were JPMC directors until the eve of the JPMC annual meeting on May 25, 2004; Frank A. Bennack, Jr. and Helene L. Kaplan were JPMC directors until the consummation of the Merger on July 1, 2004.

**C.    Wolf Haldenstein Names the Wrong Defendants
And Fails to Name A Crucial Defendant**

The Illinois Action incorrectly names Laurence Fuller, inexplicably fails to name

James Dimon, and names the corporate defendant incorrectly.

Wolf Haldenstein named Fuller as a defendant even though he retired from the

JPMC board in 2003 and, thus, could not have approved the Merger agreement, which

was reviewed and approved by the board in January 2004. This mistake is likely due to

the fact that Wolf Haldenstein indiscriminately copied documents from the Chancery

Action, in which Fuller was listed in the caption in the initial complaints but not in the

consolidated complaint. (Aff. Ex. D.)

Even more troubling than this error is Wolf Haldenstein's failure to name James

Dimon, Harrison's counterparty in the secret deal and formerly the Chairman and CEO of

Bank One. By contrast, Dimon is a defendant in the Delaware Action. Given Dimon's

crucial role in the alleged misconduct, and his prominent role in soliciting votes for the

Merger, including signing a false and misleading proxy statement, Wolf Haldenstein's

failure to name Dimon is inexplicable.[11]

Finally, Wolf Haldenstein did not even get the corporate defendant's name right.

The Illinois Action names "J. P. Morgan Chase & Co.," the name of the Company before

its charter was amended in connection with the Merger. (Aff. Ex. T.) By contrast,

JPMorgan Chase & Co. is properly named as the corporate defendant in the Delaware

Action. Although this misnomer may not be a fatal defect in the summons in the Illinois

---

[11] Also inexplicable is Wolf Haldenstein's failure to assert a number of claims asserted in the Delaware Action, including claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-promulgated thereunder, Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and pendent common law claims. *See Small v. Lorillard Tobacco Co., Inc.,* 252 A.D.2d 1, 12 (N.Y.A.D. 1998) ("The manner in which the named plaintiffs limited their claims makes them inadequate to represent [the] putative class....").

Action, it further reflects on Wolf Haldenstein's lack of care in prosecuting the Illinois

Action and ought to be corrected through amendment.

## CONCLUSION

For all the foregoing reasons, this Court should disqualify Wolf Haldenstein,

vacate the Minute Order, and transfer the Illinois Action to the District of Delaware.

Counsel welcomes any invitation to participate in oral argument.


DATED:      May 23, 2005                    Respectfully submitted,


                                            Joseph N. Gielata
                                            *of the Delaware Bar*[12]
                                            Attorney at Law
                                            501 Silverside Road, Suite 90
                                            Wilmington, DE 19809
                                            (302) 798-1096
                                            attorney@gielatalaw.com

                                            ***Attorney for Amici Curiae***
                                            ***Samuel Hyland and***
                                            ***Stephanie Speakman***

---

[12] Mr. Gielata's clients proceed as amici curiae but do not wish to intervene or otherwise formally appear in the Illinois Action for fear that doing so might waive their objections to venue. *See Commonwealth Edison Co. v. Train*, 71 F.R.D. 391, 394 (N.D. Ill. 1976). Accordingly, no *pro hac vice* application is forthcoming.