# Exhibit 4

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DR. STEPHEN BLAU, Individually and
On Behalf of All Others Similarly Situated,

    Plaintiff,

        v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL,
FRANK A. BENNACK, JR., JOHN H.
BIGGS, LAWRENCE A. BOSSIDY, M.
ANTHONY BURNS, LAURENCE
FULLER, ELLEN V. FUTTER, WILLIAM
H. GRAY, III, HELENE L. KAPLAN, LEE
R. RAYMOND, JOHN R. STAFFORD,
and J.P. MORGAN CHASE & CO.,

    Defendants.

Civil Action No. **04C 6592**

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

# FILED

AUG -2, 2005  ʳ ɋ

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

## SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE*
## SAMUEL HYLAND AND STEPHANIE SPEAKMAN

    *Amici curiae* Samuel Hyland and Stephanie Speakman (together, the "Delaware

Plaintiffs"), residents of New Castle County, Delaware and members of the putative class

in this action, respectfully submit this supplemental brief to protect the class from any

further mismanagement by the conflicted counsel for plaintiff in this action and to clarify

the proper venue and leadership of this litigation.  On June 21, 2005, the Delaware

Plaintiffs were appointed lead plaintiffs in an overlapping class action commenced in the

District of Delaware.  *See Hyland v. Harrison*, No. 05-162, Order (D. Del. Jun. 21, 2005)

(attached hereto as Exhibit A).

    By *amici curiae* brief dated May 23, 2005 (the "Amici Brief") (D.E. # 40), the

Delaware Plaintiffs previously informed this Court of numerous irregularities attributable

to the putative class counsel in the above-captioned case. Even more troubling facts surfaced subsequently, validating concerns raised in the Amici Brief. (D.E. # 50.)

By minute Order entered June 1, 2005, this Court permitted the parties in this action to file a statement addressing the Amici Brief before July 25, 2005 (D.E. # 46). That deadline passed without any response by the putative class counsel. Indeed, the putative class counsel has repeatedly stalled in responding to defendants' motion to dismiss, such that briefing in Illinois is presently not due to be completed until September 23, 2005. (D.E. # 28, 46, 47, 49, 51, 53.)

Meanwhile, the Delaware Plaintiffs' zealous prosecution of valuable class claims in the District of Delaware proceeds apace. Briefing on the motion to dismiss in that action will be completed by August 1, 2005.[1] If experience is any guide, the answering brief by putative class counsel in this action will largely mirror, if not plagiarize verbatim, the answering brief already filed by the Delaware Plaintiffs on July 11, 2005 (attached hereto as Exhibit B). Given the overlapping class actions present here, this Court may be confronted with the awkward and unnecessary task of adjudicating a controversy already being handled capably in a more appropriate venue. The Amici Brief offers several compelling reasons and options to avert an otherwise inevitable clash of rulings.

An additional reason to refrain from letting this action continue in Illinois is to prevent a "reverse auction" from taking place.[2] Already, evidence of possible collusion

---

[1] Briefing in the appeal of a related action dismissed by Delaware's Court of Chancery is also underway.
[2] Judge Posner has described a "reverse auction" as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (citations omitted). "The ineffectual lawyers are happy to sell out a class they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom line--the sum

has appeared. For instance, although the putative class counsel does not appear to have served the complaint properly on several of the defendants, the latter have refrained from raising such a defense. Indeed, one defendant signaled such a defense in defendants' motion to dismiss (*see* D.E. # 31 at 2 n.2 ("Riley P. Bechtel...was never properly served in this matter.")), but subsequently abandoned it. The timing of this change of heart is plainly suspicious: Bechtel joined in the other defendants' motion to dismiss *just three days* after the date of the Amici Brief. (*See* D.E. # 40 (dated May 23, 2005), 45 (dated May 26, 2005).)[3] The objective of such a gambit is clear: by electing to fight weaker claims, defendants hope to build precedent against the far stronger claims asserted by the Delaware Plaintiffs. No other reason adequately explains the enthusiastic willingness of several of the defendants to defend against claims without proper service of process.

This troubling pattern of accommodation also appears in the voluntary dismissal of defendant Laurence Fuller, as well as the failure to name JPMC President James Dimon, a defendant named by the Delaware Plaintiffs. As to the former, again the timing is telling: the parties jointly requested the dismissal of Fuller *just three days* after the date of the Amici Brief. (*See* D.E. # 40 (dated May 23, 2005), 41 (dated May 26, 2005).) Although Fuller should never have been named in the first place, the unusually-accommodating relationship between the putative class counsel and defendants is out of place in multi-billion-dollar class action litigation.

By contrast, the Delaware Plaintiffs have pressed their claims with maximum vigor, leaving no doubt as to their commitment to the interests of other class members. In addition to asserting several more claims backed by stronger allegations, the Delaware

---

of the settlement and the attorneys' fees--and not the allocation of money between the two categories of expense." *Id.*

[3] Indicating their haste to file, the Notice of Filing still denotes counsel as *not* representing Bechtel.

Plaintiffs have also served document-preservation subpoenas on investment bankers and

merger lawyers who likely possess relevant evidence. *See Hyland v. Harrison*, No. 05-

162, Order (D. Del. May 31, 2005), and underlying filings (attached hereto as Exhibit C).

Further, the Delaware Plaintiffs have prosecuted their action without undue delay in an

unrelenting quest for a jury trial.

For all the foregoing reasons, including the reasons set forth extensively in the

Amici Brief, this Court should disqualify the putative class counsel in this action, vacate

the minute Order appointing lead plaintiffs and lead counsel (D.E. # 20), and transfer the

above-captioned action to the District of Delaware.

Alternatively, this Court should stay the above-captioned action in favor of the

action being prosecuted ably by the Delaware Plaintiffs on a faster schedule.[4]

DATED:      July 27, 2005                   Respectfully submitted,

                                            Joseph N. Gielata
                                            *of the Delaware Bar*
                                            501 Silverside Road, Suite 90
                                            Wilmington, DE 19809
                                            attorney@gielatalaw.com
                                            (302) 798-1096

                                            ***Attorney for Amici Curiae***

---

[4] *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay
proceedings as an incident to its power to control its own docket.") (citing *Landis v. North American Co.*,
299 U.S. 248, 254 (1936)); *Colorado River Water Conservation District v. United States*, 424 U.S. 800,
817 (1975) ("As between federal district courts, …though no precise rule has evolved, the general principle
is to avoid duplicative litigation.") (affirming dismissal of concurrent federal proceeding due to, *inter alia*,
"the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior
to the motion to dismiss").

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2005, copies of the foregoing **Supplemental Memorandum of *Amici Curiae* Samuel Hyland and Stephanie Speakman** have been mailed, by U.S. mail, postage prepaid, to the persons listed below:

The Honorable William J. Hibbler
United States District Court
Northern District of Illinois, Eastern Division
Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois 60604

Michael Dobbins, Clerk of Court
United States District Court
Northern District of Illinois, Eastern Division
Everett McKinley Dirksen Building
219 South Dearborn Street
Chicago, Illinois 60604

Adam Levitt
Wolf Haldenstein Adler Freeman & Herz LLP
55 West Monroe St., Suite 1111
Chicago, Illinois 60603
*Counsel for Plaintiff*

Kathleen L. Roach
Sidley Austin Brown & Wood LLP
10 South Dearborn
Chicago, Illinois 60603
*Counsel for Defendants*

Joseph N. Gielata
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, Delaware 19809
(302) 798-1096
attorney@gielatalaw.com

**SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE*
SAMUEL HYLAND AND STEPHANIE SPEAKMAN**

# Exhibit

# A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMUEL I. HYLAND and STEPHANIE
SPEAKMAN, individually and on behalf of all
others similarly situated,

      Plaintiffs,

          vs.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK
A. BENNACK, JR., JOHN H. BIGGS,
LAWRENCE A. BOSSIDY, M. ANTHONY
BURNS, ELLEN V. FUTTER, WILLIAM H.
GRAY, III, HELENE L. KAPLAN, LEE R.
RAYMOND, JOHN R. STAFFORD,
JPMORGAN CHASE & CO., and JAMES
DIMON,

      Defendants.

Case No. **1:05-cv-162 (JJF)**

**CLASS ACTION**

---

### [PROPOSED] ORDER APPOINTING LEAD PLAINTIFFS AND LEAD COUNSEL

IT IS HEREBY ORDERED AND DECREED, this _21_ day of _June_, 2005,

that Samuel I. Hyland and Stephanie Speakman are hereby appointed lead plaintiffs in the above-

captioned litigation.

IT IS FURTHER ORDERED AND DECREED that Joseph N. Gielata, Esq. is hereby

appointed lead counsel in the above-captioned litigation. *subject to defendants reservations (D.I. 31)*

_Joseph J. Farnan Jr._

The Honorable Joseph J. Farnan, Jr.
United States District Judge

**SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE*
SAMUEL HYLAND AND STEPHANIE SPEAKMAN**

# Exhibit

# B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated, | Case No. **1:05-cv-162 (JJF)** |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON, | |
| Defendants. | |

### PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Dated: July 11, 2005

Joseph N. Gielata (DSB # 4338)
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096

*Plaintiffs' Lead Counsel*

## TABLE OF CONTENTS

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Besieged Banker and His Compliant Board . . . . . . . . . . . . . . . . . . . . . . . . .5

    The Merger and the Secret Deal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

    The Secret Deal is Exposed After Approval of the Merger. . . . . . . . . . . . . . . . . .7

    Procedural Posture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.     THE LEGAL STANDARDS APPLICABLE TO MOTIONS TO DISMISS . . . .10

II.    THE DEFENDANTS DO NOT CONTEST THAT THE
       COMPLAINT STATES VIABLE SECURITIES CLAIMS
       BASED ON MISREPRESENTATIONS IN THE PROXY/PROSPECTUS
       REGARDING THE INDEPENDENCE OF JPMC'S DIRECTORS
       AND FINANCIAL ADVISOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   THE COMPLAINT STATES VIABLE SECURITIES CLAIMS BASED ON
       MISREPRESENTATIONS IN THE PROXY/PROSPECTUS REGARDING
       THE SECRET DEAL AND RELATED MERGER DISCUSSIONS. . . . . . . . .13

    A.    No Court has Ever Held that Rule 14a-9 Claims Unrelated
          To Future Earnings Are Immaterial as a Matter of Law. . . . . . . . . . . . . 14

    B.    The Materiality of the Secret Deal and Related Merger Discussions
          Is a Fact-Intensive Question Not Amenable to Resolution
          On a Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

         1.    The Secret Deal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

         2.    The Merger Agreement's Hidden Provision . . . . . . . . . . . . . . . .18

         3.    The Misrepresented Succession Arrangement . . . . . . . . . . . . . . 18

         4.    The Misrepresented Rationale for the Merger . . . . . . . . . . . . . . 19

C.   The Complaint's 14a-9 Claims Meet
The PSLRA's Particularity Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    1.   Reliance on Reputable Journalists is
Sufficient Under the PSLRA. . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    2.   The Complaint Alleges That the Defendants All Permitted
The Use of Their Names in the Proxy/Prospectus. . . . . . . . . . . .21

    3.   The Complaint Adequately Alleges the
Negligence of the Non-Management Directors. . . . . . . . . . . . . .22

IV.   THE COMPLAINT STATES VIABLE 10B-5 SECURITIES CLAIMS
AGAINST HARRISON AND DIMON BASED ON (I) THE SCHEME, (II)
ORAL MISREPRESENTATIONS AND (III) OMISSIONS IN THE JOINT
PRESS RELEASE REGARDING THE SECRET DEAL. . . . . . . . . . . . . . . . . 24

A.   The Complaint Alleges a Scheme to Defraud
Concocted and Executed by Harrison and Dimon. . . . . . . . . . . . . . . . . .25

B.   The Complaint Alleges That Harrison and Dimon
Made Actionable Oral Misrepresentations. . . . . . . . . . . . . . . . . . . . . . . . 26

C.   The Complaint Alleges Actionable Omissions
In the Press Release Announcing the Merger. . . . . . . . . . . . . . . . . . . . . . 26

D.   Lead Plaintiffs Are Not Required to Have
Standing to Bring Every Class Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

E.   The Complaint Adequately Pleads
Scienter as to Dimon and Harrison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

V.   PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION. . . . . . 30

A.   Plaintiffs Have Alleged Loss Causation With Respect to
Their Claim that They Lost a Valuable Opportunity. . . . . . . . . . . . . . . . 31

B.   Plaintiffs Have Alleged Loss Causation with Respect to
Their Claim that JPMC's Stock Price Decline Was
Caused by False Statements by Harrison and Dimon. . . . . . . . . . . . . . . 32

VI.    THE COMPLAINT STATES VIABLE CLAIMS FOR
       BREACH OF FIDUCIARY DUTY THAT WERE SPECIFICALLY
       DISTINGUISHED BY THE DELAWARE COURT OF CHANCERY. . . . . . . . 33

       A.    This Court Should Not Refuse to Exercise
             Its Mandatory Supplemental Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . 34

       B.    The Complaint Adequately Alleges that JPMC's Board
             Did Not Contain a Majority of Independent Directors. . . . . . . . . . . . . . 35

       C.    The Complaint's Legal Theories Differ Significantly
             From Those Considered in the Chancery Action. . . . . . . . . . . . . . . . . . .36

VII.   THE PSLRA'S HEIGHTENED PLEADING STANDARD
       VIOLATES THE SEVENTH AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page**

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Atlas Roofing Co., Inc. v. OSHRC*,
  430 U.S. 442 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re BankAmerica Corp. Sec. Litig.*,
  78 F. Supp. 2d 976 (E.D. Mo. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Beacon Theatres, Inc. v. Westover*,
  359 U.S. 500 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Beaumont v. American Can. Co.*,
  797 F.2d 79 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 n.13

*Bond Opportunity Fund v. Unilab Corp.*,
  2003 U.S. Dist. LEXIS 7838, *aff'd*,
  87 Fed. Appx. 772, 2004 WL 249583 (2d Cir. Feb. 10, 2004) . . . . . . . . . . . .23, 24

*Brown v. Siegel*,
  1995 U.S. Dist. LEXIS 1945 (E.D. Pa. Feb. 10, 1995) . . . . . . . . . . . . .33-34 n.17

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*,
  494 U.S. 558 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*City of Chicago, et al. v. Int'l College of Surgeons, et al.*,
  522 U.S. 156 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 38

*Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath,*
  516 F.2d 811 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 n.13

*In re Control Data Corp. Sec. Litig.,*
  933 F.2d 616 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Digital Island Sec. Litig.,*
  357 F.3d 322 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 n.10

*Dimick v. Schiedt,*
  293 U.S. 474 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Dura Pharmaceuticals, Inc. v. Broudo,*
  125 S. Ct. 1627 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31 n.16, 39

*In re Enron Corp. Sec., Deriv. & ERISA Litig.,*
  235 F. Supp. 2d 549 (S.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*EP Medsystems, Inc. v. EchoCath, Inc.,*
  235 F.3d 865 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Fortune Sys. Sec. Litig.,*
  680 F. Supp. 1360 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Giaccio v. Pennsylvania,*
  382 U.S. 399 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38 n.21

*Gould v. American-Hawaiian S.S. Co.,*
  535 F.2d 761 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 40

*Growth Horizons, Inc. v. Delaware County,*
  983 F.2d 1277 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Herskowitz v. Nutri/System, Inc.,*
  857 F.2d 179 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Honeywell Int'l Sec. Litig.,*
  182 F. Supp. 2d 414 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 n.10

*Hoxworth v. Blinder, Robinson & Co.,*
  980 F.2d 912 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Initial Pub. Offering Sec. Litig.,*
  214 F.R.D. 117 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jacob v. New York,*
 315 U.S. 752 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*In re J.P. Morgan Chase & Co. S'holder Litig.,*
 No. 531-N, 2005 Del. Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005) . . . . . . . . . . *passim*

*Keyser v. Commonwealth National Financial Corp.,*
 675 F. Supp. 238 (M.D. Pa. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*In the Matter of KPMG Peat Marwick, LLP,*
 Exchange Act Rel. No. 43862 (Jan. 19, 2001), 74 S.E.C. Docket 384,
 *motion for reconsideration denied,* Exchange Act Rel. No. 44050 (Mar. 9, 2001),
 74 S.E.C. Docket 1351, *petition denied sub nom.,*
 *KPMG, LLP v. S.E.C.,* 289 F.3d 109 (D.C. Cir. 2002). . . . . . . . . . . . . . . . 22 n.11

*Lewis v. Curtis,*
 671 F.2d 779 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Loewen Group Inc.,*
 No. 98-6740, 2004 WL 1853137 (E.D. Pa. Aug. 18, 2004) . . . . . . . . . . . . . . . .21

*Lyon v. Mutual Benefit Assoc.,*
 305 U.S. 484 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re McKesson HBOC, Inc. Sec. Litig.,*
 126 F. Supp. 2d 1248 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 30

*Mills v. Electric Auto-Lite Co.,*
 396 U.S. 375 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 30

*In re Northwestern Corp. Sec. Litig.,*
 299 F. Supp. 2d 997 (D.S.D. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re NUI Sec. Litig.,*
 314 F. Supp. 2d 388 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Parklane Hosiery Co. v. Shore,*
 439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Parsons v. Bedford,*
 28 U.S. (3 Pet.) 433 (1830) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*Pereira v. Farace,*
 No. 03-5055, 2005 WL 1532318 (2d Cir. Jun. 30, 2005) . . . . . . . . . . . . . .36 n.19

*Public Citizen Health Research Group v. National Inst. Of Health,*
 209 F. Supp. 2d 37 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n.5

*In re Regal Communications Corp. Sec. Litig.*,
   No. 94-179, 1996 WL 411654 (E.D. Pa. July 17, 1996) . . . . . . . . . . . . . . . . . . . 33

*In re Reliance Sec. Litig.*,
   135 F. Supp. 2d 480 (D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Richardson v. MacArthur*,
   451 F.2d 35 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 n.13

*Robbins v. Amoco Prod. Co.*,
   952 F.2d 901 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 n.17

*S.E.C. v. Zandford*,
   535 U.S. 813 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15 n.6

*Salit v. Stanley Works*,
   802 F. Supp. 728 (D. Conn. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000), *cert. denied*, 531 U.S. 1149 (2001) . . . . . . . . . . . 31

*Senior Unsecured Creditors' Comm. of First Republic Bank Corp. v. FDIC*,
   749 F. Supp. 758 (N.D. Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n.5

*Shapiro v. UJB Financial Corp.*,
   964 F.2d 272 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Sheehan v. Little Switzerland, Inc.*,
   136 F. Supp. 2d 301 (D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15 n.6

*In re Stat-Tech Sec. Litig.*,
   905 F. Supp. 1416 (D. Col. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Tracinda Corp. v. DaimlerChrysler AG*,
   197 F. Supp. 2d 42 (D. Del. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tracinda Corp. v. DaimlerChrysler AG*,
   364 F. Supp. 2d 362 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Tse v. Ventana Med. Sys. Inc.*,
   No. 97-37-SLR, 1998 WL 743668 (D. Del. Sept. 23, 1998) . . . . . . . . . . 14, 31, 36

*Umbriac v. Kaiser*,
    467 F. Supp. 548 (D. Nev. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17 n.7

*United States Smelting, Refining & Mining Co. v. Clevite Corp.*,
    Nos. C68-210, C68-345, 1968 WL 2140 (N.D. Ohio Jun. 17, 1968) . . . . . . . . . .17

*In re U.S. Interactive, Inc. Sec. Litig.*,
    No. 01-522, 2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) . . . . . . . . . . . . . .22 n.10

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 n.8

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Wright v. United States*,
    139 F.3d 551 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n.5

## Statutes:

15 U.S.C. § 78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 78n(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28, 38

28 U.S.C. §1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

This brief is respectfully submitted by Samuel I. Hyland and Stephanie Speakman
(collectively, the "Plaintiffs") in opposition to the motion to dismiss and opening brief in
support thereof ("Defs.' Br.") submitted by JPMorgan Chase & Co. ("JPMC" or the
"Company") and all the individual defendants.[1]

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDING

This case involves a secret deal concocted and executed by the highest-ranking
officers of JPMC and Bank One Corporation ("Bank One") in connection with the July
2004 merger (the "Merger") of those two companies. During the course of the merger
negotiations, Bank One head James Dimon was willing to do the deal for *zero* premium
so long as he could become CEO of the combined company immediately. However,
beleaguered JPMC chairman and CEO William Harrison was so obsessed with keeping
his CEO title and retiring on his own terms that he callously rejected this opportunity and,
despite his fiduciary duty to JPMC shareholders, struck a deal with a staggering
*$7 billion* premium, solely in exchange for two more years as CEO – *equivalent to
nearly $10 million per day!*[2]  Harrison and Dimon agreed to conceal these facts and
instead falsely characterized Harrison's retention as part of an orderly succession plan.

The victims of the secret deal, the existence of which is not denied, were JPMC
shareholders who were duped into funding, out of their own pockets, a provision of the
Merger which was concealed from them. Instead of owning 61% of the combined
Company, they ended up with 58%. Without their approval, the Merger would not have
been possible. But Harrison and Dimon knew that disclosing the secret deal would have
undermined support for the Merger, since JPMC shareholders clearly would have

---

[1] Unless otherwise defined, capitalized terms have the meanings ascribed to them in defendants' opening
brief (D.I. 33). The individual defendants other than Harrison and Dimon, all of whom are or were
directors of the Company, are referred to herein as the "Non-Management Directors." References to "¶_"
are to paragraphs in the corrected amended complaint (D.I. 51) (the "Complaint"). Unreported opinions are
attached hereto as Exhibit C, except for those cited in and attached to defendants' opening brief.
[2] The $7 billion premium, divided by 730 days, equals $9,589,041.10 per day.

preferred a deal with no premium. Therefore, they were careful to conceal the secret deal in the press release announcing the Merger and the proxy statement. Even when directly confronted with questioning about the circumstances behind the Merger's succession arrangement, Harrison and Dimon dissembled to conceal their scheme.

When JPMC shareholders voted in favor of the Merger (and thereby approved a vast expansion of the Company's authority to issue shares), they did so based on an incomplete and materially misleading proxy-prospectus and other false and misleading statements. The crucial corporate authority to issue shares, without which the Merger could not have been consummated, did not cost the Company anything. However, the value of Plaintiffs' stake in the Company, as well as the stake of other pre-Merger JPMC shareholders, were directly harmed.

After an extensive investigation by counsel (including a face-to-face meeting with the journalist with *The New York Times* who exposed the secret deal), Plaintiffs have asserted three categories of claims:

|  | *Against* | *Pursuant to* |
|---|---|---|
| *Negligence* | All defendants except Dimon, for material defects in the proxy statement | **Section 14(a)** of the Securities and Exchange Act of 1934 (the "34 Act"), 15 U.S.C. § 78n(a), and **Rule 14a-9** promulgated thereunder, 17 C.F.R. § 240.14a-9 |
|  | All defendants, for material defects in the registration statement | **Section 11** of the Securities Act of 1933 (the "33 Act"), 15 U.S.C. § 77k |
|  | All defendants, for material defects in the prospectus | **Section 12(a)(2)** of the 33 Act, 15 U.S.C. § 77l(a)(2) |
|  | Harrison and Dimon, as control persons in connection with 33 Act claims | **Section 15** of the 33 Act, 15 U.S.C. § 77o |
|  | Harrison and Dimon, as control persons in connection with 34 Act claims | **Section 20(a)** of the 34 Act, 15 U.S.C. § 78t(a) |

|  | *Against* | *Pursuant to* |
|---|---|---|
| *Fraud* | Harrison and Dimon: for implementing a fraudulent scheme; for materially false oral statements; and omissions in the joint press release and proxy/prospectus | **Section 10(b)** of the 34 Act, 15 U.S.C. § 78j(b) and **Rule 10b-5** promulgated thereunder, 17 C.F.R. § 240.10b-5 |
|  | Harrison and Dimon, as control persons in connection with 34 Act claims | **Section 20(a)** of the 34 Act, 15 U.S.C. § 78t(a) |

| | *Against* | *Pursuant to* |
|---|---|---|
| **Breach of Fiduciary Duty** | All defendants except Dimon and JPMC, for breach of the duty of disclosure | Delaware common law |
| | All defendants except Dimon and JPMC, for breach of the duty of loyalty | Delaware common law |

Plaintiffs have alleged far more than is required to plead violations of federal securities laws. The Complaint documents the entire scheme by Harrison and Dimon, from start to finish, to execute the secret deal surreptitiously and without letting shareholders in on the scheme. The Complaint alleges intentional, material misrepresentations by Harrison, Dimon and the Company that caused damage. The Complaint further alleges that the remaining defendants negligently endorsed a materially defective proxy statement. That is all that is required under any provision of the securities laws.

In addition, the Complaint states in detail Plaintiffs' claim that the defendants who approved the Merger are liable under common law for any unfairness in the Merger because the JPMC Board lacked an independent majority. While not required for the negligence claims against the Non-Management Directors, the Complaint also details numerous financial and personal relationships which crippled the ability of JPMC's Board to consider the merits of the Merger without regard for personal benefit. These facts help to explain why JPMC's Board stood silently by as JPMC shareholders foot the bill for a treacherous scheme to entrench the Company's highest-ranking officer.

In a futile effort to defend the indefensible, the defendants resort to a host of tortured, technical arguments. In particular, they assert that Plaintiffs' Merger-related claims are deficient because merger discussions are always immaterial as a matter of law – an argument soundly rejected by the Supreme Court long ago. Defendants' other arguments are similarly meritless, and their motion should be denied.

## SUMMARY OF THE ARGUMENT

1.    Whether JPMC shareholders would deem the omission of the secret deal and related merger discussions in this case to be material is not an issue appropriate for resolution on a motion to dismiss.

2.    The Complaint states viable negligence-based 14a-9 securities claims based on the fact that the joint proxy statement omitted the secret deal and falsely described the rationale for the Merger and the terms of the succession arrangement.

3.    The Complaint states viable 10b-5 securities fraud claims based on the fact that Harrison and Dimon intentionally misled JPMC shareholders.

4.    The Complaint, critical portions of which were specifically distinguished by the Delaware Court of Chancery, states viable claims for breach of fiduciary duty.

5.    Plaintiffs have adequately alleged loss causation with respect to both lost opportunity and stock price decline.

6.    In securities class actions, the lead plaintiffs are not required to have standing to maintain every class claim. Accordingly, the question of standing for purchaser claims should be reserved for the determination of class certification, when the adequacy and typicality of proposed class representatives will be assessed.

7.    The PSLRA's heightened pleading standard improperly usurps the fact-finding domain of the jury, thereby violating the Seventh Amendment.

- 4 -

## STATEMENT OF FACTS

### The Besieged Banker and His Compliant Board

Defendant JPMC is a global financial services firm involved in investment banking, financial services for consumers and businesses, investment management, private banking, and private equity. (¶ 26.) Defendant Harrison has served as Chief Executive Officer ("CEO") and Chairman of the Board of Directors of JPMC since 1999. (¶¶ 27, 55.) Harrison's tenure has been distinguished by value-destroying mergers and wildly excessive compensation for himself, including merger bonuses, with little to show in terms of shareholder value. (¶¶ 56-68.) Outside observers have incessantly criticized Harrison's mismanagement of the Company. (*Id.*) Many predicted his imminent downfall. (¶¶ 61, 64, 66.) But JPMC's Board never threw in the towel, despite the Company's poor performance and repeated involvement in financial scandal.

Given the tangle of undisclosed financial and personal relationships infecting JPMC's Board, the unwillingness of JPMC's Board to show Harrison the door is unsurprising. Despite its claim of independence, the JPMC Board was packed with directors whose institutions depended on financial support from JPMC, whose law firms received millions of dollars in legal fees from JPMC, who co-invested with JPMC, and who were otherwise beholden to Harrison as a result of their considerable financial dealings with the Company. (¶¶ 172-223.)

However, by late 2003, after years of poor business decisions, costly acquisitions, and financial scandals, Harrison found it necessary to conjure yet another massive deal to protect his CEO title. (¶¶ 73-74.) Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582 restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, which, however, were "subject to continued employment." (*Id.*) If vested at

- 5 -

the target price, the stock units would be worth over $6.1 million. (*Id.*) With these
motives in mind, Harrison commenced discussions with James Dimon concerning the
possibility of a business combination between JPMC and Bank One. (¶ 77.)

### The Merger and the Secret Deal

The merger negotiations between Harrison and Dimon were conducted in the
utmost secrecy. (¶ 79.) As the negotiations progressed, JPMC retained J.P. Morgan
Securities Inc., a wholly-owned JPMC subsidiary, as its financial advisor for a fee of $40
million. (¶ 83.) By retaining a conflicted and compliant financial advisor to provide a
"fairness opinion," Harrison could justify whatever financial terms he wanted. (*Id.*)

As a result of these discussions, on January 14, 2004, JPMC and Bank One issued
a joint press release (the "Press Release") announcing their agreement to merge. (¶ 94.)
On that date, the acquisition premium for Bank One shares amounted to approximately
14 percent, based on that day's closing prices. (¶ 101.) In other words, to merge with
Bank One, JPMC shareholders paid an acquisition premium of more than $7 billion in
stock, which substantially diluted their individual holdings. (*Id.*) The total value of the
deal was approximately $57 billion. (*Id.*) One observer presciently asked: "Has Harrison
sold [JPMC] down the river to Bank One and Dimon just to save his own skin?" (¶ 95.)

The proposed acquisition of Bank One in a stock-for-stock transaction required
the approval of a majority of JPMC's shareholders, as an amendment to JPMC's
certificate of incorporation was necessary for JPMC to have the corporate authority to
issue the shares necessary for the exchange. (¶ 167.) Thus, the defendants issued a Joint
Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), to gain
shareholder approval of the Merger. (¶¶ 146-151.) Unaware that the Proxy/Prospectus
contained materially false and misleading statements and failed to disclose material facts,
as described below, shareholders of JPMC overwhelmingly approved the Merger.

(¶ 154.) At the same time, a substantial number of JPMC shareholders made clear their preference for the CEO and Chairman positions to no longer be held by the same person. (¶ 155.) While the approval threshold for the Merger was exceeded by 374.8 million votes, 562.5 million votes were cast in favor of a shareholder proposal to separate the Chairman and CEO positions. (¶ 156.)

### The Secret Deal is Exposed After Approval of the Merger

Well after JPMC shareholders had already voted for the Merger, two sources close to the secretive negotiations between Dimon and Harrison revealed that Dimon had been willing to agree to a *no-premium deal* if he could be CEO of the combined company immediately, with Harrison retaining his Chairman title. Instead, Harrison and Dimon struck a secret deal allowing Harrison to retain the CEO title for two more years in exchange for paying a premium. The Proxy/Prospectus and the Press Release carefully omitted this secret deal. However, a June 27, 2004 article in *The New York Times* entitled "The Yin, the Yang and the Deal" revealed the following stunning facts:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. *Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately*, according to two people close to the deal.
>
> *When Mr. Harrison resisted, Mr. Dimon insisted on a premium*, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

(¶ 88.) Confirming this account, one Merger negotiator, quoted in *The Financial Times*, revealed that Dimon had "laid out" a "spectrum of outcomes in terms of premium and governance," corroborating *The New York Times* article while couching the secret deal in corporate Newspeak. (¶ 84.) Interestingly, an earlier article in *FORTUNE* magazine

reported Harrison's claim that he had tried to get a "market deal," *i.e.*, a nil-premium
transaction. (¶ 86.) This claim was misleading, at best, or simply false. (¶ 87.)

It was thus revealed that the Proxy/Prospectus was incomplete and materially
misleading. The $7 billion premium paid by JPMC stockholders in the Merger was
completely unnecessary and, moreover, betrayed the interests of JPMC shareholders, as it
served only to entrench Harrison in the CEO position for two more years, even though
under his leadership JPMC's stock price has fallen significantly and JPMC's reputation
has suffered. Neither the Proxy/Prospectus nor the Press Release ever disclosed the
secret deal between Dimon and Harrison, or that Dimon had been willing to merge Bank
One into JPMC with a nil-premium exchange ratio.

The exposure of the scheme also made clear that Harrison and Dimon had lied
directly to their own shareholders to conceal their secret deal at a January 15, 2004 press
conference to explain the Merger to the investment community. *See, e.g.*:[3]

| *Question* | *Answer* |
|---|---|
| *Questioner*: With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have [Dimon] be CEO right away? (¶ 136.) | *Harrison*: It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me. (¶ 137.) |
| *Questioner*: Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience? (¶ 139.) | *Dimon*: You've got to think a little bit that these are two large organizations coming together. You want the teams to meld. I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work. (¶ 140.) |

These answers were evasive, incomplete, and misleading. In fact, Dimon *had*
moved to become CEO immediately. And as for why Harrison had "not just go[ne]
directly to Chairman and ha[d] [Dimon] be CEO right away," in reality, Harrison had
*rejected this alternative*, despite the offer of a much lower exchange ratio, and thus

---

[3] Excerpted from transcript, as filed with the SEC on January 15, 2004.

- 8 -

placed his own entrenchment far ahead of his shareholders' interests. By lying directly to

the investing public, rather than offering a simple "no comment," Harrison and Dimon

compounded their brazen misconduct and clearly demonstrated their fraudulent intent.

### Procedural Posture

After the truth was revealed, efforts commenced to hold Harrison and other JPMC

directors accountable. A consolidated lawsuit was filed in the Delaware Court of the

Chancery (the "Chancery Action") (attached hereto as Exhibit A). On April 29, 2005,

Vice Chancellor Stephen P. Lamb issued an opinion granting a motion to dismiss the

Chancery Action. *In re J.P. Morgan Chase & Co. S'holder Litig.*, No. 531-N, 2005 Del.

Ch. LEXIS 51 (Del. Ch. Apr. 29, 2005) ("*J.P. Morgan Chase*"). The opinion specifically

distinguished the factual allegations in this action, observing, in relevant part:

> A similar federal class action complaint was filed in the
> District of Delaware on March 17, 2005. The federal
> complaint alleges substantially the same claims that are
> before this court. It does, however, have several important
> differences. First, the federal complaint characterizes the
> deal between Harrison and Dimon as a "secret deal." This
> description implies that the merger negotiations were
> unknown to the board of JPMC, a fact that appears
> inconsistent with the state complaint's primary allegation,
> as well as later allegations in the federal complaint that the
> "[d]efendants were motivated to conceal Harrison's secret
> and undisclosed pact with Dimon."

> Second, the federal complaint alleges that JPMC violated
> federal securities laws, specifically Sections 10(b), 11,
> 12(a)(2), 14(a), 15, and 20(a) of the Securities Exchange
> Act of 1934. These claims are sufficient to give federal
> courts jurisdiction over the claims, including the related
> breaches of fiduciary duty claims.

> Finally, the federal complaint lists important distinguishing
> facts, some of which are inconsistent with facts in this
> action. For instance, the federal complaint states that
> *Harrison* offered the no-premium deal. The complaint
> before this court makes the opposite claim, i.e. that it was
> Dimon who made an offer of that nature. This discrepancy
> is not explained.

> The federal complaint alleges additional substantive facts
> concerning certain directors. For example, the federal
> complaint ties Futter's fund-raising activities to her board
> membership, as reported in *New York Magazine* on
> February 21, 2000. Additionally, the federal complaint
> alleges that Kaplan is an attorney whose law firm receives
> substantial fees from JPMC.

*Id.* at *15-17 (referring to D.I. 1; emphasis in original; citations omitted).[4]

On May 23, 2005, Plaintiffs filed an amended complaint on behalf of themselves

and a class of other aggrieved JPMC shareholders (the "Class"). (¶ 45.)

## ARGUMENT

Three decisions make clear that defendants' motion must be denied. First, the

Supreme Court repudiated the "bright line" materiality rule for merger discussions in

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988), well after the decisions touted in the opening

brief for this question. Second, in *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp.

2d 42 (D. Del. 2002) ("*DaimlerChrysler*"), this Court considered similar claims and

concluded that plaintiffs stated viable causes of action. Finally, in *J.P. Morgan Chase*,

Vice Chancellor Lamb specifically discussed the initial complaint in this action and

distinguished it from the complaint dismissed in that decision. Defendants' brief

carefully avoids *Basic* and *DaimlerChrysler*, and passes over the entire section in *J.P.*

*Morgan Chase* discussing this action. The glaring omission of these directly-applicable

authorities speaks to the unsound moorings of the motion.

## I.     THE LEGAL STANDARDS APPLICABLE TO MOTIONS TO DISMISS

In *DaimlerChrysler*, this Court comprehensively summarized the legal standards

applicable to a motion to dismiss:

---

[4] The dismissal of the Chancery Action is presently on appeal. Contrary to defendants' assertion,
Plaintiffs' amended complaint (D.I. 26) was filed on May 23, not May 25; thus, it was filed the day *before*
the Chancery Action appeal was filed, not the day after. (Defs.' Br. at 7.)

- 10 -

> The purpose of a motion to dismiss is to test the sufficiency
> of a complaint, not to resolve disputed facts or decide the
> merits of the case. When considering a motion to dismiss,
> a court must accept as true all allegations in the complaint
> and must draw all reasonable factual inferences in the light
> most favorable to the plaintiff. The Court is not required to
> accept legal conclusions either alleged or inferred from the
> pleaded facts. Dismissal is only appropriate when it
> appears beyond doubt that the plaintiff can prove no set of
> facts in support of his claims which would entitle him to
> relief. The burden of demonstrating that the plaintiff has
> failed to state a claim upon which relief may be granted
> rests on the movant.

197 F. Supp. 2d at 53 (internal citations and quotation marks omitted).

## II.    THE DEFENDANTS DO NOT CONTEST THAT THE COMPLAINT STATES VIABLE SECURITIES CLAIMS BASED ON MISREPRESENTATIONS IN THE PROXY/PROSPECTUS REGARDING THE INDEPENDENCE OF JPMC'S DIRECTORS AND FINANCIAL ADVISOR.

Defendants have not challenged the Complaint's allegations of misrepresentations

concerning director independence. As to defendants Bechtel, Bennack, Burns, Futter,

Kaplan, Gray, and Stafford, the Complaint alleges in detail that the Proxy/Prospectus

omitted the full extent of each of their relationships with Harrison and/or JPMC despite

the Proxy/Prospectus's reassurance that JPMC's Board "determined that each of the non-

management directors is independent...." (¶¶ 186, 192, 200, 210, 215, 220, 223.)

Accordingly, the Complaint alleges that JPMC shareholders were prevented from

assessing for themselves the purported independence of these directors. (*Id.*) *See Mills v.*

*Electric Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970) ("An adequate disclosure of this

relationship would have warned the stockholders to give more careful scrutiny to the

terms of the merger than they might to one recommended by an entirely disinterested

board.") (noting that courts below found this proxy defect material as a matter of law).

The Complaint paints a portrait of a Board with plenty of compelling reasons to

keep quiet by laying out several hidden relationships which were not disclosed anywhere

- 11 -

in the Proxy/Prospectus, not even in its discussion of "financial interests of directors and

officers." (Proxy/Prospectus at 8, 66.)  These undisclosed "ties that bind" include:

| Director | Allegation of Omitted Relationship |
|---|---|
| Bechtel | *First*, Bechtel Group, Inc. has received over $2 billion through the Trade Bank of Iraq, which is managed by JPMC. (¶ 173.) *Second*, Bechtel Group and JPMC made investments together. (¶¶ 176-77.) *Third*, Bechtel Group's interests depend on the Export-Import Bank, where JPMC Senior Vice President Jacqueline A. Kaiko held an influential position. (¶¶ 178-79.) |
| Bennack | Bennack has a leadership role and financial interest in a significantly leveraged entity dependent upon JPMC for favorable terms in its credit facility for its operations and to maximize profits. (¶¶ 187-89.) |
| Futter | JPMC is a significant benefactor of an institution headed by Futter. (¶ 201.) |
| Gray | JPMC is a significant benefactor of an institution that was headed by Gray while the Merger was negotiated. (¶¶ 216-17.) Moreover, Harrison served as the institution's treasurer. (¶ 218.) |
| Kaplan | *First*, Kaplan's law firm receives millions of dollars in legal fees from JPMC. (¶¶ 212-13.) *Second*, Kaplan is also trustee and vice-chair of an institution of which JPMC is a significant benefactor. (¶ 211.) |
| Burns | Burns has a substantial financial interest in a company with significant financial relationships with JPMC. (¶¶ 196-99.) |
| Stafford | Stafford has a substantial financial interest in a company with significant financial relationships with JPMC. (¶¶ 221-22.) |

The Complaint also alleges that the Proxy/Prospectus misrepresented the

Company's financial advisor in the Merger as an "affiliate," when in fact it is a wholly-

owned and controlled subsidiary of JPMC. (¶ 83.)  This misrepresentation is related to

the secret deal in that Harrison needed a compliant financial advisor to bless as "fair" an

otherwise unacceptable exchange ratio.

Defendants do not question the viability of these claims.[5]  Accordingly, the

Complaint's § 14(a) claims as to the foregoing omitted or misrepresented information

must proceed.

---

[5] Defendants have waived any challenge to these alleged misrepresentations and any such challenge, if raised in their reply brief, should not be considered. *See Public Citizen Health Research Group v. National Inst. Of Health*, 209 F. Supp. 2d 37, 43-44 (D.D.C. 2002) ("The Court highly disfavors parties creating new arguments at the reply stage that were not fully briefed during the litigation. *Senior Unsecured Creditors' Comm. of First Republic Bank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (noting that Defendant 'raised its third argument for the first time in its reply brief and the court will not consider it in deciding the motion to dismiss.'"); *Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998) ("The reason

## III. THE COMPLAINT STATES VIABLE SECURITIES CLAIMS BASED ON MISREPRESENTATIONS IN THE PROXY/PROSPECTUS REGARDING THE SECRET DEAL AND RELATED MERGER DISCUSSIONS.

Section 14(a) of the 34 Act states:

> It shall be unlawful for any person, by use of the mails or by any means of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security....

15 U.S.C. § 78n(a). Rule 14a-9 prohibits the making of a statement that is "false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

The Complaint asserts in Count 1 that the omission of the secret deal and related misrepresentations give rise to claims under § 14(a) and Rule 14a-9 for defects in the Proxy/Prospectus. If JPMC shareholders had known that Harrison rejected a highly favorable exchange ratio for no other reason than because he wanted to continue as CEO of the combined Company, they would not have voted for the Merger with its far less favorable exchange ratio.

First, defendants contend that Rule 14a-9 can only be premised on misrepresentations and omissions related to future earnings. (Defs.' Br. at 14.) Then, in an effort to resuscitate a long-rejected argument, defendants also contend that merger discussions are always immaterial as a matter of law. However, the Supreme Court made clear in *Basic* that this exact argument is unacceptable. Instead, evaluating the

---

for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues.").

materiality of merger discussions requires a thorough inquiry into the specific facts of

each case, and in any case calls for discovery to assess a variety of factual questions.

Finally, defendants also dispute the particularity of the Complaint's allegations by

challenging Plaintiffs' reliance on reputable media sources and arguing that the

Complaint unduly relies on group pleading. These contentions lack merit.

### A.   No Court has Ever Held that Rule 14a-9 Claims Unrelated To Future Earnings Are Immaterial as a Matter of Law.

Defendants bizarrely contend that "under Rule 14a-9, plaintiffs must allege that

the inclusion of the purported 'offer' would have had a material impact on a reasonable

shareholder's prediction of JPMC's future earnings." (Defs.' Br. at 14.) However, the

case law is replete with viable securities claims in which "future earnings" were not at

issue, such as this Court's holding in *DaimlerChrysler* that using the term "merger of

equals" to disguise a takeover is actionable. 197 F. Supp. 2d at 62; *see also In re*

*BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 999-1000 (E.D. Mo. 1999) (same);

*Tse v. Ventana Med. Sys. Inc.*, No. 97-37-SLR, 1998 WL 743668, at *7 (D. Del. Sept. 23,

1998) (plaintiffs alleged that they had been induced to approve a merger without being

informed that an insider transaction had been approved on far more favorable terms).

An unlimited variety of misrepresentations and omissions unrelated to future

earnings can be actionable under securities laws, so long as the false or omitted

information is material. *See S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002) ("[N]either the

SEC nor this Court has ever held that there must be a misrepresentation about the value

of a particular security in order to run afoul of the [34] Act."). Indeed, the Supreme

Court has stated that securities laws "should be construed not technically and

restrictively, but flexibly to effectuate [their] remedial purposes." *Id.* at 819 (citations

and quotation marks omitted). Accordingly, defendants' absurd contention that a Rule

- 14 -

14a-9 claim can only be based on "future earnings" misstatements lacks any legal
foundation.

### B. The Materiality of the Secret Deal and Related Merger Discussions Is a Fact-Intensive Question Not Amenable to Resolution On a Motion to Dismiss.

The Supreme Court has noted that "the notion of materiality assumes heightened
significance" in an analysis of a § 14(a) case. *TSC Indus., Inc. v. Northway, Inc.*, 426
U.S. 438, 444 (1976). "An omitted fact is material if there is a substantial likelihood that
a reasonable shareholder would consider it important in deciding how to vote.... Put
another way, there must be a substantial likelihood that the disclosures of the omitted fact
would have been viewed by the reasonable investor as having significantly altered the
'total mix' of information made available."[6] *Id.* at 449. Courts do not "require proof that
material omissions or misstatements in a proxy statement decisively affected voting".
*Basic*, 485 U.S. at 243.

"*Only* if the alleged misrepresentations or omissions are *so obviously
unimportant to an investor* that reasonable minds cannot differ on the question of
materiality is it appropriate for the district court to rule that the allegations are
inactionable as a matter of law." *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 410 (D.N.J.
2004) (quoting *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 281 n.11 (3d Cir. 1992)
(citing *TSC Indus.*, 426 U.S. at 450)) (emphasis added); (*see also* ¶¶ 152 (alleging that
JPMC shareholder at the annual meeting expressed concern about the exchange ratio,
which "was met with loud applause from the shareholders"), 153 (alleging JPMC

---

[6] It is undisputed that, as fiduciaries to JPMC's shareholders, the defendants other than Dimon owed a duty
to disclose. *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 310-11 (D. Del. 2001) (finding
omission actionable because corporate defendant and its directors and officers had a duty to disclose); *see
also Zandford*, 535 U.S. at 822 ("[A]ny distinction between omissions and misrepresentations is illusory in
the context of [a fiduciary]."). Also, Harrison and Dimon made materially incomplete and misleading oral
misrepresentations when the Merger was announced which the Proxy/Prospectus failed to correct.

- 15 -

shareholder "support for an immediate Dimon regime"), 155 (alleging the extraordinary

desire of JPMC shareholders to split the chairman and CEO posts).)

Defendants hang their hats on *Beaumont v. American Can Co.*, 797 F.2d 79 (2d

Cir. 1986) and *Umbriac v. Kaiser*, 467 F. Supp. 548 (D. Nev. 1979) to argue that the

secret deal was immaterial as a matter of law because it was not really part of the price or

structure of the Merger. (Defs.' Br. at 15-18.) Prior to 1988, defendants' "bright-line"

argument that merger discussions cannot be material might have been colorable.

However, in 1988, nine years after *Umbriac* and two years after *Beaumont*, the Supreme

Court unequivocally rejected the central reasoning of both cases in *Basic*, in which the

Court rejected each and every argument for a bright-line rule and held:

> We therefore find no valid justification for artificially
> excluding from the definition of materiality information
> concerning merger discussions, which would otherwise be
> considered significant to the trading decision of a
> reasonable investor, merely because agreement-in-principle
> as to price and structure has not yet been reached by the
> parties or their representatives.

485 U.S. at 236. "Disclosure, and not paternalistic withholding of accurate information,

is the policy chosen and expressed by Congress." *Id.* at 234. The Court went on to

displace the bright-line test relied upon in *Beaumont* and *Umbriac* with the following:

> Whether merger discussions in any particular case are
> material therefore depends on the facts. Generally, in order
> to assess the probability that the event will occur, a
> factfinder will need to look to indicia of interest in the
> transaction at the highest corporate levels. Without
> attempting to catalog all such possible factors, we note by
> way of example that board resolutions, instructions to
> investment bankers, and actual negotiations between
> principals or their intermediaries may serve as indicia of
> interest. To assess the magnitude of the transaction to the
> issuer of the securities allegedly manipulated, a factfinder
> will need to consider such facts as the size of the two
> corporate entities and of the potential premiums over
> market value. No particular event or factor short of closing

- 16 -

> the transaction need be either necessary or sufficient by
> itself to render merger discussions material.

*Id.* at 239. These non-exclusive factors lend themselves perfectly to the facts at bar.

### 1.    **The Secret Deal**

As to the secret deal, including the hidden nil-premium offer, the factual

allegations of the Complaint all weigh heavily in favor of the non-exclusive *Basic*

factors: (i) plainly there were *indicia of interest* in the hidden offer at the highest

corporate levels; (ii) the *probability* of the hidden offer was high, given that Harrison

claims to have offered a "market deal" and Dimon was willing to agree to such a deal

(with one condition);[7] (iii) the *magnitude* is unquestionable, as the Merger left pre-

Merger JPMC shareholders holding only 58 percent of the combined Company, while the

hidden offer would have left them holding 61 percent; and (iv) the *premium* paid in

connection with the Merger is *the* central issue underlying Plaintiffs' claims, as there

would have been no premium in the hidden offer.  Indeed, two decades before *Basic*, one

court found a merger proxy statement materially misleading for failure to disclose

another merger offer which might have been more favorable to shareholders. *See United*

*States Smelting, Refining & Mining Co. v. Clevite Corp.*, Nos. C68-210, C68-345, 1968

WL 2140, at *32 (N.D. Ohio Jun. 17, 1968).

Defendants concede the fact-intensive nature of this claim by citing *Beaumont*

(affirming summary judgment), *Umbriac* (granting summary judgment), and *Kahn v.*

*Wien*, 842 F. Supp. 667 (E.D.N.Y. 1994) (same), which were reached *after the benefit of*

*discovery*.  In *Keyser v. Commonwealth National Financial Corp.*, 675 F. Supp. 238, 250

(M.D. Pa. 1987), a pre-*Basic* action alleging the failure to disclose a competing merger

offer in a merger proxy, the court denied summary judgment after reviewing deposition

---

[7] This factor is implicitly acknowledged in *Umbriac*. *See* 467 F. Supp. at 553 ("in proposing merger or sale management must reveal any higher 'firm offers' but not mere 'feelers'" (citation omitted)).

testimony of high-level executives, board minutes, and other relevant documents. The

court concluded: "[I]t remains to be seen whether the very existence of the proposals,

coupled with the willingness of [the offeror] to negotiate, can be termed a material fact

which the Commonwealth directors had a duty to disclose. The court finds that this

question is within the province of a fact finder to decide at trial." *Id.*

In any case, the fact-intensive analysis mandated by *Basic* precludes dismissal as

a matter of law. Accordingly, defendants' motion to dismiss must be denied.

### 2. The Merger Agreement's Hidden Provision

Additionally, the Complaint alleges that the secret deal was an undisclosed

provision in the Merger agreement. (¶ 89.) This Court recognized the viability of such a

claim in *DaimlerChrysler*, where it was alleged that the terms of the merger agreement

were misrepresented to shareholders to induce them to support the merger. 197 F. Supp.

2d at 62. In particular, the defendants in *DaimlerChrysler* were accused of concealing

that the proclaimed "merger of equals" was, in reality, a takeover, which Chrysler

shareholders would not have supported. *Id.* Here, JPMC shareholders clearly supported

splitting the Chairman and CEO posts, but Harrison and Dimon duped JPMC

shareholders by concealing the *quid pro quo* behind the exchange ratio in the Merger

agreement. (¶ 155.) Here, as in *DaimlerChrysler*, "Plaintiffs have alleged that...*the*

*terms of the transaction were not fully and accurately disclosed* by Defendants." *Id.* at

63 (emphasis added).

### 3. The Misrepresented Succession Arrangement

Crediting as true the Complaint's allegations, the succession arrangement of the

Merger was also misrepresented. JPMC shareholders were advised that Harrison would

be CEO of the combined Company. However, in reality, the secret deal provided that

Dimon would be the true CEO, according to reliable sources. (¶ 98.) Thus, the premium

- 18 -

was agreed upon solely to entrench Harrison with the CEO title "on paper." (*Id.*) The reported reluctance of JPMC shareholders to fund the premium would have transformed into outrage had JPMC shareholders been told the truth. (¶ 152.)

Defendants contend that this alleged misrepresentation does not state a claim because "it does not render the succession arrangement described in the [Proxy/Prospectus] inaccurate." (Defs.' Br. at 21.) They point out that the Proxy/Prospectus promotes the Merger by listing such purported advantages as the vague "Expected Financial Synergies" and "financial benefits to [JPMC] and [the Company's] stockholders," (*id.* at 19), but the Proxy/Prospectus never levels with the reader and discloses *the one and only real reason behind the premium.* (¶¶ 6, 8.) After all, if this information would not have affected the decision-making of shareholders, then why not include it? The Complaint answers this question: "Harrison and Dimon knew that JPMC's shareholders would not have approved the Merger had they known of the secret deal." (¶ 90.) Thus, the Complaint unquestionably alleges "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 232 (quoting *TSC Indus.*, 426 U.S. at 449).

### 4.    The Misrepresented Rationale for the Merger

The stated rationale for the Merger in the Proxy/Prospectus omits that Harrison sought a business combination to preserve his tenuous grasp on the CEO title. Harrison himself acknowledged this fact when the secret deal was exposed:

> Although his board stood by him through the brutal times,
> Mr. Harrison acknowledged that he had a limited time to
> turn things around. "If we had gone another year without
> performing, the board probably would have demanded
> changes," he said, leaning back in a plush chair in his
> office. "There is a point at which you can't go on. But in
> the end, I presume that they liked my leadership."

(¶ 124.) The Complaint alleges that "Harrison's grip at the helm was growing tenuous.

But he saw salvation in yet another deal." (¶ 76.) The Complaint thus states a viable

cause of action for misrepresentation by calling into question the stated rationale for the

Merger.[8]  As in *DaimlerChrysler*, "[t]he difficulty with Defendants' argument is that its

premise rests on the assumption that the operative facts *surrounding the transaction* had

been fully and accurately disclosed in the Proxy/Prospectus and that the Proxy/Prospectus

was not false or misleading." 197 F. Supp. 2d at 62 (emphasis added).

### C. The Complaint's 14a-9 Claims Meet The PSLRA's Particularity Standards.

As discussed in Part III.B, the Complaint identifies in painstaking detail several

specific omissions and misstatements in the Proxy/Prospectus and explains why such

omissions and misstatements were materially false and/or misleading.[9]

### 1. Reliance on Reputable Journalists is Sufficient Under the PSLRA.

Under the heading, "Plaintiffs Do Not Allege with Particularity Why Defendants'

Statements Were Misleading," defendants offer an entirely unrelated argument,

challenging Plaintiffs' reliance upon newspaper articles in which journalists have cited

unnamed sources. (Defs.' Br. at 23-24.) Nowhere in their brief do defendants actually

argue that the secret deal is not presented with sufficient particularity in the Complaint.

---

[8] The cases cited by the defendants, (Defs.' Br. at 20-21), including *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), are unavailing, insofar as all are cited for the proposition that undisclosed motivation, standing alone, is not a securities fraud violation. This case does not involve mere undisclosed motivation, nor does it take issue with any defendant's "secret motives." (Defs.' Br. at 20.)  Rather, the Complaint concerns materially incomplete and misleading communications to investors which induced them to vote in favor of the Merger, deprived them of a favorable exchange ratio, and denied them the transaction they clearly would have preferred. In fact, *Virginia Bankshares* supports plaintiffs' position. In that case, the Supreme Court noted that "it would be rare to find a case with evidence solely of disbelief or undisclosed motivation without further proof that the statement was defective as to its subject matter." 501 U.S. at 1096. This case is not one of the "rare exceptions": as the Complaint makes clear, the secret deal was not only ill-motivated, but was "defective as to its subject matter" as well.

[9] The Complaint also alleges in remarkable detail (i) where the various secret meetings took place, (ii) measures taken to ensure secrecy, (iii) who was involved, and (iv) the contours of the negotiations, including which terms were agreed upon and which (succession and premium) were not. (¶¶ 77-93.)

Defendants' contention that plaintiffs cannot rely on *The New York Times* (or *The Financial Times* or *FORTUNE*, for that matter) to satisfy the particularity requirements of the PSLRA is without merit. The Third Circuit, as well as this Court, have recognized that reliance on reporting in reputable newspapers and business periodicals is appropriate and may form the basis of a well-pleaded complaint. *See DaimlerChrysler*, 197 F. Supp. 2d. at 79-80 (citing *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982)); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *In re Loewen Group Inc.*, No. 98-6740, 2004 WL 1853137, at *6 (E.D. Pa. Aug. 18, 2004) ("Media sources can satisfy the heightened pleading requirements of the [PSLRA].") (citing *DaimlerChrysler*). Moreover, as part of an extensive pre-suit investigation, plaintiffs' counsel met face-to-face with Landon Thomas, Jr., the reputable journalist who authored one of the crucial articles in this case. (¶ 224.) Defendants misread *Chubb*, which only considers confidential sources used by *plaintiffs' counsel*, not confidential sources used by *reputable journalists* who conducted an independent investigation and who lack any pecuniary interest in the litigation.

### 2.    The Complaint Alleges That the Defendants All Permitted The Use of Their Names in the Proxy/Prospectus.

As this Court recently observed:

> Courts interpreting [§ 14(a)] have recognized that a defendant who permits the use of his name in a manner substantially connected to the proxy solicitation may be held liable under Section 14(a) for misstatements and omissions contained in the proxy materials.

*Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 392 (D. Del. 2005) (concluding after trial that defendants permitted the use of their names in a manner substantially connected to proxy solicitation such that they are properly subject to liability under § 14(a)) (citations omitted); *In re Reliance Sec. Litig.*, 135 F. Supp. 2d

480, 503-04 (D. Del. 2001) ("*Reliance I*") (outside directors who signed SEC filings "had

adequate opportunity to review the allegedly misleading documents."); *DaimlerChrysler*,

197 F. Supp. 2d at 72. The defendants all endorsed or are otherwise named in the

Proxy/Prospectus, an act which by itself can give rise to liability under the securities

laws. (¶¶ 27-38, 40, 42.)

Ignoring this fact entirely, defendants mischaracterize the Complaint's extremely

narrow use of "group pleading." (Defs.' Br. at 25-26.) The Complaint relies upon

"group pleading" solely as to Harrison and Dimon with respect to the Press Release.[10]

(¶ 44.) Accordingly, defendants' argument is completely irrelevant to every claim except

for the 10b-5 claim against Harrison and Dimon for omissions in the Press Release.

### 3.  The Complaint Adequately Alleges the Negligence of the Non-Management Directors.

Defendants do not challenge the particularity of allegations as to Harrison and

Dimon, but contend that the Complaint does not adequately allege the negligence of the

Non-Management Directors. (Defs.' Br. at 26.) In the classic framing of a negligence

claim,[11] the Complaint alleges that the Non-Management Directors "knew or should have

---

[10] The Press Release issued by JPMC and Bank One is not expressly attributed to any individual. However, as the highest-ranking officers of JPMC and Bank One, there can be little doubt that Harrison and Dimon approved or oversaw drafting of the Press Release at issue here. *See, e.g., DaimlerChrysler*, 197 F. Supp. 2d at 85 ("a majority [of courts have] conclud[ed] that the group pleading doctrine has survived the PSLRA"); *In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 429 (D.N.J. 2002) (applying "group pleading" doctrine to three high ranking company officers); *In re U.S. Interactive, Inc. Sec. Litig.*, No. 01-522, 2002 WL 1971252, at *4 (E.D. Pa. Aug. 23, 2002) (applying the group pleading doctrine to high ranking officers "where it is almost certain that given the high-level position of the officer within the company and the nature of the published writing that he or she would have been involved directly with writing the document or approving its content and that the officer was privy to information concerning the accuracy of the statements within the document"); *Reliance I*, 135 F. Supp. 2d at 502-03 (applying group pleading doctrine to both inside and outside directors). *Cf. In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n.10 (3d Cir. 2004) (expressly declining to consider group pleading doctrine).

[11] *See, e.g., In the Matter of KPMG Peat Marwick, LLP*, Exchange Act Rel. No. 43862 (Jan. 19, 2001), 74 S.E.C. Docket 384, 421 (noting that the phrase "knew or should have known" is standard negligence language) (citations omitted), *motion for reconsideration denied*, Exchange Act Rel. No. 44050 (Mar. 9, 2001), 74 S.E.C. Docket 1351, *petition denied sub nom., KPMG, LLP v. S.E.C.*, 289 F.3d 109 (D.C. Cir. 2002) (discussing negligence standard under the 34 Act).

known of [Harrison's secret deal with Dimon] and nevertheless they approved and recommended the Merger to JPMC's shareholders." (¶ 14.)

Negligence is all that is required to establish a violation of § 14(a) and Rule 14a-9's prohibitions on material misrepresentations and omissions in connection with proxy solicitations. *See Reliance I*, 135 F. Supp. 2d at 511 ("In enforcing [the negligence standard under the proxy rules], courts should apply the standard of due diligence rather than the standard of actual knowledge or gross negligence."); *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 189-90 (3d Cir. 1988). By specifically alleging that "as directors, [the Non-Management Directors] had the opportunity and obligation to inquire into the details of such negotiations," the Complaint pleads even more than is required. (¶ 81.)

Defendants cite *Bond Opportunity Fund v. Unilab Corp.*, 2003 U.S. Dist. LEXIS 7838, *aff'd*, 87 Fed. Appx. 772, 774, 2004 WL 249583 (2d Cir. Feb. 10, 2004) ("[W]e do not reach the state of mind issue because Plaintiffs have failed to adequately plead that a material misrepresentation was made."), to contend that the negligence claims against the Non-Management Directors are subject to 15 U.S.C. § 78u-4(b)(2), which states:

> b. Requirements for securities fraud actions ...
> 2. Required state of mind
> In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*First*, this Court has already expressly declined to adopt the particular holding in *Bond. See In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del. 2000) ("While the PSLRA, 15 U.S.C. § 78u-4(b)(2), might be interpreted as raising the pleading requirements for alleging violations of Rule 14a-9, the court will await direction from the Third Circuit before contravening express precedent on this issue. Accordingly, the court

- 23 -

will not apply the heightened pleading requirements of the PSLRA to plaintiffs' claims under Rule 14a-9."). *Second*, neither § 14(a) nor Rule 14a-9 calls for any "particular state of mind." Rather, as negligence claims, Plaintiffs need only demonstrate that the defendants' conduct did not meet the applicable standard. *Third*, subsection (b)'s title itself indicates that it is applies to securities *fraud* claims, not negligence claims. *Fourth*, whereas the case at bar has not yet been developed through discovery, in *Bond*, the court ruled *after* plaintiffs had already conducted discovery. *See* 2003 U.S. Dist. LEXIS 7838, at *18 n.3. Finally, as discussed in Part VII, *infra*, § 78u-4(b)(2) is unconstitutional.

In any case, the Complaint specifically alleges that each of the Non-Management Directors, as JPMC directors, were in a position to ask questions of Harrison which would have led to discovery of the secret deal, even if they did not actually know of it. (¶ 81.) Indeed, as corporate directors considering a potential combination, they had the *duty* to ask such questions, and the Complaint further alleges that Futter, Bechtel, and Kaplan, as trained corporate lawyers, had an *enhanced* duty. (¶¶ 186, 209, 214.) Their liability for negligence will thus turn on what steps they took to evaluate the Merger, what materials they had, and how they monitored Harrison's negotiations, *if at all*. These factual questions are simply not amenable to disposition on a 12(b)(6) motion to dismiss.

## IV.[12]  THE COMPLAINT STATES VIABLE 10B-5 SECURITIES CLAIMS AGAINST HARRISON AND DIMON BASED ON (I) THE SCHEME, (II) ORAL MISREPRESENTATIONS AND (III) OMISSIONS IN THE JOINT PRESS RELEASE REGARDING THE SECRET DEAL.

Section 10(b) of the 34 Act prohibits the use of any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated thereunder, states:

---

[12] Parts IV and V primarily rebut shabbily-articulated points buried in a footnote. (Defs.' Br. at 10 n.7.)

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality of
> interstate commerce, or of the mails or of any facility of
> any national securities exchange,
>   (a) To employ any device, scheme, or artifice to defraud,
>   (b) To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under
> which they were made, not misleading, or
>   (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon
> any person, in connection with the purchase or sale of any
> security.

Each and every misrepresentation and omission in the Proxy/Prospectus, as

identified above, is actionable under § 10(b) and Rule 10b-5. In addition, the Complaint

alleges in Count IV: (i) a scheme to defraud by Harrison and Dimon; (ii) oral

misrepresentations by Harrison and Dimon; and (iii) actionable omissions in the Press

Release. As discussed in Parts III.B, *supra*, the Complaint adequately pleads materiality.

The Complaint adequately pleads scienter as to Dimon and Harrison. The Class has

standing to maintain these claims and, in any case, evaluating proposed Class

representatives should be reserved for the determination of class certification.

## A.    The Complaint Alleges a Scheme to Defraud Concocted and Executed by Harrison and Dimon.

The allegations in the Complaint specify in abundant detail the who, when, where

and what of the fraudulent scheme between Dimon and Harrison. This fraudulent scheme

is itself actionable. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d

549, 577 (S.D. Tex. 2002).[13]  In *Enron*, the Court noted that:

---

[13] *See also Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811, 814-15
(2d Cir. 1975) ("Not every violation of the anti-fraud provisions of the federal securities law can be, or
should be, forced into a category headed 'misrepresentations' or 'nondisclosures'. Fraudulent devices,
practices, schemes, artifices and courses of business are also interdicted by the securities laws."); *Blackie v.
Barrack*, 524 F.2d 891, 903 n.19 (9th Cir. 1975) ("Rule 10b-5 liability is not restricted solely to isolated
misrepresentations or omissions; it may also by predicated on a 'practice, or course of business which
operates ... as a fraud ....'"); *Richardson v. MacArthur*, 451 F.2d 35, 40 (10th Cir. 1971) ("Rule 10b-5 is a

> While subsection (b) of Rule 10b-5 provides a cause of
> action based on the "making of an untrue statement of a
> material fact and the omission to state a material fact,"
> subsections (a) and (c) "are not so restricted" and allow suit
> against defendants who, with scienter, participated in "a
> 'course of business' or a 'device, scheme or artifice' that
> operated as a fraud" on sellers or purchasers of stock even
> if these defendants did not make a materially false or
> misleading statement or omission.

*Id.* (citing *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 152-53 (1972)). Here, as

well, the alleged fraudulent scheme itself is actionable. (¶¶ 249-50.)

### B. The Complaint Alleges That Harrison and Dimon Made Actionable Oral Misrepresentations.

Regarding the aim and scope of the anti-fraud provisions of the federal securities

laws, the Third Circuit has noted that "the Supreme Court has had frequent occasions to

observe that 'the fundamental purpose of the [34] Act [was] to substitute a policy of full

disclosure for the philosophy of caveat emptor . . .'" *Weiner v. Quaker Oats Co.*, 129

F.3d 310, 315 (3d Cir. 1997).

Harrison and Dimon flagrantly violated this policy, as well as Rule 10b-5, at the

press conference announcing the Merger. The Complaint sets forth precise questions by

audience members which would have pinpointed the secret deal but for the evasive,

incomplete, and misleading answers by Harrison and Dimon. (¶¶ 136-43.) Harrison also

violated Rule 10b-5 by claiming in *FORTUNE* to have sought a "market deal" without

disclosing that Dimon was willing to accept such a deal. (¶ 87.)

### C. The Complaint Alleges Actionable Omissions In the Press Release Announcing the Merger.

Like the Proxy/Prospectus, the Press Release "made no mention at all of

Harrison's rejection of the opportunity to merge Bank One into JMPC without any

---

remedial measure of far greater breadth than merely prohibiting misrepresentations and nondisclosures
concerning stock prices.").

acquisition premium. Nor did it disclose that Harrison agreed to the premium solely to give himself two more years as CEO of JPMC." (¶ 96.) Furthermore, the Press Release "falsely represented that Harrison would head the combined Company, when, despite his titles, Dimon would be the true CEO of JPMC." (*Id.*) Accordingly, the Complaint states a claim that the Press Release violated Rule 10b-5.

## D.    Lead Plaintiffs Are Not Required to Have Standing to Bring Every Class Claim.

The Third Circuit permits one claimant to represent the claims of an entire class of claimants if "'the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'" *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992). In *Hoxworth*, the Third Circuit affirmed the certification of a class of securities investors who had purchased or sold any of 21 securities during a specified period because claims stemmed solely from the defendant's "course of conduct in failing to advise purchasers of its excessive markup policy." *Id.* Here, the Complaint alleges a common course of conduct in failing to disclose the secret deal to JPMC shareholders. Accordingly, Plaintiffs should be permitted to represent all claims of the Class.

Defendants' argument regarding standing is premature at this stage in the case. "While it may be favorable, it is not a requirement that a lead plaintiff under the PSLRA suffer losses on each type of security that may be at issue in the class action." *In re Northwestern Corp. Sec. Litig.*, 299 F. Supp. 2d 997, 1007 (D.S.D. 2003); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003) ("The argument that [the lead plaintiff] did not and does not have standing in this lawsuit because it does not have standing to bring claims based on the 2000 and 2001 Offerings blinks reality and requires no further discussion.").

-27-

Defendants' standing contention is an attack on the typicality of Plaintiffs as class representatives which should be reserved for the determination of class certification. *See In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 n.8 (S.D.N.Y. 2002) ("Of course, these cases have not yet reached the class certification stage so the designation of any class representatives is premature."); *WorldCom*, 294 F. Supp. 2d at 421 (noting that the lead plaintiff selection process "is not intended to substitute for the class certification process"). At that stage, this Court can consider whether Plaintiffs have adequate standing to maintain all claims of the Class and, if not, whether additional named plaintiffs may be joined to cure any concerns about standing. *WorldCom*, 294 F. Supp. 2d at 422-23 (rejecting a challenge to plaintiffs' standing on a motion to dismiss: "Whether the four plaintiffs named here will in fact be adequate class representatives will be determined at the time that the class certification motion is litigated."); *Initial Pub. Offering*, 214 F.R.D. at 123 (granting plaintiffs leave to join new named plaintiffs to obviate any challenge to standing).

Should the Court elect to dismiss any claim at this stage for lack of standing, Plaintiffs respectfully request that leave be granted to join additional named plaintiffs.

### E.    The Complaint Adequately Pleads Scienter as to Dimon and Harrison.

Despite defendants' conclusory scienter argument, (Defs.' Br. at 10 n.1), the Complaint adequately pleads scienter against Harrison and Dimon (and thereby against the Company).

To plead scienter under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).[14] In the Third Circuit, plaintiffs can meet this burden with facts

---

[14] *But see* Part VII *infra*, questioning the constitutionality of §78u-4(b)(2).

that either "'constitute circumstantial evidence of either reckless or conscious behavior'"

or establish "'a motive and an opportunity to commit fraud.'" *In re Advanta Corp. Sec.*

*Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999). The Complaint easily meets this standard as

to Dimon and Harrison, and "[n]umerous courts have recognized that scienter sufficiently

pled as to a company's agents may be imputed to the company itself." *In re Campbell*

*Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001); *see also City of Monroe*

*Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005)

("[t]he scienter of the senior controlling officers of a corporation may be attributed to the

corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5

when those senior officials were acting within the scope of their apparent authority."

(citation omitted)).

As the highest-ranking officers of JPMC and Bank One, involved in highly

secretive discussions, Harrison and Dimon plainly had the opportunity to propose and

implement the secret deal, an act of corporate egos gone astray. The Complaint details

their secret meetings and their motives: (i) "Dimon was clearly interested in succeeding

Harrison from the get-go," (¶ 80); and (ii) Harrison, faced with losing his CEO title,

desperately sought more time to enjoy unmatched pay and prestige, as well as salvage his

lucrative restricted stock units. The Complaint recounts widespread internal and external

condemnation of Harrison's mismanagement, including predictions of his imminent

demise. Harrison was desperate to buy himself time not only to retain the lucrative pay

and prestige of the CEO position but also because he had 118,582 restricted stock units

which would vest upon JPMC achieving a target price by January 25, 2007, which,

however, were "subject to continued employment." If vested at the target price, the stock

units would be worth over $6.1 million.

- 29 -

Harrison and Dimon left no doubt as to their scienter by dissembling at the conference call explaining the Merger to the investing public. Their misleading, evasive, and incomplete answers demonstrated that they sought to conceal the secret deal because they knew that its exposure would endanger the Merger. Further, Harrison's incomplete and misleading representations about the "market deal" in *FORTUNE* confirm his knowledge that the omitted information was damning.

Accordingly, the Complaint adequately pleads scienter as to Dimon and Harrison (and thereby to JPMC).[15]

## V.    PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION.

Defendants do not challenge the loss causation allegations of the Complaint's Rule 14a-9 claims. As to the Complaint's Rule 10b-5 claims, defendants present an alternative picture of JPMC's stock price fluctuations, buried in a footnote. (Defs.' Br. at 10 n.7.) In light of these competing accounts, granting a motion to dismiss on this basis is reserved for only the most exceptional cases. *McKesson HBOC*, 126 F. Supp. 2d at 1268; *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000) ("[w]hether the plaintiff has proven causation is usually reserved for the trier of fact.").

A plaintiff need not prove whether a material misrepresentation "actually had a decisive effect on the voting." *Electric Auto-Lite Co., supra*, 396 U.S. at 384-85 (referring to § 14(a) claims). "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in

---

[15] As the Proxy/Prospectus served as a prospectus as well as a proxy statement, the Complaint also states claims for violations of Sections 11 and 12(a)(2) in Counts VI and VII, respectively. The determination of standing is appropriately reserved for the class certification stage, *see* Part IV.D, *supra*. Materiality and particularity are adequately pled, *see* Parts III.B and III.C, *supra*. *See DaimlerChrysler*, 197 F. Supp. 2d at 70 ("negligence can form the basis of liability for claims under Sections 11 and 12 of the [33] Act").

the accomplishment of the transaction." *Id.* at 385. *See also In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1364 (N.D. Cal. 1987) (for purposes of § 11 claim, once a plaintiff establishes a *prima facie* case, causation is presumed and the burden is on defendants to disprove loss causation); *EP Medsystems*, 235 F.3d at 884 (plaintiffs are not required to meet a strict test of direct causation under Rule 10b-5; they need only show some causal nexus between the defendant's improper conduct and plaintiff's losses) (quoting *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 619 (8th Cir. 1991)).

Causation has been pled for all of Plaintiffs' claims based upon the omission of the secret deal and related misrepresentations. The Complaint alleges two separate types of harm: (1) the loss of a highly favorable exchange ratio; and (2) diminution in the value of shares as a result of defendants' fraud. Both have been adequately pled. *EP Medsystems*, 235 F.3d at 883-84; *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000), *cert. denied*, 531 U.S. 1149 (2001).[16] *See also Tse, supra,* 1998 WL 743668, at *6 (in merger case, loss causation was adequately pled by allegations that, but for fraud, plaintiffs would have been in a position to obtain a higher price for their shares).

### A.   Plaintiffs Have Alleged Loss Causation With Respect to Their Claim That They Lost a Valuable Opportunity.

With respect to plaintiffs' lost opportunity claims, the Complaint clearly alleges that defendants' false statements were an essential link in the losses suffered by the Class. The Merger could not have been approved without the shareholder vote solicited through the Proxy/Prospectus. The exchange ratio JPMC shareholders were induced to fund was substantially higher than the exchange ratio they would have agreed to if Harrison had

___

[16] *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005) does not dictate otherwise. (Defs.' Br. at 10 n.7.) In that case, the Supreme Court merely rejected a Ninth Circuit holding that a loss could be caused at the instant a security is purchased at an inflated price, cautioning that "[w]e need not, and do not, consider other proximate cause or loss-related questions." *Id.* at 1633-34. Only the Eighth and Ninth Circuits had adopted the price inflation theory of loss causation rejected in *Dura*. The Third Circuit had rejected this loss causation theory well before *Dura*. *See id.* at 1633 (citing *Semerenko*, 223 F.3d at 185).

simply accepted the hidden nil-premium offer. The difference is an element of plaintiffs' damages that is recoverable under Third Circuit law. *See Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976) ("recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative."). In view of the Complaint's express demand for a certain number of shares to correct the damages from the unfavorable exchange ratio, these damages are hardly speculative; thus, the loss causation requirement is clearly satisfied. In any case, defendants do not challenge loss causation as to lost opportunity.

**B.    Plaintiffs Have Alleged Loss Causation with Respect to Their Claim that JPMC's Stock Price Decline Was Caused by False Statements by Harrison and Dimon.**

The defendants challenge loss causation with respect to the Complaint's claims on behalf of open-market purchasers of JPMC stock during the Class Period. (Defs.' Br. at 10 n.7.) The Class Period begins on January 14, 2004, the date the Merger was announced, and ends on June 25, 2004, the last trading day before *The New York Times* revealed the secret deal. As set forth in the Complaint, the price of JPMC stock fell from as high as $43.84 per share during the Class Period to $37.85 per share after *The New York Times* article, and, in particular, fell the day after *The New York Times* article. (¶ 253.) These allegations are sufficient to plead loss causation and state a claim. *See Semerenko*, 223 F.3d at 184.

The defendants' only defense is that the price of JPMC stock rose, not fell, in the week after the *New York Times* article was published, and opened (but not closed) at a higher price on the day after the article was published. (Defs.' Br. at 10 n.7.) However, this argument relies on the unproven assumption, found nowhere in the Complaint, that the *New York Times* article was sufficient to cure all the material misrepresentations that

- 32 -

had infected the market during the Class Period. *See In re Regal Communications Corp. Sec. Litig.*, No. 94-179, 1996 WL 411654, at *3 (E.D. Pa. July 17, 1996) (denying summary judgment, except as to a control person claim, because "it cannot be said that the [corrective disclosures], as a matter of law, dissipated the effects of the alleged misrepresentations"). Even more to the point, this Court held in *DaimlerChrysler*:

> Further, in the Court's view, Defendants' argument is not so much an attack on the sufficiency of the pleadings, as it is an attack on Plaintiffs' ability to ultimately succeed on their claims as a factual matter. For example, Defendants contend that DaimlerChrysler's stock price actually rose for a period after Mr. Schrempp's October 30, 2000 admission. In response, Plaintiffs contend that while the stock price may have risen briefly, it ultimately fell once the complete nature of Defendants' alleged scheme was revealed. The bottom line, however, is that these arguments are fact intensive matters usually requiring expert testimony concerning the state of the financial markets and the like. Accordingly, such issues are inappropriate for disposition in the context of a motion to dismiss.

197 F. Supp. 2d at 67-68. The same reasoning compels the denial of defendants' motion.

## VI. THE COMPLAINT STATES VIABLE CLAIMS FOR BREACH OF FIDUCIARY DUTY THAT WERE SPECIFICALLY DISTINGUISHED BY THE DELAWARE COURT OF CHANCERY.

Unable to argue for collateral estoppel or *res judicata*, defendants instead contend that the principle of *stare decisis* compels against exercising supplemental jurisdiction over Count III of the Complaint even though (i) the Complaint asserts several federal securities claims, (ii) the Complaint's allegations and claims are far more broad and detailed than those in the Chancery Action, (iii) the named plaintiffs are different, (iv) Dimon is not even a defendant in the Chancery Action, and (v) *J.P Morgan Chase* is a decision still under appeal.[17] Such a far-reaching application of *stare decisis* is

---

[17] The scant authority cited by defendants does not stand for such an expansive interpretation of *stare decisis*. (Defs.' Br. at 30) In *Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 904 (5th Cir. 1992), the court applied *stare decisis* because of an earlier *federal appellate* decision on the *same plaintiff's* claim to

inconsistent with due process of law, including plaintiffs' right to have their claims heard

on the merits. *See Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329

(1971) ("Due process prohibits estopping [nonparties] despite one or more existing

adjudications of the identical issue which stand squarely against their position.").

Accordingly, this Court should decide this case on its own merits.

### A.  This Court Should Not Refuse to Exercise Its Mandatory Supplemental Jurisdiction.

Vice Chancellor Lamb observed in *J.P. Morgan Chase* that this Court has

jurisdiction over the claims in Count III of the Complaint. 2005 Del. Ch. LEXIS 51, at

*15-16. In 28 U.S.C. §1367, which states that a district court "*shall* have" jurisdiction

over claims related to claims over which it has original jurisdiction, Congress codified the

long-standing principles of pendent and ancillary jurisdiction. *City of Chicago, et al. v.*

*Int'l College of Surgeons. et al.*, 522 U.S. 156, 165 (1997); *see also Growth Horizons,*

*Inc. v. Delaware County*, 983 F.2d 1277, 1285 n.14 (3d Cir. 1993) ("The language in

§ 1367 expressly ... states ... that federal courts *shall* exercise supplemental jurisdiction

over pendent claims arising out of the same case or controversy and *may* decline to

exercise jurisdiction [as provided by § 1367(c)]." (emphasis in original)). Section

1367(c) sets out the circumstances in which this Court may decline to exercise its

mandatory supplemental jurisdiction:

> (c) The district courts may decline to exercise supplemental
> jurisdiction over a claim under subsection (a) if - -
>    (1) the claim raises a novel or complex issue of State law,
>    (2) the claim substantially predominates over the claim or
> claims over which the district court has original
> jurisdiction,

---

preclude a contract claim despite plaintiff's claim of different and better extrinsic evidence "[b]ecause the
interpretation of the unambiguous terms of a contract is purely a question of law". In *Brown v. Siegel*,
1995 U.S. Dist. LEXIS 1945, at *28 (E.D. Pa. Feb. 10, 1995), the court declined to exercise supplemental
jurisdiction only after dismissing *every* federal claim upon which original jurisdiction had been premised.

(3) the district court has dismissed all claims over which
it has original jurisdiction, or
(4) in exceptional circumstances, there are other
compelling reasons for declining jurisdiction.

In addition to these factors, the Supreme Court has also recommended that district

courts examine "the circumstances of the particular case, the nature of the state law

claims, the character of the governing state law, and the relationship between the state

and federal claims." *City of Chicago*, 522 U.S. at 173. Defendants have not articulated

any novel or complex issues of Delaware law. Nor do they contend that Count III

"substantially predominates" over the other seven counts of the Complaint. *See In re*

*Stat-Tech Sec. Litig.*, 905 F. Supp. 1416, 1425 (D. Col. 1995) (exercising supplemental

jurisdiction even though state law claims predominated over 10b-5 claims). Finally, as

though to confirm the absence of any compelling reason to decline jurisdiction, Vice

Chancellor Lamb himself acknowledged this Court's jurisdiction.

In the present case, none of the exceptions of §1367(c) apply. Accordingly, this

Court should therefore exercise supplemental jurisdiction over Count III.

## B. The Complaint Adequately Alleges That JPMC's Board Did Not Contain a Majority of Independent Directors.

The independence of JPMC directors who reviewed, approved, and recommended

the Merger requires a fact-intensive inquiry not amenable to resolution on a motion to

dismiss. The Complaint alleges in great detail why a majority of JPMC's Board was

beholden to Harrison or, at best, "asleep at the wheel," precluding the shelter of the

business judgment rule. Vice Chancellor Lamb himself went to the extraordinary length

of distinguishing, factually and legally, the Complaint in his dismissal of a related Court

of Chancery action, thereby leaving considerable room for the trier of fact in this case to

find that a majority of JPMC's Board was, indeed, under Harrison's thumb.

- 35 -

Defendants suggest that the 92-page Complaint is indistinguishable from the Chancery Action's 26-page consolidated complaint. (Defs.' Br. at 8, 28-30.) However, a comparison of the two complaints reveals vast differences in allegations attacking, *inter alia*, the independence of the Non-Management Directors who evaluated, approved, and recommended the Merger. Attached as Exhibit B hereto is a defendant-by-defendant comparison of independence-related allegations in the two complaints.[18]

Given the stark differences between the two complaints, including important differences pointed out by Vice Chancellor Lamb, it would unduly strain *stare decisis* to credit defendants' invocation of *J.P. Morgan Chase* to stifle the Complaint's claims for breach of fiduciary duty.[19] Further, it is common for such claims to be adjudicated together with securities claims. *See, e.g., Tse*, 1998 WL 743668, at *12-13 (shareholders stated federal securities claims and claim for breach of fiduciary duty under Delaware law); *BankAmerica*, 78 F. Supp. 2d at 1000-01 (same); *Salit v. Stanley Works*, 802 F. Supp. 728, 736 (D. Conn. 1992) (exercising pendent jurisdiction over breach of fiduciary duty claims "closely tied" with questions of federal securities policy).

## C.    The Complaint's Legal Theories Differ Significantly From Those Considered in the Chancery Action.

A careful reading of the Complaint will reveal theories of liability and damages that are conceptually distinct from and considerably more nuanced than the theories

---

[18] Vice Chancellor Lamb specifically pointed out crucial differences in allegations against Futter and Kaplan. *J.P. Morgan Chase*, 2005 Del. Ch. LEXIS 51 at *16. As Exhibit B indicates, such factually and legally significant differences are also present in the Complaint's allegations against defendants Bechtel, Gray, and Bossidy. *Compare id.* at *34 ("the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison") *with* (¶¶ 173-184); *id.* ("plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter") *with* (¶¶ 201-09); *id.* at *35 ("The only allegation against Kaplan is her relationship to The American Museum of Natural History.") *with* (¶¶ 211-14); *id.* at *38 ("[T]he court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray.") *with* (¶¶ 216-19).

[19] Also weighing heavily against *stare decisis* is that the jury trial sought in this action is unavailable in the Court of Chancery. Recently, the Second Circuit overruled the denial of a jury trial in a breach of fiduciary duty case involving a Delaware corporation because it violated the Seventh Amendment. *See Pereira v. Farace*, No. 03-5055, 2005 WL 1532318, at *9 (2d Cir. Jun. 30, 2005).

presented in the Chancery Action. As to liability, the Complaint spells out a scheme designed to induce JPMC shareholders to vote for an amendment to the Company's certificate of incorporation. (¶¶ 165-68.) This aspect is crucial because ordinarily a Company need not seek direct approval from its shareholders to act. However, in this case, JPMC's charter limited the number of shares the Company could issue and the Merger required this number to be increased. Since shareholders were duped into voting for the amendment, the defendants violated their duty to disclose all material facts before seeking shareholder action. The Chancery Action complaint nowhere mentions JPMC's charter, nor does the issue arise in *J.P. Morgan Chase*. As to damages, the Complaint makes clear that it does not seek to recover any "overpayment" in the Merger – rather, damages are sought to remedy the wrongfully-obtained approval of the charter amendment. (¶¶ 168-70.) Thus, *J.P. Morgan Chase* is inapplicable insofar as the Chancery Action was recharacterized as derivative for attacking the so-called "overpayment" for Bank One.[20] 2005 Del. Ch. LEXIS 51, at *20 ("At the heart of their complaint, the [Chancery Action] plaintiffs claim that JPMC overpaid for Bank One.").

Other than urging this Court not to exercise supplemental jurisdiction, defendants have presented no tenable reason to dismiss plaintiffs' claims for breach of fiduciary duty in Count III. Accordingly, these claims should be permitted to proceed.

## VII. THE PSLRA'S HEIGHTENED PLEADING STANDARD VIOLATES THE SEVENTH AMENDMENT.

As set forth above, the Complaint more than adequately pleads a "strong inference" of scienter as to Dimon and Harrison. However, in any case, the PSLRA's

---

[20] Even if any claim is recharacterized as derivative, as defendants urge, demand would have been futile. A majority of JPMC's Board when this action was commenced were either beholden to Harrison and/or Dimon, or benefited from the secret deal. If necessary, leave to amend is requested to flesh out these facts.

scienter pleading standard violates the Seventh Amendment. Recently, the Sixth Circuit

*sua sponte* questioned the constitutionality of this provision:

> We take no position as to the constitutionality of the
> [PSLRA]'s heightened scienter pleading requirements. The
> Seventh Amendment to the Constitution provides that "[In
> Suits at common law,] the right of trial by jury shall be
> preserved, and no fact tried by a jury, shall be otherwise
> reexamined in any Court of the United States, than
> according to the rules of the common law." U.S. Const.
> Am. VII. Traditionally, there has been a right to jury trial
> for securities fraud claims. *See, e.g., SEC v. Infinity Group
> Co.*, 212 F.3d 180, 196 (3d Cir. 2000). The [PSLRA]
> compels dismissal unless the facts pleaded in the Complaint
> produce a "strong inference that the defendant acted" with
> scienter. 15 U.S.C. § 78u-4(b)(2). One might argue that for
> cases where a juror could conclude that the facts pleaded
> showed scienter, but that conclusion would not be the most
> plausible of competing inferences, a Seventh Amendment
> Problem is presented.

*City of Monroe, supra*, 399 F.3d at 683 n.25.[21]  Seen another way, the PSLRA disallows a

trial by jury on factual claims that a judge believes do not amount to a "strong inference

that the defendant acted" with scienter. Thus, § 78u-4(b)(2) attempts to override the

Seventh Amendment's guarantee of a jury trial by demanding that judges, not juries,

jettison any claims in which the allegations fall short, in the judge's opinion, of pleading

the "strong inference" of scienter mandated by the PSLRA. However, this essentially

factual determination belongs to the jury.

The Seventh Amendment right was specifically designed as a check on the power

of federal judges. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343 (1979) (Rehnquist,

C.J., dissenting); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 83 (1989) (White, J.,

---

[21] In addition to the Seventh Amendment problem described herein, the use of the word "strong" in 15
U.S.C. § 78u-4(b)(2) is unconstitutionally vague. *See Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966)
(voiding unconstitutionally vague civil statute because the "law must be one that carries an understandable
meaning with legal standards that courts must enforce"). The PSLRA offers no guidance whatsoever to
differentiate a "strong" inference from an ordinary, weak, or otherwise insufficient inference of scienter.
While the phrase "strong inference" may be meaningful outside the legal realm, it lacks any such inherent
significance in the realm of securities fraud. *See, e.g.*, John R. Platt, *Strong Inference*, 146 SCIENCE 3642
(Oct. 16, 1964) <www.cof.orst.edu/cof/fs/gradprog/courses/radosevich/science.htm>.

dissenting) ("The function of the civil jury is to diffuse the otherwise autocratic power and authority of the judge.").

Mindful of this history, the Supreme Court has consistently emphasized the fundamental nature of this right and has instructed that "[t]he right of jury trial in civil cases at common law . . . should be jealously guarded by the courts." *Jacob v. New York*, 315 U.S. 752, 753 (1943). *See also Lyon v. Mutual Benefit Assoc.*, 305 U.S. 484, 492 (1939) ("It is essential that the right to trial by jury be scrupulously safeguarded").

In *Dimick v. Schiedt*, 293 U.S. 474 (1935), the Court cautioned:

> Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

293 U.S. at 486. The Court had occasion to repeat and reaffirm this principle in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959); and in *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990). The PSLRA impermissibly infringes on this principle by wresting from the jury the fact-finding task of examining whether the plaintiff has shown a strong inference that a defendant acted with scienter.

The Seventh Amendment is applicable to securities actions. In *Granfinanciera*, the Supreme Court explained that "Suits at common law" referred to those controversies in which legal rights were to be determined, as distinguished from those cases in which "'equitable rights alone were recognized, and equitable remedies were administered.'" 492 U.S. at 41 (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)). It is well-settled that actions sounding in fraud and/or negligence are traditionally the type that have been tried "at law." *See Dura*, 125 S. Ct. at 1632-33 (discussing the "common-law roots of the securities fraud action").

- 39 -

Under the Seventh Amendment, Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury." *Granfinanciera*, 492 U.S. at 51-52; *cf. Atlas Roofing Co., Inc. v. OSHRC*, 430 U.S. 442, 451, 458-9 n.7 (1977) (Congress may not deprive a litigant of a jury trial in a legal action before a tribunal customarily utilizing a jury as its fact-finding arm). Just as Congress may not directly withdraw the right to a jury by legislation, it may not impair the right by substituting the judge for the jury as the court's fact-finding arm.

The Supreme Court pithily enunciated this principle in *Jacob*:

> Without doubt the case is close and a jury might find either way. But that is no reason for a court to usurp the function of the jury. We are satisfied that a due respect for the statutory guaranty of the right of jury trial, with its resulting benefits, requires the submission of this case to the jury.

315 U.S. at 756. Accordingly, this Court should find that Congress exceeded its constitutional authority in enacting 15 U.S.C. § 78u-4(b)(2), and permit a jury to decide whether Plaintiffs have shown a strong inference that a defendant acted with scienter.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully submit that this Court should deny defendants' motion in its entirety.

DATED:     July 11, 2005             Respectfully submitted,

/s/ Joseph N. Gielata
Joseph N. Gielata (DSB # 4338)
Attorney at Law
501 Silverside Road, Suite 90
Wilmington, DE 19809
(302) 798-1096

***Plaintiffs' Lead Counsel***

SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE*
SAMUEL HYLAND AND STEPHANIE SPEAKMAN

# Exhibit

# C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>               vs.<br><br>WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON,<br><br>     Defendants. | Case No. **1:05-cv-162 (JJF)**<br><br>**CLASS ACTION** |

### ~~PROPOSED~~ ORDER

Upon consideration of Plaintiff Samuel I. Hyland's Unopposed Motion For Leave To Serve Third Party Document Preservation Subpoenas (D.I. 25), and for good cause shown,

LEAVE IS HEREBY GRANTED for Plaintiff to serve subpoenas upon Wachtell, Lipton, Rosen & Katz and Lazard Frères & Co. LLC ordering the preservation of documents relevant to this action.

IT IS FURTHER ORDERED that production shall be stayed until further action or order of this Court.

DATED:    May 3\_, 2005

                                      _Joseph J. Farnan_

The Honorable Joseph J. Farnan, Jr.
United States District Judge

# JOSEPH N. GIELATA

### ATTORNEY AT LAW

501 SILVERSIDE ROAD, SUITE 90
WILMINGTON, DELAWARE 19809
WWW.GIELATALAW.COM
TEL (302) 798-1096
FAX (302) 792-0777

May 3, 2005

**BY ELECTRONIC FILING**

The Honorable Joseph J. Farnan, Jr.
United State District Court
District of Delaware
The J. Caleb Boggs Federal Building
844 North King Street, Room 4209
Wilmington, DE 19801

Re:    *Hyland v. Harrison, et al.*, Case No. 1:05-cv-162 (JJF)

Judge Farnan,

I am writing on behalf of Plaintiff Samuel I. Hyland to request leave to serve document preservation subpoenas on two non-parties who possess documents crucially relevant to this litigation. The law firm Wachtell, Lipton, Rosen & Katz and the investment bank Lazard Frères & Co. LLC (together, the "Advisors") advised Bank One Corporation in connection with its merger with JPMorgan Chase & Co. ("JPMC").

In *In re J.P. Morgan Chase & Co. Shareholder Litigation*, Consolidated C.A. No. 531-N (the "Chancery Action"), a related class action in the Delaware Court of Chancery, Vice Chancellor Lamb previously granted leave to plaintiffs to serve subpoenas *duces tecum* on the Advisors, with production stayed pending a motion to dismiss the Chancery Action. Yesterday, the Vice Chancellor granted the motion, necessitating this request.

As Your Honor may recall, the Complaint alleges that, in the course of the negotiations between the CEOs of Bank One and JPMC, Bank One's CEO had been willing to agree to a no-premium deal if he could be CEO of the combined company immediately. Instead, the CEOs struck a secret pact allowing JPMC's CEO to retain the CEO title for two more years in exchange for paying a premium.

Based on their critical roles as high-level legal and financial advisors in the merger, I believe that the Advisors were privy to the negotiations and have substantial documents which support Plaintiff's claims. Thus, Plaintiff requests leave to serve subpoenas to preserve all documents in the Advisors' possession relevant to the instant litigation, to be subsequently produced during general discovery.

Honorable Joseph J. Farnan, Jr.
May 3, 2005, page 2

Firstly, this relief is permitted by the Federal Rules of Civil Procedure. *See* 8 Wright & Miller, *Federal Practice and Procedure*, §2046.1, at 592 ("[t]he moratorium [on discovery prior to Rule 26(f) conference] may be removed by court order … [upon] some showing of good cause").

Secondly, leave to serve preservation subpoenas is routinely granted in securities litigation. *See, e.g.*, *In re Tyco Int'l. Ltd. Sec. Litig.*, 2000 WL 33654141, at *3, 5 (D.N.H. July 27, 2000) (allowing plaintiff to serve preservation subpoenas on third parties); *Neibert v. Monarch Dental Corp.*, 1999 WL 33290643, at *1 (N.D. Tex. Oct. 20, 1999) (granting plaintiffs' request to serve document preservation subpoenas to non-parties); and *Novak v. Kasaks*, 1996 WL 467534 (S.D.N.Y. Aug. 16, 1996) (staying discovery after filing of motion to dismiss pursuant to Private Securities Litigation Reform Act, but ordering third parties to preserve documents). The documents that the Advisors have in their possession constitute important evidence necessary for the proper adjudication of the instant case. A preservation subpoena will ensure that discoverable material is preserved and any possible prejudice to Plaintiff which could potentially be caused by destruction of relevant evidence is avoided.

Finally, the categories of documents to be preserved shall be identical to the categories set forth in the subpoenas already served on the Advisors in the Chancery Action. Thus, such preservation subpoenas will not prejudice Defendants or unnecessarily inconvenience the Advisors, since they should already be preserving relevant documents under previous subpoenas. *See, e.g, In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1270, 1272 (D. Minn. 1997) (allowing service of preservation subpoenas and noting that they would not subject third-parties to "intrusive investigation").

For the above reasons, the Court should grant Plaintiff leave to serve subpoenas on the Advisors to preserve the relevant documents in their possession.

Respectfully,

Joseph N. Gielata (DSB # 4338)

cc:    Jesse A. Finkelstein, Esq. (by electronic filing)
Michael Robinson, Esq. (by electronic filing)