# Exhibit 6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED
AUG 2 4 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DR. STEPHEN BLAU, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL, FRANK A.
BENNACK, JR., JOHN H. BIGGS,
LAWRENCE A. BOSSIDY, M. ANTHONY
BURNS, ELLEN V. FUTTER, WILLIAM H.
GRAY, III, HELENE L. KAPLAN, LEE R.
RAYMOND, JOHN R. STAFFORD, and J.P.
MORGAN CHASE & CO.,

Defendants.

Civil Action No. 04 C 6592

Judge William J. Hibbler

Magistrate Judge Martin C. Ashman

## LEAD PLAINTIFF'S RESPONSE TO THE MEMORANDUM
## AND SUPPLEMENTAL MEMORANDUM OF *AMICI CURIAE* MAILED
## TO THIS COURT BY SAMUEL HYLAND AND STEPHANIE SPEAKMAN

### PRELIMINARY STATEMENT

Lead Plaintiff, Dr. Stephen Blau, by his counsel, submits this response memorandum,

together with the supporting affidavit of Gregory Mark Nespole, Esq. (the "Nespole Affidavit")

to address the issues raised by attorney Joseph N. Gielata in the *Amici Curiae* and supplemental

materials he has mailed to the Court with respect to this action.

### PROCEDURAL HISTORY

#### *Dr. Blau's Action*

On October 13, 2004, Dr. Blau commenced a securities fraud action in the United States

District Court for the Northern District of Illinois, alleging Defendants' alleged violations of

section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Specifically, Dr. Blau brought his action on his own behalf and on behalf of a class of plaintiffs who voted to approve a proposed merger between J.P. Morgan Chase & Co. ("J.P. Morgan") and Bank One Corporation ("Bank One"), based on a proxy statement issued by J.P. Morgan on April 19, 2004. In his complaint, Dr. Blau alleges that Defendants negligently failed to disclose that Mr. James Dimon – Bank One's CEO at the time of the proposed merger – had offered to consummate the merger at no premium to J.P. Morgan shareholders if he was permitted to lead the merged company as its CEO.[1]

The Complaint further avers that William Harrison's (J.P. Morgan's CEO) refused Mr. Dimon's offer because he wanted to retain control over the combined entity. It was only after this rejection that Mr. Dimon demanded a fourteen percent (14%) premium for J.P. Morgan Chase shareholders to acquire Bank One. Compl. ¶¶ 29-33. In short, the Complaint alleges that the proxy negligently omitted to disclose that approximately $7 billion in additional merger consideration – the above-described fourteen percent premium to Bank One shareholders – was a counterpart to Mr. Harrison retaining his position as CEO of J.P. Morgan for two years after the merger.

### Dr. Blau's and his Counsel's Compliance with the PSLRA

After commencing this case, Dr. Blau and his counsel complied with the procedural mandates pertaining to securities class action litigations, as established by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") codified at 15 U.S.C. § 78u-4(a), section 21D of the Securities Exchange Act of 1934. Specifically, section 21D(e)(3)(A)(i) provides that, within

---

[1] *See* Plaintiffs' Amended Consolidated Complaint, dated February 18, 2005, (hereinafter "Compl." or "Complaint").

twenty days after the date that a class action governed by the PSLRA is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the proposed class:

(i) of the pendency of the action, the claims asserted therein, and

the proposed class period; and

(ii) that, not later than 60 days after the date on which the notice is published, any member of the proposed class may move the court to serve

as lead plaintiff of the proposed class.

15 U.S.C. § 78u-4(a)(3)(A)(i). Dr. Blau, by his counsel, complied with this PSLRA requirement by publishing nationwide notice in the October 15, 2004 edition of *Investor's Business Daily*, detailing the claims asserted in the Blau Action. (*See* Exhibit D to the Nespole Affidavit).

Thereafter, pursuant to Section 21(D)(a)(3)(B)(i) of the Exchange Act, Dr. Blau and additional Class Member American Growth Fund, Inc. ("AGF") moved, on December 14, 2004 (the sixtieth day from publication of notice of pendency), to be appointed lead plaintiffs in this action and further sought the concomitant appointment of Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as lead counsel herein. On January 5, 2005, this Court entered an Order appointing Dr. Blau and AGF as Lead Plaintiffs in the *Blau* Action and further appointed Wolf Haldenstein as Lead Counsel.

On February 18, 2005, Dr. Blau filed his amended complaint. As detailed in the Nespole Affidavit, AGF, upon reviewing a draft of the amended pleading, elected to withdraw as a lead plaintiff. On February 18, 2005, Wolf Haldenstein filed the necessary papers with this Court to enable AGF to withdraw from this action. The parties then entered into a briefing schedule with

3

respect to the motion to dismiss Defendants advised the Court and counsel they intended to file –
which is presently underway.[2]

### The Later-Filed Hyland Action

In March 2005, Samuel I. Hyland, by Mr. Gielata, filed his action in the United States
District Court for the District of Delaware, styled *Hyland v. Harrison, et al.*, Case No. 1:05-cv-
162 (TJF) (the "*Hyland* Action"). The complaint in the *Hyland* Action asserts claims
substantially similar to the claims alleged in the first-filed *Blau* Action pending before this Court.
Significantly, Mr. Hyland commenced his action even though this Court already had entered a
Lead Plaintiff Order in the *Blau* Action three months prior and plaintiffs in the *Blau* Action filed
an extremely detailed amended complaint.

Importantly, neither Mr. Hyland nor his counsel took action within the statutory deadline
mandated by the PSLRA to seek appointment as lead plaintiff in the *Blau* Action. Dissatisfied
with his inability to follow the rules in the first instance, Mr. Hyland, by his counsel, instead
disregarded the plain language of the PSLRA mandating the leadership and case management
rules for these types of cases and filed his complaint in Delaware, seeking appointment as lead
plaintiff in that rogue action.[3]

---

[2] Defendants' reply brief in the *Blau* Action is due to be filed and served on September 23, 2005.

[3] In their lead plaintiff memorandum in Delaware, the *Hyland* Plaintiffs provide a mere footnote reference
to the existence of the *Blau* Action and they refer the Delaware Court to their procedurally defective
*Amici Curiae* papers that they mailed to this Court earlier this year in which they argue that Dr. Blau
purportedly published a defective notice. For the reasons detailed below, arguments attacking the *Blau*
Action's notice are feckless and provide no excuse for counsel in the *Hyland* Action to ignore the PSLRA
and to seek appointment as lead counsel in an admittedly materially similar case in another jurisdiction.
Indeed, had Hyland's counsel had an objection to the adequacy of the *Blau* Action's notice, the proper
forum – indeed the only forum – in which to air his objection is before this Court, and *not* by filing a
subsequent action in a different jurisdiction. Indeed, if Mr. Gielata's course of action was permissible, it
would enable disgruntled also-rans in lead plaintiff contests everywhere to hijack those proceedings by
filing competing actions in other courts – justifying their conduct by pointing to illusory "defects" in the
(continued...)

4

The *Hyland* Plaintiffs' attempt to interfere with the claims that Lead Plaintiff Blau has been pursuing for the past ten months, however, did not end there. Recognizing the District of Delaware was an improper venue in which to contest an Order issued by this Court, the *Hyland* Plaintiffs' counsel submitted a memorandum in this action, styled as an "*Amici Curiae*" brief (the "Hyland Memorandum"),[4] requesting therein that this Court disqualify Wolf Haldenstein as Lead Counsel, vacate its order appointing Dr. Blau as Lead Plaintiff, and transfer the *Blau* Action to the District of Delaware. The *Hyland* Plaintiffs sought this extraordinary relief without either moving to intervene in the *Blau* Action or premising their argument(s) on any colorable authority. Indeed, the *Hyland* Plaintiffs' counsel admits that he pursued this procedurally defective course because he recognized that if his clients formally intervened in the *Blau* Action, they would be subject to the jurisdiction of this Court, lose their standing as lead plaintiffs in Delaware, and consolidated into this action. *See Hyland Memorandum* at p. 37, n. 12. Such opportunistic tactics – in which the Hyland Plaintiffs' counsel clearly places his own interests ahead of the interests of his proposed class – should not be countenanced. Mr. Gielata clearly wants things both ways. Equity clearly requires that he be barred from having either.

Without legal or factual support or justification for his actions, Hyland's counsel decided to take the low road. Indeed, suspending the present legal and factual realities, Mr. Gielata began making spurious and slanderous allegations about Dr. Blau's well-respected counsel while carefully avoiding formally subjecting his clients to this Court's jurisdiction. At the same time,

(...continued)

original action(s). Fortunately (or unfortunately, for Mr. Gielata), this is not the law.

[4] The Hyland Memorandum was followed by a supplemental memorandum.

5

he pushes forward in the *Hyland* Action, even though he knows its prosecution violates the PSLRA. Nevertheless, and as explained below, the *Hyland* Plaintiffs' Memorandum lacks any factual or legal merit and contains serious (and potentially actionable) misrepresentations. Mr. Gielata's motivations are clear: he strains to usurp the role of lead counsel in an action already well in progress, notwithstanding his non-compliance with the PSLRA to advance his own interests at the expense of the class. Indeed, Mr. Gielata's tactics are nothing more than a desperate attempt to obtain the coveted status of lead counsel at all costs. In furtherance of obtaining his objective at all cost, Mr. Gielata, intentionally misrepresents the factual record. In short, Mr. Gielata's efforts evidence a serious lack of professional judgment and his recent indictment by the Attorney General of the State of Delaware further evidences his moral turpitude. *See* the Indictment by the Grand Jury in the Superior Court of the State of Delware; I.D. # 0506021946, #0507018523 attached as Exhibit A to the Nespole Affidavit (the "Gielata Indictment").

## ARGUMENT

## I.   ATTORNEY GIELATA'S FALSE ACCUSATIONS AND *AD HOMINEM* ATTACKS SHOULD NOT BE COUNTENANCED

### A.   This Court Had Already Properly Selected Lead Plaintiff And Lead Counsel Long Before Mr. Gielata Filed The *Hyland* Action

The prerequisites of the PSLRA establish a strict schedule for the process of appointing lead plaintiff and selecting class counsel. See 15 U.S.C. §78u-4(a)(3). The clear statutory scheme is that the lead plaintiff selection procedure is to be resolved for all persons nationwide with substantially similar federal securities law claims promptly after the filing of the initial action alleging such claims, and there is no provision for continuously revisiting the issue.

Here, after proper nationwide notice and the Court's consideration of the timely-filed lead plaintiff motion, and in strict compliance with the requirements of the PSLRA, the lead

6

plaintiff selection process in this case was completed in January 2005. Almost six months later, the *Hyland* Plaintiffs attempted, with no legal authority or factual basis to support their request, to interfere with this Court's Lead Plaintiff Order by filing a virtually identical case in the District of Delaware, and moving for lead plaintiff status in that case. As described above, the Delaware Court then entered an order appointing the *Hyland* Plaintiffs lead plaintiffs in the *Hyland* Action. When that court entered the lead plaintiff order in the *Hyland* Action, however, Order, the determination of the lead plaintiff issue resided, *as a matter of law*, exclusively with this Court, where that issue was resolved in January 2005. Indeed, to the extent there was any question that this Court's Lead Plaintiff Order applied to the claims and class alleged in the *Hyland* Action, the *Hyland* Plaintiffs have conceded that point in their court papers. *See* Hyland Supp. Mem. ("On June 21, 2005, the Delaware Plaintiffs were appointed lead plaintiffs in an overlapping class action commenced in the District of Delaware.") *(See* Exhibit B to the Nespole Affidavit)[5]

Moreover, the *Hyland* Plaintiffs have clearly submitted to the jurisdiction of this Court – notwithstanding their tactically dubious efforts to do otherwise – by moving here to disqualify Lead Counsel, vacate the Order appointing Dr. Blau Lead Plaintiff, and to transfer the action to the District of Delaware. In so doing, the *Hyland* Plaintiffs concede that this Court has exercised

---

[5] Hyland's counsel again proves his lack of integrity by blatantly manipulating the facts to fit his own interest. Contrary to what he says in the supplemental memorandum, the overlapping actions were not commenced in the District of Delaware. While the initial class action complaint pursuant to the J.P. Morgan merger with Bank One was filed in Delaware Chancery Court in June 2004, it was a Chancery action and was dismissed in April 2005 for failure to allege futility of demand. The remaining "overlapping actions" are the *Blau* and *Hyland* actions, clearly commenced in the Northern District of Illinois by the filing of the class action complaint in the *Blau* action in October 2004, more than five months before the filing of the *Hyland* complaint in the District of Delaware in March 2005.

7

jurisdiction over the claims asserted in the *Hyland* Action and that it already issued a binding Order, pursuant to the PSLRA, relating to the conduct of the litigation of such claims.

## B.   Mr. Gielata's Indictment Speaks For Itself

As a threshold matter, on August 4, 2005, Mr. Gielata was indicted on a felony count by the Attorney General of the State of Delaware for allegedly stealing money or other property from PayPal, Inc., in an amount exceeding $1,000.00. Mr. Gielata is also charged, in that same indictment, with a conspiracy count related to the property theft charge. *See* Gielata Indictment, Exhibit A to the Nespole Affidavit. Mr. Gielata's indictment on these (or any) grounds clearly calls his ability to continue practicing as an attorney, *see, e.g.*, Delaware Lawyers' Rules of Disciplinary Procedure, Rule 16(a) ("Interim Suspension") – let alone serve as a fiduciary for a class. This, standing along, should end the analysis. Given the sheer number of spurious and demonstrably false issues Mr. Gielata raised in his papers, however, we have elected to discuss each of those issues in full.

## C.   The *Blau* Notice Was Valid

Lacking case law support for his arguments relating to the purported invalidity of the *Blau* Notice, Mr. Gielata takes the remarkable step of creating his own rules, from whole cloth, to argue that the *Blau* Notice was inadequate, including: (i) a requirement that a notice include the names of all the defendants in the action; and (ii) a requirement that a notice explicitly advise class members of their right to retain a different counsel than that publishing the notice. In fact, the correct application of the legal tests as to the adequacy of a notice under the PSLRA demonstrates the adequacy of the *Blau* Notice that unsurprisingly is supported by the very cases Mr. Gielata cites in purported support of his position.

First, contrary to Mr. Gielata's assertion, there is no requirement that a notice include the names of all defendants. In *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1315 (N.D. Ala. 2000),

8

the court found that the notice published by the plaintiffs in that case was inadequate because it failed to inform the "potential lead plaintiffs either of the names of the plaintiffs, the names of the defendants or the style of the case." It is the combined effect of the lack of the "style of the case" *and* of the names of the plaintiffs and defendants that led the *Burke* court to deem the notice inadequate, concluding that the proposed notice failed to indicate what action was pending and to learn of such, potential lead plaintiffs had to "either search through the files of the district courts of the Northern District of Alabama or contact the law firms prominently listed in the purported notice." *Id.* Unlike the *Burke* notice, however, the *Blau* Notice here indicates that the action was filed on October 13, 2004, is pending before Judge Hibbler, and is styled *Blau v. Harrison* 04 C 6592. *See Blau* Legal Notice, attached to Nespole Affidavit as Exhibit D. Because the *Blau* Notice includes the style of the case and the name of the court where the case is pending, the notice provides class members with "accurate information from which [they] may contact the Court and readily obtain a copy of the complaint [in a pending action] and/or file a motion to be appointed as lead counsel in that case." *Janovici v. DVI, Inc.* No. 2:03-05674, 2003 U.S. Dist. LEXIS 22315, at *18 (E.D. Pa. Nov. 25, 2003) cited in Hyland Memorandum at 25.

Second, *nowhere* in the jurisprudence and in the cases cited by Mr. Gielata does one find the requirement that a notice include clear language as to "the right of class members to retain counsel of their choice." Hyland Mem. at 25. In *Burke*, 102 F. Supp. 2d at 1331, cited by Mr. Gielata on this point, the Court never discussed a requirement as to the "right to retain counsel." The *Burke* Court did however elaborate the following test to determine the adequacy of a notice, stating:

> A class member reading notice published pursuant to the PSLRA should be able to (1) determine whether she is eligible for lead plaintiff status based on the class period; (2) learn enough about the asserted claims to make an initial judgment as to whether to obtain a copy of the full Complaint (which will in turn inform her

9

final judgment about whether to pursue lead plaintiff status); and (3) contact the clerk's office to obtain a copy of the Complaint and discover the procedures for filing a motion.

*Marsden v. Select Med. Corp.*, No. 2005 U.S. Dist. LEXIS 714, at *11 (E.D. Pa. Jan. 18, 2005) citing *Burke*, 102 F. Supp. 2d at 1311-12.

The *Blau* Notice clearly satisfies the *Burke* test because it includes: (1) the dates of the class period as well as the events they are associated with; (2) a 10 line paragraph detailing the claims in the complaint and the injury to J.P. Morgan shareholders; and (3) the style of the action, the date of filing and the full name of the Court where it was filed. Accordingly, given that notice was properly given in the *Blau* Action, Mr. Gielata's factual predicate for moving to be appointed lead counsel before the Delaware Court simply does not exist.

## D. Lead Counsel Is Not Conflicted

In a further attempt to mislead this Court, Mr. Gielata asserts that Wolf Haldenstein should be disqualified as Lead Counsel because it is simultaneously representing another plaintiff against J.P. Morgan in an unrelated matter.[6] Hyland Mem. at 12-17. Mr. Gielata is wrong. Court's have repeatedly held that this kind of potential conflict is insufficient to render plaintiff's counsel inadequate to serve as lead counsel. *Mehl v. Canadian Pac. Ry.*, 227 F.R.D. 505, 515 (D.N.D. 2005) ("Most courts have held that class counsel may represent more than one class against the same set of defendants in large part because of the procedural safeguards in place to protect the proposed class; i.e., the court must approve any proposed settlement.") (citing *Dietrich v. Bauer*, 192 F.R.D. 119 (S.D.N.Y. 2000).

---

[6] Wolf Haldenstein is one of six firms on the plaintiffs' Executive Committee in *In re Initial Public Offering Securities Litigation*, 21 MC 92 (SAS) (S.D.N.Y.), in which J.P. Morgan is one of the many underwriter defendants named therein.

10

Moreover, under Illinois law, the fact that plaintiff's lead counsel also represents other classes against common defendants in other cases does not affect that lead counsel's adequacy, even if the other case involves the same set of operative facts. *Clark v. TAP Pharmaceuticals, Inc.,* 343 Ill. App. 3d 538, 798 N.E.2d 123 (Ill. App. 5th Dist. 2003). In *Clark*, plaintiffs' lead counsel in the state court case was also suing the same defendant in a related federal class action, based on the same factual allegations. In that situation, the *Clark* court held that even under those circumstances, there was no actual conflict of interest. *Id.* at 134 (citing *Sheftelman v. Jones,* 667 F. Supp. 859 (N.D. Ga. 1987)). In *Sheftelman*, the Court held that plaintiffs' counsel were adequate, even though they were also representing other classes against common defendants in unrelated class actions, and despite the contention that certain defendants in both actions could not satisfy competing judgments in both actions. *Id.* at 865. The court noted that although there may be a potential conflict of interest, such a conflict was speculative at best, and several procedural safeguards, such as an untainted co-counsel, the fact that the court must approve any settlement, and the fact that the court would require notice of the potential conflict to the class, existed to eviscerate any conflict that could arise. *Id.*[7] Again, Mr. Gielata's assertion of potential conflicts does not justify his disregarding the PSLRA.

---

[7] In his *Amici Curiae* memorandum, Mr. Gielata cites five cases for the proposition that a potential conflict may render plaintiff's counsel inadequate. Four of those cases, however, do not rely on that contention for their holdings. For example, in *In re Cardinal Health, Inc. ERISA Litg.,* 225 F.R.D. 552 (S.D. Ohio 2005), five law firms sought to be appointed lead counsel in an ERISA case and the Court chose the firm it believed to be the most adequate. At no time did the Court assert that any of the firms were disqualified from appointment; on the contrary, the Court noted that "each firm has an impressive resume and is qualified to be lead counsel." The Court chose the particular firm it did to be lead counsel because it believed that it would be "best be able to represent fairly and adequately the class because of their extensive experience in ERISA litigation." *In re Cardinal Health,* 225 F.R.D. at 555. In *Cardinal Health,* the court cited *Kuper v. Quantum Chem. Corp.,* 145 F.R.D. 80 (S.D. Ohio 1992) for the proposition that "counsel cannot represent different classes of plaintiffs with conflicting claims who are seeking recovery from a common pool of assets;" however, the Court declined to decide whether that was the case in the matter before it. *In re Cardinal Health,* 225 F.R.D. at 557. Instead, the Court considered the firms' experience to be the most important factor in making its determination of which firm should be appointed lead counsel. *In Krim v. peOrder.com, Inc.,* (continued...)

11

## E.     Lead Counsel's Diligent Investigation

Mr. Gielata further attempts to mislead this Court by arguing that Lead Counsel purportedly failed to comply with Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") because certain claims and allegations from a previously-filed complaint were purportedly incorporated into Lead Plaintiff's current Complaint. In reality, a careful review of the jurisprudence mandates a contrary finding and confirms that by reviewing analyst reports and public records, including newspaper articles, and SEC filings, and consulting an industry specialist, Lead Counsel fully complied with the Rule 11 requirement that an attorney make an adequate investigation prior to filing a complaint. Rather than prove that plaintiff's attorney's investigation was inadequate, the fact that claims and allegations of a previously-filed complaint against J.P. Morgan in this matter were incorporated into Lead Plaintiff's complaint actually provides additional evidence of the law firm's investigative efforts.[8]

------------------------------------------------------------

(...continued)

210 F.R.D. 581 (W.D. Tex. 2002), the court resolved the issue of class certification on the basis of the adequacy of the plaintiff (because only one of the proposed lead plaintiffs had standing), rather than upon the adequacy of the law firm. Finally, in *In re Continental Ill. Sec. Litig.*, 750 F. Supp. 868 (N.D. Ill. 1990) *rev'd*, 962 F. 2d 566 (7th Cir. 1992), a decision concerning attorney's fees, the Court stated that it ordered (in a previous litigation) the derivative plaintiffs and the direct plaintiffs to be represented by different counsel because the two classes had a potential conflict (e.g., because direct plaintiffs make their claims against the company, whereas derivative plaintiffs make their claims on behalf of the company over the same set of operative facts.) Therefore, *In re Continental* is, on its face inapplicable to the instant case because, here, plaintiff's counsel is not representing both the direct and the derivative plaintiffs in the same matter. The only case Mr. Gielata cites where a court actually explicitly refused to allow a law firm to represent a class until they had withdrawn from a parallel securities case against the defendant is the 1978 case from the District Court of California, *Sullivan v. Chase Inv. Servs. of Boston, Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978). The court in *Sullivan* said that where a firm represents two plaintiffs, in two actions, against the same defendants, there is a conflict where there is a "possibility that the assets and insurance of the defendants...will be insufficient to satisfy an alleged liability to the class" because that fact will influence the litigation strategy. *Id.* at 258. The *Sullivan* case, however, is inapplicable to the current case against J.P. Morgan because here the alleged conflict of interest is illusory because there is no reason to believe that J.P. Morgan, as one of the largest and most profitable companies in the world, will be unable to satisfy all the judgments if it is found liable in the cases currently pending against it. *See also, Clark*, 798 N.E.2d at 123 (holding that a potential conflict of interest is insufficient to render class counsel inadequate).

[8]  In his *Amici Curiae* memorandum, Mr. Gielata cites four cases for the legal proposition that the mere (continued...)

12

The cases Mr. Gielata cites do, however, make clear that Rule 11 requires an adequate investigation and not, as he contends, originality in the drafting of the complaint. "The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint," *De la Fuente v. DCI Telecomms., Inc.* 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003), and all the inquiry required by Rule 11 "is a brief pre-filing investigation, not pre-filing discovery." *In re Excello Press, Inc.*, 967 F.2d 1109, 1115 (7th Cir. 1992). Thus, Mr. Blau's counsel's diligence should afford Your Honor confidence that the Class is well-represented by Wolf Haldenstein.

## F.   The Lead Plaintiff Papers Were Procedurally Proper

Mr. Gielata also alleges that Lead Counsel filed a false and misleading lead plaintiff in this action with respect to American Growth Fund, Inc., the plaintiff chose to withdraw from this action (Hyland Mem. at 27) Mr. Gielata bases his falsity claim on: (i) the withdrawal of AGF from the *Blau* Action after its appointment as Lead Counsel; (ii) the lack of a certification accompanying the Amended Complaint; and (iii) that the certification attached to the initial complaint was purportedly improper. AGF's withdrawal from this action following its lead plaintiff appointment is fully explained in the Affidavit of Gregory M. Nespole as being the

--------

(...continued)

incorporation of claims or allegations derived from a previously-filed complaint renders lead counsel's investigation *ipso facto* inadequate and, in contravention of Rule 11. *See* Gielata Amici Curiae Memorandum, §V. A (citing *Greenfield v. U.S. Healthcare, Inc.*, 146 F.R.D. 118 (E.D. Pa. 1993), *aff'd sub nom*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994); *Taubenfield v. Career Education Corp.*, No. 03-8884, 2004 WL 554810 (N.D. Ill. Mar. 19, 2004); *In re Excello Press, Inc.*, 967 F.2d 1109 (7th Cir. 1992); *De la Fuente v. DCI Telecomms. Inc.*, 259 F. Supp. 2d 250 (S.D.N.Y. 2003)). The cases Mr. Gielata relies upon, however, are inapposite. For example, *In re Excello Press*, the court refused to impose Rule 11 sanctions. 967 F.2d at 1115. In *De la Fuente* the court found the fact that the plaintiffs predicated their complaint upon a previously-filed SEC complaint, actually provided support for the adequacy of their investigation. *See* 259 F. Supp. 2d at 260. In *Greenfield*, although the attorneys copied a previously-filed complaint in its entirety, they were not sanctioned for that reason, but rather, they were subject to sanctions because they failed to do any personal investigation whatsoever. *See Greenfield*, 146 F.R.D. 118 (emphasis added). Finally, in *Taubenfield*, this Court held that lead counsel was adequate, even though they had copied a prior complaint verbatim, where lead counsel had conducted an internal investigation into the wrong doing six days prior to filing their complaint as evidenced by the attorney on the case's affidavit. 2004 WL 554810, at *5.

13

result of an institutional plaintiff having second-thoughts about suing a financial institution. *See* Nespole Affidavit. As to the certification, it is undisputed that no additional certification is required when plaintiffs file an amended complaint and, here, Dr. Blau's certificate accompanied his complaint filed on October 13, 2004. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 500 (S.D.N.Y. 2004); *Fellman v. Electro Optical Sys. Corp.*, No. 98-6403, 2000 U.S. Dist. LEXIS 5324, at *40-41 (S.D.N.Y. Apr. 25, 2000).

## G.  Dr. Blau's Certificate Was Proper

In an additional strain to his credibility and reason, Mr. Gielata relies on the adjusted close price (the price at the 4:00 market close on any given day) of J.P. Morgan's shares to allege "unexplained discrepancies" in the Blau Certification. Hyland Mem. at 29. This argument is, at best, a red herring, because Dr. Blau bought his shares during the stock's trading range on a particular day. Mr. Gielata erroneously assumes that stock prices are assigned a price at the close, much like the Net Value Asset (NAV) associated with mutual funds. In any case, a review of the Bloomberg pricing information of the adjusted closing price on the days Dr. Blau purchased his shares indicates that the values cited by Mr. Gielata are incorrect. The correct adjusted close price for the three dates are $12.542 for January 21, 1994; $12.125 for March 31, 1994 and $11.375 for October 6, 1994, resulting in no price discrepancies and thus mooting Mr. Gielata's argument on this point in its entirety. *See* Exhibit C to the Nespole Affidavit.[9]

---

[9] In yet another baseless accusation, Mr. Gielata insists that Lead Plaintiff must be "lying" because he owns partial shares, "which one cannot purchase or sell." Hyland Mem. at 28. Any question with regard to Dr. Blau's purchase or sale of shares will be addressed at the class certification stage. Mr. Gielata's argument as to partial shares is nonetheless incorrect. Assuming Dr. Blau, or any other J.P. Morgan shareholder, obtained his or her shares as a result of J.P. Morgan acquiring another financial institution, that shareholder may very well have received a fractional share in the conversion. Moreover, the class is defined as a holder class as of certain dates in 2004, making partial shares all the more plausible.

14

## H.    Allegations of Collusion Are Meritless

Lastly, in his latest submission, Mr. Gielata makes the gratuitous allegation that Lead Counsel is colluding with defendants for the resolution of the claims. See Hyland Supp. Mem. at 2-3. It is only to highlight Mr. Gielata's motives and inadequacy as potential counsel to the Class that his latest chimera is given any consideration, and Lead Counsel's position, with regard to these issues are explained in the Nespole Affidavit. Simply stated, Mr. Gielata's assertions are false.

## II.    LEAD COUNSEL'S EFFORTS TO STAY THE DELAWARE ACTION

Given that Mr. Gielata's action is subordinate under the PSLRA to the first-filed *Blau* Action, lead counsel is in the process of preparing Dr. Blau's complaint in intervention in order for him to move to stay and transfer the Hyland Action to Your Honor. Lead Counsel is also informed by the Delaware counsel it has retained to assist them in that motion, that Mr. Gielata's indictment has effectively enabled his ability to prosecute the action, especially given that his suspension from the Delaware bar is imminent. Once those papers are filed, we will deliver a courtesy copy to Your Honor.

15

**Dated:** August 24, 2005

By: _____

Adam J. Levitt
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
(312) 984-0000 (t)
(312) 984-0001 (f)

Daniel W. Krasner
Gregory M. Nespole
Aya Bouchedid
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Lead Counsel for
Plaintiff and the Proposed Class*

Marc Henzel, Esq.
**LAW OFFICE OF MARC S. HENZEL**
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

*Additional Counsel for
Plaintiff and the Proposed Class*

412576

16

# Exhibit 7

1

1     IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4    DR. STEPHAN BLAU, et al.,        )
                                      )
5               Plaintiffs,           )
                                      )
6        -vs-                         )    No. 04 C 6592
                                      )
7    WILLIAM B. HARRISON, JR., et     )    Chicago, Illinois
     al.,                             )    August 29, 2005
8                                     )    9:30 a.m.
                Defendants.           )

9

              TRANSCRIPT OF PROCEEDINGS
10
       BEFORE THE HONORABLE WILLIAM J. HIBBLER
11
     APPEARANCES:
12
     For the Plaintiffs:
13                              WOLF HALDENSTEIN ADLER FREEMAN
                                & HERZ LLC
14                              BY:  MR. ADAM J. LEVITT
                                55 W. Monroe, Suite 1111
15                              Chicago, Illinois  60603
                                312-984-0001
16
     For the Defendants:
17                              SIDLEY AUSTIN BROWN & WOOD LLP
                                BY:  MS. KATHLEEN L. ROACH
18                                   MS. COURTNEY A. ROSEN
                                Bank One Plaza, 10 S. Dearborn
19                              Chicago, Illinois  60603
                                312-853-7861

20

21

     Court Reporter:
22
                    ALEXANDRA ROTH, CSR, RPR,
23                    Official Court Reporter
                    United States District Court
24         219 South Dearborn Street, Suite 1744-a
                    Chicago, Illinois  60604
25               Telephone:  (312) 294-0134

1      (Proceedings heard in open court.)

2          THE CLERK:  04 C 6592, Blau versus Harrison -- Blau,

3  et al., versus Harrison, et al., status.

4          MS. ROACH:  Good morning, your Honor.  Kathleen Roach

5  and Courtney Rosen for the defendants.

6          MR. LEVITT:  Good morning, your Honor.  I'm Adam

7  Levitt on plaintiffs' behalf.

8          THE COURT:  Okay.  Good morning.

9          The big issue in this case as far as I'm concerned is

10  the matter of the brief that I received regarding this matter

11  from counsel who represents the class in the Highland matter.

12  That has caused me some concern because of certain allegations

13  which he has made.

14          And, obviously, I received notice of the parties in

15  this action moving to intervene or stay the matter, the Highland

16  matter.  I think we need to resolve that issue as to whether or

17  not we proceed here or proceed there or these matters are so

18  similarly situated that we need to proceed in one forum as

19  opposed to both because clearly some order issued by this Court

20  or by that Court could affect the litigation in the other arena.

21          There is some indication also in the materials that

22  I've reviewed suggesting that the matter should be more properly

23  brought in that Court as opposed to this Court.

24          None of those issues have been answered to my

25  satisfaction.

1        MR. LEVITT:  I can speak to that, your Honor.

2        THE COURT:  Sure.

3        MR. LEVITT:  Once again, I'm speaking on behalf of my

4   firm, Wolf, Haldenstein, Adler, Freeman & Herz, which your Honor

5   had appointed lead counsel in this case pursuant to a proper

6   notice pursuant to all the procedures under the Private

7   Securities Litigation Reform Act of 1995.

8        Months after we filed our case and months after your

9   Honor appointed our client lead plaintiff and our firm as lead

10  counsel in this action, Mr. Gielata filed an action in Delaware.

11  Then he began to mail all sorts of papers into your Honor

12  violating local practice and procedure that he styled as

13  purported amicus briefs on behalf of his clients in Delaware.

14  And in those briefs, as your Honor is aware and as your Honor

15  just stated for the Court, Mr. Gielata made all sorts of

16  accusations and essentially embarked on a smear campaign against

17  my firm.

18       When we received these papers and when your Honor

19  received these papers, we were in court shortly thereafter.  We

20  advised your Honor at that time that Mr. Gielata has no standing

21  to be here in the first place.  Second of all, what he's done to

22  the extent we were going to have to engage in actual substantive

23  analysis of what he's saying is simply wrong and false.

24       At that point, your Honor had said that if we didn't

25  think that your Honor had to consider those papers, you'd simply

4

1  hold onto them. And we spoke to opposing counsel, and our
2  actions speak louder than words. We thought that there was no
3  need to even consider them.

4       We also learned, your Honor, at the first time up
5  before your Honor with respect to this issue that his -- that
6  Mr. Gielata's improperly submitted amicus brief had found its
7  way into the Clerk's office here and was now a part of the
8  record in this case.

9       Months thereafter -- and we went on with this case.
10 We filed an exhaustive response to the motion to dismiss that my
11 opponents had filed. That schedule is proceeding now. My
12 opponents have a reply due in this Court in about a month, and
13 it's our intention, based upon our understanding of the rules
14 and your Honor's orders, to go forward with this case.

15      A few weeks ago, Mr. Gielata filed a supplemental
16 brief before this Court saying all sorts of other things,
17 including, among other things, that my firm and my opponent's
18 firm had been conspiring in some way. I'm not going to actually
19 dignify that with anymore comment other than to say that, as my
20 opponents will advise you, this has been a hard fought
21 litigation from the outset and any idea along those lines is
22 absolutely absurd.

23      MS. ROACH:  That's certainly correct.

24      MR. LEVITT:  So where we are now is this, your Honor.
25 After receiving Mr. Gielata's second round of papers, I

1  understand that your Honor was concerned by a lot of the things
2  he was saying in those papers.  We felt it was now time to
3  undertake two courses of action.

4      Number 1, we immediately put in a response to Mr.
5  Gielata's papers, which your Honor received from us last
6  Wednesday.  We sent a courtesy copy up to your Honor after we
7  filed it.  And we also moved for intervention into Mr. Gielata's
8  action in Delaware for the sole purpose of staying that action
9  and shutting it down in light of the fact that what Mr. Gielata
10  is doing simply violates the rules and puts, very frankly, his
11  own interests over the interests of the class in this case.

12      In preparing our papers, as your Honor is now aware,
13  we learned something that we think, frankly, speaks to the heart
14  of this situation as well.  On August 5th, Mr. Gielata was
15  indicted in Delaware on felony charges for theft.

16      I was on the phone this morning with the state
17  disciplinary commission in Delaware to find out exactly what was
18  happening there, and what was happening was he was -- under the
19  rules in Delaware, Rule 16(a) specifically, if a felony
20  indictment comes down against a lawyer, the state disciplinary
21  bar has to immediately file a verified petition for interim
22  suspension, which they did.  That result your Honor should
23  really be aware of because it speaks to -- it speaks to Mr.
24  Gielata's entire approach to these things.  He sued the state
25  bar commission for filing that petition.

1           What they were able to advise me of -- because a lot
2   of this is occurring in confidential proceedings -- was that in
3   exchange for not immediately suspending him from the practice of
4   law, thereby taking this entire issue off the table, very
5   frankly, they required him to serve a copy of his indictment in
6   every case in which he was involved, which, to the extent that
7   he has something on file here in this case, he has not even
8   complied with a ruling from his home court.

9           Having said all of that, your Honor, what this comes
10  down to here, I think, is a very simple thing.  He called us all
11  sorts of names.  We answered it.  We showed you in our papers
12  that it's all a hundred percent completely and demonstrably
13  false.

14          The issue here, as Mr. Gielata said in his own papers,
15  he believed he was within his rights to file his own case in
16  Delaware because he didn't believe our notice in this case was a
17  valid and proper notice when we first had put our case on file.

18          As your Honor is aware, under the Private Securities
19  Litigation Reform Act of 1995, when the first filed case gets
20  filed, the lawyers in that case have to put a press release up,
21  a notice in either a national newspaper, a wire service or the
22  like, and we put our notice in Investors Business Daily, which
23  has been held by courts here and elsewhere in the country to be
24  a valid notice, and followed all the rules in the PSLRA.  Your
25  Honor, considering what we did with our notice, held that we

1   actually acted properly.

2          What's happening now is Mr. Gielata, for whatever

3   reason, to get his own hands in the game, so to speak, feels

4   that it was not a proper notice.  Even if he was right -- which

5   as we set forth in the response papers we filed with your Honor

6   last Wednesday, he is wrong because we satisfied every single

7   requirement for this type of notice -- but let's say for the

8   sake of this conversation he was right, the place that he has to

9   challenge that notice is here in this Court.

10         What he is trying to do now by having run off on his

11  own and filed his own action in Delaware, he is asking a

12  similarly situated Article III judge on the same level as your

13  Honor to serve as a court of review on your Honor's ruling, and

14  that's not allowed.  What he's doing now is seeking to

15  circumvent the rules to support his own ends.

16         Is he unhappy that his clients aren't in this case?

17  They're actually -- they're actually, based upon the information

18  he's now provided us about them, they're in the class if the

19  class gets certified in this case.  Is he unhappy that he is not

20  the lead counsel in this case?  That might be the case.  But as

21  your Honor is aware, we followed the rules.  He didn't put up

22  his clients.

23         The fact that he said in his letter that was recently

24  handed up to your Honor before the hearing this morning because

25  he served the letter on us on Friday night, even if he's right,

1  and even if his client has 6 times more losses than our client

2  does, it's irrelevant.

3      I can read off a laundry list of cases, your Honor,

4  where various potential class members and funds have called us

5  after the fact and said we'd like to be involved in the lead,

6  and the answer is, we're sorry, you're just too late.  The rules

7  are the rules.

8      So what's happening here, your Honor, stripping out

9  the sound and fury, is he lacks any standing to be in this

10  Court.  Frankly, his indictment raises the question of his

11  adequacy in any court.  And to the extent that he had a problem

12  with the proceedings in this Court, he had to first intervene

13  into this action and then raise that objection here in the form

14  of a motion for reconsideration.  He didn't do it.  He's not

15  here.

16      As far as we're concerned, there isn't an issue

17  whether it should be in Delaware or hear.  The case is here.

18  The case has been proceeding here, and that's the way it should

19  stay.

20      If you have any questions, I'd be more than happy to

21  answer them.

22      THE COURT:  Okay.

23      Counsel, you have anything you want to add?

24      MS. ROACH:  Your Honor, just from a defense counsel

25  perspective, we're not in a position to comment on the

1  substantive allegations that Mr. Gielata has made against Mr.
2  Levitt's firm. However, what we can say is that Mr. Gielata --
3  I would agree with what Mr. Levitt said. He has no standing
4  here. He's not filed an appearance. He's not filed a motion to
5  intervene. He's not filed a motion of any sort. All he has
6  done is sent in letters to the Court with his purported amicus
7  papers. He's not associated local counsel in Illinois.
8  Instead, he sends his letters to opposing counsel and asks us to
9  present them to the Court, which is highly improper and part of
10  a pattern and practice of ignoring local rules and local
11  practice.

12          And I agree with Mr. Levitt. The fact that he stands
13  under indictment at this point in time certainly raises
14  questions as to his competency as counsel.

15          But based on the papers, there's no motion for the
16  Court to consider. I understand the Court's concern that there
17  are these two actions pending in parallel courts, but there is a
18  properly filed or, at least, from all appearances reading it
19  this morning, there is a motion that has been filed by Mr.
20  Levitt's firm in the other action, but there is no such motion
21  pending here.

22          Mr. Gielata is either unaware of or has declined to
23  follow this Court's rules and practice, and we don't see any
24  purpose to be served by commenting further.

25          THE COURT: Okay.

1          Let me ask this.  Are you also defending the Highland

2    matter that is pending in Delaware?

3          MS. ROACH:  We are not counsel of record in that

4    matter.

5          THE COURT:  Are you engaged in any way with counsel

6    who is involved in the defense of that case because, obviously,

7    the two cases are basically the same case?

8          MS. ROACH:  We represent the same clients.  So there's

9    discussion.  But we don't represent them in that action.

10          THE COURT:  Okay.

11          Have you any opinion or any information regarding the

12    propriety of one jurisdiction as opposed to the other?

13          MS. ROACH:  At this point, I don't have any comment on

14    that, your Honor.

15          THE COURT:  Okay.

16          Let me say that, obviously, the Court has been

17    receiving a great deal of material from Counsel Gielata

18    regarding this matter in the form of an amicus curiae brief and

19    also in the form of letters which have been forwarded to the

20    Court through counsel.

21          Those materials the Court reviewed, and they raise

22    certain issues with the Court, some of which the Court viewed as

23    sour grapes perhaps, others of which caused the Court to, at

24    least, have some concern about orders entered by this Court

25    which might somehow impact orders entered by that Court or vice

11

1   versa.

2          So I did believe that it was necessary for someone to
3   become either -- one lawyer to become present here and intervene
4   so I could have that lawyer present and talk what the issues
5   really are or the lawyer here to intervene in that action so
6   that we have one forum where we know this case is going to go
7   forward in and we don't have these ancillary actions all over
8   the place.

9          Now that counsel has indicated and I have seen your
10  motion to stay the Highland matter in Delaware, that, at least,
11  should bring to fruition a hearing as to which case is going to
12  go forward.

13         Based upon the filings that have been made by counsel
14  for the Highland plaintiff in the Delaware matter, I will make
15  this order:  That based upon the fact that we now have a motion
16  pending to stay that matter in which the issues will be
17  discussed and decided by that Court, I see no need to further
18  entertain motions or writings or materials from Mr. Gielata in
19  this case.  I am not going to further make -- make any further
20  order on his motions regarding the propriety of lead counsel or
21  his other assertions in his papers.  The Court here had no
22  information and still has no information which it can base any
23  action on its part to change what the Court has previously
24  ruled.  As far as this Court is concerned, lead counsel remains
25  lead counsel.

1          Certainly there are no -- there may be other persons
2    who might suggest that they have a greater interest, for
3    instance, the Highland plaintiff, but that is of no movement to
4    this Court in that the notices that the Court reviewed were
5    proper, the lead plaintiff has indicated a willingness, and the
6    Court has found that he is a proper lead plaintiff.

7          The Court is concerned as to the ancillary or the
8    other action in Delaware, but I -- it is the Court's belief that
9    that Court can, after hearing these materials regarding the
10   intervention and the movement to stay that action, can rule, and
11   if that ruling results in that action going forward as well as
12   this action, then, I think, the next step is to decide where the
13   action should go forth, the two actions should go forth
14   simultaneously in a single court as opposed to two, but we're
15   not there because your motion to stay might be, in fact,
16   granted.

17              MR. LEVITT:  Thank you very much, your Honor.

18              MS. ROACH:  Thank you, your Honor.

19              THE COURT:  Okay.

20          Now, we already have a status date in this case,
21   correct?

22              THE CLERK:  I need to reset it back because we had
23   this one today.

24              THE COURT:  Yes.  We had it set for --

25              THE CLERK:  October 17th.

13

```
 1              THE COURT:   -- 10-17, right?

 2              Do you folks want that date again?

 3              MS. ROACH:   I think right now the briefing on the

 4    motion to dismiss, I think, will have been completed by then.

 5              MR. LEVITT:   Right.  September 23rd or 24th or

 6    something like that.

 7              MS. ROACH:   Right.  So that's not a bad time to come

 8    back in for status.

 9              THE COURT:   Okay.  10-17.

10              MR. LEVITT:   Thank you.

11              MS. ROACH:   Thank you, your Honor.

12              THE COURT:   Thank you.

13

14         (Which were all the proceedings heard.)

15                         CERTIFICATE

16         I certify that the foregoing is a correct transcript from

17    the record of proceedings in the above-entitled matter.

18

19    Alexandra Roth by mck        8-29-05
      Alexandra Roth                Date

20    Official Court Reporter

21

22

23

24

25
```

# Exhibit 8

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 6592 | **DATE** | 8/29/2005 |
| **CASE TITLE** | BLAU, et al. vs. HARRISON, et al. | | |

**DOCKET ENTRY TEXT:**

Status hearing held and continued to 10/17/05 at 9:30 a.m. Plaintiffs' attorney responds to supplemental Amici Curiae memo by Hyland litigants and disputes assertions by Atty. Gielata in that memo. Plaintiffs' attorney has also filed motion to intervene and motion to stay Hyland case. Court finds that the parties have sufficiently responded to issues raised by Amici Curiae filing and absent some further intervention authorized by the Court this matter shall proceed without further consideration regarding the Hyland case.

Docketing to mail notices.

| | |
|---|---|
| Courtroom Deputy Initials: | JHC |

04C6592 BLAU, et al. vs. HARRISON, et al.                                                    Page 1 of 1

# Exhibit 9

LEXSEE 2005 DEL. CH. LEXIS 51

IN RE J.P. MORGAN CHASE & CO. SHAREHOLDER LITIGATION

Consolidated C.A. No. 531–N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 51*

**January 27, 2005, Submitted**
**April 29, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Motion to dismiss granted.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Seth D. Rigrodsky, Esquire, Ralph N. Sianni, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, Wilmington, Delaware; Steven G. Schulman, Esquire, Richard Weiss, Esquire, MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, New York; Peter D. Bull, Esquire, BULL & LIFSHITZ, LLP, New York, New York, Attorneys for the Plaintiffs.

Jesse A. Finkelstein, Esquire, Lisa M. Zwally, Esquire, Michael R. Robinson, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael A. Cooper, Esquire, Sharon L. Nelles, Esquire, SULLIVAN & CROMWELL LLP, New York, New York; Nancy E. Schwartzkopf, Esquire, JP MORGAN CHASE LEGAL DEPT., New York, New York, Attorneys for the Defendants.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

## MEMORANDUM OPINION AND ORDER

LAMB, Vice Chancellor.

**I.**

In 2004, two banks agreed to a business combination that was expected to create the second largest financial institution in the country. One bank paid a premium over the market share price for the other bank, effectively making one bank the acquirer and the [*2] other bank the target.

After the merger was completed, the stockholders of the acquirer sued its directors, alleging breaches of fiduciary duty with regard to the acquisition. Their claims stem from the allegation that the directors paid too much for the acquired bank. Specifically, the plaintiffs claim that the CEO of the target proposed a no-premium merger if he were immediately promoted to CEO of the resulting entity. The CEO of the acquirer allegedly refused that offer, choosing instead to pay the premium for the target's stock and retain his title.

The plaintiffs bring this class action in an effort to recover damages for what they contend are direct claims. The defendants move to dismiss the complaint on the basis that the claims are derivative, not direct, and that demand was not excused. For the reasons below, that motion is granted.

**II.** n1

n1 All facts herein are taken from the well-pleaded allegations of the complaint unless otherwise noted.

A. The Parties

The plaintiffs are Ronda Robins, [*3] George Ziegler, and Bruce T. Taylor, who are stockholders of J.P. Morgan Chase & Co. ("JPMC") during the relevant times. n2 The plaintiffs bring this action on their own behalf and as a class action pursuant to Court of Chancery Rule 23. The class is alleged to consist of all persons who owned JPMC common stock on the date the merger was announced, January 14, 2004, and continued to own such stock through the date the merger closed, July 1, 2004.

n2 Bruce T. Taylor is acting as custodian for Julia Ann Taylor.

The defendants are JPMC and the members of its board of directors who approved the merger with Bank One Corporation ("Bank One").

B. Background

On January 14, 2004, JPMC and Bank One published a joint press release announcing their agreed–upon merger, which had been unanimously approved by their respective boards of directors. Pursuant to the agreement, JPMC would issue shares of its common stock to Bank One stockholders at a premium of 14% over the closing price of Bank One common stock on the date [*4] of the announcement of the merger. n3

> n3 Joint Proxy Statement at 36.

The merger agreement also laid out the succession plan for JPMC. After the merger, the CEO of JPMC, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, James Dimon, would succeed. During the interim two years, Dimon would serve as President and COO. Harrison, who was Chairman of JPMC before the merger, would continue in that role indefinitely beyond the two years.

The Joint Proxy Statement filed with the Securities and Exchange Commission on February 20, 2004 listed various reasons for the merger, including "a number of significant strategic opportunities and benefits," "more balanced business mix," "greater geographic diversification," and "expected financial synergies." n4 The merger, when announced, was expected to create the second largest financial institution in the country, measured by total assets. On May 25, 2004, the stockholders of JPMC overwhelmingly approved the merger, with 99.18% [*5] of the votes cast in its favor. n5 The merger closed July 1, 2004.

> n4 Id. at 34–35.
>
> n5 Form 8–K, May 25, 2004.

C. The Dispute

On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon. According to the article, Dimon offered to sell Bank One to JPMC at no premium if he were appointed CEO of the new entity immediately. Because much of the complaint hinges on one sentence in the article, the court finds it important to include it verbatim, as follows: "Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become the chief executive immediately, according to two people close to the deal." n6

> n6 Landon Thomas, Jr., *The Yin, the Yang, and the Deal*, N.Y. TIMES, June 27, 2004, § 3 (Sunday Business) at 1.

[*6]

The plaintiffs allege that this one sentence proves that JPMC could have purchased Bank One for no premium if JPMC agreed to appoint Dimon CEO. The plaintiffs argue that JPMC instead agreed to pay a premium simply to satisfy Harrison's desire to retain the CEO title for two more years. In addition, the plaintiffs contend that Harrison remains CEO in title only and that Dimon is effectively exercising the powers of a CEO. Therefore, they claim, the only difference between Dimon's preliminary offer and the merger as consummated was that JPMC agreed to pay the 14% premium.

The defendants respond by pointing out that the plaintiffs' argument presupposes that the boards of directors of both companies would have approved Dimon's offer. The defendants argue that there was no possibility for JPMC stockholders to approve a merger based on Dimon's alleged offer because neither board of directors ever agreed to that deal. The deal that was agreed to by the boards included a 14% premium for Bank One and a succession plan that had Harrison remaining as CEO for two years, followed by Dimon. They argue that all other possible transaction formats that may have been proposed to and rejected by the [*7] JPMC board are irrelevant and immaterial, as the JPMC directors' consideration and rejection of all such proposals are protected by the business judgment rule.

D. The Complaint

The plaintiffs pursue all defendants for breaches of fiduciary duties surrounding the refusal of Dimon's alleged no–premium offer. They argue that by allowing Harrison to keep the title of CEO, the board of JPMC overpaid for Bank One by the 14% premium. Relying on the proxy materials stating that Harrison kept the board informed of his negotiations with Dimon, the plaintiffs claim that the board knew of Dimon's no–premium offer. Moreover, the plaintiffs claim that a majority of the board was beholden to Harrison and, thus, not able to act independently of him. The plaintiffs allege that the board's lack of independence caused it to approve the 14% premium in order to let Harrison retain the title of CEO instead of insisting on the no–premium offer.

Alternatively, the plaintiffs claim that Harrison se-

cretly refused Dimon's no-premium offer. Without presenting the offer to the JPMC board, they claim, Harrison refused to concede the title of CEO, but continued negotiating with Dimon. Under this set of facts, [*8] the plaintiffs contend that Harrison's self-interested refusal caused Dimon to demand a premium over Bank One's share price, which Harrison eventually agreed to and presented to the board.

The plaintiffs seek damages in the amount of the merger exchange ratio premium, approximately $7 billion. They allege that the JPMC board of directors, by approving the unfavorable merger exchange ratio and the unnecessary premium, harmed them directly by diluting their interests in JPMC. If the JPMC board had approved a no-premium merger exchange ratio, the argument goes, the plaintiffs would have a greater stake in the resulting company. Instead, the stockholders of the pre-merger JPMC now have less of a stake in the post-merger JPMC.

The JPMC board consisted of twelve directors—eleven, outsiders plus Harrison. The plaintiffs allege that eight of the eleven outside directors lacked sufficient independence with regard to the merger. n7 The plaintiffs base their claims on certain relationships between the directors and JPMC and/or Harrison. The defendants counter that the relationships described by the plaintiffs fall into three categories: normal business relationships, inconsequential charitable [*9] relationships, or family relationships that are either disclosed or ended. The defendants contend that none of the relationships affect the ability of the directors to act independently. The defendants also point out that a majority of the board of directors was certified as independent pursuant to NYSE Corporate Governance listing standards.

> n7 The plaintiffs concede that three directors are independent: Hans W. Becherer, John H. Biggs, and Lee R. Raymond. The plaintiffs allege that Harrison benefitted from the merger by securing a $3.5 million increase in his severance package to $22.5 million. They further contend that Harrison knew his job was in jeopardy and he used the Bank One deal to retain the title of CEO for two more years. Harrison's alleged lack of independence is not disputed by the defendants in this motion to dismiss.

Set forth below are the directors in question and the specific allegations found in the complaint about each.

### 1. Riley Bechtel

Bechtel is the Chairman, CEO, and a director [*10] of the Bechtel Group, Inc. The plaintiffs allege that Bechtel

is not independent because the Bechtel Group does business with the Trade Bank of Iraq, which is managed by JPMC. The plaintiffs claim that the Bechtel Group has received $2 billion from the Trade Bank in connection with the reconstruction of Iraq. The plaintiffs further allege that Bechtel is not independent because JPMC and the Bechtel Group share other financial interests. As an example, the plaintiffs cite an investment partnership that is jointly owned by partners of the Bechtel Group and a private equity firm affiliated with JPMC.

### 2. Lawrence Bossidy

The plaintiffs question the independence of Bossidy because his son is employed as a JPMC Vice President. The plaintiffs contend that Bossidy would be unable to vote against Harrison because his vote would potentially endanger his son's career.

### 3. Ellen Futter

Futter is the President, as well as a trustee, of The American Museum of Natural History. The plaintiffs claim that Futter cannot act independently because JPMC is a significant benefactor to the museum. The plaintiffs also claim that Futter cannot act independently because JPMC employed her brother-in-law [*11] as a managing director. n8

> n8 The court takes judicial notice that Futter's brother-in-law was terminated on January 6, 2004 (effective March 8, 2004), one week before the JPMC board approved the merger with Bank One. See Cohan v. J.P. Morgan Chase & Co., No. 03–5981 (S.D.N.Y. 2004), Second Amended Compl.; Joint Proxy Statement at 34. He has since sued JPMC in connection with his termination. See Cohan, No. 03–5981, Second Amended Compl.

### 4. Helene Kaplan

Kaplan is Vice-Chair and a trustee of The American Museum of Natural History. Like Futter, Kaplan is a senior fiduciary of the museum and the plaintiffs challenge her independence on the basis of her charitable ties to JPMC.

### 5. William Gray n9

> n9 In their answering brief, the plaintiffs provide more detailed information about Gray than is contained in the complaint. For example, they specify the dollar amount of JPMC's contributions to UNCF instead of simply stating that JPMC is a sponsor. The court takes these facts as true since presumably the plaintiffs could amend the com-

plaint to include them.

[*12]

Gray is the President and CEO of the United Negro College Fund ("UNCF"). In 2003, JPMC matched over $1 million in UNCF donations from its employees. Since 1990, JPMC and its employees have contributed over $18 million to UNCF. In addition, Harrison has served as treasurer of UNCF. Based on Gray's charitable ties to JPMC and Harrison's reciprocal involvement with UNCF, the plaintiffs claim that Gray cannot vote independently.

### 6. Frank Bennack

Bennack is the Chairman of the Executive Committee and Vice Chairman of the Board of the Hearst Corporation. He was instrumental in creating Hearst-Argyle Television, Inc., which has a credit facility with a consortium of banks led, in part, by JPMC. The plaintiffs maintain that the financial relationship between JPMC and Hearst-Argyle, when viewed in the context of the relationship between Bennack and Hearst-Argyle, causes Bennack to be unable to act independently as a director.

### 7. John Stafford

Stafford is a consultant to Wyeth and he was Chairman of the Board of Wyeth from 1986 until 2003. JPMC is the administrative agent and a lending bank under Wyeth's credit facilities. JPMC serves as indenture trustee, paying agent, and conversion [*13] agent for $4.5 billion of Wyeth's debt securities. The plaintiffs maintain that the financial relationship between JPMC and Wyeth precludes Stafford's ability to exercise independence as a director.

### 8. M. Anthony Burns

Burns is the Chairman Emeritus and former CEO of Ryder Systems, Inc. JPMC serves as indenture trustee for Ryder, including its recent August 2003 registration of $800 million of securities. The plaintiffs maintain that the financial relationship between JPMC and Ryder impedes Burns's ability to act as an independent director.

### E. Procedure

The defendants move to dismiss, arguing that the claims asserted are derivative and that demand is not excused. The defendants further argue that the board of directors has a majority of members who were independent and disinterested, and, therefore, the board's decision to authorize the merger is governed by the business judgment rule.

The plaintiffs oppose the motion, arguing that the claims asserted are direct. Alternatively, they argue that if the claims are found to be derivative, demand is futile and therefore excused because a majority of the board of

JPMC was not able to act independently of Harrison in voting [*14] to authorize the merger and, therefore, is not capable of acting on a demand. Even if the claims against the board are dismissed, the plaintiffs assert that they can pursue Harrison individually if he did not relay Dimon's offer to the board for its approval.

The plaintiffs also allege a breach of the directors' disclosure duties in connection with the failure to disclose material information in the proxy statement. n10

> n10 In their answering brief, the plaintiffs assert that PP 81–89 of the complaint state a claim for equitable fraud. They further assert that the defendants did not address the equitable fraud claim in the defendants' opening brief. Therefore, the plaintiffs argue, the equitable fraud claim must be permitted to go forward. The court finds that the complaint does not adequately allege a claim for equitable fraud. Under Court of Chancery Rule 8(a), a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Nowhere in PP 81–89 of the complaint is the term "equitable fraud" to be found. Furthermore, the allegations in those paragraphs do not contain a plain statement that would put the defendants on notice that the plaintiffs were alleging equitable fraud. Moreover, "[a] class action may not be maintained in a purely common law or equitable fraud case." *Gaffin v. Teledyne, Inc., 611 A.2d 467, 474 (Del. 1992).* Even if the allegations in PP 81–89 of the complaint could be construed as equitable fraud, it is not enough to maintain a class action.

[*15]

### F. Federal Action

A similar federal class action complaint was filed in the District of Delaware on March 17, 2005. The federal complaint alleges substantially the same claims that are before this court. It does, however, have several important differences. First, the federal complaint characterizes the deal between Harrison and Dimon as a "secret deal." This description implies that the merger negotiations were unknown to the board of JPMC, a fact that appears inconsistent with the state complaint's primary allegation, as well as later allegations in the federal complaint that the "defendants were motivated to conceal Harrison's secret and undisclosed pact with Dimon." n11

> n11 Federal Compl. P 144(c).

Second, the federal complaint alleges that JPMC vio-

lated federal securities laws, specifically *Sections 10(b), 11, 12(a)(2), 14(a), 15,* and *20(a) of the Securities Exchange Act of 1934.* These claims are sufficient to give federal courts jurisdiction over the claims, including the related breaches of fiduciary [*16] duty claims.

Finally, the federal complaint lists important distinguishing facts, some of which are inconsistent with facts in this action. For instance, the federal complaint states that *Harrison* offered the no-premium deal. n12 The complaint before this court makes the opposite claim, i.e. that it was Dimon who made an offer of that nature. This discrepancy is not explained.

> n12 *Id.* P 81 (citing *Fortune,* Jan. 26, 2004, which states "Harrison was offering what he calls a 'market deal,' meaning that J.P. Morgan would simply buy Bank One at its current stock price – around $45 a share.").

The federal complaint alleges additional substantive facts concerning certain directors. For example, the federal complaint ties Futter's fund-raising activities to her board membership, as reported in *New York Magazine* on February 21, 2000. n13 Additionally, the federal complaint alleges that Kaplan is an attorney whose law firm receives substantial fees from JPMC. n14

[*17]

> n13 *Id.* P 171.

> n14 *Id.* P 174.

On April 18, 2005, the federal district court refused to enjoin this action. n15 In his decision, Judge Farnan stated that any possibility of harm to the federal plaintiff is speculative at this stage of the litigation. This court will therefore proceed to decide the motion to dismiss the state complaint.

> n15 *Hyland v. Harrison,* C.A. No. 05-162, mem. order (D. Del. Apr. 18, 2005).

## III.

In order to dismiss a complaint under Court of Chancery Rule 12(b)(6), a court "must determine whether it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief" n16 When making its decision, a court must accept as true all well-pleaded factual allegations in the complaint and all rea-

sonable inferences to be drawn from those facts. n17 But a court need not "blindly accept as true all allegations, nor must [*18] it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." n18

> n16 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 610-11 (Del. 2003)* (quotations omitted).

> n17 *Grobow v. Perot, 539 A.2d 180, 187 n.6 (Del. 1988).*

> n18 *Id. at 187.*

### A. Direct Or Derivative Analysis

The court begins by analyzing whether the stated claims are direct or derivative. The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative to "turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n19 "Under *Tooley,* the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n20 "Instead the court must look to all the facts [*19] of the complaint and determine for itself whether a direct claim exists." n21

> n19 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).*

> n20 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*

> n21 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

The plaintiffs' main complaint is that the defendant directors breached their fiduciary duty by approving a merger exchange ratio that paid an unnecessary or excessive premium to Bank One stockholders. This premium, the plaintiffs argue, prevented them from receiving their fair share of the resulting business combination, causing them to be harmed directly through dilution of their collective ownership percentage.

#### 1. Who Suffered The Alleged Harm?

In order to show a direct injury under *Tooley,* a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation. [*20] " n22

> n22 *845 A.2d at 1039.*

By describing the harm as a dilution of their stockholder interests, the plaintiffs attempt to allege a harm to them that does not affect the corporation. But their argument fails to acknowledge the context in which they were allegedly harmed. "[A] complaint that directly challenges the fairness of the process and the price' of a merger suggests ... that the corporation suffered harm ... and that the harm suffered by stockholders is only a natural and foreseeable consequence of the harm to the corporation." n23 At the heart of their complaint, the plaintiffs claim that JPMC overpaid for Bank One. If JPMC had paid cash for Bank One, their claim would clearly be derivative. JPMC would have suffered the alleged harm by paying too much money for Bank One. Any such cash overpayment would not have harmed the stockholders of JPMC directly. The only harm to the stockholders would have been the natural and foreseeable consequence of the harm to JPMC.

> n23 *Agostino v. Hicks, 845 A.2d 1110, 1119 (Del. Ch. 2004)* (quoting, in part, *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1245 (Del. 1999)).*

[*21]

The fact that this transaction was effectuated by issuing stock and not by paying cash does not change the result. The harm, if any, was still suffered by JPMC. Although "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims," n24 "[they] are individual in nature [only] where a significant stockholder's interest is increased at the sole expense of the minority." n25 "To the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." n26

> n24 *Gentile v. Singlepoint Fin., 2003 Del. Ch. LEXIS 21, 2003 WL 1240504, at *5 n.36 (Del. Ch. Mar. 5, 2003).*

> n25 *In re Paxson Communication Corp. S'holders Litig., 2001 Del. Ch. LEXIS 95, 2001 WL 812028, at *5 (Del. Ch. July 10, 2001).*

> n26 *Id.*

Here, the plaintiffs rely on the claim of "dilution" in an attempt [*22] to frame the harm as direct. But, they do not allege any stockholder dilution in relation to pre-merger voting rights. Instead, their claim of dilution is re-

lated to the issuance of stock to consummate the merger. This dilution claim is based on the merger exchange ratio, which was a necessary result of the purchase price for Bank One. Any alleged dilution was a harm suffered by all pre-merger JPMC stockholders and, consequently, JPMC itself. Thus, the harm alleged in the complaint cannot give rise to a direct claim.

In response to the court's request for support "for the proposition that a claim which would undoubtedly be a derivative claim is somehow converted into a direct claim because of the form of consideration," n27 the plaintiffs were not able to cite any persuasive authority. Indeed, in their post-hearing submissions, the plaintiffs were unable to point to any authority under Delaware law that the direct/derivative analysis is affected by the form of consideration used in a transaction. In fact, Delaware case law states that "if a board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders [*23] are injured derivatively." n28 Furthermore, as Chancellor Chandler has recently noted, "mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one." n29 Thus, the plaintiffs' argument that they were harmed directly because the merger consideration was stock instead of cash must fail as a matter of law.

> n27 Tr. at 44.

> n28 *Avacus Partners, L.P. v. Brian, 1990 Del. Ch. LEXIS 178, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990).*

> n29 *Gatz v. Ponsoldt, 2004 WL 3029868,* at *7 (Del. Ch. Nov. 5, 2004).*

Putting the 14% premium payment in the proper context, the court finds that any alleged harm was suffered by JPMC, regardless of whether the payment was in cash or in stock. The plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC. Therefore, under the first prong of *Tooley,* the court concludes that the plaintiffs' claim is derivative.

2. Who Would Receive The Benefit Of Any Recovery [*24]  Or Other Remedy?

Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n30 Here, the plaintiffs seek a return of the "proper interest" n31 of JPMC to stockholders who owned pre-merger JPMC stock, but they offer no explanation of what such a proper interest might be. Additionally, the plaintiffs are unable to demonstrate why they, and not JPMC, should receive the benefit of any remedy.

2005 Del. Ch. LEXIS 51, *24

n30 *845 A.2d at 1033.*

n31 Pls.' Answering Br. at 43.

As discussed above, if there was harm suffered by payment of a merger. premium, JPMC suffered it. Thus, if the defendants are found liable, the remedy will accrue to JPMC. Although the plaintiffs go to great lengths to define the class in a way that would allow them to argue for a direct class benefit, their effort to make the claim direct fails. The plaintiffs' argument that the previous Bank One stockholders, who ostensibly have already benefitted from any misconduct, should [*25] be excluded from the remedy is not persuasive. Any remedy from the alleged harm would necessarily accrue to JPMC and not to a subset of stockholders. Therefore, the plaintiffs' claims are derivative under the second question of *Tooley.*

B. Section 220 Demand

Before turning to the issue of whether demand should be excused, the court notes that the plaintiffs did not make a books and records demand of JPMC before filing suit. *Section 220 of the Delaware General Corporation Law* provides that stockholders have the right to inspect a corporation's books and records for "any proper purpose." n32 Both the Delaware Supreme Court and the Court of Chancery "have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a *Section 220* books and records inspection to uncover such facts." n33

n32 *8 Del. C. § 220.*

n33 *Beam v. Stewart, 845 A.2d 1040, 1056 (Del. 2004).*

In this case, the court is once again confronted [*26] with a situation in which the plaintiffs attempt to plead demand futility, but have not sought access to the books and records of the corporation under *section 220*. Like the plaintiff in *Beam,* the plaintiffs here did not seek information from the defendant corporation that may have provided them additional facts, from which they could have fashioned a more particularized complaint. For example, if the plaintiffs had successfully sought information from JPMC, they most likely would have learned whether Harrison presented a no-premium offer to the board. Instead, the plaintiffs rely on general wording from public filings that Harrison kept the board informed.

Furthermore, the plaintiffs could have used *section 220* to learn more about the relationships between Harrison and the defendant directors. As the Delaware Supreme Court noted in *Beam,* plaintiffs who seek information under *section 220* may be able to review the minutes of board meetings and determine how the directors handled the CEO's proposals or conduct in various contexts. n34 Armed with this information, the plaintiffs may have been able to link the alleged relationships to directors' conduct through particularized [*27] facts.

n34 *Id.*

Despite the frequent admonitions of the Delaware Supreme Court and the Court of Chancery, the plaintiffs did not pursue this remedy. Although their failure to use "a books and records inspection does not change the standard to be applied to review of the complaint," n35 the court notes at the outset that the plaintiffs had the time and opportunity to file such an action. The plaintiffs did not learn of the alleged no-premium offer from the newspaper article until days before the merger closed. During the short time available before the merger, they did not seek injunctive relief that may have delayed the closing. Once the merger closed, however, the plaintiffs had ample time and opportunity to investigate the facts behind the anonymous allegations in the newspaper article through the filing of a *section 220* action. The plaintiffs did not file the amended complaint until two months after the merger closed.

n35 *Id at 1057 n.52.*

[*28]

C. Demand Futility

The plaintiffs argue that if their claims are derivative, demand is excused because it would be futile. Under Court of Chancery Rule 23.1, "a plaintiff shareholder [must] make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf." n36 If a plaintiff argues demand futility, the two-prong test under *Aronson* and its progeny must be met. n37 The first prong of the *Aronson* test is whether "a shareholder [has pled] *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested." n38 The second prong of the test is whether "a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment." n39 The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused." n40

n36 *Jacobs v. Yang, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at \*2 (Del. Ch. Aug. 2, 2004),*

*aff'd, 867 A.2d 902 (Del. 2005) 2005 Del. LEXIS 38.*

[*29]

n37 *Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000); Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984).*

n38 *Jacobs, 2004 Del. Ch. LEXIS 117, 2004 WL 1728521, at *2* (emphasis in original).

n39 *Aronson, 473 A.2d at 814.*

n40 *Brehm, 746 A.2d at 256.*

1. First Prong Of *Aronson*

The plaintiffs argue that demand is excused under the first prong of the *Aronson* test because at least eight of the twelve directors on the board fail the test of being disinterested and independent. n41 Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." n42 "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." n43

n41 The plaintiffs do not challenge the independence of directors Becherer, Biggs, and Raymond. Harrison is the twelfth director and his lack of independence is not disputed in this motion to dismiss.

[*30]

n42 *Aronson, 473 A.2d at 812.*

n43 *Id. at 816.*

Here, none of the outside directors stood on both sides of the transaction nor are they alleged to have received any personal financial benefit from it other than one that devolved on all JPMC stockholders alike. Thus, there is no issue regarding these directors' interest in the deal. Rather, the thrust of the plaintiffs' allegations is that the directors were so positioned, as a result of various business, charitable, or family relationships, that they were disabled from exercising independent judgment. The complaint alleges that, through these various relationships, the outside directors were beholden to Harrison and unable to act independently of Harrison's influence.

JPMC's board consists of twelve directors. Thus, the

plaintiffs need to show that 5 directors, plus Harrison, were not independent. n44 The court's review of the complaint's well-pleaded allegations shows that, in addition to the three concededly independent directors, the plaintiffs fail to meet their burden with respect to any of the other [*31] outside directors.

n44 *See Beam, 845 A.2d at 1046* ("Demand is excused where a board is evenly divided between interested and disinterested directors.").

Before analyzing each director individually, the court pauses to note the overall structure of the JPMC board. The board is dominated by outsiders. Eleven of the twelve directors are not employees of JPMC. Harrison cannot fire any of them. Additionally, Harrison is not a controlling stockholder of JPMC and therefore has no power to oust them as directors through a stockholder vote. On the contrary, it is the eleven outside directors who collectively have the power to dismiss Harrison and the rest of his management team. The plaintiffs allege that the defendant directors are beholden to Harrison, but they fail to demonstrate why that is so. Even in cases in which the CEO had a supermajority of voting power, courts have upheld outside directors' independence in the face of additional relationships. n45 Here, Harrison reports to a board of directors [*32] that he cannot fire or remove, a fact that appears lost in the allegations that each director, no matter how indirectly, has some external relationship to JPMC.

n45 *Id. at 1051* ("Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

The court begins its analysis by looking to defendant directors Bennack, Stafford, and Burns, whose independence is questioned by the plaintiffs due to certain financial ties to JPMC. These three directors are, or were, intimately involved with several of America's largest corporations. All three directors have substantial personal wealth invested in their related companies, each of which conducts business with JPMC.

JPMC is a national commercial and investment bank. That it provided financing [*33] to large American companies should come as no shock to anyone. Yet this is all that the plaintiffs allege. What the plaintiffs fail to allege

are facts showing a connection between the financing and these three defendant directors. Instead, the plaintiffs attempt to rely on a mere inference that because a former executive of a major corporation owns a small percentage of the corporation's outstanding shares n46 and that corporation does business with a national bank, somehow that former executive could not act independently of the bank's CEO as a director of the bank. The allegations raised against all three of these directors are simply not enough, without more, to raise a substantial question about their independence.

> n46 Facts about the stock ownership of Bennack, Stafford, and Burns are contained in the plaintiffs' answering brief. *See supra* note 9.

The plaintiffs also challenge the independence of Bechtel based on his business relationships. The complaint alleges facts that indicate Bechtel's business [*34] ties to JPMC are more direct and more substantial than those of Bennack, Stafford, and Burns, but the complaint again fails to show how such facts impinge on Bechtel's ability to act independently of Harrison. Although Bechtel's company has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with JPMC or that future reconstruction work would be jeopardized if Bechtel voted against Harrison. Therefore, the complaint fails to adequately challenge Bechtel's independence.

The court next turns to Futter, whose independence is challenged because she is President and trustee of The American Museum of Natural History. n47 The plaintiffs make much of the fact that JPMC contributes to the museum. But the plaintiffs make no mention of any potential influence that JPMC's contributions may have on Futter. Indeed, the plaintiffs do not even go so far as to indicate what percentage of the museum's overall contributions are made by JPMC. The plaintiffs state that JPMC is a significant benefactor, but they never state how JPMC's contributions could, or [*35] did, affect the decision-making process of the president of one of the largest museums in the nation. Therefore, as alleged, the complaint does not demonstrate that Futter is not independent.

> n47 Futter is also challenged due her brother-in-law's employment with JPMC. This employment, however, was terminated before the JPMC board voted on the merger, so the court will not consider this allegation. *See Grobow, 539 A.2d at 187* ("A trial court need not blindly accept as true all allegations, nor must it draw all inferences from

them in plaintiffs' favor unless they are reasonable inferences.").

The plaintiffs make the same conclusory argument about Kaplan as they do about Futter. The only allegation against Kaplan is her relationship to The American Museum of Natural History. Again, the plaintiffs fail to connect JPMC's contributions to the potential lack of independence of a JPMC director. n48 They simply aver that Kaplan was a trustee of an institution that received contributions from JPMC. Therefore, [*36] as pled, the complaint does not raise a substantial question about Kaplan's independence.

> n48 Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence. *See, e.g., In re Oracle Corp. Derivative Litig., 824 A.2d 917 (Del. Ch. 2003)*; *In re The Limited, Inc. S'holders Litig., 2002 Del. Ch. LEXIS 28, 2002 WL 537692 (Del. Ch. Mar. 27, 2002)*; *Lewis v. Fuqua, 502 A.2d 962 (Del. Ch. 1985)*. But in those cases, the complaints had many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors. In *Oracle,* two special litigation committee members, both professors at Stanford, were asked to investigate other Oracle board members who had the following substantial ties to Stanford: (i) one of the other directors was a professor at Stanford who had taught one of the special litigation committee members; (ii) another director was "a Stanford alumnus who [had] directed millions of dollars of contributions to Stanford during recent years;" and (iii) "Oracle's CEO, who has made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, . . . was considering making donations of his $100 million house and $170 million for a scholarship program." *Oracle, 824 A.2d at 920–21.* In *The Limited,* the court concluded that a director, the university president of the alma mater of the corporation's largest stockholder, and the corporation's founder, President, Chairman, and CEO, was not independent in part because of a successful solicitation of $25 million donation to the university. *The Limited, Inc. S'holders Litig., 2002 Del. Ch.LEXIS 28, 2002 WL 537692 at *6–7.* In *Fuqua,* the court found that the sole member of the special litigation committee was not independent because he was President of Duke University, which had recently received a $10 million pledge

from the company, and the CEO was a trustee of Duke. *Fuqua, 502 A.2d at 966–67.* Indeed, the CEO was J.B. Fuqua of the eponymous Fuqua School of Business at Duke University. Moreover, *Oracle* and *Fuqua* were cases in which the court made searching inquiries into the nature of a special litigation committee member's independence. *Beam, 845 A.2d at 1055* (discussing the special litigation committee's burden of establishing its own independence). Finally, as noted above, the plaintiffs here did not make a *section 220* books and records demand. If they had, they would have been able to investigate the decision-making process behind the qualification of the directors as independent under the NYSE Corporate Governance rules. Instead, they rely on conclusory allegations that do not create a reasonable doubt about Futter's or Kaplan's independence based on the charitable ties to The American Museum of Natural History.

[*37]

Next in the analysis is Bossidy, whose independence is challenged because his son is employed by JPMC. Family employment ties can give rise to concerns about the ability of directors to act independently of a company's management. For example, the NYSE rules governing director independence focus on this subject, holding that employment of a child as an executive officer of the corporation may disqualify an outside director from serving as a disinterested member of the board. n49 Delaware courts also recognize that familial ties to management can disqualify one from functioning disinterestedly. n50 In this case, however, Bossidy's son is not an executive officer of JPMC, and the complaint does not allege that Bossidy and his son live in the same household. Under NYSE Corporate Governance rules, Bossidy was found to meet the criteria for certification as an outside, independent director. Moreover, the fact that Bossidy's son is employed by JPMC is duly disclosed in JPMC's proxy materials. For these reasons, the plaintiffs' attack on Bossidy's independence must fail.

> n49 NYSE Corporate Governance Rule 303A.02(b)(i) ("In addition, a director is not independent if ... the director is, or has been within the last three years, an employee of the listed company, or an immediate family member is, or has been within the last three years, an executive officer, of the listed company.").

[*38]

n50 *Grimes v. Donald, 673 A.2d 1207, 1216*

*(Del. 1996)* (finding that familial interest is a basis for demand excusal).

Finally, the court turns to Gray, who is challenged due to his charitable ties with Harrison. At first glance, the reciprocal relationship between JPMC and UNCF, as evidenced by the positions held by Gray and Harrison, could call into question the independence of Gray. However, upon closer examination, the court finds that the complaint is devoid of particularized facts that would lead to the conclusion that Harrison had any influence over Gray. Nowhere in the complaint do the plaintiffs aver that Harrison was treasurer of UNCF during the merger negotiations or the board vote. Indeed, this uncertainty about Ham son's involvement with UNCF at the relevant time is noted by the plaintiffs in their answering brief, which states that Ham son's relationship to UNCF is not disclosed in the joint proxy statement. Furthermore, just as they fail to indicate the importance of JPMC's contributions to The American Museum of Natural History, the plaintiffs fail to indicate [*39] how JPMC's contributions would affect UNCF and therefore influence Gray. The plaintiffs provide only the dollar value, not the representative percentage, of JPMC's contributions to UNCF. Thus, the plaintiffs' allegations do not successfully challenge Gray's independence.

In addition to the three concededly independent directors, the court finds that the other eight outside directors are also independent. Therefore, the plaintiffs will be unable to prove that a majority of the board of JPMC was either interested or not independent under the first prong of *Aronson.*

2. Second Prong Of Aronson

The plaintiffs argue that demand is also excused under the second prong of the *Aronson* test. In order to succeed in their argument, the "plaintiffs must allege particularized facts that raise doubt about whether the challenged transaction is entitled to the protection of the business judgment rule." n51 Specifically, the "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." n52

> n51 *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)* (citing *Aronson, 473 A.2d at 814–15*).

[*40]

n52 *Walt Disney, 825 A.2d at 286.*

Nothing in the complaint indicates that the JPMC board was not adequately informed about the negotiations with Bank One. Indeed, the plaintiffs note that the proxy materials stated Harrison kept the board informed of the negotiations. Yet this fact presents a paradox for the plaintiffs. They need to allege that Harrison informed the board in order to list the other directors as defendants, but they would rather label those same directors as "uninformed" in order to succeed on the second prong of *Aronson.* The complaint fails, however, to allege facts that would indicate that the board was presented with the decision, but was not provided with information from which it could make a proper decision.

With regard to the honesty and good faith of the board, the plaintiffs do not allege any facts that directly call into question the acts of the directors. The plaintiffs' allegations concern only the directors' relationships to Harrison. Nowhere in the complaint do the plaintiffs allege that any individual defendant director personally acted without [*41] honesty and good faith. The only allegation in the complaint is that somehow, due to their financial, charitable, or personal relationship to Harrison, the individual director defendants were beholden to Harrison, allegations that have already been found to be insufficient.

Due to the absence of particularized factual allegations calling into question the directors' good faith, honesty, or lack of adequate information, the court finds that the complaint does not give rise to a reason to doubt whether the decision of the board of directors of JPMC to approve the Merger Agreement is entitled to the protection of the business judgment rule.

The plaintiffs are unable to meet either prong of the *Aronson* test. They have failed to show that a majority of the board is either interested or not independent. They have also not shown why the board's decision is not protected by the business judgment rule. Thus, the plaintiffs' derivative claim must be dismissed because demand is not excused.

## C. Proxy Disclosure

Finally, the court turns to the plaintiffs' claim that the defendants breached their fiduciary duty by publishing materially inaccurate or incomplete disclosures regarding [*42] the proxy statement. The plaintiffs claim that the purported class was harmed because the proxy did not include information about the alleged offer from Dimon to Harrison. Notably, however, the complaint does not claim that the merger itself harmed either JPMC or the class. The harm alleged is the lost opportunity to vote for and approve a better deal, *i.e.* the Dimon offer that was rejected during negotiations and never approved by either board of directors. For this alleged harm, the complaint

seeks money damages.

The issue the court sees is whether this purported class-based disclosure claim can exist as a claim for money damages apart from the underlying derivative claim. This issue is particularly framed by the fact that the damages allegedly flowing from the disclosure violation are exactly the same as those allegedly suffered by JPMC in the underlying claim.

The disclosure claim alleged by the plaintiffs, like the disclosure claims in *In re Triarc Cos. Class & Derivative Litig.,* if proven, could have supported a claim for equitable relief. n53 In this case, the plaintiffs did not seek an injunction to stop the merger before it closed. The time period between the publication [*43] of the article in *The New York Times* and the consummation of the merger was quite short. Nevertheless, the plaintiffs had time to seek a temporary restraining order to preserve the *status quo,* and, had they done so, could have secured the ability to obtain further equitable remedies, such as an order requiring that JPMC amend its proxy statement and resolicit the stockholders for another vote. The plaintiffs also did not act promptly to preserve any other claimed equitable remedies, such as rescission. Now, of course, the "eggs" have been irretrievably "scrambled" and there is no possibility of effective equitable relief.

> n53 *791 A.2d 872, 876 (Del. Ch. 2001).* As this court stated in *Triarc, "Loudon* recognized a much broader category of cases in which a violation of the duty of disclosure will ordinarily support only a claim for equitable or injunctive relief." *Id.*

Because equitable relief is no longer practicable, the plaintiffs present their disclosure claim as one seeking money [*44] damages. There are several problems with this approach. In order for the plaintiffs' request for compensatory damages arising from a violation of the duty of disclosure to survive a motion to dismiss, the court must find that the plaintiffs have set forth in a well-pleaded complaint allegations to support those damages. n54 But, for the reasons already discussed, the court concludes that the injury alleged in the complaint is properly regarded as injury to the corporation, not to the class, and the damages, if any, flowing from that alleged breach of fiduciary duty belong to the corporation, not to the class. How then could the same directors ever be liable to pay actual compensatory damages to both the corporation and the class for the same injury? The answer, as *Loudon* implicitly recognizes, is that they could not. n55 While the disclosure claim might have given rise to an entitlement to equitable relief that could have been pursued by the stockholders individually or as a class action,

the disclosure claim simply does not give rise to a claim for substantial, compensatory damages in this situation. Instead, the claim for actual damages, if there is one, belongs to the corporation [*45] and can only be pursued by the corporation, directly or derivatively.

n54 *O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 919 (Del. Ch. 1999).*

n55 *See Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135 (Del. 1997).*

As in *Loudon,* the plaintiffs try to rely on *Tri-Star* n56 for the rule that there is a "per se rule of damages for breach of the fiduciary duty of disclosure." n57 This is no longer an accurate statement of Delaware law. *Loudon* limited *Tri-Star* to its facts, holding that *"Tri-Star* stands only for the narrow proposition that where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages." n58 For reasons already discussed, the complaint in this case does not properly allege any impairment to the economic or voting interests of the class of JPMC stockholders. The only economic injury the [*46] plaintiffs claim to have suffered is the loss of the opportunity for JPMC to have acquired Bank One on more favorable terms. That injury, if there is one, is to the corporation. Moreover, JPMC stockholders' voting rights were unaffected by the merger. Although there are now more JPMC shares outstanding and a greater number of stockholders, control of the corporation remains unchanged. Thus, the sort of "injury to voting interests" described in *Tri-Star* is absent. n59

n56 *In re Tri-Star Pictures, Inc., Litig., 634 A.2d 319 (Del. 1993).*

n57 *Loudon, 700 A.2d at 141.*

n58 *Id. at 142* (describing *Tri-Star's* per se discussion as dictum). *See also Triarc, 791 A.2d at 877* (*"Tri-Star* was narrowly limited to its facts in *Loudon v. Archer-Daniels-Midland Co."*). However, at least one subsequent case states that *Malone* "constitute[s] a retreat to *Tri-Star's* per se rule of damages for all violations of the fiduciary duty of disclosure." *O'Reilly, 745 A.2d at 918* (discussing *Malone v. Brincat, 722 A.2d 5 (Del. 1998)).* This court does not agree. The *Malone* court was presented with the issue of disclosure in the context of public documents filed as a matter of course with the SEC, not proxy statements soliciting stockholder votes. *Malone, 722 A.2d at 8.* Thus, *Malone's*

discussion of the duty of disclosure as it relates to solicitation of stockholder votes is dictum and not controlling.

[*47]

n59 *634 A.2d at 332* ("The power of *Tri-Star's* minority shareholders to oppose the [later] merger was diluted to the point of virtual oblivion.").

For these reasons, the court concludes that the complaint does not state a cognizable disclosure claim. The issues about the adequacy of the proxy statement disclosure would be of continuing relevance to the underlying derivative claim. For example, the quality of those disclosures is relevant to any potential defense based on a theory of stockholder ratification. n60 Nevertheless, there is no possibility of recovery of either nominal or substantial damages by the class on this complaint. n61

n60 See *Yiannatsis v. Stephanis, 653 A.2d 275, 280 (Del. 1995)* ("Ratification can occur only if the stockholders are fully informed of the consequences of their vote.").

n61 The court also notes with interest a recent decision of the United States Supreme Court holding that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharms., Inc. v. Broudo, 161 L. Ed. 2d 577, 125 S. Ct. 1627, 1629 (2005).* Thus, the Court affirmed the dismissal, on a Rule 12(b)(6) motion, of a claim that failed to allege facts showing that the misleading disclosures had actually caused loss to the plaintiff beyond the simple assertion that the plaintiff's purchase price was inflated by the defendants' misconduct. In its unanimous opinion, the Court recognized that judicially implied rights of action under the federal securities laws are based on the common law of deceit or misrepresentation, which recognizes that a "plaintiff must have suffered substantial damage,' not simply nominal damages, before the cause of action can arise.'" *Id. at 1632* (quoting, in part, W. KEETON ET AL., PROSSER AND KEETON ON LAW OF TORTS § 110, at 765 (5th ed. 1984)).

[*48]

IV.

For the foregoing reasons, the motion to dismiss is GRANTED. IT IS SO ORDERED.

# Exhibit 10

/35

## RULE 9 WARRANT/BOTH

### IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE ) )
V. ) INDICTMENT BY THE GRAND JURY
) I.D.#0506021946
JOSEPH N. GIELATA ) #0507018523
WAYNE CHEN )

The Grand Jury of New Castle County charges JOSEPH N. GIELATA AND WAYNE CHEN with the following offenses;

### COUNT I. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

JOSEPH N. GIELATA AND WAYNE CHEN, on or between November 25, 2003 and December 24, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain, pursuant to a common scheme, United States Currency or other miscellaneous property valued in excess of $1,000.00, belonging to Pay Pal, Inc., or another business or person, intending to deprive that business or person and/or the owner of the property, or to appropriate it.

### COUNT II. A FELONY

#N_____

#N_____

CONSPIRACY SECOND DEGREE in violation of Title 11, Section 512 of the Delaware

Code of 1974, as amended.

JOSEPH N. GIELATA AND WAYNE CHEN, on or between November 25, 2003 and December 24, 2003, in the County of New Castle, State of Delaware, when intending to promote or facilitate the commission of the felony of Theft, did agree with each other and/or Geoffrey Keston, to aid each other or another person or persons in the planning or commission of the felony or an attempt or solicitation to commit the felony, and one of them or another person, with whom they conspired, did commit an overt act in pursuance of the conspiracy.

A TRUE BILL

_____
FOREPERSON

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL