# Exhibit 11

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH N. GIELATA,<br><br>        Plaintiff,<br><br>v.<br><br>SEAN P. LUGG, individually and in his official capacity as Deputy Attorney General for the State of Delaware, THE STATE OF DELAWARE, ANDREA L. ROCANELLI, individually and in her official capacity as Chief Counsel of the Office of Disciplinary Counsel for the Supreme Court of Delaware, and THE OFFICE OF DISCIPLINARY COUNSEL FOR THE SUPREME COURT OF DELAWARE,<br><br>        Defendants. | Civil Action No. _____<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; DAMAGES FOR CIVIL RIGHTS VIOLATIONS; MALICIOUS PROSECUTION; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph N. Gielata ("Plaintiff") as and for his Complaint in the above-captioned action, alleges as follows:

## I.    Preliminary Statement

1.    This action involves out-of-control officials of the State of Delaware (the "State"), beholden to private corporations, with an ax to grind, whose actions threaten to deprive Plaintiff of his federal constitutional rights and irreparably harm him, his clients, and his reputation.

2.    Plaintiff is a Delaware attorney whose law practice is devoted to the representation of individuals defrauded by unscrupulous corporations. Plaintiff is involved in litigation against some of the State's largest employers, making Plaintiff an unwelcome presence in the State. After drawing the ire of one of the State's public servants, Plaintiff became the target of a vendetta and was singled out for prosecution.

3.    The sequence of relevant events angering State officials began when Plaintiff accepted a *pro bono* engagement in connection with a contract dispute between PayPal, Inc., a corporation incorporated in Delaware ("PayPal"), and an individual residing in Pennsylvania (the "Counterparty"). Plaintiff filed suit against PayPal on the Counterparty's behalf in the Delaware Justice of the Peace Court.

4.    PayPal retained counsel who, after contentious interactions with Plaintiff, appealed to Defendant Andrea L. Rocanelli ("Rocanelli"), who was formerly associated with PayPal's counsel but presently serves as Chief Counsel of the Office of Disciplinary Counsel for the Supreme Court of Delaware (the "ODC"). Rocanelli occupies a State position of unparalleled power over Delaware lawyers. Despite her conflict of interest, Rocanelli thereafter initiated a harassing inquiry into Plaintiff's actions, with immediate and catastrophic repercussions for Plaintiff's career and family. Not content to merely harass Plaintiff, Rocanelli also lobbied the Delaware Department of Justice to initiate a criminal investigation into the contractual controversy between PayPal and the Counterparty, to see if Plaintiff could somehow be indicted. An indictment of Plaintiff would allow Rocanelli to cripple Plaintiff's law practice without proving any misconduct by automatically suspending Plaintiff's law license.

5.    Subsequently, Delaware's Office of the Attorney General (the "AG Office"), initially through Deputy Attorney General Stuart Sklut and then through defendant Deputy Attorney General Sean Lugg, launched a broad investigation to assemble, by any means necessary, a criminal prosecution of Plaintiff, despite the absence of any crime or victim.

6.    Rocanelli subsequently launched a second, unrelated probe of Plaintiff, once again at the behest of another former colleague. This second probe, as baseless and improper as

-2-

the first, was commenced just two weeks after Plaintiff commenced a lawsuit involving a corporation where Rocanelli's husband was an executive.

7.      Finally, Rocanelli got her wish. The AG Office recently indicted Plaintiff by shoehorning a contract dispute into a felony theft statute. Through the ODC, Rocanelli has already petitioned the State to immediately suspend Plaintiff's law license, even though the indictment does not even state a cognizable crime. Thus, PayPal will have succeeded in snuffing out its legal opponent by wrongfully exploiting the State's vast powers. That Plaintiff has not committed any crime will not matter, as the indictment alone will neutralize his ability to represent aggrieved individuals and irreparably tarnish, if not end, his legal career.

8.      The indictment and Rocanelli's vindictive petition came just as Plaintiff was visiting family over 5,000 miles away in a small town in South America. Rocanelli, who knew that Plaintiff would be outside the country, and the Defendants seized this opportunity to pounce and quickly cripple Plaintiff without any opposition. Immediately upon learning of these developments, Plaintiff rushed back to the United States. Upon debarking from a plane in Miami on Saturday, July 30, 2005, Plaintiff was detained by agents with the federal Department of Homeland Security, as a result of the indictment. Plaintiff was detained, searched and questioned thoroughly, and only after the local police department declined extradition was Plaintiff released.

9.      Plaintiff seeks temporary, preliminary, and permanent injunctive relief with respect to the above-mentioned State course of conduct (the "Prosecution"). Unless the Prosecution is immediately enjoined, Plaintiff will suffer irreparable injury because his law license will be automatically and indefinitely suspended, his clients will be stripped of their

-3-

chosen counsel, all of Plaintiff's cases (all accepted *pro bono* or on contingency) will be effectively terminated, and his reputation will be forever tainted.

10.     For the State to incapacitate Plaintiff's ability to practice law upon indictment alone, without any conviction, without an adequate hearing, without determining whether the indictment even states a crime, violates Plaintiff's right to due process and, accordingly, the State's automatic suspension rule should be invalidated as unconstitutional.

11.     Plaintiff also seeks (i) declaratory relief affirming the terms of the PayPal contracts at issue in the Prosecution and (ii) damages for malicious prosecution and intentional infliction of emotional distress in connection with the Prosecution.

## II.    Jurisdiction And Venue

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2202, 42 U.S.C. § 1983 and the All Writs Act, 28 U.S.C. § 1651.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to adjudicate Plaintiff's state law claims because they arise out of the same set of facts and circumstances that give rise to Plaintiff's federal claims asserted herein.

14.     The venue of this action is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims occurred in the State of Pennsylvania, Plaintiff resides in this District and each of the Defendants is within 100 miles of this District.

## III.    Parties

15.    Plaintiff was an individual residing in the County of New Castle, State of Delaware through February 2005, and thereafter in the County of Delaware, State of Pennsylvania. Plaintiff, who presently practices law out of his own office in Delaware, has extensive experience in the prosecution of securities class actions and derivative litigation in state and federal courts across the country. He was previously associated with the two plaintiffs' law firms.

16.    Upon information and belief, Defendant Andrea L. Rocanelli ("Rocanelli") is and, at all times relevant hereto, was an individual residing in the State of Delaware.

17.    Upon information and belief, Defendant Sean P. Lugg ("Lugg") is and, at all times relevant hereto, was an individual residing in the State of Delaware.

18.    Defendant State of Delaware is a state of the United States of America. The Delaware Department of Justice, embodied by Attorney General M. Jane Brady and her deputies, was created by statute to provide legal and prosecutorial services to the State. Both the AG Office and the Supreme Court of Delaware are arms of the State.

19.    Defendant Office of Disciplinary Counsel ("ODC") is an arm of the Supreme Court of Delaware and is responsible for, among other things, regulating the practice of law within the State of Delaware. In this capacity, the ODC, under defendant Rocanelli, is charged with evaluating, investigating, and prosecuting alleged lawyer misconduct.

-5-

## IV.    Statement of Facts

### A.    PayPal's Money Back Guarantee Scam

20.    On September 18, 2002, PayPal launched a Money Back Guarantee ("MBG")

program for buyers using PayPal to purchase goods online. According to PayPal's website:

> When you make a payment on the PayPal website, you can now
> buy a Money Back Guarantee to protect your purchase of physical
> goods on selected transactions. *If you purchase the Money Back
> Guarantee, you will have the <u>option</u> to return your merchandise
> to PayPal in exchange for a reimbursement (not including the
> Guarantee fee),* provided that you file a complete reimbursement
> request within 45 days of payment.
>
> This program will only be offered for tangible goods transactions
> of less than with pre-qualified sellers. PayPal may take additional
> criteria into account in deciding whether to offer the Money Back
> Guarantee on a particular transaction.
>
> You will know if a transaction qualifies when you get to the
> Confirm Payment Details page. If we are offering the Money Back
> Guarantee, you will see a check box quoting the price of the
> Guarantee for that transaction. Just click on the box before you
> send payment. For more complete information about the Money
> Back Guarantee and its specific exclusions and fees, please go to
> the Money Back Guarantee Policy of the User Agreement.
> [Emphasis added.]

21.    According to PayPal's MBG Policy:

> PayPal's Money Back Guarantee program, which applies to
> selected physical goods transactions for less than $1,000, ensures
> that if you buy the Guarantee, you will be satisfied with your
> purchase or have an *<u>option to resell</u> the merchandise to PayPal
> for the price you paid for it for the first 30 calendar days
> following the date of payment or seven days after receipt,
> whichever is earlier.* [Emphasis added.]

22.    Thus, the MBG is nothing more than a put option contract. Such a contract gives

the holder the right to sell some underlying item (a "Covered Object") at a specified price within

a specific time period. For instance, according to the online "Investors Glossary," in the

securities market a "put is an option contract that gives the holder the right to sell a certain quantity of shares of a specified security at a specified price within a specific time period." *See* http://glossary.reference-guides.com/Investors/Put_Option_Contract/ (viewed on 7/31/05).

23.    A true copy of the MBG Policy, as amended, is annexed hereto as Exhibit "1" and incorporated by this reference. The MBG Policy provides that a Covered Object is *any good* except for the following: "[a] Items that have been damaged by the buyer, [b] Apparel items that have been worn or washed, [c] Media products such as DVDs, CDs, video and audio cassette tapes, video games and other software, etc., [d] Stored value cards (e.g. phone cards, gift cards, etc.) of any kind, [e] Hazardous materials including but not limited to chemicals, explosives, flammables, poisons, and gases, [f] Firearms, explosives, or ammunition of any sort including but not limited to guns, rifles, and bombs, [g] Illegal/contraband goods, [h] Animals, plants, or any parts thereof, [i] Motorized vehicles of any kind, including but not limited to automobiles, motorcycles, boats, and airplanes, [j] Recalled products, [k] Consumables and perishables, [l] Land, buildings, structures, or real estate properties, lots or improvements, [m] Items weighing more than 70 pounds, [n] Items that, when packed, exceed 130 inches in combined length and girth (the combined length and girth is length plus twice the height plus twice the width), and [o] Virtual or intangible items." *See* MBG Policy § 1.iii.3.

24.    PayPal does not consider the MBG to be insurance. After all, PayPal has not registered with any state insurance agency to sell insurance. Also, nowhere does PayPal refer to the MBG as insurance.

25.    On July 2, 2003, The Register, a United Kingdom publication, published an article entitled "Anyone ever managed to claim on PayPal's Money Back Guarantee?":

-7-

The perfect insurance company would have thousands of customers paying for its services but never claiming. But then that's a fantasy scenario. Or it was anyway before PayPal managed to fit for a second time into a legal grey area with its Money Back Guarantee service.

In March this year, the US Federal Deposit Insurance Corporation decided PayPal was not a bank or savings association since it does not accept deposits as defined by federal law. The decision angered thousands of customers who had seen their money fall into PayPal's coffers without an adequate explanation or appeal process.

Now it seems that the same question will be posed over whether PayPal is an insurance company and so forced to comply with all the laws that are placed upon them. At least one US State is concerned over PayPal's Money Back Guarantee that it introduced in September 2002.

There is good reason to be. Because, while PayPal is charging people on average six per cent of the cost of the transaction for its "guarantee", we find it extremely hard to imagine a scenario in which it would ever be required to pay out. There are plenty of opportunities for a claim to be filed but thanks to an over-complex process and restrictive time element in the "guarantee", it would seem that PayPal has simply built its own press to print its own online money.

If you live in the US and choose to buy a good online using PayPal, you may well be offered the choice of its Money Back Guarantee. This states that for around six per cent the cost of the transaction, you will get your money back through PayPal if you are unhappy with the goods you get or if they don't arrive.

For people nervous of buying online this may seem like a logical step to take. However, a closer inspection of the terms and conditions attached show that the chances of you ever managing to claim back on this service are tiny.

First the restrictions: The good must be under $1,000. Fair enough. It must be a physical good that you have bought and not hired/leased etc. Okay. It can't have been damaged or worn by you. It can't weigh more than 70lbs. It cannot be more than 130 inches in overall size, which in reality means a rectangle about twice your desk length, so pretty big.

-8-

No DVDs, CDs, videos, games, software, value cards, hazardous materials, ammunition, animals, plants, any form of motorised transport or consumables.

Okay, you must make your claim within 30 days of paying for the good or within seven days of receiving it - whichever is earlier. So, if you ordered something and were given a 21-day delivery time, you have nine days from the day they are late to when you have to claim. More likely though you will be given a 28-day delivery time, meaning you have just two days to apply once it has passed their agreed delivery date. If they deliver to you on the 27th day and you aren't happy, you still only have three days to make a claim to PayPal.

Before you make any claim to PayPal though you have to have tried to sort it out the situation with the seller personally or the PayPal "guarantee" is not valid. So - best case scenario - if you are lucky enough to be on a 14-day delivery and you call on the 15th day to complain and they promise it will be within you within three days and it doesn't turn up, you still have 11 days to claim on your PayPal guarantee. Most likely though, you'll be on 21-day and you'll have just three days. Or 28 days, in which case you can forget it.

Equally, if you get your goods and you're not happy with them, if they promise to send a replacement, they'd need to send it within six days and you to immediately go to PayPal if you're not happy.

If you have the good fortune to fit in with any of these scenarios, all you need to do is send the item to PayPal and it will give you a full refund. Of the money you paid the seller anyway. You will not get back the guarantee money back and you will have to pay the cost of sending the good to PayPal.

Presuming of course you have supplied all the paperwork. You will need to have filled in an online form. And then to send a properly completed reimbursement form with the transaction ID and a written explanation of why you are using the guarantee. Plus of course a printout of the website page where you bought it from. And the auction listing and email and invoice to prove how much you had paid. You need to supply tax and shipping terms with this as well.

You better hope you haven't thrown away any of the packaging because that also needs to be sent to PayPal. Plus copies of all correspondence you have had with the company. If you do all this within the allocated time span, PayPal will consider your request.

It does reserve the right to decide how much of the fee it will refund though. If it does decide to pay only part of the reimbursement, you have no appeal, its decision is final.

So you buy a jumper for $50 and pay PayPal $3 for its guarantee scheme. It arrives bang-on 21 days later. It's not the size you ordered. You call up the company and tell them. They ask you to send it back and they will send you a new one. You aren't happy with it - oh no, hang on, the guarantee's not valid because it's a different item. Go back. They say they're sorry, they will send you another. You wait for five days. Nothing. You call again. They promise it'll be there on Monday. You've already passed the guarantee's date. But wait - you didn't believe them and you decided immediately to send your jumper to PayPal and get the money back. So you go to the PayPal website and send an online complaint. Then you print off the reimbursement claim form and fill it in. You pack the jumper up, with the original packing. You go to the company's website and go to the right page and print if off. You print off the email they sent you confirming the order. You stick all this in a bag and pay $5 to send it to PayPal.

PayPal gets it just in time and emails you back two weeks later to tell you they aren't paying anything because there's no evidence that you contacted the company in question. They keep the jumper. Okay, so you remembered to write on a piece of paper all the details in your phone conversation - when you made it, who it was to, what was discussed. PayPal tells you that you didn't try hard enough to sort out the problems. It keeps the jumper, no money. Okay, PayPal believes you that they weren't trustworthy and you get the full $50 back. And it only cost you $8 and six hours of chasing to get it.

Of course this scenario is pretty unlikely anyway because PayPal only allows its guarantee to be put on top of goods from certain sellers - namely, those sellers that has been trading through PayPal for at least five months and have a very high record of delivering the right goods on time. Those companies themselves have to opt out of the guarantee system as it is automatically added to those services that PayPal deems safe enough to offer a guarantee service on.

*Now, no insurance company in the world would offer such terms as one court challenge would see them thrown out for being unreasonably restrictive. But is PayPal an insurance company? Does it again exist in legal no man's land?*

Under US law it would have to be shown to be collecting a pool of money with which to pay for the losses of a few. It would also have to go through a third party that makes the guarantee. Neither of these appear to apply to PayPal yet it is clearly offering what people would consider to be an insurance service.

The problem is that PayPal really is its own separate entity. It merely appears to be a bank and an insurer but because it takes and pays out money and offers guarantees on goods purchased. In law, however, thanks to the gap opened up by the Internet, it is currently not either.

***This means that there will continue to be hundreds of angry customers who feel cheated but who have no legal recourse.*** Only yesterday a reader complained to us that he had sold two items on eBay through PayPal for £75. He tried to transfer this into his UK bank account. PayPal sent an email a week later saying the transfer had been rejected. The PayPal account now said £61. His bank denied any such rejection of transfer. So PayPal appears to be at fault and charged £14 for the pleasure. If past experience is anything to go by, he won't get it back.

This is just one very small story of hundreds dotted all over the Internet. And these stories will continue until either a) the law changes to pull in PayPal and force it to follow the laws and regulations everyone else is subjected to or b) people learn the fine distinction between PayPal and the institutions they instinctively trust. [Emphasis added.]

## B.   The Subject Transactions: PayPal
##       Flagrantly Dishonors Its Contracts

26.    On or around November 16, 2003, Plaintiff purchased three Covered Objects from the Counterparty. Plaintiff used PayPal's electronic payment service to transmit the agreed-upon purchase price, for which PayPal received a fee. Plaintiff transmitted the purchase price separately for each Covered Object. Each time, PayPal offered the MBG to Plaintiff for a fee. Neither the terms of the MBG Policy nor the fees requested by PayPal were negotiable. Plaintiff agreed each time to pay PayPal the requested fee for the MBG and agreed to be bound by the terms of the MBG Policy. Each time, PayPal notified Plaintiff that he had "purchased

PayPal's Money Back Guarantee coverage... For specific terms and exclusions, view the PayPal

User Agreement." Thus, three separate MBG contracts were created.

27.     Plaintiff received the three Covered Objects and, within the time period provided

in the MBG Policy, Plaintiff exercised the resale option pursuant to the MBG contracts.

28.     With respect to each resale option exercised, PayPal notified Plaintiff as follows:

Dear Joe Gielata,

Thank you for contacting PayPal. Our investigation of the
following reimbursement request is now complete.

[...]

Because your request was valid, we have reimbursed you for the
full amount of your coverage under PayPal's Money Back
Guarantee program.

[...]

This case is now closed and no further action is required of you at
this time.

For more information about the Extended Money Back Guarantee,
please see the PayPal User Agreement at:

http://www.paypal.com/us/cgi-bin/webscr?cmd=p/gen/ua/ua-
outside

Sincerely,

Erica

PayPal Guarantee Department

29.     Thus, PayPal willingly paid Plaintiff the amount contractually due.

30.     Subsequently, on December 18, 2003, the Counterparty purchased a Covered

Object from Plaintiff. PayPal offered the Counterparty an MBG put option contract on the

purchase, which the Counterparty accepted, paying PayPal its requested fee (the "December Contract"). Pursuant to the December Contract, the Counterparty timely exercised the resale option and complied with all terms of the contract. However, PayPal, without explanation, reneged on its obligation to pay the Counterparty the amount specifically agreed upon in the December Contract.

31.     PayPal similarly reneged on two other MBG put option contracts entered into between PayPal and the Counterparty, in connection with purchases from Plaintiff.

## C. Battling PayPal: The Initial Litigation

32.     On or around March 19, 2004, the Counterparty, through the Plaintiff, filed a small claims complaint against PayPal in the State's Justice of the Peace Court, seeking to enforce PayPal's obligation under the December Contract and other relief (the "PayPal Lawsuit").

33.     By letter to Plaintiff dated May 17, 2004, Michelle Squires, a Senior Litigation Paralegal with PayPal, advised that PayPal intended to file a motion to compel arbitration in connection with the PayPal Lawsuit. The letter failed to mention that the mandatory arbitration provision in PayPal's user agreement had already been struck down by a federal court in California.

34.     PayPal never moved to compel arbitration. Instead, PayPal retained a prominent Delaware corporate law firm (the "Delaware Firm") to represent it in the PayPal Lawsuit.

35.     After some contentious interactions with the Delaware Firm, Plaintiff voluntarily dismissed the PayPal Lawsuit on June 16, 2004, with the intention of re-filing as a class action

on behalf of all persons who had been duped into purchasing MBG option put contracts which

PayPal reneged upon. Plaintiff advised the Delaware Firm of this possibility on June 21, 2004.

### D.  Class Action Sellout: PayPal Attempts to Evade Massive Liability

36.    On or around July 29, 2004, both the Counterparty and Plaintiff received the

following "Notice of Pendency of Class Action and Proposed Settlement", dated July 12, 2004:

> IF YOU OPENED A PAYPAL ACCOUNT BETWEEN
> OCTOBER 1999 AND JANUARY 2004, YOU MAY BE
> ENTITLED TO A PAYMENT FROM A CLASS ACTION
> SETTLEMENT.
>
> PLEASE READ THIS NOTICE CAREFULLY.
>
> UNITED STATES DISTRICT COURT
>
> NORTHERN DISTRICT OF CALIFORNIA
>
> SAN JOSE DIVISION
>
> In re PayPal litigation
>
> Case No. CV-02-01227-JF (PVT)
>
> NOTICE OF PENDENCY OF CLASS ACTION AND
> PROPOSED SETTLEMENT
>
> [...]
>
> 8. WHAT AM I GIVING UP IF I PARTICIPATE IN THE
> SETTLEMENT?
>
> If you do not exclude yourself from the class and the settlement is
> granted final approval, the judgment entered upon approval of the
> settlement will dismiss the lawsuit with prejudice, and will **release
> any and all claims, demands, rights, liabilities, and causes of
> action of every nature and description whatsoever, known or
> unknown, matured or unmatured, at law or in equity, existing
> under federal or state law, that were or could have been
> asserted in the Litigation against the Released Persons,
> including without limitation, claims under the Electronic Fund
> Transfer Act, California Business and Professions Code §§
> 17200 et seq.; the California Consumers Legal Remedies Act,**

Cal. Civ. Code §§ 1750 et seq.; and for PayPal's alleged
conversion, breach of the User Agreement or other contract,
money had and received, unjust enrichment, and negligence
under California law or any other state or federal law arising
out of, among other things, PayPal's restriction or limitation of
accounts; PayPal's dispute resolution policies, practices and
procedures; PayPal's debit of accounts following the receipt of
chargebacks, buyer complaints, reports of unauthorized access
or in connection with its Seller Protection Policy, Buyer
Complaint Process or Buyer Protection Policy; PayPal's
alleged conversion of funds; and PayPal's compliance with the
Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 et seq., or any
similar legislation arising under the laws of any state. <u>You will
be permanently barred from bringing any such claims that
arose prior to February 1, 2004.</u> With regard to accounts that
were limited prior to February 1, 2004, however, you will not be
releasing claims to recover any balance that remained in the
account 180 days after the account was initially limited.

**In summary, if you do not exclude yourself, you will not be
able to sue, continue to sue, or be part of another lawsuit
against PayPal relating to the legal issues in this case.** You will
be bound by all proceedings, orders, and judgments entered in
connection with the settlement, whether favorable or unfavorable,
and will be represented by the Representative Plaintiffs and Class
Counsel for purposes of the settlement. If you do not exclude
yourself from the class, and the settlement is granted final
approval, your claims against PayPal and its affiliates will be
released as described above. If you are a class member, you may, if
you wish, appear in this lawsuit through your own attorney at your
own expense. You need not do so to participate in the settlement,
however.

[...]

12. CAN I COMMENT ON THE SETTLEMENT?

If you decide to remain in the class, and you wish to comment in
support of or in opposition to the settlement or Class Counsel's
motion for attorneys' fees and expenses, you may do so by mailing
or delivering your written (non-email) comments, such that they
are RECEIVED on or before September 3, 2004, as follows: (1)
the original must be sent to the Court at the following address:

Clerk of the Court
United States District Court
    for the Northern District of California

-15-

280 South First Street
San Jose, California 95113

and (2) copies must be sent to Co Lead Counsel and PayPal's
counsel at the addresses listed in Section 9, above.

Your written comments must contain your name and address; be
signed by you; and include the reference In re PayPal Litigation,
Case No. CV-02-1227-JF (PVT). If you wish to appear and present
your comments orally at the hearing, your written comments must
contain a notice that you intend to appear and be heard, a statement
of the position you intend to present at the hearing, and any
supporting arguments.

If you do not comply with the foregoing procedures and deadlines
for submitting written comments or appearing at the hearing, you
will not be entitled to be heard at the hearing; contest or appeal
from approval of the settlement or any award of attorneys' fees or
expenses; or contest or appeal from any other orders or judgments
of the Court entered in connection with the settlement.

13. HOW CAN I GET MORE INFORMATION ABOUT THE
SETTLEMENT?

You can get more information by writing Plaintiffs' Co-Lead
Counsel electronically or by first class mail at:

paypalsettlement@settlement4onlinepayments.com
Girard Gibbs & De Bartolomeo LLP
601 California Street, Suite 1400
San Francisco, California 94108
Wolf Popper LLP
845 Third Avenue
New York, NY 10022

This notice is a summary and does not describe all details of the
settlement. For full details of the matters discussed in this notice,
you may wish to review the Settlement Agreement dated June 11,
2004 and on file with the Court or visit
https://www.paypal.com/settlement/. Complete copies of the
Settlement Agreement and all other pleadings and papers filed in
the lawsuit are also available for inspection and copying during
regular business hours, at the Office of the Clerk of the Court,
United States District Court for the Northern District of California,
280 South First Street, San Jose, California 95113. [Emphasis
added.]

-16-

37.    Troubled by the terms of the proposed settlement, and the unusually broad release proposed therein (potentially covering the claims in the PayPal Lawsuit), Plaintiff began questioning the class counsel and drafting a solicitation to recruit objectors to the proposed settlement. Plaintiff sent the following email, pursuant to the settlement notice:

> Date:    Mon, 2 Aug 2004 19:34:44 -0700 (PDT)
>
> From:   "Joe Gielata" <gielata@yahoo.com>
>
> Subject:    Claims Tally
> To:         paypalsettlement@settlement4onlinepayments.com
>
> Thus far, how many claims have been submitted?
> How many are Statutory Damage claims?
> How many are Short Claim Forms?
> How many are Long Claim Forms?
>
> Thank you.

38.    The next day, on August 3, 2004, Plaintiff sent the following email anonymously:

> To:         paypalsettlement@settlement4onlinepayments.com
> Subject:    claim site questions
> To Whom It May Concern,
>
> 1) Why doesn't the claims site include an exclusion form?
>
> 2) Why doesn't the claims site offer any electronic submission of objection(s)?
>
> 3) Why doesn't the claims site set forth a breakdown of the claims submitted into the 3 categories of claims pursuant to the plan of allocation?
>
> 4) Why doesn't the claims site make available the operative complaint in this case?
>
> 5) Why doesn't the claims site make available the docket or any of the relevant pleadings?
>
> -PayPal Settlement class member

39.    The never-completed draft of Plaintiff's solicitation to potential objectors to the

class settlement is reproduced below in full:

Anyone reading the PayPal settlement can see that the settlement is plainly unacceptable
because:
  1) Attorneys win millions, but anyone PayPal damaged will get little or nothing.
  2) The settlement would allow PayPal to block almost ANY legal claim by ANY PayPal
     user.
  3) The TRUE settlement amount- less than $4 million after attorneys' fees and taxes!- is
     inadequate and amounts to:
       a) less than 0.008% of the company's current net worth- over $50 billion;
       b) less than 0.2% of the company's gross profit last year of $1.75 billion;
       c) less than 0.2% of the company's total cash of $2.14 billion.
  4) The claims process is unfair and incompetently administered.

If you agree with these objections (detailed below), PLEASE SEND AN EMAIL to
PayPalSettlementStinks@yahoo.com with your real name AND PayPal user name so that I can
let the judge know that a significant number of class members agree with these objections.

If you agree with these objections, YOU WILL STILL BE ENTITLED TO RECOVER
MONIES FROM THE SETTLEMENT AND YOU WILL NOT WAIVE ANY RIGHTS.

Here are the details of each of my objections:
1) ATTORNEYS GET MILLIONS, BUT ANYONE PAYPAL DAMAGED WILL GET
LITTLE OR NOTHING
        The settlement provides that the plaintiffs' attorneys will receive $3.49 million in fees
and expenses, in cash and with no contingencies. However, there is practically no way to
determine what persons covered by the settlement will receive. Moreover, the administration of
the settlement has thus far hindered any effort to clarify what any individual claimant might
receive. This is unacceptable because someone who would submit a claim if she expects to
receive, say, $50 might not submit a claim, or might submit a claim differently (i.e., as a
different category of claimant), or might exclude herself from the settlement, if she expects to
receive less than a dollar.
        We can make some extremely rough estimates about what claimants will actually receive.
PayPal has nearly 50 million account members. Assuming that only 1% of these members make
claims (a very conservative figure given the percentage of class members making claims in
previous settlements reached by the plaintiffs' attorneys here), the total number of claims would
be 500,000. Let's further assume that the breakdown of claims will be as follows: 5% Long
Form Claimants, 35% Short Form Claimants, and 60% Statutory Damage Claimants. (We can't
know the current breakdown because THE SETTLEMENT ADMINISTRATOR REPEATEDLY
IGNORED OUR REQUESTS FOR THIS INFORMATION.) Based on this breakdown, Long
Form Claimants would each receive about $86.00, Short Form Claimants would each receive
about $12.29, and Statutory Damage Claimants would each receive about $3.33. (These amounts
are NOT adjusted to reflect taxes- for more on this see the section below calculating the TRUE
settlement amount.)

These amounts are inadequate on their face. As the plaintiffs' operative complaint alleges, members of the putative class have been damaged in a variety of ways. Their accounts have been frozen without notice or any semblance of due process. Their small businesses have been interrupted or even destroyed. They have missed opportunities due to restricted or terminated accounts. They have sought in vain to figure out why PayPal was restricting or terminating their accounts. Because lead lawyers have not made an adequate effort to estimate the number of claimants, the class notice fails to estimate the potential size of the aggregate damages experienced by the class, or the potential aggregate recovery for individual plaintiffs. As shown below, the lead lawyers are keeping quiet to better their chances for an easy payday.

Many, but not all, of the adversely-affected class members did not suffer enough damage to justify the cost of hiring attorneys, and in that respect the class mechanism makes sense under these circumstances. However, the lead lawyers for the class apparently made no effort to separate those with small claims from those with substantial claims. It does not appear that the lead lawyers made any attempt to ascertain sub-classes of plaintiffs and prosecute this case on behalf of each sub-class. As other mass tort lawyers have discovered in fen-phen and asbestos litigation, there are alternative solutions to proceed to trial with sub-classes of plaintiffs. The egregiousness of PayPal's behavior here would astonish any jury and likely yield punitive damages (where available) far in excess of compensatory damages. However, the lead lawyers apparently did not consider taking any sub-classes of plaintiffs to trial. By casting the widest net possible in its class definition, the lead lawyers have done a disservice to millions of PayPal account members who have viable and valuable claims that will be released with this inadequate settlement. PayPal will obtain through the proposed settlement a release against those with no claim at all, or less than $10 in potential recovery, as well as those who may have $10,000 claims.

Due to the variety of misconduct on a massive scale, class members are entitled to legal remedies under federal statutes, state consumer protection statutes and the common law. Some of these legal remedies provide TREBLE DAMAGES or PUNITIVE DAMAGES. However, empowered by the proposed settlement, PayPal will silence the potential tsunami of claims by causing millions of potential class members to release all their potential claims with one relatively minor payment.

Almost as important, the class notice completely fails to show what potential claimants might receive based on different assumptions- such as the number of total claimants and the breakdown of claimants. Informative tables, which could have been included in the class notice or on the settlement website, could have been as simple as the following:

### 5/35/60 Breakdown – all amounts are pre-tax

| # claimants | 5% Long Form | 35% Short Form | 60% Statutory Damages |
|---|---|---|---|
| 100,000 | $430.00 | $61.43 | $16.67 |
| 300,000 | $143.33 | $20.48 | $5.56 |
| 500,000 | $86.00 | $12.29 | $3.33 |
| 1,000,000 | $43.00 | $6.14 | $1.67 |
| 1,500,000 | $28.67 | $4.10 | $1.11 |
| 3,000,000 | $14.33 | $2.05 | $0.56 |
| 5,000,000 | $8.60 | $1.23 | $0.33 |
| 10,000,000 | $4.30 | $0.61 | $0.17 |

**10/40/50 Breakdown – all amounts are pre-tax**

| # claimants | 10% Long Form | 40% Short Form | 50% Statutory Damages |
|---|---|---|---|
| 100,000 | $215.00 | $53.75 | $20.00 |
| 300,000 | $71.67 | $17.92 | $6.67 |
| 500,000 | $43.00 | $10.75 | $4.00 |
| 1,000,000 | $21.50 | $5.38 | $2.00 |
| 1,500,000 | $14.33 | $3.58 | $1.33 |
| 3,000,000 | $7.17 | $1.79 | $0.67 |
| 5,000,000 | $4.30 | $1.08 | $0.40 |
| 10,000,000 | $2.15 | $0.54 | $0.20 |

**15/45/40 Breakdown – all amounts are pre-tax**

| # claimants | 15% Long Form | 45% Short Form | 40% Statutory Damages |
|---|---|---|---|
| 100,000 | $143.33 | $47.78 | $25.00 |
| 300,000 | $47.78 | $15.93 | $8.33 |
| 500,000 | $28.67 | $9.56 | $5.00 |
| 1,000,000 | $14.33 | $4.78 | $2.50 |
| 1,500,000 | $9.56 | $3.19 | $1.67 |
| 3,000,000 | $4.78 | $1.59 | $0.83 |
| 5,000,000 | $2.87 | $0.96 | $0.50 |
| 10,000,000 | $1.43 | $0.48 | $0.25 |

However, plaintiffs' counsel knew or should have known that such information would dissuade many class members from accepting the settlement or making a claim. This materially misleading nondisclosure has artificially depressed the number of objectors as well as the number of class members choosing to exclude themselves.

## 2) THE SETTLEMENT WOULD ALLOW PAYPAL TO BLOCK ALMOST ANY LEGAL CLAIM BY ANY PAYPAL USER

PayPal's parent company made a gross profit of $1.75 billion last year, or $4.79 million per day. In other words, at this rate it will take less than 2 days for PayPal's parent company to receive enough profit to pay for this entire settlement.

In return, PayPal will receive a broad release covering about 40 million account members. Under the settlement agreement, class members who do not exclude themselves from the settlement release "any and all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, known or unknown, matured or unmatured, at law or in equity, existing under federal or state law" against PayPal.

This settlement releases everything but the kitchen sink in return for payments that are nominal from PayPal's perspective as well as from the perspective of individual class members. The public policy of allowing defendants to buy complete peace in the legal system must be disregarded here because this settlement gives to PayPal a priceless tool against countless plaintiffs. Just as PayPal's abuse of mandatory arbitration was observed and ruled against by the judge in this case, PayPal's attempt to purchase a limitless release at a bargain price, in collusion with the lead attorneys here, should be rejected.

Plaintiffs and defendants should continue to litigate this important case until a more satisfactory outcome can be reached. At the very least, the issue of class certification should be decided by the judge. If class certification is rejected, then the case will effectively end, but at least the individual claims of class members will not be released. If the class is certified, then

plaintiffs will wield considerably greater leverage with which to proceed to trial or negotiate a superior settlement. If the lead lawyers concede that they do not believe they can win class certification, then the Court should appoint other lead lawyers better able to handle this task. However, the current settlement splits the baby at best. At worst, PayPal will pay a nominal amount to end the case and at the same time obtain a general release covering tens of millions of account members, a priceless weapon in countless pending and potential disputes. Notably, even if a future dispute is not covered by this release, PayPal will likely assert that the dispute has been released (just to be on the safe side).

This case was initiated because of PayPal's callous treatment of its members, including unilaterally freezing accounts without any reasonable basis or due process, ignoring complaints, and other assorted misconduct. The release this settlement offers to PayPal will exacerbate these concerns, not alleviate them. More than ever, PayPal will be able to tell its users to go to hell.

## 3) THE TRUE SETTLEMENT AMOUNT- LESS THAN $4 MILLION AFTER ATTORNEYS' FEES AND TAXES!- IS INADEQUATE

The average federal tax rate of US taxpayers is about 15%. State income tax rates are as high as 10% in California or New York, among others, but let's just add 5% to the federal rate to assume an average combined tax rate of 20%.

Unfortunately, current tax law does not permit individuals to deduct attorneys' fees. Settlement payments are taxed BEFORE the attorneys' fees are paid. Thus, a settlement payment of $100 minus 20% in taxes is $80, and if attorneys' fees are $30, then the total received is $50 after attorneys' fees and taxes.

In our case, the aggregate settlement payment is $9.25 million, of which $3.49 million are for attorneys' fees and expenses. The tax due is roughly 20% of the $9.25 million, or $1.85 million, and after subtracting attorneys' fees and expenses, the total amount to be received by all class members will be $3.91 million.

Nowhere in the class notice is this impact of taxes described. Not once does the class notice or the settlement website mention that the total amount to be received by all class members will be reduced by 57.7% once taxes and attorneys' fees are figured in. Instead, the lead attorneys seek to take credit for achieving a $9.25 million settlement, even though the REAL benefit to be distributed to class members will be $3.91 million at most. Clearly, the absence of the significant impact of taxes constitutes at least a materially misleading nondisclosure in the class notice and reaffirms the inadequacy of the settlement.

The class notice also fails to advise potential members of the class of the size of the settlement as compared to various informative metrics. Defendants' ability to pay is a significant factor in any decision by plaintiffs to settle, and here the immense financial capacity of PayPal's parent weighs against the adequacy of the settlement. As described above, the true settlement amount- less than $4 million after attorneys' fees and taxes- amounts to:

      a) less than 0.008% of the company's current net worth- over $50 billion;

      b) less than 0.2% of the company's gross profit last year of $1.75 billion;

      c) less than 0.2% of the company's total cash of $2.14 billion.

The class notice offers none of this information, which would allow class members to assess the adequacy of the settlement against defendants' ability to pay.

## 4) THE CLAIMS PROCESS IS UNFAIR AND INCOMPETENTLY ADMINISTERED

CONCLUSION

For all the foregoing reasons, the proposed settlement leaves much to be desired (see suggested improvements below) and leaves numerous unanswered questions (see some unanswered questions below). Unless the judge reviewing the fairness of this settlement can get complete and satisfactory answers to all these questions and correct the deficiencies of the settlement, perhaps through the suggested improvements offered below, then the settlement should be rejected and the lead attorneys' request for fees must be denied.

UNANSWERED QUESTIONS

If there are over 2.15 million valid Short-Form claims, then the award per claimant would be less than one dollar- but according to the settlement, no amount under a dollar will be awarded. Apparently, the entire Short-Form Fund would then shift over to the Long-Form Fund. But what if the aggregate amount awarded to all Long-Form claimants is less than $4.3 million (the combined amount allocated to Long-Form and Short-Form claims)?

If there are over one million Statutory Damages claims, then the award per claimant would be less than one dollar- but according to the settlement, no amount under a dollar will be awarded. What would then happen to the $1 million of the settlement fund allocated to Statutory Damages Claimants?

SUGGESTED SETTLEMENT IMPROVEMENTS

Reject the settlement and instruct the parties to litigate class certification.

Reject the settlement and appoint new lead counsel for sub-classes.

Restrict the release to class members with claims less than $100.

Add contingencies to attorneys' fee award.

Do not allow the settlement to release PayPal from claims by Long-Form Claimants whose claims are rejected by the arbitrator.

For Long Form Claimants, restrict the release to Long Form Claimants with claims less than thrice the average award to Long Form Claimants. Thus, if Long-Form Claimants receive on average $100, then all potential claims by Long-Form Claimants would be released EXCEPT for those with claims exceeding $300.

Reject the settlement unless PayPal agrees to pay attorneys' fees separate from and on top of the $9.25 million settlement amount.

Reject the settlement unless PayPal agrees to withdraw the $1.00 fee for handling and sending checks for claim awards and pay for said expense on its own.

Postpone the settlement until the lead lawyers and settlement administrator communicate to potential class members the procedure and rules for Long-Form Claimants.

Postpone the settlement until the lead lawyers and settlement administrator communicate to potential class members updated information on the breakdown of claims on an ongoing basis.

Postpone the settlement until the lead lawyers and settlement administrator communicate to potential class members estimates of claim awards based on various inputs (number of total claimants and the breakdown of claimants).

40.   Regrettably, the above solicitation would never see the light of day.

### E.  The ODC Steps In to Assist PayPal

41.    On or around August 16, 2004, Plaintiff received a letter from defendant
Rocanelli, dated August 12, 2004, on behalf of the ODC. Acting upon a complaint by the
Delaware Firm, Rocanelli launched an extensive but bogus probe into Plaintiff's actions.
*Unbeknownst to Plaintiff, Rocanelli was formerly an attorney with the Delaware Firm.*
Rocanelli never disclosed this fact to Plaintiff, nor apparently did she consider whether this
relationship might cloud her judgment with respect to civil litigation between parties represented
by the Delaware Firm and Plaintiff.

42.    The very next day, Plaintiff met personally with Rocanelli— their first and only
personal encounter— in order to explain the contractual underpinnings of the PayPal Lawsuit, as
well as his concerns about PayPal's proposed class action settlement.    Revealing her
unmistakable animus, Rocanelli rejected this explanation out of hand and severely castigated
Plaintiff for disrespecting the Delaware Firm.  She expressed her belief that Plaintiff was out of
line and saw himself as a "cowboy" in fighting against corporate misconduct, a role she
considered distasteful and inappropriate.  The thrust of Rocanelli's objection was: *"That's not the
way we do things around here in Delaware."*  She refrained from expressing an explicit opinion
as to the propriety of challenging PayPal's class action settlement, although her opposition to
such a course of action was obvious to Plaintiff.  As the meeting ended, Rocanelli coldly advised
Plaintiff to retain counsel and inform his then-employer of her probe.

43.    That day, Plaintiff advised his then-employer, a class action law firm, of
Rocanelli's inquiry.  Fearing Rocanelli's well-known vindictiveness, the law firm immediately
placed Plaintiff on a leave of absence.  On or around this day, Rocanelli contacted the AG Office

-23-

to recommend that it initiate a criminal inquiry into the circumstances surrounding the PayPal

Lawsuit. Any sort of criminal charge would give Rocanelli incredible leverage to restrict

Plaintiff's ability to continue practicing law.

44.    The *very next day* after Plaintiff's August 17 meeting with Rocanelli, Plaintiff

received the following email from the class counsel in PayPal's class action litigation:

> From: Finkel, Robert
> Sent: Wednesday, August 18, 2004 11:44 AM
> To: Gielata, Joseph; ajd@girardgibbs.com; jeh@girardgibbs.com;
> elf@girardgibbs.com
> Cc: PAYPAL
> Subject: RE: PP -- Joseph Gielata
>
> Joseph Gielata, Esq.
> Milberg Weiss
>
> Dear Mr. Gielata:
>
>     The following are responses to your questions.
>
> 1) Why doesn't the claims site include an exclusion form?
>
>     The notice requires exclusion forms and other documents to be
> hard copy mailed. I have received some email exclusions and I
> intend to recommend that the District Court accept them as valid
> exclusions. The notice clearly states the procedures to be followed
> for hard copy mailing an exclusion.
>
>     Including exclusion forms to be printed and sent in by U.S.
> Mail on the official settlement website may have appeared to be
> "soliciting opt-outs" and, for that reason, it was not considered to
> be a realistic option.
>
> 2) Why doesn't the claims site offer any electronic submission of
> objection(s)?
>
>     The notice requires that objections be filed with the District
> Court. Again, these procedures are clearly described in plan
> English and non-burdensome. Filing of documents with the
> District Court are governed by Court rules and customarily cannot
> be done by email.

3) Why doesn't the claims site set forth a breakdown of the claims submitted into the 3 categories of claims pursuant to the plan of allocation?

We will not know how many valid claims are filed until the end of the claims process. As you know, in class actions of this nature, settlement administrators do not customarily begin the costly and time consuming review of claim forms until the settlement receives court approval. It is reasonable to assume that because of the large number of notices that were emailed that a large number of claims will be filed in all three categories. The settlement documents inform class members that if they have claims they are able and willing to document, they can file a long form claim. If their claim is small and they are willing to accept up to $50 and do not want to or cannot document their claim, they should file a short form claim. Class members who do not have money damage claims are instructed to file statutory damage claims.

4) Why doesn't the claims site make available the operative complaint in this case?

You are the first class member that has asked for the complaint. I have attached it as a pdf file. The allegations of the complaint are described in the settlement documents and (as you can see) are provided to those class members upon request.

5) Why doesn't the claims site make available the docket or any of the relevant pleadings?

I have attached the docket as a pdf file. The Court file is voluminous. Any documents will be provided to class members on request.

Robert Finkel
Wolf Popper LLP
212.451.9620

45.    Notably, class counsel wrote to Plaintiff at his employer's email address, signifying that class counsel had somehow identified Plaintiff as the author of the anonymous email, set forth above, inquiring about the proposed settlement. Plainly, class counsel viewed Plaintiff as a threat to neutralize.

46.    Coming just one day after Plaintiff was forced into a leave of absence due to Rocanelli's inquiry, and after Rocanelli's excoriation of Plaintiff, Plaintiff saw the writing on the wall: Rocanelli would not look kindly upon Plaintiff objecting to PayPal's class action settlement. Plaintiff decided against risking further confrontation with Rocanelli by following through with his objection. Thus, PayPal averted a potentially significant obstacle and gained a sweeping release against liability. Rocanelli's intervention had saved the day for the client of her former employer.

47.    Unbowed, Plaintiff moved on.

48.    In early 2005, Plaintiff hung out his own shingle as a solo practitioner.

49.    Shortly after setting up his law office, Plaintiff distributed the following solicitation regarding potential claims against certain officers of eBay, Inc., PayPal's parent company:

Advertising Material
ATTORNEY INVESTIGATES WHETHER WHITMAN
MUST RETURN OVER $100 MILLION TO EBAY

WILMINGTON, DELAWARE - March 10, 2004

Shareholder attorney Joseph N. Gielata has commenced an investigation into whether eBay's accounting restatement in 2003 obligated eBay's CEO Meg Whitman to return to the company hundreds of millions of dollars in compensation and stock sales.

In its 2002 annual report, released in 2003, eBay quietly restated its pro forma earnings, revising upwards its reported pro forma losses for 2001 and 2000 by 743% and 26%, respectively. The company has never disclosed the reasons for these prior period adjustments. In effect, the restatement revealed that eBay's financial statements for 2001 and 2000 were materially false and/or misleading when issued.

While eBay issued defective financial statements, its market valuation soared and Whitman sold over $100 million in stock.

However, Whitman may be obligated to return this windfall to eBay. Under the Sarbanes-Oxley Act of 2002, the CEO and CFO of a public company must return certain compensation and proceeds from stock sales to the company if it prepares an accounting restatement as a result of misconduct. Under the corporate law of Delaware (where eBay is incorporated), a shareholder may be able to enforce this forfeiture statute on the company's behalf. Also, eBay's directors may be liable if they failed to investigate or pursue such forfeiture.

If you have owned eBay stock continuously since 2002 and would like to learn more about this claim, please contact Joe Gielata at ebay@gielatalaw.com or (302) 798-1096. His office address is 501 Silverside Road, Suite 90, Wilmington, Delaware 19809.

Mr. Gielata is licensed to practice law in Delaware.

Advertising Material

50.    Thus, PayPal's parent company would continue to view Plaintiff as a viable and dangerous adversary, but one who could be eliminated with Rocanelli's assistance.

### F.  Fighting Other Corporate Malfeasance: The JPMorgan Litigation

51.    JPMorgan Chase & Co. ("JPMorgan") is one of the State's largest employers.

52.    On March 17, 2005, Plaintiff commenced a class action against JPMorgan and certain of its present and former directors (the "JPM Litigation"). The operative complaint in the JPM Litigation alleges that JPMorgan shareholders were duped into approving a $57 billion merger with Bank One Corporation in 2004. Unbeknownst to them, JPMorgan's CEO had rejected a $50 billion deal to save his CEO title for 2 years more. JPMorgan shareholders paid for the $7 billion difference without having been told of the better offer. Plaintiff's clients assert claims under Sections 10(b), 14(a) and 20(a) of the Securities and Exchange Act of 1934 [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)], Rules 10b-5 and 14a-9 promulgated thereunder by the SEC [17 C.F.R. §§ 240.10b-5 and 240.14a-9], Sections 11, 12(a)(2) and 15 of the Securities Act of

1933 [15 U.S.C. §§ 77k, 77l(a)(2) and 77o], and pendent common law claims for breach of fiduciary duty.

53.    The JPM Litigation seeks no less than $10.5 billion in compensatory damages and punitive damages of no less than nine times compensatory damages, for a total of $105 billion. Plaintiff accepted the engagement on contingency and, of any funds recovered, anticipates receiving a reasonable percentage – in any event, no less than 5 percent.

54.    On March 18, 2005, a rival shareholder lawyer (the "Rival Lawyer") in a state court class action related to the JPM Litigation sent a letter to Vice Chancellor Stephen P. Lamb, of the State's Court of Chancery, objecting to Plaintiff's actions in the JPM Litigation. A true copy of the letter is annexed hereto as Exhibit "2" and incorporated by this reference. In a cheap tactical gambit, the Rival Lawyer copied Rocanelli on the letter.

55.    The Rival Lawyer had previously been an attorney with the Delaware Firm *and had been a colleague of Rocanelli*. The Rival Lawyer and Rocanelli knew each other and had worked together. Further, the Rival Lawyer was aware of Rocanelli's probe into Plaintiff because Plaintiff had previously worked for the Rival Lawyer. Thus, the Rival Lawyer copied Rocanelli on his letter only because he knew that Rocanelli would seize upon it as an excuse to further harass Plaintiff and interfere with his law practice.

56.    The Rival Lawyer's letter was presented not only to Vice Chancellor Lamb, but also to the district court judge in the JPM Litigation and to the State's Supreme Court. Each and every time, the letter was *completely ignored* in written opinions by the State's Court of Chancery, the federal district court of Delaware, and the State's Supreme Court, indicating that no court took seriously the Rival Lawyer's insinuations.

-28-

57.    On June 21, 2005, the district court appointed Plaintiff lead counsel in the JPM Litigation. On August 1, 2005, briefing on defendants' motion to dismiss (a crucial phase in any securities fraud class action) in the JPM Litigation was completed.

### G.  The Last Straw: The MBNA Litigation

58.    Rocanelli's bad-faith harassment of Plaintiff escalated dramatically in June 2005. On or around June 6, 2005, partnering with another law firm, Plaintiff filed a derivative lawsuit against certain directors and executives of MBNA Corporation (the "MBNA Litigation").

59.    MBNA Corporation is one of the State's largest employers.

60.    Unbeknownst to Plaintiff, Rocanelli's husband was an executive of MBNA Corporation. This allegation is made upon belief and the following information: (i) MBNA's March 19, 1999 annual report indicating that Thomas D. Veale was a company operating executive, (ii) the absence of any publicly available information indicating that Veale is no longer an MBNA executive, (iii) a December 29, 2003 newspaper article in *The News Journal* reporting Rocanelli's married status, and (iv) Delaware property records indicating that Veale and Rocanelli have purchased and sold homes together, indicating that Veale is Rocanelli's husband.

61.    The filing of the lawsuit involving the MBNA Corporation was the last straw for Rocanelli. Not only had Plaintiff challenged Rocanelli's former employer (the Delaware Firm) and her former colleagues (including the Rival Lawyer and others); now Plaintiff was challenging *her husband's own employer*. Her earlier animus towards Plaintiff transformed into a vendetta armed with the vast powers of the State. By any means necessary, including those

available to her as a State official, Rocanelli would retaliate by destroying Plaintiff's ability to practice law.

### H.  The ODC Steps In Again, This Time to
### Assist the Rival Lawyer

62.    By letter dated June 16, 2005, Rocanelli informed Plaintiff that the ODC had initiated a *second* probe into Plaintiff's conduct, this time in connection with the JPM Litigation. Curiously, Rocanelli's letter arrived the same day that defendants in the JPM Litigation filed their motion to dismiss the operative complaint in that action.    Again, Rocanelli's uncanny timing interfered with ongoing civil litigation.

63.    Citing the Rival Lawyer's letter, dated nearly *four months before* and which had been circulated and ignored by multiple courts, Rocanelli demanded that Plaintiff "provide a written explanation for [his] professional conduct in direct response to the allegations set forth in [the Rival Lawyer's] letter dated March 18, 2005 addressed to the Honorable Stephen P. Lamb, a copy of which is enclosed.    Please include specifically how you fulfilled your obligations pursuant to Rules 1.1, 1.2, 1.6, 1.9, 3.1, 3.3, 4.1 and 8.4 of the Delaware Lawyers' Rules of Professional Conduct."    Other than appending and adopting the Rival Lawyer's insinuations, Rocanelli did not articulate in any way that Plaintiff had committed any particular misconduct.

64.    Thus, Rocanelli had *once again* interfered in civil litigation *on behalf of a former colleague*.    Further, this additional harassment in the form of yet another bogus probe came only two weeks after Plaintiff had filed a lawsuit against her husband's employer.    But Rocanelli's most audacious retaliatory move was yet to come.

65.    On July 15, 2005, Plaintiff responded to Rocanelli's June 16 letter:

Dear Ms. Rocanelli:

This will respond to your June 16, 2005 letter requesting a response to the March 18, 2005 letter from Seth D. Rigrodsky of Milberg Weiss Bershad & Schulman ("Milberg Weiss") to Vice Chancellor Stephen P. Lamb (the "Letter") in connection with the above-captioned litigation (the "Chancery Action"). Thank you for the additional time to respond.

The Letter does not articulate any conflict of interest or any other violation of the Rules of Professional Conduct. Both the Court of Chancery and the District of Delaware have already disregarded the Letter in their written opinions. In opposition to my clients' request for leave to file an *amici curiae* brief in the Supreme Court appeal of the above-captioned litigation, Mr. Rigrodsky has, in a third bite at the apple, appended the Letter and, in a fourth bite at the apple, served the ODC with the opposition brief. Without predicting the Supreme Court's response, the Letter is wholly meritless, for the reasons set forth below.

## There Is No Conflict.

The critical defect in the Letter is that the interests of the putative class in my clients' action (the "Federal Action") are identical to the interests of the putative class in Milberg Weiss's action. There simply is no conflict of interest. In order for a conflict of interest as to former clients to exist, Milberg Weiss must establish, among other things, that my representation of Samuel Hyland and Stephanie Speakman is "materially adverse" to my previous work as an associate at Milberg Weiss. Under these circumstances, no material adversity is present.

While the Chancery Action includes only state law claims, the Federal Action includes federal securities claims (over which the district courts have exclusive jurisdiction) as well as state law claims, since federal courts may exercise supplemental jurisdiction over state law claims. Also, the Federal Action demands a trial by jury, but the Chancery Action cannot, as juries are unavailable in the Court of the Chancery. Thus, the Federal Action is superior to the Chancery Action in terms of maximizing the potential recovery for the putative class. Accordingly, not only is "material adversity" absent, but the Federal Action actually *enhances* the interests of the named plaintiffs in the Chancery Action.

The Letter mischaracterizes the motion for a federal injunction of related state court class actions as adverse to the interests of the named plaintiffs in the Chancery Action. However, the Letter fails to mention that, on March 20, 2005, I emailed Richard Weiss, a Milberg Weiss partner, to advise him that I would be forced to seek an injunction unless the Chancery Action relinquished its class claims (thereafter proceeding individually rather than representatively). As I explained in the email, "If the named plaintiffs in [the Chancery Action] proceed individually, but not on behalf of any class, an injunction may not be necessary." The requested injunction would have limited *only the representative character* of the Chancery Action, not the individual claims by the Chancery Action named plaintiffs. Indeed, the requested injunction would have *protected* the class by precluding collusive negotiations by class representatives asserting inherently problematic claims, *i.e.* a "reverse auction" scenario. In seeking the injunction, I was honoring my fiduciary duty to place the interests of the class before any other consideration.

Despite the fact that twelve attorneys from four law firms were listed as counsel to the named plaintiffs in the Chancery Action at one time or another, Milberg Weiss makes much of the fact that I was formerly associated with the firm and worked on the Chancery Action (among a host of other cases). The firm does not contend that I selected the venue for the case (or had any other high-level or supervisory responsibility); rather, it contends that I should be bound by the firm's selection of venue. Thus, Milberg Weiss implicitly contends that an attorney, even a subordinate attorney, may not compete with or even disagree with the firm after departing, as though the Rules of Professional Conduct somehow imply a far-reaching non-compete agreement. However, Rule 5.6 prohibits restricting the right of a lawyer to practice after leaving a law firm; such restrictions would limit the mobility of lawyers and limit the freedom of clients to choose a lawyer.[1]  Moreover, Rule 5.2(b) specifically contemplates that a subordinate lawyer is entitled to follow the directions of a supervisory lawyer *even if the former disagrees with the latter*. It follows from this that an attorney is not bound by each and every position taken by a former employer, especially where, as here, the attorney had been a subordinate lawyer.

### The Letter's "Points" Are Meritless.

The absence of specificity in the Letter makes a meaningful response difficult, if not impossible. Many of the Letter's numbered points deal with circumstances which I cannot discuss freely absent appropriate waivers of attorney-client privilege and attorney work product protection. Even absent such waivers, the points are each nonetheless meritless, as set forth below:

> 1.    *"While at Milberg Weiss, Mr. Gielata was actively involved, as one of the attorneys for Plaintiffs, in developing and litigating this action."*

*Response*:    Milberg Weiss was one of four law firms representing the putative class in the Court of Chancery. I was an associate on the JPMorgan case, and the lowest-ranking attorney with Milberg Weiss assigned to the case. I was given the responsibilities of an associate, paid like an associate, and treated like an associate. As such, I was responsible for performing electronic research and initial drafting of pleadings. I did not have the authority to select the venue or make other critical decisions in framing the case. I did not agree with every decision made by certain Milberg Weiss partners, but I was not in a position to overrule those decisions, even when I believed that the interests of the class were not being put first. Accordingly, as a subordinate lawyer at the relevant time, my conduct is protected by Rule 5.2(b).

> 2.    *"Among other things, Mr. Gielata helped prepare and appeared on the various pleadings filed by Plaintiffs[.]"*

*Response*:    Same as Response #1, with the addition that I did not sign any of the substantive pleadings.

---

[1] I am also involved in derivative litigation concerning MBNA Corp. and Xybernaut Corp., in which Milberg Weiss purports to represent shareholders asserting direct claims.

3.      *"Mr. Gielata also appeared in Court, on behalf of Plaintiffs, at the argument on
        Defendants' motion to dismiss, on January 13, 2005, and at the argument on
        Defendants' motion to stay discovery, on October 5, 2004."*

*Response*:      Same as Response #1, with the addition that I did not speak at either hearing.
Milberg Weiss partner Richard Weiss spoke for plaintiffs.

4.      *"Mr. Gielata now argues (at page 5 of his letter) that the consummation of the
        merger of J.P. Morgan Chase & Co. and Bank One Corp. on July 1, 2004
        divested this Court of jurisdiction; yet, months later he appeared on pleadings
        filed with this Court, under the strictures of Chancery Court Rule 11, and
        participated at oral argument."*

*Response*:      Same as Response #1, with the addition that the issue of jurisdiction is
specifically one where, under Rule 5.2(b), even if I believed that the interests of the class were
being harmed by the venue decision made, I was not in a position to overrule that decision.
Moreover, the complete dismissal of the Court of Chancery complaint has vindicated the
commencement of the Federal Action in the District of Delaware after I separated from Milberg
Weiss.

5.      *"As one of the attorneys at Milberg Weiss actively involved in the development
        and prosecution of this action, Mr. Gielata was privy to confidential attorney
        work-product."*

*Response*:      This point is vague, indefinite, and otherwise unanswerable due to ambiguity,
especially in its unlimited reference to "confidential attorney work-product." No discovery was
taken in the Chancery Action. No filings were made under seal, and every filing in the Chancery
Action was and is available to the public. None of the claims in the Chancery Action were based
upon confidential information. Further, every allegation in my clients' federal complaint is
based upon publicly-available information. Accordingly, I fail to see how any confidential work
product might have been improperly used.

6.      *"In blatant disregard of his duty of loyalty to his former clients, Mr. Gielata is
        now attacking the very case on which he worked as recently as one month ago.
        Mr. Gielata has not sought the consent of either my firm or his former client to his
        representation of a new plaintiff in the federal action."*

*Response*:      Mr. Rigrodsky's accusation of disloyalty to former clients is completely meritless.
As discussed above, my clients' interests are identical to those of the named plaintiffs in the
Chancery Action and thus the material adversity specified in Rule 1.9 is absent.[2] My support of
the reversal of the Chancery Action dismissal confirms this fact. If anything, the Federal Action
has salvaged valuable claims belonging to a class including the named plaintiffs in the Chancery
Action. But for the commencement and vigorous prosecution of the Federal Action, the class

---

[2] To the extent that Rule 1.9 relates to information concerning a former client, there has been no violation,
nor could there be. I have never met or communicated with any of the named plaintiffs in the Chancery Action, and
I do not otherwise have any information concerning any of them.

might well have been left with only claims against Milberg Weiss for filing suit in the wrong venue.

**Milberg Weiss Does Not Have Standing to
Challenge My Clients' Choice of Counsel.**

Even if there was a conflict of interest (which there is not), Milberg Weiss lacks standing to complain. *See Appeal of Infotechnology, Inc.*, 582 A.2d 215 (Del. 1990) (non-client litigant lacks standing to enforce technical violation of conflict of interest rule). Milberg Weiss has not articulated what specific, personal and legal interest it has in my clients' choice of counsel, how that interest has been specifically and injuriously affected, and how disqualifying me will redress that "injury." In fact, Milberg Weiss does not even claim that its legitimate rights are being harmed by my clients' choice of counsel.

A non-client litigant's standing to challenge alleged ethical conflicts deserves close scrutiny because, as the United States Supreme Court has noted, there are concerns about the "tactical use of disqualification motions to harass opposing counsel." *See Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 436 (1985); *see also Infotechnology*, 582 A.2d at 220 (parties should not use ethical rules "as procedural weapons"); *Colyer v. Smith*, 50 F. Supp. 2d 966, 973 (C.D. Cal. 1999) ("The standing requirement protects against the strategic exploitation of the rules of ethics long disfavored by the Courts").

The preamble to the Rules explicitly embraces this concept: "[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." The ODC should not dignify Milberg Weiss's tactics in this matter, as it may encourage other lawyers to employ similar gambits.

**The ODC Should Stay Its Investigation
In Favor Of The Pending Litigation.**

Rule 15(g) provides: "*Related pending litigation. -- Where there are civil...proceedings pending with respect to the respondent...*, the PRC or the Board may stay the matter as appropriate and necessary, with notice to the Court of its reasons for taking such action."

Mr. Rigrodsky sent the Letter to Vice Chancellor Lamb, and the Letter has also been presented to Judge Farnan. Both judges considered the substance of the Letter and had the opportunity to determine whether any issues raised therein were meritorious. However, neither Judge Farnan nor Vice Chancellor Lamb saw fit to even mention the Letter in their respective opinions. *See Hyland v. Harrison, et al.*, No. 05-162 slip op. (D. Del. (Apr. 18, 2005) (attached hereto as Exhibit ("Ex.") A); *In re J.P. Morgan Chase & Co. S'holder Litig.*, mem. op. (Del. Ch. Apr. 29, 2005) (Ex. B). To the contrary, Vice Chancellor Lamb went so far as to specifically discuss the superiority of the allegations in the Federal Action:

> A similar federal class action complaint was filed in the District of
> Delaware on March 17, 2005. The federal complaint alleges
> substantially the same claims that are before this court. It does,

> however, have several important differences. First, the federal
> complaint characterizes the deal between Harrison and Dimon as a
> "secret deal." This description implies that the merger negotiations
> were unknown to the board of JPMC, a fact that appears
> inconsistent with the state complaint's primary allegation, as well
> as later allegations in the federal complaint that the "[d]efendants
> were motivated to conceal Harrison's secret and undisclosed pact
> with Dimon."
>
> Second, the federal complaint alleges that JPMC violated federal
> securities laws, specifically Sections 10(b), 11, 12(a)(2), 14(a), 15,
> and 20(a) of the Securities Exchange Act of 1934. These claims
> are sufficient to give federal courts jurisdiction over the claims,
> including the related breaches of fiduciary duty claims.
>
> Finally, the federal complaint lists important distinguishing facts,
> some of which are inconsistent with facts in this action. For
> instance, the federal complaint states that *Harrison* offered the no-
> premium deal. The complaint before this court makes the opposite
> claim, i.e. that it was Dimon who made an offer of that nature.
> This discrepancy is not explained.
>
> The federal complaint alleges additional substantive facts
> concerning certain directors. For example, the federal complaint
> ties Futter's fund-raising activities to her board membership, as
> reported in *New York Magazine* on February 21, 2000.
> Additionally, the federal complaint alleges that Kaplan is an
> attorney whose law firm receives substantial fees from JPMC.

*J.P. Morgan Chase & Co.*, mem. op. at 11-12 (emphasis in original; citations omitted).

The Letter has now also been presented to the Supreme Court. Accordingly, the ODC
should stay its investigation in favor of the various courts who have reviewed and disregarded
the Letter or who are presently reviewing its contentions.

### Conclusion

It is unsurprising for "turf battles" to erupt where litigation involves multiple overlapping
class actions asserting a variety of complex claims. However, the Supreme Court has
recognized that it is inappropriate for non-client litigants to invoke the conflict-of-interest rules
under such circumstances, adopting a stringent test when opposing counsel seeks to disqualify an
adversary:

> [T]he burden [is] on the non-client litigant to prove the existence
> of a conflict and to show by clear and convincing evidence exactly
> how that conflict will affect the fair and efficient administration of

>        justice. *Any abuses for mere tactical gain should, and must, be*
>        *addressed by the trial court ...*

*Appeal of Infotechnology*, 582 A.2d at 221-22 (emphasis added).

I continue to believe that the Letter's improper purpose speaks for itself. As your investigation continues, avenues of inquiry that may better merit your consideration include: (i) the reason(s) why Milberg Weiss filed the above-captioned action in the Court of Chancery rather than in federal court; (ii) Milberg Weiss's method(s) for "obtaining" clients; and (iii) the troubling facts set forth in a recent federal indictment implicating Milberg Weiss (attached hereto as Ex. C), including allegations of kickbacks in at least three cases litigated in the state of Delaware.[3]

Please contact me should you require additional explanation or information regarding this matter. I will be out of the country visiting family between July 25 and August 9, but I expect to have email access during that time.

>                     Sincerely,

>                     Joseph N. Gielata

66.    On July 25, having heard nothing from Rocanelli, Plaintiff boarded a plane for

Santiago, Chile, looking forward to seeing his grandfather and other family members in the small

town of his birth, San Pedro de la Cruz, just outside the city of Concepcion, Chile.

### I.    The Sneak Attack: Defendants Pounce While
### Plaintiff is Outside the Country

67.    Unbeknownst to Plaintiff, Defendants were poised to move in for the kill.

---

[3] To offer some further context on Milberg Weiss's pattern of conduct in class actions, I have enclosed some recent public reports on the firm's alleged misconduct in paying kickbacks to named plaintiffs and engineering pre-packaged settlements to the detriment of class members. *See, e.g.*, John R. Wilke, *U.S. Pushes Broad Investigation Into Milberg Weiss Law Firm*, THE WALL STREET JOURNAL, June 27, 2005, A1 (Ex. D); John R. Wilke and Scot J. Paltrow, *Wide Net Cast in Milberg Case*, THE WALL STREET JOURNAL, June 28, 2005, A2 (Ex. E); Department of Justice press release, *Palm Springs Man Charged in Nationwide Kickback Scheme Involving Class Action Lawsuits*, June 23, 2005 (Ex. F); Molly Selvin and Myron Levin, *Indictment Heats Up Probe of Law Firm*, THE LOS ANGELES TIMES, July 8, 2005 (Ex. G); Gina Keating, *Milberg Weiss implicated in kickback case*, Reuters, June 24, 2005 (Ex. H); Antony Collins, *Milberg Weiss accused of trying to poach tax shelter class action*, Legal Week, Jun. 30, 2005, and related documents (Ex. I.) [Note: The lettered exhibits are not attached to this complaint.]

68.    By July 15, 2005, Rocanelli knew that Plaintiff would be "out of the country visiting family between July 25 and August 9," and the other Defendants thus had reason to know that Plaintiff would be outside the country during that time period.

69.    Sensing a perfect opportunity to strike, Defendants moved in for the kill.

70.    On July 25, 2005, the State indicted Plaintiff and the Counterparty on felony charges of theft and conspiracy to commit theft (the "Indictment"). A true copy of the two-page Indictment is annexed hereto as Exhibit "3" and incorporated by this reference. A cursory reading of the flimsy Indictment brings to mind former New York State chief judge Sol Wachtler's famous observation that "Any prosecutor who wanted to could indict a ham sandwich."

71.    Defendants Lugg and the State, through the AG Office, essentially sold the grand jury a bill of goods. The Indictment magically transforms a contractual dispute between an individual and a powerful corporation, as set forth herein, into criminal charges against the individual and his attorney! By siding with a notorious corporate malfeasant, the Defendants have given new meaning to the State's "business-friendly" reputation.

72.    The Indictment is all the more appalling because PayPal has engaged in an unlawful course of conduct with the actual knowledge and approval of the Defendants. Defendants Rocanelli and Lugg have completely abdicated their responsibilities, as public servants and state actors within the meaning of 42 U.S.C. § 1983, to implement their prosecutorial powers solely to promote the public interest. Instead, defendants Rocanelli and Lugg have knowingly allowed PayPal's interests and the interests of Rocanelli's family and friends to direct the vast prosecutorial power of the State to further purely private goals.

-37-

Incredibly, with full knowledge of PayPal's outrageous, lawless conduct with respect to the MBG scam and other corporate misconduct, the Defendants have nevertheless initiated retaliatory prosecution against Plaintiff.

73.    After Lugg and the State secured the Indictment, they further demonstrated their malice for Plaintiff by seeking and obtaining an arrest warrant for Plaintiff rather than issuing a criminal summons. Rule 9(a) of the State's Rules of Criminal Procedure provides, in relevant part, that:

> Upon the request of the attorney general certifying that there is a warrant or capias for the defendant outstanding, that there is a risk of flight or of danger to the public, or that there is other good reason that a warrant should issue in lieu of a summons, the court shall issue a warrant for each defendant named in an information or in an indictment.

74.    Neither Lugg nor the State had any basis whatsoever to assert that Plaintiff presented a risk of flight or danger to the public, or that there was any other good reason for an arrest warrant.    Nevertheless, consistent with the retaliatory and bad faith nature of the Prosecution, Defendants exhibited their malice by seeking an arrest warrant, especially since Plaintiff had yet to re-enter the country and inevitably would be detained upon re-entry.

### J.  The Deathblow: The ODC Demands
### Automatic Suspension

75.    At long last, Rocanelli got her wish.    Through the Indictment, Rocanelli's vendetta was completely realized. With the Indictment firmly in hand, the ODC rushed to file a petition for an automatic suspension of Plaintiff's law license pursuant to Rule 16 of the Delaware Lawyers' Rules of Disciplinary Procedure, which provides as follows:

Rule 16. Interim suspension.

(a) Transmittal of evidence. -- Upon receipt of sufficient evidence demonstrating that a lawyer subject to the disciplinary jurisdiction of the Court (i) has been charged with or convicted of a felony, (ii) has been charged with or convicted of other criminal conduct which demonstrates that the lawyer poses a significant threat of substantial harm to the public or to the orderly administration of justice, or (iii) has otherwise engaged in professional misconduct which demonstrates that the lawyer poses a significant threat of substantial harm to the public or to the orderly administration of justice, the ODC shall transmit such evidence to the Court together with a petition and proposed order for the lawyer's immediate interim suspension pending the disposition of disciplinary proceedings as otherwise described in these Rules. The ODC shall also take all appropriate steps to process the matter through the disciplinary system as otherwise described in these Rules. The ODC's filing of a petition for interim suspension, and all subsequent proceedings, shall be confidential unless otherwise ordered by the Court.

(b) Certificate of conviction conclusive. -- A certified copy of a judgment of conviction of an attorney for any crime shall be prima facie evidence of the commission of that crime in any disciplinary proceeding instituted against the attorney based upon the conviction.

(c) Petition for interim suspension. -- The ODC's petition for interim suspension shall set forth a plain and concise statement of the grounds, shall be verified by the member of the ODC signing the petition, or otherwise supported by an affidavit, and shall be filed with the Court and served upon the respondent.

(d) Hearing before the Court. -- The Court shall promptly schedule a hearing on the petition for interim suspension, with notice to the ODC and the respondent. The notice of hearing shall state that the respondent is entitled to be represented by a lawyer at the respondent's expense, to cross-examine witnesses, and to present evidence. At the request of the respondent, the Clerk of the Court shall compel by subpoena for any such hearing the attendance of witnesses and the production of pertinent records, books, papers, and documents. The ODC may exercise its subpoena powers as otherwise described in these Rules for purposes of the proceedings described in this Rule.

(e) Standard and burden of proof. -- The standard of proof in proceedings under this Rule shall be that the misconduct or charges are supported by clear and convincing evidence. The burden of proof in such proceedings shall be upon the ODC.

(f) Disposition by the Court. -- Following the hearing, the Court may enter an order suspending the respondent from the practice of law on an interim basis pending the disposition of disciplinary proceedings as otherwise described in these Rules, or may enter such orders as it deems necessary to protect the interests of the public and the orderly administration of justice, including but not limited to orders restricting the respondent's right to practice pending the ultimate disposition of disciplinary proceedings.

(g) Publicity. -- If the Court issues an order that suspends or otherwise restricts the respondent's authority to practice law, such order shall be public, and shall be disseminated as otherwise described in these Rules, unless otherwise ordered by the Court. If the Court issues an order which dismisses the petition, such order shall remain confidential unless otherwise ordered by the Court.

(h) Appointment of receiver. -- In the event that the Supreme Court enters an order suspending the respondent from the practice of law on an interim basis, the Supreme Court may direct that proceedings be instituted by the ODC for the appointment of a receiver of the respondent's law practice by the Court of Chancery pursuant to Rule 24.

(i) Cooperation and compliance by respondent. -- Any lawyer suspended under this Rule shall comply with the notice and other requirements for suspensions set forth in these Rules, and with any other conditions set forth in the Court's disposition of the matter. A lawyer not suspended by the Court under this Rule but whose law practice or conduct is restricted by the Court shall take all appropriate steps to comply fully with the Court's orders.

(j) Reinstatement upon dismissal of charges or reversal of conviction. demonstrates to the Court that the criminal charges have been dismissed or the underlying conviction has been reversed or vacated, the order for interim suspension may be vacated by the Court upon motion, and the lawyer reinstated to practice. The vacating of the interim suspension shall not automatically terminate any other disciplinary proceedings currently pending involving the lawyer with the ODC, the PRC, or the Board, the disposition of which shall be determined on the basis of the available evidence.

(k) Duty to report. -- Any lawyer subject to the disciplinary jurisdiction of the Court who is charged with or convicted of a felony, whether within or outside of this State, shall within 10 days of such charge or conviction report the matter to the ODC.

76.     Plaintiff is not aware of any petition for interim suspension, based on an indictment, that the State's Supreme Court has denied. After all, under Rule 16, no evidence is necessary, other than the Indictment itself, to suspend Plaintiff's law license. ***Rule 16 does not provide for exceptions and is effectively devoid of due process.*** That Plaintiff is completely innocent, and presumed as such, is irrelevant. That the Indictment does not even state a crime is equally immaterial.[4] By force of the Indictment alone, the State, upon the ODC's petition, will immediately incapacitate Plaintiff and strip his clients of their chosen counsel. The rights of thousands of persons, asserted in representative actions prosecuted by Plaintiff, will be abandoned or substantially abridged.

77.     Confirming the emptiness of Rule 16's procedure and the consequent lack of any adequate due process therein, the ODC's petition was initially set for a hearing at 10:00 a.m. on August 1, 2005, when, ***as Rocanelli knew***, Plaintiff would be out the country. Thus, but for the swift intervention of an attorney for Plaintiff in securing a continuance of the hearing until August 11, 2005, Plaintiff's law license would have been suspended on August 1, 2005.

---

[4] Notably, the disciplinary rules of other states respect this country's presumption of innocence and do not appear to provide for automatic suspension upon the issuance of an indictment alone, but rather require ***conviction*** of a crime to trigger such a draconian penalty. For instance, Michigan's lawyer disciplinary rules provide that, on ***conviction of a felony***, an attorney is automatically suspended until the effective date of an order filed by a hearing panel of its decision. Even then, the Michigan Board may, on the attorney's motion, set aside the automatic suspension when it appears consistent with the maintenance of the integrity and honor of the profession, the protection of the public, and the interests of justice. Further, the Michigan Board ***must*** set aside the automatic suspension if the felony conviction is vacated, reversed or otherwise set aside for any reason by the trial court or an appellate court. In Pennsylvania, the Rules of Disciplinary Enforcement do not provide for automatic suspension in connection with indictment at all. Rather, Rule 208(f)(1) in Pennsylvania provides that "Disciplinary Counsel, with the concurrence of a reviewing member of the Board, whenever it appears by an affidavit demonstrating facts that the continued practice of law by a person subject to these rules is causing immediate and substantial public or private harm because of the misappropriation of funds by such person to his or her own use, or because of other egregious conduct, in manifest violation of the Disciplinary Rules or the Enforcement Rules, may petition the Supreme Court for injunctive or other appropriate relief." Pennsylvania Rules of Disciplinary Enforcement Rule 208(f)(1).

78.   But the continuance offers merely a façade of due process. Rocanelli and State apparently believe that *Plaintiff's ability to practice law has __already__ been suspended.* The ODC agreed not to oppose the continuance request only "on the condition that [Plaintiff] agree that he will not appear in a Delaware court on behalf of a client until a hearing on the ODC Petition." The aforementioned continuance was granted only upon the *unauthorized* representation of an attorney for Plaintiff that Plaintiff would not appear on behalf of a client pending the hearing on the ODC's suspension petition. Plaintiff, who at the time was over 5,000 miles away in a remote town, never blessed such a representation and deplores Rocanelli's malicious manipulation of the circumstances to force such a concession. Plaintiff disavows this representation entirely and his ability to practice law presently remains unfettered.

79.   Rule 16 eviscerates the guarantee of due process provided for in both the United States Constitution and the Delaware Constitution and makes a mockery of the presumption of innocence afforded to defendants accused of crimes. Nor is there any justification for Rule 16's draconian penalty of suspension upon indictment, especially as applied in this case, since Plaintiff has never held, and does not hold, any client funds.

80.   The unconstitutional infirmity of Rule 16 is further evident in this case because the Indictment *does not even state a crime*.

81.   The interim suspension procedure provided in Rule 16 is a quasi-criminal proceeding without any of the protections necessary for such a proceeding to meet minimum constitutional standards.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Procedural Due Process – 42 U.S.C. § 1983)

82.    Plaintiff repeats and realllege each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

83.    Plaintiff has the right, secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, not to be deprived of his property without due process of law or by governmental actions that are unrelated to any legitimate governmental interest.

84.    The foregoing course of conduct, taken under color of state law by the Defendants, will deprive Plaintiff of his privileges, rights and immunities secured by the United States Constitution, including but not limited to those protected under the Due Process Clause of the Fourteenth Amendment.

85.    By reason of the foregoing course of conduct undertaken by the Defendants, Plaintiff is entitled, against all defendants, to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Substantive Due Process – 42 U.S.C. § 1983)

86.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

87.    The Defendants' aforementioned abuse of their prosecutorial and regulatory powers is so outrageously arbitrary, capricious, and irrational as to constitute a gross abuse of

-43-

governmental authority which has violated Plaintiff's substantive due process rights under the Fourteenth Amendment to the United States Constitution.

88.    By reason of the foregoing course of conduct undertaken by the Defendants, Plaintiff is entitled against all defendants to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Equal Protection – 42 U.S.C. § 1983)

89.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

90.    Plaintiff, similarly situated to other PayPal users, has been intentionally singled out by the Defendants for disparate, unlawful and malicious treatment.

91.    By reason of the foregoing course of conduct undertaken by the Defendants, Plaintiff is entitled against all defendants to such relief as the Court finds to be appropriate, including but not limited to declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action, including Plaintiff's reasonable attorneys' fees.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Declaratory Relief)

92.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

93.    Plaintiff contends that the Defendants have unlawfully interpreted PayPal's MBG Policy agreement as a form of insurance rather than, as it plainly spells out, a put option contract.

Plaintiff further contends that the MBG Policy, on its face and as implemented by PayPal, provides PayPal with an improper and unlawful degree of control over honoring or reneging on its contractual commitments under the MBG Policy.    Plaintiff further contends that the Prosecution solely benefits PayPal's purely private interest in honoring as few MBG Policy reimbursement requests as possible to increase its profits.

94.    Upon information and belief, the Defendants contend that the MBG contracts are insurance contracts.    Upon information and belief, the Defendants deny that the MBG contracts are nothing more than put option contracts.

95.    By reason of the foregoing, a serious dispute exists between Plaintiff and the Defendants concerning the validity and nature of the MBG Policy such that a judicial determination of the rights, powers, privileges, duties, obligations and liabilities of the parties to contracts governed by the MBG Policy is desirable, necessary and in the public interest.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Preliminary and Permanent Injunctive Relief)

96.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

97.    Plaintiff has been and continues to be irreparably injured as a result of the deprivation of his constitutional rights and therefore is entitled to preliminary and permanent injunctive relief, as set forth in the Prayer for Relief herein.

98.    There has been no prior application for the relief being sought herein.

-45-

### AS AND FOR A SIXTH CLAIM FOR RELIEF
(Award of Attorneys' Fees, Expert Fees
and Costs -- 42 U.S.C. § 1988)

99.     Plaintiff repeats and realleges each and every allegation contained in paragraphs

"1" through "81" above, as if fully set forth herein.

100.    Plaintiff is entitled to an award of costs, including his reasonable attorney's fees

and expert fees.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
(Declaratory and Injunctive Relief Against Enforcement of Rule 16 of the Delaware
Lawyers' Rules of Disciplinary Procedure)

101.    Plaintiff repeats and realleges each and every allegation contained in paragraphs

"1" through "81" above, as if fully set forth herein.

102.    Unless Rule 16 is declared unconstitutional, either on its face or as applied, the

State will strip Plaintiff of his license to practice law, and thereby his clients of their chosen

counsel, without due process of law.

### AS AND FOR A EIGHTH CLAIM FOR RELIEF
(Damages for Malicious Prosecution)

103.    Plaintiff repeats and realleges each and every allegation contained in paragraphs

"1" through "81" above, as if fully set forth herein.

104.    As set forth above, defendants Lugg and the State did without proper lawful

authority intentionally and maliciously institute criminal proceedings against Plaintiff through

the Indictment. The Prosecution was initiated to persecute Plaintiff, without any requisite

legitimate governmental interest.

-46-

105.    The charges in the Indictment will eventually be dismissed with prejudice; or Plaintiff shall be found not guilty of the charges.

106.    Plaintiff was specifically singled out for criminal prosecution for (i) his participation as attorney in litigation against some of the State's largest employers, and (ii) his crossing of defendant Rocanelli (by litigating against her former employer, her former colleagues, and her husband's employer) and thereby alleges specific violations of his right of redress of grievances as the basis for Malicious Prosecution.

107.    If wrongfully stripped of his law license, Plaintiff shall lose all rights to fees in connection with pending suits he is prosecuting, including the JPM Litigation, in which Plaintiff has been appointed lead counsel. Such loss of fees, among other losses, constitutes damages for the Malicious Prosecution.

## AS AND FOR A NINTH CLAIM FOR RELIEF
### (Damages for Intentional Infliction of Emotional Distress)

108.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "81" above, as if fully set forth herein.

109.    Defendants did knowingly commence the Prosecution against Plaintiff for purposes intended to disrupt his litigation activities and not to achieve otherwise legitimate governmental ends.

110.    Issuing an arrest warrant for Plaintiff under these circumstances is behavior outside that tolerated by the norms of society, and was the direct cause of extreme emotional distress for Plaintiff from the day he was indicted until the day the Indictment is dismissed.

-47-

## JURY TRIAL DEMANDED

111.   Plaintiff hereby demands a trial by jury on all issues triable by jury in this matter.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests a judgment as follows:

A)   Permanently enjoining the Defendants from continuing the Prosecution and the related suspension proceeding, and declaring that the Prosecution violates Plaintiff's constitutional rights;

B)   Declaring that Rule 16 of the Delaware Lawyers' Rules of Disciplinary Procedure, on its face and as applied, violates Plaintiff's right to due process;

C)   Declaring that the MBG contracts between Plaintiff and PayPal are valid and enforceable, as a matter of law, and that any dispute concerning the MBG contracts is, at most, a civil matter;

D)   Permanently enjoining the Defendants from wrongfully impeding or interfering with Plaintiff's right to practice law;

E)   Retaining jurisdiction in this Court to enforce any and all relief granted in favor of Plaintiff;

F)   Awarding compensatory damages in favor of Plaintiff and against the Defendants, jointly and severally, in such amount as the Court deems just and proper, but not less than Five Billion and 00/100 ($5,000,000,000.00)

Dollars, to compensate Plaintiff for the deprivation of his constitutional rights, deprivation of any legal fees that Plaintiff would have earned but for the Malicious Prosecution, his out-of-pocket expenditures, costs, fees and other charges and expenses proximately caused by the Defendants' intentional and wrongful course of conduct which has delayed, obstructed and unreasonably denied Plaintiff the ability to represent his clients;

G)   Awarding to Plaintiff his costs in this action, including all reasonable attorneys' fees and expert fees; and

H)   Awarding such other and further relief as to this Court may seem just, equitable and proper.

Dated:   August 2, 2005                    Respectfully submitted,

                                By:    /s/ Joseph N. Gielata
                                       Joseph N. Gielata, Esq., *pro se*
                                       501 Silverside Road, Suite 90
                                       Wilmington, Delaware 19809
                                       (302) 798-1096

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH N. GIELATA,

        Plaintiff,

    v.

SEAN P. LUGG, individually and in his
official capacity as Deputy Attorney
General for the State of Delaware, THE
STATE OF DELAWARE, ANDREA L.
ROCANELLI, individually and in her
official capacity as Chief Counsel of the
Office of Disciplinary Counsel for the
Supreme Court of Delaware, and THE
OFFICE OF DISCIPLINARY
COUNSEL FOR THE SUPREME
COURT OF DELAWARE,

        Defendants.

**VERIFICATION
OF
COMPLAINT**

I, Joseph N. Gielata, declare:

1.    I am the Plaintiff in this case and am proceeding *pro se*.

2.    I verify that I prepared the foregoing verified Complaint; that I have assembled the facts stated therein; and that the allegations therein are true and correct to the best of my knowledge, information, and belief.

3.    I declare under penalty of perjury that the foregoing is true and correct.

Dated:   August 2, 2005          Respectfully submitted,

                    By:   /s/ Joseph N. Gielata
                           Joseph N. Gielata, Esq., *pro se*
                           501 Silverside Road, Suite 90
                           Wilmington, Delaware 19809
                           (302) 798-1096