**Exhibit C**

S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783 (Leg.Hist.)

**679 P.L. 104-67, *1 PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

DATES OF CONSIDERATION AND PASSAGE

House: March 7, 8, December 5, 1995
Senate: June 22, 23, 26, 27, 28, December 5, 1995
Cong. Record Vol. 141 (1995)
Senate Report (Banking, Housing, and Urban Affairs Committee) No. 104-98,
June 19, 1995
(To accompany S. 240)
House Conference Report No. 104-369,
Nov. 28, 1995
(To accompany H.R. 1058)

SENATE REPORT NO. 104-98
June 19, 1995

Mr. D'Amato, from the Committee on Banking, Housing, and Urban Affairs, submitted the following

REPORT

together with

ADDITIONAL VIEWS

[To accompany S. 240]

**680 The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 240), to amend the Securities Exchange Act of 1934 to establish a filing deadline and to provide certain safeguards to ensure that the interests of investors are well protected under the implied private action provisions of the Act, having considered the same, reports favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

### CONTENTS

Page
History of the legislation ............................................. 1
Purpose and summary .................................................... 4
Purpose and scope of the legislation:
    Background ......................................................... 8
    Elimination of abusive practices in securities
        litigation .................................................... 10

Removing the incentives to participate in abusive class
    action litigation ................................................ 10
New rules relating to the settlement process ..................... 12
Attorney Sanctions for pursuing meritless litigation ............. 13
Stay of discovery ................................................ 14
A strong pleading requirement .................................... 15
A safe harbor for forward-looking statements or
    projections ..................................................... 15
Written interrogatories .......................................... 18
Limiting civil RICO actions ...................................... 19
A grant of authority to the SEC to prosecute certain aiding
    and abetting cases .............................................. 19
Limitation on damages ............................................ 19
Modification of joint and several liability ...................... 20
Loss Causation requirement for section 12(2) of the
    1933 Act ........................................................ 23
Auditor disclosure of corporate fraud ................................. 23
Section-by-section analysis of S. 240 ................................. 24
    Title I-Reduction of Abusive Litigation:
        Section 101. Elimination of Certain Abusive Practices ......... 24
        Section 102. Securities Class Action Reform .................. 24
        Section 103. Sanctions for Abusive Litigation ................ 26
        Section 104. Requirements for Securities Fraud Actions ....... 26
        Section 105. Safe Harbor for Forward-Looking
            Statements ................................................. 26
        Section 106. Written Interrogatories ......................... 27
        Section 107. Amendment to Racketeer Influenced and Corrupt
            Organizations Act .......................................... 28
        Section 108. Authority of Commission to Prosecute Aiding
            and Abetting ............................................... 28
        Section 109. Limitation on Rescission ........................ 28
        Section 110. Applicability ................................... 28
    Title II-Reduction of Coercive Settlements:
        Section 201. Limitation on Damages ........................... 28
        Section 202. Proportionate Liability ......................... 29
        Section 203. Applicability ................................... 29
    Title III-Auditor Disclosure of Corporate Fraud:
        Section 301. Fraud Detection and Disclosure .................. 29
Regulatory impact statement .......................................... 30
Changes in existing law .............................................. 30
Cost of the legislation .............................................. 30
Additional views of Senators Gramm, Mack, Faircloth, Bennett,
    Grams, and Frist ................................................. 33
Additional views of Senators Sarbanes, Bryan, and Boxer .............. 36
Additional views of Senator Dodd ..................................... 51

HISTORY OF THE LEGISLATION

On January 18, 1995, Senators Domenici and Dodd introduced S. 240, the "Private Securities Litigation Reform Act of 1995." This legislation, which was cosponsored by Senators Hatch, Mikulski, Bennett, Moseley-Braun, Lott, Murray, Mack, Johnston, Faircloth, Conrad, Burns, Chafee, Gorton, Helms, Kyl, Thomas, Hutchinson, Santorum, and Pell, contains provisions identical to those contained in S. 1976, which was introduced in the 103d Congress. Legislation to reform private litigation under the Federal securities laws, S. 3181, also was introduced in the 102d Congress.

On June 17, 1993 and July 21, 1993, the Subcommittee on Securities held hearings on private securities litigation. Witnesses testifying on June 17 included Edward R. McCracken, President and **681 *2 CEO, Silicon Graphics, Inc.; John G. Adler, President and CEO, Asaptec, Inc.; Richard J. Egan, Chairman, EMC Corp.; Thomas Dunlap, Jr., General Counsel, Intel Corp.; William R. McLucas, Director of the Division of Enforcement, Securities and Exchange Commission ("SEC"); Mark J. Griffin, Director, Securities Division of the Department of Commerce of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Joel Seligman, Professor, University of Michigan Law School; Patricia Reilly, an investor; Vincent E. O'Brien, Law and Economics Consulting Group, Inc.; William S. Lerach, Partner, Milberg Weiss Bershad Hynes & Lerach; Gordon K. Billipp, an investor; Russell E. Ramser, Jr., an investor; and Edward J. Radetich, President, Heffler & Co. Witnesses testifying on July 21 included Representative W.J. "Billy" Tauzin; Representative Ron Wyden; Jake L. Netterville, Managing Partner, Postlethwaite & Netterville, who testified on behalf of the American Institute of Certified Public Accountants; A.A. Sommer, Jr., Chairman, Public Oversight Board, American Institute of Certified Public Accountants; Ralph V. Whitworth, President, United Shareholders Association; Abraham J. Briloff, Professor, Baruch College, CUNY; Melvyn I. Weiss, Partner, Milberg Weiss Bershad Hynes & Lerach; Richard A. Bowman, Executive Vice President and CFO, ITT Corp., who testified on behalf of the Financial Executives Institute; Marc E. Lackritz, President, Securities Industry Association; Ralph Nader, Public Citizen; and Maryellen F. Andersen, Investor and Corporate Relations Director, Connecticut Retirement & Trust Funds and Treasurer of the Council of Institutional Investors. Additional material was supplied for the record by a large number of parties.

On March 24, 1994, Senators Dodd, Domenici, Mikulski, Johnston, and Faircloth introduced S. 1976, the "Private Securities Litigation Reform Act of 1994."

On May 12, 1994, the Subcommittee on Securities held a hearing on the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank of Denver, [FN1] which held that private parties could not bring suit under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 against alleged aiders and abettors of persons violating the Federal securities laws. Witnesses included Senator Howard Metzenbaum; Arthur Levitt, Chairman, SEC; Donald C. Langevoort, Professor, Vanderbilt Law School; Mark J. Griffin, Director, Securities Division of the Department of Commerce of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Stuart J. Kaswell, Senior Vice President and General Counsel, Securities Industry Association; Harvey J. Goldschmid, Professor, Columbia University School of Law; Eugene I. Goldman, Partner, McDermott, Will & Emery; and David S. Ruder, former Chairman, SEC, and Professor, Northwestern University School of Law. Harvey I. Pitt, Partner, Fried, Frank, Harris, Shriver & Jacobson, and Joel Seligman, Professor, University of Michigan Law School supplied additional

material for the record.

**682 *3 On May 17, 1994, the Subcommittee on Securities issued a 163 page Staff Report on private securities litigation.

On March 2 and 22, 1995, and April 6, 1995, the Subcommittee on Securities held hearings on securities litigation reform legislation. Witnesses testifying on March 2 included Senator Christopher J. Dodd; Senator Pete V. Domenici; Marc E. Lackritz, President, Securities Industry Association; J. Carter Beese, former Commissioner, SEC, and Chairman, Capital Markets Regulatory Reform Project of the Center for Strategic and International Studies; Nell Minow, Principal, LENS, Inc.; James F. Morgan, Founder and Chairman, Morgan, Holland Ventures, who testified on behalf of the National Venture Capital Association; Christopher J. Murphy III, President and CEO, 1st Source Corp., who testified on behalf of the Association of Publicly Traded Companies; and George Sollman, CEO, Centigram Communications Corp., who testified on behalf of the American Electronics Association.

Witnesses testifying on March 22 included Mark J. Griffin, Director, Securities Division of the Department of Commerce of the State of Utah, who testified on behalf of the North American Securities Administrators Association, Inc.; Joan R. Gallo, City Attorney, San Jose, California; Sheldon H. Elsen, who testified on behalf of The Association of the Bar of the City of New York; David Guin, Partner, Ritchie and Rediker, who testified on behalf of the National Association of Securities and Commercial Law Attorneys; and Bartlett Naylor, National Coordinator, Office of Corporate Affairs, International Brotherhood of Teamsters.

Witnesses testifying on April 6 included Senator Barbara Mikulski; The Honorable Arthur Levitt, Chairman, SEC; Richard C. Breeden, former Chairman, SEC; and Charles Cox, former Commissioner and former Acting Chairman, SEC.

On May 25, 1995, the Committee met in Executive Session to consider S. 240 and adopted an amendment in the nature of a substitute that was offered by Chairman Alfonse M. D'Amato and, by a vote of 11-4, ordered S. 240 favorably reported. Senators Shelby, Sarbanes, Bryan, and Boxer voted against this legislation. Senator Bond recused himself from voting. The Committee adopted by a voice vote an amendment offered by Senator Bennett to amend section 12(2) of the Securities Act of 1933 (the "1933 Act"). The Committee did not adopt amendments offered by Senator Bryan to extend the statute of limitations for private actions under the 1934 Act (6-9) (with Senators Shelby, Sarbanes, Dodd, Kerry, Bryan, and Boxer voting in favor of the amendment); by Senator Sarbanes to delegate promulgation of a safe harbor provision for forward looking statements to SEC rulemaking (5-10) (with Senators Sarbanes, Kerry, Bryan, Boxer and Murray voting in favor of the amendment); by Senator Sarbanes to revise the scienter language of the safe harbor provision adopted by the Committee (4-11) (with Senators Sarbanes, Kerry, Bryan and Boxer voting in favor of the amendment); by Senator Boxer to exempt from the statutory safe harbor retirement plans for senior citizens (4-11) (with Senators Sarbanes, Kerry, Bryan, and Boxer voting in favor of the amendment); and by Senator Bryan to revise the proportionate liability provision adopted by the Committee (5- 10) (with Senators Shelby, **683 *4 Sarbanes, Kerry, Bryan, and Boxer voting in favor of the amendment).

The Committee withheld consideration of two amendments pending further review: (i) to increase the uncollectible share provision for proportionate liability from 50% to 100%; and (ii) to provide for liability in private actions under Rule 10b-5 for aiders and abettors of primary securities law violators.

PURPOSE AND SUMMARY

During the Great Depression, Congress enacted the 1933 and 1934 Acts to promote investor confidence in the United States securities markets and thereby to encourage the investment necessary for capital formation, economic growth, and job creation. The Committee heard substantial testimony that today certain lawyers file frivolous "strike" suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud. All too often, the same "professional" plaintiffs appear as name plaintiffs in suit after suit.

S. 240, the "Private Securities Litigation Reform Act of 1995," is intended to lower the cost of raising capital by combatting these abuses, while maintaining the incentive for bringing meritorious actions. Specifically, S. 240 intends: (1) to encourage the voluntary disclosure of information by corporate issuers; (2) to empower investors so that they not their lawyers-exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims and defendants to fight abusive claims. Senator Pete Domenici, one of two original co-sponsors of this legislation, expects that S. 240 "will return some fairness and common sense to our broken securities class action litigation system, while continuing to provide the highest level of protection to investors in our capital markets." [FN2]

The federal securities laws and SEC rules prohibit the making of false and misleading statements or omissions in connection with the purchase and sale of securities. Under these provisions, the SEC has broad regulatory and enforcement powers. In addition, investors may bring private actions for violations of the federal securities laws. These actions typically rest upon the so called "catchall" fraud provision in Section 10(b) of the 1934 Act and SEC Rule 10b-5.

Congress has never expressly provided for private rights of action when it enacted Section 10(b). Instead, courts have held that Congress impliedly authorized such actions. As a result, 10(b) litigation has evolved out of judicial decisionmaking, not specific legislative action. The lack of congressional involvement has left judges free to develop conflicting legal standards, thereby creating substantial uncertainties and opportunities for abuses of investors, issuers, professional firms and others.

**684 *5 The Committee has determined that now is the time for Congress to reassert its authority in this area. As Chairman D'Amato made clear: "There is broad agreement on the need for reform. Shareholders' groups, Corporate America, the SEC, and even lawyers all want to curb abusive practices. Lawyers who bring meritorious suits do not benefit when strike suit artists wreak havoc on the Nation's boardrooms and courthouses. Our economy does not benefit when the threat of litigation deters capital formation." [FN3] Senator Dodd similarly said: "The flaws in the current private securities litigation system are simply too obvious to deny. The record is replete with examples of how the system is being abused and misused." [FN4] SEC Chairman Arthur Levitt concurred: "[T]here is no denying that there are real problems in the current system-problems that need to be addressed not just because of abstract rights and responsibilities, but because investors and markets are being hurt by litigation excesses." [FN5]

The purposes of S. 240 are threefold.

1.-S. 240 is intended to encourage the voluntary disclosure of information by issuers. The hallmark of our securities laws is broad, timely disclosure to investors of information about the financial condition of publicly traded companies. The mere specter of 10b-5 liability, however, has become more than a deterrent to fraud. Private securities class actions under 10b-5 inhibit

free and open communication among management, analysts, and investors. This has caused corporate management to refrain from providing shareholders forward-looking information about companies. According to the SEC: "the threat of mass shareholder litigation, whether real or perceived," has had adverse effects, especially in "chilling * * * disclosure of forward-looking information." [FN6] Public companies-particularly high-tech, bio-tech and other growth companies, which are sued disproportionately in 10b-5 litigation-fear that releasing such information makes them even more vulnerable to attack. As a result, investors often receive less, not more, information, which makes investing more risky and increases the cost of raising capital.

To reduce this chill on voluntary disclosures by issuers, S. 240 creates a carefully tailored safe harbor for forward-looking statements. This safe harbor applies only to projections or estimates that are identified as forward-looking statements and that refer "clearly" and "proximately" to "the risk that actual results may differ materially from" the projection or estimate. The safe harbor has several other important limitations. For example, the safe harbor would not apply to initial public offerings of securities. In addition, the SEC's enforcement authority would not be limited by the provisions in S. 240. To the contrary, S. 240 expands the SEC's enforcement*6 **685 authority with respect to forward-looking statements by authorizing the SEC to recover damages on behalf of investors injured by such statements.

2.-S. 240 is intended to empower investors so that they, not their lawyers, control securities litigation. Under the current system, the initiative for filing 10b-5 suits comes almost entirely from the lawyers, not from genuine investors. Lawyers typically rely on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.

Numerous studies show that investors recover only 7 to 14 cents for every dollar lost as a result of securities fraud. Indeed, a 1994 Securities Subcommittee Staff Report found "evidence * * * that plaintiffs' counsel in many instances litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing." [FN7] The comment by one plaintiffs' lawyer-"I have the greatest practice of law in the world. I have no clients." [FN8]-aptly summarizes this flaw in the current system.

S. 240 contains several provisions to transfer primary control of private securities litigation from lawyers to investors. First, S. 240 creates a presumption, rebuttable under certain conditions, that the member of a purported class of investors with the largest financial interest in the case will serve as the lead plaintiff, thereby increasing the role of institutional investors in securities class actions. Second, S. 240 requires greater disclosure of settlement terms, including the reasons for a settlement, to class members, allowing them to object to, or raise questions about, the settlement. Third, S. 240 prohibits several abusive practices, such as the payment of bounties to named plaintiffs, that have enabled lawyers to exercise nearly total fiat over the course of private securities litigation.

3.-S. 240 is intended to encourage plaintiffs' lawyers to pursue valid claims for securities fraud and to encourage defendants to fight abusive claims. The dynamics of private securities litigation create powerful incentives to settle, causing securities class actions to have a much higher settlement rate than other types of class actions. Many such actions are brought on the basis of

their settlement value. The settlement value to defendants turns more on the expected costs of defense than the merits of the underlying claim. The Supreme Court has recognized that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." [FN9]

As SEC Chairman Levitt explained, because class counsel usually advances the costs of litigation, "counsel may have a greater **686 *7 incentive than the members of the class to accept a settlement that provides a significant fee and eliminates any risk of failure to recoup funds already invested in the case." [FN10] If a defendant cannot win an early dismissal of the case, "the economics of litigation may dictate a settlement even if the defendant is relatively confident that it would prevail at trial." [FN11]

This incentive to settle stems not only from legal fees incurred but also from the doctrine of joint and several liability, which requires a defendant to pay 100 percent of the damages even if the defendant is only one percent responsible. As Chairman D'Amato stressed: "the threat of such liability often forces innocent 'deep pocket' defendants to settle frivolous suits." [FN12] Chairman Levitt similarly concluded: "Because the existing safeguards provided by the system are imperfect, there is a danger that weak claims may be overcompensated while strong claims are undercompensated." [FN13]

S. 240 includes several provisions to reduce the settlement value of frivolous securities class actions. First, S. 240, while retaining joint and several liability for defendants who knowingly engage in securities fraud, adopts a modified proportionate liability standard for defendants found to be less culpable. In cases involving insolvent co-defendants who are found to be proportionately liable, a remaining defendant must pay the share reflecting his or her degree of responsibility plus all or part of the uncollectible amount but only up to 50 percent of its share of the original judgment. Joint and several liability is also retained for all small investors whose net worth is $200,000 or less and who lose more than ten percent of their net worth as a result of the fraud. Second, S. 240 clarifies the pleading requirements for bringing securities fraud claims by adopting a standard modelled on that currently applied by the United States Court of Appeals for the Second Circuit, the leading circuit court in this area. Third, S. 240 requires courts to make findings regarding compliance by all attorneys and all parties with Rule 11(b) of the Federal Rules of Civil Procedure, which authorizes the imposition of sanctions when a complaint is legally frivolous, lacks evidentiary support, or is otherwise abusive.

S. 240 includes several other provisions intended to reduce the cost of raising capital. These provisions include establishing guidelines for calculating damages; codifying the requirement under current law that plaintiffs prove that the loss in the value of their stock was caused by the Section 10(b) violation and not by other factors; requiring auditors to notify the SEC of illegal acts that management has not adequately addressed; prohibiting the use of conduct actionable as securities fraud as the basis of private treble damages actions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and clarifying the ability of the SEC to bring aiding and abetting claims. None of the provisions in S. 240 affects the SEC's ability to bring enforcement actions.

### **687 *8 PURPOSE AND SCOPE OF THE LEGISLATION

### BACKGROUND

The United States securities markets are the most liquid and deep in the world. In just the past ten years, capital raised has risen by 1,000%. Over the last three years, the U.S. securities

industry has set new records in corporate underwriting and raising capital for new businesses. [FN14] In 1994, the industry raised $1 trillion for businesses, including $34 billion for small businesses making their first foray into the capital markets. [FN15]

The Nation's capital markets play a critical role in our domestic economy by creating jobs and expanding businesses. Small and emerging businesses now account for two-thirds of the new jobs in America. [FN16] Strong capital markets enhance the United States' competitiveness in the global markets.

The success of the U.S. securities markets is largely the result of a high level of investor confidence in the integrity and efficiency of our markets. The SEC enforcement program and the availability of private rights of action together provide a means for defrauded investors to recover damages and a powerful deterrent against violations of the securities laws. As noted by SEC Chairman Levitt, "private rights of action are not only fundamental to the success of our securities markets, they are an essential complement to the SEC's own enforcement program." [FN17] The Supreme Court has also described private securities actions as a "necessary supplement" to the SEC's enforcement regime. [FN18]

Although private securities class actions can complement SEC enforcement actions, the evils flowing from abusive securities litigation start with the filing of the complaint and continue through to the final disposition of the action. A complaint alleging violations of the Federal securities laws is easy to craft and can be filed with little or no due diligence. A drop in a public company's stock price, a failed product development project, or even unpredictable adverse market conditions that affect earnings results for a quarter can trigger numerous securities fraud lawsuits against a company.

One study concluded that, in the early 1980's, every company in one business sector that suffered a market loss of $20 million or more in its capitalization was sued. [FN19] Another survey of venture-backed companies in existence for less than ten years revealed that one in six had been sued at least once, and that such lawsuits had already consumed an average of 1,055 hours of management time and $692,000 in legal fees. [FN20]

**688 *9 Most defendants in securities class action lawsuits choose to settle rather than face the enormous expense of discovery and trial. Of the approximately 300 securities lawsuits filed each year, almost 93% settle at an average settlement cost of $8.6 million. [FN21] These cases are generally settled based not on the merits but on the size of the defendant's pocketbook.

The fact that many of these lawsuits are filed as class actions has had an in terrorem effect on Corporate America. A whole stable of "professional plaintiffs," who own shares-or sometimes fractions of shares-in many companies, stand ready to lend their names to class action complaints. These lawsuits have added significantly to the cost of raising capital and represent a "litigation tax" on business. [FN22] Smaller start-up companies bear the brunt of abusive securities fraud lawsuits. Many of these companies are high-technology companies which, by their very nature, have unpredictable business prospects and, consequently, volatile stock prices. [FN23]

This abusive litigation also threatens to undermine one of the underpinnings of the Federal securities laws-disclosure to investors. Risk-averse corporate management avoid discussions of future business plans. Many companies refuse to talk or write about future business plans, knowing that projections that fail to materialize will inevitably result in a lawsuit. [FN24]

Underwriters, lawyers, accountants, and other professionals are prime targets of abusive securities lawsuits. The deeper the pocket, the greater the likelihood that a marginal party will be named as a defendant in a securities class action. The availability of insurance also drives these

lawsuits. In 1994 alone, $1.4 billion was paid out by corporations or their insurers to settle securities lawsuits. [FN25]

The "victims" on whose behalf these lawsuits are allegedly brought often receive only pennies on the dollar in damages. [FN26] Even worse, long-term investors ultimately end up paying the costs associated with the lawsuits. As the Council for Institutional Investors advised: "We are * * * hurt if a system allows someone to force us to spend huge sums of money in legal costs by merely paying ten dollars and filing a meritless cookie cutter complaint against a company or its accountants when that plaintiff is disappointed in his or her investment." [FN27]

**689 *10 In crafting this legislation, the Committee has sought to strike the appropriate balance between protecting the rights of victims of securities fraud and the rights of public companies to avoid costly and meritless litigation. Our economy does not benefit when strike suit artists wreak havoc on our Nation's boardrooms and deter capital formation.

ELIMINATION OF ABUSIVE PRACTICES IN SECURITIES LITIGATION

Removing the incentives to participate in abusive class action litigation

The Securities Subcommittee heard extensive testimony concerning certain areas of abuse involving class actions. These abuses include the use of professional plaintiffs and the race to the courthouse to be the first to file the complaint. [FN28] State securities regulators testified that reform in both of these areas would "create a more rational system for the filing of these cases." [FN29]

The proliferation of "professional" plaintiffs has made it particularly easy for lawyers to find individuals willing to play the role of wronged investor for purposes of filing a class action lawsuit. Professional plaintiffs often are motivated by the payment of a "bonus" far in excess of their share of any recovery.

The Committee believes that lead plaintiffs are not entitled to a bounty for their service. Thus, the lead plaintiff's share of any final judgment of any settlement should be calculated in the same manner as the shares of the other class members. Recognizing that service as the lead plaintiff may require court appearances or other duties involving time away from work, the Committee grants courts discretion to award the lead plaintiff reimbursement for "reasonable costs and expenses" (including lost wages) directly relating to representation of the class.

The Committee recognizes that certain basic information about the lead plaintiff should be provided at the outset of litigation. Accordingly, the Committee requires that the lead plaintiff file a sworn certified statement with the complaint. The plaintiff must certify that he or she: (a) reviewed and authorized the filing of the complaint; (b) did not purchase the securities at the direction of counsel or to participate in a lawsuit; and (c) is willing to serve on behalf of the class. To further deter professional plaintiffs, the plaintiff must also identify any transactions in the securities covered by the class period, and the other lawsuits in which the plaintiff has sought to serve as lead plaintiff in the last three years.

The lead plaintiff should actively represent the class. The Committee believes that the lead plaintiff-not lawyers-should drive the litigation. As one witness testified: "One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then attach a plaintiff." [FN30]

**690 *11 Courts traditionally appoint the lead plaintiff and lead counsel in class action lawsuits on a "first come, first serve" basis. Since no deference is given to the most thoroughly researched complaint, the lawyers spend minimal time preparing complaints in securities class actions. The

first lawsuit filed also renders the lead plaintiff.

The Committee believes that the selection of the lead plaintiff should rest on considerations other than a speedy filing of the complaint. The Committee establishes procedures for the appointment of the lead plaintiff in class actions brought under both the 1933 Act and 1934 Act. Within 20 days of filing a complaint, the plaintiff must publish in a widely circulated business publication notice of the complaint, and that members of the purported class may move the court to serve as lead plaintiff within 60 days. The Committee does not intend for the members of the purported class who seek to serve as lead plaintiff to file with this motion the certification described above. The Committee intends "publication" to encompass a variety of mediums, including wire, electronic, or computer services.

The Committee intends to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring the court to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff." Institutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market. Pension funds total $4.5 trillion of institutional assets. [FN31] The current system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions. [FN32]

The Committee believes that increasing the role of institutional investors in class actions will ultimately benefit the class and assist the courts. According to one representative of institutional investors: "As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation." [FN33]

Scholars predict that increasing the role of institutional investors will benefit both injured shareholders and courts: "Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' than is the case with settlements negotiated by unsupervised plaintiffs' attorneys" [FN34] The Committee believes that an institutional investor acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors.

Finally, the Committee permits the lead plaintiff to choose the class counsel. This provision is intended to permit the plaintiff to choose counsel rather than have counsel choose the plaintiff. Although the Committee permits the most adequate plaintiff to **691 *12 choose class counsel, the Committee does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

New rules relating to the settlement process

The Securities Subcommittee also heard testimony that counsel in securities class actions receive a disproportionate share of the settlement award and that class members frequently lack meaningful information about the terms of the proposed settlement. [FN35]

Under current practice, courts generally award attorney's fees based on the so-called "lodestar" approach-i.e., the court multiplies the attorney's hours by a reasonable hourly fee, which may be increased by an additional amount based on risk or other relevant factors. [FN36] As a result of this methodology, attorney's fees have exceeded 50% or more of the settlement awarded to the class. The Committee limits the award of attorney's fees and costs to a reasonable percentage of

the amount of recovery awarded to the class. By not fixing the percentage of attorney's fees and costs that may be awarded, the Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The provision focuses on the final amount of damages awarded, not the means by which they are calculated.

Class members often receive insufficient notice of the terms of a proposed settlement and, thus, have little basis to evaluate the settlement. As one bar association advised, "settlement notices provided to class members are often obtuse and confusing, and should be written in plain English." [FN37] The Committee received similar testimony from an investor who was a class member in two separate securities fraud lawsuits: "Nowhere in the settlement notices were the stockholders told of how much they could expect to recover of their losses. * * * I feel that the settlement offer should have told the stockholders how little of their losses will be recovered in the settlement, and that this is a material fact to the shareholder's decision to approve or disapprove the settlement." [FN38]

The Committee requires that certain information be included in any proposed or final settlement agreement disseminated to class members. To ensure that critical information is readily ascertainable to class members, the Committee requires that such information appear in summary form on the cover page of the notice. The notice must contain a statement of the average amount of damages per share that would be recoverable if the settling parties can agree on a figure, or a statement from each settling party on why there is disagreement. It must also explain the attorney's fees and costs sought. The name, telephone number, and address of counsel for the class must be provided, and such counsel must be reasonably available to answer class members' questions about the settlement. Perhaps most importantly, the notice must include a brief statement explaining the reason for the proposed settlement.

**692 *13 Although generally barring the filing of settlement agreements under seal, the Committee recognizes that legitimate reasons may exist for the court to permit the entry of a settlement or portions of a settlement under seal. A party must show "good cause," i.e., that the publication of a portion or portions of the settlement agreement would result in direct and substantial harm. The Committee intends that "direct and substantial harm" would include reputational injury to a party.

Attorney sanctions for pursuing meritless litigation

The Securities Subcommittee heard ample testimony on the need to reduce the economic incentive to file meritless claims. Under Rule 11 of the Federal Rules of Civil Procedure, the courts may impose sanctions against an attorney or party for the filing of an abusive lawsuit. [FN39] Many believe that Rule 11 has not been an effective tool in limiting abusive litigation. Complaints about the current system include the high cost of making a Rule 11 motion, and the unwillingness of courts to impose sanctions, even when the rule is violated. [FN40]

Several proposals have been advanced to reduce the economic incentive to file abusive securities fraud suits. [FN41] The Committee recognizes the need to reduce significantly the economic incentive to file meritless lawsuits without hindering the ability of the victims of fraud to pursue legitimate claims.

Upon the final adjudication of an action, the Committee requires the court to include in the record specific findings as to whether all parties and all attorneys have complied with the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. If the court finds that either a party or an attorney violated Rule 11(b), the court must impose sanctions. Section 103 adopts a

rebuttable presumption that the appropriate sanction for the filing of a complaint in violation of Rule 11(b) is an award of attorney's fees and costs. A party may rebut this presumption by proof: (i) that the violation was de minimis, or (ii) that the imposition of fees and costs would impose an undue burden on that party. The Committee does not intend \*14 \*\*693 the court to establish a specific income or other financial threshold that would automatically carve out a category of individuals for which imposing sanctions would always cause an "undue burden." Rather, the Committee expects that the court will take into account the relevant circumstances of each case. If a party successfully rebuts the presumption, the court then must impose sanctions consistent with Rule 11(c)(2). [FN42] The Committee intends for this provision to impose upon courts the affirmative duty to scrutinize closely filings and to sanction attorneys whenever their conduct violates Rule 11(b).

Stay of discovery

The cost of discovery often forces defendants to settle abusive securities class actions. According to the general counsel of an investment bank, "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." [FN43] In addition, the threat that the time of key employees will be spent responding to discovery requests, such as providing deposition testimony, may force coercive settlements.

The Securities Subcommittee heard testimony that discovery in securities class actions resembles a fishing expedition. As one corporate executive testified, "once the suit is filed, the plaintiff's law firm proceeds to search through all of the company's documents and take endless depositions for the slightest positive comment which they can claim induced the plaintiff to invest and any shred of evidence that the company knew a downturn was coming." [FN44] Thus, plaintiffs sometimes file frivolous lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint. Accordingly, the Committee has determined that discovery should be permitted in securities class actions only after the court has sustained the legal sufficiency of the complaint. Courts should stay all discovery pending a ruling on a motion to dismiss a securities class action, except in the exceptional circumstance where particularized discovery is necessary to preserve evidence or to prevent undue prejudice to a party. The Committee recognizes, for example, that a motion to dismiss may remain pending for a period of time, and that the terminal illness of an important witness may necessitate the deposition of the witness prior to ruling on the motion to dismiss.

Because the imposition of a stay of discovery may increase the likelihood that relevant evidence may be lost, the Committee makes it unlawful for any person, upon receiving actual notice that names that person as a defendant, to destroy or otherwise alter relevant evidence. The Committee intends this provision to prohibit only the willful alteration or destruction of evidence relevant to the allegations in the complaint. This provision does not impose liability \*15 \*\*694 for the inadvertent or unintentional destruction of documents. Although this prohibition expressly applies only to defendants, the Committee believes that the willful destruction of evidence by a plaintiff would be equally improper, and that courts have ample authority to prevent such conduct or to apply sanctions as appropriate.

A strong pleading requirement

The Securities Subcommittee has heard ample testimony on the need to establish a uniform and

stringent pleading requirement to curtail the filing of abusive lawsuits. Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to plead allegations of fraud with "particularity." The courts of appeals have interpreted Rule 9(b) in different ways, creating distinctly different pleading standards among the circuits.

The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modeled upon the pleading standard of the Second Circuit. Regarded as the most stringent pleading standard, [FN45] the Second Circuit requires that the plaintiff plead facts that give rise to a "strong inference" of defendant's fraudulent intent. [FN46] The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

The plaintiff must also specifically identify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if the allegation is made on information and belief, the plaintiff must set forth all information in plaintiff's possession on which the belief is formed.

The Committee also requires the plaintiff to show that the misstatement or loss alleged in the complaint caused the loss incurred by the plaintiff. For example, the plaintiff would have to prove that the price at which the plaintiff bought the stock was artificially inflated as the result of the misstatement or omission. The defendant would then have the opportunity to prove any mitigating circumstances, or that factors unrelated to the fraud contributed to the loss.

A safe harbor for forward-looking statements or projections

Abusive litigation severely impacts the willingness of corporate managers to disclose information to the marketplace. Former SEC Chairman Richard Breeden testified: "Shareholders are also damaged due to the chilling effect of the current system on the robustness and candor of disclosure. * * * Understanding a company's own assessment of its future potential would be among the **695 *16 most valuable information shareholders and potential investors could have about a firm." [FN47]

Fear that inaccurate projections will trigger the filing of a securities fraud lawsuit has muzzled corporate management. One study found that over two-thirds of venture capital firms were reluctant to discuss their performance with analysts or the public because of the threat of litigation. [FN48] Anecdotal evidence similarly indicates company's counsel advises clients to say as little as possible, because "legions of lawyers scrub required filings to ensure that disclosures are as milquetoast as possible, so as to provide no grist for the litigation mill." [FN49]

Small, high-growth businesses-because of the volatility of their stock prices-are particularly vulnerable to securities fraud lawsuits when projections do not materialize. If a company fails to satisfy its announced earnings projections-perhaps because of changes in the business cycle or a change in the timing of an order or new product-the company is likely to face a lawsuit. In many cases, the discovery process is then used to look for evidence of fraud. One witness described the broad discovery requests that resulted in the company producing over 1,500 boxes of documents at an expense of $1.4 million. [FN50]

The Committee's statutory "safe harbor" is intended to enhance market efficiency by encouraging companies to disclose forward-looking information. This provision protects from liability certain "forward-looking" statements that are accompanied by sufficient cautionary language.

The concept of a safe harbor for forward-looking statements made under certain conditions is not new. In 1979, the SEC promulgated Rule 175 to provide a safe harbor for certain forward looking statements made with a "reasonable basis" and in "good faith." This safe harbor has not provided companies meaningful protection from litigation. In a February 1995 letter to the SEC, a leading pension fund stated: "A major failing of the existing safe harbor is that while it may provide theoretical protection to issuers from liability when disclosing projections, it fails to prevent the threat of frivolous lawsuits that arises every time a legitimate projection is not realized." [FN51]

Courts have also crafted a safe harbor for forward-looking statements or projections accompanied by sufficient cautionary language. At least five courts of appeals have recognized the so-called *17 **696 "bespeaks caution" doctrine. [FN52] In an oft-cited case, [FN53] the Third Circuit articulated this doctrine as follows:

We can state as a general matter that, when an offering document's forecasts, opinions, or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provides investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law. [FN54]

The Committee's safe harbor is based on aspects of SEC Rule 175 and the bespeaks caution doctrine. This provision applies to both oral and written statements that describe, project or estimate future events. The Committee adopts the SEC's present definition, as set forth in Rule 175, of forward- looking information. The SEC's definition covers: (i) certain financial items, including projections of revenues, income, and earnings, capital expenditures, dividends, and capital structure; (ii) management's statement of future business plans and objectives; and (iii) certain statements made in SEC required disclosures, including management's discussion and analysis and results of operations; and (iv) any statement disclosing the assumptions underlying the forward-looking statement.

The safe harbor provision protects written and oral forward-looking statements made by issuers and certain persons retained or acting on behalf of the issuer. To come within the safe harbor, the statement must "project, estimate, or describe" future events and be accompanied by sufficient notice that the information is forward-looking and that actual results may be materially different from such projections. In the case of oral statements, the Committee expects that the notice will be provided at the outset of any general discussion of future events and that further notice will not be necessary during the course of that discussion.

The Committee intends that the phrase "a person acting on behalf of such issuer" be construed in a manner that will promote the purposes of the safe harbor in accordance with securities industry practice. In this regard, the Committee intends that the safe harbor protect, not merely the statements of the issuer, but also those of employees of the issuer and of persons acting on the issuer's behalf.

The Committee has determined that the statutory safe harbor should not apply to certain forward-looking statements. Thus, the statutory safe harbor does not protect forward-looking statements: (1) included in financial statements prepared in accordance with generally accepted accounting principles; (2) contained in an initial public offering registration statement; (3) made in connection with **697 *18 a tender offer; (4) made in connection with a partnership, limited liability corporation, or direct participation program offering; or (5) made in beneficial ownership disclosure statements filed with the SEC under Section 13(d) of the 1934 Act. The

Committee expressly authorizes the SEC to consider the adoption of a regulatory safe harbor for such statements.

Moreover, the Committee has determined to extend the statutory safe harbor only to forward-looking information of certain established issuers subject to the reporting requirements of Section 15(d) of the 1934 Act. Except as provided by SEC rule or regulation, the safe harbor does not extend to an issuer who: (a) during the three year period preceding the date on which the statement was first made, has been convicted of a felony or misdemeanor described in clauses (i) through (iv) of Section 15(b)(4) of the 1934 Act or is the subject of a decree or order involving a violation of the federal securities laws; (b) makes the statement in connection with a "blank check" securities offering, "rollup transaction," or "going private" transaction; or (c) issues penny stock.

Although the Committee believes that market discipline will most likely provide sufficient disincentives for using the safe harbor as a "license to lie," the safe harbor does not protect forward-looking statements "knowingly made with the expectation, purpose, and actual intent of misleading investors." The Committee intends that the pleading requirements under new Section 36 of the 1934 Act will apply to a complaint alleging that a forward-looking statement is not within the safe harbor. Accordingly, the plaintiff would have to allege "facts giving rise to a strong inference" that the forward-looking statement was "knowingly made with the expectation, purpose, and actual intent of misleading investors." "Expectation," "purpose," and "actual intent" are independent elements of the exclusion, and plaintiffs have the burden of pleading and proving each of these elements.

The court must stay discovery (other than discovery that is specifically directed to the applicability of the safe harbor) when a defendant moves for summary judgment based on the ground that the safe harbor bars a claim for relief. Courts should, to the fullest extent possible, limit discovery to facts directly bearing upon the applicability of the safe harbor and not permit plaintiffs to engage in fishing expeditions. The Committee expects that the stay will significantly reduce the costs of discovery.

The Committee intends for its statutory safe harbor provisions to serve as a starting point and fully expects the SEC to continue its rulemaking proceedings in this area. The SEC should, as appropriate, promulgate rules or regulations to expand the statutory safe harbor by providing additional exemptions from liability or extending its coverage to additional types of information.

Written interrogatories

In an action to recover money damages, the Committee requires the court to submit written interrogatories to the jury on the issue of defendant's state of mind at the time of the violation. In expressly providing for certain interrogatories, the Committee does not intend to prohibit otherwise or discourage the submission of interrogatories concerning the mental state or relative fault of the **698 *19 plaintiff and of persons who could have been joined as defendants. For example, interrogatories may be appropriate in contribution proceedings among defendants or in computing liability when some of the defendants have entered into settlement with the plaintiff prior to verdict or judgment.

Limiting civil RICO actions

The SEC has supported removing securities fraud as a predicate act of racketeering in a civil

action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). SEC Chairman Arthur Levitt testified: "Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." [FN55]

The Committee amends Section 1964(c) of Title 18 of the U.S. Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as a predicate act of racketeering under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate act of racketeering in a civil RICO action. In addition, a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts of racketeering under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

A grant of authority to the SEC to prosecute certain aiding and abetting cases

Prior to the Supreme Court's decision in Central Bank of Denver v. First Interstate Bank of Denver, [FN56] courts of appeals had recognized that private parties could bring actions against persons who "aided and abetted" primary violators of the securities laws. In Central Bank, the Court held that there was no aiding and abetting liability for private lawsuits involving violations of the securities antifraud provisions.

The Committee considered testimony endorsing the result in Central Bank and testimony seeking to overturn this decision. The Committee believes that amending the 1934 Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to S. 240's goal of reducing meritless securities litigation. The Committee does, however, grant the SEC express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws.

Limitation on damages

The current method of calculating damages in 1934 Act securities fraud cases is complex, with no statutory guidance to provide certainty. As a result, there are often substantial variations in the damages calculated by the defendants and the plaintiffs. Typically, in an action involving a fraudulent misstatement or omission, the investor's damages are presumed to be the difference between the **699 *20 price he or she paid for the security and the price of the security on the date the corrective information is disseminated to the market.

Between the time a misrepresentation is made and the time the market receives corrected information, however, the price of the security may rise or fall for reasons unrelated to the alleged fraud. According to an analysis provided to the Securities Subcommittee, damages in securities litigation amount to approximately 27.7% [FN57] of an investor's market loss. Calculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages. [FN58] The Committee intends to rectify the uncertainty in calculating damages by providing a "bounce back" period, thereby limiting damages to those losses caused by the fraud and not by other market conditions.

This provision requires that plaintiff's damages be calculated by taking into account the value of the security on the date plaintiff originally bought or sold the security and the median market value of the security during the 90- day period after dissemination of any information correcting

the misleading statement or omission. If the plaintiff sells those securities or repurchases the subject securities during the 90-day period, damages will be calculated based on the price of that transaction and the median market value of the security immediately after the dissemination of corrective information and ending with the plaintiff's sale or repurchase of the security.

Modification of joint and several liability

The Committee heard considerable testimony about the impact of joint and several liability on private actions under the Federal securities laws. Under joint and several liability, each defendant is liable for all of the damages awarded to the plaintiff. Thus, a defendant found responsible for only 1% of the harm could be required to pay 100% of the damages.
Former SEC Commissioner J. Carter Beese, Jr., observed that "[t]his principle has a legitimate public policy purpose, but, in practice, it encourages plaintiffs to name as many deep-pocket defendants as possible, even though some of these defendants may bear very little responsibility for any injuries suffered by the plaintiff." [FN59] He noted that "[a]s a result, whenever a company is sued under Rule 10b-5, there is a strong likelihood that lawyers, accountants, underwriters and directors will be sued, as well." [FN60] Several other witnesses, including former SEC Chairmen David S. Ruder and Richard C. Breeden and former SEC Commissioner Charles C. Cox, acknowledged this problem. [FN61]
**700 *21 When peripheral defendants are sued, the pressure to settle is overwhelming-regardless of the defendant's culpability. Former SEC Chairman Ruder stated that defendants are under "enormous pressure to settle" because of "the possibility that they will be required to pay the entire amount claimed." [FN62] The exposure in securities fraud class actions is enormous because of the amount of total damages claimed. In one sample of cases the average claim was $40 million, with 10% of the cases seeking more than $100 million in damages. [FN63] The cost of discovery also contributes to this pressure to settle. [FN64] As a result, oftentimes peripheral defendants are joined simply to obtain a settlement. As Chairman D'Amato observed, "[t]he threat of [joint and several] liability often forces innocent 'deep pocket' defendants to settle frivolous suits." [FN65]
The resulting litigation burden-the combination of legal fees and settlement costs-on peripheral defendants has significant consequences. "The fact that a director of a publicly-held company faces the prospect of being sued regardless of how well he or she performs is driving some directors off corporate boards, and precluding other companies from attracting qualified board members." [FN66] Jean Head Sisco, testifying on behalf of the National Association of Corporate Directors, stated that "the proliferation of abusive 10b-5 securities suits is making it extremely difficult to attract qualified, independent people to sit on corporate boards." [FN67] Several surveys have confirmed that directors are increasingly concerned about litigation risk and are reluctant to serve on boards of start-up and high-technology companies. [FN68]
At a minimum, qualified individuals insist that the company obtain substantial D&O insurance coverage. SEC Chairman Levitt himself refused to serve on boards of companies with insufficient insurance. [FN69] But that prerequisite imposes a high cost: D&O insurance premiums have increased seven-fold over the last decade, [FN70] in large part because of the cost of this litigation. "Within the past two years, several of the major D&O insurers have priced D&O insurance out of existence for many companies, or have stopped writing policies for companies in particular industries, such as the technology sector. All investors are at risk as these growing companies put increasingly large sums of money into D&O policies instead of into

developing the long-term strength of the company." [FN71]

Accounting firms particularly have been hard hit by securities litigation. The six largest firms face $10 billion in 10b-5 claims. [FN72] Their gross audit-related litigation costs amounted to $783 million in 1992- more than 14% of their audit revenues for that year. [FN73] **701 *22 Former SEC Commissioner A.A. Sommer, who heads the Public Oversight Board, the independent body that oversees the accounting profession's self-regulatory efforts, testified that, in view of "some recent judgments and the amounts being sought in pending cases, it is not beyond the pale to believe, and some responsible people do believe-that one or more major [accounting] firms may ultimately be bankrupted. [FN74]

Because of concern about the fairness of 10b-5 litigation and because of concern about the adverse consequences of joint and several liability, a number of witnesses, including SEC Chairman Levitt, [FN75] former SEC Chairmen Ruder and Breeden, [FN76] and former SEC Commissioners Beese and Sommer, [FN77] advocated modification of the doctrine of joint and several liability in securities actions. For example, Ralph V. Whitworth, president of the United Shareholders Association, stated that in cases where there was no proof of actual fraud "[e]liminating joint and several liability * * * will significantly reduce the number of strike suits brought against defendants who have done nothing wrong but are seen as having deep pockets." [FN78] Marc Lackritz, President of the Securities Industry Association, identified proportionate liability as the most important provision to be included in securities litigation reform legislation. [FN79]

The Committee modifies joint and several liability to eliminate unfairness and to reconcile the conflicting interests of investors in a manner designed to best protect the interests of all investors-those who are plaintiffs in a particular case, those who are investors in the defendant company, and those who invest in other companies.

The provision imposes full joint and several liability, as under current law, on all defendants who engage in knowing securities fraud. Defendants who are found liable but who did not engage in knowing securities fraud are liable only for their share of the judgment (based upon the fact finder's apportionment of responsibility), with two key exceptions. First, in the event some defendant is insolvent, and therefore cannot pay his or her share of the liability, and the jointly and severally liable defendants cannot make up the difference, each of the other proportionally liable defendants must make an additional payment-up to 50% of his or her own liability-to make up the shortfall in the plaintiff's recovery.

Second, proportionally liable defendants will be liable for the uncollectible share if the plaintiff establishes that (i) the damages are more than 10% of the plaintiff's net worth, and (ii) the plaintiff's net financial worth is less than $200,000. In this scenario, there is no limitation on the amount proportionally liable defendants will be required to pay. The $200,000 financial net worth test does not reflect a judgment by the Committee that investors who fall below this standard are "small," unsophisticated, or in need of, **702 *23 or entitled to, special protection under the securities laws. The Committee intends "financial net worth" to include all of the plaintiff's financial assets including stocks, bonds, real estate, and jewelry.

Loss causation requirement for Section 12(2) of the 1933 Act

Congress adopted Section 12(2) of the 1933 Act to deter material misrepresentations and omissions in the purchase or sale of securities. Some courts have held that a plaintiff suing under Section 12(2) need not prove that the misstatement or omission caused the loss. [FN80] As a

result, issuers have been put in the position of insuring shareholders and purchasers against normal market risk. An issuer that makes a material misstatement or omission in its prospectus can be liable for losses to shareholders-even if the losses have nothing to do with the misstatement or omission.

This interpretation of Section 12(2) provides an unfair windfall to shareholders who have not in any way been harmed by the misstatement or omission. For example, a company might fail to state in a public offering prospectus that it conducts business in a foreign country. Even if the company's foreign business is highly profitable, if its overall profits decline as the result of unrelated factors (such as a downturn in its domestic business), any purchaser of the securities in the offering could rescind his or her purchase.

The Committee amends Section 12(2) to clarify that defendants may raise the absence of "loss causation" as an affirmative defense. If a defendant in a Section 12(2) action demonstrates that part or all of the decline in the value of the security was caused by factors other than the misstatement or omission alleged in the complaint, the plaintiff may not recover damages based on that portion of the decline. The defendant must bear the burden of affirmatively demonstrating the absence of loss causation. This provision does not place any additional burden on plaintiffs to demonstrate that loss causation existed, nor does it deprive investors of Section 12(2) remedies when they have incurred losses caused by inadequate disclosure. The amendment to Section 12(2) is modeled after Section 11 of the Securities Act, which provides for a similar affirmative defense.

Auditor Disclosure of Corporate Fraud

This provision requires independent public accountants to adopt certain procedures in connection with their audits and to inform the SEC of illegal acts of their auditing clients. These requirements should be carried out in accordance with generally accepted auditing standards for audits of SEC registrants-as modified from time to time by the Commission-on the detection of illegal acts, related party transactions and relationships, and evaluation of an issuer's ability to continue as a going concern.

The Committee does not intend to affect the Commission's authority in areas not specifically addressed by this provision. The Committee expects that the SEC will continue its long-standing **703 *24 practice of looking to the private sector to set and to improve auditing standards. The SEC should not act to "modify" or "supplement" generally accepted auditing standards for SEC registrants until after it has determined that the private sector is unable or unwilling to do so on a timely basis. The Committee intends for the SEC to have discretion, however, to determine the appropriateness and timeliness of the private sector response. The SEC should act promptly if required by the public interest or for the protection of investors.

SECTION-BY-SECTION ANALYSIS OF S. 240 THE "PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995"

Section 1. Short title; table of contents

Section 1 provides that S. 240 may be cited as the "Private Securities Litigation Reform Act of 1995" (the "Act") and sets out a table of contents for the Act.

## TITLE I-REDUCTION OF ABUSIVE LITIGATION

Section 101. Elimination of certain abusive practices

Section 101(a) amends the Securities Exchange Act of 1934 (the "1934 Act") by adding a new paragraph (8) to Section 15(c), prohibiting brokers or dealers or any associated persons from soliciting or receiving any type of fee or remuneration for assisting an attorney in obtaining representation of any person in private actions under the Securities Act of 1933 (the "1933 Act") or the 1934 Act.

Section 101(b) amends Section 20 of the 1933 Act by adding a new subsection (f) and Section 21 of the 1934 Act by adding a new subsection (i), requiring the court to determine whether a plaintiff's attorney who owns, or has a beneficial interest in, securities that are the subject of litigation has a disqualifying conflict of interest.

Section 101(c) amends Section 20 of the 1933 Act by adding a new subsection (g) and Section 21(d) of the 1934 Act by adding new paragraph (4), prohibiting the payment of attorneys' fees or expenses incurred by private parties out of funds disgorged as the result of action by the Securities and Exchange Commission (the "Commission" or "SEC"), except as otherwise ordered by the court upon motion by the Commission and, in the case of SEC administrative actions, by order of the Commission.

Section 102. Securities class action reform

Section 102(a) establishes five new recovery rules for private class actions under the 1933 and 1934 Acts. Section 102(a)(1) of the Act amends Section 20 of the 1933 Act by adding a new subsection (h) and Section 102(a)(2) of the Act amends Section 21 of the 1934 Act by adding new subsection (j).

The first rule requires every plaintiff seeking to serve as a representative party on behalf of a class to file a sworn certification with the complaint, stating: (i) the plaintiff reviewed the complaint and authorized its filing; (ii) the plaintiff did not purchase the securities at the direction of counsel or to participate in a lawsuit; (iii) the plaintiff is willing to serve as a representative party on behalf of the class; (iv) the plaintiff's transactions during the class period in the security that is the subject of the complaint; (v) other lawsuits *25 **704 in which the plaintiff has sought to serve as representative party in the prior three years; and (vi) the plaintiff will not receive any bonus for serving as the class representative. This certification will not be construed to waive the attorney-client privilege.

The second rule limits the class representative's recovery to his or her pro rata share of the settlement or final judgment. The court may also reimburse the class representative for "reasonable costs and expenses," including lost wages directly relating to the representation of the class.

The third rule prohibits the filing of settlements under seal except if "good cause" is shown, i.e., publication of a portion or portions of the settlement agreement would result in direct and substantial harm to a party.

The fourth rule limits the award of fees and expenses to counsel for a plaintiff class to a reasonable percentage of the amount of recovery awarded to the class.

The fifth rule specifies the information that must be included in any proposed or final settlement agreement disseminated to the class. The rule requires the settling parties, if they can agree, to

state the average amount of damages per share that would be recoverable if the plaintiff prevailed. If the parties cannot agree, each party must provide a statement on the issues on which they disagree. Such statements are inadmissible in any court action or administrative proceeding unless the action or proceeding concerns the statement itself. The rule also requires the parties or counsel who intend to seek an award of attorneys' fees or costs to state the amount sought-on an average per share basis-and to provide an explanation supporting the fees and costs sought. Any settlement agreement must also include the name, telephone number, and address of plaintiff class counsel who will answer questions from class members, and a brief statement explaining the reasons for the proposed settlement. The required information must appear, in summary form, on a cover page. The court may order disclosure of additional information.

Section 102(b)(1) amends the 1933 Act by adding a new subsection (i) to Section 20, and Section 102(b)(2) amends the 1934 Act by adding a new subsection (k) to Section 21; establishing procedures for the appointment of the lead plaintiff in class actions. A plaintiff filing a securities class action must, within 20 days of filing a complaint, provide notice to members of the purported class in a widely circulated business publication. This notice must: (i) identify the claims alleged in the lawsuit and the purported class period, and (ii) inform potential class members that, within 60 days, they may move to serve as the lead plaintiff. The notice provisions in this subsection do not replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure.

Within 90 days of the published notice, the court must consider motions made under this section and appoint the lead plaintiff. If a motion has been filed to consolidate multiple class actions brought on behalf of the same class, the court shall not appoint a lead plaintiff until after consideration of any such motion. In appointing the lead plaintiff, the court shall presume that the "most adequate plaintiff" is the member of the purported class (who has moved for such appointment and otherwise satisfies **705 *26 Rule 23 of the Federal Rules of Civil Procedure) with the largest financial interest in the relief sought by the class. This presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interests of the class or is subject to unique defenses.

Members of the purported class may seek discovery into whether the presumptively most adequate plaintiff would not adequately represent the class. Subject to court approval, the most adequate plaintiff shall retain class counsel.


Section 103. Sanctions for abusive litigation

Section 103(a) amends Section 20 of the 1933 Act by adding a new subsection (j) and Section 103(b) amends Section 21 of the 1934 Act by adding a new subsection (l), requiring the court (i) to make specific findings, upon adjudication of a private action, regarding compliance by all parties and all attorneys with each requirement of Rule 11(b), and (ii) to impose sanctions for any violations. In imposing sanctions for failure of the complaint to comply with Rule 11(b), the court will presume that the appropriate sanction is the reasonable attorneys' fees and expenses of the opposing party. This presumption may be rebutted by evidence that the imposition of sanctions would impose an undue burden on the violator or that the Rule 11 violation was de minimis.


Section 104. Requirements for securities fraud actions

Section 104(a)(1) amends Section 20 of the 1933 Act by adding a new subsection (k) and (l) and adds a new Section 36(c) to the 1934 Act, (i) requiring the court to stay discovery during the pendency of any motion to dismiss the complaint, unless particularized discovery is needed to preserve evidence or prevent undue prejudice, and (ii) prohibiting parties from wilfully destroying or altering evidence they know is relevant to the allegations in the complaint.
Section 104(b) amends the 1934 Act by adding a new Section 36, establishing pleading standards for Section 10(b) actions alleging untrue statements or omissions of a material fact. The complaint must specifically identify each misleading statement and the reason or reasons why it is misleading. In any private action to recover money damages, the plaintiff must, for each misstatement or omission, specifically allege facts giving rise to a strong inference that the defendant acted with the required state of mind.
This section also requires plaintiffs to show "loss causation," i.e., that the alleged violation caused plaintiff's loss. The defendant may mitigate the damages arising from such loss by showing that unrelated factors contributed to the loss.

Section 105. Safe harbor for forward-looking statements

Section 105 establishes a "safe harbor" protecting certain forward-looking statements from liability in private actions under the 1933 Act and the 1934 Act and grants the SEC authority to promulgate safe harbor rules under the Investment Company Act of 1940. Section 105(a) amends the 1933 Act by adding a new Section 13A; Section 105(b) amends the 1934 Act by adding a new Section 37; and Section 105(c) amends Section 24 of the Investment Company Act by adding a new subsection (g).
**706 *27 The safe harbor provision protects written and oral forward-looking statements that "project, estimate, or describe" future events made by issuers and certain persons retained or acting on behalf of issuers. To be protected, the statement must be accompanied by sufficient notice that the information is forward-looking and that actual results may be materially different from such projections, estimates, or descriptions.
The definition of "forward-looking" information is the same as contained in the SEC's present Rule 175 safe harbor. The definition includes: (i) certain financial items, including projections of revenues, income, earnings, capital expenditures, dividends, and capital structure; (ii) management's statement of future business plans and objectives; (iii) certain statements made in required SEC disclosures, including management's discussion and analysis and results of operations; and (iv) any disclosed statement of the assumptions underlying the forward-looking statement. The SEC may expand the definition by rule or regulation.
The safe harbor does not protect forward-looking statements "knowingly made with the expectation, purpose, and actual intent of misleading investors."
In order to qualify for the safe harbor, the issuer must be subject to the reporting requirements of Section 13(a) or Section 15(d) of the 1934 Act. Except as provided by SEC rule or regulation, the safe harbor does not extend to an issuer who: (a) during the three year period preceding the date on which the statement was first made, has been convicted of a felony or misdemeanor described in clauses (i) through (iv) of Section 15(b)(4) or is the subject of a decree or order involving a violation of the securities laws; (b) makes the statement in connection with a "blank check" securities offering, "rollup transaction," or "going private" transaction; or (c) issues penny stock.
The safe harbor does not cover certain statements that may otherwise qualify as forward-looking

statements. Except as provided by SEC rule or regulation, the safe harbor does not cover forward-looking statements: (i) included in financial statements prepared in accordance with generally accepted accounting principles; (ii) contained in an initial public offering registration statement; (iii) made in connection with a tender offer; (iv) made in connection with a partnership, limited liability corporation or direct participation program offering; or (v) made in beneficial ownership disclosure statements filed with the SEC under Section 13(d) of the 1934 Act.

The court must stay discovery (other than discovery that is specifically directed to the applicability of the safe harbor) pending its decision on a motion for summary judgment based on the grounds that the statement or omission is protected by the safe harbor.

The SEC may promulgate rules or regulations to expand the statutory safe harbor by providing additional exemptions from liability. This section also grants the SEC authority to recover damages on behalf of investors injured by reason of violations involving a forward-looking statement not protected by the safe harbor.

Section 106. Written interrogatories

Section 106(a) amends Section 20 of the 1933 Act by adding a new subsection (m) and Section 21 of the 1934 Act by adding a new **707 *28 subsection (m), requiring the court, in actions in which the plaintiff may recover money damages, to submit written interrogatories to the jury on the issue of defendant's state of mind at the time of the violation.

Section 107. Amendment to Racketeer Influenced and Corrupt Organizations Act

Section 107 amends Section 1964(c) of Title 18 of the U.S. Code to conduct that would have been actionable as fraud in the purchase or sale of a security as a predicate offense under civil RICO.

Section 108. Authority of Commission to prosecute aiding and abetting

Section 108 amends Section 20 of the 1934 Act by adding a new subsection (e), authorizing the SEC to bring an action seeking injunctive relief or money penalties against persons who knowingly "aid and abet" primary violators of the securities laws.

Section 109. Limitation on rescission

Section 109 amends Section 12 of the 1933 Act by adding a provision at the end of the section allowing a defendant to avoid the remedy of rescission under certain circumstances. In an action based on a misstatement or omission contained in a prospectus, a defendant may avoid rescissionary damages if the defendant proves that the depreciation in the value of the security resulted from factors unrelated to the alleged misstatement or omission. If the defendant shows there is no "loss causation" the purchaser may recover damages only for the remaining portion of the depreciation in the security's value.

Section 110. Applicability

The provisions included in Title I of this Act apply to any private action commenced after the date of enactment.

## TITLE II-REDUCTION OF COERCIVE SETTLEMENTS

Section 201. Limitation on damages

Section 201 amends Section 36 of the 1934 Act by adding a new subsection (e), providing for a "look back" period in calculating damages in a private action involving a misstatement or omission under the 1934 Act. This provision is intended to limit damages to those losses caused by the fraud and not by other market conditions.

Plaintiff's damages will be calculated by taking into account the value of the security on the date plaintiff originally bought or sold the security and the value of the security during the 90-day period after dissemination of any information correcting the misleading statement or omission. If the plaintiff sells those securities or repurchases the subject securities during the 90-day period, damages will be calculated based on the price of that transaction and the value of the security immediately after the dissemination of corrective information.

**708 *29 Section 202. Proportionate liability

Section 202 amends the 1934 Act by adding a new Section 38, establishing a system for allocating damages in private actions brought under the 1934 Act. Under this section, a defendant who commits "knowing" securities fraud is jointly and severally liable for the full amount of the damages. To commit "knowing" securities fraud, a defendant must make a "material representation or omission with actual knowledge that the information is false," and "actually know that persons are likely to rely on" the false information. Reckless conduct would not constitute knowing securities fraud.

In cases involving multiple defendants, the court shall instruct the jury to determine (i) each defendant's percentage of responsibility, including any settling defendants, and (ii) whether each defendant committed knowing securities fraud. The defendants who did not commit knowing securities fraud will only be liable for the portion of damages attributable to their percentage of responsibility.

If there are uncollectible shares because the defendants who have committed knowing securities fraud are "judgment proof," the proportionally liable defendants may be liable for an additional amount of up to 50% of their total share of damages.

In addition, proportionally liable defendants will be liable for the uncollectible share if, within six months of entry of final judgment, the plaintiff establishes that (i) the damages are more than 10% of the plaintiff's net worth, and (ii) the plaintiff's net financial worth is less than $200,000. Defendants who make an additional payment may, within six months of the date of the payment, seek contribution from other defendants in the action. A defendant who settles the action before verdict or judgment will not be subject to any claim of contribution. In determining the amount of the final judgment, the court will reduce the final judgment to take into account the settling party's percentage of responsibility and the amount the settling defendant paid to the plaintiff. A person who is liable for damages under this section may seek, within six months of entry of the final judgment, contribution from persons who were not parties to the lawsuit.

Section 203. Applicability

The provisions included in Title II of this Act apply to any private action commenced after the date of enactment.

## TITLE III-AUDITOR DISCLOSURE OF CORPORATE FRAUD

Section 301. Fraud detection and disclosure

This section amends the 1934 Act by adding a new Section 10A, requiring independent public accountants to institute certain procedures in connection with their activities. If an accountant learns of an illegal act that may be "consequential" to the company, the accountant must provide this information to the company's management. If management fails to act, and the accountant determines that the illegal act would have a material effect on the issuer's financial statements, the accountant must report the information to the board of directors. If the board fails to notify the Commission **709 *30 within one day, the accountant must notify the Commission the following day. Failure to provide this notification will subject the accountant to civil penalties. The provisions in this section apply to annual reports filed with the Commission after July 1, 1996 for registrants that file quarterly reports and January 1, 1997 for all other registrants.

## REGULATORY IMPACT STATEMENT

This legislation seeks to reform private securities litigation and thus it has limited regulatory impact. Generally, there is little or no requirement for regulatory implementation of the provisions of the bill.
Some provisions, in fact, would reduce regulatory requirements. For example, the SEC is directed in Section 105 of the legislation to provide by regulation safe harbors for forward-looking statements comprehended by the Investment Company Act of 1940, and is authorized to provide for statutory safe harbors for forward-looking statements under the 1933 and 1934 Acts. Two provisions would, however, have some regulatory impact. First, Section 105 of the legislation would broaden the SEC's authority to seek and to obtain disgorgement under the 1933 and 1934 Acts. This section authorizes the SEC to recover damages on behalf of investors involving a forward-looking statement not protected by the statutory safe harbor. Under current law, SEC disgorgement is generally limited to any ill-gotten gains. It is not possible to estimate the number of persons to whom this provision would apply. Second, Title III of this legislation would impose new reporting obligations on public accountants. Although these obligations will increase the costs of conducting audits, it is not possible to estimate precisely the extent of these new costs.

## CHANGES IN EXISTING LAW

In the opinion of the Committee, it is necessary to dispense with the requirement of subsection 12 of rule XXVI of the Standing Rules of the Senate in order to expedite the business of the Senate.

## COST OF THE LEGISLATION

The Committee has requested a cost estimate of this legislation under the provisions of Section

403 of the Congressional Budget Act of 1974. The cost estimate of the Congressional Budget
Office follows:
U.S. Congress,
Congressional Budget Office,
Washington, DC, June 19, 1995.
Hon. Alfonse M. D'Amato,
Chairman, Committee on Banking, Housing, and Urban Affairs, U.S. Senate,
Washington, DC.
Dear Mr. Chairman: The Congressional Budget Office has reviewed S. 240, the Private
Securities Litigation Reform Act of 1995, as ordered reported by the Senate Committee on
Banking, Housing, and Urban Affairs on May 25, 1995. CBO estimates that enacting S. 240
would cost the federal government between $125 million and **710 *31 $250 million over the
next five years, assuming appropriation of the necessary amounts. Because enacting S. 240
would affect receipts, pay-as-you-go procedures would apply to the bill. Enacting S. 240 would
not affect the budgets of state or local governments.

Bill purpose

Title I of S. 240 would require a court, when hearing class action litigation brought under the
Securities Exchange Act of 1934, to appoint a lead plaintiff for the class under certain
circumstances. The bill would require the full disclosure of the terms of settlement for any such
class action lawsuit and would prohibit the payment of attorneys' fees from certain funds. In
addition, the bill would establish various procedures and restrictions to discourage litigation,
restrict the liability of those persons who make forward-looking statements regarding securities
or markets, and require the Securities and Exchange Commission (SEC) to promulgate rules
establishing such limited liability. The bill would amend the Racketeer Influenced and Corrupt
Organizations statute to exclude from its purview an action involving fraud in the sale of
securities. Title II of S. 240 would limit the amount of damages that could be awarded in certain
securities litigation cases, and would limit the application of joint and several liability in those
cases. Title III would include certain procedures to be followed during a required audit of a
securities issuer, and would provide civil penalties for violations of those procedures.

Federal budgetary impact

CBO estimates that promulgating the rules required by the bill would result in increased costs to
the federal government of approximately $300,000 in 1996, primarily for personnel costs,
assuming appropriation of the necessary amounts.
By discouraging private litigation under the Securities Exchange Act of 1934, enacting S. 240
would result in an increase in the number of enforcement actions brought by the SEC. In 1994,
there were about 50 enforcement actions due to financial fraud, resulting in administrative costs
to the federal government of approximately $24 million. Although the impact on the SEC's
workload from enacting S. 240 is highly uncertain, CBO expects that financial fraud
enforcement actions would number at least 100, and possibly up to 150. Therefore, CBO
estimates that enactment of S. 240 would increase costs to the SEC for enforcement actions by
$25 million to $50 million annually, or $125 million to $250 million over the next five years,
assuming appropriation of the necessary amounts.

Pay-as-you-go impact

S. 240 would require civil penalties for violations of certain of its provisions. These civil penalties would count as governmental receipts, and thus would be subject to pay-as-you-go provisions. CBO estimates, however, that no significant additional amount of receipts would be collected.

Previous CBO estimate

On February 23, 1995, CBO provided an estimate for Title II of H.R. 10, the Securities Litigation Reform Act, as ordered reported **711 *32 by the House Committee on the Judiciary, to that committee. S. 240 differs from that bill primarily in that S. 240 would require civil penalties for violations of the provisions of Title III, and it would require additional rulemakings by the SEC. In other respects the bills are substantially similar, and CBO's estimate of the SEC's enforcement costs under S. 240 is unchanged from our estimate for Title II of H.R. 10.
If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are John Webb and Melissa Sampson.
Sincerely,
June E. O'Neill, Director.

### *33 ADDITIONAL VIEWS OF SENATORS GRAMM, MACK, FAIRCLOTH, BENNETT, GRAMS, AND FRIST

The Hippocratic Oath begins with the admonition to do no harm. The bill reported by the Committee follows that mandate. Unlike much of the legislation of past Congresses, this bill is not "two-steps-forward, one-step-back" legislation. The improvements that the bill makes over current law are not eroded by new legislative injuries.
While the bill provides significant incremental relief from abusive securities lawsuits, the costs of these lawsuits are so high that stronger reform is needed. Information presented to the Subcommittee on Securities indicates that approximately 300 securities litigation cases are filed each year. Few of these cases are brought to trial. Instead, the high costs of litigation normally induce settlements of the cases, at an average amounting to $8.6 million per case, for a combined total of nearly $2.5 billion per year. Even with settlements, the legal costs for defendants average an additional $700,000 per case.
Perhaps the most destructive aspect of securities strike suits is the disruption that they cause to company operations. For example, defendant companies devote an average of 1,000 management and employee hours to each case. This amounts to 37,500 workdays each year consumed by securities lawsuits.
Moreover, there seems to be a pattern of targeting high technology companies. A survey conducted by the American Electronics Association of their forty largest firms found that twenty-four had been sued for securities fraud, including nine out of the top ten. Either the securities litigation system is broken, or there is an enormous disrespect for the law in Silicon Valley. We believe that the problem lies with the system of litigation.
We therefore recommend that the bill's provisions be strengthened. Among such changes, particular attention should be given to (1) strengthening the proportionate liability provisions of

section 202, (2) strengthening the sanctions for abusive litigation provision of section 103, (3) strengthening the safe harbor for forward-looking statements in section 105, and (4) delineate more clearly the standard of liability provisions of section 104.

### **712 PROPORTIONATE LIABILITY (SECTION 202)

No reform was more strongly supported by witnesses and members during subcommittee hearings than the concept of introducing proportionate liability for securities lawsuits. Currently, defendants have joint and several liability, which means that any person found to have any liability at all, regardless of how insignificant, can be liable for all of the damages awarded in these securities cases. The effect of this has been to add to the lawsuit "deep-pocket" plaintiffs who have at most a marginal involvement in the alleged wrongdoing, *34 such as accounting firms, securities houses, banks, investment partners and others. Faced with (1) the risk of being jointly and severally liable for the entire settlement amount and (2) the high cost of litigation, such peripherally involved defendants frequently decide to settle the case rather than proceed to trial.

The concept of proportionate liability is that no one should be required to compensate for injuries for which they are not responsible. Unfortunately, the bill's proportionate liability provisions contain exceptions that leave deep-pocket parties still within reach of the strike-suit attorneys. Under the bill's provisions, if a clearly guilty defendant's share of a court's judgment is not collectible, every other peripherally involved defendant is jointly and severally liable for the uncollectible share if the financial net worth of the plaintiff is $200,000 or less, that is, most individual investors.

This exception to proportionate liability is open-ended, with no limitations on liability for defendants with minor fault, and no practical means of verifying the net worth or losses of those claiming to be such small investors. This is an exception with the potential for swallowing the rule and should be corrected.

### ATTORNEY SANCTIONS FOR ABUSIVE LAWSUITS (SECTION 103)

The bill contains a very modest provision to penalize attorneys who promote abusive securities suits. Currently, strike suit attorneys face little cost or risk in filing lawsuits on flimsy pretexts. Rule 11 of the Federal Rules of Civil Procedure purportedly applies penalties against attorneys for abusive litigation. But investigation by the Congressional Research Service could find only three cases in history in which Rule 11 attorneys sanctions were ever actually applied in securities Rule 10b-5 cases. We advocated and support the directive in the bill that requires judges to review Rule 11 issues in every case and provide a written statement regarding compliance with Rule 11, with mandatory sanctions in the case of a violation. However, we fear that this provision by itself will not be enough to end the "winner pays" reality of securities suits and alter the imbalance in the economics of securities litigation. This is particularly true, since the provision still relies upon the action of judges who have so far demonstrated little interest in imposing such sanctions. Innocent defendants will continue to be left in most cases to carry the expensive burden of proving their innocence.

### **713 SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS (SECTION 105)

The safe-harbor provisions of the bill must be strengthened. Currently, there is impaired

communication between investors and management regarding the forward-looking views and plans of corporations. Under the fear of costly abusive lawsuits filed when predictions of the future do not materialize, corporate representatives prefer to guard their silence or hide behind meaningless generic statements about the future. A statement from a recent securities filing by a financial services corporation is typical: "The amount of future provisions will continue to be a function of regular quarterly review of the reserve for credit losses, based upon management's assessment of risk at that time, and, as such, there can be no assurance as to the level of future provisions." Investors and analysts are left wondering.

*35 While the provisions of the bill may allow for some degree of freer communication between corporate management and investors, we believe that the provisions have been so narrowly constrained and burdened with vague terms and standards that they are unlikely to provide in many cases adequate protection against abusive lawsuits. We are concerned that innocent corporations may still be subject to expensive and time-consuming litigation and detailed fact-finding over the terms and restrictions of the safe harbor provisions and the extent of their application. In order to be effective, a safe harbor must have a bright line that is unmistakable to all parties. Otherwise, the utility of a safe harbor for obtaining early dismissal of abusive securities suits, or discouraging them entirely, may be elusive.

## STANDARD OF LIABILITY (SECTION 104)

Curiously, under current law, it is often not clear just what constitutes a violation of Rule 10b-5. The current ambiguity is one of the contributing factors allowing for the filing of abusive, meritless, strike suits. Without a clear line as to what is and what is not a violation, the issue is left to the trial process. That is to say, meritless claims are given too long of a ride, all the while imposing costs on innocent defendants. Moreover, different courts in different judicial circuits have applied different interpretations of the standard of liability. A clear standard of liability would give greater protection to the innocent while allowing courts to focus on genuine cases of securities fraud.

The legislation reported by the Committee would establish a single standard of liability. Unfortunately, it is still a vague standard that will require further judicial interpretation. Congress should provide clearer guidance to the courts than that provided in this bill. Otherwise, we will continue to provide too much legal confusion and too much room for the pursuit of meritless lawsuits. All of that imposes an unnecessary cost on the innocent and on our economy.

## **714 ROOM FOR IMPROVEMENT

While we support reporting this bill, we hope that in the remaining steps in the legislative process its provisions will be improved. At the same time, the legislation should remain free from provisions that take us backwards in the effort to eliminate abusive securities lawsuits.
Phil Gramm.
Connie Mack.
Lauch Faircloth.
Robert F. Bennett.
Rod Grams.
Bill Frist.

## *36 ADDITIONAL VIEWS OF SENATORS SARBANES, BRYAN, AND BOXER

## INTRODUCTION

We support the goal of deterring frivolous lawsuits and sanctioning appropriate parties when such lawsuits are filed. A number of the provisions in this bill are designed to achieve that goal. We support these provisions, and those that will improve class action procedures.

This legislation, however, will affect far more than frivolous suits:

The safe harbor provision will, for the first time, provide immunity under the Federal securities laws for fraudulent statements.

The proportionate liability provision will, for the first time, transfer responsibility from participants in a fraud to innocent victims of that fraud. These provisions will make it more difficult for investors to bring fraud actions, and will reduce recoveries in such actions.

The bill also fails to include provisions necessary to ensure that victims of securities fraud have adequate remedies:

The bill does not extend the statute of limitations for securities fraud actions imposed by the Supreme Court in 1991, which the SEC and the State securities regulators believe is too short. Ignoring the recommendation of the securities regulators, the bill does not restore the ability of investors to sue individuals who aid and abet violations of the securities laws.

This legislation threatens the capital formation process by undermining the confidence on which our markets depend. We are not alone in this conclusion. In a June 8, 1995 letter, the Government Finance Officers Association ("GFOA") strongly agreed with this assessment. Consisting of more than 13,000 state and local government financial officials, the GFOA's members both issue securities and invest billions of dollars of public pension and taxpayer funds. In its letter, the GFOA opposed S. 240 as reported:

We support efforts to deter frivolous securities lawsuits, but we believe that any legislation to accomplish this must also maintain an appropriate balance that ensures the **715 rights of investors to seek recovery against those who engage in fraud in the securities markets. We believe that S. 240 does not achieve this balance, but rather erodes the ability of investors to seek recovery in cases of fraud.

Securities regulators, bar associations, consumer groups, and state and local government officials share this opinion, as discussed below. We reach the same conclusion, and accordingly voted against the legislation.

## *37 STRENGTH OF U.S. CAPITAL MARKETS

By every measure, the United States capital markets are the largest and strongest in the world. In size, the U.S. markets remain preeminent: for 1993, U.S. equity market capitalization stood at $5.2 trillion, over one-third of the world total. [FN1] The U.S. markets continue to grow: the combined total of equity and debt filings for 1994, over $810 billion, was exceeded only by the record level set in 1993. [FN2] So attractive are the U.S. capital markets that more than 600 foreign companies from 41 different countries have tapped them, a level matched only in London, and more continue to come. [FN3]

The growth of trading on our exchanges is a sign of the strength of our markets. Average daily trading volume on the New York Stock Exchange increased from 44.9 million shares in 1980, to 156.8 million shares in 1990, to 291.4 million shares in 1994. [FN4] The NASDAQ and American Stock Exchanges have experienced similar gains in trading volume. [FN5]

Another sign of the strength of our markets is the rise of the mutual fund industry, one of the

fastest-growing segments of the financial services industry. From 1980 to 1993, mutual fund assets increased by more than 10 times, to $1.9 trillion. [FN6] Approximately 38 million Americans, representing 27 percent of American households, own mutual funds.

Role of the Federal Securities Laws

Our securities markets have been operating under the Federal securities laws since those laws were enacted over 60 years ago. As discussed above, our markets today are the largest and most vibrant in the world. This is so not in spite of the Federal securities laws, but in part because of the Federal securities laws. The Federal securities laws generally provide for sensible regulation, and self-regulation, of exchanges, brokers, dealers and issuers.

Even more important to ensuring the success of our markets is investor confidence. That confidence is maintained because investors know they have effective remedies against persons who would defraud them. Both Republican and Democratic Chairmen of the Securities and Exchange Commission have stressed the integral role of the private right of action in maintaining investor confidence. In 1991, then-Chairman Richard Breeden testified before the Banking Committee:

Private actions under Sections 10(b) and 14(a) of the Exchange Act have long been recognized as a "necessary supplement" to actions brought by the Commission and as an **716 "essential tool" in the enforcement of the federal securities laws. Because the Commission does not have adequate resources to detect and prosecute all violations of the federal securities laws, private actions perform a critical role in preserving the integrity of our securities markets.

*38 Current Chairman Arthur Levitt reiterated that point in testimony before the House Subcommittee on Telecommunications and Finance on February 10, 1995:

Besides serving as the primary vehicle for compensating defrauded investors, private actions also provide a "necessary supplement" to the Commission's own enforcement activities by serving to deter securities law violations. Private actions are crucial to the integrity of our disclosure system because they provide a direct incentive for issuers and other market participants to meet their obligations under the securities laws.

The importance of the private right of action is likely to increase, given the budgetary constraints on SEC resources. Testifying in 1993, the Director of the SEC's Division of Enforcement noted, Given the continued growth in the size and complexity of our securities markets, and the absolute certainty that persons seeking to perpetrate financial fraud will always be among us, private actions will continue to be essential to the maintenance of investor protection.

State of the Securities Litigation System

The Securities Subcommittee has held hearings over the past two years reviewing the health of the Federal securities litigation system. The Subcommittee received testimony from plaintiffs' lawyers, from corporate defendants, from accountants, academics, securities regulators and investors. There was sharp disagreement among the witnesses over how well the securities litigation system is functioning, and over what policy responses are appropriate.

Some argue that American business, particularly younger companies in the high-tech area, face a rising tide of frivolous securities litigation. A number of corporate executives told the Securities Subcommittee of their experiences. The American Electronics Association decried what it described as the "current practice of filing off-the-shelf legal complaints when a company

announces a downturn in performance [that] amounts to an uncontrolled 'tax on innovation.'" Clearly some frivolous securities cases are filed, as indeed some frivolous cases of every sort are filed. However, frivolous securities litigation does not appear to be at the crisis levels which some assert. **717 Presenting statistics obtained from the Administrative Office of the U.S. Courts, the Director of the SEC's Division of Enforcement testified in June 1993 that:

the approximate aggregate number of securities cases (including Commission cases) filed in Federal district courts does not appear to have increased over the past two decades. Similarly, while the approximate number of securities class actions filed during the past three years is significantly higher than during the 1980's, the numbers do not reveal the type of increase that ordinarily would be characterized as an "explosion."

Professor Joel Seligman of the University of Michigan Law School, one of the leading experts on the Federal securities laws, testified *39 at the same hearing, "there is little objective data at this time that suggests there is a need for significant reform of the federal securities laws, either to benefit plaintiffs or defendants."

The Committee Report states that it is easy to craft complaints alleging violations of the Federal securities laws. However, the Committee received evidence that it is difficult to bring even a meritorious securities action under the current system. Rule 9 of Federal Rules of Civil Procedure requires fraud to be pled with specificity. Joan Gallo, City Attorney for the City of San Jose, testified on March 22, 1995 about the successful securities fraud suit that San Jose brought against a number of brokers in the 1980's. She said, "[u]nder current law, despite the fact that the City had very experienced legal counsel, it was not until February 1986 that our third amended complaint was finally found sufficient by the Federal Court."

Some argue that securities fraud class actions are inhibiting the capital formation process. Marc Lackritz, President of the Securities Industry Association, testified on March 2, 1995 that "new or innovative ventures are fOregone because of the litigation risks involved in capital formation." James F. Morgan testified on behalf of the National Venture Capital Association that the big accounting firms are "winnowing out" growth companies because of their riskiness.

In fact, initial public offerings have been setting records in recent years: the record $39 billion in initial public offerings in 1992 was in turn exceeded by a record $57 billion in IPO's in 1993. [FN7] The $34 billion in IPO's in 1994 was exceeded only by the records set in 1992 and 1993. [FN8] Less than one month ago, on May 22, 1995, the New York Times reported:

One of the great booms in initial public offerings is now under way, providing hundreds of millions in new capital for high-tech companies, windfalls for those with good enough connections to get in on the offerings and millions in profit for the Wall Street firms underwriting the deals.

The Securities Industry Association's own publications describe the boom in initial public offerings:

"After years of weakness in the late 1980s, investment in new securities and IPOs accelerated dramatically from **718 1990-1993. During that time, the securities industry raised a record $130 billion for small business through IPOs. Again, this was more than was raised in America's first two centuries!" [FN9]

PROVISIONS OF S.240

To be sure, frivolous litigation should be deterred and sanctioned. Some of the provisions in S.240 as reported appear to be directed toward this goal. The requirement that courts include specific findings in securities class actions regarding compliance by all parties and attorneys with

Rule 11(b) of the Federal Rules of Civil Procedure *40 should act as a powerful deterrent to frivolous cases. Should a court find a violation of Rule 11, the court is required to impose sanctions.

The bill also prohibits payments to lead plaintiffs in class actions of additional compensation, other than "reasonable costs and expenses." This will help ensure that class actions are brought by real parties in interest, rather than "professional plaintiffs." To the same end, the bill requires that the plaintiff file a sworn statement that he or she authorized the filing of the complaint and did not purchase the securities at the direction of counsel or to participate in a lawsuit. The bill also prohibits attorneys from paying brokers for referring clients.

The bill also seeks to improve the procedures governing class action lawsuits. The new procedures contained in the bill for selecting a lead plaintiff in class actions are designed to encourage participation by institutional investors. We are pleased that this provision contains safeguards intended to ensure that a lead plaintiff must continue to represent the class fairly and adequately, as required under the Federal Rules of Civil Procedure.

The bill also seeks to improve the quality of information provided to investors when a securities fraud action is settled. The bill requires that a notice of a proposed settlement provided to investors must include clear information to allow investors to make an informed decision on the settlement. The statement must include the reason for the proposed settlement, the average damages recoverable per share if the settling parties can agree, and the attorneys' fees and costs.

Provisions of S.240 will hurt investors

Other provisions in S.240, however, are not tailored to deterring or sanctioning frivolous litigation. Instead, they will make it more difficult to bring all securities fraud suits, including meritorious cases, and reduce recoveries across the board.

Safe harbor provision will undermine market confidence by protecting fraudulent statements

**719 Contrary to the advice of the SEC, the North American Securities Administrators Association, the Government Finance Officers Association and others, S.240 as reported creates a statutory exemption from liability for certain "forward looking statements." Not only will this provision immunize reckless statements, but Chairman Levitt has warned that as drafted it will immunize fraudulent statements as well. By undermining confidence in our markets, such a return to the pre-Federal securities laws days of "buyer beware" would not benefit investors or issuers.

"Forward looking statements" are broadly defined in the bill, to include projections of financial items such as revenues, income and dividends as well as statements of future economic performance required in documents filed with the SEC. As with any attempt to foresee the future, such statements always have an element of risk to them, and prudent investors must be careful in relying on them. In fact, until 1979 the SEC prohibited disclosure of forward looking information. The SEC believed that forward looking information *41 was inherently unreliable, and that investors would place too much emphasis on such information in making investment decisions.

After reviewing the matter extensively in the 1970's, the SEC adopted a "safe harbor" regulation for forward looking statements. [FN10] The regulation (known as "Rule 175") generally offers protection for specified forward looking statements when made in documents filed with the SEC.

To sustain a fraud suit, the investor must show that the forward looking information lacked a reasonable basis and was not made in good faith.

There is a wide body of opinion that the current regulatory safe harbor does not provide sufficient protection for good faith corporate projections. In a May 19, 1995 letter to the members of the Senate Banking Committee, Chairman Levitt acknowledged "a need for a stronger safe harbor than currently exists." Indeed, the SEC has been conducting a comprehensive review of its safe harbor regulation. [FN11] Testifying before the Securities Subcommittee in April, Chairman Levitt said:

The Commission recently published a 'concept' release soliciting comments on current practices relating to disclosure of forward-looking information, with a view to developing a new safe harbor for projections that provides issuers with meaningful protection but continues to protect investors. The Commission has received approximately 150 comment letters in response to the release, and public hearings on the issue were conducted in Washington, DC and San Francisco during February.

As originally introduced by Senators Domenici and Dodd, S.240 would have allowed the SEC to continue this regulatory effort. The bill as introduced required that the SEC consider adopting rules or making legislative recommendations identifying criteria for exempting "forward-looking statements concerning * * * future economic performance" from antifraud liability under the Federal securities **720 laws. S.240 provided that if the SEC adopted such a rule, a defendant could request a stay of discovery while the court considered a motion for summary judgment on the grounds that the forward looking statement was within the coverage of the rule.

Chairman Levitt endorsed this approach in his April 1995 testimony before the Securities Subcommittee:

From the Commission's perspective, an appropriate legislative approach is contained in the Domenici/Dodd bill. This provision would allow the Commission to complete its rulemaking proceeding and take appropriate action after its evaluation of the extensive comments and testimony already received. Based on the Commission's experience with this issue to date, we believe that there is considerable value in proceeding with rulemaking, which can more efficiently be administered, interpreted and, if needed, modified, than can legislation.

*42 In a May 23, 1995 letter, the North American Securities Administrators Association, the Government Finance Officers Association, the National League of Cities and nine other groups expressed the same view ("we believe the more appropriate response is SEC rulemaking in this area").

However, the Committee Print substitute to S.240, unlike the bill as introduced, abandoned this approach in favor of enacting a statutory safe harbor. Like the bill passed by the House, S.240 as reported will for the first time shield fraudulent statements from liability under the Federal securities laws. This provision constitutes an ill-advised break with 60 years experience under the Federal securities laws.

Under the original Committee Print, forward looking statements were immunized from antifraud liability under the Federal securities laws unless they were "knowingly made with the expectation, purpose, and actual intent of misleading investors," and unless an investor could prove that he or she "had actual knowledge of and actually relied on" the statement. [FN12]

In a May 19, 1995 letter to the members of the Senate Banking Committee, SEC Chairman Levitt expressed his "personal views about a legislative approach to a safe harbor." He suggested that:

[a] carefully crafted safe harbor protection from meritless private lawsuits should encourage

public companies to make additional forward-looking disclosure that would benefit investors. At the same time, it should not compromise the integrity of such information which is vital to both investor protection and the efficiency of the capital markets-the two goals of the federal securities laws.

He stated, "[a] safe harbor must be thoughtful-so that it protects considered projections, but never fraudulent ones." He indicated he would support a safe harbor containing "a scienter standard other than recklessness."

**721 As explained above, the safe harbor provision in the original Committee Print did not adhere to Chairman Levitt's suggestions: the safe harbor in the original Committee Print would have protected fraudulent projections if an investor could not prove "actual knowledge" of and "actual reliance" on the projection. The substitute Committee Print offered at the Committee's May 25, 1995 mark up deleted the requirement that an investor prove he or she "had actual knowledge of and actually relied on" a fraudulent statement.

As amended, however, the substitute Committee Print continued to exclude from the safe harbor protection only statements "knowingly made with the expectation, purpose, and actual intent of misleading investors." The Committee Report states that "expectation," *43 "purpose," and "actual intent" are separate elements, each of which must be proven by the investor. This language so troubled Chairman Levitt that he wrote to Committee members again, on May 25, 1995, the morning of the markup. He stressed that even the substitute Committee Print failed to adhere to his belief that a safe harbor should never protect fraudulent statements:

I continue to have serious concerns about the safe harbor fraud exclusion as it relates to the stringent standard of proof that must be satisfied before a private plaintiff can prevail. As Chairman of the Securities and Exchange Commission, I cannot embrace proposals which allow willful fraud to receive the benefit of safe harbor protection. The scienter standard in the amendment may be so high as to preclude all but the most obvious frauds.

He warned that the bill's standard of "knowingly made with the expectation, purpose and actual intent of misleading investors" is a more stringent standard than currently used by the SEC and the courts. Given the broad definition of "forward looking statement" discussed above, it is crucial that the legislation not shield such statements from antifraud liability.

The Committee Report states that the safe harbor provision in the bill is based on current Rule 175, and a legal doctrine known as "bespeaks caution." Neither the SEC rule nor the court decisions cited, however, provide protection to fraudulent statements as the bill does.

As discussed above, the SEC's Rule 175 does not immunize fraudulent statements. It requires forward looking statements to be reasonable and made in good faith.

**722 The courts have imposed a similar requirement on forward looking statements. The Third Circuit case cited by the majority, In re Donald J. Trump Casino Securities Litigation, 7 F.3d 357 (3rd Cir. 1991), states:

We have squarely held that opinions, predictions and other forward-looking statements are not per se inactionable under the securities laws. Rather, such statements *** may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them. [FN13] Rubenstein v. Collins, 20 F.3d 160 (5th Cir. 1994), also cited in the Committee Report, reaches the same conclusion. The Fifth Circuit held that a forward looking statement contains at least three factual assertions that may be actionable: (1) The speaker genuinely believes the statement is accurate; (2) there is a reasonable basis for that belief; and (3) the speaker is unaware of any undisclosed facts that would tend seriously to undermine the accuracy of the statement. [FN14]

The Third Circuit stated that to be immunized from liability the forward looking statements must be accompanied by cautionary statements "substantive and tailored to the specific future projections *44 estimates or opinions ***" [FN15] The bill omits this requirement. Instead, it allows forward looking statements to be accompanied by general words of caution that will likely be boilerplate language, of little use to investors.

The Committee Report states that the safe harbor provision is intended to encourage disclosure of information by issuers. Encouraging companies to make fraudulent projections would hurt investors trying to make intelligent investment decisions and penalize companies trying to communicate honestly with their shareholders. We hope the majority of the Committee did not intend to achieve such a result. A safe harbor for fraudulent statements runs counter to the entire philosophy of the Federal securities laws, that fraud must be deterred and punished when it occurs. As described above, this philosophy has helped build the most vibrant securities markets in the world. While the majority of the Committee did not accept an amendment to this provision at the markup, we hope that the flaw in this provision identified by Chairman Levitt will be corrected.

Proportionate liability provision transfers losses from fraud perpetrators to fraud victims

Predating the Federal securities laws, courts have traditionally held parties who commit fraud to be "jointly and severally" liable. Under joint and several liability, each person who participates in a fraud is liable for the entire amount of the victim's damages. Mark Griffin, Securities Commissioner for the State of Utah, testified **723 before the Securities Subcommittee on March 22, 1995 on behalf of the 50 State securities commissioners. He explained why the law currently holds all parties who participate in a securities fraud jointly and severally liable: Under current law, each defendant who conspires to commit a violation of the securities law is jointly and severally liable for all the damages resulting from the violation. The underlying rationale of this concept is that a fraud will fail if one of the participants reveals its existence and, as a result, all wrongdoers are held equally culpable if the fraud achieves its aims. (emphasis in original)

In Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), the Supreme Court held that a defendant is liable under the Federal securities antifraud provision only if he or she possesses a state of mind known in the law as "scienter." Conduct intended to deceive or mislead investors satisfies the scienter requirement.

While the Supreme Court did not decide the question in Hochfelder, courts in every Federal circuit have held that reckless conduct also satisfies the scienter requirement. These courts have followed the guidance of hundreds of years of court decisions in fraud cases. As the Restatement of Torts, states, "The common law has long recognized recklessness as a form of scienter for purposes of proving fraud." [FN16]

*45 The most commonly accepted definition of reckless conduct that constitutes securities fraud was enunciated by the Seventh Circuit in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir. 1977), cert. denied, 434 U.S. 875. This demanding standard defines reckless conduct as:

Highly unreasonable [conduct], involving not merely simple, or even gross negligence, but an extreme departure from the standards of ordinary care, and which present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Under current law, then, individuals who participate in a fraud through their reckless conduct are fully liable to the victims. Recklessness liability is generally applied to an issuer's professional advisers, such as accountants, attorneys and underwriters.

The bill limits joint and several liability under the Federal securities laws to persons who committed "knowing securities fraud." All other violators will generally be liable only for their proportionate share of the fraud victim's losses. "Knowing securities fraud" is defined in the legislation specifically to exclude reckless conduct. S. 240 thus reduces the liability for reckless violators from joint and several liability to proportionate liability.

When investors' damages can be paid by a violator who is jointly and severally liable, this change will not affect the recovery available **724 to investors. In cases where the architect of the fraud is bankrupt, has fled, or otherwise cannot pay the investors' damages, though, this change will harm investors. In those cases, innocent victims of fraud will be denied full recovery of their damages. Testifying before the Securities Subcommittee on April 6, 1995, Chairman Levitt said:

Proportionate liability would inevitably have the greatest effect on investors in the most serious cases (e.g., where an issuer becomes bankrupt after a fraud is exposed). It is for this reason that the Commission has recommended that Congress focus on measures directly targeted at meritless litigation before considering any changes to the liability rules.

Perhaps recognizing this unfairness to investors, S. 240 would require violators who are proportionately liable to pay more than their proportionate share in two circumstances. Neither provision, however, goes very far toward making fraud victims whole. First, if part of the judgment is uncollectible, defendants who are proportionately liable would be jointly and severally liable to investors whose net worths are each under $200,000 and who each lost more than 10 percent of that net worth in the fraud. In our view, this will protect only a tiny number of investors. In many parts of the country, few investors who own their own homes will have net worths under $200,000. Further, very few such investors will invest 10 percent of their net worth in a single stock or bond issue. Second, if part of the judgment is uncollectible, defendants who are proportionately liable would also be liable for an additional amount, not to exceed 50 percent of their proportionate share. For *46 example, a defendant found to be 10 percent responsible for the commission of a fraud would be liable for up to 15 percent of the investors' losses. This provision therefore will likely increase the recovery of defrauded victims only marginally, leaving the balance of losses uncollectible.

In a February 23, 1995 letter to House Commerce Committee Chairman Thomas J. Bliley, Jr., Chairman Levitt wrote, "[t]he Commission has consistently opposed proportionate liability." The Association of the Bar of the City of New York agreed "it is critical that all defendants remain jointly and severally liable to the plaintiff when a wrongdoer is unable to pay his or her share of any judgment." In their June 8, 1995 letter, the Government Finance Officers Association also identified the restriction of joint and several liability as a reason for their opposition to the bill. Accountants are the class of defendants most likely to be affected by a change to proportionate liability. Dr. Abraham J. Briloff, CPA, the Emanuel Saxe Distinguished Professor Emeritus of Baruch College, City University of New York and a respected authority on accounting, testified before the Banking Committee. He stressed the crucial role accountants play in preventing fraudulent financial statements from reaching the investing public. He stated that the accountant is presumed to stand as the 'sentinel at the gates'; it is he who holds the passkey required for the history of the enterprise's **725 management and accountability, its financial statements, to become acceptable for the purposes of the securities laws.

If * * * he has permitted the passkey to be used irresponsibly, then he should be held fully liable for any resultant harm to those who relied on his professional undertaking.

To the extent he may identify those who overtly created the underlying quagmire, well, then, the auditor should have the right of subrogation. But again, as in negotiable instruments law, if you cannot find the 'maker', you proceed against the 'last endorser'-in the circumstances before us that 'last endorser' is presumed to be the certified public accountant who has undertaken the independent audit function.

The bill would undermine the independent auditor's role as the last line of defense against fraud. The legislation reported provides that defendants who meet the Sundstrand definition of recklessness, that is, who know of a fraud but in an extreme departure from the standards of ordinary care do nothing about it, will no longer be responsible for the result of their conduct. Instead, innocent investors-individuals, pension funds, county governments-will have to make up the loss. This legislation would, for the first time in our legal history, transfer responsibility for bearing the results of a fraud from participants in the fraud to innocent victims of the fraud. Such a change would be neither fair to investors nor beneficial to our markets, and is opposed *47 by a host of consumer groups, labor unions, and government officials. [FN17]

### S.240 DOES NOT CONTAIN PROVISIONS NEEDED TO PROTECT INVESTORS

We are concerned about the provisions of S.240 described above, which in our view will harm investors bringing meritorious suits. We also are disappointed that S.240 as reported does not contain provisions that would aid investors bringing meritorious suits.

Failure to extend the statute of limitations

Chairman Levitt's May 25, 1995 letter to the members of the Banking Committee stated, "[i]n addition to my concerns about the safe harbor, there is not complete resolution of two important issues for the Commission. First, there is no extension of the statute of limitations for private fraud actions from three to five years."

For over 40 years, courts held that the statute of limitations for private rights of action under Section 10(b) of the Securities Exchange Act of 1934, the principal antifraud provision of the Federal securities laws, was the statute of limitations determined by applicable State law. While these statutes varied, they generally afforded securities fraud victims sufficient time to discover and bring suit. Indeed, 13 States recognize the concept of equitable tolling, under which the statute of limitations does not begin to run until the fraud is discovered, for private securities fraud cases. [FN18]

**726 In Lampf v. Gilbertson, 501 U.S. 350 (1991), the Supreme Court significantly shortened the period of time in which investors may bring such securities fraud actions. By a five to four vote, the Court held that the applicable statute of limitations is one year after the plaintiff knew of the violation and in no event more than three years after the violation occurred. This is shorter than the statute of limitations for private securities actions under the law of 31 of the 50 States. [FN19]

Lampf's shorter period does not allow individual investors adequate time to discover and pursue violations of securities laws. Testifying before the Banking Committee in 1991, SEC Chairman Richard Breeden stated "the timeframes set forth in the [Supreme] Court's decision is unrealistically short and will do undue damage to the ability of private litigants to sue." Chairman Breeden pointed out that in many cases,

Events only come to light years after the original distribution of securities and the Lampf cases could well mean that by the time investors discover they have a case, they are already barred from the courthouse.

*48 The FDIC and the State securities regulators joined the SEC in favor of overturning the Lampf decision.

On this basis, the Banking Committee in 1991 without opposition adopted an amendment to the bill later enacted as the FDIC Improvement Act ("FDICIA"). The amendment lengthened the statute of limitations for all Section 10(b) rights of action to two years after the plaintiff knew of the securities law violation, but in no event more than five years after the violation occurred. In a letter to Senator Bryan, Chairman Breeden stated that "[a]doption of these measures would give private litigants a more realistic time frame in which to discover that they have been defrauded, while also accommodating legitimate interests in providing finality to business transactions and avoiding stale claims."

When FDICIA reached the Senate floor in November 1991, some Senators indicated they would seek to attach additional provisions relating to securities litigation. They argued that the statute of limitations should not be lengthened without additional reform of the litigation system. No arguments were raised specifically against the extension of the statute of limitations. In order to expedite consideration of FDICIA, the extension of the statute of limitations was dropped. Senators Domenici and Dodd included the extended statute of limitations in their comprehensive securities litigation reform bill, introduced as S.1976 in the 103rd Congress and as S.240 in this Congress.

**727 Now that the Congress is acting on comprehensive changes to the securities litigation system, it should include the longer statute of limitations in keeping with the 1991 agreement. Chairman Levitt testified before the Securities Subcommittee in April 1995, "[e]xtending the statute of limitations is warranted because many securities frauds are inherently complex, and the law should not reward the perpetrator of a fraud who successfully conceals its existence for more than three years."

We are deeply disappointed that the Committee did not include the extension of the statute of limitations in S. 240 as reported, and consider it imperative that the full Senate restore some balance to the legislation by voting to adopt the extension.

Failure to restore aiding and abetting liability

Chairman Levitt's May 25, 1995 letter to Banking Committee Members stated that, in addition to his concerns about the safe harbor, the Committee Print substitute did not resolve two important issues for the Commission. The first of these, discussed above, was the statute of limitations; the second was aiding and abetting liability. Chairman Levitt expressed his disappointment that "the draft bill does not fully restore the aiding and abetting liability eliminated in the Supreme Court's Central Bank of Denver opinion."

Prior to 1994, courts in every circuit in the country had recognized the ability of investors to sue aiders and abettors of securities frauds. The courts derived aiding and abetting liability from traditional principles of common law and criminal law. The notion attaches liability to those who provide assistance to the unlawful acts of others. To be held liable, most courts required that an investor show that a securities fraud was committed, that the aider and *49 abettor gave substantial assistance to the fraud, and that the aider and abettor had some degree of scienter (intent to deceive or recklessness toward the fraud). [FN20]

In [Central Bank of Denver v. First Interstate Bank of Denver, 114 S. Ct. 1439 (1994),](#) the Supreme Court eliminated the right of investors to sue aiders and abettors of securities fraud. Writing for four dissenters, Justice Stevens criticized the five member majority for "reach[ing] out to overturn a most considerable body of precedent." While the issue was not directly before the Court, Justice Stevens warned that the decision would also eliminate the SEC's ability to pursue aiders and abettors of securities fraud.

As Senator Dodd stated at a May 12, 1994 Securities Subcommittee hearing, "aiding and abetting liability has been critically important in deterring individuals from assisting possible fraudulent acts by others." Testifying at that hearing, Chairman Levitt stressed the importance of restoring aiding and abetting liability for private investors:

Persons who knowingly or recklessly assist the perpetration of a fraud may be insulated from liability to private parties if they act behind the scenes and do not themselves make statements, directly or indirectly, that are relied **728 upon by investors. Because this is conduct that should be deterred, Congress should enact legislation to restore aiding and abetting liability in private actions.

The North American Securities Administrators Association and the Association of the Bar of the City of New York also endorsed restoration of aiding and abetting liability in private actions. The bill reported by the Committee restores, in part, the SEC's ability to sue parties who aid and abet violations of the securities laws. The provision in the bill is limited to violations of Section 10(b) of the Securities Exchange Act, and to individuals who act "knowingly." It ignores the recommendation made by the SEC, the State securities regulators and the bar association that aiding and abetting liability be fully restored for the SEC and private litigants as well. While the provision in the bill is of some help, the deterrent effect of the securities laws would be strengthened if aiding and abetting liability were restored in private actions as well.

CONCLUSION

Our capital markets depend on investor confidence. Individuals and institutions are motivated to place their funds in our markets, in part because they believe in the efficiency and fairness of those markets. Their confidence depends also on the existence of effective remedies against persons who commit securities fraud.

While we support the goal of deterring and sanctioning frivolous securities litigation, provisions in this bill will deter meritorious fraud actions as well. By protecting fraudulent forward looking statements, and by restricting the application of joint and several liability, this bill may undermine investor confidence. These changes are likely to fall hardest on the elderly, who often are targeted *50 as fraud victims. [FN21] Further, it fails to include provisions that are needed to ensure that investors have adequate time and means to pursue securities fraud actions.

The securities markets are crucial to our economic performance as a nation; we should evaluate efforts to tamper with them very carefully. Because this legislation may reduce investor confidence in the capital formation process it seeks to promote, we oppose it and hope it will be improved by the full Senate.

Paul Sarbanes.

Barbara Boxer.

Richard Bryan.

**729 *51 ADDITIONAL VIEWS OF SENATOR DODD

I share the view of the Committee majority that this bill carefully addresses the flaws in the current securities litigation system, without limiting the rights of investors to bring actions to recover damages. Striking the balance between protecting the rights of victims of securities fraud and the rights of public companies to avoid costly and meritless lawsuits was difficult, but on balance, I believe the Committee has succeeded.

The measure adopted by the Committee is based on a bill that Senator Domenici and I introduced in the past two Congresses. The bill, as reported, contains several substantial improvements to S. 240 as introduced this year in the Senate. However, there are several provisions of the original bill that I wish had also been included, although I understand the need to produce a consensus document.

Specifically, I have pressed for an extension of the current statute of limitations for private actions under the Securities Exchange Act of 1934. The Committee rejected an amendment to do that, and I expect this issue will be raised again when this bill is considered by the entire Senate. Another issue of concern to me involves liability in private actions under 10b-5 for aiders and abettors of primary securities law violators. As chairman of the Subcommittee on Securities, I held a hearing on this issue in May 1994, after the Supreme Court ruled that private parties could not bring suit against alleged aiders and abettors. I am pleased that the Committee bill grants the Securities and Exchange Commission explicit authority to bring actions against those who knowingly aid and abet primary violators. However, I remain concerned about liability in private actions and will continue work with other Committee members on this issue as we move to floor consideration.

A final provision, which would have created a self-disciplinary organization for auditors, is also not part of the bill.

I favor all three of these provisions because of my belief that as we properly make it more difficult to bring meritless lawsuits, we must do all that we can to ensure that legitimate victims can continue to sue and can recover damages quickly. It is appropriate to "raise the bar," but we must provide the careful balance that is needed to protect the rights of fraud victims.

Chris Dodd.

FN1 114 S. Ct. 1439 (1994).

FN2 Statement of Senator Pete Domenici, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing and Urban Affairs, March 2, 1995.

FN3 Statement of Chairman Alfonse M. D'Amato, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN4 Statement of Senator Christopher J. Dodd, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN5 Arthur Levitt, "Between Caveat Emptor and Caveat Vendor: The Middle Ground of Litigation Reform," Remarks at the 22nd Annual Securities Regulation Institute, San Diego,

California (January 25, 1995).

FN6 Safe Harbor for Forward-Looking Statements, Exchange Act Rel. No. 33- 7107 (October 13, 1994).

FN7 "Majority Staff of the Subcommittee on Securities of the Senate Committee on Banking, Housing, and Urban Affairs, Report on Private Securities Litigation," 103d Congress, 2d Session (1994).

FN8 William P. Barrett, "I Have No Clients," Forbes, October 11, 1993.

FN9 Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 185, 739 (1975).

FN10 "Securities Litigation Reform: Hearings Before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce," 103d Congress, 2d Session, 35-36 (1994).

FN11 Id. at 36.

FN12 D'Amato Statement, supra, note 3.

FN13 House hearings, note 10, supra, at 36.

FN14 Through the U.S. securities markets, corporate issuers raised $76 billion in 1992, $102 billion in 1993, and $130 billion in 1994. Small businesses making initial public offerings of stock raised $40 billion in 1992, $57 billion in 1993, and $34 billion in 1994. "Securities Industry Trends," Securities Industry Association Newsletter, April 5, 1995.

FN15 Id. The $1 trillion figure includes private placements, underwriting and domestic medium-term note programs.

FN16 Testimony of James F. Morgan on behalf of the National Venture Capital Association, Hearings on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN17 Arthur Levitt, "Between Caveat Emptor and Caveat Vendor" supra, note 5.

FN18 Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 310 (1985); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730 (1975); J.I. Case Co. v. Borak, 377 U.S. 426, 432 (1964).

FN19 Janet Cooper Alexander, "Do the Merits Matter? A Study of Settlements in Securities Class Actions," 43 Stan. L. Rev. 497, 511-13 (1991).

FN20 Many of these lawsuits are still pending. Testimony of James F. Morgan, supra, note 16.

FN21 Testimony of George H. Sollman on behalf of the American Electronics Association: Hearings on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN22 Testimony of Marc E. Lackritz, on behalf of the Securities Industry Association: Hearings on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995. Testimony of former SEC Commissioner J. Carter Beese, on behalf of the Center for Strategic and International Studies, Hearings on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN23 Testimony of Edward R. McCracken, President and Chief Executive Officer of Silicon Graphics, Inc. and Co-Chairman of the American Entrepreneurs for Economic Growth, Hearings on Private Litigation Under Federal Securities Laws: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

FN24 Testimony of George H. Sollman, supra, note 21.

FN25 "GOP Targets Shareholder Suits," Investors Business Daily, February 26, 1995, p.A1.

FN26 Testimony of Patricia Reilly, "Hearing on Private Litigation Under Federal Securities Laws: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs," June 17, 1993; See, Majority Staff Report, supra, note 7.

FN27 Testimony of Maryellen Andersen, Council of Institutional Investors, Hearing on Private Litigation Under Federal Securities Laws: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, July 21, 1993.

FN28 See, Testimony of Arthur Levitt, Hearings on H.R. 10, the Common Sense Legal Reform Act of 1995, Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995.

FN29 Testimony of Mark J. Griffin, Director of Utah Department of Commerce, Division of Securities, on behalf of the North American Securities Administrators Association, Hearings on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 22, 1995.

FN30 Testimony of Mark E. Lackritz, supra, note 22.

FN31 The Brancato Report on Institutional Investment, "Total Assets and Equity Holdings" Volume 2, Edition 1.

FN32 Elliott J. Weiss and John S. Beckerman, "Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions"' 104 The Yale Law Journal (1995). This article provided the basis for the "most adequate plaintiff" provision.

FN33 Testimony of Maryellen Andersen, supra, note 27.

FN34 "Let the Money Do the Monitoring," supra note 32.

FN35 Testimony of Patricia Reilly, supra, note 26.

FN36 See generally, Majority Staff Report, supra note 7, at 81 et seq.

FN37 NASCAT Analysis of Pending Legislation on Securities Fraud Litigation, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN38 Testimony of Patricia Reilly, supra, note 26.

FN39 Rule 11 governs all pleadings, written motions and other papers filed with the court. Under Rule 11(b), the attorney's signature on such papers certifies that:
(1) it is not being presented for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FN40 See, response by Thomas Dunlap, Jr., General Counsel, Intel Corporation, to Written Questions of Senator Domenici, "Private Litigation Under the Federal Securities Laws: Hearings Before the Subcommittee on Securities of the Senate Committee on Banking, Housing, and Urban Affairs," 103d Cong., 1st Session. S. Hrg. No. 103-431 (1993) (noting that "Rule 11 is rarely enforced in Federal Courts").

FN41 See, Majority Staff Report, 45-48, supra, note 7.
The original S. 240 contained a provision allowed for fee shifting in cases where a party unreasonably refused to enter into Alternative Dispute Resolution ("ADR"), if that party pursued a claim or defense later deemed "not substantially justified." Because the Committee has determined to retain the voluntary nature of ADR, it has not included the original S. 240's fee shifting mechanism in the final bill. The Committee, however, supports the increased use of ADR to reduce the time and expense associated with securities fraud litigation and encourages courts to explore new and innovative methods of ADR.

FN42 Rule 11(c)(2) limits sanctions to "what is sufficient to deter the repetition of such conduct or comparable conduct by others similarly situated."

FN43 Testimony of former SEC Commissioner J. Carter Beese, Jr., Chairman of the Capital

Markets Regulatory Reform Project Center for Strategic and International Studies, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995 (citing testimony of Philip A. Lacovara, Hearing on H.R. 3185: Telecommunications and Finance Subcommittee of the House Committee on Energy and Commerce).

FN44 Testimony of Richard J. Egan, Chairman of the Board of EMC Corporation, Hearing on Private Litigation Under Federal Securities Laws: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

FN45 Testimony of Arthur Levitt, Chairman of the U.S. Securities and Exchange Commission: Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, April 6, 1995.

FN46 In Re Time Warner Inc. Securities Litigation, 9 F.3d 259, 268 (2d Cir. 1993) (citations omitted.)

FN47 Testimony of Richard C. Breeden, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, April 6, 1995.

FN48 Testimony of James F. Morgan supra, note 16.

FN49 Testimony of J. Carter Beese, supra, note 43.

FN50 Testimony of John G. Adler, Hearing on Private Litigation Under Federal Securities Laws, Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

FN51 February 14, 1995 letter from the California Public Employees' Retirement System to the SEC on SEC "safe harbor" proposal. See, note 6, supra.

FN52 The First, Second, Third, Sixth, and Ninth Circuits have adopted a version of the bespeaks caution doctrine. See e.g., In Re Worlds of Wonder Securities Litigation, 35 F.3d 1407 (9th Cir. 1994); Rubinstein v. Collins, 20 F.3d 160 (5th Cir. 1994); Kline v. First Western Government Securities, Inc., 24 F.3d 480 (3d Cir. 1994); Sinay v. Lamson & Sessions Company, 948 F.2d 1037 (6th Cir. 1991); I. Meyer Pincus & Associates v. Oppenheimer & Co., Inc., 936 F.2d 759 (2d Cir. 1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875 (1st Cir. 1991); Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986);

FN53 In Re Donald J. Trump Casino, 7 F.3d 357 (3d Cir. 1993).

FN54 Id. at 371.

FN55 Testimony of Arthur Levitt, February 10, 1995, supra, note 28.

FN 56114 S. Ct. 1439 (1994).

FN 57The percentages of damages as market losses in the analysis ranged from 7.9% to 100%. See Princeton Venture Research, Inc., "PVR Analysis, Securities Law Class Actions, Damages as a Percent of Market Losses," June 15, 1993.

FN58 Lev and de Villiers, "Stock Price Crashes and 10b-5 Damages: A Legal, Economic and Policy Analysis," Stanford Law Review, 7, 9-11 (1994).

FN59 Testimony of J. Carter Beese, Jr., supra, note 43.

FN60 Id.

FN61 See, Testimony of Richard C. Breeden, supra, note 47; Testimony of David S. Ruder, Hearing on Securities Litigation: Impact of U.S. Supreme Court Decision: Central Bank of Denver v. First Interstate of Denver, Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, May 12, 1994. Testimony of Charles C. Cox, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, April 6, 1995.

FN62 Testimony of David Ruder, see id.

FN63 Majority Report, supra. note 7.

FN64 Testimony of Marc E. Lackritz, supra, note 22.

FN65 Statement of Senator D'Amato supra, note 3.

FN66 Testimony of J. Carter Beese, Jr., supra, note 43.

FN67 Hearing Report, supra, note 40.

FN68 Hearing Report, supra, note 40 at 104. Testimony of J. Carter Beese, Jr., supra, note 43 (discussing surveys).

FN69 Statement of Arthur Levitt, April 6, 1995, supra, note 45.

FN70 See, Testimony of Marc E. Lackritz, supra, note 22. Nearly two-thirds of the companies responding in a 1994 survey reported substantial increases in D&O insurance premiums, with an average increase of 94%. Testimony of James Morgan, supra, note 16.

FN71 Testimony of James Morgan, supra, note 16.

FN72 Hearing Report, (statement of Jake L. Netterville) supra, note 40.

FN73 Id.

FN74 Id.

FN75 Testimony of Arthur Levitt, supra, note 45.

FN76 Testimony of Richard C. Breeden, supra, note 47. Testimony of David S. Ruder, supra, note 61.

FN77 Testimony of J. Carter Beese, Jr., supra, note 43; Hearing Report (testimony of A.A. Sommer, Jr.), supra, note 40 at 353-4.

FN78 Hearing Report, supra, note 40 at 465.

FN79 Testimony of Marc Lackritz, supra, note 22.

FN80 See, e.g., Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989).

FN1 U.S. Securities and Exchange Commission 1994 Annual Report, at 28.

FN2 Id. at 53.

FN3 Id.

FN4 Securities Industry TRENDS, Vol. XXI, No. 3, April 5, 1995.

FN5 Id.

FN6 See Testimony of Arthur Levitt before the Senate Securities Subcommittee, November 10, 1993.

FN7 "Securities Industry TRENDS," Vol. XXI, No. 3, April 5, 1995 (Source: Securities Data Company).

FN8 Id.

FN9 The Securities Industry Briefing Book, A Partnership with America (1994), at 11.

FN10 See Securities Act Release No. 6084 (June 25, 1979); 17 CFR 230.175 (1994), 17 CFR 240.3b-6 (1994).

FN11 See Securities Act Release No. 33-7101 (October 13, 1994).

FN12 In Basic, Inc. v. Levinson, 485 U.S. 224 (1988), the Supreme Court rejected this requirement of "actual knowledge of and actual reliance on" fraudulent statements in most circumstances. Instead, the Supreme Court recognized a doctrine called "fraud on the market"

that had previously been adopted by a majority of Federal circuit courts. The Court held that: [a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in the market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a[n antifraud] action.
485 U.S. at 247.

FN13  7 F.3d at 368.

FN14  20 F.3d at 166.

FN15  7 F.3d at 371-72.

FN16 See Restatement (Second) of Torts, Sec. 526(b), comment e; Prosser and Keeton, Law of Torts, Sec. 107.

FN17 See May 23, 1995 letter to Committee Members from American Council on Education, California Labor Federation-AFL-CIO, Congress of California Seniors-LA County, Consumer Federation of America, Consumers for Civil Justice, International Brotherhood of Teamsters, Government Finance Officers Association, Gray Panthers, National League of Cities, New York State Council of Senior Citizens, North American Securities Administrators Association, and U.S. Public Interest Research Group ("primary concerns with respect to the provisions of S. 240 * * * include * * * Limits on joint and several liability. * * *"); May 24, 1995 letter to Committee Members from Citizen Action, Consumer Federation of America, Consumers Union, Public Citizen, U.S. Public Interest Research Group, Violence Policy Center ("Abrogation of joint and several liability * * * would effectively immunize professional wrongdoers.")

FN18 See June 14, 1995 Letter from the North American Securities Administrators Association.

FN19 Id.

FN20 See, e.g., IIT v. Cornfeld, 619 F.2d 909, 992 (2nd Cir. 1980).

FN21 See "If the Hair is Gray, Con Artists See Green," The New York Times, May 21, 1995. S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783 (Leg.Hist.)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.