Case 1:05-cv-09162-LIF     Document 69-6     Filed 09/22/2005     Page 1 of 26

# Exhibit D



Home | Previous Page

**U.S. Securities and Exchange Commission**

## Speech by SEC Commissioner:
## Post-Enron America: An SEC Perspective

**by**

**Commissioner Harvey J. Goldschmid**

*U.S. Securities and Exchange Commission*

The Third Annual A.A. Sommer, Jr.* Corporate Securities & Financial Law Lecture
Fordham University School of Law
December 2, 2002

### WELCOME AND OPENING REMARKS

DEAN TREANOR: Good evening, everyone. My name is Bill Treanor. I am the Dean of Fordham Law School, and I would like to welcome you.

This is, as you know, the Third Annual A.A. Sommer, Jr., Corporate Securities & Financial Law Lecture.

I can tell you, as the Dean of the Law School for four months, I am very aware of what a busy place this is and that this lecture hall is in use virtually every night. But tonight's event stands out. Tonight's event is a moment of great distinction, and I, like the rest of you, am very excited to be here tonight.

Our lecturer is, of course, Harvey Goldschmid, Commissioner of the Securities and Exchange Commission ("SEC"), and it is a real privilege to have Commissioner Goldschmid speak to us tonight. He is a giant in legal academia. He is an award-winning law professor. At the SEC he is at the very heart of the securities world, and it is a privilege for us to have him here tonight.

I would like to acknowledge the law firm of Morgan, Lewis & Bockius for its role in tonight's events. The firm has been extraordinarily helpful to the Law School. Through its support, we have started a Corporate Securities and Financial Law Center that is now really taking off under the directorship of Professor Jill Fisch, who will be speaking to you shortly. It is one of the most exciting developments at the Law School in my tenure as a faculty member and now as Dean, and I am grateful to the firm for its support, and I am

particularly grateful for its generosity in supporting the lecture.

This again is our third annual A.A. Sommer, Jr., Lecture. It has become in a very short period of time really one of the most central contributions to the academic world that the Law School makes. It is a tribute to A.A. Sommer, Jr., who was a giant in the field of securities law. As Commissioner Goldschmid was saying to me earlier tonight, this lecture series is really a very fitting tribute to him.

Tonight we are joined by Mr. Sommer's widow, Starr Sommer, and his daughter, Susie Futter. We are delighted that you are here tonight, and we are delighted that we could pay tribute to A.A. Sommer, Jr.

I am now going to turn matters over to one of our most distinguished alumni, John F.X. Peloso, Fordham class of 1960 and also one of our great resources of our Corporate Center. Through his energy and through his commitment, it has really taken off, and he is also one of the great stars of our adjunct faculty.

You know, we appreciate here at the Law School his loyalty, his commitment, and his vision. The Corporate Center, I think, is going to become just a major player in the world of corporate law and the world of securities law. It is going to be and has become a real brain trust. So thank you, John, for helping make it possible.

John is currently Senior Counsel in the New York office of Morgan, Lewis & Bockius. He is a renowned trial lawyer whose career has been dedicated to the many aspects of securities litigation.

Following graduation from our Law School, where he was managing editor of the *Fordham Law Review*, he served as law clerk to Judge McGowan of the U.S. District Court for the Southern District of New York. From 1961 to 1965 he served as an Assistant U.S. Attorney in the Southern District of New York, and from 1970 to 1975 he was chief trial counsel for the New York Regional Office of the Securities and Exchange Commission.

He has been a leader of the organized bar, holding important positions in the Business Law and Litigation Sections of the American Bar Association. He is presently on the panel of arbitrators for the New York Stock Exchange, the National Association of Securities Dealers, and is a distinguished neutral of the CPR Institute for Dispute Resolution.

As I said, John Peloso is currently Senior Counsel at Morgan, Lewis & Bockius, and he was originally brought to the firm by A.A.

Sommer, Jr. So it is very appropriate that I now turn matters over to him.

PROFESSOR PELOSO: Thank you, Dean Treanor. With that introduction, I feel obliged to give a speech.

Actually, my role is very brief here this evening, which is to simply, on behalf of Morgan, Lewis & Bockius, to welcome you to the Third Annual A.A. Sommer Lecture.

As many of you out there know, this lecture was established three years ago by Morgan Lewis as a way of interacting with Fordham Law School to encourage interest in securities and financial law and as a stimulus for the creation of the Center for Corporate Securities and Financial Law here at the school, which has now really gotten off the ground.

We thought that a good way to do that was to have this lecture in honor of the partner of Morgan Lewis who was really most associated with the securities world and who was really the father of the security practice at Morgan Lewis.

Al Sommer was a partner of Morgan Lewis for many years when he retired in 1994. He was a practicing securities business lawyer really all of his career, with time out to serve as a distinguished member of the Securities and Exchange Commission. But he was involved in so much more. He was so active in all sorts of associations, notably the American Bar Association, where he chaired many of the important committees through the years, and in connection with the accounting industry where, among other things, he was chairman of the Public Oversight Board. He also was an adjunct professor at a number of law schools, a prolific author and commentator, and really a giant of the bar.

I must say as an aside that as I read the newspapers over the past few months and saw the search going on for a chair of the new Accounting Oversight Board, I could not help but think that Al Sommer would have been the perfect chair because of his experience and his integrity.

Al was here with us the past two years to introduce the speaker. Between last year and this year, he succumbed to an illness that was really debilitating, and he passed away. He is represented tonight by his lovely wife, Starr, and his daughter, who have come up from Washington for this, and we hope you will continue to do that. You are so welcome.

In a way, Al will always be present here because the whole idea is

that this lecture will stand as a monument to him as one of our great lawyers. Morgan Lewis is proud of its affiliation with Al Sommer, and he with us, and pleased to host this lecture in his honor.

We also want to say thank you to Commissioner Goldschmid for coming up from Washington with a very busy schedule and giving this lecture, and I know Al would have liked it, because some of you may not know that they were old and close friends. So thank you for coming up.

With that, I would like to introduce Professor Jill Fisch, who is the director of the Corporate Center, who will introduce Commissioner Goldschmid.

PROFESSOR FISCH: Good evening. I guess you cannot have too many welcomes, so I too would like to take this opportunity to welcome you to the Third Annual A.A. Sommer, Jr., Lecture. I would like to echo Dean Treanor's remarks in expressing our school's deep gratitude to the firm of Morgan Lewis & Bockius for their generosity in establishing the lecture. I would also like to extend my personal thanks to John Peloso, not just for his contributions and his work on the lecture but for everything that he has done to support the Center and the school's efforts to grow and develop and inspire in the corporate securities and financial area.

I am delighted that members of Al Sommer's family are here with us tonight, and I am really delighted that SEC Commissioner Harvey Goldschmid, who is a dear friend, has taken the time out of his schedule to come and join us.

As you know, the Sommer Lecture is really one of the crown jewels of the recently established Fordham Center for Corporate Securities and Financial Law. Somehow we have had the good fortune and foresight during the lecture's short tradition of identifying speakers who were able to offer us insights into some of the most significant and timely issues affecting the business community. And given everything that has been happening at the Securities and Exchange Commission, tonight is no exception.

As with previous lectures, tonight's lecture will be published in Fordham's specialized business journal, the *Journal of Corporate and Financial Law*, and many of you have had the opportunity to meet some of our student editors who are here tonight.

More generally, we expect the lecture and the Corporate Center to continue to build on Fordham's tradition and strengths in business

law, including its existing programs, the school's strong faculty, the nearly four dozen courses in business law taught by our full-time faculty and members of our adjunct faculty, the Securities Arbitration Clinic, and the school's remarkable alumni base, which includes the top leaders in the field of business law, many of whom are here tonight.

It gives me particular pleasure to introduce SEC Commissioner Harvey Goldschmid. I think the first time that I really got to know Harvey was about ten years ago when he and I worked together on the City Bar Association's *amicus* brief in *Central Bank v. First Interstate*.[1] As many of you will recall, *Central Bank* was the Supreme Court decision that eliminated private liability for aiding and abetting federal securities fraud. Harvey was counsel of record on the brief and the real leader in the drafting effort.

I remember being struck, as a somewhat junior academic, by both Harvey's desire to craft a workable standard of liability for the Court and the leadership role that Harvey was able to play in the drafting process. It really brought home to me the separate role that academics can play in forming a bridge between the independence, the analytic precision, and the integrity of the academic world with the pressing issues that affect the practicing bar and the business community.

Subsequent to *Central Bank*, I have had the privilege of working with Harvey on numerous occasions, ranging from City Bar projects and committees to the American Law Institute, to a range of academic programs. Harvey served as a reporter for the American Law Institute's Corporate Governance Project for more than a decade.

Prior to his current appointment as Commissioner, Harvey had extensive experience at the SEC, including serving as SEC General Counsel. During that time he was influential in developing Regulation FD,[2] which prohibits selective disclosure to securities analysts.

Harvey has also been active in SEC efforts to increase auditor independence, a topic that continues to be of extreme importance and public concern. Even before that, when the institutional investor community was in an uproar over the Commission's decision in *Cracker Barrel*,[3] Harvey devoted part of a sabbatical to volunteer at the SEC, to meet with issuers, institutions, and activists in an effort to help moderate a possible compromise.

The meetings resulted in a comment letter jointly authored by Ira

Case 1:05-cv-00162-JJF   Document 69-6   Filed 09/22/2005   Page 6 of 26

Millstein that largely roadmapped the revisions to Rule 14(a)(8) that were subsequently adopted by the SEC.

Harvey is currently on leave from Columbia University where he joined the faculty in 1970 and has been Dwight Professor of Law since 1984. His many articles in corporate securities and antitrust law have earned him the highest reputation in the scholarly community. This reputation led academic commentators uniformly to applaud the wisdom of his current appointment to the Commission, and you know how rare it is for academics to agree on anything.

Harvey graduated *magna cum laude* from both Columbia University School of Law and Columbia College. I have benefited personally from Harvey's warmth and generosity in acting as a mentor to a young colleague. Fordham has also benefited from his generous participation in many of our programs and events.

Two years ago, in one of the first Corporate Center programs, we welcomed Harvey as a panelist in our inaugural Albert A. DeStefano Lecture, which featured a panel discussion on Regulation FD, which, as you know, Harvey has real expertise on. It is worthy of note, as I look back, that just last week the SEC announced its first Regulation FD enforcement actions. It is truly a delight to welcome Harvey Goldschmid back to Fordham.

The SEC has a number of issues on its plate. Apart from the recent turmoil involving the chairman and the debate about the appropriate composition of the newly established Accounting Review Board, the SEC has just released proposed rules establishing the first federal standards of attorney conduct.

The SEC has been actively working to address problems on Wall Street, including a fluctuating relationship with New York State Attorney General Elliott Spitzer in an effort to restructure the role of the securities analyst.

The Sarbanes-Oxley Act of 2002[4] requires the SEC to study or develop rules to address a variety of perceived problems in corporate governance and the securities industry.

I cannot think of anyone better suited to help lead the SEC through these treacherous waters than Harvey Goldschmid.

### FEATURED LECTURER

COMMISSIONER GOLDSCHMID: Thank you.

It is good to be here among so many friends, and I am particularly honored to be asked to speak at this lecture. As Starr and Susie know, Al Sommer was one of the people I most respected in the world. Al was a gifted attorney, a warm and generous friend, and an outstanding public servant.

I have titled this talk "Post-Enron America: An SEC Perspective." I am not perfectly sure what I will do with my subject, but let me tell you at least a little bit about Al first.

We met more than twenty years ago when I served as a reporter for the American Law Institute's Corporate Governance Project, and Al was an adviser. In later years, with Vic Futter (who is here), we taught together in a seminar that Vic and I did uptown. We worked together when Al was Chairman of the Public Oversight Board and I was general counsel at the Commission.

Al was always generous with his time, full of insights, extraordinarily knowledgeable, and uncommonly wise. He was a remarkably effective leader of the bar and had the best of legal instincts.

Al was also a Commissioner, as has been indicated, at the SEC from 1973 into 1976, and here again we share common ground. Both of us served in turbulent times. Al became a Commissioner soon after Chairman G. Bradford Cook had resigned under fire. Cook had spent only 74 days in office.

During Al's tenure, several serious corporate scandals undermined the public's confidence in our capital markets. Hundreds of corporations admitted to bribing foreign government officials and making illegal political contributions off the books — the so-called "questionable payments" scandals. In addition, Penn Central had recently gone bankrupt. Penn Central was the nation's largest bankruptcy since the 1930s. It was our nation's largest railroad and the sixth-largest industrial corporation at the time.

Notwithstanding those scandals, Al Sommer, the Commission, and the Congress restored investor confidence. Obviously, I am hopeful that the current Commission will achieve the same success.

One thing that will be a theme of the lecture is, "In the United States, out of scandal comes reform." In the years following the crash of Penn Central, there was a new focus on corporate governance. Directors in public corporation who once served roughly 30 hours a year now spend well more than 150 hours on the job. It is not a perfect system. But out of that, too, developed

the so-called monitoring model; again not perfect, but it improved our corporate governance system enormously.

Out of the questionable payments scandals, which of course were not questionable — most were illegal — came the Foreign Corrupt Practices Act in 1977,[5] and again in an imperfect world, it made the anti-bribery situation considerably better.

Indeed, historically, the great strength of the U.S. system has been its ability to reform and heal itself. During the period of our worst financial scandals, from September 21, 1929, to July 1, 1932, the value of stock listed on the New York Stock Exchange shrank from $90 billion to just under $16 billion; from 1920 to 1930, half of the new securities sold on the New York Stock Exchange turned out to be worthless or virtually so.

The result was the 1933 Securities Act[6], the 1934 Securities and Exchange Act,[7] and the establishment of the SEC. These acts and the Commission itself remain the foundations of our securities regulation system today.

I am confident that the Sarbanes-Oxley Act, which the President signed on July 30, 2002, provides the right fundamental framework for our current healing process. This landmark legislation is the most important securities legislation since the New Deal. It is now the job of the SEC is to implement it well, and go beyond it. But it will provide the basis, I think, for restoring investor faith in the integrity and fairness of our financial markets.

Before I tell you where I think we are heading, let me spend some time on what went wrong during the 1990s and early 2000s. Put bluntly, at least in my view, we witnessed systemic failure. The checks and balances that we thought would be provided by independent directors, independent auditors, securities analysts, investment bankers, and — even before this audience I must add — lawyers, too often failed. The regulatory checks represented by the SEC and federal and state legal constraints also proved inadequate, in meaningful part, I think, because of scarce resources and overly protective case law and legislation.

When I was young, in 1998-99, and general counsel of the Commission, we saw some of the corporate governance problem developing and tried to head it off. In those days, the economy was robust, the stock markets were irrationally exuberant, and we feared the toll that short-term profit pressures were taking on corporate management.

Arthur Levitt — the first Sommer lecturer just two years ago — gave a speech in September 1998, called "The Numbers Game."[8] Arthur focused on the pressure on corporate managers to meet earnings expectations and the games that were being played to meet those goals. He recited a series of accounting tricks that worried us no end. He talked about "big bath" charges, which were restructuring charges; miscellaneous cookie-jar reserves; and improper revenue recognition. The centerpiece of that speech was the importance of corporate governance, and particularly, corporate audit committees.

This was an old Commission theme. It picked up in 1940 with the McKesson-Robbins investigation, and in a bipartisan way, worked through just about every commissioner and chairman over the next 50 or 60 years.[9]

What do you get from an active audit committee? Please keep my answer in mind, because it is very much a current theme of Sarbanes-Oxley, the NASD and Nasdaq, and the New York Stock Exchange in terms of what is being required for listing.

Some who champion the idea of an active audit committee say it will stop venal, hard-core fraud. That I do not consider realistic. An active audit committee will not, when acting alone, be able to catch thieves in most circumstances. Even the most active and effective auditors will have some trouble when hard-core fraud is involved. There are techniques being developed today to try to reach hard-core misconduct, including forensic auditing and other techniques. But when no red flags are flying, even when an audit committee acts reasonably, it will be difficult to spot fraud that is concealed and hard-core. The dangers of hard-core fraud, in short, will only be somewhat deterred or mitigated by an active audit committee.

The real pay dirt in an active audit committee will come in the presence of a dispassionate, independent view of the corporation's long-term needs. Too often a CEO or CFO begins to feel earnings pressure and says, "I need an extra five cents per share this quarter." The wheels turn — and this is something we saw in 1998-1999 and are seeing again today — and someone replies, "What about reaching into the next quarter and taking some revenue?" And the thought at the time is, "No one will notice; it may not be proper, but no one will notice, and we will make it up next quarter." But then the next quarter is not good. And what started as a kind of optimism about light at the end of the tunnel

becomes much more venal, and we get the kind of headline that we now see in the business pages. An active audit committee can bring a dispassionate, long-term perspective that ought to deter and prevent this scenario of overreaching.

Put affirmatively, active, effective audit committees can significantly enhance both the role of the independent auditor and the transparency and integrity of financial disclosure.

The rest of the story is relatively well known. A distinguished blue-ribbon committee was established.[10] Ira Millstein and John Whitehead chaired it. It had a group of eleven. They made ten recommendations for corporate governance reform, which were, in almost all respects, put into effect.

The blue-ribbon committee addressed three different groups. One was the exchanges, our self-regulatory organizations ("SROs"), because in this country, we use listing requirements to accomplish a lot of what state governments might otherwise do in terms of setting forth mandatory rules of the game for corporate governance. The report recommended, and the exchanges — the NASD, the New York Stock Exchange, and the AMEX put into effect — a strengthened independence definition for members of the audit committee. Today the SROs are recommending the same kind of independence requirements for compensation committees, for nominating committees, and for a majority of the board. All of this reflects basic corporate governance themes that began in 1970 with the downfall of Penn Central.

On the audit committee, the recommendation was that the members, three persons, be financially literate, which the bar worried a great deal about, but basically required only the ability to read key financial documents, which is not very onerous; and at least one member had to have accounting or financial expertise. These requirements were enhanced in Sarbanes-Oxley, which put a bit more emphasis on accounting expertise.

It is interesting. As Jill indicated, I spent most of my life thinking about corporate governance, and I had always assumed that the audit committee or the board was appointing the outside auditor — hiring, evaluating, and, where necessary, firing the outside auditor.

Empirically, however, as the blue-ribbon committee looked at it, this assumption turned out to be flawed. And so the committee recommended that the auditor appointment function be given to the audit committee and the board. In the kind of lawyers' language we use, the committee asked that the board and audit committee take

ultimate responsibility for the appointment. "Ultimate responsibility" meant do it. Interestingly, though, that did not happen often enough. Sarbanes-Oxley now requires that the audit committee take "direct responsibility" for appointing, evaluating, and firing, if necessary, the outside auditor. This establishes a relationship that ought to encourage more candid communications by auditors and much more effective oversight by the independent directors.

Other committee recommendations targeted the accounting profession and involved the quality of numbers and the independence of accountants.

The blue ribbon committee's recommendations were all tied together in a package, as I left as general counsel, and the Commission provided disclosure enhancements. We were all relatively optimistic about the future in those days.

Arthur Levitt, soon after this all went into effect, was talking about how active and revitalized audit committees had become. And, indeed, the empirical evidence seemed to reflect the accuracy of Arthur's view. A study done by CFO magazine in the summer of 2001 indicated substantially increased audit committee activity.[11]

That brings us to the most interesting question. If you think about Enron and WorldCom and others, at least generically, what went wrong? That also brings me to something I should have done earlier. The comments I make today are my own and do not necessarily represent the views of the Commission, my fellow Commissioners, or the Commission staff.

Let me briefly review, and I can only do it briefly, what I think went wrong in each key area during the 1990s and early 2000s. Start with independent directors. The full facts will have to be developed in the cases, both criminal and civil, that are moving forward. But let me quote from the person who probably knows most about what went on, Steve Cutler, who is Director of the Division of Enforcement at the SEC.

He recently said the following: "Yet too often, . . . boards were disinterested and disengaged. . . . They are dominated by associates and friends of senior management. . . . Many outside directors have lacked expertise in the relevant industry, and in accounting and financial reporting issues. Thus, boards were too rarely equipped to uncover and derail the determined efforts of management to cook the company's books." [12]

Perhaps even more significant than those cited by Steve Cutler are

two additional factors: First, independent directors were left inadequately informed, and thus exposed, because of the failures of others — of auditors, lawyers, investment bankers, and even research analysts. The monitoring model staffed by active, independent directors continues to make sense. Indeed, I would strengthen that model. But it cannot carry the load alone. It is heavily dependent on proper disclosure and the effectiveness of various gatekeepers.

Second, because of a series of regulatory, case law, and legislative developments, directors may have been feeling too insulated from legal vulnerability towards the end of the 1990s. I do not want to expose them too much, but some incremental incentive toward activity would have been helpful.

Turning to accountants and auditors, during the 1980s and 1990s, increasingly complex businesses turned more and more often to their auditors for help with non-audit services, such as asset valuations, merger advice, and computer system design and implementation. But when an accounting firm provides both audit and extensive consulting services to an audit client, the auditor's independence may well suffer, particularly when the consulting services are significantly more lucrative and more voluminous than the audit services.

An auditor who wants to retain an audit client's non-audit business may be less likely to question management, and that is a serious problem.

The average percentage of large accounting firm revenues in the United States attributed to accounting and auditing services fell from 55 percent in 1988 to 31 percent in 1999. Recent data — and I suggest that the data are quite imperfect — but recent data reported to the SEC indicate that, on average, non-audit fees of large public accounting firms comprise 73 percent of total fees; in other words, $2.69 in non-audit fees for every dollar of audit fees.

Adding to the independence problem was the cross-selling of services. Seriously exacerbating the overall problem were inadequate professional quality control systems, questionable professional rulemaking processes, and an ineffective professional disciplinary process. In sum, a serious failure of professional self-regulation.

With respect to research analysts and investment bankers, I do not have time to analyze the failings in any detail. But the words "serious conflict," as well as a casual scanning of business-page

headlines, indicate my concern. At the heart of the problem appears to be the fact that in the 1980s and 1990s, investment banking was far more lucrative than research or other aspects of Wall Street's business. To obtain lucrative investment banking business, favorable analyst coverage, IPO spinning opportunities, and other favors were provided.

Turning to lawyers, I wish I had more time to focus on the changes in the culture and economic structure of the legal profession. But for present purposes, I need only paraphrase Judge Stanley Sporkin in the *Lincoln Savings*[13] case: "During the most dramatic financial scandals that have occurred during my professional life, where were the lawyers?"

Let me turn to an important area that has received little focus: regulatory and legal checks. I am slightly biased, but I believe that Arthur Levitt did as much as anyone could reasonably have expected during the 1990s. He, for example, successfully pushed corporate governance and audit committee reform, promulgated Regulation FD,[14] enhanced corporate disclosure, and fought — with limited success, but with courage and tenacity — to achieve accounting profession reform. Many of Arthur's extraordinarily wise warnings were unheeded at a time of seemingly endless growth and optimism.

But then as now, the Commission was sharply constrained by inadequate resources. Now I will throw in a commercial. Today no one should accept nomination to be the SEC's chairman without first obtaining a Bush Administration pledge to support something in the order of the $776 million budget authorized by Sarbanes-Oxley. The SEC's budget was well less than $500 million in fiscal year 2002. The *New York Times* was right yesterday: We desperately need the money.

Furthermore, the scandals in the 1990s and early 2000s occurred against a backdrop of diminished exposure to liability under both state and federal laws. In 1994 the Supreme Court, as Jill indicated, eliminated aiding and abetting liability. Even before that, the Supreme Court had shortened the statute of limitations for securities fraud. And state legislatures enacted so-called shield statutes to limit or eliminate director monetary liability for failures of duties of care. I could make a case for almost every one of these developments. What I cannot make a case for is their cumulative effect. And the same can be said for the Private Securities Litigation Reform Act of 1995.[15] While it enacted a number of very useful reforms, it placed new burdens on plaintiffs in securities class

actions.

Corporate directors and other gatekeepers act properly for many reasons: pride, professionalism, reputation, et cetera. But the cumulative effect of these regulatory, case law, and legislative developments "made the legal risks" — and here I am quoting from Steve Cutler again — "associated with abdicating their gatekeeping role appear tolerable." Now, let me underscore those words: ". . . made the legal risks associated with abdicating their gatekeeping role appear tolerable."

Where are we heading? Sarbanes-Oxley, as I indicated, particularly when added to the Commission's prior statutory authority, provides the SEC with very formidable power. The trick, of course, is for the Commission to diminish or end the systemic problems I have identified without — and again I stress these words — being economically foolish or otherwise creating counterproductive effects.

I hasten to add that not all wisdom comes from Washington, D.C. The SROs are taking important steps. The New York Stock Exchange and Nasdaq, for example, have produced excellent corporate governance proposals. New initiatives by independent directors, institutional investors, and other shareholders are all needed; new reforms by professional organizations will also be necessary.

But let me run through where I think the Commission is headed:

First, with respect to corporate governance and disclosure accountability, the Commission's work to implement Sarbanes-Oxley began on August 27, 2002. It was my first public meeting as a Commissioner. We adopted rules requiring certifications by CEOs and CFOs of the accuracy and completeness of a corporation's financial information. Certifications with regard to internal controls have now also been proposed.

More in the shadows, but of large consequence, are requirements that public corporations maintain effective systems — and I underscore the word "systems" — to assure the quality and accuracy of their periodic reporting.

The emphasis on systems, on programs and procedures, takes its inspiration from Section 4.01 of the American Law Institute's *Principles of Corporate Governance* and Delaware's 1996 *Caremark* decision.16 This is a nice example of wisdom derived from state law and scholarly commentary finding its way into federal law.

In terms of increased director and officer accountability for

disclosure failures, please note that now available to the SEC or the Department of Justice are: new disgorgement powers; easier-to-obtain officer and director bars (prohibiting future service as an officer or director of a public corporation); broad, equitable remedial powers; and enhanced criminal sanctions for venal and willful conduct.

Also fully recognized now is the absolute necessity of a vigorous, effective SEC enforcement program, particularly where financial fraud may be involved. In 1999, the SEC brought 79 financial fraud cases, and that was a relatively robust year. In fiscal 2002, we brought 163 such cases. Accountability and deterrence have never been more central to the Commission's mission and to our effort to restore investor confidence.

Again, I hasten to add that fairness, proportionality, and concern about culpability count. It is critically important that "good people" not be frightened away from service as officers or directors of public companies. It is also critically important that we not interfere unnecessarily with prudent risk-taking and the entrepreneurial spirit. In this area, activity provides the basic protection against legal exposure. Under the federal recklessness standard, which is defined in the federal courts as an "extreme departure" from standards of ordinary care, and under state duty of care and business judgment rules, active, informed directors and officers acting without loyalty conflicts will almost always be shielded from liability.

In terms of disclosure and transparency, there will be additional and better disclosure coming. Some of it is already here. Management's discussion and analysis will have to focus on critical accounting issues.

In November, we put out new disclosure proposals for special purpose entities. More trend reporting is bound to occur. More timely disclosure is going to be required. Again in an August 2002 meeting, the Commission accelerated annual and quarterly reporting. Annual reporting had been required in 90 days after the end of a public corporation's year. It has now been reduced, over three years of transition, to 60 days, at least for large issuers. Quarterly reporting was reduced, again taking account of the need for transition, from 45 to 35 days.

Directors and officers reporting the sale of stock used to take, even when there was no cheating, roughly 40 days. It is now two days. There is no reason for more, given our current ability to get that information accurately and quickly into a computer.

There will be more review and monitoring of disclosure. That has got to be the case. It will not catch everything, but it certainly will create better disclosure and stronger incentives to do the right thing.

Now, I must add a qualification with respect to faster reporting. The key for me is not speed but accuracy. And also with that goes the value of certainty and clarity. We do not want to see inaccurate information disseminated because of harsh time pressure. We certainly do not want to create a litigation morass. But, at least where practicable, faster disclosure is properly on the SEC's agenda.

At the heart of Sarbanes-Oxley, as all of you know, is the Public Company Accounting Oversight Board ("PCAOB"). Now, I am not going to go into detail, but I will give you a policy framework. The PCAOB has the power to discipline, to do quality reviews, and to set rules for auditing and independence. It is precisely what the accounting profession badly needs.

It also will reestablish the credibility of our corporate numbers. Confidence in the numbers is absolutely critical for securities investment and for an efficient transactional system. The PCAOB will help to restore and rebuild.

With a break, by April 26, 2003, when the SEC must recognize the PCAOB, a new chair for that board will be in place. A chair of the highest quality and integrity is absolutely essential to reestablish trust in our financial numbers and in the accounting profession.

The Financial Accounting Standards Board ("FASB") is also going to be more independent. Because of Sarbanes-Oxley, FASB, which sets accounting rules, will now be funded in the same way as the PCAOB. It will no longer be forced to go hat-in-hand to any constituency.

The SEC is now studying the roles of research analysts and investment bankers. I have time today to indicate only my understanding of the critical need to restore investor confidence in these areas too.

New York State Attorney General Elliott Spitzer, whose name came up earlier, performed a large and most important national service in training a spotlight on analyst conflicts. In the long run, however, we will need an SEC rulemaking. It makes no sense to have 52 different sets of rules for analysts and investment bankers. I have recommended to my colleagues on the Commission that we undertake a comprehensive rulemaking to establish rigorous,

uniform, national standards, and I hope we will move forward on that in the not too distant future.

Let me turn to lawyers as gatekeepers. There is, I believe, a broad consensus that lawyers should play a critical gatekeeping role in large public corporations. In the 21st century, in the wake of Enron, how should we think about that role?

Well, Congress made some of our thinking easier. In Section 307 of Sarbanes-Oxley,[17] Congress told the SEC to establish minimum standards of professional conduct for attorneys appearing before the Commission. Sarbanes-Oxley goes on to mandate — and I underscore the word "mandate" — a reporting-up system in terms of the corporate chain of command, or "ladder" — the word used in a recent SEC release.

I have no doubt about the validity and wisdom of that basic approach. It is consistent with corporate governance developments over the past 30 years, and requires independent, dispassionate directors — and not managers alone — to resolve important legal issues that could cause material harm to the corporation. Indeed, although I acknowledge its ambiguity, Model Rule of Professional Conduct 1.13[18] has strongly suggested reporting up for the last twenty years. Though it is not in effect in New York, there is no doubt in my mind that New York ethical authorities would accept the Model Rule's approach. Of course — and this is a matter not free from controversy — Congress has now mandated reporting up as a matter of federal law, with SEC sanctions and remedies available.

The most significant additional issue raised in the SEC's recent rulemaking is a "reporting-out" provision. No one should doubt the complexity and difficulty of the so-called "noisy withdrawal" issue.

But assume serious securities fraud or looting is occurring. Involved is extremely harmful, ongoing wrongdoing. In what I believe would be a most unusual circumstance, assume the wrongdoing has been reported up the corporate chain of command, but the directors and officers have refused to take any action.

Model Rule 1.6[19] — and this is one of the reasons the Model Rules were not adopted in New York — adopted by the ABA in 1983 and reaffirmed by the ABA in the summer of 2001, basically precludes a lawyer from reporting out the ongoing financial fraud.

I recognize the need for full and frank communication by lawyers and their clients. I am also comfortable putting heavy weight on the

value of confidentiality with respect to the past, where wrongdoing has ended. But for me an absolute emphasis on confidentiality — where ongoing financial fraud is involved — is incomprehensibly out of balance.

Such an absolute emphasis is at odds with sound public policy. It is contrary to the duties we now place on accountants and on directors. How can such an emphasis on confidentiality be reconciled with the Commission's traditional mandate, reinforced in Sarbanes-Oxley, to protect investors and the public interest?

In general the proposing release on minimum standards of professional conduct for attorneys reaches reasonable conclusions on numerous difficult issues. I emphasized, however, when I voted for it, that I had doubts about specific aspects, particularly its triggering provisions, breadth, and scope. Everyone in this room is much more than welcome to provide comments.

Let me finish on one last point. Jill mentioned our *Central Bank of Denver* brief in 1994. Congress restored aiding and abetting authority for the SEC in 1995. That was wise.

Think of a situation, though, because aiding and abetting is still not available in private litigation, where a corporation commits financial fraud. It does so knowingly. Moreover, it does so with the knowing and substantial assistance of lawyers. The lawyers, for example, have submitted opinion letters that made the accountants go the wrong way: the lawyers knew they were providing substantial assistance to financial fraud.

We can reach that at the SEC, but we have limited powers with respect to investor compensation. How would we explain to the public, if my scenario were to occur, why aiding and abetting liability for private actions under Section 10(b) has not been restored?

The Supreme Court in 1994 did not say that aiding and abetting was not important to the law. The majority of five justices merely said, "We have looked at Section 10(b)[20] and we just do not see the words." They, in effect, invited Congress to act. The right thing was done for the SEC in 1995. In my view, it is time for Congress to drop the other shoe and provide aiding and abetting liability, very carefully defined, in private actions.

Let me close on an optimistic note. The Enron scandals have compelled us to face serious systemic imperfections. Our checks-and-balances system too often failed. But the Enron

scandals have also provided us with a critical stimulus to bring about healing and reform. In the end, I suspect, post-Enron developments will permit the United States to maintain and strengthen its status as the world's leader in both corporate accountability and financial disclosure.

Thank you.

Now I would be happy to take questions.

QUESTIONER: I would like to focus on the role of the independent director. How do we insulate that director when he starts exercising that independence? How do we prevent him from being eased out by still another independent director who is friendlier once he starts stepping on toes?

COMMISSIONER GOLDSCHMID: Well, that is a traditionally difficult question.

Let me start even further back than that. Every definition we have of independent director — and I have had my hand in many of them — is going to be imperfect. You can define independent director by excluding financial conflicts, family connections, work at the company, and you know that there is a next-door neighbor who is not ever going to ask a hard question. Yet he or she will pass in terms of any objective test.

On the other hand, I have known a number of senior corporate executives who would say to me, and I believed them, "If anyone is going to ask the CEO a tough question, it is going to be me."

And yet we say, by definition, inside officers cannot be classified as independent directors. Some of them will be quite independent in the real world. But you are making judgments based on a "more likely than not" analysis. If you have somebody who works inside, the chances are he or she will be much more responsive to, and inhibited by, a tough CEO than would an outsider.

How do you turn objectively independent directors into truly active, effective directors? One real possibility, of course, is to encourage and facilitate more oversight from institutional and other sophisticated investors. Another is to give independent directors real opportunities to assert themselves. One process change that has had a dramatic effect is independent directors meeting alone. If you look at CEO replacements that have occurred in some of our major corporations, from GM to IBM to American Express, they began with outside directors sitting together and communicating their concerns without the inhibiting presence of the CEO.

I am not sure how to deal with disputes among outside directors. Those who believe in current management could turn out to be correct. But I do have faith that, in an imperfect world, having a majority of independent directors, and having the audit committee, the compensation, and the nominating committee in the hands of those directors, will make the system work better.

QUESTIONER: A follow-up: I know in connection with the independent auditors the SEC many years ago, whenever an auditor was changed, they had to report why they were changing, that it did not involve a disagreement on accounting.

Perhaps you could have the same law for independent directors. If an independent director is eased out, perhaps you could have a similar disclosure or oversight.

COMMISSIONER GOLDSCHMID: That would be one way of at least reaching your concern. The question always is how much disclosure is effective and how much will you gain; the other side, of course, is cost.

In my experience, seeing the problem is relatively easy in area after area. Providing solutions that are going do more good than harm, and that are cost effective, is more difficult. But certainly your suggestion is worth thinking about.

We are going to use that technique with lawyers. They are going to have to report up, and there is also the so-called "noisy withdrawal" proposal, if the board does not provide an appropriate response to a material violation.

QUESTIONER: I was delighted that you confirmed the Caremark theme behind the audit provisions in Sarbanes-Oxley. I am wondering if you might expand now a little bit about what the roadmap ahead might be, whether there might be a journey in which the exchange is to draw out some of what the processes, the systems, should be, whether the SEC might write some rules including a requirement to disclose and a Caremark report. Where do you think it might go?

COMMISSIONER GOLDSCHMID: Well, you have got to be careful — this may show the conservative in me — not to stipulate too much. There is a one-size-fits-all problem, and therefore, we did not rigidly specify what an internal control system or a disclosure reporting system would look like. I had a hand in that ALI drafting in Section 4.01, and again, what we did is said, "Work out programs and procedures that make sense in the context of your corporation,

Case 1:05-cv-00162-JJF    Document 69-6    Filed 09/22/2005    Page 21 of 26

but be serious about it."

QUESTIONER: Right now the regulators have been meeting with the largest brokerages to settle those analyst investigations, and they are talking about what I thought were new possible rules regarding analysts. If the SEC were to take this to rulemaking, what would it mean for whatever the larger firms agree to?

COMMISSIONER GOLDSCHMID: Well, the process that you have read about — and I wish you were not reading so much about it; I am religious about not talking about enforcement — is one looking at potential enforcement matters. That is correcting something that may have gone wrong. That may involve five or ten or whatever number of firms.

The larger problem in a world where you have over 7,000 broker-dealers is how do you set up a system that works across-the-board. Now, the SROs have offered some good proposals. There were rules approved for analysts in May; this represents a good start. There is another set that is coming before the Commission.

But I think it important that the Commission step back and say, "What do we really need across-the-board in these areas?" The only thing I am absolutely sure of is that there ought to be one rigorous, comprehensive set of rules for the nation. Those rules ought to be binding; they ought to be rigorous; they ought to be national; and they ought to be uniform.

QUESTIONER: So would the SEC essentially down the road render whatever they agree to and say this enforcement action is relevant?

COMMISSIONER GOLDSCHMID: The enforcement action, if all goes well, will correct whatever problems have been found, but anything that is determined in an enforcement action would be subject to the SEC's ability to make rules that are binding across-the-board, and presumably, at least if I have my way, any conceivable settlement would be premised on adherence to any SEC rulemaking made at a later time.

Now, you might, I should add, go further in an enforcement matter than you would in a rulemaking for more than 7,000 broker-dealers. In an enforcement context, you are remedying something that has gone wrong.

QUESTIONER: With all the pressures coming on audit committees now — particularly you mentioned the critical accounting policies and other things that you have to look at — do you think that it is

going to become more common to them to retain their own outside accounting and lead counsel separate from the corporate counsel?

COMMISSIONER GOLDSCHMID: Yes, but it may not be wise for audit committees to do that as a routine matter. I think it may be costly, particularly if a redo of an audit is contemplated; again, we want to think about costs to the system. But certainly there are going to be occasions — more often than in the past — where audit committees are going to want to say, "We need our own accounting look; we need our own legal look."

QUESTIONER: You were talking about some of the failures, some of the suggestions towards enhancing more checks and balances and what went wrong before Enron and what we can do after that. You just reminded me that about a year ago there was a *Sunday New York Times* article about the auto industry, the whole effect of regulation in the auto industry toward rollovers and how a particular lawyer on the plaintiff's side had almost effectively done what the government should have done in enforcing the redesign of Ford Motor. That was the object.

And so taking my analogy, as they teach us to do at Fordham Law School, it occurred to me that with the budget problems in its enforcement, and providing ammunition for the SEC and other regulatory agencies that, you know, when I look back at it, I just wonder has the defense bar done too good a job in this checks and balances when you look at the height and feeding requirements of the PSLRA and all the other things?

I mean, before Enron there was a tendency to roll your eyes and say, "Here is another gadfly, here is that firm whose name shall not be mentioned where the problems began, only doing it for money." But, you know, like when I get into a Ford Explorer now, I do not really care that some plaintiff's lawyer made a lot of money because I feel safer because the government did do its job.

I am wondering as the investing public, as defense bar, as the insiders, have we tilted it a little bit too much? I mean, should there be ways for us to bring the balance back so that the average buyer or shareholder can feel a certain comfort that if the SEC does not have the budget that somebody else will go after them; there is an incentive there?

COMMISSIONER GOLDSCHMID: Oh, yes. The traditional SEC view, which I fully believe in, is that private actions are a necessary supplement to make the securities laws work. The SEC has been able to bring 400 to 500 cases each year. In fiscal 2002, pushed

enormously by all of the scandal out there, we have gotten up to 600 cases. But it does stretch the staff thin. If we get the $750 million-plus budget I think we need, the SEC will still not be able to begin to do it all.

On the other hand, there is in my mind a real need to make sure we do not let private litigation become offensive in terms of the validity of the claims made.

One real advantage of the 1995 PSLRA was that it told private plaintiffs' lawyers that, in effect, you need a client, and that institutional investors should often play a lead plaintiff role. It stopped the race to the courthouse, which decided who would become lead counsel. Getting rid of that was a national blessing.

I do not think the PSLRA's strong inference standard has done much harm. There was enormous danger there. But if I can be immodest, when I was general counsel in 1998-99, the SEC went from circuit to circuit indicating the recklessness standard had to be retained. I argued two of the key cases, one in the Second Circuit and one in the Sixth Circuit. We won just about all of those cases, and the recklessness standard and rational pleading standards were generally preserved. I am still worried about a few issues, particularly in the Ninth Circuit. In general, private litigation — including class actions — makes all the sense in the world. It is the only way of compensating people who are badly hurt. And the talent and intelligence of plaintiffs' lawyers can be an enormous supplement to what the SEC can do.

On the other hand, you do not want meritless cases going forward. One of the good things the 1995 PSLRA has done, in using the strong inference standard that came from the Second Circuit, is to allow courts to get rid of weak cases early.

Something like 20 to 30 percent of cases are now being dismissed either at the motion-to-dismiss stage or at early summary judgment stages. If all is going well — and that is what we have to study — we are getting rid of weak cases and not those with substantial merit. But I fully believe that plaintiffs' private actions are critical to making the securities laws work.

QUESTIONER: When the Accounting Board gets up to speed, what do we know and what do we not know about the relationship and the interplay between the SEC and the Accounting Board?

COMMISSIONER GOLDSCHMID: What we know is that the SEC has oversight authority on every key area. Everything they do in terms

of rulemaking will have to be approved by the SEC.

On the other hand, there is an immense amount of wisdom, if the Commission has confidence in the board, to giving it room and discretion. I would think if we have confidence in the board — and there are four very good members there now, and hopefully we select the right chair — our oversight would be gentle and deferential.

QUESTION: The day after Judge Webster was named as the chair of the PCAOB there was a quote from ex-accountant, chief accountant Lynn Turner in most of the major newspapers saying, "If I was an investor, I would move all my money into money markets."

Do you get the sense that the work of the Commission has become increasingly politicized over the past year?

COMMISSIONER GOLDSCHMID: Should I touch that question?

Let me take you back in history. I mean, the last time the SEC was in this kind of spotlight was when Joe Kennedy became chair in 1935. People do not realize it, but Joe Kennedy's first speech — and of course this involved radio — was to a national audience. Clearly, the amount of negative public focus is a problem, but I do not think anything we did, being as candid as I can with myself, had anything to do with politics.

Fundamentally, when it came to the Accounting Oversight Board, I had been saying from the beginning that this was the most important thing the Commission would do within the next year.

Bill Webster was a particular problem for me. Bill is an old friend, and I have enormous admiration and regard for him. The problem is that he had a limited background here. He had not dealt with these issues, and had not taken part in the debate that occurred nationally over the last few years. He was coming in under a shadow, under what was clearly a perception, and I think probably a reality, of heavy industry pressure.

One of the things that became clear to me as the dispute developed was that Harvey Pitt and I had made the right decision in stating on September 11, 2002, that we each would support John Biggs. John was a superb choice. He was moderate; he knew these issues, he was very active on these issues; and he had an integrity, a decency, and an acceptance that was immense across the nation. This was not political. The *Wall Street Journal* had written three excellent editorials about John Biggs being the right person to do this job.[21] You could go to newspapers throughout the country,

Democratic, Republican, of every stripe, saying this is the right man.

Losing John, at least insofar as we have lost him — we have another chance — was a loss not because of anything political but because for me he was clearly the right man to do this enormously important job. His not getting the job in the atmosphere — because of industry and other pressures — was a tragic mistake.

But everyone should remember that Bill Webster is a good and decent man who has been an immensely important public servant.

I think I will end with that. Thank you.

[*] The keynote herein was held at Fordham University School of Law on December 2, 2002, for the Third Annual A.A. Sommer, Jr., Corporate Securities & Financial Law Lecture. It has been edited to remove the minor cadences of speech that appear awkward in writing, and to identify significant sources when first referred to by the speakers.

## Endnotes

[1] Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994).

[2] Regulation FD, 17 C.F.R. § 243.100 (2000).

[3] Cracker Barrel Old Country Store, Inc., SEC No-Action Letter, LEXIS 984 (October 13, 1992).

[4] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002).

[5] Foreign Corrupt Practices Act of 1977, 18 U.S.C. § 1961 (2002).

[6] Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (1980).

[7] Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78mm (2002).

[8] Arthur Levitt, The Numbers Game, Address at the NYU Center for Law and Business (Sept. 28, 1998 (*at* http://www.sec.gov/news/speech/speecharchive/1998/spch220.txt).

[9] In the Matter of McKesson & Robbins, Accounting Series Release ("ASR") No. 19, Exchange Act Release No. 2707 (Dec. 5, 1940).

[10] Press Release, Securities and Exchange Commission, SEC, NYSE, and NASD Announce Members of Blue Ribbon Committee to

Improve Corporate Audit Committees (Oct. 6, 1998) (*at* http://www.sec.gov/news/press/pressarchive/1998/98-98.txt).

<u>11</u> Stephen Barr, *Life in a Fishbowl: Audit committees have been under intense scrutiny — and seem to be the better for it*, CFO Magazine, July 1, 2001, *available at* http://www.cfo.com/article/1,5309,3905||M|90,00.html.

<u>12</u> Stephen M. Cutler, _____, __ Mich. L.Rev. (2002).

<u>13</u> Lincoln Sav. and Loan Ass'n v. Wall, 743 F. Supp. 901 (D.D.C 1990).

<u>14</u> Regulation FD, 17 C.F.R. § 243.100 (2000).

<u>15</u> Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1 (1998).

<u>16</u> Cite *Caremark*

<u>17</u> Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 302, 116 Stat. 745 (2002).

<u>18</u> Model Rules of Prof'l Conduct R. 1.13 (1983).

<u>19</u> Model Rules of Prof'l Conduct R. 1.6 (1983).

<u>20</u> 17 C.F.R. § 240.10b-5 (1951).

<u>21</u> Editorial, *Fighting Mr. Biggs*, Wall St. J., Oct. 4, 2002, at A12; Editorial, *Cleaning Up Dodge*, Wall St. J., Oct. 10, 2002, at A14; Editorial, *Using Judge Webster*, Wall St. J., Oct. 24, 2002, at A16.


*http://www.sec.gov/news/speech/spch120202hjg.htm*