SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _Ramos_        PART _53m_
       Justice

_William J Heggarty_

INDEX NO. _601646/05_

MOTION DATE _____

- v -

MOTION SEQ. NO. _005_

_The New York Stock_

MOTION CAL. NO. _____

Exhibit A

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits .... | |
| Answering Affidavits — Exhibits _____ | |
| Replying Affidavits _____ | |

Cross-Motion: ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion

Exhibit A

— is decided in accordance with accompanying memorandum decision and order.

Exhibit A

Dated: _9/1/05_

_[signature]_
J.S.C.

CHARLES E. RAMOS

Check one: ☐ FINAL DISPOSITION    ☑ NON-FINAL DISPOSITION

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:COMMERCIAL DIVISION
-------------------------------------X
WILLIAM J. HIGGINS, on behalf of himself
and all others similarly situated,

                              Plaintiff,
                                              Index No. 601646/2005
     - against -


THE NEW YORK STOCK EXCHANGE, INC.,
JOHN THAIN, MARSHALL N. CARTER,
HERBERT M. ALLISON, JR., ELLYN L.
BROWN, SHIRLEY ANNE JACKSON, JAMES
S. McDONALD, ALICE M. RIVLIN, ROBERT
B. SHAPIRO, KARL M. von der HEYDEN,
DENNIS WEATHERSTONE, EDGAR S. WOOLARD,
JR., and the GOLDMAN SACHS GROUP, INC.
                              Defendants.
-------------------------------------X
```

**Charles Edward Ramos, J.S.C.:**

This dispute arises out of the proposed merger between the New York Stock Exchange, Inc. ("NYSE"), and Archipelago Holdings, LLC ("Archipelago").

In sustaining plaintiffs' direct shareholder class action complaints challenging the fairness of the merger that was allegedly tainted by numerous conflicts of interest and for an unfair price, this Court is applying a merits-based analysis, akin to Delaware's approach to reviewing shareholder challenges to mergers.

In motion sequence 004, filed under index number 601646/05, defendant Goldman Sachs Group, Inc. ("Goldman") moves to dismiss the complaint pursuant to CPLR 3016(b) and CPLR 3211(a)(7). In motion sequence 005 of the same index number, defendants NYSE, John Thain, Marshall N. Carter, Herbert M. Allison, Jr., Ellyn L. Brown, Shirley A. Jackson, James S. McDonald, Alice M. Rivlin,

Robert B. Shapiro, Karl M. von der Heyden, Dennis Weatherstone, and Edgar Woolard Jr. (collectively, "NYSE defendants"), move to dismiss the complaint, pursuant to CPLR 3211(a)(3) and 3211(a)(7).

In a related action filed under index number 106717/05, in motion sequence 002, Goldman moves to dismiss the complaint, pursuant to CPLR 3016(b) and 3211(a)(7).

These two actions, *Caldwell v The New York Stock Exchange, Inc. et al*, and *Higgins v The New York Stock Exchange, Inc. et al*, have recently been consolidated and now bear the caption *In re New York Stock Exchange/Archipelago Merger Litigation*, index number 601646/05.

**Background**

The facts set forth below are taken from the allegations of the *Higgins* and *Caldwell* complaints unless otherwise indicated.

The NYSE, affectionately termed the "Big Board" throughout its lengthy 212 year history, is the world's largest equities market, where an average of approximately 1.4 billion shares are traded in a single day. As a not-for-profit entity incorporated in New York, NYSE members hold seats rather than shares in the corporation. Seatholders are entitled to physical access to the NYSE trading floor. The NYSE is comprised of 1,366 seats altogether. Plaintiffs Higgins, Caldwell, Joselson and Horn (collectively "plaintiffs") are "seatholders" in the NYSE.

The NYSE defendants comprise the eleven members of the NYSE Board of Directors ("Board"), led by CEO Thain. Prior to assuming

2

the position of CEO of the NYSE in early 2004, Thain held various executive positions in defendant Goldman since 1994, including the positions of President, CEO, co-CEO, and CFO. Further, Thain owns in excess of 2.2 million shares of Goldman stock, worth an estimated $225 million.

Defendant Archipelago,[1] the predecessor of "ArcaEx" as it is known today, was founded in late 1996 as a fully automated, electronic stock market, one of the few existing in the world today. Unlike the NYSE, in which brokers physically buy, sell and trade equities in an auction-based market on the trading floor, all trading at Archipelago is conducted online through an automated electronic system. In this capacity, Archipelago is a direct competitor of the NYSE.

Plaintiffs allege that since Archipelago's creation, defendant Goldman has heavily invested in it and its subsidiaries, a strategy backed by current Goldman Chairman and CEO, and former NYSE Board member and NYSE Board of Executives ("Executives") member, Henry Paulson. At one point Goldman was Archipelago's largest shareholder, owning upwards of 24%; today that ownership interest stands at approximately 15.6%.[2] Plaintiffs additionally allege that aside from providing

---

[1] The parties have since stipulated to voluntarily discontinue the action against defendant Archipelago, which was "So Ordered" by this Court on July 28, 2005. The Court will therefore not discuss claims related to it, and Archipelago's motion to dismiss the *Caldwell* complaint is therefore permitted to be withdrawn.

[2] Goldman additionally owns 21 seats in the NYSE, and leases 92 others.

substantial investment capital to Archipelago over the years, Goldman served as the lead underwriter for Archipelago's initial public offering ("IPO") in 2004, earning over $1.7 million in investment banking fees.

### The Proposed Merger

Prior to Richard Grasso's resignation as Chairman of the NYSE in 2003, plaintiffs allege that many key players on Wall Street, including Thain, Goldman, Merrill Lynch & Co. ("Merrill Lynch") and JP Morgan & Co. ("JP Morgan"), began urging the NYSE to increase automated trading at the NYSE, in addition to converting the NYSE's not-for-profit status into a public, for-profit corporation, thus expanding the NYSE's competitiveness and value. According to plaintiffs, as soon as Thain assumed the position of NYSE Chairman, he began developing a plan to fulfill these goals.

On April 20, 2005, NYSE and Archipelago announced that the corporations will combine pursuant to a merger agreement ("Merger Agreement"). Under the Merger Agreement, the NYSE will merge into a newly created for-profit Delaware corporation ("Merger Sub"), upon which the NYSE will cease to exist. Each NYSE ownership interest will then convert into the right to receive $300,000 in cash and one share of the Merger Sub.[3] Archipelago and the Merger Sub will then merge into a newly created for-profit

---

[3] The $300,000 payout to each NYSE seatholder totals approximately $410,000,000, leaving $575,000,000 in cash and its equivalent on the NYSE balance sheet, that will then be transferred to the merged corporation.

4

corporation, called the NYSE Group, Inc. ("Holdco"), and each share of Merger Sub will automatically convert into the right to receive one share of Holdco common stock. A vote on the Merger is expected to take place in November, 2005.

According to plaintiffs, the proposed merger unfairly withholds from the NYSE seatholders an appropriate distribution of shareholders' equity, forcing them to relinquish their seats in the NYSE in exchange for an inadequate amount of shares in Holdco, shares which are unreasonably burdened by lock-up provisions. Moreover, the allocation scheme pursuant to the Merger Agreement drastically undervalues the NYSE while overvaluing Archipelago shares, providing a financial "windfall" to former Archipelago shareholders. The alleged inequities of the Merger Agreement and disparate treatment of NYSE seatholders are allegedly apparent in several key provisions.

The 70/30 Allocation

Under the Merger Agreement, former NYSE seatholders, will be allocated 70% of the aggregate amount of Holdco common stock, whereas former Archipelago shareholders will receive the remaining 30% of Holdco's outstanding common stock. Plaintiffs allege that this allocation is patently unfair to NYSE seatholders because it does not accurately reflect the equity value of the NYSE, which will remain at over $575,000,000 in cash and its equivalent following the payout of $300,000 to each NYSE seatholder.

In contrast to the 70% allocation of Holdco common stock

that the NYSE shareholders will receive under the Merger, plaintiffs allege that NYSE seatholders are more appropriately entitled to an aggregate equity ownership closer to 90% of the merged corporation.

The "Lock-Up" Provisions

Under the so-called "lock-up" provision of the Merger Agreement, NYSE seatholders are precluded from selling their Holdco shares for up to five years, whereas currently, NYSE seats are freely transferrable. In contrast, only certain of Archipelago shareholders, representing 40% of Archipelago's's shares, including Goldman, are subject to a similar lock-up provision. Plaintiffs allege, however, that Goldman separately negotiated "Demand Rights" which enables it to demand the release of "lock up" restrictions on certain of their shares, rights which are not granted to NYSE seatholders.

The 5% Hold-Back for Distribution to NYSE Employees

The Agreement also includes a provision that allocates shares of up to 5% of the merged company to certain NYSE employees, including non-seatholders. Plaintiffs allege that this distribution of NYSE equity, representing close to $150 million, is improperly reducing the amount of shares in the merged corporation that the seatholders are entitled to.

Conflicts of Interest

In addition to challenging the fairness of the Merger Agreement itself, plaintiffs challenge the manner in which the Merger was negotiated. Plaintiffs maintain that CEO Thain was

6

self-interested in the Merger, given his substantial relations with Goldman, and ensured that Archipelago received the most favorable terms under the Merger, including the 70/30 allocation scheme, which results in a "windfall" for Archipelago shareholders, for the ultimate benefit of Goldman and himself, as a large Goldman shareholder. Plaintiffs further allege that Goldman was also conflicted, given its substantial relations with Archipelago, and, further, improperly provided investment banking services to both Archipelago and the NYSE in the same transaction, earning millions of dollars in fees, including a total of $7 million in advisory fees. Goldman does not dispute that it was retained by both the NYSE and Archipelago to act as a "facilitator" in exploring a potential combination between the entities, in addition to providing various financial services, including valuations of both corporations, pursuant to an engagement letter executed on February 10, 2005 ("Engagement Letter"). Plaintiffs further allege that the Engagement Letter reveals the extent of the conflicts of interest that Goldman was operating under by providing both entities with financial services for the Merger.

The decision to retain Goldman to advise NYSE in the Merger was approved by the Board and by CEO Thain, who allegedly refused to recuse himself from the decision to retain Goldman to advise the NYSE in the Merger, despite his close ties to Goldman and his fiduciary duties to the NYSE, which prohibits directors from deliberating in a matter in which they are personally interested,

7

although Thain did recuse himself from the vote on Goldman's compensation for providing these services.

Plaintiffs additionally allege that Thain and Goldman dominated the remaining Board members such that they were incapable of independence. Plaintiffs additionally challenge the Board members' interestedness due to their own business and employment relations with Goldman, and other large financial institutions with large stakes in Archipelago's. Plaintiffs' complaint reveals that the majority of the Board members, Allison[4], Weatherstone[5], Shapiro[6], Woolard[7], Carter[8], von der Heyden[9], McDonald[10], Rivlin[11], Jackson[12] do indeed have some

---

[4] Allison was previously employed at Merrill Lynch, serving as President and CEO. Merrill Lynch served as an underwriter for Archipelago's IPO in 2004. Merrill Lynch invested heavily in Archipelago, acquiring a 14.9 equity interest in the corporation.

[5] Weatherstone previously served as the President and CEO of JP Morgan. JP Morgan served as the lead underwriter of Archipelago's IPO in 2004, alongside Goldman. JP Morgan also heavily invested in Archipelago's, acquiring a 20% equity interest in the corporation.

[6] Shapiro previously served as the Chairman of Monsanto Company ("Monsanto"), who retained defendant Goldman in the sale of a product line and certain Monsanto assets.

[7] Woolard previously served as Director and Chairman of Dupont. The former Senior Chairman of defendant Goldman, John Weinberg, served as co-Chairman with Woolard on the Dupont Board.

[8] Carter is the Chairman of the NYSE Board. He previously served as Chairman and CEO of State Street Bank & Trust Company, of which defendant Goldman served as financial consultant in connection with the sale of certain of its operations in 1999.

[9] Von der Heyden previously served as the CFO of RJR Nabisco. Goldman allegedly provided investment services to Nabisco in the past.

8

degree of relations to Goldman that casts doubt on their ability to place the NYSE's interests above that of Goldman's financial interests.

Moreover, plaintiffs allege that the "independent" fairness opinion rendered by Lazard Freres ("Lazard") just two weeks prior to the execution of the Merger Agreement itself was inherently flawed. Lazard was allegedly also incapable of independence due to its relations with Goldman. At the time Lazard was retained, Goldman was underwriting Lazard's IPO, which was completed in the midst of Lazard's preparation of its fairness opinion on the Merger. The details of Lazard and Goldman's relations was allegedly never disclosed to the NYSE Board. Moreover, the law firm of Wachtell, Lipton, Rosen & Katz ("Wachtell"), counsel for NYSE, whom NYSE management retained to review and revise the draft Merger Agreement, was also representing Lazard in its IPO. Moreover, the fairness opinion itself was allegedly rife with omissions and miscalculations.

In May of 2005, Plaintiffs commenced this suit as a class action comprised of NYSE seatholders, asserting causes of action

---

[10] Prior to assuming a position on the NYSE Board, McDonald served as a senior officer and Director of Pell, Rudman, who retained defendant Goldman as advisor in its acquisition by another corporation.

[11] Rivlin previously served as White House Budget Director, while Robert Rubin, the former Chairman of defendant Goldman, served as Treasury Secretary.

[12] Jackson previously served on the Board of Medtronic, whose former CEO, William George, is currently Director of defendant Goldman.

9

against Thain and the NYSE Board alleging breach of the fiduciary duty of loyalty, due care and good faith, and for aiding and abetting breach of fiduciary duty against Goldman and Archipelago. Plaintiffs ultimately seek injunctive relief enjoining the proposed merger and monetary damages.[13]

**Discussion**

    A. Lack of Capacity to Sue Directly

    1. Undifferentiated Harm

    The NYSE defendants argue that the complaints state only derivative claims, and thus plaintiffs lack standing to pursue this action directly under CPLR 3211(a)(3). Defendants maintain that because plaintiffs lack standing to bring a direct action, and have otherwise failed to comply with the prerequisites of bringing a derivative action under Not-For-Profit Corporation Law §623(a) by demonstrating that they represent 5% of the NYSE membership and have either made a demand on the NYSE Board to pursue the claims, nor provided justification for failure to make such a demand, plaintiffs actions must be dismissed. In contrast, plaintiffs argue that the *Higgins* and *Caldwell* complaints properly state direct causes of action against NYSE Board members, and thus are viable.

---

[13] Counsel for plaintiffs and the NYSE defendants are directed to Rule 19 of the Rules of the Commercial Division precluding letters to the Court subsequent to argument on a motion, in the absence of the Court's express permission. Any post-argument letters sent to chambers have therefore been returned or disposed of unread.

10

Under New York law,[14] a shareholder lacks standing to pursue a direct cause of action to redress wrongs suffered by the corporation; rather such claims must be asserted derivatively, for the benefit of the corporation. *Abrams v Donati*, 66 NY2d 951, 953 (1985) app denied 67 NY2d 758 (1986). A significant and logical exception to this rule has been carved out, however, allowing for direct claims to be asserted against a corporation where the shareholder alleges breach of a duty owed independent of any duty owed to the corporation. *Abrams*, 66 NY2d at 953. The ability to distinguish between direct and derivative claims has often been problematic for courts undertaking the analysis, and the parties sharply dispute the proper standard the Court should apply. Rather than distinguishing between who suffered the alleged harm to determine whether the claim is properly asserted as direct or derivative, defendants maintain that where, as here, shareholders allege breach of fiduciary duty by a Board in the context of approving a merger in which the shareholders' alleged harm is shared equally amongst them, the action is patently derivative in nature.

Thus, according to defendants, the Court's initial inquiry should be to determine if the harm alleged by plaintiffs affects all NYSE shareholders proportionately, and if so, the action is derivative and the requirements of Not-For-Profit Corporation Law §623(a) must be met. Defendants' insistence on the demonstration

---

[14] Claims involving corporate governance are governed by the applicable laws of the state of incorporation. *Hart v General Motors Corp.*, 129 AD2d 179, 182 (1st Dept 1987).

11

of differentiated harm as a threshold to maintaining a direct shareholder action against a corporation may leave some plaintiffs without legal redress for their injuries, however.

In the event that plaintiffs allege harm flowing to shareholders that is distinct from any wrong suffered by the corporation, as plaintiffs here allege, applying, as defendants urge, the requirement of "differentiated harm" necessarily precludes those plaintiffs from asserting a direct claim, merely because the alleged breach harms all shareholders equally. However, because such plaintiffs allege a harm distinct from that suffered by the corporation, they are additionally barred from asserting a derivative action, maintenance of which necessarily requires allegations of a *corporate*, as opposed to an *individual* harm. Consequently, plaintiff shareholders alleging proportionate harm that does not otherwise implicate harm to the corporation such that a derivative action will not lie, are necessarily left without a legal remedy to redress their injuries.

Recognition of the consequences of requiring differentiated harm as a threshold for a direct shareholder action has led several jurisdictions to expressly reject the concept that "undifferentiated harm" renders a direct claim fatal. In *Strougo v Bassini*, the Second Circuit, while applying Maryland law, rejected "undifferentiated harm" as a basis for denying a direct shareholder suit, stating, "[a]n inquiry that asks only whether shareholders have suffered 'undifferentiated harm,' rather than whether the shareholders have suffered injury distinct from any

12

potential injury to the corporation, could lead to situations in which shareholders are improperly left with an injury without proper legal recourse." *Strougo*, 282 F3d at 171-172. Moreover, Delaware courts have similarly dispensed with the requirement of differentiated harm. See *Tooley v Donaldson*, 845 A2d 1031, 1038-1039 (Del Sup Crt 2004).

While never explicitly rejecting the "undifferentiated harm" inquiry, New York courts have implicitly dispensed with the requirement on occasion, allowing shareholders to maintain direct class action suits, which necessarily requires a finding of common issues of law and fact, and presumably, undifferentiated harm, as among shareholder class members. See *In the Matter of Colt Industries Shareholder Litigation*, 77 NY2d 185 (1991)(Court of Appeals considered the right of a Missouri corporation to opt out of a New York class action, consolidating fifteen direct shareholder suits arising out of a merger between two corporations). While no analysis of the divide between direct-derivative actions was undertaken in *Colt Industries*, in holding that there is no due process right to opt out of a mandatory class that seeks equitable relief, the court necessarily found that the prerequisites to bringing a class action existed, including the existence of common issues of law and fact as between shareholder class members. *In the Matter of Colt Industries*, 77 NY2d at 195. Accordingly, the proper inquiry in distinguishing between a direct and derivative claim is what is the nature of the harm alleged and who is principally harmed: the

13

corporation or the individual shareholders.

Delaware courts additionally consider to whom the relief, if any, should go in the event that plaintiffs succeed.[15] See *Tooley v Donaldson*, 845 A2d 1031, 1038-1039 (Del Sup 2004). Accordingly, under *Tooley*, if the Court concludes that there is no injury to the corporation and thus there is no relief due and owing it, there is no basis for a finding that the complaint states a derivative claim. The Court finds this extra step particularly instructive in the harm inquiry described at length below.

### 2. The Distinction Between Direct and Derivative Claims

Despite the oftentimes problematic distinction between direct and derivative claims, however, New York courts have consistently held that diminution in the value of shares is quintessentially a derivative claim. *Paradiso & DiMenna, Inc. v DiMenna*, 232 AD2d 257, 258 (1st Dept 1996). While a decrease in share value is undoubtedly harmful to the individual shareholder, this harm is said to *derive* from the harm suffered principally by the corporation and only collaterally to shareholders, and thus is derivative in nature. *Paradiso & DiMenna, Inc.*, 232 AD2d at 258.

Further, claims alleging waste and mismanagement on the part of the board of directors, *Sook Hi Lee v 401-403 57th St. Realty*

---

[15] This reasoning is reflected in the seminal New York case, *Abrams*, which states that shareholders may not recover in their individual capacities for the corporation's losses. *Abrams*, 66 NY2d at 951.

14

Corp., 306 AD2d 108, 109 (1st Dept 2003), and damage to a corporation's name, reputation and associated goodwill due to the corporation's chairman and CEO's part in an insider trading scandal, *Hahn v Martha Stewart*, 5 AD3d 285 (1st Dept 2004), are additionally derivative in nature. Moreover, diversion of a corporate opportunity gives rise to a derivative action only. *Glen v Hoteltron Systems, Inc.*, 74 NY2d 386, 393 (1989).

Many cases have analyzed the distinction between direct and derivative claims specifically in the context of challenges to mergers and other change of control transactions. In *Fishbein v Beitzel*, shareholders challenged the acquisition of Banker's Trust by Deutsche Bank on the ground that the acquisition price was unfairly depressed at the shareholders' expense due to excessive compensation and bonus arrangements provided by the acquired bank to certain bank directors and employees. *Fishbein v Beitzel*, 281 AD2d 167 (1st Dept 2001) app denied 96 NY2d 715 (2001). While not identifying the specific nature of the harm, the First Department upheld this Court's dismissal of the plaintiff shareholder's direct claims for lack of standing. *Fishbein*, 281 AD2d at 167.

Moreover, Delaware courts have sustained direct claims by shareholders where the complaint attacks the fairness of the merger itself due to unfair price and/or unfair process, as recognized in *Kramer*. *Kramer v Western Pacific Industries*, 546 A2d 348, 354. At issue in *Kramer* was whether the former shareholder of a corporation who had been cashed-out in a merger,

15

had standing in his capacity as a shareholder to pursue a breach of fiduciary claim against management. *Kramer*, 546 A2d at 349. In holding that a former shareholder does have standing to litigate claims of breach of duty arising from the merger, the court stated, "direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give the complaining shareholder standing to pursue individual action even after they are cashed-out though the effectuation of a merger." *Id* at 354. Specifically at issue in *Kramer*, however, is the legal limbo former shareholders find themselves in subsequent to being cashed-out, as in addition to losing their equity interest in the corporation, they consequently lose their standing to sue the corporation in the capacity of a shareholder.

The *Kramer* court analogized the situation of a former shareholder who has been cashed-out and subsequently asserts a claim for breach of duty on the part of management, to a property owner who is suing for loss of property. *Id* at 354. The court noted, " ... no one would assert that a former owner suing for loss of property through deception or fraud lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of that property." *Id* at 354. In finding that the plaintiff's claims were derivative in nature because the claims were ultimately alleging corporate mismanagement resulting in waste and otherwise did not allege that the merger price was unfair or that it was obtained through unfair dealing, the court upheld the grant of summary judgment dismissing the complaint, as

16

the plaintiff, "having ceased to be a shareholder **, lacks standing to pursue the derivative claims asserted by his * complaint." *Id* at 349. Whether or not plaintiffs have standing to sue in their capacities as shareholders is not at issue here; it is indisputable that plaintiffs here have standing, as shareholders, to sue. Rather, the issue here is what is the nature of the harm alleged: direct or derivative.

Interestingly, *Kramer's* progeny has caused an enormous amount of confusion among courts attempting to distinguish direct and derivative claims under Delaware law, however, as subsequent decisions citing to *Kramer* seem to be dispensing with the distinction altogether, despite their assertions otherwise, while expanding *Kramer's* applicability beyond cash-out mergers. See *Parnes v Bally Entertainment Corp.*, 722 A2d 1243 (Sup Ct Del 1999). In *Parnes*, the court extended *Kramer* to a stock-for-stock merger, where the issue of shareholder standing was necessarily not implicated because the plaintiff was, simply put, still a shareholder. *Parnes*, 722 A2d at 1244. *Parnes* reversed a lower court's dismissal of a class action complaint directly challenging the fairness of a merger, finding that the plaintiff could pursue direct claims against management for directly challenging the fairness of the process, via allegations of CEO dominance and lack of board independence, and for unfair price in the merger, citing to *Kramer*. *Id* at 1245-1246.

Subsequent to *Parnes*, in *Agostino*, the court acknowledged that in sustaining direct claims that directly attack the

17

fairness of a merger, the distinction between direct and derivative claims was necessarily collapsing: "[i]t is unclear why a "direct" challenge to a merger price is 'ipso facto' a "direct" claim. *Agostino v Hicks*, 845 A2d 1110, 1119 (Ct Chan Del 2004). The *Agostino* court squared *Parnes* by recognizing that post-*Kramer* courts, in allowing direct claims to go forward where the complaint directly attacked the merger, are moving to a merits-based analysis in distinguishing direct and derivative claims. *Agostino*, 845 A2d at 1120-1122. The court went on to articulate its own inquiry to distinguish the claims: whether the harm alleged to the shareholder is dependent on a prior harm to the corporation. *Id* at 1120-1122.

Finally, the most recent case to take *Agostino's* lead in applying a merits-based analysis to the distinction between direct and derivative claims is in *Tooley*, mentioned above.[16] Further extrapolating on *Agostino*, *Tooley* articulated its own inquiry, since dubbed the "*Tooley* test."[17] Under *Tooley*, the court should consider, "(1) who suffered the alleged harm (the corporation or the stockholders); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the

---

[16] See also Donaldson, *Mapping Delaware's Elusive Divide: Clarification and Further Movement Toward A Merits-Based Analysis For Distinguishing Derivative and Direct Claims in Agostino v. Hick and Tooley v. Donaldson*, 30 Del J Corp L 389, 409. Donaldson notes that the substance of the emerging merits-based analysis is akin to determining whether the plaintiff has stated a claim on the merits under Rule 12(b)(6). *Id* at 409-410.

[17] *Dieterich v Harrer*, 857 A2d 1017, 1026 (Ct Chan Del 2004).