stockholders, individually). *Tooley v Donaldson,* 845 A2d 1031, 1033 (Sup Ct Del 2004). The court went on to describe how a prior decision involving this issue would have been resolved under its own test. *Tooley,* 845 A2d at 1037-1038. The Court finds the *Tooley* test to be the most instructive in isolating what lies at the core of the distinction between direct and derivative claims: the nature of the harm alleged.

At first glance, it appears that the First Department has only narrowly adopted the *Kramer* approach, finding shareholder standing based on claims of unfair price and unfair dealing where shareholders are cashed-out in an acquisition undertaken at an unfairly low price and marred by breaches of fiduciary duty. *Bernstein v Kelso,* 231 AD2d 314, 322-323 (1st Dept 1997). The *Bernstein* plaintiffs sought to recover the difference between the price received for the sale of the corporation in the cash-out and the price that would have been received but for management's breaches of fiduciary duty and misrepresentations. *Bernstein,* 231 AD2d at 322-323. In finding that plaintiffs had standing to sue directly, the *Bernstein* court cited *Kramer* for the principle that alleging unfair dealing and unfair price was a proper basis for maintaining a direct shareholder claim, while narrowing its holding to cash-out mergers. *Id* at 322-323.

While at issue in *Bernstein* was, in part, a similar dilemma to the plaintiff in *Kramer,* capacity to sue as a shareholder subsequent to losing shareholder status,[18] examining the case

---

[18]    *Bernstein,* 231 AD2d at 322-323.

19

with the illustrative *Tooley* test sheds an enormous amount of light into the direction of New York law on this issue. Therefore, in the same vein as *Tooley* applied its own test to a prior decision on the issue of direct versus derivative standing to determine how it would be resolved,[19] applying the *Tooley* test, in turn, to *Bernstein* is particularly informative to the issues peculiarly raised in this action.

In *Bernstein*, the court determined that management's alleged scheme to sell the corporation at a depressed price via a cash-out merger resulted in an unfairly low payout of shareholders' equity to the plaintiff.[20] Thus under *Tooley*, the ultimate harm suffered by the plaintiff was that he received too little shareholders' equity in the process of being cashed-out. In contrast, the corporation who cashed-out the plaintiff was not harmed, but was arguably benefitted, albeit improperly, because the benefit was allegedly obtained through a breach of duty. The element that distinguishes the harm flowing in the first instance to the plaintiff, rather than the corporation, is that the plaintiff's interests were at odds with the corporation's interests: in paying the plaintiff less shareholders' equity for his shares, more equity remained on the corporation's balance sheet, translating into the appearance of more corporate assets.

---

[19] *Tooley*, 845 A2d at 1037-1038.

[20]  Shareholder or owners' equity appears with liabilities on a corporation's balance sheet, equaling corporate assets minus liabilities, and is therefore not part of the corporation's assets. Cox, Hazen, ONeal Corporations §19.4 at n1.

20

Although the *Bernstein* did not characterize the harm to plaintiff in these terms, the *Tooley* test informs us as to what is really at issue in these claims, however unarticulated these issues may be in subsequent New York and Delaware law. Since *Bernstein*, however, the First Department has yet to consider whether direct shareholder claimed, stated as they are here by plaintiffs, alleging harm from the unfair allocation and payout of shareholders' equity in a merger are sufficiently distinct from corporate harm to withstand dismissal under CPLR 3211(a)(3) for lack of standing, since *Bernstein*. But see *Yatter v William Morrison Agency*, 256 AD2d 260, 260 (1st Dept 1998)(shareholder standing found where plaintiff asserted a direct cause of action for alleged intentional undervaluation of shares for the purpose of repurchase by the corporation, pursuant to an employment agreement).

### 3. Plaintiffs' Complaints

Turning now to the allegations of plaintiffs' complaints, plaintiffs maintain that the NYSE defendants' breach of fiduciary duty causes injury to shareholders' equity interests under several provisions of the Merger Agreement. Plaintiffs maintain that this injury distinctly harms the seatholders, the NYSE's equity-holders, while actually benefitting the NYSE and the merged corporation. Therefore, plaintiffs maintain, because the injury alleged is not a harm to the corporation but rather a distinct harm to seatholders, the claims can be asserted

21

directly.

According to plaintiffs, the payout of $300,000 and the granting of one share of Holdco common stock in exchange for members' seats depletes approximately $400,000 of NYSE shareholders' equity. Plaintiffs maintain that subsequent to this equity payout, over $575,000,000 in equity remains on the NYSE balance sheet, equity which will then be transferred to the merged corporation, a tangible benefit to both the NYSE, Archipelago and the merged corporation, as more assets will appear on the balance sheet of the merged corporation.[21] Plaintiffs maintain that the only class of interests harmed by the failure to allocate a larger portion of equity to NYSE seatholders is the seatholders themselves.

Additionally, plaintiffs argue that granting only one share of Holdco stock to seatholders drastically discounts the value of a NYSE seat. Moreover, while the NYSE itself is not receiving any shares of Holdco under the Merger, it is therefore not affected by the NYSE seatholders receiving less, rather than more Holdco shares. On this basis, plaintiffs argue they have sufficiently alleged a harm that is distinctly suffered by shareholders rather than the corporation.

Further, plaintiffs allege harm from the 5% hold-back provision which entitles certain NYSE employees, including Thain and a number of non-seatholders, to receive up to 5% of the

---

[21] Currently, the NYSE balance sheet indicates that there is a total of approximately $986 million in shareholders' equity, $1.743 billion in assets, and $723 million in liabilities.

22

shares of the merged corporation, which is valued at approximately $150 million. Plaintiffs argue that granting millions of dollars worth of equity in the merged corporation to non-seatholders is tantamount to a conversion of equity, as it is the NYSE seatholders, rather than non-equity holding NYSE employees, who are entitled to receive equity in the merged corporation. As with the reduced payout of equity and granting too few shares of stock in the merged corporation to seatholders, plaintiffs argue that the NYSE is not harmed by this payout of shareholders' equity to non-seatholders. Rather the alleged harm affects the rights of the NYSE seatholders to realize the full, overall value of the equity as it appears on the balance sheet of the NYSE.

As for the Merger term that allocates 70% of the merged corporation to the former NYSE seatholders and 30% to former Archipelago shareholders, plaintiffs maintain that this allocation is allegedly based on a discounted valuation of NYSE seats. The 70/30 allocation allegedly does not accurately reflect the amount of seatholders' equity value that the NYSE is contributing to the merged corporation. Plaintiffs allege that the discounted valuation of seats actually benefits Archipelago. Moreover, in agreeing to this allocation ratio, the NYSE defendants accepted at face value Archipelago's projections of revenue and earnings, in addition to the alleged undervaluation of NYSE seats.

Under the *Tooley* test discussed above, the loss of seats in

23

exchange for an unfairly low payout of shareholders' equity
individually harms the seatholders and is otherwise not dependent
on a harm to the NYSE. In contrast, the NYSE is being benefitted,
or, put differently, is not injured; by paying less equity out to
the seatholders, the NYSE retains more shareholders' equity,
translating into more assets appearing on the NYSE balance sheet
that is being transferred to the merged corporation,[22] which
cannot be characterized as an injury to the corporate entity. As
in *Bernstein* discussed above, the seatholders' interest in
obtaining more shareholders' equity for being cashed-out of the
present NYSE is at odds with the NYSE's interest in transferring
more shareholders' equity to the merged corporation. Moreover,
under the second prong of *Tooley*, there is no monetary relief
that would go the NYSE for the alleged breaches of duty that
results in more, rather than less, assets appearing on its
balance sheet as a result of the lower payout of shareholders'
equity.

While the First Department has not yet considered whether
the harm, characterized as it is here, to shareholders' equity
interests is separate and distinct from a harm to the corporation
and thus maintainable as a direct claim, *Strougo v Bassini* did
recognize such a harm as individual and otherwise not dependent
on a harm to the corporation. *Strougo v Bassini*, 282 F3d 162 (2nd
Cir 2002) settled by 258 FSupp2d 254 (SDNY 2003). In *Strougo*, the

---

[22] As defined above, equity is equal to the assets minus the
liabilities.

24

Second Circuit, applying Maryland law, vacated the dismissal for
lack of individual standing a shareholder's class action
complaint alleging breach of fiduciary duty on the part of
directors and officers of an equity fund undertaking an allegedly
coercive rights offering. *Strougo*, 282 F3d at 166. The plaintiff
in *Strougo* argued that the claim was not derivative because the
injury alleged was not based on harm to the fund's assets, rather
the harm was that which flowed from the coercive rights offering
that unfairly set the exercise price of the rights at a deep
discount from the pre-rights offering value, resulting in a
reduction of the net equity value of shares owned by shareholders
not participating in the rights offering, while actually
increasing the fund's assets. *Strougo*, 282 F3d at 174-175.

    The court agreed with the plaintiff that the complaint
stated a direct harm to shareholders, as the loss in value of the
*equity* positions of the non-participating shareholders, as
opposed to a reduction in the value of the shares, is distinct
from a harm to the corporation. *Id* at 175. In recognizing that
shareholders' primary interest is equity and the overall value of
their equity, the court noted that a corporation "cannot have an
equity interest in itself. As reflected in corporate balance
sheets, equity is not an asset to the corporation, but indeed its
opposite: a claim on assets." *Strougo*, 282 F3d at 175.

    Assuming plaintiffs' allegations as true for the purposes of
deciding these motions, while liberally construing the complaints
in plaintiffs' favor, *Wilson v Hochberg*, 245 AD2d 116, 116 (1st

25

Dept. 1997), the alleged disparate allocation of equity,
resulting in more seatholders' equity being contributed to the
merged corporation, non-seatholder employees, and Archipelago
shareholders, while 'short-changing' NYSE seatholders from
realizing the full value of their equity positions in the NYSE by
a higher payout of shareholders' equity, constitutes a separate
and distinct harm to NYSE seatholders that is redressable by the
assertion of direct claims against the corporation and its
fiduciaries. Accordingly, insofar as the *Higgins* and *Caldwell*
complaints allege injuries that result in harm to NYSE
seatholders' *equity* interests, as opposed to the NYSE's *assets*,
plaintiffs have standing to assert direct causes of actions for
breach of fiduciary duty.

Plaintiffs additionally argue that the lock-up provisions
harm NYSE seatholders by preventing them from freely transferring
their shares in the merged corporation for up to five years.
However, only certain of Archipelago's shareholders, representing
approximately 40% of its outstanding shares, will be subject to
any lock-up provisions with respect to their Holdco shares.
Furthermore, plaintiffs allege that despite Lazard's failure to
evaluate the financial effect of the lock-up provisions on NYSE
seatholders in rendering its fairness opinion, the NYSE Board
relied on the opinion as a basis for voting to unanimously
approve the Merger.

Defendants countered at oral arguments that the alleged harm
flowing from the lockup provisions is derivative, characterizing

the claims as complaining of the diminishing value of the NYSE's assets, "[w]hat they're [plaintiffs] claiming is that the lockup [provision] is worth a certain amount of money which is reducing, again, the value of the assets of the Exchange [NYSE]."[23]

Defendants again fail to recognize the nature of the harm plaintiffs allege. Rather than arguing that the Merger is causing NYSE's *assets* to diminish, plaintiffs maintain that the consequences of a lower payout of shareholders' equity results in more assets remaining with the NYSE, while the lock-up provisions are unfairly burdening former NYSE seatholders' Holdco shares, and, moreover, that the Board approved the provision in reliance on Lazard's flawed fairness opinion. As plaintiffs have asserted a wrong that is personal to NYSE seatholders and otherwise separate and distinct from a wrong to the NYSE, plaintiffs have sufficiently stated a direct claim against the NYSE defendants.

Defendants insistent reliance on *Alpert* for the proposition that a loss in members' seat value stemming from a breach of fiduciary duty where directors agreed to an allegedly unfair acquisition, states a derivative claim only, is misplaced.[24] Defendants cite a line from *Alpert* where the court, in holding that plaintiffs lacked standing to assert direct claims, stated,

---

[23] See Transcript of Oral Argument, July 28, 2005 at 15.

[24]   In oral arguments on this motion, defendants argued, "that [*Alpert*] was a case, like this case, brought by members of [an] Exchange claiming that a transaction in which the Exchange, I think that the directors of the Exchange breached their fiduciary duties by agreeing to an acquisition that devalued the value of the seats of the members." See Transcript of Oral Argument, July 28, 2005 at 13.

27

"to the extent that plaintiffs' allegations are based upon a loss in Amex [American Exchange] value, or lost business and investment opportunities, 'a shareholder has no individual cause of action for losing the value of his investment ...'" *Alpert v NASD,* 2004 NY Slip Op 51872U, *18 (Sup Ct NY County 2004). Relying on *Alpert,* defendants maintain that all of the Merger terms plaintiffs complain of are derivative because the claims go to the alleged reduction in the value of NYSE's assets.[25]

   *Alpert* is not analogous, however, to the extent that *Alpert* involved the alleged breach of fiduciary duty that reduced the value of member's seats, *Alpert,* 2004 NY Slip Op 51872U at *16, whereas the alleged breach here is partially based on the extinguishment of the members' seats altogether, including all of the rights that ownership of a NYSE seat carried, such as trading and leasing rights, that is allegedly not being properly compensated for in the conversion of seats to shares in the merged corporation. In this sense, plaintiffs are being "cashed-out" of the NYSE, as they are being paid a sum of money, $300,000, for the loss of their seat, rather than shares. Therefore, while plaintiffs are retaining an equity interest in the merged corporation by the receipt of one share of Holdco common stock, the primary feature of the NYSE seatholders' ownership interest, the seats, are being extinguished for an allegedly unfair price, that allegedly came about by numerous

---

   [25]    See Transcript of Oral Argument, July 28, 2005 at 15.

breaches of duty on the part of the directors. Therefore, the
"cashing out" of plaintiffs' seats at an allegedly unfairly low
price is akin to the *Bernstein* plaintiff's sale of his shares in
the    corporation at an unfairly low price.

   *Alpert* is distinguishable, moreover, because the
corporations involved in the *Alpert* action were incorporated in
Delaware, and therefore the court was necessarily applying
Delaware law. To the extent that the court was "considering" New
York law in addition to Delaware law because the corporations at
issue in the action, while incorporated in Delaware, were
licensed to do business in New York, *Id* at *17, it is well-
settled that the law of the state of incorporation governs the
applicable law. *Hart*, 129 AD2d at 179. Here, the court has no
basis to apply any other state's law, as perhaps in *Alpert*,
because in addition to being incorporated in New York, the NYSE
and Archipelago both primarily conduct business in New York.
Furthermore, the transaction at issue in *Alpert* was drastically
different than the Merger at issue in this action. *Alpert*
involved a challenge to a transaction that would unwind a
previous merger agreement in which NASD acquired Amex from AMC.
*Alpert*, 2004 NY Slip Op 51872U at *2. Under the unwinding
agreement, NASD would be released from all of its obligations to
Amex that existed under the previous merger agreement, such as
providing Amex with a multimillion dollar technology budget to
upgrade its system to make it comparable with NASDAQ. *Id* at *1-3.
The unwinding of the previous merger was allegedly spurned in

part by NASD's sale of a significant portion of its interest in NASDAQ, which purportedly frustrated the main purpose behind the NASD-AMEX merger, which was to enable NASDAQ and AMEX to become sister corporations rather than competitors, which is what NASD's sale of a portion of NASDAQ resulted in. *Id* at *3-4.

The plaintiffs in *Alpert* alleged harm, in part, from the loss in value to Amex seats that resulted from the unwinding of the previous merger that allegedly rendered AMEX technologically obsolete and burdened in debt to NASD. *Id* at *4. As previously stated, this action, in contrast, is not about the loss in value to seats belonging to members of an Exchange; rather, it is about the complete extinguishment of the primary feature of NYSE members' rights, the seats, the loss of which plaintiffs allege is not being adequately compensated for in the merged corporation, while Archipelago shareholders are being overcompensated.

Further distinguishing this action, in *Alpert,* unlike here, there were no allegations that the defendant directors were not fully informed about the transaction at issue, or were relying on flawed information. Rather, as the *Alpert* court noted, "[t]he essence of plaintiffs' argument is not that the AMC directors were not informed about the * Transaction, but rather that the AMC Directors had ample information, yet rendered a decision with which plaintiffs are dissatisfied." *Id* *13.

Here, plaintiffs' allegations of breach of fiduciary duty are based, in part, on assertions that Lazard provided a flawed

30

fairness opinion that the Board relied on in its deliberation. Specifically, plaintiffs allege that Lazard miscalculated the value of the revenue generated by seatholders who lease their seats. Lazard allegedly estimated that seatholders who lease their seats receive revenue of $25 million annually, based on an average lease price of $25,000 per seat, for 1,000 seats. It is indisputable that the NYSE is comprised of 1,366 seats, and plaintiffs maintain that seats are leased at an average price of $60,000 annually, representing $82 million in revenue. Further, plaintiffs allege that this undervaluation actually inures to the benefit of the NYSE, because the NYSE is paying the seatholders less than what the value of their equity entitles them to, freeing up more equity to be transferred to the balance sheet of the merged corporation.

The Court is mindful that while it accepts plaintiffs' theories of direct shareholder recovery, ultimately, it is premature to determine if there are indeed merits to the claims asserted. However, as this is a motion to dismiss the pleadings, all inferences are to be drawn in favor of the plaintiffs, *Rovello v Orofino Realty Co.*, 40 NY2d 633, 635. (1976), and plaintiffs are therefore permitted to conduct discovery to ascertain the merits of the claims. For the foregoing reasons, plaintiffs' complaints adequately state direct claims for relief against the NYSE defendants for breach of fiduciary. However, plaintiffs must still allege well-pleaded facts sufficient to deprive NYSE's Board of the protections of the business judgment

rule, discussed below.

### B. The Business Judgment Rule

Defendants maintain that the business judgment rule insulates the decisions of the NYSE Board from evaluation by the Court, as plaintiffs have failed to either allege facts of bad faith or fraud necessary to overcome the presumptive rule, and otherwise have failed to plead allegations of self-dealing with sufficient particularity. Defendants further argue that Goldman's role as facilitator of the Merger was unanimously approved by eleven directors, all of whom but Thain are arguably independent.

In recognition that courts are "ill equipped to evaluate the complexities of directors' business decisions," *Fair v Fuchs*, 219 AD2d 454, 456 (1st Dept 1995), adherence to the business judgment rule bars judicial inquiry into the propriety of actions taken by corporate directors made in good faith on behalf of the corporation. *Consumers Union of U.S., Inc. v State*, 2005 LEXIS 1433, *50 (2005)(Court of Appeals recently applied the business judgment rule to the decision of the board of a not-for-profit corporation). The presumptive applicability of the business judgment rule is rebutted, and judicial inquiry thereby triggered, however, by a showing that a breach of fiduciary duty occurred, *Jones v Surrey Coop. Apts., Inc.*, 263 AD2d 33, 36 (1999), which includes evidence of bad faith, self-dealing, *Van Der Lande v Stout*, 13 AD3d 261, 262 (1st Dept 2004), or by decisions made by directors' demonstrably affected by inherent conflicts of interest, *Wolf v Rand*, 258 AD2d 401, 404 (1st Dept

32

1999). Thereafter, the burden to prove the fairness of the
challenged acts shifts to defendants. *Wolf,* 258 AD2d at 404.

### 1. The Fiduciary Duty of Loyalty

The fiduciary duty of loyalty imposes on corporate directors
an obligation not to "assume and engage in the promotion of
personal interests which are incompatible with the superior
interests of their corporation ... as they [directors] owe the
corporation their undivided and unqualified loyalty." *Foley v
D'Agostino,* 21 AD2d 60, 66-67 (1st Dept 1964). Accordingly,
directors should not be permitted to "profit personally at the
expense of the corporation, [n]or must they allow their private
interests to conflict with corporate interests." *Foley,* 21 AD2d
at 67.

Director conflicts of interest are typically found where
either a director stands to receive a personal benefit from the
transaction at issue that is different from that received by all
shareholders, or where there is a loss of independence insofar as
a director with no personal interest in a transaction is
otherwise controlled by an interested director. *Marx v Akers*, 88
NY2d 189, 200-202 (1996). A director is considered to have lost
his/her independence where she/he is dominated or otherwise
controlled by an individual or entity interested in the
transaction at issue. *Rales v Blasband,* 634 A2d 927, 936 (Sup Ct
Del 1993). Additionally, charges of interest must be pleaded with
particularity. *Bansbach v Zinn*, 1 NY3d 1, 11 (2003).

Therefore, determination that a board participating in a

33

decision has lost its independence does not merely turn on whether the majority of the board voting is interested, *Pallot v Peltz*, 289 AD2d 85, 86 (1st Dept 2001), as interest is not merely limited to financial interest; rather it can be established by demonstrating that the board itself is controlled by an interested director. *Barbour v Knecht*, 296 AD2d 218, 224-225 (1st Dept 2002).

Plaintiffs allege that Thain engaged in self-dealing by putting the financial interests of himself and Goldman above that of the NYSE seatholders. Further, plaintiffs allege that Thain stands to receive a direct personal financial benefit from the unfair terms of the Merger, and given his large financial stakes in Goldman. Plaintiffs additionally maintain that Thain effectively dominated and controlled the Board, and as a consequence, the Board merely "passively rubber-stamped" the transaction. Moreover, plaintiffs maintain, in tandem with allegations of Thain's domination, that the majority of the Board was incapable of exercising independent business judgment given their extensive business and employment relations with Goldman and other financial institutions on Wall Street with large ownership interests in Archipelago, JP Morgan and Merrill Lynch.

Plaintiffs' complaint sufficiently details Thain's alleged dual loyalties to the NYSE and to Goldman. Thain's employment history at Goldman spans more than eleven years, where he held numerous executive and managerial positions including President, CEO, and CFO. Just prior to joining the NYSE, Thain was the

34

President and CEO of Goldman, and still owns more than 2.2 million shares of Goldman stock, worth approximately $240 million.

Goldman, in turn, has been substantially involved in Archipelago since its creation in 1996, providing significant investment capital, in addition to owning approximately 15.6% of its stock; the market value of this interest has allegedly been boosted by approximately $170 million since the announcement of the Merger. Moreover, Goldman owns twenty-one seats in the NYSE, consequently putting it in a position to own more than 5% of the merged corporation. Goldman additionally acted as the lead underwriter for Archipelago's IPO in 2004.

Merger discussions between Archipelago and the NYSE allegedly began when a Goldman director brought together Archipelago CEO, Putnam, and the NYSE's CFO. Within a week, Thain and Archipelago were meeting to discuss the possibility of a merger, and thereafter, Thain began meeting regularly with current Goldman CEO and Chairman and former NYSE director, Paulson, along with Putnam. These meetings were followed by both the NYSE and Archipelago's retention of Goldman to provide financial services, which included the performance of a pro forma evaluation analysis of a combined entity that might result from a merger. Under separately negotiated Engagement Letters, Goldman stood to receive $7 million in advisory fees alone if a combination between the NYSE and Archipelago came to fruition.

Further, plaintiffs allege that despite Thain's numerous

35

ties to Goldman such that he personally stands to gain tremendously from a financial boost to Goldman through its Archipelago holdings, Thain chose only to remove himself from the vote to retain Goldman's financial services in the Merger and the compensation Goldman would receive for these services, although he did not remove himself from any of the negotiations, deliberations, or the vote itself that gave rise to the Merger. Thain's participation in the deliberative process was also in contravention of the NYSE Constitution, article IV, section 15, which provides, "[n]o director shall participate in the deliberation or adjudication of any matter in which he or she is personally interested."

In addition to alleging well-pleaded facts of Thain and Goldman's interest in the Merger, plaintiffs maintain that Goldman, through Thain, was able to influence and ultimately dominate the negotiations, ensuring that Archipelago received the most favorable terms in the Merger. This alleged domination resulted in the loss of Board independence. To establish loss of independence resulting from an interested director's dominance, plaintiffs must allege particularized facts sufficient to raise the suspicion that the directors were somehow beholden to Thain. *Health-Loom Corp. v Soho Plaza Corp*, 209 AD2d 197, 198 (1st Dept 1994). Plaintiffs allege that Thain held numerous discussions with Goldman and Archipelago CEO, Putnam regarding the structure and terms of the Merger. Moreover, it was by Thain's recommendation that Goldman, and subsequently Lazard, both

allegedly conflicted, were retained to provide financial services to the NYSE.

While such allegations are sufficient to demonstrate Thain's interest in the Merger such that he is poised to receive some personal financial benefit from the Merger different from NYSE seatholders, *Marx,* 88 NY2d at 200-202, plaintiffs must allege well-pleaded facts sufficient to demonstrate Thain's coercive control of the Board. *Health-Loom Corp. v Soho Plaza Corp,* 209 AD2d 197, 198 (1st Dept 1994). See also *Bansbach,* 1 NY2d at 12 (demand on board was excused as futile where evidentiary record on a motion for summary judgment demonstrated that a self-interested director dominated and controlled board members such that they were incapable of making an impartial decision as to whether to pursue a derivative action). In this regard, plaintiffs' complaint fails.

Accordingly, the claim for breach of fiduciary duty against NYSE Board members is dismissed insofar as plaintiffs allege domination by Thain. Plaintiffs shall have leave to replead particularized facts of specific instances of Thain's coercive control, demonstrating that the Board's will was effectively supplanted by Thain's. See *Health-Loom Corp.,* 209 AD2d at 198.

Plaintiffs additionally seek to establish that Thain's interestedness notwithstanding, the majority of the purportedly "independent" Board members have extensive business and employment relations with Goldman, JP Morgan and Merrill Lynch, all of whom have significant interests in Archipelago, sufficient

37

to cast doubt on their independence.

Defendants rely on *Alpert* for the proposition that "remote ties" to Goldman or Archipelago is not enough to form the basis of an allegation of self interestedness or lack of independence. *Alpert* is additionally not factually analogous on the issue of dominance, however. The *Alpert* plaintiffs argued demand futility on the ground that a self-interested director controlled the outside directors, and that the outside directors' personal relations with the self-interested director cast doubt on their independence. *Alpert*, 2004 NY Slip Op 51872U, *9. The court found that the plaintiffs failed to allege domination with particularity, and moreover, that plaintiffs' allegations regarding the extent of personal relations with the self-interested director was insufficient to cast doubt on the outside directors' independence. *Id* at 10. While the court correctly stated the law, *Alpert* is not applicable because the cases on which the court relied involved the review of evidentiary records on a motion for summary judgment. See *Strougo v Padegs*, 27 FSupp2d 442, 450 (SDNY 1998)(application of Maryland law to a motion to dismiss the complaint or, alternatively for summary judgment, upon review of district court's interpretation of Maryland law). See also *Alpert*, 2004 NY Slip Op 51872U, *10

Moreover, the *Alpert* court improperly relied on *Bansbach*, a Third Department case, considering whether the evidentiary record established that a director's personal and prior business relations resulted in a loss of independence on a summary

38

judgment motion. *Bansbach v Zinn*, 294 AD2d 762, 763 (3rd Dept 2002) app granted 99 NY2d 504 (2003) affd in part, mod in part 1 NY3d 1 (2003), rearg denied 1 NY3d 593 (2004), affd NY App Div LEXIS 7640 (3rd Dept 2005). See also *Alpert*, 2004 NY Slip Op 51872U, *10. The decision in *Bansbach* upon which *Alpert* partially relies was subsequently modified by the Court of Appeals, which, contrary to the decision of the trial court, did find that the evidentiary record contained facts that supported plaintiff's allegations that the directors were dominated and controlled by a self-interested director, who by reason of his position, in addition to his personal and business connections to the other directors "caused them to place his [the self-interested director's] interest above those of the corporation, therefore rendering a demand on the board futile. *Bansbach v Zinn*, 1 NY3d 1, 11-12 (2003) rearg denied 1 NY3d 593 (2004).

Moreover, it is firmly established that the court's inquiry on a motion to dismiss the complaint for failure to state a cause of action and on a summary judgment motion, as in *Bansbach*, are drastically different. *Tenzer v Capri Jewelry, Inc.*, 128 AD2d 467, 469 (1st Dept 1987). On a motion to dismiss the complaint pursuant to CPLR 3211(a)(7), the court is necessarily assuming the truth of the allegations asserted in the pleadings in order to "determine whether the facts alleged fit within any legal cognizable theory." *Monroe v Monroe*, 50 NY2d 481, 489 (1980). Even in the context of the business judgment rule, this distinction does not fundamentally change, and the complaint will

39

be sustained if it contains allegations sufficient to demonstrate that directors did not act in good faith or were otherwise interested, as "pre-discovery dismissal of pleadings in the name of the business judgment rule is inappropriate." *Ackerman v 305 E.40th Owner's Corp.*, 189 AD2d 665, 667 (1st Dept 1993). On a motion for summary judgment, in contrast, the court *is* necessarily searching the record to determine the sufficiency of the underlying evidence. *Tenzer*, 128 AD2d at 469.

Plaintiffs' demonstrations that six NYSE Board members, Shapiro, Woolard, Carter, McDonald, Rivlin, and Jackson have both personal and business relations with Goldman, where plaintiffs have otherwise already succeeded in casting doubt on Thain and Goldman's interest, in addition to Goldman's provision of financial services to *both* the NYSE and Archipelago in the same transaction is, simply put, impressive.[26]

While there are no allegations that the six Goldman affiliated directors personally benefitted from the Merger, as alleged with Thain, plaintiffs have otherwise sufficiently alleged that their relations with Goldman caused them to disregard the primary corporate interest of the NYSE of which they are charged with, in order to accommodate Goldman's interests. Moreover, the denial of a motion to dismiss the pleadings is ultimately within the court's discretion, and the

---

[26] The Court is unclear as to what significant connection, their holdings in Archipelago notwithstanding, JP Morgan and Merrill Lynch have with the alleged breaches of duty that gave rise to the Merger.

40

Court concludes that plaintiffs have raised doubt of the Board
members' independence sufficient to overcome dismissal at this
stage in the pleading.

### 2. The Fiduciary Duty of Due Care and Good Faith

The fiduciary duty of due care, in turn, obligates
directors to act in an informed and "reasonably diligent" basis
in "considering material information." *Hanson Trust PLC v ML SCM
Acquisition Inc.*, 781 F2d 264, 274-275 (2nd Cir 1986). Therefore,
director decisions are protected by the business judgment rule
only to the extent that their decisions actually evince their
business judgment. *Hanson Trust PLC*, 781 F2d 275. Another
component of a fiduciary's duties to the corporation is that
directors are obligated to exercise all their responsibilities,
including the decision to approve a merger, in good faith. *Alpert
v 28 Williams St. Corp.*, 63 NY2d 557, 568 (1984). As with the
duty of loyalty, plaintiffs bear the burden of demonstrating that
a majority of directors involved in voting on the challenged
transaction were not reasonably informed. *Stoner v Walsh*, 772
FSUPP 790, 801 (SDNY 1991).

Notwithstanding Thain and Goldman's allegedly conflicted
role in the Merger, plaintiffs allege that in unanimously
approving Goldman and Lazard's participation in the Merger, the
Board 'passively rubber-stamped' the decision, relying entirely
on a flawed fairness opinion provided by Lazard. Plaintiffs
maintain that the Board's retention of Lazard as financial
advisor, by Thain's recommendation, was inappropriate in that

41

Lazard was incapable of rendering an independent fairness
opinion, and moreover, Lazard produced an incomplete, and at
times, inaccurate opinion, the Board's reliance on which was
tantamount to a breach of the fiduciary duty of due care.

Specifically, plaintiffs allege that the Board retained
Lazard solely on Thain's recommendation and without any due
diligence whatsoever, which would have revealed that Lazard's IPO
was being underwritten by Goldman at the time, and that Lazard
was therefore incapable of independently conducting a fairness
opinion. Additionally, Lazard was being represented in its IPO by
the same law firm as the NYSE, Wachtell.

Lazard further disclaimed that any of the financial
information contained in the fairness opinion was independently
verified, stating:

> We have relied upon the accuracy and completeness of the
> foregoing information, and have not assumed any
> responsibility for any independent verification of such
> information or any independent valuation or appraisal of any
> of the assets or liability of the Company [NYSE] or AHI
> [Archipelago], or concerning the solvency or fair value of
> the Company or AHI...

Furthermore, plaintiffs allege that Lazard made significant
errors and omissions, such as failing to value the effect, and/or
assumed no effect, of the lock-up provisions imposed on former
NYSE seatholders in the Merger, which the Board consented to,

> In rendering our [Lazard's] [fairness] opinion we have with
> your [NYSE Board] consent assumed no effect on the value of
> the NYSE Consideration [$300,000 payout to seatholders]
> arising from restrictions on transfer of the Common Stock of
> [Holdco] to be received in the NYSE LLC Merger.

Plaintiffs further allege that Lazard's fairness opinion

42

contained material errors. As discussed earlier, Lazard miscalculated the value of the revenue generated by seatholders who lease their seats. Lazard estimated that seatholders who lease their seats receive revenue of $25 million, based on an average lease price of $25,000 per seat, for a total of 1,000 seats. The NYSE is comprised of 1,366 seats, and seats are leased at $60,000 annually. Despite its review of the fairness opinion, the Board was apparently contented that its conclusions were sufficient for the purpose of adjudicating on the Merger, which necessarily was due, in part, to a conclusion that the Merger consideration was fair, despite Lazard's express disclaimers that it had assessed all of the financial information, and further, that its calculations were based, in part, on the presence of 1,000 NYSE seats, a striking error. As *Hanson* noted, discharging the duty of care includes, in part, satisfactorily overseeing outside financial advice upon which the Board relies. *Hanson Trust PLC*, 781 F2d at 276. However, plaintiffs' allegations raise doubt that the Board effectively discharged its obligation to oversee Lazard, such as by, at a minimum, ensuring that Lazard was basing its fairness opinion on complete and accurate information.

Plaintiffs further allege that the directors breached their duty of due care by approving the retention of Goldman to provide financial services to the NYSE, given many Board members' substantial relations with Goldman, in addition to Goldman's relations with Archipelago, while consenting to Goldman's

43

provision of services to both the NYSE and Archipelago in the
same transaction. According to plaintiffs, the directors were
aware that Goldman was simultaneously providing services to
Archipelago from the Engagement Letter, and further due diligence
would have revealed the extent of Goldman's stock holdings in
Archipelago.

As the duty of due care imposes on directors an obligation
to act on a reasonably informed basis, *Hanson Trust PLC,* 781 F2d
at 274-275, the Court is satisfied that the facts alleged in the
complaints and accompanying affidavits sufficiently state that by
relying on Lazard, an allegedly conflicted financial advisor to
render a fairness opinion that contained serious omissions, such
as failure to assess several key terms of the Merger that
plaintiffs complain of, in addition to errors, the directors did
not discharge their duty of due care. Such alleged acts of breach
are actionable, as "directors may be liable to shareholders for
failing reasonably to obtain material information or to make a
reasonable inquiry into material matters." *Id* at 274-275.

*Kimeldorf,* upon which defendants rely, is inapposite.
There, the court reviewed the grant of a preliminary injunction
staying the merger of a real estate investment fund, subsequent
to a shareholder vote that overwhelmingly approved the merger.
*Kimeldorf v First Union Real Estate Equity & Mortgage Invs.,* 309
AD2d 151 (1st Dept 2003). Granting an application for a
preliminary injunction necessarily involves determination of the
likelihood of the ultimate success of the merits of the claims

asserted, *J.A. Preston Corp. v Fabrication Enterprises Inc.*, 68
NY2d 397, 406 (1986), including making findings of fact. *Hanson
Trust PLC*, 781 F2d at 273. Determining whether there is an
evidentiary basis for the allegations of the complaint is a
wholly improper inquiry on a motion to dismiss the complaint.
*Rovello v Orofino Realty Co.*, 40 NY2d 633, 635. (1976).

Moreover, in *Kimeldorf*, the court specifically found that
plaintiffs failed to even identify any particular wrongdoing on
the part of directors in support of their breach of fiduciary
duty claim, and further, found that plaintiffs failed to offer
sufficient justification for overriding the business judgment
rule, as allegations of unfair dealing were rebutted by full,
accurate and detailed disclosure on the part of directors.
*Kimeldorf*, 309 AD2d at 156-158. Finally, as for the plaintiff's
allegations of breach of fiduciary duty stemming from a self-
interested director, the court found that because the director
had the same personal interest in the transactions as the other
shareholders did not render him "self-interested." *Id* at 159.

In contrast to the factual record being reviewed in
*Kimeldorf*, plaintiffs here have sufficiently alleged acts of
wrongdoing on the part of Thain and Board members that, if proven
true in the course of discovery, satisfies a claim for breach of
the fiduciary duty of care. As discussed at length above and
unlike in *Kimeldorf*, Lazard was not wholly independent at the
time it conducted its fairness review of the Merger, and
moreover, expressly disclosed that it did not consider the

45

financial soundness of all material terms of the transaction that
plaintiffs now complain of, which calls into question the
accurateness and comprehensiveness of the fairness opinion relied
upon by the Board in rendering its decision to approve the
Merger.

Finally, unlike in *Kimeldorf,* where the director's financial
interest in the outcome of the merger was the same as
shareholders, *Id* at 159, Thain allegedly has a markedly different
interest than the NYSE seatholders, according to plaintiffs, due
to his ownership of 2.2 million Goldman shares, while Goldman is
a principal Archipelago shareholder and thus a principal
beneficiary of the unfair terms of the Merger.

*28 Williams Street*, also relied on by defendants is
similarly inapposite; there, the court reversed a judgment
rendered in favor of minority shareholders that held directors of
a partnership liable for approving a merger in the absence of
findings of fact at a trial on the merits, of either a conflict
of interest, self-dealing, or fraud on the part of directors,
therefore providing no justification to override the business
judgment rule. *Alpert v 28 Williams St. Corp.*, 91 AD2d 530, 530-
531 (1ˢᵗ Dept 1982) reh denied 64 NY2d 1041 (1985). In contrast,
here, unlike in *28 Williams Street*, plaintiffs *have* alleged facts
establishing conflicts of interests and self-dealing on the part
of key players involved in the Merger Agreement, in addition to
the failure of Board members to reasonably inform themselves of
the financial consequences of several Merger terms, sufficient to

46

overcome the presumption of the business judgment rule at the pleading stage.

Therefore, the Court is satisfied that the material allegations of the complaints, insofar as they allege breaches of the fiduciary duty of loyalty and due care on the part of NYSE Board members, are sufficient to overcome the presumptive applicability of the business judgment rule.

C. Aiding and Abetting Breach of Fiduciary Duty Against Goldman

Goldman moves to dismiss the claim against it for aiding and abetting breach of fiduciary duty on the grounds that plaintiffs have failed to plead with requisite particularity under CPLR 3016(b), and for failure to state a cause of action. The First Department has subordinated the pleading requirement of CPLR 3016(b) with the notice standard of CPLR 3013, however, *Weiner v Lazard Freres & Co.*, 241 AD2d 114, 123 (1st Dept 1998) app withdrawn 2004 NY App Div LEXIS 10209 (2004), and generally complaints will be sustained where supporting affidavits are sufficiently detailed to apprise defendants of the conduct upon which the claim is predicated. *Ackerman v Vertical Club Corp.*, 94 AD2d 665, 666 (1st Dept 1983) app dismissed 60 NY2d 644 (1983). Therefore, the principal inquiry on the motion to dismiss this claim is whether the pleadings are sufficiently detailed to apprise Goldman of the conduct upon which the claim for aiding and abetting breach of fiduciary duty is asserted. *Weiner*, 241 AD2d at 123.

47

A claim for aiding and abetting fiduciary duty requires "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Louis Capital Mkts., v REFCO Group, Ltd., LLC*, 2005 NY Slip Op 25239, *2 (Sup Ct NY County 2005). Additionally, "[a]nyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage..." *Louis Capital Mkts.*, 2005 NY Slip Op 253239 at *2-3. Plaintiffs further must demonstrate actual knowledge, as opposed to merely constructive knowledge, *Kaufman v Cohen*, 307 AD2d 113, 125 (1st Dept 2003), in addition to "substantial assistance" on the part of the alleged aider and abetter. *Louis Capital Mkts.*, 2005 NY Slip Op 253239 at *3.

As discussed above, plaintiffs' claims for breach of the fiduciary duties of loyalty, due care and good faith on the part of the NYSE defendants are viable. Therefore, in order to succeed on a claim for aiding and abetting breach of fiduciary duty, plaintiffs must sufficiently allege that Goldman had *actual* knowledge of the breach of duty, rather than mere constructive knowledge. *Kaufman v Cohen*, 307 AD2d 113, 125 (1st Dept 2003). While attempting to prove what is in a defendant's mind is extremely difficult, at a minimum, plaintiffs may not merely rely on conclusory and sparse allegations of knowledge of the primary breach of fiduciary duty on the part of the aider and abettor. *Kaufman*, 307 AD2d at 125.

48

Goldman vigorously denies having either any knowledge of a breach by the NYSE defendants or providing substantial assistance to the NYSE defendants in their alleged breach. Goldman submits the Engagement Letter in support of its motion for dismissal. Goldman maintains that the Engagement Letter, under which it was retained  by the NYSE, acknowledges that it was additionally providing financial services to Archipelago, services that were limited to facilitating merger discussions, although pro forma valuations  were also performed, however. The Engagement Letter expressly discloses that Goldman would not negotiate any terms of the Merger, and further obligates the NYSE to retain an outside financial advisor to perform a fairness opinion.

The Engagement Letter states, in part,

> The Company [NYSE] understands and acknowledges that we are rendering services simultaneously to the Company and to Archipelago in connection with a Transaction. The Company understands the potential conflicts of interest, or a perception thereof, may arise as a result of our rendering services to both the Company and to Archipelago...

Goldman's disclosure to the NYSE Board of the potential conflicts of interest involved in its provision of services to both corporations does not necessarily lead to the conclusion that Goldman did not provide substantial assistance or otherwise aid and abet the NYSE defendants' breach of fiduciary duty, as plaintiffs maintain. While the Engagement Letter, in revealing the potential conflicts involved in its participation in the Merger, may in fact have been Goldman's attempt to insulate itself from appearances of impropriety, however, by simply disclosing the potential conflicts to the NYSE Board does not

necessarily absolve it of potential liability for its role in the alleged breach of fiduciary duty. Therefore, while Goldman claims that the Engagement Letter establishes that it could not have had "actual knowledge" that a breach of fiduciary duty was committed by the NYSE defendants, the court disagrees. Rather, the Engagement Letter establishes that Goldman was aware of conflicts. Whether these conflicts are a breach of fiduciary duty is a matter for a jury.

Goldman additionally argues that the performance of routine advisory or financial services, without more, cannot be the basis for aiding and abetting liability. For this proposition, Goldman relies on *In re Worldcom*, in which a district court dismissed a class action claim for aiding and abetting common law fraud asserted against lead underwriters who provided financial services, on the ground that plaintiffs failed to allege actual knowledge of the fraud. *In re Worldcom,* 2005 WL 701092 (SDNY 2005). Goldman mischaracterizes the district court's basis for dismissal of the claim for aiding and abetting fraud against defendant Citigroup, however. Rather than rejecting plaintiffs' theory that the lead underwriters aided and abetted fraud by assisting in the preparation of false and misleading documents and subsequently disseminating those documents, in finding that plaintiffs' complaints only alleged Salomon Smith Barney, Inc. ("Salomon") participated in the alleged fraud through preparation of misleading registration statements, the court sustained the claim against it while dismissing the aiding and abetting claim

50

against Citigroup, as all allegations of aiding and abetting
liability were aimed at Salomon. *Id* at HN 16.

Goldman's reliance on *Ryan v Hunton* is similarly misplaced.
There, plaintiffs asserted a claim for aiding and abetting fraud
against a bank for failure to shut down accounts being used in an
alleged fraudulent scheme and for not informing plaintiffs of the
suspected fraud. *Ryan v Hunton & Williams*, 2000 US Dist LEXIS
13750, *29-30 (EDNY 2000). In dismissing the claim against the
defendant bank for aiding and abetting fraud, the court stated
that "[a]bsent a confidential or fiduciary relationship between
the plaintiff and the aider and abettor, the inaction of the
latter does not constitute substantial assistance warranting
aider and abettor liability." *Ryan*, 2000 US Dist LEXIS 13750 at
*29-30. In contrast, plaintiffs' claim for aiding and abetting
breach of fiduciary duty against Goldman in no way resembles the
claim for aiding and abetting fraud asserted against a bank for
failure to disclose.

Rather, plaintiffs allege that Goldman providing substantial
assistance to the NYSE defendants in breaching its fiduciary duty
by exerting its influence through its former CEO, Thain, former
NYSE director and current Goldman CEO Paulson, and other Goldman-
affiliated NYSE directors who were overly accommodating to
Goldman, in order to structure a deal that benefitted
Archipelago. Moreover, rather than disputing Goldman's "actual
knowledge" of the potential conflicts of interest inherent in
providing financial services to both corporations in the same

51

transaction, one of which, Archipelago, Goldman remains one of
the largest shareholders, the Engagement Letter establishes
Goldman's knowledge of the potential improprieties involved in
such a role. Accordingly, if plaintiffs succeed in establishing
that the NYSE defendants breached their fiduciary duties, in
part, by retaining Goldman to provide financial services and
otherwise, by permitting Goldman to exert its influence by
obtaining more favorable terms in the Merger, Goldman's
participation by provision of those services, which it does not
dispute, in addition to exerting this alleged improper influence,
is tantamount to substantial assistance, sufficient to sustain
the claim at the pleading stage.

        To the extent that Goldman's knowledge of the breadth of the
NYSE defendants' alleged breach has not been alleged by
particularized facts, its knowledge, ultimately, is a matter for
discovery, as much of that information is necessarily in
Goldman's control. See *American Baptist Churches v Galloway,* 271
AD2d 92, 101 (1st Dept 2000)(" ... what the parties actually knew
is a matter for discovery, since much of the information is in
defendants' control."). Moreover, Goldman has sufficiently been
apprised of the conduct upon which plaintiffs' claim is
predicated, *Ackerman,* 94 AD2d at 666, and thus the notice
standard of CPLR 3013 has been met. *Weiner,* 241 AD2d at 123.
Accordingly, it is

        ORDERED that the motion to dismiss the *Higgins* and *Caldwell*
complaints is denied and this action shall continue except to the

limited extent of severing and dismissing the claim for breach of

the fiduciary duty of loyalty insofar as plaintiffs allege

domination; and it is further

    ORDERED that plaintiffs have twenty days from the filing of

this order with notice of entry for leave to replead facts of

domination; and it is further

    ORDERED that the Clerk is directed to ~~order~~ *enter* judgment

accordingly.

Dated: September 1, 2005

                                           _____

                                               J.S.C.

    Counsel are hereby directed to obtain an accurate copy of
this Court's opinion from the record room and not to rely on
decisions obtained from the internet which have been altered in
the scanning process.

53