## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMUEL I. HYLAND and STEPHANIE
SPEAKMAN, individually and on behalf of
all others similarly situated,

      Plaintiffs,

               v.

WILLIAM B. HARRISON, JR., HANS W.
BECHERER, RILEY P. BECHTEL,
FRANK A. BENNACK, JR., JOHN H.
BIGGS, LAWRENCE A. BOSSIDY, M.
ANTHONY BURNS, ELLEN V. FUTTER,
WILLIAM H. GRAY, III, HELENE L.
KAPLAN, LEE R. RAYMOND, JOHN R.
STAFFORD, JPMORGAN CHASE & CO.,
and JAMES DIMON,

      Defendants.

Case No. 1:05-cv-162 (JJF)

Dr. Stephen Blau, Individually and On
Behalf of All Others Similarly Situated,

      Intervenor.

## COMPENDIUM OF UNREPORTED
## OPINIONS CITED IN DR. BLAU'S ANSWERING BRIEF IN
## OPPOSITION TO PLAINTIFFS SAMUEL I. HYLAND AND STEPHANIE
## SPEAKMAN'S MOTION TO REOPEN AND FOR RECONSIDERATION

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis (#2172)
Robert Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, Delaware 19899
(302) 656-2500

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Gregory M. Nespole (of the New York bar)
Adam J. Levitt (of the Illinois bar)
Dated: March 6, 2006

**CASE**                                                                              **TAB**

*Hyland v. Harrison.,*
2006 WL 288247 (Del Ch. Feb. 7, 2006) ..................................................................................1

*Pharmastem Therapuetics, Inc. v. Viacell, Inc.*
2004 WL 2898061 (D. Del. Dec. 14, 2004) ..............................................................................2

*Seawright v. Carroll,*
2004 WL 396310 (D. Del. March 2, 2004) ..............................................................................3

*Smith v. Illinois Central Railroad Company,*
2005 WL 3540990 (Ill. Dist. Dec. 27, 2005) ...........................................................................4

*Spencer v. Wal-Mart Stores, Inc.,*
2005 WL 3654381 (D. Del. June 24, 2005)..............................................................................5

1

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 288247 (D.Del.)
(Cite as: Slip Copy)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Samuel I. **HYLAND** and Stephanie Speakman,
individually and on behalf of all other similarly
situated, Plaintiffs,
v.
William B. **HARRISON**, Jr., Hans W. Becherer,
Riley P. Bechtel, Frank A. Bennack, Jr., John H.
Biggs, Lawrence A. Bossidy, M. Anthony Burns,
Ellen V. Futter, William H. Gray, III, Helene L.
Kaplan, Lee R. Raymond, John R. Stafford,
Jpmorgan Chase & Co., and James Dimon,
Defendants.
Dr. Stephen BLAU, individually and on behalf of all
others similarly situated, Applicant-in-Intervention
**No. Civ.A. 05-162-JJF.**

Feb. 7, 2006.

Joseph N. Gielata, of Joseph N. Gielata, Attorney at
Law, Wilmington, Delaware, for Plaintiffs.
Jesse A. Finkelstein, and Michael R. Robinson, of
Richards, Layton & Finger, P.A., Wilmington,
Delaware, for Defendants.
Michael A. Cooper, Sharon L. Nelles, and Keith
Levenberg, of Sullivan & Cromwell LLP, New York,
New York, for the Individual Defendants, of counsel.
Nancy E. Schwarzkopf, of Jpmorgan Chase Legal
Department, New York, New York, for J.P. Morgan
Chase & Co., of counsel.
Pamela S. Tikellis, and Robert Davis, of Chimicles &
Tikellis LLP, Wilmington, Delaware, of counsel.
Gregory M. Nespole, of Wolf Haldenstein Adler
Freeman & Herz LLP, New York, New York, Adam
J. Levitt, of Wolf Haldenstein Adler Freeman & Herz
LLC, Chicago, Illinois, for Stephen Blau, of counsel.

*OPINION*

FARNAN, J.
*1 Pending before the Court is the Motion of Dr.
Stephen Blau To Intervene In Order To Further Move
That This Action Be Stayed (D.I.58) and a Motion To
Enjoin Further Prosecution Of *Blau v. Harrison, et
al.* (D.I.68) filed by Plaintiffs, Samuel Hyland and
Stephanie Speakman (the "Hyland Plaintiffs"). For
the reasons discussed, the Court will grant Dr.
Stephen Blau's Motion To Intervene and grant his

request for a stay. The Court will deny as moot the
Hyland Plaintiffs' Motion To Enjoin Further
Prosecution Of *Blau v. Harrison, et al.*

BACKGROUND

On October 13, 2004, Dr. Stephen Blau ("Dr.Blau")
commenced an action in the United States District
Court for the Northern District of Illinois (the
"Illinois Action") alleging that Defendants [FN1]
violated Section 14(a) of the Securities Exchange Act
of 1934 (the "Exchange Act") in connection with the
merger of J.P. Morgan Chase & Co. and Bank One
Corporation. Dr. Blau filed the Illinois Action on
behalf of himself and all holders of common stock of
J.P. Morgan Chase on April 2, 2004 (the record date),
or any time from April 19, 2004 (the proxy date)
through July 1, 2004 (the date the merger was
consummated). Judge William J. Hibbler presides
over the Illinois Action.

> FN1. Defendants in the Illinois Action are
> William B. Harrison, Jr., Hans W. Becherer,
> Riley P. Bechtle, Frank A. Bennack, Jr.,
> John H. Biggs, Lawrence A. Bossidy, M.
> Anthony Burns, Laurence Fuller, Ellen V.
> Futter, William H. Gray, III, Helene L.
> Kaplan, Lee R. Raymond, John R. Stafford,
> and J.P. Morgan Chase & Co.

On January 5, 2005, Judge Hibbler entered an order
appointing Dr. Blau and American Grown Fund, Inc.
("AGF") lead plaintiffs in the Illinois Action and
appointing Wolf Haldenstein Adler Freeman & Herz
LLP ("Wolf Haldenstein") as lead counsel. (D.I.60,
Exh. A). On February 18, 2005, AGF withdrew as
lead plaintiff, and Dr. Blau filed an Amended
Complaint in the Illinois Action.

On March 17, 2005, the Hyland Plaintiffs through
their counsel Joseph N. Gielata, Esquire, filed the
instant action alleging similar claims against the same
Defendants in connection with the J.P. Morgan and
Bank One Merger. [FN2] Shortly after filing the
Complaint, the Hyland Plaintiffs moved to enjoin an
action filed in the Delaware Chancery Court
involving the same circumstances. [FN3] Although the
Chancery Court action did not involve federal claims,
the Hyland Plaintiffs argued that the common law

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 288247 (D.Del.)
(Cite as: Slip Copy)

causes of action asserted in the Chancery Court were within this Court's jurisdiction and that the prospect of parallel actions frustrated the purposes of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the Securities Litigation Uniform Standards Act. The Court denied, without prejudice, Plaintiff's Motion For An Injunction Barring The Prosecution Of Relate State Court Actions (D.I.2) concluding that the "harm Plaintiff alleges is speculative, and the Court will not enjoin the state court litigation absent some tangible showing that the co-pending state court proceedings are being used to frustrate an important federal right." (D.I.19). On June 21, 2005, the Court entered an Order (D.I.46) appointing Joseph N. Gielata, Esquire lead counsel in this action, "subject to Defendants reservations" which include, but are not limited to, arguments against class certification. (D.I.31).

> FN2. The Court notes that this case includes an additional defendant, James Dimon, that is not named in the Illinois Action. In addition, this action includes seven claims not asserted in the Illinois Action, two based on the common law duty of loyalty and duty of disclosure, two based on Section 10(b) and Section 20 of the Exchange Act and three based on Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

> FN3. The Chancery Court action has since been dismissed on the merits, and the plaintiffs have filed an appeal to the Delaware Supreme Court. *In re J.P. Morgan Chase & Co. S'holder Litig.,* 2005 WL 1076069 (Del. Ch. Apr. 29, 2005).

*2 Counsel for the Hyland Plaintiffs learned of the pending Illinois Action and filed several briefs and letters styled as amici curiae submissions urging the Illinois District Court to vacate its order appointing Dr. Blau as lead plaintiff and Wolf Haldenstein as lead counsel and requesting the Illinois District Court to *sua sponte* transfer the action to Delaware. Dr. Blau then filed the instant motion to intervene and stay this action in favor of allowing the first-filed Illinois Action to proceed.

On August 29, 2005, the Illinois District Court held a status conference to discuss the impact of the Hyland Plaintiffs' amici curiae submissions on the Illinois Action. [FN4] The Illinois District Court stated:

> FN4. Mr. Gielata was not invited to participate in that status conference.

I received notice of the parties in this action moving to intervene or stay the ... [Hyland] matter. I think we need to resolve that issue as to whether or not we proceed here or proceed there or these matters are so similarly situated that we need to proceed in one forum as opposed to both because clearly some order issued by this Court or by that Court could affect the litigation in other arena.

There is some indication also in the materials that I've reviewed suggesting that the matter should be more properly brought in that Court as opposed to this Court.

None of those issues have been answered to my satisfaction.

(D.I. 69, Exh. A at 2). At the conclusion of the hearing, the Illinois District Court further stated:Let me say that, obviously, the Court has been receiving a great deal of material from Counsel Gielata regarding this matter in the form of an amicus curiae brief and also in the form of letters which have been forwarded to the Court through counsel.

Those materials the Court reviewed, and they raise certain issues with the Court, some of which the Court viewed as sour grapes perhaps, others of which caused the Court to, at least, have some concern about orders entered by this Court which might somehow impact orders entered by that Court or vice versa.

So I did believe that it was necessary for someone to become either-one lawyer to become present here and intervene so I could have that lawyer present and talk what the issues really are or that lawyer here to intervene in that action so that we have one forum where we know this case is going to go forward in and we don't have these ancillary actions all over the place.

Now that counsel has indicated and I have seen your motion to stay the Highland matter in Delaware, that, at least, should bring to fruition a hearing as to which case is going to go forward.

Based upon the filing that have been made by counsel for the Highland plaintiff in the Delaware matter, I will make this order: That based upon the fact that we now have a motion pending to stay that matter in which the issues will be discussed and decided by that Court, I see no need to further entertain motions or writings or materials from Mr. Gielata in this case. I am not going to ... make any further order on his motions regarding the propriety of lead counsel or his other assertions in his papers. The Court here had no information and still has no information which it can

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

base any action on its part to change what the Court has previously ruled. As far as this Court is concerned, lead counsel remains lead counsel.

*3 Certainly ... there may be other person who might suggest that have a greater interest, for instance, the Highland plaintiff, but that is of no movement [sic] to this Court in that the notices that the Court reviewed were proper, the lead plaintiff has indicated a willingness, and the Court has found that he is a proper lead plaintiff.

The Court is concerned as to the ancillary or the other action in Delaware, but ... it is the Court's belief that that Court can, after hearing these materials regarding the intervention and the movement to stay that action, can rule, and if that ruling results in that action going forward as well as this action, then, I think, the next step is to decide where the actions should go forth, the two actions should go forth simultaneously in a single court as opposed to two, but we're not there because your motion to stay [Dr. Blau's motion to stay the Delaware action] might be, in fact, granted.

(D.I. 69, Exh. A at 10-12).

Following the Illinois District Court's ruling, the Hyland Plaintiffs filed the instant motion to enjoin the Illinois Action. Defendants have refrained from taking a position with respect to "the tug-of-war" between Dr. Blau and the Hyland Plaintiffs for lead plaintiff status, except to file a Memorandum Of Law in response to the Hyland Plaintiffs' motion to enjoin the Illinois Action stating that "Defendants view the claims as wholly devoid of merit and have filed motions to dismiss both pending federal actions in their entirety. Whether the determination of those motions is made by this Court or the District Court in Illinois is of secondary importance to the desirability of having a single determination and avoiding duplicative litigation." (D.I. 75 at 1).

## DISCUSSION

### I. Whether Dr. Blau Should Be Permitted To Intervene In This Action

By his Motion, Dr. Blau, the lead plaintiff in the Illinois Action, moves to intervene in this action pursuant to Federal Rule of Civil Procedure 24. Dr. Blau contends that he is entitled to intervene as a matter of right under Rule 24(a). In the alternative, Dr. Blau contends that permissive intervention is warranted under Rule 24(b). In support of his Motion, Dr. Blau contends that both he and the

Hyland plaintiffs have filed legal complaints premised on the same facts and circumstances, raising similar legal issues and seeking substantially the same relief. Dr. Blau also contends that his intervention will not delay or prejudice the Hyland Plaintiffs. However, Dr. Blau contends that he will suffer undue prejudice if his Motion To Intervene is not granted, because he and his counsel have vigorously investigated the legal issues in the Illinois Action, addressed Defendants' Motion To Dismiss in the Illinois Action and are proceeding under the time frames set forth in the Pretrial Order entered by the Illinois District Court.

In response, the Hyland Plaintiffs contend that Dr. Blau's Motion To Intervene is untimely, because Motions To Dismiss have already been briefed in this Court, and Dr. Blau failed to oppose the Hyland Plaintiffs' motion for appointment as lead plaintiffs even though Dr. Blau was aware of the filing of this motion. The Hyland Plaintiffs also contend that they will be prejudiced if Dr. Blau is permitted to intervene here because (1) this action is substantially underway with briefing completed on Defendants' Motion To Dismiss, (2) Defendants have waived service of process, and (3) discovery efforts have been initiated, including the service of document preservation subpoenas on critical witnesses.

*4 In reply to the Hyland Plaintiffs, Dr. Blau further contends that his intervention is warranted, because Mr. Gielata is not an adequate representative to prosecute this action. Dr. Blau points out that Mr. Gielata did not move for lead plaintiff status in the first-filed Illinois Action and contends that Mr. Gielata is jeopardizing these actions by filing claims that were already dismissed by the Delaware Chancery Court. Dr. Blau also contends that Mr. Gielata has attempted to interfere in the first-filed Illinois Action, while trying to avoid subjecting himself to the jurisdiction of that court by filing amici curiae memorandum containing inflammatory accusations against himself and Wolf Haldenstein, including, among other things, that (1) Wolf Haldenstein plagiarized counts from the complaint filed in the Delaware Chancery Court, (2) provided insufficient notice of the Illinois Action, and (3) used AGF as an "illusory plaintiff" to show a larger financial stake in the action, when AGF did not want to be a party to the Illinois Action and indicated that its involvement in the action was a clerical error.

Federal Rule of Civil Procedure 24 provides:
(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action:

(1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

In determining whether a motion for intervention is timely, the Court should consider three factors: (1) the stage of the proceeding, (2) prejudice to the parties, and (3) the reason for the delay. *Commonwealth v. Pennsylvania v. Rizzo,* 530 F.2d 501, 506 (3d Cir.1976). The party seeking to intervene bears the burden of demonstrating that intervention is appropriate.

As a threshold matter, the Hyland Plaintiffs contend that Dr. Blau's motion is untimely, because Dr. Blau knew about this action since May 2005, but waited an unreasonable length of time, until August 2005, before filing his Motion To Intervene. In support of their contention, the Hyland Plaintiffs cite three cases: *Delaware Valley Citizens' Counsel for Clean Air v. Pennsylvania,* 674 F.2d 970, 974 (3d Cir.1982), *National Wildfire Fed'n v. Gorsuch,* 744 F.2d 963 (3d Cir.1984) and *In re Fine Paper Anti-Trust Litig.,* 695 F.2d 494 (3d Cir.1982).

*5 The Court has reviewed these cases and finds them to be distinguishable from the circumstances here. For example, in *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* the potential intervenors moved to intervene four years after the action was commenced and twenty months after a consent decree was entered. Similarly, in both *National Wildfire Fed'n v. Gorsuch* and *In re Fine Paper Anti-Trust Litig.,* intervention was sought after the court had entered a judgment in the case.

By comparison, this case has not progressed as far as the cases cited by the Hyland Plaintiffs, and although a motion to dismiss has been fully briefed, a substantive decision has not yet been issued. Indeed, no final decrees or judgments have been entered on any substantive matters, and the one order that has been entered concerning the appointment of lead plaintiffs and lead counsel was entered on a conditional basis subject to the full exposition of Defendants' reservations at a later date. Given the early stage of this proceeding, the Court is not persuaded that the Hyland Plaintiffs will be prejudiced by the intervention of Dr. Blau. The Court also finds that Dr. Blau filed his motion to intervene within a reasonable time after learning that Mr. Gielata sought to vacate the Illinois District Court's rulings on lead counsel in the Illinois Action. Accordingly, the Court concludes that Dr. Blau's Motion To Intervene is not untimely.

The Hyland Plaintiffs next contend that Dr. Blau's motion to intervene should be denied, because it is not made for a proper purpose. Citing to *Kamerman v. Steinberg,* 681 F.Supp. 206 (S.D.N.Y.1988) and *Lexington Ins. Co. v. Caleco, Inc.,* 2003 WL 21652163, *6 (E.D.Pa. Jan. 25, 2003), the Hyland Plaintiffs contend that a motion to intervene should not be granted for the purpose of seeking to stay the underlying action.

In both *Kamerman* and *Lexington,* the respective plaintiffs sought to stay the respective federal court actions during the pendency of related state court actions. The *Kamerman* and *Lexington* courts denied the respective motions to intervene concluding that the plaintiffs had not demonstrated the requirements of Rule 24(c), i.e. that the intervenors file pleadings setting forth the claims or defenses for which intervention is sought. In reaching this conclusion, the *Kamerman* and *Lexington* courts specifically noted that the potential intervenors had no claims to press against any defendants or any defenses to assert against any plaintiffs, and no intention of litigating the causes of action set forth in the respective federal complaints.

In the Court's view, neither the *Kamerman* decision nor the *Lexington* decision provide a basis to deny Dr. Blau's motion. First, this case does not involve a federal action co-existing with a state court action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 288247 (D.Del.)
(Cite as: Slip Copy)

Rather, this case involves two co-existing federal actions. More importantly, Dr. Blau has asserted claims against Defendants, and the Court is not persuaded that Dr. Blau's Motion To Intervene is meant to delay the resolution of those claims, which he has also asserted in the Illinois District Court. Rather, it appears to the Court that Dr. Blau's interest lies in preserving the jurisdiction of the Illinois District Court and recovering for the class of investors he represents. Further, unlike the plaintiffs in *Kamerman* and *Lexington,* Dr. Blau appears to have every intention of pressing his claims, the concern is in which of the two federal district courts those claims will be litigated.

\*6 Having concluded that Dr. Blau's Motion is not untimely and is not being pressed for the sole purpose of delay, the Court concludes that Dr. Blau has established that permissive intervention is appropriate. The Illinois Action filed by Dr. Blau is based on the same facts and circumstances as this case, seeks substantially the same relief, and raises similar legal issues. For the reasons discussed in determining the timeliness of Dr. Blau's motion, the Court further concludes that the Hyland Plaintiffs will not be prejudiced by Dr. Blau's intervention. Accordingly, the Court will grant Dr. Blau's Motion For Intervention.

### II. Whether This Action Should Be Stayed In Favor Of Allowing The Illinois Action To Proceed

By his Motion To Stay, Dr. Blau contends that this action should be stayed, because it was brought at an impermissible time and in contravention of the procedures set forth in the PSLRA for appointing lead plaintiff and selecting lead counsel. Dr. Blau points out that the Illinois Action was the first filed action, and Dr. Blau contends that the Hyland Plaintiffs should have moved for appointment as lead plaintiffs in the Illinois Action within the 60 day time period provided for in Section 27(a)(3)(b)(i) of the Securities Act and Section 21D(a)(3)(B)(i) of the Exchange Act. Dr. Blau contends that by filing the instant action, the Hyland Plaintiffs are attempting to overrule the Illinois District Court's determination that Dr. Blau's appointment as lead plaintiff was proper and the notice in the Illinois Action was adequate.

In response, the Hyland Plaintiffs contend that a stay is inappropriate. Specifically, the Hyland Plaintiffs contend that staying this action would expose them, and the class they represent, to (1) reduced recovery

due to (a) the absence of certain claims in the Illinois Action and (b) Wolf Haldenstein's alleged conflict of interest and lack of prosecution of the Illinois Action, (2) the risk that claims will be released in the event that Wolf Haldenlstein settles or voluntarily dismisses the Illinois Action, (3) the harm of having claims litigated in an inconvenient venue where important witnesses cannot be summoned for trial, and (4) the risk of no recovery as a result of service of process issues. The Hyland Plaintiffs also contend that there are significant differences between this action and the Illinois Action, and that a stay of this action would effectively be a dismissal of the claims asserted here.

The Hyland Plaintiffs further contend that the existence of a lead plaintiff order in the Illinois Action is not a basis to stay this action. The Hyland Plaintiffs point out that a lead plaintiff order has also been entered in this case, and the Hyland Plaintiffs contend that the lead plaintiff order in this case does not overrule any orders entered in the Illinois Action. The Hyland Plaintiffs further point out that they have not sought to intervene in the Illinois Action, and Dr. Blau has not sought reargument under Local Rule 7.1.5 or relief under Federal Rule of Civil Procedure 60 from the lead plaintiff order entered in this case.

\*7 In addition, the Hyland Plaintiffs contend that, by requesting a stay, Dr. Blau is trying to "sidestep" three issues. Specifically, the Hyland Plaintiffs contend that (1) Dr. Blau failed to commence the Illinois Action in a proper or convenient forum, (2) the Delaware Plaintiffs have a financial interest that exceeds Dr. Blau's financial interest, and (3) Dr. Blau failed to include valuable class claims and substantive allegations in this Illinois Action that have been asserted here.

The power of the Court to stay proceedings is incidental to its inherent power to control the disposition of the cases on its docket. *Landis v. North American Co.,* 299 U.S. 248, 254 (1936) The decision to stay a proceeding lies within the discretion of the Court. In exercising this discretion, the Court "must weigh competing interests and maintain an even balance." *Id.* at 255. The party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Id.*

In determining whether a stay is appropriate in this case, the Court also finds it necessary to consider

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certain provisions of the PSLRA relating to the appointment of lead plaintiff. The PSLRA was enacted to end perceived abuses in federal securities actions by eliminating the "race to the courthouse" as the method for selecting lead plaintiffs, and instead requiring the court to choose the most adequate plaintiff to represent the class' interests. Procedurally, the selection of lead plaintiff requires the party who files the initial action to publish notice within 20 days of the filing to inform class members of the pendency of the action, the claims asserted, the class period and their right to file a motion for appointment of lead plaintiff. Within 60 days of the publication of that notice, any member of the putative class may move the court for appointment to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(i). When multiple actions are filed asserting substantially the same claims, only the plaintiff in the first filed action is required to provide notice. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

However, courts have recognized that, in actuality, The PSLRA did not completely eliminate the "race to the courthouse".... [P]laintiffs who are first to file suit are obligated to provide notice to other purported class members of the asserted claims and the purported class period. Plaintiffs who are first to file, moreover, are in a better position to aggregate plaintiffs in an effort to obtain the largest financial interest in the litigation, an important aspect of the lead plaintiff status.

*In re Nice Sys., Ltd. Sec. Litig.,* 188 F.R.D. 206, 215 n. 7 (D.N.J.1999) (citations omitted).

Weighing the parties' interests in light of the facts and circumstances in this case, the Court concludes that this action should be stayed in deference to the first-filed Illinois Action. By the nature of the various filings in this Court, as well as in the Illinois District Court, it is apparent to the Court that the Hyland Plaintiffs and their counsel and Dr. Blau and his counsel are in a "tug of war" over who is going to serve as lead plaintiff and lead counsel. Consistent with the procedures of the PSLRA, the Illinois District Court has appointed Dr. Blau as lead plaintiff and approved Wolf Haldenstein to serve as lead counsel in that action. If the Hyland Plaintiffs wished to challenge that decision, their remedy was not to file a second action in this Court, but to follow the procedures laid out in the PSLRA and contest that decision in the Illinois District Court. Instead, the Hyland Plaintiffs, through their counsel, have circumvented this procedure by filing this action and presenting their arguments to the Illinois District Court in the form of amici curiae briefs.

*8 Nevertheless, the Illinois Court has considered and rejected the arguments of the Hyland Plaintiffs concerning the appointment of Dr. Blau as lead counsel, including the Hyland Plaintiffs' assertion that Dr. Blau did not provide them with proper notice under the PSLRA. This Court will not second-guess the decisions of the Illinois District Court on this matter.

Although it is true that this Court has also entered a lead plaintiff order, the Court's order was entered on a conditional basis. At this juncture, it appears to the Court that neither action has progressed to a substantive review of the merits. Indeed, Motions To Dismiss are fully briefed and pending in both this Court and the Illinois District Court. However, the Illinois District Court has acknowledged that there may be questions concerning whether Illinois is the appropriate venue for the action filed there . [FN5] In light of these questions and the first-filed status of the Illinois Action, the Court is persuaded that this action should be stayed pending resolution of the Illinois Action. Once the Illinois Action is resolved, the stay can be lifted here, and this action can then proceed to its end. In addition, the Court is not persuaded that the Hyland Plaintiffs will be prejudiced by this decision, because the Illinois District Court has concluded that Dr. Blau and Wolf Haldemstein are appropriate representatives for the class. Thus, the Court concludes that a stay will adequately preserve the interests of the Hyland Plaintiffs in this action, while simultaneously allowing their interests to be served in the Illinois Action to the extent their claims are being pressed there. Accordingly, the Court will grant Dr. Blau's Motion and stay this action pending resolution of the Illinois Action.

> FN5. Although Defendants have not requested a transfer of the Illinois Action, Mr. Gielata has requested a transfer in his amici curiae papers. Dr. Blau suggests that the Illinois District Court has already rejected Mr. Gielata's request for a transfer; however, Judge Hibbler has indicated that these issues were not addressed to his satisfaction.

## CONCLUSION

For the reasons discussed, the Court will grant the Motion of Dr. Stephen Blau To Intervene In Order To Further Move That This Action Be Stayed (D.I.58). The above-captioned action will be stayed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pending the resolution of the Illinois Action. The Motion To Enjoin Further Prosecution Of Blau v. Harrison, et al. (D.I.68) will be denied as moot.

An appropriate Order will be entered.

D.Del.,2006.
Hyland v. Harrison
Slip Copy, 2006 WL 288247 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2868093 (Trial Motion, Memorandum and Affidavit) Dr. Blau'S Answering Brief in Opposition to Plaintiffs Samuel I. Hyland and Stephanie Speakman'S Motion to Enjoin Further Prosecution of Blau V. Harrison, Etal. (Oct. 06, 2005)
• 2005 WL 2868097 (Trial Motion, Memorandum and Affidavit) Dr. Blau'S Answering Brief in Opposition to Plaintiffs Samuel I. Hyland and Stephanie Speakman'S Motion to Enjoin Further Prosecution of Blau V. Harrison, et Al. (Oct. 06, 2005)
• 2005 WL 2868099 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Response to Plaintiffs' Motion to Enjoin Further Prosecution of Blau V. Harrison (Oct. 06, 2005)
• 2005 WL 2868102 (Trial Motion, Memorandum and Affidavit) Dr. Blau's Answering Brief in Opposition to Plaintiffs Samuel I. Hyland and Stephanie Speakman's Motion to Enjoin Further Prosecution of Blau V. Harrison, et Al. (Oct. 06, 2005)
• 2005 WL 2868095 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Plaintiffs' Motion to Enjoin Further Prosecution of Blau v. Harrison, et al. (Sep. 22, 2005)
• 2005 WL 2385649 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of their Motion to Dismiss Plaintiffs' Amended Complaint (Aug. 01, 2005)
• 2005 WL 2603673 (Trial Motion, Memorandum and Affidavit) Complaint in Intervention (Aug. 01, 2005)
• 2005 WL 2385527 (Trial Pleading) Plaintiffs' Answering Brief in Opposition to the Defendants' Motion to Dismiss the Amended Complaint (Jul. 11, 2005)
• 2005 WL 1171953 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiff's Motion for an Injunction Barring the Prosecution of Related State Court Actions (Apr. 07, 2005)
• 2005 WL 1171979 (Trial Motion, Memorandum

and Affidavit) Opening Brief in Support of Plaintiff Hyland's Motion for an Injunction Barring the Prosecution of Related State Court Class Actions (Mar. 21, 2005)
• 2005 WL 1171978 (Trial Pleading) Class Action Complaint (Mar. 17, 2005)
• 1:05cv00162 (Docket) (Mar. 17, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 2

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2898061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PHARMASTEM THERAPEUTICS, INC., Plaintiff,
v.
VIACELL, INC., et al., Defendants.
No. 02-148 GMS.

Dec. 14, 2004.

Philip A. Rovner, Potter Anderson & Corroon, LLP,
Wilmington, DE, for Plaintiff and Defendant.
Richard D. Kirk, Morris, James, Hitchens &
Williams, Wilmington, DE, for Defendants.
Jeffrey L. Moyer, Richards, Layton & Finger, Robert
F. Stewart, Jr., Dilworth Paxson LLP, David Allan
Felice, Cozen & O'ConnorChase Manhattan Centre,
Wilmington, DE, for Counter-Claimant.

*MEMORANDUM*

SLEET, J.

### I. INTRODUCTION

*1 On February 22, 2002, PharmaStem Therapeutics,
Inc. ("PharmaStem") filed this lawsuit against
ViaCell, Inc. ("ViaCell"), Cryo-Cell International,
Inc. ("Cryo-Cell"), CorCell, Inc. ("CorCell"),
StemCyte, Inc. ("StemCyte"), CBR Systems, Inc.
("CBR"), Birthcells Technology, Inc. ("Birthcells"),
Nustem Technologies, Inc. ("Nustem"), and Bio-Cell,
Inc. ("Bio-Cell") (collectively, the "defendants"), [FN1]
alleging infringement of United States Patents Nos.
B1 5,004,681 (" '681 Patent") and 5,192,553 (" '553
Patent"). On October 29, 2003, the jury returned a
unanimous verdict on all claims in favor of
Pharmastem. The parties then filed several post-trial
motions. [FN2] On September 15, 2004, the court issued
a Memorandum Opinion and Order (the "Post-trial
Order") addressing the post-trial motions. The court
concluded that the defendants do not infringe the '553
patent and granted a partial new trial on the issue of
infringement and damages with respect to the '681
Patent. [FN3]

FN1. A default judgment was subsequently
rendered against NuStem on July 10, 2002.

StemCyte and PharmaStem entered a
settlement agreement before trial, and
StemCyte accordingly was dismissed from
this action on October 21, 2003.

FN2. ViaCell filed a renewed motion for
judgment as a matter of law, and, in the
alternative, a motion for a new trial or for a
remittitur, in which the defendants CBR,
CorCell, and Cryo-Cell joined. ViaCell filed
another alternative motion, in which the
other defendants also joined, for findings by
the court and/or to alter or amend judgment
pursuant to Federal Rule of Civil Procedure
52, 59(e) and/or the court's equitable power.
PharmaStem filed a motion for enhanced
damages, attorneys' fees, pre-judgment
interest and post judgment interest, a motion
for a permanent injunction, and a motion to
strike the affidavit of Chris Adams
submitted in support of ViaCell's motion to
alter or amend the judgment.

FN3. For a complete recitation of the facts,
procedural history, and post-trial rulings of
this case, please see *Pharmastem
Therapeutics, Inc. v. Viacell, Inc.,* C.A. No.
02-148 GMS, 2004 WL 2127192 (D.Del.
Sept.15, 2004).

Following the Post-trial Order, CorCell and Cryo-
Cell filed a motion for partial reconsideration of the
court's post-trial rulings. CBR and Viacell joined the
motion and submitted individual memoranda that
addressed issues specific to each of them. In addition,
ViaCell filed a motion for entry of separate and final
judgment pursuant to Federal Rule of Civil Procedure
54(b) and a motion for certification for interlocutory
appeal pursuant to 28 U.S.C. § 1292(b), in which
CBR, CorCell, and Cryo-Cell joined. PharmaStem
filed a motion for a preliminary injunction, as well as
a motion for entry of separate and final judgment
pursuant to Federal Rule of Civil Procedure 54(b).
For the following reasons, the court will grant the
defendants' motion for partial reconsideration,
reverse its post-trial ruling as to the '681 patent, and
enter judgment as a matter of law ("JMOL") that the
defendants do not infringe the '681 patent. [FN4]

FN4. The court will deny the plaintiff's and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2898061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the defendants' motions for entry of separate and final judgment pursuant to <u>Federal Rule of Civil Procedure 54(b)</u>, the defendants' motion for certification for interlocutory appeal pursuant to <u>28 U.S.C. § 1292(b)</u>, and the plaintiff's motion for preliminary injunction, because the court's ruling on the motion for reconsideration renders them moot.

## II. STANDARDS OF REVIEW

### A. Motion For Reconsideration

As a general rule, motions for reconsideration should be granted only "sparingly." <u>Tristrata Tech., Inc. v. ICN Pharms., Inc.,</u> 313 F.Supp.2d 405, 407 (D.Del.2004); <u>Karr v. Castle,</u> 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. <u>See, e.g., Shering Corp. v. Amgen, Inc.,</u> 25 F.Supp.2d 293, 295 (D.Del.1998); <u>Brambles USA, Inc. v. Blocker,</u> 735 F.Supp. 1239, 1240 (D.Del.1990) (citing <u>Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,</u> 99 F.R.D. 99 (E.D.Va.1983)); <u>see also Karr,</u> 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. <u>See Pirelli Cable Corp. v. Ciena Corp.,</u> 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." <u>TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.,</u> 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D.Del.2002) (citation omitted); <u>see also Quaker Alloy Casting v. Gulfco Industries, Inc.,</u> 123 F.R.D. 282, 288 (N.D.Ill.1988) ( "This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

### B. Renewed Motion for Judgment as a Matter of Law

*2 Pursuant to <u>Federal Rule of Civil Procedure 50</u>, a court may render JMOL after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." <u>Walter v. Holiday Inns, Inc.,</u> 985 F.2d 1232, 1238 (3d Cir.1993)

(citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. <u>Fed.R.Civ.P. 50(b)</u>. To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." ' <u>Pannu v. Iolab Corp.,</u> 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting <u>Perkin-Elmer Corp. v. Computervision Corp.,</u> 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." <u>Perkin-Elmer Corp.,</u> 732 F.2d. at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the nonmovant. <u>Id.;</u> <u>Richardson-Vicks Inc. v. UpJohn Co.,</u> 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. <u>Dawn Equip. Co. v. Kentucky Farms, Inc.,</u> 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." <u>Perkin-Elmer Corp.,</u> 732 F.2d at 893.

## III. DISCUSSION

In the Post-trial Order, dated September 15, 2004, the court denied the defendants' motion for JMOL on the issue of infringement and damages with respect to the '681 patent, but granted the defendants' motion in the alternative for a new trial on this issue. By their motion, the defendants request the court to reconsider its Post-trial Order and grant the motion for JMOL.

The defendants contend that Pharmastem failed to meet its burden with respect to infringement of the '681 patent because: (1) the issue before the jury, as Pharmastem chose to try the case, was whether all of the cord blood units processed and cryopreserved by the defendants infringe the '681 patent, and they do not; and (2) Pharmastem was obligated, as a matter of law, to adduce evidence with respect to specific units of cord blood stored by the defendants and to show with respect to those specific units that they contain sufficient stem cells to reconstitute a human adult, and did not meet this obligation. The defendants rely on the Post-trial order for support.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In response, Pharmastem asserts that it adduced substantial evidence at trial that the defendants infringe the '681 patent. Pharmastem also asserts that the scientific and medical evidence support cord blood transplantation in adults, and that the defendants use that evidence to promote their cord blood banking services for adult use. Pharmastem supports its assertions with statements from the defendants' marketing materials regarding the potential for adult transplantation. Pharmastem also relies on the defendants' testimony regarding their marketing materials, the threshold quantity of cord blood they collect, and the threshold amount of cells they require. Lastly, Pharmastem relies on the Post-trial Order, which states, "[t]he record suggests that at least some of the defendants' cord blood units infringe in that there is evidence of successful transplants of the defendants' compositions into human adults." *Pharmastem Therapeutics, Inc. v. Viacell, Inc.,* C.A. No. 02-148 GMS, 2004 WL 2127192, at *11 (D.Del. Sept.15, 2004).

*3 The parties agree that the only disputed issue at trial was which of the defendants' cord blood units contain stem cells in an amount sufficient to effect hematopoietic reconstitution of an adult. According to Pharmastem's presentation to the jury, the answer to that issue was 100%. In other words, Pharmastem's position at trial was that "all" of the defendants' cord blood units infringe the '681 patent. [FN5] Pharmastem's post-trial motions, as well as its motion for preliminary injunction are unclear as to whether it has changed its position regarding infringement. For example, Pharmastem's opposition to CBR's motion for judgment as a matter of law states that "CBR's admissions in its marketing documents, the standard operating procedures of the company, as well as the testimony of Dr. Harris support a finding that all of the samples infringe...." (D.I. 418, at 3). In addition, Pharmastem's opening brief in support of its motion for preliminary injunction defines the issue as follows: "As the Court recognizes, the dispute is not whether any of the defendants' cord blood units infringe, as 'the record suggests that at least some of the defendants' cord blood units infringe ...', but whether *all (i.e., every single one)* of the defendants' cord blood units infringe." (D.I. 559, at 5) (emphasis added). Pharmastem's opposition brief to the motion for reconsideration, however, states that "[t]here is abundant medical, scientific, and party proof that the vast majority, if not all, of the defendants cord blood units contain stem cells in an amount sufficient to effect hematopoietic reconstitution of an adult." (D.I. 571, at 14). After reviewing the record, the post-trial motions, and the motion for reconsideration, the court

concludes that Pharmastem's position, prior to its briefing on the motion for reconsideration, was that 100% of the defendants cord blood units infringe the '681 patent. [FN6] Therefore, in order to meet its burden, Pharmastem had to adduce evidence that 100% of the defendants' cord blood units contained stem cells in a sufficient amount to reconstitute a human adult. Pharmastem, however, did not meet its burden.

> FN5. Indeed, when referring to question fourteen of the verdict form during closing arguments (*i.e.* the question that directed the jury to enter the number of cord blood units that infringe the '681 patent), counsel for Pharmastem told the jury to base the number of units that infringe on the numbers provided by the defendants-that is, 34,293 for ViaCell; 49,646 for Cryo-Cell; 4,640 for CorCell; and 34,649 for CBR. These numbers are equivalent to the total number of cord blood units stored by each of the defendants. Further, Pharmastem did not refer to any specific unit or units in presenting its case to the jury. Rather, Pharmastem referred to the defendants' cord blood units as a whole.

> FN6. The court will hold Pharmastem to its presentation to the jury, as well as its assertions in its post-trial motions and its motion for preliminary injunction.

First, the court has already determined that "the record overwhelmingly indicates that cord blood units will not all contain sufficient cells to reconstitute an adult." *Pharmastem Therapeutics, Inc. v. Viacell, Inc., et al.,* No. C.A. 02-148 GMS, 2004 WL 2127192, at *11 (D.Del. Sept.15, 2004). For example, the '681 patent illustrates that each cord blood sample will vary in terms of its cell count. '681 patent Table III (providing cord blood samples with different total volumes and total nucleated blood cells). In addition, Pharmastem represented to the PTO that cord blood units "are highly variable in their stem cell content such that any particular cord blood collection may have low or no stem cells." Tr. Ex. 1370, at 30; *see* Wagner Tr. at 1270. The court, therefore, will affirm its post-trial conclusion that "[t]he jury's finding that *all* of the defendants' cord blood units infringe the '681 patent ... was against the great weight of the evidence." *Pharmastem,* 2004 WL 2127192, at *11.

*4 Second, even assuming that "at least some of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2898061 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

defendants' cord blood units infringe in that there is evidence of successful transplants of the defendants' compositions into human adults," the court finds that Pharmastem presented no evidence to the jury from which it could conclude that any specific cord blood unit or units stored by any of the defendants contained stem cells in a sufficient amount to reconstitute a human adult. All of the defendants made available to Pharmastem their data with respect to individual units. Pharmastem, however, did not have its infringement expert, Dr. Mary Hendrix ("Dr.Hendrix"), testify regarding whether the data indicated that any of the defendants' units infringed. In fact, Dr. Hendrix testified that she did not review the defendants' data. Hendrix Tr. at 1038. Rather, Dr. Hendrix based her infringement opinion on the fact that the defendants "promise stem cells for pediatric and adult transplantation." *Pharmastem,* 2004 WL 2127192, at *11.

In addition, Pharmastem presented no evidence to the court regarding how to quantify the defendants' infringement and damages flowing from the infringement. Instead, Pharmastem chose to offer the evidence of successful adult transplants to prove that 100% of the defendants' units infringe. However, evidence of one successful adult transplant with a single cord blood unit does not prove that any other unit has sufficient stem cells to reconstitute a human adult because, as previously stated, cord blood units are highly variable in their stem cell content. As such, the court will not infer that 100% of the defendants' units infringe based on the defendants' statements regarding adult transplantation. Pharmastem failed to present evidence to the jury from which it could conclude that any specific cord blood unit or units stored by any of the defendants contained stem cells in a sufficient amount to reconstitute a human adult. The court, therefore, cannot determine which or how many of the defendants' units infringe, or how to quantify damages for infringement. Thus, the defendants are entitled to JMOL because there was no legally sufficient evidentiary basis for a reasonable jury to find that all, or any specific number, of the defendants cord blood units infringe the '681 patent.

### ORDER

For the reasons set forth in the court's Memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:
1. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Partial Reconsideration of the Court's Post-Trial Rulings (D.I.547, 551, 552) is GRANTED.
2. PharmaStem, Inc.'s Motion for a Preliminary Injunction (D.I.558) is DENIED as moot.
3. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Entry of Separate and Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b) (D.I.547, 548, 552) is DENIED as moot.
4. The Motion by ViaCell, Inc., Cryo-Cell, Inc., CorCell, Inc., CBR Systems, Inc. for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) (D.I.547, 549, 552) is DENIED as moot.
*5 5. Pharmastem, Inc.'s Motion for Entry of Final Judgment Pursuant to Federal Rule of Civil Procedure 54(b) (D.I.563) is DENIED as moot.
6. The clerk shall enter judgment in favor of the defendants and against the plaintiff on the claim of infringement of U.S. Patent No. B1 5,004,681.


D.Del.,2004.
Pharmastem Therapeutics, Inc. v. Viacell, Inc.
Not Reported in F.Supp.2d, 2004 WL 2898061 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 23310808 (Verdict and Settlement Summary) (Oct. 29, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 396310 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Darren SEAWRIGHT, Petitioner,
v.
Thomas CARROLL, Warden, and M. Jane Brady,
Attorney General of the State of Delaware,
Respondents.
No. Civ.A. 02-1258-KAJ.

March 2, 2004.

Darren Lamont Seawright, pro se, Smyrna, DE, for
Petitioner.
Loren C. Meyers, Department of Justice,
Wilmington, DE, for Respondents.

*MEMORANDUM ORDER*

JORDAN, J.
*1 On August 14, 2003, this Court dismissed as
procedurally barred Darren Seawright's petition for a
writ of habeas. (D.I.42.) In reaching this conclusion,
the Court determined that Seawright had failed to
exhaust state remedies for his federal habeas claims,
and that he did not provide any cause for the default
or demonstrate any prejudice resulting therefrom.
Moreover, Seawright did not present any evidence of
actual innocence, thereby failing to show that a
miscarriage of justice would result if the Court did
not review his petition.

The Court has now received a timely "Motion for
Reconsideration" from Seawright. [FN1] (D.I.43.)
Seawright's Motion for Reconsideration alleges that
his appellate counsel provided ineffective assistance
of counsel when, despite Seawright's urging, his
counsel decided not to include certain issues in
Seawright's appeal. Seawright contends that the
omitted issues are the ones this Court found to be
procedurally defaulted. Seawright further argues that
his appellate counsel's alleged ineffective assistance
constitutes cause to excuse the default, thereby
permitting federal habeas review of his claims. For
the following reasons, the Court will deny
Seawright's Motion for Reconsideration. (D.I.14.)

FN1. A motion for reconsideration must be

filed no later than 10 days after the entry of
judgment. Fed.R.Civ.P. 59(e). However, in
calculating the time period, Saturdays and
Sundays are excluded. Fed .R.Civ.P. 6(a).
The Court's judgment was entered on
August 14, 2003, and Seawright filed his
motion on August 26, 2003. Excluding the
intervening Saturday and Sunday renders his
motion timely.

I. STANDARD OF REVIEW

The purpose of a motion for reconsideration is to
correct manifest errors of law or fact or to present
newly discovered evidence. *Harsco Corp. v.
Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985).
Accordingly, a court may grant a motion for
reconsideration if the moving party shows one of the
following: (1) an intervening change in the
controlling law; (2) the availability of new evidence
that was not available when the court issued its order;
or (3) the need to correct a clear error of law or fact
or to prevent a manifest injustice. *Max's Seafood
Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999)
(citing *North River Ins. Co. v. CIGNA Reinsurance
Co.,* 52 F.3d 1194, 1218 (3d Cir.1995). A motion for
reconsideration is not appropriate to reargue issues
that the court has already considered and decided.
*Brambles USA Inc. v. Blocker,* 735 F.Supp. 1239,
1240 (D.Del.1990).

II. DISCUSSION

Seawright has not provided any ground warranting
reconsideration of his habeas petition. Seawright does
not identify any intervening change of law, nor does
he offer any new evidence that was previously
unavailable. Indeed, the letters Seawright provides to
support his claim are dated August and October 2000.
(D.I.43.) The Delaware Supreme Court decided his
appeal in 2001, and Seawright filed his habeas
petition on July 21, 2002. Clearly, Seawright was
well aware of any alleged ineffectiveness before he
filed his habeas petition, yet he failed to include this
claim in his petition or in his response to the
Respondent's Answer. (*See* D.I. 2; D.I. 41.)

To the extent that Seawright suggests that the Court
committed a clear error of law, the Court is
unpersuaded. The Court also concludes that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 396310 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

manifest injustice will not result by denying
Seawright's motion for reconsideration.

### III. CONCLUSION

**\*2** For these reasons, IT IS HEREBY ORDERED
THAT:

Petitioner   Darren   Seawright's   Motion   for
Reconsideration is DENIED. (D.I.43.)

D.Del.,2004.
Seawright v. Carroll
Not Reported in F.Supp.2d, 2004 WL 396310
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV01258 (Docket) (Jul. 01, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4

2005 WL 3540990                                                                Page 1
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
**(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))**

⊞

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

Appellate Court of Illinois,
Fifth District.
Marvin SMITH, Roberta Smith, Pam Runnells, Mark
Chaney, Teddie Maxton, Max
Dearman, Thomas Trigg, Cheryl Trigg, Klaudine
Kwiatakowski, Larry Galbraith,
and Shirley Galbraith, All Individually and as
Representatives of All Persons
and Entities Who Are Members of the Class
Described Herein, Plaintiffs-
Appellees,
v.
ILLINOIS CENTRAL RAILROAD COMPANY,
d/b/a Canadian National/Illinois Central
Railroad, Defendant-Appellant.
**No. 5-04-0411.**

Dec. 27, 2005.

**Background:** Purported class action was brought
against railroad, arising out of a train derailment that
exposed individuals and businesses to toxic
chemicals and prompted a mandatory evacuation.
The Circuit Court, Perry County, Michael J.
O'Malley, J., certified class of individuals and
businesses affected by the derailment. Railroad
petitioned for leave to appeal, and the Appellate
Court denied the petition. Railroad petitioned for
leave to appeal, and the Supreme Court denied
petition but ordered Appellate Court to consider
appeal on the merits.

**Holdings:** The Appellate Court, Donovan, J., held
that:

(1) trial court was not precluded from determining
that proposed class satisfied the commonality
requirement;

(2) trial court did not abuse its discretion by
determining that class satisfied commonality
requirement;

(3) sufficient evidence established that class

satisfied the numerosity requirement; and
(4) issue of whether trial court's definition of class
was overbroad would be remanded.
Affirmed, and remanded with directions.

Welch, J., filed dissenting opinion.

**[1] Parties** ☜⟶35.1

287k35.1 Most Cited Cases
The recognized objectives of class actions include
judicial economy and efficiency, the protection of
defendants from inconsistent obligations, the
protection of the interests of absentees, access to
judicial relief for small claimants, and enhanced
means for private attorney general suits to enforce
laws and deter wrongdoing. S.H.A. 735 ILCS 5/2-
801.

**[2] Courts** ☜⟶97(1)
106k97(1) Most Cited Cases
Illinois statute governing class certification is
patterned after federal rule governing class
certification, and the federal decisions interpreting
such rule constitute persuasive authority for class
certification issues in Illinois. Fed.Rules
Civ.Proc.Rule 23, 28 U.S.C.A.; S.H.A. 735 ILCS
5/2-801.

**[3] Appeal and Error** ☜⟶949
30k949 Most Cited Cases
Decisions regarding class certification are within the
sound discretion of the trial court and should be
overturned only where the court clearly abused its
discretion or applied impermissible legal criteria.
S.H.A. 735 ILCS 5/2-801.

**[3] Parties** ☜⟶35.9
287k35.9 Most Cited Cases
Decisions regarding class certification are within the
sound discretion of the trial court and should be
overturned only where the court clearly abused its
discretion or applied impermissible legal criteria.
S.H.A. 735 ILCS 5/2-801.

**[4] Parties** ☜⟶35.17
287k35.17 Most Cited Cases
Commonality requirement for class certification
requires that there be questions of fact or law
common to the class that predominate over other

questions affecting only individual class members. S.H.A. 735 ILCS 5/2-801.

## [5] Parties ☜35.17
287k35.17 Most Cited Cases

A single issue common to all members of a proposed class will satisfy the commonality requirement for class certification if it predominates. S.H.A. 735 ILCS 5/2-801.

## [6] Parties ☜35.13
287k35.13 Most Cited Cases

## [6] Parties ☜35.17
287k35.17 Most Cited Cases

Factual differences will not render a claim atypical, for purposes of the commonality requirement for class certification, if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members and if it is based on the same legal theory. S.H.A. 735 ILCS 5/2-801.

## [7] Parties ☜35.17
287k35.17 Most Cited Cases

A class action can properly be prosecuted where the defendant allegedly acted in the same basic manner with respect to an entire class, and it will not be defeated for failure to satisfy the commonality requirement for class certification solely because of some factual variations among the grievances of class members. S.H.A. 735 ILCS 5/2-801.

## [8] Parties ☜35.17
287k35.17 Most Cited Cases

In order to satisfy the commonality requirement for class certification, it must be shown that successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members. S.H.A. 735 ILCS 5/2-801.

## [9] Parties ☜35.69
287k35.69 Most Cited Cases

Trial court was not precluded from determining that proposed class of individuals and businesses affected by train derailment satisfied the commonality requirement for class certification, even if class members' particular damages were not identical; class-wide questions of liability, arising from a common nucleus of operative facts, could still predominate over such individual damage issues. S.H.A. 735 ILCS 5/2-801.

## [10] Parties ☜35.69
287k35.69 Most Cited Cases

Trial court did not abuse its discretion in class action against railroad arising out of a train derailment by determining that proposed class of individuals and businesses affected by derailment satisfied commonality requirement for class certification; liability could be determined on a class-wide basis since all claims arose from single catastrophic event, and requiring class members to separately litigate such issues would be an extreme waste of judicial resources. S.H.A. 735 ILCS 5/2-801.

## [11] Parties ☜35.17
287k35.17 Most Cited Cases

If differences in the amounts of individual damages would make a class action improper due to failure to satisfy the commonality requirement for class certification, a class action for damages would never be possible because variations in the amounts of damages among class members are inevitable. S.H.A. 735 ILCS 5/2-801.

## [12] Parties ☜35.69
287k35.69 Most Cited Cases

Sufficient evidence established that proposed class of individuals and businesses affected by train derailment satisfied the numerosity requirement for class certification; more than 430 individuals signed representation agreements with counsel for class representatives, approximately 1,000 people were impacted by the derailment and resulting mandatory evacuation, and putative class members were not easily identified and located, had varying claim values, and were not particularly sophisticated in the litigation process. S.H.A. 735 ILCS 5/2-801.

## [13] Parties ☜35.11
287k35.11 Most Cited Cases

To satisfy the prerequisites for the maintenance of a class action, the representatives must show that the class is so numerous that the joinder of all members is impracticable, but they need not show that a joinder is impossible. S.H.A. 735 ILCS 5/2-801.

## [14] Parties ☜35.11
287k35.11 Most Cited Cases

## [14] Parties ☜35.33
287k35.33 Most Cited Cases

The impracticality of joinder of all class members, so as to satisfy the numerosity requirement for class certification, must be determined in the context of the particular litigation, because there is no magic number that clearly defines numerosity; some evidence of the number of class members must be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3540990
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))

Case 1:05-cv-00162-JJF     Document 99     Filed 03/06/2006     Page 22 of 34
Page 3

shown, but the exact class size is not required, and a good-faith estimate is sufficient when the number of class members is not readily ascertainable. S.H.A. 735 ILCS 5/2-801.

[15] Parties ⚖35.11
287k35.11 Most Cited Cases
Numerosity.
Additional reasons why joinder of the members of a relatively small class may be impractical, so as to satisfy the numerosity requirement for class certification, include the class members' geographical distribution, the ability to identify and locate putative class members, the degree of knowledge and sophistication of the class members and their need for protection, the amounts of the claims of individual class members, and the nature of the cause of action. S.H.A. 735 ILCS 5/2-801.

[16] Appeal and Error ⚖1178(1)
30k1178(1) Most Cited Cases
Issue of whether trial court's definition of class of individuals and businesses affected by train derailment was overbroad, due to its use of the geographic terms "vicinity" and "environs" and its limitation of membership to entities sustaining "legally cognizable damages" would be remanded for consideration by the trial court; trial court did not have opportunity to consider the objections to the definition, and court had broad discretion to limit or redefine the class to correct any deficiencies. S.H.A. 735 ILCS 5/2-801.

[17] Parties ⚖35.41
287k35.41 Most Cited Cases
A class must be sufficiently defined so that it is identifiable; an identifiable and definite class exists if it is defined in terms of objective criteria for membership. S.H.A. 735 ILCS 5/2-801.

[18] Parties ⚖35.41
287k35.41 Most Cited Cases
A court has broad discretion in a class action to limit or redefine the class definition to correct deficiencies. S.H.A. 735 ILCS 5/2-801.
Kurt E. Reitz, Robert J. Wagner, Heath H. Hooks, Thompson Coburn LLP, Belleville, for Appellant.

Edward J. Kionka, Belleville; Joseph M. Leberman, Bryant & Kautz, P.C., Marion; JoDee Favre, Law Office of JoDee Favre, Belleville, for Appellees.

Justice DONOVAN delivered the opinion of the court:

*1 The plaintiffs filed a negligence action against the defendant, Illinois Central Railroad Company, doing business as Canadian National/Illinois Central Railroad (the railroad), in the circuit court of Perry County, Illinois, on behalf of themselves and those persons and businesses who sustained personal injuries and property damages as a result of the derailment of the railroad's freight train in Tamaroa, Illinois, on February 9, 2003. The plaintiffs moved to certify the case as a class action. The circuit court granted the motion and the railroad appealed. On appeal, the railroad contends that the circuit court applied an erroneous legal standard or abused its discretion in finding that the class satisfied the commonality and numerosity requirements for class certification, and it further contends that the order certifying the class must be reversed because the class definition does not specify the conditions for class membership in clear and objective terms.

I. BACKGROUND AND PROCEDURAL HISTORY
According to the record, 11 plaintiffs sought to bring an action against the railroad in the circuit court of Perry County on behalf of themselves and those persons and businesses who sustained injuries and damages as a result of the derailment of the railroad's freight train in Tamaroa, Illinois. The complaint contains counts for negligence, res ipsa loquitur, nuisance, abnormally dangerous activity, and trespass. It includes the following factual allegations. On Sunday, February 9, 2003, 21 cars on the railroad's northbound freight train derailed in Tamaroa, Illinois. Tank cars carrying hydrochloric acid, vinyl chloride, methanol, and a methanol/formaldehyde mixture ruptured, and the contents thereof were spilled into the surrounding environment, including the ground, water, and air. Some of the cars containing methanol caught fire and burned. As a result of the chemical spill, the area within a three-mile radius of the derailment was subject to a mandatory evacuation and more than 1,000 Tamaroa residents were evacuated. Additional discharges or leaks occurred at the derailment site subsequent to February 9, 2003, including on February 20, 2003, and May 7, 2003.

The plaintiffs moved for class status and the railroad objected. Following a hearing, the circuit court granted the motion to certify the class. The certification order identified the class as follows: "All persons, firms, and legal entities residing, maintaining a place of business, owning property, employed or attending school, or otherwise present in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or in the vicinity of Tamaroa, Illinois, or its environs on or after February 9, February 20, or May 7, 2003, and who or which have sustained legally cognizable compensatory or punitive damages or may incur or may claim to have incurred legally cognizable compensatory or punitive damages as a proximate result of the Canadian National train derailment which occurred on February 9, 2003, in Tamaroa, Illinois." The railroad sought interlocutory review. We initially denied the railroad's petition for leave to appeal on August 12, 2004. The railroad then petitioned for leave to appeal to the Illinois Supreme Court. The Illinois Supreme Court denied the petition but issued a supervisory order directing this court to vacate the order denying interlocutory review and to consider the class certification issue on the merits. *Smith v. Illinois Central R.R. Co.,* 212 Ill.2d 554, 288 Ill.Dec. 243, 817 N.E.2d 893 (2004) (supervisory order).

## II. ANALYSIS

### A. The Class Certification Requirements

**\*2** [1] Created in the English courts of chancery as a convenient tool to afford partial justice to parties unable to join under the then-compulsory joinder rules, class action suits have been recognized as an acceptable method in appropriate cases to advance the efficiency and economy of litigation, which is a principal purpose of the procedure. See *Hansberry v. Lee,* 311 U.S. 32, 41-42, 61 S.Ct. 115, 118, 85 L.Ed. 22, 27 (1940); 1 A. Conte & H. Newberg, Newberg on Class Actions § 1:6, at 25 (4th ed.2002). The recognized objectives of class actions include judicial economy and efficiency, the protection of defendants from inconsistent obligations, the protection of the interests of absentees, access to judicial relief for small claimants, and enhanced means for private attorney general suits to enforce laws and deter wrongdoing. 1 Newberg on Class Actions § 1:6, at 27-28.

[2][3] In Illinois, class certification is governed by section 2-801 of the Code of Civil Procedure (735 ILCS 5/2-801 (West 1998)). Under section 2- 801, a class may be certified only if the proponent establishes the following: (1) the class is so numerous that a joinder of all members is impracticable, (2) there are questions of fact or law common to the class that predominate over any questions affecting only individual members, (3) the representative parties will fairly and adequately protect the interest of the class, and (4) the class action is an appropriate method for the fair and efficient adjudication of the controversy. 735 ILCS 5/2-801 (West 1998). Section 2-801 is patterned after Rule 23 of the Federal Rules

of Civil Procedure (Fed.R.Civ.P. 23), and the federal decisions interpreting Rule 23 constitute persuasive authority for class certification issues in Illinois. *Avery v. State Farm Mutual Auto. Insurance Co.,* 216 Ill.2d 100, 125, 296 Ill.Dec. 448, 835 N.E.2d 801, 819 (2005); *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 341, 13 Ill.Dec. 699, 371 N.E.2d 634, 644-45 (1977). Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. *McCabe v. Burgess,* 75 Ill.2d 457, 464-65, 27 Ill.Dec. 501, 389 N.E.2d 565, 568 (1979).

### B. The Commonality Requirement

[4][5][6] "Commonality" requires that there be questions of fact or law common to the class that predominate over other questions affecting only individual class members. 735 ILCS 5/2-801 (West 1998); *Steinberg,* 69 Ill.2d at 338, 13 Ill.Dec. 699, 371 N.E.2d at 643. A single issue common to all members of the class will satisfy the requirement if it predominates. 1 Newberg on Class Actions § 3:10, at 273-74; 5 Newberg on Class Actions § 17:10, at 321. Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members and if it is based on the same legal theory. 1 Newberg on Class Actions § 3:15, at 335-56.

**\*3** [7][8] A class action can properly be prosecuted where the defendant allegedly acted in the same basic manner with respect to an entire class, and it will not be defeated solely because of some factual variations among the grievances of class members. *Steinberg,* 69 Ill.2d at 340-41, 13 Ill.Dec. 699, 371 N.E.2d at 644; *Saldana v. American Mutual Corp.,* 97 Ill.App.3d 334, 337, 52 Ill.Dec. 651, 422 N.E.2d 860, 862 (1981). In order to satisfy the commonality requirement of section 2-801, it must be shown that " 'successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members.' " *Avery,* 216 Ill.2d at 128, 296 Ill.Dec. 448, 835 N.E.2d at 821 (quoting *Goetz v. Village of Hoffman Estates,* 62 Ill.App.3d 233, 236, 19 Ill.Dec. 401, 378 N.E.2d 1276, 1279 (1978)).

[9] On appeal, the railroad contends that the circuit court applied an "unprecedented and erroneous legal standard" in determining that there are questions of fact or law common to the class which predominate over questions affecting the individual class members. In support of its contention, the railroad

2005 WL 3540990
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))

Case 1:05-cv-00162-JJF   Document 99   Filed 03/06/2006   Page 24 of 34   Page 5

suggests that personal injury actions should not be certified as class actions because those actions would trigger an unworkable array of factually-intensive-and-claimant-specific questions and would "inexorably devolve" into hundreds of minitrials that defy class treatment.

We reject the contention that the circuit court employed an "unprecedented and erroneous legal standard" in determining the commonality issue, for a number of reasons. First, the record clearly illustrates that the circuit court carefully considered whether the factual issues and the elements of the legal theories alleged were subject to class-wide proofs versus individual proofs and whether the class-wide questions were predominant. Next, we are unaware of any blanket declaration by any court, state or federal, stating that class certification may be denied simply because an action may be classified as a mass tort.

Historically, the courts were reluctant to employ class certification in mass tort cases on the grounds that plaintiffs who assert personal injuries or wrongful death should be permitted to control their own actions and that significant questions regarding damages and affirmative defenses would require multiple minitrials, but that no longer appears to be the prevailing view. See 5 Newberg on Class Actions § 17:5, at 309-10. In fact, we have reviewed a number of state and federal decisions wherein the reviewing court found the class action suit to be the most appropriate procedural vehicle for the management of an action based on a single catastrophic incident such as a train derailment. For a representative, but admittedly noncomprehensive, sample of such decisions, see *Sala v. National R.R. Passenger Corp.*, 120 F.R.D. 494 (E.D.Pa.1988) (an Amtrak train derailment); *Summons v. Missouri Pacific R.R.*, 306 Ark. 116, 813 S.W.2d 240 (1991) (an overturned chemical tank car); *Louisville & Nashville R.R. Co. v. Wollenmann*, 180 Ind.App. 588, 390 N.E.2d 669 (1979) (overturned tanker cars filled with liquid propane); *Livingston Parish Police Jury v. Illinois Central Gulf R.R. Co.*, 432 So.2d 1027 (La.App.1983) (a train derailment); *Reynolds v. CSX Transportation, Inc.*, 55 Ohio App.3d 19, 561 N.E.2d 1047 (1989) (a train derailment with phosphorous fire).

*4 In the *Reynolds v. CSX Transportation, Inc.*, case, the Ohio Court of Appeals affirmed the circuit court's decision to grant certification in an action for money damages instituted on behalf of persons evacuated from their homes and businesses after a tanker car containing phosphorous derailed and its contents

caught fire, sending a thick cloud of smoke through a number of residential and commercial districts beyond the site of the derailment. *Reynolds*, 55 Ohio App.3d 19, 561 N.E.2d 1047. The appellate court found that all the prerequisites for class action status had been satisfied for five subclasses and that the trial court did not abuse its discretion in determining that the issues of negligence and malice predominated over the individualized issues of proximate cause and compensatory damages. *Reynolds*, 55 Ohio App.3d at 24, 561 N.E.2d at 1052.

In *Livingston Parish Police Jury v. Illinois Central Gulf R.R. Co.*, another case involving a train derailment and mandatory evacuation, an action was filed on behalf of the residents of Livingston Parish who alleged personal and property damages as a result of a train derailment and the forced evacuation of 3,000 residents. *Livingston Parish Police Jury*, 432 So.2d 1027. In that case, the Illinois Central Gulf Railroad Company argued that a mass accident case was unsuitable for class action treatment. The lower court rejected the railroad's assertion and the appellate court affirmed. The appellate court determined that class certification was appropriate where the action arose from a single event and the prosecution of numerous separate actions would seriously threaten the ability of individual class members with relatively small claims to protect their interests. *Livingston Parish Police Jury*, 432 So.2d at 1032-34.

Our research also yielded cases wherein class certification was deemed appropriate in mass tort actions alleging exposures to hazardous substances. See, *e.g.*, *LeClercq v. The Lockformer Co.*, No. 00-C-7164, order at 5-6, 2001 WL 199840 (N.D.Ill. February 28, 2001) (memorandum opinion and order); *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988); *Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D.Mich.2001), *aff'd*, 383 F.3d 495 (6th Cir.2004).

In *LeClercq v. The Lockformer Co.*, a federal district court in Illinois granted class action status in a mass tort case involving trichloroethylene contamination, finding that the proof regarding the defendant's history of operations, the spillage, the level and duration of the contamination, the impact on the land, soil, and water, and possible remedies would be identical and that the amount of damages sustained by each class member could be reserved for individualized treatment. *LeClercq*, order at 5-6 (and cases cited therein).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3540990
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))

Case 1:05-cv-00162-JJF    Document 99    Filed 03/06/2006    Page 25 of 34
Page 6

In *Sterling v. Velsicol Chemical Corp.,* the Sixth Circuit Court of Appeals affirmed the district court's decision to certify an action filed on behalf of residents who lived near the defendant's landfill and who allegedly suffered personal injuries and property damage from exposure to chemicals leaking from the defendant's landfill, finding that almost identical evidence would be required to establish the defendant's liability and the level and duration of contamination and that the single issue distinguishing the class members--the amount of damages that each resident sustained--could be reserved for individualized treatment. *Sterling,* 855 F.2d at 1197. The Sixth Circuit stated, "[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling,* 855 F.2d at 1197.

\*5 In *Olden v. LaFarge Corp.,* the Sixth Circuit affirmed the district court's decision to grant class certification in an action filed against a cement manufacturing plant on behalf of nearby homeowners who alleged that they sustained personal injuries and property damages caused by toxic cement dust spewed from the plant. *Olden,* 383 F.3d at 508-11. The Sixth Circuit determined that there were common issues, including the defendant's conduct, foreseeability, and the fact of damages resulting from toxins, which predominated over the individual issues and that the individualized personal medical issues and minor property damages could be dealt with in the damages phase. *Olden,* 383 F.3d at 508-11.

In the aforementioned catastrophic-incident cases, a court found that the putative class members' claims arose from the same course of conduct and a common nucleus of operative facts so that almost identical evidence would be required to establish the defendant's liability and that the liability issues predominated over the individual questions of proximate cause and damages. In each case, a court considered the objectives of the class action and concluded that even if the action should evolve into a series of minitrials on damages, the resolution of the common issues would represent a substantial savings in time and resources and that the application of the class action device should be given serious consideration. These cases clearly illustrate that the commonality requirement can be met despite the differences in individual claims of injuries and damages. The railroad's claim that the circuit court applied an unprecedented and erroneous legal standard in considering the commonality requirement

is without merit.

[10] The railroad also contends that the circuit court abused its discretion in finding that the plaintiffs satisfied the commonality requirement for class certification.

In this case, the circuit court determined that there were common questions, "including the legal duties owed to the proposed plaintiffs; all liability questions relating to the cause of the occurrence; whether Canadian National breached duties owed to persons in the vicinity of the spill; the nature of the chemicals; the types of damages that are related to the chemicals in question; [and] the effect of these chemicals on persons and property." The court also determined that the common questions predominate over questions involving individual class members.

According to the record, the fact of the derailment is common to all potential class members. The court correctly concluded that the railroad's liability could be determined on a class-wide basis because the claims arise from a single catastrophic event with a common nucleus of operative facts. In the absence of class action status, each claimant would be required to prove the facts surrounding the derailment, the railroad's history of operations, the railroad's breach of duty, the content of the substances spilled, the level and duration of the contamination, including the impact upon the land, soil, water, and real property, and the causal connection between human exposure to the chemicals and contaminants and the types of injuries suffered.

\*6 In our view, requiring the parties to litigate the same liability issues over and over would be an extraordinary waste of judicial resources and would impose an extreme burden on the court and the jurors of Perry County. According to the numbers from the Administrative Office of the Illinois Courts, the Perry County circuit court disposed of 106 law cases in 2004, 4 of which were terminated by jury verdict, and 419 law cases were pending; in 2004, the average time from filing to jury verdict was 24.4 months. Administrative Office of the Illinois Courts, 2004 Annual Report of the Illinois Courts, Statistical Summary 55, 56. In 2003, the court disposed of 123 law cases, 3 of which were terminated by jury verdict (Administrative Office of the Illinois Courts, 2003 Annual Report of the Illinois Courts, Statistical Summary 55), and in 2002, the court disposed of 101 civil cases, 2 of which were terminated by jury verdict (Administrative Office of the Illinois Courts, 2002 Annual Report of the Illinois Courts, Statistical

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3540990
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))

Case 1:05-cv-00162-JJF    Document 99    Filed 03/06/2006    Page 26 of 34    Page 7

Summary 55). The prospect of filing an additional 200 to 1,000 jury cases could overwhelm the court system. In terms of deciding the most appropriate and efficient way to proceed with this case, due deference ought to be given to the judge assigned to this circuit, who routinely handles case-management issues, knows the docket, and is intimately familiar with the pending case and the lawyers and parties involved and consequently is in a superior position to analyze the difficulties of class actions and anticipate the challenges of the pending case.

[11] The issues distinguishing the class members are the extent of each member's exposure to harmful contaminants and the resulting personal injuries and property damages sustained. If differences in the amounts of individual damages would make a class action improper, a class action for damages would never be possible because variations in the amounts of damages among class members are inevitable. 1 Newberg on Class Actions § 3:16, at 370. Decades ago, the Illinois Supreme Court recognized that the commonality requirement is not destroyed merely because there are individual questions peculiar to some members. *Steinberg,* 69 Ill.2d at 340-42, 13 Ill.Dec. 699, 371 N.E.2d at 644- 45. Giving a nod to the pathway cut by the federal courts, the supreme court stated that various procedures, such as the establishment of subclasses or split trials where the same jury considers individualized or grouped damages claims after the common issues have been resolved, could be utilized to resolve individualized questions. *Steinberg,* 69 Ill.2d at 340-42, 13 Ill.Dec. 699, 371 N.E.2d at 644-45.

In this case, the record reveals that the circuit court's finding that the liability issues are predominant and pervasive in the class is supported in the record. A class action would be a fair and efficient method for disposing of the litigation because it would resolve the predominant issues, thereby avoiding a multiplicity of suits and possible inconsistent results. If the fact finder determines the liability issues in favor of the railroad, then the case is over. If the fact finder finds in favor of the class, then there will be individual issues remaining with respect to the damages. In either case, judicial economy will be preserved because the common issues constitute a significant and substantial part of the litigation, the resolution of which will advance the resolution of the controversy. We find no abuse of discretion.

### C. The Numerosity Requirement

\*7 [12][13][14] The railroad also claims that the class does not encompass a sufficiently numerous

group of persons or entities who have common and cognizable exposure claims. In order to satisfy the prerequisites for the maintenance of a class action, the representatives must show that the class is so numerous that the joinder of all members is impracticable, but they need not show that a joinder is impossible. 1 Newberg on Class Actions § 3:4, at 230. The impracticality of a joinder must be determined in the context of the particular litigation, because there is no magic number that clearly defines numerosity. See 1 Newberg on Class Actions § 3:3, at 225; *Wood River Area Development Corp. v. Germania Federal Savings & Loan Ass'n,* 198 Ill.App.3d 445, 449-50, 144 Ill.Dec. 631, 555 N.E.2d 1150, 1153 (1990). Some evidence of the number of class members must be shown, but the exact class size is not required, and a good-faith estimate is sufficient when the number of class members is not readily ascertainable. See 1 Newberg on Class Actions § 3:5, at 233; see also *Livingston Parish Police Jury,* 432 So.2d at 1030 (the plaintiffs' estimate that some 3,000 residents were adversely affected by the train derailment and suffered property damages was sufficient to meet the numerosity requirement for class certification); *Sala,* 120 F.R.D. 494 (a class of 40 to 50 passengers allegedly injured as a result of the derailment of an Amtrak train was sufficient to satisfy the numerosity requirement); *LeClercq,* order at 3-4 (in a mass tort case alleging the release of hazardous substances from a landfill, the numerosity requirement was met where the plaintiffs alleged that more than 100 homes were affected and plaintiffs submitted a list of 130 clients who lived in the proposed geographic area); *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 184 (N.D.Ill.1992) (the court found that a potential class of 129 to 300 members met the numerosity requirement where the plaintiffs' estimate was established through public documents and common-sense assumptions).

[15] When the number of class members is fairly small, courts have required a demonstration of additional reasons why a joinder is impractical. *Wood River Area Development Corp.,* 198 Ill.App.3d at 450-51, 144 Ill.Dec. 631, 555 N.E.2d at 1153-54. These additional reasons include the class members' geographical distribution, the ability to identify and locate putative class members, the degree of knowledge and sophistication of the class members and their need for protection, the amounts of the claims of individual class members, and the nature of the cause of action. *Wood River Area Development Corp.,* 198 Ill.App.3d at 450-51, 144 Ill.Dec. 631, 555 N.E.2d at 1153-54; *Kulins v. Malco, A Microdot*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3540990
--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)
(Cite as: 2005 WL 3540990 (Ill.App. 5 Dist.))

Case 1:05-cv-00162-JJF    Document 99    Filed 03/06/2006    Page 27 of 34    Page 8

_Co.,_ 121 Ill.App.3d 520, 530, 76 Ill.Dec. 903, 459 N.E.2d 1038, 1046 (1984).

In the case at bar, the circuit court found that the numerosity requirement was met where the record showed that potential claimants number in the hundreds. The court also found that the costs of litigation would make it economically unfeasible for many of the potential claimants with small or modest damages to bring an individual action. The record supports these findings. The plaintiffs' counsel has represented that more than 430 individuals have signed representation agreements and that more than 200 of those have not signed releases. It is also estimated that approximately 1,000 people were impacted by the derailment and the evacuation. Given the Perry County circuit court's current docket and the plaintiffs' estimate of potential claimants, it appears that hundreds of additional individual suits would be unmanageable and could potentially cripple the Perry County circuit court. See _Kulins,_ 121 Ill.App.3d at 530, 76 Ill.Dec. 903, 459 N.E.2d at 1046. The record suggests that the putative class members in the case at bar are not easily identified and located for purposes of joinder and have varying claims values. The record also suggests that the class members are diverse and not particularly sophisticated in the litigation process. Despite the diversity, there is no indication that the named plaintiffs are inadequate class representatives or antagonistic to any unnamed persons or business entities. The trial court did not abuse its discretion in concluding that the numerosity requirement has been met.

### D. The Class Definition

\*8 [16] Next, the railroad contends that the class certification must be reversed because the class definition is "unworkably overbroad." More specifically, the railroad complains that the term "vicinity" and "environs" are not defined by geographic borders and that the limitation of membership to those who have sustained legally cognizable claims makes membership contingent upon whether a given person's claim is meritorious, and not objectively ascertainable without individualized fact-finding.

[17][18] A class must be sufficiently defined so that it is identifiable. An identifiable and definite class exists if it is defined in terms of objective criteria for membership. _LeClercq,_ order at 2; _Gomez v. Illinois State Board of Education,_ 117 F.R.D. 394, 397 (N.D.Ill.1987). A court has broad discretion to limit or redefine the class definition to correct deficiencies.

_Gomez,_ 117 F.R.D. at 397; 2 Newberg on Class Actions § 6.17, at 633.

Initially, we note that the circuit court did not have an opportunity to consider the railroad's objections. A preliminary review of the record leads us to conclude that any alleged deficiencies may be corrected. For example, the railroad contends that the class definition makes membership contingent upon whether a potential member's claim is meritorious. Neither the parties nor the court should be required to delve into the merits of the case to determine membership in the class. _LeClercq,_ order at 2. In order to alleviate any misconception that the phrase "persons who have sustained legally cognizable compensatory or punitive damages" requires a finding that membership requires proof of a meritorious claim, alternative language, such as "persons who make good-faith allegations that they have sustained compensatory or punitive damages," may be substituted. Likewise, "the vicinity" may be geographically delineated or further described. Rather than modify the definition at this stage, we refer this matter back to the circuit court to consider the objections and appropriate modifications in light of our discussion.

### III. CONCLUSION

On this record, the circuit court concluded that a class action could best secure the economies of time, effort, and expense and promote the uniformity of decisions, while accomplishing the other ends of equity and justice that class actions seek to obtain. The record supports the court's determination to certify the class. Because the class action device is flexible, it may be modified to accommodate newly discovered facts as they arise. See _Steinberg,_ 69 Ill.2d at 338, 13 Ill.Dec. 699, 371 N.E.2d at 643; _Gordon v. Boden,_ 224 Ill.App.3d 195, 202-03, 166 Ill.Dec. 503, 586 N.E.2d 461, 466 (1991).

Accordingly, the circuit court's decision to grant class certification is affirmed, and the cause is remanded to the circuit court with directions to consider the railroad's stated objections to the wording of the class definition and to make appropriate modifications in light of our discussion.

\*9 Affirmed; cause remanded with directions.

CHAPMAN, J., concurs.

Justice WELCH, dissenting:

I respectfully dissent. I believe the circuit court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

abused its discretion in certifying this class because the questions of law and fact common to the class do not predominate over any questions affecting only individual members. See 735 ILCS 5/2-801(2) (West 2004). This is precisely why no Illinois appellate court has ever approved class certification under circumstances similar to the case at bar.

Section 2-801(2) of the Illinois Code of Civil Procedure requires that, in order to be certified as a class action, the questions common to the class must *predominate* over any questions affecting only individual members. 735 ILCS 5/2-801(2) (West 2004). This is rarely true in mass tort personal injury actions and it is not true in the case at bar. The drafters of Federal Rules of Civil Procedure 23(b)(3), after which our rule is patterned, knew this:

"A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." Fed.R.Civ.P. 23(b)(3) Notes of Advisory Committee on Rules.

In *Morrissy v. Eli Lilly & Co.,* 76 Ill.App.3d 753, 759, 32 Ill.Dec. 30, 394 N.E.2d 1369 (1979), the appellate court also recognized that mass tort actions for damages do not lend themselves to class action status but belong to the type of action whose proof requirements preclude class maintenance. See also *Mele v. Howmedica, Inc.,* 348 Ill.App.3d 1, 22-24, 283 Ill.Dec. 738, 808 N.E.2d 1026 (2004).

In *Morrissy,* 76 Ill.App.3d at 759, 32 Ill.Dec. 30, 394 N.E.2d 1369, the appellate court distinguished between the type of class action arising out of a mass accident in which a number of people in an isolated condition sustain injuries suddenly under similar circumstances, where a class may be properly certified, from one such as the case at bar in which different kinds of injuries are alleged to have occurred under different circumstances to various class members and to continue for prolonged periods of time. The case at bar involves claims for personal injuries, emotional injuries, and property damages, some premised on an exposure to toxic chemicals, some premised on the evacuation, by claimants who were located at different distances from the derailment site, some inside homes or vehicles, some outside, some with preexisting conditions, some without. It does not involve, for example, an airplane accident where the class consists of passengers killed

or injured in the accident. In the case at bar, determinations of proximate cause and the existence and extent of damages predominate over any common issues. Furthermore, some of the class members signed releases after receiving compensation from the defendant, and the validity and extent of these releases must be litigated with respect to each such class member.

**\*10** While, as the majority states, a single issue common to all members of the class is sufficient to justify class certification if that common issue predominates over issues affecting only individual members, in the instant case the numerous issues that affect only individual members predominate over any common issues of law or fact. Questions such as the existence of damages, the proximate cause of damages, and the extent of damages are so individualized and so predominant that they are not appropriate for class action status. In a case such as this, the common questions simply do not predominate over the individual issues the court must address to resolve the claims of each of the individual class members.

In *Avery v. State Farm Mutual Auto. Insurance Co.,* the Illinois Supreme Court held that, in order to satisfy the commonality requirement of section 2-801, it must be shown that " 'successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members.' " *Avery v. State Farm Mutual Auto. Insurance Co.,* 216 Ill.2d 100, 128, 296 Ill.Dec. 448, 835 N.E.2d 801 (2005) (quoting *Goetz v. Village of Hoffman Estates,* 62 Ill.App.3d 233, 236, 19 Ill.Dec. 401, 378 N.E.2d 1276 (1978)). In such a case, all that should remain for nonrepresentative class members is to file proofs of their claim. That is not the case here where, although questions such as the cause of the train derailment and whether the railroad breached its duty of care may be common to all the class members, the questions of proximate cause and the existence and extent of damages certainly are not. That the injuries of a class representative may have been proximately caused by the defendant does not establish that the injuries of any other class member were caused by the defendant, nor does it establish the existence or extent of other class members' damages. Instead, minitrials must be held with respect to each class member to determine these individual issues. Indeed, it is likely that these individual issues will be the object of most of the efforts of the litigants, the court, and the jury.

I recognize that, as the majority points out, class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

actions have been approved of in mass tort personal injury actions in jurisdictions other than ours. Nevertheless, Illinois appellate courts have never approved of class certification in such a case. I believe that if Illinois is to begin certifying class actions in mass tort personal injury actions, the Illinois Supreme Court should take the lead, not the circuit court of Perry County or this court on appeal. Accordingly, I would have reversed the decision of the circuit court of Perry County certifying this class action.

--- N.E.2d ----, 2005 WL 3540990 (Ill.App. 5 Dist.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

Slip Copy                                                                    Page 1
Slip Copy, 2005 WL 3654381 (D.Del.)
**(Cite as: Slip Copy)**

⊞
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
            United States District Court,D. Delaware.
               Lily SPENCER Plaintiff, Plaintiff,
                            v.
         WAL-MART STORES, INC., Defendant.
                **No. Civ.A. 03-104-KAJ.**

                     June 24, 2005.

               MEMORANDUM ORDER

JORDAN, J.

         I. INTRODUCTION & BACKGROUND

*1 Presently before me is a Motion to Alter or
Amend Judgment and Motion for Relief from
Judgment (Docket Item ["D.I."] 91; the "Motion")
filed by Lily Spencer ("Plaintiff") pursuant to Federal
Rule of Civil Procedure 59(e). [FN1] Plaintiffs' Motion,
which is in essence a motion for reconsideration,
comes in response to my March 11, 2005 Opinion, in
which I ruled that Plaintiff was not entitled to lost
wages and denied Plaintiff's Motion to Amend
Judgment to Include Attorney's Fees. (D.I.90.)

         FN1. The factual background of the case is
         described in detail in *Spencer v. Wal-Mart
         Stores, Inc.,* C.A. No. 03-104-KAJ, 2005
         U.S. Dist. LEXIS 4373 (D.Del. March 11,
         2005).

              II. STANDARD OF REVIEW

A motion for reconsideration should be sparingly
granted. The purpose of a motion for reconsideration
is to correct manifest errors of law or fact or to
present newly discovered evidence. *Seawright v.
Carroll,* No. 02-1258-KAJ, 2004 WL 396310, at *1
(D.Del. Mar. 2, 2004) (citing *Harsco Corp. v.
Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985)). "A
motion for reconsideration is not appropriate to
reargue issues that the court has already considered
and denied." *Id.* (internal citation omitted). A court
may grant a motion for reconsideration "if the
moving party shows: (1) an intervening change in the
controlling law; (2) the availability of new evidence

that was not available when the court issued its order;
or (3) the need to correct a manifest injustice." *Id.*
(citing *Max's Seafood Café v. Quinteros,* 176 F.3d
669, 677 (3d Cir.1999)).

                   III. DISCUSSION

                A. *Lost Wages* [FN2]

         FN2. The terms "back pay" and "lost
         wages" are used interchangeably throughout
         this order.

Plaintiff argues that, although equitable in nature,
"the amount of back pay and front pay damages is
left to the jury" and, therefore, I should have only
"determined whether or not the jury's award was
based on a reasonable method of calculation." (D.I.
92 at 3.) However, the case Plaintiff cites, *Bates v.
Board of Educ.,* does not support her position. C.A.
No. 97-394-SLR, 2000 U.S. Dist. LEXIS 4873, *24-
25, 31 (D.Del. March 31, 2000). That case shows that
a jury can determine the amount of back pay and or
front pay that should be awarded, but the decision
makes clear that it is the province of the court to
determine if back pay or front pay is appropriate. *Id.*
at *24-25, 31. As to Plaintiff's argument that she is
entitled to back pay as an equitable remedy, I have
already ruled that she is not, and nothing has changed
in the interim to alter that decision. (D.I.90.)

                 B. *Attorney's Fees*

In her Motion, Plaintiff argues that I based my denial
of attorney's fees on the mistaken belief that the
settlement of the state workers compensation claim
occurred before the jury rendered a verdict in this
case. (D.I. 92 at 5-6.) Specifically, Plaintiff argues
that "[i]t was only after the jury awarded [her]
damages for lost wages and emotional distress that
she agreed to compromise her workers compensation
claim...." (*Id.* at 6.) Defendant does not dispute that
the settlement was reached after the jury rendered its
verdict, but instead argues that the timing is
inconsequential because Plaintiff will still receive
nothing as a result of this ligation. (D.I. 93 at 7.) As I
was under a misimpression as to the timing of the

settlement before issuing my last opinion, and because I think the timing is consequential, I will now reconsider my opinion in light of this newly presented evidence. (D.I. 90 at 8-10.)

**\*2** The case law is clear that in order to be a prevailing party for purposes of the attorney's fees, a party must "succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983) (internal quotations omitted). The Supreme Court has said "[t]his is a generous formulation that brings the plaintiff only across the statutory threshold." *Id.* In the instant case, at the time the jury verdict was rendered, Plaintiff received a monetary award for emotional distress, which is what she sought in bringing suit. (D.I.72.) The subsequent agreement to offset the recovery in her workers compensation case does not alter her prevailing party status. [FN3] When the verdict was rendered, Plaintiff had not yet entered into the settlement of her workers compensation case. (D.I. 72; D.I. 92, Attach. A.) The timing matters here because it demonstrates that Plaintiff had her victory in hand and made knowledgeable decisions about how best to use that limited victory to her advantage. This is a significantly different circumstance than what I had understood previously, which was that Plaintiff had gone into the trial having already bargained away her potential recovery. *But cf. Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 414, 423 (3d Cir.1993) (holding that "the reduction of a plaintiff's net recovery due to the offset of a jury verdict by prior settlements does not indicate that plaintiff failed to prove any of its claims at trial"). She is indeed a statutory prevailing party.

> FN3. Plaintiff argues that because the state workers compensation claim cannot include claims for emotional distress, any settlement of her workers compensation claim cannot be used to offset her emotional distress award. (D.I. 92 at 6.) The settlement agreement has no such restrictions. (D.I.93, Ex. B.) Consequently, I reaffirm the holding implicit in my earlier decision (D.I. 89 at 9-10) that the settlement of the workers compensation claim can be used by Defendant to offset the damages award for emotional distress.

Although the determination of whether a plaintiff is a prevailing party is "generous," it only brings the plaintiff "across the statutory threshold [,].... It

remains for the district court to determine what fee is 'reasonable.' " *Hensley,* 461 U.S. at 433. A reasonable fee is one that is adequate to attract competent counsel, but which does not produce a windfall for attorneys. *Pub. Interest Research Group of New Jersey, Inc. v. Windall,* F.3d 1179, 1185 (3d Cir.1995) (internal quotations omitted); *Blum v. Stenson,* 465 U.S. 886, 897 (1984). The starting point for determining the reasonableness of a fee is to calculate the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley,* 461 U.S. at 433. The result of this calculation is called the "lodestar;" the lodestar is presumed to be a reasonable fee. *See Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir.1990). There are, however, "other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.' " *Hensley,* 461 U.S. at 434. In fact, the degree of the success obtained is the most "critical factor" in the calculation of a "reasonable fee." *Id.* at 436. The most common scenario in which the "results obtained" has an effect on the calculation of a "reasonable fee" occurs when a plaintiff succeeds on only some of the claims for relief. *See, e.g., id.* (stating that, in such a situation, the questions that need to be answered are "did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded [and] did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award").

**\*3** In the context of enhancing the lodestar to account for excellent results, the Supreme Court stated that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee" and further said that the " 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 566 (1986). The Third Circuit subsequently held that the lodestar may be adjusted to account for the "results obtained," but such an adjustment is done solely with relation to "wholly or partially unsuccessful claims that are related to the litigation of the successful claims." *Rode,* 892 F.2d at 1183 (citing *Hensley,* 461 U.S. at 434-37). Further, "[t]his adjustment should be taken independently of the other adjustments and should be the first adjustment applied to the lodestar." *Id.* (internal citation omitted). Generally, "where a plaintiff prevails on one or more claims but not on others, fees shall not be awarded for time that would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not have been spent had the unsuccessful claims not been pursued." *Lanni v. New Jersey,* 259 F.3d 146, 151 (3d Cir.2001). If the claims were "were inter-related, nonfrivolous, and raised in good faith," *Hensley,* 461 U.S. at 435, it still may be proper to reduce an award of attorney's fees to account for a plaintiff's failure to succeed on all claims. *Buss v. Quigg,* No. 02-4053, 91 Fed. Appx. 759, 761 (3d Cir. Feb. 5, 2004). [FN4]

> FN4. Third Circuit Internal Operation Procedure 5.7 notes that the Court of Appeals, by tradition, does not cite non-precedential opinions; however, the citation of such opinions is not forbidden. *Cf.* Third Circuit Local Appellate Rule 28.3 ("[c]itations to federal decisions that have not been formally reported shall identify the court, docket number and date, and refer to the electronically transmitted decision").

The Third Circuit has stated that it is permissible to look at "the amount of damages awarded, ... compared with the amount of damages requested" when determining a reasonable fee. [FN5] *Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1042 (3d Cir.1996). In other words "the amount of damages awarded, when compared with the amount of damages requested may be one measure of how successful [a] plaintiff was in his or her action ." *General Instrument Corp. v. Nu-Tek Elecs. & Mfg.,* 197 F.3d 83, 91 (3d Cir.1999) (citing *Washington,* 89 F.3d at 1041) (also holding, however, "that comparison may be an imperfect measure ..."). [FN6]

> FN5. It is not permissible, however, to consider what percentage of the damage award the lodestar comprises, however. *Washington,* 89 F.3d at 1041. Such a rule "would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts ." *Id.* (quoting *City of Riverside v. Rivera,* 477 U.S. 561, 578 (1986) (plurality opinion)).

> FN6. Such an adjustment to the lodestar may conflict with the holding in *Rode, i.e.,* that the adjustment for "results obtained" is done solely with respect to the comparison of successful and unsuccessful claims. *See Rode* 892 F.2d at 1183. However, the Third

Circuit may have contemplated that the adjustment to the lodestar to account for a plaintiff's limited monetary success would be done after the first independent adjustment for the "results obtained."

The propriety of comparing the amount of damages awarded to the amount requested is supported by the Supreme Courts decision in *Farrar v. Hobby.,* 506 U.S. 103 (1992). In that case, the Court held that "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." 506 U.S. at 114. The logic of that statement supports the argument that more than "prevailing" is important in determining a "reasonable fee," that a qualitative assessment of the victory is also important, and that such an assessment may have a quantitative component.

In the case at bar, Plaintiff's counsel has submitted his hours worked and rates charged to come to a calculated lodestar of $149,320 and expenses of $4,957.34 for a total of 154,277.34. (D.I.79.) As a general matter I find these hours and rates reasonable, and chose not to reduce the hours or rates to reach a "reasonable fee." Instead I will determine if a general reduction of the lodestar is in order. *See Rode,* 892 F.2d at 1182 (stating that the court may account for limited success through the reduction of hours or a general reduction of the lodestar).

*4 Because of my ruling with respect to Plaintiff's claim for back pay, *see supra,* Part III A, Plaintiff prevailed on only one of her claims, namely her claim of emotional distress. The presentation of evidence at trial and its development in discovery were such that the back pay and emotional distress aspects of the case are not subject to simple compartmentalization. As the time spent on Plaintiff's successful and unsuccessful claims can be parsed, I am not required to reduce the award of attorney's fees to account for unsuccessful claims. *Lanni,* 259 F.3d at 151.

Instead, the primary factor I look to in order to adjust the lodestar to arrive at a "reasonable fee" is the limited success of Plaintiff on the one claim as to which she prevailed, namely the $12,000 in damages awarded for Plaintiff's emotional distress. Plaintiff did not benefit in any tangible way from this litigation, other than the $12,000 award. In fact, as part of the settlement of her workers compensation claim, Plaintiff agreed to officially terminate her employment with Defendant. Therefore, the only real

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

benefit Plaintiff received from this litigation is the $12,000, which she later bargained away. While in some cases, an award of $12,000 may be considered a significant success, this is surely not one of those cases. Plaintiff indicated in the pretrial briefing that potential damages amounted to $500,000, not including compensatory and punitive damages. (D.I. 47 at 20-21.) Comparing the actual award of $12,000 to the projected damages of over $500,000 shows that this litigation was a serious disappointment for Plaintiff.

Plaintiff's counsel are highly experienced and deservedly enjoy excellent reputations. Counsel no doubt believed that Plaintiff had a strong case and that she would likely prevail on her claims, but they did not achieve the level of success they had anticipated. Nevertheless, in recognition of the limited success that was obtained, some limited award is appropriate. I have determined that a negative multiplier of 75% to the lodestar is appropriate to arrive at a "reasonable fee." This represents my effort to recognize the good faith efforts and skill brought to bear by Plaintiff's counsel and balance that against the minimal success achieved. Consequently, I hold that Plaintiff will be awarded $38,569.34 in fees and costs.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion (D.I.91) is DENIED with respect to reconsideration of the March 11, 2005 Opinion as it pertains to Plaintiff's claim for lost wages, and the Motion is GRANTED with respect to reconsideration of the application for attorney's fees. IT IS FURTHER ORDERED that plaintiff is awarded, and Defendant shall pay, $38,569.34 in attorney's fees, inclusive of any costs.

D.Del.,2005.
Spencer v. Wal-Mart Stores, Inc.
Slip Copy, 2005 WL 3654381 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1171936 (Trial Motion, Memorandum and Affidavit) Brief of Defendant Wal-Mart Stores, Inc. in Opposition to Plaintiff's Motion to Alter or Amend Judgment and for Relief from Judgment (Apr. 05, 2005)
• 2005 WL 1171935 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiff's Motion to Alter or Amend Judgment and Motion for

Relief from Judgment (Mar. 22, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.