# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND and STEPHANIE SPEAKMAN, individually and on behalf of all others similarly situated, | Civil Action No. **05-162 JJF** |
| | **CLASS ACTION** |
| *Plaintiffs*, | |
| v. | |
| WILLIAM B. HARRISON, JR., HANS W. BECHERER, RILEY P. BECHTEL, FRANK A. BENNACK, JR., JOHN H. BIGGS, LAWRENCE A. BOSSIDY, M. ANTHONY BURNS, ELLEN V. FUTTER, WILLIAM H. GRAY, III, HELENE L. KAPLAN, LEE R. RAYMOND, JOHN R. STAFFORD, JPMORGAN CHASE & CO., and JAMES DIMON, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES FROM VIOLATIONS OF SECURITIES LAWS AND BREACHES OF FIDUCIARY DUTY

Lead plaintiffs Samuel I. Hyland and Stephanie Speakman (together, "Plaintiffs"), individually and on behalf of all others similarly situated, through counsel, as and for this Second Amended Class Action Complaint, allege the following upon personal knowledge as to themselves and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by counsel, as detailed in paragraph 243, below.

## INTRODUCTION

1.     This class action seeks relief in connection with defendants' issuance of incomplete and materially misleading statements, breaches of fiduciary duty, and failure

to disclose material facts in connection with the merger (the "Merger") of Bank One Corporation ("Bank One") into JPMorgan Chase & Co. ("JPMC" or the "Company").

2.      The class seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breach of fiduciary duty by certain of JPMC's current and former directors.

## OVERVIEW

3.      By 2003, Bank One's Chief Executive Officer ("CEO") and Chairman, the widely-lauded Jamie Dimon ("Dimon"), was credited with turning around Bank One's profitability and reputation during his four-year tenure.  However, Dimon's unceremonious ouster as the "CEO-in-waiting" from financial titan Citigroup Inc. years earlier had instilled in him a fierce desire to quickly become CEO of a Wall Street financial giant in order to vindicate himself against his former employer.

4.      In contrast to Bank One's ascent under Dimon, by late 2003, JPMC's performance, stock price, and reputation had deteriorated for years under the stewardship of William B. Harrison, Jr. ("Harrison"), the Company's Chairman and then-CEO.

5.      Following years of mismanagement characterized by disastrous transactions, increasingly-vocal shareholder discontent and widespread public reports of Harrison's imminent ouster, Harrison recognized that his lucrative and powerful position was in jeopardy as 2004 approached.

6.      Unwilling to yield the riches and power of his position, and desperate to shape a graceful conclusion to his career, Harrison pursued a business combination between JPMC and Bank One.

7.      In a stunning betrayal of shareholder trust, Harrison rejected the opportunity to merge JPMC with Bank One *without any acquisition premium at all.*

8.    According to persons close to the secretive negotiations surrounding the Merger, Harrison rejected such a merger of equals for no other reason than because Dimon sought to be CEO of the combined entity immediately.

9.    Instead, Harrison and Dimon struck a backroom deal to be concealed from JPMC's shareholders.  In exchange for remaining CEO for two more years, Harrison agreed to a Merger exchange ratio providing for a massive premium over Bank One's market value.

10.    After the Merger received shareholder approval, an independent investigation conducted by the *New York Times* revealed that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so.  Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.

> When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent.  The two men declined to comment on the specifics of their negotiations.

11.    Placing this revelation into perspective, another reputable media source quoted one observer's view after the Merger was announced: "If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the [JPMC] stock would have been up a few bucks."

12.    Thus, for the sole purpose of keeping his CEO title for another two years, Harrison caused JPMC shareholders to lose a multi-billion-dollar opportunity to combine with Bank One without unfairly harming JPMC shareholders' equity stake.

13.    The defendants violated federal securities laws by omitting the backroom deal, including Harrison's rejection of the opportunity to merge Bank One into JPMC using a zero-premium exchange ratio, from the Joint Proxy Statement, dated April 19, 2004 (the "Proxy Statement"), disseminated by the defendants to gain shareholder approval of the Merger.  Defendants falsely described the Merger and concealed the backroom deal in numerous written and oral statements to shareholders.

14.    As a result, JPMC investors were induced to believe that Harrison had bargained on their behalf to maximize their interest in the combined Company.  In fact, Harrison had sold JPMC investors "down the river…just to save his own skin," as one observer put it.

15.    JPMC investors were also left with the mistaken impression that, in light of the acquisition premium, Harrison would run the combined Company, when in fact, part of the backroom deal was that Dimon would serve as the true CEO of the combined Company.

16.    Unaware of the rejected no-premium opportunity, and due to materially false and misleading statements as well as the failure to disclose material facts in the Proxy Statement, shareholders of JPMC and Bank One approved the Merger, which was completed on July 1, 2004.

17.    Harrison and the other JPMC directors breached the fiduciary duties of loyalty and disclosure they owed to JPMC's shareholders by agreeing to an unfair exchange ratio in the Merger merely to entrench Harrison in the CEO office.

18.    JPMC's directors knew or should have known of the backroom deal and nevertheless they approved and recommended the Merger to JPMC's shareholders.

19.    Neither JPMC nor its directors had the authority to issue the new JPMC shares necessary to effectuate the Merger without amending JPMC's certificate of incorporation, which required approval by a majority vote of JPMC's shareholders.  Such approval was solicited and wrongfully obtained without disclosing, as the defendants should have, the backroom deal and the rejected nil-premium opportunity.

20.    The omission of the backroom deal and the rejected nil-premium opportunity throughout the solicitation of votes thus violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information.  Accordingly, the shareholder approval of the necessary amendment to JPMC's charter to expand the corporate authorization to issue shares was wrongfully obtained by the defendants and is null and void.

21.    Confirming the critical importance of the backroom deal, before the shareholder vote on the Merger many JPMC shareholders and analysts publicly questioned why Dimon would not become CEO immediately after the Merger, expressed concerns about Harrison's remaining in that position, and denounced the Merger's dilutive impact.

22.    Also, a shareholder proposal to separate the Chairman and CEO posts presented at JPMC's annual meeting received over 500 million votes in its favor.  This resounding and extraordinary outcome left no doubt as to the will of JPMC's pre-Merger shareholders, which was stealthily thwarted by the backroom deal.

## JURISDICTION AND VENUE

23.    This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §§ 78a-78jj] and 28 U.S.C. § 1367.

24.    Venue in this case is proper in the District of Delaware pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in the District of Delaware.  In addition, JPMC is incorporated in Delaware and conducts substantial business in the District of Delaware.  Bank One was also incorporated in Delaware.

25.    In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

26.    Venue is also proper in the District of Delaware because JPMC and Bank One conducted substantial business in Delaware and JPMC continues to conduct substantial business in Delaware in the wake of the Merger.

27.    Venue is also proper in the District of Delaware because Plaintiffs reside in Delaware.

28.    As directors of a Delaware corporation, the Director Defendants, as defined below, submitted themselves to the jurisdiction of the state of Delaware.

## THE PARTIES

29.     Plaintiffs reside in New Castle County, Delaware and owned JPMC common stock at all relevant times, including on April 2, 2004.  Plaintiff Samuel I. Hyland sold his JPMC shares on August 13, 2004.

30.     Defendant JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices at 270 Park Avenue, New York, NY 10017, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding.  JPMC's common stock is listed and traded on the New York Stock Exchange under the ticker symbol "JPM."

31.     Defendant Harrison served as CEO and Chairman of the Board of Directors of JPMC since 1999, and was instrumental in negotiating the Merger and signed the Proxy Statement issued in connection therewith.  Harrison relinquished the CEO title at the end of 2005.

32.     Defendant Hans W. Becherer was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998 but retired in May 2006.

33.     Defendant Riley P. Bechtel was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting.

34.     Defendant Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He was

a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004.

35.    Defendant John H. Biggs was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC since March 2003.

36.    Defendant Lawrence A. Bossidy was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1998 but retired in May 2006.

37.    Defendant M. Anthony Burns was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.

38.    Defendant Ellen V. Futter was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  She has been a director of JPMC or a predecessor institution since 1997.

39.    Defendant Helene L. Kaplan was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004.

40.    Defendant Lee R. Raymond was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1987.

41.     Defendant William H. Gray, III was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1992.

42.     Defendant John R. Stafford was, during the relevant time, a director of JPMC and signed the Proxy Statement issued in connection with the Merger.  He has been a director of JPMC or a predecessor institution since 1982.

43.     Defendants Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "Director Defendants."

44.     By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the Director Defendants owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the acquisition of Bank One; (c) to disclose to JPMC shareholders all material facts concerning the Merger; (d) to disseminate a complete and accurate proxy statement; and (e) to refrain from abusing their positions of control.

45.     Defendant Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as CEO of JPMC.

46.     Defendant Dimon and the Director Defendants are referred to collectively herein as the "Individual Defendants."

47.     Defendants Harrison and Dimon are collectively referred to herein as the "Insider Defendants."  The Insider Defendants, because of their positions of control and authority as chief officers and directors of JPMC or Bank One, were able to and did

control the contents of the SEC filings, press releases and presentations to investors and securities analysts pertaining to those entities, including, without limitation, the Proxy Statement. Each of the Insider Defendants was provided with copies of press releases and SEC filings alleged herein to be misleading prior to, or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. As a result, each of the Insider Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore responsible and liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the class (the "Class") consisting of those present and former JPMC shareholders who (1) held common stock of JPMC on or before January 14, 2004 but sold or otherwise disposed of any or all such stock after the Merger was announced, and/or (2) as shareholders of record of JPMC on April 2, 2004, were entitled to vote on the Merger (and thereby on the proposed amendment to JPMC's certificate of incorporation in connection with the Merger). Excluded from the Class are defendants herein; any person related to any of the Individual Defendants; any firm, trust, corporation, or other entity affiliated with any of the defendants (except for those holding JPMC common stock in solely a fiduciary capacity); the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

49.     This action is properly maintainable as a class action.

50.     The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all class

members is impracticable. There were in excess of 2 billion shares of JPMC common

stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are

members of the Class. According to the Proxy Statement:

> The board of directors of JPMorgan Chase has fixed the
> close of business on April 2, 2004 as the record date for
> determination of stockholders entitled to notice of and to
> vote at the annual meeting of stockholders. On the record
> date, there were 2,081,783,154 shares of JPMorgan Chase
> common stock outstanding, held by approximately 126,350
> holders of record.

51.    Plaintiffs' claims are typical of the claims of the members of the Class as

all members of the Class were similarly damaged by defendants' wrongful conduct as

complained of herein. Among other things, members of the Class sustained damages as a

result of a Proxy Statement and other public statements issued in connection with the

Merger that omitted and/or misrepresented material facts about the Merger that were

required to be disclosed.

52.    Plaintiffs will fairly and adequately protect the interests of the members of

the Class and have retained counsel competent and experienced in class and shareholder

litigation. Plaintiffs have no interests that are in conflict with the interests of the Class.

53.    Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the

defendants' acts as alleged herein;

b.    Whether the Proxy Statement, and other documents and/or

statements disseminated to members of the Class in connection with the Merger omitted

or misrepresented material facts about the Merger that were required to be disclosed;

c.     Whether the Insider Defendants acted with the requisite state of mind in omitting to state and/or misrepresenting material facts about the Merger;

d.     Whether the Director Defendants other than Harrison knew or should have known about the secret deal and/or the rejected nil-premium opportunity;

e.     Whether the Director Defendants breached fiduciary and other common law duties owed by them to Plaintiffs and other members of the Class; and

f.     Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

54.     In addition, the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine. The market for JPMC common stock was at all times an efficient market for the following reasons, among others:

a.     JPMC's common stock met the requirements for listing, and were listed on the New York Stock Exchange, a highly efficient securities market;

b.     As a regulated issuer, JPMC filed periodic public reports with the SEC;

c.     JPMC common stock trading volume was substantial during the relevant time period and on or about the date the Merger was announced;

d.     JPMC was followed by numerous securities analysts who wrote reports available to investors through various automated data retrieval services;

e.     JPMC disseminated information on a market-wide basis through various electronic media services; and

f.     The market price of JPMC securities reacted efficiently to new information entering the market.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

56.     Defendants have acted in a manner which affects Plaintiffs and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

57.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### Background: The Besieged Banker

58.     In June 1999, defendant Harrison became CEO of Chase Manhattan, the predecessor of JPMC.  According to Harrison, "It's a lot more fun being a CEO than I would have guessed."  Moyer, Liz, "Banker of the Year: Harrison Has the Helm," *The American Banker* (Feb. 1, 2001).

59.     According to the entry on Harrison in the *International Directory of Business Biographies* (St. James Press 2004):

> Harrison spent exorbitantly on an acquisitions spree, aiming to become a one-stop destination for meeting corporations' financial needs.  In 2000 the spree culminated in the $34 billion purchase of J.P. Morgan, a deal that created a major market contender with assets that ranked third behind only Citigroup and Bank of America.  Commenting on the contention that he had paid too much, Harrison told *Market Week with Maria Bartiromo*, "You don't get any great property at a discount."

60.     An April 7, 2002 article in the *New York Times* suggested that Harrison's motivation in entering into large transactions was not necessarily to benefit shareholders:

> William B. Harrison was beaming. Mr. Harrison, as chairman of the Chase Manhattan Corporation, had signed a deal to buy J. P. Morgan & Company for $30.9 billion the night before and was already spinning the deal to shareholders. It was mid-September 2000, the economy was in its longest expansion ever, and anything seemed possible. "It's a very fair deal," he said, grinning uncharacteristically. "And most importantly, when we look at the overall transaction two years from now, it should be accretive to the shareholders."
>
> Mr. Harrison had reason to grin — and still does, though not because the bank's shareholders have gained as he predicted. Rather than being "accretive" — that is, increasing earnings per share — the merger has not delivered much for shareholders so far; the stock has lost more than one-third of its value in 18 months. Mr. Harrison

- 14 -

might have been glowing because, like many top
executives these days, he was about to be paid — a lot —
to go shopping.

For overseeing the acquisition of J. P. Morgan, which he
nonchalantly said took only three weeks to negotiate, he
received a special bonus of $20 million — far more than
the total lifetime earnings of the average working stiff. And
that bonus, which is spread over 2001 and 2002, came on
top of his $1 million salary and $5 million regular bonuses
last year and whatever else he receives for this year. Mr.
Harrison's three lieutenants, including Geoffrey T. Boisi, a
vice chairman who had joined Chase only four months
earlier, received special bonuses of $10 million each, on
top of their regular salaries and bonuses. All told, Chase
directors paid the bank's executives more than $50 million
for their outing at the bank mall. (They had done a little
window-shopping, chatting up Goldman Sachs and
Deutsche Bank, before settling on J. P. Morgan.)

61.    In connection with the merger that created JPMC, the Company's

compensation committee, comprised of defendants Gray, Bechtel, Stafford, and

Raymond, awarded Harrison $10,000,000 in cash and 237,164 restricted stock units.

According to the March 19, 2002 report of the committee, included in the Company's

2002 proxy statement:

This award will vest and be paid out or distributed as
follows, subject to continued employment: 50% of the cash
and 50% of the restricted stock units in January 2002; 50%
of the cash in January 2003; and 50% of the restricted stock
units if the price of JPMorgan Chase common stock
achieves the $52 Target Price by January 25, 2007 (but no
sooner than January 25, 2003). The cash awards would be
paid out in the event of job elimination, death, or total
disability. The restricted stock unit awards would vest and
be distributed in the event of death or total disability. In the
case of job elimination or retirement, the restricted stock
unit awards related to the Target Price would vest only if
the Target Price is achieved, unless otherwise determined
by the committee.

62.    Thus, 118,582 of the restricted stock units, which would vest upon JPMC achieving a target price by January 25, 2007, were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.

63.    Harrison was notorious not only for being overpaid but also for overpaying in deal after deal.  As an interviewer noted in a February 23, 2004 interview with Harrison on CNBC: "You acquired JP Morgan at the top of the equity bubble, you acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset Management] at the top of the asset management bubble."

64.    A February 7, 2002 article in *Forbes* entitled "Is Harrison Breaking Morgan's Bank?" reviewed Harrison's tenure, including its many failures, concluding that "Fiscal 2002 will be the make or break."

65.    A June 7, 2002 article in *EuroWeek* entitled "Time for an outsider to shake up troubled JP Morgan Chase" strongly criticized Harrison's leadership, pointed out his poor, costly deals, and suggested that Harrison was due to lose his job:

> Look at the evidence. Today no one questions the fact that Chase's chairman and CEO, Billy Harrison, grossly overpaid for Flemings, the patrician but still itsy-bitsy UK asset manager with a quirky securities operation bolted on to the side. It was a brilliant deal for the Fleming family and blew the myth that Roddy Fleming couldn't cut a deal without the help of his childhood Scottish nanny. Billy Harrison would now probably admit that he was sold a bum steer with Flemings, but he might also blame the purchase on the recently departed Geoff Boisi, who was, after all, in charge of investment banking at the time.
>
> However, even if the unassuming Billy Harrison tries to evade the Flemings transaction by pointing an accusing finger at Geoff Boisi, this isn't quite the end of the story.
>
> The harsh fact is that Chase and Billy Harrison had also significantly overpaid to acquire Geoff Boisi's investment banking boutique, Beacon Group, just because they

- 16 -

clamoured for the services of its dynamic leader. It is
perhaps even more ironic that Chase's attention was so
focused on the brilliance of Mr Boisi that they may not
have appreciated that David Coulter, who now has Boisi's
old job, also came with the Beacon package.

If Chase's Billy Harrison paid over the top for Beacon
Group and then Geoff Boisi made the Fleming family rich
beyond their wildest dreams, shouldn't Chase shareholders
have been wary about the next acquisition? Perhaps there
was nothing wrong with putting JP Morgan out of its
misery, and the JPM road pointed downhill all the way -
but did Chase need to pay $34bn for the privilege? Yes, say
the JP Morgan fat-cat top managers who walked away with
fortunes which in some individual cases exceeded $100m
each. No, say the Chase shareholders who must be asking
themselves what they actually bought, other than a large
can of worms.

The combined JP Morgan Chase in its present form is
nowhere in investment banking, nowhere in equities and its
asset management division can be described as fair to
middling rather than the crème de la crème. Most of JP
Morgan's old guard has left - who said "Thank heavens"? -
and for its $34bn, Chase seems to have bought little more
than a fizzy derivatives business and an upgrade in debt
capital markets.

With such a litany of financial misjudgements, you would
have thought that shareholders would be baying for blood.
*At the top of the execution list you might have expected to
see JPMC's chairman and CEO, Billy Harrison.*
However, in the past fortnight it was Boisi who fell rather
than Harrison, much to the amazement of most observers
and certainly the bookmakers, who will lose a fortune if
Harrison is still there by Christmas.

The situation regarding Mr Harrison is especially
interesting to ourselves, and please be assured that we are
not, and never have been, shareholders in either Chase
Manhattan, JP Morgan or JP Morgan Chase.

*In the aftermath of Enron, Billy Harrison's press was so
bad that at one time it didn't look as if he would last until
April* - remember those bounders and scallywags who said
that the best double bet was for Billy Harrison and Credit

Suisse's Lukas Muhlemann to be gone before the first polka
dot bikini could be seen on the Côte d'Azure this summer.

But while Harrison has defied the bookmakers' odds so far,
he must, unless he requires the services of a guide-dog, be
able to see the writing on the wall. Chase Manhattan wasn't
exactly the most sparkling bank in the universe. By adding
Flemings, Beacon Group and JP Morgan, did Chase then
become a world-beater? Not at all. Instead, the combined
JP Morgan Chase was described to us by one Scottish fund
manager as a dog's dinner - presumably a West Highland
White or a Scottie?

That may be slightly unfair, but when you look at the
JPMC share price, you have to ask yourself where it's
going. Does he realise his own apparent shortcomings or
the possible deficiencies of his subordinates, who are
considered to be his most likely successors? We don't think
so, when you read that *he intends to stay on for another
seven years, ie until he is 65.*

We were almost speechless when we saw that comment,
and in the world's main financial centres some irreverent
bankers rolled around on the floor with laughter. One
prominent private banker in Geneva said: "Mr Harrison
must be living in cloud cuckoo land" - and in Switzerland
they certainly know their cuckoos. In London, one
notoriously aggressive proprietary trader commented: *"The
odds on Billy Harrison lasting for seven years are longer
than those on the United States winning the World Cup."*
[Emphasis added.]

66.    An April 22, 2002 *BusinessWeek* article on Harrison entitled "The

Besieged Banker" noted that Harrison was "under siege" due to his poorly timed, badly

executed, and expensive deals and numerous disastrous loans.  Despite JPMC's poor

performance under his direction, the article observed that "Harrison stands to earn at least

$16 million in merger-related bonuses if the stock recovers to $52, its price the day the

[Chase-JP Morgan] deal closed.  His top lieutenants will split $25 million more.  And

they have given themselves plenty of time to do it—until 2007, to be exact."  Noting that

"[t]he execution of the J.P. Morgan merger wasn't much to write home about," the article

observed that:

> Unlike a steel mill or auto maker, a bank's assets are people, not plants. But after paying top dollar for J.P. Morgan (3.5 times its book value), Harrison let its people walk. Defections started as soon as the deal closed--despite hefty retention bonuses that could have yielded executives princely sums. Within a year, 25 top former J.P. Morgan executives had left, and Chairman Douglas A. "Sandy" Warner III quit at the end of 2001. "We would have liked some of them to stay," says Harrison. "But I don't think it has cut into the core of what we're about."

67.     The article also observed internal criticisms of Harrison's poor

management:

> In interviews about management style, [JPMC] executives invariably quote [former General Electric Co. CEO Jack] Welch. They preface answers with "As Jack says..." and few quote Harrison or even mention him unless they're asked. As bank executives tell it, Harrison emphasizes what they call "the soft stuff"--management coaches, 360-degree reviews, discussing problems until everyone is singing in harmony. Trouble is, Harrison has to be more than a choirmaster, he needs his managers to make their numbers.

68.     A subsequent January 13, 2003 article on Harrison in a *BusinessWeek*

report on "The Best & Worst Managers" noted that "Some investors speculate that

***Harrison could lose his job by the end of January*** if the bank's fourth-quarter results,

due out mid-month, don't show signs of improvement." (Emphasis added.)

69.     According to a January 19, 2004 article by Aaron Elstein in *Crain's New

York Business*: "One of Wall Street's favorite games for the past two years has been

guessing when William B. Harrison, the embattled chairman and chief executive of

[JPMC], would finally be shown the door."

- 19 -

70.    According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large strategic acquisitions…"  However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

71.    The January 18, 2004 *Sunday Tribune* described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that ***few would have given odds on him even surviving the year***, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, ***it seemed to be largely Harrison's fault.*** At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

72.    From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22.  By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent.

73.    Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent.  JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

74.    JPMC's involvement in financial scandal also has marked Harrison's tenure.  In particular, JPMC found itself targeted in securities litigation involving Enron, WorldCom, and initial public offering ("IPO") allocation.

75.    A July 22, 2004 *Wall Street Journal* article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the [M]erger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

76.    On September 18, 2002, the *Wall Street Journal* published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

77.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the SEC, which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

78.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal, involving allegations that numerous IPOs were manipulated by Wall Street investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

79.    By late 2003, Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582

restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, but which were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.

**Dimon's Destiny: If I Were King of a Megabank…**

80.    Dimon is known as the once protégé of Citigroup chief Sandy Weill. "By the mid-1990s, Dimon was Weill's heir apparent, says Mary McDermott, 60, a retired Citigroup senior vice president who worked with Weill for 34 years and has known Dimon since 1982. 'Jamie was indispensable to Sandy,' McDermott says. 'He was Sandy's alter ego.'" Edward Robinson, "J.P. Morgan's Dimon to Show Citigroup Who's Boss," *Bloomberg* (July 1, 2004). "'He was Sandy's intellectual torpedo,' says William McCormick, 63, a former American Express executive vice president. 'He worked on whatever issues were hot.'" *Ibid.* Under Weill's mentorship, Dimon developed a reputation as a shrewd operator as well as a powerful manager with immense credibility in the financial services industry.

81.    Dimon's entry in the *International Directory of Business Biographies* (St. James Press 2004) describes the dramatic arc of his ascent under Weill and his unceremonious ouster from Citigroup:

> **SHAPED BY A MENTOR**
>
> In 1978 Dimon graduated cum laude from Tufts University. He worked for the Management Analysis Center, a consulting firm in Boston, for several years and then enrolled in Harvard Business School. The Harvard professor Jay O. Light noted in *BusinessWeek*, "He was generally perceived as one of the very brightest guys in finance in that class" (October 21, 1996).
>
> While a student at Harvard, Dimon interned at Goldman Sachs and was offered a job there after graduation in 1982. He declined, instead going to work for the mentor who

would profoundly shape his career: Sandy Weill. The two men had met six years earlier; Weill knew Dimon's father and the two families had formed a close relationship, convening annually for Passover dinners. Dimon's mother gave Weill a copy of the college thesis her son had written about the 1970 merger of the two brokerage firms Shearson Hammill and Hayden Stone—a union engineered by Weill, who had been running Hayden at the time. Impressed, Weill offered Dimon a summer job. Recalled Weill in the *New York Times*, "After a week he was telling me how we could do things better" (July 13, 1995).

## BUILDING FROM THE GROUND UP

From 1982 to 1985 Weill and Dimon teamed up at American Express, where Dimon signed on as vice president and assistant to the president. Dimon's abilities to crunch numbers meshed well with Weill's people skills. When Weill was forced out of American Express, he made Dimon his second in command at the little-known consumer-lending outfit that he bought called Commercial Credit Company. That tiny firm was the beginning of what would eventually become Citigroup; as quoted by the *New York Times*, when asked about his decision to stay with Weill, Dimon replied, "I love the idea of being in on the ground floor" (July 13, 1995).

## RESTRUCTURING AN ULTIMATE WINNER

Dimon was a key member of the team that launched and defined Commercial Credit's strategy. He served as the company's chief financial officer and an executive vice president and then later as president. Through the course of Dimon's time at the firm, Commercial Credit was completely restructured and made numerous acquisitions and divestitures, substantially improving its profitability. The most significant transaction was the 1987 acquisition of Primerica Corporation, which included Smith Barney. Commercial Credit then assumed the Primerica name. In 1983 Primerica had acquired the Travelers Corporation (of which Smith Barney was a part), which had then been renamed Travelers Group. Between 1987 and 1994 the Travelers unit of Primerica touted compound annual growth of 21 percent in per-share earnings—an achievement that executives credited to Dimon's staunch financial discipline.

## EMERGING FROM MERGER AFTER MERGER

At Travelers, Dimon was named chairman and CEO of its Smith Barney subsidiary in January 1996, having previously served as COO and chief administrative officer. Dimon's father had once worked at Smith Barney, so the younger Dimon knew the firm well; he would help transform Smith Barney from a small brokerage into a major Wall Street player. He was put in charge of integrating Smith Barney with Shearson, the brokerage business that Smith Barney purchased in 1993. Dimon recalled the difficulty of extricating Shearson from Lehman Brothers, its former sister company, and from American Express, its old parent—comparing the process in the *New York Times* to "splitting apart Siamese twins" (July 13, 1995). Elsewhere he stumbled trying to build the company's investment-banking business, luring bankers from Morgan Stanley with exorbitant pay packages that robbed colleagues of a substantial portion of the bonus pool. Morale declined and dozens of bankers left the company. In January 1996 Dimon apologized to his team, as quoted by *BusinessWeek*: "I know I made mistakes, and I'm sorry. Let's move forward" (October 21, 1996).

## A PRECOCIOUS PERFORMER

Dimon quickly rebounded and in 1996 became the chairman and CEO of Travelers' Smith Barney subsidiary—at age 40 he was the youngest CEO of a major securities firm. His achievements included spearheading the firm's arrival on the Internet, making Smith Barney the only brokerage to tie into the widely used personal-finance software program Quicken, and pushing the company to become the first brokerage to offer no-load mutual funds to customers. As Dimon emerged from his mentor's shadow with the confidence to make his own decisions, tensions between the two began to surface. One insider who wished to remain anonymous noted in *BusinessWeek*, "Jamie's riding high on Smith Barney's success. He can hold stronger views than ever before" (October 21, 1996).

## NUMBERS ARE NOT EVERYTHING

A bullish market—along with Dimon's unrelenting focus on keeping costs down—continued to fuel Smith Barney's strong performance. In 1996 the company's return on equity was among the highest in the industry; in the second

quarter of that year it was a record 36.7 percent. In the fall of 1996 Smith Barney contributed 30 to 40 percent of its parents' earnings. Dimon's only demerit throught [*sic*] that period of time was his lack of people skills; during one meeting with 20 employees, as reported by *BusinessWeek*, Dimon openly disparaged one underling, saying, "That is the stupidest thing I ever heard" (October 21, 1996). An employee who witnessed the exchange noted, "It wasn't personal or mean spirited, but he would be more effective if he would lighten up" (October 21, 1996).

## TOO MANY MERGERS COMPROMISE QUALITY

In November 1997, with the merger of Smith Barney and Salomon Brothers, Dimon became cochairman and co-CEO of the combined firm. In 1998 Weill and Dimon engineered a $73 billion deal: Travelers Group, the brokerage and investment-banking and insurance giant they had created from humble beginnings, purchased the retail market leader Citicorp to form Citigroup. Their aim was nothing less than to transform the financial-services landscape by creating the first comprehensive financial-services behemoth with dealings in both the consumer and corporate banking markets.

For half a year after the $73 billion 1998 merger of Citicorp and Travelers, Dimon, Sir Deryck Maughan, and Victor Menezes were all given co-CEO status to supervise the investment-banking segment of Salomon Smith Barney (SSB). Under their watch SSB lost hundreds of millions of dollars in overseas markets and other risky bond investments.

## POWER STRUGGLES DESTROY A RELATIONSHIP

Concurrently the tension between Dimon and Weill reached a boiling point when Dimon refused to appoint Weill's daughter, Jessica Bibliowicz, as chief of asset management at Travelers and as well to turn over Salomon's bond business to Weill's son, Marc. A $1.3 billion trading loss in Dimon's Salomon division further exacerbated the situation. On November 1, 1998, the man Dimon had once referred to as a second father asked him to resign. Dimon said several years later in *Money* magazine, "It was a surprise. And yes, it was hard, because that company was my baby, my family" (February 2002).

Dimon had been forced out. Given the choice between his own children and his "adopted" son, Sandy Weill had favored his blood. Ironically both of Weill's children wound up leaving their father's firm.

The news of Dimon's departure seemed to stun Wall Street, which had expected Dimon to become chairman of Citigroup after Weill's retirement. Sally Krawcheck, the analyst at Sanford C. Bernstein & Company, told the Washington Post, "I was shocked, followed by terror about his resignation. I went through mourning, denial, all that stuff. This is a man who is tremendously respected" (November 3, 1998). In fact Dimon was so well respected that when he stepped onto the Salomon Smith Barney trading floor after handing in his resignation, one thousand traders responded by giving him a standing ovation. In the *Washington Post* a Salomon investment banker said, "We all wanted to hate him, but he turned out to be a real quality guy. He was thoughtful and always willing to spend time explaining" (November 3, 1998). In a coincidental twist, in 2003 Krawcheck joined Citigroup as director of research for its Smith Barney Division—the unit Dimon had helped build.

As far as Dimon was concerned, Weill's motivation in forcing out his right-hand man and protégé of 17 years was transparent. He compared the situation to a Shakespearean tragedy, casting himself as the Earl of Kent, who paid the price for challenging the authority of King Lear.

**TIED TO THE BANKING INDUSTRY**

On March 27, 2000, after an 18-month break from the financial-services industry, Dimon became the chairman and CEO of Bank One, the fifth-largest bank in the country. Dimon said he turned down top jobs at Amazon.com and other coveted employers because banking was an inextricable part of his life. As he told *Money* magazine, he came to his decision after taking more than a year off: "I just took out that old white pad: Maybe I want to be an investor. Maybe I want to be a teacher. Maybe I want to write books. Maybe I want to stay home and be with my kids when they're growing up. I thought about all of that, and I was very open-minded about it, and what I came to is: My craft is financial services. Right or wrong, that's what I know, and I'm pretty good at it" (February 2002).

Dimon had been hired to turn around the ailing Bank One, which had been hit by a series of management missteps and earnings shortfalls beginning in 1999 that left the bank with a $511 million net loss in 2000. Dimon told the Lafayette (IN) Journal and Courier, "I want to make the company strong so it's a predator, not the prey" (April 3, 2000). Dimon backed up his words with cash, buying two million shares of his new company. He remarked in *Money* magazine, "Ownership is a critical thing. Even if you run a retail store, you think, 'Hey, it's my store, my company,' and you run it like it's your own. And I learned that from Sandy" (February 2002).

## A FOCUS ON COSTS BEGETS A TURNAROUND

In his first year at Bank One, Dimon strengthened the management team and fortified the corporation's balance sheet, saving more than $1 billion through waste-reduction efforts. He severed relationships with corporate borrowers that failed to purchase the company's more profitable services, such as money management and stock underwriting, and closed the much-hyped but unprofitable online division, WingspanBank.com. Each of the company's 1,800 offices were ordered to post profit-and-loss statements, and branch managers were compensated based on net revenues, not sales. Dimon scrutinized every dollar the company spent. As reported by *Money*, when a high-level executive informed him of the numerous subscriptions held by the company, Dimon said, "You're a businessman; pay for your own Wall Street Journal" (February 2002).

During this period Dimon's conservative side emerged. After taking the reins at Bank One, he immediately implemented a complex risk-management system that left the company with a more diversified investment portfolio. The procedure put in place by that system led Bank One to reduce loans to WorldCom and other risky firms by billions of dollars—before the technology market tanked; Dimon's leadership was prescient. Effective May 2004 Dimon's former employer Citigroup agreed to pay $2.65 billion to settle a lawsuit brought by WorldCom investors, opening an expensive new chapter in the company's efforts to clean up after various corporate scandals.

Dimon judiciously turned down several possible deals. Household International, the struggling consumer-finance

company based in the Chicago area, went up for sale in 2002. Dimon was more than familiar with the firm's core business: like Commercial Credit, the outfit he had developed with Weill, Household offered loans to consumers with poor credit. But Dimon passed; Household was later sold to HSBC. Dimon told London's *Financial Times*, "I don't think we are ready to take on whole other business lines" (March 28, 2003).

82.    Despite Dimon's successful turn at the helm of Bank One, he was not content to lead a Midwestern bank; rather, he sought to reclaim the mantle of Wall Street superstar.  If he could not be chief of Citigroup, then he would parlay his Bank One success into becoming the head of some other Wall Street megabank.

83.    While JPMC shareholders endured Harrison's reign, Dimon created substantial value for Bank One shareholders.  From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22.  During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

**Harrison's Backroom Deal: The Merger of Jupiter and Apollo**

84.    By late 2003, the fallout from various scandals entangling JPMC, as well as his poor business decisions, forced the besieged banker Harrison to conjure yet another massive deal to protect his position.

85.    According to an article published on July 7, 2004 by the online magazine *Slate* (owned by The Washington Post Co.), entitled "The $7 Billion Ego: Did J.P. Morgan Chase waste billions so its CEO could keep his job?":

> ***Harrison's grip at the helm was growing tenuous. But he saw salvation in yet another deal.*** Chicago-based Bank One, run by the charismatic Citigroup exile Jamie Dimon, seemed like a natural acquisition.  Dimon had pulled off an

impressive turnaround at Bank One. With his operational
expertise and cadre of loyal bankers, Dimon could help
improve morale and performance at Chase and eventually
succeed Harrison. [Emphasis added.]

86.     During November 2003, Harrison and Dimon commenced negotiations
concerning the possibility of a business combination between JPMC and Bank One.
Among other things, Harrison and Dimon discussed the possible structure of such a
transaction.

87.     According to a January 17, 2005 article in *Investment Dealers Digest*
entitled "Putting JPMorgan On the Map," the negotiations were conducted in the utmost
secrecy "at an apartment in the Waldorf Towers, a sanctuary a few blocks from
JPMorgan's midtown headquarters that the bank keeps as a permanent venue for quiet
meetings with clients." As the merger discussion proceeded, financial advisors came up
with the codenames of "Apollo" and "Jupiter" for Bank One and JPMC, respectively, to
ensure the secrecy of the negotiations.

88.     According to a January 15, 2004 *CBS Marketwatch.com* article, "By
December, according to a person at the table, Dimon and Harrison and a few other
executives huddled in the conference room of Bank One's M&A law firm, Wachtell
Lipton Rosen & Katz."

89.     The *Investment Dealers Digest* article reports that "Sources agree that
Harrison and Dimon ironed out a lot of the deal's particulars together and that Dimon
was clearly interested in succeeding Harrison from the get-go[.]"

90.     According to the Proxy Statement sent to JPMC and Bank One
shareholders in connection with the Merger, Dimon and Harrison periodically updated
members of their respective Boards of Directors about their negotiations. Thus, the

Director Defendants other than Harrison either were fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to inquire into the details of such negotiations.

91.     According to the Proxy Statement, Harrison briefed the full Board on his discussions with Dimon at a meeting of the JPMC Board (consisting of the Director Defendants) on November 18, 2003 and the JPMC Board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

92.     According to the Proxy Statement, in November 2003, each party retained legal and financial advisors in connection with the merger discussions.  JPMC retained J.P. Morgan Securities Inc., a wholly-owned JPMC subsidiary, as its financial advisor for a fee of $40 million.

93.     The Proxy Statement states: "[JPMC's] Financial Advisor is an Affiliate of [JPMC] and May be Deemed to Have Conflicts of Interest."  This statement was false and misleading because JPMC's financial advisor was not simply a JPMC affiliate; rather, it was a wholly-owned and controlled subsidiary.  Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was fair or necessary for Bank One.

94.     The January 19, 2004 *Financial Times* described the negotiation process:

"There was a ***spectrum of outcomes*** *in terms of premium and governance: Jamie laid them out* and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

95.    Although Harrison wanted to merge JPMC with Bank One, he refused to relinquish his position as CEO.  Dimon, on the other hand, sought to be CEO immediately.  Ultimately, Harrison agreed to an unfair exchange ratio in order to continue as CEO of the combined entity for two years after the Merger, with the expectation of remaining the Company's Chairman thereafter.  Little did JPMC shareholders know that this extra time for Harrison would cost them **billions** of dollars.

96.    Harrison would later claim that he offered a no-premium merger during the negotiations.  However, Harrison's claims omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  A January 26, 2004 *FORTUNE* article entitled "The Dealmaker and the Dynamo" detailed the negotiations and reported Harrison's claims:

> It was early January, and the merger talks between Jamie Dimon, CEO of Bank One, and William Harrison, his counterpart at J.P. Morgan Chase, were deadlocked. In the short time they'd been negotiating, Dimon, a brash boy wonder from Queens, and Harrison, a courtly Southern gentleman, had agreed on a host of issues. Succession was a snap: Dimon would get a virtually ironclad guarantee to replace Harrison as CEO in 2006. The board would be split fifty-fifty between Bank One and J.P. Morgan directors. Dimon's most trusted lieutenants would be given key roles in the merged company. Most of all, the two men agreed that if they could pull off this deal, combining Bank One's strong consumer businesses and J.P. Morgan's corporate banking franchise, they could create a true banking colossus—the second largest in America and one that could go toe to toe with giant Citigroup.
>
> What was hanging up the deal was the price. ***Harrison was offering what he calls a "market deal," meaning that J.P. Morgan would simply buy Bank One at its current stock price***—around $45 a share. His reasoning was simple. "We'd been criticized for overpaying on past deals, notably Chase's acquisition of J.P. Morgan in 2000," says Harrison. "I thought that if we paid a big premium again, the market would hammer our stock."

> Dimon, however, was demanding a markup north of 20%.
> Pointing to Bank of America's bid to buy FleetBoston for a
> gigantic 43% premium in late October, Dimon argued that
> Harrison would be getting a bargain at 20% to 25% over
> market. In vintage, ultra-enthusiastic Dimon style, the Bank
> One CEO insisted that the fit was so compelling that even
> with a big premium, the market wouldn't discount J.P.
> Morgan's stock. "Jamie was so excited by the combination
> that he thought he could sell a high premium deal to
> investors," says Harrison with a grin. "I disagreed."
> [Emphasis added.]

97.     However, after the Merger received shareholder approval, it was revealed

that, in fact, Dimon had been willing to agree to a **no-premium deal** if he could be CEO

of the combined company immediately.  Thus, Harrison's claim to have offered a

"market deal" without disclosing that Dimon was willing to accept such a deal, albeit

with one condition, omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not

misleading.

98.     On June 27, 2004, the *New York Times* published an article by Landon

Thomas, Jr., entitled "The Yin, the Yang and the Deal," which revealed that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to **give
> himself the two extra years**, to secure a smooth transition, **although he
> may have cost J.P. Morgan shareholders extra money** in doing so. Mr.
> Dimon, always the tough deal maker, **offered to do the deal for <u>no
> premium</u> if he could become chief executive immediately, according to
> two people close to the deal.**
>
> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium**, which
> Mr. Harrison was able to push down to 14 percent. The two men declined
> to comment on the specifics of their negotiations. [Emphasis added.]

99.     As revealed in "The Yin, the Yang and the Deal," Harrison had been

presented with an option: (a) merge Bank One into JPMC using an exchange ratio of

1.153,[1] and serve as Chairman but not CEO of the combined Company; *or* (b) merge Bank One into JPMC using an exchange ratio of 1.32, and serve as both Chairman and CEO of the combined Company.  Harrison chose (b).  This backroom deal, in effect an option which was exercised, was the most critical term of the Merger.

100.    For Harrison and Dimon this undisclosed provision was plainly the sine qua non of the Merger.  However, Harrison and Dimon understood that JPMC's shareholders would not have approved the Merger had they known of the backroom deal.  In particular, JPMC shareholders would not have preferred Harrison over Dimon as the CEO of the combined Company.  Moreover, as set forth below, a substantial number of JPMC shareholders specifically did not want the Chairman and CEO positions to be held by the same person.

101.    The June 27, 2004 *New York Times* article was the first opportunity for JPMC stockholders to have discovered that Harrison had turned down a no-premium opportunity and engaged in a deceptive entrenchment scheme.

102.    A January 15, 2004 *CBS Marketwatch.com* article supports this account: "The [merger] talks ran through Christmas week and during that time, the stickiest issue, succession, was resolved by the two-year compromise."  However, while this account, the January 19, 2004 *Financial Times* article, and the January 26, 2004 *FORTUNE* article entitled "The Dealmaker and the Dynamo" all corroborate the portrait of the negotiations in the June 27, 2004 *New York Times* article, none of the previous articles revealed or even suggested the availability of a no-premium exchange ratio.

---

[1] This exchange ratio would not have represented any premium over the market value of Bank One shares, based on the closing stock prices of JPMC and Bank One on January 14, 2004.  However, given the market's possible anticipation of merger synergies, this lower exchange ratio does not mean that Bank One's price per share would not have surged had the Merger been announced with a 1.153 exchange ratio.

103.    With the unfair exchange ratio agreed upon in exchange for a guarantee of

his continuation as CEO, Harrison presented the proposed Merger to the other Director

Defendants, who knew or should have known about the *quid pro quo*.  Nevertheless, the

Director Defendants approved the Merger.

104.    After the close of trading on January 14, 2004, JPMC and Bank One

issued a joint press release (the "Press Release") announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase &
> Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today
> announced that they have agreed to merge in a strategic business
> combination establishing the second largest banking franchise in the
> United States, based on core deposits. The combined company will have
> assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen
> states and top-tier positions in retail banking and lending, credit cards,
> investment banking, asset management, private banking, treasury and
> securities services, middle-market, and private equity. With balanced
> earnings contributions from retail and wholesale banking, the combined
> company will be well-positioned to achieve strong and stable financial
> performance and increase shareholder value through its balanced business
> mix, greater scale, and enhanced efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of
> directors of both companies, provides for a stock-for-stock merger in
> which 1.32 shares of JPMorgan Chase common stock will be exchanged,
> on a tax-free basis, for each share of Bank One common stock. Based on
> JPMorgan Chase's closing price of $39.22 on Wednesday, January 14,
> 2004, the transaction would have a value of approximately $51.77 for each
> share of Bank One common stock, and would create an enterprise with a
> combined market capitalization of approximately $130 billion. The
> premium, based upon the average closing stock prices of JPMorgan Chase
> and Bank One for the previous month, would be approximately 8 percent
> and would be approximately 14 percent based on today's closing prices.
>
> Under the agreement, the combined company will be headed by William
> B. Harrison, 60, as Chairman and Chief Executive Officer, and by James
> Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to
> succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to
> serve as Chairman. The company's sixteen-member Board of Directors
> will have fourteen outside directors, seven each from JPMorgan Chase and
> Bank One, plus Messrs. Harrison and Dimon. …

105.    As one observer related on *eFinancialNews.com* on February 8, 2004,

after hearing the announcement of the Merger:

> One of the first calls I received was: "That's a hell of a price that Bill
> Harrison is paying to recruit Jamie Dimon."
>
> …
>
> **Has Harrison sold JP Morgan Chase down the river to Bank One and
> Dimon just to save his own skin?** [Emphasis added.]

106.    The Press Release made no mention at all of Harrison's rejection of the

opportunity to merge Bank One into JMPC without any acquisition premium.  Nor did it

disclose that Harrison agreed to the premium solely to give himself two more years as

CEO of JPMC.  Accordingly, the Press Release omitted to state material facts necessary

in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.  Also, the Press Release falsely represented that Harrison

would head the combined Company, when, in fact, Dimon would be the true CEO of

JPMC, even though he would not have the CEO title "on paper."

107.    Within minutes of the announcement of the Merger, JPMC shares fell 4

percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that

day of $39.22.  The drop reflected the unnecessarily dilutive impact of the Merger.  By

contrast, in early trading the next day, Bank One shares rose $6.28, or approximately 14

percent.

108.    On January 17, 2004, Ian Kerr of eFinancialNews.com commented on the

deal:

> Do not doubt for a minute that the real winner in the proposed merger
> between JP Morgan Chase and Bank One is Jamie Dimon. Without his
> presence there would have been no deal. Dimon returns to New York in
> triumph after being dumped by Sandy Weill, his former boss at Citigroup.
> **For JP Morgan, Dimon's arrival is a blessing because William**

> ***Harrison, chairman and chief executive, has never looked to be more
> than a part-time caretaker.*** The line managers below him were described
> to me by a former Morgan banker as "a rum bunch who spend too much
> time squabbling with each other".
>
> …
>
> ***Harrison, who is not due to retire for two years, will be the nominal
> leader and, on paper at least, Dimon's boss. However, senior sources
> within JP Morgan Chase and Bank One confirm that Dimon will be
> calling most of the shots.*** "It is now the Dimon show and he knows that he
> has the full support of Harrison and the JP Morgan Chase board. You
> won't even have to wait until the summer to see some big personnel
> changes, which will all have Dimon's stamp on them," said a partner in
> one of Wall Street's most prestigious law firms, who has been a friend of
> Dimon since his early days as a protege of Weill. [Emphasis added.]

109.    104.    As reported in the March 23, 2006 article "In This Corner! The

Contender" in *FORTUNE* magazine:

> Harrison, who was scheduled to stay on as CEO through
> June 2006, quickly ceded day-to-day control.  In October it
> was announced that Dimon would take the helm in January,
> six months ahead of schedule (Harrison remains chairman).
> ***The truth is, he has been in charge from the moment he
> walked in the door.*** [Emphasis added.]

110.    Harrison acknowledged Dimon's considerable experience with mergers in

an interview on CNBC: "Well, I would just say again that Jamie and I have been through

as many mergers over the last ten years as any two executives out there combined."

Thus, any claim that there was a business justification for Harrison to be CEO in order to

secure a smooth transition in connection with the Merger is mere pretext.

111.    Confirming that there was no business justification or need for Harrison to

be CEO, JPMC's stock price rose substantially after it was announced that Dimon would

take the CEO title earlier than planned.  As reported in the January 25, 2006 *Wall Street

Journal*: "When reporting third-quarter results, J.P. Morgan disclosed that president and

operating chief Jamie Dimon would take over as CEO on Jan. 1, [2006,] six months

ahead of schedule.  The move helped sent [*sic*] J.P. Morgan's slumping stock rocketing higher over the next three months."

112.    The proposed acquisition of Bank One in a stock-for-stock transaction required the approval of JPMC's shareholders, as an amendment to JPMC's certificate of incorporation was necessary for JPMC to have the corporate authority to issue the shares necessary for the exchange.

113.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices.  In other words, to merge with Bank One, JPMC shareholders would be asked to fund the Merger premium of more than $7 billion in stock, resulting in a substantial reduction of their equity allocation.  The total value of the deal was approximately $57 billion.

114.    None of the Merger "consideration" came from the Company itself; rather, the stock issued in connection with the Merger, including the stock issued to cover the unnecessary premium, directly lessened the stake of JPMC's pre-Merger shareholders in the resultant entity.  Thus, while the equity stake of JPMC's pre-Merger shareholders in the resultant entity was reduced by the premium, the Company itself was not affected in any way.  Indeed, neither the Company's assets nor its liabilities nor its income nor its cash flow (nor any other quality in which a corporation can be said to exist) could have been affected in any way by the premium, no matter how large or how small.  By contrast, the size of the premium directly impacted the percentage of the combined Company held by JPMC's pre-Merger shareholders.

115.    Public criticism of the Merger's premium was immediate.  When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer

show: "[S]ome people I spoke to today said this is too dilutive. They said JP Morgan is

paying too big a premium. It's great for Bank One shareholders but it's not great for JP

Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical

shareholders, etc."

116.    James Cramer of Kudlow & Cramer discussed the Merger announcement

with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two
> mergers of equals get together that one is more equal than the other, to use
> kind of an Orwellian view. When NationsBank merged in with Banc of
> America, it turned out to be the Nations guys, even though it turned out to
> be Banc of America to be the title. Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One
> management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip
> of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know. It's an odd -- a lot of people -- I mean, this is
> kind of an interesting thing because of what it says about both sides. I
> mean, Dimon, I guess, is the powerhouse manager here.

117.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary,

noted that "the 14% premium to [Bank One's] close may seem high…"

118.    Under the heading "Not a Cheap Acquisition – But Has Harrison Ever

Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's

shareholders will be relieved to hear that Bank One's Dimon is expected to take control

of the combined company in 2006, given Harrison's missteps in the last few years."

119.    The market recognized that, although the Merger was structured as an

acquisition, with an acquisition premium, it was, in reality, a merger of equals at best,

with the balance tipping in Dimon's favor. Many observers considered Dimon to be the

de facto CEO. All that distinguished the Merger from a true merger of equals was

Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly funded by JPMC shareholders to secure that benefit for Harrison.

120.    In a January 15, 2004 presentation by the Company's management entitled "Creating Scale, Balance and Shareholder Value," it was stated that "Value of cost savings [in the Merger] exceeds premium."  This statement has been shown to be false, as the Company's financial performance in the wake of the Merger has disappointed investors; thus far the Merger's cost savings have not exceeded the multi-billion-dollar premium.  The presentation also misleadingly claimed that the Merger would produce "Value creation for all shareholders" and represented "A Compelling Value Proposition for Shareholders."  These statements omitted to state material facts (such as that Harrison rejected the opportunity to merge Bank One into JPMC without paying any premium) necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

121.    In connection with the Merger, JPMC amended its by-laws to include the following provisions:

> Section 2.09. CEO Position and Succession; Board Composition.
> (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the

"Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

122.    The Proxy Statement summarized the Merger-related amendments to the

Company's by-laws as follows:

> The by-laws of JPMorgan Chase will be amended, effective
> not later than the completion of the merger, to add a new
> by-law providing the following:
>
> •      that the board of directors has resolved that,
> effective as of the completion of the merger, Mr. Harrison
> will continue to serve as Chairman of the Board and Chief
> Executive Officer of JPMorgan Chase and Mr. Dimon will
> become the President and Chief Operating Officer of
> JPMorgan Chase; and that Mr. Dimon will be the successor
> to Mr. Harrison as the Chief Executive Officer of
> JPMorgan Chase, effective on the second anniversary of
> the completion of the merger or any such earlier date as of
> which Mr. Harrison ceases for any reason to serve in the
> position of Chief Executive Officer of JPMorgan Chase,
> and that Mr. Harrison will continue to serve as Chairman of
> the Board following that succession;
>
> •      that on the effective date of the merger, the
> board of directors will be comprised of eight Bank One
> directors, including Mr. Dimon, and eight JPMorgan Chase
> directors, including Mr. Harrison;
>
> •      that until the date of Mr. Dimon's
> succession as Chief Executive Officer of JPMorgan Chase,
> the number of directors that comprises the full board of
> directors of JPMorgan Chase will be sixteen; and
>
> •      that until Mr. Dimon's succession as Chief
> Executive Officer of JPMorgan Chase, all vacancies on the
> board of directors created by the cessation of service of a
> director will be filled by a nominee proposed by the
> governance committee of the board of directors, which will
> be co-chaired by one former Bank One director and one
> former JPMorgan Chase director and comprised of an equal
> number of former Bank One directors and former
> JPMorgan Chase directors (any deadlocks on the
> governance committee will be resolved in good faith by the
> nonmanagement members of the board of directors in a
> manner intended to preserve the principles of
> representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

• the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment agreement, prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, or any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of JPMorgan Chase on that date of succession,

• the removal of Mr. Harrison from, or the failure to appoint or reelect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase,

• any determination not to nominate Mr. Harrison or Mr. Dimon as a director of JPMorgan Chase prior to Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, and

• any modification, amendment or repeal of, or any adoption of any bylaw provision inconsistent with, the provisions of the by-law amendments described above.

123.    In addition to entrenching himself with the CEO title, Harrison secured for himself an extraordinarily lucrative severance package, as noted in the Proxy Statement:

[I]n connection with the [Merger], the severance policy for Mr. Harrison will be amended, effective upon completion of the merger, so that Mr. Harrison's severance will be the greater of (a) $22.2 million or (b) three times his current base salary and three-year average annual cash performance bonus if he is terminated involuntarily without cause prior to the second anniversary of the completion of the merger.

124.    Despite the premium agreed upon in connection with the Merger, the combination of JPMC and Bank One was in all other respects a merger of equals, for which little or no premium was appropriate.

125.    According to an Institutional Shareholder Services report analyzing the Merger: "The board and management considerations detailed…under the bylaw amendments indicate a merger of equals deal."

126.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a ***merger of equals***, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently ***highly beneficial to ONE shareholders*** considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

127.    Harrison himself endorsed this view at a January 15, 2004 town hall meeting concerning the Merger, during which he stated: "[T]he way we did it was doing a deal that had merger vehicle characteristics, but we're calling this a merger, we're not calling it a purchase."

128.    The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars, at the expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

129.    By rejecting Dimon's offer to merge JPMC and Bank One without any acquisition premium, Harrison and the other defendants cost JPMC shareholders billions of dollars of value and substantially harmed their equity stake in the combined Company merely so Harrison could remain CEO.

130.    The Proxy Statement stated that the 1.32 exchange ratio agreed to in connection with the Merger significantly exceeded the "implied exchange ratio from

contribution" based on a variety of financial metrics, confirming the unfairness of the exchange ratio. However, Harrison concealed from his shareholders the *reason* for this apparent unfairness.

131. The valuation analysis by JPMC's conflicted banker in the Proxy Statement disclosed the following:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
|---|---|---|---|
| | 57.8% | 42.2% | 1.320 |

| | Contribution by JPMorgan Chase | Contribution by Bank One | Implied Exchange Ratio from Contribution |
|---|---|---|---|
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

132. It follows from the analysis of JPMC's financial advisor that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness, based on a comparison against exchange ratios implied from various other metrics, as set forth above.

133. The valuation analysis by Bank One's financial advisor in the Proxy Statement disclosed the following:

| | | | Implied | |
|---|---|---|---|---|
| | Bank One % | JPMorgan Chase % | Exchange Ratio | Premium/ (Discount) To Bank One |
| **Income Statement** | | | | |
| GAAP (I/B/E/S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |

| | | | | |
|---|---|---|---|---|
| Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
| Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk-Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common Stockholders' Equity | 33.3 | 66.7 | 0.918 | (20.0) |
| Tangible Common Stockholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

134.    It follows from the analysis of Bank One's financial advisor that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness, based on a comparison against exchange ratios implied from various other metrics, as set forth above.

135.    Revealing that the Merger's exchange ratio offered an unreasonable, extraordinary and unfair premium compared to similar transactions (indeed, only the premium in the merger between Fleet Financial Group, Inc. and BankBoston Corporation was comparable), the valuation analysis by Bank One's banker in the Proxy Statement also disclosed the following analysis of premiums in comparable transactions:

| | Announcement Date | 1-Day Premium (%) | Ownership (%) |
|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 |
| Travelers Property Casualty Corp. /   The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 |
| First Union Corporation / Wachovia  Corporation | 4/15/01 | 7 | 73/27 |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 |

| | | | |
|---|---|---|---|
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 |
| Dean Witter, Discover & Co. / Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 |

136.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined.  In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Comparing JPMC's performance while Harrison was CEO against the performance of Bank One under Dimon reveals the absurdity of even suggesting that Harrison's service as CEO for two more years was worth billions of dollars.

137.    Despite his poor leadership, Harrison was compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted.  Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

138.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 *New York Times* article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around.  "If we had gone another year without performing, the board probably would have

demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on. But in the end, I presume that they liked my leadership."

139.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

140.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive. I guess he is going to be running the show from day one."

141.    London's *Sunday Telegraph* reported on January 18, 2004:

JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

142.    "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

143.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

144.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

145.    An April 19, 2005 article in *Bloomberg* reported the following comment: "'He is their future,' said Jack Welch, the former CEO of General Electric Co., who has worked as a consultant to JPMorgan, in an interview. 'He's the new guy. It's his company."

146.    The June 27, 2004 *New York Times* article observed, "William Harrison may be the acquirer in the [Merger], but it is becoming clear that James Dimon and his posse will call many of the shots."

147.    The *Australian* reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[….]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

148.    *Retail Banker International* reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint."  *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively."  The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One."  According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

149.    *Retail Banker International* further observed:

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

150.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community.  One analyst specifically asked Harrison:

With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

151.    Harrison's evasive answer omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

It's all part of creating a structure in a negotiation process that works for both firms. I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance. And as I said before, I will stay around as Chairman as long as Jamie wants me.

152.    Harrison's answer specifically concealed that he had preserved his CEO title only by agreeing to a massive premium in connection with the Merger, at the expense of pre-Merger JPMC shareholders. Despite Harrison's assertion that the two-year arrangement represented "a good balance," he specifically concealed that he had obtained his two additional years by rejecting a zero premium exchange ratio.

153.    Another analyst on the January 15, 2004 conference call also probed the specific issues of succession and titles:

Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move for that now, as you know, things can change a lot in two years based on your experience?

154.    Dimon's response to this question omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

You've got to think a little bit that these are two large organizations coming together. You want the teams to meld. I have a lot to learn there. Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

155.    Harrison's failure to respond to this clear question, which demonstrated shareholder interest in the two-year arrangement, also represented a failure to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  In fact, Harrison knew that Dimon **had** sought the CEO position immediately.

156.    Despite these clear questions, Harrison concealed that, in fact, he had contemplated a merger of equals with no premium at all for Bank One, and Dimon assuming the CEO position.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to fund a multi-billion-dollar premium for Bank One and receive a smaller share of the combined Company.

157.    Similarly, Dimon also concealed the *quid pro quo* at the conference call.

158.    After the Merger was announced, Harrison retreated and appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  By contrast, Dimon managed the operations of the combined Company.  Thus, even though Harrison ceded billions of dollars of value belonging to JPMC shareholders to retain his CEO title for another two years, in many respects Dimon functioned as the de facto CEO of the combined entity immediately after the Merger was announced.

159.    In addition to his financial motives, Harrison kept the CEO title to shape a graceful exit for himself.  In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal…."

**The False and Misleading Proxy Statement Violates Federal Securities Laws**

160.    JPMC shareholders were repeatedly encouraged to review the Proxy Statement sent to JPMC shareholders on or about April 21, 2004 in connection with the Merger.  For instance, the Press Release accompanying the announcement of the Merger stated: "Stockholders are urged to read the joint proxy statement/prospectus regarding the proposed transaction when it becomes available, because it will contain important information."  The Proxy Statement itself stated: "You should carefully read this entire document and the other documents we refer you to for a more complete understanding of the [M]erger."

161.    However, the Proxy Statement made no mention at all of Harrison's rejection of the opportunity to merge Bank One into JMPC without any acquisition premium.

162.    Although the Proxy Statement represents that the Director Defendants were regularly kept apprised of the negotiations, not once does the Proxy Statement advise shareholders that Dimon was willing to do a zero-premium merger of equals but this was rejected solely because Harrison wanted to keep his CEO title.  The Proxy Statement described the negotiation process in great detail but carefully omitted any reference to the rejected opportunity:

>    William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.

>    During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon

preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.

Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.

The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due

diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and

Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

…

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

163.    The Proxy Statement advised shareholders that the JPMC Board (i.e., the Director Defendants) "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

164.    The Proxy Statement also included a fairness opinion authored and endorsed by the Company's conflicted financial advisor to the Director Defendants which stated, in relevant part, "it is our opinion as of the date hereof that the Exchange Ratio in the proposed Merger is fair, from a financial point of view, to the Company." Although the Proxy Statement advised that "Holders of [JPMC] common stock are urged to, and should, read this opinion carefully and in its entirety," the fairness opinion omitted any analysis of the premium itself.

165.    As investors ultimately learned, and as detailed herein, the statements made in the Proxy Statement issued in connection with the Merger were incomplete and materially misleading (and were known by the Insider Defendants to be misleading at that time, or were recklessly disregarded thereby as such, for the reasons stated herein). At no time during the solicitation of votes from JPMC shareholders was the *quid pro quo* between Dimon and Harrison ever disclosed. Also not disclosed was that Dimon was willing to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

166.    In addition to obligations under federal securities laws and a fiduciary's duty of disclosure, standard business practice dictates that the superior offer should have been disclosed. For instance, in an August 11, 2004 merger proxy statement issued in connection with the banking merger of Riggs National Corporation and The PNC Financial Services Group, Inc., the proxy statement explicitly disclosed a competing offer that, on its face, was financially superior:

> The Riggs board of directors met at 12:00 noon on July 15 to review the two other bids. One of these bids was the proposal by PNC ultimately accepted by Riggs. The second bid was for an all stock offer which had a value,

based on closing prices of the bidder's stock and PNC's
stock on July 14, that was approximately $0.97 (or 4%)
higher than the PNC bid.

167.    The law firms behind the Riggs/PNC combination were none other than

Wachtell Lipton Rosen & Katz and Sullivan & Cromwell LLP, the legal advisors for

Bank One and JPMC's Board, respectively, in connection with the Merger.

168.    The omissions in the Proxy Statement were designed by the Insider

Defendants to mislead shareholders of JPMC into approving the Merger (and the

amendment to JPMC's certificate of incorporation to expand the corporate authorization

to issue shares, without which the Merger could not have been consummated) without

knowing that Harrison had passed on a nil-premium exchange ratio solely to preserve his

CEO title, which he considered to be in danger.  These statements also materially misled

investors as to the true rationale for the Merger and, as such, also operated as a fraud and

deceit as to investors who sold shares of the Company at any time during the Class

Period.

169.    On May 25, 2004, in justifiable reliance on the materially deceptive Proxy

Statement and having been kept in the dark about the full truth concerning the terms of

the deal, JPMC shareholders approved the Merger.  According to a Dow Jones Newswire

report on the shareholder meeting:

> While the merger was approved, *some shareholders did express concern
> that the $58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that ***Bank One will get
> the sweeter deal***, even though its earnings power was 6% less than J.P.
> Morgan's in the last quarter. Bank One will obtain J.P. Morgan's
> investment-banking expertise, its international capability and half of the
> company's board of directors, he said. And given the fact that Bank One's
> Chief Executive James Dimon will take on the role of J.P. Morgan's top
> officer two years from the conclusion of the merger, the shareholder said,
> ***"It appears as if we're merging into them."***

- 56 -

***The statement was met with loud applause from the shareholders who attended the meeting.*** [Emphasis added.]

170.    According to a June 3, 2004 article by David Weidner of *CBS MarketWatch* entitled "Bank One's Dimon may get early start atop J.P. Morgan":

> The support for an ***immediate Dimon regime*** became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of the meeting.
>
> "Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off." [Emphasis added.]

171.    On May 25, 2004, JPMC released the results of the shareholder vote at the annual meeting. The Merger was approved by 68 percent of the votes outstanding.

172.    Among the shareholder proposals put to a vote at the JPMC annual meeting, the proposal that received by far the most support was one recommending that JPMC's Board adopt a resolution requiring the separation of the Chairman and CEO posts. There were 562.5 million votes cast in favor of this proposal, confirming the extraordinary desire of JPMC shareholders to separate the Chairman and CEO posts. The seven other shareholder proposals put to a vote received between 55.1 million votes and 202.6 million votes. Had Harrison accepted Dimon's nil-premium exchange ratio offer, the Chairman and CEO posts would have been separated, with Harrison occupying the Chairman post and Dimon serving as CEO. However, Harrison concealed this opportunity from JPMC shareholders.

173.    With 2,081,783,154 shares entitled to vote at the annual meeting, at least 1,040,891,578 votes had to be cast in favor of the Merger for it to be approved and JPMC's certificate of incorporation amended to reflect the corporate authority necessary to issue enough shares in connection with the Merger.  The threshold was exceeded by 374,785,482 votes, but 562,557,770 votes were cast in favor of the shareholder proposal to separate the Chairman and CEO posts.

174.    On July 1, 2004, JPMC completed the Merger.

175.    The statements contained in the Proxy Statement were each materially false and misleading when made, as they misrepresented and/or omitted the following adverse facts which then existed, the disclosure of which was necessary to make the statements made not false and/or misleading, including:

a.    When the Merger was negotiated and recommended, JPMC's Board did not intend for Harrison to be the true CEO of the combined Company, such that it was false and materially misleading to pretend that this was the intention of Bank One and JPMC prior to the effective time of the Merger, or of JPMC following the effective time of the Merger;

b.    When the Merger was negotiated, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio;

c.    When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio because Dimon sought to be the CEO of the combined Company;

d.    A majority of JPMC's Board was not independent as a result of numerous undisclosed financial relationships between certain of the Director Defendants

and JPMC and personal relationships between certain of the Director Defendants and Harrison, as set forth more fully below;

   e. As a result of the undisclosed *quid pro quo* between Harrison and Dimon, JPMC shareholders were materially misled as to the true structure and rationale of the Merger; and

   f. The Insider Defendants were motivated to conceal their backroom deal and made materially false and misleading statements in the Proxy Statement because this allowed Harrison to preserve his CEO title and allowed Dimon to acquire dominance over the combined Company while securing for himself and other Bank One shareholders a premium to the detriment of JPMC shareholders.

   176. Officers, employees, and agents of JPMC, among others, drafted and finalized all communications to JPMC shareholders, including the Proxy Statement, to solicit their approval of the Merger. JPMC paid for the distribution of the Proxy Statement and for all other efforts to solicit proxies in favor of the Merger.

   177. At all relevant times, Harrison was acting as an agent of the Company and the Board with respect to the matters here at issue, among other things, pursuant to authority granted by the Board. JPMC is vicariously liable for Harrison's actions.

**Damages Sustained by Pre-Merger JPMC Shareholders**

   178. Many shareholders would not have voted in favor of the Merger had they known that Dimon was willing to merge Bank One into JPMC for no acquisition premium if Harrison would relinquish his CEO title immediately. In light of their expressed concerns about the hefty amount being paid to merge with Bank One, that information was plainly critical to JPMC shareholders. The Insider Defendants

concealed the information to prevent JPMC shareholders from discovering it and remained silent in the face of a duty to speak.

179.    Plaintiffs and other members of the Class have been damaged in that, because of defendants' wrongdoing, they were required to vote on the Merger without having been advised of critical facts, did not receive their fair share of the value of the assets and business of the combined entity, suffered the dilution of their individual holdings of JPMC stock, and were prevented from benefiting from a value-maximizing transaction.

180.    Pre-Merger JPMC shareholders were damaged by the lost opportunity to merge with Bank One without paying an unfair and unnecessary premium.  As a result of the Merger, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, owned approximately 58 percent of the combined Company as a result of the Merger.  If JPMC had merged with Bank One without any acquisition premium, as Dimon was willing to do, pre-Merger JPMC shareholders, including Plaintiffs and other members of the Class, would have owned approximately 61 percent of the combined Company.

181.    Sections 102, 161, and 242 of Delaware's General Corporate Law expressly limit the Company's authority to issue shares to the authorization set forth in JPMC's certificate of incorporation and require the direct approval of a majority of shareholders in favor of any expansion of this authority:

> § 102. Contents of certificate of incorporation.
>
> (a) The certificate of incorporation shall set forth:
>
> (4) If the corporation is to be authorized to issue only 1 class of stock, the *total number of shares of stock which the corporation shall have authority to issue*….

§ 161. Issuance of additional stock; when and by whom. The directors may, at any time and from time to time, if all of the shares of capital stock *which the corporation is authorized by its certificate of incorporation to issue* have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock *up to the amount authorized* in its certificate of incorporation.

§ 242. Amendment of certificate of incorporation after receipt of payment for stock; nonstock corporations.

(a) After a corporation has received payment for any of its capital stock, it may amend its certificate of incorporation,

(3) To increase or decrease its authorized capital stock….

(b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

(1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a *special meeting of the stockholders entitled to vote* in respect thereof for the consideration of such amendment or directing that the amendment proposed be *considered at the next annual meeting of the stockholders*….

(2) The holders of the outstanding shares of a class *shall be entitled to vote* as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, *if the amendment would increase or decrease the aggregate number of authorized shares* of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely….The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the *affirmative vote of the holders of a majority of the stock of the corporation*…. [Emphasis added.]

182.    In connection with the Merger, shareholders approved, based on the

defective Proxy Statement, the following amendment to JPMC's certificate of

incorporation:

Article Fourth of the Certificate of Incorporation of the
Surviving Corporation shall be amended by: (i) deleting the
words "FOUR BILLION SEVEN HUNDRED MILLION"
in the first sentence thereof and inserting in its place the
words "NINE BILLION TWO HUNDRED MILLION",
and (ii) deleting the words "FOUR BILLION FIVE
HUNDRED MILLION" in the first sentence thereof and
inserting in its place the words "NINE BILLION".

183.    The Proxy Statement described the necessity of this amendment as

follows:

Because JPMorgan Chase does not currently have a
sufficient number of authorized but unissued and
unreserved shares to complete the merger and related
transactions, the merger agreement also provides that, as
part of the merger, JPMorgan Chase's certificate of
incorporation will be amended to increase the authorized
shares of its common stock from 4,500,000,000 to
9,000,000,000 and, as amended, will be the certificate of
incorporation of the combined company. This amendment
will not be effected unless the merger is approved by
stockholders and completed.

184.    As a result of the misrepresentations and omissions of material facts set

forth herein, including the failure to disclose that Harrison rejected the opportunity to

merge Bank One into JPMC with a nil-premium exchange ratio, JPMC shareholders

voted in favor of amending the Company's certificate of incorporation to allow the

Company to issue far more shares than the Company would have needed to issue had

Harrison agreed to a nil-premium exchange ratio.

185.    The wrongfully-obtained shareholder approval of corporate authority

caused the unfair allocation of the equity of pre-Merger JPMC shareholders in the

combined Company.

186.    Given that over 500 million votes were cast in favor of separating the

CEO and Chairman titles, Harrison would have been pressured to accept Dimon's no-

premium offer (which would have had the effect of separating the CEO and Chairman titles) but for the omission of the backroom deal from the Proxy Statement and other statements soliciting votes in favor of the Merger.

187.    Pre-Merger JPMC shareholders were lulled into inaction by the entrenchment scheme foisted upon them by the Insider Defendants.  Thus, JPMC shareholders were deprived of the opportunity to press for a zero premium combination as well as the opportunity to object to, or vote down, the Merger as proposed.

188.    But for the entrenchment scheme described herein, sellers of JPMC stock would have sold their stock at a significantly higher price.  The highly efficient markets for JPMC and Bank One securities promptly incorporated the misleading information set forth in the Press Release as well as oral misrepresentations by the Insider Defendants and thus reflected the market's assessment of the Merger.  After the announcement of the Merger, the combined market capitalization of JPMC and Bank One reflected the market's assessment of the combined Company's value.

189.    Based on the market reaction in the wake of the Merger announcement, the price per share of JPMC common stock would have increased by several dollars had a 1.153 Merger exchange ratio been agreed to and announced instead of 1.32.  As a result of the foregoing conduct, members of the Class were fraudulently deprived of the opportunity to sell or otherwise dispose of their JPMC securities at the higher price.

## JPMC'S BOARD LACKED AN INDEPENDENT MAJORITY

190.    JPMC's Board of Directors lacked an independent majority when the Merger was considered, approved and recommended to JPMC shareholders, and accordingly the Director Defendants' decisions and actions herein are not entitled to the shelter of the business judgment rule.

191.    Each of the Director Defendants other than Harrison received an annual retainer of $75,000, an annual grant of common stock equivalents valued at $170,000 on the date of grant, and several other valuable benefits.  Further, each chairman of a JPMC Board committee received an additional fee of $15,000 per year.  In addition to the director-specific reasons set forth below, the extraordinary magnitude of the JPMC director compensation package undermined the independence of each of the Director Defendants other than Harrison.

**1. Riley P. Bechtel**

192.    Defendant Bechtel was beholden to Harrison because the Bechtel Group, Inc., of which he is Chairman and CEO, has received over $2 billion from the Trade Bank of Iraq in connection with the reconstruction of that country.  The Trade Bank of Iraq is managed by JPMC.

193.    The staggering size of this financial relationship shows that JPMC and the Bechtel Group, and their respective CEOs, are mutually interested in their ventures in Iraq.  The importance of this relationship to Bechtel Group is clear from its corporate website, which lists the "U.S. Government's Iraq Infrastructure Reconstruction Program" prominently on its homepage.  Further, the website proudly points out that "Iraq Infrastructure II," Bechtel Group's second major Iraq contract, is valued at up to $1.8 billion.  Bechtel Group depends on the Trade Bank of Iraq to execute its lucrative contractual commitments in rebuilding Iraq's infrastructure.  JPMC, headed by Harrison, leads the consortium of banks operating the Trade Bank of Iraq.

194.    Given JPMC's control over the Trade Bank of Iraq, and Bechtel Group's dependence on the Trade Bank of Iraq to execute its projects abroad, future

reconstruction work for Bechtel Group would be jeopardized if defendant Bechtel voted against Harrison or otherwise vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.  Of course, such friction between Harrison and Bechtel was avoided entirely by Bechtel because it could have harmed any future Bechtel Group projects in which JPMC was in any way involved.

195.    The Bechtel Group and JPMC share other considerable financial interests, such as their holdings in Nexant Corporation, which is partly owned by Bechtel Capital Partners, LLC, an investment partnership owned by certain partners of the Bechtel Group and The Beacon Group, a private equity investment firm affiliated with JPMC, which manages approximately $1.6 billion in assets in the energy industry.  Nexant purports to be a "provider of technology solutions and experience-based technical and management consulting services to the global energy industry."  On September 27, 2000, Nexant completed its first venture investment round, announcing:

> Nexant, Inc., the energy technology and consulting company formed by Bechtel Capital Partners LLC earlier this year, announced today that it has successfully completed its first venture investment round, securing $15 million in capital from a blue chip group of investors, including The Beacon Group, Morgan Stanley Dean Witter, the partners of Hellman & Friedman LLC, and Nth Power Technologies, Inc. Nexant will use the investment proceeds to complete development of new technology solutions for the energy industry.

196.    In 1986, Bechtel Group spun off its Bechtel Investments subsidiary into a separate corporation called the Fremont Group, headed by Alan Dachs, Riley Bechtel's brother-in-law.  In addition to their shared interest in Nexant, JPMC (through its J.P. Morgan Fleming Asset Management subsidiary) and Bechtel Group (through the Fremont

Group) are co-investors in LightSand Communications, Inc., which manufactures equipment used to transport data in storage area networks.

197.    Defendant Bechtel was also beholden to Harrison because Bechtel Group's financial interests (and thus Bechtel's financial interests) depend on the Export-Import Bank, the official export credit agency of the United States, which has financed or guaranteed numerous loans for Bechtel Group projects abroad.

198.    According to the Export-Import Bank December 2003 annual report, JPMC Senior Vice President Jacqueline A. Kaiko was a member of the Export-Import Bank's advisory committee.  Thus, Ms. Kaiko served in this capacity while the Merger was negotiated.

199.    According to the list of attendees for the Export-Import Bank 2003 Annual Conference, Ms. Kaiko attended on behalf of JPMC, as did the following other JPMC personnel: Maria Adamczyk (Assistant Vice President), Robert Blades (Senior Vice President), Gamal Boulos (Assistant Treasurer), Sergio Chua (Vice President), Charles Dugan (Vice President), Marguerite Gill (Vice President), Joseph Longo (Vice President), Olivera Mladenovic (Vice President), Jo Morrison (Vice President) and M.G. Shetty (Vice President).

200.    Also in attendance at the Export-Import Bank 2003 Annual Conference were three Bechtel Group personnel: Ed Crooks (Business Development Manager, Bechtel Infrastructure), Robert Draggon (Associate Managing Director, Bechtel Enterprises, Inc.), and Arthur Pilzer (Vice President, Bechtel Enterprises, Inc.).

201.    Moreover, (1) according to the Export-Import Bank's list of Delegated Authority Lenders dated November 30, 2004, JPMC was one of the Export-Import

Bank's Delegated Authority Lenders, with Ms. Kaiko designated the contact person for

JPMC; and (2) Chase Manhattan Bank NA, a JPMC subsidiary, was listed on the Export-

Import Bank's Lender Referral List as of June 30, 2004, with Ms. Kaiko designated the

contact person.

202.    Thus, as the Merger was being negotiated, future projects abroad for

Bechtel Group would be jeopardized if defendant Bechtel voted against Harrison or

otherwise vigorously opposed an action by Harrison to favor himself over JPMC's

shareholders.

203.    The depth of the relationship between the Bechtel Group and JPMC is

further corroborated by the fact that former secretary of state George P. Shultz serves on

the Bechtel Group board of directors and served as chairman of the International Council

of JPMC.  Shultz is also a member of the Augusta National Golf Club, as are defendants

Bechtel, Harrison, and Bossidy.

204.    As a trained corporate lawyer, Bechtel possessed legal expertise which

enhanced his understanding of fiduciary obligations and disclosure obligations under

federal securities laws.

205.    Although the Proxy Statement represented that the Director Defendants

"determined that each of the non-management directors is independent in accordance

with the director independence definition specified in the Corporate Governance

Practices of JPMorgan Chase's board, which definition includes the independence

standards applicable under the listing standards of the New York Stock Exchange for

independence of board members," the Proxy Statement omitted the full extent of

defendant Bechtel's relationship with JPMC, as set forth above.  Accordingly, JPMC

shareholders were prevented from assessing for themselves Bechtel's purported

independence as well as the purported independence of the Board as a whole.

## 2. Frank A. Bennack, Jr.

206.    Defendant Bennack has been Chairman of the Executive Committee and

Vice Chairman of the Board of The Hearst Corporation since June 2002.  He also is the

immediate past President and Chief Executive Officer of The Hearst Corporation,

positions he held beginning in 1979.  Hearst-Argyle Television, Inc. ("Hearst-Argyle") is

related to The Hearst Corporation, which folded its television holdings into Hearst-

Argyle.  Bennack was not an independent director because Hearst-Argyle has a credit

facility with a consortium of banks led, in part, by JPMC.

207.    Hearst-Argyle, which is majority-owned by The Hearst Corporation, was

formed in 1997 by the merger of the broadcast group of The Hearst Corporation and

Argyle Television, Inc.  According to his executive biography, Bennack was instrumental

in creating Hearst-Argyle.  A Hearst-Argyle quarterly report discusses its financial

relationship with JPMC as follows:

> *J.P. Morgan Chase & Co.* The lead agent bank under the
> Company's $500 million credit facility entered into in April
> 1999 was J.P. Morgan Chase & Co ("J.P. Morgan"). The
> outstanding balance on the credit facility was paid off as of
> September 2003, and the facility matured on April 12,
> 2004. Frank A. Bennack, Jr., a Director of the Company,
> served as a Director of J.P. Morgan until July of this year.
> We expect to enter into a new credit facility for $250
> million with J.P. Morgan, and other parties, before the end
> of the year.

208.    As of September 30, 2004, Hearst-Argyle had approximately $1 billion in

long-term debt, amounting to nearly half of its $2.4 billion market capitalization.  Thus,

Hearst-Argyle is a significantly leveraged entity that depends upon favorable terms in its

credit facility for its operations and to maximize profits.  As a leading creditor, JPMC

possesses substantial leverage over Hearst-Argyle.

209.    In addition, according to Hearst-Argyle's SEC filings, JPMC and Hearst-

Argyle are co-investors in ProAct Technologies, a privately held corporation in which

Hearst-Argyle invested $25 million on March 22, 2000.

210.    According to Hearst-Argyle's SEC filings, Bennack owns 25,000 shares

of Hearst-Argyle, worth approximately $625,000.  Moreover, Bennack's senior position

at The Hearst Corporation, the majority owner of Hearst-Argyle, reinforces the

importance of Hearst-Argyle's success to Bennack.  Accordingly, as Hearst-Argyle is

indebted to JPMC, and also co-invests with JPMC, Bennack was unlikely to have

challenged Harrison.  Doing so would have risked incurring the wrath of the head of one

of Hearst-Argyle's most powerful creditors, potentially resulting in such repercussions

as: (1) a less favorable credit facility for Hearst-Argyle when renewed; (2) increased

pressure on Hearst-Argyle from a major creditor; or (3) the elimination of further co-

investment opportunities with JPMC.  Any of these consequences would have adverse

implications for the value of Bennack's investment in Hearst-Argyle, as well as the value

of The Hearst Corporation's investment in Hearst-Argyle.  Taken together, Bennack's

direct interest in Hearst-Argyle, coupled with JPMC's relationship with Heart-Argyle and

Bennack's position with Hearst-Argyle's majority owner, raise serious doubts that he

would have vigorously opposed an action by Harrison to favor himself over JPMC's

shareholders.

211.    Although the Proxy Statement represented that the Director Defendants

"determined that each of the non-management directors is independent in accordance

- 69 -

with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy Statement omitted the full extent of defendant Bennack's relationship with JPMC, as set forth above. Accordingly, JPMC shareholders were prevented from assessing for themselves Bennack's purported independence as well as the purported independence of the Board as a whole.

**3. Lawrence A. Bossidy**

212.    Defendant Bossidy is not an independent director because his son is employed by JPMC as a Vice President who received over $100,000 in compensation from the Company in 2003 (and, according to a publicly-available salary survey of JPMC Vice Presidents, closer to $200,000). Bossidy's independence falls short because he was unable to take a position adverse to Harrison without endangering his son's career at JPMC. Any controversy between Bossidy and Harrison might well have adversely affected Bossidy's son's bonus or other compensation or his career advancement. Even if Bossidy was otherwise a capable and independent director, for the purposes of this action, his familial interest raises serious doubts that he would have opposed actively an action by Harrison to favor himself over JPMC's shareholders.

213.    Bossidy's close relationship to Harrison is also demonstrated by the fact that both men serve as directors of Merck & Co., Inc. and are members of the Augusta National Golf Club.

214.    Bossidy is also beholden to Harrison because Bossidy has authored best-selling books on business management and Harrison has personally assisted Bossidy's efforts to sell the books by lending his name and recommendation to back cover blurbs.

**4. M. Anthony Burns**

215.    Defendant Burns, the Chairman Emeritus and former CEO of Ryder System, Inc. was not an independent director because J.P. Morgan Trust Company, a JPMC subsidiary, serves as indenture trustee for Ryder, including as indenture trustee for Ryder's $800 million August 2003 registration of securities.

216.    According to Ryder's SEC filings, Burns owns 1,158,384 shares of Ryder, or about 2 percent of its outstanding shares, worth approximately $50 million.

217.    As indenture trustee, JPMC acts as a fiduciary for Ryder bondholders. Under the indenture agreement between J.P. Morgan Trust Company and Ryder, if Ryder defaults, the trustee has a number of rights and powers to protect Ryder bondholders. For instance, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Ryder was either undersecured or would be undersecured within a relatively short time. In this way, JPMC possesses significant leverage over Ryder.

218.    Given Burns' financial interest in Ryder and JPMC's relationship with Ryder, it is doubtful that Burns would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. Doing so might have created a conflict between Ryder and the indenture trustee for Ryder's bondholders, with adverse repercussions for the value of Burns' Ryder stake.

219.    Although the Proxy Statement represented that the Director Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy Statement omitted the full extent of defendant Burns' relationship with JPMC, as set forth above. Accordingly, JPMC shareholders were prevented from assessing for themselves Burns' purported independence as well as the purported independence of the Board as a whole.

**5. Ellen V. Futter**

220.    Defendant Futter is not an independent director because JPMC is a significant benefactor of The American Museum of Natural History (the "Museum"), of which Futter is President and Trustee. A former corporate lawyer, Futter earned $470,362 annually from the Museum, according to a May 10, 2003 article in the <u>New York Daily News</u> entitled "Nonprofit execs still sit pretty." However, according to the same article, Futter was paid $440,000 in connection with her service as a paid director of JPMC, Con Edison, Bristol-Myers Squibb, and American International Group, not including stock or option awards. Thus, Futter's compensation for her directorships represent a substantial and material portion of her total income.

221.    Due to JPMC's extensive philanthropic involvement with the Museum, Futter could not endanger the Museum's important relationship with JPMC by vigorously opposing an action by Harrison to favor himself over JPMC's shareholders. Among other things, the Museum's Young Naturalist awards are funded by a grant from the J.P.

Morgan Chase Foundation (the "Foundation"). JPMC makes donations through the

Foundation and, according to "The JPMorgan Chase Corporate Responsibility Annual

Report," the Foundation made $312,500 in contributions to the Museum in 2003. This

carries on JPMC's long-standing support for the Museum, originating with financier J.P.

Morgan's donations of gems and minerals to the Museum's Tiffany-Morgan Collection

of Gems, many of which are on display in the J.P. Morgan Hall of Gems.

     222.    In addition to her corporate directorship fees, Futter's career and success

depend on the nurturing and retention of corporate donors such as JPMC. For Futter to

stand in Harrison's way would not only endanger the Museum's relationship with JPMC,

but also diminish Futter's ability to solicit other large donations from the corporate

community and her desirability as a compliant director.

     223.    An article in the June 20, 2003 edition of <u>The Wall Street Journal</u>

specifically profiled Futter and questioned whether she was, in fact, an independent

director:

> *Giving at the Office*
>
> On Corporate Boards, Officials From Nonprofits Spark
> Concern When Directors' Position Helps Raise Funds
>
> When Directors' Positions Help Them Raise Funds, Danger
> of Conflict Follows
>
> Aiding Ms. Futter's Museum
>
> By David Bank And Joann S. Lublin
>
> When companies look for outsiders to join their boards,
> they often turn to people such as Ellen Futter, the president
> of the American Museum of Natural History in New York.
> As corporations see it, the leaders of big nonprofits can
> bring independence and a broader view of social issues to a
> board. Ms. Futter serves on four: insurer American
> International Group Inc., pharmaceutical maker Bristol-

Myers Squibb Co., the energy company Consolidated
Edison Inc. and J.P. Morgan Chase & Co., the nation's
second-biggest bank.

For museum directors, university presidents and other
nonprofit leaders, a corporate directorship offers a big plus
too: connections that can lead to major donations. All four
of the companies on whose boards Ms. Futter sits have
made substantial contributions to her museum -- both
during her nine years as president and before.

But those contributions create a potential conflict of
interest: the possibility that money flowing from companies
and their executives will make nonprofit officials beholden
to the corporate management they are supposed to monitor.

Exhibit A is Enron Corp. The onetime energy-trading giant,
its chief executive and affiliated foundations directed
millions in donations during the 1990s to a Houston cancer
center headed by Enron director John Mendelsohn, who
served on Enron's now-famously-inattentive audit
committee. (An Enron spokesman declines to comment. Dr.
Mendelsohn has said the center doesn't depend heavily on
Enron philanthropy.)

The potential problem goes far beyond the well-publicized
Enron example. A Delaware Chancery Court judge ruled
just last week that a supposedly independent investigative
committee created by Oracle Corp.'s board was in fact
fraught with "bias-creating relationships." One conflict:
The two directors that constituted the panel -- a pair of
Stanford University professors -- were asked to investigate
controversial stock sales by fellow board members, some of
whom had donated heavily to Stanford. The ruling allowed
a shareholder lawsuit to go forward against those board
members, including Oracle's chairman and chief executive,
Larry Ellison, who personally and through the company has
given millions to Stanford.

Now, concern about this kind of problem is spurring the
Nasdaq Stock Market to propose new rules encouraging
companies to limit donations to nonprofits whose
executives sit on the companies' boards. The New York
Stock Exchange also wants to promote directors'
independence, but proposals it has made don't specifically
target nonprofit conflicts.

It isn't clear yet how tough the exchanges' new rules will be, but several corporate boards have begun to take action in anticipation of new restrictions. All this comes amid wide-ranging efforts to reform corporate boards after a wave of business scandals that boards did little to curtail.

Acting on her own, Ms. Futter resigned last year from the committee of Bristol-Myers directors that oversees the company's audits. She also stepped down last year from the AIG committee that helps set top executive salaries. Ms. Futter wanted to avoid "even the appearance of conflict" between her duties overseeing the companies and her fund raising, a spokeswoman for the natural-history museum says. The expectation of the new rules also factored into Ms. Futter's decisions, the spokeswoman says.

Ms. Futter, who declined to be interviewed, remains on the four corporate boards. She continues to serve on committees such as the Bristol-Myers corporate-governance panel, which considers questions of possible conflicts of interest of board members, among other duties. It's far from certain that the proposed rule changes would force any alteration in her relationships with the companies.

The museum chief's fund-raising success illustrates the potential problem created by nonprofit executives serving on corporate boards. In 2001, she received a bonus of more than $150,000 on top of her $450,000 annual salary, in part for opening the museum's $210 million Rose Center for Earth and Space, according to the museum. On a wall honoring major contributors to the multimedia Rose Center, the list of 34 "friends" includes: Bristol-Myers, Con Edison and the Starr Foundation, which was endowed by AIG's founder and is run by current and former AIG executives. Ms. Futter served on the boards of all of the companies when they or their related foundations made these contributions.

Bristol-Myers, through the Bristol-Myers Squibb Foundation, was also the primary sponsor of the museum's 1999 exhibit, "Epidemic!" The foundation contributed $1.2 million over four years for the display on infectious diseases. In addition, Bristol-Myers has given the museum a total of $700,000 for other purposes during Ms. Futter's tenure as president.

Ms. Futter, a lawyer by training and a former president of Barnard College in New York, has also raised large amounts of money from companies and foundations to which she has no direct connection. During her time at the museum, giving by the four companies on whose boards she sits has been "consistent with the philanthropic support these corporations have provided historically to the museum before Ms. Futter became president and/or joined these boards," the museum says in a written statement.

She served on the six-member Bristol-Myers audit committee from 1993 until 2002, chairing the panel in 1998 and 1999. In March, Bristol-Myers restated its financial results from recent years, acknowledging that from 1999 through 2001, it had overstated revenue by a total of nearly $2.5 billion. The restatement raised its revenue by $653 million for the first half of 2002. The company's financial reporting is now under investigation by the Securities and Exchange Commission and the Justice Department. The company has said it is cooperating with the government probes and doing its own internal investigation. There is no indication the government inquiries are focusing on board members.

Bristol-Myers says that its contributions to the natural-history museum haven't compromised Ms. Futter's role on its board. "Since 1990, she has provided important independent counsel and guidance to the company," Rebecca Taylor, a company spokeswoman, says.

AIG reached a similar conclusion, says company spokesman Joseph Norton. He points out that the Starr Foundation is for legal purposes independent of AIG. But Maurice Greenberg, AIG's chief executive, serves as chairman of the foundation, and other members of AIG's board serve on the foundation's board. Mr. Greenberg serves as a trustee of the natural-history museum, as well.

In 1999, the year Ms. Futter joined AIG's board, the Starr Foundation committed $10 million over two years to build the museum's C.V. Starr Natural Science Building, a $35 million, nine-story research facility in New York, with labs, exhibits and retail space. "We've been funding the museum long before Ellen was there," says Florence Davis, the foundation's president and formerly AIG's top in-house lawyer. "It has nothing to do with her being on AIG's board."

> Anne Canty, the museum spokeswoman, says none of the
> corporate contributions had any effect on Ms. Futter's
> boardroom decisions. "Ms. Futter's role as a director is
> independent of her role as president of the museum," Ms.
> Canty says.
>
> Con Ed and J.P. Morgan Chase say they continue to
> consider Ms. Futter to be an independent board member.
>
> […]

224.    Other publications have also criticized Futter for conflicts of interest in

connection with her corporate directorships.  The February 21, 2000 issue of *New York

Magazine* observed that as "[a] skilled fund-raiser, [Futter] has made the [Museum]

corporate-friendly," and that "Futter -- whose other accomplishments include being the

first woman to chair the board of the New York Federal Reserve Bank as well as

memberships on the boards of Con Edison, Bristol-Myers Squibb, and J.P. Morgan --

tapped her extensive contacts not just for funding but to boost the museum's visibility."

Futter's willingness to capitalize on her corporate directorships has on at least one

occasion drawn fire for blurring corporate interests with Museum interests.  According to

the *New York Magazine* article:

> Take the 1999 exhibit "Epidemic! The World of Infectious
> Diseases," sponsored by drug behemoth Bristol-Myers
> Squibb. That Charles A. Heimbold Jr., Bristol-Myers's
> CEO, sits on the museum's board looked like natural fund-
> raising synergy. That Futter sits on Bristol-Myers's board
> had the appearance of conflict of interest. That, as The
> Nation first reported, Richard Colonno, a Bristol-Myers
> vice-president, served on a special advisory committee that
> helped "shape the content of the exhibition" suggested in-
> house censorship that blunted related issues such as
> pharmaceutical price-gouging.

225.    Futter's accommodation of corporate interests (especially those of

corporations on which she is a director) to bolster the Museum's fund raising efforts and

improve her own career was also exposed in connection with her service as a director of AIG, a company which has been recently plagued by scandal. An article entitled "AIG's Secret Connection with Director" in the June 23, 2003 issue of *Schiff's Insurance Observer* revealed that AIG's proxy statements did not disclose that (a) The Starr Foundation, a charitable foundation affiliated with AIG and controlled by AIG executives, gave $36.5 million to the Museum; or that (b) Hank Greenberg, the recently-deposed CEO of AIG, is a trustee of the Museum. The *Schiff's* article presented the following question: "Might the fact that The Starr Foundation gave $36.5 million to Futter's museum make her, as an AIG director, disinclined to differ with Hank Greenberg?"

226.    In addition to JPMC's direct philanthropic contributions to the Museum, JPMC also makes payments and channels contributions to the Museum in other ways. For instance, according to the March 28, 2005 *BusinessWeek* article entitled "Dimon's Grand Design," JPMC sponsors events at the Museum: "One recent winter night, [JPMC] pulled out the stops for a lavish bash at New York's American Museum of Natural History. Among the 200 or so guests were such luminaries as Senator Hillary Rodham Clinton (D-N.Y.) and Apple Computer Inc. (AAPL) CEO Steven P. Jobs. It was as much a celebration of the bank as it was a fund-raiser for the Global Fund for Women."

227.    It is reasonable to expect that Futter, the head of an institution dependent on the continued financial support of the corporate community, including JPMC, would not endanger her institution's financial backing, as well as her own career, by standing in the way of Harrison's self-dealing. Accordingly, Futter must be considered to be

beholden to Harrison for the purpose of determining whether a majority of JPMC's Board was independent from Harrison in approving the improper premium.

228.    As a trained corporate lawyer who spent over five years with the New York corporate law firm of Milbank, Tweed, Hadley & McCloy, Futter possessed legal expertise which enhanced her understanding of fiduciary obligations and disclosure obligations under federal securities laws.

229.    Although the Proxy Statement represented that the Director Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy Statement omitted the full extent of defendant Futter's relationship with JPMC (and the Museum's relationship with JPMC), as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Futter's purported independence as well as the purported independence of the Board as a whole.

**6. Helene L. Kaplan**

230.    Defendant Kaplan was not an independent director because she is a Trustee and Vice-Chair of the Museum, of which, as previously alleged, JPMC is a significant benefactor.  As one of the senior fiduciaries of the Museum, Kaplan is a steward of its charitable assets and it can reasonably be inferred that she is interested in ensuring that the Museum remains on a firm financial footing, among other things, by nurturing and pleasing corporate donors like JPMC.  Like Futter, Kaplan's interest in the

Company's continued financial support of the Museum renders her insufficiently independent to assure that she would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders. Kaplan also serves on the Board of ExxonMobil, of which Raymond, her fellow JPMC director, is Chairman and CEO.

231.    Kaplan is also not independent because, as an attorney with Skadden, Arps, Slate, Meagher & Flom LLP, which receives substantial fees from JPMC, she must be careful not to cross an important client. Skadden represented Chase Manhattan and Chemical Bank in their merger; Chase Manhattan in its merger with J.P. Morgan; and JPMC in the Merger (performing antitrust and regulatory work). Skadden also represented JPMC in the Currency Conversion Fee Antitrust class action litigation and, as the Merger was negotiated, was representing JPMC in the WorldCom securities litigation, among other cases. According to a March 24, 2005 article by Laurie P. Cohen and Robin Sidel in the *Wall Street Journal* with the headline, "J.P. Morgan's $630 Million Error," subtitled "The Role of a Skadden Arps Lawyer":

> [The primary Skadden partner] had dozens of Skadden lawyers on his team, and J.P. Morgan's co-general counsel, William McDavid, was heavily involved in guiding strategy, say lawyers for other syndicate members. These lawyers say the syndicate was paying Skadden some $13 million in monthly legal fees, a figure that Mr. Kasner declined to comment upon.

232.    Upon information and belief, JPMC was paying tens of millions of dollars in legal fees to Skadden when the Merger was negotiated, approved and recommended, thereby compromising Kaplan's independence.

233.    As a trained and highly experienced corporate lawyer, Kaplan possessed legal expertise which enhanced her understanding of fiduciary obligations and disclosure obligations under federal securities laws.

234.    Although the Proxy Statement represented that the Director Defendants

"determined that each of the non-management directors is independent in accordance

with the director independence definition specified in the Corporate Governance

Practices of JPMorgan Chase's board, which definition includes the independence

standards applicable under the listing standards of the New York Stock Exchange for

independence of board members," the Proxy Statement omitted the full extent of

defendant Kaplan's relationship with JPMC, as set forth above, including without

limitation the substantial legal fees paid by JPMC to Kaplan's law firm and the

Museum's relationship with JPMC.  Accordingly, JPMC shareholders were prevented

from assessing for themselves Kaplan's purported independence as well as the purported

independence of the Board as a whole.


**7. William H. Gray, III**

235.    Defendant Gray is not an independent director because JPMC is a

National Sponsor of the United Negro College Fund (UNCF), of which Gray was

President and CEO at all relevant times.  An article in the March 31, 2003 edition of

*Barron's* critiqued the relationship between Gray and Harrison, as well as UNCF and

JPMC:

> Sweet Charity
>
> Should the head of a nonprofit be on the compensation
> committee of one of its corporate donors?
>
> JUST A FEW WEEKS AGO, the annual campaign for the
> United Negro College Fund began at J.P. Morgan Chase,
> with a high-spirited reception at the International Center for
> Photography in New York City. A blizzard of solicitations
> from bank executives ensued, encouraging employees to

donate to the "workplace campaign" through a secure
Website or an interactive telephone voice response system.

The longstanding relationship between the two institutions
is warm and cozy. The Rockefellers, who founded the
Chase Manhattan Bank, were charter supporters of the
United Negro College Fund since the UNCF was
established in 1944 by Frederick Patterson. A third of the
money to be raised from J.P. Morgan Chase supports the
John F. McGillicuddy Scholarship Fund, which has
awarded $1.4 million in scholarships since 1993. The
recipients are students going to United Negro College Fund
member schools.

In many ways, the relationship between Bill Harrison,
chairman of the bank that's the nation's second-largest after
Citigroup, and Bill Gray, is warm and comfortable, too, in
the way of men who've served on boards with each other
for more than a decade.

Gray, 61, is the United Negro College Fund's chairman and
chief executive. A Baptist minister and Democratic
congressman from Philadelphia from 1979 to 1991, he is
today a director of Dell Computer, Electronic Data
Systems, MBIA, Pfizer, Prudential Insurance, Rockwell
Automation, Viacom and Visteon. Gray is a director of J.P.
Morgan, having become a director of Chase Manhattan just
after he gave up his congressional seat in '91. Moreover, he
also sits on the bank's compensation committee, along with
Bechtel Chairman Riley Bechtel, ExxonMobil CEO Lee
Raymond and Wyeth Chairman John Stafford, who heads
the committee.

In January 2001, that same group approved a $10 million
bonus to Harrison for completing the merger between J.P.
Morgan and Chase.

It cut Harrison's stock package last year by 50%. But in
January of this year, Harrison got the second $5 million
installment of the merger-related bonus, even though, like
other financial institutions, J.P. Morgan has been
hammered by declines in investment banking, increases in
bad debt, legal disputes, regulatory investigations and
fallout from its relations with Enron and WorldCom. Since
Dec. 29, 2000, the day before the merger became effective,
J.P. Morgan stock has fallen by 46.9%. In the same period,
the S&P 500 index has slid by 34.2%.

Harrison, in turn, serves as treasurer of the United Negro College Fund. And J.P. Morgan and its employees are some of the fund's largest contributors. Last year J.P. Morgan employees raised some $1.28 million, or an average of $179 per gift, which the J.P. Morgan Chase Foundation matched dollar for dollar. Over the past six years, the contribution has totaled approximately $11 million.

Recently, the annual appeal to J.P. Morgan workers kicked off with a target of $1.37 million -- some 7% above the level achieved last year, even though head count has fallen sharply. Midway through last month, the campaign had already raised $414,000 from 1,893 employees, according to a J.P. Morgan Website. The campaign ends on April 4, and payroll deductions start in June. Those giving at the "leadership level" -- or more than $350 -- will be recognized as "UNCF Leaders" and receive a gift.

Arrangements like the one involving Gray, Harrison and JP Morgan draw fire from corporate-governance experts. "This is known as director interlock -- You scratch my back, and I scratch yours," says Charles Elson, head of the Center for Corporate Governance at the University of Delaware. "If I give money to your foundation and you're on my board, and you serve on the compensation committee, in today's environment, that's a conflict of interest. That individual, in my view, would be classified as a non-independent director and should probably reconsider their service on that board."

Harrison's status as the college fund's treasurer isn't disclosed in J.P. Morgan's proxy statement, including the latest, which was filed Friday. Continues Elson: "From my point of view as a shareholder, I would want that information for voting. I'm surprised it's not disclosed, particularly in today's environment, when discretion is the better part of valor." Elson draws comparison with the case of Charles A. LeMaistre, a former Enron director who was president of the M.D. Anderson Cancer Center at the University of Texas. The cancer center was promised $600,000 in donations from Enron while LeMaistre served on Enron's board.

In a prominent section of J.P. Morgan's Website that addresses corporate governance, Harrison describes his pride in "the 200-year tradition of integrity on which this firm is built." Each of the bank's directors, the Website

relates, is independent. Its definition of independence? "The director has no material relationship with the firm, either directly or as a partner, stockholder or officer of an organization that has a relationship with the firm."

J.P. Morgan declined to comment to Barron's. However, a person familiar with the relationship with the fund stressed that "the vast majority" of contributions came from employees, and that a Chase executive has served as the fund's treasurer since inception, "a tradition that's not questioned and nothing untoward and nobody has seen a problem with this for over 60 years." Finally, this person pointed out, J.P. Morgan's own governance guidelines declare that if the bank accounted for 2% of a not-for-profits' budget, and the nonprofit's executive sits on the bank's board, only "then is that director no longer independent." And, this person points out, J.P. Morgan's contribution accounts for less than 2% of the fund's budget.

Gray wasn't available to comment.

J.P. Morgan certainly isn't another Enron. And the fund is indubitably a worthy recipient: 60% of its scholarships go to people who are the first in their families to attend college. Roughly the same percentage goes to people whose families have annual incomes under $25,000. And half its scholars come from single-parent households.

And the J.P. Morgan Chase contribution last year was just a fraction of the $178.8 million in annual support and revenues pledged to the fund. The J.P. Morgan Chase Foundation and J.P. Morgan Chase Bank gave away $73 million in 2002.

Other J.P. Morgan contributions to the fund included sponsoring its celebrity golf tournament and contributing about $800,000 to the fund's technology-enhancement capital campaign, the first year of a two-year commitment. Sure, raising money for charities is generally a very worthwhile activity. But there are ways to do it without creating the potential for a conflict of interest.

Happily, conflicts of interest, while rife, are less so than they once were, observes Elson of the University of Delaware. "They are certainly on the decline, given what's happened with Enron." But in relationships like the one between Gray and Harrison, "It's not to say [the nonprofit

executive] wouldn't make a good director. But should they
be on this particular board?"

236.    In 2003, JPMC matched nearly $1.3 million in UNCF donations, making

possible a combined total of $2.6 million raised through employee contributions and

matching gifts.  Since 1990, JPMC employees have donated more than $6.6 million to the

UNCF, which when combined with the matching gift and sponsorships, has resulted in a

total contribution of nearly $18.7 million.  The November 3, 2003 issue of Jet, in

reporting Gray's intention to retire as President and CEO of UNCF on March 31, 2004,

observed that Gray had raised over $1.5 billion for the organization.  Thus, the

philanthropic relationship between JPMC and UNCF is significant and long-standing,

and Gray's lauded success in fundraising has been due, in large part, to his ability to

nurture and retain corporate donors such as JPMC.

237.    Gray's financial relationship with JPMC and Harrison's service as

UNCF's treasurer (which is disclosed nowhere in the Proxy Statement) raise serious

doubts that Gray would have vigorously opposed an action by Harrison to favor himself

over JPMC's shareholders.  It would not be reasonable to expect the head of an institution

interested in the Company's continued financial support to stand in the way of Harrison's

self-dealing.  Moreover, Harrison's undisclosed service as UNCF's treasurer further

evidences his close relationship with Gray.  Accordingly, Gray must be considered

beholden to Harrison for the purpose of determining whether a majority of JPMC's Board

was independent from Harrison in approving the improper premium.

238.    According to an article entitled "Fat cats feeding" in the October 9, 2003

edition of The Economist, Gray serves on the boards of eight S&P 500 companies, more

than any other director of an S&P 500 company.  According to a July 11, 2003 article by

Virginia Citrano in *Forbes* entitled "Overworked Directors Still Overworked, But Not As Much," Gray is a director of Dell Computer, Electronic Data Systems, JPMC, Pfizer, Prudential Financial, Rockwell Automation, Viacom, and Visteon.  As Gray is not likely to have become wealthy heading a non-profit institution (or serving as a legislator prior to his work heading UNCF), upon information and belief, the substantial directorship fees he receives constitute a material percentage of his income.  Accordingly, Gray is not independent because he depends on directorship fees, including the extraordinary fees he receives as a JPMC director.

239.    Although the Proxy Statement represented that the Director Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy Statement omitted the full extent of defendant Gray's relationship with Harrison and JPMC, as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Gray's purported independence as well as the purported independence of the Board as a whole.


**8. John R. Stafford**

240.    Defendant Stafford has been Retired Chairman of the Board of, and consultant to, Wyeth since January 2003.  He was Chairman of the Board from 1986 until 2003.  Stafford also was Chief Executive Officer of Wyeth from 1986 until May 2001.  Stafford is not an independent director because JPMC is the administrative agent and a

lending bank under Wyeth's credit facilities.  Also, JPMC serves as indenture trustee, paying agent, and conversion agent for Wyeth's $2 billion February 2004 registration of Floating Rate Convertible Senior Debentures due 2024, as well as for Wyeth's $2.5 billion August 2003 registration of debt securities.  According to a November 19, 2004 SEC filing, J.P. Morgan Securities Inc. holds $62,145,000, or just over 6 percent, of Wyeth's Floating Rate Convertible Senior Debentures Due 2024 and is entitled to sell 1,029,059 shares of Wyeth.

241.    According to Wyeth's SEC filings, Stafford owns 619,429 shares of Wyeth, worth approximately $25 million.  JPMC's numerous financial dealings with Wyeth, as creditor, shareholder, indenture trustee, paying agent, and conversion agent, undermine Stafford's independence.  JPMC could adversely affect the value of Stafford's considerable stake in Wyeth through its various financial relationships with Wyeth.  For instance, JPMC could at any time sell its entire Wyeth common stock holding and depress Wyeth's stock price.  JPMC could have refused to purchase 6 percent of Wyeth's recent convertible debt issuance.  As indenture trustee, JPMC acts as a fiduciary for hundreds of Wyeth bondholders.  Given the possibility of bankruptcy in light of Wyeth's massive legal exposure in connection with Fen-Phen "Diet Drug" litigation, it is conceivable that JPMC *qua* indenture trustee could seek adequate protection, pursuant to the Trust Indenture Act of 1939, 15 U.S.C. § 77 aaa et. seq. and 11 U.S.C. § 362, using its discretion to determine that Wyeth was either undersecured or would be undersecured within a relatively short time.  In all these ways, JPMC possesses substantial leverage over Wyeth.  Taken together, Stafford's financial interest in Wyeth and JPMC's

relationship with Wyeth raise serious doubts that he would have vigorously opposed an action by Harrison to favor himself over JPMC's shareholders.

242.     Although the Proxy Statement represented that the Director Defendants "determined that each of the non-management directors is independent in accordance with the director independence definition specified in the Corporate Governance Practices of JPMorgan Chase's board, which definition includes the independence standards applicable under the listing standards of the New York Stock Exchange for independence of board members," the Proxy Statement omitted the full extent of defendant Stafford's relationship with JPMC, as set forth above.  Accordingly, JPMC shareholders were prevented from assessing for themselves Stafford's purported independence as well as the purported independence of the Board as a whole.

## PLAINTIFFS' INVESTIGATION

243.     Plaintiffs' allegations set forth herein are based on a thorough investigation, conducted by and through counsel, of all reasonably-available sources of information, in order to obtain information necessary to plead Plaintiffs' claims, including:

a.     The review and analysis of public filings of JPMC and Bank One with the SEC, as well as documents disseminated to shareholders of JPMC and Bank One;

b.     The review and analysis of securities analysts' reports and investor advisory services concerning JPMC and Bank One, including without limitation the analyst and advisory reports cited herein;

c.    The review and analysis of JPMC and Bank One press releases and other publicly disseminated statements made by the defendants, including but not limited to documents filed with and available at the SEC's EDGAR database system;

d.    The review and analysis of reports concerning JPMC and Bank One that have appeared in the print and electronic media and computer databases, including without limitation the articles cited herein; and

e.    Interviews of relevant witnesses, including face-to-face and telephone conversations with Landon Thomas, Jr., the reporter for the *New York Times* who first broke the story that Harrison had turned down the no-premium deal opportunity.  Mr. Thomas has extensively followed and reported on JPMC for years.  For instance, he previously authored a comprehensive article on JPMC and Harrison entitled "The Two J.P. Morgans" in the October 7, 2002 issue of *New York Magazine* as well as an article in the January 18, 2004 edition of the *New York Times* on Dimon and the Merger entitled "Dimon's Bank Deal: Big, but Maybe Not His Last."

244.    In addition to the conversations with and personal interviews of reporters relied upon for certain allegations made upon information and belief, as set forth hereinabove, Plaintiffs rely in part on the *New York Times* guidelines for granting confidentiality to unidentified sources, dated February 25, 2004, set forth in full below:

> Readers of The New York Times demand to know as much as possible about where we obtain our information and why it merits their trust. For that reason, we have long observed the principle of identifying our sources by name and title or, when that is not possible, explaining why we consider them authoritative, why they are speaking to us and why they have demanded confidentiality. Guidance on limiting the use of unidentified sources, and on informative description of those we do use, has appeared in several

editions of our stylebook, including the current one, and in our Integrity Statement, dating from 1999.

In the last few months, readers and our professional colleagues have asked for additional assurances — that we heed our own guidelines uniformly and that we are accountable for compliance. This restatement of our sourcing policy adds those elements. The rules are effective on March 1, 2004, and will become part of a revised Integrity Statement to be issued in the coming months.

**Principles for Granting Anonymity**

The use of unidentified sources is reserved for situations in which the newspaper could not otherwise print information it considers reliable and newsworthy. When we use such sources, we accept an obligation not only to convince a reader of their reliability but also to convey what we can learn of their motivation — as much as we can supply to let a reader know whether the sources have a clear point of view on the issue under discussion.

In routine interviewing — that is, most of the interviewing we do — anonymity must not be automatic or an assumed condition. In that kind of reporting, anonymity should not be <u>offered</u> to a source. Exceptions will occur in the reporting of highly sensitive stories, when it is we who have sought out a source who may face legal jeopardy or loss of livelihood for speaking with us. Similarly they will occur in approaches to authoritative officials in government who, as a matter of policy, do not speak for attribution. On those occasions, we may use an offer of anonymity as a wedge to make telephone contact, get an interview or learn a fact. In such a case, the reporter should press the source, after the conversation, to go on the record with the newsworthy information that has emerged.

Whenever anonymity is granted, it should be the subject of energetic negotiation to arrive at phrasing that will tell the reader as much as possible about the <u>placement and motivation</u> of the source — in particular, whether the source has firsthand knowledge of the facts.

In any situation when we cite anonymous sources, at least some readers may suspect that the newspaper is being used to convey tainted information or special pleading. If the

impetus for anonymity has originated with the source, further reporting is essential to satisfy the reporter and the reader that the paper has sought the whole story.

We will not use anonymous sourcing when sources we can name are readily available.

Confidential sources must have direct knowledge of the information they are giving us — or they must be the authorized representatives of an authority, known to us, who has such knowledge.

We do not grant anonymity to people who are engaged in speculation, unless the very act of speculating is newsworthy and can be clearly labeled for what it is.

We do not grant anonymity to people who use it as cover for a personal or partisan attack. If pejorative opinions are worth reporting and cannot be specifically attributed, they may be paraphrased or described after thorough discussion between writer and editor. The vivid language of direct quotation confers an unfair advantage on a speaker or writer who hides behind the newspaper, and turns of phrase are valueless to a reader who cannot assess the source.

Anonymity should not be invoked for a trivial comment, or to make an unremarkable comment appear portentous.

We do not promise sources that we will refrain from additional reporting or efforts to verify the information being reported.

We do not promise sources that we will refrain from seeking comment from others on the subject of the story. (We may, however, agree to a limited delay in further inquiries — until the close of stock trading, for example.)

**Responsibilities of Editors**

When anonymity is granted, reporter and source must understand that the commitment is undertaken by the newspaper, not alone by an individual journalist. Any editor who learns a source's identity is required to maintain exactly the same confidentiality as the reporter. That editor may not divulge the identity to other reporters, or to unauthorized editors. And the editor may not use the source — either for reporting on the current story or for later ones.

In the case of a routine story with unidentified sourcing, the name or explicit role of the source should be conveyed confidentially to the reporter's department head. At the discretion of the department head — and provided the reporter agrees — the responsibility for learning about the source may be delegated to a subordinate supervising editor. (Departments are expected to formulate their own day-to-day routines, in consultation with reporters, for expeditious handling of source information.) In all such routine cases, the department head is accountable for knowing the identity of the source, or for knowing which subordinate editor has been informed. Upon request, the executive editor and the managing editors are entitled to know the identity of the source.

In the case of a moderately sensitive story, the reporter may wish to share the identity with the executive editor or managing editor only. Such a request should be honored without prejudice, and not taken to signify a lack of trust.

In the case of exceptionally sensitive reporting, on crucial issues of law or national security in which sources face dire consequences if exposed, the reporter may appeal to the executive editor for total confidentiality. In such circumstances, intended to be extremely rare, the executive editor may choose to ask for only a limited description of the source and waive the right to know the full identity. Only the executive editor may approve such a request.

The standards editor, while not necessarily entitled to know the identity of a confidential source, is responsible for spot-checking compliance with our procedures — that is, for knowing which editors have learned the identity.

### Forms of Attribution to Confidential Sources

When we agree to anonymity, the reporter's duty is to obtain terms that conceal as little as possible of what the reader needs to gauge reliability. We should distinguish conscientiously between high-level and lower-level executives or officials. We should not use blind attribution — *"sources said,"* for example — which is more a tease than a signpost. Attribution should never amount to a truism: since *"source"* merely means a provider of

information, *"one source said"* is equivalent to *"somebody said."* And *"informed"* or *"reliable source"* is no improvement. (Would The Times quote an uninformed or unreliable one?) The objection is not to the word *"source,"* but to its emptiness without a meaningful modifier: *"a Senate source,"* for example, may be acceptable — unless, of course, it is possible to tell the reader still more. The word *"official"* is overused, and cries out for greater specificity.

Trail markers should be as detailed as possible. *"United States diplomat"* is better than *"Western diplomat,"* which is better than *"diplomat."* Still better is *"a United States diplomat who took part in the meeting."* And *"a lawyer who has read the brief"* or *"an executive close to the XYZ Company"* is far better than *"a person familiar with the case,"* a phrase so vague that it could even mean the reporter.

Readers value signs of candor: *"The report was provided by a Senate staff member working to defeat the bill."*

Whenever possible, in writing about documents we should specify how we received them.

We should avoid automatic references to sources who "insisted on anonymity" or "demanded anonymity"; rote phrases offer the reader no help and make our decisions appear automatic. When possible, though, articles should tersely explain what kind of understanding was actually reached by reporter and source, and should shed light on the reasons and the source's motives.

In editing on the copy desk or at higher levels, the description of a source must never be altered without consultation with the reporter who made the confidentiality commitment.

It should go without saying that The Times is truthful. We do not dissemble about our sources — we do not, for example, refer to a single person as "sources" and do not say "other officials" when quoting someone who has already been cited by name. We do not say a source has refused to comment if in fact that person has commented off the record. (We may, however, say — when it is true — that the source refused to comment on a specific aspect of

the story.) There can be no prescribed formula for attribution, but it must be literally truthful, and not coy.

**Multiple Anonymous Sources**

When we grant anonymity, we do not necessarily require multiple sources. A cabinet official, for example, or the White House adviser on national security, may require anonymity while conveying a policy decision that is clearly "authorized," necessitating no corroborating source.

But when we grant anonymity for less verifiable assertions — especially if they form a disputed account, or are potentially damaging to one side in a court case, for example — corroborating sources are often necessary. The reporter should confer with the department head or senior deputy to agree upon the need and the number.

In such a case, the reporter and editor must be satisfied that the sources are genuinely independent of one another, not connected behind the scenes in any kind of "echo chamber" that negates the value of a cross-check.

245.    Except as alleged herein, due to the extraordinary measures undertaken to ensure the secrecy of the Merger negotiations, the underlying information relating to defendants' misconduct and the particulars thereof are not available to Plaintiffs and the public, and lie exclusively within the possession and control of defendants and their agents, thus preventing Plaintiffs from further detailing defendants' misconduct.

## <u>NO SAFE HARBOR</u>

246.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint because the specific statements pleaded herein either were not identified as "forward-looking statements" when made or were unaccompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe

harbor applies to any of the statements pleaded herein, defendants are liable for those

false forward-looking statements because at the time each of those forward-looking

statements were made, the speaker knew or had reason to know that the particular

forward-looking statement was false, and/or the forward-looking statement was made by

or with the approval of an executive officer of JPMC or Bank One who knew or had

reason to know that the statement was false or misleading.

**COUNT I**

**AGAINST JPMC AND THE INDIVIDUAL DEFENDANTS FOR
VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
AND RULE 14A-9 THEREUNDER**

247.    Members of the Class who were entitled to vote on the Merger (the

"JPMC Holder Class") repeat and reallege each and every allegation in paragraphs 1

through 246, above, as if fully set forth herein.

248.    This Count is brought pursuant to Section 14(a) of the Exchange Act [15

U.S.C. § 78n(a)] and Rule 14a-9 promulgated thereunder by the SEC [17 C.F.R. § 240.

14a-9] on behalf of the members of the JPMC Holder Class, against JPMC and the

Individual Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-

9 thereunder, and does not sound in fraud.

249.    The defendants named herein violated Section 14(a) of the Exchange Act

and Rule 14a-9 thereunder in that these defendants solicited proxies from the members of

the JPMC Holder Class by means of a Proxy Statement that contained statements which,

at the time and in the light of the circumstances under which they were made, were false

and misleading with respect to material facts, and omitted to state material facts

necessary in order to make the statements therein not false or misleading.

250.    As a result, members of the JPMC Holder Class were denied the opportunity to make an informed decision in voting on the Merger, and lost the opportunity to receive or press for a larger equity stake in the combined Company than they in fact received.

251.    The members of the JPMC Holder Class have suffered damages as a result of the Merger which was approved through the use of a proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

252.    The JPMC Holder Class repeats and realleges each and every allegation in paragraphs 1 through 251, above, as if fully set forth herein.

253.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Holder Class, against the Individual Defendants.

254.    Each of the Individual Defendants was a control person of JPMC by virtue of his/her positions as a director and/or senior officer of JPMC.

255.    Each of the Individual Defendants was a culpable participant in the violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, alleged in Count I, above, based on their having participated in the wrongful conduct alleged herein.

## COUNT III

### AGAINST THE DIRECTOR DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

256.    The JPMC Holder Class as well as members of the Class who held common stock of JPMC on or before January 14, 2004 but sold or otherwise disposed of

any or all such stock after the Merger was announced (the "JPMC Seller Class"), repeat and reallege each and every allegation in paragraphs 1 through 246, above, as if fully set forth herein.

257.    This count is brought pursuant to Delaware common law, on behalf of the members of the JPMC Holder Class and JPMC Seller Class, against the Director Defendants for breach of those defendants' fiduciary duties owed to the members of the JPMC Holder Class and JPMC Seller Class.

258.    Each defendant named herein was a director and/or chief executive officer of JPMC, and owed to JPMC shareholders the highest obligations of good faith, loyalty, fair dealing, due care and candor.

259.    By entrenching himself with the CEO title for another two years at a cost to JPMC's shareholders of billions of dollars of value, Harrison violated his fiduciary duty of loyalty owed to the public shareholders of JPMC.  The other Director Defendants also breached their duty of loyalty by approving the Merger with a significant acquisition premium solely to secure a benefit for Harrison to the detriment of JPMC shareholders. The Director Defendants other than Harrison knew or should have known of Harrison's backroom deal with Dimon and nevertheless they approved and recommended the Merger to JPMC's shareholders.

260.    The Director Defendants' fiduciary obligations under these circumstances required them to evaluate the Merger and obtain the best value for JPMC's public shareholders.  Instead, the Director Defendants (1) agreed to the Merger with an exchange ratio presenting a $7 billion premium, funded by JPMC shareholders, to Bank One shareholders just so Harrison could keep his CEO title and (2) failed to disclose to

JPMC's shareholders the backroom deal, including the opportunity to merge with Bank One without paying any acquisition premium at all. Acting individually and in concert and aiding and abetting and conspiring with one another and others, the Director Defendants breached their fiduciary duties to the public shareholders of JPMC by proceeding with the Merger without making the requisite effort to secure the best transaction available or disclosing to shareholders facts highly material to their decision to vote for or against the Merger.

261.    Each defendant named herein breached and violated his or her fiduciary duties to the members of the JPMC Holder Class and JPMC Seller Class to the detriment of those class members by reason of the wrongful conduct alleged above.

262.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium) because, as set forth above, at least nine of JPMC's twelve directors who approved the Merger were either interested in the improper premium or not sufficiently independent from Harrison.

263.    The entire fairness standard is the proper standard of review for the Merger (in particular, the unnecessary and improper premium) because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of JPMC of his backroom deal with Dimon.

264.    The entire fairness standard is the proper standard of review for the Merger because, after a reasonable opportunity for further investigation or discovery, there will likely be evidence showing that Harrison did not inform the other directors of

JPMC that he rejected the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio.

265.    The Merger was not entirely fair to JPMC shareholders because, as a result of the rejection of the no-premium merger opportunity, they were wrongfully deprived of the opportunity to own a larger equity stake in the combined Company.

266.    As a result of these defendants' breaches of their fiduciary duties, the members of the JPMC Holder Class and JPMC Seller Class have suffered and continue to suffer substantial damages.

<u>COUNT IV</u>

<u>AGAINST JPMC AND THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER</u>

267.    The JPMC Seller Class repeats and realleges each and every allegation in paragraphs 1 through 246, above, as if fully set forth herein.

268.    This count is brought pursuant to Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], on behalf of the members of the JPMC Seller Class, against JPMC and the Insider Defendants.

269.    The defendants named herein knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they themselves, or a person whom they controlled: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and a course of conduct that operated as

a fraud or deceit upon the members of the JPMC Seller Class in connection with their purchases of JPMC securities.

270.    Each of the defendants named herein participated in and joined the alleged scheme and course of conduct specified above, including the Merger negotiations and creation of the Merger agreement, Press Release and Proxy Statement, and each is liable primarily for the aforesaid wrongful acts and statements specified above.

271.    In ignorance of the false and misleading nature of the representations and omissions described above, members of the JPMC Seller Class relied, to their detriment, directly on the misrepresentations and omissions or on the integrity of the market both as to price and as to whether to sell or otherwise dispose of the securities.  The highly efficient markets for JPMC and Bank One securities promptly incorporated the misleading information set forth in the Press Release and reflected the market's assessment of the Merger.

272.    As alleged herein, defendants caused the losses suffered by Plaintiffs and other members of the JPMC Seller Class.

273.    By virtue of the foregoing, defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## COUNT V

### AGAINST THE INSIDER DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

274.    The JPMC Seller Class repeats and realleges each and every allegation in paragraphs 1 through 246, above, as if fully set forth herein.

275.    This Count is brought pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] on behalf of the members of the JPMC Seller Class, against the Insider Defendants.

276.    Each of the Insider Defendants was a control person of JPMC by virtue of his positions as a director and senior officer of JPMC or Bank One.

277.    Each of the Insider Defendants was a culpable participant in the violations of Section 10 of the Exchange Act and Rule 10b-5 thereunder, alleged in Count IV, above, based on their having participated in the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs demand judgment against defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as representatives of the Class;

B.    Ordering JPMC to issue shares of stock to Plaintiffs and the other members of the Class as appropriate to remedy the misconduct alleged herein;

C.    Declaring and determining that the defendants violated the federal securities laws and common law by reason of their conduct as alleged herein;

D.    Awarding the Class compensatory and punitive damages against defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.    Awarding Plaintiffs their costs and disbursements, including the fees of Plaintiffs' counsel and experts, and reimbursement of expenses; and

F.    Granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

# JURY TRIAL DEMAND

278.    Plaintiffs hereby demand a trial by jury for all issues so triable.

DATED:        June 26, 2006                Respectfully submitted,

JOSEPH N. GIELATA (#4338)
ATTORNEY AT LAW

/s/ *Joseph N. Gielata*
501 Silverside Road, No. 90
Wilmington, Delaware 19809
(302) 798-1096

*Plaintiffs' Lead Counsel*