## Unreported Decisions

*Matsushita Electrical Industrial Co. v. Cinram Int'l, Inc.*, 01-882-SLR (D. Del. Jan. 5, 2004)

*Pegasus Dev. Corp. v. DirecTV, Inc.*, No. 00-1020-GMS (D. Del. Apr. 18, 2002)

*In re Adams Golf, Inc., Sec. Litig.*, No. 99-371-KAJ (D. Del. Jan. 24, 2006)

*Blau v. Harrison*, No. 04-6592 (N.D. Ill. Mar. 24, 2006)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MATSUSHITA ELECTRICAL          )
INDUSTRIAL CO., LTD.,          )
                               )
          Plaintiff,           )
                               )
          v.                   )   Civ. No. 01-882-SLR
                               )
CINRAM INTERNATIONAL, INC.     )
                               )
          Defendants.          )

**MEMORANDUM ORDER**

At Wilmington, this 5th day of January, 2004, having

reviewed Cinram's motion to supplement its answer and

counterclaims and MEI's motion for leave to file a brief surreply

and the papers submitted in connection with both motions;

IT IS ORDERED that MEI's motion (D.I. 251) is granted.

IT IS FURTHER ORDERED that Cinram's motion (D.I. 237) is

denied, for the reasons that follow:

1.  Matsushita Electric Industrial Co., Ltd ("MEI") filed

an action against Cinram International, Inc. ("Cinram") on December

20, 2001 for patent infringement of patents related to optical

information media, including digital versatile discs ("DVDs").

(D.I. 1)  The precise patents in suit have evolved over the course

of the litigation.  The current litigation involves the alleged

infringement of U.S. Patent Nos. 5,681,634 and 5,972,250

(hereinafter "the '634 patent" and "the '250 patent,"

respectively).  Trial concerning these patents is slated to

commence on February 9, 2004.

2.   On Febraury 24, 2000, Time Warner and MEI entered into a cross-license arrangement wherein MEI granted a royalty free license to the '634 and '250 patents to Time Warner (hereinafter "Cross License Agreement").  (D.I. 238, ex. A)  On July 18, 2003, Time Warner agreed to sell all shares in its optical disc pressing plants located in Commerce, California, Olyphant, Pennsylvania, and Alsdorf, Germany to Cinram pursuant to a "Stock Purchase Agreement."  (D.I. 238, ex. B)  Cinram formally acquired Time Warner's said plants for approximately one billion dollars on October 24, 2003.  (D.I. 238 at 3)  As part of this transaction, Cinram entered into a "Cross-License Acceptance Agreement" with Time Warner.

3.   Cinram requests the court's permission to supplement its answer and counterclaims in its ongoing litigation pursuant to Federal Rule of Civil Procedure 15(d) to assert a new license defense based upon license rights that it claims to have acquired from Time Warner by virtue of the Time Warner-MEI Cross-License Agreement.  Federal Rule of Civil Procedure 15(d) states, in relevant part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  Fed. R. Civ. P. 15(d) (2003). "The purpose of Rule 15(d) is to promote as complete an

2

adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed." William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1057 (9th Cir. 1981). Leave to file a supplemental complaint under Rule 15(d) rests within the court's discretion and should be freely granted if it will promote the just disposition of the case, not cause undue prejudice or delay, and not prejudice the rights of any parties. See Medeva Pharma Ltd. V. Am. Home Prods. Corp., 201 F.R.D. 103, 104 (D. Del. 2001) (internal citations omitted).

4.    Cinram claims that it is licensed to practice the '634 and '250 patents and, as such, its supplement will completely dispose of the instant litigation. Cinram also asserts that leave to amend will not cause undue delay or prejudice because there is very little, if any, additional discovery necessary. Moreover, Cinram contends it did not delay in moving to supplement because its only acquired Time Warner's optical disc facilities on October 24, 2003 and advised MEI of its intent to move to supplement its answer on October 26, 2003.

5.    MEI disagrees with Cinram's characterization of the proposed supplement. MEI argues that Cinram's new license defense only bears on the issue of future injunctive relief, not past infringement or past damages. Additionally, MEI challenges Cinram's characterization of the terms of the Cross License Agreement and asserts that substantial third-party discovery is

necessary to understand the terms of the Cinram-Time Warner
transaction and to properly interpret the scope of the Cross-
License Agreement.  MEI claims that it would be prejudical to force
such discovery prior to the upcoming February 2004 trial.

   6.   The court finds that Cinram's new affirmative defense
raises issues of contract interpretation involving the Cross
License Agreement, the Stock Purchase Agreement, and the Cross-
License Acceptance Agreement.  The court is unfamilar with these
agreements and requires time to understand their scope.  In
particular, the court agrees with MEI that the nature of Cinram's
acquisition must be explored through discovery to determine whether
Cinram qualifies for a license to either the '634 patent or the
'250 patent and, if so, the timing for this license.  Contrary to
Cinram's simplistic argument, the court is not entirely clear based
upon its reading of the relevant agreements and briefing documents
whether Cinram purchased Time Warner's entire optical disc pressing
business or only three optical disc pressing plants within Time
Warner's optical disc pressing business.  The answer to this
question directly bears upon Cinram's license defense.  Moreover,
the court does not believe that this supplement will result in the
complete resolution of the case.  Rather, the court agrees with MEI
that Cinram's new license defense, if it exists at all, likely
bears only on the issue of future injunctive relief, not past
infringement or past damages.  Furthermore, the court believes that
introducing this complex licensing defense into a suit where other

contracts are currently in play may overshadow the disputed issues and create significant confusion for the jury.  The court, therefore, concludes that the principle of judicial economy is not served by permitting Cinram to supplement its complaint at this late date given that trial commences in less than two months.[1]

                                        Sue L. Robinson
                                  United States District Judge

---

[1]As suggested and agreed to by MEI in its surreply, past damages to be tried in the February 2004 trial will be limited to those incurred as of October 24, 2003.  Post October 24, 2003 damages will be ripe for future adjudication at a later time.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ─────────────────────────────── ) | |
| PEGASUS DEVELOPMENT ) | |
| CORPORATION and PERSONALIZED ) | |
| MEDIA COMMUNICATIONS, L.L.C., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 00-1020-GMS |
| ) | |
| DIRECTV, INC., HUGHES ELECTRONICS ) | |
| CORPORATION, THOMPSON CONSUMER ) | |
| ELECTRONICS, INC., and PHILIPS ) | |
| ELECTRONICS NORTH AMERICA ) | |
| CORPORATION, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ─────────────────────────────── ) | |
| ) | |
| THOMSON MULTIMEDIA, Inc., ) | |
| ) | |
| Counterplaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PEGASUS DEVELOPMENT ) | |
| CORPORATION, PERSONALIZED ) | |
| MEDIA COMMUNICATIONS, L.L.C., ) | |
| TVG-PMC, INC., STARSIGHT TELECAST, INC.,) | |
| and GEMSTAR-TV GUIDE INTERNATIONAL, ) | |
| INC., ) | |
| ) | |
| Counterdefendants. ) | |
| ─────────────────────────────── ) | |

## <u>MEMORANDUM  AND  ORDER</u>

## I.    INTRODUCTION

On December 4, 2000, the plaintiffs, Pegasus Development Corporation ("Pegasus") and

Personalized Media Communications, LLC ("PMC"), filed the above-captioned action alleging

patent infringement.  Specifically, Pegasus and PMC allege that each defendant has willfully infringed seven patents owned or licensed exclusively by PMC and Pegasus.

On November 2, 2001, the defendant Thomson Multimedia, Inc. ("Thomson") sought leave to add third-parties Gemstar-TV Guide International, Inc., StarSight Telecast, Inc., and TVG-PMC, Inc. (collectively "Gemstar") to the case.  At that time, Thomson also filed a pleading entitled, "First Amended Answer and Counterclaim and Third Party Complaint."  Along with this amended pleading, Thomson also filed a motion for a sixty-day extension of time to "amend [its] pleadings to add counts relating to [the] newly added [Gemstar] parties."

On January 7, 2002, Thomson filed its "Second Amended Answer and Counterclaims and Third Party Complaint."  On February 1, 2002, Gemstar moved to dismiss Thomson's second amended counterclaims.  Subsequently, on March 1, 2002, Thomson sought leave to amend its second amended answer and counterclaims and third-party complaint.[1]  Thomson's motion proposes the following changes to its counterclaims and third-party complaint:  (1) reorganization of the facts and claims set forth in the allegations, (2) additional detail supporting Thomson's allegations as to how the counterdefendants have violated the antitrust laws, and (3) a restatement of its claims to cure any alleged defects in its pleading.  The Gemstar parties are the only parties that oppose this motion.  For the reasons that follow, the court will grant Thomson's motion.

## II.    DISCUSSION

Federal Rule of Civil Procedure 15(a) provides that leave to amend shall be freely given when justice so requires.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Following this mandate, the Third Circuit has routinely held that leave to amend should be freely granted when pleadings

---

[1]Although the motion is entitled "Thomson's motion for leave to amend its second amended answer and counterclaim and third party complaint," Thomson has indicated that it is seeking only to amend its counterclaim and third party complaint.

lack the requisite factual specificity for a particular cause of action. *See District Council 47 v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986); *see also U.S. v. Teeven*, 1992 WL 683682, at *8 (D. Del. Oct. 27, 1992) (citing cases). Indeed, "[t]he clearest cases for leave to amend are correction of an insufficient claim or defense and amplification of previously alleged claims or defenses." *Teeven*, 1992 WL 683682, at *7. Notwithstanding Rule 15(a)'s broad application, courts may deny leave to amend where they find "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment . . . ." *Foman*, 371 U.S. at 182.      In its opposition to this motion, Gemstar first argues that Thomson has continuously acted improperly with regard to its Gemstar claims, beginning with adding Gemstar as a counterdefendant in November 2001. The court disagrees. It was not until September 14, 2001 that the plaintiffs identified sixteen claims from the patents that it was asserting against Thomson. Moreover, it was not until October 15, 2001 that the plaintiffs set forth their infringement contentions concerning these claims. Thomson maintains that these infringement contentions clearly rely on functionality that falls squarely within an exclusive field of use that Gemstar admittedly has licensed from PMC.

Less than a month after receiving the plaintiffs' contentions, Thomas sought, and was granted, leave to add Gemstar as a party based on the license defense. Furthermore, Thomson argues that it needed additional time to review the plaintiff's "voluminous" document production. Thus, when Thomson sought leave to add Gemstar as a defendant, it simultaneously filed a motion for a sixty-day extension for leave to add additional claims against Gemstar. The court granted the motion, thereby giving Thomson until January 7, 2002 to file additional claims against Gemstar. Accordingly, Thomson timely filed its second amended counterclaim on January 7, 2002. On these

facts, Gemstar's charges that Thomson acted in bad faith or with dilatory intent in adding Gemstar as a party are baseless.

Gemstar next relies on statements made by Thomson's counsel at the December 5, 2001 office conference. Specifically, on that date, Thomson's counsel stated that, "we can live with an early January date by which we either amend, that we should make any amendments based on the documents we currently have access to." Gemstar reads this statement as precluding Thomson from filing any additional pleadings in this action. However, based on the transcript of that conference, the court concludes that the issue of whether Thomson should be permitted to seek leave to amend in the future was not before the court at that time. Thus, to read such a broad meaning into Thomson's statements at that conference would be improper.

Gemstar further argues that it will suffer undue prejudice if the court were to grant Thomson's motion. Gemstar bears the burden of proving that actual prejudice will result from an amendment. *See Pension Fund v. North Philadelphia Health Sys.*, 1999 WL 236606, at *2 (E.D. Pa. April 21, 1999). To satisfy this burden, Gemstar must do more than merely claim prejudice. *See id*. Instead, Gemstar "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the . . . amendments been timely." *Id*. (citing *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989)). "Prejudice does not result merely from a party's having to incur additional counsel fees; nor does it result from a delay in the movement of a case." *Pension Fund*, 199 WL 236606, at *2 (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 869 (3d Cir. 1984)). Rather, prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change in tactics or theories on the part of the other party." *Pension Fund*, 1999 WL 236606, at *2 (citing *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir. 1990)).

4

On the facts before it, the court concludes that Gemstar has failed to demonstrate how it would be prejudiced if the court were to grant Thomson permission to amend. Indeed, nowhere does Gemstar explain how it was "deprived of the opportunity to present facts or evidence." *See Pension Fund*, 1999 WL 236606, at *2. Nor does Gemstar explain how it would suffer "undue difficulty" in defending against Thomson's claims in the face of an amendment. *See id.* Indeed, the only prejudice Gemstar has asserted is that it has incurred, and will incur, attorney's fees in briefing the motions to dismiss.[2] The law is clear, however, that "prejudice does not result merely from a party's having to incur additional counsel fees . . . ." *Id.*, *see also Adams*, 739 F.2d at 869.

Furthermore, given the current stage of the proceedings, the court finds no indication of any prejudice to Gemstar that would result from the grant of this amendment. The Markman schedule remains in flux. The fact that this case may be transferred to the MDL Court in Atlanta, Georgia creates further uncertainty with regard to the schedule. Additionally, at least several months of discovery remain in this case, and no duplicative discovery will be necessary as a result of Thomson's proposed amended counterclaims. Given the fact that Thomson is not seeking to add new claims, there is ample time for Gemstar to conduct discovery on Thomson's counterclaims.

Finally, Gemstar contends that this will be Thomson's third amended pleading. As such, Gemstar is of the opinion that, because Thomson was unable to cure the defects twice before, it should not be given another bite at the pleading apple. While the court is sympathetic to this argument, it concludes that Gemstar has overstated Thomson's earlier actions. Thomson first filed an answer to the complaint on January 22, 2001, when it was arguably unclear whether Gemstar's license would be invoked. In November 2001, when it became clear to Thomson that it should

---

[2]The court notes, however, that it appears that Gemstar filed substantially similar motions to dismiss in the pending MDL cases as well.

include Gemstar in this action, it did so.  Thereafter, on January 7, 2002, it amended its answer again

in light of relevant new information it had discovered.  The January 7, 2002 pleading is the first time

the antitrust allegations appear.  Thus, Thomson has, in fact, had no opportunity to correct any

pleading defects or to amplify its allegations with regard to the antitrust issues.

In granting Thomson's motion, the court is particularly mindful that one of Thomson's

objectives in amending its pleading is to survive Gemstar's motion to dismiss.  In that motion,

Gemstar argued, among other things, that the allegations in Thomson's existing pleading were

"vague and unsupported."  Allowing an amendment which purports to rectify this alleged fatal

defect in a pleading is surely in the interest of justice.  *See Kiser v. General Elec. Corp.*, 831 F.2d

423, 427 (3d Cir. 1987) (rejecting the approach that pleading is a game of skill in which one misstep

by counsel my be decisive to the outcome, when the Federal Rules clearly accept that the purpose

of pleading is to facilitate a proper decision on the merits.)

## III.    CONCLUSION

For the foregoing reasons, the court will grant Thomson's motion to amend.[3]

Therefore, IT IS HEREBY ORDERED that:

1.      Thomson's motion for leave to amend (D.I. 232) is GRANTED.


Dated: April 18, 2002                                      Gregory M. Sleet
                                                    UNITED STATES DISTRICT JUDGE


---

[3]Because the court has found no evidence of reckless and indifferent conduct on
Thomson's part which would warrant the imposition of sanctions, it need not address Gemstar's
request for sanctions.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE :                                    )
                                           )    Civil Action No. 99-371-KAJ
ADAMS GOLF, INC., SECURITIES               )       (Consolidated)
LITIGATION                                 )

## MEMORANDUM ORDER

### I.    INTRODUCTION

This is a securities class action brought by plaintiff-shareholders ("Plaintiffs")

against Adams Golf, Inc. and certain of its officers and underwriters (collectively,

"Defendants").  Before me now is Plaintiffs' Motion for Leave to File Second

Consolidated and Amended Class Action Complaint (D.I. 180) and Defendants' Motion

to Amend the Scheduling Order (D.I. 188).  For the reasons that follow, I will grant

Plaintiffs' motion and deny Defendants' motion as moot.

### II.   BACKGROUND

The background of this action has been set forth in earlier opinions.  *In re Adams*

*Golf, Inc. Sec. Litig.*, 381 F.3d 267, 270-73 (3d Cir. 2004); *In re Adams Golf, Inc. Sec.*

*Litig.*, 176 F. Supp. 2d 216, 218-21 (D. Del. 2001).[1]  In short, Plaintiffs allege that the

registration statement and prospectus accompanying the Initial Public Offering ("IPO")

of Adams Golf common stock in 1998 "contained materially false and misleading

---

[1]This case was originally assigned to the Honorable Roderick R. McKelvie.  (D.I.
12.)  When he retired from the court in 2002, the case was referred to Magistrate Judge
Mary Pat Thynge, on June 14, 2002.  (D.I. 80.)  On January 6, 2003, the case was
reassigned to me.  (D.I. 87.)

statements" in violation of the Securities Act of 1933. *In re Adams Golf*, 381 F.3d at 270. Specifically, according to Plaintiffs, those materials "failed to disclose that [Adams Golf's] revenues were artificially inflated by a 'gray market' distribution of Adams Golf golf clubs." *Id.* at 271.

On September 1, 2005, Plaintiffs filed a motion (D.I. 180) seeking leave to amend their complaint by adding the following:

(1) additional allegations concerning gray marketing;

(2) allegations that Defendants failed to "disclose the material risk that pre-IPO double-shipping, unlimited rights of return and improper reserving would adversely impact post-IPO financial results;"

(3) allegations that Defendants failed to "disclose the risk Adams Golf faced because it had no individual written contract with its retailers and no method to trace its clubs;"

(4) allegations that Defendants failed to "disclose the material risk facing Adams Golf if retailers' profit margins were to decrease;" and

(5) changes to conform the complaint to "rulings on class certification and the ending date of the Class Period." (D.I. 182 at 1-2.)

## III.    DISCUSSION

According to the Federal Rules of Civil Procedure, leave to amend "shall be freely given [by the court] when justice so requires." Fed. R. Civ. P. 15(a). "A policy of favoring decisions on the merits, rather than on the technicalities, underlies this Rule." *CenterForce Techs., Inc. v. Austin Logistics Inc.*, No. Civ.A.99-243, 2000 WL 652943,

2

at *3 (D. Del. Mar. 10, 2000) (citing *Foman v. Davis*, 371 U.S. 178, 181-82 (1962)).

Thus, "leave to amend should be freely granted . . . unless there is sufficient reason to

deny leave." *Id.* "Sufficient reasons include undue delay, bad faith or dilatory motive on

the part of the movant, undue prejudice to the opposing party, failure to cure

deficiencies in former amendments, and futility of amendment." *Id.* (citing *Foman*, 371

U.S. at 182; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.

1997)).

According to Plaintiffs, the need to amend arises from new facts discovered

during the course of this litigation, which support the new allegations and "further

support the original gray market claim." (D.I. 182 at 4.) In support of their position that

leave to amend should be denied, Defendants make two arguments.

First, Defendants argue that they will be unduly prejudiced by the proposed

amendments unless the case schedule is amended to allow sufficient time for

additional discovery. (D.I. 187 at 3-4.) However, any prejudice to Defendants as a

result of a compressed schedule has been removed by the parties' agreement, to which

I have assented (D.I. 192), to extend the time for discovery. According to the parties'

stipulation, in the event that Plaintiffs are allowed to amend, Defendants will move to

dismiss, "thereby triggering the mandatory discovery stay imposed by the Private

Securities Litigation Reform Act of 1995." (*Id.*) Thus, discovery would be stayed

pending decision on Defendants' motion to dismiss, and the parties have agreed that

discovery would continue for 81 days after the end of that stay. (*Id.*) Not only does that

agreement reduce the prejudice to Defendants, it also effectively makes moot

3

Defendants' Motion to Amend the Scheduling Order to extend the discovery and other case deadlines by 90 days. (D.I. 188.)

Second, Defendants argue that the proposed amendments are futile. (D.I. 187 at 4-5.) However, the Defendants "believe that it may be more appropriate to fully address the new claims' shortcomings on a motion to dismiss rather than in [an opposition to Plaintiffs' motion.]" (*Id.* at 4.) Since Defendants do no more than outline a "basic sense for the proposed amendment's futility" in preparation for such a motion to dismiss (*id.*), the issue will not be decided here.

Therefore, since Defendants have not shown that they will be unduly prejudiced or that the proposed amendments are futile, I will grant Plaintiffs leave to amend the complaint.

## IV.    CONCLUSION

Accordingly, for the reasons set forth herein, it is hereby ORDERED that Plaintiffs' Motion for Leave to File Second Consolidated and Amended Class Action Complaint (D.I. 180) is GRANTED, and Defendants' Motion to Amend the Scheduling Order (D.I. 188) is DENIED as moot.

UNITED STATES DISTRICT JUDGE

January 24, 2006
Wilmington, Delaware

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Dr. Stephen Blau, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, | ) ) ) ) | No. 04 C 6592 |
| v. | ) ) ) | The Honorable William J. Hibbler |
| William B. Harrison, Jr. Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M.. Anthony Burns, Laurence Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford, and J.P. Morgan Chase & Co., Defendants. | ) ) ) ) ) ) ) ) ) ) ) | |

## MEMORANDUM OPINION AND ORDER

MOTION TO STRIKE

As an initial matter, Defendants filed a motion to strike the expert report of Steven Wolfe attached to Plaintiffs' response to the motion to dismiss. Defendants' move to strike this submission because the pleadings neither referenced nor included the report. Blau argues that the report is an "affidavit" submitted with the intent of demonstrating that the materiality of a proxy omission raises issues of fact that cannot be determined on a motion to dismiss.

In reviewing a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. The Court, however, may consider matters outside the pleadings without converting the motion to dismiss into one for summary judgment if they are referred to in the plaintiff's complaint and are central to plaintiff's claim. *Rosenblaum v.*

1

*Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). In addition, documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *Fed. R. Civ. P. 10(c)*. As Wolfe's affidavit is neither referenced in the Complaint nor attached to the pleadings, the Court may not consider this affidavit in ruling on the Defendants' *Rule 12(b)(6)* motion. Accordingly, the Court grants Defendants' motion to strike and excludes the extraneous material.

MOTION TO DISMISS

Plaintiffs allege that Defendants negligently failed to disclose material terms of the negotiation involving the merger between Bank One Corporation ("Bank One") and J.P. Morgan Chase & Co. ("J.P. Morgan") to J.P. Morgan shareholders in its proxy statement. Specifically, Plaintiffs contend that Defendants failed to disclose Bank One's CEO's offer to "do the deal for no premium if he could become chief executive immediately." According to Plaintiffs, Defendants' actions amounted to negligence, and resulted in J.P. Morgan Shareholders approval of a 14 percent premium in favor of Bank One shares.

Defendants seek to dismiss Blau's Amended Class Action Complaint ("Complaint") for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, for failure to plead fraud with particularity pursuant to *Federal Rule of Civil Procedure 9(b)*, and for failure to meet the pleading standards set forth in the Private Securities Litigation Reform Act of 1995, *15 U.S.C. § 78u-4(b)* (the "PSLRA"). In addition, Defendants maintain that the putative class lacks standing to bring this claim. For the reasons set forth below, Defendants' motion is DENIED in part and GRANTED in part.

2

## FACTUAL BACKGROUND

I. The Parties

This putative class action lawsuit is brought by Dr. Stephen Blau individually and on behalf of all persons who held common stock of J.P. Morgan, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date on which the company consummated the merger with Bank One. On January 5, 2005, this Court entered an order appointing Dr. Blau and American Growth Fund lead Plaintiffs.[1]

Prior to the merger, J.P. Morgan was a Delaware corporation with its principal place of business in New York, New York. J.P. Morgan, a financial and multi-bank holding firm, was engaged in the provision of investment banking, securities, investment management, and other financial and banking services. Defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford (collectively "Individual Defendants") were all directors of J.P. Morgan prior to the merger.[2]   William B. Harrison ("Harrison") also served as Chief Executive Officer ("CEO") and Chairman of the Board during the relevant period. Bank One was a financial holding and multi-bank holding company, incorporated in Delaware, with its headquarters in Chicago.

II. Merger

In resolving the motion to dismiss, the Court takes as true the following facts from Plaintiffs'

---

[1] Lead Plaintiff American Growth Fund withdrew as co-Lead Plaintiff on February 18, 2005.

[2] Defendant Laurence Fuller was dismissed from this action on June 6, 2005.

Complaint. In November 2003, J.P. Morgan CEO and Chairman William Harrison began discussing the possibility of a merger with James Dimon ("Dimon"), then the CEO and Chairman of Bank One. After briefing their respective boards on their conversations on November 18, 2003, both CEO's were encouraged to continue discussions regarding the potential merger. During December 2003, Dimon and Harrison continued their discussions regarding the key terms of the financial transaction and periodically updated their respective boards on these communications. In early to mid-January 2004, each company's respective board of directors convened special meetings to consider the terms of the merger. At these meetings board members reviewed the terms of Dimon's employment agreement, proposed employment arrangements for other senior management, along with the exchange ratio and related valuation information for the stock. On January 14, 2004, the Board of Directors of both J.P. Morgan and Bank One each unanimously approved a stock-for-stock merger in which 1.32 shares of J.P. Morgan common stock would be issued to Bank One shareholders for each share of Bank One common stock. On April 21, 2004, the J.P. Morgan Board of Directors disseminated its proxy statement regarding the merger to its shareholders. While the proxy statement listed the factors the board considered in approving the merger, it did not disclose Dimon's offer to transact the merger without a premium in favor of Bank One if Dimon were appointed CEO of the merged company immediately.

On May 25, 2004, J.P. Morgan shareholders approved the merger at a special meeting, with 99.18% of the shareholders voting in favor of transacting the merger. On July 1, 2004, the merger was consummated and included a premium, based on closing stock prices the trading day before the merger was agreed to and announced, of approximately 14% for Bank One shares. The merger agreement also included a provision that Harrison would remain CEO of J.P. Morgan for two years

4

after completion of the merger, Dimon would serve as President and Chief Operating Officer, and would become CEO after Harrison's tenure.

III. Newspaper Articles

Shortly after the merger was transacted, several news sources reported that during negotiations Dimon offered to conduct the transaction with no premium if he could become CEO of the merged entity immediately. According to these sources, Harrison rejected the Dimon's offer so that he could be appointed CEO of the merged company and, in response, Dimon requested a premium for Bank One shares. Specifically, on June 27, 2004, the *New York Times* published an article containing allegations regarding Harrison's refusal to accept Bank One's proposal to conduct a no premium stock exchange. The article stated:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the extra two years, to secure a smooth transition, **although he may cost J.P. Morgan shareholders extra money in doing so.** Mr. Dimon, always the tough deal maker, **offered to do the deal for no premium** if he could become chief executive immediately, **according to two people close to the deal.**
>
> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent.** The two men declined to comment on the specifics of their negotiations.

Comp. ¶ 31 (emphasis supplied in Complaint). Several days later on July 3, 2004, *The Financial Times* (London) reported on the merger negotiations and quoted an additional source, allegedly an advisor on the negotiations, who attested that Harrison refused to conduct the merger for no premium if he were named the immediate CEO. That article noted "'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time. Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay." Id. ¶ 32. Additionally, on

December 29, 2004, the *Wall Street Journal* reported that "in-house bankers at J.P. Morgan endorsed the $56.9 billion price [Merger] - negotiated by their boss [Harrison] - as 'fair,'" even though "during the negotiations [Dimon] . . . suggested selling his bank [Bank One] for billions of dollars less if, among other conditions, he immediately became chief of the merged firm, according to a person familiar with the talks. The suggestion wasn't accepted by J.P. Morgan." Id. ¶ 35.

**ANALYSIS**

The two-count Complaint in this case is premised on the alleged negligence of J.P. Morgan with regard to an alleged omission of a material fact in its proxy statement. In count one, Plaintiffs allege that Defendants violated *Section 14(a)*[3] of the Securities and Exchange Act of 1934 ("the Exchange Act") and Rule 14a-9[4] promulgated by the SEC. Count two alleges that the Individual Defendants violated *Section 20(a) of the Exchange Act*. Defendants move to dismiss the Complaint in its entirety for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, for failure to plead fraud with particularity pursuant to *Federal Rule of Civil Procedure 9(b)*, and for failure to meet the pleading standards set forth in the PSLRA. Defendants further allege that Plaintiffs lack standing to bring this cause of action.

I. Standard of Review

---

[3] Section 14(a) of the Exchange Act provides that "It shall be unlawful for any person, by use of the mails . . . or otherwise . . . to solicit or permit the use of his name to solicit any proxy or consent or   authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of the title."

[4] Rule 14a-9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . ." *17 C.F.R. § 240.14a*

6

The purpose of a motion to dismiss pursuant to *Rule 12(b)(6)* is to test the legal sufficiency of a complaint, not the merits of the case. *See Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F. 2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The Court views all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to Plaintiff. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000). Dismissal of a complaint is appropriate only where it appears beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999); *Kennedy v. National Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999).

## II. Count I - *Section 14(a)*

### A. Pleading

In order to state a claim under *Section 14(a)*, Plaintiffs must allege that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 354-85, 90 S. Ct. 616, 621-22, 24 L.Ed. 2d 593 (1970). "The purpose of [Section] 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431, 12 L. Ed. 2d 423, 84 S. Ct. 1555 (1965). *Section 14(a)* and Rule 14a-9 regulate the proxy solicitation process and "prohibit[] the solicitation of proxies by means of materially false or misleading statements."

7

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991).

In enacting the Private Securities Litigation Reform Act, Congress raised the pleading standards for claims alleging private securities fraud, "to a very specific version of fact pleading - - one that exceeds even the particularity requirements of *Federal Rule of Civil Procedure 9(b)*. *See Makor Issues & Rights, Ltd., et al. v. Tellabs, Inc., et al.*, 437 F.3d 588 (7th Cir. 2006) *citing In re: Rockefeller Crt. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)(noting that the PSLRA "imposes another layer of factual particularity to allegations of securities fraud"). As such plaintiffs asserting a securities fraud claim must assert the "who, what, when, where, and how," of the claim. *DiLeo v. Ernest & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The PSLRA mandates that for a securities fraud claim, the complaint must "specify each statement alleged to have been misleading, the reasons or reasons why the statement is misleading, and if an allegation regarding the state or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. Additionally, a plaintiff is required to demonstrate "proof that the defendant acted with a particular state of mind, the complaint with respect to each act or omission . . . must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

Defendants contend that both the PLSRA's heightened pleading standards and the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)*, apply to Plaintiffs' *Section 14(a)* claims. *See e.g., Hayes v. Crown Cent. Petroleum Corp.*, 249 F. Supp. 2d 725, 728 (E.D. Va. 2002), (aff'd in part, vacated in part); *In re Harmonic Inc.*, 2002 U.S. District Lexis 26676 * 64 n. 17 (N.D. Cal. Nov. 13, 2002); *Bond Opportunity Fund v. Unilab Corp.*, 2003 U.S. Dist. LEXIS 7838 at *8

(S.D.N.Y. May 9, 2003). Defendants argue that Blau's *Section 14(a)* claims must plead with particularity facts that give rise to a strong inference of negligence on the part of all defendants. *See In re McKesson HBOC, Inc. Sec. Lit..* 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000). Defendants further argue that Plaintiffs' Complaint fails to meet the heightened standards as it fails to state with particularity facts giving a strong inference of negligence. Further, in its allegations based upon "information and belief," the Complaint fails to state with particularity all facts on which that belief is formed as required by the PSLRA. *15 U.S.C. § 78u-4(b)(1)*.

Plaintiffs respond that its *Section 14(a)* claims are sufficiently pled pursuant to *Federal Rule of Civil Procedure 8(a)*.[5] Plaintiffs argue that because the Complaint purports that Defendants acted with negligence, *not fraud*, the heightened pleading requirements of the PSLRA are not implicated. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 n.9 (3d Cir. 2004)(noting that because plaintiff's *Section 14(a)* claims were grounded in fraud, the claims must meet the PSLRA particularity requirements.); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 378 (D.N.J. 1999)(holding that because plaintiffs have alleged that defendants acted negligently, they need not plead fraud at all, let alone with particularity); *In re: Trump Hotels Shareholder Derivative Litig.*, 2000 U.S. Dist. LEXIS 13550, (S.D.N.Y. Sept. 21, 2000). Thus, Plaintiff contends that its Complaint is sufficiently pled in accordance with *Fed. R. Civ. Pro. 8(a)* as the Complaint neither alleges intentional conduct, nor does the Complaint "sound in fraud." *See e.g. Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003).

In *Kennedy*, the Seventh Circuit considered the pleading requirements for a claim that alleged

---

[5]*Federal Rule of Civil Procedure 8(a)* requires a pleading to set forth a short and plain statement of the claim showing that the pleader is entitled to relief.

that the proxy statement contained material omissions and discussed the nuances between a proxy claim pleading fraud and a proxy claim pleading solely negligence. The *Kennedy* court queried "[I]n charging that the proxy statement contained material omissions and misstatements, are the plaintiffs charge fraud, and fraud alone?" *Id.* In response, the Seventh Circuit stated that a plaintiff was not required to plead fraud with regard to a proxy statement omitting material facts. *Id.* The court reasoned that if a claim failed to plead fraud, than *Rule 9(b)* was inapplicable to the plaintiffs' allegations, and, therefore did not have to be pled with particularity. *Id.* The court further explained that a plaintiff was not precluded from alleging negligence in omission of a material fact from a proxy statement because pursuant to *Section 14(a)* negligent omission of material information from a proxy statement violated federal law. *Id.* (citations omitted). While the *Kennedy* court did not set forth the applicability of the PSLRA to *Section 14(a)* claims, this Court finds its reasoning applicable to the facts of the instant case.

Viewing, as the Court must, all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to Plaintiff. *Stachon*, 229 F.3d 673 at 675. Plaintiffs' Complaint sets forth a *Section 14(a)* claim alleging that Defendants acted negligently; thus, they need not plead fraud at all, let alone fraud with particularity. Simply, Plaintiffs' *Section 14(a)* allegations are not required to meet the PSLRA particularity requirements because these claims are based on averments of negligence. Plaintiffs allege that the Defendants acted negligently in not revealing the "no premium" offer which resulted in shareholders voting on the proxy without benefit of the knowledge of the alternative offer. Plaintiffs charge that this material omission/misrepresentation from this proxy statement caused them injury, and that the proxy solicitation itself was an essential link in the transaction. Specifically, the Complaint alleges

10

that the Proxy Statement was materially misleading because "it failed to disclose material facts about Mr. Dimon's offer on behalf of Bank One to engage in a transaction with no premium for Bank One shareholders." Am. Comp. ¶ 86. The Complaint further alleges that Defendants were negligent in disseminating the Proxy Statement containing the materially false and misleading statements. Id. at ¶ 87. The Complaint also states that each shareholder has been damaged ". . . as a direct and proximate result of such violations because they were denied an opportunity to make an informed decision in response to the proposed transaction with respect to the Merger premium . . ." Id. at. ¶ 91. Accordingly, the Court finds that Blau's Complaint sufficiently pled violations of *Section 14(a)*.

### B. Materiality

An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway*, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976). "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* at 450.

The crux of Plaintiffs' Complaint is Defendants negligently failed to disclose a material fact during the proxy solicitation regarding Harrison's rejection of an offer to conduct the merger with no premium. According to the Complaint, after Harrison rejected this offer, the negotiations resulted in Bank One shareholders receiving a 14% premium for their stock and which ultimately cost J.P. Morgan shareholders over 7 billion dollars in unnecessary merger compensation. Defendants argue that the proxy statement was not required to disclose alleged negotiating positions. *See e.g. Kaufman v. Cooper Comps., Inc.*, 719 F. Supp. 174, 183 (S.D.N.Y. 1989)(holding that defendant's efforts to

work out an arrangement for preferred shareholders were adequately disclosed and that defendant did not have to describe each step of negotiations); *Beaumont v. American Can Co.*, 797 F.2d 79, 85 (2d Cir. 1986).

On a motion to dismiss, the Court must assume the truth of the facts asserted by Plaintiffs and all reasonable inferences in favor of the Plaintiff. The Proxy Statement indicated that the offer was "fair, from a financial point of view." If, as Plaintiffs allege, Dimon offered to consummate the transaction for no premium and the only reason Harrison rejected the offer was to retain a position as CEO of the merged company, this may be a fact a "reasonable shareholder would consider ... important." TSC Indus., 426 U.S. at 449. While it is not necessary to disclose all factors in a negotiation, failure to offer shareholders a more profitable exchange may have been important to shareholders in considering whether or not to approve the merger. For the purposes of the instant motion to dismiss, the Court concludes that the omission regarding an alleged "no premium" stock exchange is material.

Accordingly, Defendants' motion to dismiss Plaintiffs' *Section 14(a)* claim against them in Count I of the Complaint is DENIED.

III. Count II - - *Section 20(a)*

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall be liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did nor directly or indirectly induce the act or acts constituting the violation of the cause of the action.

12

*15 U.S.C. §78t(a)*. Plaintiffs must allege the following in order to state a *Section 20(a)* claim: (1) a primary securities violation; (2) each of the Individual Defendants exercised general control over the operations of J.P. Morgan; (3) each of the Individual Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

Plaintiffs have pled an underlying violation of *Section 14(a)* of the Exchange Act by Individual Defendants. The Complaint alleges that the Individual Defendants "By virtue of their positions as Directors . . . and, participation as directors . . . they had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contend are false and misleading." Am. Comp. ¶ 93. The Complaint further alleges that these Defendants were "provided with or had unlimited access to copies of the Company's proxy statements and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id. ¶ 95. Lastly, it alleges that "each of the individual defendants . . . is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein." Thus, Plaintiffs have sufficiently alleged that the Individual Defendants acted as controlling persons within the meaning of *§ 20* of the Exchange Act. The ultimate determination of whether Defendants were controlling persons involves questions of fact not to be resolved at the pleading stage of this litigation. *See e.g. In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003). Accordingly, the Defendants' motion to dismiss the §20(a) claims against them in Count II is denied.

13

IV. Standing

Alternatively, Defendants argue that, as defined, the putative class lacks standing because the Proxy Statement explicitly sets forth that only "common stockholders of record at the close of business on April 2, 2004 may vote at the meeting."[6] Def. Exh. A at Notice of Annual Meeting. They allege that *Section 14(a)* and Rule 14a-9 establishes a cause of action solely for shareholders who are entitled to vote on the transaction as set forth in the proxy statement. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2004 U.S. Dist. Lexis 7917, *125 (S.D.N.Y. May 5, 2004)(holding that "Section 14(a)'s emphasis on the Proxy Statement solicitation process indicates that the stature was designed to protect only those shareholders with voting rights"). Defendants maintain that because some members of the putative class were not entitled to vote on the merger, the class is overbroad and, thus does not have standing to bring this claim. *See Shields v. Erickson*, 710 F. Supp. 686, 693 (N.D. Ill. 1989)(dismissing class action where complaint failed to indicate whether any plaintiffs had standing under the proxy statement and class as a whole was improperly defined).

Plaintiffs respond alleging that because the defined class is inclusive of all individuals who were injured through dilution of their stock by Defendants' violations of *Section 14(a)* and Rule 14a-9, the class as a whole has standing. Plaintiffs further argue that several courts have certified classes, bringing private actions pursuant to Section 14(a), which included members other than those entitled

---

[6] In ruling on a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *Fed. R. Civ. P. 10(c)* Accordingly, the Court may consider the proxy statement.

to vote on the proxy statement. *See, e.g., Alexander v. Centrafarm Group, N.V.* 124 F.R.D. 178, 186

(N.D. Ill 1988); *Koppel v. 4987 Corp.*, 191 F.R.D. 360, 369 n.12; *Tracinda Corp v. DaimlerChrysler*

*AG*, 216 F.R.D. 291, 301 (D. Del. 2003).

Indeed, the Proxy Statement notice entitled J.P. Morgan "common stockholders of record at

the close of business on April 2, 2004" to vote on the merger. In converse to the proxy statement,

Plaintiffs' Complaint defined the putative Class as:

> . . . all persons . . ., who held shares of the common stock of J.P. Morgan Chase,
> either on April 2, 2004 (the record date for voting at the May 25, 2004
> shareholder meeting), or at any time from April 19, 2004 (the date of the proxy
> statement associated with such meeting (the "Proxy Statement")) through July
> 1, 2004, (the date on which the Company consummated a merger with Bank
> One Corporation ("Bank One")),

Comp. ¶ 1. Thus, extending the class to include members who held shares from the date the

proxy statement was issued to the date the merger was consummated.

Standing to sue, even in class actions, is determined at the time the suit is filed. *See Walters*

*v. Edgar*, 163 F.3d 430, 432-33 (7th Cir. 1998)("Certification of a class action comes after the suit

is filed, so if the named plaintiffs lacked standing when they filed the suit . . . there was no case when

class certification was sought."). There is no issue that members who held shares on April 2, 2004

have standing to bring this claim pursuant to *Section 14(a)* and Rule 14a-9. The question remains

whether *Section 14(a)* and Rule 14a-9, which mandate the proxy solicitation process and prohibit

the selection of proxies by means of materially false or misleading statements, provide causes of

action for shareholders with no voting rights.

*Section 14(a)* of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails . . . or otherwise . . .
> to solicit or permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of the title.

15 U.S.C. § 78n(a). Rule 14a-9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . ." *17 C.F.R. § 240.14a-9*. The *AOL Time Warner* court reasoned that *Section 14a's* focus on the proxy solicitation process reflects the statute's intent to protect only the shareholder's having voting rights. *In re AOL Time Warner, Inc.*, 2004 U.S. Dist. Lexis 7917 at 125 (citing *7547 Corporation v. Parker & Parsley*, 38 F.3d 211, 229-30 (4th Cir. 1994); Hazen, The Law of Securities Regulation § 11.3 (3d ed. 1995)("Since the proxy regulations are designed to protect shareholder voting rights, standing should be limited to shareholders who had the right to vote."). This Court agrees with the District Court's approach in *AOL Time Warner, Inc.* Accordingly, this Court finds that only common stockholders of record who held J.P. Morgan stock on April 2, 2004 the record date for voting on the merger, have standing to bring this private action under *Section 14(a)*.

**CONCLUSION**

For the reasons set forth above, Defendant Harrison's motion to dismiss is DENIED in part and Granted in Part. Plaintiff Blau is ordered to file an Amended Complaint consistent with this opinion.

IT IS SO ORDERED.

_3/24/06_
Dated

_Wm. J. Hibbler_
The Honorable William J. Hibbler
United States District Court

16